**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P.

§
§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§
vs. §

3:26-CV-02496-D

**Highland Capital Management, L.P., et al**-Appellee
§
§

**[4689] Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026**

**APPELLANT RECORD**

**VOLUME 2**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02496-D<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4698] on July 24, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689] now files this *Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the Court's June 15, 2026 Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate?

2. Did the Bankruptcy Court err in finding Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate ("Dugaboy's Motion") [Docket No. 4684] was "without merit?"

3. Did the Bankruptcy Court err in denying Dugaboy's Motion without a full record, including that Dugaboy was not allowed to file a reply brief and was not granted a hearing?

4. Did the Bankruptcy Court err in denying Dugaboy the opportunity to file a reply brief to Highland's Opposition to Dugaboy's Motion, including that Dugaboy indicated a date certain for filing a reply?

5. Did the Bankruptcy Court err in finding Dugaboy's Motion was "without merit" without granting a hearing?

6. Did the Bankruptcy Court err by summarily denying Dugaboy's Motion without explaining its reasoning for the denial?

7. Did the Bankruptcy Court err in failing to consider Dugaboy's Notice of Intervening Event?

8. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(2) when it determined that it had not manifestly erred in deciding the evidence of Mark Patrick's misconduct contained in the Cayman Islands proceeding was not "newly discovered" even though that information was not contained in James Dondero's affidavit executed April 16, 2025?

9. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant

to Rule 60(b)(2) when it determined it had not manifestly erred in deciding the Dondero Affidavit indicated information gained in the Cayman Islands proceedings was not "newly discovered" despite the fact the Affidavit lacked any evidence of the restructuring discovered in the Cayman Islands proceedings?

10. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding on the grounds that Rule 60(b)(3) purportedly requires fraud or misconduct to have occurred in the judicial proceeding itself?

11. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding that Highland did not provide misleading or incomplete answers during the discovery of Mark Patrick's misconduct and resulting lack of authority to negotiate the Rule 9019 settlement agreement from Dugaboy leading to the Rule 9019 Order?

12. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding that Dugaboy had not presented a basis for relief under Rule 60(b)(6) that was separate from the grounds presented for Rule 60(b)(2) and Rule 60(b)(3)?

13. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding on the grounds that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain?

14. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of the Bankruptcy Court's special responsibility to monitor arrangements and settlements made between Highland's appointed managers and third parties?

15. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of its manifest error in failing to consider the Bankruptcy Court's role as a court of equity and responsibility to prevent misconduct before it, such as Mark Patrick's use of stolen assets in the 9019 Settlement?

16. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

Vol. 1 000001 – 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4698] filed by Appellant;

000010 2. The Bankruptcy Court's July 10, 2026 *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000012 4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

Vol. 2

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |

000648 thru Vol 3

Vol. 4 001843

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 4 001845 thru vol 6 | 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol 7 003634 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003647 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003650 & 003651 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003652 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003663 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003667 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003670 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 7 003709 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004733 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol. 8 004790 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol 9 005207 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005209 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005217 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| vol 9 | | Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 04/07/2026 005222 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 04/07/2026 005225 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 04/10/2026 005227 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 04/16/2026 005229 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/17/2026 005233 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol 9 | | | Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| 005330 | 04/17/2026 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| vol 10<br>005590 | 04/21/2026 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 005594 | 04/22/2026 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005615 | 04/22/2026 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 005682 | 04/22/2026 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 10 | | | Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| 005692 | 04/22/2026 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 005705 | 04/24/2026 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 005726 | 04/24/2026 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 005727 | 04/25/2026 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005729 | 04/27/2026 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 005737 | 04/28/2026 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11 005746 | 04/28/2026 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 005755 | 04/28/2026 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005761 | 04/28/2026 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005767 | 04/29/2026 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 005776 | 04/29/2026 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 005783 | 04/29/2026 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| Vol. 10 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| 005785 | 04/29/2026 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005787 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005794 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005796 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005798 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005801 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005884 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005902 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005905 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005907 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11 | | | Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005913 | 05/06/2026 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005920 | 05/06/2026 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005927 | 05/06/2026 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 005929 | 05/07/2026 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005936 | 05/08/2026 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 005939 | 05/08/2026 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 005942 | 05/08/2026 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 005945 | 05/08/2026 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol. 12 006100 Thru Vol 21 | 05/08/2026 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and* |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | *Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| ol. 22 05/08/2026 008156 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 05/08/2026 008172 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 05/09/2026 008188 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 22 008256 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008293 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008429 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008465 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008472 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008916 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| Vol 25 009554 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| Vol. 26 009868 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| Vol 27 010229 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| Vol. 28 010538 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| Vol. 28 010664 | 05/11/2026 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29 010736 | 05/11/2026 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol 30 011150 | 05/11/2026 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol 31 011734 | 05/11/2026 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol 32 013203 Thru Vol 33 | 05/11/2026 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34 014888 | 05/11/2026 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol 35 05/11/2026 015349 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 05/11/2026 015505 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 05/12/2026 015506 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 05/12/2026 015538 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 05/12/2026 015565 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 05/15/2026 015566 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36 05/18/2026 015569 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol 37 05/18/2026 015996 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 05/19/2026 016008 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 05/20/2026 016079 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 05/20/2026 016082 – 016084 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 05/21/2026 016085 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 05/21/2026 016134 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 37 | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| 05/23/2026 016135 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 05/28/2026 016233 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 06/15/2026 016490 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s)4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 06/15/2026 016504 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| Vol. 39 06/29/2026 016505 | 4684 | (162 pgs; 2 docs) Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Appendix) (Edney, Michael) |
| 06/29/2026 016667 | 4685 | (7 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s)4679 Order on motion to reconsider). Appellant Designation due by 07/13/2026. (Attachments: # 1 Exhibit)(Edney, Michael) |
| 07/06/2026 016674 | 4687 | (32 pgs; 2 docs) Response opposed to (related document(s): 4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 07/09/2026 016706 | 4688 | (23 pgs; 2 docs) Notice of Intent to Reply and Request for Hearing on Its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 39 | | (Attachments: # 1 Appendix)). (Attachments: # 1 Attachment A) (Edney, Michael) |
| 07/10/2026 016729 | 4689 | (2 pgs) Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026. (Okafor, M.) Modified text on 7/10/2026 (mdo). |
| 07/13/2026 016731 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |
| 07/24/2026 016733 | 4698 | (9 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)(Edney, Michael) |
| 07/28/2026 016742 | 4704 | (5 pgs) DISTRICT COURT Notice of docketing notice of appeal. Civil Action Number: 3:26-cv-02496-E. (RE: related document(s)4698 Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court;

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J"); and

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No.

4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: August 7, 2026

Respectfully submitted,

/s/ *Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**MEMORANDUM OF LAW IN SUPPORT OF THE DUGABOY INVESTMENT TRUST'S MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........ 1

II. BACKGROUND ........ 5

A. Patrick Serves as a Tax Attorney and Advisor to Dondero and His Companies for More than 16 Years ........ 5

B. Patrick Designs a Pooled Investment Vehicle to Fund and Protect Dondero's Charitable Endeavors ........ 6

C. Patrick Creates Hunter Mountain as a Tax-Advantaged, Charitable Vehicle to Hold the Majority of Highland's Equity and to Further Ensure Highland's Charitable Legacy ........ 7

D. Highland Seeks Bankruptcy Protection, the Court Confirms Highland's Plan, and Litigation Ensues ........ 10

E. Hunter Mountain Initially Aligned With Dondero to Oppose the Bankruptcy Professionals' Misuse of Highland's Assets ........ 12

F. Patrick Secretly Steals the DAF's Assets from the Charities Through Secret Corporate Restructurings and Brazen Self-Dealing ........ 13

G. The Charitable Owners Send a "No Confidence" Letter, and Patrick Carries Out His Secret "Work Plan" ........ 15

H. Patrick Moves to Liquidate the Original DAF, and the Charitable Owners Ask the Cayman Islands Court to Throw Patrick Out ........ 18

I. Patrick Repeats His Theft Playbook to Convert Hunter Mountain's Assets from The Dallas Foundation ........ 19

J. While Stakeholders Scramble to Unravel Patrick's Fraudulent Scheme, Highland and Hunter Mountain Announce their 9019 Settlement ........ 22

K. New Evidence on Patrick's Actions Demands Additional Scrutiny ........ 27

L. The Predecessor Judge in this Matter Recuses ........ 29

III. THE COURT SHOULD RECONSIDER AND VACATE THE 9019 SETTLEMENT ORDER ........ 31

A. This Court Has Ample Authority to Reconsider and Reverse Settlement Orders That Were Error, Are Undermined by Newly Discovered Evidence, Are Affected by Fraud or Misconduct, or Are Themselves Inequitable ........ 31

B. The Court Should Reconsider and Vacate the 9019 Settlement Order Due to Patrick's Fraud and Misconduct ........ 33

1. This Court Should Reconsider and Vacate the 9019 Settlement Order Because Newly Discovered Evidence Shows It Was Affected by Fraud and Misconduct ........ 33

2. This Court Should Vacate the 9019 Settlement Order Because It Is the Product of Patrick's Misconduct and Fraud ........ 40

3. This Court Should Vacate the 9019 Settlement Order Because Letting It Stand Is Contrary to this Court's Equitable Purpose and Powers ................ 42

C. The Court Should Reconsider and/or Vacate the Rule 9019 Settlement Order Because It Was Issued by a Judge Who Lacked Authority Because She Should Have Been Disqualified ........................................................................................ 43

IV. CONCLUSION ........................................................................................................ 50

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abshire v. Seacoast Prods., Inc.*,
668 F.2d 832 (5th Cir. 1982) ....................31, 40, 44, 49

*In re Acis Cap. Mgmt., L.P.*,
No. 18-03078-sgj, Bankr. N.D. Tex. Dkt. 85-2 at 190 ....................46

*Allen v. United States*,
No. 3:96-cv-256-K, 2015 WL 3824448 (N.D. Tex. June 18, 2015) ....................33, 40

*Matter of AWECO, Inc.*,
725 F.2d 293 (5th Cir. 1984) ....................42

*Brengettecy v. Horton*,
423 F.3d 674 (7th Cir. 2005) ....................31

*Cap. Exp., LLC v. Zinus, Inc.*,
996 F.3d 1332 (Fed. Cir. 2021) ....................42

*Carter v. Fenner*,
136 F.3d 1000 (5th Cir. 1998) ....................42

*Castner v. First Nat'l Bank of Anchorage*,
278 F.2d 376 (9th Cir. 1960) ....................32

*In re Charitable DAF Holdco Ltd. (In Official Liquidation)*,
No. 25-11376-BLS (Bankr. D. Del. July 21, 2025), Dkt. 1 ....................19

*In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*,
No. 05-26-90042 (Dec. 29, 2025), https://tinyurl.com/yynh3u67 ....................29, 45

*In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*,
No. 05-26-90044 (Dec. 29, 2025), https://tinyurl.com/3vym9yu4 ....................45

*In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*,
No. 05-26-90045 (Dec. 29, 2025), https://tinyurl.com/2vka5dn6 ....................45

*Demodulation, Inc. v. United States*,
114 Fed. Cl. 655 (2014) ....................50

*Diaz v. Methodist Hosp.*,
46 F.3d 492 (5th Cir. 1995) ....................41

*Dondero et al. v. Stacey G. Jernigan*,
No. 3:21-CV-0879-K, Dkt. 39 (N.D. Tex. Feb. 9, 2022) ....................48

*Dondero v. Jernigan*,
No. 24-10287, 2025 WL 1122466 (5th Cir. Apr. 16, 2025) ....................30, 47, 48, 49

*Dondero v. Jernigan*,
No. 25-355 (Sup. Ct.) ....................31, 48

*Dugaboy Inv. Tr. v. Highland Cap. Mgmt., L.P.*,
No. 23-03038-sgj, Dkt. 1 (Bankr. N.D. Tex. May 10, 2023) ....................13

*Exxon Corp. v. United States*,
931 F.2d 874 (Fed. Cir. 1991) ....................32

*In re Ford Motor Co.*,
591 F.3d 406 (5th Cir. 2009) ....................32

*Frew v. Janek*,
780 F.3d 320 (5th Cir. 2015) ....................33

*Greyhound Corp., Inc. v. Int'l Bus. Machs. Corp.*,
559 F.2d 488 (9th Cir. 1977) ....................31

*Harrison v. Byrd*,
765 F.2d 501 (5th Cir. 1985) ....................34

*Hayman Cash Reg. Co. v. Sarokin*,
669 F.2d 162 (3d Cir. 1982) ....................31

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*,
322 U.S. 238 (1944) ....................33

*Hernandez v. Results Staffing, Inc.*,
907 F.3d 354 (5th Cir. 2018) ....................41

*In re Highland Cap. Mgmt., L.P.*,
No. 19-cv-34054-sgj (Bankr. N.D. Tex.) ....................1, 46

*In re J.P. Jeanneret Assocs., Inc.*,
769 F. Supp. 2d 340 (S.D.N.Y. 2011) ....................38

*Jackson v. Thaler*,
348 F. App'x 29 (5th Cir. 2009) ....................40

*Johnson Waste Materials v. Marshall*,
611 F.2d 593 (5th Cir. 1980) ....................33

*Kirschner v. Dondero*,
Adv. Proc. No. 21-03076-sgj, Dkt. 1 (Bankr. N.D. Tex. Oct. 15, 2021) ....................4, 12

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
523 U.S. 26 (1998) ....................49

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988) ....................44

*Loumar, Inc. v. Smith*,
698 F.2d 759 (5th Cir. 1983) ....................31, 32, 33

*Nelson v. City of Albuquerque*,
921 F.3d 925 (10th Cir. 2019) ....................32

*In re Osborne*,
379 F.3d 277 (5th Cir. 2004) ....................42

*In re Paradigm Cap. Mgmt., Inc.*, Securities and Exchange Commission Investment
Advisers Act Release No. 3857, 2014 WL 2704311 (June 16, 2014) ....................38

*Philip Morris USA Inc. v. Lee*,
494 F. Supp. 2d 544 (W.D. Tex. 2007) ....................34

*Rozier v. Ford Motor Co.*,
573 F.2d 1332 (5th Cir. 1978) ....................40, 41

*Stilwell v. Travelers Ins. Co.*,
327 F.2d 931 (5th Cir. 1964) ....................34

*Tramonte v. Chrysler Corp.*,
136 F.3d 1025 (5th Cir. 1998) ....................44

*Transamerica Mortg. Advisors, Inc. v. Lewis*,
444 U.S. 11 (1979) ....................38

*In re United States*,
733 F.2d 10 (2d Cir. 1984) ....................31

*United States v. Balistrieri*,
779 F.2d 1191 (7th Cir. 1985) ....................49

*United States v. O'Keefe*,
128 F.3d 885 (5th Cir. 1997) ....................32

*United States v. Philpot*,
773 F. App'x 583 (11th Cir. 2019) ....................................................................................32

*Zarnow v. City of Wichita Falls, Tex.*,
614 F.3d 161 (5th Cir. 2010) ..........................................................................................32

*Zeyen v. Bonneville Joint Dist., #93*,
114 F.4th 1129 (9th Cir. 2024) ........................................................................................32

**Statutes**

11 U.S.C. § 363 ..............................................................................................*passim*

15 U.S.C. § 80b-15(b) ....................................................................................................38

28 U.S.C. § 455 ...................................................................................................32, 47, 49

28 U.S.C. § 455(a) ........................................................................................43, 44, 47, 49

Bankruptcy Code Chapter 15 ..........................................................................................19

Investment Advisors Act § 206 ...................................................................................37, 38

Investment Advisors Act § 215 ..........................................................................................37

**Other Authorities**

Federal Rule of Bankruptcy Procedure 9019 ...........................................................*passim*

Crown Global Insurance Group, LLC Website,
https://www.crownglobalinsurance.com ..............................................................................8

Dallas Foundation Website, https://www.thedallasfoundation/about-us/ .............................8

Fed. R. Bankr. P. 2015.3...............................................................................................11, 12

Fed. R. Bankr. P. 9024..............................................................................................1, 33, 34

Fed. R. Civ. P. 60.......................................................................................................33, 49

Fed. R. Civ. P. 60(b).................................................................................................1, 33, 44

Fed. R. Civ. P. 60(b)(1)–(6)..................................................................................................33

Fed. R. Civ. P. 60(b)(2) ....................................................................................................33, 34

Fed. R. Civ. P. 60(b)(3) ................................................................................................40, 41, 42

Fed. R. Civ. P. 60(d)..............................................................................................................40

Internal Revenue Service, Donor-advised funds (Nov. 26, 2024), https://www.irs.gov/charities-non-profits/charitable-organizations/donor-advised-funds ........ 6

Stacey G. Jernigan, *He Watches All My Paths*, SJ Novels (self-published) (Jan. 16, 2019) ........ 46, 47

Stacey G. Jernigan, *Hedging Death*, White Bird Publications (Mar. 22, 2022) ........ 46, 47

Fifth Circuit Judicial Conduct and Discipline Rule 4(a)(7) ........ 45

Securities and Exchange Commission, Interpretation of Section 206(3) of the Investment Advisers Act of 1940, Inv. Adv. Act Rel. No. 1732 (July 17, 1998), 63 Fed. Reg. 39,056 (July 23, 1998) ........ 38

The Dugaboy Investment Trust ("Dugaboy") files this motion (1) for reconsideration of the Court's Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, No. 19-34054-sgj11, Dkt. 4297[1] (Bankr. N.D. Tex. June 30, 2025) (Exhibit 1, "Rule 9019 Settlement Order"); (2) seeking relief under Fed. R. Bankr. P. 9024 and Fed. R. Civ. P. 60(b); and (3) asking the Court to use its inherent power to vacate the Rule 9019 Settlement Order. The Court should do so because the Rule 9019 Settlement Order was the product of fraud and misconduct, is being used to advance and protect from further inquiry that fraud and misconduct, and was entered by a judge who should already have been disqualified.

## I. INTRODUCTION

The Movant represents James Dondero, one of the principal former equity owners of Highland Capital Management, L.P. ("Highland"). Highland is a Dallas-based, Delaware-domiciled hedge fund manager, commenced its bankruptcy in late 2019 in the District of Delaware, after encountering a significant judgment. Highland needed temporary bankruptcy protection to sell a handful of assets in an orderly manner to satisfy that judgment. The bankruptcy was to be a reorganization, and a short and discrete one at that.

When the case was transferred to the Northern District of Texas, all that changed. Several participants in the bankruptcy—including a law firm that Highland's owners retained to ensure a brief and straightforward process—saw an opportunity to extend the bankruptcy into a multi-year saga. It was a perfect storm. The bankruptcy judge had encountered Dondero in a prior case and formed a very negative view of him and his line of business. So much so that the judge was writing

[1] Unless otherwise specified, all references to "Dkt." herein are references to the docket in the main bankruptcy case, *In re Highland Cap. Mgmt., L.P.*, No. 19-cv-34054-sgj (Bankr. N.D. Tex.).

books deriding a hedge fund and manager that resembled Highland and Dondero.

In the very first hearing, the bankruptcy judge suggested on her own initiative that Dondero should be removed from Highland's management during the pendency of the restructuring. Exhibit 2, Transcript of Status and Scheduling Conference Hearing Held 12/6/19 at 23:2–15, Dkt. 207. From that point forward, the bankruptcy professionals took every opportunity to make Highland look as though it were irredeemably insolvent and had to be saved from financial crisis by a long, drawn-out, liquidation that would take years and generate massive fees for those professionals.

This windfall was only possible because Highland was not then, and is not now, insolvent. It had more than enough assets to pay its actual creditors what they were legitimately owed. Through a variety of means—from not reporting on the value of Highland's assets (as ordinarily required in bankruptcy) to inflating Highland's supposed liabilities—the bankruptcy professionals dragged out the bankruptcy and turned it into a multi-year liquidation. Along the way, the chief restructuring officer appointed to run Highland gave long-time colleagues at selected hedge funds the opportunity to scoop up creditor claims, with assurances that there would ultimately be plenty of money to pay them.

Despite all these efforts to portray Highland as a company in financial shambles, Highland has paid most creditor claims and was poised to have something left over for equity holders. That is where the June 2025 Rule 9019 settlement that is the subject of this Motion became relevant.

Dondero and his partners—long ago—had restructured Highland to achieve certain long-term tax efficiencies and so that the company could serve a long-term charitable purpose. To that end, in 2015, Dondero and the other Highland equity holders sold their equity stake in Highland to Hunter Mountain Investment Trust ("Hunter Mountain"). And they selected The Dallas

Foundation as the primary charitable beneficiary of the restructuring. The Dallas Foundation is a century-old charity dedicated to improving the lives of people in the hometown of Dondero and Highland. It was ultimately structured to run like a donor-advised fund, controlled by an administrator—charged with acting in the best interest of the charitable beneficiaries—and advised by the donors as to the fund's investments and charitable purposes.

In 2021 and 2022, Mark Patrick became that administrator. Patrick hijacked the fund to benefit himself instead of charitable causes. He pulled this off by defrauding the charitable beneficiaries of the fund and the donors to it. As explained below, he secretly reorganized the corporate structure of the donor-advised fund to make its beneficiary a sham charity run out of his house, rather than the genuine charities Dondero meant to benefit. And Patrick started mowing through the charitable assets to pay himself massive "bonuses," including more than $11 million in 2024 alone. To put this theft into scale, his predecessor was compensated only tens of thousands of dollars per year.

The charities that were the fund's intended beneficiaries started asking questions. By early 2025, Patrick's misconduct was being investigated by the judicial system of the Cayman Islands, where the key donor-advised fund entities had been incorporated. Patrick went into overdrive to cover up his misconduct, in the face of these inquiries. He saw an opportunity in the form of Hunter Mountain, the entity that held much of the interests of Highland's former equity holders. For years, Hunter Mountain had pressed those equity rights in an effort to stem and to remedy the above-described unjustifiable financial bleeding from the bankruptcy professionals and process. Given the investigations into his misconduct, that was no longer important for Patrick. He was willing to sacrifice any charitable asset to deter or slow inquiries into his theft. And Patrick knew he had a short window of time to remain in nominal charge of the donor-advised fund, as

the investigations advanced.

Patrick secretly started negotiations with Highland's bankruptcy professionals. They offered Patrick a modest cash payment for the donor-advised fund and (more importantly for Patrick) for an assignment of the so-called *Kirschner* litigation. *Kirschner* consisted of meritless claims by the Highland corporate debtor against the former equity owners and leaders of Highland, including Dondero and his colleagues, for allegedly mismanaging Highland.[2] Highland's chief restructuring officer knew that Patrick would sign away all the rights of former Highland equity owners, for virtually nothing, to gain a weapon against the donors who were urging investigations into his misconduct. And that is exactly what happened.

So the Highland Entities[3] and the HMIT Entities[4] entered into a Rule 9019 settlement that crushed the interests of the equity owners, to serve the short-term, fraudulent ends of Mark Patrick. There were already indicia of Patrick's misconduct when the predecessor judge in this matter approved the 9019 Settlement in June 2025, in the form of the ongoing investigations of the Cayman Islands court and the plea of the Texas Attorney General for this Court to pause these proceedings pending his own inquiry. The predecessor judge erred in glossing over those concerns. But subsequent to the approval of the 9019 Settlement, newly discovered evidence has laid bare the breathtaking scope and severity of Patrick's perfidy.

The formerly presiding bankruptcy judge's approval of the 9019 Settlement should be set aside. First, this Court should exercise its authority to reevaluate the rulings of its predecessor

[2] *See Kirschner v. Dondero, et al.*, Adv. Proc. No. 21-cv-03076-sgj (N.D. Tex.).

[3] The "Highland Entities" are Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust. *See* Exhibit 24, Settlement Agreement & General Release, Dkt. 4217-1, at 1.

[4] The "HMIT Entities" are Hunter Mountain Investment Trust, Beacon Mountain LLC, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, and Atlas IDF, LP. *Id.*

judge and to reconsider the Rule 9019 Settlement Order. The predecessor judge should not have approved—and this Court cannot let stand—a settlement effectively advancing Patrick's inequitable and, indeed, criminal conduct. Newly discovered evidence proves that the settlement agreement was the product of misconduct and obtained by fraud, that the settlement is being used to perpetrate a continuing fraudulent scheme, and that the settlement could interfere with the victims' ability to recover nine figures' worth of stolen assets.

Second, the predecessor bankruptcy judge who approved the 9019 Settlement should have recused herself long before that approval due to her novel writing and concomitant stripping away of the public confidence in judicial impartiality, as subsequent developments discussed below have made more apparent. Amid the judicial and governmental investigations into Patrick, the most reasonable course of action would have been for the Court to pause consideration of the settlement. But the Court—at the urging of its appointed bankruptcy professionals—accelerated it. This created a situation where the predecessor judge's impartiality could reasonably be called into question. In particular, one might reasonably wonder whether the predecessor judge's reason for rushing the settlement—whatever its merits—was to dampen inquiries into her handling of the bankruptcy and whether she should have been presiding over it at all. This Court should determine that the predecessor judge should have recused herself before issuing the Rule 9019 Settlement Order, vacate that order, and examine the 9019 resolution on a clean slate.

## II. BACKGROUND

### A. Patrick Serves as a Tax Attorney and Advisor to Dondero and His Companies for More than 16 Years

James Dondero and Mark Okada founded Highland in 1993. Before its bankruptcy, Highland was an SEC-registered multi-billion-dollar investment advisor that employed dozens of individuals to manage its complex financial vehicles and investments.

Mark Patrick—a Texas-licensed attorney and tax professional—initially came to work for Highland as tax counsel in January 2008. *See* Caymans Exhibit A, First Affidavit of Mark Eric Patrick, *In the Matter of Charitable DAF Holdco, Ltd.* ("First Patrick Aff."), No. FSD 116 of 2025 (JAJ) (Grand Ct. Cayman Islands – Financial Services Division), ¶ 64.[5] In his capacity as tax counsel, Patrick advised Dondero, Highland, and Dondero's affiliates (including Dugaboy) on the tax consequences of various transactions and corporate structures. Patrick continued in this role until February 2021, when he left Highland to join Skyview Group, a company founded by former Highland employees to provide Dondero and his companies the same legal and tax services that Patrick had provided while at Highland. Once at Skyview, Patrick performed essentially the same role as tax counsel. *Id.*, ¶¶ 64, 67.

**B. Patrick Designs a Pooled Investment Vehicle to Fund and Protect Dondero's Charitable Endeavors**

As Highland grew and enjoyed financial success, Dondero sought to create a charitable legacy. In 2006, he gave an initial gift to a newly formed charitable trust that, in October 2011, was converted into an investment vehicle for long-term charitable endeavors. That investment vehicle was a form of donor-advised fund.[6] Patrick, as Highland's longtime tax counsel, was the architect of the vehicle and oversaw internal and external professionals in its creation. *See* Exhibit 3, Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd. to the Motion for

[5] The lettered exhibits in this Motion have been segregated in accordance with a Protective Order governing confidential materials in the parallel Cayman Islands proceedings. Dugaboy will file a motion for protective order in this Court seeking leave to submit the complete, unredacted exhibits under seal.

[6] A donor-advised fund is a philanthropic giving vehicle set up as a fund or account within a public charity (the "sponsoring organization"). The donor contributes assets (cash, stock, etc.) to the sponsoring 501(c)(3) charity and receives an immediate tax deduction, but legally the charity owns and controls the donation. The donor (or designated advisor) retains advisory privileges—meaning it can recommend how the charity should invest the assets and which charitable causes to grant funds to over time. *See* Internal Revenue Service, Donor-advised funds (Nov. 26, 2024), available at https://www.irs.gov/charities-non-profits/charitable-organizations/donor-advised-funds.

Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith ("Charities' Obj."), Dkt 4231, ¶ 12. At the top of the structure sat Charitable DAF HoldCo, Ltd. (the "DAF").[7] Control of the DAF rested with an independent fiduciary, which for many years was Grant Scott ("Scott"), while the beneficial ownership was held by three (and eventually four) charitable foundations through "participation shares." *See* Caymans Exhibit B, Writ of Summons and Statement of Claim, *In the Matter of Charitable DAF HoldCo, Ltd.*, Cause No. FSD 201 of 2025 (Grant Ct. Cayman Islands – Financial Services Division July 15, 2025) ("Statement of Claim"), ¶¶ 54–57.

The DAF was the sole limited partner of Charitable DAF Fund, LP (the "DAF Fund"), a Cayman Islands limited partnership formed to invest and manage assets for the benefit of the charitable foundations. For most of its existence, the DAF Fund was managed by its general partner, Charitable DAF GP, LLC ("DAF GP"), whose managing member was also Scott. *See* DAF Org Chart, Ex. 4; *see also* Ex. 3, Charities' Obj., Dkt. 4231, ¶ 11. Under Scott's management, the DAF Fund grew to almost $300 million in assets and distributed more than $40 million to a wide range of causes, including support for military veterans, underserved youth, and victims of domestic violence.

### C. Patrick Creates Hunter Mountain as a Tax-Advantaged, Charitable Vehicle to Hold the Majority of Highland's Equity and to Further Ensure Highland's Charitable Legacy

In 2015, Patrick devised a plan that he believed would minimize taxes paid by Highland and its owners, while expanding Dondero's charitable legacy. The plan involved a complex series of transactions, summarized as follows:

- Highland's co-founders, Dondero and Okada, donated $29.5 million to an independent charitable organization. Ultimately, they chose The Dallas

[7] Attached as Exhibit 4 is the DAF's original organizational chart ("DAF Org Chart").

Foundation, a charity formed in 1929 and dedicated to improving the lives of people in Dallas.[8] *See* Caymans Exhibit C, Transcript of Deposition of Torrey Littleton ("Littleton Dep.") at 19:16–25.

- The Dallas Foundation invested the $29.5 million donation through an independent insurance company, Crown Global Insurance Group, LLC ("Crown Global").[9] In exchange for that investment, Crown Global issued The Dallas Foundation's sponsoring charities—Empower Dallas and the Okada Foundation—annuity policies that would guarantee the charities a regular stream of income.[10] *Id.* at 17:3–24, 21:8–13; *see also* Ex. 3, Charities' Obj., Dkt. 4231, ¶ 18. The charities' use of an insurance mechanism is a common method of financial planning to ensure more regular income over the life of a charitable gift.

- Crown Global then invested in various income-producing vehicles. Among those was an entity called Atlas IDF, LP ("Atlas Fund"). Caymans Ex. C, Littleton Dep. at 17:25–18:7. The Atlas Fund, in turn, invested into Rand PE Fund I, LP ("Rand PE Fund"). *See id.* For many years, Rand PE Fund was managed by John Honis ("Honis"), a financial professional working for an SEC-registered investment advisor, Rand Advisors, LLC ("Rand Advisors"). *See* Exhibit 5, Rand Advisors, LLC Form ADV Part 2A (March 2021) at 5–7.

---

[8] *See* The Dallas Foundation Website, available at https://www.thedallasfoundation/about-us/.

[9] *See* Crown Global Insurance Group, LLC Website, available at https://www.crownglobalinsurance.com.

[10] The "annuity" given to the charities effectively operated as equity with an optional redemption. The charities could redeem the accrued equity by surrendering the policy.

- Rand PE Fund was the sole member of a company called Beacon Mountain, LLC ("Beacon Mountain"), which in turn became the sole owner of Hunter Mountain. *See* Caymans Ex. C, Littleton Dep. at 17:25–18:7.[11]




To ensure that The Dallas Foundation and its sponsoring charities became the ultimate beneficiaries of Highland's financial success, the principal equity owners of Highland (Dondero and Okada, and their associated entities, including Dugaboy) sold their limited partnership interests in Highland to Hunter Mountain in exchange for cash payments and notes payable. Hunter Mountain thus became the holder of 99.5% of the outstanding limited partnership shares of Highland. *See* Exhibit 6, Amended Complaint and Objection to Claims, *Kirschner v. Dondero*,

[11] Attached as Exhibit 40 is the original organizational chart for Hunter Mountain.

Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex.), Dkt. 158, ¶ 27. The idea was that The Dallas Foundation would become Highland's ultimate beneficiary and use its assets for good works. In the interim, The Dallas Foundation and its sponsoring charities would receive the income that the structure was designed to produce. *See* Charities' Obj., Dkt. 4231, ¶ 18; Caymans Ex. C, Littleton Dep. at 21:8–13.

**D. Highland Seeks Bankruptcy Protection, the Court Confirms Highland's Plan, and Litigation Ensues**

In October 2019, Highland sought bankruptcy protection in the District of Delaware. That move was a limited effort to sell in an orderly manner some less liquid assets to satisfy an unanticipated judgment that Highland encountered. Exhibit 43, Voluntary Petition, Dkt. 3. At the time, the company's equity ownership was as follows: (i) Hunter Mountain (99.5%); (ii) Dugaboy (a family trust associated with Dondero) (0.1866%); (iii) Okada, personally and through family trusts (0.0627%); and (iv) Strand Advisors, Inc. ("Strand"), Highland's general partner (0.25%). Exhibit 41, Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief ("Confirmation Order"), Dkt. 1943, ¶ 5. The lawyers who encouraged Dondero to have Highland seek Chapter 11 protection confidently projected Highland would enter and exit the bankruptcy process in a few months.

The bankruptcy did not go as planned.

The case was transferred to the Northern District of Texas, on grounds that its chief bankruptcy judge there was familiar with Dondero's businesses. At her first hearing, the predecessor judge in this case began acting on her negative views of Dondero, suggesting that he be removed from Highland's management while the restructuring occurred. That ultimately led to a chief restructuring officer being given sole control over Highland. The Unsecured Creditors Committee became stacked with Highland's historic litigation adversaries. *See* Ex. 41,

Confirmation Order, Dkt. 1943, ¶ 8.

Highland's bankruptcy counsel—originally hired by Dondero—began to see the financial opportunity of a long-drawn out bankruptcy and quickly took sides against Dondero. They and the chief restructuring officer began misleadingly portraying Highland as insolvent, in need of what effectively would become a marathon liquidation, instead of the short-duration restructuring necessary to satisfy an emergency judgment and then resume normal operations. To do so, they consistently refused to provide any information on Highland's present financial condition (in stark contravention of the rules governing any bankruptcy, such as Rule 2015.3). Instead, they kept citing stale data from the deepest darkest financial hour of the country at the beginning of the Covid-19 pandemic in March 2020. And they began inflating the claims of creditors.

On February 22, 2021, over the objections of all equity holders, the Bankruptcy Court confirmed Highland's Fifth Amended Plan of Reorganization (as Modified) (the "Plan"). Ex. 41, Confirmation Order, Dkt. 1943. The Plan stretched the word "Reorganization" beyond the limits of the English language; it was effectively a liquidation. It classified all claims into eleven classes. Hunter Mountain, as a holder of pre-bankruptcy Class B and C limited partnership interests, received an unliquidated Class 10 claim subordinate to all pre-bankruptcy creditors. *Id.* at Caymans Ex. A at Art. I.B, ¶¶ 33–36, III.B, III.H.11. The other equity holders, which held pre-bankruptcy Class A limited partnership interests in Highland, received an unliquidated Class 11 claim, subordinate to Hunter Mountain. *Id.* at Caymans Ex. A at Art. I.B.33, III.B, III.H.11. As holders of the lowest classes of claims under the Plan, all the former equity holders were given "Contingent Claimant Trust Interests" in the Plan-created Highland Claimant Trust—the entity created to hold, monetize, and distribute the assets of Highland's estate. *Id.* at Art. III.H.10–11, Art. IV.B. Contingent Claimant Trust Interests were to vest only upon certification by the

Claimant Trustee—James P. Seery, Jr. ("Seery")—that all unsecured creditors had been paid in full with interest. *Id.* at Art. I.B, ¶ 44. Notably, the Claimant Trust had no fixed value; it was to receive the residual value of the Highland estate. *Id.* at Art.1.B.26–27, Art. III.H.10–11.

The Plan became effective on August 11, 2021. Exhibit 7, Notice of Occurrence of Effective Date of Confirmed Plan of Reorganization, Dkt. 2700. Because the bankruptcy professionals were inaccurately portraying Highland as insolvent, they urged the need for some complicated mechanism to recover the fictitious gap between assets and liabilities from Highland's former owners and managers. At their urging, the bankruptcy judge approved the creation of a Litigation Sub-Trust and the appointment of a Litigation Trustee to sue Highland's pre-bankruptcy management to fill the supposed gap between Highland's assets and liabilities. The Litigation Trustee was Marc A. Kirschner ("Kirschner"), and in October 2021, he filed a 36-count complaint (the "Kirschner Litigation") against dozens of defendants, including Dondero, Okada, Dugaboy, Strand, Hunter Mountain, and Rand PE Fund. Exhibit 8, *Kirschner v. Dondero*, Adv. Proc. No. 21-03076-sgj, Dkt. 1 (Bankr. N.D. Tex. Oct. 15, 2021).

### E. Hunter Mountain Initially Aligned With Dondero to Oppose the Bankruptcy Professionals' Misuse of Highland's Assets

All along, the equity owners disputed the bankruptcy professionals' claims that Highland was insolvent and advocated that Highland should be restructured to pay creditors what they were legitimately owed and then to return Highland to its equity owners. They pressed the chief restructuring officer to file required reports on Highland's financial condition, but the predecessor judge refused to enforce compliance with the bankruptcy rules' transparency requirements. *See* Exhibit 45, Motion to Compel Compliance with Bankruptcy Rule 2015.3, Dkt. 2256; Exhibit 46, Order Denying Motion to Compel Compliance with Bankruptcy Rule 2015.3, Dkt. 2812.

The DAF Fund was one of the parties aligned with former equity holders in arguing that

Highland's estate was worth far more than what bankruptcy management was publicly representing. Exhibit 12, Complaint to (I) Compel Disclosures About the Assets of the Highland Claimant Trust and (II) Determine (A) Relative Value of Those Assets, and (B) Nature of Plaintiffs' Interests in the Claimant Trust, *The Dugaboy Investment Trust v. Highland Cap. Mgmt., L.P.*, No. 23-03038-sgj, Dkt. 1 (Bankr. N.D. Tex. May 10, 2023) ("Valuation Litigation"). In March 2021, Scott—the DAF's longtime trustee—decided to move on. Patrick, who had participated in the DAF's creation, volunteered to assume that role. Accordingly, in April 2021, Scott transferred the DAF's management shares and ownership of the DAF Fund's general partner to Patrick. Ex. 3, Charities' Obj., Dkt. 4231 at ¶ 12.

In August 2022, Patrick became Hunter Mountain's administrator when a subsidiary of the DAF Fund became the manager of Hunter Mountain. Patrick directed Hunter Mountain to vindicate the rights of equity holders through a series of motions and lawsuits which are summarized in Appendix A to this Motion. For their part, Highland's professionals continued to delay resolution of the estate while paying themselves handsome salaries and fees. Although the chief restructuring officer and his retained bankruptcy professionals have not been required to account for their compensation for some time, the post-effective date administrative expenses look to be well over $225 million.[12]

**F. Patrick Secretly Steals the DAF's Assets from the Charities Through Secret Corporate Restructurings and Brazen Self-Dealing**

As early as mid-2023, Patrick set out to take advantage of his positions of power. In June 2023, Patrick stated that the DAF would make a $10,000 distribution to Highland Dallas

[12] This amount was calculated using the post-effective date quarterly operating reports reflecting distributions and total expenditures. *See* Dkts. 3200–3202, 3325–3326, 3409–3410, 3582–3583, 3652–3653, 3756–3757, 3888–3889, 3955–3956, 4020–4021, 4049–4050, 4130–4131, 4171–4172, 4201–4202, 4207–4208, 4319–4320, 4438–4439, 4503–4504.

Foundation and asked that the foundation, in turn, make a $10,000 charitable donation to an entity named Creative Hearts TX. Ex. 3, Charities' Obj., Dkt. 4231, ¶ 14. Patrick did not disclose that he, his wife, and his daughter had recently formed Creative Hearts and were its directors. *Id.* A few months later, Patrick attempted a kick-back scheme with a vendor, Fortaris Capital Advisors ("Fortaris"). Patrick approached Fortaris principal Kevin Cronin and proposed that the DAF make a monthly payment of $25,000 to $50,000 to an entity controlled by Cronin that Cronin would then split with Patrick. Believing that such an arrangement constituted fraud, Cronin declined the proposal and informed Dondero. Patrick has admitted his effort to effectuate this illegal scheme. *See* Caymans Ex. A, First Patrick Aff., ¶ 173.

After learning of the attempted embezzlement, Dondero demanded greater transparency into the DAF's operations. New evidence shows that within two months of Dondero's request, Patrick reached out to a loyalist law firm, The Shields Law Group, seeking guidance on how to steal the DAF from the charities. Caymans Ex. B, Statement of Claim, ¶¶ 77–80. At the heart of this scheme was secretly creating a new general partner for the DAF. Patrick's instruction was that this new corporate entity be "***hard to find or track, or trace. Or find owners, etc. Generic name. Strong litigation protection***." *Id.* ¶ 82 (emphasis added). These lawyers created a shocking "Work Plan" that outlined how to insert a couple of surreptitious companies into the corporate structure so that Patrick could separate the DAF from the charities it was created to benefit.

Patrick began to execute this scheme, setting up new companies in the dark of night. *See id.*, ¶¶ 36–37, 82–84. Patrick needed to divorce the DAF from the charities because he was stealing the DAF's assets. The scale of his self-dealing, new evidence shows, was breathtaking. Patrick increased his "director fees" *more than fifty-fold*, from approximately $40,000 in 2022 to nearly $600,000 in 2023 and then to $2.25 million in the first half of 2024. Patrick also awarded himself

"bonuses," resulting in total compensation of $11.259 million in September and October 2024 alone. *Id.*, ¶¶ 86–87. All of this for something—running the DAF—that would not have been a full-time job for anyone not busy stealing its assets. Patrick shut down any disclosures to the charities and gave them no notice or explanation for this staggering "compensation." *Id.*; *see also* Ex. 3, Charities' Obj., Dkt. 4231, ¶ 22.

### G. The Charitable Owners Send a "No Confidence" Letter, and Patrick Carries Out His Secret "Work Plan"

In November 2024, the charities told Patrick they had "no confidence" in his management and requested protections against misuse of their assets. Caymans Ex. B, Statement of Claim, ¶ 90. Between December 2024 and April 2025,[13] while feigning a desire to engage with the charities on an amicable path forward, Patrick secretly implemented his planned restructuring of the DAF. Here is the DAF structure before Patrick's restructuring:

[13] In February 2024, Patrick replaced the DAF Fund's Delaware general partner, Charitable DAF GP, LLC, with a new Cayman entity as the general partner, CDH GP, Ltd. ("New GP"). He did not inform the Charities of this change.

**DAF Structure Chart**
*(as of 3/6/2024)*




Patrick restructured it as follows:

- Patrick incorporated a new charitable foundation in Delaware, DFW Charitable Foundation. Caymans Ex. B, Statement of Claim, at ¶¶ 25, 93. The new foundation, which is based out of Patrick's home, conducts almost no known charitable activity, and Patrick is its sole director, president, and member. *Id.* ¶ 26.

- Patrick created a new donor-advised fund ("DAF 2.0") in Delaware and made himself its sole manager. *Id.* ¶¶ 39, 42, 97.

- Patrick and Murphy, without providing notice to anyone, much less the charities, assigned the DAF's limited partnership interests to DAF 2.0 in exchange for 100% of the member interests in DAF 2.0. *Id.* ¶¶ 98–99.[14]

- Patrick caused the new DAF 2.0 to enter into a new limited liability company agreement with himself as sole manager. The agreement was a homemade recipe for facilitating Patrick's theft. It provided that Patrick would have no fiduciary duties to the new donor-advised fund or to protect the assets of his charities, and that Patrick would have the sole power and discretion to value and to redeem any member's interest in the DAF. *Id.* ¶¶ 99–101.

- Finally, Patrick asked a loyalist financial advisor to figure out a way to devalue the charitable owners' membership interests by more than 99% from just a few months earlier. With that bogus valuation in hand, he secretly added his new foundation

[14] Attached as Exhibit 19 is an organizational chart reflecting the DAF restructuring.

as the owner of DAF 2.0 and redeemed the charitable owners' collective interests for $1.6 million. *Id.* ¶¶ 121–122, 136–145, 146.7, 148.

The problem is that the DAF did not hold $1.6 million in assets, but instead ***nearly 200 times as much.*** The charitable owners received approximately $1.6 million for assets worth approximately $270 million. And Patrick's personal charitable foundation became the sole beneficial owner of his new DAF and its $270 million in assets. The result was two remaining structures: DAF 1.0, owned by Patrick and the Charities, with zero assets; and DAF 2.0, owned entirely by Patrick, with $270 million in assets.






**H. Patrick Moves to Liquidate the Original DAF, and the Charitable Owners Ask the Cayman Islands Court to Throw Patrick Out**

Now that Patrick had drained the original DAF of any assets, he placed it into voluntary liquidation in the Cayman Islands court on April 2, 2025. Caymans Ex. B, Statement of Claim, ¶ 151. He did so without informing the charities or anyone else.

For their part, the charities were unaware of what Patrick had been up to, except that Patrick was not answering any of their questions. The charities separately filed a petition in the Cayman Islands court seeking to take the DAF away from Patrick. *See* Caymans Exhibit E, Winding Up Petition, *In the Matter of Charitable DAF Holdco, Ltd.*, No. FSD 99 of 2025 (JAJ) (Grand Court, Cayman Islands, Financial Services Division Apr. 23, 2025).

Only after that filing did the charities learn of Patrick's parallel and secret attempt to liquidate the DAF. The liquidators selected by Patrick immediately resigned. *See* Charities' Obj.,

Dkt. 4231, ¶ 31 n.4. And on May 6, 2025, the Cayman Islands court stepped in, determining that there was enough evidence of misconduct that Patrick could no longer manage the DAF and that the court needed to remove Patrick from its management. It did so by appointing what the Cayman Islands court calls "joint official liquidators"—the equivalent of a court-appointed receiver in the U.S. legal system—to oversee the DAF's operations. *See* Caymans Ex. B, Statement of Claim, ¶ 154; Ex. 3, Charities' Obj., Dkt. 4231, ¶ 31.

As the court-appointed liquidators sought discovery into Patrick's activities, Patrick spent millions from the charitable assets opposing those investigative efforts. On July 21, 2025, the joint official liquidators filed a Writ of Summons and Statement of Claim in the Cayman Islands proceeding, naming as defendants Patrick, Paul Murphy, and Patrick's new corporate entities that (as it turns out) had stolen the DAF's assets. On the same date, to ensure that they could discover the additional details of Patrick's fraud, the joint official liquidators filed a separate Chapter 15 petition in the United States Bankruptcy Court for the District of Delaware seeking recognition of the Cayman Islands proceeding. *See* Caymans Exhibit D, Chapter 15 Petition for (I) Recognition of a Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code, *In re Charitable DAF Holdco Ltd. (In Official Liquidation)*, No. 25-11376-BLS (Bankr. D. Del. July 21, 2025), Dkt. 1.

### I. Patrick Repeats His Theft Playbook to Convert Hunter Mountain's Assets from The Dallas Foundation

Patrick next moved against Hunter Mountain. At the time, Patrick was a fiduciary of Hunter Mountain and the entities in its ownership chain (including Rand PE Fund and Atlas Fund) because of his role in Rand Advisors, the SEC-registered investment adviser tasked with managing those entities.

But rather than acting as a trusted fiduciary, Patrick had other plans. On February 20, 2025,

one of the 4 percent minority investors in Rand PE Fund received an unexplained notice of a distribution. *See* Exhibit 20, Email from Shawn Raver to Chris Rice dated Feb. 20, 2025. The sole asset of Rand PE Fund was Beacon Mountain—the sole (100%) beneficial owner of Hunter Mountain. After inquiring, the minority investor was told that Rand PE Fund had sold its investment in Beacon Mountain (and thereby Beacon Mountain's interest in Hunter Mountain) to an undisclosed third party for $1 million. *See* Exhibit 21, Email from Chris Rice to Skyview Group dated Mar. 12, 2025. Despite further investigation, it was impossible to determine who the undisclosed third-party purchaser was or how the sale of the Hunter Mountain interest had been accomplished.

It has since come to light that Patrick engineered the sale to the structure owned by DFW Charitable, a company he controlled. And no doubt his playbook mirrors the one he used in the DAF restructuring: Obtain a sham valuation from a loyalist financial advisor, use that valuation to justify the sale of an otherwise valuable asset to a captive company owned by Patrick, and then extract all the value for himself. Through this playbook, Patrick ensured that the entire beneficial interest in Hunter Mountain was diverted from its original charitable purpose and went into a structure over which he has absolute control and that he can manipulate for his personal enrichment. As was later discovered, the interest in Beacon Mountain/Hunter Mountain was sold in February 2025 to CLO Holdco, LLC—an entity whose sole economic beneficiary is, by virtue of Patrick's fraudulent DAF restructuring, Patrick's own sham "charity." *See* Exhibit 23, Transcript of Hearing dated June 25, 2025 ("9019 Hrg. Tr.") at 173:22–174:14.

To represent the transaction, here is the ownership of Hunter Mountain before Patrick's self-dealing:




Patrick then caused Rand Fund to receive $1 million in exchange for the Hunter Mountain Asset:




**J. While Stakeholders Scramble to Unravel Patrick's Fraudulent Scheme, Highland and Hunter Mountain Announce their 9019 Settlement**

Knowing he would shortly be taking ownership of Hunter Mountain, Patrick approached Highland to settle Hunter Mountain's stake in the Highland bankruptcy estate in the hopes of monetizing his fraud and deterring further inquiry into his misconduct. The Dallas Foundation and the other charities for which Mr. Dondero established these funds and entities were in it for the long term. Patrick's horizon—with investigations bearing down upon him—could not have been shorter term. He needed to make off with as much cash as he could before investigations progressed further and courts kicked him out from control of these entities. And he needed weaponry to deter the donors and others from pressing the investigation forward.

So in the Spring of 2025, Patrick sharply pivoted with respect to Hunter Mountain's duty to protect the asset of the former equity stake in Highland. He started to negotiate with Highland's chief restructuring officer. And on May 19, 2025, while the charities were still attempting to understand and unravel Patrick's machinations, Highland and its constituents filed their Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith ("9019 Motion"), Dkt. 4216, Exhibit 22. The settlement would:

- Resolve all pending disputes between Hunter Mountain and the Highland Entities;
- Transfer all remaining claims in the Kirschner Litigation to Hunter Mountain;
- Make an immediate, lump-sum payment of $500,000 to Hunter Mountain;
- Make an immediate initial distribution on Hunter Mountain's Class 10 claim of $10 million, with subsequent distributions of $6,500,000 planned in 2027 and 2028;
- Grant Hunter Mountain an allowed Class 10 claim in the amount of $336,940,230.58; and
- Entitle Hunter Mountain to receive a "final distribution" of "all excess remaining Indemnity Trust Assets" at the close of all proceedings involving the estate.

Exhibit 24, Settlement Agreement & General Release, Dkt. 4217-1, ¶¶ 1–8. There was nothing special about the last two items. Hunter Mountain was a Class 10 claimant. And it was entitled to a substantial amount of the excess after the creditors were paid.

What Hunter Mountain "got" for attempting to give the bankruptcy professional running Highland a free pass was a half-million dollar wire payment and a $10 million distribution for its Class 10 status that frankly it should have received long ago. And Patrick got the right to control the Kirschner litigation against Dondero and his colleagues for purportedly ruining Highland. *That he needed desperately*, because Dondero was asking hard questions about what Patrick had stolen from Dondero's charitable legacy. Patrick—rightly—was on defense against the emerging

evidence of his theft and misconduct. He needed something with which to fight back.

Several parties, including Dugaboy, objected to the 9019 Settlement. *See generally* Exhibit 25, Preliminary Objection of The Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities, Dkt. 4230. The Dallas Foundation and Crown Global also objected to the 9019 Settlement, but the objection itself (and the stale documents offered as exhibits in support of their objection) highlights the dearth of information they had at the time about Patrick's misconduct. As those two entities explained:

> [T]he Settlement is ***potentially tainted*** by the actions of Mark Patrick, ***the apparent sole manager and director*** of the HMIT Entities. Specifically, ***upon information and belief,*** Mr. Patrick illicitly restructured the ownership of the HMIT Entities in a manner ***that seems to facilitate the diversion of millions of dollars*** in assets from the charitable entities that are the beneficial owners of the HMIT Entities. . . . [G]iven the actions of Mr. Patrick and the pending proceedings related thereto, rather than provide the peace sought by Movants, approval of and consummation of the Settlement will ***most likely*** result in further litigation both before this Court and in jurisdictions outside of the United States.

Ex. Charities' Obj., Dkt. 4231, ¶ 2 (emphasis added).

The objection from Crown Global and The Dallas Foundation prompted a show of overwhelming force in defense of Patrick from the bankruptcy professionals. Highland insisted on deposing their representatives—Julie Diaz, the President and CEO of The Dallas Foundation, and Torrey Littleton, its CFO—on an emergency basis over the following weekend, giving them very little time to prepare to give testimony in a very contentious bankruptcy proceeding.[15] Following their depositions, Highland pressured Diaz and Littleton to withdraw their objection in exchange for the disclosure of information regarding Patrick's actions vis-à-vis the DAF. Faced

[15] *See* Caymans Ex. F, Transcript of Deposition of Julie Diaz at 9:21–23; Caymans Ex. C, Littleton Dep. at 11:4–14.

with a fight they felt ill-equipped to handle, Diaz and Littleton relented.

The Court held a hearing on Highland's Rule 9019 Motion on June 25, 2025. *See* Ex. 26, Notice of Hearing Held, Dkt. 4295. At the beginning of that hearing, Highland announced its agreement with The Dallas Foundation and Crown Global and explained that those two entities would be withdrawing their objections to the Rule 9019 Settlement. *See* Ex. 23, 9019 Hrg. Tr., at 22:3–16. The terms of that agreement provided, among other things, that (1) Hunter Mountain would hold $7.5 million of any initial settlement payments received for a period of 30 calendar days in an identified account; and (2) Hunter Mountain's representative Shawn Raver would meet with The Dallas Foundation by no later than July 7, 2025, to explain the DAF's current structure, provide its most recent balance sheets, and account for any transfers of assets made by the DAF during periods covered by the balance sheets. *See* Ex. 27, Stipulation Withdrawing Objection of the Dallas Foundation and Crown Global Life Insurance, Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith ("Withdrawal Stip."), Dkt. 4291 at Attachment 1.

After The Dallas Foundation and Crown Global withdrew their objections, Dugaboy's counsel orally objected to the 9019 Settlement on similar grounds to those raised in the withdrawn objections—including Patrick's fraud and his lack of authority based on that fraud to enter into the settlement. Ex. 23, 9019 Hrg. Tr. at 33:11–12. The Court overruled Dugaboy's objection and approved the Rule 9019 Settlement. *See* Ex. 1, Rule 9019 Settlement Order, Dkt. 4297, ¶ 10. To do so, the Court had to address whether the "Settlement Agreement was negotiated and entered into by . . . the HMIT Entities without collusion or fraud [and] in good faith . . . ." *Id.* ¶ 4. The Court found that the HMIT Entities were "acquiring the Transferred Claims and Dugaboy Note in

good faith" and had "proceeded with all aspects of the Settlement Agreement in good faith." *Id.* ¶ 6.

On July 9, 2025, Texas Attorney General Ken Paxton asked the Court to grant a brief stay of the bankruptcy proceeding to allow the AG's office time to investigate and enforce potential breaches of fiduciary duties by those entrusted with managing charitable trusts and other nonprofit organizations involved in the proceedings. *See* Exhibit 28, Letter from Ken Paxton re: Request for a Stay; Dkt. 4308.

The meeting Patrick promised the Dallas Foundation did not materialize as planned. Patrick failed to show up to explain himself. And Raver was unable to convey the information that The Dallas Foundation had demanded as a prerequisite to their capitulation.

After filing its notice of appeal of the Rule 9019 Settlement Order, on July 17, 2025, Dugaboy likewise sought a stay of the Order pending appeal. *See* Ex. 29, Notice of Appeal, Dkt. 4311; Ex. 30, The Dugaboy Investment Trust's Motion to Stay 9019 Order ("Dugaboy Motion to Stay"), Dkt. 4326. Dugaboy explained that filings by the joint official liquidators in the Cayman Islands proceeding demonstrated that Patrick had "restructured the ownership of the HMIT Entities in a manner that seems to facilitate the diversion of millions of dollars in assets from the charitable entities that are the beneficial owners of the HMIT Entities." Ex. 30, Dugaboy Motion to Stay, Dkt. 4326, ¶ 2. Dugaboy argued that Patrick's actions called the validity of the 9019 Settlement into question and that the settlement itself helped further Patrick's fraudulent scheme. *Id.*, ¶¶ 33–34.

Three days later, on July 21, 2025—and without the benefit of any further briefing or oral argument on the stay requests—the predecessor judge summarily denied the requests. In doing so, the Court concluded that: "***Whatever the misdeeds may or may not be of Mark Patrick, they***

***are not sufficiently intertwined with the Highland bankruptcy estate (or the Settlement Agreement) to justify a stay.***" Ex. 31, Memorandum Order and Opinion Regarding Stay Requests ("Stay Order"), Dkt. 4333, at 4 (emphasis in original). The Court refused a stay despite knowing of judicial proceedings in the Cayman Islands that already had removed Patrick from control of the DAF structure and that were likely to eventually reach the entities over which he claimed authority to enter into the 9019 Settlement. The Court also held that neither the bankruptcy case nor the contested matter involving the 9019 Settlement was a "proceeding involving a charitable trust." *Id.* Finally, the Court concluded that "the parties have other avenues to address any malfeasance of Mark Patrick," including the liquidation proceedings in the Cayman Islands. *Id.*

**K. New Evidence on Patrick's Actions Demands Additional Scrutiny**

As explained above, in the lead up to the June 25, 2025, hearing on the 9019 Settlement, the charitable owners, The Dallas Foundation, Crown Global, Dugaboy, and various other interested parties were scrambling to determine what Patrick had done vis-à-vis various charitable assets, how far his potential fraud extended, and whether there was any path forward to ensure that he could not abscond with money and assets earmarked for long-term charitable purposes.

It was not until the hearing itself that Dugaboy and others learned that Hunter Mountain had been sold to CLO HoldCo and that the ultimate beneficial owner of the Hunter Mountain interest was Patrick's captive charity rather than The Dallas Foundation and its supporting charitable organizations. *See* Ex. 23, 9019 Hrg Tr. at 173:22–174:16. But that shocking news was only the beginning.

On July 15, 2025, the first real evidence about the scale of Patrick's fraudulent scheme began to emerge. On that date, the joint official liquidators appointed in the Cayman Islands filed a Writ of Summons and Statement of Claim against Mark Patrick, Paul Murphy, CDMCFAD, LLC (referred to as "DAF 2.0"), DFW Charitable Foundation (Patrick's personal charitable foundation),

CDH GP, Ltd. (Patrick's newly-created general partner for DAF 2.0), and CLO HoldCo, Ltd. Caymans Ex. B, Statement of Claim, ¶ 1. The evidence in that Statement of Claim is highlighted throughout the discussion above. That Statement of Claim revealed, for the first time, that Patrick had secretly effectuated the DAF restructuring and thereby fraudulently absconded with $270 million in charitable assets belonging to the charitable owners. *See generally id.* Further evidence of this wrongdoing was unearthed by the Joint Liquidators in December 2025 filings, just a few weeks ago. *See, e.g.*, Caymans Ex. A, First Patrick Aff. (released December 2025); *but see* Caymans Ex. B, Statement of Claim; Caymans Ex. C, Littleton Depo. Trans.; Caymans Ex. D, Ch. 15 Petition; Caymans Ex. E, Winding Up Petition; Caymans Ex. F, Diaz Depo. Trans.; Caymans Ex. G, MacInnis Dec. (released July 2025).

And while representatives of Highland repeatedly suggested at the hearing on the Rule 9019 Settlement that the DAF and Hunter Mountain structures were entirely separate, what is now crystal clear is that is untrue. Patrick made sure that Hunter Mountain was folded into the DAF structure through the sale of Beacon Mountain's interest in Hunter Mountain to CLO HoldCo. That transaction—surreptitiously orchestrated by Patrick (and about which Dugaboy still has few salient details)—made certain that Patrick could control all of Hunter Mountain's assets that should belong to charitable organizations.

Much of this information has only recently come to light, however, as the proceedings in the Cayman Islands investigating Patrick's and his associates' malfeasance have been subject to a protective order under the confidentiality rules of the Cayman Islands judicial system. After a hearing in December 2025, the formerly confidential documents arising after July 2025 in the Caymans proceedings appended hereto became publicly available.

The documents released in December 2025 revealed details of the charitable assets Patrick and his conspirators have been stuffing in their own pockets. Patrick took more than $10.5 million and $3.32 million in director's fees alone in 2024 and 2025, respectively, for work that did not amount to a full-time job. *See* Third Affidavit of Margot MacInnis ("MacInnis Aff. 3") at ¶ 52. Patrick's co-conspirator Murphy even revised his own compensation plan to pay himself $500,000 in fees triggered when injunctions are sought against the DAF, the very proceedings now pending in the Caymans. *Id.* at ¶ 79.2. This revision was backdated to the beginning of 2025 in monthly installments, and thus Murphy is receiving additional compensation from the very fund the liquidators in the Cayman Islands are working to save. *Id.* Moreover, both Patrick and Murphy sought indemnification from the DAF for their own legal fees incurred obstructing the joint liquidators' investigation into *the fraud they committed*. Ex. MM-3, at 199–202, 829.

The December 2025 documents revealed Patrick's desperate efforts to prevent the courts from learning about his shifting of funds. In response to judicial orders that he open the books of the DAF and all related entities, Patrick provided only a consolidated balance sheet for the overall Fund so that his corporate shell game could not be traced. *Id.* at ¶¶ 102–03. And the December 2025 documents showed his intent to defraud, revealing how he confided in advisors about getting assets away from the charities and into his own, exclusive control. *See* Ex. MM-3, 61–82.

**L. The Predecessor Judge in this Matter Recuses**

As explained further below, the predecessor judge who approved the challenged settlement in July 2025 has been recused from this case. That outcome was announced by the Fifth Circuit Judicial Council in resolutions of judicial conduct complaints dated December 29, 2025.[16] That is

[16] *See, e.g.*, *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90042 (Dec. 29, 2025), at 7, available at https://tinyurl.com/yynh3u67.

an outcome the predecessor judge resisted, denying multiple motions seeking it.

The grounds for the recusal was the predecessor judge's authoring of novels that negatively depicted a hedge fund and its manager. Dondero contended the novel's hedge fund and manager was hard to distinguish from his own. This novel writing was occurring when the case was started and well before the July 2025 Rule 9019 Settlement Order at issue here.

The Fifth Circuit's Chief Judge resolved the judicial conduct complaint through arranging for extensive "corrective action," including the predecessor judge's recusal from this case and professional education. Of the more than 500 Fifth Circuit Judicial Council resolutions of judicial conduct complaints in the last decade, there had been only four prior instances of resolving them through "corrective action" rather than dismissal. (One other had been referred to a special committee for sanction, some others were cut off by resignation of the subject judge).

The Fifth Circuit Chief Judge's resolution noted that it did not pass judgment on whether the predecessor judge's prior refusals to recuse were error, or on the validity of her prior orders. Ex. 32, Order 05-26-90042 at 6 n.3. Nor could it have, because those issues must be addressed inside the pending case, with arguments from the parties to it.[17]

Most notably, Dondero and others challenged the predecessor judge's refusal to recuse through a writ of mandamus. The Fifth Circuit held that there was "a strong argument that [the predecessor judge] had a duty to recuse" due to the novels and their similarity to Dondero, but that the argument did not rise to the level of a "clear and indisputable" abuse of discretion required for mandamus relief. *Dondero v. Jernigan*, No. 24-10287, 2025 WL 1122466, at *7 (5th Cir. Apr. 16, 2025). The Fifth Circuit distinguished that high standard from the more searching review that would be available on direct review from an eventual final judgment. *Id.* at *4.

[17] *See* R. Judicial-Conduct and Judicial-Disability Procs., r. 3 Fifth Cir. cmt. 3.2.

Dondero is seeking review of the mandamus-stage decision in the Supreme Court. *See Dondero v. Jernigan*, No. 25-355. The Supreme Court initially denied certiorari on January 12, 2026. In doing so, neither Dondero nor the Supreme Court was aware of the Fifth Circuit Judicial Council resolution imposing the corrective action of recusal. Dondero timely petitioned for rehearing in the Supreme Court alerting it to these intervening developments on February 6, 2026. That petition remains pending.

## III. THE COURT SHOULD RECONSIDER AND VACATE THE 9019 SETTLEMENT ORDER

The Rule 9019 Settlement Order was obtained by and unintentionally advances fraud and misconduct, as newly discovered evidence conclusively demonstrates. Only *after* the hearing on Highland's 9019 Motion did shocking but clear and convincing evidence of Patrick's fraud and misconduct come to light. It was also entered by a judge who lacked the authority to act, because circumstances were already in place disqualifying her from presiding. The Court should reconsider and vacate the Rule 9019 Settlement Order.

### A. This Court Has Ample Authority to Reconsider and Reverse Settlement Orders That Were Error, Are Undermined by Newly Discovered Evidence, Are Affected by Fraud or Misconduct, or Are Themselves Inequitable

The Court has the power to reconsider, vacate, or otherwise grant relief from the Rule 9019 Settlement Order. When a successor judge takes over a case from a predecessor, "[t]he successor judge has the same discretion as the first judge to reconsider [] order[s]" issued previously in the case. *Abshire v. Seacoast Prods., Inc.*, 668 F.2d 832, 837–38 (5th Cir. 1982). This is a well-established power that a majority of circuits have confirmed. *See In re United States*, 733 F.2d 10, 13 (2d Cir. 1984); *Hayman Cash Reg. Co. v. Sarokin*, 669 F.2d 162, 169 (3d Cir. 1982); *Loumar, Inc. v. Smith*, 698 F.2d 759, 762–63 (5th Cir. 1983); *Brengettecy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005); *Greyhound Corp., Inc. v. Int'l Bus. Machs. Corp.*, 559 F.2d 488, 508 (9th Cir. 1977);

*Nelson v. City of Albuquerque*, 921 F.3d 925, 930 n.2 (10th Cir. 2019); *United States v. Philpot*, 773 F. App'x 583, 588 (11th Cir. 2019); *Exxon Corp. v. United States*, 931 F.2d 874, 878 (Fed. Cir. 1991). Some circuits require a showing that the operation of the previous ruling be "clearly erroneous and its enforcement would work a manifest injustice" or that "intervening controlling authority" makes reconsideration appropriate, see, e.g., *Zeyen v. Bonneville Joint Dist., #93*, 114 F.4th 1129, 1138 (9th Cir. 2024), and other circuits have described a successor judge's authority as "plenary" to reconsider prior orders, *see Philpot*, 773 Fed. Appx. at 588. The Fifth Circuit strikes a middle path, empowering a successor judge with discretion to reconsider an order of the predecessor judge, but cautioning not to overrule an earlier order "merely because the later judge might have decided matters differently" in order to maintain general principles of comity. *In re Ford Motor Co.*, 591 F.3d 406, 411 (5th Cir. 2009).

Concern for leaving prior rulings undisturbed gives way "to the interests of justice and economy." *Id.* at 837. The successor judge need only have "reason [he] deems sufficient" to overturn a prior judge's orders, even in the absence of new evidence or a change of law. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 171 (5th Cir. 2010). The successor judge has "necessarily bountiful discretion" to review prior work in a case before it. *Loumar, Inc.*, 698 F.2d at 763. To "conscientiously carry out his judicial function," a judge has discretion to correct "what he believes to be a prior erroneous ruling[.]" *Castner v. First Nat'l Bank of Anchorage*, 278 F.2d 376, 380 (9th Cir. 1960). This is particularly so when a predecessor judge has recused herself: the successor judge must be able to reconsider the order or else risk jeopardizing the important values of impartial adjudication underlying 28 U.S.C. § 455. *United States v. O'Keefe*, 128 F.3d 885, 891 n.6 (5th Cir. 1997).

In addition, the Court may revisit its orders for any of several enumerated reasons within a

"reasonable" time after the order's issuance, even when the order has come in the form of a final judgment ending a case. Fed. R. Civ. P. 60(b).[18] Specifically, Rule 60(b) empowers the Court to give relief from a "final judgment, order, or proceeding" for the following reasons: (1) mistake, (2) newly discovered evidence, (3) fraud, misrepresentation, or misconduct by an opposing party, (4) the judgment is void; (5) applying it prospectively is no longer equitable, or (6) "any other reason that justifies relief." Rule 60(b)(1)–(6). Rule 60(b) "is to be construed liberally to do substantial justice. . . [it] is broadly phrased and many of the itemized grounds are overlapping, freeing Courts to do justice in hard cases where the circumstances generally measure up to one or more of the itemized grounds." *Frew v. Janek*, 780 F.3d 320, 327 (5th Cir. 2015) (quoting *Johnson Waste Materials v. Marshall*, 611 F.2d 593, 600 (5th Cir. 1980)). As explained below, relief is warranted in this case under several of Rule 60(b)'s subsections. Finally, even beyond the powers bestowed by Rule 60(b), the Court has the inherent power "to vacate a judgment obtained by fraud." *Allen v. United States*, No. 3:96-cv-256-K, 2015 WL 3824448, at *2 (N.D. Tex. June 18, 2015) (citing *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944)).

### B. The Court Should Reconsider and Vacate the 9019 Settlement Order Due to Patrick's Fraud and Misconduct

#### 1. This Court Should Reconsider and Vacate the 9019 Settlement Order Because Newly Discovered Evidence Shows It Was Affected by Fraud and Misconduct

The Court should reconsider its Rule 9019 Settlement Order because the scope of Patrick's misconduct was unknown before the hearing on Highland's 9019 Motion. The Court should exercise its "necessarily bountiful discretion" to reconsider the Rule 9019 Settlement Order. *See Loumar*, 698 F.2d at 763. In addition, Federal Rule of Civil Procedure 60(b)(2) authorizes reversal

[18] Federal Rule of Civil Procedure 60 applies in bankruptcy proceedings. Fed. R. Bankr. P. 9024.

or vacatur of an order, even a final judgment, based on "newly discovered evidence." Fed. R. Civ. P. 60(b)(2); *see also* Fed. R. Bankr. P. 9024. Reconsideration is appropriate where the evidence "could not through due diligence have been discovered" before the prior order and "would have clearly produced a different result if presented to the court before" the prior order. *Harrison v. Byrd*, 765 F.2d 501, 503 (5th Cir. 1985); *see also Stilwell v. Travelers Ins. Co.*, 327 F.2d 931, 933 (5th Cir. 1964) (reversing trial court's denial of Rule 60(b)(2) motion where newly discovered evidence changed facts of the case). The newly discovered evidence may be direct or circumstantial. *Philip Morris USA Inc. v. Lee*, 494 F. Supp. 2d 544, 550 (W.D. Tex. 2007). And the evidence may include affidavits of the moving party. *Harrison*, 765 F.2d at 502–03.

Here, newly discovered evidence amply demonstrates that Patrick was not presenting his settlement proposal to the Court "without collusion or fraud [and] in good faith," as the predecessor judge had determined. Ex. 1, Rule 9019 Settlement Order, Dkt. 4297, ¶ 4. The newly discovered evidence, instead, demonstrates that Patrick remained in his position only because of fraudulent efforts to cover up his misconduct and that, indeed, he was seeking the settlement to deter investigation into it.

There was smoke of this misconduct at the June 25, 2025, hearing approving the settlement, including signs of wrongdoing and requests for caution from Cayman Islands court-appointed investigators and the Texas Attorney General. The flames of the misconduct were revealed, however, by successive later filings in July and December of 2025 by the joint official liquidators appointed in the Cayman Islands.

First, those filings showed that Patrick had secretly restructured the DAF and Hunter Mountain to steal their assets from the charities they were meant to benefit. Then, we learned that Patrick had established his own sham charity, run out of his house with his family as directors, to

take over more than $270 million in assets actually belonging to established charities. It became apparent that Patrick effected this restructuring in the dark of night, with instructions to lawyers to make the new maze of companies he was setting up untraceable.

At the heart of all this is Patrick's newly created sham charity, the so-called DFW Foundation. Leading up to the hearing, Patrick wanted to keep everyone away from this curious new entity. At his deposition on June 23, 2025, Patrick avoided answering whether his sham charity was the ultimate owner of Hunter Mountain, ultimately testifying it was another company instead. *See* Exhibit 49, Transcript of Deposition of Mark Patrick, 8:1–6 (June 23, 2025) ("Q: Does DFW Charities own CDMCFAD, LLC? A: Yeah, again, you know Mr. Lang, you know, there are several entities in this structure, and I – I just don't want to go beyond what I have a hundred percent knowledge of."); *see id.* at 11:10–12:7 (testifying that the ultimate owner of Hunter Mountain was a company called Beacon Mountain). The Liquidators' later filings laid bare the truth: That Patrick's sham charity had been reorganized into its role as the ultimate beneficial owner of Hunter Mounter, the settling entity. Documents from the Cayman litigation later revealed that Patrick is the registered director, sole member, and president of DFW Foundation. *See* Caymans Ex. G, First Affidavit of Margot MacInnis dated July 15, 2025 at ¶¶ 11.5, 31.4, and 31.5.

And that sham charity was part of a massive fraud scheme to steal DAF's more than $270 million in charitable assets. *See id*. at Ex. 33, pages 448–53 (internal Patrick email Nov. 26, 2024 at 4:11 pm). Internal communications, not available before the 9019 Hearing, revealed that in November 2024, Patrick sought advice on creating DFW Foundation to dilute the existing Charities and take the ownership of the DAF. *See* Caymans Ex. B, Statement of Claim at ¶¶ 91–93. He intentionally misled the Charities and obfuscated his self-dealing transactions in

communications with the Charities in November 2024–March 2025. *See* Caymans Ex. G (MacInnis Declaration dated July 21, 2025) at Ex. 60–64, 70–71, 75–76, and 86. This enabled Patrick to enter into a series of self-dealing transactions whose result was that the new buyer of Hunter Mountain was entirely controlled by him. *See id.* at Ex. 44–47, 49, 52–55, and 65. Had this series of transactions been revealed before the 9019 hearing, the Court would have known that the owners of Hunter Mountain who signed the 9019 Settlement only recently came to that ownership through breach of fiduciary duty and fraud, and that the 9019 Settlement essentially provided the Court's approval of Patrick's monetization of a stolen asset.

Second, newly discovered evidence showed that Patrick paid himself more than $12 million in September and October 2024 alone for the part-time job of running this charitable exercise. *See* Caymans Ex. B, July Statement of Claim at ¶¶ 86–88. The proceeds of any distribution approved by the 9019 Motion would have gone into the same pool of charitable assets from which Patrick had just paid himself $12 million. This Court never would have poured settlement proceeds into Patrick's vessel if it had known there was a hole in the bottom of it leading directly to Patrick's pocket.

Third, the newly discovered evidence shows that Patrick structured the settlement to protect himself from further investigation into his misconduct. Dondero and others were asking questions about his handling of the DAF, so Patrick gave away asset value for the charities in exchange for acquiring the Kirschner claims. Ex. 24, Settlement and General Release, ¶¶ 3–4, 8(a). These are meritless claims that historical managers of Highland mismanaged it. And obtaining them would give Patrick an offensive weapon against Dondero and his partners who had donated to the DAF and wished to see their gift flourish for the charities' benefit. In this way, Patrick used the settlement for his own personal benefit, to obtain at the expense of the charitable beneficiaries

some kind of deterrence against Dondero and his former owner partners from asking hard questions about Patrick's misconduct going forward. Patrick set out immediately to deploy it, asking the predecessor judge to take the Kirschner claims out of hibernation and to freeze all Dondero's other assets, lest they be used to investigate Patrick. Caymans Exhibit H, Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver, No. 25-BC01B-0027 (July 1, 2025). And it led to a bizarre world in which the beneficiaries of Dondero's gift—through the self-interested intervention of Patrick—would be suing Dondero for alleged historical misconduct.

The prominence of the Kirschner aspect of the settlement should have given the Court a moment of pause. But with the newly discovered evidence showing the scale of Patrick's misconduct, Patrick's motive in seeking the Kirschner claims—and dealing away value for the charitable beneficiaries to obtain those claims—becomes apparent. Patrick's clear objective in entering into the rushed settlement was to obtain a weapon against Dondero so that he could deter further inquiry into his misconduct. That weapon was the Kirschner litigation, and Patrick sacrificed the long-term assets of pressing the case of former equity holders against Highland for the short-term cudgel of gaining a litigation tool against Dondero. Equity demands that this Bankruptcy Court not allow a 9019 settlement to help a wrongdoer deter investigation into misconduct and cover up his wrongdoing. When it becomes apparent that happened, a settlement should be reconsidered and/or vacated. And this one should be.

Fourth, the newly discovered evidence shows that Patrick's self-dealing to transfer the economic benefit of Hunter Mountain from the Dallas Foundation to himself violated Sections 206 and 215 of the Investment Advisors Act and that the 9019 settlement advances that clear violation of federal law. As the control person of Rand Advisors, Patrick caused Hunter Mountain to be

traded to the DAF structure under his new DFW Foundation entity.[19] This rendered the trade a principal transaction prohibited under Advisors Act § 206. *See* Securities and Exchange Commission, Interpretation of Section 206(3) of the Investment Advisers Act of 1940, Inv. Adv. Act Rel. No. 1732 (July 17, 1998), 63 Fed. Reg. 39,056 (July 23, 1998) (internal citations omitted). Additionally, it would have rendered the entire transaction void and subject to rescission. 15 U.S.C. §80b-15(b); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 367 (S.D.N.Y. 2011) (*citing Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 24, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979)).

It also violates a provision of the governing documents of Atlas Fund, the 96% owner of Rand Fund, which prohibits Rand Fund from selling Hunter Mountain to an affiliate of Patrick without investor consent. *See* Ex. 50, Amended and Restated Limited Partnership Agreement of Atlas Fund as of November 30, 2015 at §3.01(b). As revealed in Rand Fund's audit issued *the day after* the 9019 Hearing, as of December 2024, Rand Fund's sole asset was Beacon Mountain, the beneficiary of Hunter Mountain. *See* Ex. 48, Rand Fund 2024 Audit at 4. As a result, while Patrick did not transfer Atlas Fund's direct ownership of Rand Fund, Patrick did transfer all of Rand Fund's value without disclosure to, or consent from, a client. Ex. 23, Hrg. Tr. June 25, 2025 at 214:2–6.

Under applicable law, Patrick was not permitted to use his position as investment advisor of Atlas Fund to approve of Rand Fund selling an asset to Patrick's own account. *See In re Paradigm Cap. Mgmt., Inc.*, Securities and Exchange Commission Investment Advisers Act

[19] Rand Advisors was the investment advisor of Rand PE Fund, which was the owner of Beacon Mountain, the sole beneficiary of Hunter Mountain. Exhibit 5, Rand Advisors, LLC Form ADV Part 2A (March 2021). Beacon Mountain, with its beneficial ownership of Hunter Mountain, was the asset transferred by Patrick to his own ultimate benefit.

Release No. 3857, 2014 WL 2704311, at *2 ¶ 15 (June 16, 2014). Patrick should have sought the consent of Crown Global as the sole limited partner of Atlas Fund, which in turn was the 96% owner of Rand Fund, the selling party. Ex. 40, Hunter Mountain Org. Chart. Crown Global, the annuity policy issuer, would have taken instructions from the Dallas Foundation, the annuity policy beneficiary. *See* Ex. 47, Deferred Variable Annuity Policy No. 30218 dated as of December 10, 2015, issued to Empower Dallas as Policyholder and Beneficiary. Rescission of the transfer renders the 9019 Settlement fatally flawed because the Debtor signed the agreement with the wrong owner of Hunter Mountain. Had Patrick timely disclosed both that DFW Foundation was the ultimate beneficial owner of Hunter Mountain after it was traded, and his own relationship to DFW Foundation, the parties objecting to the 9019 Settlement, both Dugaboy and the Dallas Foundation, would have been able to take additional discovery, submit additional exhibits, and brief additional arguments opposing the 9019 Settlement. Patrick prevented them from doing so.

That this information had to come out after the hearing was not for lack of diligent inquiry. When asked at the 9019 hearing to explain the recent changes in Hunter Mountain's ownership structure, Patrick first lodged his own relevance objections from the witness stand, then argued he should not have to answer because it would affect related litigation, and finally resorted to being entirely confused as to the names of entities even when spelled out in their entirety. Ex. 23, Hrg. Tr. June 25, 2025 at 174:23–175:3 and 177:2–22. He even feigned unfamiliarity with the DAF itself even though he personally put it into liquidation less than three months earlier. *Id.* at 178:5–8, 179:7–21.

None of this information was available to Dugaboy before the 9019 hearing, despite its diligence. As explained above, because Patrick carefully hid his machinations from all affected parties, including his clients Dondero and Dugaboy and the charities for which he served as a

fiduciary, it was impossible for any relevant stakeholders to know or fully grasp the extent of Patrick's deception. Nor could Dugaboy have known that Patrick had self-dealt Hunter Mountain into the DAF structure through the sale of Beacon Mountain's interest in Hunter Mountain to CLO Holdco. Despite inquiries, Patrick and his inner circle refused to reveal the details of the sale.

This evidence—which was unknown and unavailable at the hearing on Highland's 9019 Motion—was material and should have produced a different result had it been presented to the Court before the Rule 9019 Settlement Order was issued.

**2. This Court Should Vacate the 9019 Settlement Order Because It Is the Product of Patrick's Misconduct and Fraud**

For many of the same reasons, the Court also should reconsider the Rule 9019 Settlement Order because Patrick's elaborate, carefully concealed fraud prevented Dugaboy (or any other affected stakeholder) from fully and fairly objecting to the 9019 Settlement. Upholding a previous order begotten in part by fraud weighs against "the interests of justice and economy," and thus this Court should not rigidly adhere to prior order it is empowered to rectify. *Abshire v. Seacoast Prods., Inc.*, 668 F.2d at 837. Further, where a party engages in "fraud . . . , misrepresentation, or misconduct," the opposing party is entitled to reconsideration of a prior court order. Fed. R. Civ. P. 60(b)(3); Fed. R. Civ. P. 60(d) (recognizing court's power to "set aside a judgment for fraud on the court"). As the Fifth Circuit has recognized, Rule 60(b)(3) "allows the courts to 'set aside a judgment for fraud on the court' without a strict time bar." *Jackson v. Thaler*, 348 F. App'x 29, 34 (5th Cir. 2009) (per curiam) (quoting *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978)). And "[c]ourts are given wide discretion in determining whether relief should be granted under Rule 60(b)(3) based on fraud." *Allen v. United States*, 2015 WL 3824448, at *2 (N.D. Tex. June 18, 2015) (citation omitted). That is because Rule 60(b)(3) "is aimed at judgments which were unfairly obtained, not at those which are factually incorrect." *Rozier*, 573 F.2d at 1339.

Reconsideration is particularly appropriate where, as here, the offending party's "misconduct prevented the moving party from fully and fairly presenting his case." *Hernandez v. Results Staffing, Inc.*, 907 F.3d 354, 364 (5th Cir. 2018). The offending party's misconduct need not rise to the level of actionable fraud. *See* Fed. R. Civ. P. 60(b)(3). Rather, misconduct warranting reconsideration may consist of misleading statements or a failure to disclose relevant information. *Hernandez*, 907 F.3d at 365. The test is whether the misconduct "inhibited the unearthing of evidence" or "substantially interfered" with the moving party's "preparation." *Id.* (internal quotation marks omitted). The analysis thus rests on whether an order was "unfairly obtained" as a result of the offending party's misconduct. *Id.* at 364 n.20 (quoting *Diaz v. Methodist Hosp.*, 46 F.3d 492, 496 (5th Cir. 1995)).

As described above,[20] Patrick's actions involve just the sort of fraud, misrepresentations, or misconduct that requires reconsideration of the Rule 9019 Settlement Order. Patrick concealed his restructurings of the DAF and Hunter Mountain so that he could divert assets intended to flow to charitable beneficiaries to entities that he owned and controlled. Indeed, Patrick specifically told his lawyers when crafting his fraudulent scheme that he wanted to hide his actions by creating a new entity that was "hard to find or track, or trace. Or find owners, etc. Generic name. Strong litigation protection." Caymans Ex. B, Statement of Claim, ¶ 82. He also surreptitiously increased his own compensation to the tune of millions of dollars to the detriment of the same charitable beneficiaries he was planning to defraud. He then sought out and negotiated a settlement on behalf of Hunter Mountain knowing that all the settlement value would benefit entities he controlled instead of funding the charitable legacy that the Hunter Mountain structure was created to benefit. The courts routinely employ their powers to correct much less significant wrongdoing. *See Rozier*,

[20] *See supra* Sections II.F–II.K.

573 F.2d at 1342–46 (reversing district court's denial of Rule 60(b)(3) motion for new trial where non-moving party failed to produce materials during discovery); *Cap. Exp., LLC v. Zinus, Inc.*, 996 F.3d 1332, 1342 (Fed. Cir. 2021) (affirming vacatur under Rule 60(b)(3) where expert witness misrepresented his knowledge of material prior art in patent case); *Carter v. Fenner*, 136 F.3d 1000, 1005–07 (5th Cir. 1998) (voiding judgment approving wrongful death settlement due to lack of authority to consent).

Patrick's restructuring of the DAF and Hunter Mountain to divert valuable charitable assets to his own control and use amounts to self-dealing, fraud, and—at the bare minimum—misconduct.

**3. This Court Should Vacate the 9019 Settlement Order Because Letting It Stand Is Contrary to this Court's Equitable Purpose and Powers**

The Court should reconsider its Rule 9019 Settlement Order because equity strongly favors a hearing to explore the scope of Patrick's fraud and how it impacts Hunter Mountain. *See In re Osborne*, 379 F.3d 277, 284 (5th Cir. 2004).

The facts of this case overwhelmingly militate in favor of reconsideration. In fashioning its Rule 9019 Settlement Order, the Bankruptcy Court explicitly concluded that the 9019 Settlement was "negotiated and entered into by . . . the HMIT Entities without collusion or fraud [and] in good faith." Ex. 1, Rule 9019 Settlement Order, Dkt. 4297, ¶ 4. That finding was a prerequisite to approving a settlement under Rule 9019. *See Matter of AWECO, Inc.*, 725 F.2d 293, 299 (5th Cir. 1984).

For the above reasons, this settlement was the product of fraud and misconduct, not free of it. And there was no good faith here. As important, the settlement itself was structured by Patrick to help him keep his misconduct from public view. It was designed to throw charitable assets—the interests in pressing the rights of former Highland equity holders in and regarding the

administration of the bankruptcy estate—over the side of the boat so that Patrick could obtain a weapon against Dondero. It was a desperate attempt to deter those whose generosity created these charitable structures from asking the hard questions about Patrick—criminally—running off with them.

Parties with unclean hands cannot come to courts of equity and ask for relief. That is because the orders of courts of equity should not be sullied with misconduct. A natural corollary is that when the perfidious have obtained relief from courts of equity, and worse when such relief advances their misconduct to the slightest degree, it should be reversed.

Under the circumstances, equity and justice favor Dugaboy (*i.e.*, the deceived party) over Patrick (*i.e.*, the deceiving party). And equity and justice require reconsideration of the Rule 9019 Settlement Order in light of Patrick's many uncovered misdeeds.

**C. The Court Should Reconsider and/or Vacate the Rule 9019 Settlement Order Because It Was Issued by a Judge Who Lacked Authority Because She Should Have Been Disqualified**

Finally, the Court should reconsider the 9019 Settlement Order because the predecessor judge lacked the authority to enter it, as already existing circumstances disqualified her from acting in this case. Congress mandated that the judge "shall disqualify" herself "in any proceeding in which [her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). By the time of the 9019 Settlement Order, the circumstances compromising the appearance of her impartiality were already present: the writing of novels about a hedge fund and its manager similar to Dondero. That has resulted in the Fifth Circuit Judicial Council taking corrective action to recuse the predecessor judge from the case going forward. This Court should address the consequences of these circumstances going backward.

The bankruptcy remains pending, and the currently presiding judge retains discretion to reverse any ruling made in the bankruptcy, for any reason, before the bankruptcy is closed through

a final judgment. *Abshire v. Seacoast Prods., Inc.*, 668 F.2d at 837–38. In addition, Federal Rule of Civil Procedure Rule 60(b) authorizes vacatur of orders issued when a judge should have recused herself. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863–64 (1988). This is because "to perform its high function in the best way[,] 'justice must satisfy the appearance of justice.'" *Id.* at 864 (citation omitted); *see also Tramonte v. Chrysler Corp.*, 136 F.3d 1025, 1028 (5th Cir. 1998) (stating that a judge that should have recused lacks authority to enter subsequent orders).

In determining whether a judgment should be vacated for a violation of 28 U.S.C. § 455(a)—which mandates recusal whenever a judge's impartiality "might reasonably be questioned")—courts must consider "the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Liljeberg*, 486 U.S. at 864. In discussing the third prong, the Supreme Court explained that because the purpose of the recusal statute is "to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible . . . it is critically important in a case of this kind to identify the facts that *might reasonably cause an objective observer* to question [a judge's] impartiality." *Id.* at 865 (emphasis added). The *Liljeberg* Court therefore affirmed the circuit court's granting of a Rule 60(b) motion to vacate a judgment where the judge *was not even aware* of his fiduciary interest in the litigation. *Id.* at 867–68. As described below, the facts present here weigh even heavier in favor of vacatur.

Here, the Fifth Circuit Judicial Council, acting through the Fifth Circuit Chief Judge, effected a recusal of the predecessor judge as "corrective action" for books she authored and published critical of the hedge-fund industry and negatively depicting characters with striking similarity to Dondero while presiding over the Highland bankruptcy. The corrective action was

taken in disposition of three ethics complaints by the Judicial Council of the Fifth Circuit regarding the judge's impartiality.[21] In the dispositions, Chief Judge Elrod determined that recusal was one of several significant measures constituting "appropriate corrective action that acknowledges and remedies the problems" raised by the complainants. Ex. 32, Order 05-26-90042 at 7; Ex. 33, Order 05-26-90044 at 3–4; Ex. 34, Order 05-26-90045 at 3. The corrective action of recusal was meant to redress "conduct occurring outside the performance of official duties if the conduct is reasonably likely to have prejudicial effect on the administration of the business of the courts, including a substantial and widespread lowering of public confidence in the courts among reasonable people." Ex. 32, Order 05-26-90042 at 5 (quoting Judicial Conduct and Discipline Rule 4(a)(7)).

The Fifth Circuit Chief Judge noted that the judicial misconduct resolution should not "be interpreted as an opinion or reflection on the merits of the judge's prior decision not to recuse . . . or on the validity of any decision" she had issued. Ex._32, Order 05-26-90042 at 6 n.3, Ex._33, Order 05-26-90044 at 3 n.1, & Ex. 34, Order 05-26-90045 at 3 n.1. That is because there are judicial proceedings to address consequences for rulings in a case. The Judicial Conduct and Discipline Rules are clear that proceedings thereunder are not to be used to reverse rulings in pending cases, because all the parties to those cases should be heard on such rulings. R. Judicial-Conduct and Judicial-Disability Procs., r. 3 Fifth Cir. cmt. 3.2. This motion is one such mechanism for that.

As the corrective action acknowledges, the predecessor judge wrote and published *He*

---

[21] *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90042 (Dec. 29, 2025), at 7, available at https://tinyurl.com/yynh3u67; *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90044 (Dec. 29, 2025), at 3, available at https://tinyurl.com/3vym9yu4; *In re Complaint of Judicial Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90045 (Dec. 29, 2025), at 3, available at https://tinyurl.com/2vka5dn6.

*Watches All My Paths*[22] and *Hedging Death*,[23] while presiding over this bankruptcy and the previous involuntary bankruptcy commenced against Acis Capital Management, L.P. and Acis Capital Management GP, L.L.C.—entities owned by or closely associated with Dondero.

The novels follow a Texas bankruptcy judge—portrayed to be heroic and modeled after Judge Jernigan herself—who faces hedge funds and a nefarious hedge-fund manager, Cade Graham, in her court. Graham bears striking similarities to Dondero. For instance, Graham shares much of the same biographical information as Dondero, such as stature, age, and general professional experience. Ex. 35, *Hedging Death* excerpt, at 112a.[24] Graham's hedge fund is named Ranger Capital, just as Dondero's had been before rebranding as Highland Capital Management. *Id.*, 133a (*Hedging Death* excerpt); Exhibit 36, Memorandum of Law in Support of Highland Capital Management Fund Advisors, L.P.'s Motion to Recuse at 16–17, *Highland Cap. Mgmt. L.P. v. Kirschner*, Adv. Proc. No. 21-03076, Dkt. 310 (Bankr. N.D. Tex. Feb. 27, 2023) ("Motion to Recuse"). References to the historical name of Dondero's hedge fund were made in both the Acis and Highland bankruptcies, which Judge Jernigan presided over while writing the books in question.[25] Ranger Capital also had a unique mix of investments that mirrored Highland—with "hedge funds . . . private equity funds, CDOs, CLOs, REITs, life settlement, all

[22] Stacey G. Jernigan, *He Watches All My Paths*, SJ Novels (self-published) (Jan. 16, 2019), available on Amazon at http://bit.ly/4nhfTRd. Movants are submitting a hard copy of this book, which is designated as Exhibit 54 and will be delivered to the Court later this week.

[23] Stacey G. Jernigan, *Hedging Death*, White Bird Publications (Mar. 22, 2022), available on Amazon at http://bit.ly/3KfFCL6. Movants are submitting a hard copy of this book, which is designated as Exhibit 53 and will be delivered to the Court later this week.

[24] Attached to this Motion as Exhibits 35 (*Hedging Death*) and 51 (*He Watches All My Paths*) are pertinent excerpts of both novels, as included in Movants' Petition Appendix to their Petition for Certiorari at the Supreme Court filed on September 22, 2025. The pagination in these book excerpts matches that used in the Petition Appendix.

[25] *In re Acis Cap. Mgmt., L.P.*, Case No. 18-03078-sgj, Dkt. 85-2 at 190; *In re Highland Cap. Mgmt., L.P.*, Case No. 19-34054-sgj, Dkts. 74-2 at 5; 247 at 59-60; 400 at 6; 675 at 23; 883 at 57; 1719 at 7; 1761 at 33; 1810-1 at 8; 1811 at 6; 1875-5 at 6; 1895-1 at 46; 1895-6 at 60–61; 1943 at 159.

manner of complicated financial products." Ex. 35, *Hedging Death* excerpt, at 112a; Ex. 36, Mot. to Recuse at 16–17 (Dkt. 310). ("As Judge Jernigan is well aware, [Highland] and its affiliates managed hedge funds, private equity funds, CDOs, CLOs, REITs, life settlement portfolios and private investment accounts for institutions around the world—exactly the same unusual mix of investments at issue in Judge Jernigan's second 'fictional' novel."). This combination is not just rare; it is one of a kind.

The novels also make derogatory comments about hedge funds and their managers, describing them as "suck[ing] up money . . . like an i-Robot vacuum" with "outrageous amount[s] of hubris." Ex. 51, *He Watches All My Paths* excerpt, at 104a. The books further deride certain international tax structures as "byzantine," a word Judge Jernigan has frequently used to describe Dondero's companies. Ex. 35, *Hedging Death* excerpt at 144a; *Dondero v. Jernigan*, No. 24-10287, 2025 WL 1122466, at *7 (5th Cir. Apr. 16, 2025), *cert. denied*, No. 25-355, 2026 WL 79972 (U.S. Jan. 12, 2026). Moreover, *Hedging Death* describes the life-settlement industry as "creepy," and as mentioned, Highland and Dondero invested in the life-settlement industry. Ex. 35, *Hedging Death* excerpt at 117a.

Dondero and others sought recusal on the basis of these novels long before the 9019 Settlement Order. Exhibit 37, Movant's Supplemental Memorandum of Law in Support of Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455, No. 19-34054, Dkt. 3673 (Bankr. N.D. Tex. Mar. 3, 2023). On March 6, 2023, the predecessor judge denied that motion, with the same explanations provided to the Fifth Circuit Chief Judge in response to the judicial misconduct complaints. *Compare* Exhibit 38, Memorandum Opinion and Order Denying "Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455," No. 19-34054, Dkt. 3676 at 32–36 (Bankr. N.D. Tex. Mar. 6, 2023), *with* Ex. 32, Order 05-26-90042 at 5, Ex. 33, Order 05-

26-90044 at 3, & Ex. 34, Order 05-26-90045 at 2–3.

Dondero and the other parties seeking recusal then appealed. The District Court held a direct appeal of the recusal denial to be jurisdictionally improper, and that the issue could be reviewed only through a petition for writ of mandamus. Order, *Dondero et al. v. Stacey G. Jernigan*, No. 3:21-CV-0879-K, at 1, 12–13, Dkt. 39 (N.D. Tex. Feb. 9, 2022). Dondero and the other parties then filed a mandamus petition with the District Court. *See* Exhibit 39, Order re: Writ of Mandamus at 3, No. 3:23-cv-00726-S, Dkt. 25 (N.D. Tex. Mar. 8, 2024). The issue as raised on mandamus reached the United States Court of Appeals for the Fifth Circuit. After a petition for rehearing, the Fifth Circuit amended its opinion with renewed focus on the novels, and the Court observed that "[d]ue to the similarities between the characters in Chief Judge Jernigan's novel and the litigants currently before her in court, a strong argument could be made that she had a duty to recuse." *Dondero*, 2025 WL 1122466, at *7. However, the Fifth Circuit withheld relief on mandamus, reasoning that the Court could act at the interlocutory, mandamus stage only upon a "clear and indisputable abuse of discretion." *Id.* The Fifth Circuit repeatedly explained how high a bar the "clear and indisputable" standard on mandamus is, and distinguished it from the lower standard of review to be applied on appeal from a final order affected by the recusal issue. *See id.* at *4 (describing the standard as a "high burden," and explaining that "in general, if a matter is within the district court's discretion, the litigant's right to a particular result cannot be 'clear and indisputable," and that such relief is granted on disqualification "only in exceptional circumstances") (citations and quotation marks omitted).

Dondero sought Supreme Court review of the Fifth Circuit's mandamus-stage decision. *Dondero v. Jernigan*, No. 25-355 (Sup. Ct.) Unaware of the Fifth Circuit Judicial Council's parallel corrective action recusing the predecessor judge from this matter going forward, the

Supreme Court denied certiorari on January 12, 2026. Dondero timely filed a petition for rehearing based on the intervening Fifth Circuit corrective action, which is pending. *See* Petition for Rehearing, *Dondero v. Jernigan* (attached as Exhibit 52).

This Court is not restrained by the standard of review issues that appeared to be the only thing keeping the recusal decision from already having been reversed on mandamus.[26] The law is clear: A successor judge in an ongoing proceeding may reverse any prior order for any reason and without deference to the rulings of the previous judge. *Abshire v. Seacoast Prods., Inc.*, 668 F.2d at 837–38. That is because the prior rulings become those of the replacement judge when addressed on appeal from a final order in the case. This Court can and should do the following: Determine that, as the Fifth Circuit put it, the "strong argument that [the predecessor judge] had a duty to recuse" disqualified her from ruling on and deprived her of authority to enter the 9019 Order, thus voiding it. Because this Court is not sitting as a reviewing court, no standard of review or extremely elevated showing required on mandamus restrains it from taking such action. This Court, instead, is cleaning up one aspect of the docket so that the reviewing courts are not presented with a problem when this issue arrives on direct review. As the Supreme Court has made clear, successor judges should use Rule 60 even after final judgment (and presumably other authorities before) to void orders by a judge who was disqualified from acting in a matter under 28 U.S.C. §

[26] Dugaboy, Dondero, and others continue to contest that the standard of appellate review of orders denying recusal is abuse of discretion. Congress made recusal under certain circumstances—including where a judge's impartiality may be reasonably questioned—mandatory, not optional or discretionary. 28 U.S.C. § 455(a) (mandating that a judge "*shall* disqualify himself in any proceeding in which his impartiality might reasonably be questioned") (emphasis added); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (explaining that "the mandatory 'shall[]'" in a statute "normally creates an obligation impervious to judicial discretion"). Moreover, no one is a particularly good judge of her own misconduct, making *de novo* review particularly appropriate when the grounds of recusal overlap with violations of the rules of judicial conduct. *See* Ex. 32, Order 05-26-90042 at 4–5, Ex.33, Order 05-26-90044 at 3, & Ex. 34, Order 05-26-90045 at 2. For these and other reasons, the Seventh Circuit reviews a judge's decision not to recuse *de novo*. *United States v. Balistrieri*, 779 F.2d 1191, 1202–03 (7th Cir. 1985).

455.

Given the predecessor judge's disqualification and lack of authority, this Court should reconsider the 9019 Settlement Order on a "clean slate." *See Demodulation, Inc. v. United States*, 114 Fed. Cl. 655, 657 (2014) ("[I]f the orders of the now-recused judge were allowed to stand, Plaintiff could one day wonder whether the outcome of the case was influenced by a judge who later recused herself from the case"). The Court should vacate that order, subject to Highland somehow reasserting its motion to approve the settlement if the circumstances now extant with the evidence of Patrick's misconduct could possibly support such a move.

## IV. CONCLUSION

Highland's bankruptcy has been long and complicated, but the issues raised by Dugaboy's Motion are not. Something very bad happened here, and the Bankruptcy Court's Rule 9019 Settlement Order facilitated that conduct. This Court should ensure that all bankruptcy constituents act fairly and free of fraud. Recent events make clear that the 9019 Settlement at issue was tainted by both, and the Court should exercise its considerable discretion to reconsider and vacate the Rule 9019 Settlement Order.

Dated: February 9, 2026

Respectfully submitted,

*/s/ John Michael Gaddis*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on February 9, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ John Michael Gaddis*
John Michael Gaddis

# Proposed Order

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054-sjg11 |

**[PROPOSED] ORDER DUGABOY INVESTMENT TRUST'S MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

This Court has considered The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate (the "**Motion**"), seeking (1) reconsideration of the Court's Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, No. 19-34054-sgj11, Dkt. 4297 (Bankr. N.D. Tex. June 30, 2025) (the "Rule 9019 Settlement Order"); (2) relief under Federal Rule of Bankruptcy Procedure 9024 and Federal Rule of Civil Procedure 60(b); and (3) vacatur of the Rule 9019 Settlement Order pursuant to the

Court's inherent power. Based on the evidence and argument presented by the parties, the Court hereby finds and concludes that the Motion is well taken. Accordingly, it is hereby **ORDERED THAT**:

1. The Motion is **GRANTED**.

2. The Court's Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, No. 19-34054-sgj11, Dkt. 4297 (Bankr. N.D. Tex. June 30, 2025), is hereby **VACATED**.

3. The settlement approved by the Rule 9019 Settlement Order is hereby **SET ASIDE** and is of no further force or effect.

4. To the extent any party seeks to reassert the proposed settlement or any portion thereof, such party may file an appropriate motion, subject to the rights of all interested parties to object in light of the evidence now available regarding Mark Patrick's alleged fraud and misconduct.

5. The Court retains jurisdiction to hear and determine all matters arising from or related to the implementation of this Order.

# # # End of Order # # #

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

| Exhibit No. | Document |
|---|---|
| Dugaboy Proposed Order | |
| Appendix A Pre-9019 Settlement Hunter Mountain Litigation Efforts | |
| 1 | Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, No. 19-34054-sgj11, Dkt. 4297 (Bankr. N.D. Tex. June 30, 2025) ("Rule 9019 Settlement Order") |
| 2 | Transcript of Status and Scheduling Conference Hearing Held 12/6/19 at 23:2–15, Dkt. 207 |
| 3 | Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd. to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, Dkt 4231("Charities' Obj.") |
| 4 | DAF's original organizational chart ("DAF Org Chart") |
| 5 | Rand Advisors, LLC Form ADV Part 2A (March 2021) |
| 6 | *Kirschner v. Dondero*, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex.), Dkt. 158 |
| 7 | Notice of Occurrence of Effective Date of Confirmed Plan of Reorganization, Dkt. 2700 |
| 8 | *Kirschner v. Dondero*, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex.), Dkt. 1 |
| 9 | Order Pursuant to Plan "**Gatekeeper Provision**" and Pre-Confirmation "Gatekeeper Orders": Denying Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding, Dkt. 3904 |
| 10 | Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding ("Motion for Leave"), Dkt. 3699 |
| 11 | Order, *Hunter Mountain Inv. Trust v. Highland Cap. Mgmt., L.P.*, No. 3:23-cv-02071-E (N.D. Tex. Mar. 21, 2025), Dkt. 44 |
| 12 | Complaint to (I) Compel Disclosures About the Assets of the Highland Claimant Trust and (II) Determine (A) Relative Value of Those Assets, and (B) Nature of Plaintiffs' Interests in the Claimant Trust, *The Dugaboy Investment Trust v. Highland* |

| | |
|---|---|
| | *Cap. Mgmt., L.P.*, No. 23-03038-sgj (Bankr. N.D. Tex. May 10, 2023), Dkt. 1 ("Valuation Litigation") |
| 13 | Memorandum Opinion and Order Granting Motion to Dismiss Adversary Proceeding in Which Contingent Interest Holders in Chapter 11 Plan Trust Seek a Post-Confirmation Valuation of Trust Assets, Adv., Dkt. 27, No. 23-03038 |
| 14 | Notice of Appeal, *The Dugaboy Inv. Trust v. Highland Cap. Mgmt., L.P.*, No. 3:24-cv-01531-X (N.D. Tex. Aug. 29, 2025), Dkt. 32 |
| 15 | *The Dugaboy Inv. Trust v. Highland Cap. Mgmt., L.P.*, No. 25-10999 (5th Cir. Oct. 1, 2025), Dkt. 32 |
| 16 | Motion for Leave to File a Delaware Complaint ("Delaware Motion for Leave"), Dkt. 4000 |
| 17 | Highland's Motion to Stay Contested Matter or for Alternative Relief, Dkt. 4013 |
| 18 | Order Extending Stay of Contested Matter, Dkt. 4104 |
| 19 | Organizational chart reflecting the DAF Restructuring |
| 20 | Email from Shawn Raver to Chris Rice dated Feb. 20, 2025 |
| 21 | Email from Chris Rice to Skyview Group dated Mar. 12, 2025 |
| 22 | Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith ("9019 Motion"), Dkt. 4216 |
| 23 | Transcript of Hearing dated June 25, 2025 ("9019 Hr'g Tr.") |
| 24 | Settlement Agreement & General Release, Dkt. 4217-1 |
| 25 | Preliminary Objection of The Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities, Dkt. 4230 |
| 26 | Notice of Hearing Held 6/25//2025, Dkt. 4295 |
| 27 | Stipulation Withdrawing Objection of the Dallas Foundation and Crown Global Life Insurance, Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, Dkt. 4291 ("Withdrawal Stip.") |
| 28 | Letter from Ken Paxton re: Request for a Stay; Dkt. 4308 |

| | |
|---|---|
| 29 | Notice of Appeal, Dkt. 4311; Ex. 30, The Dugaboy Investment Trust's Motion to Stay 9019 Order, Dkt. 4326 ("Dugaboy Motion to Stay") |
| 30 | The Dugaboy Investment Trust's Motion to Stay 9019 Order, Dkt. 4326 |
| 31 | Memorandum Order and Opinion Regarding Stay Requests, Dkt. 4333 ("Stay Order") |
| 32 | Order 05-26-90042 |
| 33 | Order 05-26-90044 |
| 34 | Order 05-26-90045 |
| 35 | Stacey G. Jernigan, *Hedging Death*, White Bird Publications (Mar. 22, 2022) (excerpt) |
| 36 | Memorandum of Law in Support of Highland Capital Management Fund Advisors, L.P.'s Motion to Recuse at 16–17, *Highland Cap. Mgmt. L.P. v. Kirschner*, Adv. Proc. No. 21-03076, Dkt. 310 (Bankr. N.D. Tex. Feb. 27, 2023) ("Motion to Recuse") |
| 37 | Movant's Supplemental Memorandum of Law in Support of Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455, No. 19-34054, Dkt. 3673 (Bankr. N.D. Tex. Mar. 3, 2023) |
| 38 | Memorandum Opinion and Order Denying "Amended Renewed Motion to Recuse Pursuant to 28 U.S.C. § 455," No. 19-34054, Dkt. 3676 at 32–36 (Bankr. N.D. Tex. Mar. 6, 2023) |
| 39 | Order re: Writ of Mandamus at 3, No. 3:23-cv-00726-S, Dkt. 25 (N.D. Tex. Mar. 8, 2024) |
| 40 | Original organizational chart for Hunter Mountain ("Hunter Mountain Org Chart") |
| 41 | Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief, Dkt. 1943 ("Confirmation Order") |
| 42 | Notice of Appeal, Dkt. 4111 |
| 43 | Voluntary Petition, Dkt. 3 |
| 44 | Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 281 |

| | |
|---|---|
| 45 | Motion to Compel Compliance with Bankruptcy Rule 2015.3, Dkt. 2256 |
| 46 | Order Denying Motion to Compel Compliance with Bankruptcy Rule 2015.3, Dkt. 2812 |
| 47 | Deferred Variable Annuity Policy No. 30218 dated as of December 10, 2015, issued to Empower Dallas as Policyholder and Beneficiary |
| 48 | Rand Fund 2024 Audit |
| 49 | Transcript of Deposition of Mark Patrick (June 23, 2025) |
| 50 | Amended and Restated Limited Partnership Agreement of Atlas Fund as of November 30, 2015 at § 3.01 |
| 51 | Stacey G. Jernigan, *He Watches All My Paths*, SJ Novels (self-published) (Jan. 16, 2019) (excerpt) |
| 52 | Petition for Rehearing in the Supreme Court |
| 53 | Stacey G. Jernigan, *Hedging Death*, White Bird Publications (Mar. 22, 2022) (full text) |
| 54 | Stacey G. Jernigan, *He Watches All My Paths*, SJ Novels (self-published) (Jan. 16, 2019) (full text) |

# Appendix A

**Appendix A**

**Pre-9019 Settlement Hunter Mountain Litigation Efforts**

- In March 2023, Hunter Mountain sought leave to file a verified adversary proceeding against Seery, Highland, and the Highland Claimant Trust, among others, alleging claims for breach of fiduciary duty, conspiracy, and unjust enrichment and seeking hundreds of millions of dollars in damages. Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding, Dkt. 3699 ("Motion for Leave"). The Bankruptcy Court denied the Motion for Leave, Hunter Mountain appealed, and the United States District Court for the Northern District of Texas *sua sponte* remanded the case for further proceedings consistent with instructions given by the Fifth Circuit in a related proceeding. *See* Gatekeeper Order, Dkt. 3904; Order, *Hunter Mountain Inv. Trust v. Highland Cap. Mgmt., L.P.*, No. 3:23-cv-02071-E, Dkt. 44 (N.D. Tex. Mar. 21, 2025). Had it been allowed to proceed, the suit conservatively sought approximately $260 million in damages.

- In May 2023, Dugaboy and Hunter Mountain filed an adversary complaint seeking to compel disclosure of the assets in the Claimant Trust and determine whether former equity holders were "in the money" such that their Contingent Claimant Trust Interests should be treated as vested. *See* Complaint to (I) Compel Disclosures About the Assets of the Highland Claimant Trust and (II) Determine (A) Relative Value of Those Assets, and (B) Nature of Plaintiffs' Interests in the Claimant Trust, *The Dugaboy Investment Trust v. Highland Cap. Mgmt., L.P.*, No. 23-03038-sgj, Dkt. 1 (Bankr. N.D. Tex. May 10, 2023) ("Valuation Litigation"). The Bankruptcy Court dismissed the adversary proceeding, and Dugaboy and Hunter Mountain appealed the dismissal all the way to the Fifth Circuit. *See* Memorandum Opinion and Order Granting Motion to Dismiss Adversary Proceeding in Which Contingent Interest Holders in Chapter 11 Plan Seek a Post-Confirmation Valuation of Trust Assets, *The Dugaboy Inv. Trust v. Highland Cap. Mgmt., L.P.*, Adv. Proc. No. 3:23-03038-sgj, Dkt. 27; Notice of Appeal, *The Dugaboy Inv. Trust v. Highland Cap. Mgmt., L.P.*, No. 3:24-cv-01531-X, Dkt. 32 (N.D. Tex. Aug. 29, 2025). The Fifth Circuit ordered a briefing schedule in the case on October 1, 2025. *The Dugaboy Inv. Trust v. Highland Cap. Mgmt., L.P.*, No. 25-10999, Dkt. 32 (5th Cir. Oct. 1, 2025). If successful, the lawsuit could have revealed information about the level and use of assets that bankruptcy management had been unwilling to disclose and that would undermine Highland's contentions that former equity holders held no interest in the estate.

- In January 2024, Hunter Mountain filed a contested matter seeking leave to file a Delaware complaint to remove Seery as Claimant Trustee due to breaches of fiduciary duty and irreconcilable conflicts of interest. *See* Motion for Leave to File a Delaware Complaint, Dkt. 4000. Highland moved to stay the contested matter pending resolution of the Valuation Litigation, the Bankruptcy Court issued an order staying the matter, and Hunter Mountain appealed the stay order. Highland's Motion to Stay Contested Matter or for Alternative Relief, Dkt. 4013; Order Extending Stay of Contested Matter, Dkt. 4104; Notice of Appeal, Dkt. 4111. If successful, that lawsuit could have ended the diversion of assets to an increasingly sizeable Indemnity Trust and put tens of millions back into the estate's coffers.

# Exhibit 1

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 30, 2025**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § | |

**ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT BETWEEN THE HIGHLAND ENTITIES AND THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

This matter having come before the Court on the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216] (the "Motion")[2] filed by Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland") in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are 8357. The headquarters and service address for the Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion or the Settlement Agreement, as applicable.

Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"); and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 as well as the retention of jurisdiction provisions of the Plan; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue in this District being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having considered (a) the Motion, (b) *Patrick Daugherty's Objection to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4229] (the "Daugherty Objection") filed by Patrick Daugherty, (c) the *Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities* [Docket No. 4230] (the "Dugaboy Objection," and together with the Daugherty Objection, the "Objections"), filed by The Dugaboy Investment Trust, (d) the *Objection of the Dallas Foundation and Crown Global Life Insurance Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4231] (the "Charitable Foundation Objection"), filed by The Dallas Foundation (the "Dallas Foundation") (on behalf of Empower Dallas Foundation ("EDF") and The Okada Family Foundation ("Okada Family"), and Crown Global Life Insurance, Ltd., not individually, but solely in respect of Segregated Accounts 30218 and 30219 ("Crown"), (e) the evidence admitted into the record during the hearing on the Motion on June 25, 2025 (the "Hearing") in support of, and in opposition to, the Motion, including the Court's assessment of the witnesses' credibility, and (f) all arguments heard at the Hearing in connection therewith; and the Court having found that the legal and factual bases set forth in the Motion establish sufficient

cause for the relief granted herein; and adequate notice of the Motion having been given; and after due deliberation and good cause appearing therefor,

**THE COURT HEREBY FINDS THAT:**

1. The Court's findings of fact and conclusions of law set forth on the record at the conclusion of the Hearing are incorporated by reference except as supplemented in this Order, and as may be further supplemented by the Court.

2. Entry into the Settlement Agreement is an appropriate exercise of the Movants' business judgment.

3. The Settlement Agreement is fair, reasonable, and in the best interests of each of the Highland Entities and their creditors and constituents.

4. The Settlement Agreement was negotiated and entered into by the Highland Entities and the HMIT Entities without collusion or fraud, in good faith, and was the product of arm's- length negotiations.

5. The HMIT Entities are not "insiders" or "affiliates" of Highland as those terms are defined in Bankruptcy Code sections 101(31) and 101(2).

6. The HMIT Entities entered into the Settlement Agreement, are acquiring the Transferred Claims and Dugaboy Note in good faith, and have proceeded with all aspects of the Settlement Agreement in good faith, and have received fair value in consideration of their entry into the Settlement Agreement.

7. The Transferred Claims and Dugaboy Note are property of the estate, and the Highland Entities' sale of those assets free and clear of all liens and encumbrances but otherwise subject to the Settlement Agreement is a proper exercise of their business judgment.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED THAT:**

8. The Motion is **GRANTED**.

9. As stated on the record during the Hearing, The Charitable Foundation Objection is withdrawn with prejudice.

10. All other Objections to the Motion are overruled.

11. The Settlement Agreement attached as **Exhibit 1** to the Demo Declaration is approved in all respects pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and section 363(b) of the Bankruptcy Code.

12. HMIT's Class 10 Interest is Allowed in the amount of $336,940,230.58.

13. The HMIT Entities, as good faith purchasers of Estate assets in the Settlement, are entitled to the protections contained in section 363(m) of the Bankruptcy Code.

14. The Highland Entities and their agents are authorized to take any and all actions necessary or desirable to implement the Settlement Agreement without further notice or further Court approval.

15. Notwithstanding anything in the Settlement Agreement to the contrary, none of the Dallas Foundation, EDF, Okada Family, or Crown (collectively, the "Foundation Parties") are or will be included in the definitions of "HMIT Releasors" or "Highland Releasors." For the avoidance of doubt, however, any attempt by the Foundation Parties to assert a Claim against a HMIT Released Party by, through, or under, including derivatively, a Highland Entity, or against a Highland Released Party by, through, or under, including derivatively, a HMIT Entity is barred by this Order and the Settlement Agreement.

16. The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

**### END OF ORDER ###**

# Exhibit 2

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 19-34054-sgj11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) STATUS/SCHEDULING CONFERENCE |
| Debtor. | ) |
| | ) December 6, 2019 |
| | ) Dallas, Texas |

Appearances:

| | |
|---|---|
| For the Debtor: | Jeffrey N. Pomerantz<br>Ira D. Kharasch<br>Pachulski Stang Ziehl & Jones LLP<br>10100 Santa Monica Boulevard, 13th Floor<br>Los Angeles, California 90067 |
| | Chuck Gibbs<br>Katten Muchin Rosenman LLP<br>1301 McKinney Street, Suite 3000<br>Houston, Texas 77010 |
| For the Official Committee of Unsecured Creditors: | Matthew A. Clemente<br>Penny P. Reid<br>Paige Holden Montgomery<br>Charles M. Persons<br>Sidley Austin LLP<br>One South Dearborn<br>Chicago, Illinois 60603 |
| For ACIS Capital Management: | Brian Shaw<br>Winstead PC<br>2728 North Harwood Street, Suite 500<br>Dallas, Texas 75201 |
| For the U.S. Department of Justice: | Lisa Lambert, Assistant U.S. Trustee<br>Office of the U.S. Trustee, Region 6<br>William T. Neary, U.S. Trustee<br>1100 Commerce Street, Room 976<br>Dallas, Texas 75242-1496 |

Appearances continued on next page.

Appearances continued:

| | |
|---|---|
| For the Redeemer Committee of the Highland Crusader Fund: | Mark A. Platt<br>Frost Brown Todd LLC<br>100 Crescent Court, Suite 350<br>Dallas, Texas 75201 |
| For Alvarez & Marsal CRF Management, LLC: | Michael A. Rosenthal<br>Gibson Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, New York 10066 |
| (via telephone:) | |
| For the Debtor: | John A. Morris<br>Pachulski Stang Ziehl & Jones LLP<br>780 Third Avenue, 34th Floor<br>New York, New York 10017 |
| For the Redeemer Committee of the Highland Crusader Fund: | Marc B. Hankin<br>Jenner & Block LLP<br>919 Third Avenue<br>New York, New York 10022-3098 |
| | Terri Mascherin<br>Jenner & Block LLP<br>353 North Clark Street<br>Chicago, Illinois 60654-3456 |
| For Jefferies LLC: | Patrick C. Maxcy<br>Dentons US LLP<br>233 South Wacker Drive, Suite 5900<br>Chicago, Illinois 60606-6361 |
| Digital Court Reporter: | United States Bankruptcy Court<br>Northern District of Texas<br>Michael F. Edmond Sr., Judicial Support Specialist<br>Earle Cabell Building, U.S. Courthouse<br>1100 Commerce Street, Room 1254<br>Dallas, Texas 75242<br>(214) 753-2062, direct; 753-2072, fax |
| Certified Electronic Transcriber: | Palmer Reporting Services<br>1948 Diamond Oak Way<br>Manteca, California 95336-9124 |

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

Friday, December 6, 2019 9:35 o'clock a.m.

P R O C E E D I N G S

COURT SECURITY OFFICER: All rise. The United States Bankruptcy Court for the Northern District of Texas, Dallas Division, is now in session, the Honorable Stacey Jernigan presiding.

THE COURT: All right. Please be seated.

All right. We have a larger crowd in the courtroom than I thought we might, also lots of people on the phone. Let's start by getting appearances from the lawyers in the courtroom who wish to appear.

MR. GIBBS: Good morning, Your Honor.

THE COURT: Good morning.

MR. GIBBS: Chuck Gibbs from Katten Muchin. We had filed a notice of appearance as proposed co-counsel for the debtor on Wednesday and had filed the notice of scheduling for today's status conference. We had agreed on Wednesday when we were contacted to represent Highland Capital subject to clearance of conflicts. And late last night a conflict arose that we can't resolve, so we will not be able to accept the representation, but I got a limited waiver to appear today for the primary purpose of introducing the lead counsel for the debtor, the Pachulski Stang, in particular Jeff Pomerantz and Ira Kharasch, and they will handle the hearing today.

THE COURT: Okay. Thank you.

MR. GIBBS: Thank you.

MR. POMERANTZ: Good morning, Your Honor.

MR. KHARASCH: Good morning, Your Honor.

THE COURT: Good morning.

MR. CLEMENTE: Excuse me. Good morning, Your Honor. Matthew Clemente from Sidley Austin, proposed counsel to the Official committee of Unsecured Creditors. With me in the courtroom today are my colleagues, Ms. Penny Reid, —

THE COURT: Good morning.

MR. CLEMENTE: — Ms. Paige Montgomery, and Mr. Charles Persons. They have filed a pro hac vice for me. I don't believe it's been entered yet, but with Your Honor's indulgence, please allow me to address the Court later today.

THE COURT: You certainly may.

MR. CLEMENTE: Thank you so much. I appreciate it.

THE COURT: And I think Ms. Reid and I went to law school together, but we —

MS. REID: It's been a few years.

THE COURT: — haven't seen each other in 30 years.

All right. Good to see you after all these years.

MR. SHAW: Good morning, Your Honor. Brian Shaw —

THE COURT: Good morning.

MR. SHAW: — on behalf of ACIS Capital Management. Ms. Patel is delayed by a medical appointment, but she is on her way as well.

THE COURT: Okay. Good morning.

MR. SHAW: Thank you. Good morning.

MR. PLATT: Good morning, Your Honor. Mark Platt from Frost Brown Todd on behalf of the Redeemer Committee of the Highland Crusader Fund. I believe on the phone is Terri Mascherin and Marc Hankin — and from the Jenner and Block firm.

THE COURT: Okay. Thank you.

MS. LAMBERT: May it please the Court, my name is Lisa Lambert. I represent the United States Trustee William Neary.

THE COURT: Good morning.

MR. ROSENTHAL: Good morning, Your Honor. Michael Rosenthal from Gibson Dunn and Crutcher. I represent Alvarez and Marsal, as investment manager of the Highland Crusader Funds.

THE COURT: Okay. Thank you.

All right. Now we will look to the phone list. Of this you wish to appear, — well, I'll just call the people who have asked for a live line.

Asif Attarwala for UBSC; are you there?

(No audible response.)

THE COURT: All right. How about Jeff Bjork, also with that firm, for UBSC?

(No audible response.)

THE COURT: All right. Andrew Plubock (phonetic) for UBSC; are you on the phone?

(No audible response.)

THE COURT: Well, how about this: Anyone on the phone who wishes to appear go ahead. I'm all ears.

MR. MAXCY: Good morning, Your Honor. This is Patrick Maxcy from Dentons US LLP on behalf of Jefferies LLC. My — my pro hac vice motion, application was really filed this afternoon and notice of appearance. I ask your indulgence to allow me to appear today.

THE COURT: Okay. Yes, you may appear today.

Anyone else?

MR. MAXCY: Thank you, Your Honor.

MS. MASCHERIN: Yes. Your Honor, Terri Mascherin of Jenner and Block. Mr. Platt has already introduced my colleague Mark Hankin and I. We represent the Redeemer Committee of the Highland Crusader Fund.

THE COURT: All right. Good morning to you.

Anyone else?

MR. MORRIS: Your Honor, it's John Morris — excuse me — from Pachulski Stang Ziehl and Jones, on behalf of the debtor.

THE COURT: All right. Good morning.

Anyone else?

(No audible response.)

THE COURT: All right. Well, we're here obviously for what we've called a status/scheduling conference. A couple of housekeeping matters.

We do have pulled over to the Dallas docket now all of the pleadings that were filed in the Delaware case. So just for your ease of operation, if you will. I think we've got a complete docket now in Dallas.

Obviously I'm going to defer to Highland at the outset to see what it thinks we need to accomplish today. I'll tell you that I did pull up — my law clerk pulled up the agenda that was on file in Delaware for the hearing earlier this week, December 2nd. I saw that there were 12 matters on it. One was venue the motion, so there are 11 matters. Looks like two didn't really need court hearing time. Interim orders have become final.

So I guess — one thing I'm going to ask you: Do we have nine matters — doing the math subtraction — that need hearings and how soon? Four or five of those look like employment matters. So I'll defer now to Highland's counsel to see what you think we need to accomplish today, but I figure this agenda is one of the things we need to talk about.

MR. POMERANTZ: Good morning, Your Honor. Again it's Jeff Pomerantz and Ira Kharasch from Pachulski Stang Ziehl Jones, representing the debtor. Good to be in Your Honor's courtroom.

What I thought I would do is I would like to introduce some people on behalf of the debtor who are here with me. And then I thought it might be helpful for Your Honor for me to give

Case 19-34054-sgj11 Doc 207 Filed 12/06/19 Entered 12/06/19 01:55:54 Page 8 of 27
Exhibit 2 Page 9 of 28



Your Honor a little background on the case, what transpired in Delaware, how we got here, and then some thoughts about where we're going.

THE COURT: Okay, that would be good.

MR. POMERANTZ: Your Honor, in the courtroom sitting in the first row is Mr. Brad Sharp.

THE COURT: Good morning.

MR. POMERANTZ: He is the managing director of DSI. He is the debtor's proposed chief restructuring officer.

THE COURT: Okay.

MR. POMERANTZ: Also as I will discuss in a few moments, the debtor is in discussions with the creditors committee with respect to some management changes, significant management changes, and in connection with that the appointment of the new board. The debtor has identified certain people to serve on that board. While those people have not yet been agreed to and you will hear it's the subject of discussion, we invited Judge Lee Clark (phonetic) to be here. He is one of the debtor's proposed —

THE COURT: Well, good morning. I just now saw you.

MR. CLARK: Here I am.

THE COURT: Okay. Nice to see you.

MR. POMERANTZ: So his presence should be nothing other than he is one of the debtor's proposed people. We are in conversations, as you will hear, with the committee on the

management training.

THE COURT: Very good.

MR. POMERANTZ: So, Your Honor, Highland is a multibillion dollar global asset management fund. There are 75 employees in Dallas and its affiliates have approximately 50 employees at locations around the world. It directly manages two and a half billion dollars of assets and also provides shared services for additionally seven and a half billion dollars of assets. And the assets consist primarily of public securities, interests in private equity funds, interest in hedge funds. And there are assets located all around the world, Singapore, Latin America, and Korea.

The debtor commenced the case on October 16th as a result of an adverse arbitration ruling in a dispute between the debtor and the Redeemer Committee, which was a committee appointed in connection with the winddown of one of Highland's Funds, the Crusader Fund. The debtor lacked the liquidity to satisfy the Redeemer arbitration award, and the debtor sought Chapter 11 protection to provide a time to develop a restructuring plan with respect to how it would address those claims as well as other claims.

The debtor retained our firm on approximately September 26th. And based upon our understanding of the claims that were asserted in the Redeemer matter, prior proceedings in this Court, as well as the claims of other creditors, we

Case 19-34054-sgj11 Doc 207 Filed 12/08/19 Entered 12/08/19 01:53:54 Page 10 of 27
Exhibit 2 Page 10 of 28



recommended that the debtor appoint a chief restructuring officer with expanded powers. The debtor retained Brad Sharp and DSI October 7th. And I'm not sure if the Court is familiar with Mr. Sharp and DSI, but DSI is a nationally-recognized restructuring and financial advisory firm headquartered in Chicago. And Mr. Sharpe served as the chief restructuring officer in a variety of extremely challenging cases. And he is known too and respected by the committee.

Mr. Sharp has been serving as the chief restructuring officer for the past two months. And he and his lieutenant Fred Caruso (phonetic) have been onsite at the debtor almost every day since then as well as several other DSI personnel. And, as a result, they have developed a substantial amount of knowledge regarding the debtor's operations, its business, its assets, and its liabilities. Importantly, Your Honor, since DSI's retention there have been no allegations of any postpetition misconduct; and DSI has been and will continue to be accessible to the committee as well as answerable to the Court and transparent with respect to the debtor's operations.

While under the Bankruptcy Code the debtor can operate in the ordinary course without Bankruptcy Court approval, Mr. Sharp and our firm thought that especially in a case like this and given the debtor's operations, it was unclear how the ordinary course standard should be applied to an asset-management firm such as Highland. This is especially true

giving the — given the interconnective relationship the debtor has with a lot of its affiliates and inside. Also we felt it was collect — we collectively felt it was important to be transparent with the creditors in the Court in light of the allegations that have been made in various forums against the debtor relating to certain of its prepetition conduct. As a result, Pachulski Stang and DSI work with the debtor to develop a series of protocols that would outline what is and what is not an ordinary course transaction. And in developing those protocols, the debtor tried to balance the concerns of a fair and transparent process with creditor input with the necessary time exigencies, given the company such as the debtor and the need to quickly transact business.

The committee was formed on October 29th, and the debtor and its professionals immediately engaged with the committee and their professionals in a dialogue to discuss a variety of things, including the nature and scope of the CRO's duties, the ordinary course protocols, and other matters relating to the debtor's business. And such efforts have included the debtor providing a substantial amount of discovery, both informal and formal to the committee; and also having several of the debtor personnel, including the CRO, sit for depositions.

The committee filed its motion-to-transfer-venue motion early on in the case. And while for the better part of

Case 19-34054-sgj11 Doc 207 Filed 12/08/19 Entered 12/08/19 01:55:54 Page 12 of 27




the last three weeks, the parties have been focused on written discovery and depositions, the debtor has also worked with the committee to narrow the disputes that were pending before Judge Sontchi on December 2nd. While the parties made some progress and several orders had been entered, including I think some of the items Your Honor may see on the docket, they had not reached agreement by December 2nd on a variety of issues.

In addition to the venue matter, the following four motions were the motions that were to be contested at the hearing on the 2nd. First, the motion to obtain the chief restructuring officer. Second, the protective motion to approve ordinary-course protocols. Third, the cash-management motion. And, fourth, the motion to approve the retention of Foley Gardere and Lynn Pinker as special litigation counsel.

After Judge Sontchi granted the committee's motion to transfer venue, he declined to rule on the remaining motions, instead deferring to Your Honor. For the reasons I will explain in a couple of moments, Your Honor, we do not believe that the Court right now at this hearing needs to schedule those motions for hearing. Rather, we will be seeking a continued hearing, perhaps for later next week, to discuss the results of what I'm about to describe to the Court.

Leading up to today, the debtor has engaged the committee on an alternative corporate governing structure that we hope will address the committee's concerns with the

management and operation of the debtor, and will allow the parties to start working consensually and constructively towards a reorganization plan.

The debtor has heard the committee loud and clear, Your Honor, that the committee does not want Mr. Dondero to be in this position to manage the debtor's operations. Accordingly, the debtors have informed the committee that Mr. Dondero is willing to resign from any and all positions of the debtor, and use his authority over the debtor's general partner to appoint an independent board that would be in charge with managing the debtor. Mr. Dondero would further agree that any further changes to the board could only be made with the committee's consent. The CRO would remain. It would be the senior most employees answering directly to the board.

While Mr. Dondero will no longer be in a position of control with the debtor, the committee and the debtor will be discussing whether maximizing the estate's assets will need to include Mr. Dondero being involved with the debtor in some capacity, subject to appropriate controls. That is because the debtor may lose certain valuable revenue streams if Mr. Dondero is not associated with the business, based upon the various contracts the debtor was a party to.

In any event, Your Honor, that decision will be made first in the first instance subject to this committee's consent and, second, subject to the directly of the board. The debtor

has actually provided documents to the committee that Mr. Dondero has signed effectuating these management changes, and those documents are being held in our, my firm's, possession and trust, pending approval of the Court.

The debtor signed these documents not to be presumptuous enough that the committee would accept them without modification. Rather, the debtor wanted to impress upon the committee and this Court that the proposal is more than just a concept, and then Mr. Dondero is serious about change.

Last night we received a termsheet from the committee regarding the governance proposal. And as recently as right before this hearing, we have had further discussions with committee counsel, and we expect that dialogue to continue over the next few days.

I believe the debtor and the committee both recognize this case is at a crossroads and it takes some time — and it makes sense to take some time to see if the parties can reach an agreement on a consensual path forward. And I think I speak for the debtor and the committee in saying that achieving a consensual resolution on governance control is more preferable than time-consuming and costly litigation of what would likely be a trustee motion, a deal I think would also be better for the business and allow the stakeholders to focus on the business and not on litigation. It is for this reason, Your Honor, that we request that the Court continue this hearing until perhaps later

next week, consistent with the Court's calendar. And by that time, I think, Your Honor, it will be clear whether the debtor and the committee have reached a deal for which we would seek approval from Your Honor, which can be sought under appropriate notice or whether the case will go in another direction, which will likely involve one or more motions for a trustee and litigation over those motions.

Based upon the ongoing dialogue, the committee has told the debtor that while of course it reserves the right to file a trustee motion at any time, it is not seeking that relief today.

The debtor wants the Court and the committee to be assured that pending any resolution or any litigation, the debtor will continue to comply with the protocols that were shared with the committee in advance of the December 2nd hearing — there are further modifications that make it even more stringent than what is on the docket — and that either Mr. Sharp or Mr. Caruso, his lieutenant, will be onsite at the debtor's headquarters pending whatever outcome is reached.

Your Honor, I'm happy to answer any further questions you might have.

THE COURT: All right. Well, before I ask questions I'll ask does the committee want to speak up —

MR. CLEMENTE: Yes, Your Honor.

THE COURT: — and give its own version, consistent or

Case 19-34054-sgj11 Doc 207 Filed 12/06/19 Entered 12/06/19 01:33:54 Page 16 of 27




not consistent, with this.

MR. CLEMENTE: Good morning, Your Honor. Matthew Clemente from Sidley Austin on behalf of the committee. It is a pleasure to be in front of Your Honor this morning.

If I could just maybe make a few preliminary comments to provide Your Honor with some background that Mr. Pomerantz didn't cover, and then we can talk a little bit further about what Mr. Pomerantz did talk about.

THE COURT: By the way, —

MR. CLEMENTE: Yes.

THE COURT: — you're probably going to get to this, but who are the members of the committee —

MR. CLEMENTE: Yes. That's exactly my first starting point, Your Honor.

THE COURT: Okay, very good.

MR. CLEMENTE: I would say great minds, but I wouldn't consider mine a great mind, so, Your Honor, it is a four-member committee.

THE COURT: Okay.

MR. CLEMENTE: And the committee consists of the following parties: The Redeemer Committee of the Highland Crusader Fund. Your Honor, this is a formal committee appointed — there was a Bermuda winddown proceeding for the Crusader Fund, and that was a committee appointed in connection with that winddown proceeding.

The second member of the committee, Your Honor, is ACIS Capital Management, L.P. and ACIS Capital Management, GP, LLP. I believe Your Honor is familiar with ACIS.

THE COURT: Yes.

MR. CLEMENTE: The third member, Your Honor, is UBS Securities, LLC and UBS AG London Branch.

The fourth member, Your Honor, is Meta-e Discovery, and Meta-e Discovery is a trade vendor to the debtor.

The committee hired Sidley on October 29th, 2019, and hired FTI as its financial advisor on November 6th, 2019. Now that we're before Your Honor, we will be filing our retention application very shortly.

It is important to note, Your Honor, that three of the four members of the committee, the Redeemer Committee, ACIS, and UBS, all have extensive experience litigating with Highland, several of the unaffiliated myriad Highland entities — excuse me — nondebtor affiliated Highland entities and Mr. Dondero, the sole person in control of Highland — Highland Capital Management — excuse me — who is our debtor here. The vast majority of claims in terms of dollar amount, Your Honor, in this case arise from litigation claims against the debtor. And, in fact, as Mr. Pomerantz stated, the precipitating factor behind the bankruptcy filing was the arbitration award obtained by the Redeemer Committee.

So, Your Honor, we do not believe that this is a case

where the balance sheet became over levered. Instead, this is a case driven by litigation claims arising out of conduct with this debtor prior to the bankruptcy.

Although the schedules have not yet been filed, Your Honor, I believe they're due to be filed shortly, within the next week or two. We do not believe there are other large creditors, secured or unsecured, that exist, but there are two secured creditors that we are aware of. Jefferies is a name Your Honor may have seen. They're owed, I believe, approximately $30 million, and they are significantly over secured by virtue of a trading account. It's a margin loan, I believe.

Frontier Bank, Your Honor, is owed approximately $5 million, and we also believe they are significantly over secured.

So from the committee's perspective, Your Honor, I provide you with that background because we believe this is a case about unsecured creditors, and the vast majority in terms of dollar amount are represented on the creditor's committee. And the overwhelming amount of those dollars arise from litigation judgments against the creditors — excuse me — against the debtor.

Your Honor, the first thing the committee did after its appointment was determine that venue was more appropriate in this Court, so we filed our motion, which was ultimately granted

by Judge Sontchi, and we are now very pleased to be in front of Your Honor here in Dallas.

The second thing the committee did was immediately focus on the governance and the need for transparency by this debtor. On the governance, Your Honor, the debtor and some of its 2,000 affiliated nondebtor entities are all owned and controlled in one fashion by Mr. Dondero. The committee quickly came to the conclusion that a world where Mr. Dondero remained in control, from a governance perspective, particularly given the very real history many of the parties have with Mr. Dondero, was not one which could work.

The debtor did file a CRO motion and a protective ordinary-course motion designed, Your Honor, we believe in our view, the cement these otherwise unacceptable governance issues in place. And that is why we filed our objection, and we're prepared to prosecute that objection very vigorously.

Regarding transparency, Your Honor, the situation is unique in a couple respects. One is there is no DIP loan or use of cash collateral. So where you normally have a DIP lender or a cash collateral provider, there is reporting, transparency that — discipline that's inherent in that process. And we don't have that because we don't have that type of postpetition secured lender here.

Additionally, there are myriad transactions and structures that are Byzantine and we believe intentionally

Case 19-34054-sgj11 Doc 207 Filed 12/08/19 Entered 12/08/19 01:33:54 Page 20 of 27




opaque and are rife with insider and related-party dealings, requiring a tremendous need for open dialogue and access to information to understand the web of interconnected transactions, issues, and agreements.

So we believe that those two factors create a heightened level of transparency that's required by this committee.

Some efforts, Your Honor, were made to address these concerns, in particular the transparency concern, but the creditors committee does not believe the debtor's current governance structure, where Mr. Dondero remains in control, can work. And, therefore, the committee has been, as Mr. Pomerantz referred to, focused on preparing a motion for the appointment of a Chapter 11 trustee as the solution to the governance and transparency issues. The status quo as it exists today simply cannot and does not and will not be able to work for the committee.

However, as Mr. Pomerantz pointed out, the debtors have approached the committee with a structure to address the governance issues. And the committee is engaging with the debtor on that structure. However, if we are not able to come to resolution is that, we will be pursuing a Chapter 11 trustee.

As Mr. Pomerantz pointed out, they have some documents that they have prepared, they have identified some certain names. Again to be clear to, Your Honor, the committee has not

Case 19-34054-sgj11 Doc 207 Filed 12/08/19 Entered 12/08/19 01:53:54 Page 21 of 27



consented to any of that at this point, but we are engaged in a dialogue with the debtor concerning the governance issues, and we're hopeful, cautiously hopeful, that we will be able to come to a resolution on that. But again if we do not, we believe the only way to resolve the governance issues and to create the transparency necessary is to bring forth a Chapter 11 trustee motion.

Your Honor, regarding the ultimate outcome of the cases, and if I may for a moment, it's too early to tell. The statement and schedules have not been filed yet. It's not a — not a criticism, it's just a fact they haven't been filed yet.

The committee needs much more transparency into the assets of the debtors, the liabilities, and what can be done in terms of an exit solution, and what the contours of an exit solution might look like here. And, again, given the tangled web of insider and affiliated and related-party transactions that have occurred, that is going to be a critical focus understanding those past historical transactions in order to determine ways that potentially supplement the estate by bringing things back into the estate that we may conclude appropriately belong in the estate.

Your Honor, to sum up, we do remain very concerned about the governance issues and the existing structure and the lack of transparency. We are hopeful that by engaging with the debtor on a new governance structure we can address those

concerns. If not, we will proceed to seek a Chapter 11 trustee. It's only once we have the governance issues resolved and have full and complete transparency will we be able to then assess the best way to resolve these cases.

In terms of timing, Your Honor, I do think it makes sense to have a status conference again maybe some time late in the week next week. It could be something that perhaps we can do by telephone or folks can show up in person because, you know, as a committee we — obviously we need to work through these issues and we have multiple members and it takes us, you know, time to work through them. So I wouldn't want to suggest to Your Honor we'd be in a position to be back before Your Honor early next week, but perhaps something later in the week next week.

With that, unless Your Honor has any questions of me, I will cede the podium.

THE COURT: I don't think I have any more questions.

MR. CLEMENTE: Thank you, Your Honor.

THE COURT: Thank you.

Who else wishes to speak, anyone else?

(No audible response.)

THE COURT: So when — when are the schedules due? I know there was an order, you know, obviously extending the deadline, but I heard next week perhaps?

MR. POMERANTZ: Your Honor, Jeff Pomerantz, Pachulski

Stang Ziehl and Jones. They are due to be filed next Friday.

THE COURT: Next Friday, okay.

All right. Well, obviously I'm very glad to hear there are constructive conversations going on with the committee regarding these governance issues. I'm not meaning to compare apples to oranges here, but the ACIS case that this Court presided over, fairly quickly got a Chapter 11 trustee because of I think some of these same issues that are being mentioned with regard to Mr. Dondero and a concern about independence and — and people in charge appreciating fiduciary duties. So obviously if there's some in-between approach here, where we have independent people involved and that potentially preserves value of revenue streams which has been alluded to, that sounds like a nice fix to address people's concerns, and get the company fairly quickly focused on a reorganization plan.

Again, we had a very contentious, litigated Chapter 11 with ACIS, and it would seem to me that if we get these corporate governance issues quickly resolved to everybody's satisfaction, we might have a more constructive path in this case than we sometimes did in the ACIS case.

So, anyway, that's very good music to my ears. I would hate to think we're going to have lots of adversary proceedings and lots of litigation at the very start of this case — well, it's not the start. The case has been pending almost two months, but — but it occurs to me that, well, if what

I'm hearing is true, we've got two secured creditors who are very over secured and then we have several large creditors already with judgments or arbitration awards. The focus needs to be on how to pay those people more than, you know, claim objections, challenges with various parties-in-interest.

So I am happy to give you time next week for another status conference. It sounds like that is all you want it to be at this point. You don't want any of these hangover motions from the December 2nd agenda set yet?

MR. POMERANTZ: That is correct, Your Honor.

THE COURT: Okay.

MR. POMERANTZ: There is nothing on those hangover motions that are emergent.

There was a matter also scheduled for December 17th before Judge Sontchi dealing with bonuses, which is not on the agenda. That is something that we'll be talking with the committee about and at least with respect to part of it, having it go forward as quickly as possible but not something we're going to ask for Your Honor now. We feel that next week when we come back and we have a little better sense of where the case is going, we could then propose an appropriate schedule for Your Honor taking up those motions.

THE COURT: Okay. Well, I am going to see if I can work you in Thursday if that is good for everyone. My son's graduating from grad school on Friday, so I'm trying to take the

day off, but —

MR. POMERANTZ: I'm glad Your Honor has her priorities straight.

(Pause in the proceedings at 10:04 a.m.)

THE COURT: All right. So we can give you 9:30 next Thursday, December 12th.

And, as far as your future planning, we could give you time the week of December 16th if motions end up needing time that week, just you know let us know when. But the week of the 23rd, I am out the entire week, so plan to be back in the office the 31st, December, and thereafter. So that's going to be the one bad week for hearings, the week of the 23rd. You're probably glad to hear that, a lot of folks, so.

MR. CLEMENTE: Thank you for that, Your Honor.

THE COURT: Um-hum.

MR. POMERANTZ: After the hearing before Judge Sontchi on the Monday after Thanksgiving, it's very nice to hear that you're going to be out that week.

THE COURT: Okay. Well, you know, I was having court that day too, so.

MR. POMERANTZ: Your Honor, one other comment. Ms. O'Neill mentioned to me that there's an appellate brief due on December 15th in one of the ACIS matters, for which we are seeking Foley Gardere and Lynn Pinker's retention. I think we're going to just proceed with preparing those but recognize

that Your Honor has not yet approved their employment. And I suspect that we will try hopefully, you know, by the end of next Friday to maybe get a consensual order, if that's possible. And if not, perhaps have that hearing set for the week of the 16th.

THE COURT: All right. We'll stay tuned for that possibly.

All right. Anything else?

MR. POMERANTZ: Thank you, Your Honor.

THE COURT: All right. Good to see you and we'll see you next Thursday.

MR. CLEMENTE: Thank you.

THE COURT: All right.

MR. POMERANTZ: Thank you.

COURT SECURITY OFFICER: All rise.

(The hearing was adjourned at 10:06 o'clock a.m.)

—o0o—

State of California )
) SS.
County of San Joaquin )

I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of Texas, Office of the Clerk, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am not a party to nor in any way interested in the outcome of this matter.

I am a Certified Electronic Reporter and Transcriber by the American Association of Electronic Reporters and Transcribers, Certificate Nos. CER-124 and CET-124. Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.



Susan Palmer
Palmer Reporting Services

Dated December 6, 2019

# Exhibit 3

Matthew S. Okin
Texas Bar No. 00784695
David L. Curry, Jr.
Texas Bar No. 24065107
Okin Adams Bartlett Curry LLP
1113 Vine Street, Suite 240
Houston, Texas 77002
Tel: (713) 228-4100
Fax: (346) 247-7158
mokin@okinadams.com
dcurry@okinadams.com

ATTORNEYS FOR THE DALLAS FOUNDATION AND
CROWN GLOBAL LIFE INSURANCE, LTD.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**OBJECTION OF THE DALLAS FOUNDATION AND CROWN GLOBAL LIFE INSURANCE, LTD TO MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**
[Related Docket No. 4216]

The Dallas Foundation (the "Foundation"), on behalf of Empower Dallas Foundation ("EDF") and The Okada Family Foundation (the "Okada Foundation"), and Crown Global Life Insurance, Ltd. ("Crown,"), not individually, but solely in respect of Segregated Accounts 30218 & 30219 (the "Segregated Accounts") hereby file this objection (the "Objection") to the Motion (the "9019 Motion") for entry of an order pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") filed on behalf of Highland Capital Management, L.P., the

reorganized debtor (the "Debtor" or "Highland," as applicable) in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust" and together with Highland and the Claimant Trust, the "Movants"), and respectfully states as follows:

## I.
## PRELIMINARY STATEMENT

1. Through the Motion, the Movants seek approval of a settlement agreement (the "Settlement") purportedly entered into by Movants with Hunter Mountain Investment Trust ("HMIT"), Beacon Mountain LLC ("Beacon Mountain"), Rand Advisors, LLC ("Rand Advisors"), Rand PE Fund I, LP ("Rand PE Fund"), Rand PE Fund Management, LLC ("Rand GP"), Atlas IDF, LP ("Atlas IDF"), and Atlas IDF GP, LLC ("Atlas GP" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP, and Atlas IDF, the "HMIT Entities"), which Movants describe as "one of the most significant developments in the long-running Highland Bankruptcy Case." *Motion*, p. 3. As described by Movants, the significance of the settlement rests in the belief that it will bring to an end "protracted and value-destructive litigation that has impeded the Highland Entities' ability to distribute their assets to their constituents and fully implement the Plan." *Id.*

2. Unfortunately, unbeknownst to the Movants, the Settlement is potentially tainted by the actions of Mark Patrick, the apparent sole manager and director of the HMIT Entities. Specifically, upon information and belief, Mr. Patrick illicitly restructured the ownership of the HMIT Entities in a manner that seems to facilitate the diversion of millions of dollars in assets from the charitable entities that are the beneficial owners of the HMIT Entities. As set forth herein, given the actions of Mr. Patrick and the pending proceedings related thereto, rather than

provide the peace sought by Movants, approval of and consummation of the Settlement will most likely result in further litigation both before this Court and in jurisdictions outside of the United States.

3. Further, as set forth in more detail herein, the alleged actions of Mr. Patrick, taken in his capacity as the sole manager or officer of various entities within the charitable organization structure supported by the HMIT Entities and their assets, along with the timing of the Settlement, all establish a cloud of suspicion over the HMIT Entities' entry into the Settlement. Upon information and belief, under the structure illicitly put in place by Mr. Patrick, more than half of the proceeds of the Settlement will flow to an entity formed very recently by Mr. Patrick and based out his personal home, rather than to the Charitable Entities (defined below) who should be receiving such proceeds. Approval of the Settlement would, therefore, also be inequitable at this time.

4. For these reasons, as more fully set forth herein, the 9019 Motion should be denied.

## II. FACTUAL BACKGROUND

5. The lengthy procedural history of this Bankruptcy Case has been well documented in numerous prior pleadings and orders from this Court and is, therefore, not repeated herein. Moreover, the Beneficial Owners do not at this time have sufficient information to either admit or deny the procedural or background allegations set forth in the Motion but admit that those certain publicly available pleadings and orders referenced were filed or entered, as the case may be, on the dates and in the proceedings set forth in the Motion.

above, the Fund issued to the Orignial GP 100 management shares (the "Management Shares") representing the only voting rights for any and all shareholders. In essence, this structure granted complete control of the Fund to the holder of the Management Shares, which shares have at all material times been held by a single individual as the manager of the Original GP. As a result, the manager of the general partner has substantial control over the entire Fund structure (the "Control Position"). From the inception of the Fund until March 25, 2021, the Control Position was held by Grant Scott.

## C. Change of Control in 2021 and Resulting Concerns Regarding Mr. Patrick

12. In March 2021, Mr. Scott indicated his desire to retire from the Control Position. Mr. Patrick offered himself as a replacement to both Mr. Dondero and Mr. Scott. Mr. Patrick had been employed by the Debtor as tax counsel since 2008.[2] He had also provided personal tax advice to Mr. Dondero. Significantly, Mr. Patrick was intimately involved in the creation of the Fund in 2011, including providing advice as to the Fund's structure and in drafting the Fund's governing documents. He was at the time clearly an individual trusted by both Mr. Dondero and Mr. Scott to oversee the DAF and its charitable purposes. Thus, on March 25, 2021, Mr. Scott transferred the Management Shares, and the shares held in Holdco, to Mr. Patrick.

13. There was, initially, no noticeable change in the Fund's management following the transfer to Mr. Patrick. Over time, however, communications from Mr. Patrick and the Fund became less frequent and less substantive when provided. Further, through the Supporting Organizations, the Foundation and Crown became aware that Mr. Patrick had taken or had attempted to take various actions that appeared to be in conflict with the duties owed to the

[2] In February 2021, as part of this Bankruptcy Case, the employment contracts of many of Highland's employees, including Mr. Patrick, were terminated. Mr. Patrick, along with many other of the former back-office employees of the Debtor thereafter became employees of a newly formed company, Skyview Group ("Skyview"), that provides middle and back-office services to various clients.

Charitable Entities as beneficial owners of the Fund. Finally, an initial investigation into these alleged improper actions highlighted a substantial and sudden increase in the costs and expenses borne by the Fund.

*i.* *Mr. Patrick attempts to direct charitable funds to benefit his own family.*

14. An early example of these concerns occurred in June 2023. On June 28, 2023, Mr. Patrick attempted to have HDFI "*direct $10,000*" to Creative HEARTS TX ("CHTX"), a non-profit entity formed just two weeks earlier. Following due diligence, it was discovered that the directors of the CHTX were Mr. Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr. Patrick did not initially disclose either his or his family's involvement with CHTX.

15. When questioned regarding the nature of CHTX and his family's involvement Mr. Patrick represented that the nonprofit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Upon information and belief, Mr. Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. The grant payment to CHTX was authorized on September 5, 2023, but Mr. Patrick was informed that further payments were unlikely.

*ii.* *Mr. Patrick resigns amidst insider trading concerns.*

16. In August 2024, additional concerns arose regarding Mr. Patrick when he attempted to provide advice to the Foundation regarding an asset held directly by the Foundation (the asset in question was held separately from the Fund). Upon information and belief, the information provided was obtained by Mr. Patrick through his employment at Skyview and constituted material non-public information ("MNPI"). On the basis of this MNPI, Mr. Patrick advised the Foundation to exercise a put option it held in the subject asset. Uncomfortable with

the nature of the information provided and the "tip" from Mr. Patrick, the Foundation notified Skyview of Mr. Patrick's actions and declined to act upon Mr. Patrick's advice.

17. On October 2, 2024, while his actions were being reviewed by Skyview's internal compliance department, Mr. Patrick abruptly resigned from his position at Skyview. On the same day, Mr. Patrick also terminated Skyview's service agreement with the Fund.

*iii.* *Diversion of assets through the creation of new entities.*

18. Through the Control Position, Mr. Patrick also manages the HMIT Entities, including Atlas IDF and its general partner, Atlas GP, which itself is a wholly owned subsidiary of the Fund. The economic beneficiaries of Atlas IDF are EDF and the Okada Foundation as the holders of annuity policies issued by Crown.

19. On February 20, 2025, Mr. Patrick in his capacity as the general partner of Atlas GP, sent a letter to Crown advising of the intention to dissolve Atlas IDF in accordance with the partnership agreement dated November 30, 2015, on the basis of (i) concerns about the long-term availability and viability of back-office support; (ii) unsuccessful efforts to sell certain defaulted Notes (the "HCRE Notes") issued by HCRE Partners (a Dondero affiliate) dated May 7, 2014, in the amount of $2,300,000.00, and May 27, 2014, in the amount of $5,000,000, which notes were held by Atlas IDF; and (iii) the decision by an affiliate of Atlas GP to purchase the HCRE Notes at a price above their appraised value of zero dollars to facilitate an orderly wind-up. At the time, the amounts outstanding on the HCRE Notes, including accumulated interest, was in excess of $13,000,000. The stated intention was to sell the HCRE Notes collectively for $500,000.

20. Crown initially provided consent to the sale and liquidation, but withdrew said consent on February 28, 2025, after being advised of the potential misconduct by Mr. Patrick. That same day, Mr. Patrick sent a further letter to Crown Global responding to the revocation of

consent, and noting that: "*in addition to the purchase of the 'Notes' for $500,000, we also intend to include a provision in the purchase and sale documents that, if the Notes are repaid in full within 12 months, all amounts received (minus fees and expenses of collection and purchase price) will be remitted to you as the sole limited partner of Atlas IDF, LP.*"

21. At the time that Mr. Patrick attempted to sell the HCRE Notes, upon information and belief, HCRE had proposed to cure its default and repay the HCRE Notes in full pursuant to a revised amortization schedule. As such, the initial zero valuation and proposed $500,000 sale price disclosed to Crown is troubling. More troubling, however, is the fact that the proposed amortization schedule extends beyond 12 months. In other words, Mr. Patrick's proposed "fix" – i.e. sharing upside in the event the HCRE Notes were repaid within one year – was carefully tailored to give the appearance of addressing Crown's concerns even though Mr. Patrick already knew that the repayment would not occur within the 12 month period.

**D. <u>The Cayman Insolvency Proceedings</u>**

22. In or around October 2024, the Charitable Entities, acting through counsel and the Supporting Organizations, requested that Mr. Patrick provide financial information explaining certain significant increases in the costs charged to the Fund.[3] In November 2024, having not received any of the requested financial information, the Charitable Entities delivered a letter of no confidence to Mr. Patrick requesting a formal reorganization of the Fund. No response to the no confidence letter was received.

[3] For example, directors' fees increased from $40,000 in 2022 to almost $600,000 in 2023 –and increased even further to around $2.25 million in the first half of 2024 alone. Expenses overall for the first half of 2024 were around $18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. $18.6 million).

dilution of the interests beneficially held by the Charitable Entities such that, following the new issuance: (i) HDFI's interest was diluted from 32.787% to 16.05%; (ii) HKCF's interest was diluted from 32.787% to 16.05%; (iii) HSBFI's interest was diluted from 32.787% to 16.05%; and (iv) HCMLP's interest was diluted from 1.639% to 0.80%.

28. Publicly available records indicate that the MP Charity was formed in December 2024 and is based out of Mr. Patrick's home.

29. Additionally, the Supporting Organizations and the Charitable Entities learned that Mr. Patrick had caused the formation of another new entity, CDMCFAD, LLC ("CDMCFAD"), which was secretly inserted into the charitable organization structure. CDMCFAD is nominally a new wholly-owned subsidiary of the Fund, though, like the MP Charity, it is based out of Mr. Patrick's home. Upon information and belief, Mr. Patrick then caused the Fund to transfer its 100% interests in Charitable DAF Fund, LP to CDMCFAD. On March 27, 2025, the Fund's interest in CDMCFAD was purportedly redeemed for proceeds totaling $1,612,192.00 to be distributed to the Fund's participating interest holders.

30. In light of the existing liquidation and with these newly discovered facts, the Supporting Organizations amended their Cayman Petition to request that liquidation of the Fund continue under the supervision of the Cayman courts and that new independent, joint official liquidators be appointed to replace Kroll.

31. Following a hearing to consider the amended Cayman petition, the Cayman court entered its Supervision Order on May 6, 2025, and appointed Margo MacInnis and Sandipan Bhowmik as Joint Official Liquidators.[4]

[4] Mr. Patrick's chosen liquidators, Kroll, withdrew their consent to nomination prior to a May 5, 2025, hearing to consider the amended petition.

# Exhibit 4

58

# Before


DFW Charitable Foundation (nonprofit)
51.04% 318 Participating Shares
The Community Foundation of North Texas (nonprofit)
.80% 5 Participating Shares
Santa Barbara Foundation (nonprofit)
Highland Santa Barbara Foundation, Inc. (nonprofit)
16.05% 100 Participating Shares
Greater Kansas City Community Foundation (nonprofit)
Highland Kansas City Foundation, Inc. (nonprofit)
16.05% 100 Participating Shares
The Dallas Foundation (nonprofit)
Highland Dallas Foundation, Inc. (nonprofit)
16.05% 100 Participating Shares
Charitable DAF HoldCo, Ltd. (Cayman Islands)
Management Shares
Mark Patrick
Manager
CDMCFAD, LLC (Delaware)
100% and sole Director
CDH GP, Ltd. (Cayman Islands)
General Partner
CDH GP, Ltd. (Cayman Islands)
General Partner
Charitable DAF Fund, LP (Cayman Islands)
Charitable DAF Fund 2, LP (Cayman Islands)
CLO HoldCo, Ltd. (Cayman Islands)
CLO HoldCo, LLC (Delaware)
MGM Stucios Holdco, Ltd. (Cayman Islands)
HCT Holdco 2, Ltd. (Cayman Islands)
Liberty Sub, Ltd. (Delaware)
Liberty CLO HoldCo, Ltd. (Cayman Islands)
Liberty CLO HoldCo, LLC (Delaware)
Charitable DAF Holdings Corp. (Delaware)
BVP Property, LLC (Delaware with CA Registration)
CDHC Stewart Creek, LLC (Texas)
CDHC Fort Worth Land, LLC (Texas)
CDHC Assets, LLC (Texas)
Royse City Land Company, LLC (Texas)
CDHC Royse City Land, LLC (Texas)
Allanon Capital Management LLC (Texas)
DST Investco, LLC (Delaware)
Rand Advisors, LLC (Delaware)

# Exhibit 5

# EXHIBIT 89

**FORM ADV**

**UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND REPORT BY EXEMPT REPORTING ADVISERS**

| | |
|---|---|
| **Primary Business Name: RAND ADVISORS, LLC** | **CRD Number: 172839** |
| **Annual Amendment - All Sections** | **Rev. 10/2021** |
| **3/17/2025 8:51:05 AM** | |

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 4.

**Item 1 Identifying Information**

Responses to this Item tell us who you are, where you are doing business, and how we can contact you. If you are filing an *umbrella registration*, the information in Item 1 should be provided for the *filing adviser* only. General Instruction 5 provides information to assist you with filing an *umbrella registration*.

A. Your full legal name (if you are a sole proprietor, your last, first, and middle names):
**RAND ADVISORS, LLC**

B. (1) Name under which you primarily conduct your advisory business, if different from Item 1.A.
**RAND ADVISORS, LLC**

*List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

(2) If you are using this Form ADV to register more than one investment adviser under an *umbrella registration*, check this box ☐

*If you check this box, complete a Schedule R for each relying adviser.*

C. If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.(1)), enter the new name and specify whether the name change is of
☐ your legal name or ☐ your primary business name:

D. (1) If you are registered with the SEC as an investment adviser, your SEC file number: **801-80265**

(2) If you report to the SEC as an *exempt reporting adviser*, your SEC file number:

(3) If you have one or more Central Index Key numbers assigned by the SEC ("CIK Numbers"), all of your CIK numbers:

| CIK Number |
|---|
| 1660386 |
| 1660401 |

E. (1) If you have a number ("*CRD* Number") assigned by the *FINRA's CRD* system or by the IARD system, your *CRD* number: **172839**

*If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

(2) If you have additional *CRD* Numbers, your additional *CRD* numbers:
No Information Filed

F. *Principal Office and Place of Business*

(1) Address (do not use a P.O. Box):

| | | | |
|---|---|---|---|
| Number and Street 1: | | Number and Street 2: | |
| 2101 CEDAR SPRINGS ROAD | | SUITE 1200 | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| DALLAS | Texas | United States | 75201 |

If this address is a private residence, check this box: ☐

*List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for SEC registration, if you are registered only with the SEC, or if you are reporting to the SEC as an exempt reporting adviser, list the largest twenty-five offices in terms of numbers of employees as of the end of your most recently completed fiscal year.*

(2) Days of week that you normally conduct business at your *principal office and place of business:*
◉ Monday - Friday ○ Other:

Normal business hours at this location:
9AM-5PM

(3) Telephone number at this location:
214-908-8130

(4) Facsimile number at this location, if any:

214-550-4459

(5) What is the total number of offices, other than your *principal office and place of business*, at which you conduct investment advisory business as of the end of your most recently completed fiscal year?
0

G. Mailing address, if different from your *principal office and place of business* address:

| | | | |
|---|---|---|---|
| Number and Street 1: | | Number and Street 2: | |
| City: | State: | Country: | ZIP+4/Postal Code: |

If this address is a private residence, check this box: ☐

H. If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

| | | | |
|---|---|---|---|
| Number and Street 1: | | Number and Street 2: | |
| City: | State: | Country: | ZIP+4/Postal Code: |

I. Do you have one or more websites or accounts on publicly available social media platforms (including, but not limited to, Twitter, Facebook and LinkedIn)? **Yes** ◉ **No** ○

*If "yes," list all firm website addresses and the address for each of the firm's accounts on publicly available social media platforms on* Section 1.I. of Schedule D*. If a website address serves as a portal through which to access other information you have published on the web, you may list the portal without listing addresses for all of the other information. You may need to list more than one portal address. Do not provide the addresses of websites or accounts on publicly available social media platforms where you do not control the content. Do not provide the individual electronic mail (e-mail) addresses of employees or the addresses of employee accounts on publicly available social media platforms.*

J. Chief Compliance Officer

(1) Provide the name and contact information of your Chief Compliance Officer. If you are an *exempt reporting adviser*, you must provide the contact information for your Chief Compliance Officer, if you have one. If not, you must complete Item 1.K. below.

| | | | |
|---|---|---|---|
| Name: | | Other titles, if any: | |
| Telephone number: | | Facsimile number, if any: | |
| Number and Street 1: | | Number and Street 2: | |
| City: | State: | Country: | ZIP+4/Postal Code: |

Electronic mail (e-mail) address, if Chief Compliance Officer has one:

(2) If your Chief Compliance Officer is compensated or employed by any *person* other than you, a *related person* or an investment company registered under the Investment Company Act of 1940 that you advise for providing chief compliance officer services to you, provide the *person's* name and IRS Employer Identification Number (if any):

Name:

IRS Employer Identification Number:

K. Additional Regulatory Contact Person: If a person other than the Chief Compliance Officer is authorized to receive information and respond to questions about this Form ADV, you may provide that information here.

| | | | |
|---|---|---|---|
| Name: | | Titles: | |
| Telephone number: | | Facsimile number, if any: | |
| Number and Street 1: | | Number and Street 2: | |
| City: | State: | Country: | ZIP+4/Postal Code: |

Electronic mail (e-mail) address, if contact person has one:

L. Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*? **Yes** ◉ **No** ○

*If "yes," complete* Section 1.L. of Schedule D*.*

M. Are you registered with a *foreign financial regulatory authority*? **Yes** ○ **No** ◉

*Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes," complete* Section 1.M. of Schedule D*.*

N. Are you a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934? **Yes** ○ **No** ◉

O. Did you have $1 billion or more in assets on the last day of your most recent fiscal year? **Yes** ○ **No** ◉
If yes, what is the approximate amount of your assets:

- $1 billion to less than $10 billion
- $10 billion to less than $50 billion
- $50 billion or more

*For purposes of Item 1.O. only, "assets" refers to your total assets, rather than the assets you manage on behalf of clients. Determine your total assets using the total assets shown on the balance sheet for your most recent fiscal year end.*

P. Provide your *Legal Entity Identifier* if you have one:

A *legal entity identifier* is a unique number that companies use to identify each other in the financial marketplace. You may not have a *legal entity identifier*.

**SECTION 1.B. Other Business Names**

No Information Filed

**SECTION 1.F. Other Offices**

No Information Filed

**SECTION 1.I. Website Addresses**

List your website addresses, including addresses for accounts on publicly available social media platforms where you control the content (including, but not limited to, Twitter, Facebook and/or LinkedIn). You must complete a separate Schedule D Section 1.I. for each website or account on a publicly available social media platform.

Address of Website/Account on Publicly Available Social Media Platform: HTTP://WWW.RANDADVISORS.COM/

**SECTION 1.L. Location of Books and Records**

Complete the following information for each location at which you keep your books and records, other than your *principal office and place of business*. You must complete a separate Schedule D, Section 1.L. for each location.

Name of entity where books and records are kept:
HIGHGATE CONSULTING GROUP INC

| Number and Street 1: | | Number and Street 2: | |
|---|---|---|---|
| 2101 CEDAR SPRINGS RD | | SUITE 1200 | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| DALLAS | Texas | United States | 75201 |

If this address is a private residence, check this box: ☐

Telephone Number: 214-550-4459
Facsimile number, if any:

This is (check one):
- ○ one of your branch offices or affiliates.
- ● a third-party unaffiliated recordkeeper.
- ○ other.

Briefly describe the books and records kept at this location.
ALL BOOKS AND RECORDS OF THE ADVISER

**SECTION 1.M. Registration with Foreign Financial Regulatory Authorities**

**Item 2 SEC Registration/Reporting**

Responses to this Item help us (and you) determine whether you are eligible to register with the SEC. Complete this Item 2.A. only if you are applying for SEC registration or submitting an *annual updating amendment* to your SEC registration. If you are filing an *umbrella registration*, the information in Item 2 should be provided for the *filing adviser* only.

A. To register (or remain registered) with the SEC, you must check **at least one** of the Items 2.A.(1) through 2.A.(12), below. If you are submitting an *annual updating amendment* to your SEC registration and you are no longer eligible to register with the SEC, check Item 2.A.(13). Part 1A Instruction 2 provides information to help you determine whether you may affirmatively respond to each of these items.

You (the adviser):

☑ (1) are a **large advisory firm** that either:

(a) has regulatory assets under management of $100 million (in U.S. dollars) or more; or

(b) has regulatory assets under management of $90 million (in U.S. dollars) or more at the time of filing its most recent *annual updating amendment* and is registered with the SEC;

☐ (2) are a **mid-sized advisory firm** that has regulatory assets under management of $25 million (in U.S. dollars) or more but less than $100 million (in U.S. dollars) and you are either:

(a) not required to be registered as an adviser with the *state securities authority* of the state where you maintain your *principal office and place of business*; or

(b) not subject to examination by the *state securities authority* of the state where you maintain your *principal office and place of business*;

*Click **HERE** for a list of states in which an investment adviser, if registered, would not be subject to examination by the state securities authority.*

(3) Reserved

☐ (4) have your *principal office and place of business* **outside the United States**;

☐ (5) are **an investment adviser (or subadviser) to an investment company** registered under the Investment Company Act of 1940;

☐ (6) are **an investment adviser to a company which has elected to be a business development company** pursuant to section 54 of the Investment Company Act of 1940 and has not withdrawn the election, and you have at least $25 million of regulatory assets under management;

☐ (7) are a **pension consultant** with respect to assets of plans having an aggregate value of at least $200,000,000 that qualifies for the exemption in rule 203A-2(a);

☐ (8) are a **related adviser** under rule 203A-2(b) that *controls*, is *controlled* by, or is under common *control* with, an investment adviser that is registered with the SEC, and your *principal office and place of business* is the same as the registered adviser;

*If you check this box, complete Section 2.A.(8) of Schedule D.*

☐ (9) are an **adviser** relying on rule 203A-2(c) because you **expect to be eligible for SEC registration within 120 days;**

*If you check this box, complete Section 2.A.(9) of Schedule D.*

☐ (10) are a **multi-state adviser** that is required to register in 15 or more states and is relying on rule 203A-2(d);

*If you check this box, complete Section 2.A.(10) of Schedule D.*

☐ (11) are an **Internet adviser** relying on rule 203A-2(e);

*If you check this box, complete Section 2.A.(11) of Schedule D.*

☐ (12) have **received an SEC order** exempting you from the prohibition against registration with the SEC;

*If you check this box, complete Section 2.A.(12) of Schedule D.*

☐ (13) are **no longer eligible** to remain registered with the SEC.

***State Securities Authority Notice Filings* and State Reporting by *Exempt Reporting Advisers***

C. Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings*. In addition, *exempt reporting advisers* may be required to provide *state securities authorities* with a copy of reports and any amendments they file with the SEC. If this is an initial application or report, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to direct your *notice filings* or reports to additional state(s), check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to your registration to stop your *notice filings* or reports from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

Jurisdictions

| | | | |
|---|---|---|---|
| ☐ AL | ☐ IL | ☐ NE | ☐ SC |
| ☐ AK | ☐ IN | ☐ NV | ☐ SD |
| ☐ AZ | ☐ IA | ☐ NH | ☐ TN |
| ☐ AR | ☐ KS | ☐ NJ | ☑ TX |

| | | | |
|---|---|---|---|
| ☐ CA | ☐ KY | ☐ NM | ☐ UT |
| ☐ CO | ☐ LA | ☐ NY | ☐ VT |
| ☐ CT | ☐ ME | ☐ NC | ☐ VI |
| ☐ DE | ☐ MD | ☐ ND | ☐ VA |
| ☐ DC | ☐ MA | ☐ OH | ☐ WA |
| ☐ FL | ☐ MI | ☐ OK | ☐ WV |
| ☐ GA | ☐ MN | ☐ OR | ☐ WI |
| ☐ GU | ☐ MS | ☐ PA | ☐ WY |
| ☐ HI | ☐ MO | ☐ PR | |
| ☐ ID | ☐ MT | ☐ RI | |

*If you are amending your registration to stop your notice filings or reports from going to a state that currently receives them and you do not want to pay that state's notice filing or report filing fee for the coming year, your amendment must be filed before the end of the year (December 31).*

**SECTION 2.A.(8) Related Adviser**

If you are relying on the exemption in rule 203A-2(b) from the prohibition on registration because you *control*, are *controlled* by, or are under common *control* with an investment adviser that is registered with the SEC and your *principal office and place of business* is the same as that of the registered adviser, provide the following information:

Name of Registered Investment Adviser

*CRD* Number of Registered Investment Adviser

SEC Number of Registered Investment Adviser
-

**SECTION 2.A.(9) Investment Adviser Expecting to be Eligible for Commission Registration within 120 Days**

If you are relying on rule 203A-2(c), the exemption from the prohibition on registration available to an adviser that expects to be eligible for SEC registration within 120 days, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations. You must make both of these representations:

☐ I am not registered or required to be registered with the SEC or a *state securities authority* and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.

☐ I undertake to withdraw from SEC registration if, on the 120th day after my registration with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from registering with the SEC.

**SECTION 2.A.(10) Multi-State Adviser**

If you are relying on rule 203A-2(d), the multi-state adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations.

If you are applying for registration as an investment adviser with the SEC, you must make both of these representations:

☐ I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 15 or more states to register as an investment adviser with the *state securities authorities* in those states.

☐ I undertake to withdraw from SEC registration if I file an amendment to this registration indicating that I would be required by the laws of fewer than 15 states to register as an investment adviser with the *state securities authorities* of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

☐ Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 15 states to register as an investment adviser with the *state securities authorities* in those states.

**SECTION 2.A.(11) Internet Adviser**

If you are relying on rule 203A-2(e), the Internet adviser exemption from the prohibition on registration, you are required to make a representation about your eligibility for SEC registration. By checking the appropriate box, you will be deemed to have made the required representation.

If you are applying for registration as an investment adviser with the SEC or changing your existing Item 2 response regarding your eligibility for SEC registration, you must make this representation:

☐ I will provide investment advice on an ongoing basis to more than one client exclusively through an *operational interactive website*.

If you are filing an annual updating amendment to your existing registration and are continuing to rely on the Internet adviser exemption for SEC registration, you must make this representation:

☐ I have provided and will continue to provide investment advice on an ongoing basis to more than one client exclusively through an *operational interactive website*.

**SECTION 2.A.(12) SEC Exemptive *Order***

If you are relying upon an SEC *order* exempting you from the prohibition on registration, provide the following information:

Application Number:
803-

Date of *order*:

**Item 3 Form of Organization**

If you are filing an *umbrella registration*, the information in Item 3 should be provided for the *filing adviser* only.

A. How are you organized?

- ○ Corporation
- ○ Sole Proprietorship
- ○ Limited Liability Partnership (LLP)
- ○ Partnership
- ◉ Limited Liability Company (LLC)
- ○ Limited Partnership (LP)
- ○ Other (specify):

*If you are changing your response to this Item, see Part 1A Instruction 4.*

B. In what month does your fiscal year end each year?
DECEMBER

C. Under the laws of what state or country are you organized?

| State | Country |
|---|---|
| Delaware | United States |

*If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor, provide the name of the state or country where you reside.*

*If you are changing your response to this Item, see Part 1A Instruction 4.*

**Item 4 Successions**

| | Yes | No |
|---|---|---|
| A. Are you, at the time of this filing, succeeding to the business of a registered investment adviser, including, for example, a change of your structure or legal status (e.g., form of organization or state of incorporation)? | ○ | ◉ |

*If "yes", complete Item 4.B. and Section 4 of Schedule D.*

B. Date of Succession: (MM/DD/YYYY)

*If you have already reported this succession on a previous Form ADV filing, do not report the succession again. Instead, check "No." See Part 1A Instruction 4.*

**SECTION 4 Successions**

No Information Filed

**Item 5 Information About Your Advisory Business - Employees, Clients, and Compensation**

Responses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use when making regulatory policy. Part 1A Instruction 5.a. provides additional guidance to newly formed advisers for completing this Item 5.

***Employees***

*If you are organized as a sole proprietorship, include yourself as an employee in your responses to Item 5.A. and Items 5.B.(1), (2), (3), (4), and (5). If an employee performs more than one function, you should count that employee in each of your responses to Items 5.B.(1), (2), (3), (4), and (5).*

A. Approximately how many *employees* do you have? Include full- and part-time *employees* but do not include any clerical workers.

1

B. (1) Approximately how many of the *employees* reported in 5.A. perform investment advisory functions (including research)?

1

(2) Approximately how many of the *employees* reported in 5.A. are registered representatives of a broker-dealer?

0

(3) Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives*?

0

(4) Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives* for an investment adviser other than you?

0

(5) Approximately how many of the *employees* reported in 5.A. are licensed agents of an insurance company or agency?

0

(6) Approximately how many firms or other *persons* solicit advisory *clients* on your behalf?

0

*In your response to Item 5.B.(6), do not count any of your employees and count a firm only once – do not count each of the firm's employees that solicit on your behalf.*

***Clients***

*In your responses to Items 5.C. and 5.D. do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

C. (1) To approximately how many *clients* for whom you do not have regulatory assets under management did you provide investment advisory services during your most recently completed fiscal year?

0

(2) Approximately what percentage of your *clients* are non-*United States persons*?

0%

D. *For purposes of this Item 5.D., the category "individuals" includes trusts, estates, and 401(k) plans and IRAs of individuals and their family members, but does not include businesses organized as sole proprietorships.*
*The category "business development companies" consists of companies that have made an election pursuant to section 54 of the Investment Company Act of 1940. Unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, do not answer (1)(d) or (3)(d) below.*

Indicate the approximate number of your *clients* and amount of your total regulatory assets under management (reported in Item 5.F. below) attributable to each of the following type of *client*. If you have fewer than 5 *clients* in a particular category (other than (d), (e), and (f)) you may check Item 5.D.(2) rather than respond to Item 5.D.(1).

The aggregate amount of regulatory assets under management reported in Item 5.D.(3) should equal the total amount of regulatory assets under management reported in Item 5.F.(2)(c) below.

If a *client* fits into more than one category, select one category that most accurately represents the *client* to avoid double counting *clients* and assets. If you advise a registered investment company, business development company, or pooled investment vehicle, report those assets in categories (d), (e), and (f) as applicable.

| **Type of *Client*** | **(1) Number of *Client(s)*** | **(2) Fewer than 5 *Clients*** | **(3) Amount of Regulatory Assets under Management** |
|---|---|---|---|
| (a) Individuals (other than *high net worth individuals*) | 0 | ☐ | $ 0 |
| (b) *High net worth individuals* | 0 | ☐ | $ 0 |
| (c) Banking or thrift institutions | 0 | ☐ | $ 0 |
| (d) Investment companies | 0 | | $ 0 |
| (e) Business development companies | 0 | | $ 0 |
| (f) Pooled investment vehicles (other than investment companies and business development companies) | 3 | | $ 153,660,847 |
| (g) Pension and profit sharing plans (but not the plan participants or government pension plans) | 0 | ☐ | $ 0 |
| (h) Charitable organizations | 0 | ☐ | $ 0 |
| (i) State or municipal *government entities* (including government pension plans) | 0 | ☐ | $ 0 |
| (j) Other investment advisers | 0 | ☐ | $ 0 |

| | | | |
|---|---|---|---|
| (k) Insurance companies | 0 | ☐ | $ 0 |
| (l) Sovereign wealth funds and foreign official institutions | 0 | ☐ | $ 0 |
| (m) Corporations or other businesses not listed above | 0 | ☐ | $ 0 |
| (n) Other: | 0 | ☐ | $ 0 |

**Compensation Arrangements**

E. You are compensated for your investment advisory services by (check all that apply):

- ☑ (1) A percentage of assets under your management
- ☐ (2) Hourly charges
- ☐ (3) Subscription fees (for a newsletter or periodical)
- ☐ (4) Fixed fees (other than subscription fees)
- ☐ (5) Commissions
- ☐ (6) *Performance-based fees*
- ☐ (7) Other (specify):

**Item 5 Information About Your Advisory Business - Regulatory Assets Under Management**

**Regulatory Assets Under Management**

| | Yes | No |
|---|---|---|
| F. (1) Do you provide continuous and regular supervisory or management services to securities portfolios? | ◉ | ○ |

(2) If yes, what is the amount of your regulatory assets under management and total number of accounts?

| | | U.S. Dollar Amount | | Total Number of Accounts |
|---|---|---|---|---|
| Discretionary: | (a) | $ 153,660,847 | (d) | 80 |
| Non-Discretionary: | (b) | $ 0 | (e) | 0 |
| Total: | (c) | $ 153,660,847 | (f) | 80 |

*Part 1A Instruction 5.b. explains how to calculate your regulatory assets under management. You must follow these instructions carefully when completing this Item.*

(3) What is the approximate amount of your total regulatory assets under management (reported in Item 5.F.(2)(c) above) attributable to *clients* who are non-*United States persons*?

$ 0

**Item 5 Information About Your Advisory Business - Advisory Activities**

**Advisory Activities**

G. What type(s) of advisory services do you provide? Check all that apply.

- ☐ (1) Financial planning services
- ☐ (2) Portfolio management for individuals and/or small businesses
- ☐ (3) Portfolio management for investment companies (as well as "business development companies" that have made an election pursuant to section 54 of the Investment Company Act of 1940)
- ☑ (4) Portfolio management for pooled investment vehicles (other than investment companies)
- ☐ (5) Portfolio management for businesses (other than small businesses) or institutional *clients* (other than registered investment companies and other pooled investment vehicles)
- ☐ (6) Pension consulting services
- ☐ (7) Selection of other advisers (including *private fund* managers)
- ☐ (8) Publication of periodicals or newsletters
- ☐ (9) Security ratings or pricing services
- ☐ (10) Market timing services
- ☐ (11) Educational seminars/workshops
- ☐ (12) Other(specify):

*Do not check Item 5.G.(3) unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, including as a subadviser. If you check Item 5.G.(3), report the 811 or 814 number of the investment company or investment companies to which you provide advice in Section 5.G.(3) of Schedule D.*

H. If you provide financial planning services, to how many *clients* did you provide these services during your last fiscal year?

- ○ 0
- ○ 1 - 10
- ○ 11 - 25
- ○ 26 - 50
- ○ 51 - 100
- ○ 101 - 250
- ○ 251 - 500
- ○ More than 500

If more than 500, how many?
(round to the nearest 500)

*In your responses to this Item 5.H., do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

| | | Yes | No |
|---|---|---|---|
| I. | (1) Do you participate in a *wrap fee program*? | ○ | ◉ |

(2) If you participate in a *wrap fee program*, what is the amount of your regulatory assets under management attributable to acting as:

(a) *sponsor* to a *wrap fee program*
$

(b) portfolio manager for a *wrap fee program*?
$

(c) *sponsor* to and portfolio manager for the same *wrap fee program*?
$

*If you report an amount in Item 5.I.(2)(c), do not report that amount in Item 5.I.(2)(a) or Item 5.I.(2)(b).*

*If you are a portfolio manager for a wrap fee program, list the names of the programs, their sponsors and related information in* Section 5.I.(2) of Schedule D*.*

*If your involvement in a wrap fee program is limited to recommending wrap fee programs to your clients, or you advise a mutual fund that is offered through a wrap fee program, do not check Item 5.I.(1) or enter any amounts in response to Item 5.I.(2).*

| | | Yes | No |
|---|---|---|---|
| J. | (1) In response to Item 4.B. of Part 2A of Form ADV, do you indicate that you provide investment advice only with respect to limited types of investments? | ○ | ◉ |
| | (2) Do you report *client* assets in Item 4.E. of Part 2A that are computed using a different method than the method used to compute your regulatory assets under management? | ○ | ◉ |

K. Separately Managed Account *Clients*

| | Yes | No |
|---|---|---|
| (1) Do you have regulatory assets under management attributable to *clients* other than those listed in Item 5.D.(3)(d)-(f) (separately managed account *clients*)? | ○ | ◉ |

*If yes, complete* Section 5.K.(1) of Schedule D*.*

| | Yes | No |
|---|---|---|
| (2) Do you engage in borrowing transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ◉ |

*If yes, complete* Section 5.K.(2) of Schedule D*.*

| | Yes | No |
|---|---|---|
| (3) Do you engage in derivative transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ◉ |

*If yes, complete* Section 5.K.(2) of Schedule D*.*

| | Yes | No |
|---|---|---|
| (4) After subtracting the amounts in Item 5.D.(3)(d)-(f) above from your total regulatory assets under management, does any custodian hold ten percent or more of this remaining amount of regulatory assets under management? | ○ | ◉ |

*If yes, complete* Section 5.K.(3) of Schedule D *for each custodian.*

L. Marketing Activities

| | Yes | No |
|---|---|---|
| (1) Do any of your *advertisements* include: | | |
| (a) Performance results? | ○ | ◉ |
| (b) A reference to specific investment advice provided by you (as that phrase is used in rule 206(4)-1(a)(5))? | ○ | ◉ |
| (c) *Testimonials* (other than those that satisfy rule 206(4)-1(b)(4)(ii))? | ○ | ◉ |
| (d) *Endorsements* (other than those that satisfy rule 206(4)-1(b)(4)(ii))? | ○ | ◉ |
| (e) *Third-party ratings*? | ○ | ◉ |
| (2) If you answer "yes" to L(1)(c), (d), or (e) above, do you pay or otherwise provide cash or non-cash compensation, directly or indirectly, in connection with the use of *testimonials*, *endorsements*, or *third-party ratings*? | ○ | ○ |
| (3) Do any of your *advertisements* include *hypothetical performance* ? | ○ | ◉ |

**SECTION 5.G.(3) Advisers to Registered Investment Companies and Business Development Companies**

No Information Filed

**SECTION 5.I.(2) *Wrap Fee Programs***

No Information Filed

**SECTION 5.K.(1) Separately Managed Accounts**

After subtracting the amounts reported in Item 5.D.(3)(d)-(f) from your total regulatory assets under management, indicate the approximate percentage of this remaining amount attributable to each of the following categories of assets. If the remaining amount is at least $10 billion in regulatory assets under management, complete Question (a). If the remaining amount is less than $10 billion in regulatory assets under management, complete Question (b).

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment* . Mid-year is the date six months before the end of year date. Each column should add up to 100% and numbers should be rounded to the nearest percent.

Investments in derivatives, registered investment companies, business development companies, and pooled investment vehicles should be reported in those categories. Do not report those investments based on related or underlying portfolio assets. Cash equivalents include bank deposits, certificates of deposit, bankers' acceptances and similar bank instruments.

Some assets could be classified into more than one category or require discretion about which category applies. You may use your own internal methodologies and the conventions of your service providers in determining how to categorize assets, so long as the methodologies or conventions are consistently applied and consistent with information you report internally and to current and prospective clients. However, you should not double count assets, and your responses must be consistent with any instructions or other guidance relating to this Section.

(a)

| Asset Type | Mid-year | End of year |
|---|---|---|
| (i) Exchange-Traded Equity Securities | % | % |
| (ii) Non Exchange-Traded Equity Securities | % | % |
| (iii) U.S. Government/Agency Bonds | % | % |
| (iv) U.S. State and Local Bonds | % | % |
| (v) *Sovereign Bonds* | % | % |
| (vi) Investment Grade Corporate Bonds | % | % |
| (vii) Non-Investment Grade Corporate Bonds | % | % |
| (viii) Derivatives | % | % |
| (ix) Securities Issued by Registered Investment Companies or Business Development Companies | % | % |
| (x) Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development Companies) | % | % |
| (xi) Cash and Cash Equivalents | % | % |
| (xii) Other | % | % |

Generally describe any assets included in "Other"

(b)

| Asset Type | End of year |
|---|---|
| (i) Exchange-Traded Equity Securities | % |
| (ii) Non Exchange-Traded Equity Securities | % |
| (iii) U.S. Government/Agency Bonds | % |
| (iv) U.S. State and Local Bonds | % |
| (v) *Sovereign Bonds* | % |
| (vi) Investment Grade Corporate Bonds | % |
| (vii) Non-Investment Grade Corporate Bonds | % |
| (viii) Derivatives | % |
| (ix) Securities Issued by Registered Investment Companies or Business Development Companies | % |
| (x) Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development | % |

| | | |
|---|---|---|
| | Companies) | |
| (xi) | Cash and Cash Equivalents | % |
| (xii) | Other | % |

Generally describe any assets included in "Other"

**SECTION 5.K.(2) Separately Managed Accounts - Use of *Borrowings* and Derivatives**

☑ **No information is required to be reported in this Section 5.K.(2) per the instructions of this Section 5.K.(2)**

If your regulatory assets under management attributable to separately managed accounts are at least $10 billion, you should complete Question (a). If your regulatory assets under management attributable to separately managed accounts are at least $500 million but less than $10 billion, you should complete Question (b).

(a) In the table below, provide the following information regarding the separately managed accounts you advise. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise. End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. Mid-year is the date six months before the end of year date.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

In column 3, provide aggregate *gross notional value* of derivatives divided by the aggregate regulatory assets under management of the accounts included in column 1 with respect to each category of derivatives specified in 3(a) through (f).

You may, but are not required to, complete the table with respect to any separately managed account with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

(i) Mid-Year

| **Gross Notional Exposure** | **(1) Regulatory Assets Under Management** | **(2) *Borrowings*** | **(3) Derivative Exposures** | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | **(a) *Interest Rate Derivative*** | **(b) *Foreign Exchange Derivative*** | **(c) *Credit Derivative*** | **(d) *Equity Derivative*** | **(e) *Commodity Derivative*** | **(f) *Other Derivative*** |
| **Less than 10%** | $ | $ | % | % | % | % | % | % |
| **10-149%** | $ | $ | % | % | % | % | % | % |
| **150% or more** | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(ii) End of Year

| **Gross Notional Exposure** | **(1) Regulatory Assets Under Management** | **(2) *Borrowings*** | **(3) Derivative Exposures** | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | **(a) *Interest Rate Derivative*** | **(b) *Foreign Exchange Derivative*** | **(c) *Credit Derivative*** | **(d) *Equity Derivative*** | **(e) *Commodity Derivative*** | **(f) *Other Derivative*** |
| **Less than 10%** | $ | $ | % | % | % | % | % | % |
| **10-149%** | $ | $ | % | % | % | % | % | % |
| **150% or more** | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(b) In the table below, provide the following information regarding the separately managed accounts you advise as of the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

You may, but are not required to, complete the table with respect to any separately managed accounts with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* |
|---|---|---|
| **Less than 10%** | $ | $ |
| **10-149%** | $ | $ |
| **150% or more** | $ | $ |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

**SECTION 5.K.(3) Custodians for Separately Managed Accounts**

No Information Filed

**Item 6 Other Business Activities**

In this Item, we request information about your firm's other business activities.

A. You are actively engaged in business as a (check all that apply):

- ☐ (1) broker-dealer (registered or unregistered)
- ☐ (2) registered representative of a broker-dealer
- ☐ (3) commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- ☐ (4) futures commission merchant
- ☐ (5) real estate broker, dealer, or agent
- ☐ (6) insurance broker or agent
- ☐ (7) bank (including a separately identifiable department or division of a bank)
- ☐ (8) trust company
- ☐ (9) registered municipal advisor
- ☐ (10) registered security-based swap dealer
- ☐ (11) major security-based swap participant
- ☐ (12) accountant or accounting firm
- ☐ (13) lawyer or law firm
- ☐ (14) other financial product salesperson (specify):

*If you engage in other business using a name that is different from the names reported in Items 1.A. or 1.B.(1), complete* Section 6.A. of Schedule D.

| | | Yes | No |
|---|---|---|---|
| B. (1) | Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)? | ○ | ◉ |
| (2) | If yes, is this other business your primary business? | ○ | ○ |

*If "yes," describe this other business on* Section 6.B.(2) of Schedule D*, and if you engage in this business under a different name, provide that name.*

| | | Yes | No |
|---|---|---|---|
| (3) | Do you sell products or provide services other than investment advice to your advisory *clients*? | ○ | ◉ |

*If "yes," describe this other business on* Section 6.B.(3) of Schedule D*, and if you engage in this business under a different name, provide that name.*

**SECTION 6.A. Names of Your Other Businesses**

No Information Filed

**SECTION 6.B.(2) Description of Primary Business**

Describe your primary business (not your investment advisory business):

If you engage in that business under a different name, provide that name:

**SECTION 6.B.(3) Description of Other Products and Services**

Describe other products or services you sell to your *client*. You may omit products and services that you listed in Section 6.B.(2) above.

If you engage in that business under a different name, provide that name:

**Item 7 Financial Industry Affiliations**

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients*.

A. This part of Item 7 requires you to provide information about you and your *related persons*, including foreign affiliates. Your *related persons* are all of your *advisory affiliates* and any *person* that is under common *control* with you.

You have a *related person* that is a (check all that apply):

- ☐ (1) broker-dealer, municipal securities dealer, or government securities broker or dealer (registered or unregistered)
- ☐ (2) other investment adviser (including financial planners)
- ☐ (3) registered municipal advisor
- ☐ (4) registered security-based swap dealer
- ☐ (5) major security-based swap participant
- ☐ (6) commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- ☐ (7) futures commission merchant
- ☐ (8) banking or thrift institution
- ☐ (9) trust company
- ☐ (10) accountant or accounting firm
- ☐ (11) lawyer or law firm
- ☐ (12) insurance company or agency
- ☐ (13) pension consultant
- ☐ (14) real estate broker or dealer
- ☐ (15) sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
- ☐ (16) sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

*Note that Item 7.A. should not be used to disclose that some of your employees perform investment advisory functions or are registered representatives of a broker-dealer. The number of your firm's employees who perform investment advisory functions should be disclosed under Item 5.B.(1). The number of your firm's employees who are registered representatives of a broker-dealer should be disclosed under Item 5.B.(2).*

*Note that if you are filing an umbrella registration, you should not check Item 7.A.(2) with respect to your relying advisers, and you do not have to complete Section 7.A. in Schedule D for your relying advisers. You should complete a Schedule R for each relying adviser.*

*For each related person, including foreign affiliates that may not be registered or required to be registered in the United States, complete Section 7.A. of Schedule D.*

*You do not need to complete Section 7.A. of Schedule D for any related person if: (1) you have no business dealings with the related person in connection with advisory services you provide to your clients; (2) you do not conduct shared operations with the related person; (3) you do not refer clients or business to the related person, and the related person does not refer prospective clients or business to you; (4) you do not share supervised persons or premises with the related person; and (5) you have no reason to believe that your relationship with the related person otherwise creates a conflict of interest with your clients.*

*You must complete Section 7.A. of Schedule D for each related person acting as qualified custodian in connection with advisory services you provide to your clients (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)), regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

**SECTION 7.A. Financial Industry Affiliations**

No Information Filed

**Item 7 *Private Fund* Reporting**

| | Yes | No |
|---|---|---|
| B. Are you an adviser to any *private fund*? | ◉ | ○ |

*If "yes," then for each private fund that you advise, you must complete a Section 7.B.(1) of Schedule D, except in certain circumstances described in the next sentence and in Instruction 6 of the Instructions to Part 1A. If you are registered or applying for registration with the SEC or reporting as an SEC exempt reporting adviser, and another SEC-registered adviser or SEC exempt reporting adviser reports this information with respect to any such private fund in Section 7.B.(1) of Schedule D of its Form ADV (e.g., if you are a subadviser), do not complete Section 7.B.(1) of Schedule D with respect to that private fund. You must, instead, complete Section 7.B.(2) of Schedule D.*

*In either case, if you seek to preserve the anonymity of a private fund client by maintaining its identity in your books and records in numerical or alphabetical code, or similar designation, pursuant to rule 204-2(d), you may identify the private fund in Section 7.B.(1) or 7.B.(2) of Schedule D using the same code or designation in place of the fund's name.*

SECTION 7.B.(1) ***Private Fund*** **Reporting**

**Funds per Page:** 15 Total Funds: 2

A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:

   ATLAS IDF, LP

   (b) *Private fund* identification number:
   (include the "805-" prefix also)

   805-9274628204

2. Under the laws of what state or country is the *private fund* organized:

| State: | Country: |
|---|---|
| Delaware | United States |

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| ATLAS IDF GP, LLC |

   (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

   No Information Filed

4. The *private fund* (check all that apply; you must check at least one):

   ☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

   ☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

   No Information Filed

| | Yes | No |
|---|---|---|
| 6. (a) Is this a "master fund" in a master-feeder arrangement? | ○ | ◉ |

   (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

   No Information Filed

| | Yes | No |
|---|---|---|
| (c) Is this a "feeder fund" in a master-feeder arrangement? | ○ | ◉ |

   (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

   Name of *private fund*:

   *Private fund* identification number:
   (include the "805-" prefix also)

   NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

   No Information Filed

   NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

| | Yes | No |
|---|---|---|
| 8. (a) Is this *private fund* a "fund of funds"? | ○ | ◉ |

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

| | | |
|---|---|---|
| (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

| | Yes | No |
|---|---|---|
| 9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ◉ |

10. What type of fund is the *private fund*?

○ hedge fund ○ liquidity fund ◉ private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:
$ 29,902,788

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:
$ 500,000
NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:
2

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:
0%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:
0%

| | Yes | No |
|---|---|---|
| (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:
100%

**Your Advisory Services**

| | Yes | No |
|---|---|---|
| 17. (a) Are you a subadviser to this *private fund*? | ○ | ◉ |

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

No Information Filed

| | Yes | No |
|---|---|---|
| 18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ◉ |

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

No Information Filed

| | Yes | No |
|---|---|---|
| 19. Are your *clients* solicited to invest in the *private fund*? | ○ | ◉ |

*NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?
0%

**Private Offering**

Yes No

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? (•) Yes ( ) No

22. If yes, provide the *private fund's* Form D file number (if any):

No Information Filed

B. SERVICE PROVIDERS

**Auditors**

| | Yes | No |
|---|---|---|
| 23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? | (•) | ( ) |
| (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | (•) | ( ) |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:
COHEN & CO.

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| AKRON | Ohio | United States |

| | Yes | No |
|---|---|---|
| (d) Is the auditing firm an *independent public accountant*? | (•) | ( ) |
| (e) Is the auditing firm registered with the Public Company Accounting Oversight Board? | (•) | ( ) |

If yes, Public Company Accounting Oversight Board-Assigned Number:
925

| | Yes | No |
|---|---|---|
| (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? | (•) | ( ) |

| | Yes | No |
|---|---|---|
| (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | (•) | ( ) |

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

(•) Yes ( ) No ( ) Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

| | Yes | No |
|---|---|---|
| 24. (a) Does the *private fund* use one or more prime brokers? | ( ) | (•) |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

No Information Filed

**Custodian**

| | Yes | No |
|---|---|---|
| 25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | (•) | ( ) |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
US BANK

(c) Primary business name of custodian:
US BANK

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DALLAS | Texas | United States |

(e) Is the custodian a *related person* of your firm? Yes ○ No ◉

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
-
CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

**Administrator**

26. (a) Does the *private fund* use an administrator other than your firm? Yes ◉ No ○

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b) Name of administrator:
HIGHGATE CONSULTING GROUP INC

(c) Location of administrator (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DALLAS | Texas | United States |

(d) Is the administrator a *related person* of your firm? Yes ○ No ◉

(e) Does the administrator prepare and send investor account statements to the *private fund's* investors?
◉ Yes (provided to all investors) ○ Some (provided to some but not all investors) ○ No (provided to no investors)

(f) If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? Yes ○ No ◉

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

No Information Filed

A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:
RAND PE FUND I, L.P.
(b) *Private fund* identification number:
(include the "805-" prefix also)
805-7357834832

2. Under the laws of what state or country is the *private fund* organized:
State: Delaware
Country: United States

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| RAND PE FUND MANAGEMENT, LLC |

(b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

No Information Filed

4. The *private fund* (check all that apply; you must check at least one):
☑ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

No Information Filed

| | Yes | No |
|---|---|---|
| 6. (a) Is this a "master fund" in a master-feeder arrangement? | ○ | ◉ |

(b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

No Information Filed

| | Yes | No |
|---|---|---|
| (c) Is this a "feeder fund" in a master-feeder arrangement? | ○ | ◉ |

(d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

No Information Filed

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their

assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.





| | Yes | No |
|---|---|---|
| 8. (a) Is this *private fund* a "fund of funds"? | ○ | ● |

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

| | Yes | No |
|---|---|---|
| (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

| | Yes | No |
|---|---|---|
| 9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ● |

10. What type of fund is the *private fund*?

○ hedge fund ○ liquidity fund ● private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

$ 0

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:

$ 500,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

3

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

0%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

| | Yes | No |
|---|---|---|
| (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ● | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

100%

**Your Advisory Services**

| | Yes | No |
|---|---|---|
| 17. (a) Are you a subadviser to this *private fund*? | ○ | ● |

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

No Information Filed

| | Yes | No |
|---|---|---|
| 18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ● |

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

No Information Filed

| | Yes | No |
|---|---|---|
| 19. Are your *clients* solicited to invest in the *private fund*? | ○ | ● |

*NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

| | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ◉ | ○ |

22. If yes, provide the *private fund's* Form D file number (if any):

No Information Filed

B. SERVICE PROVIDERS

**Auditors**

| | Yes | No |
|---|---|---|
| 23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? | ◉ | ○ |
| (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ◉ | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:
COHEN & CO

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| AKRON | Ohio | United States |

| | Yes | No |
|---|---|---|
| (d) Is the auditing firm an *independent public accountant*? | ◉ | ○ |
| (e) Is the auditing firm registered with the Public Company Accounting Oversight Board? | ◉ | ○ |

If yes, Public Company Accounting Oversight Board-Assigned Number:
925

| | Yes | No |
|---|---|---|
| (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? | ◉ | ○ |

| | Yes | No |
|---|---|---|
| (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ◉ | ○ |

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

◉ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

| | Yes | No |
|---|---|---|
| 24. (a) Does the *private fund* use one or more prime brokers? | ○ | ◉ |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

No Information Filed

**Custodian**

| | Yes | No |
|---|---|---|
| 25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ◉ | ○ |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
STATE STREET GLOBAL MARKETS, LLC

(c) Primary business name of custodian:
STATE STREET GLOBAL MARKETS, LLC

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| BOSTON | Massachusetts | United States |

| | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ◉ |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
8 - 69862
CRD Number (if any):
285852

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

**Administrator**

| | Yes | No |
|---|---|---|
| 26. (a) Does the *private fund* use an administrator other than your firm? | ◉ | ○ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b) Name of administrator:
HIGHGATE CONSULTING GROUP INC

(c) Location of administrator (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DALLAS | Texas | United States |

| | Yes | No |
|---|---|---|
| (d) Is the administrator a *related person* of your firm? | ○ | ◉ |

(e) Does the administrator prepare and send investor account statements to the *private fund's* investors?
◉ Yes (provided to all investors) ○ Some (provided to some but not all investors) ○ No (provided to no investors)

(f) If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?
100%
Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

| | Yes | No |
|---|---|---|
| 28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ○ | ◉ |

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

No Information Filed

**Funds per Page:** 15 Total Funds: 2

**SECTION 7.B.(2) *Private Fund* Reporting**

1. Name of the *private fund*:
   RAND ADVISORS SERIES I INSURANCE FUND SERIES INTERESTS OF THE SALI MULTISERIES

2. *Private fund* identification number:
   (include the "805-" prefix also)
   805-9425927696

3. Name and SEC File number of adviser that provides information about this *private fund* in Section 7.B.(1) of Schedule D of its Form ADV filing
   Name:
   SALI FUND SERVICES
   SEC File Number:
   801 - 61702

| | Yes | No |
|---|---|---|
| 4. Are your *clients* solicited to invest in this *private fund*? | ○ | ◉ |

In answering this question, disregard feeder funds' investment in a master fund. For purposes of this question, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

**Item 8 Participation or Interest in *Client* Transactions**

In this Item, we request information about your participation and interest in your *clients*' transactions. This information identifies additional areas in which conflicts of interest may occur between you and your *clients*. Newly-formed advisers should base responses to these questions on the types of participation and interest that you expect to engage in during the next year.

Like Item 7, Item 8 requires you to provide information about you and your *related persons*, including foreign affiliates.

**Proprietary Interest in *Client* Transactions**

| A. Do you or any *related person*: | Yes | No |
|---|---|---|
| (1) buy securities for yourself from advisory *clients*, or sell securities you own to advisory *clients* (principal transactions)? | ○ | ◉ |
| (2) buy or sell for yourself securities (other than shares of mutual funds) that you also recommend to advisory *clients*? | ◉ | ○ |
| (3) recommend securities (or other investment products) to advisory *clients* in which you or any *related person* has some other proprietary (ownership) interest (other than those mentioned in Items 8.A.(1) or (2))? | ◉ | ○ |

**Sales Interest in *Client* Transactions**

| B. Do you or any *related person*: | Yes | No |
|---|---|---|
| (1) as a broker-dealer or registered representative of a broker-dealer, execute securities trades for brokerage customers in which advisory *client* securities are sold to or bought from the brokerage customer (agency cross transactions)? | ○ | ◉ |
| (2) recommend to advisory *clients*, or act as a purchaser representative for advisory *clients* with respect to, the purchase of securities for which you or any *related person* serves as underwriter or general or managing partner? | ◉ | ○ |
| (3) recommend purchase or sale of securities to advisory *clients* for which you or any *related person* has any other sales interest (other than the receipt of sales commissions as a broker or registered representative of a broker-dealer)? | ○ | ◉ |

**Investment or Brokerage Discretion**

| C. Do you or any *related person* have *discretionary authority* to determine the: | Yes | No |
|---|---|---|
| (1) securities to be bought or sold for a *client's* account? | ◉ | ○ |

| | | Yes | No |
|---|---|---|---|
| (2) | amount of securities to be bought or sold for a *client's* account? | ◉ | ○ |
| (3) | broker or dealer to be used for a purchase or sale of securities for a *client's* account? | ◉ | ○ |
| (4) | commission rates to be paid to a broker or dealer for a *client's* securities transactions? | ◉ | ○ |

| | | Yes | No |
|---|---|---|---|
| D. | If you answer "yes" to C.(3) above, are any of the brokers or dealers *related persons*? | ○ | ◉ |
| E. | Do you or any *related person* recommend brokers or dealers to *clients*? | ◉ | ○ |
| F. | If you answer "yes" to E. above, are any of the brokers or dealers *related persons*? | ○ | ◉ |
| G. (1) | Do you or any *related person* receive research or other products or services other than execution from a broker-dealer or a third party ("soft dollar benefits") in connection with *client* securities transactions? | ◉ | ○ |
| (2) | If "yes" to G.(1) above, are all the "soft dollar benefits" you or any *related persons* receive eligible "research or brokerage services" under section 28(e) of the Securities Exchange Act of 1934? | ◉ | ○ |
| H. (1) | Do you or any *related person*, directly or indirectly, compensate any *person* that is not an *employee* for *client* referrals? | ○ | ◉ |
| (2) | Do you or any *related person*, directly or indirectly, provide any *employee* compensation that is specifically related to obtaining *clients* for the firm (cash or non-cash compensation in addition to the *employee's* regular salary)? | ○ | ◉ |
| I. | Do you or any *related person*, including any *employee*, directly or indirectly, receive compensation from any *person* (other than you or any *related person*) for *client* referrals? | ○ | ◉ |

*In your response to Item 8.I., do not include the regular salary you pay to an employee.*

*In responding to Items 8.H. and 8.I., consider all cash and non-cash compensation that you or a related person gave to (in answering Item 8.H.) or received from (in answering Item 8.I.) any person in exchange for client referrals, including any bonus that is based, at least in part, on the number or amount of client referrals.*

**Item 9 Custody**

In this Item, we ask you whether you or a *related person* has *custody* of *client* (other than *clients* that are investment companies registered under the Investment Company Act of 1940) assets and about your custodial practices.

A. (1) Do you have *custody* of any advisory *clients'*:

| | Yes | No |
|---|---|---|
| (a) cash or bank accounts? | ◉ | ○ |
| (b) securities? | ◉ | ○ |

*If you are registering or registered with the SEC, answer "No" to Item 9.A.(1)(a) and (b) if you have custody solely because (i) you deduct your advisory fees directly from your clients' accounts, or (ii) a related person has custody of client assets in connection with advisory services you provide to clients, but you have overcome the presumption that you are not operationally independent (pursuant to Advisers Act rule 206(4)-2(d)(5)) from the related person.*

(2) If you checked "yes" to Item 9.A.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which you have *custody*:

| U.S. Dollar Amount | Total Number of *Clients* |
|---|---|
| (a) $ 153,649,022 | (b) 3 |

*If you are registering or registered with the SEC and you have custody solely because you deduct your advisory fees directly from your clients' accounts, do not include the amount of those assets and the number of those clients in your response to Item 9.A.(2). If your related person has custody of client assets in connection with advisory services you provide to clients, do not include the amount of those assets and number of those clients in your response to 9.A.(2). Instead, include that information in your response to Item 9.B.(2).*

B. (1) In connection with advisory services you provide to *clients*, do any of your *related persons* have *custody* of any of your advisory *clients'*:

| | Yes | No |
|---|---|---|
| (a) cash or bank accounts? | ○ | ◉ |
| (b) securities? | ○ | ◉ |

*You are required to answer this item regardless of how you answered Item 9.A.(1)(a) or (b).*

(2) If you checked "yes" to Item 9.B.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which your *related persons* have *custody*:

| U.S. Dollar Amount | Total Number of *Clients* |
|---|---|
| (a) $ | (b) |

C. If you or your *related persons* have *custody* of *client* funds or securities in connection with advisory services you provide to *clients*, check all the following that apply:

(1) A qualified custodian(s) sends account statements at least quarterly to the investors in the pooled investment vehicle(s) you manage. ☐

(2) An *independent public accountant* audits annually the pooled investment vehicle(s) that you manage and the audited financial statements ☑

are distributed to the investors in the pools.

(3) An *independent public accountant* conducts an annual surprise examination of *client* funds and securities. ☐

(4) An *independent public accountant* prepares an internal control report with respect to custodial services when you or your *related persons* are qualified custodians for *client* funds and securities. ☐

*If you checked Item 9.C.(2), C.(3) or C.(4), list in Section 9.C. of Schedule D the accountants that are engaged to perform the audit or examination or prepare an internal control report. (If you checked Item 9.C.(2), you do not have to list auditor information in Section 9.C. of Schedule D if you already provided this information with respect to the private funds you advise in Section 7.B.(1) of Schedule D).*

D. Do you or your *related person(s)* act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*?

| | Yes | No |
|---|---|---|
| (1) you act as a qualified custodian | ○ | ◉ |
| (2) your *related person(s)* act as qualified custodian(s) | ○ | ◉ |

*If you checked "yes" to Item 9.D.(2), all related persons that act as qualified custodians (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)) must be identified in Section 7.A. of Schedule D, regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

E. If you are filing your *annual updating amendment* and you were subject to a surprise examination by an *independent public accountant* during your last fiscal year, provide the date (MM/YYYY) the examination commenced:

F. If you or your *related persons* have *custody* of *client* funds or securities, how many *persons*, including, but not limited to, you and your *related persons,* act as qualified custodians for your *clients* in connection with advisory services you provide to *clients?*
2

**SECTION 9.C. *Independent Public Accountant***

No Information Filed

**Item 10 Control Persons**

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you. If you are filing an *umbrella registration*, the information in Item 10 should be provided for the *filing adviser* only.

If you are submitting an initial application or report, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners. If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application or report, you must complete Schedule C.

| | Yes | No |
|---|---|---|
| A. Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies? | ○ | ◉ |

*If yes, complete Section 10.A. of Schedule D.*

B. If any *person* named in Schedules A, B, or C or in Section 10.A. of Schedule D is a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934, please complete Section 10.B. of Schedule D.

**SECTION 10.A. *Control Persons***

No Information Filed

**SECTION 10.B. *Control Person* Public Reporting Companies**

No Information Filed

**Item 11 Disclosure Information**

In this Item, we ask for information about your disciplinary history and the disciplinary history of all your *advisory affiliates*. We use this information to determine whether to grant your application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below. In accordance with General Instruction 5 to Form ADV, "you" and "your" include the *filing adviser* and all *relying advisers* under an *umbrella registration*.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you.

If you are a "separately identifiable department or division" (SID) of a bank, see the Glossary of Terms to determine who your *advisory affiliates* are.



*If you are registered or registering with the SEC or if you are an exempt reporting adviser, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a state, you must respond to the questions as posed; you may, therefore, limit your disclosure to ten years following the date of an event only in responding to Items 11.A.(1), 11.A.(2), 11.B.(1), 11.B.(2), 11.D.(4), and 11.H.(1)(a). For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.*

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

| | Yes | No |
|---|---|---|
| Do any of the events below involve you or any of your *supervised persons*? | ○ | ● |

For "yes" answers to the following questions, complete a Criminal Action DRP:

| | Yes | No |
|---|---|---|
| A. In the past ten years, have you or any *advisory affiliate*: | | |
| (1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? | ○ | ● |
| (2) been *charged* with any *felony*? | ○ | ● |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.A.(2) to charges that are currently pending.*

| | Yes | No |
|---|---|---|
| B. In the past ten years, have you or any *advisory affiliate*: | | |
| (1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor* involving: investments or an *investment-related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | ○ | ● |
| (2) been *charged* with a *misdemeanor* listed in Item 11.B.(1)? | ○ | ● |

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.B.(2) to charges that are currently pending.*

For "yes" answers to the following questions, complete a Regulatory Action DRP:

| | Yes | No |
|---|---|---|
| C. Has the SEC or the Commodity Futures Trading Commission (CFTC) ever: | | |
| (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ● |
| (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes? | ○ | ● |
| (3) *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ● |
| (4) entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity? | ○ | ● |
| (5) imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity? | ○ | ● |
| D. Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*: | | |
| (1) ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical? | ○ | ● |
| (2) ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes? | ○ | ● |
| (3) ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ● |
| (4) in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity? | ○ | ● |
| (5) ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory affiliate*, by *order*, from associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity? | ○ | ● |
| E. Has any *self-regulatory organization* or commodities exchange ever: | | |
| (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ● |
| (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a "*minor rule violation*" under a plan approved by the SEC)? | ○ | ● |
| (3) *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ● |
| (4) disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities? | ○ | ● |
| F. Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended? | ○ | ● |
| G. Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.? | ○ | ● |

For "yes" answers to the following questions, complete a Civil Judicial Action DRP:

| | Yes | No |
|---|---|---|
| H. (1) Has any domestic or foreign court: | | |

(a) in the past ten years, *enjoined* you or any *advisory affiliate* in connection with any *investment-related* activity? ○ ◉

(b) ever *found* that you or any *advisory affiliate* were *involved* in a violation of *investment-related* statutes or regulations? ○ ◉

(c) ever dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you or any *advisory affiliate* by a state or *foreign financial regulatory authority*? ○ ◉

(2) Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could result in a "yes" answer to any part of Item 11.H.(1)? ○ ◉

**Item 12 Small Businesses**

The SEC is required by the Regulatory Flexibility Act to consider the effect of its regulations on small entities. In order to do this, we need to determine whether you meet the definition of "small business" or "small organization" under rule 0-7.

Answer this Item 12 only if you are registered or registering with the SEC **and** you indicated in response to Item 5.F.(2)(c) that you have regulatory assets under management of less than $25 million. You are not required to answer this Item 12 if you are filing for initial registration as a state adviser, amending a current state registration, or switching from SEC to state registration.

For purposes of this Item 12 only:

- Total Assets refers to the total assets of a firm, rather than the assets managed on behalf of *clients*. In determining your or another *person's* total assets, you may use the total assets shown on a current balance sheet (but use total assets reported on a consolidated balance sheet with subsidiaries included, if that amount is larger).
- *Control* means the power to direct or cause the direction of the management or policies of a *person*, whether through ownership of securities, by contract, or otherwise. Any *person* that directly or indirectly has the right to vote 25 percent or more of the voting securities, or is entitled to 25 percent or more of the profits, of another *person* is presumed to *control* the other *person*.

| | Yes | No |
|---|---|---|
| A. Did you have total assets of $5 million or more on the last day of your most recent fiscal year? | ○ | ○ |
| *If "yes," you do not need to answer Items 12.B. and 12.C.* | | |
| B. Do you: | | |
| (1) *control* another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| (2) *control* another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| C. Are you: | | |
| (1) *controlled* by or under common *control* with another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| (2) *controlled* by or under common *control* with another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |

**Schedule A**

**Direct Owners and Executive Officers**

1. Complete Schedule A only if you are submitting an initial application or report. Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.
2. Direct Owners and Executive Officers. List below the names of:
   (a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Compliance Officer is required if you are registered or applying for registration and cannot be more than one individual), director, and any other individuals with similar status or functions;
   (b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act);
   Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.
   (c) if you are organized as a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital;
   (d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and
   (e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.
3. Do you have any indirect owners to be reported on Schedule B? ◉ Yes ○ No
4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.
5. Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).
6. Ownership codes are: NA - less than 5%; B - 10% but less than 25%; D - 50% but less than 75%; A - 5% but less than 10%; C - 25% but less than 50%; E - 75% or more
7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does

not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

(b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

(c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| CHARITABLE DAF HOLDINGS CORP. | DE | OWNER | 08/2022 | E | Y | N | |
| Patrick, Mark | I | CCO | 08/2022 | NA | Y | N | 7626259 |

**Schedule B**

**Indirect Owners**

1. Complete Schedule B only if you are submitting an initial application or report. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners. Use Schedule C to amend this information.
2. Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:
   (a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation;

   For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (b) in the case of an owner that is a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital;
   (c) in the case of an owner that is a trust, the trust and each trustee; and
   (d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, all elected managers.
3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.
4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.
5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).
6. Ownership codes are: C - 25% but less than 50% E - 75% or more
   D - 50% but less than 75% F - Other (general partner, trustee, or elected manager)
7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.
   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.
   (c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Entity in Which Interest is Owned | Status | Date Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|---|
| LIBERTY CLO HOLDCO, LTD. | FE | CHARITABLE DAF HOLDINGS CORP. | OWNER OF CHARITABLE DAF HOLDINGS CORP. | 04/2023 | E | Y | N | |
| CHARITABLE DAF HOLDCO LTD. | FE | LIBERTY CLO HOLDCO, LTD. | OWNER OF CHARITABLE DAF FUND, L.P. | 11/2011 | E | Y | N | |
| CDH GP, LTD | DE | LIBERTY CLO HOLDCO, LTD. | GNEREAL PARTNER OF CHARITABLE DAF FUND, L.P | 03/2024 | F | Y | N | |
| Patrick, Mark | I | CDH GP, LTD | SOLE OWNER AND SOLE DIRECTOR OF CDH GP, LTD. | 03/2024 | E | Y | N | 7626259 |

**Schedule D - Miscellaneous**

You may use the space below to explain a response to an Item or to provide any other information.

**Schedule R**

No Information Filed

**DRP Pages**

**CRIMINAL DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**Part 2**

**Exemption from brochure delivery requirements for SEC-registered advisers**

SEC rules exempt SEC-registered advisers from delivering a firm brochure to some kinds of clients. If these exemptions excuse you from delivering a brochure to *all* of your advisory clients, you do not have to prepare a brochure.

| | Yes | No |
|---|---|---|
| Are you exempt from delivering a brochure to all of your clients under these rules? | ○ | ◉ |

*If no, complete the ADV Part 2 filing below.*

Amend, retire or file new brochures:

| Brochure ID | Brochure Name | Brochure Type(s) |
|---|---|---|
| 400181 | ADV PART 2A | Private funds or pools |
| 409351 | ADV PART 2 | Private funds or pools |

**Part 3**

| CRS | Type(s) | Affiliate Info | Retire |
|---|---|---|---|

There are no CRS filings to display.

**Execution Pages**

**DOMESTIC INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

## Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing*.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

| | |
|---|---|
| Signature:<br>SHAWN RAVER | Date: MM/DD/YYYY<br>03/17/2025 |
| Printed Name:<br>SHAWN RAVER | Title:<br>OPERATIONS |

**_NON-RESIDENT_ INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a *notice filing*.

2. Appointment and Consent: Effect on Partnerships

If you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner withdraws from or is admitted to the partnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable power of attorney and consent shall be in effect for any action brought against you or any of your former partners.

3. *Non-Resident* Investment Adviser Undertaking Regarding Books and Records

By signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal office in Washington D.C., at any Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current, and complete copies of any or all records that you are required to maintain under Rule 204-2 under the Investment Advisers Act of 1940. This undertaking shall be binding upon you, your heirs, successors and assigns, and any *person* subject to your written irrevocable consents or powers of attorney or any of your general partners and *managing agents*.

Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the *non-resident* investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

| | |
|---|---|
| Signature: | Date: MM/DD/YYYY |
| Printed Name: | Title: |
| Adviser *CRD* Number: 172839 | |

# Exhibit 6

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
Susheel Kirpalani (admitted *pro hac vice*)
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
Benjamin I. Finestone (admitted *pro hac vice*)
Calli Ray (admitted *pro hac vice*)
Alexandre J. Tschumi (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

**SIDLEY AUSTIN LLP**
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as Litigation Trustee of the Highland Litigation Sub-Trust*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |
| MARC S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST,<br><br>Plaintiff,<br><br>v.<br><br>JAMES D. DONDERO; MARK A. OKADA; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1 AND LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; MARK & PAMELA OKADA FAMILY TRUST – | Adv. Pro. No. 21-03076-sgj<br><br>AMENDED COMPLAINT AND OBJECTION TO CLAIMS |

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are (8357). The Reorganized Debtor is a Delaware limited partnership. The Reorganized Debtor's headquarters and service address are 100 Crescent Court, Suite 1850, Dallas, TX 75201.

EXEMPT TRUST #2 AND LAWRENCE TONOMURA IN HIS CAPACITY AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2; CLO HOLDCO, LTD.; CHARITABLE DAF HOLDCO, LTD.; CHARITABLE DAF FUND, LP.; HIGHLAND DALLAS FOUNDATION; RAND PE FUND I, LP, SERIES 1; MASSAND CAPITAL, LLC; MASSAND CAPITAL, INC.; AND SAS ASSET RECOVERY, LTD.,

Defendants.

as Highland Dallas's president, and Scott served as its treasurer. Highland Dallas's principal office address is 3963 Maple Avenue, Suite 390, Dallas, Texas, 75219.

26. Defendant Scott, in addition to being named above in his individual capacity, is named in his capacity as Trustee of Get Good Trust, a trust established under the laws of the State of Delaware. According to Get Good's July 9, 2021, disclosure to this Court, Get Good consists of three related trusts: Get Good Trust, Get Good Non Exempt Trust No. 1, and Get Good Non Exempt Trust No. 2, all of which are included in the term "Get Good." Dondero is the settlor of Get Good, its beneficiaries are his "living descendants," and Scott was Get Good's trustee at all times relevant to this Amended Complaint.

27. Defendant Hunter Mountain Investment Trust ("Hunter Mountain") is a statutory trust established under the laws of the state of Delaware. Hunter Mountain was formed on December 17, 2015, shortly before it purchased limited partnership interests in HCMLP from HCMLP's then-existing limited partners (*i.e.*, Dondero, Okada, and entities that they controlled) and HCMLP. Through a complex series of transactions that occurred on December 21, 2015, and December 24, 2015, Dondero caused Hunter Mountain to become the owner-in-name of 99.5% of the economic interests of HCMLP. Meanwhile, Dondero caused Hunter Mountain to issue a series of notes and cash, such that Dondero, Okada, and certain entities that they controlled (including Dugaboy, The Mark & Pamela Okada Family Trust – Exempt Trust #1, and The Mark & Pamela Okada Family Trust – Exempt Trust #2) continued to receive the economic benefit of limited partnership distributions made by HCMLP to Hunter Mountain even after they had purportedly sold their limited partnership interests to Hunter Mountain. One such note was a $63 million secured promissory note Hunter Mountain entered into with HCMLP on December 21, 2015 (the "Hunter Mountain Note").

# Exhibit 7

PACHULSKI STANG IEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (admitted *pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (admitted *pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward HaywardFirm.com
achery . Annable
Texas Bar No. 24053075
Annable HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |

**NOTICE OF OCCURRENCE OF EFFECTIVE DATE OF CONFIRMED FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.**

**PLEASE TAKE NOTICE** that on February 22, 2021, the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* Docket No. 1943 (the "Confirmation Order") confirming the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* Docket No. 1808 (as

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

amended, supplemented, or modified, the "Plan"). Unless otherwise defined in this notice, capitalized terms used in this notice shall have the meanings ascribed to them in the Plan and the Confirmation Order, as applicable.

**PLEASE TAKE FURTHER NOTICE** that the Effective Date of the Plan occurred on August 11, 2021.

**PLEASE TAKE FURTHER NOTICE** that, except with respect to Administrative Expense Claims that are Professional Fee Claims or as otherwise set forth in the Plan, requests for payment of an Administrative Expense Claim must be Filed with the Bankruptcy Court **no later than forty-five (45) days after the Effective Date** (the "Administrative Expense Claims Bar Date"). **HOLDERS OF ADMINISTRATIVE EXPENSE CLAIMS THAT ARE REQUIRED TO FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE EXPENSE CLAIMS BY THE ADMINISTRATIVE EXPENSE CLAIMS BAR DATE THAT DO NOT FILE AND SERVE SUCH A REQUEST BY THE ADMINISTRATIVE EXPENSE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE EXPENSE CLAIMS AGAINST THE DEBTOR OR THE REORGANIZED DEBTOR.**

**PLEASE TAKE FURTHER NOTICE** that, unless otherwise ordered by the Bankruptcy Court, all final requests for payment of Professional Fee Claims must be Filed **no later than sixty (60) days after the Effective Date**.

**PLEASE TAKE FURTHER NOTICE** that the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtor or the Reorganized Debtor, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan and Confirmation Order, including, without limitation: the injunction with respect to the commencement of claims and causes of action against Protected Parties set forth in Section IX.F of the Plan and Sections AA and BB of the Confirmation Order, the duration of injunction and stays set forth in Section IX.G of the Plan and Section AA of the Confirmation Order, and the continuance of the January 9 Order and July 16 Order set forth in Section IX.H of the Plan and Section CC of the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that on the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B C Limited Partnerships in the Debtor will be deemed cancelled, and all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, such Class A Limited Partnership Interests and Class B C Limited Partnership Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

**PLEASE TAKE FURTHER NOTICE** that the Confirmation Order and the Plan

are available for inspection. If you would like to obtain copies you may: (a) access the Debtor's restructuring website at http: www.kccllc.net hcmlp; (b) call toll free: (877) 573-3984 or international: (310) 751-1829; or (c) email HighlandInfo kccllc.com and reference "Highland" in the subject line. You may also obtain copies of any pleadings filed in this case for a fee via PACER at: pacer.uscourts.gov.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

Dated: August 11, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz pszjlaw.com
ikharasch pszjlaw.com
gdemo pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward HaywardFirm.com
achery . Annable
Texas Bar No. 24053075
Annable HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor*

# Exhibit 8

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
Susheel Kirpalani (admitted *pro hac vice*)
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
Benjamin I. Finestone (admitted *pro hac vice*)
Calli Ray (admitted *pro hac vice*)
Alexandre J. Tschumi (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

**SIDLEY AUSTIN LLP**
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as Litigation Trustee of the Highland Litigation Sub-Trust*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |
| MARC S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST,<br><br>Plaintiff,<br><br>v.<br><br>JAMES D. DONDERO; MARK A. OKADA; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1 AND LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; MARK & PAMELA OKADA FAMILY TRUST – | Adv. Pro. No. 21-03076-sgj<br><br>AMENDED COMPLAINT AND OBJECTION TO CLAIMS |

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are (8357). The Reorganized Debtor is a Delaware limited partnership. The Reorganized Debtor's headquarters and service address are 100 Crescent Court, Suite 1850, Dallas, TX 75201.

EXEMPT TRUST #2 AND LAWRENCE TONOMURA IN HIS CAPACITY AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2; CLO HOLDCO, LTD.; CHARITABLE DAF HOLDCO, LTD.; CHARITABLE DAF FUND, LP.; HIGHLAND DALLAS FOUNDATION; RAND PE FUND I, LP, SERIES 1; MASSAND CAPITAL, LLC; MASSAND CAPITAL, INC.; AND SAS ASSET RECOVERY, LTD.,

Defendants.

# TABLE OF CONTENTS

Page

I. INTRODUCTION ....1

II. PARTIES ....4

III. JURISDICTION, VENUE & STANDING ....12

IV. FACTUAL ALLEGATIONS ....14

A. Dondero Creates HCMLP ....14

B. HCMLP Narrowly Survives The Financial Crisis Of 2008, And Emerges Facing Hundreds Of Millions Of Dollars In Potential Litigation Damages ....15

C. In A Scheme To Evade HCMLP's Creditors, Dondero Creates "Lifeboats" To Usurp HCMLP's Business ....18

1. NexPoint ....19

2. HCMFA ....22

D. Dondero, Ellington, and Leventon Cause HCMLP To Engage In Misconduct That Exposes It To Additional Liability ....25

1. Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry ....26

2. Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest ....29

3. Dondero And His Accomplices, Including Ellington and Leventon, Cause HCMLP To Engage In Misconduct That Increases Its Liability To UBS ....30

4. Dondero Causes HCMLP To Engage In Misconduct That Results In Liability To HERA And Patrick Daugherty ....33

E. Dondero, Ellington, and Leventon Cause HCMLP To Engage In Conduct That Results In An Arbitration Award Against It Of Approximately $190 Million And Forces HCMLP Into Bankruptcy ....35

F. Dondero's Schemes Result In Hundreds Of Millions Of Dollars Of Liability For HCMLP ....38

1. HCMLP Incurs $125 Million In Liability To UBS As A Result Of Dondero's, Leventon's, and Ellington's Misconduct ....39

2. HCMLP Incurs More Than $185 Million In Liability To The Redeemer Committee And Crusader Funds As A Result Of Dondero's Misconduct ....41

3. HCMLP Incurs More Than $100 Million In Liability To Acis, Terry, And HarbourVest As A Result Of Dondero's Misconduct ....42

G. HCMLP Was Insolvent, Inadequately Capitalized, And/Or Intended To Incur Debts Beyond Its Ability To Pay Well Before The Redeemer Committee Arbitration Award Forced It Into Bankruptcy ....43

H. At All Time Relevant To This Amended Complaint, Dondero Hopelessly Commingled And Exploited Entities Within His Enterprise For His Own Personal Benefit ....46

1. Prior To Dondero's Resignation From Strand, Dondero Was The Alter Ego Of Strand ....46

2. Dondero Routinely Commingled Entities And Employees Throughout The Dondero Corporate Web And Abused The Corporate Form ....47

I. Dondero And His Loyalists Also Engaged In Other Conduct That Harmed HCMLP ....55

1. Dondero And His Loyalists Fraudulently Transferred Assets To Themselves And Their Affiliated Entities ....55

(a) The Fraudulent CLO Holdco Transaction ....55

(b) Fraudulent Distributions ....58

(c) Fraudulent Transfers To Massand ....63

J. Dondero And Ellington Breach Their Fiduciary Duties To HCMLP By Misappropriating Its Funds ....65

K. Dondero Loyalists Receive Their Deferred Compensation By Engaging In The Tall Pine Transaction ....66

V. CAUSES OF ACTION ....67

PRAYER FOR RELIEF ....141

Plaintiff Marc S. Kirschner (the "Litigation Trustee"), as Litigation Trustee of the Litigation Sub-Trust (the "Trust") established pursuant to the Fifth Amended Plan of Reorganization (the "Plan") of Highland Capital Management L.P. ("HCMLP" or the "Reorganized Debtor") (Docket No. 1472), through his undersigned counsel, brings this action and alleges as follows:

## I. INTRODUCTION[2]

1. The Litigation Trustee brings this action to recover hundreds of millions of dollars in damages that HCMLP suffered at the hands of its founder, James Dondero, acting in concert with other entities that he owned and/or controlled (collectively, the "Dondero Entities"), and with the aid of other HCMLP officers and attorneys who disregarded their fiduciary duties to HCMLP in favor of Dondero and their own self-interests.

2. HCMLP was founded in 1993 as an investment advisor that also provided middle- and back-office services and engaged in proprietary trading. Prior to its bankruptcy filing on October 16, 2019, HCMLP was one of more than 2,000 Dondero Entities. The Dondero Entities were operated and controlled for Dondero's benefit, with Dondero utilizing complex corporate structures and transactions to transfer money and assets between the various Dondero Entities in the manner he viewed most advantageous to his own bottom line, including to avoid creditors, exploit personal tax benefits, and ensure that assets were preserved for his benefit and profits ultimately flowed to him.

3. HCMLP was at the center of Dondero's web: it employed nearly all of the people who performed services for myriad Dondero Entities, and it was those employees who carried out the substantive work for the Dondero Entities. Even when HCMLP's full role was hidden—

[2] Capitalized terms not defined in this section are defined later in the Amended Complaint.

either because it was not credited at all, or because it was identified only as a sub-advisor or service provider to Dondero's other management companies—it was HCMLP personnel executing Dondero's strategies for a wide array of Dondero Entities.

4. In or about 2008, after years of successful operations, HCMLP was hit hard by the economic recession. The recession gave rise to a multitude of lawsuits against HCMLP, and it became embroiled in litigations that threatened to impose crippling damages amounting to hundreds of millions of dollars.

5. Faced with this looming threat, Dondero devised a plan to siphon business away from HCMLP through the creation of "lifeboats" that he owned and controlled, which he sought to insulate from the claims of HCMLP's litigation creditors once they crystalized. The lifeboats were set up to provide the management services that HCMLP had been providing before the lifeboats' creation. The lifeboats were really HCMLP in disguise, however, as they conducted their business through HCMLP's employees, operated out of HCMLP's office, and in several cases, simply took over HCMLP's contracts, diverting the resulting fees away from HCMLP while HCMLP continued to provide the underlying services. The lifeboats collected the lion's share of the profits for HCMLP's work, while HCMLP bore the majority of expenses.

6. In the years that followed, Dondero—acting with the aid of certain HCMLP officers and employees—operated HCMLP to further his own personal interests, to HCMLP's detriment. Among other transgressions, Dondero, standing behind HCMLP's perceived corporate shield:

- Caused HCMLP to pay tens of millions of dollars to or for the benefit of Dondero and his affiliates in order to evade creditors, at a time when HCMLP was insolvent, inadequately capitalized, or intended to incur debts beyond its ability to pay;

- Caused HCMLP to transfer assets to other Dondero Entities for less than reasonably equivalent value at a time when HCMLP was insolvent, inadequately capitalized, or intended to incur debts beyond its ability to pay, in order to deprive creditors of the value of the transferred assets;

- Exploited HCMLP to exact vendettas on employees he perceived as disloyal, going so far as to destroy value at HCMLP and other Dondero Entities solely to inflict losses on his perceived enemies;

- Used HCMLP as a vehicle to fraudulently induce an investment of approximately $75 million into another Dondero Entity, with the goal of moving funds to yet another Dondero Entity;

- Caused the fraudulent transfer of assets worth at least $100 million out of HCMLP-managed funds to evade pending litigation claims asserted by UBS;

- Disregarded HCMLP's contractual and fiduciary obligations to investors in certain of HCMLP liquidating funds; and

- Siphoned funds out of HCMLP for use by other Dondero Entities, in exchange for artificially low interest, long-term notes that Dondero later purported to extend (by 30 years) or retroactively forgive, all for no consideration to HCMLP.

7. Dondero's conduct resulted in a second wave of litigation against HCMLP, exacerbating HCMLP's insolvency, inadequate capitalization, and inability to pay its debts. As was wholly foreseeable, Dondero's conduct hobbled HCMLP with hundreds of millions of dollars of additional contingent litigation liabilities that were all but certain to come due given Dondero's brazen wrongdoing.

8. In October 2019, the dam broke, and the repercussions of Dondero's actions came crashing down on HCMLP. An arbitration award of approximately $190 million was issued against HCMLP based on Dondero's failure to abide by a negotiated plan of distribution for certain of its liquidating funds, forcing HCMLP to file for bankruptcy protection. Shortly thereafter, a judgment of more than $1 billion was rendered for UBS against two HCMLP-managed funds, leading UBS to file a proof of claim against HCMLP that sought to hold

HCMLP responsible for its role in preventing the Fund Counterparties (defined below) from satisfying any of their debt to UBS.

9. In 2020, HCMLP, finally operating under the control of true and independent fiduciaries, negotiated a settlement with UBS for a total of $75 million in allowed claims. HCMLP was forced to reopen settlement discussions and increase that number to $125 million, however, when HCMLP discovered that in 2017, Dondero and his loyalists had surreptitiously transferred the two funds' remaining assets to a Dondero Entity. Other settlements followed, as HCMLP, burdened by Dondero's blatant wrongdoing, was forced to compromise claim after claim in order to avoid even greater dilution of creditor recoveries.

10. HCMLP now stands liable for more than $350 million in allowed creditor claims—in addition to tens of millions of dollars of costs occasioned by HCMLP's bankruptcy filing—that stem solely from, and would not exist but for, the knowing misconduct of Dondero and his loyalists. The Litigation Trustee thus brings this action to seek redress for the significant harm Dondero and his affiliates and accomplices inflicted on HCMLP, and to ensure that Dondero and those who aided him are not permitted to abscond with or divert value that rightfully belongs to HCMLP and its creditors.

## II. PARTIES

11. Plaintiff Marc S. Kirschner is the Litigation Trustee for the Trust established under HCMLP's Plan.

12. Defendant James D. Dondero is an individual who, upon information and belief, at all times relevant to this Amended Complaint was residing in Dallas, Texas. Dondero is the co-founder of HCMLP and, prior to his removal on January 9, 2020, was the Chief Executive Officer and President of HCMLP. From the time that HCMLP was founded through October

16, 2019, when it filed for bankruptcy (the "Petition Date"), Dondero controlled HCMLP through his position at HCMLP, his ownership of HCMLP's general partner, and his ownership of, or control over the owners of, HCMLP's limited partnership interests. As set forth below, Dondero also owns and/or directly or indirectly controls hundreds of Dondero Entities within the Highland web, including the dozens of Dondero Entities referenced herein.

13. Defendant Mark A. Okada is an individual who, upon information and belief, at all times relevant to this Amended Complaint was residing in Dallas, Texas. Okada is the co-founder of HCMLP and was its Chief Investment Officer until he stepped down in 2019, after which he assumed an advisory role through the end of that year. After Dondero, Okada was the next-largest owner of HCMLP or a beneficiary of the distributions it made to its limited partners. Like Dondero, Okada held his interest in HCMLP directly and through trusts.

14. Defendant Strand Advisors, Inc. ("Strand") is a Delaware corporation that is wholly-owned by Dondero. Since HCMLP's formation, Strand has been its general partner and owned limited partnership interests in HCMLP. At all times relevant to this Amended Complaint, Strand's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

15. Defendant NexPoint Advisors, L.P. ("NexPoint") is a Delaware limited partnership. NexPoint is 99.9% owned by the Dugaboy Investment Trust, its sole limited partner. NexPoint's general partner, NexPoint Advisors GP, LLC ("NexPoint GP"), owns the remaining 0.1%. NexPoint and NexPoint GP were both formed on March 20, 2012. NexPoint concedes that it is controlled by Dondero, who owns 100% of NexPoint GP and is NexPoint GP's sole member and president. At all times relevant to this Amended Complaint, NexPoint's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

16. Defendant Nancy Dondero is named in her capacity as Trustee of Defendant Dugaboy Investment Trust ("Dugaboy"). Dugaboy is a grantor trust established under the laws of the state of Delaware. Dugaboy was formed pursuant to an October 2010 Trust Agreement between Dana Scott Breault, as Settlor, and James D. Dondero and Commonwealth Trust Company, as Trustees. Dondero is Dugaboy's primary beneficiary. Under the Dugaboy trust agreement, Dondero has the power to remove trustees without cause, as well as the power to appoint successive trustees. Dugaboy's original Family Trustee was Dondero, and Defendant Grant James Scott III ("Scott") was its Independent Trustee. In 2015, Dondero appointed Scott as the Family Trustee, and shortly thereafter replaced Scott with his sister Nancy. Between 2016 through confirmation of the Plan, Dugaboy owned a 0.1866% economic interest and a 74.4426% voting interest in HCMLP's Class A partnership interests, and, as set forth above, owns a 99.9% economic interest in NexPoint. At all times relevant to this Amended Complaint, Dugaboy's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

17. Defendant Highland Capital Management Fund Advisors, L.P. ("HCMFA") is a Delaware limited partnership.[3] HCMFA is owned by Strand Advisors XVI, Inc.[4] (which is HCMFA's general partner and owns a 1% interest in HCMFA); Highland Capital Management Services, Inc. ("HCMS") (which owns limited partnership interests in HCMFA equal to a 89.6667% ownership interest); and the Okada Family Revocable Trust (which owns limited partnership interests in HCMFA equal to a 9.3333% ownership interest). Dondero controls,

3 HCMFA was originally created by Dondero on February 9, 2009, as Highland Funds Asset Management, L.P. ("HFAM"). On January 9, 2012, HFAM was renamed Pyxis Capital, L.P. ("Pyxis"), and on February 8, 2013, Pyxis was renamed HCMFA.

4 Strand Advisors XVI, Inc. purports to be managed by six individuals, all but one of whom were previously on HCMLP's payroll.

and is the sole stockholder and director of, Strand Advisors XVI, Inc. Additionally, Dondero and Okada own 75% and 25% of HCMS, respectively.[5] HCMFA has acknowledged that it is controlled by Dondero. At all times relevant to this Amended Complaint, HCMFA's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

18. Defendant Scott is an individual who currently resides in North Carolina. At all times relevant to this proceeding, Scott had various roles at numerous Dondero-controlled or affiliated entities: he was the trustee of Get Good Trust; a director of the Highland Dallas Foundation; the managing member of Charitable DAF GP, LLC; the sole director of Charitable DAF Holdco, Ltd.; the managing member of the Charitable DAF Fund; and the director of CLO Holdco, Ltd. Scott is Dondero's long-time friend, former college roommate, and was the best man at Dondero's wedding. Scott has testified under oath that Dondero is his "closest friend." Dondero personally selected Scott as his successor to run the Charitable DAF Fund. Dondero also caused Scott to serve on multiple boards on which Dondero also served, including the boards of the Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., and Highland Kansas City Foundation, Inc. Scott is also the executor of Dondero's will. Dondero, HCMLP, and/or entities controlled by Dondero transferred tens of thousands of dollars' worth of "business gifts" to Scott in the five years prior to the Petition Date. Scott has no training in finance or compliance and no investment experience. Scott routinely rubber-stamped Dondero's and HCMLP's directives without asking questions or requesting additional information.

[5] Dondero is the Director and President of Highland Capital Management Services, Inc. Scott Ellington is its Secretary.

19. Defendant Scott Ellington ("Ellington") was HCMLP's Chief Legal Officer and General Counsel until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interest. At all times relevant to this Amended Complaint, Ellington was a Texas resident.

20. Defendant Isaac Leventon ("Leventon") was Assistant General Counsel at HCMLP from March 2011 until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interests. At all times relevant to this Amended Complaint, Leventon was a Texas resident.

21. Defendant Charitable DAF Fund, LP (the "DAF") is an exempted company incorporated in the Cayman Islands. Dondero was the initial managing member of the DAF's General Partner, Charitable DAF GP, LLC ("DAF GP"), but in January 2011 he transferred all membership interests to Scott, who held those interests until March 2021. At all times relevant to this proceeding, Scott served as managing member of DAF GP and director of the DAF. HCMLP acted as the formal or informal non-discretionary investment manager for the DAF from its inception through 2020, and provided advisory and back-office services to the DAF and its subsidiaries, including CLO Holdco, Ltd., from 2012 until HCMLP terminated that relationship in February 2021. According to the DAF, Dondero currently serves as its investment advisor (although without an advisory contract).

22. Defendant Charitable DAF Holdco, Ltd. ("DAF Holdco") is an exempted company incorporated in the Cayman Islands. At all times relevant to this proceeding, Scott served as DAF Holdco's managing member and sole director. DAF Holdco is the limited partner of the DAF and owns 100% of the partnership interests in the DAF.

23. Defendant CLO Holdco, Ltd. ("CLO Holdco") is an exempted company incorporated in the Cayman Islands that was formed on December 13, 2010. CLO Holdco is a wholly-owned subsidiary of the DAF. CLO Holdco filed a proof of claim in HCMLP's bankruptcy case, which was subsequently amended to reduce the claim amount to zero.[6] In January 2022, CLO Holdco attempted to further amend the proof of claim to reassert a positive claim amount. CLO Holdco has no employees or officers. According to CLO Holdco, Dondero currently serves as an investment advisor to CLO Holdco (although without an advisory contract). Until Dondero's departure from HCMLP in January 2020, HCMLP (through Dondero) effectively made all investment decisions for the DAF which allocated the investments to CLO Holdco, which would then be rubber-stamped by Scott. At all times relevant to this Amended Complaint, CLO Holdco's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

24. As of December 31, 2020, CLO Holdco and the DAF collectively controlled approximately $260 million in assets. Dondero has testified under oath that he was unaware of a single investment decision that HCMLP ever recommended to Scott regarding the DAF that Scott rejected. Likewise, Dondero was unaware of any investment Scott made on behalf of the DAF that did not originate with HCMLP.

25. Defendant Highland Dallas Foundation ("Highland Dallas") is registered as a Delaware nonprofit, nonstock corporation. The directors of Highland Dallas at the time of the events relevant to this proceeding were Dondero, Scott, and Mary Jalonick. Dondero also acted

[6] This proof of claim was signed by Grant Scott in his capacity as CLO Holdco's sole director. Grant Scott served in that capacity at all times relevant to this proceeding.

as Highland Dallas's president, and Scott served as its treasurer. Highland Dallas's principal office address is 3963 Maple Avenue, Suite 390, Dallas, Texas, 75219.

26. Defendant Scott, in addition to being named above in his individual capacity, is named in his capacity as Trustee of Get Good Trust, a trust established under the laws of the State of Delaware. According to Get Good's July 9, 2021, disclosure to this Court, Get Good consists of three related trusts: Get Good Trust, Get Good Non Exempt Trust No. 1, and Get Good Non Exempt Trust No. 2, all of which are included in the term "Get Good." Dondero is the settlor of Get Good, its beneficiaries are his "living descendants," and Scott was Get Good's trustee at all times relevant to this Amended Complaint.

27. Defendant Hunter Mountain Investment Trust ("Hunter Mountain") is a statutory trust established under the laws of the state of Delaware. Hunter Mountain was formed on December 17, 2015, shortly before it purchased limited partnership interests in HCMLP from HCMLP's then-existing limited partners (*i.e.*, Dondero, Okada, and entities that they controlled) and HCMLP. Through a complex series of transactions that occurred on December 21, 2015, and December 24, 2015, Dondero caused Hunter Mountain to become the owner-in-name of 99.5% of the economic interests of HCMLP. Meanwhile, Dondero caused Hunter Mountain to issue a series of notes and cash, such that Dondero, Okada, and certain entities that they controlled (including Dugaboy, The Mark & Pamela Okada Family Trust – Exempt Trust #1, and The Mark & Pamela Okada Family Trust – Exempt Trust #2) continued to receive the economic benefit of limited partnership distributions made by HCMLP to Hunter Mountain even after they had purportedly sold their limited partnership interests to Hunter Mountain. One such note was a $63 million secured promissory note Hunter Mountain entered into with HCMLP on December 21, 2015 (the "Hunter Mountain Note").

28. Rand PE Fund I, LP, Series 1 ("Rand") is a Delaware series limited partnership. Rand is the indirect parent of Hunter Mountain and is a guarantor of the Hunter Mountain Note.

29. Defendant Lawrence Tonomura is named in his capacity as trustee of Defendant The Mark & Pamela Okada Family Trust – Exempt Trust #1 ("MAP #1"), a trust established under the laws of the state of Texas. Okada controls MAP #1, which he created for the benefit of his children.

30. Defendant Lawrence Tonomura is named in his capacity as trustee of Defendant The Mark & Pamela Okada Family Trust – Exempt Trust #2 ("MAP #2"), a trust established under the laws of the state of Texas. Okada controls MAP #2, which he created for the benefit of his siblings.

31. Defendant Massand Capital, Inc. ("Massand Inc.") is a New York corporation that was created in 2002. Defendant Massand Capital, LLC ("Massand LLC") is a Delaware limited liability company created in 2014, pursuant to a certificate of incorporation signed by Leventon. Massand Inc. received payments from HCMLP between February 4, 2014 and January 7, 2015. Massand LLC received payments from HCMLP between February 25, 2015, and August 1, 2019. Massand Inc. and Massand LLC are referred to collectively herein as "Massand Capital".

32. Defendant SAS Asset Recovery Ltd. ("SAS") is a Cayman Island entity created in 2012, whose principal place of business is Dallas, Texas. Upon information and belief, SAS is a litigation funding and management business created by Dondero and Ellington in 2012 and operated out of HCMLP's headquarters. SAS, along with its direct and indirect subsidiaries, is owned and controlled by Dondero and Ellington, who own 70% and 30% of the economic

interests in SAS, respectively. Upon information and belief, Ellington is the Chief Executive Officer of SAS.

## III. JURISDICTION, VENUE & STANDING

33. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 because this is a civil proceeding arising under or relating to the bankruptcy petition filed by HCMLP under Chapter 11 of the United States Bankruptcy Code. *See In re Highland Capital Management, L.P.*, No. 19-34054-sgj11 (Bankr. N.D. Tex.). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

34. Venue is proper in this Court under 28 U.S.C. § 1409(a).

35. This Court has personal jurisdiction over the defendants because each of the Defendants: (i) is a Texas resident; (ii) was formed under the laws of Texas; (iii) is the alter ego of a Texas resident or an entity that was formed under the laws of Texas; (iv) has a business presence in Texas; (v) filed a proof of claim in HCMLP's bankruptcy case; and/or (vi) had minimum contacts with the state of Texas by either invoking the benefits and protections of the state of Texas or otherwise purposefully directing conduct toward a Texas resident.

36. The Plan created the Claimant Trust, which was vested with assets including substantially "all Causes of Action" and "any proceeds realized or received from such Assets." The Plan also created the Litigation Sub-Trust, as a "sub-trust established within the Claimant Trust or as a wholly-owned subsidiary of the Claimant Trust," for the purpose of "investigating, prosecuting, settling, or otherwise resolving the Estate Claims" transferred to it by the Claimant Trust pursuant to the Plan. The Plan defines Estate Claims to include "any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of [HCMLP], and each of the Related Entities, including any promissory notes held by any of the foregoing." Proceeds

from the Litigation Trust's pursuit of claims "shall be distributed . . . to the Claimant Trust for distribution to the Claimant Trust Beneficiaries[.]"

37. On October 8, 2021, the Claimant Trust confirmed the assignment of certain Causes of Action (as defined in the Plan) to the Trust, including all claims set forth in this Amended Complaint. All of the claims asserted in this Amended Complaint belong to the Litigation Sub-Trust, not the Reorganized Debtor.

38. Under the Plan, the Claimant Trust Beneficiaries are (i) the Holders of Allowed General Unsecured Claims and (ii) the Holders of Allowed Subordinated Claims, whose Claims are junior to those distributed to Holders of Allowed General Unsecured Claims.[7] The Claimant Trust Beneficiaries' claims against the Reorganized Debtor's estate are substantial and exceed, in aggregate, $380 million. To date, neither the Holders of Allowed General Unsecured Claims nor the Holders of Allowed Subordinated Claims have been paid at all.

39. The Trustee has standing to avoid all transfers described herein pursuant to 11 U.S.C. § 544(b) and applicable law. On the date of the Debtor's bankruptcy filing, at least one or more unsecured creditors who held an allowable claim, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis (all as defined herein), could have sought under state law to avoid each of the transfers made on or after October 16, 2015. The Internal Revenue Service filed an amended Proof of Claim in the Debtor's bankruptcy case on October 6, 2021, which asserts unsecured claims including for the tax period of June 30, 2015. Under applicable state and federal law, the IRS was entitled to seek to avoid all transfers at issue herein

[7] Holders of certain Allowed Limited Partnership Interests may become Claimant Trust Beneficiaries but only if *all* Allowed General Unsecured Claims, Allowed Subordinated Claims, and costs and expenses are indefeasibly paid in full.

as a present or future creditor, including transfers that occurred on or before October 16, 2015, because the IRS's claim arose within a reasonable time of those transfers.

## IV. FACTUAL ALLEGATIONS

### A. Dondero Creates HCMLP

40. HCMLP was a global alternative investment manager and registered investment advisor that was founded in 1993 by Dondero and Okada. The funds managed by HCMLP originally focused on the leveraged loan market, and subsequently expanded into other asset classes such as high-yield credit, public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific industries.

41. By the mid-2000s, HCMLP employed over 100 employees, including executive-level management employees, finance and legal staff, investment professionals, and back-office accounting and administrative personnel. As of the Petition Date, HCMLP had three primary business lines: (i) investment management; (ii) the provision of middle- and back-office services ("shared services") to other registered investment advisors; and (iii) proprietary trading.

42. Dondero exercised complete control over HCMLP from its founding until January 9, 2020, when this Court entered an order implementing the settlement and term sheet entered into between HCMLP and the unsecured creditors' committee, pursuant to which three new independent directors (the "Independent Board") were appointed at Strand to oversee the management and reorganization of HCMLP. HCMLP's employees have bluntly acknowledged that, prior to the appointment of the Independent Board, Dondero was HCMLP's solitary decision-maker on all matters concerning the company's operation and management. Dondero

served as HCMLP's Chief Executive Officer and President from the time that HCMLP was founded until he resigned from those roles on January 9, 2020.

43. As of December 31, 2006, HCMLP provided investment advisory services pursuant to management agreements for: (i) 22 CLOs, (ii) 1 SLT; (iii) 11 RICs, (iv) 7 warehouse transactions, (v) 4 SMAs; (vi) one trust; and (vii) 10 hedge fund structures.[8] At that time, the value of HCMLP's assets under management ("AUM") was approximately $33.1 billion.[9]

**B. HCMLP Narrowly Survives The Financial Crisis Of 2008, And Emerges Facing Hundreds Of Millions Of Dollars In Potential Litigation Damages**

44. Around 2008, HCMLP's business began to falter, as the financial crisis began to set in. The funds that HCMLP managed faced large losses, followed by substantial redemptions. In January 2008, HCMLP experienced its worst performance to date, with the value of many of its managed funds deteriorating significantly.

45. At the same time that HCMLP was facing significant losses that threatened its existence, the company also became ensnared in litigation posing the threat of hundreds of millions of dollars in damages. In March 2008, HCMLP and its managed funds Highland CDO

[8] A collateralized loan obligation ("CLO") is a structure that acquires and manage a pool of debt or loans. The CLO issues multiple debt tranches as well as equity, and uses the proceeds of those issuances to obtain loans. A structured loan transaction ("SLT") is a transaction involving structured financial instruments such as collateralized loan obligations. A registered investment company ("RIC") is a corporation, partnership, or trust registered with the Securities and Exchange Commission under the Investment Company Act of 1940. A warehouse transaction is an intermediate transaction that involves purchasing loans or bonds that will undergo the warehousing period prior to serving as collateral for a CLO security. A separately-managed account ("SMA") is a managed investment vehicle that has only one investor. A trust is a fiduciary agreement in which one entity that holds property or assets as its owner for one or more beneficiaries. A hedge fund structure is an actively managed investment pool held by a limited partnership of investors that allows partners to "redeem" their investment, subject to certain limitations.

[9] At its high-water mark, HCMLP's AUM exceeded $40 billion.

Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC" and together with CDO Fund, the "Fund Counterparties")[10] had entered into a transaction with UBS to finance the purchase of various CLO tranches (*i.e.*, tranches of debt issued by existing CLOs) and other assets, including credit default swaps ("CDS"). The governing agreements required the Fund Counterparties to post collateral based on the mark-to-market value of certain collateralized debt obligations. The value of these assets dropped by more than $400 million in the fall of 2008, and in November 2008, the Fund Counterparties failed to meet UBS's margin demand. In December 2008, UBS terminated the agreements, and claimed that it was owed 100% of its losses—which UBS alleged was as much as $745 million—from HCMLP and the Fund Counterparties.

46. On February 24, 2009, UBS commenced an action against HCMLP and the Fund Counterparties in New York state court. As amended and consolidated, UBS asserted claims against HCMLP for actual and constructive fraudulent transfer and breach of the implied covenant of good faith and fair dealing. Among other things, UBS alleged that in March 2009, HCMLP had orchestrated transfers of approximately $233 million of assets from SOHC's parent entity HFP, which UBS alleged was the alter ego of SOHC or its subsidiaries (the "March 2009 Transfers"). UBS sought to disgorge those transfers, and also sought damages against

[10] The CDO Fund is an indirectly-controlled subsidiary of HCMLP. At all times relevant to this proceeding, the CDO Fund was controlled by HCMLP, either pursuant to an investment advisory agreement and/or through HCMLP's indirect ownership of CDO Fund's general partner. SOHC is a subsidiary of Highland Financial Partners, L.P. ("HFP"). At all times relevant to this proceeding, HFP was managed and controlled by Dondero in his capacity as an officer of HFP and its general partner and as a member of HFP's monitoring committee. HFP's general partner is a wholly-owned indirect subsidiary of HCMLP. After 2010, Dondero was the sole member of HFP's monitoring committee until his resignation in mid-2021. At all times relevant to this Complaint, Dondero managed and controlled SOHC through his control of HFP.

HCMLP, including punitive damages, attorneys' fees, and pre-judgment interest (calculated at 9% under New York law).

47. Meanwhile, in December 2008, CDO Fund ceased meeting margin calls issued by Citibank N.A., Citigroup Global Markets Limited, Citigroup Financial Products Inc., and Citigroup Global Markets Inc. (together, "Citi") in connection with CDS entered into by CDO Fund and Citi. Citi seized assets posted by CDO Fund to collateralize the CDS, and, by March 2009, conducted two auctions to sell the collateral. The proceeds of the collateral sales, however, were not sufficient to satisfy CDO Fund's obligations to Citi. On April 5, 2012, CDO Fund sued Citi, alleging various claims arising from the margin calls. On May 3, 2013, Citi answered and countersued CDO Fund, HCMLP, and Highland CDO Opportunity Fund GP, L.P. ("CDO Fund GP") to: (i) recover a deficit of more than $24 million, plus accrued interest, still owed under the agreements governing the CDS; (ii) recoup $3 million in liquidation proceeds mistakenly received from a third party; and (iii) seek indemnification for all losses and costs Citi incurred as a result of CDO Fund's breach.

48. In addition, on April 2, 2009, Barclays Bank PLC ("Barclays PLC") and its wholly-owned subsidiary HYMF, Inc. ("HYMF" and, together with Barclays PLC, "Barclays") commenced an action against HCMLP and certain of its managed funds (the "Fund Defendants") and related entities for breach of contract, breach of fiduciary duty, and equitable accounting (the "Barclays Action"). The Barclays Action focused on hedge contracts that HYMF had entered into with various HCMLP-managed funds, which provided that HYMF would be able to remove its investments in a preferential fashion via a "redemption" right, usually as quickly as one day. Barclays alleged that HYMF attempted to exercise that redemption right in mid-October 2008 but was rejected by HCMLP and its managed funds,

notwithstanding the clear terms of the HYMF contracts. This breach of the HYMF contracts was accompanied by Dondero personally stating he would withhold over $100 million for over a year unless HYMF performed certain unrelated financial services for the Fund Defendants. Barclays alleged that it had invested more than $700 million into the Fund Defendants, that Dondero personally held at least $100 million of that "hostage," and that "hundreds of millions of dollars" were still owed to HYMF.

49. Additionally, on June 3, 2011, HCMLP became aware that on November 1, 2010, the Securities and Exchange Commission (the "SEC") had commenced an investigation with respect to potential violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940. While the SEC investigation was settled years later for a reduced amount, HCMLP's understanding in 2011 was that the SEC investigation could result in significant penalties, including substantial monetary penalties, for the company.

**C. In A Scheme To Evade HCMLP's Creditors, Dondero Creates "Lifeboats" To Usurp HCMLP's Business**

50. In 2012, Dondero explained HCMLP's precarious financial condition, testifying under oath that the 2008 financial crisis took HCMLP "to a state of insolvency and we've been juggling liquidity since that," and that "[t]he last three, four years have been negative to the tune of hundreds of millions of dollars[.]" Dondero testified further that the contingent liabilities resulting from the lawsuits filed against HCMLP were a primary driver of HCMLP's insolvency.

51. It was against this backdrop that in or about 2011, Dondero determined to create a series of new entities—referred to internally by some at HCMLP as "lifeboats"—to take over HCMLP's business, with the aim of placing the resulting profits beyond the reach of HCMLP's

creditors. Ultimately, the most successful of the lifeboats were NexPoint and HCMFA, which are described in greater detail below. However Dondero also created other lifeboats at or around this time, including:

- Tunstall Capital Management, LP—which was created to manage stressed and distressed investing in hedge funds, private equity funds, and retail funds;
- Falcon E&P Opportunities GP, LLC—which was created to manage oil and gas investments in private equity funds;
- Granite Bay Advisors, LP—which was created to manage long-short credit investing; and
- Highland Capital Healthcare Advisors, LP ("HCHA")—which was created to serve as a healthcare equity advisor.

**1. NexPoint**

52. NexPoint was effectively a shell entity that Dondero created in March 2012 to siphon profits from HCMLP in order to evade HCMLP's creditors. Dondero's family trust Dugaboy, of which Dondero is the primary beneficiary, owns 99.9% of NexPoint.

53. Between 2012 and 2015, NexPoint had no employees of its own, and performed no business activities that were distinguishable from those performed by HCMLP. To the contrary, NexPoint used HCMLP's employees to perform the same investment management and advisory services—including investment advisory, compliance, accounting, tax, human resources, and information technology services—that were performed by HCMLP.

54. For over a year, HCMLP performed all services for NexPoint, without any sub-advisory or shared services agreements that even purported to compensate HCMLP for the use of its employees. In mid-2013, Dondero attempted to retroactively infuse this scheme with a patina of legitimacy, by causing NexPoint to enter into a shared services agreement with HCMLP that required NexPoint to pay fees to HCMLP based on a formula that resulted in low

fee payments. NexPoint continued to reap the vast majority of the generated fees, however. NexPoint's fees were based on a percentage of AUM, set at a level to yield fees far in excess of those NexPoint was paying HCMLP. The NexPoint scheme is illustrated in Figure 1, below.

**Figure 1.**




55. Adding insult to injury, HCMLP funded NexPoint's operations whenever needed, seeded large investments made by NexPoint, and funded a large portion of the distributions NexPoint made to its owner, Dugaboy (the beneficiary of which was Dondero). Indeed, in June 2012, at the time that Dondero was transferring HCMLP's advisory services business to NexPoint, Okada complained to Dondero that he was "using Highland's cash flow" to set up new entities controlled by Dondero and to "fund all their negative working capital."

56. Between 2012 and 2017, HCMLP loaned NexPoint approximately $30 million, and entered into a revolving line of credit to provide NexPoint with additional liquidity. Initially, the loans were in the form of demand notes and were unsecured, frequently below-

market, and had few to no covenants. NexPoint paid no principal or interest to HCMLP on the loans during the 2012-2017 period. At the same time, NexPoint made limited partner distributions of approximately $34 million—99.9% of which were made to Dugaboy for Dondero's benefit.

57. Dondero caused HCMLP to enter into multiple forbearance agreements with respect to the NexPoint loans, pursuant to which HCMLP agreed not to collect on the NexPoint loans for a period of one year from the time of the agreement. According to NexPoint's financial statements, these agreements were entered into to provide NexPoint "with the necessary financial support to fund [NexPoint's] obligations as they come due[.]" By May 2017, NexPoint owed HCMLP more than $30 million. Although all of these obligations were payable on demand, HCMLP again agreed not to demand repayment—this time through May 31, 2018—and also agreed to provide support to fund NexPoint's obligations through the same period. Meanwhile, HCMLP recorded the NexPoint loans at face amount on HCMLP's books.

58. Upon information and belief, on May 31, 2017, following discussions with NexPoint's auditors, Dondero restructured the NexPoint loans into a consolidated $30,746,812.33 note (the "NexPoint Loan") with an unusually long 30-year term maturity, a low coupon rate, no covenants, and no security. HCMLP received no consideration in exchange for its agreement to extend the NexPoint loans' maturity date from on-demand to 30 years.

59. Subsequent to Dondero's resignation from HCMLP, on December 31, 2020, NexPoint defaulted on the NexPoint Loan and the full outstanding amount of the loan was accelerated. On January 22, 2021, HCMLP filed an adversary proceeding in the Bankruptcy Court to collect on the NexPoint Loan. *See Highland Capital Management, L.P. v. NexPoint Advisors, L.P.*, Adv. Pro. 21-03005-sgj (Bankr. N.D. Tex. Jan. 22, 2021). NexPoint has raised

a series of frivolous defenses to HCMLP's claims, including that HCMLP—acting through the owner of a majority of its Class A interests, Dugaboy (which was acting through Dondero's sister, as Dugaboy's Family Trustee)—orally agreed to forgive the NexPoint Loan as part of Dondero's compensation. More than $23 million remains outstanding on the NexPoint Loan, and interest and fees continue to accrue. HCMLP has moved for summary judgment on this matter.

60. From the time that it was created in 2012 through 2019, NexPoint—which used HCMLP's employees to perform the same management and advisory services that are performed by HCMLP—earned over $150 million in revenues (including over $120 million in advisory and administrative fees) and approximately $50 million in operating income. Between 2012 and 2015, NexPoint's AUM increased 34%, from $700 million to $936 million, and revenues increased from $4.1 million to $16.2 million. Between 2015 and 2019, NexPoint's AUM increased by approximately 408%—from $936 million to $4.8 billion, and revenue increased from $16.2 million to $46.8 million. By contrast, over the same 2015 to 2019 period, HCMLP's AUM decreased from $9.5 billion to $2.3 billion.

**2. HCMFA**

61. Dondero utilized the same basic playbook for HCMFA, which is directly or indirectly owned by Dondero and Okada. HCMFA was created to replace HCMLP as the new investment manager for certain open-ended retail investment funds, but in a manner similarly designed to ensure that the profits generated by the business would not be available to HCMLP's litigation creditors in the event they achieved favorable judgments.

62. On December 15, 2011, Dondero caused HCMLP to transfer HCMLP's rights and obligations to provide investment advisory services for Highland Credit Strategies Fund,[11] Highland Floating Rate Opportunities Fund ("HFRO") (n/k/a Highland Income Fund), Highland Long/Short Equity Fund, Highland Long/Short Healthcare Fund, and Highland Special Situations Fund to HCMFA. HCMLP received no consideration for the transfer. Prior to the transfer, HCMLP received management and advisory fees under those agreements in return for the services it performed. Following the transfer, it was HCMFA rather than HCMLP that received those fees, notwithstanding that HCMFA used HCMLP's employees to perform most services. Thus, the effect of the transfer was to insert a new entity to reap the profits earned from the same HCMLP employees performing the same work that had been performed prior to the transfer.

63. HCMFA collected management fees from its managed funds based on a percentage of their net asset value ("NAV"). Meanwhile, HCMLP—whose employees performed most services required by HCMFA—received a low fee that was only a small fraction of the fees earned by HCMFA. And HCMLP received no fee with respect to the advisory services it provided to HCMFA, despite the fact that HCMLP's employees were named portfolio managers, and constituted entire teams of supporting investment analysts, for HCMFA-managed funds. Indeed, HCMFA did not execute a sub-advisory agreement with HCMLP, and it was only in May 2018 that HCMFA executed a payroll reimbursement agreement to partially compensate HCMLP for the services of certain HCMLP employees. If

[11] On June 13, 2012, the management agreements for Highland Credit Strategies Fund were purportedly "novated" to the newly-created NexPoint. Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as "NHF." The result of this transfer was simply to shift management fees relating to NHF—which had previously been diverted from HCMLP—from one lifeboat (Pyxis/HCMFA) to another (NexPoint).

HCMLP had managed the HCMFA-managed funds directly rather than doing so through an entity that was created to evade HCMLP's creditors, then HCMLP would have earned tens of millions of dollars (potentially over $100 million) in additional fees between 2012 and 2018. The HCMFA scheme is illustrated by Figure 2, below.

**Figure 2.**




64. Following Dondero's "lifeboat" playbook, HCMLP also provided financial support to HCMFA so that HCMFA was well-positioned to earn profits that bypassed HCMLP's creditors and flowed directly to Dondero and his affiliated entities, primarily through HCMFA's largest limited partner, HCMS (of which Dondero and Okada owned 75% and 25%, respectively). Between 2011 and 2019, HCMLP loaned HCMFA approximately $12 million. Those HCMFA loans were evidenced by demand notes, for which Dondero caused HCMLP to enter into multiple forbearances, ultimately preventing HCMLP from demanding payment until May 31, 2021. As of the Petition Date, $6.3 million was outstanding on the notes subject to the

forbearance agreement. In May 2019, HCMFA borrowed an additional $7.4 million from HCMLP pursuant to two additional demand notes.

65. Subsequent to Dondero's resignation from HCMLP, HCMFA defaulted on its debt to HCMLP. On January 22, 2021, HCMLP filed an adversary proceeding in the Bankruptcy Court to collect on the debt. HCMFA has raised a series of frivolous defenses to HCMLP's claims, including that the notes were executed in error. As of December 11, 2020, approximately $7.7 million in principal and interest was due and owing to HCMLP on the HCMFA notes dated May 2 and 3, 2019 and, as of June 4, 2021, approximately $3.1 million in principal and interest was due and owing to HCMLP on the HCMFA notes dated February 26, 2014, and February 26, 2016, and interest and fees continue to accrue. HCMLP has moved for summary judgment on this matter.

### D. Dondero, Ellington, and Leventon Cause HCMLP To Engage In Misconduct That Exposes It To Additional Liability

66. As described more fully below, in addition to establishing the lifeboats to usurp HCMLP's business and evade its contingent creditors, Dondero, along with Scott Ellington, HCMLP's Chief Legal Officer and General Counsel, and Isaac Leventon, HCMLP's Assistant General Counsel, engaged in other actions that meaningfully harmed HCMLP. This included exposing HCMLP to significant liability by utilizing it to exact revenge on Dondero's perceived adversaries, and carrying out schemes that personally benefitted Dondero and, in certain instances, Ellington, but conferred no benefit on HCMLP. Ellington and Leventon were also financially rewarded by Dondero for faithfully serving Dondero's interest, rather than HCMLP's, even where doing was detrimental to HCMLP. As described below, these actions ultimately resulted in more than one billion dollars in litigation and arbitration claims against

HCMLP and millions of dollars in legal fees, necessitated HCMLP's bankruptcy filing, and ultimately forced HCMLP to enter into settlements for hundreds of millions of dollars.

**1. Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry**

67. In 2011, Dondero formed Acis Capital Management, L.P. ("Acis") and Acis Capital Management GP, LLC ("Acis GP"). Dondero was President both of Acis and Acis GP, and controlled their overall financial strategies and decisions. Upon information and belief, prior to its bankruptcy filing in 2018, Acis was indirectly owned by Dondero (through Dugaboy), Okada, and Joshua Terry ("Terry"), an HCMLP employee that Dondero tapped to manage Acis. Like HCMLP, Acis was a registered investment advisor whose purpose was to raise money from third-party investors to launch or invest in CLOs. HCMLP was the investment manager for Acis, and Acis performed almost all of its services through HCMLP employees. Dondero created Acis to act as another lifeboat—*i.e.*, to divert income away from HCMLP when HCMLP was facing the risk that all of its assets would be absorbed by its creditors. In 2013, HCMLP began what proved to be a short-lived turnaround, spurred by improving financial performance and settlement of the Barclays litigation. At this point, Dondero became more troubled by the dilution of his share of Acis's income, caused by Terry's ownership in Acis, than he was about evading HCMLP's liabilities. As a result, Dondero once again redirected the flow of money for his own benefit, this time by siphoning value from Acis back to HCMLP.

68. By 2016, tensions between Dondero and Terry hit a boiling point. Dondero sought to finance an acquisition by an HCMLP portfolio company through a loan from HCMLP-managed CLOs, and an extension of the maturity dates on the portfolio company's notes that were held by the CLOs. Terry was the investment manager for the CLOs, and

opposed the plan on the ground that agreeing to extend the notes' maturity dates would breach his fiduciary duties to the CLOs. Dondero responded to Terry's opposition by firing him from Acis and HCMLP, making up a pretextual claim of termination for "cause." Shortly thereafter, Dondero amended the Acis limited partnership agreement to terminate Terry's interests in Acis, and directed Acis to sue Terry in Texas state court. Terry counterclaimed and demanded arbitration.

69. On October 20, 2017, following a ten-day arbitration, the arbitration panel issued Terry an award of $7,949,749.15, plus interest, against Acis. The arbitration panel found, among other things, that (i) Terry's termination was "without cause," and Acis had "knowingly and willfully" invoked HCMLP's false pretext of "for cause" in order to deny Terry his contractual entitlement to the value of his Acis partnership interest, (ii) Acis had breached its limited partnership agreement, and breached the fiduciary duties it owed to Terry as Acis's limited partner, (iii) beginning in 2013, Dondero had caused Acis to pay HCMLP more than its contractual entitlement for shared expenses in order to reduce the amount of Terry's limited partnership distributions, and (iv) one month after Terry was terminated from Acis, Dondero significantly increased the amounts that Acis was paying HCMLP under their shared services and sub-advisory agreements, retroactive to January 1, 2016.

70. Beginning on October 24, 2017—four days after Terry's arbitration judgment was issued—Dondero, acting through HCMLP, and with the aid of Ellington and Leventon, entered into numerous transactions designed to take control of Acis's assets and business, and strip Acis of assets so that it would be unable to pay Terry's arbitration award. Ellington and Leventon aided Dondero by implementing Dondero's directives and taking the steps necessary to consummate these transactions, notwithstanding their knowledge that the transactions

Case 19-34054-sgj11 Doc 4513-11 Filed 09/26 Entered 09/26 Desc Exhibit 8 Page 38 of 147

benefitted only Dondero, and would ultimately harm HCMLP by exposing it to significant liability.

71. Ultimately, Dondero's elaborate schemes to render Acis judgment-proof led Terry to file involuntary petitions for protection under chapter 11 of the United States Bankruptcy Code against Acis and Acis GP on January 30, 2018. In response to the bankruptcy filings, Dondero caused HCMLP, which served as the sub-advisor to the Acis CLOs, to grossly mismanage the Acis CLOs, including by failing to purchase a single loan for the CLOs following the appointment of a chapter 11 trustee in the Acis bankruptcy case. This abrogation of duties caused the chapter 11 trustee to replace HCMLP with Brigade Capital Management, LP ("Brigade") and Cortland Capital Markets Services LLC ("Cortland"). Put another way, Dondero's use of HCMLP to cause damage to Acis actually harmed HCMLP itself, leading HCMLP to incur exorbitant legal fees attacking Acis, the loss of its investment management contracts and the income flowing from those contracts, and reputational harm that precluded HCMLP from launching any future CLOs and generating fee income therefrom.

72. Dondero also caused HCMLP to commence litigation against the Acis chapter 11 trustee, prompting a countersuit pursuant to which the chapter 11 trustee sought to recover fraudulent transfers Dondero had directed (through HCMLP) and to stop HCMLP from engaging in a course of conduct that was harmful to Acis and the Acis CLOs. This led to the entry of a temporary restraining order against HCMLP, which Dondero caused HCMLP to violate. Dondero also caused Highland CLO Funding, Ltd. ("HCLOF") to initiate an additional frivolous lawsuit against Terry in the Royal Court of Guernsey (the "Guernsey Suit"), which was ultimately dismissed, resulting in Terry arguing that HCMLP, as the owner of HCLOF's

advisor Highland HCF Advisors, Ltd. ("HHCFA"), was liable for Terry's attorneys' fees and expenses under Guernsey's "loser pays" regime.[12]

### 2. Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest

73. Dondero and Ellington also exposed HCMLP to substantial liability to third-party investors HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). At the same time that Dondero was surreptitiously transferring valuable rights associated with the Acis CLOs away from Acis in order to evade Terry's arbitration award, he and Ellington were using HCMLP to induce the HarbourVest Entities to purchase 49.9% of HCLOF—the owner of the equity tranche of the Acis CLOs—from CLO Holdco for approximately $75 million in cash, with a commitment to invest an additional $75 million in HCLOF.[13] In soliciting this investment, Dondero and Ellington failed to disclose material facts

[12] Dondero's litigation crusade against Terry and Acis continues to date. On May 14, 2021, NexPoint, acting under Dondero's direction, caused one of its managed retail funds, NSOF, to commence a lawsuit in the district court for the Southern District of New York against Acis, Terry, U.S. Bank, N.A., and Brigade, alleging that the Acis CLOs had been mismanaged. On May 20, 2021, NSOF then filed a motion in Acis's bankruptcy case, seeking a ruling that the complaint did not violate the injunction contained in Acis's plan of reorganization. On September 9, 2021, the bankruptcy court conducted a lengthy hearing, and on September 24, 2021, declined to issue the order requested by NSOF and held that NSOF must amend its complaint to comply with the plan injunction. On October 8, 2021, NSOF then filed a motion asking the Bankruptcy Court to reconsider its ruling, but withdrew the motion on December 1, 2021. NSOF filed an Amended Complaint in the SDNY action on November 23, 2021. Acis, U.S. Bank, N.A., Brigade, and HCLOF (as defendant intervenor) filed motions to dismiss, which were fully briefed in March 2022, and remain pending.

[13] CLO Holdco acquired Acis CLO equity tranches when the CLOs were launched and then transferred them to HCLOF in exchange for a 100% ownership interest in HCLOF after it was formed.

to HarbourVest regarding the Terry disputes and Acis frauds, thus exposing HCMLP to substantial and unnecessary liability.[14]

74. In inducing HarbourVest's investment, Dondero and Ellington, purportedly acting through HCMLP, made numerous misrepresentations and omissions, including: (1) failing to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million arbitration award against it, including by causing Acis to consummate a series of fraudulent transfers; (2) misrepresenting the reasons that Dondero changed the name of the holding company for the Acis CLOs from Acis Loan Funding, Ltd. ("ALF") to HCLOF immediately prior to the HCLOF Investment; and (3) expressing confidence in HCLOF's ability to reset or redeem the CLOs under its control, when in actuality Dondero's actions to evade Terry's arbitration award against Acis resulted in Acis's bankruptcy, and rendered the resets impossible.

75. Moreover, unbeknownst to HarbourVest, Dondero intended for CLO Holdco to use the $75 million that it received from HarbourVest to make investments in other Dondero-owned entities, including entities managed by NexPoint and HCMFA. Thus, the HarbourVest investment benefitted Dondero personally, but left HCMLP exposed to hundreds of millions of dollars in potential damages to HarbourVest.

### 3. Dondero And His Accomplices, Including Ellington and Leventon, Cause HCMLP To Engage In Misconduct That Increases Its Liability To UBS

76. In March 2017, the New York state court presiding over UBS's claims against HCMLP and the Fund Counterparties ruled that UBS's claims against the Fund Counterparties,

[14] HCLOF has never paid a management fee to HHCFA, a wholly-owned subsidiary of HCMLP that is managed and controlled by HCMLP and operated using HCMLP employees. Consequently, HCMLP has indirectly provided free investment management services to HCLOF since its inception.

and its fraudulent transfer claims against HCMLP, could proceed to trial.[15] Shortly thereafter, Dondero, Ellington, and Leventon, along with HCMLP employees Jean Paul Sevilla, Katie (Irving) Lucas, and Matthew DiOrio, took steps to transfer the Fund Counterparties' remaining assets to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands entity indirectly owned and controlled by Dondero and Ellington,[16] in order to ensure that such assets would be out of UBS's reach in the event that a judgment was entered in its favor.[17] In or around August 2017, Dondero, Ellington, Leventon, Sevilla, Lucas, and DiOrio orchestrated the surreptitious transfer of substantially all of the Fund Counterparties' assets—with a face amount of $300 million and a fair market value of at least $100 million—to Sentinel.

77. The pretextual justification for these transfers was to satisfy a $25 million premium on an "after the event" insurance policy issued by Sentinel that purportedly insured the Fund Counterparties' first $100 million of liability to UBS. The real goal of the transfer, however, was to drain the Fund Counterparties' assets and render the Fund Counterparties judgment-proof, while keeping the assets within Dondero's and Ellington's control. There is no legitimate explanation as to why the Fund Counterparties transferred assets worth at least four times the premium payment to Sentinel. And given that Dondero and Ellington indirectly own and control Sentinel, they personally and improperly benefitted from this overpayment.

---

[15] UBS's claim against HCMLP for breach of the implied covenant of good faith and fair dealing was subsequently also permitted to proceed.

[16] Sentinel was created in 2012 and is 70%-owned by Dondero and 30%-owned by Ellington through intermediate holding companies. Sentinel has no employees or physical office space. HCMLP employees, including Leventon, performed work on behalf of Sentinel.

[17] In December 2017, Ellington caused Dilip Massand and DiOrio to be appointed as directors of Sentinel.

78. Moreover, Ellington and Leventon (along with Sevilla, Lucas, and DiOrio) actively concealed the transfer of assets and the existence of the purported insurance policy from the Independent Board, apparently in order to prevent the Fund Counterparties from making a claim under the policy. Indeed, Leventon, who was directly involved in the transfers to Sentinel, was tasked with educating the Independent Board about UBS's claim and the assets potentially available to satisfy it. In response, Leventon delivered an extensive—but intentionally misleading—presentation to the Independent Board that said nothing about the August 2017 asset transfer and the purported Sentinel insurance policy, and lied to HCMLP regarding the Fund Counterparties' assets. Additionally, around the same time that Ellington and Leventon were hiding this secret insurance policy from the Independent Board, (i) Ellington charged the policy for personal expenses in excess of $500,000 that bore no relation to the UBS litigation and provided no benefit whatsoever to the Fund Counterparties or HCMLP; and (ii) Ellington and Leventon, among others, entered into agreements whereby Sentinel agreed to pay attorneys' fees and expenses they incurred in connection with HCMLP's bankruptcy.

79. As a direct result of Ellington's and Leventon's fraudulent concealment of the transfers to Sentinel, HCMLP inadvertently made factually inaccurate statements to the Bankruptcy Court and incurred millions of dollars in additional fees litigating (rather than settling) with UBS. In March 2021, after the policy was uncovered through HCMLP's diligence (notwithstanding Ellington's and Leventon's cover-up), the CDO Fund made a claim on the policy. To date, Sentinel has refused to make any payments.

80. On February 10, 2020, the New York state court entered a judgment against the Fund Counterparties in connection with the phase one litigation, in the principal amount of $519,374,149, plus $523,016,882.79 in prejudgment interest, for an overall judgment of

$1,042,391,031.79. Trial on UBS's claims against HCMLP was still pending when HCMLP filed for bankruptcy on October 16, 2019 (as discussed *infra*).

**4. Dondero Causes HCMLP To Engage In Misconduct That Results In Liability To HERA And Patrick Daugherty**

81. HCMLP's poor performance during the 2008-09 financial crisis left it with insufficient available cash and assets to offer incentive-based compensation to key senior employees. After HCMLP defaulted on a credit facility with a group of unsecured banks, the lender group demanded a security interest in all HCMLP's assets, but permitted the creation of a retention program to stave off an exodus of employees. With the consent of the lenders, on June 23, 2009, HCMLP created Highland Employee Retention Assets LLC ("HERA"), an employee-owned (subject to a two-year vesting period) entity that served as a replacement for certain senior employees' deferred compensation, which had been previously-awarded but wiped out by the financial crisis. HCMLP contributed assets to HERA, which then distributed proceeds from time to time. Patrick Daugherty, a former senior HCMLP employee, was a director of HERA and its largest unitholder.

82. Dondero's relationship with Daugherty deteriorated, and Daugherty resigned from HCMLP in the fall of 2011. Instead of simply allowing HERA to pay Daugherty what he was owed, Dondero caused HCMLP to carry out his personal vendetta against Daugherty through years of spiteful, unnecessary litigation borne out of personal animosity. As a result of that litigation, HCMLP accrued (i) litigation expenses and pre- and post-judgment interest that exceeded the amounts that HERA owed Daugherty in the first place; and (ii) liability in connection with a jury verdict that HCMLP defamed Daugherty with malice and breached the implied covenant of good faith and fair dealing.

83. Moreover, Dondero, through HCMLP, engaged in an asset-stripping campaign designed to render HERA judgment-proof, further exposing HCMLP to liability and unnecessary legal costs. In furtherance of that scheme, Dondero caused: (i) HCMLP to buy out all HERA unitholders except for Daugherty; (ii) HERA's board to transfer its powers to Highland ERA Management, a newly formed entity for which Dondero served as president and sole member; and (iii) HERA to distribute substantially all of HERA's assets to HCMLP, while claiming that HCMLP would place Daugherty's interests in HERA into escrow.

84. When Daugherty demanded payment of his judgment from HERA, HERA claimed it had become insolvent, citing that it owed HCMLP more than $7.5 million for legal expenses—approximately $4.9 million of which HCMLP had written off because of "lack of collectability."

85. Daugherty then sued HCMLP, HERA, Highland ERA Management, and Dondero in the Delaware Chancery Court. A Vice Chancellor concluded that HCMLP, Dondero, and the other defendants (who were also controlled by Dondero) were "improperly withholding documents," that "there is a reasonable basis to believe" that they perpetrated a fraud—and solicited "the services of attorneys to aid in furtherance of that fraud"—as part of an effort to evade Daugherty's judgment during the pendency of his case. The Vice Chancellor concluded that "defendants, with [counsel's] advice and assistance, were never going to let the assets held in the escrow agreement to make their way to Daugherty."

86. In total, HCMLP suffered at least $10 million in harm as a result of Dondero's decision to launch a protracted and unnecessary war against Daugherty.

**E. Dondero, Ellington, and Leventon Cause HCMLP To Engage In Conduct That Results In An Arbitration Award Against It Of Approximately $190 Million And Forces HCMLP Into Bankruptcy**

87. Dondero, Ellington, and Leventon also engaged in misconduct relating to HCMLP managed funds Highland Offshore Partners L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Crusader Funds") that resulted in an arbitration award against HCMLP of approximately $190 million. HCMLP had placed the Crusader Funds into wind-down in October 2008. Investors in the funds subsequently commenced lawsuits alleging breach of fiduciary duty claims against HCMLP, based on allegations that Dondero had refused to make mandated distributions and honor redemption requests, and traded the funds' positions in a manner designed to render them illiquid in order to deter future redemptions, which led to multiple disputes among redeeming investors. Certain of these lawsuits were ultimately resolved in July 2011, when the parties entered into a Joint Plan of Distribution of the Crusader Fund and a Scheme of Arrangement for its creditors (together, the "Joint Plan and Scheme"). As part of the Joint Plan and Scheme, a committee referred to as the "Redeemer Committee" was elected from the Crusader Funds' investors to oversee HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors.

88. The peace would not last, however. On July 5, 2016, the Redeemer Committee (i) terminated HCMLP as investment manager; (ii) filed a complaint in Delaware Chancery Court against HCMLP seeking a limited status quo order, a declaration that the Redeemer Committee had "cause" to terminate HCMLP as manager, and a declaration that HCMLP had forfeited any right to indemnification as a result of its failure to distribute proceeds to investors of various funds; and (iii) commenced an arbitration proceeding (the "Redeemer Arbitration")

against HCMLP alleging that it had engaged in various forms of misconduct in its role as investment advisor. After two years of arbitration proceedings, the Redeemer Arbitration culminated in a nine-day evidentiary hearing in September 2018 that included testimony from eleven fact witnesses and four expert witnesses. On March 6, 2019, the arbitration panel issued an award in favor of the Redeemer Committee, which resulted in gross damages of $136.8 million and total damages (including interest) of $190.8 million. Ultimately, the panel awarded ten forms of damages: (1) the Deferred Fee Claim ($43,105,395); (2) the Distribution Fee Claim ($22,922,608); (3) the Taking of Plan Claims ($3,277,991); (4) the CLO Trades Claim ($685,195); (5) the Credit Suisse Claim ($3,660,130); (6) the UBS Claim ($2,600,968); (7) the Barclays Claim ($30,811,366); (8) the Legal Fees, Costs, and Expenses Claim ($11,351,850); (9) the Portfolio Company Award ($71,894,891); and (10) the Administrative Fees Award ($514, 164).

89. The claims that were asserted against HCMLP by the Redeemer Committee stemmed from the various breaches of fiduciary duty to the Crusader Funds that Dondero, Ellington, and Leventon caused HCMLP to commit. For example, the "Barclays Claim"—which gave rise to over $30 million in liability for HCMLP—arose out of Dondero, Ellington, and Leventon causing HCMLP to transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, after the Redeemer Committee had already refused to approve that transfer. In so doing, Dondero, Ellington, and Leventon caused HCMLP to violate the Joint Plan and Scheme and its fiduciary duties. Because of Dondero, Ellington, and Leventon's wrongful conduct, HCMLP was ordered to pay: (1) over $30 million on account of disgorged partnership interests; (2) additional sums for disgorgement

of distribution fees (that were included within the $22.9 million Distribution Fee Award); and (3) interest, fees, and expenses incurred in connection with the arbitration.

90. In addition, from December 2013 through January 2016, Dondero, Ellington, and Leventon caused HCMLP to purchase 28 Plan Claims from Crusader investors in violation of the Redeemer Committee's right of first refusal ("ROFR"). During this time, Leventon told multiple investors interested in possible transfers of their interests that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. Leventon also made affirmative misrepresentations to the Redeemer Committee to disguise the fact that HCMLP had purchased the Plan Claims. Pursuant to the arbitration award, HCMLP was required to transfer the 28 Plan Claims to the Redeemer Committee, and to disgorge to the Committee whatever financial benefits Highland obtained from the 28 transactions, plus interest at the rate of 9%, from the date of each purchase.

91. Dondero's, Ellington's, and Leventon's conduct also resulted in HCMLP becoming liable to the Redeemer Committee for over $71 million (the "Portfolio Company Claim") in connection with claims arising from a portfolio company that was owned, directly and indirectly, by HCMLP (the "Portfolio Company"). Some of the Portfolio Company's stock was owned by the Crusader Funds. Dondero, Ellington, and Leventon caused HCMLP to covertly purchase shares in the Portfolio Company from another fund that Dondero controlled at below-market prices, and failed to liquidate the Crusader Funds' shares in the Portfolio Company as their fiduciary duties required. Pursuant to the arbitration award, HCMLP was required to purchase the Crusader Funds' shares in the Portfolio Company at a fixed price of $48,070,407, and to pay pre-judgment interest that brought the total claim to $71,894,891.

92. Additionally, the Joint Plan and Scheme required HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete. Dondero, Ellington, and Leventon caused HCMLP to violate that provision of the Joint Plan and Scheme by causing HCMLP to surreptitiously transfer approximately $32 million in Deferred Fees from the Crusader Funds' accounts on January 21 and April 6, 2016. The arbitration panel ruled that as a consequence of Dondero's, Ellington's, and Leventon's blatant breach of the payment requirements of the Joint Plan and Scheme, HCMLP forfeited its right to these fees entirely.

93. The Redeemer Committee set a hearing in Delaware Chancery Court for October 8, 2019 to obtain entry of a judgment with respect to the award. The hearing was subsequently continued to October 16, 2019. HCMLP filed for bankruptcy on the day of oral arguments for the Redeemer Committee's motion to enforce the Award in Delaware Chancery Court.

### F. Dondero's Schemes Result In Hundreds Of Millions Of Dollars Of Liability For HCMLP

94. As noted, Dondero's schemes ultimately resulted in hundreds of millions of dollars of liability for HCMLP. As described below, the creditors that Dondero had sought to cheat and evade filed proofs of claim in HCMLP's bankruptcy proceeding, and HCMLP's management, burdened with Dondero's blatant misconduct (and that of Ellington, Leventon, and other of Dondero's loyalists), was forced to settle these claims for amounts that enabled HCMLP to escape the risk of even greater liability.

95. Additionally, HCMLP has incurred in excess of $40 million in professional fees in connection with the bankruptcy filing, which was necessitated solely as a result of Dondero's misconduct. HCMLP also incurred legal expenses for entities that HCMLP did not own, including several of the "lifeboats."

### 1. HCMLP Incurs $125 Million In Liability To UBS As A Result Of Dondero's, Leventon's, and Ellington's Misconduct

96. On June 26, 2020, UBS filed a proof of claim (the "UBS Claim") in HCMLP's bankruptcy proceeding for the full $1,039,957,799.44 of its judgment against the Fund Counterparties.[18] The UBS claim sought "damages arising from HCMLP's breach of the implied covenant of good faith and fair dealing, its specific role in directing the fraudulent transfers of assets involving HFP," and interest, punitive damages, and attorneys' fees.

97. In November 2020, the Court considered the value of the UBS Claim for purposes of plan voting. In connection therewith, the Court temporarily allowed the UBS Claim in the amount of $94,761,076. Of that amount, approximately $43 million related to transfers HCMLP caused to be made to one of HCMLP's managed funds, based on the Court's estimation that there was a 90% chance that UBS would prevail on that portion of its claim under either a fraudulent conveyance or breach of implied covenant theory.

98. Subsequently, HCMLP and UBS engaged in settlement discussions and mediation. Following mediation, the parties reached an initial settlement in principle, pursuant to which UBS would receive a $75 million unsecured claim, consisting of a $50 million Class 8 General Unsecured Claim and a $25 million Class 9 Subordinated General Unsecured Claim. That settlement was disclosed to the Court at the February 2, 2021 confirmation hearing. This settlement was in satisfaction of damages resulting from conduct that Dondero, Ellington, and Leventon perpetrated on behalf of HCMLP. But for that conduct, HCMLP would not have been liable to, or required to enter into the settlement with, UBS.

---

[18] The UBS Claim consists of two substantively identical claims: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG, London Branch.

99. While the preliminary settlement for the known misconduct of Dondero, Ellington, and Leventon was being finalized, the Independent Board learned that Dondero and Ellington had surreptitiously caused the Fund Counterparties to transfer their remaining assets to Sentinel, and had caused HCMLP to misrepresent to UBS that the Fund Counterparties had no assets prior to that transfer occurring. Purportedly acting on behalf of HCMLP, Dondero, Ellington, and Leventon had concealed this transfer from the Independent Board, while advising the Independent Board that the Fund Counterparties lacked any material assets. The Independent Board had communicated that information to UBS (and the Court) and negotiated with UBS on those bases.

100. When the Independent Board discovered that Dondero, Ellington, and Leventon engaged in a conspiracy to cover up the fraudulent Sentinel transfer, it disclosed the transfer to UBS. As a result, the parties reopened settlement discussions. Ultimately, in order to limit HCMLP's potential liability to UBS as a result of Dondero's, Leventon's, and Ellington's bad acts, HCMLP entered into a revised settlement with UBS that granted UBS a claim totaling $125 million, consisting of a $65 million Class 8 General Unsecured Claim and a $60 million Class 9 Subordinated Unsecured Claim. In addition to the increased settlement amount and litigation costs, HCMLP is required to expend up to $3 million (subject to reimbursement) pursuant to certain cooperation provisions contained in the settlement agreement with UBS as a result of the fraudulent Sentinel transfer. The Bankruptcy Court approved the UBS settlement on May 27, 2021.

### 2. HCMLP Incurs More Than $185 Million In Liability To The Redeemer Committee And Crusader Funds As A Result Of Dondero's Misconduct

101. On April 3, 2020, the Redeemer Committee filed a general unsecured claim in the amount of its $190,824,557.00 arbitration award, plus "post-petition interest, attorneys' fees, costs and other expenses that continue to accrue." Likewise, on April 3, 2020, the Crusader Funds filed a claim for $23.5 million, consisting of $8.2 million in management fees and $15.3 million in distribution fees. Faced with this potential liability, HCMLP entered into a settlement whereby, among other things: (i) the Redeemer Committee was granted an allowed general unsecured claim of $136,696,610.00; (ii) the Crusader Funds were granted an allowed general unsecured claim of $50,000.00; (iii) HCMLP and Eames each consented to the cancellation of interests they and the Charitable DAF held in the Crusader Funds that the arbitration panel had determined were wrongfully-acquired; (iv) HCMLP and Eames each acknowledged that they would not receive any portion of distributions reserved by the Crusader Funds, and HCMLP further acknowledged that it will not receive any future payments from the Crusader Funds in respect of any Deferred Fees, Distribution Fees, or Management Fees; and (v) HCMLP and the Redeemer Committee agreed to a form of amendment to the Portfolio Company's shareholders' agreement and to a process whereby HCMLP would use commercially reasonable efforts to monetize all Portfolio Company shares held by HCMLP, funds managed by HCMLP, and the Crusader Funds.[19] The Bankruptcy Court approved HCMLP's settlement with the Redeemer Committee and Crusader Funds on October 23, 2020.

---

[19] Because HCMLP did not have the money to purchase the shares, the Redeemer Committee and HCMLP agreed to treat the Portfolio Company's shares differently than the process required under the arbitration award. Rather than having HCMLP purchase the Crusader Funds' shares in the Portfolio Company for approximately $48 million, they agreed that the Crusader Funds would



000846

### 3. HCMLP Incurs More Than $100 Million In Liability To Acis, Terry, And HarbourVest As A Result Of Dondero's Misconduct

102. Acis also filed proofs of claim against HCMLP, seeking, among other things, the amounts Dondero had caused HCMLP to overcharge Acis in order to diminish Terry's limited partner distributions from Acis, and damages arising from HCMLP's efforts to transfer assets out of Acis, in order to evade Terry's arbitration award and ensure that Dondero would benefit from the transferred assets. Terry and his wife also filed a proof of claim against HCMLP, alleging that HCMLP, acting through Dondero, had misappropriated assets in their retirement account. The Acis and Terry proofs of claim were settled in mediation after Dondero resigned from HCMLP. Pursuant to that settlement, Acis received a $23 million allowed claim against HCMLP, and HCMLP was required to pay (1) Terry and his wife $425,000 plus 10% interest to resolve the Terry's claim that HCMLP had misappropriated their retirement account;[20] (ii) Terry $355,000 in legal fees because of HCLOF's frivolous suit in Guernsey; and (iii) Acis an additional $97,000 for legal fees incurred defending another frivolous lawsuit initiated by Dondero.

103. On April 8, 2020, the HarbourVest entities filed proofs of claim against HCMLP (the "<u>HarbourVest Proofs of Claim</u>") alleging that HCMLP had fraudulently induced them into entering into the HCLOF Investment based on HCMLP's misrepresentations and omissions concerning certain material facts, including that HCMLP: (1) failed to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million arbitration award; (2) failed to disclose that it orchestrated a series of fraudulent transfers to prevent Terry from collecting on his

---

retain their shares in the Portfolio Company and that the total damages award would be reduced by approximately $30.5 million to account for the perceived fair market value of those shares.

20 Because of the interest component, HCMLP ultimately paid the Terrys approximately $1 million to compensate them for Dondero's theft of their retirement account.

arbitration award, and misrepresented the reasons for changing the portfolio manager for HCLOF immediately prior to HarbourVest's HCLOF Investment; (3) indicated that the dispute with Terry would not impact HCLOF's investment activities; and (4) falsely expressed confidence in HCLOF's ability to reset or redeem the CLOs under its control.

104. HarbourVest sought to rescind its HCLOF Investment and alleged damages in excess of $300 million. Ultimately, following Dondero's departure from HCMLP, the parties reached a resolution whereby HarbourVest agreed to transfer its interests in HCLOF to a new entity designated by HCMLP in exchange for a $45 million general unsecured claim and a $35 million subordinated general unsecured allowed claim. The value of the HCLOF interests that HarbourVest transferred to the HCMLP-designated entity was tens of millions of dollars less than the allowed amount of HarbourVest's claim against HCMLP.

### G. HCMLP Was Insolvent, Inadequately Capitalized, And/Or Intended To Incur Debts Beyond Its Ability To Pay Well Before The Redeemer Committee Arbitration Award Forced It Into Bankruptcy

105. The Redeemer Committee's $190 million arbitration award left HCMLP with no choice but to file for bankruptcy. But HCMLP was insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay well before the Redeemer Committee arbitration award was issued. As Dondero himself has acknowledged under oath, as a result of the economic recession of 2008 HCMLP "almost went under and . . . moved to a state of insolvency" from which HCMLP was still struggling to emerge in 2012.[21] Indeed, as shown below, a valuation of HCMLP's assets and liabilities shows that HCMLP was balance sheet insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay in

[21] Mar. 28, 2012 H'rg Tr. 62:06-10 (J. Dondero), *In the Matter of the Marriage of I.C. and Q.C.*, Cause No. 11-16417-Z (Tex. Dist. [256th Dist.]).

2011 and 2012, when Dondero created lifeboats NexPoint and HCMFA, and transferred certain of HCMLP's management contracts to HCMFA for no value. Contemporaneous valuations performed by the company itself corroborate this conclusion.

106. More specifically, these valuations show that when litigation liabilities resulting from claims by Barclays and UBS against HCMLP are taken into account, HCMLP was insolvent from no later than April 9, 2010 until no earlier than April 30, 2013.

| | Apr. 9, 2010 | Dec. 31, 2010 | Dec. 31, 2011 | Dec. 31, 2012 | Apr. 30, 2013 |
|---|---|---|---|---|---|
| Total Assets Less Financial Liabilities[22] | ($32M) | ($22) | $60M | $101M | $145M |
| Litigation Liabilities[23] | $365M | $365M | $365M | $145M | $145M |
| Net Value | ($397M) | ($387M) | ($305M) | ($44M) | ($1M) |

107. The creation of the lifeboats and subsequent transfer of management contracts (and business value) all but ensured HCMLP's demise. HCMLP's assets under management, operating income from its investment management business, and operating margins steadily declined, and almost no new third-party investor money came into the company. HCMLP continued to shoulder the burden of providing services to NexPoint and HCMFA without compensation. HCMLP's financial condition began to improve in late 2013, due largely to

[22] HCMLP's "Total Assets Less Financial Liabilities" is exclusive of litigation liabilities and is estimated as the sum of the enterprise value of the investment fund management business, the fair market value of HCMLP's investment portfolio, and the value of related parties notes receivable, less HCMLP's non-contingent financial liabilities. HCMLP's valuation is corroborated by valuations prepared by CBIZ, Inc. on behalf of HCMLP's general partner. Figures are rounded to the nearest million.

[23] Litigation liabilities are set at the values at which they were settled, or the values at which they were estimated by the Court in the course of the bankruptcy proceeding.

successful proprietary trading and overall improving market conditions, but those gains began to dissipate in 2015 due to Dondero's reckless trading.

108. By December 2016, the company was again firmly insolvent, inadequately capitalized, and/or unable to pay its debts as they came due, in large part because its CLOs were generating diminishing returns, and the company was earning only minimal fees for servicing other Dondero Entities rather than generating new business of its own, while continuing to bear significant employee expenses. HCMLP's financial condition deteriorated further between 2017 and 2019, as additional litigation claims were levied against the company, and it was forced to answer for the misconduct perpetrated in its name by Dondero and his loyalists.

109. Specifically, as shown below, when litigation liabilities resulting from claims by UBS, the Redeemer Committee, and Acis against HCMLP are taken into account in valuations prepared on HCMLP's behalf, HCMLP was insolvent from no later than December 31, 2016, until the date it filed for bankruptcy.

| | Dec. 19, 2016 | Dec. 31, 2017 | Dec. 31, 2018 | Oct. 16, 2019 |
|---|---|---|---|---|
| Total Assets Less Financial Liabilities[24] | $183M | $260M | $184M | $101M |
| Litigation Liabilities[25] | $212M | $365M | $365M | $365M |
| Net Value | ($29M) | ($105M) | ($181M) | ($264M) |

24 HCMLP's "Total Assets Less Financial Liabilities" is exclusive of litigation liabilities and is estimated as the sum of the enterprise value of the investment fund management business, the fair market value of HCMLP's investment portfolio, and the value of related parties notes receivable, less HCMLP's non-contingent financial liabilities. HCMLP's valuation is corroborated by valuations prepared by CBIZ, Inc. on behalf of HCMLP's general partner. Figures are rounded to the nearest million.

25 Litigation liabilities are set at the values at which they were settled, or the values at which they were estimated by the Court in the course of the bankruptcy proceeding.

### H. At All Time Relevant To This Amended Complaint, Dondero Hopelessly Commingled And Exploited Entities Within His Enterprise For His Own Personal Benefit

110. At all times relevant to this Amended Complaint, Dondero exploited HCMLP, Strand, and the various entities he controlled within the Highland empire for his own personal benefit, both directly and through other HCMLP fiduciaries whose loyalties ran to Dondero rather than HCMLP, and who aided Dondero in his various schemes. Dondero treated the elaborate corporate web he had created as a single integrated entity that existed solely to further his own self-enriching schemes, rather than as individual entities with their own respective stakeholders and corporate governance.

#### 1. Prior To Dondero's Resignation From Strand, Dondero Was The Alter Ego Of Strand

111. Dondero singularly dominated and controlled HCMLP and was its solitary decision-maker. Dondero made every material business, operational, management, and financial decision for HCMLP. Dondero exercised his complete control of HCMLP through HCMLP's general partner Strand, which Dondero similarly dominated and controlled. Dondero was Strand's 100% owner, sole director, and president between 1993 and 2020. For eight years he was also its secretary and only officer.

112. Strand did not even attempt to maintain the pretenses of observing corporate formalities. As an initial matter, Strand did not hold regular board meetings. Indeed, the Litigation Trustee, having reviewed HCMLP's books and records, has been unable to identify a single instance in which a Strand board meeting was held prior to the Petition Date. This is consistent with Dondero's own testimony in 2020 in an unrelated proceeding that he cannot recall ever attending a board meeting for Strand or seeing Strand board meeting minutes.

113. Although Strand's bylaws require annual meetings of stockholders, over the 26 years that Dondero controlled Strand, only six annual stockholder meetings were ever held, and no such meetings took place after 2005. The Litigation Trustee was able to identify only twelve instances of documented corporate action taken by the Strand board over the course of approximately 26 years, eight of which related to the appointment or removal of officers.

114. Dondero was the only officer of Strand between 1993 and 2001. Although Strand had certain elected officers between 2001 and 2019, they performed no duties in their capacities as officers of Strand and were appointed or fired from their roles based on their loyalty to, and standing with, Dondero. Indeed, when Dondero was asked under oath in 2020 about Strand's officers, he testified that he did not know if Strand even had officers, and stated that he was "not aware of [Strand] having any employees or active … governance." Moreover, he did not know whether Strand had a board of directors or if he was solely Strand's president.

**2. Dondero Routinely Commingled Entities And Employees Throughout The Dondero Corporate Web And Abused The Corporate Form**

115. As of the Petition Date, the Highland complex spanned more than 2,000 entities. For at least the last two decades, it has functioned largely as a single economic unit that was operated and controlled by Dondero, who abused his direct or indirect ownership stakes for his own personal benefit. Dondero directed the integrated enterprise himself, using friends, family members, and directors-for-hire that the Court has previously described as "nominal figureheads"[26] to carry out his will. As high-level HCMLP employees have testified under

---

[26] *See In re Acis Cap. Mgmt., L.P.*, No. 18-30264-SGJ-11, 2019 WL 417149, at *17 (Bankr. N.D. Tex. Jan. 31, 2019), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019), *appeal dismissed as moot sub nom. Matter of Acis Cap. Mgmt. G.P., L.L.C.*, 850 F. App'x 300 (5th Cir. 2021), and *aff'd sub nom. Matter of Acis Cap. Mgmt., L.P.*, 850 F. App'x 302 (5th Cir. 2021).

oath, Dondero was the "ultimate decision-maker" for "every [] entity in the firm and for the firm as a whole."

116. Dondero managed the entities as a single integrated unit. Internal business plans and projections were prepared in the aggregate across entities, including entities that were not owned by HCMLP, but were instead otherwise directly or indirectly owned by Dondero. Internal financial forecasts even projected AUM growth in non-HCMLP entities that was predicated upon HCMLP acting as support and service provider, even though HCMLP itself was effectively a melting ice-cube when those projections were made. Indeed, as far back as 2011, company projections provided to the valuation advisor CBIZ Valuation Group projected negative operating income for HCMLP.

117. Dondero used his domination of his web of entities, operated as a single unit, to facilitate his pillaging of HCMLP, moving HCMLP's assets and revenue out of reach of its creditors while preserving those funds and assets for his own use or for the benefit of other entities he created or controlled. As described above, Dondero operated NexPoint and HCMFA for the purpose of siphoning off HCMLP's revenue and value; in addition, he used HCMLP as NexPoint's and HCMFA's direct piggy-bank, transferring not only HCMLP's business and agreements, but also its cash, which was used to seed new funds and investment vehicles, among other things.

118. Dondero's control of the various entities within the Highland web was so pervasive that his own co-founder Okada remarked at one point in 2012, "I am not cool with you coming up with ideas, using Highland's cash flow to set them up, fund all their negative working capital and then somehow think the split shouldn't be 75 25 without some sort of negotiation and true up [(i.e., making new entities that Dondero owned entirely on his own)]."

Indeed, a 2016 draft accounting memo concluded that HCMLP, HCMFA, and NexPoint (and all of their subsidiaries) "are considered to be under common control … James Dondero controls all 3 of the entities." This conclusion accords with statements NexPoint's and HCMFA's own funds have made in public filings,[27] as well as the Bankruptcy Court's finding that they are both "controlled by Dondero."[28]

119. Dondero also funneled his own personal expenses through HCMLP, routinely seeking expense reimbursements from HCMLP in excess of $1 million per year. At Dondero's direction, HCMLP employed certain employees whose only responsibilities and obligations were to manage Dondero's and Okada's personal affairs and private business interests. For example, Melissa Schroth was employed by HCMLP, but her only duties were to serve as Dondero's and Okada's personal bookkeeper. Her duties involved no work for HCMLP, but rather concerned Dondero's and Okada's personal investments and entities, including but not limited to Dugaboy and Get Good. Dondero also used HCMLP and its employees for the benefit of other entities he dominated without adequate compensation to HCMLP—including for the benefit of NexPoint and HCMFA as described above, as well as for the benefit of his personal trusts. For example, Dondero used his domination of HCMLP to make its employee resources available to Dugaboy and Get Good at his sole discretion. HCMLP employees were involved

[27] *See*, *e.g.*, NexPoint Real Estate Strategies Fund, Prospectus (Form 497) (as filed Apr. 29, 2022) ("NexPoint Advisors, L.P. … is controlled by James Dondero by virtue of his control of its general partner, Nexpoint Advisors GP, LLC."); Highland Income Fund, Prospectus Supplement (To Prospectus dated July 1, 2019) (Form 497) (July 29, 2019) ("HCMFA is owned by Highland Capital Management Services, Inc. ("HCM Services") and its general partner, Strand Advisors XVI, Inc., of which James Dondero is the sole stockholder. HCM Services is controlled by Mr. Dondero and Mr. Mark Okada by virtue of their respective share ownership.").

[28] *See* Order Dismissing as Moot Debtor's Motion for a Mandatory Injunction, *Highland Capital Mgmt., L.P. v. Highland Capital Mgmt. Fund Advisors, L.P. (In re Highland Capital Mgmt., L.P.)*, Adv. Proc. No. 21-03010-sgj11 (Bankr. N.D. Tex. Feb. 24, 2021) (Docket No. 25).

in creating, managing, and providing accounting services to Dugaboy, and certain of those employees, including Melissa Schroth, performed work on behalf of Get Good in connection with Dondero's estate planning and transactions between Get Good and other Dondero Entities. Moreover, both Dugaboy and Get Good have acknowledged in the course of HCMLP's bankruptcy that HCMLP hosted their documents on its server. However, neither Dugaboy nor Get Good compensated HCMLP for the use of its employees or its resources.

120. This use of HCMLP's employees for Dondero's personal benefit continued even after the commencement of HCMLP's bankruptcy. For example, after the bankruptcy commenced, Schroth instructed Nancy Dondero to send a letter in her capacity as a trustee of Dugaboy instructing the Swiss entity Highland Capital Management AG ("HCM AG"), which is majority-owned by Dugaboy (which is ultimately owned and controlled by Dondero), to write off a liability that it owed to HCMLP for payments that HCMLP had made on its behalf. Schroth even ghost-wrote a letter for Nancy Dondero to send to HCM AG authorizing this theft. Likewise, Dondero frequently instructed HCMLP's employees to perform services in connection with Dondero's personal and business interests, which conferred no value on HCMLP.

121. Highland employees frequently did not know whether they or their colleagues were employees of HCMLP or another entity within the Dondero web. Employees shared the same office space in HCMLP's headquarters. Indeed, each of Strand, NexPoint, NexPoint GP, HCMFA, Dugaboy, CLO Holdco, the Highland Dallas Foundation, the Highland Santa Barbara Foundation, the Highland Kansas City Foundation, HFP, SAS, and Acis listed its business headquarters at this same address: 300 Crescent Court, Suite 700, Dallas, Texas 75201. Moreover, when employees of HCMLP performed services for other Dondero entities, they

sometimes did so pursuant to agreements that Dondero signed for both HCMLP, on the one hand, and the counterparty, on the other hand. In other instances, HCMLP's employees performed services for non-HCMLP entities without any formal agreements in place at all. For example, Leventon testified that he performed work for SAS "on and off" for approximately seven years (*e.g.*, in connection with whether to invest in a new litigation funding case), notwithstanding that he was never an employee of SAS and HCMLP did not have a shared services agreement with SAS.[29] Moreover, when shared services and advisory agreements were in place, HCMLP frequently charged Dondero's other entities below-market rates for use of HCMLP's employees and resources.

122. Additionally, Dondero delegated authority to his loyalists irrespective of their titles or roles. For example, Dondero delegated decision-making authority for Acis to Ellington, notwithstanding that he was not an officer, director, or employee of Acis. And Leventon testified that although he was an HCMLP employee, HCMLP could request that he perform legal services for any of the 2,000 entities in the Highland web.

123. Dondero would also use HCMLP as his own personal piggy-bank. For example, between January and August of 2018, Dondero borrowed $16,725,000 on four demand notes. Dondero remains obligated on three of the demand notes and maintains an outstanding principal

---

[29] Similarly, several HCMLP employees, including Ellington, Leventon, Katie Irving, and JP Sevilla, had SAS email addresses, and there were frequent meetings among HCMLP's legal department—including Ellington, Leventon, and Sevilla—and Dilip Massand in connection with SAS. SAS did not compensate any of these HCMLP employees for their work for SAS. Moreover, in 2014, when a telephone call was placed to the number listed on SAS's website, the call was routed to HCMLP's office in Dallas with a message that stated: "Thank you for calling SAS Asset Recovery. For reception press 0. For Scott [Ellington], press 1. For Dilip [Massand], press 2. For JP [Sevilla], press 3. For Tabor [Pittman, former HCMLP Associate GC], press 4. For Katie [Irving], press 5. For Isaac [Leventon], press 6. Thanks and have a good day."

balance of approximately $9 million. HCMLP has demanded payment on all of the outstanding demand notes, but to date, Dondero has failed to make any repayments on that debt.[30]

124. Dondero also effectively paid himself and Okada distributions from HCMLP through other Dondero Entities, including HCMS. Between 2013 and 2017, HCMS issued dozens of demand notes to HCMLP in return for tens of millions of dollars in cash, and between May 2017 through 2020, HCMS issued four additional promissory demand notes with an aggregate face amount of $900,000. Frequently, these notes functioned as disguised distributions to Dondero and Okada, by virtue of a "loan" from HCMLP to HCMS followed by a "loan" from HCMS to Dondero and Okada. As with other intercompany notes between HCMLP and other Dondero Entities, these notes had minimal covenants. Moreover, Dondero caused HCMLP to issue these loans to HCMS with minimal interest.

125. To take yet another example, Dondero exploited HCMLP's employees and capital in order to launch HCRE Partners, LLC ("HCRE"), another entity designed to evade HCMLP's creditors.[31] HCRE pursued financial and real estate investments, failing to pay

[30] In January 2021, HCMLP filed adversary proceedings against Dondero and four of his affiliated entities (HCMFA, NexPoint, HCRE, and HCMS) in the Bankruptcy Court to collect on these notes. *See*, *e.g.*, *Highland Capital Management, L.P. v. James Dondero*, Adv. Pro. 21-03003-sgj (Bankr. N.D. Tex. Jan. 22, 2021). Dondero and his affiliated entities have raised a series of frivolous defenses to repayment of the notes, including that Dugaboy—acting through Dondero's sister—agreed to forgive the notes as part of Dondero's compensation. As of December 2021, the defendants owed an aggregate of over $50 million in past-due principal and interest on the notes. In November 2021, HCMLP filed a second adversary proceeding against HCMFA to collect on additional notes. *See Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.*, Adv. Pro. 21-03082-sgj. In this second notes litigation, HCMFA has raised a similarly frivolous defense.

[31] HCRE is 70% owned by Dugaboy, 25% owned by Highland Capital Management Real Estate Holdings I, LLC ("HCMRE I") (owned by a former HCMLP managing director) and 5% owned by Highland Capital Management Real Estate Holdings II, LLC ("HCMRE II") (owned by Ellington).

HCMLP any consideration for advisory, administrative, and other services HCMLP provided. Moreover, Dondero (1) caused HCMLP to loan HCRE tens of millions of dollars on terms that were unfair to HCMLP; (2) used the proceeds of those loans to pay approximately $32 million in distributions (between 2016 and 2020) to Dugaboy, Ellington, and another former HCMLP employee; and (3) caused HCRE to default on its debt to HCMLP and assert frivolous defenses to HCMLP's right to repayment. As of January 8, 2021, approximately $6.1 million in principal and interest was due and owing to HCMLP on HCRE notes.

126. As explained above, Dondero also used HCMLP to support the growth of lifeboats like NexPoint and HCMFA. Additionally, in December 2010, certain preferred tranches of CLOs managed by HCMLP and held by Highland CDO Holding Company, a portion of which was indirectly owned by HCMLP, were sold to CLO Holdco, a Cayman Islands entity then owned and controlled by a Dondero trust. CLO Holdco purported to pay approximately $39 million in return, but $33 million of that amount consisted of a note that was never repaid. The value of these preferred securities predictably skyrocketed soon thereafter, and generated substantial income that was used to benefit Dondero's lifeboats. An analysis of CLO Holdco's cash flows over time demonstrates that income generated from these assets was used to seed a variety of NexPoint-managed funds and entities, HCMFA-managed funds and entities, and Acis-managed CLOs and other vehicles—all for Dondero's benefit—rather than accruing in favor of HCMLP or its subsidiaries.

127. Dondero used HCMLP's funds to support other entities in his web as well. In or around 2013, HCM AG entered into a joint venture with a Brazilian entity named Brasilinvest Investimentos e Participacoes Ltda ("Brasilinvest Investimentos") for a shared interest in a Brazilian entity named Highland Capital Brasilinvest Gestora de Recursos, Ltda (a.k.a Highland

Capital Brasil Gestora de Recursos). With Dondero's approval, HCM AG acquired Brasilinvest Investimentos's shares in this joint venture through a $230,000 cash payment in October 2016. However, at Dondero's direction, the $230,000 was paid by HCMLP rather than HCM AG or Dugaboy.

128. Dondero did not bother to distinguish between himself and HCMLP. After Dondero was removed as HCMLP's Chief Executive Officer and President in January 2020, he continued using his HCMLP email account and continued working out of HCMLP's headquarters until his forced resignation in October 2020 and removal from HCMLP's premises in December 2020. When the Court entered an order restraining Dondero from communicating with HCMLP employees, Dondero flouted the order, including by communicating with Ellington and instructing Melissa Schroth (an HCMLP employee at the time) to resist Dugaboy-related document production requests, even though those documents were always kept on HCMLP's computer system. Likewise, a temporary restraining order entered by this Court prohibited Dondero from participating in, or encouraging others to participate in, any action that undermined decisions made by HCMLP's Chief Restructuring Officer, James Seery ("Seery"), regarding the disposition of HCMLP assets. Nevertheless, Dondero did so multiple times, including by contacting various employees and instructing them to act in a manner that was inconsistent with Seery's directions.

129. Dondero evinced no respect for HCMLP as an entity separate and apart from himself. Thus, he disposed of a cell phone that belonged to HCMLP that contained relevant data, likely resulting in the spoliation of valuable evidence that HCMLP could have used to pursue claims benefitting HCMLP. In addition, Dondero interfered with document productions of HCMLP and trespassed on HCMLP's property.

## I. Dondero And His Loyalists Also Engaged In Other Conduct That Harmed HCMLP

### 1. Dondero And His Loyalists Fraudulently Transferred Assets To Themselves And Their Affiliated Entities

130. Dondero and his loyalists also engaged in other transactions that siphoned value from HCMLP to themselves. As described in greater detail below, these included (i) transfers of liquid assets for illiquid notes that could not have been monetized for the same value as the assets for which they were exchanged, (ii) limited partner distributions, and (iii) payments for services provided to other Dondero Entities rather than HCMLP.

(a) <u>The Fraudulent CLO Holdco Transaction</u>

131. On December 28, 2016, shortly after the Redeemer Committee commenced its Delaware state court action and arbitration against HCMLP, and while UBS's action against HCMLP was pending, Dondero, acting with substantial assistance from Scott, undertook a scheme whereby HCMLP transferred assets valued by the company at approximately $24 million through a series of related assignments (the "<u>Transferred CLO Holdco Assets</u>") to CLO Holdco, in exchange for an assignment from Get Good of an existing Dugaboy obligation (the "<u>Dugaboy Note</u>"), which was worth significantly less than the transferred assets (the "<u>CLO Holdco Transaction</u>").

132. Upon information and belief, Dondero consummated the CLO Holdco Transaction in order to claim a charitable deduction on his tax returns, and to place value out of his ex-wife's reach. Specifically, Dondero wanted to transfer assets out of Get Good so that they would not be available to his ex-wife, and to do so through a charitable donation so that he would get the added benefit of a tax deduction. Get Good, however, did not own enough assets that qualified for a tax-deductible charitable donation. Accordingly, Dondero caused Get Good

to exchange the Dugaboy Note, which did not qualify for a tax-deductible donation, for HCMLP's Transferred CLO Holdco Assets, which did. Dondero, acting with Scott's assistance, then caused the Transferred CLO Holdco Assets to be immediately transferred from Get Good to Highland Dallas, to the Charitable DAF, to the DAF, and ultimately to CLO Holdco. The CLO Holdco Transaction thus furthered Dondero's personal interests, but harmed HCMLP and its creditors by replacing liquid and liquidating assets with an illiquid note of significantly less value.

133. The Transferred CLO Holdco Assets consisted of: (1) $2,032,183.24 or potentially more in Series A Interests in Highland Capital Loan Fund, L.P., an HCMLP-managed hedge fund investing primarily in liquid loans; (2) a participation interest worth $8,710,000 or potentially more in call options of publicly-traded American Airlines Group, Inc. (the "AA Interests"); and (3) a participation interest in certain Highland Crusader Fund L.P. and Highland Crusader Fund II, Ltd. shares, as well as a tracking interest in certain participation shares of Highland Crusader Fund II, Ltd., which at the time of the transfer HCMLP valued at $12,625,395.44 (the "Crusader Interests"). The transfer of the Transferred CLO Holdco Assets was initiated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good. Pursuant to that agreement, the Transferred CLO Holdco Assets were received by Get Good.

134. Dondero caused HCMLP to transfer the Transferred CLO Holdco Assets to Get Good in exchange for the Dugaboy Note. While the face amount of the Dugaboy Note was equal to the reported value of the Transferred CLO Holdco Assets, in actuality, the value of the Dugaboy Note did not come close to the value of the Transferred CLO Holdco Assets. The interest rate on the Dugaboy Note was a paltry 2.75%. There was no security interest provided

in respect of the Dugaboy Note or other material covenants or lender protections other than rights to cost of collections. No payments of principal or interest were required on the note until 2036. And because Dugaboy was a completely private and opaque counterparty, there was no third-party market for the sale of the Dugaboy Note. Lastly, from a counterparty risk perspective, Dondero's control over the repayment of a note clearly does not ensure timely repayment without litigation, as evidenced by the several entities controlled by Dondero that are currently seeking to evade their unambiguous payment obligations on other notes owed to HCMLP, on frivolous grounds such as mistake and subsequent alleged oral agreements between Dondero and his sister. In the end, Dondero caused HCMLP to exchange valuable liquid or otherwise near-term liquidating assets for a paper-thin promise 20 years into the future.

135. Following Get Good's receipt of the Transferred CLO Holdco Assets, Scott—at Dondero's direction—immediately caused Get Good to donate the assets to Highland Dallas Foundation in his capacity as trustee of Get Good. Dondero and Scott caused the Highland Dallas Fund to immediately contribute the Transferred CLO Holdco Assets to DAF Holdco by unanimous written consent executed by Dondero, Scott, and Jalonick, each in their capacity as the directors of Highland Dallas Foundation. Following that transfer, through an omnibus assignment agreement, Scott caused DAF Holdco to transfer the Transferred CLO Holdco Assets to the DAF, which itself immediately transferred them to CLO Holdco. The DAF GP issued a written resolution, as general partner of the DAF and as 100% owner of CLO Holdco, contributing the Transferred CLO Holdco Assets to CLO Holdco. Scott again executed this document as managing member of DAF GP. As purported consideration for these transfers, the Highland Dallas Foundation, DAF Holdco, the DAF, and CLO Holdco all agreed to be fully bound by apparently unrelated "Multi Strat Governing Documents." Scott executed the

requisite consent documents on behalf of each entity, in his capacities as director of DAF Holdco, managing member of the DAF, and director of CLO Holdco. Upon information and belief, Scott consented to each step of the CLO Holdco Transaction on behalf of Get Good, DAF Holdco, the DAF, DAF GP, and CLO Holdco solely at Dondero's request, and without performing any independent analysis.

136. The structure of the CLO Holdco Transaction is set forth below in Figure 3.

**Figure 3.**




(b) Fraudulent Distributions

137. Notwithstanding HCMLP's limited liquidity and hundreds of millions of dollars in looming liabilities, Dondero caused HCMLP to make a series of equity distributions between 2010 and 2012, and 2015 and 2019, for Dondero's and Okada's ultimate benefit, and to the detriment of HCMLP's creditors. These distributions were made at a time when HCMLP was insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay, and

were intended to hinder, delay, and/or defraud creditors by siphoning value to limited partners that should have been preserved for creditors' benefit.

138. Although Dondero and Okada placed certain of their limited partnership interests in trusts that they ultimately owned or controlled, Dondero frequently disregarded corporate formalities, including with respect to limited partnership distributions. Until 2015, distributions were made to Dondero personally, notwithstanding that he owned HCMLP largely through certain trusts. Beginning in 2015, it appears that distributions were made directly to Strand and Dugaboy, *i.e.*, the Dondero Entities that actually held HCMLP limited partnership interests. As such, the distributions made to Dondero between April 9, 2010 and February 28, 2015 (identified below) were made for the benefit of Dondero, Dugaboy, and/or Strand. The distributions made after February 28, 2015, were, upon information and belief, made directly to the limited partnership interest holders, for the benefit of Dondero and Okada.

139. Likewise, until 2015, distributions were made to Okada individually, rather than HCMLP's limited partners MAP #1 and MAP #2. As such, the distributions made to Okada between April 9, 2010, and February 28, 2015, (identified below) were made for the benefit of Okada, MAP #1, and/or MAP #2. The distributions to Okada made after February 28, 2015, were broken out into three transfers in HCMLP's records, in amounts proportionate to the limited partnership interests of Okada, MAP #1, and MAP #2.

140. On or around April 9, 2010, HCMLP made distributions to Dondero and Okada, in the amounts of $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) and

$405,585.62 (two transfers of $375,000.00 and $30,585.62), respectively (the "April 9, 2010 Distributions").[32]

141. On or around April 13, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $649,318.45 and $216,439.49, respectively (the "April 13, 2011 Distributions").

142. On or around May 2, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $3,124,435.00 and $1,024,018.00, respectively (the "May 2, 2011 Distributions").

143. On or around September 13, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $5,351,316.00 and $1,705,813.00, respectively (the "September 13, 2011 Distributions").

144. On or around November 25, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $5,250,000.00 and $1,750,000.00, respectively (the "November 25, 2011 Distributions").

145. On or around February 22, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $3,000,000.00 and $1,000,000.00, respectively (the "February 22, 2012 Distributions").

146. On or around February 29, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $4,514,780.25 and $1,504,926.75, respectively (the "February 29, 2012 Distributions").

[32] Plaintiff's original Complaint referred to the distributions as being made on or around the dates reflected on HCMLP's general ledger. Plaintiffs have now located the bank transfer statements for each distribution, and use the bank transfer date instead. The distributions being challenged, however, have not changed.

147. On or around April 10, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $6,221,364.15 and $2,073,788.05, respectively (the "April 10, 2012 Distributions").

148. On or around April 9, 2013, HCMLP made distributions to Dondero and Okada, in the amounts of $25,375,083.16 and $8,440,148.31, respectively (the "April 9, 2013 Distributions").

149. On or around December 19, 2016, HCMLP made distributions to Hunter Mountain,[33] Dugaboy, and Strand, in the amounts of $4,769,570, $8,945, and $12,017, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $2,334, $470, and $201, respectively (the "December 19, 2016 Distributions").

150. On or around January 5, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $11,034,754, $20,694, and $27,803, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2,[34] in the amounts of $5,401, $1,087, and $466, respectively (the "January 5, 2017 Distributions").

---

[33] In December 2015, Dondero orchestrated two sequential transactions, whereby Hunter Mountain purchased virtually all of HCMLP's limited partnership interests in exchange for cash and notes (collectively, the "Hunter Mountain Transaction"). The effect of the Hunter Mountain Transaction was to consolidate over 99% of all existing limited partners' interests in HCMLP into a single entity, Hunter Mountain. Hunter Mountain is owned through a series of intermediate shell companies, and ultimately all economic interests are held in a series of tax-favored life insurance accounts at Crown Global Life Insurance Ltd. ("Crown Global"). On information and belief, these accounts were created by Dondero and Okada, who were the direct or indirect owners of nearly all of the Debtor's limited partner interests prior to the Hunter Mountain Transaction. Dondero orchestrated the Hunter Mountain Transaction in order to avail himself of personal tax benefits.

[34] At the time of the December 19, 2016 distributions and thereafter, Okada and two trusts (MAP #1 and MAP #2) established for the benefit of Okada's children and siblings held economic interests in HCMLP. HCMLP's accounting records indicate that distributions allocated to Okada, MAP #1, and MAP #2 were all made to a single account in Okada's name. Thus, with respect to this and subsequent, applicable distributions, Plaintiff pleads that they were made to or for the benefit of Okada, MAP #1, and MAP #2.

151. On or around February 7, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $7,169,970.00, $13,446.40, and $18,065.44, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $3,509.32, $706.19, and $302.65, respectively (the "February 7, 2017 Distributions").

152. On or around June 15, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $79,600.00, $149.28, and $200.56, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $38.96, $7.84, and $3.36, respectively (the "June 15, 2017 Distributions").

153. On or around December 21, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $2,651,675.00, $4,972,89, and $6,681.16, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $1,297.86, $261.17, and $111.93, respectively (the "December 21, 2017 Distributions").

154. On or around March 9, 2018, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $84,575.00, $158.61, and $213.10, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $41.40, $8.33, and $3.57, respectively (the "March 9, 2018 Distributions").

155. On or around December 19, 2018, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $4,930,722.50, $9,246.96, and $12,423.44, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $2,413.33, $485.64, and $208.13, respectively (the "December 19, 2018 Distributions").

156. On or around March 28, 2019, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $3,711,456.47, $6,960.38, and $9,351.38, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $1,816.56, $365.55,

and $156.66, respectively (the "March 28, 2019 Distributions," and together with the April 9, 2010 Distributions, April 13, 2011 Distributions, May 2, 2011 Distributions, September 13, 2011 Distributions, November 25, 2011 Distributions, February 22, 2012 Distributions, February 29, 2021 Distributions, April 10, 2012 Distributions, April 9, 2013 Distributions, December 19, 2016 Distributions, January 5, 2017 Distributions, February 7, 2017 Distributions, June 15, 2017 Distributions, December 21, 2017 Distributions, March 9, 2018 Distributions, December 19, 2018 Distributions, March 28, 2019 Distributions, the "HCMLP Distributions").

157. All of these distributions were made at a time when HCMLP was insolvent and as part of a scheme to transfer HCMLP's value to Dondero and Okada and divert value away from HCMLP's current and potential future creditors. The March 28, 2019 Distributions, which were made shortly after the arbitration panel awarded the Redeemer Committee over $190 million, were the final distributions made by HCMLP. The distributions ceased at that time—the end result of HCMLP's valuable businesses being usurped by the "lifeboats" and a years-long effort to transfer HCMLP's remaining cash to its limited partners via distributions.

(c) Fraudulent Transfers To Massand

158. HCMLP also made payments of at least $519,000 per year to Massand Capital from November 2014 through 2019. On January 1, 2014, HCMLP entered into a one-year consulting agreement with Massand Inc., pursuant to which HCMLP agreed to pay Massand Inc. $25,000 per month in fees, $7,500 per month in "accommodations," $750 per month in cell phone expenses, and other "reasonable" expenses. Then, on January 5, 2015, HCMLP entered into a consulting agreement (together, the "Massand Consulting Agreements") on the same terms with Massand LLC, pursuant to which HCMLP agreed to pay Massand LLC $35,000 per

month in fees, $7,500 per month in "accommodations," $750 per month in cell phone expenses, and other "reasonable" expenses. In exchange, the Massand Consulting Agreements provided that HCMLP's Chairman, Dondero, and its General Counsel, Ellington, would assign certain unspecified "tasks" to Massand Capital.

159. Massand Capital's monthly invoices to HCMLP were consecutively numbered, indicating that Massand Capital had no customers other than HCMLP. Moreover, Massand Capital's invoices contained no information about the services it purportedly rendered to HCMLP.

160. The Massand Consulting Agreements noted that Massand Capital would be responsible for advising HCMLP on its "Investment Recovery Strategies business in the Countries of the Gulf Cooperation Council"—specifically Bahrain, Saudi Arabia, the United Arab Emirates, Kuwait, Qatar, and Oman. Based upon a review of information to date, it appears that Massand Capital provided no actual services to HCMLP, and that HCMLP did not have any "business" that was related to "investment recovery strategies."

161. Rather, Massand Capital appears to have provided services solely to SAS—a separate entity that was owned and controlled by Dondero and Ellington. The owner of Massand Capital, Dilip Massand, was assigned an SAS email address, was bestowed the title of "Managing Director" of SAS, and was involved in communications relating to SAS's claims purchase litigation financing business.[35] As set forth above, SAS was owned by Dondero and Ellington, not HCMLP.

---

[35] In a speaker profile in 2014, Dilip Massand was described as overseeing "the operations of SAS Asset Recovery in the Middle East."

162. Thus, based on the documents and information that Plaintiff has reviewed to date, Dondero caused HCMLP to pay millions of dollars in consulting fees to Massand Capital in exchange for no value to HCMLP, all solely to benefit other Dondero-controlled entities. HCMLP received no value for the payments that Dondero and Ellington directed to Massand Capital.

### J. Dondero And Ellington Breach Their Fiduciary Duties To HCMLP By Misappropriating Its Funds

163. HCMLP owned a 97.5% interest in HE Capital 232 Phase I, LLC ("HE Capital 232"). In February 2018, HE Capital 232 and its wholly-owned subsidiary, HE Capital 232 Phase I Property, LLC ("HE Capital 232 Property"), sold real property in Arizona. Net of costs and expenses in connection with the transaction, HE Capital 232 was due $8,687,245.15. These proceeds were placed in an escrow account maintained by HCMLP's counsel, Wick Phillips Gould & Martin LLP ("Wick Phillips"), "pending distribution of the proceeds to the direct and indirect owners of interests in [HE Capital 232 Property]."

164. On March 2, 2018, Ellington directed Wick Phillips to disburse from the escrow account $4,510,000 to HCMLP and $1,200,000 to an HCMLP managed fund to pay down mezzanine debt. This left $2,977,245.15 in the escrow account that was due and owing to HCMLP. On information and belief, Dondero and Ellington directed Wick Phillips to keep these funds in the escrow account so that they could funnel the money to themselves. For three months, Wick Phillips requested disbursement instructions for the remaining funds from Ellington, but Ellington demurred while "waiting for answers from others so can tell you where to send." Upon information and belief, during this period, Ellington and Dondero were determining how to direct the funds to themselves.

165. On June 4, 2018, Ellington dropped HCMLP's Managing Director (Real Estate) from an email chain and directed Wick Phillips to disburse the remainder to an account in the name of MaplesFS—a fiduciary services company in the Cayman Islands acting as a payment agent—for further credit to Grey Royale Ltd., a Cayman Islands shell company owned and controlled by Dondero and Ellington. MaplesFS subsequently transferred the full amount to Grey Royale Ltd. A Wick Phillips employee commented that the payment to Grey Royale Ltd. was "pretty suspicious."

166. In September 2019, in connection with the preparation of HE Capital 232's tax return, HCMLP's Tax Director inquired about the missing funds owed to HCMLP as a result of the Arizona property sale. Ellington responded that the "facts as I know them" were that the approximately $3 million in missing HCMLP funds were "additional cost[s] of sale, reducing the gain," and "used to pay various legal expenses and other closing costs." Ellington did not disclose that he had directed that the funds be paid to a Cayman Islands shell company owned by Dondero and Ellington, which had no role in the real estate transaction and was not owed any legal expenses or closing costs.

167. Neither Dondero, Ellington, nor Grey Royale Ltd. were parties to the escrow agreement or had any legal claim to the proceeds of the real estate sale held by the escrow agent.

### K. Dondero Loyalists Receive Their Deferred Compensation By Engaging In The Tall Pine Transaction

168. HCMLP employees other than Dondero also engaged in, and improperly benefited from, self-interested transactions and schemes involving HCMLP.

169. In early 2020, only months after the Petition Date, Ellington and Leventon formed a group of entities that have received millions of dollars of payments from four Dondero Entities pursuant to a services agreement dated March 13, 2020, among Tall Pine, NexBank,

DAF Holdco, NexPoint, and HCMFA (the "Tall Pine Services Agreement"). The Tall Pine scheme was an elaborate arrangement pursuant to which Dondero would be able to keep certain key employees, including Ellington and Leventon, loyal to Dondero during the bankruptcy. Through the Tall Pine scheme, Ellington and Leventon ensured that they would profit off their wrongdoing, and that Dondero would compensate them no matter what happened to HCMLP.

170. Pursuant to the Tall Pine Services Agreement, HCMLP employees, including Ellington and Leventon, would receive approximately $17 million through pass-through entities that they created and owned over the course of two years. When Tall Pine would receive a payment from any of the counterparties to the Tall Pine Services Agreement, Tall Pine contemporaneously transferred funds to Leventon's pass-through entity, Clairmont Holdings, LLC ("Clairmont"). Ellington, who owned Tall Pine, profited from the amounts that remained in Tall Pine after it had distributed sums to Clairmont and other pass-through entities controlled by HCMLP employees.

171. After the Petition Date, Dondero surreptitiously approved wire transfers from accounts held by NexPoint, NexBank, and the DAF to Tall Pine for the benefit of himself, Ellington, and Leventon. These payments were made to compensate Ellington and Leventon for the amounts that would have been paid to them in 2020 but for the Committee's objection. Ellington and Leventon did not disclose these payments to the Independent Board.

## V. CAUSES OF ACTION

### COUNT I
### Avoidance and Recovery of HCMLP Distributions as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law

*(Against Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain)*

172. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

173. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

174. As set forth below, HCMLP made the following HCMLP Distributions to or for the benefit of Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain.

| | **Dondero (for the benefit of Dondero, Strand, and/or Dugaboy)** | **Hunter Mountain** | **Dugaboy** | **Okada (for the benefit of Okada)** | **Okada (for the benefit of MAP #1)** | **Okada (for the benefit of MAP #2)** | **Strand** |
|---|---|---|---|---|---|---|---|
| April 9, 2010 Distributions | $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) | N/A | N/A | $405,585.62 (two transfers of $375,000.00 and $30,585.62) | | | N/A |
| April 13, 2011 Distributions | $649,318.45 | N/A | N/A | $216,439.49 | | | N/A |
| May 2, 2011 Distributions | $3,124,435.00 | N/A | N/A | $1,024,018.00 | | | N/A |
| September 13, 2011 Distributions | $5,351,316.00 | N/A | N/A | $1,705,813.00 | | | N/A |
| November 25, 2011 Distributions | $5,250,000.00 | N/A | N/A | $1,750,000.00 | | | N/A |
| February 22, 2012 Distributions | $3,000,000.00 | N/A | N/A | $1,000,000.00 | | | N/A |
| February 29, 2012 Distributions | $4,514,780.25 | N/A | N/A | $1,504,926.75 | | | N/A |
| April 10, 2012 Distributions | $6,221,364.15 | N/A | N/A | $2,073,788.05 | | | N/A |
| April 9, 2013 Distributions | $25,375,083.16 | N/A | N/A | $8,440,148.31 | | | N/A |
| December 19, 2016 Distributions | N/A | $4,769,570.00 | $8,945.00 | $2,334.00 | $470.00 | $201.00 | $12,017.00 |

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| January 5, 2017 Distributions | N/A | $11,034,754.00 | $20,694.00 | $5,401.00 | $1,087.00 | $466.00 | $27,803.00 |
| February 7, 2017 Distributions | N/A | $7,169,970.00 | $13,446.40 | $3,509.32 | $706.19 | $302.65 | $18,065.44 |
| June 15, 2017 Distributions | N/A | $79,600.00 | $149.28 | $38.96 | $7.84 | $3.36 | $200.56 |
| December 21, 2017 Distributions | N/A | $2,651,675.00 | $4,972.89 | $1,297.86 | $261.17 | $111.93 | $6,681.16 |
| March 9, 2018 Distributions | N/A | $84,575.00 | $158.61 | $41.40 | $8.33 | $3.57 | $213.10 |
| December 19, 2018 Distributions | N/A | $4,930,722.50 | $9,246.96 | $2,413.33 | $485.64 | $208.13 | $12,423.44 |
| March 28, 2019 Distributions | N/A | $3,711,456.47 | $6,960.38 | $1,816.56 | $365.55 | $156.66 | $9,351.38 |
| Total | $54,703,053.88 | $34,432,322.97 | $64,573.52 | $18,142,416.67 | | | $86,755.08 |
| Grand Total | $107,429,122.12 | | | | | | |

175. At the time of each HCMLP Distribution, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

176. HCMLP received less than reasonably equivalent value in exchange for each of HCMLP Distributions set forth above. Indeed, HCMLP received no value for HCMLP the Distributions, each of which was a gratuitous transfer from HCMLP, either to one of its limited partners or for the benefit of one of its limited partners and/or Dondero.

177. Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain did not receive HCMLP Distributions in good faith. To the contrary, at the times that Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain received each of HCMLP Distributions, they knew that HCMLP was balance sheet insolvent (or would be rendered balance sheet insolvent), inadequately capitalized, and/or unable to pay its debts as they came due. Each of these defendants was aware that Dondero had siphoned HCMLP's valuable assets and business opportunities after HCMLP had incurred substantial contingent liabilities. Moreover, each of these defendants was aware that HCMLP Distributions were yet another effort to siphon value from HCMLP to Dondero, Okada, and their affiliated entities at a time when HCMLP was insolvent, inadequately capitalized, and unable to pay its debts as they came due.

178. Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of distributions made to Hunter Mountain, given that Hunter Mountain transferred proceeds of such distributions to them.

179. Each HCMLP Distribution is voidable as a constructively fraudulent transfer. Accordingly, each HCMLP Distribution should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT II**
**Avoidance and Recovery of HCMLP Distributions as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain)*

180. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

181. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

182. As set forth below, HCMLP made the following HCMLP Distributions to or for the benefit of Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain.

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| April 9, 2010 Distributions | $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) | N/A | N/A | $405,585.62 (two transfers of $375,000.00 and $30,585.62) | | | N/A |
| April 13, 2011 Distributions | $649,318.45 | N/A | N/A | $216,439.49 | | | N/A |
| May 2, 2011 Distributions | $3,124,435.00 | N/A | N/A | $1,024,018.00 | | | N/A |
| September 13, 2011 Distributions | $5,351,316.00 | N/A | N/A | $1,705,813.00 | | | N/A |
| November 25, 2011 Distributions | $5,250,000.00 | N/A | N/A | $1,750,000.00 | | | N/A |
| February 22, 2012 Distributions | $3,000,000.00 | N/A | N/A | $1,000,000.00 | | | N/A |
| February 29, 2012 Distributions | $4,514,780.25 | N/A | N/A | $1,504,926.75 | | | N/A |
| April 10, 2012 Distributions | $6,221,364.15 | N/A | N/A | $2,073,788.05 | | | N/A |
| April 9, 2013 Distributions | $25,375,083.16 | N/A | N/A | $8,440,148.31 | | | N/A |
| December 19, 2016 Distributions | N/A | $4,769,570.00 | $8,945.00 | $2,334.00 | $470.00 | $201.00 | $12,017.00 |

| | **Dondero (for the benefit of Dondero, Strand, and/or Dugaboy)** | **Hunter Mountain** | **Dugaboy** | **Okada (for the benefit of Okada)** | **Okada (for the benefit of MAP #1)** | **Okada (for the benefit of MAP #2)** | **Strand** |
|---|---|---|---|---|---|---|---|
| January 5, 2017 Distributions | N/A | $11,034,754.00 | $20,694.00 | $5,401.00 | $1,087.00 | $466.00 | $27,803.00 |
| February 7, 2017 Distributions | N/A | $7,169,970.00 | $13,446.40 | $3,509.32 | $706.19 | $302.65 | $18,065.44 |
| June 15, 2017 Distributions | N/A | $79,600.00 | $149.28 | $38.96 | $7.84 | $3.36 | $200.56 |
| December 21, 2017 Distributions | N/A | $2,651,675.00 | $4,972.89 | $1,297.86 | $261.17 | $111.93 | $6,681.16 |
| March 9, 2018 Distributions | N/A | $84,575.00 | $158.61 | $41.40 | $8.33 | $3.57 | $213.10 |
| December 19, 2018 Distributions | N/A | $4,930,722.50 | $9,246.96 | $2,413.33 | $485.64 | $208.13 | $12,423.44 |
| March 28, 2019 Distributions | N/A | $3,711,456.47 | $6,960.38 | $1,816.56 | $365.55 | $156.66 | $9,351.38 |
| Total | $54,703,053.88 | $34,432,322.97 | $64,573.52 | $18,142,416.67 | | | $86,755.08 |
| Grand Total | $107,429,122.12 | | | | | | |

183. Dondero was HCMLP's Chief Executive Officer, President, Co-Chief Investment Officer, and Co-Founder. Okada was HCMLP's Co-Chief Investment Officer and Co-Founder. Together, Dondero and Okada directly or indirectly owned substantially all of the equity interests in HCMLP, or were the beneficiaries of all distributions HCMLP made to its limited partners. Dondero exercised complete control over HCMLP, and Okada acquiesced to and profited from schemes orchestrated by Dondero to enrich HCMLP's direct and indirect owners.

184. To that end, Dondero caused HCMLP to make the HCMLP Distributions set forth above with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero and Okada were insiders of HCMLP;

(b) before HCMLP Distributions were made, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c) HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved both siphoning HCMLP's valuable business opportunities through newly-created "lifeboat" entities and siphoning HCMLP's value through HCMLP Distributions (among other means);

(d) HCMLP received less than reasonably equivalent value (and in fact, received zero consideration) in exchange for the HCMLP Distributions;

(e) at the time of each HCMLP Distribution, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(f) The initial recipients of the HCMLP Distributions were Dondero, Dugaboy, Okada, Strand, and Hunter Mountain, each of which was owned and/or controlled by Dondero and Okada;

(g) Dondero and Okada personally received certain HCMLP Distributions instead of HCMLP's limited partners Dugaboy, Strand, MAP #1, and MAP #2; and

(h) Dondero made HCMLP Distributions during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming

contingent liabilities, and effected the transfers in order to siphon value so that such value would not be available to satisfy HCMLP's creditors.

185. Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of distributions made to Hunter Mountain, given that Hunter Mountain transferred proceeds of such distributions to them.

186. Each HCMLP Distribution is voidable as an intentionally fraudulent transfer. Accordingly, each of the HCMLP Distributions should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT III**
**Illegal Distributions Under Delaware Revised Uniform Limited Partnership Act**
*(Against Dondero, Dugaboy, Strand, and Hunter Mountain)*

187. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

188. The Delaware Revised Uniform Limited Partnership Act ("DRULPA") § 17-607(a) prohibits distributions "to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited partnership … exceed the fair value of the assets of the limited partnership[.]"

189. Under 17-607(b), "[a] limited partner who receives a distribution in violation of subsection (a) … and who knew at the time of the distribution that the distribution violated subsection (a) of this section, shall be liable to the limited partnership for the amount of the distribution."

190. As set forth below, between December 31, 2016 and the Petition Date, HCMLP made the following distributions to Hunter Mountain, Dugaboy, and Strand (the "Illegal Distributions").

| | Hunter Mountain | Dugaboy | Strand |
|---|---|---|---|
| December 31, 2016 Distributions | $4,769,570.00 | $8,945.00 | $12,017.00 |
| January 31, 2017 Distributions | $11,034,754.00 | $20,694.00 | $27,803.00 |
| February 28, 2017 Distributions | $7,169,970.00 | $13,446.40 | $18,065.44 |
| June 30, 2017 Distributions | $79,600.00 | $149.28 | $200.56 |
| December 31, 2017 Distributions | $2,651,675.00 | $4,972.89 | $6,681.16 |
| March 31, 2018 Distributions | $84,575.00 | $158.61 | $213.10 |
| December 31, 2018 Distributions | $4,930,722.50 | $9,246.96 | $12,423.44 |
| March 31, 2019 Distributions | $3,711,456.47 | $6,960.38 | $9,351.38 |
| Total | $34,432,322.97 | $64,573.52 | $86,755.08 |
| Grand Total | $34,583,651.57 | | |

191. Hunter Mountain, Dugaboy, and Strand knew that HCMLP made the Illegal Distributions at a time that its liabilities exceeded the fair value of its assets. As set forth herein and in the counts below, each of Hunter Mountain, Dugaboy, and Strand were the alter egos of Dondero. Even if Hunter Mountain, Dugaboy, or Strand were not the alter egos of Dondero, they would be imputed with Dondero's knowledge. Dondero was the sole owner of Strand. Likewise, Dondero created Hunter Mountain as a shell entity whose sole purpose was to purchase the majority of HCMLP's limited partnership interests from himself and his Dugaboy trust (among others). Through Hunter Mountain, Dondero continued to receive the economic

benefit of HCMLP's limited partnership distributions through distributions on notes that would be triggered by those Illegal Distributions made to Hunter Mountain.

192. Hunter Mountain, Dugaboy, and Strand are liable to HCMLP and its creditors for the full amount of the Illegal Distributions, plus interest.

**COUNT IV**
**Breach of Fiduciary Duty Arising Out Of Dondero's Lifeboat Scheme**
*(Against Dondero and Strand)*

193. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

194. During all periods relevant to the allegations set forth herein, Strand owed fiduciary duties to HCMLP in its capacity as HCMLP's general partner. Likewise, during all periods relevant to the allegations set forth herein, Dondero owed fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP and as an officer of HCMLP.

195. Neither the Litigation Trustee nor the Estate could have discovered the conduct by Dondero or Strand set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given Strand's and Dondero's fiduciary obligations, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal. By their nature, the breaches alleged herein were inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit. Dondero and Strand transferred HCMLP's valuable business to the lifeboat entities, including but not limited to NexPoint and HCMFA. Pursuant to the scheme, the lifeboats utilized HCMLP's employees to

perform management and advisory services that HCMLP had provided directly, and should have continued to provide directly. As a result of this scheme, HCMLP would perform the same services via the same employees, but would now either receive only a small fraction of the profits that were generated or, in some instances, provide these services at a loss because the service agreements between HCMLP and the lifeboats would not even cover HCMLP's costs of providing the services. The majority of profits were paid to the lifeboats, which were owned by Dondero and/or entities that he controlled, placing those profits beyond the reach of HCMLP's creditors.

196. Dondero and Strand willfully and wantonly orchestrated this scheme in bad faith in order to evade HCMLP's present and future creditors.

197. Strand was dominated and controlled by its sole owner, Dondero. Dondero also owned substantial economic interests in each of the lifeboats either directly or through entities that he owned and/or controlled. As such, Dondero appeared on both sides of the agreements and transactions entered into between HCMLP, on one hand, and NexPoint, HCMFA, Acis, and the other lifeboats, on the other hand.

198. The wrongful acts that Dondero and Strand committed in connection with the lifeboat scheme—including but not limited to funneling new business to the lifeboat entities and undercompensating HCMLP for the use of its employees—continued through the Petition Date. Likewise, injury to HCMLP—in the form of lost profits and misappropriation of its employees and resources—continued through the Petition Date.

199. HCMLP suffered tens or hundreds of millions of dollars of harm, as the result of Dondero's and Strand's breaches, in the form of lost management and advisory fee revenue that far exceeded the amounts that the lifeboats paid to HCMLP under their respective shared

services and other agreements. Between the date of its formation and the Petition Date, NexPoint earned approximately $120 million in advisory and administrative fees and approximately $50 million in profits. Between the date of its formation and the Petition Date, HCMFA earned approximately $150 million in advisory and administrative fees.

200. Strand and Dondero profited from their breaches of fiduciary duties in connection with their lifeboat scheme in violation of Delaware law. Strand and Dondero are liable to HCMLP for their breaches of fiduciary duty in connection with the lifeboat scheme in an amount to be proven at trial.

**COUNT V**
**Breach of Fiduciary Duty Arising Out Of Conduct That Resulted in HCMLP Liabilities To Third Parties**
*(Against Dondero, Strand, Ellington, and Leventon)*

201. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

202. During all periods relevant to the allegations set forth herein: (1) Strand owed fiduciary duties to HCMLP in its capacity as HCMLP's general partner; (2) Dondero owed fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP, and as an officer of HCMLP; (3) Ellington owed fiduciary duties to HCMLP in his capacity as HCMLP's Chief Legal Officer and General Counsel; and (4) Leventon owed fiduciary duties to HCMLP in his capacity as HCMLP's Assistant General Counsel.

203. Neither the Litigation Trustee nor the Estate could have discovered the conduct by Dondero, Strand, Ellington, or Leventon set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed by all these parties to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into

the breaches set out herein prior to Dondero's removal. By their nature, the breaches alleged herein were inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

204. Dondero (and in turn, Strand), Ellington, and Leventon each breached their fiduciary duties to HCMLP by engaging in willful and wanton misconduct that foreseeably resulted in liability to HCMLP. In total, these breaches resulted in more than $350 million in allowed claims against HCMLP. But for their breaches of fiduciary duty, either HCMLP never would have incurred these claims, or HCMLP would have resolved these claims for substantially lower amounts. These breaches resulted in millions of dollars to Dondero, Ellington, and Leventon, either directly, through transfers from HCMLP to entities owned in whole or in part by Dondero and Ellington, or indirectly, through compensation paid to Ellington and Leventon in exchange for their loyalty to Dondero in perpetrating schemes that breached their duties to HCMLP.

205. **Liabilities to UBS.** Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to incur substantial liability to UBS. Dondero exposed HCMLP and its subsidiaries to litigation against UBS that resulted in an adverse judgment that exceeded $1 billion. Among other things, acting through HCMLP, Dondero caused the Fund Counterparties to refuse to meet their obligations to UBS, and orchestrated transfers of more than $233 million of assets from HFP, exposing HCMLP to claims for fraudulent transfer, breach of the implied covenant of good faith and fair dealing, and extensive prejudgment interest and legal fees.

206. Then, in 2017, after a New York state court ruled that UBS's fraudulent transfer claims against HCMLP and claims against the Fund Counterparties could proceed to trial,

Dondero, Ellington, Leventon, Sevilla, Lucas, and DiOrio caused HCMLP, in its capacity as investment manager for the Fund Counterparties, to orchestrate the surreptitious transfer of assets worth at least $100 million to Sentinel, an entity located in the Cayman Islands that was indirectly owned and controlled by Dondero and Ellington. Neither HCMLP nor the Fund Counterparties received legitimate value in exchange for this transfer.

207. After the Petition Date, Dondero, Ellington, and Leventon actively concealed this transfer from the Independent Board, UBS, and the Bankruptcy Court. Ellington even went so far as to state in August 2020 that "[Leventon] and myself have spent in excess of 100 hours trying to piece together everything we can [about the Fund Counterparties' assets] to create a true and accurate document based record of what happened with these target entities['s assets]." Ellington made this statement knowing that the Fund Counterparties' assets had been transferred to an offshore entity he owned and controlled. When this transfer was uncovered, HCMLP was forced to increase the amount of its settlement with UBS from a total of $75 million in allowed claims to $125 million in allowed claims.

208. **Liabilities to Acis.** Dondero willfully and wantonly caused HCMLP to incur over $23 million in liability to Acis and Terry. As with NexPoint and HCMFA, Acis was originally created to perform management and advisory services that were previously provided by HCMLP. When Dondero's relationship with Terry deteriorated, Dondero set in motion a series of contentious litigation with Terry, which resulted in Terry obtaining a $7.95 million arbitration award against Acis.

209. Dondero then embarked on a crusade to ensure Terry would not collect from Acis. In connection therewith, Dondero acted through HCMLP to, among other things: (1) siphon assets from Acis, causing Terry to commence an involuntary bankruptcy against Acis

and causing HCMLP to lose its advisory and shared services contracts with Acis; (2) enter into costly, frivolous litigation with Terry in Guernsey, a "loser pays" jurisdiction; (3) convert the retirement accounts owned by Terry and his wife, leading to additional legal fees incurred in litigation in Texas state court; (4) violate injunctive provisions set forth in Acis's plan of reorganization, exposing HCMLP to additional liability; (5) enter into costly litigation with Acis's chapter 11 trustee in connection with Acis's bankruptcy case; and (6) mismanage Acis CLOs, exposing HCMLP to substantial liability in its capacity as advisor and fiduciary to Acis. As a result of these actions and the reputational harm they caused, it became impossible for HCMLP to launch another CLO either directly or indirectly.

210. In connection with his vendetta against Terry, Dondero willfully and wantonly subjected HCMLP to substantial liability to Acis and Terry, including by giving testimony at trial which, along with Leventon's testimony, was found "to be of questionable reliability" and structured "to convey plausible deniability." Ultimately, in order to avoid further liability to Terry and Acis, HCMLP settled those claims for more than $23 million pursuant to a settlement approved by this Court.

211. Beginning on October 24, 2017, four days after Terry's arbitration judgment was issued, Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to enter into numerous transactions to take control of Acis's business and strip it of assets so it could not pay the arbitration award. Ellington and Leventon implemented Dondero's directives and took the steps necessary to consummate the transactions.

212. Leventon willfully and wantonly helped to transfer value away from Acis in an attempt to make it judgment-proof. Among other things, Leventon assisted in the drafting and execution of the agreement that transferred Acis's interest in a note receivable from HCMLP,

which had a balance owing of over $9.5 million, to Cayman Island entity Highland CLO Management Ltd. just ten days after Terry obtained his arbitration award. The agreement recites that (1) HCMLP is no longer willing to continue providing support services to Acis; (2) Acis, therefore, can no longer fulfill its duties as a collateral manager; and (3) Highland CLO Management Ltd. agrees to step in to the collateral manager role. Given the timing of the assignment—just days after Terry's arbitration award—Leventon knew that it was part of a scheme to strip Acis of its assets, which ultimately resulted in millions of dollars of damage to HCMLP.

213. **Liabilities to HarbourVest.** Dondero and Ellington also willfully and wantonly caused harm to HCMLP by exposing it to substantial liability to HarbourVest. Dondero and Ellington, acting through HCMLP, fraudulently induced HarbourVest to purchase 49% of HCLOF from CLO Holdco for approximately $75 million in cash, with a commitment for an additional $75 million in the future, while concealing that Dondero was actively engaged in a campaign against Terry that would significantly impair the value of HarbourVest's investment. In addition, Dondero did not intend to use the $75 million that CLO Holdco received from HarbourVest to satisfy capital calls at HCLOF, and instead intended for CLO Holdco to use those funds as part of a scheme to infuse other Dondero Entities (including entities that benefitted the NexPoint and HCMFA lifeboats) with additional cash. Ultimately, HCMLP was forced to settle with HarbourVest by providing it with $80 million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to a new entity designated by HCMLP. But for Dondero's and Ellington's conduct, HCMLP would not have incurred the foregoing liabilities. As a result of their conduct, those interests in HCLOF were then worth tens of millions of dollars less than the $75 million HarbourVest paid to acquire them.

214. **Liabilities to Crusader Funds.** Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to incur substantial liability to the Redeemer Committee due to their conduct in connection with HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors. Among other things, Dondero, Ellington, and Leventon caused HCMLP to: (1) transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, Ltd., after the Redeemer Committee had refused to approve that transfer, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (2) purchase 28 Plan Claims for the benefit of HCMLP without the approval of the Redeemer Committee, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (3) covertly purchase the stock of the Portfolio Company and fail to liquidate the Crusader Funds' shares in the Portfolio Company, in violation of HCMLP's fiduciary duties; and (4) violate the provision of the Joint Plan and Scheme requiring HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete, causing HCMLP to forfeit its rights to those fees entirely. Both Ellington and Leventon provided false narratives and misrepresentations in furtherance of Dondero's harm to the Crusader Funds. The Redeemer Arbitration panel found, for example, that Leventon "was significantly involved in providing direction" to keep the Redeemer Committee in the dark and "was the principal instrument through which [certain] misrepresentation[s] and omission[s] were communicated." As a result of Dondero's, Ellington's, and Leventon's conduct, the Redeemer Committee received an arbitration award against HCMLP in excess of $190 million, and in HCMLP's bankruptcy, HCMLP agreed to pay over $136 million in connection therewith.

215. Beyond the direct losses identified in the preceding paragraphs, HCMLP suffered additional harm from the breaches of fiduciary duty committed by Dondero, Ellington,

Leventon and Strand. For example, the $190 million Redeemer arbitration award—which was itself caused by Dondero's, Ellington's, Leventon's and Strand's breaches of their fiduciary duty to HCMLP—caused HCMLP to file for bankruptcy. As of October 15, 2021, HCMLP had incurred in excess of $40 million in professional fees in connection with the bankruptcy. But for Dondero's, Ellington's, Leventon's, and Strand's willful and wanton misconduct, HCMLP would not have been obligated to pay any of these fees.

216. In light of the foregoing, Dondero, Strand, Ellington, and Leventon are liable for breaches of their fiduciary duties to HCMLP in an amount to be determined at trial.

**COUNT VI**
**Declaratory Judgment That Strand Is Liable For HCMLP's Debts In Its Capacity As HCMLP's General Partner**
*(Against Strand)*

217. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

218. Under DRULPA § 17-403(b), "a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law … to persons other than the partnership and the other partners." Moreover, "[e]xcept as provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law … to the partnership and to the other partners." *Id.*

219. Under Delaware Uniform Partnership Law ("DUPL") § 15-306(a), partners of a partnership "are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law."

220. During all periods relevant to the allegations set forth herein, Strand was the general partner of HCMLP. Moreover, Strand has not been relieved of its obligation to satisfy HCMLP's obligations by agreement or law.

221. Accordingly, under the operative partnership agreements and applicable law, Strand is liable to HCMLP and "to persons other than [HCMLP]" for the full amount of HCMLP's liabilities.

**COUNT VII**
**Declaratory Judgment That Dondero Is Liable For Strand's Debts As Strand's Alter Ego**
*(Against Dondero)*

222. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

223. Between the formation of Strand and the Petition Date, Dondero, Strand's sole equity owner, dominated and controlled Strand such that Dondero and Strand operated as a single economic entity. Although Strand was the general partner of HCMLP, Strand—as opposed to Dondero himself—rarely took any official corporate action. Between its formation and the Petition Date, Strand documented only 12 instances in which it took corporate action, eight of which related to the appointment or removal of officers.

224. Dondero was the only officer of Strand between 1993 and 2001. Although Strand elected certain officers between 2001 and the Petition Date, they performed no duties in their capacities as officers of Strand and were appointed or fired from their roles based on their loyalty to, and their current relationship with, Dondero. Dondero testified that he did not know whether Strand even had any officers, stating that he was "not aware of [Strand] ever having any employees or active … governance." Likewise, Dondero did not know whether Strand had a board of directors and whether he sat on Strand's board.

225. Strand did not observe corporate formalities. Based on a review of HCMLP's books and records, between the formation of Strand and the Petition Date, Strand never held a board meeting. Indeed, Dondero testified that he is not aware of attending a board meeting for Strand and does not recall ever seeing board minutes for Strand.

226. Strand did not comply with its own bylaws, which require annual meetings of stockholders.

227. Strand was a sham entity whose sole purpose was to serve as a vehicle through which Dondero could dominate and control HCMLP. Dondero used this abuse of the corporate form to facilitate his scheme to make HCMLP act contrary to its own interests and in favor of Dondero's interests by insulating assets from HCMLP's creditors, including those whose liabilities were the direct result of Dondero's own wrongdoing. As such, Dondero is Strand's alter ego, and the Court should pierce the corporate veil to hold Dondero liable for Strand's debts.

**COUNT VIII**
**Declaratory Judgment That Dondero and Strand Are Liable For HCMLP's Debts In Their Capacities As HCMLP's Alter Ego**
*(Against Dondero and Strand)*

228. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

229. Dondero, using his alter ego Strand, dominated and exercised total control over HCMLP through the Petition Date, such that Dondero, Strand, and HCMLP operated as a single economic entity. Dondero had total decision-making authority and governed HCMLP by decree—using the lack of an independent Strand to render HCMLP a mere instrumentality of Dondero. HCMLP had no independence and could not exercise any business discretion separate

and apart from Dondero, in service of his personal interests and the interests of his integrated web of entities.

230. Strand, like innumerable entities within Dondero's empire—including NexPoint GP, HCMFA, Dugaboy, CLO Holdco, Highland Dallas, Highland Santa Barbara, Highland Kansas City, HFP, and Acis—listed HCMLP's headquarters as its business address.

231. Dondero failed to observe corporate formalities with regard to HCMLP. Indeed, he did not distinguish between HCMLP and his personal interests and businesses. Dondero used HCMLP employees to service his own interests that were unrelated to HCMLP. For example, Dondero caused HCMLP to employ individuals to carry out roles serving Dondero personally. Such employees included Dondero's accountant, security guard, and landscaper. Dondero also frequently instructed HCMLP's legal department to perform legal services in connection with his own personal and business interests, which conferred no value on HCMLP.

232. Dondero used his domination and control over HCMLP to perpetrate numerous injustices, abuses, and frauds.

233. Dondero siphoned value from HCMLP to other entities he owned and controlled by causing HCMLP's employees and resources to be used for his lifeboat businesses. In connection with this fraudulent scheme to move assets out of the reach of HCMLP's creditors, Dondero exploited HCMLP by using its employees and resources for the benefit of other lifeboat entities, either at no cost to the lifeboats, at a loss to HCMLP, or at substantially below-market rates. In fact, HCMLP should have received all of the profits generated from the services performed by the lifeboats, which in fact were performed by HCMLP's employees. The purpose and effect of this scheme was to cause HCMLP to provide the employees and

infrastructure that were needed by Dondero's profitable business ventures, while also ensuring that HCMLP would remain cash poor and lack the funds to satisfy its own obligations.

234. Dondero caused HCMLP to enter into agreements, including the Massand Consulting Agreement, the object and purpose of which were to cause HCMLP to incur obligations for services that conferred benefits on Dondero, through benefits conferred to entities he owned other than HCMLP.

235. Dondero used his abusive domination and control to cause HCMLP's assets to be commingled with those of his other businesses, without observing corporate formalities. By commingling entities and using HCMLP's employees and resources to further his own personal goals, Dondero exposed HCMLP to hundreds of millions of dollars in liability to numerous parties, including UBS, Acis, Terry, HarbourVest, the Redeemer Committee, and the Crusader Funds.

236. By virtue of his complete control over HCMLP, Dondero caused HCMLP to willfully and wantonly breach contractual obligations and take measures to render HCMLP "judgment-proof." Ultimately, this brazen disregard for HCMLP as an independent entity with its own obligations rendered HCMLP insolvent, including by resulting in multiple adverse awards such as the $190 million arbitration award that caused HCMLP to file for bankruptcy.

237. Dondero further abused the corporate form to siphon assets from HCMLP by orchestrating intercompany transfers that were designed to siphon assets from HCMLP. For example, Dondero orchestrated the CLO Holdco Transaction, through which he caused HCMLP to transfer assets valued by the company at approximately $24 million through a series of entities he controlled in exchange for consideration that was worth a small fraction of the value of the transferred assets.

238. Because Dondero operated Strand and HCMLP as a single economic entity and used that domination to defraud HCMLP's creditors, Dondero and Strand are the alter egos of HCMLP and should be held liable for the full amount of HCMLP's obligations.

**COUNT IX**
**Declaratory Judgment That Dugaboy Is Liable For The Debts Of Dondero and HCMLP In Its Capacity As Dondero's Alter Ego**
*(Against Dugaboy)*

239. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

240. Dondero operated Dugaboy—Dondero's personal trust—as an extension of himself and his alter ego HCMLP. Dondero treated himself, Dugaboy, and HCMLP as a single economic entity. Dondero dominated and controlled Dugaboy. Under the terms of Dugaboy's trust agreement, Dondero has the power to remove trustees without cause—leverage that allowed him to control Dugaboy. Dondero appointed Scott, his longtime personal friend, as the trustee of Dugaboy, for the purpose of serving as a rubber stamp of approval for all transactions that Dondero (or HCMLP employees acting at Dondero's direction) presented to Scott.

241. Dondero treated Dugaboy as a vehicle for his own interests. For example, Dondero caused Dugaboy to falsely assert in HCMLP's notes litigation that Dugaboy, acting through Dondero's sister, Nancy Dondero, allegedly caused HCMLP to enter into an agreement whereby the notes owed to HCMLP by various Dondero Entities would be forgiven as compensation to Dondero upon satisfaction of certain conditions subsequent. Dondero also caused Dugaboy to help facilitate HCMLP's transfer of the Transferred CLO Holdco Assets to Get Good, by agreeing to provide the Dugaboy Note, purportedly but not actually equal to the value of the Transferred CLO Holdco Assets and with a paltry 2.75% interest rate and no security, covenants, lender protections provided to Dugaboy, or payments due until 2036.

242. Dondero disregarded corporate formalities between Dugaboy and HCMLP. Dondero used HCMLP employees, on HCMLP's payroll, to transact business on behalf of Dugaboy, without any compensation to HCMLP. Dondero used HCMLP employees for Dondero's personal estate planning and caused HCMLP to comingle Dugaboy's electronically stored information with HCMLP's data. Dugaboy shared its principal place of business, 300 Crescent Court, Suite 700, Dallas, Texas 75201, with HCMFA and other Dondero Entities.

243. With Dondero as the primary beneficiary of Dugaboy, there are no other innocent shareholders whose expectations could be impaired by holding Dugaboy liable for Dondero or HCMLP's debts. There are no innocent third-party creditors of Dugaboy who would be harmed by holding Dugaboy liable for Dondero's or HCMLP's debts.

244. Dugaboy is the alter ego of Dondero, and the Court should hold Dugaboy liable for Dondero's debts. Because Dondero is also HCMLP's alter ego, and because Dugaboy knowingly participated in Dondero's scheme to abuse the corporate form to defraud creditors, Dugaboy is also the alter ego of HCMLP and the Court should hold Dugaboy liable for the debts of HCMLP.

**COUNT X**
**Declaratory Judgment That NexPoint Is Liable For The Debts Of Dondero and HCMLP As Their Alter Egos**
*(Against NexPoint)*

245. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

246. Dondero dominated and controlled NexPoint such that Dondero, NexPoint, and Dondero's alter ego HCMLP operated as a single economic entity. NexPoint is owned and controlled by Dondero through Dugaboy and NexPoint GP.

247. NexPoint knowingly participated in—and played a core role in accomplishing—Dondero's scheme to move HCMLP's assets out of reach of its creditors by operating NexPoint as a facade of HCMLP, in order to siphon profits away from HCMLP and to Dondero and other entities he controlled. Dondero and NexPoint acted together to place the profits that were generated from HCMLP's business and services beyond the reach of HCMLP's then present and future creditors.

248. Dondero disregarded the corporate formalities and the distinctions between himself, NexPoint, and HCMLP. Between 2012 and 2015, NexPoint had no employees of its own, and performed no business activities that were distinguishable from those performed by HCMLP. NexPoint shared its principal place of business, 300 Crescent Court, Suite 700, Dallas, Texas 75201, with HCMFA and other Dondero Entities. NexPoint was a facade of HCMLP that used HCMLP's employees to perform the same investment management and advisory services that HCMLP routinely performed. Dondero caused internal business plans and projections to be prepared as if these entities were part of a single economic unit.

249. For over one year, HCMLP performed all services for NexPoint without any sub-advisory or shared services agreements that even purported to compensate HCMLP for the use of its employees. Even after Dondero attempted to infuse this scheme with a patina of legitimacy by causing NexPoint to enter into agreements with HCMLP, they were structured to ensure that NexPoint retained the vast majority of profits for the work performed by HCMLP and its employees.

250. Dondero used NexPoint as a part of his scheme to extract value from HCMLP. Dondero caused HCMLP to fund NexPoint's operations, seed its investments, and provide a substantial amount of the capital that ultimately funded distributions NexPoint made to its

owner, Dugaboy. Transferring funds from HCMLP to NexPoint funded distributions by NexPoint to Dondero's alter ego Dugaboy, draining HCMLP's value to Dondero with NexPoint's knowledge and participation. Between 2012 and 2017, HCMLP loaned NexPoint approximately $30 million, and during that same period, NexPoint made limited partner distributions of approximately $34 million—99.9% of which were paid to Dugaboy. Distributions to Dugaboy were made at the direction of, and for the benefit of, Dondero.

251. Dondero and NexPoint worked together to further extract value from HCMLP by causing HCMLP to lend to NexPoint on terms entirely determined by Dondero. Dondero further caused HCMLP to enter into multiple agreements with NexPoint providing for forbearance and other relief. As of the Petition Date, NexPoint owed HCMLP approximately $23 million, and HCMLP is currently embroiled in litigation with Dondero and NexPoint following a payment default that occurred January 2021.

252. There are no other innocent shareholders whose expectations could be impaired by holding NexPoint liable for Dondero or HCMLP's debts. Similarly, there are no innocent third-party creditors of NexPoint who would be harmed by holding NexPoint liable for Dondero or HCMLP's debts.

253. NexPoint is the alter ego of Dondero and the Court should hold NexPoint liable for the debts of its ultimate shareholder Dondero. Because Dondero is also HCMLP's alter ego, and because NexPoint knowingly participated in Dondero's scheme to abuse the corporate form to defraud creditors, NexPoint is also alter ego of HCMLP and the Court should hold NexPoint liable for the debts of HCMLP.

**COUNT XI**
**Declaratory Judgment That HCMFA Is Liable**
**For The Debts Of Dondero and HCMLP As Their Alter Ego**
*(Against HCMFA)*

254. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

255. Dondero dominated and controlled HCMFA such that Dondero, HCMFA, and Dondero's alter ego HCMLP operated as a single economic entity. HCMFA is controlled by Dondero through its general partner, Strand Advisors XVI, Inc., which owns a 1% interest in HCMFA and is wholly-owned by Dondero. Dondero and Okada are the ultimate owners of the remaining stakes in HCMFA: HCMS owns an 89.6667% ownership interest in HCMFA, and is itself owned 75% by Dondero and 25% by Okada; the Okada Family Revocable Trust owns the remaining 9.3333% ownership interest in HCMFA. Dondero caused internal business plans and projections to be prepared as if these entities were part of a single economic unit.

256. HCMFA knowingly participated in—and played a key role in accomplishing—Dondero's scheme to move HCMLP's assets out of reach of its creditors by operating HCMFA as a facade of HCMLP, in order to siphon profits away from HCMLP and to Dondero directly or indirectly through other entities he controlled. Dondero and HCMFA acted together to place the profits that were generated from HCMLP's business and services beyond the reach of HCMLP's then present and future creditors.

257. Dondero disregarded the corporate formalities and the distinctions between HCMFA and HCMLP. HCMFA was a facade of HCMLP that used HCMLP's employees to perform the same investment management and advisory services that HCMLP routinely performed. Strand Advisors XVI, Inc., HCMFA's general partner, purports to be managed by six individuals, all but one of whom were previously on HCMLP's payroll. HCMFA shared its

principal place of business, 300 Crescent Court, Suite 700, Dallas, Texas 75201, with HCMFA and other Dondero Entities.

258. HCMFA was effectively a shell entity created to replace HCMLP as the new investment manager for open-ended retail investment funds. Agreements between HCMLP and HCMFA were structured to ensure that HCMFA retained the vast majority of profits for the work performed by HCMLP and its employees. To the extent that sub-advisory and shared services agreements existed between HCMLP and HCMFA, they existed to lend credibility to Dondero's fraudulent scheme to divert HCMLP's profits to himself and Okada through HCMFA.

259. Dondero used HCMFA as a part of his scheme to extract value from HCMLP. Dondero caused HCMLP to use its resources to support HCMFA. Between 2011 and 2019, HCMLP loaned HCMFA approximately $12 million; Dondero caused HCMLP to enter into multiple forbearances on HCMFA's debts. In May 2019, HCMLP loaned HCMFA an additional $7.4 million, and HCMFA again failed to repay. Dondero exerted his control and dominance of these entities to direct both sides of those agreements, with the knowing participation of HCMFA, to accomplish his own ultimate goal of siphoning value from HCMLP to insulate it from creditors.

260. There are no other innocent shareholders whose expectations could be impaired by holding HCMFA liable for Dondero or HCMLP's debts. Similarly, there are no innocent third-party creditors of HCMFA who would be harmed by holding NexPoint liable for Dondero or HCMLP's debts.

261. HCMFA is the alter ego of Dondero and the Court should hold HCMFA liable for Dondero's debts. Because Dondero is also HCMLP's alter ego, and because HCMFA

knowingly participated in Dondero's scheme to abuse of the corporate form to defraud creditors, HCMFA is also the alter ego of HCMLP and the Court should hold HCMFA liable for the debts of HCMLP.

**COUNT XII**
**Avoidance of Transfer of Management Agreements As Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against HCMFA and NexPoint)*

262. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

263. On the date of the Debtor's bankruptcy filing, the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

264. On December 15, 2011, HCMLP entered into a novation agreement, pursuant to which HCMFA became the investment advisor for Highland Credit Strategies Fund, Highland Floating Rate Opportunities Fund, the Highland Long/Short Equity Fund, the Highland Long/Short Healthcare Fund, and the Highland Special Situations Fund (collectively, the "Transferred Funds"). Dondero caused HCMLP to transfer these agreements to HCMFA as part of his scheme to evade HCMLP's creditors.

265. HCMLP received less than reasonably equivalent value in connection with the novation agreement. Prior to the transfer, HCMLP received management and advisory fees in return for the services that its employees performed for the Transferred Funds. After the transfer, HCMLP's employees provided the same services for the Transferred Funds, except that the vast majority of the profits were diverted to HCMFA following the extinguishment of HCMLP's credit facility.

266. At the time of the transfer, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

267. On June 13, 2012, Dondero caused HCMFA to transfer the Highland Credit Strategies Fund to the newly-created NexPoint, after which Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as NHF. The result of this transfer was simply to shift the management fees relating to NHF from one lifeboat entity to another.

268. The transfer of HCMLP's valuable management and advisory contracts with the Transferred Funds (the fair market value of which likely exceeded $25 million at the time of transfer) is voidable as constructively fraudulent against HCMFA and its subsequent transferee, NexPoint. Accordingly, these transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XIII**
**Avoidance of Transfer of Management Agreements As Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against HCMFA and NexPoint)*

269. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

270. On the date of the Debtor's bankruptcy filing, the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count. On December 15, 2011, HCMLP entered into

a novation agreement, pursuant to which HCMFA became the investment advisor for the Transferred Funds. Dondero caused HCMLP to transfer these agreements to HCMFA as part of his scheme to evade HCMLP's creditors.

271. Dondero caused HCMLP to make the transfer with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero was an insider of HCMLP and HCMFA;

(b) before the transfer, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c) HCMLP, through Dondero, was engaged in a multi-faceted scheme to defraud HCMLP's creditors, which involved, among other things, causing HCMLP to transfer its valuable management contracts and business opportunities to newly-created "lifeboat" entities;

(d) at the time of the transfer, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e) Dondero caused HCMLP to make the transfer during a period when he believed the value of HCMLP may ultimately be distributed to its creditors, as a result of its looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's present and future creditors; and

(f) HCMLP did not receive reasonably equivalent value in return for transferring its valuable management and advisory contracts with the Transferred Funds to HCMFA.

272. On June 13, 2012, Dondero caused HCMFA to transfer the Highland Credit Strategies Fund to the newly-created NexPoint, after which Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as NHF. The result of this transfer was simply to shift the management fees relating to NHF from one lifeboat entity to another.

273. The transfer of HCMLP's valuable management and advisory contracts with the Transferred Funds is voidable as intentionally fraudulent against HCMFA and its subsequent transferee, NexPoint. Accordingly, these transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XIV**
**Breach of Fiduciary Duty In Connection With Fraudulent Transfers And Schemes**
*(Against Dondero, Strand, Ellington, and Okada)*

274. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

275. During all periods relevant to the allegations set forth herein: (1) Strand owed fiduciary duties to HCMLP in its capacity as HCMLP's general partner; (2) Dondero owed fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP, and as an officer of HCMLP; (3) Ellington owed fiduciary duties to HCMLP in his capacity as HCMLP'S Chief Legal Officer and General Counsel; and (4) Okada owed fiduciary duties to HCMLP in his capacity as Chief Investment Officer.

276. Neither the Litigation Trustee nor the Estate could have discovered the conduct by Dondero, Strand, Ellington, or Okada set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed by all these parties to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal. By their nature, the breaches alleged herein were inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

277. Dondero and Ellington caused HCMLP to enter into the Massand Consulting Agreements, with the intent to have Massand Capital perform services for SAS, an entity that they surreptitiously created and owned. Likewise, Dondero and Ellington oversaw and approved the Massand Transfers. The payment obligations Dondero and Ellington caused HCMLP to incur, and the payments that Dondero and Ellington caused HCMLP to make, conferred no benefit on HCMLP. In addition, Dondero and Ellington caused HCMLP employees to perform work for SAS—at least seven HCMLP employees received SAS email addresses—without compensating HCMLP.

278. Likewise, Dondero orchestrated the fraudulent CLO Holdco Transaction, pursuant to which he (acting through Strand) siphoned valuable assets from HCMLP in return for illusory consideration, in the form of a note from Dugaboy, an entity that he controlled. Dondero siphoned these assets from HCMLP in order to benefit other entities that he owned and controlled, including CLO Holdco, NexPoint, and HCMFA.

279. Moreover, as part of his scheme to evade HCMLP's creditors, Dondero, acting through Strand, approved hundreds of millions of dollars of distributions from HCMLP at a time that Dondero believed HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

280. As Dondero's co-founder and HCMLP's Chief Investment Officer, Okada knew or willfully blinded himself to the fact that the HCMLP Distributions—including, but not limited to, the distributions made to Okada, MAP #1, and MAP #2—were made at times that HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

281. By willfully and wantonly not returning the distributions made to Okada, MAP #1, and MAP #2 that were made at times that Okada knew that HCMLP was insolvent, and knowingly permitting unlawful distributions to Dondero and his controlled entities, Okada breached his fiduciary duties to HCMLP.

282. Dondero and Okada further breached their fiduciary duties by using HCMLP employees for their own personal affairs and private business interests, on HCMLP's time and payroll.

283. Dondero and Ellington breached their fiduciary duties by diverting approximately $3 million that was held in escrow for HCMLP to an entity that they owned in the Cayman Islands.

284. By willfully and wantonly orchestrating these fraudulent transfers, Dondero, Strand, and Ellington breached their fiduciary duties to HCMLP.

**COUNT XV**
**Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing Participation in Breach of Fiduciary Duty under Texas Law**
*(Against NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, Highland Dallas)*

285. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

286. NexPoint and HCMFA aided and abetted the breaches of fiduciary duty committed by Dondero and Strand. NexPoint and HCMFA were each dominated and controlled by Dondero. As such, each of NexPoint and HCMFA knowingly participated in their breaches of their fiduciary duties to HCMLP. NexPoint and HCMFA knowingly participated in Dondero's scheme to divert HCMLP's valuable business into new "lifeboat" entities that he owned and controlled. The breaches of fiduciary duty that were aided and abetted by NexPoint and HCMFA caused tens of million (and potentially over one hundred million) of dollars in damage to HCMLP.

287. SAS, which was owned and controlled by Dondero and Ellington, knowingly participated in Dondero's and Ellington's breaches of their fiduciary duties in connection with the Massand Consulting Agreement and Massand Transfers. SAS was aware of the fiduciary duties that Dondero and Ellington owed to HCMLP as high ranking officers. SAS received the benefit of the services performed by Massand Capital, which Dondero and Ellington surreptitiously charged to HCMLP. The breaches of fiduciary duty that were aided and abetted by SAS caused millions of dollars of damage to HCMLP.

288. Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas aided and abetted Dondero's breach of fiduciary duties relating to the CLO Holdco Transaction. Scott—and in turn, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas—

knowingly participated in the scheme to transfer assets valued by the company at approximately $24 million to CLO Holdco in exchange for a note worth significantly less than the transferred assets. Scott either knew or willfully blinded himself to the fact that Dondero breached his fiduciary duties to HCMLP by orchestrating the CLO Holdco Transaction, as evidenced by, among other things, the low interest rate on the Dugaboy Note; the lack of security, material covenants; or other protections; the unfair repayment terms; and the fact that Dondero stood on both sides of the transaction. Moreover, Scott dutifully executed the necessary documentation in order to cause the Transferred CLO Holdco Assets to be transferred to Get Good, DAF Holdco, DAF, CLO Holdco, and Highland Dallas.

289. Neither the Litigation Trustee nor the Estate could have discovered the conduct set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal. By its nature, the conduct alleged herein was inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

**COUNT XVI**
**Civil Conspiracy to Breach Fiduciary Duties Under Texas Law**
*(Against Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, Highland Dallas)*

290. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

291. Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas conspired with Dondero to breach his fiduciary duties to HCMLP by intentionally siphoning assets away from HCMLP to evade HCMLP's creditors. To effectuate the conspiracy, Dondero, Ellington, and Leventon acted outside the scope of their HCMLP employments, as agents of the non-HCMLP entities they owned and controlled, and for their personal benefits.

292. Neither the Litigation Trustee nor the Estate could have discovered the conduct set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal. By its nature, the conspiracy alleged herein was inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

293. Dondero, Ellington, and Leventon orchestrated myriad transactions to divert funds from HCMLP to Dondero and the entities that he owned and controlled, as well as to Ellington, Leventon, and the entities they owned and controlled. NexPoint and HCMFA took over valuable HCMLP management agreements and used HCMLP's employees to usurp HCMLP's business in return for little or no consideration to HCMLP. SAS—which is owned and controlled by Dondero and Ellington, who own 70% and 30% of the economic interests in SAS, respectively—received valuable services from Massand while HCMLP bore the expense. Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas participated in the

fraudulent CLO Holdco Transaction that siphoned valuable assets from HCMLP in return for patently insufficient consideration.

294. Ellington and Leventon understood that their conduct was directed at enriching themselves and Dondero at the expense of HCMLP, and each of them were compensated in excess of their HCMLP salaries by Dondero (sometimes via minority ownership in an entity, like Ellington's stake in SAS, and sometimes via complex, circuitous schemes like the Tall Pine arrangement) for their participation. NexPoint, HCMFA, and SAS—each of which was controlled by Dondero—likewise understood that their role in the conspiracy was to obtain value for Dondero at HCMLP's expense. Scott, too, understood that he was appointed to be a rubber-stamp for Dondero's self-interested schemes to siphon value from HCMLP and distribute it throughout the vast web of Dondero Entities. Scott acted on the basis of his longstanding loyalty to his "closest friend" Dondero and was compensated with "business gifts" for his service in furtherance of the conspiracy.

295. In furtherance of the conspiracy, Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, CLO Holdco, DAF Holdco, the DAF, Get Good, and Highland Dallas undertook, *inter alia*, the following schemes and overt acts:

(a) Dondero, NexPoint, and HCMFA conspired to perpetrate the lifeboat scheme in order to place valuable assets outside the reach of HCMLP's creditors, in violation of Dondero's fiduciary duties. NexPoint and HCMFA were each dominated and controlled by Dondero and, as such, they each consciously acted in furtherance of the conspiracy, including by transferring existing business to NexPoint and HCMFA, generating new business through NexPoint and HCMFA, and failing to compensate

HCMLP for the use of its employees and resources. NexPoint and HCMFA were aware that the lifeboat scheme caused substantial damages to HCMLP.

(b) Dondero, Ellington, and SAS caused HCMLP to enter into the fraudulent Massand Consulting Agreements, pursuant to which HCMLP paid Massand millions of dollars in return for services that were rendered for SAS, which Dondero and Ellington owned and controlled. Likewise, SAS acted in furtherance of the conspiracy by surreptitiously receiving the benefits from the Massand Consulting Agreements while HCMLP incurred the costs under those agreements. Each of Dondero, Ellington, and SAS were aware that causing HCMLP to pay SAS's expenses—for the benefit of SAS and its owners Dondero and Ellington—harmed HCMLP.

(c) Dondero, Scott, CLO Holdco, DAF Holdco, the DAF, Get Good, and Highland Dallas conspired to cause HCMLP to transfer valuable assets to CLO Holdco for less than reasonably equivalent value. Scott—and in turn, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas—consciously participated in the scheme to transfer assets valued by the company at approximately $24 million to CLO Holdco in exchange for a note worth significantly less than the transferred assets, including by executing the necessary documentation to cause the Transferred CLO Holdco Assets to be transferred to Get Good, DAF Holdco, DAF, CLO Holdco, and Highland Dallas. Each of Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas were aware that the CLO Holdco Transaction breached fiduciary duties to HCMLP, constituted a

fraudulent transfer, and harmed HCMLP by diverting valuable assets in exchange for the far less valuable Dugaboy Note.

(d) Ellington and Dondero conspired to disburse to a Cayman Islands shell company they owned and controlled nearly $3 million of escrowed proceeds rightfully owing to HCMLP.

(e) In furtherance of the conspiracy and to maintain loyalty to Dondero, Ellington and Leventon accepted benefits like minority ownership in entities (like Ellington's stake in SAS) and additional compensation via complex, circuitous schemes like the Tall Pine arrangement.

296. Each of Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas understood that his or its conduct was causing damage to HCMLP and that Dondero was breaching his fiduciary duties to HCMLP by orchestrating and participating in these transactions. The participants specifically intended to benefit themselves and Dondero at the expense of HCMLP, and agreed with Dondero to undertake acts in furtherance of the conspiracy notwithstanding the harm to HCMLP.

**COUNT XVII**
**Tortious Interference with Prospective Business Relations**
*(Against Dondero, NexPoint, and HCMFA)*

297. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

298. Dondero siphoned business away from HCMLP and its creditors through the creation of "lifeboats" owned and controlled by Dondero. The "lifeboats," which included

NexPoint and HCMFA, were companies set up to provide management services that HCMLP had previously been providing.

299. But for the actions of Dondero, NexPoint, and HCMFA, HCMLP would have continued to pursue the business opportunities that Dondero diverted to NexPoint and HCMFA. Indeed, NexPoint and HCMFA used HCMLP's employees, operated out of HCMLP's office, and performed the same advisory and administrative services for its managed funds that HCMLP had previously performed.

300. By using NexPoint and HCMFA as part of his lifeboat scheme, Dondero breached his fiduciary duties to HCMLP. In addition, Dondero breached his fiduciary duties to HCMLP by causing HCMLP to fraudulently transfer certain of its existing management contracts to NexPoint and HCMFA. NexPoint and HCMFA conspired with, and aided and abetted, Dondero's breaches of his fiduciary duties and HCMLP's fraudulent transfers.

301. Dondero, NexPoint, and HCMFA acted with a conscious desire to prevent HCMLP from continuing to directly manage the funds that were subsequently managed by NexPoint and HCMFA. Moreover, Dondero, NexPoint, and HCMFA knew that their interference in HCMLP's business relationships was certain to occur as a result of their conduct.

302. HCMLP suffered, at minimum, tens of millions of dollars in damage from Dondero's, NexPoint's, and HCMFA's tortious interference with its prospective business relations.

**COUNT XVIII**
**Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550 and Applicable State Law**
*(Against Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas Foundation)*

303. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

304. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

305. On December 28, 2016, HCMLP transferred to Get Good the Transferred CLO Holdco Assets, which were valued by the company at approximately $24 million. The transfer of the Transferred CLO Holdco Assets was effectuated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good.

306. As purported consideration for the Transferred CLO Holdco Assets, HCMLP received the Dugaboy Note, which was worth substantially less than the Transferred CLO Holdco Assets. The Dugaboy Note replaced HCMLP's liquid or liquidating assets with an illiquid, private loan on below market terms.

307. Immediately after HCMLP transferred the Transferred CLO Holdco Assets to Get Good, Dondero caused Get Good to transfer the Transferred CLO Holdco Assets to Highland Dallas by an exercise of discretion executed by Scott in his capacity as trustee of Get Good.

308. Immediately after the Transferred CLO Holdco Assets were transferred to Highland Dallas by Get Good, Dondero caused Highland Dallas to transfer the Transferred CLO Holdco Assets to DAF Holdco by unanimous written consent executed by Dondero, Scott, and Jalonick in their capacities as the sole directors of Highland Dallas.

309. Immediately after the Transferred CLO Holdco Assets were transferred to DAF Holdco by Highland Dallas, Dondero caused DAF Holdco, DAF, and CLO Holdco to enter into an omnibus assignment agreement, pursuant to which DAF Holdco transferred the Transferred CLO Holdco Assets to DAF, and DAF transferred the Transferred CLO Holdco Assets to CLO Holdco. Scott signed on behalf of each entity, as director of DAF Holdco, managing member of the DAF, and director of CLO Holdco. Scott also executed a written resolution by DAF GP, in his capacity as the managing member of the general partner of the DAF, effectuating the transfer of the Transferred CLO Holdco Assets to CLO Holdco (which was wholly-owned by the DAF).

310. Dondero directly or indirectly controlled each entity in the chain of transfers that together constitute the CLO Holdco Transaction. Dondero controlled each of Get Good, Highland Dallas, DAF Holdco, DAF, and CLO Holdco either along with or through Scott, who was Dondero's longtime friend, former roommate, loyalist, and fellow board member on multiple boards of directors.

311. At the time of the CLO Holdco Transaction, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

312. None of Get Good, DAF Holdco, the DAF, or CLO Holdco paid reasonably equivalent value for the Transferred CLO Holdco Assets, or received the Transferred CLO Holdco Assets in good faith.

313. At all relevant times, each of Get Good, DAF Holdco, the DAF, and CLO Holdco was aware that, pursuant to the CLO Holdco Transaction, HCMLP transferred its assets to CLO Holdco for less than reasonably equivalent value.

314. The CLO Holdco Transaction is voidable as constructively fraudulent transfers. Accordingly, the CLO Holdco Transaction should be set aside and avoided and Transferred CLO Holdco Assets should be recovered under 11 U.S.C. §§ 544 and 550 and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XIX**
**Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets as Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550 and Applicable State Law**
*(Against Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas Foundation)*

315. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

316. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

317. On December 28, 2016, HCMLP transferred to Get Good the Transferred CLO Holdco Assets, which the company valued at approximately $24 million. The transfer of the Transferred CLO Holdco Assets was effectuated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good.

318. As purported consideration for the Transferred CLO Holdco Assets, HCMLP received the Dugaboy Note, which was worth substantially less than the Transferred CLO Holdco Assets. The Dugaboy Note replaced HCMLP's liquid or liquidating assets with an illiquid, private loan that was worth significantly less than the value of the transferred assets.

319. After HCMLP transferred the Transferred CLO Holdco Assets to Get Good, Dondero caused the assets to be transferred to Get Good, Highland Dallas, DAF Holdco, DAF, and CLO Holdco. Dondero effected each transfer through his direct or indirect control of each of these entities.

320. Dondero caused HCMLP to enter into the CLO Holdco Transaction with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero was an insider of HCMLP;

(b) Dondero controlled Get Good, the initial transferee, and each of the subsequent transferees, Highland Dallas, DAF Holdco, DAF, and CLO Holdco, through Scott;

(c) before the CLO Holdco Transaction, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(d) at the time of the CLO Holdco Transaction, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were

unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e) The CLO Holdco Transaction siphoned value away from HCMLP, so that such value would not be available to satisfy HCMLP's creditors; and

(f) The purported consideration for the Transferred CLO Holdco Assets, the Dugaboy Note, was worth less than the reasonably equivalent value of the Transferred CLO Holdco Assets, and replaced HCMLP's liquid or liquidating assets with an illiquid, private loan on below-market terms, the repayment of which was subject to Dondero's control.

321. None of Get Good, DAF Holdco, the DAF, or CLO Holdco paid reasonably equivalent value for the Transferred CLO Holdco Assets, or received the Transferred CLO Holdco Assets in good faith.

322. At all relevant times, each of Get Good, DAF Holdco, the DAF, and CLO Holdco was aware that the CLO Holdco Transaction transferred HCMLP's assets to CLO Holdco for less than reasonably equivalent value.

323. The CLO Holdco Transaction is voidable as an intentionally fraudulent transfer. Accordingly, the CLO Holdco Transaction should be set aside and avoided, and the Transferred CLO Holdco Assets should be recovered under 11 U.S.C. §§ 544 and 550 and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XX**
**Avoidance of Obligations Under Massand Consulting Agreement as Constructively Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand LLC)*

324. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

325. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

326. On January 5, 2015, HCMLP entered into a consulting agreement with Massand LLC. Pursuant to each agreement, HCMLP agreed to pay Massand Capital tens of thousands of dollars per month.

327. HCMLP received less than reasonably equivalent value in exchange for the payment obligations that it incurred under the Massand Consulting Agreements (and in fact, received zero value). Dondero and Ellington caused HCMLP to hire Massand Capital in order for Massand Capital to provide services to SAS, which conferred no benefit to HCMLP.

328. At the time it entered into the Massand Consulting Agreements, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

329. HCMLP's obligations incurred under the Massand Consulting Agreements are voidable as constructively fraudulent.

**COUNT XXI**
**Avoidance of Obligations Under Massand Consulting Agreement as Intentionally Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand Capital)*

330. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

331. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

332. On January 1, 2014, HCMLP entered into a consulting agreement with Massand Inc. On January 5, 2015, HCMLP entered into a consulting agreement with Massand LLC. Pursuant to each agreement, HCMLP agreed to pay them tens of thousands of dollars per month.

333. Dondero caused HCMLP to enter into the Massand Consulting Agreements with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero was an insider of HCMLP;

(b) Dondero was an insider of SAS;

(c) Dondero benefitted from HCMLP's payments to Massand Capital because they conferred value on SAS, an entity that Dondero owned and controlled;

(d) before HCMLP entered into the Massand Consulting Agreements, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(e) HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved, among other things, causing HCMLP to incur obligations of other entities owned or controlled by Dondero, including SAS;

(f) at the time HCMLP entered into the consulting agreement with Massand LLC, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due; and

(g) Dondero caused HCMLP to enter into the Massand Consulting Agreements during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's creditors.

334. HCMLP's obligations incurred under the Massand Consulting Agreements are voidable as intentionally fraudulent.

**COUNT XXII**
**Avoidance and Recovery of Certain Massand Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand Capital, SAS, Dondero, and Ellington)*

335. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

336. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and

Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

337. HCMLP entered into the fraudulent Massand Consulting Agreements, pursuant to which HCMLP agreed to pay Massand Capital tens of thousands of dollars per month. The transfers from HCMLP to Massand Capital (the "Massand Transfers") are set forth below:

| Date | Amount | Date | Amount |
|---|---|---|---|
| January 3, 2017 | $49,644 | May 1, 2018 | $55,852 |
| February 1, 2017 | $55,691 | June 1, 2018 | $55,093 |
| March 3, 2017 | $47,929 | July 2, 2018 | $64,516 |
| April 3, 2017 | $57,563 | August 1, 2018 | $56,539 |
| May 1, 2017 | $57,861 | September 4, 2018 | $53,749 |
| June 1, 2017 | $60,814 | October 1, 2018 | $52,537 |
| July 3, 2017 | $51,974 | November 1, 2018 | $53,278 |
| August 1, 2017 | $58,074 | December 3, 2018 | $52,219 |
| September 5, 2017 | $50,371 | January 2, 2019 | $47,812 |
| October 2, 2017 | $53,016 | February 1, 2019 | $51,437 |
| November 1, 2017 | $59,971 | March 1, 2019 | $51,156 |
| December 1, 2017 | $56,031 | April 2, 2019 | $54,063 |
| January 2, 2018 | $52,894 | May 1, 2019 | $55,359 |
| February 1, 2018 | $51,378 | June 3, 2019 | $56,470 |
| March 1, 2018 | $54,396 | July 1, 2019 | $54,878 |
| April 3, 2018 | $54,538 | August 1, 2019 | $54,979 |
| | | Total | $1,742,082 |

338. HCMLP did not receive any consideration in exchange for its payments to Massand Capital. The consulting agreement between Massand Capital and HCMLP provided that Massand would be responsible for advising HCMLP on its "investment recovery strategies" business in certain countries where HCMLP did not have any business.

339. Rather, upon information and belief, Massand Capital provided services to SAS, a separate entity owned and controlled by Dondero. As such, HCMLP's transfers to Massand Capital were made for the benefit of SAS and Dondero.

340. Massand Capital's monthly invoices to HCMLP were consecutively numbered, indicating that Massand Capital had no customers other than HCMLP, and Massand Capital's invoices contained no information about the services it purportedly rendered to HCMLP.

341. At the time of each of the Massand Transfers, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

342. The Massand Transfers are voidable as constructively fraudulent transfers. Accordingly, the Massand Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XXIII**
**Avoidance and Recovery of Massand Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand Capital, SAS, Dondero, and Ellington)*

343. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

344. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

345. On January 5, 2015, HCMLP entered into a fraudulent consulting agreement, pursuant to which HCMLP agreed to pay Massand Capital tens of thousands of dollars per month. The transfers from HCMLP to Massand Capital (the "Massand Transfers") are set forth below:

| Date | Amount | Date | Amount |
|---|---|---|---|
| January 3, 2017 | $49,644 | May 1, 2018 | $55,852 |
| February 1, 2017 | $55,691 | June 1, 2018 | $55,093 |
| March 3, 2017 | $47,929 | July 2, 2018 | $64,516 |
| April 3, 2017 | $57,563 | August 1, 2018 | $56,539 |
| May 1, 2017 | $57,861 | September 4, 2018 | $53,749 |
| June 1, 2017 | $60,814 | October 1, 2018 | $52,537 |
| July 3, 2017 | $51,974 | November 1, 2018 | $53,278 |
| August 1, 2017 | $58,074 | December 3, 2018 | $52,219 |
| September 5, 2017 | $50,371 | January 2, 2019 | $47,812 |
| October 2, 2017 | $53,016 | February 1, 2019 | $51,437 |
| November 1, 2017 | $59,971 | March 1, 2019 | $51,156 |
| December 1, 2017 | $56,031 | April 2, 2019 | $54,063 |
| January 2, 2018 | $52,894 | May 1, 2019 | $55,359 |
| February 1, 2018 | $51,378 | June 3, 2019 | $56,470 |
| March 1, 2018 | $54,396 | July 1, 2019 | $54,878 |

| Date | Amount | Date | Amount |
|---|---|---|---|
| April 3, 2018 | $54,538 | August 1, 2019 | $54,979 |
| | | Total | $1,742,082 |

346. Dondero caused HCMLP to make the Massand Transfers with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero was an insider of HCMLP and Massand Capital;

(b) before the Massand Transfers, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c) HCMLP, through Dondero, was engaged in a multi-faceted scheme to defraud HCMLP's creditors, which involved, among other things, causing HCMLP to become an obligor on certain contracts, including the Massand Consulting Agreements, that did not confer value on HCMLP;

(d) at the time of the transfers to Massand LLC, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e) Dondero caused HCMLP to make the Massand Transfers during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's creditors; and

(f) The Massand Transfers were made for no consideration to HCMLP, and the services provided by Massand were made for the benefit of SAS, an entity that was not owned by HCMLP.

347. The Massand Transfers are voidable as intentionally fraudulent transfers. Accordingly, the Massand Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XXIV**
**Breach of Contract Arising Out of Hunter Mountain Note**
*(Against Hunter Mountain and Rand)*

348. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

349. On December 21, 2015, HCMLP and Hunter Mountain entered into the Hunter Mountain Note, pursuant to which Hunter Mountain agreed to pay HCMLP $63 million at an interest rate of 2.61% per annum.

350. Rand is a guarantor on the Hunter Mountain Note.

351. Pursuant to the Hunter Mountain Note, accrued interest and principal is due and payable in accordance with an amortization schedule attached to the note.

352. Hunter Mountain breached the Hunter Mountain Note by failing to make the payments due under the note on December 21, 2019 and December 21, 2020.

353. On May 3, 2021, HCMLP sent a demand letter to Hunter Mountain stating that the Hunter Mountain Note was in default and therefore, pursuant to the "Remedies" section of the note, all principal, interest, and any other amounts due and owing on the Hunter Mountain

Note are immediately due and payable. As of May 5, 2021, that amount was more than $72 million, with interest continuing to accrue.

354. The Hunter Mountain Note is currently in default. Pursuant to the Hunter Mountain Note, HCMLP is entitled to damages from Hunter Mountain and Rand in an amount equal to all unpaid principal and interest, in addition to HCMLP's cost of collection, including attorneys' fees.

**COUNT XXV**
**Conversion**
*(Against Dondero and Ellington)*

355. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

356. In February 2018, HE Capital 232 and its wholly-owned subsidiary, HE Capital 232 Property obtained the HE Capital 232 Proceeds and placed them in an escrow account maintained by HCMLP's counsel, Wick Phillips, "pending distribution of the proceeds to the direct and indirect interest owners in [HE Capital 232 Property]."

357. On March 2, 2018, Wick Phillips disbursed a portion of those funds from the escrow account. The Remaining HE Capital 232 Proceeds, worth approximately $2.98 million, were never disbursed to HCMLP.

358. HCMLP owned, had possession of (through its counsel Wick Phillips), or had entitlement to possession of the Remaining HE Capital 232 Proceeds.

359. The Remaining HE Capital 232 Proceeds had been held for safekeeping, were intended to be kept segregated, specific and identifiable money, in the form they were received, and not subject to a claim by anyone other than HCMLP.

360. Upon information and belief, Dondero and Ellington directed Wick Phillips to withhold the Remaining HE Capital 232 Proceeds in a scheme to funnel the money to themselves through shell companies that they owned in the Cayman Islands. Indeed, on June 4, 2018, at Ellington's direction, Wick Phillips disbursed the remainder of the proceeds to MapleFS, a fiduciary services company in the Cayman Islands, which subsequently transferred the full amount to Grey Royale Ltd., a Cayman Islands shell company owned and controlled by Dondero and Ellington.

361. Dondero's and Ellington's acts manifest a clear repudiation of HCMLP's rights in the Remaining HE Capital 232 Proceeds.

**COUNT XXVI**
**Unjust Enrichment or Money Had and Received**
*(Against Dondero)*

362. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

363. As set forth above, Dondero caused HCMLP to enter into numerous intercompany note transactions with other Dondero Entities in order to, among other things: (i) fund distributions to himself and his loyalists; (ii) inject funds into other entities he owns; and (iii) obtain personal tax benefits. Now, Dondero is actively spearheading an expensive, frivolous litigation campaign against HCMLP, through these same Dondero Entities, in order to avoid or delay their repayment obligations.

364. Dondero exploited HCMLP by using it to pursue goals that did not benefit HCMLP. Dondero orchestrated countless transactions and schemes designed to benefit himself and other Dondero Entities at the expense of HCMLP, including but not limited to: (i) the lifeboat scheme; (ii) distributions from HCMLP to himself and certain trusts he owned and

controlled during periods when HCMLP was insolvent; and (iii) intercompany transactions involving various Dondero Entities that distributed cash throughout his vast web of entities. Dondero unjustly profited from these schemes, either by directly transferring value to himself (*e.g.*, through distributions) or by using HCMLP's money to seed business activities and investments that would inure to his own personal benefit. Dondero diverted millions or tens of millions of dollars to himself, at HCMLP's expense.

365. Likewise, Dondero was willing to harm HCMLP even when it would seem economically irrational for him to do so, such as when he caused HCMLP to incur more in legal fees pursuing a vendetta against Daugherty than the total funds Daugherty was owed.

366. Dondero, together with Ellington, caused HCMLP's counsel to improperly divert approximately $3 million of HCMLP's cash being held in an escrow account to an entity that they owned and controlled in the Cayman Islands.

367. Dondero obtained personal services from individuals who were employed and paid by HCMLP, including with respect to private business ventures.

368. There was no valid express contract governing the subject matter of this dispute.

369. As a result of fraud, duress, or taking undue advantage of his own position of authority within HCMLP, Dondero holds or has held money that in equity and good conscience belongs to HCMLP, which unjustly enriched him and would be unconscionable to retain.

370. Plaintiff seeks restitution from Dondero and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by him as a result of the unjust conduct set forth above.

**COUNT XXVII**
**Unjust Enrichment or Money Had and Received**
*(Against Ellington and Leventon)*

371. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

372. Ellington and Leventon were employees of HCMLP who received millions of dollars in compensation. However, each of them understood and performed their duties as functionaries for Dondero. As such, both Ellington and Leventon subordinated the interests of HCMLP to the interests of Dondero, and actively participated in and implemented his schemes to divert value from HCMLP. Portions of Ellington's and Leventon's compensation, paid for by HCMLP, was consideration for their willingness to elevate Dondero's interests over those of HCMLP.

373. Together with Dondero, Ellington caused HCMLP's counsel to improperly divert approximately $3 million of HCMLP's cash being held in an escrow account to an entity that they owned and controlled in the Cayman Islands.

374. Ellington and Leventon engaged in willful and wanton misconduct that gave rise to more than $350 million in allowed claims against HCMLP. Among other things, Ellington and Leventon participated in the scheme to evade UBS collection efforts by fraudulently transferring assets to Sentinel.

375. There was no valid express contract governing the subject matter of this dispute.

376. As a result of fraud, duress, or taking undue advantage of their own positions of authority within HCMLP, Ellington and Leventon hold or have held money that in equity and good conscience belongs to HCMLP, which unjustly enriched them and would be unconscionable to retain.

377. Plaintiff seeks restitution from Ellington and Leventon and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

**COUNT XXVIII**
**Unjust Enrichment or Money Had and Received**
*(Against NexPoint and HCMFA)*

378. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

379. The lifeboat scheme was perpetrated primarily through NexPoint and HCMFA. NexPoint and HCMFA utilized HCMLP's employees to perform management and advisory services that HCMLP had directly provided, and should have continued to provide directly. Neither NexPoint nor HCMFA fairly compensated HCMLP for the use of its employees or resources.

380. HCMLP provided substantial financial support for NexPoint and HCMFA, including in the form of below-market note agreements. Both NexPoint and HCMFA have defaulted on their debts to HCMLP and are currently pursuing expensive, frivolous litigation against HCMLP in an effort to evade their payment obligations.

381. NexPoint and HCMFA were effectively HCMLP in disguise, conducting HCMLP's business, with HCMLP's employees, operating out of HCMLP's office, beginning with HCMLP's contracts.

382. Through their exploitation of HCMLP, NexPoint and HCMFA received tens or hundreds of millions of dollars of profits.

383. There was no valid express contract governing the subject matter of this dispute.

384. As a result of fraud, duress, or taking undue advantage of HCMLP, NexPoint and HCMFA hold or have held money that in equity and good conscience belongs to HCMLP, which unjustly enriched them and would be unconscionable to retain.

385. Plaintiff seeks restitution from NexPoint and HCMFA and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

**COUNT XXIX**
**Unjust Enrichment or Money Had and Received**
*(Against Massand Capital and SAS)*

386. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

387. Massand Capital received millions of dollars in payments from HCMLP under the Massand Consulting Agreements. Nevertheless, Massand Capital was aware that it would not and never intended to perform any services on behalf of HCMLP. Rather, Massand Capital was performing services on behalf of SAS, with HCMLP footing the bill. HCMLP received no benefit under the Massand Consulting Agreements.

388. Further, the value of the services provided to SAS were far less than HCMLP's payments, resulting in Massand receiving unearned profits to the tune of millions of dollars.

389. HCMLP employees performed work for SAS. Indeed, at least four HCMLP employees even received SAS email addresses. SAS did not compensate HCMLP for these services.

390. SAS has profited from the services performed by Massand Capital and from the use of HCMLP's employees and resources.

391. There was no valid express contract governing the subject matter of this dispute.

392. As a result of fraud, duress, or taking undue advantage of HCMLP, Massand and SAS hold or have held money that in equity and good conscience belongs to HCMLP, which unjustly enriched them and would be unconscionable to retain.

393. Plaintiff seeks restitution from Massand Capital and SAS and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

**COUNT XXX**
**Unjust Enrichment or Money Had and Received**
*(Against CLO Holdco)*

394. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

395. Dondero, acting through HCMLP, fraudulently induced HarbourVest to purchase 49% of HCLOF for approximately $75 million, with a commitment to fund an additional $75 million. CLO Holdco was the beneficiary of the funds invested by HarbourVest. HCMLP received no benefit from the HarbourVest investment. Nevertheless, HarbourVest filed a proof of claim against HCMLP for fraudulently inducing the HarbourVest investment, and HCMLP was ultimately forced to settle with HarbourVest by providing them with $80 million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to a new entity designated by HCMLP. As a result of Dondero's conduct, however, the HCLOF interests were then worth significantly less than the face amount of HarbourVest's allowed claim. HCMLP bore the consequences for Dondero and CLO Holdco in a scheme that deposited $75 million into the coffers of CLO Holdco.

396. CLO Holdco was aware that HarbourVest was fraudulently induced by Dondero to make the $75 million investment. Nonetheless, CLO Holdco said nothing to HarbourVest

and received their money, all while leaving HCMLP on the hook when HarbourVest ultimately filed their proof of claim.

397. There was no valid express contract governing the subject matter of this dispute.

398. As a result of fraud, duress, or taking undue advantage of HCMLP, CLO Holdco holds or has held money that in equity and good conscience belongs to HCMLP, which unjustly enriched it and would be unconscionable to retain

399. Plaintiff seeks restitution from CLO Holdco and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by it as a result of its unjust receipt and use of the proceeds of the HarbourVest investment.

**COUNT XXXI**
**Avoidance and Recovery of the One-Year Transfers as Preferential Transfers under 11 U.S.C. §§ 547 and 550**
*(Against Dondero and Ellington)*

400. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

401. Dondero and Ellington are insiders of HCMLP.

402. As set forth below, within one year of the Petition Date, HCMLP made payments to Dondero of $4,753,911 and payments to Ellington of $318,893 (the "Alleged Expense Transfers" and the "March 28, 2019 Repayment Transfer," as set forth below, and collectively the "One-Year Transfers"):

| March 28, 2019 Repayment Transfer | | |
|---|---|---|
| Date | Transferee | Amount |
| March 28, 2019 | Dondero | $3,750,000 |
| Alleged Expense Transfers | | |
| Date | Transferee | Amount |
| October 31, 2018 | Dondero | $8,986 |

| | | |
|---|---|---|
| November 15, 2018 | Dondero | $65,078 |
| December 14, 2018 | Dondero | $115,481 |
| January 15, 2019 | Dondero | $96,786 |
| January 31, 2019 | Dondero | $38,628 |
| February 15, 2019 | Dondero | $42,435 |
| February 28, 2019 | Dondero | $19,063 |
| March 15, 2019 | Dondero | $50,771 |
| March 29, 2019 | Dondero | $21,935 |
| April 15, 2019 | Dondero | $60,191 |
| April 30, 2019 | Dondero | $7,164 |
| May 15, 2019 | Dondero | $89,257 |
| May 31, 2019 | Dondero | $38,804 |
| June 14, 2019 | Dondero | $82,710 |
| June 28, 2019 | Dondero | $7,605 |
| July 15, 2019 | Dondero | $47,006 |
| August 15, 2019 | Dondero | $85,059 |
| August 30, 2019 | Dondero | $12,714 |
| August 30, 2019 | Ellington | $205,788 |
| September 13, 2019 | Dondero | $56,763 |
| September 30, 2019 | Dondero | $24,498 |
| October 15, 2019 | Dondero | $32,977 |
| October 15, 2019 | Ellington | $113,105 |
| Total | Dondero | $4,753,911 |
| Total | Ellington | $318,893 |
| Grant Total | | $5,072,804 |

403. The One-Year Transfers were made on account of antecedent debt.

404. HCMLP was insolvent when each One-Year Transfer was made.

405. Each One-Year Transfer enabled Dondero and Ellington to receive more than they would have if (i) the One-Year Transfers had not been made; and (ii) Dondero and Ellington received payment on account of the debt paid by the One-Year Transfers to the extent provided by the Bankruptcy Code.

406. Each One-Year Transfer constitutes an avoidable preference pursuant to Section 547(b) of the Bankruptcy Code.

407. Plaintiff is entitled to an order and judgment under 11 U.S.C. §§ 547 and 550 that each of the One-Year Transfers is avoided and recoverable.

**COUNT XXXII**
**Avoidance and Recovery of the Alleged Expense Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law**
*(Against Dondero and Ellington)*

408. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

409. To the extent the Alleged Expense Transfers do not constitute reimbursement for valid expenses, they constitute constructive fraudulent transfers that were made to or for the benefit of Dondero and Ellington.

410. At the time of each Alleged Expense Transfer, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

411. HCMLP received less than reasonably equivalent value in exchange for each of the Alleged Expense Transfers. Indeed, HCMLP received no value for the Alleged Expense Transfers, each of which was a gratuitous transfer from HCMLP to or for the benefit of Dondero and Ellington.

412. Each Alleged Expense Transfer is voidable as a constructively fraudulent transfer. Accordingly, each Alleged Expense Transfer should be set aside, avoided, and recovered under 11 U.S.C. §§ 544, 548, and 550, and Delaware and Texas law, as applicable,

against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XXXIII**
**Avoidance and Recovery of the Alleged Expense Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law**
*(Against Dondero and Ellington)*

413. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

414. To the extent the Alleged Expense Transfers do not constitute reimbursement for valid expenses, they constitute intentional fraudulent transfers that were made to or for the benefit of Dondero and Ellington.

415. Dondero was HCMLP's Chief Executive Officer, President, Co-Chief Investment Officer, and Co-Founder. Ellington was HCMLP's Chief Legal Officer and General Counsel until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interest. Dondero exercised complete control over HCMLP, and Ellington acquiesced to and profited from schemes orchestrated by Dondero to enrich Dondero, Ellington, and HCMLP's direct and indirect owners.

416. To that end, Dondero and Ellington caused HCMLP to make the Alleged Expense Transfers with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero and Ellington were insiders of HCMLP;

(b) although Dondero and Ellington assert that the Alleged Expense Transfers constitute reimbursement for valid expenses, on information and belief, there is no factual basis for that assertion;

(c) before the Alleged Expense Transfers were made, HCMLP had been sued and Dondero and Ellington believed HCMLP's legal exposure rendered it insolvent;

(d) HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved both siphoning HCMLP's valuable business opportunities through newly-created "lifeboat" entities and siphoning HCMLP's value through HCMLP Distributions (among other means);

(e) HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved siphoning HCMLP's value through the Alleged Expense Transfers (among other means);

(f) HCMLP received less than reasonably equivalent value (and in fact, received zero consideration) in exchange for the Alleged Expense Transfers;

(g) at the time of each Alleged Expense Transfer, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(h) Dondero and Ellington made the Alleged Expense Transfers during a period when they believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to

siphon value so that such value would not be available to satisfy HCMLP's creditors.

417. Each Alleged Expense Transfer is voidable as an intentionally fraudulent transfer. Accordingly, each of the Alleged Expense Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544, 548, and 550, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XXXIV**
**Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing Participation in Breach of Fiduciary Duty under Texas Law Out Of Conduct That Resulted in HCMLP Liabilities**
*(Against Ellington and Leventon)*

418. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

419. Ellington and Leventon aided and abetted the breaches of fiduciary duty committed by Dondero and Strand that foreseeably resulted in liability to HCMLP. Ellington and Leventon knowingly participated in Dondero's schemes that foreseeably resulted in liability to HCMLP. In total, these breaches that were aided and abetted by Ellington and Leventon resulted in more than $350 million in allowed claims against HCMLP.

420. Neither the Litigation Trustee nor the Estate could have discovered the conduct by Ellington and Leventon set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the conduct set out herein prior to Dondero's removal. By its nature, the conduct alleged herein was inherently undiscoverable because of

the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

421. **Liabilities to UBS.** Ellington and Leventon aided and abetted Dondero in causing HCMLP to incur substantial liability to UBS. In 2017, after a New York state court ruled that UBS's fraudulent transfer claims against HCMLP and claims against the Fund Counterparties could proceed to trial, Ellington and Leventon aided Dondero in causing HCMLP, in its capacity as investment manager for the Fund Counterparties, to orchestrate a surreptitious transfer of more than $300 million in face amount of assets from the Fund Counterparties to Sentinel, an entity located in the Cayman Islands that was indirectly owned and controlled by Dondero and Ellington, ostensibly to pay a premium on the Sentinel insurance policy that was only $25 million. Ellington and Leventon knew or willfully blinded themselves to the fact that Dondero breached his fiduciary duties to HCMLP by orchestrating the transfer to Sentinel

422. After the Petition Date, Dondero, Ellington, and Leventon actively concealed this transfer from the Independent Board, UBS, and the Bankruptcy Court. When this transfer was uncovered, HCMLP was forced to increase the amount of its settlement with UBS from a total of $75 million in allowed claims to $125 million in allowed claims.

423. **Liabilities to Acis.** After the Terry arbitration award issued, Ellington and Leventon aided and abetted Dondero in causing HCMLP to enter into numerous transactions to take control of Acis's business and strip it of assets so it could not pay the arbitration award. Ellington and Leventon implemented Dondero's directives and took necessary steps to

consummate the transactions, knowingly or willfully blinding themselves to the fact that Dondero breached his fiduciary duties to HCMLP by stripping Acis of assets.

424. Leventon knowingly participated in the scheme to transfer value away from Acis in an attempt to make it judgment-proof. Among other things, Leventon assisted in the drafting and execution of the agreement, approved by Dondero in a breach of his fiduciary duty, that transferred Acis's interest in a note receivable from HCMLP, which had a balance owing of over $9.5 million, to Cayman Island entity Highland CLO Management Ltd. just ten days after Terry obtained his arbitration award. The agreement recites that (1) HCMLP is no longer willing to continue providing support services to Acis; (2) Acis, therefore, can no longer fulfill its duties as a collateral manager; and (3) Highland CLO Management Ltd. agrees to step in to the collateral manager role. Given the timing of the assignment—just days after Terry's arbitration award—Leventon knew that it was part of a scheme to strip Acis of its assets and a breach of Dondero's fiduciary duty, which ultimately resulted in millions of dollars of damage to HCMLP.

425. **Liabilities to HarbourVest.** Ellington also aided and abetted Dondero in causing harm to HCMLP by exposing it to substantial liability to HarbourVest. Ellington aided Dondero, acting through HCMLP, in fraudulently inducing HarbourVest to purchase 49% of HCLOF from CLO Holdco for approximately $75 million in cash, with a commitment for an additional $75 million in the future, while concealing that Dondero was actively engaged in a campaign against Terry that would significantly impair the value of HarbourVest's investment. In addition, Dondero did not intend to use the $75 million that CLO Holdco received from HarbourVest to satisfy capital calls at HCLOF, and instead intended for CLO Holdco to use those funds as part of a scheme to infuse other Dondero Entities (including entities that

benefitted the NexPoint and HCMFA lifeboats) with additional cash. Ultimately, HCMLP was forced to settle with HarbourVest by providing it with $80 million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to an affiliate of HCMLP. As a result of Dondero's and Ellington's conduct, those interests in HCLOF were then worth tens of millions of dollars less than the $75 million HarbourVest paid to acquire them. Ellington either knew or willfully blinded himself to the fact that Dondero breach his fiduciary duties to HCMLP by fraudulently inducing HarbourVest to purchase 49% of HCLOF from CLO Holdco for approximately $75 million in cash.

426. **Liabilities to Crusader Funds.** Ellington and Leventon aided and abetted Dondero in causing HCMLP to incur substantial liability to the Redeemer Committee due to his conduct in connection with HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors. Among other things, Dondero, Ellington, and Leventon caused HCMLP to: (1) transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, Ltd., after the Redeemer Committee had refused to approve that transfer, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (2) purchase 28 Plan Claims for the benefit of HCMLP without the approval of the Redeemer Committee, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (3) covertly purchase the stock of the Portfolio Company and fail to liquidate the Crusader Funds' shares in the Portfolio Company, in violation of HCMLP's fiduciary duties; and (4) violate the provision of the Joint Plan and Scheme requiring HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete, causing HCMLP to forfeit its rights to those fees entirely. Additionally, both Ellington and Leventon were active participants in Dondero's scheme; they both provided false narratives or misrepresentations in furtherance

of Dondero's harm to the Crusader Funds. The Redeemer Arbitration panel found, for example, that Leventon "was significantly involved in providing direction" to keep the Redeemer Committee in the dark and "was the principal instrument through which [certain] misrepresentation[s] and omission[s] were communicated." As a result of Dondero's, Ellington's, and Leventon's conduct, the Redeemer Committee received an arbitration award against HCMLP in excess of $190 million, and in HCMLP's bankruptcy, HCMLP agreed to pay over $136 million in connection therewith. Ellington and Leventon either knew or willfully blinded themselves to the fact that Dondero breached his duties to HCMLP through the foregoing acts.

427. Beyond the direct losses identified in the preceding paragraphs, HCMLP suffered additional harm from Ellington's and Leventon's aiding and abetting the breaches of fiduciary duty committed by Dondero and Strand. For example, the $190 million Redeemer arbitration award—which was itself caused by the Dondero's and Strand's breaches of their fiduciary duty to HCMLP and Ellington's and Leventon's aiding and abetting of those breaches—caused HCMLP to file for bankruptcy. As of October 15, 2021, HCMLP had incurred in excess of $40 million in professional fees in connection with the bankruptcy. Ellington and Leventon either knew or willfully blinded themselves to the fact that Dondero and Strand breached their fiduciary duties to HCMLP through their actions that led to the $190 million Redeemer arbitration award.

428. In light of the foregoing, Ellington and Leventon are liable for aiding and abetting Dondero's breaches of fiduciary duties to HCMLP in an amount to be determined at trial.

## COUNT XXXV
## Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing Participation in Breach of Fiduciary Duty under Texas Law In Connection With Fraudulent Transfers And Schemes

*(Against Ellington and Okada)*

429. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

430. Neither the Litigation Trustee nor the Estate could have discovered the conduct by Ellington and Okada set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the conduct set out herein prior to Dondero's removal. By its nature, the conduct alleged herein was inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

431. Ellington aided and abetted Dondero in causing HCMLP to enter into the Massand Consulting Agreements. Likewise, Ellington aided and abetted Dondero in overseeing and approving the Massand Transfers. The payment obligations Dondero and Ellington caused HCMLP to incur, and the payments that Dondero and Ellington caused HCMLP to make, conferred no benefit on HCMLP. In addition, Ellington aided and abetted Dondero in causing HCMLP employees to perform work for SAS—at least seven HCMLP employees received SAS email addresses—without compensating HCMLP. Ellington either knew or willfully blinded himself to the fact that Dondero breached his fiduciary duties to HCMLP through the foregoing actions.

432. Moreover, as part of his scheme to evade HCMLP's creditors, Dondero, acting through Strand, approved hundreds of millions of dollars of distributions from HCMLP at a time that Dondero believed HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

433. As Dondero's co-founder and HCMLP's Chief Investment Officer, Okada knew or willfully blinded himself to the fact that the HCMLP Distributions—including the distributions made to Okada, MAP #1, and MAP #2—were made at times that HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors. Okada either knew or willfully blinded himself to the fact that Dondero breached his fiduciary duties to HCMLP by approving hundreds of millions of dollars of distributions from HCMLP at a time HCMLP was insolvent.

**COUNT XXXVI**
**Disallowance or Subordination of Claims Under**
**Section 502 and 510 of the Bankruptcy Code**
*(Against CLO Holdco)*

434. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

435. On April 8, 2020, CLO Holdco filed Claim No. 133 seeking approximately $11 million (the "CLO Holdco Claim"). The basis of the CLO Holdco Claim was that CLO Holdco purchased a participation interest in certain interests that HCMLP held in the Crusader Fund.

436. HCMLP acquired the interests in the Crusader Fund that are the subject of the CLO Holdco Claim in violation of the Joint Plan and Scheme. HCMLP released its claim on those interests in connection with HCMLP's settlement with the Redeemer Committee. Accordingly, CLO Holdco is not entitled to any value on account of the CLO Holdco Claim. In recognition of this fact, on October 21, 2020, CLO Holdco amended its claim to seek $0.

437. Additionally, CLO Holdco subsequently agreed to withdraw the CLO Holdco Claim. Nevertheless, CLO Holdco has failed to date to actually withdraw the claim, notwithstanding the Reorganized Debtor's request. Accordingly, out of an abundance of caution, and to the extent that CLO Holdco attempts to pursue the CLO Holdco Claim, the Litigation Trustee objects to the CLO Holdco Claim, and the CLO Holdco Claim should be disallowed in its entirety or subordinated.

**[Remainder of Page Intentionally Left Blank]**

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court enter judgment in favor of Plaintiff and against Defendants as follows:

A. awarding Plaintiff damages against, and disgorgement and restitution from each Defendant in an amount to be determined at trial;

B. setting aside, avoiding, and granting recovery of the HCMLP Distributions;

C. setting aside, avoiding, and granting recovery of the CLO Holdco Transfer;

D. setting aside and avoiding the payment obligations under the Massand Consulting Agreement;

E. setting aside, avoiding, and granting recovery of the Massand Transfers;

F. setting aside and avoiding the transfers of management and advisory agreements to HCMFA and NexPoint;

G. setting aside, avoiding, and granting recovery of the One-Year Transfers;

H. disallowing or subordinating, to the extent applicable, the CLO Holdco Claim;

I. awarding Plaintiff pre- and post-judgment interest at the maximum rate permitted by law;

J. awarding Plaintiff his attorneys' fees, costs, and other expenses incurred in this action; and

K. awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: May 19, 2022
Dallas, Texas

Respectfully submitted,

SIDLEY AUSTIN LLP
/s/ *Paige Holden Montgomery*
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

-and-

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Susheel Kirpalani (admitted *pro hac vice*)
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
Benjamin I. Finestone (admitted *pro hac vice*)
Calli Ray (admitted *pro hac vice*)
Alexander J. Tschumi (admitted *pro hac vice*)
51 Madison Avenue
Floor 22
New York, NY 10010
Telephone: (212) 849-7000

*Counsel for the Litigation Trustee*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document was sent via electronic mail via the Court's ECF system to parties authorized to receive electronic notice in this case on May 19, 2022.

*/s/ Paige Holden Montgomery*
Paige Holden Montgomery

# Exhibit 9

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

United States Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

**IN RE**

**HI HLAND CAPITAL MANA EMENT L P**

**R r d D r**

**C r**

**C N**

**MEMORANDUM OPINION AND ORDER PURSUANT TO PLAN ATEKEEPER PROVISION AND PRE CONFIRMATION ATEKEEPER ORDERS DENYIN HUNTER MOUNTAIN INVESTMENT TRUST S EMER ENCY MOTION FOR LEAVE TO FILE VERIFIED ADVERSARY PROCEEDIN BANKR DKT NOS d**

## I INTRODUCTION

BEFORE THIS COURT is yet another post-confirmation dispute relating to the Chapter 11 bankruptcy case of Highland Capital Management, L.P. ("Highland" or "Reorganized Debtor").

[1] On August 2, 2023, this court signed an Order Bankr. Dkt. No. 3897 that was agreed to among various parties, after the filing of a Motion to Stay and Compel Mediation Bankr. Dkt. No. 3752 filed by James D. Dondero and related entities. Pursuant to paragraph 7 of that order, certain pending matters in the bankruptcy court are stayed pending mediation. The parties did not agree to stay the matter addressed in this Memorandum Opinion and Order.

own interests above those of the estate, here, there are a couple of points that seem noteworthy. One, the claims trading activity was post-confirmation so while certain of the claim-sellers may have still been on the unsecured creditors committee, as the effective date of the plan had not yet occurred the circumstances are very different than if this had all happened during the early, contentious stages of the case. It seems inconceivable that there was somehow a disparity of information that might be troubling the Plan had been confirmed and it was available for the world to see. The whole notion of "insider information" (just after confirmation here) feels a bit off-point. Bankruptcy practitioners and judges sometimes call bankruptcy a fishbowl or use the "open kimono" metaphor for good reason. It is generally a very open process. And information-sharing on the part of a debtor-in-possession or unsecured creditors committee is intended to be robust. *See, e.g.,* Bankruptcy Code sections 521 and 1102(b)(3). In a way, HMIT here seems to be complaining about this very situation that the Code and Rules have designed.

In summary, claims trading is a highly ***unregulated*** activity in the bankruptcy world. ***HMIT is attempting to pursue causes of action here that, to this court's knowledge, have never been allowed in a context like this***.

*. ac to Standing ould HM T Have Standing to ring the roposed Clai s*

The Proposed Defendants argue that HMIT lacks standing to bring the Proposed Claims, either: (a) derivatively on behalf of the Reorganized Debtor and Claimant Trust, or (b) directly on behalf of itself. Thus, they argue that this is one reason that the Motion for Leave should be denied.

In making their specific standing arguments, the parties analyze things slightly differently:

The Claims Purchasers focus primarily on HMIT's lack of ***constitutional*** standing but also argue that HMIT does not have ***prudential*** standing under Delaware trust law to bring the Proposed Claims either individually or derivatively. Why do they mention Delaware trust law Because the Claimant Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. 3801–29.[150]

The Highland Parties' standing arguments focus almost entirely on HMIT's lack of ***prudential*** standing under Delaware trust law to bring the Proposed Claims.

HMIT argues that the Proposed Defendants "play fast and loose with standing arguments" and that HMIT has ***constitutional*** standing as a "party aggrieved"[151] to bring the Proposed Claims on behalf of itself. HMIT also argues that it has standing under Delaware trust law to bring a

[150] *See* Proposed Complaint, 26.

[151] Proposed Complaint, 7.

derivative action on behalf of the Claimant Trust, and that it not only has standing to bring the Proposed Claims derivatively on behalf of the Reorganized Debtor under the Plan, but it is the best party to do so.

1. <u>The Different Types of Standing: Constitutional Versus Prudential</u>

The parties are addressing two concepts of standing that can sometimes be confused and misapplied by both attorneys and judges: ***constitutional Article III standing***, which implicates federal court subject matter jurisdiction,[152] and the narrower standing concept of ***prudential standing***, which does not implicate subject matter jurisdiction but nevertheless might prevent a party from having capacity to sue, pursuant to limitations set by courts, statutes or other law.

Article III constitutional standing works as follows: a plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing three elements: (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[153] "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve."[154] These elements ensure that a plaintiff has " such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."[155]

---

152 Article III, Section 2 of the U.S. Constitution gives federal courts jurisdiction over enumerated cases and controversies.

153 *See Thole v. .S. an , . .*, 140 S.Ct. 1615, 1618 (2020)(citing the Supreme Court's seminal case on the tripartite test for Article III constitutional standing, *Lu an v. efenders of ildlife*, 504 U.S. 555, 560-61 (1992), where the Supreme Court stated that "the irreducible constitutional minimum of standing contains the three elements"); *see also Spo eo*, 578 U.S. at 338; *braugh v. lti us*, 26 F.4th 298, 302 (5th Cir. 2022) (citing *id.*).

154 *Transunion LLC v. a ire* , 141 S.Ct. 2190, 2203 (2021)(cleaned up).

155 *arth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *a er v. Carr*, 369 U.S. 186, 204 (1962)).

Apart from this minimal constitutional mandate, courts and statutes have set other limits on the class of persons who may seek judicial remedies and this is the concept of prudential standing. In its recent opinion in *braugh v. lti us*,[156] the Fifth Circuit set forth a detailed analysis of the two types of "standing," noting that the term "standing" is often "misused" in our legal system, which has led to confusion for both attorneys and judges.[157] The constitutional standing that is necessary for a court to exercise subject matter jurisdiction is broader than prudential standing and is only the first hurdle a party must clear before pursuing a claim in federal court.

The Fifth Circuit explained that ***in addition to*** Article III constitutional standing, "courts have occasionally articulated other standing' requirements that plaintiffs must satisfy under certain conditions, ***beyond those imposed by Article III***,"[158] such as the "standing" requirement that might be imposed by a statute or by jurisprudence. The *braugh* case was a perfect example of the latter.

*braugh* involved the civil rights statutes that provide, among other things, that "a party must have standing under the state wrongful death or survival statutes to bring a 1983 cause of action " and noted that these statutes impose additional "standing" requirements that are a matter of prudential standing, not constitutional standing.[159] In *braugh*, the Fifth Circuit reversed and remanded a district court's dismissal of a 1983 civil rights cause of action noting that the district court had stated that it was dismissing based on a "lack of subject matter jurisdiction" because the plaintiff in that action lacked standing.[160] The plaintiff was the mother of a prisoner

[156] 26 F.4th 298.

[157] *d.* at 303.

[158] *d.* at 302 (emphasis added).

[159] *d.* at 302-303.

[160] *d.* at 301.

who died by suicide while in custody who brought a 1983 action against Louisiana correctional officers and officials. After finding that the plaintiff mother lacked standing under Louisiana's wrongful death and survival statutes (because there had been a surviving child and wife of the prisoner who were the proper parties with capacity to sue), the district court held that it was dismissing for lack of subject matter jurisdiction. The Fifth Circuit pointed out that the plaintiff mother may have lacked standing under Louisiana's wrongful death and survival statutes to bring the claim under 1983, but that type of standing was matter of ***prudential*** standing, and the plaintiff mother actually ***did*** have ***Article III*** constitutional standing ("a constitutionally cognizable interest in the life of her son").[161] Thus, the district court's error was ***not*** in finding that the plaintiff mother lacked prudential standing but in improperly conflating the two standing concepts when it held that it had lacked ***subject matter jurisdiction*** to consider any of the plaintiff's mother's amended complaints.[162] The Fifth Circuit noted specifically that[163]

> prudential standing does not present a jurisdictional question, but "a merits question: who, according to the governing substantive law, is entitled to enforce the right " As the Federal Rules of Civil Procedure make clear, "an action must be prosecuted in the name of the real party in interest." FED. R. CIV. P. 17(a)(1). And a violation of this rule is a failure of "prudential" standing. "Not one of our precedents holds that the inquiry is jurisdictional." It goes only to the validity of the cause of action. And "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction."

Somewhat relevant to this prudential standing discussion is the fact that, in this bankruptcy case, there have been dozens of appeals of bankruptcy court orders by Dondero and Dondero-related entities. In connection therewith, both the district court and the Fifth Circuit, in evaluating the ***appellate standing*** of the appellants, have taken pains to distinguish between the concepts of:

---

[161] *d.*

[162] *d.* at 301, 303-304. The Fifth Circuit opined that "the district court did not err in describing the mother's inability to sue under Louisiana law as a defect of standing , b ut it is a defect of prudential standing, not Article III standing" thus technically not implicating the federal court's subject matter jurisdiction. *d.* at 303.

[163] *d.* at 304 (cleaned up).

(a) traditional, constitutional standing, and (b) a type of prudential standing known as the "person aggrieved" test, which is applied in the Fifth Circuit in determining whether a party has ***standing to appeal a bankruptcy court order*** which it describes as a narrower and "more exacting" standard than constitutional standing. As explained in a Fifth Circuit opinion addressing the standing of a Dondero-related entity called NexPoint to appeal bankruptcy court orders allowing professional fees, the "person aggrieved" standard that is typically applied to ascertain bankruptcy ***appellate*** standing originated in a statute in the Bankruptcy Act. The Fifth Circuit continued to apply it after Congress removed the provision when it enacted the Bankruptcy Code in 1978.[164] Because it is narrower and "more exacting" than the test for Article III constitutional standing, it involves application of prudential standing considerations.[165] The Fifth Circuit describes the "person aggrieved" test for bankruptcy appellant standing as requiring that an appellant show that it was "*directl and adversel affected pecuniaril* by the order of the bankruptcy court," requiring "a higher causal nexus between act and injury than traditional standing . . . that best deals with the unique posture of bankruptcy actions."[166] In affirming the district court's dismissal of NexPoint's appeal of the bankruptcy court's fee orders, due to NexPoint's lack of prudential standing under the "person aggrieved" test, the court rejected NexPoint's argument that it had standing to appeal

---

[164] *e oint dvisors, L. . v. achuls i Stang iehl ones, L.L. . n re Highland Capital Manage ent, L. .* , No. 22-10575, 2023 WL 4621466, 2 (5th Cir. July 19, 2023)(citing *n re Coho nerg nc.*, 395 F.3d 198, 202 (5th Cir. 2004)(cleaned up)).

[165] *d.* at 1, 4-6 (where the Fifth Circuit repeatedly throughout its opinion refers to the "person aggrieved" test for standing in bankruptcy actions as a test for "prudential standing."); *see also ondero v. Highland Capital Mgt., L. .*, Civ. Act. No. 3:20-cv-3390-X, 2002 WL 837208 (N.D. Tex. Mar. 18, 2022)(where the district court, in addressing Dondero's standing to appeal a bankruptcy court order approving a Rule 9019 settlement (between Highland and Acis Capital Management GP LLC), notes that " i t is substantially more difficult to have standing to appeal a bankruptcy court's order than it is to pursue a typical complaint under Article III of the U.S. Constitution" and that "the Fifth Circuit has long recognized that bankruptcy cases' wide-reaching scope calls for a more stringent standing test.").

[166] *See id.* at 3 (cleaned up). The court quotes its 2018 opinion in *Matter of Technicool S s., nc. n re Technicool* , 896 F.3d 382, 385 (5th Cir. 2018), which explains why the "person aggrieved" prudential standing standard is applied in bankruptcy actions: "Bankruptcy cases often involve numerous parties with conflicting and overlapping interests. Allowing each and every party to appeal each and every order would clog up the system and bog down the courts. Given the specter of such sclerotic litigation, standing to appeal a bankruptcy court order is, of necessity, *uite li ited*." *d.* (cleaned up).

because "it meets traditional Article III standing requirements and that the more exacting prudential standing considerations such as the person aggrieved' standard" did not survive the Supreme Court's 2014 *Le ar* opinion,[168] which addressed standing issues in the context of false advertising claims under the Lanham Act and reminded that courts may not "limit a cause of action that Congress has created merely because prudence' dictates."[169] The Fifth Circuit held that the Supreme Court's reminder in *Le ar* did not nullify the "person aggrieved" test for prudential standing in bankruptcy appeals, citing its own decision in *Superior M Services nc. v. lliance Healthcare Services, nc.*[170] (rendered a year after *Le ar* was decided), in which it held that *Le ar* applied only to the circumstances of that case, "rather than broadly modifying or undermining *all* prudential standing concerns, such as the one animating the person aggrieved' standard in bankruptcy appeals."[171]

Similarly, in yet another appeal in this bankruptcy case involving three Dondero-related entities as appellants (NexPoint, Dugaboy, and HCMFA) this one an appeal of a bankruptcy court order authorizing the creation of an indemnity subtrust and entry into an indemnity trust agreement the district court noted the parties' confusion about the standing issue, as exemplified in the parties' reference to constitutional standing when they were actually arguing that they had prudential standing under the "person aggrieved" test: "Although the parties frame this issue as one of constitutional standing . . . they cite case law and present arguments about the prudential

---

[167] *Le ar nt l, nc. v. Static Control Co ponents, nc.*, 572 U.S. 118 (2014).

[168] *d.* at 2.

[169] *See id.* at 4 (cleaned up).

[170] 778 F.3d 502 (5th Cir. 2015).

[171] *e oint*, 2023 WL 4621466 at 4 (cleaned up). The Fifth Circuit explicitly stated that "*Le ar* does not expressly reach prudential concerns in bankruptcy appeals and brought no change relevant here." *d.* at 5 (cleaned up).

standing requirement embodied in the person aggrieved' test."[172] The district court noted that it had an "independent obligation to consider constitutional standing before reaching its prudential aspects."[173] The district court dismissed the appeal as to Dugaboy and HCMFA for lack of standing but, upon concluding that NexPoint did have standing, dismissed the appeal as to it on the merits. The Fifth Circuit affirmed.[174] Interestingly, the court noted that, while the parties did not contest the district court's determination that NexPoint had standing to pursue the appeal, it "may consider prudential standing issues *sua sponte*."[175] In doing so, the Fifth Circuit recognized the distinction between constitutional standing and the prudential "person aggrieved" test applied to bankruptcy appeals, which "is, of necessity, quite limited" and "an even more exacting standard than traditional constitutional standing," as it requires an appellant to show that it is "directly, adversely, and financially impacted by a bankruptcy order."[176]

In summary, in analyzing whether HMIT would have standing to bring the Proposed Claims, this court must ***first*** determine whether HMIT would have constitutional standing under Article III (which is a subject matter jurisdiction hurdle) and, assuming it does, then ***additionally*** address whether HMIT would also have prudential standing (i.e., capacity to sue) pursuant to any applicable statutes (e.g., Delaware statutes), jurisprudence, or other substantive law that might ***limit*** who may sue. Notwithstanding HMIT's argument that it has standing under the "person

---

[172] *Highland Capital Mgt. und dvisors, L. . v. Highland Capital Mgt., L. . n re Highland Capital Mgt., L. .*, Civ. Act. No. 3:21-cv-1895-D, 2002 WL 270862, 1 (N.D. Tex. Jan. 18, 2022)(cleaned up). The district court dismissed the appeals of two of the appellants, Dugaboy and HCMFA, finding that they lacked both constitutional standing and prudential standing under the "person aggrieved" test and affirmed the bankruptcy court's order after finding the third appellant, NexPoint, to have prudential standing under the "person aggrieved" test. *d.* at 1-3 and 4.

[173] *d.* at 1 n.2.

[174] *Highland Capital Mgt. und, L. . v. Highland Capital Mgt., L. . n re Highland Capital Mgt., L. .*, 57 F.4th 494 (5th Cir. 2023).

[175] *d.* at 501 (cleaned up).

[176] *d.*

aggrieved" test[177] which, as discussed above, is a matter of prudential standing this is applied only in the context of bankruptcy ***appellate*** matters.[178] As noted in its most recent opinion discussing standing in an appeal from the Highland bankruptcy case, the Fifth Circuit reiterated that the "person aggrieved" test is a test for bankruptcy ***appellate*** standing, which is narrower than a party in interest's right to be heard in bankruptcy cases in general.[179] The court rejected an argument that Bankruptcy Code 1109, which provides that " a party in interest . . . may raise and may appear and be heard on any issue in a case under this chapter" confers ***appellate*** standing, noting that "one's standing to appear and be heard before the bankruptcy court is a concept distinct from standing to appeal the merits of a decision" and that the "person aggrieved" test for bankruptcy appellate standing is narrower than the test for determining one's standing to appear and be heard in a bankruptcy proceeding.[180]

Thus, the court will now analyze whether HMIT would, at a minimum, have constitutional standing to bring the Proposed Claims.

2. <u>HMIT Would Lack Article III Constitutional Standing to Bring the Proposed Claims</u>.

As noted above, the Supreme Court and the Fifth Circuit have made clear that constitutional standing is necessary for a court to exercise subject matter jurisdiction. It is only the first hurdle a party must clear before pursuing a claim in federal court. HMIT, as plaintiff, would bear the

---

[177] HMIT insists that it has constitutional standing to bring claims on its individual behalf "as an aggrieved party." *See* Reply, 7.

[178] HMIT's argument in this matter that it has constitutional standing because it is a "party aggrieved" incorrectly conflates the prudential bankruptcy appellate "person aggrieved" test with the broader test that is applied to constitutional standing. The court is not being critical of this mistake. As noted at *supra* note 149, the Fifth Circuit in *braugh* pointed out that courts and attorneys alike have created confusion by misusing the term "standing" when they equate a lack of "standing," in all instances, with a lack of subject matter jurisdiction, even when the party is found to lack only prudential standing. Thus, HMIT is not alone in its confusion over the two different concepts of standing.

[179] *See e oint*, 2023 WL 4621466 at 6.

[180] *d.* at 6 (cleaned up)("Because Section 1109(b) expands the right to be heard in a bankruptcy proceeding to a wider class than those who qualify under the person aggrieved' standard, courts considering the issue have concluded that merely being a party in interest is insufficient to confer ***appellate*** standing.")(emphasis added).

burden of establishing: (1) that it suffered an injury in fact that is concrete, particularized, and actual or imminent not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[181]

Concrete and Particularized; Actual or Imminent. As the Supreme Court made clear in the *Lu an* case, the injury in fact element requires a showing that the injury was "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[182] The Supreme Court in the *Spo eo* case expounded on the "concrete and particularized" requirements of the "injury in fact" element. Particularization requires a showing that the injury "must affect the plaintiff in a personal and individual way," but while particularization is necessary, it alone is "not sufficient," because an injury in fact must also be "concrete."[183] And, concreteness is "quite different from particularization."[184] A "concrete" injury must be "real," and "not abstract," though it does not mean that the injury must be "tangible," as the injury can be intangible and nevertheless be concrete.[185] In addition to the concreteness and particularization requirements, an injury in fact must be "actual or imminent" such that "allegations of injury that is merely conjectural or hypothetical do not suffice to confer standing."[186] "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes that the injury is *certainl*

[181] *See supra* note 153.
[182] *Lu an*, 504 U.S. at 560 (cleaned up).
[183] *Spo eo*, 578 U.S. at 339.
[184] *d.* at 340.
[185] *d.*
[186] *Little v. K M LL* , 575 F.3d 533, 540 (5th Cir. 2009).

impending"; "allegations of *possible* future injury are not sufficient."[187]

Traceability - Causal Connection. As to the second element that the injury was caused by the defendant the Supreme Court in *Lu an* further described it as requiring a showing that "the injury has to be fairly traceable to the challenged action of the defendant."[188] The "fairly traceable" test requires an examination of "the causal connection between the assertedly unlawful conduct and the alleged injury."[189]

Redressability. The third element redressability requires the court to examine the connection "between the alleged injury and the judicial relief requested."[190] "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court."[191] " A court must determine that there is an available remedy which will have a substantial probability' of redressing the plaintiff's injury."[192]

The Claims Purchasers argue that HMIT lacks constitutional standing to pursue the claims asserted in the Proposed Complaint because: (i) neither HMIT nor the Bankruptcy Estate was injured by the Claim Purchasers' acquisition of the claims; and (ii) the Proposed Complaint lacks a theory of cognizable damages to the Reorganized Debtor, the Claimant Trust, and or the beneficiaries of the Claimant Trust.[193]

---

[187] *Clapper v. nest ntern. S* , 568 U.S. 398, 409 (2013)(cleaned up); *see also bdullah v. a ton*, 65 F.4th 204, 208 (5th Cir. 2023)(" Injury cannot be speculative, conjectural, or hypothetical and a llegations of only a possible' future injury similarly will not suffice.")(cleaned up).

[188] *Lu an*, 504 U.S. at 560-61 (cleaned up).

[189] *llen v. right*, 468 U.S. 737, 753 n. 19 (1984).

[190] *d.* (noting "it is important to keep the fairly traceable' and redressability' inquiries separate if the redressability' component is to focus on the requested relief.").

[191] *Steel Co. v. Citi ens for a etter nv t*, 523 U.S. 83, 107 (1998).

[192] *Cit of Los ngeles v. L ons*, 461 U.S. 95, 129 n.20 (1983)(Marshall, J., dissenting)(cleaned up); *see also ndruse v. .S. r Corps of ngineers*, Civ. Act. No. 3:22-cv-1874-N, 2023 WL 2169908, at 5 ("Plaintiffs have not demonstrated that any available remedy would be sufficiently likely to relieve their alleged economic losses. Without a showing of redressability, those harms also cannot support Plaintiff's Article III standing.").

[193] As noted earlier, certain of the Proposed Defendants the Highland Parties do not focus on HMIT's lack of constitutional standing to pursue the Proposed Claims against them, but on its lack of prudential standing under

The court agrees with the Claims Purchasers' argument here. What is HMIT's concrete and particularized injury that is "real" and is not abstract That is not conjectural or hypothetical That is actual or imminent

Recall that, under the Plan, HMIT holds a Class 10 contingent interest in the Claimant Trust that only realizes value if all creditors are paid in full with interest. HMIT alleges the following injury: it has suffered a devaluation of its unvested Contingent Claimant Trust Interest by virtue of the alleged over-compensation of Seery as the Claimant Trustee Seery's alleged over-compensation depletes the assets in the Claimant Trust available for distribution to creditors under the Plan, such that there is less likely a chance that HMIT ultimately receives any distributions on account of its Class 10 Contingent Claimant Trust Interest.[194] Yet, HMIT testified, through both witnesses Dondero and Patrick, that it had no personal knowledge of what Seery's actual compensation is under the CTA at the time HMIT filed its Motion for Leave. It was clear that HMIT's allegations regarding Seery's "excessive" compensation were based entirely on Dondero's pure speculation. In reality, Seery's base salary is exactly what the bankruptcy court approved during the bankruptcy case by a court order (after negotiations between Seery and the Committee). The CTA now further governs his compensation. The CTA, which was publicly filed ***in advance of*** the Plan confirmation hearing and approved by this court as part of the Plan

---

applicable law. Because constitutional standing is a matter of subject matter jurisdiction, the court has an independent duty to determine whether HMIT would have constitutional standing to pursue the Proposed Claims in federal court. The issue cannot be forfeited or waived by a party. *See braugh v. H Corp.*, 546 U.S. 500, 514 (2006)(" S subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived. Moreover, courts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.")(cleaned up); *braugh*, 26 F.4th at 304 ("It is our constitutional duty, of course, to decline subject matter jurisdiction where it does not exist and that is so whether the parties challenge Article III standing or not.")(cleaned up).

[194] At the June 8 Hearing, HMIT's counsel was unable to identify any other injury HMIT has alleged to have suffered. HMIT's counsel acknowledged that claims trades, in and of themselves, would not "involve injury to the Reorganized Debtor and to the Claimant Trust" and that claims trades are "normally outside the purview of the bankruptcy court" but that " h ere, we have alleged . . . . injury that takes the form of unearned excessive fees that Mr. Seery has garnered as a result of his relationship and arrangements, as we have alleged, with the Claims Purchasers." June 8 Hearing Transcript, 67:16-68:8. HMIT can only point to Seery's excess compensation as injury.

(which has been affirmed by the Fifth Circuit), specifically provides that Seery's post-Effective Date compensation would include a "Base Salary" (again, same as during the bankruptcy case), a "success fee," and "severance."[195] The CTA discussed the role of the Committee and then the CTOB in setting the success fee and severance and the like. A fully executed copy of the CTA was admitted into evidence at the June 8 Hearing. HMIT is essentially arguing that its injury (i.e., diminished likelihood of realizing value on its Contingent Claimant Trust Interest) stems from a court-sanctioned and creditor-approved process for approving compensation to Seery. Moreover, HMIT has failed to plead facts sufficient to show that, even if Seery received excessive compensation and that compensation is ordered to be returned, HMIT's Contingent Claimant Trust Interest will ever vest. The district court and the Fifth Circuit in various appeals by Dugaboy, another Dondero-related entity that, similar to HMIT, was a holder of a limited partnership interest in Highland whose interests were terminated as of the Effective Date of the Plan in exchange for a Contingent Claimant Trust Interest, have repeatedly rejected Dugaboy's claims to have standing based on the ***speculative nature of its alleged injuries as a contingent beneficiary of the Claimant Trust under the Plan***. For example, the Fifth Circuit affirmed the district court's dismissal of an appeal by Dugaboy of the bankruptcy court's order authorizing the creation of an indemnity subtrust, wherein Judge Fitzwater found that, in addition to lacking prudential standing under the

---

[195] The Disclosure Statement that was approved by this court, after notice and a hearing, on November 24, 2020, provided that "The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement . . . ." The CTA was part of a Plan Supplement (as amended) that was filed in advance of the confirmation hearing and provided:

> Compensation. As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary"). Within the first forty-five days following the Confirmation Date, the Claimant Trustee, on the one hand, and the Committee, if prior to the Effective Date, or the Oversight Board, if on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary, (b) a success fee, and (c) severance.

*See* Highland Ex. 38, at 3.13(a)(i).

"person aggrieved" test to appeal the bankruptcy court's order, Dugaboy lacked constitutional standing "because they have not identified any injury fairly traceable to the Order: ***the injuries identified are speculative at best and nonexistent at worst***."[196] HMIT's allegations of injury are, without a doubt, "merely conjectural or hypothetical" and are only speculative of possible future injury if its Contingent Claimant Trust Interest ever vests."[197] The court finds that HMIT would not meet the "concrete and particularized" or the "actual or imminent" requirements for an "injury in fact," and, thus, would lack constitutional standing to pursue the Proposed Claims.

With regard to the second requirement of constitutional standing whether HMIT could show "traceability" with respect to the Claims Purchasers and or Seery (i.e., a "causal connection between the assertedly unlawful conduct and the alleged injury"[198]), as noted above, there is only a speculative injury. Even if there is unlawful conduct asserted (i.e., sharing of MNPI to Claims Purchasers who then, as a *uid pro uo*, rubber stamped excessive compensation for Seery), there is nothing other than a hypothetical theory of an alleged injury (i.e., an allegedly less likelihood of a distribution on a Contingent Claimant Trust Interest).

With respect to the third requirement of constitutional standing whether HMIT can show "redressability" (i.e., that it is likely, not speculative, that the injury can be redressed by a favorable

---

[196] *Highland Capital Mgt. und dvisors, L. . v. Highland Capital Mgt., L. . n re Highland Capital Mgt., L. .*, Civ. Act. No. 3:21-cv-1895-D, 2022 WL 270862, 1 n.2 (N.D. Tex. Jan. 28, 2022), *aff d* 57 F.4th 494 (5th Cir. 2023)(emphasis added); *see also* Judge Scholer's opinion in *ugabo nv. Tr. v. Highland Capital Mgt., L. . n re Highland Capital Mgt., L. .*, Civ. Act. No. 3:21-cv-2268-S, 2022 WL 3701720, 3 (N.D. Tex. Aug. 8, 2022)(cleaned up), *aff d per curiu* , No. 22-10831, 2023 WL 2263022 (5th Cir. Feb. 28, 2023) (where Dugaboy had argued that "***its pecuniary interest is*** . . . ***a potential recovery under the Plan as one of Debtor's former equity holders***" and that "it ha d standing as a contingent beneficiary' under the Plan, or a beneficiary who will be entitled to payment after all creditors are paid in full," and Judge Scholer stated, "This assertion is premised on the assumption that Dugaboy s 0.1866% pre-bankruptcy limited partnership interest in Debtor which was extinguished under the Plan makes it a contingent beneficiary of the creditor trust created under the Plan. . . . S uch a speculative prospect of harm is far from a direct, adverse, pecuniary hit' as required to confer standing."

[197] *Little v. K M LL* , 575 F.3d 533, 540 (5th Cir. 2009).

[198] *llen v. right*, 468 U.S. 737, 753 n. 19 (1984).

decision), there are multiple problems here.[199] The major remedy sought here is the equitable disallowance of the allowed Purchased Claims (and disgorgement and or constructive trust of amounts paid or owed to the Claim Purchasers on account of their claims). There is no such remedy available here. As noted earlier, there is a similar concept of ***equitable subordination*** of a claim to another claim, or of an interest to another interest, pursuant to Bankruptcy Code section 510(c). But under the literal terms of section 510(c), ***claims cannot be subordinated to interests***. Moreover, the Fifth Circuit noted in the *Mobile Steel* case,[200] that ***equitable disallowance*** of a claim (as opposed to equitable subordination of a claims) is not an available remedy. Bankruptcy Code section 502(b)(1) and the Fifth Circuit's *Lothian  il* case might permit "recharacterization" of a claim from debt to equity in certain circumstances  but not based on inequitable conduct but rather on the nature of a financial transaction. In any event, here, the claims have already been adjudicated and allowed (some after mediation, and all after Rule 9019 settlement orders). The only way to reconsider a claim in a bankruptcy case that has already been allowed is through Bankruptcy Code section 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause. . . according to the equities of the case."). As noted earlier, the problem here is that Bankruptcy Rule 9024 provides that a motion for "reconsideration of an order allowing or disallowing a claim against the estate ***entered without a contest*** is not subject to the one year limitation prescribed in Rule 60(c)" (emphasis added). As further noted earlier, here there was most definitely a "contest" with regard to all of these purchased claims. ***Thus, it would appear***

---

[199] *See supra* notes 182-184 and accompanying text. The court will note that, as discussed *supra* note 141 and pages 71-72, the remedy of equitable subordination (as to the Claims Purchasers) would not redress HMIT's alleged injury (because equitable subordination of claims to interests is not an available remedy in the Fifth Circuit and thus subordination of the Purchased Claims to other claims would not change HMIT's distributions from the Claimant Trust, if any), and because outright disallowance of all or part of the already allowed Purchased Claims is not an available remedy either, HMIT would not be able to meet the "redressability" requirement with respect to the Claims Purchasers.

[200] *n re Mobile Steel Co.,  nc.*, 563 F.2d 692 (5th Cir. 1977).

***that any effort to have a court reconsider and potentially disallow these claims pursuant to section 502(j) is untimely—as it has been well beyond a year since they were allowed.***

3. HMIT Would Also Lack Prudential Standing to Bring the Proposed Claims.

Even if HMIT would have constitutional standing to bring the Proposed Claims in an adversary proceeding filed in the bankruptcy court, the Proposed Claims would still be barred if HMIT would lack prudential standing to bring them under applicable state or federal law. HMIT argues that it does have prudential standing under both federal bankruptcy law and Delaware law to pursue the Proposed Claims derivatively and also to bring the Proposed Claims in its individual capacity.

With regard to "federal bankruptcy law," HMIT argues that it has standing pursuant to: (a) Rule 23.1 of the Federal Rules of Civil Procedure, pertaining to derivative actions, which "applies to this proceeding pursuant to" Rule 7023.1 of the Federal Rules of Bankruptcy Procedure, and (b) *Louisiana orld position v. ederal nsurance Co. L* ,[201] the Fifth Circuit's leading case addressing when a creditors committee may be granted standing to bring causes of action on behalf of a bankruptcy estate. But, federal bankruptcy law does not confer standing ***where the plaintiff otherwise lacks standing under applicable state law***. In other words, whether HMIT would have prudential standing to sue under Delaware law is dispositive of the issue, regardless of the forum. Rule 23.1 "speaks only to the adequacy of the . . . pleadings," and "cannot be understood to abridge, enlarge, or modify any substantive right,'"[202] including a right (or lack thereof) to bring a derivative action under the substantive law of Delaware. Additionally, HMIT's reliance on *L* is misplaced: *L* permits creditors, in certain circumstances ***during*** a bankruptcy case, to "file

[201] 858 F.2d 233 (5th Cir. 1988).

[202] *Ka en v. Ke per in. Servs., nc.*, 500 U.S. 90, 96 (1991)(quoting 28 U.S.C. 2072(b)).

suit on behalf of a debtor-in-possession or a trustee"[203] and does not apply to a party's right to sue, derivatively, on behalf of the Reorganized Debtor or any entity that is the assignee of the former bankruptcy estate's assets. Upon confirmation of the Plan, the bankruptcy estate of Highland ceased to exist;[204] Highland is no longer a debtor-in-possession but a reorganized debtor, and the Claimant Trust is a new entity created under the Plan and Claimant Trust Agreement. Even if *L* did apply in this ***post***-confirmation context, it supports the application of Delaware law to the issue of prudential standing and does not supersede state-law requirements for standing. In *L* , before addressing the requirements a creditors' committee must meet to sue derivatively on behalf of a bankruptcy estate as a matter of federal bankruptcy law, the Fifth Circuit conducted a lengthy analysis to determine "as a threshold issue" whether the creditors' committee in that case could assert its claims under Louisiana law.[205] The court specifically addressed whether the creditors' committee could pursue a derivative action under Louisiana law and concluded that "there is no bar in Louisiana law to actions brought by or in the name of a corporation against the directors and officers of the corporation which benefit only the creditors of the corporation; indeed, Louisiana law specifically recognizes such actions."[206] So, even under *L* (which the court does not think applies in this post-confirmation context), if HMIT would be barred from bringing a derivative action on behalf the Reorganized Debtor or Claimant Trust under state law, the analysis stops there.[207] Thus, the court looks to Delaware law to determine if HMIT would have prudential standing to pursue the derivative claims on behalf the Reorganized Debtor and the Claimant Trust.

---

[203] *L* , 858 F.2d at 247.

[204] *See n re Craig s Stores*, 266 F.3d 388, 390 (5th Cir. 2001).

[205] *L* , 858 F.2d at 236-45.

[206] *d.* at 243.

[207] *See n re ura uto otive S s., LLC*, No. 19-123728 (Bankr. D. Del. June 10, 2020), Docket No. 1115 at 46 (where the Delaware bankruptcy court denied the creditors' committee standing to sue derivatively on behalf of a Delaware LLC because the committee lacked standing under the Delaware LLC Act, stating, "To determine that the third party

HMIT acknowledges that both the Reorganized Debtor and the Claimant Trust are organized under Delaware law, and thus the cause of action against Seery alleging breach of fiduciary duties to the Reorganized Debtor and the Claimant Trust are governed by Delaware law under the "Internal Affairs Doctrine."[208] In addition, because HMIT's breach of fiduciary duties claim is governed by Delaware law, its aiding and abetting theory of liability as to the Claims Purchasers is also governed by Delaware law.[209] For the reasons set forth below, the court finds that HMIT would lack prudential standing under Delaware law to bring the claims set forth in the Proposed Complaint, derivatively, on behalf of either the Claimant Trust or the Reorganized Debtor.

a) First, HMIT Would Lack Prudential Standing Under Delaware Law to Bring Derivative Actions on behalf of the Claimant Trust.

The Claimant Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. 3801–29,[210] and "to proceed derivatively against a Delaware statutory trust, a plaintiff has the burden of satisfying the continuous ownership requirement" such that "the plaintiff must be a beneficial owner" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action."[211] This requirement is "mandatory and exclusive" and only "a beneficial owner" "has standing to bring a derivative claim on behalf of the

---

may bring the claim under the derivative basis and, thus, step into the shoes of the debtor to pursue them, the Court must look to the law of the debtors' state of incorporation or formation.").

[208] Motion for Leave, 21 and n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity); *Sagarra nversiones, S.L. v. Ce entos ortland alderrivas, S.* ., 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). The Reorganized Debtor and the Claimant Trust are both organized under the laws of Delaware.

[209] *See tre e o er lan Tr. v. Schindler n re tre e o er*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas).

[210] *See* Proposed Complaint, 26.

[211] *Hartsel v. anguard rp., nc.*, 2011 WL 2421003, at 19 n.123 (Del. Ch. June 15, 2011), *aff d* 38 A.3d 1254 (Del. 2012); 12 Del C. 3816(b).

Trust."[212] The Highland Parties argue that HMIT is not a "beneficial owner" of the Claimant Trust and, therefore, would lack standing to bring derivative claims on behalf of the Claimant Trust. HMIT argues to the contrary: that it ***is*** currently, and was at all relevant times, a "beneficial owner" of the Claimant Trust under Delaware trust law such that it would have standing to bring derivative claims on behalf of the Claimant Trust if it were allowed to proceed with the filing of the Proposed Complaint. The disagreement turns on the nature of HMIT's interest under the Plan and the Claimant Trust Agreement and whether HMIT, as a holder of such interest, would be considered a "beneficial owner" of the Claimant Trust under Delaware trust law.

As noted, pursuant to the Plan, HMIT's former limited partnership interest in Highland was cancelled as of the Effective Date in exchange for its pro rata share of a "Contingent Claimant Trust Interest," as defined under the Plan.[213] HMIT argues that its Contingent Claimant Trust Interest makes it a contingent beneficiary of the Claimant Trust, which makes it a present "beneficial owner" under Delaware trust law.

The Highland Parties argue that HMIT is not a "beneficial owner" of the Claimant Trust; rather, the "beneficial owners" of the Claimant Trust are the "Claimant Trust Beneficiaries,"[214] which are defined in the Plan and the CTA as "the Holders of Allowed General Unsecured Claims" (which are in Class 8 under the Plan) and "Holders of Allowed Subordinated Claims" (which are in Class 9 under the Plan);[215] HMIT, a holder of a Class 10 interest under the Plan, is neither.

---

[212] *n re at l Coll. Student Loan Tr. Litig.*, 251 A.3d 116, 191 (Del. Ch. 2020) (citing *CML , LLC v. a* , 28 A.3d 1037, 1042 (Del. 2011)). HMIT acknowledges this requirement in its Reply: "Delaware statutory trust law provides that a plaintiff in a derivative action on behalf of a trust must be a beneficial owner at the time of the action and at the time of the transaction." Reply, 19 (citing 12 Del C. 3816).

[213] *See* Plan Art. III.H.10 and Art. I.B.44.

[214] Section 2.8 of the CTA provides, "The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust . . . ." HMIT Ex. 26, 2.8.

[215] *See* Plan Art. I.B.44 (" *Clai ant Trust eneficiaries*' means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the

HMIT, as the holder of a "Contingent Claimant Trust Interest," has only an ***unvested*** contingent interest in the Claimant Trust and, as such, is not a "beneficial owner" of the Claimant Trust for standing purposes under Delaware trust law. HMIT argues that it "should be treated as a vested Claimant Trust Beneficiary due to the Proposed Defendants' wrongful conduct and considering the current value of the Claimant Trust Assets before and after the relief requested herein."[216] The court disagrees.

HMIT's status as a "beneficiary" of the Claimant Trust is defined by the CTA itself, pure and simple. The CTA specifically provides that "Contingent Trust Interests" "shall not have any rights under this Agreement" and will not "be deemed Beneficiaries' under this Agreement," "unless and until" they vest in accordance with the Plan and the CTA. It is undisputed that HMIT's Contingent Trust Interest has not vested under the terms of the Plan and the CTA, and the court does not have the power to equitably deem HMIT's Contingent Trust Interest to be vested based on HMIT's unsupported allegation of wrongdoing on the part of Seery, the Claimant Trustee. Thus, the court finds that HMIT is not a "beneficial owner" of the Claimant Trust and, therefore, lacks prudential standing under Delaware law to bring derivative claims on behalf of the Claimant Trust.[217]

---

Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests."); CTA 1.1(h). *See also*, CTA, 1 at n.2 ("For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan."). HMIT Ex. 26.

[216] Proposed Complaint 24.

[217] *See at l Coll.*, 251 A.3d at 190–92 (dismissing creditors' derivative claims because they were not "beneficial owners of the Trusts"); *Hartsel*, 2011 WL 2421003, at 19 n.123 (dismissing derivative claims by investors that "no longer own shares" because "those investors no longer have standing to pursue a derivative claim").

b) HMIT Would Likewise Lack Prudential Standing Under Delaware Law to Bring Derivative Actions on behalf of the Reorganized Debtor.

HMIT acknowledges that the Reorganized Debtor, Highland Capital Management, L.P., is a Delaware limited liability partnership governed by the Delaware Limited Partnership Act, 6 Del. C. 17-101, *et se* .[218] To bring "a derivative action" on behalf of a limited partnership, "the plaintiff must be a partner or an assignee of a partnership interest" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action."[219]

HMIT is not a partner, general or limited, of the Reorganized Debtor limited partnership. HMIT ***was*** a limited partner in the original debtor (specifically, a holder of Class B C Limited Partnership interests in Highland), but that limited partnership interest was extinguished on August 11, 2021 (the Effective Date of the Plan) per the terms of the Plan, and HMIT does not own any partnership interest in the newly created Reorganized Debtor limited partnership.[220] Because HMIT would not hold a partnership interest in the Reorganized Debtor at "the time of bringing the action," it "lacks derivative standing" to bring claims "on the partnership's behalf."[221] HMIT likewise cannot satisfy "the continuous ownership requirement"; when HMIT's limited partnership interest in the original Debtor was cancelled on the Plan's Effective Date, HMIT "los t standing to continue a derivative suit" on behalf of the Debtor.[222] Finally, to the extent HMIT

---

[218] Proposed Complaint 25.

[219] 6 Del. C. 17-1002; *see To v. eg an , . .*, 976 F. Supp. 2d 889, 904 (S.D. Tex. 2013) ("The Delaware partnership act facially bars any party other than a limited partner from suing derivatively. . . . Delaware courts historically have interpreted the provisions as giving the partners exclusive rights to sue for breach of another party's fiduciary duties to them.") (quoting *CML , LLC v. a* , 6 A.3d 238, 245 (Del. Ch. 2010), *aff d* 28 A.3d 1037 (Del. 2011)); *l aso ipeline Co. v. rinc erhoff*, 152 A.3d 1248, 1265 n.87 (Del. 2016) ("The statutory foundation for the continuous ownership requirement in the corporate realm is echoed in the limited partnership context.") (citing 6 Del. C. 17-211(h)).

[220] *See* Plan Art. IV.A.

[221] *To* , 976 F. Supp. 2d at 904 (dismissing derivative claims by creditor on behalf of partnership for lack of standing).

[222] *l aso*, 152 A.3d at 1265 (cleaned up) (dismissing derivative action for lack of standing where plaintiff's partnership interest was extinguished by a merger transaction); *see also Sch er erhorn v. Centur Tel, nc. n re*

seeks to bring a "double derivative" action on behalf of the Claimant Trust based on claims purportedly held by its wholly owned subsidiary, the Reorganized Debtor, HMIT lacks standing. A "double derivative" action is a suit "brought by a shareholder of a parent corporation to enforce a claim belonging to a subsidiary that is either wholly owned or majority controlled."[223] And, under Delaware law, "parent level standing is required to enforce a subsidiary's claim derivatively."[224] Because HMIT would lack derivative standing to bring claims on behalf of the parent Claimant Trust,[225] it also would lack standing to bring a double derivative action.

c) Finally, HMIT Would Also Lack Prudential Standing under Applicable Law to Bring the Proposed Claims As ***Direct*** Claims.

HMIT argues that it has "direct" standing to pursue the Proposed Claims on behalf of itself, individually.[226] But just because HMIT asserts that some or even all of the Proposed Claims are direct, not derivative claims, does not make it so: "a claim is not direct' simply because it is pleaded that way."[227] Rather, in determining whether claims are direct or derivative, a court must "look at the substance of the Petition, and the nature of the wrongs alleged therein, rather than the Plaintiffs' characterization."[228] And, under Delaware law, "whether a claim is solely derivative or

*S ort lobal Co cn s, nc.*, 2011 WL 111427, at 25–26 (Bankr. S.D. Tex. Jan. 13, 2011) (holding that pre-petition shareholders "lack standing to bring a derivative claim" under Delaware law because they "had their equity interests in the company extinguished pursuant to the merger under the Plan"); *n re orldCo , nc.*, 351 B.R. 130, 134 (Bankr. S.D.N.Y. 2006) (" T he cancellation of WorldCom shares under the Plan prevents the required continuation of shareholder status through the litigation.") (cleaned up).

[223] *La brecht v. eal*, 3 A.3d 277, 282 (Del. 2010).

[224] *Sagarra*, 34 A.3d at 1079–81 (capitalization omitted) (citing *La brecht*, 3 A.3d at 282).

[225] *See supra* pp. 80-82.

[226] *See e.g.*, Motion for Leave 10 ("HMIT has individual standing to bring this action because Seery owed fiduciary duties directly to HMIT at that time . . . ."); *id.* 67 (arguing that "HMIT has d irect s tanding"); Proposed Complaint 24 ("HMIT has constitutional standing and capacity to bring these claims both individually and derivatively.").

[227] *Sch er erhorn*, 2011 WL 111427, at 26 (quoting *at v. onsoldt*, 2004 WL 3029868 at 7 (Del. Ch. Nov. 5, 2004)).

[228] *See id.* (citing *r strong v. Capsha , oss o ers LL* , 404 F.3d 933, 936 (5th Cir. 2005)); *see also Moore v. Si on nters., nc.*, 919 F.Supp. 1007, 1009 (N.D. Tex. 1995)("The determination of whether a claim is a derivative claim or a direct claim is made by reference to the nature of the wrongs alleged in the complaint, and is not limited by a party's characterization or stated intention.")(cleaned up).

may continue as a dual-natured claim must turn ***solely*** on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually) .'"[229] "In addition, to prove that a claim is direct, a plaintiff must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.'"[230] Similarly, in the bankruptcy context, whether a creditor can assert a claim directly or whether the claim belongs to the estate turns on the nature of the injury for which relief is sought: " i f the harm to the creditor comes about only because of harm to the debtor, then its injury is derivative, and the claim is property of the estate," such that "only the bankruptcy trustee has standing to pursue the claim for the estate . . . ."[231] "To pursue a claim on its own behalf, a creditor must show this direct injury is not dependent on injury to the estate."[232]

As a reminder, HMIT argues that the injury it has suffered is a devaluation of its interests in the Claimant Trust by virtue of alleged over-compensation of Seery as the Claimant Trustee. HMIT was unable, when pressed during closing arguments, to identify any other injury. It essentially admitted that the claims trades, in and of themselves, would not have harmed the Claimant Trust, the Reorganized Debtor, or individual stakeholders, including HMIT, ***since the Claims Purchasers acquired already allowed unsecured claims, such that the distributions on those claims pursuant to the Plan would be unchanged in the hands of new holders of the claims***.

---

229 *l aso*, 152 A.3d at 1260 (quoting *Toole v. onaldson, Luf in enrette, nc.*, 845 A.2d 1031, 1033 (Del. 2004)) (emphasis in original).

230 *d.* (quoting *Toole* , 845 A.2d at 1033); *see also Sch er erhorn*, 2011 WL 111427, at 24 (same).

231 *Meridian Cap. C S und v. urton n re uccaneer es., L.L.C.* , 912 F.3d 291, 293 (5th Cir. 2019) (citing 11 U.S.C. 541(a)(1)).

232 *d.*; *see also Schert -Cibolo- niversal Cit ndep. Sch. ist. v. right n re ducators rp. Health Tr.* , 25 F.3d 1281, 1284 (5th Cir. 1994)("If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate.")(citations omitted).

Thus, by its own concessions, any alleged harm to HMIT (through devaluation of assets in the Claimant Trust) "comes about only because of harm to the debtor," so the alleged "injury is derivative."[233] The court concludes that all of the claims set forth in the Proposed Complaint allege derivative claims only, and that none would be direct claims against the Proposed Defendants. Thus, HMIT would lack prudential standing to bring any of the Proposed Claims in the Proposed Complaint, so its Motion for Leave should be denied.

d) Some Final Points Regarding Standing.

In this standing discussion, one should not lose sight of the fact that there are both procedural safeguards in place, as well as certain independent individuals in place with fiduciary duties that might act in the event of any shenanigans regarding Claimant Trust activities. Under section 4.1 of the CTA (approved as part of the Plan process), the CTOB, which includes an independent disinterested member in addition to representatives of the Claims Purchasers,[234] oversees the Claimant Trustee's performance of his duties, approves his compensation, and may remove him for cause. Moreover, there is a separate "Litigation Trustee" in this case who was brought in, post-confirmation, as an independent fiduciary to pursue claims and causes of action. These independent persons are checks and balances in the post-confirmation wind down of Highland. This is what creditors voted on in connection with the Plan. Seery and the Claims Purchasers are not in sole control of anything. The CTA, as well as Delaware law, very clearly set forth who can bring an action in the event of some colorable claim. This is the reality of prudential

---

[233] *Meridian*, 912 F.3d at 293–94 ("The creditors' injury (reduced bankruptcy recovery) derived from injury to the debtor (the loss of estate assets), so only the estate could sue the third parties."); *see also l aso,* 152 A.3d at 1260–61 & n.60 (holding that claim "claims of corporate overpayment are normally treated as causing harm solely to the corporation and, thus, are regarded as derivative") (collecting cases); *erber v Holdings, LLC*, 2013 WL 209658, at 12 (Del. Ch. Jan. 18, 2013) (holding that claims were derivative because plaintiff had "not identified any independent harm suffered by the limited partners"; "the partnership suffered all the harm at issue it paid too much").

[234] *See supra* note 23 and accompanying text.

standing. Just as in the braugh case, where Louisiana law dictated that a mother could not bring a wrongful death case when the deceased prisoner had a surviving wife and child, Delaware law and the CTA dictate here that a contingent beneficiary cannot bring the Proposed Claims here. This is separate and apart from whether the claims are colorable.

*C. re the roposed Clai s Colorable*

1. <u>What is the Proper Standard of Review for a "Colorability" Determination</u>

Although the court has determined that HMIT would ***not*** have standing (constitutional or prudential) to bring the Proposed Claims, this court will nevertheless evaluate whether the claims assuming HMIT somehow has standing might be "colorable." This, in turn, requires the court to assess what the legal standard is to determine if a claim is "colorable." As a reminder, the Plan's Gatekeeper Provision and this court's prior Gatekeeper Orders entered in January and July 2020 each required that, before a party may commence or pursue claims relating to the bankruptcy case against certain protected parties, it must first obtain a finding from the bankruptcy court that its proposed claims are "colorable." The Gatekeeper Provision and Gatekeeper Orders did not specifically define "colorable" or what type of legal standard should apply.

HMIT argues that the standard for review to be applied by this court is the same as a simple "plausibility" standard used in connection with a Rule 12(b)(6) motions to dismiss. In other words, the court should simply assess whether the allegations of the Proposed Complaint, taken as true and with all inferences drawn in favor of the movant, state a ***plausible*** claim for relief (i.e., colorable equals plausible), and that this standard does not allow for the weighing of evidence by the court.[235] The Proposed Defendants, however, argue that the test for colorability should be more

[235] Reply, 5 (" T he determination of colorability' does not allow the weighing' of evidence. At most, a Rule 12(b)(6) plausibility' standard applies.").

# Exhibit 10

Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056
Telephone: (713) 960-7315
Facsimile: (713) 960-7347
*Attorneys for Hunter Mountain Investment Trust*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | **Chapter 11** |
| | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR LEAVE TO FILE VERIFIED ADVERARY PROCEEDING**

Hunter Mountain Investment Trust ("HMIT"), Movant, files this Emergency Motion for Leave to File Verified Adversary Proceeding ("Motion"), both in its individual capacity and as a derivative action on behalf of the Reorganized Debtor, Highland Capital Management, L.P. ("HCM" or "Reorganized Debtor") and the Highland Claimant Trust against Muck Holdings, LLC ("Muck"), Jessup Holdings, LLC ("Jessup"), Farallon

Capital Management, LLC ("Farallon"), Stonehill Capital Management, LLC ("Stonehill"), James P. Seery, Jr. ("Seery") and John Doe Defendant Nos. 1-10 (Muck, Jessup, Stonehill, Farallon, Seery and the John Doe Defendant Nos. 11-10 are collectively "Respondents" or "Proposed Defendants").

## I. Good Cause for Expedited Relief

1. HMIT seeks leave to file an Adversary Proceeding pursuant to the Court's "gatekeeping" orders, as well as the injunction and exculpation provisions in the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (Doc. 1943), as modified (the "Plan").[1] A copy of HMIT's proposed Verified Adversary Proceeding ("Adversary Proceeding") is attached as Exhibit 1 to this Motion. This Motion is separately supported by objective evidence derived from historical filings in the bankruptcy proceedings,[2] as well as the declarations of James Dondero, dated May 2022 (Ex. 2), James Dondero, dated February 2023 (Ex. 3), and Sawnie A. McEntire with attached evidence (Ex. 4).[3]

---

[1] The exculpation provisions were recently modified by a decision of the Fifth Circuit. Such provisions apply to James P. Seery, Jr. only and are limited to his capacity as an Independent Director. *Matter of Highland Cap. Mgmt., L.P.*, 48 F.4th 419, 438 (5th Cir. 2022).

[2] Unless otherwise referenced, all references to evidence involving documents filed in the Debtor's bankruptcy proceedings (Case No. 19-34054-sgj11 (Bankr. N.D. Tex.)) are cited by "Doc." reference. HMIT asks the Court to take judicial notice of the documents identified by such entries.

[3] The supporting declarations will be cited as Dondero 2022 Dec. (Ex. 2), Dondero 2023 Dec. (Ex. 3), and McEntire Dec. (Ex. 4).

2. The expedited nature of this Motion is permitted under Fed. R. Bank P. 9006 (c)(1), which authorizes a shortened time for a response and hearing for good cause. For the reasons set forth herein, HMIT has shown good cause and requests that the Court schedule a hearing on this Motion on three (3) days' notice, and that any responses be filed no later than twenty-four hours before the scheduled hearing.[4]

3. HMIT brings this Motion on behalf of itself and derivatively on behalf of the Reorganized Debtor and the Highland Claimant Trust ("Claimant Trust"), as defined in the Claimant Trust Agreement (Doc. 3521-5) ("CTA").[5] Upon the Plan's Effective Date, Highland Capital Management, LP, as the original Debtor ("Original Debtor"), transferred its assets, including its causes of action, to the Claimant Trust, including the causes of action set forth in the attached Adversary Proceeding. The attached Adversary Proceeding alleges claims which are substantially more than "colorable" based upon plausible allegations that the Proposed Defendants, acting in concert, perpetrated a fraud,[6] including a fraud upon innocent stakeholders, as well as breaches of fiduciary

[4] Expedited action on this Motion is also warranted to hasten Movants' opportunity to file suit, pursue prompt relevant discovery, and reduce the threat of loss of potentially key evidence. Upon information and belief, Seery has been deleting text messages on his personal iPhone via a rolling, automatic deletion setting.

[5] Solely in the alternative, and in the unlikely event HMIT's proposed causes of actions against Seery, Stonehill, Farallon, Muck, and/or Jessup are considered to be "Estate Claims" as those terms are used and defined within the CTA and Exhibit A to the Notice of Final Term Sheet [Docket No. 354] in HCM's bankruptcy (and without admitting the same), HMIT alternatively seeks standing to bring this action as a derivative action on behalf of the Litigation Sub-Trust as appropriate.

[6] Neither this Motion nor the proposed Adversary Complaint seeks to challenge the Court's Orders or the Plan. In addition, neither this Motion nor the proposed Adversary Complaint seeks to redistribute the assets of the Claimant Trust in a manner that would adversely impact innocent creditors. Rather, the

duties and knowing participation in (or aiding and abetting) breaches of fiduciary duty. The Adversary Proceeding also alleges that the Proposed Defendants did so collectively by falsely representing the value of the Debtor's Estate, failing to timely disclose accurate values of the Debtor's Estate, and trading on material non-public information regarding such values. HMIT also alleges that the Proposed Defendants colluded to manipulate the Debtor's Estate—providing Seery the opportunity to plant close business allies into positions of control to approve Seery's compensation demands following the Effective Date.

4. Emergency relief is needed because of a fast-approaching date (April 16, 2023) that one or more of the Proposed Defendants *may* argue, depending upon choice of law, constitutes the expiration of the statute of limitations concerning some of the common law claims available to the Claimant Trust, as well as to HMIT.[7] Although HMIT offered to enter tolling agreements from each of the Proposed Defendants, they either rejected HMIT's requests or have not confirmed their willingness to do so, thereby necessitating the expedited nature of this Motion.[8] Because this Motion is subject to the

---

proposed Adversary Proceeding seeks to benefit all innocent stakeholders while working within the terms and provisions of the Plan, as well as the Claimant Trust Agreement.

[7] The first insider trade at issue involved the sale and transfer of Claim 23 in the amount of $23 million held by ACMLD Claim, LLC to Muck on April 16, 2021 (Doc. 2215).

[8] HMIT has been diligent in its efforts to investigate the claims described in this Motion, including the filing of a Tex. R. Civ. P. Rule 202 proceeding in January 2023, which was not adjudicated until recently in March 2023. Those proceeding were conducted in the 191st Judicial District Court in Dallas County, Texas, under Cause DC-23-01004. *See* McEntire Dec. Ex. 4 and the attached Ex. 4-A. Farallon and Stonehill defended those proceedings by aggressively arguing, in significant part, that the discovery issues were better undertaken in this Court.[8] The Rule 202 Petition was recently dismissed (**necessarily without prejudice**)

Court's "gatekeeping" orders and the injunction provisions of the Plan, emergency leave is required.

5. This Motion will come as no surprise to the Proposed Defendants. Farallon and Stonehill were involved in recent pre-suit discovery proceedings under Rule 202 of the Texas Rules of Civil Procedure relating to the same insider trading allegations described in this Motion. Muck and Jessup, special purpose entities created and ostensibly controlled by Farallon and Stonehill, respectively, also were provided notice of these Rule 202 Proceedings in February 2023.[9] Like this Motion, the Rule 202 Proceedings focused on Muck, Jessup, Farallon, and Stonehill and their wrongful purchase of large, allowed claims in the Original Debtor's bankruptcy based upon material non-public information. Seery is also aware of these insider trading allegations because of a prior written demand.

6. In light of the Proposed Defendants' apparent refusal to enter tolling agreements, or their failure to fully affirm their willingness to do so, HMIT is forced to seek emergency relief from this Court to proceed timely with the proposed Adversary Proceeding before the expiration of any *arguable* limitations period.[10]

on March 8, 2023, ostensibly based on such arguments. However, it is telling that Stonehill and Farallon admitted during the Rule 202 Proceedings to their "affiliation" with Muck and Jessup and that they bought the Claims through these entities.

[9] *See* Dec. of Sawnie McEntire, Ex. 4.

[10] HMIT respectfully requests that this Motion be addressed and decided on an expedited basis that provides HMIT sufficient time to bring the proposed action timely. In the event the Court denies the requested relief, HMIT respectfully requests prompt notice of the Court's ruling to allow HMIT sufficient

## II. Summary of Claims

7. HMIT requests leave to commence the proposed Adversary Proceeding, attached as Exhibit 1, seeking redress for breaches of duty owed to HMIT, breaches of duties owed to the Original Debtor's Estate, aiding and abetting breaches of those fiduciary duties, conspiracy, unjust enrichment, and fraud. HMIT also alleges several viable remedies, including (i) imposition of a constructive trust; (ii) equitable disallowance of any unpaid balance on the claims at issue;[11] (iii) disgorgement of ill-gotten profits (received by Farallon, Stonehill, Muck and Jessup) to be restituted to the Claimant Trust; (iv) disgorgement of ill-gotten compensation (received by Seery) to be restituted to the Claimant Trust; (v) declaratory judgment relief; (vi) actual damages; and (vii) punitive damages.

## III. Standing

8. **HMIT.** Prior to the Plan's Effective Date, HMIT was the largest equity holder in the Original Debtor and held a 99.5% limited partnership interest. HMIT currently holds a Class 10 Claim as a contingent Claimant Trust Interest under the CTA

time to seek, if necessary, appropriate relief in the United States District Court. In order to have a fair opportunity to seek such relief on a timely basis and protect HMIT's rights and the rights of the Reorganized Debtor, HMIT will need to seek such relief on or before Wednesday, April 5, 2023, if this Motion has not been resolved.

[11] In the alternative only, subordination of Muck's and Jessup's General Unsecured Claim Trust Interests and Subordinated Claim Trust Interests to all other interests in the Claimant Trust, including HMIT's Contingent Trust Interest, is necessary and appropriate to remedy Muck's and Jessup's wrongful conduct, and is also consistent with the purposes of the Bankruptcy Code.

(Doc. 3521-5). Upon information and belief, all conditions precedent to HMIT's certification as a vested Claimant Trust Beneficiary would be readily satisfied but for the Defendants' wrongful actions and conduct described in this Motion and the attached Adversary Proceeding.

9. **Reorganized Debtor.** Although HMIT has standing as a former Class B/C Equity Holder, Class 10 claimant, and now contingent Claimant Trust Interest under the CTA,[12] this Motion separately seeks authorization to prosecute the Adversary Proceeding derivatively on behalf of the Reorganized Debtor and Claimant Trust. All conditions precedent to bringing a derivative action are satisfied.

10. Fed. R. Civ. P. 23.1 provides the procedural steps for "derivative actions," and applies to this proceeding pursuant to Fed. R. Bank. P. 7023.1. Applying Rule 7023.1, the Proposed Defendants' wrongful conduct occurred, and the improper trades consummated, in the spring and early summer of 2021, before the Effective Date in August 2021. During this period, HMIT was the 99.5% Class B/C limited partner in the original Debtor. As such, HMIT has individual standing to bring this action because Seery owed fiduciary duties directly to HMIT at that time, and the other Proposed Defendants aided and abetted breaches of those duties at that time.

[12] The last transaction at issue involved Claim 190, the Notice for which was filed on August 9, 2021. (Doc. 2698).

11. The derivative nature of this proceeding is also appropriate because any demand on Seery would be futile.[13] Seery is the Claimant Trustee under the terms of the CTA. Furthermore, any demand on the Oversight Board to prosecute these claims would be equally futile because Muck and Jessup, both of whom are Proposed Defendants, dominate the Oversight Board.[14]

12. The "classic example" of a proper derivative action is when a debtor-in-possession is "unable or unwilling to fulfill its obligations" to prosecute an otherwise colorable claim where a conflict of interest exists. *Cooper*, 405 B.R. at 815 (quoting *Louisiana World*, 858 F.2d at 252). Here, because HMIT's proposed Adversary Proceeding includes claims against Seery, Muck, and Jessup, the conflicts of interest are undeniable. Seery is the Trustee of the Claimant Trust Assets under the CTA, and he also serves as the "Estate Representative."[15] Muck and Jessup, as successors to Acis, the Redeemer Committee and UBS, effectively control the Oversight Board, with the responsibility to "monitor and oversee the administration of the Claimant Trust and the Claimant Trustee's performance . . . ."[16]

---

[13] Any demand on the Litigation Sub-Trust would be equally futile for the same reasons addressed herein, since the Litigation Trustee serves at the direction of the Oversight Board.

[14] *See* Footnote 8, *infra.* In December 2021, several stakeholders made a demand on the Debtor through James Seery, in his capacity as Trustee to the Claimant Trust, to pursue claims related to these insider trades.

[15] *See* Claimant Trust Agreement (Doc. 3521-5), Sec. 3.11.

[16] *Id.* at Sec. 4.2(a) and (b).

13. Creditors' committees frequently bring suit on behalf of bankruptcy estates. Yet, it is clear that any ***appropriately designated party*** also may bring derivative claims. *In re Reserve Prod., Inc.*, 232 B.R. 899, 902 (Bankr. E.D. Tex. 1999) (citations omitted); *see In re Enron Corp.*, 319 B.R. 128, 131 (Bankr. S.D. Tex. 2004). As this Court has held in *In Re Cooper*:

> In Chapter 11 [cases], there is both a textual basis . . . and, frequently, a non-textual, equitable rationale for granting a creditor or creditors committee derivative standing to pursue estate actions (*i.e.*, the equitable rationale coming into play when the debtor-in-possession has a conflict of interest in pursuing an action, such as in the situation of an insider-defendant).

*In re Cooper*, 405 B.R. 801, 803 (Bankr. N.D. Tex. 2009) (also noting that "[c]onflicts of interest are, of course, frequently encountered in Chapter 11, where the metaphor of the 'fox guarding the hen house' is often apropos"); *see also In re McConnell*, 122 B.R. 41, 43-44 (Bankr. S.D. Tex. 1989) ("[I]ndividual creditors can also act in lieu of the trustee or debtor-in-possession . . . ."). Here, the Proposed Defendants are the "*foxes guarding the hen house*," and their conflicts of interest abound.[17] Proceeding in a derivative capacity is necessary, if not critical.

[17] *See Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 987 (3d Cir. 1998) (settlement noteholders purchased Debtors' securities with "the benefit of non-public information acquired as a fiduciary" for the "dual purpose of making a profit and influenc[ing] the reorganization in [their] own self-interest."), *see also, Wolf v. Weinstein*, 372 U.S. 633, 642, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963) ("Access to inside information or strategic position in a corporate reorganization renders the temptation to profit by trading in the Debtor's stock particularly pernicious.").

14. The proposed Adversary Proceeding also sets forth claims that readily satisfy the Court's threshold standards requiring "colorable" claims, as well as the requirements for a derivative action. This Motion, which is supported by objective evidence contained in historical filings in the bankruptcy proceedings, also incorporates sworn declarations. At the very least, this additional evidence satisfies the Court's threshold requirements of willful misconduct and fraud set forth in the "gatekeeping" orders, as well as the injunction and exculpation provisions in the Plan.[18] This evidence also supports well-pleaded allegations exempted from the scope of the releases included in the Plan.

15. HMIT is an appropriate party to bring this action on behalf of the Reorganized Debtor and the Claimant Trust. If successful, the Adversary Proceeding will likely recover well over $100 million for the Claimant Trust, thereby enabling the Reorganized Debtor and Claimant Trust to pay off any remaining innocent creditors and make significant distributions to HMIT as a vested Claimant Trust Beneficiary.

16. As of December 31, 2022, the Claimant Trust had distributed 64.2% of the total $397,485,568 par value of all Class 8 and Class 9 unsecured creditor claims. The

[18] HMIT recognizes that it is an "Enjoined Party" under the Plan. The Plan requires a showing, *inter alia*, of bad faith, willful misconduct, or fraud against a "Protected Party." Seery is a "Protected Party" and an "Exculpated Party" in his capacity as an Independent Director. Muck and Jessup *may* be "Protected Parties" as members of the Oversight Committee, but they were not "protected" when they purchased the Claims before the Effective Date. While it is HMIT's position that Farallon and Stonehill do not qualify as "Protected Parties," they are included in this Motion in the interest of judicial economy.

Claims acquired by Muck and Jessup have an allowed par value of $365,000,000. Based on these numbers, the innocent unsecured creditors hold approximately $32 million in allowed claims.[19]

17. As of December 31, 2022, the Claimant Trust has distributed $255,201,228.[20] On a *pro rata* basis, that means that innocent creditors have received approximately $22,373,000 in distributions against the stated value of their allowed claims. That leaves a remaining unpaid balance of approximately $9,627,000.

18. Muck and Jessup already have received approximately $232.8 million on their Claims. Assuming and original investment of approximately $160 million, this represents over $72 million in ill-gotten profits that, if disgorged, would be far more than what is required to fully pay all other innocent creditors - immediately placing HMIT in the status of a vested Claimant Trust Beneficiary. The benefits to the Reorganized Debtor, the Claimant Trust and innocent stakeholders are undeniable.[21]

19. Seery and the Oversight Board should be estopped from challenging HMIT's status to bring this derivative action on behalf of the Claimant Trust. Seery, Muck and Jessup have committed fraud, acted in bad faith and have unclean hands, and they should not be allowed to undermine the proposed Adversary Proceeding - which seeks

[19] Doc. 3653.

[20] *Id.*

[21] Further, under the present circumstances and time constraints, this Motion should be granted to avoid the prospect of the loss of some of HMIT's and the Claimant Trust's claims and denial of due process.

to rectify significant wrongdoing. To hold otherwise would allow Seery, Muck, Jessup, Stonehill, and Farallon the opportunity to not just "guard the hen house," but to also open the door and take what they want.[22] HMIT seeks a declaratory judgment of its rights, accordingly.

## IV. The Proposed Defendants

20. Seery acted in several capacities during relevant times. He served as the Debtor's Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO"). He also served as member of the Debtor's Independent Board.[23] He currently serves as Claimant Trustee under the CTA and remains the CEO of the Reorganized Debtor.

21. There is no doubt Seery owed the Original Debtor's Estate, as well as equity, fiduciary duties, including the duty of loyalty and the duty to avoid conflicts of interest. *See In re Xtreme Power Inc.*, 563 B.R. 614, 632-33 (Bankr. W.D. Tex. 2016) (detailing fiduciary duties owed by corporate officers and directors under Delaware law); *Louisiana World*, 858 F.2d at 245-46 (detailing duties owed by debtors-in-possession).[24]

---

[22] "The doctrine of 'unclean hands' provides that "a litigant who engages in reprehensible conduct in relation to the matter in controversy ... forfeits his right to have the court hear his claim, regardless of its merit. [T]he purpose of the clean hands maxim is to protect the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims, regardless of their merit. As such it is not a matter of defense to be applied on behalf of a litigant; rather it is a rule of public policy." *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 80–81 (Del. Ch. 2008) (citations omitted) (internal quotations omitted for clarity).

[23] Seery is the beneficiary of the Court's "gatekeeping" orders and is an "exculpated" party in his capacity as an Independent Director. He is also a "Protected Party."

[24] The Internal Affairs Doctrine dictates choice of law. Here, the Debtor, Highland Capital Management, was organized under the law of Delaware. As much, Seery's fiduciary duties and claims involving breaches of those duties will be governed by Delaware law.

22. Farallon and Stonehill are capital management companies which manage hedge funds; they are also Seery's close business allies with a long history of business ventures and close affiliation. Although they were strangers to the Original Debtor's bankruptcy on the petition date, and were not original creditors, they became entangled in this bankruptcy at Seery's invitation and encouragement—and then knowingly participated in the wrongful insider trades at issue. By doing so, Seery was able to plant friendly allies onto the Oversight Board to rubber stamp compensation demands. The proposed Adversary Proceeding alleges that Farallon and Stonehill bargained to receive handsome pay days in exchange.

23. Muck and Jessup are special purpose entities, admittedly created by Farallon and Stonehill on the eve of the alleged insider trades, and they were used as vehicles to assume ownership of the purchased claims.[25] The record is clear that Muck and Jessup ***did not exist*** before confirmation of the Plan in February 2021.[26] Now, however, Muck and Jessup serve on the Oversight Board with immense powers under the CTA.[27] When they purchased the claims at issue, Muck and Jessup were ***not*** acting in their official capacities on the Oversight Committee and, therefore, they were not "Protected Persons" under the Plan.

[25] *See* Ex. 4-B, Rule 202 Transcript at 55:22-25.

[26] *See* McEntire Dec., Ex. 4, Ex. 4-D, Ex. 4-E. Muck was created on March 9, 2021 before the Effective Date. Jessup was created on April 8, 2021, before the Effective Date.

[27] *See* Doc. 3521-5, Sec. 4(a) and 4(b).

24. By trading on the alleged material non-public information, Farallon, Stonehill, Muck, and Jessup became non-statutory "insiders" with duties owed directly to HMIT at a time when HMIT was the largest equity holder.[28] *See S.E.C. v. Cuban*, 620 F.3d 551, 554 (5th Cir. 2010) ("The corporate insider is under a duty to 'disclose or abstain'—he must tell the shareholders of his knowledge and intention to trade or abstain from trading altogether."). In this context, there is no credible doubt that Farallon's and Stonehill's dealings with Seery were ***not*** arms-length. Again, Farallon and Stonehill were Seery's past business partners and close allies.[29] By virtue of the insider trades at issue, Farallon and Stonehill acquired control (acting through Muck and Jessup) over the Original Debtor and Reorganized Debtor through Seery's compensation agreement and awards, as well as supervisory powers over the Claimant Trust. This makes Farallon and Stonehill paradigm non-statutory insiders.

25. HMIT also seeks recovery against John Doe Defendant Nos. 1 through 10.[30] It is clear Farallon and Stonehill refuse to disclose the precise details of their legal

---

[28] Because of their "insider" status, this Court should closely scrutinize the transactions at issue.

[29] Farallon and Stonehill are two capital management firms (similar to HCM) with whom Seery has had substantial business relationships. Also, Seery previously served as legal counsel to Farallon. Seery also has a long-standing relationship with Stonehill. GCM Grosvenor, a global asset management firm, held four seats on the Redeemer Committee (an original member of the Unsecured Creditors Committee in HCM's bankruptcy). Upon information and belief, GCM Grosvenor is a significant investor in Stonehill and Farallon. GCM Grosvenor, through Redeemer, also played a large part in appointing Seery as a director of Strand Advisors and approved his appointment as HCM's CEO and CRO.

[30] Farallon and Stonehill consummated their trades concealing their actual involvement through Muck and Jessup as shell companies. Farallon's and Stonehill's identities were not discovered until much later after the fact.

relationships with Muck and Jessup. They resisted such discovery in the prior Rule 202 Proceedings in state district court.[31] They also refused to disclose such details in response to a prior inquiry to their counsel.[32] Furthermore, the corporate filings of both Muck and Farallon conspicuously omit the identity of their respective members or managing members.[33] Accordingly, HMIT intends to prosecute claims against John Doe Defendant Nos. 1 -- 10 seeking equitable tolling pending further discovery whether Farallon and Stonehill inserted intermediate corporate layers between themselves and the special purpose entities (Muck and Jessup) they created. *See In re ATP Oil & Gas Corp.*, No. 12-36187, 2017 WL 2123867, *4 (Bankr. S.D. Tex. May 16, 2017) (lsgur .J.); *see also In re IFS Fin. Corp.* No. 02-39553, 2010 WL 4614293, *3 (Bankr. S.D. Tex. No. 2, 2010) ("The identity of the party concealing the fraud is immaterial, the critical factor is whether any of the parties involved concealed property of the estate." "In either case, the trustee must demonstrate that despite exercising diligence, he could not have discovered the identity of the [unnamed] defendants prior to the expiration of the limitations period.") *ATP Oil,* 2017 WL 2123867 at *4. That burden is easily satisfied here.

---

[31] *See* McEntire Dec., Ex. 4.

[32] *See* McEntire Dec., Ex. 4, *see also*, Ex. 4-F.

[33] *See* Ex. 4-D, Ex. 4-E.

## V. Background

26. As part of this Court's Governance Order, an independent board of directors—which included Seery as one of the selections of the Unsecured Creditor's Committee—was appointed to the Board of Directors (the "Board") of Strand Advisors, Inc., ("Strand Advisors"), the Original Debtor's general partner. Following approval of the Governance Order, the Board then appointed Seery as the Original Debtor's CEO and CRO. [34] Following the Effective Date of the Plan, Seery now serves as Trustee of the Claimant Trust (the Reorganized Debtor's sole post-reorganization limited partner), and continues to serve as the Reorganized Debtor's CEO. [35]

27. Imbued with his powers as CEO and CRO, Seery negotiated and obtained bankruptcy court approval of several settlements prior to the Effective Date, resulting in the following approximate allowed claims (hereinafter "Claims"):[36]

| **Creditor** | **Class 8** | **Class 9** |
|---|---|---|
| Redeemer | $137 mm | $0 mm |
| Acis | $23 mm | $0 mm |
| HarbourVest | $45 mm | $35 mm |
| UBS | $65 mm | $60 mm |
| **(Totals)** | $270 mm | $95 mm |

[34] Doc. 854, Order Approving Retention of Seery as CEO/CRO.

[35] *See* Doc. 1943, Order Approving Plan, p. 34.

[36] Orders Approving Settlements [Doc. 1273, Doc. 1302, Doc. 1788, Doc. 2389].

Each of the settling parties curiously sold their Claims to Farallon or Stonehill (or their affiliated special purpose entities) shortly after they obtained court approval of their settlements. One of these "trades" occurred within just a few weeks before the Effective Date. Farallon and Stonehill coordinated and controlled the purchase of these Claims through Muck and Jessup, and they admitted in open court that Muck and Jessup were created to allow their purchase of the Claims.[37]

28. HMIT alleges that Seery filed (or caused to be filed) deflated, misleading projections regarding the value of the Debtor's Estate,[38] while inducing unsecured creditors to discount and sell their Claims to Farallon and Stonehill. But as reflected in the attached declarations, it is now known that Seery provided material, non-public information to Farallon. The circumstantial evidence is also clear that both Farallon and Stonehill had access to and used this non-public information in connection with their purchase decisions.

29. Farallon and Stonehill are registered investment advisors who have their own fiduciary duties to their investors, and they are acutely aware of what these duties entail. Yet, upon information and belief, they collectively invested over $160 million dollars to purchase the Claims in the absence of any publicly available information that

---

[37] *See* Ex. 4-B, Rule 202 Transcript at 55:22-25.

[38] The pessimistic projections were issued as part of the Plan Analysis on February 2, 2021. [Doc. 1875-1]. The Debtor projected 0% return on Class 9 claims and only 71.32% return on Class 8 Claims.

could rationally justify such investments. These "trades" become even more suspect because, at the time of confirmation, the Plan provided pessimistic projections advising stakeholders that the Claim holders would never receive full satisfaction:

- From October 2019, when the original Chapter 11 Petition was filed, to January 2021, just before the Plan was confirmed, the valuation of HCM's assets dropped over $200 million from $566 million to $328.3 million.[39]

- HCM's Disclosure Statement projected payment of 71.32% of Class 8 claims, and 0% of claims in Classes 9-11;[40]

    - This meant that Farallon and Stonehill invested more than $103 million in Claims ***when the publicly available information indicated they would receive $0 in return on their investment as Class 9 creditors and substantially less than par on their Class 8 Claims***.

- In HCM's Q3 2021 Post-Confirmation Report, HCM reported that the amount of Class 8 claims expected to be paid dropped even further from 71% *to 54%*;[41]

30. In the third financial quarter of 2021, just over $6 million of the projected $205 million available to satisfy general unsecured creditors was disbursed.[42] No additional distributions were made to the unsecured claimholders until, suddenly, in Q3 2022 almost $250 million was paid toward Class 8 general unsecured claims—**$45 million more than was *ever* projected**.[43]

---

[39] Doc. 1473, Disclosure Statement, p. 18.

[40] Doc. 1875-1, Plan Supplement, p. 4.

[41] Doc 2949.

[42] Doc 3200.

[43] Doc 3582.

31. According to Highland Capital's Motion for Exit Financing,[44] and a recent motion filed by Dugaboy Investment Trust,[45] there remain ***substantial*** assets to be monetized for the benefit of the Reorganized Debtor's creditors. Thus, upon information and belief, Stonehill and Farallon, stand to realize significant profits on their wrongful investments. In turn, Stonehill and Farallon will garner (and already have garnered) substantial fees – both base fees and performance fees – as the result of their acquiring and/or managing the Claims. Upon information and belief, HMIT also alleges that Seery has received excessive compensation and bonuses approved by Farallon (Muck) and Stonehill (Jessup) as members of the Oversight Board.

32. As evidenced in the supporting declarations (Exs. 2 and 3):

- Farallon admitted it conducted no due diligence and relied upon Seery in making its multi-million-dollar investment decisions at issue.[46]

- Farallon admitted it was unwilling to sell its stake in these Claims at any price because Seery assured Farallon that the Claims were tremendously valuable.[47]

- Farallon bragged about the value of its investment referencing non-public information regarding Amazon, Inc.'s ("Amazon") interest in acquiring Metro-Goldwyn-Mayer Studios Inc. ("MGM").[48]

---

[44] Doc 2229.

[45] Doc 3382.

[46] *See* Ex. 2, 2022 Dondero Declaration.

[47] *See* Ex. 2, 2022 Dondero Declaration, Ex. 3, 2023 Dondero Declaration.

[48] *See* Ex. 3, 2023 Dondero Declaration.

- Farallon was unwilling to sell its stake in the newly acquired Claims even though publicly available information suggested that Farallon would lose millions of dollars on its investment.[49]

Farallon can offer ***no credible explanation*** to explain its significant investment, and its refusal to sell at any price, ***except*** Farallon's access to material non-public information. In essence, Seery became the guarantor of Farallon's significant investment. Farallon admitted as much in its statements to James Dondero.

33. The same holds true for Stonehill. Given the negative, publicly available information, Stonehill's multi-million-dollar investments make no rational sense unless Stonehill had access to material non-public information.

34. Fed. R. Bank. P. 2015.3 requires debtors to "file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." However, no public reports required by Rule 2015.3 were filed. Seery testified they simply "fell through the cracks." [50]

35. Six days prior to the filing of the motion seeking approval of the HarbourVest Settlement, Seery acquired material non-public information regarding Amazon's interest in acquiring MGM.[51] Upon receipt of this material non-public

---

[49] *See* Ex. 3, 2023 Dondero Declaration, *see also* Doc. 1875-1.

[50] Doc. 1905, February 3, 2021, Hearing Transcript, 49:5-21.

[51] *See* Adversary No. 20-3190-sgj11, Doc. 150-1.

information, MGM should have been placed on the Original Debtor's "restricted list," but Seery continued to move forward with deals that involved MGM stock and notes.[52] Because the Original Debtor additionally held direct interests in MGM,[53] the value of MGM was of paramount importance to the value of the estate.

36. Armed with this and other insider information, Farallon—through Muck—proceeded to invest in the Claims and, acting through Muck, acceded to a powerful position on the Oversight Board to oversee future distributions to Muck and itself. It is no coincidence Seery invited his business allies into these bankruptcy proceedings with promises of great profits. Seery's allies now oversee his compensation.[54]

37. The Court also should be aware that the Texas States Securities Board ("TSSB") opened an investigation into the subject matter of the insider trades at issue, and this investigation has not been closed. The continuing nature of this investigation

---

[52] As part of the HarbourVest Settlement, Seery negotiated the purchase of HarbourVest's interest in HCLOF for approximately $22.5 million as part of the transaction. Approximately 19.1% of HCLOF's assets were comprised of debt and equity in MGM. The HCLOF interest was not to be transferred to the Debtor for distribution as part of the bankruptcy estate, but rather to "to an entity to be designated by the Debtor"—*i.e.*, one that was not subject to typical bankruptcy reporting requirements. Doc. 1625, p. 9, n. 5. Doc. 1625.

[53] *See* Doc. 2229, Motion for Exit Financing.

[54] Amazon closed on its acquisition of MGM in March 2022, but the evidence strongly suggests that agreements for the trades already had been reached - while announcement of the trades occurred strategically after the MGM news became public. Now, as a result of their wrongful conduct, Stonehill and Farallon profited significantly on their investments, and they stand to gain substantially more profits.

underscores HMIT's position that the claims described in the attached Adversary Proceeding are plausible and certainly far more than merely "colorable."

## VI. Argument

### A. *HMIT has asserted Colorable Claims against Seery, Stonehill, Farallon, Muck, and Jessup.*

38. Unlike the terms "Enjoined Party," "Protected Party," or "Exculpated Party," the Plan does not define what constitutes a "colorable" claim. Nor does the Bankruptcy Code define the term. However, relevant authorities suggest that a Rule 12(b)(6) standard is an appropriate analogue.

39. The Fifth Circuit has held that a "colorable" claim standard is met if a [movant], such as HMIT, has asserted claims for relief that, on appropriate proof, would allow a recovery. A court need not and should not conduct an evidentiary hearing but must ensure that the claims do not lack any merit whatsoever. *Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 248 (5th Cir. 1988). Stated differently, the Court need not be satisfied there is an evidentiary basis for the asserted claims but instead should allow the claims if they ***appear*** to have ***some*** merit.

40. Other federal appellate courts have reached similar conclusions. For example, the Eighth Circuit holds that "creditors' claims are colorable if they would survive a motion to dismiss." *In re Racing Services, Inc.*, 540 F.3d 892, 900 (8th Cir. 2008); *accord In Re Foster*, 516 B.R. 537, 542 (B.A.P. 8th Cir. 2014), aff'd 602 Fed. Appx. 356 (8th Cir. 2015) (*per curiam*). The Sixth Circuit has adopted a similar test requiring that the court

look ***only*** to the face of the complaint to determine if claims are colorable. *In re The Gibson Group, Inc*., 66 F.3d 1436, 1446 (6th Cir. 1995) (emphasis added).

41. Although there is a dearth of federal court authorities in Texas, other federal courts have adopted the same standard—*i.e.*, a claim is colorable if it is "plausible" and could survive a motion to dismiss. *See In re America's Hobby Center, Inc*., 223 B.R. 273, 282 (S.D.N.Y 1998). In addition, in the non-bankruptcy context, the District Court for the Northern District of Texas explained that "[t]he requirement of a 'colorable claim' means only that the plaintiff must have an '*arguable* claim' and not that the plaintiff must be able to succeed on that claim." *Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P*., 207 F. Supp. 2d 570, 577 (N.D. Tex. 2002) (Emphasis added).

42. Thus, in this instance, this Court's gatekeeping inquiry is properly limited to whether HMIT has stated a plausible claim on the face of the proposed pleadings involving "bad faith," "willful misconduct," or "fraud." Because the face of the Adversary Complaint alleges plausible facts, HMIT's Motion is properly granted. Clearly, the attached Adversary Proceeding would survive a Rule 12(b)(6) challenge. Furthermore, the supporting declarations and documentary evidence provide additional support, and the circumstantial evidence proves that Farallon and Stonehill, strangers to the bankruptcy on the petition date, would not have leaped into these proceedings without undisclosed assurances of profit.

*B. Fraud*

43. As set forth in the proposed Adversary Proceeding, HMIT alleges a colorable claim for fraud—both fraud by knowing misrepresentation and fraud by omission of material fact. Here, these allegations of fraud are appropriately governed by Texas law under appropriate choice of law principals.[55]

44. Seery had a duty to not provide material inside information to his business allies. But, he did so. At the latest, Seery became aware of the potential sale of MGM in December 2020 when he received an email from Jim Dondero.[56] Thus, Seery knew at that time that this potential sale would likely yield significant value to the Original Debtor's Estate. Yet, the financial disclosures associated with the Plan's confirmation, which were provided only a month later, presented an entirely different outlook for both Class 8 and Class 9 unsecured creditors.[57] Seery knew at that time that these pessimistic disclosures were misleading, if not inaccurate.

45. There is no credible doubt Seery intended that innocent stakeholders would rely upon the pessimistic projections set forth in the Plan Analysis. Indeed, the singular purpose of the Plan Analysis was to advise stakeholders. As such, HMIT alleges that Seery knowingly made misrepresentations with the intention that innocent stakeholders

---

[55] However, Delaware law is substantially similar on the elements of fraud. *See Malinals v. Kramer*, No. CIV.A. CPU 6-11002145, 2012 WL 174958, at 2 (Del. Com. PI. Jan. 5, 2012)

[56] *See*, Dondero 2022 Dec., Ex. 2-1.

[57] *See* Doc. 1875-1, Plan Analysis, February 1, 2021.

would rely, and that he failed to disclose material information concerning his entanglements with Farallon and Stonehill, as well as the related negotiations that were chock full of conflicts of interest.

46. On the flip side of this conspiracy coin, Farallon and Stonehill were engaged in negotiations to acquire the Claims at discounted prices; and, they successfully did so. HMIT alleges that their success was based on knowledge that the financial disclosures associated with the Plan Analysis were significantly understated. Otherwise, it would make no financial sense for Farallon and Stonehill to do the deals at issue. Indeed, Farallon admitted that it would not sell the Claims at any price, expressing great confidence in the substantial profits it expected even in the absence of any supporting, publicly available information.[58]

47. All of the Proposed Defendants had a duty of affirmative disclosure under these circumstances. Seery always had this duty. Muck, Jessup, Farallon, and Stonehill assumed this duty when they became non-statutory "insiders." Thus, all of the Proposed Defendants are liable for conspiring to perpetrate a fraud by omission of material facts.

48. HMIT also claims that Seery and the other Proposed Defendants failed to disclose material information concerning Seery's involvement in brokering the Claims in exchange for *quid pro quo* assurances of enhanced compensation. Seery's compensation

---

[58] Ex. 3, 2023 Dondero Declaration.

should be disgorged or, alternatively, such compensation constitutes a damage recoverable by the Reorganized Debtor and Claimant Trust as assignees (or transferees) of the Original Debtor's causes of action. This compensation was the product of the alleged self-dealing, breaches of fiduciary duty, and fraud.

***C. Breaches and Aiding and Abetting Breaches of Fiduciary Duties***

49. It is beyond dispute Seery owed fiduciary duties to the Estate. *See Xtreme Power*, 563 B.R. at 632-33 (detailing fiduciary duties owed by corporate officers and directors under Delaware law);[59] *Louisiana World*, 858 F.2d at 245-46 (5th Cir. 1988) (detailing duties owed by debtors-in-possession). Although Seery did not buy the Claims at issue, he stood to profit from these sales because his close business allies would do his bidding after they had acceded to positions of power and control on the Oversight Board. Muck and Jessup were essentially stepping into the shoes of three of the largest unsecured creditors who were already slated to serve on the Oversight Board. Thus, by acquiring their Claims, all of the Proposed Defendants knew that Muck and Jessup would occupy these powerful oversight positions after the Effective Date.

50. Thus, the alleged conspiracy was successfully implemented before the Effective Date. Farallon and Stonehill now occupy control positions through the shell

[59] The *Xtreme* case also notes that "several Delaware courts have recognized that 'directors who are corporate employees lack independence because of their substantial interest in retaining their employment." 563 B.R. at 633-34. Because Muck and Jessup are now in control of Seery's compensation, it follows that Seery is beholden to them, and Seery's disclosure of inside information to Stonehill and Farallon confirms his conflict of interest.

entities (Muck and Jessup) overseeing large compensation packages for Seery. Of course, this control (and the opportunity to control) presented a patent conflict of interest which Seery should have avoided, but instead knowingly created, fostered, and encouraged. HMIT alleges that Seery breached his duty to avoid this conflict or otherwise disclose this conflict and Farallon and Stonehill aided and abetted this breach.

51. The Original Debtor, as an investment adviser registered with the SEC, is also required to make public disclosures on its Form ADV, the uniform registration form for investment advisers required by the SEC. These Form ADV disclosures, which were in effect at the time of the insider trades at issue, explicitly forbade "any access person from trading either personally or on behalf of others . . . on material non-public information or communicating material non-public information to others in violation of the law or duty owed to another party."[60] It now appears these representations were false when made. Seery's alleged conduct also violated, at minimum, the duties Seery owed in his various capacities with the Original Debtor under the Form ADV disclosures.

52. Although initially strangers to the original bankruptcy, by accepting and using inside information, Farallon and Stonehill became "temporary insiders" and thus owed separate duties to the Estate. *See S.E.C. v. Cuban*, 620 F.3d 551 (5th Cir. 2010) ("[E]ven

---

[60] *See, e.g.*, https://files.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRCHR_VRSN_ID=777026.

an individual who does not qualify as a traditional insider may become a 'temporary insider' if by entering 'into a special confidential relationship in the conduct of the business of the enterprise [they] are given access to information solely for corporate purposes." *In re Washington Mut., Inc.*, 461 B.R. 200 (Bankr. D. Del. 2011), *vacated in part*, 08-12229 MFW, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) (finding that equity committee stated colorable claim for equitable disallowance against creditors who "became temporary insiders of the Debtors when the Debtors gave them confidential information and allowed them to participate in negotiations with JPMC for the shared goal of reaching a settlement that would form the basis of a consensual plan of reorganization"; vacated in part as a condition of settlement only);[61] *See also, In re Smith*, 415 B.R. 222, 232-33 (Bankr. N.D. Tex. 2009) ("[a]n insider is an entity or person with 'a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor.' 'Thus, the term "insider" is viewed to encompass two classes: (1) per se insiders as listed in the Code and (2) extra-statutory insiders that do not deal at arm's length.'" (citations omitted)). Farallon, Stonehill, Muck, and Jessup clearly fall into this latter category.

---

[61] Although the *Washington Mutual* case was subsequently vacated, the Court's intellectual reasoning remains valid because the vacatur was mandated by a mediated settlement, not because the court's logic was flawed or changed, and the court expressly noted that the parties' settlement was conditioned on vacatur. *See In re Washington Mut., Inc.*, No. 08-12229 MFW, 2012 WL 1563880, *8 (Bankr. D. Del. Feb. 24, 2012) ("grant[ing] partial vacatur . . . *in furtherance of the settlement embodied in the Plan*," and noting that "absent the requested vacatur, the collapse of the Plan could result in the termination of the Global Settlement Agreement." (emphasis added)).

53. Because Farallon and Stonehill (acting through Muck and Jessup) now hold the majority of the seats on the Oversight Board, they, along with Seery, exercise control of the reorganization proceedings. At no time were Farallon, Stonehill, or Seery's plans disclosed to the other creditors or equity. In fact, the only inference that can be reasonably drawn is that Farallon and Stonehill brazenly sought to conceal their involvement by establishing shell entities—Muck and Jessup—to nominally hold the Claims and create an opaque barrier to any effort to identify the "*Oz behind the curtain*." Such conduct aligns precisely with the inequitable conduct detailed in *Citicorp* and *Adelphia* (discussed below).

54. In sum, the proposed Adversary Proceeding sets forth plausible allegations that Stonehill and Farallon were aware of Seery's fiduciary duties. Indeed, as registered investment advisors, both Farallon and Stonehill were acutely aware of Seery's fiduciary obligations, including, without limitation, the duty to act in the best interests of the Original Debtor's Estate and the duty not to engage in insider trading that would benefit Seery, as an insider, and themselves, as non-statutory insiders. By accepting and then acting on material non-public information, Farallon and Stonehill (as well as Muck and Jessup) aided and abetted breaches of these fiduciary duties. By placing themselves in positions to control Seery's compensation, Farallon and Stonehill (acting through Muck and Jessup) induced, encouraged, aided and abetted Seery's self-dealing.

*D. Equitable Disallowance is an Appropriate Remedy*

55. HMIT also seeks equitable disallowance. Although the Fifth Circuit in *Matter of Mobile Steel Co.* generally limited the court's equitable powers to subordination rather than disallowance,[62] the Fifth Circuit **did *not* foreclose** the viability of equitable disallowance as a potential remedy. *See* 563 F.2d 692, 699 n. 10 (5th Cir. 1977). Binding U.S. Supreme Court precedent in *Pepper v. Litton* also permits bankruptcy courts to fashion disallowance remedies. 308 U.S. 295, 304-11 (1939). Bankruptcy Code § 510, which supplies the authority for equitable subordination, was "intended to codify case law, such as *Pepper v. Litton . . . and is not intended to limit the court's power in any way…. Nor does [it] preclude a bankruptcy court from completely disallowing a claim in appropriate circumstances*." *In re Adelphia Commun. Corp.*, 365 B.R. 24, 71-72 (Bankr. S.D.N.Y. 2007), *aff'd in part sub nom. Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *adhered to on reconsideration*, 05 CIV. 9050 (LMM), 2008 WL 1959542 (S.D.N.Y. May 5, 2008) (emphasis and omissions in original).[63]

56. The Fifth Circuit's decision in *Mobile Steel* also was premised on the notion that disallowance would not add to the quiver of defenses to fight unfairness because

[62] Equitable subordination is an inadequate remedy in this instance.

[63] In *Washington Mutual,* the Court's intellectual reasoning when imposing disallowance is instructive. *See In re Washington Mut., Inc.*, No. 08-12229 MFW, 2012 WL 1563880, *8 (Bankr. D. Del. Feb. 24, 2012) ("grant[ing] partial vacatur . . . *in furtherance of the settlement embodied in the Plan*," and noting that "absent the requested vacatur, the collapse of the Plan could result in the termination of the Global Settlement Agreement." (emphasis added)).

creditors "are fully protected by subordination" and "[i]f the misconduct directed against the bankrupt is so extreme that disallowance might appear to be warranted, then *surely* the claim is either invalid or the bankrupt possesses a clear defense against it." *Mobile Steel*, 563 F.2d at 699 n. 10 (emphasis added). Importantly, however, the factual scenarios considered in *Mobile Steel* do not exist here.

57. Here, Muck and Jessup purchased both Class 8 and Class 9 Claims, and they now effectively occupy more than 90% of the entire field of unsecured creditors in these two claimant tiers. Thus, subordination cannot effectively address the current facts where the Original Debtor's CEO and CRO conspired directly with close business allies who acquired the largest unsecured claims to the detriment of other innocent creditors and *former equity*. The reasoning in published cases from other circuits supports this conclusion. *See Adelphia*, 365 B.R. at 71-73; *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 n. 7 (3d Cir. 1998).

58. The purpose of equitable subordination is to assure that the wrongdoer does not profit from bad conduct. In the typical case, subordination to other creditors will achieve this deterrence. But, it is clear that the Third Circuit's decision in *Citicorp* was structured to use subordination as just one tool in a larger tool box to make sure "at a minimum, the remedy here should deprive – [the fiduciary] of its profit on the purchase of the notes." *Id* at 991. In *Adelphia*, the Southern District of New York also used equitable

subordination as a remedy to address wrongs of non-insiders who aided and abetted breaches a fiduciary duty by the debtor's management. 365 B.R. at 32.

59. But subordination cannot adequately address the wrongful conduct at issue. This is because subordination is typically limited to instances where one creditor is subordinated to other creditors, not equity. Here, for all practical purposes, there are only a few other unsecured creditors with relatively small stakes. Therefore, subordination as a weapon of deterrence is neutered.

60. In sum, by engaging in the alleged wrongful acts, including aiding and abetting Seery's breaches of fiduciary duty, Farallon, Stonehill, Muck, and Jessup should not be rewarded. The Proposed Defendants engaged in alleged conduct which damaged the Original Debtor's estate, including improper agreements to compensate Seery under the terms of the CTA. Equitable disallowance is an appropriate remedy which, when combined with disgorgement of all ill-gotten profits, will deprive the Proposed Defendants of their ill-gotten gains.

*E. Disgorgement and Unjust Enrichment*

61. The law is clear that disgorgement is an available remedy for breach of fiduciary duty both under Texas Law, see *Kinzbach Tool Co. v. Corbett-Wallace Corporation*, 160 S.W. 2d 509 (Tex. 1942), and under Delaware law, see *Metro Storage International, LLC v. Harron*, 275 A.3d 810 (Del. Ch. 2022). Disgorgement is also an appropriate remedy for unjust enrichment under Texas law, *Hunter v. Shell Oil Co.*, 198 F.2d 485 (5th Cir. 1952),

and under Delaware law, *In re Tyson Foods, Inc. Consolidated Shareholder Litigation*, 919 A.2d 563 (Del. Ch. 2007).[64]

62. Likewise, the imposition of a constructive trust is proper for addressing unjust enrichment under both Delaware and Texas law, see *Teacher's Retirement System of Louisiana v. Aidinoff*, 900 A.2d 654 (Del. Ch. 2006) and *Hsin-Chi-Su v. Vantage Drilling Company*, 474 S.W. 3d 384 (Tex. App. – 14th Dist. 2015), pet. denied. The elements of unjust enrichment are: (1) the defendant must have gained a benefit (2) at the expense of plaintiff, (3) and retention of that benefit must be shown to be unjust. *See Restatement (Third) of Restitution and Unjust Enrichment* §321, cmt. e (2011).

63. Here, the imposition of a constructive trust and disgorgement are clearly appropriate to provide redress for the alleged breaches of fiduciary duty and the knowing participation in (or aiding and abetting) those breaches. Furthermore, the imposition of a constructive trust and disgorgement are appropriate to disgorge the improper benefits that all of the Proposed Defendants received by virtue of collusion and insider trading.

64. As set forth in the proposed Adversary Proceeding, Seery gained the opportunity to have his compensation demands rubber stamped. The other Defendants gained the opportunity to purchase valuable claims at a discount knowing that

[64] It is likely that the Internal Affairs Doctrine will dictate that Delaware choice of law governs the breach of fiduciary duty claims.

pessimistic financial projections were false and that the upside investment potential was great. Retention of the benefits they received would be unjust and inequitable.

65. Clearly, the Debtor's Estate was damaged by virtue of the claimed conduct. Seery obtained profits and compensation to the detriment of that estate as well as the estate of the Reorganized Debtor, other innocent creditors and HMIT, as former equity and as a contingent Claimant Trust Beneficiary.

***F. Declaratory Relief***

66. HMIT also seeks declaratory relief pursuant to Fed. R. Bank P. 7001(9). Specifically, HMIT seeks a declaratory judgment that: (a) there is a ripe controversy concerning HMIT's rights and entitlements under the Claimant Trust Agreement; (b) as a general matter, HMIT has standing to bring an action against a trustee even if its interest is considered "contingent;" (c) HMIT's status as a Claimant Trust Beneficiary is fully vested upon disgorgement of the ill-gotten profits of Muck and Jessup, and by extension, Farallon and Stonehill; (d) HMIT's status as a Claimant Trust Beneficiary is fully vested upon the equitable disallowance of the Claims held by Muck and Jessup over and above their initial investments; (e) Seery is properly estopped from asserting that HMIT is not an appropriate party to bring this derivative action on behalf of the Reorganized Debtor and/or the Claimant Trust because of fraudulent conduct, bad faith, willful misconduct, and unclean hands; (f) Muck and Jessup are properly estopped from asserting that HMIT is not an appropriate party to bring this derivative action on behalf of the Reorganized

Debtor and the Claimant Trust because of their fraudulent conduct, bad faith, willful misconduct, and unclean hands; and (g) all of the Proposed Defendants are estopped from asserting that HMIT does not have standing in its individual capacity due to their fraudulent conduct, bad faith, willful misconduct, and unclean hands.

***G. HMIT has Direct Standing.***

67. The Texas Supreme Court recently held that "a partner or other stakeholder in a business organization has constitutional standing to sue for an alleged loss in the value of its interest in the organization." *Pike v. Texas EMC Mgt., LLC*, 610 S.W.3d 763, 778 (Tex. 2020). In so holding, the Court considered federal law and found that the traditional "incantation that a shareholder may not sue for the corporation's injury" is really a question of capacity, which goes to the merits of a claim, rather than an issue of standing that would impact subject matter jurisdiction. *Id.* at 777 (noting that the 5th Circuit and "[o]ther federal circuits agree that a plaintiff has standing to sue for the lost value of its investment in a corporation"). Because Seery, Muck, Jessup, Stonehill, Farallon's alleged actions devalued HMIT's interest in the Debtor's Estate, including, without limitation, payment of excessive compensation to Seery, HMIT has standing to pursue its common law claims directly. HMIT also has direct standing to seek declaratory relief as set forth in the proposed Adversary Proceeding.

## VII. Prayer

WHEREFORE, PREMISES CONSIDERED, Hunter Mountain Investment Trust respectfully requests this Court grant HMIT leave authorizing it to file the Adversary Complaint, attached as Exhibit 1, as an Adversary Proceeding in this United States Bankruptcy Court for the Northern District of Texas, in its own name and as a derivative action on behalf of the Debtor Highland Capital Management, L.P., against Muck Holdings, LLC, Jessup Holdings, LLC, Farallon Capital Management, LLC, Stonehill Capital Management, LLC, James P. Seery, Jr., and John Doe Defendants Nos. 1 – 10, and further grant HMIT all such other and further relief to which HMIT may be justly entitled.

Dated: March 28, 2023

Respectfully Submitted,
**PARSONS MCENTIRE MCCLEARY PLLC**

By: *<u>/s/ Sawnie A. McEntire</u>*
Sawnie A. McEntire
Texas State Bar No. 13590100
smcentire@pmmlaw.com
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
Telephone: (214) 237-4300
Facsimile: (214) 237-4340

Roger L. McCleary
Texas State Bar No. 13393700
rmccleary@pmmlaw.com
One Riverway, Suite 1800
Houston, Texas 77056

Telephone: (713) 960-7315
Facsimile: (713) 960-7347

***Attorneys for Hunter Mountain Investment Trust***

**CERTIFICATE OF CONFERENCE**

Beginning on March 24, 2023, and also on March 27, 2023, the undersigned counsel conferred either by telephone or via email with all counsel for all Respondents regarding the relief requested in the foregoing Motion, including John A. Morris on behalf of James P. Seery, and Brent McIlwain on behalf of Muck Holdings LLC, Jessup Holdings LLC, Stonehill Capital Management, and Farallon Capital Management. Mr. Seery is opposed to this Motion. Based upon all communications with Mr. McIlwain, it is reasonably believed his clients are also opposed and we advised him that this recitation would be placed in the certificate of conference.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

**CERTIFICATE OF SERVICE**

I certify that on the 28th day of March 2023, a true and correct copy of the foregoing Motion was served on all counsel of record or, as appropriate, on the Respondents directly.

*/s/ Sawnie A. McEntire*
Sawnie A. McEntire

# Exhibit 11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| HUNTER MOUNTAIN INVESTMENT TRUST, et al. | § | |
| Appellant, | § | Civil Action No. 3:23-CV-02834-E |
| v. | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., et al. | § | |
| Appellees | § | |

**ORDER**

Before the Court is Appellant Hunter Mountain Investment Trusts' appeal of bankruptcy court orders related to the denial of the Emergency Motion for Leave to File Verified Adversary Proceeding. The Appellee parties, consisting of the Purchaser-Appellees and the Highland-Appellees, move to dismiss the appeal, arguing that Appellant lacks standing. After this appeal was filed, the Fifth Circuit issued its opinion in *Matter of Highland Cap. Mgmt., L.P.*, (hereinafter "*Highland II")* which instructs the bankruptcy court to amend the contents of the Gatekeeper Provision—the provision this appeal is premised upon. No. 23-10534, 2025 WL 841189 (5th Cir. Mar. 18, 2025) Accordingly, this Court *sua sponte* **REMANDS** this appeal to the bankruptcy court for review in light of the Fifth Circuit's opinion.

## I. BACKGROUND

This bankruptcy appeal is part of the ongoing Chapter 11 bankruptcy case of Highland Capital Management, L.P. (ECF No. 1-1 at 7). The instant appeal arises from the bankruptcy court's denial of the Emergency Motion for Leave to File Verified Adversary Proceeding, (hereinafter the "Motion"), filed by Appellant Hunter Management Investment Trust, (hereinafter "HMIT"), a

former equity owner of Highland Capital Management, L.P. (ECF No. 1-1 at 7). Highland's reorganization plan, (hereinafter, the "Plan"), was confirmed by the bankruptcy court in 2021 and, as such, the Motion was filed as a post-confirmation dispute (ECF No. 1-1 at 7). The 2021 Plan included a Gatekeeper Provision, prohibiting enjoined parties from taking specific actions against protected parties, stating:

> [N]o Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing with the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party[.]

*Highland II*, 2025 WL 841189 at *2. Thus, pursuant to the above Gatekeeper Provision, HMIT sought leave from the bankruptcy court before filing their adversary proceeding. After motion briefing and a hearing, the bankruptcy court denied HMIT's Motion for three independent reasons:

> (1) HMIT would lack constitutional standing to bring the Proposed Claims (and, thus, the federal courts would lack subject matter jurisdiction over the Proposed Claims); (2) even if HMIT would have constitutional standing to pursue the Proposed Claims, it would lack prudential standing to bring the Proposed Claims; and (3) even if HMIT would have both constitutional standing and prudential standing to bring the Proposed Claims, it has not met its burden under the Gatekeeper Colorability Test of showing that the proposed claims are "colorable claims"—that the Proposed Claims are not without foundation, not without merit, and not being pursued for an improper purpose.

(ECF No. 1-1 at 109). Appellant HMIT timely appealed. (ECF No. 1). Briefing was completed by the parties and a notice of supplemental authority was filed. (ECF Nos. 29; 34; 35; 38; 39).

Subsequently, on March 18, 2025, the Fifth Circuit issued its opinion addressing the underlying Gatekeeper Provision relevant to this case. *See generally Matter of Highland Cap. Mgmt., L.P.*, 2025 WL 841189.

## II. INTERVENING FIFTH CIRCUIT AUTHORITY

The March 18, 2025, opinion, *Highland II,* is the second direct appeal to the Fifth Circuit Court of Appeals regarding the Plan's Exculpation and Gatekeeping Clauses. *Matter of Highland Cap. Mgmt., L.P.*, 2025 WL 841189. In the first case, *Matter of Highland Cap. Mgmt., L.P.,* (hereinafter "*Highland I")*, several parties associated with James Dondero, the former co-founder of Highland Capital Management, as well as the United States Trustee, objected to the Plan as put forth by the unsecured creditors' committee and the independent directors on the grounds that, amongst other things, the provisions constituted an impermissible nonconsensual release of non-debtors' claims against other non-debtors. 48 F.4th 415, 427-429 (5th Cir. 2022). In *Highland I*, the Fifth Circuit reversed the bankruptcy court "only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), str[uck] those few parties from the plan's exculpation, and affirm[ed] on all remaining grounds." *Matter of Highland Cap. Mgmt., L.P.*, 2025 WL 841189 at 3. Following *Highland I*, the bankruptcy court amended only the definition of the term "Exculpated Parties" in the Exculpation Clause but declined to change the definition of "Protected Parties" used in the Gatekeeper Clause. *Matter of Highland Cap. Mgmt., L.P.*, 2025 WL 841189 at 3.

The *Highland II* appeal followed with Appellants arguing that the bankruptcy court erred in failing to narrow the definition of "Protected Parties" used in the Gatekeeper Clause to mirror its narrowing of the "Exculpated Parties" in the Exculpation Clause. *Matter of Higland Cap. Mgmt., L.P.*, 2025 WL 841189 at 4. In its March 28, 2025, opinion, the Fifth Circuit held that the

Gatekeeper Clause included in the Plan had not been properly amended by the bankruptcy court and, as such, remanded the case. *Matter of Highland Cap. Mgmt., L.P.*, 2025 WL 841189 at 4. Specifically, the Fifth Circuit instructed the bankruptcy court as follows,

> As it must, *Highland I* obeys these bedrock principles concerning bankruptcy courts' power to protect non-debtors. Consequently, the proper reading of *Highland I* is to require the bankruptcy court to narrow the definition of "Protected Parties" used in the Gatekeeper Clause coextensively with the definition of "Exculpated Parties" used in the Exculpation Provision, to read simply: "collectively, (i) the Debtor; (ii) the Independent Directors, for conduct within the scope of their duties; (iii) the Committee; and (iv) the members of the Committee in their official capacities, for conduct within the scope of their duties." Both (1) the opinion's plain language and (2) the change made to the opinion on rehearing elucidate this holding.

*Matter of Highland Cap. Mgmt., L.P.*, 2025 WL 841189 at 4.

In the instant appeal before this Court, HMIT was required to seek leave of court prior to filing their adversarial proceeding. In denying its' Motion, the bankruptcy court held that under the Gatekeeper Clause, as it existed at the time, that HMIT lacked standing to bring the adversarial proceeding. (*see generally* ECF No. 1-1). As remanded, the bankruptcy court has not had an opportunity to address the jurisdictional issues on appeal—in light of the remanded instruction. Consequently, the Court *sua sponte* remands this appeal to the bankruptcy court to permit its review of this issue. The Court takes no position as to whether the bankruptcy court erred in its jurisdictional determination.

(*this space left intentionally blank*)

## III. CONCLUSION

Accordingly, the Court **REMANDS** this appeal to the bankruptcy court for consideration in light of the Fifth Circuit's recent opinion.

**SO ORDERED:** this 21st day of March, 2025.

Ada Brown
UNITED STATES DISTRICT JUDGE

# Exhibit 12

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
Susheel Kirpalani (admitted *pro hac vice*)
Deborah J. Newman (admitted *pro hac vice*)
Robert Loigman (*pro hac vice* pending)
Benjamin I. Finestone (admitted *pro hac vice*)
Jordan Harap (admitted *pro hac vice*)
Alexandre J. Tschumi (*pro hac vice* pending)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

**SIDLEY AUSTIN LLP**
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as Litigation Trustee of the Highland Litigation Sub-Trust*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |
| MARC S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST,<br><br>Plaintiff,<br><br>v.<br><br>JAMES D. DONDERO; MARK A. OKADA; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; FRANK WATERHOUSE; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1 AND LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; MARK & PAMELA | Adv. Pro. No. _________<br><br>COMPLAINT AND OBJECTION TO CLAIMS |

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are (8357). The Reorganized Debtor is a Delaware limited partnership. The Reorganized Debtor's headquarters and service address are 100 Crescent Court, Suite 1850, Dallas, TX 75201.

OKADA FAMILY TRUST – EXEMPT TRUST #2 AND LAWRENCE TONOMURA IN HIS CAPACITY AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2; CLO HOLDCO, LTD.; CHARITABLE DAF HOLDCO, LTD.; CHARITABLE DAF FUND, LP.; HIGHLAND DALLAS FOUNDATION; RAND PE FUND I, LP, SERIES 1; MASSAND CAPITAL, LLC; MASSAND CAPITAL, INC.; SAS ASSET RECOVERY, LTD.; AND CPCM, LLC,

Defendants.

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....................1

II. PARTIES ....................4

III. JURISDICTION AND VENUE ....................12

IV. FACTUAL ALLEGATIONS ....................13

A. Dondero Creates HCMLP ....................13

B. HCMLP Narrowly Survives The Financial Crisis Of 2008, And Emerges Facing Hundreds Of Millions Of Dollars In Potential Litigation Damages ....................14

C. In A Scheme To Evade HCMLP's Creditors, Dondero Creates "Lifeboats" To Usurp HCMLP's Business ....................17

1. NexPoint ....................18

2. HCMFA ....................21

D. Dondero Causes HCMLP To Engage In Misconduct That Exposes It To Additional Liability ....................24

1. Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry ....................24

2. Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest ....................27

3. Dondero And His Accomplices Cause HCMLP To Engage In Misconduct That Increases Its Liability To UBS ....................29

4. Dondero Causes HCMLP To Engage In Misconduct That Results In Liability To HERA And Patrick Daugherty ....................30

E. Dondero Causes HCMLP To Engage In Conduct That Results In An Arbitration Award Against It Of Approximately $190 Million And Forces HCMLP Into Bankruptcy ....................32

F. Dondero's Schemes Result In Hundreds Of Millions Of Dollars Of Liability For HCMLP ....................35

1. HCMLP Incurs $125 Million In Liability To UBS As A Result Of Dondero's, Leventon's, and Ellington's Misconduct ....................35

2. HCMLP Incurs More Than $185 Million In Liability To The Redeemer Committee And Crusader Funds As A Result Of Dondero's Misconduct ....................37

3. HCMLP Incurs More Than $100 Million In Liability To Acis, Terry, And HarbourVest As A Result Of Dondero's Misconduct ....................38

G. HCMLP Was Insolvent, Inadequately Capitalized, And/Or Intended To Incur Debts Beyond Its Ability To Pay Well Before The Redeemer Committee Arbitration Award Forced It Into Bankruptcy ....40

H. At All Time Relevant To This Complaint, Dondero Hopelessly Commingled And Exploited Entities Within His Enterprise For His Own Personal Benefit ....41

1. Prior To Dondero's Resignation From Strand, Dondero Was The Alter Ego Of Strand ....41

2. Dondero Routinely Commingled Entities And Employees Throughout The Dondero Corporate Web And Abused The Corporate Form ....42

I. Dondero And His Loyalists Also Engaged In Other Conduct That Harmed HCMLP ....49

1. Dondero And His Loyalists Fraudulently Transferred Assets To Themselves And Their Affiliated Entities ....49

(a) The Fraudulent CLO Holdco Transaction ....50

(b) Fraudulent Distributions ....53

(c) Fraudulent Transfers To Massand ....59

J. Dondero And Ellington Breach Their Fiduciary Duties To HCMLP By Misappropriating Its Funds ....60

K. Dondero Loyalists Receive Their Deferred Compensation By Engaging In The Tall Pine Transaction ....61

V. CAUSES OF ACTION ....62

PRAYER FOR RELIEF ....129

Plaintiff Marc S. Kirschner (the "Litigation Trustee"), as Litigation Trustee of the Litigation Sub-Trust (the "Trust") established pursuant to the Fifth Amended Plan of Reorganization (the "Plan") of Highland Capital Management L.P. ("HCMLP" or the "Reorganized Debtor") (Docket No. 1472), through his undersigned counsel, brings this action and alleges as follows:

## I. INTRODUCTION[2]

1. The Litigation Trustee brings this action to recover hundreds of millions of dollars in damages that HCMLP suffered at the hands of its founder, James Dondero, acting in concert with other entities that he owned and/or controlled (collectively, the "Dondero Entities"), and with the aid of other HCMLP officers and attorneys who disregarded their fiduciary duties to HCMLP in favor of Dondero and their own self-interests.

2. HCMLP was founded in 1993 as an investment advisor that also provided middle- and back-office services and engaged in proprietary trading. Prior to its bankruptcy filing on October 16, 2019, HCMLP was one of more than 2,000 Dondero Entities. The Dondero Entities were operated and controlled for Dondero's benefit, with Dondero utilizing complex corporate structures and transactions to transfer money and assets between the various Dondero Entities in the manner he viewed most advantageous to his own bottom line, including to avoid creditors, exploit personal tax benefits, and ensure that assets were preserved for his benefit and profits ultimately flowed to him.

3. HCMLP was at the center of Dondero's web: it employed nearly all of the people who performed services for myriad Dondero Entities, and it was those employees who carried out the substantive work for the Dondero Entities. Even when HCMLP's full role was

[2] Capitalized terms not defined in this section are defined later in the Complaint.

hidden—either because it was not credited at all, or because it was identified only as a sub-advisor or service provider to Dondero's other management companies—it was HCMLP personnel executing Dondero's strategies for a wide array of Dondero Entities.

4. In or about 2008, after years of successful operations, HCMLP was hit hard by the economic recession. The recession gave rise to a multitude of lawsuits against HCMLP, and it became embroiled in litigations that threatened to impose crippling damages amounting to hundreds of millions of dollars.

5. Faced with this looming threat, Dondero devised a plan to siphon business away from HCMLP through the creation of "lifeboats" that he owned and controlled, which he sought to insulate from the claims of HCMLP's litigation creditors once they crystalized. The lifeboats were set up to provide the management services that HCMLP had been providing before the lifeboats' creation. The lifeboats were really HCMLP in disguise, however, as they conducted their business through HCMLP's employees, operated out of HCMLP's office, and in several cases, simply took over HCMLP's contracts, diverting the resulting fees away from HCMLP while HCMLP continued to provide the underlying services. The lifeboats collected the lion's share of the profits for HCMLP's work, while HCMLP bore the majority of expenses.

6. In the years that followed, Dondero—acting with the aid of certain HCMLP officers and employees—operated HCMLP to further his own personal interests, to HCMLP's detriment. Among other transgressions, Dondero, standing behind HCMLP's perceived corporate shield:

- Caused HCMLP to pay tens of millions of dollars to or for the benefit of Dondero and his affiliates in order to evade creditors, at a time when HCMLP was insolvent, inadequately capitalized, or intended to incur debts beyond its ability to pay;

- Caused HCMLP to transfer assets to other Dondero Entities for less than reasonably equivalent value at a time when HCMLP was insolvent, inadequately capitalized, or intended to incur debts beyond its ability to pay, in order to deprive creditors of the value of the transferred assets;

- Exploited HCMLP to exact vendettas on employees he perceived as disloyal, going so far as to destroy value at HCMLP and other Dondero Entities solely to inflict losses on his perceived enemies;

- Used HCMLP as a vehicle to fraudulently induce an investment of approximately $75 million into another Dondero Entity, and used the proceeds to support yet other Dondero Entities;

- Caused the fraudulent transfer of assets worth at least $100 million out of two HCMLP-managed funds to evade pending litigation claims asserted by UBS;

- Disregarded HCMLP's contractual and fiduciary obligations to investors in certain of HCMLP liquidating funds; and

- Siphoned funds out of HCMLP for use by other Dondero Entities, in exchange for artificially low interest, long-term notes that Dondero later purported to extend (by 30 years) or retroactively forgive, all for no consideration to HCMLP.

7. Dondero's conduct resulted in a second wave of litigation against HCMLP, exacerbating HCMLP's insolvency, inadequate capitalization, and inability to pay its debts. As was wholly foreseeable, Dondero's conduct hobbled HCMLP with hundreds of millions of dollars of additional contingent litigation liabilities that were all but certain to come due given Dondero's brazen wrongdoing.

8. In October 2019, the dam broke, and the repercussions of Dondero's actions came crashing down on HCMLP. An arbitration award of approximately $190 million was issued against HCMLP based on Dondero's failure to abide by a negotiated plan of distribution for certain of its liquidating funds, forcing HCMLP to file for bankruptcy protection. Shortly thereafter, a judgment of more than $1 billion was rendered for UBS against two HCMLP-managed funds, leading UBS to file a proof of claim against HCMLP that sought to hold

HCMLP responsible for its role in preventing the Fund Counterparties (defined below) from satisfying any of their debt to UBS.

9. In 2020, HCMLP, finally operating under the control of true and independent fiduciaries, negotiated a settlement with UBS for a total of $75 million in allowed claims. HCMLP was forced to reopen settlement discussions and increase that number to $125 million, however, when HCMLP discovered that in 2017, Dondero and his loyalists had surreptitiously transferred the two funds' remaining assets to a Dondero Entity. Other settlements followed, as HCMLP, burdened by Dondero's blatant wrongdoing, was forced to compromise claim after claim in order to avoid even greater dilution of creditor recoveries.

10. HCMLP now stands liable for more than $350 million in allowed creditor claims—in addition to tens of millions of dollars of costs occasioned by HCMLP's bankruptcy filing—that stem solely from, and would not exist but for, the knowing misconduct of Dondero and his loyalists. The Litigation Trustee thus brings this action to seek redress for the significant harm Dondero and his affiliates and accomplices inflicted on HCMLP, and to ensure that Dondero and those who aided him are not permitted to abscond with or divert value that rightfully belongs to HCMLP and its creditors.

## II. PARTIES

11. Plaintiff Marc S. Kirschner is the Litigation Trustee for the Trust established under HCMLP's Plan. Under the Plan, the Trust was established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims, which are defined to include "any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of [HCMLP], and each of the Related Entities, including any promissory notes held by any of the foregoing [excluding] any estate claim or cause of action against any then-current employee of [HCMLP] other than Mr. Dondero." On October 8, 2021, the Claimant

Trust established under the Plan confirmed the assignment of certain Causes of Action (as defined in the Plan) to the Trust, including all claims set forth in this Complaint.

12. Defendant James D. Dondero is an individual who, upon information and belief, at all times relevant to this Complaint was residing in Dallas, Texas. Dondero is the co-founder of HCMLP and, prior to his resignation on January 9, 2020, was the Chief Executive Officer and President of HCMLP. From the time that HCMLP was founded through October 16, 2019 when it filed for bankruptcy (the "Petition Date"), Dondero controlled HCMLP through his position at HCMLP, his ownership of HCMLP's general partner, and his ownership of, or control over the owners of, HCMLP's limited partnership interests. As set forth below, Dondero also owns and/or directly or indirectly controls hundreds of Dondero Entities within the Highland web, including the dozens of Dondero Entities referenced herein.

13. Defendant Mark A. Okada is an individual who, upon information and belief, at all times relevant to this Complaint was residing in Dallas, Texas. Okada is the co-founder of HCMLP and was its Chief Investment Officer until he stepped down in 2019, after which he assumed an advisory role through the end of that year. After Dondero, Okada was the next-largest owner of HCMLP or a beneficiary of the distributions it made to its limited partners. Like Dondero, Okada held his interest in HCMLP directly and through trusts.

14. Defendant Strand Advisors, Inc. ("Strand") is a Delaware corporation that is wholly-owned by Dondero. Since HCMLP's formation, Strand has been its general partner and owned limited partnership interests in HCMLP. At all times relevant to this Complaint, Strand's principal place of business was 300 Crescent Street, Suite 700, Dallas, Texas 75201.

15. Defendant NexPoint Advisors, L.P. ("NexPoint") is a Delaware limited partnership. NexPoint is 99.9% owned by the Dugaboy Investment Trust, its sole limited

partner. NexPoint's general partner, NexPoint Advisors GP, LLC ("NexPoint GP"), owns the remaining 0.1%. NexPoint and NexPoint GP were both formed on March 20, 2012. NexPoint concedes that it is controlled by Dondero, who owns 100% of NexPoint GP and is NexPoint GP's sole member and president. At all times relevant to this Complaint, NexPoint's principal place of business was 300 Crescent Street, Suite 700, Dallas, Texas 75201.

16. Defendant Nancy Dondero is named in her capacity as Trustee of Defendant Dugaboy Investment Trust ("Dugaboy"). Dugaboy is a grantor trust established under the laws of the state of Delaware. Dugaboy was formed pursuant to an October 2010 Trust Agreement between Dana Scott Breault, as Settlor, and James D. Dondero and Commonwealth Trust Company, as Trustees. Dondero is Dugaboy's primary beneficiary. Under the Dugaboy trust agreement, Dondero has the power to remove trustees without cause, as well as the power to appoint successive trustees. Dugaboy's original Family Trustee was Dondero, and Defendant Grant James Scott III ("Scott") was its Independent Trustee. In 2015, Dondero appointed Scott as the Family Trustee, and shortly thereafter replaced Scott with his sister Nancy. Between 2016 through confirmation of the Plan, Dugaboy owned a 0.1866% economic interest and a 74.4426% voting interest in HCMLP's Class A partnership interests, and, as set forth above, owns a 99.9% economic interest in NexPoint. Dugaboy filed multiple proofs of claim in HCMLP's bankruptcy case, which were submitted by Scott in his capacity as trustee of Dugaboy. At all times relevant to this Complaint, Dugaboy's principal place of business was 300 Crescent Street, Suite 700, Dallas, Texas 75201.

17. Defendant Highland Capital Management Fund Advisors, L.P. ("HCMFA") is a Delaware limited partnership.[3] HCMFA is owned by Strand Advisors XVI, Inc.[4] (which is HCMFA's general partner and owns a 1% interest in HCMFA); Highland Capital Management Services, Inc. ("HCMS") (which owns limited partnership interests in HCMFA equal to a 89.6667% ownership interest); and the Okada Family Revocable Trust (which owns limited partnership interests in HCMFA equal to a 9.3333% ownership interest). Dondero controls, and is the sole stockholder and director of, Strand Advisors XVI, Inc. Additionally, Dondero and Okada own 75% and 25% of HCMS, respectively.[5] HCMFA has acknowledged that it is controlled by Dondero. At all times relevant to this Complaint, HCMFA's principal place of business was 300 Crescent Street, Suite 700, Dallas, Texas 75201.

18. Defendant Scott is an individual who currently resides in North Carolina. At all times relevant to this proceeding, Scott had various roles at numerous Dondero-controlled or affiliated entities: he was the trustee of Get Good Trust; a director of the Highland Dallas Foundation; the managing member of Charitable DAF GP, LLC; the sole director of Charitable DAF Holdco, Ltd.; the managing member of the Charitable DAF Fund; and the director of CLO Holdco, Ltd. Scott is Dondero's long-time friend, former college roommate, and was the best man at Dondero's wedding. Scott has testified under oath that Dondero is his "closest friend." Dondero personally selected Scott as his successor to run the Charitable DAF Fund. Dondero

---

[3] HCMFA was originally created by Dondero on February 9, 2009 as Highland Funds Asset Management, L.P. ("HFAM"). On January 9, 2012, HFAM was renamed Pyxis Capital, L.P. ("Pyxis"), and on February 8, 2013, Pyxis was renamed HCMFA.

[4] Strand Advisors XVI, Inc. purports to be managed by six individuals, all but one of whom were previously on HCMLP's payroll.

[5] Dondero is the Director and President of Highland Capital Management Services, Inc. Scott Ellington is its Secretary and Frank Waterhouse is its Treasurer.

also caused Scott to serve on multiple boards on which Dondero also served, including the boards of the Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., and Highland Kansas City Foundation, Inc. Scott is also the executor of Dondero's will. Dondero, HCMLP, and/or entities controlled by Dondero transferred tens of thousands of dollars' worth of "business gifts" to Scott in the five years prior to the Petition Date. Scott has no training in finance or compliance and no investment experience. Scott routinely rubber-stamped Dondero's and HCMLP's directives without asking questions or requesting additional information.

19. Defendant Scott Ellington ("Ellington") was HCMLP's Chief Legal Officer and General Counsel until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interest. At all times relevant to this Complaint, Ellington was a Texas resident.

20. Defendant Isaac Leventon ("Leventon") was Assistant General Counsel at HCMLP from March 2011 until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interests. At all times relevant to this Complaint, Leventon was a Texas resident.

21. Defendant Frank Waterhouse ("Waterhouse") was the Chief Financial Officer of HCMLP, and was an HCMLP partner and the Treasurer of HCMLP's general partner, Strand. At all times relevant to this Complaint, Waterhouse was a Texas resident.

22. Defendant CPCM, LLC ("CPCM") is a Texas limited liability company created in February 2021. Upon information and belief, CPCM was created and owned by Ellington, Leventon, and/or Waterhouse.

23. Defendant Charitable DAF Fund, LP (the "DAF") is an exempted company incorporated in the Cayman Islands. Dondero was the initial managing member of the DAF's General Partner, Charitable DAF GP, LLC ("DAF GP"), but in January 2011 he transferred all membership interests to Scott, who held those interests until March 2021. At all times relevant to this proceeding, Scott served as managing member of DAF GP and director of the DAF. HCMLP acted as the formal or informal non-discretionary investment manager for the DAF from its inception through 2020, and provided advisory and back-office services to the DAF and its subsidiaries, including CLO Holdco, Ltd., from 2012 until HCMLP terminated that relationship in February 2021. According to the DAF, Dondero currently serves as its investment advisor (although without an advisory contract).

24. Defendant Charitable DAF Holdco, Ltd. ("DAF Holdco") is an exempted company incorporated in the Cayman Islands. At all times relevant to this proceeding, Scott served as DAF Holdco's managing member and sole director. DAF Holdco is the limited partner of the DAF and owns 100% of the partnership interests in the DAF.

25. Defendant CLO Holdco, Ltd. ("CLO Holdco") is an exempted company incorporated in the Cayman Islands that was formed on December 13, 2010. CLO Holdco is a wholly-owned subsidiary of the DAF. CLO Holdco filed two proofs of claim in HCMLP's bankruptcy case, which were signed by Scott in his capacity as CLO Holdco's sole director.[6] CLO Holdco has no employees or officers. According to CLO Holdco, Dondero currently serves as an investment advisor to CLO Holdco (although without an advisory contract). Until Dondero's departure from HCMLP in January 2020, HCMLP (through Dondero) effectively made all investment decisions for the DAF which allocated the investments to CLO Holdco,

[6] Scott served in that capacity at all times relevant to this proceeding.

which would then be rubber-stamped by Scott. At all times relevant to this Complaint, CLO Holdco's principal place of business was 300 Crescent Street, Suite 700, Dallas, Texas 75201.

26. As of December 31, 2020, CLO Holdco and the DAF collectively controlled approximately $260 million in assets. Dondero has testified under oath that he was unaware of a single investment decision that HCMLP ever recommended to Scott regarding the DAF that Scott rejected. Likewise, Dondero was unaware of any investment Scott made on behalf of the DAF that did not originate with HCMLP.

27. Defendant Highland Dallas Foundation ("Highland Dallas") is registered as a Delaware nonprofit, nonstock corporation. The directors of Highland Dallas at the time of the events relevant to this proceeding were Dondero, Scott, and Mary Jalonick. Dondero also acted as Highland Dallas's president, and Scott served as its treasurer. Highland Dallas's principal office address is 3963 Maple Avenue, Suite 390, Dallas, Texas, 75219.

28. Defendant Scott, in addition to being named above in his individual capacity, is named in his capacity as Trustee of Get Good Trust, a trust established under the laws of the State of Delaware. According to Get Good's July 9, 2021 disclosure to this Court, Get Good consists of three related trusts: Get Good Trust, Get Good Non Exempt Trust No. 1, and Get Good Non Exempt Trust No. 2, all of which are included in the term "Get Good." Dondero is the settlor of Get Good, its beneficiaries are his "living descendants," and Scott was Get Good's trustee at all times relevant to this Complaint. Get Good filed a proof of claim in HCMLP's bankruptcy case, which was submitted by Scott in his capacity as trustee of Get Good.

29. Defendant Hunter Mountain Investment Trust ("Hunter Mountain") is a statutory trust established under the laws of the state of Delaware. Hunter Mountain was formed on December 17, 2015, shortly before it purchased limited partnership interests in HCMLP from

HCMLP's then-existing limited partners (*i.e.*, Dondero, Okada, and entities that they controlled) and HCMLP. Through a complex series of transactions that occurred on December 21, 2015 and December 24, 2015, Dondero caused Hunter Mountain to become the owner-in-name of 99.5% of the economic interests of HCMLP. Meanwhile, Dondero caused Hunter Mountain to issue a series of notes and cash, such that Dondero, Okada, and certain entities that they controlled (including Dugaboy, The Mark & Pamela Okada Family Trust – Exempt Trust #1, and The Mark & Pamela Okada Family Trust – Exempt Trust #2) continued to receive the economic benefit of limited partnership distributions made by HCMLP to Hunter Mountain even after they had purportedly sold their limited partnership interests to Hunter Mountain. Hunter Mountain filed multiple proofs of claim in HCMLP's bankruptcy case, including a proof of claim in the amount of $60,298,739, in connection with alleged setoff rights under a $63 million secured promissory note Hunter Mountain entered into with HCMLP on December 21, 2015 (the "Hunter Mountain Note").

30. Rand PE Fund I, LP, Series 1 ("Rand") is a Delaware series limited partnership. Rand is the indirect parent of Hunter Mountain and is a guarantor of the Hunter Mountain Note.

31. Defendant Lawrence Tonomura is named in his capacity as trustee of Defendant The Mark & Pamela Okada Family Trust – Exempt Trust #1 ("MAP #1"), a trust established under the laws of the state of Texas. Okada controls MAP #1, which he created for the benefit of his children.

32. Defendant Lawrence Tonomura is named in his capacity as trustee of Defendant The Mark & Pamela Okada Family Trust – Exempt Trust #2 ("MAP #2"), a trust established under the laws of the state of Texas. Okada controls MAP #2, which he created for the benefit of his siblings.

33. Defendant Massand Capital, Inc. ("Massand Inc.") is a New York corporation that was created in 2002. Defendant Massand Capital, LLC ("Massand LLC") is a Delaware limited liability company created in 2014, pursuant to a certificate of incorporation signed by Leventon. Massand Inc. received payments from HCMLP between February 4, 2014 and January 7, 2015. Massand LLC received payments from HCMLP between February 25, 2015 and August 1, 2019. Massand Inc. and Massand LLC are referred to collectively herein as "Massand Capital".

34. Defendant SAS Asset Recovery Ltd. ("SAS") is a Cayman Island entity created in 2012, whose principal place of business is Dallas, Texas. Upon information and belief, SAS is a litigation funding and management business created by Dondero and Ellington in 2012 and operated out of HCMLP's headquarters. SAS, along with its direct and indirect subsidiaries, is owned and controlled by Dondero and Ellington, who own 70% and 30% of the economic interests in SAS, respectively. Upon information and belief, Ellington is the Chief Executive Officer of SAS.

## III. JURISDICTION AND VENUE

35. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 because this is a civil proceeding arising under or relating to the bankruptcy petition filed by HCMLP under Chapter 11 of the United States Bankruptcy Code. *See n re Highland Capital Manage ent, L.* ., No. 19-34054-sgj11 (Bankr. N.D. Tex.). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

36. Venue is proper in this Court under 28 U.S.C. § 1409(a).

37. This Court has personal jurisdiction over the defendants because each of the Defendants: (i) is a Texas resident; (ii) was formed under the laws of Texas; (iii) is the alter ego of a Texas resident or an entity that was formed under the laws of Texas; (iv) has a business

presence in Texas; (v) filed a proof of claim in HCMLP's bankruptcy case; and/or (vi) had minimum contacts with the state of Texas by either invoking the benefits and protections of the state of Texas or otherwise purposefully directing conduct toward a Texas resident.

## IV. FACTUAL ALLEGATIONS

### A. Dondero Creates HCMLP

38. HCMLP was a global alternative investment manager and registered investment advisor that was founded in 1993 by Dondero and Okada. The funds managed by HCMLP originally focused on the leveraged loan market, and subsequently expanded into other asset classes such as high-yield credit, public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific industries.

39. By the mid-2000s, HCMLP employed over 100 employees, including executive-level management employees, finance and legal staff, investment professionals, and back-office accounting and administrative personnel. As of the Petition Date, HCMLP had three primary business lines: (i) investment management; (ii) the provision of middle- and back-office services ("shared services") to other registered investment advisors; and (iii) proprietary trading.

40. Dondero exercised complete control over HCMLP from its founding until January 9, 2020, when this Court entered an order implementing the settlement and term sheet entered into between HCMLP and the unsecured creditors' committee, pursuant to which three new independent directors (the "Independent Board") were appointed at Strand to oversee the management and reorganization of HCMLP. HCMLP's employees have bluntly acknowledged that, prior to the appointment of the Independent Board, Dondero was HCMLP's solitary decision-maker on all matters concerning the company's operation and management. Dondero

Case 21-03076-sgj Doc 1-3 Filed 10/15/21 Entered 10/15/21 15:22:50 Desc Exhibit 12 Page 109 of 135

served as HCMLP's Chief Executive Officer and President from the time that HCMLP was founded until he resigned from those roles on January 9, 2020.

41. As of December 31, 2006, HCMLP provided investment advisory services pursuant to management agreements for: (i) 22 CLOs, (ii) 1 SLT; (iii) 11 RICs, (iv) 7 warehouse transactions, (v) 4 SMAs; (vi) one trust; and (vii) 10 hedge fund structures.[7] At that time, the value of HCMLP's assets under management ("AUM") was approximately $33.1 billion.[8]

## B. HCMLP Narrowly Survives The Financial Crisis Of 2008, And Emerges Facing Hundreds Of Millions Of Dollars In Potential Litigation Damages

42. Around 2008, HCMLP's business began to falter, as the financial crisis began to set in. The funds that HCMLP managed faced large losses, followed by substantial redemptions. In January 2008, HCMLP experienced its worst performance to date, with the value of many of its managed funds deteriorating significantly.

43. At the same time that HCMLP was facing significant losses that threatened its existence, the company also became ensnared in litigation posing the threat of hundreds of millions of dollars in damages. In March 2008, HCMLP and its managed funds Highland CDO

[7] A collateralized loan obligation ("CLO") is a structure that acquires and manage a pool of debt or loans. The CLO issues multiple debt tranches as well as equity, and uses the proceeds of those issuances to obtain loans. A structured loan transaction ("SLT") is a transaction involving structured financial instruments such as collateralized loan obligations. A registered investment company ("RIC") is a corporation, partnership, or trust registered with the Securities and Exchange Commission under the Investment Company Act of 1940. A warehouse transaction is an intermediate transaction that involves purchasing loans or bonds that will undergo the warehousing period prior to serving as collateral for a CLO security. A separately-managed account ("SMA") is a managed investment vehicle that has only one investor. A trust is a fiduciary agreement in which one entity that holds property or assets as its owner for one or more beneficiaries. A hedge fund structure is an actively managed investment pool held by a limited partnership of investors that allows partners to "redeem" their investment, subject to certain limitations.

[8] At its high-water mark, HCMLP's AUM exceeded $40 billion.

Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC" and together with CDO Fund, the "Fund Counterparties")[9] had entered into a transaction with UBS to finance the purchase of various CLO tranches (*i.e.*, tranches of debt issued by existing CLOs) and other assets, including credit default swaps ("CDS"). The governing agreements required the Fund Counterparties to post collateral based on the mark-to-market value of certain collateralized debt obligations. The value of these assets dropped by more than $400 million in the fall of 2008, and in November 2008, the Fund Counterparties failed to meet UBS's margin demand. In December 2008, UBS terminated the agreements, and claimed that it was owed 100% of its losses—which UBS alleged was as much as $745 million—from HCMLP and the Fund Counterparties.

44. On February 24, 2009, UBS commenced an action against HCMLP and the Fund Counterparties in New York state court. As amended and consolidated, UBS asserted claims against HCMLP for actual and constructive fraudulent transfer and breach of the implied covenant of good faith and fair dealing. Among other things, UBS alleged that in March 2009, HCMLP had orchestrated transfers of approximately $233 million of assets from SOHC's parent entity HFP, which UBS alleged was the alter ego of SOHC or its subsidiaries (the "March 2009 Transfers"). UBS sought to disgorge those transfers, and also sought damages against

[9] The CDO Fund is an indirectly-controlled subsidiary of HCMLP. At all times relevant to this proceeding, the CDO Fund was controlled by HCMLP, either pursuant to an investment advisory agreement and/or through HCMLP's indirect ownership of CDO Fund's general partner. SOHC is a subsidiary of Highland Financial Partners, L.P. ("HFP"). At all times relevant to this proceeding, HFP was managed and controlled by Dondero in his capacity as an officer of HFP and its general partner and as a member of HFP's monitoring committee. HFP's general partner is a wholly-owned indirect subsidiary of HCMLP. After 2010, Dondero was the sole member of HFP's monitoring committee until his resignation in mid-2021. At all times relevant to this Complaint, Dondero managed and controlled SOHC through his control of HFP.

HCMLP, including punitive damages, attorneys' fees, and pre-judgment interest (calculated at 9% under New York law).

45. Meanwhile, in December 2008, CDO Fund ceased meeting margin calls issued by Citibank N.A., Citigroup Global Markets Limited, Citigroup Financial Products Inc., and Citigroup Global Markets Inc. (together, "Citi") in connection with CDS entered into by CDO Fund and Citi. Citi seized assets posted by CDO Fund to collateralize the CDS, and, by March 2009, conducted two auctions to sell the collateral. The proceeds of the collateral sales, however, were not sufficient to satisfy CDO Fund's obligations to Citi. On April 5, 2012, CDO Fund sued Citi, alleging various claims arising from the margin calls. On May 3, 2013, Citi answered and countersued CDO Fund, HCMLP, and Highland CDO Opportunity Fund GP, L.P. ("CDO Fund GP") to: (i) recover a deficit of more than $24 million, plus accrued interest, still owed under the agreements governing the CDS; (ii) recoup $3 million in liquidation proceeds mistakenly received from a third party; and (iii) seek indemnification for all losses and costs Citi incurred as a result of CDO Fund's breach.

46. In addition, on April 2, 2009, Barclays Bank PLC ("Barclays PLC") and its wholly-owned subsidiary HYMF, Inc. ("HYMF" and, together with Barclays PLC, "Barclays") commenced an action against HCMLP and certain of its managed funds (the "Fund Defendants") and related entities for breach of contract, breach of fiduciary duty, and equitable accounting (the "Barclays Action"). The Barclays Action focused on hedge contracts that HYMF had entered into with various HCMLP-managed funds, which provided that HYMF would be able to remove its investments in a preferential fashion via a "redemption" right, usually as quickly as one day. Barclays alleged that HYMF attempted to exercise that redemption right in mid-October 2008 but was rejected by HCMLP and its managed funds,

notwithstanding the clear terms of the HYMF contracts. This breach of the HYMF contracts was accompanied by Dondero personally stating he would withhold over $100 million for over a year unless HYMF performed certain unrelated financial services for the Fund Defendants. Barclays alleged that it had invested more than $700 million into the Fund Defendants, that Dondero personally held at least $100 million of that "hostage," and that "hundreds of millions of dollars" were still owed to HYMF.

47. Additionally, on June 3, 2011, HCMLP became aware that on November 1, 2010, the Securities and Exchange Commission (the "SEC") had commenced an investigation with respect to potential violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940. While the SEC investigation was settled years later for a reduced amount, HCMLP's understanding in 2011 was that the SEC investigation could result in significant penalties, including substantial monetary penalties, for the company.

### C. In A Scheme To Evade HCMLP's Creditors, Dondero Creates "Lifeboats" To Usurp HCMLP's Business

48. In 2012, Dondero explained HCMLP's precarious financial condition, testifying under oath that the 2008 financial crisis took HCMLP "to a state of insolvency and we've been juggling liquidity since that," and that "[t]he last three, four years have been negative to the tune of hundreds of millions of dollars[.]" Dondero testified further that the contingent liabilities resulting from the lawsuits filed against HCMLP were a primary driver of HCMLP's insolvency.

49. It was against this backdrop that in or about 2011, Dondero determined to create a series of new entities—referred to internally by some at HCMLP as "lifeboats"—to take over HCMLP's business, with the aim of placing the resulting profits beyond the reach of HCMLP's

creditors. Ultimately, the most successful of the lifeboats were NexPoint and HCMFA, which are described in greater detail below. However Dondero also created other lifeboats at or around this time, including:

- Tunstall Capital Management, LP—which was created to manage stressed and distressed investing in hedge fund, private equity fund, and retail funds;
- Falcon E&P Opportunities GP, LLC—which was created to manage oil and gas investments in private equity funds;
- Granite Bay Advisors, LP—which was created to manage long-short credit investing; and
- Highland Capital Healthcare Advisors, LP ("HCHA")—which was created to serve as health care equity advisor.

**1. NexPoint**

50. NexPoint was effectively a shell entity that Dondero created in March 2012 to siphon profits from HCMLP in order to evade HCMLP's creditors. Dondero's family trust Dugaboy, of which Dondero is the primary beneficiary, owns 99.9% of NexPoint.

51. Between 2012 and 2015, NexPoint had no employees of its own, and performed no business activities that were distinguishable from those performed by HCMLP. To the contrary, NexPoint used HCMLP's employees to perform the same investment management and advisory services—including investment advisory, compliance, accounting, tax, human resources, and information technology services—that were performed by HCMLP.

52. For over a year, HCMLP performed all services for NexPoint, without any sub-advisory or shared services agreements that even purported to compensate HCMLP for the use of its employees. In mid-2013, Dondero attempted to retroactively infuse this scheme with a patina of legitimacy, by causing NexPoint to enter into a shared services agreement with HCMLP that required NexPoint to pay fees to HCMLP based on a formula that resulted in low fee payments. NexPoint continued to reap the vast majority of the generated fees, however.

NexPoint's fees were based on a percentage of AUM, set at a level to yield fees far in excess of those NexPoint was paying HCMLP. The NexPoint scheme is illustrated in Figure 1, below.

**Figure 1.**




53. Adding insult to injury, HCMLP funded NexPoint's operations whenever needed, seeded large investments made by NexPoint, and funded a large portion of the distributions NexPoint made to its owner, Dugaboy (the beneficiary of which was Dondero). Between 2012 and 2017, HCMLP loaned NexPoint approximately $30 million, and entered into a revolving line of credit to provide NexPoint with additional liquidity. Initially, the loans were in the form of demand notes and were unsecured, frequently below-market, and had few to no covenants. NexPoint paid no principal or interest to HCMLP on the loans during the 2012-2017 period. At the same time, NexPoint made limited partner distributions of approximately $34 million—99.9% of which were made to Dugaboy for Dondero's benefit.

54. Dondero caused HCMLP to enter into multiple forbearance agreements with respect to the NexPoint loans, pursuant to which HCMLP agreed not to collect on the NexPoint loans for a period of one year from the time of the agreement. According to NexPoint's financial statements, these agreements were entered into to provide NexPoint "with the necessary financial support to fund [NexPoint's] obligations as they come due[.]" By May 2017, NexPoint owed HCMLP more than $30 million. Although all of these obligations were payable on demand, HCMLP again agreed not to demand repayment—this time through May 31, 2018—and also agreed to provide support to fund NexPoint's obligations through the same period. Meanwhile, HCMLP recorded the NexPoint loans at face amount on HCMLP's books.

55. Upon information and belief, on May 31, 2017, following discussions with NexPoint's auditors, Dondero restructured the NexPoint loans into a consolidated $30,746,812.33 note (the "NexPoint Loan") with an unusually long 30-year term maturity with a low coupon rate, no covenants, and no security. HCMLP received no consideration in exchange for its agreement to extend the NexPoint loans' maturity date from on-demand to 30 years.

56. Subsequent to Dondero's resignation from HCMLP, on December 31, 2020, NexPoint defaulted on the NexPoint Loan and the full outstanding amount of the loan was accelerated. On January 22, 2021, HCMLP filed an adversary proceeding in the Bankruptcy Court to collect on the NexPoint Loan. *See Highland Capital Manage ent, L. . v. e oint dvisors, L.* ., Adv. Pro. 21-03005-sgj (Bankr. N.D.Tex. Jan. 22, 2021). NexPoint has raised a series of frivolous defenses to HCMLP's claims, including that HCMLP—acting through the owner of a majority of its Class A interests, Dugaboy (which was acting through Dondero's sister, as Dugaboy's Family Trustee)—orally agreed to forgive the NexPoint Loan as part of

Dondero's compensation. More than $23 million remains outstanding on the NexPoint Loan, and interest and fees continue to accrue.

57. From the time that it was created in 2012 through 2019, NexPoint—which used HCMLP's employees to perform the same management and advisory services that are performed by HCMLP—earned over $150 million in revenues (including over $120 million in advisory and administrative fees) and approximately $50 million in operating income. Between 2012 and 2015, NexPoint's AUM increased 34%, from $700 million to $936 million, and revenues increased from $4.1 million to $16.2 million. Between 2015 and 2019, NexPoint's AUM increased by approximately 408%—from $936 million to $4.8 billion, and revenue increased from $16.2 million to $46.8 million. By contrast, over the same 2015 to 2019 period, HCMLP's AUM decreased from $9.5 billion to $2.3 billion.

**2. HCMFA**

58. Dondero utilized the same basic playbook for HCMFA, which is directly or indirectly owned by Dondero and Okada. HCMFA was created to replace HCMLP as the new investment manager for certain open-ended retail investment funds, but in a manner similarly designed to ensure that the profits generated by the business would not be available to HCMLP's litigation creditors in the event they achieved favorable judgments.

59. On December 15, 2011, Dondero caused HCMLP to transfer HCMLP's rights and obligations to provide investment advisory services for Highland Credit Strategies Fund,[10] Highland Floating Rate Opportunities Fund ("HFRO") (n/k/a Highland Income Fund),

[10] On June 13, 2012, the management agreements for Highland Credit Strategies Fund were purportedly "novated" to the newly-created NexPoint. Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as "NHF." The result of this transfer was simply to shift management fees relating to NHF—which had previously been diverted from HCMLP—from one lifeboat (Pyxis/HCMFA) to another (NexPoint).

Highland Long/Short Equity Fund, Highland Long/Short Healthcare Fund, and Highland Special Situations Fund to HCMFA. HCMLP received no consideration for the transfer. Prior to the transfer, HCMLP received management and advisory fees under those agreements in return for the services it performed. Following the transfer, it was HCMFA rather than HCMLP that received those fees, notwithstanding that HCMFA used HCMLP's employees to perform most services. Thus, the effect of the transfer was to insert a new sham entity to reap the profits earned from the same HCMLP employees performing the same work that had been performed prior to the transfer.

60. HCMFA collected management fees from its managed funds based on a percentage of their net asset value ("NAV"). Meanwhile, HCMLP—whose employees performed most services required by HCMFA—received a low fee that was only a small fraction of the fees earned by HCMFA. And HCMLP received no fee in respect of the advisory services it provided to HCMFA, despite the fact that HCMLP's employees were named portfolio managers, and constituted entire teams of supporting investment analysts, for HCMFA-managed funds. Indeed, HCMFA did not execute a sub-advisory agreement with HCMLP, and it was only in May 2018 that HCMFA executed a payroll reimbursement agreement to partially compensate HCMLP for the services of certain HCMLP employees. If HCMLP had managed the HCMFA-managed funds directly rather than doing so through an entity that was created to evade HCMLP's creditors, then HCMLP would have earned tens of millions of dollars (potentially over $100 million) in additional fees between 2012 and 2018. The HCMFA scheme is illustrated by Figure 2, below.

**Figure 2.**




61. Following Dondero's "lifeboat" playbook, HCMLP also provided financial support to HCMFA so that HCMFA was well-positioned to earn profits that bypassed HCMLP's creditors and flowed directly to Dondero and his affiliated entities, primarily through HCMFA's largest limited partner, HCMS (of which Dondero and Okada owned 75% and 25%, respectively). Between 2011 and 2019, HCMLP loaned HCMFA approximately $12 million. Those HCMFA loans were evidenced by demand notes, for which Dondero caused HCMLP to enter into multiple forbearances, ultimately preventing HCMLP from demanding payment until May 31, 2021. As of the Petition Date, $6.3 million was outstanding on the notes subject to the forbearance agreement. In May 2019, HCMFA borrowed an additional $7.4 million from HCMLP pursuant to two additional demand notes.

62. Subsequent to Dondero's resignation from HCMLP, HCMFA defaulted on its debt to HCMLP. On January 22, 2021, HCMLP filed an adversary proceeding in the Bankruptcy

Court to collect on the debt. HCMFA has raised a series of frivolous defenses to HCMLP's claims, including that the notes were executed in error. As of December 11, 2020, approximately $7.7 million in principal and interest was due and owing to HCMLP on the HCMFA notes dated May 2 and 3, 2019 and, as of June 4, 2021, approximately $3.1 million in principal and interest was due and owing to HCMLP on the HCMFA notes dated February 26, 2014 and February 26, 2016, and interest and fees continue to accrue.

### D. Dondero Causes HCMLP To Engage In Misconduct That Exposes It To Additional Liability

63. As described more fully below, in addition to establishing the lifeboats to usurp HCMLP's business and evade its contingent creditors, Dondero engaged in other actions that meaningfully harmed HCMLP. This included exposing HCMLP to significant liability by utilizing it to exact revenge on Dondero's perceived adversaries, and carrying out schemes that personally benefitted Dondero and, in certain instances, HCMLP's Chief Legal Officer and General Counsel Scott Ellington, but conferred no benefit on HCMLP. As described above, these actions ultimately resulted in more than one billion dollars in litigation and arbitration claims against HCMLP and millions of dollars in legal fees, necessitated HCMLP's bankruptcy filing, and ultimately forced HCMLP to enter into settlements requiring it to pay hundreds of millions of dollars.

#### 1. Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry

64. In 2011, Dondero formed Acis Capital Management, L.P. ("Acis") and Acis Capital Management GP, LLC ("Acis GP"). Dondero was President both of Acis and Acis GP, and controlled their overall financial strategies and decisions. Upon information and belief, prior to its bankruptcy filing in 2018, Acis was indirectly owned by Dondero (through Dugaboy), Okada, and Joshua Terry ("Terry"), an HCMLP employee that Dondero tapped to manage Acis.

Like HCMLP, Acis was a registered investment advisor whose purpose was to raise money from third-party investors to launch or invest in CLOs. HCMLP was the investment manager for Acis, and Acis performed almost all of its services through HCMLP employees. Dondero created Acis to act as another lifeboat—*i.e.*, to divert income away from HCMLP when HCMLP was facing the risk that all of its assets would be absorbed by its creditors. In 2013, HCMLP began what proved to be a short-lived turnaround, spurred by improving financial performance and settlement of the Barclays litigation. At this point, Dondero became more troubled by the dilution of his share of Acis's income, caused by Terry's ownership in Acis, than he was about evading HCMLP's liabilities. As a result, Dondero once again redirected the flow of money for his own benefit, this time by siphoning value from Acis back to HCMLP.

65. By 2016, tensions between Dondero and Terry hit a boiling point. Dondero sought to finance an acquisition by an HCMLP portfolio company through a loan from HCMLP-managed CLOs, and an extension of the maturity dates on the portfolio company's notes that were held by the CLOs. Terry was the investment manager for the CLOs, and opposed the plan on the ground that agreeing to extend the notes' maturity dates would breach his fiduciary duties to the CLOs. Dondero responded to Terry's opposition by firing him from Acis and HCMLP, making up a pretextual claim of termination for "cause." Shortly thereafter, Dondero amended the Acis limited partnership agreement to terminate Terry's interests in Acis, and directed Acis to sue Terry in Texas state court. Terry counterclaimed and demanded arbitration.

66. On October 20, 2017, following a ten-day arbitration, the arbitration panel issued Terry an award of $7,949,749.15, plus interest, against Acis. The arbitration panel found, among other things, that (i) Terry's termination was "without cause," and Acis had "knowingly and willfully" invoked HCMLP's false pretext of "for cause" in order to deny Terry his

contractual entitlement to the value of his Acis partnership interest, (ii) Acis had breached its limited partnership agreement, and breached the fiduciary duties it owed to Terry as Acis's limited partner, (iii) beginning in 2013, Dondero had caused Acis to pay HCMLP more than its contractual entitlement for shared expenses in order to reduce the amount of Terry's limited partnership distributions, and (iv) one month after Terry was terminated from Acis, Dondero significantly increased the amounts that Acis was paying HCMLP under their shared services and sub-advisory agreements, retroactive to January 1, 2016.

67. Beginning on October 24, 2017—four days after Terry's arbitration judgment was issued—Dondero, acting through HCMLP, and with the aid of Ellington and Leventon, entered into numerous transactions designed to take control of Acis's assets and business, and strip Acis of assets so that it would be unable to pay Terry's arbitration award. Ellington and Leventon aided Dondero by implementing Dondero's directives and taking the steps necessary to consummate these transactions.

68. Ultimately, Dondero's elaborate schemes to render Acis judgment-proof led Terry to file involuntary petitions for protection under chapter 11 of the United State Bankruptcy Code against Acis and Acis GP on January 30, 2018. In response to the bankruptcy filings, Dondero caused HCMLP, which served as the sub-advisor to the Acis CLOs, to grossly mismanage the Acis CLOs, including by failing to purchase a single loan for the CLOs following the appointment of a chapter 11 trustee in the Acis bankruptcy case. This abrogation of duties caused the chapter 11 trustee to replace HCMLP with Brigade Capital Management, LP ("Brigade") and Cortland Capital Markets Services LLC ("Cortland"). Put another way, Dondero's use of HCMLP to cause damage to Acis actually harmed HCMLP itself, leading HCMLP to incur exorbitant legal fees attacking Acis, the loss of its investment management

contracts and the income flowing from those contracts, and reputational harm that precluded HCMLP from launching any future CLOs and generating fee income therefrom.

69. Dondero also caused HCMLP to commence litigation against the Acis chapter 11 trustee, prompting a countersuit pursuant to which the chapter 11 trustee sought to recover fraudulent transfers Dondero had directed (through HCMLP) and to stop HCMLP from engaging in a course of conduct that was harmful to Acis and the Acis CLOs. This led to the entry of a temporary restraining order against HCMLP, which Dondero caused HCMLP to violate. Dondero also caused Highland CLO Funding, Ltd. ("HCLOF") to initiate an additional frivolous lawsuit against Terry in the Royal Court of Guernsey (the "Guernsey Suit"), which was ultimately dismissed, resulting in Terry arguing that HCMLP, as the owner of HCLOF's advisor Highland HCF Advisors, Ltd. ("HHCFA"), was liable for Terry's attorneys' fees and expenses under Guernsey's "loser pays" regime.[11]

**2. Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest**

70. Dondero and Ellington also exposed HCMLP to substantial liability to third-party investors HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively,

[11] Dondero's litigation crusade against Terry and Acis continues to date. On May 13, 2021, NexPoint caused one of its managed retail funds, NHF, to commence a lawsuit in the district court for the Southern District of New York against Acis, Terry, U.S. Bank, N.A., and Brigade, alleging that the Acis CLOs had been mismanaged. NHF then filed an action in Acis's bankruptcy case, seeking a ruling that the complaint did not violate the injunction contained in Acis's plan of reorganization. The bankruptcy court declined to issue the order requested by NHF and held that NHF must amend its complaint to comply with the plan injunction. NHF then filed a motion asking the Bankruptcy Court to reconsider its ruling.

"HarbourVest"). At the same time that Dondero was surreptitiously transferring valuable rights associated with the Acis CLOs away from Acis in order to evade Terry's arbitration award, he and Ellington, HCMLP's Chief Legal Officer and General Counsel, were using HCMLP to induce the HarbourVest Entities to purchase 49.9% of HCLOF—the owner of the equity tranche of the Acis CLOs—from CLO Holdco for approximately $75 million in cash, with a commitment to invest an additional $75 million in HCLOF.[12] In soliciting this investment, Dondero and Ellington failed to disclose material facts to HarbourVest regarding the Terry disputes and Acis frauds, thus exposing HCMLP to substantial and unnecessary liability.[13]

71. In inducing HarbourVest's investment, Dondero and Ellington, purportedly acting through HCMLP, made numerous misrepresentations and omissions, including: (1) failing to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million arbitration award against it, including by causing Acis to consummate a series of fraudulent transfers; (2) misrepresenting the reasons that Dondero changed the name of the holding company for the Acis CLOs from Acis Loan Funding, Ltd. ("ALF") to HCLOF immediately prior to the HCLOF Investment; and (3) expressing confidence in HCLOF's ability to reset or redeem the CLOs under its control, when in actuality Dondero's actions to evade Terry's arbitration award against Acis resulted in Acis's bankruptcy, and rendered the resets impossible.

72. Moreover, unbeknownst to HarbourVest, Dondero caused CLO Holdco to use the $75 million that it received from HarbourVest to make investments in other Dondero-owned

[12] CLO Holdco acquired Acis CLO equity tranches when the CLOs were launched and then transferred them to HCLOF in exchange for a 100% ownership interest in HCLOF after it was formed.

[13] HCLOF has never paid a management fee to HHCFA, a wholly-owned subsidiary of HCMLP that is managed and controlled by HCMLP and operated using HCMLP employees. Consequently, HCMLP has indirectly provided free investment management services to HCLOF since its inception.

entities, including entities managed by NexPoint and HCMFA. Thus, the HarbourVest investment benefitted Dondero personally, but left HCMLP exposed to hundreds of millions of dollars in potential damages to HarbourVest.

### 3. Dondero And His Accomplices Cause HCMLP To Engage In Misconduct That Increases Its Liability To UBS

73. In March 2017, the New York state court presiding over UBS's claims against HCMLP and the Fund Counterparties ruled that UBS's claims against the Fund Counterparties, and its fraudulent transfer claims against HCMLP, could proceed to trial.[14] Shortly thereafter, Dondero and Ellington took steps to transfer the Fund Counterparties' remaining assets to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands entity indirectly owned and controlled by Dondero and Ellington,[15] in order to ensure that such assets would be out of UBS's reach in the event that a judgment was entered in its favor.[16] In or around August 2017, Dondero and Ellington orchestrated the surreptitious transfer of substantially all of the Fund Counterparties' assets—with a face amount of $300 million and a fair market value of more than $100 million—to Sentinel.

74. The pretextual justification for these transfers was to satisfy a $25 million premium on an "after the event" insurance policy issued by Sentinel that purportedly insured the first $100 million of liability to UBS. That justification, however, hid the real goal: to drain the Fund Counterparties' assets (but keep them within the control of Dondero and Ellington) and render the Fund Counterparties (and certain related entities) judgment-proof.

---

14 UBS's claim against HCMLP for breach of the implied covenant of good faith and fair dealing was subsequently also permitted to proceed.

15 Sentinel was created in 2012 and is 70%-owned by Dondero and 30%-owned by Ellington through intermediate holding companies. Sentinel has no employees or physical office space. HCMLP employees, including Leventon, performed work on behalf of Sentinel.

16 In September 2017, Ellington caused Dilip Massand to be appointed as a director of Sentinel.

75. Moreover, the existence of this purported insurance policy was actively concealed from the Independent Board by Ellington, Leventon, Sevilla, Lucas, and DiOrio. This concealment caused HCMLP to make factually inaccurate statements to the Bankruptcy Court and incur millions of dollars in additional fees litigating (rather than settling) with UBS. After the policy was uncovered through the diligence of the Independent Board, CDO Fund made a claim on the policy in March 2021. Despite CDO Fund's efforts to collect on the policy, Sentinel has refused to make any payments to HCMLP or the Fund Counterparties. This purported insurance policy was the only such policy Sentinel had issued during its existence.

76. On February 10, 2020, the New York state court entered a judgment against the Fund Counterparties in connection with the phase one litigation, in the principal amount of $519,374,149, plus $523,016,882.79 in prejudgment interest, for an overall judgment of $1,042,391,031.79. Trial on UBS's claims against HCMLP was still pending when HCMLP filed for bankruptcy on October 16, 2019 (as discussed *infra*).

#### 4. Dondero Causes HCMLP To Engage In Misconduct That Results In Liability To HERA And Patrick Daugherty

77. HCMLP's poor performance during the 2008-09 financial crisis left it with insufficient available cash and assets to offer incentive-based compensation to key senior employees. After HCMLP defaulted on a credit facility with a group of unsecured banks, the lender group demanded a security interest in all HCMLP's assets, but permitted the creation of a retention program to stave off an exodus of employees. With the consent of the lenders, on June 23, 2009, HCMLP created Highland Employee Retention Assets LLC ("HERA"), an employee-owned (subject to a two-year vesting period) entity that served as a replacement for certain senior employees' deferred compensation, which had been previously-awarded but wiped out by the financial crisis. HCMLP contributed assets to HERA, which then distributed

proceeds from time to time. Patrick Daugherty, a former senior HCMLP employee, was a director of HERA and its largest unitholder.

78. Dondero's relationship with Daugherty deteriorated, and Daugherty resigned from HCMLP in the fall of 2011. Instead of simply allowing HERA to pay Daugherty what he was owed, Dondero caused HCMLP to carry out his personal vendetta against Daugherty through years of spiteful, unnecessary litigation borne out of personal animosity. As a result of that litigation, HCMLP accrued (i) litigation expenses and pre- and post-judgment interest that exceeded the amounts that HERA owed Daugherty in the first place; and (ii) liability in connection with a jury verdict that HCMLP defamed Daugherty with malice and breached the implied covenant of good faith and fair dealing.

79. Moreover, Dondero, through HCMLP, engaged in an asset-stripping campaign designed to render HERA judgment-proof, further exposing HCMLP to liability and unnecessary legal costs. In furtherance of that scheme, Dondero caused: (i) HCMLP to buy out all HERA unitholders except for Daugherty; (ii) HERA's board to transfer its powers to HERA Management, a newly formed entity for which Dondero served as president and sole member; and (iii) HERA to distribute substantially all of HERA's assets to HCMLP, while claiming that HCMLP would place Daugherty's interests in HERA into escrow.

80. When Daugherty demanded payment of his judgment from HERA, HERA claimed it had become insolvent, citing that it owed HCMLP more than $7.5 million for legal expenses—approximately $4.9 million of which HCMLP had written off because of "lack of collectability."

81. Daugherty then sued HCMLP, HERA, HERA Management, and Dondero in the Delaware Chancery Court. A Vice Chancellor concluded that HCMLP, Dondero, and the other

defendants (who were also controlled by Dondero) were "improperly withholding documents," that "there is a reasonable basis to believe" that they perpetrated a fraud—and solicited "the services of attorneys to aid in furtherance of that fraud"—as part of an effort to evade Daugherty's judgment during the pendency of his case. The Vice Chancellor concluded that "defendants, with [counsel's] advice and assistance, were never going to let the assets held in the escrow agreement to make their way to Daugherty."

82. In total, HCMLP suffered approximately $10 million in harm as a result of Dondero's decision to launch a protracted and unnecessary war against Daugherty.

**E. Dondero Causes HCMLP To Engage In Conduct That Results In An Arbitration Award Against It Of Approximately $190 Million And Forces HCMLP Into Bankruptcy**

83. Dondero also engaged in misconduct relating to HCMLP managed funds Highland Offshore Partners L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Crusader Funds") that resulted in an arbitration award against HCMLP of approximately $190 million. HCMLP had placed the Crusader Funds into wind-down in October 2008. Investors in the funds subsequently commenced lawsuits alleging breach of fiduciary duty claims against HCMLP, based on allegations that Dondero had refused to make mandated distributions and honor redemption requests, and traded the funds' positions in a manner designed to render them illiquid in order to deter future redemptions, which led to multiple disputes among redeeming investors. Certain of these lawsuits were ultimately resolved in July 2011, when the parties entered into a Joint Plan of Distribution of the Crusader Fund and a Scheme of Arrangement for its creditors (together, the "Joint Plan and Scheme"). As part of the Joint Plan and Scheme, a committee referred to as the "Redeemer Committee" was elected from the Crusader Funds' investors to oversee HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors.

84. The peace would not last, however. On July 5, 2016, the Redeemer Committee (i) terminated HCMLP as investment manager; (ii) filed a complaint in Delaware Chancery Court against HCMLP seeking a limited status quo order, a declaration that the Redeemer Committee had "cause" to terminate HCMLP as manager, and a declaration that HCMLP had forfeited any right to indemnification as a result of its failure to distribute proceeds to investors of various funds; and (iii) commenced an arbitration proceeding (the "Redeemer Arbitration") against HCMLP alleging that it had engaged in various forms of misconduct in its role as investment advisor. After two years of arbitration proceedings, the Redeemer Arbitration culminated in a nine-day evidentiary hearing in September 2018 that included testimony from eleven fact witnesses and four expert witnesses. On March 6, 2019, the arbitration panel issued an award in favor of the Redeemer Committee, which resulted in gross damages of $136.8 million and total damages (including interest) of $190.8 million. Ultimately, the panel awarded ten forms of damages: (1) the Deferred Fee Claim ($43,105,395); (2) the Distribution Fee Claim ($22,922,608); (3) the Taking of Plan Claims ($3,277,991); (4) the CLO Trades Claim ($685,195); (5) the Credit Suisse Claim ($3,660,130); (6) the UBS Claim ($2,600,968); (7) the Barclays Claim ($30,811,366); (8) the Legal Fees, Costs, and Expenses Claim ($11,351,850); and (9) the Portfolio Company Award: ($71,894,891).

85. The claims that were asserted against HCMLP by the Redeemer Committee stemmed from the various breaches of fiduciary duty to the Crusader Funds that Dondero caused HCMLP to commit. For example, the "Barclays Claim"—which gave rise to over $30 million in liability for HCMLP—arose out of Dondero causing HCMLP to transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, after the Redeemer Committee had already refused to approve that transfer. In so doing, Dondero

caused HCMLP to violate the Joint Plan and Scheme and its fiduciary duties. Because of Dondero's wrongful conduct, HCMLP was ordered to pay: (1) over $30 million on account of disgorged partnership interests; (2) additional sums for disgorgement of distribution fees (that were included within the $22.9 million Distribution Fee Award); and (3) interest, fees, and expenses incurred in connection with the arbitration.

86. Dondero's conduct also resulted in HCMLP becoming liable to the Redeemer Committee for over $71 million (the "Portfolio Company Claim") in connection with claims arising from a portfolio company that was owned, directly and indirectly, by HCMLP (the "Portfolio Company"). Some of the Portfolio Company's stock was owned by the Crusader Funds. Dondero caused HCMLP to covertly purchase shares in the Portfolio Company from another fund that he controlled at below-market prices, and failed to liquidate the Crusader Funds' shares in Portfolio Company as his fiduciary duties required. Pursuant to the arbitration award, HCMLP was required to purchase the Crusader Funds' shares in the Portfolio Company at a fixed price of $48,070,407, and also to pay pre-judgment interest, which brought the total claim to $71,894,891.

87. Additionally, the Joint Plan and Scheme required HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete. Dondero caused HCMLP to violate that provision of the Joint Plan and Scheme by causing HCMLP to surreptitiously transfer approximately $32 million in Deferred Fees from the Crusader Funds' accounts in early 2016. The arbitration panel ruled that as a consequence of Dondero's blatant breach of the payment requirements of the Joint Plan and Scheme, HCMLP forfeited its right to these fees entirely.

88. The Redeemer Committee set a hearing in Delaware Chancery Court for October 8, 2019 to obtain entry of a judgment with respect to the award. The hearing was subsequently continued to October 16, 2019. HCMLP filed for bankruptcy on the day of oral arguments for the Redeemer Committee's motion to enforce the Award in Delaware Chancery Court.

**F. Dondero's Schemes Result In Hundreds Of Millions Of Dollars Of Liability For HCMLP**

89. As noted, Dondero's schemes ultimately resulted in hundreds of millions of dollars of liability for HCMLP. As described below, the creditors that Dondero had sought to cheat and evade filed proofs of claim in HCMLP's bankruptcy proceeding, and HCMLP's management, burdened with Dondero's blatant misconduct (and that of Ellington and other of Dondero's loyalists), was forced to settle these claims for amounts that enabled HCMLP to escape the risk of even greater liability.

90. Additionally, HCMLP has incurred in excess of $40 million in professional fees in connection with the bankruptcy filing, which was necessitated solely as a result of Dondero's misconduct. HCMLP also incurred legal expenses for entities that HCMLP did not own, including several of the "lifeboats."

**1. HCMLP Incurs $125 Million In Liability To UBS As A Result Of Dondero's, Leventon's, and Ellington's Misconduct**

91. On June 26, 2020, UBS filed a proof of claim (the "UBS Claim") in HCMLP's bankruptcy proceeding for the full $1,039,957,799.44 of its judgment against the Fund Counterparties.[17] The UBS claim sought "damages arising from HCMLP's breach of the

[17] The UBS Claim consists of two substantively identical claims: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG, London Branch.

implied covenant of good faith and fair dealing, its specific role in directing the fraudulent transfers of assets involving HFP," and interest, punitive damages, and attorneys' fees.

92. In November 2020, the Court considered the value of the UBS Claim for purposes of plan voting. In connection therewith, the Court temporarily allowed the UBS Claim in the amount of $94,761,076. Of that amount, approximately $43 million related to transfers HCMLP caused to be made to one of HCMLP's managed funds, based on the Court's estimation that there was a 90% chance that UBS would prevail on that portion of its claim under either a fraudulent conveyance or breach of implied covenant theory.

93. Subsequently, HCMLP and UBS engaged in settlement discussions and mediation. Following mediation, the parties reached an initial settlement in principle, pursuant to which UBS would receive a $75 million unsecured claim, consisting of a $50 million Class 8 General Unsecured Claim and a $25 million Class 9 Subordinated General Unsecured Claim. That settlement was disclosed to the Court at the February 2, 2021 confirmation hearing. This settlement was in satisfaction of damages resulting from conduct that Dondero, Ellington, and Leventon perpetrated on behalf of HCMLP. But for that conduct, HCMLP would not have been liable to, or required to enter into the settlement with, UBS.

94. While the preliminary settlement for the known misconduct of Dondero, Ellington, and Leventon was being finalized, the Independent Board learned that Dondero and Ellington had surreptitiously caused the Fund Counterparties to transfer their remaining assets to Sentinel, and had caused HCMLP to misrepresent to UBS that the Fund Counterparties had no assets prior to that transfer occurring. Acting on behalf of HCMLP, Dondero, Ellington, and Leventon had concealed this transfer from the Independent Board, while advising the Independent Board that the Fund Counterparties lacked any material assets. The Independent

Board had communicated that information to UBS (and the Court) and negotiated with UBS on those bases.

95. When the Independent Board discovered that Dondero, Ellington, and Leventon engaged in a conspiracy to cover up the fraudulent Sentinel transfer, it disclosed the transfer to UBS. As a result, the parties reopened settlement discussions. Ultimately, in order to limit HCMLP's potential liability to UBS as a result of Dondero's, Leventon's, and Ellington's bad acts, HCMLP entered into a revised settlement with UBS that granted UBS a claim totaling $125 million, consisting of a $65 million Class 8 General Unsecured Claim and a $60 million Class 9 Subordinated Unsecured Claim. In addition to the increased settlement amount and litigation costs, HCMLP is required to expend up to $3 million (subject to reimbursement) pursuant to certain cooperation provisions contained in the settlement agreement with UBS as a result of the fraudulent Sentinel transfer. The Bankruptcy Court approved the UBS settlement on May 27, 2021.

**2. HCMLP Incurs More Than $185 Million In Liability To The Redeemer Committee And Crusader Funds As A Result Of Dondero's Misconduct**

96. On April 3, 2020, the Redeemer Committee filed a general unsecured claim in the amount of its $190,824,557.00 arbitration award, plus "post-petition interest, attorneys' fees, costs and other expenses that continue to accrue." Likewise, on April 3, 2020, the Crusader Funds filed a claim for $23.5 million, consisting of $8.2 million in management fees and $15.3 million in distribution fees. Faced with this potential liability, HCMLP entered into a settlement whereby, among other things: (i) the Redeemer Committee was granted an allowed general unsecured claim of $136,696,610.00; (ii) the Crusader Funds were granted an allowed general unsecured claim of $50,000.00; (iii) HCMLP and Eames each consented to the cancellation of interests they and the Charitable DAF held in the Crusader Funds that the arbitration panel had

determined were wrongfully-acquired; (iv) HCMLP and Eames each acknowledged that they would not receive any portion of distributions reserved by the Crusader Funds, and HCMLP further acknowledged that it will not receive any future payments from the Crusader Funds in respect of any Deferred Fees, Distribution Fees, or Management Fees; and (v) HCMLP and the Redeemer Committee agreed to a form of amendment to the Portfolio Company's shareholders' agreement and to a process whereby HCMLP would use commercially reasonable efforts to monetize all Portfolio Company shares held by HCMLP, funds managed by HCMLP, and the Crusader Funds.[18] The Bankruptcy Court approved HCMLP's settlement with the Redeemer Committee and Crusader Funds on October 23, 2020.

### 3. HCMLP Incurs More Than $100 Million In Liability To Acis, Terry, And HarbourVest As A Result Of Dondero's Misconduct

97. Acis also filed proofs of claim against HCMLP, seeking, among other things, the amounts Dondero had caused HCMLP to overcharge Acis in order to diminish Terry's limited partner distributions from Acis, and damages arising from HCMLP's efforts to transfer assets out of Acis, in order to evade Terry's arbitration award and ensure that Dondero would benefit from the transferred assets. Terry and his wife also filed a proof of claim against HCMLP, alleging that HCMLP, acting through Dondero, had misappropriated assets in their retirement account. The Acis and Terry proofs of claim were settled in mediation after Dondero resigned from HCMLP. Pursuant to that settlement, Acis received a $23 million allowed claim

[18] Because HCMLP did not have the money to purchase the shares, the Redeemer Committee and HCMLP agreed to treat the Portfolio Company's shares differently than the process required under the arbitration award. Rather than having HCMLP purchase the Crusader Funds' shares in the Portfolio Company for approximately $48 million, they agreed that the Crusader Funds would retain their shares in the Portfolio Company and that the total damages award would be reduced by approximately $30.5 million to account for the perceived fair market value of those shares.

against HCMLP, and HCMLP was required to pay (1) Terry and his wife $425,000 plus 10% interest to resolve the Terry's claim that HCMLP had misappropriated their retirement account;[19] (ii) Terry $355,000 in legal fees because of HCLOF's frivolous suit in Guernsey; and (iii) Acis an additional $97,000 for legal fees incurred defending another frivolous lawsuit initiated by Dondero.

98. On April 8, 2020, the HarbourVest entities filed proofs of claim against HCMLP (the "HarbourVest Proofs of Claim") alleging that HCMLP had fraudulently induced them into entering into the HCLOF Investment based on HCMLP's misrepresentations and omissions concerning certain material facts, including that HCMLP: (1) failed to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million arbitration award; (2) failed to disclose that it orchestrated a series of fraudulent transfers to prevent Terry from collecting on his arbitration award, and misrepresented the reasons for changing the portfolio manager for HCLOF immediately prior to HarbourVest's HCLOF Investment; (3) indicated that the dispute with Terry would not impact HCLOF's investment activities; and (4) falsely expressed confidence in HCLOF's ability to reset or redeem the CLOs under its control.

99. HarbourVest sought to rescind its HCLOF Investment and alleged damages in excess of $300 million. Ultimately, following Dondero's departure from HCMLP, the parties reached a resolution whereby HarbourVest agreed to transfer its interests in HCLOF to a new entity designated by HCMLP in exchange for a $45 million general unsecured claim and a $35 million subordinated general unsecured allowed claim. These value of the HCLOF interests

[19] Because of the interest component, HCMLP ultimately paid the Terrys approximately $1 million to compensate them for Dondero's theft of their retirement account.

that HarbourVest transferred to the HCMLP-designated entity was tens of millions of dollars less than the allowed amount of HarbourVest's claim against HCMLP.

**G. HCMLP Was Insolvent, Inadequately Capitalized, And/Or Intended To Incur Debts Beyond Its Ability To Pay Well Before The Redeemer Committee Arbitration Award Forced It Into Bankruptcy**

100. The Redeemer Committee's $190 million arbitration award left HCMLP with no choice but to file for bankruptcy. But HCMLP was insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay well before the Redeemer Committee arbitration award was issued. As Dondero himself has acknowledged under oath, the economic recession of 2008, and the litigation commenced against HCMLP shortly thereafter, left HCMLP in an insolvent state from which HCMLP was still struggling to emerge in 2012. Indeed, valuations based on contemporaneous projections prepared on HCMLP's behalf and conservative valuations of HCMLP's contingent litigation liabilities show that HCMLP was balance sheet insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay in 2011 and 2012, when Dondero created lifeboats NexPoint and HCMFA, and transferred certain of HCMLP's management contracts to HCMFA for no value.

101. The creation of the lifeboats and the subsequent transfer of management contracts (and business value) all but ensured HCMLP's demise. HCMLP's assets under management, operating income from its investment management business, and operating margins steadily declined, and almost no new third-party investor money came into the company. HCMLP continued to shoulder the burden of providing services to NexPoint and HCMFA without compensation. While HCMLP's financial condition began to improve in 2013 due largely to successful proprietary trading and overall improving market conditions, those gains were largely dissipated in 2015 due to Dondero's reckless trading.

102. However, by 2015, the company was again firmly insolvent, inadequately capitalized and/or unable to pay its debts as they came due, in large part because its CLOs were generating diminishing returns, and the company was earning only minimal fees for servicing other Dondero Entities rather than generating new business of its own, while continuing to bear significant employee expenses. HCMLP's financial condition deteriorated further between 2016 and 2019, as additional litigation claims were levied against the company, and it was forced to answer for the misconduct perpetrated in its name by Dondero and his loyalists.

### H. At All Time Relevant To This Complaint, Dondero Hopelessly Commingled And Exploited Entities Within His Enterprise For His Own Personal Benefit

103. At all times relevant to this Complaint, Dondero exploited HCMLP, Strand, and the various entities he controlled within the Highland empire for his own personal benefit, both directly and through other HCMLP fiduciaries whose loyalties ran to Dondero rather than HCMLP, and who aided Dondero in his various schemes. Dondero treated the elaborate corporate web he had created as a series of integrated entities that existed solely to further his own self-enriching schemes, rather than as individual entities with their own respective stakeholders and corporate governance.

#### 1. Prior To Dondero's Resignation From Strand, Dondero Was The Alter Ego Of Strand

104. Dondero singularly dominated and controlled HCMLP and was its solitary decision-maker. Dondero made every material business, operational, management, and financial decision for HCMLP. Dondero exercised his complete control of HCMLP through HCMLP's general partner Strand, which Dondero similarly dominated and controlled. Dondero was Strand's 100% owner, sole director, and president between 1993 and 2020. For eight years he was also its secretary and only officer.

105. Strand did not even attempt to maintain the pretenses of observing corporate formalities. As an initial matter, Strand did not hold regular board meetings. Indeed, the Litigation Trustee, having reviewed HCMLP's books and records, has been unable to identify a single instance in which a Strand board meeting was held prior to the Petition Date. This is consistent with Dondero's own testimony in 2020 in an unrelated proceeding that he cannot recall ever attending a board meeting for Strand or seeing Strand board meeting minutes.

106. Although Strand's bylaws require annual meetings of stockholders, based on the Litigation Trustee's review of materials available to him, over the 26 years that Dondero controlled Strand, only six annual stockholder meetings were ever held, and no such meetings took place after 2005. The Litigation Trustee was able to identify only twelve instances of documented corporate action taken by the Strand board over the course of approximately 26 years, eight of which related to the appointment or removal of officers.

107. Dondero was the only officer of Strand between 1993 and 2001. Although Strand had certain elected officers between 2001 and 2019, they performed no duties in their capacities as officers of Strand and were appointed or fired from their roles based on their loyalty to, and standing with, Dondero. Indeed, when Dondero was asked under oath in 2020 about Strand's officers, he testified that he did not know if Strand even had officers, and stated that he was "not aware of [Strand] having any employees or active … governance." Moreover, he did not know whether Strand had a board of directors or if he was solely Strand's president.

**2. Dondero Routinely Commingled Entities And Employees Throughout The Dondero Corporate Web And Abused The Corporate Form**

108. As of the Petition Date, the Highland complex spanned more than 2,000 entities. For at least the last two decades, it has functioned largely as a single economic unit that was directly or indirectly operated and controlled by Dondero for his own personal benefit. Dondero

directed the integrated enterprise himself, using friends, family members, and directors-for-hire that the Court has previously described as "nominal figureheads"[20] to carry out his will. As high-level HCMLP employees have testified under oath, Dondero was the "ultimate decision-maker" for "every [] entity in the firm and for the firm as a whole."

109. Dondero managed the entities as a single integrated unit. Internal business plans and projections were prepared in the aggregate across entities, including entities that were not owned by HCMLP, but were instead otherwise directly or indirectly owned by Dondero. Internal financial forecasts even projected AUM growth in non-HCMLP entities that was predicated upon HCMLP acting as support and service provider, even though HCMLP itself was effectively a melting ice-cube when those projections were made. Indeed, as far back as 2011, company projections provided to the valuation advisor CBiz Valuation Group projected negative operating income for HCMLP.

110. Dondero also pillaged HCMLP for the benefit of other entities he created or controlled. In or around 2013, the Swiss entity Highland Capital Management AG ("HCM AG"), which is majority-owned by Dugaboy (which is ultimately owned and controlled by Dondero), entered into a joint venture with a Brazilian entity named Brasilinvest Investimentos e Participacoes Ltda ("Brasilinvest Investimentos") for a shared interest in a Brazilian entity named Highland Capital Brasilinvest Gestora de Recursos, Ltda (a.k.a Highland Capital Brasil Gestora de Recursos). With Dondero's approval, HCM AG acquired Brasilinvest Investimentos's shares in this joint venture through a $230,000 cash payment in October 2016.

---

[20] *See n re cis Cap. Mg t., L. .*, No. 18-30264-SGJ-11, 2019 WL 417149, at *17 (Bankr. N.D. Tex. Jan. 31, 2019), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019), *appeal dis issed as oot sub no . Matter of cis Cap. Mg t. . ., L.L.C.*, 850 F. App'x 300 (5th Cir. 2021), and *aff'd sub no . Matter of cis Cap. Mg t., L. .*, 850 F. App'x 302 (5th Cir. 2021).

However, at Dondero's direction, the $230,000 was paid by HCMLP rather than HCM AG or Dugaboy.

111. Dondero also funneled his own personal expenses through HCMLP, routinely seeking expense reimbursements from HCMLP in excess of $1 million per year. At Dondero's direction, HCMLP employed certain employees whose only responsibilities and obligations were to manage Dondero's and Okada's personal affairs and private business interests. For example, Melissa Schroth was employed by HCMLP, but her only duties were to serve as Dondero's and Okada's personal bookkeeper. Her duties involved no work for HCMLP, but rather concerned Dondero's and Okada's personal investments and entities, including but not limited to Dugaboy and Get Good.

112. Indeed, notwithstanding the fact that Schroth was nominally an HCMLP employee, she subordinated the interests of HCMLP to Dondero's personal interests. For example, following the commencement of HCMLP's bankruptcy, Schroth instructed Dondero's sister, Nancy, to send a letter in her capacity as a trustee of Dugaboy instructing a Swiss entity, Highland Capital AG, to write off a liability that it owed to HCMLP for payments that HCMLP had made on its behalf. Schroth even ghost-wrote a letter for Nancy Dondero to send to Highland Capital AG authorizing this theft.

113. Schroth was not an anomaly. Several other professionals on HCMLP's payroll dedicated material amounts of their working time to performing work in connection with Dondero's personal businesses, investments, and homes. Likewise, Dondero frequently instructed HCMLP's legal department to perform legal services in connection with Dondero's personal and business interests, which conferred no value on HCMLP.

114. Highland employees frequently did not know whether they or their colleagues were employees of HCMLP or another entity within the Dondero web. Employees shared the same office space in HCMLP's headquarters. Indeed, each of Strand, NexPoint, NexPoint GP, HCMFA, Dugaboy, CLO Holdco, the Highland Dallas Foundation, the Highland Santa Barbara Foundation, the Highland Kansas City Foundation, HFP, SAS, and Acis listed its business headquarters at this same address: 300 Crescent Court, Suite 700, Dallas, Texas 75201. Moreover, when employees of HCMLP performed services for other Dondero entities, they sometimes did so pursuant to agreements that Dondero signed for both HCMLP, on the one hand, and the counterparty, on the other hand. In other instances, HCMLP's employees performed services for non-HCMLP entities without any formal agreements in place at all. For example, Leventon testified that he performed work for SAS "on and off" for approximately seven years (*e.g.*, in connection with whether to invest in a new litigation funding case), notwithstanding that he was never an employee of SAS and HCMLP did not have a shared services agreement with SAS.[21] Moreover, when shared services and advisory agreements were in place, HCMLP frequently charged Dondero's other entities below-market rates for use of HCMLP's employees and resources.

115. Additionally, Dondero would delegate authority to his loyalists irrespective of their titles or roles. For example, Dondero delegated decision-making authority for Acis to

[21] Similarly, several HCMLP employees, including Ellington, Leventon, Katie Irving, and JP Sevilla, had SAS email addresses, and there were frequent meetings among HCMLP's legal department—including Ellington, Leventon, and Sevilla—and Dilip Massand in connection with SAS. SAS did not compensate any of these HCMLP employees for their work for SAS. Moreover, in 2014, when a telephone call was placed to the number listed on SAS's website, the call was routed to HCMLP's office in Dallas with a message that stated: "Thank you for calling SAS Asset Recovery. For reception press 0. For Scott [Ellington], press 1. For Dilip [Massand], press 2. For JP [Sevilla], press 3. For Tabor [Pittman, former HCMLP Associate GC], press 4. For Katie [Irving], press 5. For Isaac [Leventon], press 6. Thanks and have a good day."

Ellington, notwithstanding that he was not an officer, director, or employee of Acis. And Leventon testified that although he was an HCMLP employee, HCMLP could request that he perform legal services for any of the 2,000 entities in the Highland web.

116. Dondero would also use HCMLP as his own personal piggy-bank (in addition to using HCMLP as NexPoint's and HCMFA's piggy-bank, as described above). For example, between January and August of 2018, Dondero borrowed $16,725,000 on four demand notes. Dondero remains obligated on three of the demand notes and maintains an outstanding principal balance of approximately $9 million. HCMLP has demanded payment on all of the outstanding demand notes, but to date, Dondero has failed to make any repayments on that debt.[22]

117. Dondero also effectively paid himself and Okada distributions from HCMLP through other Dondero Entities, including HCMS. Between 2013 and 2017, HCMS issued dozens of demand notes to HCMLP in return for tens of millions of dollars in cash, and between May 2017 through 2020, HCMS issued four additional promissory demand notes with an aggregate face amount of $900,000. Frequently, these notes functioned as disguised distributions to Dondero and Okada, by virtue of a "loan" from HCMLP to HCMS followed by a "loan" from HCMS to Dondero and Okada. As with other intercompany notes between HCMLP and other Dondero Entities, these notes had minimal covenants. Moreover, Dondero caused HCMLP to issue these loans to HCMS with minimal interest.

---

[22] On January 1, 2021, HCMLP filed an adversary proceeding in the Bankruptcy Court to collect on these notes. *Highland Capital Manage ent, L. . v. a es ondero*, Adv. Pro. 21-03003-sgj (Bankr. N.D. Tex. Jan. 22, 2021). Dondero has raised a series of frivolous defenses to repayment of the notes, including that Dugaboy—acting through Dondero's sister—agreed to forgive the notes as part of Dondero's compensation. As of December 3, 2020, Dondero owed $9,004,013 in past-due principal and interest on the notes.

118. To take yet another example, Dondero exploited HCMLP's employees and capital in order to launch HCRE Partners, LLC ("HCRE"), another entity designed to evade HCMLP's creditors.[23] HCRE pursued financial and real estate investments, failing to pay HCMLP any consideration for advisory, administrative, and other services HCMLP provided. Moreover, Dondero (1) caused HCMLP to loan HCRE tens of millions of dollars on terms that were unfair to HCMLP; (2) used the proceeds of those loans to pay approximately $32 million in distributions (between 2016 and 2020) to Dugaboy, Ellington, and another former HCMLP employee; and (3) caused HCRE to default on its debt to HCMLP and assert frivolous defenses to HCMLP's right to repayment. As of January 8, 2021, approximately $6.1 million in principal and interest was due and owing to HCMLP on HCRE notes.

119. As explained above, Dondero also used HCMLP to support the growth of lifeboats like NexPoint and HCMFA. Additionally, in December 2010, certain preferred tranches of CLOs managed by HCMLP and held by Highland CDO Holding Company, a portion of which was indirectly owned by HCMLP, were sold to CLO Holdco, a Cayman Islands entity then owned and controlled by a Dondero trust. CLO Holdco purported to pay approximately $39 million in return, but $33 million of that amount consisted of a note that was never repaid. The value of these preferred securities predictably skyrocketed soon thereafter, and generated substantial income that was used to benefit Dondero's lifeboats. An analysis of CLO Holdco's cash flows over time demonstrates that income generated from these assets was used to seed a variety of NexPoint-managed funds and entities, HCMFA managed funds and

[23] HCRE is 70% owned by Dugaboy, 25% owned by Highland Capital Management Real Estate Holdings I, LLC ("HCMRE I") (owned by a former HCMLP managing director) and 5% owned by Highland Capital Management Real Estate Holdings II, LLC ("HCMRE II") (owned by Ellington).

entities, and Acis-managed CLOs and other vehicles—all for Dondero's benefit—rather than accruing in favor of HCMLP or its subsidiaries.

120. Dondero did not bother to distinguish between himself and HCMLP. After Dondero resigned from HCMLP, he continued using his HCMLP email account and continued working out of HCMLP's headquarters until December 2020. When the Court entered an order restraining Dondero from communicating with HCMLP employees, Dondero flouted the order, including by communicating with Ellington and instructing Melissa Schroth (an HCMLP employee at the time) to resist Dugaboy-related document production requests, even though those documents were always kept on HCMLP's computer system. Likewise, a temporary restraining order entered by this Court prohibited Dondero from participating in, or encouraging others to participate in, any action that undermined decisions made by HCMLP's Chief Restructuring Officer, James Seery ("Seery"), regarding the disposition of HCMLP assets. Nevertheless, Dondero did so multiple times, including by contacting various employees and instructing them to act in a manner that was inconsistent with Seery's directions.

121. Dondero evinced no respect for HCMLP as an entity separate and apart from himself. Thus, he disposed of a cell phone that belonged to HCMLP that contained relevant data, likely resulting in the spoliation of valuable evidence that HCMLP could have used to pursue claims benefitting HCMLP. In addition, Dondero interfered with document productions of HCMLP and trespassed on HCMLP's property.

122. Separately, in Court orders entered in January 2020 and July 2020, the Court included "gatekeeper" provisions that prevented parties from suing the Independent Board, Seery, and their agents (among others), unless they sought permission from the bankruptcy court. Dondero and his affiliated entities flouted this order, too, and this Court subsequently

held Dondero, the DAF, CLO Holdco, Mark Patrick, and Sbaiti & Co. (counsel to the DAF and CLO Holdco) in contempt. As this Court observed, Dondero "sparked th[e] fire" to bring actions in the district court in violation of the Bankruptcy Court's order.

123. Dondero also used HCMLP and its employees for the benefit of his personal trusts. For example, as the control person for HCMLP, Dugaboy, and Get Good, Dondero treated HCMLP, its employees, and its resources as available to Dugaboy and Get Good at his sole discretion. HCMLP employees were involved in creating, managing, and accounting for Dugaboy, and certain of those employees, including Melissa Schroth, performed work on behalf of Get Good in connection with Dondero's estate planning and transactions between Get Good and other Dondero Entities. Moreover, both Dugaboy and Get Good have acknowledged in the course of HCMLP's bankruptcy that HCMLP hosted their documents on its server. However, neither Dugaboy nor Get Good compensated HCMLP for the use of its employees or its resources. And, Dondero is now causing Dugaboy to falsely assert in HCMLP's notes litigation that Dugaboy, acting through Nancy Dondero, caused HCMLP to forgive the notes owed to HCMLP by various Dondero Entities as compensation to Dondero.

### I. Dondero And His Loyalists Also Engaged In Other Conduct That Harmed HCMLP

#### 1. Dondero And His Loyalists Fraudulently Transferred Assets To Themselves And Their Affiliated Entities

124. Dondero and his loyalists also engaged in other transactions that siphoned value from HCMLP to themselves. As described in greater detail below, these included (i) transfers of liquid assets for illiquid notes that could not have been monetized for the same value as the assets for which they were exchanged, (ii) limited partner distributions, and (iii) payments for services provided to other Dondero Entities rather than HCMLP.

(a) The Fraudulent CLO Holdco Transaction

125. On December 28, 2016, shortly after the Redeemer Committee commenced its Delaware state court action and arbitration against HCMLP, and while UBS's action against HCMLP was pending, Dondero, acting with substantial assistance from Scott, undertook a scheme whereby HCMLP transferred assets through a series of related assignments worth approximately $24 million or potentially more (the "Transferred CLO Holdco Assets") to CLO Holdco, in exchange for an assignment from Get Good of an existing Dugaboy obligation (the "Dugaboy Note"), which was worth significantly less than the transferred assets (the "CLO Holdco Transaction").

126. Upon information and belief, Dondero consummated the CLO Holdco Transaction in order to claim a charitable deduction on his tax returns, and to place value out of his ex-wife's reach. Specifically, Dondero wanted to transfer assets out of Get Good so that they would not be available to his ex-wife, and to do so through a charitable donation so that he would get the added benefit of a tax deduction. Get Good, however, did not own enough assets that qualified for a tax-deductible charitable donation. Accordingly, Dondero caused Get Good to exchange the Dugaboy Note, which did not qualify for a tax-deductible donation, for HCMLP's Transferred CLO Holdco Assets, which did. Dondero, acting with Scott's assistance, then caused the Transferred CLO Holdco Assets to be immediately transferred from Get Good to Highland Dallas, to the Charitable DAF, to the DAF, and ultimately to CLO Holdco. The CLO Holdco Transaction thus furthered Dondero's personal interests, but harmed HCMLP and its creditors by replacing liquid and liquidating assets with an illiquid note of significantly less value.

127. The Transferred CLO Holdco Assets consisted of: (1) $2,032,183.24 or potentially more in Series A Interests in Highland Capital Loan Fund, L.P., an HCMLP-

managed hedge fund investing primarily in liquid loans; (2) a participation interest worth $8,710,000 or potentially more in call options of publicly-traded American Airlines Group, Inc. (the "AA Interests"); and (3) a participation interest in certain Highland Crusader Fund L.P. and Highland Crusader Fund II, Ltd. shares, as well as a tracking interest in certain participation shares of Highland Crusader Fund II, Ltd., which at the time of the transfer were collectively valued at $12,625,395.44 and worth potentially more (the "Crusader Interests"). The transfer of the Transferred CLO Holdco Assets was initiated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good. Pursuant to that agreement, the Transferred CLO Holdco Assets were received by Get Good.

128. Dondero caused HCMLP to transfer the Transferred CLO Holdco Assets to Get Good in exchange for the Dugaboy Note. While the face amount of the Dugaboy Note was equal to the reported value of the Transferred CLO Holdco Assets, in actuality, the value of the Dugaboy Note did not come close to the value of the Transferred CLO Holdco Assets. The interest rate on the Dugaboy Note was a paltry 2.75%. There was no security interest provided in respect of the Dugaboy Note or other material covenants or lender protections other than rights to cost of collections. No payments of principal or interest were required on the note until 2036. And because Dugaboy was a completely private and opaque counterparty, there was no third-party market for the sale of the Dugaboy Note. Lastly, from a counterparty risk perspective, Dondero's control over the repayment of a note clearly does not ensure timely repayment without litigation, as evidenced by the several entities controlled by Dondero that are currently seeking to evade their unambiguous payment obligations on other notes owed to HCMLP, on frivolous grounds such as mistake and subsequent alleged oral agreements between

Dondero and his sister. In the end, Dondero caused HCMLP to exchange valuable liquid or otherwise near-term liquidating assets for a paper-thin promise 20 years into the future.

129. Following Get Good's receipt of the Transferred CLO Holdco Assets, Scott—at Dondero's direction—immediately caused Get Good to donate the assets to Highland Dallas Foundation by Scott in his capacity as trustee of Get Good. Dondero and Scott caused the Highland Dallas Fund to immediately contribute the Transferred CLO Holdco Assets to DAF Holdco by unanimous written consent executed by Dondero, Scott, and Jalonick, each in their capacity as the directors of Highland Dallas Foundation. Following that transfer, through an omnibus assignment agreement, Scott caused DAF Holdco to transfer the Transferred CLO Holdco Assets to the DAF, which itself immediately transferred them to CLO Holdco. The DAF GP issued a written resolution, as general partner of the DAF and as 100% owner of CLO Holdco, contributing the Transferred CLO Holdco Assets to CLO Holdco. Scott again executed this document as managing member of DAF GP. As purported consideration for these transfers, the Highland Dallas Foundation, DAF Holdco, the DAF, and CLO Holdco all agreed to be fully bound by apparently unrelated "Multi Strat Governing Documents." Scott executed the requisite consent documents on behalf of each entity, in his capacities as director of DAF Holdco, managing member of the DAF, and director of CLO Holdco. Upon information and belief, Scott consented to each step of the CLO Holdco Transaction on behalf of Get Good, DAF Holdco, the DAF, DAF GP, and CLO Holdco solely at Dondero's request, and without performing any independent analysis.

130. The structure of the CLO Holdco Transaction is set forth below in Figure 3.

**Figure 3.**




(b) Fraudulent Distributions

131. Notwithstanding HCMLP's limited liquidity and hundreds of millions of dollars in looming liabilities, Dondero caused HCMLP to make a series of equity distributions between 2010 and 2012, and 2015 and 2019, for Dondero's and Okada's ultimate benefit, and to the detriment of HCMLP's creditors. These distributions were made at a time when HCMLP was insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay, and were intended to hinder, delay, and/or defraud creditors by siphoning value to limited partners that should have been preserved for creditors' benefit.

132. Although Dondero and Okada placed certain of their limited partnership interests in trusts that they ultimately owned or controlled, Dondero frequently disregarded corporate formalities, including with respect to limited partnership distributions. Until 2015, distributions were made to Dondero personally, notwithstanding that he owned HCMLP largely through

certain trusts. Beginning in 2015, it appears that distributions were made directly to Strand and Dugaboy, *i.e.*, the Dondero Entities that actually held HCMLP limited partnership interests. As such, the distributions made to Dondero between April 9, 2010 and February 28, 2015 (identified below) were made for the benefit of Dondero, Dugaboy, and/or Strand. The distributions made after February 28, 2015 were, upon information and belief, made directly to the limited partnership interest holders, for the benefit of Dondero and Okada.

133. Likewise, until 2015, distributions were made to Okada individually, rather than HCMLP's limited partners MAP #1 and MAP #2. As such, the distributions made to Okada between April 9, 2010 and February 28, 2015 (identified below) were made for the benefit of Okada, MAP #1, and/or MAP #2. The distributions to Okada made after February 28, 2015 were broken out into three transfers in HCMLP's records, in amounts proportionate to the limited partnership interests of Okada, MAP #1, and MAP #2.

134. On or around April 9, 2010, HCMLP made "distributions" to Dondero and Okada, in the amounts of $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) and $405,585.62 (two transfers of $375,000.00 and $30,585.62), respectively (the "April 9, 2010 Distributions").

135. On or around April 13, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $649,318.45 and $216,439.49, respectively (the "April 13, 2011 Distributions").

136. On or around May 3, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $3,124,435.00 and $1,024,018.00, respectively (the "May 3, 2011 Distributions").

137. On or around September 13, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $5,351,316.00 and $1,705,813.00, respectively (the "September 13, 2011 Distributions").

138. On or around November 25, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $5,250,000.00 and $1,750,000.00, respectively (the "November 25, 2011 Distributions").

139. On or around February 23, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $3,000,000.00 and $1,000,000.00, respectively (the "February 23, 2012 Distributions").

140. On or around February 29, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $4,514,780.25 and $1,504,926.75, respectively (the "February 29, 2012 Distributions").

141. On or around April 10, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $6,221,364.15 and $2,073,788.05, respectively (the "April 10, 2012 Distributions").

142. On or around April 30, 2013, HCMLP made distributions to Dondero and Okada, in the amounts of $25,375,083.16 and $8,440,148.31, respectively (the "April 30, 2013 Distributions").

143. On or around February 28, 2015, HCMLP made distributions to Dondero in the amount of $2,850,000, and to or for the benefit of Okada, MAP #1, and MAP #2,[24] in the

[24] At the time of these distributions, Okada and two trusts (MAP #1 and MAP #2) established for the benefit of Okada's children held economic interests in HCMLP. HCMLP's accounting records indicate that distributions allocated to Okada, MAP #1, and MAP #2 were all made to a single account in Okada's name. Thus, with respect to this and subsequent, applicable distributions, Plaintiff pleads that they were made to or for the benefit of Okada, MAP #1, and MAP #2.

amounts of $738,217.40, $148,247.82, and $63,534.78, respectively (the "February 28, 2015 Distributions").

144. On or around September 30, 2015, HCMLP made distributions to Dugaboy and Strand in the amounts of $16,005,159 and $119,820, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $4,176,762, $838,780, and $359,480, respectively (the "September 30, 2015 Distributions").

145. On or around December 8, 2015, HCMLP made in-kind distributions of shares of the company Ocean Rig UDW, Inc. (ORIG), which had a value of $1.51 per share at the time of the distribution. These in-kind distributions were made to Dugaboy in the amount of 4,813,132 shares valued at $7,267,829.32, and to or for the benefit of Okada, MAP #1, and MAP #2 in the amounts of 1,246,710 shares valued at $1,882,532.10; 250,336 shares valued at $378,052.66; and 107,301 shares valued at $162,024.51, respectively (the "December 8, 2015 In-Kind Distributions").

146. On or around December 31, 2015, HCMLP made distributions to Dugaboy and Strand in the amounts of $16,005,159 and $119,820, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $4,176,762, $838,780, and $359,480, respectively (the "December 31, 2015 Distributions").

147. On or around July 31, 2016, HCMLP made distributions to Hunter Mountain,[25] Dugaboy, and Strand in the amounts of $1,600,000, $3,001, and $4,033, respectively, and to or

[25] In December 2015, Dondero orchestrated two sequential transactions, whereby Hunter Mountain purchased virtually all of HCMLP's limited partnership interests in exchange for cash and notes (collectively, the "Hunter Mountain Transaction"). The effect of the Hunter Mountain Transaction was to consolidate over 99% of all existing limited partners' interests in HCMLP into a single entity, Hunter Mountain. Hunter Mountain is owned through a series of intermediate shell companies, and ultimately all economic interests are held in a series of tax-favored life insurance

for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $783, $158, and $68, respectively (the "July 31, 2016 Distributions").

148. On or around December 31, 2016, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $4,769,570, $8,945, and $12,017, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $2,334, $470, and $201, respectively (the "December 31, 2016 Distributions").

149. On or around January 31, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $11,034,754, $20,694, and $27,803, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $5,401, $1,087, and $466, respectively (the "January 31, 2017 Distributions").

150. On or around February 28, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $7,169,970.00, $13,446.40, and $18,065.44, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $3,509.32, $706.19, and $302.65, respectively (the "February 28, 2017 Distributions").

151. On or around June 30, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $79,600.00, $149.28, and $200.56, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $38.96, $7.84, and $3.36, respectively (the "June 30, 2017 Distributions").

152. On or around December 31, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $2,651,675.00, $4,972,89, and $6,681.16,

---

accounts at Crown Global Life Insurance Ltd. ("Crown Global"). On information and belief, these accounts were created by Dondero and Okada, who were the direct or indirect owners of nearly all of the Debtor's limited partner interests prior to the Hunter Mountain Transaction. Dondero orchestrated the Hunter Mountain Transaction in order to avail himself of personal tax benefits.

respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $1,297.86, $261.17, and $111.93, respectively (the "December 31, 2017 Distributions").

153. On or around March 31, 2018, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $84,575.00, $158.61, and $213.10, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $41.40, $8.33, and $3.57, respectively (the "March 31, 2018 Distributions").

154. On or around December 31, 2018, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $4,930,722.50, $9,246.96, and $12,423.44, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $2,413.33, $485.64, and $208.13, respectively (the "December 31, 2018 Distributions").

155. On or around March 31, 2019, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $3,711,456.47, $6,960.38, and $9,351.38, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $1,816.56, $365.55, and $156.66, respectively (the "March 31, 2019 Distributions," and together with the April 9, 2010 Distributions, April 13, 2011 Distributions, May 3, 2011 Distributions, September 13, 2011 Distributions, November 25, 2011 Distributions, February 23, 2012 Distributions, February 29, 2021 Distributions, April 10, 2012 Distributions, April 30, 2013 Distributions, February 28, 2015 Distributions, September 30, 2015 Distributions, December 8, 2015 In-Kind Distributions, December 31, 2015 Distributions, July 31, 2016 Distributions, December 31, 2016 Distributions, January 31, 2017 Distributions, June 30, 2017 Distributions, December 31, 2017 Distributions, March 31, 2018 Distributions, December 31, 2018 Distributions, March 31, 2019 Distributions, the "HCMLP Distributions").

156. All of these distributions were made at a time when HCMLP was insolvent and as part of a scheme to, transfer HCMLP's value to Dondero and Okada and divert value away from HCMLP's current and potential future creditors. The March 31, 2019 Distributions, which were made shortly after the arbitration panel awarded the Redeemer Committee over $190 million, were the final distributions made by HCMLP. The distributions ceased at that time—the end result of HCMLP's valuable businesses being usurped by the "lifeboats" and a years-long effort to transfer HCMLP's remaining cash to its limited partners via distributions.

(c) Fraudulent Transfers To Massand

157. HCMLP also made payments of at least $519,000 per year to Massand Capital from November 2014 through 2019. On January 1, 2014, HCMLP entered into a one-year consulting agreement with Massand Inc., pursuant to which HCMLP agreed to pay Massand Inc. $25,000 per month in fees, $7,500 per month in "accommodations," $750 per month in cell phone expenses, and other "reasonable" expenses. Then, on January 5, 2015, HCMLP entered into a consulting agreement (together, the "Massand Consulting Agreements") on the same terms with Massand LLC, pursuant to which HCMLP agreed to pay Massand LLC $35,000 per month in fees, $7,500 per month in "accommodations," $750 per month in cell phone expenses, and other "reasonable" expenses. In exchange, the Massand Consulting Agreements provided that HCMLP's Chairman, Dondero, and its General Counsel, Ellington, would assign certain unspecified "tasks" to Massand Capital.

158. Massand Capital's monthly invoices to HCMLP were consecutively numbered, indicating that Massand Capital had no customers other than HCMLP. Moreover, Massand Capital's invoices contained no information about the services it purportedly rendered to HCMLP.

159. The Massand Consulting Agreements noted that Massand Capital would be responsible for advising HCMLP on its "Investment Recovery Strategies business in the Countries of the Gulf Cooperation Council"—specifically Bahrain, Saudi Arabia, the United Arab Emirates, Kuwait, Qatar, and Oman. Based upon a review of information to date, it appears that Massand Capital provided no actual services to HCMLP, and that HCMLP did not have any "business" that was related to "investment recovery strategies."

160. Rather, Massand Capital appears to have provided services solely to SAS—a separate entity that was owned and controlled by Dondero. The owner of Massand Capital, Dilip Massand, was assigned an SAS email address, was bestowed the title of "Managing Director" of SAS, and was involved in communications relating to SAS's claims purchase litigation financing business.[26] As set forth above, SAS was owned by Dondero and Ellington, not HCMLP.

161. Thus, based on the documents and information that Plaintiff has reviewed to date, Dondero caused HCMLP to pay millions of dollars in consulting fees to Massand Capital in exchange for no value to HCMLP, all solely to benefit other Dondero-controlled entities. HCMLP received no value for the payments that Dondero and Ellington directed to Massand Capital.

**J. Dondero And Ellington Breach Their Fiduciary Duties To HCMLP By Misappropriating Its Funds**

162. HCMLP owned a 97.5% interest in HE Capital 232 Phase I, LLC ("HE Capital 232"). In February 2018, HE Capital 232 and its wholly-owned subsidiary, HE Capital 232 Phase I Property, LLC ("HE Capital 232 Property"), sold real property in Arizona for

---

[26] In a speaker profile in 2014, Dilip Massand was described as overseeing "the operations of SAS Asset Recovery in the Middle East."

$8,687,245.15. The proceeds were placed in an escrow account maintained by HCMLP's counsel, Wick Phillips Gould & Martin LLP ("Wick Phillips"), "pending distribution of the proceeds to the direct and indirect owners of interests in [HE Capital 232 Property]."

163. On March 2, 2018, Wick Phillips disbursed $4,510,000 to HCMLP out of the escrow account, $2,977,245.15 less than HCMLP was due. On information and belief, Dondero and Ellington directed Wick Phillips to withhold these proceeds in a scheme to funnel the money to themselves through shell companies they owned in the Cayman Islands. Indeed, on June 4, 2018, at Ellington's direction, Wick Phillips disbursed the remainder to Maple FS, a so-called fiduciary services company in the Cayman Islands, which subsequently transferred the full amount to Grey Royale Ltd., a Cayman Islands shell company owned and controlled by Dondero and Ellington.

**K. Dondero Loyalists Receive Their Deferred Compensation By Engaging In The Tall Pine Transaction**

164. HCMLP employees other than Dondero also engaged in self-interested transactions and schemes involving HCMLP.

165. In early 2020, only months after the Petition Date, Ellington and Leventon formed a group of entities that have received millions of dollars of payments from four Dondero Entities pursuant to a services agreement dated March 13, 2020, among Tall Pine, NexBank, DAF Holdco, NexPoint, and HCMFA (the "Tall Pine Services Agreement"). The Tall Pine scheme was an elaborate arrangement pursuant to which Dondero would be able to keep certain key employees, including Ellington, Leventon, and Waterhouse, loyal to Dondero during the bankruptcy.

166. Pursuant to the Tall Pine Services Agreement, HCMLP employees, including Ellington, Leventon, and Waterhouse would receive approximately $17 million through pass-

through entities that they created and owned over the course of two years. When Tall Pine would receive a payment from any of the counterparties to the Tall Pine Services Agreement, Tall Pine contemporaneously transferred funds to Waterhouse's and Leventon's pass-through entities, FHCT Consulting, LLC ("FHCT") (owned and controlled by Waterhouse) and Clairmont Holdings, LLC ("Clairmont") (owned and controlled by Leventon). Ellington, who owned Tall Pine, profited from the amounts that remained in Tall Pine after it had distributed sums to Clairmont and FHCT.

167. After the Petition Date, Dondero and Waterhouse surreptitiously approved wire transfers from accounts held by NexPoint, NexBank, and the DAF to Tall Pine for the benefit of himself, Ellington, and Leventon. These payments were made to compensate Waterhouse, Ellington, and Leventon for the amounts that would have been paid to them in 2020 but for the Committee's objection. Indeed, Waterhouse, Ellington, and Leventon did not disclose these payments to the Independent Board.[27]

## V. CAUSES OF ACTION

### COUNT I
### Avoidance and Recovery of HCMLP Distributions as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law

*gainst ondero, ugabo , ada, M , M , Strand, and Hunter Mountain*

168. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

[27] On September 21, 2021, HCMLP filed a motion under 11 U.S.C. §§ 105(a) and 502(j) seeking to disallow in its entirety Waterhouse's claim that was previously resolved pursuant to that *Senior plo ee Stipulation and Tolling gree ent tending Statutes of Li itation*, dated as of January 20, 2021 (Docket No. 1811-13) based on, among other things, these payments. *See Motion of the eorgani ed ebtor to isallo Clai of ran aterhouse ursuant to an ruptc Code Section* (Docket No. 2857) (the "Waterhouse Motion").

169. As set forth below, HCMLP made the following HCMLP Distributions to or for the benefit of Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain.

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| April 9, 2010 Distributions | $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) | N/A | N/A | $405,585.62 (two transfers of $375,000.00 and $30,585.62) | | | N/A |
| April 13, 2011 Distributions | $649,318.45 | N/A | N/A | $216,439.49 | | | N/A |
| May 3, 2011 Distributions | $3,124,435.00 | N/A | N/A | $1,024,018.00 | | | N/A |
| September 13, 2011 Distributions | $5,351,316.00 | N/A | N/A | $1,705,813.00 | | | N/A |
| November 25, 2011 Distributions | $5,250,000.00 | N/A | N/A | $1,750,000.00 | | | N/A |
| February 23, 2012 Distributions | $3,000,000.00 | N/A | N/A | $1,000,000.00 | | | N/A |
| February 29, 2012 Distributions | $4,514,780.25 | N/A | N/A | $1,504,926.75 | | | N/A |
| April 10, 2012 Distributions | $6,221,364.15 | N/A | N/A | $2,073,788.05 | | | N/A |
| April 30, 2013 Distributions | $25,375,083.16 | N/A | N/A | $8,440,148.31 | | | N/A |
| February 28, 2015 Distributions | $2,850,000.00 | N/A | N/A | $950,000.00 | | | N/A |
| September 30, 2015 Distributions | N/A | N/A | $16,005,159.00 | $4,176,762.00 | $838,780.00 | $359,480.00 | $119,820.00 |
| December 8, 2015 In-Kind Distributions | N/A | N/A | $7,267,829.32 | $1,882,532.10 | $378,052.66 | $162,024.51 | N/A |
| December 31, 2015 Distributions | N/A | N/A | $16,005,159.00 | $4,176,762.00 | $838,780.00 | $359,480.00 | $119,820.00 |
| July 31, 2016 Distributions | N/A | $1,600,000.00 | $3,001.00 | $783.00 | $158.00 | $68.00 | $4,033.00 |
| December 31, 2016 Distributions | N/A | $4,769,570.00 | $8,945.00 | $2,334.00 | $470.00 | $201.00 | $12,017.00 |
| January 31, 2017 Distributions | N/A | $11,034,754.00 | $20,694.00 | $5,401.00 | $1,087.00 | $466.00 | $27,803.00 |

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| February 28, 2017 Distributions | N/A | $7,169,970.00 | $13,446.40 | $3,509.32 | $706.19 | $302.65 | $18,065.44 |
| June 30, 2017 Distributions | N/A | $79,600.00 | $149.28 | $38.96 | $7.84 | $3.36 | $200.56 |
| December 31, 2017 Distributions | N/A | $2,651,675.00 | $4,972.89 | $1,297.86 | $261.17 | $111.93 | $6,681.16 |
| March 31, 2018 Distributions | N/A | $84,575.00 | $158.61 | $41.40 | $8.33 | $3.57 | $213.10 |
| December 31, 2018 Distributions | N/A | $4,930,722.50 | $9,246.96 | $2,413.33 | $485.64 | $208.13 | $12,423.44 |
| March 31, 2019 Distributions | N/A | $3,711,456.47 | $6,960.38 | $1,816.56 | $365.55 | $156.66 | $9,351.38 |
| Total | $57,553,053.88 | $36,032,322.97 | $39,345,721.84 | | $32,266,078.94 | | $330,428.08 |

170. At the time of each HCMLP Distribution, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

171. HCMLP received less than reasonably equivalent value in exchange for each of HCMLP Distributions set forth above. Indeed, HCMLP received no value for HCMLP the Distributions, each of which was a gratuitous transfer from HCMLP, either to one of its limited partners or for the benefit of one of its limited partners and/or Dondero.

172. Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain did not receive HCMLP Distributions in good faith. To the contrary, at the times that Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain received each of HCMLP Distributions, they knew that HCMLP was balance sheet insolvent (or would be rendered

balance sheet insolvent), inadequately capitalized, and/or unable to pay its debts as they came due. Each of these defendants was aware that Dondero had siphoned HCMLP's valuable assets and business opportunities after HCMLP had incurred substantial contingent liabilities. Moreover, each of these defendants was aware that HCMLP Distributions were yet another effort to siphon value from HCMLP to Dondero, Okada, and their affiliated entities at a time when HCMLP was insolvent, inadequately capitalized, and unable to pay its debts as they came due.

173. Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of distributions made to Hunter Mountain, given that Hunter Mountain transferred proceeds of such distributions to them.

174. Each HCMLP Distribution is voidable as a constructively fraudulent transfer. Accordingly, each HCMLP Distribution should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT II**

**Avoidance and Recovery of HCMLP Distributions as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law**

*gainst ondero, ugabo , ada, M , M , Strand, and Hunter Mountain*

175. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

176. As set forth below, HCMLP made the following HCMLP Distributions to or for the benefit of Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain.

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| April 9, 2010 Distributions | $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) | N/A | N/A | $405,585.62 (two transfers of $375,000.00 and $30,585.62) | | | N/A |
| April 13, 2011 Distributions | $649,318.45 | N/A | N/A | $216,439.49 | | | N/A |
| May 3, 2011 Distributions | $3,124,435.00 | N/A | N/A | $1,024,018.00 | | | N/A |
| September 13, 2011 Distributions | $5,351,316.00 | N/A | N/A | $1,705,813.00 | | | N/A |
| November 25, 2011 Distributions | $5,250,000.00 | N/A | N/A | $1,750,000.00 | | | N/A |
| February 23, 2012 Distributions | $3,000,000.00 | N/A | N/A | $1,000,000.00 | | | N/A |
| February 29, 2012 Distributions | $4,514,780.25 | N/A | N/A | $1,504,926.75 | | | N/A |
| April 10, 2012 Distributions | $6,221,364.15 | N/A | N/A | $2,073,788.05 | | | N/A |
| April 30, 2013 Distributions | $25,375,083.16 | N/A | N/A | $8,440,148.31 | | | N/A |
| February 28, 2015 Distributions | $2,850,000.00 | N/A | N/A | $950,000.00 | | | N/A |
| September 30, 2015 Distributions | N/A | N/A | $16,005,159.00 | $4,176,762.00 | $838,780.00 | $359,480.00 | $119,820.00 |
| December 8, 2015 In-Kind Distributions | N/A | N/A | $7,267,829.32 | $1,882,532.10 | $378,052.66 | $162,024.51 | N/A |
| December 31, 2015 Distributions | N/A | N/A | $16,005,159.00 | $4,176,762.00 | $838,780.00 | $359,480.00 | $119,820.00 |
| July 31, 2016 Distributions | N/A | $1,600,000.00 | $3,001.00 | $783.00 | $158.00 | $68.00 | $4,033.00 |
| December 31, 2016 Distributions | N/A | $4,769,570.00 | $8,945.00 | $2,334.00 | $470.00 | $201.00 | $12,017.00 |
| January 31, 2017 Distributions | N/A | $11,034,754.00 | $20,694.00 | $5,401.00 | $1,087.00 | $466.00 | $27,803.00 |
| February 28, 2017 Distributions | N/A | $7,169,970.00 | $13,446.40 | $3,509.32 | $706.19 | $302.65 | $18,065.44 |

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| June 30, 2017 Distributions | N/A | $79,600.00 | $149.28 | $38.96 | $7.84 | $3.36 | $200.56 |
| December 31, 2017 Distributions | N/A | $2,651,675.00 | $4,972.89 | $1,297.86 | $261.17 | $111.93 | $6,681.16 |
| March 31, 2018 Distributions | N/A | $84,575.00 | $158.61 | $41.40 | $8.33 | $3.57 | $213.10 |
| December 31, 2018 Distributions | N/A | $4,930,722.50 | $9,246.96 | $2,413.33 | $485.64 | $208.13 | $12,423.44 |
| March 31, 2019 Distributions | N/A | $3,711,456.47 | $6,960.38 | $1,816.56 | $365.55 | $156.66 | $9,351.38 |
| Total | $57,553,053.88 | $36,032,322.97 | $39,345,721.84 | $32,266,078.94 | | | $330,428.08 |

177. Dondero was HCMLP's Chief Executive Officer, President, Co-Chief Investment Officer, and Co-Founder. Okada was HCMLP's Co-Chief Investment Officer and Co-Founder. Together, Dondero and Okada directly or indirectly owned substantially all of the equity interests in HCMLP, or were the beneficiaries of all distributions HCMLP made to its limited partners. Dondero exercised complete control over HCMLP, and Okada acquiesced to and profited from schemes orchestrated by Dondero to enrich HCMLP's direct and indirect owners.

178. To that end, Dondero caused HCMLP to make the HCMLP Distributions set forth above with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero and Okada were insiders of HCMLP;

(b) before HCMLP Distributions were made, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c) HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved both siphoning HCMLP's valuable business opportunities through newly-created "lifeboat" entities and siphoning HCMLP's value through HCMLP Distributions (among other means);

(d) HCMLP received less than reasonably equivalent value (and in fact, received zero consideration) in exchange for the HCMLP Distributions;

(e) at the time of each HCMLP Distribution, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(f) The initial recipients of the HCMLP Distributions were Dondero, Dugaboy, Okada, Strand, and Hunter Mountain, each of which was owned and/or controlled by Dondero and Okada;

(g) Dondero and Okada personally received certain HCMLP Distributions instead of HCMLP's limited partners Dugaboy, Strand, MAP #1, and MAP #2; and

(h) Dondero made HCMLP Distributions during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that such value would not be available to satisfy HCMLP's creditors.

179. Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of distributions made to Hunter Mountain, given that Hunter Mountain transferred proceeds of such distributions to them.

180. Each HCMLP Distribution is voidable as an intentionally fraudulent transfer. Accordingly, each of the HCMLP Distributions should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT III**
**Illegal Distributions Under Delaware Revised Uniform Limited Partnership Act**
*gainst ondero, ugabo , Strand, and Hunter Mountain*

181. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

182. The Delaware Revised Uniform Limited Partnership Act ("DRULPA") § 17-607(a) prohibits distributions "to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited partnership … exceed the fair value of the assets of the limited partnership[.]"

183. Under 17-607(b), "[a] limited partner who receives a distribution in violation of subsection (a) … and who knew at the time of the distribution that the distribution violated subsection (a) of this section, shall be liable to the limited partnership for the amount of the distribution."

184. As set forth below, between December 31, 2016 and the Petition Date, HCMLP made the following distributions to Hunter Mountain, Dugaboy, and Strand (the "Illegal Distributions").

| | Hunter Mountain | Dugaboy | Strand |
|---|---|---|---|
| December 31, 2016 Distributions | $4,769,570.00 | $8,945.00 | $12,017.00 |
| January 31, 2017 Distributions | $11,034,754.00 | $20,694.00 | $27,803.00 |
| February 28, 2017 Distributions | $7,169,970.00 | $13,446.40 | $18,065.44 |
| June 30, 2017 Distributions | $79,600.00 | $149.28 | $200.56 |
| December 31, 2017 Distributions | $2,651,675.00 | $4,972.89 | $6,681.16 |
| March 31, 2018 Distributions | $84,575.00 | $158.61 | $213.10 |
| December 31, 2018 Distributions | $4,930,722.50 | $9,246.96 | $12,423.44 |
| March 31, 2019 Distributions | $3,711,456.47 | $6,960.38 | $9,351.38 |
| Total | $34,432,322.97 | $64,573.52 | $86,755.08 |

185. Strand, Hunter Mountain, and Dugaboy knew that HCMLP made the Illegal Distributions at a time that its liabilities exceeded the fair value of its assets. As set forth herein and in the counts below, each of Strand, Hunter Mountain, and Dugaboy were the alter egos of Dondero. Even if Strand, Hunter Mountain, or Dugaboy were not the alter egos of Dondero, they would be imputed with Dondero's knowledge. Dondero was the sole owner of Strand. Likewise, Dondero created Hunter Mountain as a shell entity whose sole purpose was to purchase the majority of HCMLP's limited partnership interests from himself and his Dugaboy trust (among others). Through Hunter Mountain, Dondero continued to receive the economic benefit of HCMLP's limited partnership distributions through distributions on notes that would be triggered by those Illegal Distributions made to Hunter Mountain.

186. Hunter Mountain, Dugaboy, and Strand are liable to HCMLP and its creditors for the full amount of the Illegal Distributions, plus interest.

**COUNT IV**
**Breach of Fiduciary Duty Arising Out Of Dondero's Lifeboat Scheme**
*gainst ondero and Strand*

187. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

188. During all periods relevant to the allegations set forth herein, Strand owed fiduciary duties to HCMLP in its capacity as HCMLP's general partner. Likewise, during all periods relevant to the allegations set forth herein, Dondero owed fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP and as an officer of HCMLP.

189. Dondero and Strand transferred HCMLP's valuable business to the lifeboat entities, including but not limited to NexPoint and HCMFA. Pursuant to the scheme, the lifeboats utilized HCMLP's employees to perform management and advisory services that HCMLP had provided directly, and should have continued to provide directly. As a result of this scheme, HCMLP would perform the same services via the same employees, but would now either receive only a small fraction of the profits that were generated or, in some instances, provide these services at a loss because the service agreements between HCMLP and the lifeboats would not even cover HCMLP's costs of providing the services. The majority of profits were paid to the lifeboats, which were owned by Dondero and/or entities that he controlled, placing those profits beyond the reach of HCMLP's creditors.

190. Dondero and Strand willfully and wantonly orchestrated this scheme in bad faith in order to evade HCMLP's present and future creditors.

191. Strand was dominated and controlled by its sole owner, Dondero. Dondero also owned substantial economic interests in each of the lifeboats either directly or through entities that he owned and/or controlled. As such, Dondero appeared on both sides of the agreements

and transactions entered into between HCMLP, on one hand, and NexPoint, HCMFA, Acis, and the other lifeboats, on the other hand.

192. The wrongful acts that Dondero and Strand committed in connection with the lifeboat scheme—including but not limited to funneling new business to the lifeboat entities and undercompensating HCMLP for the use of its employees—continued through the Petition Date. Likewise, injury to HCMLP—in the form of lost profits and misappropriation of its employees and resources—continued through the Petition Date.

193. HCMLP suffered tens or hundreds of millions of dollars of harm, as the result of Dondero's and Strand's breaches, in the form of lost management and advisory fee revenue that far exceeded the amounts that the lifeboats paid to HCMLP under their respective shared services and other agreements. Between the date of its formation and the Petition Date, NexPoint earned approximately $120 million in advisory and administrative fees and approximately $50 million in profits. Between the date of its formation and the Petition Date, HCMFA earned approximately $150 million in advisory and administrative fees.

194. Strand and Dondero profited from their breaches of fiduciary duties in connection with their lifeboat scheme in violation of Delaware law. Strand and Dondero are liable to HCMLP for their breaches of fiduciary duty in connection with the lifeboat scheme in an amount to be proven at trial.

**COUNT V**
**Breach of Fiduciary Duty Arising Out Of Conduct That Resulted in HCMLP Liabilities**
*gainst ondero, Strand, llington, and Leventon*

195. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

196. During all periods relevant to the allegations set forth herein: (1) Strand owed fiduciary duties to HCMLP in its capacity as HCMLP's general partner; (2) Dondero owed fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP, and as an officer of HCMLP; (3) Ellington owed fiduciary duties to HCMLP in his capacity as HCMLP's Chief Legal Officer and General Counsel; and (4) Leventon owed fiduciary duties to HCMLP in his capacity as HCMLP's Assistant General Counsel.

197. Dondero (and in turn, Strand), Ellington, and Leventon each breached their fiduciary duties to HCMLP by engaging in willful and wanton misconduct that foreseeably resulted in liability to HCMLP. In total, these breaches resulted in more than $350 million in allowed claims against HCMLP. But for their breaches of fiduciary duty, either HCMLP never would have incurred these claims, or HCMLP would have resolved these claims for substantially lower amounts.

198. **Liabilities to UBS.** Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to incur substantial liability to UBS. Dondero exposed HCMLP and its subsidiaries to litigation against UBS that resulted in an adverse judgment that exceeded $1 billion. Among other things, acting through HCMLP, Dondero caused the Fund Counterparties to refuse to meet their obligations to UBS, and orchestrated transfers of more than $233 million of assets from HFP, exposing HCMLP to claims for fraudulent transfer, breach of the implied covenant of good faith and fair dealing, and extensive prejudgment interest and legal fees.

199. Then, in 2017, after a New York state court ruled that UBS's fraudulent transfer claims against HCMLP and claims against the Fund Counterparties could proceed to trial, Dondero and Ellington caused HCMLP, in its capacity as investment manager for the Fund Counterparties, to orchestrate a surreptitious transfer of more than $300 million in face amount

of assets from the Fund Counterparties to Sentinel, an entity located in the Cayman Islands that was indirectly owned and controlled by Dondero and Ellington. Neither HCMLP nor the Fund Counterparties received legitimate value in exchange for this transfer.

200. After the Petition Date, Dondero, Ellington, and Leventon actively concealed this transfer from the Independent Board, UBS, and the Bankruptcy Court. Ellington even went so far as to state in August 2020 that "[Leventon] and myself have spent in excess of 100 hours trying to piece together everything we can [about the Fund Counterparties' assets] to create a true and accurate document based record of what happened with these target entities['s assets]." Ellington made this statement knowing that the Fund Counterparties' assets had been transferred to an offshore entity he owned and controlled. When this transfer was uncovered, HCMLP was forced to increase the amount of its settlement with UBS from a total of $75 million in allowed claims to $125 million in allowed claims.

201. **Liabilities to Acis.** Dondero willfully and wantonly caused HCMLP to incur over $23 million in liability to Acis and Terry. As with NexPoint and HCMFA, Acis was originally created to perform management and advisory services that were previously provided by HCMLP. When Dondero's relationship with Terry deteriorated, Dondero set in motion a series of contentious litigation with Terry, which resulted in Terry obtaining a $7.95 million arbitration award against Acis.

202. Dondero then embarked on a crusade to ensure Terry would not collect from Acis. In connection therewith, Dondero acted through HCMLP to, among other things: (1) siphon assets from Acis, causing Terry to commence an involuntary bankruptcy against Acis and causing HCMLP to lose its advisory and shared services contracts with Acis; (2) enter into costly, frivolous litigation with Terry in Guernsey, a "loser pays" jurisdiction; (3) convert the

retirement accounts owned by Terry and his wife, leading to additional legal fees incurred in litigation in Texas state court; (4) violate injunctive provisions set forth in Acis's plan of reorganization, exposing HCMLP to additional liability; (5) enter into costly litigation with Acis's chapter 11 trustee in connection with Acis's bankruptcy case; and (6) mismanage Acis CLOs, exposing HCMLP to substantial liability in its capacity as advisor and fiduciary to Acis. As a result of these actions and the reputational harm they caused, it became impossible for HCMLP to launch another CLO either directly or indirectly.

203. In connection with his vendetta against Terry, Dondero willfully and wantonly subjected HCMLP to substantial liability to Acis and Terry, including by giving testimony at trial which, along with Leventon's testimony, was found "to be of questionable reliability" and structured "to convey plausible deniability." Ultimately, in order to avoid further liability to Terry and Acis, HCMLP settled those claims for more than $23 million pursuant to a settlement approved by this Court.

204. Leventon knowingly participated in the scheme to transfer value away from Acis in an attempt to make it judgment-proof. Among other things, Leventon assisted in the drafting and execution of the agreement that transferred Acis's interest in a note receivable from HCMLP, which had a balance owing of over $9.5 million, to Cayman Island entity Highland CLO Management Ltd. just ten days after Terry obtained his arbitration award. The agreement recites that (1) HCMLP is no longer willing to continue providing support services to Acis; (2) Acis, therefore, can no longer fulfill its duties as a collateral manager; and (3) Highland CLO Management Ltd. agrees to step in to the collateral manager role. Given the timing of the assignment—just days after Terry's arbitration award—Leventon knew that it was part of a

scheme to strip Acis of its assets, which ultimately resulted in millions of dollars of damage to HCMLP.

205. **Liabilities to HarbourVest.** Dondero also willfully and wantonly caused harm to HCMLP by exposing it to substantial liability to HarbourVest. Dondero, acting through HCMLP, fraudulently induced HarbourVest to purchase 49% of HCLOF from CLO HoldCo for approximately $75 million in cash, with a commitment for an additional $75 million in the future, while concealing that he was actively engaged in a campaign against Terry that would significantly impair the value of HarbourVest's investment. In addition, Dondero did not intend to use the $75 million that CLO Holdco received from HarbourVest to satisfy capital calls at HCLOF, and instead surreptitiously caused CLO Holdco to use those funds as part of a scheme to infuse other Dondero Entities (including entities that benefitted the NexPoint and HCMFA lifeboats) with additional cash. Ultimately, HCMLP was forced to settle with HarbourVest by providing it with $80 million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to a new entity designated by HCMLP. But for Dondero's conduct, HCMLP would not have incurred the foregoing liabilities. As a result of Dondero's conduct, those interests in HCLOF were then worth tens of millions of dollars less than the $75 million HarbourVest paid to acquire them.

206. **Liabilities to Crusader Funds.** Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to incur substantial liability to the Redeemer Committee due to his conduct in connection with HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors. Among other things, Dondero, Ellington, and Leventon caused HCMLP to: (1) transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, Ltd., after the Redeemer Committee had refused to approve that

transfer, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (2) covertly purchase the stock of the Portfolio Company and fail to liquidate the Crusader Funds' shares in the Portfolio Company, in violation of HCMLP's fiduciary duties; and (3) violate the provision of the Joint Plan and Scheme requiring HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete, causing HCMLP to forfeit its rights to those fees entirely. Additionally, both Ellington and Leventon were active participants in Dondero's scheme; they both provided false narratives or misrepresentations in furtherance of Dondero's harm to the Crusader Funds. The Redeemer Arbitration panel found, for example, that Leventon "was significantly involved in providing direction" to keep the Redeemer Committee in the dark and "was the principal instrument through which [certain] misrepresentation[s] and omission[s] were communicated." As a result of Dondero's, Ellington's, and Leventon's conduct, the Redeemer Committee received an arbitration award against HCMLP in excess of $190 million, and in HCMLP's bankruptcy, HCMLP agreed to pay over $136 million in connection therewith.

207. Beyond the direct losses identified in the preceding paragraphs, HCMLP suffered additional harm from the breaches of fiduciary duty committed by Dondero, Strand, Ellington, and Leventon. For example, the $190 million Redeemer arbitration award—which was itself caused by Dondero's, Ellington's, Leventon's, and Strand's breaches of their fiduciary duty to HCMLP—caused HCMLP to file for bankruptcy. To date, HCMLP has incurred in excess of $40 million in professional fees in connection with the bankruptcy. But for Dondero's, Ellington's, Leventon's, and Strand's willful and wanton misconduct, HCMLP would not have been obligated to pay any of these fees.

208. In light of the foregoing, Dondero, Strand, Ellington, and Leventon are liable for breaches of their fiduciary duties to HCMLP in an amount to be determined at trial.

**COUNT VI**
**Declaratory Judgment That Strand Is Liable For HCMLP's Debts In Its Capacity As HCMLP's General Partner**
*gainst Strand*

209. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

210. Under DRULPA § 17-403(b), "a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law … to persons other than the partnership and the other partners." Moreover, "[e]xcept as provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law … to the partnership and to the other partners." *d.*

211. Under Delaware Uniform Partnership Law ("DUPL") § 15-306(a), partners of a partnership "are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law."

212. During all periods relevant to the allegations set forth herein, Strand was the general partner of HCMLP. Moreover, Strand has not been relieved of its obligation to satisfy HCMLP's obligations by agreement or law.

213. Accordingly, under the operative partnership agreements and applicable law, Strand is liable to HCMLP and "to persons other than [HCMLP]" for the full amount of HCMLP's liabilities.

**COUNT VII**
**Declaratory Judgment That Dondero Is Liable For Strand's Debts As Strand's Alter Ego**
*gainst ondero*

214. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

215. Between the formation of Strand and the Petition Date, Dondero dominated and controlled Strand and was its sole equity owner. Dondero was the only officer of Strand between 1993 and 2001. Although Strand elected certain officers between 2001 and the Petition Date, they performed no duties in their capacities as officers of Strand and were appointed or fired from their roles based on their loyalty to, and their current relationship with, Dondero. Dondero testified that he did not know whether Strand even had any officers, stating that he was "not aware of [Strand] ever having any employees or active … governance." Likewise, Dondero did not know whether Strand had a board of directors and whether he sat on Strand's board.

216. Strand did not observe corporate formalities. Based on a review of HCMLP's books and records, between the formation of Strand and the Petition Date, Strand never held a board meeting. Indeed, Dondero testified that he is not aware of attending a board meeting for Strand and does not recall ever seeing board minutes for Strand.

217. Strand did not comply with its own bylaws, which require annual meetings of stockholders.

218. Although Strand was the general partner of HCMLP, Strand—as opposed to Dondero himself—rarely took any official corporate action. Based on the Litigation Trustee's review of documents, between its formation and the Petition Date, Strand documented only 12 instances in which it took corporate action, eight of which related to the appointment or removal of officers.

219. Strand was a sham entity whose sole purpose was to serve as a vehicle through which Dondero was able to dominate and control HCMLP, while seeking to insulate from HCMLP's liabilities, which were frequently the direct result of Dondero's own wrongdoing. As such, Dondero is Strand's alter ego, and the Court should pierce the corporate veil to hold Dondero liable for Strand's debts.

**COUNT VIII**
**Declaratory Judgment That Dondero and Strand Are Liable For HCMLP's Debts In Their Capacities As HCMLP's Alter Ego**
*gainst ondero and Strand*

220. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

221. Dondero, both through Strand and as an officer of HCMLP, dominated and exercised total control over HCMLP from its formation through the Petition Date. Dondero had total decision-making authority and governed HCMLP by decree—notwithstanding the existence of Strand (itself a sham entity) and the terms and obligations imposed by HCMLP's limited partnership agreement. HCMLP was a mere instrumentality of Dondero, and HCMLP had no independence and could not exercise any business discretion separate and apart from Dondero.

222. Strand, like myriad entities within Dondero's empire—including NexPoint GP, HCMFA, Dugaboy, CLO Holdco, Highland Dallas, Highland Santa Barbara, Highland Kansas City, HFP, and Acis—listed HCMLP's headquarters as its business address.

223. Dondero failed to observe corporate formalities with regard to HCMLP. Indeed, he did not distinguish between HCMLP and his personal interests and businesses. Dondero used HCMLP employees to service his own interests that were unrelated to HCMLP. For example, Dondero caused HCMLP to employ individuals notwithstanding that their role was to

serve Dondero personally. Such employees included Dondero's accountant, security guard, and landscaper. Dondero also frequently instructed HCMLP's legal department to perform legal services in connection with his own personal and business interests, which conferred no value on HCMLP.

224. Dondero used his domination and control over HCMLP to perpetrate numerous injustices, abuses, and frauds.

225. Dondero caused HCMLP's employees and resources to be used for his lifeboat businesses as part of his fraudulent scheme to siphon value from HCMLP to other entities he owned and controlled. In connection with these schemes, Dondero exploited HCMLP by using its employees and resources for the benefit of other lifeboat entities, either at no cost to the lifeboats, at a loss to HCMLP, or at substantially below-market rates. In fact, HCMLP should have received all of the profits generated from the services performed by the lifeboats, which in fact were performed by HCMLP's employees. The purpose and effect of this scheme was to cause HCMLP to provide the employees and infrastructure that were needed by Dondero's profitable business ventures, while also ensuring that HCMLP would remain cash poor and lack the funds to satisfy its own obligations.

226. Dondero caused HCMLP to enter into agreements, including the Massand Consulting Agreement, the object and purpose of which were to cause HCMLP to incur obligations for services that conferred benefits on Dondero Entities other than HCMLP.

227. Dondero, both through Strand and as HCMLP's President and CEO, caused HCMLP's assets to be commingled with those of his other businesses, without observing corporate formalities. By commingling entities and using HCMLP's employees and resources to further his own personal goals, Dondero exposed HCMLP to hundreds of millions of dollars

in liability to numerous parties, including UBS, Acis, Terry, HarbourVest, the Redeemer Committee, and the Crusader Funds.

228. By virtue of his complete control over HCMLP, Dondero caused HCMLP to willfully and wantonly breach contractual obligations and take measures to render HCMLP and other Dondero Entities "judgment-proof." Ultimately, this brazen disregard for HCMLP as an independent entity with its own contractual and fiduciary obligations resulted in multiple adverse awards, including the $190 million arbitration award that caused HCMLP to file for bankruptcy.

229. Dondero wielded his control over his web of entities to orchestrate intercompany transfers that were designed to siphon assets from HCMLP. For example, Dondero orchestrated the CLO Holdco Transaction, through which he caused HCMLP to transfer $24 million or potentially more worth of assets through a series of entities he controlled in exchange for consideration that was worth a small fraction of the value of the transferred assets.

230. As the alter egos of HCMLP, Dondero and Strand should be held liable for the full amount of HCMLP's obligations.

**COUNT IX**
**Declaratory Judgment That NexPoint and HCMFA Are Liable For The Debts Of HCMLP, Strand, And Dondero As Their Alter Egos**
*gainst e oint and HCM*

231. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

232. NexPoint and HCMFA were created as facades of HCMLP, in order to siphon profits away from HCMLP and to Dondero and other entities he controlled. Pursuant to the scheme, Dondero sought to place the profits that were generated from HCMLP's business and services beyond the reach of HCMLP's then present and future creditors.

233. NexPoint was owned and controlled by Dondero through Dugaboy and NexPoint GP. Between 2012 and 2015, NexPoint had no employees of its own, and performed no business activities that were distinguishable from those performed by HCMLP. NexPoint was a facade of HCMLP that used HCMLP's employees to perform the same investment management and advisory services that HCMLP routinely performed.

234. For over one year, HCMLP performed all services for NexPoint without any sub-advisory or shared services agreements that even purported to compensate HCMLP for the use of its employees. Even after Dondero attempted to infuse this scheme with a patina of legitimacy by causing NexPoint to enter into agreements with HCMLP, they were structured to ensure that NexPoint retained the vast majority of profits for the work performed by HCMLP and its employees.

235. Dondero used HCMLP's resources to establish NexPoint and perpetrate his scheme to extract value from HCMLP. Dondero caused HCMLP to fund NexPoint's operations, seed its investments, and provide a substantial amount of the capital that ultimately funded distributions NexPoint made to its owner, Dugaboy. Between 2012 and 2017, HCMLP loaned NexPoint approximately $30 million, and during that same period, NexPoint made limited partner distributions of approximately $34 million—99.9% of which were paid to Dugaboy. Distributions to Dugaboy were made at the direction of, and for the benefit of, Dondero. Meanwhile, as of the Petition Date, NexPoint owed HCMLP approximately $23 million, and HCMLP is currently embroiled in litigation with Dondero following a payment default that occurred January 2021. Dondero exercised complete control over the terms of the note and whether it would be repaid, and caused HCMLP to enter into multiple agreements with NexPoint providing for forbearance and other relief.

236. Likewise, HCMFA was owned by Dondero and Okada through a series of entities owned and controlled by Dondero through its general partner, Strand Advisors XVI, Inc., which was wholly-owned by Dondero. HCMFA was effectively a shell entity that was created to replace HCMLP as the new investment manager for open-ended retail investment funds. To the extent that sub-advisory and shared services agreements existed between HCMLP and HCMFA, they existed to lend credibility to Dondero's fraudulent scheme to divert HCMLP's profits to himself and Okada through HCMFA.

237. Dondero used HCMLP's resources to support HCMFA as well. Between 2011 and 2019, HCMLP loaned HCMFA approximately $12 million and entered into multiple forbearances on HCMFA's debts, and in May 2019 HCMFA borrowed an additional $7.4 million from HCMLP that it failed to repay. Dondero was on both sides of those agreements, and used HCMLP in order to establish HCMFA as a successor to HCMLP.

238. As such, NexPoint and HCMFA are the alter egos of each of HCMLP, Dondero, and Strand, and the Court should pierce the corporate veil to hold NexPoint and HCMFA liable for the debts of each of HCMLP, Dondero, and Strand.

**COUNT X**
**Declaratory Judgment That Dugaboy Is Liable For The Debts Of Dondero In Their Capacities As Dondero's Alter Ego**
*gainst ugabo*

239. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

240. Dondero operated Dugaboy—Dondero's personal trust—as an extension of himself and HCMLP. Dondero used HCMLP employees, on HCMLP's payroll, to transact business on behalf of Dugaboy, without any compensation to HCMLP. Dondero used HCMLP

employees for Dondero's personal estate planning and caused HCMLP to comingle Dugaboy's electronically stored information with HCMLP's data.

241. Dondero dominated and controlled Dugaboy. Dondero appointed Scott, his longtime personal friend, as the trustee of Dugaboy, for the purpose of serving as a rubber stamp of approval for all transactions that Dondero (or HCMLP employees acting at Dondero's direction) presented to Scott.

242. Under the terms of Dugaboy's trust agreement, Dondero also has the power to remove trustees without cause—leverage that allowed him to control what transactions Dugaboy was involved in.

243. As such, Dugaboy is the alter ego of Dondero, and the Court should pierce the corporate veil to hold Dugaboy liable for the debts of each of HCMLP, Dondero, and Strand.

**COUNT XI**
**Avoidance of Transfer of Management Agreements As Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*gainst HCM and e oint*

244. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

245. On December 15, 2011, HCMLP entered into a novation agreement, pursuant to which HCMFA became the investment advisor for Highland Credit Strategies Fund, Highland Floating Rate Opportunities Fund, the Highland Long/Short Equity Fund, the Highland Long/Short Healthcare Fund, and the Highland Special Situations Fund (collectively, the "Transferred Funds"). Dondero caused HCMLP to transfer these agreements to HCMFA as part of his scheme to evade HCMLP's creditors.

246. HCMLP received less than reasonably equivalent value in connection with the novation agreement. Prior to the transfer, HCMLP received management and advisory fees in

return for the services that its employees performed for the Transferred Funds. After the transfer, HCMLP's employees provided the same services for the Transferred Funds, except that the vast majority of the profits were diverted to HCMFA following the extinguishment of HCMLP's credit facility.

247. At the time of the transfer, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

248. On June 13, 2012, Dondero caused HCMFA to transfer the Highland Credit Strategies Fund to the newly-created NexPoint, after which Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as NHF. The result of this transfer was simply to shift the management fees relating to NHF from one lifeboat entity to another.

249. The transfer of HCMLP's valuable management and advisory contracts with the Transferred Funds is voidable as constructively fraudulent against HCMFA and its subsequent transferee, NexPoint. Accordingly, these transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XII**
**Avoidance of Transfer of Management Agreements As Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*gainst HCM and e oint*

250. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

251. On December 15, 2011, HCMLP entered into a novation agreement, pursuant to which HCMFA became the investment advisor for the Transferred Funds. Dondero caused HCMLP to transfer these agreements to HCMFA as part of his scheme to evade HCMLP's creditors.

252. Dondero caused HCMLP to make the transfer with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero was an insider of HCMLP and HCMFA;

(b) before the transfer, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c) HCMLP, through Dondero, was engaged in a multi-faceted scheme to defraud HCMLP's creditors, which involved, among other things, causing HCMLP to transfer its valuable management contracts and business opportunities to newly-created "lifeboat" entities;

(d) at the time of the transfer, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e) Dondero caused HCMLP to make the transfer during a period when he believed the value of HCMLP may ultimately be distributed to its creditors, as a result of its looming contingent liabilities, and effected the transfers in

order to siphon value so that it would not be available to satisfy HCMLP's present and future creditors; and

(f) HCMLP did not receive reasonably equivalent value in return for transferring its valuable management and advisory contracts with the Transferred Funds to HCMFA.

253. On June 13, 2012, Dondero caused HCMFA to transfer the Highland Credit Strategies Fund to the newly-created NexPoint, after which Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as NHF. The result of this transfer was simply to shift the management fees relating to NHF from one lifeboat entity to another.

254. The transfer of HCMLP's valuable management and advisory contracts with the Transferred Funds is voidable as intentionally fraudulent against HCMFA and its subsequent transferee, NexPoint. Accordingly, these transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XIII**
**Successor Liability**
*gainst HCM and e oint*

255. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

256. HCMFA and NexPoint each were mere continuations of HCMLP. Dondero caused each of HCMFA and NexPoint to perform the same investment and advisory services as HCMLP, using HCMLP's employees, in order to service HCMLP's managed funds. HCMFA and NexPoint were dependent on HCMLP employees and personnel.

257. HCMLP, HCMFA, and NexPoint were each dominated and controlled by Dondero. Under his common direction, there was continuity of management, personnel, physical location, assets, and general business operations between HCMLP, on one hand, and HCMFA and NexPoint, on the other hand. After HCMFA and NexPoint were created, HCMLP ceased launching any new RIC or real estate investment funds. HCMFA and NexPoint took over these aspects of HCMLP's business such that there was uninterrupted continuation of normal business operations, including new fund launches, generating substantial fee income and AUM growth.

258. As such, HCMFA and NexPoint are liable for HCMLP's debts as the successors to HCMLP.

**COUNT XIV**
**Breach of Fiduciary Duty In Connection With Fraudulent Transfers And Schemes**
*gainst ondero, Strand, llington, and ada*

259. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

260. Dondero and Ellington caused HCMLP to enter into the Massand Consulting Agreements, with the intent to have Massand Capital perform services for SAS, an entity that they surreptitiously created and owned. Likewise, Dondero and Ellington oversaw and approved the Massand Transfers. The payment obligations Dondero and Ellington caused HCMLP to incur, and the payments that Dondero and Ellington caused HCMLP to make, conferred no benefit on HCMLP. In addition, Dondero and Ellington caused HCMLP employees to perform work for SAS—at least seven HCMLP employees received SAS email addresses—without compensating HCMLP.

261. Likewise, Dondero orchestrated the fraudulent CLO Holdco Transaction, pursuant to which he (acting through Strand) siphoned valuable assets from HCMLP in return

for illusory consideration, in the form of a note from Dugaboy, an entity that he controlled. Dondero siphoned these assets from HCMLP in order to benefit other entities that he owned and controlled, including CLO Holdco, NexPoint, and HCMFA.

262. Moreover, as part of his scheme to evade HCMLP's creditors, Dondero, acting through Strand, approved hundreds of millions of dollars of distributions from HCMLP at a time that Dondero believed HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

263. As Dondero's co-founder and HCMLP's Chief Investment Officer, Okada knew or willfully blinded himself to the fact that the HCMLP Distributions—including the distributions made to Okada, MAP #1, and MAP #2—were made at a time that HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

264. Dondero and Ellington breached their fiduciary duties by diverting approximately $3 million that was held in escrow for HCMLP to an entity that they owned in the Cayman Islands.

265. By willfully and wantonly orchestrating these fraudulent transfers, Dondero, Strand, and Ellington breached their fiduciary duties to HCMLP.

**COUNT XV**
**Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing Participation in Breach of Fiduciary Duty under Texas Law**
*gainst e oint, HCM , S S, Scott, CL Holdco, Holdco, , et ood, Highland allas*

266. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

267. NexPoint and HCMFA aided and abetted the breaches of fiduciary duty committed by Dondero and Strand. NexPoint and HCMFA were each dominated and controlled by Dondero. As such, each of NexPoint and HCMFA knowingly participated in their breaches

of their fiduciary duties to HCMLP. NexPoint and HCMFA knowingly participated in Dondero's scheme to divert HCMLP's valuable business into new "lifeboat" entities that he owned and controlled. The breaches of fiduciary duty that were aided and abetted by NexPoint and HCMFA caused tens of million (and potentially over one hundred million) of dollars in damage to HCMLP.

268. SAS, which was owned and controlled by Dondero and Ellington, knowingly participated in Dondero's and Ellington's breaches of their fiduciary duties in connection with the Massand Consulting Agreement and Massand Transfers. SAS was aware of the fiduciary duties that Dondero and Ellington owed to HCMLP as high ranking officers. SAS received the benefit of the services performed by Massand Capital, which Dondero and Ellington surreptitiously charged to HCMLP. The breaches of fiduciary duty that were aided and abetted by SAS caused millions of dollars of damage to HCMLP.

269. Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas aided and abetted Dondero's breach of fiduciary duties relating to the CLO Holdco Transaction. Scott—and in turn, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas—knowingly participated in the scheme to transfer $24 million or potentially more of assets to CLO Holdco in exchange for a note worth significantly less than the transferred assets. Scott either knew or willfully blinded himself to the fact that Dondero breached his fiduciary duties to HCMLP by orchestrating the CLO Holdco Transaction, as evidenced by, among other things, the low interest rate on the Dugaboy Note; the lack of security, material covenants; or other protections; the unfair repayment terms; and the fact that Dondero stood on both sides of the transaction. Moreover, Scott dutifully executed the necessary documentation in order to cause

the Transferred CLO Holdco Assets to be transferred to Get Good, DAF Holdco, DAF, CLO Holdco, and Highland Dallas.

**COUNT XVI**
**Civil Conspiracy to Breach Fiduciary Duties Under Texas Law**
*gainst ondero, llington, Leventon, e oint, HCM , S S, Scott, CL Holdco, Holdco, , et ood, Highland allas*

270. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

271. Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas conspired with Dondero to breach his fiduciary duties to HCMLP by intentionally siphoning assets away from HCMLP to evade HCMLP's creditors.

272. Dondero, Ellington, and Leventon orchestrated myriad transactions to divert funds from HCMLP to Dondero and the entities that he owned and controlled. NexPoint and HCMFA took over valuable HCMLP management agreements and used HCMLP's employees to usurp HCMLP's business in return for little or no consideration to HCMLP. SAS received valuable services from Massand while HCMLP bore the expense. Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas participated in the fraudulent CLO Holdco Transaction that siphoned valuable assets from HCMLP in return for patently insufficient consideration.

273. Ellington and Leventon understood that their conduct was directed at enriching Dondero at the expense of HCMLP, and each of them were compensated by Dondero (sometimes via minority ownership in an entity, like Ellington's stake in SAS, and sometimes via complex, circuitous schemes like the Tall Pine arrangement) for their participation. NexPoint, HCMFA, and SAS—each of which was controlled by Dondero—likewise

understood that their role in the conspiracy was to obtain value for Dondero at HCMLP's expense. Scott, too, understood that he was appointed to be a rubber-stamp for Dondero's self-interested schemes to siphon value from HCMLP and distribute it throughout the vast web of Dondero Entities. Scott acted on the basis of his longstanding loyalty to his "closest friend" Dondero and was compensated with "business gifts" for his service in furtherance of the conspiracy.

274. In furtherance of the conspiracy, Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, CLO Holdco, DAF Holdco, the DAF, Get Good, and Highland Dallas undertook, *inter alia*, the following schemes and overt acts:

(a) Dondero, NexPoint, and HCMFA conspired to perpetrate the lifeboat scheme in order to place valuable assets outside the reach of HCMLP's creditors, in violation of Dondero's fiduciary duties. NexPoint and HCMFA were each dominated and controlled by Dondero and, as such, they each consciously acted in furtherance of the conspiracy, including by transferring existing business to NexPoint and HCMFA, generating new business through NexPoint and HCMFA, and failing to compensate HCMLP for the use of its employees and resources. NexPoint and HCMFA were aware that the lifeboat scheme caused substantial damages to HCMLP.

(b) Dondero, Ellington, and SAS caused HCMLP to enter into the fraudulent Massand Consulting Agreements, pursuant to which HCMLP paid Massand millions of dollars in return for services that were rendered for SAS, which Dondero and Ellington owned and controlled. Likewise, SAS acted in furtherance of the conspiracy by surreptitiously receiving the benefits from

the Massand Consulting Agreements while HCMLP incurred the costs under those agreements. Each of Dondero, Ellington, and SAS were aware that causing HCMLP to pay SAS's expenses—for the benefit of SAS and its owners Dondero and Ellington—harmed HCMLP.

(c) Dondero, Scott, CLO Holdco, DAF Holdco, the DAF, Get Good, and Highland Dallas conspired to cause HCMLP to transfer valuable assets to CLO HoldCo for less than reasonably equivalent value. Scott—and in turn, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas—consciously participated in the scheme to transfer $24 million or potentially more of assets to CLO Holdco in exchange for a note worth significantly less than the transferred assets, including by executing the necessary documentation to cause the Transferred CLO Holdco Assets to be transferred to Get Good, DAF Holdco, DAF, CLO Holdco, and Highland Dallas. Each of Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas were aware that the CLO Holdco Transaction breached fiduciary duties to HCMLP, constituted a fraudulent transfer, and harmed HCMLP by diverting valuable assets in exchange for the far less valuable Dugaboy Note.

275. Each of Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas understood that his or its conduct was causing damage to HCMLP and that Dondero was breaching his fiduciary duties to HCMLP by orchestrating and participating in these transactions. The participants specifically intended to benefit themselves and Dondero at the expense of HCMLP, and agreed with

Dondero to undertake acts in furtherance of the conspiracy notwithstanding the harm to HCMLP.

**COUNT XVII**
**Tortious Interference with Prospective Business Relations**
*gainst ondero, e oint, and HCM*

276. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

277. Dondero siphoned business away from HCMLP and its creditors through the creation of "lifeboats" owned and controlled by Dondero. The "lifeboats," which included NexPoint and HCMFA, were companies set up to provide management services that HCMLP had previously been providing.

278. But for the actions of Dondero, NexPoint, and HCMFA, HCMLP would have continued to pursue the business opportunities that Dondero diverted to NexPoint and HCMFA. Indeed, NexPoint and HCMFA used HCMLP's employees, operated out of HCMLP's office, and performed the same advisory and administrative services for its managed funds that HCMLP had previously performed.

279. By using NexPoint and HCMFA as part of his lifeboat scheme, Dondero breached his fiduciary duties to HCMLP. In addition, Dondero breached his fiduciary duties to HCMLP by causing HCMLP to fraudulently transfer certain of its existing management contracts to NexPoint and HCMFA. NexPoint and HCMFA conspired with, and aided and abetted, Dondero's breaches of his fiduciary duties and HCMLP's fraudulent transfers.

280. Dondero, NexPoint, and HCMFA acted with a conscious desire to prevent HCMLP from continuing to directly manage the funds that were subsequently managed by

NexPoint and HCMFA. Moreover, Dondero, NexPoint, and HCMFA knew that their interference in HCMLP's business relationships was certain to occur as a result of their conduct.

281. HCMLP suffered, at minimum, tens of millions of dollars in damage from Dondero's, NexPoint's, and HCMFA's tortious interference with its prospective business relations.

**COUNT XVIII**
**Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550 and Applicable State Law**
*gainst ondero, Scott, CL Holdco, Holdco, , et ood, and Highland allas oundation*

282. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

283. On December 28, 2016, HCMLP transferred to Get Good the Transferred CLO Holdco Assets, which were worth approximately $24 million or potentially more. The transfer of the Transferred CLO Holdco Assets was effectuated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good.

284. As purported consideration for the Transferred CLO Holdco Assets, HCMLP received the Dugaboy Note, which was worth substantially less than the Transferred CLO Holdco Assets. The Dugaboy Note replaced HCMLP's liquid or liquidating assets with an illiquid, private loan on below market terms.

285. Immediately after HCMLP transferred the Transferred CLO Holdco Assets to Get Good, Dondero caused Get Good to transfer the Transferred CLO Holdco Assets to Highland Dallas by an exercise of discretion executed by Scott in his capacity as trustee of Get Good.

286. Immediately after the Transferred CLO Holdco Assets were transferred to Highland Dallas by Get Good, Dondero caused Highland Dallas to transfer the Transferred CLO Holdco Assets to DAF Holdco by unanimous written consent executed by Dondero, Scott, and Jalonick in their capacities as the sole directors of Highland Dallas.

287. Immediately after the Transferred CLO Holdco Assets were transferred to DAF Holdco by Highland Dallas, Dondero caused DAF Holdco, DAF, and CLO Holdco to enter into an omnibus assignment agreement, pursuant to which DAF Holdco transferred the Transferred CLO Holdco Assets to DAF, and DAF transferred the Transferred CLO Holdco Assets to CLO Holdco. Scott signed on behalf of each entity, as director of DAF Holdco, managing member of the DAF, and director of CLO Holdco. Scott also executed a written resolution by DAF GP, in his capacity as the managing member of the general partner of the DAF, effectuating the transfer of the Transferred CLO Holdco Assets to CLO Holdco (which was wholly-owned by the DAF).

288. Dondero directly or indirectly controlled each entity in the chain of transfers that together constitute the CLO Holdco Transaction. Dondero controlled each of Get Good, Highland Dallas, DAF Holdco, DAF, and CLO Holdco either along with or through Scott, who was Dondero's longtime friend, former roommate, loyalist, and fellow board member on multiple boards of directors.

289. At the time of the CLO Holdco Transaction, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

290. None of Get Good, DAF Holdco, the DAF, or CLO Holdco paid reasonably equivalent value for the Transferred CLO Holdco Assets, or received the Transferred CLO Holdco Assets in good faith.

291. At all relevant times, each of Get Good, DAF Holdco, the DAF, and CLO Holdco was aware that, pursuant to the CLO Holdco Transaction, HCMLP transferred its assets to CLO Holdco for less than reasonably equivalent value.

292. The CLO Holdco Transaction is voidable as constructively fraudulent transfers. Accordingly, the CLO Holdco Transaction should be set aside and avoided and Transferred CLO Holdco Assets should be recovered under 11 U.S.C. §§ 544 and 550 and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XIX**
**Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets as Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550 and Applicable State Law**
*gainst ondero, Scott, CL Holdco, Holdco, , et ood, and Highland allas oundation*

293. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

294. On December 28, 2016, HCMLP transferred to Get Good the Transferred CLO Holdco Assets, which were worth $24 million or potentially more. The transfer of the Transferred CLO Holdco Assets was effectuated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good.

295. As purported consideration for the Transferred CLO Holdco Assets, HCMLP received the Dugaboy Note, which was worth substantially less than the Transferred CLO

Holdco Assets. The Dugaboy Note replaced HCMLP's liquid or liquidating assets with an illiquid, private loan that was worth significantly less than the value of the transferred assets.

296. After HCMLP transferred the Transferred CLO Holdco Assets to Get Good, Dondero caused the assets to be transferred to Get Good, Highland Dallas, DAF Holdco, DAF, and CLO Holdco. Dondero effected each transfer through his direct or indirect control of each of these entities.

297. Dondero caused HCMLP to enter into the CLO Holdco Transaction with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero was an insider of HCMLP;

(b) Dondero controlled Get Good, the initial transferee, and each of the subsequent transferees, Highland Dallas, DAF Holdco, DAF, and CLO Holdco, through Scott;

(c) before the CLO Holdco Transaction, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(d) at the time of the CLO Holdco Transaction, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e) The CLO Holdco Transaction siphoned value away from HCMLP, so that such value would not be available to satisfy HCMLP's creditors; and

(f) The purported consideration for the Transferred CLO Holdco Assets, the Dugaboy Note, was worth less than the reasonably equivalent value of the Transferred CLO Holdco Assets, and replaced HCMLP's liquid or liquidating assets with an illiquid, private loan on below-market terms, the repayment of which was subject to Dondero's control.

298. None of Get Good, DAF Holdco, the DAF, or CLO Holdco paid reasonably equivalent value for the Transferred CLO Holdco Assets, or received the Transferred CLO Holdco Assets in good faith.

299. At all relevant times, each of Get Good, DAF Holdco, the DAF, and CLO Holdco was aware that the CLO Holdco Transaction transferred HCMLP's assets to CLO Holdco for less than reasonably equivalent value.

300. The CLO Holdco Transaction is voidable as an intentionally fraudulent transfer. Accordingly, the CLO Holdco Transaction should be set aside and avoided, and the Transferred CLO Holdco Assets should be recovered under 11 U.S.C. §§ 544 and 550 and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XX**
**Avoidance of Obligations Under Massand Consulting Agreement as Constructively Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law**
*gainst Massand LLC*

301. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

302. On January 5, 2015, HCMLP entered into a consulting agreement with Massand LLC. Pursuant to each agreement, HCMLP agreed to pay Massand Capital tens of thousands of dollars per month.

303. HCMLP received less than reasonably equivalent value in exchange for the payment obligations that it incurred under the Massand Consulting Agreements (and in fact, received zero value). Dondero and Ellington caused HCMLP to hire Massand Capital in order for Massand Capital to provide services to SAS, which conferred no benefit to HCMLP.

304. At the time it entered into the Massand Consulting Agreements, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

305. HCMLP's obligations incurred under the Massand Consulting Agreements are voidable as constructively fraudulent.

**COUNT XXI**
**Avoidance of Obligations Under Massand Consulting Agreement as Intentionally Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law**
*gainst Massand Capital*

306. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

307. On January 1, 2014, HCMLP entered into a consulting agreement with Massand Inc. On January 5, 2015, HCMLP entered into a consulting agreement with Massand LLC. Pursuant to each agreement, HCMLP agreed to pay them tens of thousands of dollars per month.

308. Dondero caused HCMLP to enter into the Massand Consulting Agreements with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero was an insider of HCMLP;

(b) Dondero was an insider of SAS;

(c) Dondero benefitted from HCMLP's payments to Massand Capital because they conferred value on SAS, an entity that Dondero owned and controlled;

(d) before HCMLP entered into the Massand Consulting Agreements, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(e) HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved, among other things, causing HCMLP to incur obligations of other entities owned or controlled by Dondero, including SAS;

(f) at the time HCMLP entered into the consulting agreement with Massand LLC, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due; and

(g) Dondero caused HCMLP to enter into the Massand Consulting Agreements during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's creditors.

309. HCMLP's obligations incurred under the Massand Consulting Agreements are voidable as intentionally fraudulent.

**COUNT XXII**
**Avoidance and Recovery of Certain Massand Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law**
*gainst Massand Capital, S S, ondero, and llington*

310. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

311. HCMLP entered into the fraudulent Massand Consulting Agreements, pursuant to which HCMLP agreed to pay Massand Capital tens of thousands of dollars per month. The transfers from HCMLP to Massand Capital (the "Massand Transfers") are set forth below:

| Date | Amount | Date | Amount |
|---|---|---|---|
| January 7, 2015 | $38,054 | May 1, 2017 | $57,861 |
| February 25, 2015 | $47,748 | June 1, 2017 | $60,814 |
| March 3, 2015 | $54,954 | July 3, 2017 | $51,974 |
| March 31, 2015 | $53,261 | August 1, 2017 | $58,074 |
| May 5, 2015 | $47,531 | September 5, 2017 | $50,371 |
| June 2, 2015 | $51,328 | October 2, 2017 | $53,016 |
| June 30, 2015 | $48,532 | November 1, 2017 | $59,971 |
| August 5, 2015 | $59,856 | December 1, 2017 | $56,031 |
| September 1, 2015 | $57,776 | January 2, 2018 | $52,894 |
| September 29, 2015 | $48,376 | February 1, 2018 | $51,378 |
| November 2, 2015 | $50,890 | March 1, 2018 | $54,396 |
| December 1, 2015 | $48,671 | April 3, 2018 | $54,538 |
| January 4, 2016 | $57,197 | May 1, 2018 | $55,852 |
| February 1, 2016 | $51,343 | June 1, 2018 | $55,093 |
| March 1, 2016 | $61,857 | July 2, 2018 | $64,516 |
| April 1, 2016 | $50,081 | August 1, 2018 | $56,539 |
| May 2, 2016 | $47,801 | September 4, 2018 | $53,749 |
| May 10, 2016 | $6 | October 1, 2018 | $52,537 |

| Date | Amount | Date | Amount |
|---|---|---|---|
| June 2, 2016 | $52,970 | November 1, 2018 | $53,278 |
| July 1, 2016 | $60,029 | December 3, 2018 | $52,219 |
| August 2, 2016 | $47,402 | January 2, 2019 | $47,812 |
| September 1, 2016 | $50,457 | February 1, 2019 | $51,437 |
| October 4, 2016 | $55,668 | March 1, 2019 | $51,156 |
| November 1, 2016 | $53,199 | April 2, 2019 | $54,063 |
| December 1, 2016 | $51,901 | May 1, 2019 | $55,359 |
| January 3, 2017 | $49,644 | June 3, 2019 | $56,470 |
| February 1, 2017 | $55,691 | July 1, 2019 | $54,878 |
| March 3, 2017 | $47,929 | August 1, 2019 | $54,979 |
| April 3, 2017 | $57,563 | | |
| | | Total | $2,988,970 |

312. HCMLP did not receive any consideration in exchange for its payments to Massand Capital. The consulting agreement between Massand Capital and HCMLP provided that Massand would be responsible for advising HCMLP on its "investment recovery strategies" business in certain countries where HCMLP did not have any business.

313. Rather, upon information and belief, Massand Capital provided services to SAS, a separate entity owned and controlled by Dondero. As such, HCMLP's transfers to Massand Capital were made for the benefit of SAS and Dondero.

314. Massand Capital's monthly invoices to HCMLP were consecutively numbered, indicating that Massand Capital had no customers other than HCMLP, and Massand Capital's invoices contained no information about the services it purportedly rendered to HCMLP.

315. At the time of each of the Massand Transfers, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or

reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

316. The Massand Transfers are voidable as constructively fraudulent transfers. Accordingly, the Massand Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XXIII**
**Avoidance and Recovery of Massand Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law**
*gainst Massand Capital, S S, ondero, and llington*

317. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

318. On January 5, 2015, HCMLP entered into a fraudulent consulting agreement, pursuant to which HCMLP agreed to pay Massand Capital tens of thousands of dollars per month. The transfers from HCMLP to Massand Capital (the "Massand Transfers") are set forth below:

| Date | Amount | Date | Amount |
|---|---|---|---|
| January 7, 2015 | $38,054 | May 1, 2017 | $57,861 |
| February 25, 2015 | $47,748 | June 1, 2017 | $60,814 |
| March 3, 2015 | $54,954 | July 3, 2017 | $51,974 |
| March 31, 2015 | $53,261 | August 1, 2017 | $58,074 |
| May 5, 2015 | $47,531 | September 5, 2017 | $50,371 |
| June 2, 2015 | $51,328 | October 2, 2017 | $53,016 |
| June 30, 2015 | $48,532 | November 1, 2017 | $59,971 |
| August 5, 2015 | $59,856 | December 1, 2017 | $56,031 |
| September 1, 2015 | $57,776 | January 2, 2018 | $52,894 |
| September 29, 2015 | $48,376 | February 1, 2018 | $51,378 |

| Date | Amount | Date | Amount |
|---|---|---|---|
| November 2, 2015 | $50,890 | March 1, 2018 | $54,396 |
| December 1, 2015 | $48,671 | April 3, 2018 | $54,538 |
| January 4, 2016 | $57,197 | May 1, 2018 | $55,852 |
| February 1, 2016 | $51,343 | June 1, 2018 | $55,093 |
| March 1, 2016 | $61,857 | July 2, 2018 | $64,516 |
| April 1, 2016 | $50,081 | August 1, 2018 | $56,539 |
| May 2, 2016 | $47,801 | September 4, 2018 | $53,749 |
| May 10, 2016 | $6 | October 1, 2018 | $52,537 |
| June 2, 2016 | $52,970 | November 1, 2018 | $53,278 |
| July 1, 2016 | $60,029 | December 3, 2018 | $52,219 |
| August 2, 2016 | $47,402 | January 2, 2019 | $47,812 |
| September 1, 2016 | $50,457 | February 1, 2019 | $51,437 |
| October 4, 2016 | $55,668 | March 1, 2019 | $51,156 |
| November 1, 2016 | $53,199 | April 2, 2019 | $54,063 |
| December 1, 2016 | $51,901 | May 1, 2019 | $55,359 |
| January 3, 2017 | $49,644 | June 3, 2019 | $56,470 |
| February 1, 2017 | $55,691 | July 1, 2019 | $54,878 |
| March 3, 2017 | $47,929 | August 1, 2019 | $54,979 |
| April 3, 2017 | $57,563 | | |
| | | Total | $2,988,970 |

319. Dondero caused HCMLP to make the Massand Transfers with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero was an insider of HCMLP and Massand Capital;

(b) before the Massand Transfers, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c) HCMLP, through Dondero, was engaged in a multi-faceted scheme to defraud HCMLP's creditors, which involved, among other things, causing HCMLP to become an obligor on certain contracts, including the Massand Consulting Agreements, that did not confer value on HCMLP;

(d) at the time of the transfers to Massand LLC, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e) Dondero caused HCMLP to make the Massand Transfers during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's creditors; and

(f) The Massand Transfers were made for no consideration to HCMLP, and the services provided by Massand were made for the benefit of SAS, an entity that was not owned by HCMLP.

320. The Massand Transfers are voidable as intentionally fraudulent transfers. Accordingly, the Massand Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XXIV**
**Breach of Contract Arising Out of Hunter Mountain Note**
*gainst Hunter Mountain and and*

321. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

322. On December 21, 2015, HCMLP and Hunter Mountain entered into the Hunter Mountain Note, pursuant to which Hunter Mountain agreed to pay HCMLP $63 million at an interest rate of 2.61% per annum.

323. Rand is a guarantor on the Hunter Mountain Note.

324. Pursuant to the Hunter Mountain Note, accrued interest and principal is due and payable in accordance with an amortization schedule attached to the note.

325. Hunter Mountain breached the Hunter Mountain Note by failing to make the payments due under the note on December 21, 2019 and December 21, 2020.

326. On May 3, 2021, HCMLP sent a demand letter to Hunter Mountain stating that the Hunter Mountain Note was in default and therefore, pursuant to the "Remedies" section of the note, all principal, interest, and any other amounts due and owing on the Hunter Mountain Note are immediately due and payable. As of May 5, 2021, that amount was more than $72 million, with interest continuing to accrue.

327. The Hunter Mountain Note is currently in default. Pursuant to the Hunter Mountain Note, HCMLP is entitled to damages from Hunter Mountain and Rand in an amount equal to all unpaid principal and interest, in addition to HCMLP's cost of collection, including attorneys' fees.

**COUNT XXV**
**Conversion**
*gainst ondero and llington*

328. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

329. In February 2018, HE Capital 232 and its wholly-owned subsidiary, HE Capital 232 Property obtained the HE Capital 232 Proceeds and placed them in an escrow account maintained by HCMLP's counsel, Wick Phillips, "pending distribution of the proceeds to the direct and indirect interest owners in [HE Capital 232 Property]."

330. On March 2, 2018, Wick Phillips disbursed a portion of those funds from the escrow account. The Remaining HE Capital 232 Proceeds, worth approximately $2.98, were never disbursed to HCMLP.

331. HCMLP owned, had possession of (through its counsel Wick Phillips), or had entitlement to possession of the Remaining HE Capital 232 Proceeds.

332. The Remaining HE Capital 232 Proceeds had been held for safekeeping, were intended to be kept segregated, specific and identifiable money, in the form they were received, and not subject to a claim by anyone other than HCMLP.

333. Upon information and belief, Dondero and Ellington directed Wick Phillips to withhold the Remaining HE Capital 232 Proceeds in a scheme to funnel the money to themselves through shell companies that they owned in the Cayman Islands. Indeed, on June 4, 2018, at Ellington's direction, Wick Phillips disbursed the remainder of the proceeds to Maple FS, a so-called fiduciary services company in the Cayman Islands, which subsequently transferred the full amount to Grey Royale Ltd., a Cayman Islands shell company owned and controlled by Dondero and Ellington.

334. Dondero's and Ellington's acts manifest a clear repudiation of HCMLP's rights in the Remaining HE Capital 232 Proceeds.

**COUNT XXVI**
**Unjust Enrichment**
*gainst ondero*

335. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

336. As set forth above, Dondero caused HCMLP to enter into myriad intercompany note transactions with other Dondero Entities in order to, among other things: (i) fund distributions to himself and his loyalists; (ii) inject funds into other entities he owns; and (iii) obtain personal tax benefits. Now, Dondero is actively spearheading an expensive, frivolous litigation campaign against HCMLP, through these same Dondero Entities, in order to avoid or delay their repayment obligations.

337. Dondero exploited HCMLP by using it to pursue goals that did not benefit HCMLP. Dondero orchestrated myriad transactions and schemes designed to benefit himself and other Dondero Entities at the expense of HCMLP, including but not limited to: (i) the lifeboat scheme; (ii) distributions from HCMLP to himself and certain trusts he owned and controlled during periods when HCMLP was insolvent; and (iii) intercompany transactions involving various Dondero Entities that distributed cash throughout his vast web of entities. Dondero unjustly profited from these schemes, either by directly transferring value to himself (*e.g.*, through distributions) or by using HCMLP money in order to seed business activities and investments that would accrue to his own personal benefit. Likewise, Dondero was willing to harm HCMLP even when it would seem economically irrational for him to do so, such as when he caused HCMLP to incur more in legal fees pursuing a vendetta against Daugherty than the total funds Daugherty was owed.

338. Dondero, together with Ellington, caused HCMLP's counsel to improperly divert approximately $3 million of HCMLP cash being held in an escrow account to an entity that they owned and controlled in the Cayman Islands.

339. Dondero obtained personal services from individuals who were employed and paid by HCMLP, including with respect to private business ventures.

340. Plaintiff seeks restitution from Dondero and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by him as a result of the unjust conduct set forth above.

**COUNT XXVII**
**Unjust Enrichment**
*gainst llington and Leventon*

341. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

342. Ellington and Leventon were employees of HCMLP who received millions of dollars in compensation. However, each of them understood and performed their duties as functionaries for Dondero. As such, both Ellington and Leventon subordinated the interests of HCMLP to the interests of Dondero, and actively participated in and implemented his schemes to divert value from HCMLP. Portions of Ellington's and Leventon's compensation was consideration for their willingness to elevate Dondero's interests over those of HCMLP.

343. Together with Dondero, Ellington caused HCMLP's counsel to improperly divert approximately $3 million of HCMLP cash being held in an escrow account to an entity that they owned and controlled in the Cayman Islands.

344. Ellington and Leventon engaged in willful and wanton misconduct that gave rise to more than $350 million in allowed claims against HCMLP. Among other things, Ellington

and Leventon participated in the scheme to evade UBS collection efforts by fraudulently transferring assets to Sentinel.

345. Plaintiff seeks restitution from Ellington and Leventon and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

**COUNT XXVIII**
**Unjust Enrichment**
*gainst e oint and HCM*

346. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

347. The lifeboat scheme was perpetrated primarily through NexPoint and HCMFA. NexPoint and HCMFA utilized HCMLP's employees to perform management and advisory services that HCMLP had directly provided, and should have continued to provide directly. Neither NexPoint nor HCMFA fairly compensated HCMLP for the use of its employees or resources.

348. HCMLP provided substantial financial support for NexPoint and HCMFA, including in the form of note agreements. Both NexPoint and HCMFA have defaulted on their debts to HCMLP and are currently pursuing expensive, frivolous litigation against HCMLP in an effort to evade their payment obligations.

349. NexPoint and HCMFA were effectively HCMLP in disguise, conducting HCMLP's business, with HCMLP's employees, operating out of HCMLP's office, beginning with HCMLP's contracts.

350. Through their exploitation of HCMLP, NexPoint and HCMFA received tens or hundreds of millions of dollars of profits.

351. Plaintiff seeks restitution from NexPoint and HCMFA and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

**COUNT XXIX**
**Unjust Enrichment**
*gainst Massand Capital and S S*

352. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

353. Massand Capital received millions of dollars in payments from HCMLP under the Massand Consulting Agreements. Nevertheless, Massand Capital was aware that it was not performing any services on behalf of HCMLP. Rather, Massand Capital was performing services on behalf of SAS. HCMLP received no benefit under the Massand Consulting Agreements.

354. HCMLP employees performed work for SAS. Indeed, at least four HCMLP even receiving SAS email addresses. SAS did not compensate HCMLP for these services.

355. SAS has profited from the services performed by Massand Capital and from the use of HCMLP's employees and resources.

356. Plaintiff seeks restitution from Massand Capital and SAS and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

**COUNT XXX**
**Unjust Enrichment**
*gainst CL Holdco*

357. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

358. Dondero, acting through HCMLP, fraudulently induced HarbourVest to purchase 49% of HCLOF for approximately $75 million, with a commitment to fund an additional $75 million. CLO Holdco was the beneficiary of the funds invested by HarbourVest. HCMLP received no benefit from the HarbourVest investment. Nevertheless, HarbourVest filed a proof of claim against HCMLP for fraudulently inducing the HarbourVest investment, and HCMLP was ultimately forced to settle with HarbourVest by providing them with $80 million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to a new entity designated by HCMLP. As a result of Dondero's conduct, however, the HCLOF interests were then worth significantly less than the face amount of HarbourVest's allowed claim.

359. Plaintiff seeks restitution from CLO Holdco and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by it as a result of its unjust receipt and use of the proceeds of the HarbourVest investment.

**COUNT XXXI**
**Avoidance and Recovery of the One-Year Transfers as Preferential Transfers under 11 U.S.C. §§ 547 and 550**
*gainst ondero and llington*

360. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

361. Dondero and Ellington are insiders of HCMLP.

362. As set forth below, within one year of the Petition Date, HCMLP made payments to Dondero of $4,755,2017 and payments to Ellington of $326,225 (the "Alleged Expense Transfers" and the "March 28, 2019 Repayment Transfer," as set forth below, and collectively the "One-Year Transfers"):

| March 28, 2019 Repayment Transfer | | |
|---|---|---|
| Date | Transferee | Amount |
| March 28, 2019 | Dondero | $3,750,000 |
| Alleged Expense Transfers | | |
| Date | Transferee | Amount |
| October 31, 2018 | Dondero | $8,986 |
| November 15, 2018 | Dondero | $65,078 |
| November 15, 2018 | Ellington | $1,296 |
| December 14, 2018 | Dondero | $115,481 |
| December 31, 2018 | Dondero | $548 |
| December 31, 2018 | Ellington | $5,150 |
| January 15, 2019 | Dondero | $96,786 |
| January 15, 2019 | Ellington | $60 |
| January 31, 2019 | Dondero | $38,628 |
| February 15, 2019 | Dondero | $42,435 |
| February 15, 2019 | Ellington | $102 |
| February 28, 2019 | Dondero | $19,063 |
| March 15, 2019 | Dondero | $50,771 |
| March 29, 2019 | Dondero | $21,935 |
| March 29, 2019 | Ellington | $60 |
| April 15, 2019 | Dondero | $60,191 |
| April 30, 2019 | Dondero | $7,164 |
| April 30, 2019 | Ellington | $60 |
| May 15, 2019 | Dondero | $89,257 |
| May 15, 2019 | Ellington | $365 |
| May 31, 2019 | Dondero | $38,804 |
| June 14, 2019 | Dondero | $82,710 |
| June 28, 2019 | Dondero | $7,605 |
| June 28, 2019 | Ellington | $60 |
| July 15, 2019 | Dondero | $47,006 |
| July 15, 2019 | Ellington | $60 |
| July 31, 2019 | Dondero | $748 |
| August 15, 2019 | Dondero | $85,059 |
| August 30, 2019 | Dondero | $12,714 |
| August 30, 2019 | Ellington | $205,788 |
| September 13, 2019 | Dondero | $56,763 |
| September 30, 2019 | Dondero | $24,498 |
| September 30, 2019 | Ellington | $60 |
| October 15, 2019 | Dondero | $32,977 |

| | | |
|---|---|---|
| October 15, 2019 | Ellington | $60 |
| October 15, 2019 | Ellington | $113,105 |
| Total | Dondero | $4,755,207 |
| Total | Ellington | $326,226 |

363. The One-Year Transfers were made on account of antecedent debt.

364. HCMLP was insolvent when each One-Year Transfer was made.

365. Each One-Year Transfer enabled Dondero and Ellington to receive more than they would have if (i) the One-Year Transfers had not been made; and (ii) Dondero and Ellington received payment on account of the debt paid by the One-Year Transfers to the extent provided by the Bankruptcy Code.

366. Each One-Year Transfer constitutes an avoidable preference pursuant to Section 547(b) of the Bankruptcy Code.

367. Plaintiff is entitled to an order and judgment under 11 U.S.C. §§ 547 and 550 that each of the One-Year Transfers is avoided and recoverable.

**COUNT XXXII**
**Avoidance and Recovery of the Alleged Expense Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law**
*gainst ondero and llington*

368. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

369. To the extent the Alleged Expense Transfers do not constitute reimbursement for valid expenses, they constitute constructive fraudulent transfers that were made to or for the benefit of Dondero and Ellington.

370. At the time of each Alleged Expense Transfer, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or

reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

371. HCMLP received less than reasonably equivalent value in exchange for each of the Alleged Expense Transfers. Indeed, HCMLP received no value for the Alleged Expense Transfers, each of which was a gratuitous transfer from HCMLP to or for the benefit of Dondero and Ellington.

372. Each Alleged Expense Transfer is voidable as a constructively fraudulent transfer. Accordingly, each Alleged Expense Transfer should be set aside, avoided, and recovered under 11 U.S.C. §§ 544, 548, and 550, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XXXIII**
**Avoidance and Recovery of the Alleged Expense Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law**
*gainst ondero and llington*

373. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

374. To the extent the Alleged Expense Transfers do not constitute reimbursement for valid expenses, they constitute intentional fraudulent transfers that were made to or for the benefit of Dondero and Ellington.

375. Dondero was HCMLP's Chief Executive Officer, President, Co-Chief Investment Officer, and Co-Founder. Ellington was HCMLP's Chief Legal Officer and General Counsel until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interest. Dondero exercised complete control over HCMLP, and Ellington

acquiesced to and profited from schemes orchestrated by Dondero to enrich Dondero, Ellington, and HCMLP's direct and indirect owners.

376. To that end, Dondero and Ellington caused HCMLP to make the Alleged Expense Transfers with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero and Ellington were insiders of HCMLP;

(b) although Dondero and Ellington assert that the Alleged Expense Transfers constitute reimbursement for valid expenses, on information and belief, there is no factual basis for that assertion;

(c) before the Alleged Expense Transfers were made, HCMLP had been sued and Dondero and Ellington believed HCMLP's legal exposure rendered it insolvent;

(d) HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved both siphoning HCMLP's valuable business opportunities through newly-created "lifeboat" entities and siphoning HCMLP's value through HCMLP Distributions (among other means);

(e) HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved siphoning HCMLP's value through the Alleged Expense Transfers (among other means);

(f) HCMLP received less than reasonably equivalent value (and in fact, received zero consideration) in exchange for the Alleged Expense Transfers;

(g) at the time of each Alleged Expense Transfer, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(h) Dondero and Ellington made the Alleged Expense Transfers during a period when they believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that such value would not be available to satisfy HCMLP's creditors.

377. Each Alleged Expense Transfer is voidable as an intentionally fraudulent transfer. Accordingly, each of the Alleged Expense Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544, 548, and 550, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XXXIV**
**Disallowance of Claims Under Sections 502(b), 502(d), and 502(e) of the Bankruptcy Code**
*gainst ondero, llington, Leventon, aterhouse, and C CM*

378. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

379. Each of Dondero, Ellington, Leventon, and Waterhouse filed multiple proofs of claim in HCMLP's bankruptcy case. Moreover, Ellington, Leventon, and Waterhouse

transferred certain of their alleged claims against HCMLP to CPCM. The claims that Dondero, Ellington, Leventon, Waterhouse, and CPCM currently have outstanding against HCMLP are set forth below (collectively, the "Proofs of Claim").

| Claim No. | Filed By | Description | Amount |
|---|---|---|---|
| 138 | Dondero | • Expense reimbursement for expenses paid for HCMLP and "various related entities" | Not less than $100,000 |
| 142 | Dondero | • Indemnification for acts performed or omitted to be performed on behalf of HCMLP. | Undisclosed |
| 188 | Dondero | • Contingent claim related to possible efforts to collect on various promissory notes. In the event collection efforts are made, Dondero asserts the notes were issued by him for funds in lieu of compensation. | Notes total $69,471,056.08 |
| 214 | Leventon | • Indemnification for acts performed or omitted to be performed on behalf of HCMLP;<br>• Damages for wrongful termination. | Undisclosed |
| 216 | CPCM (transferred by Leventon) | • Performance bonuses for 2018;<br>• Deferred performance awards for 2016 through 2018. | $687,594.79 (as of January 30, 2021) |
| 217 | CPCM (transferred by Waterhouse) | • Performance bonuses for 2018;<br>• Deferred performance awards (2016 through 2018);<br>• Compensation in accordance with the terms of the Senior Employee Stipulation (as defined in claim). | $1,514,105.57 (as of January 30, 2021) |
| 218 | Waterhouse | • Indemnification for acts performed or omitted to be performed on behalf of HCMLP;<br>• Vacation and paid time off. | $24,676.92 (liquidated) plus undisclosed amount for indemnification |
| 244 | CPCM (transferred by Ellington) | • Performance bonuses for 2018;<br>• Deferred performance awards for 2015 through 2018. | $3,074,408.16 (as of January 30, 2021) |
| 255 | Ellington | • Vacation and paid time off. | $38,900.40 (liquidated) |

380. Dondero, Ellington, and Waterhouse owed fiduciary duties to HCMLP in their capacities as officers of HCMLP. Leventon owed fiduciary duties to HCMLP in his capacity as counsel to HCMLP.

381. The Proofs of Claim are all subject to disallowance under Section 502(b). As set forth above, Dondero, Ellington, Leventon, and Waterhouse have committed multiple breaches of their fiduciary duties to HCMLP, including in connection with the SAS, Massand, Sentinel, Acis, and Crusader schemes. Ultimately, Dondero, Ellington and Leventon were terminated on account of their conduct. Because of this misconduct and their repeated breaches of fiduciary duty, Dondero, Ellington, Leventon, and Waterhouse are no longer entitled to their compensation-related claims, including any claims for vacation, paid time off, or bonuses or similar awards, whether individually held or transferred to CPCM.

382. Moreover, pursuant to the Tall Pine scheme, each of Ellington, Leventon, and Waterhouse received surreptitious payments from various Dondero Entities. Ellington, Leventon, and Waterhouse did not perform any services in exchange for these fees; rather, the payments were on account of deferred compensation that is currently requested in the Proofs of Claim. Therefore, Ellington's and Leventon's Proofs of Claim for compensation-related payments should, at a minimum, be reduced by the amount of the payments these individuals received from the Dondero- and Ellington-controlled payments as part of the Tall Pine scheme.[28]

[28] Waterhouse's proof of claim should also be reduced in an amount equal to what Waterhouse received in the Tall Pine scheme; however, HCMLP is seeking a reduction of Waterhouse's claim pursuant to the Waterhouse Motion.

383. For these same reasons, Leventon's claim for wrongful termination should be disallowed, as he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interests.

384. HCMLP's Code of Ethics required all employees of HCMLP to "devote their full time and efforts to the business of the Company;" "adhere to the highest standards of ethical conduct," and "disclose any activities that may create an actual or potential conflict of interest between the Employee, the Company and/or any Client." Indeed, the Code required employees to submit a required disclosure form and receive approval from the Chief Compliance Officer prior to: (1) serving as a director, officer, general partner or trustee of, or as a consultant to, any business, corporation or partnership, including family owned businesses and charitable, non-profit and political organizations; (2) accepting a second job or part time job of any kind or engaging in any other business outside of the HCMLP; or (3) receiving compensation of any nature, directly or indirectly, from any person, firm, corporation, estate, trust or association, other than HCMLP, whether as a fee, commission, bonus or other consideration such as stock, options or warrants. Upon information and belief, no such form was submitted by Ellington, Leventon, or Waterhouse in connection with the Tall Pine scheme.

385. Further, any Proof of Claim transferred or assigned to CPCM should be disallowed under Section 502(b) because Ellington's, Leventon's, and Waterhouse's: (1) performance bonuses are non-transferable under the terms of HCMLP's annual bonus plan; (2) deferred performance awards are non-transferable under the terms of HCMLP's deferred incentive plan; and (3) deferred performance awards are non-transferable under their respective Contingent Bonus Award Agreements. Pursuant to those agreements governing payment of

performance bonuses and deferred performance awards, any transfer of such awards to CPCM are null and void and create no obligation or liability of HCMLP.

386. To the extent CPCM's Proofs of Claim seek payment for any deferred performance awards or annual bonus awards allegedly payable to Ellington, Leventon, and Waterhouse, those claims should be disallowed because (i) all amounts due and owing under such awards have already been paid, (ii) such amounts are subject to offset as set forth above, or (iii) Ellington's, Leventon's, and Waterhouse's employment with HCMLP was terminated prior to the vesting date of those awards. Any such awards were automatically forfeited at the end of their respective employments.

387. To the extent the Proofs of Claim seek payment for indemnification, those claims should similarly be disallowed. Dondero, Waterhouse, and Leventon claim they are generally entitled to indemnification for "all acts performed or omitted to be performed on behalf of or in connection with [HCMLP]'s business" pursuant to Article 4.1(h) of the Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. (the "Previous LPA") and the Resolution of the Board of Directors of Strand Advisor, Inc., dated May 12, 2020 (the "Resolution"). The Previous LPA ceased to be operative upon the effective date of the Plan. The Plan required entry into the current limited partnership agreement (which did not include any indemnification for Dondero, Leventon, or Waterhouse) and also expressly disclaimed any prior indemnification claims. Further, under the terms of the Previous LPA and the Resolution, HCMLP has no obligation to indemnify Dondero, Leventon, or Waterhouse for any conduct that constitutes gross negligence or willful or wanton misconduct. Therefore, to the extent that the indemnification claims arose from conduct constituting gross negligence or

willful or wanton misconduct (whether detailed in this Complaint or not) such claims should be disallowed.

388. As set forth above, Dondero is a transferee of transfers avoidable under sections 544 and 548 of the Bankruptcy Code, and property is recoverable from Dondero under section 550 of the Bankruptcy Code. Accordingly, pursuant to section 502(d), all claims asserted by Dondero should be disallowed unless and until Dondero pays to Plaintiff the value of any transfer avoided pursuant to this Complaint.

389. Dondero's, Leventon's, Ellington's, and Waterhouse's claims for indemnification should be similarly disallowed pursuant to Section 502(e)(1)(B). Until such liabilities are established, the claims for indemnification are contingent. And because the purported claims for indemnification are for actions made on behalf of HCMLP, HCMLP could be co-liable. Therefore, these contingent claims for indemnification should be disallowed on that basis pursuant to Section 502(e)(1)(B).

390. The Proofs of Claim should be disallowed and expunged in their entirety pursuant to section 502 of the Bankruptcy Code.

391. Plaintiff expressly reserves its right to supplement or amend this objection to the Proofs of Claim and any other proof of claim. Plaintiff hereby reserves all objections and defenses to the Proofs of Claim and any other proof of claim filed in the bankruptcy proceeding.

**COUNT XXXV**
**Disallowance or Subordination of Claims Under**
**Section 502 and 510 of the Bankruptcy Code**
*gainst ondero, ugabo , et ood, ada, M , M , and Hunter Mountain*

392. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

393. Each of Dondero, Dugaboy, Get Good, Okada, MAP #1, MAP #2, and Hunter Mountain filed unripe proofs of claim in HCMLP's bankruptcy case arising from a tax audit currently being conducted by the Internal Revenue Service (the "IRS"). The claims that Dondero, Dugaboy, Get Good, Okada, MAP #1, MAP #2, and Hunter Mountain currently have outstanding against HCMLP are set forth below (collectively, the "Unripe Proofs of Claim").

| Claim No. | Filed By | Description | Amount |
|---|---|---|---|
| 70 | Hunter Mountain | • Indemnification for obligations related to a secured promissory note | $60,298,739 |
| 113 | Dugaboy[29] | • Potential claims against HCMLP related to HCMLP's 2008 tax return, which is being audited.<br>• Potential claims against HCMLP related to failure to make tax distributions to its limited partners for certain years between 2004 and 2018. | Undisclosed |
| 120 | Get Good | • Potential claims against HCMLP related to HCMLP's 2008 tax return, which is being audited.<br>• Potential claims against HCMLP related to failure to make tax distributions to its limited partners for certain years between 2004 and 2018. | Undisclosed |
| 128 | Get Good Non Exempt Trust No. 1 | • Potential claims against HCMLP related to HCMLP's 2008 tax return, which is being audited.<br>• Potential claims against HCMLP related to failure to make tax distributions to its limited partners for certain years between 2004 and 2018. | Undisclosed |
| 129 | Get Good Non Exempt Trust No. 2 | • Potential claims against HCMLP related to HCMLP's 2008 tax return, which is being audited.<br>• Potential claims against HCMLP related to failure to make tax distributions to its | Undisclosed |

[29] Dugaboy has two other proofs of claim on file (Claim Nos. 131 and 177). HCMLP previously objected to these claims [Docket Nos. 2796, 2819] and they are subject to a separate proceeding.

| | | | |
|---|---|---|---|
| | | limited partners for certain years between 2004 and 2018. | |
| 135 | Okada | • Potential claims against HCMLP related to HCMLP's 2008 tax return, which is being audited.<br>• Potential claims against HCMLP related to failure to make tax distributions to its limited partners for certain years between 2004 and 2018. | Undisclosed |
| 137 | MAP #1 | • Potential claims against HCMLP related to HCMLP's 2008 tax return, which is being audited.<br>• Potential claims against HCMLP related to failure to make tax distributions to its limited partners for certain years between 2004 and 2018. | Undisclosed |
| 139 | MAP #2 | • Potential claims against HCMLP related to HCMLP's 2008 tax return, which is being audited.<br>• Potential claims against HCMLP related to failure to make tax distributions to its limited partners for certain years between 2004 and 2018. | Undisclosed |
| 141 | Dondero | • Potential claims against HCMLP related to HCMLP's 2008 tax return, which is being audited.<br>• Potential claims against HCMLP via Dondero's trusts related to failure to make tax distributions to its limited partners for certain years between 2004 and 2018. | Undisclosed |
| 145 | Dondero | • Potential claims against HCMLP as successor-in-interest to The Canis Major Trust, a limited partner of HCMLP, related to HCMLP's 2008 tax return, which is being audited.<br>• Potential claims against HCMLP as successor-in-interest to The Canis Major Trust, a limited partner of HCMLP, related to HCMLP's failure to make tax distributions to its limited partners for certain years between 2004 and 2018. | Undisclosed |

394. The Unripe Proofs of Claim are contingent on the IRS assessing tax liability against HCMLP's former limited partners and may never materialize against HCMLP. For example, Strand is currently defending an IRS audit and a determination as to the limited partners' tax liability is expected prior to year end. If the tax audit determines that there is no tax exposure, the Unripe Proofs of Claim will be moot. However, to the extent these Unripe Proofs of Claim mature into claims against HCMLP, they should be disallowed or subordinated pursuant to Section 502 or Section 510.

395. Further, Hunter Mountain's Proof of Claim should be disallowed. Hunter Mountain amended its Proof of Claim on April 8, 2020. Hunter Mountain later entered into a settlement agreement and withdrew its amended Proof of Claim in connection with that settlement. Although its original Proof of Claim remains on the ledger, Hunter Mountain's amended Proof of Claim superseded the original Proof of Claim and was withdrawn. The original Proof of Claim, accordingly, should be disallowed.

396. Plaintiff expressly reserves its right to supplement or amend this objection to the Unripe Proofs of Claim and any other proof of claim. Plaintiff hereby reserves all objections and defenses to the Unripe Proofs of Claim and any other proof of claim filed in the bankruptcy proceeding.

**COUNT XXXVI**
**Disallowance or Subordination of Claims Under**
**Section 502 and 510 of the Bankruptcy Code**
*gainst CL Holdco*

397. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

398. On April 8, 2020, CLO HoldCo filed Claim No. 133 seeking approximately $11 million (the "CLO Holdco Claim"). The basis of the CLO HoldCo Claim was that CLO Holdco purchased a participation interest in certain interests that HCMLP held in the Crusader Fund.

399. HCMLP acquired the interests in the Crusader Fund that are the subject of the CLO Holdco Claim in violation of the Joint Plan and Scheme. HCMLP released its claim on those interests in connection with HCMLP's settlement with the Redeemer Committee. Accordingly, CLO Holdco is not entitled to any value on account of the CLO Holdco Claim. In recognition of this fact, on October 21, 2020, CLO Holdco amended its claim to seek $0.

400. Additionally, CLO Holdco subsequently agreed to withdraw the CLO Holdco Claim. Nevertheless, CLO Holdco has failed to date to actually withdraw the claim, notwithstanding the Reorganized Debtor's request. Accordingly, out of an abundance of caution, and to the extent that CLO Holdco attempts to pursue the CLO Holdco Claim, the Litigation Trustee objects to the CLO Holdco Claim, and the CLO Holdco Claim should be disallowed in its entirety or subordinated.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that the Court enter judgment in favor of Plaintiff and against Defendants as follows:

A. awarding Plaintiff damages against, and disgorgement and restitution from each Defendant in an amount to be determined at trial;

B. setting aside, avoiding, and granting recovery of the HCMLP Distributions;

C. setting aside, avoiding, and granting recovery of the CLO Holdco Transfer;

D. setting aside and avoiding the payment obligations under the Massand Consulting Agreement;

E. setting aside, avoiding, and granting recovery of the Massand Transfers;

F. setting aside and avoiding the transfers of management and advisory agreements to HCMFA and NexPoint;

G. setting aside, avoiding, and granting recovery of the One-Year Transfers;

H. disallowing or subordinating the Proofs of Claim and, to the extent applicable, the Unripe Proofs of Claim and the CLO Holdco Claim;

I. awarding Plaintiff pre- and post-judgment interest at the maximum rate permitted by law;

J. awarding Plaintiff his attorneys' fees, costs, and other expenses incurred in this action; and

K. awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: October 15, 2021
Dallas, Texas

Respectfully submitted,

SIDLEY AUSTIN LLP
/s/ *aige Holden Montgo er*
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

-and-

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Susheel Kirpalani (admitted *pro hac vice*)
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (*pro hac vice* pending)
Benjamin I. Finestone (admitted *pro hac vice*)
Jordan Harap (admitted *pro hac vice*)
Alexander J. Tschumi (*pro hac vice* pending)
51 Madison Avenue
Floor 22
New York, NY 10010
Telephone: (212) 849-7000

*Counsel for the Litigation Trustee*

# Exhibit 13

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 24, 2024**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.** | § | |
| | § | **Case No. 19-34054-sgj-11** |
| **Reorganized Debtor.** | § | |
| | § | |
| | § | |
| **DUGABOY INVESTMENT TRUST and HUNTER MOUNTAIN INVESTMENT TRUST** | § | **Adv. Pro. No. 23-03038-sgj** |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P. and HIGHLAND CLAIMANT TRUST,** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM OPINION AND ORDER GRANTING MOTION TO DISMISS ADVERSARY PROCEEDING IN WHICH CONTINGENT INTEREST HOLDERS IN CHAPTER 11 PLAN TRUST SEEK A POST-CONFIRMATION VALUATION OF TRUST ASSETS**

1934054240528000000000005
001154

## I. INTRODUCTION

Before the court is a motion to dismiss ("Rule 12(b) Motion") the above-referenced adversary proceeding ("Adversary Proceeding").[1] The Rule 12(b) Motion was filed by the two Defendants named in the Adversary Proceeding: Highland Capital Management, L.P. ("Highland" or the "Reorganized Debtor") and the Highland Claimant Trust ("Claimant Trust"). Highland obtained confirmation of a chapter 11 Plan[2] on February 22, 2021 (which Plan went effective on August 21, 2021). The Claimant Trust was established pursuant to the terms of the Plan and the Claimant Trust Agreement approved pursuant thereto. The Claimant Trust was created for the benefit of "Claimant Trust Beneficiaries," which was defined under the Plan and the Claimant Trust Agreement to be the holders of allowed general unsecured (Class 8) and subordinated claims (Class 9) against Highland.

The Adversary Proceeding was brought more than two-years post-confirmation by Plaintiffs Hunter Mountain Investment Trust ("HMIT") and The Dugaboy Investment Trust ("Dugaboy," and, together with HMIT, the "Plaintiffs").[3] These two Plaintiffs are controlled by Highland's co-founder and former President and Chief Executive Officer, James D. Dondero ("Dondero"). The Plaintiffs held equity interests (i.e., limited partnership interests) in Highland. Pursuant to the terms of the Highland Plan, Plaintiffs now hold ***unvested contingent interests*** in the Claimant Trust—since the limited partnership interests in Highland were cancelled in exchange for unvested contingent interests in the Claimant Trust. These contingent interests will vest if, and

[1] *The Highland Parties' Motion to Dismiss Complaint to (I) Compel Disclosures about the Assets of the Highland Claimant Trust and (II) Determine (A) Relative Value of Those Assets, and (B) Nature of Plaintiffs' Interests in the Claimant Trust* ("Motion to Dismiss"), Dkt. No. 13. A memorandum of law in support of the Motion to Dismiss ("MTD Brief") was filed at Dkt. No. 14.

[2] Capitalized terms not defined in this introduction shall be defined later herein.

[3] *See Complaint to (I) Compel Disclosures about the Assets of the Highland Claimant Trust and (II) Determine (A) Relative Value of Those Assets, and (B) Nature of Plaintiff's Interests in the Claimant Trust* ("Complaint"). Dkt. No. 1.

only if, the Claimant Trustee certifies that the Claimant Trust Beneficiaries (i.e., the Class 8 general unsecured claims and Class 9 subordinated claims under the Plan), have been paid in full ***and*** certain other obligations – primarily, the Claimant Trust's significant indemnity obligations – have been satisfied.

In this Adversary Proceeding, Plaintiffs seek: (1) an order from the bankruptcy court compelling the Reorganized Debtor and the Claimant Trustee to disclose certain information about the assets and liabilities remaining in the Claimant Trust, and, if they are compelled to disclose that information, (2) a declaratory judgment regarding the relative value of those assets and liabilities, and (3) if assets exceed liabilities, a declaratory judgment that HMIT's and Dugaboy's unvested contingent interests in the Claimant Trust are likely to vest at some point in the future.

To be clear, it is undisputed that neither HMIT nor Dugaboy are currently Claimant Trust Beneficiaries under the terms of the Plan and Claimant Trust Agreement and that the vesting conditions under the terms of the Plan and Claimant Trust Agreement have not occurred.

Highland and the Claimant Trust filed their Motion to Dismiss, seeking a dismissal, with prejudice, of all three counts of the Complaint. For the following reasons, the court grants the Motion to Dismiss.

## I. JURISDICTION

This court has jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157(b)(1) and (b)(2)(A) and (O) and 1334.

## II. BACKGROUND

### *A. The Bankruptcy Case and the Plan*

Highland was a Dallas-based investment firm that was co-founded in 1993 by Dondero and Mark Okada. It managed billion-dollar investment portfolios and assets, both directly and indirectly, through numerous affiliates that were owned or controlled by Dondero. On October

16, 2019 (the "Petition Date"), Highland, with Dondero in control[4] and acting as its CEO, president, and portfolio manager, and facing a myriad of massive, business litigation claims, filed for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The bankruptcy case was transferred to the Northern District of Texas, Dallas Division in December 2019.

Highland, a Delaware limited partnership, had three classes of limited partnership interests (Class A, Class B, and Class C) as of the Petition Date.[5] The Class A interests were held by the Plaintiff Dugaboy, and also Mark Okada's family trusts, and Strand Advisors, Inc. (the latter of which was an entity wholly owned by Dondero and was also Highland's only general partner). The Class B and C interests were held by the Plaintiff HMIT.[6]

Very shortly after the Petition Date, the official committee of unsecured creditors (the "Committee") threatened to seek the appointment of a chapter 11 trustee due to concerns over and distrust of Dondero, his numerous conflicts of interest, and his history of alleged mismanagement. Later, the United States Trustee actually moved for the appointment of a chapter 11 trustee. Under the specter of a possible appointment of a trustee, Highland engaged in substantial and lengthy negotiations with the Committee, resulting in a corporate governance settlement approved by this court on January 9, 2020.[7] As a result of this corporate governance settlement, Dondero relinquished control of Highland and resigned his positions as officer or director of Highland and its general partner, Strand,[8] although he stayed on with Highland as an unpaid portfolio manager.

---

[4] Mark Okada resigned from his role with Highland prior to the Petition Date.

[5] *See Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* ("Disclosure Statement") Art. II(D)4, at 20. Bankr. Dkt. No. 1473.

[6] *Id.*

[7] Bankr. Dkt. No. 339.

[8] Dondero agreed to this settlement pursuant to a stipulation he executed and that was filed in connection with Highland's motion to approve the settlement. *See Stipulation in Support of Motion of the Debtor for Approval of*

Three independent directors ("Independent Directors") were chosen to lead Highland through its chapter 11 case: James P. Seery, Jr. ("Seery"), John S. Dubel, and retired bankruptcy judge Russell Nelms. Seery was appointed Highland's Chief Executive Officer and Chief Restructuring Officer in July 2020.[9] According to Seery's testimony at various hearings, it was during subsequent negotiations regarding a plan for Highland that Dondero made a threat to "burn down the place" if Dondero's own proposed plan terms were not accepted by the company and its creditors. Indeed, soon after Highland negotiated compromises with its major creditors in the case (*e.g.,* the Redeemer Committee of the Crusader Fund; Joshua Terry; Acis; UBS) and began pursuing a plan supported by those creditors, Dondero and entities under his control began engaging in substantial, costly, and time-consuming litigation in the Highland case.[10] As the Fifth Circuit has described the situation, after Dondero's plans failed, "he and others under his control began to frustrate the proceedings by objecting to settlements, appealing orders, seeking writs of mandamus, interfering with Highland's management, threatening employees, and canceling trades between Highland and its clients."[11]

Highland's negotiations with the Committee eventually culminated in the filing of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* (the

---

*Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course*, Bankr. Dkt. No. 338.

[9] Bankr. Dkt. No. 854.

[10] As mentioned earlier, after January 2020, Dondero stayed on at Highland as an unpaid portfolio manager. In October 2020, Dondero resigned from all positions with Highland and its affiliates in response to a demand by the Independent Directors made after Dondero's purported threats and disruptions to the Debtor's operations.

[11] *NexPoint Advisors, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, 48 F.4th 419, 426 (citing *Highland Cap. Mgmt., L.P. v. Dondero (In re Highland Capital Mgmt., L.P.)*, Ch. 11 Case No. 19-34054-SGJ11, Adv. No. 20-03190-SGJ11, 2021 WL 2326350, at *1, *26 (Bankr. N.D. Tex. June 7, 2021) where this court "h[eld] Dondero in civil contempt, sanctioning him $100,000, and comparing this case to a 'nasty divorce.'").

"Plan"),[12] which was confirmed[13] in February 2021 over the objections of Dondero and Dondero-controlled entities. The Plan, which became effective on August 21, 2021 ("Effective Date"), is essentially an "asset monetization" plan pursuant to which the Committee was dissolved, and four new entities were created: the Reorganized Debtor; a new general partner for the Reorganized Debtor called HCMLP GP, LLC; the Claimant Trust (administered by Seery, its trustee); and a Litigation Sub-Trust (administered by its trustee, Marc Kirschner). The Claimant Trust owns the limited partnership interests in the Reorganized Debtor, HCMLP GP LLC, and the Litigation Sub-Trust and is charged with winding down Highland over a three-year period by monetizing its assets and making distributions to the "Claimant Trust Beneficiaries," as defined in the Plan and the CTA. General unsecured claims were classified as Class 8, and subordinated claims were classified as Class 9. Under the terms of the Plan, the holders of claims in Classes 8 and 9 received as of the Effective Date, in exchange for their claims, beneficial interests in the Claimant Trust and became "Claimant Trust Beneficiaries." HMIT's and Dugaboy's former limited partnership interests in Highland were classified as Class 10 and Class 11, respectively. Under the terms of the Plan, these interests were cancelled in exchange for ***unvested*** contingent interests in the Claimant Trust ("Contingent Trust Interests") that will vest if, and only if, the Claimant Trustee certifies that the Class 8 general unsecured claims and Class 9 subordinated claims have been paid in full, all disputed claims in Classes 8 and 9 have been resolved, ***and*** certain other obligations – primarily, the Claimant Trust's significant indemnity obligations – have been satisfied.[14] In other

---

[12] Bankr. Case Dkt. No. 1808.

[13] The Plan was confirmed on February 22, 2021. *See Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* ("Confirmation Order"). Bankr. Dkt. No. 1943.

[14] *See generally* Plan, Arts. III & IV.

words, HMIT and Dugaboy will become "Claimant Trust Beneficiaries" if, and only if, the vesting conditions occur.

### *B. Information Rights under the CTA*

The Claimant Trust is a Delaware statutory trust established pursuant to the terms of that certain *Claimant Trust Agreement* ("CTA"), effective August 11, 2021, for the benefit of Claimant Trust Beneficiaries, which are defined in the CTA to be[15]

> the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest at the federal judgment rate in accordance with the terms and conditions set forth herein, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

Under the clear terms of the CTA, information rights are limited, and the Claimant Trustee has no duty to provide an accounting of the Claimant Trust's assets to any party, including the Claimant Trust Beneficiaries.[16] The CTA grants limited information rights solely to a "Claimant Oversight Board"[17] and the Claimant Trust Beneficiaries:[18]

> The Claimant Trustee shall provide quarterly reporting to the Oversight Board and Claimant Trust Beneficiaries of (i) the status of the Claimant Trust Assets, (ii) the balance of Cash held by the Claimant Trust (including in each of the Claimant Trust Expense Reserve and Disputed Claim Reserve), (iii) the determination and any re-

---

[15] CTA § 1.1(h). The CTA was expressly incorporated into and is a part of the Plan. *See* Confirmation Order ¶ 25, at 27; Plan Art. IV(J). The final form of the CTA was filed with the court at docket number 1811-2, as modified by docket number 1875-4.

[16] CTA § 3.12(a) ("Except as otherwise provided herein, nothing in this Agreement requires the Claimant Trustee to file any accounting . . . ."); § 5.2 ("The ownership of the beneficial interests in the Claimant Trust shall not entitle the Claimant Trust Beneficiaries to any title in or to the Claimant Trust Assets (which title shall be vested in the Claimant Trust) or to any right to call for a partition or division of the Claimant Trust Assets ***or to require an accounting***.") (emphasis added).

[17] "Oversight Board" was defined in the CTA as "the board comprised of five (5) Members established pursuant to the Plan and Article III of this Agreement to oversee the Claimant Trustee's performance of his duties and otherwise serve the functions set forth in this Agreement and those of the "Claimant Trust Oversight Committee" described in the Plan. Subject to the terms of this Agreement, the initial Members of the Oversight Board shall be: (i) Eric Felton, as representative of the Redeemer Committee; (ii) Josh Terry, as representative of Acis; (iii) Elizabeth Kozlowski, as representative of UBS; (iv) Paul McVoy, as representative of Meta-e Discovery; and (v) David Pauker."

[18] CTA § 3.12(b).

determination, as applicable, of the total amount allocated to the Disputed Claim Reserve, (iv) the status of Disputed Claims and any resolutions thereof, (v) the status of any litigation, including the pursuit of the Causes of Action, (vi) the Reorganized Debtor's performance, and (vii) operating expenses; provided, however, that the Claimant Trustee may, with respect to any Member of the Oversight Board or Claimant Trust Beneficiary, redact any portion of such reports that relate to such Entity's Claim or Equity Interest, as applicable and any reporting provided to Claimant Trust Beneficiaries may be subject to such Claimant Trust Beneficiary's agreement to maintain confidentiality with respect to any non-public information.

Nothing in the Plan or the CTA grants any other information rights, and, in fact, the CTA makes clear that the Claimant Trust Beneficiaries do not have any information rights outside of those limited information rights set forth in the CTA,[19] which do not include rights to the granular asset and subsidiary level information that the Plaintiffs are asking for in their Complaint (as later further discussed).

As earlier noted, the Claimant Trust Beneficiaries are defined in the CTA to be only the holders of allowed Class 8 general unsecured claims and allowed Class 9 subordinated claims unless and until the Contingent Trust Interests held by the holders of the former limited partnership interests (classified in Classes 10 and 11 under the Plan) vest, at which point, the Class 10 and Class 11 claimants will become Contingent Trust Beneficiaries.[20] The CTA specifically provides that the holders of Contingent Trust Interests "shall not have any rights under this Agreement" and will not "be deemed 'Beneficiaries' under this Agreement," "unless and until" they vest in accordance with the Plan and the CTA and the Claimant Trustee files with the Bankruptcy Court a certification that all holders of general unsecured claims have been indefeasibly paid in full,

[19] CTA § 5.10(a) ("The Claimant Trust Beneficiaries shall have no rights other than those set forth in this Agreement, the Confirmation Order, or the Plan (including any Plan Supplement documents incorporated therein).").

[20] *See* CTA § 1.1(h); Plan Art. I.B.27.

including, as to Class 8 claims, "all accrued and unpaid post-petition interest consistent with the Plan and all Disputed Claims have been resolved (the 'GUC Payment Certification')."[21]

### C. *The Complaint and Motion to Dismiss*

#### 1. <u>The Complaint</u>

On May 10, 2023, HMIT and Dugaboy filed the Complaint in this Adversary Proceeding, asserting one claim for equitable relief and, if the court grants the request for equitable relief, two claims for declaratory relief.

In Count I,[22] entitled "First Claim for Relief - Disclosures of Claimant Trust Assets and Request for Accounting," Plaintiffs seek an order compelling Highland and the Claimant Trust "to provide information regarding the Claimant Trust assets, including the amount of cash and the remaining non-cash assets, and details of all transactions that have occurred since the [alleged] wall of silence was erected, and all liabilities."[23] Plaintiffs acknowledge in their Complaint that, under the terms of the Plan and the CTA, they are not entitled to the information they seek: While "[t]he Plan requires the Claimant Trustee to determine the fair market value of the Claimant Trust Assets as of the Effective Date and to notify the applicable Claimant Trust Beneficiaries of such a valuation, as well as distribute tax information to Claimant Trust Beneficiaries as appropriate[,][24] . . . ***no like information regarding valuation of the Claimant Trust Assets is available to Plaintiffs as holders of Contingent Claimant Trust Interests*** . . . ."[25] Thus, Plaintiffs seek equitable relief

[21] *See* CTA § 5.1(c).

[22] For ease of reference, the court will refer to the Plaintiffs' "First Claim for Relief," "Second Claim for Relief," and "Third Claim for Relief" as Count I, Count II, and Count III, respectively.

[23] Complaint ¶¶ 82-88.

[24] *Id.* ¶ 75 (citing Plan, Art. IV(B)(9)).

[25] *Id.* ¶ 76.

in Count I – an order compelling the Highland Parties to disclose information that Plaintiffs admit they are not otherwise entitled to under the terms of the Plan and the CTA.

In Count II, entitled "Second Claim for Relief – Declaratory Judgment Regarding Value of Claimant Trust Assets," Plaintiffs seek a declaratory judgment and "determination from the Court of the relative value of the Claimant Trust assets compared to the bankruptcy estate obligations," "[o]nce Defendants are compelled to provide information about the Claimant Trust assets."[26]

Finally, in Count III, entitled "Third Claim for Relief – Declaratory Judgment and Determination Regarding Nature of Plaintiffs' Interests," the Plaintiffs seek a declaratory judgment and determination, "[i]n the event that the Court determines that the Claimant Trust assets exceed the obligations of the bankruptcy estate in an amount sufficient so that all Allowable Claims may be indefeasibly paid . . . that the conditions are such that their Contingent Claimant Trust Interests are likely to vest into Claimant Trust Interests, making them Claimant Trust Beneficiaries."[27] HMIT and Dugaboy, by asking the court for a declaratory judgment that "the conditions are such that their Contingent Claimant Trust Interests ***are likely to vest*** into Claimant Trust Interests, making them Claimant Trust Beneficiaries"[28] (if the court first grants the equitable relief requested in Count I and the declaratory relief in Count II), admit and acknowledge that they are ***not*** Claimant Trust Beneficiaries and that their Claimant Trust Interests ***have not vested*** under the terms of the Plan and CTA. In fact, HMIT and Dugaboy clarify in footnote 6, with respect to Count III, that "[they] do not ask the Court to determine that they are Claimant Trust Beneficiaries or otherwise to convert their contingent interests into non-contingent interests[,]" and they

[26] *Id.* ¶¶ 89-92, at 26. The court notes that Plaintiffs' request for declaratory relief in Count II is predicated on the court granting the equitable relief sought in Count I.

[27] *Id.* ¶¶ 93-95, at 27. The court notes that Plaintiffs' request for declaratory relief in Count III is predicated on the court granting the declaratory relief sought in Count II, which (as noted) is, in turn, predicated on the court granting the equitable relief sought in Count I.

[28] *Id.* ¶ 94, at 27 (emphasis added).

acknowledge that "[a]ll of that must be done according to the terms of the Plan and the Claimant Trust Agreement."[29]

2. *The Valuation Motion, Precursor to the Complaint*

This is not the first time Plaintiffs have sought a valuation and accounting from the Claimant Trustee. In fact, the Complaint was filed after two prior efforts by the Plaintiffs to seek a valuation and accounting for the purported purpose of having the court determine that the Claimant Trust assets exceeded liabilities such that they were "in the money" and therefore, they argued, their Contingent Trust Interests were likely to vest in the near future. The first time was via a motion[30] that Dugaboy (with the support of HMIT)[31] filed in June 2022, that this court denied[32] on the ground that it was procedurally defective – that the claims for equitable and declaratory relief sought therein must be brought as an adversary proceeding. Specifically, this court held that, in asking the court to determine whether Dugaboy was "in the money" and whether "its status as a holder of a 'Contingent Trust Interest' [would] soon spring into the status of a 'Claimant Trust Beneficiary,'" the Valuation Motion was asking "for the court to ***determine*** the ***extent*** of Dugaboy's ***interest*** in the ***property*** in the Creditor's Trust," which is a "proceeding to

---

[29] *Id.* ¶ 94 n.6, at 27.

[30] On June 30, 2022, Dugaboy filed a *Motion for Determination of the Value of the Estate and Assets Held by the Claimant Trust* in which Dugaboy sought "a determination by this Court of the current value of the estate and an accounting of the assets currently held the [sic] Claimant Trust and available for distribution to creditors" and, on September 21, 2022, a *Supplemental and Amended Motion for Determination of the Value of the Estate and Assets Held by the Claimant Trust* in which Dugaboy further stated that "the Court should conduct an evidentiary hearing and require disclosure by the Reorganized Debtor and Claimant Trustee of the value of the estate and all assets held by Claimant Trust that are available for distribution to creditors and residual equity holders." (together, the "Valuation Motion"). In the Valuation Motion, the movants sought a determination of the value of the assets of the Claimant Trust and the entry of "an order: (i) finding that Dugaboy has standing in these bankruptcy proceedings under 11 U.S.C. § 1109(b), Delaware trust law, and Article III of the United States Constitution; and (ii) setting an evidentiary hearing to ascertain the assets currently available for distribution to allowed claimants, to determine the current value of those assets, and to determine whether there is a potential for settling the estate now . . . ."

[31] HMIT filed a *Limited Response in Support of Certain Requested Relief* on August 24, 2022.

[32] *See Order Denying Motion [DE #3383] and Supplemental Motion [DE #3533] of Dugaboy Investment Trust Due to Procedural Deficiency: Adversary Proceeding is Required* ("Order Denying Valuation Motion"), entered on December 20, 2022. Bankr. Dkt. No. 3645.

Case 23-03038-sgj Doc 21 Filed 02/09/26 Entered 02/09/26 19:03:50 Main Document Page 18 of 37

determine the validity, priority, or extent of . . . [an] interest in property" under Fed. R. Bankr. P. 7001(2) that must be brought as an adversary proceeding.[33] Additionally, the court held that the movants' request for the court to make a determination of the current value of the estate and for an accounting of the Claimant Trust assets was a request for equitable relief that was not provided for in the Plan, and that such a request must be brought via an adversary complaint pursuant to Fed. R. Bankr. P. 7001(7).[34] Finally, the court held that the request in the Valuation Motion clearly was requesting a declaratory judgment as to the value of assets, the extent of Dugaboy's and HMIT's interests in assets, and ultimately, "a declaration as to Dugaboy's standing" that should be brought as an adversary proceeding under the terms of Fed. R. Bankr. P. 7001(9) as "a proceeding to obtain declaratory judgment relating to any of the foregoing [types of procedures listed in Rule 7001]."[35] Accordingly, the court denied the Valuation Motion "for procedural deficiency[,] without prejudice to the filing of an adversary proceeding."[36]

Next, Dugaboy and HMIT filed a motion seeking leave from this court to file the Complaint, pursuant to the "Gatekeeper Provisions" of the court's prior orders and the Plan (which have been discussed at length in various Highland opinions),[37] but then withdrew the motion for leave (the "Withdrawn Motion for Leave"), after Highland agreed at a status conference held on April 24, 2023 that leave of court was not necessary for the filing of this particular Adversary

[33] Order Denying Valuation Motion, 4.

[34] *Id.* Fed. R. Bankr. P. 7001(7) states that "a proceeding to obtain an injunction or other equitable relief, except when a . . . chapter 11 plan provides for the relief" is an adversary proceeding governed by Bankruptcy Rules 7001 *et seq.*

[35] *See id.* at 6 (quoting Fed. R. Bankr. P. 7001(9)).

[36] *Id.* at 6.

[37] *E.g., NexPoint Advisors, L.P. v. Highland Capital Management, L.P. (In re Highland Capital Management, L.P.)*, 48 F.4th 419, 439 (5th Cir. 2022) (Fifth Circuit upheld "Gatekeeper Provisions" approved by the bankruptcy court in this case, that required persons to obtain leave of the bankruptcy court before initiating action against certain parties).

Proceeding.[38] Plaintiffs then filed the Complaint that initiated this Adversary Proceeding on May 10, 2023.

3. *Meanwhile, HMIT Files Gatekeeper Motion for Leave to File a Different Adversary Proceeding against the Claimant Trustee and Others Regarding Claims Trading*

Meanwhile, HMIT filed a separate *Emergency Motion for Leave to File Verified Adversary Proceeding* ("HMIT Motion for Leave Regarding Claims Trading"),[39] which was later supplemented and modified.[40] HMIT's Motion for Leave Regarding Claims Trading should not be confused with its (and Dugaboy's) earlier Withdrawn Motion for Leave, just discussed. In the HMIT Motion for Leave Regarding Claims Trading, it sought leave pursuant to the Gatekeeper Provisions to sue Highland, Seery (i.e., the Claimant Trustee), and certain purchasers of large unsecured claims based upon allegations of "insider trading" and breach of fiduciary duty. A hearing was held on the HMIT Motion for Leave Regarding Claims Trading, following which the court took the matter under advisement.

While the matter was pending under advisement, Dondero and certain of his controlled entities (the "Dondero Parties") filed a *Motion to Stay and to Compel Mediation* (the "Mediation Motion"),[41] which was granted, in part, on August 2, 2023.[42] In compliance with an agreed-upon court order[43] and in furtherance of mediation, Highland filed a *pro forma* adjusted balance sheet

[38] In confirming that Highland had agreed that a gatekeeper motion would not be necessary "since the adversary would just be seeking a valuation and not monetary or other relief," Highland's counsel reported that Highland "does not believe [HMIT] or Dugaboy is entitled to any information whatsoever" and that "[t]hey certainly have no legal right to the information [which is] why they have to pursue . . . an equitable claim." Transcript of April 24, 2023 Status Conference, 4:7-23. Bankr. Dkt. No. 3765.

[39] Bankr. Dkt. No. 3699 (filed on March 28, 2023).

[40] *See* Bankr. Dkt. Nos. 3760, 3815, and 3816.

[41] Bankr. Dkt. No. 3757.

[42] Bankr. Dkt. No. 3897.

[43] Bankr. Dkt. No. 3870.

("Pro Forma Adjusted Balance Sheet") for the Claimant Trust,[44] which disclosed a May 31, 2023 point-in-time $152 million in assets (of which only $37 million was cash or restricted cash) and $130 million in liabilities, for a total equity value of $22 million. The information disclosed on the Pro Forma Adjusted Balance Sheet was consistent with information that had already been filed in the Bankruptcy Case in certain "Post-Confirmation Reports" as of April 2023.[45] Highland and the Claimant Trustee represent that the Post-Confirmation Reports were "enhanced" and publicly filed to provide interested parties substantially more information than was required, and that these disclosures should have resolved any good faith dispute around receiving sufficient information with which to make a global settlement offer.[46] In any event, the Pro Forma Adjusted Balance Sheet and Post-Confirmation Reports are now central to Highland and the Claimant Trustee's "mootness" argument later discussed herein.

On August 25, 2023, the court issued a 105-page memorandum opinion and order denying HMIT's Motion for Leave Regarding Claims Trading ("Order Denying Leave to Bring Claims Pertaining to Claims Trading")[47] on multiple grounds, including on the bases that: (a) HMIT lacked constitutional standing to bring the claims; (b) even if it had constitutional standing, it lacked prudential standing under Delaware trust law to bring the claims; and (c) the proposed claims also were not "colorable" claims that the court, pursuant to its gatekeeping function under the Gatekeeper Provisions, should allow HMIT to bring. The court found, among other things, that HMIT was not a "Claimant Trust Beneficiary" and not a "beneficial owner" of the Claimant Trust. The court further determined that HMIT should not be treated as a "Claimant Trust

---

[44] Bankr. Dkt. No. 3872 (filed July 6, 2023).

[45] *See* Bankr. Dkt. Nos. 3756 and 3757 ("Post-Confirmation Reports").

[46] MTD Brief ¶ 20, at 10.

[47] Bankr. Dkt. No. 3904.

Beneficiary" after both "considering the current value of the Claimant Trust Assets" and the allegations of wrongful conduct by the Claimant Trustee, as the court "does not have the power to equitably deem HMIT's Contingent Trust Interest to be vested." The court noted that "HMIT's status as a 'beneficiary' of the Claimant Trust is defined by the CTA itself, pure and simple," and it was undisputed that HMIT's Contingent Trust Interest had not vested yet under the terms of the Plan and the CTA.

On September 8, 2023, HMIT filed a motion to reconsider ("HMIT's Motion to Reconsider Lack of Standing")[48] the Order Denying Leave to Bring Claims Pertaining to Claims Trading. HMIT argued that the court should reconsider its ruling because the Pro Forma Adjusted Balance Sheet, filed in July 2023 (after the court took the HMIT Motion for Leave Regarding Claims Trading under advisement, but before the court issued its August 2023 Order Denying Leave to Bring Claims Pertaining to Claims Trading, established that (1) the value of the Claimant Trust assets exceeded liabilities; (2) HMIT was "in the money"; and (3) its unvested Contingent Trust Interest was likely to vest and, therefore, HMIT had both constitutional and prudential standing as a Claimant Trust Beneficiary to bring the proposed claims.

On October 6, 2023, the court entered an order denying reconsideration ("Order Denying HMIT's Motion to Reconsider Lack of Standing"),[49] finding that the Pro Forma Adjusted Balance sheet did not "demonstrate that HMIT's contingent interest [wa]s 'in the money,'" noting that HMIT d[id] not give proper attention to the voluminous supplemental notes" in the Pro Form Adjusted Balance Sheet that are "integral to understanding the numbers therein."[50] In addition

[48] Bankr. Dkt. No. 3905.

[49] Bankr. Dkt. No. 3936.

[50] Order Denying HMIT's Motion to Reconsider Lack of Standing, 3 (citing Notes 5 and 6 of the Balance Sheet, which show that Highland will operate at an "operating loss prospectively," and that the administrative expenses and legal fees continue to deplete assets, with "significant and widespread litigation result[ing] in massive indemnification obligations, as well as massive, continuing legal fees and expenses").

this court also found that the Pro Forma Adjusted Balance Sheet did not constitute "newly discovered evidence" because it did not contain information that was materially different from the information disclosed in the Post-Confirmation Reports, filed three months earlier.[51]

4. *The Rule 12(b) Motion*

As noted earlier, this Adversary Proceeding was briefly stayed pending a court-ordered[52] mediation that ultimately proved to have been unsuccessful.[53] Then, on November 22, 2023, Highland and the Claimant Trustee filed their Rule 12(b) Motion that is now pending before the court.[54]

In their Rule 12(b) Motion, Highland and the Claimant Trustee seek a dismissal of Counts I and III pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure[55] (made applicable herein pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure[56]) for ***lack of subject matter jurisdiction***—specifically, Counts I and III based on ***mootness***, and Count III based on the additional ground that Plaintiffs seek an ***impermissible advisory opinion.*** Thus, there is no ***justiciable controversy*** with respect to either of these counts. In addition to the lack of subject matter arguments, Highland and the Claimant Trustee also seek dismissal of Count III on the basis that the Plaintiffs are ***collaterally estopped*** from bringing the claim for declaratory relief. Finally,

---

[51] *Id.* at 2-3.

[52] See, Bankr. Dkt. No. 3879, which was entered on August 2, 2023, granting, in part, the April 20, 2023 *Motion to Stay and to Compel Mediation* [Bankr. Dkt. No. 3752] filed by Dondero and certain of his affiliates in the main bankruptcy case.

[53] *See Joint Notice of Mediation Report* (filed on November 7, 2023). Bankr. Dkt. No. 3964.

[54] *See Order Approving Stipulation and Proposed Scheduling Order* (entered on November 21, 2023). Dkt. No. 12.

[55] Hereinafter, the court shall refer to a rule of the Federal Rules of Civil Procedure as "Rule ___."

[56] Hereinafter, the court shall refer to a rule of the Federal Rules of Bankruptcy Procedure as "Bankruptcy Rule ___."

the Highland Parties seek dismissal of all three counts pursuant to Rule 12(b)(6) (made applicable herein by Bankruptcy Rule 7012) for ***failure to state a claim upon which relief can be granted***.[57]

The court has considered the Rule 12(b) Motion, HMIT's and Dugaboy's response[58] in opposition, and the reply thereto.[59] Oral arguments were heard on February 14, 2024, following which this court took the matter under advisement.[60] Having considered all of this, the undisputed facts set forth in the Complaint, and certain facts of which this court takes judicial notice, and for the following reasons, this court concludes that: (a) it does not lack subject matter jurisdiction over Count I of the Complaint but that HMIT and Dugaboy have failed to state a claim upon which relief can be granted as to Count I, and thus, Count I should be dismissed pursuant to Rule 12(b)(6); (b) that Count II of the Complaint is not justiciable and that, pursuant to Rule 12(b)(1) and Rule 12(h)(3), Count II of the Complaint should be dismissed for lack of subject matter jurisdiction; and, (c) Count III of the Complaint is not justiciable and that, pursuant to Rule 12(b)(1), Count III of the Complaint should be dismissed for lack of subject matter jurisdiction.

## III. CONCLUSIONS OF LAW

### *A. Legal Standards*

"When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citation omitted). "Moreover, when a complaint could be dismissed for both lack of jurisdiction and failure to state a claim, the court

[57] *See generally* MTD Brief, 11-25.

[58] *The Dugaboy Investment Trust and Hunter Mountain Investment Trust's Response to the Highland Parties' Motion to Dismiss Complaint to (I) Compel Disclosures about the Assets of the Highland Claimant Trust and (II) Determine (A) Relative Value of Those Assets, and (B) Nature of Plaintiffs' Interest in the Claimant Trust* ("Response"). Dkt. No. 17.

[59] *The Highland Parties' Reply in Further Support of Motion to Dismiss Complaint* ("Reply"). Dkt. No. 21.

[60] A transcript of the February 14 hearing was filed on February 20, 2024. Dkt. No. 25.

should dismiss only on the jurisdictional ground under Rule 12(b)(1), without reaching the questions of failure to state a claim under Rule 12(b)(6)"—a "practice [that] prevents courts from issuing advisory opinions." *Crenshaw-Logal v. City of Abilene, Texas*, 436 F. App'x 306 (5th Cir. 2011) (cleaned up). "The practice also prevents courts without jurisdiction 'from prematurely dismissing a case with prejudice.'" *Id.* (quoting *Ramming,* 281 F.3d at 161). Thus, the court will address the Rule 12(b)(1) issues and, then, to the extent the court finds that it has subject matter jurisdiction over any of the claims asserted by the Plaintiffs, the court will address the separate collateral estoppel argument and whether the Plaintiffs have failed to state a claim upon which relief can be granted.

*1. Rule 12(b)(1) – Lack of Subject Matter Jurisdiction*

As noted, the Defendants argue that the court lacks subject matter jurisdiction over Plaintiffs' claims asserted in Counts I and III of their Complaint, and, therefore, they must be dismissed pursuant to Rule 12(b)(1). The court notes that, pursuant to Rule 12(h)(3), the court "must dismiss the action" "if [it] determines at any time that it lacks subject matter jurisdiction," whether the issue is raised by a party or *sua sponte* by the court. This is so because federal courts have a "constitutional duty . . . to decline subject matter jurisdiction where it does not exist—and that is so whether the parties challenge Article III standing or not." *Abraugh v. Altimus*, 26 F.4th 298, 304 (5th Cir. 2022).

Under Article III of the Constitution, a federal court "may only adjudicate actual, ongoing controversies." *Shemwell v. City of McKinney, Texas*, 63 F.4th 480, 483 (5th Cir. 2023) (citing *Honig v. Doe*, 484 U.S. 305, 317 (1988)). and thus "[w]hether a case or controversy remains live throughout litigation is a jurisdictional matter." *Id.* (citations omitted). "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). As noted by the Supreme

Court, "the doctrines of [constitutional standing,] mootness, ripeness, and political question all originate in Article III's 'case' or 'controversy' language." *Id.* at 352 (citations omitted). The justiciability requirement found in Article III forms the basis of the overarching and, at times, overlapping well-settled rule that federal courts are not permitted to issue advisory opinions. *See Su v. F Elephant, Inc. (In re TMT Procurement Corp.)*, No. 21-20146, 2022 WL 38985, at *2 (5th Cir. Jan. 4, 2022) ("'[T]he federal courts established pursuant to Article III of the Constitution do not render advisory opinions,' and parties must articulate 'concrete legal issues, presented in actual cases, not abstractions.'") (quoting *Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (quoting *United Public Workers of America (C.I.O.) v. Mitchell*, 330 U.S. 75, 89 (1947))). The Fifth Circuit in *Shemwell*[61] recently expounded on the "interplay among the justiciability doctrines" that are "rooted in the Constitution":

> Our justiciability doctrines – including mootness – are rooted in the Constitution. Under Article III of the Constitution, this court may only adjudicate actual, ongoing controversies. Accordingly, whether a case or controversy remains live throughout litigation is a jurisdictional matter. Reframed in the familiar taxonomy of standing and ripeness, this means that, throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision. Or, as the Court has sometimes articulated the interplay among the justiciability doctrines, standing generally assesses whether the [requisite] interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings.

The Supreme Court has interpreted the "cases" and "controversies" language in Article III "to demand that an actual controversy be extant at all stages of review, not merely at the time the complaint is filed," and, thus, "[i]f an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160-161 (2016)

---

[61] 63 F.4th at 483.

(cleaned up); *see also Center for Individual Freedom v. Carmouche*, 449 F.3d 655, 661 (5th Cir. 2006) ("Mootness is the doctrine of standing in a time frame. The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness).") (cleaned up). "A case becomes moot, however, only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Campbell-Ewald,* 577 U.S. at 161 (cleaned up). In other words, "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purpose of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome" and "no matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights." *Yarls v. Bunton*, 905 F.3d 905, 909 (5th Cir. 2018) (cleaned up).

As alluded to above, ripeness is another justiciability doctrine that originates in Article III's "case" or "controversy" requirement. *See also Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967) ("Ripeness is a constitutional prerequisite to the exercise of jurisdiction.")). "Ripeness 'separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for judicial review.'" *In re Boyd Veigel, P.C.*, 575 F. App'x 393, 396 (5th Cir. 2014) (quoting *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000) and citing and quoting *United Pub. Workers v. Mitchell*, 330 U.S. 75, 89 (1947) on the doctrine of ripeness). The Fifth Circuit set forth the standard for determining whether a dispute is ripe for adjudication in *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583 (5th Cir. 1987): "A court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical. . . . A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if

further factual development is required." *Orix*, 212 F.3d at 895 (quoting *id.* at 586-87) (additional citations omitted).

As noted by the *Orix* court, "[m]any courts have recognized that applying the ripeness doctrine in the declaratory judgment context presents a unique challenge." When considering a declaratory judgment action (and Plaintiffs here are seeking declaratory relief in Counts II and III), the court must first determine whether the action is justiciable, as the court must do in connection with all claims for relief. Under the federal Declaratory Judgment Act, "any court of the United States" is authorized to "declare the rights and other legal relations" of parties in "a case of actual controversy." 28 U.S.C. § 2201; Fed. R. Civ. P. 57; *see also Texas Cent. Bus. Lines Corp. v. City of Midlothian*, 669 F.3d 525, 534 (5th Cir. 2012). "That controversy must be of a justiciable nature, thus excluding an advisory decree upon a hypothetical state of facts." *Id.* (cleaned up).[62] The "unique challenge" that applying the ripeness doctrine to requests for declaratory judgment presents arises from the fact that declaratory judgments are "typically sought before a completed 'injury-in-fact' has occurred," *Orix*, 212 F.3d at 896 (quoting *Foster*, 205 F.3d 851, 857 (5th Cir. 2000)), and, "declaratory actions contemplate an 'ex ante determination of rights' that 'exists in some tension with traditional notions of ripeness.'" *Orix*, 212 F.3d at 896 (quoting *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 692 (1st Cir. 1994)). Notwithstanding this tension that exists in applying the justiciability requirements to declaratory judgment actions, "a declaratory judgment action, like any other action, must be ripe in order to be justiciable." *Id.* "Thus, courts will not grant declaratory judgments unless the suit is ripe for review." *Boyd Veigel*, 575 F. App'x at 396 (citing *Foster*, 205 F.3d at 857); *see also Mitchell*, 330 U.S. at 89 ("As is well known the federal courts established pursuant to Article III of the Constitution do not render advisory

[62] The Fifth Circuit "interprets the § 2201 'case or controversy' requirement to be coterminous with Article III's 'case or controversy' requirement." *Id.* (quoting *Hosein v. Gonzales*, 452 F.3d 401, 403 (5th Cir. 2006)).

opinions. For adjudication of constitutional issues, concrete legal issues, presented in actual cases, not abstractions are requisite. This is as true of declaratory judgments as any other field.") (cleaned up).

In addressing the ripeness doctrine in the declaratory judgment context, the Fifth Circuit has stated that "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment," *Boyd Veigel*, 575 F. App'x at 396 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)), and that "[w]hether particular facts are sufficiently immediate to establish an actual controversy is a question that must be addressed on a case-by-case basis. *Orix*, 212 F.3d at 896 (citations omitted). "The controversy must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional or based upon the possibility of a factual situation that may never develop." *Val-Com Acquisitions Tr. v. Chase Home Fin., L.L.C.*, 434 F. App'x 395, 395-96 (5th Cir. 2011) (cleaned up).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction, so the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Shemwell v. City of McKinney, Texas*, 63 F.4th 480, 483 (5th Cir. 2023) (citing *id.*) (cleaned up) *see also Val-Com*, 434 F. App'x at 396 ("The plaintiffs have the burden of establishing the existence of an actual controversy under the [Declaratory Judgment] Act."). "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

2. <u>*Rule 12(b)(6) – Failure to State a Claim upon which Relief Can Be Granted*</u>

As noted, Highland and the Claimant Trust also argue that all three counts of the Complaint should be dismissed pursuant to Rule 12(b)(6), made applicable herein by Bankruptcy Rule 7012, because Plaintiffs have failed "to state a claim upon which relief can be granted." To survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). "When well-pleaded facts fail to meet th[e] [*Twombly*] standard, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679. "In ruling on a Rule 12(b)(6) motion to dismiss, the court cannot look beyond the pleadings and must accept as true those well-pleaded factual allegations in the complaint," *Hall v. Hodgkins*, 305 F. App'x 224, 227 (5th Cir. 2008) (cleaned up), but it is "not bound to accept as true a legal conclusion couched as factual allegation." *Randall D. Wolcott MD PA v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (cleaned up). The court "may also consider matters of which it may take judicial notice, and it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Hall v. Hodgkins*, 305 F. App'x at 227 (cleaned up). Dismissal is proper under Rule 12(b)(6), if, after taking the facts alleged in the complaint as true, "it appears certain that the plaintiff cannot prove any set of facts that would entitle it to the relief it seeks." *Test*

*Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005) (quoting *C.C. Port, Ltd. v. Davis-Penn Mortg. Co.*, 61 F.3d 288, 289 (5th Cir. 1995)).

3. *Collateral Estoppel*

Highland and the Claimant Trust also argue that Plaintiffs' claims for declaratory relief asserted in Count III should be dismissed for the additional reason that Plaintiffs are collaterally estopped from bringing the claim. Collateral estoppel, or issue preclusion, is a preclusive doctrine that falls under the umbrella of the res judicata doctrine, which affords preclusive effect to final judgments, orders, and decrees of a federal court, including those of bankruptcy courts. *See In re Reddy Ice Holdings, Inc.*, 611 B.R. 802, 808 (Bankr. N.D. Tex. 2020) (quoting *Test Masters*, 428 F.3d at 571 ("The rule of res judicata encompasses two separate but linked preclusive doctrines: (1) true res judicata or claim preclusion and (2) collateral estoppel or issue preclusion.") and citing *Bullard v. Blue Hills Bank*, 575 U.S. 496, 501-02 (2015)). Whereas "claim preclusion, or true res judicata, precludes parties from relitigating claims or causes of action that were or could have been raised in earlier litigation," *id.*, issue preclusion, or collateral estoppel, "prevents the same parties or their privies from relitigating [an issue of fact or law] . . . when: '(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; and (3) the previous determination was necessary to the decision.'" *Bradberry v. Jefferson Co., Texas*, 732 F.3d 540, 548 (5th Cir. 2013) (quoting *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290 (5th Cir. 2005)); *see also In re Reddy Ice*, 611 B.R. at 809-10 ("To establish collateral estoppel under federal law one must show: (1) that the issue at stake be identical to the one involved in the prior litigation; (2) that the issue has been actually litigated in the prior litigation; and (3) that the determination of the issue in the prior litigation has been a critical and necessary part of the judgment in that earlier action.") (quoting *Rabo Agrifinance, Inc. v. Terra XXI, Ltd.*, 583 F.3d 348, 353 (5th Cir. 2009)). "By precluding parties from contesting matters that they have had a full and fair opportunity to litigate, these two

doctrines protect against the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions." *In re Reddy Ice*, 611 B.R. at 808 (quoting *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008)). Although as a general rule res judicata must be pled as an affirmative defense, Fed. R. Bankr. P. 7008; Fed. R. Civ. P. 8(c)(1), "[i]f, based on the facts pleaded and judicially noticed, a successful affirmative defense appears, then dismissal under Rule 12(b)(6) is proper." *Hall v. Hodgkins*, 305 F. App'x at 227-28.[63]

### ***B. Application of the Legal Standards Here***

1. *Count I – Disclosure and Accounting*

**a) Plaintiffs' equitable claim for disclosure and accounting in Count I cannot be considered "moot"; Defendants' motion to dismiss Count I pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction must be denied.**

As earlier noted, in Count I of their Complaint, Plaintiffs seek an order compelling Highland and the Claimant Trust "to provide information regarding the Claimant Trust assets, including the amount of cash and the remaining non-cash assets, and details of all transactions that have occurred since the wall of silence was erected, and all liabilities."[64] Plaintiffs, as holders of Contingent Trust Interests, have neither a contractual right to an accounting of the Claimant Trust assets nor a contractual right to whatever limited information rights under the terms of the Plan and CTA that are afforded to the Claimant Trust Beneficiaries. Plaintiffs acknowledge that they are not "Claimant Trust Beneficiaries." But they ask the court, without any supporting facts or authority, to treat them as such and to order the Defendants to disclose not just information that

---

[63] A court may also raise the issue of res judicata or collateral estoppel *sua sponte* in dismissing a claim or cause of action "in the interest of judicial economy where both actions were brought before the same court" or "where all of the relevant facts are contained in the record and all are uncontroverted." *McIntyre v. Ben E. Keith Co.*, 754 F. App'x 264-65 (5th Cir. 2018) (cleaned up).

[64] Complaint ¶ 88.

Claimant Trust Beneficiaries are entitled to under the Plan and CTA but also information and an accounting that is not otherwise available even to the Claimant Trust Beneficiaries. To be clear, the Plaintiffs are asking this court to disregard the unambiguous and plain terms of the CTA and the Plan and grant the relief sought in Count I based upon equitable considerations.

Ignoring for a moment the Defendants' Rule 12(b)(6) "failure to state a claim upon which relief may be granted" argument, this court will first focus on Defendants' argument that Plaintiffs' claim for equitable relief in Count I is moot and, thus, nonjusticiable and must be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).

Highland and the Claimant Trust take the position that their filing of the Pro Forma Adjusted Balance Sheet in July 2023, nearly two months after the filing of the Complaint on May 10, 2023, renders moot the Plaintiffs' request for equitable relief in Count I because the balance sheet provided Plaintiffs (and all parties) with the very information Plaintiffs are asking for in Count I. Thus, "the issue presented in Count I is no longer 'live.'"[65] Highland and the Claimant Trust add that the Post-Confirmation Reports, filed on the bankruptcy court docket in April 2023, prior to the Complaint being filed, "similarly disclose the financial information requested in Count One, including, *inter alia*, the cash and the identification of remaining assets." In essence, Defendants argue that the filing of these two items "ha[s] thus eliminated the 'actual controversy' at the core of Count One, and there is no conceivable relief available to Plaintiffs through this claim that has not already been provided."[66]

Plaintiffs argue that Highland and the Claimant Trust's mootness argument is exactly backward—that the filing of the Pro Forma Balance Sheet has not eliminated the "actual

[65] MTD Brief ¶ 25.

[66] MTD Brief ¶¶ 25-26.

controversy" between the parties precisely ***because of*** the Defendants' persistent "contentions and arguments that the Balance Sheet is not conclusive [as to the issue of whether Plaintiffs' Contingent Trust Interests are likely to vest]" – that whether assets exceed liabilities at any one given point in time and whether Plaintiffs appear to be "in the money" is irrelevant to the question of vesting under the terms of the Plan and CTA.[67] Plaintiffs point out that Defendants have argued that Plaintiffs should not rely on the balance sheet, which, again, gives pro forma values as of May 31, 2023, adding that it is not determinative of whether Plaintiffs Contingent Trust Interests will likely vest at any point in the future because, under the terms of the CTA and Plan, Plaintiffs' unvested, contingent interests in the Claimant Trust will vest if, and only if, the Claimant Trustee files the GUC Payment Certification, certifying that the Class 8 general unsecured claims and Class 9 subordinated claims, the Claimant Trust Beneficiaries under the CTA who are entitled to distributions of the Claimant Trust assets and have other rights under the terms of the CTA, have been indefeasibly paid in full (including as to Class 8, accrued and unpaid post-petition interest), all disputed claims in Classes 8 and 9 have been resolved, ***and*** certain other obligations – primarily, the Claimant Trust's significant indemnity obligations – have been satisfied. Because it is impossible to know or predict, in particular, what the indemnity obligations and the professional fees will be going forward, it would be just as impossible for the court to make any determination of whether Plaintiffs are "in the money" or whether their contingent interests are likely to vest.

This court cannot conclude that Defendants' production and filing of the point-in-time Pro Forma Balance Sheet (as of May 31, 2023) and the Post-Confirmation Reports has rendered Plaintiffs' current request in Count I for information and an accounting moot. A balance sheet and financial disclosures generally are fluid concepts. Relevant information in early 2023 may not

---

[67] *See* Response ¶¶ 17-18.

remain relevant in mid-2024. Thus, Plaintiffs' equitable claim is not mooted by these earlier filed items, and the Count I request is justiciable. Accordingly, Defendants' motion to dismiss Count I under Rule 12(b)(1) for lack of subject matter jurisdiction will be denied. This determination simply means that the court has subject matter jurisdiction here to address Count I. Thus, this court will now consider whether Plaintiffs have stated a claim (in Count I) upon which relief can be granted under Rule 12(b)(6) standards.

**b) Plaintiffs have failed to state a claim upon which relief can be granted in Count I; dismissal of Count I is proper under Rule 12(b)(6).**

As noted above, dismissal under Rule 12(b)(6) is proper if, based upon the facts alleged in the Complaint, taken as true, as well as any judicially noticed facts, "it appears certain that the [Plaintiffs] cannot prove any set of facts that would entitle [them] to the relief [they] seek[ ]." *Test Masters*, 428 F.3d at 570 (quoting *C.C. Port, Ltd.*, 61 F.3d at 289). As noted above, in Count I, Plaintiffs, as holders of unvested contingent interests in the Claimant Trust, seek an order from this court compelling Defendants "to provide information regarding the Claimant Trust assets, including the amount of cash and the remaining non-cash assets," and a detailed accounting of "all transactions that have occurred since [an alleged] wall of silence was erected, and all liabilities." As also noted above, Plaintiffs have acknowledged[68] that their contingent interests in the Claimant Trust have not vested, and Plaintiffs are not Claimant Trust Beneficiaries; thus, under the terms of the CTA, they are not entitled to the information and accounting they seek and do not have even the limited information rights afforded to the Claimant Trust Beneficiaries under the CTA.[69]

The court takes judicial notice of its Order Denying Leave to Bring Claims Pertaining to Claims Trading, in which the court found that HMIT, as a holder of a "Contingent Claimant Trust

---

[68] *See supra* p.10.

[69] *See supra* pp. 7-9 (discussion of information rights under the terms of the CTA).

Interest" was not a Claimant Trust Beneficiary, who, under the terms of the CTA and Delaware law, are the "beneficial owners" of the Claimant Trust, and rejected HMIT's argument that its Contingent Claimant Trust Interest makes it a contingent beneficiary of the Claimant Trust, which, in turn, makes it a present "beneficial owner" under Delaware trust law.[70] The court concluded that, under Delaware Trust law, "HMIT's status as a 'beneficiary' of the Claimant Trust is defined by the CTA itself, pure and simple" and that under the terms of the CTA, the holders of Contingent Trust Interests have no rights under the agreement and will not "be deemed 'Beneficiaries'" under the CTA "'unless and until' they vest in accordance with the Plan and the CTA" and that "the court does not have the power to equitably deem HMIT's Contingent Trust Interest to be vested based on HMIT's unsupported allegation of wrongdoing on the part of . . . the Claimant Trustee."[71]

Now, as before, the court finds and concludes that under the terms of the CTA and Delaware law, Plaintiffs are not beneficiaries or "beneficial owners" of the Claimant Trust who would be entitled to assert rights under the CTA. The court specifically rejects an argument of Plaintiffs that Delaware trust law does not define "beneficiary," so the court should ignore the terms of the CTA and look to the definition of "beneficiary" under the Restatement (Third) of Trusts, under which they would be considered "beneficiaries" of the Claimant Trust, albeit a contingent beneficiary, who would be entitled under Delaware law to the relief they are requesting. The Claimant Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act (the "Trust Act," Chapter 38 of Title 12 of the Delaware Code), and the Trust Act does define "beneficial owner" and uses that term exclusively to refer to the beneficiaries of a Delaware statutory trust. Specifically, under the Trust Act, a statutory trust's "beneficial owners" are "any

---

[70] Order Denying Leave, 77-78.

[71] *Id.*, 78.

owner[s] of a beneficial interest in a statutory trust, the fact of ownership ***to be determined and evidenced . . . in conformity to the applicable provisions of the governing instrument of the statutory trust***."[72] Thus, the question of whether Plaintiffs are "beneficiaries" of the Claimant Trust is (as the court concluded in the Order Denying Leave to Bring Claims Pertaining to Claims Trading) determined "by the CTA itself, pure and simple." And, under the terms of the CTA, "Claimant Trust Beneficiaries" is defined to exclude Plaintiffs, who hold Class 10 and 11 unvested, contingent interests in the Claimant Trust, unless and until the GUC Payment Certification has been filed by the Claimant Trust. Until then, Plaintiffs "shall not have any rights under [the CTA]" and will not "be deemed 'Beneficiaries' under [the CTA]."[73]

Plaintiffs ask the court to ignore the plain terms of the CTA and to grant them the relief they have requested on an equitable basis because they "are unable to determine whether their Contingent Claimant Trust Interests may vest into Claimant Trust Interests."[74] But, they have not alleged any set of facts that would entitled them to equitable relief either. The court makes the same observation regarding Plaintiffs as it made in its Order Denying Valuation Motion: It appears that Plaintiffs "may be frustrated that they did not negotiate or obtain the same oversight rights as the actual Claimant Trust Beneficiaries in the Plan and CTA." The Plan with the incorporated CTA was confirmed over three years ago now, and neither of the Plaintiffs objected to or appealed the terms of the Plan or CTA that dictate oversight rights.[75] The Fifth Circuit, in September 2022,

---

[72] 12 Del. C. § 3801(a) (emphasis added).

[73] *See, e.g.*, Plan, Art. I.B.44; CTA §§ 1.1(h), 5.1(c).

[74] Complaint ¶ 83.

[75] HMIT did not file an objection to confirmation of the Plan and did not appeal the Confirmation Order. Dugaboy filed an objection to confirmation and appealed the Confirmation Order, but did not object to the terms of the CTA that limited oversight and information rights to "Claimant Trust Beneficiaries" and specifically excluded the holders of the unvested, contingent interests in the Claimant Trust – such as Plaintiffs – from having any rights under the CTA unless and until their interests vested, The CTA was filed prior to the confirmation hearing and Plaintiffs and other parties could have objected to the terms of the Plan or CTA; they could have complained then about any lack of transparency, oversight, and information rights they believe existed under the terms of the CTA. They did not.

affirmed the Confirmation Order and the terms of the Plan and its incorporated documents, including the CTA, in all respects other than striking certain exculpations. *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th 419 (5th Cir. 2022). As was the case when the court entered its Order Denying Leave to Bring Claims Pertaining to Claims Trading, "[i]t is undisputed that HMIT's [and Dugaboy's] Contingent Trust Interest[s] ha[ve] not vested under the terms of the Plan and the CTA, and the court does not have the power to equitably deem HMIT's [and Dugaboy's] Contingent Trust Interest[s] to be vested."[76] The court did not have that power back in August 2023 (when it entered the Order Denying Leave to Bring Claims Pertaining to Claims Trading), and the court does not have that power now. Equitable relief is not available where, as here, the parties' rights and obligations at issue are set forth in the Plan and the CTA. *See In re Am. Home Mortg. Holdings, Inc.*, 386 Fed. Appx. 209, 212-13 (3d Cir. 2010) (affirming bankruptcy court's denial of equitable relief to distributions under trust documents where, among other things, the trust documents controlled distribution of monthly payments, and the Trust Certificate "cannot be rewritten on equitable grounds," and noting "[i]n interpreting the provisions of the Trust Documents, we apply Delaware law, which instructs that a party is bound by the plain meaning of clear and unequivocal contract terms.").

Plaintiffs' make an argument that an implied covenant of good faith and fair dealing under Delaware law necessarily means that the terms of the CTA that govern the parties' rights, here, including the information rights and rights to an accounting from the Claimant Trustee that Plaintiffs are seeking in Count I, can be overridden here. The court disagrees. Courts will not use the implied covenant of good faith to override the rights and responsibilities that were bargained for in a trust agreement. *See IKB Int'l S.A. v. Wilmington Trust Co.*, 774 F. App'x 719, 727-28 (3d

---

[76] Order Denying Leave to Bring Claims Pertaining to Claims Trading, 78.

Cir. 2019)(citing *Homan v. Turoczy*, 2005 WL 2000756 (Del. Ch. Aug. 12, 2005)); *see also Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) ("Existing contract terms control such that implied good faith cannot be used to circumvent the parties' bargain or to create a free-floating duty unattached to the underlying legal document.") (cleaned up); *Gilbert v. El Paso Co.*, 575 A.2d 1131, 1143 (Del. 1990) (holding that the "subjective standards [of good faith and fair dealing] cannot override the literal terms of an agreement.") (citation omitted). Because the terms of the CTA expressly address the Claimant Trustee's duties to provide, and parties' rights to receive, information and an accounting with respect to the Claimant Trust, and those duties do not inure to the benefit of the Plaintiffs, who are not Claimant Trust Beneficiaries, the implied covenant of good faith and fair dealing cannot be used by the Plaintiffs or the court to compel the Claimant Trustee to disclose the information or provide the accounting as requested in Count I.

After considering the facts alleged in the Complaint, taken as true, and the facts and record of which the court has taken judicial notice, the court has determined that Plaintiffs cannot prove any set of facts that would entitle them to the relief they seek. Thus, dismissal of their claim for disclosure of additional information and for an accounting in Count I under Rule 12(b)(6) is proper.

2. *Count II – Request for Declaratory Relief*

In Count II of the Complaint, Plaintiffs seek a declaratory judgment and "determination from the Court of the relative value of the Claimant Trust assets compared to the bankruptcy estate obligations," but this is only if "Defendants are compelled to provide information about the Claimant Trust assets" – in other words, this Count II request is conditioned on the court granting the equitable relief Plaintiffs seek in Count I.[77]

[77] Complaint ¶¶ 89-92.

Defendants seek dismissal of Count II under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Before the court can address Defendants' Rule 12(b)(6) motion, the court must first determine whether the claim for declaratory relief in Count II is justiciable such that the court has constitutional jurisdiction – subject matter jurisdiction – to consider and rule on the merits of Plaintiffs' claim.[78] As noted above,[79] Plaintiffs' request for declaratory relief in Count II is clearly predicated on the court first granting the relief requested in Count I: ordering the Defendants to disclose information about the Claimant Trust assets and liabilities (beyond what is contained in the Pro Forma Balance Sheet) and to provide to Plaintiffs a detailed accounting of all transactions involving the Claimant Trust. The court has concluded that Plaintiffs are not entitled to the information and accounting they have requested in Count I and that Count I should, thus, be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Because Plaintiffs' request for declaratory relief in Count II is predicated on the court granting the relief requested in Count I and the court has denied that relief, Count II has now been rendered moot or, at least, not ripe such that it is not justiciable. *See American Precision Ammunition, L.L.C. v. City of Mineral Wells*, 90 F.4th 820, 827 (2024) (where the Fifth Circuit affirmed the district court's Rule 12(b)(1) dismissal of a claim to reinstate an agreement as moot, where plaintiff's claim was predicated on a finding by the district court that the agreement was valid and

[78] Even though Defendants did not raise the issue of subject matter jurisdiction with respect to Count II, the court has an independent duty to assure itself that it has subject matter jurisdiction over a claim or cause of action before it addresses the merits of the claim under Rule 12(b)(6). *See supra* pp. 18-19; *see also Abraugh v. Altimus*, 26 F.4th 298, 304 (2022) (federal courts have a "constitutional duty . . . to decline subject matter jurisdiction where it does not exist—and that is so whether the parties challenge Article III standing or not.").

[79] *See supra* note 26.

enforceable, and the Fifth Circuit agreed with the district court that the agreement was unenforceable).[80]

In summary, the court has determined that Defendants' request for declaratory relief in Count II is not justiciable and, as such, Count II must be dismissed pursuant to Rule 12(h)(3) for lack of subject matter jurisdiction. Anything this court might conclude with respect to Defendants' motion to dismiss Count II under Rule 12(b)(6) would be an impermissible advisory opinion, so the court will not address Defendants' arguments that Count II should be dismissed for failure to state a claim upon which relief can be granted.

3. *Count III – Request for Declaratory Relief*

In Count III of the Complaint, Plaintiffs seek a declaratory judgment and determination, "[i]n the event that the Court determines that the Claimant Trust assets exceed the obligations of the bankruptcy estate in an amount sufficient so that all Allowable Claims may be indefeasibly paid . . . that the conditions are such that their Contingent Claimant Trust Interests are likely to vest into Claimant Trust Interests, making them Claimant Trust Beneficiaries."[81]

Defendants argue that the court should dismiss Count III under Rule 12(b)(1) for lack of subject matter jurisdiction on the basis that their request for declaratory relief in Count III is not justiciable because it is moot and otherwise seeks an impermissible advisory opinion. Defendants also argue that, if the court determines that it does have subject matter jurisdiction over Plaintiff's claim for declaratory relief in Count III, Count III should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, including on the ground that Plaintiffs

---

[80] Although Defendants did not argue in their briefing that Count II was not justiciable and so must be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, in so many words, Defendants did argue during oral argument that "Count II must . . . be dismissed because it depends on Highland being 'compelled to provide information about the Claimant Trust assets.' . . . So if the Court doesn't compel Highland, the Court has no ability to make the declaration that's sought." Feb. 14, 2024 Hrg. Trans., 17:9-13.

[81] *Id.* ¶¶ 93-95, at 27.

are collaterally estopped from asserting the claim for declaratory relief in Count III. The court agrees with Defendants that Count III is not justiciable and that Count III should be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, and, thus, the court does not have jurisdiction to issue any pronouncement regarding the merits of Plaintiffs' claim for declaratory relief in Count III (and so it will not address Defendants' motion to dismiss pursuant to Rule 12(b)(6) with respect to Count III).

Similar to Plaintiffs' request for declaratory relief in Count II, Plaintiffs' request for declaratory relief in Count III is a contingent request – this one being predicated on the court first granting the declaratory relief in Count II, which, itself, is predicated on the court granting the equitable relief requested in Count I. Because Counts I and II are being dismissed for failure to state a claim and lack of subject matter jurisdiction, respectively, Plaintiffs' claim for declaratory relief in Count III is, thus, rendered not justiciable. That Counts II and III fall, if Count I falls, is inherent in the way Plaintiffs framed their claims and causes of action in the Complaint. Because Plaintiffs are not entitled to the information and accounting they are requesting in Count I, Plaintiffs' claims for declaratory relief in Counts II and III are rendered moot and/or not ripe and, thus, not justiciable. Plaintiffs' request for a declaratory judgment in Count III is not ripe for adjudication for the additional reason that Plaintiffs are asking the court to issue an opinion based on a set of "hypothetical, conjectural, conditional" facts "or based upon the possibility of a factual situation that may never develop" – the "likely" vesting of Plaintiffs' contingent interests in the Claimant Trust, making them Claimant Trust Beneficiaries. This is something federal courts are not permitted to do, even in the context of a request for declaratory relief (as is the case here with

Counts II and III).[82] The court finds and concludes that Plaintiffs' claim for declaratory relief in Count III is not justiciable and thus must be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.

This being the case, the court, as it must, declines to address the merits of whether Count III should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted (including based on Defendants' collateral estoppel argument).

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss Count I of the Complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), be, and hereby is, **DENIED**;

**IT IS FURTHER ORDERED** that Plaintiffs have failed to state a claim upon which relief can be granted in Count I of the Complaint, and thus Count I of the Complaint is **DISMISSED** pursuant to Rule 12(b)(6);

**IT IS FURTHER ORDERED** that Count II of the Complaint is not justiciable and that, pursuant to Rule 12(b)(1) and Rule 12(h)(3), Count II of the Complaint is **DISMISSED** for lack of subject matter jurisdiction;

**IT IS FURTHER ORDERED** that Count III of the Complaint is not justiciable and that, pursuant to Rule 12(b)(1), Count III of the Complaint is **DISMISSED** for lack of subject matter jurisdiction.

***###End of Memorandum Opinion and Order###***

---

[82] *See Val-Com Acquisitions*, 434 F. App'x at 395-96; *see also Boyd Veigel*, 575 F. App'x at 396 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)) (where the Fifth Circuit discusses the ripeness doctrine in the context of declaratory judgment actions and states that "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.").

# Exhibit 14

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

October 01, 2025

Mr. Michael Philip Aigen
Stinson, L.L.P.
2200 Ross Avenue
Suite 2900
Dallas, TX 75201

Ms. Deborah Rose Deitsch-Perez
Stinson, L.L.P.
2200 Ross Avenue
Suite 2900
Dallas, TX 75201

Mr. Jeffrey T. Prudhomme
Stinson, L.L.P.
2200 Ross Avenue
Suite 2900
Dallas, TX 75201

No. 25-10999 Dugaboy Invst Trust v. Highland Capital Mgmt
USDC No. 3:24-CV-1531

Dear Counsel,

We have docketed the appeal referenced above. Please use the assigned case number for all future inquires.

**Briefing Notice:** The record is now complete for the purposes of this appeal, as outlined in Fed. R. App. P. 12. The appellant's brief and record excerpts must be submitted within 40 days of the date listed above on November 10, 2025 in accordance with Fed. R. App. P. & 5th Cir. R. 28, 30, and 31. Please review 5th Cir. R. 30.1.2 and 5th Cir. R. 31.1 to determine if you are required to file electronic copies of the brief and record excerpts. If required, electronic copies must be in Portable Document Format (PDF). Please refer to our briefing checklist on the Fifth Circuit's website at: http://www.ca5.uscourts.gov/docs/default-source/forms-and-documents---clerks-office/rules/brchecklist.pdf.

**Paper Copies of Briefs Not Required unless directed by the Clerk.** The court has waived requirement to file paper copies of briefs or record excerpts. Should paper copies be required, the clerk will notify you and instruct the number of copies to file.

**Brief Covers:** The case captions on brief covers must match the case captions on the enclosed title caption sheets exactly. Any modifications to the captions must be corrected before the brief is submitted to the court.

**Record Excerpts:** As specified in 5th Cir. R. 30.1.7(c), an appellant must file record excerpts. The electronic PDF version of the record excerpts should include pages representing the "tabs" identified in the document index. If you are notified to provide paper copies of the excerpts, please ensure that copies filed contain actual physical tabs that extend beyond the edge of the document, to facilitate easy identification and review.

**Policy on Extensions:** The court grants extensions sparingly, following the criteria outlined in 5th Cir. R. 31.4. If you request an extension, you must notify opposing counsel and inform us whether the extension is opposed or unopposed. Note that, except in extraordinary circumstances, the maximum extension for filing briefs is 30 days in criminal cases and 40 days in civil cases.

**Reply Brief:** Cases are generally not submitted to the court until all briefs are filed, except in criminal appeals. Reply briefs must be filed within the 21-day period specified in Fed. R. App. P. 31(a)(1). Please refer to 5th Cir. R. 31.1 to determine if electronic copies of the reply brief are required, and for guidance on format.

**Dismissal of Appeals:** Please be aware that the clerk may dismiss appeals without notice if briefs are not filed on time, or if other rules are not followed.

**Appearance Form:** If you have not yet electronically filed a "Form for Appearance of Counsel," please do so within 14 days of this notice. Ensure that you name each party you represent, as required by Fed. R. App. P. and 5th Cir. R. 12. The form is available on the Fifth Circuit's website at www.ca5.uscourts.gov.

**Brief Template:** The clerk's office provides brief templates and a tool to check briefs for potential deficiencies before docketing. To access these resources, log in to CM/ECF and select 'Brief Template' (Counsel Only) or 'PDF Check Document' from the Utilities menu or the "Attorney Toolbox".

**Electronic Record on Appeal (EROA):** We permit you to download all or part of the electronic record on appeal (EROA) after this is approved by the U.S. District Court. You will receive a notice when access to the EROA is available. Counsel must be approved for electronic filing and be listed as an attorney of record in the case before access will be granted. Instructions for accessing and downloading the EROA will be included in the notice you receive from the district court, but are also available here: http://www.ca5.uscourts.gov/docs/default-source/forms/instructions-for-electronic-record-download-feature-of-cm.

Please note that sealed documents, except for the presentence investigation report in criminal appeals, will not be included in the EROA. You must file a motion in our court for access to sealed documents, which will be provided by the district court only upon the filing and granting of a motion by our court.

**Video/Audio Exhibits:** If this record contains exhibits, such as dash cam or body cam videos, that need to be submitted to the court, please provide them to the District Court in MP4 format for submission to our court.

**Citation Guidelines:** Pursuant to 5th Cir. R. 28.2.2, use the following citation format:

- For single record cases, use "ROA." followed by the page number (e.g., "ROA.123").
- For multiple record cases, cite "ROA." followed by the Fifth Circuit appellate case number, followed by the page of the record (e.g., "ROA.13-12345.123").
- Each citation must end with a period (.) or semicolon (;).

**Pro Se Litigants:** If you are a pro se litigant, you may request the record from the district court to prepare your brief. Those proceeding in forma pauperis may receive the record without payment of shipping costs. If you wish to receive exhibits, you must specifically request them. Upon receiving the record, please review it within 14 days for any missing or incomplete items. If you need to request a supplemental record or order transcripts, do so promptly. The court will not grant extensions of time to file your brief due to a delay in checking the record.

**Reminder Regarding Sealed Documents:** Our court presumes the public has a right to court records, and request to seal pleadings, record excerpts, or other documents must be justified with particularity. Simply stating that the originating court sealed the matter is insufficient. Counsel is responsible for justifying a request to file under seal, as well as for notifying the court when sealing is no longer necessary. An unopposed motion to seal does not relieve counsel of the obligation to justify the motion.

**Signing Pleadings.** While our rules do not directly regulate the process by which a party or an attorney produces the filing—such as writing it personally with no assistance, delegating part of its preparation to another, or using generative artificial intelligence, the signature is an attestation that the signer has reviewed the filing and is responsible for the accuracy of its contents.

If you have any questions or require further assistance, please do not hesitate to contact our office.

Sincerely,

LYLE W. CAYCE, Clerk

By: /s/ Jasmine Forman
Jasmine Forman, Deputy Clerk
504-310-7649

Enclosure(s)

cc w/encl:
Mr. Zachery Z. Annable
Mr. Gregory Vincent Demo
Ms. Melissa Sue Hayward
Mr. Jordan A. Kroop
Mr. John A. Morris
Mr. Jeffrey N. Pomerantz
Ms. Hayley R. Winograd

___________

Case No. 25-10999

___________

In the Matter of: Highland Capital Management, L.P.

Debtor

Dugaboy Investment Trust,

Appellant

v.

Highland Capital Management, L.P.; Highland Claimant Trust,

Appellees

# Exhibit 15

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

October 01, 2025

Mr. Michael Philip Aigen
Stinson, L.L.P.
2200 Ross Avenue
Suite 2900
Dallas, TX 75201

Ms. Deborah Rose Deitsch-Perez
Stinson, L.L.P.
2200 Ross Avenue
Suite 2900
Dallas, TX 75201

Mr. Jeffrey T. Prudhomme
Stinson, L.L.P.
2200 Ross Avenue
Suite 2900
Dallas, TX 75201

No. 25-10999 Dugaboy Invst Trust v. Highland Capital Mgmt
USDC No. 3:24-CV-1531

Dear Counsel,

We have docketed the appeal referenced above. Please use the assigned case number for all future inquires.

**Briefing Notice:** The record is now complete for the purposes of this appeal, as outlined in Fed. R. App. P. 12. The appellant's brief and record excerpts must be submitted within 40 days of the date listed above on November 10, 2025 in accordance with Fed. R. App. P. & 5th Cir. R. 28, 30, and 31. Please review 5th Cir. R. 30.1.2 and 5th Cir. R. 31.1 to determine if you are required to file electronic copies of the brief and record excerpts. If required, electronic copies must be in Portable Document Format (PDF). Please refer to our briefing checklist on the Fifth Circuit's website at: http://www.ca5.uscourts.gov/docs/default-source/forms-and-documents---clerks-office/rules/brchecklist.pdf.

**Paper Copies of Briefs Not Required unless directed by the Clerk.** The court has waived requirement to file paper copies of briefs or record excerpts. Should paper copies be required, the clerk will notify you and instruct the number of copies to file.

**Brief Covers:** The case captions on brief covers must match the case captions on the enclosed title caption sheets exactly. Any modifications to the captions must be corrected before the brief is submitted to the court.

**Record Excerpts:** As specified in 5th Cir. R. 30.1.7(c), an appellant must file record excerpts. The electronic PDF version of the record excerpts should include pages representing the "tabs" identified in the document index. If you are notified to provide paper copies of the excerpts, please ensure that copies filed contain actual physical tabs that extend beyond the edge of the document, to facilitate easy identification and review.

**Policy on Extensions:** The court grants extensions sparingly, following the criteria outlined in 5th Cir. R. 31.4. If you request an extension, you must notify opposing counsel and inform us whether the extension is opposed or unopposed. Note that, except in extraordinary circumstances, the maximum extension for filing briefs is 30 days in criminal cases and 40 days in civil cases.

**Reply Brief:** Cases are generally not submitted to the court until all briefs are filed, except in criminal appeals. Reply briefs must be filed within the 21-day period specified in Fed. R. App. P. 31(a)(1). Please refer to 5th Cir. R. 31.1 to determine if electronic copies of the reply brief are required, and for guidance on format.

**Dismissal of Appeals:** Please be aware that the clerk may dismiss appeals without notice if briefs are not filed on time, or if other rules are not followed.

**Appearance Form:** If you have not yet electronically filed a "Form for Appearance of Counsel," please do so within 14 days of this notice. Ensure that you name each party you represent, as required by Fed. R. App. P. and 5th Cir. R. 12. The form is available on the Fifth Circuit's website at www.ca5.uscourts.gov.

**Brief Template:** The clerk's office provides brief templates and a tool to check briefs for potential deficiencies before docketing. To access these resources, log in to CM/ECF and select 'Brief Template' (Counsel Only) or 'PDF Check Document' from the Utilities menu or the "Attorney Toolbox".

**Electronic Record on Appeal (EROA):** We permit you to download all or part of the electronic record on appeal (EROA) after this is approved by the U.S. District Court. You will receive a notice when access to the EROA is available. Counsel must be approved for electronic filing and be listed as an attorney of record in the case before access will be granted. Instructions for accessing and downloading the EROA will be included in the notice you receive from the district court, but are also available here: http://www.ca5.uscourts.gov/docs/default-source/forms/instructions-for-electronic-record-download-feature-of-cm.

Please note that sealed documents, except for the presentence investigation report in criminal appeals, will not be included in the EROA. You must file a motion in our court for access to sealed documents, which will be provided by the district court only upon the filing and granting of a motion by our court.

**Video/Audio Exhibits:** If this record contains exhibits, such as dash cam or body cam videos, that need to be submitted to the court, please provide them to the District Court in MP4 format for submission to our court.

**Citation Guidelines:** Pursuant to 5th Cir. R. 28.2.2, use the following citation format:

- For single record cases, use "ROA." followed by the page number (e.g., "ROA.123").
- For multiple record cases, cite "ROA." followed by the Fifth Circuit appellate case number, followed by the page of the record (e.g., "ROA.13-12345.123").
- Each citation must end with a period (.) or semicolon (;).

**Pro Se Litigants:** If you are a pro se litigant, you may request the record from the district court to prepare your brief. Those proceeding in forma pauperis may receive the record without payment of shipping costs. If you wish to receive exhibits, you must specifically request them. Upon receiving the record, please review it within 14 days for any missing or incomplete items. If you need to request a supplemental record or order transcripts, do so promptly. The court will not grant extensions of time to file your brief due to a delay in checking the record.

**Reminder Regarding Sealed Documents:** Our court presumes the public has a right to court records, and request to seal pleadings, record excerpts, or other documents must be justified with particularity. Simply stating that the originating court sealed the matter is insufficient. Counsel is responsible for justifying a request to file under seal, as well as for notifying the court when sealing is no longer necessary. An unopposed motion to seal does not relieve counsel of the obligation to justify the motion.

**Signing Pleadings.** While our rules do not directly regulate the process by which a party or an attorney produces the filing—such as writing it personally with no assistance, delegating part of its preparation to another, or using generative artificial intelligence, the signature is an attestation that the signer has reviewed the filing and is responsible for the accuracy of its contents.

If you have any questions or require further assistance, please do not hesitate to contact our office.

Sincerely,

LYLE W. CAYCE, Clerk

By: /s/ Jasmine Forman
Jasmine Forman, Deputy Clerk
504-310-7649

Enclosure(s)

cc w/encl:
Mr. Zachery Z. Annable
Mr. Gregory Vincent Demo
Ms. Melissa Sue Hayward
Mr. Jordan A. Kroop
Mr. John A. Morris
Mr. Jeffrey N. Pomerantz
Ms. Hayley R. Winograd

___________

Case No. 25-10999

___________

In the Matter of: Highland Capital Management, L.P.

Debtor

Dugaboy Investment Trust,

Appellant

v.

Highland Capital Management, L.P.; Highland Claimant Trust,

Appellees

# Exhibit 16

**STINSON LLP**
Deborah Deitsch-Perez
Michael P. Aigen
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com

*Counsel for Hunter Mountain Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor.[1] | § | |

**MOTION FOR LEAVE TO FILE A DELAWARE COMPLAINT**

[1] The *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., (As Modified)* [Dkt. No. 1808] (the "***Plan***"), filed by Highland Capital Management, L.P. ("***HCMLP***") became effective on August 11, 2021 (the "***Effective Date***").

**TABLE OF CONTENTS**

Page

I. PRELIMINARY STATEMENT ..... 1

II. STATEMENT OF FACTS ..... 1

A. Highland's Plan Contemplated Orderly "Monetization" of Highland's Assets, Payment of Eleven Classes of Claims, and Winding Up of Highland's Business ..... 1

B. The Confirmation Order and the Plan Contemplated the Creation of a Claimant Trust Managed by Mr. Seery under the Supervision of an Oversight Board ..... 3

C. The Plan Did Not Contemplate, but the Court Subsequently Approved, the Creation of an Indemnity Subtrust ..... 6

D. Despite Governance Protections Contained in the Confirmation Order, the Plan, and the CTA, with Regard to Indemnification Issues, Mr. Seery Operates with Unfettered Discretion and without Supervision of the Contemplated Oversight Board ..... 8

E. Mr. Seery Has Used the Indemnification Reserve to Avoid Paying Creditors in Full and to Benefit Himself ..... 10

III. ARGUMENT ..... 14

A. The Proposed Complaint Alleges a Colorable Claim That Mr. Seery Should be Removed as Claimant Trustee ..... 14

1) Movant's Delaware Complaint Sets Forth a *Prima Facie* Case for Removal of Mr. Seery as Claimant Trustee ..... 15

2) Movant Has Standing to Seek Mr. Seery's Removal ..... 15

3) Delaware Law Mandates Movant's Complaint Proceed in Delaware Court ..... 23

4) There Are Multiple Grounds for Seery's Removal ..... 23

a) Mr. Seery Has Breached His Duty of Loyalty ..... 24

b) Mr. Seery's Continued Service Substantially Impairs the Administration of the Trust ..... 28

c) Mr. Seery Is Hostile to Movant, the Largest Class 10 Equity Holder ..... 29

B. Movant Seeks to File its Delaware Complaint for a Proper Purpose ..... 30

IV. CONCLUSION ..... 31

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Angstadt v. Red Clay Consol. Sch. Dist.*,
4 A.3d 382 (Del. 2010) .......... 16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......... 13, 14

*Benerofe v. Cha*,
No. 14614, 1998WL 83081 (Del. Ch. Feb. 20, 1998) .......... 20

*Estate of Cornell v. Johnson*,
367 P.3d 173 (Idaho 2016) .......... 21

*Coster v. UIP Companies, Inc.*,
255 A.3d 952 (Del. 2021) .......... 24

*Dunlap v. State Farm Fire and Cas. Co.*,
878 A.2d 434 (Del. 2005) .......... 19

*Edwards v. Gillis*,
146 Cal.Rptr.3d 256 (Cal.App. 4 Dist., 2012) .......... 21

*FMS Bonds, Inc. v. Bank of New York Mellon*,
2016 WL 4059155 (S.D.N.Y. July 28, 2016) .......... 27, 28

*Guiricich v. Emtrol Corp.*,
449 A.2d 232 (Del. 1982) .......... 17

*Hardy v. Hardy*,
No. CIV.A. 7531-VCP, 2014 WL 3736331 (Del. Ch. July 29, 2014) .......... 24

*Matter of Highland Capital Management, L.P.*,
48 F.4th 419 (5th Cir. 2022) .......... 6, 31

*Injective Labs Inc. v. Wang*,
No. CV 22-943-WCB, 2023 WL 3318477 (D. Del. May 9, 2023) .......... 20, 21

*J.P. Morgan Tr. Co. of Delaware, Tr. of Fisher 2006 Tr. v. Fisher*,
No. CV 12894-VCL, 2021 WL 2407858 (Del. Ch. June 14, 2021), *judgment entered sub nom* .......... 27, 28

*Matter of Jeremy Paradise Dynasty Tr.*,
No. CV 2021-0354-KSJM, 2021 WL 3625375 (Del. Ch. Aug. 17, 2021) .......... 29

*Keybank Nat'l Ass'n v. Franklin Advisers, Inc.*,
616 B.R. 14 (Bankr. S.D.N.Y. 2020) .......... 27, 28

*In re National Collegiate Student Loan Trusts Litigation*,
251 A.3d 116 (Del. Ch. 2020) .......... 19

*Estate of Necastro*,
No. C.A. 10,538, 1991 WL 29958 (Del. Ch. Feb. 28, 1991) .......... 18

*Oberly v. Kirby*,
592 A.2d 445 (Del. 1991) .......... 25

*Paradee v. Paradee*,
No. 4988-VCL, 2010 WL 3959604 (Del. Ch. Oct. 5, 2010) .......... 24

*Rende v. Rende*,
No. 2021-0734-SEM, 2023 WL 2180572 (Del. Ch. Feb. 23, 2023) .......... 19

*Schnell v. Chris-Craft Indus., Inc.*,
285 A.2d 437 (Del. 1971) .......... 24

*Snow Phipps Grp., LLC v. Kcake Acquisition, Inc.*,
No. CV 2020-0282-KSJM, 2021 WL 1714202 (Del. Ch. Apr. 30, 2021) .......... 20

*Stegemeier v. Magness*,
728 A.2d 557 (Del. 1999) .......... 25

*Taglialatela v. Galvin*,
No. 5841-MA, 2015 WL 757880 (Del. Ch. Feb. 23, 2015) .......... 24

*Taglialatela v. Galvin*,
No. CIV.A. 5841-MA, 2013 WL 2122044 (Del. Ch. May 14, 2013) .......... 29, 30

*Tigani v. Tigani*,
No. CV 2017-0786-KSJM, 2021 WL 1197576 (Del. Ch. Mar. 30, 2021), *aff'd,*
271 A.3d 741 (Del. 2022) .......... 16

*Estate of Tigani*,
No. CV 7339-ML, 2016 WL 593169 (Del. Ch. Feb. 12, 2016) .......... 18

*In re Tr. Under Will of Flint for the Benefit of Shadek*,
118 A.3d 182 (Del. Ch. 2015) .......... 16

*Unit Trainship, Inc. v. Soo Line R. Co.*,
905 F.2d 160 (7th Cir. 1990) .......... 20, 21

*United Bhd. of Carpenters Pension Plan v. Fellner*,
C.A. No. 9475-VCN, 2015 WL 894810 (Del. Ch. Feb. 26, 2015) .......... 23

*Walls v. Peck*,
Civ. A. No. 497, 1979 WL 26236 (Del. Ch. Oct. 24, 1979) .......... 24

*Wilmington Trust Co. v. Barry*,
338 A.2d 575 (Del Super. 1975), *aff'd*, 359 A.2d 664 (Del. 1976) ....................................... 17

**Statutes**

11 U.S.C. § 524(e) ....................................................................................................................... 6

Del. Code Ann. tit. 12, § 2302(d) ..................................................................................................... 17

Del. Code Ann. tit. 12, § 3327 ............................................................................................... 15, 17, 22

Del. Code Ann. tit. 12, § 3327(1) ..................................................................................................... 24

Del. Code Ann. tit. 12, § 3327(2) ..................................................................................................... 24

Del. Code Ann. tit. 12, § 3327(3)(b) and (c) ..................................................................................... 24

Del. Code Ann. tit. 12, § 3804(e) ..................................................................................................... 23

Del. Code Ann. tit. 12, § 3806(c) ..................................................................................................... 19

Del. Code Ann. tit. 12, § 3809 .......................................................................................................... 19

Federal Rule of Civil Procedure 12(b)(6) .................................................................................. 13, 14

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019) ......................................................................................... 17

GEORGE GLEASON BOGERT, THE LAW OF TRUSTS AND TRUSTEES, § 543 (3d ed. 2019) .................. 24

RESTATEMENT (SECOND) OF TRUSTS, § 198 (1959) ......................................................................... 21

RESTATEMENT (THIRD) OF TRUSTS, § 48 cmt. a (2003) .................................................................. 16

RESTATEMENT (THIRD) OF TRUSTS, § 94 cmt. b (2012). ........................................................... 16, 17

RESTATEMENT (THIRD) OF TRUSTS, § 94, Reporter's Notes, cmt. a(1) (2012). ................................ 16

## I. PRELIMINARY STATEMENT

1. Movant Hunter Mountain Investment Trust ("Movant") seeks leave to file a complaint in Delaware Chancery Court seeking the removal of James P. Seery, Jr. ("Mr. Seery") as Trustee of the Claimant Trust created pursuant to the plan of reorganization of Highland Capital Management, L.P. ("Highland" or the "Debtor"). Under applicable Delaware law, removal of a trustee is warranted when the trustee commits a breach of trust, substantially impairs the administration of the trust through the Trustee's continued service, is unwilling or unable to perform his duties properly, or has hostility toward one or more beneficiaries that threatens efficient administration of the trust. As set forth below in greater detail, all four of these circumstances exist here.

2. Mr. Seery has breached his duties, including his duty of loyalty by using Claimant Trust assets to fund a separate indemnity sub-trust (to pay his own potential legal expenses – in a blatant conflict of interest) instead of using those assets to pay the claims of Claimant Trust beneficiaries. In addition, Mr. Seery is overtly hostile to Movant—the holder of Class 10 claims and the largest holder of Contingent Trust Interests under the Claimant Trust. Either of these circumstances alone justifies Mr. Seery's removal, but the combination requires it. The attached proposed Delaware complaint states a "colorable" claim, and this Motion should be granted.

## II. STATEMENT OF FACTS

### A. Highland's Plan Contemplated Orderly "Monetization" of Highland's Assets, Payment of Eleven Classes of Claims, and Winding Up of Highland's Business

3. The Bankruptcy Court entered an order (the "Confirmation Order") confirming the Fifth Amended Plan of Highland Capital Management, L.P. (as Modified) (the "Plan") on February 22, 2021.[2] In broad strokes, the Plan called for "the orderly wind-down of the Debtor's estate,

[2] Confirmation Order, Dkt. 1943.

Case 3:26-cv-02496-D Document 16-1 Filed 03/26/26 Page 586 of 624 PageID 1587

including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds, subject to the oversight of the Claimant Trust Oversight Board."[3]

4. The Plan contemplated payment of 11 classes of claims. Classes 1 through 7 have already been paid. The remainder are: Class 8, comprising general unsecured claims, of which 93% of allowed claims have been paid;[4] Class 9, comprising subordinated claims; Class 10, comprising Class B/C limited partnership interest claims; and Class 11, comprising Class A limited partnership interest claims.[5] Highland's former equity holders were assigned Class 10 and 11 claims. Movant Hunter Mountain Investment Trust is the only holder of Class 10 claims and owner of the lion's share of the residual equity in Highland.[6]

5. The Plan contemplated that all of Highland's assets would be managed through three entities: (1) a Claimant Trust, (2) a Litigation Sub-Trust, and (3) the Reorganized Debtor.[7] The Claimant Trust was tasked with administering "Claimant Trust Assets" and serving as the Reorganized Debtor's limited partner.[8] The Litigation Sub-Trust, a sub-trust of the Claimant Trust, was tasked with pursuing "Estate Claims."[9] And the Reorganized Debtor was tasked with

---

[3] *Id.*, ¶ 2.

[4] *See* Dkts. 3956 at p. 7 and 3757 at p. 13.

[5] *See* Plan, Ex. A to Dkt. 1943, at Art. III, §§ B, H.

[6] *See* Plan at Art. I, § B, ¶¶ 34-36.

[7] *See* Plan at Art. IV, § A.

[8] The Plan defines "Claimant Trust Assets" to mean all assets of the estate that are not "Reorganized Debtor Assets," including all causes of action, available cash, proceeds realized from such assets, any rights of setoff or recoupment and other defenses with respect to such assets, any assets transferred to the Claimant Trust by the Reorganized Debtor, the limited partnership interests in the Reorganized Debtor, and the ownership interests in the Reorganized Debtor's new general partner. *See* Plan at Art. I, § B, ¶ 26.

[9] *See* Plan at Art. IV, § A. The Plan defines "Estate Claims" to mean "any and all estate claims and causes of action against [James] Dondero, [Mark] Okada, other insiders of the Debtor, and any of their related entities, including any promissory notes held by any of the foregoing. Plan at Art. I, § B, ¶ 60; Dkt. 354, Ex. A at p. 4 (defining "Estate Claims" to mean "claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing.").

administering the "Reorganized Debtor Assets" and managing the wind down of the "Managed Funds."[10]

**B. The Confirmation Order and the Plan Contemplated the Creation of a Claimant Trust Managed by Mr. Seery under the Supervision of an Oversight Board**

6. The confirmed Plan contemplated the creation of a "Claimant Trust," to be created pursuant to a separate Claimant Trust Agreement, the "CTA."[11] According to the Bankruptcy Court, the whole reason for the Claimant Trust was to "manage and monetize the Claimant Trust Assets for the benefit of the Debtor's economic stakeholders."[12] The Court further observed that, upon full payment of allowed claims, the Claimant Trust contemplated that "any residual value would then flow to the holders of Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests)."[13]

7. Beneficiaries of the Claimant Trust are termed "Claimant Trust Beneficiaries," a term defined to mean (1) holders of allowed general unsecured claims, (2) holders of allowed subordinated claims, and upon certification by the Claimant Trustee that holders of allowed general unsecured and allowed subordinated claims have been paid in full with interest, and (3) holders of allowed Class A and B/C limited partnership interests.[14] Notably, the CTA repeatedly instructs that the Claimant Trustee is to act "with a view toward maximizing value in a reasonable time" for the purpose of

[10] *See* Plan at Art. IV, § B. The Plan defines "Reorganized Debtor Assets" to mean "any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust." Plan at Art. I, § B, ¶ 115. The Plan defines "Managed Funds" to mean Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Partners, L.P., and any other investment vehicle managed by Highland pursuant to an executory contract. Plan at Art. I, § B, ¶ 84.

[11] *See* Plan at Art. IV, § B.

[12] *See* Confirmation Order, Dkt. 1943, at ¶ 2.

[13] *Id.* at ¶ 42(c).

[14] *See* CTA, Dkt. 3521-5, at ¶ 1.1(h).

distributing the Claimant Trust assets to Claimant Trust Beneficiaries.[15] Consistent with the Confirmation Order's description of the Plan's waterfall, upon paying the holders of claims in Classes 1-9 in full with interest, the Claimant Trustee is obligated to file with the Bankruptcy Court a certification (called the "GUC Certification" in the CTA) deeming holders of Class A, B, and C limited partnership interests (*i.e.*, Class 10 and 11 claims holders) "Beneficiaries" of the CTA with entitlement to distributions of residual assets under the terms of the CTA.[16]

8. Under the Plan, Mr. Seery is the designated Claimant Trustee tasked with the obligation to oversee the administration and distribution of Claimant Trust Assets to unsecured claims and equity interests represented by Classes 8 through 11.[17] Importantly, both the Confirmation Order and the Plan contemplated that Mr. Seery's management of the Claimant Trust would be supervised by a five-member committee (comprised of at least two disinterested members), referred to in the CTA as the "Oversight Board."[18]

9. In its Confirmation Order, the Bankruptcy Court described the Oversight Board's role and its membership at some length. According to the Court, "[t]he Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor…**will all be managed and overseen by the Claimant Trust Oversight Committee**."[19] In terms of the Board's membership, the Court explained that the members of the Unsecured Creditors Committee ("UCC") had volunteered to serve as the initial members of the

---

[15] *Id.* at ¶ 2.3(b)(viii); *see also id.* at ¶ 2.3(b)(i) (Claimant Trustee must act "in an expeditious but orderly manner with a view toward maximizing value"), ¶ 3.2(a) ("Claimant Trustee shall, in an expeditious but orderly manner, monetize the Claimant Trust Assets, make timely distributions and not unduly prolong the duration of the Claimant Trust.").

[16] *Id.* at § 5.1(c).

[17] *See* Plan, Ex. A to Dkt. 1943, at Art. I, § B, ¶ 28 and Art. IV, § B.1.

[18] *See Id* at Art. IV, § B.2; CTA, ¶¶ 1.1(ll), 4.1. Despite the CTA's mandate that the Oversight Board "shall" be comprised of at least two disinterested members, the initial Board's makeup consisted of four members of the UCC and only one disinterested member, David Pauker. *See id.*, ¶ 1.1(ll).

[19] *See* Confirmation Order, Dkt. 1943, at ¶ 42(a) (emphasis added).

Oversight Board.[20] The Confirmation Order goes on to discuss in detail the initial members and their qualifications to serve.[21] In approving their appointment, the Court emphasized Mr. Seery's testimony that "he believe[d] the selection of the . . . members of the Claimant Trust Oversight Board [was] in the best interests of Debtor's economic constituents."[22] Plainly, the Court believed that a five-member Board would oversee Mr. Seery's conduct as Claimant Trustee to ensure that the Plan would be fully performed.

10. The Plan likewise contemplated that the five-member Oversight Board would supervise Mr. Seery's monetization of Claimant Trust assets and his management and distribution of those assets after monetization. Indeed, the Plan expressly stated that the Oversight Board would oversee "the management and monetization of the Claimant Trust Assets, [] the management of the Reorganized Debtor . . . and the Litigation Sub-Trust . . ., subject to the terms of the Claimant Trust Agreement."[23] The CTA, in turn, provides that the Oversight Board "shall," among other things: (1) "consult with and advise the Claimant Trustee and Litigation Trustee as to the administration and management of the Claimant Trust and the Litigation Sub-Trust;" and (2) "oversee, review, and govern the activities of the Claimant Trust, including the Litigation Sub-Trust, and the performance of the Claimant Trustee and Litigation Trustee."[24] The CTA further limits the Claimant Trustee's power to undertake certain actions without "vote of a simple majority of the Oversight Board pursuant to the notice and quorum requirements" of the Agreement.[25] Thus, the Claimant Trustee should consult the Oversight Board before terminating or extending the term of the Claimant Trust, litigating or settling any "Material Claims," selling or monetizing certain assets, including Reorganized Debtor

[20] *Id.* at ¶ 8.
[21] *Id.* at ¶ 44.
[22] *Id.* at ¶ 42.
[23] *See* Plan, Ex. A to Dkt. 1943, at Art. IV, § B.2.
[24] CTA, Dkt. 3521-5, at ¶ 4.2(a).
[25] *Id.* at ¶ 3.3(b).

assets valued at greater than $3 million, making certain cash distributions to Claimant Trust Beneficiaries, making distributions on "Disputed Claims," reserving cash or cash equivalents to meet contingent liabilities (including indemnification obligations), borrowing, investing Claimant Trust assets, changing the Claimant Trustee's compensation, or retaining certain counsel, experts, advisors, or other professionals.[26] In other words, the Oversight Board, as originally conceived, was contemplated to have a substantial governance role in the day-to-day activities of the Claimant Trust and the Claimant Trustee.

11. In its September 7, 2022 opinion, confirming the Plan in part, the Fifth Circuit likewise observed that, "[t]he whole operation is overseen by a Claimant Trust Oversight Board (the "Oversight Board") comprised of four creditor representatives and one restructuring advisor."[27] Notably, in the same opinion, the Fifth Circuit struck down a provision of the Plan purporting to exculpate from liability parties other than Highland, the UCC and its members, and the three independent directors appointed to manage Highland during bankruptcy, holding that broader exculpation was inconsistent with 11 U.S.C. § 524(e).[28] In short, the Fifth Circuit refused to exculpate Mr. Seery for actions taken in his role as Claimant Trustee and expressed the understanding that his post-confirmation conduct as Trustee of the Claimant Trust would be affirmatively overseen by an independent Oversight Board.

### C. The Plan Did Not Contemplate, but the Court Subsequently Approved, the Creation of an Indemnity Subtrust

12. One entity the Plan did not contemplate was an indemnity sub-trust designed to cover potential post-confirmation claims against estate professionals. Instead, Mr. Seery testified

[26] *Id.* at ¶ 3.3(b)(i)-(xii).

[27] *Matter of Highland Capital Management, L.P.*, 48 F.4th 419, 427 (5th Cir. 2022).

[28] *Id.* at 438. Nor is Mr. Seery exculpated for "any acts or omissions…arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct." Confirmation Order, Dkt 1943, at ¶ Y.

extensively during the hearing on Plan confirmation that Highland would obtain director and officer ("D&O") insurance to cover any claims against or liabilities imposed on those individuals charged with implementing the Plan. Indeed, one of the conditions to the Plan becoming effective was "the Debtor obtaining D&O Insurance acceptable to the Debtor, the Committee, the Claimant Trust Oversight Committee, and the Litigation Trustee."[29] Nonetheless, four months after Plan confirmation, Highland filed a motion with the Bankruptcy Court seeking authorization to create a new "Indemnity Subtrust" designed to maintain an indemnity trust account with a balance of "not less than $25 million" that would conditionally indemnify post-confirmation professionals "in lieu of obtaining D&O insurance."[30]

13. The parties to be conditionally indemnified under the Indemnity Subtrust include Mr. Seery as Claimant Trustee, the Oversight Board and its members (described below), their professionals, the Litigation Trustee, the Reorganized Debtor and its partners, members, directors, and officers, and the new general partner of the Reorganized Debtor and its partners, members, directors, and officers (including Mr. Seery).[31] In support of the Subtrust Motion, Mr. Seery testified that he and other post-confirmation management "intend[ed] to look for insurance coverage that would appropriately replace the Indemnity Trust if that's a more efficient vehicle."[32] Over various objections, the Court granted Highland's Subtrust Motion on July 21, 2021.[33]

---

[29] *See* Motion for Entry of an Order (I) Authorizing the (A) Creation of an Indemnity Subtrust and (B) Entry into an Indemnity Trust Agreement and (II) Granting Related Relief (the "Subtrust Motion"), Dkt. 2491 at ¶ 13.

[30] *Id.* at ¶¶ 21, 26.

[31] *See id.* at ¶ 18 n.8; *see also* CTA, Dkt. 3521-5 at § 8.2.

[32] July 19, 2021 Hearing Transcript, Dkt. 2598 at 45:14-25.

[33] Order Approving Debtor's Motion for Entry of an Order (I) Authorizing the (A) creation of an Indemnity Subtrust and (B) Entry into an Indemnity Trust Agreement and (II) Granting Related Relief, Dkt. 2599.

14. The Subtrust Motion identified Mr. Seery as the "Indemnity Trust Administrator."[34] In his capacity as Administrator, Mr. Seery was given total control of the administration of the Indemnity Subtrust:

> …For any action contemplated or required in connection with the operation of the Indemnity Trust, and for any guidance or instruction to be provided to the Indemnity Trustee, **such function, rights and responsibility shall be vested in the Indemnity Trust Administrator, and the Indemnity Trustee will take written directions from the Indemnity Trust Administrator**, in such form specified in the Indemnity Trust Agreement and otherwise satisfactory to the Indemnity Trustee.[35]

And although Highland's motion assured the Court that **"[b]eneficiaries will not be involved in or have any rights with respect to the administration of the Indemnity Trust** or have any right to direct the actions of the Indemnity Trustee with respect to the Indemnity Trust or the assets held in the Indemnity Trust Account," Highland carved out Mr. Seery (to the extent he is acting in his capacity as Indemnity Trust Administrator) from that exclusion.[36]

### D. Despite Governance Protections Contained in the Confirmation Order, the Plan, and the CTA, with Regard to Indemnification Issues, Mr. Seery Operates with Unfettered Discretion and without Supervision of the Contemplated Oversight Board

15. Notwithstanding that creditor constituencies voted to support, and the Bankruptcy Court approved, the Plan, understanding that there would be a partially independent, five-member Oversight Board supervising the monetization and distribution of estate assets, that contemplated governance structure has long since been ignored and has failed to safeguard the Claimant Trust. The representations in the Plan, the findings by this Court, and the belief of the Fifth Circuit that Mr. Seery's conduct as Claimant Trustee would be affirmatively overseen to assure that the Plan would be fully performed, are – at least as to the appropriate use of funds and indemnification -- all false.

---

34 *See* Subtrust Motion, Dkt. 2491, at ¶ 21 under "Indemnity Trust Administrator" on p. 8.

35 *Id.* (emphasis added) under "Governance of the Indemnity Trust" on p. 9.

36 *Id.* (emphasis added).

16. The five-member Board no longer exists. Instead, the Board is comprised of two claims buyers (and current Claimant Trust Beneficiaries)—Muck Holdings and Jessup Holdings—and one ostensibly disinterested member, Richard Katz,[37] about whom no information demonstrating independence was provided with his appointment.[38] Although the CTA mandates that the Board includes two disinterested members, there has only ever been Mr. Katz. That contrivance creates potential governance problems. For example, the Board must in many instances approve actions undertaken by the Claimant Trustee by a "majority" vote.[39] But if any Board member has a conflict or *potential* conflict of interest with respect to an issue at hand (including, without limitation, a pecuniary interest in the issue), then the conflicted member cannot vote.[40] In the case of the current three-member Board, any potential conflict of interest thus derails a majority vote and precludes the Board from approving actions contemplated by the Claimant Trustee.

17. Even without this governance problem, contrary to the impression left by the provisions of the Plan discussed above,[41] the Claimant Trust lacks the requisite safeguards to prevent abuse by the Claimant Trustee. That has proven particularly problematic when it comes to the Claimant Trust's indemnity obligations. Specifically, the CTA states:

> Notwithstanding anything to the contrary contained herein, the Claimant Trustee shall distribute to the holders of Trust Interests at least annually the Cash on hand net of any amounts that…(d) are necessary to satisfy or reserve for other liabilities incurred or anticipated by the Claimant Trustee in accordance with the Plan and this Agreement **(including, but not limited**

[37] While Movants have little to go on, if Mr. Katz is the Richard Katz of Torque Point Advisors, he may have interacted with Mr. Seery while he was at Lehman Brothers. *See* TORQUE POINT ADVISORS, https://www.torquepointllc.com/ (last visited Dec. 20, 2023) (involved in restructuring of Lehman Brothers Holdings Inc.) and Jim Seery, LINKEDIN, (listing Lehman Brothers, 1999-2009) [App. 110-112]. Furthermore, the Claims Purchasers, Muck and Jessup are proposed defendants, together with Mr. Seery and others, in a separate proposed adversary proceeding involving allegations of use of material non-public information. As such, Movant has alleged that at least two members of the Oversight Board are in an alleged conspiracy with Mr. Seery. *See* Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding, Dkt. 3816.

[38] *See* Notice of Appointment of Members of the Oversight Board of the Highland Claimant Trust, Dkt. 2801.

[39] *See* CTA, Dkt. 3521-5 at §§ 3.3(b)(i)-(xii), 3.4, 3.8, 3.9, and 4.6(a).

[40] *See id.* at § 4.6(c).

[41] See notes 18 to 28 *supra* and accompanying text.

> **to, indemnification obligations and similar expenses in such amounts and for such period of time as the Claimant Trustee determines, in good faith, may be necessary and appropriate, which determination shall not be subject to consent of the Oversight Board, may not be modified without the express written consent of the Claimant Trustee, and shall survive the termination of the Claimant Trustee)**….[42]

18. In other words, Mr. Seery, both as the Claimant Trustee and as the Indemnity Trust Administrator, effectively has the sole authority to reserve for potential indemnification obligations ***without any*** Oversight Board or other supervision. This is problematic because Mr. Seery (both as claimant Trustee and as the owner of the Reorganized Debtor's general partner) is one of the principal indemnified parties who stand to benefit from the funding of the indemnification reserve. That means Mr. Seery has a vested financial interest in all decisions he makes regarding the indemnification reserve, including how much to reserve and whether to pay out of the reserve to indemnified parties, including himself. Mr. Seery's unfettered right over the Indemnity Sub-Trust is a material deviation from the Plan: while the Plan always contemplated a conditional indemnification right to certain parties, such right was to be supervised by the Oversight Board. Not only has the Oversight Board with its mechanism for independent members been removed from the supervision of the indemnification *res*, but the sole party with authority over the indemnification *res*, Mr. Seery, is conflicted.

### E. Mr. Seery Has Used the Indemnification Reserve to Avoid Paying Creditors in Full and to Benefit Himself

19. Mr. Seery has used the Claimant Trust and the Indemnity Subtrust to his own pecuniary advantage. The Claimant Trust now has more than sufficient assets to pay holders of Classes 8 and 9 in full with interest with surplus available to former equity. Yet it has failed to do so, despite the mandate of the CTA that Mr. Seery act expeditiously to maximize value for Claimant Trust Beneficiaries. Instead, he has been funding an increasingly sizeable indemnification reserve

[42] CTA, Dkt. 3521-5 at § 6.1(a) (emphasis added).

without any discernable justification other than as a subterfuge for avoiding certifying that holders of Class 10 and 11 claims (including Movant) are Claimant Trust Beneficiaries.

20. Based on a consolidated balance sheet filed on July 6, 2023, the Claimant Trust has about $250 million in assets (of which an estimated $180 million is cash) and, at that time, only about $126 million in remaining non-Dondero-related Class 8 and 9 claims.[43]

**Highland Claimant Trust**
**Summarized Consolidated Balance Sheet [(1)]**
**As of May 31, 2023**
**The accompanying notes are integral to understanding this balance sheet**
**(Estimated and unaudited, $ in millions)**

| | Balance per books | adjustments (see notes) | Adjusted balance |
|---|---|---|---|
| **Assets** | | | |
| Cash and equivalents | $ 13 | $ - | $ 13 |
| Disputed claims reserve [(2)] | 12 | - | 12 |
| Other restricted cash | 12 | - | 12 |
| Investments [(3)] | 118 | (12) [(6)] | 106 |
| Notes receivable, net [(4)] | 86 | (83) [(4)] | 3 |
| Other assets | 6 | - | 6 |
| **Total assets** | **$ 247** | **$ (95)** | **$ 152** |
| **Liabilities** | | | |
| Secured and other debt | $ - | $ - | $ - |
| Distribution payable [(2)] | 12 | - | 12 |
| Additional indemnification reserves | - | 90 [(5)] | 90 |
| Other liabilities | 15 | 13 [(5)] | 28 |
| **Total liabilities [(5)]** | **$ 27** | **$ 103** | **$ 130** |
| **Book/adjusted book equity (see accompanying notes) [(5)]** | **220** | **(198)** | **22** |
| **Total liabilities and book/adjusted book equity** | **$ 247** | **$ (95)** | **$ 152** |
| **Supplemental Info: [(7)]** | | | |
| Sum of remaining allowed Class 8 Trust Beneficiaries, excluding interest | $ 27 | | |
| Sum of remaining allowed Class 9 Trust Beneficiaries, excluding interest | 99 | | |
| Sum of face amount of pending Class 8/9 potential Trust Beneficiaries, excluding interest | 13 | | |
| Sub-total | $ 139 | | |

21. Since that time, the Post-Confirmation Reports for the period ending September 30, 2023 reflect that an additional $14,361,077 has been paid to GUCs, with $6,805,592 being paid to GUC Classes 6 and 7, leaving a balance of $119,222,451 remaining in Class 8 and 9 claims (subtracting the total "Paid Cumulative" from the "Total Allowed" amounts as reflected on page 7 of those Reports and adding in the amounts paid to GUC Classes 6 and 7).[44] The Reports do not disclose

[43] Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust, Dkt. 3872 at Ex. A. The Claimant Trust's asset balance is exclusive of any recovery on litigation against dozens of defendants by Marc S. Kirschner, the Trustee of the Litigation Sub-Trust (the "Kirschner Action").

[44] *See* Amended Post-Confirmation Reports of Reorganized Debtor and of the Highland Claimant Trust, Dkts. 3955 and 3956.

the current cash position of the Claimant Trust. Cash may have increased or decreased. But in the worst case, adjusting the cash from amounts shown in the May 31, 2023 Balance Sheet by the amount paid out to Classes 8 and 9, the Trust still has cash of at least $165 million, and remaining Class 8 and 9 claims that now total less than $120 million.

22. Notably, the Claimant Trust's balance sheet assets do not include a fully cash-funded at least $35 million indemnity account (reportedly now $50 million) that presumably may be used to pay creditors in the event it is not consumed by the estate's professionals.[45] In addition, to reduce the Claimant Trust's book value, Highland purports to add "non-book" adjustments to the balance sheet. One such adjustment gives zero asset value to certain notes payable by Mr. Dondero and his alleged affiliates.[46] However, $70 million of those notes are now fully bonded by cash deposited in the registry of the District Court.[47]

23. Another accounting "adjustment" creates a $90 million "additional indemnification reserve," on top of the at least $35 (or $50) million cash indemnity reserve, with no explanation.[48] Indeed, were it not for the at least $125-140 million in inappropriate indemnity reserves—which is $100 million more than Debtor originally proposed it would need in insurance coverage when it sought approval of the Indemnity Subtrust—Highland's creditors could have been paid, the estate closed, and the residual estate returned to equity months if not years ago.

[45] *See* Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust, Dkt. 3872 at Ex. A, Note 1. The information provided does not make it clear whether the $90 million reserve is reduced by the $15 million increase in the Indemnity Sub-Trust.

[46] *Id.* at Ex. A.

[47] *See* Order Granting Joint Agreed Emergency Motion for Order Approving Stipulation for the Bonding of Judgments and Stays of Executions Pending Appeals, Dkt. 149; Notices of Bonding, Case No. 3:21-cv-00881-X (N.D. Tex.), Dkts. 151, 152, 160-162 [App. 039-078].

[48] *See* Notice of Filing of the Current Balance Sheet of the Highland Claimant Trust, Dkt. 3872 at Ex. A.

24. As the Post-Confirmation Reports reveal, all of the administrative claims, secured claims, and priority claims have been paid in full.[49] Thus, as a practical matter, the Claimant Trust could pay the Class 8 and 9 claims in full with interest, Mr. Seery could file the GUC Certification,[50] and Movant (along with other Holders of Class A, B, and C of limited partnership interests) would become a fully vested Claimant Trust Beneficiary under the terms of the CTA.[51] All of these steps could be, and indeed, should have been, completed without any interference from the Indemnity Subtrust Administrator.

25. The failure to pay creditors has had a material impact on the Movant and other Holders of Class A, B, and C of limited partnership interests. In the first nine months of 2023, Debtor and the Claimant Trust accumulated $48,447,234 in (undisclosed) expenses,[52] for an average of $5.4 million per month. Even after the voluntary stay of the *Kirschner* litigation, which appears to have been a significant cost-driver, the Debtor and the Claimant Trust have continued to accumulate $4.6 million per month in expenses. While monies to pay Class 8 and Class 9 Claims remain unimpaired, cash to pay the former equity holders continues to disappear as undisclosed expenses.

26. As explained below in greater detail, the proposed Delaware Complaint sets forth claims that are both plausible under federal pleading standards[53] and "colorable" under this Court's articulated gatekeeping standard.

---

[49] *See* Amended Post-Confirmation Reports of Reorganized Debtor and of the Highland Claimant Trust, Dkts. 3955 and 3956.

[50] *See* CTA, Dkt. 3521-5 at §§ 1.1(aa), 5.1(c).

[51] *See id.*, §§ 1.1(h), 5.1.

[52] *See* Dkt. 3756, 3757, 3888, 3889, 3955, and 3956 (showing Claimant Trust expenditures of $60,421,756 and Debtor expenditures of $37,430,919 in Q1 – Q3 2023, then subtracting out $29,405,441 in distributions to creditors and $20 million presumably added to the Indemnity Sub-Trust).

[53] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (holding a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face" in order to survive a motion to dismiss pursuant to Rule 12(b)(6)).

## III. ARGUMENT

### A. The Proposed Complaint Alleges a Colorable Claim That Mr. Seery Should be Removed as Claimant Trustee

27. According to this Court, to state a "colorable" claim under the gatekeeping provision of the Plan (the "Gatekeeper Provision"), a moving party must do more than allege a "plausible" claim for relief—the standard applied by federal district courts in deciding whether a claim can proceed under Federal Rule of Civil Procedure 12(b)(6).[54] Instead, a movant in this Court must survive an "***additional level of review***."[55] Specifically, the movant bears the "burden of making a prima facie case that its proposed claims are ***not without foundation***, are ***not without merit***, and are ***not being pursued for any improper purpose such as harassment***."[56] And in deciding whether the movant has met this prima facie burden, the Court "may, and should, take into consideration its ***knowledge*** of the ***bankruptcy proceedings*** and ***the parties*** and any additional evidence presented at the hearing on the Motion for Leave."[57] The Court termed this new standard the "Gatekeeper Colorability Test."[58]

28. As set forth below, Movant's Delaware complaint meets the Court's Gatekeeper Colorability Test because it sets forth a *prima facie* case under Delaware law that Mr. Seery should

---

[54] Movant has objected and continues to object to the Court's ruling with respect to the standard that should be applied under the Gatekeeper Provision. Movant has appealed the Court's rulings regarding this standard. *See* Hunter Mountain Investment Trust's Second Notice of Appeal, Dkt. 3945. No admission is made by or on behalf of Movant in connection with this Motion regarding the "colorability" standard applied by the Court or the Court's related substantive and procedural rulings. Movant expressly reserves all of Movant's substantive and procedural rights and waives none of the same in connection with this Motion, the proposed Complaint, or otherwise. Movant believes the proper standard is set forth in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007) (holding a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face" in order to survive a motion to dismiss pursuant to Rule 12(b)(6)), and that this standard is also satisfied by this Motion.

[55] Memorandum Opinion, Dkt. 3903 at p. 91 (emphasis in original).

[56] *Id.* (emphases in original).

[57] *Id.* (emphases in original).

[58] Movant disagrees with this new test and is challenging this test on appeal at this time. Nothing in this current Motion should be deemed an admission or an acknowledgment of the propriety of this test. *See* Dkt. 3915.

be removed as Claimant Trustee. Moreover, Movant's Delaware complaint is not brought for any improper purpose but, rather, to protect Movant's sizeable residual interest in the Claimant Trust.

**1) Movant's Delaware Complaint Sets Forth a *Prima Facie* Case for Removal of Mr. Seery as Claimant Trustee**

29. Under Delaware law, the Court of Chancery may remove the trustee of a Delaware statutory trust "on [its] own initiative or on petition of a trustor, another officeholder, or beneficiary" in any of five circumstances:

a) *The officeholder has committed a breach of trust*; or

b) *The continued service of the officeholder substantially impairs the administration of the trust*; or

c) The court, having due regard for the expressed intention of the trustor and the best interests of the beneficiaries, determines that notwithstanding the absence of a breach of trust, there exists:

i. A substantial change in circumstances;

ii. *Unfitness, unwillingness or inability of the officeholder to administer the trust or perform its duties properly; or*

iii. *Hostility between the officeholder and beneficiaries or other officeholders that threatens the efficient administration of the trust*.

Del. Code Ann. tit. 12, § 3327 (emphases added). As set forth below in greater detail, Movant is an intended beneficiary of the Claimant Trust and, as such, Movant is entitled to ask a Delaware court to remove Mr. Seery as Claimant Trustee because he has engaged in multiple acts warranting his removal under Delaware statute. Accordingly, Movant's complaint sets forth a *prima facie* case, and the Court should grant its Motion and allow the case to proceed.

**2) Movant Has Standing to Seek Mr. Seery's Removal**

30. At the outset, in reality, Movant should be recognized as being "in the money" and a vested beneficiary with the associated standing to pursue the proposed Delaware complaint. In any event, however, Movant also has standing to seek removal of Mr. Seery because Movant is an intended (albeit contingent) beneficiary of the Claimant Trust under the CTA. *All* beneficiaries,

including contingent beneficiaries, have standing under Delaware law to seek to remove a trustee. To argue otherwise – that only "vested" beneficiaries under the CTA may bring such an action – is to impermissibly limit the statute.

31. The Delaware Code does not define the term "beneficiary," but Delaware courts follow the RESTATEMENT (THIRD) OF TRUSTS,[59] which defines beneficiaries to include contingent beneficiaries:

> *Persons who are beneficiaries: in general.* The "beneficiaries" of a trust are the persons or classes of persons, or the successors in interest of persons or class members, upon whom the settlor manifested an intention to confer beneficial interests (vested **or contingent**) under the trust, plus persons who hold powers of appointment (special or general) or have reversionary interests by operation of law. Also included are persons who have succeeded to interests of beneficiaries by assignment, inheritance, or otherwise.[60]

32. Further, the RESTATEMENT expressly contemplates that contingent beneficiaries may file suit to enforce a private trust:

> *"Beneficiaries."* A suit to enforce a private trust ordinarily (see Reporter's Note) may be maintained by any beneficiary whose rights are or may be adversely affected by the matter(s) at issue. The beneficiaries of a trust include any person who holds a beneficial interest, present or future, vested or contingent.[61]

And "enforcement" extends to "enforcement proceedings in a more comprehensive sense, such as petitions for removal of a trustee . . . even though no breach-of-trust issue is involved."[62]

33. Delaware courts routinely hold that, in interpreting undefined statutory terms, courts must give those terms a "reasonable and sensible meaning in light of their intent and purpose." *Angstadt v. Red Clay Consol. Sch. Dist.*, 4 A.3d 382, 390 (Del. 2010). In ascertaining the "reasonable

[59] *See, e.g.*, *In re Tr. Under Will of Flint for the Benefit of Shadek*, 118 A.3d 182, 195 (Del. Ch. 2015); *Tigani v. Tigani*, No. CV 2017-0786-KSJM, 2021 WL 1197576, at *14 (Del. Ch. Mar. 30, 2021), *aff'd,* 271 A.3d 741 (Del. 2022).

[60] RESTATEMENT (THIRD) OF TRUSTS, § 48 cmt. a (2003) (emphasis added).

[61] RESTATEMENT (THIRD) OF TRUSTS, § 94 cmt. b (2012).

[62] *Id.*, § 94, Reporter's Notes, cmt. a(1).

and sensible meaning" of terms, Delaware courts rely on dictionaries as a source of interpretation. *See id.*

34. Black's Law Dictionary defines "beneficiary" as, among other things, "[s]omeone who is designated to receive the advantages from an action or change . . . or to receive something as a result of a legal arrangement or instrument" and includes both "contingent benficiar[ies]" and "direct benficiar[ies]" within the definition without any qualification regarding their rights.[63] By contrast, Black's distinguishes an "incidental beneficiary" as a "third-party beneficiary, who, though benefiting indirectly, is not intended to benefit from a contract and thus does not acquire rights under the contract."[64] Nothing in the CTA indicates that Movants are merely "incidental beneficiaries."

35. In light of the RESTATEMENT and the definition in Black's Law Dictionary, it is reasonable and sensible to interpret the word "beneficiary" used in Section 3327 of the Delaware statute to include contingent beneficiaries. Rules of statutory interpretation support this conclusion. As the Delaware Supreme Court has explained, a court "may not engraft upon a statute language which has been clearly excluded therefrom by the Legislature." *Guiricich v. Emtrol Corp.*, 449 A.2d 232, 238 (Del. 1982) (citing *Wilmington Trust Co. v. Barry*, 338 A.2d 575, 578 (Del Super. 1975), *aff'd*, 359 A.2d 664 (Del. 1976)). If the Delaware Legislature had intended that only "vested" beneficiaries could bring an action to remove a trustee, as opposed to any beneficiary (whether residual or contingent), it would have so specified. In this case, the relevant statute—Del. Code Ann. tit. 12, § 3327—uses the term "beneficiary" without defining or limiting it. Accordingly, a court may not do what the Delaware Legislature refused to do by engrafting the term "vested" into the statute to qualify the term "beneficiary."

[63] *Black's Law Dictionary* (11th ed. 2019).

[64] *Id.*

36. Delaware courts refuse to read statutory language restrictively to exclude certain classes of beneficiaries. *See Estate of Tigani*, No. CV 7339-ML, 2016 WL 593169, at *14 (Del. Ch. Feb. 12, 2016) (holding that the "statute's use of the general term beneficiary, without any language restricting the class of beneficiary to whom it refers, fairly encompasses a vested beneficiary subject to divestiture"); *Estate of Necastro*, No. C.A. 10,538, 1991 WL 29958, at *1 (Del. Ch. Feb. 28, 1991) (rejecting a "restrictive reading" of "beneficiary" under 12 Del.C. § 2302(d) and instead holding that "Exceptants [whom the parties characterized as "contingent beneficiaries"] have standing . . . based upon their indirect interest in a share of the estate through their status as beneficiaries of a testamentary trust").

37. In short, neither the applicable Delaware statute nor Delaware case law limits the term "beneficiary" to "vested" beneficiaries to the exclusion of contingent ones.

38. The Claimant Trustee will no doubt argue that the language of the CTA purportedly strips Movant of its standing to seek removal of the Trustee. In particular, the CTA states that holders of Contingent Trust Interests (including Movant) "shall not have any rights under this Agreement, unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all GUC Beneficiaries have been paid indefeasibly in full, including, to the extent applicable, all accrued and unpaid post-petition interest consistent with the Plan and all Disputed Claims have been resolved (the 'GUC Payment Certification')."[65] The Agreement further states that "Equity Holders will only be deemed 'Beneficiaries' under this Agreement upon the filing of a GUC Payment Certification with the Bankruptcy Court."[66] But Delaware law makes clear that a trust agreement, however worded, may

[65] CTA, Dkt. 3521-5 at § 5.1(c).
[66] *Id.*

not strip the trustee's duty of good faith and fair dealing.[67] And in this case, observance of that duty precludes any argument that the language of the CTA undercuts Movant's standing.

39. Under Delaware law, unless the governing trust agreement says otherwise, the trustee of a statutory trust has those duties set forth in common law, including the duties of loyalty, good faith, and due care. *See* Del. Code Ann. tit. 12, § 3809; *Rende v. Rende*, No. 2021-0734-SEM, 2023 WL 2180572, at *11 (Del. Ch. Feb. 23, 2023). And while a governing trust agreement may expressly disclaim these duties (although this one does not), Delaware law prohibits the elimination of the duty of good faith and fair dealing. *In re National Collegiate Student Loan Trusts Litigation*, 251 A.3d 116, 185-86 (Del. Ch. 2020) ("While parties may agree to waive default fiduciary duties, the DSTA forbids parties from eliminating the "implied contractual covenant of good faith and fair dealing.") (citing Del. Code. Ann. tit. 12, § 3806(c)).

40. The duty of good faith and fair dealing is particularly important here, where Movant's status as a "beneficiary" under the CTA is purportedly dependent upon Mr. Seery's discretion to file a GUC Certification declaring Movant's status as such. "Stated in its most general terms, the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal quotations omitted). "Thus, parties are liable for breaching the covenant when their conduct frustrates the overarching purpose of the contract by taking advantage of their position to control implementation of the agreement's terms." *Id.* (internal quotations omitted).

41. Given the purpose of the covenant, "it is possible to rest a claim of breach of the implied covenant of good faith and fair dealing on the assertion that defendants have deliberately

---

[67] The CTA is governed by Delaware law. *Id.* at § 11.10.

prevented the occurrence of conditions precedent." *Injective Labs Inc. v. Wang*, No. CV 22-943-WCB, 2023 WL 3318477, at *7 (D. Del. May 9, 2023) (quoting *Benerofe v. Cha*, No. 14614, 1998WL 83081, at *6 (Del. Ch. Feb. 20, 1998)). *See also Snow Phipps Grp., LLC v. Kcake Acquisition, Inc.*, No. CV 2020-0282-KSJM, 2021 WL 1714202, at *53 (Del. Ch. Apr. 30, 2021) (noting the duty of good faith and fair dealing "requires some cooperation ... either by refraining from conduct that will prevent or hinder the occurrence of that condition or by taking affirmative steps to cause its occurrence") (internal quotes omitted).

42. Mr. Seery's failure and refusal to pay the Class 8 and 9 creditors, in an attempt to prevent the Contingent Interest Holders' interests from vesting under the terms of the CTA, falls squarely within the scope of the duty of good faith and fair dealing. In *Injective Labs Inc. v. Wang*, the defendant asserted a counterclaim for the breach of the implied duty of good faith and fair dealing. The defendant argued that plaintiff breached the implied duty by "sending a belated request that [defendant] satisfy a condition precedent, knowing that it was effectively impossible for him to do so." *Injective Labs Inc. v. Wang*, 2023 WL 3318477, at *7. The court rejected plaintiff's motion to dismiss the counterclaim, holding "[t]hat allegation, and in particular the allegation that [plaintiff] knew that [defendant] would be unable to satisfy the condition precedent . . . is directed to the type of conduct that typically falls within the scope of the implied duty of good faith and fair dealing." *Id.*

43. In another case, the Court of Appeals for the Seventh Circuit affirmed summary judgment against a defendant because the defendant "did not exercise good faith under the contract by attempting to hinder the occurrence of the condition precedent in the contract." *Unit Trainship, Inc. v. Soo Line R. Co.*, 905 F.2d 160, 162-63 (7th Cir. 1990). There, the parties entered a contract for the running of a unit-train between Chicago and Seattle. *Id.* at 161. Because the running of the unit-train required the approval of the Interstate Commerce Commission ("ICC"), the parties filed a joint petition with the ICC seeking approval. *Id.* Thereafter, one party moved to withdraw from the ICC

proceeding and failed to participate in the joint petition, thereby stymieing the condition precedent to the performance of the contract. *Id.* The Seventh Circuit, applying Illinois law, which is similar in this regard to Delaware law, held that "where a party's obligation is subject to a condition precedent, a duty of good faith and fair dealing is imposed upon that party to cooperate and to not hinder the occurrence of the condition." *Id.* at 163.

44. These cases inform the Claimant Trustee's contractual duties under Delaware law. In *Injective Labs Inc.*, the plaintiff/counterclaim defendant prevented the performance of a condition precedent, which violated the duty of good faith and fair dealing. 2023 WL 3318477, at *7. In *Unit Trainship*, one of the parties to the relevant contract prevented the occurrence of a condition precedent, which violated the duty of good faith and fair dealing. 905 F.2d at 163. Similarly, here the Claimant Trustee is deliberately refusing to pay the unsecured creditors in Classes 8 and 9 with interest, thereby breaching his duty to pay Classes 10 and 11. That violates the Trustee's duty of good faith and fair dealing and fatally undermines any argument that Movant lacks standing to seek removal of the Trustee.

45. As other RESTATEMENT jurisdictions have recognized, Mr. Seery's conduct warrants treating those classes as fully vested. "[V]esting cannot be postponed by unreasonable delay in distributing an estate and [] when there is such delay, contingent interests vest at the time distribution ***should*** have been made." *Estate of Cornell v. Johnson*, 367 P.3d 173, 178 (Idaho 2016) (emphasis added) (discussed in RESTATEMENT (SECOND) OF TRUSTS, § 198 (1959)); *see also Edwards v. Gillis*, 146 Cal.Rptr.3d 256, 263 (Cal.App. 4 Dist., 2012) ("when there is [unreasonable] delay contingent interests vest at the time distribution should have been made."). As set forth above, the Claimant Trust had sufficient assets to pay unsecured creditors in Classes 8 and 9 in full with interest at least as early

as July 2023, and in all probability as early as September 2022.[68] And the CTA requires Mr. Seery as Claimant Trustee to "make timely distributions and not unduly prolong the duration of the Claimant Trust."[69] Had Mr. Seery fulfilled that mandate, he could and should have distributed remaining funds to Classes 8 and 9 by July 2023, filed the GUC Certification with the Court, and begun distributing remaining assets to Classes 10 and 11. In short, Movant's interests were properly vested under the CTA many months ago, and Delaware law therefore treats Movant as a Claimant Trust Beneficiary, regardless of the language of the CTA.

46. Indeed, any argument that the CTA precludes Movant from vindicating its rights (including by seeking removal of the Trustee) only underscores why Delaware law is crafted the way it is. Were it not for the duty of good faith and fair dealing imposed by Delaware law, Mr. Seery arguably could increase the funds set aside for indemnification continually, hold final distributions to Class 8 and Class 9 creditors in abeyance, and refuse to file the GUC Certification based on the theoretical possibility that he might in the future need to draw upon more than the originally contemplated indemnity reserve of $25 million to pay his own legal expenses (all while drawing a salary of $150,000 per month). And it appears that, for now, Mr. Seery is content to do just that. This is exactly the kind of conflict that Section 3327 of the Delaware Code was designed to prevent, and the duty of good faith and fair dealing in Delaware precludes the Claimant Trustee from relying on the language of the CTA to prevent the Delaware courts from remedying the conflict. Under these circumstances, Movant has standing to proceed under Delaware law.

---

[68] Two of the estate's major private equity positions sold in May 2022, and the remaining largest positions sold in September 2022. The May 2022 assets were Cornerstone Healthcare Group [*see* App. 013-017] and MGM [*see* App. 009-012]. The September 2022 positions were CCS Medical [*see* App. 018-022] and Trussway [*see* App. 023-025].

[69] CTA, Dkt. 3521-5 at § 3.2(a).

### 3) Delaware Law Mandates Movant's Complaint Proceed in Delaware Court

47. Under Delaware law, beneficial owners of a trust are entitled to seek redress in the courts of Delaware, regardless of the language of the relevant trust agreement: "Except by agreeing to arbitrate any arbitrable matter in a specified jurisdiction or in the State, ***a beneficial owner who is not a trustee may not waive its right to maintain a legal action or proceeding in the courts of the State with respect to matters relating to the organization or internal affairs of a statutory trust***." Del. Code Ann. tit. 12, § 3804(e) (emphasis added). This is because the removal of a trustee is a "matter[] relating to the organization or internal affairs of a statutory trust." *United Bhd. of Carpenters Pension Plan v. Fellner*, C.A. No. 9475-VCN, 2015 WL 894810, at *2 n. 13 (Del. Ch. Feb. 26, 2015). Where a company's internal affairs are involved, Delaware law disregards the forum selection clause in the parties' trust agreement. *Id.*

48. Because Movant's Delaware complaint seeks relief relating to the internal affairs of the Claimant Trust, Movant is entitled to have its dispute decided by the courts of Delaware, regardless of any contrary choice of forum clause in the CTA.[70] The Court should permit Movant to file its Delaware complaint in the Delaware Chancery Court.

### 4) There Are Multiple Grounds for Seery's Removal

49. As set forth in the proposed Delaware Complaint, Mr. Seery's removal as Claimant Trustee is warranted for multiple reasons. Specifically, Mr. Seery has breached his duty of loyalty by failing to pay creditors, failing to file the GUC Certification, and failing to certify that equity holders in Classes 10 and 11 (of which Movant is the largest) are vested under the CTA. Seery has failed to act expeditiously as required under the terms of the CTA,[71] and has failed to maximize the value of the Claimant Trust for the benefit of the Claimant Trust Beneficiaries by filing unnecessary

[70] *See* CTA, Dkt. 3521-5 at § 11.11.

[71] *See, e.g.*, *id.* at §§ 2.2(b), 2.3(b)(i), 3.2(a).

proceedings, including the Kirschner Action, and spending inordinate amounts of cash. Those breaches of duty warrant Mr. Seery's removal under Del. Code Ann. tit. 12, § 3327(1). Further, Mr. Seery's roles as both Claimant Trustee and as Indemnity Subtrust Administrator substantially impairs the administration of the Claimant Trust, warranting his removal under Del. Code Ann. tit. 12, § 3327(2). In addition, Mr. Seery's removal is warranted under Del. Code Ann. tit. 12, § 3327(3)(b) and (c) because he is unwilling to perform his duties as Claimant Trustee, and has manifested a personal hostility toward, and conflict with, Movant and the holders of Contingent Trust Interests.

**a) Mr. Seery Has Breached His Duty of Loyalty**

50. The facts set forth above demonstrate without doubt that Mr. Seery has breached his duty of loyalty in administering the Claimant Trust. A trustee breaches the duty of loyalty by acting in his own self-interest "[i]nstead of evaluating what was in the best interests of [a] [t]rust." *Paradee v. Paradee*, No. 4988-VCL, 2010 WL 3959604, at *10 (Del. Ch. Oct. 5, 2010). "Self-interested transactions involving a fiduciary or one in a confidential relationship with another are presumptively fraudulent and voidable in equity. If the transaction is challenged, the burden of persuasion to justify upholding the transaction is on the fiduciary." *Hardy v. Hardy*, No. CIV.A. 7531-VCP, 2014 WL 3736331 at *8 (Del. Ch. July 29, 2014) (internal quotations omitted). Significantly, and importantly in this case, an inequitable action taken "does not become permissible simply because it is legally possible" within the letter of the law or the language of an agreement. *Coster v. UIP Companies, Inc.*, 255 A.3d 952, 953 (Del. 2021) (citing *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971)). Self-dealing amounts to a breach of duty of loyalty. *See Taglialatela v. Galvin*, No. 5841-MA, 2015 WL 757880, at *4 (Del. Ch. Feb. 23, 2015); *Walls v. Peck*, Civ. A. No. 497, 1979 WL 26236, at *4 (Del. Ch. Oct. 24, 1979); GEORGE GLEASON BOGERT, THE LAW OF TRUSTS AND TRUSTEES, § 543 (3d ed. 2019) ("The trustee must administer the trust with complete loyalty to the

interests of the beneficiary, without consideration of the personal interests of the trustee or the interests of third persons.").

51. Indeed "[u]nlike corporate law, '[u]nder trust law, self-dealing on the part of a trustee is virtually prohibited.'" *Stegemeier v. Magness*, 728 A.2d 557, 563 (Del. 1999) (citing *Oberly v. Kirby*, 592 A.2d 445, 466 (Del. 1991). As a result, the interested trustee bears the burden of persuasion to justify upholding the transaction. *Id.*

52. In this case, as the Delaware Complaint alleges, Mr. Seery has breached his duty of loyalty. That breach was inevitable given the manner in which Mr. Seery and Highland constructed the Claimant Trust and the Indemnity Subtrust. As set forth above, Mr. Seery is the Trustee of the Claimant Trust with an absolute duty to manage and administer that trust for the benefit of the Trust's beneficiaries. But Mr. Seery is also the Indemnity Trust Administrator charged with funding and spending an indemnity reserve for the benefit of Indemnified Parties, including himself. His duties as Claimant Trustee and Indemnity Subtrustee are in hopeless conflict as a result of this arrangement.

53. As now apparent, that conflict has manifested to the detriment of the intended beneficiaries of the Claimant Trust, including Movant. Essentially, Mr. Seery is seeking to hold the assets of the Claimant Trust hostage by reserving an increasing and inexplicably gigantic indemnity reserve to benefit the Indemnified Parties, including himself.

54. But consider the nature of claims potentially triggering indemnification, such as the insider trading claims against Mr. Seery, Muck and Jessop.[72] If the potentially indemnified parties prevail, there can be no judgment to indemnify. If the potentially indemnified parties lose, the nature of the claim is such that there would be no indemnity owed – so how could $125 million in

[72] *See* Hunter Mountain Investment Trust's Emergency Motion for Leave to File Verified Adversary Proceeding, Dkt. 3816.

indemnification reserves be needed? That large indemnity reserve is antithetical to the interests of the intended beneficiaries of the Claimant Trust.

55. Moreover, Mr. Seery's conduct in contravention of his duty of loyalty to beneficiaries of the Claimant Trust contravenes the language and intent of the Plan itself. The Plan does not require holders of Class 10 and 11 claims (or parties related thereto) to grant releases of liability to the Claimant Trustee or the Indemnified Parties, but by refusing to pay out Classes 8 and 9 and refusing to issue the required GUC Certification in favor of funding up to $125 million in indemnity reserves, that is functionally what Mr. Seery is seeking to leverage Classes 10 and 11 (and even other non-parties) to provide.[73]

56. Forcing Classes 10 and 11 to bear the cost of Mr. Seery's indemnification reserve also goes beyond what the CTA allows. Paragraph 8.2 of that Agreement expressly allows parties to sue Mr. Seery and other indemnified parties for actions that constitute fraud, willful misconduct, or gross negligence, provided that they seek Bankruptcy Court approval to proceed on such claims. In other words, not even the CTA contemplates that Classes 10 and 11 would grant full, general releases to the Indemnified Parties, much less fund their defense for cognizable claims under the Agreement. By trying to insulate himself from ***all*** claims as a condition of performing his mandatory duties under the CTA, Mr. Seery is putting his personal self-interest ahead of the beneficiaries of the Trust.

57. There is ample case law holding that a trustee may not make a release (or its equivalent) a condition of performing his duties to a trust. Indeed, as the Delaware Chancery Court has explained, "[a]lthough the practice of demanding a release is widespread, a trustee who insists on a release as the price [of] doing what is in the best interests of the trust—and what the trustee's fiduciary duties therefore require—engages in self-interested conduct by extracting a personal benefit

[73] Highland Parties' Objection to Motion to Stay and Motion to Compel Mediation, Dkt. 3796, at fn. 4.

at the expense of the trust and its beneficiaries." *J.P. Morgan Tr. Co. of Delaware, Tr. of Fisher 2006 Tr. v. Fisher*, No. CV 12894-VCL, 2021 WL 2407858, at *22 n.9 (Del. Ch. June 14, 2021), *judgment entered sub nom* (noting that "[t]he trustee's insistence on a release may also fuel the beneficiaries' concern about improper conduct, as it did in this case").

58. Similarly, the Southern District of New York has held that a fiduciary's refusal to distribute assets without getting a release can constitute a breach of fiduciary duty:

> Defendants also argue that the demand for a release was not a breach of fiduciary duty because there is no merit to KeyBank's underlying claims. I have held for the reasons stated above that some of KeyBank's claims have been properly pleaded and survive a motion to dismiss. Even if that were not the case, however, the First Amended Complaint properly alleges that the refusal to deliver stock to which KeyBank was entitled – based on the defendants' self-interested insistence that they be released from KeyBank's claims – was an abuse of defendants' control of the buyer that had nothing to do with the buyer's legitimate business interests and that instead served only the self-interests of the defendants themselves.

*Keybank Nat'l Ass'n v. Franklin Advisers, Inc.*, 616 B.R. 14, 44 (Bankr. S.D.N.Y. 2020).

59. In yet another similar case, the Southern District of New York held that a trustee breached its fiduciary duties by insisting on indemnification before carrying out its contractual obligations. In *FMS Bonds, Inc. v. Bank of New York Mellon*, the plaintiffs, holders of industrial revenue bonds, filed suit for breach of contract and breach of fiduciary duty against the indenture trustee responsible for servicing the bonds. No. 15 CIV. 9375 (ER), 2016 WL 4059155, at *1 (S.D.N.Y. July 28, 2016). The plaintiffs alleged the trustee failed to file a timely proof of claim in the bankruptcy proceedings on behalf of the entities obligated to make payments under the bonds. *Id.* at 7. The trustee offered to file a late proof of claim, but only if the plaintiffs agreed to "further indemnification protection" for the trustee. *Id.* The plaintiffs argued that "where the Trustee's 'gross negligence' prevented bondholders from collecting on the Bonds, the Trustee's inaction and insistence on further indemnification in order to rectify that gross negligence was a breach of the Trustee's fiduciary duties." *Id.* at 13. The trustee moved to dismiss plaintiffs' breach of fiduciary duty

claim, and the court denied the motion, stating that the plaintiffs' allegations "that the Trustee . . . breached its fiduciary duties by insisting on indemnification before taking further action" properly pleaded a breach of fiduciary duty claim. *Id.* at 14.

60. The reasoning of these cases applies with equal force here. Mr. Seery is obligated under the CTA to administer the Claimant Trust expeditiously, with an aim toward maximizing value for the Trust's intended beneficiaries, and to distribute the Claimant Trust's assets to those beneficiaries within a reasonable time. Instead of doing so, Mr. Seery is increasing the indemnity reserve so he can indemnify himself and others against future, unidentified lawsuits, potentially in perpetuity. In other words, like the trustees in *Fisher*, *Keybank National Association*, and *FMS Bonds*, Mr. Seery is refusing to comply with his obligations under the relevant trust agreement to extract some benefit for himself. That is a breach of the duty of loyalty, and that is a sufficient basis for Movant to seek Mr. Seery's removal under Delaware law.

**b) Mr. Seery's Continued Service Substantially Impairs the Administration of the Trust**

61. Mr. Seery's dual roles as Claimant Trustee and Indemnity Subtrust Administrator create an irreconcilable conflict of interest that substantially impairs the administration of the trust. As Claimant Trustee, Mr. Seery has duties to the Claimant Trust Beneficiaries to timely pay the remaining Class 8 and 9 claims, and file the GUC Certification. However, Mr. Seery, as an Indemnified Party as well as Indemnity Subtrust Administrator, instead is using the assets of the Claimant Trust to fund a $35-50 million cash reserve to the Indemnity Subtrust and create an additional $90 million "indemnity reserve." In other words, Mr. Seery has chosen to pursue creation of an "indemnity wall" rather than perform his duties as Claimant Trustee. Under these circumstances, Mr. Seery's continued service as Claimant Trustee while he also serves as Indemnity Subtrust Administrator impairs the administration of the Claimant Trust, warranting his removal as Trustee.

c) **Mr. Seery Is Hostile to Movant, the Largest Class 10 Equity Holder**

62. "Removal of a trustee is appropriate where 'there exists . . . hostility between the trustee[] and the beneficiaries that threatens the efficient administration of the trust.'" *Matter of Jeremy Paradise Dynasty Tr.*, No. CV 2021-0354-KSJM, 2021 WL 3625375, at *1 (Del. Ch. Aug. 17, 2021). Where, as here, hostility rises to the point of preventing trust funds from being distributed, removal is appropriate. *See, e.g.*, *Taglialatela v. Galvin*, No. CIV.A. 5841-MA, 2013 WL 2122044, at *3 (Del. Ch. May 14, 2013) ("The ongoing hostility and lack of communication and trust between the Trustee and three of her siblings have prevented the trust funds from being distributed to the six beneficiaries in a reasonable time after the settlor's death. . . . I conclude that it is in the best interest of the beneficiaries here to remove [the Trustee.]").

63. There can be no doubt that Mr. Seery is hostile to Movant and the holders of Class 10 and 11 claims (the holders of Contingent Trust Interests under the CTA). Among other things:

- Mr. Seery has provided testimony on repeated occasions accusing Class 10 and 11 claims holders of "bad faith" and other misconduct;
- Mr. Seery has helped facilitate lawsuits against Class 10 and 11 claims holders, including the *Kirschner* Action;
- Mr. Seery has helped facilitate the filing of motions against Class 10 and 11 claims holders, including a Motion to Deem the Dondero Parties Vexatious Litigants, currently pending in the United States District Court for the Northern District of Texas;
- Mr. Seery not only has failed to communicate with the Class 10 and 11 claim holders about the estate's finances, but opposes their efforts to obtain such information;[74] and
- Mr. Seery has resisted and opposed relief sought by Class 10 and 11 claims holders, even where that relief was reasonable and designed to benefit the estate as a whole.[75]

---

[74] Memorandum of Law in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Motion to Dismiss Complaint Case No. 23-03038 (N.D. Tex.) at Dkt. 14 [App. 079-109]. The claim holders have requested this information since at least June 2022 (Dkt. 3382), which was approximately $80 million in estate expenses ago. *See* ¶ 25 *supra.*

[75] *See* Highland Capital Management, L.P.'s Memorandum of Law in Support of its Motion to Deem the Dondero Entities Vexatious Litigants and for Related Relief, Case No. 21-00881 (N.D. Tex.), Dkt. 137 [App. 031-038] (wherein the Reorganized Debtor (under the control of the Claimant Trust), defines "Dondero Entities" as including HMIT (Movant herein) at fn. 1; states "The Dondero Entities—all of which are dominated and controlled by or acting in concert with

64. The hostility described herein between Mr. Seery and the beneficiaries of the Claimant Trust is more than sufficient to warrant Mr. Seery's removal. In *Taglialatela*, the court removed the trustee because "ongoing hostility and lack of communication" between the trustee and beneficiaries "prevented the trust funds from being distributed" to the beneficiaries in a reasonable time. 2013 WL 2122044, at *3. Similarly, here, the hostility between Mr. Seery and the beneficiaries is so extreme that Mr. Seery refuses to administer the trust funds without first establishing an indemnity fund with potentially more than one hundred million dollars. That is impermissible under Delaware law.

65. For all the foregoing reasons, Movant's Delaware complaint sets forth a *prima facie* claim for removal of Mr. Seery as Trustee of the Claimant Trust, consistent with the applicable legal standard and also even consistent with this Court's new Gatekeeper Colorability Test.

**B. Movant Seeks to File its Delaware Complaint for a Proper Purpose**

66. Even though Movant does not agree with the Court's Gatekeeper Colorability Test, Movant can readily satisfy the next element of that test because it has a legitimate and proper reason to seek Mr. Seery's removal under Delaware law. As the allegations above make clear, Movant has no other legal avenue available to protect its sizeable interest in the assets of the Claimant Trust.

67. The latest information from the Highland Parties is that the Indemnity Subtrust now holds reportedly $50 million in cash, and that an additional $90 million of the Claimant Trust assets have been held in an indemnity reserve. That means that at least $140 million is currently being held for indemnity—on the sole authority of Mr. Seery in order to protect himself. Contrary to the

---

Dondero, HCMLP's co-founder and ousted Chief Executive Officer—are engaged in a coordinated litigation strategy spanning nearly three years to wear down HCMLP and its management and undermine HCMLP's confirmed Plan." *Id.*, at ¶ 1.; "Thereafter, directly and through the Dondero Entities, he began interfering with the management of the estate, threatening HCMLP employees, challenging nearly every action taken to further HCMLP's reorganization, commencing new (and frivolous) litigation against HCMLP and its management both insider and outside of Bankruptcy Court…" *Id.* at ¶ 4; "Separately, in March 2023, HMIT sought leave to sue HCMLP for allegedly breaching its fiduciary duty and other obligations to HMIT—a prepetition equity holder…. However, HMIT's putative complaint is emblematic of the Dondero Entities' unceasing litigation--…" *Id.* at ¶ 30); Dec. 14, 2020 Depo. Tr. at 37:22-25 [App. 003]; Aug. 4, 2021 Hr'g Tr. At 66:15-18 [App. 007]; June 2, 2023 Depo. Tr. At 113:17-20 [App. 028].

representations in the Subtrust Motion, the amount now held for indemnity is 560% of the original $25 million represented. By comparison, for the pre-effective date period, the entire bankruptcy case only cost approximately $40 million in administrative fees through August 10, 2021.[76]

68. The Plan and Trusts have now turned into nothing more than vehicles for Mr. Seery to leverage to seek to force Class 10 and 11 Equity Holders, and even related party non-equity holders, to deliver releases and other consideration to Mr. Seery and the Indemnified Parties. By his conduct, Mr. Seery seeks the complete exculpation the Fifth Circuit denied him.[77] Under the guise of "indemnity," he holds assets that belong to beneficiaries, vested and contingent, entirely hostage at his sole and unfettered discretion. Meanwhile, Seery continues to collect his monthly compensation of $150,000 per month, plus authorize over $5 million in undisclosed monthly expenses. The present circumstances demonstrate that, if not stopped, Seery will continue to use his position in this manner until the Trusts are exhausted and the Plan is entirely frustrated. The creation of the Trusts and limitless authority of Mr. Seery have resulted in a conflict of interest which cannot be resolved without a court's appropriate, and entirely necessary, equitable resolution.

69. In short, the claims to remove Mr. Seery as Claimant Trustee are not without foundation, not without merit, and not being pursued for an improper purpose. Based on the Delaware law described herein, Movant meets the applicable legal standard, and also even this Court's Gatekeeper Colorability Test, and the Court should allow Movant to proceed with its complaint in Delaware.

## IV. CONCLUSION

For all of the forgoing reasons, this Motion should be granted.

---

[76] September 30, 2023, Post-confirmation Reports, Dkt. Nos. 3955 and 3956, p.2.

[77] *In re Highland Capital Management, L.P.,* 48 F.4th 419, 435 (5th Cir. 2022).

WHEREFORE, Movant requests the entry of an order i) granting this Motion for Leave; ii) determining that the Gatekeeping Provision is satisfied as applied to the Delaware Proceeding; and iii) authorizing Movant to file the Delaware Complaint.

Respectfully submitted,

**STINSON LLP**

*/s/ Deborah Deitsch-Perez*
Deborah Deitsch-Perez
Texas Bar No. 24036072
Michael P. Aigen
Texas Bar No. 24012196
2200 Ross Avenue, Suite 2900
Dallas, Texas 75201
Telephone: (214) 560-2201
Facsimile: (214) 560-2203
Email: deborah.deitschperez@stinson.com
Email: michael.aigen@stinson.com
*Counsel for The Hunter Mountain Investment Trust*

**CERTIFICATE OF CONFERENCE**

The undersigned hereby certifies that on December 21, 2023, counsel for Hunter Mountain Investment Trust conferred with opposing counsel regarding this motion and opposing counsel indicated that the Debtor is opposed.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on January 1, 2024, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/Deborah Deitsch-Perez*
Deborah Deitsch-Perez

Case 3:26-cv-02496-D Document 17-2 Filed 03/08/26 Page 618 of 624 PageID 1619

# Exhibit 17

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |

# HIGHLAND'S MOTION TO STAY CONTESTED MATTER [DKT NO. 4000] OR FOR ALTERNATIVE RELIEF

Highland Capital Management, L.P., the reorganized debtor in this chapter 11 case ("**HCMLP**"), and the Highland Claimant Trust (the "**Claimant Trust**" and, together with HCMLP, "**Highland**"), move the Court for an order staying all proceedings (the "**Stay Motion**") in connection with the *Motion for Leave to File a Delaware Complaint* [Docket No. 4000], filed by Hunter Mountain Investment Trust ("**HMIT**") on January 1, 2024 (the "**Delaware Motion for Leave**").

## I. PRELIMINARY STATEMENT[1]

1. The relief HMIT seeks in the Delaware Motion for Leave depends on the Court's determination of whether HMIT is a beneficiary of the Plan-created Claimant Trust. That issue is already squarely before this Court in Adversary Proceeding No. 23-03038 (the "**Valuation Proceeding**"), in which HMIT is a plaintiff and in which Highland moved to dismiss HMIT's complaint on the basis that HMIT is not entitled to any of the relief it seeks in the complaint because, among other reasons, HMIT is not a beneficiary of the Claimant Trust under the plain terms of the Plan and Claimant Trust Agreement and under applicable law. Briefing on Highland's motion to dismiss the Valuation Proceeding will be complete by January 19, 2024, and oral argument is scheduled for February 14, 2024, just a month from now.

2. As explained more fully below, if this Court rules that HMIT is not a beneficiary of the Claimant Trust as a matter of law—and if HMIT does not prevail on its likely appeal of such a ruling—then the ruling will necessarily dispose of the Delaware Motion for Leave. It would be needlessly duplicative and wasteful of judicial and estate resources to litigate the same threshold issue in the Valuation Proceeding and again in this matter, particularly since the issue will be *sub judice* in the Valuation Proceeding in several weeks. Accordingly, Highland respectfully requests the Court stay all proceedings in connection with the Delaware Motion for Leave until there is a final, non-appealable determination in the Valuation Proceeding regarding whether or not HMIT

[1] This Court has jurisdiction over this case and this contested matter under 28 U.S.C. §§ 157(b) and 1334. Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409 because, among other things, this dispute is a contested matter under the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [Docket No. 1943-1] (the "**Plan**") and involves the enforcement and construction of any right or remedy under the Claimant Trust Agreement or any act or omission of the Claimant Trustee acting in his capacity as such. Claimant Trust Agreement § 11.11. Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Plan.

is a beneficiary of the Claimant Trust under the plain terms of the Plan and Claimant Trust Agreement and under applicable law.[2]

## II. BACKGROUND

3. On December 7, 2022, the Court issued an order [Docket No. 3645] finding that an adversary proceeding was necessary with regard to the relief sought in a motion filed by The Dugaboy Investment Trust ("**Dugaboy**") [Docket No. 3382 and Docket No. 3533] (the "**Valuation Motion**"), which sought a "determination by this Court of the current value of the estate and an accounting of the assets currently held by the Claimant Trust and available for distribution to creditors."[3]

4. On May 10, 2023, Dugaboy and HMIT commenced the Valuation Proceeding by filing a complaint seeking essentially the same relief originally sought in the Valuation Motion. Highland filed a motion to dismiss the Valuation Proceeding on November 22, 2023 [Adv. Proc. 23-03038, Docket No. 13] (the "**Motion to Dismiss Valuation Complaint**"), asserting, among other arguments, that neither Dugaboy nor HMIT are beneficiaries of the Trust and, therefore, are not entitled to any of the relief sought in the Valuation Proceeding. Briefing on the Motion to Dismiss Valuation Complaint will be completed with the filing of Highland's reply in support on January 19, 2024, and oral argument is scheduled for February 14, 2024 [Adv. Proc. 23-03038, Docket No. 19], after which this Court will determine, among other things, whether HMIT is a beneficiary of the Trust.[4]

---

[2] Alternatively, if the Court denies the Stay Motion (a "**Denial Order**"), Highland respectfully requests that the Court simultaneously enter an order granting Highland an extension of time to respond to the Delaware Motion for Leave equal to 21 days from the date any Denial Order is entered.

[3] HMIT filed various pleadings in support of Dugaboy's Valuation Motion. *See* Docket Nos. 3467, 3605, 3606, and 3638.

[4] On March 28, 2023, HMIT filed a separate *Emergency Motion for Leave to File Verified Adversary Proceeding* [Docket No. 3699], which was later supplemented and modified [Docket Nos. 3760, 3815, and 3816] (collectively, the "**First Motion for Leave**"). On August 25, 2023, this Court denied the First Motion for Leave on the ground

5. This Court's ruling on whether HMIT is a Claimant Trust beneficiary in the Valuation Proceeding (and following the inevitably ensuing appeals if HMIT does not prevail in this Court) will necessarily directly affect the viability of the Delaware Motion for Leave.

6. The Delaware Motion for Leave seeks leave under the Plan's gatekeeper provision to file the five-count complaint attached to the Delaware Motion for Leave (the "**Proposed Delaware Complaint**") in the Delaware Court of Chancery, principally to remove James Seery as trustee of the Claimant Trust. HMIT explicitly bases each of the five counts in the Proposed Delaware Complaint on HMIT's allegation that, notwithstanding the plain terms of the Claimant Trust Agreement, it is somehow a beneficiary of the Claimant Trust under Delaware law.[5]

7. But whether HMIT is a Claimant Trust beneficiary under applicable law is already squarely before this Court in the Valuation Proceeding. A determination of HMIT's status vis-à-vis the Claimant Trust is coming, and it is coming undoubtedly sooner than it would come were the Delaware Motion for Leave fully litigated and then appealed. Instead, such a determination in the Valuation Proceeding that HMIT is *not* a beneficiary would necessarily dispose of the Delaware Motion for Leave. This Court should stay all proceedings related to the Delaware Motion for Leave pending a final, non-appealable determination regarding whether or not HMIT is a

(among others) that HMIT lacked standing to assert the claims because it is not a beneficiary under the Claimant Trust. Docket No. 3903; *In re Highland Cap. Mgmt., L.P.*, 2023 Bankr. LEXIS 2104, 2023 WL 5523949 (Bankr. N.D. Tex. Aug. 25, 2023) (the "**Order Denying Leave**"). HMIT has appealed the Order Denying Leave to the United States District Court for the Northern District of Texas (Case No. 3:23-cv-02071-E) along with seven (7) related interlocutory orders entered in connection with the First Motion for Leave. Given the scope of the appeal, it is unclear whether the District Court will address the Bankruptcy Court's determination that HMIT is not a beneficiary under the Claimant Trust.

[5] On January 19, 2024, Highland will file a reply in further support of its motion to dismiss the Valuation Proceeding that will establish conclusively that HMIT—the holder of a mere unvested, contingent interest in the Trust—is not a beneficiary of the Claimant Trust for any purpose under the plain terms of the Plan, the Claimant Trust Agreement, or applicable law.

beneficiary of the Claimant Trust under the plain terms of the Plan, the Claimant Trust Agreement, and applicable law.

### III. RELIEF REQUESTED AND BASIS FOR IT

8. Because this Court (or, ultimately, the Fifth Circuit Court of Appeals) will determine conclusively whether HMIT is a beneficiary of the Claimant Trust, and because such a determination—if adverse to HMIT—will dispose of the Delaware Motion for Leave, Highland respectfully urges the Court to conserve judicial resources and the time, effort, and expense of the litigants and stay all proceedings in connection with the Delaware Motion for Leave until a final, non-appealable order determines HMIT's status vis-à-vis the Claimant Trust.[6]

9. Federal courts, including this Court, have the inherent power to control their own dockets and to stay proceedings when appropriate.[7] The Fifth Circuit Court of Appeals has also recognized the power to stay proceedings as part of the court's power to control its own docket and avoid wasting time and effort.[8] Courts are sensitive to the prejudice a stay would have on the non-moving party, such as "the hardship of being forced to wait for an indefinite and … lengthy time before their causes are heard."[9]

10. Here, HMIT will not be harmed by a stay of its latest (third) motion for leave to sue under the gatekeeper provision. HMIT is litigating, right now, the issue of whether it is a beneficiary of the Claimant Trust in the Valuation Proceeding before this Court. Staying the Delaware Motion for Leave will not force HMIT to wait *any* time for that issue to be litigated and

---

[6] Again, if the Court issues a Denial Order, Highland requests as alternative relief that its deadline to respond to the Delaware Motion for Leave be extended to the date that is 21 days after a Denial Order is entered. *See supra* n.2.

[7] *See, e.g.*, *Clinton v. Jones*, 520 U.S. 681, 706–07 (1997) ("the power to stay proceedings is incidental to the power inherent in every court to control the disposition of causes on its docket with economy of time and effort for itself, for counsel, and for litigants") (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936)).

[8] *See, e.g.*, *United States v. Rainey*, 757 F.3d 234, 241 (5th Cir. 2014).

[9] *Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076 (3d Cir. 1983) (citing *Landis*, 299 U.S. at 254–55).

decided, much less an "indefinite" or even "lengthy" time. Staying the Delaware Motion for Leave will have no effect on HMIT's ability to litigate the issue of its contingent, unvested interest in the Claimant Trust. HMIT will not be harmed by a stay.

11. A stay will, however, significantly conserve resources for this Court and for these parties. There is no good reason to require the parties to brief and argue during the course of (likely) months of litigation an issue that will be determined by this Court in the Valuation Proceeding after argument on February 14, 2024. A final, non-appealable order on the fundamental, threshold issue of whether HMIT is a beneficiary under the Claimant Trust will apply to the Delaware Motion for Leave, either by disposing of that motion because HMIT is not a Claimant Trust beneficiary or by precluding Highland from arguing that HMIT is not a Claimant Trust beneficiary in opposing the Delaware Motion for Leave.[10]

12. A stay of the Delaware Motion for Leave serves common sense, is well within this Court's discretion, and will allow HMIT full reign to litigate and appeal and appeal again the issue of whether it is a beneficiary of the Claimant Trust in the Valuation Proceeding already underway and significantly further along than the nascent Delaware Motion for Leave.

## IV. CONCLUSION

13. For these reasons, the Court should grant this motion and stay all proceedings on the Delaware Motion for Leave until entry of a final, non-appealable order determining whether HMIT is or is not a beneficiary of the Claimant Trust under the plain terms of the Plan, the Claimant Trust Agreement, and applicable law.

---

[10] In such case, Highland reserves, and does not waive, all other defenses available to it.