**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P**.**

§
§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§
vs. §

3:26-CV-02496-D

**Highland Capital Management, L.P., et al**-Appellee
§
§

**[4689] Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026**

**APPELLANT RECORD**

**VOLUME 4**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br><br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02496-D<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4698] on July 24, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689] now files this *Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the Court's June 15, 2026 Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate?

2. Did the Bankruptcy Court err in finding Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate ("Dugaboy's Motion") [Docket No. 4684] was "without merit?"

3. Did the Bankruptcy Court err in denying Dugaboy's Motion without a full record, including that Dugaboy was not allowed to file a reply brief and was not granted a hearing?

4. Did the Bankruptcy Court err in denying Dugaboy the opportunity to file a reply brief to Highland's Opposition to Dugaboy's Motion, including that Dugaboy indicated a date certain for filing a reply?

5. Did the Bankruptcy Court err in finding Dugaboy's Motion was "without merit" without granting a hearing?

6. Did the Bankruptcy Court err by summarily denying Dugaboy's Motion without explaining its reasoning for the denial?

7. Did the Bankruptcy Court err in failing to consider Dugaboy's Notice of Intervening Event?

8. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(2) when it determined that it had not manifestly erred in deciding the evidence of Mark Patrick's misconduct contained in the Cayman Islands proceeding was not "newly discovered" even though that information was not contained in James Dondero's affidavit executed April 16, 2025?

9. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant

to Rule 60(b)(2) when it determined it had not manifestly erred in deciding the Dondero Affidavit indicated information gained in the Cayman Islands proceedings was not "newly discovered" despite the fact the Affidavit lacked any evidence of the restructuring discovered in the Cayman Islands proceedings?

10. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding on the grounds that Rule 60(b)(3) purportedly requires fraud or misconduct to have occurred in the judicial proceeding itself?

11. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding that Highland did not provide misleading or incomplete answers during the discovery of Mark Patrick's misconduct and resulting lack of authority to negotiate the Rule 9019 settlement agreement from Dugaboy leading to the Rule 9019 Order?

12. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding that Dugaboy had not presented a basis for relief under Rule 60(b)(6) that was separate from the grounds presented for Rule 60(b)(2) and Rule 60(b)(3)?

13. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding on the grounds that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain?

14. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of the Bankruptcy Court's special responsibility to monitor arrangements and settlements made between Highland's appointed managers and third parties?

15. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of its manifest error in failing to consider the Bankruptcy Court's role as a court of equity and responsibility to prevent misconduct before it, such as Mark Patrick's use of stolen assets in the 9019 Settlement?

16. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

Vol. 1 000001 – 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4698] filed by Appellant;

000010 2. The Bankruptcy Court's July 10, 2026 *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000012 4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 2 000648 thru Vol. 3 | 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| Vol. 4 001843 | 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 4 001845 thru vol 6 | 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol 7 003634 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003647 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003650 & 003651 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003652 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003663 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003667 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003670 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 7<br>003709 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004733 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol. 8<br>004790 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol 9<br>005207 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005209 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005217 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to |

vol 9

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 04/07/2026 005222 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 04/07/2026 005225 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 04/10/2026 005227 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 04/16/2026 005229 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/17/2026 005233 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol 9 | | | Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| 005330 | 04/17/2026 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| vol. 10 005590 | 04/21/2026 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 005594 | 04/22/2026 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005615 | 04/22/2026 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 005682 | 04/22/2026 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol 10 | | Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| 04/22/2026<br>005692 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 04/24/2026<br>005705 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 04/24/2026<br>005726 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 04/25/2026<br>005727 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/27/2026<br>005729 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 04/28/2026<br>005737 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11 005746 | 04/28/2026 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 005755 | 04/28/2026 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005761 | 04/28/2026 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005767 | 04/29/2026 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held*)Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 005776 | 04/29/2026 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 005783 | 04/29/2026 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| Vol. 10 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| 005785 | 04/29/2026 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005787 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005794 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005796 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005798 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005801 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005884 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005902 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005905 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005907 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund |

Vol. 11

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 05/06/2026 005913 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/06/2026 005920 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/06/2026 005927 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 05/07/2026 005929 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/08/2026 005936 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 05/08/2026 005939 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 05/08/2026 005942 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 05/08/2026 005945 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol. 12 05/08/2026 006100 Thru Vol 21 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and* |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | *Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| 10). 22<br>008156 | 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 008172 | 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 008188 | 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 22 008256 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008293 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008429 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008465 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008472 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008916 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| Vol 25 009554 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| Vol. 26 009868 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| Vol 27 010229 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| Vol. 28 010538 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| Vol. 28<br>05/11/2026<br>010664 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29<br>05/11/2026<br>010736 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol 30<br>05/11/2026<br>011150 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol 31<br>05/11/2026<br>011734 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol 32<br>05/11/2026<br>013203<br>thru Vol 33 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34<br>05/11/2026<br>014888 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol 35 015349 05/11/2026 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 015505 05/11/2026 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 015506 05/12/2026 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 015538 05/12/2026 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 015565 05/12/2026 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 015566 05/15/2026 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36 015569 05/18/2026 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol 37 015996 | 05/18/2026 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 016008 | 05/19/2026 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 016079 | 05/20/2026 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 016082 – 016084 | 05/20/2026 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 016085 | 05/21/2026 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 016134 | 05/21/2026 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 37 | | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| 016135 | 05/23/2026 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 016233 | 05/28/2026 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 016490 | 06/15/2026 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s)4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 016504 | 06/15/2026 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| Vol. 39 016505 | 06/29/2026 | 4684 | (162 pgs; 2 docs) Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Appendix) (Edney, Michael) |
| 016667 | 06/29/2026 | 4685 | (7 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s)4679 Order on motion to reconsider). Appellant Designation due by 07/13/2026. (Attachments: # 1 Exhibit)(Edney, Michael) |
| 016674 | 07/06/2026 | 4687 | (32 pgs; 2 docs) Response opposed to (related document(s): 4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 016706 | 07/09/2026 | 4688 | (23 pgs; 2 docs) Notice of Intent to Reply and Request for Hearing on Its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| vol. 39 | | (Attachments: # 1 Appendix)). (Attachments: # 1 Attachment A) (Edney, Michael) |
| 07/10/2026<br>016729 | 4689 | (2 pgs) Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026. (Okafor, M.) Modified text on 7/10/2026 (mdo). |
| 07/13/2026<br>016731 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |
| 07/24/2026<br>016733 | 4698 | (9 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)(Edney, Michael) |
| 07/28/2026<br>016742 | 4704 | (5 pgs) DISTRICT COURT Notice of docketing notice of appeal. Civil Action Number: 3:26-cv-02496-E. (RE: related document(s)4698 Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court;

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J"); and

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No.

4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: August 7, 2026

Respectfully submitted,

/s/ *Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 12, 2026**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Highland Capital Management, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

## ORDER

On February 9, 2026, Dugaboy Investment Trust ("Dugaboy") filed a motion asking the Court to reconsider the Order (the "Motion") [ECF No. 4513]. On February 10, 2026, Judge Jernigan recused from handling the Motion, and the Motion was reassigned to the undersigned judge. It is hereby

ORDERED that the Motion will be heard on Thursday, March 12, 2026, at 10:00 a.m. by WebEx;[1] it is further

[1] The WebEx attendance information for this hearing will be posted on the Court's website, www.txnb.uscourts.gov, under Judge Odell's "Hearing Dates and Calendar" tab prior to the hearing.

ORDERED that any response to the Motion must be filed by Monday, March 2, 2026, and Dugaboy may file a reply no later than Monday, March 9, 2026; it is further

ORDERED that each party must file with the Court its witness and exhibit list by Monday, March 9, 2026, to the extent the party intends to call any witnesses or introduce any evidence at the Hearing. Further, each party must exchange exhibits listed on their witness and exhibit list with opposing counsel on Monday, March 9, 2026. The parties are encouraged to review Judge Odell's Judge-Specific Guidelines located on the Court's website in preparation for the Hearing.

### End of Order ###

# Exhibit A

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO.: FSD 116 of 2025 (JAJ)

IN THE MATTER OF SECTION 110(3) OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)

---

**FIRST AFFIDAVIT OF MARK ERIC PATRICK**

---

I, **MARK ERIC PATRICK**, of 6716 Glenhurst Drive, Dallas, Texas, United Sates of America, 75254, do say as follows:

1. I am a registered director, president and sole member of DFW Charitable Foundation, a Delaware 501(c)(3) nonprofit corporation (**DFW**). DFW is the majority Participating Shareholder of Charitable DAF Holdco, Ltd. (**Holdco** or **Company**) of which I am both a director and the sole Management Shareholder. The remaining Participating Shareholders of Holdco are Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., Highland Kansas City Foundation, Inc., and HCMLP Charitable Fund (collectively, **Highland Foundations** and also referred to as the **Supporting Organisations**).

2. In addition, I am the sole director of CDH GP Ltd. (**GP**), a Cayman Islands limited company incorporated in or around 7 February 2024 which is the general partner of Charitable DAF Fund LP (**DAF**).

3. This affidavit is provided pursuant to the Orders of Justice Asif KC handed down at the directions hearing on 23 May 2025 (**Directions Order**) made with respect to an

EXHIBIT
47

*(iii) No requirement for US Counsel at this stage*

60. DFW objects to the application for sanction by the JOLs to engage US counsel at this juncture. As is accepted by the JOLs, Holdco presently holds no assets in Cayman or anywhere else.

61. The issues that are raised by the Highland Foundations and which have been assumed by the JOLs, concern the validity and potential ability to unwind the DAF Restructuring.

62. In due course DFW intends to seek a declaration as to the validity of the DAF Restructuring from this Honorable Court and to make that application within the liquidation. Until such time as a determination has been made that would result in assets being conveyed to the Holdco estate, DFW objects to the sanction and engagement of US counsel for the reason that it is neither proportionate nor necessary.

**B. PROFESSIONAL BACKGROUND AND DEALINGS WITH HOLDCO /DAF**

63. I am a US tax attorney and have practiced as US tax counsel from 1998 until 2008. I hold a bachelors degree from the University of Miami Herbert Business School (BBA, Finance, Cum Laude); an LLM in Taxation from the New York University School of Law and am a Juris Doctor from the Boston University (Cum Laude).

64. For a significant part of my career through until October 2024 I have been employed by companies connected with or controlled by Mr Dondero. From January 2008 to February 2021 I was employed as Tax Counsel by Highland Capital Management, L.P. (**Highland**). During my employment with Highland, I provided tax consulting advice to Highland and engaged outside tax lawyers to provide legal advice to Highland relating to the management of its tax liabilities and the ability to make use of tax efficient structures.

65. Contrary to the assertion made by Mr Dondero (**Dondero 1, paragraph 17**) I have not and did not represent Mr Dondero as his personal tax counsel while employed at Highland or at any time thereafter. During this time, I held a license to practice

law but my role within Highland was as a tax professional and not as an attorney and I was assigned to the tax department, not the legal department. To the extent that Mr Dondero required tax or trust advice in respect of his assets, external tax counsel were hired to fulfil that role. It is well understood in the U.S. that attorneys who are employed by a company represent the company and not its officers or directors.

66. Highland was an entity formerly owned and controlled by Mr Dondero, which was later placed into Chapter 11 Bankruptcy in the United States (**Highland Bankruptcy**). It is my understanding that the bankruptcy of Highland in 2019 was precipitated by Highland incurring significant exposure in what has been characterised as vexatious and oppressive litigation which Mr Dondero was instrumental in prosecuting. In particular in 2019 it was expected that a judgment would be made against Highland in favour of certain of its investors in the amount of US$189.3m. Highland was not in a position to satisfy this judgment and Mr Dondero placed the Company into Chapter 11. Following the collapse of Highland, Mr Dondero set up a new investment manager under the name NexPoint. Skyview was formed to provide back-office services to NexPoint and its managed funds

67. I was employed by Skyview from March 2021 to October 2024.

68. I note that Mr Dondero refers to many of the former back-office employees of Highland becoming employees of the newly formed Skyview (**Dondero 1, paragraph 7**). Mr Dondero does not accurately describe the business of Skyview. From my time employed by Skyview I understand that almost all the clients of Skyview are entities owned and controlled by Mr Dondero.

69. Further, the Chief Executive Officer and owner of Skyview is Mr Scott Ellington, a longtime business associate of Mr Dondero and former General Counsel of Highland. During my employment at Skyview it was well understood by those working there including myself, that Mr Dondero had actual control of Skyview. By way of example, the compensation determination for all of Mr Dondero's companies' employees is carried out in January-to February. During this time the

Head of Human Resources and a member of the Executive Board of Skyview would attend Mr Dondero's office at the Crescent where he would set the pay of every Skyview employee.

70. I provided tax advice to Skyview. In September 2021 my title was formally changed from "Tax Counsel" to "Managing Director, Tax". I requested this title change to make it objectively clear that I was not providing any legal services for Skyview, Mr Dondero, nor any of Mr Dondero's companies, which met no resistance from Skyview.

71. Contrary to the assertions made in **Diaz 1, para 25(b)**) and **Dondero 1, para 18**, at no point during my tenure at Skyview was I retained by Mr Dondero to advise in respect of his personal tax liability. As with my employment at Highland, external legal counsel was engaged to advise Mr Dondero in respect of his personal tax affairs and trusts. I submitted my resignation to Skyview by letter dated 2 October 2024, a copy of which I exhibit at **MP1/ page 48.** The significance of my resignation which I explain in further detail below has a direct correlation to the rapid deterioration of the ensuing interactions with the Highland Foundations.

72. During the course of my employment with Highland I, along with outside advisor Mr Douglas Mancino (**Mr Mancino**), was instrumental in the establishment of Holdco, DAF and the DAF Structure. Mr Mancino and I exchanged a series of letters exhibited at **MP1/ pages 49 – 52, 53 – 55, 56 – 58 and 59 - 61** commissioned a memorandum exhibited at **MP1/ page 62 - 66** and had in-depth discussions regarding the most advantageous structures, compliance implications, and outreach to potential recipients of the Participating Shares. This runs contrary to **paragraph 9 of Dondero 1**, where Mr Dondero over-states his involvement in establishing the DAF.

73. Contrary to the assertions made at **paragraphs 8 and 9 of Dondero 1**, Mr Dondero does not have the ability to use or influence the DAF to donate to charitable organizations. Furthermore, DAF entities are all for-profit entities and to the best of my knowledge and belief, Mr Dondero has never donated to.

Highland Foundations) and a "disqualified person". The term disqualified person" includes an officer, director, or trustee of a foundation. Given Mr Dondero's involvement with the Highland Foundations, and further to the evidence which I give below, by late 2024 I harbored concerns that the IRS may consider Mr Dondero to be a "disqualified person" with respect to each and every Highland Foundation, which could expose each of those entities to revocation by the IRS of its tax-exempt status and possible criminal prosecution.

85. To the extent that the DAF's assets could have been used in such a way, my further concern was that creditors of Mr Dondero could view the DAF as Mr Dondero's financial alter ego under U.S. law. In tun that could expose DAF and its assets to creditor claims unrelated to the DAF Structure. Such claims could risk depleting the pool of assets held by DAF, which would result in depriving current and future charities from the benefit of those assets. I note that significant amounts of DAF's liquid assets are held in the U.S. and whilst I understand (without waiving privilege) that concepts of alter ego are different under Cayman Islands law, that would not prevent attachment of DAF's assets held in the U.S.

86. Quite simply, the assertions made on behalf of the Highland Foundations by the evidence of Ms Diaz show a fundamental misunderstanding of the corporate structure and charitable purpose of DAF. Primarily, the Highland Foundations assume that DAF was a "consolidated entity" when in fact the fundamental scheme of the corporate group intentionally, and necessarily, delineated between control of and economic interest in the DAF Structure.

87. In this regard, Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011 with registration number 263805 (see **MP1/ page 86**). Since its incorporation and until the DAF Restructuring in March 2025 (discussed below) Holdco was the Limited Partner of DAF through which it indirectly owned the entities in the DAF Structure. However, Holdco did not hold voting, control, or management rights in respect of DAF. Its sole purpose was to act as a conduit through which discretionary, charitable donations would pass.

88. DAF, an exempted Cayman Islands limited partnership was controlled and operated by its former general partner, Charitable DAF GP, LLC (**Original GP**) between October 2011 through to the Restructuring. From February 2024 DAF has been operated by the GP. The Original GP was arranged in Delaware and also registered in the Cayman Islands under Part IX of the Companies Act (as revised). The control of the Original GP and the Replacement GP are also explained below.

89. The characterization by the Highland Foundations through the evidence of Ms Diaz of DAF as a 'Fund' (**Diaz 1, paragraph 12**) is therefore misleading and liable to create confusion. DAF is not an investment fund but is a charitable vehicle and properly understood, DAF:

(a) Did not solicit capital from investors;

(b) Had / has no subscription agreements through which interests are taken up. Notably, the Highland Foundations did not "subscribe" to DAF in the way, I am informed by counsel (without waiving privilege), commonly used by investment funds in the Cayman Islands, but were granted Participating Shares in Holdco by way of a gift at the inception of the DAF Structure.

(c) Holdco as Limited Partner had restrictive rights in its participation and management of DAF, including restricted rights to information.

(d) Had no entitlement to make capital calls against the Supporting Organisations or indeed against Holdco;

(e) Does not have a registered investment advisor;

(f) There are no investment hurdles or reporting requirements;

(g) There are no marketing brochures, private placement memorandums or other materials relating to solicitation for investments;

(h) The economic substance filing lists business of Holdco; and

103. In or around March 2021 I approached Mr Scott to assume the role as Control Person of the DAF. This required me to take on the directorship of the Original GP and be registered as holder of the Management Shares issued by Holdco. I assumed the role of Control Person as of 24 March 2021. Therefore, the concept of their being a sole human agent in control of the DAF is one that has represented the status quo since its inception in 2011. The aspersions and innuendos cast by Johnstone Law on behalf of the Highland Foundations and more recently the JOLs are therefore inappropriate and are also consistent with their prevailing inaccurate view that DAF should be regarded as a "consolidated entity."

104. At this time I understood from my conversations with Mr Scott that he and Mr Dondero had suffered a falling out because Mr Scott refused to take a step at the request of Mr Dondero which would have caused him to breach his fiduciary duties to DAF.

105. It is my understanding and belief that Mr Scott's refusal to act at the direction of Mr Dondero angered him and that, as a result of Mr Scott's opposition to Mr Dondero's instructions, Mr Dondero wanted Mr Scott to resign. I exhibit an email from Mr Scott to John Kane on 30 January 2021 at **MP1/ page 147** which, contrary to the assertion made by Mr Dondero at **paragraph 20** of **Dondero 1** that Mr Scott informed him that he wished to resign in March 2021, Mr Dondero and Mr Scott reached a mutual agreement on a call on 30 January 2021 that Mr Scott would resign as a result of being at a "*cross-roads*" with Mr Dondero. In fact, Mr Dondero had stated to Mr Scott that "*The releases and non objection to the plan was all Seery cared about ... accusations of non independence was tweaking and always alleged against all trustees, very hard to prove ... not a real threat but Seery got a lot for it, look what you signed*". Mr Scott is not prepared to provide me with a copy of the unredacted email due to privilege but has intimated that he would be prepared to give evidence in these proceedings. My understanding is that Mr Dondero did not have the power to remove Mr Scott from his position, but he nonetheless encouraged Mr Scott to resign because he was displeased that Mr Scott had done something to benefit Seery as outlined above (the Highland Capital Management, L.P. chief restructuring officer after Mr Dondero was ousted from Highland Capital Management).

agreed that a full slate of grants would be presented that were desirable to Mr Dondero, and would be allocated to the US $1 million funding.

171. This emerging pattern of coercing others through financial control compounds my concerns that Mr Dondero may leverage the private funding which he is providing to run this liquidation, as a means of influencing the direction of the liquidation itself. He could do so by threatening to withhold funding (which the JOLs and their counsel depend on to cover their costs and expenses) from the JOLs and/or their counsel, thereby placing undue pressure on the JOLs and/or their counsel, which may affect the JOLs and/or their counsel's ability to conduct themselves impartially in this liquidation.

172. As previously mentioned, I had identified that it was imperative that DAF was and was seen to be operated independently from Mr Dondero. Given my employment at Skyview it was my view that I should be paid from DAF in respect of services I provided to DAF and its related entities as the Control Person. Not only would the compensation need to be provided independently of Skyview but the level of compensation would need to be based on an objective third party compensation valuation. An independent compensation review was provided for the role as Control Person. This was then independently verified by Mr Murphy.

173. Given my concerns that the influence and control that was being asserted by Mr Dondero over DAF may have given was giving rise to allegations of DAF being an alter ego of Mr Dondero, I sought to consider ways in which my remuneration in respect of DAF could properly be paid without being subject to Mr Dondero's oversight, precisely because of the alter ego risk. I recall having two brief telephone conversations with Mr Cronin, as I explored whether my compensation (which would be paid by DAF) could be routed through Fortaris. I believed that, given historical payments by Mr Dondero's entities to Mr Cronin and Fortaris, payments by DAF to Fortaris would not raise suspicion with the Skyview employees monitoring DAF's finances. I shared with Mr Cronin an organisational chart and legal advice from Alex McGeoch, a tax expert at Hunton Andrews Kurth LLP, asserting that DAF can independently compensate me.

# Exhibit B

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 ( )**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

---

**WRIT OF SUMMONS**

---

TO: (1) **MARK ERIC PATRICK** of 6716 Glenhurst Drive, Dallas, Texas, 72554, United States of America

THIS WRIT was issued by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83527361)

(2) **PAUL MURPHY** of Windsor Village #24, South Church Street, Grand Cayman, Cayman Islands

(3) **CDMCFAD, LLC** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(4) **DFW CHARITABLE FOUNDATION** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(5) **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

(6) **CLO HOLDCO, LTD.** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

THIS WRIT OF SUMMONS has been issued against you by the above-named Plaintiff in respect of the claim set out on the next page.

Within 14 days after the service of this Writ on you, counting the day of service, or, if you are served out of the jurisdiction, within such other period of time as the Court may order, you must either satisfy the claim or return to the Registrar of the Financial Services Division, Court Office, PO Box 495, George Town, Grand Cayman, KY1-1106, Cayman Islands, the accompanying Acknowledgment of Service stating therein whether you intend to contest these proceedings.

If you fail to satisfy the claim or to return the Acknowledgment within the time stated, or if you return the Acknowledgment without stating therein an intention to contest the proceedings, the Plaintiff may proceed with the action and judgment may be entered against you forthwith without further notice.

Issued this 15th day of July 2025

NOTE - This Writ may not be served later than 4 calendar months (or, if leave is required to effect service out of the jurisdiction, 6 months) beginning with the date of issue unless renewed by order of the Court.

**IMPORTANT**

Directions for Acknowledgment of Service are given with the accompanying form

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 ( )**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

---

**STATEMENT OF CLAIM**

---

**INTRODUCTION**

1 The Plaintiff, Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "**Company**"), is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Ltd, 68 Fort Street, George Town, PO Box 31726, Grand

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Cayman KY1-1207. The authorised and issued share capital of the Company is divided into Participating Shares and Management Shares.

2 The Company was placed into court supervised liquidation and Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited were appointed as joint official liquidators (the "**JOLs**") pursuant to an order of this Honourable Court dated 6 May 2025.

3 The Company was, between November 2011 and 18 December 2024, the sole limited partner of Charitable DAF Fund, LP (the "**Fund**"). At all relevant times, the net asset value of the Fund's assets was c. US$270million.

4 The Fund is a Cayman Islands exempted limited partnership formed to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organisations in the U.S. namely The Dallas Foundation; the Greater Kansas City Community Foundation; the Santa Barbara Foundation and The Community Foundation of North Texas (the "**Charities**"). These charities are the owners or the ultimate beneficial owners of Participating Shares in the Company.

5 In March 2021, Mark Patrick (the "**First Defendant**") was appointed the sole director and registered as the sole Management Shareholder of the Company. In April 2021, Paul Murphy (the "**Second Defendant**") was appointed by the First Defendant as a second director of Holdco.

6 By virtue of a series of transactions or purported transactions between March 2024 and March 2025, unbeknownst to the holders of the Participating Shares (the "**Participating Shareholders**") of the Company, Mr Patrick caused:

6.1 the Company, with the agreement and concurrence of Mr Murphy, to assign its interest in the Fund to the Third Defendant, a Delaware limited liability company, formed in

December 2024 and controlled by Mr Patrick, in exchange for a membership interest in that entity;

6.2 the Company, with the agreement and concurrence of Mr Murphy, to issue and allot further Participating Shares (representing a majority of the issued participating share capital) to the Fourth Defendant, a Delaware company, incorporated in December 2024 and controlled by Mr Patrick;

6.3 the Third Defendant to redeem the Company's membership interest in the Third Defendant for a consideration of c. US$1.6 million, representing approximately 0.59% of the total net asset value of the assets held by the Fund; and

6.4 the Company, with the agreement and concurrence of Mr Murphy, to be placed into voluntary liquidation after having made a final distribution to all Original Participating Shareholders (defined below) in the Company of the proceeds of redemption,

collectively the "**Impugned Transactions**".

7 The First and Second Defendants effected the Impugned Transactions in breach of their fiduciary and other duties to the Company in order to bring ownership of the Fund and its assets, with a net value of c. US$270 million (as assessed at 30 September 2024), under Mr Patrick's effective control to the exclusion of the interests of the Charities. The Charities, as the original, and rightful, ultimate beneficiaries of the Fund, have been left with nothing.

8 Further, during the period March 2021 to June 2024, the First and Second Defendants, in breach of fiduciary duty, caused the Company to pay excessive fees and expenses to Mr Patrick.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**THE PARTIES**

The Company

9 The Company is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Limited, Ltd, 68 Fort Street, George Town, PO Box 31726, Grand Cayman, KY1-1207, Cayman Islands.

10 The directors of the Company are Mr Patrick (appointed on 25 March 2021) and Mr Murphy (appointed by Mr Patrick on 22 April 2021).

11 The Company has been governed by the following memorandum and articles of association from time to time:

11.1 The memorandum and articles of association dated 27 October 2011; and

11.2 The amended and restated memoranda and articles of association dated 19 January 2015; 24 January 2024; and 20 February 2025 respectively.

The Company remains governed by the memorandum and articles of association as amended and restated on 20 February 2025 (the "**Articles**") save that the Company reserves the right to challenge the validity of the Articles.

12 Save as set out above, the Company will rely on the Articles and all previous iterations for their applicable full terms and effect.

13 Pursuant to the Articles and at all relevant times, the authorised share capital of the Company was US$50,000 divided into 100 Management Shares of US$0.01 par value each and 4,999,900 Participating Shares of US$0.01 par value each.

14 The Articles (with reference to the defined term of 'Restricted Person') require that the Participating Shareholders must at all times qualify as a tax-exempt organisation pursuant to section 501(c)(3) of the United States Internal Revenue Code of 1986 ("**IRC**").

15 The Participating Shares do not have voting rights but confer the right to participate in the profits or assets of the Company including by way of the receipt of dividends (Article 12).

16 The Management Shares have voting rights but confer no other right to participate in the profits or assets of the Company (Article 11).

17 The Participating Shareholders therefore have the entirety of the economic interest in the Company, whereas the Management Shareholders have the control rights.

18 On 7 November 2011, the Company issued:

18.1 300 Participating Shares to The Highland Capital Management Partners Charitable Trust #2 ("**Trust #2**"); and

18.2 100 Management Shares to Grant Scott.

19 On 30 November 2011, Trust #2 transferred its 300 Participating Shares equally amongst:

19.1 Highland Kansas City Foundation, Inc.;

19.2 Highland Dallas Foundation, Inc.[1]; and

19.3 Highland Santa Barbara Foundation, Inc.,

collectively, the "**Supporting Organisations**".

[1] Since June 2024, Highland Dallas Foundation, Inc. has also done business as 'NexPoint Philanthropies Dallas, Inc.', per an Assumed Name Certificate filed with the Secretary of State of Texas.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

20 On 12 August 2015, the Company issued 5 Participating Shares to the Community Foundation of North Texas, ("**CFNT**", and together with the Supporting Organisations the "**Original Participating Shareholders**") for Highland Capital Management, L.P. Charitable Fund at CFNT.

21 On 25 March 2021, the Management Shares were transferred to Mr Patrick and he continues to hold these shares.

22 The Participating Shares held by the Original Participating Shareholders represented the entire issued Participating Share capital of the Company until 7 February 2025. On that date, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to issue 318 Participating Shares to the Fourth Defendant, DFW Charitable Foundation ("**DFW**"), significantly diluting the shareholdings of the Original Participating Shareholders and the indirect economic interest of the Charities.

23 Until 18 December 2024, the sole asset of the Company was its limited partnership interest in the Fund (the "**Partnership Interest**").

24 As a result of the Impugned Transactions, the Company now has no material assets.

DFW

25 DFW (the Fourth Defendant) is a non-profit non-stock corporation incorporated in Delaware on 9 December 2024, which is organised under the General Corporation Law of the State of Delaware exclusively for charitable purposes.

26 DFW is the majority Participating Shareholder of the Company by virtue of the purported share issuance on 7 February 2025, and Mr Patrick is its registered director, president and sole member.

The Fund

27 The Fund is a Cayman Islands exempted limited partnership formed on 28 October 2011 (registration no. 53083), having its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

28 The Fund is governed by the Second Amended and Restated Exempted Limited Partnership Agreement dated 11 March 2024 (the "**LPA**"). The initial exempted limited partnership agreement of the Fund was dated 25 October 2011, was amended and restated on 7 November 2011 and further amended on 26 July 2022 (with effect from 24 March 2021). The Company will rely on the LPA for its applicable full terms and effect.

29 Mr Patrick was instrumental in the establishment of the Company, the Fund and the Fund structure.

30 Until 18 December 2024, the Company was the sole limited partner of the Fund.

31 On 18 December 2024, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to transfer its limited partnership interest to CDMCFAD, LLC ("**CDM**") (the Third Defendant) in exchange for a membership interest in CDM.

32 The original general partner of the Fund was Charitable DAF GP, LLC (the "**Original GP**"), a Delaware limited liability company registered as a foreign company in the Cayman Islands. The Original GP was the general partner from the Fund's formation until 7 March 2024.

33 On 7 March 2024, the Original GP was replaced by CDH GP, Ltd. (the "**New GP**") (the Fifth Defendant).

34 The sole asset of the Fund is its 100% shareholding in CLO HoldCo, Ltd. ("**CLO HoldCo**") (the Sixth Defendant), a Cayman Islands exempted company incorporated with limited liability,

having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

35 The assets of the Fund were valued at c. $270 million in September 2024.

The New GP

36 The New GP (the Fifth Defendant) is a Cayman Islands exempted company incorporated on 27 February 2024, having its registered office located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

37 Mr Patrick is the New GP's sole director and sole shareholder.

38 The New GP is a defendant to these proceedings in two capacities: (i) in its capacity as General Partner; and (ii) for and on behalf of the Fund in order to join the Fund as a defendant to these proceedings.

CDM

39 CDM (the Third Defendant) is a limited liability company incorporated in Delaware on 12 December 2024, having its registered address c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

40 CDM is governed by the terms of a Limited Liability Company Agreement dated 18 December 2024.

41 Since 18 December 2024, the primary asset of CDM has been the limited partnership interest in the Fund.

42 The sole manager of CDM is Mark Patrick.

43 From 18 December 2024 to 27 March 2025, the sole member of CDM was the Company.

44 On 27 March 2025, Mr Patrick caused CDM to redeem the Company and admit DFW as the sole participating member.

<u>CLO HoldCo</u>

45 CLO HoldCo (the Sixth Defendant) is a Cayman Islands exempted company incorporated on 13 December 2010, having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands, and which is the Fund's main subsidiary.

46 The directors of CLO Holdco are Messrs Patrick and Murphy.

47 The sole shareholder of CLO Holdco is the Fund.

<u>The Directors</u>

*Mark Patrick*

48 Mr Patrick (the First Defendant) is a U.S. resident who is:

48.1 a director, holds the offices of (i) President, (ii) General Counsel, and (iii) Chief Investment Officer and is the current Management Shareholder of the Company;

48.2 the Manager of CDM (the Third Defendant);

48.3 the sole director and the sole member of DFW (the Fourth Defendant);

48.4 the sole director and sole shareholder of the New GP (the Fifth Defendant); and

48.5 a director of CLO HoldCo (the Sixth Defendant).

49 Mr Patrick was employed as tax counsel by Highland Capital Management, L.P. ("**Highland**") from 2008 to 2021 and as tax counsel by Highgate Consulting Group, Inc. d/b/a Skyview Group from March 2021 to October 2024.

*Paul Murphy*

50 Mr Murphy (the Second Defendant) is a Cayman Islands resident who is:

50.1 a director of the Company;

50.2 a director of CLO HoldCo (the Fifth Defendant); and

50.3 a director of various other entities in the Charitable DAF structure.[2]

51 Mr Patrick and Mr Murphy are referred to herein as the "**Directors**".

**THE CHARITABLE PURPOSE OF THE FUND**

52 The Fund was formed on 28 October 2011 at the instigation of Mr James Dondero, a U.S. resident and the founder of Highland to enable certain assets, held through the shares in CLO Holdco, to be donated to a charitable foundation.

53 Upon the formation of the Fund, the Company was admitted as a limited partner and, by way of capital contribution, contributed all of the outstanding equity interests in CLO HoldCo to the Fund.

54 The purpose of the Fund was to make investments for the ultimate benefit of the Original Participating Shareholders and the Charities:

[2] Mr Murphy was appointed to the board of directors of the following entities on 22 April 2021; Liberty CLO Holdco, Ltd., Liberty Sub, Ltd., HCT Holdco 2, Ltd. and MGM Studios Holdco, Ltd. at the same time as Charitable DAF HoldCo, Ltd and CLO HoldCo, Ltd.

54.1 The recitals to the LPA of the Fund provide that the purpose of the Fund was to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code … for the economic benefit of the Limited Partner and its Indirect Charitable Owners*…".

54.2 Clause 1.3 of the LPA provides that "… *the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners*".

54.3 Clause 1.6(a) of the LPA provides that "*the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*".

54.4 "Indirect Charitable Owners" is defined in the LPA as "*the indirect equity owners of the Limited Partners which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.*" i.e., the Company's Participating Shareholders or the Charities.

54.5 Clause 4.2(a) of the LPA provides that "*Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses*…".

54.6 The LPA does not modify the statutory duty of the General Partner to act in good faith and in the interests of the Fund.

55 The Charities are the following four US charitable or non-profit foundations:

55.1 *The Dallas Foundation*: a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets.

55.2 *Greater Kansas City Community Foundation*: a charitable entity established in Missouri in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds.

55.3 *Santa Barbara Foundation*: a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

55.4 *North Texas Community Foundation*: which manages assets totalling $513 million and donated $38.9 million to local non-profits in 2023.

56 The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (the "**Supported Organisations**") hold their interests in the Company through their respective Supporting Organisation namely Highland Dallas Foundation, Inc. as the Supporting Organisation for The Dallas Foundation; Highland Kansas City Foundation, Inc. as the Supporting Organisation for the Greater Kansas City Community Foundation; Highland Santa Barbara Foundation, Inc as the Supporting Organisation for the Santa Barbara Foundation.

57 CFNT holds its Participating Shares in the Company directly.

**THE TAX STRUCTURE**

58 As a matter of U.S. tax law, in order for the Supported Organisations to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore corporate blocker entity, namely the Company:

58.1 S501(c)(3) of the IRC provides that charitable organisations which meet certain criteria are exempt from state and federal taxes except to the extent that it receives income classified as unrelated business taxable income ("**UBTI**"); and

58.2 the Supported Organisations and their Supporting Organisations meet the criteria of s501(c)(3). They are therefore generally exempt from U.S. state and federal taxes, with a few exceptions, including to the extent that they receive UBTI.

59 As a matter of U.S. tax law, at least a portion of income received directly from the Fund by the Supported Organisations would likely be considered UBTI.

60 In order to insulate the Supported Organisations from UBTI, instead of holding their interest in the Fund directly, they held through an offshore corporate blocker structure, namely the Company.

**THE SUPPORTED ORGANISATIONS CONTROL THE SUPPORTING ORGANISATIONS**

61 The Supporting Organisations were incorporated in Delaware by Mr Dondero on or about 22 November 2011 for the purpose of making charitable donations to their respective charity from the proceeds of dividends received by the Supporting Organisations from the Company.

62 Supporting organisations under the IRC are tax exempt charitable organisations that provide financial or operational support to one or more public charitable organisations (called "supported organisations"). Because of the link with the supported public charities, supporting organisations are classified as public charities themselves, as opposed to private foundations, despite the fact that a supporting organisation's sources of funding may be limited to a single individual, which would otherwise cause the entity to be classified as a private foundation.

63 Contributions to supporting organisations, as public charities, qualify for the highest tax deductibility thresholds under the IRC (up to 50% of the taxpayer's adjusted gross income, or

60%, in the case of cash gifts) instead of the substantially lower threshold for contributions to private foundations (30% of adjusted gross income, regardless of the character of the contribution).

64 The Supporting Organisations are "Type I" tax exempt organisations under the IRC which means they must be organised and operated exclusively to support and benefit their relevant charity and controlled by that charity:

64.1 S509(a)(3) of the IRC contains the qualifications for a "supporting organisation". Under that section, a supporting organisation is a tax-exempt entity that must be organised and then operate exclusively for either (i) the benefit of, (ii) to perform the functions of, or (iii) to carry out the purposes of one or more supported organisations. The supported organisations must also be s501(c)(3) entities;

64.2 There are three types of supporting organisations, known as “Type I”, “Type II” and “Type III”. S509(a)(3)(B)(i), (ii) and (iii) sets out the requirements for each “Type”, respectively;

64.3 S509(a)(3)(B)(i) provides that a Type I supporting organisation must be operated, supervised or controlled by the supported organisation; and

64.4 S509(a)(3)(C) provides that the supporting organisation may not be controlled by a disqualified person, other than the foundation managers and the supported organisation.

65 The Supporting Organisations are so controlled by the respective Supported Organisations.

66 The Supporting Organisations are governed by the terms of their respective Certificate of Incorporation and by-laws (the "**Bylaws**").

67 The Certificates of Incorporation provide (amongst other things) that:

67.1 the Supporting Organisation:

(a) is organised and shall be operated exclusively for charitable, educational and scientific purposes;

(b) is organised and operated exclusively to support and benefit the particular charity that controls it; and

(c) is a non-profit non-stock corporation and cannot issue any capital stock;

67.2 no part of the net earnings of the Supporting Organisation shall be distributable to the directors and officers of the Supporting Organisation or other private persons save that the Supporting Organisation can pay reasonable compensation for services rendered; and

67.3 net earnings can be used to make grants, loans and similar payments for charitable, educational and scientific purposes to benefit the relevant Supported Organisation.

68 The Bylaws provide that (amongst other things):

68.1 There are two classes of members of the Supporting Organisations with one member in each such class:

(a) the institutional member (the "**Institutional Member**") which shall be the Supported Organisation; and

(b) the individual member (the "**Individual Member**") which shall be Mr Dondero or an individual designated as the Individual Member in the Bylaws.

68.2 In terms of voting on a matter submitted to a vote of the members (except as otherwise provided in the Bylaws):

(a) the Institutional Member is entitled to two votes; and

(b) the Individual Member is entitled to one vote.

68.3 Institutional membership is not transferable or assignable.

68.4 Individual membership is transferable or assignable only upon approval of the Institutional Member.

68.5 Both the Institutional Member and the Individual Member must be present in person or by represented proxy to constitute a quorum at all meetings of members.

68.6 There shall be three directors of the board of the Supporting Organisation. Two directors shall be elected annually by the Institutional Member and one director shall be elected annually by the Individual Member.

69 The relationship between the Supporting Organisations and their respective Supported Organisation are governed by separate operating/legal relationship agreements (collectively "**Operating Agreements**"). These agreements provide, among other things, that:

69.1 the Supported Organisation will provide certain services to the Supporting Organisation;

69.2 the Supported Organisation will appoint two of the three directors of the Supporting Organisation as required by Bylaws; and

69.3 in consideration for the services provided by the Supported Organisation to the Supporting Organisation, the Supporting Organisation shall pay a fee to the Supported Organisation.

70 Mr Dondero sits on the board of each of the Supporting Organisations with two other directors from each of the Supported Organisations respectively.

71 The relationships, rights and obligations created by and between the Supported Organisations and the Supporting Organisations pursuant to the agreements entered into between them were at all material times in summary that:

71.1 the Supported Organisations control the Supporting Organisations through their majority voting interest and their ability to elect a majority of the directors of the Supporting Organisations;

71.2 the Supporting Organisations support the Supported Organisations by way of making grants to them from time to time from their assets, including any dividends received from the Company;

71.3 the Supporting Organisations have no ability to pay dividends to any private person or make payments to their directors (save reasonable reimbursement for reasonable out-of-pocket expenses) and can only make grants to the relevant Charity in furtherance of their charitable purposes; and

71.4 while Mr Dondero sits on the board of the Supporting Organisations, he does not control them, as a supermajority of the votes are always held by the respective Charity.

72 The Company will rely on the Certificates of Incorporation, Bylaws, Operating Agreements and terms of the IRC for their applicable full terms and effect.

**THE CONTROL POSITION OF MR PATRICK OVER THE COMPANY AND THE FUND**

73 The terms of the LPA grant sole control over the management and distribution of the Fund's assets to the General Partner. The terms of the Articles grant sole control over the management and distribution of the Company's assets to the Management Shareholder.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

<u>The LPA</u>

73.1 Clause 1.12

(i) The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

73.2 Clause 1.6

*(i) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*

*(ii) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners*

*hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.*

<u>The Articles</u>

73.3 Article 11

*The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganization or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.*

73.4 Article 12

*Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.*

73.5 Article 13

*…the rights attached to any such Class may… only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes case at such a meeting.*

73.6 Article 84 (d)

*The office of Director shall be vacated if the Director…is removed from office by Ordinary Resolution.*

*The definition of Ordinary Resolution is a vote of the Management Shares.*

73.7 Article 99

*Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.*

73.8 Article 104

*Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.*

74 The Management Shares in the Company and the General Partner in the Fund have at all material times been held and/or controlled by a single individual who, as a result, has sole control of the Fund structure (the "**Control Position**"):

74.1 In or around November 2011:

(a) Grant Scott was appointed as the sole director and allotted the 100 Management Shares of the Company; and

(b) Grant Scott became the holder of the membership interest in the Original GP and was appointed the Manager thereof,

thereby assuming the Control Position from that date.

74.2 In or around 24 March 2021, Mr Scott:

(a) assigned 100% of the membership interest in the Original GP to Mr Patrick pursuant to an Assignment and Assumption of Membership Interests Agreement, which membership interest gave Mr Patrick the sole right to manage the Original GP;

(b) transferred to Mr Patrick the 100 Management Shares in the Company; and

(c) resigned as a director of the Company and resolved to appoint Mr Patrick as the sole director in his place.

74.3 On 25 March 2021, Mr Patrick was entered into the Company's Register of Members as the holder of the Management Shares.

74.4 Mr Patrick therefore assumed the Control Position from that date.

74.5 On 22 April 2021, Mr Patrick resolved to appoint Mr Murphy as a second director of the Company.

74.6 On 7 March 2024, by way of a Deed of Assignment and Assumption, Mr Patrick, as managing member of the Original GP, caused the Original GP to transfer its general partnership interest in the Fund to the New GP.

74.7 Mr Patrick is the sole shareholder and director of the New GP.

74.8 Mr Patrick therefore remains in the Control Position and was in such position at all relevant times since 25 March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

75 Further, the sole asset of the Fund is its shares in CLO Holdco (the Sixth Defendant). Mr Patrick and Mr Murphy are the directors of CLO Holdco and were appointed on 2 April 2021 and 22 April 2021 respectively.

76 The Control Position was not and is not a term of art but was nevertheless a legal and factual position:

76.1 where a single individual was the sole Management, and therefore voting, Shareholder of the Company;

76.2 where the same individual was a director of the Company;

76.3 where the same individual was the sole shareholder or controller of the General Partner;

76.4 where the same individual was a director of the General Partner;

76.5 where the same individual was in complete and effective control of at least the Company, of the General Partner, of the Fund and of CLO Holdco;

76.6 where the same individual was in effective sole control of all assets of the Fund;

76.7 where the same individual had no economic, residual, beneficial or winding up interest in assets of the Company;

76.8 where the same individual had no economic, residual, beneficial or winding up interest in assets of the General Partner;

76.9 where the same individual had no economic, residual, beneficial or winding up interest in assets of the Fund;

76.10 where the same individual was, irrespective of his or her formal positions, functions or duties, including as a director, acting as a trustee, fiduciary or in a trustee-like or fiduciary-like position with respect to the assets held by the Fund;

76.11 where the same individual was at all times acting solely for the benefit or the ultimate benefit of the Original Participating Shareholders and/or through them the Supported Organisations and/or through them the Charities; and

76.12 in the alternative to the plea directly above, where the duties otherwise owed by the same individual as a matter of law, including as a director, were affected and/or altered by the existence of the structure as pleaded above, including the facts and matters relating to the Control Position and including the fact that the structure as pleaded above was designed and intended to be solely for the benefit or the ultimate benefit of the Original Participating Shareholders, and/or through them the Charities.

**EVENTS RESULTING IN THE COMPANY HAVING NO MATERIAL ASSETS AND THE DILUTION OF THE SUPPORTING ORGANISATIONS' INTERESTS**

Plan to defeat the interests of the Original Participating Shareholders

77 On 9 November 2023, Shields Legal Group ("**Shields Legal**") (the U.S. attorneys for the Company) sent to Campbells LLP ("**Campbells**") (then Cayman Islands attorneys for the Company) a work plan (the "**Work Plan**") relevant to the Company, the Fund and CLO HoldCo.

78 It can be inferred, and is averred, that the purpose of the Work Plan and the subsequent advice and steps taken as detailed below was to seek to entrench Mr Patrick's Control Position and defeat the interests of the Original Participating Shareholders.

79 The Work Plan stated that (amongst other things):

79.1 the advice required related to "…*potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc*..."; and

79.2 "…*we may need to rely on opinions and memoranda in potential future disputes*..."

80 The Work Plan set out the issues on which the Directors sought advice, including among other things the following questions:

80.1 'Can the controlling person dilute shares, e.g., the Participation Shares?'

80.2 'Can the controlling person redeem shares, e.g., the Participation Shares?'

80.3 'Is there any Cayman law requirement that the Company distribute money upwards to the next level of entities (Highland Dallas Foundation, Inc. and others)?'

80.4 'Could the Company liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares worthless?'

80.5 'What can be done at this point to make [the share transfers in the Company from Mr Scott to Mr Patrick] bullet proof?'

81 The Directors were advised that any steps taken in relation to the proposed issuance of new Participating Shares and withholding dividends must be in compliance with their fiduciary duties and taken in the best interest of the Company:

81.1 On 8 January 2024, Walkers (Cayman) LLP ("**Walkers**") (also then Cayman Islands counsel for the Company) provided advice on issues set out in the Work Plan to the effect that (amongst other things)*:*

(a) the Directors have power under the Articles to issue new Participating Shares that dilute the current Participating Shareholders, but must consider their fiduciary duties (including the duty to act in the best interests of the Company) when issuing such shares;

(b) the Participating Shares are non-redeemable;

(c) while payment of a dividend or other distribution is at the discretion of the Directors, if the Company were to have distributable reserves available, there may be a question of whether the Directors would be acting in its best interests to not pay some dividend or distribution; and

(d) the Directors have fiduciary duties to the Company which are paramount when considering (i) making a distribution and (ii) the distributable reserves available from which to make payments; they must have regard to what is in the Company's best interests, its future cash requirements, and its present and future solvency.

82 In February 2024, without telling the Supporting Organisations or the Charities, Mr Patrick sought to form a new entity to replace the Original GP. On 5 February 2024, Walkers emailed Mr Patrick to ask whether that entity should be a Cayman LLC or an exempted company, to which he responded later that day: "*Doesn't matter to me. Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection*."

83 On 27 February 2024, without telling the Supporting Organisations or the Charities, the New GP (the Fifth Defendant) was incorporated in the Cayman Islands.

84 On 7 March 2024, Mr Patrick, in his capacity as Managing Member of the Original GP, and without telling the Supporting Organisations or the Charities, executed a written consent for the

transfer of the GP Interest to the New GP, thereby replacing the Fund's General Partner. The Supporting Organisations subsequently discovered this change only by chance in February 2025.

85 In or around August 2024, the Supporting Organisations were provided with a financial analysis (prepared by NexPoint Advisors LP) of the Fund's annual expenses which showed or appeared to show increases in expenditure, particularly as follows (and without prejudice to any further relevant facts and matters relating to Directors' fees or expenses):

85.1 directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased further to around US$2.25 million in the first half of 2024; and

85.2 expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

86 On 13 September 2024, without telling the Supporting Organisations or the Charities, the Directors resolved (amongst other things) with respect to Mr Patrick's compensation:

86.1 to increase Mr Patrick's salary to US$850,000 per annum;

86.2 include a long-term incentive ("**LTI**") tied to the Fund's returns, being 7.5% of annualised net fund returns in excess of 10% (capped at 25% annualised return); and

86.3 the Company should assess legal expenses attributable to investment which impacted the LTI compensation and then determine whether the LTI compensation should be increased.

87 On 1 October 2024, without telling the Supporting Organisations or the Charities:

87.1 the Directors resolved (amongst other things) that Mr Patrick would receive:

(a) an LTI payment of US$975,000; and

(b) an 'annual discretionary bonus' for 2023 at an amount of 2.5 times his base salary.

87.2 Previously, in or around October 2021, Mr Patrick had signed an 'employment agreement' for his position at the Company, for the period commencing 24 March 2021, which provides that Mr Patrick:

(a) shall receive a base salary of US$850,000;

(b) shall receive an LTI payment for the period 24 March 2021 to 24 March 2024 in the amount of US$4,759,000; and

(c) is eligible for both annual and discretionary bonuses as determined at the 'sole and absolute discretion of the Directors'.

88 Comparatively, Mr Scott's salary during his tenure in the Control Position was approximately US$60,000 per annum. Notwithstanding the above, the Supporting Organisations were not informed of these increases to the Directors' fees, remuneration and/or benefits.

89 In late October 2024, as a result of concerns arising from this additional expenditure, the Supporting Organisations requested that Mr Patrick provide relevant financial information for the Company and the Fund. Mr Patrick did not do so.

90 On 11 November 2024, Holland and Knight ("**H&K**"), U.S. attorneys for the Supporting Organisations, issued a letter to Mr Murphy advising that the Supporting Organisations no longer had confidence in the governance of the Company and/or the Fund and considered that a reorganisation of the governance structures was required to protect the charitable efforts of the Supporting Organisations (the "**No Confidence Letter**").

91 On 26 November 2024, Mr Patrick sought advice from Walkers as to whether the Company could issue further Participating Shares to a new non-profit organisation to dilute the Supporting Organisations so as to weaken any winding-up petition brought by the Supporting Organisations on just and equitable grounds. Mr Murphy wrote that:

> "*Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position by diluting them therefore the company should be wound up or an order made for change of management /revocation of the share issuances. It's a very difficult situation to get right without gifting them a potential ground…*"

92 On 27 November 2024, Walkers responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition will be taken into consideration and would likely help.

93 On 9 December 2024, DFW was incorporated as a non-profit non-stock company in Delaware, by or with the assistance of Mr Douglas Mancino, partner of U.S. firm, Seyfarth Shaw LLP ("**Seyfarth**"), who, worked alongside Mr Patrick in the establishment of the Company and the Fund structure. The sole member of DFW was and is Mr Patrick.

94 On 7 February 2025, 318 Participating Shares were issued to DFW.

95 On 20 February 2025, Mr Patrick as the Management Shareholder of the Company resolved to adopt the Amended and Restated Memorandum and Articles of Association dated 20 February 2025 which, among other things:

95.1 Amended the Memorandum at paragraph 3 to give the Company charitable objects;

95.2 Amended article 70 to introduce the concept of a Management Director (being a director holding the Management Share) and to weight the voting such that on all matters the Management Director had 10 votes and any other directors had 1 vote;

95.3 Deleted the previous articles 70 and 71 giving the right to appoint alternate directors and proxies. By email dated 27 February 2025, Walkers confirmed that the purpose of this deletion was to "*avoid the risk of 'outsiders' being brought into the fold*".

96 The Company reserves its position in respect of the validity of these amendments.

The purported restructuring: Mr Patrick causes the assignment of the Partnership Interest to CDM

97 On 12 December 2024, CDM was incorporated as a limited liability company in Delaware.

98 On 18 December 2024, without telling the Supporting Organisations or the Charities, the Directors of the Company resolved (the "**Transfer Resolutions**") to approve the transfer of the entirety of the Company's limited partnership interest in the Fund to CDM, in consideration for the contribution by the sole member of CDM of 100% of the membership interest in CDM. The Transfer Resolutions provide (amongst other things) that, based apparently on U.S. tax advice, the transfer of the limited partnership interest to CDM:

98.1 *"…would help insulate the DAF from exposure to [Dondero] and his entities who may be at risk of causing the [IRS] to revoke the tax-exempt status of one or more of the Participating Shareholders/supporting organizations which could imperil the assets of the Company*";

98.2 "*The IRS would look favorably upon any and all attempts for DAF to maintain its influence from what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement*";

98.3 As a Delaware limited liability company (CDM): "…*as permitted under the LLC Act, the terms of the LLC Agreement eliminate the fiduciary duties of the manager of the Transferee*".

99 On 18 December 2024, without telling the Supporting Organisations or the Charities, the Company, CDM and the New GP entered into a Deed of Assignment and Assumption (the "**Deed**") which was executed by Mr Patrick on behalf of each of (i) the Company in his capacity as Director; (ii) CDM in his capacity as Manager; and (iii) the New GP in his capacity as Director. Pursuant to the terms of the Deed:

99.1 The Company assigned its entire limited partnership interest in the Fund to CDM (the "**CDM Assignment**").

99.2 The New GP provided its written consent to the CDM Assignment and the admission of CDM as the new limited partner, in accordance with clause 1.11(a) of the LPA.

99.3 CDM agreed to exercise its reasonable best endeavours to ensure that 100% of the membership interest in CDM held by Mr Patrick would be transferred to the Company (the "**CDM Membership Interest**").

100 On 18 December 2024, the Company (as member) and Mr Patrick (as manager) entered into a Delaware law governed Limited Liability Company Agreement in respect of CDM (the "**LLC Agreement**").

101 The LLC Agreement, materially provides (amongst other things) that:

*"Fair Market Value shall have the meaning set forth in Section 6.9(b).*

*…*

*The initial Manager shall be Mark Patrick.*

*…*

*6.5 No Duties to the Company. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.*

*…*

*6.9 Valuation of Company Assets.*

*(a) General. The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.*

*(b) Binding Effect. The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.*

*…*

*7.3 Redemption. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the*

*Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal amount of the Fair Market Value of such Member's Interest being redeemed, as determined* by *the Manager in its sole discretion."*

102 The Company will rely on the terms of the LLC Agreement for their applicable full terms and effect.

103 The effect of these transactions was that:

103.1 CDM was inserted into the corporate structure below and as a subsidiary of the Company and would hold the entirety of the limited partnership interest in the Fund previously held by the Company; and

103.2 The Company would hold the entire membership interest in CDM, with the result that the Company's sole asset, having previously been its limited partnership interest in the Fund, was exchanged for the CDM Membership Interest

(the "**Restructuring**")

104 The Restructuring was at an undervalue and not in the interests of the Company (in that the CDM Membership Interest was less valuable than the limited partnership interest that the Company assigned to CDM) because (amongst other things)*:*

104.1 The General Partner owed fiduciary duties to the Company in the Fund, but the Manager (Mr Patrick) did not owe any fiduciary duties to CDM; and

104.2 The CDM Membership Interests were susceptible to being redeemed by Mr Patrick (as Manager) in his sole discretion and for any reason, for "fair market value" as defined by Article 6.9, i.e. a "good faith determination of the value".

105 On 3 April 2025, the Company obtained retrospective advice from Leading Counsel on the steps taken by the Company in December 2024 to effect the Restructuring and whether the transfer is "*open to challenge by the Participating Shareholders*", which advice:

105.1 refers to the justifications for the decisions taken as set out in the Restructuring Resolutions, and considers that, if called upon to justify the purpose of those decisions, the Directors would need to explain:

(a) how the penalisation or loss of tax-exempt status any of the current Participating Shareholders could have "*imperil[ed]"* the *"assets"* of the Company;

(b) the detrimental issues the Company was facing that the Directors believed would be mitigated by the interposition of CDM into the Fund structure; and

(c) how and/or why the Restructuring would (i) benefit the Company and (ii) reduce the influence of Mr Dondero; and

105.2 considers that a shareholder reviewing the reasons listed in the Restructuring Resolutions "*might suggest that the contents of the resolution are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board*".

<u>Persistent and continual lack of information for the Supporting Organisations</u>

106 On 23 January 2025, having received no response from Mr Murphy to the No-Confidence Letter, Julie Diaz, the CEO of The Dallas Foundation, sent Mr Patrick an email advising that the Supporting Organisations needed to better understand the Company's/Fund's asset position, and requesting certain information be provided by 10 February 2025.

107 Having received no response, on 28 January 2025, Ms Diaz sent a further email to the Directors expressing serious concern (i) that the Supporting Organisations' requests for information

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

continued to be disregarded, and (ii) about the ongoing lack of transparency on the part of the Directors.

108 On 30 January 2025, Mr Murphy replied to Ms Diaz stating that the Directors:

108.1 had not received the 23 January email – but understood the next step was for the Directors to "*present directly*" to the Supporting Organisations to address the No-Confidence Letter; and

108.2 are cooperating with the Supporting Organisations to provide additional information – but "*have no legal obligation to do so*" and such cooperation "*should not be construed as an implicit acknowledgement of any duty to continue providing information to you*".

109 On 31 January 2025, Mr Michael Stockham of H&K responded to Mr Murphy noting that he and Mr Patrick were fiduciaries, managing US$270 million in assets for the benefit of charities that support the most vulnerable (i.e. the Charities) and: *"[w]hatever your side's obvious antagonism to Mr Dondero, the fact remains that the underlying assets are ultimately for these charitable missions.*"

110 On 4 February 2025, Mr Murphy responded that while open to resolving the concerns, they (i.e. the Directors) were struggling to understand the Supporting Organisations' change in position.

111 On 7 February 2025, H&K responded that the Directors were fiduciaries in control of US$270 million for the benefit of charities: "*these monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed and … fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees*".

112 On 14 February 2025, H&K received a letter from Mr Mancino which rejected the accuracy of the reported increases in expenditure. On 27 February 2025, H&K responded that his clients

were frustrated by the lack of transparency and refusal to answer simple queries about the financial position. In response, Seyfarth sought available dates for Mr Murphy to make the promised presentation to the Supporting Organisations. H&K responded the next day with three potential dates/times for the proposed call between 26 March and 3 April 2025. Mr Mancino did not respond.

113 On 20 March 2025, Mr Mancino sent a letter purportedly on behalf of the Company to the IRS about alleged undue influence and control exercised over the Supporting Organisations by Mr Dondero. The letter makes serious and unsubstantiated allegations about the Supporting Organisations, absent evidential support, including that they each (i.e. all of them): "*operates for Mr Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of DAF Holdco to wrest control of DAF Holdco and its assets…*".

114 On 3 April 2025, Mr Mancino sent an email to H&K stating that he had just learned there was a call scheduled for the following day and seeking to reschedule. H&K responded that no such call had been arranged and queried the apparent source of confusion.

115 Mr Mancino, and Mr Patrick and Mr Murphy (each in part through Mr Mancino as an instructed attorney) acted in bad faith by maintaining a pretence of actual or potential cooperation with the Supporting Organisations when this was not the case, and by sending or causing to be sent the email of 20 March 2025 in secret:

115.1 four (4) months after the Directors and/or the Company transferred away the Company's interest in the Fund without telling the Supporting Organisations or the Charities;

115.2 two (2) months after the Directors and/or the Company diluted the existing Participating Shareholders without telling the Supporting Organisations or the Charities (see below);

115.3 one (1) week after the Directors and/or the Company redeemed the Company's interest in CDM without telling the Supporting Organisations or the Charities (see below);

115.4 one (1) day after the Directors placed the Company in voluntary liquidation, without telling the Supporting Organisations or the Charities.

Purported Share Issuance and allotment to DFW

116 In November 2024, without telling the Supporting Organisations or the Charities, the Directors began seeking advice from Walkers on whether the Company could issue new Participating Shares that would have the effect of diluting the existing Participating Shareholders - "*in light of a possible just and equitable winding up petition*" being filed by one of the Supporting Organisations.

117 On 7 February 2025, Walkers advised that, while there must be a corporate benefit to the exercise of the power, the Articles grant the Directors power to issue new shares that dilute the Participating Shareholders, and recommended the shares be issued sooner than later, and before any winding up petition was presented, since any alteration to the Company's membership made after the presentation of the petition would be void.

118 On 7 February 2025, without telling the Supporting Organisations or the Charities, the Directors resolved to issue 318 Participating Shares to DFW (the "**Share Issue Resolutions**"), resulting in DFW owning 51.04% of the Participating Shareholding and the dilution of the Supporting Organisations from an aggregate shareholding of 100% to 48.96% (the "**Share Issuance**"). The Share Issue Resolutions provided that:

118.1 Participating Shareholders had requested information and made false and misleading claims about the Company and its finances which the Directors believe were directed by Mr Dondero.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

118.2 Based apparently on U.S. tax advice:

(a) There was a heightened risk the IRS could revoke the tax-exempt status of the Participating Shareholders which could imperil the status and assets of the Company.

(b) Increasing the number of Participating Shareholders would mitigate the undue influence and private inurement of Mr Dondero.

(c) The IRS would look favourably upon attempts by the Fund to maintain its independence from his (i.e. Mr Dondero's) attempts to use the Fund for his private benefit.

118.3 The Directors believed the Share Issuance to DFW would protect the Company and the Participating Shareholders and resolved that the Share Issuance to DFW be approved.

119 On 5 March 2025, Leading Counsel (Mr Tony Beswetherick KC) issued draft retrospective (but final) advice to the Company on the Share Issuance in which he opined (amongst other things) as follows:

119.1 where Articles confer a power on directors to issues shares, that power is a fiduciary one and must only be exercised for proper purposes; an issue of shares "…*deliberately aimed at altering the balance of power between*" is problematic; the power should not be exercised with a view to altering an existing balance of power, irrespective of whether the directors consider that doing so is in the interests of the company;

119.2 the effect of the Share Issuance was that, if there were to be a company meeting or proposal to approve a modification that affects the Participating Shareholders' rights,

the ability of the prior Participating Shareholders to vote down such a change was negatively affected (DFW now having over 50% of the total Participating Shares);

119.3 it is not immediately clear from the Share Issue Resolutions whether the justifications stated were actually relevant to the Directors' decision. If they were relevant, it is not explained why the issue of shares to DFW would prevent false claims being made by Mr Dondero; it may be that those matters are part of the context, rather than part of the reason for the decision; and

119.4 the Participating Shareholders might suggest the Share Issue Resolutions are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board.

Plan to redeem the Original Participating Shareholders

120 In January and February 2025, the Directors, in connection with a plan to try to redeem the Participating Shareholders and/or the CDM Membership Interest held by the Company, and without telling the Supporting Organisations or the Charities, sought to obtain an analysis of the fair market value of the Participation Shares, and the discount that should be applied to such valuation, given the limited rights conferred upon Participating Share under the Articles.

*Historic ValueScope Valuations*

121 At the request of the Company, ValueScope, Inc. ("**ValueScope**") conducted a series of valuation analyses of 100 Participation Shares on a net asset value ("**NAV**") basis between December 2020 and September 2024 to determine their fair market value ("**FMV**"). These valuations were apparently prepared for internal reporting purposes and apparently applied consistent methodologies throughout the period. The results of these valuations are summarised below:

| Valuation date | NAV | NAV Per Share | Combined Discounts | FMV Per Share | FMV (100 shares) |
|---|---|---|---|---|---|
| 31 December 2020 | $176.96M | $580,193 | 17.0% | $481,468 | $48,146,754 |
| 31 December 2021 | $243.19M | $797,343 | 11.6% | $705,210 | $70,521,019 |
| 31 December 2022 | $276.24M | $905,711 | 15.4% | $766,549 | $76,654,941 |
| 31 December 2023 | $277.57M | $910,076 | 14.0% | $782,847 | $78,284,712 |
| 30 September 2024 | $269.05M | $882,140 | 13.9% | $759,614 | $75,961,370 |

122 The final NAV-based valuation prepared by ValueScope prior to the Restructuring was dated 7 January 2025, and gave a valuation of 100 Participating Shares as at 30 September 2024 (the "**September 2024 Valuation**").

*PwC and FTI*

123 On 14 January 2025, Walkers inquired with PwC about a valuation of "*the shares of Charitable DAF Holdco*". In that email, Walkers, presumably on instructions from the Directors, listed the Supporting Organisations as "*potential adverse parties*".

124 On 7 February 2025, Walkers informed PwC that CDM had been inserted into the structure and requested that a second valuation be prepared of all the CDM Membership Interest, which valuation Walkers said was also to rely on the NAV as previously advised (rather than leaving

PwC to determine their own valuation methodology). PwC responded that their initial view is "*there is no meaningful difference*" between the two valuations requested - "*i.e. the economic interest in the underlying NAV still fully accrues to the participating shareholders*" - but that voting power/control remains with Mr Patrick (or with entities he controls). PwC asked for further information about what Mr Patrick was trying to achieve by the Restructuring to help them understand the valuation implications.

125 On 10 February 2025, PwC suggested a call with Walkers to discuss the second valuation, which call took place on 11 February 2025, and was also attended by Mr Patrick's '*onshore and Delaware counsel*'. Following that call, PwC declined to take on the instructions:

> *"... our view is that the new Delaware entity (CDMCFAD) effectively has full economic interest and control over the Fund, so we don't really see a basis for applying any discounts to the underlying Fund NAV for that entity. As it relates to the participating shareholders' interest in Charitable DAF Holdco, Ltd., we don't think we can reliably estimate the value/discount given the current fact pattern. While we could make hypothetical assumptions about how the articles may be interpreted, and/or how future cash flows may or may not be distributed, the impact on value is so substantial that we don't think it would be a meaningful exercise (i.e. we'd end up with the discount being 100% in one scenario, but 0% in another). On that basis, I don't think there is a fee / scope that can work for us currently."*

*The FTI Memo*

126 On 13 February 2025, without telling the Supporting Organisations or the Charities, the Company engaged FTI Consulting in London ("**FTI**") to advise on (i) the discount applicable (if any) to a valuation considering how the rights attached to Participation Shares differed from those typically associated with ordinary shares, and (ii) the impact of the existence of an additional share class (being the Management Shares held by Mr Patrick). FTI's engagement

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

letter also stated that "*The Memo will also include a valuation of the ordinary shares of CDMCFAD, LLC, the immediate subsidiary of Charitable DAF HoldCo*".

127 On 2 March 2025, FTI provided a draft memorandum to Walkers/the Company.

128 On 27 March 2025, FTI issued its final memorandum (the "**FTI Memo**"), which stated (amongst other things) that the rights of Participating Shares were extremely limited, and the potential distribution of cash was highly dependent on a member's alignment with the Fund's mission. The FTI Memo concluded that a "limited discount" for lack of control and marketability should be applied where a member is aligned with the Fund's mission (said to be close to the range concluded by ValueScope in its 7 January ValueScope Report, i.e. a discount of 13.9%), and a "high discount" of 95% where a member is not.

*Legal advice sought*

129 On 25 February 2025, without telling the Supporting Organisations or the Charities, the Directors sought advice from Walkers and Shields Legal on any powers under the Articles to enable the removal of the Supporting Organisations, including by (i) redemption of the Participating Shares (Art 14 and 28), (ii) a forced transfer of Participating Shares held by a Restricted Person (Art 21) (iii) or an alternative course whereby DFW repurchased the shares, which could then be cancelled, and new shares issued which are redeemable by the Company. Walkers advised that both redemption and forced transfers were not permitted but agreed with the alternative course involving DFW.

130 On 5 March 2025, as stated above, Leading Counsel provided retrospective advice to the Company regarding the Share Issuance, which also considered whether the Directors had power under the Articles to redeem the Participating Shares. Leading Counsel opined that they did not, on the basis that the Participating Shares were not issued as redeemable shares, and could not be redeemed unless there were a prior variation of the rights ascribed to them. That said, any proposal to vary the rights attached to the shares to make them redeemable would

support an argument "*that the [DFW Share Issue] was itself procured with a view, ultimately, to disenfranchising the pre-existing Participating Shareholders*".

131 On 17 March 2025, Mr Patrick wrote to Walkers in the following terms:

> *"Agree we need to finalise the [FTI valuation] reports …We should request any limits on use removed.*
>
> *We are seeking U.S. tax counsel to send emails to Paul and I that the non profits are Restricted Persons and/or best interests of the Company to have non dondero holders of its interests. After that, an alternative approach is to give them what they want – liquidate Holdco Ltd after its only investment is redeemed by the US. LLC pursuant to U.S. counsel advice above, that it's in the best interests of the Company to redeem all non-profits affiliated with Dondero. US LLC has same valuation conducted on its shares as the participation shares. so we would redeem the LLC interest, then distribute the proceeds out of Holdco Ltd., and file articles of Dissolution for Charitable daf Holdco Ltd before a wind up petition is filled. That would put us on the "high ground" to fight (rather the way this is currently heading in a defensive posture). they would have to scrap their wond up petition and fight for reinstatement, gripe about the valuations, and file fiduciary breach actions …*
>
> *We will stage this in light of the Doug letter, new advice of two separate U.S Tax counsel, and seeing how successful (or not) our outreach to the Texas attorney general office is.*
>
> *Note US LLC would make DFW its sole owner."*

132 The email of 19 March 2025 makes plain that the Directors, or at least Mr Patrick, intended to liquidate the Company without notice to the Supporting Organisations and to otherwise obstruct

the Supporting Organisations' ability to exercise any right to petition to wind up the Company on just and equitable grounds.

133 On 20 March 2025, Walkers provided comments on the FTI draft valuation, and FTI responded. These comments include, amongst other things*:*

> "Walkers: *It is stated at [3.2(2)] that "there is no overriding duty of DAF's Directors to act in the shareholders' interest. The Directors will act according to the best interest of the company, that is, to achieve the charitable causes that are aligned with DAF's mission". However, as a matter of Cayman law, directors owe duties to the company, and must act in its best interests [which are] generally regarded as the interests of the members as a whole, and in certain circumstances the objects of the company may be taken into account when determining what is in its best interests.*
>
> FTI: *Can you explain how it was in the interests of the company to materially dilute the existing shareholders*?
>
> …
>
> Walkers: *It is stated at [3.10] that "the Participating Shareholders do not have any rights to cause a liquidation/winding up of the company". However, the Participating Shareholders do have the right to seek a winding up of the company, as conferred upon them by the Companies Act (rather than the Articles).*
>
> FTI: *Why won't they just do this immediately and seek distributions? Isn't the ability to trigger a liquidation contradictory with point 1 which states* "*Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed*".
>
> …

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Walkers: *As per our comments, please could you delete references to our advice so as to avoid any potential arguments about waiver of privilege.*

FTI: *Your advice is important in us arriving at our conclusions. I understand from our legal team that we either (i) keep the reference to your advice or (ii) address the memo to you. Are you expecting there to be litigation in relation to the proposed transaction?*

…

Walkers: *Our client now seeks a valuation report which may, in connection with a proposed redemption of the membership interests in CDM, be disclosed to third parties and relied on to establish fair market value of both the membership interests in CDM, and in turn HoldCo.*

FTI: *This is a material change in the purpose and access rights of the report. Please provide more detail of the transaction. Is it the case that Mark will make CDM redeem the shares owned in by DAF? And who would you like to share the report with? And on what basis (e.g. non-reliance)? We also note our memo is not a valuation – it is a quantification of discounts given the rights of the participating shares. To do a valuation, we would need to do a more detailed exercise, including valuing the underlying assets."*

134 On 21 to 24 March 2025, FTI and Walkers had an exchange (amongst other things) as follows*:*

"FTI: *If the firm was wound down, would it result in distributions to the existing participating shareholders? Or would Mark still be able to shareholder structure to ensure the existing participating shareholders got nothing? Given they haven't received dividends since 2019, why haven't the participating shareholders triggered a wind down? If they can trigger a wind down and then in short order receive $300m of distributions, it does change things re discount.*

Walkers: *if HoldCo was wound up, the Participating Shareholders would receive distributions which would be made pari passu, and Mark (if he was the liquidator) would not be able to ensure the existing Participating Shareholders get nothing. Whilst the Participating Shareholders have the right to seek to wind up under the Companies Act, they need a proper basis to do so… We can only assume [they] have not commenced proceedings seeking to wind the company up because they do not have a proper basis on which to do so …*

…

FTI: *Would an absence of distributions be sufficient grounds to make an application to wind the company up? If the participating shareholders did make the application, would Mark be able to issue a vast number of shares to another party before the distributions were made thereby ensuring the existing shareholders received very little?*

Walkers: *A Participating Shareholder may consider an absence of distributions sufficient grounds for a winding up order on the just and equitable basis… But it is difficult for us to say whether that petition would be successful. If (a) a Participating Shareholder presented a petition; (b) new shares were purportedly issued; and (c) the Court then made a winding up order, the issue of the new shares would be void and not impact the amounts the Participating Shareholders would receive.*"

135 On 26 and 27 March 2025, FTI and Walkers had an exchange (amongst other things) as follows*:*

"Walkers: *We have discussed with our client and onshore counsel and set out some amendments in the attached. In addition, we note (1) we have not received any material addressing reliance on the memo by CDM; and (2) the "Limitations and restrictions" section still provides that the memo "should not be used to support a transaction". For*

*the memo to be useful in the circumstances, CDM [and HoldCo] need to be able to rely on it or a separate memo would need to be addressed to CDM on which it may rely. Further, both entities need to be able to rely on the memo(s) to support the proposed transaction.*

FTI: *What is the intention of adding that directors should act in the interests of future members? I am struggling to understand how a director could act in a manner which is beneficial for future shareholders which is not also helpful for existing shareholders.*

*The limitations in our note will remain. To do a valuation to support a transaction, we will need to do significantly more detailed work. This is an unusual/complicated situation. We are open to doing a fairness opinion on the transaction. But this will require approval from our risk committee and more information on the transaction and situation. We are happy for CDM to have our memo on a non-reliance basis. But this memo should not be used to support a transaction.*"

*March 2025 ValueScope Valuation*

136 Following the Restructuring, ValueScope was requested by Shields Legal, without telling the Supporting Organisations or the Charities, to prepare two valuation analyses:

136.1 100% Membership Interest in CDM; and

136.2 Certain Participating Shares of the Company as at 25 March 2025 (the "**March 2025 Valuation**").

137 The March 2025 Valuation had the same instructions, definition of value and scope of work as the September 2024 Valuation. Like the September 2024 Valuation, the March 2025 Valuation also referenced a 30 September 2024 balance sheet (and did not refer to any later analysis of

assets and liabilities). As shown below, the September 2024 Valuation and March 2025 Valuation produced very different results.

138 A comparative summary of the September 2024 and March 2025 Valuations is set out below:

| **Valuation Date** | **DLOC*** | **DLOM**** | **Valuation Basis** | **FMV (100 Shares)** |
|---|---|---|---|---|
| 30 September 2024 | 8.1% | 6.3% | NAV | $75,961,370 |
| 25 March 2025 | 99.2% | 20.00% | DCF*** | $536,784 |
| **Difference** | **+91.1%** | **+13.7%** | | **-$75,424,586** |

*DLOC – Discounted for Lack of Control

**DLOM – Discounted for Lack of Marketability

***DCF – Discounted Cash Flow

139 The March 2025 Valuation stated: "*for the valuation of non-controlling assets in holding companies such as DAF, the asset-based approach is most commonly used [as Valuescope had always done previously]. When applied to such companies, the approach consists of measuring the underlying net asset value of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity. However, in the case of the participation shares under consideration, the asset-based approach is not applicable. These shares do not confer control and only have a claim in respect of the underlying assets in a winding up.*"

140 ValueScope does not appear to have considered whether winding up was a possibility, and therefore, whether value could have been realised that way and by reference to NAV.

141 For reasons which are unclear to the Company, the March 2025 Valuation expressly rejected the asset-based (NAV) approach on the basis that the economic benefits of the Participating Shares in the Company were contingent on discretionary distributions by its manager. The report states.

> '*Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of these shares are contingent upon discretionary distributions by the director. As such, their value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality*'.

142 Accordingly, the methodology applied in the March 2025 Valuation was markedly different from the methodology applied in the September 2024 Valuation. Instead of relying on discounted net assets, the March 2025 Valuation:

142.1 applied a discounted cash flow ("**DCF**") methodology to estimate the present value of expected future distributions, rather than an asset-based approach, as had been applied in at least the past five annual valuations by ValueScope;

142.2 determined the FMV of 100 Participating Shares to be US$536,784;

142.3 applied a discount of 99.2% for DLOC; and

142.4 applied a discount of 20.00% for DLOM.

143 The DCF model is based on the present value of future distributions to the Company. ValueScope's report shows that these were estimated based on historic distributions themselves controlled by Mr Patrick.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

144 Based on the valuations above, between 30 September 2024 and 25 March 2025, the FMV of 100 Participating Shares in the Company apparently declined from US$75,961,370 to US$536,784, representing a reduction in value of 99.29% in less than a six month period, in which the Restructuring occurred, attributable to a change in valuation basis (amongst other things) from NAV to DCF.

145 Furthermore, ValueScope does not appear to have sense-tested their valuation. Although they identified “total equity” of c. US$270 million and concluded that all of the Participation Shares had a value of only c. US$1.6 million, they did not address themselves to who benefitted from the residual value of c. US$268 million.

Admission and Redemption

146 On 27 March 2025, Mr Patrick, as manager of CDM, executed a written consent (the "**Manager Consent**") to (a) cause CDM to admit DFW as an additional member of CDM pursuant to the terms of an Admission and Amendment No.1 Agreement (the "**Admission Agreement**") and (b) redeem the CDM Membership Interest held by the Company pursuant to the terms of a Redemption and Amendment No. 2 Agreement (the "**Redemption Agreement**" and together with the Admission Agreement, the "**Restructure Agreements**"):

146.1 The recitals to the Manager Consent stated that the redemption of the Company's membership interest was justified by reason of alleged attempts by the Supporting Organisations to exert control, and the potential loss of their (i.e. the Supporting Organisations’) non-profit and tax-exempt status:

> *“… the Manager has formed the view that the Current Member, by virtue of being a member of the Company and having as Participating Shareholders the Highland Foundations, poses a material risk to the Company, its assets, and the Mission Statement of DAF due to, among other things, (i) officers and directors of the Highland Foundations seeking to assert dominion and control*

*over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii)*"

146.2 The Manager Consent further stated:

"*WHEREAS, in connection with the Restructure Agreements and the transactions contemplated thereby, the Manager (on behalf of the Company) obtained a valuation report of the membership interests of the Company from ValueScope and FTI Consulting, copies of which are attached hereto as Exhibit E, which valuation reports have informed the Manager the fair market value of the membership interests*"

146.3 Exhibits C and D to the Manager Consent are documents purportedly containing information regarding various alleged U.S. tax issues relating to the Company.

146.4 Exhibit C is the letter from Mr Mancino to the IRS dated 20 March 2025, in which Mr Mancino (amongst other things) stated:

(a) there has been "deterioration" of the Company's relationship with Highland Dallas Foundation, Inc. ("**HDF**") due to the undue influence and control exercised over HDF by Mr Dondero.

(b) the information in the letter will demonstrate clearly that Mr Dondero's influence and control is an inappropriate donor relationship with representatives of the HDF who serve on the Board of Directors of and as officers of HDF.

(c) such undue influence and control potentially jeopardises the tax-exempt status of HDF as an organisation described in s.501(c)(3) and, at a minimum, causes it to fail to remain a supporting organisation described in s. 509(a)(3).

146.5 Exhibit D is an advice produced by Carrington Coleman (U.S. law firm) dated 25 March 2025 (the "**Carrington Advice**") which amongst other things:

(a) asserts that Mr Dondero has been attempting "*through his control of the Highland SOs, to exert dominion and control over the cash and property he previously donated to DAF and for which he claimed charitable deductions, all for his personal benefit.*"

(b) suggests that Mr Dondero was using the Company as his personal "*piggy bank*", and that it may be perceived by the IRS that the Fund has been or is his financial alter ego.

(c) concludes that "*the IRS will look favourably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by Dondero, and the entities controlled by him to use DAF for his private benefit and inurement.*"

146.6 Exhibit E contained two valuation reports:

(a) The first was a ValueScope valuation.

(b) The second is the FTI Memo referred to above, in which FTI expressly stated that the analysis in the FTI Memo should not be used in support of a transaction, but which Mr Patrick, in any event:

(i) expressly relied upon in the Manager Consent to determine the fair market value of the CDM Membership Interest and the basis for the redemption of the Company's interests; and

(ii) permitted Carrington Coleman to refer to and rely on in the FTI Memo (indeed, having provided the 27 March 2025 copy which was a draft copy only).

146.7 On 27 March 2025, without telling the Supporting Organisations or the Charities, Mr Patrick executed the:

(a) Admission Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192; and

(b) Redemption Agreement under which CDM redeemed the Company's membership interest in CDM for the same sum of US$1,637,192 (the "**Redemption Sum**").

147 On 27 March 2025, without telling the Supporting Organisations or the Charities, the Company entered into a letter agreement with CDM (the "**Letter Agreement**"), pursuant to which the Company assigned to CDM various contracts and agreements to which the Company was a party, listed in Schedule A to the Letter Agreement and CDM agreed to assume the liabilities and obligations in respect of those contracts.

148 On 2 April 2025, the Directors of the Company, by way of written resolution:

148.1 Noted the redemption of the Company's membership interest in CDM for the Redemption Sum (the "**Redemption**").

148.2 Resolved to pay a dividend to the Original Participating Shareholders of US$1,612,192.01 in the amount of (i) US$528,587.54 with respect to each of HDF, Highland Kansas City Foundation, Inc. and Highland Santa Barbara Foundation, Inc.; and (ii) US$26,429.39 with respect to CFNT.

149 The substantive financial effect of the Redemption, under which DFW did or was committed to make a capital contribution equivalent to the Redemption Sum to CDM, and the CDM Membership Interest held by the Company were redeemed for the Redemption Sum, was that the Company's membership interest in CDM was purchased by or otherwise transferred to DFW for the Redemption Sum.

150 The substantive effect of the overall transaction or series of transactions pleaded above, including the Impugned Transactions already pleaded, was that:

150.1 The Company realised its interest in the Fund, which had a NAV of c. US$270 million, for c. US$1.6 million.

150.2 The Company made a distribution to the Original Participating Shareholders (c. US$1.6 million).

150.3 The Supporting Organisations and the Charities were actually or effectively divested of their indirect interest in the Fund, and the assets underlying the Fund; and

150.4 The Original Participating Shareholders were diluted from 100% of the economic interests in the Company to less than 50%.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Voluntary Liquidation and Supervision Order

151 On 2 April 2025, the Directors resolved, without telling the Supporting Organisations or the Charities, to place the Company into voluntary liquidation and appoint Mitchell Mansfield and William Clarke (the JVLs) of Kroll (Cayman) Ltd as voluntary liquidators.

152 However, unaware of the voluntary liquidation, on 10 April 2025, the Supporting Organisations presented a petition seeking the winding up of the Company on a just and equitable basis, under section 92(e) of the Companies Act (2025 Revision) (the "**J&E Petition**").

153 On 25 April 2025, Walkers and Shields Legal held a call to discuss the J&E Petition. Following that call, Mr Patrick wrote in an email that the "*message ideas*" "*for Monday*" were to "*poison the well*", by which he meant to create a negative impression of Mr Dondero in the eyes of the Court.

154 On 6 May 2025, Justice Jalil Asif KC made a supervision order, under which voluntary liquidation of the Company was to be continued under the supervision of the Court pursuant to s.131 of the Companies Act (As Revised), and the JOLs were appointed.

**OBLIGATIONS OWED BY THE DIRECTORS**

155 At all material times, the Directors, as directors, owed the following duties individually to the Company:

155.1 A fiduciary duty to act *bona fide* in what he considers to be the best interests of the Company (the "**Best Interests Duty**").

155.2 A fiduciary duty to exercise his powers for a proper purpose, and for the purposes for which they were conferred (the "**Proper Purpose Rule**").

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

155.3 A fiduciary duty not to place himself in a position where his personal interest actually or potentially conflicted with his duty of loyalty to the Company (the "**First No-Conflicts Duty**").

155.4 A fiduciary duty not to place himself in a position where his duty to another actually or potentially conflicted with his duty of loyalty to the Company (the "**Second No-Conflicts Duty**").

155.5 A fiduciary duty to not make an unauthorised profit from or by reason of his fiduciary position (the "**No Profit Duty**").

155.6 A fiduciary duty not to accrue or take a benefit or commercial opportunity from the Company without the full and informed consent of the Company (the "**No Self-Dealing Rule**").

155.7 A duty to exercise reasonable skill, care, and diligence in the performance of his role and function as director (the "**Reasonable Care Duty**").

156 With respect at least to Mr Patrick, his duties above and the standard to which he was obliged to comply with such duties are affected by being in the Control Position and the trustee or trustee-like position he occupied. Paragraph 76 above is also relied upon.

157 The Company reserves its position as to whether Mr Patrick, by reason of being in the Control Position and the trustee or trustee-like position he occupied, was an express or other trustee of the assets of the Fund for the Original Participating Shareholders and, through or in addition to them, the Charities.

**ATTRIBUTION OF KNOWLEDGE AND INTENTION**

158 As a matter of Cayman Islands law, Mr Patrick's intention and knowledge of facts and matters for all such purposes relevant to this claim is to be attributed to each of DFW, CDM, and the New GP on the basis of at least the following facts:

158.1 As regards DFW, Mr Patrick is listed under DFW's certificate of incorporation, dated 9 December 2024, as "the member of the corporation", and the Admission Agreement showed he served as its "President". Mr Patrick is also the registered director of DFW. Mr Patrick the agent of DFW, in which capacity Mr Patrick executed the Admission Agreement.

158.2 As regards CDM, Mr Patrick is described under the LLC Agreement as the "Manager" of CDM, in which role Mr Patrick was CDM's agent, and in which capacity he (i) executed the Deed of Assignment and Assumption on behalf of CDM, and (ii) executed a written 'Manager Consent' (the "**Manager Consent**") approving the Redemption and Admission Agreements; and executed the Redemption and Admission Agreements.

158.3 As regards the New GP, Mr Patrick was and remains its director, and therefore its agent (in which capacity, Mr Patrick executed the Deed of Assignment and Assumption on the New GP's behalf). Further, Mr Patrick is the sole shareholder of the New GP.

159 Further, if applicable, as a matter of the laws of the State of Delaware, Mr Patrick's knowledge and intention is to be attributed to DFW, CDM, and the New GP on a like basis.

**CLAIMS AGAINST THE DEFENDANTS**

Breaches of fiduciary and other duty

160 The First and Second Defendants, and each of them, in their capacity as a Director of the Company, acted in breach of their fiduciary and other duties to the Company as follows.

Restructuring, including the CDM Assignment

161 The Directors (and each of them), in procuring, directing or effecting the Restructuring as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring, directing or effecting the Restructuring as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

161.1 The Plaintiff relies on paragraphs 77 to 105 above.

161.2 With the assistance of Mr Mancino, Mr Patrick took steps to form CDM and appoint himself as Manager of CDM.

161.3 Mr Patrick designed and/or negotiated and/or directed and/or effected the Restructuring in his capacity as Director of the Company, Director of the New GP, and Manager of CDM, being each of the parties to the Deed, and signed the Deed on behalf of each party.

161.4 The Directors (and each of them) approved the transfer of the Company's entire limited partnership interest in the Fund (having net assets worth c. US$270 million) to CDM, a Delaware entity whose LLC Agreement excluded any fiduciary obligations owed by its Manager (i.e. Mr Patrick) to CDM itself or to its members; in exchange for membership interest in CDM, which interest was capable of being extinguished, by redemption, and for a "fair value", determined at the discretion of the Manager (i.e. Mr Patrick).

161.5 The Restructuring was of no benefit to the Company and not in its best interests, and Mr Patrick was subject to conflicts of interest (First and Second No-Conflicts Duties) and committed acts of self-dealing.

161.6 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known that the Company was proposing to exchange the Partnership Interest for a membership interest in CDM that was subject to redemption entirely at Mr Patrick's discretion, and for a "*fair value*" determined, in good faith, in his discretion.

(b) knew or ought to have known that the Company was therefore proposing to trade its Partnership Interest, which was not in practical terms defeasible, for an interest that could be extinguished: (i) at a time over which it had no control, (ii) for a price over which it had very limited control and (iii) for a potential valuation basis which excluded a net asset valuation of the assets held in the Fund.

(c) knew or ought to have known that the CDM Membership Interest was to be in a Delaware-incorporated company whose LLC Agreement excluded any fiduciary obligations owed by its Manager either to CDM itself or to its members and was therefore less valuable than the Partnership Interest.

(d) knew or ought to have known that the CDM Assignment was therefore a transaction at an undervalue.

161.7 It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from CDM without the full authorisation or full and informed consent of the Company.

161.8 Further, and in any event, the Directors (and each of them) acted when each of them:

(a) knew or ought to have known that the CDM Assignment was the first step in a series of connected future transactions, including those pursuant to the CDM Assignment, the Share Issuance, the Admission Agreement, the Redemption Agreement and the Redemption, under which the Directors were able to and ultimately did procure the redemption of the Company's CDM Membership Interest, thus extinguishing the Company's interest in the Fund, for an undervalue.

(b) knew or ought to have known that:

(i) the full terms and effect of the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

(ii) the full terms and effect the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk to the Company, which was not itself a Donor Advised Fund and/or did not enjoy or require tax-exempt status under s.501(c)(3) of the U.S. Internal Revenue Code.

(iii) other approaches to address concerns with respect to the tax-exempt status of the HDF short of undertaking the Restructuring (and entering into the CDM Assignment) included notifying the HDF of the conflict and/or concerns and requesting it to remedy it or them.

(iv) even if the facts and matters alleged in relation to the HDF were correct, there was more than a possibility, after an extended passage of time and at least two levels of appeal, that a U.S. tax audit would result in an adverse determination with respect to the tax-exempt status of the HDF.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(v) the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

(c) knew or ought to have known that they were keeping the Restructuring, the CDM Assignment, CDM itself and all the surrounding circumstances secret from the Participating Shareholders.

162 By reason of the foregoing breaches of duty or any of them:

162.1 The CDM Assignment is void, alternatively voidable and hereby avoided.

162.2 CDM holds the Partnership Interest on trust or constructive trust for the Company.

162.3 CDM is required to re-transfer the Partnership Interest to the Company and account for any profits on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

Share Issuance

163 The Directors (and each of them), in procuring, directing or effecting the Share Issuance as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring, directing or effecting the Share Issuance as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

163.1 The Plaintiff relies on paragraphs 77 to 84, 91 to 96 and 106 to 119 above.

163.2 The Directors (and each of them) designed and/or engineered the Share Issuance, having sought legal advice in relation to the powers conferred on them as Directors of the Company, for the improper purpose of:

(a) diluting without any proper reason or corporate purpose the existing Participating Shareholders and/or depriving the ability of the Supporting Organisations to continue to comprise a majority of the Participating Shareholders.

(b) inserting DFW as a new Participating Shareholder, an entity under the sole control of Mr Patrick, to obstruct and/or prejudice and/or adversely affect the exercise of a Participating Shareholders' right to petition for the just and equitable winding-up of the Company.

163.3 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known the issue and allotment of shares at par to DFW was of no benefit to the Company.

(b) knew or ought to have known that the exercise of the power to issue shares and allot them to DFW was for the improper purpose of diluting the interest of the Original Participating Shareholders.

(c) knew or ought to have known that the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was a response to the prospect that the Supporting Organisations might present a petition for the winding-up of the Company on a just and equitable basis, as indeed they did on 10 April 2025 in ignorance of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW.

(d) knew or ought to have known that the sole or primary purpose of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was to insert a new majority Participating Shareholder (under their or at least Mr Patrick's control) into the Company's share capital structure to (if they or at least Mr Patrick deemed fit) to oppose the actions of the Supporting Organisations and/or the Original Participating Shareholders, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

163.4 Mr Patrick designed and/or directed and/or effected the Share Issuance in his capacity as Director of the Company, even though he was 'President' of DFW and the sole member and the sole director of DFW.

163.5 It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from DFW (if not also from CDM) without the full authorisation or full and informed consent of the Company.

164 By reason of the foregoing breaches of duty or any of them:

164.1 the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW is void, alternatively voidable and hereby avoided.

164.2 DFW holds its shares on trust or constructive trust for the Company.

164.3 DFW is required to concur in the rescission of the allotment and to re-transfer its shares to the Company on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

164.4 The Company's register of shareholders shall be rectified accordingly.

Admission and Redemption

165 The Directors (and each of them), in procuring or entering into the Admission Agreement and the Redemption Agreement, and/or in procuring, directing or effecting the Redemption acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring or entering into the Admission Agreement and the Redemption Agreement, or in procuring, directing or effecting the Redemption as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

165.1 The Plaintiff relies on paragraphs 120 to 150 above.

165.2 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known that:

(i) proceeding on the basis of the Seyfarth/Mancino letter to the IRS dated 20 March 2025 was flawed or unreasonable.

(ii) proceeding was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

(iii) the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

(iv) proceeding on the basis of the March 2025 Valuation and the FTI Report was flawed in that: (i) the 99.2% discount in value proposed by the

ValueScope Report was a manifestly excessive discount, and resulted in the Company parting with its indirect ownership of 99% of the economic interest in the Fund (which had net assets worth c. US$270 million) for a mere US$1,637,192; and (ii) as pleaded above, the FTI Report expressly stated that *"this memo should not be used to support a transaction."*

(v) the Admission Agreement and the Redemption Agreement were steps in a series of connected transactions, including those pursuant to the CDM Assignment, the Share Issuance, under which the Directors were able to and ultimately did procure the extinguishment of the Company's interest in the Fund, through the redemption of the Company's membership interest in CDM, for an undervalue.

(b) knew or ought to have known that the sole or primary purpose of the Admission Agreement, the Redemption Agreement and the Redemption was to ensure that the Company was fully and finally deprived of an asset (its interest in the Fund) at an undervalue; and to enable a third party, DFW, controlled by Mr Patrick, to procure ownership of an interest in the Fund in complete replacement of the Company.

165.3 Mr Patrick designed and/or negotiated and/or directed and/or effected the Admission Agreement, the Redemption Agreement and the Redemption as Director of the Company, even though he was Manager of CDM and 'President' of DFW, sole member of CDM and sole member and sole director of DFW.

166 By reason of the foregoing breaches of duty or any of them:

166.1 DFW holds the CDM Membership Interest on trust or constructive trust for the Company.

166.2 DFW is required to concur in the transfer of the CDM Membership Interest to the Company or as the Company directs on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

Further claims against Mr Murphy

167 In respect of any breach of duty as set out above for which Mr Patrick alone is liable:

167.1 At all material times, Mr Murphy worked in close concert with Mr Patrick, including at his direction.

167.2 Mr Murphy knew or ought to have known all the facts and matters pleaded above as known or ought to have been known by Mr Patrick.

167.3 Mr Murphy knew or ought to have known of all the facts and matters pertaining to such breach or breaches by Mr Patrick.

167.4 Mr Murphy took no steps to stop Mr Patrick or to prevent or report the breach or breaches of duty by Mr Patrick.

167.5 Mr Murphy accepted and acquiesced in all steps and actions suggested, promoted or effected by Mr Patrick.

167.6 Mr Murphy accepted and acquiesced in the breach or breaches of duty by Mr Patrick.

167.7 As a consequence, Mr Murphy has acted in breach of his duties to the Company, including the Best Interests Duty and the Reasonable Care Duty.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Directors' Fees, Remuneration and Expenses

168 The Company is still unclear as to what precise fees or remuneration or emoluments or benefits were afforded to the Directors and from what source, and as to the proper expenses of the Company, in the period after March 2021 and thus reserves its position.

169 As is pleaded above in paragraphs 85 to 89, the Directors approved large increases for Mr Patrick's remuneration, benefits or emoluments: by around 1 October 2024, Mr Patrick's remuneration comprised a base salary of US$850,000, a bonus of 2.5 times that base salary, an LTI incentive payment of US$975,000; for the period March 2021 to March 2024, Mr Patrick was entitled to an aggregate LTI payment of US$4,759,000; and eligibility for discretionary and annual bonuses in addition, to be determined at the sole and absolute discretion of the Directors. By contrast, Mr Scott's annual salary and entire benefits during his tenure in the Control Position was US$60,000.

170 Insofar as the Directors (or each of them) approved of or procured any payment or benefit to or for Mr Patrick or Mr Murphy more than the sum of US$60,000 per annum each in respect of fees or remuneration or emoluments or benefits, such sum was excessive and conferred in breach of duty to the Company, including the Best Interests Duty, the Proper Purpose Rule, the first No-Conflicts Duty, the No Self-Dealing Rule and the Reasonable Care Duty.

171 Further, as is pleaded above, the Directors (or each of them) approved or caused the payment of considerable sums by way of expenses, amounting for example to US$18.3 million for the first half of 2024, and US$18.6 million spent over 2023. Such expenses may include the expenses incurred in effecting the transactions which are the subject matter of these proceedings. The reasonableness or *bona fides* of these expenses is not accepted by the Company.

172 The Company claims:

172.1 Full information, documents and discovery as to the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

172.2 Full information, documents and discovery as to expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

172.3 Repayment to the Company of all fees or remuneration or emoluments or benefits paid or claimed by Mr Patrick or Mr Murphy and each of them in excess of US$60,000 per annum; together with all improperly paid expenses caused or procured by Mr Patrick or Mr Murphy (or damages or equitable compensation in relation thereto).

Unlawful Means Conspiracy

173 The facts and matters pleaded above amount to an unlawful means conspiracy as follows:

173.1 It is unclear when the conspiracy began but it appears to have started by around the start of 2024.

173.2 The original conspirators were Mr Patrick and Mr Murphy. The Company is unaware of the circumstances in which Mr Patrick and Mr Murphy agreed or combined and is unable to plead further pending further information or discovery.

173.3 As they were incorporated and participated in the facts and matters pleaded above, the New GP, CDM and DFW joined the conspiracy but remain liable in damages for all losses, including prior to joining the conspiracy.

173.4 The conspiracy was a conspiracy to injure the Company.

173.5 The overt acts of the conspiracy were all the facts and matters pleaded above, including as breaches by Mr Patrick or Mr Murphy.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

173.6 The unlawful means of the conspiracy were all the facts and matters pleaded above as breaches of duty by Mr Patrick or Mr Murphy.

173.7 Each of the conspirators intended to injure the Company. This averment is an inference from all the facts and matters pleaded above.

173.8 As a consequence, the Company has suffered loss and damage, as a result of the Restructuring, the CDM Assignment, and the Admission and Redemption, and the combined effect thereof, as set out above.

<u>Proprietary claim and/or unconscionable receipt</u>

174 The facts and matters pleaded above give rise to claims by the Company for unconscionable receipt as follows:

174.1 CDM received the Company's Partnership Interest in the Fund under the CDM Assignment.

174.2 The knowledge of CDM was and is that of Mr Patrick.

174.3 The breaches of duty in relation to the CDM Assignment above are relied upon.

174.4 CDM knew that the CDM Assignment was at an undervalue and that causing or procuring the Company to enter into the CDM Assignment was a breach of fiduciary duty by Mr Patrick and/or Mr Murphy.

174.5 By reason of the foregoing, it is unconscionable for CDM to retain the Partnership Interest in the Fund and CDM is liable to account to the Company in equity, by restoring Partnership Interest in the Fund to the Company and/or accounting for any profits or otherwise accounting to the Company in equity.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Unjust Enrichment

175 In receiving the Company's Partnership Interest in the Fund, CDM was unjustly enriched at the Company's expense and is liable to the Company in restitution:

175.1 The Partnership Interest was transferred on the basis that there was a valid assignment agreement effecting that transfer.

175.2 That basis has totally failed, the CDM Assignment being either void, or avoided hereby.

Alter Ego and Lifting the Corporate Veil

176 In order to obtain the return to it of the Partnership Interest in the Fund, together with an Account of Profits, the Company does not need as a matter of law to make any allegation of "alter ego" or to lift the corporate veil in relation to CDM or DFW.

177 If, contrary to the paragraph above, the Company does so need, it makes the following allegations for the purposes of all relevant claims or causes of action set out above.

177.1 CDM is the "alter ego" of Mr Patrick.

177.2 DFW is the "alter ego" of Mr Patrick.

177.3 In relation to the receipt of any property by CDM directly or indirectly from the Company or the accrual of any profits or benefits by reason of such receipt, the corporate veil should be lifted, with the consequence that such receipt and such profits or benefits should be treated as those of Mr Patrick personally.

177.4 In relation to the receipt of any property by DFW directly or indirectly from the Company or the accrual of any profits or benefits by reason of such receipt, the corporate veil should be lifted, with the consequence that such receipt and such profits or benefits should be treated as those of Mr Patrick personally.

PARTICULARS

(a) In relation to CDM:

(i) Mr Patrick was and is the Manager. There are no other officers or managers.

(ii) Mr Patrick was and is the managing member.

(iii) CDM was incorporated at Mr Patrick's instigation in order to enter into the CDM Assignment or a transaction of like nature.

(iv) CDM's sole or primary purpose was to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company.

(v) CDM exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

(b) In relation to DFW:

(i) Mr Patrick was and is the 'President'. There are no other officers or managers.

(ii) Mr Patrick was and is the sole member.

(iii) Mr Patrick was and is the sole registered director.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(iv) DFW was incorporated at Mr Patrick's instigation in order to enter into a transaction whereby it would in effect take over the Company's interest in CDM pursuant to the CDM Assignment.

(v) DFW's sole or primary purpose was (i) to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company, (ii) to be the ultimate vehicle by which Mr Patrick would so control of the Company's Partnership Interest in the Fund and (iii) to be a newly-inserted majority Participating Shareholder (under at least Mr Patrick's control) in the Company's share capital structure to oppose the actions of the Supporting Organisations, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

(vi) DFW exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

Loss and Damage

178 As a consequence of the above, the Company has suffered loss and damage, including but not limited to:

178.1 Its Partnership Interest in the Fund.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

178.2 The costs and expenses incurred in relation to the CDM Assignment, the Share Issuance, the Letter Agreement and the Redemption (including all legal or other advice taken in relation thereto).

178.3 Excessive Directors' fees or remuneration or emoluments or benefits.

178.4 Improper expenses (if any).

178.5 The lost opportunity cost of the Fund and its subsidiaries deploying such funds (as set out in (1), (2) and (3) above) elsewhere, and the consequent fall in value of the Company's interest in the Fund.

178.6 The legal and liquidation costs of investigating the conspiracy, and the costs of these proceedings.

**RESERVATION OF POSITION**

179 The Company and the JOLs (who direct the Company in bringing these proceedings) fully reserve their position to apply to amend this claim in any way or to bring fresh or further proceedings against any of the Defendants (whether in the Cayman Islands or elsewhere) in the name of the Company or in the name of the JOLs.

**OTHER**

180 CLO Holdco is joined as a party to these proceedings in order that, as the main subsidiary of the Fund, it may abide by any Order that the Court may make.

**INTEREST**

181 The Company claims interest pursuant to section 34 of the *Judicature Act (2021 Revision)* and the *Judgment Debts (Rates of Interest) Rules (2021 Revision)*, alternatively pursuant to the

Court's equitable jurisdiction, compounded in equity at quarterly rests, alternately at common law, for such period and at such rate as the Court thinks just.

**PRAYER FOR RELIEF**

In the premises, the Company claims:

(1) Damages or equitable compensation.

(2) Orders for restitution or disgorgement.

(3) Orders for the restoration of property to the Company.

(4) Interlocutory or final injunctions as may be necessary or appropriate.

(5) Orders for the appointment of a Receiver or Receivers, as may be necessary or appropriate.

(6) Orders for the provision of documents or information at an early interlocutory stage.

(7) Orders for the cancellation of the Share Issuance, as appropriate.

(8) Rectification of the register of the Company, as appropriate.

(9) Orders pursuant to s.99 of the Companies Act (as revised), as appropriate.

(10) An Account of the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

(11) An Account of all expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(12) All other Accounts, including an Account of Profits, or Inquiries as may be necessary or appropriate; and further Orders to give effect to the outcome of such Accounts or Inquiries, including Orders for payment of sums to the Company.

(13) All such declarations as may be necessary or appropriate, including to give effect to the continuing interest of the Company in the Fund on the basis of a proprietary interest, trust, constructive trust or otherwise.

(14) All such other relief relating to the Impugned Transactions as may be necessary or appropriate.

(15) Interest as above.

(16) Further or other relief.

(17) Costs.

DATED this 15th day of July 2025

Maples and Calder (Cayman) LLP

---

**Maples and Calder (Cayman) LLP**

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**DIRECTIONS FOR ACKNOWLEDGMENT OF SERVICE**

**OF WRIT OF SUMMONS**

182 The accompanying form of Acknowledgment of Service should be completed by an Attorney acting on behalf of the Defendant or by the Defendant if acting in person.

After completion it must be delivered or sent by post to the Law Courts, PO Box 495G, George Town, Grand Cayman, KY1-1106, Cayman Islands.

183 A Defendant who states in the Defendant's Acknowledgment of Service that the Defendant intends to contest the proceedings must also serve a Defence on the Attorney for the Plaintiff (or on the Plaintiff if acting in person).

If a Statement of Claim is indorsed on the Writ (i.e. the words "Statement of Claim" appear on the top of page 2), the Defence must be served within 14 days after the time for acknowledging service of the Writ, unless in the meantime a summons for judgment is served on the Defendant.

If the Statement of Claim is not indorsed on the Writ, the Defence need not be served until 14 days after a Statement of Claim has been served on the Defendant.

If the Defendant fails to serve his Defence within the appropriate time, the Plaintiffs may enter judgment against the Defendant without further notice.

184 A Stay of Execution against the Defendant's goods may be applied for where the Defendant is unable to pay the money for which any judgment is entered. If a Defendant to an action for a debt or liquidated demand (i.e. a fixed sum) who does not intend to contest the proceedings

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiffs, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

states, in answer to Question 3 in the Acknowledgment of Service, that the Defendant intends to apply for a stay, execution will be stayed for 14 days after that Defendant's Acknowledgment, but the Defendant must, within that time, issue a Summons for a stay of execution, supported by an affidavit of the Defendant's means. The affidavit should state any offer which the Defendant desires to make for payment of the money by instalments or otherwise.

**See overleaf for Notes for Guidance**

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**Notes for Guidance**

1 Each Defendant (if there are more than one) is required to complete an Acknowledgment of Service and return it to the Courts Office.

2 For the purpose of calculating the period of 14 days for acknowledging service, a writ served on the Defendant personally is treated as having been served on the day it was delivered to the Defendant.

3 Where the Defendant is sued in a name different from the Defendant's own, the form must be completed by the Defendant with the addition in paragraph 1 of the words "sued as (the name stated on the Writ of Summons)".

4 Where the Defendant is a FIRM and an attorney is not instructed, the form must be completed by a PARTNER by name, with the addition in paragraph 1 of the description "Partner in the firm of (......................................)" after that Partner's name.

5 Where the Defendant is sued as an individual TRADING IN A NAME OTHER THAN THAT PERSON'S OWN, the form must be completed by the Defendant with the addition in paragraph 1 of the description "trading as (..........................)" after that Defendant's name.

6 Where the Defendant is a LIMITED COMPANY the form must be completed by an Attorney or by someone authorised to act on behalf of the Company, but the Company can take no further step in the proceedings without an Attorney acting on its behalf.

7 Where the Defendant is a MINOR or a MENTAL PATIENT, the form must be completed by an Attorney acting for a guardian *ad litem*.

8 A Defendant acting in person may obtain help in completing the form at the Courts Office.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD OF 2025 ( )**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

**ACKNOWLEDGMENT OF SERVICE**

**OF WRIT OF SUMMONS**

If you intend to instruct an Attorney to act for you, give that Attorney this form IMMEDIATELY.

Important. Read the accompanying directions and notes for guidance carefully before completing this form. If any information required is omitted or given wrongly, THIS FORM MAY HAVE TO BE RETURNED.

Delay may result in judgment being entered against a Defendant whereby he may have to pay the costs of applying to set it aside.

---

1. State the full name of the Defendant by whom or on whose behalf the service of the Writ is being acknowledged.

---

2. State whether the Defendant intends to contest the proceedings (tick appropriate box)

☐ yes ☐ no

3. If the claim against the Defendant is for a debt or liquidated demand, AND the Defendant does not intend to contest the proceedings, state if the Defendant intends to apply for a stay of execution against any judgment entered by the Plaintiff (tick box)

☐yes ☐ no

Service of the Writ is acknowledged accordingly

(Signed).....................................................

Attorney for

**Notes on address for service**

Attorney: where the Defendant is represented by an attorney, state the attorney's place of business in the Cayman Islands. A Defendant may not act by a foreign attorney.

Defendant in person: where the Defendant is acting in person, the Defendant must give the Defendant's post office box number and the physical address of the Defendant's residence or, if the Defendant does not reside in the Cayman Islands, the Defendant must give an address in Grand Cayman where communications for the Defendant should be sent. In the case of a limited company, "residence" means its registered or principal office.

Indorsement by plaintiff's Attorney (or by plaintiff if suing in person) of that Plaintiff's name, address and reference, if any, in the box below.

| |
|---|
| Maples and Calder (Cayman) LLP<br>PO Box 309 Ugland House<br>Grand Cayman KY1-1104<br><br>Cayman Islands: CJM/JRN/LRA/TQR/858403-01 |

Indorsement by defendant's Attorney (or by defendant if suing in person) of that defendant's name, address and reference, if any, in the box below.

| |
|---|
| |

# Exhibit C

**EXHIBIT 125**

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

--------------------------

In Re: Case No. 19-34054-sgj11

HIGHLAND CAPITAL MANAGEMENT, L.P.,

Debtor. Chapter 11

--------------------------X.

REMOTE VIDEO-RECORDED DEPOSITION of
TORREY LITTLETON
Sunday, June 22, 2025
3:30 p.m. Central time

Reported Stenographically by:
Gail L. Inghram,
BA, RDR, CRR, RSA, CA-CSR No. 8635

WHEREUPON, the remote video-recorded deposition of TORREY LITTLETON was held via video-conferencing on Sunday, June 22, 2025, beginning at approximately 3:30 p.m. Central Time, the proceedings being recorded stenographically by Gail Inghram, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Shorthand Reporter, and transcribed under her direction, there being present:

A P P E A R A N C E S:

[All parties appeared via remote videoconferencing.]

On behalf of Highland Capital Management, and the Highland Claimant Trust:

JOHN MORRIS, ESQ.
jmorris@pszjlaw.com
GREGORY V. DEMO, ESQ.
gdemo@pszjlaw.com
JEFFREY POMERANTZ, ESQ.
jpomerantz@pszjlaw.com
HAYLEY WINOGRAD, ESQ.
hwinograd@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES
780 Third Avenue, 34th Floor
New York, New York 10017-2024
310.277.6910

On behalf of Highland Litigation Trustee:

ROBERT S. LOIGMAN, ESQ.
robertloigman@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue 22nd Floor
New York, New York 10010
212.849.7615

A P P E A R A N C E S (Cont'd):

On behalf of Defendant Dallas Foundation and Crown Global Life Insurance:

MATTTHEW OKIN, ESQ.
mokin@okinadams.com
DAVID CURRY, ESQ.
dcurry@okinadams.com
OKIN ADAMS BARTLETT CURRY LLP
1113 Vine Street, Suite 240
Houston, Texas 77002
713.228.4100

On behalf of Defendant Dugaboy Investment Trust:

MICHAEL LANG, ESQ.
mlang@cwl.law.com
CRAWFORD WISHNEW & LANG PLLC
1700 Pacific Avenue, Suite 2390
Dallas, Texas 75201
214.817.4500

A P P E A R A N C E S (Cont'd):

On Behalf of Hunter Mountain Investment Trust:

LOUIS M. PHILLIPS, ESQ.
lphillips@kellyhart.com
AMELIA L. HURT, ESQ.
ahurt@kellyhart.com
KELLY HART & HALLMAN LLP
301 Main Street, Suite 1600
Baton Rouge, Louisiana 70801
225.381.9643

VIDEOGRAPHER:
PAUL D'AMBRA

ALSO PRESENT:
NATHAN HALL, Pachulski Stang Ziehl & Jones
JAMES SEERY
SHAWN RAVER
JULIE DIAZ

- - -

I N D E X

- - -


EXAMINATION OF: PAGE

TORREY LITTLETON

Attorney Morris ..................8

PREVIOUSLY MARKED EXHIBITS REFERENCED:

NUMBER PAGE

Exhibit Highland 1 ..........58

DEPOSITION SUPPORT INDEX

INSTRUCTION NOT TO ANSWER:

PAGE LINE

67 21

REQUEST FOR PRODUCTION OF DOCUMENTS

PAGE LINE

(None)

STIPULATIONS

PAGE LINE

(None)

QUESTIONS MARKED

PAGE LINE

(None)

REPORTER'S NOTE:

QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT NECESSARILY REFLECT A DIRECT QUOTE.

- - -

P R O C E E D I N G S

- - -

WHEREUPON,

TORREY LITTLETON,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY ATTORNEY MORRIS:

Q. Actually, I just want to start by apologizing to the witness that I did not tell him that Sunday depositions were casual. Thanks for dressing up.

A. I appreciate it. No worries.

Q. And for some of us, Mr. Littleton, every day is Sunday unless we're going to court.

It's nice to meet you, sir.

A. Same here.

Q. Can you hear me okay, sir?

A. Yes, I can hear you.

Q. Okay. Good afternoon. My name is John Morris. I'm an attorney at a law firm who represents Highland Capital Management, LP, and

the Highland Claimant Trust. And we're here today for your deposition in connection with the Dallas Foundation's objection to a certain proposed settlement agreement between Highland and some affiliates and some entities that are controlled by Mark Patrick.

Do you understand that?

A. Yes.

Q. Have you ever been deposed before, sir?

A. No. This is my first time.

Q. Okay. It's not -- just relax. It's a -- it's a formal process, but it's not a complicated process. I'm going to ask you a series of questions, and it's very important that you let me finish my question before you begin your answer. Okay?

A. Yes, sir.

Q. It's important that I allow you to finish your answer before I begin my next question; and if I fail to do that, will you let me know?

A. Yes, sir, I will.

Q. Do you understand that your testimony today is being transcribed by Gail, the court

reporter?

A. Yes.

Q. So everything you and I say is going to be written down verbatim, or that's the goal anyway.

Do you understand that?

A. Yes, I do.

Q. Okay. If there's a question that I ask that you don't understand, will you let me know and I'll try to rephrase it?

A. Yes.

Q. From time to time your lawyer might object to some of my questions. It will give -- it's formal, legal stuff, lawyer stuff. It gives me a chance to think about whether there's a legal infirmity in my question, and it gives me an opportunity to rephrase it if I want.

But unless he directs you not to answer, I'm going to ask you to answer the question anyway. Okay?

A. Okay.

Q. Just so you're not surprised by the process.

If you need a break for any reason at any time, let me know, and I'll try to

accommodate you as long as a question is not pending. Okay?

A. Yes.

Q. Are you affiliated with the Dallas Foundation, sir?

A. Yes, I am.

Q. In what capacity?

A. I am the CFO here at the Dallas Foundation.

Q. How long have you been the CFO of the Dallas Foundation?

A. I've been the CFO here since January 1st of 2022, but I've been with the organization for 13 years.

Q. And what are your duties and responsibilities as the CFO?

A. As the CFO, my main duty is to ensure the proper oversight and fiduciary stewardship of our charitable assets. That means having fiduciary oversight of our investments, our financial reporting, any legal aspects that may impact the foundation in any capacity.

I also serve as a board director as relates to some of our supporting organizations, part of our conversation here today with Empower

Foundation and the Okada Family Foundation.

Q. Are you a lawyer?

A. No, sir.

Q. Are you familiar with a company called Highland Capital Management, LP?

A. Yes, sir.

Q. Are you aware that that entity filed for bankruptcy a number of years ago?

A. Yes, sir.

Q. Are you aware that that entity used to be controlled by a gentleman named Jim Dondero?

A. Yes, sir.

Q. Okay. Are you aware that the Dallas Foundation recently filed an objection in the bankruptcy court overseeing Highland's bankruptcy and the objection pertaining to a proposed settlement agreement between Highland and certain affiliates and certain entities that are controlled by Mr. Patrick?

A. Yes, sir.

Q. Did you review that objection before it was filed?

A. Yeah, I read through the objections. But for the most part, I rely on our legal team to give us a summary and kind of walk us through

some of the pertinent details.

Q. Are you familiar with the entities that Mr. Patrick signed that agreement on behalf of?

A. Yeah; I believe it's the Hunter Mountain Investment Trust.

Q. Right. And you're aware that in addition to the Hunter Mountain -- can we refer to Hunter Mountain Investment Trust as "HMIT" today?

A. Yes.

Q. And are you aware that certain affiliates of HMIT are also party to the settlement agreement that is the subject of this proceeding?

A. I am.

Q. And can we refer to HMIT and those affiliates that are party to the agreement as "the HMIT entities"?

A. Yes.

Q. Okay. It's going to make our day a little bit quicker and a little bit easier.

A. Sure.

Q. Do you know who approved the filing of the objection on behalf of the Dallas Foundation?

A. Yeah, so it was approved by President Julie Diaz.
Q. Anybody else?
A. Then our legal team helped us kind of put together the objection.
Q. Do you know, have you ever met Jim Dondero?
A. I have never met him personally, no.
Q. Have you ever spoken with him?
A. I think I was on one conference call with him one time that I can recall.
Q. Okay. Do you know if he had any role in the preparation of the Dallas Foundation's objection?
A. I didn't have any exposure with Mr. Dondero. So, no, I do not know.
Q. Do you know where the idea of filing the objection originated? Like, whose idea was it?
A. Yes -- yes.
Q. Whose idea was it to file the objection?
A. Well, it's a combination of the Empower and Okada Foundation boards. Just looking at some of the investment activity that

transpired through the first quarter, we had some concerns about the activity. And a portion of that activity was the sale of Hunter Mountain interests through the Rand PE Fund I that ultimately rolled up to the Atlas, LP Fund, which impacted the economic value of the portfolio that's held by Crown Global.

Q. That's why the -- let's unpack that a little bit. I asked where did the -- who came up with the idea of objecting? Let's take that first.

A. Sure, sure. Yeah, I think it was the board of the foundations, so primarily Julie Diaz and myself just kind of thinking through the activity that we became aware of.

Q. And Mr. Dondero is a member of the board; right?

A. That's correct.

Q. And it's just the three of you; correct?

A. That's correct.

ATTORNEY OKIN: Object to form.

BY ATTORNEY MORRIS:

Q. The Dallas Foundation's objection refers to certain litigation pending in the

Cayman Islands.

Are you aware of that?

A. Yes.

Q. Are you aware that Mr. Dondero is funding that litigation on behalf of the supporting organizations that commenced it?

A. Yes, sir.

Q. And you're aware that he's funding this litigation on behalf of the Dallas Foundation; correct?

A. That's correct.

Q. Do you know why Empower Dallas Foundation and the Okada Family Foundation didn't just file the objection in their own name rather than having the Dallas Foundation do it for them?

ATTORNEY OKIN: Object to form.

A. I think we looked it as the Dallas Foundation is the supporting organization of the two entities. And we felt that the Dallas Foundation and our president, Julie Diaz, we just decided to file it under the foundation based on a recommendation from our legal counsel.

BY ATTORNEY MORRIS:

Q. Are you aware that the objection is also filed on behalf of Crown Global Life

Insurance, Limited?
A. Yes, sir.
Q. Okay. And what is Crown Global Life Insurance, Limited?
A. The Crown Global Life Insurance, Limited, is an issuer of insurance annuities.
Q. What -- what role does it play with respect to the Dallas Foundation?
A. Yeah, so it plays a role more so with the Empower Dallas and Okada Family Foundation. They each hold policies with Crown Global through the insurance annuities. So the legal contract is between Empower Dallas and Okada Family Foundation with Crown Global.
Q. And -- and is the withdrawn.
Does the annuity pay dividends or make other distributions?
A. Yeah, it makes distributions to the fund as fixed payments through the contract, yes, sir.
Q. And do those fixed payments go directly from Crown Global to Empower Dallas and the Okada Family Foundation respectively?
A. That's correct.
Q. And do you know what the annuities are

invested in?

A. I don't know the actual underlying investments. I know the annuities have within them the Atlas IDF, LP Fund, and that they -- what ultimately rolls up is the Rand Fund I, the Beacon Mountain and the Hunter Mountain, HMIT, ultimately rolls up.

Q. And is -- are the annuities the sole source of Empower Dallas and the Okada Family Foundation's income, to the best of your knowledge?

A. That's correct, yes, sir.

Q. And does a portion of that income then flow up to the Dallas Foundation?

A. Well, the income doesn't flow to the Dallas Foundation. What does happen is, as Empower and the Okada Family Foundations make recommendations, those recommendations flow to the Dallas Foundation, to the corresponding donor-advised fund; and then ultimately those donor-advised funds make the grants out to the community.

We typically don't get any of the income through the Crown Global vehicle -- the Dallas Foundation doesn't get any income through

the Crown Global vehicle.

Q. Is there anybody in the room with you right now?

A. No, sir.

Q. Do you have any device on other than the computer that we're sharing right now?

A. No. I have a fan on. Is it causing feedback?

Q. No, but I have a fan on too. Maybe it's --

A. Okay. Sorry. Yeah. Sorry about that.

Q. Do you have any notes or anything that you're reading from or that you're looking at?

A. No, sir, no.

Q. Okay. So there are these annuities. How did those annuities get funded? Do you know?

A. Yes. So back in 2015, I believe, in November of 2015, we funded the annuities with about $29 million. So contributions from -- I think it was about $22 million from the -- Mr. Dondero, and then I believe another $7 million from Mr. Okada, which ultimately were sent over to Crown Global to invest in the annuities.

Q. And under the annuities, they pay fixed amounts to both supporting organizations?

A. Yes, sir, that's correct.

Q. And is there any market risk that the supporting organizations have, or is this a -- is it your understanding that it's a contractual obligation of Crown Global to pay that fixed amount for some duration?

A. Yeah, I believe Crown Global takes the risk. They have to pay a fixed amount through the obligation. I believe they take an M&E expense, which compensates for the risk.

Q. What's that last piece? I missed --

A. The M&E expenses, it's part of their -- we receive their statements quarterly. They have an administrative fee that they take, and then they have what they call an M&E expense, which it was explained a while back that's a percentage that they take to compensate for the risk associated with insurance annuities.

Q. And is the annuity tied to a -- is it a fixed period of time, or is it tied to a particular event?

A. That, I cannot answer.

Q. Okay. But is it fair to say that the

supporting organizations paid money to Crown Royal -- Crown Global -- it's getting late. Sorry.

ATTORNEY OKIN: Sounds good.

THE WITNESS: No. Sounds good, yeah.

BY ATTORNEY MORRIS:

Q. Let me restate the question.

Is it your understanding that the supporting organizations paid money to Crown Global; and in exchange, they got annuities which produced a fixed stream of income for a period of time in the future? Is that right?

A. That's correct.

Q. Okay. And that the assets -- the segregated accounts themselves are owned by Crown Global; correct?

A. I believe the Atlas IDF Fund, I believe Crown Global has partnership interests in that particular fund. I don't think they have any ownership of the other underlying segregated accounts. Not that I'm aware of.

Q. Do the segregated accounts hold anything other than the annuities? Withdrawn.

Do the segregated accounts hold the annuities?

A. The segregated accounts, not to my knowledge do they hold the annuities. What I believe hold the annuities is the Atlas IDF, LP Fund holds the annuities.

Q. But Crown Global is the one who takes the risk with respect to the investments in the annuities; correct?

A. That's correct.

Q. And do they take the risk as well with respect to the value of Atlas, for example?

A. Yes, they do take the risk with the value of Atlas.

Q. So whether Atlas is worth a dollar or a billion dollars, Crown Global has the same obligation to the supporting organizations to pay the fixed stream of income that it agreed to when it sold the annuity to them; correct?

A. That's my understanding.

Q. Okay. So that regardless of the value of the segregated accounts, the supporting organizations are guaranteed to receive the exact same amount of money over time as long as Crown Global complies with its obligations in the annuity contract; correct?

A. Yes, sir.

Q. Okay. Do you know if the Dallas Foundation ever appeared in the Highland bankruptcy before it filed this objection?

A. No, sir, I don't believe we did.

Q. And as the CFO, is it fair to say that you know that the Dallas Foundation never filed a claim in the Highland bankruptcy?

A. Yes, sir.

Q. And do you also know that the Dallas Foundation does not have an interest in the Highland Claimant Trust that was formed as part of the plan of reorganization?

ATTORNEY OKIN: Object to form.

BY ATTORNEY MORRIS:

Q. Withdrawn. Let me lay a little bit of foundation.

Are you familiar with an entity called the Highland Claimant Trust?

A. Yes.

Q. Okay. Does the Dallas Foundation have, directly or indirectly, any interest in the Highland Claimant Trust?

ATTORNEY OKIN: Object to form.

A. What I could say is that it depends on the settlement with relationship with Hunter

Mountain and indirectly with the roll-up that the beneficial interest to Empower and Okada Foundation and how that settlement impacts the economic interest there. I think that's where the Dallas Foundation could indirectly have some interest. While we're not the sole ownership of the Crown Global policy, we do have a relationship with Empower Dallas and the Okada supporting organizations.

BY ATTORNEY MORRIS:

Q. Well, you don't have an interest in what, did you say? The annuities?

A. We do have an interest in the annuity contracts.

Q. The Dallas Foundation didn't fund the annuity contracts; correct?

A. No, we did not fund them. But --

Q. And the Dallas Foundation doesn't own the annuity contracts; correct?

A. No, we don't own the annuity contracts. But what we do is we do have a fiduciary responsibility for any relationship that they financially to protect, preserve and to grow these charitable assets. And, ultimately, the supporting organizations, they roll up into

our financial statements.

Q. Is it your understanding that Crown Global has a duty to distribute -- withdrawn.

Is it your understanding that Crown Global has a duty to make distributions to the Dallas Foundation?

A. No, sir. They make distributions to Empower and Okada supporting organizations.

Q. Do you have any reason to believe that Crown Global owes any duty at all to the Dallas Foundation with respect to the annuities?

ATTORNEY OKIN: Object to form.

A. There's no direct responsibility from Crown Global to the Dallas Foundation. But because of our relationship with Okada and Empower, there is an indirect relationship there, that we have an interest.

BY ATTORNEY MORRIS:

Q. And let's go beyond the annuities.

Do you know whether Crown Global has any direct duty to the Dallas Foundation for any reason?

ATTORNEY OKIN: Object to form.

A. I'm going to say not directly.

BY ATTORNEY MORRIS:

Q. Okay. Thank you.

Does the Dallas Foundation carry on its balance sheet any interest in the Highland Claimant Trust?

A. No, sir.

Q. Do you know if the Dallas Foundation has any contractual relationship with Highland Capital Management or the Highland Claimant Trust?

A. No, sir, we don't.

Q. Do you have any reason to believe today that Highland Capital Management or the Highland Claimant Trust owes any duties or obligations to the Dallas Foundation?

ATTORNEY OKIN: Object to form.

A. I wouldn't say there was any duties or obligations to the Dallas Foundation. But I do think we have, again, some interest in the settlements and how the funds originally were supposed to flow up to Empower and Okada.

Empower and Okada, they roll up to the Dallas Foundation's financial statements. So I think there is some indirect interest in Highland Capital Claimant Trust and the decisions that are

being made as it relates to the settlement.

BY ATTORNEY MORRIS:

Q. I'm going to respectfully move to strike and ask you to listen carefully to my question --

A. Yes, sir.

Q. -- and this will go very smoothly.

Do you have any reason to believe that Highland Capital Management or the Highland Claimant Trust owes any duties or obligations to the Dallas Foundation?

ATTORNEY OKIN: Objection; form.

THE WITNESS: My apologies.

ATTORNEY OKIN: Go ahead.

A. No, sir.

BY ATTORNEY MORRIS:

Q. Are you aware that if the settlement between the Highland entities and the HMIT entities is approved, that the HMIT entities will receive cash and other assets as set forth in the agreement?

A. Yes.

Q. Do you have any reason to believe that the Dallas Foundation has a right to receive any of the cash or other assets that would be

delivered to HMIT if the settlement is approved?

ATTORNEY OKIN: Object to form.

A. Like I say based on the facts is that the interest in HMIT were sold for a million dollars. So I believe the current structure as of now, the two supporting organizations would not receive any settlements. They would not have any economic benefit of the settlement payout.

Based on the historical structure, yes, I would have said yes. We had interest in that settlement that would ultimately impact the fair market values for Empower and Okada.

BY ATTORNEY MORRIS:

Q. Are you familiar with the fair market value of Empower and Okada?

A. So the fair market value is through the insurance annuity. So based on the --

Q. I'm sorry. Through the insurance what?

A. It's the insurance through Crown Global, so they produce a fund statement on a quarterly basis. We use that to state the fair market value.

Q. And is the fair market value based on anything other than the projected future income

stream that you described earlier?

A. I believe there is impact related to some of the sub accounts. One thing we do know is in February of 2025, we saw the fair market value increased by 918,000 due to the sale of Rand's interest in Hunter Mountain. So we do believe there are other assets that impact the fair market value.

Q. But that's the fair market value of the annuities; is that right?

A. The sale of the Rand -- the interest in the Hunter Mountain, the Rand?

Q. Yeah, yeah. Is what you're describing the fair market value of the annuities that flows up to the supporting organizations?

A. I believe we have a couple of investments that are within the Crown Global structure. I think you have insurance annuities, and then you have other assets that are also within that structure through the Atlas platform. The way I understand it, the Atlas platform allows for other alternative investments to be wrapped within the insurance annuities.

Q. Did the supporting organizations have an ownership interest in Crown Global?

A. Yeah. They hold the policy, right? The supporting organizations hold the policy through Crown Global, so absolutely.
Q. And the policy that you're referring to are the annuity policies?
A. The annuity policies, that's correct.
Q. And, again, just for clarity, it does not matter to the supporting organization what the value of the assets that are held by Crown Global is; what matters is the agreed-upon future flow of distributions; fair?
A. That's fair, yes, sir. Yes.
Q. Are you familiar at all with the structure of the Highland Claimant Trust?
A. Not with the Highland Claimant Trust, no. I'm familiar with the structure of the -- the Rand structure here as relates to the Empower Dallas, and then I'm familiar with the DAF Holdco structure.
Q. Are you familiar with the HMIT structure?
A. I'm familiar -- I know how the structure flows up to the Atlas IDF Fund.
Q. Have you reviewed any of the governing documents for HMIT or any of the Rand funds or

any of the Atlas funds? Have you ever reviewed the governing documents?

A. At a high level, I took a glance at the governing documents to get an understanding of the flow. I've seen organizational flow charts to kind of give me an idea of who owns what and how does it roll up ultimately to Crown Global.

Q. Do you have any knowledge as to what, if any, role Crown Global played in the Highland bankruptcy?

A. No, sir.

Q. So we've talked about the Rand and the Atlas entities and Hunter Mountain, and we've referred to those that signed on to the agreement as "the HMIT entities"; right?

A. Yes.

Q. Do you know why each of the HMIT entities was created? Do you know what purpose they served?

A. You know, I know that they create some vehicles that allow some different types of investments. I would imagine -- I don't know why the structures were created the way they were. We don't have that kind of insight. That's just

an assumption.

Q. Can you identify any assets that HMIT owns today?

A. No, sir.

Q. Were you ever able to identify any assets that HMIT owned?

A. No.

Q. In your duties as the CFO for the Dallas Foundation, did you ever make an inquiry as to what assets HMIT owned?

A. We made an inquiry to the Atlas structure unsuccessfully over the years because they were able to get to the underlying assets to have a clear understanding of the holdings; so, no, I couldn't tell you that I was successful in understanding the underlying assets.

Q. So you've been the CFO for three years now --

A. Yes, sir.

Q. -- and a half?

But you were with the organization for about six; right?

A. For 13, 13 total.

Q. Thank you.

So you've been with the organization

long before Mark Patrick ever had any role with respect to the HMIT entities; right?
A. Yes, sir.
Q. Okay. At any time that you've been with the Dallas Foundation, were you ever informed as to the assets that were held by HMIT?
A. No, sir.
Q. No; right?
A. That's correct -- no.
Q. Do you know today what assets are held by any of the HMIT entities?
A. No, sir.
Q. At any time during your tenure at the Dallas Foundation, were you ever informed as to what the assets were that any of the HMIT entities owned?
A. No, sir.
Q. Okay. And did you ever think that, as part of your duties and responsibilities working for the Dallas Foundation, that you needed to know that information?
A. Absolutely. Yeah, we inquired on multiple occasions to get our auditors comfortable with the investment vehicle.
Q. And you were never able to get that

information, is that right?
A. That's right.
Q. And that was true for the entire time of your tenure at the Dallas Foundation?
A. Yes, sir.
Q. Okay. In the course of your duties, did you ever communicate with anybody who was acting on behalf of HMIT?
A. I had some communications with Mark Patrick, but I don't think he was over HMIT at the time. I don't know. So it's kind of hard to understand the transfer of a trustee or ownership or oversight those accounts had.
So at a high level, he was probably the person I tried to communicate with if we had any questions around the valuations.
Q. But it wasn't necessarily because he was wearing the HMIT hat; it was because he wore a lot of hats. Is that fair?
A. That's fair, yes.
Q. During the course of your tenure at the Dallas Foundation, did you ever once say to yourself, I need to speak to the guy who's the head of HMIT?
A. No, we've never said that.

Q. Okay. Did you ever say to yourself at any time during your tenure at the Dallas Foundation, I need to speak to the head of any of the HMIT entities?

A. No, sir.

Q. Do you know if the Dallas Foundation ever received anything of value from HMIT directly?

A. I can't say directly, no. I just assumed it had rolled up. It was -- we had some value through the structure, I would imagine.

Q. Do you know if the Dallas Foundation ever received anything of value directly from any of the HMIT entities?

A. No, sir.

Q. Do you know if any of the -- withdrawn.

Do you have any reason to believe that any of the HMIT entities owes a duty or obligation to the Dallas Foundation today?

ATTORNEY OKIN: Object to the form.

A. I believe that there's going to be impact to our economic interest in Crown Global. I do believe there's a fiduciary obligation to the Dallas Foundation to have communication if

there are investment decisions that are being made that's going to impact that economic interest, positive or negatively.

BY ATTORNEY MORRIS:

Q. Sorry. I may not have heard it clearly.

But do you believe that Highland Capital Management or the Highland Claimant Trust owes a fiduciary duty to the Dallas Foundation?

A. Sorry. No. No. No. I thought you said HMIT. Sorry.

Q. You know what? I probably did. Let's do that.

A. Yeah.

Q. Did you believe -- do you believe that any of the HMIT entities owes a fiduciary duty to the Dallas Foundation?

ATTORNEY OKIN: Object to form.

A. Again, I'll just restate what I said.

If it's starting to impact the economic interest for the value of the Crown Global policies, I do think there's a fiduciary obligation to have a conversation to inform of any investment decisions that are being made that could have significant impact to that

value.

BY ATTORNEY MORRIS:

Q. Okay. Are you aware that HMIT filed a motion in the bankruptcy court a couple of years ago seeking permission to file a lawsuit against Highland Capital Management and others?

A. Yes, sir, I am aware of that.

Q. You are.

Did HMIT seek the Dallas Foundation's approval before filing that motion?

A. No, sir, not that I'm aware of.

Q. Do you believe that HMIT was required to seek the Dallas Foundation's approval before filing that lawsuit?

A. Again, I think it -- I don't know if "seek approval" is the right language I would use. But I do think informing the Dallas Foundation, that this could impact the economic interests of Empower and Okada Foundation.

Q. And nobody ever told you that; is that right?

A. That's correct.

Q. How did you learn about the lawsuit that HMIT commenced against Highland and others a couple of years ago?

A. Well, as we kind of got -- one, it was kind of some news that was -- that came about through some other research. Currently, as of today, we have our legal team working, pulling together facts so they kind of reiterated some of the facts that could impact the overall case. So I will just lean on our legal team to kind of bring us up to speed on this fact-finding.

Q. Do you know who authorized the filing of that motion?

A. From HMIT?

ATTORNEY OKIN: Object to form. Which motion do you mean, John?

ATTORNEY MORRIS: The same one we're talking about, the motion for permission from the bankruptcy court to sue Highland and other parties.

ATTORNEY OKIN: The one he told you he didn't even know about what was filed.

ATTORNEY MORRIS: Hey, Matt, he did tell me. He actually did tell me --

ATTORNEY OKIN: He told you he heard about it after, but go ahead.

BY ATTORNEY MORRIS:

Q. So...

A. Yes, sir, I believe it was Mr. Mark Patrick that filed them.

Q. That authorized the filing of that lawsuit?

A. Yes, sir.

Q. Do you think he did anything wrong in doing that?

ATTORNEY OKIN: Object to form.

A. What I can say is that it has impact -- it can potentially have some impact on the -- it's convoluted. I can't say he did anything wrong with filing that motion. But if it's going to impact the Empower and Okada Foundation, which is why I'm here today, is to represent those supporting orgs, you know, I think we have interest in the decisions that he's making, right?

BY ATTORNEY MORRIS:

Q. Okay. But we can agree that he never sought nor obtained the Dallas Foundation's approval to file that motion; correct?

A. Yes, sir, we can agree.

Q. And can we also agree that you only heard about that lawsuit after it was commenced or after the motion was filed?

A. Yes, sir.

Q. Okay. Have you read the settlement agreement that is the subject of the Dallas Foundation's objection?

A. Yeah, I've got some high-level facts related to the settlement agreement. We had a legal team kind of -- again, we leaned on them to kind of pull out some of the important facts that could impact the Empower and Okada Foundation.

Q. Do you know generally what HMIT is proposing to give and receive under the settlement agreement?

A. Yes, sir, generally, I do know. I believe they're trying to release liability on some of the claims. I think that's part of the settlement agreement. I'm also aware that there are future payouts that will be made to Hunter Mountain.

Q. And are you aware of other assets that Hunter Mountain might receive if the settlement agreement is pursued?

A. Yes.

Q. And what other assets are you aware of?

A. I know there's a large sum of assets,

you know, in the -- 300 million, I think that's the amount of it that I don't recall. But I couldn't go verbatim.

Q. It's not your understanding that there's $300 million worth of anything that's related to that agreement --

A. Oh, yeah, yeah, yeah. But, yeah, it's not -- it's not there -- I was thinking about there was some data around -- I apologize if I'm getting my facts confused.

Q. That's okay.

A. Yeah, actually, there's a -- as it relates to the Empower and Okada, I believe there was an impact of roughly 23-plus million dollars, potentially.

Q. But that has nothing to do with Highland; correct?

A. That's correct.

Q. And it has nothing to do with this settlement agreement; correct?

ATTORNEY OKIN: Object to form.

A. Well, I think if it has impact, ultimately, again, to Empower and Okada, again, we sold our interest in Highland Capital Management -- or Hunter Mountain for a million

dollars. So based on what we know is if there is a payout of $23 million, Empower and Okada, we won't benefit from it.

BY ATTORNEY MORRIS:

Q. So is it fair to say that the Dallas Foundation's concern is not with the terms of the settlement agreement itself but with the disposition of the assets that Hunter Mountain will receive if the settlement agreement is approved?

ATTORNEY OKIN: Object to form.

A. Well, the only thing I would say about that is we have individuals making some questionable decisions and, you know, with charitable assets. I believe Highland Dallas has entered into a settlement agreement with this individual. I think that's -- that's what I could say is somewhat problematic.

BY ATTORNEY MORRIS:

Q. What's problematic?

A. Oh, we have an individual that's shifting around charitable assets out of the responsibility of Empower and Okada; right? And, you know, Highland Capital has entered into an agreement with this individual. I think we all

understand the facts that are at play.

Q. Do you have any reason to believe that the settlement agreement was not the product of an arm's-length, good-faith negotiation between adverse parties?

ATTORNEY OKIN: Object to form.

A. I can't say anything. Yeah, I wasn't a part of those conversations, so I can't opine.

BY ATTORNEY MORRIS:

Q. And you don't have any facts that would suggest that the settlement agreement is anything other than the product of good-faith, arm's-length negotiations; correct?

ATTORNEY OKIN: Object to the form.

A. I wasn't part of the conversation, so I can't opine. But what I can state is that I believe there's significant impact to the Okada and Empower Dallas Foundation.

BY ATTORNEY MORRIS:

Q. And that's as -- not as a result of the settlement agreement, but as a result of what the Dallas Foundation contends was the restructuring that Mr. Patrick engaged in earlier this year; fair?

ATTORNEY OKIN: Object to form.

A. For the most part, I'd say that's fair.

BY ATTORNEY MORRIS:

Q. Okay. Do you have any concerns that the settlement agreement is not the product of arm's-length, good-faith negotiations?

A. I'd have to restate that, again, we have an individual who's moving around charitable assets. And, again, I think we understand the facts of restructuring, and the agreement was made to settle with this individual. So from our standpoint, again, it impacts the two supporting organizations that we are here representing.

So I think there's two things at play. The negotiations that you had with this individual, I can't opine whether or not that it wasn't done in good faith; but the impact of that settlement agreement does impact Okada and Empower Dallas.

Q. And that's because as a result of Mr. Patrick's restructuring, the Dallas Foundation is concerned that it may not have -- it may not receive as much as it would have indirectly had the restructuring not taken place; fair?

A. That's fair.
ATTORNEY OKIN: Object to form.
BY ATTORNEY MORRIS:
Q. Okay. Do you have any reason to believe that the proposed settlement is unfair to Highland Capital Management, LP?
A. Yeah, I don't have any reason to opine, no.
Q. Okay. Do you have any reason to opine as to whether or not the proposed settlement agreement is unfair to the Highland Claimant Trust?
A. No, sir.
Q. Do you have any reason to opine that the proposed settlement agreement is unfair to the Highland Litigation Subtrust?
A. No, sir.
Q. Do you have any reason to opine that the settlement agreement is unfair to Hunter Mountain Investment Trust?
A. No, sir. We can make good-faith settlements, given that there are facts that certain organizations or entities could be impacted, given what we've already talked about, what Mark Patrick has done with the

restructuring.

Q. So two things can be true, at the same time --

A. Two things can be true.

Q. Two things can be true at the same time; right, sir? The settlement agreement can be a fair and reasonable settlement that's the product of arm's-length and good-faith negotiations; while at the same time, the Dallas Foundation can still have concerns over the disposition of the assets that Hunter Mountain receives as a result of this restructuring; fair?

A. I think for the most part, that's fair. The only caveat I would add to that is if I'm negotiating with an individual that we know is causing harm to other organizations, I just say maybe we don't care about that. But from our standpoint, we do.

Q. Do you have any reason to believe that the proposed settlement is unfair to any of the HMIT entities?

A. No, sir.

Q. Are you aware that under the settlement agreement, the HMIT entities are releasing the Highland parties from any liability

other than that which arises out of the settlement agreement itself?

A. Yeah. I believe that was a part of the settlement. That's why we have the settlement. Yeah.

Q. Do you have any concern about the scope of the releases that the HMIT entities are providing?

ATTORNEY OKIN: Object to form.

BY ATTORNEY MORRIS:

Q. You can answer, sir.

A. No, sir; only as it impacts, how does it impact or potentially can impact lost income for Okada and Empower.

Q. Do you have any reason to believe that the granting of the releases in the proposed settlement agreement by the HMIT entities will have any impact at all on the supporting organizations?

ATTORNEY OKIN: Object to form.

A. Again, I think there's an economic interest in what does the settlement -- the loss of income streams to Empower and Okada, which we believe is true.

///

BY ATTORNEY MORRIS:
Q. I'm just focused on the releases now.
A. Sure.
Q. Do you have any reason to believe that the releases that the HMIT parties are granting under the proposed settlement will have any economic impact on the supporting organizations?
ATTORNEY OKIN: Object to form.
A. No, sir.
BY ATTORNEY MORRIS:
Q. Okay. Are you aware of any facts that could give rise to a claim by the Dallas Foundation against Highland?
ATTORNEY OKIN: Object to form.
A. Can you elaborate on that a little bit for me.
BY ATTORNEY MORRIS:
Q. Sure.
So I'm just -- I'm wondering if you know of any facts that might give rise to a claim or a cause of action by the Dallas Foundation against Highland Capital Management.
ATTORNEY OKIN: Object to form.
A. Not directly, no, sir.
///

BY ATTORNEY MORRIS:
Q. Okay. Are you aware of any facts that might give rise to a claim or cause of action that the Dallas Foundation could assert against the Highland Claimant Trust?
ATTORNEY OKIN: Object to form.
A. No, sir, not directly, no.
BY ATTORNEY MORRIS:
Q. Do you understand the basis for the Dallas Foundation's objection to the proposed settlement?
A. Absolutely, yes, I do.
Q. Can you describe for me in your own words what your understanding is of the basis of the objection.
A. Yeah. We are aware that we sold Rand PE Fund, which rolls up to the Atlas IDF Fund, sold its interest in the Hunter Mountain for a million dollars; and we believe that we have significant future economic payments that would be paid out to Hunter Mountain that Empower and Okada would no longer benefit from.
Q. Is it fair to say that the Dallas Foundation is concerned, not with the terms of the settlement agreement itself, but with the

possibility that it may not get its fair share of the consideration that the HMIT entities are to receive under the settlement agreement?

ATTORNEY OKIN: Object to form.

A. Yeah, for the most part, that's the key -- that's our concern.

BY ATTORNEY MORRIS:

Q. Okay. Do you understand that Mark Patrick has entered into the settlement agreement with the Highland entities on behalf of each of the HMIT entities?

A. That's my understanding.

Q. Do you have any reason to believe that the governing documents for the HMIT entities did not authorize Mr. Patrick to enter into the settlement agreement on behalf of each of the HMIT entities?

ATTORNEY OKIN: Object to form.

A. You know, what I would say to that is, you know, regardless of the governing documents, I do believe there's a fiduciary obligation that Mr. Patrick had to the supporting organizations, to inform us of any significant investment decisions that could impact the economic interest in the Crown Global vehicle.

So I just believe that, you know, just like any trustee investment advisor/control person, those are just normal conversations that we expect to have; and we not did not have that in this situation.

BY ATTORNEY MORRIS:

Q. Okay. Anything else?

A. No, sir.

Q. Okay. You don't believe that Mr. Patrick was required to obtain the Dallas Foundation's consent before entering into the settlement agreement; fair?

A. That's fair.

Q. And you don't have any reason to believe that the Dallas Foundation has any right or ability to prevent Mr. Patrick from entering into the settlement agreement on behalf of the HMIT entities; fair?

ATTORNEY OKIN: Object to form.

A. You know, I think there's two things can be true again. I think there's documentation which I haven't seen, but, again, there's a fiduciary obligation to the interested parties, I believe, just as any relationship with an investment advisor or control person.

BY ATTORNEY MORRIS:

Q. And in your view, does the fiduciary duty that you believe Mr. Patrick had as the representative of the HMIT entities, does that extend anywhere beyond the duty to inform?

ATTORNEY OKIN: Object to form.

A. Well, I'm just trying to think about -- you know, we advised $650 million of assets under management. We have advisors all the time, before they make any decisions on the sale of investments, we're informed about it. They kind of let us know if it's going to have impact to our portfolios. And that's just an expectation that we have of any investment advisor or control person.

BY ATTORNEY MORRIS:

Q. I appreciate that you have that expectation. Do you have an expectation that the HMIT entities needed to obtain the Dallas Foundation's consent before entering into the settlement agreement?

A. I'm not a legal person. But I would imagine if you have the documentation legally, I don't know if you had to get our consent. It's more so just a fiduciary obligation.

Q. And, legally, do you have any reason to believe that the Dallas Foundation has a legal right over transactions that Mark Patrick, in his capacity as the representative of any of the HMIT entities, wanted to enter into?

ATTORNEY OKIN: Object to form.

A. As an interested party, I think we have an ability to have conversations to see if this decision was made that negatively impacted the supporting organizations. I think we do have a right there to really understand why this decision was made. Why are we selling the interest for a million dollars? Why now? Why is the timing that happened now? Because if nothing happened, what we know is we would have benefited from the settlement payouts.

BY ATTORNEY MORRIS:

Q. Does the Dallas Foundation have a direct ownership interest in any of the HMIT entities?

A. Not a direct ownership, no, sir.

Q. Does the Dallas Foundation have any indirect ownership interest in any of the HMIT entities?

ATTORNEY OKIN: Object to form.

A. Not directly. The Dallas Foundation does not.

BY ATTORNEY MORRIS:

Q. So no direct interest -- withdrawn.

No direct ownership interest and no indirect ownership interest; fair?

ATTORNEY OKIN: Object to form.

A. We do have an interest in -- because the assets roll up to our balance sheet overall, they would present an audited financial statement. So we do have to understand the fluctuations in market value to explain not just to our board but to our auditors what's happened. So we do have indirect interest.

BY ATTORNEY MORRIS:

Q. And none of the HMIT entities appear as an asset on the Dallas Foundation's balance sheet; correct?

A. Not directly. But if they roll up and they feed into the Atlas IDF Fund, right, and then the Atlas IDF Fund, which is a part of the Crown Global annuities, feeds into our balance sheet, there is an indirect interest in HMIT.

Fair to say?

Q. Does any Atlas entity appear on the

Dallas Foundation balance sheet?
A. Yeah, through the Crown Global annuity. So if you look at the Crown Global statement, it lists an Atlas LP as the investment vehicle.
Q. Do you know if the Dallas Foundation has any right to control any of the HMIT entities?
ATTORNEY OKIN: Object to form.
A. No, we can't directly control the HMIT entities.
BY ATTORNEY MORRIS:
Q. Do you know if the Dallas Foundation has any right to approve or disapprove of any potential transaction that an HMIT entity was contemplating entering into?
A. Yeah, so with the Atlas IDF Fund, what I can say is the Empower and Okada, they do have the opportunity to consent.
We had some notes that were -- there were some notes that Mark Patrick wanted to sell in February. We had to get the consent of Crown Global in order to sell these notes; and we had -- we opined with Crown Global to withdraw consent, right?

So he did reach out to Crown Global for consent in which the Empower and Okada had an opportunity to provide our recommendation.

Q. Let's focus on the settlement agreement.

Do you have any reason to believe that Mr. Patrick was required to obtain the consent of the Dallas Foundation before he signed it on behalf of the HMIT entities?

ATTORNEY OKIN: Object to form.

A. No.

BY ATTORNEY MORRIS:

Q. Do you have any reason to believe that Mr. Patrick was required to obtain the consent of the supporting organizations before entering into the settlement agreement on behalf of the HMIT entities?

ATTORNEY OKIN: Object to form.

A. No, sir.

BY ATTORNEY MORRIS:

Q. Do you have any reason to believe that Mr. Patrick was required to obtain the consent of Crown Global before entering into the proposed settlement agreement on behalf of each of the HMIT entities?

ATTORNEY OKIN: Object to form.

A. No, sir.

BY ATTORNEY MORRIS:

Q. Do you have any reason to believe that Crown Global has any right to control any of the HMIT entities?

ATTORNEY OKIN: Object to form.

A. Not that I'm aware of, no.

BY ATTORNEY MORRIS:

Q. Do you have any reason to believe that -- we're going to move on.

So we're going to put up on the screen the Dallas Foundation's objection.

A. Yes, sir.

Q. It will just take a moment for my colleague to do that.

While he's doing that, let me just tell you that this can be a little bit of a cumbersome process. I'm doing this by Zoom. If there's any aspect of the document that you recall that you think you need to review to refresh your recollection or to put it in context, will you just let me know that so that I give you a full and fair opportunity to answer the questions?

A. Yes, sir.

ATTORNEY MORRIS: Okay. Can we go to paragraph 32, please.

(Previously marked Highland Exhibit 1 introduced by counsel.)

BY ATTORNEY MORRIS:

Q. So I've put up on the screen, Mr. Littleton, the portion of the Dallas Foundation's objection that was filed in this case.

And you're familiar with that document; is that right?

A. Yeah. I couldn't repeat it back to you verbatim, but I understand some of the high-level facts in this objection.

Q. You give me comfort when you say that. You should not be able to repeat verbatim what this document is. So --

ATTORNEY OKIN: And, Mr. Littleton, although he didn't say it this time, he did say it in the prior one: If you need to see any more of this in order to be able to answer his questions, be sure to point that out.

THE WITNESS: Absolutely.

ATTORNEY MORRIS: I actually did say

that. That's okay.

ATTORNEY OKIN: Did you say that this time? I know you said it last time.

ATTORNEY MORRIS: Sorry, I must be putting you to sleep.

ATTORNEY OKIN: That's a possibility.

BY ATTORNEY MORRIS:

Q. Looking at the third line, I'm just going to read this quote: "Unfortunately, it does not appear, however, that joint official liquidators are parties to or have authorized the settlement."

Do you see that sentence?

A. Yes, sir.

Q. Do you know the entity over which the joint official liquidators were appointed?

A. Yes, sir. It's the DAF Foundation Holdco.

Q. And that's in the Cayman Islands; is that right?

A. Yes, sir; that's correct.

Q. Are you aware that all of the HMIT entities are Delaware organizations?

A. Yes, sir; that's correct.

Q. Have you ever communicated with the

joint official liquidators?
A. No, not officially. We do have a planned communication this week.
Q. Do you know if anybody acting on behalf of the Dallas Foundation has ever informed the joint official liquidators of Highland's motion to have the settlement agreement approved?
A. No, sir.
Q. Do you know if anybody acting on behalf of the Dallas Foundation has provided a copy of the objection that's on the screen to the joint official liquidators?
A. Not that I'm aware of, sir.
Q. Do you have any reason to believe, as you sit here today, that the joint official liquidators have any knowledge of the settlement agreement that is going to be before the Court on Wednesday?
ATTORNEY OKIN: Object to form.
A. I can't directly say.
BY ATTORNEY MORRIS:
Q. Okay. You haven't had any communications with anybody in the world at any time that led you to believe that the joint official liquidators were informed of the

proposed settlement agreement or the Dallas Foundation's objection; fair?

A. That's fair, sir.

Q. Okay. Do you have any reason to believe that Mr. Patrick was required to obtain the authorization of the joint official liquidators before entering into this settlement agreement on behalf of the HMIT entities?

ATTORNEY OKIN: Object to form.

A. No, sir, I can't. I can't speak to that.

BY ATTORNEY MORRIS:

Q. Can you speak to whether or not the joint official liquidators have any right to veto or prevent the HMIT entities from entering into the settlement agreement?

A. Again, I'm not a legal person, so I can't really opine on the official capacity of the joint liquidators and what they're capable of doing and not doing. So I'm going to have to say, no, I can't answer that question.

Q. Further down in the paragraph it states that:

"Indeed, many of Mr. Patrick's actions, including the insertion of

newly created entities into the fund's structure for the apparent purpose of diverting charitable assets will now be subject to the scrutiny of an independent, Court-appointed fiduciary and may be subject to clawback or other avoidance actions in the Cayman liquidation or such other tribunal as has jurisdiction."

Have I read that correctly, sir?

A. Yes, sir, you have.

Q. Okay. You're not an expert in Cayman Islands law; correct?

A. No, sir.

Q. I think you said earlier you're not a lawyer. Right?

A. That's correct.

Q. Do you have any understanding as to what facts must be established in order to succeed in a clawback or avoidance action?

A. It would just be assumption of mine that I would have, whether it's a breach of contract, discovery of various actions decision-making. But, no, I can't give you a legal opinion.

Q. Do you have any view at all as to likelihood that the supporting organizations or the Dallas Foundation might succeed in clawing back or succeeding in other avoidance actions to set aside the settlement agreement if it's approved by the Court?

ATTORNEY OKIN: Object to form.

And I'll also just remind you, Mr. Littleton, to the extent it's implicated, don't go into attorney-client privileged information that you may have received.

A. Yeah, I can't -- I can't answer your question, Mr. Morris, on that one.

BY ATTORNEY MORRIS:

Q. Is it fair to say you'd have to speculate as to whether or not -- let me just finish the question.

Is it fair to say that you would have to speculate as to whether or not the Dallas Foundation or anybody else might succeed in clawing back or avoiding the settlement agreement if it's approved by the Court?

ATTORNEY OKIN: Object to form.

A. It would be my opinion. It would be speculation of how I feel, given the facts that

I've seen and just some of the impact that we've seen on our supporting organizations; and I would just leave it there.

ATTORNEY MORRIS: Okay. If we could scroll up to paragraph 33, please.

BY ATTORNEY MORRIS:

Q. Okay. The last sentence of paragraph 33 says: "Thus, even if approved by this Court, consummation of the settlement is not likely to buy the peace the debtor now seeks."

Do you see that?

A. Yes, sir.

Q. Do you have any reason to believe that the Highland parties have done anything wrong in entering into this proposed settlement agreement?

ATTORNEY OKIN: Object to form.

A. You know, what I would say is we have an individual, in Mr. Patrick, that's moving around charitable assets; and we -- Highland Capital or the Highland entities have settled -- have made a settlement agreement with this individual, knowing some of the facts of how the charities are being negatively impacted. That's -- that would be my comment there.

///

BY ATTORNEY MORRIS:
Q. I'm not asking about the impact on the charitable foundations, and I'm not asking about Mr. Patrick. I'm just asking if you have any facts that lead you to believe that Highland has engaged in any wrongdoing with respect to negotiation and entry into the proposed settlement agreement.
ATTORNEY OKIN: Object to form. He answered your question.
BY ATTORNEY MORRIS:
Q. You can answer, sir.
A. No, sir. I'll just leave it as I stated. That was my answer.
Q. All right. So I didn't hear any facts, so you don't have any facts. Is that fair?
ATTORNEY OKIN: Object to form; argumentative. Come on, John.
ATTORNEY MORRIS: Matt, I'm being --
ATTORNEY OKIN: You asked him if they did anything wrong. He told you they did something wrong by --
(Indiscernible cross-talk.)
THE COURT REPORTER: I'm sorry. I

can't understand you both when you are talking at the same time.

BY ATTORNEY MORRIS:

Q. Mr. Littleton, are you aware of any facts that cause you to believe that the Highland parties have done anything wrong in entering into this agreement?

ATTORNEY OKIN: Object to form.

A. Again, I would just state that we have an individual who is moving around charitable assets, and I think we all are aware of the facts of what has taken place. Now, whether we want to consider that as anything wrong, in quotations, that's up for opinion.

In terms of "facts" facts, I can't -- no, I'm going to say, no, I don't have facts that I can with share you, Mr. Morris.

BY ATTORNEY MORRIS:

Q. And you don't even have any facts that suggest Highland had any role in moving the assets around that you just described; fair?

A. Yeah, I don't understand that Highland has moved around the assets. But I think when you're making a deal knowing that the individual that I'm settling with has done some things that

are questionable, you know, I think that discussion can be up for debate, whether -- you know, charities are being impacted; significant dollars are not going to be going out to the community; there's a lot of uncertainty with these assets.

And we all know the facts. The facts are clearly outlined.

Q. Do you know why the Dallas Foundation contends that: "Even if approved by the Court, consummation of the settlement is not likely to buy the peace that the debtor now seeks"?

What's the basis for that, if you have any understanding at all?

A. That one there, sir, I'm not going to be able to answer that one for you.

Q. Are you aware of any potential claims that the Dallas Foundation is considering bringing against Highland Capital Management or the Highland Claimant Trust?

ATTORNEY OKIN: I'm going to instruct him not to answer that. To the extent that he would be aware of those, that would be --

ATTORNEY MORRIS: Why don't we just do "yes" or "no," Matt. Okay?

ATTORNEY OKIN: No. I think -- I think whether or not there are any claims and whether we're considering any claims is attorney-client privilege. It's not a "yes" or "no" or detail; it's a not answer.

ATTORNEY MORRIS: I'll ask him on Wednesday.

ATTORNEY OKIN: Okay.

BY ATTORNEY MORRIS:

Q. Let's go to -- yeah, paragraph 34 says that "there is ample evidence that Mr. Patrick has acted and is acting well outside the scope of his authority and fiduciary obligations."

Do you see that?

A. Yes, sir, I do.

Q. Okay. I want to focus solely on the negotiation and execution of the settlement agreement.

Focusing --

A. Yes, sir.

Q. Focusing solely on the settlement agreement, do you believe that Mr. Patrick acted outside of the scope of his authority to negotiate and enter into the settlement agreement on behalf of each of the HMIT entities?

ATTORNEY OKIN: Object to form of the question.

A. Again, I think it's something that I've stated a few times now. Two things can be true. I think we've already agreed on that.

BY ATTORNEY MORRIS:

Q. Which two things can be true here?

A. The good-faith conversation with the settlement; but at the same time, it could have a consequential impact on the Okada and Empower Dallas supporting organizations.

Q. Okay. Do you believe -- do you have any reason to believe that Mr. Patrick acted outside of his fiduciary obligations with respect to his negotiation and execution of the settlement agreement on behalf of the HMIT entities?

ATTORNEY OKIN: Object to form. Are you asking him personally or the organization that filed this?

ATTORNEY MORRIS: It's not a 30(b)(6) witness. I know the difference.

ATTORNEY OKIN: Just so we're clear.

A. Yeah, I do think there was a fiduciary obligation to inform and have a conversation with

the interested parties.

BY ATTORNEY MORRIS:

Q. Okay. So, again, it's a duty to inform but nothing more; is that fair?

ATTORNEY OKIN: Object to form.

A. Yeah, yeah, again, I think it's, you know, something that we all expect to have, again, with our investment advisors, control persons, trustees.

BY ATTORNEY MORRIS:

Q. Okay. Can we go to paragraph 16, please.

Do you see paragraph 16 refers to material nonpublic information?

A. Yes, sir. I see it.

Q. Do you know what material nonpublic information is being referred to there?

A. No, sir.

Q. Did you ever ask anybody?

A. No. I didn't want to get involved in that conversation, no, sir. I did not ask anybody.

Q. Do you know where -- withdrawn.

Do you know the Dallas Foundation's source of information that enabled it to state,

upon information and belief, that the information provided was obtained by Mr. Patrick through his employment at Skyview and constituted MNPI?

ATTORNEY OKIN: Object to form.

A. No, sir, I was not -- no.

BY ATTORNEY MORRIS:

Q. You don't know where that information came from?

A. No, sir.

Q. The next sentence refers to a put option.

Do you see that?

A. Yes, sir.

Q. Did the foundation have a put option?

A. Yeah, the Highland Dallas Foundation had a put option agreement with the Dugaboy Investment Trust. I think we had 1.5 million shares of NexPoint Hospitality Trust. I think it was a contribution that was given in 2019 with the 7-year put option.

Q. And is that option now expired?

A. I believe it converted into a different investment vehicle now.

Q. So the Dallas Foundation never exercised that option; correct?

A. Correct.
Q. Why not?
A. We didn't have a -- we didn't feel we had any reason to exercise the put option.
Q. Did you ever do any analysis to try to determine what the economic impact would be on the Dallas Foundation if they actually exercised that put option?
A. We had some conversations with our internal investment advisor, and at the time his recommendation was not to make any changes or call the put option.
Q. Who was that advisor?
A. Madden & Associates at the time -- excuse me. Madden Asset Management.
Q. Do you have the shares to exercise the put today?
A. To be honest, Mr. Morris, there's a little bit of discovery we have to understand now that the shares have converted. I believe they converted to a different vehicle in April of this year.
Q. Are you aware that the Dallas Foundation lost $9 million by not exercising the put option before it converted?

ATTORNEY OKIN: Object to form.
A. I think we -- so we do have some information that we just need to understand thoroughly about what's happened now that the assets transferred into a different vehicle.
BY ATTORNEY MORRIS:
Q. Well, you're the CFO; right? And I think you said that your duty is to be responsible for the foundation's assets; right?
A. That's fair; yes, sir.
Q. Were you aware that the put was going to convert before it actually converted?
A. I was not aware of that. I was not informed of that.
Q. Were you ever told what the value would be to the Dallas Foundation if the Dallas Foundation exercised the put?
A. Yeah, I believe you're correct, it was in the ballpark range of $9 million.
Q. So is it fair to say that had the Dallas Foundation exercised the put, then it would have recovered $9 million?
A. Yeah, I think that's fair, yeah.
Q. What's the value of the shares that it received upon conversion? Do you know that?

A. No, I don't know that. We were just notified recently that the shares had converted.

Q. Is one of the reasons that you didn't exercise the put option is because Dugaboy, Mr. Dondero's family trust, was the counterparty?

ATTORNEY OKIN: Object to the form.

A. No, sir, that wouldn't be the reason.

BY ATTORNEY MORRIS:

Q. Do you think Mark Patrick breached his fiduciary duty by telling the Dallas Foundation that it should consider exercising a put that was worth $9 million?

ATTORNEY OKIN: Object to form.

A. You know, I think there was information that was not privy to individuals, so I don't know if we could rely on that information to make a decision.

BY ATTORNEY MORRIS:

Q. This was a put that was owned by the Dallas Foundation; do I have that right?

A. The Highland Dallas Foundation, supporting organization.

Q. And what's the relationship between the Dallas Foundation and the Highland Dallas Foundation?

A. Very similar to the relationship between Empower Dallas and Okada Dallas. The Highland Dallas Foundation is the supporting org that we have indirect oversight of.

Q. And if the Highland Dallas Foundation had exercised the put, would that have inured to the benefit of the Dallas Foundation?

ATTORNEY OKIN: Object to form.

A. It ultimately would have. What it would have benefited was the supporting organization to allow for more impactful grant-making. So you would have had $9 million of liquidity that could be pushed out into the community.

ATTORNEY MORRIS: Okay. How much time do I have left, Matt? I know you're watching.

ATTORNEY OKIN: I lost track, I was so enraptured by your questions.

18 minutes.

ATTORNEY MORRIS: You wouldn't be the first one.

Why don't we take a short break here. I've got 18 minutes left. If we could just take a five-minute break.

///

(Recess taken from 4:42 p.m. to 4:49 p.m.)

BY ATTORNEY MORRIS:

Q. Mr. Littleton, I think you answered this. If I did, I apologize.

Can you confirm for me that you've never communicated with the joint official liquidators?

A. Yes, sir. That is correct, other than emails to set up a conversation.

Q. Conversations that you did not participate in; is that right?

A. Yeah, just for -- yeah, just for some questions they wanted to ask of the Dallas Foundation's finance team.

Q. But did you participate -- so you spoke with the joint official liquidators' finance team?

A. No. They wanted to set up a call. That's the only time -- the only communication I've had.

Q. And you haven't had that call yet; is that right?

A. That's correct.

Q. And that call is going to be scheduled

for sometime in the future; fair?

A. Yes, sir.

ATTORNEY MORRIS: I have no further questions.

ATTORNEY PHILLIPS: No questions.

ATTORNEY OKIN: All right.

ATTORNEY MORRIS: Mr. Littleton, thank you very, very much for your time and patience.

Matt, thank you for arranging this on short notice.

Gail, do you need anything else from anybody?

THE COURT REPORTER: Okay. I have copies for Mr. Morris, Mr. Lang, Mr. Okin, and Mr. Phillips.

Anybody else?

ATTORNEY OKIN: Gail, we do want to read and sign both transcripts.

(Whereupon, at 4:50 p.m. Central Time the proceedings concluded.)

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it. DO NOT make marks or notations on the transcript volume itself.

E R R A T A

I wish to make the following changes, for the following reasons:

Page Line

_____ _____ CHANGE: ____________________________________

REASON: ________________________________________________

_____ _____ CHANGE: ____________________________________

REASON: ________________________________________________

_____ _____ CHANGE: ____________________________________

REASON: ________________________________________________

_____ _____ CHANGE: ____________________________________

REASON: ________________________________________________

_____ _____ CHANGE: ____________________________________

REASON: ________________________________________________

_____ _____ CHANGE: ____________________________________

REASON: ________________________________________________

_____ _____ CHANGE: ____________________________________

REASON: ________________________________________________

_____ _____ CHANGE: ____________________________________

REASON: ________________________________________________

_____ _____ CHANGE: ____________________________________

REASON: ________________________________________________

C E R T I F I C A T I O N

I hereby certify that I have read the foregoing transcript of my deposition testimony, and that my answers to the questions propounded, with the attached corrections or changes, if any, are true and correct.

-----------------------------------
TORREY LITTLETON

CERTIFICATE OF SHORTHAND REPORTER

I, Gail Inghram, Registered Diplomate Reporter, Certified Realtime Reporter, Realtime Systems Administrator, CA-Certified Shorthand Reporter No. 8635, and Notary Public, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.



Gail Inghram,
BA, RDR, CRR, RSA, CA-CSR No. 8635

**WORD INDEX**


< $ >
**$22** 19:21
**$23** 42:2
**$29** 19:20
**$300** 41:5
**$650** 52:8
**$7** 19:22
**$9** 72:24 73:19, 22 74:12 75:12

< 1 >
**1** 6:13 58:5
**1.5** 71:17
**10010** 3:24
**10017-2024** 3:16
**11** 1:8
**1113** 4:10
**13** 11:14 32:23
**16** 70:11, 13
**1600** 5:9
**1700** 4:18
**18** 75:19, 23
**19-34054-sgj11** 1:5
**1st** 11:13

< 2 >
**2015** 19:18, 19
**2019** 71:19
**2022** 11:13
**2025** 1:14 2:10 29:4
**21** 7:4
**212.849.7615** 3:25
**214.817.4500** 4:20
**22** 1:14 2:10
**225.381.9643** 5:11
**22nd** 3:23
**2390** 4:18
**23-plus** 41:14
**240** 4:10

< 3 >
**3:30** 1:15 2:11
**30(b)(6** 69:21
**300** 41:1
**301** 5:9
**310.277.6910** 3:17
**32** 58:3
**33** 64:5, 8
**34** 68:10
**34th** 3:15

< 4 >
**4:42** 76:1
**4:49** 76:2
**4:50** 77:19

< 5 >
**51** 3:23
**58** 6:13

< 6 >
**67** 7:4

< 7 >
**70801** 5:10
**713.228.4100** 4:12
**75201** 4:19
**77002** 4:11
**780** 3:15
**7-year** 71:20

< 8 >
**8** 6:7
**8635** 1:22 81:8, 21

< 9 >
**918,000** 29:5

< A >
**ability** 51:16 53:8
**able** 32:5, 13 33:25 58:17, 22 67:16
**absolutely** 30:3 33:22 49:12 58:24
**accommodate** 11:1
**accounts** 21:15, 21, 22, 24 22:1, 20 29:3 34:13
**acted** 68:12, 22 69:13
**acting** 34:8 60:4, 9 68:12
**action** 48:21 49:3 62:20
**actions** 61:25 62:7, 23 63:4
**activity** 14:25 15:2, 3, 15
**actual** 18:2
**ADAMS** 4:9
**add** 46:14
**addition** 13:8
**administrative** 20:16
**Administrator** 81:7
**adverse** 43:5
**advised** 52:8
**advisor** 51:25 52:15 72:10, 13
**advisor/control** 51:2
**advisors** 52:9 70:8
**affiliated** 11:4
**affiliates** 9:5 12:18 13:13, 18
**affirmed** 8:6
**afternoon** 8:23
**ago** 12:8 37:5, 25
**agree** 39:19, 22, 23
**agreed** 22:16 69:5
**agreed-upon** 30:10
**agreement** 9:4 12:17 13:3, 14, 18 27:21 31:15 40:3, 6, 12, 16, 21 41:6, 20 42:7, 9, 16, 25 43:3, 11, 21 44:5, 10, 18 45:11, 15, 19 46:6, 24 47:2, 17 49:25 50:3, 9, 16 51:12, 17 52:21 56:5, 16, 24 60:7, 17 61:1, 8, 16 63:5, 21 64:15, 21 65:8 66:7 68:18, 22, 24 69:16 71:16
**ahead** 27:14 38:23
**ahurt@kellyhart.com** 5:7
**allow** 9:19 31:22 75:11
**allows** 29:22
**alternative** 29:22
**AMELIA** 5:6
**amount** 20:8, 10 22:22 41:2
**amounts** 20:2
**ample** 68:11
**analysis** 72:5
**annuities** 17:6, 12, 25 18:3, 8 19:16, 17, 19, 25 20:1, 20 21:10, 23, 25 22:2, 3, 4, 7 24:12 25:12, 20 29:10, 14, 18, 23 54:22
**annuity** 17:16 20:21 22:17, 24 24:13, 16, 19, 20 28:17 30:5, 6 55:3
**ANSWER** 7:2 9:17, 20 10:19 20:24 47:11 57:24 58:22 61:21 63:12 65:12, 14 67:16, 22 68:5
**answered** 65:10 76:4
**answers** 80:8
**Anybody** 14:3 19:2 34:7 60:4, 9, 23 63:20 70:19, 22 77:12, 16
**anyway** 10:5, 20
**apologies** 27:13
**apologize** 41:9 76:5
**apologizing** 8:13
**apparent** 62:2
**appear** 54:16, 25 59:10
**appeared** 3:2 23:2
**appointed** 59:16
**appreciate** 8:16 52:17
**approval** 37:10, 13, 16 39:21
**approve** 55:14
**approved** 13:24 14:1 27:19 28:1 42:10 60:7 63:6, 22 64:8 67:10
**approximately** 2:11
**April** 72:21
**argumentative** 65:19
**arises** 47:1
**arm's-length** 43:4, 13 44:6 46:8
**arranging** 77:9
**aside** 63:5
**asked** 15:9 65:21
**asking** 65:2, 3, 4 69:19
**aspect** 57:20

**aspects** 11:*21*
**assert** 49:*4*
**asset** 54:*17* 72:*15*
**assets** 11:*19* 21:*14* 24:*24* 27:*20*, *25* 29:*7*, *19* 30:9 32:*2*, *6*, *10*, *13*, *16* 33:*6*, *10*, *15* 40:*19*, *23*, *25* 42:*8*, *15*, *22* 44:9 46:*11* 52:9 54:9 62:*3* 64:*19* 66:*11*, *21*, *23* 67:*6* 73:*5*, *9*
**associated** 20:*20*
**Associates** 72:*14*
**assumed** 35:*10*
**assumption** 32:*1* 62:*21*
**Atlas** 15:*5* 18:*4* 21:*17* 22:*3*, *10*, *12*, *13* 29:*20*, *21* 30:*23* 31:*1*, *14* 32:*11* 49:*17* 54:*20*, *21*, *25* 55:*4*, *17*
**attached** 80:*9*
**Attorney** 6:*7* 8:*11*, *24* 15:*22*, *23* 16:*16*, *23* 21:*4*, *6* 23:*13*, *14*, *23* 24:*10* 25:*13*, *19*, *24* 26:*1*, *16* 27:*2*, *12*, *14*, *16* 28:*2*, *13* 35:*21* 36:*4*, *18* 37:*2* 38:*12*, *14*, *18*, *20*, *22*, *24* 39:*8*, *18* 41:*21* 42:*4*, *11*, *19* 43:*6*, *9*, *14*, *19*, *25* 44:*3* 45:*2*, *3* 47:*9*, *10*, *20* 48:*1*, *8*, *10*, *14*, *17*, *23* 49:*1*, *6*, *8* 50:*4*, *7*, *18* 51:*6*, *19* 52:*1*, *6*, *16* 53:*6*, *17*, *25* 54:*3*, *7*, *15* 55:*9*, *12* 56:*10*, *12*, *18*, *20* 57:*1*, *3*, *7*, *9* 58:*2*, *6*, *19*, *25* 59:*2*, *4*, *6*, *7* 60:*19*, *21* 61:*9*, *12* 63:*7*, *14*, *23* 64:*4*, *6*, *16* 65:*1*, *9*, *11*, *18*, *20*, *21* 66:*3*, *8*, *18* 67:*21*, *24* 68:*1*, *6*, *8*, *9* 69:*1*, *6*, *18*, *21*, *23* 70:*2*, *5*, *10* 71:*4*, *6* 73:*1*, *6* 74:*6*, *8*, *13*, *18* 75:*8*, *15*, *17*, *20* 76:*3* 77:*3*, *5*, *6*, *7*, *17*
**attorney-client** 63:*10* 68:*4*
**audited** 54:*10*
**auditors** 33:*23* 54:*13*
**authority** 68:*13*, *23*
**authorization** 61:*6*
**authorize** 50:*15*
**authorized** 38:9 39:*3* 59:*11*
**Avenue** 3:*15*, *23* 4:*18*
**avoidance** 62:*7*, *20* 63:*4*
**avoiding** 63:*21*
**aware** 12:*7*, *10*, *13* 13:*7*, *12* 15:*15* 16:*2*, *4*, *8*, *24* 21:*21* 27:*17* 37:*3*, *7*, *11* 40:*16*, *19*, *23* 46:*23* 48:*11* 49:*2*, *16* 57:*8* 59:*22* 60:*13* 66:*4*, *11* 67:*17*, *23* 72:*23* 73:*11*, *13*

**< B >**
**BA** 1:*22* 81:*21*
**back** 19:*18* 20:*18* 58:*13* 63:*4*, *21*
**balance** 26:*4* 54:*9*, *17*, *22* 55:*1*
**ballpark** 73:*19*
**BANKRUPTCY** 1:*1* 12:*8*, *15* 23:*3*, *7* 31:*11* 37:*4* 38:*16*
**BARTLETT** 4:*9*
**based** 16:*21* 28:*3*, *9*, *17*, *24* 42:*1*
**basis** 28:*22* 49:*9*, *14* 67:*13*
**Baton** 5:*10*
**Beacon** 18:*6*
**beginning** 2:*11*
**behalf** 3:*4*, *19* 4:*3*, *14* 5:*3* 13:*3*, *25* 16:*5*, *9*, *25* 34:*8* 50:*10*, *16* 51:*17* 56:*9*, *16*, *24* 60:*5*, *10* 61:*8* 68:*25* 69:*16*
**belief** 71:*1*
**believe** 13:*5* 19:*18*, *22* 20:*9*, *11* 21:*17*, *18* 22:*3* 23:*4* 25:*10* 26:*12* 27:*8*, *23* 28:*5* 29:*2*, *7*, *16* 35:*18*, *22*, *24* 36:*7*, *15* 37:*12* 39:*1* 40:*14* 41:*13* 42:*15* 43:*2*, *17* 45:*5* 46:*19* 47:*3*, *15*, *24* 48:*4* 49:*19* 50:*13*, *21* 51:*1*, *9*, *15*, *24* 52:*3* 53:*2* 56:*6*, *13*, *21* 57:*4*, *10* 60:*14*, *24* 61:*5* 64:*13* 65:*5* 66:*5* 68:*22* 69:*12*, *13* 71:*22* 72:*20* 73:*18*
**beneficial** 24:*2*
**benefit** 28:*8* 42:*3* 49:*22* 75:*7*
**benefited** 53:*15* 75:*10*
**best** 18:*10*
**beyond** 25:*20* 52:*5*
**billion** 22:*14*
**bit** 13:*22* 15:9 23:*15* 48:*15* 57:*18* 72:*19*
**board** 11:*23* 15:*13*, *17* 54:*13*
**boards** 14:*24*
**breach** 62:*22*
**breached** 74:9
**break** 10:*24* 75:*22*, *24*
**bring** 38:*8*
**bringing** 67:*19*
**buy** 64:*10* 67:*12*

**< C >**
**CA-Certified** 81:*7*
**CA-CSR** 1:*22* 81:*21*
**call** 14:*10* 20:*17* 72:*12* 76:*19*, *22*, *25*
**called** 12:*4* 23:*17*
**capable** 61:*19*
**capacity** 11:*7*, *22* 53:*4* 61:*18*
**CAPITAL** 1:*6* 3:*4* 8:*25* 12:*5* 26:*9*, *13*, *25* 27:9 36:*8* 37:*6* 41:*24* 42:*24* 45:*6* 48:*22* 64:*20* 67:*19*
**care** 46:*17*
**carefully** 27:*4*
**carry** 26:*3*
**Case** 1:*5* 38:*6* 58:*10* 81:*16*
**cash** 27:*20*, *25*
**casual** 8:*14*
**cause** 48:*21* 49:*3* 66:*5*
**causing** 19:*7* 46:*16*
**caveat** 46:*14*
**Cayman** 16:*1* 59:*19* 62:*7*, *12*
**Central** 1:*15* 2:*11* 77:*19*
**certain** 9:*3* 12:*17*, *18* 13:*12* 15:*25* 45:*23*
**CERTIFICATE** 81:*2*
**Certified** 2:*14*, *15* 81:*6*
**certify** 80:*6* 81:*10*
**CFO** 11:*8*, *10*, *12*, *16*, *17* 23:*5* 32:*8*, *17* 73:*7*
**chance** 10:*15*
**CHANGE** 79:*6*, *8*, *10*, *12*, *14*, *16*, *18*, *20*, *22*
**changes** 72:*11* 78:*3* 79:*3* 80:9
**Chapter** 1:*8*
**charitable** 11:*19* 24:*24* 42:*15*, *22* 44:*8* 62:*3* 64:*19* 65:*3* 66:*10*
**charities** 64:*23* 67:*3*
**charts** 31:*6*
**claim** 23:*7* 48:*12*, *20* 49:*3*
**Claimant** 3:*5* 9:*1* 23:*11*, *18*, *22* 26:*5*, *9*, *14*, *25* 27:*10* 30:*14*, *15* 36:*8* 45:*11* 49:*5* 67:*20*
**claims** 40:*15* 67:*17* 68:*2*, *3*
**CLARITY** 7:*22* 30:*7*
**clawback** 62:*6*, *20*

**clawing** 63:3, 21
**clear** 32:14 69:23
**clearly** 36:6 67:8
**colleague** 57:16
**combination** 14:23
**Come** 65:19
**comfort** 58:16
**comfortable** 33:24
**commenced** 16:6 37:24 39:24
**comment** 64:24
**communicate** 34:7, 15
**communicated** 59:25 76:7
**communication** 35:25 60:3 76:20
**communications** 34:9 60:23
**community** 18:22 67:5 75:14
**company** 12:4
**compensate** 20:19
**compensates** 20:12
**complicated** 9:14
**complies** 22:23
**computer** 19:6
**concern** 42:6 47:6 50:6
**concerned** 44:22 49:24
**concerns** 15:2 44:4 46:10
**concluded** 77:20
**conference** 14:10
**confirm** 76:6
**confused** 41:10
**connection** 9:2
**consent** 51:11 52:20, 24 55:19, 22, 25 56:2, 7, 14, 22
**consequential** 69:10
**consider** 66:13 74:11
**consideration** 50:2
**considering** 67:18 68:3
**constituted** 71:3
**consummation** 64:9 67:11
**Cont'd** 4:1 5:1
**contemplating** 55:16
**contends** 43:22 67:10
**context** 57:23
**contract** 17:12, 19 22:24 62:23
**contracts** 24:14, 16, 19, 21
**contractual** 20:6 26:8
**contribution** 71:19
**contributions** 19:20
**control** 51:25 52:15 55:7, 10 57:5 70:8
**controlled** 9:6 12:11, 19
**conversation** 11:25 36:23 43:15 69:8, 25 70:21 76:10
**conversations** 43:8 51:3 53:8 72:9 76:11
**conversion** 73:25
**convert** 73:12
**converted** 71:22 72:20, 21, 25 73:12 74:2
**convoluted** 39:11
**copies** 77:14
**copy** 60:11
**correct** 15:18, 20, 21 16:10, 11 17:24 18:12 20:3 21:13, 16 22:7, 8, 17, 24 24:16, 19 30:6 33:9 37:22 39:21 41:17, 18, 20 43:13 54:18 59:21, 24 62:13, 17 71:25 72:1 73:18 76:9, 24 80:10 81:11
**corrections** 78:3 80:9
**correctly** 62:10
**corresponding** 18:19
**counsel** 16:22 58:5 81:15
**counterparty** 74:5
**couple** 29:16 37:4, 25
**course** 34:6, 21
**COURT** 1:1 8:18 9:25 12:15 37:4 38:16 60:17 63:6, 22 64:9 65:25 67:10 77:13
**Court-appointed** 62:5
**CRAWFORD** 4:17
**create** 31:21
**created** 31:19, 24 62:1
**cross-talk** 65:24
**Crown** 4:3 15:7 16:25 17:3, 5, 11, 14, 22 18:24 19:1, 24 20:7, 9 21:1, 2, 10, 16, 18 22:5, 14, 23 24:7 25:3, 6, 11, 15, 21 28:21 29:17, 25 30:3, 10 31:8, 10 35:23 36:22 50:25 54:22 55:2, 3, 23, 24 56:1, 23 57:5
**CRR** 1:22 81:21
**cumbersome** 57:19
**current** 28:5
**Currently** 38:3
**CURRY** 4:7, 9

**< D >**
**DAF** 30:18 59:17
**DALLAS** 1:3 4:3, 19 9:3 11:4, 8, 11 12:13 13:25 14:13 15:24 16:9, 12, 15, 17, 19 17:8, 10, 13, 22 18:9, 14, 16, 19, 25 23:1, 6, 9, 20 24:5, 8, 15, 18 25:7, 11, 15, 22 26:3, 7, 15, 18, 23 27:11, 24 30:18 32:9 33:5, 14, 20 34:4, 22 35:2, 6, 12, 20, 25 36:9, 17 37:9, 13, 17 39:20 40:3 42:5, 15 43:18, 22 44:19, 21 46:9 48:12, 21 49:4, 10, 23 51:10, 15 52:19 53:2, 18, 22 54:1, 17 55:1, 6, 13 56:8 57:13 58:8 60:5, 10 61:1 63:3, 19 67:9, 18 69:11 70:24 71:15, 24 72:7, 23 73:16, 21 74:10, 20, 21, 24 75:2, 3, 5, 7 76:14
**D'AMBRA** 5:14
**data** 41:9
**DAVID** 4:7
**day** 8:18 13:21
**dcurry@okinadams.com** 4:8
**deal** 66:24
**debate** 67:2
**Debtor** 1:8 64:10 67:12
**decided** 16:21
**decision** 53:9, 12 74:17
**decision-making** 62:24
**decisions** 26:25 36:1, 24 39:16 42:14 50:24 52:10
**Defendant** 4:3, 14
**Delaware** 59:23
**delivered** 28:1
**DEMO** 3:8
**depends** 23:24
**DEPONENT** 78:1
**deposed** 9:9
**DEPOSITION** 1:12 2:9 7:1 9:2 78:3 80:7
**depositions** 8:14
**describe** 49:13
**described** 29:1 66:21
**describing** 29:13
**detail** 68:5
**details** 13:1
**determine** 72:6
**device** 19:5
**DIAZ** 5:21 14:2 15:13 16:20
**difference** 69:22
**different** 31:22 71:23 72:21 73:5
**Diplomate** 2:14 81:5
**DIRECT** 7:23 25:14, 22 53:19, 21 54:4, 5
**direction** 2:16
**directly** 17:22 23:21 25:25 35:8, 9, 13

48:*24* 49:*7* 54:*1*, *19* 55:*10* 60:*20*
**director** 11:*23*
**directs** 10:*18*
**disapprove** 55:*14*
**discovery** 62:*23* 72:*19*
**discussion** 67:*2*
**disposition** 42:*8* 46:*11*
**distribute** 25:*3*
**distributions** 17:*17*, *18* 25:*6*, *8* 30:*11*
**DISTRICT** 1:*2*
**diverting** 62:*3*
**dividends** 17:*16*
**DIVISION** 1:*3*
**document** 57:*20* 58:*12*, *18*
**documentation** 51:*21* 52:*23*
**DOCUMENTS** 7:*7* 30:*25* 31:*2*, *4* 50:*14*, *20*
**doing** 39:*7* 57:*17*, *19* 61:*20*
**dollar** 22:*13*
**dollars** 22:*14* 28:*5* 41:*14* 42:*1* 49:*19* 53:*13* 67:*4*
**Dondero** 12:*11* 14:*7*, *16* 15:*16* 16:*4* 19:*22*
**Dondero's** 74:*5*
**donor-advised** 18:*20*, *21*
**dressing** 8:*15*
**due** 29:*5*
**Dugaboy** 4:*14* 71:*16* 74:*4*
**duly** 8:*6*
**duration** 20:*8*
**duties** 11:*15* 26:*14*, *17* 27:*10* 32:*8* 33:*19* 34:*6*
**duty** 11:*17* 25:*3*, *6*, *11*, *22* 35:*19* 36:*9*, *16* 52:*3*, *5* 70:*3* 73:*8* 74:*10*

**< E >**
**earlier** 29:*1* 43:*23* 62:*15*
**easier** 13:*22*
**economic** 15:*6* 24:*4* 28:*8* 35:*23* 36:*2*, *21* 37:*18* 47:*21* 48:*7* 49:*20* 50:*24* 72:*6*
**elaborate** 48:*15*
**emails** 76:*10*
**EMANUEL** 3:*22*
**employed** 81:*15*
**employment** 71:*3*
**Empower** 11:*25* 14:*24* 16:*12* 17:*10*, *13*, *22* 18:*9*, *17* 24:*2*, *8* 25:*9*, *17* 26:*21*, *22* 28:*12*, *15* 30:*17* 37:*19* 39:*13* 40:*9* 41:*13*, *23* 42:*2*, *23* 43:*18* 44:*19* 47:*14*, *23* 49:*21* 55:*18* 56:*2* 69:*10* 75:*2*
**enabled** 70:*25*
**engaged** 43:*23* 65:*6*
**enraptured** 75:*18*
**ensure** 11:*17*
**enter** 50:*15* 53:*5* 68:*24*
**entered** 42:*16*, *24* 50:*9*
**entering** 51:*11*, *16* 52:*20* 55:*16* 56:*15*, *23* 61:*7*, *15* 64:*15* 66:*6*
**entire** 34:*3*
**entities** 9:*5* 12:*18* 13:*2*, *19* 16:*19* 27:*18*, *19* 31:*14*, *16*, *19* 33:*2*, *11*, *16* 35:*4*, *14*, *19* 36:*16* 45:*23* 46:*21*, *24* 47:*7*, *17* 50:*2*, *10*, *11*, *14*, *17* 51:*18* 52:*4*, *19* 53:*5*, *20*, *24* 54:*16* 55:*8*, *11* 56:*9*, *17*, *25* 57:*6* 59:*23* 61:*8*, *15* 62:*1* 64:*20* 68:*25* 69:*17*
**entity** 12:*7*, *10* 23:*17* 54:*25* 55:*15* 59:*15*
**entry** 65:*7*
**Errata** 78:*5*
**ESQ** 3:*6*, *8*, *10*, *12*, *20* 4:*5*, *7*, *15* 5:*4*, *6*
**established** 62:*19*
**event** 20:*23*
**evidence** 68:*11*
**exact** 22:*21*
**EXAMINATION** 6:*5* 8:*10*
**examined** 8:*8*
**example** 22:*10*
**exchange** 21:*10*
**excuse** 72:*15*
**execution** 68:*17* 69:*15*
**exercise** 72:*4*, *16* 74:*4*
**exercised** 71:*25* 72:*7* 73:*17*, *21* 75:*6*
**exercising** 72:*24* 74:*11*
**Exhibit** 6:*13* 58:*4*
**EXHIBITS** 6:*11*
**expect** 51:*4* 70:*7*
**expectation** 52:*14*, *18*
**expense** 20:*12*, *17*
**expenses** 20:*14*
**expert** 62:*12*
**expired** 71:*21*
**explain** 54:*12*
**explained** 20:*18*
**exposure** 14:*15*
**extend** 52:*5*
**extent** 63:*9* 67:*22*

**< F >**
**fact-finding** 38:*8*
**facts** 28:*3* 38:*5*, *6* 40:*5*, *8* 41:*10* 43:*1*, *10* 44:*10* 45:*22* 48:*11*, *20* 49:*2* 58:*15* 62:*19* 63:*25* 64:*22* 65:*5*, *16* 66:*5*, *11*, *15*, *16*, *19* 67:*7*
**fail** 9:*21*
**fair** 20:*25* 23:*5* 28:*12*, *14*, *16*, *22*, *24* 29:*4*, *8*, *9*, *14* 30:*11*, *12* 34:*19*, *20* 42:*5* 43:*24* 44:*2*, *25* 45:*1* 46:*7*, *12*, *14* 49:*23* 50:*1* 51:*12*, *13*, *18* 54:*6*, *24* 57:*24* 61:*2*, *3* 63:*15*, *18* 65:*17* 66:*21* 70:*4* 73:*10*, *20*, *23* 77:*1*
**faith** 44:*17*
**familiar** 12:*4* 13:*2* 23:*17* 28:*14* 30:*13*, *16*, *18*, *20*, *22* 58:*11*
**Family** 12:*1* 16:*13* 17:*10*, *13*, *23* 18:*9*, *17* 74:*5*
**fan** 19:*7*, *9*
**February** 29:*4* 55:*22*
**fee** 20:*16*
**feed** 54:*20*
**feedback** 19:*8*
**feeds** 54:*22*
**feel** 63:*25* 72:*3*
**felt** 16:*19*
**fiduciary** 11:*18*, *20* 24:*22* 35:*24* 36:*9*, *16*, *23* 50:*21* 51:*23* 52:*2*, *25* 62:*5* 68:*13* 69:*14*, *24* 74:*10*
**file** 14:*21* 16:*14*, *21* 37:*5* 39:*21*
**filed** 12:*7*, *14*, *22* 16:*25* 23:*3*, *6* 37:*3* 38:*19* 39:*2*, *25* 58:*9* 69:*20*
**filing** 13:*24* 14:*17* 37:*10*, *14* 38:*9* 39:*3*, *12*
**finance** 76:*15*, *18*
**financial** 11:*21* 25:*1* 26:*23* 54:*10* 81:*17*
**financially** 24:*23*
**finish** 9:*16*, *20* 63:*17*
**firm** 8:*24*
**first** 8:*6* 9:*11* 15:*1*, *11* 75:*21*
**five-minute** 75:*24*
**fixed** 17:*19*, *21* 20:*2*, *7*, *10*, *22* 21:*11* 22:*16*
**Floor** 3:*15*, *23*
**flow** 18:*14*, *15*, *18*

26:*21* 30:*11* 31:*5*
**flows** 29:*14* 30:*23*
**fluctuations** 54:*12*
**focus** 56:*4* 68:*16*
**focused** 48:*2*
**Focusing** 68:*19*, *21*
**following** 79:*3*, *4*
**follows** 8:*8*
**foregoing** 80:*7* 81:*9*, *10*
**form** 15:*22* 16:*16* 23:*13*, *23* 25:*13*, *24* 26:*16* 27:*12* 28:*2* 35:*21* 36:*18* 38:*12* 39:*8* 41:*21* 42:*11* 43:*6*, *14*, *25* 45:*2* 47:*9*, *20* 48:*8*, *14*, *23* 49:*6* 50:*4*, *18* 51:*19* 52:*6* 53:*6*, *25* 54:*7* 55:*9* 56:*10*, *18* 57:*1*, *7* 60:*19* 61:*9* 63:*7*, *23* 64:*16* 65:*9*, *18* 66:*8* 69:*1*, *18* 70:*5* 71:*4* 73:*1* 74:*6*, *13* 75:*8*
**formal** 9:*13* 10:*14*
**formed** 23:*11*
**forth** 27:*20*
**Foundation** 4:*3* 11:*5*, *9*, *11*, *22* 12:*1*, *14* 13:*25* 14:*24* 16:*10*, *13*, *15*, *18*, *20*, *21* 17:*8*, *10*, *14*, *23* 18:*14*, *16*, *19*, *25* 23:*2*, *6*, *10*, *16*, *20* 24:*3*, *5*, *15*, *18* 25:*7*, *12*, *15*, *22* 26:*3*, *7*, *15*, *18* 27:*11*, *24* 32:*9* 33:*5*, *14*, *20* 34:*4*, *22* 35:*3*, *6*, *12*, *20*, *25* 36:*9*, *17* 37:*18*, *19* 39:*14* 40:*9* 43:*18*, *22* 44:*22* 46:*10* 48:*13*, *21* 49:*4*, *24* 51:*15* 53:*2*, *18*, *22* 54:*1* 55:*1*, *6*, *13* 56:*8* 59:*17* 60:*5*, *10* 63:*3*, *20* 67:*9*, *18* 71:*14*, *15*, *24* 72:*7*, *24* 73:*16*, *17*, *21* 74:*10*, *20*, *21*, *24*, *25* 75:*3*, *5*, *7*
**foundations** 15:*13* 18:*17* 65:*3*
**Foundation's** 9:*3* 14:*13* 15:*24* 18:*10* 26:*23* 37:*9*, *13* 39:*20* 40:*4* 42:*6* 49:*10* 51:*11* 52:*20* 54:*17* 57:*13* 58:*9* 61:*2* 70:*24* 73:*9* 76:*15*
**full** 57:*24*
**Fund** 15:*4*, *5* 17:*19* 18:*4*, *5*, *20* 21:*17*, *19* 22:*4* 24:*15*, *17* 28:*21* 30:*23* 49:*17* 54:*20*, *21* 55:*17*
**funded** 19:*17*, *19*
**funding** 16:*5*, *8*
**funds** 18:*21* 26:*20* 30:*25* 31:*1*
**fund's** 62:*1*
**Further** 61:*22* 77:*3*
**future** 21:*12* 28:*25* 30:*11* 40:*17* 49:*20* 77:*1*

**< G >**
**Gail** 1:*21* 2:*13* 9:*25* 77:*11*, *17* 81:*5*, *21*
**gdemo@pszjlaw.com** 3:*9*
**generally** 40:*10*, *13*
**gentleman** 12:*11*
**getting** 21:*2* 41:*10*
**give** 10:*13* 12:*25* 31:*6* 40:*11* 48:*12*, *20* 49:*3* 57:*24* 58:*16* 62:*24*
**given** 45:*22*, *24* 63:*25* 71:*19*
**gives** 10:*14*, *16*
**glance** 31:*3*
**Global** 4:*3* 15:*7* 16:*25* 17:*3*, *5*, *11*, *14*, *22* 18:*24* 19:*1*, *24* 20:*7*, *9* 21:*2*, *10*, *16*, *18* 22:*5*, *14*, *23* 24:*7* 25:*3*, *6*, *11*, *15*, *21* 28:*21* 29:*17*, *25* 30:*3*, *10* 31:*8*, *10* 35:*23* 36:*22* 50:*25* 54:*22* 55:*2*, *3*, *23*, *24* 56:*1*, *23* 57:*5*
**go** 17:*21* 25:*20* 27:*7*, *14* 38:*23* 41:*3* 58:*2* 63:*10* 68:*10* 70:*11*
**goal** 10:*4*
**going** 8:*18* 9:*14* 10:*3*, *19* 13:*21* 25:*25* 27:*3* 35:*22* 36:*2* 39:*13* 52:*12* 57:*11*, *12* 59:*9* 60:*17* 61:*20* 66:*16* 67:*4*, *15*, *21* 73:*11* 76:*25*
**Good** 8:*23* 21:*4*, *5* 44:*17*
**good-faith** 43:*4*, *12* 44:*6* 45:*21* 46:*8* 69:*8*
**governing** 30:*24* 31:*2*, *4* 50:*14*, *20*
**granting** 47:*16* 48:*5*
**grant-making** 75:*12*
**grants** 18:*21*
**GREGORY** 3:*8*
**grow** 24:*24*
**guaranteed** 22:*21*
**guy** 34:*23*

**< H >**
**half** 32:*20*
**HALL** 5:*18*
**HALLMAN** 5:*8*
**happen** 18:*16*
**happened** 53:*14*, *15* 54:*13* 73:*4*
**hard** 34:*11*
**harm** 46:*16*
**HART** 5:*8*
**hat** 34:*18*
**hats** 34:*19*
**HAYLEY** 3:*12*
**head** 34:*24* 35:*3*
**hear** 8:*21*, *22* 65:*15*
**heard** 36:*5* 38:*22* 39:*24*
**held** 2:*9* 15:*7* 30:*9* 33:*6*, *10*
**helped** 14:*4*
**Hey** 38:*20*
**high** 31:*3* 34:*14*
**HIGHLAND** 1:*6* 3:*4*, *19* 6:*13* 8:*25* 9:*1*, *4* 12:*5*, *17* 23:*2*, *7*, *11*, *18*, *22* 26:*4*, *8*, *9*, *13*, *14*, *24* 27:*9*, *18* 30:*14*, *15* 31:*10* 36:*7*, *8* 37:*6*, *24* 38:*16* 41:*17*, *24* 42:*15*, *24* 45:*6*, *11*, *16* 46:*25* 48:*13*, *22* 49:*5* 50:*10* 58:*4* 64:*14*, *19*, *20* 65:*5* 66:*5*, *20*, *22* 67:*19*, *20* 71:*15* 74:*21*, *24* 75:*3*, *5*
**Highland's** 12:*15* 60:*6*
**high-level** 40:*5* 58:*15*
**historical** 28:*9*
**HMIT** 13:*9*, *13*, *17*, *19* 18:*6* 27:*18*, *19* 28:*1*, *4* 30:*20*, *25* 31:*16*, *18* 32:*2*, *6*, *10* 33:*2*, *6*, *11*, *15* 34:*8*, *10*, *18*, *24* 35:*4*, *7*, *14*, *19* 36:*11*, *16* 37:*3*, *9*, *12*, *24* 38:*11* 40:*10* 46:*21*, *24* 47:*7*, *17* 48:*5* 50:*2*, *11*, *14*, *17* 51:*18* 52:*4*, *19* 53:*4*, *19*, *23* 54:*16*, *23* 55:*7*, *10*, *15* 56:*9*, *16*, *25* 57:*6* 59:*22* 61:*8*, *15* 68:*25* 69:*16*
**hold** 17:*11* 21:*22*, *24* 22:*2*, *3* 30:*1*, *2*
**Holdco** 30:*18* 59:*18*
**holdings** 32:*14*
**holds** 22:*4*
**honest** 72:*18*
**Hospitality** 71:*18*
**Houston** 4:*11*
**Hunter** 5:*3* 13:*5*, *8*, *9* 15:*3* 18:*6* 23:*25* 29:*6*, *12* 31:*14* 40:*17*, *20* 41:*25* 42:*8* 45:*19* 46:*11* 49:*18*, *21*
**HURT** 5:*6*
**hwinograd@pszjlaw.com** 3:*13*

< I >
**idea** 14:17, 18, 21 15:10 31:6
**identify** 32:2, 5
**IDF** 18:4 21:17 22:3 30:23 49:17 54:20, 21 55:17
**imagine** 31:23 35:11 52:23
**impact** 11:22 28:11 29:2, 7 35:23 36:2, 20, 25 37:18 38:6 39:10, 13 40:9 41:14, 22 43:17 44:17, 18 47:13, 18 48:7 50:24 52:13 64:1 65:2 69:10 72:6
**impacted** 15:6 45:24 53:9 64:23 67:3
**impactful** 75:11
**impacts** 24:3 44:12 47:12
**implicated** 63:9
**important** 9:15, 19 40:8
**including** 61:25
**income** 18:10, 13, 15, 24, 25 21:11 22:16 28:25 47:13, 23
**increased** 29:5
**independent** 62:5
**INDEX** 7:1
**indicate** 78:3
**indirect** 25:17 26:24 53:23 54:6, 14, 23 75:4
**indirectly** 23:21 24:1, 5 44:24
**Indiscernible** 65:24
**individual** 42:17, 21, 25 44:8, 11, 16 46:15 64:18, 22 66:10, 24
**individuals** 42:13 74:15
**infirmity** 10:16
**inform** 36:24 50:23 52:5 69:25 70:4
**information** 33:21 34:1 63:11 70:14, 17, 25 71:1, 7 73:3 74:15, 16
**informed** 33:6, 14 52:11 60:5, 25 73:14
**informing** 37:17
**Inghram** 1:21 2:13 81:5, 21
**inquired** 33:22
**inquiry** 32:9, 11
**insertion** 61:25
**insight** 31:25
**instruct** 67:21
**INSTRUCTION** 7:2
**INSTRUCTIONS** 78:1
**Insurance** 4:4 17:1, 4, 5, 6, 12 20:20 28:17, 18, 20 29:18, 23
**interest** 23:10, 21 24:2, 4, 6, 11, 13 25:18 26:4, 19, 24 28:4, 10 29:6, 11, 25 35:23 36:3, 21 39:16 41:24 47:22 49:18 50:24 53:13, 19, 23 54:4, 5, 6, 8, 14, 23 81:17
**interested** 51:23 53:7 70:1
**interests** 15:4 21:18 37:19
**internal** 72:10
**introduced** 58:5
**inured** 75:6
**invest** 19:24
**invested** 18:1
**Investment** 4:14 5:3 13:6, 9 14:25 33:24 36:1, 24 45:20 50:23 51:2, 25 52:14 55:4 70:8 71:17, 23 72:10
**investments** 11:20 18:3 22:6 29:17, 22 31:23 52:11
**involved** 70:20
**Islands** 16:1 59:19 62:13
**issuer** 17:6
**its** 22:23 26:4 49:18 50:1 81:17

< J >
**JAMES** 5:19
**January** 11:13
**JEFFREY** 3:10
**Jim** 12:11 14:7
**jmorris@pszjlaw.com** 3:7
**JOHN** 3:6 8:24 38:13 65:19
**joint** 59:10, 16 60:1, 6, 12, 15, 24 61:6, 14, 19 76:7, 17
**JONES** 3:14 5:18
**jpomerantz@pszjlaw.com** 3:11
**JULIE** 5:21 14:2 15:13 16:20
**June** 1:14 2:10
**jurisdiction** 62:9

< K >
**KELLY** 5:8
**key** 50:6
**kind** 12:25 14:4 15:14 31:6, 25 34:11 38:1, 2, 5, 7 40:7, 8 52:12
**know** 9:22 10:10, 25 13:24 14:6, 12, 16, 17 16:12 17:25 18:2, 3 19:17 23:1, 6, 9 25:21 26:7 29:3 30:22 31:18, 19, 21, 23 33:10, 21 34:11 35:6, 12, 16 36:12 37:15 38:9, 19 39:15 40:10, 13, 25 41:1 42:1, 14, 24 46:15 48:20 50:19, 20 51:1, 20 52:8, 12, 24 53:15 55:6, 13 57:23 59:3, 15 60:4, 9 64:17 67:1, 3, 7, 9 69:22 70:7, 16, 23, 24 71:7 73:25 74:1, 14, 16 75:16
**knowing** 64:22 66:24
**knowledge** 18:11 22:2 31:9 60:16

< L >
**L.P** 1:7
**LANG** 4:15, 17 77:14
**language** 37:16
**large** 40:25
**late** 21:2
**law** 8:24 62:13
**lawsuit** 37:5, 14, 23 39:4, 24
**lawyer** 10:12, 14 12:2 62:16
**lay** 23:15
**lead** 65:5
**lean** 38:7
**leaned** 40:7
**learn** 37:23
**leave** 64:3 65:13
**led** 60:24
**left** 75:16, 23
**legal** 10:14, 16 11:21 12:24 14:4 16:22 17:12 38:4, 7 40:7 52:22 53:2 61:17 62:25
**legally** 52:23 53:1
**level** 31:3 34:14
**liability** 40:14 46:25
**Life** 4:4 16:25 17:3, 5
**likelihood** 63:2
**Limited** 17:1, 4, 6
**LINE** 7:3, 8, 13, 17 59:8 79:5
**liquidation** 62:8
**liquidators** 59:11, 16 60:1, 6, 12, 16, 25 61:7, 14, 19 76:8, 17
**liquidity** 75:13
**listen** 27:4
**lists** 55:4
**Litigation** 3:19 15:25 16:5, 9 45:16
**little** 13:22 15:9 23:15 48:15 57:18 72:19

**LITTLETON** 1:13 2:9 6:6 8:5, 17 58:8, 19 63:9 66:4 76:4 77:7 80:12
**LLP** 3:22 4:9 5:8
**LOIGMAN** 3:20
**long** 11:1, 10 22:22 33:1
**longer** 49:22
**look** 55:3
**looked** 16:17
**looking** 14:25 19:14 59:8
**loss** 47:22
**lost** 47:13 72:24 75:17
**lot** 34:19 67:5
**LOUIS** 5:4
**Louisiana** 5:10
**LP** 8:25 12:5 15:5 18:4 22:3 45:6 55:4
**lphillips@kellyhart.com** 5:5

< M >
**M&E** 20:11, 14, 17
**Madden** 72:14, 15
**Madison** 3:23
**Main** 5:9 11:17
**making** 39:17 42:13 66:24
**MANAGEMENT** 1:6 3:4 8:25 12:5 26:9, 13 27:9 36:8 37:6 41:25 45:6 48:22 52:9 67:19 72:15
**Mark** 9:6 33:1 34:10 39:2 45:25 50:8 53:3 55:21 74:9
**MARKED** 6:11 7:16 58:4
**market** 20:4 28:12, 14, 16, 23, 24 29:4, 8, 9, 14 54:12
**MARKS** 7:22 78:6
**material** 70:14, 16
**Matt** 38:20 65:20 67:25 75:16 77:9
**matter** 30:8
**matters** 30:10
**MATTTHEW** 4:5
**mean** 38:13
**means** 11:19
**meet** 8:19
**member** 15:16
**met** 14:6, 8
**MICHAEL** 4:15
**million** 19:20, 21, 23 28:4 41:1, 5, 14, 25 42:2 49:19 52:8 53:13 71:17 72:24 73:19, 22 74:12 75:12
**mine** 62:21
**minutes** 75:19, 23
**missed** 20:13
**mlang@cwl.law.com** 4:16
**MNPI** 71:3
**mokin@okinadams.com** 4:6
**moment** 57:15
**money** 21:1, 9 22:22
**MORRIS** 3:6 6:7 8:11, 24 15:23 16:23 21:6 23:14 24:10 25:19 26:1 27:2, 16 28:13 36:4 37:2 38:14, 20, 24 39:18 42:4, 19 43:9, 19 44:3 45:3 47:10 48:1, 10, 17 49:1, 8 50:7 51:6 52:1, 16 53:17 54:3, 15 55:12 56:12, 20 57:3, 9 58:2, 6, 25 59:4, 7 60:21 61:12 63:13, 14 64:4, 6 65:1, 11, 20 66:3, 17, 18 67:24 68:6, 9 69:6, 21 70:2, 10 71:6 72:18 73:6 74:8, 18 75:15, 20 76:3 77:3, 7, 14
**motion** 37:4, 10 38:10, 13, 15 39:12, 21, 25 60:7
**Mountain** 5:3 13:6, 8, 9 15:3 18:6 24:1 29:6, 12 31:14 40:18, 20 41:25 42:8 45:20 46:11 49:18, 21
**move** 27:3 57:11
**moved** 66:23
**moving** 44:8 64:18 66:10, 20
**multiple** 33:23

< N >
**name** 8:23 16:14
**named** 12:11
**NATHAN** 5:18
**NECESSARILY** 7:22 34:17
**need** 10:24 34:23 35:3 57:21 58:21 73:3 77:11
**needed** 33:20 52:19
**negatively** 36:3 53:9 64:23
**negotiate** 68:24
**negotiating** 46:15
**negotiation** 43:4 65:7 68:17 69:15
**negotiations** 43:13 44:6, 15 46:9
**neither** 81:15
**never** 14:8 23:6 33:25 34:25 39:19 71:24 76:7
**New** 3:16, 24
**newly** 62:1
**news** 38:2
**NexPoint** 71:18
**nice** 8:19
**nonpublic** 70:14, 16
**normal** 51:3
**NORTHERN** 1:2
**Notary** 81:8
**notations** 78:6
**NOTE** 7:21
**notes** 19:13 55:20, 21, 23
**notice** 77:10
**notified** 74:2
**November** 19:19
**NUMBER** 6:12 12:8

< O >
**object** 10:13 15:22 16:16 23:13, 23 25:13, 24 26:16 28:2 35:21 36:18 38:12 39:8 41:21 42:11 43:6, 14, 25 45:2 47:9, 20 48:8, 14, 23 49:6 50:4, 18 51:19 52:6 53:6, 25 54:7 55:9 56:10, 18 57:1, 7 60:19 61:9 63:7, 23 64:16 65:9, 18 66:8 69:1, 18 70:5 71:4 73:1 74:6, 13 75:8
**objecting** 15:10
**objection** 9:3 12:14, 16, 21 13:25 14:5, 14, 18, 22 15:24 16:14, 24 23:3 27:12 40:4 49:10, 15 57:13 58:9, 15 60:11 61:2
**objections** 12:23
**obligation** 20:7, 11 22:15 35:20, 24 36:23 50:21 51:23 52:25 69:25
**obligations** 22:23 26:15, 18 27:10 68:13 69:14
**obtain** 51:10 52:19 56:7, 14, 22 61:5
**obtained** 39:20 71:2
**occasions** 33:23
**officer** 81:8
**official** 59:10, 16 60:1, 6, 12, 15, 25 61:6, 14, 18 76:7, 17
**officially** 60:2
**Oh** 41:7 42:21
**Okada** 12:1 14:24 16:13 17:10, 13, 23 18:9, 17 19:23 24:2, 8 25:9, 16 26:21, 22 28:12, 15 37:19 39:13 40:9 41:13, 23 42:2, 23 43:17 44:18 47:14, 23 49:22 55:18 56:2 69:10 75:2

**okay** 8:*21*, *23* 9:*12*, *17* 10:*8*, *20*, *21* 11:2 12:*13* 13:*21* 14:*12* 17:*3* 19:*11*, *16* 20:*25* 21:*14* 22:*19* 23:*1*, *20* 26:*2* 33:*4*, *18* 34:*6* 35:*1* 37:*3* 39:*19* 40:*2* 41:*11* 44:*4* 45:*4*, *9* 48:*11* 49:*2* 50:*8* 51:*7*, *9* 58:*2* 59:*1* 60:*22* 61:*4* 62:*12* 64:*4*, *7* 67:*25* 68:*8*, *16* 69:*12* 70:*3*, *11* 75:*15* 77:*13*
**OKIN** 4:*5*, *9* 15:*22* 16:*16* 21:*4* 23:*13*, *23* 25:*13*, *24* 26:*16* 27:*12*, *14* 28:*2* 35:*21* 36:*18* 38:*12*, *18*, *22* 39:*8* 41:*21* 42:*11* 43:*6*, *14*, *25* 45:*2* 47:*9*, *20* 48:*8*, *14*, *23* 49:*6* 50:*4*, *18* 51:*19* 52:*6* 53:*6*, *25* 54:*7* 55:*9* 56:*10*, *18* 57:*1*, *7* 58:*19* 59:*2*, *6* 60:*19* 61:*9* 63:*7*, *23* 64:*16* 65:*9*, *18*, *21* 66:*8* 67:*21* 68:*1*, *8* 69:*1*, *18*, *23* 70:*5* 71:*4* 73:*1* 74:*6*, *13* 75:*8*, *17* 77:*6*, *14*, *17*
**once** 34:*22*
**opine** 43:*8*, *16* 44:*16* 45:*8*, *9*, *14*, *18* 61:*18*
**opined** 55:*24*
**opinion** 62:*25* 63:*24* 66:*14*
**opportunity** 10:*17* 55:*19* 56:*3* 57:*24*
**option** 71:*11*, *14*, *16*, *20*, *21*, *25* 72:*4*, *8*, *12*, *25* 74:*4*
**order** 55:*23* 58:*22* 62:*19*
**org** 75:*3*
**organization** 11:*14* 16:*18* 30:*8* 32:*21*, *25* 69:*19* 74:*22* 75:*11*
**organizational** 31:*5*
**organizations** 11:*24* 16:*6* 20:*2*, *5* 21:*1*, *9* 22:*15*, *21* 24:*9*, *25* 25:*9* 28:*6* 29:*15*, *24* 30:*2* 44:*13* 45:*23* 46:*16* 47:*19* 48:*7* 50:*22* 53:*10* 56:*15* 59:*23* 63:*2* 64:*2* 69:*11*
**orgs** 39:*15*
**originally** 26:*20*
**originated** 14:*18*
**outcome** 81:*17*
**outlined** 67:*8*
**outside** 68:*12*, *23* 69:*14*
**overall** 38:*6* 54:*9*
**overseeing** 12:*15*
**oversight** 11:*18*, *20* 34:*13* 75:*4*
**owes** 25:*11* 26:*14* 27:*10* 35:*19* 36:*9*, *16*
**owned** 21:*15* 32:*6*, *10* 33:*16* 74:*19*
**ownership** 21:*20* 24:*6* 29:*25* 34:*13* 53:*19*, *21*, *23* 54:*5*, *6*
**owns** 31:*6* 32:*3*

**< P >**
**p.m** 1:*15* 2:*11* 76:*1*, *2* 77:*19*
**PACHULSKI** 3:*14* 5:*18*
**Pacific** 4:*18*
**PAGE** 6:*5*, *12* 7:*3*, *8*, *13*, *17* 79:*5*
**paid** 21:*1*, *9* 49:*21*
**paragraph** 58:*3* 61:*22* 64:*5*, *8* 68:*10* 70:*11*, *13*
**part** 11:*25* 12:*24* 20:*14* 23:*11* 33:*19* 40:*15* 43:*8*, *15* 44:*1* 46:*13* 47:*3* 50:*5* 54:*21*
**participate** 76:*12*, *16*
**particular** 20:*23* 21:*19*
**parties** 3:*2* 38:*17* 43:*5* 46:*25* 48:*5* 51:*23* 59:*11* 64:*14* 66:*6* 70:*1* 81:*16*
**partnership** 21:*18*
**party** 13:*13*, *18* 53:*7*
**patience** 77:*8*
**Patrick** 9:*6* 12:*19* 13:*3* 33:*1* 34:*10* 39:*2* 43:*23* 45:*25* 50:*9*, *15*, *22* 51:*10*, *16* 52:*3* 53:*3* 55:*21* 56:*7*, *14*, *22* 61:*5* 64:*18* 65:*4* 68:*11*, *22* 69:*13* 71:*2* 74:*9*
**Patrick's** 44:*21* 61:*24*
**PAUL** 5:*14*
**pay** 17:*16* 20:*1*, *7*, *10* 22:*15*
**payments** 17:*19*, *21* 49:*20*
**payout** 28:*8* 42:*2*
**payouts** 40:*17* 53:*16*
**PE** 15:*4* 49:*17*
**peace** 64:*10* 67:*12*
**pending** 11:*2* 15:*25*
**percentage** 20:*19*
**period** 20:*22* 21:*12*
**permission** 37:*5* 38:*15*
**person** 34:*15* 51:*3*, *25* 52:*15*, *22* 61:*17*
**personally** 14:*8* 69:*19*
**persons** 70:*9*
**pertaining** 12:*16*
**pertinent** 13:*1*
**PHILLIPS** 5:*4* 77:*5*, *15*
**piece** 20:*13*
**place** 44:*24* 66:*12*
**plan** 23:*12*
**planned** 60:*3*
**platform** 29:*20*, *21*
**play** 17:*7* 43:*1* 44:*14*
**played** 31:*10*
**plays** 17:*9*
**please** 58:*3* 64:*5* 70:*12*
**PLLC** 4:*17*
**point** 58:*23*
**policies** 17:*11* 30:*5*, *6* 36:*22*
**policy** 24:*7* 30:*1*, *2*, *4*
**POMERANTZ** 3:*10*
**portfolio** 15:*6*
**portfolios** 52:*13*
**portion** 15:*2* 18:*13* 58:*8*
**positive** 36:*3*
**possibility** 50:*1* 59:*6*
**potential** 55:*15* 67:*17*
**potentially** 39:*10* 41:*15* 47:*13*
**preparation** 14:*13*
**present** 2:*16* 5:*17* 54:*10*
**preserve** 24:*23*
**President** 14:*1* 16:*20*
**prevent** 51:*16* 61:*15*
**PREVIOUSLY** 6:*11* 58:*4*
**primarily** 15:*13*
**prior** 58:*21*
**privilege** 68:*4*
**privileged** 63:*10*
**privy** 74:*15*
**probably** 34:*14* 36:*12*
**problematic** 42:*18*, *20*
**proceeding** 13:*15*
**proceedings** 2:*12* 77:*20* 81:*9*, *11*, *12*
**process** 9:*13*, *14* 10:*23* 57:*19*
**produce** 28:*21*
**produced** 21:*11*
**product** 43:*3*, *12* 44:*5* 46:*8*
**PRODUCTION** 7:*7*
**projected** 28:*25*
**proper** 11:*18*
**proposed** 9:*4* 12:*16* 45:*5*, *10*, *15* 46:*20* 47:*16* 48:*6* 49:*10* 56:*23* 61:*1* 64:*15* 65:*7*

**proposing** 40:11
**propounded** 80:8
**protect** 24:23
**provide** 56:3
**provided** 60:10 71:2
**providing** 47:8
**Public** 81:8
**pull** 40:8
**pulling** 38:4
**purpose** 31:19 62:2
**pursued** 40:21
**pushed** 75:13
**put** 14:5 57:12, 22 58:7 71:10, 14, 16, 20 72:4, 8, 12, 17, 25 73:11, 17, 21 74:4, 11, 19 75:6
**putting** 59:5

**< Q >**
**quarter** 15:1
**quarterly** 20:15 28:22
**question** 9:16, 21 10:8, 16, 20 11:1 21:7 27:5 61:21 63:13, 17 65:10 69:2
**questionable** 42:14 67:1
**QUESTIONS** 7:16 9:15 10:13 34:16 57:25 58:23 75:18 76:14 77:4, 5 80:8
**quicker** 13:22
**QUINN** 3:22
**QUOTATION** 7:22
**quotations** 66:13
**QUOTE** 7:23 59:9

**< R >**
**Rand** 15:4 18:5 29:11, 12 30:17, 25 31:13 49:16
**Rand's** 29:6
**range** 73:19
**RAVER** 5:20
**RDR** 1:22 81:21
**reach** 56:1
**read** 12:23 40:2 59:9 62:10 77:18 80:6
**reading** 19:14 78:2
**really** 53:11 61:18
**Realtime** 2:14 81:6
**reason** 10:24 25:10, 23 26:12 27:8, 23 35:18 43:2 45:4, 7, 9, 14, 18 46:19 47:15 48:4 50:13 51:14 53:1 56:6, 13, 21 57:4, 10 60:14 61:4 64:13 69:13 72:4 74:7 79:7, 9, 11, 13, 15, 17, 19, 21, 23
**reasonable** 46:7
**reasons** 74:3 78:4 79:4
**recall** 14:11 41:2 57:21
**receive** 20:15 22:21 27:20, 24 28:7 40:11, 20 42:9 44:23 50:3
**received** 35:7, 13 63:11 73:25
**receives** 46:12
**Recess** 76:1
**recollection** 57:22
**recommendation** 16:22 56:3 72:11
**recommendations** 18:18
**record** 81:11
**recorded** 2:12
**recovered** 73:22
**reduced** 81:13
**refer** 13:8, 17
**REFERENCED** 6:11
**referred** 31:15 70:17
**referring** 30:4
**refers** 15:25 70:13 71:10
**REFLECT** 7:23
**refresh** 57:22
**regardless** 22:19 50:20
**Registered** 2:13 81:5
**reiterated** 38:5
**related** 29:2 40:6 41:6 81:15
**relates** 11:24 27:1 30:17 41:13
**relationship** 23:25 24:8, 22 25:16, 17 26:8 51:24 74:23 75:1
**relax** 9:12
**release** 40:14
**releases** 47:7, 16 48:2, 5
**releasing** 46:25
**rely** 12:24 74:16
**remind** 63:8
**REMOTE** 1:12 2:8 3:2
**reorganization** 23:12
**repeat** 58:13, 17
**rephrase** 10:10, 17
**Reported** 1:20
**Reporter** 2:14, 15 10:1 65:25 77:13 81:2, 6, 8
**REPORTER'S** 7:21
**reporting** 11:21
**represent** 39:15
**representative** 52:4 53:4
**representing** 44:13
**represents** 8:25
**REQUEST** 7:7
**required** 37:12 51:10 56:7, 14, 22 61:5
**research** 38:3
**respect** 17:8 22:6, 10 25:12 33:2 65:6 69:14
**respectfully** 27:3
**respectively** 17:23
**responsibilities** 11:16 33:19
**responsibility** 24:22 25:14 42:23
**responsible** 73:9
**restate** 21:7 36:19 44:7
**restructuring** 43:23 44:10, 21, 24 46:1, 12
**result** 43:20, 21 44:20 46:12
**review** 12:21 57:21
**reviewed** 30:24 31:1
**Right** 13:7 15:17 19:3, 6 21:12 27:24 29:10 30:1 31:16 32:22 33:2, 8 34:1, 2 37:16, 21 39:17 42:23 46:6 51:15 53:3, 11 54:20 55:7, 14, 25 57:5 58:12 59:20 61:14 62:16 65:15 73:7, 9 74:20 76:12, 23 77:6
**rise** 48:12, 20 49:3
**risk** 20:4, 10, 12, 20 22:6, 9, 11
**ROBERT** 3:20
**robertloigman@quinnemanuel.com** 3:21
**role** 14:12 17:7, 9 31:10 33:1 66:20
**roll** 24:25 26:22 31:7 54:9, 19
**rolled** 15:5 35:10
**rolls** 18:5, 7 49:17
**roll-up** 24:1
**room** 19:2
**Rouge** 5:10
**roughly** 41:14
**Royal** 21:2
**RSA** 1:22 81:21

**< S >**
**sale** 15:3 29:5, 11 52:11
**saw** 29:4
**says** 64:8 68:10
**scheduled** 76:25
**scope** 47:7 68:12, 23
**screen** 57:12 58:7 60:11
**scroll** 64:5
**scrutiny** 62:4
**see** 53:8 58:21 59:13 64:11 68:14 70:13, 15 71:12
**seek** 37:9, 13, 16

**seeking** 37:5
**seeks** 64:10 67:12
**seen** 31:5 51:22 64:1, 2
**SEERY** 5:19
**segregated** 21:15, 20, 22, 24 22:1, 20
**sell** 55:21, 23
**selling** 53:12
**sent** 19:24
**sentence** 59:13 64:7 71:10
**series** 9:15
**serve** 11:23
**served** 31:20
**set** 27:20 63:5 76:10, 19
**settle** 44:11
**settled** 64:20
**settlement** 9:4 12:17 13:14 23:25 24:3 27:1, 17 28:1, 8, 11 40:2, 6, 12, 16, 20 41:20 42:7, 9, 16 43:3, 11, 21 44:5, 18 45:5, 10, 15, 19 46:6, 7, 20, 24 47:2, 4, 5, 17, 22 48:6 49:11, 25 50:3, 9, 16 51:12, 17 52:21 53:16 56:4, 16, 24 59:12 60:7, 16 61:1, 7, 16 63:5, 21 64:9, 15, 21 65:8 67:11 68:17, 21, 24 69:9, 16
**settlements** 26:20 28:7 45:22
**settling** 66:25
**share** 50:1 66:17
**shares** 71:18 72:16, 20 73:24 74:2
**sharing** 19:6
**SHAWN** 5:20
**sheet** 26:4 54:9, 18, 23 55:1 78:5
**shifting** 42:22
**short** 75:22 77:10
**Shorthand** 2:15 81:2, 7
**sign** 77:18 78:5
**signed** 13:3 31:15 56:8
**significant** 36:25 43:17 49:20 50:23 67:3
**similar** 75:1
**sir** 8:19, 21 9:10, 18, 23 11:5 12:3, 6, 9, 12, 20 16:7 17:2, 20 18:12 19:4, 15 20:3 22:25 23:4, 8 25:8 26:6, 11 27:6, 15 30:12 31:12 32:4, 19 33:3, 7, 12, 17 34:5 35:5, 15 37:7, 11 39:1, 5, 22 40:1, 13 45:13, 17, 21 46:6, 22 47:11, 12 48:9, 24 49:7 51:8 53:21 56:19 57:2, 14 58:1 59:14, 17, 21, 24 60:8, 13 61:3, 10 62:10, 11, 14 64:12 65:12, 13 67:15 68:15, 20 70:15, 18, 21 71:5, 9, 13 73:10 74:7 76:9 77:2
**sit** 60:15
**situation** 51:5
**six** 32:22
**Skyview** 71:3
**sleep** 59:5
**smoothly** 27:7
**sold** 22:17 28:4 41:24 49:16, 18
**sole** 18:8 24:6
**solely** 68:16, 21
**somewhat** 42:18
**Sorry** 19:11 21:3 28:18 36:5, 10, 11 59:4 65:25
**sought** 39:20
**Sounds** 21:4, 5
**source** 18:9 70:25
**speak** 34:23 35:3 61:10, 13
**speculate** 63:16, 19
**speculation** 63:25
**speed** 38:8
**spoke** 76:17
**spoken** 14:9
**standpoint** 44:12 46:18
**STANG** 3:14 5:18
**start** 8:12
**starting** 36:20
**state** 28:22 43:16 66:9 70:25
**stated** 65:14 69:4
**statement** 28:21 54:11 55:4
**statements** 20:15 25:1 26:23
**STATES** 1:1 61:23
**Stenographically** 1:20 2:13 81:13
**stewardship** 11:18
**STIPULATIONS** 7:12
**stream** 21:11 22:16 29:1
**streams** 47:23
**Street** 4:10 5:9
**strike** 27:4
**structure** 28:5, 9 29:18, 20 30:14, 16, 17, 19, 21, 23 32:12 35:11 62:2
**structures** 31:24
**stuff** 10:14
**sub** 29:3
**subject** 13:14 40:3 62:4, 6
**Subtrust** 45:16
**succeed** 62:20 63:3, 20
**succeeding** 63:4
**successful** 32:15
**sue** 38:16
**suggest** 43:11 66:20
**Suite** 4:10, 18 5:9
**SULLIVAN** 3:22
**sum** 40:25
**summary** 12:25
**Sunday** 1:14 2:10 8:14, 18
**supervision** 81:14
**supplied** 78:5
**SUPPORT** 7:1
**supporting** 11:24 16:6, 18 20:2, 5 21:1, 9 22:15, 20 24:9, 25 25:9 28:6 29:15, 24 30:2, 8 39:15 44:12 47:18 48:7 50:22 53:10 56:15 63:2 64:2 69:11 74:22 75:3, 10
**supposed** 26:21
**Sure** 13:23 15:12 48:3, 18 58:23
**surprised** 10:22
**sworn** 8:6
**Systems** 81:7

**< T >**
**take** 15:10 20:11, 16, 19 22:9, 11 57:15 75:22, 23
**taken** 44:24 66:12 76:1 81:9, 12
**takes** 20:9 22:5
**talked** 31:13 45:24
**talking** 38:15 66:1
**team** 12:24 14:4 38:4, 7 40:7 76:15, 18
**tell** 8:13 32:15 38:21 57:18
**telling** 74:10
**tenure** 33:13 34:4, 21 35:2
**terms** 42:6 49:24 66:15
**testified** 8:8
**testify** 8:6
**testimony** 9:24 78:4 80:7
**TEXAS** 1:2 4:11, 19
**Thank** 26:2 32:24 77:7, 9
**Thanks** 8:14
**therefor** 78:4
**thing** 29:3 42:12
**things** 44:14 46:2, 4, 5 51:20 66:25 69:4, 7
**think** 10:15 14:10 15:12 16:17 19:21

21:19 24:4 26:19, 24 29:18 33:18 34:10 36:22 37:15, 17 39:6, 16 40:15 41:1, 22 42:17, 25 44:9, 14 46:13 47:21 51:20, 21 52:7 53:7, 10 57:21 62:15 66:11, 23 67:1 68:1, 2 69:3, 5, 24 70:6 71:17, 18 73:2, 8, 23 74:9, 14 76:4
**thinking** 15:14 41:8
**Third** 3:15 59:8
**thoroughly** 73:4
**thought** 36:10
**three** 15:19 32:17
**tied** 20:21, 22
**time** 1:15 2:12 9:11 10:12, 25 14:11 20:22 21:12 22:22 33:4, 13 34:3, 11 35:2 46:3, 6, 9 52:10 58:20 59:3 60:24 66:2 69:9 72:10, 14 75:15 76:20 77:8, 20
**times** 69:4
**timing** 53:14
**today** 9:2, 25 11:25 13:10 26:13 32:3 33:10 35:20 38:4 39:14 60:15 72:17
**told** 37:20 38:18, 22 65:22 73:15
**TORREY** 1:13 2:9 6:6 8:5 80:12
**total** 32:23
**track** 75:17
**transaction** 55:15
**transactions** 53:3
**transcribed** 2:15 9:25
**transcript** 78:6 80:7 81:10
**transcripts** 77:18
**transfer** 34:12
**transferred** 73:5
**transpired** 15:1
**tribunal** 62:8
**tried** 34:15
**true** 34:3 46:2, 4, 5 47:24 51:21 69:5, 7 80:10 81:11
**Trust** 3:5 4:14 5:3 9:1 13:6, 9 23:11, 18, 22 26:5, 10, 14, 25 27:10 30:14, 15 36:8 45:12, 20 49:5 67:20 71:17, 18 74:5
**Trustee** 3:19 34:12 51:2
**trustees** 70:9
**truth** 8:7
**try** 10:10, 25 72:5
**trying** 40:14 52:7
**two** 16:19 28:6 44:12, 14 46:2, 4, 5 51:20 69:4, 7
**types** 31:22
**typewriting** 81:14
**typically** 18:23

**< U >**
**ultimately** 15:5 18:5, 7, 20 19:23 24:24 28:11 31:7 41:23 75:9
**uncertainty** 67:5
**underlying** 18:2 21:20 32:13, 16
**understand** 9:7, 24 10:6, 9 29:21 34:12 43:1 44:9 49:9 50:8 53:11 54:11 58:14 66:1, 22 72:19 73:3
**understanding** 20:6 21:8 22:18 25:2, 5 31:4 32:14, 16 41:4 49:14 50:12 62:18 67:14
**unfair** 45:5, 11, 15, 19 46:20
**Unfortunately** 59:9
**UNITED** 1:1
**unpack** 15:8
**unsuccessfully** 32:12
**URQUHART** 3:22
**use** 28:22 37:17

**< V >**
**valuations** 34:16
**value** 15:6 22:10, 12, 19 28:15, 16, 23, 24 29:5, 8, 9, 14 30:9 35:7, 11, 13 36:21 37:1 54:12 73:15, 24
**values** 28:12
**various** 62:23
**vehicle** 18:24 19:1 33:24 50:25 55:5 71:23 72:21 73:5
**vehicles** 31:22
**verbatim** 10:4 41:3 58:14, 17
**veto** 61:14
**videoconferencing** 3:2
**video-conferencing** 2:10
**VIDEOGRAPHER** 5:13
**VIDEO-RECORDED** 1:12 2:8
**view** 52:2 63:1
**Vine** 4:10
**volume** 78:2, 6

**< W >**
**walk** 12:25
**want** 8:12 10:17 66:12 68:16 70:20 77:17
**wanted** 53:5 55:21 76:14, 19
**watching** 75:16
**way** 29:21 31:24
**wearing** 34:18
**Wednesday** 60:18 68:7
**week** 60:3
**Well** 14:23 18:15 22:9 24:11 38:1 41:22 42:12 52:7 68:12 73:7
**we're** 8:18 9:1 19:6 24:6 38:14 52:11 57:11, 12 68:3 69:23
**we've** 31:13, 14 34:25 45:24 64:1
69:5
**WINOGRAD** 3:12
**wish** 79:3
**WISHNEW** 4:17
**withdraw** 55:24
**withdrawn** 17:15 21:23 23:15 25:4 35:17 54:4 70:23
**witness** 8:13 21:5 27:13 58:24 69:22
**wondering** 48:19
**words** 49:14
**wore** 34:18
**working** 33:19 38:4
**world** 60:23
**worries** 8:16
**worth** 22:13 41:5 74:12
**wrapped** 29:23
**written** 10:4
**wrong** 39:6, 12 64:14 65:22, 23 66:6, 13
**wrongdoing** 65:6

**< Y >**
**Yeah** 12:23 13:5 14:1 15:12 17:9, 18 19:11 20:9 21:5 29:13 30:1 33:22 36:14 40:5 41:7, 12 43:7 45:7 47:3, 5 49:16 50:5 55:2, 17 58:13 63:12 66:22 68:10 69:24 70:6 71:15 73:18, 23 76:13
**year** 43:24 72:22
**years** 11:14 12:8 32:12, 17 37:4, 25
**York** 3:16, 24

**< Z >**
**ZIEHL** 3:14 5:18
**Zoom** 57:19

**WORD LIST**

< $ >
**$22** (*1*)
**$23** (*1*)
**$29** (*1*)
**$300** (*1*)
**$650** (*1*)
**$7** (*1*)
**$9** (*5*)

< 1 >
**1** (*2*)
**1.5** (*1*)
**10010** (*1*)
**10017-2024** (*1*)
**11** (*1*)
**1113** (*1*)
**13** (*3*)
**16** (*2*)
**1600** (*1*)
**1700** (*1*)
**18** (*2*)
**19-34054-sgj11** (*1*)
**1st** (*1*)

< 2 >
**2015** (*2*)
**2019** (*1*)
**2022** (*1*)
**2025** (*3*)
**21** (*1*)
**212.849.7615** (*1*)
**214.817.4500** (*1*)
**22** (*2*)
**225.381.9643** (*1*)
**22nd** (*1*)
**2390** (*1*)
**23-plus** (*1*)
**240** (*1*)

< 3 >
**3:30** (*2*)
**30(b)(6** (*1*)
**300** (*1*)
**301** (*1*)
**310.277.6910** (*1*)
**32** (*1*)
**33** (*2*)
**34** (*1*)
**34th** (*1*)

< 4 >
**4:42** (*1*)
**4:49** (*1*)
**4:50** (*1*)

< 5 >
**51** (*1*)
**58** (*1*)

< 6 >
**67** (*1*)

< 7 >
**70801** (*1*)
**713.228.4100** (*1*)
**75201** (*1*)
**77002** (*1*)
**780** (*1*)
**7-year** (*1*)

< 8 >
**8** (*1*)
**8635** (*3*)

< 9 >
**918,000** (*1*)

< A >
**ability** (*2*)
**able** (*6*)
**absolutely** (*4*)
**accommodate** (*1*)
**accounts** (*8*)
**acted** (*3*)
**acting** (*4*)
**action** (*3*)
**actions** (*4*)
**activity** (*4*)
**actual** (*1*)
**ADAMS** (*1*)
**add** (*1*)
**addition** (*1*)
**administrative** (*1*)
**Administrator** (*1*)
**adverse** (*1*)
**advised** (*1*)
**advisor** (*4*)
**advisor/control** (*1*)
**advisors** (*2*)
**affiliated** (*1*)
**affiliates** (*4*)
**affirmed** (*1*)
**afternoon** (*1*)
**ago** (*3*)
**agree** (*3*)
**agreed** (*2*)
**agreed-upon** (*1*)
**agreement** (*57*)
**ahead** (*2*)
**ahurt@kellyhart.com** (*1*)
**allow** (*3*)
**allows** (*1*)
**alternative** (*1*)
**AMELIA** (*1*)
**amount** (*4*)
**amounts** (*1*)
**ample** (*1*)
**analysis** (*1*)
**annuities** (*26*)
**annuity** (*12*)
**ANSWER** (*16*)
**answered** (*2*)
**answers** (*1*)
**Anybody** (*11*)
**anyway** (*2*)
**apologies** (*1*)
**apologize** (*2*)
**apologizing** (*1*)
**apparent** (*1*)
**appear** (*3*)
**appeared** (*2*)
**appointed** (*1*)
**appreciate** (*2*)
**approval** (*4*)
**approve** (*1*)
**approved** (*10*)
**approximately** (*1*)
**April** (*1*)
**argumentative** (*1*)
**arises** (*1*)
**arm's-length** (*4*)
**arranging** (*1*)
**aside** (*1*)
**asked** (*2*)
**asking** (*4*)
**aspect** (*1*)
**aspects** (*1*)
**assert** (*1*)
**asset** (*2*)
**assets** (*34*)
**associated** (*1*)
**Associates** (*1*)
**assumed** (*1*)
**assumption** (*2*)
**Atlas** (*19*)
**attached** (*1*)
**Attorney** (*143*)
**attorney-client** (*2*)
**audited** (*1*)
**auditors** (*2*)
**authority** (*2*)
**authorization** (*1*)
**authorize** (*1*)
**authorized** (*3*)
**Avenue** (*3*)
**avoidance** (*3*)
**avoiding** (*1*)
**aware** (*32*)

< B >
**BA** (*2*)
**back** (*5*)
**balance** (*5*)
**ballpark** (*1*)
**BANKRUPTCY** (*9*)
**BARTLETT** (*1*)
**based** (*6*)
**basis** (*4*)
**Baton** (*1*)
**Beacon** (*1*)
**beginning** (*1*)
**behalf** (*22*)
**belief** (*1*)
**believe** (*62*)
**beneficial** (*1*)
**benefit** (*4*)
**benefited** (*2*)
**best** (*1*)
**beyond** (*2*)
**billion** (*1*)
**bit** (*7*)
**board** (*4*)
**boards** (*1*)

**breach** (*1*)
**breached** (*1*)
**break** (*3*)
**bring** (*1*)
**bringing** (*1*)
**buy** (*2*)

**< C >**
**CA-Certified** (*1*)
**CA-CSR** (*2*)
**call** (*6*)
**called** (*2*)
**capable** (*1*)
**capacity** (*4*)
**CAPITAL** (*16*)
**care** (*1*)
**carefully** (*1*)
**carry** (*1*)
**Case** (*4*)
**cash** (*2*)
**casual** (*1*)
**cause** (*3*)
**causing** (*2*)
**caveat** (*1*)
**Cayman** (*4*)
**Central** (*3*)
**certain** (*6*)
**CERTIFICATE** (*1*)
**Certified** (*3*)
**certify** (*2*)
**CFO** (*9*)
**chance** (*1*)
**CHANGE** (*9*)
**changes** (*4*)
**Chapter** (*1*)
**charitable** (*9*)
**charities** (*2*)
**charts** (*1*)
**claim** (*4*)
**Claimant** (*16*)
**claims** (*4*)
**CLARITY** (*2*)
**clawback** (*2*)
**clawing** (*2*)
**clear** (*2*)
**clearly** (*2*)
**colleague** (*1*)
**combination** (*1*)
**Come** (*1*)
**comfort** (*1*)
**comfortable** (*1*)
**commenced** (*3*)
**comment** (*1*)
**communicate** (*2*)
**communicated** (*2*)
**communication** (*3*)
**communications** (*2*)
**community** (*3*)
**company** (*1*)
**compensate** (*1*)
**compensates** (*1*)
**complicated** (*1*)
**complies** (*1*)
**computer** (*1*)
**concern** (*3*)
**concerned** (*2*)
**concerns** (*3*)
**concluded** (*1*)
**conference** (*1*)
**confirm** (*1*)
**confused** (*1*)
**connection** (*1*)
**consent** (*10*)
**consequential** (*1*)
**consider** (*2*)
**consideration** (*1*)
**considering** (*2*)
**constituted** (*1*)
**consummation** (*2*)
**Cont'd** (*2*)
**contemplating** (*1*)
**contends** (*2*)
**context** (*1*)
**contract** (*4*)
**contracts** (*4*)
**contractual** (*2*)
**contribution** (*1*)
**contributions** (*1*)
**control** (*6*)
**controlled** (*3*)
**conversation** (*7*)
**conversations** (*5*)
**conversion** (*1*)
**convert** (*1*)
**converted** (*6*)
**convoluted** (*1*)
**copies** (*1*)
**copy** (*1*)
**correct** (*36*)
**corrections** (*2*)
**correctly** (*1*)
**corresponding** (*1*)
**counsel** (*3*)
**counterparty** (*1*)
**couple** (*3*)
**course** (*2*)
**COURT** (*13*)
**Court-appointed** (*1*)
**CRAWFORD** (*1*)
**create** (*1*)
**created** (*3*)
**cross-talk** (*1*)
**Crown** (*45*)
**CRR** (*2*)
**cumbersome** (*1*)
**current** (*1*)
**Currently** (*1*)
**CURRY** (*2*)

**< D >**
**DAF** (*2*)
**DALLAS** (*116*)
**D'AMBRA** (*1*)
**data** (*1*)
**DAVID** (*1*)
**day** (*2*)
**dcurry@okinadams.com** (*1*)
**deal** (*1*)
**debate** (*1*)
**Debtor** (*3*)
**decided** (*1*)
**decision** (*3*)
**decision-making** (*1*)
**decisions** (*7*)
**Defendant** (*2*)
**Delaware** (*1*)
**delivered** (*1*)
**DEMO** (*1*)
**depends** (*1*)
**DEPONENT** (*1*)
**deposed** (*1*)
**DEPOSITION** (*6*)
**depositions** (*1*)
**describe** (*1*)
**described** (*2*)
**describing** (*1*)
**detail** (*1*)
**details** (*1*)
**determine** (*1*)
**device** (*1*)
**DIAZ** (*4*)
**difference** (*1*)
**different** (*4*)
**Diplomate** (*2*)
**DIRECT** (*7*)
**direction** (*1*)
**directly** (*12*)
**director** (*1*)
**directs** (*1*)
**disapprove** (*1*)
**discovery** (*2*)
**discussion** (*1*)
**disposition** (*2*)
**distribute** (*1*)
**distributions** (*5*)
**DISTRICT** (*1*)
**diverting** (*1*)
**dividends** (*1*)
**DIVISION** (*1*)
**document** (*3*)
**documentation** (*2*)
**DOCUMENTS** (*6*)
**doing** (*5*)
**dollar** (*1*)
**dollars** (*7*)
**Dondero** (*6*)
**Dondero's** (*1*)
**donor-advised** (*2*)
**dressing** (*1*)
**due** (*1*)
**Dugaboy** (*3*)
**duly** (*1*)
**duration** (*1*)
**duties** (*7*)
**duty** (*13*)

**< E >**
**earlier** (*3*)
**easier** (*1*)
**economic** (*12*)
**elaborate** (*1*)
**emails** (*1*)
**EMANUEL** (*1*)
**employed** (*1*)
**employment** (*1*)

**Empower** (33)
**enabled** (1)
**engaged** (2)
**enraptured** (1)
**ensure** (1)
**enter** (3)
**entered** (3)
**entering** (10)
**entire** (1)
**entities** (48)
**entity** (6)
**entry** (1)
**Errata** (1)
**ESQ** (10)
**established** (1)
**event** (1)
**evidence** (1)
**exact** (1)
**EXAMINATION** (2)
**examined** (1)
**example** (1)
**exchange** (1)
**excuse** (1)
**execution** (2)
**exercise** (3)
**exercised** (5)
**exercising** (2)
**Exhibit** (2)
**EXHIBITS** (1)
**expect** (2)
**expectation** (3)
**expense** (2)
**expenses** (1)
**expert** (1)
**expired** (1)
**explain** (1)
**explained** (1)
**exposure** (1)
**extend** (1)
**extent** (2)

< F >
**fact-finding** (1)
**facts** (28)
**fail** (1)
**fair** (42)
**faith** (1)
**familiar** (10)
**Family** (8)
**fan** (2)
**February** (2)
**fee** (1)
**feed** (1)
**feedback** (1)
**feeds** (1)
**feel** (2)
**felt** (1)
**fiduciary** (16)
**file** (5)
**filed** (12)
**filing** (7)
**finance** (2)
**financial** (5)
**financially** (1)
**finish** (3)
**firm** (1)
**first** (5)
**five-minute** (1)
**fixed** (8)
**Floor** (2)
**flow** (7)
**flows** (2)
**fluctuations** (1)
**focus** (2)
**focused** (1)
**Focusing** (2)
**following** (2)
**follows** (1)
**foregoing** (3)
**form** (53)
**formal** (2)
**formed** (1)
**forth** (1)
**Foundation** (101)
**foundations** (3)
**Foundation's** (20)
**full** (1)
**Fund** (18)
**funded** (2)
**funding** (2)
**funds** (4)
**fund's** (1)
**Further** (2)
**future** (6)

< G >
**Gail** (7)
**gdemo@pszjlaw.com** (1)
**generally** (2)
**gentleman** (1)
**getting** (2)
**give** (10)
**given** (4)
**gives** (2)
**glance** (1)
**Global** (44)
**go** (10)
**goal** (1)
**going** (23)
**Good** (4)
**good-faith** (6)
**governing** (5)
**granting** (2)
**grant-making** (1)
**grants** (1)
**GREGORY** (1)
**grow** (1)
**guaranteed** (1)
**guy** (1)

< H >
**half** (1)
**HALL** (1)
**HALLMAN** (1)
**happen** (1)
**happened** (4)
**hard** (1)
**harm** (1)
**HART** (1)
**hat** (1)
**hats** (1)
**HAYLEY** (1)
**head** (2)
**hear** (3)
**heard** (3)
**held** (5)
**helped** (1)
**Hey** (1)
**high** (2)
**HIGHLAND** (59)
**Highland's** (2)
**high-level** (2)
**historical** (1)
**HMIT** (65)
**hold** (7)
**Holdco** (2)
**holdings** (1)
**holds** (1)
**honest** (1)
**Hospitality** (1)
**Houston** (1)
**Hunter** (18)
**HURT** (1)
**hwinograd@pszjlaw.com** (1)

< I >
**idea** (5)
**identify** (2)
**IDF** (8)
**imagine** (3)
**impact** (29)
**impacted** (5)
**impactful** (1)
**impacts** (3)
**implicated** (1)
**important** (3)
**including** (1)
**income** (10)
**increased** (1)
**independent** (1)
**INDEX** (1)
**indicate** (1)
**indirect** (7)
**indirectly** (4)
**Indiscernible** (1)
**individual** (11)
**individuals** (2)
**infirmity** (1)
**inform** (5)
**information** (12)
**informed** (6)
**informing** (1)
**Inghram** (4)
**inquired** (1)
**inquiry** (2)
**insertion** (1)
**insight** (1)
**instruct** (1)
**INSTRUCTION** (1)
**INSTRUCTIONS** (1)
**Insurance** (12)
**interest** (34)
**interested** (3)
**interests** (3)

**internal** (*1*)
**introduced** (*1*)
**inured** (*1*)
**invest** (*1*)
**invested** (*1*)
**Investment** (*18*)
**investments** (*7*)
**involved** (*1*)
**Islands** (*3*)
**issuer** (*1*)
**its** (*5*)

< J >
**JAMES** (*1*)
**January** (*1*)
**JEFFREY** (*1*)
**Jim** (*2*)
**jmorris@pszjlaw.com** (*1*)
**JOHN** (*4*)
**joint** (*12*)
**JONES** (*2*)
**jpomerantz@pszjlaw.com** (*1*)
**JULIE** (*4*)
**June** (*2*)
**jurisdiction** (*1*)

< K >
**KELLY** (*1*)
**key** (*1*)
**kind** (*13*)
**know** (*76*)
**knowing** (*2*)
**knowledge** (*4*)

< L >
**L.P** (*1*)
**LANG** (*3*)
**language** (*1*)
**large** (*1*)
**late** (*1*)
**law** (*2*)
**lawsuit** (*5*)
**lawyer** (*4*)
**lay** (*1*)
**lead** (*1*)
**lean** (*1*)
**leaned** (*1*)
**learn** (*1*)
**leave** (*2*)
**led** (*1*)
**left** (*2*)
**legal** (*14*)
**legally** (*2*)
**level** (*2*)
**liability** (*2*)
**Life** (*4*)
**likelihood** (*1*)
**Limited** (*3*)
**LINE** (*6*)
**liquidation** (*1*)
**liquidators** (*12*)
**liquidity** (*1*)
**listen** (*1*)
**lists** (*1*)
**Litigation** (*5*)
**little** (*7*)
**LITTLETON** (*12*)
**LLP** (*3*)
**LOIGMAN** (*1*)
**long** (*4*)
**longer** (*1*)
**look** (*1*)
**looked** (*1*)
**looking** (*3*)
**loss** (*1*)
**lost** (*3*)
**lot** (*2*)
**LOUIS** (*1*)
**Louisiana** (*1*)
**LP** (*7*)
**lphillips@kellyhart.com** (*1*)

< M >
**M&E** (*3*)
**Madden** (*2*)
**Madison** (*1*)
**Main** (*2*)
**making** (*3*)
**MANAGEMENT** (*15*)
**Mark** (*9*)
**MARKED** (*3*)
**market** (*11*)
**MARKS** (*2*)
**material** (*2*)
**Matt** (*5*)
**matter** (*1*)
**matters** (*1*)
**MATTTHEW** (*1*)
**mean** (*1*)
**means** (*1*)
**meet** (*1*)
**member** (*1*)
**met** (*2*)
**MICHAEL** (*1*)
**million** (*18*)
**mine** (*1*)
**minutes** (*2*)
**missed** (*1*)
**mlang@cwl.law.com** (*1*)
**MNPI** (*1*)
**mokin@okinadams.com** (*1*)
**moment** (*1*)
**money** (*3*)
**MORRIS** (*79*)
**motion** (*9*)
**Mountain** (*19*)
**move** (*2*)
**moved** (*1*)
**moving** (*4*)
**multiple** (*1*)

< N >
**name** (*2*)
**named** (*1*)
**NATHAN** (*1*)
**NECESSARILY** (*2*)
**need** (*7*)
**needed** (*2*)
**negatively** (*3*)
**negotiate** (*1*)
**negotiating** (*1*)
**negotiation** (*4*)
**negotiations** (*4*)
**neither** (*1*)
**never** (*7*)
**New** (*4*)
**newly** (*1*)
**news** (*1*)
**NexPoint** (*1*)
**nice** (*1*)
**nonpublic** (*2*)
**normal** (*1*)
**NORTHERN** (*1*)
**Notary** (*1*)
**notations** (*1*)
**NOTE** (*1*)
**notes** (*4*)
**notice** (*1*)
**notified** (*1*)
**November** (*1*)
**NUMBER** (*2*)

< O >
**object** (*53*)
**objecting** (*1*)
**objection** (*22*)
**objections** (*1*)
**obligation** (*10*)
**obligations** (*6*)
**obtain** (*6*)
**obtained** (*2*)
**occasions** (*1*)
**officer** (*1*)
**official** (*12*)
**officially** (*1*)
**Oh** (*2*)
**Okada** (*33*)
**okay** (*51*)
**OKIN** (*71*)
**once** (*1*)
**opine** (*8*)
**opined** (*1*)
**opinion** (*3*)
**opportunity** (*4*)
**option** (*11*)
**order** (*3*)
**org** (*1*)
**organization** (*8*)
**organizational** (*1*)
**organizations** (*27*)
**orgs** (*1*)
**originally** (*1*)
**originated** (*1*)
**outcome** (*1*)
**outlined** (*1*)
**outside** (*3*)
**overall** (*2*)
**overseeing** (*1*)
**oversight** (*4*)
**owes** (*6*)

**owned** *(5)*
**ownership** *(9)*
**owns** *(2)*

**< P >**
**p.m** *(5)*
**PACHULSKI** *(2)*
**Pacific** *(1)*
**PAGE** *(7)*
**paid** *(3)*
**paragraph** *(7)*
**part** *(13)*
**participate** *(2)*
**particular** *(2)*
**parties** *(11)*
**partnership** *(1)*
**party** *(3)*
**patience** *(1)*
**Patrick** *(27)*
**Patrick's** *(2)*
**PAUL** *(1)*
**pay** *(5)*
**payments** *(3)*
**payout** *(2)*
**payouts** *(2)*
**PE** *(2)*
**peace** *(2)*
**pending** *(2)*
**percentage** *(1)*
**period** *(2)*
**permission** *(2)*
**person** *(6)*
**personally** *(2)*
**persons** *(1)*
**pertaining** *(1)*
**pertinent** *(1)*
**PHILLIPS** *(3)*
**piece** *(1)*
**place** *(2)*
**plan** *(1)*
**planned** *(1)*
**platform** *(2)*
**play** *(3)*
**played** *(1)*
**plays** *(1)*
**please** *(3)*
**PLLC** *(1)*
**point** *(1)*
**policies** *(4)*
**policy** *(4)*
**POMERANTZ** *(1)*
**portfolio** *(1)*
**portfolios** *(1)*
**portion** *(3)*
**positive** *(1)*
**possibility** *(2)*
**potential** *(2)*
**potentially** *(3)*
**preparation** *(1)*
**present** *(3)*
**preserve** *(1)*
**President** *(2)*
**prevent** *(2)*
**PREVIOUSLY** *(2)*
**primarily** *(1)*
**prior** *(1)*
**privilege** *(1)*
**privileged** *(1)*
**privy** *(1)*
**probably** *(2)*
**problematic** *(2)*
**proceeding** *(1)*
**proceedings** *(5)*
**process** *(4)*
**produce** *(1)*
**produced** *(1)*
**product** *(4)*
**PRODUCTION** *(1)*
**projected** *(1)*
**proper** *(1)*
**proposed** *(13)*
**proposing** *(1)*
**propounded** *(1)*
**protect** *(1)*
**provide** *(1)*
**provided** *(2)*
**providing** *(1)*
**Public** *(1)*
**pull** *(1)*
**pulling** *(1)*
**purpose** *(2)*
**pursued** *(1)*
**pushed** *(1)*
**put** *(20)*
**putting** *(1)*

**< Q >**
**quarter** *(1)*
**quarterly** *(2)*
**question** *(13)*
**questionable** *(2)*
**QUESTIONS** *(11)*
**quicker** *(1)*
**QUINN** *(1)*
**QUOTATION** *(1)*
**quotations** *(1)*
**QUOTE** *(2)*

**< R >**
**Rand** *(8)*
**Rand's** *(1)*
**range** *(1)*
**RAVER** *(1)*
**RDR** *(2)*
**reach** *(1)*
**read** *(6)*
**reading** *(2)*
**really** *(2)*
**Realtime** *(3)*
**reason** *(39)*
**reasonable** *(1)*
**reasons** *(3)*
**recall** *(3)*
**receive** *(10)*
**received** *(4)*
**receives** *(1)*
**Recess** *(1)*
**recollection** *(1)*
**recommendation** *(3)*
**recommendations** *(2)*
**record** *(1)*
**recorded** *(1)*
**recovered** *(1)*
**reduced** *(1)*
**refer** *(2)*
**REFERENCED** *(1)*
**referred** *(2)*
**referring** *(1)*
**refers** *(3)*
**REFLECT** *(1)*
**refresh** *(1)*
**regardless** *(2)*
**Registered** *(2)*
**reiterated** *(1)*
**related** *(4)*
**relates** *(4)*
**relationship** *(9)*
**relax** *(1)*
**release** *(1)*
**releases** *(4)*
**releasing** *(1)*
**rely** *(2)*
**remind** *(1)*
**REMOTE** *(3)*
**reorganization** *(1)*
**repeat** *(2)*
**rephrase** *(2)*
**Reported** *(1)*
**Reporter** *(10)*
**REPORTER'S** *(1)*
**reporting** *(1)*
**represent** *(1)*
**representative** *(2)*
**representing** *(1)*
**represents** *(1)*
**REQUEST** *(1)*
**required** *(6)*
**research** *(1)*
**respect** *(7)*
**respectfully** *(1)*
**respectively** *(1)*
**responsibilities** *(2)*
**responsibility** *(3)*
**responsible** *(1)*
**restate** *(3)*
**restructuring** *(6)*
**result** *(4)*
**review** *(2)*
**reviewed** *(2)*
**Right** *(38)*
**rise** *(3)*
**risk** *(7)*
**ROBERT** *(1)*
**robertloigman@quinnemanuel.com** *(1)*
**role** *(6)*
**roll** *(5)*
**rolled** *(2)*
**rolls** *(3)*
**roll-up** *(1)*
**room** *(1)*
**Rouge** *(1)*
**roughly** *(1)*
**Royal** *(1)*
**RSA** *(2)*

< S >
**sale** (4)
**saw** (1)
**says** (2)
**scheduled** (1)
**scope** (3)
**screen** (3)
**scroll** (1)
**scrutiny** (1)
**see** (8)
**seek** (3)
**seeking** (1)
**seeks** (2)
**seen** (4)
**SEERY** (1)
**segregated** (6)
**sell** (2)
**selling** (1)
**sent** (1)
**sentence** (3)
**series** (1)
**serve** (1)
**served** (1)
**set** (4)
**settle** (1)
**settled** (1)
**settlement** (68)
**settlements** (3)
**settling** (1)
**share** (2)
**shares** (5)
**sharing** (1)
**SHAWN** (1)
**sheet** (6)
**shifting** (1)
**short** (2)
**Shorthand** (3)
**sign** (2)
**signed** (3)
**significant** (5)
**similar** (1)
**sir** (87)
**sit** (1)
**situation** (1)
**six** (1)
**Skyview** (1)
**sleep** (1)
**smoothly** (1)
**sold** (5)
**sole** (2)
**solely** (2)
**somewhat** (1)
**Sorry** (9)
**sought** (1)
**Sounds** (2)
**source** (2)
**speak** (4)
**speculate** (2)
**speculation** (1)
**speed** (1)
**spoke** (1)
**spoken** (1)
**standpoint** (2)
**STANG** (2)
**start** (1)
**starting** (1)
**state** (4)
**stated** (2)
**statement** (3)
**statements** (3)
**STATES** (2)
**Stenographically** (3)
**stewardship** (1)
**STIPULATIONS** (1)
**stream** (3)
**streams** (1)
**Street** (2)
**strike** (1)
**structure** (13)
**structures** (1)
**stuff** (2)
**sub** (1)
**subject** (4)
**Subtrust** (1)
**succeed** (3)
**succeeding** (1)
**successful** (1)
**sue** (1)
**suggest** (2)
**Suite** (3)
**SULLIVAN** (1)
**sum** (1)
**summary** (1)
**Sunday** (4)
**supervision** (1)
**supplied** (1)
**SUPPORT** (1)
**supporting** (30)
**supposed** (1)
**Sure** (6)
**surprised** (1)
**sworn** (1)
**Systems** (1)

< T >
**take** (9)
**taken** (5)
**takes** (2)
**talked** (2)
**talking** (2)
**team** (7)
**tell** (5)
**telling** (1)
**tenure** (4)
**terms** (3)
**testified** (1)
**testify** (1)
**testimony** (3)
**TEXAS** (3)
**Thank** (4)
**Thanks** (1)
**therefor** (1)
**thing** (2)
**things** (8)
**think** (50)
**thinking** (2)
**Third** (2)
**thoroughly** (1)
**thought** (1)
**three** (2)
**tied** (2)
**time** (31)
**times** (1)
**timing** (1)
**today** (12)
**told** (5)
**TORREY** (5)
**total** (1)
**track** (1)
**transaction** (1)
**transactions** (1)
**transcribed** (2)
**transcript** (3)
**transcripts** (1)
**transfer** (1)
**transferred** (1)
**transpired** (1)
**tribunal** (1)
**tried** (1)
**true** (10)
**Trust** (24)
**Trustee** (3)
**trustees** (1)
**truth** (3)
**try** (3)
**trying** (2)
**two** (10)
**types** (1)
**typewriting** (1)
**typically** (1)

< U >
**ultimately** (10)
**uncertainty** (1)
**underlying** (4)
**understand** (17)
**understanding** (13)
**unfair** (5)
**Unfortunately** (1)
**UNITED** (1)
**unpack** (1)
**unsuccessfully** (1)
**URQUHART** (1)
**use** (2)

< V >
**valuations** (1)
**value** (21)
**values** (1)
**various** (1)
**vehicle** (8)
**vehicles** (1)
**verbatim** (4)
**veto** (1)
**videoconferencing** (1)
**video-conferencing** (1)
**VIDEOGRAPHER** (1)
**VIDEO-RECORDED** (2)
**view** (2)
**Vine** (1)
**volume** (2)

< W >

**walk** (*1*)
**want** (*6*)
**wanted** (*4*)
**watching** (*1*)
**way** (*2*)
**wearing** (*1*)
**Wednesday** (*2*)
**week** (*1*)
**Well** (*10*)
**we're** (*10*)
**we've** (*6*)
**WINOGRAD** (*1*)
**wish** (*1*)
**WISHNEW** (*1*)
**withdraw** (*1*)
**withdrawn** (*7*)
**witness** (*5*)
**wondering** (*1*)
**words** (*1*)
**wore** (*1*)
**working** (*2*)
**world** (*1*)
**worries** (*1*)
**worth** (*3*)
**wrapped** (*1*)
**written** (*1*)
**wrong** (*7*)
**wrongdoing** (*1*)

**< Y >**
**Yeah** (*41*)
**year** (*2*)
**years** (*6*)
**York** (*4*)

**< Z >**
**ZIEHL** (*2*)
**Zoom** (*1*)

# Exhibit D

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

District of Delaware

Case number (*If known*): ______________________ Chapter 15

❑ Check if this is an amended filing

# Official Form 401

## Chapter 15 Petition for Recognition of a Foreign Proceeding

12/15

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write debtor's name and case number (if known).**

1. **Debtor's name**

   Charitable DAF HoldCo, Ltd

2. **Debtor's unique identifier**

   **For non-individual debtors:**

   ❑ Federal Employer Identification Number (EIN) __ __ – __ __ __ __ __ __ __

   ☑ Other 263805. Describe identifier Cayman Registration No..

   **For individual debtors:**

   ❑ Social Security number: xxx – xx– ____ ____ ____ ____

   ❑ Individual Taxpayer Identification number (ITIN): **9** xx – xx – ____ ____ ____ ____

   ❑ Other ______________. Describe identifier ______________.

3. **Name of foreign representative(s)**

   Margot MacInnis and Sandipan Bhowmik

4. **Foreign proceeding in which appointment of the foreign representative(s) occurred**

   Grand Court of the Cayman Islands Cause No. FSD 116 of 2025 (JAJ)

5. **Nature of the foreign proceeding**

   *Check one:*

   ❑ Foreign main proceeding
   ❑ Foreign nonmain proceeding
   ☑ Foreign main proceeding, or in the alternative foreign nonmain proceeding

6. **Evidence of the foreign proceeding**

   ☑ A certified copy, translated into English, of the decision commencing the foreign proceeding and appointing the foreign representative is attached.

   ❑ A certificate, translated into English, from the foreign court, affirming the existence of the foreign proceeding and of the appointment of the foreign representative, is attached.

   ❑ Other evidence of the existence of the foreign proceeding and of the appointment of the foreign representative is described below, and relevant documentation, translated into English, is attached.

   ______________________________________________

   ______________________________________________

7. **Is this the only foreign proceeding with respect to the debtor known to the foreign representative(s)?**

   ❑ No. (Attach a statement identifying each country in which a foreign proceeding by, regarding, or against the debtor is pending.)

   ☑ Yes

Debtor Charitable DAF HoldCo, Ltd
Name

Case number (*if known*)

**8. Others entitled to notice**

Attach a list containing the names and addresses of:

(i) all persons or bodies authorized to administer foreign proceedings of the debtor,

(ii) all parties to litigation pending in the United States in which the debtor is a party at the time of filing of this petition, and

(iii) all entities against whom provisional relief is being sought under § 1519 of the Bankruptcy Code.

**9. Addresses**

**Country where the debtor has the center of its main interests:**

Cayman Islands

**Debtor's registered office:**

68 Fort Street
Number Street

P.O. Box 31726
P.O. Box

George Town KY1-1207
City State/Province/Region ZIP/Postal Code

Cayman Islands
Country

**Individual debtor's habitual residence:**

Number Street

P.O. Box

City State/Province/Region ZIP/Postal Code

Country

**Address of foreign representative(s):**

2nd Floor, Century Yard, Cricket Square
Number Street

P.O. Box 1044
P.O. Box

George Town KY1-1102
City State/Province/Region ZIP/Postal Code

Cayman Islands
Country

**10. Debtor's website** (URL)

https://dafholdco.com/

**11. Type of debtor**

*Check one:*

☑ Non-individual (*check one*):

❑ Corporation. Attach a corporate ownership statement containing the information described in Fed. R. Bankr. P. 7007.1.

❑ Partnership

☑ Other. Specify: Cayman Islands exempted company

❑ Individual



002041

Debtor Charitable DAF HoldCo, Ltd
Name

Case number (*if known*)

**12. Why is venue proper in *this district*?**

*Check one:*

- ☑ Debtor's principal place of business or principal assets in the United States are in this district.
- ☐ Debtor does not have a place of business or assets in the United States, but the following action or proceeding in a federal or state court is pending against the debtor in this district:
  ______________________________________________.
- ☐ If neither box is checked, venue is consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative, because:
  ______________________________________________.

**13. Signature of foreign representative(s)**

I request relief in accordance with chapter 15 of title 11, United States Code.

I am the foreign representative of a debtor in a foreign proceeding, the debtor is eligible for the relief sought in this petition, and I am authorized to file this petition.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct,

✘ /s/ Margot MacInnis
Signature of foreign representative

Margot MacInnis
Printed name

Executed on 07/21/2025
MM / DD / YYYY

✘ /s/ Sandipan Bhowmik
Signature of foreign representative

Sandipan Bhowmik
Printed name

Executed on 07/21/2025
MM / DD / YYYY

**14. Signature of attorney**

✘ /s/ Jason D. Angelo
Signature of Attorney for foreign representative

Date 07/21/2025
MM / DD / YYYY

Jason D. Angelo
Printed name

Reed Smith LLP
Firm name

1201 North Market Street, Suite 1500
Number Street

Wilmington
City

DE 19801
State ZIP Code

(302) 778-7500
Contact phone

jangelo@reedsmith.com
Email address

6009
Bar number

DE
State

# Exhibit E

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD** 99 **OF 2025 (**JAJ**)**

**IN THE MATTER OF SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD**

---

## WINDING UP PETITION

---

**TO: The Grand Court of the Cayman Islands**

**THE HUMBLE PETITION** of the **Supporting Organisations** (as defined below) (the ***Petitioners***), in their capacity as members of Charitable DAF Holdco, Ltd (the ***LP***) (and indirectly by way of separate petition the Charitable DAF Fund, LP (the ***Fund***)) shows that:

## A <u>INTRODUCTION</u>

1. The Petitioners respectfully seek:

   (a) an order pursuant to section 92(e) of the Companies Act (2025 Revision) (the ***Act***) that the LP be wound up on the basis that it is just and equitable to do so; and

   (b) the appointment of Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard, Cricket Square, George Town, Grand Cayman, Cayman Islands as joint official liquidators (the ***JOLs***) of the Fund; and/or

   (c) such other orders as the Court considers to be appropriate.

**B** **THE FUND**

2. The Fund is a Cayman Islands limited partnership formed on 28 October 2011 (registration number 53083) whose registered office is Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

3. The Fund is governed by the Amended and Restated Limited Partnership Agreement dated 7 November 2011 (the ***ARLPA***).

4. The Fund invests in securities for the purpose of benefiting, directly and indirectly, its Supporting Organisations (as defined below) which support various charitable causes in the U.S., including education, veteran and first responder welfare, medical research, economic and community initiatives, and youth and family programs.

5. The LP is the sole limited partner of the Fund and is a Cayman Islands exempt company incorporated on 27 October 2011 (registration number 263805) whose registered office is Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

6. The LP is governed by the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (the ***Articles***).

7. The general partner of the Fund is (or at least was at the time of the Fund's formation and pursuant to the ARLPA) Charitable DAF GP, LLC (the ***GP***), a Delaware company incorporated on 25 October 2011, whose registered office is Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

*Ownership and Management*

8. The Fund was formed to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code (the* ***Code****) … for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" (ARLPA, Recitals).

9. The Petitioners understand that exempt entities under section 501(c)(3) of the Code, commonly referred to as charitable organisations, must be operated exclusively for charitable purposes and not for the benefit of private interests. 'Supporting organizations' under section 509(a)(3) of the Code must carry out such exempt purposes by supporting *other* charities.

10. In this context:

    (a) The LP holds ninety-nine percent (99%) of the economic interest in the Fund. The other one per cent (1%) in the Fund is held by the GP or its successor as GP.

(b) The LP issued 305 participation shares (the ***Participation Shares***) that are held by four Delaware corporate entities, namely: The Highland Dallas Foundation, Inc. (***HDF***), The Highland Kansas City Foundation, Inc. (***HKCF***), The Highland Santa Barbara Foundation, Inc. (***HSBF***), and The HCMLP Charitable Fund (***HCMLP***) (together, the ***Supporting Organisations***).

(c) Each Supporting Organisation provides funding to its respective U.S. charitable foundation (together, the ***Charities***) which are the ultimate beneficial owners of the Fund's entire economic interest.

(d) The LP also issued 100 management shares (the ***Management Shares***) which attach the only voting rights for all shareholders of the LP. The terms of the ARLPA and the Articles together grant complete management control of the Fund to the holder of the Management Shares, and the holder of the entire issued share capital in the GP (the ***Membership Interest***).

11. The Management Shares and the Membership Interest have at all material times been held by a single individual who, as a result, has sole control of the Fund structure (the ***Control Position***).

## C THE PETITIONERS

12. As stated above, the Petitioners (the Supporting Organisations) are non-profit charitable entities exempt from taxation under section 501(c)(3) of the \ Code and through the LP hold 99% of the economic interest in the Fund.

13. The Supporting Organisations provide funding directly to the Charities as follows:

(a) HDF holds 32.87% of the Participating Shares. HDF provides funding to The Dallas Foundation, a charitable entity established in Texas in 1929, which has awarded over $1 billion in grants and manages over $500 million in assets.

(b) HKCF holds 32.87% of the Participating Shares. HKCF provides funding to the Greater Kansas City Community Foundation, a charitable entity established in Kansas in 1978 which has awarded over $7 billion in grants and currently manages over $5 billion in assets.

(c) HSBF holds 32.787% of the Participating Shares. HSBF provides funding to the Santa Barbara Foundation, a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

(d) HCMLP holds 1.639% of the Participating Shares. HCMLP provides funding to the North Texas Community Foundation, which manages assets totaling $513 million and donated $38.9 million to local nonprofits in 2023.

14. Since the Fund's inception in 2011, through profits generated by the Fund the Supporting Organisations have granted over $42 million to charitable foundations and have funded $32 million in total commitments, including donations to 275 organisations, with average annual grant payments of $3.7 million.

**D** **BACKGROUND**

15. The Fund was created in 2011 on the instructions of James Dondero. Mr Dondero is the President of NexPoint Advisors, L.P. (***NexPoint***), an alternative investment firm registered with the U.S. Securities and Exchange Commission (***SEC***), and the former President of Highland Capital Management, L.P. (***Highland***), also an SEC registered investment advisor which he founded in 1993. Mr Dondero is a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles he utilises to donate such funds to charitable organisations. Mr Dondero holds no ownership or control stake in the Fund or any related entities, although he sits on the boards of the Supporting Organisations.

16. From the Fund's formation until March 2021, the Control Position was held by Grant Scott. On 25 March 2021, Mr Scott: (i) resigned as director of the Fund and the LP, (ii) appointed Mark Patrick as director of the Fund and the LP, and (iii) transferred to Mr Patrick the Management Shares in the LP and Management Interest in the GP. Mr Patrick therefore assumed the Control Position from that date.

17. From 2008 to 2021, Mr Patrick was employed as tax counsel by Highland Capital Management, LP (***Highland***), an investment advisor founded by Mr Dondero. From March 2021 to October 2024, Mr Patrick was employed as tax counsel by Skyview Group (***Skyview***). In both positions, Mr Patrick acted as an advisor to Mr Dondero and entities owned or affiliated to him.

18. On 22 April 2021, Paul Murphy, a Cayman Islands resident, was appointed as director of the LP.

19. On 16 October 2019, Highland filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code in the Northern District of Texas (the ***Highland Bankruptcy***). The Highland Bankruptcy plan was confirmed in February 2021, and the estate remains open as it makes distributions to creditors.

**E** **EVENTS FOLLOWING MR PATRICK'S ASSUMPTION OF THE CONTROL POSITION**

20. Since assuming the Control Position, Mr Patrick has used that position to advance his own interests to the detriment of the LP, the Fund, the Supporting Organisations and the Charities.

*Non-disclosure of personal interest in grant*

21. In June 2023, Mr Patrick made a request that the Highland Dallas Foundation (i.e. the Supporting

Organization that supports the Dallas Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, it was discovered that the directors of the entity were Mr Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr Patrick had made the grant request without disclosing his and/or his family's involvement.

22. The grant payment was authorised on 5 September 2023, but Mr Patrick was informed that further payments were unlikely.

*Attempt to obtain secret profit*

23. In September 2023, Mr Dondero was contacted by Kevin Cronin of Fortaris Capital Advisors (***Fortaris***), a firm providing litigation support and investigative services which, at the time, was engaged by the Fund on an unrelated matter.

24. Mr Cronin disclosed to Mr Dondero that Mr Patrick had approached him with a proposition whereby Mr Patrick (on behalf of the Fund) would engage an entity controlled by Mr Cronin (other than Fortaris) at a monthly fee of between US$25,000 and US$50,000, and that this fee would be split between Fortaris and Mr Patrick as a supplement to Mr Patrick's compensation.

25. Mr Cronin refused Mr Patrick's proposal.

26. Mr Patrick's attempt to obtain a secret, undisclosed personal profit from the Fund would, if successful, have constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. It was otherwise a breach of Mr Patrick's duties to the LP and, through the LP, to the Fund.

*Unauthorised use of MNPI / Insider Trading*

27. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (***MNPI***) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities and other laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (the ***Compliance Policy***). NexPoint and its affiliates, and Skyview, require their employees to abide by the Compliance Policy at all times and employees are required to confirm in writing each quarter that they will not use MNPI while trading. Mr Patrick completed an annual 2023, Q4 2023, Q1 2024 and Q2 2024 certifications, among others.

28. In late August 2024, Mr Patrick contacted the attorneys to the Dallas Foundation to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr Patrick through his employment at Skyview and constituted MNPI. On the basis of this MNPI, Mr Patrick advised the Dallas Foundation to

exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

29. Upon receipt of the allegations against Mr Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr Patrick's knowledge, so as to avoid potentially tipping off Mr Patrick. The investigation concluded that Mr Patrick's actions constituted a serious breach of his compliance and employee obligations and that Mr Patrick had attempted a serious breach of U.S. securities laws.

30. Mr Patrick resigned from Skyview immediately before the internal investigation was finalised. At the same time, he terminated the Fund's services agreement with Skyview. That termination was not in the interests of the Fund, was for Mr Patrick's own self-protection and was otherwise a breach of Mr Patrick's duties to the LP and, through the LP, to the Fund.

*Financial Irregularities in the Fund / Unexplained Expenditure*

31. A review of the Fund's financial records conducted by Skyview covering the calendar years ending 2018 to 2023 and the first half of 2024 showed significant increases in expenditures, notably:

(a) **Directors' fees**, which increased from US$40,000 in 2022 to almost US$600,000 in 2023, and in the first half of 2024 alone, increased further to around US$2.25 million; and

(b) **Expenses overall**, which for the first half of 2024 were around US$18.3 million, with a further US$18.6 million being spent in the calendar year 2023.

32. In October 2024, the Charities requested that Mr Patrick provide financial information about the Fund entities to seek to understand these increases in expenditures. This information was not provided.

33. In November 2024, Holland and Knight (***H&K***), the Charities' US attorneys, delivered a letter to Mr Murphy from the Charities advising that the Charities no longer had confidence in the governance of the Fund and considered that a reorganisation was required (the ***No Confidence Letter***). No response to the No Confidence Letter was received.

34. In January 2025, further correspondence was sent to Mr Patrick and Mr Murphy advising that a better understanding of the Fund's asset position was needed and expressing serious concern that the Charities' requests for information continued to be disregarded, reflecting an ongoing lack of transparency on the part of Mr Patrick and Mr Murphy. Mr Murphy responded via email to this request noting that he and Mr Patrick would "*present directly to the foundations/supporting organisations*" to address some of the concerns in the No Confidence Letter.

35. H&K responded to Mr Murphy's email noting, *inter alia*, that the Supporting Organisations had legitimate concerns and highlighted that "*the last information they received from in July of 2024, before Mr Patrick shut down [communication] showed that legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022*" (a 300% increase, if annualized) and "*director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024*" (a 12,400% increase, if annualized).

36. In February 2025, further correspondence was sent between H&K and Douglas Mancino (***Mr Mancino***) of Seyfarth Shaw LLP (***Seyfarth***), US counsel purporting to act for the Fund, whereby Seyfarth rejected the reported increases in legal and directors' fees and provided a valuation of the Fund from 2020 to support the suggestion that similar information was provided to the Charities when Mr Scott was in the Control Position. It is clear that Mr Patrick and/or Mr Murphy has instructed Seyfarth, purportedly on behalf of the Fund, to take a hostile, indignant and non-neutral stance when faced with reasonable requests on behalf of the Charities, as ultimate beneficiaries of the assets of the Fund. Such conduct is a breach of their duties to the LP and, through the LP, to the Fund.

37. H&K responded to Seyfarth that the Charities were becoming frustrated by the ongoing lack of transparency and refusal to respond to simple inquiries about the financial position and governance of the Fund. Seyfarth sent an email to H&K requesting available dates for Mr Murphy to make the promised presentation to the Charities. The next day, H&K suggested three potential dates/times for such a call between 26 March and 3 April 2025, but did not receive any response. On 3 April 2025, Seyfarth sent an email to H&K stating that they had just learned that a call was scheduled for the following day and seeking to reschedule. H&K responded that no such call had been arranged and queried the source of confusion. Seyfarth has made no further efforts to schedule the meeting, nor has it otherwise provided any of the requested financial information.

*<u>Replacement of GP without notification</u>*

38. In February 2025, H&K discovered that Mr Patrick had redomiciled and replaced the general partner of the Fund, without notice to the Charities, almost one year prior.

39. On 27 February 2024, CDH GP, Ltd (the ***New GP***) was incorporated in the Cayman Islands (registration number 407515) with its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

40. Mr Patrick is the sole director of the New GP.

*<u>Sale of assets</u>*

41. Following Mr Patrick's resignation from Skyview and his termination of Skyview's services agreement with the Fund, the Petitioners have become aware that assets of the Fund have been

sold without explanation, at values which appear to be below-market.

*Hunter Mountain*

42. In February 2025, an individual associated with Mr Patrick, Shawn Raver, asked for the in-bound wire instructions for one of Mr Dondero's affiliates that owned a position in a trust called Hunter Mountain. Hunter Mountain is an indirect majority owned subsidiary of the Fund and owns the majority of the distribution rights of the equity position in the Highland Bankruptcy. The residual value of the Highland estate should be distributed to Hunter Mountain at the close of the Highland Bankruptcy.

43. According to Hunter Mountain's own filings, this value has been calculated in excess of $100 million gross, with approximately $17 million net value. After additional inquiries from accounting staff, Mr Raver disclosed that the entire Hunter Mountain position had been sold, at potentially a substantial undervalue, to an unidentified party for $1 million. The Fund has not disclosed the identity of the purchaser. In the absence of a further or better explanation, there is the inference of self-dealing, fair dealing, no profit or conflict rules

*Atlas IDF, L.P.*

44. Atlas IDF, L.P. is a fund controlled by its general partner Atlas IDF GP, LLC, a wholly owned subsidiary of the Fund. The economic beneficiaries of Atlas IDF are the holders of annuity policies issued by Crown Global Insurance Company. The majority annuity policyholder is Empower Dallas Foundation (***EDF***), a charitable foundation for which Mr Dondero serves as President whose purpose is to benefit the Dallas Foundation.

45. On 20 February 2025, Mr Patrick in his capacity as the general partner of Atlas IDF GP, LLC, sent a letter to Crown Global Insurance advising of the intention to dissolve Atlas in accordance with the partnership agreement dated 30 November 2015 on the basis of:

(a) concerns about the long-term availability and viability of back-office support;

(b) unsuccessful efforts to sell the defaulted Notes issued by HCRE Partners (one of Mr Donero's affiliates) dated 7 May 2014 in the amount of $2.3M and 27 May 2014 in the amount of $5M, held by the Partnership; and

(c) the decision by an affiliate of the GP to purchase the Notes at a price above their appraised value of zero dollars to facilitate an orderly wind-up.

46. At the time, the amounts outstanding on the two Notes, including accumulated interest, were in excess of $13M. The intention was to sell the Notes collectively for $500,000. Mr Patrick launched litigation related to these Notes prior to the 20 February 2025 and attempted sale of the Notes to

an affiliate.

47. On 27 February 2025, H&K as counsel for EDF (the policyholder), sent an email to Crown Global advising that the foundation was gathering information and requested that Crown Global therefore withdraw its consent to the proposed sale of the Notes.

48. On 28 February 2025, Mr Patrick sent a further letter to Crown Global noting the revocation of consent to sell the Notes, and further noting that: "*in addition to the purchase of the "Notes" for $500,000, we also intend to include a provision in the purchase and sale documents that, if the Notes are repaid in full within 12 months, all amounts received (minus fees and expenses of collection and purchase price) will be remitted to you as the sole limited partner of Atlas IDF, LP*." The initial zero valuation and proposed $500,000 sale price is commercially unjustifiable.

*Attorney General Investigation*

49. The Petitioners have been informed that on 14 March 2025, the Texas Attorney General (***Texas AG***) commenced an investigation into Charitable DAF GP, LLC (the Fund's former general partner) in relation to the organisation, conduct and management of Charitable DAF GP, LLC, and its related entities.

50. It is understood that the Texas AG has the power to investigate a charity, should it deem necessary, to determine whether a charity is complying with Texas law.

51. The Charities have requested information about the investigation from the Texas AG, but do not have knowledge of any further details.

## F GROUNDS FOR WINDING UP

52. The Supporting Organizations bring this Petition based on the multiple concerns identified above about the governance of the LP and the Fund, including potential mismanagement of assets and/or use of assets for purposes other than to benefit and support the Charities, as the ultimate beneficial owners of the Fund's interest, in carrying out their charitable purposes, in accordance with the terms of the ARLPA, on the basis of a complete breakdown in confidence in the person in the Control Position.

53. Accordingly, the Petitioners seek a winding up of the LP on a just and equitable basis and in particular, without limitation, on the following grounds (each discussed in detail below):

(a) governance issues and mismanagement; and

(b) the need for an investigation into the recent activities and expenditure of the Fund; and

(c) justifiable loss of faith and confidence in the management of the Fund.

**F** **APPLICATION**

54. Given the above, the Petitioners seek an order that the LP be wound up pursuant to section 92(e) of the Act.

55. The Petitioners also seek an order appointing Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard, Cricket Square, George Town, Grand Cayman, Cayman Islands, as the joint official liquidators (***JOLs***) of the LP.

56. Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd:

(a) are "qualified insolvency practitioners" as defined in section 89 of the Act and as prescribed by Regulation 4 of the Insolvency Practitioners' Regulations (2023 Consolidation) (***IPR***);

(b) meet the residency requirements contained in Regulation 5 of the IPR;

(c) meet the independence requirements prescribed by Regulation 6 of the IPR;

(d) meet the insurance requirements prescribed by Regulation 7 of the IPR and A&M holds a trade licence which authorises its staff to carry on business as professional insolvency practitioners; and

(e) consent to their appointment as official liquidators of the LP, if so appointed by the Court.

**YOUR PETITIONERS THEREFORE HUMBLY PRAY THAT** –

1. The LP be wound up by the Court in accordance with section 92(e) of the Act.

2. Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard, Cricket Square, George Town, Grand Cayman, Cayman Islands be appointed as the joint official liquidators (the ***JOLs***) of the LP.

3. The JOLs be authorized to act jointly and severally in their capacity as liquidators of the LP.

4. The JOLs shall not be required to give security for their appointment.

5. In addition to their powers prescribed in Part II of the Third Schedule to the Act, which are exercisable without sanction of this Honourable Court, the JOLs may also without further sanction or intervention from this Honourable Court exercise the following powers set out in Part I of the Third Schedule to the Act:

(a) The power to engage staff, agents and/or consultants (whether or not as employees of the LP) in the Cayman Islands and elsewhere to assist the JOLs in the performance of their

functions; and

(b) The power to engage attorneys and other professionally qualified persons in the Cayman Islands and elsewhere to assist the JOLs in the performance of their functions.

6. The JOLs be authorised to do any act or thing considered by them to be necessary or desirable in connection with the liquidation of the LP.

7. The JOLs' remuneration and expenses be paid out of the assets of the LP in accordance with section 109 of the Act, Part III of the Regulations, and CWR Order 20.

8. The costs of this Petition shall be paid out of the assets of the LP as an expense in the liquidation, such costs to be taxed if not agreed with the JOLs.

9. The JOLs shall be at liberty to apply to further directions concerning their functions and the exercise or the proposed exercise of their powers.

10. Such further or other orders and directions be made as the Court shall deem fit.

**AND** your Petitioners will ever pray etc.

Dated 10 April 2025

Johnstone Law

**Johnstone Law Ltd.**

**NOTE:** This Petition is intended to be served on:

**CHARITABLE DAF HOLDCO, LTD** at its registered office at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands

.

**THIS PETITION** was presented by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/00016**)

**NOTICE OF HEARING**

**TAKE NOTICE THAT** the hearing of this Petition will take place at the Law Courts, George Town, Grand Cayman, Cayman Islands on April 29 2025 at 2:00pm ~~am.~~

Any correspondence or communication with the Court related to the hearing of this Petition should be addresses to the Registrar of the Financial Services Division of the Grand Court at PO Box 495, George Town, Grand Cayman, KY1-1106, Cayman Islands.

# Exhibit F

**EXHIBIT 124**

UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

--------------------------
In Re: Case No. 19-34054-sgj11
HIGHLAND CAPITAL MANAGEMENT,
L.P.,
Debtor. Chapter 11
--------------------------X.

REMOTE VIDEO-RECORDED DEPOSITION of
JULIE DIAZ
Sunday, June 22, 2025
1:37 p.m. Central Time

Reported Stenographically by:
Gail L. Inghram,
BA, RDR, CRR, RSA, CA-CSR No. 8635

WHEREUPON, the remote video-recorded deposition of JULIE DIAZ was held via video-conferencing on Sunday, June 22, 2025, beginning at approximately 1:37 p.m. Central Time, the proceedings being recorded stenographically by Gail Inghram, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Shorthand Reporter, and transcribed under her direction, there being present:

A P P E A R A N C E S:

[All parties appeared via remote videoconferencing.]

On behalf of Highland Capital Management, and the Highland Claimant Trust:

JOHN MORRIS, ESQ.
jmorris@pszjlaw.com
GREGORY V. DEMO, ESQ.
gdemo@pszjlaw.com
JEFFREY POMERANTZ, ESQ.
jpomerantz@pszjlaw.com
HAYLEY WINOGRAD, ESQ.
hwinograd@pszjlaw.com
PACHULSKI STANG ZIEHL & JONES
780 Third Avenue, 34th Floor
New York, New York 10017-2024
310.277.6910

On behalf of Highland Litigation Trustee:

ROBERT S. LOIGMAN, ESQ.
robertloigman@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue 22nd Floor
New York, New York 10010
212.849.7615

A P P E A R A N C E S (Cont'd):

On behalf of Defendant Dallas Foundation and Crown Global Life Insurance:

MATTTHEW OKIN, ESQ.
mokin@okinadams.com
DAVID CURRY, ESQ.
dcurry@okinadams.com
OKIN ADAMS BARTLETT CURRY LLP
1113 Vine Street, Suite 240
Houston, Texas 77002
713.228.4100

On behalf of Defendant Dugaboy Investment Trust:

MICHAEL LANG, ESQ.
mlang@cwl.law.com
CRAWFORD WISHNEW & LANG PLLC
1700 Pacific Avenue, Suite 2390
Dallas, Texas 75201
214.817.4500

A P P E A R A N C E S (Cont'd):

On Behalf of Hunter Mountain Investment Trust:
LOUIS M. PHILLIPS, ESQ.
lphillips@kellyhart.com
AMELIA L. HURT, ESQ.
ahurt@kellyhart.com
KELLY HART & HALLMAN LLP
301 Main Street, Suite 1600
Baton Rouge, Louisiana 70801
225.381.9643

VIDEOGRAPHER:
PAUL D'AMBRA

ALSO PRESENT:
NATHAN HALL, Pachulski Stang Ziehl & Jones
JAMES SEERY
TORREY LITTLETON
SHAWN RAVER

- - -

INDEX

- - -


EXAMINATION OF: PAGE

JULIE DIAZ

By Attorney Morris ...............8


EXHIBITS


HIGHLAND: PAGE

Highland 1 Objection of the Dallas ..........63 Foundation and Crown Global to Motion for Entry of An Order Approving Settlement (15 pages)

DEPOSITION SUPPORT INDEX

QUESTIONS INSTRUCTED NOT TO ANSWER:
PAGE LINE
(None)

REQUEST FOR PRODUCTION OF DOCUMENTS
PAGE LINE
(None)

STIPULATIONS
PAGE LINE
(None)

QUESTIONS MARKED
PAGE LINE
(None)

REPORTER'S NOTE:
QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT NECESSARILY REFLECT A DIRECT QUOTE.

- - -

P R O C E E D I N G S

- - -

WHEREUPON,

JULIE DIAZ,

being first duly sworn or affirmed to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY ATTORNEY MORRIS:

Q. Good afternoon, Ms. Diaz. Can you hear me okay?
A. I can.
Q. My name is John Morris. I'm an attorney for Highland Capital Management, and we're here to take your deposition today in connection with the Dallas Foundation's objection to a certain settlement.
Are you aware of that?
A. Yes, I am.
Q. Have you ever been deposed before?
A. Yes, I have.
Q. Okay. So just some quick ground rules so we're on the same page.

I'm going to ask a series of questions, and it's very important that you allow me to finish my question before you begin the answer.

Is that fair?

A. Yes.

Q. I will try to allow you to finish your answer before I begin a question; but if I fail to do so, will you let me know that?

A. Yes, I will.

Q. If I ask a question that you don't understand, will you let me know that?

A. I will.

Q. If you need a break at any time, I'm happy to accommodate you; but I just ask that you not seek a break while a question is pending unless you need to consult with your lawyer about privilege questions.

Is that fair?

A. Yes.

Q. Are you affiliated with the Dallas Foundation?

A. Yes. I am the president and CEO.

Q. When did you become the president and CEO of the Dallas Foundation?

A. Formally, April 1st, 2024. Prior to that, I was interim CEO; and have been with the foundation for six years.

Q. Are you familiar with the company called Highland Capital Management, LP?

A. Yes, I am.

Q. Are you aware that Highland Capital Management, LP, filed for bankruptcy back in 2019?

A. Yes, I am.

Q. Are you aware that the Dallas Foundation recently filed in the bankruptcy court an objection to a proposed settlement between certain Highland affiliates and certain affiliates of Hunter Mountain Investment Trust?

A. Yes, I am.

Q. Are you aware of the parties to the settlement agreement that the Dallas Foundation has objected to?

A. Can you clarify that question.

Q. Can you identify the parties on the Highland side that are -- that executed the settlement agreement that the Dallas Foundation objected to?

A. No.

Q. Can you identify the parties -- withdrawn.

Are you aware that there are parties -- are you aware that Hunter Mountain Investment Trust is a party to the settlement agreement?

A. Yes, I am.

Q. Are you aware that a gentleman named Mark Patrick signed the agreement on behalf of the Hunter Mountain Investment Trust?

A. I'm aware of his involvement.

Q. But you're not aware as you sit here right now that Mr. Patrick signed on behalf of Hunter Mountain Investment Trust?

A. No.

Q. Can I refer to Hunter Mountain Investment Trust as "HMIT" for purposes of the deposition?

A. Yes, you may.

Q. Are you aware that there are other entities that are affiliated with HMIT that are also party to the settlement agreement?

A. Yes, I am.

Q. Can we generally refer to all of the affiliates of HMIT and HMIT itself as "the HMIT

entities" for purposes of today's deposition?
A. Yes.
Q. Did you review the Dallas Foundation's objection before it was filed?
A. Yes, I did.
Q. Were you responsible for authorizing its filing?
A. Yes.
Q. Are you aware that the objection was filed on behalf of an entity called Empower Dallas Foundation?
A. Yes.
Q. Are you familiar with that entity?
A. Yes, I am.
Q. What is the Empower Dallas Foundation?
A. Empower Dallas Foundation is a supporting organization that is sponsored by the Dallas Foundation. It's a grant-making organization that's been in existence for at least 10 years.
Q. Do you know who formed Empower Dallas Foundation?
A. Yes. I'm aware that it came from Jim Dondero.
Q. What do you mean that it came from Jim

Dondero?

A. Well, that the donation was made from Mr. Dondero.

Q. Did Mr. Dondero make a donation to Empower Dallas Foundation?

A. Yes.

Q. And does Empower Dallas Foundation fund the Dallas Foundation?

A. Technically, it is a -- we are a -- it is a supporting organization of the Dallas Foundation, which is an IRS entity for which it makes grant recommendations that then flow to a donor-advised fund that then the Dallas Foundation effectuates, basically, the grant.

Q. Do you know if the Dallas -- did I step on your words?

A. No.

Q. Do you know if the Dallas -- withdrawn.

Do you know if Empower Dallas Foundation had any contractual obligation to make donations to the Dallas Foundation?

A. I believe that through its charitable status, it is required to make contributions on a regular basis. And we also have governance that

oversees activity within all of our charitable funds.

Q. Is there an agreement of any kind between the Dallas Foundation and Empower Dallas Foundation?

A. Yes. We have a fund agreement.

Q. And under that fund agreement, is the Dallas Foundation entitled to receive contributions from Empower Dallas?

A. Yes. I don't know the technical language offhand.

Q. Do you know if Mr. Dondero plays any role in the management of Empower Dallas Foundation?

A. What do you mean by "management"?

Q. Does he have any involvement in --

A. Yes. As any fundholder, he would have involvement in making recommendations for grants he would like to put into the community, as all of our fundholders do.

Q. Does he play any other role, to the best of your knowledge, with respect to the Empower Dallas Foundation?

A. No.

Q. Are you familiar with --

A. Oh, sorry. May I correct myself?
The Empower Dallas Foundation does have its own governance, of which he is president of the foundation. I'm the vice president. And we have a treasurer. As with all of our supporting orgs, the Dallas Foundation has majority oversight.
Q. The Dallas Foundation has majority oversight of Empower Dallas Foundation?
A. Yes.
Q. And how does it exercise that oversight?
A. In voting.
Q. And who gets to vote?
A. The officers: the president, the vice president, and the treasurer.
Q. Of which entity?
A. Of the supporting organization, the Empower Dallas Foundation.
Q. Can you identify who those people are.
A. Jim Dondero is the president; I'm the vice president; and our CFO, Torrey Littleton, is the treasurer.
Q. How about the Okada Family Foundation? Are you familiar with that?

A. Oh, excuse me -- sorry.
I'm -- I need to correct myself. That is for Empower Dallas, because we have two funds I'm confusing. Empower Dallas Foundation, I am the president; Torrey is the treasurer; and we have a secretary.
For consent agendas, Jim Dondero plays an individual member role.
Q. Ma'am, what are you reading right now?
A. I'm looking at the structure of our supporting organizations.
Q. Can you just hold that up for me so I can see what you're looking at.
A. It literally lists that for all of them.
Q. Do you have any other documents with you today?
A. Just my notes.
Q. Can I ask you to put those away for now.
A. Oh, sure.
Q. How about the Okada Family Foundation; is that another supporting organization?
A. Yes, it is.
Q. And do you know if Mr. Dondero has any

involvement with that entity?
A. It does not have any involvement with that entity.
Q. Okay. Do you know if Mr. Dondero played any role in the Dallas Foundation's decision to object to the proposed settlement between the Highland entities and the HMIT entities?
A. Did not have any role.
Q. Did you ever speak to him about the objection?
A. I have spoken to him in the last six months.
Q. Did you ever speak with him about the objection?
A. No.
Q. Did you speak with him about any of the facts that are set forth in the objection?
A. No.
Q. Was Mr. Dondero a source for some of the facts that are set forth in the Dallas Foundation's objection?
A. No.
Q. Did Mr. Dondero or anyone acting on his behalf provide any information to the Dallas

Foundation that the Dallas Foundation used in its objection?

A. Repeat the question.

Q. Did Mr. Dondero or anybody you believe was acting on his behalf provide any information that the Dallas Foundation used in its objection?

A. I'll abstain from answering that.

Q. Excuse me?

A. I'd rather not answer that question.

Q. I appreciate that, but you have to.

A. Well, there's a lot of context around the formation of where we are today. So I have been engaged with our counterpart over the last six years, so I have a lot of information from working through our grant-making and the management of the assets over the past six years.

So in that same vein, I've learned a lot from many interested parties.

Q. Okay. So I ask you to listen carefully to my question, because it's rather precise.

Do you know if Mr. Dondero or anybody you believed was acting on his behalf provided the Dallas Foundation with any information that is -- that was used to prepare the objection?

A. No.
Q. Are you familiar with the objection?
A. I am familiar. I authorized it and read it.
Q. And it's your testimony that Jim Dondero wasn't the source of any information that's in that objection. Is that fair?
A. That is fair.
Q. Do you know where the idea of filing the objection originated?
A. I don't.
Q. Do you know whose idea, who came up with the idea to object to this -- withdrawn.
Do you know whose idea it was to object to the Highland/HMIT settlement?
ATTORNEY OKIN: Okay. Actually, Ms. Diaz, before you answer, just want to caution you that as long as it's not conveying advice of counsel, you can answer the question.
A. You'll have to repeat that. I don't understand that.
BY ATTORNEY MORRIS:
Q. Do you know who came up with the idea of objecting to the proposed Highland/HMIT settlement?

A. I believe it came out of discussions in another settlement.
Q. What settlement are you referring to?
A. In the Cayman Islands.
Q. What settlement is that?
A. Well, it has to do with the three large supporting orgs and an entity called DAF Holdco.
Q. Which three large supporting orgs are you referring to?
A. Kansas City Foundation; Santa Barbara Foundation; Highland Dallas Foundation; and really in a small way, North Texas Community Foundation. All --
Q. And I apologize. What did you just refer to those entities as? Supporting organizations?
A. Yes.
Q. The Kansas -- and you called it the Kansas City --
A. Foundation.
Q. -- Foundation, the Santa Barbara Foundation and the Dallas Foundation? And those are three additional supporting organizations of the Dallas Foundation?

A. Sorry. We have three -- four community foundations; right? Dallas Foundation, Santa Barbara Foundation, Kansas City Foundation, and North Texas Community Foundations.

The three -- Kansas City, Dallas and Highland -- I'm sorry -- Dallas, Kansas City, and Santa Barbara all have supporting organizations that were the result of contributions from Highland Capital in 2011.

Q. Do you know if Mr. Dondero has any relationship to the Dallas, Kansas City, or Santa Barbara Foundations that you just identified?

A. My understanding is they have -- he has the same structure of supporting org with Kansas City, Santa Barbara, and Dallas.

Q. Is he the president of each, to the best of your knowledge?

A. Yes.

Q. And are those the entities that commenced the Cayman Islands proceedings, to the best of your understanding?

A. Yes.

Q. Is it your understanding that Mr. Dondero directed those entities to do so?

A. No.
Q. Who directed those entities to do so, to the best of your knowledge?
A. CEOs of the organizations.
Q. And who are they?
A. Debbie Wilkerson is the CEO of Kansas City. Jackie Carrera is the CEO of Santa Barbara. Rose Bradshaw is the CEO of North Texas Community Foundation, although she did not enter in, in the formal filing. They have a very de minimis role in the asset.
Q. Are you aware that Mr. Dondero filed a declaration or an affidavit in the Cayman Islands in support of the Community Foundation's litigation that they commenced?
A. I did see that.
Q. Did you read it?
A. Yeah.
Q. Did you see any familiarity between that declaration and the Dallas Foundation's objection?
A. I think there were some similarities because of the nature of the activities that have been happening.
Q. Did you learn, when you read

Mr. Dondero's declaration in the Cayman Islands, that he's actually funding that litigation on behalf of the supporting organizations?

A. No, that's not when I learned that.

Q. That's not when you learned it or -- withdrawn.

Are you aware that he's funding that litigation?

A. Yes.

Q. When did you learn that he was funding that litigation?

A. Before we got into litigation.

Q. Is he funding this litigation on behalf of the Dallas Foundation?

A. Yes, he is.

Q. And how much money did he provide for the funding of this litigation?

A. We have not agreed on an amount. As with any of our fundholders', legal expenses will get paid through by the fund. So that's a very common business practice. And it would go until the legal issues ceased.

Q. But he's made a commitment to fund -- to personally fund the expenses of the Dallas Foundation in connection with this litigation; is

that right?

A. Yes.

Q. Are you aware of any particular reason that that's not disclosed in the Dallas Foundation's objection?

A. I'm not aware.

Q. Why did the Dallas Foundation file the objection on behalf of Empower Dallas Foundation?

A. Well, we filed the objection on behalf of both Empower and Okada Family Foundation, in essence, because the person who has been overseeing the activity ceased to communicate with us as of last fall. And there were enough irregularities in our communication and accounting leading up to then some pretty dramatic changes in valuations that raised a red flag for us.

Q. Who is the person that you're referring to?

A. Mark Patrick.

Q. And did the Empower Dallas Foundation ask the Dallas Foundation to file this objection on its behalf?

A. As fiduciaries of all of our charitable assets, we oversee the activity; and

when there is any irregular activity, we investigate.

Q. I appreciate that. I'm just asking you if the Empower Dallas Foundation asked the Dallas Foundation to file the objection on its behalf.

A. Well, since I am representative of the Empower Dallas Foundation, I don't have to ask anybody except ourselves to do that.

Q. And did you confer with Mr. Dondero about that decision?

A. I think we informed him.

Q. Did he review a copy of the objection before it was filed?

A. Not to my knowledge, no.

Q. Are you aware that the Dallas Foundation also filed the objection on behalf of certain segregated accounts held at Crown Global Life Insurance Limited?

A. Yes.

Q. Can I refer to Crown Global Life Insurance Limited as just "Crown Global"?

A. Yes.

Q. And can I refer to the segregated accounts that are identified in the Dallas

Foundation's objection as "the segregated accounts"?

A. Yes.

Q. And are you familiar with those segregated accounts?

A. At a high level.

Q. What's your understanding at a high level of what those segregated accounts are?

A. That the Crown Global assets are really insurance annuities that pay out to the fund; and that's the source of income for charitable purposes.

Q. Where does the income from the annuity flow to?

A. Flows to the supporting organizations.

Q. And then the supporting organizations have the proceeds from the annuity available for the foundations; is that fair?

A. Yes.

Q. And do you know who took out these insurance policies or these annuities? Which of the -- withdrawn.

Can you identify the supporting organization that funded the purchase of the annuities?

A. Empower Dallas Foundation and Okada Family Foundation.

Q. And is the cash that is thrown off from the annuities -- withdrawn.

To the best of your understanding, is the cash that's thrown off from the annuities the sole source of income for Empower Dallas Foundation and the Okada Foundation?

A. That's my understanding.

Q. Is it your understanding that the Dallas Foundation has not received anything of value from Empower Dallas Foundation or the Okada Family Foundation other than proceeds from the annuities?

A. That's my understanding.

Q. Do you know why the Dallas Foundation filed the objection on behalf of the segregated accounts at Crown Global?

A. Yes.

Q. Why did the Dallas Foundation file its objection on behalf of the segregated accounts?

A. As I said earlier, because there had been activity and essentially a write-down of 40 percent of value, we were concerned that there were activities within Crown Global for the

organizations that support that that we did not have any, you know, access to, vision or communication around.

Q. Does the Dallas Foundation have any relationship with Crown Global?

A. Yes.

Q. As it pertains to -- what relationship does the Dallas Foundation have with Crown Global?

A. Well, I don't understand on a transactional, but we get quarterly reports from them. They obviously send the proceeds to us. I mean, they are a fiduciary to us in the same way we are to others.

Q. Crown Global is?

A. Yeah.

Q. With respect to the disbursement of proceeds from the annuity?

A. Yes.

Q. Okay. So the proceeds from the annuity don't go to Empower Dallas or the Okada Family Foundation; they get remitted directly to the Dallas Foundation.

Do I have that right?

A. No. They go -- they go to the

supporting organizations. But in our governance that -- I refer to both as -- it flows into our finance office, and then they get allocated to the foundations.

Q. You mentioned that there was a 40 percent write-down in value. Is that with respect to the annuities?

A. I don't know all of the transactions that led up to that. But what we understood, there were a few -- sorry.

There are a few requests for us to approve that we didn't understand and sent them to our counsel, and then got the first-quarter report for March 30th, and it was significantly lower and we didn't know why.

So in asking for that, we found out there was a decline.

Q. And is that -- is it your understanding that it's the decline in value -- withdrawn.

Is it your understanding that it's the unexplained decline in value that caused the Dallas Foundation to file the objection on behalf of the segregated accounts?

A. Yes.

Q. Did anybody ask the Dallas Foundation to file the objection on behalf of the segregated accounts?
A. No.
Q. Can you identify the owner of the segregated accounts on behalf of -- on whose behalf the Dallas Foundation filed the objection?
Withdrawn. Too many words.
Do you know who owns the segregated accounts?
A. No. I won't guess.
Q. Are you aware that the owner of the segregated accounts is Crown Global?
A. Oh, yes.
Q. And so is that your understanding, that Crown Global --
A. Yes.
Q. -- owns the segregated accounts?
A. Yes.
Q. Did anybody from the Dallas Foundation seek Crown Global's consent and approval before filing the objection on behalf of the segregated accounts?
A. Yes.
Q. Yes?

And who at Crown Global gave the authorization, if you know?

A. Mr. -- the CEO and their chief legal, Hernandez -- Paul --

ATTORNEY OKIN: Let me interrupt here too, John. You're acting as though the objection was filed solely by the Dallas Foundation. We represent two clients here. We represent the Dallas Foundation and Crown Global.

And you're putting Ms. Diaz in a position where I think she thinks she has to justify having -- Crown Global's actions when they -- we represent them as well.

ATTORNEY MORRIS: Well, as I read the pleading that you filed, it said the Dallas Foundation -- I won't --

ATTORNEY OKIN: I think that's a --

ATTORNEY MORRIS: I'll ask the questions, and we'll --

ATTORNEY OKIN: Take a look at our signature block. It says clearly that we're doing it on behalf of the Dallas Foundation and Crown Global.

BY ATTORNEY MORRIS:

Q. Ms. Diaz, do you know if the Dallas

Foundation ever appeared in the Highland bankruptcy case before it filed this objection?

A. I do not believe so.

Q. To the best of your knowledge, the Dallas Foundation never filed a claim against Highland in the Highland bankruptcy case; correct?

A. No.

Q. To the best of your knowledge -- withdrawn.

Have you ever heard of the Highland Claimant Trust?

A. No.

Q. So is it fair to say that you have no reason to believe that the Dallas Foundation has any interest in the Highland Claimant Trust?

A. No. That is not -- that's not fair to claim.

Q. So is it your testimony that you believe the Dallas Foundation has a direct or indirect interest in the Highland Claimant Trust?

A. What you asked me was had we ever participated and did we then have any result from it.

I don't know the answer to that

question.

Q. I apologize if my questioning wasn't clear to you. Let me try again.

To the best of your knowledge, the Dallas Foundation has never appeared in the Highland bankruptcy case until it filed the objection that we're talking about today; correct?

A. I don't know the answer to that.

Q. But to the -- you have no knowledge that they ever did; is that fair?

A. I have no knowledge.

Q. Okay. And you have no knowledge that the Dallas Foundation ever filed a claim against Highland in the Highland bankruptcy case; correct?

A. I have no knowledge of that.

Q. And you have no knowledge that the Dallas Foundation has any interest of any kind in the Highland Claimant Trust; correct?

A. I do not agree with that statement.

Q. What knowledge do you have that the Dallas Foundation has an interest in the Highland Claimant Trust?

A. Because of the relationship between

Hunter Mountain and how it feeds up to Crown Global and, therefore, the supporting organizations.

Q. It might be my fault that I'm not being clear, but I'm really just focused on Highland right now. Has nothing to do with Crown Global --

A. Okay.

Q. -- or Hunter Mountain; it's just Highland.

A. Okay.

Q. Are you aware that as a result of the bankruptcy, an entity Called the Highland Claimant Trust was formed?

A. I was not, no.

Q. Okay. So if you weren't aware that an entity called the Highland Claimant Trust was formed, is it also fair to say you have no knowledge that the Dallas Foundation has an interest in the Highland Claimant Trust?

A. Okay.

Q. Okay. And does the Dallas Foundation have any contractual relationship with Highland Capital Management, LP?

A. No.

Q. Has the Dallas Foundation ever had a contractual relationship with Highland Capital Management, LP, to the best of your knowledge?

A. No.

Q. Does the Dallas Foundation have any contractual relationship with an entity called the Highland Claimant Trust, to the best of your knowledge?

A. No.

Q. And to the best of your knowledge, has the Dallas Foundation ever had a contractual relationship with an entity called the Highland Claimant Trust?

A. No.

Q. Do you have any reason to believe, as you sit here today, that Highland Capital Management, LP, owes any duties or obligations to the Dallas Foundation?

ATTORNEY OKIN: Object to form.

BY ATTORNEY MORRIS:

Q. You can answer.

A. Can you ask the question again.

Q. Sure.

As you sit here today, do you have any reason to believe that Highland Capital

Management, LP, owes any duties or obligations to the Dallas Foundation?

ATTORNEY OKIN: Object to form.

A. No.

BY ATTORNEY MORRIS:

Q. As you sit here today, do you have any reason to believe that Highland Capital Management, LP, ever had any duties or obligations that it owed to the Dallas Foundation?

ATTORNEY OKIN: Object to form.

A. No.

BY ATTORNEY MORRIS:

Q. Are you aware that if the settlement agreement between the Highland entities and the HMIT entities is approved, the HMIT entities will receive cash and other assets pursuant to the terms of the settlement agreement?

A. I'm assuming that there is assets within the agreement.

Q. Have you reviewed the settlement agreement yourself, Ms. Diaz?

A. No.

Q. Are you generally familiar with the terms of the settlement agreement?

A. At a high level.
Q. What's your understanding at a high level?
A. That once the settlement is complete, that Hunter Mountain will receive assets of some size that will flow up to Crown Global.
Q. Do you know if the requirement that the assets flow up to Crown Global is part of the settlement agreement that's before the Court and that the Dallas Foundation is objecting to?
A. That was our understanding.
Q. From the agreement itself?
A. I have not seen the settlement agreement.
Q. So you authorized an objection to a settlement agreement that you haven't seen; is that fair?
A. That's fair.
Q. Do you have any reason to believe that the Dallas Foundation has a right to recover any of the assets you just described that HMIT will receive if the settlement is approved by the Court?
ATTORNEY OKIN: Object to form.
A. Can you repeat the question.

BY ATTORNEY MORRIS:

Q. Do you have any reason to believe that the Dallas Foundation has a right to recover any portion of the assets that HMIT will receive if the settlement agreement is approved by the bankruptcy court?

ATTORNEY OKIN: Object to form.

A. My job is to protect the charitable assets under our organization's fiduciary compliance role; and so if there is any opportunity for assets to either be diminished or not move forward, it's my job to ensure that I've done everything I can to recover them.

BY ATTORNEY MORRIS:

Q. But do you have an understanding as to whether or not -- withdrawn.

I think you just testified that it's your understanding at a high level that HMIT will receive certain assets if the settlement agreement is approved.

Do I have that right?

A. Yes.

Q. Do you have an understanding that the Dallas Foundation is entitled to receive all or any portion of the assets that HMIT would receive

under the settlement agreement?

ATTORNEY OKIN: Object to form.

A. I don't know that.

BY ATTORNEY MORRIS:

Q. You don't know that?

A. (Shakes head.)

Q. Have you asked anybody whether the Dallas Foundation has a right to recover any portion of the assets that HMIT will receive under the settlement agreement?

ATTORNEY OKIN: Before you answer that, Ms. Diaz, I'll just remind you: Other than disclosing any of your conversations with counsel for you or for the foundation.

BY ATTORNEY MORRIS:

Q. But you can answer the question.

A. You'll have to ask the question again.

Q. No problem. I appreciate that.

Did you ever ask anybody whether the Dallas Foundation had a right to receive any of the assets that HMIT will receive under the settlement agreement?

A. Like somebody-who in your question?

Q. Anybody. Did you ever ask the question of anybody? Let's just start with "yes"

or "no."

A. Yes.

Q. And who did you ask?

A. I'll strike that, because it would be -- I couldn't tell you definitively I did that.

Q. Did Mr. Dondero tell you that the Dallas Foundation had a right to the assets that HMIT was going to receive under the settlement agreement?

A. No.

Q. And you don't recall asking that question of anybody; is that fair?

A. The only person I talked to this -- about these assets to is Mark Patrick.

Q. And did Mr. Patrick tell you that the Dallas Foundation had a right to recover any of the proceeds under the HMIT/Highland settlement agreement?

A. I don't know.

Q. Have you ever received any documents that lead you to believe that the Dallas Foundation has an ownership interest in any of the assets that HMIT will receive under the settlement agreement?

ATTORNEY OKIN: Object to form.

A. My understanding is that through the Hunter Mountain settlement, that those assets flow into the Atlas fund that I know Mark Patrick was managing. So indirectly.

BY ATTORNEY MORRIS:

Q. Is there a document that you reviewed that leads you to believe that the assets HMIT receives will go to the Atlas fund?

A. No.

Q. Can you identify with any specificity which Atlas entity you have in mind that's expected to receive the proceeds from the HMIT/Highland settlement?

A. No.

Q. Do you know if the Atlas entity that you just identified, does that have any obligation to disburse any of the assets it may receive from HMIT?

A. I don't know.

Q. Okay. Let's -- do you have any reason to believe that the Dallas Foundation will be impacted in any way if the settlement between Highland and the HMIT entities is approved?

A. As I said, because the Crown Global is

to disburse money that it receives from Atlas, then there would be an impact. That's why we filed the objection.

Q. Is it fair to say that the Dallas Foundation's concern is what happens to the assets that HMIT receives after the settlement is approved and it's not with the agreement itself?

A. I can't answer that.

Q. If Mark Patrick hadn't done anything to change any of the structure that's described in the Dallas Foundation's objection such that the Dallas Foundation's expectations as set forth in its objection were met, would the Dallas Foundation have any reason to object to this settlement?

ATTORNEY OKIN: Objection; form.

A. I don't know.

BY ATTORNEY MORRIS:

Q. Isn't the problem here that you're concerned about what happens to the money after it's received by HMIT?

A. I'm concerned that the case that's pending in the Cayman Islands shows that $300 million of charitable assets have vanished and that the same type of behavior is happening

in Crown Global and impacts those funds to the tune of $25 million.

Q. But that has nothing to do with Highland.

Fair enough?

A. I don't know.

Q. Do you have any basis to say that Highland has any involvement in anything you just described?

A. Well, I'm not a lawyer and, technically, I don't know how to answer that. But Highland has been involved from day one.

Q. Involved in what?

A. The original contribution to set up the supporting orgs with those shares; like I said, I -- all the different legal entities -- GPs, LPs, et cetera -- I leave you all to track.

Q. If the Court approved the settlement and Mark Patrick decided to give all of the proceeds to the Dallas Foundation, would the Dallas Foundation have any reason to object to the settlement?

ATTORNEY OKIN: Object to form.

A. I think we'd want to know more.

///

BY ATTORNEY MORRIS:
Q. What would you want to know?
A. What are the assets that we would be receiving? What would the structure be?
Q. Well, the assets are set forth in the settlement agreement; right? So there's no mystery about the assets.
Fair enough?
A. I don't know that. I don't know -- are they -- is it cash? Is it securities? What are the nature of the -- I would want to know a lot more before accepting all things like that.
Q. Do you know if Crown Global ever appeared in the Highland bankruptcy?
A. I don't know.
Q. Do you know if the segregated accounts ever filed a notice of appearance in the Highland bankruptcy?
A. I don't know.
Q. Do you know if Crown Global ever filed a claim against Highland in the Highland bankruptcy?
A. I don't know.
Q. Do you know if the segregated accounts ever filed a claim against Highland in the

Highland bankruptcy?
A. I don't know.
Q. Do you know if Crown Global has an interest in the Highland Claimant Trust?
A. No. No, I don't know.
Q. Do you know if the segregated accounts have an interest in the Highland Claimant Trust?
A. I don't know.
Q. Do you know if Crown Global has any contractual relationship with Highland?
A. I don't know.
Q. Do you know if Crown Global has any contractual relationship with the Highland Claimant Trust?
A. No.
Q. I'm going to take Mr. -- I think it's Mr. Littleton's deposition next.
A. Yep.
Q. Do you know if he is affiliated with Crown Global in any way?
A. No. He's an employee of the Dallas Foundation.
Q. Thank you.
Do you know if Crown Global has any right to recover any of the assets that HMIT and

the HMIT entities may receive under the settlement agreement?

ATTORNEY OKIN: Object to form.

A. I don't know.

BY ATTORNEY MORRIS:

Q. Have you asked that question of anybody?

ATTORNEY OKIN: Other than your lawyers, you can answer that, Ms. Diaz.

ATTORNEY MORRIS: Please --

BY ATTORNEY MORRIS:

Q. Was the answer "no," Ms. Diaz?

A. Ask the question again, please.

Q. Have you ever asked anybody whether Crown Global had the right to receive any of the assets that Highland will convey to HMIT under the settlement agreement?

A. No.

Q. We're using the phrase "HMIT entities" to mean the entities on whose behalf Mark Patrick signed the settlement agreement; right? Are we on the same page?

A. That's what you're telling me.

Q. Okay. Are you familiar with any of those entities?

A. Tell me what they are.
Q. Are you familiar with any of the Rand entities?
A. I'm familiar with Rand.
Q. And what's your familiarity with Rand?
A. Certainly it was another vehicle that flowed through to Atlas. And when Mr. Patrick came to see me last October, told me that there might be some issues with Rand and that structure might be changing. That's vague.
Q. Let's stick with the Hunter Mountain Investment Trust.
Are you aware of any assets that the Hunter Mountain Investment Trust owns today?
A. No.
Q. Was it your understanding that Mr. Patrick controlled Rand?
A. Yes.
Q. And is it your understanding that he controls Rand today?
A. Yes.
Q. And going back to Hunter Mountain Investment Trust, you're not aware of any assets that that entity holds today; correct?
A. No.

Q. Were you --

A. I'm assuming Rand is one of the assets, I guess.

Q. Were you ever -- did you ever know -- were you ever aware of any asset that HMIT owned?

A. Well, Atlas.

Q. It's your understanding --

A. Yeah, I feel like I'm being quizzed on Hunter Mountain Trust.

ATTORNEY OKIN: Let me interrupt here. John, two things.

One, if you want to show her an org chart so she can actually see these entities in a way that actually would help her remember them. Nobody can possibly keep them in their mind cold.

And, second, Ms. Diaz is not going to be our witness on this Hunter Mountain structure and the Rand structure. You can keep asking her questions about it and testing her memory on it, but I don't think you're going to find that the answers are going to be any different.

Mr. Littleton will talk to these issues, yes. I can't promise you he'll be able to answer every one of your questions. But to the extent you want somebody with the Dallas

Foundation's knowledge of the workings of that structure, he's the one to ask about that.

ATTORNEY MORRIS: I'll continue to ask the questions, but I appreciate that.

BY ATTORNEY MORRIS:

Q. Do you know if the Dallas Foundation ever received anything of value from any of the HMIT entities?

A. Crown Global.

Q. Crown Global is not an HMIT entity. So I'm asking you to just focus on the entities that Mark Patrick controlled, the Rand entities, the Atlas entities and Hunter Mountain.

Did any of those entities ever give anything of value to the Dallas Foundation?

A. Not directly that I'm aware of, no.

Q. Did any of those entities ever have any business dealings with the Dallas Foundation?

A. Only in the relationship with Crown Global.

Q. Do you have any understanding as to whether any of the HMIT entities owes any duties or obligations to the Dallas Foundation today?

ATTORNEY OKIN: Objection to form.

A. I don't know.

BY ATTORNEY MORRIS:
Q. I understand there was some corporate reorganization earlier this year. I think that's described in the Dallas Foundation's objection.
Is that just generally fair?
A. As it relates to Mr. Patrick?
Q. Yes.
A. (Nods head.)
Q. Okay. Do you have any reason to believe that before Mr. Patrick effectuated those changes, that any of the HMIT entities owed any duty or obligation to the Dallas Foundation?
ATTORNEY OKIN: Objection to form.
A. I don't know.
BY ATTORNEY MORRIS:
Q. Are you aware that HMIT filed a couple of years ago a motion in the bankruptcy court for permission to bring certain claims against Highland Capital Management and a gentleman named James Seery?
A. No.
Q. Nobody ever told you that; is that fair?
A. Fair.
Q. Are you aware that Highland contends

that the settlement agreement that it has entered into with the HMIT entities is the product of good-faith, arm's-length negotiations?

A. Am I aware? No.

Q. Do you have any knowledge of the nature of any negotiations between the Highland entities and the HMIT entities?

A. I'm aware that it's been going on for four years.

Q. I'm just talking about the settlement agreement now.

A. Okay.

Q. Do you have any knowledge of any facts concerning the negotiation of that particular settlement agreement?

A. No.

Q. Do you have any knowledge of any facts that might suggest that the settlement agreement was not the product of good-faith, arm's-length negotiations?

A. No.

Q. Do you have any reason to believe that the proposed settlement is unfair to Highland Capital Management, LP?

ATTORNEY OKIN: Object to form.

BY ATTORNEY MORRIS:

Q. You can answer, ma'am.

A. I don't know.

Q. Do you know whether the proposed settlement is unfair to the Highland Claimant Trust?

A. I don't know.

ATTORNEY OKIN: Object to form.

BY ATTORNEY MORRIS:

Q. You don't have a view on that; is that fair?

A. Yes.

Q. And is it fair that in connection with the preparation and the filing of the objection -- withdrawn.

The Dallas Foundation, in its objection, does not contend that the settlement is unfair to Highland Capital Management; is that correct?

A. I don't know.

Q. You reviewed and authorized the filing of the objection; isn't that right, ma'am?

A. Right.

Q. And you're familiar with the document that you authorized to be filed; fair?

A. Yes.

Q. And based on your recollection, do you recall the Dallas Foundation making any assertion or claim that the settlement agreement was unfair to Highland Capital Management, LP, or any of its affiliates?

A. The claim was that it was unfair to the supporting organizations.

Q. And how is the settlement agreement unfair to the supporting organizations?

A. Because we would -- well, what we claimed is that because of our lack of transparency of the flow of those funds and the changes in the fund recently, that the supporting organizations were losing their assets and any potential future assets.

Q. Is there any other basis that you're aware of by which the Dallas Foundation contends that the settlement agreement is unfair to it?

A. No.

Q. Does the Dallas Foundation contend that the settlement agreement is unfair to Hunter Mountain Investment Trust?

A. I don't know.

Q. As the person who authorized the

filing of the objection on behalf of the Dallas Foundation, do you have any reason to believe that the terms of the settlement are unfair to the Hunter Mountain Investment Trust?

A. I do not.

Q. Are you aware that under the settlement agreement, the HMIT entities and the Highland entities are releasing each other from all liabilities except for the liabilities arising under the settlement agreement?

A. I'm assuming that's what the settlement is intended to do.

Q. And the Dallas Foundation doesn't have any concern about the scope of the mutual releases; is that fair?

ATTORNEY OKIN: Objection to form.

A. I don't know.

BY ATTORNEY MORRIS:

Q. As the person who authorized the filing of the objection on behalf of the Dallas Foundation, do you recall there being any statement in the objection where the Dallas Foundation expressed any concern at all about the scope of the mutual releases that are in the settlement agreement?

ATTORNEY OKIN: Object to form. The document speaks for itself. I mean, if you want to show it to her and ask her to find it, that's fine.

BY ATTORNEY MORRIS:

Q. You can answer, ma'am.

A. I don't --

Q. I'm sorry?

A. I don't recall that.

Q. Okay. Thank you.

Are you aware of any facts that could give rise to a claim by the Dallas Foundation against any Highland entity?

ATTORNEY OKIN: Object to form.

A. Repeat the question.

BY ATTORNEY MORRIS:

Q. Are you aware of any facts that would support a claim by the Dallas Foundation against Highland Capital Management, LP, or the Highland Claimant Trust?

ATTORNEY OKIN: Object to form.

A. No.

BY ATTORNEY MORRIS:

Q. Do you understand the basis for the Dallas Foundation's objection?

A. Yes.

Q. Can you articulate that for me. What's your understanding of the basis of the Dallas Foundation's objection?

ATTORNEY OKIN: Object to form.

A. Our objection --

BY ATTORNEY MORRIS:

Q. Pardon me? What's that, ma'am?

ATTORNEY OKIN: I said I object to the form of the question.

Go ahead. You can answer.

A. Our objection is based on -- and I've said this before -- the fact that there's been irregular significant erosion of the assets to date by the party who seems to control a lot of the liquidity flows and oversight of the assets.

And so with the backdrop of all of the work we're doing in the Cayman Islands to recover 300-plus million dollars, this seemed not insignificant to protect the $25 million for these two supporting organizations.

So as this happens on Wednesday, what we've learned is that every opportunity we can to slow down decisions that are made give us time to understand where -- what is happening with these

charitable assets and where they are.

BY ATTORNEY MORRIS:

Q. Do you have any reason to believe that Mark Patrick does not have the authority to enter into the settlement agreement on behalf of each of the HMIT entities?

ATTORNEY OKIN: Object to the form of the question.

A. I don't know what authority he has to enter into that.

BY ATTORNEY MORRIS:

Q. Do you have any facts that you can share with me that suggest that Mr. Patrick does not have the legal authority to enter into the settlement agreement on behalf of any of the HMIT entities?

ATTORNEY OKIN: Object to the form of the question.

A. I don't.

BY ATTORNEY MORRIS:

Q. Is it your understanding that Mr. Patrick was required to obtain the Dallas Foundation or Crown Global's consent before entering into this settlement agreement?

A. I think what we would have appreciated

and what had been our business as usual was information prior to and during anything that involved the assets under our aegis.

Q. Do you know if any of the HMIT entities had an obligation or duty to provide information to the Dallas Foundation or Crown Global before entering into the settlement agreement?

ATTORNEY OKIN: Object to the form of the question.

A. I don't --

BY ATTORNEY MORRIS:

Q. I'm sorry. Ms. Diaz, you don't know?

A. I don't contractually know that. But whether it's authority that he was given or assumed, he should have communicated with us.

Q. Should he have communicated with you before filing a lawsuit against the Highland -- withdrawn.

Do you believe that Mr. Patrick should have communicated with the Dallas Foundation before filing a lawsuit on behalf of Hunter Mountain Investment Trust against Highland, Mr. Seery, and others?

A. I don't know.

Q. You don't have a view on that; is that fair?

A. Fair.

Q. I apologize if I asked this, but do you have any reason to believe that Mr. Patrick was required to obtain either the Dallas Foundation's or Crown Global's consent before entering into the settlement on behalf of the HMIT entities?

ATTORNEY OKIN: Object to form of the question.

A. I don't know.

BY ATTORNEY MORRIS:

Q. Do you have any reason to believe that the Dallas Foundation or Crown Global has -- withdrawn.

Do you know if the Dallas Foundation has a direct ownership interest in any of the HMIT entities that are party to the settlement agreement?

A. I don't believe so.

Q. Do you know if Crown Global has a direct ownership interest in any of the HMIT entities that are party to the settlement agreement?

A. I don't know.

Q. Do you know if the Dallas Foundation has an indirect ownership interest in any of the HMIT entities that are party to the settlement agreement?

A. Indirect ownership?

ATTORNEY OKIN: Object to the form of the question.

A. I don't know.

BY ATTORNEY MORRIS:

Q. Did you ever ask anybody?

A. No.

Q. No?

A. No.

Q. Do you know if Crown Global has an indirect ownership interest in any of the HMIT entities that are party to the settlement agreement?

ATTORNEY OKIN: Object to the form of the question.

A. I don't know.

BY ATTORNEY MORRIS:

Q. Do you know if the Dallas Foundation has any right to control any of the HMIT entities?

A. No.
Q. No, you don't know; or, no, they don't have that right?
A. No, we don't have that right.
Q. Do you know if Crown Global has the right to control any of the HMIT entities?
A. I don't know.
Q. Do you know if the Dallas Foundation has the right to approve transactions that are entered into by any of the HMIT entities?
A. I don't know.
Q. Do you know if Crown Global has the right to approve any transaction that's entered into by any of the HMIT entities?
A. I don't know.
Q. Do you know if Crown Global or the segregated accounts has any right to control any of the HMIT entities?
A. I don't know.
Q. Do you know if Crown Global or the segregated accounts has any right to approve transactions that any of the HMIT entities might enter into?
A. I don't know.
Q. Do you know if any of the HMIT

entities were required to obtain the segregated accounts' consent before entering into the settlement agreement?

ATTORNEY OKIN: Object to the form of the question.

A. I don't know.

ATTORNEY MORRIS: Okay. We're going to put up on the screen -- Nathan, can you please put up on the screen the Dallas Foundation's objection.

BY ATTORNEY MORRIS:

Q. And while we wait, Ms. Diaz, I will tell you that, you know, the good news with COVID -- or at least one piece of the good news -- is that we learned to do these remote depositions so people don't have to travel and it's much less expensive for clients.

The bad news is that I'm not in the room with you and we have to put documents on the screen, and sometimes that can be a little bit cumbersome.

The Dallas Foundation's objection is fairly lengthy. This is not a test at all. I am going to point to certain parts of the objection. But if you believe that you need to see any other

portion of the document, will you let me know that so that I give you a chance to be fully informed?

A. Yes.

ATTORNEY MORRIS: Okay. I think it's towards the end, Nathan, paragraph 32.

This will be -- let's just call it Highland 1.

(Whereupon, Exhibit Highland 1 was marked for identification and is attached hereto.)

BY ATTORNEY MORRIS:

Q. So we've got up on the screen paragraph 32 of the objection. And the third sentence states, "Unfortunately, it does not appear, however, that joint official liquidators are parties to or have authorized the settlement."

Do you see that?

A. I see it.

Q. Okay. Are you aware that joint official liquidators were appointed by a Cayman court?

A. Yes.

Q. Do you know the entity over which the

joint official liquidators were appointed?

A. I've met with them.

Entity?

ATTORNEY OKIN: Ms. Diaz, maybe you need the question repeated. You seem to be confused by the wrong part of it.

THE WITNESS: Okay.

ATTORNEY MORRIS: Thank you, Matt. That's fine. That's fine. I'll ask the question again.

BY ATTORNEY MORRIS:

Q. Can you identify the entity that's the subject of the Cayman Islands liquidation proceeding?

A. Yes; the DAF Holdco.

Q. Are you aware that all of the HMIT entities are Delaware corporations? Withdrawn.

Are you aware that all of the HMIT entities were formed under the laws of the State of Delaware?

A. Sounds familiar.

Q. And have you ever communicated with the joint official liquidators?

A. Yes.

Q. When did you do that?

A. Two weeks ago.
Q. Did you make them aware of Highland's motion to have the settlement between the Highland entities and the HMIT entities approved?
A. I'd have to look at my calendar.
Q. Do you need your calendar to refresh your recollection as to whether or not you informed them of the Highland settlement motion?
A. I would want to make sure that the day I met with them is clear in my mind as to this versus when we've talked to them.
Q. Fair enough.
A. As you can imagine, there's been a lot of detail around all of these cases.
Q. Sure. And I don't mean to be disrespectful at all, ma'am. I apologize if you took it that way.
Do you recall ever making the joint official liquidators aware of the Dallas Foundation's objection to the settlement motion?
A. As I said, I don't know if we've made them aware of the objection, except as it relates to ancillary activity that we're concerned about regarding Mark Patrick.
So this was filed on June 9th, and I

would want to make sure that I spoke with them before or after that; and I don't have that.

Q. Do you know if anybody provided a copy of the Dallas Foundation's objection to the joint official liquidators?

A. I don't know that.

Q. Did you ever consider doing that?

A. I will after today.

Q. Do you know if anybody asked the joint official liquidators to make an appearance in this case?

A. I don't know that.

Q. Did you ever ask the joint official liquidators to appear in this case?

A. We've already precluded that we don't know whether I've actually talked to them about this case, so that's moot; right?

Q. Okay. Do you believe that Mr. Patrick was required to obtain the joint official liquidators' authorization before entering into the settlement agreement?

A. I don't know that.

ATTORNEY OKIN: Object to the form of the question.

///

BY ATTORNEY MORRIS:

Q. I'm sorry, ma'am. What did you say?

A. I don't know that.

Q. Did you have any reason to believe that Mr. Patrick was required to obtain the joint official liquidators' consent before entering into this settlement agreement?

A. I don't know.

Q. Do you have any reason to believe that the joint official liquidators have any authority to reject the proposed settlement?

ATTORNEY OKIN: Object to the form.

A. I don't know.

BY ATTORNEY MORRIS:

Q. A little bit further down, towards the bottom of this paragraph, there's a reference, it says that the Court-appointed fiduciary, quote, may -- withdrawn.

It says:

"Indeed, many of Mr. Patrick's actions, including the insertion of newly created entities into the fund's structure for the apparent purpose of diverting charitable assets, will now be subject to the scrutiny of an

independent, Court-appointed fiduciary
and may be subject to clawback or other
avoidance actions in the Cayman
liquidation or such other tribunal as
has jurisdiction."

Do you see that?

A. No. You need to scroll down on the --

Q. It's just at the end of paragraph 32 here. It's the last sentence of 32.

A. And so what's your question?

Q. I just want to make sure that you and I are on the same page, because I'm going to ask some questions about this sentence.

A. Yeah.

Q. You're not an expert in Cayman Islands law; fair?

A. Fair.

Q. You're not a lawyer, are you?

A. Nope.

Q. You're not an expert on clawback or other avoidance actions, as that phrase is used in the Dallas Foundation's objection in paragraph 32; fair?

A. Fair.

Q. Do you have any understanding as to

what facts must be established to succeed in a clawback or other avoidance action?

A. Repeat the question.

Q. Do you have any understanding as to what facts somebody needs to prove in order to succeed on a clawback or other avoidance action?

A. Not in a corporate setting.

Q. Is there any other type of setting that would pertain to the Dallas Foundation's claims against Mr. Patrick?

A. No.

Q. Okay. Do you have a view as to the likelihood that the Dallas Foundation might succeed in clawing back or asserting another avoidance action to set aside the settlement agreement if it's approved by the bankruptcy court?

ATTORNEY OKIN: Object to form.

A. I don't know.

BY ATTORNEY MORRIS:

Q. And you don't have a view; is that fair?

A. No, I just really don't know --

Q. If we could --

A. -- whether we will.

Q. Okay. You would have to speculate; is that fair?

A. Yes.

ATTORNEY MORRIS: Can we scroll down to paragraph 33, please.

ATTORNEY OKIN: John, how much longer do you anticipate going? We talked about these being an hour and a half.

ATTORNEY MORRIS: Correct. And we started at exactly 2:37 New York time. I expect to finish at 4:07 New York time.

ATTORNEY OKIN: Are we doing additional questions from anybody else?

ATTORNEY MORRIS: Mr. Phillips, do you have any questions?

You're on mute, sir.

We'll be done in the 90 minutes.

ATTORNEY PHILLIPS: Not at this time.

ATTORNEY MORRIS: Okay. Thank you.

BY ATTORNEY MORRIS:

Q. So in paragraph 33, it says at the end, quote: "Even if approved by this Court, consummation of the settlement is not likely to buy the peace the debtor now seeks."

Do you see that?

A. Yes.
Q. Are you aware of anything in the Dallas Foundation's objection that suggests the Highland parties have done anything wrong here?
A. Repeat that question.
Q. Is there anything in the Dallas Foundation objection that you read and authorized to be filed that suggests that any of the Highland parties have done anything wrong?
ATTORNEY PHILLIPS: I'm going to object to that question because you said that she read and authorized it to be filed.
ATTORNEY MORRIS: I apologize. I apologize. Thank you.
BY ATTORNEY MORRIS:
Q. Let me start again, Ms. Diaz.
Do you recall whether there's anything in the Dallas Foundation objection that asserts that any of the Highland parties have done anything wrong in connection with the entry into the settlement agreement?
A. I don't recall.
Q. Are you aware of any facts that cause you to believe that any of the Highland entities did anything wrong in negotiating and entering

into the settlement agreement?

A. I don't know.

Q. If you're not aware of any facts suggesting that Highland has engaged in wrongdoing, do you know why the Dallas Foundation has informed the Court that consummation of the settlement is not likely to buy the peace the debtor now seeks?

ATTORNEY OKIN: Object to form.

A. I'll abstain from answering that.

BY ATTORNEY MORRIS:

Q. That's not a thing, respectfully.

ATTORNEY MORRIS: If -- Matt, if you want to just help your witness out.

ATTORNEY OKIN: You want me to give her the answer?

BY ATTORNEY MORRIS:

Q. Well, there's no abstention, so you have to answer the question, ma'am.

ATTORNEY OKIN: As best you can answer it, Ms. Diaz, answer it. If you can't answer it, tell him you can't answer it.

A. And I'll just say, when you say "Highland," you want to be more specific?

///

BY ATTORNEY MORRIS:

Q. Sure. Highland Capital Management, LP, the Highland Claimant Trust or the Highland Litigation Subtrust.

A. And so repeat the question.

Q. Okay. If you don't have any facts suggesting that they've done anything wrong, why did the Dallas Foundation inform the Court, at the end of paragraph 33, that consummation of the settlement is not likely to buy the peace the debtor now seeks?

ATTORNEY OKIN: Object to form.

BY ATTORNEY MORRIS:

Q. You can answer.

ATTORNEY OKIN: If you can answer it.

A. Again, I'll just repeat that the peace that the debtor seeks will be tainted because of the harm that will come to the Dallas Foundation.

BY ATTORNEY MORRIS:

Q. Anything else?

A. No.

Q. Is the Dallas Foundation considering bringing any claims against Highland, the Highland Claimant Trust or any of its fiduciaries?

A. (No audible response.)
Q. I'm sorry, ma'am. Did you answer?
A. I did. I said, "No."
Q. Thank you.
In paragraph 34 --
ATTORNEY MORRIS: Yeah, right there. Thank you Nathan --
BY ATTORNEY MORRIS:
Q. -- it says, quote: "There is ample evidence that Mr. Patrick has acted and is acting well outside the scope of his authority and fiduciary obligations."
Have I read that correctly?
A. Yes.
Q. Focusing solely on the settlement agreement, do you have any reason to believe that Mr. Patrick is acting outside of the scope of his authority in entering into the settlement agreement on behalf of each of the HMIT entities?
ATTORNEY OKIN: Object to form.
A. And I don't know.
BY ATTORNEY MORRIS:
Q. Okay. Focusing solely on the settlement agreement, do you have any reason to believe that Mr. Patrick is breaching his

fiduciary obligations by entering into the settlement agreement on behalf of each of the HMIT entities?

A. I don't know.

ATTORNEY MORRIS: Can we scroll up to paragraph 16, please.

Do you see paragraph 16 concerns material nonpublic inside information?

A. Yes.

Q. And was Mr. Dondero the source of the information in this particular paragraph?

A. No.

Q. Who was?

A. My attorneys.

Q. That's how you learned about it; is that fair?

A. Yes.

Q. Do you see there's a reference to a put option in the last line of this paragraph?

A. Yes.

Q. Are you generally familiar with that put option?

A. Yes.

Q. And do you know who the counterparty is for that put option?

A. No, I don't.
Q. You don't know?
A. No.
Q. Did you ever ask?
A. I'm sure when we --
ATTORNEY OKIN: Louis, you're not on mute, by the way.
BY ATTORNEY MORRIS:
Q. Go ahead, Ms. Diaz. I'm sorry.
A. I'm sure when we received the contribution, we asked. And you can ask our CFO that question.
My understanding from the original call in Labor Day weekend to our attorney was that we should call the put. That was a 10-year, I believe, and this would have been at year 7; and we didn't understand why he would be calling to ask that. And ...
Q. Has the Dallas Foundation exercised the put as of today?
A. Absolutely not.
Q. Why not?
A. We stopped all activity because this, again, was the beginning of, why is somebody doing that, not giving us the information, not

talking to us directly; and that -- and at advice of counsel, we -- we have been very careful with any of our activities to date.

Q. And do you know what material nonpublic inside information Mr. Patrick supposedly misused?

A. I'll just tell you the quote he gave us, which was Jim Dondero's spiraling out of control and you need to do this because nothing appears to be what it is.

Q. He didn't tell you who -- withdrawn.

Is that your basis for alleging that he had material nonpublic inside information --

A. I'll -- well, I guess, I can't abstain. I don't know.

Q. Do you have any other --

A. If my --

Q. I'm sorry.

A. Well, if my attorney says, "Don't do that," we don't do it.

Q. I appreciate that. I don't quarrel with you. I'm just trying to learn facts here.

Can you identify any information that you believe Mr. Patrick had that constitutes material nonpublic inside information, as that

phrase is used in the Dallas Foundation's objections?

A. Right.

ATTORNEY OKIN: Hold on, John. I assume you're not -- I assume we're talking about information that's no longer nonpublic?

ATTORNEY MORRIS: If -- if you all want to mark this -- I don't know what it is, Matt, so I can't say. And it's not my information either. So I'm happy to mark it confidential if you really prefer.

ATTORNEY OKIN: I -- I don't even know if she knows the answer to the question.

A. I don't know the answer to that. But I will tell you that we quickly got a call from Skyview saying that Mark Patrick was no longer employed there and that that was confidential, yeah, insider information.

BY ATTORNEY MORRIS:

Q. Oh, so somebody at Skyview told you that; is that fair?

A. That's fair.

Q. And who was that at Skyview?

A. Well, it was an attorney for Skyview.

Q. Was it D.C. Sauder?

A. No. A woman.

Q. Okay. So a female attorney at Skyview told you that Mark Patrick had been terminated and that he had material nonpublic inside information.

Do I have that right?

A. That they were investigating him and understood that we had called the -- he had called -- told us to call the put option.

Q. Okay. But as you sit here today, you're not able to tell me what material nonpublic inside information Mr. Patrick supposedly had; fair?

A. Fair.

ATTORNEY MORRIS: Ma'am, thank you so much. I appreciate your time.

Matt, thank you for a professional deposition.

We'll see you all, I guess, in a little bit for the next deposition.

Thanks, folks.

THE COURT REPORTER: Do you want a copy of the transcript?

ATTORNEY OKIN: Yes, rushed, please. Whenever John gets it.

ATTORNEY PHILLIPS: Yes, expedited, like everybody else.

THE COURT REPORTER: Mr. Lang, do you want a copy of the transcript?

ATTORNEY LANG: Yes, please.

(Whereupon, at 3:08 p.m. Central Time, the proceedings concluded.)

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it. DO NOT make marks or notations on the transcript volume itself.

# E R R A T A

I wish to make the following changes, for the following reasons:

Page Line

_____ _____ CHANGE: ________________________________
REASON: ____________________________________________
_____ _____ CHANGE: ________________________________
REASON: ____________________________________________
_____ _____ CHANGE: ________________________________
REASON: ____________________________________________
_____ _____ CHANGE: ________________________________
REASON: ____________________________________________
_____ _____ CHANGE: ________________________________
REASON: ____________________________________________
_____ _____ CHANGE: ________________________________
REASON: ____________________________________________
_____ _____ CHANGE: ________________________________
REASON: ____________________________________________
_____ _____ CHANGE: ________________________________
REASON: ____________________________________________
_____ _____ CHANGE: ________________________________
REASON: ____________________________________________

C E R T I F I C A T I O N

I hereby certify that I have read the foregoing transcript of my deposition testimony, and that my answers to the questions propounded, with the attached corrections or changes, if any, are true and correct.

-----------------------------------
JULIE DIAZ

CERTIFICATE OF SHORTHAND REPORTER

I, Gail Inghram, Registered Diplomate Reporter, Certified Realtime Reporter, Realtime Systems Administrator, CA-Certified Shorthand Reporter No. 8635, and Notary Public, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.



Gail Inghram,
BA, RDR, CRR, RSA, CA-CSR No. 8635

WORD INDEX

< $ >
**$25** 43:2 56:20
**$300** 42:24

< 1 >
**1** 6:14 63:8, 9
**1:37** 1:16 2:11
**10** 12:20
**10010** 3:24
**10017-2024** 3:16
**10-year** 76:15
**11** 1:8
**1113** 4:10
**15** 6:18
**16** 75:6, 7
**1600** 5:9
**1700** 4:18
**19-34054-sgj11** 1:5
**1st** 10:1

< 2 >
**2:37** 70:10
**2011** 21:9
**2019** 10:9
**2024** 10:1
**2025** 1:15 2:10
**212.849.7615** 3:25
**214.817.4500** 4:20
**22** 1:15 2:10
**225.381.9643** 5:11
**22nd** 3:23
**2390** 4:18
**240** 4:10

< 3 >
**3:08** 80:6
**300-plus** 56:19
**301** 5:9
**30th** 29:14
**310.277.6910** 3:17
**32** 63:6, 14 68:8, 9, 23
**33** 70:5, 21 73:9
**34** 74:5
**34th** 3:15

< 4 >
**4:07** 70:11
**40** 27:24 29:6

< 5 >
**51** 3:23

< 6 >
**63** 6:14

< 7 >
**7** 76:16
**70801** 5:10
**713.228.4100** 4:12
**75201** 4:19
**77002** 4:11
**780** 3:15

< 8 >
**8** 6:6
**8635** 1:22 84:8, 21

< 9 >
**90** 70:17
**9th** 65:25

< A >
**able** 48:23 79:11
**Absolutely** 76:21
**abstain** 18:7 72:10 77:15
**abstention** 72:18
**accepting** 44:12
**access** 28:2
**accommodate** 9:15
**accounting** 24:15
**accounts** 25:18, 25 26:2, 5, 8 27:18, 21 29:24 30:3, 6, 10, 13, 18, 23 44:16, 24 45:6 61:17, 21 62:2
**acted** 74:10
**acting** 17:24 18:5, 23 31:6 74:10, 17
**action** 69:2, 6, 15
**actions** 31:12 67:21 68:3, 21
**activities** 22:23 27:25 77:3
**activity** 14:1 24:12, 25 25:1 27:23 65:23 76:23
**ADAMS** 4:9
**additional** 20:24 70:13
**Administrator** 84:7
**advice** 19:18 77:1
**aegis** 58:3
**affidavit** 22:13
**affiliated** 9:21 11:21 45:19
**affiliates** 10:14, 15 11:25 53:6
**affirmed** 8:6
**afternoon** 8:12
**agendas** 16:7
**ago** 50:17 65:1
**agree** 33:21
**agreed** 23:18
**agreement** 10:18, 23 11:6, 9, 22 14:3, 6, 7 36:15, 18, 20, 22, 25 37:9, 12, 14, 16 38:5, 20 39:1, 10, 22 40:10, 19, 25 42:7 44:6 46:2, 17, 21 51:1, 11, 15, 18 53:4, 9, 19, 22 54:7, 10, 25 57:5, 15, 24 58:8 59:20, 25 60:5, 18 62:3 66:21 67:7 69:16 71:21 72:1 74:16, 19, 24 75:2
**ahead** 56:11 76:9
**ahurt@kellyhart.com** 5:7
**alleging** 77:12
**allocated** 29:3
**allow** 9:2, 7
**AMELIA** 5:6
**amount** 23:18
**ample** 74:9
**ancillary** 65:23
**annuities** 26:10, 21, 25 27:4, 6, 14 29:7
**annuity** 26:13, 17 28:18, 21
**ANSWER** 7:3 9:4, 8 18:9 19:17, 19 32:25 33:9 35:21 39:11, 16 42:8 43:11 46:9, 12 48:24 52:2 55:6 56:11 72:16, 19, 20, 21, 22 73:14, 15 74:2 78:13, 14
**answering** 18:7 72:10
**answers** 48:21 83:8
**anticipate** 70:7
**anybody** 18:4, 22 25:9 30:1, 20 39:7, 19, 24, 25 40:13 46:7, 14 60:11 66:3, 9 70:13
**apologize** 20:15 33:2 59:4 65:16 71:13, 14
**apparent** 67:23
**appear** 63:16 66:14
**appearance** 44:17 66:10
**appeared** 3:2 32:1 33:5 44:14
**appears** 77:10
**appointed** 63:22 64:1
**appreciate** 18:10 25:3 39:18 49:4 77:21 79:16
**appreciated** 57:25
**approval** 30:21
**approve** 29:12 61:9, 13, 21
**approved** 36:16 37:22 38:5, 20 41:24 42:7 43:18 65:4 69:16 70:22
**Approving** 6:17
**approximately** 2:11
**April** 10:1
**arising** 54:10
**arm's-length** 51:3, 19
**articulate** 56:2
**aside** 69:15
**asked** 25:4 32:22 39:7 46:6, 14 59:4 66:9 76:11
**asking** 25:3 29:16 40:12 48:18 49:11
**asserting** 69:14

**assertion** 53:*3*
**asserts** 71:*18*
**asset** 22:*11* 48:*5*
**assets** 18:*16* 24:*25* 26:*9* 36:*17*, *19* 37:*5*, *8*, *21* 38:*4*, *9*, *11*, *19*, *25* 39:*9*, *21* 40:*8*, *15*, *24* 41:*3*, *8*, *18* 42:*6*, *24* 44:*3*, *5*, *7* 45:*25* 46:*16* 47:*13*, *23* 48:*3* 53:*15*, *16* 56:*14*, *16* 57:*1* 58:*3* 67:*24*
**assume** 78:*5*
**assumed** 58:*16*
**assuming** 36:*19* 48:*2* 54:*11*
**Atlas** 41:*4*, *9*, *12*, *16* 42:*1* 47:*7* 48:*6* 49:*13*
**attached** 63:*11* 83:*9*
**Attorney** 6:*6* 8:*11*, *16* 19:*16*, *22* 31:*5*, *14*, *17*, *18*, *20*, *24* 35:*19*, *20* 36:*3*, *5*, *11*, *13* 37:*24* 38:*1*, *7*, *14* 39:*2*, *4*, *11*, *15* 41:*1*, *6* 42:*16*, *18* 43:*23* 44:*1* 46:*3*, *5*, *8*, *10*, *11* 48:*10* 49:*3*, *5*, *24* 50:*1*, *13*, *15* 51:*25* 52:*1*, *8*, *9* 54:*16*, *18* 55:*1*, *5*, *14*, *16*, *21*, *23* 56:*5*, *7*, *9* 57:*2*, *7*, *11*, *17*, *20* 58:*9*, *12* 59:*10*, *13* 60:*7*, *10*, *19*, *22* 62:*4*, *7*, *11* 63:*5*, *12* 64:*4*, *8*, *11* 66:*23* 67:*1*, *12*, *14* 69:*18*, *20* 70:*4*, *6*, *9*, *12*, *14*, *18*, *19*, *20* 71:*10*, *13*, *15* 72:*9*, *11*, *13*, *15*, *17*, *20* 73:*1*, *12*, *13*, *15*, *19* 74:*6*, *8*, *20*, *22* 75:*5* 76:*6*, *8*, *14* 77:*19* 78:*4*, *7*, *12*, *19*, *24* 79:*2*, *15*, *24* 80:*1*, *5*
**attorneys** 75:*14*
**audible** 74:*1*
**authority** 57:*4*, *9*, *14* 58:*15* 67:*10* 74:*11*, *18*
**authorization** 31:*2* 66:*20*
**authorized** 19:*3* 37:*15* 52:*21*, *25* 53:*25* 54:*19* 63:*17* 71:*7*, *12*
**authorizing** 12:*6*
**available** 26:*17*
**Avenue** 3:*15*, *23* 4:*18*
**avoidance** 68:*3*, *21* 69:*2*, *6*, *15*
**aware** 8:*20* 10:*7*, *11*, *17* 11:*3*, *4*, *8*, *11*, *12*, *20* 12:*9*, *23* 22:*12* 23:*7* 24:*3*, *6* 25:*16* 30:*12* 34:*12*, *16* 36:*14* 47:*13*, *23* 48:*5* 49:*16* 50:*16*, *25* 51:*4*, *8* 53:*18* 54:*6* 55:*11*, *17* 63:*21* 64:*16*, *18* 65:*2*, *19*, *22* 71:*2*, *23* 72:*3*

< B >
**BA** 1:*22* 84:*21*
**back** 10:*8* 47:*22* 69:*14*
**backdrop** 56:*17*
**bad** 62:*18*
**BANKRUPTCY** 1:*1* 10:*8*, *12* 32:*2*, *6* 33:*6*, *15* 34:*13* 38:*6* 44:*14*, *18*, *22* 45:*1* 50:*17* 69:*16*
**Barbara** 20:*11*, *22* 21:*3*, *7*, *12*, *16* 22:*8*
**BARTLETT** 4:*9*
**based** 53:*2* 56:*12*
**basically** 13:*14*
**basis** 13:*25* 43:*7* 53:*17* 55:*24* 56:*3* 77:*12*
**Baton** 5:*10*
**beginning** 2:*11* 76:*24*
**behalf** 3:*4*, *19* 4:*3*, *14* 5:*3* 11:*9*, *13* 12:*10* 17:*25* 18:*5*, *23* 23:*3*, *14* 24:*8*, *9*, *23* 25:*6*, *17* 27:*17*, *21* 29:*23* 30:*2*, *6*, *7*, *22* 31:*22* 46:*20* 54:*1*, *20* 57:*5*, *15* 58:*22* 59:*8* 74:*19* 75:*2*
**behavior** 42:*25*
**believe** 13:*23* 18:*4* 20:*1* 32:*3*, *15*, *20* 35:*15*, *25* 36:*7* 37:*19* 38:*2* 40:*22* 41:*8*, *22* 50:*10* 51:*22* 54:*2* 57:*3* 58:*20* 59:*5*, *14*, *21* 62:*25* 66:*18* 67:*4*, *9* 71:*24* 74:*16*, *25* 76:*16* 77:*24*
**believed** 18:*23*
**best** 14:*22* 21:*18*, *22* 22:*3* 27:*5* 32:*4*, *9* 33:*4* 35:*3*, *7*, *10* 72:*20*
**bit** 62:*20* 67:*15* 79:*20*
**block** 31:*21*
**bottom** 67:*16*
**Bradshaw** 22:*8*
**breaching** 74:*25*
**break** 9:*14*, *16*
**bring** 50:*18*
**bringing** 73:*23*
**business** 23:*21* 49:*18* 58:*1*
**buy** 70:*24* 72:*7* 73:*10*

< C >
**CA-Certified** 84:*7*
**CA-CSR** 1:*22* 84:*21*
**calendar** 65:*5*, *6*
**call** 63:*7* 76:*14*, *15* 78:*15* 79:*9*
**called** 10:*5* 12:*10* 20:*7*, *19* 34:*13*, *17* 35:*6*, *12* 79:*8*, *9*
**calling** 76:*17*
**CAPITAL** 1:*6* 3:*4* 8:*16* 10:*5*, *7* 21:*9* 34:*24* 35:*2*, *16*, *25* 36:*7* 50:*19* 51:*24* 52:*18* 53:*5* 55:*19* 73:*2*
**careful** 77:*2*
**carefully** 18:*20*
**Carrera** 22:*7*
**Case** 1:*5* 32:*2*, *6* 33:*6*, *15* 42:*22* 66:*11*, *14*, *17* 84:*16*
**cases** 65:*14*
**cash** 27:*3*, *6* 36:*17* 44:*10*
**cause** 71:*23*
**caused** 29:*22*
**caution** 19:*17*
**Cayman** 20:*4* 21:*21* 22:*13* 23:*1* 42:*23* 56:*18* 63:*22* 64:*13* 68:*3*, *15*
**ceased** 23:*22* 24:*12*
**Central** 1:*16* 2:*11* 80:*6*
**CEO** 9:*23*, *25* 10:*2* 22:*6*, *7*, *8* 31:*3*
**CEOs** 22:*4*
**certain** 8:*19* 10:*14* 25:*18* 38:*19* 50:*18* 62:*24*
**Certainly** 47:*6*
**CERTIFICATE** 84:*2*
**Certified** 2:*14*, *15* 84:*6*
**certify** 83:*6* 84:*10*
**cetera** 43:*17*
**CFO** 15:*22* 76:*11*
**chance** 63:*2*
**change** 42:*10* 82:*6*, *8*, *10*, *12*, *14*, *16*, *18*, *20*, *22*
**changes** 24:*16* 50:*11* 53:*14* 81:*3* 82:*3* 83:*9*
**changing** 47:*10*
**Chapter** 1:*8*
**charitable** 13:*23* 14:*1* 24:*25* 26:*12* 38:*8* 42:*24* 57:*1* 67:*24*
**chart** 48:*13*
**chief** 31:*3*

**City** 20:*11*, *20* 21:*3*, *5*, *6*, *11*, *16* 22:*7*
**claim** 32:*5*, *18* 33:*14* 44:*21*, *25* 53:*4*, *7* 55:*12*, *18*
**Claimant** 3:*5* 32:*12*, *16*, *21* 33:*20*, *24* 34:*14*, *17*, *20* 35:*7*, *13* 45:*4*, *7*, *14* 52:*5* 55:*20* 73:*3*, *24*
**claimed** 53:*12*
**claims** 50:*18* 69:*10* 73:*23*
**clarify** 10:*20*
**CLARITY** 7:*22*
**clawback** 68:*2*, *20* 69:*2*, *6*
**clawing** 69:*14*
**clear** 33:*3* 34:*5* 65:*10*
**clearly** 31:*21*
**clients** 31:*8* 62:*17*
**cold** 48:*15*
**come** 73:*18*
**commenced** 21:*21* 22:*15*
**commitment** 23:*23*
**common** 23:*21*
**communicate** 24:*12*
**communicated** 58:*16*, *17*, *21* 64:*22*
**communication** 24:*14* 28:*3*
**community** 14:*19* 20:*13* 21:*2*, *4* 22:*9*, *14*
**company** 10:*4*
**complete** 37:*4*
**compliance** 38:*10*
**concern** 42:*5* 54:*14*, *23*
**concerned** 27:*24* 42:*20*, *22* 65:*23*
**concerning** 51:*14*
**concerns** 75:*7*
**concluded** 80:*7*
**confer** 25:*10*
**confidential** 78:*11*, *17*
**confused** 64:*6*
**confusing** 16:*4*
**connection** 8:*18* 23:*25* 52:*13* 71:*20*
**consent** 16:*7* 30:*21* 57:*23* 59:*7* 62:*2* 67:*6*
**consider** 66:*7*
**considering** 73:*22*
**constitutes** 77:*24*
**consult** 9:*17*
**consummation** 70:*23* 72:*6* 73:*9*
**Cont'd** 4:*1* 5:*1*
**contend** 52:*17* 53:*21*
**contends** 50:*25* 53:*18*
**context** 18:*11*
**continue** 49:*3*
**contractual** 13:*21* 34:*23* 35:*2*, *6*, *11* 45:*10*, *13*
**contractually** 58:*14*
**contribution** 43:*14* 76:*11*
**contributions** 13:*24* 14:*9* 21:*8*
**control** 56:*15* 60:*24* 61:*6*, *17* 77:*9*
**controlled** 47:*17* 49:*12*
**controls** 47:*20*
**conversations** 39:*13*
**convey** 46:*16*
**conveying** 19:*18*
**copy** 25:*13* 66:*3* 79:*23* 80:*4*
**corporate** 50:*2* 69:*7*
**corporations** 64:*17*
**correct** 15:*1* 16:*2* 32:*7* 33:*8*, *16*, *20* 47:*24* 52:*19* 70:*9* 83:*10* 84:*11*
**corrections** 81:*3* 83:*9*
**correctly** 74:*13*
**counsel** 19:*19* 29:*13* 39:*13* 77:*2* 84:*15*
**counterpart** 18:*13*
**counterparty** 75:*24*
**couple** 50:*16*
**COURT** 1:*1* 10:*12* 37:*9*, *23* 38:*6* 43:*18* 50:*17* 63:*23* 69:*17* 70:*22* 72:*6* 73:*8* 79:*22* 80:*3*
**Court-appointed** 67:*17* 68:*1*
**COVID** 62:*14*
**CRAWFORD** 4:*17*
**created** 67:*22*
**Crown** 4:*3* 6:*15* 25:*18*, *21*, *22* 26:*9* 27:*18*, *25* 28:*5*, *9*, *15* 30:*13*, *16*, *21* 31:*1*, *9*, *12*, *23* 34:*2*, *7* 37:*6*, *8* 41:*25* 43:*1* 44:*13*, *20* 45:*3*, *9*, *12*, *20*, *24* 46:*15* 49:*9*, *10*, *20* 57:*23* 58:*7* 59:*7*, *15*, *22* 60:*15* 61:*5*, *12*, *16*, *20*
**CRR** 1:*22* 84:*21*
**cumbersome** 62:*21*
**CURRY** 4:*7*, *9*

**< D >**
**D.C** 78:*25*
**DAF** 20:*8* 64:*15*
**DALLAS** 1:*3* 4:*3*, *19* 6:*14* 8:*18* 9:*21*, *25* 10:*11*, *18*, *23* 12:*3*, *11*, *15*, *16*, *18*, *21* 13:*5*, *7*, *8*, *10*, *13*, *15*, *18*, *20*, *22* 14:*4*, *8*, *9*, *13*, *23* 15:*2*, *6*, *8*, *9*, *19* 16:*3*, *4* 17:*5*, *21*, *25* 18:*1*, *6*, *24* 20:*12*, *23*, *25* 21:*2*, *5*, *6*, *11*, *16* 22:*20* 23:*14*, *24* 24:*4*, *7*, *8*, *21*, *22* 25:*4*, *5*, *8*, *16*, *25* 27:*1*, *7*, *11*, *12*, *16*, *20* 28:*4*, *8*, *21*, *23* 29:*23* 30:*1*, *7*, *20* 31:*7*, *9*, *15*, *22*, *25* 32:*5*, *15*, *20* 33:*5*, *14*, *19*, *23* 34:*19*, *22* 35:*1*, *5*, *11*, *18* 36:*2*, *9* 37:*10*, *20* 38:*3*, *24* 39:*8*, *20* 40:*8*, *17*, *22* 41:*22* 42:*4*, *11*, *12*, *13* 43:*20*, *21* 45:*21* 48:*25* 49:*6*, *15*, *18*, *23* 50:*4*, *12* 52:*16* 53:*3*, *18*, *21* 54:*1*, *13*, *20*, *22* 55:*12*, *18*, *25* 56:*4* 57:*22* 58:*6*, *21* 59:*6*, *15*, *17* 60:*2*, *23* 61:*8* 62:*9*, *22* 65:*19* 66:*4* 68:*22* 69:*9*, *13* 71:*3*, *6*, *18* 72:*5* 73:*8*, *18*, *22* 76:*19* 78:*1*
**D'AMBRA** 5:*14*
**date** 56:*15* 77:*3*
**DAVID** 4:*7*
**day** 43:*12* 65:*9* 76:*14*
**dcurry@okinadams.com** 4:*8*
**de** 22:*11*
**dealings** 49:*18*
**Debbie** 22:*6*
**Debtor** 1:*8* 70:*24* 72:*8* 73:*11*, *17*
**decided** 43:*19*
**decision** 17:*6* 25:*11*
**decisions** 56:*24*
**declaration** 22:*13*, *20* 23:*1*
**decline** 29:*17*, *19*, *22*
**Defendant** 4:*3*, *14*
**definitively** 40:*5*
**Delaware** 64:*17*, *20*
**DEMO** 3:*8*
**DEPONENT** 81:*1*
**deposed** 8:*22*
**DEPOSITION** 1:*13* 2:*9* 7:*1* 8:*17* 11:*18* 12:*1* 45:*17* 79:*18*, *20* 81:*3* 83:*7*
**depositions** 62:*16*
**described** 37:*21* 42:*10* 43:*9* 50:*4*
**detail** 65:*14*
**DIAZ** 1:*14* 2:*9* 6:*5* 8:*5*, *12* 19:*17* 31:*10*, *25* 36:*22* 39:*12* 46:*9*, *12* 48:*16* 58:*13* 62:*12* 64:*4* 71:*16* 72:*21* 76:*9* 83:*12*
**different** 43:*16* 48:*21*
**diminished** 38:*11*
**Diplomate** 2:*14* 84:*5*

**DIRECT** 7:23 32:20 59:18, 23
**directed** 21:25 22:2
**direction** 2:16
**directly** 28:22 49:16 77:1
**disburse** 41:18 42:1
**disbursement** 28:17
**disclosed** 24:4
**disclosing** 39:13
**discussions** 20:1
**disrespectful** 65:16
**DISTRICT** 1:2
**diverting** 67:24
**DIVISION** 1:3
**document** 41:7 52:24 55:2 63:1
**DOCUMENTS** 7:7 16:16 40:21 62:19
**doing** 31:22 56:18 66:7 70:12 76:25
**dollars** 56:19
**donation** 13:2, 4
**donations** 13:22
**Dondero** 12:24 13:1, 3, 4 14:12 15:21 16:7, 25 17:4, 20, 24 18:4, 22 19:6 21:10, 25 22:12 25:10 40:7 75:10
**Dondero's** 23:1 77:8
**donor-advised** 13:13
**dramatic** 24:16
**Dugaboy** 4:14
**duly** 8:6
**duties** 35:17 36:1, 8 49:22
**duty** 50:12 58:5

**< E >**
**earlier** 27:22 50:3
**effectuated** 50:10
**effectuates** 13:14
**either** 38:11 59:6 78:10
**EMANUEL** 3:22
**employed** 78:17 84:15
**employee** 45:21
**Empower** 12:10, 15, 16, 21 13:5, 7, 20 14:4, 9, 13, 23 15:2, 9, 19 16:3, 4 24:8, 10, 21 25:4, 8 27:1, 7, 12 28:21
**engaged** 18:13 72:4
**ensure** 38:12
**enter** 22:10 57:4, 10, 14 61:23
**entered** 51:1 61:10, 13
**entering** 57:24 58:7 59:8 62:2 66:20 67:6 71:25 74:18 75:1
**entities** 11:21 12:1 17:7, 8 20:16 21:20, 25 22:2 36:15, 16 41:24 43:16 46:1, 19, 20, 25 47:3 48:13 49:8, 11, 12, 13, 14, 17, 22 50:11 51:2, 7 54:7, 8 57:6, 16 58:5 59:9, 19, 24 60:4, 17, 25 61:6, 10, 14, 18, 22 62:1 64:17, 19 65:4 67:22 71:24 74:19 75:3
**entitled** 14:8 38:24
**entity** 12:10, 13 13:11 15:17 17:1, 3 20:7 34:13, 17 35:6, 12 41:12, 16 47:24 49:10 55:13 63:25 64:3, 12
**Entry** 6:16 71:20
**erosion** 56:14
**Errata** 81:5
**ESQ** 3:6, 8, 10, 12, 20 4:5, 7, 15 5:4, 6
**essence** 24:11
**essentially** 27:23
**established** 69:1
**et** 43:17
**everybody** 80:2
**evidence** 74:10
**exactly** 70:10
**EXAMINATION** 6:4 8:10
**examined** 8:8
**excuse** 16:1 18:8
**executed** 10:22
**exercise** 15:11
**exercised** 76:19
**Exhibit** 63:9
**existence** 12:19
**expect** 70:10
**expectations** 42:12
**expected** 41:13
**expedited** 80:1
**expenses** 23:19, 24
**expensive** 62:17
**expert** 68:15, 20
**expressed** 54:23
**extent** 48:25

**< F >**
**fact** 56:13
**facts** 17:18, 21 51:13, 17 55:11, 17 57:12 69:1, 5 71:23 72:3 73:6 77:22
**fail** 9:8
**fair** 9:5, 19 19:7, 8 26:18 32:14, 17 33:11 34:18 37:17, 18 40:13 42:4 43:5 44:8 50:5, 23, 24 52:11, 13, 25 54:15 59:2, 3 65:12 68:16, 17, 23, 24 69:22 70:2 75:16 78:21, 22 79:13, 14
**fairly** 62:23
**fall** 24:13
**familiar** 10:4 12:13 14:25 15:25 19:2, 3 26:4 36:24 46:24 47:2, 4 52:24 64:21 75:21
**familiarity** 22:19 47:5
**Family** 15:24 16:22 24:10 27:2, 13 28:22
**fault** 34:4
**feeds** 34:1
**feel** 48:8
**female** 79:2
**fiduciaries** 24:24 73:25
**fiduciary** 28:13 38:9 67:17 68:1 74:12 75:1
**file** 24:7, 22 25:5 27:20 29:23 30:2
**filed** 10:8, 12 12:4, 10 22:12 24:9 25:14, 17 27:17 30:7 31:7, 15 32:2, 5 33:6, 14 42:3 44:17, 20, 25 50:16 52:25 65:25 71:8, 12
**filing** 12:7 19:9 22:10 30:22 52:14, 21 54:1, 20 58:18, 22
**finance** 29:3
**financial** 84:17
**find** 48:20 55:3
**fine** 55:4 64:9
**finish** 9:3, 7 70:11
**first** 8:6
**first-quarter** 29:13
**flag** 24:17
**Floor** 3:15, 23
**flow** 13:12 26:14 37:6, 8 41:4 53:13
**flowed** 47:7
**Flows** 26:15 29:2 56:16
**focus** 49:11
**focused** 34:5
**Focusing** 74:15, 23
**folks** 79:21
**following** 82:3, 4
**follows** 8:8
**foregoing** 83:7 84:9, 10
**form** 35:19 36:3, 11 37:24 38:7 39:2 41:1 42:16 43:23 46:3 49:24 50:13 51:25 52:8 54:16 55:1, 14, 21 56:5, 10 57:7, 17 58:9 59:10 60:7, 19 62:4 66:23 67:12 69:18 72:9 73:12 74:20

**formal** 22:*10*
**Formally** 10:*1*
**formation** 18:*12*
**formed** 12:*21* 34:*14*, *18* 64:*19*
**forth** 17:*18*, *21* 42:*12* 44:*5*
**forward** 38:*12*
**found** 29:*16*
**Foundation** 4:*3* 6:*15* 9:*22*, *25* 10:*3*, *12*, *18*, *23* 12:*11*, *15*, *16*, *18*, *22* 13:*5*, *7*, *8*, *11*, *14*, *21*, *22* 14:*4*, *5*, *8*, *14*, *23* 15:*2*, *4*, *6*, *8*, *9*, *19*, *24* 16:*4*, *22* 18:*1*, *6*, *24* 20:*11*, *12*, *14*, *21*, *22*, *23*, *25* 21:*2*, *3* 22:*9* 23:*14*, *25* 24:*7*, *8*, *10*, *21*, *22* 25:*4*, *5*, *8*, *17* 27:*1*, *2*, *8*, *11*, *12*, *13*, *16*, *20* 28:*4*, *8*, *22*, *23* 29:*23* 30:*1*, *7*, *20* 31:*7*, *9*, *16*, *22* 32:*1*, *5*, *15*, *20* 33:*5*, *14*, *19*, *23* 34:*19*, *22* 35:*1*, *5*, *11*, *18* 36:*2*, *10* 37:*10*, *20* 38:*3*, *24* 39:*8*, *14*, *20* 40:*8*, *17*, *23* 41:*22* 42:*14* 43:*20*, *21* 45:*22* 49:*6*, *15*, *18*, *23* 50:*12* 52:*16* 53:*3*, *18*, *21* 54:*2*, *13*, *21*, *23* 55:*12*, *18* 57:*23* 58:*6*, *21* 59:*15*, *17* 60:*2*, *23* 61:*8* 69:*13* 71:*7*, *18* 72:*5* 73:*8*, *18*, *22* 76:*19*
**foundations** 21:*2*, *4*, *12* 26:*18* 29:*4*
**Foundation's** 8:*18* 12:*3* 17:*5*, *22* 22:*14*, *20* 24:*5* 26:*1* 42:*5*, *11*, *12* 49:*1* 50:*4* 55:*25* 56:*4* 59:*7* 62:*9*, *22* 65:*20* 66:*4* 68:*22* 69:*9* 71:*3* 78:*1*
**four** 21:*1* 51:*9*
**fully** 63:*2*
**fund** 13:*8*, *13* 14:*6*, *7* 23:*20*, *23*, *24* 26:*11* 41:*4*, *9* 53:*14*
**funded** 26:*24*
**fundholder** 14:*17*
**fundholders** 14:*20* 23:*19*
**funding** 23:*2*, *7*, *10*, *13*, *17*
**funds** 14:*2* 16:*3* 43:*1* 53:*13*
**fund's** 67:*22*
**further** 67:*15*
**future** 53:*16*

**< G >**
**Gail** 1:*21* 2:*13* 84:*5*, *21*
**gdemo@pszjlaw.com** 3:*9*
**generally** 11:*24* 36:*24* 50:*5* 75:*21*
**gentleman** 11:*8* 50:*19*
**give** 43:*19* 49:*14* 55:*12* 56:*24* 63:*2* 72:*15*
**given** 58:*15*
**giving** 76:*25*
**Global** 4:*3* 6:*15* 25:*18*, *21*, *22* 26:*9* 27:*18*, *25* 28:*5*, *9*, *15* 30:*13*, *16* 31:*1*, *9*, *23* 34:*2*, *7* 37:*6*, *8* 41:*25* 43:*1* 44:*13*, *20* 45:*3*, *9*, *12*, *20*, *24* 46:*15* 49:*9*, *10*, *20* 58:*7* 59:*15*, *22* 60:*15* 61:*5*, *12*, *16*, *20*
**Global's** 30:*21* 31:*12* 57:*23* 59:*7*
**go** 23:*21* 28:*21*, *25* 41:*9* 56:*11* 76:*9*
**going** 9:*1* 40:*9* 45:*16* 47:*22* 48:*16*, *20*, *21* 51:*8* 62:*7*, *24* 68:*12* 70:*7* 71:*10*
**Good** 8:*12* 62:*13*, *14*
**good-faith** 51:*3*, *19*
**governance** 13:*25* 15:*3* 29:*1*
**GPs** 43:*17*
**grant** 13:*12*, *14*
**grant-making** 12:*18* 18:*15*
**grants** 14:*18*
**GREGORY** 3:*8*
**ground** 8:*24*
**guess** 30:*11* 48:*3* 77:*14* 79:*19*

**< H >**
**half** 70:*8*
**HALL** 5:*18*
**HALLMAN** 5:*8*
**happening** 22:*24* 42:*25* 56:*25*
**happens** 42:*5*, *20* 56:*22*
**happy** 9:*15* 78:*10*
**harm** 73:*18*
**HART** 5:*8*
**HAYLEY** 3:*12*
**head** 39:*6* 50:*8*
**hear** 8:*13*
**heard** 32:*11*
**held** 2:*9* 25:*18*
**he'll** 48:*23*
**help** 48:*14* 72:*14*
**hereto** 63:*11*
**Hernandez** 31:*4*
**high** 26:*6*, *7* 37:*1*, *2* 38:*18*
**HIGHLAND** 1:*6* 3:*4*, *19* 6:*12*, *14* 8:*16* 10:*5*, *7*, *14*, *22* 17:*7* 20:*12* 21:*6*, *9* 32:*1*, *6*, *11*, *16*, *21* 33:*6*, *15*, *20*, *23* 34:*6*, *10*, *13*, *17*, *20*, *23* 35:*2*, *7*, *12*, *16*, *25* 36:*7*, *15* 41:*24* 43:*4*, *8*, *12* 44:*14*, *17*, *21*, *25* 45:*1*, *4*, *7*, *10*, *13* 46:*16* 50:*19*, *25* 51:*6*, *23* 52:*5*, *18* 53:*5* 54:*8* 55:*13*, *19* 58:*18*, *23* 63:*8*, *9* 65:*4*, *8* 71:*4*, *9*, *19*, *24* 72:*4*, *24* 73:*2*, *3*, *23*, *24*
**Highland/HMIT** 19:*15*, *24*
**Highland's** 65:*2*
**HMIT** 11:*17*, *21*, *25* 17:*7* 36:*16* 37:*21* 38:*4*, *18*, *25* 39:*9*, *21* 40:*9*, *24* 41:*8*, *19*, *24* 42:*6*, *21* 45:*25* 46:*1*, *16*, *19* 48:*5* 49:*8*, *10*, *22* 50:*11*, *16* 51:*2*, *7* 54:*7* 57:*6*, *15* 58:*4* 59:*9*, *19*, *23* 60:*4*, *16*, *24* 61:*6*, *10*, *14*, *18*, *22*, *25* 64:*16*, *18* 65:*4* 74:*19* 75:*3*
**HMIT/Highland** 40:*18* 41:*14*
**hold** 16:*12* 78:*4*
**Holdco** 20:*8* 64:*15*
**holds** 47:*24*
**hour** 70:*8*
**Houston** 4:*11*
**Hunter** 5:*3* 10:*15* 11:*4*, *10*, *14*, *16* 34:*1*, *9* 37:*5* 41:*3* 47:*11*, *14*, *22* 48:*9*, *17* 49:*13* 53:*22* 54:*4* 58:*22*
**HURT** 5:*6*
**hwinograd@pszjlaw.com** 3:*13*

**< I >**
**idea** 19:*9*, *12*, *13*, *14*, *23*
**identification** 63:*10*
**identified** 21:*13* 25:*25* 41:*17*
**identify** 10:*21* 11:*1* 15:*20* 26:*23* 30:*5* 41:*11* 64:*12* 77:*23*
**imagine** 65:*13*
**impact** 42:*2*
**impacted** 41:*23*
**impacts** 43:*1*
**important** 9:*2*
**including** 67:*21*
**income** 26:*11*, *13* 27:*7*
**independent** 68:*1*

**INDEX** 7:1
**indicate** 81:3
**indirect** 32:21 60:3, 6, 16
**indirectly** 41:5
**individual** 16:8
**inform** 73:8
**information** 17:25 18:5, 14, 24 19:6 58:2, 6 75:8, 11 76:25 77:5, 13, 23, 25 78:6, 10, 18 79:5, 12
**informed** 25:12 63:3 65:8 72:6
**Inghram** 1:21 2:13 84:5, 21
**insertion** 67:21
**inside** 75:8 77:5, 13, 25 79:4, 12
**insider** 78:18
**insignificant** 56:20
**INSTRUCTED** 7:3
**INSTRUCTIONS** 81:1
**Insurance** 4:4 25:19, 22 26:10, 21
**intended** 54:12
**interest** 32:16, 21 33:19, 23 34:20 40:23 45:4, 7 59:18, 23 60:3, 16 84:17
**interested** 18:18
**interim** 10:2
**interrupt** 31:5 48:10
**investigate** 25:2
**investigating** 79:7
**Investment** 4:14 5:3 10:15 11:5, 10, 14, 17 47:12, 14, 23 53:23 54:4 58:23
**involved** 43:12, 13 58:3
**involvement** 11:11 14:16, 18 17:1, 2 43:8
**irregular** 25:1 56:14
**irregularities** 24:14
**IRS** 13:11
**Islands** 20:4 21:21 22:13 23:1 42:23 56:18 64:13 68:15
**issues** 23:22 47:9 48:23
**its** 12:7 13:23 15:3 18:1, 6 24:23 25:5 27:20 42:13 52:16 53:5 73:24 84:17

**< J >**
**Jackie** 22:7
**JAMES** 5:19 50:20
**JEFFREY** 3:10
**Jim** 12:23, 25 15:21 16:7 19:5 77:8
**jmorris@pszjlaw.com** 3:7
**job** 38:8, 12
**JOHN** 3:6 8:15 31:6 48:11 70:6 78:4 79:25
**joint** 63:16, 21 64:1, 23 65:18 66:4, 9, 13, 19 67:5, 10
**JONES** 3:14 5:18
**jpomerantz@pszjlaw.com** 3:11
**JULIE** 1:14 2:9 6:5 8:5 83:12
**June** 1:15 2:10 65:25
**jurisdiction** 68:5
**justify** 31:12

**< K >**
**Kansas** 20:11, 19, 20 21:3, 5, 6, 11, 16 22:7
**keep** 48:15, 18
**KELLY** 5:8
**kind** 14:3 33:19
**know** 9:9, 12 12:21 13:15, 18, 20 14:10, 12 16:25 17:4 18:22 19:9, 12, 14, 23 21:10 26:20 27:16 28:2 29:8, 15 30:9 31:2, 25 32:25 33:9 37:7 39:3, 5 40:20 41:4, 16, 20 42:17 43:6, 11, 24 44:2, 9, 11, 13, 15, 16, 19, 20, 23, 24 45:2, 3, 5, 6, 8, 9, 11, 12, 19, 24 46:4 48:4 49:6, 25 50:14 52:3, 4, 7, 20 53:24 54:17 57:9 58:4, 13, 14, 25 59:12, 17, 22 60:1, 2, 9, 15, 21, 23 61:2, 5, 7, 8, 11, 12, 15, 16, 19, 20, 24, 25 62:6, 13 63:1, 25 65:21 66:3, 6, 9, 12, 16, 22 67:3, 8, 13 69:19, 23 72:2, 5 74:21 75:4, 24 76:2 77:4, 15 78:8, 12, 14
**knowledge** 14:22 21:18 22:3 25:15 32:4, 9 33:4, 10, 12, 13, 17, 18, 22 34:19 35:3, 8, 10 49:1 51:5, 13, 17
**knows** 78:13

**< L >**
**L.P** 1:7
**Labor** 76:14
**lack** 53:12
**LANG** 4:15, 17 80:3, 5
**language** 14:11
**large** 20:7, 9
**law** 68:16
**laws** 64:19
**lawsuit** 58:18, 22
**lawyer** 9:17 43:10 68:18
**lawyers** 46:9
**lead** 40:22
**leading** 24:15
**leads** 41:8
**learn** 22:25 23:10 77:22
**learned** 18:17 23:4, 5 56:23 62:15 75:15
**leave** 43:17
**led** 29:9
**legal** 23:19, 22 31:3 43:16 57:14
**lengthy** 62:23
**level** 26:6, 8 37:1, 3 38:18
**liabilities** 54:9
**Life** 4:4 25:19, 21
**likelihood** 69:13
**Limited** 25:19, 22
**LINE** 7:4, 8, 13, 17 75:19 82:5
**liquidation** 64:13 68:4
**liquidators** 63:16, 22 64:1, 23 65:19 66:5, 10, 14, 20 67:6, 10
**liquidity** 56:16
**listen** 18:19
**lists** 16:14
**literally** 16:14
**Litigation** 3:19 22:15 23:2, 8, 11, 12, 13, 17, 25 73:4
**little** 62:20 67:15 79:20
**LITTLETON** 5:20 15:22 48:22
**Littleton's** 45:17
**LLP** 3:22 4:9 5:8
**LOIGMAN** 3:20
**long** 19:18
**longer** 70:6 78:6, 16
**look** 31:20 65:5
**looking** 16:10, 13
**losing** 53:15
**lot** 18:11, 14, 18 44:12 56:15 65:13
**LOUIS** 5:4 76:6
**Louisiana** 5:10
**lower** 29:15
**LP** 10:5, 8 34:24 35:3, 17 36:1, 8 51:24 53:5 55:19 73:3
**lphillips@kellyhart.com** 5:5
**LPs** 43:17

**< M >**
**Ma'am** 16:9 52:2, 22 55:6 56:8 65:16 67:2 72:19 74:2

79:15
**Madison** 3:23
**Main** 5:9
**majority** 15:7, 8
**making** 14:18 53:3 65:18
**MANAGEMENT** 1:6 3:4 8:16 10:5, 8 14:13, 15 18:16 34:24 35:3, 17 36:1, 8 50:19 51:24 52:18 53:5 55:19 73:2
**managing** 41:5
**March** 29:14
**Mark** 11:9 24:20 40:15 41:4 42:9 43:19 46:20 49:12 57:4 65:24 78:8, 10, 16 79:3
**MARKED** 7:16 63:10
**MARKS** 7:22 81:6
**material** 75:8 77:4, 13, 25 79:4, 11
**Matt** 64:8 72:13 78:9 79:17
**MATTTHEW** 4:5
**mean** 12:25 14:15 28:13 46:20 55:2 65:15
**member** 16:8
**memory** 48:19
**mentioned** 29:5
**met** 42:13 64:2 65:10
**MICHAEL** 4:15
**million** 42:24 43:2 56:19, 20
**mind** 41:12 48:15 65:10
**minimis** 22:11
**minutes** 70:17
**misused** 77:6
**mlang@cwl.law.com** 4:16
**mokin@okinadams.com** 4:6
**money** 23:16 42:1, 20
**months** 17:13
**moot** 66:17
**MORRIS** 3:6 6:6 8:11, 15 19:22 31:14, 18, 24 35:20 36:5, 13 38:1, 14 39:4, 15 41:6 42:18 44:1 46:5, 10, 11 49:3, 5 50:1, 15 52:1, 9 54:18 55:5, 16, 23 56:7 57:2, 11, 20 58:12 59:13 60:10, 22 62:7, 11 63:5, 12 64:8, 11 67:1, 14 69:20 70:4, 9, 14, 19, 20 71:13, 15 72:11, 13, 17 73:1, 13, 19 74:6, 8, 22 75:5 76:8 78:7, 19 79:15
**Motion** 6:16 50:17 65:3, 8, 20
**Mountain** 5:3 10:15 11:4, 10, 14, 16 34:1, 9 37:5 41:3 47:11, 14, 22 48:9, 17 49:13 53:23 54:4 58:23
**move** 38:12
**mute** 70:16 76:7
**mutual** 54:14, 24
**mystery** 44:7

**< N >**
**name** 8:15
**named** 11:8 50:19
**NATHAN** 5:18 62:8 63:6 74:7
**nature** 22:23 44:11 51:6
**NECESSARILY** 7:22
**need** 9:14, 17 16:2 62:25 64:5 65:6 68:7 77:9
**needs** 69:5
**negotiating** 71:25
**negotiation** 51:14
**negotiations** 51:3, 6, 20
**neither** 84:15
**never** 32:5 33:5
**New** 3:16, 24 70:10, 11
**newly** 67:22
**news** 62:13, 15, 18
**Nods** 50:8
**nonpublic** 75:8 77:5, 13, 25 78:6 79:4, 12
**Nope** 68:19
**North** 20:13 21:4 22:8
**NORTHERN** 1:2
**Notary** 84:8
**notations** 81:6
**NOTE** 7:21
**notes** 16:18
**notice** 44:17

**< O >**
**object** 17:6 19:13, 15 35:19 36:3, 11 37:24 38:7 39:2 41:1 42:14 43:21, 23 46:3 51:25 52:8 55:1, 14, 21 56:5, 9 57:7, 17 58:9 59:10 60:7, 19 62:4 66:23 67:12 69:18 71:11 72:9 73:12 74:20
**objected** 10:19, 24
**objecting** 19:24 37:10
**Objection** 6:14 8:18 10:13 12:4, 9 17:11, 15, 18, 22 18:2, 6, 25 19:2, 7, 10 22:21 24:5, 8, 9, 22 25:5, 13, 17 26:1 27:17, 21 29:23 30:2, 7, 22 31:6 32:2 33:7 37:15 42:3, 11, 13, 16 49:24 50:4, 13 52:15, 17, 22 54:1, 16, 20, 22 55:25 56:4, 6, 12 62:10, 22, 24 63:14 65:20, 22 66:4 68:22 71:3, 7, 18
**objections** 78:2
**obligation** 13:21 41:18 50:12 58:5
**obligations** 35:17 36:1, 9 49:23 74:12 75:1
**obtain** 57:22 59:6 62:1 66:19 67:5
**obviously** 28:12
**October** 47:8
**offhand** 14:11
**office** 29:3
**officer** 84:8
**officers** 15:15
**official** 63:16, 22 64:1, 23 65:19 66:5, 10, 13, 19 67:6, 10
**Oh** 15:1 16:1, 21 30:14 78:20
**Okada** 15:24 16:22 24:10 27:1, 8, 12 28:21
**okay** 8:13, 24 17:4 18:19 19:16 28:20 33:13 34:8, 11, 16, 21, 22 41:21 46:24 50:9 51:12 55:10 62:7 63:5, 21 64:7 66:18 69:12 70:1, 19 73:6 74:23 79:2, 10
**OKIN** 4:5, 9 19:16 31:5, 17, 20 35:19 36:3, 11 37:24 38:7 39:2, 11 41:1 42:16 43:23 46:3, 8 48:10 49:24 50:13 51:25 52:8 54:16 55:1, 14, 21 56:5, 9 57:7, 17 58:9 59:10 60:7, 19 62:4 64:4 66:23 67:12 69:18 70:6, 12 72:9, 15, 20 73:12, 15 74:20 76:6 78:4, 12 79:24
**once** 37:4
**opportunity** 38:11 56:23
**option** 75:19, 22, 25 79:9
**Order** 6:16 69:5
**org** 21:15 48:12
**organization** 12:17, 19 13:10 15:18 16:23 26:24
**organizations** 16:11 20:17, 24 21:7 22:4

23:3 26:15, 16 28:1 29:1 34:3 53:8, 10, 15 56:21
**organization's** 38:9
**orgs** 15:6 20:7, 9 43:15
**original** 43:14 76:13
**originated** 19:10
**outcome** 84:17
**outside** 74:11, 17
**oversee** 24:25
**overseeing** 24:12
**oversees** 14:1
**oversight** 15:7, 9, 12 56:16
**owed** 36:9 50:11
**owes** 35:17 36:1 49:22
**owned** 48:5
**owner** 30:5, 12
**ownership** 40:23 59:18, 23 60:3, 6, 16
**owns** 30:9, 18 47:14

**< P >**
**p.m** 1:16 2:11 80:6
**PACHULSKI** 3:14 5:18
**Pacific** 4:18
**PAGE** 6:4, 12 7:4, 8, 13, 17 8:25 46:22 68:12 82:5
**pages** 6:18
**paid** 23:20
**paragraph** 63:6, 14 67:16 68:8, 23 70:5, 21 73:9 74:5 75:6, 7, 11, 19
**Pardon** 56:8
**part** 37:8 64:6
**participated** 32:23
**particular** 24:3 51:14 75:11
**parties** 3:2 10:17, 21 11:1, 4 18:18 63:17 71:4, 9, 19 84:16
**parts** 62:24
**party** 11:5, 22 56:15 59:19, 24 60:4, 17
**Patrick** 11:9, 13 24:20 40:15, 16 41:4 42:9 43:19 46:20 47:7, 17 49:12 50:6, 10 57:4, 13, 22 58:20 59:5 65:24 66:18 67:5 69:10 74:10, 17, 25 77:5, 24 78:16 79:3, 12
**Patrick's** 67:20
**PAUL** 5:14 31:4
**pay** 26:10
**peace** 70:24 72:7 73:10, 16
**pending** 9:16 42:23
**people** 15:20 62:16
**percent** 27:24 29:6
**permission** 50:18
**person** 24:11, 18 40:14 53:25 54:19
**personally** 23:24
**pertain** 69:9
**pertains** 28:7
**PHILLIPS** 5:4 70:14, 18 71:10 80:1
**phrase** 46:19 68:21 78:1
**piece** 62:14
**play** 14:21
**played** 17:5
**plays** 14:12 16:7
**pleading** 31:15
**Please** 46:10, 13 62:8 70:5 75:6 79:24 80:5
**PLLC** 4:17
**point** 62:24
**policies** 26:21
**POMERANTZ** 3:10
**portion** 38:4, 25 39:9 63:1
**position** 31:11
**possibly** 48:15
**potential** 53:16
**practice** 23:21
**precise** 18:21
**precluded** 66:15
**prefer** 78:11
**preparation** 52:14
**prepare** 18:25
**present** 2:16 5:17
**president** 9:23, 24 15:3, 4, 15, 16, 21, 22 16:5 21:17
**pretty** 24:15
**Prior** 10:1 58:2
**privilege** 9:18
**problem** 39:18 42:19
**proceeding** 64:14
**proceedings** 2:12 21:21 80:7 84:9, 11, 12
**proceeds** 26:17 27:13 28:12, 18, 20 40:18 41:13 43:20
**product** 51:2, 19
**PRODUCTION** 7:7
**professional** 79:17
**promise** 48:23
**proposed** 10:13 17:6 19:24 51:23 52:4 67:11
**propounded** 83:8
**protect** 38:8 56:20
**prove** 69:5
**provide** 17:25 18:5 23:16 58:5
**provided** 18:23 66:3
**Public** 84:8
**purchase** 26:24
**purpose** 67:23
**purposes** 11:17 12:1 26:12
**pursuant** 36:17
**put** 14:19 16:19 62:8, 9, 19 75:19, 22, 25 76:15, 20 79:9
**putting** 31:10

**< Q >**
**quarrel** 77:21
**quarterly** 28:11
**question** 9:3, 8, 11, 16 10:20 18:3, 9, 20 19:19 33:1 35:22 37:25 39:16, 17, 23, 25 40:13 46:6, 13 55:15 56:10 57:8, 18 58:10 59:11 60:8, 20 62:5 64:5, 9 66:24 68:10 69:3 71:5, 11 72:19 73:5 76:12 78:13
**questioning** 33:2
**QUESTIONS** 7:3, 16 9:2, 18 31:19 48:19, 24 49:4 68:13 70:13, 15 83:8
**quick** 8:24
**quickly** 78:15
**QUINN** 3:22
**quizzed** 48:8
**QUOTATION** 7:22
**QUOTE** 7:23 67:17 70:22 74:9 77:7

**< R >**
**raised** 24:16
**Rand** 47:2, 4, 5, 9, 17, 20 48:2, 18 49:12
**RAVER** 5:21
**RDR** 1:22 84:21
**read** 19:4 22:17, 25 31:14 71:7, 12 74:13 83:6
**reading** 16:9 81:2
**really** 20:13 26:10 34:5 69:23 78:11
**Realtime** 2:14 84:6
**reason** 24:3 32:15 35:15, 25 36:7 37:19 38:2 41:21 42:14 43:21 50:9 51:22 54:2 57:3 59:5, 14 67:4, 9 74:16, 24 82:7, 9, 11, 13, 15, 17, 19, 21, 23
**reasons** 81:4 82:4
**recall** 40:12 53:3 54:21 55:9 65:18 71:17, 22
**receive** 14:8 36:17 37:5, 22 38:4, 19, 24, 25 39:9, 20, 21 40:9, 24 41:13, 19 46:1, 15
**received** 27:11 40:21 42:21 49:7 76:10
**receives** 41:9 42:1, 6
**receiving** 44:4

**recollection** 53:2 65:7
**recommendations** 13:12 14:18
**record** 84:11
**recorded** 2:12
**recover** 37:20 38:3, 13 39:8 40:17 45:25 56:18
**red** 24:16
**reduced** 84:13
**refer** 11:16, 24 20:16 25:21, 24 29:2
**reference** 67:16 75:18
**referring** 20:3, 10 24:19
**REFLECT** 7:23
**refresh** 65:6
**regarding** 65:24
**Registered** 2:13 84:5
**regular** 13:25
**reject** 67:11
**related** 84:15
**relates** 50:6 65:22
**relationship** 21:11 28:5, 7 33:25 34:23 35:2, 6, 12 45:10, 13 49:19
**releases** 54:15, 24
**releasing** 54:8
**remember** 48:14
**remind** 39:12
**remitted** 28:22
**REMOTE** 1:13 2:8 3:2 62:15
**reorganization** 50:3
**Repeat** 18:3 19:20 37:25 55:15 69:3 71:5 73:5, 16
**repeated** 64:5
**report** 29:14
**Reported** 1:20
**Reporter** 2:14, 15 79:22 80:3 84:2, 6, 8
**REPORTER'S** 7:21
**reports** 28:11
**represent** 31:8, 13
**representative** 25:7
**REQUEST** 7:7
**requests** 29:11
**required** 13:24 57:22 59:6 62:1 66:19 67:5
**requirement** 37:7
**respect** 14:22 28:17 29:7
**respectfully** 72:12
**response** 74:1
**responsible** 12:6
**result** 21:8 32:23 34:12
**review** 12:3 25:13
**reviewed** 36:21 41:7 52:21
**right** 11:13 16:9 21:2 24:1 28:24 34:6 37:20 38:3, 21 39:8, 20 40:8, 17 44:6 45:25 46:15, 21 52:22, 23 60:24 61:3, 4, 6, 9, 13, 17, 21 66:17 74:6 78:3 79:6
**rise** 55:12
**ROBERT** 3:20
**robertloigman@quinnemanuel.com** 3:21
**role** 14:13, 21 16:8 17:5, 9 22:11 38:10
**room** 62:19
**Rose** 22:8
**Rouge** 5:10
**RSA** 1:22 84:21
**rules** 8:24
**rushed** 79:24

**< S >**
**Santa** 20:11, 22 21:3, 7, 12, 16 22:8
**Sauder** 78:25
**saying** 78:16
**says** 31:21 67:17, 19 70:21 74:9 77:19
**scope** 54:14, 24 74:11, 17
**screen** 62:8, 9, 20 63:13
**scroll** 68:7 70:4 75:5
**scrutiny** 67:25
**second** 48:16
**secretary** 16:6
**securities** 44:10
**see** 16:13 22:16, 19 47:8 48:13 62:25 63:19, 20 68:6 70:25 75:7, 18 79:19
**seek** 9:16 30:21
**seeks** 70:24 72:8 73:11, 17
**seen** 37:13, 16
**SEERY** 5:19 50:20 58:24
**segregated** 25:18, 24 26:1, 5, 8 27:17, 21 29:24 30:2, 6, 9, 13, 18, 22 44:16, 24 45:6 61:17, 21 62:1
**send** 28:12
**sent** 29:12
**sentence** 63:15 68:9, 13
**series** 9:1
**set** 17:18, 21 42:12 43:14 44:5 69:15
**setting** 69:7, 8
**Settlement** 6:17 8:19 10:13, 18, 23 11:5, 22 17:6 19:15, 25 20:2, 3, 5 36:14, 18, 21, 25 37:4, 9, 13, 16, 22 38:5, 19 39:1, 10, 22 40:9, 18, 25 41:3, 14, 23 42:6, 15 43:18, 22 44:6 46:2, 17, 21 51:1, 10, 15, 18, 23 52:5, 17 53:4, 9, 19, 22 54:3, 7, 10, 12, 25 57:5, 15, 24 58:7 59:8, 19, 24 60:4, 17 62:3 63:18 65:3, 8, 20 66:21 67:7, 11 69:15 70:23 71:21 72:1, 7 73:10 74:15, 18, 24 75:2
**Shakes** 39:6
**share** 57:13
**shares** 43:15
**SHAWN** 5:21
**Sheet** 81:5
**Shorthand** 2:15 84:2, 7
**show** 48:12 55:3
**shows** 42:23
**side** 10:22
**sign** 81:5
**signature** 31:21
**signed** 11:9, 13 46:21
**significant** 56:14
**significantly** 29:14
**similarities** 22:22
**sir** 70:16
**sit** 11:12 35:16, 24 36:6 79:10
**six** 10:3 17:12 18:14, 16
**size** 37:6
**Skyview** 78:16, 20, 23, 24 79:2
**slow** 56:24
**small** 20:13
**sole** 27:7
**solely** 31:7 74:15, 23
**somebody** 48:25 69:5 76:24 78:20
**somebody-who** 39:23
**sorry** 15:1 16:1 21:1, 6 29:10 55:8 58:13 67:2 74:2 76:9 77:18
**Sounds** 64:21
**source** 17:20 19:6 26:11 27:7 75:10
**speak** 17:10, 14, 17
**speaks** 55:2
**specific** 72:24
**specificity** 41:11
**speculate** 70:1
**spiraling** 77:8
**spoke** 66:1
**spoken** 17:12
**sponsored** 12:17
**STANG** 3:14 5:18
**start** 39:25 71:16
**started** 70:10
**State** 64:19

**statement** 33:21 54:22
**STATES** 1:1 63:15
**status** 13:24
**Stenographically** 1:20 2:13 84:13
**step** 13:16
**stick** 47:11
**STIPULATIONS** 7:12
**stopped** 76:23
**Street** 4:10 5:9
**strike** 40:4
**structure** 16:10 21:15 42:10 44:4 47:9 48:17, 18 49:2 67:23
**subject** 64:13 67:25 68:2
**Subtrust** 73:4
**succeed** 69:1, 6, 14
**suggest** 51:18 57:13
**suggesting** 72:4 73:7
**suggests** 71:3, 8
**Suite** 4:10, 18 5:9
**SULLIVAN** 3:22
**Sunday** 1:15 2:10
**supervision** 84:14
**supplied** 81:5
**SUPPORT** 7:1 22:14 28:1 55:18
**supporting** 12:17 13:10 15:6, 18 16:11, 23 20:7, 9, 16, 24 21:7, 15 23:3 26:15, 16, 23 29:1 34:2 43:15 53:8, 10, 14 56:21
**supposedly** 77:6 79:13
**sure** 16:21 35:23 65:9, 15 66:1 68:11 73:2 76:5, 10
**sworn** 8:6
**Systems** 84:7

**< T >**
**tainted** 73:17
**take** 8:17 31:20 45:16
**taken** 84:9, 12
**talk** 48:22
**talked** 40:14 65:11 66:16 70:7
**talking** 33:7 51:10 77:1 78:5
**technical** 14:10
**Technically** 13:9 43:11
**tell** 40:5, 7, 16 47:1 62:13 72:22 77:7, 11 78:15 79:11
**telling** 46:23
**terminated** 79:3
**terms** 36:18, 25 54:3
**test** 62:23
**testified** 8:8 38:17
**testify** 8:6
**testimony** 19:5 32:19 81:4 83:7
**testing** 48:19
**TEXAS** 1:2 4:11, 19 20:13 21:4 22:9
**Thank** 45:23 55:10 64:8 70:19 71:14 74:4, 7 79:15, 17
**Thanks** 79:21
**therefor** 81:4
**thing** 72:12
**things** 44:12 48:11
**think** 22:22 25:12 31:11, 17 38:17 43:24 45:16 48:20 50:3 57:25 63:5
**thinks** 31:11
**Third** 3:15 63:14
**three** 20:6, 9, 24 21:1, 5
**thrown** 27:3, 6
**Time** 1:16 2:12 9:14 56:24 70:10, 11, 18 79:16 80:7
**today** 8:17 16:17 18:12 33:7 35:16, 24 36:6 47:14, 20, 24 49:23 66:8 76:20 79:10
**today's** 12:1
**told** 47:8 50:22 78:20 79:3, 9
**TORREY** 5:20 15:22 16:5
**track** 43:17
**transaction** 61:13
**transactional** 28:11
**transactions** 29:8 61:9, 22
**transcribed** 2:15
**transcript** 79:23 80:4 81:6 83:7 84:10
**transparency** 53:13
**travel** 62:16
**treasurer** 15:5, 16, 23 16:5
**tribunal** 68:4
**true** 83:10 84:11
**Trust** 3:5 4:14 5:3 10:15 11:5, 10, 14, 17 32:12, 16, 21 33:20, 24 34:14, 17, 20 35:7, 13 45:4, 7, 14 47:12, 14, 23 48:9 52:6 53:23 54:4 55:20 58:23 73:3, 24
**Trustee** 3:19
**truth** 8:7
**try** 9:7 33:3
**trying** 77:22
**tune** 43:2
**two** 16:3 31:8 48:11 56:21 65:1
**type** 42:25 69:8
**typewriting** 84:14

**< U >**
**understand** 9:12 19:21 28:10 29:12 50:2 55:24 56:25 76:17
**understanding** 21:14, 22, 24 26:7 27:5, 9, 10, 15 29:19, 21 30:15 37:2, 11 38:15, 18, 23 41:2 47:16, 19 48:7 49:21 56:3 57:21 68:25 69:4 76:13
**understood** 29:9 79:8
**unexplained** 29:22
**unfair** 51:23 52:5, 18 53:4, 7, 10, 19, 22 54:3
**Unfortunately** 63:15
**UNITED** 1:1
**URQUHART** 3:22
**usual** 58:1

**< V >**
**vague** 47:10
**valuations** 24:16
**value** 27:12, 24 29:6, 19, 22 49:7, 15
**vanished** 42:24
**vehicle** 47:6
**vein** 18:17
**versus** 65:11
**vice** 15:4, 15, 22
**videoconferencing** 3:2
**video-conferencing** 2:10
**VIDEOGRAPHER** 5:13
**VIDEO-RECORDED** 1:13 2:8
**view** 52:10 59:1 69:12, 21
**Vine** 4:10
**vision** 28:2
**volume** 81:2, 6
**vote** 15:14
**voting** 15:13

**< W >**
**wait** 62:12
**want** 19:17 43:24 44:2, 11 48:12, 25 55:2 65:9 66:1 68:11 72:14, 15, 24 78:8 79:22 80:4
**way** 20:13 28:13 41:23 45:20 48:14 65:17 76:7
**Wednesday** 56:22
**weekend** 76:14
**weeks** 65:1

**Well** 13:*2* 18:*11* 20:*6* 24:*9* 25:*7* 28:*10* 31:*13*, *14* 43:*10* 44:*5* 48:*6* 53:*11* 72:*18* 74:*11* 77:*14*, *19* 78:*24*
**we're** 8:*17*, *25* 31:*21* 33:*7* 46:*19* 56:*18* 62:*7* 65:*23* 78:*5*
**we've** 56:*23* 63:*13* 65:*11*, *21* 66:*15*
**Wilkerson** 22:*6*
**WINOGRAD** 3:*12*
**wish** 82:*3*
**WISHNEW** 4:*17*
**withdrawn** 11:*2* 13:*19* 19:*13* 23:*6* 26:*22* 27:*4* 29:*20* 30:*8* 32:*10* 38:*16* 52:*15* 58:*19* 59:*16* 64:*17* 67:*18* 77:*11*
**witness** 48:*17* 64:*7* 72:*14*
**woman** 79:*1*
**words** 13:*16* 30:*8*
**work** 56:*18*
**working** 18:*15*
**workings** 49:*1*
**write-down** 27:*23* 29:*6*
**wrong** 64:*6* 71:*4*, *9*, *20*, *25* 73:*7*
**wrongdoing** 72:*5*

**< Y >**
**Yeah** 22:*18* 28:*16* 48:*8* 68:*14* 74:*6* 78:*18*
**year** 50:*3* 76:*16*
**years** 10:*3* 12:*20* 18:*14*, *16* 50:*17* 51:*9*
**Yep** 45:*18*
**York** 3:*16*, *24* 70:*10*, *11*

**< Z >**
**ZIEHL** 3:*14* 5:*18*

## WORD LIST

< $ >
$25 (2)
$300 (1)

< 1 >
1 (3)
1:37 (2)
10 (1)
10010 (1)
10017-2024 (1)
10-year (1)
11 (1)
1113 (1)
15 (1)
16 (2)
1600 (1)
1700 (1)
19-34054-sgj11 (1)
1st (1)

< 2 >
2:37 (1)
2011 (1)
2019 (1)
2024 (1)
2025 (2)
212.849.7615 (1)
214.817.4500 (1)
22 (2)
225.381.9643 (1)
22nd (1)
2390 (1)
240 (1)

< 3 >
3:08 (1)
300-plus (1)
301 (1)
30th (1)
310.277.6910 (1)
32 (5)
33 (3)
34 (1)
34th (1)

< 4 >
4:07 (1)
40 (2)

< 5 >
51 (1)

< 6 >
63 (1)

< 7 >
7 (1)
70801 (1)
713.228.4100 (1)
75201 (1)
77002 (1)
780 (1)

< 8 >
8 (1)
8635 (3)

< 9 >
90 (1)
9th (1)

< A >
able (2)
Absolutely (1)
abstain (3)
abstention (1)
accepting (1)
access (1)
accommodate (1)
accounting (1)
accounts (20)
acted (1)
acting (6)
action (3)
actions (4)
activities (3)
activity (7)
ADAMS (1)
additional (2)
Administrator (1)
advice (2)
aegis (1)
affidavit (1)
affiliated (3)
affiliates (4)
affirmed (1)
afternoon (1)
agendas (1)
ago (2)
agree (1)
agreed (1)
agreement (59)
ahead (2)
ahurt@kellyhart.com (1)
alleging (1)
allocated (1)
allow (2)
AMELIA (1)
amount (1)
ample (1)
ancillary (1)
annuities (7)
annuity (4)
ANSWER (30)
answering (2)
answers (2)
anticipate (1)
anybody (16)
apologize (6)
apparent (1)
appear (2)
appearance (2)
appeared (4)
appears (1)
appointed (2)
appreciate (6)
appreciated (1)
approval (1)
approve (4)
approved (10)
Approving (1)
approximately (1)
April (1)
arising (1)
arm's-length (2)
articulate (1)
aside (1)
asked (8)
asking (5)
asserting (1)
assertion (1)
asserts (1)
asset (2)
assets (38)
assume (2)
assumed (1)
assuming (3)
Atlas (8)
attached (2)
Attorney (126)
attorneys (1)
audible (1)
authority (7)
authorization (2)
authorized (9)
authorizing (1)
available (1)
Avenue (3)
avoidance (5)
aware (42)

< B >
BA (2)
back (3)
backdrop (1)
bad (1)
BANKRUPTCY (15)
Barbara (7)
BARTLETT (1)
based (2)
basically (1)
basis (6)
Baton (1)
beginning (2)
behalf (35)
behavior (1)
believe (31)
believed (1)
best (12)
bit (3)
block (1)
bottom (1)
Bradshaw (1)
breaching (1)
break (2)
bring (1)
bringing (1)
business (3)
buy (3)

< C >
CA-Certified (1)
CA-CSR (2)

**calendar** (2)
**call** (5)
**called** (10)
**calling** (1)
**CAPITAL** (17)
**careful** (1)
**carefully** (1)
**Carrera** (1)
**Case** (10)
**cases** (1)
**cash** (4)
**cause** (1)
**caused** (1)
**caution** (1)
**Cayman** (10)
**ceased** (2)
**Central** (3)
**CEO** (7)
**CEOs** (1)
**certain** (7)
**Certainly** (1)
**CERTIFICATE** (1)
**Certified** (3)
**certify** (2)
**cetera** (1)
**CFO** (2)
**chance** (1)
**change** (10)
**changes** (6)
**changing** (1)
**Chapter** (1)
**charitable** (8)
**chart** (1)
**chief** (1)
**City** (8)
**claim** (9)
**Claimant** (18)
**claimed** (1)
**claims** (3)
**clarify** (1)
**CLARITY** (1)
**clawback** (4)
**clawing** (1)
**clear** (3)
**clearly** (1)
**clients** (2)
**cold** (1)
**come** (1)
**commenced** (2)
**commitment** (1)
**common** (1)
**communicate** (1)
**communicated** (4)
**communication** (2)
**community** (6)
**company** (1)
**complete** (1)
**compliance** (1)
**concern** (3)
**concerned** (4)
**concerning** (1)
**concerns** (1)
**concluded** (1)
**confer** (1)
**confidential** (2)
**confused** (1)
**confusing** (1)
**connection** (4)
**consent** (6)
**consider** (1)
**considering** (1)
**constitutes** (1)
**consult** (1)
**consummation** (3)
**Cont'd** (2)
**contend** (2)
**contends** (2)
**context** (1)
**continue** (1)
**contractual** (7)
**contractually** (1)
**contribution** (2)
**contributions** (3)
**control** (5)
**controlled** (2)
**controls** (1)
**conversations** (1)
**convey** (1)
**conveying** (1)
**copy** (4)
**corporate** (2)
**corporations** (1)
**correct** (11)
**corrections** (2)
**correctly** (1)
**counsel** (5)
**counterpart** (1)
**counterparty** (1)
**couple** (1)
**COURT** (14)
**Court-appointed** (2)
**COVID** (1)
**CRAWFORD** (1)
**created** (1)
**Crown** (45)
**CRR** (2)
**cumbersome** (1)
**CURRY** (2)

**< D >**
**D.C** (1)
**DAF** (2)
**DALLAS** (160)
**D'AMBRA** (1)
**date** (2)
**DAVID** (1)
**day** (3)
**dcurry@okinadams.com** (1)
**de** (1)
**dealings** (1)
**Debbie** (1)
**Debtor** (5)
**decided** (1)
**decision** (2)
**decisions** (1)
**declaration** (3)
**decline** (3)
**Defendant** (2)
**definitively** (1)
**Delaware** (2)
**DEMO** (1)
**DEPONENT** (1)
**deposed** (1)
**DEPOSITION** (11)
**depositions** (1)
**described** (4)
**detail** (1)
**DIAZ** (20)
**different** (2)
**diminished** (1)
**Diplomate** (2)
**DIRECT** (4)
**directed** (2)
**direction** (1)
**directly** (3)
**disburse** (2)
**disbursement** (1)
**disclosed** (1)
**disclosing** (1)
**discussions** (1)
**disrespectful** (1)
**DISTRICT** (1)
**diverting** (1)
**DIVISION** (1)
**document** (4)
**DOCUMENTS** (4)
**doing** (5)
**dollars** (1)
**donation** (2)
**donations** (1)
**Dondero** (20)
**Dondero's** (2)
**donor-advised** (1)
**dramatic** (1)
**Dugaboy** (1)
**duly** (1)
**duties** (4)
**duty** (2)

**< E >**
**earlier** (2)
**effectuated** (1)
**effectuates** (1)
**either** (3)
**EMANUEL** (1)
**employed** (2)
**employee** (1)
**Empower** (25)
**engaged** (2)
**ensure** (1)
**enter** (5)
**entered** (3)
**entering** (9)
**entities** (55)
**entitled** (2)
**entity** (19)
**Entry** (2)
**erosion** (1)
**Errata** (1)
**ESQ** (10)
**essence** (1)
**essentially** (1)
**established** (1)
**et** (1)
**everybody** (1)

evidence (1)
exactly (1)
EXAMINATION (2)
examined (1)
excuse (2)
executed (1)
exercise (1)
exercised (1)
Exhibit (1)
existence (1)
expect (1)
expectations (1)
expected (1)
expedited (1)
expenses (2)
expensive (1)
expert (2)
expressed (1)
extent (1)

< F >
fact (1)
facts (13)
fail (1)
fair (36)
fairly (1)
fall (1)
familiar (14)
familiarity (2)
Family (6)
fault (1)
feeds (1)
feel (1)
female (1)
fiduciaries (2)
fiduciary (6)
file (6)
filed (25)
filing (10)
finance (1)
financial (1)
find (2)
fine (3)
finish (3)
first (1)
first-quarter (1)
flag (1)
Floor (2)
flow (6)
flowed (1)
Flows (3)
focus (1)
focused (1)
Focusing (2)
folks (1)
following (2)
follows (1)
foregoing (3)
form (33)
formal (1)
Formally (1)
formation (1)
formed (4)
forth (4)
forward (1)
found (1)
Foundation (145)
foundations (5)
Foundation's (24)
four (2)
fully (1)
fund (11)
funded (1)
fundholder (1)
fundholders (2)
funding (5)
funds (4)
fund's (1)
further (1)
future (1)

< G >
Gail (4)
gdemo@pszjlaw.com (1)
generally (4)
gentleman (2)
give (6)
given (1)
giving (1)
Global (41)
Global's (4)
go (7)
going (13)
Good (3)
good-faith (2)
governance (3)
GPs (1)
grant (2)
grant-making (2)
grants (1)
GREGORY (1)
ground (1)
guess (4)

< H >
half (1)
HALL (1)
HALLMAN (1)
happening (3)
happens (3)
happy (2)
harm (1)
HART (1)
HAYLEY (1)
head (2)
hear (1)
heard (1)
held (2)
he'll (1)
help (2)
hereto (1)
Hernandez (1)
high (5)
HIGHLAND (82)
Highland/HMIT (2)
Highland's (1)
HMIT (54)
HMIT/Highland (2)
hold (2)
Holdco (2)
holds (1)
hour (1)
Houston (1)
Hunter (19)
HURT (1)
hwinograd@pszjlaw.com (1)

< I >
idea (5)
identification (1)
identified (3)
identify (8)
imagine (1)
impact (1)
impacted (1)
impacts (1)
important (1)
including (1)
income (3)
independent (1)
INDEX (1)
indicate (1)
indirect (4)
indirectly (1)
individual (1)
inform (1)
information (19)
informed (4)
Inghram (4)
insertion (1)
inside (6)
insider (1)
insignificant (1)
INSTRUCTED (1)
INSTRUCTIONS (1)
Insurance (5)
intended (1)
interest (13)
interested (1)
interim (1)
interrupt (2)
investigate (1)
investigating (1)
Investment (13)
involved (3)
involvement (6)
irregular (2)
irregularities (1)
IRS (1)
Islands (8)
issues (3)
its (13)

< J >
Jackie (1)
JAMES (2)
JEFFREY (1)
Jim (6)
jmorris@pszjlaw.com (1)
job (2)
JOHN (7)
joint (11)
JONES (2)

**jpomerantz@pszjlaw.com** (1)
**JULIE** (5)
**June** (3)
**jurisdiction** (1)
**justify** (1)

< K >
**Kansas** (9)
**keep** (2)
**KELLY** (1)
**kind** (2)
**know** (122)
**knowledge** (21)
**knows** (1)

< L >
**L.P** (1)
**Labor** (1)
**lack** (1)
**LANG** (4)
**language** (1)
**large** (2)
**law** (1)
**laws** (1)
**lawsuit** (2)
**lawyer** (3)
**lawyers** (1)
**lead** (1)
**leading** (1)
**leads** (1)
**learn** (3)
**learned** (6)
**leave** (1)
**led** (1)
**legal** (5)
**lengthy** (1)
**level** (5)
**liabilities** (2)
**Life** (3)
**likelihood** (1)
**Limited** (2)
**LINE** (6)
**liquidation** (2)
**liquidators** (11)
**liquidity** (1)
**listen** (1)
**lists** (1)
**literally** (1)
**Litigation** (10)
**little** (3)
**LITTLETON** (3)
**Littleton's** (1)
**LLP** (3)
**LOIGMAN** (1)
**long** (1)
**longer** (3)
**look** (2)
**looking** (2)
**losing** (1)
**lot** (6)
**LOUIS** (2)
**Louisiana** (1)
**lower** (1)
**LP** (11)
**lphillips@kellyhart.com** (1)
**LPs** (1)

< M >
**Ma'am** (10)
**Madison** (1)
**Main** (1)
**majority** (2)
**making** (3)
**MANAGEMENT** (19)
**managing** (1)
**March** (1)
**Mark** (14)
**MARKED** (2)
**MARKS** (2)
**material** (6)
**Matt** (4)
**MATTTHEW** (1)
**mean** (6)
**member** (1)
**memory** (1)
**mentioned** (1)
**met** (3)
**MICHAEL** (1)
**million** (4)
**mind** (3)
**minimis** (1)
**minutes** (1)
**misused** (1)
**mlang@cwl.law.com** (1)
**mokin@okinadams.com** (1)
**money** (3)
**months** (1)
**moot** (1)
**MORRIS** (69)
**Motion** (5)
**Mountain** (19)
**move** (1)
**mute** (2)
**mutual** (2)
**mystery** (1)

< N >
**name** (1)
**named** (2)
**NATHAN** (4)
**nature** (3)
**NECESSARILY** (1)
**need** (8)
**needs** (1)
**negotiating** (1)
**negotiation** (1)
**negotiations** (3)
**neither** (1)
**never** (2)
**New** (6)
**newly** (1)
**news** (3)
**Nods** (1)
**nonpublic** (7)
**Nope** (1)
**North** (3)
**NORTHERN** (1)
**Notary** (1)
**notations** (1)
**NOTE** (1)
**notes** (1)
**notice** (1)

< O >
**object** (35)
**objected** (2)
**objecting** (2)
**Objection** (63)
**objections** (1)
**obligation** (4)
**obligations** (6)
**obtain** (5)
**obviously** (1)
**October** (1)
**offhand** (1)
**office** (1)
**officer** (1)
**officers** (1)
**official** (11)
**Oh** (5)
**Okada** (7)
**okay** (29)
**OKIN** (52)
**once** (1)
**opportunity** (2)
**option** (4)
**Order** (2)
**org** (2)
**organization** (6)
**organizations** (15)
**organization's** (1)
**orgs** (4)
**original** (2)
**originated** (1)
**outcome** (1)
**outside** (2)
**oversee** (1)
**overseeing** (1)
**oversees** (1)
**oversight** (4)
**owed** (2)
**owes** (3)
**owned** (1)
**owner** (2)
**ownership** (6)
**owns** (3)

< P >
**p.m** (3)
**PACHULSKI** (2)
**Pacific** (1)
**PAGE** (10)
**pages** (1)
**paid** (1)
**paragraph** (13)
**Pardon** (1)
**part** (2)
**participated** (1)
**particular** (3)
**parties** (11)
**parts** (1)

**party** *(7)*
**Patrick** *(31)*
**Patrick's** *(1)*
**PAUL** *(2)*
**pay** *(1)*
**peace** *(4)*
**pending** *(2)*
**people** *(2)*
**percent** *(2)*
**permission** *(1)*
**person** *(5)*
**personally** *(1)*
**pertain** *(1)*
**pertains** *(1)*
**PHILLIPS** *(5)*
**phrase** *(3)*
**piece** *(1)*
**play** *(1)*
**played** *(1)*
**plays** *(2)*
**pleading** *(1)*
**Please** *(7)*
**PLLC** *(1)*
**point** *(1)*
**policies** *(1)*
**POMERANTZ** *(1)*
**portion** *(4)*
**position** *(1)*
**possibly** *(1)*
**potential** *(1)*
**practice** *(1)*
**precise** *(1)*
**precluded** *(1)*
**prefer** *(1)*
**preparation** *(1)*
**prepare** *(1)*
**present** *(2)*
**president** *(10)*
**pretty** *(1)*
**Prior** *(2)*
**privilege** *(1)*
**problem** *(2)*
**proceeding** *(1)*
**proceedings** *(6)*
**proceeds** *(8)*
**product** *(2)*
**PRODUCTION** *(1)*
**professional** *(1)*
**promise** *(1)*
**proposed** *(6)*
**propounded** *(1)*
**protect** *(2)*
**prove** *(1)*
**provide** *(4)*
**provided** *(2)*
**Public** *(1)*
**purchase** *(1)*
**purpose** *(1)*
**purposes** *(3)*
**pursuant** *(1)*
**put** *(11)*
**putting** *(1)*

**< Q >**
**quarrel** *(1)*
**quarterly** *(1)*
**question** *(39)*
**questioning** *(1)*
**QUESTIONS** *(12)*
**quick** *(1)*
**quickly** *(1)*
**QUINN** *(1)*
**quizzed** *(1)*
**QUOTATION** *(1)*
**QUOTE** *(5)*

**< R >**
**raised** *(1)*
**Rand** *(9)*
**RAVER** *(1)*
**RDR** *(2)*
**read** *(8)*
**reading** *(2)*
**really** *(5)*
**Realtime** *(3)*
**reason** *(29)*
**reasons** *(2)*
**recall** *(7)*
**receive** *(17)*
**received** *(5)*
**receives** *(3)*
**receiving** *(1)*
**recollection** *(2)*
**recommendations** *(2)*
**record** *(1)*
**recorded** *(1)*
**recover** *(7)*
**red** *(1)*
**reduced** *(1)*
**refer** *(6)*
**reference** *(2)*
**referring** *(3)*
**REFLECT** *(1)*
**refresh** *(1)*
**regarding** *(1)*
**Registered** *(2)*
**regular** *(1)*
**reject** *(1)*
**related** *(1)*
**relates** *(2)*
**relationship** *(11)*
**releases** *(2)*
**releasing** *(1)*
**remember** *(1)*
**remind** *(1)*
**remitted** *(1)*
**REMOTE** *(4)*
**reorganization** *(1)*
**Repeat** *(8)*
**repeated** *(1)*
**report** *(1)*
**Reported** *(1)*
**Reporter** *(9)*
**REPORTER'S** *(1)*
**reports** *(1)*
**represent** *(3)*
**representative** *(1)*
**REQUEST** *(1)*
**requests** *(1)*
**required** *(6)*
**requirement** *(1)*
**respect** *(3)*
**respectfully** *(1)*
**response** *(1)*
**responsible** *(1)*
**result** *(3)*
**review** *(2)*
**reviewed** *(3)*
**right** *(31)*
**rise** *(1)*
**ROBERT** *(1)*
**robertloigman@quinnemanuel.com** *(1)*
**role** *(7)*
**room** *(1)*
**Rose** *(1)*
**Rouge** *(1)*
**RSA** *(2)*
**rules** *(1)*
**rushed** *(1)*

**< S >**
**Santa** *(7)*
**Sauder** *(1)*
**saying** *(1)*
**says** *(6)*
**scope** *(4)*
**screen** *(4)*
**scroll** *(3)*
**scrutiny** *(1)*
**second** *(1)*
**secretary** *(1)*
**securities** *(1)*
**see** *(13)*
**seek** *(2)*
**seeks** *(4)*
**seen** *(2)*
**SEERY** *(3)*
**segregated** *(20)*
**send** *(1)*
**sent** *(1)*
**sentence** *(3)*
**series** *(1)*
**set** *(6)*
**setting** *(2)*
**Settlement** *(84)*
**Shakes** *(1)*
**share** *(1)*
**shares** *(1)*
**SHAWN** *(1)*
**Sheet** *(1)*
**Shorthand** *(3)*
**show** *(2)*
**shows** *(1)*
**side** *(1)*
**sign** *(1)*
**signature** *(1)*
**signed** *(3)*
**significant** *(1)*
**significantly** *(1)*
**similarities** *(1)*
**sir** *(1)*
**sit** *(5)*
**six** *(4)*
**size** *(1)*
**Skyview** *(5)*

**slow** (*1*)
**small** (*1*)
**sole** (*1*)
**solely** (*3*)
**somebody** (*4*)
**somebody-who** (*1*)
**sorry** (*11*)
**Sounds** (*1*)
**source** (*5*)
**speak** (*3*)
**speaks** (*1*)
**specific** (*1*)
**specificity** (*1*)
**speculate** (*1*)
**spiraling** (*1*)
**spoke** (*1*)
**spoken** (*1*)
**sponsored** (*1*)
**STANG** (*2*)
**start** (*2*)
**started** (*1*)
**State** (*1*)
**statement** (*2*)
**STATES** (*2*)
**status** (*1*)
**Stenographically** (*3*)
**step** (*1*)
**stick** (*1*)
**STIPULATIONS** (*1*)
**stopped** (*1*)
**Street** (*2*)
**strike** (*1*)
**structure** (*9*)
**subject** (*3*)
**Subtrust** (*1*)
**succeed** (*3*)
**suggest** (*2*)
**suggesting** (*2*)
**suggests** (*2*)
**Suite** (*3*)
**SULLIVAN** (*1*)
**Sunday** (*2*)
**supervision** (*1*)
**supplied** (*1*)
**SUPPORT** (*4*)
**supporting** (*23*)
**supposedly** (*2*)
**sure** (*9*)
**sworn** (*1*)
**Systems** (*1*)

< T >
**tainted** (*1*)
**take** (*3*)
**taken** (*2*)
**talk** (*1*)
**talked** (*4*)
**talking** (*4*)
**technical** (*1*)
**Technically** (*2*)
**tell** (*10*)
**telling** (*1*)
**terminated** (*1*)
**terms** (*3*)
**test** (*1*)
**testified** (*2*)
**testify** (*1*)
**testimony** (*4*)
**testing** (*1*)
**TEXAS** (*6*)
**Thank** (*9*)
**Thanks** (*1*)
**therefor** (*1*)
**thing** (*1*)
**things** (*2*)
**think** (*11*)
**thinks** (*1*)
**Third** (*2*)
**three** (*5*)
**thrown** (*2*)
**Time** (*9*)
**today** (*14*)
**today's** (*1*)
**told** (*5*)
**TORREY** (*3*)
**track** (*1*)
**transaction** (*1*)
**transactional** (*1*)
**transactions** (*3*)
**transcribed** (*1*)
**transcript** (*5*)
**transparency** (*1*)
**travel** (*1*)
**treasurer** (*4*)
**tribunal** (*1*)
**true** (*2*)
**Trust** (*32*)
**Trustee** (*1*)
**truth** (*3*)
**try** (*2*)
**trying** (*1*)
**tune** (*1*)
**two** (*5*)
**type** (*2*)
**typewriting** (*1*)

< U >
**understand** (*8*)
**understanding** (*26*)
**understood** (*2*)
**unexplained** (*1*)
**unfair** (*9*)
**Unfortunately** (*1*)
**UNITED** (*1*)
**URQUHART** (*1*)
**usual** (*1*)

< V >
**vague** (*1*)
**valuations** (*1*)
**value** (*7*)
**vanished** (*1*)
**vehicle** (*1*)
**vein** (*1*)
**versus** (*1*)
**vice** (*3*)
**videoconferencing** (*1*)
**video-conferencing** (*1*)
**VIDEOGRAPHER** (*1*)
**VIDEO-RECORDED** (*2*)
**view** (*4*)
**Vine** (*1*)
**vision** (*1*)
**volume** (*2*)
**vote** (*1*)
**voting** (*1*)

< W >
**wait** (*1*)
**want** (*16*)
**way** (*7*)
**Wednesday** (*1*)
**weekend** (*1*)
**weeks** (*1*)
**Well** (*17*)
**we're** (*9*)
**we've** (*5*)
**Wilkerson** (*1*)
**WINOGRAD** (*1*)
**wish** (*1*)
**WISHNEW** (*1*)
**withdrawn** (*16*)
**witness** (*3*)
**woman** (*1*)
**words** (*2*)
**work** (*1*)
**working** (*1*)
**workings** (*1*)
**write-down** (*2*)
**wrong** (*6*)
**wrongdoing** (*1*)

< Y >
**Yeah** (*6*)
**year** (*2*)
**years** (*6*)
**Yep** (*1*)
**York** (*6*)

< Z >
**ZIEHL** (*2*)

# Exhibit G
Part 1

# Exhibit G

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION),[1]<br><br>Debtor in a foreign proceeding. | Chapter 15<br><br>Case No. 25-11376 (___) |

**DECLARATION OF MARGOT MACINNIS IN SUPPORT OF CHAPTER 15 PETITION FOR (I) RECOGNITION OF FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

I, Margot MacInnis, pursuant to 28 U.S.C. § 1746, hereby declare (this "Declaration") under penalty of perjury under the laws of the United States of America, that the following is true and correct to the best of my knowledge and belief:

## A. The Joint Official Liquidators and the Cayman Proceeding

1. My colleague, Sandipan Bhowmik, and I (the "Petitioners" or "JOLs") are the duly appointed Joint Official Liquidators of Charitable DAF HoldCo, Ltd (in Official Liquidation) ("HoldCo" or the "Debtor"), a Cayman Islands exempted company in official liquidation in the Cayman Islands (the "Cayman Proceeding"), which was brought under the supervision of the Grand Court of the Cayman Islands Financial Services Division (the "Cayman Court") by an order dated May 6, 2025 (Cause No. FSD 116 of 2025)(JAJ) (the "Supervision Order").[2]

[1] The Debtor is incorporated in the Cayman Islands as an exempted company, and registered with registration number 53083. The Debtor's registered office is located at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.

[2] Ex. 1, Supervision Order in the Grand Court of the Cayman Islands FSD 2025-0116 (JAJ).

2. I respectfully submit this Declaration in support of the Petitioners' Verified Petition dated July 21, 2025 (the "Verified Petition")[3] seeking the United States Bankruptcy Court for the District of Delaware's (this "Court") (a) recognition of the Cayman Proceeding as a "foreign main proceeding" pursuant to 11 U.S.C. § 1517(b)(1) of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") or in the alternative as a "foreign nonmain proceeding" pursuant to section 1517(b)(2) of the Bankruptcy Code; (b) recognition of the Petitioners as "foreign representatives" of HoldCo, pursuant to sections 1509 and 1517 of the Bankruptcy Code; and (c) granting relief pursuant to sections 105(a), 1502, 1507, 1510, 1520 and 1521 of the Bankruptcy Code.

3. I am Managing Director of Grant Thornton Specialist Services (Cayman) Limited ("Grant Thornton"). I am one of the JOLs of HoldCo, alongside Mr. Bhowmik also of Grant Thornton. Mr. Bhowmik and I were appointed as JOLs of HoldCo by the Supervision Order.[4]

4. I have been practicing in the field of insolvency and financial investigations for over 25 years and have been appointed as an official liquidator of numerous companies and investment funds over this period. I am the practice leader for Grant Thornton UK's investments in Grant Thornton's Specialist Services practice in the Cayman Islands and the British Virgin Islands ("BVI"), as well as the Offshore Group leader. My practice over the past 25 or so years has focused on asset tracing and recovery, insolvency, and corporate recovery assignments in the Cayman Islands and Offshore. Over that period, I have taken voluntary and compulsory appointments in connection with entities that were solvent, insolvent and in some cases of doubtful solvency both in the Cayman Islands and BVI. I have been appointed liquidator on some of the

[3] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Verified Petition.

[4] Ex. 1, Supervision Order in the Grand Court of the Cayman Islands FSD 2025-0116 (JAJ).

most complex, contentious and high-profile liquidations in the Cayman Islands and BVI, and in circumstances where the result and return to stakeholders were objectively successful. I am a Chartered Accountant, CPA, and hold professional certifications with ACAMS and CFE. I have been a board member of both RISA, IWIRC Cayman Islands and the international board of IWIRC, a member of ABI and INSOL, and in my various roles with these organizations over the years I have sat on technical committees responsible for the creating and delivering the technical content for conferences, seminars and roundtables.[5]

5. I am duly authorized to make this Declaration on behalf of the JOLs. I am fully familiar with the facts of this matter. Unless otherwise indicated, all statements contained herein are true to the best of my knowledge and based upon my personal knowledge of HoldCo's operations and financial condition, my review of relevant documents and my conversations with relevant personnel. I am over the age of 18 and, if called to testify, would testify competently about the facts set forth herein.

6. I am familiar with the Model Law on Cross-Border Insolvency, adopted by the United Nations Commission on International Trade Law (UNCITRAL), and approved by a resolution of the United Nations General Assembly on December 15, 1997. I also understand that the Model Law has been adopted in the United States as chapter 15 of the Bankruptcy Code.

7. I make this Declaration in my statutory capacity as an officer of the Cayman Court and request an extension of comity for the benefit of all of HoldCo's creditors and investors, whose interests I represent. For the reasons discussed below, I submit that: (a) Mr. Bhowmik and I are duly appointed "foreign representatives" of HoldCo in the Cayman Proceeding and that the Cayman Proceeding constitutes a "foreign proceeding" within the meaning of sections 101(23)

---

[5] Ex. 2, Curriculum Vitae of Margot MacInnis.

and (24) of the Bankruptcy Code, respectively; (b) this case was properly commenced in accordance with the requirements of chapter 15 of the Bankruptcy Code; and (c) the Cayman Proceeding satisfies all of the requirements to be recognized as a "foreign main proceeding" pursuant to sections 1502(4) and 1517(b)(1) of the Bankruptcy Code or in the alternative as a "foreign nonmain proceeding" pursuant to sections 1502(5) and 1517(b)(2) of the Bankruptcy Code.

**B. <u>Overview of HoldCo and its Stakeholders</u>**

8. HoldCo is a Cayman Islands exempted company, incorporated on October 27, 2011.[6] Its registered office is at HSM Corporate Services Limited, P.O. Box 31726, 68 Fort Street, George Town, Grand Cayman, KY1-1207, Cayman Islands.[7]

9. HoldCo's share capital is divided into Participating Shares, which do not have voting rights but confer the right to participate in HoldCo's profits or assets including by way of the receipt of dividends, and Management Shares, which have voting rights but confer no other right to participate in HoldCo's profits or assets.[8] Accordingly, Participating Shareholders have the entirety of the economic interest in HoldCo, whereas the Management Shareholder has the control rights.[9]

10. Until recently, four nonprofit corporations collectively held 100% of HoldCo's Participating Shares: Highland Dallas Foundation, Highland Kansas City Foundation, Highland Santa Barbara Foundation, and CFNT.[10]

---

[6] Ex. 3, Certificate of Incorporation - Charitable DAF Holdco, Ltd; Ex. 4, Charitable DAF HoldCo Articles of Association.

[7] Previously, HoldCo maintained its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

[8] Ex. 5, Amended and Restated Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd.

[9] Id.

[10] Ex. 6, Register of Members Charitable DAF Holdco Ltd.

11. As of the date hereof, HoldCo has one Management Shareholder and five registered Participating Shareholders.[11] The Management Shares in HoldCo are held entirely by Mr. Mark Eric Patrick, a U.S. resident, who is also a director of HoldCo. Mr. Patrick acquired the Management Shares on March 25, 2021, upon taking assignment of the Management Shares previously held by Mr. Grant Scott.[12] HoldCo's second director is Mr. Paul Murphy, a Cayman Islands resident.[13]

12. As of the date hereof, the Participating Shareholders are:

(a) Highland Dallas Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on November 22, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;[14]

(b) Highland Kansas City Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on November 23, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;[15]

(c) Highland Santa Barbara Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on November 22, 2011, which was issued 100 Participating Shares in HoldCo on November 30, 2011;[16]

(d) CFNT for the Highland Capital Management, L.P. Charitable Fund at CFNT, a public charity exempt from federal income tax under § 501(c)(3) of the IRC

---

[11] Id.

[12] Ex. 7, Resolutions of the Sole Director (100 Management Shares); Ex. 8, Share Transfer (100 Management Shares) from Grant James Scott to Mark E. Patrick.

[13] Ex. 6, Register of Members Charitable DAF Holdco Ltd; Ex. 9, Director Resolutions - Appointment of Paul Murphy; Ex. 10, Director Report of Charitable DAF Holdco, Ltd.

[14] Ex. 11, IRS Determination Letter to Highland Dallas Foundation; Ex. 12, Share Transfer Form; Ex. 13, Highland Dallas Foundation Share Transfer.

[15] Ex. 12, Share Transfer Form; Ex. 14, IRS Determination Letter to Highland Kansas City Foundation; Ex. 15, Highland Kansas City Foundation Share Transfer.

[16] Ex. 12, Share Transfer Form; Ex. 16, IRS Determination Letter to Highland Santa Barbara; Ex. 17, Highland Santa Barbara Foundation Share Transfer.

incorporated in Texas, which was issued 5 Participating Shares in HoldCo on August 12, 2015;[17] and

(e) DFW Charitable Foundation, a nonprofit corporation exempt from federal income tax under § 501(c)(3) of the IRC incorporated in Delaware on December 9, 2024, which was issued 318 Participating Shares in HoldCo on February 7, 2025.[18] Mr. Patrick is its registered director, president and sole member.

**i. <u>The Charitable Structure</u>**

13. Four charities held the ultimate economic interest in HoldCo prior to the DFW Share Issuance and held Participating Shares, either directly or indirectly. They are:

(a) The Dallas Foundation (which controls Highland Dallas Foundation): a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets;

(b) Greater Kansas City Community Foundation (which controls Highland Kansas Foundation): a charitable entity established in Missouri in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds;

(c) Santa Barbara Foundation (which controls Highland Santa Barbara Foundation): a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million; and

(d) CFNT is a charity established in 1981 which manages assets totaling $513 million and donated $38.9 million to local nonprofits in 2023. CFNT holds its Participating Shares in HoldCo directly (i.e., without interposing a supporting organization). Prior to the DFW Share Issuance, CFNT held 1.639% of the Participating Shares.[19]

14. Each of the Charities held its interests in HoldCo indirectly through Highland Dallas Foundation, Highland Kansas City Foundation, and Highland Santa Barbara Foundation

[17] Ex. 18, IRS Determination Letter to CFNT; Ex. 19, Share Transfer Form of CFNT.

[18] Ex. 20, DFW Share Transfer; Ex. 21, Director Resolution (Share Issuance to DFW).

[19] Ex. 19, Share Transfer Form of CFNT.

respectively (i.e., TDF held its interest through the Participating Shares held by Highland Dallas Foundation, etc.).[20]

15. The Supporting Organizations were incorporated by Mr. James Dondero in November 2011 for the purpose of making charitable donations to their respective charity from the proceeds received by the Supporting Organizations from HoldCo.[21]

16. Each of the Supporting Organizations is "organized and operated exclusively to support and benefit" its relevant, supported Charity.[22] For U.S. tax purposes, each Supporting Organization is classified as a Type I supporting organization of its respective Charity, which means that it is operated, supervised and controlled by that Charity.[23] Consistent with this classification, the governance arrangements of each of the Supporting Organizations affords each Charity two votes and two director-nominees, to the individual member's (Mr. Dondero or his designee's) one vote and one director-nominee.[24]

17. HoldCo was formed for tax efficiency purposes to avoid a Charity or Supporting Organization becoming liable for UBTI with respect to investments it may wish to make in a hedge fund or private equity fund, here, the Fund, where substantial assets were held.[25]

18. HoldCo was, between November 2011 and December 18, 2024, the sole limited partner of the Fund, a Cayman Islands exempted limited partnership formed to invest and manage

---

[20] Ex. 23 Highland Dallas Foundation SO Agreement; Ex. 24 Highland Kansas City Foundation SO Agreement; Ex. 25 Highland Santa Barbara Foundation SO Agreement.

[21] Ex. 26, Highland Dallas Foundation Certificate of Formation; Ex. 27, Highland Kansas City Foundation Certificate of Formation; Ex. 28, Highland Santa Barbara Foundation Certificate of Formation.

[22] Id.

[23] Ex. 23 Highland Dallas Foundation SO Agreement; Ex. 24 Highland Kansas City Foundation SO Agreement; Ex. 25 Highland Santa Barbara Foundation SO Agreement.

[24] Ex. 29 Highland Dallas Foundation By-Laws; Ex. 30 Highland Kansas City Foundation By-Laws; Ex. 31 Highland Santa Barbara Foundation By-Laws.

[25] Ex. 91, Haynes & Boone Memo.

assets for the benefit or ultimate benefit of certain registered charitable organizations in the United States, through which it indirectly owned the DAF Structure.

19. The role of HoldCo was to facilitate the making of discretionary cash distributions to Participating Shareholders, which would be drawn from the proceeds of investment returns made within asset-holding entities in the DAF Structure.[26]

**C. <u>Overview of the Fund</u>**

20. The Fund is a Cayman Islands exempted limited partnership formed October 25, 2011 (registration no. 53083), having its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands. The Fund is governed by the Second Amended and Restated Limited Partnership Agreement, dated March 11, 2024. Prior to the Relevant Transactions, HoldCo was the sole limited partner of the Fund.[27]

21. The Fund was formed and operates to "make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code … for the economic benefit of [HoldCo] and its Indirect Charitable Owners".[28]

22. Charitable DAF GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands which was, at the Fund's formation and until March 7, 2024, the general partner of the Fund, at which time it was replaced by CDH GP, LTD, a Cayman

[26] Ex. 32, Structure chart of the DAF Structure prior to the Relevant Transactions; Ex. 33, Structure chart of the DAF Structure after to the Relevant Transactions; Ex. 35, A&R Exempted Limited Partnership Agreement of Charitable DAF Fund, LP; Ex. 36, Second A&R Exempted Limited Partnership Agreement of Charitable DAF Fund, LP.

[27] Ex. 34, Certificate of Registration of Charitable DAF Fund LP; Ex. 35, A&R Exempted Limited Partnership Agreement of Charitable DAF Fund, LP; Ex. 36, Second A&R Exempted Limited Partnership Agreement of Charitable DAF Fund, LP.

[28] Ex. 5, Amended and Restated Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd.

Islands exempt company incorporated on February 27, 2024, by Mr. Patrick, its sole director, at Mr. Patrick's instigation, without notice to the Original Participating Shareholders.[29]

23. The Fund's sole asset is or was its ownership of 100% of the issued share capital, in CLO HoldCo Ltd.[30] CLO Holdco is organized as a Cayman Islands exempt company incorporated with limited liability, having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.[31]

24. Based upon their initial research and investigation, the JOLs understand that the Fund's known subsidiaries, that it holds through CLO HoldCo (as listed in Schedule A of the proposed order accompanying the Injunction Application)[32], are mostly passive investment vehicles holding a mix of assets, including cash, promissory notes, shares in Nexpoint[33] entities, publicly traded stock, real estate, receivables/proceeds from litigation proceedings, receivable amounts from brokers, dividends due, and amounts due from affiliates.

25. At all relevant times, the Fund had a net asset value of approximately $270 million.[34]

---

[29] Ex. 37, Charitable DAF GP LLC Managing Member Consent to Assignment to CDH GP Ltd; Ex. 38, Section 10-Replacement of Charitable DAF GP LLC; Ex. 39, Register of Members for CDH GP Ltd.; Ex. 94, Certificate of Incorporation - CDH GP, Ltd.

[30] Ex. 40, CLO HoldCo, Ltd Register of Members as of 5.19.2021; Ex. 32, Structure chart of the DAF Structure prior to the Relevant Transactions; Ex. 33, Structure chart of the DAF Structure after to the Relevant Transactions.

[31] Ex. 41, CLO HoldCo, Ltd CORIS Report; Ex. 42, CLO HoldCo, Ltd - Members & Articles of Association; Ex. 43, CLO HoldCo, Ltd Certificate of Incorporation.

[32] Ex. 82, Injunction Application.

[33] Nexpoint is an investment management firm registered with the U.S. Securities and Exchange Commission that was founded by Mr. Dondero, who currently serves as its President.

[34] Ex. 51, September 2024 ValueScope Valuation.

## D. Key Transactions Precipitating the Debtor's Liquidation

### i. The Relevant Transactions

26. Beginning in 2024, HoldCo's Directors executed a series of complex, interrelated transactions without the knowledge or consent of the Original Participating Shareholders. These transactions consisted of (a) HoldCo's contribution of its interest in the Fund to a newly formed entity organized in Delaware, CDM, controlled by Mr. Patrick, in exchange for membership interests in CDM that, unlike the Original Participating Shareholders Participating Shares in HoldCo, were redeemable and afforded HoldCo no fiduciary safeguards;[35] (b) the DFW Share Issuance, i.e., the purported issuance of 318 participating shares in HoldCo to DFW, a Delaware nonprofit corporation incorporated and controlled by Mr. Patrick, on February 7, 2025, sufficient to make it, rather than the Original Participating Shareholders, the majority owner of HoldCo's participating shares;[36] and (c) the purported redemption of HoldCo's interest in CDM in exchange for approximately $1.6 million on March 27, 2025.[37]

#### 1. The LP/LLC Exchange

27. On December 12, 2024, CDM was incorporated as a limited liability company in Delaware. Mr. Patrick was the sole member of CDM.[38]

28. On December 18, 2024, without informing the Supporting Organizations or the Charities: (i) the Directors passed resolutions to transfer HoldCo's Fund Partnership Interest to CDM, in exchange for a contribution by CDM's sole member—Mr. Patrick—of 100% of the

[35] Ex. 44, Director Resolutions to Transfer Fund from HoldCo to CDM for CDM Shares; Ex. 45, Deed of Assignment & Assumption to CDM.

[36] Ex. 20, DFW Share Transfer; Ex. 21, Director Resolution (Share Issuance to DFW).

[37] Ex. 46, Director Resolutions - Redemption of CDM Shares.

[38] Ex. 47, CDM Certificate of Formation; Ex. 48, CDM LLC Agreement.

issued and outstanding membership interests in CDM;[39] and (ii) HoldCo, CDM, and the New GP entered into a Deed of Assignment and Assumption, executed by Mr. Patrick in three capacities: on behalf of: (x) HoldCo, as Director; (y) CDM, as manager; and (z) the New GP, as Director, pursuant to which: (a) HoldCo assigned its Fund Partnership Interest to CDM; (b) the New GP provided its written consent to the CDM Assignment and the admission of CDM as the new limited partner, in accordance with the Fund LPA; and (c) CDM agreed to exercise its reasonable best endeavors to ensure that the CDM Membership Interest would be transferred to HoldCo.[40]

29. The LP/LLC Exchange occurred in at least two stages: (a) first, HoldCo transferred its entire interest in the Fund to CDM; and (b) second, CDM procured the transfer of 100% of its share capital to HoldCo, making HoldCo the sole membership interest holder of CDM rather than the sole limited partner in the Fund. The effect of the LP/LLC Exchange was that: (a) CDM was inserted into the corporate structure as a subsidiary of HoldCo and became the holder of the entire interest in the Fund previously held by HoldCo;[41] and (b) HoldCo became the sole membership interest holder in CDM, resulting in its sole asset—formerly its 100% limited partnership interest in the Fund—being exchanged for the CDM Membership Interest.[42]

30. The LP/LLC Exchange prejudiced the interests of HoldCo. The CDM Membership Interest was less valuable than the Fund Partnership Interest because, among other reasons, whereas the New GP had owed fiduciary duties to HoldCo in the Fund, the manager, Mr. Patrick, did not owe any fiduciary duties to CDM; and, unlike the Fund Partnership Interest, the CDM Membership Interest was susceptible to being redeemed by Mr. Patrick (as Manager) in his sole

[39] Ex. 44, Director Resolutions to Transfer Fund from HoldCo to CDM for CDM Shares.

[40] Ex. 45, Deed of Assignment & Assumption to CDM.

[41] Ex. 32, Structure chart of the DAF Structure prior to the Relevant Transactions.

[42] Ex. 45, Deed of Assignment & Assumption to CDM; Ex. 46, Director Resolutions - Redemption of CDM Shares.

discretion and for any reason, for "fair market value" as defined by Article 6.9, i.e., a "good faith determination of value."[43]

### 2. DFW Share Issuance

31. On December 9, 2024, DFW, a nonprofit non-stock corporation, was incorporated in Delaware exclusively for charitable purposes.[44]

32. On February 7, 2025, without informing the Supporting Organizations or the Charities, the Directors passed resolutions for HoldCo to issue 318 Participating Shares to DFW, which, upon issuance, would allot DFW 51.04% of the Participating Shares of HoldCo. That same day, also without notice to the Supporting Organizations or the Charities, HoldCo issued and allotted 318 Participating Shares to DFW, resulting in DFW holding a 51.04% interest in HoldCo and diluting the Original Participating Shareholders' aggregate shareholding from 100% to 48.96%.[45]

### 3. Redemption

33. Following the LP/LLC Exchange, ValueScope was instructed without informing the Supporting Organizations or the Charities to prepare two valuation analyses: (a) the CDM Membership Interest;[46] and (b) certain Participating Shares of HoldCo as of March 25, 2025.[47] Historically, between December 2020 and September 2024, ValueScope conducted a series of valuation analyses of 100 Participating Shares on a NAV basis at HoldCo's request to determine their FMV. The final NAV-based valuation prepared by ValueScope prior to the Relevant

[43] Ex. 48, CDM LLC Agreement.

[44] Ex. 49, Certificate of Incorporation of DFW Charitable Foundation.

[45] Ex. 20, DFW Share Transfer; Ex. 21, Director Resolution (Share Issuance to DFW).

[46] Ex. 93, March 2025 ValueScope Valuation of Membership Interests of CDM.

[47] Ex. 50, March 2025 ValueScope Valuation of Participation Shares of HoldCo.

Transactions was dated January 7, 2025, and gave a valuation of 100 Participating Shares as of September 30, 2024. ValueScope determined that, as of September 30, 2024, the NAV of the Fund was $269.05 million, NAV per share was $882,140, FMV per share was $759,614 and the FMV of 100 Participating shares was $75,961,370.[48]

34. The March 2025 ValueScope Valuation, however: (a) applied a DCF methodology to estimate the present value of expected future distributions, rather than the NAV based approach used in at least the prior five annual valuations by ValueScope; (b) determined the FMV of 100 Participating Shares to be $536,784; (c) applied a 99.2% DLOC; and (d) applied a 20.00% DLOM.[49] The DCF model relied on projected future distributions to HoldCo, with those projections based on historical distributions that were also controlled by Mr. Patrick.[50]

35. Accordingly, the FMV of 100 Participating Shares in HoldCo apparently declined from $75,961,370 on September 30, 2024, to $536,784 on March 25, 2025—a 99.29% reduction in less than six months, coinciding with the LP/LLC Exchange and attributable to the shift in valuation methodology from NAV to DCF.[51] Although the March 2025 ValueScope Valuation report identified "total equity" of approximately $269 million and concluded that all Participating Shares had a combined value of only approximately $1.6 million, the analysis did not address who benefited from the residual value of roughly $267.4 million.[52]

36. On March 27, 2025, without informing the Supporting Organizations or the Charities, HoldCo entered into the Letter Agreement with CDM, pursuant to which HoldCo

[48] Ex. 51, September 2024 ValueScope Valuation.

[49] Ex. 50, March 2025 ValueScope Valuation of Participation Shares of HoldCo; Ex. 93, March 2025 ValueScope Valuation of Membership Interests of CDM.

[50] Id.

[51] Ex. 50, March 2025 ValueScope Valuation of Participation Shares of HoldCo.

[52] Id.

assigned to CDM various contracts and agreements to which it was a party.[53] On the same day, Mr. Patrick executed, in his capacity as manager of CDM and president of DFW, the following, again without notice to the Supporting Organizations or the Charities: (i) an Admission and Amendment No. 1 Agreement between CDM and DFW, under which DFW was admitted as a member of CDM in exchange for a capital contribution of $1,637,192;[54] and (ii) a Redemption and Amendment No. 2 Agreement under which CDM redeemed HoldCo's CDM shares for the same sum of $1,637,192.[55]

37. Additionally, on March 27, 2025, Mr. Patrick, in his capacity as manager of CDM, executed the Manager Consent approving the Admission and Redemption.[56] The Manager Consent stated that the redemption of HoldCo's shares of CDM under the Letter Agreement was justified due to alleged attempts by the Supporting Organizations to exert control, and the potential loss of their nonprofit and tax-exempt status.[57]

38. On April 2, 2025, the Directors, by written resolution: (a) noted the redemption of HoldCo's shareholding in CDM for the Redemption Sum; and (b) resolved to make a shareholder distribution totaling $1,612,192.01.[58]

39. The substantive financial effect of the Redemption was that DFW paid the Redemption Sum to CDM, and HoldCo's shares in CDM were redeemed for that same amount—effectively transferring or selling HoldCo's interest in CDM to DFW for the Redemption Sum. As a result of the Redemption: (a) HoldCo realized its interest in the Fund, which had a NAV of

---

[53] Ex. 52, Letter Agreement.

[54] Ex. 53, CDM Redemption Agreement (Amendment #1).

[55] Ex. 54, CDM Redemption Agreement (Amendment #2).

[56] Ex. 55 CDM Manager Consent to Admission and Redemption.

[57] Id.

[58] Ex. 46, Director Resolutions - Redemption of CDM Shares.

approximately $269.1 million, for only around $1.6 million; (b) HoldCo purported to distribute that approximately $1.6 million to accounts in the name of the Participating Shareholders; (c) the Original Participating Shareholders, being the Supporting Organizations and CFNT were actually or effectively divested of their indirect interest—subject to the discretion of the person holding the Control Position—in the Fund and its underlying assets; and (d) the Original Participating Shareholders, being the Supporting Organizations and CFNT, whose economic interest in HoldCo had been diluted from 100% to 48.96% following the DFW Share Issuance, were entitled to their proportionate share of distributions in the amount of 48.96% of the Redemption Sum. As such, HoldCo had no assets at that time.

**ii. <u>The Remuneration Transactions</u>**

40. Following his appointment as director of HoldCo on March 25, 2021, Mr. Patrick resolved to dramatically increase his remuneration. Specifically (and among other things):

(a) Directors' fees increased from around $40,000 in 2022 to almost $600,000 in 2023.[59]

(b) On September 13, 2024, the Directors resolved to increase Mr. Patrick's salary to $850,000 per annum and approve an LTI of 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).[60]

(c) On or around October 1, 2024:

(i) The Directors resolved that Mr. Patrick was to receive an LTI payment of $975,000 and an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary.[61]

(ii) Mr. Patrick signed an "employment agreement" for his position at HoldCo, effective as of March 24, 2021, which provided, among other

[59] Ex. 56, Expenses.

[60] Ex. 57, 09.13.2024 Director Resolutions re. M. Patrick Compensation.

[61] Ex. 58, 10.01.2024 - Director Resolutions re. M. Patrick Compensation.

things, for a base salary of $850,000 and an LTI payment of $4,759,000 for the period from March 24, 2021 to March 24, 2024.[62]

41. By way of contrast to the remuneration that Mr. Patrick resolved he should be awarded, his predecessor's salary (Grant Scott) during his tenure in the same position was approximately $60,000 per annum.[63]

42. As regards expenses, expenses overall for the first half of 2024 were around $18.3 million – almost the same amount spent over the entire course of 2023 (i.e., $18.6 million).[64]

**E. <u>Lack of Transparency and Misleading Disclosures Provided to Supporting Organizations</u>**

43. As more fully set forth in the Statement of Claim, prior to and during the time when the Directors were consummating the Relevant Transactions, the Directors persistently declined to disclose information regarding their actions and intentions notwithstanding the Supporting Organizations repeated requests.[65]

44. In November 2023, the Directors sought legal advice under Cayman law regarding the rights and duties of HoldCo's controlling person in connection with various matters including, diluting Participating Shares, redeeming Participating Shares, liquidating HoldCo to distribute its assets elsewhere or otherwise render the Participating Shares worthless, each in the context of potential future disputes with the Original Participating Shareholders.

45. In or around August 2024, the Supporting Organizations were provided with a financial analysis of the Fund's annual expenses, which showed—or appeared to show—a

---

[62] Ex. 92, Mark Patrick Employment Agreement.

[63] Ex. 83, Hr'g Tr. 132:10-11, *In re Highland Capital Management, L.P.*, No. 19-34054-sgj-11, Bankr. N.D. Tex. (Dallas Div.) Jun. 8, 2021, ECF No. 2440.

[64] Ex. 56, Expenses.

[65] Ex. 59, Statement of Claim.

significant increase in expenditures, as described above, both with respect to Directors fees and overall expenses.[66]

46. In late October 2024, as a result of concerns from this additional expenditure, the Supporting Organizations requested that Mr. Patrick provide relevant financial information for the HoldCo and the Fund. Mr. Patrick did not do so.

47. On November 11, 2024, H&K, U.S. attorneys for the Supporting Organizations, issued a letter to Mr. Murphy advising that the Supporting Organizations no longer had confidence in the governance of HoldCo and/or the Fund and considered that a reorganization of the governance structures was required to protect the charitable efforts of the Supporting Organizations.[67]

48. On November 26, 2024, Mr. Patrick sought and obtained advice regarding whether HoldCo could issue further Participating Shares to a new nonprofit organization to dilute the Supporting Organizations so as to weaken any winding-up petition brought by the Supporting Organizations on just and equitable grounds.[68] On November 27, 2024, Cayman Islands counsel responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition would be taken into consideration and would likely help.[69] Mr. Patrick incorporated DFW as a nonprofit, non-stock corporation in Delaware on December 9, 2024.[70]

49. On December 11, 2024, Mr. Murphy and HoldCo's Cayman counsel gave a presentation to attorneys from H&K on behalf of the Supporting Organizations providing various

---

[66] Ex. 56, Expenses.

[67] Ex. 60, No Confidence Letter.

[68] Ex. 61, Email from Mr. Murphy to Mr. Patrick.

[69] Ex. 62, Email from Walkers to the Directors.

[70] Ex. 49, Certificate of Incorporation of DFW Charitable Foundation.

assurances regarding governance matters being addressed by the Directors.[71] The meeting was, by all accounts, positively regarded. The attorneys on behalf of the Supporting Organizations invited Mr. Murphy to make the same presentation directly to the Supporting Organizations.

50. Nonetheless, the very next day, Mr. Patrick incorporated CDM and, on December 18, 2024, the Directors consummated the LP/LLC Exchange, each without disclosing the same to the Supporting Organizations.[72]

51. On January 23, 2025, having received no follow-up to the December 11, 2024 meeting with Mr. Murphy, Julie Diaz, the CEO of The Dallas Foundation, sent Mr. Patrick an email advising that the Supporting Organizations needed to better understand HoldCo and the Fund's asset position, and requesting certain information be provided by February 10, 2025. [73]

52. Having received no response, on January 28, 2025, Ms. Diaz sent a further email to the Directors expressing serious concern: (i) that the Supporting Organization's requests for information continued to be disregarded; and (ii) about the ongoing lack of transparency on the party of the Directors.[74]

53. On January 30, 2025, Mr. Murphy replied to Ms. Diaz stating that the Directors: (i) had not received the January 23 email, but understood the next step was for the Directors to "present directly" to the Supporting Organizations to address the No-Confidence Letter; and (ii) are coopering with the Supporting Organizations to provide additional information – but "have no

---

[71] Ex. 63, Walkers Presentation - Participating Shareholder Rights Charitable DAF HoldCo Ltd.

[72] See ¶¶27-30, above.

[73] Ex. 64, Emails (Julie Diaz, Paul Murphy, Michael Stockham).

[74] Id.

legal obligation to do so" and such cooperation "should not be construed as an implicit acknowledgement of any duty to continue providing information to you."[75]

54. On January 31, 2025, Mr. Michael Stockham of H&K responded to Mr. Murphy noting that he and Mr. Patrick were fiduciaries, managing $270 million in assets for the benefit of charities that support the most vulnerable (i.e., the Charities) and: "[w]hatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions."[76]

55. On February 4, 2025, Mr. Murphy responded that while open to resolving the concerns, they (i.e., the Directors) were struggling to understand the Supporting Organization's change in position.[77]

56. On February 7, 2025, H&K responded that the Directors were fiduciaries in control of $270 million for the benefit of charities: "these monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed and … fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees."[78]

57. On the same date, without informing the Supporting Organizations, the Directors consummated the purported DFW Share Issuance.[79]

58. On February 14, 2025, H&K received a letter from Mr. Mancino, a partner in Seyfarth, a U.S. law firm apparently engaged by the Fund, which rejected the accuracy of the reported increases in expenditure.[80] On February 27, 2025, H&K responded that his clients were

---

[75] Id.

[76] Id.

[77] Id.

[78] Id.

[79] Ex. 21, Director Resolution (Share Issuance to DFW).

[80] Ex. 70, February 14, 2025 Seyfarth Letter.

frustrated by the lack of transparency and refusal to answer simple queries about the financial position.[81] In response, Seyfarth sought available dates for Mr. Murphy to make the promised presentation to the Supporting Organizations.[82] H&K responded the next day with three potential dates/times for the proposed call between March 26 and April 3, 2025. Mr. Mancino did not respond. [83]

59. On March 20, 2025, Mr. Mancino sent a letter purportedly on behalf of HoldCo to the IRS about Mr. Dondero's alleged influence and control over the Supporting Organizations.[84] The letter makes serious and unsubstantiated allegations about the Supporting Organizations, absent evidentiary support, including that they each (i.e., all of them): "operates for Mr. Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of [HoldCo] to wrest control of [HoldCo] and its assets. . ."[85]

60. Commencing on March 27, 2025, the Directors initiated steps to effectuate the Redemption, which they consummated on April 2, 2025, without informing the Supporting Organizations.[86] On that same day, the Directors resolved to place HoldCo into voluntary liquidation and appointed Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd as joint voluntary liquidators.[87]

---

[81] Ex. 71, February 27, 2025 H&K Letter.

[82] Ex. 75, March 2025 Emails (D. Mancion & D. Rosenberg).

[83] Id.

[84] Ex. 72, Seyfarth Letter to IRS.

[85] Id.

[86] Ex. 46, Director Resolutions - Redemption of CDM Shares; Ex. 55, CDM Manager Consent to Admission and Redemption; Ex. 73, Director Resolutions - Assignment of Contracts to CDM.

[87] Ex. 65, Charitable DAF Holdco Resolutions re Voluntary Liquidation; Ex. 74, Sole Voting Shareholder Resolutions (Voluntary Liquidation).

61. Notwithstanding the consummation of the Redemption and the commencement of voluntary liquidation of HoldCo the day prior, on April 3, 2025, Mr. Mancino sent an email to H&K stating that he had just learned there was a call scheduled for the following day and seeking to reschedule.[88] H&K responded that no such call had been arranged and queried about the apparent source of confusion.[89]

**F. <u>The Cayman Proceeding</u>**

62. Unaware of the Directors resolution to place HoldCo into voluntary liquidation, on April 23, 2025, the Supporting Organizations presented a petition seeking the winding up of HoldCo on a just and equitable basis under section 92(e) of the Companies Act.[90] It was only after filing the J&E Petition that the Directors disclosed they had consummated the Relevant Transactions and commenced a voluntary liquidation of HoldCo on April 2, 2025.[91]

63. On May 2, 2025, the Supporting Organizations filed a petition seeking an order for the voluntary liquidation of HoldCo—now a debtor—to continue under the supervision of the Cayman Court pursuant to section 131 of the Companies Act.[92] Following a hearing and review of the Supervision Petition, supporting affidavits and affirmations with exhibits, and the documents filed in Cause No. FSD 116 of 2025 (JAJ)—including the J&E Petition and the affidavits of the JOLs confirming their consent to act—the Cayman Court issued the Supervision Order.[93] Pursuant to the Supervision Order, the voluntary liquidation of the Debtor was continued

[88] Ex. 76, April 2025 Emails (D. Mancion & D. Rosenberg).

[89] Id.

[90] Ex. 77, J&E Petition; Ex. 78, Companies Act.

[91] Ex. 66, Walkers Letter re Charitable DAF Holdco. Ltd in Voluntary Liquidation.

[92] Ex. 67, Supervision Petition in the Grand Court of the Cayman Islands FSD 2025-0116 (JAJ).

[93] Ex. 1, Supervision Order in the Grand Court of the Cayman Islands FSD 2025-0116 (JAJ).

under the supervision of the Cayman Court, and the JOLs were appointed under section 131 of the Companies Act and Order 15, rule 8 of the Winding Up Rules.[94]

64. Also pursuant to the Supervision Order, the Petitioners were authorized to exercise the following powers, among others, under Part I of Schedule 3 to the Companies Act[95] without further Cayman Court sanction: (a) the power to commence legal proceedings in the name and on behalf of the Debtor to obtain information, documents, or the examination of individuals in the Cayman Islands or the United States; and (b) the power to apply in the Cayman Islands or the United States for the preservation, freezing, or attachment of assets to which the Debtor is or may arguably be entitled.[96] Moreover, the Petitioners were authorized to seek registration or recognition of themselves and/or the Cayman Proceeding in any U.S. state for any purpose related to the exercise of the above-described powers in the Supervision Order.[97]

**i. <u>Conduct of the Cayman Proceeding</u>**

65. The JOLs have diligently performed their duties in progressing the Cayman Proceeding from and after their appointment. The JOLs have taken steps to fulfil their statutory obligations: by filing notice of the winding up with the Cayman Islands Registrar of Companies; circulating notices of the winding up to known stakeholders, service providers of HoldCo, and known contributories of HoldCo; publishing their notice of appointment in the Cayman Islands Gazette and Cayman Compass Newspaper;[98] determining HoldCo should be treated as solvent for the purposes of Section 110(4) of the Companies Act, as well as Orders 8 & 9 of the Winding Up

[94] Id.; Ex. 78, Companies Act; Ex. 79, Winding Up Rules.

[95] Ex. 78, Companies Act.

[96] Id.

[97] Id.

[98] Ex. 68, Charitable DAF HoldCo - Gazette - Notice of Appointment JOL; Ex. 69, Charitable DAF HoldCo - Compass - Notice of First Meeting of Contributories.

Rules; determining the functional currency of the liquidation to be U.S. dollars pursuant to Order 16, Rule 13 of the Winding Up Rules; changing the registered office of HoldCo from Campbells Corporate Services Limited to HSM Corporate Services Ltd; publishing a Report to Contributories on July 2, 2025; and on July 3, 2025, convening the first meeting of contributories held on July 9, 2025.[99]

66. Moreover, to identify, secure and recover HoldCo's books and records, the JOLs have: (a) issued formal correspondence to over 50 parties, including, directors, shareholders, banks, service providers, the prior appointed joint voluntary liquidators, notifying them of the JOLs appointment and requesting books and records; (b) issued requests to hold an interview with the directors; and (c) held discussions with various parties to discuss the history and financial affairs of HoldCo.

67. The JOLs have engaged extensively with representatives of various interested parties in connection with, among other things, seeking and obtaining sanction of the Cayman Court to engage Cayman and U.S. counsel.[100] In addition, the JOLs, through counsel, have engaged with representatives of CDM, New GP, and CLO HoldCo in relation to a potential protocol intended to allay the JOLs' concerns regarding asset dissipation, transparency and asset management while the JOLs progress their investigation. The JOLs, however, do not believe the protocol proposed by CDM, the New GP, and CLO HoldCo would adequately protect HoldCo's position and, to date, the parties have been unable to reach terms of agreement with respect to any protocol.[101]

---

[99] Ex. 78, Companies Act; Ex. 79, Winding Up Rules; Ex. 80, Filed Resolutions re Change of Registered Office - Charitable DAF Holdco, Ltd.

[100] In respect of which, on June 24, 2025, the Cayman Court sanctioned the engagements of Cayman and U.S. counsel by the JOLs.

[101] Ex. 81, Various May & June 2025 Letters and Drafts of the Protocol.

68. Since the date of their appointment, the JOLs have conducted an extensive and detailed investigation into HoldCo's affairs, albeit that those investigations are not yet complete. This has involved a review of HoldCo's books and records (to the extent that they have been able to obtain them and to the extent that they are complete) and numerous inquiries and requests for information directed to persons previously involved with HoldCo. There have, however, been several limitations on the JOLs' investigations in connection with the information requests made from those persons previously involved in the HoldCo, including certain U.S.-based service providers who have asserted that they do not recognize the JOLs authority under the Supervision Order, where the JOLs have not been able to obtain copies of the requested information. Notwithstanding these limitations, the JOLs investigation has progressed sufficiently to enable them to identify significant areas of concern.

**ii. <u>Commencement of the Cayman Litigation</u>**

69. On July 4, 2025, the JOLs applied to the Cayman Court in the Cayman liquidation proceedings on an *ex parte* basis for sanction to commence litigation proceedings by way of filing the Statement of Claim[102] against the following defendants: (1) Mark Eric Patrick; (2) Paul Murphy; (3) CDM; (4) DFW; (5) CDH as general partner for and on behalf of the Fund, and in its capacity as New GP; and (6) CLO HoldCo.[103]

[102] Ex. 59, Statement of Claim; Ex. 85, Sanction to File Statement of Claim.

[103] In determining whether to commence the Cayman Litigation, the JOLs gave due regard to the Named Defendants' likely defenses with respect to the propriety of the Relevant Transactions and the Remuneration Transactions. At a high level, the JOLs understand that the Named Defendants will seek to justify the Relevant Transactions on three independent grounds: (1) on the basis that the Original Participating Shareholders did not have an economic interest in HoldCo, which was formed simply to act as a throughput for discretionary, charitable donations to qualifying recipients (which were not necessarily the Supporting Organizations, CFNT or the Charities), such that the Original Participating Shareholders did not lose any cognizable interest because of the Relevant Transactions; (2) the Relevant Transactions were necessary and appropriate to protect HoldCo and its Directors from attempts by Mr. Dondero and the Supporting Organizations to improperly exercise dominion and control over HoldCo's assets, which would (x) expose HoldCo (x) to breaches of US tax law and regulation and (y) claims from third parties that HoldCo and the Fund Entities were alter egos of Mr. Dondero in lawsuits against Mr. Dondero; and (3) on the basis that the Directors relied appropriately on third party valuation reports in effectuating the Redemption at FMV. The JOLs likewise

70. A further description of each of the Named Defendants is as follows:

(a) **Mr. Mark Patrick**. Mr. Patrick is a U.S. attorney and was employed as tax counsel by Highland Capital Management, L.P., an investment company founded by Mr. James Dondero, from 2008 – 2021 and as tax counsel by Highgate Consulting Group, Inc. d/b/a d/b/a Skyview Group from March 2021 to October 2024. He was instrumental in the creation of the Fund in 2011; in particular, he advised on the tax structure of using an offshore "blocker" company. Mr. Patrick is one of two directors of HoldCo, having been appointed as director on March 25, 2021. In that capacity, he was responsible for the supervision of the day-to-day operations of HoldCo. As director, Mr. Patrick owed, and continues to owe, fiduciary duties to HoldCo. Mr. Patrick was also: (i) the holder of all of the Management Shares in HoldCo; (ii) the manager of CDM; (iii) the sole member and sole director of DFW, which is now the sole member of CDM; (iv) the sole director and sole shareholder of CDH GP, Ltd, the New GP; and (v) a director of CLO HoldCo, the entity through which the Fund holds its assets.

(b) **Mr. Paul Murphy**. Mr. Murphy was the other director of HoldCo, having been appointed so on April 22, 2021. Mr. Murphy is also a director of CLO HoldCo.

(c) **CDM**. A limited liability company incorporated in Delaware on December 12, 2024, Mr. Patrick is the Manager of CDM. DFW has been the sole member of CDM since March 27, 2025.

(d) **DFW**. A nonprofit non-stock corporation incorporated in Delaware on December 9, 2024, by Mr. Douglas Mancino, a partner in Seyfarth, a U.S. law firm apparently engaged by the Fund. DFW is organized under the General Corporation Law of the State of Delaware exclusively for charitable purposes. The JOLs understand that DFW is now the holder of the majority of the Participating Shares in HoldCo pursuant to the DFW Share issuance on February 7, 2025, and controlled by Mr. Patrick as its sole member.

(e) **The New GP**. A Cayman Islands exempted limited company incorporated on February 27, 2024. It replaced the Original GP as the Fund's current general partner on March 7, 2024, after Mr. Patrick sought advice from Walkers on forming a new entity to replace the Original GP. On February 5, 2024, Shields Legal asked Mr. Patrick whether that entity should be a Cayman LLC or exempted company, to which he responded: "*Doesn't matter to me. Whatever from a strategic point of view – hard to find or track, or trace. Or find owners, etc. Generic name. Strong litigation protection.*"

---

understand that Mr. Patrick intends to rely on a third party report to justify the Remuneration Transactions. On the basis of the investigation conducted by the JOLs to date, the JOLs do not find these defenses and justifications to be availing or credible.

(f) **CLO HoldCo**. A Cayman Islands exempted limited company. CLO HoldCo is the Fund's only direct subsidiary. The Fund held all of CLO HoldCo's issued shares.

71. HoldCo's claims pleaded in the Statement of Claim arise as a result of the breaches by the Directors of their fiduciary duties owed to HoldCo, having caused HoldCo to have dissipated its assets through a combination of: (a) the Relevant Transactions; and (b) the Remuneration Transactions, all of which were for the benefit of entities controlled by Mr. Patrick or for his benefit, personally.[104] In addition to asserting claims against the Directors for willful breaches of their fiduciary duties to HoldCo, the Statement of Claim asserts claims against: (i) the Named Defendants for unlawful means conspiracy based on the Named Defendants having conspired and combined together to injure HoldCo by unlawful means and HoldCo having suffered loss and damage as a result; (ii) CDM for knowing receipt of HoldCo's property, its partnership interest in the Fund, which had been misappropriated from HoldCo by virtue of the Directors breach of fiduciary duties; and (iii) CDM for unjust enrichment on the basis that it received HoldCo's interest in the Fund without there being a valid assignment or other justification for that receipt, such that it is liable to HoldCo in restitution.[105]

72. At the hearing of the sanction proceeding on July 14, 2025, to obtain an order granting the JOLs sanction to commence the Cayman Proceeding, the JOLs were required to satisfy the Cayman Court in the Cayman liquidation proceedings that: (a) the Cayman Litigation had a reasonable prospect of success; and (b) the interests of HoldCo's stakeholders were best

[104] Ex. 59, Statement of Claim.

[105] Ex. 59, Statement of Claim.

served by the JOLs commencing the Cayman Litigation.[106] The Cayman Court granted sanction for the JOLs to commence the Cayman Litigation.[107]

73. On July 15, 2025, the Debtor proceeded to file the Statement of Claim with the Cayman Court to commence the Cayman Litigation (which has the cause number FSD 201 of 2025 (RPJ)).[108] At the same time the JOLs filed an application for: (a) a proprietary injunction to prevent the Named Defendants from dealing with the assets of the Debtor that are held now held or controlled by the Named Defendant together with disclosure orders; and (b) leave to serve the U.S. based defendants with the Statement of Claim and Injunction Application.[109]

74. Additionally, on July 15, 2025, the Debtor: (1) emailed copies of the Statement of Claim and the Applications to the Cayman Islands attorneys for the Named Defendants and asked them to accept service; and (2) served copies of the Statement of Claim at the Cayman Islands registered addresses of CDH GP, Ltd. and CLO Holdco, Ltd. The Applications have been listed for hearing on July 31, 2025.

75. The Named Defendants are entitled to participate and be heard on that date. In the event the Named Defendants do not participate, the Cayman Court will hear the Injunction Application on an *ex parte on notice* basis and, if the Injunction is granted, will schedule an *inter partes* hearing for a later date.[110]

76. Should the Cayman Court grant the Injunctive Relief Application following the scheduled hearing on the Injunction Hearing date, and issue the Injunctive Relief Order, the JOLs

---

[106] *Re ICP Strategic Credit Income Fund* [2014] 1 CILR 314.

[107] Ex. 85, Sanction to File Statement of Claim.

[108] Ex. 59, Statement of Claim.

[109] Ex. 82, Injunction Application.

[110] Ex. 82, Injunction Application.

expect to seek recognition and enforcement of the Injunctive Relief Order against the Named Defendants on a provisional basis pursuant to section 1519 of the Bankruptcy Code pending the recognition of the Cayman Proceeding, at which time the JOLs will also seek recognition of the Injunctive Relief Order in this Chapter 15 Case pursuant to sections 1507(a) and 1521(a) of the Bankruptcy Code.[111]

**iii. Injunction Application**

77. The Injunction Application seeks orders that:

(a) the Named Defendants will: (i) preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest of (of whatsoever nature) whether held directly or indirectly, in the Fund, the Fund Entities, and/or any assets of the Fund; and (ii) procure that the Fund Entities and their wholly owned subsidiaries will not in any way dispose of, deal with, encumber, transfer or diminish the value of any of their assets;

(b) the Named Defendants will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish any assets in their possession or control, whether they are in or outside the Cayman Islands, which were, are or may be received (whether directly or indirectly): (i) by way of distribution, disposition, dividend, benefit, payment or other transfer from (as the case may be) HoldCo, the Fund, DFW, CDM, the New GP, the Fund Entities and/or their wholly owned subsidiaries; or (ii) from any assets of the Fund, the Fund Entities, and/or their wholly owned subsidiaries;

(c) the Named Defendants shall not do anything to cause, procure, incite, promote or assist a breach by any other Named Defendant of the above sections (a) and (b); and

(d) the Named Defendants shall make ancillary asset disclosures.[112]

78. The basis for the injunctive relief sought is that the Named Defendants each own and/or control assets that HoldCo has an equitable proprietary interest in (or at least a seriously arguable case that it does):

[111] Ex. 82, Injunction Application.

[112] Ex. 82, Injunction Application.

(a) Prior to the Relevant Transactions taking place, HoldCo held the Fund Partnership Interest, and thereby indirectly owned (99%) of all assets held by the Fund through its wholly owned subsidiary, CLO HoldCo (and its subsidiaries).[113]

(b) After the Relevant Transactions took place, and by reason of the Directors' breaches of fiduciary duty – (i) CDM now holds the Fund Partnership Interest, which continues to hold its assets through CLO HoldCo (and its subsidiaries); (ii) DFW is the sole member of CDM; (iii) Mark Patrick is the sole member of DFW; and (iv) Mark Patrick has full control over DFW, CDM, the New GP (and thus the Fund), and (together with Mr. Murphy) CLO HoldCo. Mr. Patrick therefore has the ability to control and/or deal with the Fund Partnership Interest and the Fund's assets, including any distributions of the Fund's assets received by CDM as its sole limited partner. Mr. Patrick now exercises this control free from the oversight previously exercised by the Supporting Organizations and CFNT through their holding of Participating Shares in HoldCo.[114]

79. Moreover, HoldCo has at least a seriously arguable case that CDM and DFW hold these assets through steps taken by the Directors that amounted to breaches of fiduciary duty, and therefore that these assets are subject to a constructive trust in favor of HoldCo, which is the necessary pre-requisite for the Cayman Court to grant a proprietary injunction restraining the disposition of that property. [115]

80. Under Cayman law, to obtain proprietary injunctive relief, the Debtor must show: (1) the existence of a serious issue to be tried as to whether it has a proprietary interest in the assets (such that the claim would be capable of surviving summary judgment); (2) that the balance of convenience is in favor of granting the injunction; and (3) that it is otherwise just and convenient

[113] Ex. 40, CLO HoldCo, Ltd Register of Members as of 5.19.2021; Ex. 84, Charitable DAF Fund, LP Register of Members as of 5.19.2021.

[114] Ex. 6, Register of Members Charitable DAF Holdco Ltd; Ex. 44, Director Resolutions to Transfer Fund from HoldCo to CDM for CDM Shares; Ex. 45, Deed of Assignment & Assumption to CDM; Ex. 46, Director Resolutions - Redemption of CDM Shares; Ex. 47, CDM Certificate of Formation; Ex. 49, Certificate of Incorporation of DFW Charitable Foundation; Ex. 52, Letter Agreement; Ex. 53, CDM Redemption Agreement (Amendment #1); Ex. 54, CDM Redemption Agreement (Amendment #2); Ex. 55, CDM Manager Consent to Admission and Redemption.

[115] See Moran Decl. ¶¶ 40, 42-45.

to grant the injunction. Moreover, under Cayman law, a court may order defendants to disclose information if the Debtor demonstrates that it is just and convenient to do so.[116]

**1. <u>Serious issues to be tried</u>**

81. On July 14, 2025, the Cayman Court granted sanction for the JOLs to file the Statement of Claim and in doing so accepted that the merits of the JOLs' claims satisfied the relevant threshold for the sanction of commencement of claims by official liquidators.

82. The Directors and DFW have put forward explanations as to why the transfer of the Fund Partnership Interest to CDM was legally justifiable, which the JOLs do not believe stand up to scrutiny as explained above.[117]

**2. <u>Balance of convenience</u>**

83. The JOLs do not believe that the proprietary injunctions they seek would hinder the operation of the Fund or the Fund Entities in any material way.[118] The Fund and the Fund Entities are mostly passive investment vehicles that hold shares or interests in other Fund Entities, cash, debt instruments, receivables, vacant land and/or stock in publicly traded companies. They are not, as far as the JOLs understand, engaged in the active trading of assets or the making of new investments on a frequent basis.

84. Accordingly, the JOLs believe that there is no justification for any new investments or other transactions to be made by any of those entities, beyond payments needed to stay in good standing and comply with their statutory obligations.

---

[116] See Moran Decl. ¶¶ 42-45.

[117] Ex. 44, Director Resolutions to Transfer Fund from HoldCo to CDM for CDM Shares; Ex. 70, February 14, 2025 Seyfarth Letter; Ex. 72, Seyfarth Letter to IRS; Ex. 86, Paul Murphy 12.4.2024 Presentation Slides; Ex. 87, 12.18.2024 Carrington Coleman Email.

[118] Ex. 82, Injunction Application.

85. Against that backdrop, the JOLs' position is that no dispositions of the assets of the Fund, the Fund Entities or any other subsidiaries above $10,000 need or should be made pending the determination of HoldCo's proprietary claim which, if successful, would see the Fund Partnership Interest returned to HoldCo and HoldCo would therefore wholly own (indirectly) all assets of the Fund, the Fund Entities and their wholly owned subsidiaries. Should any payments or dispositions be made by the Fund, the Fund Entities or any of their wholly owned subsidiaries that have the effect of harming the value of the Fund Partnership Interest, such payment or disposition would render the proprietary relief the JOLs are seeking much less effective.

86. Notwithstanding the above, the JOLs recognize that there may become a need for certain payments or other dispositions of assets to be made to preserve, maintain or improve the value of existing assets held by the Named Defendants, the Fund Entities and/or their wholly owned subsidiaries. Accordingly, the JOLs' proposed order to the Injunctive Relief Application provides for:

(a) The entity concerned to make a written request to the JOLs to make any such payments, together with full supporting information and documentation as well as an explanation of the rationale for the transaction; and

(b) The JOLs to decide within 7 days whether to approve or disapprove the proposed transaction.[119]

87. The JOLs also recognize that there will likely be a need for certain payments to be made by the Named Defendants, the Fund Entities or their wholly owned subsidiaries that are reasonably necessary in the ordinary course of business to keep the corporate Named Defendants, the Fund Entities or their wholly owned subsidiaries in good standing. The JOLs' proposed order to the Injunctive Relief Application allows for any such payments of $10,000 or less to be made.[120]

[119] Ex. 82, Injunction Application.

[120] Id.

88. The JOLs are also unaware of any harm that would be caused to CDM by preserving the status quo in respect of the Fund Partnership Interest. By comparison, if a proprietary injunction is not granted and CDM were to transfer the Fund Partnership Interest to another party or otherwise deal with that interest in some way, HoldCo could be significantly prejudiced. Specifically, HoldCo's proprietary claim to the Fund Partnership Interest could be undermined or become more difficult to enforce.

89. As to whether damages would be an adequate remedy for HoldCo in lieu of proprietary relief, as far as the JOLs' are aware, CDM has no other assets beyond the Fund Partnership Interest and therefore would likely be unable to meet any order for damages made against it. Only an order for CDM (and the other Named Defendants, to the extent they hold assets that derive from the Fund Partnership Interest) to restore HoldCo's property could return HoldCo to the position it would have been in had the improper transactions carried out by the Named Defendants not taken place. The JOLs' believe that the only way to ensure that such an order will be effective at the conclusion of these proceedings is for a proprietary injunction to be granted against the Named Defendants in respect of that property in the interim.

90. Further, as explained above, HoldCo, its Supporting Organizations, the Charities and the Fund are part of a carefully constructed investment structure for (i) the tax efficient treatment of charitable donations; and (ii) investments to be made for the ultimate benefit of the Charities and CFNT.[121] Without the re-transfer of the Fund Partnership Interest to HoldCo, those parties may be unable to achieve their charitable objectives as effectively or at all. An award of damages in lieu of proprietary relief would mean that HoldCo would hold only cash and no other assets or investments, and the Charities and Supporting Organizations would effectively be back

---

[121] See ¶¶13-19, above.

to square one in terms of setting up a proper investment structure to carry out their investments and protect their tax-exempt status.

**3. <u>Disclosure of assets</u>**

91. The JOLs have only limited information as to what assets each of the Named Defendants, Fund Entities and their wholly owned subsidiaries hold. Even so, the JOLs have no way of verifying this information or knowing if it is completely up to date.

92. In circumstances where, in the JOLs' case, a misappropriation of the HoldCo's sole and valuable asset has already occurred, the JOLs believe protection is needed to prevent any further dissipation of assets from occurring in breach of any injunction that is granted. The JOLs believe that this protection can be afforded by way of disclosure orders in support of the injunction requiring the Named Defendants to disclose what assets they each hold and their approximate value. Having that information in hand will allow the JOLs (and the Cayman Court) to effectively police the injunction (in terms of preventing dissipation of Fund assets and thereby preserving the value of the Fund Partnership Interest).

93. In addition, the proposed order in support of the Injunctive Relief Application seeks confirmation as to:

(a) All of the entities owned directly or indirectly by the Fund, including full details as to their owners, directors, officers or other controllers, and places and details of incorporation. This will allow the JOLs to have a complete picture of the Fund structure.[122]

(b) All payments by way of salary, bonus, dividend, distribution or other compensation made to Mr. Patrick or Mr. Murphy by HoldCo, the Fund, DFW, CDM, the New GP, CLO HoldCo, or any of the Fund Entities or other entities revealed by (a) above since February 27, 2024.[123]

---

[122] Ex. 82, Injunction Application.

[123] Id.

(c) All payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor, whether a firm, partnership, company or individual, made by HoldCo, the Fund, DFW, CDM, the New GP, CLO HoldCo, or any of the Fund Entities or other entities revealed by (a) above since February 27, 2024.[124]

**4. <u>Cross undertaking in damages</u>**

94. The Debtor is not offering to provide a cross-undertaking as to damages in the Injunction Application. This is because in this case, the JOLs are not only acting in the Debtor's best interests, but also in a position analogous to the public interest based on the charitable or non-profit status of at least the underlying Charities, which are the intended recipients of donations made from the Debtor. No cross-undertaking in damages should be required in such circumstances.

## G. <u>The Texas Proceeding</u>

95. On July 1, 2025, the Supporting Organizations commenced the TRO Action against defendants Mark Patrick, DFW, CDM, CDH, and the Original GP by filing *Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver* in the Texas Business Court, 1st Division.[125] Among other things, the TRO Action seeks: (1) a temporary restraining order; (2) a temporary injunction; and (3) the appointment of a receiver against some of the TRO Defendants arising from various breaches of fiduciary duties and related claims alleged to be owed to the Supporting Organizations directly.[126]

96. On July 2, 2025, during the hearing for the TRO Action, in lieu of a decision rendered by the Texas Court, and at the direction of the Texas Court, the parties entered into a

---

[124] Id.

[125] Ex. 85, Supporting Organizations Texas Business Court TRO Petition.

[126] Id.

Rule 11 Agreement under the Texas Rules of Civil Procedure, which the JOLs understand is a binding contract among the parties.[127] The key points of the Rule 11 Agreement are: (a) that the TRO Defendants shall not make any payments or disbursements other than those in the ordinary course of business; (b) investments and monies must be kept in the existing entities that currently hold those investments and monies, provided that, if any investment is monetized on its own terms, then the entity may prudently reinvest the resulting cash proceeds into liquid securities; and (c) there shall be no changes to the corporate structure of ownership of the TRO Defendants.[128] The Texas Court scheduled a further hearing on the TRO Action on July 24 and 25, 2025.

97. Following the hearing on July 2, 2025, the parties to the TRO Action amended and modified the Rule 11 Agreement to: (a) provide the TRO Defendants the opportunity to challenge the Texas Court's jurisdiction pursuant to a briefing schedule concluding on July 24, 2025; (b) clarify the parties' discovery rights with respect to the TRO Action; and (c) evidence the restrictions imposed upon the activities of the TRO Defendants and their subsidiaries pursuant to the Rule 11 Agreement pending a decision by the Texas Court of the TRO Action and the Plea.[129] On July 14, 2025, the TRO Defendants filed a jurisdictional challenge, asserting that: (1) the Texas Court lacks subject matter jurisdiction to hear the TRO Action; and (2) the Supporting Organizations lack standing, suggesting that the JOLs, on behalf of HoldCo, are the appropriate parties to assert the claims alleged in the TRO Action.[130]

98. The JOLs support the Final Rule 11 Agreement in the near term in that it imposes restrictions on the covered entities regarding asset dissipation in the short term, pending the

[127] Ex. 88, Proposed Order (Rule 11 Agreement).

[128] Id.

[129] Ex. 89, Final Rule 11 Agreement.

[130] Ex. 90, Defendants' MTD & Plea to the Jurisdiction.

outcome of the Injunctive Relief Application filed by the JOLs in the Cayman Court and the recognition of relief as may be granted by the Cayman Court in this Chapter 15 Case.[131] The JOLs believe that the Cayman Court is the appropriate forum to adjudicate causes of action that belong to HoldCo as asserted in the Cayman Litigation.[132] The JOLs are also cognizant of the need for administrative efficiency in connection with the Cayman Proceeding and their duties to realize upon HoldCo's assets, and, accordingly, reserve rights with respect to coordination and management of the TRO Action, the Cayman Litigation and this Chapter 15 Case.

**H. <u>This Chapter 15 Case</u>**

99. On the Petition Date and in my capacity as one of the JOLs of the Debtor, I, alongside Mr. Bhowmik, filed a petition under chapter 15 of the Bankruptcy Code for recognition of the Cayman Proceeding, thereby commencing the Debtor's Chapter 15 Case.

100. Consistent with the purpose of official liquidation under Part V of the Companies Act, section 110(2), the Petitioners are also empowered to investigate: (a) the causes for the failure of HoldCo, as necessary, and (b) generally, the promotion, business, dealings and financial affairs of HoldCo.[133]

101. Section 97(1) of the Companies Act provides in relevant part that upon the entry of a winding up order against a company, no suit or other proceeding may be commenced or continued against the company except with leave of the Cayman Court and subject to such terms as the Cayman Court might impose.[134] This automatic stay mirrors the stay imposed in United

[131] Ex. 89, Final Rule 11 Agreement.

[132] Ex. 59, Statement of Claim.

[133] Ex. 78, Companies Act.

[134] Id.

States bankruptcy proceedings and serves to, *inter alia*, facilitate the Petitioners' ability to deal with claims and creditors collectively and comprehensively.

102. A general principle underlying the Companies Act and the Cayman Proceeding is that creditors are treated on a *pari passu* basis, subject to certain exceptions.[135]

103. Cayman liquidation proceedings are fair and equitable insofar as all creditors and interest holders have the opportunity to be heard by the Cayman Court and no creditors will be prejudiced on the sole basis that they are foreign based. All creditors are treated equally, regardless of where they are domiciled.

## I. Qualifications for Recognition and Jurisdiction in the United States

104. On the Petition Date and in my capacity as one of the JOLs of the Debtor, I, alongside Mr. Bhowmik, filed a petition under chapter 15 of the Bankruptcy Code for recognition of the Cayman Proceeding, thereby commencing the Debtor's Chapter 15 Cases.

105. I was authorized pursuant to the Supervision Order to act as one of the JOLs of the Cayman Proceeding and to seek recognition and approval of the Cayman Proceeding as necessary, including as "foreign main proceedings" under the Bankruptcy Code. In light of the statutory presumption embodied in section 1516(a) of the Bankruptcy Code, the Bankruptcy Code's definition of "foreign representative," and the Supervision Order, I understand that I satisfy the requirements to serve as the "foreign representative" of the Cayman Proceeding.

106. I have been advised that, in order to qualify for recognition under chapter 15, the Verified Petition must meet certain requirements. In particular, it must be brought by a "foreign representative" of a "foreign proceeding" that is pending before a "foreign court," all as defined in the Bankruptcy Code.

[135] For example, see sections 140 and 141 of the Companies Act. Ex. 78, Companies Act.

107. I am aware of the definition of "foreign representative," as referred to in 11 U.S.C. § 101(24), and I believe that the JOLs qualify as such. The JOLs were appointed by the Cayman Court pursuant to the Companies Act to act as the JOLs of HoldCo. Among other things, the JOLs are authorized to exercise the following powers under Part I of Schedule 3 to the Companies Act without further Cayman Court sanction: (a) the power to commence legal proceedings in the name and on behalf of HoldCo to obtain information, documents, or the examination of individuals in the Cayman Islands or the United States; and (b) the power to apply in the Cayman Islands or the United States for the preservation, freezing, or attachment of assets to which HoldCo is or may arguably be entitled. Moreover, the JOLs are authorized to seek registration or recognition of themselves and/or the Official Liquidation in any U.S. state for any purpose related to the exercise of the powers described in the Supervision Order.[136] As such, the JOLs are the persons responsible for representing HoldCo in the Cayman Proceedings and in all related matters, including this matter, and are therefore "foreign representatives" of HoldCo within the meaning of section 101(24) of the Bankruptcy Code.[137]

108. I also have been advised that a "foreign court" is defined in section 1502 of the Bankruptcy Code as "a judicial or other authority competent to control or supervise a foreign proceeding." I respectfully submit that the Cayman Court qualifies as a foreign court for the purposes of section 1502.

109. I understand that a "foreign proceeding" is defined as "a collective judicial . . . proceeding in a foreign country . . . under a law relating to insolvency or the adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a

[136] Id.

[137] Ex. 1, Supervision Order.

foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23). I respectfully submit that the Cayman Proceeding qualifies as such, since, by definition, it is a liquidation proceeding pursuant to and governed by the Companies Act under the collective judicial supervision of the Cayman Court for the benefit of all of HoldCo's creditors, and parties in interest.[138]

110. I am also aware that section 1517(b)(1) of the Bankruptcy Code provides that a foreign proceeding shall be recognized as a "foreign main proceeding" if the foreign proceeding is "pending in the country where the debtor has the center of its main interests". I understand that section 1516(c) of the Bankruptcy Code provides that a debtor's "registered office" is presumed to be the debtor's COMI in the absence of evidence to the contrary. Since HoldCo was formed under the laws of the Cayman Islands and maintains its registered office there,[139] I believe that there is no basis for rebutting this statutory presumption that is afforded. In any case, the facts clearly indicate that HoldCo's COMI is the Cayman Islands. As demonstrated by the facts included herein, I further believe that HoldCo is engaged in non-transitory economic activity in the Cayman Islands.

111. As JOLs, we have displaced the prior board of directors of HoldCo. No action with respect to HoldCo, whether transactional-related or litigation-related, may be taken without the express approval and consent of myself and Mr. Bhowmik. All of HoldCo's known assets and interests are under the sole and exclusive control of the JOLs from the Cayman Islands. Consistent

[138] Id.; Ex. 77, J&E Petition.

[139] Ex. 3, Certificate of Incorporation - Charitable DAF Holdco, Ltd; Ex. 5, Amended and Restated Memorandum and Articles of Association of Charitable DAF; Ex. 80, Filed Resolutions re Change of Registered Office - Charitable DAF Holdco, Ltd.

with the Companies Act, the Winding Up Rules and the Supervision Order, Mr. Bhowmik and I have engaged in numerous activities to further HoldCo's liquidation.[140]

112. Since our appointment by the Cayman Court, we have worked from our offices at Grant Thornton in the Cayman Islands, from which all decisions are made, and have: (i) retained Cayman Islands and U.S. legal counsel from our Cayman Islands offices and under Cayman Islands law; (ii) obtained certain books and records of HoldCo in the Cayman Islands; (iii) regularly communicated with creditors and shareholders from the Cayman Islands; and (iv) commenced investigations into the affairs of HoldCo and its subsidiaries, including taking steps to identify and seek discovery from potential parties in interest both within and outside the Cayman Islands. All relevant inquiries from creditors and other parties-in-interest are now directed to the JOLs.

113. I have reviewed documentation issued by and to HoldCo prior to the Cayman Proceeding, including the Amended and Restated Memorandum and Articles of Association of HoldCo dated February 20, 2025, the Fund LPA, books and records of HoldCo, and various shareholder and directors resolutions of HoldCo. In all such documentation which I have reviewed, HoldCo is referred to and addressed as a Cayman Islands company. Thus, all parties-in-interest were aware that HoldCo was a Cayman Islands company. No creditor or stakeholder objected to the liquidation in the Cayman Islands and all major stakeholders are actively participating in the Cayman Proceeding. All creditors of HoldCo must submit their claims in the Cayman Proceeding, and stakeholders have the right to access the Cayman Court and appeal decisions of the JOLs.

114. Based upon the above, I am confident that HoldCo's "nerve center" has been established in the Cayman Islands with the JOLs. I also believe that all relevant creditors,

[140] Ex. 1, Supervision Order; Ex. 78, Companies Act; Ex. 79, Winding Up Rules.

stakeholders, and shareholders regard HoldCo to be a Cayman Islands company and the Cayman Islands to be HoldCo's current "nerve center." I further believe it is clear that since the commencement of the Cayman Proceeding, HoldCo has been engaged in non-transitory economic activity in the Cayman Islands.

115. In accordance with 11 U.S.C. § 1515(c), I am aware of no other pending foreign insolvency proceedings, except the Cayman Proceeding, in which HoldCo is the subject of the proceeding.

116. In accordance with Rule 1007-1(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), a schedule of known and pending actions in the United States in which HoldCo is named as a party is attached to the Form 401 Petition, together with the disclosures required under Bankruptcy Rule 7007.1, the JOLs are authorized under Cayman Islands law, subject to sanction of the Cayman Court, to act on behalf of HoldCo in staying, defending against, or prosecuting these actions, as applicable.

**J. Need for Broad Discovery Rights**

117. I am aware that this Court can afford the JOLs broad discovery rights pursuant to sections 542(e), 1521(a)(4), and 1521(a)(7) of the Bankruptcy Code.

118. I am of the belief that the JOLs must be afforded broad discovery rights in the United States to facilitate their investigations, particularly with respect to the Fund. First, this requires access to all documents relating to the Debtor's property or financial affairs, necessitating the need for section 542(e) relief. Second, the Petitioners must be able to broadly issue Rule 2004 examinations, as well as to be afforded all discovery rights under the Federal Rules of Civil Procedures, as incorporated by the Bankruptcy Rules. Only by affording the Petitioners the

necessary tools to complete their investigations will the JOLs be able to maximize distributions such that creditors and interested parties are sufficiently protected.

## K. Need for Recognition of the Injunctive Relief Order

119. I am aware that this Court can recognize the Injunctive Relief Order under section 1507(b) after considering certain equitable and practical considerations. These include: (i) just treatment of all holders of claims against or interests in HoldCo's property; (ii) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims the Cayman Proceeding; (iii) prevention of preferential or fraudulent dispositions of property of HoldCo; (iv) distribution of proceeds of HoldCo's property substantially in accordance with the order prescribed under U.S. Bankruptcy law; and (v) if appropriate, the provision of an opportunity for a fresh start for HoldCo pursuant to the Cayman Proceeding.

120. I am of the belief that the Injunctive Relief Order should be recognized by this Court under section 1507(b). First, the relief promotes fair and equitable treatment of all creditors by preserving the value of HoldCo's estate for the benefit of all stakeholders, rather than potentially allowing the Named Defendants to obtain an unfair advantage through the dissipation or diversion of assets. Second, recognition ensures that U.S.-based creditors are not exposed to procedural disadvantage in the Cayman Proceeding, as the Injunctive Relief Order operates neutrally to safeguard HoldCo's property pending full adjudication of the claims, rather than favoring any specific jurisdiction or creditor group.[141] Third, the Injunctive Relief Order directly addresses and prevents improper transfers or dissipation of HoldCo's assets, which is essential to maintaining the status quo during the JOLs' ongoing investigation and the Cayman Litigation.[142] Finally, I have

[141] Ex. 82, Injunction Application.

[142] Id.

been advised that the relief sought supports a distribution framework that is aligned, in substance, with U.S. bankruptcy priorities by ensuring assets are preserved for collective resolution and eventual equitable distribution.

121. Additionally, I have been advised that the Injunctive Relief Order can be recognized by this Court under section 1521(a)(7) of the Bankruptcy Code if such relief is otherwise available to a trustee in bankruptcy. The Cayman Court has already determined that: (a) the Cayman Litigation had a reasonable prospect of success; and (b) that the interests of the Debtor's stakeholders were best served by the JOLs commencing the Cayman Litigation.[143] Further, the Named Defendants have been afforded due process and given notice of the Injunctive Relief Application and the Injunction Hearing Date and will have the opportunity to appear at the hearing and respond to the Injunctive Relief Application before relief is granted by the Cayman Court.[144] Therefore, to the extent the Injuncitve Relief Order is entered in the Cayman Islands, I am of the belief it should be recognized by this Court in the interests of comity.

122. For all of these reasons, I respectfully request that this Court enter an Order: (a) recognizing my colleague, Sandipan Bhowmik, and myself as duly authorized foreign representatives of HoldCo and the Cayman Proceeding as a foreign main proceeding, or in the alternative as a "foreign non main proceeding", under chapter 15 of the Bankruptcy Code; (b) granting relief pursuant to sections 105(a), 1502, 1507, 1510, 1520 and 1521 of the Bankruptcy Code; and (c) granting such other and further relief as this Court may deem just and proper.

[*Remainder of page intentionally left blank.*]

[143] Ex. 85, Sanction to File Statement of Claim.

[144] Ex. 82, Injunction Application.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 21, 2025
Cayman Islands

_/s/ Margot MacInnis_____________
MARGOT MACINNIS

*Joint Official Liquidator of*
*Charitable DAF HoldCo, Ltd*
*(in Official Liquidation)*

# EXHIBIT 1

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**
**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD**

**BEFORE THE HONOURABLE JUSTICE JALIL ASIF KC**
**IN CHAMBERS**

**6 MAY 2025**

## SUPERVISION ORDER

**UPON** the petition filed on 2 May 2025 by (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund for an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd continue under the supervision of the Court pursuant to s.131 Companies Act (2025 Revision)

**AND UPON** hearing counsel for the Petitioners and counsel for DFW Charitable Foundation

**AND UPON** reading the petition herein, the affidavit of Julie Diaz and exhibit JD-2 sworn on 29 April 2025 and the affirmation of Rhiannon Zanetic and exhibit RMZ-1 signed (but not affirmed) on 29 April 2025

**AND UPON** reading the following documents filed in Cause FSD 2025-0099 (JAJ): the winding up petition filed on 10 April 2025, the first affidavit of Julie Diaz and exhibit JD-1 sworn on 10 April 2025, the affidavit of James Dondero and exhibit JDD-1 sworn on 9 April 2025 and the affidavit of Geoffrey Sykes and exhibit GS-1 sworn on 27 April 2025

**AND UPON** reading the affidavit of Margot Macinnis and exhibit MM-1 sworn on 28 April 2025 and the affidavit of Sandipan Bhowmik and exhibit SB-1 sworn on 28 April 2025 providing their consents to act as official liquidators of Charitable DAF HoldCo, Ltd

**IT IS HEREBY ORDERED that:**

1. The voluntary liquidation of Charitable DAF HoldCo, Ltd ("the Company") be continued under the supervision of the Court pursuant to s.131 of the Act and O.15, r.8 of the Companies Winding Up Rules (2023 Consolidation).

**THIS ORDER** was filed by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

2. The following persons are appointed as joint official liquidators of the Company:

| Name | Address | Contact Details |
|---|---|---|
| Margot MacInnis | Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands | +1 345 949 8588<br>margot.macinnis@uk.gt.com |
| Sandipan Bhowmik | | +1 345 949 8588<br>sandipan.bhowmik@uk.gt.com |

3. The joint official liquidators may act jointly and severally.

4. The joint official liquidators are not required to give security for their appointment.

5. The joint official liquidators are authorised to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:

   a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and

   b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

6. The joint official liquidators are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:

   a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

   b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

   c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

7. The Court dispenses with the requirement for the summons herein and the hearing of the summons to be advertised pursuant to CWR O.15.

8. The joint official liquidators' reasonable remuneration and expenses be paid out of the assets of the Company in accordance with s.109 of the Act, Part III of the Insolvency Practitioners Regulations and CWR O.20.

9. The joint voluntary liquidators shall prepare a final report and accounts for the period from the commencement of the voluntary liquidation until the date of this Order and shall deliver such report to the joint official liquidators within 28 days of this Order.

**THIS ORDER** was filed by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

GENERAL REGISTRY CAYMAN ISLANDS


www.verify.gov.ky File#: 263805
Filed: 09-May-2025 15:00 EST
Auth Code: C02067594574

10. The costs of this summons shall be paid out of the assets of the Company as an expense in the liquidation, such costs to be taxed on the indemnity basis if not agreed with the joint official liquidators.

**Dated 6 May 2025**

Filed 6 May 2025

______________________________________

**THE HONOURABLE JUSTICE JALIL ASIF KC**
**JUDGE OF THE GRAND COURT**

**THIS ORDER** was filed by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

GENERAL REGISTRY CAYMAN ISLANDS


Filed: 09-May-2025 15:00 EST
www.verify.gov.ky File#: 263805
Auth Code: C02067594574

# EXHIBIT

# Margot MacInnis

## Partner, Practice Leader – Cayman Islands



Contact details
T +1 345 769 7218
E margot.macinnis@uk.gt.com

### Background

Margot is the head of Grant Thornton Specialist Services in the Cayman Islands. With over 25 years of experience in offshore and cross border restructuring and insolvency matters, Margot is an innovator and known for her leadership and success across dozens of high profile complex cross border asset recovery and insolvency cases.

Margot has extensive experience in insolvency and forensic assignments, including global asset recovery engagements. Margot is a certified fraud examiner and has provided expert or supporting forensic or financial analysis and regularly appointed to by the Cayman and BVI Courts and regulators in connection with provisional, official liquidation appointments as well as a Receiver in litigated disputes and other insolvency matters

Margot is regularly appointed by the Cayman court as an official on provisional liquidator to locate assets, secure and enforce collateral internationally and work closely with creditors and liquidation committees to establish strategy to maximise their return. Margot's experience covers various industries including funds and alternative investment, oil and gas, medical technology banking, mining, real estate and property investment and manufacturing companies. Her work often has a cross-border focus including work in Cayman, BVI, Asia, United States, Canada, Switzerland, U.K. and Europe.

### Professional Qualifications and Memberships

- Appointment Taker recognized by the Grand Court in the Cayman Islands and BVI Court.
- Member of the Association of Certified Fraud Examiners
- Member of the Association of Certified Anti Money Laundering Specialists
- Member of the New Brunswick Institute of Chartered Accountants, Canada
- Member of several other professional associations including:
  - NBICA (Canada),
  - Cayman Islands Society of Professional Accountants (CIIPA)
  - International Women's Insolvency & Restructuring Confederation (IWIRC)

### Relevant Experience

- Appointed Joint Provisional Liquidator of a Cayman top co Company trading on the NYSE, headquartered in HK with subsidiaries in BVI, PRC and Singapore with the entire group estimated to be worth north of US$1 billion. Work included pursuing litigation in HK and Cayman against former management and preserving assets in the PRC.
- Appointed Liquidator of a number of large US based hedge funds and appointed under Chapter 15 as the foreign representative including Sphinx Group of Companies, China Medical, and Platinum Partners.
- Regularly appointed with the Hong Kong office on cross-border insolvency matters, many of which involve hedge funds and developing realisation strategies in respect of the wind up of the portfolios or funds.
- Appointed under Chapter 15 as the foreign representative in a number of high-profile bankruptcy and restructuring cases including Richard Pelletier, China Medical, China Milk, William & Patricia Millard, Richard Pelletier and Platinum Partners.
- Appointed Liquidator (in Cayman) of a group of 22 companies with an investment strategy designed to achieve returns consistent with the performance of the S&P Index. Work included the winding up of the portfolio positions; obtaining Chapter 15 recognition; asset tracing and investigation of third-party claims; resolving issues relating to rights and interest of creditors and investors; and the successful scheme of arrangement to achieve distributions of the US$500m of assets and recoveries from the litigation strategy.

### An Industry Thought Leader

- Former Caribbean board member of International board of and local chapter of the Women's Insolvency & Restructuring Confederation (IWIRC)
- Who's Who Legal Global Elite Thought Leaders – Asset Recovery Expert 2021, 2022, 2023 and 2024
- Lexology Index (fka. Who's Who Legal) Country Awards, Cayman Islands - Experts 2024 and Consulting Experts – Asset Recovery 2024
- Who's Who Legal Thought Leaders - Restructuring & Insolvency Advisors 2022
- Who's Who Legal Advisors – Restructuring & Insolvency Advisors 2020
- Who's Who Legal's Restructuring and Insolvency Advisers – Leading Practitioner 2024

# EXHIBIT

*WK–263805*

# *Certificate Of Incorporation*

*I,* ***FLOSSIEBELL M. MARAGH*** *Assistant Registrar of Companies of the Cayman Islands DO HEREBY CERTIFY, pursuant to the Companies Law CAP. 22, that all requirements of the said Law in respect of registration were complied with by*

**Charitable DAF HoldCo, Ltd**

*an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect from the 27th day of October Two Thousand Eleven*

*Given under my hand and Seal at George Town in the Island of Grand Cayman this 27th day of October Two Thousand Eleven*

REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS

**Assistant Registrar of Companies,**
**Cayman Islands.**

COPY

*WK–263805*

# *Certificate Of Incorporation*

*I, **FLOSSIEBELL M. MARAGH** Assistant Registrar of Companies of the Cayman Islands DO HEREBY CERTIFY, pursuant to the Companies Law CAP. 22, that all requirements of the said Law in respect of registration were complied with by*

**Charitable DAF HoldCo, Ltd**

*an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect from the 27th day of October Two Thousand Eleven*

*Given under my hand and Seal at George Town in the Island of Grand Cayman this 27th day of October Two Thousand Eleven*

***CERTIFIED TO BE A TRUE AND CORRECT COPY***

***Sig..*** [signature]

*Flossiebell M. Maragh*
*Assistant Registrar*

***Date*** *27 October 2011*

*(SGD. FLOSSIEBELL M. MARAGH)*

**Assistant Registrar of Companies,**
**Cayman Islands.**

REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS

COPY

*WK–263805*

# *Certificate Of Incorporation*

*I, **FLOSSIEBELL M. MARAGH** Assistant Registrar of Companies of the Cayman Islands DO HEREBY CERTIFY, pursuant to the Companies Law CAP. 22, that all requirements of the said Law in respect of registration were complied with by*

**Charitable DAF HoldCo, Ltd**

*an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect from the 27th day of October Two Thousand Eleven*

*Given under my hand and Seal at George Town in the Island of Grand Cayman this 27th day of October Two Thousand Eleven*

***CERTIFIED TO BE A TRUE AND CORRECT COPY***

***Sig..*** [signature]

***Flossiebell M. Maragh***
***Assistant Registrar***

***Date*** ***27 October 2011***

***(SGD. FLOSSIEBELL M. MARAGH)***

**Assistant Registrar of Companies,**
**Cayman Islands.**

REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS

# EXHIBIT

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

WALKERS

Walker House, 87 Mary Street, George Town
Grand Cayman KY1-9001, Cayman Islands
T 345 949 0100 F 345 949 7886 www.walkersglobal.com

REF: RP/GOL/H-109190

REGISTERED AND FILED AS NO: 263805 THIS 20 DAY OF October, 2011
Asst. Registrar of Companies Cayman Islands

**THE COMPANIES LAW (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**MEMORANDUM OF ASSOCIATION**

**OF**

# CHARITABLE DAF HOLDCO, LTD

1. The name of the company is Charitable DAF HoldCo, Ltd (the "**Company**").

2. The registered office of the Company will be situated at the offices of Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is **US$50,000.00** divided into **5,000,000** shares of a nominal or par value of **US$0.01** each provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.

REGISTRAR OF COMPANIES EXEMPTED CAYMAN ISLANDS

The undersigned, whose name, address and description are set out below, wishes the Company to be incorporated as a company in the Cayman Islands in accordance with this Memorandum of Association, and agrees to take the number of shares in the capital of the Company as set out opposite the undersigned's name.

| NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER | NUMBER OF SHARES TAKEN BY SUBSCRIBER |
|---|---|
| Walkers Nominees Limited, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands | ONE SHARE |

(Sgd) Roderick Palmer
Roderick Palmer
as Authorised Signatory of Walkers Nominees Limited

Dated: 27 October 2011

(Sgd) Grainne O'Leary
Signature of Witness

Name: Grainne O'Leary

Address: 87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands

Occupation: Secretary

CERTIFIED TO BE A TRUE AND CORRECT COPY
SIG. [signature]
Flossiebell M. Maragh
Assistant Registrar
Date. 27 October, 2011

REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS



4828489_1
4828489.1 H0851.109190

## TABLE OF CONTENTS


| CLAUSE | PAGE |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 3 |
| SHARES | 4 |
| MODIFICATION OF RIGHTS | 4 |
| CERTIFICATES | 5 |
| FRACTIONAL SHARES | 5 |
| LIEN | 5 |
| CALLS ON SHARES | 6 |
| FORFEITURE OF SHARES | 6 |
| TRANSFER OF SHARES | 7 |
| TRANSMISSION OF SHARES | 7 |
| ALTERATION OF SHARE CAPITAL | 8 |
| REDEMPTION, PURCHASE AND SURRENDER OF SHARES | 8 |
| TREASURY SHARES | 9 |
| GENERAL MEETINGS | 9 |
| NOTICE OF GENERAL MEETINGS | 10 |
| PROCEEDINGS AT GENERAL MEETINGS | 10 |
| VOTES OF SHAREHOLDERS | 11 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 12 |
| DIRECTORS | 12 |
| ALTERNATE DIRECTOR | 13 |
| POWERS AND DUTIES OF DIRECTORS | 13 |
| BORROWING POWERS OF DIRECTORS | 15 |
| THE SEAL | 15 |

DISQUALIFICATION OF DIRECTORS .......... 15
PROCEEDINGS OF DIRECTORS .......... 16
DIVIDENDS .......... 17
ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION .......... 18
CAPITALISATION OF RESERVES .......... 19
SHARE PREMIUM ACCOUNT .......... 19
NOTICES .......... 20
INDEMNITY .......... 21
NON-RECOGNITION OF TRUSTS .......... 21
WINDING UP .......... 22
AMENDMENT OF ARTICLES OF ASSOCIATION .......... 22
CLOSING OF REGISTER OR FIXING RECORD DATE .......... 22
REGISTRATION BY WAY OF CONTINUATION .......... 22
MERGERS AND CONSOLIDATION .......... 23
DISCLOSURE .......... 23

1 22 86 18 57 43
GRAND CAYMAN 03.10.11 CAYMAN ISLANDS
CAYMAN ISLANDS ≈,000,002 GOVERNMENT STAMP DUTY PB01006

**COMPANIES LAW (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**ARTICLES OF ASSOCIATION**

**OF**

REGISTERED AND FILED AS NO: 263805 THIS 27 DAY OF October, 2011
Asst. Registrar of Companies Cayman Islands

# CHARITABLE DAF HOLDCO, LTD

**TABLE A**

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

**INTERPRETATION**

1. In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Law**" means the Companies Law (as amended) of the Cayman Islands.

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

"**Office**" means the registered office of the Company as required by the Law.

"**Ordinary Resolution**" means a resolution:

REGISTRAR OF COMPANIES EXEMPTED CAYMAN ISLANDS

(a) passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Law and these Articles, means the Register maintained by the Company pursuant to the Law and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law and includes any Branch Register(s) established by the Company in accordance with the Law.

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a share in the capital of the Company. All references to "Shares" herein shall be deemed to be Shares of any or all Classes as the context may require. For the avoidance of doubt in these Articles the expression "Share" shall include a fraction of a Share.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a) passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders

and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

2. In these Articles, save where the context requires otherwise:

(a) words importing the singular number shall include the plural number and vice versa;

(b) words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c) the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d) reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e) reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;

(f) reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

(g) reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

3. Subject to the preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

## PRELIMINARY

4. The business of the Company may be commenced at any time after incorporation.

5. The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

6. The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

7. The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Law and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Law, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Law.

## SHARES

8. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

   (a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

   (b) grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

   and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

9. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

10. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

11. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MODIFICATION OF RIGHTS

12. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Shares of the relevant Class, or with the sanction of a resolution passed at a separate meeting of the holders of the Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that all such Classes would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes.

13. The rights conferred upon the holders of the Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation,

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

WALKERS

Walker House, 87 Mary Street, George Town
Grand Cayman KY1-9001, Cayman Islands
T 345 949 0100 F 345 949 7886 www.walkersglobal.com

REF: RP/GOL/H-109190

REGISTERED AND FILED AS NO: 263805 THIS 27 DAY OF October, 2011
Asst. Registrar of Companies Cayman Islands

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

1. The name of the company is Charitable DAF HoldCo, Ltd (the "**Company**").

2. The registered office of the Company will be situated at the offices of Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is **US$50,000.00** divided into **5,000,000** shares of a nominal or par value of **US$0.01** each provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.

REGISTRAR OF COMPANIES EXEMPTED CAYMAN ISLANDS

The undersigned, whose name, address and description are set out below, wishes the Company to be incorporated as a company in the Cayman Islands in accordance with this Memorandum of Association, and agrees to take the number of shares in the capital of the Company as set out opposite the undersigned's name.

| NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER | NUMBER OF SHARES TAKEN BY SUBSCRIBER |
|---|---|
| Walkers Nominees Limited, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands | ONE SHARE |

(Sgd) Roderick Palmer
Roderick Palmer
as Authorised Signatory of Walkers Nominees Limited

Dated: 27 October 2011

(Sgd) Grainne O'Leary
Signature of Witness

Name: Grainne O'Leary

Address: 87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands

Occupation: Secretary

CERTIFIED TO BE A TRUE AND CORRECT COPY
SIG. [signature]
Flossiebell M. Maragh
Assistant Registrar
Date. 27 October, 2011

REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS



4828489_1
4828489.1 H0851.109190

002227

## TABLE OF CONTENTS


| CLAUSE | PAGE |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 3 |
| SHARES | 4 |
| MODIFICATION OF RIGHTS | 4 |
| CERTIFICATES | 5 |
| FRACTIONAL SHARES | 5 |
| LIEN | 5 |
| CALLS ON SHARES | 6 |
| FORFEITURE OF SHARES | 6 |
| TRANSFER OF SHARES | 7 |
| TRANSMISSION OF SHARES | 7 |
| ALTERATION OF SHARE CAPITAL | 8 |
| REDEMPTION, PURCHASE AND SURRENDER OF SHARES | 8 |
| TREASURY SHARES | 9 |
| GENERAL MEETINGS | 9 |
| NOTICE OF GENERAL MEETINGS | 10 |
| PROCEEDINGS AT GENERAL MEETINGS | 10 |
| VOTES OF SHAREHOLDERS | 11 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 12 |
| DIRECTORS | 12 |
| ALTERNATE DIRECTOR | 13 |
| POWERS AND DUTIES OF DIRECTORS | 13 |
| BORROWING POWERS OF DIRECTORS | 15 |
| THE SEAL | 15 |

DISQUALIFICATION OF DIRECTORS ........ 15
PROCEEDINGS OF DIRECTORS ........ 16
DIVIDENDS ........ 17
ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION ........ 18
CAPITALISATION OF RESERVES ........ 19
SHARE PREMIUM ACCOUNT ........ 19
NOTICES ........ 20
INDEMNITY ........ 21
NON-RECOGNITION OF TRUSTS ........ 21
WINDING UP ........ 22
AMENDMENT OF ARTICLES OF ASSOCIATION ........ 22
CLOSING OF REGISTER OR FIXING RECORD DATE ........ 22
REGISTRATION BY WAY OF CONTINUATION ........ 22
MERGERS AND CONSOLIDATION ........ 23
DISCLOSURE ........ 23

1 22 86 18 57 43 GRAND CAYMAN 03.10.11 CAYMAN ISLANDS
CAYMAN ISLANDS ≈,000,002 GOVERNMENT STAMP DUTY PB01006

COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

OF

REGISTERED AND FILED AS NO: 263805 THIS 27 DAY OF October, 2011
Asst. Registrar of Companies Cayman Islands

# CHARITABLE DAF HOLDCO, LTD

## TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

## INTERPRETATION

1. In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Law**" means the Companies Law (as amended) of the Cayman Islands.

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

"**Office**" means the registered office of the Company as required by the Law.

"**Ordinary Resolution**" means a resolution:

REGISTRAR OF COMPANIES EXEMPTED CAYMAN ISLANDS

(a) passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Law and these Articles, means the Register maintained by the Company pursuant to the Law and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law and includes any Branch Register(s) established by the Company in accordance with the Law.

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a share in the capital of the Company. All references to "Shares" herein shall be deemed to be Shares of any or all Classes as the context may require. For the avoidance of doubt in these Articles the expression "Share" shall include a fraction of a Share.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a) passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders

and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

2. In these Articles, save where the context requires otherwise:

(a) words importing the singular number shall include the plural number and vice versa;

(b) words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c) the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d) reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e) reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;

(f) reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

(g) reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

3. Subject to the preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

## PRELIMINARY

4. The business of the Company may be commenced at any time after incorporation.

5. The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

6. The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

7. The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Law and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Law, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Law.

## SHARES

8. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

   (a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

   (b) grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

   and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

9. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

10. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

11. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MODIFICATION OF RIGHTS

12. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Shares of the relevant Class, or with the sanction of a resolution passed at a separate meeting of the holders of the Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that all such Classes would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes.

13. The rights conferred upon the holders of the Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation,

allotment or issue of further Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Shares of any Class by the Company.

**CERTIFICATES**

14. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

**FRACTIONAL SHARES**

15. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

**LIEN**

16. The Company has a first and paramount lien on every Share (whether or not fully paid) for all amounts (whether presently payable or not) payable at a fixed time or called in respect of that Share. The Company also has a first and paramount lien on every Share (whether or not fully paid) registered in the name of a Person indebted or under liability to the Company (whether he is the sole registered holder of a Share or one of two or more joint holders) for all amounts owing by him or his estate to the Company (whether or not presently payable). The Directors may at any time declare a Share to be wholly or in part exempt from the provisions of this Article. The Company's lien on a Share extends to any amount payable in respect of it.

17. The Company may sell, in such manner as the Directors in their absolute discretion think fit, any Share on which the Company has a lien, but no sale shall be made unless an amount in respect of which the lien exists is presently payable nor until the expiration of fourteen days after a notice in writing, demanding payment of such part of the amount in respect of which the lien exists as is presently payable, has been given to the registered holder for the time being of the Share, or the Persons entitled thereto by reason of his death or bankruptcy.

18. For giving effect to any such sale the Directors may authorise some Person to transfer the Shares sold to the purchaser thereof. The purchaser shall be registered as the holder of the Shares comprised in any such transfer and he shall not be bound to see to the application of the purchase money, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the sale.

19. The proceeds of the sale after deduction of expenses, fees and commission incurred by the Company shall be received by the Company and applied in payment of such part of the amount in respect of which the lien exists as is presently payable, and the residue shall (subject to a like lien for sums not presently payable as existed upon the Shares prior to the sale) be paid to the Person entitled to the Shares immediately prior to the sale.

## CALLS ON SHARES

20. The Directors may from time to time make calls upon the Shareholders in respect of any moneys unpaid on their Shares, and each Shareholder shall (subject to receiving at least fourteen days' notice specifying the time or times of payment) pay to the Company at the time or times so specified the amount called on such Shares.

21. The joint holders of a Share shall be jointly and severally liable to pay calls in respect thereof.

22. If a sum called in respect of a Share is not paid before or on the day appointed for payment thereof, the Person from whom the sum is due shall pay interest upon the sum at the rate of eight percent per annum from the day appointed for the payment thereof to the time of the actual payment, but the Directors shall be at liberty to waive payment of that interest wholly or in part.

23. The provisions of these Articles as to the liability of joint holders and as to payment of interest shall apply in the case of non-payment of any sum which, by the terms of issue of a Share, becomes payable at a fixed time, whether on account of the amount of the Share, or by way of premium, as if the same had become payable by virtue of a call duly made and notified.

24. The Directors may make arrangements on the issue of partly paid Shares for a difference between the Shareholders, or the particular Shares, in the amount of calls to be paid and in the times of payment.

25. The Directors may, if they think fit, receive from any Shareholder willing to advance the same all or any part of the moneys uncalled and unpaid upon any partly paid Shares held by him, and upon all or any of the moneys so advanced may (until the same would, but for such advance, become presently payable) pay interest at such rate (not exceeding without the sanction of an Ordinary Resolution, eight percent per annum) as may be agreed upon between the Shareholder paying the sum in advance and the Directors.

## FORFEITURE OF SHARES

26. If a Shareholder fails to pay any call or instalment of a call in respect of any Shares on the day appointed for payment, the Directors may, at any time thereafter during such time as any part of such call or instalment remains unpaid, serve a notice on him requiring payment of so much of the call or instalment as is unpaid, together with any interest which may have accrued.

27. The notice shall name a further day (not earlier than the expiration of fourteen days from the date of the notice) on or before which the payment required by the notice is to be made, and shall state that in the event of non-payment at or before the time appointed the Shares in respect of which the call was made will be liable to be forfeited.

28. If the requirements of any such notice as aforesaid are not complied with, any Share in respect of which the notice has been given may at any time thereafter, before the payment required by notice has been made, be forfeited by a resolution of the Directors to that effect.

29. A forfeited Share may be sold or otherwise disposed of on such terms and in such manner as the Directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the Directors think fit.

30. A Person whose Shares have been forfeited shall cease to be a Shareholder in respect of the forfeited Shares, but shall, notwithstanding, remain liable to pay to the Company all moneys which at the date of forfeiture were payable by him to the Company in respect of the Shares

forfeited, but his liability shall cease if and when the Company receives payment in full of the amount unpaid on the Shares forfeited.

31. A statutory declaration in writing that the declarant is a Director, and that a Share has been duly forfeited on a date stated in the declaration, shall be conclusive evidence of the facts in the declaration as against all Persons claiming to be entitled to the Share.

32. The Company may receive the consideration, if any, given for a Share on any sale or disposition thereof pursuant to the provisions of these Articles as to forfeiture and may execute a transfer of the Share in favour of the Person to whom the Share is sold or disposed of and that Person shall be registered as the holder of the Share, and shall not be bound to see to the application of the purchase money, if any, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the disposition or sale.

33. The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which by the terms of issue of a Share becomes due and payable, whether on account of the amount of the Share, or by way of premium, as if the same had been payable by virtue of a call duly made and notified.

## TRANSFER OF SHARES

34. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

35. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor.

36. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

37. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

## TRANSMISSION OF SHARES

38. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

39. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to

decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

40. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

41. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

42. The Company may by Ordinary Resolution:

(a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

43. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION, PURCHASE AND SURRENDER OF SHARES

44. Subject to the Law, the Company may:

(a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;

(b) purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c) make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law; and

(d) accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.

45. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

46. The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

47. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

## TREASURY SHARES

48. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Law. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

49. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

50. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

(a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

(b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Law, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.

51. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

## GENERAL MEETINGS

52. The Directors may, whenever they think fit, convene a general meeting of the Company.

53. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

54. General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least ten percent of the paid up voting share capital of the Company deposited at the Office specifying the

objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

55. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

56. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

57. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

58. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

59. No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

60. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

61. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

62. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

63. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

64. The chairman may adjourn a meeting from time to time and from place to place either:

(a) with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting); or

(b) without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

(i) secure the orderly conduct or proceedings of the meeting; or

(ii) give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

65. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

66. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

67. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

68. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

## VOTES OF SHAREHOLDERS

69. Subject to any rights and restrictions for the time being attached to any Share, on a show of hands every Shareholder present in person and every Person representing a Shareholder by proxy shall, at a general meeting of the Company, each have one vote and on a poll every

Shareholder and every Person representing a Shareholder by proxy shall have one vote for each Share of which he or the Person represented by proxy is the holder.

70. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

71. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

72. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

73. On a poll votes may be given either personally or by proxy.

74. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

75. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

76. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

77. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

78. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

79. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

## DIRECTORS

80. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

81. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

82. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

83. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

84. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

85. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

86. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

## ALTERNATE DIRECTOR

87. Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be deemed to be an officer of the Company solely as a result of his appointment as an alternate. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

88. Any Director may appoint any Person , whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

## POWERS AND DUTIES OF DIRECTORS

89. Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

90. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the

administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

91. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

92. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

93. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

94. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

95. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

96. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

97. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

## BORROWING POWERS OF DIRECTORS

98. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

## THE SEAL

99. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

100. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

101. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DISQUALIFICATION OF DIRECTORS

102. The office of Director shall be vacated, if the Director:

(a) becomes bankrupt or makes any arrangement or composition with his creditors;

(b) dies or is found to be or becomes of unsound mind;

(c) resigns his office by notice in writing to the Company;

(d) is removed from office by Ordinary Resolution;

(e) is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number); or

(f) is removed from office pursuant to any other provision of these Articles.

## PROCEEDINGS OF DIRECTORS

103. The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

104. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

105. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one. A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

106. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

107. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

108. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

109. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a) all appointments of officers made by the Directors;

(b) the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c) all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

110. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

111. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

112. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

113. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

114. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

115. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

116. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

## DIVIDENDS

117. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Law and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

118. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

119. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

120. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

121. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

122. Subject to any rights and restrictions for the time being attached to any Shares, all dividends shall be declared and paid according to the amounts paid up on the Shares, but if and for so long as nothing is paid up on any of the Shares dividends may be declared and paid according to the par value of the Shares.

123. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

124. No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

125. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

126. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

127. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

128. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

129. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

## CAPITALISATION OF RESERVES

130. Subject to the Law and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Shares held by them respectively, or

(ii) paying up in full unissued Shares or debentures of a nominal amount equal to that sum,

and allot the Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Shares,

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

## SHARE PREMIUM ACCOUNT

131. The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

132. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price

provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

## NOTICES

133. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

134. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

135. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

136. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

137. Notice of every general meeting of the Company shall be given to:

(a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

## INDEMNITY

138. Every Director (including for the purposes of this Article any alternate Director appointed pursuant to the provisions of these Articles), Secretary, assistant Secretary, or other officer for the time being and from time to time of the Company (but not including the Company's auditors) and the personal representatives of the same (each an "**Indemnified Person**") shall be indemnified and secured harmless against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such Indemnified Person, other than by reason of such Indemnified Person's own dishonesty, wilful default or fraud, in or about the conduct of the Company's business or affairs (including as a result of any mistake of judgment) or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such Indemnified Person in defending (whether successfully or otherwise) any civil proceedings concerning the Company or its affairs in any court whether in the Cayman Islands or elsewhere.

139. No Indemnified Person shall be liable:

(a) for the acts, receipts, neglects, defaults or omissions of any other Director or officer or agent of the Company; or

(b) for any loss on account of defect of title to any property of the Company; or

(c) on account of the insufficiency of any security in or upon which any money of the Company shall be invested; or

(d) for any loss incurred through any bank, broker or other similar Person; or

(e) for any loss occasioned by any negligence, default, breach of duty, breach of trust, error of judgement or oversight on such Indemnified Person's part; or

(f) for any loss, damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers, authorities, or discretions of such Indemnified Person's office or in relation thereto;

unless the same shall happen through such Indemnified Person's own dishonesty, wilful default or fraud.

## NON-RECOGNITION OF TRUSTS

140. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

## WINDING UP

141. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

142. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

## AMENDMENT OF ARTICLES OF ASSOCIATION

143. Subject to the Law and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

## CLOSING OF REGISTER OR FIXING RECORD DATE

144. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

145. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

146. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BY WAY OF CONTINUATION

147. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being

incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## MERGERS AND CONSOLIDATION

148. The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Law.

## DISCLOSURE

149. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

**NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER**

Walkers Nominees Limited, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands

(Sgd) Roderick Palmer
Roderick Palmer
as Authorised Signatory for and on behalf of Walkers Nominees Limited

Dated: 27 October 2011

(Sgd) Grainne O'Leary
Signature of Witness

Name: Grainne O'Leary

Address 87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands

Occupation: Secretary

CERTIFIED TO BE A TRUE AND CORRECT COPY
SIG. [signature]
Flossiebell M. Maragh
Assistant Registrar
Date. 27 October, 2011

REGISTRAR OF COMPANIES CAYMAN ISLANDS
EXEMPTED

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

WALKERS

Walker House, 87 Mary Street, George Town
Grand Cayman KY1-9001, Cayman Islands
T 345 949 0100 F 345 949 7886 www.walkersglobal.com

REF: RP/GOL/H-109190

REGISTERED AND FILED AS NO: 263805 THIS 27 DAY OF October, 2011
Asst. Registrar of Companies Cayman Islands

**THE COMPANIES LAW (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**MEMORANDUM OF ASSOCIATION**

**OF**

# CHARITABLE DAF HOLDCO, LTD

1. The name of the company is Charitable DAF HoldCo, Ltd (the "**Company**").

2. The registered office of the Company will be situated at the offices of Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is **US$50,000.00** divided into **5,000,000** shares of a nominal or par value of **US$0.01** each provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.

REGISTRAR OF COMPANIES EXEMPTED CAYMAN ISLANDS

The undersigned, whose name, address and description are set out below, wishes the Company to be incorporated as a company in the Cayman Islands in accordance with this Memorandum of Association, and agrees to take the number of shares in the capital of the Company as set out opposite the undersigned's name.

| NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER | NUMBER OF SHARES TAKEN BY SUBSCRIBER |
|---|---|
| Walkers Nominees Limited, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands | ONE SHARE |

(Sgd) Roderick Palmer
Roderick Palmer
as Authorised Signatory of Walkers Nominees Limited

Dated: 27 October 2011

(Sgd) Grainne O'Leary
Signature of Witness

Name: Grainne O'Leary

Address: 87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands

Occupation: Secretary

CERTIFIED TO BE A TRUE AND CORRECT COPY
SIG. [signature]
Flossiebell M. Marag
Assistant Registrar
Date. 27 October, 2011

REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS



4828489_1
4828489.1 H0851.109190

## TABLE OF CONTENTS

**CLAUSE** **PAGE**

TABLE A ........ 1
INTERPRETATION ........ 1
PRELIMINARY ........ 3
SHARES ........ 4
MODIFICATION OF RIGHTS ........ 4
CERTIFICATES ........ 5
FRACTIONAL SHARES ........ 5
LIEN ........ 5
CALLS ON SHARES ........ 6
FORFEITURE OF SHARES ........ 6
TRANSFER OF SHARES ........ 7
TRANSMISSION OF SHARES ........ 7
ALTERATION OF SHARE CAPITAL ........ 8
REDEMPTION, PURCHASE AND SURRENDER OF SHARES ........ 8
TREASURY SHARES ........ 9
GENERAL MEETINGS ........ 9
NOTICE OF GENERAL MEETINGS ........ 10
PROCEEDINGS AT GENERAL MEETINGS ........ 10
VOTES OF SHAREHOLDERS ........ 11
CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS ........ 12
DIRECTORS ........ 12
ALTERNATE DIRECTOR ........ 13
POWERS AND DUTIES OF DIRECTORS ........ 13
BORROWING POWERS OF DIRECTORS ........ 15
THE SEAL ........ 15

DISQUALIFICATION OF DIRECTORS ..... 15
PROCEEDINGS OF DIRECTORS ..... 16
DIVIDENDS ..... 17
ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION ..... 18
CAPITALISATION OF RESERVES ..... 19
SHARE PREMIUM ACCOUNT ..... 19
NOTICES ..... 20
INDEMNITY ..... 21
NON-RECOGNITION OF TRUSTS ..... 21
WINDING UP ..... 22
AMENDMENT OF ARTICLES OF ASSOCIATION ..... 22
CLOSING OF REGISTER OR FIXING RECORD DATE ..... 22
REGISTRATION BY WAY OF CONTINUATION ..... 22
MERGERS AND CONSOLIDATION ..... 23
DISCLOSURE ..... 23

1228948 0796 GRAND CAYMAN 14.10.11 CAYMAN ISLANDS
CAYMAN ISLANDS ≋,000,002 GOVERNMENT STAMP DUTY PB01006

**COMPANIES LAW (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**ARTICLES OF ASSOCIATION**

**OF**

REGISTERED AND FILED AS NO: 263805 THIS 27 DAY OF October, 2011
Asst. Registrar of Companies Cayman Islands

# CHARITABLE DAF HOLDCO, LTD

## TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

## INTERPRETATION

1. In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Law**" means the Companies Law (as amended) of the Cayman Islands.

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

"**Office**" means the registered office of the Company as required by the Law.

"**Ordinary Resolution**" means a resolution:

REGISTRAR OF COMPANIES EXEMPTED CAYMAN ISLANDS

(a) passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Law and these Articles, means the Register maintained by the Company pursuant to the Law and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law and includes any Branch Register(s) established by the Company in accordance with the Law.

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a share in the capital of the Company. All references to "Shares" herein shall be deemed to be Shares of any or all Classes as the context may require. For the avoidance of doubt in these Articles the expression "Share" shall include a fraction of a Share.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a) passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders

and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

2. In these Articles, save where the context requires otherwise:

(a) words importing the singular number shall include the plural number and vice versa;

(b) words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c) the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d) reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e) reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;

(f) reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

(g) reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

3. Subject to the preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

## PRELIMINARY

4. The business of the Company may be commenced at any time after incorporation.

5. The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

6. The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

7. The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Law and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Law, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Law.

## SHARES

8. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

   (a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

   (b) grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

   and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

9. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

10. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

11. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MODIFICATION OF RIGHTS

12. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Shares of the relevant Class, or with the sanction of a resolution passed at a separate meeting of the holders of the Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that all such Classes would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes.

13. The rights conferred upon the holders of the Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation,

allotment or issue of further Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Shares of any Class by the Company.

**CERTIFICATES**

14. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

**FRACTIONAL SHARES**

15. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

**LIEN**

16. The Company has a first and paramount lien on every Share (whether or not fully paid) for all amounts (whether presently payable or not) payable at a fixed time or called in respect of that Share. The Company also has a first and paramount lien on every Share (whether or not fully paid) registered in the name of a Person indebted or under liability to the Company (whether he is the sole registered holder of a Share or one of two or more joint holders) for all amounts owing by him or his estate to the Company (whether or not presently payable). The Directors may at any time declare a Share to be wholly or in part exempt from the provisions of this Article. The Company's lien on a Share extends to any amount payable in respect of it.

17. The Company may sell, in such manner as the Directors in their absolute discretion think fit, any Share on which the Company has a lien, but no sale shall be made unless an amount in respect of which the lien exists is presently payable nor until the expiration of fourteen days after a notice in writing, demanding payment of such part of the amount in respect of which the lien exists as is presently payable, has been given to the registered holder for the time being of the Share, or the Persons entitled thereto by reason of his death or bankruptcy.

18. For giving effect to any such sale the Directors may authorise some Person to transfer the Shares sold to the purchaser thereof. The purchaser shall be registered as the holder of the Shares comprised in any such transfer and he shall not be bound to see to the application of the purchase money, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the sale.

19. The proceeds of the sale after deduction of expenses, fees and commission incurred by the Company shall be received by the Company and applied in payment of such part of the amount in respect of which the lien exists as is presently payable, and the residue shall (subject to a like lien for sums not presently payable as existed upon the Shares prior to the sale) be paid to the Person entitled to the Shares immediately prior to the sale.

## CALLS ON SHARES

20. The Directors may from time to time make calls upon the Shareholders in respect of any moneys unpaid on their Shares, and each Shareholder shall (subject to receiving at least fourteen days' notice specifying the time or times of payment) pay to the Company at the time or times so specified the amount called on such Shares.

21. The joint holders of a Share shall be jointly and severally liable to pay calls in respect thereof.

22. If a sum called in respect of a Share is not paid before or on the day appointed for payment thereof, the Person from whom the sum is due shall pay interest upon the sum at the rate of eight percent per annum from the day appointed for the payment thereof to the time of the actual payment, but the Directors shall be at liberty to waive payment of that interest wholly or in part.

23. The provisions of these Articles as to the liability of joint holders and as to payment of interest shall apply in the case of non-payment of any sum which, by the terms of issue of a Share, becomes payable at a fixed time, whether on account of the amount of the Share, or by way of premium, as if the same had become payable by virtue of a call duly made and notified.

24. The Directors may make arrangements on the issue of partly paid Shares for a difference between the Shareholders, or the particular Shares, in the amount of calls to be paid and in the times of payment.

25. The Directors may, if they think fit, receive from any Shareholder willing to advance the same all or any part of the moneys uncalled and unpaid upon any partly paid Shares held by him, and upon all or any of the moneys so advanced may (until the same would, but for such advance, become presently payable) pay interest at such rate (not exceeding without the sanction of an Ordinary Resolution, eight percent per annum) as may be agreed upon between the Shareholder paying the sum in advance and the Directors.

## FORFEITURE OF SHARES

26. If a Shareholder fails to pay any call or instalment of a call in respect of any Shares on the day appointed for payment, the Directors may, at any time thereafter during such time as any part of such call or instalment remains unpaid, serve a notice on him requiring payment of so much of the call or instalment as is unpaid, together with any interest which may have accrued.

27. The notice shall name a further day (not earlier than the expiration of fourteen days from the date of the notice) on or before which the payment required by the notice is to be made, and shall state that in the event of non-payment at or before the time appointed the Shares in respect of which the call was made will be liable to be forfeited.

28. If the requirements of any such notice as aforesaid are not complied with, any Share in respect of which the notice has been given may at any time thereafter, before the payment required by notice has been made, be forfeited by a resolution of the Directors to that effect.

29. A forfeited Share may be sold or otherwise disposed of on such terms and in such manner as the Directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the Directors think fit.

30. A Person whose Shares have been forfeited shall cease to be a Shareholder in respect of the forfeited Shares, but shall, notwithstanding, remain liable to pay to the Company all moneys which at the date of forfeiture were payable by him to the Company in respect of the Shares

forfeited, but his liability shall cease if and when the Company receives payment in full of the amount unpaid on the Shares forfeited.

31. A statutory declaration in writing that the declarant is a Director, and that a Share has been duly forfeited on a date stated in the declaration, shall be conclusive evidence of the facts in the declaration as against all Persons claiming to be entitled to the Share.

32. The Company may receive the consideration, if any, given for a Share on any sale or disposition thereof pursuant to the provisions of these Articles as to forfeiture and may execute a transfer of the Share in favour of the Person to whom the Share is sold or disposed of and that Person shall be registered as the holder of the Share, and shall not be bound to see to the application of the purchase money, if any, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the disposition or sale.

33. The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which by the terms of issue of a Share becomes due and payable, whether on account of the amount of the Share, or by way of premium, as if the same had been payable by virtue of a call duly made and notified.

## TRANSFER OF SHARES

34. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

35. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor.

36. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

37. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

## TRANSMISSION OF SHARES

38. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

39. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to

decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

40. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

41. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

42. The Company may by Ordinary Resolution:

(a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

43. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION, PURCHASE AND SURRENDER OF SHARES

44. Subject to the Law, the Company may:

(a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;

(b) purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c) make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law; and

(d) accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.

45. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

46. The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

47. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

**TREASURY SHARES**

48. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Law. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

49. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

50. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

(a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

(b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Law, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.

51. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

**GENERAL MEETINGS**

52. The Directors may, whenever they think fit, convene a general meeting of the Company.

53. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

54. General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least ten percent of the paid up voting share capital of the Company deposited at the Office specifying the

objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

55. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

56. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

57. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

58. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

59. No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

60. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

61. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

62. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

63. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

64. The chairman may adjourn a meeting from time to time and from place to place either:

(a) with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting); or

(b) without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

(i) secure the orderly conduct or proceedings of the meeting; or

(ii) give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

65. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

66. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

67. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

68. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

## VOTES OF SHAREHOLDERS

69. Subject to any rights and restrictions for the time being attached to any Share, on a show of hands every Shareholder present in person and every Person representing a Shareholder by proxy shall, at a general meeting of the Company, each have one vote and on a poll every

Shareholder and every Person representing a Shareholder by proxy shall have one vote for each Share of which he or the Person represented by proxy is the holder.

70. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

71. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

72. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

73. On a poll votes may be given either personally or by proxy.

74. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

75. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

76. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

77. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

78. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

79. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

## DIRECTORS

80. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

81. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

82. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

83. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

84. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

85. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

86. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

## ALTERNATE DIRECTOR

87. Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be deemed to be an officer of the Company solely as a result of his appointment as an alternate. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

88. Any Director may appoint any Person , whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

## POWERS AND DUTIES OF DIRECTORS

89. Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

90. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the

administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

91. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

92. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

93. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

94. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

95. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

96. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

97. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

## BORROWING POWERS OF DIRECTORS

98. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

## THE SEAL

99. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

100. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

101. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DISQUALIFICATION OF DIRECTORS

102. The office of Director shall be vacated, if the Director:

(a) becomes bankrupt or makes any arrangement or composition with his creditors;

(b) dies or is found to be or becomes of unsound mind;

(c) resigns his office by notice in writing to the Company;

(d) is removed from office by Ordinary Resolution;

(e) is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number); or

(f) is removed from office pursuant to any other provision of these Articles.

## PROCEEDINGS OF DIRECTORS

103. The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

104. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

105. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one. A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

106. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

107. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

108. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

109. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a) all appointments of officers made by the Directors;

(b) the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c) all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

110. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

111. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

112. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

113. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

114. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

115. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

116. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

## DIVIDENDS

117. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Law and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

118. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

119. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

120. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

121. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

122. Subject to any rights and restrictions for the time being attached to any Shares, all dividends shall be declared and paid according to the amounts paid up on the Shares, but if and for so long as nothing is paid up on any of the Shares dividends may be declared and paid according to the par value of the Shares.

123. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

124. No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

125. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

126. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

127. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

128. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

129. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

## CAPITALISATION OF RESERVES

130. Subject to the Law and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Shares held by them respectively, or

(ii) paying up in full unissued Shares or debentures of a nominal amount equal to that sum,

and allot the Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Shares,

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

## SHARE PREMIUM ACCOUNT

131. The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

132. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price

provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

## NOTICES

133. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

134. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

135. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

136. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

137. Notice of every general meeting of the Company shall be given to:

(a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

## INDEMNITY

138. Every Director (including for the purposes of this Article any alternate Director appointed pursuant to the provisions of these Articles), Secretary, assistant Secretary, or other officer for the time being and from time to time of the Company (but not including the Company's auditors) and the personal representatives of the same (each an "**Indemnified Person**") shall be indemnified and secured harmless against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such Indemnified Person, other than by reason of such Indemnified Person's own dishonesty, wilful default or fraud, in or about the conduct of the Company's business or affairs (including as a result of any mistake of judgment) or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such Indemnified Person in defending (whether successfully or otherwise) any civil proceedings concerning the Company or its affairs in any court whether in the Cayman Islands or elsewhere.

139. No Indemnified Person shall be liable:

(a) for the acts, receipts, neglects, defaults or omissions of any other Director or officer or agent of the Company; or

(b) for any loss on account of defect of title to any property of the Company; or

(c) on account of the insufficiency of any security in or upon which any money of the Company shall be invested; or

(d) for any loss incurred through any bank, broker or other similar Person; or

(e) for any loss occasioned by any negligence, default, breach of duty, breach of trust, error of judgement or oversight on such Indemnified Person's part; or

(f) for any loss, damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers, authorities, or discretions of such Indemnified Person's office or in relation thereto;

unless the same shall happen through such Indemnified Person's own dishonesty, wilful default or fraud.

## NON-RECOGNITION OF TRUSTS

140. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

## WINDING UP

141. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

142. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

## AMENDMENT OF ARTICLES OF ASSOCIATION

143. Subject to the Law and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

## CLOSING OF REGISTER OR FIXING RECORD DATE

144. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

145. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

146. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BY WAY OF CONTINUATION

147. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being

incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## MERGERS AND CONSOLIDATION

148. The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Law.

## DISCLOSURE

149. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

**NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER**

Walkers Nominees Limited, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands

(Sgd) Roderick Palmer
Roderick Palmer
as Authorised Signatory for and on behalf of Walkers Nominees Limited

Dated: 27 October 2011

(Sgd) Grainne O'Leary
Signature of Witness

Name: Grainne O'Leary

Address 87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands

Occupation: Secretary

CERTIFIED TO BE A TRUE AND CORRECT COPY
SIG.
Flossiebell M. Maragh
Assistant Registrar
Date. 27 October, 2011

REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS

# EXHIBIT

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

Campbells

Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

campbellslegal.com

(14133-42760)



Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

1. The name of the Company is Charitable DAF HoldCo, Ltd.

2. The registered office of the Company will be situated at the offices of Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are:

   (a) to benefit community-focused non-profit foundations established or located anywhere in the world or for the purposes recognised as charitable, as the Directors may from time to time determine, in furtherance of the following mission statement: "Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference"; and

   (b) to do all such things in the opinion of the Directors are or may be incidental or conducive to the above objects or any part of them.

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Companies Act (as amended) of the Cayman Islands (the "**Act**").

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power



GENERAL REGISTRY CAYMAN ISLANDS
002285
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Act to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



www.verify.gov.ky File#: 263805
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

**TABLE OF CONTENTS**

**CLAUSE** **PAGE**

**TABLE A** .... 1

**INTERPRETATION** .... 1

**PRELIMINARY** .... 5

**SHARES** .... 6

**MANAGEMENT SHARES** .... 6

**PARTICIPATING SHARES** .... 7

**MODIFICATION OF RIGHTS** .... 7

**CERTIFICATES** .... 7

**FRACTIONAL SHARES** .... 7

**TRANSFER OF SHARES** .... 8

**TRANSMISSION OF SHARES** .... 8

**ALTERATION OF SHARE CAPITAL** .... 9

**REDEMPTION, PURCHASE AND SURRENDER OF SHARES** .... 9

**TREASURY SHARES** .... 10

**GENERAL MEETINGS** .... 11

**NOTICE OF GENERAL MEETINGS** .... 11

**PROCEEDINGS AT GENERAL MEETINGS** .... 11

**VOTES OF SHAREHOLDERS** .... 13

**CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS** .... 14

**DIRECTORS** .... 14

**POWERS AND DUTIES OF DIRECTORS** .... 15



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

**BORROWING POWERS OF DIRECTORS** ........ 17

**THE SEAL** ........ 17

**DISQUALIFICATION OF DIRECTORS** ........ 17

**PROCEEDINGS OF DIRECTORS** ........ 18

**DIVIDENDS** ........ 21

**ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION** ........ 21

**CAPITALISATION OF RESERVES** ........ 22

**SHARE PREMIUM ACCOUNT** ........ 23

**NOTICES** ........ 23

**NON-RECOGNITION OF TRUSTS** ........ 24

**WINDING UP** ........ 25

**AMENDMENT OF ARTICLES OF ASSOCIATION** ........ 25

**CLOSING OF REGISTER OR FIXING RECORD DATE** ........ 25

**REGISTRATION BYWAY OF CONTINUATION** ........ 26

**MERGERS AND CONSOLIDATION** ........ 26

**DISCLOSURE** ........ 26

**INDEMNITY** ........ 27

**DISPUTE RESOLUTION** ........ 28

**AEOI** ........ 30



002288
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

## TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Act shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

## INTERPRETATION

1. In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Act**" means the Companies Act (as amended) of the Cayman Islands.

"**AEOI**" means:

(i) sections 1471 to 1474 of the Code and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

(ii) the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters - the Common Reporting Standard and any associated guidance;

(iii) any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in



GENERAL REGISTRY CAYMAN ISLANDS
002289
Filed: [illegible]1-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

order to comply with, facilitate, supplement or implement the legislation, regulations or guidance described in sub-paragraphs (i) and (ii); and

(iv) any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs.

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Code**" means the US Internal Revenue Code of 1986, as amended.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Electronic Record**" has the same meaning as in the Electronic Transactions Act.

"**Electronic Transactions Act**" means the Electronic Transactions Act (as amended) of the Cayman Islands.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Management Director**" means a director of the Company holding a Management Share (as defined below).

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Act and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Material Transaction**" means any transaction (or series of connected transactions), including an acquisition, distribution, investment or divestiture by the Company, for the aggregate amount in excess of $250,000;

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

"**Office**" means the registered office of the Company as required by the Act.

"**Ordinary Resolution**" means a resolution:

(a) passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a



GENERAL REGISTRY CAYMAN ISLANDS
002290
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Act and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "Participating Shares" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Act and these Articles, means the Register maintained by the Company pursuant to the Act and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Act and includes any Branch Register(s) established by the Company in accordance with the Act.

"**Restricted Person**" means any Person holding Participating Shares:

(a) in breach of the law or requirements of any country or governmental authority;

(b) that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the Code or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c) in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.



GENERAL REGISTRY CAYMAN ISLANDS
002291
www.verify.gov.ky File#: 263805
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber.

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Act.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Act, being a resolution:

(a) passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" and "**US**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a) words importing the singular number shall include the plural number and vice versa;

(b) words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c) the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d) reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e) reference to a statutory enactment shall include reference to any amendment or re- enactment thereof for the time being in force;

(f) reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case;

(g) reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another;

(h) any requirements as to execution or signature under the Articles including the execution of the Articles themselves can be satisfied in the form of an electronic signature as defined in the Electronic Transactions Act; and

(i) sections 8 and 19(3) of the Electronic Transactions Act shall not apply.

2. Subject to the preceding Articles, any words defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

3. The business of the Company may be commenced at any time after incorporation.

4. The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5. The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6. The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Act and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may



002293
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Act, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Act.

## SHARES

7. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

   (a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

   (b) and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

   and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MANAGEMENT SHARES

11. The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.


GENERAL REGISTRY CAYMAN ISLANDS
www.verify.gov.ky File#: 263805
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

## PARTICIPATING SHARES

12. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

## MODIFICATION OF RIGHTS

13. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

14. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.

## CERTIFICATES

15. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

16. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.



GENERAL REGISTRY CAYMAN ISLANDS
002295
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

## TRANSFER OF SHARES

17. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

18. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

19. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

20. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

21. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

## TRANSMISSION OF SHARES

22. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

23. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the



GENERAL REGISTRY CAYMAN ISLANDS
002296
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

24. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

**ALTERATION OF SHARE CAPITAL**

25. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

26. The Company may by Ordinary Resolution:

(a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

27. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

**REDEMPTION, PURCHASE AND SURRENDER OF SHARES**

28. Subject to the Act, the Company may:

(a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;



GENERAL REGISTRY CAYMAN ISLANDS
002297 Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

(b) purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c) make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Act; and

(d) accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.

29. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

30. The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

31. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

**TREASURY SHARES**

32. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Act. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

33. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

34. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

(a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

(b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Act, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.



GENERAL REGISTRY CAYMAN ISLANDS
002298
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

35. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

## GENERAL MEETINGS

36. The Directors may, whenever they think fit, convene a general meeting of the Company.

37. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

38. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

39. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

40. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

41. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

42. No business shall be transacted at any general meeting unless a quorum of Shareholders Is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles,



GENERAL REGISTRY CAYMAN ISLANDS
002299
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

43. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

44. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

45. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

46. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

47. The chairman may adjourn a meeting from time to time and from place to place either:

(a) with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting): or

(b) without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

(i) secure the orderly conduct or proceedings of the meeting; or

(ii) give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

48. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded



GENERAL REGISTRY CAYMAN ISLANDS
002300
www.verify.gov.ky File#: 263805
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

49. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

50. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

51. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

**VOTES OF SHAREHOLDERS**

52. On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

53. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

54. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

55. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

56. On a poll votes may be given either personally or by proxy.

57. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.



GENERAL REGISTRY CAYMAN ISLANDS
002301
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

58. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

59. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

60. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

61. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at genera! meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

**CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS**

62. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

**DIRECTORS**

63. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

64. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

65. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

66. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

67. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

68. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.



002302
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

69. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

70. The Management Director shall be entitled to cast ten (10) votes on all matters and each other Director shall be entitled to cast one (1) vote. Such voting powers shall apply to voting in any committee or subcommittee of the Board. Every reference in these Articles to a majority or other proportion of the Directors, including for purposes of determining a quorum, shall refer to a majority or other proportion of the votes of the Directors then in office.

**POWERS AND DUTIES OF DIRECTORS**

71. Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

72. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or



GENERAL REGISTRY CAYMAN ISLANDS
002303
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

73. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

74. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

75. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

76. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

77. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

78. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and



GENERAL REGISTRY CAYMAN ISLANDS
002304
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

79. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

**BORROWING POWERS OF DIRECTORS**

80. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

**THE SEAL**

81. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

82. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

83. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

**DISQUALIFICATION OF DIRECTORS**

84. The office of Director shall be vacated, if the Director:

(a) becomes bankrupt or makes any arrangement or composition with his creditors;



GENERAL REGISTRY CAYMAN ISLANDS
002305
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

(b) dies or is found to be or becomes of unsound mind;

(c) resigns his office by notice in writing to the Company;

(d) is removed from office by Ordinary Resolution;

(e) is removed from office by notice addressed to him at his last known address and signed by ail of his co-Directors (not being less than two in number); or

(f) is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

**PROCEEDINGS OF DIRECTORS**

85. The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

86. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

87. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two which must include the Management Director, and if there be one Director the quorum shall be one.

88. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

89. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director



GENERAL REGISTRY CAYMAN ISLANDS
002306
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

90. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

91. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a) all appointments of officers made by the Directors;

(b) the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c) all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

92. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

93. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be, shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors. Notwithstanding anything to the contrary herein, a resolution in writing signed by all the Directors in respect of a Material Transaction must be duly notarized by a notary public.

94. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.



GENERAL REGISTRY CAYMAN ISLANDS
002307
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

95. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

96. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

97. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

98. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.



GENERAL REGISTRY CAYMAN ISLANDS
002308
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495

## DIVIDENDS

99. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

100. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

101. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

102. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

103. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

104. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

105. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

106. No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

107. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.



002309
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495

108. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

109. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

110. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

111. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Act and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

**CAPITALISATION OF RESERVES**

112. Subject to the Act and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii) paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or



GENERAL REGISTRY CAYMAN ISLANDS
002310
Filed: [illegible]1-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of ail the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares, and any such agreement made under this authority being effective and binding on all those Shareholders; and

(iii) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

## SHARE PREMIUM ACCOUNT

113. The Directors shall in accordance with the Act establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

114. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Act, out of capital.

## NOTICES

115. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

116. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.



GENERAL REGISTRY CAYMAN ISLANDS
002311 Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

117. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

118. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

119. Notice of every general meeting of the Company shall be given to:

(a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

**NON-RECOGNITION OF TRUSTS**

120. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial



GENERAL REGISTRY CAYMAN ISLANDS
002312 Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

interest in any Share or (except only as otherwise provided by these Articles or as the Act requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

**WINDING UP**

121. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

122. Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

(a) first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

(b) second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

123. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

**AMENDMENT OF ARTICLES OF ASSOCIATION**

124. Subject to the Act and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

**CLOSING OF REGISTER OR FIXING RECORD DATE**

125. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of,



GENERAL REGISTRY CAYMAN ISLANDS
002313 Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

126. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

127. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BYWAY OF CONTINUATION

128. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## MERGERS AND CONSOLIDATION

129. The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Act.

## DISCLOSURE

130. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.



GENERAL REGISTRY CAYMAN ISLANDS
002314 Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

## INDEMNITY

131. To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "Covered Person" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes wilful misconduct or Gross Negligence by such Covered Person (as determined by a non-appeaiable judgment of a court of competent jurisdiction).

132. Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

133. To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

134. Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.



GENERAL REGISTRY CAYMAN ISLANDS
002315
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

135. The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

**DISPUTE RESOLUTION**

136. Subject to the prior written consent of all parties involved in the Dispute (as defined below) to such dispute resolution procedures, the following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, a trustee appointed to represent the Company on claims derivative of the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation:

(i) subject to the prior written consent of all parties involved in the Dispute, any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

(ii) the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

(iii) the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

(iv) each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties,

(b) Arbitration:

Subject to the prior written consent of all parties involved in the Dispute to such dispute resolution procedure, if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be administered by JAMS/Endispute pursuant to JAMS' Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

(i) the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue



GENERAL REGISTRY CAYMAN ISLANDS
002316 Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, provided, however, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii) the arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrators) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii) the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv) no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty- five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non- parties, shall not be permitted;

(v) all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable



GENERAL REGISTRY CAYMAN ISLANDS
002317 Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi) the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

(c) Notwithstanding anything to the contrary herein, for greater certainty, in accordance with the terms herein, if all parties involved in the Dispute do not provide written consent to following the mediation and/or arbitration provisions herein, a party shall maintain its right to pursue his/her/its Dispute in court.

**AEOI**

137. Notwithstanding any other Article, in order to comply with AEOI, any Director shall be entitled to release and/or disclose on behalf of the Company to the Cayman Islands Tax Information Authority or equivalent authority (the "**TIA**") and any other foreign government body as required by AEOI, any information in its or its agents' or delegates' possession regarding a Member including, without limitation, financial information concerning the Member's investment in the Company, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Member. Any such Director may also authorise any third party agent, including but not limited to, the Investment Manager or Administrator, to release and/or disclose such information on behalf of the Company.

138. In order to comply with AEOI and, if necessary, to reduce or eliminate any risk that the Company or its Members are subject to withholding taxes pursuant to AEOI or incur any costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) (together, "**costs**") associated with AEOI, the Directors may cause the Company to undertake any of the following actions:

(a) compulsorily redeem any or all of the Shares held by a Member either (i) where the Member fails to provide (in a timely manner) to the Company, or any agent or delegate of the Company, including but not limited to, the Investment Manager or the Administrator, any information requested by the Company or such agent or delegate pursuant to AEOI; or (ii) where there has otherwise been non-compliance by the Company with AEOI whether caused, directly or indirectly, by the action or inaction of such Member, or any related person, or otherwise;

(b) deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

(i) comply with any applicable requirement to apply and collect withholding tax pursuant to AEOI;

(ii) allocate to a Member an amount equal to any withholding tax imposed on the Company as a result of the Member's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Company with AEOI;



GENERAL REGISTRY CAYMAN ISLANDS
002318
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

(iii) ensure that any AEOI related costs are recovered from the Member(s) whose action or inaction (directly or indirectly, including the action or inaction of any person related to such Member) gave rise or contributed to such costs.

139. In order to give effect to the requirements imposed upon the Company by AEOI, as well as any of the actions contemplated by Articles 138(a) and 139(b), the Directors may undertake any of the following actions:

(a) create separate classes and/or series of Shares ("**AEOI Shares**"), with such rights and terms as the Directors may in their sole discretion determine, and following the compulsory redemption of some or all of a Member's Shares may immediately apply such redemption proceeds in subscribing for such number of AEOI Shares as the Directors determine;

(b) may re-name any number of Shares (whether issued or unissued) as AEOI Shares, create a Separate Account with respect to such AEOI Shares and apply any AEOI related costs or withholding taxes to such Separate Account;

(c) allocate any AEOI costs or withholding tax among Separate Accounts on a basis determined solely by the Directors; and

(d) adjust the Net Asset Value per Share of any relevant Shares (including any AEOI Share).



GENERAL REGISTRY CAYMAN ISLANDS
002319
Filed: 1-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

## Annexure

**Fiscal Year**

The fiscal year of the Company ends on the 31st day of December in each year, unless the Directors prescribe some other period therefor.



GENERAL REGISTRY CAYMAN ISLANDS
002320
Filed: [illegible]1-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495

# EXHIBIT

Register of Members of

**Charitable DAF HoldCo, Ltd**

**Registration No: 263805**

**Share Class: Management**

**Authorised Capital of USD 1.00 divided into 100.00 Management shares of par value USD 0.01 each**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **WNL Limited**<br>190 Elgin Avenue<br>George Town<br>Grand Cayman KY1-9001<br>Cayman Islands | 7-Nov-2011 | | 1.00 | 0.01 | In Full | 7-Nov-2011 : Allotment of 1.00 Management share(s) | 7-Nov-2011 | 1.00 | | 0.00 | 7-Nov-2011 : Repurchase of 1.00 Management share(s) |
| 2 | **Grant James Scott**<br>Highland Capital Managment, L.P.<br>13455 Noel Road, Suite 800<br>Dallas, TX 75240<br>USA | 7-Nov-2011 | | 100.00 | 1.00 | In Full | 7-Nov-2011 : Allotment of 100.00 Management share(s) | 25-Mar-2021 | 100.00 | | 0.00 | 25-Mar-2021 : Transfer of 100.00 Management share(s) to Mark E. Patrick |
| 3 | **Mark E. Patrick**<br>6716 Glenhurst Dr<br>Dallas, TX 75254<br>USA | 25-Mar-2021 | | 100.00 | 1.00 | In Full | 25-Mar-2021 : Transfer of 100.00 Management share(s) to Mark E. Patrick | | 0.00 | | 100.00 | |

Notes

1 *Where there is only one class of shares in issue, all issued shares carry equal (and unconditional) voting rights. Unless shares are described as "Non-Voting" they carry voting rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). Where shares are described as "Non-Voting" this designates that they do not carry rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). All shares carry unconditional voting rights, save where shares are described as "conditional" which designates that they only carry rights to vote at general meetings in certain circumstances.*

Register of Members of

**Charitable DAF HoldCo, Ltd**

**Registration No: 263805**

**Summary**

| Name | Number and Class of Shares Held | |
|---|---|---|
| Mark E. Patrick | 100.00 | Management |
| | | |
| **Total Management Shares outstanding: 100.00** | | |
| **Total Management Shares remaining unissued: 0.00** | | |

Register of Members of

**Charitable DAF HoldCo, Ltd**

**Registration No: 263805**

**Share Class: Participating**

**Authorised Capital of USD 49,999.00 divided into 4,999,900.00 Participating shares of par value USD 0.01 each**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **The Highland Capital Management Partners CharitableTrust #2**<br>Highland Capital Management, L.P<br>13455 Noel Rd, Suite 800<br>TX 75240<br>Dallas Texas<br>USA | 7-Nov-2011 | | 300.00 | 3.00 | In Full | 7-Nov-2011 : Allotment of 300.00 Participating share(s) | 30-Nov-2011 | 300.00 | | 0.00 | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Kansas City Foundation, Inc<br>30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Dallas Foundation, Inc<br>30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Santa Barbara Foundation, Inc |
| 2 | **Highland Kansas City Foundation, Inc**<br>- | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Kansas City Foundation, Inc | | 0.00 | | 100.00 | |
| 3 | **Highland Dallas Foundation, Inc**<br>- | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Dallas Foundation, Inc | | 0.00 | | 100.00 | |
| 4 | **Highland Santa Barbara Foundation, Inc**<br>- | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Santa Barbara Foundation, Inc | | 0.00 | | 100.00 | |

Register of Members of

**Charitable DAF HoldCo, Ltd**

**Registration No: 263805**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | **Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT** 306 W. 7th St., Suite 1045 Forth Worth TX 76102 USA | 13-Aug-2015 | | 5.00 | 0.05 | In Full | 13-Aug-2015 : Allotment of 5.00 Participating share(s) | | 0.00 | | 5.00 | |
| 6 | **DFW Charitable Foundation** The Corporation Trust Company 1209 Orange Street Wilmington, DE 19801 United States | 7-Feb-2025 | | 318.00 | 3.18 | In Full | 7-Feb-2025 : Allotment of 318.00 Participating share(s) | | 0.00 | | 318.00 | |

Notes

1 *Where there is only one class of shares in issue, all issued shares carry equal (and unconditional) voting rights. Unless shares are described as "Non-Voting" they carry voting rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). Where shares are described as "NonVoting" this designates that they do not carry rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). All shares carry unconditional voting rights, save where shares are described as "conditional" which designates that they only carry rights to vote at general meetings in certain circumstances.*

**Summary**

| Name | Number and Class of Shares Held | |
|---|---|---|
| Highland Kansas City Foundation, Inc | 100.00 | Participating |
| Highland Dallas Foundation, Inc | 100.00 | Participating |
| Highland Santa Barbara Foundation, Inc | 100.00 | Participating |
| Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT | 5.00 | Participating |
| DFW Charitable Foundation | 318.00 | Participating |
| **Total Participating Shares outstanding: 623.00** | | |
| **Total Participating Shares remaining unissued: 4,999,277.00** | | |

# EXHIBIT

**CHARITABLE DAF HOLDCO, LTD**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE SOLE DIRECTOR OF THE COMPANY DATED** March 25 **2021**

**1. SHARE TRANSFER**

1.1 **IT IS NOTED** that the Director has received a duly executed share transfer form relating to the transfer by Grant James Scott of 100 Management Shares to Mark E. Patrick.

1.2 **IT IS RESOLVED** that:

(a) the following share transfer (the "**Transfer**") be and is hereby ratified, confirmed and approved:

| TRANSFEROR | TRANSFEREE | NO OF SHARES | DATE OF TRANSFER |
|---|---|---|---|
| Grant James Scott | Mark E. Patrick | 100 Management Shares | 24 March 2021 |

(b) the Company's registered office provider be instructed to update the Register of Members of the Company to reflect the Transfer.

**2. GENERAL AUTHORISATION**

2.1 **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, the Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as the Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

**3. RATIFICATION OF PRIOR ACTIONS**

3.1 **IT IS RESOLVED** that any and all actions of the Company, or of the Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, the Director prior to such action being taken.

These written resolutions are signed by the sole Director of the Company.

Mark Patrick

**Mark E. Patrick**

# EXHIBIT

**CHARITABLE DAF HOLDCO, LTD**

**(the "Company")**

**SHARE TRANSFER FORM**

**Dated 24 March 2021**

I, **Grant James Scott** (the "**Transferor**"), for good and valuable consideration received by me from **Mark E. Patrick** (the "**Transferee**"), do hereby:

1. transfer to the Transferee 100 Management Shares (the "**Shares**") for the par value of $0.01 each standing in my name in the register of members of the Company to hold unto the Transferee, his executors, administrators and assigns, subject to the several conditions on which I held the same at the time of execution of this Share Transfer Form; and

2. consent that my name remains on the register of the Company until such time as the Company enters the Transferee's name in the register of the Company.

**SIGNED by TRANSFEROR**: )
)

Name: Grant J. Scott

And the Transferee does hereby agree to take the Shares subject to the same conditions.

**SIGNED by TRANSFEREE**: )
)

Name: Mark E. Patrick



078673.0000002 EMF_US 84436263v1

# EXHIBIT

**THE COMPANIES LISTED IN THE ATTACHED SCHEDULE**
**(EACH A "COMPANY" AND TOGETHER THE "COMPANIES")**

---

**WRITTEN RESOLUTIONS OF THE SOLE DIRECTOR**
**OF EACH COMPANY DATED** April 22, **2021**

---

**1. APPOINTMENT OF DIRECTOR**

1.1 **IT IS NOTED** that the Directors wish to appoint Paul Murphy as a Director of each Company with effect from the date of these resolutions and that such proposed Director has indicated a willingness to hold such office and has executed a letter of consent and/or a services agreement in relation thereto (such appointment, the "**Director's Appointment**").

1.2 **IT IS RESOLVED** that:

(a) the Director's Appointment be and is hereby approved with effect from the date of these resolutions until such time as the Director resigns or is removed from office in accordance with the Articles of Association of each Company; and

(b) the registered office service provider be and is hereby instructed to update the Register of Directors of each Company and to make the necessary filings with the Registrar of Companies to reflect the Director's Appointment.

**2. GENERAL AUTHORISATION**

2.1 **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, the Director or any officer or (if applicable) any attorney or duly authorised signatory of each Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of each Company, to do such further acts and things as the Director or any officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of each Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

**3. RATIFICATION OF PRIOR ACTIONS**

3.1 **IT IS RESOLVED** that any and all actions of each Company, or of the Director or any officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, the Director prior to such action being taken.

*[Remainder of page left blank intentionally]*

These written resolutions are signed by the sole Director of the Company.

Mark E. Patrick

**Schedule**
**(*List of Companies*)**

**Charitable DAF HoldCo, Ltd.**
**CLO HoldCo, Ltd.**
**Liberty CLO Holdco, Ltd.**
**Liberty Sub, Ltd.**
**HCT Holdco 2, Ltd.**
**MGM Studios Holdco, Ltd.**

# EXHIBIT 1

General Registry
CAYMAN ISLANDS

## Director Details

Entity Name: **CHARITABLE DAF HOLDCO, LTD**

| Director Name |
|---|
| Mark E. Patrick |
| Paul Murphy |

Back to Entity Search | View Receipt

# EXHIBIT 11

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH 45201

DEPARTMENT OF THE TREASURY

Date: JAN 19 2013

HIGHLAND DALLAS FOUNDATION INC
C/O HUNTON & WILLIAMS LLP
DOUGLAS M MANCINO
550 S HOPE ST STE 2000
LOS ANGELES, CA 90071

Employer Identification Number:
45-3961755
DLN:
17053058308022
Contact Person:
SHEILA M ROBINSON ID# 31220
Contact Telephone Number:
(877) 829-5500
Accounting Period Ending:
December 31
Public Charity Status:
509(a)(3)
Form 990 Required:
Yes
Effective Date of Exemption:
November 22, 2011
Contribution Deductibility:
Yes
Addendum Applies:
No

Dear Applicant:

We are pleased to inform you that upon review of your application for tax exempt status we have determined that you are exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code. Contributions to you are deductible under section 170 of the Code. You are also qualified to receive tax deductible bequests, devises, transfers or gifts under section 2055, 2106 or 2522 of the Code. Because this letter could help resolve any questions regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified as either public charities or private foundations. We determined that you are a public charity under the Code section(s) listed in the heading of this letter.

Specifically, we have determined that you are a Type I supporting organization under section 509(a)(3). A Type I supporting organization is operated, supervised, or controlled by one or more publicly supported organizations.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities, for some helpful information about your responsibilities as an exempt organization.

HIGHLAND DALLAS FOUNDATION INC

Sincerely,

Holly O. Paz

Holly O. Paz
Director, Exempt Organizations
Rulings and Agreements

Enclosure: Publication 4221-PC

Letter 947 (DO/CG)

# EXHIBIT 1

**CHARITABLE DAF HOLDCO, LTD**
**(THE "COMPANY")**

---

**WRITTEN RESOLUTIONS OF THE SOLE DIRECTOR**
**OF THE COMPANY DATED NOVEMBER 30, 2011**

---

**1. PARTIPATING SHARE TRANSFER UPON DISSOLUTION OF THE HIGHLAND CAPITAL MANAGEMENT PARTNERS CHARITABLE TRUST #2**

1.1 **IT IS NOTED** that the Director has received a duly executed share transfer form relating to the proposed transfer by The Highland Capital Management Partners Charitable Trust #2 of 100 Participating Shares to each of the three transferees listed below upon the dissolution of The Highland Capital Management Partners Charitable Trust #2.

1.2 **IT IS RESOLVED** that:

(a) the following share transfers (the "**Transfers**") be approved with effect from the date of dissolution of The Highland Capital Management Partners Charitable Trust #2 on November 30, 2011:

| TRANSFEROR | TRANSFEREE | NO OF SHARES |
|---|---|---|
| The Highland Capital Management Partners Charitable Trust #2 | Highland Kansas City Foundation, Inc. | 100 Participating Shares |
| The Highland Capital Management Partners Charitable Trust #2 | Highland Dallas Foundation, Inc. | 100 Participating Shares |
| The Highland Capital Management Partners Charitable Trust #2 | Highland Santa Barbara Foundation, Inc. | 100 Participating Shares |

(b) Walkers Corporate Services Limited be instructed to update the Register of Members of the Company to reflect the Transfers.

Grant Scott
**Director**



78673.000002 EMF_US 37950517v1

002341

# EXHIBIT 1

**CHARITABLE DAF HOLDCO, LTD**
**(THE "COMPANY")**

**SHARE TRANSFER FORM**
**DATED NOVEMBER 30, 2011**

**The Highland Capital Management Partners Charitable Trust #2** (the "**Transferor**") for good and valuable consideration received by it from Highland Dallas Foundation, Inc. (the "**Transferee**"), does hereby transfer to the Transferee 100 Participating Shares of a par value of **US$0.01** each.

| | | |
|---|---|---|
| **SIGNED** for and behalf of **The Highland Capital Management Partners Charitable Trust #2** | ) | Duly Authorised Signatory |
| | ) | Name: GRANT SCOTT |
| | ) | Title: TRUSTEE |

# EXHIBIT 1

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH 45201

DEPARTMENT OF THE TREASURY

Date: MAR 21 2013

HIGHLAND KANSAS CITY FOUNDATION INC
C/O HUNTON & WILLIAMS LLP
DOUGLAS M MANCINO
550 SOUTH HOPE ST STE 2000
LOS ANGELES, CA 90071

Employer Identification Number:
45-3961865
DLN:
17053066302032
Contact Person:
GREGORY WOO ID# 95340
Contact Telephone Number:
(877) 829-5500
Accounting Period Ending:
December 31
Public Charity Status:
509(a)(3)
Form 990 Required:
Yes
Effective Date of Exemption:
November 23, 2011
Contribution Deductibility:
Yes
Addendum Applies:
Yes

Dear Applicant:

We are pleased to inform you that upon review of your application for tax exempt status we have determined that you are exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code. Contributions to you are deductible under section 170 of the Code. You are also qualified to receive tax deductible bequests, devises, transfers or gifts under section 2055, 2106 or 2522 of the Code. Because this letter could help resolve any questions regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified as either public charities or private foundations. We determined that you are a public charity under the Code section(s) listed in the heading of this letter.

Specifically, we have determined that you are a Type I supporting organization under section 509(a)(3). A Type I supporting organization is operated, supervised, or controlled by one or more publicly supported organizations.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities, for some helpful information about your responsibilities as an exempt organization.

Sincerely,

Holly O. Paz

Holly O. Paz
Director, Exempt Organizations
Rulings and Agreements

Enclosure: Publication 4221-PC

# EXHIBIT 1

**CHARITABLE DAF HOLDCO, LTD**
**(THE "COMPANY")**

**SHARE TRANSFER FORM**
**DATED NOVEMBER 30, 2011**

**The Highland Capital Management Partners Charitable Trust #2** (the "**Transferor**") for good and valuable consideration received by it from Highland Kansas City Foundation, Inc. (the "**Transferee**"), does hereby transfer to the Transferee 100 Participating Shares of a par value of **US$0.01** each.

| | | |
|---|---|---|
| **SIGNED** for and behalf of **The Highland Capital Management Partners Charitable Trust #2** | ) | Duly Authorised Signatory |
| | ) | Name: GRANT SCOTT |
| | ) | Title: TRUSTEE |

# EXHIBIT 1

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH 45201

DEPARTMENT OF THE TREASURY

Date: FEB 12 2013

HIGHLAND SANTA BARBARA FOUNDATION
INC
C/O MARK PATRICK
300 CRESCENT CT STE 700
DALLAS, TX 75201

Employer Identification Number:
45-3962008
DLN:
17053060398012
Contact Person:
GINGER L JONES ID# 31646
Contact Telephone Number:
(877) 829-5500

Accounting Period Ending:
December 31
Public Charity Status:
509(a)(3)
Form 990 Required:
Yes
Effective Date of Exemption:
November 22, 2011
Contribution Deductibility:
Yes
Addendum Applies:
No

Dear Applicant:

We are pleased to inform you that upon review of your application for tax exempt status we have determined that you are exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code. Contributions to you are deductible under section 170 of the Code. You are also qualified to receive tax deductible bequests, devises, transfers or gifts under section 2055, 2106 or 2522 of the Code. Because this letter could help resolve any questions regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified as either public charities or private foundations. We determined that you are a public charity under the Code section(s) listed in the heading of this letter.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities, for some helpful information about your responsibilities as an exempt organization.

We have sent a copy of this letter to your representative as indicated in your power of attorney.

Sincerely,

Holly O. Paz

Holly O. Paz
Director, Exempt Organizations
Rulings and Agreements

Enclosure: Publication 4221-PC

# EXHIBIT 1

**CHARITABLE DAF HOLDCO, LTD**
**(THE "COMPANY")**

**SHARE TRANSFER FORM**
**DATED NOVEMBER 30, 2011**

**The Highland Capital Management Partners Charitable Trust #2** (the "**Transferor**") for good and valuable consideration received by it from Highland Santa Barbara Foundation, Inc. (the "**Transferee**"), does hereby transfer to the Transferee 100 Participating Shares of a par value of **US$0.01** each.

**SIGNED** for and behalf of **The Highland Capital Management Partners Charitable Trust #2** )

Duly Authorised Signatory

Name: GRANT SCOTT

Title: TRUSTEE

# EXHIBIT 1

INTERNAL REVENUE SERVICE
DISTRICT DIRECTOR
1100 COMMERCE STREET
DALLAS, TX 75242-0000

DEPARTMENT OF THE TREASURY

Date: MAY 1 9 1994

COMMUNITY FOUNDATION OF
METROPOLITAN TARRANT COUNTY INC
306 W 7TH ST STE 702
FORT WORTH, TX 76102-4906

Employer Identification Number:
75-2267767
Case Number:
754123072
Contact Person:
SHARI FLOWERS
Contact Telephone Number:
(214) 767-6023
Our Letter Dated:
July 27, 1989
Addendum Applies:
No

Dear Applicant:

This modifies our letter of the above date in which we stated that you would be treated as an organization that is not a private foundation until the expiration of your advance ruling period.

Your exempt status under section 501(a) of the Internal Revenue Code as an organization described in section 501(c)(3) is still in effect. Based on the information you submitted, we have determined that you are not a private foundation within the meaning of section 509(a) of the Code because you are an organization of the type described in section 509(a)(1) and 170(b)(1)(A)(vi).

Grantors and contributors may rely on this determination unless the Internal Revenue Service publishes notice to the contrary. However, if you lose your section 509(a)(1) status, a grantor or contributor may not rely on this determination if he or she was in part responsible for, or was aware of, the act or failure to act, or the substantial or material change on the part of the organization that resulted in your loss of such status, or if he or she acquired knowledge that the Internal Revenue Service had given notice that you would no longer be classified as a section 509(a)(1) organization.

If we have indicated in the heading of this letter that an addendum applies, the addendum enclosed is an integral part of this letter.

Because this letter could help resolve any questions about your private foundation status, please keep it in your permanent records.

If you have any questions, please contact the person whose name and telephone number are shown above.

Sincerely yours,

Bobby E. Scott

Bobby E. Scott
District Director

Letter 1050 (DO/CG)

002356

RECEIVED MAY 2 3 1994

**Internal Revenue Service**

**Department of the Treasury**
**P. O. Box 2508**
**Cincinnati, OH 45201**

**Date:** March 2, 2006

**Person to Contact:**
Roger Meyer
ID# 31-07707
**Toll Free Telephone Number:**
877-829-5500
**Federal Identification Number:**
75-2267767

COMMUNITY FOUNDATION OF NORTH TEXAS
306 W 7TH ST STE 306
FORT WORTH, TX 76102-4906

Dear Sir or Madam:

This is in response to your request of December 29, 2005, regarding your tax-exempt status.

In June 1989 we issued a determination letter that recognized you as exempt from federal income tax. Our records indicate that you are currently exempt under section 501(c)(3) of the Internal Revenue Code.

Our records indicate that you are also classified as a public charity under sections 509(a)(1) and 170(b)(1)(A)(vi) of the Internal Revenue Code.

Our records indicate that contributions to you are deductible under section 170 of the Code, and that you are qualified to receive tax deductible bequests, devises, transfers or gifts under section 2055, 2106 or 2522 of the Internal Revenue Code.

If you have any questions, please call us at the telephone number shown in the heading of this letter.

Sincerely,

Cindy M. Westcott

Cindy Westcott
Manager, EO Determinations

# EXHIBIT 1

**CHARITABLE DAF HOLDCO, LTD**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE SOLE DIRECTOR**
**OF THE COMPANY DATED** August 12, **2015**

**1. ISSUE OF SHARES**

1.1 **IT IS NOTED** that:

(a) capitalised terms not otherwise defined herein shall have the meaning given to those terms in the Articles of Association of the Company, as may be amended from time to time (the "**Articles**");

(b) the Company has received an application from the Community Foundation of North Texas (the "**Subscriber**") to subscribe for Participating Shares of the Company having a par value of US$0.01 each, in the amount set forth in the table below, at their aggregate nominal par value (the "**Shares**"):

| SUBSCRIBER | NO. OF SHARES | SUBSCRIPTION PRICE |
|---|---|---|
| Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT | 5 Participating Shares | $0.05 |

(c) in the opinion of the Directors, the issuance of the Shares to the Subscriber would be in the best interests of the Company.

1.2 **IT IS RESOLVED** that:

(a) in the opinion of the Directors, the issuance of the Shares to the Subscriber would be in the best interests of the Company.

(b) subject to payment in full being received by the Company, the Shares be and are hereby issued to the Subscriber, fully paid, in accordance with the table set forth above; and

(c) as the Subscriber has not requested the issue of a share certificate, Intertrust Corporate Services (Cayman) Limited, be and is hereby instructed to make the appropriate entries in the Register of Members of the Company in respect of the foregoing issue.

**2. GENERAL AUTHORISATION**

2.1 **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, the Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as the Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of

the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

**3. RATIFICATION OF PRIOR ACTIONS**

3.1 **IT IS RESOLVED** that any and all actions of the Company, or of the Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, the Director prior to such action being taken.

[***Signature page follows***]

Grant James Scott
**Sole Director**

# EXHIBIT

DFW Foundation
6716 Glenhurst Dr.
Dallas, TX 75254

February 7, 2025

Charitable DAF Holdco, Ltd.
Attn: Mark Patrick, Director
6716 Glenhurst Dr.
Dallas, TX 75254

Dear Mr. Patrick:

DFW Charitable Foundation, a Delaware non-profit non-stock corporation ("DFW"), wishes to acquire 318 participating shares in Charitable DAF Holdco, Ltd. ("DAF Holdco"), par value $0.01, for a total price of $3.18. Please find enclosed funds to acquire such 318 participating shares, effective as of the date first set forth above.

Thank you for your attention to this matter.

Sincerely,

DFW Foundation

By:____________________________
Shawn Raver
Director



# EXHIBIT 1

**Charitable DAF HoldCo, Ltd**
(the "**Company**")

---

**Unanimous Written Resolutions of the Board of Directors of the Company**

---

## 1 Directors' Interests

1.1 It is noted that none of the directors of the Company (together the "**Directors**", and each a "**Director**") have any monetary or financial interest in the matters referred to herein.

## 2 Recent Developments

2.1 It is noted that the Directors have received communications from certain current Participating Shareholders requesting information and making false and misleading claims regarding the Company's and its subsidiaries' finances.

2.2 It is noted that the Directors believe the aforementioned communications were motivated and/or directed by James Dondero as retaliation for Mark Patrick's resignation from Skyview Group and the Company's various efforts to create independence between the Company and its subsidiaries on the one hand and James Dondero and his affiliates on the other hand.

2.3 It is noted that the Directors have knowledge that the false and misleading information forming the basis of these claims was provided by SEI, a back-office service provider to the Company and certain of its subsidiaries, to employees of certain Dondero-controlled entities such as Skyview Group or NexPoint.

2.4 It is noted that none of the concerns raised by the current Participating Shareholders were raised prior to Mark Patrick's resignations from Skyview Group, despite there being no change in the information provided or the frequency of information provided.

## 3 U.S. Counsel Tax Advice

3.1 It is noted that the Directors have received United States Tax Counsel advice that, among other things:

(a) "there is a significantly heightened risk that the Internal Revenue Service of the United States could severely penalize and/or revoke the tax-exempt status of one or more of the current Participating Shareholders, which could imperil the status and assets of the Company"; and

(b) "Increasing the number of Participating Shareholders would mitigate considerations of undue influence/private inurement/private beneift and broaden the scope of DAF's charitable reach to the public; and

(c) "The IRS will look favorably upon any and all attempts for DAF to maintain its

independence from what seems to be persistent attempts by James Dondero and the entities controled by him to use DAF for his private benefit and private inurement."

3.2 It is noted that the Directors believe the Share Issuance (as defined below) to DFW (as defined below) is based on this U.S. tax advice and will protect the Company and the current Participating Shareholders and will also further the Company's charitable mission.

## 4 Cayman Counsel Legal Advice

4.1 It is noted that the Directors have sought and obtained legal advice from separate Cayman Islands counsel ("**Walkers**"), who have confirmed that (i) the Directors have the ability to issue new Participating Shares as contemplated by the Share Issuance, (ii) if the Directors believe the Participating Shares are held by a Restricted Person (as defined in Article 21 of the Company's M&A), the Directors may require such shareholder to transfer its shares, and (iii) the Participating Shareholders have no or limited rights to information.

4.2 It is noted that attached as Exhibit A hereto is the Walkers presentation outlining the rights accompanying the Participating Shares (the "**Walkers Presentation**").

## 5 Issue of Shares

5.1 It is noted that the Company proposes to issue 318 Participating Shares of a nominal or par value of US$0.01 each as fully paid up (the "**Participating Shares**") to DFW Charitable Foundation ("**DFW**"), a Delaware non-profit non-stock corporation (the "**Share Issuance**").

5.2 Following the Share Issuance, DFW shall own 51.04% of the issued Participating Shares of the Company.

5.3 It is resolved that:

(a) the Share Issuance be approved with effect from the date of these resolutions;

(b) Campbells Corporate Services Limited be and is hereby instructed to make the appropriate entry in the register of members of the Company in respect of the Share Issuance;

(c) any and all actions of the Company, the Directors or any officer of the Company taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such actions had been presented for approval and approved by the Directors prior to such action(s) being taken; and

(d) the Directors shall meet on not less than a quarterly basis to discuss recent developments and how to best protect the Company and its shareholders.

## 6 Ancillary Documents

6.1 It is further resolved that:

(a) the Company do give, make, sign, execute and deliver all such agreements, letters, notices, certificates, acknowledgements, instructions and other documents (whether of a like nature or not) (the "**Ancillary Documents**") as may in the sole opinion and absolute discretion of any Director be considered necessary or desirable for the purpose of compliance with any condition precedent or the coming into effect of or otherwise giving effect to, consummating or completing or procuring the performance and completion of all or any of the transactions contemplated by or referred to in all or any of the documents referred to above and the Company do all other such acts and things as might in the sole opinion and absolute discretion of any Director be necessary or desirable for the purpose aforesaid;

(b) the Ancillary Documents be in such form as any Director should in his absolute discretion and sole opinion approve, the signature of any such person on any of the Ancillary Documents being due evidence for all purposes of his approval of the terms thereof on behalf of the Company;

(c) the Ancillary Documents (where required to be executed by the Company) be executed by the signature thereof of any one Director together with such changes as such Director shall in his absolute discretion consider necessary or appropriate (the signature of such Director on any Ancillary Document being conclusive evidence of his approval of the same for and on behalf of the Company);

(d) the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner aforesaid;

(e) any and all actions of the Company, or of any Director or officer, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and hereby are ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval, and approved by, the Directors prior to such action being taken; and

(f) the prior execution of any Ancillary Documents by any Director are approved, ratifed and confirmed in all respects.

[*signature page(s) follow(s)*]

____________________________________

Name: **Mark Patrick**
Title: Director

Date: 2-7-2025

Name: **Paul Murphy**
Title: Director

Date: 7th February 2025

**Exhibit A**

**Walkers Presentation**

Walkers

# Participating Shareholder Rights
# **Charitable DAF Holdco Ltd.**



Making financial services work

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

# Binding Effect of Articles of Association

# Binding Effect of Articles of Association

"… the binding effect of the Articles as they stand … is given statutory force by section 25(3) of the Companies Law which reads:

> ‘(3) Where registered the said articles of association shall bind the company and the members thereof to the same extent as if each member had subscribed his name and affixed his seal thereto, and there were in such articles contained a covenant on the part of himself, his heirs, executors and administrators to conform to all the regulations contained in such articles subject to this law; ….’"

(*In the Matter of Strategic Turnaround Master Partnership Ltd* [2008] CIGC J1128-1, per Chief Justice Smellie at paragraph 135)

# Participation in Discretionary Dividends

# Participate in Discretionary Dividends

“The Participating Shares shall confer upon the Shareholders … the right to participate in the profits or assets of the Company in accordance with these Articles.” **(Art 12)**

# Participation in Discretionary Dividends

"The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit." **(Art 102)**

"Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares." **(Art 105)**

**Participating Shareholders do not have:**

- **the right to cause or vote on distributions;**
- **the right to pro rata distributions based on their shareholding;**
- **the right to annual or timed distributions; or**
- **the right to receive notice of distributions to other Participating Shareholders.**

# Removal of Directors

# Removal of Directors

**“**Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.” **(Art 65)**

**Participating Shareholders do not have:**

- the right to remove Directors; or
- the right to appoint Directors.

**Note: the right to appoint Directors is held by the Management Shareholder and the Directors, and the right to remove Directors is held solely by the Management Shareholder (Articles 64, 65, and 69, and Definition of “Ordinary Resolution”).**

# Modification of Rights

# Modification of Rights

"… the rights attached to [any] Class may … only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting." **(Art 13)**

**Participating Shareholders do not have:**

- **the right to cause a distribution; or**
- **the right to amend the Articles.**

# Modification of Rights – Issuance of Shares

"The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not … be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company." **(Art 14)**

"… all Shares for the time being unissued shall be under the control of the Directors who may:

(a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

(b) and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued." **(Art 7)**

**Participating Shareholders do not have:**

- **the right to vote on the issuance of further Participating Shares;**
- **pre-emption rights; or**
- **the right to receive notice of such issuance.**

# Modification of Rights – Issuance of Shares

"The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each…" **(Art 7)**

**Note:** Of the authorised share capital of the Company, 305 Participating Shares have been issued. In accordance with the Articles, the Directors may unilaterally issue additional Participating Shares and thereby dilute the power of existing shareholders for the purposes of voting on matters that may materially adversely vary or abrogate the rights of the Participating Shareholders.

**Additional Note: many of the rights that shareholders of a company typically hold (e.g. the right to receive notices, and the right to vote at general meetings, including in respect of the appointment and removal of directors) are held by the Management Shareholder (Mark Patrick) rather than the Participating Shareholders. In addition, the Directors (Mark Patrick and Paul Murphy) have the ability to unilaterally declare dividends and issue new Participating Shares without the approval of the Participating Shareholders (or the Management Shareholder).**

# Share Redemption

# Share Redemption

“**"Participating Share"** means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Act and these Articles…”

“… the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them…” **(Paragraph 7, Memorandum)**

“The rights conferred upon the holders of the Participating Shares … shall not … be deemed to be materially adversely varied or abrogated by … the redemption or purchase of any Participating Shares of any Class by the Company.” **(Art 14)**

**Participating Shareholders do not have:**

- the right to redeem their shares; or
- the right to vote on the Company’s redemption of their shares.

# Transfer of Shares

# Share Transfer by Notice of the Directors – Restricted Person

"If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles." **(Art 21)**

"**Restricted Person**" means any Person holding Participating Shares:

a) in breach of the law or requirements of any country or governmental authority;
b) that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the Code or an entity or organisation all of whose beneficiaries are exempt under Section 501 (c)(3) of the Code; or
c) in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered."

**Note: the Directors have duties to act, and to exercise their powers, in the best interests of the Company. The scope of those duties includes continually evaluating whether any Participating Shareholder may pose a threat to the Company which could cause them to fall within the definition of Restricted Person, and how best to protect the Company against any such threat.**

# General Meetings

# General Meetings

"Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company…" **(Art 12)**

**Participating Shareholders do not have:**

- **the right to receive notice of general meetings;**
- **the right to attend general meetings;**
- **the right to speak at general meetings;**
- **the right to vote at general meetings; or**
- **the right to information regarding proceedings of general meetings.**

# Limited Information Rights

# Limited Information Rights

"The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors." **(Art 108)**

"The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution." **(Art 110)**

**Participating shareholders have very limited information rights. Specifically, the articles do not provide the Participating Shareholders with the following:**

- **the right to inspect any account;**
- **the right to inspect any book; or**
- **the right to inspect any document of the Company.**

Further to the above, we note that :

- This only applies to the limited company which issued the participation shares, i.e. DAF HoldCo;
- It does not apply to subsidiary entities;
- It does not apply to entities in which DAF HoldCo holds a passive interest; and
- There is no "look- through" down through all the entities in the structure.

# EXHIBIT

intertrust GROUP A CSC COMPANY

Registration No.: **263805**
Client No.: **KY059904**

REGISTER OF DIRECTORS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| **Name & Address** | **Office Held** | **Date of Appointment** | **Date of Resignation** |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 04 Nov 2011 | 04 Nov 2011 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 04 Nov 2011 | 25 Mar 2021 |
| **Mark E. Patrick**<br>6716 Glenhurst Dr, Dallas, Texas, TX 75254; USA. | Director | 25 Mar 2021 | |
| **Paul Murphy**<br>Windsor Village, Unit #24; South Sound; Grand Cayman; Cayman Islands. | Director | 22 Apr 2021 | |
| | | | |

Date printed: 18 December, 2023

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

# EXHIBIT

**THE DALLAS FOUNDATION**

**SUPPORTING ORGANIZATION OPERATING AGREEMENT**

THIS SUPPORTING ORGANIZATION OPERATING AGREEMENT (this "Agreement") is made and entered into on November 30, 2011, by and between **THE DALLAS FOUNDATION** ("Foundation") and the **HIGHLAND DALLAS FOUNDATION, INC.** ("Supporting Organization").

**RECITALS:**

A. Foundation is a Texas nonprofit corporation exempt from taxation under Internal Revenue Code ("Code") Section 501(c)(3), and a public charity described in Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Code. The principal objective of Foundation is to solicit, receive and accept property to be administered, used and applied for charitable purposes, primarily but not exclusively in or for the benefit of Dallas County, Texas.

B. Supporting Organization, a Delaware nonprofit non-stock charitable corporation, is established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of Foundation.

C. Supporting Organization expects to obtain a determination letter from the Internal Revenue Service (the "IRS") that Supporting Organization is a tax-exempt organization described in Section 501(c)(3) of the Code and a Type 1 supporting organization described in Section 509(a)(3) of the Code.

D. Foundation and Supporting Organization have entered into this Agreement for the purpose of documenting their agreements relating to the operation of Supporting Organization as a Type 1 supporting organization of Foundation. It is the intent of the parties that the assets held by Supporting Organization will generate funds for grantmaking primarily but not exclusively in Dallas County and for the payment of fees to Foundation under this Agreement.

**NOW THEREFORE,** the parties agree as follows:

## 1. GOVERNANCE OF SUPPORTING ORGANIZATION

1.1 **OPERATIONS.** Supporting Organization is a separately-incorporated corporation, solely responsible for its own operations and for its compliance with tax and other laws. At all times during the term of this Agreement, Supporting Organization shall operate as a Type 1 supporting organization of Foundation, as contemplated in Section 509(a)(3)(B)(i) of the Code. Foundation recognizes that assets contributed to Supporting Organization will be held in the name of Supporting Organization and will be subject to spending and investment policies as shall be determined by the Board of Directors of Supporting Organization from time to time.

1.2 **BOARD OF DIRECTORS.** Supporting Organization's Board of Directors will be the governing body for Supporting Organization. Unless otherwise agreed by the parties, Supporting Organization's initial Board of Directors shall consist of three (3) members.

**(a) FOUNDATION APPOINTMENTS.** Foundation's Board of Trustees, as required by the Code, will at all times appoint a majority of Supporting Organization's directors. Foundation will cooperate with Supporting Organization to ensure that all persons appointed by Foundation are committed to the purposes of Supporting Organization. Foundation's appointees to Supporting Organization's Board of Directors may include Foundation's trustees or staff, as well as third parties selected by Foundation. Foundation's appointees shall not, apart from their service as Supporting

Organization directors or officers, be "disqualified persons" with respect to Supporting Organization as defined in Sections 509(a)(3)(C) and 4946 of the Code. Supporting Organization shall notify Foundation if any appointee is a disqualified person other than by virtue of his or her service as a Supporting Organization director or officer. Foundation's appointees to Supporting Organization's Board of Directors shall serve in accordance with Supporting Organization's Bylaws.

**(b) SUPPORTING ORGANIZATION APPOINTMENTS.** Mr. James Dondero or his successor shall elect or appoint a minority of the members of the Board of Directors of Supporting Organization (i.e., one, as long as the Board of Directors numbers three), who may be a disqualified person(s).

**(c) DISQUALIFIED PERSONS.** Under no circumstances shall individuals who are disqualified persons (other than by virtue of their service as directors or officers of Supporting Organization) have majority control of Supporting Organization's Board of Directors or have veto powers over actions by the Supporting Organization's Board of Directors, nor shall disqualified persons described in Section 4946 of the Code and persons described in Section 4958(c)(3)(B) of the Code be compensated by Supporting Organization or receive grants, loans or similar payments from Supporting Organization.

**1.3 NO COMPENSATION.** The parties agree that in order to avoid even the perception of personal benefit, no directors of Supporting Organization shall receive compensation for their service as such. Notwithstanding the foregoing, Supporting Organization's directors may be reimbursed for reasonable and necessary out of pocket expenses actually incurred for their board service.

**1.4 MEETINGS.** Supporting Organization's Board of Directors shall meet at least once annually in a manner permitted under Delaware law. The directors shall meet at least once annually in person, unless unforeseen circumstances make attendance in person impossible.

## 2. FINANCE AND OPERATIONS

**2.1 FISCAL YEAR.** Supporting Organization's fiscal year shall be the calendar year.

**2.2 SERVICES.** Foundation will provide the services to Supporting Organization described in **SCHEDULE A**, attached, and as such schedule may be amended by Foundation and Supporting Organization in writing from time to time.

**2.3 FEES:**

**(a)** In consideration for Foundation's services under this Agreement, Supporting Organization shall pay to Foundation the annual fees described more particularly in **SCHEDULE B**, attached.

**(b)** The parties may agree to additional fees in respect to the performance of any additional services not described in **SCHEDULE A** to this agreement. Foundation shall notify the Supporting Organization in advance of any changes in annual fees set forth in **SCHEDULE A**.

**2.4 INVESTMENTS**

**(a)** From time to time, some or all of Supporting Organization's funds may be invested with the pooled endowment funds of Foundation to achieve economies of scale and strive for the highest expected level of returns for a given level of risk with the goal of enabling Supporting Organization to achieve its philanthropic and financial objectives. Decisions with respect to the retention, investment, or reinvestment of assets or commingling of assets shall be made by Foundation's Board of Trustees or by a committee or agent authorized by the Board of Trustees, in accordance with Foundation's investment policies. Supporting Organization's funds will be accounted for and reported on separately.

(b) Supporting Organization may at any time remove any or all of its funds invested with Foundation's pooled investment fund and invest its own funds separately from those of Foundation, subject to limitations on investment withdrawals with regard to any particular investment class (e.g., limitations on early withdrawals from "fund of funds"). Supporting Organization may select its own custodian and investment consultant and pay the relevant fees directly, subject to Section 1.2(c) of this Agreement.

## 3. TERM

**3.1 COMMENCEMENT.** The term of this Agreement commenced upon the contribution of funds to Supporting Organization on November 30, 2011.

**3.2 TERM.** Supporting Organization and Foundation intend to engage in a long-term relationship. The initial term of this agreement shall be one year, and the term shall be renewed automatically for successive one-year periods. Notwithstanding the foregoing, this agreement may be terminated at any time by either party providing the other party with 30 days advance written notice of its intent to terminate the Agreement. Should either party wish to terminate this relationship, the following process will be followed:

(a) The parties will agree on amendments to the certificate of incorporation and bylaws of Supporting Organization. The amendments will change the status of Supporting Organization from a supporting organization of Foundation and provide for the transfer of Supporting Organization's assets to one or more of the following entities as determined by Supporting Organization:

(i) A stand-alone publicly-supported organization described in Section 501(c)(3) of the Code.

(ii) A supporting organization of another publicly-supported 501(c)(3) organization.

(iii) A donor-advised fund of a publicly-supported organization described in Section 501(c)(3) of the Code.

(b) Neither party will unreasonably withhold its approval of these amendments.

(c) In the event of the termination of this Agreement, each party shall be responsible for its own fees and costs related to the termination.

**3.3 LOSS OF TAX-EXEMPT STATUS.** This agreement shall be automatically terminated in the event that Supporting Organization is determined to not qualify as a tax-exempt organization described in Section 501(c)(3) of the Code.

## 4. INDEMNIFICATION AND INSURANCE

**4.1** Foundation will indemnify, defend, and hold harmless Supporting Organization, its officers, directors, employees, members, agents, and affiliated organizations against and from any claims, liability, suits, damages, losses, or expenses whatsoever, including reasonable attorneys fees incurred, arising or alleged to arise out of the acts or omissions of Foundation, its officers, employees, members, agents, and affiliated organizations, under this Agreement. Foundation will maintain at all times during the term of this Agreement general liability and director and officer liability insurance in such amounts and against such risks as are standard in the industry, naming Supporting Organization and its directors and officers as additional insureds. The coverage will protect against the acts or omissions of Supporting Organization, its officers, directors, agents, and employees.

4.2 Supporting Organization will indemnify, defend, and hold harmless Foundation, its officers, trustees, employees, members, agents, and affiliated organizations against and from any claims, liability, suits, damages, losses, or expenses whatsoever, including reasonable attorneys fees incurred, arising or alleged to arise out of the acts or omissions of Supporting Organization, its officers, directors, employees, members, agents, and affiliated organizations, under this Agreement.

## 5. MISCELLANEOUS

5.1 **GOVERNING LAW.** This Agreement and the legal relations between the parties shall be governed by and construed under the laws of the State of Texas.

5.2 **RECORDS.** Supporting Organization will supply to Foundation on a timely basis copies of the following materials as they are created, updated, or amended: incorporation documents; annual filings with the State of Texas; meeting minutes and actions of the Board of Directors and of any committee with Board authority; board contact information; investment statements; and board policies.

5.3 **PUBLICITY.** Foundation may disclose the existence, funding and grants of the Supporting Organization in its Annual Report and other documentation published by Foundation. Any information presented for publication by the media shall be approved in advance by Supporting Organization. Foundation reserves the right to approve in advance any publicity from Supporting Organization mentioning Foundation.

5.4 **FURTHER ASSURANCES.** Each of the parties hereto does hereby covenant and agree, without any further consideration, to execute, acknowledge, and deliver all such other documents and to take all such other actions as may be necessary or convenient in order to carry out more effectively any of the purposes of this Agreement.

5.5 **AMENDMENTS.** This Agreement may be amended from time to time only by written instrument signed by both parties; and this Agreement shall be amended by the parties whenever necessary or advisable in order to comply with requirements of the Code relating to tax-exempt organizations and supporting organizations.

5.6 **ENTIRE AGREEMENT.** This Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior agreements between the parties with regard to such subject matter.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

| | |
|---|---|
| **HIGHLAND DALLAS FOUNDATION, INC.** | **DALLAS FOUNDATION** |
| James Dondero, President | Mary M. Jalonick, President |

## SCHEDULE A

### SCHEDULE OF SERVICES

Foundation will provide to Supporting Organization the services indicated below:

1.1 Administrative Services.

a. Maintenance of Supporting Organization's records, reports and files.

b. Performance of related accounting services for Supporting Organization.

c. Payment of accounts payable and other liabilities of Supporting Organization.

d. Preparation and distribution of all financial statements required to be generated by Supporting Organization.

e. Oversight of the preparation and filing of all federal and state returns required of Supporting Organization.

f. As needed, preparation and distribution to the governing body of Supporting Organization of periodic reports on the financial condition of the Supporting Organization.

1.2 Corporate Formalities Services.

a. Calendaring of required member and board meetings.

b. Notice of all meetings.

c. Facilities and administrative support for member and board meetings.

d. Preparation of minutes.

e. Maintenance of minute book.

f. Assistance with selection of candidates for the board.

1.3 Grant Administration.

a. Assistance with development of program goals, guidelines and a form of Request for Proposal.

b. Disseminate RFP to target groups.

c. Receive and screen all proposals.

d. Preparation of a summary grid of proposals for review and decision by the Supporting Organization.

e. Prepare and send responses to applicants.

f. Disbursement of grants with grant letters.

g. Monitor performance of grantees.

h. Receive and review interim and annual reports from grantees.

Supporting Organization acknowledges that Foundation is providing only the services listed above. Any services not selected, and any services not listed above, shall not be within the scope of Foundation's responsibilities under this Agreement. Without limiting the foregoing, Supporting Organization acknowledges that Foundation is not providing any investment advice or services to Supporting Organization, and that Supporting Organization is responsible for the management and investment of its assets.

## SCHEDULE B

## SCHEDULE OF FEES

In consideration of the services provided to Supporting Organization by Foundation, Supporting Organization shall pay Foundation an annual administrative fee (Fee) in the amount of .25% of the assets owned directly or indirectly by Supporting Organization, plus out-of-pocket costs. The Fee is payable in quarterly installments in arrears in the amount of .0625% of the prior quarter-end net asset value, plus out-of-pocket expenses for said quarter.

# EXHIBIT

## Agreement and Acknowledgment of Legal Relationship

The Highland Kansas City Foundation, Inc. (the "Foundation") will request the IRS to grant to it public charity status, effective as of the date of its incorporation, by reason of its supporting organization relationship with the Greater Kansas City Community Foundation, a Missouri nonprofit corporation ("Community Foundation"). This relationship requires the active oversight and involvement of the Community Foundation. In furtherance of this relationship, the Community Foundation and the Foundation agree as follows:

The Community Foundation shall provide the following Base Services to the Foundation: (1) quarterly statements evidencing all account transactions including receipts, disbursements and investment earnings, (2) access to on-line tools provided to donors by the Community Foundation, (3) information upon request regarding grant making opportunities, (4) processing of all grants, (5) all other services generally provided for donor advised funds by the Community Foundation under the standard administrative fee schedule, and (6) appointment of two of the three directors of the Foundation as required by the Foundation's Articles of Incorporation and Bylaws. Additional services may be provided for an additional fee. Both parties shall agree in writing as to any additional services to be provided and the fee for such additional services.

The Community Foundation shall perform no management, accounting, tax or other services with respect to any subsidiaries of the Foundation, or any entities in which the Foundation owns or holds any interest.

In consideration of the Base Services to be provided, the Foundation shall pay the greater of (i) $62,500 or (ii) the administrative fee as set forth in the Community Foundation's then current public Administrative Fee Schedule (the "Administrative Fee Schedule"). The Foundation hereby acknowledges receipt of the current Administrative Fee Schedule attached as Exhibit B and accepts the terms of said schedule. This fee will be applied against the market value of assets held in the Foundation. Such fees will be assessed monthly, however the Foundation shall at all times maintain a cash reserve sufficient to cover the estimated fees for one year. Any and all direct operating expenses incurred by the Community Foundation, such as transaction fees, courier services, tax return preparation fees for Forms 990, legal fees and special audit fees, will be billed at actual cost. The Administrative Fee Schedule is subject to modification and may be increased or decreased at the sole discretion of the Community Foundation's Board of Directors. The Community Foundation shall promptly notify the Foundation of any such modification and send to the Foundation the new, modified Administrative Fee Schedule.

The Foundation agrees to provide the Community Foundation with any other records and data necessary for the Community Foundation to provide the Foundation with the Base Services and any additional services, and further, the Foundation warrants that any such records and data provided shall be accurate and true and that the Community Foundation may rely on such records and data in fulfilling its obligations hereunder. Further the Foundation shall cooperate in any audit of the Community Foundation for which information related to the Foundation is requested. The Foundation agrees to provide the Community Foundation with any and all information needed to fulfill the Community Foundation's obligations hereunder on such forms and in such format as may be reasonably requested by the Community Foundation.

Specifically, the Foundation agrees to provide the Community Foundation with the following on a timely basis (1) copies of the Foundation's Articles of Incorporation and Bylaws and tax exemption letter from the Internal Revenue Service, (2) copies of all Board meeting notices and minutes of the Board meetings, (3) financial reports at least quarterly, (4) copies of all account statements of the Foundation upon request of the Community Foundation, and (5) a copy of the Foundation's annual Form 990 report to the Internal Revenue Service. Further, the Foundation will notify the Community Foundation when any director appointed by the Community Foundation that is not otherwise affiliated with the Community Foundation finishes his or her term, resigns or otherwise ceases to serve.

This Agreement shall commence on November 30, 2011 and shall continue in effect until terminated by either party. Either party may terminate this Agreement upon 60 days advance written notice to the other party.

The Community Foundation is a public charity and any and all terms and conditions of this agreement which would otherwise adversely affect its status as a public charity shall be considered null and void.

This Agreement shall be interpreted and enforced according to the laws of the State of Missouri.

This Agreement contains the entire understanding of the parties and shall not be supplemented with any other term or condition unless such term or condition is reduced to writing and specifically incorporated herein by written agreement of the parties.

The undersigned have read and understand the contents of this agreement and are authorized to enter into this agreement on behalf of the parties hereto.

| | |
|---|---|
| James Dondero, President | Laura W. McKnight, President |
| Highland Kansas City Foundation, Inc. | Greater Kansas City Community Foundation |
| Date: November 30, 2011 | Date: 11/30/11 |



21481479\V-3

002403 94

**EXHIBIT B**

# ADMINISTRATIVE FEES
## TO SUPPORT THE GREATER KANSAS CITY COMMUNITY FOUNDATION'S MISSION-BASED OPERATIONS

This administrative fee schedule applies to all funds at the Greater Kansas City Community Foundation and its regional affiliates. Through economies of scale, the Foundation is able to charge minimal fees compared to the cost of establishing and maintaining your own private foundation. The fees are used exclusively to support the Community Foundation's operating expenses—your investment in a public charity dedicated to improving the quality of life in our region and ensuring that each philanthropic investment returns the greatest personal and civic benefit possible.

**ANNUAL ADMINISTRATIVE FEES ON THE MARKET VALUE OF FUND ASSETS**

**1.00% on the first $500,000**
0.60% on the next $500,000
0.30% on the next $2 million
0.10% on the next $4 million

Funds with assets in excess of $7 million will be charged a flat fee of 0.25% on the total assets. The minimum fee is $250 per year. The minimum amount to establish a fund is $10,000. The fees stated above are the annual fees; fees are charged to the fund monthly based on the average fair market value of assets. For newly established funds, the minimum annual fee is prorated over the remainder of the year.

Funds will be charged for any extraordinary direct expenses incurred on behalf of a specific fund, such as commissions for the sale of contributed stock. Additional fees may be assessed for extraordinary services such as special grant processing and review or other non-standard services.

21481479\V-1

# EXHIBIT

# SANTA BARBARA FOUNDATION

## SUPPORTING ORGANIZATION OPERATING AGREEMENT

THIS AGREEMENT is made and entered into on November 30, 2011, by and between the **SANTA BARBARA FOUNDATION** ("Foundation") and the **Highland Santa Barbara Foundation, Inc.** ("Supporting Organization"),

**RECITALS:**

A. Foundation is a California nonprofit public benefit corporation exempt from taxation under Internal Revenue Code ("Code") Section 501(c)(3), and a public charity described in Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Code. The principal objective of Foundation is to solicit, receive and accept property to be administered, used and applied for charitable purposes, primarily but not exclusively in, or for the benefit of Santa Barbara County.

B. Supporting Organization, a Delaware nonprofit non-stock charitable corporation, is a "Type 1 Supporting Organization" under Section 509(a)(3) of the Code established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of Foundation.

C. Supporting Organization expects to obtain a determination letter from the Internal Revenue Service that it is a tax-exempt organization under Section 501(c)(3) and a Type 1 supporting organization.

D. Foundation and Supporting Organization have entered into this Agreement for the purpose of documenting their agreements relating to the operation of Supporting Organization as a Type 1 Supporting Organization of Foundation. It is the intent of the parties that each year the assets held by Supporting Organization will generate funds for grantmaking primarily but not exclusively in Santa Barbara County and for the payment of fees to Foundation under this Agreement.

**NOW THEREFORE**, the parties agree as follows:

## 1. GOVERNANCE OF SUPPORTING ORGANIZATION

**1.1 OPERATIONS.** Supporting Organization is a separately-incorporated corporation, solely responsible for its own operations and for its compliance with tax and other laws. At all times during the term of this Agreement, Supporting Organization shall operate as a Type 1 Supporting Organization of Foundation, as contemplated in Section 509(a)(3)(B)(i) of the Code. Foundation recognizes that assets contributed to Supporting Organization will be held in the name of Supporting Organization and will be subject to spending and investment policies as shall be determined by the Board of Directors of Supporting Organization from time to time.

**1.2 BOARD OF DIRECTORS.** Supporting Organization's Board of Directors will be the governing body for Supporting Organization. Unless otherwise agreed by the parties, Supporting Organization's initial Board of Directors shall consist of 3 members.

**(a) FOUNDATION APPOINTMENTS.** Foundation's Board of Trustees, as required by the Code, will at all times appoint a majority of Supporting Organization's directors. Foundation will cooperate with Supporting Organization to ensure that all persons appointed by Foundation are committed to the purposes of Supporting Organization. Foundation's appointees to Supporting Organization's Board of Directors may include Foundation's trustees or staff, as well as third parties selected by Foundation.

Foundation's appointees shall not, apart from their service as Supporting Organization directors or officers, be "disqualified persons" as defined in Sections 509(a)(3)(C) and 4946 of the Code. Supporting Organization shall notify Foundation if any appointee is a disqualified person other than by virtue of his or her service as a Supporting Organization director or officer. Foundation's appointees to Supporting Organization's Board of Directors shall serve at the will of Foundation or for terms outlined in Supporting Organization's Bylaws.

(b) **SUPPORTING ORGANIZATION APPOINTMENTS.** Mr. James Dondero or his successor shall elect or appoint a minority of the board members (i.e., one, as long as the Board of Directors numbers three), who may be a disqualified person(s).

(c) **DISQUALIFIED PERSONS.** Under no circumstances shall individuals who are disqualified persons (other than by virtue of their service as directors or officers of Supporting Organization) have majority control of Supporting Organization's board or have veto powers over Supporting Organization's board. Disqualified persons described in Section 4946 of the Code and persons described in Section 4958(c)(3)(B) of the Code cannot be compensated by Supporting Organization or receive grants, loans or similar payments from Supporting Organization.

**1.3 COMPENSATION.** Foundation does not pay trustees or hire trustees to provide specific services. The parties agree that in order to avoid even the perception of personal benefit, no directors of Supporting Organization shall receive compensation for their service as such. Notwithstanding the foregoing, Supporting Organization's directors may be reimbursed for reasonable and necessary out of pocket expenses actually incurred for their board service.

**1.4 MEETINGS.** Supporting Organization's Board of Directors shall meet at least once annually in a manner permitted under Delaware law.

**1.5 POLICIES.** Within the first year of Supporting Organization's existence, Supporting Organization's Board of Directors shall establish the following policies, and provide copies of such policies to Foundation when they are created and amended: Charitable Mission Statement, Gift Acceptance Policy, Investment Policy, and Grantmaking Policy.

## 2. FINANCE AND OPERATIONS

**2.1 FISCAL YEAR.** Supporting Organization's fiscal year will be the calendar year.

**2.2 SERVICES.** Foundation will provide the services to Supporting Organization described in **SCHEDULE A**, attached, and as such schedule may be amended by Foundation and Supporting Organization in writing from time to time.

**2.3 FEES:**

(a) Supporting Organization shall pay to Foundation the fees described more particularly in **SCHEDULE B**, attached.

(b) The parties may agree to additional fees in respect to the performance of any additional services not described in **SCHEDULE A** to this agreement. Foundation shall notify the Supporting Organization in advance of any changes in administrative fees enacted by Foundation's Board of Trustees.

**2.4 INVESTMENTS**

**(a)** From time to time, some or all of Supporting Organization's funds may be invested with the pooled endowment funds of Foundation to achieve economies of scale and strive for the highest expected level of returns for a given level of risk with the goal of enabling Supporting Organization to achieve its philanthropic and financial objectives. Decisions with respect to the retention, investment, or reinvestment of assets or commingling of assets shall be made by Foundation's Board of Trustees or by a committee or agent authorized by the Board of Trustees, in accordance with Foundation's investment policies. Supporting Organization's funds will be accounted for and reported on separately.

**(b)** Supporting Organization may at any time remove any or all of its funds invested with Foundation's pooled investment fund and invest its own funds separately from those of Foundation, subject to limitations on investment withdrawals with regard to any particular investment class (e.g., limitations on early withdrawals from "fund of funds"). Supporting Organization may select its own custodian and investment consultant and pay the relevant fees directly.

## 3. TERM

**3.1 COMMENCEMENT.** The term of this Agreement shall commence upon the contribution of funds to Supporting Organization.

**3.2 TERM.** Supporting Organization and Foundation intend to engage in a long-term relationship. The initial term of this agreement shall be one year, and the term shall be renewed automatically for successive one-year periods. Notwithstanding the foregoing, this agreement may be terminated at any time by either party providing the other party with 30 days advance written notice of its intent to terminate the Agreement. Should either party wish to dissolve this relationship, the following process will be followed:

**(a)** The parties will agree on amendments to the certificate of incorporation and bylaws of Supporting Organization. The amendments will change the status of Supporting Organization from a supporting organization of Foundation and provide for the transfer of Supporting Organization's assets to one or more of the following entities as determined by Supporting Organization:

**(i)** A stand-alone publicly-supported 501(c)(3) organization, or

**(ii)** A supporting organization of another publicly-supported 501(c)(3) organization.

**(iii)** A donor-advised fund of a publicly-supported 501(c)(3) organization.

**(b)** Neither party will unreasonably withhold its approval of these amendments.

**(c)** In the event of the dissolution of this relationship, each party shall be responsible for its own fees and costs related to the dissolution.

**3.3 LOSS OF TAX-EXEMPT STATUS.** This agreement shall be automatically terminated upon the date the IRS determines that Supporting Organization is not a tax-exempt organization under Section 501(c)(3) of the Code.

## 4. INDEMNIFICATION AND INSURANCE

**4.1** Foundation will indemnify, defend, and hold harmless Supporting Organization, its officers, directors, employees, members, agents, and affiliated organizations against and from any claims, liability, suits, damages, losses, or expenses whatsoever, including reasonable attorneys fees incurred, arising or alleged to arise out of the acts or omissions of Foundation, its officials, employees, members, agents, and affiliated organizations, under this Agreement. Foundation will maintain at all times during the term of this Agreement general liability and director and officer liability insurance in such amounts and against such risks as are standard in the industry, naming Supporting Organization and its directors and officers as additional insureds. The coverage will protect against the acts or omissions of Supporting Organization, its officers, directors, agents, and employees.

**4.2** Supporting Organization will indemnify, defend, and hold harmless Foundation, its officers, trustees, employees, members, agents, and affiliated organizations against and from any claims, liability, suits, damages, losses, or expenses whatsoever, including reasonable attorneys fees incurred, arising or alleged to arise out of the acts or omissions of Supporting Organization, its officers, directors, employees, members, agents, and affiliated organizations, under this Agreement.

## 5. MISCELLANEOUS

**5.1** **GOVERNING LAW.** This Agreement and the legal relations between the parties shall be governed under the laws of the State of California.

**5.2** **RECORDS.** Supporting Organization will supply to Foundation on a timely basis copies of the following materials as they are created, updated, or amended: incorporation documents; annual filings with the State of California and IRS; meeting minutes and actions of the Board and of any committee with Board authority; board contact information; investment statements; and board policies.

**5.3** **PUBLICITY.** Foundation may disclose the existence, funding and grants of the Supporting Organization in its Annual Report and other documentation published byFoundation. Any information presented for publication by the media shall be approved in advance by Supporting Organization. Foundation reserves the right to approve any publicity from Supporting Organization mentioning Foundation.

**5.4** **FURTHER ASSURANCES.** Each of the parties hereto does hereby covenant and agree, without any further consideration, to execute, acknowledge, and deliver all such other documents and to take all such other actions as may be necessary or convenient in order to carry out more effectively any of the purposes of this Agreement.

**5.5** **AMENDMENTS.** This Agreement may be amended from time to time by written instrument signed by the parties; and this Agreement shall be amended by the parties whenever necessary or advisable in order to comply with requirements of the Code relating to tax-exempt organizations and supporting organizations.

**5.6** **ENTIRE AGREEMENT.** This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements between the parties with regard to such subject matter.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**HIGHLAND SANTA BARBARA FOUNDATION, INC.**

James Dondero, President
November 30, 2011

**SANTA BARBARA FOUNDATION**

Ronald V. Gallo, President & CEO
November 30, 2011

## SCHEDULE A

## SCHEDULE OF SERVICES

Foundation will provide to Supporting Organization the services indicated below:

1.1 Administrative Services.

a. Maintenance of Supporting Organization's records, reports and files.

b. Performance of related accounting services for Supporting Organization.

c. Payment of accounts payable and other liabilities of Supporting Organization.

d. Preparation and distribution of all financial statements required to be generated by Supporting Organization.

e. Oversight of the preparation and filing of all federal and state returns required of Supporting Organization.

f. As needed, preparation and distribution to the governing body of Supporting Organization of periodic reports on the financial condition of the Supporting Organization.

1.2 Corporate Formalities Services.

a. Calendaring of required member and board meetings.

b. Notice of all meetings.

c. Facilities and secretarial support for member and board meetings.

d. Preparation of minutes.

e. Maintenance of minute book.

f. Assistance with selection of candidates for the board.

1.3 Grant Administration.

a. Assistance with development of program goals, guidelines and a form of Request for Proposal.

b. Disseminate RFP to target groups.

c. Receive and screen all proposals.

d. Preparation of a summary grid of proposals for review and decision by the Corporation's governing board or officers.

e. Prepare and send responses to applicants.

f. Disbursement of grants with grant letters.

g. Monitor performance of grantees.

h. Receive and review interim and annual reports from grantees.

Supporting Organization acknowledges that Foundation is providing only the services listed above. Any services not selected, and any services not listed above, shall not be within the scope of Foundation's responsibilities under this Agreement. Without limiting the foregoing, Supporting Organization acknowledges that Foundation is not providing any investment advice or services to Supporting Organization, and that Supporting Organization is responsible for the management and investment of its assets.

## SCHEDULE B

## SCHEDULE OF FEES

In consideration of the services provided to Supporting Organization by Foundation, Supporting Organization shall pay Foundation an annual support fee (Fee) as outlined below. Fees are payable quarterly in arrears and are based on the prior quarter-end net asset value.

1% (100 basis points) per annum (i.e., 25 basis points per quarter) on the first $3 million
0.75% (75 basis points) per annum (i.e., 18.75 basis points per quarter) on the next $2 million
0.50% (50 basis points) per annum (i.e., 12.5 basis points per quarter) on the next $5 million up to $10 million
0.25% (25 basis points) per annum (i.e., 6.25 basis points per quarter) on all amounts over $10 million

# EXHIBIT

**EXHIBIT 4**

# Delaware



*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND DALLAS FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF NOVEMBER, A.D. 2011, AT 7:34 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

5069985 8100

111224468

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 9177054

DATE: 11-23-11

You may verify this certificate online at corp.delaware.gov/authver.shtml

**EXHIBIT 4**

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:17 PM 11/22/2011
FILED 07:34 PM 11/22/2011
SRV 111224468 - 5069985 FILE

# CERTIFICATE OF INCORPORATION

# OF

# HIGHLAND DALLAS FOUNDATION, INC.

FIRST: The name of the corporation is Highland Dallas Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit The Dallas Foundation, a Texas nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by The Dallas Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions

to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to The Dallas Foundation. If The Dallas Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 2[illegible] day of November, 2011.

[signature]

James Dondero

# EXHIBIT

**EXHIBIT 4**

# Delaware



*The First State*

*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND KANSAS CITY FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-THIRD DAY OF NOVEMBER, A.D. 2011, AT 4:23 O'CLOCK P.M.*

*A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.*




Jeffrey W. Bullock, Secretary of State

*5070449 8100*

*111227849*

*AUTHENTICATION: 9179752*

*DATE: 11-28-11*

*You may verify this certificate online at corp.delaware.gov/authver.shtml*

**EXHIBIT 4**

State of Delaware
Secretary of State
Division of Corporations
Delivered 05:03 PM 11/23/2011
FILED 04:23 PM 11/23/2011
SRV 111227849 - 5070449 FILE

# CERTIFICATE OF INCORPORATION

# OF

# HIGHLAND KANSAS CITY FOUNDATION, INC.

FIRST: The name of the corporation is Highland Kansas City Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit the Greater Kansas City Community Foundation, a Missouri nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by the Greater Kansas City Community Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation

exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to the Greater Kansas City Community Foundation. If the Greater Kansas City Community Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 22nd day of November, 2011.

James Dondero



78673.000002 EMF_US 37829386v4

# EXHIBIT

**EXHIBIT 4**

# Delaware



*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND SANTA BARBARA FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF NOVEMBER, A.D. 2011, AT 7:36 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

SECRETARY OF STATE — DELAWARE — 1776 — 1970

Jeffrey W. Bullock, Secretary of State

5069989 8100

111224480

AUTHENTICATION: 9177064

DATE: 11-23-11

You may verify this certificate online at corp.delaware.gov/authver.shtml

**EXHIBIT 4**

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:17 PM 11/22/2011
FILED 07:36 PM 11/22/2011
SRV 111224480 - 5069989 FILE

## CERTIFICATE OF INCORPORATION

## OF

## HIGHLAND SANTA BARBARA FOUNDATION, INC.

FIRST: The name of the corporation is Highland Santa Barbara Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated, exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit Santa Barbara Foundation, a California nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code of 1986 as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by Santa Barbara Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions

**EXHIBIT 4**

to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to Santa Barbara Foundation. If Santa Barbara Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 21st day of November, 2011.

James Dondero

# EXHIBIT

# BYLAWS
# OF

# HIGHLAND DALLAS FOUNDATION, INC.

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| ARTICLE I OFFICES | | 1 |
| Section 1.1 | Registered Office | 1 |
| Section 1.2 | Other Offices | 1 |
| ARTICLE II MEMBERSHIP | | 1 |
| Section 2.1 | Classes and Number | 1 |
| Section 2.2 | Voting | 1 |
| Section 2.3 | Transfer of Membership | 1 |
| Section 2.4 | Resignation of Member | 2 |
| Section 2.5 | Place of Meetings | 2 |
| Section 2.6 | Annual Meetings | 2 |
| Section 2.7 | Special Meetings | 2 |
| Section 2.8 | Notice of Meetings of Members | 2 |
| Section 2.9 | Quorum | 3 |
| Section 2.10 | Voting | 3 |
| Section 2.11 | Proxies | 3 |
| Section 2.12 | Action by Written Consent | 3 |
| ARTICLE III DIRECTORS | | 4 |
| Section 3.1 | General Powers | 4 |
| Section 3.2 | Number of Directors | 4 |
| Section 3.3 | Vacancies | 4 |
| Section 3.4 | Place of Meetings | 4 |
| Section 3.5 | Committees of Directors | 4 |
| Section 3.6 | Compensation of Directors | 4 |
| Section 3.7 | Annual Meeting | 4 |
| Section 3.8 | Additional Regular Meetings | 5 |
| Section 3.9 | Special Meetings | 5 |
| Section 3.10 | Method and Timing of Notice | 5 |
| Section 3.11 | Purpose not Required in Notice | 5 |
| Section 3.12 | Waiver of Notice | 5 |
| Section 3.13 | Action by Written Consent. | 6 |
| Section 3.14 | Validation of Action by Consent | 6 |
| Section 3.15 | Quorum and Manner of Acting | 6 |
| Section 3.16 | Resignation and Removal of Directors | 6 |
| ARTICLE IV OFFICERS | | 6 |
| Section 4.1 | Officers | 6 |
| Section 4.2 | Election, Term of Office and Eligibility | 7 |

Section 4.3 Subordinate Officers .....7
Section 4.4 Removal .....7
Section 4.5 The President .....7
Section 4.6 The Secretary .....7
Section 4.7 The Assistant Secretaries .....7
Section 4.8 Chairman .....8
Section 4.9 The Chief Financial Officer .....8
Section 4.10 The Assistant Chief Financial Officers .....8
Section 4.11 Delegation of Duties .....8

ARTICLE V BOOKS AND RECORDS .....8

Section 5.1 Location .....8
Section 5.2 Inspection .....9

ARTICLE VI MISCELLANEOUS PROVISIONS .....9

Section 6.1 Fiscal Year .....9
Section 6.2 Depositories .....9
Section 6.3 Checks, Drafts and Notes .....9
Section 6.4 Contracts and Other Instruments .....9
Section 6.5 Conflicts of Interest .....9
Section 6.6 Waivers of Notice .....10
Section 6.7 Ownership Interests in Other Entities .....10
Section 6.8 Indemnification .....10
Section 6.9 Amendment of Bylaws .....11

BYLAWS

OF

HIGHLAND DALLAS FOUNDATION, INC.

## ARTICLE I

## OFFICES

Section 1.1 Registered Office. The registered office of Highland Dallas Foundation, Inc. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2 Other Offices. The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II

## MEMBERSHIP

Section 2.1 Classes and Number. The Corporation shall have two classes of members and one member in each such class: the Institutional Member, which shall be The Dallas Foundation, and the Individual Member, which shall be James Dondero or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2 Voting. Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members. In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3 Transfer of Membership. Institutional Membership in the Corporation is not transferable or assignable. The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member. Subject to the approval of the Institutional Member, Mr. Dondero, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member

interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4 Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5 Place of Meetings. All meetings of the members be held shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6 Annual Meetings. Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2012, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7 Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall be called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8 Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the

facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9 Quorum. Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. If, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10 Voting. When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11 Proxies. At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.12. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting.

## ARTICLE III

## DIRECTORS

Section 3.1 General Powers. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2 Number of Directors. The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the Institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3 Vacancies. If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4 Place of Meetings. The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5 Committees of Directors. The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6 Compensation of Directors. Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7 Annual Meeting. The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of

Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8 Additional Regular Meetings. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9 Special Meetings. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10 Method and Timing of Notice. Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the telephone message shall reach and be communicated to a responsible individual at the phone number listed for a Director's residence or place of business.

Section 3.11 Purpose not Required in Notice. Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12 Waiver of Notice. Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall be deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14 Validation of Action by Consent. All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15 Quorum and Manner of Acting. A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall be the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16 Resignation and Removal of Directors. Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

## ARTICLE IV

## OFFICERS

Section 4.1 Officers. The officers of the Corporation shall include a President and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

Section 4.2 Election, Term of Office and Eligibility. The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof. Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3 Subordinate Officers. The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4 Removal. The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5 The President. The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation. In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6 The Secretary. The Secretary shall:

(a) keep the minutes of the meetings of the members and of the Board of Directors;

(b) see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c) be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d) in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7 The Assistant Secretaries. If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant

Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8 Chairman. The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time.

Section 4.9 The Chief Financial Officer. The Chief Financial Officer, if any, shall:

(a) receive and be responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b) render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c) in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10 The Assistant Chief Financial Officers. If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief Financial Officer.

Section 4.11 Delegation of Duties. In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V

## BOOKS AND RECORDS

Section 5.1 Location. The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2 Inspection. The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI

## MISCELLANEOUS PROVISIONS

Section 6.1 Fiscal Year. The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2 Depositories. The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3 Checks, Drafts and Notes. All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4 Contracts and Other Instruments. The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances.

Section 6.5 Conflicts of Interest. No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an “Insider”); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an “Entity”) in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a “disqualified person” with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the “rebuttable presumption safe harbor” provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment. All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

Section 6.6 Waivers of Notice. Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members, Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7 Ownership Interests in Other Entities. Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8 Indemnification.

(a) Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking, by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b) If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the

unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct.

(c) The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d) The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e) To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f) Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g) The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9 Amendment of Bylaws. Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the

Board of Directors to the extent such alteration or amendment expressly states that it can only be altered or amended by the members.

# EXHIBIT

## HIGHLAND KANSAS CITY FOUNDATION, INC.

**Unanimous Written Consent of Directors**
**In Lieu of Organizational Meeting**

THE UNDERSIGNED, being all of the directors of Highland Kansas City Foundation, Inc. (the "Foundation"), a Delaware nonprofit nonstock corporation, do hereby consent to the adoption of, and do hereby adopt, the following resolutions pursuant to Section 141(f) of the General Corporation Law of the State of Delaware, and hereby direct that this Written Consent be filed with the minutes of the proceedings of the Board of Directors of the Foundation:

Approval of Certificate of Incorporation

The Certificate of Incorporation, filed with the Secretary of State of Delaware on November 23, 2011, is ratified and approved; and the Secretary is hereby ordered to file the Certificate of Incorporation in the minute book.

Adoption of Bylaws

The bylaws attached to this consent is hereby adopted and approved as the Bylaws of the Foundation; and the Secretary is ordered to file a copy of the Bylaws in the minute book.

Election of Officers

The following persons are elected as officers of the Foundation in the capacities set forth opposite their respective names below to serve until the next annual meeting of the Board of Directors and until their respective successors are elected and qualified or until their earlier death, resignation or removal:

| | |
|---|---|
| President | James Dondero |
| Secretary and Treasurer | Grant Scott |

Confirmation of Tax-Exempt Status

The officers are authorized (i) to proceed with preparation of an exemption application (IRS Form 1023) seeking to have the Foundation classified as a charitable organization under Section 501(c)(3) of the Internal Revenue Code, (ii) to sign the application and related documents on behalf of the Foundation, (iii) to file the completed application package with the Internal Revenue Service, and (iv) to deal with the Service in all matters relating to the exemption application both in person and

through attorneys and other agents, all without any requirement to seek further authorization from the Board. When the Service issues a determination letter recognizing the Foundation's tax-exempt status, the Secretary is ordered to make copies of the exemption application and the IRS determination letter available for public inspection at the Foundation's principal office during regular business hours, as required by Section 6104(d) of the Internal Revenue Code.

Ratification of Preorganization Activities

The Foundation hereby adopts, approves, ratifies and confirms all contracts and agreements entered into and all other actions taken or performed by the incorporator of the Foundation in connection with the incorporation, organization and commencement of business of this Foundation.

Establishment of Corporate Bank Accounts

The officers of the Foundation are hereby authorized to open one or more commercial banking accounts for and in the name of the Foundation anywhere within the United States, at any time and from time to time, and to deposit to the credit of the Foundation in such banking accounts any monies, checks, drafts, orders or other commercial paper payable to the Foundation or its order, and at any time and from time to time to withdraw all or any part of the funds on deposit in the name of the Foundation in any such banking accounts and to designate or change the designation of the officer or officers or their designees who are authorized to make such deposits or withdrawals;

the forms of banking resolutions used by any banks in which accounts of the Foundation are established pursuant to the immediately preceding resolution, are hereby approved and adopted as if set forth herein in full;

the proper officers of the Foundation are hereby authorized to execute on behalf of the Foundation and to file with such banks (and the President or any Vice President or the Secretary of the Foundation is hereby authorized to certify) such forms of banking resolutions, together with proper signature cards designating the officers and agents of the Foundation who are authorized to sign checks and drafts to be paid from the Foundation's accounts in order to be filed in the minute book of the Foundation; and

with respect to any such banking accounts, any banking institution may act in reliance on such banking resolutions and signature cards until receipt of actual notice of the modification or revocation of the same.

Enabling Resolution

The officers of this Foundation be, and each of them hereby is, authorized, empowered and directed, for and on behalf of the Foundation, to take any and all further actions, to negotiate for and enter into agreements and amendments to agreements, to perform all such acts and things, to make, execute, file, deliver or record in the name and on behalf of the Foundation all such certificates, instruments, agreements, applications, papers or other documents, and to make all such payments as they, in their judgment, or in the judgment of any one or more of them, may deem necessary, advisable or appropriate in order to carry out the purposes and intent of, or consummate the transactions contemplated by, the foregoing resolutions and/or all of the transactions contemplated therein or thereby, and to carry on the business of this Foundation, the authorization therefor to be conclusively evidenced by the taking of such action or the execution and delivery of such certificates, instruments, agreements or documents.

*[Remainder of page intentionally left blank; signatures appear on following page.]*