**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P.

§
§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§
vs. §

3:26-CV-02496-D

**Highland Capital Management, L.P., et al**-Appellee
§
§

**[4689] Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026**

**APPELLANT RECORD**

**VOLUME 7**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02496-D<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4698] on July 24, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689] now files this *Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the Court's June 15, 2026 Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate?

2. Did the Bankruptcy Court err in finding Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate ("Dugaboy's Motion") [Docket No. 4684] was "without merit?"

3. Did the Bankruptcy Court err in denying Dugaboy's Motion without a full record, including that Dugaboy was not allowed to file a reply brief and was not granted a hearing?

4. Did the Bankruptcy Court err in denying Dugaboy the opportunity to file a reply brief to Highland's Opposition to Dugaboy's Motion, including that Dugaboy indicated a date certain for filing a reply?

5. Did the Bankruptcy Court err in finding Dugaboy's Motion was "without merit" without granting a hearing?

6. Did the Bankruptcy Court err by summarily denying Dugaboy's Motion without explaining its reasoning for the denial?

7. Did the Bankruptcy Court err in failing to consider Dugaboy's Notice of Intervening Event?

8. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(2) when it determined that it had not manifestly erred in deciding the evidence of Mark Patrick's misconduct contained in the Cayman Islands proceeding was not "newly discovered" even though that information was not contained in James Dondero's affidavit executed April 16, 2025?

9. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant

to Rule 60(b)(2) when it determined it had not manifestly erred in deciding the Dondero Affidavit indicated information gained in the Cayman Islands proceedings was not "newly discovered" despite the fact the Affidavit lacked any evidence of the restructuring discovered in the Cayman Islands proceedings?

10. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding on the grounds that Rule 60(b)(3) purportedly requires fraud or misconduct to have occurred in the judicial proceeding itself?

11. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding that Highland did not provide misleading or incomplete answers during the discovery of Mark Patrick's misconduct and resulting lack of authority to negotiate the Rule 9019 settlement agreement from Dugaboy leading to the Rule 9019 Order?

12. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding that Dugaboy had not presented a basis for relief under Rule 60(b)(6) that was separate from the grounds presented for Rule 60(b)(2) and Rule 60(b)(3)?

13. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding on the grounds that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain?

14. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of the Bankruptcy Court's special responsibility to monitor arrangements and settlements made between Highland's appointed managers and third parties?

15. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of its manifest error in failing to consider the Bankruptcy Court's role as a court of equity and responsibility to prevent misconduct before it, such as Mark Patrick's use of stolen assets in the 9019 Settlement?

16. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

Vol. 1 000001 – 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4698] filed by Appellant;

000010 2. The Bankruptcy Court's July 10, 2026 *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000012 4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

Vol. 2

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |
| | | |

000648 thru Vol. 3

Vol. 4 001843

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 4 001845 thru vol 6 | 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol 7 003634 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003647 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003650 & 003651 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003652 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003663 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003667 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003670 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 7 003709 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004733 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol. 8 004790 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol 9 005207 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005209 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005217 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to |

vol 9

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 04/07/2026 005222 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 04/07/2026 005225 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 04/10/2026 005227 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 04/16/2026 005229 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/17/2026 005233 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol 9 | | Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| 04/17/2026<br>005330 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| Vol 10<br>04/21/2026<br>005590 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/22/2026<br>005594 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/22/2026<br>005615 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 04/22/2026<br>005682 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 10 | | | Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| 005692 | 04/22/2026 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 005705 | 04/24/2026 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 005726 | 04/24/2026 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 005727 | 04/25/2026 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005729 | 04/27/2026 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 005737 | 04/28/2026 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11<br>005746 | 04/28/2026 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 005755 | 04/28/2026 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005761 | 04/28/2026 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005767 | 04/29/2026 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 005776 | 04/29/2026 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 005783 | 04/29/2026 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| Vol. 10 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| 005785 | 04/29/2026 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005787 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005794 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005796 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005798 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005801 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005884 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005902 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005905 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005907 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11 | | | Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005913 | 05/06/2026 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005920 | 05/06/2026 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005927 | 05/06/2026 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 005929 | 05/07/2026 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005936 | 05/08/2026 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 005939 | 05/08/2026 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 005942 | 05/08/2026 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 005945 | 05/08/2026 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol. 12 006100 Thru Vol 21 | 05/08/2026 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and* |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | *Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| Vol. 22 008156 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 008172 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 008188 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 22 008256 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008293 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008429 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008465 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008472 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008916 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| Vol 25 009554 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| Vol. 26 009868 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| Vol 27 010229 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| Vol. 28 010538 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| Vol. 28<br>05/11/2026<br>010664 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29<br>05/11/2026<br>010736 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol 30<br>05/11/2026<br>011150 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol 31<br>05/11/2026<br>011734 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol 32<br>05/11/2026<br>013203<br>Thru Vol 33 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34<br>05/11/2026<br>014888 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol 35 05/11/2026 015349 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 05/11/2026 015505 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 05/12/2026 015506 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 05/12/2026 015538 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 05/12/2026 015565 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 05/15/2026 015566 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36 05/18/2026 015569 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol 37 05/18/2026 015996 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 05/19/2026 016008 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 05/20/2026 016079 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 05/20/2026 016082 – 016084 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 05/21/2026 016085 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 05/21/2026 016134 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 37 | | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| 016135 | 05/23/2026 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 016233 | 05/28/2026 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 016490 | 06/15/2026 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s)4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 016504 | 06/15/2026 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| Vol. 39 016505 | 06/29/2026 | 4684 | (162 pgs; 2 docs) Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Appendix) (Edney, Michael) |
| 016667 | 06/29/2026 | 4685 | (7 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s)4679 Order on motion to reconsider). Appellant Designation due by 07/13/2026. (Attachments: # 1 Exhibit)(Edney, Michael) |
| 016674 | 07/06/2026 | 4687 | (32 pgs; 2 docs) Response opposed to (related document(s): 4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 016706 | 07/09/2026 | 4688 | (23 pgs; 2 docs) Notice of Intent to Reply and Request for Hearing on Its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 39 | | (Attachments: # 1 Appendix)). (Attachments: # 1 Attachment A) (Edney, Michael) |
| 07/10/2026 016729 | 4689 | (2 pgs) Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026. (Okafor, M.) Modified text on 7/10/2026 (mdo). |
| 07/13/2026 016731 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |
| 07/24/2026 016733 | 4698 | (9 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)(Edney, Michael) |
| 07/28/2026 016742 | 4704 | (5 pgs) DISTRICT COURT Notice of docketing notice of appeal. Civil Action Number: 3:26-cv-02496-E. (RE: related document(s)4698 Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court;

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J"); and

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No.

4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Case 19-34054-sgj11 Doc 4707 Filed 08/07/26 Entered 08/07/26 19:37:31 Desc
Main Document Page 22 of 23

Dated: August 7, 2026

Respectfully submitted,

*/s/ Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**DUGABOY'S UNOPPOSED MOTION FOR ENTRY OF AN ORDER AUTHORIZING FILING OF CONFIDENTIAL INFORMATION UNDER SEAL PURSUANT TO SECTION 107 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9018**

Interested Party The Dugaboy Investment Trust ("Dugaboy") respectfully moves to file certain confidential exhibits under seal for its February 9, 2026 Motion for Relief from Order and Motion to Vacate (Dkt. No. 4513, "Motion for Relief"), and states as follows in support of the motion to seal (the "Motion to Seal"):

**Request for Relief**

1. Dugaboy seeks entry of an order (the "Order"), substantially in the form attached hereto as **Exhibit A**, authorizing the filing under seal of certain exhibits for its February 9, 2026 Motion for Relief (Dkt. No. 4513). Specifically, Dugaboy seeks to file (1) its Exhibit I, the Affidavit of Margot MacInnis (hereinafter "Exhibit I") and (2) its Exhibit J, Exhibit MM-3 to the Affidavit of Margot MacInnis (hereinafter "Exhibit J") under seal. Highland Capital Management L.P. and Highland Claimant Trust (the "Highland Entities") do not oppose a limited motion to seal at this time, but reserve the right to move to unseal the exhibits and to object to their admissibility.

**Jurisdiction and Venue**

2. The United States Bankruptcy Court for the Northern District of Texas (this "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 157.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The bases for the relief requested herein are sections 105(a) and 107(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 9018 of the Federal Rules of Bankruptcy Procedure, and Rule 9077-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas.

**Background**

5. On October 6, 2019, Highland Capital Management, L.P. ("Highland" or the "Debtor") commenced the above-captioned bankruptcy case in the District of Delaware, which was subsequently transferred to this Court. On February 22, 2021, this Court entered the Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Relief [Dkt. No. 1943], which confirmed the Fifth Amended Plan of

Reorganization of Highland Capital Management, L.P. (as Modified) [Dkt. No. 1943-1] (the "Plan"). The Plan became effective on August 11, 2021 [Dkt. No. 2700] (the "Effective Date").

6. On June 30, 2025, this Court entered its Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith [Docket No. 4297] (the "Rule 9019 Settlement Order").

7. On July 14, 2025, Dugaboy filed a Notice of Appeal of the Rule 9019 Settlement Order [Dkt. No. 4311]. That appeal remains pending before the United States District Court for the Northern District of Texas (Case No. 3:25-cv-01876-K).

8. On February 9, 2026, Dugaboy Filed its Motion for Relief from Order and Motion to Vacate [Docket 4513] (the "Motion for Relief") in this Court, seeking reconsideration of the Rule 9019 Settlement Order pursuant to Federal Rule of Civil Procedure 60(b) and Federal Rule of Bankruptcy Procedure 9024.

9. In connection with the Motion for Relief, Dugaboy seeks to file under seal certain confidential information contained in Exhibit I and Exhibit J. An unredacted version of these Exhibits will be provided to this Court and the other parties entitled hereto.

**<u>Basis for Relief</u>**

10. Exhibit I and Exhibit J contain confidential information that is subject to a confidentiality agreement in connection with pending proceedings in the Cayman Islands involving Charitable DAF Holdco, Ltd. and related entities. These proceedings involve sensitive matters concerning the structure and operations and allegations of misconduct relating to the Charitable Funds and their management. This confidentiality agreement would require permission from the Grand Court of the Cayman Islands in order to be filed publicly in this matter and not

under seal. These documents also contain sensitive information and have never before been filed publicly.

11. Section 107(b) of the Bankruptcy Code provides that, on request of a party in interest, a bankruptcy court shall protect an entity with respect to confidential research, development, or commercial information. 11 U.S.C. § 107(b). Bankruptcy Rule 9018 further authorizes the Court to "make any order which justice requires . . . to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information." Fed. R. Bankr. P. 9018. Local Bankruptcy Rule 9077-1 permits a party to file a document under seal on motion and by permission of the Court when no statute or rule otherwise requires or permits such filing. In addition, a bankruptcy court has broad discretion to order enforcement of confidentiality and sealing orders entered in foreign proceedings consistent with principles of comity. *In re Transbrasil S.A. Linhas Aereas*, No. 11-19484, 2014 WL 1655990, at *2 (Bankr. S.D. Fla. Apr. 24, 2014) ("The Court understood [the concern for the trustee's effort to locate assets] and extended comity to the seal ordered in Brazil.").

12. Exhibit I and Exhibit J contain sensitive, confidential information regarding the Dallas Foundation, Crown Global Life Insurance, Ltd., Empower Dallas Foundation, the Okada Family Foundation, and related charitable entities. These Exhibits contain information regarding, among other things, the funding and operation of insurance annuities, the relationship between the supporting organizations and their sponsoring foundations, and matters directly related to the disputes pending in the Cayman Islands court. Portions of the testimony are cited in the Motion for Relief and are necessary to support the arguments set forth therein.

13. Out of respect for the Cayman Islands' confidentiality obligations and confidential information contained in Exhibit I and Exhibit J , Dugaboy seeks leave to file these documents

under seal. Public disclosure of this information could interfere with the ongoing Cayman Islands proceedings and potentially violate the terms of the confidentiality agreement governing those proceedings. Sealing these documents is therefore appropriate to protect the interests of the parties and entities involved in those proceedings while still allowing this Court and other parties entitled thereto to review the materials in connection with the Motion for Relief.

**Notice**

14. The Dugaboy Investment Trust has served notice of this Motion electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case. Dugaboy submits that, in light of the nature of relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

WHEREFORE, Dugaboy respectfully requests entry of the order substantially in the form attached to this Motion, granting the relief requested herein and such further and other relief as the Court deems appropriate.

Dated: February 27, 2026

**WINSTON & STRAWN LLP**

***/s/ John Michael Gaddis***

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on February 27, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ John Michael Gaddis*
John Michael Gaddis

**CERTIFICATE OF CONFERENCE**

Pursuant to Local Bankruptcy Rule 7007-1(b), I certify that on February 27, 2026 I conferred by email with John Morris, counsel for the Highland Entities, and was informed that the Highland Entities do not oppose a limited motion to seal at this time, but reserve the right to move to unseal the exhibits and to object to their admissibility.

*/s/ John Michael Gaddis*
John Michael Gaddis

**<u>Exhibit A</u>**

**Proposed Order**

Case 3:26-cv-02496-D Document 17-7 Filed 03/08/26 Page 433 of 1180 PageID 4140

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054-sjg11 |

**[PROPOSED] ORDER GRANTING MOTION FOR ENTRY OF AN ORDER AUTHORIZING FILING OF CONFIDEDNTIAL INFORMATION UNDER SEAL PURSUANT TO SECTION 107 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9018**

Upon the Motion of The Dugaboy Investment Trust to File Confidential Information Under Seal Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9018 (the "Motion") filed by The Dugaboy Investment Trust ("Dugaboy") seeking entry of an order (this "Order") authorizing Dugaboy to file its Exhibit I, Affidavit of Margot MacInnis, and its Exhibit J, Exhibit MM-3 to the Affidavit of Margot MacInnis (collectively the "Exhibits") under seal; and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. § 157; and this Court having found venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties in interest; and this Court having found that Dugaboy's notice of the Motion was appropriate under the circumstances and no other notice need be provided; and after due deliberation and sufficient cause appearing therefor, it is ORDERED THAT:

1. The Motion is granted as set forth herein.

2. Dugaboy is authorized to file the Exhibits under seal pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018, and Local Rule 9077-1.

3. The only entities permitted to review the Exhibits are those entities specified herein: (a) the judge presiding over this case; (b) the judge's law clerk(s); (c) the Courtroom Deputy responsible for this case; (d) the Office of the United States Trustee; (e) counsel for Highland Capital Management, L.P.; (f) counsel for the Highland Claimant Trust and the Highland Litigation Sub-Trust; (g) counsel for The Dugaboy Investment Trust; (h) counsel for the HMIT Entities; and (i) any other party to whom Dugaboy has provided or will provide the Exhibits pursuant to any applicable confidentiality agreement or protective order.

4. The Exhibits shall remain sealed until the date that is the earlier of (a) two years from the date of entry of this Order and (b) the closing of the above-captioned case, provided, however, that any party in interest may seek an extension or modification of the time in which the Exhibits are sealed by motion to this Court.

5. This Order does not limit the use of the Exhibits in connection with any party's obligation to refer criminal or ethical violations or otherwise required by law.

6. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

# # # END OF ORDER # # #

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

# Exhibit I

Filed Under Seal

# Exhibit J

## Filed Under Seal

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 2, 2026**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |

**ORDER GRANTING MOTION FOR ENTRY OF AN ORDER AUTHORIZING FILING OF CONFIDEDNTIAL INFORMATION UNDER SEAL PURSUANT TO SECTION 107 OF THE BANKRUPTCY CODE AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 9018**

Upon the Motion of The Dugaboy Investment Trust to File Confidential Information Under Seal Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9018 (the "Motion") filed by The Dugaboy Investment Trust ("Dugaboy") seeking entry of an order (this "Order") authorizing Dugaboy to file its Exhibit I, Affidavit of Margot MacInnis, and its Exhibit J, Exhibit MM-3 to the Affidavit of Margot MacInnis (collectively the "Exhibits") under seal; and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. § 157; and this Court having found venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtor's estate, its creditors, and other parties in interest; and this Court having found that Dugaboy's notice of the Motion was appropriate under the circumstances and no other notice need be provided; and after due deliberation and sufficient cause appearing therefor, it is ORDERED THAT:

1. The Motion is granted as set forth herein.

2. Dugaboy is authorized to file the Exhibits under seal pursuant to sections 105(a) and 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018, and Local Rule 9077-1.

3. The only entities permitted to review the Exhibits are those entities specified herein: (a) the judge presiding over this case; (b) the judge's law clerk(s); (c) the Courtroom Deputy responsible for this case; (d) the Office of the United States Trustee; (e) counsel for Highland Capital Management, L.P.; (f) counsel for the Highland Claimant Trust and the Highland Litigation Sub-Trust; (g) counsel for The Dugaboy Investment Trust; (h) counsel for the HMIT Entities; and (i) any other party to whom Dugaboy has provided or will provide the Exhibits pursuant to any applicable confidentiality agreement or protective order.

4. The Exhibits shall remain sealed until the date that is the earlier of (a) two years from the date of entry of this Order and (b) the closing of the above-captioned case, provided, however, that any party in interest may seek an extension or modification of the time in which the Exhibits are sealed by motion to this Court.

5. This Order does not limit the use of the Exhibits in connection with any party's obligation to refer criminal or ethical violations or otherwise required by law.

6. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

# # # END OF ORDER # # #

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

# DKT. 4525-1

# "Exhibit J"

# FILED UNDER SEAL

# DKT. 4525
# "Exhibit I"
## FILED UNDER SEAL

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**AGREED JOINT MOTION TO EXTEND BRIEFING AND HEARING DATES FOR DUGABOY'S MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE (DKT. 4513)**

Interested Party The Dugaboy Investment Trust ("Dugaboy") and Reorganized Debtor Highland Capital Management L.P. and the Highland Claimant Trust ("Highland Entities" or "Highland") (collectively, "the Parties") respectfully ask the Court to extend the briefing deadlines

and hearing date for Dugaboy's Motion for Relief from Order and Motion to Vacate ("Motion for Relief") (Dkt. 4513).

**Background**

1. On October 6, 2019, Highland Capital Management, L.P. ("Highland" or the "Debtor") commenced the above-captioned bankruptcy case in the District of Delaware, which was subsequently transferred to this Court. On February 22, 2021, this Court entered the Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Relief [Dkt. No. 1943], which confirmed the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) [Dkt. No. 1943-1] (the "Plan"). The Plan became effective on August 11, 2021 [Dkt. No. 2700] (the "Effective Date").

2. On June 30, 2025, this Court entered its Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith [Dkt. No. 4297] (the "Rule 9019 Settlement Order").

3. On July 14, 2025, Dugaboy filed a Notice of Appeal of the Rule 9019 Settlement Order [Dkt. No. 4311]. That appeal remains pending before the United States District Court for the Northern District of Texas (Case No. 3:25-cv-01876-K).

4. On February 9, 2026, Dugaboy Filed its Motion for Relief from Order and Motion to Vacate [Docket 4513] (the "Motion for Relief") in this Court, seeking reconsideration of the Rule 9019 Settlement Order pursuant to Federal Rule of Civil Procedure 60(b) and Federal Rule of Bankruptcy Procedure 9024.

5. On February 13, 2026, this Court issued an Order (Dkt. 4515) setting the current operative deadlines for the Motion for Relief as follows:

a. Highland's Opposition is due March 2, 2026.

b. Dugaboy's Reply is due March 9, 2026.

c. The Hearing is set for March 12, 2026 at 10:00 a.m. via WebEx.

**Bases for Requested Relief**

6. The Parties jointly request that the Court vacate the existing deadlines and adopt the proposed schedule detailed below.

7. Good cause under Federal Rule of Bankruptcy Procedure 9006(b)(1)(A) exists for the requested scheduling postponement for multiple reasons.

8. First, the Parties are filing this request before any current deadlines have expired. *See* Rule 9006(b)(1)(A).

9. Second, Highland has requested a 30-day extension on the deadline for its Opposition due to its lead counsel's travel plans and other professional commitments, and Dugaboy has agreed not to oppose that request.

10. Third, both Parties need additional time to serve targeted written discovery and depose witnesses in advance of the hearing on Dugaboy's Motion for Relief, subject to Highland's reservation of the right to object to any and all discovery in connection with the Motion for relief.

11. Both Dugaboy and the Highland Entities have agreed to join this Agreed Joint Motion subject to each party reserving its rights to object to any depositions or written discovery sought by the other party (the "Reservation of Rights").

**Proposed Schedule**

12. The proposed schedule jointly requested by the Parties is as follows:

a. Highland's Opposition will be due April 3, 2026.

b. All discovery is subject to the Reservation of Rights.

c. The Parties shall disclose any witnesses they intend to call by April 6, 2026.

i. To the extent not prohibited by Court order, each side may take the depositions of up to three witnesses. Of those, each party is allowed one deposition of eight hours and two other depositions of four hours each.

ii. Depositions shall be completed during the week of April 6–10, 2026, but the Parties may continue depositions into the following week of April 13–17, 2026, if needed.

d. Dugaboy's Reply will be due April 24, 2026.

e. The Hearing shall be set for a one-day hearing on a date convenient to the Court during the time period from April 27, 2026 to May 8, 2026.

i. The deadlines for filing lists of exhibits and witnesses and serving exhibits shall be seven (7) days before the hearing date.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Parties respectfully request entry of the order substantially in the form attached to this Motion, granting the relief requested herein and such further and other relief as the Court deems appropriate.

Dated: March 2, 2026

**WINSTON & STRAWN LLP**

***/s/ John Michael Gaddis***

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717) John A. Morris (NY Bar No. 2405397) Gregory V. Demo (NY Bar No. 5371992) Jordan A. Kroop (AZ Bar No. 018825)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067 Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*

Melissa S. Hayward (Texas Bar No. 24044908) Zachery Z. Annable (Texas Bar No. 24053075) 10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com

*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 2, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ John Michael Gaddis*
John Michael Gaddis

## CERTIFICATE OF CONFERENCE

Pursuant to Local Bankruptcy Rule 7007-1(b), I certify that during the week leading up to March 2, 2026, I exchanged multiple emails with John Morris, counsel for the Highland Entities, and was informed that the Highland Entities agree to join this Agreed Joint Motion subject to each party reserving its rights to object to witnesses or discovery.

*/s/ John Michael Gaddis*
John Michael Gaddis

**<u>Exhibit A</u>**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054-sjg11 |

**[PROPOSED] ORDER GRANTING AGREED JOINT MOTION TO EXTEND BRIEFING AND HEARING DATES FOR DUGABOY'S MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE (DKT. 4513)**

Upon the Agreed Joint Motion of The Dugaboy Investment Trust ("Dugaboy") and Highland Capital Management, L.P. (the "Highland Entities" or "Highland") (together, "the Parties") to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief from Order and Motion to Vacate (Dkt. 4513) (the "Motion"), the Court finds that the Motion is well-taken and its requested relief is proper, and after due deliberation and sufficient cause appearing therefor, it is ORDERED THAT:

1. The Motion is granted as set forth herein.
2. Highland's Opposition to the Motion for Relief is due April 3, 2026.
3. All discovery is subject to the Parties' respective reservation of the right to object to any depositions or written discovery sought by the other party.
4. The Parties shall disclose their respective witnesses by April 6, 2026.
5. To the extent not prohibited by Court order, each party is allowed to depose three witnesses, of which one witness may be deposed up to eight (8) hours and the other two witnesses up to four (4) hours.
6. Depositions shall be completed during the week of April 6–10, 2026, but the Parties may agree to extend depositions into the week of April 13–17 if necessary.
7. Dugaboy's Reply is due April 24, 2026.
8. The Hearing on the Motion for Relief shall be set for a one-day hearing at a date convenient to the Court during the time period from April 27, 2026, and May 8, 2026.
9. The Parties must file and serve witness and exhibit lists, and exchange exhibits, no later than seven (7) days before the Hearing Date.

# # # END OF ORDER # # #

Geoffrey S. Harper
Texas Bar No. 00795408

gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Jordan A. Kroop (AZ Bar No. 018825)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com
*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

**Exhibit A**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054-sjg11 |

**ORDER GRANTING AGREED JOINT MOTION TO EXTEND BRIEFING AND HEARING DATES FOR DUGABOY'S MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE (DKT. 4513)**

Upon the Agreed Joint Motion of The Dugaboy Investment Trust ("Dugaboy") and Highland Capital Management, L.P. (the "Highland Entities" or "Highland") (together, "the Parties") to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief from Order and Motion to Vacate (Dkt. 4513) (the "Motion"), the Court finds that the Motion is well-taken and its requested relief is proper, and after due deliberation and sufficient cause appearing therefor, it is ORDERED THAT:

1. The Motion is granted as set forth herein.

2. Highland's Opposition to the Motion for Relief is due April 3, 2026.

3. All discovery is subject to the Parties' respective reservation of the right to object to any depositions or written discovery sought by the other party.

4. The Parties shall disclose their respective witnesses by April 6, 2026.

5. To the extent not prohibited by Court order, each party is allowed to depose three witnesses, of which one witness may be deposed up to eight (8) hours and the other two witnesses up to four (4) hours.

6. Depositions shall be completed during the week of April 6–10, 2026, but the Parties may agree to extend depositions into the week of April 13–17 if necessary.

7. Dugaboy's Reply is due April 24, 2026.

8. The Hearing on the Motion for Relief shall be set for a one-day hearing on April 27, 2026 at 9:00 a.m. at 1100 Commerce Street, 14th Floor, Courtroom #1, Dallas, TX 75242.

9. The Parties must file and serve witness and exhibit lists, and exchange exhibits, no later than seven (7) days before the Hearing Date.

# # # END OF ORDER # # #

Geoffrey S. Harper
Texas Bar No. 00795408

gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Jordan A. Kroop (AZ Bar No. 018825)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com
*Counsel for Highland Capital Management, L.P.*
*and the Highland Claimant Trust*

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 3, 2026**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054-sjg11 |

**ORDER GRANTING AGREED JOINT MOTION TO EXTEND BRIEFING AND HEARING DATES FOR DUGABOY'S MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE (DKT. 4513)**

Upon the Agreed Joint Motion of The Dugaboy Investment Trust ("Dugaboy") and Highland Capital Management, L.P. (the "Highland Entities" or "Highland") (together, "the Parties") to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief from Order and Motion to Vacate (Dkt. 4513) (the "Motion"), the Court finds that the Motion is well-taken and its requested relief is proper, and after due deliberation and sufficient cause appearing therefor, it is ORDERED THAT:

1. The Motion is granted as set forth herein.
2. Highland's Opposition to the Motion for Relief is due April 3, 2026.
3. All discovery is subject to the Parties' respective reservation of the right to object to any depositions or written discovery sought by the other party.
4. The Parties shall disclose their respective witnesses by April 6, 2026.
5. To the extent not prohibited by Court order, each party is allowed to depose three witnesses, of which one witness may be deposed up to eight (8) hours and the other two witnesses up to four (4) hours.
6. Depositions shall be completed during the week of April 6–10, 2026, but the Parties may agree to extend depositions into the week of April 13–17 if necessary.
7. Dugaboy's Reply is due April 24, 2026.
8. The Hearing on the Motion for Relief shall be set for a one-day hearing on April 27, 2026 at 9:00 a.m. at 1100 Commerce Street, 14th Floor, Courtroom #1, Dallas, TX 75242.
9. The Parties must file and serve witness and exhibit lists, and exchange exhibits, no later than seven (7) days before the Hearing Date.

# # # END OF ORDER # # #

Geoffrey S. Harper
Texas Bar No. 00795408

gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Jordan A. Kroop (AZ Bar No. 018825)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com
*Counsel for Highland Capital Management, L.P.*
*and the Highland Claimant Trust*

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expwy., Ste. 106
Dallas, TX 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |

**HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR A PROTECTIVE ORDER AGAINST THE DUGABOY INVESTMENT TRUST'S DISCOVERY REQUESTS**

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 6333 E. Mockingbird Lane, Suite 147 #5045, Dallas, TX 75214.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..... 1

RELEVANT BACKGROUND ..... 8

A. The Relevant Parties ..... 8

B. Dondero Uses Dugaboy And HMIT To File Frivolous And Harassing Litigation Against Highland And Seery. ..... 10

C. The Court Approves The 9019 Settlement After Full Discovery And An Evidentiary Hearing. ..... 11

D. Dondero Accuses Patrick Of Fraud In The Cayman Islands And The Cayman Islands Court Dismisses The Claim. ..... 13

E. Dugaboy's Rule 60 Motion And The Discovery Requests. ..... 16

LEGAL STANDARD ..... 17

ARGUMENT ..... 17

I. DUGABOY CANNOT SEEK DISCOVERY TO BRING A RULE 60(B) MOTION AS A MATTER OF LAW. ..... 17

II. DUGABOY'S REQUESTS ARE NOT RELEVANT TO ITS RULE 60(B) MOTION ..... 21

III. DUGABOY'S REQUESTS ARE UNREASONABLY CUMULATIVE AND DUPLICATIVE BECAUSE IT ALREADY RECEIVED FULL DISCOVERY DURING OBJECTIONS TO THE 9019 SETTLEMENT. ..... 23

IV. DUGABOY'S REQUESTS ARE AN IMPROPER FISHING EXPEDITION SEEKING TO INVADE ATTORNEY-CLIENT PRIVILEGE AND CAUSE UNNECESSARY DELAY. ..... 26

V. DUGABOY'S SUBPOENAS AND DEPOSITION REQUESTS ARE IMPROPER ..... 29

PRAYER ..... 30

CERTIFICATE OF CONFERENCE ..... 32

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Ackerman v. United States*,
340 U.S. 193 (1950) ....20

*Adams v. Hermann*,
2018 WL 5886800 (S.D. Tex. Nov. 9, 2018) ....28

*Balakrishnan v. Bd. of Super. of La. State Univ.*,
2010 WL 11538662 (E.D. La. July 26, 2010) ....27

*Blom Bank SAL v. Honickman*,
605 U.S. 204 (2025) ....20

*In re BNP Petroleum Corp.*,
2013 WL 5493125 (Bankr. S.D. Tex. Oct. 1, 2013) ....19, 21

*Brown v. Ft. Hood Fam. Hous. LP*,
2022 WL 22883290 (W.D. Tex. Nov. 17, 2022) ....5, 22

*Camoco, LLC v. Leyva*,
2019 WL 6131452 (W.D. Tex. Nov. 19, 2019) ....21

*Dugaboy Inv. Tr. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*,
2026 WL 755100 (5th Cir. Mar. 17, 2026) ....8

*In re Ferro Corp. Deriv. Litig.*,
511 F.3d 611 (6th Cir. 2008) ....5, 18

*Gen. Univ. Sys., Inc. v. Lee*,
379 F.3d 131 (5th Cir. 2004) ....22

*Goodson v. Nasco Healthcare Inc.*,
2025 WL 2322793 (N.D. Tex. Aug. 12, 2025) ....17

*In re Grand Jury Subpoena*,
419 F.3d 329 (5th Cir. 2005) ....7, 28

*H.K. Porter Co. v. Goodyear Tire & Rubber Co.*,
536 F.2d 1115 (6th Cir. 1976) ....18, 19

*Halliburton Energy Servs., Inc. v. NL Indus.*,
618 F. Supp. 2d 614 (S.D. Tex. 2009) ....*passim*

*Hesling v. CSX Transp., Inc.*,
396 F.3d 632 (5th Cir. 2005) ....................18

*Jackson v. Thaler*,
348 F. App'x 29 (5th Cir. 2009) ....................21

*Longden v. Sunderman*,
979 F.2d 1095 (5th Cir. 1992) ....................22

*McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*,
2016 WL 3033544 (N.D. Tex. May 26, 2016) ....................29

*NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*,
48 F.4th 419 (5th Cir. 2022) ....................8

*Nguyen v. Excel Corp.*,
197 F.3d 200 (5th Cir. 1999) ....................7, 17, 29

*Nichols v. White*,
2020 WL 8271876 (E.D. Tex. Feb. 10, 2020) ....................21, 27

*Nowlin v. Shannon*,
2017 WL 8790963 (N.D. Tex. June 13, 2017) ....................22

*Official Comm. of Unsecured Creditors v. Moeller (In re Age Refining, Inc.)*,
801 F.3d 530 (5th Cir. 2015) ....................20

*Optimal Health Care Servs., Inc. v. Travelers Ins. Co.*,
801 F. Supp. 1558 (E.D. Tex. 1992) .................... *passim*

*Ramey v. Salazar*,
2018 WL 703431 (W.D. Tex. Feb. 2, 2018) ....................27

*Rozier v. Ford Motor Co.*,
573 F.2d 1332 (5th Cir. 1978) ....................22

*Southmark Props. v. Charles House Corp.*,
742 F.2d 862 (5th Cir. 1984) ....................5, 22

*Trans Miss. Corp. v. United States*,
494 F.2d 770 (5th Cir. 1974) ....................18

**Rules**

Fed. R. Civ. P. 26(b)(1) ....................21

Fed. R. Civ. P. 26(b)(2)(C) .................... *passim*

Fed. R. Civ. P. 26(b)(2)(C)(ii) ....................25

Fed. R. Civ. P. 26(c)(1) ....................17

Fed. R. Civ. P. 26(g)(1)(B)(ii) ....................7, 28

Fed. R. Civ. P. 34(a)(1) ....................27

Fed. R. Civ. P. 45(c)(1)(A) ....................29

Fed. R. Civ. P. 45(d)(1) ....................7, 29

Fed. R. Civ. P. 59(b) ....................18

Fed. R. Civ. P. 60(b)(2) ....................4, 18, 23

Fed. R. Civ. P. 60(b)(3) ....................20

**Other Authority**

Fed. Jud. Ctr., Manual for Complex Litigation § 11.45 (4th ed. 2025) ....................29

Pursuant to Federal Rule of Civil Procedure 26(c)(1), which is incorporated into bankruptcy proceedings by Federal Rules of Bankruptcy Procedure 7026 and 9014(c)(1), Highland Capital Management, L.P. ("HCMLP"), the reorganized debtor in the above-referenced bankruptcy case, by and through its undersigned counsel, hereby moves for entry of a protective order (the "Motion") against The Dugaboy Investment Trust's ("Dugaboy") efforts to conduct discovery in connection with its February 9, 2026 motion pursuant to Rule 60(b) (the "Rule 60(b) Motion" or "Mot."; Dkt. No. 4513), including its First Set of Requests for Production of Documents to HCMLP, dated March 23, 2026 (the "Requests"; Ex. 1); eight additional document subpoenas that Dugaboy has attempted to serve on various entities and law firms, dated March 23–25, 2026 (the "Subpoenas"; Ex. 2); and request to take three depositions (Ex. 3).[2] In support of its Motion, HCMLP states as follows:

**PRELIMINARY STATEMENT**

1. Dugaboy's discovery demands are merely the latest installment in the campaign of Highland's founder and pre-bankruptcy CEO, James Dondero ("Dondero"), to delay, disrupt, and attack HCMLP's Chapter 11 proceedings whenever the outcome is not to his liking. At issue is a Rule 9019 settlement (the "9019 Settlement") between HCMLP and certain related entities (collectively, "Highland") and Hunter Mountain Investment Trust ("HMIT") and certain related entities (collectively, the "HMIT Entities") approved over Dugaboy's objection, following extensive discovery and a lengthy evidentiary hearing. Dugaboy unsuccessfully sought a stay of the 9019 Settlement and has appealed approval to the District Court. In the meantime, Dugaboy and its allies waged a series of collateral attacks on Mark Patrick ("Patrick"), the duly appointed

[2] All references to "Ex." refer to exhibits to the accompanying declaration of John A. Morris ("Morris Decl."). Unless otherwise indicated, all emphasis is added and all alterations, citations, and quotations are omitted.

and authorized signatory for the HMIT Entities party to the 9019 Settlement, in the courts of the Cayman Islands and the Texas Business Court for alleged conduct involving entities entirely unrelated to the HMIT Entities. The Cayman Islands proceeding failed—a fact that Dugaboy conspicuously does not mention—and the Texas Business Court action has been abated for failure of the Dondero-related complainant(s) to join necessary parties. Despite those failures, Dugaboy nevertheless files this Rule 60(b) Motion in this Court, which rests on the same baseless (yet breathless) claims that have been rejected time and again. Dugaboy has now launched a host of far-flung discovery demands against HCMLP and many others—not because Dugaboy actually has any legitimate grounds for Rule 60(b) relief to explore, but in the hope that it might find some other avenue of attack in this proceeding or elsewhere or create further cost, delay and chaos. Dugaboy's gambit is entirely improper and should be nipped in the bud.

2. On May 19, 2025, Highland and the HMIT Entities entered into the 9019 Settlement to resolve pending litigation against Highland, transfer cash and certain other assets to HMIT, fix the amount and terms of HMIT's subordinated interest in the Highland Claimant Trust, and exchange full mutual releases of claims. The parties sought Court approval under Bankruptcy Rule 9019 and 11 U.S.C. § 363, and Dugaboy and others it controlled objected to that relief. As was their right at that time, Dugaboy and the other objectors sought and obtained extensive discovery from Highland and HMIT in connection with the objections. Highland produced more than 4,000 pages of documents and fully responded to interrogatories. Numerous parties were deposed, including the reorganized Highland's CEO and COO/CFO, as well as HMIT's official administrator and its operating manager. On June 25, 2025, the Court held an all-day evidentiary hearing, during which the Court heard live testimony from three witnesses and admitted more than

125 exhibits. On June 30, 2025, the Court overruled the objections and approved the 9019 Settlement (the "9019 Order"; Dkt. No. 4297).

3. Dugaboy appealed the 9019 Order, which is fully briefed and pending before the District Court. On July 17, 2025, Dugaboy sought a stay of the implementation of the 9019 Settlement based almost solely on the claims and allegations asserted in a *Writ* filed in the Cayman Islands. Finding no connection between the 9019 Settlement and the Cayman Islands proceedings, the Bankruptcy Court denied Dugaboy's stay motion. (Dkt. No. 4333.) Since the entry of the 9019 Order, the 9019 Settlement has been fully consummated: the litigations have been dismissed with prejudice; the assets sold to HMIT have been transferred; the allowed Class 10 interest has received payment; and Class 9 holders have received additional distributions. Even Dugaboy paid HMIT on the promissory note Highland transferred to HMIT as part of the 9019 Settlement.

4. On February 9, 2026, more than seven months later and *after* receiving a draft of the Cayman Islands court's adverse decision but one day before the decision being made public, Dugaboy filed a motion seeking to "reconsider and vacate the 9019 Settlement Order" pursuant to Rule 60(b). *Six weeks after* filing the 60(b) Motion and *three weeks after* agreeing to a joint scheduling motion, Dugaboy launched the sweeping discovery demands at issue here, which include 55 document requests to HCMLP and eight equally far-flung Subpoenas served on various non-debtor entities and law firms containing *hundreds* of wildly overbroad and facially improper requests. This Court should enter a protective order against Dugaboy's improper discovery requests for at least four reasons.

5. ***First***, Dugaboy does not and cannot show that it is entitled to *any* discovery in connection with its Rule 60(b) Motion. "[T]hose seeking post-judgment relief under Rule 60(b)(2) will not be afforded post-trial discovery unless, at a minimum, the newly discovered evidence

relied upon 'could not have been discovered in time to move for a new trial under Rule 59(b),'" which is 28 days after entry of judgment. *Halliburton Energy Servs., Inc. v. NL Indus.*, 618 F. Supp. 2d 614, 654 (S.D. Tex. 2009) (quoting Fed. R. Civ. P. 60(b)(2)). Dugaboy's Rule 60(b) Motion utterly fails to make this threshold showing. Rather, every scrap of "evidence" upon which Dugaboy now relies simply repeats information already known to it when the Rule 9019 Settlement was considered or, at the very least, was readily available or discoverable within the 28-day period following the Court's 9019 Order. Indeed, Dugaboy (and other Dondero-sponsored entities) openly pushed the same theories, based on the same allegations, about Patrick in this Court and other fora before, during, and immediately after the Rule 9019 hearing. In response to Highland's discovery request seeking confirmation as to what specific "newly discovered evidence" Dugaboy was relying on in support of its 60(b) Motion, Dugaboy simply reproduced the identical bundle of exhibits it had previously filed – virtually all of which predate 28 days after entry of the 9019 Order. Simply put, Dugaboy has identified no newly discovered evidence for purposes of Rule 60(b)(2).

6. Similarly, to the extent Dugaboy's Rule 60(b) Motion relies on allegations of fraud, Dugaboy must make a "prima facie showing of fraud" to reopen a case under Rule 60(b) and obtain discovery. *Halliburton*, 618 F. Supp. 2d at 654 (collecting cases). Dugaboy cannot do so. Most glaringly—and despite appending more than 2,000 pages of mostly Cayman Islands exhibits to its Rule 60(b) Motion—*Dugaboy withheld from this Court a 56-page decision from the Cayman Islands court* ***rejecting its theory of fraud***, which relates only to a certain "DAF Holdco" and does not even mention the HMIT Entities or the 9019 Settlement, and ***declining to take any action against Patrick***. (Ex. 4.) In effect, Dugaboy turns Rule 60(b) on its head, seeking to improperly use its Rule 60(b) Motion "to allow [it] to *begin* Rule 26 discovery to see *if* [it] *might* be able to

uncover facts that *might* bolster [its] [] allegations" of fraud. *In re Ferro Corp. Deriv. Litig.*, 511 F.3d 611, 624 (6th Cir. 2008) (emphasis in original). This Court should therefore enter a protective order stopping Dugaboy from taking *any* discovery in connection with its Rule 60(b) Motion.

7. ***Second***, Dugaboy's Requests are not relevant to its Rule 60(b) Motion. Dugaboy's Motion alleges that HMIT's duly appointed and authorized administrator, Patrick, "defraud[ed] the charitable beneficiaries of the [Cayman Islands] fund and the donors to it" by "secretly reorganiz[ing] the corporate structure of the donor-advised fund to make its beneficiary a sham charity run out of his house." (Mot. at 3.) But Dugaboy does not seek documents regarding the allegedly fraudulent restructuring, which of course would not be in HCMLP's possession, custody, or control. Rather, Dugaboy seeks documents regarding the 9019 Settlement, such as documents regarding the negotiation, drafting, and diligence of the 9019 Settlement (Request Nos. 1–7, 9–13, 18, 21); HMIT's diligence and analysis of the 9019 Settlement (Request Nos. 8, 14, 17); and the valuation of the Highland Entities and certain bankruptcy claims (Request Nos. 25, 30–33, 39–50, 53–55). None of this concerns the grounds actually articulated in Dugaboy's Rule 60(b) Motion.

8. Further, Dugaboy impermissibly seeks documents that did not exist until after entry of the 9019 Order it seeks to vacate. "The Fifth Circuit is clear that 'evidence not in existence at the time of an earlier judgment is not an available ground for attacking that judgment[]'" as "newly discovered evidence" under Rule 60(b)(2). *Brown v. Ft. Hood Fam. Hous. LP*, 2022 WL 22883290, at *3 (W.D. Tex. Nov. 17, 2022) (quoting *Southmark Props. v. Charles House Corp.*, 742 F.2d 862, 873 (5th Cir. 1984)). Similarly, under Rule 60(b)(3), the 9019 Order could not have been procured by fraud based on conduct that allegedly occurred after the date of the Order. Dugaboy nonetheless seeks documents "through the present," including documents regarding the

implementation of the 9019 Order, which necessarily were not in existence at the time of the Order. (Requests at 18; *id.* No. 26.)

9. ***Third***, Dugaboy's Requests are "unreasonably cumulative or duplicative," because Dugaboy already "had ample opportunity to obtain" and in fact ***already obtained*** much of the discovery it now seeks during discovery on the objections to the 9019 Settlement. Fed. R. Civ. P. 26(b)(2)(C). As noted above, Highland produced more than 4,000 pages of documents, including all documents and communications between Highland and the HMIT Entities up to the execution of the 9019 Settlement on May 19, 2025. Yet Dugaboy again seeks the exact same "Documents and Communications between or among Highland Capital Management, L.P. . . . and any of the HMIT Entities concerning the 9019 Settlement." (Request No. 1; *see also* Request Nos. 2–5, 8–15, 17, 24, 27–33, 39–50, 53–54.) Thus, to the extent any of Dugaboy's Requests are relevant to the Rule 60(b) arguments Dugaboy advances (which they are not), Highland has already produced the requested documents.

10. ***Fourth***, Dugaboy's Requests are vastly overbroad, seek documents not in HCMLP's possession, and seek clearly privileged documents. For example, Dugaboy seeks "[a]ll Communications between [HCMLP] and James P. Seery, Jr." (Request No. 19.) Dugaboy thus seeks every single internal email HCMLP's CEO sent or received, including privileged communications with attorneys. Dugaboy also seeks documents regarding diligence and actions taken *by Patrick and the HMIT Entities* (Request Nos. 8, 16), which are not in *HCMLP's* possession, custody, or control. Dugaboy even seeks legal analyses and communications with outside counsel by simply asserting that "attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter waiver." (Request Nos. 22–23, 37–38, 41–43 nn.3–9.) As "the party seeking to breach the walls of privilege," Dugaboy must

"produce evidence," such as "affidavits and exhibits," to "make the necessary *prima facie* showing for the application of the crime fraud exception" or subject-matter waiver. *In re Grand Jury Subpoena*, 419 F.3d 329, 336–37 (5th Cir. 2005) (collecting cases). Dugaboy does not and cannot provide any support whatsoever for its assertions that the crime-fraud exception or subject-matter waiver applies, so its attempt to invade the attorney-client privilege should be rejected out of hand.

11. ***Finally***, for all the same reasons, Dugaboy's wide-ranging Subpoenas to eight non-debtor entities and law firms and Dugaboy's request to take three depositions are improper. Dugaboy's Subpoenas contain ***532 requests in total*** and thus fail to "take reasonable steps to avoid imposing undue burden or expense" on third parties. Fed. R. Civ. P. 45(d)(1). That is particularly true for the subpoenas to law firms, which are "disfavored" by the Fifth Circuit. *Nguyen v. Excel Corp.*, 197 F.3d 200, 209 (5th Cir. 1999). Dugaboy also seeks to depose Patrick, Jim Seery, Jr. ("Seery"), and Paul Murphy ("Murphy"). But Dugaboy has no way to depose Murphy as a practical matter because he is located in the Cayman Islands. And Dugaboy has already deposed and examined Patrick and Seery during the 9019 Settlement approval process. Dugaboy's attempt to get a third bite at the apple is therefore "unreasonably cumulative or duplicative." Fed. R. Civ. P. 26(b)(2)(C).

12. At bottom, Dugaboy has served such extensive and improper discovery to harass and burden Highland and others to obtain information it might use in other proceedings, and to delay proceedings on its Rule 60(b) Motion, which are all improper purposes for propounding discovery requests. Fed. R. Civ. P. 26(g)(1)(B)(ii). Accordingly, this Court should enter a protective order against Dugaboy's efforts to take discovery, including the Requests, the Subpoenas, and any depositions.

## RELEVANT BACKGROUND

### A. The Relevant Parties

13. Dondero is the co-founder and former CEO of HCMLP. Dugaboy is Dondero's family trust and he is the lifetime beneficiary. (Dkt. No. 3904.) Dondero controls Dugaboy. *See Dugaboy Inv. Tr. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 2026 WL 755100, at *1 (5th Cir. Mar. 17, 2026) ("Dugaboy Investment Trust – controlled by HCM co-founder and former Chief Executive Officers, James Dondero"). On October 16, 2019, HCMLP filed for Chapter 11 bankruptcy. On February 22, 2021, the Court confirmed Highland's Fifth Amended Plan of Reorganization (the "Plan"; Dkt. 1808) and the Fifth Circuit affirmed (with minor modifications not relevant here). *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 48 F.4th 419 (5th Cir. 2022).

14. HMIT was formed in 2015 by John Honis ("Honis"), a long-time friend and former employee of Dondero's, as part of a highly complex series of transactions designed to "minimize taxes paid by Highland and its owners." (Mot. at 7.) The transactions resulted in HMIT owning 99.5% of HCMLP's pre-petition limited partnership interests. (Ex. 5 (Am. Compl. & Obj. to Claims, *Kirschner v. Dondero*, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex.), Dkt. 158) ¶ 27.) Under the Plan, HMIT received an unvested, senior Class 10 contingent claim, which would receive distributions after all pre-petition creditors in Classes 1–9 received full payment with interest. (Plan Art. I.B ¶¶ 33–36; *id.* Art. III.B; *id.* Art. III.H ¶¶ 10–11.) The remaining 0.5% of pre-petition HCMLP limited partners, including Dugaboy (0.1866%), received Class 11 contingent, unvested claims, which were subordinate to Class 10 claims. (*Id.*) Honis had full authority and control of HMIT and the other HMIT Entities, which he voluntarily transferred to Patrick in August of 2022 while Patrick was still effectively in Dondero's employ.

15. In 2011, *four years before* the creation of HMIT, Dondero directed the creation of the Charitable DAF Holdco, Ltd., a Cayman Islands exempted company (the "DAF Holdco"), which is a tax-blocker holding entity. (Ex. 6 (Winding Up Petition) ¶¶ 2, 5, 15; Ex. 7 (Dondero Apr. 2025 Aff.) ¶ 9; Ex. 4 (Cayman Decision) ¶¶ 24–30.) For both tax and continuing control objectives, Dondero originally caused DAF Holdco to issue non-voting Participating Shares to the Dondero Foundations (defined below). (Ex. 6 (Winding Up Petition) at ¶ 10(b); Ex. 7 (Dondero Apr. 2025 Aff.) ¶ 19.) Those Participating Shares were potentially entitled to discretionary distributions from Charitable DAF Fund, L.P., a Cayman Islands exempted limited partnership (the "DAF Fund"; together with DAF Holdco, "DAF"), in which DAF Holdco held non-voting limited partnership interests. (Ex. 6 (Winding Up Petition) ¶ 2.) But such distributions, if any, were at the sole discretion of DAF Fund's general partner. (Ex. 4 (Cayman Decision) at ¶¶ 108(7), 147–48.) Holders of the Participating Shares do not have, and have never had, any governance, management, or control rights over the DAF Fund. (*Id.* ¶¶ 160–61.) Complete control (the "Control Person") of (i) DAF Holdco is vested in the owner of the Management Shares of DAF Holdco, and (ii) the DAF Fund is vested in the owner of the general partner of the DAF Fund. (Ex. 6 (Winding Up Petition) ¶¶ 10(d), 11; Ex. 7 (Dondero Apr. 2025 Aff.) ¶ 12.) The Control Person was initially an individual named Grant Scott ("Scott"), a long-time friend of Dondero. (Ex. 6 (Winding Up Petition) ¶ 16; Ex. 7 (Dondero Apr. 2025 Aff.) ¶ 15.) Scott voluntarily transferred ownership of the Management Shares and the DAF Fund's general partner to Patrick in March 2021, while Patrick was still effectively in Dondero's employ, making Patrick the Control Person over DAF and its subsidiaries. (Ex. 6 (Winding Up Petition) ¶ 16; Ex. 7 (Dondero Apr. 2025 Aff.) ¶¶ 17–18, 20–21.)

16. The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. (collectively, the "Dondero Foundations") are Supporting Organizations (as defined by the U.S. Internal Revenue Code) formed in 2011 and effectively controlled by Dondero as their founder, funder, director, president, and principal officer. (Ex. 8 (JOL Writ and Statement of Claim) ¶ 61.) The Dondero Foundations organizationally sit below larger foundations, like The Dallas Foundation. (Ex. 6 (Winding Up Petition) ¶¶ 12–13.) Each of the Dondero Foundations has three board members, one of which is Dondero and the other two are associated with the larger foundations. (Ex. 8 (JOL Writ and Statement of Claim) ¶ 70.) Dondero is also the president of each Dondero Foundation and its largest, if not only, benefactor, and each is a member of the Cayman Islands Liquidation Committee for DAF Holdco. (Ex. 9 (Charitable DAF Holdco Guidance Notes for Members of the Liquidation Committee).)

17. Patrick was a member of Highland's tax department from 2008 to 2021. (Ex. 7 (Dondero Apr. 2025 Aff.) ¶ 17.) In 2021, Patrick continued his employment at an entity called Skyview, which is the provider of many "back office" (tax, legal, accounting, etc.) services to Dondero-controlled entities, including the entities in the DAF structure. (*Id.* ¶ 18; Ex. 10 (Patrick June 2025 Aff.) ¶¶ 66–70.) In late 2024, Patrick resigned from Skyview and ceased his affiliations with Dondero, including terminating applicable service agreements between the DAF entities he controlled and Skyview. (Ex. 10 (Patrick June 2025 Aff.) ¶¶ 71, 147(f).)

**B. Dondero Uses Dugaboy And HMIT To File Frivolous And Harassing Litigation Against Highland And Seery.**

18. Throughout the bankruptcy process, and even after Highland's bankruptcy plan was confirmed, Dondero used Dugaboy to pay HMIT's legal fees to file endless litigation against Highland, Seery, and others. Patrick, as HMIT's representative, testified in Court that "Dugaboy

was paying HMIT attorneys' fees," which led the Court to conclude that "HMIT [is] really Dondero by another name," because "Dondero is the driving force behind HMIT's" litigation. (Aug. 25, 2023 Mem. Op. & Order Denying Leave To File Verified Adversary Proceeding ("Aug. 2023 Order"; Dkt. No. 3903) at 39–42.)

19. For example, from March 2023 to June 2023, HMIT filed multiple motions for leave to file an adversary proceeding alleging a fanciful *quid pro quo* conspiracy among Seery and some of the purchasers of Highland's bankruptcy claims. (Dkt. Nos. 3699, 3760, 3815, 3816.) The Court issued a 105-page decision rejecting all of HMIT's claims, both on standing grounds and on the merits, and therefore denied leave to file an adversary proceeding. (Aug. 2023 Order at 58–105.) HMIT then moved for reconsideration, which the Court denied. (Dkt. Nos. 3905, 3936.) And HMIT appealed to the District Court. (Dkt. No. 3928.)

20. As another example, on New Years' Day 2024, HMIT filed another motion for leave to file a proceeding seeking to remove Seery as Trustee of the Highland Claimant Trust. (Dkt. 4000.) The Court stayed this motion pending resolution of related appeals. (Dkt. No. 4104.) HMIT then sought leave to file an interlocutory appeal of the stay order (Dkt. No. 4115), which the District Court denied (Mem. Op. & Order, *Hunter Mt. Inv. Tr. v. Highland Cap. Mgmt, L.P.*, Dkt. No. 22).

### C. The Court Approves The 9019 Settlement After Full Discovery And An Evidentiary Hearing.

21. In 2025, HMIT finally stopped following Dondero's direction and settled the frivolous, Dondero-financed litigation against Highland. On May 19, 2025, Highland and the HMIT Entities entered into the 9019 Settlement resolving all pending litigation among them and sought Court approval for the settlement and the sale of certain assets. (Dkt. No. 4216.) Dugaboy, The Dallas Foundation, and its insurer Crown Global Life Insurance, Ltd. ("Crown Global";

collectively, the "Objectors") each filed objections to the 9019 Settlement (the "Objections"; Dkt. Nos. 4229–31).[3]

22. The Objectors—all of whose objections were financed by Dondero (*see* Ex. 11 (June 25, 2025 Hr'g Tr.) at 221:3–14)—sought and obtained extensive discovery from Highland and HMIT. In response to the Objectors' discovery requests, Highland produced more than 4,000 pages of documents, including all documents and communications between Highland and the HMIT Entities up to the execution of the 9019 Settlement on May 19, 2025. (Morris Decl. ¶ 2; Ex. 12 (Highland Resps. & Objs.).) The Objectors also deposed Seery, Patrick, HCMLP's CFO and COO, and HMIT's operations manager. (Dkt. Nos. 4243, 4246, 4267, 4259, 4260, 4267, 4244, 4245.) None of the Objectors raised any concerns about the scope of discovery they received or moved to compel additional discovery. To the contrary, after full discovery, The Dallas Foundation and Crown Global ***voluntarily withdrew their Objections*** challenging Patrick's authority to enter into the 9019 Settlement and confirmed Patrick's authority over HMIT and DAF. (Dkt. No. 4282.) The Dallas Foundation and Crown Global also explicitly barred themselves from asserting any claims against Highland by, through, or under any HMIT Entity. (*Id.*)

23. On June 25, 2025, the Court held an all-day evidentiary hearing on the remaining Objections. During the hearing, and mere minutes after confirming that Dugaboy was *not* challenging Patrick's authority to bind HMIT to the 9019 Settlement, Dugaboy abruptly reversed course and raised for the very first time the exact same Objections that The Dallas Foundation and Crown Global voluntarily withdrew. (Ex. 11 (June 25, 2025 Hr'g Tr.) at 31:4–34:15.) To address these Objections (and notwithstanding the supposed bias repeatedly alleged by Dugaboy), the

[3] Patrick Daugherty, an individual unrelated to the Dondero-controlled entities, also objected for mostly different reasons.

Court actually provided wide latitude to Dugaboy and allowed it to proceed with its newly adopted argument while hearing testimony from Seery, Patrick, and Dondero, who were each subject to live cross-examination. (*Id.* at 110:9–134:22; 184:3–188:18; 206:4–223:25.) Highland also entered into evidence 126 exhibits totaling 2,899 pages, including a demonstrative exhibit containing a complete structure chart of DAF and the HMIT Entities. (Dkt. Nos. 4253, 4293.)

24. On June 30, 2025, the Court overruled the Objections and entered the 9019 Order approving the 9019 Settlement. (Dkt. No. 4297.) On July 14, 2025, Dugaboy filed a notice of appeal of the 9019 Order (Dkt. No. 4311), which is fully briefed and remains pending before the District Court.

**D. Dondero Accuses Patrick Of Fraud In The Cayman Islands And The Cayman Islands Court Dismisses The Claim.**

25. Once Patrick began acting independently, Dondero began funding litigation against Patrick using the same tactics he employed against Highland and Seery. This time, he directed the Dondero Foundations to file a petition in the Cayman Islands to impose a court-supervised liquidation of DAF Holdco (unaware that Patrick had initiated an earlier voluntarily liquidation). (Ex. 6 (Winding Up Petition, *In the Matter of Charitable DAF Holdco, Ltd., No. FSD 99 of 2025* (JAJ) (Grand Court, Cayman Islands, Fin. Servs. Div. Apr. 16, 2025).) The petition was based entirely on affidavits from Julie Diaz (President of The Dallas Foundation and Vice President of a Dondero Foundation) and Dondero in which Dondero admitted that he was "fund[ing] the action personally," and accused Patrick of, among other things, fraud, "misappropriation of [] assets," and "misapplication of fiduciary property." (Ex. 7 (Dondero Apr. 2025 Aff.) ¶¶ 23–42, 48).) After learning that DAF Holdco had already been placed in voluntary liquidation by Patrick, the Dondero Foundations filed a second petition in the Cayman Islands to convert the voluntary liquidation to a court-supervised liquidation (Ex.13 (Petition for Court Supervision of a Voluntary Liquidation,

*In re Charitable DAF Holdco, Ltd.*, No. FSD 116 of 2025 (JAJ) (Grand Court, Cayman Islands, Fin. Servs. Div. May 2, 2025)).) The Petition for Court Supervision includes additional allegations relating to the restructuring of DAF but does not even mention the HMIT Entities or the 9019 Settlement.

26. In May 2025, the Cayman Islands court granted the unopposed request for the appointment of joint official liquidators (the "JOLs") for DAF Holdco. (Ex.13 (Petition for Court Supervision of a Voluntary Liquidation, *In re Charitable DAF Holdco, Ltd.*, No. FSD 116 of 2025 (JAJ) (Grand Court, Cayman Islands, Fin. Servs. Div. May 2, 2025)); Ex. 14 (Order Granting Petition for Court Supervision of a Voluntary Liquidation, *In re Charitable DAF Holdco, Ltd., No. FSD 116 of 2025* (JAJ) (Grand Court, Cayman Islands, Fin. Servs. Div. May 6, 2025)).) DAF Holdco is the only entity over which the JOLs were appointed as liquidators. The JOLs, who were being financed by Dondero, then brought the claims against Patrick that were outlined in Dondero's April 2025 affidavit, the Petition for Court Supervision, and The Dallas Foundation's Objection to the 9019 Settlement. They alleged that Patrick committed fraud and breached his fiduciary duties to DAF Holdco by reorganizing the company to benefit himself and sought to remove him as the Control Person over DAF Holdco. (Ex.8 (Compl. by JOLs, *In re Charitable DAF Holdco, Ltd.*, No. FSD 201 of 2025 (JAJ) (Grand Court, Cayman Islands, Fin. Servs. Div. July 15, 2025)).) Once again, the JOLs' statement of claims does not even mention the HMIT Entities or the 9019 Settlement.

27. On July 1, 2025 (one day after the entry of the 9019 Order), the Dondero Foundations filed a petition against Patrick and others in the Texas Business Court also making the exact same allegations from Dondero's affidavit and the proceedings in the Cayman Islands, and buttressed by another Dondero affidavit. (Ex. 15 (Petition, *The Highland Dallas Found., Inc.*

*v. Patrick*, No. 25-BC01B-0027 (Tex. Bus. Ct., 1st Div., Dallas, Tex., July 1, 2025)).) Like the Cayman Islands litigation, the petitioners in Texas sought to effectively remove Patrick's control over DAF through a preliminary restraining order, temporary injunction, and the appointment of a receiver. (*Id.*) The Texas Business Court abated the case because it determined that the JOLs were "necessary parties," so "this case should be abated until when the JOLs become parties." (Ex. 16 (Order ¶ 4, *The Highland Dallas Found., Inc. v. Patrick*, No. 25-BC01B-0027 (Tex. Bus. Ct., 1st Div., Dallas, Tex., Sept. 18, 2025)).) The JOLs have not become parties to the Texas litigation, which remains abated. And, yet again, the Texas Business Court petition does not even mention the HMIT Entities or the 9019 Settlement.

28. On July 17, 2025, Dugaboy made the strategic decision to file a motion in this Court to stay the implementation of the 9019 Order (the "Motion to Stay"; Dkt. No. 4326) based on the Dondero-funded litigation in the Cayman Islands. Dugaboy represented that "if ***the Cayman Proceeding determines that Mr. Patrick may retain his control position in the DAF*** and its subsidiaries, then such a decision would likely ***remove any additional obstacles to the HMIT settlement***." (*Id.* ¶ 31.) On July 22, 2025, the Court denied the Motion to Stay (Dkt. No. 4334), finding that the Cayman Proceedings had no connection to the 9019 Settlement or HCMLP's bankruptcy, and Dugaboy appealed the denial (Dkt. No. 4353), which remains pending before the District Court. But Dugaboy otherwise sat on its hands awaiting the outcome of its Cayman Proceeding and chose not to file any Rule 60(b) motion.

29. On February 10, 2026, after a two-day hearing, the Cayman Islands court rejected the claims of the JOLs that Dondero created and financed denying a proprietary injunction on a standard akin to a motion to dismiss. The court determined that Patrick, as the Control Person of DAF Holdco, had authority to reorganize DAF and that neither DAF Holdco nor the charitable

funds had a "proprietary interest" in the assets controlled by Patrick. (Ex. 4 (Feb. 10, 2026 Order ¶¶ 130–61, *In re Charitable DAF Holdco, Ltd.,* No. FSD 116 of 2025 (RPJ) (Grand Court, Cayman Islands, Fin. Servs. Div.)).) The Cayman Islands court also found that Patrick had not engaged in self-enrichment and, in the event it determines that any breach of fiduciary duty has occurred, such a claim would be satisfied through monetary damages paid from the DAF Fund's assets, not by Patrick. In other words, ***the Cayman Islands court reviewed the same evidence Dugaboy now presents to this Court, refused to remove Patrick from his control position in DAF, dismissed the claims of fraud, and never mentioned HMIT or the 9019 Settlement at all***. While this is all a curious sideshow, the fact remains that nothing in the Cayman Islands litigation or the decision of the Cayman Islands court has anything to do with Highland, HMIT or the 9019 Settlement.

**E. Dugaboy's Rule 60 Motion And The Discovery Requests.**

30. On February 9, 2026, Dugaboy filed the Rule 60(b) Motion seeking to vacate the 9019 Order based on the exact same alleged DAF Holdco fraud by Patrick that the Cayman Islands court rejected. (Dkt. No. 4513.) Despite filing over 2,000 pages of exhibits in support of its Rule 60(b) Motion, Dugaboy has withheld from this Court the Cayman Islands court decision. This is unsurprising because, by Dugaboy's own admission, there are now no "obstacles to the HMIT settlement" so there is no basis to attack it.

31. Six weeks later, on March 23, 2026, Dugaboy emailed its Requests on HCMLP and eight Subpoenas. The Requests contain 55 separate document requests and have a response date of April 22, just five days before the hearing on the Rule 60(b) Motion. (Requests at 1.) The cover email to the Requests also demands that HCMLP "search the emails of James P. Seery and Richard M. Pachulski in response to these Requests." (Ex. 1.)

32. On March 25, 2026, HCMLP's counsel responded that "[w]e have reviewed the RFPs and do not believe they are proper for a variety of reasons, not least because Dugaboy has

not established a prima facie case in support of its motion. Accordingly, we intend to file a motion for a protective order" and proposed a briefing schedule. (Ex. 3.) Five days later on March 30, 2026, Dugaboy's counsel responded with a lengthy briefing schedule that proposed "to postpone both the deposition and the hearing until a reasonable time after [this Court] rules on your Motion for Protective Order." (*Id.*) Dugaboy also "disclose[d] that it will depose Mark Patrick for its eight-hour deposition, and James Seery and Paul Murphy for its two four-hour depositions." (*Id.*)

## LEGAL STANDARD

33. Under Rule 26(c)(1), "[t]he Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including" by "forbidding the disclosure or discovery[,]" "forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." Fed. R. Civ. P. 26(c)(1). "The Court may also issue a protective order on relevant discovery that is unduly burdensome." *Goodson v. Nasco Healthcare Inc.*, 2025 WL 2322793, at *2 (N.D. Tex. Aug. 12, 2025). "The 'decision whether to grant or deny a request for a protective order is entrusted to the [bankruptcy] court's sound discretion.'" *Id.* (quoting *Nguyen*, 197 F.3d at 209 n.27).

## ARGUMENT

### I. DUGABOY CANNOT SEEK DISCOVERY TO BRING A RULE 60(b) MOTION AS A MATTER OF LAW.

34. Dugaboy is seeking discovery in support of its Rule 60(b) Motion to vacate the 9019 Settlement based on purportedly "newly discovered evidence" showing that the 9019 Settlement and Order were "affected by fraud and misconduct." (Mot. at 33–42.) "Postjudgment discovery into alleged fraud is not appropriate" generally because of courts' "strong interest in the finality of judgments." *Halliburton*, 618 F. Supp. 2d at 654 (collecting cases); *see also id.* ("A discovery request for the purpose of attacking a final judgment involves considerations not present

in pursuing discovery in a pending action prior to judgment. Primary among these considerations is the public interest of the judiciary in protecting the finality of judgments.") (quoting *H.K. Porter Co. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1118 (6th Cir. 1976)).

35. As to its Rule 60(b)(2) motion, Dugaboy fails to identify ***any*** "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)," which is "28 days after the entry of judgment." Fed. R. Civ. P. 59(b), 60(b)(2). As Highland will explain in greater detail in its forthcoming opposition to the Rule 60(b) Motion, Dugaboy knew or reasonably could have known within 28 days of the 9019 Order everything alleged in its Rule 60(b) Motion. Indeed, Dugaboy even admits the purportedly "new" information revealed only more detail about "the scope of Patrick's misconduct," not anything substantively new. (Mot. at 33; *see also id.* at 34 ("There was smoke of this misconduct at the June 25, 2025, hearing approving the settlement.").) Dugaboy thus has no basis to seek discovery, because a "judgment will not be reopened if the evidence is merely cumulative or impeaching and would not have changed the result." *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 640 (5th Cir. 2005) (quoting *Trans Miss. Corp. v. United States*, 494 F.2d 770, 773 (5th Cir. 1974)). As a matter of law, Dugaboy cannot use its Rule 60(b) Motion "to *begin* Rule 26 discovery to see *if* [it] *might* be able to uncover facts that *might* bolster [its] [] allegations." *Ferro*, 511 F.3d at 624 (emphasis in original).

36. Moreover, Dugaboy already knew ***all*** of the purportedly "new" evidence from "the joint official liquidators appointed in the Cayman Islands." (Mot. at 34.) The Dondero Foundations were on the liquidation committee of DAF Holdco (*see* Ex. 17 (Form 15)), so they had full access to all of the information obtained by the JOLs. And, as discussed above, Dondero himself controls

both the Dondero Foundations and Dugaboy as well as the entity financing the JOLs. (*See supra* at ¶¶ 13, 16, 26.)

37. As to its Rule 60(b)(3) motion based on alleged fraud, Dugaboy is "required to make a prima facie showing of fraud in order to be entitled to discovery after judgment." *Halliburton*, 618 F. Supp. 2d at 654 (collecting cases); *see also In re BNP Petroleum Corp.*, 2013 WL 5493125, at *4 (Bankr. S.D. Tex. Oct. 1, 2013) (applying the "'prima facie' standard" to determine whether a party was entitled to discovery on whether "the Settlement Order was procured by fraud on the Court"), *aff'd*, 642 F. App'x 429 (5th Cir. 2016). Dugaboy cannot satisfy the "prima facie" standard to obtain discovery for its Rule 60(b) Motion.

38. As discussed above (*see supra* at ¶ 7), Dugaboy alleges that Patrick, as Trustee of HMIT, "defraud[ed] the charitable beneficiaries of the fund and the donors to it" by "secretly reorganiz[ing] the corporate structure of the donor-advised fund to make its beneficiary a sham charity run out of his house" (Mot. at 3). Dugaboy speculates—without any evidence—that had Patrick not "concealed his restructurings of the DAF and Hunter Mountain," then a Cayman Islands court would have removed Patrick as Trustee and then he would have lacked "authority to enter into the 9019 Settlement." (*Id.* at 17–18, 27, 41.) Putting aside the fact that Dugaboy had full knowledge of the restructuring, such "unsupported charges of fraud" do not satisfy the "prima facie" standard required to obtain Rule 60(b) discovery. *Halliburton*, 618 F. Supp. 2d at 654 (quoting *H.K. Porter*, 536 F.2d at 1112). To the contrary, while Dugaboy relies heavily on documents obtained from the Cayman Islands proceedings (*see* Mot. at 5–30), Dugaboy tellingly did not disclose that the Cayman Islands court ***refused to remove Patrick as control person over DAF*** and ***dismissed all claims of fraud against Patrick*** (Ex. 4 at ¶¶ 130–61). Dugaboy represented to this Court that "if the Cayman Proceeding determines that Mr. Patrick may retain his control

position in the DAF and its subsidiaries, then such a decision would likely ***remove any additional obstacles to the HMIT settlement***." (Motion to Stay ¶ 31.) Thus, by Dugaboy's own admission, it has no basis to seek Rule 60(b) relief, let alone discovery in support of such relief. And Rule 60(b) cannot be used to rescue Dugaboy from its own failed bet on a Cayman Islands decision. *See Blom Bank SAL v. Honickman*, 605 U.S. 204, 212 (2025) ("'[T]here must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from.'") (quoting *Ackerman v. United States*, 340 U.S. 193, 198 (1950)).

39. In any event, Dugaboy has not adduced any evidence that ***the challenged 9019 Order*** was procured by "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." Fed. R. Civ. P. 60(b)(3). Rather, Dugaboy alleges that Patrick (who is not individually "an opposing party") defrauded DAF's charitable beneficiaries through a series of transactions that have nothing to do with Highland, Dugaboy, the 9019 Settlement, Patrick's authority and control over the relevant HMIT Entities, or the manner in which Patrick exercised such authority and control in entering into the 9019 Settlement. (*See* Mot. at 21–30.) Dugaboy does not present any evidence whatsoever that HMIT defrauded Highland, Dugaboy, or the Court in connection with the 9019 Settlement. Under Bankruptcy Rule 9019(a), the Court may approve a settlement if it is fair, reasonable, and "in the best interest[s] ***of the estate***." *Official Comm. of Unsecured Creditors v. Moeller (In re Age Refining, Inc.)*, 801 F.3d 530, 540 (5th Cir. 2015). Dugaboy's allegations that Patrick defrauded *DAF's charitable beneficiaries* are irrelevant to whether the 9019 Settlement was in the best interests of the *Highland estate*. Nor does this alleged fraud constitute "fraud on the court," which is "a rarely applied doctrine that requires extreme circumstances" that "covers 'only the most egregious conduct' aimed at 'defiling the court itself,' such as 'bribery of a judge or members of the jury, or the fabrication of evidence by a party

in which an attorney is implicated.'" *BNP*, 2013 WL 5493125, at *5 (quoting *Jackson v. Thaler*, 348 F. App'x 29, 34 (5th Cir. 2009)).

40. Because Dugaboy does not have any evidence of fraud in connection with the 9019 Order, let alone "prima facie" evidence of fraud, Dugaboy has served extensive discovery on HCMLP and others in the hopes of manufacturing some. That is exactly backwards. A party seeking to reopen a final judgment under Rule 60(b) must come forward with evidence to do so, otherwise final judgments would be meaningless. This Court should therefore enter a protective order preventing Dugaboy from seeking *any* discovery in connection with its Rule 60(b) Motion.[4]

## II. DUGABOY'S REQUESTS ARE NOT RELEVANT TO ITS RULE 60(b) MOTION.

41. "The party seeking discovery 'bears the initial burden of showing that the materials and information sought are relevant to the action or will lead to the discovery of admissible evidence.'" *Nichols v. White*, 2020 WL 8271876, at *1 (E.D. Tex. Feb. 10, 2020) (quoting *Camoco, LLC v. Leyva*, 2019 WL 6131452, at *2 (W.D. Tex. Nov. 19, 2019)). A discovery request is relevant only if it "is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Here, the discovery must be relevant to Dugaboy's Rule 60(b) Motion, not HMIT or the 9019 Settlement generally, because Rule 60(b) "seeks to rectify judgments improperly entered because of misrepresentations and unfair litigation tactics, not to provide a backdoor to undermine an otherwise valid merit-based dismissal of an action based on fraud or dishonesty." *Optimal Health Care Servs., Inc. v. Travelers Ins. Co.*, 801 F. Supp. 1558,

[4] Nor can Chief Judge Jernigan's recusal justify any of the discovery Dugaboy seeks. Contrary to Dugaboy's characterizations (*see* Mot. at 33–50), Chief Judge Jernigan in fact voluntarily decided to recuse herself from this case going forward, which does not call into question "the validity of any decision" she previously issued, including the 9019 Order. Order at 6 & n.3, *In re Compl. of Jud. Misconduct Under the Judicial Improvements Act of 2002*, No. 05-26-90042 (Dec. 29, 2025). As HCMLP will explain more fully in its forthcoming opposition to Dugaboy's Rule 60(b) Motion, Chief Judge Jernigan's recusal does not present any valid basis to vacate her prior decisions. In any event, none of the discovery Dugaboy seeks relates to Chief Judge Jernigan's recusal.

1561 (E.D. Tex. 1992) (citing *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978)). None of Dugaboy's Requests are relevant to its Rule 60(b) Motion.

42. As discussed above (*see supra* at ¶¶ 7, 38), Dugaboy alleges that Patrick used his control of DAF to defraud certain charitable beneficiaries, which is irrelevant to the 9019 Settlement between HMIT and Highland and the 9019 Order. But Dugaboy does not even seek documents regarding the alleged fraud among HMIT, DAF, and the charitable funds. Dugaboy instead attempts to re-take discovery on the Objections to the 9019 Settlement by seeking documents regarding the negotiation, drafting, and diligence of the 9019 Settlement (Request Nos. 1–7, 9–13, 18, 21); HMIT's diligence and analysis of the 9019 Settlement (Request Nos. 8, 14, 17); and the valuation of the Highland Entities and certain bankruptcy claims (Request Nos. 25, 30–33, 39–50, 53–55). None of this has anything to do with Dugaboy's Rule 60(b) Motion, so it is irrelevant. A Rule 60(b) motion is not an opportunity to "relitigate" claims, which "'would impermissibly give those plaintiffs a second bite at the apple.'" *Nowlin v. Shannon*, 2017 WL 8790963, at *1 (N.D. Tex. June 13, 2017) (quoting *Optimal Health*, 801 F. Supp. at 1561).

43. Further, Dugaboy impermissibly seeks documents that did not exist until after the 9019 Order it seeks to vacate. "The Fifth Circuit is clear that 'evidence not in existence at the time of an earlier judgment is not an available ground for attacking that judgment[]'" as "newly discovered evidence" under Rule 60(b)(2). *Brown*, 2022 WL 22883290, at *3 (quoting *Southmark*, 742 F.2d at 873); *see also Gen. Univ. Sys., Inc. v. Lee*, 379 F.3d 131, 158 (5th Cir. 2004) ("'[T]he newly discovered evidence must be in existence at the time of trial and not discovered until after trial.'") (quoting *Longden v. Sunderman*, 979 F.2d 1095, 1102–03 (5th Cir. 1992)). Similarly, "Rule 60(b)(3) is aimed at misconduct which occurs between the time the plaintiff files a lawsuit and the time the court enters judgment," not conduct that occurred after judgment. *Optimal Health*,

801 F. Supp. at 1561. But Dugaboy seeks documents "through the present," including documents regarding the implementation of the 9019 Order, which necessarily were not in existence at the time of the Order. (Requests at 18; *id.* No. 26.) Dugaboy cannot obtain such documents for its Rule 60(b) Motion as a matter of law.

44. Dugaboy also seeks documents dated ***years*** before the 9019 Order in 2025, including documents regarding "the ***2015*** sale of Highland Capital Management, L.P. equity holders' stake to Hunter Mountain Investment Trust"; "the reasons behind the equity ownership allocation reflected in Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization," which was confirmed ***in 2021***; "any tax benefit, tax efficiency, or charitable purpose associated with the restructuring of Highland Capital Management, L.P. ownership ***in 2015***"; "the conversion of the charitable trust originally formed ***in 2006*** into a donor-advised fund investment vehicle for long-term charitable endeavors in or around ***October 2011***." (Request Nos. 34–37.) Such documents cannot constitute "newly discovered evidence" under Rule 60(b)(2) because they could "have been discovered in time to move for a new trial." Fed. R. Civ. P. 60(b)(2). Nor can they support allegations of fraud under Rule 60(b)(3) because they do not concern alleged misconduct "between the time the plaintiff files a lawsuit and the time the court enters judgment." *Optimal Health*, 801 F. Supp. at 1561. Accordingly, they are not relevant to Dugaboy's Rule 60(b) Motion, clearly could have been sought before the hearing on the 9019 Settlement, and therefore cannot be subject to discovery.

## III. DUGABOY'S REQUESTS ARE UNREASONABLY CUMULATIVE AND DUPLICATIVE BECAUSE IT ALREADY RECEIVED FULL DISCOVERY DURING OBJECTIONS TO THE 9019 SETTLEMENT.

45. Under Rule 26(b)(2)(C), "the court ***must*** limit the frequency or extent of discovery otherwise allowed by these rules or by local rules if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more

convenient, less burdensome, or less expensive; [or] (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action." Both apply here because Dugaboy already had the opportunity to obtain discovery with the Objections to the 9019 Settlement, and Highland already produced more than 4,000 documents in response to such discovery.

46. During the 9019 Settlement approval process, The Dallas Foundation and Crown Global raised Objections based on the exact same alleged conduct Dugaboy raises in its Rule 60(b) Motion. Specifically, The Dallas Foundation and Crown Global argued that "the Settlement is potentially tainted by the actions of Mark Patrick," because he "restructured the ownership of the HMIT Entities in a manner that seems to facilitate the diversion of millions of dollars in assets from the charitable entities that are the beneficial owners of the HMIT Entities," and the Dondero Foundations were challenging Patrick's actions through insolvency proceedings "under the supervision of the Cayman Islands court and the appointment of joint official liquidators." (Ex. 18 ¶¶ 2–3, 22–31; *see also id.* ¶¶ 14–21, 32–34.) After The Dallas Foundation and Crown Global voluntarily withdrew their Objections, with prejudice, Dugaboy began asserting the same objections during the 9019 Settlement approval hearing. (Ex. 11 (June 25, 2025 Hr'g Tr.) at 31:4–34:15.)

47. The Objectors, including Dugaboy, had the opportunity to (and did, in fact) take discovery from Patrick and the HMIT Entities about these allegations, including deposing Patrick and examining him live at an evidentiary hearing. (*See supra* at ¶¶ 22-23.) Dugaboy did not raise any concerns that it did not receive sufficient discovery during the 9019 Settlement approval process and did not bring any motions to compel additional discovery. (*Id.*) Thus, Dugaboy has

already had more than "ample opportunity to obtain the information by discovery in the action." Fed. R. Civ. P. 26(b)(2)(C)(ii).

48. Further, many of Dugaboy's Requests seek the exact same documents it requested—and received—in discovery on the Objections to the 9019 Settlement. For example:

| Dugaboy's 9019 Document Requests | Dugaboy's Rule 60(b) Motion Requests |
|---|---|
| "All communications between [Highland] and the HMIT Entities . . . related to the proposed Settlement Agreement[.]" (Request No. 1.) | "All Documents and Communications between or among [Highland] and any of the HMIT Entities concerning the 9019 Settlement[.]" (Request No. 1.) |
| "All communications between [Highland] and any third-party related to the proposed Settlement Agreement." (Request No. 2.) | "All Communications between [HCMLP] and any third party relating to the Settlement Agreement, the 9019 Motion, or the HMIT Entities." (Request No. 24.) |
| "All drafts of the proposed Settlement Agreement." (Request No. 3.) | "All Documents and Communications between or among [Highland] and any of the HMIT Entities concerning the 9019 Settlement, including but not limited to draft agreements[.]" (Request No. 1.) |
| "All documents evidencing the extensive arm's-length, good faith negotiations over the last several months related to the proposed Settlement Agreement[.]" (Request No. 6.) | "All Documents and Communications relating to, referencing, or reflecting negotiations over the terms of the Settlement Agreement & General Release[.]" (Request No. 13.) |
| "Documents demonstrating any efforts by the Movants to sell or transfer the claims and causes of action that were asserted by the Litigation Trustee in the Amended Kirschner Complaint to any parties." (Request No. 12.) | "All Documents and Communications relating to, referencing, or reflecting negotiations over the terms of the Settlement Agreement & General Release, including . . . the transfer of the Kirschner Claims." (Request No. 13.)<br><br>"All Documents relating to the transfer of the Kirschner Litigation claims to the HMIT Entities pursuant to the 9019 Settlement, including any Communications discussing the strategic purpose, value, or intended use of such claims." (Request No. 15.) |

| Dugaboy's 9019 Document Requests | Dugaboy's Rule 60(b) Motion Requests |
|---|---|
| "Documents related to or identifying the value of any consideration received or exchanged as part of the proposed Settlement Agreement, including any communications related to the value of any such consideration." (Request No. 14.) | "All Documents and Communications relating to, referencing, or reflecting the consideration received by Hunter Mountain Investment Trust in exchange for entering into the Settlement Agreement & General Release dated May 19, 2025, including any valuations, appraisals, or analyses of the value received." (Request No. 12.) |

(Ex. 1 at 19–21; Ex. 19 at 4–5.)

49. In response to the Objectors' discovery requests, Highland produced more than 4,000 documents, including all documents and communications between Highland and the HMIT Entities up to the execution of the 9019 Settlement on May 19, 2025. (*See supra* at ¶ 22.) During the hearing on the Objections, Highland entered into evidence 126 exhibits totaling 2,899 pages, including a demonstrative exhibit containing a complete, up-to-date structure chart of DAF and the HMIT Entities, which Dugaboy used to cross-examine Patrick. (*Id.*) Thus, Dugaboy's Rule 60(b) Requests are cumulative and duplicative of discovery on the Objections, and this Court "***must*** limit the frequency or extent" of such discovery. Fed. R. Civ. P. 26(b)(2)(C).

## IV. DUGABOY'S REQUESTS ARE AN IMPROPER FISHING EXPEDITION SEEKING TO INVADE ATTORNEY-CLIENT PRIVILEGE AND CAUSE UNNECESSARY DELAY.

50. In addition to all of the reasons set forth above, Dugaboy's Requests are also improper for at least four more reasons.

51. ***First***, Dugaboy's Requests are vastly overbroad. For example, Dugaboy seeks "[a]ll Communications between [HCMLP] and James P. Seery, Jr." (Request No. 19.) Dugaboy thus seeks every single internal email HCMLP's CEO sent or received—regardless of whether they relate to the 9019 Settlement or the HMIT Entities—including privileged communications with attorneys. In fact, in its cover email Dugaboy demanded in bold that HCMLP "confirm that

you will search the emails of James P. Seery." (Ex. 1.) Dugaboy also seeks every single "Communication between [HCMLP] and ***any third party*** relating to the Settlement Agreement, the 9019 Motion, or the HMIT Entities," which again includes privileged communications with attorneys. (Request No. 24.) Courts in this Circuit routinely reject "discovery requests [that] are overbroad as written" or "facially overbroad." *Ramey v. Salazar*, 2018 WL 703431, at *2 (W.D. Tex. Feb. 2, 2018) (collecting cases); *see also Nichols*, 2020 WL 8271876, at *2 (quashing subpoenas because the "request is overbroad and unduly burdensome on its face"); *Balakrishnan v. Bd. of Super. of La. State Univ.*, 2010 WL 11538662, at *5 (E.D. La. July 26, 2010) (denying portion of motion to compel where "the Court finds that the request is facially overbroad").

52. ***Second***, Dugaboy seeks documents not in HCMLP's "possession, custody, or control." Fed. R. Civ. P. 34(a)(1). For example, Dugaboy seeks documents regarding "due diligence performed ***by any HMIT Entity*** prior to the execution of the Settlement Agreement." (Request No. 8.) Dugaboy also seeks documents "sufficient to show the reason or rationale ***for the HMIT Entities'*** agreement to transfer or relinquish litigation rights previously asserted against Highland Entities in exchange for the consideration set forth in the Settlement Agreement." (Request No. 14.) And Dugaboy seeks documents regarding "any litigation commenced or actions ***taken by Patrick or any HMIT Entity*** using the Kirschner Litigation claims obtained through the 9019 Settlement." (Request No. 16.) Notably, Dugaboy also subpoenaed six HMIT Entities. (Ex. 2.) Thus, there is no valid basis to seek such discovery from HCMLP, which in any event does not possess any such documents.

53. ***Third***, Dugaboy's Requests seek clearly privileged documents. Dugaboy's Requests seek communications with outside counsel (Request Nos. 22–23) and legal analysis and memoranda (Request Nos. 37–38, 41–43). Dugaboy's cover email also demanded, in bold, that

HCMLP "confirm that you will search the emails of . . . Richard M. Pachulski" (Ex. 1), who is the named partner of the law firm representing Highland as bankruptcy and litigation counsel, without explaining how or why his emails would be responsive to any specific Request. Dugaboy appears to acknowledge that its Requests seek privileged documents in a series of footnotes stating that "this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver." (Request Nos. 22–23, 37–38, 41–43 nn.3–9.) It is settled law that "the party seeking to breach the walls of privilege" must "produce evidence," such as "affidavits and exhibits," to "make the necessary *prima facie* showing for the application of the crime fraud exception" or subject-matter waiver. *Grand Jury Subpoena*, 419 F.3d at 336–37 (collecting cases). But Dugaboy provides "no evidence of that privilege being waived and no evidence to support Plaintiffs' claims that the crime/fraud exception applies." *Adams v. Hermann*, 2018 WL 5886800, at *4 (S.D. Tex. Nov. 9, 2018) (refusing to consider privileged communications and denying request for *in camera* review), *aff'd*, 973 F.3d 343 (5th Cir. 2020). Dugaboy thus has no basis to obtain privileged communications.

54. ***Finally***, Dugaboy served its requests for improper purposes. Every party that serves a discovery request must certify that it is "not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 26(g)(1)(B)(ii). Dugaboy waited six weeks from its Rule 60(b) Motion and three weeks from an agreed scheduling order to serve the Requests and set a return date of April 22, 2026, which is just five days before the scheduled hearing on the Rule 60(b) Motion. Predictably, when HCMLP tried to set a briefing schedule on this Motion, Dugaboy sought to delay the hearing. (Ex. 3.) Dugaboy is plainly trying to use the prospect of discovery to delay consideration of its meritless Rule 60(b)

Motion while it continues to litigate and re-litigate (and lose) on the same theory of fraud in courts across the world. This Court should reject such gamesmanship out of hand.

## V. DUGABOY'S SUBPOENAS AND DEPOSITION REQUESTS ARE IMPROPER.

55. For all the same reasons that Dugaboy's Requests are improper, this Court should also enter a protective order against Dugaboy's Subpoenas and request to take three depositions.

56. As to the Subpoenas, the Federal Rules require that Dugaboy "***must*** take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). Dugaboy failed to do so. Instead, Dugaboy served massive Subpoenas totaling ***more than 500 requests*** on eight separate non-debtor entities and law firms. For example, the Subpoena to Beacon Mountain LLC contains ***99 requests***, the Subpoena to CLO Holdco, Ltd. contains ***74 requests***, the Subpoena to law firm Shields Legal Group P.C. contains ***77 requests***, and the Subpoena to law firm Kelly Hart & Hallman LLP also contains ***77 requests***. (Ex. 2.) Further, "under Fifth Circuit law," discovery requests to "counsel are disfavored and should be permitted only in limited circumstances." *McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*, 2016 WL 3033544, at *5–6 (N.D. Tex. May 26, 2016) (citing *Nguyen*, 197 F.3d at 209). Courts in this Circuit routinely enter "protective orders and quashal orders" against efforts to seek discovery from counsel, *id.* (collecting cases), and this Court should do the same here.

57. As to the depositions, they are also unduly burdensome, duplicative, and unnecessary. "Depositions are often overused" and are "the most costly and time-consuming activity in complex litigation." Fed. Jud. Ctr., Manual for Complex Litigation § 11.45 (4th ed. 2025). Dugaboy seeks to depose Patrick for eight hours, Seery for four hours, and Murphy for four hours. (Ex. 3.) Murphy is located in the Cayman Islands so, as a practical matter, Dugaboy has no way to take his deposition without his consent. *See* Fed. R. Civ. P. 45(c)(1)(A) (limiting deposition

travel "within 100 miles of where the person resides, is employed, or regularly transacts business in person"). If Murphy does not consent, Dugaboy will have to use international processes, such as the Hague Convention on Evidence or letters rogatory, to obtain the deposition, which can "take a year or more." U.S. Dep't of State, Preparation of Letters Rogatory.[5] Dugaboy already deposed Patrick and Seery during discovery on its Objections and then examined them again during the hearing on those Objections. (*See supra* at ¶¶ 22-23.) Dugaboy's request to examine Patrick and Seery a third time is "unreasonably cumulative or duplicative," because it "has had ample opportunity to obtain the information by discovery in this action." Fed. R. Civ. P. 26(b)(2)(C). It is time for this bankruptcy case and Dondero's continued harassment to end.

**PRAYER**

WHEREFORE, HCMLP respectfully requests that this Court enter an order (1) protecting against Dugaboy's efforts to take discovery in connection with its Rule 60(b) Motion, including its Requests, Subpoenas, and deposition requests, and (2) granting HCMLP such other and further relief the Court deems just and proper under the circumstances.

[5] https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/obtaining-evidence/Preparation-Letters-Rogatory.html.

Dated: April 1, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expwy., Ste. 106
Dallas, TX 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**CERTIFICATE OF CONFERENCE**

The undersigned hereby certifies that, on April 1, 2026, John A. Morris, counsel for HCMLP, corresponded with Michael Gaddis, counsel for Dugaboy, regarding the relief requested in the foregoing Motion. Dugaboy's counsel advised HCMLP's counsel that Dugaboy is **OPPOSED** to the relief requested in the Motion.

*/s/ Zachery Z. Annable*
Zachery Z. Annable

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | ) | |

**[PROPOSED] ORDER GRANTING HIGHLAND CAPITAL MANAGEMENT, L.P.'s MOTION FOR A PROTECTIVE ORDER AGAINST THE DUGABOY INVESTMENT TRUST'S DISCOVERY REQUESTS**

Having considered (i) Highland Capital Management, L.P.'s ("HCMLP") *Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests* (the "Motion"), (ii) the *Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests*, (iii) any responses to the Motion, and (iv) any replies in support of the Motion, the arguments of counsel, and the entire record herein, and good cause having been shown, it is **HEREBY ORDERED** that:

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 6333 E. Mockingbird Lane, Suite 147 #5045, Dallas, TX 75214.

1. HCMLP's Motion is **GRANTED**, and The Dugaboy Investment Trust is hereby prohibited from seeking, propounding, serving, or otherwise pursuing any discovery in connection with its pending *Motion for Relief from Order and Motion to Vacate* [Dkt. No. 4513], including but not limited to requests for production of documents, depositions, interrogatories, requests for admission, and subpoenas directed to any party or non-party.

2. The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

###End of Order###

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expwy., Ste. 106
Dallas, TX 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |

**DECLARATION OF JOHN A. MORRIS IN SUPPORT OF HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR A PROTECTIVE ORDER AGAINST THE DUGABOY INVESTMENT TRUST'S DISCOVERY REQUESTS**

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 6333 E. Mockingbird Lane, Suite 147 #5045, Dallas, TX 75214.

I, John A. Morris, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am admitted to this Court *pro hac vice* and am a partner in the law firm of Pachulski, Stang, Ziehl & Jones LLP, counsel to Highland Capital Management, L.P. ("HCMLP"), the reorganized debtor in the above-referenced bankruptcy case. I respectfully submit this Declaration to provide this Court with certain materials cited in *Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests*. Unless stated otherwise, this Declaration is based on my personal knowledge and review of the documents listed below.

2. HCMLP and certain related entities (collectively, "Highland") produced more than 4,000 pages of documents in response to discovery requests served by The Dugaboy Investment Trust ("Dugaboy"), The Dallas Foundation and Crown Global Life Insurance, Ltd., and Patrick Daugherty in connection with their objections to the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216] (the "9019 Settlement"). This document production included all documents and communications between Highland and Hunter Mountain Investment Trust ("HMIT") and certain related entities up to the execution of the 9019 Settlement on May 19, 2025.

3. Attached hereto as **Exhibit 1** is a true and correct copy of Dugaboy's *First Set of Requests for Production of Documents to Highland Capital Management, L.P.*, dated March 23, 2026.

4. Attached hereto as **Exhibit 2** are true and correct copies of eight subpoenas Dugaboy served respectively on Shields Legal Group P.C., Kelly Hart & Hallman LLP, Beacon Mountain LLC, Rand PE Fund Management, LLC, Rand PE Fund I, LP, Rand Advisors, LLC, CLO Holdco LTD, and Valuescope, LLC, dated March 23–25, 2026.

5. Attached hereto as **Exhibit 3** is a true and correct copy of an email thread among counsel for HCMLP and counsel for Dugaboy, dated March 30, 2026 to April 1, 2026.

6. Attached hereto as **Exhibit 4** is a true and correct copy of the *Judgment* in *In re Charitable DAF Holdco, Ltd.*, filed in the Grand Court of the Cayman Islands Financial Services Division on February 10, 2026.

7. Attached hereto as **Exhibit 5** is a true and correct copy of the *Amended Complaint and Objection to Claims* [Docket No. 158] in *Kirschner v. Dondero*, Adv. Proc. No. 21-03076-sgj, filed in the United States Bankruptcy Court for the Northern District of Texas on May 19, 2022.

8. Attached hereto as **Exhibit 6** is a true and correct copy of the *Winding Up Petition* in *In re Charitable DAF Holdco, Ltd.*, filed in the Grand Court of the Cayman Islands Financial Services Division on April 16, 2025.

9. Attached hereto as **Exhibit 7** is a true and correct copy of the *Affidavit of James David Dondero*, notarized on April 9, 2025 and filed in support of the *Winding Up Petition* in *In re Charitable DAF Holdco, Ltd.*, filed in the Grand Court of the Cayman Islands Financial Services Division on April 16, 2025.

10. Attached hereto as **Exhibit 8** is a true and correct copy of *The Dugaboy Investment Trust's Motion to Stay 9019 Order* [Docket No. 4326] and accompanying exhibits, filed in the United States Bankruptcy Court for the Northern District of Texas on July 17, 2025.

11. Attached hereto as **<u>Exhibit 9</u>** is a true and correct copy of Charitable DAF Holdco, Ltd. Guidance Notes for Members of the Liquidation Committee.

12. Attached hereto as **<u>Exhibit 10</u>** is a true and correct copy of the *Affidavit of Mark Eric Patrick*, notarized on June 4, 2025, in *In re Charitable DAF Holdco, Ltd.* and filed in the Grand Court of the Cayman Islands Financial Services Division on June 4, 2025.

13. Attached hereto as **<u>Exhibit 11</u>** is a true and correct copy of the excerpted transcript of the June 25, 2025 hearing in the United States Bankruptcy Court for the Northern District of Texas on the *Motion for an Order Further Extending Duration of Trusts* [Docket No. 4213] and *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216].

14. Attached hereto as **<u>Exhibit 12</u>** is a true and correct copy of *Highland Capital Management, L.P., the Highland Claimant Trust, and the Highland Litigation Sub-Trust's Responses and Objections to Dugaboy's Discovery Related to Rule 9019 Motion*, dated June 13, 2025.

15. Attached hereto as **<u>Exhibit 13</u>** is a true and correct copy of the *Petition for Court Supervision of a Voluntary Liquidation* in *In re Charitable DAF Holdco, Ltd.*, filed in the Grand Court of the Cayman Islands Financial Services Division on May 2, 2025.

16. Attached hereto as **<u>Exhibit 14</u>** is a true and correct copy of the *Order Granting Petition for Court Supervision of a Voluntary Liquidation* in *In re Charitable DAF Holdco, Ltd.*, entered in the Grand Court of the Cayman Islands Financial Services Division on May 6, 2025.

17. Attached hereto as **Exhibit 15** is a true and correct copy of the *Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver* in *The Highland Dallas Foundation, Inc., et al. v. Patrick, et al.*, No. 25-BC01B-0027, filed in the Texas Business Court, 1st Division on July 1, 2025.

18. Attached hereto as **Exhibit 16** is a true and correct copy of the *Order* in *The Highland Dallas Foundation, Inc., et al. v. Patrick, et al.*, No. 25-BC01B-0027, filed in the Texas Business Court, 1st Division on September 18, 2025.

19. Attached hereto as **Exhibit 17** is a true and correct copy of CWR Form No. 15, Liquidator's Certificate (Composition of Liquidation Committee) (O. 9, r. 1) in the Grand Court of the Cayman Islands Financial Services Division, dated July 21, 2025.

20. Attached hereto as **Exhibit 18** is a true and correct copy of the *Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4231], filed in the United States Bankruptcy Court for the Northern District of Texas on June 9, 2025.

21. Attached hereto as **Exhibit 19** is a true and correct copy of the *Dugaboy Investment Trust's Discovery Related to Rule 9019 Motion* in the above-captioned bankruptcy case, dated June 10, 2025.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of April 2026.

*/s/ John A. Morris*
John A. Morris

**EXHIBIT 1**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO HIGHLAND CAPITAL MANAGEMENT, LP**

**To:** Highland Capital Management, LP, by and through its counsel of record, Jeffrey N. Pomerantz, jpoerantz@pszjlaw.com, John A. Morris, jmorris@pszjlaw.com, Gregory V. Demo, gdemo@pszjlaw.com, Hayley R. Winograd, hwinograd@pszjlaw.com, **Pachulski Stang Ziehl & Jones LLP**, 10100 Santa Monica Blvd, 13th Floor, Los Angeles, CA 90067 and Melissa S. Hayward, mhayward@haywardfirm.com, Zachary Z. Annable, zannable@haywardfirm.com, **Hayward PLLC**, 10501 N. Central Expressway, Suite 106, Dallas, TX 75231

Interested Party The Dugaboy Investment Trust ("Dugaboy") serves this First Set of Requests for Production of Documents to Highland Capital Management, LP ("Highland"), pursuant to Rule 34 of the Federal Rules of Civil Procedure, which is incorporated into bankruptcy proceedings by Federal Rules of Bankruptcy Procedure 7034 and 9014(c)(1). Highland must respond to these Requests for Production within thirty (30) days of service. We ask that You produce documents at the offices of King & Spalding, 2601 Olive Street, Suite 2300, Dallas, TX 75201, or by electronic production in a mutually agreed format.

## INSTRUCTIONS

1. In responding to these Requests, You must furnish all information that is available to You, that is within Your possession, custody, or control, or that is subject to Your reasonable inquiry,

including information in the possession of Your attorneys, accountants, advisors, representatives, agents, or other persons directly or indirectly employed by, or connected with, You or Your attorneys, and anyone else otherwise subject to Your control. All Documents that respond, in whole or in part, to any portion of the Requests below shall be produced in their entirety, including all attachments and enclosures.

2. The relevant time period for documents responsive to these Requests, unless otherwise specified in an individual Request, is the period beginning on the earlier of October 1, 2024, or such date as identified in response to Request No. 1,[1] through the present.

3. To the extent that the below Requests include requests for paper records, such paper records shall be scanned or otherwise converted into electronic form from paper documents in the following format:

(a) All documents shall be scanned to single page Group 4, TIFF format, at least 300 dpi and 8½ x 11 inch page size, except for documents requiring higher resolution or different page size.

(b) In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). The Parties will make their best efforts to have their vendors unitize documents correctly and will commit to address situations where there are improperly unitized documents. For documents found in folders or other containers with labels, tabs, or other identifying information, such labels and tabs shall be scanned where practicable. Pages with Post-it notes shall be scanned both with and

[1] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

without the Post-it, with the image of the page with the Post-it preceding the image of the page without the Post-it.

(c) Productions of the images shall be made using an image load file (.OPT or .LFP) and a delimited database/metadata load file (.DAT). Each image file should have a unique file name which shall be the Bates number of the page.

(d) The following objective coding fields should be provided, if applicable:

(1) beginning Bates number;

(2) ending Bates number;

(3) beginning attachment Bates number;

(4) ending attachment Bates number;

(5) page count; and

(6) source location/custodian.

(e) Document level OCR should be provided as a separate text file. The file name of each text file should correspond to the file name of the first image file of the document with which it is associated. The text files will not contain the redacted portions of the documents. OCR software should be set to the highest quality setting during processing. For documents in foreign languages, the OCR shall be performed using an OCR tool and settings suitable for the particular byte or multi-byte languages.

4. To the extent that the below Requests include requests for electronically stored information ("ESI"), all ESI shall be produced in TIFF format according to the following specifications:

(a) All TIFF formatted documents will be single page, Group 4 TIFF at 300 x 300 dpi resolution and 8½ x 11 inch page size, except for documents requiring different resolution or page size.

(b) An image load file, in standard Opticon format, showing the Bates number of each page and the appropriate unitization of the documents, will accompany all document images.

(c) Each imaged version of an electronic document will be created directly from the original electronic document.

(d) TIFFs shall be produced as black and white, single-page TIFF images in accordance with the technical specifications set out above. Word documents that have tracked changes or comments shall be produced in color. In addition, upon written request that identifies a reasonable number of individual documents at issue by Bates number, a party shall produce color images for those documents. Documents produced in color shall be produced as single page, 300 DPI, color JPG images with the quality setting of 75% or higher.

(e) All TIFF files are to be provided with an accompanying searchable text (.TXT) file extracted from the native, electronic file (not generated as an OCR file from the TIFF image(s)), and such text files shall contain the full text extraction. To the extent reasonably feasible, extracted text shall provide all comments, tracked changes, speaker's notes, and text from hidden worksheets, slides, columns, and rows. In the case of files with redacted text, OCR'ed text of the redacted documents may be provided in lieu of extracted text. OCR software should be set to the highest quality setting during processing.

5. To the extent reasonably feasible, all Documents produced shall be produced with metadata and attachments intact. The term "metadata" means all information describing the history, tracking, or management of an electronic document including, but not limited to, the date(s) the document was created, modified, accessed, or distributed; the author(s) and all recipient(s) of the document; the file's name; the file's location (e.g., directory structure or pathname); the file format or file type; and the file size. For comparison purposes and to ensure authenticity, where documents are produced in native format, such documents shall also be produced in the ESI format described in Instruction No. 3, unless otherwise agreed by the parties.

6. Should You object to any Request, You must specifically and in detail state the grounds and reasons for the objection, and state in detail the part of the language of the Request to which You object, and state which part of the Request, if any, You are answering.

7. Under the Crime-Fraud Exception and Subject-Matter Waiver, items which would typically be privileged are not privileged in this matter. The Fifth Circuit recognizes the Crime-Fraud Exception to privilege, under which attorney-client communications and/or work product materials are not privileged if "the client consults an attorney for advice that will assist the client in carrying out a contemplated illegal or fraudulent scheme." *Lewis v. Crochet*, 105 F.4th 272, 282 (5th Cir. 2024) (quoting *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1242 (5th Cir. 1982)). The exception applies where (1) a crime or fraud was impending or continuing at the time of the communication, and (2) the communications or work product at issue were in furtherance of that criminal or fraudulent activity. *See In re E.E.O.C.*, 207 F. App'x 426, 434 (5th Cir. 2006). Dugaboy reasonably believes, and has evidence to support, that certain communications and work product it seeks were intended to further continuing or future criminal or fraudulent activity and are therefore not privileged.

Likewise, Subject-Matter Waiver under Federal Rule of Evidence 502(a) provides that disclosure of certain information in a federal proceeding waives privilege for related information when (1) the waiver was intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) the disclosed and undisclosed communications and work product "ought in fairness to be considered together." Fed. R. Evid. 502(a); *see also Crider Inc. v. Silgan Containers LLC*, 2023 WL 479094, at *22 (N.D. Tex. Jan. 13, 2023). Any communications or work product that would otherwise be privileged, but concern the same subject matter intentionally disclosed by Mark Patrick in his affidavits or testimony in this Proceeding or Related Proceedings fall under this exception, and privilege has been waived.

Accordingly, under these exceptions and waivers, You must produce documents that would typically be privileged as they relate to (1) any fraudulent activity that counsel was involved in or knew of, or (2) any privileged conversation or information that has already been disclosed elsewhere in this litigation.

If You still contend that any Documents sought by the Requests are privileged or otherwise protected from discovery, You must nevertheless identify for each Document withheld:

(a) the legal basis for withholding the Document;

(b) the person asserting any claim of privilege and/or protection;

(c) a description and identification of the requested Document sufficient to frame an appropriate demand for the Document and a motion to compel disclosure thereof, setting forth at least the following:

(i) the author and/or signatory of the Document withheld;

(ii) the date of the Document withheld;

(iii) all addressees and/or recipients of the Document withheld; and

(iv) the subject matter and circumstances under which the Document withheld was created in sufficient detail to ascertain applicability of such privilege or other legal basis.

8. Notwithstanding a claim that a portion of a Document is privileged or otherwise protected from disclosure, any such Document must be produced with the portion claimed to be protected excised.

9. If You contend that any Request is ambiguous or unclear, contact undersigned counsel as soon as possible so that the Request can be clarified to avoid unnecessary delays in discovery.

10. These Requests are continuing in nature. Any Documents located, created, or obtained subsequent to the Documents provided in response to these Requests and that should have been produced had they been known shall be promptly supplied by supplemental responses whenever You find, locate, or acquire such Documents. You are required to supplement and correct Your answers and responses on a timely basis.

## DEFINITIONS

As used herein, the terms listed below shall be defined as follows. Insofar as a term is not explicitly defined, the meaning to be used is the commonly accepted definition of the term. Notwithstanding any definition set forth below, each word, term, or phrase used in these Requests is intended to have the broadest meaning permitted under applicable rules. The following terms are to be given their ascribed definitions:

### A. Proceedings

1. The term "this Proceeding" or "this Litigation" or "Main Case" refers to the main bankruptcy proceeding *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

2. The term "Related Proceedings" includes all other legal proceedings or actions involving or related to Highland, HMIT, and persons, parties, or entities involved with or affected by the Settlement, specifically including but not limited to the Cayman Islands Proceedings, the Chapter 15 proceeding in the United States Bankruptcy Court for the District of Delaware, and the Texas Business Court proceeding, as well as any bankruptcy adversary proceedings before the United States Bankruptcy Court for the Northern District of Texas that are separate from the Main Case.

**B. Parties and Individuals**

1. The term "You" or "Your" refers to Highland Capital Management, LP, as well as its agents, attorneys, accountants, advisors, representatives, or any other individual(s) or entity(ies) acting or authorized to act on behalf of it, and any related companies, divisions, or subsidiaries, past or present, including, without limitation, the directors, officers, employees, agents, or attorneys thereof, as well as any predecessors-in-interest or successors-in-interest.

2. The term "Patrick" refers to Mark Eric Patrick.

3. The term "Dondero" refers to James Dondero.

4. The term "Okada" refers to Mark Okada.

5. The term "Seery" or "Claimant Trustee" refers to James P. Seery, Jr.

6. The term "Kirschner" or "Litigation Trustee" refers to Marc S. Kirschner.

7. The term "Murphy" refers to Paul Murphy.

8. The term "Scott" refers to Grant Scott.

9. The term "Cronin" refers to Kevin Cronin.

10. The term "Honis" refers to John Honis.

11. The term "Raver" refers to Shawn Raver.

**C. Highland Entities and Related Trusts**

12. The term "Highland" or "Highland Capital Management" refers to Highland Capital Management, L.P., a Dallas-based, Delaware-domiciled investment advisor, and the Debtor in the matter *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

13. The term "Highland Entities" or "Highland Entity" refers collectively to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

14. The term "Highland Claimant Trust" refers to the entity created under the Plan to hold, monetize, and distribute the assets of Highland's estate.

15. The term "Highland Litigation Sub-Trust" or "Litigation Sub-Trust" refers to the trust created under the Plan for the purpose of pursuing litigation claims on behalf of the Highland estate.

16. The term "Highland Indemnity Trust" or "Indemnity Trust" refers to the trust created under the Plan to hold assets for the purpose of indemnification obligations arising out of the Highland estate.

17. The term "Highland Party" or "Highland Parties" refers to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, the Highland Indemnity Trust, and each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, and subsidiaries, and any persons or entities acting or authorized to act on their behalf.

**D. HMIT Entities and Related Parties**

1. The term "HMIT Entities" refers collectively to Hunter Mountain Investment Trust and Beacon Mountain, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "HMIT Parties" refers broadly to the HMIT Entities, Mark Patrick, and any related decision maker with respect to the HMIT Entities, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

3. The term "Hunter Mountain" or "HMIT" refers to Hunter Mountain Investment Trust.

4. The term "Beacon Mountain" refers to Beacon Mountain, LLC.

5. The term "Beacon Hunter" refers to Beacon Hunter, LLC.

**E. Rand Entities**

1. The term "Rand Parties" or "Rand Entities" refers collectively to Rand PE Fund I, LP, Rand Advisors, LLC, and Rand PE Fund Management, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "Rand Fund" or "Rand PE Fund" refers to Rand PE Fund I, LP.

3. The term "Rand Advisors" refers to Rand Advisors, LLC, an SEC-registered investment advisor that served as the investment adviser to Rand PE Fund I, LP.

4. The term "Rand PE Fund Management" refers to Rand PE Fund Management, LLC.

**F. DAF Entities and Related Structures**

1. The term "DAF" or "Charitable DAF Holdco" refers to Charitable DAF Holdco, Ltd.

2. The term "DAF Fund" or "Charitable DAF Fund" refers to Charitable DAF Fund, LP.

3. The term "DAF GP" or "Charitable DAF GP" refers to Charitable DAF GP, LLC.

4. The term "DAF Structure" refers to the overall donor-advised fund investment vehicle and its constituent entities, including Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, and any entity holding ownership or management interests therein or formed in connection therewith, including any entities created as part of the restructuring of the DAF.

5. The term "DAF Entities" refers collectively to Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, CDH GP, Ltd., CDMCFAD, LLC, DFW Charitable Foundation, CLO Holdco, LLC, and any other entity formed, restructured, or otherwise created in connection with or derived from the DAF Structure, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

6. The terms "New GP" or "CDH GP" refer to CDH GP, Ltd.

7. The term "CDMCFAD" or "DAF 2.0" refers to CDMCFAD, LLC.

8. The term "DFW Charitable Foundation" or "DFW Foundation" refers to DFW Charitable Foundation.

9. The term "CLO Holdco" refers to CLO Holdco, LLC.

**G. Charitable and Donor Entities**

1. The terms "The Dallas Foundation" or "Dallas Foundation" refer to The Dallas Foundation.

2. The term "Crown Global" refers to Crown Global Life Insurance, Ltd.

3. The terms "Empower" or "Empower Dallas" refer to Empower Dallas.

4. The term "Okada Foundation" refers to the Okada Foundation.

5. The term "Charitable Beneficiaries" or "Charities" refers collectively to The Dallas Foundation, Crown Global Life Insurance, Ltd., Empower Dallas, the Okada Foundation, and any other charitable organization or foundation that held beneficial ownership in the DAF Structure through participation shares or annuity policies.

6. The term "Highland Dallas Foundation" refers to Highland Dallas Foundation, Inc.

7. The term "Highland Santa Barbara Foundation" refers to Highland Santa Barbara Foundation, Inc.

8. The term "Highland Kansas City Foundation" refers to Highland Kansas City Foundation, Inc.

9. The term "Participation Shares" refers to the shares in Charitable DAF Holdco, Ltd. held by the Charitable Foundations through which the Foundations held beneficial ownership in the DAF Structure.

**H. Other Entities**

1. The term "Dugaboy" refers to The Dugaboy Investment Trust.

2. The term "Strand" or "Strand Advisors" refers to Strand Advisors, Inc.

3. The terms "Atlas Fund" or "Atlas IDF" refers to Atlas IDF, LP.

4. The terms "Skyview" or "Skyview Group" refers to The Skyview Group.

5. The term "Fortaris" or "Fortaris Capital Advisors" refers to Fortaris Capital Advisors.

6. The term "ValueScope" refers to ValueScope, LLC.

7. The term "Celia Holdco" refers to Celia Holdco LLC.

8. The terms "Creative Hearts" or "Creative Hearts TX" refer to Creative Hearts TX.

**I. Law Firms**

1. The term "Kelly Hart" refers to Kelly Hart & Hallman LLP, or any predecessor or successor firm or any associated attorney.

2. The term "Shields Law Group" refers to Shields Law Group, P.C., or any predecessor or successor firm or any associated attorney.

**J. Litigation, Settlement, and Bankruptcy Terms**

1. The term "Highland Bankruptcy" refers to the Chapter 11 bankruptcy case titled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj, pending in the United States Bankruptcy Court for the Northern District of Texas.

2. The term "Settlement Agreement" refers to each and every discussion or negotiation of settlement or iteration of the settlement agreement between the Highland Entities and the HMIT Entities, together with all exhibits, schedules, appendices, and ancillary documents, and including any preliminary drafts, associated documents, and communications related thereto.

3. The term "Settlement Agreement & General Release" or "9019 Settlement" refers to the Settlement Agreement & General Release dated May 19, 2025, by and among the Highland Entities and the HMIT Entities, as approved by the Court, together with all exhibits, schedules, appendices, and ancillary documents.

4. The term "9019 Motion" refers to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, filed on May 19, 2025 (Bankr. Dkt. 4217).

5. The term "Rule 9019 Settlement Order" refers to the Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, entered on June 30, 2025 (Bankr. Dkt. 4297).

6. The term "Kirschner Litigation" or "Kirschner Claims" or "Transferred Claims" refers to the 36-count adversary complaint filed by Marc A. Kirschner, as Litigation Trustee, styled Kirschner v. Dondero, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex. Oct. 15, 2021), together with any amended, supplemental, or related pleadings, and the claims asserted therein.

7. The term "Plan" refers to Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization (as Modified), confirmed on February 22, 2021.

8. The term "Confirmation Order" refers to the Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.

9. The term "Class 10" refers to the class of claims under the Plan designated as "Class 10 Claims" and consisting of the claim held by Hunter Mountain Investment Trust as a holder of pre-bankruptcy Class B and C limited partnership interests in Highland.

10. The term "Class 11" refers to the class of claims under the Plan designated as "Class 11 Claims" and consisting of the claim held by other equity holders holding pre-bankruptcy Class A limited partnership interests in Highland.

11. The term "Class 10 Interest" or "HMIT Class 10 Interest" refers to Hunter Mountain Investment Trust's allowed Class 10 claim in the amount of $336,940,230.58 as set forth in the Settlement Agreement and associated Order.

12. The term "Contingent Claimant Trust Interests" refers to the interests given to the former equity holders under the Plan in the Highland Claimant Trust, which were to vest only upon certification by the Claimant Trustee that all unsecured creditors had been paid in full with interest.

13. The term "Work Plan" refers to the plan or plans prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities.

14. The term "Withdrawal Stipulation" refers to the Stipulation Withdrawing Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd. to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith (Bankr. Dkt. 4291).

15. The term "Dugaboy Note" refers to the promissory note dated May 31, 2017, in the original amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

16. The term "Texas Business Court Proceeding" or "Business Court Proceeding" refers to Case No. 25-BC01B-0027 filed in the Texas Business Court, First Division on July 1, 2025, and captioned *The Highland Dallas Foundation, Inc. ,The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. vs. DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC,CDH GP, Ltd., and Mark Patrick.*

**K. Cayman Islands Proceedings**

1. The terms "Cayman Islands Proceeding(s)" or "Cayman Proceeding" refer collectively to all judicial proceedings in the Cayman Islands relating to Charitable DAF Holdco, Ltd. or any DAF Entity, including (a) the voluntary liquidation filed by Patrick on April 2, 2025; (b) the winding up petition filed by the charitable owners on April 23, 2025 (No. FSD 99 of 2025 (JAJ)); (c) the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators on July

15, 2025 (No. FSD 201 of 2025); and (d) all related proceedings, investigations, hearings, orders, and filings.

2. The term "Joint Official Liquidators" or "JOLs" refers to the court-appointed liquidators designated by the Cayman Islands court on or about May 6, 2025 to oversee the DAF's operations.

3. The term "Statement of Claim" refers to the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators in the Cayman Islands Proceeding on July 15, 2025.

4. The term "Chapter 15 Petition" refers to the petition filed by the Joint Official Liquidators in the United States Bankruptcy Court for the District of Delaware on July 21, 2025.

5. The term "Patrick-Cronin Proposal" refers to the proposal made by Mark Patrick to Kevin Cronin, a principal of Fortaris Capital Advisors, to make and split monthly payments to the DAF, as referenced in Paragraph 173 of the Third Affidavit of Mark Patrick.

**L. General Discovery Terms**

1. The term "Document" or "Documents" is used in its broadest possible sense and refers, without limitation, to anything upon which any expression, communication, or representation has been recorded by any means. The term includes, but is not limited to: correspondence, emails, text messages, instant messages, messages/posts on social media, handwritten notes, photographs, working papers, any drafts of documents (preliminary, intermediate, and/or final), memoranda, contracts/agreements, tapes, business records, financial records, charts, notes, records of any sort of meetings, reports of telephone or other oral conversations, calendars (whether hardcopy or electronic, including desk calendars, phone calendars, or other calendars using software or an application), appointment books, audio or video tape recordings, information on computer disc/card/drive, computer entries that can be retrieved electronically, databases, and all other writings and recordings of every kind that are in Your actual or constructive possession, custody,

or control. The term includes, but is not limited to, drafts and copies of any documents, whether identical to the original or different from the original because of notes, comments, highlighting, edits, any other alterations made on such copies, indications that said copies were sent to different individuals than were the originals, or any other reason.

2. The term "Communication" or "Communications" means any transmission of information in any context or situation by or between two or more Persons by any means or medium whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically, or digitally, or on tape, either orally or in writing, including, but not limited to, conversations, correspondence, emails, text messages, instant messages, social media communications, telexes, facsimile transmissions, telecopies, recordings in any medium of oral, written, or typed communication, telephone or message logs, notes or memoranda relating to written or oral communications, and any translation thereof.

3. The terms "Person" or "Entity" and their plural forms mean natural persons, proprietorships, partnerships, firms, trusts, estates, companies, corporations, public corporations, sole practitioners, municipal corporations, federal, state, and local governments, all departments and agencies thereof, any other governmental agencies, subdivisions, groups, associations, or organizations, or any other entity, whether foreign or domestic.

4. The term "thing" means any tangible item, including without limitation, models, prototypes, and samples of any device or apparatus or product.

5. The terms "concerning," "regarding," "referring to," "related to," or "relating to" shall be construed in the broadest possible sense, and shall mean without limitation and whether in whole or in part: referring to, constituting, bearing upon, commenting upon, reflecting, evidencing, pertaining to, describing, depicting, consisting of, containing, comprising, embodying, identifying,

stating, discussing, analyzing, studying, summarizing, dealing with, relating to, or having any logical or factual connection whatsoever with the subject addressed.

6. The terms "state" or "describe" mean to fully elucidate by reference to underlying facts rather than by reference to ultimate facts or conclusions of fact or law; where applicable, to particularize as to time, place, and manner; and to set forth all relevant facts necessary to complete the understanding of the act, process, event, or thing in question.

7. The term "Relevant Period" refers to the period beginning on the earlier of January 1, 2025, or such date as identified in Response to Request No. 1,[2] through the present.

8. The present tense includes the past and future tenses.

9. The singular includes the plural, and the plural includes the singular.

10. Words in the masculine, feminine, and neutral form shall include each of the other genders.

11. Whenever used herein, "and" may be understood to mean "or" and vice versa whenever such construction results in a broader request for information.

12. "All" means "any and all" and "any" means "any and all."

13. "Including" means "including but not limited to."

14. The term "identify" means and requires You to:

(a) With reference to an individual, state his or her full name and last known residential address, business address, telephone and/or facsimile number, the name and address of his or her employer, the individual's job title or job responsibilities, and his or her relationship to You;

[2] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

(b) With reference to a company or organization, state the entity's full legal name, business addresses, telephone number, and a person with whom You had direct contact within that entity;

(c) With reference to a document, describe the document, state the date when the document was created, name the creator of the document, and name each person to whom the document was sent;

(d) With reference to an oral communication, provide the date(s) of the communication, the names and addresses of all parties, when the communication occurred, the place(s) where the communication took place, the subject matter of the communication, and the general substance of the communication; and

(e) With reference to an occurrence or event, provide the date and location of the occurrence or event, the identity of each person involved in the occurrence or event, the subject matter discussed, and the identity of any document that records, refers to, or relates to such occurrence or event.

## DOCUMENT REQUESTS

**REQUEST NO. 1:** All Documents and Communications between or among Highland Capital Management, L.P. (or its representatives, including James P. Seery, Jr. or the Claimant Trustee) and any of the HMIT Entities concerning the 9019 Settlement, including but not limited to draft agreements, term sheets, and settlement proposals, and including Documents sufficient to show the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement.

**RESPONSE:**

**REQUEST NO. 2:** All Documents and Communications sufficient to show that the Settlement Agreement & General Release, by and among the Highland Entities and the HMIT Entities, was executed by persons with full power and authority to bind each HMIT Entity party thereto, including any board resolutions, corporate authorizations, consents, or approvals obtained prior to execution.

**RESPONSE:**

**REQUEST NO. 3**: All Documents relating to due diligence performed by Highland Capital Management, L.P. (or its representatives) concerning (a) the authority of Mark Patrick or any other person to bind the HMIT Entities to the 9019 Settlement; (b) the ownership structure of the HMIT Entities; or (c) any corporate restructuring of the HMIT Entities or the DAF Entities.

**RESPONSE:**

**REQUEST NO. 4**: All Documents and Communications exchanged between any Highland Party and any HMIT Entity prior to execution of the Settlement Agreement relating to or evidencing legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any changes thereto.

**RESPONSE:**

**REQUEST NO. 5:** All Documents and Communications exchanged between any Highland Party and any Rand Party prior to execution of the Settlement Agreement relating to or evidencing legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any changes thereto.

**RESPONSE:**

**REQUEST NO. 6:** All Documents and Communications exchanged between any Highland Party and any person or party prior to execution of the Settlement Agreement relating to or evidencing any change in legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any transaction related thereto.

**RESPONSE:**

**REQUEST NO. 7:** All Documents and Communications exchanged between any Highland Party and any person or party prior to execution of the Settlement Agreement relating to CLO Holdco, LLC, including, but not limited to, its formation, purpose, officers, members, managers, and participation or role in any transaction.

**RESPONSE:**

**REQUEST NO. 8:** All Documents and Communications relating to, referencing, or reflecting due diligence performed by any HMIT Entity prior to the execution of the Settlement Agreement and

General Release dated May 19, 2025, including any analysis of whether execution of the Settlement Agreement violated any other agreements, contracts, or fiduciary duties.

**RESPONSE:**

**REQUEST NO. 9:** All Documents evidencing any Communications between any HMIT Entity representative and any Highland Entity representative regarding the terms of the Settlement Agreement.

**RESPONSE:**

**REQUEST NO. 10:** All Documents constituting or relating to the Representations and Warranties in paragraph 13 of the Settlement Agreement & General Release, including any documents that support, substantiate, or were relied upon in making such representations.

**RESPONSE:**

**REQUEST NO. 11:** All Documents relating to the Claimant Trustee's evaluation of the 9019 Settlement, including any analyses of the settlement's fairness, the value of the claims being released, and any Communications with Patrick or the HMIT Entities regarding Settlement terms.

**RESPONSE:**

**REQUEST NO. 12:** All Documents and Communications relating to, referencing, or reflecting the consideration received by Hunter Mountain Investment Trust in exchange for entering into the Settlement Agreement & General Release dated May 19, 2025, including any valuations, appraisals, or analyses of the value received.

**RESPONSE:**

**REQUEST NO. 13:** All Documents and Communications relating to, referencing, or reflecting negotiations over the terms of the Settlement Agreement & General Release, including the cash payment to HMIT, the allowance of the HMIT Class 10 Interest, and the transfer of the Kirschner Claims.

**RESPONSE:**

**REQUEST NO. 14:** All Documents and Communications sufficient to show the reason or rationale for the HMIT Entities' agreement to transfer or relinquish litigation rights previously asserted against Highland Entities in exchange for the consideration set forth in the Settlement Agreement.

**RESPONSE:**

**REQUEST NO. 15:** All Documents relating to the transfer of the Kirschner Litigation claims to the HMIT Entities pursuant to the 9019 Settlement, including any Communications discussing the strategic purpose, value, or intended use of such claims.

**RESPONSE:**

**REQUEST NO. 16:** All Documents relating to any litigation commenced or actions taken by Patrick or any HMIT Entity using the Kirschner Litigation claims obtained through the 9019 Settlement, including the filing styled *Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver*, No. 25-BC01B-0027 (July 1, 2025).

**RESPONSE:**

**REQUEST NO. 17:** All Documents evidencing any Communications with Highland Capital Management, L.P., or any Highland Entity relating to, referencing, or reflecting any plan or strategy by Mark Patrick regarding a potential settlement of Hunter Mountain Investment Trust's claims.

**RESPONSE:**

**REQUEST NO. 18:** All Communications between You and Highland Capital Management, L.P., or any Highland Entity regarding the Settlement Agreement & General Release.

**RESPONSE:**

**REQUEST NO. 19:** All Communications between You and James P. Seery, Jr., in any capacity.

**RESPONSE:**

**REQUEST NO. 20:** All Communications between You and Marc S. Kirschner, in any capacity.

**RESPONSE:**

**REQUEST NO. 21:** All Documents and Communications reflecting any due diligence conducted by You or on Your behalf regarding the authority of Mark Patrick to enter into the Settlement Agreement on behalf of the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 22:** All Documents and Communications, including billing records, invoices, and engagement letters, between You and Kelly Hart & Hallman LLP (or any predecessor or successor

firm or any associated attorney) relating to work involving the Settlement Agreement, the 9019 Motion, or the HMIT Entities, the DAF Entities, or any restructuring of such entities.[3]

**RESPONSE:**

**REQUEST NO. 23:** All Documents and Communications, including billing records, invoices, and engagement letters, between You and Shields Law Group, P.C. (or any associated attorney) relating to work involving (a) the DAF Structure, Hunter Mountain Investment Trust, the formation or restructuring of any DAF Entity or HMIT Entity; (b) the separation of DAF assets from the charitable beneficiaries; or (c) the "Work Plan" for restructuring.[4]

**RESPONSE:**

**REQUEST NO. 24:** All Communications between You and any third party relating to the Settlement Agreement, the 9019 Motion, or the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 25:** All Documents relating to the current value of the Highland Claimant Trust, including any reports, analyses, or projections of Highland's remaining assets, estimated distributions to claimants, and any anticipated residual value available for Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 26:** All Documents relating to any payments made or to be made pursuant to the 9019 Settlement, including the $500,000 lump-sum payment, the $10 million initial distribution, and any subsequent distributions, including wire transfer records, bank statements, and any documents reflecting the disposition of such funds.

**RESPONSE:**

**REQUEST NO. 27:** All Documents reflecting Highland Capital Management, L.P.'s knowledge of (a) the restructuring of the DAF Entities; (b) the sale of Beacon Mountain to CLO Holdco, LLC; (c) any change in the beneficial ownership of Hunter Mountain; or (d) any investigation of Patrick by the Cayman Islands court, the Texas Attorney General, or any other governmental authority.

**RESPONSE:**

**REQUEST NO. 28:** All Communications between Highland Capital Management, L.P. and any of the following regarding the 9019 Settlement or any restructuring of the HMIT Entities or DAF

---

[3] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[4] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

Entities: The Dallas Foundation, Crown Global Life Insurance, Ltd., the Texas Attorney General, or any Cayman Islands governmental or judicial authority.

**RESPONSE:**

**REQUEST NO. 29:** All Documents relating to the Stipulation Withdrawing Objection of The Dallas Foundation and Crown Global, including all Communications between Highland and The Dallas Foundation regarding the terms thereof.

**RESPONSE:**

**REQUEST NO. 30:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Highland Capital Management, L.P. estate.

**RESPONSE:**

**REQUEST NO. 31:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Class 10 and Class 11 claims in the Highland Bankruptcy.

**RESPONSE:**

**REQUEST NO. 32:** All Documents and Communications related to or evidencing the knowledge of any Highland Party about DFW Charitable Foundation, including, but not limited to, the identity of the officers, directors, agents, or other persons with authority over DFW Charitable Foundation, the economic beneficiaries of DFW Charitable Foundation, and any payments made by DFW Charitable Foundation or any of its subsidiaries to Patrick.

**RESPONSE:**

**REQUEST NO. 33:** All Documents and Communications sufficient to show when Hunter Mountain Investment Trust or any HMIT Party first received any indication, analysis, projection, or belief that the Class 10 or Class 11 claims would have net value available for distribution, including the timing of such indication, the basis therefor, and any valuations, projections, or analyses supporting such indication

**RESPONSE:**

**REQUEST NO. 34:** All Documents and Communications sufficient to show the original purpose and stated objectives of the 2015 sale of Highland Capital Management, L.P. equity holders' equity stake to Hunter Mountain Investment Trust, including any term sheets, memoranda, presentations, tax advice, or planning documents.

**RESPONSE:**

**REQUEST NO. 35:** All Documents and Communications regarding the reasons behind the equity ownership allocation reflected in Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization, including the allocation of (i) 99.5% to Hunter Mountain Investment Trust; (ii)

0.1866% to The Dugaboy Investment Trust; (iii) 0.0627% to Mark Okada and associated family trusts; and (iv) 0.25% to Strand Advisors, Inc.

**RESPONSE:**

**REQUEST NO. 36:** All Documents and Communications relating to, referencing, or reflecting any tax benefit, tax efficiency, or charitable purpose associated with the restructuring of Highland Capital Management, L.P. ownership in 2015.

**RESPONSE:**

**REQUEST NO. 37:** All Documents and Communications sufficient to show the conversion of the charitable trust originally formed in 2006 into a donor-advised fund investment vehicle for long-term charitable endeavors in or around October 2011, including any organizational documents, trust amendments, partnership agreements, or memoranda.[5]

**RESPONSE:**

**REQUEST NO. 38:** All Documents and Communications relating to, referencing, or reflecting the original structure and purpose of the donor-advised fund created in October 2011, including any tax opinions, IRS determination letters, or legal memoranda.[6]

**RESPONSE:**

**REQUEST NO. 39:** All Documents and Communications relating to, referencing, or reflecting the valuation of Highland Capital Management, L.P., or its assets.

**RESPONSE:**

**REQUEST NO. 40:** All Documents and Communications relating to, referencing, or reflecting Highland Capital Management, L.P.'s financial condition, including any monthly operating reports or quarterly operating reports.

**RESPONSE:**

**REQUEST NO. 41:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for any bankruptcy professional, creditor, or equity holder.[7]

---

[5] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[6] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[7] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**RESPONSE:**

**REQUEST NO. 42:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[8]

**RESPONSE:**

**REQUEST NO. 43:** All Documents and Communications relating to any valuation of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[9]

**RESPONSE:**

**REQUEST NO. 44:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 45:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 46:** All Communications between You and Charitable DAF Fund, LP reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 47:** All Communications between You and Charitable DAF Fund, LP regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

---

[8] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[9] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**RESPONSE:**

**REQUEST NO. 48:** All Communications between You and Hunter Mountain Investment Trust reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 49:** All Communications between You and Hunter Mountain Investment Trust regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 50:** All Documents and Communications relating to, referencing, or reflecting efforts by any HMIT Entity to obtain updated financial reporting from Highland Capital Management, L.P., or its bankruptcy professionals during the bankruptcy proceedings.

**RESPONSE:**

**REQUEST NO. 51**: All organizational charts reflecting the corporate structure of (a) the DAF Entities; (b) the HMIT Entities; and (c) any entities through which Patrick directly or indirectly held an interest in Hunter Mountain, for any time during the Relevant Period.

**RESPONSE:**

**REQUEST NO. 52**: All audit reports, financial statements, and quarterly or annual reports for Rand PE Fund I, LP from January 1, 2023 to the present, including the 2024 audit issued on or about June 26, 2025.

**RESPONSE:**

**REQUEST NO. 53:** All Documents, correspondence, engagement letters, contracts, or agreements between You and ValueScope, LLC (or any other valuation firm) relating to the valuation of any interest, holding in, or security issued by any of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate.

**RESPONSE:**

**REQUEST NO. 54:** All draft and final valuation reports, memoranda, models, or analyses prepared by ValueScope, LLC relating to Beacon Hunter, LLC; Hunter Mountain Investment

Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to the valuation of the Participation Shares; and any Communications challenging or questioning the valuation methodology or conclusions.

**RESPONSE:**

**REQUEST NO. 55:** All Documents relating to the methodology used in any valuation of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to instructions received regarding methodology, communications discussing the change from net asset value methodology to discounted cash flow methodology, supporting calculations, assumptions, and comparable transactions or valuations.

**RESPONSE:**

Dated: March 23, 2026

*<u>/s/ Geoffrey S. Harper</u>*

**Geoffrey S. Harper**
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

**John Michael Gaddis**
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

I certify that on March 23, 2026, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

***Via Electronic Mail:***

Jeffrey N. Pomerantz (jpoerantz@pszjlaw.com)
John A. Morris (jmorris@pszjlaw.com)
Gregory V. Demo (gdemo@pszjlaw.com)
Hayley R. Winograd (hwinograd@pszjlaw.com)
**Pachulski Stang Ziehl & Jones LLP**
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067

Melissa S. Hayward (mhayward@haywardfirm.com)
Zachary Z. Annable (zannable@haywardfirm.com)
**Hayward PLLC**
10501 N. Central Expressway, Suite 106
Dallas, TX 75231

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

**EXHIBIT 2**

RECEIVED
MAR 25 2026
BY: 9:45 AM

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S NOTICE OF SUBPOENA TO VALUESCOPE, LLC**

PLEASE TAKE NOTICE that, under Federal Rule of Bankruptcy Procedure 9016, which incorporates Federal Rule of Civil Procedure 45, The Dugaboy Investment Trust ("Dugaboy"), by and through its counsel, requests documents from non-party ValueScope, LLC ("ValueScope") under the attached Subpoena. The materials requested in Exhibit A are to be produced under the enclosed document subpoena by 5:00 p.m. local time on April 24, 2026 at King & Spalding, LLP, 500 W 2nd Street, Suite 1800, Austin, TX 78701.

If ValueScope has retained counsel to assist with responding to this Subpoena, please notify us immediately and provide counsel's name, firm, address, telephone number, and email address so that we may direct correspondence accordingly.

DELIVERED:
ON: 3 / 25 / 2026
BY: VS PSC# 12617

Dated: March 25, 2026

*/s/ Geoffrey S. Harper*

**Geoffrey S. Harper**
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

**John Michael Gaddis**
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

I certify that on March 25, 2026, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Northern District of Texas

| | | |
|---|---|---|
| In re: Highland Capital Management, L.P. (Debtor)<br>*Plaintiff*<br>v.<br><br>*Defendant* | ) | Civil Action No. 19-bk-34054 (SGJ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: ValueScope, LLC, by and through its Registered Agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th St., Suite 620, Austin, TX 78701-3218

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A - The Dugaboy Investment Trust's First Set of Requests for Production of Documents to ValueScope, LLC

| Place: King & Spalding LLP, 500 W. 2nd Street, Suite 1800, Austin, TX 78701 | Date and Time: 04/24/2026 5:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 03/25/2026

*CLERK OF COURT*

_________________________ OR Geoffrey S. Harper

*Signature of Clerk or Deputy Clerk* — *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* The Dugaboy Investment Trust, who issues or requests this subpoena, are:

Geoffrey S. Harper, King & Spalding LLP, 2601 Olive St., Ste 2300, Dallas, TX 75201, 214-763-6894, gharper@kslaw.com

**Notice to the person who issues or requests this subpoena**

A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 19-bk-34054 (SGJ)

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________

on *(date)* ____________ .

☐ I served the subpoena by delivering a copy to the named person as follows: ______________

______________________________________________________________

______________________________ on *(date)* ____________ ; or

☐ I returned the subpoena unexecuted because: ______________________

______________________________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ____________ .

My fees are $ ____________ for travel and $ ____________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S FIRST SET**
**OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO VALUESCOPE LLC**

**To:** ValueScope, LLC, by and through its Registered Agent, Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218

Interested Party The Dugaboy Investment Trust ("Dugaboy") serves this First Set of Requests for Production of Documents to ValueScope, LLC ("ValueScope"), pursuant to Rule 34 of the Federal Rules of Civil Procedure, which is incorporated into bankruptcy proceedings by Federal Rules of Bankruptcy Procedure 7034 and 9014(c)(1). ValueScope must respond to these Requests for Production within thirty (30) days of service. We ask that You produce documents at the offices of King & Spalding, 2601 Olive Street, Suite 2300, Dallas, TX 75201, or by electronic production in a mutually agreed format.

**INSTRUCTIONS**

1. In responding to these Requests, You must furnish all information that is available to You, that is within Your possession, custody, or control, or that is subject to Your reasonable inquiry, including information in the possession of Your attorneys, accountants, advisors, representatives, agents, or other persons directly or indirectly employed by, or connected with, You or Your

attorneys, and anyone else otherwise subject to Your control. All Documents that respond, in whole or in part, to any portion of the Requests below shall be produced in their entirety, including all attachments and enclosures.

2. The relevant time period for documents responsive to these Requests, unless otherwise specified in an individual Request, is the period beginning on the earlier of October 1, 2024, or such date as identified in response to Request No. 1,[1] through the present.

3. To the extent that the below Requests include requests for paper records, such paper records shall be scanned or otherwise converted into electronic form from paper documents in the following format:

(a) All documents shall be scanned to single page Group 4, TIFF format, at least 300 dpi and 8½ x 11 inch page size, except for documents requiring higher resolution or different page size.

(b) In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). The Parties will make their best efforts to have their vendors unitize documents correctly and will commit to address situations where there are improperly unitized documents. For documents found in folders or other containers with labels, tabs, or other identifying information, such labels and tabs shall be scanned where practicable. Pages with Post-it notes shall be scanned both with and without the Post-it, with the image of the page with the Post-it preceding the image of the page without the Post-it.

[1] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

(c) Productions of the images shall be made using an image load file (.OPT or .LFP) and a delimited database/metadata load file (.DAT). Each image file should have a unique file name which shall be the Bates number of the page.

(d) The following objective coding fields should be provided, if applicable:

(1) beginning Bates number;

(2) ending Bates number;

(3) beginning attachment Bates number;

(4) ending attachment Bates number;

(5) page count; and

(6) source location/custodian.

(e) Document level OCR should be provided as a separate text file. The file name of each text file should correspond to the file name of the first image file of the document with which it is associated. The text files will not contain the redacted portions of the documents. OCR software should be set to the highest quality setting during processing. For documents in foreign languages, the OCR shall be performed using an OCR tool and settings suitable for the particular byte or multi-byte languages.

4. To the extent that the below Requests include requests for electronically stored information ("ESI"), all ESI shall be produced in TIFF format according to the following specifications:

(a) All TIFF formatted documents will be single page, Group 4 TIFF at 300 x 300 dpi resolution and 8½ x 11 inch page size, except for documents requiring different resolution or page size.

(b) An image load file, in standard Opticon format, showing the Bates number of each page and the appropriate unitization of the documents, will accompany all document images.

(c) Each imaged version of an electronic document will be created directly from the original electronic document.

(d) TIFFs shall be produced as black and white, single-page TIFF images in accordance with the technical specifications set out above. Word documents that have tracked changes or comments shall be produced in color. In addition, upon written request that identifies a reasonable number of individual documents at issue by Bates number, a party shall produce color images for those documents. Documents produced in color shall be produced as single page, 300 DPI, color JPG images with the quality setting of 75% or higher.

(e) All TIFF files are to be provided with an accompanying searchable text (.TXT) file extracted from the native, electronic file (not generated as an OCR file from the TIFF image(s)), and such text files shall contain the full text extraction. To the extent reasonably feasible, extracted text shall provide all comments, tracked changes, speaker's notes, and text from hidden worksheets, slides, columns, and rows. In the case of files with redacted text, OCR'ed text of the redacted documents may be provided in lieu of extracted text. OCR software should be set to the highest quality setting during processing.

5. To the extent reasonably feasible, all Documents produced shall be produced with metadata and attachments intact. The term "metadata" means all information describing the history, tracking, or management of an electronic document including, but not limited to, the date(s) the document was created, modified, accessed, or distributed; the author(s) and all recipient(s) of the

document; the file's name; the file's location (e.g., directory structure or pathname); the file format or file type; and the file size. For comparison purposes and to ensure authenticity, where documents are produced in native format, such documents shall also be produced in the ESI format described in Instruction No. 3, unless otherwise agreed by the parties.

6. Should You object to any Request, You must specifically and in detail state the grounds and reasons for the objection, and state in detail the part of the language of the Request to which You object, and state which part of the Request, if any, You are answering.

7. Under the Crime-Fraud Exception and Subject-Matter Waiver, items which would typically be privileged are not privileged in this matter. The Fifth Circuit recognizes the Crime-Fraud Exception to privilege, under which attorney-client communications and/or work product materials are not privileged if "the client consults an attorney for advice that will assist the client in carrying out a contemplated illegal or fraudulent scheme." *Lewis v. Crochet*, 105 F.4th 272, 282 (5th Cir. 2024) (quoting *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1242 (5th Cir. 1982)). The exception applies where (1) a crime or fraud was impending or continuing at the time of the communication, and (2) the communications or work product at issue were in furtherance of that criminal or fraudulent activity. *See In re E.E.O.C.*, 207 F. App'x 426, 434 (5th Cir. 2006). Dugaboy reasonably believes, and has evidence to support, that certain communications and work product it seeks were intended to further continuing or future criminal or fraudulent activity and are therefore not privileged.

Likewise, Subject-Matter Waiver under Federal Rule of Evidence 502(a) provides that disclosure of certain information in a federal proceeding waives privilege for related information when (1) the waiver was intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) the disclosed and undisclosed

communications and work product "ought in fairness to be considered together." Fed. R. Evid. 502(a); *see also Crider Inc. v. Silgan Containers LLC*, 2023 WL 479094, at *22 (N.D. Tex. Jan. 13, 2023). Any communications or work product that would otherwise be privileged, but concern the same subject matter intentionally disclosed by Mark Patrick in his affidavits or testimony in this Proceeding or Related Proceedings fall under this exception, and privilege has been waived.

Accordingly, under these exceptions and waivers, You must produce documents that would typically be privileged as they relate to (1) any fraudulent activity that counsel was involved in or knew of, or (2) any privileged conversation or information that has already been disclosed elsewhere in this litigation.

If You still contend that any Documents sought by the Requests are privileged or otherwise protected from discovery, You must nevertheless identify for each Document withheld:

(a) the legal basis for withholding the Document;

(b) the person asserting any claim of privilege and/or protection;

(c) a description and identification of the requested Document sufficient to frame an appropriate demand for the Document and a motion to compel disclosure thereof, setting forth at least the following:

(i) the author and/or signatory of the Document withheld;

(ii) the date of the Document withheld;

(iii) all addressees and/or recipients of the Document withheld; and

(iv) the subject matter and circumstances under which the Document withheld was created in sufficient detail to ascertain applicability of such privilege or other legal basis.

8. Notwithstanding a claim that a portion of a Document is privileged or otherwise protected from disclosure, any such Document must be produced with the portion claimed to be protected excised.

9. If You contend that any Request is ambiguous or unclear, contact undersigned counsel as soon as possible so that the Request can be clarified to avoid unnecessary delays in discovery.

10. These Requests are continuing in nature. Any Documents located, created, or obtained subsequent to the Documents provided in response to these Requests and that should have been produced had they been known shall be promptly supplied by supplemental responses whenever You find, locate, or acquire such Documents. You are required to supplement and correct Your answers and responses on a timely basis.

## DEFINITIONS

As used herein, the terms listed below shall be defined as follows. Insofar as a term is not explicitly defined, the meaning to be used is the commonly accepted definition of the term. Notwithstanding any definition set forth below, each word, term, or phrase used in these Requests is intended to have the broadest meaning permitted under applicable rules. The following terms are to be given their ascribed definitions:

### A. Proceedings

1. The term "this Proceeding" or "this Litigation" or "Main Case" refers to the main bankruptcy proceeding *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

2. The term "Related Proceedings" includes all other legal proceedings or actions involving or related to Highland, HMIT, and persons, parties, or entities involved with or affected by the Settlement, specifically including but not limited to the Cayman Islands Proceedings, the Chapter

15 proceeding in the United States Bankruptcy Court for the District of Delaware, and the Texas Business Court proceeding, as well as any bankruptcy adversary proceedings before the United States Bankruptcy Court for the Northern District of Texas that are separate from the Main Case.

**B. Parties and Individuals**

1. The term "You" or "Your" refers to ValueScope, LLC, as well as its agents, attorneys, accountants, advisors, representatives, or any other individual(s) or entity(ies) acting or authorized to act on behalf of it, and any related companies, divisions, or subsidiaries, past or present, including, without limitation, the directors, officers, employees, agents, or attorneys thereof, as well as any predecessors-in-interest or successors-in-interest.

2. The term "Patrick" refers to Mark Eric Patrick.

3. The term "Dondero" refers to James Dondero.

4. The term "Okada" refers to Mark Okada.

5. The term "Seery" or "Claimant Trustee" refers to James P. Seery, Jr.

6. The term "Kirschner" or "Litigation Trustee" refers to Marc S. Kirschner.

7. The term "Murphy" refers to Paul Murphy.

8. The term "Scott" refers to Grant Scott.

9. The term "Cronin" refers to Kevin Cronin.

10. The term "Honis" refers to John Honis.

11. The term "Raver" refers to Shawn Raver.

**C. Highland Entities and Related Trusts**

12. The term "Highland" or "Highland Capital Management" refers to Highland Capital Management, L.P., a Dallas-based, Delaware-domiciled investment advisor, and the Debtor in the

matter *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

13. The term "Highland Entities" or "Highland Entity" refers collectively to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

14. The term "Highland Claimant Trust" refers to the entity created under the Plan to hold, monetize, and distribute the assets of Highland's estate.

15. The term "Highland Litigation Sub-Trust" or "Litigation Sub-Trust" refers to the trust created under the Plan for the purpose of pursuing litigation claims on behalf of the Highland estate.

16. The term "Highland Indemnity Trust" or "Indemnity Trust" refers to the trust created under the Plan to hold assets for the purpose of indemnification obligations arising out of the Highland estate.

17. The term "Highland Party" or "Highland Parties" refers to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, the Highland Indemnity Trust, and each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, and subsidiaries, and any persons or entities acting or authorized to act on their behalf.

**D. HMIT Entities and Related Parties**

1. The term "HMIT Entities" refers collectively to Hunter Mountain Investment Trust and Beacon Mountain, LLC, together with each of their respective officers, directors, managers,

general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "HMIT Parties" refers broadly to the HMIT Entities, Mark Patrick, and any related decision maker with respect to the HMIT Entities, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

3. The term "Hunter Mountain" or "HMIT" refers to Hunter Mountain Investment Trust.

4. The term "Beacon Mountain" refers to Beacon Mountain, LLC.

5. The term "Beacon Hunter" refers to Beacon Hunter, LLC.

**E. Rand Entities**

1. The term "Rand Parties" or "Rand Entities" refers collectively to Rand PE Fund I, LP, Rand Advisors, LLC, and Rand PE Fund Management, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "Rand Fund" or "Rand PE Fund" refers to Rand PE Fund I, LP.

3. The term "Rand Advisors" refers to Rand Advisors, LLC, an SEC-registered investment advisor that served as the investment adviser to Rand PE Fund I, LP.

4. The term "Rand PE Fund Management" refers to Rand PE Fund Management, LLC.

**F. DAF Entities and Related Structures**

1. The term "DAF" or "Charitable DAF Holdco" refers to Charitable DAF Holdco, Ltd.

2. The term "DAF Fund" or "Charitable DAF Fund" refers to Charitable DAF Fund, LP.

3. The term "DAF GP" or "Charitable DAF GP" refers to Charitable DAF GP, LLC.

4. The term "DAF Structure" refers to the overall donor-advised fund investment vehicle and its constituent entities, including Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, and any entity holding ownership or management interests therein or formed in connection therewith, including any entities created as part of the restructuring of the DAF.

5. The term "DAF Entities" refers collectively to Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, CDH GP, Ltd., CDMCFAD, LLC, DFW Charitable Foundation, CLO Holdco, LLC, and any other entity formed, restructured, or otherwise created in connection with or derived from the DAF Structure, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

6. The terms "New GP" or "CDH GP" refer to CDH GP, Ltd.

7. The term "CDMCFAD" or "DAF 2.0" refers to CDMCFAD, LLC.

8. The term "DFW Charitable Foundation" or "DFW Foundation" refers to DFW Charitable Foundation.

9. The term "CLO Holdco" refers to CLO Holdco, LLC.

**G. Charitable and Donor Entities**

1. The terms "The Dallas Foundation" or "Dallas Foundation" refer to The Dallas Foundation.

2. The term "Crown Global" refers to Crown Global Life Insurance, Ltd.

3. The terms "Empower" or "Empower Dallas" refer to Empower Dallas.

4. The term "Okada Foundation" refers to the Okada Foundation.

5. The term "Charitable Beneficiaries" or "Charities" refers collectively to The Dallas Foundation, Crown Global Life Insurance, Ltd., Empower Dallas, the Okada Foundation, and any

other charitable organization or foundation that held beneficial ownership in the DAF Structure through participation shares or annuity policies.

6. The term "Highland Dallas Foundation" refers to Highland Dallas Foundation, Inc.

7. The term "Highland Santa Barbara Foundation" refers to Highland Santa Barbara Foundation, Inc.

8. The term "Highland Kansas City Foundation" refers to Highland Kansas City Foundation, Inc.

9. The term "Participation Shares" refers to the shares in Charitable DAF Holdco, Ltd. held by the Charitable Foundations through which the Foundations held beneficial ownership in the DAF Structure.

**H. Other Entities**

1. The term "Dugaboy" refers to The Dugaboy Investment Trust.
2. The term "Strand" or "Strand Advisors" refers to Strand Advisors, Inc.
3. The terms "Atlas Fund" or "Atlas IDF" refers to Atlas IDF, LP.
4. The terms "Skyview" or "Skyview Group" refers to The Skyview Group.
5. The term "Fortaris" or "Fortaris Capital Advisors" refers to Fortaris Capital Advisors.
6. The term "ValueScope" refers to ValueScope, LLC.
7. The term "Celia Holdco" refers to Celia Holdco LLC.
8. The terms "Creative Hearts" or "Creative Hearts TX" refer to Creative Hearts TX.

**I. Law Firms**

1. The term "Kelly Hart" refers to Kelly Hart & Hallman LLP, or any predecessor or successor firm or any associated attorney.

2. The term "Shields Law Group" refers to Shields Law Group, P.C., or any predecessor or successor firm or any associated attorney.

**J. Litigation, Settlement, and Bankruptcy Terms**

1. The term "Highland Bankruptcy" refers to the Chapter 11 bankruptcy case titled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj, pending in the United States Bankruptcy Court for the Northern District of Texas.

2. The term "Settlement Agreement" refers to each and every discussion or negotiation of settlement or iteration of the settlement agreement between the Highland Entities and the HMIT Entities, together with all exhibits, schedules, appendices, and ancillary documents, and including any preliminary drafts, associated documents, and communications related thereto.

3. The term "Settlement Agreement & General Release" or "9019 Settlement" refers to the Settlement Agreement & General Release dated May 19, 2025, by and among the Highland Entities and the HMIT Entities, as approved by the Court, together with all exhibits, schedules, appendices, and ancillary documents.

4. The term "9019 Motion" refers to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, filed on May 19, 2025 (Bankr. Dkt. 4217).

5. The term "Rule 9019 Settlement Order" refers to the Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, entered on June 30, 2025 (Bankr. Dkt. 4297).

6. The term "Kirschner Litigation" or "Kirschner Claims" or "Transferred Claims" refers to the 36-count adversary complaint filed by Marc A. Kirschner, as Litigation Trustee, styled

Kirschner v. Dondero, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex. Oct. 15, 2021), together with any amended, supplemental, or related pleadings, and the claims asserted therein.

7. The term "Plan" refers to Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization (as Modified), confirmed on February 22, 2021.

8. The term "Confirmation Order" refers to the Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.

9. The term "Class 10" refers to the class of claims under the Plan designated as "Class 10 Claims" and consisting of the claim held by Hunter Mountain Investment Trust as a holder of pre-bankruptcy Class B and C limited partnership interests in Highland.

10. The term "Class 11" refers to the class of claims under the Plan designated as "Class 11 Claims" and consisting of the claim held by other equity holders holding pre-bankruptcy Class A limited partnership interests in Highland.

11. The term "Class 10 Interest" or "HMIT Class 10 Interest" refers to Hunter Mountain Investment Trust's allowed Class 10 claim in the amount of $336,940,230.58 as set forth in the Settlement Agreement and associated Order.

12. The term "Contingent Claimant Trust Interests" refers to the interests given to the former equity holders under the Plan in the Highland Claimant Trust, which were to vest only upon certification by the Claimant Trustee that all unsecured creditors had been paid in full with interest.

13. The term "Work Plan" refers to the plan or plans prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities.

14. The term "Withdrawal Stipulation" refers to the Stipulation Withdrawing Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd. to the Motion for Entry of an Order

Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith (Bankr. Dkt. 4291).

15. The term "Dugaboy Note" refers to the promissory note dated May 31, 2017, in the original amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

16. The term "Texas Business Court Proceeding" or "Business Court Proceeding" refers to Case No. 25-BC01B-0027 filed in the Texas Business Court, First Division on July 1, 2025, and captioned *The Highland Dallas Foundation, Inc. ,The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. vs. DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC,CDH GP, Ltd., and Mark Patrick.*

**K. Cayman Islands Proceedings**

1. The terms "Cayman Islands Proceeding(s)" or "Cayman Proceeding" refer collectively to all judicial proceedings in the Cayman Islands relating to Charitable DAF Holdco, Ltd. or any DAF Entity, including (a) the voluntary liquidation filed by Patrick on April 2, 2025; (b) the winding up petition filed by the charitable owners on April 23, 2025 (No. FSD 99 of 2025 (JAJ)); (c) the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators on July 15, 2025 (No. FSD 201 of 2025); and (d) all related proceedings, investigations, hearings, orders, and filings.

2. The term "Joint Official Liquidators" or "JOLs" refers to the court-appointed liquidators designated by the Cayman Islands court on or about May 6, 2025 to oversee the DAF's operations.

3. The term "Statement of Claim" refers to the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators in the Cayman Islands Proceeding on July 15, 2025.

4. The term "Chapter 15 Petition" refers to the petition filed by the Joint Official Liquidators in the United States Bankruptcy Court for the District of Delaware on July 21, 2025.

5. The term "Patrick-Cronin Proposal" refers to the proposal made by Mark Patrick to Kevin Cronin, a principal of Fortaris Capital Advisors, to make and split monthly payments to the DAF, as referenced in Paragraph 173 of the Third Affidavit of Mark Patrick.

**L. General Discovery Terms**

1. The term "Document" or "Documents" is used in its broadest possible sense and refers, without limitation, to anything upon which any expression, communication, or representation has been recorded by any means. The term includes, but is not limited to: correspondence, emails, text messages, instant messages, messages/posts on social media, handwritten notes, photographs, working papers, any drafts of documents (preliminary, intermediate, and/or final), memoranda, contracts/agreements, tapes, business records, financial records, charts, notes, records of any sort of meetings, reports of telephone or other oral conversations, calendars (whether hardcopy or electronic, including desk calendars, phone calendars, or other calendars using software or an application), appointment books, audio or video tape recordings, information on computer disc/card/drive, computer entries that can be retrieved electronically, databases, and all other writings and recordings of every kind that are in Your actual or constructive possession, custody, or control. The term includes, but is not limited to, drafts and copies of any documents, whether identical to the original or different from the original because of notes, comments, highlighting, edits, any other alterations made on such copies, indications that said copies were sent to different individuals than were the originals, or any other reason.

2. The term "Communication" or "Communications" means any transmission of information in any context or situation by or between two or more Persons by any means or medium

whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically, or digitally, or on tape, either orally or in writing, including, but not limited to, conversations, correspondence, emails, text messages, instant messages, social media communications, telexes, facsimile transmissions, telecopies, recordings in any medium of oral, written, or typed communication, telephone or message logs, notes or memoranda relating to written or oral communications, and any translation thereof.

3. The terms "Person" or "Entity" and their plural forms mean natural persons, proprietorships, partnerships, firms, trusts, estates, companies, corporations, public corporations, sole practitioners, municipal corporations, federal, state, and local governments, all departments and agencies thereof, any other governmental agencies, subdivisions, groups, associations, or organizations, or any other entity, whether foreign or domestic.

4. The term "thing" means any tangible item, including without limitation, models, prototypes, and samples of any device or apparatus or product.

5. The terms "concerning," "regarding," "referring to," "related to," or "relating to" shall be construed in the broadest possible sense, and shall mean without limitation and whether in whole or in part: referring to, constituting, bearing upon, commenting upon, reflecting, evidencing, pertaining to, describing, depicting, consisting of, containing, comprising, embodying, identifying, stating, discussing, analyzing, studying, summarizing, dealing with, relating to, or having any logical or factual connection whatsoever with the subject addressed.

6. The terms "state" or "describe" mean to fully elucidate by reference to underlying facts rather than by reference to ultimate facts or conclusions of fact or law; where applicable, to particularize as to time, place, and manner; and to set forth all relevant facts necessary to complete the understanding of the act, process, event, or thing in question.

7. The term "Relevant Period" refers to the period beginning on the earlier of January 1, 2025, or such date as identified in Response to Request No. 1,[2] through the present.

8. The present tense includes the past and future tenses.

9. The singular includes the plural, and the plural includes the singular.

10. Words in the masculine, feminine, and neutral form shall include each of the other genders.

11. Whenever used herein, "and" may be understood to mean "or" and vice versa whenever such construction results in a broader request for information.

12. "All" means "any and all" and "any" means "any and all."

13. "Including" means "including but not limited to."

14. The term "identify" means and requires You to:

(a) With reference to an individual, state his or her full name and last known residential address, business address, telephone and/or facsimile number, the name and address of his or her employer, the individual's job title or job responsibilities, and his or her relationship to You;

(b) With reference to a company or organization, state the entity's full legal name, business addresses, telephone number, and a person with whom You had direct contact within that entity;

(c) With reference to a document, describe the document, state the date when the document was created, name the creator of the document, and name each person to whom the document was sent;

(d) With reference to an oral communication, provide the date(s) of the communication, the names and addresses of all parties, when the communication occurred, the place(s)

[2] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

where the communication took place, the subject matter of the communication, and the general substance of the communication; and

(e) With reference to an occurrence or event, provide the date and location of the occurrence or event, the identity of each person involved in the occurrence or event, the subject matter discussed, and the identity of any document that records, refers to, or relates to such occurrence or event.

## DOCUMENT REQUESTS

**REQUEST NO. 1:** All Documents and Communications relating to, referencing, or reflecting the consideration received by Hunter Mountain Investment Trust in exchange for entering into the Settlement Agreement & General Release dated May 19, 2025, including any valuations, appraisals, or analyses of the value received.

**RESPONSE:**

**REQUEST NO. 2:** All Documents relating to the current value of the Highland Claimant Trust, including any reports, analyses, or projections of Highland's remaining assets, estimated distributions to claimants, and any anticipated residual value available for Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 3:** All Documents relating to any payments made or to be made pursuant to the 9019 Settlement, including the $500,000 lump-sum payment, the $10 million initial distribution, and any subsequent distributions, including wire transfer records, bank statements, and any documents reflecting the disposition of such funds.

**RESPONSE:**

**REQUEST NO. 4:** All Communications between Patrick and any financial advisor regarding the valuation of the charitable owners' membership interests or any DAF Entity assets.

**RESPONSE:**

**REQUEST NO. 5:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Highland Capital Management, L.P. estate.

**RESPONSE:**

**REQUEST NO. 6:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Class 10 and Class 11 claims in the Highland Bankruptcy.

**RESPONSE:**

**REQUEST NO. 7:** All Documents and Communications sufficient to show the fair market value of Charitable DAF Fund, LP or its assets as of March 2025.

**RESPONSE:**

**REQUEST NO. 8:** All Documents and Communications referencing, relating to, or reflecting the valuation that resulted in the charitable owners receiving approximately $1.6 million for their direct or indirect interests in CDMCFAD and/or Charitable DAF Fund, LP in or around March 2025, including the redemption agreement and any valuation supporting such redemption.

**RESPONSE:**

**REQUEST NO. 9:** All Documents and Communications sufficient to show the original purpose and stated objectives of the 2015 sale of Highland Capital Management, L.P. equity holders' equity stake to Hunter Mountain Investment Trust, including any term sheets, memoranda, presentations, tax advice, or planning documents.

**RESPONSE:**

**REQUEST NO. 10:** All Documents and Communications regarding the reasons behind the equity ownership allocation reflected in Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization, including the allocation of (i) 99.5% to Hunter Mountain Investment Trust; (ii) 0.1866% to The Dugaboy Investment Trust; (iii) 0.0627% to Mark Okada and associated family trusts; and (iv) 0.25% to Strand Advisors, Inc.

**RESPONSE:**

**REQUEST NO. 11:** All Documents relating to any Communications between Patrick and the charitable beneficiaries (The Dallas Foundation, Crown Global, Empower Dallas, or the Okada Foundation) from November 2024 through April 2025, including the "no confidence" letter sent by the charities in November 2024.

**RESPONSE:**

**REQUEST NO. 12:** All Documents and Communications reflecting, referencing, or relating to any inquiries, questions, or requests for information from Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., Highland Kansas City Foundation, Inc., or The Dallas Foundation regarding (a) the DAF Structure, (b) DAF assets, (c) distributions to charitable beneficiaries, (d) Mark Patrick's compensation, or (e) corporate restructuring.

**RESPONSE:**

**REQUEST NO. 13:** All Documents reflecting the "Work Plan" prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities, including any instructions to create entities that were "hard to find or track."[3]

**RESPONSE:**

**REQUEST NO. 14:** All Documents and Communications sufficient to show the basis for the $1 million valuation of Beacon Mountain, LLC's interest in Hunter Mountain Investment Trust in or around February 2025, including any valuation reports, appraisals, financial analyses, or Communications with ValueScope, LLC or any other valuation firm concerning such valuation.

**RESPONSE:**

**REQUEST NO. 15:** All Documents, correspondence, engagement letters, contracts, or agreements between You and ValueScope, LLC (or any other valuation firm) relating to the valuation of any interest, holding in, or security issued by any of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate.

**RESPONSE:**

**REQUEST NO. 16:** All draft and final valuation reports, memoranda, models, or analyses prepared by ValueScope, LLC relating to Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to the valuation of the Participation Shares; and any Communications challenging or questioning the valuation methodology or conclusions.

**RESPONSE:**

**REQUEST NO. 17:** All Documents relating to the methodology used in any valuation of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to instructions received regarding methodology, communications discussing the change from net asset value methodology to discounted cash flow methodology, supporting calculations, assumptions, and comparable transactions or valuations.

**RESPONSE:**

[3] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 18:** All Documents and Communications related to the identity, ownership structure, principals, managers, or beneficial owners of Celia Holdco LLC.

**RESPONSE:**

Dated: March 25, 2026

*/s/ Geoffrey S. Harper*
**Geoffrey S. Harper**
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

**John Michael Gaddis**
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

I certify that on March 25, 2026, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

***Via Process Server:***

ValueScope, LLC
Registered Agent
Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company
211 E. 7th Street, Suite 620
Austin, Texas 78701-3218

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO KELLY HART & HALLMAN LLP**

**To:** Kelly Hart & Hallman LLP, by and through their counsel of record, Louis M. Phillips, louis.phillips@kellyhart.com, **Kelly Hart Pitre**, One American Place, 301 Main Street, Suite 1600, Baton Rouge, LA 70801-1916; Amelia L. Hurt, amelia.hurt@kellyhart.com, **Kelly Hart Pitre**, 400 Poydras Street, Suite 1812, New Orleans, LA 70130; Hugh G. Connor II, hugh.connor@kellyhart.com, Michael D. Anderson, michael.anderson@kellyhart.com, Katherine T. Hopkins, katherine.hopkins@kellyhart.com, **Kelly Hart & Hallman LLP**, 201 Main Street, Suite 2500, Fort Worth, TX 76102

Interested Party The Dugaboy Investment Trust ("Dugaboy") serves this First Set of Requests for Production of Documents to Kelly Hart & Hallman LLP ("Kelly Hart"), pursuant to Rule 34 of the Federal Rules of Civil Procedure, which is incorporated into bankruptcy proceedings by Federal Rules of Bankruptcy Procedure 7034 and 9014(c)(1). Kelly Hart must respond to these Requests for Production within thirty (30) days of service. We ask that You produce documents at the offices of King & Spalding, 2601 Olive Street, Suite 2300, Dallas, TX 75201, or by electronic production in a mutually agreed format.

**INSTRUCTIONS**

1. In responding to these Requests, You must furnish all information that is available to You, that is within Your possession, custody, or control, or that is subject to Your reasonable inquiry,

including information in the possession of Your attorneys, accountants, advisors, representatives, agents, or other persons directly or indirectly employed by, or connected with, You or Your attorneys, and anyone else otherwise subject to Your control. All Documents that respond, in whole or in part, to any portion of the Requests below shall be produced in their entirety, including all attachments and enclosures.

2. The relevant time period for documents responsive to these Requests, unless otherwise specified in an individual Request, is the period beginning on the earlier of October 1, 2024, or such date as identified in response to Request No. 1,[1] through the present.

3. To the extent that the below Requests include requests for paper records, such paper records shall be scanned or otherwise converted into electronic form from paper documents in the following format:

(a) All documents shall be scanned to single page Group 4, TIFF format, at least 300 dpi and 8½ x 11 inch page size, except for documents requiring higher resolution or different page size.

(b) In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). The Parties will make their best efforts to have their vendors unitize documents correctly and will commit to address situations where there are improperly unitized documents. For documents found in folders or other containers with labels, tabs, or other identifying information, such labels and tabs shall be scanned where practicable. Pages with Post-it notes shall be scanned both with and

[1] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

without the Post-it, with the image of the page with the Post-it preceding the image of the page without the Post-it.

(c) Productions of the images shall be made using an image load file (.OPT or .LFP) and a delimited database/metadata load file (.DAT). Each image file should have a unique file name which shall be the Bates number of the page.

(d) The following objective coding fields should be provided, if applicable:

(1) beginning Bates number;

(2) ending Bates number;

(3) beginning attachment Bates number;

(4) ending attachment Bates number;

(5) page count; and

(6) source location/custodian.

(e) Document level OCR should be provided as a separate text file. The file name of each text file should correspond to the file name of the first image file of the document with which it is associated. The text files will not contain the redacted portions of the documents. OCR software should be set to the highest quality setting during processing. For documents in foreign languages, the OCR shall be performed using an OCR tool and settings suitable for the particular byte or multi-byte languages.

4. To the extent that the below Requests include requests for electronically stored information ("ESI"), all ESI shall be produced in TIFF format according to the following specifications:

(a) All TIFF formatted documents will be single page, Group 4 TIFF at 300 x 300 dpi resolution and 8½ x 11 inch page size, except for documents requiring different resolution or page size.

(b) An image load file, in standard Opticon format, showing the Bates number of each page and the appropriate unitization of the documents, will accompany all document images.

(c) Each imaged version of an electronic document will be created directly from the original electronic document.

(d) TIFFs shall be produced as black and white, single-page TIFF images in accordance with the technical specifications set out above. Word documents that have tracked changes or comments shall be produced in color. In addition, upon written request that identifies a reasonable number of individual documents at issue by Bates number, a party shall produce color images for those documents. Documents produced in color shall be produced as single page, 300 DPI, color JPG images with the quality setting of 75% or higher.

(e) All TIFF files are to be provided with an accompanying searchable text (.TXT) file extracted from the native, electronic file (not generated as an OCR file from the TIFF image(s)), and such text files shall contain the full text extraction. To the extent reasonably feasible, extracted text shall provide all comments, tracked changes, speaker's notes, and text from hidden worksheets, slides, columns, and rows. In the case of files with redacted text, OCR'ed text of the redacted documents may be provided in lieu of extracted text. OCR software should be set to the highest quality setting during processing.

5. To the extent reasonably feasible, all Documents produced shall be produced with metadata and attachments intact. The term "metadata" means all information describing the history, tracking, or management of an electronic document including, but not limited to, the date(s) the document was created, modified, accessed, or distributed; the author(s) and all recipient(s) of the document; the file's name; the file's location (e.g., directory structure or pathname); the file format or file type; and the file size. For comparison purposes and to ensure authenticity, where documents are produced in native format, such documents shall also be produced in the ESI format described in Instruction No. 3, unless otherwise agreed by the parties.

6. Should You object to any Request, You must specifically and in detail state the grounds and reasons for the objection, and state in detail the part of the language of the Request to which You object, and state which part of the Request, if any, You are answering.

7. Under the Crime-Fraud Exception and Subject-Matter Waiver, items which would typically be privileged are not privileged in this matter. The Fifth Circuit recognizes the Crime-Fraud Exception to privilege, under which attorney-client communications and/or work product materials are not privileged if "the client consults an attorney for advice that will assist the client in carrying out a contemplated illegal or fraudulent scheme." *Lewis v. Crochet*, 105 F.4th 272, 282 (5th Cir. 2024) (quoting *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1242 (5th Cir. 1982)). The exception applies where (1) a crime or fraud was impending or continuing at the time of the communication, and (2) the communications or work product at issue were in furtherance of that criminal or fraudulent activity. *See In re E.E.O.C.*, 207 F. App'x 426, 434 (5th Cir. 2006). Dugaboy reasonably believes, and has evidence to support, that certain communications and work product it seeks were intended to further continuing or future criminal or fraudulent activity and are therefore not privileged.

Likewise, Subject-Matter Waiver under Federal Rule of Evidence 502(a) provides that disclosure of certain information in a federal proceeding waives privilege for related information when (1) the waiver was intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) the disclosed and undisclosed communications and work product "ought in fairness to be considered together." Fed. R. Evid. 502(a); *see also Crider Inc. v. Silgan Containers LLC*, 2023 WL 479094, at *22 (N.D. Tex. Jan. 13, 2023). Any communications or work product that would otherwise be privileged, but concern the same subject matter intentionally disclosed by Mark Patrick in his affidavits or testimony in this Proceeding or Related Proceedings fall under this exception, and privilege has been waived.

Accordingly, under these exceptions and waivers, You must produce documents that would typically be privileged as they relate to (1) any fraudulent activity that counsel was involved in or knew of, or (2) any privileged conversation or information that has already been disclosed elsewhere in this litigation.

If You still contend that any Documents sought by the Requests are privileged or otherwise protected from discovery, You must nevertheless identify for each Document withheld:

(a) the legal basis for withholding the Document;

(b) the person asserting any claim of privilege and/or protection;

(c) a description and identification of the requested Document sufficient to frame an appropriate demand for the Document and a motion to compel disclosure thereof, setting forth at least the following:

(i) the author and/or signatory of the Document withheld;

(ii) the date of the Document withheld;

(iii) all addressees and/or recipients of the Document withheld; and

(iv) the subject matter and circumstances under which the Document withheld was created in sufficient detail to ascertain applicability of such privilege or other legal basis.

8. Notwithstanding a claim that a portion of a Document is privileged or otherwise protected from disclosure, any such Document must be produced with the portion claimed to be protected excised.

9. If You contend that any Request is ambiguous or unclear, contact undersigned counsel as soon as possible so that the Request can be clarified to avoid unnecessary delays in discovery.

10. These Requests are continuing in nature. Any Documents located, created, or obtained subsequent to the Documents provided in response to these Requests and that should have been produced had they been known shall be promptly supplied by supplemental responses whenever You find, locate, or acquire such Documents. You are required to supplement and correct Your answers and responses on a timely basis.

## DEFINITIONS

As used herein, the terms listed below shall be defined as follows. Insofar as a term is not explicitly defined, the meaning to be used is the commonly accepted definition of the term. Notwithstanding any definition set forth below, each word, term, or phrase used in these Requests is intended to have the broadest meaning permitted under applicable rules. The following terms are to be given their ascribed definitions:

### A. Proceedings

1. The term "this Proceeding" or "this Litigation" or "Main Case" refers to the main bankruptcy proceeding *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

2. The term "Related Proceedings" includes all other legal proceedings or actions involving or related to Highland, HMIT, and persons, parties, or entities involved with or affected by the Settlement, specifically including but not limited to the Cayman Islands Proceedings, the Chapter 15 proceeding in the United States Bankruptcy Court for the District of Delaware, and the Texas Business Court proceeding, as well as any bankruptcy adversary proceedings before the United States Bankruptcy Court for the Northern District of Texas that are separate from the Main Case.

**B. Parties and Individuals**

1. The term "You" or "Your" refers to Kelly Hart & Hallman LLP collectively or individually, as well as its agents, attorneys, accountants, advisors, representatives, or any other individual(s) or entity(ies) acting or authorized to act on behalf of them, and any related companies, divisions, or subsidiaries, past or present, including, without limitation, the directors, officers, employees, agents, or attorneys thereof, as well as any predecessors-in-interest or successors-in-interest.

2. The term "Patrick" refers to Mark Eric Patrick.

3. The term "Dondero" refers to James Dondero.

4. The term "Okada" refers to Mark Okada.

5. The term "Seery" or "Claimant Trustee" refers to James P. Seery, Jr.

6. The term "Kirschner" or "Litigation Trustee" refers to Marc S. Kirschner.

7. The term "Murphy" refers to Paul Murphy.

8. The term "Scott" refers to Grant Scott.

9. The term "Cronin" refers to Kevin Cronin.

10. The term "Honis" refers to John Honis.

11. The term "Raver" refers to Shawn Raver.

**C. Highland Entities and Related Trusts**

12. The term "Highland" or "Highland Capital Management" refers to Highland Capital Management, L.P., a Dallas-based, Delaware-domiciled investment advisor, and the Debtor in the matter *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

13. The term "Highland Entities" or "Highland Entity" refers collectively to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

14. The term "Highland Claimant Trust" refers to the entity created under the Plan to hold, monetize, and distribute the assets of Highland's estate.

15. The term "Highland Litigation Sub-Trust" or "Litigation Sub-Trust" refers to the trust created under the Plan for the purpose of pursuing litigation claims on behalf of the Highland estate.

16. The term "Highland Indemnity Trust" or "Indemnity Trust" refers to the trust created under the Plan to hold assets for the purpose of indemnification obligations arising out of the Highland estate.

17. The term "Highland Party" or "Highland Parties" refers to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, the Highland Indemnity Trust, and each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, and subsidiaries, and any persons or entities acting or authorized to act on their behalf.

**D. HMIT Entities and Related Parties**

1. The term "HMIT Entities" refers collectively to Hunter Mountain Investment Trust and Beacon Mountain, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "HMIT Parties" refers broadly to the HMIT Entities, Mark Patrick, and any related decision maker with respect to the HMIT Entities, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

3. The term "Hunter Mountain" or "HMIT" refers to Hunter Mountain Investment Trust.

4. The term "Beacon Mountain" refers to Beacon Mountain, LLC.

5. The term "Beacon Hunter" refers to Beacon Hunter, LLC.

**E. Rand Entities**

1. The term "Rand Parties" or "Rand Entities" refers collectively to Rand PE Fund I, LP, Rand Advisors, LLC, and Rand PE Fund Management, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "Rand Fund" or "Rand PE Fund" refers to Rand PE Fund I, LP.

3. The term "Rand Advisors" refers to Rand Advisors, LLC, an SEC-registered investment advisor that served as the investment adviser to Rand PE Fund I, LP.

4. The term "Rand PE Fund Management" refers to Rand PE Fund Management, LLC.

**F. DAF Entities and Related Structures**

1. The term "DAF" or "Charitable DAF Holdco" refers to Charitable DAF Holdco, Ltd.

2. The term "DAF Fund" or "Charitable DAF Fund" refers to Charitable DAF Fund, LP.

3. The term "DAF GP" or "Charitable DAF GP" refers to Charitable DAF GP, LLC.

4. The term "DAF Structure" refers to the overall donor-advised fund investment vehicle and its constituent entities, including Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, and any entity holding ownership or management interests therein or formed in connection therewith, including any entities created as part of the restructuring of the DAF.

5. The term "DAF Entities" refers collectively to Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, CDH GP, Ltd., CDMCFAD, LLC, DFW Charitable Foundation, CLO Holdco, LLC, and any other entity formed, restructured, or otherwise created in connection with or derived from the DAF Structure, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

6. The terms "New GP" or "CDH GP" refer to CDH GP, Ltd.

7. The term "CDMCFAD" or "DAF 2.0" refers to CDMCFAD, LLC.

8. The term "DFW Charitable Foundation" or "DFW Foundation" refers to DFW Charitable Foundation.

9. The term "CLO Holdco" refers to CLO Holdco, LLC.

**G. Charitable and Donor Entities**

1. The terms "The Dallas Foundation" or "Dallas Foundation" refer to The Dallas Foundation.

2. The term "Crown Global" refers to Crown Global Life Insurance, Ltd.

3. The terms "Empower" or "Empower Dallas" refer to Empower Dallas.

4. The term "Okada Foundation" refers to the Okada Foundation.

5. The term "Charitable Beneficiaries" or "Charities" refers collectively to The Dallas Foundation, Crown Global Life Insurance, Ltd., Empower Dallas, the Okada Foundation, and any other charitable organization or foundation that held beneficial ownership in the DAF Structure through participation shares or annuity policies.

6. The term "Highland Dallas Foundation" refers to Highland Dallas Foundation, Inc.

7. The term "Highland Santa Barbara Foundation" refers to Highland Santa Barbara Foundation, Inc.

8. The term "Highland Kansas City Foundation" refers to Highland Kansas City Foundation, Inc.

9. The term "Participation Shares" refers to the shares in Charitable DAF Holdco, Ltd. held by the Charitable Foundations through which the Foundations held beneficial ownership in the DAF Structure.

**H. Other Entities**

1. The term "Dugaboy" refers to The Dugaboy Investment Trust.

2. The term "Strand" or "Strand Advisors" refers to Strand Advisors, Inc.

3. The terms "Atlas Fund" or "Atlas IDF" refers to Atlas IDF, LP.

4. The terms "Skyview" or "Skyview Group" refers to The Skyview Group.

5. The term "Fortaris" or "Fortaris Capital Advisors" refers to Fortaris Capital Advisors.

6. The term "ValueScope" refers to ValueScope, LLC.

7. The term "Celia Holdco" refers to Celia Holdco LLC.

8. The terms "Creative Hearts" or "Creative Hearts TX" refer to Creative Hearts TX.

**I. Law Firms**

1. The term "Kelly Hart" refers to Kelly Hart & Hallman LLP, or any predecessor or successor firm or any associated attorney.

2. The term "Shields Law Group" refers to Shields Law Group, P.C., or any predecessor or successor firm or any associated attorney.

**J. Litigation, Settlement, and Bankruptcy Terms**

1. The term "Highland Bankruptcy" refers to the Chapter 11 bankruptcy case titled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj, pending in the United States Bankruptcy Court for the Northern District of Texas.

2. The term "Settlement Agreement" refers to each and every discussion or negotiation of settlement or iteration of the settlement agreement between the Highland Entities and the HMIT Entities, together with all exhibits, schedules, appendices, and ancillary documents, and including any preliminary drafts, associated documents, and communications related thereto.

3. The term "Settlement Agreement & General Release" or "9019 Settlement" refers to the Settlement Agreement & General Release dated May 19, 2025, by and among the Highland Entities and the HMIT Entities, as approved by the Court, together with all exhibits, schedules, appendices, and ancillary documents.

4. The term "9019 Motion" refers to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, filed on May 19, 2025 (Bankr. Dkt. 4217).

5. The term "Rule 9019 Settlement Order" refers to the Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, entered on June 30, 2025 (Bankr. Dkt. 4297).

6. The term "Kirschner Litigation" or "Kirschner Claims" or "Transferred Claims" refers to the 36-count adversary complaint filed by Marc A. Kirschner, as Litigation Trustee, styled Kirschner v. Dondero, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex. Oct. 15, 2021), together with any amended, supplemental, or related pleadings, and the claims asserted therein.

7. The term "Plan" refers to Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization (as Modified), confirmed on February 22, 2021.

8. The term "Confirmation Order" refers to the Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.

9. The term "Class 10" refers to the class of claims under the Plan designated as "Class 10 Claims" and consisting of the claim held by Hunter Mountain Investment Trust as a holder of pre-bankruptcy Class B and C limited partnership interests in Highland.

10. The term "Class 11" refers to the class of claims under the Plan designated as "Class 11 Claims" and consisting of the claim held by other equity holders holding pre-bankruptcy Class A limited partnership interests in Highland.

11. The term "Class 10 Interest" or "HMIT Class 10 Interest" refers to Hunter Mountain Investment Trust's allowed Class 10 claim in the amount of $336,940,230.58 as set forth in the Settlement Agreement and associated Order.

12. The term "Contingent Claimant Trust Interests" refers to the interests given to the former equity holders under the Plan in the Highland Claimant Trust, which were to vest only upon certification by the Claimant Trustee that all unsecured creditors had been paid in full with interest.

13. The term "Work Plan" refers to the plan or plans prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities.

14. The term "Withdrawal Stipulation" refers to the Stipulation Withdrawing Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd. to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith (Bankr. Dkt. 4291).

15. The term "Dugaboy Note" refers to the promissory note dated May 31, 2017, in the original amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

16. The term "Texas Business Court Proceeding" or "Business Court Proceeding" refers to Case No. 25-BC01B-0027 filed in the Texas Business Court, First Division on July 1, 2025, and captioned *The Highland Dallas Foundation, Inc. ,The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. vs. DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC,CDH GP, Ltd., and Mark Patrick.*

**K. Cayman Islands Proceedings**

1. The terms "Cayman Islands Proceeding(s)" or "Cayman Proceeding" refer collectively to all judicial proceedings in the Cayman Islands relating to Charitable DAF Holdco, Ltd. or any DAF Entity, including (a) the voluntary liquidation filed by Patrick on April 2, 2025; (b) the winding up petition filed by the charitable owners on April 23, 2025 (No. FSD 99 of 2025 (JAJ)); (c) the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators on July

15, 2025 (No. FSD 201 of 2025); and (d) all related proceedings, investigations, hearings, orders, and filings.

2. The term "Joint Official Liquidators" or "JOLs" refers to the court-appointed liquidators designated by the Cayman Islands court on or about May 6, 2025 to oversee the DAF's operations.

3. The term "Statement of Claim" refers to the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators in the Cayman Islands Proceeding on July 15, 2025.

4. The term "Chapter 15 Petition" refers to the petition filed by the Joint Official Liquidators in the United States Bankruptcy Court for the District of Delaware on July 21, 2025.

5. The term "Patrick-Cronin Proposal" refers to the proposal made by Mark Patrick to Kevin Cronin, a principal of Fortaris Capital Advisors, to make and split monthly payments to the DAF, as referenced in Paragraph 173 of the Third Affidavit of Mark Patrick.

**L. General Discovery Terms**

1. The term "Document" or "Documents" is used in its broadest possible sense and refers, without limitation, to anything upon which any expression, communication, or representation has been recorded by any means. The term includes, but is not limited to: correspondence, emails, text messages, instant messages, messages/posts on social media, handwritten notes, photographs, working papers, any drafts of documents (preliminary, intermediate, and/or final), memoranda, contracts/agreements, tapes, business records, financial records, charts, notes, records of any sort of meetings, reports of telephone or other oral conversations, calendars (whether hardcopy or electronic, including desk calendars, phone calendars, or other calendars using software or an application), appointment books, audio or video tape recordings, information on computer disc/card/drive, computer entries that can be retrieved electronically, databases, and all other writings and recordings of every kind that are in Your actual or constructive possession, custody,

or control. The term includes, but is not limited to, drafts and copies of any documents, whether identical to the original or different from the original because of notes, comments, highlighting, edits, any other alterations made on such copies, indications that said copies were sent to different individuals than were the originals, or any other reason.

2. The term “Communication” or “Communications” means any transmission of information in any context or situation by or between two or more Persons by any means or medium whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically, or digitally, or on tape, either orally or in writing, including, but not limited to, conversations, correspondence, emails, text messages, instant messages, social media communications, telexes, facsimile transmissions, telecopies, recordings in any medium of oral, written, or typed communication, telephone or message logs, notes or memoranda relating to written or oral communications, and any translation thereof.

3. The terms “Person” or “Entity” and their plural forms mean natural persons, proprietorships, partnerships, firms, trusts, estates, companies, corporations, public corporations, sole practitioners, municipal corporations, federal, state, and local governments, all departments and agencies thereof, any other governmental agencies, subdivisions, groups, associations, or organizations, or any other entity, whether foreign or domestic.

4. The term “thing” means any tangible item, including without limitation, models, prototypes, and samples of any device or apparatus or product.

5. The terms “concerning,” “regarding,” “referring to,” “related to,” or “relating to” shall be construed in the broadest possible sense, and shall mean without limitation and whether in whole or in part: referring to, constituting, bearing upon, commenting upon, reflecting, evidencing, pertaining to, describing, depicting, consisting of, containing, comprising, embodying, identifying,

stating, discussing, analyzing, studying, summarizing, dealing with, relating to, or having any logical or factual connection whatsoever with the subject addressed.

6. The terms "state" or "describe" mean to fully elucidate by reference to underlying facts rather than by reference to ultimate facts or conclusions of fact or law; where applicable, to particularize as to time, place, and manner; and to set forth all relevant facts necessary to complete the understanding of the act, process, event, or thing in question.

7. The term "Relevant Period" refers to the period beginning on the earlier of January 1, 2025, or such date as identified in Response to Request No. 1,[2] through the present.

8. The present tense includes the past and future tenses.

9. The singular includes the plural, and the plural includes the singular.

10. Words in the masculine, feminine, and neutral form shall include each of the other genders.

11. Whenever used herein, "and" may be understood to mean "or" and vice versa whenever such construction results in a broader request for information.

12. "All" means "any and all" and "any" means "any and all."

13. "Including" means "including but not limited to."

14. The term "identify" means and requires You to:

(a) With reference to an individual, state his or her full name and last known residential address, business address, telephone and/or facsimile number, the name and address of his or her employer, the individual's job title or job responsibilities, and his or her relationship to You;

[2] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

(b) With reference to a company or organization, state the entity's full legal name, business addresses, telephone number, and a person with whom You had direct contact within that entity;

(c) With reference to a document, describe the document, state the date when the document was created, name the creator of the document, and name each person to whom the document was sent;

(d) With reference to an oral communication, provide the date(s) of the communication, the names and addresses of all parties, when the communication occurred, the place(s) where the communication took place, the subject matter of the communication, and the general substance of the communication; and

(e) With reference to an occurrence or event, provide the date and location of the occurrence or event, the identity of each person involved in the occurrence or event, the subject matter discussed, and the identity of any document that records, refers to, or relates to such occurrence or event.

## DOCUMENT REQUESTS

**REQUEST NO. 1:** All Documents and Communications between or among Highland Capital Management, L.P. (or its representatives, including James P. Seery, Jr. or the Claimant Trustee) and any of the HMIT Entities concerning the 9019 Settlement, including but not limited to draft agreements, term sheets, and settlement proposals, and including Documents sufficient to show the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement.

**RESPONSE:**

**REQUEST NO. 2:** All Documents and Communications relating to, referencing, or reflecting due diligence performed by any HMIT Entity prior to the execution of the Settlement Agreement and General Release dated May 19, 2025, including any analysis of whether execution of the Settlement Agreement violated any other agreements, contracts, or fiduciary duties.

**RESPONSE:**

**REQUEST NO. 3:** All Documents evidencing any Communications between any HMIT Entity representative and any Highland Entity representative regarding the terms of the Settlement Agreement.

**RESPONSE:**

**REQUEST NO. 4:** All Documents constituting or relating to the Representations and Warranties in paragraph 13 of the Settlement Agreement & General Release, including any documents that support, substantiate, or were relied upon in making such representations.

**RESPONSE:**

**REQUEST NO. 5:** All Documents relating to the Claimant Trustee's evaluation of the 9019 Settlement, including any analyses of the settlement's fairness, the value of the claims being released, and any Communications with Patrick or the HMIT Entities regarding Settlement terms.

**RESPONSE:**

**REQUEST NO. 6:** All Documents and Communications relating to, referencing, or reflecting the consideration received by Hunter Mountain Investment Trust in exchange for entering into the Settlement Agreement & General Release dated May 19, 2025, including any valuations, appraisals, or analyses of the value received.

**RESPONSE:**

**REQUEST NO. 7:** All Documents and Communications relating to, referencing, or reflecting negotiations over the terms of the Settlement Agreement & General Release, including the cash payment to HMIT, the allowance of the HMIT Class 10 Interest, and the transfer of the Kirschner Claims.

**RESPONSE:**

**REQUEST NO. 8:** All Documents evidencing any Communications with Highland Capital Management, L.P., or any Highland Entity relating to, referencing, or reflecting any plan or strategy by Mark Patrick regarding a potential settlement of Hunter Mountain Investment Trust's claims.

**RESPONSE:**

**REQUEST NO. 9:** All Documents and Communications reflecting any due diligence conducted by You or on Your behalf regarding the authority of Mark Patrick to enter into the Settlement Agreement on behalf of the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 10:** All Documents and Communications, including billing records, invoices, and engagement letters, between You and Kelly Hart & Hallman LLP (or any predecessor or successor firm or any associated attorney) relating to work involving the Settlement Agreement, the 9019 Motion, or the HMIT Entities, the DAF Entities, or any restructuring of such entities.[3]

**RESPONSE:**

**REQUEST NO. 11:** All Documents and Communications, including billing records, invoices, and engagement letters, between You and Shields Law Group, P.C. (or any associated attorney) relating to work involving (a) the DAF Structure, Hunter Mountain Investment Trust, the formation or restructuring of any DAF Entity or HMIT Entity; (b) the separation of DAF assets from the charitable beneficiaries; or (c) the "Work Plan" for restructuring.[4]

**RESPONSE:**

**REQUEST NO. 12:** All Communications between You and any third party relating to the Settlement Agreement, the 9019 Motion, or the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 13:** All Documents reflecting Highland Capital Management, L.P.'s knowledge of (a) the restructuring of the DAF Entities; (b) the sale of Beacon Mountain to CLO Holdco, LLC; (c) any change in the beneficial ownership of Hunter Mountain; or (d) any investigation of Patrick by the Cayman Islands court, the Texas Attorney General, or any other governmental authority.

**RESPONSE:**

**REQUEST NO. 14:** All Communications between Highland Capital Management, L.P. and any of the following regarding the 9019 Settlement or any restructuring of the HMIT Entities or DAF Entities: The Dallas Foundation, Crown Global Life Insurance, Ltd., the Texas Attorney General, or any Cayman Islands governmental or judicial authority.

**RESPONSE:**

**REQUEST NO. 15:** All bank statements, brokerage statements, investment account statements, balance sheets, financial statements, and accounting records for the following: Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco, LLC; CDMCFAD, LLC; Charitable DAF Holdco, Ltd.; Charitable DAF Fund, LP; DFW Charitable Foundation; and any other DAF entity, including consolidated and entity-level statements.

---

[3] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[4] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**RESPONSE:**

**REQUEST NO. 16:** All Documents and Communications relating to any transfer of any interests in Hunter Mountain Investment Trust, Beacon Mountain, LLC, CLO Holdco, LLC, CDMCFAD, LLC, and DFW Charitable Foundation, including but not limited to assignment agreements, contribution agreements, and corporate resolutions approving transfers.

**RESPONSE:**

**REQUEST NO. 17:** All Communications between Patrick and any financial advisor regarding the valuation of the charitable owners' membership interests or any DAF Entity assets.

**RESPONSE:**

**REQUEST NO. 18:** All Communications between You and Charitable DAF Fund, LP regarding the estimated or actual value of the Highland Capital Management, L.P. estate.

**RESPONSE:**

**REQUEST NO. 19:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Highland Capital Management, L.P. estate.

**RESPONSE:**

**REQUEST NO. 20:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Class 10 and Class 11 claims in the Highland Bankruptcy.

**RESPONSE:**

**REQUEST NO. 21:** All Documents and Communications sufficient to show the fair market value of Charitable DAF Fund, LP or its assets as of March 2025.

**RESPONSE:**

**REQUEST NO. 22:** All Documents and Communications referencing, relating to, or reflecting the valuation that resulted in the charitable owners receiving approximately $1.6 million for their direct or indirect interests in CDMCFAD and/or Charitable DAF Fund, LP in or around March 2025, including the redemption agreement and any valuation supporting such redemption.

**RESPONSE:**

**REQUEST NO. 23:** All Documents and Communications, including communications with counsel,[5] relating to the formation, incorporation, organization, or structuring of CDMCFAD, LLC (also known as "DAF 2.0"), including but not limited to articles of organization, operating agreements, corporate resolutions, board minutes, and all amendments thereto.

**RESPONSE:**

**REQUEST NO. 24:** All Documents relating to the limited liability company agreement for CDMCFAD, LLC, including provisions relating to (a) fiduciary duties; (b) Patrick's powers and discretion; and (c) the valuation and redemption of member interests.

**RESPONSE:**

**REQUEST NO. 25:** All Documents relating to the formation, organization, or structuring of DFW Charitable Foundation, including articles of incorporation, bylaws, board minutes, member lists, and any charitable activities undertaken by said entity.

**RESPONSE:**

**REQUEST NO. 26:** All Documents and Communications related to or evidencing the knowledge of any Highland Party about DFW Charitable Foundation, including, but not limited to, the identity of the officers, directors, agents, or other persons with authority over DFW Charitable Foundation, the economic beneficiaries of DFW Charitable Foundation, and any payments made by DFW Charitable Foundation or any of its subsidiaries to Patrick.

**RESPONSE:**

**REQUEST NO. 27:** All Documents relating to the formation of CDH GP, Ltd., including any documents reflecting (a) Patrick's role or authority in the entity; (b) the replacement of Charitable DAF GP, LLC as the general partner of Charitable DAF Fund, LP; and (c) any Communications discussing the purpose of such replacement.

**RESPONSE:**

**REQUEST NO. 28:** All Documents relating to any transfer of assets from Charitable DAF Holdco, Ltd. or Charitable DAF Fund, LP to CDMCFAD, LLC or any entity controlled by Patrick, including the assignment of limited partnership interests referenced in the Statement of Claim filed in the Cayman Islands.

**RESPONSE:**

**REQUEST NO. 29:** All Documents and Communications sufficient to show when Hunter Mountain Investment Trust or any HMIT Party first received any indication, analysis, projection, or belief that the Class 10 or Class 11 claims would have net value available for distribution,

---

[5] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

including the timing of such indication, the basis therefor, and any valuations, projections, or analyses supporting such indication

**RESPONSE:**

**REQUEST NO. 30:** All Documents and Communications sufficient to show the original purpose and stated objectives of the 2015 sale of Highland Capital Management, L.P. equity holders' equity stake to Hunter Mountain Investment Trust, including any term sheets, memoranda, presentations, tax advice, or planning documents.

**RESPONSE:**

**REQUEST NO. 31:** All Documents and Communications regarding the reasons behind the equity ownership allocation reflected in Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization, including the allocation of (i) 99.5% to Hunter Mountain Investment Trust; (ii) 0.1866% to The Dugaboy Investment Trust; (iii) 0.0627% to Mark Okada and associated family trusts; and (iv) 0.25% to Strand Advisors, Inc.

**RESPONSE:**

**REQUEST NO. 32:** All Documents and Communications relating to, referencing, or reflecting any tax benefit, tax efficiency, or charitable purpose associated with the restructuring of Highland Capital Management, L.P. ownership in 2015.

**RESPONSE:**

**REQUEST NO. 33:** All Documents and Communications sufficient to show the circumstances surrounding Mark Patrick becoming the administrator of Hunter Mountain Investment Trust in 2022, including any appointment documents, resolutions, consents, correspondence, or agreements.

**RESPONSE:**

**REQUEST NO. 34:** All Documents and Communications sufficient to show the basis for, approval of, and payment of any bonuses to Mark Patrick in September 2024 and October 2024, including any written agreements, board resolutions, or documentation of performance metrics.

**RESPONSE:**

**REQUEST NO. 35:** All Documents relating to Paul Murphy’s role, authority, and compensation in connection with any DAF Entity, including (a) any agreement or arrangement governing Murphy’s compensation; (b) any revision or amendment to Murphy’s compensation plan, including any revision backdating payments to the beginning of 2025 that provided for $500,000 in fees triggered when injunctions are sought against the DAF; and (c) any Communications between Patrick and Murphy regarding the DAF restructuring, the 9019 Settlement, or the transfer of DAF assets.

**RESPONSE:**

**REQUEST NO. 36:** All Documents relating to any Communications between Patrick and the charitable beneficiaries (The Dallas Foundation, Crown Global, Empower Dallas, or the Okada Foundation) from November 2024 through April 2025, including the “no confidence” letter sent by the charities in November 2024.

**RESPONSE:**

**REQUEST NO. 37:** All Communications between You and Highland Dallas Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

**REQUEST NO. 38:** All Communications between You and Highland Santa Barbara Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

**REQUEST NO. 39:** All Communications between You and Highland Kansas City Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

**REQUEST NO. 40:** All Communications between You and The Dallas Foundation from January 1, 2021, to the present regarding the DAF Structure, Hunter Mountain Investment Trust, or the Settlement Agreement and General Release.

**RESPONSE:**

**REQUEST NO. 41:** All Documents and Communications reflecting, referencing, or relating to any inquiries, questions, or requests for information from Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., Highland Kansas City Foundation, Inc., or The Dallas Foundation regarding (a) the DAF Structure, (b) DAF assets, (c) distributions to charitable beneficiaries, (d) Mark Patrick's compensation, or (e) corporate restructuring.

**RESPONSE:**

**REQUEST NO. 42:** All Documents and Communications relating to, referencing, or reflecting the valuation of Highland Capital Management, L.P., or its assets.

**RESPONSE:**

**REQUEST NO. 43:** All Documents and Communications relating to, referencing, or reflecting Highland Capital Management, L.P.'s financial condition, including any monthly operating reports or quarterly operating reports.

**RESPONSE:**

**REQUEST NO. 44:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for any bankruptcy professional, creditor, or equity holder.[6]

**RESPONSE:**

**REQUEST NO. 45:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[7]

**RESPONSE:**

**REQUEST NO. 46:** All Documents and Communications relating to any valuation of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[8]

**RESPONSE:**

**REQUEST NO. 47:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC reflecting any analysis or determination regarding the

---

[6] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[7] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[8] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 48:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 49:** All Communications between You and Charitable DAF Fund, LP reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 50:** All Communications between You and Charitable DAF Fund, LP regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 51:** All Communications between You and Hunter Mountain Investment Trust reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 52:** All Communications between You and Hunter Mountain Investment Trust regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 53:** All Documents and Communications relating to, referencing, or reflecting efforts by any HMIT Entity to obtain updated financial reporting from Highland Capital Management, L.P., or its bankruptcy professionals during the bankruptcy proceedings.

**RESPONSE:**

**REQUEST NO. 54:** All Documents reflecting the "Work Plan" prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities, including any instructions to create entities that were "hard to find or track."[9]

**RESPONSE:**

**REQUEST NO. 55:** All Documents and Communications between Mark Patrick and any attorney or law firm from January 1, 2023, to the present regarding corporate restructuring, entity formation, or changes to the governance of the DAF Structure, including any "work plans" or engagement letters.[10]

**RESPONSE:**

**REQUEST NO. 56:** All Documents and Communications relating to, referencing, or reflecting the formation of any new entity within, related to, or derived from the DAF Structure from January 1, 2023, to the present, including DFW Charitable Foundation, CDMCFAD, LLC, and CDH GP, Ltd.[11]

**RESPONSE:**

**REQUEST NO. 57:** All Documents and Communications between any attorney or law firm and Mark Patrick relating to the creation of new corporate entities within the DAF Structure.[12]

**RESPONSE:**

---

[9] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[10] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[11] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[12] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 58**: All Documents relating to Mark Patrick's authority to act on behalf of Rand Advisors, LLC, Rand PE Fund I, LP, or any HMIT Entity, including any power of attorney, board resolutions, or operating agreement provisions granting such authority.

**RESPONSE:**

**REQUEST NO. 59:** All Documents relating to any change in the ownership, management, or control of Hunter Mountain Investment Trust, Beacon Mountain LLC, or any entity in the Hunter Mountain ownership chain from January 1, 2024 to the present.

**RESPONSE:**

**REQUEST NO. 60**: All organizational charts reflecting the corporate structure of (a) the DAF Entities; (b) the HMIT Entities; and (c) any entities through which Patrick directly or indirectly held an interest in Hunter Mountain, for any time during the Relevant Period.

**RESPONSE:**

**REQUEST NO. 61:** All documents and communications relating to, referencing, or reflecting the sale of Rand PE Fund I, LP's investment in Beacon Mountain, LLC in or around February 2025, including any purchase agreements, valuations, appraisals, or closing documents.

**RESPONSE:**

**REQUEST NO. 62**: All Documents relating to the transition of management of Rand PE Fund I, LP from John Honis to Patrick or any Patrick-controlled entity, including any Communications with investors or regulatory authorities regarding such transition.

**RESPONSE:**

**REQUEST NO. 63**: All audit reports, financial statements, and quarterly or annual reports for Rand PE Fund I, LP from January 1, 2023 to the present, including the 2024 audit issued on or about June 26, 2025.

**RESPONSE:**

**REQUEST NO. 64:** All Documents relating to the sale of Beacon Mountain LLC (or its interest in Hunter Mountain Investment Trust) to CLO Holdco, LLC, including but not limited to the purchase agreement, any valuations, closing documents, and wire transfer records.

**RESPONSE:**

**REQUEST NO. 65**: All Documents relating to any consent (or lack thereof) from Crown Global Life Insurance, Ltd., The Dallas Foundation, or Atlas IDF, LP regarding the sale of Beacon Mountain's interest in Hunter Mountain to CLO Holdco, LLC or any Patrick-controlled entity.

**RESPONSE:**

**REQUEST NO. 66**: All Documents relating to compliance (or non-compliance) with Section 3.01(b) of the Amended and Restated Limited Partnership Agreement of Atlas Fund, which prohibits Rand Fund from selling Hunter Mountain to an affiliate of Patrick without investor consent.

**RESPONSE:**

**REQUEST NO. 67:** All Documents and Communications relating to any notice or other information given to investors in Rand PE Fund I, LP (including any 4% minority investor) from January 1, 2025, to the present regarding the sale of Beacon Mountain, LLC's interest in HMIT, or any distribution relating thereto, including the February 20, 2025 notice referenced in Dugaboy's Motion for Reconsideration.

**RESPONSE:**

**REQUEST NO. 68:** All Documents and Communications sufficient to show the basis for the $1 million valuation of Beacon Mountain, LLC's interest in Hunter Mountain Investment Trust in or around February 2025, including any valuation reports, appraisals, financial analyses, or Communications with ValueScope, LLC or any other valuation firm concerning such valuation.

**RESPONSE:**

**REQUEST NO. 69:** All Documents, correspondence, engagement letters, contracts, or agreements between You and ValueScope, LLC (or any other valuation firm) relating to the valuation of any interest, holding in, or security issued by any of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate.

**RESPONSE:**

**REQUEST NO. 70:** All draft and final valuation reports, memoranda, models, or analyses prepared by ValueScope, LLC relating to Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to the

valuation of the Participation Shares; and any Communications challenging or questioning the valuation methodology or conclusions.

**RESPONSE:**

**REQUEST NO. 71:** All Documents relating to the methodology used in any valuation of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to instructions received regarding methodology, communications discussing the change from net asset value methodology to discounted cash flow methodology, supporting calculations, assumptions, and comparable transactions or valuations.

**RESPONSE:**

**REQUEST NO. 72:** All Documents and Communications related to the identity, ownership structure, principals, managers, or beneficial owners of Celia Holdco LLC.

**RESPONSE:**

**REQUEST NO. 73:** All Documents relating to the voluntary liquidation of Charitable DAF Holdco, Ltd. filed on April 2, 2025 in the Cayman Islands, including the petition, any supporting documents, and Communications regarding the decision to initiate liquidation.

**RESPONSE:**

**REQUEST NO. 74**: All Documents produced to or received from the Joint Official Liquidators of Charitable DAF Holdco, Ltd. in connection with their investigation of Patrick's activities.

**RESPONSE:**

**REQUEST NO. 75**: All Documents relating to any actions taken by Patrick or Murphy in response to the investigative efforts of the Joint Official Liquidators in the Cayman Islands, including any expenditures of DAF assets for legal fees or other expenses incurred in opposing such efforts.[13]

**RESPONSE:**

[13] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 76**: All Documents relating to Creative Hearts TX, including (a) its formation documents; (b) the involvement of Patrick, his wife, or his daughter with the entity; and (c) any donations or payments made to it by any DAF Entity.[14]

**RESPONSE:**

**REQUEST NO. 77**: All Documents relating to the Patrick-Cronin Proposal.

**RESPONSE:**

Dated: March 23, 2026

*/s/ Geoffrey S. Harper*
**Geoffrey S. Harper**
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

**John Michael Gaddis**
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

[14] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

## CERTIFICATE OF SERVICE

I certify that on March 23, 2026, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

***Via Electronic Mail:***

Louis M. Phillips (louis.phillips@kellyhart.com)
**Kelly Hart Pitre**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916

Amelia L. Hurt (amelia.hurt@kellyhart.com)
**Kelly Hart Pitre**
400 Poydras Street, Suite 1812
New Orleans, LA 70130

Hugh G. Connor II, hugh.connor@kellyhart.com
Michael D. Anderson, Michael.anderson@kellyhart.com,
Katherine T. Hopkins, katherine.hopkins@kellyhart.com
**Kelly Hart & Hallman**
201 Main Street, Suite 2500
Fort Worth, TX 76102

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO SHIELDS LEGAL GROUP P.C.**

**To:** Shields Legal Group P.C., by and through their Registered Agent, James D. Shields, jshields@shieldslegal.com, Shields Legal Group, 16400 Dallas Parkway, Suite 300, Dallas, TX 75248

Interested Party The Dugaboy Investment Trust ("Dugaboy") serves this First Set of Requests for Production of Documents to Shields Legal Group P.C. ("Shields"), pursuant to Rule 34 of the Federal Rules of Civil Procedure, which is incorporated into bankruptcy proceedings by Federal Rules of Bankruptcy Procedure 7034 and 9014(c)(1). Shields must respond to these Requests for Production within thirty (30) days of service. We ask that You produce documents at the offices of King & Spalding, 2601 Olive Street, Suite 2300, Dallas, TX 75201, or by electronic production in a mutually agreed format.

**INSTRUCTIONS**

1. In responding to these Requests, You must furnish all information that is available to You, that is within Your possession, custody, or control, or that is subject to Your reasonable inquiry, including information in the possession of Your attorneys, accountants, advisors, representatives, agents, or other persons directly or indirectly employed by, or connected with, You or Your attorneys, and anyone else otherwise subject to Your control. All Documents that respond, in

whole or in part, to any portion of the Requests below shall be produced in their entirety, including all attachments and enclosures.

2. The relevant time period for documents responsive to these Requests, unless otherwise specified in an individual Request, is the period beginning on the earlier of October 1, 2024, or such date as identified in response to Request No. 1,[1] through the present.

3. To the extent that the below Requests include requests for paper records, such paper records shall be scanned or otherwise converted into electronic form from paper documents in the following format:

(a) All documents shall be scanned to single page Group 4, TIFF format, at least 300 dpi and 8½ x 11 inch page size, except for documents requiring higher resolution or different page size.

(b) In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). The Parties will make their best efforts to have their vendors unitize documents correctly and will commit to address situations where there are improperly unitized documents. For documents found in folders or other containers with labels, tabs, or other identifying information, such labels and tabs shall be scanned where practicable. Pages with Post-it notes shall be scanned both with and without the Post-it, with the image of the page with the Post-it preceding the image of the page without the Post-it.

[1] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

(c) Productions of the images shall be made using an image load file (.OPT or .LFP) and a delimited database/metadata load file (.DAT). Each image file should have a unique file name which shall be the Bates number of the page.

(d) The following objective coding fields should be provided, if applicable:

(1) beginning Bates number;

(2) ending Bates number;

(3) beginning attachment Bates number;

(4) ending attachment Bates number;

(5) page count; and

(6) source location/custodian.

(e) Document level OCR should be provided as a separate text file. The file name of each text file should correspond to the file name of the first image file of the document with which it is associated. The text files will not contain the redacted portions of the documents. OCR software should be set to the highest quality setting during processing. For documents in foreign languages, the OCR shall be performed using an OCR tool and settings suitable for the particular byte or multi-byte languages.

4. To the extent that the below Requests include requests for electronically stored information ("ESI"), all ESI shall be produced in TIFF format according to the following specifications:

(a) All TIFF formatted documents will be single page, Group 4 TIFF at 300 x 300 dpi resolution and 8½ x 11 inch page size, except for documents requiring different resolution or page size.

(b) An image load file, in standard Opticon format, showing the Bates number of each page and the appropriate unitization of the documents, will accompany all document images.

(c) Each imaged version of an electronic document will be created directly from the original electronic document.

(d) TIFFs shall be produced as black and white, single-page TIFF images in accordance with the technical specifications set out above. Word documents that have tracked changes or comments shall be produced in color. In addition, upon written request that identifies a reasonable number of individual documents at issue by Bates number, a party shall produce color images for those documents. Documents produced in color shall be produced as single page, 300 DPI, color JPG images with the quality setting of 75% or higher.

(e) All TIFF files are to be provided with an accompanying searchable text (.TXT) file extracted from the native, electronic file (not generated as an OCR file from the TIFF image(s)), and such text files shall contain the full text extraction. To the extent reasonably feasible, extracted text shall provide all comments, tracked changes, speaker's notes, and text from hidden worksheets, slides, columns, and rows. In the case of files with redacted text, OCR'ed text of the redacted documents may be provided in lieu of extracted text. OCR software should be set to the highest quality setting during processing.

5. To the extent reasonably feasible, all Documents produced shall be produced with metadata and attachments intact. The term "metadata" means all information describing the history, tracking, or management of an electronic document including, but not limited to, the date(s) the document was created, modified, accessed, or distributed; the author(s) and all recipient(s) of the

document; the file's name; the file's location (e.g., directory structure or pathname); the file format or file type; and the file size. For comparison purposes and to ensure authenticity, where documents are produced in native format, such documents shall also be produced in the ESI format described in Instruction No. 3, unless otherwise agreed by the parties.

6. Should You object to any Request, You must specifically and in detail state the grounds and reasons for the objection, and state in detail the part of the language of the Request to which You object, and state which part of the Request, if any, You are answering.

7. Under the Crime-Fraud Exception and Subject-Matter Waiver, items which would typically be privileged are not privileged in this matter. The Fifth Circuit recognizes the Crime-Fraud Exception to privilege, under which attorney-client communications and/or work product materials are not privileged if "the client consults an attorney for advice that will assist the client in carrying out a contemplated illegal or fraudulent scheme." *Lewis v. Crochet*, 105 F.4th 272, 282 (5th Cir. 2024) (quoting *In re Int'l Sys. & Controls Corp. Sec. Litig*., 693 F.2d 1235, 1242 (5th Cir. 1982)). The exception applies where (1) a crime or fraud was impending or continuing at the time of the communication, and (2) the communications or work product at issue were in furtherance of that criminal or fraudulent activity. *See In re E.E.O.C.*, 207 F. App'x 426, 434 (5th Cir. 2006). Dugaboy reasonably believes, and has evidence to support, that certain communications and work product it seeks were intended to further continuing or future criminal or fraudulent activity and are therefore not privileged.

Likewise, Subject-Matter Waiver under Federal Rule of Evidence 502(a) provides that disclosure of certain information in a federal proceeding waives privilege for related information when (1) the waiver was intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) the disclosed and undisclosed

communications and work product "ought in fairness to be considered together." Fed. R. Evid. 502(a); *see also Crider Inc. v. Silgan Containers LLC*, 2023 WL 479094, at *22 (N.D. Tex. Jan. 13, 2023). Any communications or work product that would otherwise be privileged, but concern the same subject matter intentionally disclosed by Mark Patrick in his affidavits or testimony in this Proceeding or Related Proceedings fall under this exception, and privilege has been waived.

Accordingly, under these exceptions and waivers, You must produce documents that would typically be privileged as they relate to (1) any fraudulent activity that counsel was involved in or knew of, or (2) any privileged conversation or information that has already been disclosed elsewhere in this litigation.

If You still contend that any Documents sought by the Requests are privileged or otherwise protected from discovery, You must nevertheless identify for each Document withheld:

(a) the legal basis for withholding the Document;

(b) the person asserting any claim of privilege and/or protection;

(c) a description and identification of the requested Document sufficient to frame an appropriate demand for the Document and a motion to compel disclosure thereof, setting forth at least the following:

(i) the author and/or signatory of the Document withheld;

(ii) the date of the Document withheld;

(iii) all addressees and/or recipients of the Document withheld; and

(iv) the subject matter and circumstances under which the Document withheld was created in sufficient detail to ascertain applicability of such privilege or other legal basis.

8. Notwithstanding a claim that a portion of a Document is privileged or otherwise protected from disclosure, any such Document must be produced with the portion claimed to be protected excised.

9. If You contend that any Request is ambiguous or unclear, contact undersigned counsel as soon as possible so that the Request can be clarified to avoid unnecessary delays in discovery.

10. These Requests are continuing in nature. Any Documents located, created, or obtained subsequent to the Documents provided in response to these Requests and that should have been produced had they been known shall be promptly supplied by supplemental responses whenever You find, locate, or acquire such Documents. You are required to supplement and correct Your answers and responses on a timely basis.

**DEFINITIONS**

As used herein, the terms listed below shall be defined as follows. Insofar as a term is not explicitly defined, the meaning to be used is the commonly accepted definition of the term. Notwithstanding any definition set forth below, each word, term, or phrase used in these Requests is intended to have the broadest meaning permitted under applicable rules. The following terms are to be given their ascribed definitions:

**A. Proceedings**

1. The term "this Proceeding" or "this Litigation" or "Main Case" refers to the main bankruptcy proceeding *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

2. The term "Related Proceedings" includes all other legal proceedings or actions involving or related to Highland, HMIT, and persons, parties, or entities involved with or affected by the Settlement, specifically including but not limited to the Cayman Islands Proceedings, the Chapter

15 proceeding in the United States Bankruptcy Court for the District of Delaware, and the Texas Business Court proceeding, as well as any bankruptcy adversary proceedings before the United States Bankruptcy Court for the Northern District of Texas that are separate from the Main Case.

**B. Parties and Individuals**

1. The term "You" or "Your" refers to Shields Law Group as well as its agents, attorneys, accountants, advisors, representatives, or any other individual(s) or entity(ies) acting or authorized to act on behalf of them, and any related companies, divisions, or subsidiaries, past or present, including, without limitation, the directors, officers, employees, agents, or attorneys thereof, as well as any predecessors-in-interest or successors-in-interest.

2. The term "Patrick" refers to Mark Eric Patrick.
3. The term "Dondero" refers to James Dondero.
4. The term "Okada" refers to Mark Okada.
5. The term "Seery" or "Claimant Trustee" refers to James P. Seery, Jr.
6. The term "Kirschner" or "Litigation Trustee" refers to Marc S. Kirschner.
7. The term "Murphy" refers to Paul Murphy.
8. The term "Scott" refers to Grant Scott.
9. The term "Cronin" refers to Kevin Cronin.
10. The term "Honis" refers to John Honis.
11. The term "Raver" refers to Shawn Raver.

**C. Highland Entities and Related Trusts**

12. The term "Highland" or "Highland Capital Management" refers to Highland Capital Management, L.P., a Dallas-based, Delaware-domiciled investment advisor, and the Debtor in the matter *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

13. The term "Highland Entities" or "Highland Entity" refers collectively to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

14. The term "Highland Claimant Trust" refers to the entity created under the Plan to hold, monetize, and distribute the assets of Highland's estate.

15. The term "Highland Litigation Sub-Trust" or "Litigation Sub-Trust" refers to the trust created under the Plan for the purpose of pursuing litigation claims on behalf of the Highland estate.

16. The term "Highland Indemnity Trust" or "Indemnity Trust" refers to the trust created under the Plan to hold assets for the purpose of indemnification obligations arising out of the Highland estate.

17. The term "Highland Party" or "Highland Parties" refers to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, the Highland Indemnity Trust, and each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, and subsidiaries, and any persons or entities acting or authorized to act on their behalf.

**D. HMIT Entities and Related Parties**

1. The term "HMIT Entities" refers collectively to Hunter Mountain Investment Trust and Beacon Mountain, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "HMIT Parties" refers broadly to the HMIT Entities, Mark Patrick, and any related decision maker with respect to the HMIT Entities, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

3. The term "Hunter Mountain" or "HMIT" refers to Hunter Mountain Investment Trust.

4. The term "Beacon Mountain" refers to Beacon Mountain, LLC.

5. The term "Beacon Hunter" refers to Beacon Hunter, LLC.

**E. Rand Entities**

1. The term "Rand Parties" or "Rand Entities" refers collectively to Rand PE Fund I, LP, Rand Advisors, LLC, and Rand PE Fund Management, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "Rand Fund" or "Rand PE Fund" refers to Rand PE Fund I, LP.

3. The term "Rand Advisors" refers to Rand Advisors, LLC, an SEC-registered investment advisor that served as the investment adviser to Rand PE Fund I, LP.

4. The term "Rand PE Fund Management" refers to Rand PE Fund Management, LLC.

**F. DAF Entities and Related Structures**

1. The term "DAF" or "Charitable DAF Holdco" refers to Charitable DAF Holdco, Ltd.

2. The term "DAF Fund" or "Charitable DAF Fund" refers to Charitable DAF Fund, LP.

3. The term "DAF GP" or "Charitable DAF GP" refers to Charitable DAF GP, LLC.

4. The term "DAF Structure" refers to the overall donor-advised fund investment vehicle and its constituent entities, including Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, and any entity holding ownership or management interests therein or formed in connection therewith, including any entities created as part of the restructuring of the DAF.

5. The term "DAF Entities" refers collectively to Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, CDH GP, Ltd., CDMCFAD, LLC, DFW Charitable Foundation, CLO Holdco, LLC, and any other entity formed, restructured, or otherwise created in connection with or derived from the DAF Structure, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

6. The terms "New GP" or "CDH GP" refer to CDH GP, Ltd.

7. The term "CDMCFAD" or "DAF 2.0" refers to CDMCFAD, LLC.

8. The term "DFW Charitable Foundation" or "DFW Foundation" refers to DFW Charitable Foundation.

9. The term "CLO Holdco" refers to CLO Holdco, LLC.

**G. Charitable and Donor Entities**

1. The terms "The Dallas Foundation" or "Dallas Foundation" refer to The Dallas Foundation.

2. The term "Crown Global" refers to Crown Global Life Insurance, Ltd.

3. The terms "Empower" or "Empower Dallas" refer to Empower Dallas.

4. The term "Okada Foundation" refers to the Okada Foundation.

5. The term "Charitable Beneficiaries" or "Charities" refers collectively to The Dallas Foundation, Crown Global Life Insurance, Ltd., Empower Dallas, the Okada Foundation, and any other charitable organization or foundation that held beneficial ownership in the DAF Structure through participation shares or annuity policies.

6. The term "Highland Dallas Foundation" refers to Highland Dallas Foundation, Inc.

7. The term "Highland Santa Barbara Foundation" refers to Highland Santa Barbara Foundation, Inc.

8. The term "Highland Kansas City Foundation" refers to Highland Kansas City Foundation, Inc.

9. The term "Participation Shares" refers to the shares in Charitable DAF Holdco, Ltd. held by the Charitable Foundations through which the Foundations held beneficial ownership in the DAF Structure.

**H. Other Entities**

1. The term "Dugaboy" refers to The Dugaboy Investment Trust.

2. The term "Strand" or "Strand Advisors" refers to Strand Advisors, Inc.

3. The terms "Atlas Fund" or "Atlas IDF" refers to Atlas IDF, LP.

4. The terms "Skyview" or "Skyview Group" refers to The Skyview Group.

5. The term "Fortaris" or "Fortaris Capital Advisors" refers to Fortaris Capital Advisors.

6. The term "ValueScope" refers to ValueScope, LLC.

7. The term "Celia Holdco" refers to Celia Holdco LLC.

8. The terms "Creative Hearts" or "Creative Hearts TX" refer to Creative Hearts TX.

**I. Law Firms**

1. The term "Kelly Hart" refers to Kelly Hart & Hallman LLP, or any predecessor or successor firm or any associated attorney.

2. The term "Shields Law Group" refers to Shields Law Group, P.C., or any predecessor or successor firm or any associated attorney.

**J. Litigation, Settlement, and Bankruptcy Terms**

1. The term "Highland Bankruptcy" refers to the Chapter 11 bankruptcy case titled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj, pending in the United States Bankruptcy Court for the Northern District of Texas.

2. The term "Settlement Agreement" refers to each and every discussion or negotiation of settlement or iteration of the settlement agreement between the Highland Entities and the HMIT Entities, together with all exhibits, schedules, appendices, and ancillary documents, and including any preliminary drafts, associated documents, and communications related thereto.

3. The term "Settlement Agreement & General Release" or "9019 Settlement" refers to the Settlement Agreement & General Release dated May 19, 2025, by and among the Highland Entities and the HMIT Entities, as approved by the Court, together with all exhibits, schedules, appendices, and ancillary documents.

4. The term "9019 Motion" refers to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, filed on May 19, 2025 (Bankr. Dkt. 4217).

5. The term "Rule 9019 Settlement Order" refers to the Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, entered on June 30, 2025 (Bankr. Dkt. 4297).

6. The term "Kirschner Litigation" or "Kirschner Claims" or "Transferred Claims" refers to the 36-count adversary complaint filed by Marc A. Kirschner, as Litigation Trustee, styled Kirschner v. Dondero, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex. Oct. 15, 2021), together with any amended, supplemental, or related pleadings, and the claims asserted therein.

7. The term "Plan" refers to Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization (as Modified), confirmed on February 22, 2021.

8. The term "Confirmation Order" refers to the Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.

9. The term "Class 10" refers to the class of claims under the Plan designated as "Class 10 Claims" and consisting of the claim held by Hunter Mountain Investment Trust as a holder of pre-bankruptcy Class B and C limited partnership interests in Highland.

10. The term "Class 11" refers to the class of claims under the Plan designated as "Class 11 Claims" and consisting of the claim held by other equity holders holding pre-bankruptcy Class A limited partnership interests in Highland.

11. The term "Class 10 Interest" or "HMIT Class 10 Interest" refers to Hunter Mountain Investment Trust's allowed Class 10 claim in the amount of $336,940,230.58 as set forth in the Settlement Agreement and associated Order.

12. The term "Contingent Claimant Trust Interests" refers to the interests given to the former equity holders under the Plan in the Highland Claimant Trust, which were to vest only upon certification by the Claimant Trustee that all unsecured creditors had been paid in full with interest.

13. The term "Work Plan" refers to the plan or plans prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities.

14. The term "Withdrawal Stipulation" refers to the Stipulation Withdrawing Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd. to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith (Bankr. Dkt. 4291).

15. The term "Dugaboy Note" refers to the promissory note dated May 31, 2017, in the original amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

16. The term "Texas Business Court Proceeding" or "Business Court Proceeding" refers to Case No. 25-BC01B-0027 filed in the Texas Business Court, First Division on July 1, 2025, and captioned *The Highland Dallas Foundation, Inc. ,The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. vs. DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC,CDH GP, Ltd., and Mark Patrick.*

**K. Cayman Islands Proceedings**

1. The terms "Cayman Islands Proceeding(s)" or "Cayman Proceeding" refer collectively to all judicial proceedings in the Cayman Islands relating to Charitable DAF Holdco, Ltd. or any DAF Entity, including (a) the voluntary liquidation filed by Patrick on April 2, 2025; (b) the winding up petition filed by the charitable owners on April 23, 2025 (No. FSD 99 of 2025 (JAJ)); (c) the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators on July

15, 2025 (No. FSD 201 of 2025); and (d) all related proceedings, investigations, hearings, orders, and filings.

2. The term "Joint Official Liquidators" or "JOLs" refers to the court-appointed liquidators designated by the Cayman Islands court on or about May 6, 2025 to oversee the DAF's operations.

3. The term "Statement of Claim" refers to the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators in the Cayman Islands Proceeding on July 15, 2025.

4. The term "Chapter 15 Petition" refers to the petition filed by the Joint Official Liquidators in the United States Bankruptcy Court for the District of Delaware on July 21, 2025.

5. The term "Patrick-Cronin Proposal" refers to the proposal made by Mark Patrick to Kevin Cronin, a principal of Fortaris Capital Advisors, to make and split monthly payments to the DAF, as referenced in Paragraph 173 of the Third Affidavit of Mark Patrick.

**L. General Discovery Terms**

1. The term "Document" or "Documents" is used in its broadest possible sense and refers, without limitation, to anything upon which any expression, communication, or representation has been recorded by any means. The term includes, but is not limited to: correspondence, emails, text messages, instant messages, messages/posts on social media, handwritten notes, photographs, working papers, any drafts of documents (preliminary, intermediate, and/or final), memoranda, contracts/agreements, tapes, business records, financial records, charts, notes, records of any sort of meetings, reports of telephone or other oral conversations, calendars (whether hardcopy or electronic, including desk calendars, phone calendars, or other calendars using software or an application), appointment books, audio or video tape recordings, information on computer disc/card/drive, computer entries that can be retrieved electronically, databases, and all other writings and recordings of every kind that are in Your actual or constructive possession, custody,

or control. The term includes, but is not limited to, drafts and copies of any documents, whether identical to the original or different from the original because of notes, comments, highlighting, edits, any other alterations made on such copies, indications that said copies were sent to different individuals than were the originals, or any other reason.

2. The term "Communication" or "Communications" means any transmission of information in any context or situation by or between two or more Persons by any means or medium whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically, or digitally, or on tape, either orally or in writing, including, but not limited to, conversations, correspondence, emails, text messages, instant messages, social media communications, telexes, facsimile transmissions, telecopies, recordings in any medium of oral, written, or typed communication, telephone or message logs, notes or memoranda relating to written or oral communications, and any translation thereof.

3. The terms "Person" or "Entity" and their plural forms mean natural persons, proprietorships, partnerships, firms, trusts, estates, companies, corporations, public corporations, sole practitioners, municipal corporations, federal, state, and local governments, all departments and agencies thereof, any other governmental agencies, subdivisions, groups, associations, or organizations, or any other entity, whether foreign or domestic.

4. The term "thing" means any tangible item, including without limitation, models, prototypes, and samples of any device or apparatus or product.

5. The terms "concerning," "regarding," "referring to," "related to," or "relating to" shall be construed in the broadest possible sense, and shall mean without limitation and whether in whole or in part: referring to, constituting, bearing upon, commenting upon, reflecting, evidencing, pertaining to, describing, depicting, consisting of, containing, comprising, embodying, identifying,

stating, discussing, analyzing, studying, summarizing, dealing with, relating to, or having any logical or factual connection whatsoever with the subject addressed.

6. The terms "state" or "describe" mean to fully elucidate by reference to underlying facts rather than by reference to ultimate facts or conclusions of fact or law; where applicable, to particularize as to time, place, and manner; and to set forth all relevant facts necessary to complete the understanding of the act, process, event, or thing in question.

7. The term "Relevant Period" refers to the period beginning on the earlier of January 1, 2025, or such date as identified in Response to Request No. 1,[2] through the present.

8. The present tense includes the past and future tenses.

9. The singular includes the plural, and the plural includes the singular.

10. Words in the masculine, feminine, and neutral form shall include each of the other genders.

11. Whenever used herein, "and" may be understood to mean "or" and vice versa whenever such construction results in a broader request for information.

12. "All" means "any and all" and "any" means "any and all."

13. "Including" means "including but not limited to."

14. The term "identify" means and requires You to:

(a) With reference to an individual, state his or her full name and last known residential address, business address, telephone and/or facsimile number, the name and address of his or her employer, the individual's job title or job responsibilities, and his or her relationship to You;

[2] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

(b) With reference to a company or organization, state the entity's full legal name, business addresses, telephone number, and a person with whom You had direct contact within that entity;

(c) With reference to a document, describe the document, state the date when the document was created, name the creator of the document, and name each person to whom the document was sent;

(d) With reference to an oral communication, provide the date(s) of the communication, the names and addresses of all parties, when the communication occurred, the place(s) where the communication took place, the subject matter of the communication, and the general substance of the communication; and

(e) With reference to an occurrence or event, provide the date and location of the occurrence or event, the identity of each person involved in the occurrence or event, the subject matter discussed, and the identity of any document that records, refers to, or relates to such occurrence or event.

## DOCUMENT REQUESTS

**REQUEST NO. 1:** All Documents and Communications between or among Highland Capital Management, L.P. (or its representatives, including James P. Seery, Jr. or the Claimant Trustee) and any of the HMIT Entities concerning the 9019 Settlement, including but not limited to draft agreements, term sheets, and settlement proposals, and including Documents sufficient to show the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement.

**RESPONSE:**

**REQUEST NO. 2:** All Documents and Communications relating to, referencing, or reflecting due diligence performed by any HMIT Entity prior to the execution of the Settlement Agreement and General Release dated May 19, 2025, including any analysis of whether execution of the Settlement Agreement violated any other agreements, contracts, or fiduciary duties.

**RESPONSE:**

**REQUEST NO. 3:** All Documents evidencing any Communications between any HMIT Entity representative and any Highland Entity representative regarding the terms of the Settlement Agreement.

**RESPONSE:**

**REQUEST NO. 4:** All Documents constituting or relating to the Representations and Warranties in paragraph 13 of the Settlement Agreement & General Release, including any documents that support, substantiate, or were relied upon in making such representations.

**RESPONSE:**

**REQUEST NO. 5:** All Documents relating to the Claimant Trustee's evaluation of the 9019 Settlement, including any analyses of the settlement's fairness, the value of the claims being released, and any Communications with Patrick or the HMIT Entities regarding Settlement terms.

**RESPONSE:**

**REQUEST NO. 6:** All Documents and Communications relating to, referencing, or reflecting the consideration received by Hunter Mountain Investment Trust in exchange for entering into the Settlement Agreement & General Release dated May 19, 2025, including any valuations, appraisals, or analyses of the value received.

**RESPONSE:**

**REQUEST NO. 7:** All Documents and Communications relating to, referencing, or reflecting negotiations over the terms of the Settlement Agreement & General Release, including the cash payment to HMIT, the allowance of the HMIT Class 10 Interest, and the transfer of the Kirschner Claims.

**RESPONSE:**

**REQUEST NO. 8:** All Documents evidencing any Communications with Highland Capital Management, L.P., or any Highland Entity relating to, referencing, or reflecting any plan or strategy by Mark Patrick regarding a potential settlement of Hunter Mountain Investment Trust's claims.

**RESPONSE:**

**REQUEST NO. 9:** All Documents and Communications reflecting any due diligence conducted by You or on Your behalf regarding the authority of Mark Patrick to enter into the Settlement Agreement on behalf of the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 10:** All Documents and Communications, including billing records, invoices, and engagement letters, between You and Kelly Hart & Hallman LLP (or any predecessor or successor firm or any associated attorney) relating to work involving the Settlement Agreement, the 9019 Motion, or the HMIT Entities, the DAF Entities, or any restructuring of such entities.[3]

**RESPONSE:**

**REQUEST NO. 11:** All Documents and Communications, including billing records, invoices, and engagement letters, between You and Shields Law Group, P.C. (or any associated attorney) relating to work involving (a) the DAF Structure, Hunter Mountain Investment Trust, the formation or restructuring of any DAF Entity or HMIT Entity; (b) the separation of DAF assets from the charitable beneficiaries; or (c) the "Work Plan" for restructuring.[4]

**RESPONSE:**

**REQUEST NO. 12:** All Communications between You and any third party relating to the Settlement Agreement, the 9019 Motion, or the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 13:** All Documents reflecting Highland Capital Management, L.P.'s knowledge of (a) the restructuring of the DAF Entities; (b) the sale of Beacon Mountain to CLO Holdco, LLC; (c) any change in the beneficial ownership of Hunter Mountain; or (d) any investigation of Patrick by the Cayman Islands court, the Texas Attorney General, or any other governmental authority.

**RESPONSE:**

**REQUEST NO. 14:** All Communications between Highland Capital Management, L.P. and any of the following regarding the 9019 Settlement or any restructuring of the HMIT Entities or DAF Entities: The Dallas Foundation, Crown Global Life Insurance, Ltd., the Texas Attorney General, or any Cayman Islands governmental or judicial authority.

**RESPONSE:**

**REQUEST NO. 15:** All bank statements, brokerage statements, investment account statements, balance sheets, financial statements, and accounting records for the following: Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco, LLC; CDMCFAD, LLC; Charitable DAF Holdco, Ltd.; Charitable DAF Fund, LP; DFW Charitable Foundation; and any other DAF entity, including consolidated and entity-level statements.

---

[3] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[4] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**RESPONSE:**

**REQUEST NO. 16:** All Documents and Communications relating to any transfer of any interests in Hunter Mountain Investment Trust, Beacon Mountain, LLC, CLO Holdco, LLC, CDMCFAD, LLC, and DFW Charitable Foundation, including but not limited to assignment agreements, contribution agreements, and corporate resolutions approving transfers.

**RESPONSE:**

**REQUEST NO. 17:** All Communications between Patrick and any financial advisor regarding the valuation of the charitable owners' membership interests or any DAF Entity assets.

**RESPONSE:**

**REQUEST NO. 18:** All Communications between You and Charitable DAF Fund, LP regarding the estimated or actual value of the Highland Capital Management, L.P. estate.

**RESPONSE:**

**REQUEST NO. 19:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Highland Capital Management, L.P. estate.

**RESPONSE:**

**REQUEST NO. 20:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Class 10 and Class 11 claims in the Highland Bankruptcy.

**RESPONSE:**

**REQUEST NO. 21:** All Documents and Communications sufficient to show the fair market value of Charitable DAF Fund, LP or its assets as of March 2025.

**RESPONSE:**

**REQUEST NO. 22:** All Documents and Communications referencing, relating to, or reflecting the valuation that resulted in the charitable owners receiving approximately $1.6 million for their direct or indirect interests in CDMCFAD and/or Charitable DAF Fund, LP in or around March 2025, including the redemption agreement and any valuation supporting such redemption.

**RESPONSE:**

**REQUEST NO. 23:** All Documents and Communications, including communications with counsel,[5] relating to the formation, incorporation, organization, or structuring of CDMCFAD, LLC (also known as "DAF 2.0"), including but not limited to articles of organization, operating agreements, corporate resolutions, board minutes, and all amendments thereto.

**RESPONSE:**

**REQUEST NO. 24:** All Documents relating to the limited liability company agreement for CDMCFAD, LLC, including provisions relating to (a) fiduciary duties; (b) Patrick's powers and discretion; and (c) the valuation and redemption of member interests.

**RESPONSE:**

**REQUEST NO. 25:** All Documents relating to the formation, organization, or structuring of DFW Charitable Foundation, including articles of incorporation, bylaws, board minutes, member lists, and any charitable activities undertaken by said entity.

**RESPONSE:**

**REQUEST NO. 26:** All Documents and Communications related to or evidencing the knowledge of any Highland Party about DFW Charitable Foundation, including, but not limited to, the identity of the officers, directors, agents, or other persons with authority over DFW Charitable Foundation, the economic beneficiaries of DFW Charitable Foundation, and any payments made by DFW Charitable Foundation or any of its subsidiaries to Patrick.

**RESPONSE:**

**REQUEST NO. 27:** All Documents relating to the formation of CDH GP, Ltd., including any documents reflecting (a) Patrick's role or authority in the entity; (b) the replacement of Charitable DAF GP, LLC as the general partner of Charitable DAF Fund, LP; and (c) any Communications discussing the purpose of such replacement.

**RESPONSE:**

**REQUEST NO. 28:** All Documents relating to any transfer of assets from Charitable DAF Holdco, Ltd. or Charitable DAF Fund, LP to CDMCFAD, LLC or any entity controlled by Patrick, including the assignment of limited partnership interests referenced in the Statement of Claim filed in the Cayman Islands.

**RESPONSE:**

**REQUEST NO. 29:** All Documents and Communications sufficient to show when Hunter Mountain Investment Trust or any HMIT Party first received any indication, analysis, projection, or belief that the Class 10 or Class 11 claims would have net value available for distribution,

---

[5] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

including the timing of such indication, the basis therefor, and any valuations, projections, or analyses supporting such indication

**RESPONSE:**

**REQUEST NO. 30:** All Documents and Communications sufficient to show the original purpose and stated objectives of the 2015 sale of Highland Capital Management, L.P. equity holders' equity stake to Hunter Mountain Investment Trust, including any term sheets, memoranda, presentations, tax advice, or planning documents.

**RESPONSE:**

**REQUEST NO. 31:** All Documents and Communications regarding the reasons behind the equity ownership allocation reflected in Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization, including the allocation of (i) 99.5% to Hunter Mountain Investment Trust; (ii) 0.1866% to The Dugaboy Investment Trust; (iii) 0.0627% to Mark Okada and associated family trusts; and (iv) 0.25% to Strand Advisors, Inc.

**RESPONSE:**

**REQUEST NO. 32:** All Documents and Communications relating to, referencing, or reflecting any tax benefit, tax efficiency, or charitable purpose associated with the restructuring of Highland Capital Management, L.P. ownership in 2015.

**RESPONSE:**

**REQUEST NO. 33:** All Documents and Communications sufficient to show the circumstances surrounding Mark Patrick becoming the administrator of Hunter Mountain Investment Trust in 2022, including any appointment documents, resolutions, consents, correspondence, or agreements.

**RESPONSE:**

**REQUEST NO. 34:** All Documents and Communications sufficient to show the basis for, approval of, and payment of any bonuses to Mark Patrick in September 2024 and October 2024, including any written agreements, board resolutions, or documentation of performance metrics.

**RESPONSE:**

**REQUEST NO. 35:** All Documents relating to Paul Murphy’s role, authority, and compensation in connection with any DAF Entity, including (a) any agreement or arrangement governing Murphy’s compensation; (b) any revision or amendment to Murphy’s compensation plan, including any revision backdating payments to the beginning of 2025 that provided for $500,000 in fees triggered when injunctions are sought against the DAF; and (c) any Communications between Patrick and Murphy regarding the DAF restructuring, the 9019 Settlement, or the transfer of DAF assets.

**RESPONSE:**

**REQUEST NO. 36:** All Documents relating to any Communications between Patrick and the charitable beneficiaries (The Dallas Foundation, Crown Global, Empower Dallas, or the Okada Foundation) from November 2024 through April 2025, including the "no confidence" letter sent by the charities in November 2024.

**RESPONSE:**

**REQUEST NO. 37:** All Communications between You and Highland Dallas Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

**REQUEST NO. 38:** All Communications between You and Highland Santa Barbara Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

**REQUEST NO. 39:** All Communications between You and Highland Kansas City Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

**REQUEST NO. 40:** All Communications between You and The Dallas Foundation from January 1, 2021, to the present regarding the DAF Structure, Hunter Mountain Investment Trust, or the Settlement Agreement and General Release.

**RESPONSE:**

**REQUEST NO. 41:** All Documents and Communications reflecting, referencing, or relating to any inquiries, questions, or requests for information from Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., Highland Kansas City Foundation, Inc., or The Dallas Foundation regarding (a) the DAF Structure, (b) DAF assets, (c) distributions to charitable beneficiaries, (d) Mark Patrick's compensation, or (e) corporate restructuring.

**RESPONSE:**

**REQUEST NO. 42:** All Documents and Communications relating to, referencing, or reflecting the valuation of Highland Capital Management, L.P., or its assets.

**RESPONSE:**

**REQUEST NO. 43:** All Documents and Communications relating to, referencing, or reflecting Highland Capital Management, L.P.'s financial condition, including any monthly operating reports or quarterly operating reports.

**RESPONSE:**

**REQUEST NO. 44:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for any bankruptcy professional, creditor, or equity holder.[6]

**RESPONSE:**

**REQUEST NO. 45:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[7]

**RESPONSE:**

**REQUEST NO. 46:** All Documents and Communications relating to any valuation of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[8]

**RESPONSE:**

**REQUEST NO. 47:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC reflecting any analysis or determination regarding the

---

[6] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[7] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[8] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 48:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 49:** All Communications between You and Charitable DAF Fund, LP reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 50:** All Communications between You and Charitable DAF Fund, LP regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 51:** All Communications between You and Hunter Mountain Investment Trust reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 52:** All Communications between You and Hunter Mountain Investment Trust regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 53:** All Documents and Communications relating to, referencing, or reflecting efforts by any HMIT Entity to obtain updated financial reporting from Highland Capital Management, L.P., or its bankruptcy professionals during the bankruptcy proceedings.

**RESPONSE:**

**REQUEST NO. 54:** All Documents reflecting the "Work Plan" prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities, including any instructions to create entities that were "hard to find or track."[9]

**RESPONSE:**

**REQUEST NO. 55:** All Documents and Communications between Mark Patrick and any attorney or law firm from January 1, 2023, to the present regarding corporate restructuring, entity formation, or changes to the governance of the DAF Structure, including any "work plans" or engagement letters.[10]

**RESPONSE:**

**REQUEST NO. 56:** All Documents and Communications relating to, referencing, or reflecting the formation of any new entity within, related to, or derived from the DAF Structure from January 1, 2023, to the present, including DFW Charitable Foundation, CDMCFAD, LLC, and CDH GP, Ltd.[11]

**RESPONSE:**

**REQUEST NO. 57:** All Documents and Communications between any attorney or law firm and Mark Patrick relating to the creation of new corporate entities within the DAF Structure.[12]

**RESPONSE:**

---

[9] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[10] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[11] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[12] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 58**: All Documents relating to Mark Patrick's authority to act on behalf of Rand Advisors, LLC, Rand PE Fund I, LP, or any HMIT Entity, including any power of attorney, board resolutions, or operating agreement provisions granting such authority.

**RESPONSE:**

**REQUEST NO. 59:** All Documents relating to any change in the ownership, management, or control of Hunter Mountain Investment Trust, Beacon Mountain LLC, or any entity in the Hunter Mountain ownership chain from January 1, 2024 to the present.

**RESPONSE:**

**REQUEST NO. 60**: All organizational charts reflecting the corporate structure of (a) the DAF Entities; (b) the HMIT Entities; and (c) any entities through which Patrick directly or indirectly held an interest in Hunter Mountain, for any time during the Relevant Period.

**RESPONSE:**

**REQUEST NO. 61:** All documents and communications relating to, referencing, or reflecting the sale of Rand PE Fund I, LP's investment in Beacon Mountain, LLC in or around February 2025, including any purchase agreements, valuations, appraisals, or closing documents.

**RESPONSE:**

**REQUEST NO. 62**: All Documents relating to the transition of management of Rand PE Fund I, LP from John Honis to Patrick or any Patrick-controlled entity, including any Communications with investors or regulatory authorities regarding such transition.

**RESPONSE:**

**REQUEST NO. 63**: All audit reports, financial statements, and quarterly or annual reports for Rand PE Fund I, LP from January 1, 2023 to the present, including the 2024 audit issued on or about June 26, 2025.

**RESPONSE:**

**REQUEST NO. 64:** All Documents relating to the sale of Beacon Mountain LLC (or its interest in Hunter Mountain Investment Trust) to CLO Holdco, LLC, including but not limited to the purchase agreement, any valuations, closing documents, and wire transfer records.

**RESPONSE:**

**REQUEST NO. 65**: All Documents relating to any consent (or lack thereof) from Crown Global Life Insurance, Ltd., The Dallas Foundation, or Atlas IDF, LP regarding the sale of Beacon Mountain's interest in Hunter Mountain to CLO Holdco, LLC or any Patrick-controlled entity.

**RESPONSE:**

**REQUEST NO. 66**: All Documents relating to compliance (or non-compliance) with Section 3.01(b) of the Amended and Restated Limited Partnership Agreement of Atlas Fund, which prohibits Rand Fund from selling Hunter Mountain to an affiliate of Patrick without investor consent.

**RESPONSE:**

**REQUEST NO. 67:** All Documents and Communications relating to any notice or other information given to investors in Rand PE Fund I, LP (including any 4% minority investor) from January 1, 2025, to the present regarding the sale of Beacon Mountain, LLC's interest in HMIT, or any distribution relating thereto, including the February 20, 2025 notice referenced in Dugaboy's Motion for Reconsideration.

**RESPONSE:**

**REQUEST NO. 68:** All Documents and Communications sufficient to show the basis for the $1 million valuation of Beacon Mountain, LLC's interest in Hunter Mountain Investment Trust in or around February 2025, including any valuation reports, appraisals, financial analyses, or Communications with ValueScope, LLC or any other valuation firm concerning such valuation.

**RESPONSE:**

**REQUEST NO. 69:** All Documents, correspondence, engagement letters, contracts, or agreements between You and ValueScope, LLC (or any other valuation firm) relating to the valuation of any interest, holding in, or security issued by any of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate.

**RESPONSE:**

**REQUEST NO. 70:** All draft and final valuation reports, memoranda, models, or analyses prepared by ValueScope, LLC relating to Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to the

valuation of the Participation Shares; and any Communications challenging or questioning the valuation methodology or conclusions.

**RESPONSE:**

**REQUEST NO. 71:** All Documents relating to the methodology used in any valuation of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to instructions received regarding methodology, communications discussing the change from net asset value methodology to discounted cash flow methodology, supporting calculations, assumptions, and comparable transactions or valuations.

**RESPONSE:**

**REQUEST NO. 72:** All Documents and Communications related to the identity, ownership structure, principals, managers, or beneficial owners of Celia Holdco LLC.

**RESPONSE:**

**REQUEST NO. 73:** All Documents relating to the voluntary liquidation of Charitable DAF Holdco, Ltd. filed on April 2, 2025 in the Cayman Islands, including the petition, any supporting documents, and Communications regarding the decision to initiate liquidation.

**RESPONSE:**

**REQUEST NO. 74**: All Documents produced to or received from the Joint Official Liquidators of Charitable DAF Holdco, Ltd. in connection with their investigation of Patrick's activities.

**RESPONSE:**

**REQUEST NO. 75**: All Documents relating to any actions taken by Patrick or Murphy in response to the investigative efforts of the Joint Official Liquidators in the Cayman Islands, including any expenditures of DAF assets for legal fees or other expenses incurred in opposing such efforts.[13]

**RESPONSE:**

[13] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 76**: All Documents relating to Creative Hearts TX, including (a) its formation documents; (b) the involvement of Patrick, his wife, or his daughter with the entity; and (c) any donations or payments made to it by any DAF Entity.[14]

**RESPONSE:**

**REQUEST NO. 77**: All Documents relating to the Patrick-Cronin Proposal.

**RESPONSE:**

Dated: March 23, 2026

*/s/ Geoffrey S. Harper*
**Geoffrey S. Harper**
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

**John Michael Gaddis**
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

[14] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**CERTIFICATE OF SERVICE**

I certify that on March 23, 2026, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

***Via Electronic Mail:***

James D. Shields, jshields@shieldslegal.com
Registered Agent
Shields Legal Group P.C.
16400 Dallas Parkway, Suite 300
Dallas, TX 75248

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO CLO HOLDCO, LTD.**

**To:** CLO Holdco, Ltd., by and through their counsel of record, Louis M. Phillips, louis.phillips@kellyhart.com, **Kelly Hart Pitre**, One American Place, 301 Main Street, Suite 1600, Baton Rouge, LA 70801-1916; Amelia L. Hurt, amelia.hurt@kellyhart.com, **Kelly Hart Pitre**, 400 Poydras Street, Suite 1812, New Orleans, LA 70130; Hugh G. Connor II, hugh.connor@kellyhart.com, Michael D. Anderson, michael.anderson@kellyhart.com, Katherine T. Hopkins, katherine.hopkins@kellyhart.com, **Kelly Hart & Hallman**, 201 Main Street, Suite 2500, Fort Worth, TX 76102

Interested Party The Dugaboy Investment Trust ("Dugaboy") serves this First Set of Requests for Production of Documents to Charitable DAF Fund, LP ("DAF Entities"), pursuant to Rule 34 of the Federal Rules of Civil Procedure, which is incorporated into bankruptcy proceedings by Federal Rules of Bankruptcy Procedure 7034 and 9014(c)(1). The DAF Entities must respond to these Requests for Production within thirty (30) days of service. We ask that You produce documents at the offices of King & Spalding, 2601 Olive Street, Suite 2300, Dallas, TX 75201, or by electronic production in a mutually agreed format.

**INSTRUCTIONS**

1. In responding to these Requests, You must furnish all information that is available to You, that is within Your possession, custody, or control, or that is subject to Your reasonable inquiry,

including information in the possession of Your attorneys, accountants, advisors, representatives, agents, or other persons directly or indirectly employed by, or connected with, You or Your attorneys, and anyone else otherwise subject to Your control. All Documents that respond, in whole or in part, to any portion of the Requests below shall be produced in their entirety, including all attachments and enclosures.

2. The relevant time period for documents responsive to these Requests, unless otherwise specified in an individual Request, is the period beginning on the earlier of October 1, 2024, or such date as identified in response to Request No. 1,[1] through the present.

3. To the extent that the below Requests include requests for paper records, such paper records shall be scanned or otherwise converted into electronic form from paper documents in the following format:

(a) All documents shall be scanned to single page Group 4, TIFF format, at least 300 dpi and 8½ x 11 inch page size, except for documents requiring higher resolution or different page size.

(b) In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). The Parties will make their best efforts to have their vendors unitize documents correctly and will commit to address situations where there are improperly unitized documents. For documents found in folders or other containers with labels, tabs, or other identifying information, such labels and tabs shall be scanned where practicable. Pages with Post-it notes shall be scanned both with and

[1] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

without the Post-it, with the image of the page with the Post-it preceding the image of the page without the Post-it.

(c) Productions of the images shall be made using an image load file (.OPT or .LFP) and a delimited database/metadata load file (.DAT). Each image file should have a unique file name which shall be the Bates number of the page.

(d) The following objective coding fields should be provided, if applicable:

(1) beginning Bates number;

(2) ending Bates number;

(3) beginning attachment Bates number;

(4) ending attachment Bates number;

(5) page count; and

(6) source location/custodian.

(e) Document level OCR should be provided as a separate text file. The file name of each text file should correspond to the file name of the first image file of the document with which it is associated. The text files will not contain the redacted portions of the documents. OCR software should be set to the highest quality setting during processing. For documents in foreign languages, the OCR shall be performed using an OCR tool and settings suitable for the particular byte or multi-byte languages.

4. To the extent that the below Requests include requests for electronically stored information ("ESI"), all ESI shall be produced in TIFF format according to the following specifications:

(a) All TIFF formatted documents will be single page, Group 4 TIFF at 300 x 300 dpi resolution and 8½ x 11 inch page size, except for documents requiring different resolution or page size.

(b) An image load file, in standard Opticon format, showing the Bates number of each page and the appropriate unitization of the documents, will accompany all document images.

(c) Each imaged version of an electronic document will be created directly from the original electronic document.

(d) TIFFs shall be produced as black and white, single-page TIFF images in accordance with the technical specifications set out above. Word documents that have tracked changes or comments shall be produced in color. In addition, upon written request that identifies a reasonable number of individual documents at issue by Bates number, a party shall produce color images for those documents. Documents produced in color shall be produced as single page, 300 DPI, color JPG images with the quality setting of 75% or higher.

(e) All TIFF files are to be provided with an accompanying searchable text (.TXT) file extracted from the native, electronic file (not generated as an OCR file from the TIFF image(s)), and such text files shall contain the full text extraction. To the extent reasonably feasible, extracted text shall provide all comments, tracked changes, speaker's notes, and text from hidden worksheets, slides, columns, and rows. In the case of files with redacted text, OCR'ed text of the redacted documents may be provided in lieu of extracted text. OCR software should be set to the highest quality setting during processing.

5. To the extent reasonably feasible, all Documents produced shall be produced with metadata and attachments intact. The term "metadata" means all information describing the history, tracking, or management of an electronic document including, but not limited to, the date(s) the document was created, modified, accessed, or distributed; the author(s) and all recipient(s) of the document; the file's name; the file's location (e.g., directory structure or pathname); the file format or file type; and the file size. For comparison purposes and to ensure authenticity, where documents are produced in native format, such documents shall also be produced in the ESI format described in Instruction No. 3, unless otherwise agreed by the parties.

6. Should You object to any Request, You must specifically and in detail state the grounds and reasons for the objection, and state in detail the part of the language of the Request to which You object, and state which part of the Request, if any, You are answering.

7. Under the Crime-Fraud Exception and Subject-Matter Waiver, items which would typically be privileged are not privileged in this matter. The Fifth Circuit recognizes the Crime-Fraud Exception to privilege, under which attorney-client communications and/or work product materials are not privileged if "the client consults an attorney for advice that will assist the client in carrying out a contemplated illegal or fraudulent scheme." *Lewis v. Crochet*, 105 F.4th 272, 282 (5th Cir. 2024) (quoting *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1242 (5th Cir. 1982)). The exception applies where (1) a crime or fraud was impending or continuing at the time of the communication, and (2) the communications or work product at issue were in furtherance of that criminal or fraudulent activity. *See In re E.E.O.C.*, 207 F. App'x 426, 434 (5th Cir. 2006). Dugaboy reasonably believes, and has evidence to support, that certain communications and work product it seeks were intended to further continuing or future criminal or fraudulent activity and are therefore not privileged.

Likewise, Subject-Matter Waiver under Federal Rule of Evidence 502(a) provides that disclosure of certain information in a federal proceeding waives privilege for related information when (1) the waiver was intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) the disclosed and undisclosed communications and work product "ought in fairness to be considered together." Fed. R. Evid. 502(a); *see also Crider Inc. v. Silgan Containers LLC*, 2023 WL 479094, at *22 (N.D. Tex. Jan. 13, 2023). Any communications or work product that would otherwise be privileged, but concern the same subject matter intentionally disclosed by Mark Patrick in his affidavits or testimony in this Proceeding or Related Proceedings fall under this exception, and privilege has been waived.

Accordingly, under these exceptions and waivers, You must produce documents that would typically be privileged as they relate to (1) any fraudulent activity that counsel was involved in or knew of, or (2) any privileged conversation or information that has already been disclosed elsewhere in this litigation.

If You still contend that any Documents sought by the Requests are privileged or otherwise protected from discovery, You must nevertheless identify for each Document withheld:

(a) the legal basis for withholding the Document;

(b) the person asserting any claim of privilege and/or protection;

(c) a description and identification of the requested Document sufficient to frame an appropriate demand for the Document and a motion to compel disclosure thereof, setting forth at least the following:

(i) the author and/or signatory of the Document withheld;

(ii) the date of the Document withheld;

(iii) all addressees and/or recipients of the Document withheld; and

(iv) the subject matter and circumstances under which the Document withheld was created in sufficient detail to ascertain applicability of such privilege or other legal basis.

8. Notwithstanding a claim that a portion of a Document is privileged or otherwise protected from disclosure, any such Document must be produced with the portion claimed to be protected excised.

9. If You contend that any Request is ambiguous or unclear, contact undersigned counsel as soon as possible so that the Request can be clarified to avoid unnecessary delays in discovery.

10. These Requests are continuing in nature. Any Documents located, created, or obtained subsequent to the Documents provided in response to these Requests and that should have been produced had they been known shall be promptly supplied by supplemental responses whenever You find, locate, or acquire such Documents. You are required to supplement and correct Your answers and responses on a timely basis.

## DEFINITIONS

As used herein, the terms listed below shall be defined as follows. Insofar as a term is not explicitly defined, the meaning to be used is the commonly accepted definition of the term. Notwithstanding any definition set forth below, each word, term, or phrase used in these Requests is intended to have the broadest meaning permitted under applicable rules. The following terms are to be given their ascribed definitions:

### A. Proceedings

1. The term "this Proceeding" or "this Litigation" or "Main Case" refers to the main bankruptcy proceeding *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

2. The term “Related Proceedings” includes all other legal proceedings or actions involving or related to Highland, HMIT, and persons, parties, or entities involved with or affected by the Settlement, specifically including but not limited to the Cayman Islands Proceedings, the Chapter 15 proceeding in the United States Bankruptcy Court for the District of Delaware, and the Texas Business Court proceeding, as well as any bankruptcy adversary proceedings before the United States Bankruptcy Court for the Northern District of Texas that are separate from the Main Case.

**B. Parties and Individuals**

1. The term “You” or “Your” refers to CLO Holdco, Ltd. as well as its agents, attorneys, accountants, advisors, representatives, or any other individual(s) or entity(ies) acting or authorized to act on behalf of them, and any related companies, divisions, or subsidiaries, past or present, including, without limitation, the directors, officers, employees, agents, or attorneys thereof, as well as any predecessors-in-interest or successors-in-interest.

2. The term “Patrick” refers to Mark Eric Patrick.

3. The term “Dondero” refers to James Dondero.

4. The term “Okada” refers to Mark Okada.

5. The term “Seery” or “Claimant Trustee” refers to James P. Seery, Jr.

6. The term “Kirschner” or “Litigation Trustee” refers to Marc S. Kirschner.

7. The term “Murphy” refers to Paul Murphy.

8. The term “Scott” refers to Grant Scott.

9. The term “Cronin” refers to Kevin Cronin.

10. The term “Honis” refers to John Honis.

11. The term “Raver” refers to Shawn Raver.

**C. Highland Entities and Related Trusts**

12. The term "Highland" or "Highland Capital Management" refers to Highland Capital Management, L.P., a Dallas-based, Delaware-domiciled investment advisor, and the Debtor in the matter *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

13. The term "Highland Entities" or "Highland Entity" refers collectively to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

14. The term "Highland Claimant Trust" refers to the entity created under the Plan to hold, monetize, and distribute the assets of Highland's estate.

15. The term "Highland Litigation Sub-Trust" or "Litigation Sub-Trust" refers to the trust created under the Plan for the purpose of pursuing litigation claims on behalf of the Highland estate.

16. The term "Highland Indemnity Trust" or "Indemnity Trust" refers to the trust created under the Plan to hold assets for the purpose of indemnification obligations arising out of the Highland estate.

17. The term "Highland Party" or "Highland Parties" refers to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, the Highland Indemnity Trust, and each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, and subsidiaries, and any persons or entities acting or authorized to act on their behalf.

**D. HMIT Entities and Related Parties**

1. The term "HMIT Entities" refers collectively to Hunter Mountain Investment Trust and Beacon Mountain, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "HMIT Parties" refers broadly to the HMIT Entities, Mark Patrick, and any related decision maker with respect to the HMIT Entities, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

3. The term "Hunter Mountain" or "HMIT" refers to Hunter Mountain Investment Trust.

4. The term "Beacon Mountain" refers to Beacon Mountain, LLC.

5. The term "Beacon Hunter" refers to Beacon Hunter, LLC.

**E. Rand Entities**

1. The term "Rand Parties" or "Rand Entities" refers collectively to Rand PE Fund I, LP, Rand Advisors, LLC, and Rand PE Fund Management, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "Rand Fund" or "Rand PE Fund" refers to Rand PE Fund I, LP.

3. The term "Rand Advisors" refers to Rand Advisors, LLC, an SEC-registered investment advisor that served as the investment adviser to Rand PE Fund I, LP.

4. The term "Rand PE Fund Management" refers to Rand PE Fund Management, LLC.

**F. DAF Entities and Related Structures**

1. The term "DAF" or "Charitable DAF Holdco" refers to Charitable DAF Holdco, Ltd.

2. The term "DAF Fund" or "Charitable DAF Fund" refers to Charitable DAF Fund, LP.

3. The term "DAF GP" or "Charitable DAF GP" refers to Charitable DAF GP, LLC.

4. The term "DAF Structure" refers to the overall donor-advised fund investment vehicle and its constituent entities, including Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, and any entity holding ownership or management interests therein or formed in connection therewith, including any entities created as part of the restructuring of the DAF.

5. The term "DAF Entities" refers collectively to Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, CDH GP, Ltd., CDMCFAD, LLC, DFW Charitable Foundation, CLO Holdco, LLC, and any other entity formed, restructured, or otherwise created in connection with or derived from the DAF Structure, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

6. The terms "New GP" or "CDH GP" refer to CDH GP, Ltd.

7. The term "CDMCFAD" or "DAF 2.0" refers to CDMCFAD, LLC.

8. The term "DFW Charitable Foundation" or "DFW Foundation" refers to DFW Charitable Foundation.

9. The term "CLO Holdco" refers to CLO Holdco, LLC.

**G. Charitable and Donor Entities**

1. The terms "The Dallas Foundation" or "Dallas Foundation" refer to The Dallas Foundation.

2. The term "Crown Global" refers to Crown Global Life Insurance, Ltd.

3. The terms "Empower" or "Empower Dallas" refer to Empower Dallas.

4. The term "Okada Foundation" refers to the Okada Foundation.

5. The term "Charitable Beneficiaries" or "Charities" refers collectively to The Dallas Foundation, Crown Global Life Insurance, Ltd., Empower Dallas, the Okada Foundation, and any other charitable organization or foundation that held beneficial ownership in the DAF Structure through participation shares or annuity policies.

6. The term "Highland Dallas Foundation" refers to Highland Dallas Foundation, Inc.

7. The term "Highland Santa Barbara Foundation" refers to Highland Santa Barbara Foundation, Inc.

8. The term "Highland Kansas City Foundation" refers to Highland Kansas City Foundation, Inc.

9. The term "Participation Shares" refers to the shares in Charitable DAF Holdco, Ltd. held by the Charitable Foundations through which the Foundations held beneficial ownership in the DAF Structure.

**H. Other Entities**

1. The term "Dugaboy" refers to The Dugaboy Investment Trust.
2. The term "Strand" or "Strand Advisors" refers to Strand Advisors, Inc.
3. The terms "Atlas Fund" or "Atlas IDF" refers to Atlas IDF, LP.
4. The terms "Skyview" or "Skyview Group" refers to The Skyview Group.
5. The term "Fortaris" or "Fortaris Capital Advisors" refers to Fortaris Capital Advisors.
6. The term "ValueScope" refers to ValueScope, LLC.
7. The term "Celia Holdco" refers to Celia Holdco LLC.
8. The terms "Creative Hearts" or "Creative Hearts TX" refer to Creative Hearts TX.

**I. Law Firms**

1. The term "Kelly Hart" refers to Kelly Hart & Hallman LLP, or any predecessor or successor firm or any associated attorney.

2. The term "Shields Law Group" refers to Shields Law Group, P.C., or any predecessor or successor firm or any associated attorney.

**J. Litigation, Settlement, and Bankruptcy Terms**

1. The term "Highland Bankruptcy" refers to the Chapter 11 bankruptcy case titled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj, pending in the United States Bankruptcy Court for the Northern District of Texas.

2. The term "Settlement Agreement" refers to each and every discussion or negotiation of settlement or iteration of the settlement agreement between the Highland Entities and the HMIT Entities, together with all exhibits, schedules, appendices, and ancillary documents, and including any preliminary drafts, associated documents, and communications related thereto.

3. The term "Settlement Agreement & General Release" or "9019 Settlement" refers to the Settlement Agreement & General Release dated May 19, 2025, by and among the Highland Entities and the HMIT Entities, as approved by the Court, together with all exhibits, schedules, appendices, and ancillary documents.

4. The term "9019 Motion" refers to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, filed on May 19, 2025 (Bankr. Dkt. 4217).

5. The term "Rule 9019 Settlement Order" refers to the Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT

Entities and Authorizing Actions Consistent Therewith, entered on June 30, 2025 (Bankr. Dkt. 4297).

6. The term "Kirschner Litigation" or "Kirschner Claims" or "Transferred Claims" refers to the 36-count adversary complaint filed by Marc A. Kirschner, as Litigation Trustee, styled Kirschner v. Dondero, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex. Oct. 15, 2021), together with any amended, supplemental, or related pleadings, and the claims asserted therein.

7. The term "Plan" refers to Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization (as Modified), confirmed on February 22, 2021.

8. The term "Confirmation Order" refers to the Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.

9. The term "Class 10" refers to the class of claims under the Plan designated as "Class 10 Claims" and consisting of the claim held by Hunter Mountain Investment Trust as a holder of pre-bankruptcy Class B and C limited partnership interests in Highland.

10. The term "Class 11" refers to the class of claims under the Plan designated as "Class 11 Claims" and consisting of the claim held by other equity holders holding pre-bankruptcy Class A limited partnership interests in Highland.

11. The term "Class 10 Interest" or "HMIT Class 10 Interest" refers to Hunter Mountain Investment Trust's allowed Class 10 claim in the amount of $336,940,230.58 as set forth in the Settlement Agreement and associated Order.

12. The term "Contingent Claimant Trust Interests" refers to the interests given to the former equity holders under the Plan in the Highland Claimant Trust, which were to vest only upon certification by the Claimant Trustee that all unsecured creditors had been paid in full with interest.

13. The term "Work Plan" refers to the plan or plans prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities.

14. The term "Withdrawal Stipulation" refers to the Stipulation Withdrawing Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd. to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith (Bankr. Dkt. 4291).

15. The term "Dugaboy Note" refers to the promissory note dated May 31, 2017, in the original amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

16. The term "Texas Business Court Proceeding" or "Business Court Proceeding" refers to Case No. 25-BC01B-0027 filed in the Texas Business Court, First Division on July 1, 2025, and captioned *The Highland Dallas Foundation, Inc. ,The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. vs. DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC,CDH GP, Ltd., and Mark Patrick.*

**K. Cayman Islands Proceedings**

1. The terms "Cayman Islands Proceeding(s)" or "Cayman Proceeding" refer collectively to all judicial proceedings in the Cayman Islands relating to Charitable DAF Holdco, Ltd. or any DAF Entity, including (a) the voluntary liquidation filed by Patrick on April 2, 2025; (b) the winding up petition filed by the charitable owners on April 23, 2025 (No. FSD 99 of 2025 (JAJ)); (c) the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators on July 15, 2025 (No. FSD 201 of 2025); and (d) all related proceedings, investigations, hearings, orders, and filings.

2. The term "Joint Official Liquidators" or "JOLs" refers to the court-appointed liquidators designated by the Cayman Islands court on or about May 6, 2025 to oversee the DAF's operations.

3. The term "Statement of Claim" refers to the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators in the Cayman Islands Proceeding on July 15, 2025.

4. The term "Chapter 15 Petition" refers to the petition filed by the Joint Official Liquidators in the United States Bankruptcy Court for the District of Delaware on July 21, 2025.

5. The term "Patrick-Cronin Proposal" refers to the proposal made by Mark Patrick to Kevin Cronin, a principal of Fortaris Capital Advisors, to make and split monthly payments to the DAF, as referenced in Paragraph 173 of the Third Affidavit of Mark Patrick.

**L. General Discovery Terms**

1. The term "Document" or "Documents" is used in its broadest possible sense and refers, without limitation, to anything upon which any expression, communication, or representation has been recorded by any means. The term includes, but is not limited to: correspondence, emails, text messages, instant messages, messages/posts on social media, handwritten notes, photographs, working papers, any drafts of documents (preliminary, intermediate, and/or final), memoranda, contracts/agreements, tapes, business records, financial records, charts, notes, records of any sort of meetings, reports of telephone or other oral conversations, calendars (whether hardcopy or electronic, including desk calendars, phone calendars, or other calendars using software or an application), appointment books, audio or video tape recordings, information on computer disc/card/drive, computer entries that can be retrieved electronically, databases, and all other writings and recordings of every kind that are in Your actual or constructive possession, custody, or control. The term includes, but is not limited to, drafts and copies of any documents, whether identical to the original or different from the original because of notes, comments, highlighting,

edits, any other alterations made on such copies, indications that said copies were sent to different individuals than were the originals, or any other reason.

2. The term "Communication" or "Communications" means any transmission of information in any context or situation by or between two or more Persons by any means or medium whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically, or digitally, or on tape, either orally or in writing, including, but not limited to, conversations, correspondence, emails, text messages, instant messages, social media communications, telexes, facsimile transmissions, telecopies, recordings in any medium of oral, written, or typed communication, telephone or message logs, notes or memoranda relating to written or oral communications, and any translation thereof.

3. The terms "Person" or "Entity" and their plural forms mean natural persons, proprietorships, partnerships, firms, trusts, estates, companies, corporations, public corporations, sole practitioners, municipal corporations, federal, state, and local governments, all departments and agencies thereof, any other governmental agencies, subdivisions, groups, associations, or organizations, or any other entity, whether foreign or domestic.

4. The term "thing" means any tangible item, including without limitation, models, prototypes, and samples of any device or apparatus or product.

5. The terms "concerning," "regarding," "referring to," "related to," or "relating to" shall be construed in the broadest possible sense, and shall mean without limitation and whether in whole or in part: referring to, constituting, bearing upon, commenting upon, reflecting, evidencing, pertaining to, describing, depicting, consisting of, containing, comprising, embodying, identifying, stating, discussing, analyzing, studying, summarizing, dealing with, relating to, or having any logical or factual connection whatsoever with the subject addressed.

6. The terms "state" or "describe" mean to fully elucidate by reference to underlying facts rather than by reference to ultimate facts or conclusions of fact or law; where applicable, to particularize as to time, place, and manner; and to set forth all relevant facts necessary to complete the understanding of the act, process, event, or thing in question.

7. The term "Relevant Period" refers to the period beginning on the earlier of January 1, 2025, or such date as identified in Response to Request No. 1,[2] through the present.

8. The present tense includes the past and future tenses.

9. The singular includes the plural, and the plural includes the singular.

10. Words in the masculine, feminine, and neutral form shall include each of the other genders.

11. Whenever used herein, "and" may be understood to mean "or" and vice versa whenever such construction results in a broader request for information.

12. "All" means "any and all" and "any" means "any and all."

13. "Including" means "including but not limited to."

14. The term "identify" means and requires You to:

(a) With reference to an individual, state his or her full name and last known residential address, business address, telephone and/or facsimile number, the name and address of his or her employer, the individual's job title or job responsibilities, and his or her relationship to You;

(b) With reference to a company or organization, state the entity's full legal name, business addresses, telephone number, and a person with whom You had direct contact within that entity;

[2] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

(c) With reference to a document, describe the document, state the date when the document was created, name the creator of the document, and name each person to whom the document was sent;

(d) With reference to an oral communication, provide the date(s) of the communication, the names and addresses of all parties, when the communication occurred, the place(s) where the communication took place, the subject matter of the communication, and the general substance of the communication; and

(e) With reference to an occurrence or event, provide the date and location of the occurrence or event, the identity of each person involved in the occurrence or event, the subject matter discussed, and the identity of any document that records, refers to, or relates to such occurrence or event.

## DOCUMENT REQUESTS

**REQUEST NO. 1:** All Documents and Communications between or among Highland Capital Management, L.P. (or its representatives, including James P. Seery, Jr. or the Claimant Trustee) and any of the HMIT Entities concerning the 9019 Settlement, including but not limited to draft agreements, term sheets, and settlement proposals, and including Documents sufficient to show the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement.

**RESPONSE:**

**REQUEST NO. 2:** All Documents and Communications exchanged between any Highland Party and any person or party prior to execution of the Settlement Agreement relating to CLO Holdco, LLC, including, but not limited to, its formation, purpose, officers, members, managers, and participation or role in any transaction.

**RESPONSE:**

**REQUEST NO. 3:** All Documents and Communications relating to, referencing, or reflecting the consideration received by Hunter Mountain Investment Trust in exchange for entering into the Settlement Agreement & General Release dated May 19, 2025, including any valuations, appraisals, or analyses of the value received.

**RESPONSE:**

**REQUEST NO. 4:** All Documents and Communications sufficient to show the reason or rationale for the HMIT Entities' agreement to transfer or relinquish litigation rights previously asserted against Highland Entities in exchange for the consideration set forth in the Settlement Agreement.

**RESPONSE:**

**REQUEST NO. 5:** All Communications between You and any third party relating to the Settlement Agreement, the 9019 Motion, or the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 6:** All Documents relating to the current value of the Highland Claimant Trust, including any reports, analyses, or projections of Highland's remaining assets, estimated distributions to claimants, and any anticipated residual value available for Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 7:** All Documents reflecting Highland Capital Management, L.P.'s knowledge of (a) the restructuring of the DAF Entities; (b) the sale of Beacon Mountain to CLO Holdco, LLC; (c) any change in the beneficial ownership of Hunter Mountain; or (d) any investigation of Patrick by the Cayman Islands court, the Texas Attorney General, or any other governmental authority.

**RESPONSE:**

**REQUEST NO. 8:** All Communications between Highland Capital Management, L.P. and any of the following regarding the 9019 Settlement or any restructuring of the HMIT Entities or DAF Entities: The Dallas Foundation, Crown Global Life Insurance, Ltd., the Texas Attorney General, or any Cayman Islands governmental or judicial authority.

**RESPONSE:**

**REQUEST NO. 9:** All Documents relating to the Stipulation Withdrawing Objection of The Dallas Foundation and Crown Global, including all Communications between Highland and The Dallas Foundation regarding the terms thereof.

**RESPONSE:**

**REQUEST NO. 10:** All bank statements, brokerage statements, investment account statements, balance sheets, financial statements, and accounting records for the following: Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco, LLC; CDMCFAD, LLC; Charitable DAF Holdco, Ltd.; Charitable DAF Fund, LP; DFW Charitable Foundation; and any other DAF entity, including consolidated and entity-level statements.

**RESPONSE:**

**REQUEST NO. 11:** All Documents and Communications relating to any transfer of any interests in Hunter Mountain Investment Trust, Beacon Mountain, LLC, CLO Holdco, LLC, CDMCFAD, LLC, and DFW Charitable Foundation, including but not limited to assignment agreements, contribution agreements, and corporate resolutions approving transfers.

**RESPONSE:**

**REQUEST NO. 12:** All Communications between Patrick and any financial advisor regarding the valuation of the charitable owners' membership interests or any DAF Entity assets.

**RESPONSE:**

**REQUEST NO. 13:** All Communications between You and Charitable DAF Fund, LP regarding the estimated or actual value of the Highland Capital Management, L.P. estate.

**RESPONSE:**

**REQUEST NO. 14:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Highland Capital Management, L.P. estate.

**RESPONSE:**

**REQUEST NO. 15:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Class 10 and Class 11 claims in the Highland Bankruptcy.

**RESPONSE:**

**REQUEST NO. 16:** All Documents and Communications sufficient to show the fair market value of Charitable DAF Fund, LP or its assets as of March 2025.

**RESPONSE:**

**REQUEST NO. 17:** All Documents and Communications referencing, relating to, or reflecting the valuation that resulted in the charitable owners receiving approximately $1.6 million for their direct or indirect interests in CDMCFAD and/or Charitable DAF Fund, LP in or around March 2025, including the redemption agreement and any valuation supporting such redemption.

**RESPONSE:**

**REQUEST NO. 18:** All Documents and Communications, including communications with counsel,[3] relating to the formation, incorporation, organization, or structuring of CDMCFAD, LLC (also known as "DAF 2.0"), including but not limited to articles of organization, operating agreements, corporate resolutions, board minutes, and all amendments thereto.

**RESPONSE:**

**REQUEST NO. 19:** All Documents relating to the limited liability company agreement for CDMCFAD, LLC, including provisions relating to (a) fiduciary duties; (b) Patrick's powers and discretion; and (c) the valuation and redemption of member interests.

**RESPONSE:**

[3] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 20:** All Documents relating to the formation, organization, or structuring of DFW Charitable Foundation, including articles of incorporation, bylaws, board minutes, member lists, and any charitable activities undertaken by said entity.

**RESPONSE:**

**REQUEST NO. 21:** All Documents and Communications related to or evidencing the knowledge of any Highland Party about DFW Charitable Foundation, including, but not limited to, the identity of the officers, directors, agents, or other persons with authority over DFW Charitable Foundation, the economic beneficiaries of DFW Charitable Foundation, and any payments made by DFW Charitable Foundation or any of its subsidiaries to Patrick.

**RESPONSE:**

**REQUEST NO. 22:** All Documents relating to the formation of CDH GP, Ltd., including any documents reflecting (a) Patrick's role or authority in the entity; (b) the replacement of Charitable DAF GP, LLC as the general partner of Charitable DAF Fund, LP; and (c) any Communications discussing the purpose of such replacement.

**RESPONSE:**

**REQUEST NO. 23:** All Documents relating to any transfer of assets from Charitable DAF Holdco, Ltd. or Charitable DAF Fund, LP to CDMCFAD, LLC or any entity controlled by Patrick, including the assignment of limited partnership interests referenced in the Statement of Claim filed in the Cayman Islands.

**RESPONSE:**

**REQUEST NO. 24:** All Documents and Communications sufficient to show when Hunter Mountain Investment Trust or any HMIT Party first received any indication, analysis, projection, or belief that the Class 10 or Class 11 claims would have net value available for distribution, including the timing of such indication, the basis therefor, and any valuations, projections, or analyses supporting such indication

**RESPONSE:**

**REQUEST NO. 25:** All Documents and Communications regarding the reasons behind the equity ownership allocation reflected in Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization, including the allocation of (i) 99.5% to Hunter Mountain Investment Trust; (ii) 0.1866% to The Dugaboy Investment Trust; (iii) 0.0627% to Mark Okada and associated family trusts; and (iv) 0.25% to Strand Advisors, Inc.

**RESPONSE:**

**REQUEST NO. 26:** All Documents and Communications sufficient to show the circumstances surrounding Mark Patrick becoming the administrator of Hunter Mountain Investment Trust in 2022, including any appointment documents, resolutions, consents, correspondence, or agreements.

**RESPONSE:**

**REQUEST NO. 27:** All Documents and Communications relating to the transfer of management shares and ownership of Charitable DAF Fund, LP's general partner from Grant Scott to Mark Patrick in or around April 2021, including (a) any agreements governing the transfer; (b) any conditions or limitations on Patrick's authority; (c) any fiduciary duty obligations assumed by Patrick; (d) any Communications between Scott, Patrick, and the charitable owners regarding the transition; and (e) the consideration, if any, received by Grant Scott in exchange for such transfer.

**RESPONSE:**

**REQUEST NO. 28:** All Documents and Communications relating to, referencing, or reflecting any compensation, benefits, director fees, bonuses, or other remuneration paid to Grant Scott during his tenure as administrator or control person of the DAF Structure from 2011 through 2021.

**RESPONSE:**

**REQUEST NO. 29:** All Documents and Communications relating to, referencing, or reflecting any bonuses, compensation, director fees, or other remuneration paid to Mark Patrick from January 1, 2021, to the present from Hunter Mountain Investment Trust or any affiliated entity.

**RESPONSE:**

**REQUEST NO. 30:** All Documents and Communications relating to, referencing, or reflecting any bonuses, compensation, director fees, or other remuneration paid to Mark Patrick from January 1, 2021, to the present from DFW Charitable Foundation or any affiliated entity.

**RESPONSE:**

**REQUEST NO. 31:** All Documents and Communications relating to, referencing, or reflecting any bonuses, compensation, director fees, or other remuneration paid to Mark Patrick from January 1, 2021, to the present from Charitable DAF HoldCo, Ltd., Charitable DAF Fund, LP, or any affiliated entity within the DAF Structure.

**RESPONSE:**

**REQUEST NO. 32:** All Documents and Communications sufficient to show the basis for, approval of, and payment of director fees to Mark Patrick in each of 2022, 2023, 2024, and 2025, including any compensation studies, benchmarking reports, board approvals, or third-party assessments.

**RESPONSE:**

**REQUEST NO. 33:** All Documents and Communications sufficient to show the basis for, approval of, and payment of any bonuses to Mark Patrick in September 2024 and October 2024, including any written agreements, board resolutions, or documentation of performance metrics.

**RESPONSE:**

**REQUEST NO. 34:** All Documents relating to Mark Patrick's deposition testimony on June 23, 2025, including any preparation materials, Communications with counsel regarding anticipated questions, and documents reviewed in preparation for the deposition.[4]

**RESPONSE:**

**REQUEST NO. 35:** All Documents relating to Paul Murphy's role, authority, and compensation in connection with any DAF Entity, including (a) any agreement or arrangement governing Murphy's compensation; (b) any revision or amendment to Murphy's compensation plan, including any revision backdating payments to the beginning of 2025 that provided for $500,000 in fees triggered when injunctions are sought against the DAF; and (c) any Communications between Patrick and Murphy regarding the DAF restructuring, the 9019 Settlement, or the transfer of DAF assets.

**RESPONSE:**

**REQUEST NO. 36:** All Documents relating to indemnification payments or requests for indemnification made by or on behalf of Mark Patrick or Paul Murphy from any DAF Entity for legal fees or other expenses.

**RESPONSE:**

**REQUEST NO. 37:** All Documents relating to any Communications between Patrick and the charitable beneficiaries (The Dallas Foundation, Crown Global, Empower Dallas, or the Okada Foundation) from November 2024 through April 2025, including the "no confidence" letter sent by the charities in November 2024.

**RESPONSE:**

**REQUEST NO. 38:** All Communications between You and Highland Dallas Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

**REQUEST NO. 39:** All Communications between You and Highland Santa Barbara Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

**REQUEST NO. 40:** All Communications between You and Highland Kansas City Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

---

[4] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 41:** All Communications between You and The Dallas Foundation from January 1, 2021, to the present regarding the DAF Structure, Hunter Mountain Investment Trust, or the Settlement Agreement and General Release.

**RESPONSE:**

**REQUEST NO. 42:** All Documents and Communications reflecting, referencing, or relating to any inquiries, questions, or requests for information from Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., Highland Kansas City Foundation, Inc., or The Dallas Foundation regarding (a) the DAF Structure, (b) DAF assets, (c) distributions to charitable beneficiaries, (d) Mark Patrick's compensation, or (e) corporate restructuring.

**RESPONSE:**

**REQUEST NO. 43:** All Documents and Communications sufficient to show the conversion of the charitable trust originally formed in 2006 into a donor-advised fund investment vehicle for long-term charitable endeavors in or around October 2011, including any organizational documents, trust amendments, partnership agreements, or memoranda.[5]

**RESPONSE:**

**REQUEST NO. 44:** All Documents and Communications relating to, referencing, or reflecting the original structure and purpose of the donor-advised fund created in October 2011, including any tax opinions, IRS determination letters, or legal memoranda.[6]

**RESPONSE:**

**REQUEST NO. 45:** All Documents and Communications relating to, referencing, or reflecting the valuation of Highland Capital Management, L.P., or its assets.

**RESPONSE:**

**REQUEST NO. 46:** All Documents and Communications relating to, referencing, or reflecting Highland Capital Management, L.P.'s financial condition, including any monthly operating reports or quarterly operating reports.

**RESPONSE:**

**REQUEST NO. 47:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for any bankruptcy professional, creditor, or equity holder.[7]

---

[5] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[6] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[7] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**RESPONSE:**

**REQUEST NO. 48:** All Communications between You and Hunter Mountain Investment Trust reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 49:** All Communications between You and Hunter Mountain Investment Trust regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 50:** All Documents and Communications relating to, referencing, or reflecting efforts by any HMIT Entity to obtain updated financial reporting from Highland Capital Management, L.P., or its bankruptcy professionals during the bankruptcy proceedings.

**RESPONSE:**

**REQUEST NO. 51:** All Documents reflecting the "Work Plan" prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities, including any instructions to create entities that were "hard to find or track."[8]

**RESPONSE:**

**REQUEST NO. 52:** All Documents and Communications between Mark Patrick and any attorney or law firm from January 1, 2023, to the present regarding corporate restructuring, entity formation, or changes to the governance of the DAF Structure, including any "work plans" or engagement letters.[9]

**RESPONSE:**

**REQUEST NO. 53:** All Documents and Communications relating to, referencing, or reflecting the formation of any new entity within, related to, or derived from the DAF Structure from January 1, 2023, to the present, including DFW Charitable Foundation, CDMCFAD, LLC, and CDH GP, Ltd.[10]

**RESPONSE:**

---

[8] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[9] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[10] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 54:** All Documents and Communications between any attorney or law firm and Mark Patrick relating to the creation of new corporate entities within the DAF Structure.[11]

**RESPONSE:**

**REQUEST NO. 55**: All Documents relating to Mark Patrick's authority to act on behalf of Rand Advisors, LLC, Rand PE Fund I, LP, or any HMIT Entity, including any power of attorney, board resolutions, or operating agreement provisions granting such authority.

**RESPONSE:**

**REQUEST NO. 56:** All Documents relating to any change in the ownership, management, or control of Hunter Mountain Investment Trust, Beacon Mountain LLC, or any entity in the Hunter Mountain ownership chain from January 1, 2024 to the present.

**RESPONSE:**

**REQUEST NO. 57:** All organizational charts reflecting the corporate structure of (a) the DAF Entities; (b) the HMIT Entities; and (c) any entities through which Patrick directly or indirectly held an interest in Hunter Mountain, for any time during the Relevant Period.

**RESPONSE:**

**REQUEST NO. 58:** All documents and communications relating to, referencing, or reflecting the sale of Rand PE Fund I, LP's investment in Beacon Mountain, LLC in or around February 2025, including any purchase agreements, valuations, appraisals, or closing documents.

**RESPONSE:**

**REQUEST NO. 59**: All Documents relating to the transition of management of Rand PE Fund I, LP from John Honis to Patrick or any Patrick-controlled entity, including any Communications with investors or regulatory authorities regarding such transition.

**RESPONSE:**

**REQUEST NO. 60**: All audit reports, financial statements, and quarterly or annual reports for Rand PE Fund I, LP from January 1, 2023 to the present, including the 2024 audit issued on or about June 26, 2025.

**RESPONSE:**

**REQUEST NO. 61:** All Documents relating to the sale of Beacon Mountain LLC (or its interest in Hunter Mountain Investment Trust) to CLO Holdco, LLC, including but not limited to the purchase agreement, any valuations, closing documents, and wire transfer records.

**RESPONSE:**

---

[11] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 62**: All Documents relating to any consent (or lack thereof) from Crown Global Life Insurance, Ltd., The Dallas Foundation, or Atlas IDF, LP regarding the sale of Beacon Mountain's interest in Hunter Mountain to CLO Holdco, LLC or any Patrick-controlled entity.

**RESPONSE:**

**REQUEST NO. 63**: All Documents relating to compliance (or non-compliance) with Section 3.01(b) of the Amended and Restated Limited Partnership Agreement of Atlas Fund, which prohibits Rand Fund from selling Hunter Mountain to an affiliate of Patrick without investor consent.

**RESPONSE:**

**REQUEST NO. 64:** All Documents and Communications relating to any notice or other information given to investors in Rand PE Fund I, LP (including any 4% minority investor) from January 1, 2025, to the present regarding the sale of Beacon Mountain, LLC's interest in HMIT, or any distribution relating thereto, including the February 20, 2025 notice referenced in Dugaboy's Motion for Reconsideration.

**RESPONSE:**

**REQUEST NO. 65:** All Documents and Communications sufficient to show the basis for the $1 million valuation of Beacon Mountain, LLC's interest in Hunter Mountain Investment Trust in or around February 2025, including any valuation reports, appraisals, financial analyses, or Communications with ValueScope, LLC or any other valuation firm concerning such valuation.

**RESPONSE:**

**REQUEST NO. 66:** All Documents, correspondence, engagement letters, contracts, or agreements between You and ValueScope, LLC (or any other valuation firm) relating to the valuation of any interest, holding in, or security issued by any of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate.

**RESPONSE:**

**REQUEST NO. 67:** All draft and final valuation reports, memoranda, models, or analyses prepared by ValueScope, LLC relating to Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to the valuation of the Participation Shares; and any Communications challenging or questioning the valuation methodology or conclusions.

**RESPONSE:**

**REQUEST NO. 68:** All Documents relating to the methodology used in any valuation of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to instructions received regarding methodology, communications discussing the

change from net asset value methodology to discounted cash flow methodology, supporting calculations, assumptions, and comparable transactions or valuations.

**RESPONSE:**

**REQUEST NO. 69:** All Documents and Communications related to the identity, ownership structure, principals, managers, or beneficial owners of Celia Holdco LLC.

**RESPONSE:**

**REQUEST NO. 70:** All Documents relating to the voluntary liquidation of Charitable DAF Holdco, Ltd. filed on April 2, 2025 in the Cayman Islands, including the petition, any supporting documents, and Communications regarding the decision to initiate liquidation.

**RESPONSE:**

**REQUEST NO. 71**: All Documents produced to or received from the Joint Official Liquidators of Charitable DAF Holdco, Ltd. in connection with their investigation of Patrick's activities.

**RESPONSE:**

**REQUEST NO. 72**: All Documents relating to any actions taken by Patrick or Murphy in response to the investigative efforts of the Joint Official Liquidators in the Cayman Islands, including any expenditures of DAF assets for legal fees or other expenses incurred in opposing such efforts.[12]

**RESPONSE:**

**REQUEST NO. 73**: All Documents relating to Creative Hearts TX, including (a) its formation documents; (b) the involvement of Patrick, his wife, or his daughter with the entity; and (c) any donations or payments made to it by any DAF Entity.[13]

**RESPONSE:**

**REQUEST NO. 74**: All Documents relating to the Patrick-Cronin Proposal.

**RESPONSE:**

---

[12] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[13] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

Dated: March 23, 2026

*/s/ Geoffrey S. Harper*
**Geoffrey S. Harper**
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

**John Michael Gaddis**
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

I certify that on March 23, 2026, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

***Via Electronic Mail:***

Louis M. Phillips (louis.phillips@kellyhart.com)
**Kelly Hart Pitre**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916

Amelia L. Hurt (amelia.hurt@kellyhart.com)
**Kelly Hart Pitre**
400 Poydras Street, Suite 1812
New Orleans, LA 70130

Hugh G. Connor II, hugh.connor@kellyhart.com
Michael D. Anderson, Michael.anderson@kellyhart.com,
Katherine T. Hopkins, katherine.hopkins@kellyhart.com
**Kelly Hart & Hallman**
201 Main Street, Suite 2500
Fort Worth, TX 76102

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S FIRST SET OF REQUESTS FOR <u>PRODUCTION OF DOCUMENTS TO BEACON MOUNTAIN LLC</u>**

**To:** Beacon Mountain LLC, by and through their counsel of record, Louis M. Phillips, louis.phillips@kellyhart.com, **Kelly Hart Pitre**, One American Place, 301 Main Street, Suite 1600, Baton Rouge, LA 70801-1916 and Amelia L. Hurt, amelia.hurt@kellyhart.com, **Kelly Hart Pitre**, 400 Poydras Street, Suite 1812, New Orleans, LA 70130

Interested Party The Dugaboy Investment Trust ("Dugaboy"), serves this First Set of Requests for Production of Documents to Beacon Mountain LLC ("HMIT Entities"), pursuant to Rule 34 of the Federal Rules of Civil Procedure, which is incorporated into bankruptcy proceedings by Federal Rules of Bankruptcy Procedure 7034 and 9014(c)(1). The HMIT Entities must respond to these Requests for Production within thirty (30) days of service. We ask that You produce documents at the offices of King & Spalding, 2601 Olive Street, Suite 2300, Dallas, TX 75201, or by electronic production in a mutually agreed format.

**INSTRUCTIONS**

1. In responding to these Requests, You must furnish all information that is available to You, that is within Your possession, custody, or control, or that is subject to Your reasonable inquiry, including information in the possession of Your attorneys, accountants, advisors, representatives,

agents, or other persons directly or indirectly employed by, or connected with, You or Your attorneys, and anyone else otherwise subject to Your control. All Documents that respond, in whole or in part, to any portion of the Requests below shall be produced in their entirety, including all attachments and enclosures.

2. The relevant time period for documents responsive to these Requests, unless otherwise specified in an individual Request, is the period beginning on the earlier of October 1, 2024, or such date as identified in response to Request No. 1,[1] through the present.

3. To the extent that the below Requests include requests for paper records, such paper records shall be scanned or otherwise converted into electronic form from paper documents in the following format:

(a) All documents shall be scanned to single page Group 4, TIFF format, at least 300 dpi and 8½ x 11 inch page size, except for documents requiring higher resolution or different page size.

(b) In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). The Parties will make their best efforts to have their vendors unitize documents correctly and will commit to address situations where there are improperly unitized documents. For documents found in folders or other containers with labels, tabs, or other identifying information, such labels and tabs shall be scanned where practicable. Pages with Post-it notes shall be scanned both with and without the Post-it, with the image of the page with the Post-it preceding the image of the page without the Post-it.

[1] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

(c) Productions of the images shall be made using an image load file (.OPT or .LFP) and a delimited database/metadata load file (.DAT). Each image file should have a unique file name which shall be the Bates number of the page.

(d) The following objective coding fields should be provided, if applicable:

(1) beginning Bates number;

(2) ending Bates number;

(3) beginning attachment Bates number;

(4) ending attachment Bates number;

(5) page count; and

(6) source location/custodian.

(e) Document level OCR should be provided as a separate text file. The file name of each text file should correspond to the file name of the first image file of the document with which it is associated. The text files will not contain the redacted portions of the documents. OCR software should be set to the highest quality setting during processing. For documents in foreign languages, the OCR shall be performed using an OCR tool and settings suitable for the particular byte or multi-byte languages.

4. To the extent that the below Requests include requests for electronically stored information ("ESI"), all ESI shall be produced in TIFF format according to the following specifications:

(a) All TIFF formatted documents will be single page, Group 4 TIFF at 300 x 300 dpi resolution and 8½ x 11 inch page size, except for documents requiring different resolution or page size.

(b) An image load file, in standard Opticon format, showing the Bates number of each page and the appropriate unitization of the documents, will accompany all document images.

(c) Each imaged version of an electronic document will be created directly from the original electronic document.

(d) TIFFs shall be produced as black and white, single-page TIFF images in accordance with the technical specifications set out above. Word documents that have tracked changes or comments shall be produced in color. In addition, upon written request that identifies a reasonable number of individual documents at issue by Bates number, a party shall produce color images for those documents. Documents produced in color shall be produced as single page, 300 DPI, color JPG images with the quality setting of 75% or higher.

(e) All TIFF files are to be provided with an accompanying searchable text (.TXT) file extracted from the native, electronic file (not generated as an OCR file from the TIFF image(s)), and such text files shall contain the full text extraction. To the extent reasonably feasible, extracted text shall provide all comments, tracked changes, speaker's notes, and text from hidden worksheets, slides, columns, and rows. In the case of files with redacted text, OCR'ed text of the redacted documents may be provided in lieu of extracted text. OCR software should be set to the highest quality setting during processing.

5. To the extent reasonably feasible, all Documents produced shall be produced with metadata and attachments intact. The term "metadata" means all information describing the history, tracking, or management of an electronic document including, but not limited to, the date(s) the document was created, modified, accessed, or distributed; the author(s) and all recipient(s) of the document; the file's name; the file's location (e.g., directory structure or pathname); the file format or file type; and the file size. For comparison purposes and to ensure authenticity, where documents

are produced in native format, such documents shall also be produced in the ESI format described in Instruction No. 3, unless otherwise agreed by the parties.

6. Should You object to any Request, You must specifically and in detail state the grounds and reasons for the objection, and state in detail the part of the language of the Request to which You object, and state which part of the Request, if any, You are answering.

7. Under the Crime-Fraud Exception and Subject-Matter Waiver, items which would typically be privileged are not privileged in this matter. The Fifth Circuit recognizes the Crime-Fraud Exception to privilege, under which attorney-client communications and/or work product materials are not privileged if "the client consults an attorney for advice that will assist the client in carrying out a contemplated illegal or fraudulent scheme." *Lewis v. Crochet*, 105 F.4th 272, 282 (5th Cir. 2024) (quoting *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1242 (5th Cir. 1982)). The exception applies where (1) a crime or fraud was impending or continuing at the time of the communication, and (2) the communications or work product at issue were in furtherance of that criminal or fraudulent activity. *See In re E.E.O.C.*, 207 F. App'x 426, 434 (5th Cir. 2006). Dugaboy reasonably believes, and has evidence to support, that certain communications and work product it seeks were intended to further continuing or future criminal or fraudulent activity and are therefore not privileged.

Likewise, Subject-Matter Waiver under Federal Rule of Evidence 502(a) provides that disclosure of certain information in a federal proceeding waives privilege for related information when (1) the waiver was intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) the disclosed and undisclosed communications and work product "ought in fairness to be considered together." Fed. R. Evid. 502(a); *see also Crider Inc. v. Silgan Containers LLC*, 2023 WL 479094, at *22 (N.D. Tex. Jan.

13, 2023). Any communications or work product that would otherwise be privileged, but concern the same subject matter intentionally disclosed by Mark Patrick in his affidavits or testimony in this Proceeding or Related Proceedings fall under this exception, and privilege has been waived.

Accordingly, under these exceptions and waivers, You must produce documents that would typically be privileged as they relate to (1) any fraudulent activity that counsel was involved in or knew of, or (2) any privileged conversation or information that has already been disclosed elsewhere in this litigation.

If You still contend that any Documents sought by the Requests are privileged or otherwise protected from discovery, You must nevertheless identify for each Document withheld:

(a) the legal basis for withholding the Document;

(b) the person asserting any claim of privilege and/or protection;

(c) a description and identification of the requested Document sufficient to frame an appropriate demand for the Document and a motion to compel disclosure thereof, setting forth at least the following:

(i) the author and/or signatory of the Document withheld;

(ii) the date of the Document withheld;

(iii) all addressees and/or recipients of the Document withheld; and

(iv) the subject matter and circumstances under which the Document withheld was created in sufficient detail to ascertain applicability of such privilege or other legal basis.

8. Notwithstanding a claim that a portion of a Document is privileged or otherwise protected from disclosure, any such Document must be produced with the portion claimed to be protected excised.

9. If You contend that any Request is ambiguous or unclear, contact undersigned counsel as soon as possible so that the Request can be clarified to avoid unnecessary delays in discovery.

10. These Requests are continuing in nature. Any Documents located, created, or obtained subsequent to the Documents provided in response to these Requests and that should have been produced had they been known shall be promptly supplied by supplemental responses whenever You find, locate, or acquire such Documents. You are required to supplement and correct Your answers and responses on a timely basis.

**DEFINITIONS**

As used herein, the terms listed below shall be defined as follows. Insofar as a term is not explicitly defined, the meaning to be used is the commonly accepted definition of the term. Notwithstanding any definition set forth below, each word, term, or phrase used in these Requests is intended to have the broadest meaning permitted under applicable rules. The following terms are to be given their ascribed definitions:

**A. Proceedings**

1. The term "this Proceeding" or "this Litigation" or "Main Case" refers to the main bankruptcy proceeding *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

2. The term "Related Proceedings" includes all other legal proceedings or actions involving or related to Highland, HMIT, and persons, parties, or entities involved with or affected by the Settlement, specifically including but not limited to the Cayman Islands Proceedings, the Chapter 15 proceeding in the United States Bankruptcy Court for the District of Delaware, and the Texas Business Court proceeding, as well as any bankruptcy adversary proceedings before the United States Bankruptcy Court for the Northern District of Texas that are separate from the Main Case.

**B. Parties and Individuals**

1. The term "You" or "Your" refers to Beacon Mountain LLC as well as its agents, attorneys, accountants, advisors, representatives, or any other individual(s) or entity(ies) acting or authorized to act on behalf of them, and any related companies, divisions, or subsidiaries, past or present, including, without limitation, the directors, officers, employees, agents, or attorneys thereof, as well as any predecessors-in-interest or successors-in-interest.

2. The term "Patrick" refers to Mark Eric Patrick.

3. The term "Dondero" refers to James Dondero.

4. The term "Okada" refers to Mark Okada.

5. The term "Seery" or "Claimant Trustee" refers to James P. Seery, Jr.

6. The term "Kirschner" or "Litigation Trustee" refers to Marc S. Kirschner.

7. The term "Murphy" refers to Paul Murphy.

8. The term "Scott" refers to Grant Scott.

9. The term "Cronin" refers to Kevin Cronin.

10. The term "Honis" refers to John Honis.

11. The term "Raver" refers to Shawn Raver.

**C. Highland Entities and Related Trusts**

12. The term "Highland" or "Highland Capital Management" refers to Highland Capital Management, L.P., a Dallas-based, Delaware-domiciled investment advisor, and the Debtor in the matter *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

13. The term "Highland Entities" or "Highland Entity" refers collectively to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

14. The term "Highland Claimant Trust" refers to the entity created under the Plan to hold, monetize, and distribute the assets of Highland's estate.

15. The term "Highland Litigation Sub-Trust" or "Litigation Sub-Trust" refers to the trust created under the Plan for the purpose of pursuing litigation claims on behalf of the Highland estate.

16. The term "Highland Indemnity Trust" or "Indemnity Trust" refers to the trust created under the Plan to hold assets for the purpose of indemnification obligations arising out of the Highland estate.

17. The term "Highland Party" or "Highland Parties" refers to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, the Highland Indemnity Trust, and each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, and subsidiaries, and any persons or entities acting or authorized to act on their behalf.

**D. HMIT Entities and Related Parties**

1. The term "HMIT Entities" refers collectively to Hunter Mountain Investment Trust and Beacon Mountain, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "HMIT Parties" refers broadly to the HMIT Entities, Mark Patrick, and any related decision maker with respect to the HMIT Entities, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

3. The term "Hunter Mountain" or "HMIT" refers to Hunter Mountain Investment Trust.

4. The term "Beacon Mountain" refers to Beacon Mountain, LLC.

5. The term "Beacon Hunter" refers to Beacon Hunter, LLC.

**E. Rand Entities**

1. The term "Rand Parties" or "Rand Entities" refers collectively to Rand PE Fund I, LP, Rand Advisors, LLC, and Rand PE Fund Management, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "Rand Fund" or "Rand PE Fund" refers to Rand PE Fund I, LP.

3. The term "Rand Advisors" refers to Rand Advisors, LLC, an SEC-registered investment advisor that served as the investment adviser to Rand PE Fund I, LP.

4. The term "Rand PE Fund Management" refers to Rand PE Fund Management, LLC.

**F. DAF Entities and Related Structures**

1. The term "DAF" or "Charitable DAF Holdco" refers to Charitable DAF Holdco, Ltd.

2. The term "DAF Fund" or "Charitable DAF Fund" refers to Charitable DAF Fund, LP.

3. The term "DAF GP" or "Charitable DAF GP" refers to Charitable DAF GP, LLC.

4. The term "DAF Structure" refers to the overall donor-advised fund investment vehicle and its constituent entities, including Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP,

Charitable DAF GP, LLC, and any entity holding ownership or management interests therein or formed in connection therewith, including any entities created as part of the restructuring of the DAF.

5. The term "DAF Entities" refers collectively to Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, CDH GP, Ltd., CDMCFAD, LLC, DFW Charitable Foundation, CLO Holdco, LLC, and any other entity formed, restructured, or otherwise created in connection with or derived from the DAF Structure, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

6. The terms "New GP" or "CDH GP" refer to CDH GP, Ltd.

7. The term "CDMCFAD" or "DAF 2.0" refers to CDMCFAD, LLC.

8. The term "DFW Charitable Foundation" or "DFW Foundation" refers to DFW Charitable Foundation.

9. The term "CLO Holdco" refers to CLO Holdco, LLC.

**G. Charitable and Donor Entities**

1. The terms "The Dallas Foundation" or "Dallas Foundation" refer to The Dallas Foundation.

2. The term "Crown Global" refers to Crown Global Life Insurance, Ltd.

3. The terms "Empower" or "Empower Dallas" refer to Empower Dallas.

4. The term "Okada Foundation" refers to the Okada Foundation.

5. The term "Charitable Beneficiaries" or "Charities" refers collectively to The Dallas Foundation, Crown Global Life Insurance, Ltd., Empower Dallas, the Okada Foundation, and any other charitable organization or foundation that held beneficial ownership in the DAF Structure through participation shares or annuity policies.

6. The term "Highland Dallas Foundation" refers to Highland Dallas Foundation, Inc.

7. The term "Highland Santa Barbara Foundation" refers to Highland Santa Barbara Foundation, Inc.

8. The term "Highland Kansas City Foundation" refers to Highland Kansas City Foundation, Inc.

9. The term "Participation Shares" refers to the shares in Charitable DAF Holdco, Ltd. held by the Charitable Foundations through which the Foundations held beneficial ownership in the DAF Structure.

**H. Other Entities**

1. The term "Dugaboy" refers to The Dugaboy Investment Trust.
2. The term "Strand" or "Strand Advisors" refers to Strand Advisors, Inc.
3. The terms "Atlas Fund" or "Atlas IDF" refers to Atlas IDF, LP.
4. The terms "Skyview" or "Skyview Group" refers to The Skyview Group.
5. The term "Fortaris" or "Fortaris Capital Advisors" refers to Fortaris Capital Advisors.
6. The term "ValueScope" refers to ValueScope, LLC.
7. The term "Celia Holdco" refers to Celia Holdco LLC.
8. The terms "Creative Hearts" or "Creative Hearts TX" refer to Creative Hearts TX.

**I. Law Firms**

1. The term "Kelly Hart" refers to Kelly Hart & Hallman LLP, or any predecessor or successor firm or any associated attorney.

2. The term "Shields Law Group" refers to Shields Law Group, P.C., or any predecessor or successor firm or any associated attorney.

**J. Litigation, Settlement, and Bankruptcy Terms**

1. The term "Highland Bankruptcy" refers to the Chapter 11 bankruptcy case titled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj, pending in the United States Bankruptcy Court for the Northern District of Texas.

2. The term "Settlement Agreement" refers to each and every discussion or negotiation of settlement or iteration of the settlement agreement between the Highland Entities and the HMIT Entities, together with all exhibits, schedules, appendices, and ancillary documents, and including any preliminary drafts, associated documents, and communications related thereto.

3. The term "Settlement Agreement & General Release" or "9019 Settlement" refers to the Settlement Agreement & General Release dated May 19, 2025, by and among the Highland Entities and the HMIT Entities, as approved by the Court, together with all exhibits, schedules, appendices, and ancillary documents.

4. The term "9019 Motion" refers to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, filed on May 19, 2025 (Bankr. Dkt. 4217).

5. The term "Rule 9019 Settlement Order" refers to the Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, entered on June 30, 2025 (Bankr. Dkt. 4297).

6. The term "Kirschner Litigation" or "Kirschner Claims" or "Transferred Claims" refers to the 36-count adversary complaint filed by Marc A. Kirschner, as Litigation Trustee, styled Kirschner v. Dondero, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex. Oct. 15, 2021), together with any amended, supplemental, or related pleadings, and the claims asserted therein.

7. The term "Plan" refers to Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization (as Modified), confirmed on February 22, 2021.

8. The term "Confirmation Order" refers to the Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.

9. The term "Class 10" refers to the class of claims under the Plan designated as "Class 10 Claims" and consisting of the claim held by Hunter Mountain Investment Trust as a holder of pre-bankruptcy Class B and C limited partnership interests in Highland.

10. The term "Class 11" refers to the class of claims under the Plan designated as "Class 11 Claims" and consisting of the claim held by other equity holders holding pre-bankruptcy Class A limited partnership interests in Highland.

11. The term "Class 10 Interest" or "HMIT Class 10 Interest" refers to Hunter Mountain Investment Trust's allowed Class 10 claim in the amount of $336,940,230.58 as set forth in the Settlement Agreement and associated Order.

12. The term "Contingent Claimant Trust Interests" refers to the interests given to the former equity holders under the Plan in the Highland Claimant Trust, which were to vest only upon certification by the Claimant Trustee that all unsecured creditors had been paid in full with interest.

13. The term "Work Plan" refers to the plan or plans prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities.

14. The term "Withdrawal Stipulation" refers to the Stipulation Withdrawing Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd. to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith (Bankr. Dkt. 4291).

15. The term “Dugaboy Note” refers to the promissory note dated May 31, 2017, in the original amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

16. The term “Texas Business Court Proceeding” or “Business Court Proceeding” refers to Case No. 25-BC01B-0027 filed in the Texas Business Court, First Division on July 1, 2025, and captioned *The Highland Dallas Foundation, Inc. ,The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. vs. DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC,CDH GP, Ltd., and Mark Patrick.*

**K. Cayman Islands Proceedings**

1. The terms “Cayman Islands Proceeding(s)” or “Cayman Proceeding” refer collectively to all judicial proceedings in the Cayman Islands relating to Charitable DAF Holdco, Ltd. or any DAF Entity, including (a) the voluntary liquidation filed by Patrick on April 2, 2025; (b) the winding up petition filed by the charitable owners on April 23, 2025 (No. FSD 99 of 2025 (JAJ)); (c) the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators on July 15, 2025 (No. FSD 201 of 2025); and (d) all related proceedings, investigations, hearings, orders, and filings.

2. The term “Joint Official Liquidators” or “JOLs” refers to the court-appointed liquidators designated by the Cayman Islands court on or about May 6, 2025 to oversee the DAF’s operations.

3. The term “Statement of Claim” refers to the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators in the Cayman Islands Proceeding on July 15, 2025.

4. The term “Chapter 15 Petition” refers to the petition filed by the Joint Official Liquidators in the United States Bankruptcy Court for the District of Delaware on July 21, 2025.

5. The term "Patrick-Cronin Proposal" refers to the proposal made by Mark Patrick to Kevin Cronin, a principal of Fortaris Capital Advisors, to make and split monthly payments to the DAF, as referenced in Paragraph 173 of the Third Affidavit of Mark Patrick.

**L. General Discovery Terms**

1. The term "Document" or "Documents" is used in its broadest possible sense and refers, without limitation, to anything upon which any expression, communication, or representation has been recorded by any means. The term includes, but is not limited to: correspondence, emails, text messages, instant messages, messages/posts on social media, handwritten notes, photographs, working papers, any drafts of documents (preliminary, intermediate, and/or final), memoranda, contracts/agreements, tapes, business records, financial records, charts, notes, records of any sort of meetings, reports of telephone or other oral conversations, calendars (whether hardcopy or electronic, including desk calendars, phone calendars, or other calendars using software or an application), appointment books, audio or video tape recordings, information on computer disc/card/drive, computer entries that can be retrieved electronically, databases, and all other writings and recordings of every kind that are in Your actual or constructive possession, custody, or control. The term includes, but is not limited to, drafts and copies of any documents, whether identical to the original or different from the original because of notes, comments, highlighting, edits, any other alterations made on such copies, indications that said copies were sent to different individuals than were the originals, or any other reason.

2. The term "Communication" or "Communications" means any transmission of information in any context or situation by or between two or more Persons by any means or medium whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically, or digitally, or on tape, either orally or in writing, including, but not limited to,

conversations, correspondence, emails, text messages, instant messages, social media communications, telexes, facsimile transmissions, telecopies, recordings in any medium of oral, written, or typed communication, telephone or message logs, notes or memoranda relating to written or oral communications, and any translation thereof.

3. The terms "Person" or "Entity" and their plural forms mean natural persons, proprietorships, partnerships, firms, trusts, estates, companies, corporations, public corporations, sole practitioners, municipal corporations, federal, state, and local governments, all departments and agencies thereof, any other governmental agencies, subdivisions, groups, associations, or organizations, or any other entity, whether foreign or domestic.

4. The term "thing" means any tangible item, including without limitation, models, prototypes, and samples of any device or apparatus or product.

5. The terms "concerning," "regarding," "referring to," "related to," or "relating to" shall be construed in the broadest possible sense, and shall mean without limitation and whether in whole or in part: referring to, constituting, bearing upon, commenting upon, reflecting, evidencing, pertaining to, describing, depicting, consisting of, containing, comprising, embodying, identifying, stating, discussing, analyzing, studying, summarizing, dealing with, relating to, or having any logical or factual connection whatsoever with the subject addressed.

6. The terms "state" or "describe" mean to fully elucidate by reference to underlying facts rather than by reference to ultimate facts or conclusions of fact or law; where applicable, to particularize as to time, place, and manner; and to set forth all relevant facts necessary to complete the understanding of the act, process, event, or thing in question.

7. The term "Relevant Period" refers to the period beginning on the earlier of January 1, 2025, or such date as identified in Response to Request No. 1,[2] through the present.

8. The present tense includes the past and future tenses.

9. The singular includes the plural, and the plural includes the singular.

10. Words in the masculine, feminine, and neutral form shall include each of the other genders.

11. Whenever used herein, "and" may be understood to mean "or" and vice versa whenever such construction results in a broader request for information.

12. "All" means "any and all" and "any" means "any and all."

13. "Including" means "including but not limited to."

14. The term "identify" means and requires You to:

(a) With reference to an individual, state his or her full name and last known residential address, business address, telephone and/or facsimile number, the name and address of his or her employer, the individual's job title or job responsibilities, and his or her relationship to You;

(b) With reference to a company or organization, state the entity's full legal name, business addresses, telephone number, and a person with whom You had direct contact within that entity;

(c) With reference to a document, describe the document, state the date when the document was created, name the creator of the document, and name each person to whom the document was sent;

(d) With reference to an oral communication, provide the date(s) of the communication, the names and addresses of all parties, when the communication occurred, the place(s)

---

[2] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

where the communication took place, the subject matter of the communication, and the general substance of the communication; and

(e) With reference to an occurrence or event, provide the date and location of the occurrence or event, the identity of each person involved in the occurrence or event, the subject matter discussed, and the identity of any document that records, refers to, or relates to such occurrence or event.

**DOCUMENT REQUESTS**

**REQUEST NO. 1:** All Documents and Communications between or among Highland Capital Management, L.P. (or its representatives, including James P. Seery, Jr. or the Claimant Trustee) and any of the HMIT Entities concerning the 9019 Settlement, including but not limited to draft agreements, term sheets, and settlement proposals, and including Documents sufficient to show the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement.

**RESPONSE:**

**REQUEST NO. 2:** All Documents and Communications sufficient to show that the Settlement Agreement & General Release, by and among the Highland Entities and the HMIT Entities, was executed by persons with full power and authority to bind each HMIT Entity party thereto, including any board resolutions, corporate authorizations, consents, or approvals obtained prior to execution.

**RESPONSE:**

**REQUEST NO. 3**: All Documents relating to due diligence performed by Highland Capital Management, L.P. (or its representatives) concerning (a) the authority of Mark Patrick or any other person to bind the HMIT Entities to the 9019 Settlement; (b) the ownership structure of the HMIT Entities; or (c) any corporate restructuring of the HMIT Entities or the DAF Entities.

**RESPONSE:**

**REQUEST NO. 4**: All Documents and Communications exchanged between any Highland Party and any HMIT Entity prior to execution of the Settlement Agreement relating to or evidencing legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any changes thereto.

**RESPONSE:**

**REQUEST NO. 5:** All Documents and Communications exchanged between any Highland Party and any Rand Party prior to execution of the Settlement Agreement relating to or evidencing legal

ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any changes thereto.

**RESPONSE:**

**REQUEST NO. 6:** All Documents and Communications exchanged between any Highland Party and any person or party prior to execution of the Settlement Agreement relating to or evidencing any change in legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any transaction related thereto.

**RESPONSE:**

**REQUEST NO. 7:** All Documents and Communications exchanged between any Highland Party and any person or party prior to execution of the Settlement Agreement relating to CLO Holdco, LLC, including, but not limited to, its formation, purpose, officers, members, managers, and participation or role in any transaction.

**RESPONSE:**

**REQUEST NO. 8:** All Documents and Communications relating to, referencing, or reflecting due diligence performed by any HMIT Entity prior to the execution of the Settlement Agreement and General Release dated May 19, 2025, including any analysis of whether execution of the Settlement Agreement violated any other agreements, contracts, or fiduciary duties.

**RESPONSE:**

**REQUEST NO. 9:** All Documents evidencing any Communications between any HMIT Entity representative and any Highland Entity representative regarding the terms of the Settlement Agreement.

**RESPONSE:**

**REQUEST NO. 10:** All Documents constituting or relating to the Representations and Warranties in paragraph 13 of the Settlement Agreement & General Release, including any documents that support, substantiate, or were relied upon in making such representations.

**RESPONSE:**

**REQUEST NO. 11:** All Documents relating to the Claimant Trustee's evaluation of the 9019 Settlement, including any analyses of the settlement's fairness, the value of the claims being released, and any Communications with Patrick or the HMIT Entities regarding Settlement terms.

**RESPONSE:**

**REQUEST NO. 12:** All Documents and Communications relating to, referencing, or reflecting the consideration received by Hunter Mountain Investment Trust in exchange for entering into the Settlement Agreement & General Release dated May 19, 2025, including any valuations, appraisals, or analyses of the value received.

**RESPONSE:**

**REQUEST NO. 13:** All Documents and Communications relating to, referencing, or reflecting negotiations over the terms of the Settlement Agreement & General Release, including the cash payment to HMIT, the allowance of the HMIT Class 10 Interest, and the transfer of the Kirschner Claims.

**RESPONSE:**

**REQUEST NO. 14:** All Documents and Communications sufficient to show the reason or rationale for the HMIT Entities' agreement to transfer or relinquish litigation rights previously asserted against Highland Entities in exchange for the consideration set forth in the Settlement Agreement.

**RESPONSE:**

**REQUEST NO. 15:** All Documents relating to the transfer of the Kirschner Litigation claims to the HMIT Entities pursuant to the 9019 Settlement, including any Communications discussing the strategic purpose, value, or intended use of such claims.

**RESPONSE:**

**REQUEST NO. 16:** All Documents relating to any litigation commenced or actions taken by Patrick or any HMIT Entity using the Kirschner Litigation claims obtained through the 9019 Settlement, including the filing styled *Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver*, No. 25-BC01B-0027 (July 1, 2025).

**RESPONSE:**

**REQUEST NO. 17:** All Documents evidencing any Communications with Highland Capital Management, L.P., or any Highland Entity relating to, referencing, or reflecting any plan or strategy by Mark Patrick regarding a potential settlement of Hunter Mountain Investment Trust's claims.

**RESPONSE:**

**REQUEST NO. 18:** All Communications between You and Highland Capital Management, L.P., or any Highland Entity regarding the Settlement Agreement & General Release.

**RESPONSE:**

**REQUEST NO. 19:** All Communications between You and James P. Seery, Jr., in any capacity.

**RESPONSE:**

**REQUEST NO. 20:** All Communications between You and Marc S. Kirschner, in any capacity.

**RESPONSE:**

**REQUEST NO. 21:** All Documents and Communications reflecting any due diligence conducted by You or on Your behalf regarding the authority of Mark Patrick to enter into the Settlement Agreement on behalf of the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 22:** All Documents and Communications, including billing records, invoices, and engagement letters, between You and Kelly Hart & Hallman LLP (or any predecessor or successor firm or any associated attorney) relating to work involving the Settlement Agreement, the 9019 Motion, or the HMIT Entities, the DAF Entities, or any restructuring of such entities.[3]

**RESPONSE:**

**REQUEST NO. 23:** All Documents and Communications, including billing records, invoices, and engagement letters, between You and Shields Law Group, P.C. (or any associated attorney) relating to work involving (a) the DAF Structure, Hunter Mountain Investment Trust, the formation or restructuring of any DAF Entity or HMIT Entity; (b) the separation of DAF assets from the charitable beneficiaries; or (c) the "Work Plan" for restructuring.[4]

**RESPONSE:**

**REQUEST NO. 24:** All Communications between You and any third party relating to the Settlement Agreement, the 9019 Motion, or the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 25:** All Documents relating to the current value of the Highland Claimant Trust, including any reports, analyses, or projections of Highland's remaining assets, estimated distributions to claimants, and any anticipated residual value available for Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 26:** All Documents relating to any payments made or to be made pursuant to the 9019 Settlement, including the $500,000 lump-sum payment, the $10 million initial distribution, and any subsequent distributions, including wire transfer records, bank statements, and any documents reflecting the disposition of such funds.

**RESPONSE:**

**REQUEST NO. 27:** All Documents reflecting Highland Capital Management, L.P.'s knowledge of (a) the restructuring of the DAF Entities; (b) the sale of Beacon Mountain to CLO Holdco, LLC; (c) any change in the beneficial ownership of Hunter Mountain; or (d) any investigation of Patrick by the Cayman Islands court, the Texas Attorney General, or any other governmental authority.

**RESPONSE:**

---

[3] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[4] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 28:** All Communications between Highland Capital Management, L.P. and any of the following regarding the 9019 Settlement or any restructuring of the HMIT Entities or DAF Entities: The Dallas Foundation, Crown Global Life Insurance, Ltd., the Texas Attorney General, or any Cayman Islands governmental or judicial authority.

**RESPONSE:**

**REQUEST NO. 29:** All Documents relating to the Stipulation Withdrawing Objection of The Dallas Foundation and Crown Global, including all Communications between Highland and The Dallas Foundation regarding the terms thereof.

**RESPONSE:**

**REQUEST NO. 30:** All bank statements, brokerage statements, investment account statements, balance sheets, financial statements, and accounting records for the following: Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco, LLC; CDMCFAD, LLC; Charitable DAF Holdco, Ltd.; Charitable DAF Fund, LP; DFW Charitable Foundation; and any other DAF entity, including consolidated and entity-level statements.

**RESPONSE:**

**REQUEST NO. 31:** All Documents and Communications relating to any transfer of any interests in Hunter Mountain Investment Trust, Beacon Mountain, LLC, CLO Holdco, LLC, CDMCFAD, LLC, and DFW Charitable Foundation, including but not limited to assignment agreements, contribution agreements, and corporate resolutions approving transfers.

**RESPONSE:**

**REQUEST NO. 32:** All Communications between Patrick and any financial advisor regarding the valuation of the charitable owners' membership interests or any DAF Entity assets.

**RESPONSE:**

**REQUEST NO. 33:** All Communications between You and Charitable DAF Fund, LP regarding the estimated or actual value of the Highland Capital Management, L.P. estate.

**RESPONSE:**

**REQUEST NO. 34:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Highland Capital Management, L.P. estate.

**RESPONSE:**

**REQUEST NO. 35:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Class 10 and Class 11 claims in the Highland Bankruptcy.

**RESPONSE:**

**REQUEST NO. 36:** All Documents and Communications sufficient to show the fair market value of Charitable DAF Fund, LP or its assets as of March 2025.

**RESPONSE:**

**REQUEST NO. 37:** All Documents and Communications referencing, relating to, or reflecting the valuation that resulted in the charitable owners receiving approximately $1.6 million for their direct or indirect interests in CDMCFAD and/or Charitable DAF Fund, LP in or around March 2025, including the redemption agreement and any valuation supporting such redemption.

**RESPONSE:**

**REQUEST NO. 38:** All Documents and Communications, including communications with counsel,[5] relating to the formation, incorporation, organization, or structuring of CDMCFAD, LLC (also known as "DAF 2.0"), including but not limited to articles of organization, operating agreements, corporate resolutions, board minutes, and all amendments thereto.

**RESPONSE:**

**REQUEST NO. 39:** All Documents relating to the limited liability company agreement for CDMCFAD, LLC, including provisions relating to (a) fiduciary duties; (b) Patrick's powers and discretion; and (c) the valuation and redemption of member interests.

**RESPONSE:**

**REQUEST NO. 40:** All Documents relating to the formation, organization, or structuring of DFW Charitable Foundation, including articles of incorporation, bylaws, board minutes, member lists, and any charitable activities undertaken by said entity.

**RESPONSE:**

**REQUEST NO. 41:** All Documents and Communications related to or evidencing the knowledge of any Highland Party about DFW Charitable Foundation, including, but not limited to, the identity of the officers, directors, agents, or other persons with authority over DFW Charitable Foundation, the economic beneficiaries of DFW Charitable Foundation, and any payments made by DFW Charitable Foundation or any of its subsidiaries to Patrick.

**RESPONSE:**

**REQUEST NO. 42:** All Documents relating to the formation of CDH GP, Ltd., including any documents reflecting (a) Patrick's role or authority in the entity; (b) the replacement of Charitable DAF GP, LLC as the general partner of Charitable DAF Fund, LP; and (c) any Communications discussing the purpose of such replacement.

**RESPONSE:**

**REQUEST NO. 43:** All Documents relating to any transfer of assets from Charitable DAF Holdco, Ltd. or Charitable DAF Fund, LP to CDMCFAD, LLC or any entity controlled by Patrick,

---

[5] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

including the assignment of limited partnership interests referenced in the Statement of Claim filed in the Cayman Islands.

**RESPONSE:**

**REQUEST NO. 44:** All Documents and Communications sufficient to show when Hunter Mountain Investment Trust or any HMIT Party first received any indication, analysis, projection, or belief that the Class 10 or Class 11 claims would have net value available for distribution, including the timing of such indication, the basis therefor, and any valuations, projections, or analyses supporting such indication

**RESPONSE:**

**REQUEST NO. 45:** All Documents and Communications sufficient to show the original purpose and stated objectives of the 2015 sale of Highland Capital Management, L.P. equity holders' equity stake to Hunter Mountain Investment Trust, including any term sheets, memoranda, presentations, tax advice, or planning documents.

**RESPONSE:**

**REQUEST NO. 46:** All Documents and Communications regarding the reasons behind the equity ownership allocation reflected in Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization, including the allocation of (i) 99.5% to Hunter Mountain Investment Trust; (ii) 0.1866% to The Dugaboy Investment Trust; (iii) 0.0627% to Mark Okada and associated family trusts; and (iv) 0.25% to Strand Advisors, Inc.

**RESPONSE:**

**REQUEST NO. 47:** All Documents and Communications relating to, referencing, or reflecting any tax benefit, tax efficiency, or charitable purpose associated with the restructuring of Highland Capital Management, L.P. ownership in 2015.

**RESPONSE:**

**REQUEST NO. 48:** All Documents and Communications sufficient to show the circumstances surrounding Mark Patrick becoming the administrator of Hunter Mountain Investment Trust in 2022, including any appointment documents, resolutions, consents, correspondence, or agreements.

**RESPONSE:**

**REQUEST NO. 49:** All Documents and Communications relating to the transfer of management shares and ownership of Charitable DAF Fund, LP's general partner from Grant Scott to Mark Patrick in or around April 2021, including (a) any agreements governing the transfer; (b) any conditions or limitations on Patrick's authority; (c) any fiduciary duty obligations assumed by Patrick; (d) any Communications between Scott, Patrick, and the charitable owners regarding the transition; and (e) the consideration, if any, received by Grant Scott in exchange for such transfer.

**RESPONSE:**

**REQUEST NO. 50:** All Documents and Communications relating to, referencing, or reflecting any compensation, benefits, director fees, bonuses, or other remuneration paid to Grant Scott during his tenure as administrator or control person of the DAF Structure from 2011 through 2021.

**RESPONSE:**

**REQUEST NO. 51:** All Documents and Communications relating to, referencing, or reflecting any bonuses, compensation, director fees, or other remuneration paid to Mark Patrick from January 1, 2021, to the present from Hunter Mountain Investment Trust or any affiliated entity.

**RESPONSE:**

**REQUEST NO. 52:** All Documents and Communications relating to, referencing, or reflecting any bonuses, compensation, director fees, or other remuneration paid to Mark Patrick from January 1, 2021, to the present from DFW Charitable Foundation or any affiliated entity.

**RESPONSE:**

**REQUEST NO. 53:** All Documents and Communications relating to, referencing, or reflecting any bonuses, compensation, director fees, or other remuneration paid to Mark Patrick from January 1, 2021, to the present from Charitable DAF HoldCo, Ltd., Charitable DAF Fund, LP, or any affiliated entity within the DAF Structure.

**RESPONSE:**

**REQUEST NO. 54:** All Documents and Communications sufficient to show the basis for, approval of, and payment of director fees to Mark Patrick in each of 2022, 2023, 2024, and 2025, including any compensation studies, benchmarking reports, board approvals, or third-party assessments.

**RESPONSE:**

**REQUEST NO. 55:** All Documents and Communications sufficient to show the basis for, approval of, and payment of any bonuses to Mark Patrick in September 2024 and October 2024, including any written agreements, board resolutions, or documentation of performance metrics.

**RESPONSE:**

**REQUEST NO. 56:** All Documents relating to Mark Patrick's deposition testimony on June 23, 2025, including any preparation materials, Communications with counsel regarding anticipated questions, and documents reviewed in preparation for the deposition.[6]

**RESPONSE:**

**REQUEST NO. 57:** All Documents relating to Paul Murphy's role, authority, and compensation in connection with any DAF Entity, including (a) any agreement or arrangement governing Murphy's compensation; (b) any revision or amendment to Murphy's compensation plan,

---

[6] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

including any revision backdating payments to the beginning of 2025 that provided for $500,000 in fees triggered when injunctions are sought against the DAF; and (c) any Communications between Patrick and Murphy regarding the DAF restructuring, the 9019 Settlement, or the transfer of DAF assets.

**RESPONSE:**

**REQUEST NO. 58:** All Documents relating to indemnification payments or requests for indemnification made by or on behalf of Mark Patrick or Paul Murphy from any DAF Entity for legal fees or other expenses.

**RESPONSE:**

**REQUEST NO. 59:** All Documents relating to any Communications between Patrick and the charitable beneficiaries (The Dallas Foundation, Crown Global, Empower Dallas, or the Okada Foundation) from November 2024 through April 2025, including the "no confidence" letter sent by the charities in November 2024.

**RESPONSE:**

**REQUEST NO. 60:** All Communications between You and Highland Dallas Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

**REQUEST NO. 61:** All Communications between You and Highland Santa Barbara Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

**REQUEST NO. 62:** All Communications between You and Highland Kansas City Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

**REQUEST NO. 63:** All Communications between You and The Dallas Foundation from January 1, 2021, to the present regarding the DAF Structure, Hunter Mountain Investment Trust, or the Settlement Agreement and General Release.

**RESPONSE:**

**REQUEST NO. 64:** All Documents and Communications reflecting, referencing, or relating to any inquiries, questions, or requests for information from Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., Highland Kansas City Foundation, Inc., or The Dallas Foundation regarding (a) the DAF Structure, (b) DAF assets, (c) distributions to charitable beneficiaries, (d) Mark Patrick's compensation, or (e) corporate restructuring.

**RESPONSE:**

**REQUEST NO. 65:** All Documents and Communications sufficient to show the conversion of the charitable trust originally formed in 2006 into a donor-advised fund investment vehicle for long-term charitable endeavors in or around October 2011, including any organizational documents, trust amendments, partnership agreements, or memoranda.[7]

**RESPONSE:**

**REQUEST NO. 66:** All Documents and Communications relating to, referencing, or reflecting the original structure and purpose of the donor-advised fund created in October 2011, including any tax opinions, IRS determination letters, or legal memoranda.[8]

**RESPONSE:**

**REQUEST NO. 67:** All Documents and Communications relating to, referencing, or reflecting the valuation of Highland Capital Management, L.P., or its assets.

**RESPONSE:**

**REQUEST NO. 68:** All Documents and Communications relating to, referencing, or reflecting Highland Capital Management, L.P.'s financial condition, including any monthly operating reports or quarterly operating reports.

**RESPONSE:**

**REQUEST NO. 69:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for any bankruptcy professional, creditor, or equity holder.[9]

**RESPONSE:**

**REQUEST NO. 70:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[10]

**RESPONSE:**

---

[7] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[8] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[9] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[10] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 71:** All Documents and Communications relating to any valuation of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[11]

**RESPONSE:**

**REQUEST NO. 72:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 73:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 74:** All Communications between You and Charitable DAF Fund, LP reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 75:** All Communications between You and Charitable DAF Fund, LP regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 76:** All Documents reflecting the "Work Plan" prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities, including any instructions to create entities that were "hard to find or track."[12]

**RESPONSE:**

**REQUEST NO. 77:** All Documents and Communications between Mark Patrick and any attorney or law firm from January 1, 2023, to the present regarding corporate restructuring, entity

---

[11] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[12] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

formation, or changes to the governance of the DAF Structure, including any "work plans" or engagement letters.[13]

**RESPONSE:**

**REQUEST NO. 78:** All Documents and Communications relating to, referencing, or reflecting the formation of any new entity within, related to, or derived from the DAF Structure from January 1, 2023, to the present, including DFW Charitable Foundation, CDMCFAD, LLC, and CDH GP, Ltd.[14]

**RESPONSE:**

**REQUEST NO. 79:** All Documents and Communications between any attorney or law firm and Mark Patrick relating to the creation of new corporate entities within the DAF Structure.[15]

**RESPONSE:**

**REQUEST NO. 80**: All Documents relating to Mark Patrick's authority to act on behalf of Rand Advisors, LLC, Rand PE Fund I, LP, or any HMIT Entity, including any power of attorney, board resolutions, or operating agreement provisions granting such authority.

**RESPONSE:**

**REQUEST NO. 81:** All Documents relating to any change in the ownership, management, or control of Hunter Mountain Investment Trust, Beacon Mountain LLC, or any entity in the Hunter Mountain ownership chain from January 1, 2024 to the present.

**RESPONSE:**

**REQUEST NO. 82**: All organizational charts reflecting the corporate structure of (a) the DAF Entities; (b) the HMIT Entities; and (c) any entities through which Patrick directly or indirectly held an interest in Hunter Mountain, for any time during the Relevant Period.

**RESPONSE:**

**REQUEST NO. 83:** All documents and communications relating to, referencing, or reflecting the sale of Rand PE Fund I, LP's investment in Beacon Mountain, LLC in or around February 2025, including any purchase agreements, valuations, appraisals, or closing documents.

**RESPONSE:**

---

[13] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[14] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[15] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 84**: All Documents relating to the transition of management of Rand PE Fund I, LP from John Honis to Patrick or any Patrick-controlled entity, including any Communications with investors or regulatory authorities regarding such transition.

**RESPONSE:**

**REQUEST NO. 85**: All audit reports, financial statements, and quarterly or annual reports for Rand PE Fund I, LP from January 1, 2023 to the present, including the 2024 audit issued on or about June 26, 2025.

**RESPONSE:**

**REQUEST NO. 86:** All Documents relating to the sale of Beacon Mountain LLC (or its interest in Hunter Mountain Investment Trust) to CLO Holdco, LLC, including but not limited to the purchase agreement, any valuations, closing documents, and wire transfer records.

**RESPONSE:**

**REQUEST NO. 87**: All Documents relating to any consent (or lack thereof) from Crown Global Life Insurance, Ltd., The Dallas Foundation, or Atlas IDF, LP regarding the sale of Beacon Mountain's interest in Hunter Mountain to CLO Holdco, LLC or any Patrick-controlled entity.

**RESPONSE:**

**REQUEST NO. 88**: All Documents relating to compliance (or non-compliance) with Section 3.01(b) of the Amended and Restated Limited Partnership Agreement of Atlas Fund, which prohibits Rand Fund from selling Hunter Mountain to an affiliate of Patrick without investor consent.

**RESPONSE:**

**REQUEST NO. 89:** All Documents and Communications relating to any notice or other information given to investors in Rand PE Fund I, LP (including any 4% minority investor) from January 1, 2025, to the present regarding the sale of Beacon Mountain, LLC's interest in HMIT, or any distribution relating thereto, including the February 20, 2025 notice referenced in Dugaboy's Motion for Reconsideration.

**RESPONSE:**

**REQUEST NO. 90:** All Documents and Communications sufficient to show the basis for the $1 million valuation of Beacon Mountain, LLC's interest in Hunter Mountain Investment Trust in or around February 2025, including any valuation reports, appraisals, financial analyses, or Communications with ValueScope, LLC or any other valuation firm concerning such valuation.

**RESPONSE:**

**REQUEST NO. 91:** All Documents, correspondence, engagement letters, contracts, or agreements between You and ValueScope, LLC (or any other valuation firm) relating to the valuation of any interest, holding in, or security issued by any of Beacon Hunter, LLC; Hunter

Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate.

**RESPONSE:**

**REQUEST NO. 92:** All draft and final valuation reports, memoranda, models, or analyses prepared by ValueScope, LLC relating to Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to the valuation of the Participation Shares; and any Communications challenging or questioning the valuation methodology or conclusions.

**RESPONSE:**

**REQUEST NO. 93:** All Documents relating to the methodology used in any valuation of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to instructions received regarding methodology, communications discussing the change from net asset value methodology to discounted cash flow methodology, supporting calculations, assumptions, and comparable transactions or valuations.

**RESPONSE:**

**REQUEST NO. 94:** All Documents and Communications related to the identity, ownership structure, principals, managers, or beneficial owners of Celia Holdco LLC.

**RESPONSE:**

**REQUEST NO. 95:** All Documents relating to the voluntary liquidation of Charitable DAF Holdco, Ltd. filed on April 2, 2025 in the Cayman Islands, including the petition, any supporting documents, and Communications regarding the decision to initiate liquidation.

**RESPONSE:**

**REQUEST NO. 96**: All Documents produced to or received from the Joint Official Liquidators of Charitable DAF Holdco, Ltd. in connection with their investigation of Patrick's activities.

**RESPONSE:**

**REQUEST NO. 97**: All Documents relating to any actions taken by Patrick or Murphy in response to the investigative efforts of the Joint Official Liquidators in the Cayman Islands, including any expenditures of DAF assets for legal fees or other expenses incurred in opposing such efforts.[16]

**RESPONSE:**

[16] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 98**: All Documents relating to Creative Hearts TX, including (a) its formation documents; (b) the involvement of Patrick, his wife, or his daughter with the entity; and (c) any donations or payments made to it by any DAF Entity.[17]

**RESPONSE:**

**REQUEST NO. 99**: All Documents relating to the Patrick-Cronin Proposal.

**RESPONSE:**

[17] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

Dated: March 23, 2026

*/s/ Geoffrey S. Harper*
**Geoffrey S. Harper**
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

**John Michael Gaddis**
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

I certify that on March 23, 2026, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

***Via Electronic Mail:***

Louis M. Phillips (louis.phillips@kellyhart.com)
**Kelly Hart Pitre**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916

Amelia L. Hurt (amelia.hurt@kellyhart.com)
**Kelly Hart Pitre**
400 Poydras Street, Suite 1812
New Orleans, LA 70130

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO RAND ADVISORS, LLC**

**To:** Rand Advisors, LLC, by and through their counsel of record, Louis M. Phillips, louis.phillips@kellyhart.com, **Kelly Hart Pitre**, One American Place, 301 Main Street, Suite 1600, Baton Rouge, LA 70801-1916 and Amelia L. Hurt, amelia.hurt@kellyhart.com, **Kelly Hart Pitre**, 400 Poydras Street, Suite 1812, New Orleans, LA 70130

Interested Party The Dugaboy Investment Trust ("Dugaboy") serves this First Set of Requests for Production of Documents to Rand Advisors, LLC ("Rand Entities"), pursuant to Rule 34 of the Federal Rules of Civil Procedure, which is incorporated into bankruptcy proceedings by Federal Rules of Bankruptcy Procedure 7034 and 9014(c)(1). The Rand Entities must respond to these Requests for Production within thirty (30) days of service. We ask that You produce documents at the offices of King & Spalding, 2601 Olive Street, Suite 2300, Dallas, TX 75201, or by electronic production in a mutually agreed format.

**INSTRUCTIONS**

1. In responding to these Requests, You must furnish all information that is available to You, that is within Your possession, custody, or control, or that is subject to Your reasonable inquiry, including information in the possession of Your attorneys, accountants, advisors, representatives,

agents, or other persons directly or indirectly employed by, or connected with, You or Your attorneys, and anyone else otherwise subject to Your control. All Documents that respond, in whole or in part, to any portion of the Requests below shall be produced in their entirety, including all attachments and enclosures.

2. The relevant time period for documents responsive to these Requests, unless otherwise specified in an individual Request, is the period beginning on the earlier of October 1, 2024, or such date as identified in response to Request No. 1,[1] through the present.

3. To the extent that the below Requests include requests for paper records, such paper records shall be scanned or otherwise converted into electronic form from paper documents in the following format:

(a) All documents shall be scanned to single page Group 4, TIFF format, at least 300 dpi and 8½ x 11 inch page size, except for documents requiring higher resolution or different page size.

(b) In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). The Parties will make their best efforts to have their vendors unitize documents correctly and will commit to address situations where there are improperly unitized documents. For documents found in folders or other containers with labels, tabs, or other identifying information, such labels and tabs shall be scanned where practicable. Pages with Post-it notes shall be scanned both with and without the Post-it, with the image of the page with the Post-it preceding the image of the page without the Post-it.

[1] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

(c) Productions of the images shall be made using an image load file (.OPT or .LFP) and a delimited database/metadata load file (.DAT). Each image file should have a unique file name which shall be the Bates number of the page.

(d) The following objective coding fields should be provided, if applicable:

(1) beginning Bates number;

(2) ending Bates number;

(3) beginning attachment Bates number;

(4) ending attachment Bates number;

(5) page count; and

(6) source location/custodian.

(e) Document level OCR should be provided as a separate text file. The file name of each text file should correspond to the file name of the first image file of the document with which it is associated. The text files will not contain the redacted portions of the documents. OCR software should be set to the highest quality setting during processing. For documents in foreign languages, the OCR shall be performed using an OCR tool and settings suitable for the particular byte or multi-byte languages.

4. To the extent that the below Requests include requests for electronically stored information ("ESI"), all ESI shall be produced in TIFF format according to the following specifications:

(a) All TIFF formatted documents will be single page, Group 4 TIFF at 300 x 300 dpi resolution and 8½ x 11 inch page size, except for documents requiring different resolution or page size.

(b) An image load file, in standard Opticon format, showing the Bates number of each page and the appropriate unitization of the documents, will accompany all document images.

(c) Each imaged version of an electronic document will be created directly from the original electronic document.

(d) TIFFs shall be produced as black and white, single-page TIFF images in accordance with the technical specifications set out above. Word documents that have tracked changes or comments shall be produced in color. In addition, upon written request that identifies a reasonable number of individual documents at issue by Bates number, a party shall produce color images for those documents. Documents produced in color shall be produced as single page, 300 DPI, color JPG images with the quality setting of 75% or higher.

(e) All TIFF files are to be provided with an accompanying searchable text (.TXT) file extracted from the native, electronic file (not generated as an OCR file from the TIFF image(s)), and such text files shall contain the full text extraction. To the extent reasonably feasible, extracted text shall provide all comments, tracked changes, speaker's notes, and text from hidden worksheets, slides, columns, and rows. In the case of files with redacted text, OCR'ed text of the redacted documents may be provided in lieu of extracted text. OCR software should be set to the highest quality setting during processing.

5. To the extent reasonably feasible, all Documents produced shall be produced with metadata and attachments intact. The term "metadata" means all information describing the history, tracking, or management of an electronic document including, but not limited to, the date(s) the document was created, modified, accessed, or distributed; the author(s) and all recipient(s) of the

document; the file's name; the file's location (e.g., directory structure or pathname); the file format or file type; and the file size. For comparison purposes and to ensure authenticity, where documents are produced in native format, such documents shall also be produced in the ESI format described in Instruction No. 3, unless otherwise agreed by the parties.

6. Should You object to any Request, You must specifically and in detail state the grounds and reasons for the objection, and state in detail the part of the language of the Request to which You object, and state which part of the Request, if any, You are answering.

7. Under the Crime-Fraud Exception and Subject-Matter Waiver, items which would typically be privileged are not privileged in this matter. The Fifth Circuit recognizes the Crime-Fraud Exception to privilege, under which attorney-client communications and/or work product materials are not privileged if "the client consults an attorney for advice that will assist the client in carrying out a contemplated illegal or fraudulent scheme." *Lewis v. Crochet*, 105 F.4th 272, 282 (5th Cir. 2024) (quoting *In re Int'l Sys. & Controls Corp. Sec. Litig*., 693 F.2d 1235, 1242 (5th Cir. 1982)). The exception applies where (1) a crime or fraud was impending or continuing at the time of the communication, and (2) the communications or work product at issue were in furtherance of that criminal or fraudulent activity. *See In re E.E.O.C.*, 207 F. App'x 426, 434 (5th Cir. 2006). Dugaboy reasonably believes, and has evidence to support, that certain communications and work product it seeks were intended to further continuing or future criminal or fraudulent activity and are therefore not privileged.

Likewise, Subject-Matter Waiver under Federal Rule of Evidence 502(a) provides that disclosure of certain information in a federal proceeding waives privilege for related information when (1) the waiver was intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) the disclosed and undisclosed

communications and work product "ought in fairness to be considered together." Fed. R. Evid. 502(a); *see also Crider Inc. v. Silgan Containers LLC*, 2023 WL 479094, at *22 (N.D. Tex. Jan. 13, 2023). Any communications or work product that would otherwise be privileged, but concern the same subject matter intentionally disclosed by Mark Patrick in his affidavits or testimony in this Proceeding or Related Proceedings fall under this exception, and privilege has been waived.

Accordingly, under these exceptions and waivers, You must produce documents that would typically be privileged as they relate to (1) any fraudulent activity that counsel was involved in or knew of, or (2) any privileged conversation or information that has already been disclosed elsewhere in this litigation.

If You still contend that any Documents sought by the Requests are privileged or otherwise protected from discovery, You must nevertheless identify for each Document withheld:

(a) the legal basis for withholding the Document;

(b) the person asserting any claim of privilege and/or protection;

(c) a description and identification of the requested Document sufficient to frame an appropriate demand for the Document and a motion to compel disclosure thereof, setting forth at least the following:

(i) the author and/or signatory of the Document withheld;

(ii) the date of the Document withheld;

(iii) all addressees and/or recipients of the Document withheld; and

(iv) the subject matter and circumstances under which the Document withheld was created in sufficient detail to ascertain applicability of such privilege or other legal basis.

8. Notwithstanding a claim that a portion of a Document is privileged or otherwise protected from disclosure, any such Document must be produced with the portion claimed to be protected excised.

9. If You contend that any Request is ambiguous or unclear, contact undersigned counsel as soon as possible so that the Request can be clarified to avoid unnecessary delays in discovery.

10. These Requests are continuing in nature. Any Documents located, created, or obtained subsequent to the Documents provided in response to these Requests and that should have been produced had they been known shall be promptly supplied by supplemental responses whenever You find, locate, or acquire such Documents. You are required to supplement and correct Your answers and responses on a timely basis.

## DEFINITIONS

As used herein, the terms listed below shall be defined as follows. Insofar as a term is not explicitly defined, the meaning to be used is the commonly accepted definition of the term. Notwithstanding any definition set forth below, each word, term, or phrase used in these Requests is intended to have the broadest meaning permitted under applicable rules. The following terms are to be given their ascribed definitions:

### A. Proceedings

1. The term "this Proceeding" or "this Litigation" or "Main Case" refers to the main bankruptcy proceeding *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

2. The term "Related Proceedings" includes all other legal proceedings or actions involving or related to Highland, HMIT, and persons, parties, or entities involved with or affected by the Settlement, specifically including but not limited to the Cayman Islands Proceedings, the Chapter

15 proceeding in the United States Bankruptcy Court for the District of Delaware, and the Texas Business Court proceeding, as well as any bankruptcy adversary proceedings before the United States Bankruptcy Court for the Northern District of Texas that are separate from the Main Case.

**B. Parties and Individuals**

1. The term "You" or "Your" refers to Rand Advisors, LLC as well as its agents, attorneys, accountants, advisors, representatives, or any other individual(s) or entity(ies) acting or authorized to act on behalf of them, and any related companies, divisions, or subsidiaries, past or present, including, without limitation, the directors, officers, employees, agents, or attorneys thereof, as well as any predecessors-in-interest or successors-in-interest.

2. The term "Patrick" refers to Mark Eric Patrick.
3. The term "Dondero" refers to James Dondero.
4. The term "Okada" refers to Mark Okada.
5. The term "Seery" or "Claimant Trustee" refers to James P. Seery, Jr.
6. The term "Kirschner" or "Litigation Trustee" refers to Marc S. Kirschner.
7. The term "Murphy" refers to Paul Murphy.
8. The term "Scott" refers to Grant Scott.
9. The term "Cronin" refers to Kevin Cronin.
10. The term "Honis" refers to John Honis.
11. The term "Raver" refers to Shawn Raver.

**C. Highland Entities and Related Trusts**

12. The term "Highland" or "Highland Capital Management" refers to Highland Capital Management, L.P., a Dallas-based, Delaware-domiciled investment advisor, and the Debtor in the matter *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

13. The term "Highland Entities" or "Highland Entity" refers collectively to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

14. The term "Highland Claimant Trust" refers to the entity created under the Plan to hold, monetize, and distribute the assets of Highland's estate.

15. The term "Highland Litigation Sub-Trust" or "Litigation Sub-Trust" refers to the trust created under the Plan for the purpose of pursuing litigation claims on behalf of the Highland estate.

16. The term "Highland Indemnity Trust" or "Indemnity Trust" refers to the trust created under the Plan to hold assets for the purpose of indemnification obligations arising out of the Highland estate.

17. The term "Highland Party" or "Highland Parties" refers to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, the Highland Indemnity Trust, and each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, and subsidiaries, and any persons or entities acting or authorized to act on their behalf.

**D. HMIT Entities and Related Parties**

1. The term "HMIT Entities" refers collectively to Hunter Mountain Investment Trust and Beacon Mountain, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "HMIT Parties" refers broadly to the HMIT Entities, Mark Patrick, and any related decision maker with respect to the HMIT Entities, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

3. The term "Hunter Mountain" or "HMIT" refers to Hunter Mountain Investment Trust.

4. The term "Beacon Mountain" refers to Beacon Mountain, LLC.

5. The term "Beacon Hunter" refers to Beacon Hunter, LLC.

**E. Rand Entities**

1. The term "Rand Parties" or "Rand Entities" refers collectively to Rand PE Fund I, LP, Rand Advisors, LLC, and Rand PE Fund Management, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "Rand Fund" or "Rand PE Fund" refers to Rand PE Fund I, LP.

3. The term "Rand Advisors" refers to Rand Advisors, LLC, an SEC-registered investment advisor that served as the investment adviser to Rand PE Fund I, LP.

4. The term "Rand PE Fund Management" refers to Rand PE Fund Management, LLC.

**F. DAF Entities and Related Structures**

1. The term “DAF” or “Charitable DAF Holdco” refers to Charitable DAF Holdco, Ltd.

2. The term “DAF Fund” or “Charitable DAF Fund” refers to Charitable DAF Fund, LP.

3. The term “DAF GP” or “Charitable DAF GP” refers to Charitable DAF GP, LLC.

4. The term “DAF Structure” refers to the overall donor-advised fund investment vehicle and its constituent entities, including Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, and any entity holding ownership or management interests therein or formed in connection therewith, including any entities created as part of the restructuring of the DAF.

5. The term “DAF Entities” refers collectively to Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, CDH GP, Ltd., CDMCFAD, LLC, DFW Charitable Foundation, CLO Holdco, LLC, and any other entity formed, restructured, or otherwise created in connection with or derived from the DAF Structure, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

6. The terms “New GP” or “CDH GP” refer to CDH GP, Ltd.

7. The term “CDMCFAD” or “DAF 2.0” refers to CDMCFAD, LLC.

8. The term “DFW Charitable Foundation” or “DFW Foundation” refers to DFW Charitable Foundation.

9. The term “CLO Holdco” refers to CLO Holdco, LLC.

**G. Charitable and Donor Entities**

1. The terms “The Dallas Foundation” or “Dallas Foundation” refer to The Dallas Foundation.

2. The term "Crown Global" refers to Crown Global Life Insurance, Ltd.

3. The terms "Empower" or "Empower Dallas" refer to Empower Dallas.

4. The term "Okada Foundation" refers to the Okada Foundation.

5. The term "Charitable Beneficiaries" or "Charities" refers collectively to The Dallas Foundation, Crown Global Life Insurance, Ltd., Empower Dallas, the Okada Foundation, and any other charitable organization or foundation that held beneficial ownership in the DAF Structure through participation shares or annuity policies.

6. The term "Highland Dallas Foundation" refers to Highland Dallas Foundation, Inc.

7. The term "Highland Santa Barbara Foundation" refers to Highland Santa Barbara Foundation, Inc.

8. The term "Highland Kansas City Foundation" refers to Highland Kansas City Foundation, Inc.

9. The term "Participation Shares" refers to the shares in Charitable DAF Holdco, Ltd. held by the Charitable Foundations through which the Foundations held beneficial ownership in the DAF Structure.

**H. Other Entities**

1. The term "Dugaboy" refers to The Dugaboy Investment Trust.

2. The term "Strand" or "Strand Advisors" refers to Strand Advisors, Inc.

3. The terms "Atlas Fund" or "Atlas IDF" refers to Atlas IDF, LP.

4. The terms "Skyview" or "Skyview Group" refers to The Skyview Group.

5. The term "Fortaris" or "Fortaris Capital Advisors" refers to Fortaris Capital Advisors.

6. The term "ValueScope" refers to ValueScope, LLC.

7. The term "Celia Holdco" refers to Celia Holdco LLC.

8. The terms "Creative Hearts" or "Creative Hearts TX" refer to Creative Hearts TX.

**I. Law Firms**

1. The term "Kelly Hart" refers to Kelly Hart & Hallman LLP, or any predecessor or successor firm or any associated attorney.

2. The term "Shields Law Group" refers to Shields Law Group, P.C., or any predecessor or successor firm or any associated attorney.

**J. Litigation, Settlement, and Bankruptcy Terms**

1. The term "Highland Bankruptcy" refers to the Chapter 11 bankruptcy case titled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj, pending in the United States Bankruptcy Court for the Northern District of Texas.

2. The term "Settlement Agreement" refers to each and every discussion or negotiation of settlement or iteration of the settlement agreement between the Highland Entities and the HMIT Entities, together with all exhibits, schedules, appendices, and ancillary documents, and including any preliminary drafts, associated documents, and communications related thereto.

3. The term "Settlement Agreement & General Release" or "9019 Settlement" refers to the Settlement Agreement & General Release dated May 19, 2025, by and among the Highland Entities and the HMIT Entities, as approved by the Court, together with all exhibits, schedules, appendices, and ancillary documents.

4. The term "9019 Motion" refers to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, filed on May 19, 2025 (Bankr. Dkt. 4217).

5. The term "Rule 9019 Settlement Order" refers to the Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, entered on June 30, 2025 (Bankr. Dkt. 4297).

6. The term "Kirschner Litigation" or "Kirschner Claims" or "Transferred Claims" refers to the 36-count adversary complaint filed by Marc A. Kirschner, as Litigation Trustee, styled Kirschner v. Dondero, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex. Oct. 15, 2021), together with any amended, supplemental, or related pleadings, and the claims asserted therein.

7. The term "Plan" refers to Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization (as Modified), confirmed on February 22, 2021.

8. The term "Confirmation Order" refers to the Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.

9. The term "Class 10" refers to the class of claims under the Plan designated as "Class 10 Claims" and consisting of the claim held by Hunter Mountain Investment Trust as a holder of pre-bankruptcy Class B and C limited partnership interests in Highland.

10. The term "Class 11" refers to the class of claims under the Plan designated as "Class 11 Claims" and consisting of the claim held by other equity holders holding pre-bankruptcy Class A limited partnership interests in Highland.

11. The term "Class 10 Interest" or "HMIT Class 10 Interest" refers to Hunter Mountain Investment Trust's allowed Class 10 claim in the amount of $336,940,230.58 as set forth in the Settlement Agreement and associated Order.

12. The term "Contingent Claimant Trust Interests" refers to the interests given to the former equity holders under the Plan in the Highland Claimant Trust, which were to vest only upon certification by the Claimant Trustee that all unsecured creditors had been paid in full with interest.

13. The term "Work Plan" refers to the plan or plans prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities.

14. The term "Withdrawal Stipulation" refers to the Stipulation Withdrawing Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd. to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith (Bankr. Dkt. 4291).

15. The term "Dugaboy Note" refers to the promissory note dated May 31, 2017, in the original amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

16. The term "Texas Business Court Proceeding" or "Business Court Proceeding" refers to Case No. 25-BC01B-0027 filed in the Texas Business Court, First Division on July 1, 2025, and captioned *The Highland Dallas Foundation, Inc. ,The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. vs. DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC,CDH GP, Ltd., and Mark Patrick.*

**K. Cayman Islands Proceedings**

1. The terms "Cayman Islands Proceeding(s)" or "Cayman Proceeding" refer collectively to all judicial proceedings in the Cayman Islands relating to Charitable DAF Holdco, Ltd. or any DAF Entity, including (a) the voluntary liquidation filed by Patrick on April 2, 2025; (b) the winding up petition filed by the charitable owners on April 23, 2025 (No. FSD 99 of 2025 (JAJ)); (c) the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators on July

15, 2025 (No. FSD 201 of 2025); and (d) all related proceedings, investigations, hearings, orders, and filings.

2. The term "Joint Official Liquidators" or "JOLs" refers to the court-appointed liquidators designated by the Cayman Islands court on or about May 6, 2025 to oversee the DAF's operations.

3. The term "Statement of Claim" refers to the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators in the Cayman Islands Proceeding on July 15, 2025.

4. The term "Chapter 15 Petition" refers to the petition filed by the Joint Official Liquidators in the United States Bankruptcy Court for the District of Delaware on July 21, 2025.

5. The term "Patrick-Cronin Proposal" refers to the proposal made by Mark Patrick to Kevin Cronin, a principal of Fortaris Capital Advisors, to make and split monthly payments to the DAF, as referenced in Paragraph 173 of the Third Affidavit of Mark Patrick.

**L. General Discovery Terms**

1. The term "Document" or "Documents" is used in its broadest possible sense and refers, without limitation, to anything upon which any expression, communication, or representation has been recorded by any means. The term includes, but is not limited to: correspondence, emails, text messages, instant messages, messages/posts on social media, handwritten notes, photographs, working papers, any drafts of documents (preliminary, intermediate, and/or final), memoranda, contracts/agreements, tapes, business records, financial records, charts, notes, records of any sort of meetings, reports of telephone or other oral conversations, calendars (whether hardcopy or electronic, including desk calendars, phone calendars, or other calendars using software or an application), appointment books, audio or video tape recordings, information on computer disc/card/drive, computer entries that can be retrieved electronically, databases, and all other writings and recordings of every kind that are in Your actual or constructive possession, custody,

or control. The term includes, but is not limited to, drafts and copies of any documents, whether identical to the original or different from the original because of notes, comments, highlighting, edits, any other alterations made on such copies, indications that said copies were sent to different individuals than were the originals, or any other reason.

2. The term "Communication" or "Communications" means any transmission of information in any context or situation by or between two or more Persons by any means or medium whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically, or digitally, or on tape, either orally or in writing, including, but not limited to, conversations, correspondence, emails, text messages, instant messages, social media communications, telexes, facsimile transmissions, telecopies, recordings in any medium of oral, written, or typed communication, telephone or message logs, notes or memoranda relating to written or oral communications, and any translation thereof.

3. The terms "Person" or "Entity" and their plural forms mean natural persons, proprietorships, partnerships, firms, trusts, estates, companies, corporations, public corporations, sole practitioners, municipal corporations, federal, state, and local governments, all departments and agencies thereof, any other governmental agencies, subdivisions, groups, associations, or organizations, or any other entity, whether foreign or domestic.

4. The term "thing" means any tangible item, including without limitation, models, prototypes, and samples of any device or apparatus or product.

5. The terms "concerning," "regarding," "referring to," "related to," or "relating to" shall be construed in the broadest possible sense, and shall mean without limitation and whether in whole or in part: referring to, constituting, bearing upon, commenting upon, reflecting, evidencing, pertaining to, describing, depicting, consisting of, containing, comprising, embodying, identifying,

stating, discussing, analyzing, studying, summarizing, dealing with, relating to, or having any logical or factual connection whatsoever with the subject addressed.

6. The terms "state" or "describe" mean to fully elucidate by reference to underlying facts rather than by reference to ultimate facts or conclusions of fact or law; where applicable, to particularize as to time, place, and manner; and to set forth all relevant facts necessary to complete the understanding of the act, process, event, or thing in question.

7. The term "Relevant Period" refers to the period beginning on the earlier of January 1, 2025, or such date as identified in Response to Request No. 1,[2] through the present.

8. The present tense includes the past and future tenses.

9. The singular includes the plural, and the plural includes the singular.

10. Words in the masculine, feminine, and neutral form shall include each of the other genders.

11. Whenever used herein, "and" may be understood to mean "or" and vice versa whenever such construction results in a broader request for information.

12. "All" means "any and all" and "any" means "any and all."

13. "Including" means "including but not limited to."

14. The term "identify" means and requires You to:

(a) With reference to an individual, state his or her full name and last known residential address, business address, telephone and/or facsimile number, the name and address of his or her employer, the individual's job title or job responsibilities, and his or her relationship to You;

[2] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

(b) With reference to a company or organization, state the entity's full legal name, business addresses, telephone number, and a person with whom You had direct contact within that entity;

(c) With reference to a document, describe the document, state the date when the document was created, name the creator of the document, and name each person to whom the document was sent;

(d) With reference to an oral communication, provide the date(s) of the communication, the names and addresses of all parties, when the communication occurred, the place(s) where the communication took place, the subject matter of the communication, and the general substance of the communication; and

(e) With reference to an occurrence or event, provide the date and location of the occurrence or event, the identity of each person involved in the occurrence or event, the subject matter discussed, and the identity of any document that records, refers to, or relates to such occurrence or event.

## DOCUMENT REQUESTS

**REQUEST NO. 1:** All Documents and Communications between or among Highland Capital Management, L.P. (or its representatives, including James P. Seery, Jr. or the Claimant Trustee) and any of the HMIT Entities concerning the 9019 Settlement, including but not limited to draft agreements, term sheets, and settlement proposals, and including Documents sufficient to show the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement.

**RESPONSE:**

**REQUEST NO. 2:** All Documents relating to due diligence performed by Highland Capital Management, L.P. (or its representatives) concerning (a) the authority of Mark Patrick or any other person to bind the HMIT Entities to the 9019 Settlement; (b) the ownership structure of the HMIT Entities; or (c) any corporate restructuring of the HMIT Entities or the DAF Entities.

**RESPONSE:**

**REQUEST NO. 3:** All Documents and Communications exchanged between any Highland Party and any HMIT Entity prior to execution of the Settlement Agreement relating to or evidencing legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any changes thereto.

**RESPONSE:**

**REQUEST NO. 4:** All Documents and Communications exchanged between any Highland Party and any Rand Party prior to execution of the Settlement Agreement relating to or evidencing legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any changes thereto.

**RESPONSE:**

**REQUEST NO. 5:** All Documents and Communications exchanged between any Highland Party and any person or party prior to execution of the Settlement Agreement relating to or evidencing any change in legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any transaction related thereto.

**RESPONSE:**

**REQUEST NO. 6:** All Documents and Communications relating to, referencing, or reflecting the consideration received by Hunter Mountain Investment Trust in exchange for entering into the Settlement Agreement & General Release dated May 19, 2025, including any valuations, appraisals, or analyses of the value received.

**RESPONSE:**

**REQUEST NO. 7:** All Documents and Communications sufficient to show the reason or rationale for the HMIT Entities' agreement to transfer or relinquish litigation rights previously asserted against Highland Entities in exchange for the consideration set forth in the Settlement Agreement.

**RESPONSE:**

**REQUEST NO. 8:** All Communications between You and any third party relating to the Settlement Agreement, the 9019 Motion, or the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 9:** All Documents relating to the current value of the Highland Claimant Trust, including any reports, analyses, or projections of Highland's remaining assets, estimated distributions to claimants, and any anticipated residual value available for Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 10:** All Documents relating to any payments made or to be made pursuant to the 9019 Settlement, including the $500,000 lump-sum payment, the $10 million initial distribution, and any subsequent distributions, including wire transfer records, bank statements, and any documents reflecting the disposition of such funds.

**RESPONSE:**

**REQUEST NO. 11:** All Documents reflecting Highland Capital Management, L.P.'s knowledge of (a) the restructuring of the DAF Entities; (b) the sale of Beacon Mountain to CLO Holdco, LLC; (c) any change in the beneficial ownership of Hunter Mountain; or (d) any investigation of Patrick by the Cayman Islands court, the Texas Attorney General, or any other governmental authority.

**RESPONSE:**

**REQUEST NO. 12:** All bank statements, brokerage statements, investment account statements, balance sheets, financial statements, and accounting records for the following: Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco, LLC; CDMCFAD, LLC; Charitable DAF Holdco, Ltd.; Charitable DAF Fund, LP; DFW Charitable Foundation; and any other DAF entity, including consolidated and entity-level statements.

**RESPONSE:**

**REQUEST NO. 13:** All Documents and Communications relating to any transfer of any interests in Hunter Mountain Investment Trust, Beacon Mountain, LLC, CLO Holdco, LLC, CDMCFAD, LLC, and DFW Charitable Foundation, including but not limited to assignment agreements, contribution agreements, and corporate resolutions approving transfers.

**RESPONSE:**

**REQUEST NO. 14:** All Documents relating to any transfer of assets from Charitable DAF Holdco, Ltd. or Charitable DAF Fund, LP to CDMCFAD, LLC or any entity controlled by Patrick, including the assignment of limited partnership interests referenced in the Statement of Claim filed in the Cayman Islands.

**RESPONSE:**

**REQUEST NO. 15:** All Documents and Communications sufficient to show the original purpose and stated objectives of the 2015 sale of Highland Capital Management, L.P. equity holders' equity stake to Hunter Mountain Investment Trust, including any term sheets, memoranda, presentations, tax advice, or planning documents.

**RESPONSE:**

**REQUEST NO. 16:** All Documents and Communications regarding the reasons behind the equity ownership allocation reflected in Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization, including the allocation of (i) 99.5% to Hunter Mountain Investment Trust; (ii) 0.1866% to The Dugaboy Investment Trust; (iii) 0.0627% to Mark Okada and associated family trusts; and (iv) 0.25% to Strand Advisors, Inc.

**RESPONSE:**

**REQUEST NO. 17:** All Documents and Communications relating to, referencing, or reflecting any tax benefit, tax efficiency, or charitable purpose associated with the restructuring of Highland Capital Management, L.P. ownership in 2015.

**RESPONSE:**

**REQUEST NO. 18:** All Documents and Communications sufficient to show the circumstances surrounding Mark Patrick becoming the administrator of Hunter Mountain Investment Trust in 2022, including any appointment documents, resolutions, consents, correspondence, or agreements.

**RESPONSE:**

**REQUEST NO. 19:** All Documents and Communications relating to the transfer of management shares and ownership of Charitable DAF Fund, LP's general partner from Grant Scott to Mark Patrick in or around April 2021, including (a) any agreements governing the transfer; (b) any conditions or limitations on Patrick's authority; (c) any fiduciary duty obligations assumed by Patrick; (d) any Communications between Scott, Patrick, and the charitable owners regarding the transition; and (e) the consideration, if any, received by Grant Scott in exchange for such transfer.

**RESPONSE:**

**REQUEST NO. 20:** All Documents and Communications relating to, referencing, or reflecting any compensation, benefits, director fees, bonuses, or other remuneration paid to Grant Scott during his tenure as administrator or control person of the DAF Structure from 2011 through 2021.

**RESPONSE:**

**REQUEST NO. 21:** All Documents and Communications sufficient to show the conversion of the charitable trust originally formed in 2006 into a donor-advised fund investment vehicle for long-term charitable endeavors in or around October 2011, including any organizational documents, trust amendments, partnership agreements, or memoranda.[3]

**RESPONSE:**

**REQUEST NO. 22:** All Documents and Communications relating to, referencing, or reflecting the original structure and purpose of the donor-advised fund created in October 2011, including any tax opinions, IRS determination letters, or legal memoranda.[4]

**RESPONSE:**

**REQUEST NO. 23:** All Documents and Communications relating to, referencing, or reflecting the valuation of Highland Capital Management, L.P., or its assets.

**RESPONSE:**

---

[3] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[4] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 24:** All Documents and Communications relating to, referencing, or reflecting Highland Capital Management, L.P.'s financial condition, including any monthly operating reports or quarterly operating reports.

**RESPONSE:**

**REQUEST NO. 25:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for any bankruptcy professional, creditor, or equity holder.[5]

**RESPONSE:**

**REQUEST NO. 26:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[6]

**RESPONSE:**

**REQUEST NO. 27:** All Documents and Communications relating to any valuation of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[7]

**RESPONSE:**

**REQUEST NO. 28:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 29:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

---

[5] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[6] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[7] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 30**: All Documents relating to Mark Patrick's authority to act on behalf of Rand Advisors, LLC, Rand PE Fund I, LP, or any HMIT Entity, including any power of attorney, board resolutions, or operating agreement provisions granting such authority.

**RESPONSE:**

**REQUEST NO. 31:** All Documents relating to any change in the ownership, management, or control of Hunter Mountain Investment Trust, Beacon Mountain LLC, or any entity in the Hunter Mountain ownership chain from January 1, 2024 to the present.

**RESPONSE:**

**REQUEST NO. 32**: All organizational charts reflecting the corporate structure of (a) the DAF Entities; (b) the HMIT Entities; and (c) any entities through which Patrick directly or indirectly held an interest in Hunter Mountain, for any time during the Relevant Period.

**RESPONSE:**

**REQUEST NO. 33:** All documents and communications relating to, referencing, or reflecting the sale of Rand PE Fund I, LP's investment in Beacon Mountain, LLC in or around February 2025, including any purchase agreements, valuations, appraisals, or closing documents.

**RESPONSE:**

**REQUEST NO. 34**: All Documents relating to the transition of management of Rand PE Fund I, LP from John Honis to Patrick or any Patrick-controlled entity, including any Communications with investors or regulatory authorities regarding such transition.

**RESPONSE:**

**REQUEST NO. 35**: All audit reports, financial statements, and quarterly or annual reports for Rand PE Fund I, LP from January 1, 2023 to the present, including the 2024 audit issued on or about June 26, 2025.

**RESPONSE:**

**REQUEST NO. 36:** All Documents relating to the sale of Beacon Mountain LLC (or its interest in Hunter Mountain Investment Trust) to CLO Holdco, LLC, including but not limited to the purchase agreement, any valuations, closing documents, and wire transfer records.

**RESPONSE:**

**REQUEST NO. 37**: All Documents relating to any consent (or lack thereof) from Crown Global Life Insurance, Ltd., The Dallas Foundation, or Atlas IDF, LP regarding the sale of Beacon Mountain's interest in Hunter Mountain to CLO Holdco, LLC or any Patrick-controlled entity.

**RESPONSE:**

**REQUEST NO. 38**: All Documents relating to compliance (or non-compliance) with Section 3.01(b) of the Amended and Restated Limited Partnership Agreement of Atlas Fund, which

prohibits Rand Fund from selling Hunter Mountain to an affiliate of Patrick without investor consent.

**RESPONSE:**

**REQUEST NO. 39:** All Documents and Communications relating to any notice or other information given to investors in Rand PE Fund I, LP (including any 4% minority investor) from January 1, 2025, to the present regarding the sale of Beacon Mountain, LLC's interest in HMIT, or any distribution relating thereto, including the February 20, 2025 notice referenced in Dugaboy's Motion for Reconsideration.

**RESPONSE:**

**REQUEST NO. 40:** All Documents and Communications sufficient to show the basis for the $1 million valuation of Beacon Mountain, LLC's interest in Hunter Mountain Investment Trust in or around February 2025, including any valuation reports, appraisals, financial analyses, or Communications with ValueScope, LLC or any other valuation firm concerning such valuation.

**RESPONSE:**

**REQUEST NO. 41:** All Documents, correspondence, engagement letters, contracts, or agreements between You and ValueScope, LLC (or any other valuation firm) relating to the valuation of any interest, holding in, or security issued by any of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate.

**RESPONSE:**

**REQUEST NO. 42:** All draft and final valuation reports, memoranda, models, or analyses prepared by ValueScope, LLC relating to Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to the valuation of the Participation Shares; and any Communications challenging or questioning the valuation methodology or conclusions.

**RESPONSE:**

**REQUEST NO. 43:** All Documents relating to the methodology used in any valuation of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to instructions received regarding methodology, communications discussing the change from net asset value methodology to discounted cash flow methodology, supporting calculations, assumptions, and comparable transactions or valuations.

**RESPONSE:**

**REQUEST NO. 44:** All Documents and Communications related to the identity, ownership structure, principals, managers, or beneficial owners of Celia Holdco LLC.

**RESPONSE:**

Dated: March 23, 2026

*/s/ Geoffrey S. Harper*

**Geoffrey S. Harper**
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

**John Michael Gaddis**
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

I certify that on March 23, 2026, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

***Via Electronic Mail:***

Louis M. Phillips (louis.phillips@kellyhart.com)
**Kelly Hart Pitre**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916

Amelia L. Hurt (amelia.hurt@kellyhart.com)
**Kelly Hart Pitre**
400 Poydras Street, Suite 1812
New Orleans, LA 70130

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO RAND PE FUND I, LP**

**To:** Rand PE Fund I, LP, by and through their counsel of record, Louis M. Phillips, louis.phillips@kellyhart.com, **Kelly Hart Pitre**, One American Place, 301 Main Street, Suite 1600, Baton Rouge, LA 70801-1916 and Amelia L. Hurt, amelia.hurt@kellyhart.com, **Kelly Hart Pitre**, 400 Poydras Street, Suite 1812, New Orleans, LA 70130

Interested Party The Dugaboy Investment Trust ("Dugaboy") serves this First Set of Requests for Production of Documents to Rand PE Fund I, LP ("Rand Entities"), pursuant to Rule 34 of the Federal Rules of Civil Procedure, which is incorporated into bankruptcy proceedings by Federal Rules of Bankruptcy Procedure 7034 and 9014(c)(1). The Rand Entities must respond to these Requests for Production within thirty (30) days of service. We ask that You produce documents at the offices of King & Spalding, 2601 Olive Street, Suite 2300, Dallas, TX 75201, or by electronic production in a mutually agreed format.

**INSTRUCTIONS**

1. In responding to these Requests, You must furnish all information that is available to You, that is within Your possession, custody, or control, or that is subject to Your reasonable inquiry, including information in the possession of Your attorneys, accountants, advisors, representatives,

agents, or other persons directly or indirectly employed by, or connected with, You or Your attorneys, and anyone else otherwise subject to Your control. All Documents that respond, in whole or in part, to any portion of the Requests below shall be produced in their entirety, including all attachments and enclosures.

2. The relevant time period for documents responsive to these Requests, unless otherwise specified in an individual Request, is the period beginning on the earlier of October 1, 2024, or such date as identified in response to Request No. 1,[1] through the present.

3. To the extent that the below Requests include requests for paper records, such paper records shall be scanned or otherwise converted into electronic form from paper documents in the following format:

(a) All documents shall be scanned to single page Group 4, TIFF format, at least 300 dpi and 8½ x 11 inch page size, except for documents requiring higher resolution or different page size.

(b) In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). The Parties will make their best efforts to have their vendors unitize documents correctly and will commit to address situations where there are improperly unitized documents. For documents found in folders or other containers with labels, tabs, or other identifying information, such labels and tabs shall be scanned where practicable. Pages with Post-it notes shall be scanned both with and without the Post-it, with the image of the page with the Post-it preceding the image of the page without the Post-it.

[1] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

(c) Productions of the images shall be made using an image load file (.OPT or .LFP) and a delimited database/metadata load file (.DAT). Each image file should have a unique file name which shall be the Bates number of the page.

(d) The following objective coding fields should be provided, if applicable:

(1) beginning Bates number;

(2) ending Bates number;

(3) beginning attachment Bates number;

(4) ending attachment Bates number;

(5) page count; and

(6) source location/custodian.

(e) Document level OCR should be provided as a separate text file. The file name of each text file should correspond to the file name of the first image file of the document with which it is associated. The text files will not contain the redacted portions of the documents. OCR software should be set to the highest quality setting during processing. For documents in foreign languages, the OCR shall be performed using an OCR tool and settings suitable for the particular byte or multi-byte languages.

4. To the extent that the below Requests include requests for electronically stored information ("ESI"), all ESI shall be produced in TIFF format according to the following specifications:

(a) All TIFF formatted documents will be single page, Group 4 TIFF at 300 x 300 dpi resolution and 8½ x 11 inch page size, except for documents requiring different resolution or page size.

(b) An image load file, in standard Opticon format, showing the Bates number of each page and the appropriate unitization of the documents, will accompany all document images.

(c) Each imaged version of an electronic document will be created directly from the original electronic document.

(d) TIFFs shall be produced as black and white, single-page TIFF images in accordance with the technical specifications set out above. Word documents that have tracked changes or comments shall be produced in color. In addition, upon written request that identifies a reasonable number of individual documents at issue by Bates number, a party shall produce color images for those documents. Documents produced in color shall be produced as single page, 300 DPI, color JPG images with the quality setting of 75% or higher.

(e) All TIFF files are to be provided with an accompanying searchable text (.TXT) file extracted from the native, electronic file (not generated as an OCR file from the TIFF image(s)), and such text files shall contain the full text extraction. To the extent reasonably feasible, extracted text shall provide all comments, tracked changes, speaker's notes, and text from hidden worksheets, slides, columns, and rows. In the case of files with redacted text, OCR'ed text of the redacted documents may be provided in lieu of extracted text. OCR software should be set to the highest quality setting during processing.

5. To the extent reasonably feasible, all Documents produced shall be produced with metadata and attachments intact. The term "metadata" means all information describing the history, tracking, or management of an electronic document including, but not limited to, the date(s) the document was created, modified, accessed, or distributed; the author(s) and all recipient(s) of the

document; the file's name; the file's location (e.g., directory structure or pathname); the file format or file type; and the file size. For comparison purposes and to ensure authenticity, where documents are produced in native format, such documents shall also be produced in the ESI format described in Instruction No. 3, unless otherwise agreed by the parties.

6. Should You object to any Request, You must specifically and in detail state the grounds and reasons for the objection, and state in detail the part of the language of the Request to which You object, and state which part of the Request, if any, You are answering.

7. Under the Crime-Fraud Exception and Subject-Matter Waiver, items which would typically be privileged are not privileged in this matter. The Fifth Circuit recognizes the Crime-Fraud Exception to privilege, under which attorney-client communications and/or work product materials are not privileged if "the client consults an attorney for advice that will assist the client in carrying out a contemplated illegal or fraudulent scheme." *Lewis v. Crochet*, 105 F.4th 272, 282 (5th Cir. 2024) (quoting *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1242 (5th Cir. 1982)). The exception applies where (1) a crime or fraud was impending or continuing at the time of the communication, and (2) the communications or work product at issue were in furtherance of that criminal or fraudulent activity. *See In re E.E.O.C.*, 207 F. App'x 426, 434 (5th Cir. 2006). Dugaboy reasonably believes, and has evidence to support, that certain communications and work product it seeks were intended to further continuing or future criminal or fraudulent activity and are therefore not privileged.

Likewise, Subject-Matter Waiver under Federal Rule of Evidence 502(a) provides that disclosure of certain information in a federal proceeding waives privilege for related information when (1) the waiver was intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) the disclosed and undisclosed

communications and work product "ought in fairness to be considered together." Fed. R. Evid. 502(a); *see also Crider Inc. v. Silgan Containers LLC*, 2023 WL 479094, at *22 (N.D. Tex. Jan. 13, 2023). Any communications or work product that would otherwise be privileged, but concern the same subject matter intentionally disclosed by Mark Patrick in his affidavits or testimony in this Proceeding or Related Proceedings fall under this exception, and privilege has been waived.

Accordingly, under these exceptions and waivers, You must produce documents that would typically be privileged as they relate to (1) any fraudulent activity that counsel was involved in or knew of, or (2) any privileged conversation or information that has already been disclosed elsewhere in this litigation.

If You still contend that any Documents sought by the Requests are privileged or otherwise protected from discovery, You must nevertheless identify for each Document withheld:

(a) the legal basis for withholding the Document;

(b) the person asserting any claim of privilege and/or protection;

(c) a description and identification of the requested Document sufficient to frame an appropriate demand for the Document and a motion to compel disclosure thereof, setting forth at least the following:

(i) the author and/or signatory of the Document withheld;

(ii) the date of the Document withheld;

(iii) all addressees and/or recipients of the Document withheld; and

(iv) the subject matter and circumstances under which the Document withheld was created in sufficient detail to ascertain applicability of such privilege or other legal basis.

8. Notwithstanding a claim that a portion of a Document is privileged or otherwise protected from disclosure, any such Document must be produced with the portion claimed to be protected excised.

9. If You contend that any Request is ambiguous or unclear, contact undersigned counsel as soon as possible so that the Request can be clarified to avoid unnecessary delays in discovery.

10. These Requests are continuing in nature. Any Documents located, created, or obtained subsequent to the Documents provided in response to these Requests and that should have been produced had they been known shall be promptly supplied by supplemental responses whenever You find, locate, or acquire such Documents. You are required to supplement and correct Your answers and responses on a timely basis.

**DEFINITIONS**

As used herein, the terms listed below shall be defined as follows. Insofar as a term is not explicitly defined, the meaning to be used is the commonly accepted definition of the term. Notwithstanding any definition set forth below, each word, term, or phrase used in these Requests is intended to have the broadest meaning permitted under applicable rules. The following terms are to be given their ascribed definitions:

**A. Proceedings**

1. The term "this Proceeding" or "this Litigation" or "Main Case" refers to the main bankruptcy proceeding *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

2. The term "Related Proceedings" includes all other legal proceedings or actions involving or related to Highland, HMIT, and persons, parties, or entities involved with or affected by the Settlement, specifically including but not limited to the Cayman Islands Proceedings, the Chapter

15 proceeding in the United States Bankruptcy Court for the District of Delaware, and the Texas Business Court proceeding, as well as any bankruptcy adversary proceedings before the United States Bankruptcy Court for the Northern District of Texas that are separate from the Main Case.

**B. Parties and Individuals**

1. The term "You" or "Your" refers to Rand PE Fund I, LP as well as its agents, attorneys, accountants, advisors, representatives, or any other individual(s) or entity(ies) acting or authorized to act on behalf of them, and any related companies, divisions, or subsidiaries, past or present, including, without limitation, the directors, officers, employees, agents, or attorneys thereof, as well as any predecessors-in-interest or successors-in-interest.

2. The term "Patrick" refers to Mark Eric Patrick.
3. The term "Dondero" refers to James Dondero.
4. The term "Okada" refers to Mark Okada.
5. The term "Seery" or "Claimant Trustee" refers to James P. Seery, Jr.
6. The term "Kirschner" or "Litigation Trustee" refers to Marc S. Kirschner.
7. The term "Murphy" refers to Paul Murphy.
8. The term "Scott" refers to Grant Scott.
9. The term "Cronin" refers to Kevin Cronin.
10. The term "Honis" refers to John Honis.
11. The term "Raver" refers to Shawn Raver.

**C. Highland Entities and Related Trusts**

12. The term "Highland" or "Highland Capital Management" refers to Highland Capital Management, L.P., a Dallas-based, Delaware-domiciled investment advisor, and the Debtor in the matter *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

13. The term "Highland Entities" or "Highland Entity" refers collectively to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

14. The term "Highland Claimant Trust" refers to the entity created under the Plan to hold, monetize, and distribute the assets of Highland's estate.

15. The term "Highland Litigation Sub-Trust" or "Litigation Sub-Trust" refers to the trust created under the Plan for the purpose of pursuing litigation claims on behalf of the Highland estate.

16. The term "Highland Indemnity Trust" or "Indemnity Trust" refers to the trust created under the Plan to hold assets for the purpose of indemnification obligations arising out of the Highland estate.

17. The term "Highland Party" or "Highland Parties" refers to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, the Highland Indemnity Trust, and each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, and subsidiaries, and any persons or entities acting or authorized to act on their behalf.

**D. HMIT Entities and Related Parties**

1. The term "HMIT Entities" refers collectively to Hunter Mountain Investment Trust and Beacon Mountain, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "HMIT Parties" refers broadly to the HMIT Entities, Mark Patrick, and any related decision maker with respect to the HMIT Entities, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

3. The term "Hunter Mountain" or "HMIT" refers to Hunter Mountain Investment Trust.

4. The term "Beacon Mountain" refers to Beacon Mountain, LLC.

5. The term "Beacon Hunter" refers to Beacon Hunter, LLC.

**E. Rand Entities**

1. The term "Rand Parties" or "Rand Entities" refers collectively to Rand PE Fund I, LP, Rand Advisors, LLC, and Rand PE Fund Management, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "Rand Fund" or "Rand PE Fund" refers to Rand PE Fund I, LP.

3. The term "Rand Advisors" refers to Rand Advisors, LLC, an SEC-registered investment advisor that served as the investment adviser to Rand PE Fund I, LP.

4. The term "Rand PE Fund Management" refers to Rand PE Fund Management, LLC.

**F. DAF Entities and Related Structures**

1. The term "DAF" or "Charitable DAF Holdco" refers to Charitable DAF Holdco, Ltd.

2. The term "DAF Fund" or "Charitable DAF Fund" refers to Charitable DAF Fund, LP.

3. The term "DAF GP" or "Charitable DAF GP" refers to Charitable DAF GP, LLC.

4. The term "DAF Structure" refers to the overall donor-advised fund investment vehicle and its constituent entities, including Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, and any entity holding ownership or management interests therein or formed in connection therewith, including any entities created as part of the restructuring of the DAF.

5. The term "DAF Entities" refers collectively to Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, CDH GP, Ltd., CDMCFAD, LLC, DFW Charitable Foundation, CLO Holdco, LLC, and any other entity formed, restructured, or otherwise created in connection with or derived from the DAF Structure, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

6. The terms "New GP" or "CDH GP" refer to CDH GP, Ltd.

7. The term "CDMCFAD" or "DAF 2.0" refers to CDMCFAD, LLC.

8. The term "DFW Charitable Foundation" or "DFW Foundation" refers to DFW Charitable Foundation.

9. The term "CLO Holdco" refers to CLO Holdco, LLC.

**G. Charitable and Donor Entities**

1. The terms "The Dallas Foundation" or "Dallas Foundation" refer to The Dallas Foundation.

2. The term "Crown Global" refers to Crown Global Life Insurance, Ltd.

3. The terms "Empower" or "Empower Dallas" refer to Empower Dallas.

4. The term "Okada Foundation" refers to the Okada Foundation.

5. The term "Charitable Beneficiaries" or "Charities" refers collectively to The Dallas Foundation, Crown Global Life Insurance, Ltd., Empower Dallas, the Okada Foundation, and any other charitable organization or foundation that held beneficial ownership in the DAF Structure through participation shares or annuity policies.

6. The term "Highland Dallas Foundation" refers to Highland Dallas Foundation, Inc.

7. The term "Highland Santa Barbara Foundation" refers to Highland Santa Barbara Foundation, Inc.

8. The term "Highland Kansas City Foundation" refers to Highland Kansas City Foundation, Inc.

9. The term "Participation Shares" refers to the shares in Charitable DAF Holdco, Ltd. held by the Charitable Foundations through which the Foundations held beneficial ownership in the DAF Structure.

**H. Other Entities**

1. The term "Dugaboy" refers to The Dugaboy Investment Trust.

2. The term "Strand" or "Strand Advisors" refers to Strand Advisors, Inc.

3. The terms "Atlas Fund" or "Atlas IDF" refers to Atlas IDF, LP.

4. The terms "Skyview" or "Skyview Group" refers to The Skyview Group.

5. The term "Fortaris" or "Fortaris Capital Advisors" refers to Fortaris Capital Advisors.

6. The term "ValueScope" refers to ValueScope, LLC.

7. The term "Celia Holdco" refers to Celia Holdco LLC.

8. The terms "Creative Hearts" or "Creative Hearts TX" refer to Creative Hearts TX.

**I. Law Firms**

1. The term "Kelly Hart" refers to Kelly Hart & Hallman LLP, or any predecessor or successor firm or any associated attorney.

2. The term "Shields Law Group" refers to Shields Law Group, P.C., or any predecessor or successor firm or any associated attorney.

**J. Litigation, Settlement, and Bankruptcy Terms**

1. The term "Highland Bankruptcy" refers to the Chapter 11 bankruptcy case titled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj, pending in the United States Bankruptcy Court for the Northern District of Texas.

2. The term "Settlement Agreement" refers to each and every discussion or negotiation of settlement or iteration of the settlement agreement between the Highland Entities and the HMIT Entities, together with all exhibits, schedules, appendices, and ancillary documents, and including any preliminary drafts, associated documents, and communications related thereto.

3. The term "Settlement Agreement & General Release" or "9019 Settlement" refers to the Settlement Agreement & General Release dated May 19, 2025, by and among the Highland Entities and the HMIT Entities, as approved by the Court, together with all exhibits, schedules, appendices, and ancillary documents.

4. The term "9019 Motion" refers to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, filed on May 19, 2025 (Bankr. Dkt. 4217).

5. The term "Rule 9019 Settlement Order" refers to the Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, entered on June 30, 2025 (Bankr. Dkt. 4297).

6. The term "Kirschner Litigation" or "Kirschner Claims" or "Transferred Claims" refers to the 36-count adversary complaint filed by Marc A. Kirschner, as Litigation Trustee, styled Kirschner v. Dondero, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex. Oct. 15, 2021), together with any amended, supplemental, or related pleadings, and the claims asserted therein.

7. The term "Plan" refers to Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization (as Modified), confirmed on February 22, 2021.

8. The term "Confirmation Order" refers to the Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.

9. The term "Class 10" refers to the class of claims under the Plan designated as "Class 10 Claims" and consisting of the claim held by Hunter Mountain Investment Trust as a holder of pre-bankruptcy Class B and C limited partnership interests in Highland.

10. The term "Class 11" refers to the class of claims under the Plan designated as "Class 11 Claims" and consisting of the claim held by other equity holders holding pre-bankruptcy Class A limited partnership interests in Highland.

11. The term "Class 10 Interest" or "HMIT Class 10 Interest" refers to Hunter Mountain Investment Trust's allowed Class 10 claim in the amount of $336,940,230.58 as set forth in the Settlement Agreement and associated Order.

12. The term "Contingent Claimant Trust Interests" refers to the interests given to the former equity holders under the Plan in the Highland Claimant Trust, which were to vest only upon certification by the Claimant Trustee that all unsecured creditors had been paid in full with interest.

13. The term "Work Plan" refers to the plan or plans prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities.

14. The term "Withdrawal Stipulation" refers to the Stipulation Withdrawing Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd. to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith (Bankr. Dkt. 4291).

15. The term "Dugaboy Note" refers to the promissory note dated May 31, 2017, in the original amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

16. The term "Texas Business Court Proceeding" or "Business Court Proceeding" refers to Case No. 25-BC01B-0027 filed in the Texas Business Court, First Division on July 1, 2025, and captioned *The Highland Dallas Foundation, Inc. ,The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. vs. DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC,CDH GP, Ltd., and Mark Patrick.*

**K. Cayman Islands Proceedings**

1. The terms "Cayman Islands Proceeding(s)" or "Cayman Proceeding" refer collectively to all judicial proceedings in the Cayman Islands relating to Charitable DAF Holdco, Ltd. or any DAF Entity, including (a) the voluntary liquidation filed by Patrick on April 2, 2025; (b) the winding up petition filed by the charitable owners on April 23, 2025 (No. FSD 99 of 2025 (JAJ)); (c) the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators on July

15, 2025 (No. FSD 201 of 2025); and (d) all related proceedings, investigations, hearings, orders, and filings.

2. The term "Joint Official Liquidators" or "JOLs" refers to the court-appointed liquidators designated by the Cayman Islands court on or about May 6, 2025 to oversee the DAF's operations.

3. The term "Statement of Claim" refers to the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators in the Cayman Islands Proceeding on July 15, 2025.

4. The term "Chapter 15 Petition" refers to the petition filed by the Joint Official Liquidators in the United States Bankruptcy Court for the District of Delaware on July 21, 2025.

5. The term "Patrick-Cronin Proposal" refers to the proposal made by Mark Patrick to Kevin Cronin, a principal of Fortaris Capital Advisors, to make and split monthly payments to the DAF, as referenced in Paragraph 173 of the Third Affidavit of Mark Patrick.

### L. General Discovery Terms

1. The term "Document" or "Documents" is used in its broadest possible sense and refers, without limitation, to anything upon which any expression, communication, or representation has been recorded by any means. The term includes, but is not limited to: correspondence, emails, text messages, instant messages, messages/posts on social media, handwritten notes, photographs, working papers, any drafts of documents (preliminary, intermediate, and/or final), memoranda, contracts/agreements, tapes, business records, financial records, charts, notes, records of any sort of meetings, reports of telephone or other oral conversations, calendars (whether hardcopy or electronic, including desk calendars, phone calendars, or other calendars using software or an application), appointment books, audio or video tape recordings, information on computer disc/card/drive, computer entries that can be retrieved electronically, databases, and all other writings and recordings of every kind that are in Your actual or constructive possession, custody,

or control. The term includes, but is not limited to, drafts and copies of any documents, whether identical to the original or different from the original because of notes, comments, highlighting, edits, any other alterations made on such copies, indications that said copies were sent to different individuals than were the originals, or any other reason.

2. The term "Communication" or "Communications" means any transmission of information in any context or situation by or between two or more Persons by any means or medium whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically, or digitally, or on tape, either orally or in writing, including, but not limited to, conversations, correspondence, emails, text messages, instant messages, social media communications, telexes, facsimile transmissions, telecopies, recordings in any medium of oral, written, or typed communication, telephone or message logs, notes or memoranda relating to written or oral communications, and any translation thereof.

3. The terms "Person" or "Entity" and their plural forms mean natural persons, proprietorships, partnerships, firms, trusts, estates, companies, corporations, public corporations, sole practitioners, municipal corporations, federal, state, and local governments, all departments and agencies thereof, any other governmental agencies, subdivisions, groups, associations, or organizations, or any other entity, whether foreign or domestic.

4. The term "thing" means any tangible item, including without limitation, models, prototypes, and samples of any device or apparatus or product.

5. The terms "concerning," "regarding," "referring to," "related to," or "relating to" shall be construed in the broadest possible sense, and shall mean without limitation and whether in whole or in part: referring to, constituting, bearing upon, commenting upon, reflecting, evidencing, pertaining to, describing, depicting, consisting of, containing, comprising, embodying, identifying,

stating, discussing, analyzing, studying, summarizing, dealing with, relating to, or having any logical or factual connection whatsoever with the subject addressed.

6. The terms "state" or "describe" mean to fully elucidate by reference to underlying facts rather than by reference to ultimate facts or conclusions of fact or law; where applicable, to particularize as to time, place, and manner; and to set forth all relevant facts necessary to complete the understanding of the act, process, event, or thing in question.

7. The term "Relevant Period" refers to the period beginning on the earlier of January 1, 2025, or such date as identified in Response to Request No. 1,[2] through the present.

8. The present tense includes the past and future tenses.

9. The singular includes the plural, and the plural includes the singular.

10. Words in the masculine, feminine, and neutral form shall include each of the other genders.

11. Whenever used herein, "and" may be understood to mean "or" and vice versa whenever such construction results in a broader request for information.

12. "All" means "any and all" and "any" means "any and all."

13. "Including" means "including but not limited to."

14. The term "identify" means and requires You to:

(a) With reference to an individual, state his or her full name and last known residential address, business address, telephone and/or facsimile number, the name and address of his or her employer, the individual's job title or job responsibilities, and his or her relationship to You;

[2] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

(b) With reference to a company or organization, state the entity's full legal name, business addresses, telephone number, and a person with whom You had direct contact within that entity;

(c) With reference to a document, describe the document, state the date when the document was created, name the creator of the document, and name each person to whom the document was sent;

(d) With reference to an oral communication, provide the date(s) of the communication, the names and addresses of all parties, when the communication occurred, the place(s) where the communication took place, the subject matter of the communication, and the general substance of the communication; and

(e) With reference to an occurrence or event, provide the date and location of the occurrence or event, the identity of each person involved in the occurrence or event, the subject matter discussed, and the identity of any document that records, refers to, or relates to such occurrence or event.

## DOCUMENT REQUESTS

**REQUEST NO. 1:** All Documents and Communications between or among Highland Capital Management, L.P. (or its representatives, including James P. Seery, Jr. or the Claimant Trustee) and any of the HMIT Entities concerning the 9019 Settlement, including but not limited to draft agreements, term sheets, and settlement proposals, and including Documents sufficient to show the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement.

**RESPONSE:**

**REQUEST NO. 2:** All Documents relating to due diligence performed by Highland Capital Management, L.P. (or its representatives) concerning (a) the authority of Mark Patrick or any other person to bind the HMIT Entities to the 9019 Settlement; (b) the ownership structure of the HMIT Entities; or (c) any corporate restructuring of the HMIT Entities or the DAF Entities.

**RESPONSE:**

**REQUEST NO. 3:** All Documents and Communications exchanged between any Highland Party and any HMIT Entity prior to execution of the Settlement Agreement relating to or evidencing legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any changes thereto.

**RESPONSE:**

**REQUEST NO. 4:** All Documents and Communications exchanged between any Highland Party and any Rand Party prior to execution of the Settlement Agreement relating to or evidencing legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any changes thereto.

**RESPONSE:**

**REQUEST NO. 5:** All Documents and Communications exchanged between any Highland Party and any person or party prior to execution of the Settlement Agreement relating to or evidencing any change in legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any transaction related thereto.

**RESPONSE:**

**REQUEST NO. 6:** All Documents and Communications relating to, referencing, or reflecting the consideration received by Hunter Mountain Investment Trust in exchange for entering into the Settlement Agreement & General Release dated May 19, 2025, including any valuations, appraisals, or analyses of the value received.

**RESPONSE:**

**REQUEST NO. 7:** All Documents and Communications sufficient to show the reason or rationale for the HMIT Entities' agreement to transfer or relinquish litigation rights previously asserted against Highland Entities in exchange for the consideration set forth in the Settlement Agreement.

**RESPONSE:**

**REQUEST NO. 8:** All Communications between You and any third party relating to the Settlement Agreement, the 9019 Motion, or the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 9:** All Documents relating to the current value of the Highland Claimant Trust, including any reports, analyses, or projections of Highland's remaining assets, estimated distributions to claimants, and any anticipated residual value available for Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 10:** All Documents relating to any payments made or to be made pursuant to the 9019 Settlement, including the $500,000 lump-sum payment, the $10 million initial distribution, and any subsequent distributions, including wire transfer records, bank statements, and any documents reflecting the disposition of such funds.

**RESPONSE:**

**REQUEST NO. 11:** All Documents reflecting Highland Capital Management, L.P.'s knowledge of (a) the restructuring of the DAF Entities; (b) the sale of Beacon Mountain to CLO Holdco, LLC; (c) any change in the beneficial ownership of Hunter Mountain; or (d) any investigation of Patrick by the Cayman Islands court, the Texas Attorney General, or any other governmental authority.

**RESPONSE:**

**REQUEST NO. 12:** All bank statements, brokerage statements, investment account statements, balance sheets, financial statements, and accounting records for the following: Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco, LLC; CDMCFAD, LLC; Charitable DAF Holdco, Ltd.; Charitable DAF Fund, LP; DFW Charitable Foundation; and any other DAF entity, including consolidated and entity-level statements.

**RESPONSE:**

**REQUEST NO. 13:** All Documents and Communications relating to any transfer of any interests in Hunter Mountain Investment Trust, Beacon Mountain, LLC, CLO Holdco, LLC, CDMCFAD, LLC, and DFW Charitable Foundation, including but not limited to assignment agreements, contribution agreements, and corporate resolutions approving transfers.

**RESPONSE:**

**REQUEST NO. 14:** All Documents relating to any transfer of assets from Charitable DAF Holdco, Ltd. or Charitable DAF Fund, LP to CDMCFAD, LLC or any entity controlled by Patrick, including the assignment of limited partnership interests referenced in the Statement of Claim filed in the Cayman Islands.

**RESPONSE:**

**REQUEST NO. 15:** All Documents and Communications sufficient to show the original purpose and stated objectives of the 2015 sale of Highland Capital Management, L.P. equity holders' equity stake to Hunter Mountain Investment Trust, including any term sheets, memoranda, presentations, tax advice, or planning documents.

**RESPONSE:**

**REQUEST NO. 16:** All Documents and Communications regarding the reasons behind the equity ownership allocation reflected in Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization, including the allocation of (i) 99.5% to Hunter Mountain Investment Trust; (ii) 0.1866% to The Dugaboy Investment Trust; (iii) 0.0627% to Mark Okada and associated family trusts; and (iv) 0.25% to Strand Advisors, Inc.

**RESPONSE:**

**REQUEST NO. 17:** All Documents and Communications relating to, referencing, or reflecting any tax benefit, tax efficiency, or charitable purpose associated with the restructuring of Highland Capital Management, L.P. ownership in 2015.

**RESPONSE:**

**REQUEST NO. 18:** All Documents and Communications sufficient to show the circumstances surrounding Mark Patrick becoming the administrator of Hunter Mountain Investment Trust in 2022, including any appointment documents, resolutions, consents, correspondence, or agreements.

**RESPONSE:**

**REQUEST NO. 19:** All Documents and Communications relating to the transfer of management shares and ownership of Charitable DAF Fund, LP's general partner from Grant Scott to Mark Patrick in or around April 2021, including (a) any agreements governing the transfer; (b) any conditions or limitations on Patrick's authority; (c) any fiduciary duty obligations assumed by Patrick; (d) any Communications between Scott, Patrick, and the charitable owners regarding the transition; and (e) the consideration, if any, received by Grant Scott in exchange for such transfer.

**RESPONSE:**

**REQUEST NO. 20:** All Documents and Communications relating to, referencing, or reflecting any compensation, benefits, director fees, bonuses, or other remuneration paid to Grant Scott during his tenure as administrator or control person of the DAF Structure from 2011 through 2021.

**RESPONSE:**

**REQUEST NO. 21:** All Documents and Communications sufficient to show the conversion of the charitable trust originally formed in 2006 into a donor-advised fund investment vehicle for long-term charitable endeavors in or around October 2011, including any organizational documents, trust amendments, partnership agreements, or memoranda.[3]

**RESPONSE:**

**REQUEST NO. 22:** All Documents and Communications relating to, referencing, or reflecting the original structure and purpose of the donor-advised fund created in October 2011, including any tax opinions, IRS determination letters, or legal memoranda.[4]

**RESPONSE:**

**REQUEST NO. 23:** All Documents and Communications relating to, referencing, or reflecting the valuation of Highland Capital Management, L.P., or its assets.

**RESPONSE:**

---

[3] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[4] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 24:** All Documents and Communications relating to, referencing, or reflecting Highland Capital Management, L.P.'s financial condition, including any monthly operating reports or quarterly operating reports.

**RESPONSE:**

**REQUEST NO. 25:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for any bankruptcy professional, creditor, or equity holder.[5]

**RESPONSE:**

**REQUEST NO. 26:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[6]

**RESPONSE:**

**REQUEST NO. 27:** All Documents and Communications relating to any valuation of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[7]

**RESPONSE:**

**REQUEST NO. 28:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 29:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

---

[5] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[6] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[7] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 30**: All Documents relating to Mark Patrick's authority to act on behalf of Rand Advisors, LLC, Rand PE Fund I, LP, or any HMIT Entity, including any power of attorney, board resolutions, or operating agreement provisions granting such authority.

**RESPONSE:**

**REQUEST NO. 31:** All Documents relating to any change in the ownership, management, or control of Hunter Mountain Investment Trust, Beacon Mountain LLC, or any entity in the Hunter Mountain ownership chain from January 1, 2024 to the present.

**RESPONSE:**

**REQUEST NO. 32**: All organizational charts reflecting the corporate structure of (a) the DAF Entities; (b) the HMIT Entities; and (c) any entities through which Patrick directly or indirectly held an interest in Hunter Mountain, for any time during the Relevant Period.

**RESPONSE:**

**REQUEST NO. 33:** All documents and communications relating to, referencing, or reflecting the sale of Rand PE Fund I, LP's investment in Beacon Mountain, LLC in or around February 2025, including any purchase agreements, valuations, appraisals, or closing documents.

**RESPONSE:**

**REQUEST NO. 34**: All Documents relating to the transition of management of Rand PE Fund I, LP from John Honis to Patrick or any Patrick-controlled entity, including any Communications with investors or regulatory authorities regarding such transition.

**RESPONSE:**

**REQUEST NO. 35**: All audit reports, financial statements, and quarterly or annual reports for Rand PE Fund I, LP from January 1, 2023 to the present, including the 2024 audit issued on or about June 26, 2025.

**RESPONSE:**

**REQUEST NO. 36:** All Documents relating to the sale of Beacon Mountain LLC (or its interest in Hunter Mountain Investment Trust) to CLO Holdco, LLC, including but not limited to the purchase agreement, any valuations, closing documents, and wire transfer records.

**RESPONSE:**

**REQUEST NO. 37**: All Documents relating to any consent (or lack thereof) from Crown Global Life Insurance, Ltd., The Dallas Foundation, or Atlas IDF, LP regarding the sale of Beacon Mountain's interest in Hunter Mountain to CLO Holdco, LLC or any Patrick-controlled entity.

**RESPONSE:**

**REQUEST NO. 38**: All Documents relating to compliance (or non-compliance) with Section 3.01(b) of the Amended and Restated Limited Partnership Agreement of Atlas Fund, which

prohibits Rand Fund from selling Hunter Mountain to an affiliate of Patrick without investor consent.

**RESPONSE:**

**REQUEST NO. 39:** All Documents and Communications relating to any notice or other information given to investors in Rand PE Fund I, LP (including any 4% minority investor) from January 1, 2025, to the present regarding the sale of Beacon Mountain, LLC's interest in HMIT, or any distribution relating thereto, including the February 20, 2025 notice referenced in Dugaboy's Motion for Reconsideration.

**RESPONSE:**

**REQUEST NO. 40:** All Documents and Communications sufficient to show the basis for the $1 million valuation of Beacon Mountain, LLC's interest in Hunter Mountain Investment Trust in or around February 2025, including any valuation reports, appraisals, financial analyses, or Communications with ValueScope, LLC or any other valuation firm concerning such valuation.

**RESPONSE:**

**REQUEST NO. 41:** All Documents, correspondence, engagement letters, contracts, or agreements between You and ValueScope, LLC (or any other valuation firm) relating to the valuation of any interest, holding in, or security issued by any of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate.

**RESPONSE:**

**REQUEST NO. 42:** All draft and final valuation reports, memoranda, models, or analyses prepared by ValueScope, LLC relating to Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to the valuation of the Participation Shares; and any Communications challenging or questioning the valuation methodology or conclusions.

**RESPONSE:**

**REQUEST NO. 43:** All Documents relating to the methodology used in any valuation of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to instructions received regarding methodology, communications discussing the change from net asset value methodology to discounted cash flow methodology, supporting calculations, assumptions, and comparable transactions or valuations.

**RESPONSE:**

**REQUEST NO. 44:** All Documents and Communications related to the identity, ownership structure, principals, managers, or beneficial owners of Celia Holdco LLC.

**RESPONSE:**

Dated: March 23, 2026

*/s/ Geoffrey S. Harper*

**Geoffrey S. Harper**
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

**John Michael Gaddis**
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

I certify that on March 23, 2026, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

***Via Electronic Mail:***

Louis M. Phillips (louis.phillips@kellyhart.com)
**Kelly Hart Pitre**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916

Amelia L. Hurt (amelia.hurt@kellyhart.com)
**Kelly Hart Pitre**
400 Poydras Street, Suite 1812
New Orleans, LA 70130

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO RAND PE FUND MANAGEMENT, LLC**

**To:** Rand PE Fund Management, LLC, by and through their counsel of record, Louis M. Phillips, louis.phillips@kellyhart.com, **Kelly Hart Pitre**, One American Place, 301 Main Street, Suite 1600, Baton Rouge, LA 70801-1916 and Amelia L. Hurt, amelia.hurt@kellyhart.com, **Kelly Hart Pitre**, 400 Poydras Street, Suite 1812, New Orleans, LA 70130

Interested Party The Dugaboy Investment Trust ("Dugaboy") serves this First Set of Requests for Production of Documents to Rand PE Fund Management, LLC ("Rand Entities"), pursuant to Rule 34 of the Federal Rules of Civil Procedure, which is incorporated into bankruptcy proceedings by Federal Rules of Bankruptcy Procedure 7034 and 9014(c)(1). The Rand Entities must respond to these Requests for Production within thirty (30) days of service. We ask that You produce documents at the offices of King & Spalding, 2601 Olive Street, Suite 2300, Dallas, TX 75201, or by electronic production in a mutually agreed format.

**INSTRUCTIONS**

1. In responding to these Requests, You must furnish all information that is available to You, that is within Your possession, custody, or control, or that is subject to Your reasonable inquiry, including information in the possession of Your attorneys, accountants, advisors, representatives,

agents, or other persons directly or indirectly employed by, or connected with, You or Your attorneys, and anyone else otherwise subject to Your control. All Documents that respond, in whole or in part, to any portion of the Requests below shall be produced in their entirety, including all attachments and enclosures.

2. The relevant time period for documents responsive to these Requests, unless otherwise specified in an individual Request, is the period beginning on the earlier of October 1, 2024, or such date as identified in response to Request No. 1,[1] through the present.

3. To the extent that the below Requests include requests for paper records, such paper records shall be scanned or otherwise converted into electronic form from paper documents in the following format:

(a) All documents shall be scanned to single page Group 4, TIFF format, at least 300 dpi and 8½ x 11 inch page size, except for documents requiring higher resolution or different page size.

(b) In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). The Parties will make their best efforts to have their vendors unitize documents correctly and will commit to address situations where there are improperly unitized documents. For documents found in folders or other containers with labels, tabs, or other identifying information, such labels and tabs shall be scanned where practicable. Pages with Post-it notes shall be scanned both with and without the Post-it, with the image of the page with the Post-it preceding the image of the page without the Post-it.

[1] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

(c) Productions of the images shall be made using an image load file (.OPT or .LFP) and a delimited database/metadata load file (.DAT). Each image file should have a unique file name which shall be the Bates number of the page.

(d) The following objective coding fields should be provided, if applicable:

(1) beginning Bates number;

(2) ending Bates number;

(3) beginning attachment Bates number;

(4) ending attachment Bates number;

(5) page count; and

(6) source location/custodian.

(e) Document level OCR should be provided as a separate text file. The file name of each text file should correspond to the file name of the first image file of the document with which it is associated. The text files will not contain the redacted portions of the documents. OCR software should be set to the highest quality setting during processing. For documents in foreign languages, the OCR shall be performed using an OCR tool and settings suitable for the particular byte or multi-byte languages.

4. To the extent that the below Requests include requests for electronically stored information ("ESI"), all ESI shall be produced in TIFF format according to the following specifications:

(a) All TIFF formatted documents will be single page, Group 4 TIFF at 300 x 300 dpi resolution and 8½ x 11 inch page size, except for documents requiring different resolution or page size.

(b) An image load file, in standard Opticon format, showing the Bates number of each page and the appropriate unitization of the documents, will accompany all document images.

(c) Each imaged version of an electronic document will be created directly from the original electronic document.

(d) TIFFs shall be produced as black and white, single-page TIFF images in accordance with the technical specifications set out above. Word documents that have tracked changes or comments shall be produced in color. In addition, upon written request that identifies a reasonable number of individual documents at issue by Bates number, a party shall produce color images for those documents. Documents produced in color shall be produced as single page, 300 DPI, color JPG images with the quality setting of 75% or higher.

(e) All TIFF files are to be provided with an accompanying searchable text (.TXT) file extracted from the native, electronic file (not generated as an OCR file from the TIFF image(s)), and such text files shall contain the full text extraction. To the extent reasonably feasible, extracted text shall provide all comments, tracked changes, speaker's notes, and text from hidden worksheets, slides, columns, and rows. In the case of files with redacted text, OCR'ed text of the redacted documents may be provided in lieu of extracted text. OCR software should be set to the highest quality setting during processing.

5. To the extent reasonably feasible, all Documents produced shall be produced with metadata and attachments intact. The term "metadata" means all information describing the history, tracking, or management of an electronic document including, but not limited to, the date(s) the document was created, modified, accessed, or distributed; the author(s) and all recipient(s) of the

document; the file's name; the file's location (e.g., directory structure or pathname); the file format or file type; and the file size. For comparison purposes and to ensure authenticity, where documents are produced in native format, such documents shall also be produced in the ESI format described in Instruction No. 3, unless otherwise agreed by the parties.

6. Should You object to any Request, You must specifically and in detail state the grounds and reasons for the objection, and state in detail the part of the language of the Request to which You object, and state which part of the Request, if any, You are answering.

7. Under the Crime-Fraud Exception and Subject-Matter Waiver, items which would typically be privileged are not privileged in this matter. The Fifth Circuit recognizes the Crime-Fraud Exception to privilege, under which attorney-client communications and/or work product materials are not privileged if "the client consults an attorney for advice that will assist the client in carrying out a contemplated illegal or fraudulent scheme." *Lewis v. Crochet*, 105 F.4th 272, 282 (5th Cir. 2024) (quoting *In re Int'l Sys. & Controls Corp. Sec. Litig*., 693 F.2d 1235, 1242 (5th Cir. 1982)). The exception applies where (1) a crime or fraud was impending or continuing at the time of the communication, and (2) the communications or work product at issue were in furtherance of that criminal or fraudulent activity. *See In re E.E.O.C*., 207 F. App'x 426, 434 (5th Cir. 2006). Dugaboy reasonably believes, and has evidence to support, that certain communications and work product it seeks were intended to further continuing or future criminal or fraudulent activity and are therefore not privileged.

Likewise, Subject-Matter Waiver under Federal Rule of Evidence 502(a) provides that disclosure of certain information in a federal proceeding waives privilege for related information when (1) the waiver was intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) the disclosed and undisclosed

communications and work product "ought in fairness to be considered together." Fed. R. Evid. 502(a); *see also Crider Inc. v. Silgan Containers LLC*, 2023 WL 479094, at *22 (N.D. Tex. Jan. 13, 2023). Any communications or work product that would otherwise be privileged, but concern the same subject matter intentionally disclosed by Mark Patrick in his affidavits or testimony in this Proceeding or Related Proceedings fall under this exception, and privilege has been waived.

Accordingly, under these exceptions and waivers, You must produce documents that would typically be privileged as they relate to (1) any fraudulent activity that counsel was involved in or knew of, or (2) any privileged conversation or information that has already been disclosed elsewhere in this litigation.

If You still contend that any Documents sought by the Requests are privileged or otherwise protected from discovery, You must nevertheless identify for each Document withheld:

(a) the legal basis for withholding the Document;

(b) the person asserting any claim of privilege and/or protection;

(c) a description and identification of the requested Document sufficient to frame an appropriate demand for the Document and a motion to compel disclosure thereof, setting forth at least the following:

(i) the author and/or signatory of the Document withheld;

(ii) the date of the Document withheld;

(iii) all addressees and/or recipients of the Document withheld; and

(iv) the subject matter and circumstances under which the Document withheld was created in sufficient detail to ascertain applicability of such privilege or other legal basis.

8. Notwithstanding a claim that a portion of a Document is privileged or otherwise protected from disclosure, any such Document must be produced with the portion claimed to be protected excised.

9. If You contend that any Request is ambiguous or unclear, contact undersigned counsel as soon as possible so that the Request can be clarified to avoid unnecessary delays in discovery.

10. These Requests are continuing in nature. Any Documents located, created, or obtained subsequent to the Documents provided in response to these Requests and that should have been produced had they been known shall be promptly supplied by supplemental responses whenever You find, locate, or acquire such Documents. You are required to supplement and correct Your answers and responses on a timely basis.

**DEFINITIONS**

As used herein, the terms listed below shall be defined as follows. Insofar as a term is not explicitly defined, the meaning to be used is the commonly accepted definition of the term. Notwithstanding any definition set forth below, each word, term, or phrase used in these Requests is intended to have the broadest meaning permitted under applicable rules. The following terms are to be given their ascribed definitions:

**A. Proceedings**

1. The term "this Proceeding" or "this Litigation" or "Main Case" refers to the main bankruptcy proceeding *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

2. The term "Related Proceedings" includes all other legal proceedings or actions involving or related to Highland, HMIT, and persons, parties, or entities involved with or affected by the Settlement, specifically including but not limited to the Cayman Islands Proceedings, the Chapter

15 proceeding in the United States Bankruptcy Court for the District of Delaware, and the Texas Business Court proceeding, as well as any bankruptcy adversary proceedings before the United States Bankruptcy Court for the Northern District of Texas that are separate from the Main Case.

**B. Parties and Individuals**

1. The term "You" or "Your" refers to Rand PE Fund Management, LLC as well as their agents, attorneys, accountants, advisors, representatives, or any other individual(s) or entity(ies) acting or authorized to act on behalf of them, and any related companies, divisions, or subsidiaries, past or present, including, without limitation, the directors, officers, employees, agents, or attorneys thereof, as well as any predecessors-in-interest or successors-in-interest.

2. The term "Patrick" refers to Mark Eric Patrick.
3. The term "Dondero" refers to James Dondero.
4. The term "Okada" refers to Mark Okada.
5. The term "Seery" or "Claimant Trustee" refers to James P. Seery, Jr.
6. The term "Kirschner" or "Litigation Trustee" refers to Marc S. Kirschner.
7. The term "Murphy" refers to Paul Murphy.
8. The term "Scott" refers to Grant Scott.
9. The term "Cronin" refers to Kevin Cronin.
10. The term "Honis" refers to John Honis.
11. The term "Raver" refers to Shawn Raver.

### C. Highland Entities and Related Trusts

12. The term "Highland" or "Highland Capital Management" refers to Highland Capital Management, L.P., a Dallas-based, Delaware-domiciled investment advisor, and the Debtor in the matter *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

13. The term "Highland Entities" or "Highland Entity" refers collectively to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

14. The term "Highland Claimant Trust" refers to the entity created under the Plan to hold, monetize, and distribute the assets of Highland's estate.

15. The term "Highland Litigation Sub-Trust" or "Litigation Sub-Trust" refers to the trust created under the Plan for the purpose of pursuing litigation claims on behalf of the Highland estate.

16. The term "Highland Indemnity Trust" or "Indemnity Trust" refers to the trust created under the Plan to hold assets for the purpose of indemnification obligations arising out of the Highland estate.

17. The term "Highland Party" or "Highland Parties" refers to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, the Highland Indemnity Trust, and each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, and subsidiaries, and any persons or entities acting or authorized to act on their behalf.

**D. HMIT Entities and Related Parties**

1. The term "HMIT Entities" refers collectively to Hunter Mountain Investment Trust and Beacon Mountain, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "HMIT Parties" refers broadly to the HMIT Entities, Mark Patrick, and any related decision maker with respect to the HMIT Entities, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

3. The term "Hunter Mountain" or "HMIT" refers to Hunter Mountain Investment Trust.

4. The term "Beacon Mountain" refers to Beacon Mountain, LLC.

5. The term "Beacon Hunter" refers to Beacon Hunter, LLC.

**E. Rand Entities**

1. The term "Rand Parties" or "Rand Entities" refers collectively to Rand PE Fund I, LP, Rand Advisors, LLC, and Rand PE Fund Management, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "Rand Fund" or "Rand PE Fund" refers to Rand PE Fund I, LP.

3. The term "Rand Advisors" refers to Rand Advisors, LLC, an SEC-registered investment advisor that served as the investment adviser to Rand PE Fund I, LP.

4. The term "Rand PE Fund Management" refers to Rand PE Fund Management, LLC.

**F. DAF Entities and Related Structures**

1. The term “DAF” or “Charitable DAF Holdco” refers to Charitable DAF Holdco, Ltd.

2. The term “DAF Fund” or “Charitable DAF Fund” refers to Charitable DAF Fund, LP.

3. The term “DAF GP” or “Charitable DAF GP” refers to Charitable DAF GP, LLC.

4. The term “DAF Structure” refers to the overall donor-advised fund investment vehicle and its constituent entities, including Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, and any entity holding ownership or management interests therein or formed in connection therewith, including any entities created as part of the restructuring of the DAF.

5. The term “DAF Entities” refers collectively to Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, CDH GP, Ltd., CDMCFAD, LLC, DFW Charitable Foundation, CLO Holdco, LLC, and any other entity formed, restructured, or otherwise created in connection with or derived from the DAF Structure, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

6. The terms “New GP” or “CDH GP” refer to CDH GP, Ltd.

7. The term “CDMCFAD” or “DAF 2.0” refers to CDMCFAD, LLC.

8. The term “DFW Charitable Foundation” or “DFW Foundation” refers to DFW Charitable Foundation.

9. The term “CLO Holdco” refers to CLO Holdco, LLC.

**G. Charitable and Donor Entities**

1. The terms “The Dallas Foundation” or “Dallas Foundation” refer to The Dallas Foundation.

2. The term “Crown Global” refers to Crown Global Life Insurance, Ltd.

3. The terms “Empower” or “Empower Dallas” refer to Empower Dallas.

4. The term “Okada Foundation” refers to the Okada Foundation.

5. The term “Charitable Beneficiaries” or “Charities” refers collectively to The Dallas Foundation, Crown Global Life Insurance, Ltd., Empower Dallas, the Okada Foundation, and any other charitable organization or foundation that held beneficial ownership in the DAF Structure through participation shares or annuity policies.

6. The term “Highland Dallas Foundation” refers to Highland Dallas Foundation, Inc.

7. The term “Highland Santa Barbara Foundation” refers to Highland Santa Barbara Foundation, Inc.

8. The term “Highland Kansas City Foundation” refers to Highland Kansas City Foundation, Inc.

9. The term “Participation Shares” refers to the shares in Charitable DAF Holdco, Ltd. held by the Charitable Foundations through which the Foundations held beneficial ownership in the DAF Structure.

**H. Other Entities**

1. The term “Dugaboy” refers to The Dugaboy Investment Trust.

2. The term “Strand” or “Strand Advisors” refers to Strand Advisors, Inc.

3. The terms “Atlas Fund” or “Atlas IDF” refers to Atlas IDF, LP.

4. The terms “Skyview” or “Skyview Group” refers to The Skyview Group.

5. The term “Fortaris” or “Fortaris Capital Advisors” refers to Fortaris Capital Advisors.

6. The term “ValueScope” refers to ValueScope, LLC.

7. The term “Celia Holdco” refers to Celia Holdco LLC.

8. The terms "Creative Hearts" or "Creative Hearts TX" refer to Creative Hearts TX.

**I. Law Firms**

1. The term "Kelly Hart" refers to Kelly Hart & Hallman LLP, or any predecessor or successor firm or any associated attorney.

2. The term "Shields Law Group" refers to Shields Law Group, P.C., or any predecessor or successor firm or any associated attorney.

**J. Litigation, Settlement, and Bankruptcy Terms**

1. The term "Highland Bankruptcy" refers to the Chapter 11 bankruptcy case titled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj, pending in the United States Bankruptcy Court for the Northern District of Texas.

2. The term "Settlement Agreement" refers to each and every discussion or negotiation of settlement or iteration of the settlement agreement between the Highland Entities and the HMIT Entities, together with all exhibits, schedules, appendices, and ancillary documents, and including any preliminary drafts, associated documents, and communications related thereto.

3. The term "Settlement Agreement & General Release" or "9019 Settlement" refers to the Settlement Agreement & General Release dated May 19, 2025, by and among the Highland Entities and the HMIT Entities, as approved by the Court, together with all exhibits, schedules, appendices, and ancillary documents.

4. The term "9019 Motion" refers to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, filed on May 19, 2025 (Bankr. Dkt. 4217).

5. The term "Rule 9019 Settlement Order" refers to the Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, entered on June 30, 2025 (Bankr. Dkt. 4297).

6. The term "Kirschner Litigation" or "Kirschner Claims" or "Transferred Claims" refers to the 36-count adversary complaint filed by Marc A. Kirschner, as Litigation Trustee, styled Kirschner v. Dondero, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex. Oct. 15, 2021), together with any amended, supplemental, or related pleadings, and the claims asserted therein.

7. The term "Plan" refers to Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization (as Modified), confirmed on February 22, 2021.

8. The term "Confirmation Order" refers to the Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.

9. The term "Class 10" refers to the class of claims under the Plan designated as "Class 10 Claims" and consisting of the claim held by Hunter Mountain Investment Trust as a holder of pre-bankruptcy Class B and C limited partnership interests in Highland.

10. The term "Class 11" refers to the class of claims under the Plan designated as "Class 11 Claims" and consisting of the claim held by other equity holders holding pre-bankruptcy Class A limited partnership interests in Highland.

11. The term "Class 10 Interest" or "HMIT Class 10 Interest" refers to Hunter Mountain Investment Trust's allowed Class 10 claim in the amount of $336,940,230.58 as set forth in the Settlement Agreement and associated Order.

12. The term "Contingent Claimant Trust Interests" refers to the interests given to the former equity holders under the Plan in the Highland Claimant Trust, which were to vest only upon certification by the Claimant Trustee that all unsecured creditors had been paid in full with interest.

13. The term "Work Plan" refers to the plan or plans prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities.

14. The term "Withdrawal Stipulation" refers to the Stipulation Withdrawing Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd. to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith (Bankr. Dkt. 4291).

15. The term "Dugaboy Note" refers to the promissory note dated May 31, 2017, in the original amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

16. The term "Texas Business Court Proceeding" or "Business Court Proceeding" refers to Case No. 25-BC01B-0027 filed in the Texas Business Court, First Division on July 1, 2025, and captioned *The Highland Dallas Foundation, Inc. ,The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. vs. DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC,CDH GP, Ltd., and Mark Patrick.*

**K. Cayman Islands Proceedings**

1. The terms "Cayman Islands Proceeding(s)" or "Cayman Proceeding" refer collectively to all judicial proceedings in the Cayman Islands relating to Charitable DAF Holdco, Ltd. or any DAF Entity, including (a) the voluntary liquidation filed by Patrick on April 2, 2025; (b) the winding up petition filed by the charitable owners on April 23, 2025 (No. FSD 99 of 2025 (JAJ)); (c) the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators on July

15, 2025 (No. FSD 201 of 2025); and (d) all related proceedings, investigations, hearings, orders, and filings.

2. The term "Joint Official Liquidators" or "JOLs" refers to the court-appointed liquidators designated by the Cayman Islands court on or about May 6, 2025 to oversee the DAF's operations.

3. The term "Statement of Claim" refers to the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators in the Cayman Islands Proceeding on July 15, 2025.

4. The term "Chapter 15 Petition" refers to the petition filed by the Joint Official Liquidators in the United States Bankruptcy Court for the District of Delaware on July 21, 2025.

5. The term "Patrick-Cronin Proposal" refers to the proposal made by Mark Patrick to Kevin Cronin, a principal of Fortaris Capital Advisors, to make and split monthly payments to the DAF, as referenced in Paragraph 173 of the Third Affidavit of Mark Patrick.

### L. General Discovery Terms

1. The term "Document" or "Documents" is used in its broadest possible sense and refers, without limitation, to anything upon which any expression, communication, or representation has been recorded by any means. The term includes, but is not limited to: correspondence, emails, text messages, instant messages, messages/posts on social media, handwritten notes, photographs, working papers, any drafts of documents (preliminary, intermediate, and/or final), memoranda, contracts/agreements, tapes, business records, financial records, charts, notes, records of any sort of meetings, reports of telephone or other oral conversations, calendars (whether hardcopy or electronic, including desk calendars, phone calendars, or other calendars using software or an application), appointment books, audio or video tape recordings, information on computer disc/card/drive, computer entries that can be retrieved electronically, databases, and all other writings and recordings of every kind that are in Your actual or constructive possession, custody,

or control. The term includes, but is not limited to, drafts and copies of any documents, whether identical to the original or different from the original because of notes, comments, highlighting, edits, any other alterations made on such copies, indications that said copies were sent to different individuals than were the originals, or any other reason.

2. The term "Communication" or "Communications" means any transmission of information in any context or situation by or between two or more Persons by any means or medium whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically, or digitally, or on tape, either orally or in writing, including, but not limited to, conversations, correspondence, emails, text messages, instant messages, social media communications, telexes, facsimile transmissions, telecopies, recordings in any medium of oral, written, or typed communication, telephone or message logs, notes or memoranda relating to written or oral communications, and any translation thereof.

3. The terms "Person" or "Entity" and their plural forms mean natural persons, proprietorships, partnerships, firms, trusts, estates, companies, corporations, public corporations, sole practitioners, municipal corporations, federal, state, and local governments, all departments and agencies thereof, any other governmental agencies, subdivisions, groups, associations, or organizations, or any other entity, whether foreign or domestic.

4. The term "thing" means any tangible item, including without limitation, models, prototypes, and samples of any device or apparatus or product.

5. The terms "concerning," "regarding," "referring to," "related to," or "relating to" shall be construed in the broadest possible sense, and shall mean without limitation and whether in whole or in part: referring to, constituting, bearing upon, commenting upon, reflecting, evidencing, pertaining to, describing, depicting, consisting of, containing, comprising, embodying, identifying,

stating, discussing, analyzing, studying, summarizing, dealing with, relating to, or having any logical or factual connection whatsoever with the subject addressed.

6. The terms "state" or "describe" mean to fully elucidate by reference to underlying facts rather than by reference to ultimate facts or conclusions of fact or law; where applicable, to particularize as to time, place, and manner; and to set forth all relevant facts necessary to complete the understanding of the act, process, event, or thing in question.

7. The term "Relevant Period" refers to the period beginning on the earlier of January 1, 2025, or such date as identified in Response to Request No. 1,[2] through the present.

8. The present tense includes the past and future tenses.

9. The singular includes the plural, and the plural includes the singular.

10. Words in the masculine, feminine, and neutral form shall include each of the other genders.

11. Whenever used herein, "and" may be understood to mean "or" and vice versa whenever such construction results in a broader request for information.

12. "All" means "any and all" and "any" means "any and all."

13. "Including" means "including but not limited to."

14. The term "identify" means and requires You to:

(a) With reference to an individual, state his or her full name and last known residential address, business address, telephone and/or facsimile number, the name and address of his or her employer, the individual's job title or job responsibilities, and his or her relationship to You;

[2] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

(b) With reference to a company or organization, state the entity's full legal name, business addresses, telephone number, and a person with whom You had direct contact within that entity;

(c) With reference to a document, describe the document, state the date when the document was created, name the creator of the document, and name each person to whom the document was sent;

(d) With reference to an oral communication, provide the date(s) of the communication, the names and addresses of all parties, when the communication occurred, the place(s) where the communication took place, the subject matter of the communication, and the general substance of the communication; and

(e) With reference to an occurrence or event, provide the date and location of the occurrence or event, the identity of each person involved in the occurrence or event, the subject matter discussed, and the identity of any document that records, refers to, or relates to such occurrence or event.

## DOCUMENT REQUESTS

**REQUEST NO. 1:** All Documents and Communications between or among Highland Capital Management, L.P. (or its representatives, including James P. Seery, Jr. or the Claimant Trustee) and any of the HMIT Entities concerning the 9019 Settlement, including but not limited to draft agreements, term sheets, and settlement proposals, and including Documents sufficient to show the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement.

**RESPONSE:**

**REQUEST NO. 2:** All Documents relating to due diligence performed by Highland Capital Management, L.P. (or its representatives) concerning (a) the authority of Mark Patrick or any other person to bind the HMIT Entities to the 9019 Settlement; (b) the ownership structure of the HMIT Entities; or (c) any corporate restructuring of the HMIT Entities or the DAF Entities.

**RESPONSE:**

**REQUEST NO. 3:** All Documents and Communications exchanged between any Highland Party and any HMIT Entity prior to execution of the Settlement Agreement relating to or evidencing legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any changes thereto.

**RESPONSE:**

**REQUEST NO. 4:** All Documents and Communications exchanged between any Highland Party and any Rand Party prior to execution of the Settlement Agreement relating to or evidencing legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any changes thereto.

**RESPONSE:**

**REQUEST NO. 5:** All Documents and Communications exchanged between any Highland Party and any person or party prior to execution of the Settlement Agreement relating to or evidencing any change in legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any transaction related thereto.

**RESPONSE:**

**REQUEST NO. 6:** All Documents and Communications relating to, referencing, or reflecting the consideration received by Hunter Mountain Investment Trust in exchange for entering into the Settlement Agreement & General Release dated May 19, 2025, including any valuations, appraisals, or analyses of the value received.

**RESPONSE:**

**REQUEST NO. 7:** All Documents and Communications sufficient to show the reason or rationale for the HMIT Entities' agreement to transfer or relinquish litigation rights previously asserted against Highland Entities in exchange for the consideration set forth in the Settlement Agreement.

**RESPONSE:**

**REQUEST NO. 8:** All Communications between You and any third party relating to the Settlement Agreement, the 9019 Motion, or the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 9:** All Documents relating to the current value of the Highland Claimant Trust, including any reports, analyses, or projections of Highland's remaining assets, estimated distributions to claimants, and any anticipated residual value available for Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 10:** All Documents relating to any payments made or to be made pursuant to the 9019 Settlement, including the $500,000 lump-sum payment, the $10 million initial distribution, and any subsequent distributions, including wire transfer records, bank statements, and any documents reflecting the disposition of such funds.

**RESPONSE:**

**REQUEST NO. 11:** All Documents reflecting Highland Capital Management, L.P.'s knowledge of (a) the restructuring of the DAF Entities; (b) the sale of Beacon Mountain to CLO Holdco, LLC; (c) any change in the beneficial ownership of Hunter Mountain; or (d) any investigation of Patrick by the Cayman Islands court, the Texas Attorney General, or any other governmental authority.

**RESPONSE:**

**REQUEST NO. 12:** All bank statements, brokerage statements, investment account statements, balance sheets, financial statements, and accounting records for the following: Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco, LLC; CDMCFAD, LLC; Charitable DAF Holdco, Ltd.; Charitable DAF Fund, LP; DFW Charitable Foundation; and any other DAF entity, including consolidated and entity-level statements.

**RESPONSE:**

**REQUEST NO. 13:** All Documents and Communications relating to any transfer of any interests in Hunter Mountain Investment Trust, Beacon Mountain, LLC, CLO Holdco, LLC, CDMCFAD, LLC, and DFW Charitable Foundation, including but not limited to assignment agreements, contribution agreements, and corporate resolutions approving transfers.

**RESPONSE:**

**REQUEST NO. 14:** All Documents relating to any transfer of assets from Charitable DAF Holdco, Ltd. or Charitable DAF Fund, LP to CDMCFAD, LLC or any entity controlled by Patrick, including the assignment of limited partnership interests referenced in the Statement of Claim filed in the Cayman Islands.

**RESPONSE:**

**REQUEST NO. 15:** All Documents and Communications sufficient to show the original purpose and stated objectives of the 2015 sale of Highland Capital Management, L.P. equity holders' equity stake to Hunter Mountain Investment Trust, including any term sheets, memoranda, presentations, tax advice, or planning documents.

**RESPONSE:**

**REQUEST NO. 16:** All Documents and Communications regarding the reasons behind the equity ownership allocation reflected in Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization, including the allocation of (i) 99.5% to Hunter Mountain Investment Trust; (ii) 0.1866% to The Dugaboy Investment Trust; (iii) 0.0627% to Mark Okada and associated family trusts; and (iv) 0.25% to Strand Advisors, Inc.

**RESPONSE:**

**REQUEST NO. 17:** All Documents and Communications relating to, referencing, or reflecting any tax benefit, tax efficiency, or charitable purpose associated with the restructuring of Highland Capital Management, L.P. ownership in 2015.

**RESPONSE:**

**REQUEST NO. 18:** All Documents and Communications sufficient to show the circumstances surrounding Mark Patrick becoming the administrator of Hunter Mountain Investment Trust in 2022, including any appointment documents, resolutions, consents, correspondence, or agreements.

**RESPONSE:**

**REQUEST NO. 19:** All Documents and Communications relating to the transfer of management shares and ownership of Charitable DAF Fund, LP's general partner from Grant Scott to Mark Patrick in or around April 2021, including (a) any agreements governing the transfer; (b) any conditions or limitations on Patrick's authority; (c) any fiduciary duty obligations assumed by Patrick; (d) any Communications between Scott, Patrick, and the charitable owners regarding the transition; and (e) the consideration, if any, received by Grant Scott in exchange for such transfer.

**RESPONSE:**

**REQUEST NO. 20:** All Documents and Communications relating to, referencing, or reflecting any compensation, benefits, director fees, bonuses, or other remuneration paid to Grant Scott during his tenure as administrator or control person of the DAF Structure from 2011 through 2021.

**RESPONSE:**

**REQUEST NO. 21:** All Documents and Communications sufficient to show the conversion of the charitable trust originally formed in 2006 into a donor-advised fund investment vehicle for long-term charitable endeavors in or around October 2011, including any organizational documents, trust amendments, partnership agreements, or memoranda.[3]

**RESPONSE:**

**REQUEST NO. 22:** All Documents and Communications relating to, referencing, or reflecting the original structure and purpose of the donor-advised fund created in October 2011, including any tax opinions, IRS determination letters, or legal memoranda.[4]

**RESPONSE:**

**REQUEST NO. 23:** All Documents and Communications relating to, referencing, or reflecting the valuation of Highland Capital Management, L.P., or its assets.

**RESPONSE:**

---

[3] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[4] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 24:** All Documents and Communications relating to, referencing, or reflecting Highland Capital Management, L.P.'s financial condition, including any monthly operating reports or quarterly operating reports.

**RESPONSE:**

**REQUEST NO. 25:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for any bankruptcy professional, creditor, or equity holder.[5]

**RESPONSE:**

**REQUEST NO. 26:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[6]

**RESPONSE:**

**REQUEST NO. 27:** All Documents and Communications relating to any valuation of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[7]

**RESPONSE:**

**REQUEST NO. 28:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 29:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

---

[5] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[6] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[7] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 30**: All Documents relating to Mark Patrick's authority to act on behalf of Rand Advisors, LLC, Rand PE Fund I, LP, or any HMIT Entity, including any power of attorney, board resolutions, or operating agreement provisions granting such authority.

**RESPONSE:**

**REQUEST NO. 31:** All Documents relating to any change in the ownership, management, or control of Hunter Mountain Investment Trust, Beacon Mountain LLC, or any entity in the Hunter Mountain ownership chain from January 1, 2024 to the present.

**RESPONSE:**

**REQUEST NO. 32**: All organizational charts reflecting the corporate structure of (a) the DAF Entities; (b) the HMIT Entities; and (c) any entities through which Patrick directly or indirectly held an interest in Hunter Mountain, for any time during the Relevant Period.

**RESPONSE:**

**REQUEST NO. 33:** All documents and communications relating to, referencing, or reflecting the sale of Rand PE Fund I, LP's investment in Beacon Mountain, LLC in or around February 2025, including any purchase agreements, valuations, appraisals, or closing documents.

**RESPONSE:**

**REQUEST NO. 34**: All Documents relating to the transition of management of Rand PE Fund I, LP from John Honis to Patrick or any Patrick-controlled entity, including any Communications with investors or regulatory authorities regarding such transition.

**RESPONSE:**

**REQUEST NO. 35**: All audit reports, financial statements, and quarterly or annual reports for Rand PE Fund I, LP from January 1, 2023 to the present, including the 2024 audit issued on or about June 26, 2025.

**RESPONSE:**

**REQUEST NO. 36:** All Documents relating to the sale of Beacon Mountain LLC (or its interest in Hunter Mountain Investment Trust) to CLO Holdco, LLC, including but not limited to the purchase agreement, any valuations, closing documents, and wire transfer records.

**RESPONSE:**

**REQUEST NO. 37**: All Documents relating to any consent (or lack thereof) from Crown Global Life Insurance, Ltd., The Dallas Foundation, or Atlas IDF, LP regarding the sale of Beacon Mountain's interest in Hunter Mountain to CLO Holdco, LLC or any Patrick-controlled entity.

**RESPONSE:**

**REQUEST NO. 38**: All Documents relating to compliance (or non-compliance) with Section 3.01(b) of the Amended and Restated Limited Partnership Agreement of Atlas Fund, which

prohibits Rand Fund from selling Hunter Mountain to an affiliate of Patrick without investor consent.

**RESPONSE:**

**REQUEST NO. 39:** All Documents and Communications relating to any notice or other information given to investors in Rand PE Fund I, LP (including any 4% minority investor) from January 1, 2025, to the present regarding the sale of Beacon Mountain, LLC's interest in HMIT, or any distribution relating thereto, including the February 20, 2025 notice referenced in Dugaboy's Motion for Reconsideration.

**RESPONSE:**

**REQUEST NO. 40:** All Documents and Communications sufficient to show the basis for the $1 million valuation of Beacon Mountain, LLC's interest in Hunter Mountain Investment Trust in or around February 2025, including any valuation reports, appraisals, financial analyses, or Communications with ValueScope, LLC or any other valuation firm concerning such valuation.

**RESPONSE:**

**REQUEST NO. 41:** All Documents, correspondence, engagement letters, contracts, or agreements between You and ValueScope, LLC (or any other valuation firm) relating to the valuation of any interest, holding in, or security issued by any of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate.

**RESPONSE:**

**REQUEST NO. 42:** All draft and final valuation reports, memoranda, models, or analyses prepared by ValueScope, LLC relating to Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to the valuation of the Participation Shares; and any Communications challenging or questioning the valuation methodology or conclusions.

**RESPONSE:**

**REQUEST NO. 43:** All Documents relating to the methodology used in any valuation of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to instructions received regarding methodology, communications discussing the change from net asset value methodology to discounted cash flow methodology, supporting calculations, assumptions, and comparable transactions or valuations.

**RESPONSE:**

**REQUEST NO. 44:** All Documents and Communications related to the identity, ownership structure, principals, managers, or beneficial owners of Celia Holdco LLC.

**RESPONSE:**

Dated: March 23, 2026

*/s/ Geoffrey S. Harper*

**Geoffrey S. Harper**
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

**John Michael Gaddis**
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

I certify that on March 23, 2026, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

***Via Electronic Mail:***

Louis M. Phillips (louis.phillips@kellyhart.com)
**Kelly Hart Pitre**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916

Amelia L. Hurt (amelia.hurt@kellyhart.com)
**Kelly Hart Pitre**
400 Poydras Street, Suite 1812
New Orleans, LA 70130

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

**EXHIBIT 3**

**From:** Gaddis, Mike
**To:** "John A. Morris"
**Cc:** Jeff Pomerantz; Hayley R. Winograd; Zachery Annable; Gaddis, Mike; Geoffrey Harper; Sandi Staskus; Sydney Rose; Miller, Zoey Elizabeth; Louis M. Phillips
**Subject:** RE: Highland: Meet and Confer on Motion for Protective Order
**Date:** Wednesday, April 1, 2026 5:48:51 PM
**Attachments:** image001.png
image002.png

---

John,

We agree to the schedule you propose below.

Yours,

WINSTON & STRAWN LLP

MICHAEL GADDIS
OF COUNSEL

**T** +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, April 1, 2026 4:30 PM
**To:** Gaddis, Mike <MGaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Sandi Staskus <sstaskus@kslaw.com>; Sydney Rose <srose@kslaw.com>; Miller, Zoey Elizabeth <ZMiller@winston.com>; Louis M. Phillips <louis.phillips@kellyhart.com>; Gaddis, Mike <MGaddis@winston.com>
**Subject:** Re: Highland: Meet and Confer on Motion for Protective Order

Thank you, Mike.

We propose to proceed as follows:

Highland files MPO and supporting documents tonight.
Dugaboy opposition 4/15
Highland reply 4/17
Zoom hearing (no witnesses) 4/21 or as soon thereafter as counsel can he heard
Merits hearing 5/11 or as soon thereafter as counsel can be heard.

We confer tomorrow on discovery dates, as and if required.

If that works, Zack Annable will write to the court now (copying you) and try and get the

two hearing dates.

Please confirm.

Thanks.

Get Outlook for iOS

---

**From:** Gaddis, Mike <MGaddis@winston.com>
**Sent:** Wednesday, April 1, 2026 5:17:58 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Sandi Staskus <sstaskus@kslaw.com>; Sydney Rose <srose@kslaw.com>; Miller, Zoey Elizabeth <ZMiller@winston.com>; Louis M. Phillips <louis.phillips@kellyhart.com>; Gaddis, Mike <MGaddis@winston.com>
**Subject:** RE: Highland: Meet and Confer on Motion for Protective Order

John,

We agree to setting the Rule 60(b) hearing during the week of May 11 or as soon thereafter as the Court has availability.

Yours,

WINSTON & STRAWN LLP

**MICHAEL GADDIS**
OF COUNSEL

**T** +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, April 1, 2026 3:28 PM
**To:** Gaddis, Mike <MGaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Sandi Staskus <sstaskus@kslaw.com>; Sydney Rose <srose@kslaw.com>; Miller, Zoey Elizabeth <ZMiller@winston.com>; Louis M. Phillips <louis.phillips@kellyhart.com>
**Subject:** RE: Highland: Meet and Confer on Motion for Protective Order

Thanks.

**John A. Morris**

Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Gaddis, Mike <MGaddis@winston.com>
**Sent:** Wednesday, April 1, 2026 4:24 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Sandi Staskus <sstaskus@kslaw.com>; Sydney Rose <srose@kslaw.com>; Miller, Zoey Elizabeth <ZMiller@winston.com>; Louis M. Phillips <louis.phillips@kellyhart.com>; Gaddis, Mike <MGaddis@winston.com>
**Subject:** RE: Highland: Meet and Confer on Motion for Protective Order

John,

Thank you for the quick response. I am conferring with our client and will get back to you shortly.

Yours,

WINSTON & STRAWN LLP

**MICHAEL GADDIS**
OF COUNSEL

**T** +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, April 1, 2026 2:46 PM
**To:** Gaddis, Mike <MGaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Sandi Staskus <sstaskus@kslaw.com>; Sydney Rose <srose@kslaw.com>; Miller, Zoey Elizabeth

<ZMiller@winston.com>; Louis M. Phillips <louis.phillips@kellyhart.com>
**Subject:** FW: Highland: Meet and Confer on Motion for Protective Order

Mike,

Having this heard in late May or June is not acceptable to Highland.

If Dugaboy would agree to have this heard no later than the week of May 11, let me know.

Otherwise, we'll file our papers later today and mark Dugaboy down as opposed.

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

PSZJ

Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Gaddis, Mike <MGaddis@winston.com>
**Sent:** Wednesday, April 1, 2026 3:12 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Sandi Staskus <sstaskus@kslaw.com>; Sydney Rose <srose@kslaw.com>; Miller, Zoey Elizabeth <ZMiller@winston.com>; Gaddis, Mike <MGaddis@winston.com>; Louis M. Phillips <louis.phillips@kellyhart.com>
**Subject:** RE: Highland: Meet and Confer on Motion for Protective Order

John,

1. We oppose your motion for protective order.

2. We agree with most of your proposed schedule for briefing the MPO, with two proposed changes as discussed below.
3. We do not see a need for a motion for expedited hearing as I think we should be able to work out any remaining differences on the scheduling.

These are our proposed changes:

First, we propose arguing your MPO at the existing hearing date that's already set for the morning of April 27. That's not much later than your proposed date and avoids any uncertainty around the Court's availability.

Second, we propose pushing back the hearing on Dugaboy's Rule 60(b) motion by approximately one month, with a new date to be set around the end of May depending on the Court's and counsels' availability. The reason for delaying the 60(b) hearing is to allow sufficient time for:

(1) obtaining and reviewing document production to the extent the Court allows discovery;

(2) conducting the depositions with the benefit of such documents (if any); and

(3) scheduling Dugaboy's Reply on the Rule 60(b) motion so that it can address the deposition testimony and any document production.

If we go ahead with the 4/27 hearing on the Rule 60(b) motion, there probably won't be time for us to obtain or use any written discovery even if the Court allows it, which would render the entire exercise pointless.

If you agree generally with our approach to postponing the Rule 60(b) hearing, then we can nail down specific dates later. We should build in some flexibility since we don't know how long the Court will take to rule on the MPO. Either way, I'm happy to discuss further.

Yours,

WINSTON & STRAWN LLP

MICHAEL GADDIS
OF COUNSEL

T +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, April 1, 2026 12:51 PM
**To:** Gaddis, Mike <MGaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>;

Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Sandi Staskus <sstaskus@kslaw.com>; Sydney Rose <srose@kslaw.com>; Miller, Zoey Elizabeth <ZMiller@winston.com>; Louis M. Phillips <louis.phillips@kellyhart.com>
**Subject:** Highland: Meet and Confer on Motion for Protective Order

Mike,

Unless Dugaboy accepts the proposal below by 4:00 pm Central Time, Highland intends to file its motion for a protective order, a motion to set the same briefing schedule below, and a motion for an expedited hearing on the briefing motion (the "Motion to Expedite"), with a request to be heard on Monday.

Please let us know either (a) the proposal below is acceptable (in which case we'll only file the MPO), or (b) if not, whether Dugaboy opposes the Motion to Expedite.

If we don't receive a response by 4:30 pm Central Time, we'll note that in the Certificate of Conference.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

PSZJ
Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Tuesday, March 31, 2026 6:15 PM
**To:** Gaddis, Mike <MGaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Sandi Staskus <sstaskus@kslaw.com>; Louis M. Phillips <louis.phillips@kellyhart.com>; Miller, Zoey

Elizabeth <ZMiller@winston.com>; Sydney Rose <srose@kslaw.com>; Gaddis, Mike <MGaddis@winston.com>
**Subject:** Re: Highland: Meet and Confer on Motion for Protective Order

Thank you.

Get Outlook for iOS

---

**From:** Gaddis, Mike <MGaddis@winston.com>
**Sent:** Tuesday, 31 March 2026 18:14:02
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Sandi Staskus <sstaskus@kslaw.com>; Louis M. Phillips <louis.phillips@kellyhart.com>; Miller, Zoey Elizabeth <ZMiller@winston.com>; Sydney Rose <srose@kslaw.com>; Gaddis, Mike <MGaddis@winston.com>
**Subject:** RE: Highland: Meet and Confer on Motion for Protective Order

John, you are correct that under the current schedule your response to our motion is due Friday 4/3 and the witness disclosure deadline is Monday 4/6. I apologize for the error. I will discuss the rest of your points with my team and try to get back to you tomorrow.

Yours,

WINSTON & STRAWN LLP

**MICHAEL GADDIS**
OF COUNSEL

**T** +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Tuesday, March 31, 2026 4:44 PM
**To:** Gaddis, Mike <MGaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Sandi Staskus <sstaskus@kslaw.com>; Louis M. Phillips <louis.phillips@kellyhart.com>; Miller, Zoey Elizabeth <ZMiller@winston.com>; Sydney Rose <srose@kslaw.com>
**Subject:** Highland: Meet and Confer on Motion for Protective Order

Mike,

I'm not sure of the confusion, but according to the scheduling order (Docket No. 4528), Highland's opposition brief is due on Friday (not Thursday), and we were to disclose witnesses on Monday (although we appreciate your having done so already).

With respect to the balance of your email, we seem to have an agreement on the time frames for the motion for a protective order (the "MPO"), although we propose moving the first two dates up by a day and shorten the time for the reply to have the issues resolved sooner rather than later. So, we're prepared to do the following:

April 1: Highland serves files opening brief on the MPO.

April 15: Dugaboy serves and files its opposition to the MPO.

April 17 : Highland serves and files its reply in further support of the MPO.

April 21: Subject to the Court's availability, Zoom argument on the MPO.

If the MPO is granted in full, we proceed to argument on April 27.

If the MPO is denied in any respect, we seek a hearing date during the week of May 4 or 11 and confer further on intermittent dates for document production and depositions, to the extent authorized.

Please let us know if that works.

Highland intends to file its MPO tomorrow in all events so please respond by noon Central Time.

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

PSZJ
Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Gaddis, Mike <MGaddis@winston.com>
**Sent:** Monday, March 30, 2026 1:35 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>;

Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Sandi Staskus <sstaskus@kslaw.com>; Louis M. Phillips <louis.phillips@kellyhart.com>; Miller, Zoey Elizabeth <ZMiller@winston.com>; Sydney Rose <srose@kslaw.com>; Gaddis, Mike <MGaddis@winston.com>
**Subject:** RE: Highland: Meet and Confer on Motion for Protective Order

John,

Thank you for your proposal. We obviously disagree with your contention that our RFPs are in any way improper, and we will oppose your motion for a protective order. That said, we agree we should set a briefing schedule that makes sense for both the depositions and the hearing.

Unfortunately, we cannot agree to your proposed briefing schedule because even if the Court denies your motion, the timing will make it effectively impossible for us to use any resulting discovery materials in either the depositions (currently set for the weeks of April 6–10 and/or 13–17) or the hearing (currently set for April 27). You have Highland's reply brief due just six days before the hearing, and there's no guarantee how quickly Judge Odell will rule or that he will make any ruling in advance of the hearing. A process that denies us meaningful relief even if we succeed in defeating your motion is not a fair process.

We believe the best path forward is to ask the Court to postpone both the depositions and the hearing until a reasonable time after it rules on your Motion for Protective Order. That way (1) you get a fair opportunity to make your argument that there should be no written discovery, and (2) if the Court disagrees and allows discovery, both parties have sufficient time to obtain and use the resulting documents in preparation for their depositions and the hearing. Here is a proposed schedule to that end:

- March 30: Dugaboy will respond to Highland's RFPs and begin production of additional responsive documents (to the extent Dugaboy has any) on a rolling basis. Any such supplemental production will be completed no later than the deadline for the parties to file exhibit lists and exchange exhibits. That deadline is seven days before the hearing, which is April 20 under the current schedule and would be pushed back to mid-May under the proposed schedule outlined below.

- April 2: Highland to file its Motion for Protective Order (as per your proposed schedule).

- April 2: Current deadline for Highland's response to Dugaboy's Rule 60(b) motion. We won't object if you want to push this back a couple weeks.

- April 3: Highland to disclose names of witnesses it intends to depose. To aid in your

planning, Dugaboy hereby discloses that it will depose Mark Patrick for its eight-hour deposition, and James Seery and Paul Murphy for its two four-hour depositions.

- April 16: Dugaboy to file its response to the Motion for Protective Order.
- April 21: Highland to file its reply in support of its Motion for Protective Order.
  - Depending on when and how the Court rules on the Motion for Protective Order, Highland will produce responsive documents during the last week of April and/or first week of May.
  - Meanwhile (as discussed above) Dugaboy will continue its production on a rolling basis to the extent it obtains any additional responsive documents not already produced.
- First and second weeks of May: The parties will conduct their depositions as previously agreed.
- At least one week after the conclusion of depositions, and several days in advance of the hearing date, Dugaboy will file its reply in support of its Rule 60(b) motion. This reply is currently due April 24 and would be pushed back to sometime in late May under the proposed schedule depending on when the hearing is set.
- One week before the hearing date: Deadline for the parties to file witness and exhibit lists with the Court and exchange exhibits. Any supplemental document production by either side must be completed no later than this date. The exhibit-list deadline is currently April 20 and under the proposed schedule would be pushed back to sometime in late May depending on when the hearing is set.
- The hearing on Dugaboy's Rule 60(b) motion will be reset to a date convenient for the Court and the parties, probably during the last week of May and/or first week of June.

These are suggestions and not set in stone. If you have other ideas we're happy to discuss.

We look forward to your thoughts.

Yours,

WINSTON & STRAWN LLP

MICHAEL GADDIS
OF COUNSEL

T +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

---

**From:** Sydney Rose <SRose@kslaw.com>
**Sent:** Thursday, March 26, 2026 9:36 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Gaddis, Mike <MGaddis@winston.com>; Sandi Staskus <sstaskus@kslaw.com>; Louis M. Phillips <louis.phillips@kellyhart.com>
**Subject:** RE: Highland: Meet and Confer on Motion for Protective Order

Thank you for confirming.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Thursday, March 26, 2026 9:35 AM
**To:** Sydney Rose <SRose@kslaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Gaddis, Mike <mgaddis@winston.com>; Sandi Staskus <sstaskus@kslaw.com>; Louis M. Phillips <louis.phillips@kellyhart.com>
**Subject:** RE: Highland: Meet and Confer on Motion for Protective Order

CAUTION: **MAIL FROM OUTSIDE THE FIRM**

Yes, we received your first email 59 minutes before midnight, Central Time, and the revised e-mail 19 minutes before midnight Central Time.

Yes, I meant “Dugaboy” in the response date.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760

Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Sydney Rose <SRose@kslaw.com>
**Sent:** Thursday, March 26, 2026 10:29 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Gaddis, Mike <mgaddis@winston.com>; Sandi Staskus <sstaskus@kslaw.com>; Louis M. Phillips <louis.phillips@kellyhart.com>
**Subject:** RE: Highland: Meet and Confer on Motion for Protective Order

Hi John,

We have received your proposed schedule and will discuss it with our team and get back to you shortly.

In the meantime, would you please confirm that you received these RFPs on Monday, 3/23 according to the Court's time zone?

Also, in the schedule below did you mean "Dugaboy's Response: Thursday, 4/16"?

Thank you for your prompt reply,
Sydney

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, March 25, 2026 2:11 PM
**To:** Sydney Rose <SRose@kslaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>;

Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Gaddis, Mike <mgaddis@winston.com>; Sandi Staskus <sstaskus@kslaw.com>; Louis M. Phillips <louis.phillips@kellyhart.com>
**Subject:** Highland: Meet and Confer on Motion for Protective Order

| CAUTION: **MAIL FROM OUTSIDE THE FIRM** |
|---|

Sydney:

I write regarding Dugaboy's requests for production, which you emailed early yesterday morning.

We have reviewed the RFPs and do not believe they are proper for a variety of reasons, not least because Dugaboy has not established a prima facie case in support of its motion. Accordingly, we intend to file a motion for a protective order, and we believe it makes sense to work out a briefing schedule that provides the Court time to decide the motion sufficiently in advance of the April 27 hearing date so that we can all prepare accordingly. To that end, we propose the following:

Highland's Motion: Thursday, 4/2 (9 days from service of RFPs)
HMIT Response: Thursday, 4/16 (14 days from motion)
Highland Reply: Tuesday, 4/21 (5 days from response)

Please let us know if this schedule would work for you, or whether you'd like to discuss anything else regarding the above.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

PSZJ
Los Angeles | New York | Wilmington, DE | Houston | San Francisco

King & Spalding Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message or attachments and we ask that you please comply with any additional instructions from the sender regarding deletion of messages or attachments sent in error. Click here to view our Privacy Notice.

The contents of this message may be privileged and confidential. If this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under applicable tax laws and regulations.

**EXHIBIT 4**

Digitally signed by Advance Performance Exponents Inc.
Date: 2026.02.10 15:05:57 -05:00
Reason: Apex Certified
Location: Apex

**NEUTRAL CITATION NUMBER: [2026] CIGC (FSD) 9**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. FSD 201 OF 2025 (RPJ)**

**IN THE MATTER OF THE GRAND COURT ACT**

**B E T W E E N:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

**Plaintiff/Applicant**

**- AND -**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD**

**Defendants/Respondents**

**Before:** The Hon. Raj Parker

**Heard:** 15 and 16 December 2025

**Appearances:** Andrew Ayres KC with Caroline Moran, Luke Armitage and Alasdair Munro of Maples and Calder (Cayman) LLP on behalf of the Company

Andrew Scott KC with Mark Goodman, Ronan O'Doherty and George Connolly of Campbells LLP on behalf of the 1st, 3rd, 5th and 6th Defendants

David Quest KC with Peter Tyers-Smith and Daniel Mills of Kobre & Kim (Cayman) on behalf of the 2nd Defendant

Jennifer Colegate with Fleur O'Driscoll and Nia Statham of Baker & Partners (Cayman) Limited on behalf of the 4th Defendant

**Draft judgment circulated:** 28 January 2026

**Judgment delivered:** 10 February 2026

*Proprietary injunction - jurisdiction - s.11 of the Grand Court Act (2015 Revision) - O.29, r.1 and r.2 of the Grand Court Rules - test for grant of injunction - serious issue to be tried - nature of proprietary interest - discretion - cross undertaking in damages - fortification - charitable fund structure - Cayman Islands exempted limited company in structure to make charitable distributions for US tax reasons to US charities - reorganisation by directors of fund structure - transference of limited partnership interest without notification to supporting organisations - claims of improper purpose to gain control - claims of excessive remuneration against directors - alleged transactions at undervalue.*

*Introduction*

1. Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "Company") is a Cayman Islands exempted company. It applies[1] for a proprietary injunction restraining the disposal of and dealing with assets over which the Company asserts a proprietary claim.

2. The application arises from transactions procured by the First and Second Defendants (Mr Mark Patrick and Mr Paul Murphy, collectively "the Directors" and D1 and D2) in alleged breach of fiduciary duties owed to the Company.

3. Four parties addressed the Court over a two-day hearing. Mr Andrew Ayres KC represented the Company, Mr Andrew Scott KC represented D1, D3, D5 and D6 (the "CDM Defendants" or "CDM Entities"), Mr David Quest KC represented D2 ("Mr Murphy"), and Ms Jennifer Colegate represented D4 ("DFW").

4. All of the Defendants contested the application on various grounds. The affidavits and exhibits submitted on the application are voluminous.[2]

5. In a nutshell the Company's claim alleges that unlawful steps were taken by the Directors to divest the Company of its sole asset, which is a limited partnership interest (the "Partnership

---

[1] *By summons dated 15 July 2025 as amended on 4 December 2025.*

[2] *Including: First Affidavit of Margot MacInnis; Third Affidavit of Margot MacInnis; Second Affidavit of Mark Eric Patrick; Third Affidavit of Mark Eric Patrick; First Affidavit of Paul Murphy; First Affidavit of Alexander L. Reid; First Affidavit of Douglas Mancino; First Affidavit of Marvin Bradford Bedingfield.*

Interest") in a Cayman Islands exempted limited partnership, Charitable DAF Fund, LP (the "Fund").

6. The Company alleges that control of the Partnership Interest of the Company was transferred to D3 and/or D4, entities under Mr Patrick's sole control and ownership, for a gross undervalue of c.US$ 1.6 million in March 2025.

7. The Company points to the fact that the Fund's net asset value was estimated at c.US$ 270 million in September 2024.

8. The joint official liquidators ("JOLs")[3], who bring the claim on behalf of the Company, are concerned that the Directors remain in control of the relevant assets and that the Company has been divested of its control of the Fund. They are concerned that value has been lost and will continue to be lost while the Directors enrich themselves by paying themselves what the JOLs say are 'vast and unjustifiable' fees and by the expenditure of large sums under the guise of 'ordinary business expenses'.

*Factual Background*

*The Fund*

9. The factual background to the Fund's establishment and the transfer of the Partnership Interest is explained in the First Affidavit of Margot MacInnis sworn 15 July 2025 ("MacInnis 1"). The following is a summary of the relevant structures and transactions which show how this worked.

10. The Fund is a Cayman Islands exempted limited partnership formed to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organisations in the US.

11. The Fund is governed by the Second Amended and Restated Exempted Limited Partnership Agreement dated 11 March 2024 (the "ARLPA").

12. The Fund was formed in 2011 at the instigation of Mr James Dondero, a U.S. resident and the founder of Highland Capital Management, L.P. ("Highland"), to enable certain assets to be donated to those registered charitable organisations.

---

[3] *Appointed on 6 May 2025.*

13. The Fund's sole asset is or was its single share, comprising 100% of the issued share capital in CLO HoldCo, Ltd (D6).

*The Company*

14. The Company, until recently the Fund's sole limited partner, and owner of the 99% Partnership Interest, was incorporated in the Cayman Islands on 7 November 2011.

15. The Company's share capital is divided into Participating Shares and Management Shares[4]:

(1) The entirety of the Participating Shares were, from 2011 to 2024, held by four non-profit U.S. companies[5] (the "Original Participating Shareholders") that act as "Supporting Organisations" to US charities (the "Charities").[6] Each is a charitable entity exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code of 1986 (the "IR Code"). Mr Dondero was (and remains) involved at board level with these Supporting Organisations, but according to Ms MacInnis he does not control them. The Defendants say that he does own and in effect controls them.

(2) The Management Shares were initially held by a Mr Grant Scott, but were transferred to Mr Patrick on 25 March 2021, on which date Mr Patrick was also appointed to replace Mr Scott as sole director of the Company.

16. On 22 April 2021, Mr Patrick, as Management Shareholder, appointed Mr Murphy as a director of the Company. Mr Murphy is resident in the Cayman Islands.

17. The Company's Memorandum and Articles of Association[7] provide that Management Shareholders had the right to receive notice of, and to attend, to speak at and to vote at, any general meeting of the Company, but no right to participate in the profits or assets of the Company (Article 11).

---

*[4] Authorised share capital of US$50,000 divided into 100 Management Shares of US$0.01 par value each and 4,999,900 Participating Shares of US$0.01 par value each.*
*[5] Highland Dallas Foundation, Inc, Highland Santa Barbara Foundation Inc, Highland Kansas City Foundation Inc (together the "Highland Foundations"), and subsequently Community Foundation of North Texas ("CFNT").*
*[6] Save that CFNT an underlying charity, has no "Supporting Organisation" and holds its shares in the Company directly.*
*[7] The memorandum and articles of association dated 27 October 2011; and the amended and restated memoranda and articles of association dated 19 January 2015; 24 January 2024; and 20 February 2025 respectively.*

18. The Participating Shareholders have no right to vote at Company meetings, but did have rights in a winding up or repayment of capital and the right to participate in the profits or assets of the Company by way of dividend in accordance with Article 12.

19. The Participating Shareholders therefore have the economic interest in the Company, whereas the Management Shareholders have the control rights.

20. The Company was placed into voluntary liquidation by directors' resolution on 2 April 2025.

*The General Partner of the Fund*

21. Under the ARLPA, sole control over the management and distribution of the Fund's assets was granted to the Fund's general partner. From its formation until 7 March 2024, the Fund's General Partner was Charitable DAF GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands (the "Original GP"). On 25 March 2021, the same date he appointed Mr Patrick sole director of the Company, and transferred his 100 Management Shares to him, Mr Scott also transferred to Mr Patrick the entire issued share capital in the Original GP. On 7 March 2024, the Original GP was replaced by CDH GP, Ltd, a Cayman Islands incorporated company (D5 and the "New GP"), of which Mr Patrick is sole shareholder and director.

*Charitable Purpose and Tax Considerations*

*The Fund's Purpose*

22. The purpose of the Fund was to make investments for the ultimate benefit of the Charities which the Supporting Organisations supported.

23. The Charities are the following four U.S. charitable or non-profit organisations:

(1) *The Dallas Foundation*: a charitable entity established in Texas in 1929 which has awarded over US$1 billion in grants and manages over US$500 million in assets.

(2) *Greater Kansas City Community Foundation*: a charitable entity established in Missouri in 1978 which has awarded over US$7 billion in grants and manages over US$6 billion held in charitable funds.

(3) *Santa Barbara Foundation*: a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over US$800 million.

(4) *North Texas Community Foundation*: which manages assets totalling US$513 million and donated US$38.9 million to local non-profits in 2023.

*The Tax Structure*[8]

24. As a matter of US tax law, in order for the Charities to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore 'corporate blocker', i.e. the Company.

25. Section 501(c)(3) of the IR Code provides that charitable organisations which meet certain criteria are exempt from state and federal taxes except to the extent that they receive income classified as unrelated business taxable income ("UBTI").

26. Section 509 of the IR Code defines the term "supporting organisation" as a tax-exempt entity that must be organised and then operate exclusively either (i) for the benefit of, (ii) to perform the functions of, or (iii) to carry out the purposes of, one or more supported organisations (the Charities). The supported organisations must also be s501(c)(3) entities.

27. Both the Charities and the Supporting Organisations apparently meet the criteria of s501(c)(3), and are therefore exempt from US state and federal taxes save to the extent that they receive UBTI.

28. Apparently as a matter of US tax law, some income received directly from the Fund by the Charities would likely be considered UBTI.

29. In order to 'insulate' the Charities from UBTI, instead of holding their interest in the Fund directly, the Supporting Organisations hold their interest through an 'offshore corporate blocker' structure, i.e. the Company.

30. The purpose of inserting the Company into the structure was that any tax that was due from these investments would be paid at the Company level, and the proceeds would then be distributed to the Supporting Organisations and then to the Charities free of any tax liability.

[8] *See affidavit of Marvin Bradford Bedingfield.*

*Company Submission on this Structure*

31. The Company argues that:

(1) The Supporting Organisations (the four non-profit US companies who were the original Participating Shareholders) and the Charities hold or ultimately hold the real economic interest in the Fund;

(2) They are not merely discretionary beneficiaries whom the Fund may or may not choose to confer a benefit on, but the ultimate owners of the Fund, albeit through the Company as a tax filter, and with the Fund having its own discretion as to how to manage its investments; and

(3) The fact that the GP had a discretion as to whether to make any distribution to any of the Participating Shareholders does not change this analysis.

*Relationship between Supporting Organisations and the Charities*

32. As to the relationship between the Supporting Organisations and the Charities:

(1) The Supported Organisations (Charities) are said to control the Supporting Organisations (Participating Shareholders) through their majority voting interest and their ability to elect a majority of the directors of the Supporting Organisations (Participating Shareholders);

(2) The Supporting Organisations (Participating Shareholders) support the Supported Organisations (Charities) by way of paying fees (i.e. making grants) to them from time to time from their assets, including any dividends received from the Company;

(3) The Supporting Organisations (Participating Shareholders) have no ability to pay dividends to any private person or make payments to their directors (save reasonable reimbursement for reasonable out-of-pocket expenses) and can only make grants to their relevant Charity in furtherance of their charitable purposes; and

(4) Whilst Mr Dondero sits on the board of the Supporting Organisations (Participating Shareholders), he does not control them, as a supermajority of the votes are always held by the respective Charity.

33. As described above, the structure was set up to make discretionary distributions to qualifying tax exempt organisations under Section 501(c)(3) of the IR Code. US tax rules apparently require donors to cede 'dominion and control' over contributed assets and for donees to be genuinely independent from donor influence.[9]

*Mr Patrick's Role*

34. Mr Patrick is a US attorney and was employed as tax counsel by Highland from 2008 to 2021, and as tax counsel by Highland Consulting Group, Inc. d/b/a Skyview Group from March 2021 to October 2024. Highland is a group of companies set up by Mr Dondero. Mr Patrick was instrumental in the creation of the Fund in 2011; in particular, he advised on the tax structure of using an offshore 'blocker' company.

35. From March 2021, Mr Patrick was the sole director of the Company, and holder of the 100 Management Shares in it, and the sole director and shareholder in the Fund's general partner (as at March 2021, the Original GP). Mr Patrick occupied a position informally termed "the Control Position", the effect of which was that Mr Patrick was in effective sole control of the limited partner (i.e. the Company), the general partner (the Original GP), and was therefore in effective sole control of the Fund and all its assets, albeit, according to the Company, with no economic, residual, beneficial or winding up interest in either the Company or the Original GP.

*Directors' Fees and Expenditure*

36. The Company says that the Fund's annual expenses showed increases in expenditure which show:

(1) Directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 and increased further to around US$2.25 million in the first half of 2024; and

(2) Expenses overall for the first half of 2024 were around US$18.3 million, almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

---

[9] *Patrick 2 section D, Reid 1 and Mancino 1.*

37. As is explained in MacInnis 1,[10] in October 2024, Mr Patrick executed an employment agreement, under which he was entitled to receive a base salary of US$850,000; a long-term incentive plan payment for the period 24 March 2021 to 24 March 2024 in the amount of US$4,759,000; and is eligible for both annual and discretionary bonuses as determined at the sole and absolute discretion of the Directors.

38. The Company points to Mr Grant Scott's salary during his previous tenure which, by contrast, was approximately US$60,000 per annum, and says Mr Patrick's remuneration and benefits are 'grossly excessive'.

*The Divestiture of the Company's Limited Partnership Interest in the Fund*

*Supporting Organisations' Concerns*

39. In late October 2024, as a result of concerns arising from the expenditure by the Directors on fees and expenses, the Supporting Organisations asked for financial information from Mr Patrick.

40. On 11 November 2024, Holland and Knight, U.S. attorneys for the Supporting Organisations, sent a letter to Mr Murphy advising that they no longer had confidence in the governance of the Company and/or the Fund and considered that a reorganisation of the governance structures was required to protect the charitable efforts of the Supporting Organisations.

41. On 26 November 2024, Mr Patrick sought advice from Walkers (Cayman) LLP ("Walkers"), then Cayman attorneys to the Company, as to whether the Company could issue further Participating Shares to a new non-profit organisation to dilute the Supporting Organisations and insert a new member able to oppose a potential winding up petition brought by the Supporting Organisations on just and equitable grounds.

42. On 27 November 2024, Walkers responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition would be taken into consideration and would likely help any efforts Mr Patrick might make to resist such a winding up.

[10] *At §49.*

*The Reorganisation*

43. The Company relies on the following steps taken by the Defendants, each without informing the Supporting Organisations or the Charities.

*CDM*

44. On 18 December 2024, the Directors passed a resolution (the "18 December Resolution"), under which:

> "*In connection with a corporate restructure of the Company's group, the Company proposes to transfer, convey, assign or otherwise contribute to CDMCFAD, LLC, a Delaware limited liability company (the "Transferee"), 100% of the Company's interests in CHARITABLE DAF FUND, LP, an exempted limited partnership established in the Cayman Islands (the "Partnership") in consideration for the contribution by the sole member of the Transferee of 100% of the issued and outstanding limited liability company interests in the Transferee (the "Transfer"*).

45. The 18 December Resolution also provided that (based apparently on US tax advice) the proposed assignment of the Partnership Interest to D3, CDM (the "CDM Assignment"):

> *"… would help insulate the DAF from exposure to [Dondero] and his entities … who may be at risk of causing the [IRS] to revoke the tax-exempt status of one or more of the participating shareholders/supporting organizations, which could imperil the assets of the DAF";* and that
>
> *"The IRS would look favorably upon any and all attempts for DAF to maintain its influence from 'what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement'".*

46. This resolution was given effect by way of a Deed of Assignment and Assumption of the same date which was executed by Mr Patrick on behalf of each of: (i) the Company, in his capacity as Director; (ii) CDM, in his capacity as Manager; and (iii) the New GP, in his capacity as Director (a position which the Company says gives rise to an irreconcilable conflict of interest).

47. CDM is a Delaware limited liability company. Its Certificate of Formation, dated 12 December 2024, is signed by Mr Patrick, who is CDM's sole member.

48. Also on 18 December 2024, the Company (as member) and Mr Patrick (as manager) entered into a Delaware law governed Limited Liability Company Agreement in respect of CDM (the "LLC Agreement").

49. The LLC Agreement provides that:

"*Fair Market Value shall have the meaning set forth in Section 6.9(b).*

…

*The initial Manager shall be Mark Patrick.*

…

*6.5 No Duties to the Company. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.*

…

*6.9 Valuation of Company Assets.*

*(a) General. The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.*

*(b) Binding Effect. The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.*

…

*7.3 Redemption. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal*

*amount of the Fair Market Value of such Member's Interest being redeemed, as determined by the Manager in its sole discretion."*

50. The Company says the effect of these changes was that:

(1) CDM was inserted into the corporate structure and as a subsidiary of the Company and would hold the Partnership Interest (previously held by the Company);

(2) The Company would hold the entire membership interest in CDM, with the result that the Company's sole asset, having previously been the Partnership Interest, was exchanged for its membership of CDM (the "Company's CDM Membership"); and

(3) The Company's CDM Membership was inherently fragile as it was held in a company that (by a combination of Delaware law and the LLC Agreement) was owed no fiduciary duties by its manager, Mr Patrick; and subject to redemption at any time of Mr Patrick's choosing, and for any price of Mr Patrick's choosing, subject to the 'good faith' proviso at paragraph 6.9(a) of the LLC Agreement.

*New Shares to DFW*

51. In February 2025, the Directors again sought advice from Walkers on whether the Company could issue new Participating Shares that would have the effect of diluting the existing Participating Shareholders, *"in light of a possible just and equitable winding up petition"* being filed by one of the Supporting Organisations.

52. On 7 February 2025, the Company's board passed a resolution (the "Share Issuance Resolution") approving a proposed share issue of 318 Participating Shares, of a nominal or par value of US$0.01 each as fully paid up, to D4, DFW. Paragraph 5.2 of the Share Issuance Resolution noted that "*following the Share Issuance, DFW shall own 51.04% of the issued Participating Shares of the Company*."

53. DFW is, according to its Certificate of Incorporation, a Delaware non-profit non-stock corporation. It is organised under the General Corporation Law of the State of Delaware exclusively for charitable purposes, incorporated on 9 December 2024, and was incorporated by Mr Douglas Mancino, then a partner at Seyfarth Shaw, a U.S. law firm apparently engaged by the Fund. The sole member of DFW is Mr Patrick.

54. The Share Issuance Resolution stated that the Directors believed the issuance of shares to DFW was justified as a means of protecting the Company, because:

(1) There was a heightened risk that the IRS could revoke the tax-exempt status of the Participating Shareholders which could imperil the status and assets of the Company;

(2) Increasing the number of Participating Shareholders would mitigate the undue influence and private inurement of Mr Dondero; and

(3) The IRS would look favourably upon attempts by the Fund to maintain its independence from his (i.e. Mr Dondero's) attempts to use the Fund for his private benefit.

55. The Company says the effect of the Share Issuance Resolution was to remove the majority that was held by the Original Participating Shareholders, and to dilute their shareholding into a minority stake. DFW (D4) now holds 51% of the Participating Shares.

*The Admission and Redemption*

56. On 27 March 2025, the Company entered into a letter agreement with CDM, pursuant to which it was agreed that CDM would redeem the Company's CDM Membership, and CDM would admit DFW to membership of CDM, with DFW obtaining membership in it.

57. On 27 March 2025, Mr Patrick executed:

(1) Admission and Amendment No.1 Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192; and

(2) Admission and Amendment No.2 Agreement under which CDM redeemed (the "Redemption") the Company's CDM Membership for the same sum of US$1,637,192 (the "Redemption Sum").

58. On the same day, Mr Patrick executed a written consent (the "Manager Consent") to the Admission and Redemption, on behalf of CDM, under which the Admission and Redemption was justified by reference to Participating Shareholders allegedly posing a material risk to the Company, due to:

"*among other things, (i) officers and directors of the Highland Foundations seeking to assert dominion and control over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii).*"

59. The Company says that the substantive financial effect of the Redemption, under which DFW paid the Redemption Sum to CDM, and the Company's CDM Membership was redeemed for the Redemption Sum, was that the Company's CDM Membership was purchased by or otherwise transferred to DFW for the Redemption Sum.

*Effect of the Reorganisation*

60. The Company says that the result of these transactions, all done 'in secret', is that:

(1) The Company realised its interest in the Fund, which it says had a Net Asset Value ("NAV") of c.US$269.1m, for only US$1.6m;

(2) The Company made a distribution to Participating Shareholders (c.US$1.6m);

(3) The Supporting Organisations and the Charities were divested of their indirect interest in the Fund, and the assets underlying the Fund; and

(4) The Original Participating Shareholders were diluted from 100% of the economic interests in the Company to less than 50%.

*The Issue of Control*

61. The Company argues that:

(1) the Company, in its role as tax blocker and which formerly held a very valuable interest in the Fund, no longer has that interest or anything like proper value in exchange for it;

(2) the Charities have been completely disconnected from the Fund and structure which was set up to produce capital and income for their activities; and

(3) Mr Patrick remains in control of the Fund and its assets but in a way and pursuant to a structure which has no supervision by the Charities or the Supporting Organisations, and nor do they have any economic interest in it.[11]

62. The Defendants in answer broadly say that:

(1) It is because of Mr Dondero's historic intermeddling and wrongdoing that the Control Person for the DAF structure, D1 (Mr Patrick), acted to reorganise the DAF structure to protect it from Mr Dondero's predations and the risks these posed to its assets and charitable mission, in the sole service of which the Company existed;

(2) Mr Patrick took this protective restructuring action together with the other director of the Company, D2 (Mr Murphy), in good faith, believing it to be in the best interest of the Company, and acting with the benefit of legal and tax advice from an array of respected advisors in this jurisdiction and in the US;[12] and

(3) CDM redeemed the Company's membership interest for fair market value, and the Company paid dividends with the proceeds to its Participating Shareholders.

63. Mr Patrick and Mr Murphy vehemently deny, for the reasons set out in detail in their affidavit evidence, that the restructuring was done in breach of their fiduciary duties to the Company or that they are in any other way in breach as alleged by the Company.

64. Mr Ayres KC for the Company described the reason given for the restructuring as a bogus reason. It has never been properly explained how the assets of the Fund might be imperilled by Mr Dondero.

---

[11] *The claims are pleaded in the Statement of Claim dated 15 July 2025 and amended on 15 October 2025.*
[12] *Including Walkers (Cayman) LLP ("Walkers"), Maples & Calder (Cayman) LLP ("Maples") and Campbells LLP in the Cayman Islands, Shields Legal Group, Carrington Coleman & Sloman & Blumenthal, L.L.P, Dorsey & Whitney and others in the US, and Tony Beswetherick KC in the UK.*

*The Interim Undertakings and Disclosure*

65. The JOLs originally requested urgent injunctive relief last year and the application was listed for 31 July 2025, the last day of term. In the event there was a compromise, the hearing was adjourned and a series of undertakings (the "Interim Undertakings") were given by the Defendants pending the determination of this application.

66. In outline, the effect of the Interim Undertakings was as follows:

(1) Pending the determination of this application, the Defendants and the CDM Entities undertook not to deal with or dispose of any assets of the CDM Entities other than in the ordinary course of business;

(2) The Defendants undertook not to dispose of or diminish the value of their, or any, interest in the Fund other than in the ordinary course of business;

(3) The Defendants and the CDM Entities were not prohibited from making payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor which is required, either in the ordinary course of business, or in respect of their reasonable legal fees and expenses in connection with these proceedings or the official liquidation of Charitable DAF HoldCo, Ltd (in Official Liquidation) FSD 116 of 2025 (JAJ) (the "Liquidation Proceedings"), or the related Chapter 15 recognition application commenced by the JOLs; and

(4) The Defendants were to provide a retrospective notification of transactions below US$50,000, and agreed to give 7 days' notice of any transactions above US$50,000.

*The JOLs' Continuing Concerns about the Interim Undertakings*

67. The JOLs say that the Interim Undertakings, although not adequate for the long-term because there is no ability to prevent any inappropriate or suspicious transactions, were agreed out of a desire for a pragmatic compromise to adjourn a hearing on the last day of the summer term.

68. They say that the Interim Undertakings were expressed to apply only until the determination of the present application (as opposed to through to trial), and the Defendants expressly agreed as part of the Interim Undertakings that the issue of whether they are permitted to use funds that

derive directly or indirectly from the Partnership Interest to pay their legal fees and other service providers will be determined as part of this application.

69. The JOLs are also concerned that the 'ordinary course of business' exception to the prohibition contained in the Interim Undertakings is susceptible to exploitation by Mr Patrick and Mr Murphy because they are likely to say that their 'exorbitant' fees are paid in the ordinary course of business, and are also concerned that the legal fees that have been incurred by the Defendants so far are excessive.[13]

*JOLs' Legal Fees - Funding Agreement*

70. In July 2025, the JOLs filed an *ex parte* sanction application in the Liquidation Proceedings seeking approval to enter a funding agreement (the "Funding Agreement") with an entity named Crossvine Litigation Funding LLC ("Crossvine"), a special purpose vehicle whose managers are Mr Scott Ellington and Mr Michael McDonald. Mr Ellington is apparently a longtime business associate of Mr Dondero.

71. On 5 September 2025, the JOLs notified DFW (D4) (but apparently none of the other Defendants) that they had exhausted the litigation funding provided by Crossvine.

72. Crossvine is apparently:

> "*incorporated for the purpose of ultimately Mr Dondero … funding the liquidation of the Company and the JOLs pursuing the Proposed Proceedings"*[14]

73. As to the arrangements with Crossvine, the CDM Defendants maintain that through the Company, the JOLs are asserting proprietary claims over assets of the CDM Entities that include causes of action and litigation receivables which would inure to the benefit of the liquidation estate, and those causes of action and litigation receivables are, in many cases, directly adverse to the interests of Messrs Dondero and Ellington.

74. The CDM Defendants believe this constitutes an unacceptable conflict of interest, as does the profit Mr Dondero stands to make on any sums advanced under the Funding Agreement.

*Disclosure*

---

[13] *Amounting to, as far as the JOLs are aware, at least US$4,256,882 (MacInnis 3, §111).*
[14] *MacInnis 6, §11.*

75. The JOLs also complain that the disclosure provided by the Defendants under the Interim Undertakings has been deficient. The disclosure deficiencies are described in the detailed chronology referred to at §106 of MacInnis 3. It is not necessary to set them out. They are denied by the Defendants.

76. The JOLs are of the view that no exercise has been undertaken to determine where the assets of the Fund and each of its subsidiaries are held, which raises a wider question about how Mr Patrick has performed his duties to manage the Fund, receiving large fees for doing so, without proper information concerning the Fund's assets. This again is denied by the Defendants, particularly the CDM Defendants.

77. The JOLs say Mr Patrick's attempt to justify his approach at Patrick 2 §151, is cursory and unconvincing.[15]

78. The JOLs argue that the objection is not that consolidated balance sheets were provided, but that there was a failure to provide more detailed, entity-by-entity disclosure that would provide the JOLs with proper visibility into the Fund's asset position.

79. The CDM Defendants respond that the DAF structure historically produced consolidated balance sheets and accompanying quarterly valuation materials. That was always what was provided to the Supporting Organisations and was given to the JOLs immediately following entry into the Interim Undertakings on 31 July 2025.[16]

*The Relevant Law*

*Proprietary Injunction*

80. It is important to emphasise that this is an application for a proprietary injunction. It is not an application for *Mareva* style relief which would require a risk of dissipation and which would normally include an ordinary course of business exception. A proprietary injunction would not usually provide such an exception.

---

[15] *"...as the DAF Structure prepares consolidated financial materials in the ordinary course, I believe that these allegations are incorrect".*

[16] *They add that once the JOLs requested entity specific financials (which go beyond the existing consolidated records), the CDM Defendants engaged an external accounting firm, Armanino LLC, to prepare entity-level financial information at year-end 31 December 2024, and subsequently as at 30 June 2025.*

*Jurisdiction*

81. The Court's power to grant such relief arises under s.11 of the Grand Court Act (2015 Revision) in conjunction with O.29, r.1 and r.2 of the Grand Court Rules (2023 Revision) ("GCR").

*"Section 11.*

*(1) The Court shall be a superior court of record and, in addition to any jurisdiction heretofore exercised by the Court or conferred by this or any other law for the time being in force in the Islands, shall possess and exercise, subject to this and any other law, the like jurisdiction within the Islands which is vested in or capable of being exercised in England by-*

*(a) Her Majesty's High Court of Justice; and*
*(b) the Divisional Courts of that Court, as constituted by the Senior Courts Act, 1981, and any Act of the Parliament of the United Kingdom amending or replacing that Act.*

*Application for injunction (O.29, r.1)*

*1. (1) An application for the grant of an injunction may be made by any party to a cause or matter before or after the trial of the cause or matter, whether or not a claim for the injunction was included in that party's writ, originating summons, counterclaim or third party notice, as the case may be.*

*(2) Where the applicant is the plaintiff and the case is one of urgency such application may be ex parte on affidavit but, except as aforesaid, such application must be made by motion or summons."*

82. A key feature of the jurisdiction is that a proprietary injunction is only available where the plaintiff can maintain a *prima facie* proprietary claim to the assets which are the subject of the injunction.

§28-199 of Grant and Mumford on Civil Fraud (1st ed) ("Civil Fraud") states:

*"Accordingly, where a claimant asserts a claim in specie to relevant property that claimant can apply to the court for an interim injunction aimed at preserving in the hands of the defendant that property on the basis that at trial the claimant will seek a*

*remedy which involves the return of that property to the claimant. The term "proprietary injunction" is used to describe the type of injunction issued by the court in response to such a claim."*

*Test*

83. In deciding whether to grant a proprietary injunction, the Court applies the principles of *American Cyanamid v Ethicon Ltd [1975] AC 396.*[17]

84. In applying those principles, the applicant must establish three general matters:

(1) There is a serious issue to be tried on the merits;

(2) The balance of convenience is in favour of the grant of an injunction; and

(3) It is just and convenient to grant the injunction.

85. This Court, in *In Frabran Holdings Limited and Ors. -v- Daventree Trustees Limited and Ors,*[18] ("*Daventree Trustees*") confirmed the application of the *American Cyanamid* principles to proprietary injunctions, and stated at §154:

*"In applications for proprietary injunctions, the matter is one for the discretion of the court. On ordinary principles, a plaintiff beneficiary would have to show:*

*a) a prima facie case the property is his,*

*b) a serious issue to be tried that the trust property is in danger pending the hearing of his claim,*

*c) that damages would not be an adequate remedy,*

*d) that the balance of convenience favours the grant of an injunction,*

---

[17] *Polly Peck International plc v Nadir [1992] 4 All ER 769 at 784G-H.; In Ascentra Holdings Inc (in OL) v Yoshida [2024 (1) CILR 409] at §96 (Parker J).*
[18] *Parker J (Unreported, 17 January 2024).*

e) *and that it is just and convenient to order an injunction.*"[19]

86. In a recent case Ramsay-Hale CJ helpfully set out the scope of the Court's power to order proprietary injunctions[20] at §29:

> *"The scope of the Court's power to make property preservation orders pursuant to GCR O.29, r.2(1) is usefully summarized in the White Book:*
>
> i. *the source of the Court's power is the inherent jurisdiction of the Court to secure by orders the just and proper trial of the issues: see White Book note 29/8A/2;*
>
> ii. *the Court may only make an order in relation to property "which is the subject-matter of the cause or matter or as to which any question may arise therein." The property must be bona fide the subject-matter of the action: see note 29/8A/7;*
>
> iii. *the order may be granted even where the party against whom it is sought has a proprietary interest in it. An order should not be refused merely because the defendant claims that he has a discretionary power to determine whether or not the property should be preserved and how it should be preserved, when one of the issues in the case is whether or not the power is untrammelled by a duty to the plaintiff to preserve the property: Johnson v Tobacco Leaf Marketing Board [1967] VR 427."*

*Serious Issue to be Tried*

87. The Company must show a serious issue to be tried that it has a specific proprietary interest in the asset under consideration i.e. the Partnership Interest. The test is whether the claim has a real (as opposed to a fanciful) prospect of success which would withstand a reverse summary judgment application.

88. As the Court said in *Ascentra*:[21]

---

[19] *See also Smellie CJ in Classroom Investments Inc v China Hospitals Inc [2015] (1) CILR 451 at §§50-57.*
[20] *Lakeshore Biopharma Co Ltd [2025] CIGC (FSD) 24 ("Lakeshore") Ramsay-Hale CJ.*
[21] *Ascentra Holdings, Inc (in official liquidation) v Yoshida [2024 (1) CILR 409] Parker J.*

> "*97. The company must show a serious issue to be tried, i.e., that there is a "real, as opposed to a fanciful, prospect of success on the claim." This is lower than the "good arguable case" threshold that applies in freezing injunction cases. A serious issue to be tried has to be shown on the evidence, not by mere assertion or allegation.*
>
> *98. Further, it follows from the nature of a proprietary injunction that the serious issue to be tried should be in respect of facts which, if proven, would afford the claimant a proprietary remedy."*

*Balance of Convenience*

89. If a properly arguable claim to a proprietary interest is established, it may well be the case that damages will not be an adequate remedy if the property is dealt with pending trial, and so the balance of convenience will generally be in favour of the applicant.[22]

90. As Flaux J said in *Madoff Securities v Raven [2011] EHWC 3102 (Comm)* at §140, once a sufficiently arguable proprietary case has been established, arguments by respondents that '"*it would be frightfully inconvenient to tell you what I've done with your money or to be prevented from continuing to use it" when, on this hypothesis [the respondent] should not have had the money in the first place, do not cut much ice".*

91. Whilst the Court will not enquire too closely into the merits at this stage, where the scales are evenly balanced in relation to the balance of convenience, the Court can take into account the relative strengths of the parties' cases.[23]

92. As to the exercise of discretion, the court said in *Ascentra* at §124:

> *"The question in relation to this issue is which course is likely to involve the least risk of injustice or irremediable prejudice to one party or the other. The analysis will include the prejudice to the company if no injunction is granted, or to the defendants if it is, the likelihood of such prejudice actually occurring, the extent to which it may be compensated by an award of damages or enforcement of the cross-undertaking, the likelihood of either party being able to satisfy such an award, and the likelihood that the injunction will turn out to have been wrongly granted or withheld."*

[22] *Grant and Mumford (eds), Civil Fraud: Law, Practice, & Procedure ("Civil Fraud") at 28-206.*
[23] *Polly Peck International plc v Nadir [1992] 4 All ER 769 at 784G–784H.*

93. For the Court to exercise its discretion in all the circumstances of the case, the effect of the injunction must be examined to ensure that it is in the interests of justice overall and does not work unfairly, oppressively or is granted without good cause. The court must assess whether granting or refusing to grant an injunction is more likely to produce a just result.

94. As Lord Hoffmann said as to the purpose and effect of interim injunctions:

> *"It is often said that the purpose of an interlocutory injunction is to preserve the status quo, but it is of course impossible to stop the world pending trial. The court may order a defendant to do something or not to do something else, but such restrictions on the defendant's freedom of action will have consequences, for him and for others, which a court has to take into account. The purpose of such an injunction is to improve the chances of the court being able to do justice after a determination of the merits at the trial. At the interlocutory stage, the court must therefore assess whether granting or withholding an injunction is more likely to produce a just result…that means that if damages will be an adequate remedy for the plaintiff, there are no grounds for interference with the defendant's freedom of action by the grant of an injunction..."*[24]

*Just and Convenient*

95. Generally speaking where the Court finds that the balance of convenience favours the grant of the injunction, it would be unlikely that the Court found that it was not just and convenient to grant the injunction.[25]

*Use of Funds for Ordinary Course Business Purposes*

96. In *Polly Peck International plc v Nadir,* Scott LJ commented that a proprietary injunction "*would not be subject to provisos enabling the use of the money for normal business purposes, or for the payment of legal fees, or the like*".[26]

97. The rationale for this is that the applicant has established that the particular asset in question arguably belongs to him and so the question is whether the respondent should be permitted to use assets which may turn out to be the applicant's for any of those purposes.

---

[24] *National Commercial Bank of Jamaica v Olint Corp Ltd [2009] UKPC 16, at §16.*
[25] *Ascentra ibid, §150.*
[26] *Page 784.*

98. Therefore, in the case of a proprietary injunction, if ordered, whilst there is no presumption in favour of the exceptions for such payments being included in a proprietary order, the defendants may show (and the burden is on them) that it is nonetheless appropriate for any expenditure from the injuncted assets to be permitted.[27]

99. This issue was further examined in *Marino v FM Capital Partners [2016] EWCA Civ 1301* per Sales LJ at §23:

> "*Lewison J (as he then was) in Independent Trustee Services Ltd v GP Noble Trustees Ltd [2009] EWHC 161 (Ch) helpfully summarised the proper approach at para. [6] by setting out the four questions which should be addressed: (1) does the claimant have an arguable proprietary claim to the funds in issue? (2) if yes, does the defendant have arguable grounds for denying that claim? (3) if yes, has the defendant demonstrated that without the release of the funds in issue he cannot effectively defend the proceedings (or, it may be added, meet his legitimate living expenses)? (4) if yes, where does the balance of justice lie as between, on the one hand, permitting the defendant to expend funds which might belong to the claimant and, on the other hand, refusing to allow the defendant to expend funds which might belong to it?*"

*Legal Expenses*

100. Similarly, if there is an argument that provision for legal expenses is to be carved out from the injunction, the defendants will need to satisfy the court that they have no other source of funding available apart from the disputed funds, and that the balance of prejudice comes down in their favour.[28]

101. Further, Miles J in *AB v CD [2023] EWHC 2419 (Ch)* at §43 noted that the balancing exercise must be carried out in relation to "*all relevant circumstances",* and that *'[t]he court will "act cautiously so as to ensure that the funds are not wasted", which may be achieved by "limiting the amount ...even if that may cause a defendant to reassess how to pursue her case or to consider alternative funding models*"'.

[27] *Civil Fraud ibid at 32-059 to 32-060.*
[28] *Ascentra ibid, §151.*

*Ancillary Disclosure*

102. Ancillary to freezing and proprietary jurisdiction, it is well established that the Court has jurisdiction to require respondents to provide disclosure.

103. In the context of proprietary injunctions, it is legitimate for such disclosure orders to be aimed at establishing the whereabouts of missing funds, as opposed to merely policing the terms of the order.

104. As the editors of Civil Fraud point out at 29-028 to 29-029:

> "*The court's approach is epitomised in the famous dictum of Templeman LJ in Mediterranea Raffineria Siciliana Petroli SpA v Mabanaft GmbH:*
>
> > *"A court of equity has never hesitated to use the strongest powers to protect and preserve a trust fund in interlocutory proceedings on the basis that, if the trust fund disappears by the time the action comes to trial, equity will have been invoked in vain."*
>
> *The disclosure typically ordered in such a case is categorically different to a normal asset disclosure order. What the court is here doing is requiring the respondent to identify the current location and status of assets, or their proceeds, to which the claimant lays claim, even if they are no longer in the possession of the respondent and regardless of whether the respondent himself claims ownership of the assets…*"

*Cross-Undertakings and Fortification*

105. The court will normally require a cross undertaking in damages as the price for interfering with the defendant's freedom before they have been found liable for anything and to indemnify the defendants for any damage found wrongfully to have been caused to them by the injunction, if they ultimately prevailed at trial.[29]

[29] *Kelly v Fujigmo Limited [2012] (2) CILR 222 Smellie CJ at §13; JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev [2015] EWCA 139 at §68.*

106. This would be the usual order to achieve justice at the trial.[30] There are rare exceptions where the court has waived or limited the size of the cross undertaking required, but there would have to be a good reason not to make the usual order, for example where the applicant's inability to provide the undertaking has been caused by the wrongful conduct of the defendants or where there is no practical possibility of damage being suffered. The mere fact that the claim is being brought by liquidators of an insolvent company does not lead to the conclusion that a cross undertaking should be capped.[31]

*Fortification*

107. Assuming that the defendants can show:

(1) on a good arguable case basis, that the injunction will cause them loss; and

(2) that the party offering the cross undertaking will not be good for the money absent fortification,[32]

the approach is for the Court to make an intelligent estimate of the likely amount of any loss which might be suffered by the applicant for fortification by reason of making the interim order, and assess whether the making of the interim order is or was a cause without which the relevant loss would not be or would not have been suffered.[33]

*D1, D3, D5 and D6 (CDM Defendants) Arguments in Outline*

108. The following represents a summary of the points Mr Andrew Scott KC made on behalf of the CDM Defendants:

(1) Mr Patrick and Mr Murphy vehemently deny that there has been any breach of their fiduciary duties to the Company for the reasons set out in their affidavit evidence;

---

[30] *Hoffmann-La Roche & Co. A.G. v Trade & Indus. [1975] AC 295 at §361 (Lord Diplock), cited by the Cayman Islands Court of Appeal in Ennismore Fund Management Ltd v Fenris Consulting Limited [2020] (2) CILR 147 at §37.*
[31] *Re IAHP Group Holdings Limited; Bucknall v Rizvi [2025] EWHC 2069 (Ch) per Mellor J at §87.*
[32] *Omni Bridgeway (Fund 5) Cayman Invt Limited v Bugsby Property LLC & Anor [2024] Costs LR 405 per Jacobs J at §9.*
[33] *Daventree Trustees at §162.*

(2) The proprietary injunction sought, in respect of the limited partnership interest (the Partnership Interest) held by CDM is too wide and would restrain dealings with partnership assets of the Fund to which the Company has no pleaded proprietary claim;

(3) There is no legal basis for such a claim under the Exempted Limited Partnership Act (as amended) ("ELP Act") or the ARLPA;[34]

(4) The relevant assets are held by the general partner on statutory trust for the partnership and not by or for any limited partner;

(5) Even if there were a proprietary interest in the limited partnership, it is of no economic value to the Company, being a right to be considered by the general partner for discretionary charitable distributions for the benefit of qualifying Indirect Charitable Owners, and so any loss would fall on those owners, not the Company, and being financial in nature it could be adequately compensated in damages;

(6) The effect of the relief sought would be to 'lock down' the Fund and the CDM Entities and place their operations under the control of the JOLs, which is not justified. It would restrain the CDM Defendants from conducting their lawful business operations in the ordinary course, impairing their ability to make distributions to charitable causes;

(7) The Company's only rights as the former limited partner of the Fund were to be considered for discretionary distributions at the sole discretion of the general partner[35], and there is no justification for the JOLs taking such control;

(8) The Company's purpose and role within the DAF structure was to facilitate charitable distributions to qualifying non-profit organisations. It did not exist to operate or transact business as a commercial entity or to benefit its Participating Shareholders;[36]

---

[34] *The limited partnership interest is a bundle of contractual and /or statutory rights not a proprietary interest in the Fund's assets.*

[35] *See Article 4.2 of the ARLPA. The ARLPA also confirms that: (i) the General Partner has full, exclusive and complete discretion to manage the DAF's affairs and assets (Article 1.6(a)); (ii) Limited Partners do not participate in management and have no power to bind the DAF (Article 1.6(b)); (iii) distributions are at the General Partner's discretion (Article 4.2(a)); and (iv) partners renounce any right to partition partnership property (Article 6.14).*

[36] *See Asif J's comments at the June 2024 sanction hearing in the Liquidation Proceedings: "this structure is unlike the majority of funds in that there is no right to receive dividends. So it's purely discretionary, it's almost like a discretionary trust" and "could, for example, be set up as a foundation company."*

(9) The JOLs are being funded by Mr Dondero (who allegedly has a history of dishonesty and vexatious litigation) through a funding vehicle, Crossvine, established for his benefit, which has opaque financial standing;

(10) The reason Mr Patrick acted in late 2024 and 2025 to restructure was to protect the Fund from Mr Dondero's predations and the risks[37] that these posed to its assets and charitable mission;

(11) Both Mr Patrick and Mr Murphy carried out the restructuring in good faith believing it to be in the best interests of the Company having taken legal and tax advice from respected advisers in this jurisdiction and in the US;[38]

(12) When Mr Patrick and Mr Murphy caused the Company to assign the Partnership Interest as part of the DAF restructuring, they did so in good faith, in the best interests of the Company, and for valuable consideration in the form of the Company's CDM Membership. They likewise acted when the Company's CDM Membership was redeemed. The Company was paid US$1,637,192 upon redemption, a fair market valuation supported at the time by two independent valuation exercises (by ValueScope and FTI) and subsequently confirmed by a third independent firm, Weaver & Tidwell LLP ("Weaver").[39] Having received the fair market value of its CDM membership interest, the Company immediately distributed those proceeds to the Original Participating Shareholders;

(13) Having carried out the restructuring, there is no realistic risk that CDM will dispose of or diminish the value of the Partnership Interest now that it has been put beyond Mr Dondero's reach;

---

[37] *An illustration of that exposure is, according to the CDM Defendants, the litigation that UBS pursued in the US Courts against Mr Dondero and entities with which he was affiliated or controlled (the "UBS Litigation"). On 8 February 2023, UBS filed a Special Turnover Petition whereby, apparently, it sought to challenge as fraudulent certain transactions by which attempts were made to put assets beyond UBS's reach and to affix liability to the entities involved on the basis that they were the "alter egos" of Mr Dondero. One such transaction involved D6 ("CLO HoldCo"), one of the holding companies within the DAF Structure, which was joined as a defendant to the petition. UBS alleged that "CLO HoldCo is a wholly owned subsidiary of [the DAF] which Dondero indirectly controls and has funded from personal assets, his family trusts, and HCM". Mr Patrick and Mr Murphy were able to settle UBS's claims and secure broad releases for the benefit of CLO HoldCo and other CDM Entities. The CDM Defendants say that UBS were willing to settle and provide releases as they were satisfied that CLO HoldCo and the CDM Entities were no longer aligned with Mr Dondero.*

[38] *The decision-making is recorded in the Company board resolutions dated 18 December 2024,7 February 2025 and 2 April 2025.*

[39] *See Patrick 2 at §81.*

(14) The relief sought would risk causing irremediable harm to the Fund, the CDM Entities, and their ongoing businesses, impairing the charitable mission they support by US$126.7 million[40]. The JOLs are unwilling or unable to offer a properly fortified cross undertaking in damages in respect of this risk and so the balance of convenience weighs decisively against granting the injunctive relief;

(15) The imposition of an injunction stands to benefit Mr Dondero, and Mr Ellington personally. For example, it would prevent the CDM Entities from pursuing valuable litigation claims which are adverse to their interests (claims which, taking the JOLs' pleaded case at its height, would otherwise inure to the benefit of the liquidation estate); and

(16) There is no basis for a proprietary injunction against Mr Patrick in respect of his properly incurred, approved and documented salary and bonus payments or the two pieces of US real estate referred to in the pleaded case, as he was paid by other entities within the structure, not the Company, and it has no pleaded proprietary claim to those assets or any *prima facie* case that they belong to it.[41]

*Constructive Trust*

109. The CDM Defendants also argue that there is also no arguable proprietary case available to the JOLs that:

(1) CDM holds its limited partnership interest in the Fund on constructive trust for the Company; or

(2) DFW holds the Participating Shares issued to it on constructive trust for the Company; or

(3) DFW holds its membership interest in CDM on constructive trust for the Company.

---

[40] *As set out in the Damages Report from ValueScope.*
[41] *Mr Patrick is a US citizen who lawfully purchased these assets with remuneration received from his employment by US entities.*

*No Assets at Risk*

110. The CDM Defendants argue that even if any of the proprietary claims were sustainable, they would not support the extraordinary relief sought, where the JOLs have had the benefit of the Interim Undertakings, which have 'held the ring' in a manner that is just and convenient and which has allowed the Fund and the CDM Entities to further their charitable mission in the ordinary course of their business.

111. The CDM Defendants say that the criticisms the JOLs advance[42] are not a fair reflection of how they have worked in practice and that there has been no exploitation of the ordinary course of business exception as alleged. The CDM Defendants also say the JOLs have had ample opportunity to police and if required prevent suspicious transactions of which there have been none.

*Remuneration*

112. They strongly refute the criticisms regarding the alleged excessive remuneration received by Mr Patrick and Mr Murphy[43] and rely, in respect of Mr Patrick's remuneration, on the compensation benchmarking work done by Mercer, a global consulting firm, and by the remuneration/compensation committee.

113. They also rely on the fact that the JOLs have not filed expert evidence which challenges Mercer's recommendations. They point out that the comparisons the JOLs make with Mr Grant Scott's historical remuneration are inappropriate for a number of reasons, not least that Mr Scott's role was fundamentally different in scope, complexity and exposure to Mr Patrick's. They say that Mr Scott only passively managed the structure, outsourcing management of the assets and investment decisions to entities owned or controlled by Mr Dondero, who then charged significant investment management and advisory fees.[44]

*Modified Undertakings*

114. The CDM Defendants refer to the modified set of undertakings that they offered on 24 November 2025, to last until the determination of the trial, subject to the provision of appropriate fortification of the cross undertaking, which the JOLs refused.

---

[42] *See MacInnis 3.*
[43] *See in detail Patrick 2 and Murphy 1.*
[44] *Estimated at approximately US$30 million between 2014 and 2020, Patrick 2 at §137.*

115. As to the modified undertakings offered, Mr Ayres KC explained the objection taken by the JOLs, in particular to the suggestions which now said that the CDM Entities would only be obliged to give 7 days' notice of transactions above US$100,000 (as opposed to US$50,000) and that no disclosure was required of payments made by the CDM Entities to Mr Patrick and Mr Murphy above US$50,000 where the payments were contractual salary or bonus entitlements accrued in the ordinary course.

116. Mr Andrew Scott KC argued that if the Court were minded to grant some form of injunctive relief, it should be the minimum necessary to maintain the *status quo* pending trial and any order should be modelled on these undertakings.

117. He argued that the JOLs' criticisms regarding the Interim Undertakings' apparent 'inadequacies' and lack of protection are overblown. He submitted that the JOLs have not shown any irreparable harm to the Company or that there is any real risk that the assets would be adversely dealt with.

*Texas Proceedings*

118. Reference was made to Texas proceedings which it is necessary to briefly describe.

119. The Highland Foundations applied in July 2025 to obtain a Temporary Restraining Order that would have 'locked down' the DAF structure.

120. In the Texas Petition, the Highland Foundations sought (among other things) the imposition of a constructive trust over all assets, interests, and property of, and immediate injunctive relief to freeze all assets held in, the Fund. The Highland Foundations alleged that Mr Patrick owed them fiduciary duties which were breached in the restructuring that he organised.

121. The CDM Defendants point out that the Judge in the Texas proceedings observed to the Highland Foundations at the hearing that:

> "*I'm struggling to find evidence in the record that there is an immediate threat of irreparable harm. It appears that the $270 million is gone. Your concern is you don't want to confirm it away. But I'm not seeing anything in the record to indicate to me that there is an immediate threat of that*".

122. The matter was settled (by the Rule 11 Agreement) upon the CDM Entities giving undertakings on 11 July 2025.

123. Mr Scott KC invited the Court to endorse the Texas court's recognition that there was no risk of irremediable harm. Particularly in the light of the Rule 11 Agreement in Texas where undertakings were given not to make payments other than in the ordinary course of business, for investments and monies to be kept in the entities which they currently resided in, and for there to be no further change in the corporate structure. Subject to that the Fund and its assets could be operated in the ordinary course.

124. Mr Ayres KC pointed out that these proceedings did not concern the Company, the relief sought was not refused and the agreement made was outside the JOLs' control.

125. Mr Scott KC urged the Court to have regard to the effect of an injunction which would:

(1) cause serious and irreversible prejudice to the CDM Defendants by restraining them from conducting their lawful business operations and impairing their ability to make distributions to charitable causes; and

(2) benefit Mr Dondero and Mr Ellington personally. It would, he said, prevent the CDM Entities from pursuing valuable litigation claims which were adverse to their personal interests which would be otherwise for the benefit of the liquidation estate, and it would also benefit them personally as they would gain from any uplift of sums advanced under the funding agreement.

*Legal Fees*

126. The CDM Defendants argue that the JOLs' criticism of the amount of legal fees expended was misplaced because such fees were caused by the JOLs' litigation tactics in the U.S. and Cayman, for example their conduct of the sanction application in June 2025 which resulted in indemnity costs of *circa* US$1m being awarded against them in favour of DFW and Mr Patrick.

*D2 Submissions in Outline*

127. Mr David Quest KC's submissions included the following points on behalf of Mr Murphy:

(1) There is no adequately pleaded case or serious issue to be tried on the evidence that the payment of remuneration to Mr Murphy amounted to a breach of fiduciary duty;

(2) There is no tracing claim that money paid to him by way of remuneration would justify a proprietary, as opposed to a personal, claim against him;

(3) If there were any such case, the proper plaintiff would be the corporate entity that made the payment and the Company did not make any payment. The Company does not have and never has had its own source of liquidity given its purpose as a blocker for UBTI;[45]

(4) The Company has no proprietary claim to the assets of the Fund and less so to the assets held by subsidiaries of the Fund because its limited partnership interest only gave it an entitlement to be considered for discretionary charitable distributions, not for its own account but for the account of the appropriately qualified charities;

(5) The Terms of the ARLPA[46] made clear that the Company had no entitlement to remain an object of the charitable purposes of the Fund and, unlike a shareholder, never had any right to exercise managerial control over the Fund assets;

(6) Pursuant to section 16(1) of the ELP Act, the general partner of the Fund held its sole asset (the shares in CLO HoldCo) on trust for the Fund in accordance with the ARLPA;[47]

(7) Damages would be an adequate remedy if liability were established at trial and so the balance of convenience is against any proprietary injunctive relief;

(8) If an injunction were granted against Mr Murphy, the assets in question would have a maximum value of US$900,000[48] which is insignificant compared to the value of the overall claim (c.US$270m); and

---

[45] *Patrick 1, §30-31.*
[46] *LPA 2011 cl.4.3 and LPA 2024 cl.16.*
[47] *Section 16: "(1) Any rights or property of every description of the exempted limited partnership, including all choses in action and any right to make capital calls and receive the proceeds thereof that is conveyed to or vested in or held on behalf of any one or more of the general partners or which is conveyed into or vested in the name of the exempted limited partnership shall be held or deemed to be held by the general partner and if more than one then by the general partners jointly, upon trust as an asset of the exempted limited partnership in accordance with the terms of the partnership agreement".*
[48] *Although he has been spending money on outgoings: Murphy 1, §§84-87.*

(9) An injunction would be highly invasive and prejudicial to Mr Murphy as it would freeze most of his liquid assets and the bank accounts into which his salary and bonus were paid.

*DFW (being the majority Participating Shareholder of the Company) (D4) Submissions in Outline*

128. The only liquid assets which DFW holds are the discretionary distributions it receives through its limited partnership membership in CDM (the "CDM Interest"). It also has 51% of the Participating Shares of DFW in the Company.

129. Ms Jennifer Colegate's submissions included the following points:

(1) The property in the hands of DFW was not property which could be followed or traced from the Company to DFW, and as such cannot be the subject of a constructive trust;

(2) There is no basis for restitution as between DFW and the Company in respect of the CDM Interest because the interest conferred on DFW has not been done so at the expense of the Company - it was redeemed for value;

(3) Damages would be an adequate remedy if the redemption was found at trial to be for insufficient consideration;

(4) There is no serious issue to be tried as to the Company having a proprietary interest under Cayman law in the CDM Interest and it is not pleaded how agreements governed by the laws of Delaware would support the imposition of a proprietary injunction;

(5) The Company does not and cannot as a matter of law hold title to its own shares and cannot assert a constructive trust over shares it has issued;

(6) There is no risk of DFW disposing of any assets and DFW has no intention to do so;

(7) An injunction would prevent DFW from making charitable distributions to charities in accordance with the Fund's charitable purposes; and

(8) DFW should be allowed to defray necessary legal costs from funds available to it via CDM.

***Decision***

*Is there a serious issue to be tried that the Company has a proprietary interest in the asset(s) over which an injunction is sought to be imposed?*

130. The Court has carefully considered whether the Company, as a limited partner in the Fund, has a proprietary interest as a limited partner which would entitle it to be protected by way of the injunction sought and/or an indirect beneficial interest in the underlying assets of the Fund.

131. The Court answers both of these questions in the negative.

132. Taking a step back, wide interim proprietary injunctive relief with similarly broad orders for asset disclosure are sought by the Company which would require (among other things) each Defendant to:

> *"preserve and… not in any way dispose of, deal with, encumber, transfer or diminish the value of… any interest… in Charitable DAF Fund, LP… the Fund Entities… and/or any assets of the Fund",*

with no exceptions for ordinary course dealings.

133. The Court accepts the Defendants' submissions that it would restrain dealings with partnership assets of the Fund to which the Company has no pleaded proprietary claim which may be because, under Cayman law, the assets are held by the general partner on statutory trust for the partnership and not by or for any limited partner.

134. An Exempted Limited Partnership ("ELP") under Cayman law is different from an ordinary partnership and a registered company. It has no legal personality.

135. The property and rights of an ELP are held on trust by the general partner as an asset of the partnership in accordance with the terms of the partnership agreement.[49]

136. The limited partners do not own those assets, whether legally or beneficially. They instead have contractual rights under the ARLPA and statutory rights under the ELP Act. Those rights do not in the Court's view found a seriously arguable proprietary claim to partnership assets.

---

[49] *Section 16(1) of the ELP Act.*

137. Notwithstanding this, a limited partner may be said to have a 'proprietary interest' in the partnership assets,[50] a concept which Mr Ayres KC relied upon.

138. However, in the same way beneficiaries under a discretionary trust may have a 'proprietary interest' in the trust assets and their interests are to be considered.

139. The limited partnership interest in this case is not a proprietary interest in the assets themselves but the right to be considered for potential distributions[51] which the Company then passes on to the Charities.

140. The Court is not satisfied in this case that there is a real prospect of showing that the Company has a legitimate proprietary claim to legal or beneficial ownership of the assets it seeks to injunct.

141. The Court has examined the particular features of the legal structure of the ELP and the terms of the relevant partnership agreement to ascertain the extent and nature of any proprietary claim and entitlement of the limited partner.[52]

142. The recitals to the ARLPA provide that the purpose of the Fund was to:

> "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code ... for the economic benefit of* ***the Limited Partner and its Indirect Charitable Owners****...".* (emphasis added)

143. Clause 1.3 of the ARLPA provides that:

> "*... the Partnership may make investments in other types of securities, investment vehicles and instruments* ***in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners".*** (emphasis added)

---

*[50] Aquapoint LP (in Official Liquidation) v Fan [2025] UKPC 56 per Lord Richards at §48: this view was expressed in the context of a winding up petition appeal, not a proprietary injunction case.*
*[51] Y v R [2018] 1 CILR 1 Mangatal J at §59 and §§66-68 and JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA) [2016] 1 WLR 160.*
*[52] The legal interest of the limited partner is expressed in the partnership agreement to be an ownership interest equal to each limited partner's opening capital account: clause 4.1 of the ARLPA.*

144. "*Indirect Charitable Owners*" is defined in clause 1.12 of the ARLPA as:

> "***the indirect equity owners of the Limited Partners****, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code."* (emphasis added)

145. Clause 4.2(a) of the ARLPA provides that:

> "*Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash* ***and the needs of the Indirect Charitable Owners of the Limited Partner*** *for funds to cover their administrative and operating expenses…*". (emphasis added)

146. The particular position and purpose of the Company in the structure gives it no proprietary claim to the assets of the Fund or the assets held by the subsidiaries of the Fund.

147. The Company's limited partnership interest only gave it an entitlement to be considered for discretionary distributions, not for its own account, but for the account of the appropriately qualified charities.

148. It is true that the Original Participating Shareholders had the right to be considered for a dividend from the Company (Article 12), but the purpose of the Fund was to make charitable distributions to the relevant Charities through the Company which was given no ownership rights and, in the Court's view, was not entitled to be an object of the charitable purposes of the Fund.

149. Mr Ayres KC submitted that clause 4.2 of the ARLPA is expressed in mandatory terms with regard to distributions, but reading the clause as a whole, together with the ARLPA, it is clear that discretion was left to the general partner after first taking into consideration available cash and the needs of the Indirect Charitable Owners.

150. It also appears from Mr Patrick's evidence[53] that the distributions which the Company made to each of the Supporting Organisations were not linked to the number of Participating Shares

[53] *Patrick 2, §§66-67.*

held by each organisation, but on a predetermined formula primarily linked to the Company's NAV. This is set out by Mr Patrick in an excel spreadsheet.

151. The Participating Shareholders did not receive a *pro rata* distribution or dividend from the Company and instead their annual distribution was dependent on the contractual terms which governed the relationship between each of these Supporting Organisations and their underlying Charities which are, as an average, set out in Mr Patrick's evidence:

> "§68 *These distributions were, on average, c.US$160,000 per annum for Highland Kansas City, c.US$280,000 per annum for Highland Dallas, and c.US$60,000 per annum for Highland Santa Barbara. In addition, CFNT was paid $100,000 per year annually in the fourth quarter of each year."*

152. This is further support for the Court's view, on a proper analysis, that the Company has no legal or beneficial claim to own assets of the Fund or the CDM Entities.

153. This also accords with the Mission Statement adopted by the Company and its objects.

154. The Mission Statement, adopted by the Company by way of written resolution of the Directors on 3 December 2024, stated:

> *'1. ADOPTION OF COMPANY MISSION STATEMENT.*
> *1.1 NOTED THAT:*
> *(a) The Company wishes to adopt a mission statement to clearly outline the purpose and objectives of the Company.*
>
> *(b) Based on the Company's operating history (which includes significant donations to various charities) and the reason for establishing the Company, the Company wishes to adopt the following mission statement:*
>
> *"Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference." ("Mission Statement")'*

155. The Court finds that this accords with the purpose of the Fund structure, which is to support the Fund's charitable mission, and that the assets are assets of the Fund which are held by the general partner on statutory trust in accordance with the ELP Act and the ARLPA.

156. Moreover, by clause 4.3 of the ARLPA, the general partner can terminate the limited partner's interest in its sole discretion and apparently at will. The limited partner has no entrenched rights.

157. Clause 4.3 of the ARLPA provides that:

> "*The General Partner may require the withdrawal of all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall be directly or indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code.*"

158. The following clauses also make clear that the Company is to be considered for distributions at the general partner's sole discretion, not for its own account, but for the benefit of the Supporting Organisations insofar as they qualified as Indirect Charitable Owners.

159. As the Court has found, that is not a proprietary right to the Fund's assets, but is a limited right consistent with the role of the Company to act as a tax blocker and conduit for charitable distributions.

160. Clause 1.6 (GP powers) of the ARLPA provides that:

> *(a) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs* ***and fulfill the purposes of the Partnership****;*[54] *provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner. (emphasis added)*

[54] *i.e. principally to benefit the Indirect Charitable Owners.*

*(b) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement."*

161. In addition, in keeping with the limited rights afforded, Clause 6.14 of the ARLPA provides that all Partners:

> "*renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek to bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held*".

*Koza*[55]*,Gill and Kaur, and Bourlakova*

162. Mr Ayres KC sought to rely on the English Court of Appeal's decision in *Koza* and the subsequent decisions which considered *Koza* to persuade the Court that a proprietary claim was justified in this case. The Court has carefully considered these decisions and the helpful submissions of both Mr Ayres KC and Mr Scott KC.

163. The Court has concluded that there is good reason not to follow each of these decisions in the way that Mr Ayres KC suggested the Court should. To explain why the court has decided not to follow them in the way Mr Ayres KC suggested, it is necessary to give short explanations and analysis.

164. The *Koza* case was principally concerned with the *Mareva* jurisdiction (freezing orders) of the English court, not the proprietary injunction jurisdiction.

165. One of the issues considered by the Court of Appeal was whether the court had jurisdiction to make the injunction regardless of whether there had been a breach of an undertaking given to

---

[55] *[2020] EWCA Civ 1018.*

the court. The Court of Appeal decided that there was such jurisdiction and Lord Justice Popplewell gave the leading judgment:

> *"67 Although at first sight it might seem surprising that the jurisdiction to make ancillary orders to enforce or render effective undertakings can be invoked when it is not, and never will be, definitively established that the threatened conduct is a breach of the undertaking, and there is no decided case revealed by counsel's researches in which it has been exercised in such circumstances, it seems to me that it is consistent with established principle and practice that such jurisdiction exists and can be exercised in such circumstances.*
>
> *68 The starting point is that where the court has by injunction restrained conduct in general terms, the ancillary jurisdiction permits the grant of a further injunction to restrain something specific which is within the scope of the general restraint.* ***This is a common feature of freezing orders****."*(emphasis added)

166. Popplewell LJ made the distinction between the freezing order jurisdiction and a proprietary claim to assets which he described as founding a principled basis for preserving those assets pending trial:[56]

> *"82 I would also accept the existence of this alternative jurisdictional basis for the injunction granted by the judge. Where there is a dispute over control of a company the court may make interim orders,* ***including freezing orders, whose purpose is to preserve the value of the company in favour of a party who has a legitimate interest in preserving its value.*** *(emphasis added)*
>
> *83 Section 37(1) of the Senior Courts Act 1981 is in very wide terms. … Where a claimant has a proprietary claim to assets, there is obviously a principled basis for preserving those assets pending trial, and a proprietary freezing order is commonly granted in such circumstances.* ***In the present case Koza Altin has no proprietary claim as such to the assets in question: the funding will be from assets owned by its subsidiary, Koza Ltd. However, a parent company does have an interest in the use by its subsidiary of the latter's assets because such use affects the value of its shareholding in the subsidiary, and such***

[56] *§§82-83.*

***interest is proprietary in nature because the shareholding is a species of property.*** *It is, therefore, in accordance with principle that the court's wide jurisdiction under section 37 should be exercisable to protect such a proprietary interest in appropriate circumstances.* ***Koza Altin's proprietary interest in preserving the value of Koza Ltd's assets, and the consequent value of its own shareholding, is a legitimate interest which is capable of justifying protection by the grant of a freezing order****. It is a separate question whether the circumstances justify the grant of such an injunction in any particular case; but the existence of a power to grant it is consistent with principle."* (emphasis added)

167. As to the freezing order jurisdiction, the court needed to determine whether there was a real risk that the alleged expenditure at issue in breach of undertaking would be an unjustified dissipation of assets otherwise than in the ordinary and proper course of Koza Ltd's business.

168. In the Court's view, the *Koza* decision does not assist Mr Ayres KC in relation to the jurisdiction to grant the proprietary injunction in this case, where the facts are very different.

*Gill and Kaur*[57]

169. In this case the respondents to the injunctions did not appear and were unrepresented. Bryan J had heard no opposition to the injunctions and said, purporting to apply *Koza,* at § 40:

> "*In order to obtain a proprietary injunction, it is not necessary for the applicant to have a direct proprietary claim to the assets themselves."*

170. The Court finds this to be unpersuasive authority in the circumstances in which the Judge made that comment, against the jurisprudence to the contrary which requires a proprietary claim to the assets themselves.

---

[57] *[2025] EWHC 156 (Comm).*

*Bourlakova*[58]

171. This, unlike *Koza* and *Gill and Kaur, was* a proprietary injunction case where the claimant sought injunctions to restrain dealings with the company's assets pending trial. The claimants claimed to be shareholders of the relevant companies.

172. However, the judge in that case, Smith J, was not being asked to order an injunction which would prevent the companies from continuing in the ordinary course of their business. That is unusual for a proprietary injunction case, which unlike the freezing order jurisdiction, does not require a real risk of dissipation of assets and would normally not allow an ordinary course of business exception because the assets themselves are claimed to be owned by the applicant.

173. Smith J took *Koza* to establish that a proprietary injunction could be made to restrain the company from dealing with assets without the need for any proprietary claim and without the need to show any risk of unjustified dissipation.[59]

174. With respect to the Judge, this Court does not accept that the analysis he makes of Popplewell LJ's judgment in *Koza* is correct.

175. Popplewell LJ found on the particular facts of that case that the parent had an interest in the use by its subsidiary of the subsidiary's assets, even though it did not have a proprietary claim to those assets, because he found that such use affected the value of its shareholding in the subsidiary, and such an interest is proprietary in nature because the shareholding was a species of property.

176. Popplewell LJ, however, was dealing with a freezing order which could still be made provided its requirements were met in relation to a real risk of dissipation.

177. In any event, *Bourlakova* can also be distinguished on the facts.

178. An ordinary course exception is applied for in this case which concerns a limited partner interest in a Fund, not a shareholder's interest in a Company.

---

[58] *[2025] EWHC 1792 (Ch).*
[59] *§§140-144.*

FSD2025-0201 Page 44 of 56 2026-02-10

*Lakeshore*[60]

179. Even if it could be said that the rights of the Company in this case, as a limited partner in the Fund, are somehow analogous to a shareholder's rights in the above three cases (which the Court doubts), the Court could not grant a proprietary injunction if there is no *prima facie* ownership interest in the relevant assets sought to be injuncted.

180. This issue was considered by the Chief Justice in *Lakeshore.* In that case a displaced shareholder sought a proprietary injunction against a company in respect of the company's assets. This was refused on the basis that there was no good claim to beneficial ownership of those assets and the shareholder rights asserted in that case did not found a basis for proprietary injunctive relief.

181. The Court held that a proprietary claim is one where the claimant asserts a legal or beneficial interest in an asset and that the asset must be specific and ascertained, citing Gee Commercial Injunctions (7th Ed.) at 2-026.[61]

182. The Court noted that a company's shareholders have no proprietary interest in its assets.

183. This Court accepts the reasoning in that case and applies it to this application.

*Valuation Issues*

184. The Court has also reviewed the detailed advice of Mr Beswetherick KC who advised the Company that the Company's objects, revised in line with the Mission Statement, could not realistically be challenged by the Participating Shareholders.[62]

185. The Court has concluded that the Fund structure in this case gave the Company and its Participating Shareholders no rights of legal or beneficial ownership or indeed control with regard to the Fund and its assets.

186. There is evidence that other charitable entities were unwilling to accept 'a gift of Participating Shares' on this basis:

---

*[60] [2025] CIGC (FSD) 24.*
*[61] §61 and see §§62-69.*
*[62] See §§56-60.*

*"[t]hese charities carried out extensive due diligence on the Participating Shares and ultimately rejected the gift. These charities determined that the shares did not confer sufficient economic rights to qualify as a gift because they provided only discretionary dividends, carried no liquidation rights, and were susceptible to being diluted at any point".*[63]

187. As borne out by the valuations conducted in this case, this outcome was of more limited economic value to the Company as a limited partner in the Fund than an asset valuation of the Fund's assets.

188. Having considered the Company's arguments and evidence, the Court takes the view that there is no good reason to impugn ValueScope's assessments of the CDM Interest,[64] or to second guess the FTI report[65] (which considered appropriate discounts in relation to the Participating Shares), and/or the Weaver fairness opinion.

189. The Court is unpersuaded on this application that the transactions undertaken were at an undervalue. The JOLs have adduced no valuation evidence.

*What Rights did the Company have as a Limited Partner in the Fund?*

190. The Court accepts Mr Scott KC's submissions that the Company's rights as a limited partner in this structure were not typical of those in a commercial Cayman investment fund. The Fund was not an investment vehicle for limited partners on commercial terms as is usually the case.[66]

191. Unlike a limited partnership agreement used for commercial investment purposes, the ARLPA did not have the usual provisions relating to, for example: the limited partners' capital commitments; investment objectives; carried interest and distributions; and investment periods. The Fund did not solicit capital from investors. There are no subscription agreements through which interests are taken up as the Supporting Organisations did not make any capital commitments. The Fund was not able to make capital calls against the Supporting Organisations or against the Company.[67]

---

[63] *Patrick Liquidation 1 at §96.*
[64] *7 January and 26 March 2025.*
[65] *27 March 2025.*
[66] *Patrick 1, §§89-99.*
[67] *Patrick 2, §63(d).*

192. Rather, the ARLPA reflects the charitable purpose of the Fund which was to benefit a defined class of qualifying beneficiaries, namely the Indirect Charitable Owners.[68]

193. As stated above, the Court agrees with the Defendants' submissions that the Company only had the right to be considered for discretionary distributions by the general partner at the partnership level and by the Directors at the Company level (by way of dividend).[69]

194. As a matter of US tax law, in order for the Charities to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore 'corporate blocker', i.e. the Company. The Company was constituted in a form to facilitate the surrender of ownership and control.

195. It did not hold any assets or cash reserves.[70]

196. It is clear having reviewed the Memorandum and Articles of the Company that the Participating Shareholders (who paid no money for their shares) had no control or ownership rights in the Fund's assets.

197. The Court accepts Mr Scott KC's submission that any economic rights that the Company may have had[71] were satisfied when the Company was voluntarily wound up after the restructuring had taken place.

*The Company's Pleaded Proprietary Claims against CDM and DFW*

198. The claims are in respect of:

(1) the limited partnership interest held by CDM;

(2) the participating shares held by DFW; and

(3) the membership interest in CDM also held by DFW.

199. They are all pleaded to arise from the restructuring on the basis of a constructive trust.

---

*[68] Murphy 1, §28.*
*[69] That is the basis on which ValueScope, FTI and Weaver produced the US$1.6 million valuation.*
*[70] Patrick 1, §31.*
*[71] Under Article 12 "The participating shares shall confer upon the shareholders rights in a winding up of repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles."*

200. The Court, consistent with its findings in relation to the proprietary injunction analysis, finds that those claims raise no serious issue to be tried. The Court finds that there is no seriously arguable case that the Participating Shares held by DFW and the CDM Interest also held by DFW were assets owned legally or beneficially by the Company. No constructive trust arises absent a proprietary interest.[72]

201. The Court is also unpersuaded that there is a real risk that those assets will be diminished or otherwise unlawfully dealt with (see below).

*The Injunction against Mr Patrick*

*The Corporate Entity which made the Remuneration Payments*

202. The Court has reviewed the relevant evidence and the pleadings. The Court takes the provisional view that the sums paid to Mr Patrick as remuneration for his work did not come from Company funds or assets.

203. Whilst there are Company board resolutions in respect of the payments, other companies in the structure actually paid Mr Patrick on behalf of the Company.[73] This may give rise to a proprietary tracing claim by the Company, but there is no seriously arguable case that the payments represent assets which belong to the Company.

*Excessive Remuneration*

204. The Company says in contrast to Mr Scott, who was paid US$60,000 per annum, Mr Patrick awarded himself sums comprising a base salary of US$850,000, a bonus of 2.5 times that base salary, and a long-term incentive ("LTI") payment of US$975,000. For the period March 2021 to March 2024, Mr Patrick was entitled to an aggregate LTI payment of US$4,759,000.

205. From disclosure provided pursuant to the Interim Undertakings, the JOLs say that Mr Patrick received, by way of director's fees, a total of US$10,548,778 in 2024 and US$3,325,000 in the first six months of 2025.[74]

---

[72] *Foskett v McKeown [2001] 1 AC 102.*
[73] *They seem to have been paid by Liberty CLO HoldCo, Ltd, CLO HoldCo Ltd, and Charitable DAF Holdings Corp.*
[74] *MacInnis 3, §52.*

206. Having reviewed the affidavit evidence on this question including the detailed report dated 26 August 2024 from Mercer, the Court finds that there is no serious issue to be tried that this remuneration was excessive and in breach of his duty to the Company.

207. If there were any such irregularity in Mr Patrick's remuneration, the Articles contain an indemnity for officers for conduct short of bad faith.

208. The remuneration levels were the subject of professional advice. Mercer undertook benchmarking and market research which considered the complexity of Mr Patrick's role and the value of the Fund's assets and holdings.

209. The JOLs and the Company have not provided any expert evidence to gainsay Mercer's view.

210. In addition, the remuneration was structured in accordance with legal advice including the establishment of a remuneration committee.

211. Mr Patrick's second affidavit and Mr Murphy's first affidavit set out in some detail the demands of the role of being a Director, their own expertise, and the level of risk involved, particularly in relation to the extensive litigation involving the Fund. Apparently, Mr Murphy was unable to obtain directors and officers insurance given the history of claims made by Mr Dondero.

212. It may be said that as a matter of common sense the Court should objectively assess whether the amounts paid were excessive.

213. Even if there was a seriously arguable case that these amounts were excessive from that point of view and Mr Patrick acted in breach of duty (in bad faith) in relation to his remuneration, the Court finds that this is not a proprietary claim of the Company and is a claim for which damages would be an adequate remedy.

214. The court finds that there is no serious issue to be tried that a proprietary claim lies against the Texas and Missouri properties such that would justify a proprietary injunction restraining the disposition of these properties. The Court accepts Mr Scott KC's submission that there is no pleaded proprietary claim to these specific properties and there is no *prima facie* case that the Company owns those properties or that they are the traceable proceeds of anything belonging to it.

215. There is insufficient evidence that the alleged excess remuneration was used to purchase these properties.

*The Injunction against Mr Murphy*

216. Mr Ayres KC made clear that as Mr Murphy still plays a role in the Fund and the Company, the JOLs apply to injunct him in respect of all the Fund entities.

217. However, it is undisputed, on the evidence before the court, that Mr Murphy does not hold any interest in the Fund or in its limited or general partner and has no shareholding or any other interest in any of the companies connected with the Fund.

218. The Company's proprietary claim concerns only money that was paid to him as remuneration under his director's service agreements.

219. The Court takes the view that the damages and compensation claimed based on his participation in the restructuring are not proprietary claims in nature.

220. Having reviewed Mr Murphy's affidavit evidence,[75] the levels of remuneration he received (which is not contradicted) do not seem to the Court to be excessive in the circumstances. They are within the margin of appreciation in respect of commercial decisions such as risk and reward relating to remuneration.

221. In 2024, Mr Murphy was paid a total of US$466,667[76] including a bonus of US$250,000 in recognition of his:

> "*contribution to the increased independence of the Company"* and *"input in responding to the Supporting Organisations' behaviour in November/December*".

222. The Company says that this appears to be a reward for Mr Murphy's actions in supporting the restructuring and therefore the Company claims to recover this sum.

223. Mr Murphy was also paid US$500,000[77] in fees payable in monthly instalments and backdated to 1 January 2025, to be paid in advance:

---

[75] *Murphy 1, §§48-78.*
[76] *MacInnis 3, §§64-66, §74.*
[77] *On or after 12 May 2025: Murphy 1, §72.*

> "*in circumstances where the Companies may have an inability to discharge their financial obligations to [Mr Murphy], for example, where freezing injunctions or temporary restraining orders may be sought against the Companies*".

224. The Court accepts that the comparison made by the Company with the salary paid to Mr Grant Scott is not apposite given the complex and contentious issues that Mr Murphy had to deal with and the professional services he provided.

225. Moreover Mr Patrick, and not Mr Murphy, replaced Mr Scott. Mr Scott had been the sole Management Shareholder of the Company. Mr Murphy's role was newly created.

226. A second director was appointed because entities in the Fund had become involved in US Chapter 11 proceedings (including proceedings for contempt of court) and proceedings brought by UBS in respect of a judgment exceeding US$1 billion. It was considered that there was an urgent need to appoint a robust independent director with litigation experience.[78]

227. Mr Grant Scott was a close personal friend of Mr Dondero, and was:

> "*a patent lawyer with no experience in finance or running charitable organisations, who was Mr. Dondero's long-time friend, college housemate and best man at his wedding".*[79]

228. Mr Dondero's deposition evidence in the Highland Capital Chapter 11 bankruptcy proceedings (in Texas) given on 1 June 2021 shows that Mr Scott was not fulfilling a serious role and reveals the difficulties in identifying anyone prepared to take on his position without sufficient protections.

229. Mr Quest KC emphasised that Mr Murphy is a professional independent director with (by 2021) 17 years of relevant legal, financial services, and asset-management experience.

230. The Court is not persuaded that the payment of his remuneration gave rise to an actionable breach of fiduciary duty.

231. Moreover, there is no pleaded case of fraud or wilful default against him or any deliberate decision by him to act in breach of his fiduciary duty. There is also no evidence that would

---

[78] *Murphy 1, §35.6.*
[79] *As noted by Judge Jernigan in the US civil contempt proceedings.*

support an allegation of fraud or wilful default against Mr Murphy, or which would support any allegation of relevant actual knowledge.

232. The Court does not however agree with Mr Quest KC that there is no evidence to support the suggestion that Mr Murphy was paid in return for his agreement to the course of action that Mr Patrick took in relation to the restructuring.[80] The timing of the payment of US$250,000 and the reason given for it, raise a plausible inference.

233. However, the Court is of the view that in the light of the *'Directors liability and indemnity'* provisions of his service agreement,[81] there is no serious issue to be tried.

234. The Court accepts Mr Ayres KC's point that he does not need in his pleading to anticipate defences which may or may not be run. However, the evidence does not show a serious issue to be tried against the liability and indemnity protection.

235. In addition, the Company did not pay Mr Murphy. The Court is not persuaded that the Company owned the funds that were paid to Mr Murphy or that it had a proprietary interest in the remuneration paid by CLO HoldCo (D6) to Mr Murphy. The Company as a limited partner had no control over CLO HoldCo (D6).

236. The balance of convenience is firmly against granting a proprietary injunction against Mr Murphy. The injunction sought against him is not against any identifiable fund over which any proprietary claim by the Company could be made. Even if there were such an identifiable fund, if the injunction were to be granted, it would give Mr Murphy a difficult task to comply with.

237. The remuneration was paid into Mr Murphy's bank accounts. If an order was made against him, he would be left having to work out which monies he still had (and from a proportion of his remuneration said to be excessive over 4 ½ years) or which may be received from any assets of the Fund, at the risk of committal for breach. No tracing claim is pleaded. This ambiguity would be a reason as a matter of discretion to refuse to make the injunction against him.[82]

238. The Court accepts Mr Quest KC's cogent submissions that it is hard to see any benefit to the Company and the JOLs in the injunction application against Mr Murphy not to diminish assets, and there is real potential oppression to Mr Murphy in seeking to comply with the injunction sought.

---

[80] *Company written argument, §128.*
[81] *See clause 6 of the April 2021 Directors Services Agreement.*
[82] *Vestey Foods UK Ltd v Cox [2018] EWHC 3466 (Ch).*

*The Balance of Convenience Generally*

*Assets in Danger*

239. Had the Court been persuaded that there was a serious issue to be tried in relation to the proprietary interest of the Company and there was a legitimate juridical basis to grant a proprietary injunction, it would not have granted the injunction against any of the Defendants because it is not persuaded that there is a real risk that the assets are in danger.

240. There is no good reason to believe that the relevant assets will be adversely dealt with given the evidence that the Court has considered on this application, and following the undertakings in July 2025 and suggested in November 2025, as well as the Texas Rule 11 Agreement.

241. Having considered the affidavit evidence and submissions made, the Court is unpersuaded that the ordinary course of business exception poses any real risk to the Fund or to the Company.

242. The Court has concluded that the course which is likely to involve the least risk of injustice is not to grant the injunction.

*Lock Down and Transference of Control to JOLs*

243. The balance of convenience would also come down firmly in favour of the Defendants because the effect of the relief if granted would be to lock down the charitable activities of the Fund and place it under the control of the JOLs, which the Court regards as unjustified at this interlocutory stage.

244. The Court is not persuaded that the carve outs for specific projects proposed by the JOLs remedy the issue.

245. There is on the other hand no real risk of irremediable prejudice to the Company and the JOLs if the injunction is refused.

*Serious Issue to be Tried on the Restructuring*

246. The question whether the allegations made against the Directors are true or not will be properly investigated at trial. The principal allegation is a serious one, namely that they have stripped

the Company of its only asset so as to seize control and enrich themselves without the scrutiny of the Supporting Organisations.

247. They each vehemently deny these allegations and give reasons for the reorganisation which will need to be investigated at trial. There is a mass of contemporaneous documentary material to consider including legal and professional advice provided at the time. The Defendants say that it is inherently improbable that all of these advisers were wrong and that the restructuring was invalid or illegal and that the Directors knew this to be the case at the time.

248. No doubt the allegations the Defendants make that the Highland Foundations, which Mr Dondero controlled as Participating Shareholders, were used as vehicles to exert influence over the assets and operations of the Fund, inconsistently with its purpose and exposing it and its assets to litigation in which he was personally involved, will also be examined in detail at trial.[83]

249. All of the evidence will be properly tested at trial against the contemporaneous material so that a conclusion may be drawn as to whether the Directors took the decisions they did because they believed them to be in the best interests of the Company, as they say, or whether they are in breach of fiduciary duty as the JOLs and the Company say.

250. It is clear that Mr Dondero and his affiliates have a long history of contention with Mr Patrick and the Fund. The Court also notes that the Defendants say that Mr Dondero is the primary stakeholder in the liquidation, is funding it, and has a considerable personal stake in the claims being advanced by the Company, as well as the standing to benefit from any recoveries made pursuant to the funding agreement with Crossvine.

251. The Court has carefully considered the actions taken by the Directors, the advice sought and given, and the justifications put forward for the actions that were undertaken. The time when these actions were undertaken coincides with when the Supporting Organisations (Participating Shareholders) were getting increasingly concerned about the conduct of the Directors.

252. The Court has also taken into account the Company's point that these complex transactions were undertaken in secret without notifying the Original Participating Shareholders (Supporting Organisations) and in effect presented them with a *fait accompli*.

---

[83] *Patrick 1 Liquidation, §§101-164 and Patrick 2, §§26-43*

253. The Court has been persuaded that the Company and JOLs have a case which the Directors need to answer in relation to the divestiture of the Company's limited partner interest in the Fund which does withstand a reverse summary judgment application.

254. Weighing all of these points at this stage with a necessarily incomplete picture, the Court is persuaded that there is a serious issue to be tried as to whether the Directors acted in breach of duty in undertaking the restructuring.

255. The Court expresses no view as to whether that case is likely to succeed or not at this stage, merely that it has cleared the relatively low bar of having a real, as opposed to a fanciful, prospect of success at trial.

256. That finding does not change the analysis or outcome on this application and in particular does not affect the Court's view on the balance of convenience and the exercise of its discretion generally.

257. The Company's interest at stake is not proprietary, is of no economic value to the Company which has not already been reimbursed, and was a right to be considered by the general partner for discretionary charitable distributions for the Indirect Charitable Owners. Any loss would be felt by those owners and could be compensated by an award of damages which could be met from the Fund's assets.

*Cross Undertaking*

258. There is a further important reason why the Court, even had it been persuaded that there was a juridical basis to grant a proprietary injunction, would not have done so.

259. Given the wide nature of the injunction applied for and the significant costs which the Defendants would need to spend to comply with it, the absence of a secure cross undertaking is a good reason to not grant the injunction.

260. The default position is that an applicant for an interim injunction is required to give a cross undertaking in damages. This is not a case where it would be right to waive the cross undertaking required.

261. The Court has concluded that if the injunction were granted, significant loss would be likely to be caused to the Fund and its charitable recipients. There might also be business related and reputational impacts on individuals, including most obviously the Directors, which may be hard to quantify.

*Fortification*

262. The Court has also concluded in its discretion that this is a proper case for fortification. The JOLs themselves are not offering a cross undertaking and yet ask for wide ranging relief and further disclosure orders.

263. The Court is not persuaded that Crossvine, which is put forward to provide a cross undertaking, would be good to make up the likely loss sustained if it was to be found that the injunction had been wrongly granted.

264. The Defendants say Crossvine is controlled by Messrs Dondero and Ellington, both of whom are involved in the UBS Litigation in the US where it is alleged that Mr Dondero has an outstanding judgment against him of more than US$1.2 billion.

265. There is scant material on this application as to the nature, extent and location of Crossvine's assets. Apparently, the original funding Crossvine agreed has been exhausted.

266. The Defendants point out that an indemnity costs order[84] that was made against the Company as part of a June sanction application in the Liquidation Proceedings has not been complied with.

267. The Defendants have a good arguable case that there is a real risk that Crossvine, on the present evidence available, will not be good for the money.

268. Mr Ayres KC argued that the evidence from ValueScope suggesting potential damage to the Fund of c.US$127m if the injunction is granted is flawed because they had been involved in justifying the redemption of the Company's interest in CDM and so were not able to provide objective and independent evidence to the Court by way of the Damages Report. The Court does not agree.

---

[84] *Said to be circa US$1 million.*

269. An intelligent estimate of the loss is, in the Court's view, in the region of the ValueScope Damages Report. There is a real need for fortification in this case and none is offered. That in itself is a powerful factor against the granting of the proprietary injunction sought on the balance of convenience.

*Conclusion*

270. For these reasons, the Court refuses to make an order in the terms of the amended injunction summons filed on 4 December 2025.



**THE HON. JUSTICE RAJ PARKER**
**JUDGE OF THE GRAND COURT**

**EXHIBIT 5**

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
Susheel Kirpalani (admitted *pro hac vice*)
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
Benjamin I. Finestone (admitted *pro hac vice*)
Calli Ray (admitted *pro hac vice*)
Alexandre J. Tschumi (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

**SIDLEY AUSTIN LLP**
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as Litigation Trustee of the Highland Litigation Sub-Trust*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |
| MARC S. KIRSCHNER, AS LITIGATION TRUSTEE OF THE LITIGATION SUB-TRUST,<br><br>Plaintiff,<br><br>v.<br><br>JAMES D. DONDERO; MARK A. OKADA; SCOTT ELLINGTON; ISAAC LEVENTON; GRANT JAMES SCOTT III; STRAND ADVISORS, INC.; NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; DUGABOY INVESTMENT TRUST AND NANCY DONDERO, AS TRUSTEE OF DUGABOY INVESTMENT TRUST; GET GOOD TRUST AND GRANT JAMES SCOTT III, AS TRUSTEE OF GET GOOD TRUST; HUNTER MOUNTAIN INVESTMENT TRUST; MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1 AND LAWRENCE TONOMURA AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #1; MARK & PAMELA OKADA FAMILY TRUST – | Adv. Pro. No. 21-03076-sgj<br><br>AMENDED COMPLAINT AND OBJECTION TO CLAIMS |

[1] The last four digits of the Reorganized Debtor's taxpayer identification number are (8357). The Reorganized Debtor is a Delaware limited partnership. The Reorganized Debtor's headquarters and service address are 100 Crescent Court, Suite 1850, Dallas, TX 75201.

EXEMPT TRUST #2 AND LAWRENCE TONOMURA IN HIS CAPACITY AS TRUSTEE OF MARK & PAMELA OKADA FAMILY TRUST – EXEMPT TRUST #2; CLO HOLDCO, LTD.; CHARITABLE DAF HOLDCO, LTD.; CHARITABLE DAF FUND, LP.; HIGHLAND DALLAS FOUNDATION; RAND PE FUND I, LP, SERIES 1; MASSAND CAPITAL, LLC; MASSAND CAPITAL, INC.; AND SAS ASSET RECOVERY, LTD.,

Defendants.

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. PARTIES ..... 4

III. JURISDICTION, VENUE & STANDING ..... 12

IV. FACTUAL ALLEGATIONS ..... 14

A. Dondero Creates HCMLP ..... 14

B. HCMLP Narrowly Survives The Financial Crisis Of 2008, And Emerges Facing Hundreds Of Millions Of Dollars In Potential Litigation Damages ..... 15

C. In A Scheme To Evade HCMLP's Creditors, Dondero Creates "Lifeboats" To Usurp HCMLP's Business ..... 18

1. NexPoint ..... 19

2. HCMFA ..... 22

D. Dondero, Ellington, and Leventon Cause HCMLP To Engage In Misconduct That Exposes It To Additional Liability ..... 25

1. Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry ..... 26

2. Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest ..... 29

3. Dondero And His Accomplices, Including Ellington and Leventon, Cause HCMLP To Engage In Misconduct That Increases Its Liability To UBS ..... 30

4. Dondero Causes HCMLP To Engage In Misconduct That Results In Liability To HERA And Patrick Daugherty ..... 33

E. Dondero, Ellington, and Leventon Cause HCMLP To Engage In Conduct That Results In An Arbitration Award Against It Of Approximately $190 Million And Forces HCMLP Into Bankruptcy ..... 35

F. Dondero's Schemes Result In Hundreds Of Millions Of Dollars Of Liability For HCMLP ..... 38

1. HCMLP Incurs $125 Million In Liability To UBS As A Result Of Dondero's, Leventon's, and Ellington's Misconduct ..... 39

2. HCMLP Incurs More Than $185 Million In Liability To The Redeemer Committee And Crusader Funds As A Result Of Dondero's Misconduct ..... 41

3. HCMLP Incurs More Than $100 Million In Liability To Acis, Terry, And HarbourVest As A Result Of Dondero's Misconduct ..... 42

G. HCMLP Was Insolvent, Inadequately Capitalized, And/Or Intended To Incur Debts Beyond Its Ability To Pay Well Before The Redeemer Committee Arbitration Award Forced It Into Bankruptcy ....................................43

H. At All Time Relevant To This Amended Complaint, Dondero Hopelessly Commingled And Exploited Entities Within His Enterprise For His Own Personal Benefit ....................................46

1. Prior To Dondero's Resignation From Strand, Dondero Was The Alter Ego Of Strand ....................................46

2. Dondero Routinely Commingled Entities And Employees Throughout The Dondero Corporate Web And Abused The Corporate Form ....................................47

I. Dondero And His Loyalists Also Engaged In Other Conduct That Harmed HCMLP ....................................55

1. Dondero And His Loyalists Fraudulently Transferred Assets To Themselves And Their Affiliated Entities ....................................55

(a) The Fraudulent CLO Holdco Transaction ....................................55

(b) Fraudulent Distributions ....................................58

(c) Fraudulent Transfers To Massand ....................................63

J. Dondero And Ellington Breach Their Fiduciary Duties To HCMLP By Misappropriating Its Funds ....................................65

K. Dondero Loyalists Receive Their Deferred Compensation By Engaging In The Tall Pine Transaction ....................................66

V. CAUSES OF ACTION ....................................67

PRAYER FOR RELIEF ....................................141

Plaintiff Marc S. Kirschner (the "Litigation Trustee"), as Litigation Trustee of the Litigation Sub-Trust (the "Trust") established pursuant to the Fifth Amended Plan of Reorganization (the "Plan") of Highland Capital Management L.P. ("HCMLP" or the "Reorganized Debtor") (Docket No. 1472), through his undersigned counsel, brings this action and alleges as follows:

## I. INTRODUCTION[2]

1. The Litigation Trustee brings this action to recover hundreds of millions of dollars in damages that HCMLP suffered at the hands of its founder, James Dondero, acting in concert with other entities that he owned and/or controlled (collectively, the "Dondero Entities"), and with the aid of other HCMLP officers and attorneys who disregarded their fiduciary duties to HCMLP in favor of Dondero and their own self-interests.

2. HCMLP was founded in 1993 as an investment advisor that also provided middle- and back-office services and engaged in proprietary trading. Prior to its bankruptcy filing on October 16, 2019, HCMLP was one of more than 2,000 Dondero Entities. The Dondero Entities were operated and controlled for Dondero's benefit, with Dondero utilizing complex corporate structures and transactions to transfer money and assets between the various Dondero Entities in the manner he viewed most advantageous to his own bottom line, including to avoid creditors, exploit personal tax benefits, and ensure that assets were preserved for his benefit and profits ultimately flowed to him.

3. HCMLP was at the center of Dondero's web: it employed nearly all of the people who performed services for myriad Dondero Entities, and it was those employees who carried out the substantive work for the Dondero Entities. Even when HCMLP's full role was hidden—

---

[2] Capitalized terms not defined in this section are defined later in the Amended Complaint.

either because it was not credited at all, or because it was identified only as a sub-advisor or service provider to Dondero's other management companies—it was HCMLP personnel executing Dondero's strategies for a wide array of Dondero Entities.

4. In or about 2008, after years of successful operations, HCMLP was hit hard by the economic recession. The recession gave rise to a multitude of lawsuits against HCMLP, and it became embroiled in litigations that threatened to impose crippling damages amounting to hundreds of millions of dollars.

5. Faced with this looming threat, Dondero devised a plan to siphon business away from HCMLP through the creation of "lifeboats" that he owned and controlled, which he sought to insulate from the claims of HCMLP's litigation creditors once they crystalized. The lifeboats were set up to provide the management services that HCMLP had been providing before the lifeboats' creation. The lifeboats were really HCMLP in disguise, however, as they conducted their business through HCMLP's employees, operated out of HCMLP's office, and in several cases, simply took over HCMLP's contracts, diverting the resulting fees away from HCMLP while HCMLP continued to provide the underlying services. The lifeboats collected the lion's share of the profits for HCMLP's work, while HCMLP bore the majority of expenses.

6. In the years that followed, Dondero—acting with the aid of certain HCMLP officers and employees—operated HCMLP to further his own personal interests, to HCMLP's detriment. Among other transgressions, Dondero, standing behind HCMLP's perceived corporate shield:

- Caused HCMLP to pay tens of millions of dollars to or for the benefit of Dondero and his affiliates in order to evade creditors, at a time when HCMLP was insolvent, inadequately capitalized, or intended to incur debts beyond its ability to pay;

- Caused HCMLP to transfer assets to other Dondero Entities for less than reasonably equivalent value at a time when HCMLP was insolvent, inadequately capitalized, or intended to incur debts beyond its ability to pay, in order to deprive creditors of the value of the transferred assets;

- Exploited HCMLP to exact vendettas on employees he perceived as disloyal, going so far as to destroy value at HCMLP and other Dondero Entities solely to inflict losses on his perceived enemies;

- Used HCMLP as a vehicle to fraudulently induce an investment of approximately $75 million into another Dondero Entity, with the goal of moving funds to yet another Dondero Entity;

- Caused the fraudulent transfer of assets worth at least $100 million out of HCMLP-managed funds to evade pending litigation claims asserted by UBS;

- Disregarded HCMLP's contractual and fiduciary obligations to investors in certain of HCMLP liquidating funds; and

- Siphoned funds out of HCMLP for use by other Dondero Entities, in exchange for artificially low interest, long-term notes that Dondero later purported to extend (by 30 years) or retroactively forgive, all for no consideration to HCMLP.

7. Dondero's conduct resulted in a second wave of litigation against HCMLP, exacerbating HCMLP's insolvency, inadequate capitalization, and inability to pay its debts. As was wholly foreseeable, Dondero's conduct hobbled HCMLP with hundreds of millions of dollars of additional contingent litigation liabilities that were all but certain to come due given Dondero's brazen wrongdoing.

8. In October 2019, the dam broke, and the repercussions of Dondero's actions came crashing down on HCMLP. An arbitration award of approximately $190 million was issued against HCMLP based on Dondero's failure to abide by a negotiated plan of distribution for certain of its liquidating funds, forcing HCMLP to file for bankruptcy protection. Shortly thereafter, a judgment of more than $1 billion was rendered for UBS against two HCMLP-managed funds, leading UBS to file a proof of claim against HCMLP that sought to hold

HCMLP responsible for its role in preventing the Fund Counterparties (defined below) from satisfying any of their debt to UBS.

9. In 2020, HCMLP, finally operating under the control of true and independent fiduciaries, negotiated a settlement with UBS for a total of $75 million in allowed claims. HCMLP was forced to reopen settlement discussions and increase that number to $125 million, however, when HCMLP discovered that in 2017, Dondero and his loyalists had surreptitiously transferred the two funds' remaining assets to a Dondero Entity. Other settlements followed, as HCMLP, burdened by Dondero's blatant wrongdoing, was forced to compromise claim after claim in order to avoid even greater dilution of creditor recoveries.

10. HCMLP now stands liable for more than $350 million in allowed creditor claims—in addition to tens of millions of dollars of costs occasioned by HCMLP's bankruptcy filing—that stem solely from, and would not exist but for, the knowing misconduct of Dondero and his loyalists. The Litigation Trustee thus brings this action to seek redress for the significant harm Dondero and his affiliates and accomplices inflicted on HCMLP, and to ensure that Dondero and those who aided him are not permitted to abscond with or divert value that rightfully belongs to HCMLP and its creditors.

## II. PARTIES

11. Plaintiff Marc S. Kirschner is the Litigation Trustee for the Trust established under HCMLP's Plan.

12. Defendant James D. Dondero is an individual who, upon information and belief, at all times relevant to this Amended Complaint was residing in Dallas, Texas. Dondero is the co-founder of HCMLP and, prior to his removal on January 9, 2020, was the Chief Executive Officer and President of HCMLP. From the time that HCMLP was founded through October

16, 2019, when it filed for bankruptcy (the "Petition Date"), Dondero controlled HCMLP through his position at HCMLP, his ownership of HCMLP's general partner, and his ownership of, or control over the owners of, HCMLP's limited partnership interests. As set forth below, Dondero also owns and/or directly or indirectly controls hundreds of Dondero Entities within the Highland web, including the dozens of Dondero Entities referenced herein.

13. Defendant Mark A. Okada is an individual who, upon information and belief, at all times relevant to this Amended Complaint was residing in Dallas, Texas. Okada is the co-founder of HCMLP and was its Chief Investment Officer until he stepped down in 2019, after which he assumed an advisory role through the end of that year. After Dondero, Okada was the next-largest owner of HCMLP or a beneficiary of the distributions it made to its limited partners. Like Dondero, Okada held his interest in HCMLP directly and through trusts.

14. Defendant Strand Advisors, Inc. ("Strand") is a Delaware corporation that is wholly-owned by Dondero. Since HCMLP's formation, Strand has been its general partner and owned limited partnership interests in HCMLP. At all times relevant to this Amended Complaint, Strand's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

15. Defendant NexPoint Advisors, L.P. ("NexPoint") is a Delaware limited partnership. NexPoint is 99.9% owned by the Dugaboy Investment Trust, its sole limited partner. NexPoint's general partner, NexPoint Advisors GP, LLC ("NexPoint GP"), owns the remaining 0.1%. NexPoint and NexPoint GP were both formed on March 20, 2012. NexPoint concedes that it is controlled by Dondero, who owns 100% of NexPoint GP and is NexPoint GP's sole member and president. At all times relevant to this Amended Complaint, NexPoint's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

16. Defendant Nancy Dondero is named in her capacity as Trustee of Defendant Dugaboy Investment Trust ("Dugaboy"). Dugaboy is a grantor trust established under the laws of the state of Delaware. Dugaboy was formed pursuant to an October 2010 Trust Agreement between Dana Scott Breault, as Settlor, and James D. Dondero and Commonwealth Trust Company, as Trustees. Dondero is Dugaboy's primary beneficiary. Under the Dugaboy trust agreement, Dondero has the power to remove trustees without cause, as well as the power to appoint successive trustees. Dugaboy's original Family Trustee was Dondero, and Defendant Grant James Scott III ("Scott") was its Independent Trustee. In 2015, Dondero appointed Scott as the Family Trustee, and shortly thereafter replaced Scott with his sister Nancy. Between 2016 through confirmation of the Plan, Dugaboy owned a 0.1866% economic interest and a 74.4426% voting interest in HCMLP's Class A partnership interests, and, as set forth above, owns a 99.9% economic interest in NexPoint. At all times relevant to this Amended Complaint, Dugaboy's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

17. Defendant Highland Capital Management Fund Advisors, L.P. ("HCMFA") is a Delaware limited partnership.[3] HCMFA is owned by Strand Advisors XVI, Inc.[4] (which is HCMFA's general partner and owns a 1% interest in HCMFA); Highland Capital Management Services, Inc. ("HCMS") (which owns limited partnership interests in HCMFA equal to a 89.6667% ownership interest); and the Okada Family Revocable Trust (which owns limited partnership interests in HCMFA equal to a 9.3333% ownership interest). Dondero controls,

[3] HCMFA was originally created by Dondero on February 9, 2009, as Highland Funds Asset Management, L.P. ("HFAM"). On January 9, 2012, HFAM was renamed Pyxis Capital, L.P. ("Pyxis"), and on February 8, 2013, Pyxis was renamed HCMFA.

[4] Strand Advisors XVI, Inc. purports to be managed by six individuals, all but one of whom were previously on HCMLP's payroll.

and is the sole stockholder and director of, Strand Advisors XVI, Inc. Additionally, Dondero and Okada own 75% and 25% of HCMS, respectively.[5] HCMFA has acknowledged that it is controlled by Dondero. At all times relevant to this Amended Complaint, HCMFA's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

18. Defendant Scott is an individual who currently resides in North Carolina. At all times relevant to this proceeding, Scott had various roles at numerous Dondero-controlled or affiliated entities: he was the trustee of Get Good Trust; a director of the Highland Dallas Foundation; the managing member of Charitable DAF GP, LLC; the sole director of Charitable DAF Holdco, Ltd.; the managing member of the Charitable DAF Fund; and the director of CLO Holdco, Ltd. Scott is Dondero's long-time friend, former college roommate, and was the best man at Dondero's wedding. Scott has testified under oath that Dondero is his "closest friend." Dondero personally selected Scott as his successor to run the Charitable DAF Fund. Dondero also caused Scott to serve on multiple boards on which Dondero also served, including the boards of the Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., and Highland Kansas City Foundation, Inc. Scott is also the executor of Dondero's will. Dondero, HCMLP, and/or entities controlled by Dondero transferred tens of thousands of dollars' worth of "business gifts" to Scott in the five years prior to the Petition Date. Scott has no training in finance or compliance and no investment experience. Scott routinely rubber-stamped Dondero's and HCMLP's directives without asking questions or requesting additional information.

---

[5] Dondero is the Director and President of Highland Capital Management Services, Inc. Scott Ellington is its Secretary.

19. Defendant Scott Ellington ("Ellington") was HCMLP's Chief Legal Officer and General Counsel until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interest. At all times relevant to this Amended Complaint, Ellington was a Texas resident.

20. Defendant Isaac Leventon ("Leventon") was Assistant General Counsel at HCMLP from March 2011 until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interests. At all times relevant to this Amended Complaint, Leventon was a Texas resident.

21. Defendant Charitable DAF Fund, LP (the "DAF") is an exempted company incorporated in the Cayman Islands. Dondero was the initial managing member of the DAF's General Partner, Charitable DAF GP, LLC ("DAF GP"), but in January 2011 he transferred all membership interests to Scott, who held those interests until March 2021. At all times relevant to this proceeding, Scott served as managing member of DAF GP and director of the DAF. HCMLP acted as the formal or informal non-discretionary investment manager for the DAF from its inception through 2020, and provided advisory and back-office services to the DAF and its subsidiaries, including CLO Holdco, Ltd., from 2012 until HCMLP terminated that relationship in February 2021. According to the DAF, Dondero currently serves as its investment advisor (although without an advisory contract).

22. Defendant Charitable DAF Holdco, Ltd. ("DAF Holdco") is an exempted company incorporated in the Cayman Islands. At all times relevant to this proceeding, Scott served as DAF Holdco's managing member and sole director. DAF Holdco is the limited partner of the DAF and owns 100% of the partnership interests in the DAF.

23. Defendant CLO Holdco, Ltd. ("CLO Holdco") is an exempted company incorporated in the Cayman Islands that was formed on December 13, 2010. CLO Holdco is a wholly-owned subsidiary of the DAF. CLO Holdco filed a proof of claim in HCMLP's bankruptcy case, which was subsequently amended to reduce the claim amount to zero.[6] In January 2022, CLO Holdco attempted to further amend the proof of claim to reassert a positive claim amount. CLO Holdco has no employees or officers. According to CLO Holdco, Dondero currently serves as an investment advisor to CLO Holdco (although without an advisory contract). Until Dondero's departure from HCMLP in January 2020, HCMLP (through Dondero) effectively made all investment decisions for the DAF which allocated the investments to CLO Holdco, which would then be rubber-stamped by Scott. At all times relevant to this Amended Complaint, CLO Holdco's principal place of business was 300 Crescent Court, Suite 700, Dallas, Texas 75201.

24. As of December 31, 2020, CLO Holdco and the DAF collectively controlled approximately $260 million in assets. Dondero has testified under oath that he was unaware of a single investment decision that HCMLP ever recommended to Scott regarding the DAF that Scott rejected. Likewise, Dondero was unaware of any investment Scott made on behalf of the DAF that did not originate with HCMLP.

25. Defendant Highland Dallas Foundation ("Highland Dallas") is registered as a Delaware nonprofit, nonstock corporation. The directors of Highland Dallas at the time of the events relevant to this proceeding were Dondero, Scott, and Mary Jalonick. Dondero also acted

[6] This proof of claim was signed by Grant Scott in his capacity as CLO Holdco's sole director. Grant Scott served in that capacity at all times relevant to this proceeding.

as Highland Dallas's president, and Scott served as its treasurer. Highland Dallas's principal office address is 3963 Maple Avenue, Suite 390, Dallas, Texas, 75219.

26. Defendant Scott, in addition to being named above in his individual capacity, is named in his capacity as Trustee of Get Good Trust, a trust established under the laws of the State of Delaware. According to Get Good's July 9, 2021, disclosure to this Court, Get Good consists of three related trusts: Get Good Trust, Get Good Non Exempt Trust No. 1, and Get Good Non Exempt Trust No. 2, all of which are included in the term "Get Good." Dondero is the settlor of Get Good, its beneficiaries are his "living descendants," and Scott was Get Good's trustee at all times relevant to this Amended Complaint.

27. Defendant Hunter Mountain Investment Trust ("Hunter Mountain") is a statutory trust established under the laws of the state of Delaware. Hunter Mountain was formed on December 17, 2015, shortly before it purchased limited partnership interests in HCMLP from HCMLP's then-existing limited partners (*i.e.*, Dondero, Okada, and entities that they controlled) and HCMLP. Through a complex series of transactions that occurred on December 21, 2015, and December 24, 2015, Dondero caused Hunter Mountain to become the owner-in-name of 99.5% of the economic interests of HCMLP. Meanwhile, Dondero caused Hunter Mountain to issue a series of notes and cash, such that Dondero, Okada, and certain entities that they controlled (including Dugaboy, The Mark & Pamela Okada Family Trust – Exempt Trust #1, and The Mark & Pamela Okada Family Trust – Exempt Trust #2) continued to receive the economic benefit of limited partnership distributions made by HCMLP to Hunter Mountain even after they had purportedly sold their limited partnership interests to Hunter Mountain. One such note was a $63 million secured promissory note Hunter Mountain entered into with HCMLP on December 21, 2015 (the "Hunter Mountain Note").

28. Rand PE Fund I, LP, Series 1 ("Rand") is a Delaware series limited partnership. Rand is the indirect parent of Hunter Mountain and is a guarantor of the Hunter Mountain Note.

29. Defendant Lawrence Tonomura is named in his capacity as trustee of Defendant The Mark & Pamela Okada Family Trust – Exempt Trust #1 ("MAP #1"), a trust established under the laws of the state of Texas. Okada controls MAP #1, which he created for the benefit of his children.

30. Defendant Lawrence Tonomura is named in his capacity as trustee of Defendant The Mark & Pamela Okada Family Trust – Exempt Trust #2 ("MAP #2"), a trust established under the laws of the state of Texas. Okada controls MAP #2, which he created for the benefit of his siblings.

31. Defendant Massand Capital, Inc. ("Massand Inc.") is a New York corporation that was created in 2002. Defendant Massand Capital, LLC ("Massand LLC") is a Delaware limited liability company created in 2014, pursuant to a certificate of incorporation signed by Leventon. Massand Inc. received payments from HCMLP between February 4, 2014 and January 7, 2015. Massand LLC received payments from HCMLP between February 25, 2015, and August 1, 2019. Massand Inc. and Massand LLC are referred to collectively herein as "Massand Capital".

32. Defendant SAS Asset Recovery Ltd. ("SAS") is a Cayman Island entity created in 2012, whose principal place of business is Dallas, Texas. Upon information and belief, SAS is a litigation funding and management business created by Dondero and Ellington in 2012 and operated out of HCMLP's headquarters. SAS, along with its direct and indirect subsidiaries, is owned and controlled by Dondero and Ellington, who own 70% and 30% of the economic

interests in SAS, respectively. Upon information and belief, Ellington is the Chief Executive Officer of SAS.

## III. JURISDICTION, VENUE & STANDING

33. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 because this is a civil proceeding arising under or relating to the bankruptcy petition filed by HCMLP under Chapter 11 of the United States Bankruptcy Code. *See In re Highland Capital Management, L.P.*, No. 19-34054-sgj11 (Bankr. N.D. Tex.). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

34. Venue is proper in this Court under 28 U.S.C. § 1409(a).

35. This Court has personal jurisdiction over the defendants because each of the Defendants: (i) is a Texas resident; (ii) was formed under the laws of Texas; (iii) is the alter ego of a Texas resident or an entity that was formed under the laws of Texas; (iv) has a business presence in Texas; (v) filed a proof of claim in HCMLP's bankruptcy case; and/or (vi) had minimum contacts with the state of Texas by either invoking the benefits and protections of the state of Texas or otherwise purposefully directing conduct toward a Texas resident.

36. The Plan created the Claimant Trust, which was vested with assets including substantially "all Causes of Action" and "any proceeds realized or received from such Assets." The Plan also created the Litigation Sub-Trust, as a "sub-trust established within the Claimant Trust or as a wholly-owned subsidiary of the Claimant Trust," for the purpose of "investigating, prosecuting, settling, or otherwise resolving the Estate Claims" transferred to it by the Claimant Trust pursuant to the Plan. The Plan defines Estate Claims to include "any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of [HCMLP], and each of the Related Entities, including any promissory notes held by any of the foregoing." Proceeds

from the Litigation Trust's pursuit of claims "shall be distributed . . . to the Claimant Trust for distribution to the Claimant Trust Beneficiaries[.]"

37. On October 8, 2021, the Claimant Trust confirmed the assignment of certain Causes of Action (as defined in the Plan) to the Trust, including all claims set forth in this Amended Complaint. All of the claims asserted in this Amended Complaint belong to the Litigation Sub-Trust, not the Reorganized Debtor.

38. Under the Plan, the Claimant Trust Beneficiaries are (i) the Holders of Allowed General Unsecured Claims and (ii) the Holders of Allowed Subordinated Claims, whose Claims are junior to those distributed to Holders of Allowed General Unsecured Claims.[7] The Claimant Trust Beneficiaries' claims against the Reorganized Debtor's estate are substantial and exceed, in aggregate, $380 million. To date, neither the Holders of Allowed General Unsecured Claims nor the Holders of Allowed Subordinated Claims have been paid at all.

39. The Trustee has standing to avoid all transfers described herein pursuant to 11 U.S.C. § 544(b) and applicable law. On the date of the Debtor's bankruptcy filing, at least one or more unsecured creditors who held an allowable claim, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis (all as defined herein), could have sought under state law to avoid each of the transfers made on or after October 16, 2015. The Internal Revenue Service filed an amended Proof of Claim in the Debtor's bankruptcy case on October 6, 2021, which asserts unsecured claims including for the tax period of June 30, 2015. Under applicable state and federal law, the IRS was entitled to seek to avoid all transfers at issue herein

[7] Holders of certain Allowed Limited Partnership Interests may become Claimant Trust Beneficiaries but only if *all* Allowed General Unsecured Claims, Allowed Subordinated Claims, and costs and expenses are indefeasibly paid in full.

as a present or future creditor, including transfers that occurred on or before October 16, 2015, because the IRS's claim arose within a reasonable time of those transfers.

## IV. FACTUAL ALLEGATIONS

### A. Dondero Creates HCMLP

40. HCMLP was a global alternative investment manager and registered investment advisor that was founded in 1993 by Dondero and Okada. The funds managed by HCMLP originally focused on the leveraged loan market, and subsequently expanded into other asset classes such as high-yield credit, public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific industries.

41. By the mid-2000s, HCMLP employed over 100 employees, including executive-level management employees, finance and legal staff, investment professionals, and back-office accounting and administrative personnel. As of the Petition Date, HCMLP had three primary business lines: (i) investment management; (ii) the provision of middle- and back-office services ("shared services") to other registered investment advisors; and (iii) proprietary trading.

42. Dondero exercised complete control over HCMLP from its founding until January 9, 2020, when this Court entered an order implementing the settlement and term sheet entered into between HCMLP and the unsecured creditors' committee, pursuant to which three new independent directors (the "Independent Board") were appointed at Strand to oversee the management and reorganization of HCMLP. HCMLP's employees have bluntly acknowledged that, prior to the appointment of the Independent Board, Dondero was HCMLP's solitary decision-maker on all matters concerning the company's operation and management. Dondero

served as HCMLP's Chief Executive Officer and President from the time that HCMLP was founded until he resigned from those roles on January 9, 2020.

43. As of December 31, 2006, HCMLP provided investment advisory services pursuant to management agreements for: (i) 22 CLOs, (ii) 1 SLT; (iii) 11 RICs, (iv) 7 warehouse transactions, (v) 4 SMAs; (vi) one trust; and (vii) 10 hedge fund structures.[8] At that time, the value of HCMLP's assets under management ("AUM") was approximately $33.1 billion.[9]

**B. HCMLP Narrowly Survives The Financial Crisis Of 2008, And Emerges Facing Hundreds Of Millions Of Dollars In Potential Litigation Damages**

44. Around 2008, HCMLP's business began to falter, as the financial crisis began to set in. The funds that HCMLP managed faced large losses, followed by substantial redemptions. In January 2008, HCMLP experienced its worst performance to date, with the value of many of its managed funds deteriorating significantly.

45. At the same time that HCMLP was facing significant losses that threatened its existence, the company also became ensnared in litigation posing the threat of hundreds of millions of dollars in damages. In March 2008, HCMLP and its managed funds Highland CDO

---

[8] A collateralized loan obligation ("CLO") is a structure that acquires and manage a pool of debt or loans. The CLO issues multiple debt tranches as well as equity, and uses the proceeds of those issuances to obtain loans. A structured loan transaction ("SLT") is a transaction involving structured financial instruments such as collateralized loan obligations. A registered investment company ("RIC") is a corporation, partnership, or trust registered with the Securities and Exchange Commission under the Investment Company Act of 1940. A warehouse transaction is an intermediate transaction that involves purchasing loans or bonds that will undergo the warehousing period prior to serving as collateral for a CLO security. A separately-managed account ("SMA") is a managed investment vehicle that has only one investor. A trust is a fiduciary agreement in which one entity that holds property or assets as its owner for one or more beneficiaries. A hedge fund structure is an actively managed investment pool held by a limited partnership of investors that allows partners to "redeem" their investment, subject to certain limitations.

[9] At its high-water mark, HCMLP's AUM exceeded $40 billion.

Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC" and together with CDO Fund, the "Fund Counterparties")[10] had entered into a transaction with UBS to finance the purchase of various CLO tranches (*i.e.*, tranches of debt issued by existing CLOs) and other assets, including credit default swaps ("CDS"). The governing agreements required the Fund Counterparties to post collateral based on the mark-to-market value of certain collateralized debt obligations. The value of these assets dropped by more than $400 million in the fall of 2008, and in November 2008, the Fund Counterparties failed to meet UBS's margin demand. In December 2008, UBS terminated the agreements, and claimed that it was owed 100% of its losses—which UBS alleged was as much as $745 million—from HCMLP and the Fund Counterparties.

46. On February 24, 2009, UBS commenced an action against HCMLP and the Fund Counterparties in New York state court. As amended and consolidated, UBS asserted claims against HCMLP for actual and constructive fraudulent transfer and breach of the implied covenant of good faith and fair dealing. Among other things, UBS alleged that in March 2009, HCMLP had orchestrated transfers of approximately $233 million of assets from SOHC's parent entity HFP, which UBS alleged was the alter ego of SOHC or its subsidiaries (the "March 2009 Transfers"). UBS sought to disgorge those transfers, and also sought damages against

[10] The CDO Fund is an indirectly-controlled subsidiary of HCMLP. At all times relevant to this proceeding, the CDO Fund was controlled by HCMLP, either pursuant to an investment advisory agreement and/or through HCMLP's indirect ownership of CDO Fund's general partner. SOHC is a subsidiary of Highland Financial Partners, L.P. ("HFP"). At all times relevant to this proceeding, HFP was managed and controlled by Dondero in his capacity as an officer of HFP and its general partner and as a member of HFP's monitoring committee. HFP's general partner is a wholly-owned indirect subsidiary of HCMLP. After 2010, Dondero was the sole member of HFP's monitoring committee until his resignation in mid-2021. At all times relevant to this Complaint, Dondero managed and controlled SOHC through his control of HFP.

HCMLP, including punitive damages, attorneys' fees, and pre-judgment interest (calculated at 9% under New York law).

47. Meanwhile, in December 2008, CDO Fund ceased meeting margin calls issued by Citibank N.A., Citigroup Global Markets Limited, Citigroup Financial Products Inc., and Citigroup Global Markets Inc. (together, "Citi") in connection with CDS entered into by CDO Fund and Citi. Citi seized assets posted by CDO Fund to collateralize the CDS, and, by March 2009, conducted two auctions to sell the collateral. The proceeds of the collateral sales, however, were not sufficient to satisfy CDO Fund's obligations to Citi. On April 5, 2012, CDO Fund sued Citi, alleging various claims arising from the margin calls. On May 3, 2013, Citi answered and countersued CDO Fund, HCMLP, and Highland CDO Opportunity Fund GP, L.P. ("CDO Fund GP") to: (i) recover a deficit of more than $24 million, plus accrued interest, still owed under the agreements governing the CDS; (ii) recoup $3 million in liquidation proceeds mistakenly received from a third party; and (iii) seek indemnification for all losses and costs Citi incurred as a result of CDO Fund's breach.

48. In addition, on April 2, 2009, Barclays Bank PLC ("Barclays PLC") and its wholly-owned subsidiary HYMF, Inc. ("HYMF" and, together with Barclays PLC, "Barclays") commenced an action against HCMLP and certain of its managed funds (the "Fund Defendants") and related entities for breach of contract, breach of fiduciary duty, and equitable accounting (the "Barclays Action"). The Barclays Action focused on hedge contracts that HYMF had entered into with various HCMLP-managed funds, which provided that HYMF would be able to remove its investments in a preferential fashion via a "redemption" right, usually as quickly as one day. Barclays alleged that HYMF attempted to exercise that redemption right in mid-October 2008 but was rejected by HCMLP and its managed funds,

notwithstanding the clear terms of the HYMF contracts. This breach of the HYMF contracts was accompanied by Dondero personally stating he would withhold over $100 million for over a year unless HYMF performed certain unrelated financial services for the Fund Defendants. Barclays alleged that it had invested more than $700 million into the Fund Defendants, that Dondero personally held at least $100 million of that "hostage," and that "hundreds of millions of dollars" were still owed to HYMF.

49. Additionally, on June 3, 2011, HCMLP became aware that on November 1, 2010, the Securities and Exchange Commission (the "SEC") had commenced an investigation with respect to potential violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Advisers Act of 1940. While the SEC investigation was settled years later for a reduced amount, HCMLP's understanding in 2011 was that the SEC investigation could result in significant penalties, including substantial monetary penalties, for the company.

### C. In A Scheme To Evade HCMLP's Creditors, Dondero Creates "Lifeboats" To Usurp HCMLP's Business

50. In 2012, Dondero explained HCMLP's precarious financial condition, testifying under oath that the 2008 financial crisis took HCMLP "to a state of insolvency and we've been juggling liquidity since that," and that "[t]he last three, four years have been negative to the tune of hundreds of millions of dollars[.]" Dondero testified further that the contingent liabilities resulting from the lawsuits filed against HCMLP were a primary driver of HCMLP's insolvency.

51. It was against this backdrop that in or about 2011, Dondero determined to create a series of new entities—referred to internally by some at HCMLP as "lifeboats"—to take over HCMLP's business, with the aim of placing the resulting profits beyond the reach of HCMLP's

creditors. Ultimately, the most successful of the lifeboats were NexPoint and HCMFA, which are described in greater detail below. However Dondero also created other lifeboats at or around this time, including:

- Tunstall Capital Management, LP—which was created to manage stressed and distressed investing in hedge funds, private equity funds, and retail funds;
- Falcon E&P Opportunities GP, LLC—which was created to manage oil and gas investments in private equity funds;
- Granite Bay Advisors, LP—which was created to manage long-short credit investing; and
- Highland Capital Healthcare Advisors, LP ("HCHA")—which was created to serve as a healthcare equity advisor.

**1. NexPoint**

52. NexPoint was effectively a shell entity that Dondero created in March 2012 to siphon profits from HCMLP in order to evade HCMLP's creditors. Dondero's family trust Dugaboy, of which Dondero is the primary beneficiary, owns 99.9% of NexPoint.

53. Between 2012 and 2015, NexPoint had no employees of its own, and performed no business activities that were distinguishable from those performed by HCMLP. To the contrary, NexPoint used HCMLP's employees to perform the same investment management and advisory services—including investment advisory, compliance, accounting, tax, human resources, and information technology services—that were performed by HCMLP.

54. For over a year, HCMLP performed all services for NexPoint, without any sub-advisory or shared services agreements that even purported to compensate HCMLP for the use of its employees. In mid-2013, Dondero attempted to retroactively infuse this scheme with a patina of legitimacy, by causing NexPoint to enter into a shared services agreement with HCMLP that required NexPoint to pay fees to HCMLP based on a formula that resulted in low

fee payments. NexPoint continued to reap the vast majority of the generated fees, however. NexPoint's fees were based on a percentage of AUM, set at a level to yield fees far in excess of those NexPoint was paying HCMLP. The NexPoint scheme is illustrated in Figure 1, below.

**Figure 1.**




55. Adding insult to injury, HCMLP funded NexPoint's operations whenever needed, seeded large investments made by NexPoint, and funded a large portion of the distributions NexPoint made to its owner, Dugaboy (the beneficiary of which was Dondero). Indeed, in June 2012, at the time that Dondero was transferring HCMLP's advisory services business to NexPoint, Okada complained to Dondero that he was "using Highland's cash flow" to set up new entities controlled by Dondero and to "fund all their negative working capital."

56. Between 2012 and 2017, HCMLP loaned NexPoint approximately $30 million, and entered into a revolving line of credit to provide NexPoint with additional liquidity. Initially, the loans were in the form of demand notes and were unsecured, frequently below-

market, and had few to no covenants. NexPoint paid no principal or interest to HCMLP on the loans during the 2012-2017 period. At the same time, NexPoint made limited partner distributions of approximately $34 million—99.9% of which were made to Dugaboy for Dondero's benefit.

57. Dondero caused HCMLP to enter into multiple forbearance agreements with respect to the NexPoint loans, pursuant to which HCMLP agreed not to collect on the NexPoint loans for a period of one year from the time of the agreement. According to NexPoint's financial statements, these agreements were entered into to provide NexPoint "with the necessary financial support to fund [NexPoint's] obligations as they come due[.]" By May 2017, NexPoint owed HCMLP more than $30 million. Although all of these obligations were payable on demand, HCMLP again agreed not to demand repayment—this time through May 31, 2018—and also agreed to provide support to fund NexPoint's obligations through the same period. Meanwhile, HCMLP recorded the NexPoint loans at face amount on HCMLP's books.

58. Upon information and belief, on May 31, 2017, following discussions with NexPoint's auditors, Dondero restructured the NexPoint loans into a consolidated $30,746,812.33 note (the "NexPoint Loan") with an unusually long 30-year term maturity, a low coupon rate, no covenants, and no security. HCMLP received no consideration in exchange for its agreement to extend the NexPoint loans' maturity date from on-demand to 30 years.

59. Subsequent to Dondero's resignation from HCMLP, on December 31, 2020, NexPoint defaulted on the NexPoint Loan and the full outstanding amount of the loan was accelerated. On January 22, 2021, HCMLP filed an adversary proceeding in the Bankruptcy Court to collect on the NexPoint Loan. *See Highland Capital Management, L.P. v. NexPoint Advisors, L.P.*, Adv. Pro. 21-03005-sgj (Bankr. N.D. Tex. Jan. 22, 2021). NexPoint has raised

a series of frivolous defenses to HCMLP's claims, including that HCMLP—acting through the owner of a majority of its Class A interests, Dugaboy (which was acting through Dondero's sister, as Dugaboy's Family Trustee)—orally agreed to forgive the NexPoint Loan as part of Dondero's compensation. More than $23 million remains outstanding on the NexPoint Loan, and interest and fees continue to accrue. HCMLP has moved for summary judgment on this matter.

60. From the time that it was created in 2012 through 2019, NexPoint—which used HCMLP's employees to perform the same management and advisory services that are performed by HCMLP—earned over $150 million in revenues (including over $120 million in advisory and administrative fees) and approximately $50 million in operating income. Between 2012 and 2015, NexPoint's AUM increased 34%, from $700 million to $936 million, and revenues increased from $4.1 million to $16.2 million. Between 2015 and 2019, NexPoint's AUM increased by approximately 408%—from $936 million to $4.8 billion, and revenue increased from $16.2 million to $46.8 million. By contrast, over the same 2015 to 2019 period, HCMLP's AUM decreased from $9.5 billion to $2.3 billion.

**2. HCMFA**

61. Dondero utilized the same basic playbook for HCMFA, which is directly or indirectly owned by Dondero and Okada. HCMFA was created to replace HCMLP as the new investment manager for certain open-ended retail investment funds, but in a manner similarly designed to ensure that the profits generated by the business would not be available to HCMLP's litigation creditors in the event they achieved favorable judgments.

62. On December 15, 2011, Dondero caused HCMLP to transfer HCMLP's rights and obligations to provide investment advisory services for Highland Credit Strategies Fund,[11] Highland Floating Rate Opportunities Fund ("HFRO") (n/k/a Highland Income Fund), Highland Long/Short Equity Fund, Highland Long/Short Healthcare Fund, and Highland Special Situations Fund to HCMFA. HCMLP received no consideration for the transfer. Prior to the transfer, HCMLP received management and advisory fees under those agreements in return for the services it performed. Following the transfer, it was HCMFA rather than HCMLP that received those fees, notwithstanding that HCMFA used HCMLP's employees to perform most services. Thus, the effect of the transfer was to insert a new entity to reap the profits earned from the same HCMLP employees performing the same work that had been performed prior to the transfer.

63. HCMFA collected management fees from its managed funds based on a percentage of their net asset value ("NAV"). Meanwhile, HCMLP—whose employees performed most services required by HCMFA—received a low fee that was only a small fraction of the fees earned by HCMFA. And HCMLP received no fee with respect to the advisory services it provided to HCMFA, despite the fact that HCMLP's employees were named portfolio managers, and constituted entire teams of supporting investment analysts, for HCMFA-managed funds. Indeed, HCMFA did not execute a sub-advisory agreement with HCMLP, and it was only in May 2018 that HCMFA executed a payroll reimbursement agreement to partially compensate HCMLP for the services of certain HCMLP employees. If

[11] On June 13, 2012, the management agreements for Highland Credit Strategies Fund were purportedly "novated" to the newly-created NexPoint. Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as "NHF." The result of this transfer was simply to shift management fees relating to NHF—which had previously been diverted from HCMLP—from one lifeboat (Pyxis/HCMFA) to another (NexPoint).

HCMLP had managed the HCMFA-managed funds directly rather than doing so through an entity that was created to evade HCMLP's creditors, then HCMLP would have earned tens of millions of dollars (potentially over $100 million) in additional fees between 2012 and 2018. The HCMFA scheme is illustrated by Figure 2, below.

**Figure 2.**




64. Following Dondero's "lifeboat" playbook, HCMLP also provided financial support to HCMFA so that HCMFA was well-positioned to earn profits that bypassed HCMLP's creditors and flowed directly to Dondero and his affiliated entities, primarily through HCMFA's largest limited partner, HCMS (of which Dondero and Okada owned 75% and 25%, respectively). Between 2011 and 2019, HCMLP loaned HCMFA approximately $12 million. Those HCMFA loans were evidenced by demand notes, for which Dondero caused HCMLP to enter into multiple forbearances, ultimately preventing HCMLP from demanding payment until May 31, 2021. As of the Petition Date, $6.3 million was outstanding on the notes subject to the

forbearance agreement. In May 2019, HCMFA borrowed an additional $7.4 million from HCMLP pursuant to two additional demand notes.

65. Subsequent to Dondero's resignation from HCMLP, HCMFA defaulted on its debt to HCMLP. On January 22, 2021, HCMLP filed an adversary proceeding in the Bankruptcy Court to collect on the debt. HCMFA has raised a series of frivolous defenses to HCMLP's claims, including that the notes were executed in error. As of December 11, 2020, approximately $7.7 million in principal and interest was due and owing to HCMLP on the HCMFA notes dated May 2 and 3, 2019 and, as of June 4, 2021, approximately $3.1 million in principal and interest was due and owing to HCMLP on the HCMFA notes dated February 26, 2014, and February 26, 2016, and interest and fees continue to accrue. HCMLP has moved for summary judgment on this matter.

### D. Dondero, Ellington, and Leventon Cause HCMLP To Engage In Misconduct That Exposes It To Additional Liability

66. As described more fully below, in addition to establishing the lifeboats to usurp HCMLP's business and evade its contingent creditors, Dondero, along with Scott Ellington, HCMLP's Chief Legal Officer and General Counsel, and Isaac Leventon, HCMLP's Assistant General Counsel, engaged in other actions that meaningfully harmed HCMLP. This included exposing HCMLP to significant liability by utilizing it to exact revenge on Dondero's perceived adversaries, and carrying out schemes that personally benefitted Dondero and, in certain instances, Ellington, but conferred no benefit on HCMLP. Ellington and Leventon were also financially rewarded by Dondero for faithfully serving Dondero's interest, rather than HCMLP's, even where doing was detrimental to HCMLP. As described below, these actions ultimately resulted in more than one billion dollars in litigation and arbitration claims against

HCMLP and millions of dollars in legal fees, necessitated HCMLP's bankruptcy filing, and ultimately forced HCMLP to enter into settlements for hundreds of millions of dollars.

**1. Dondero Causes HCMLP To Engage In Misconduct Designed To Exact Revenge On Joshua Terry**

67. In 2011, Dondero formed Acis Capital Management, L.P. ("Acis") and Acis Capital Management GP, LLC ("Acis GP"). Dondero was President both of Acis and Acis GP, and controlled their overall financial strategies and decisions. Upon information and belief, prior to its bankruptcy filing in 2018, Acis was indirectly owned by Dondero (through Dugaboy), Okada, and Joshua Terry ("Terry"), an HCMLP employee that Dondero tapped to manage Acis. Like HCMLP, Acis was a registered investment advisor whose purpose was to raise money from third-party investors to launch or invest in CLOs. HCMLP was the investment manager for Acis, and Acis performed almost all of its services through HCMLP employees. Dondero created Acis to act as another lifeboat—*i.e.*, to divert income away from HCMLP when HCMLP was facing the risk that all of its assets would be absorbed by its creditors. In 2013, HCMLP began what proved to be a short-lived turnaround, spurred by improving financial performance and settlement of the Barclays litigation. At this point, Dondero became more troubled by the dilution of his share of Acis's income, caused by Terry's ownership in Acis, than he was about evading HCMLP's liabilities. As a result, Dondero once again redirected the flow of money for his own benefit, this time by siphoning value from Acis back to HCMLP.

68. By 2016, tensions between Dondero and Terry hit a boiling point. Dondero sought to finance an acquisition by an HCMLP portfolio company through a loan from HCMLP-managed CLOs, and an extension of the maturity dates on the portfolio company's notes that were held by the CLOs. Terry was the investment manager for the CLOs, and

opposed the plan on the ground that agreeing to extend the notes' maturity dates would breach his fiduciary duties to the CLOs. Dondero responded to Terry's opposition by firing him from Acis and HCMLP, making up a pretextual claim of termination for "cause." Shortly thereafter, Dondero amended the Acis limited partnership agreement to terminate Terry's interests in Acis, and directed Acis to sue Terry in Texas state court. Terry counterclaimed and demanded arbitration.

69. On October 20, 2017, following a ten-day arbitration, the arbitration panel issued Terry an award of $7,949,749.15, plus interest, against Acis. The arbitration panel found, among other things, that (i) Terry's termination was "without cause," and Acis had "knowingly and willfully" invoked HCMLP's false pretext of "for cause" in order to deny Terry his contractual entitlement to the value of his Acis partnership interest, (ii) Acis had breached its limited partnership agreement, and breached the fiduciary duties it owed to Terry as Acis's limited partner, (iii) beginning in 2013, Dondero had caused Acis to pay HCMLP more than its contractual entitlement for shared expenses in order to reduce the amount of Terry's limited partnership distributions, and (iv) one month after Terry was terminated from Acis, Dondero significantly increased the amounts that Acis was paying HCMLP under their shared services and sub-advisory agreements, retroactive to January 1, 2016.

70. Beginning on October 24, 2017—four days after Terry's arbitration judgment was issued—Dondero, acting through HCMLP, and with the aid of Ellington and Leventon, entered into numerous transactions designed to take control of Acis's assets and business, and strip Acis of assets so that it would be unable to pay Terry's arbitration award. Ellington and Leventon aided Dondero by implementing Dondero's directives and taking the steps necessary to consummate these transactions, notwithstanding their knowledge that the transactions

benefitted only Dondero, and would ultimately harm HCMLP by exposing it to significant liability.

71. Ultimately, Dondero's elaborate schemes to render Acis judgment-proof led Terry to file involuntary petitions for protection under chapter 11 of the United States Bankruptcy Code against Acis and Acis GP on January 30, 2018. In response to the bankruptcy filings, Dondero caused HCMLP, which served as the sub-advisor to the Acis CLOs, to grossly mismanage the Acis CLOs, including by failing to purchase a single loan for the CLOs following the appointment of a chapter 11 trustee in the Acis bankruptcy case. This abrogation of duties caused the chapter 11 trustee to replace HCMLP with Brigade Capital Management, LP ("Brigade") and Cortland Capital Markets Services LLC ("Cortland"). Put another way, Dondero's use of HCMLP to cause damage to Acis actually harmed HCMLP itself, leading HCMLP to incur exorbitant legal fees attacking Acis, the loss of its investment management contracts and the income flowing from those contracts, and reputational harm that precluded HCMLP from launching any future CLOs and generating fee income therefrom.

72. Dondero also caused HCMLP to commence litigation against the Acis chapter 11 trustee, prompting a countersuit pursuant to which the chapter 11 trustee sought to recover fraudulent transfers Dondero had directed (through HCMLP) and to stop HCMLP from engaging in a course of conduct that was harmful to Acis and the Acis CLOs. This led to the entry of a temporary restraining order against HCMLP, which Dondero caused HCMLP to violate. Dondero also caused Highland CLO Funding, Ltd. ("HCLOF") to initiate an additional frivolous lawsuit against Terry in the Royal Court of Guernsey (the "Guernsey Suit"), which was ultimately dismissed, resulting in Terry arguing that HCMLP, as the owner of HCLOF's

advisor Highland HCF Advisors, Ltd. ("HHCFA"), was liable for Terry's attorneys' fees and expenses under Guernsey's "loser pays" regime.[12]

**2. Dondero And Ellington Expose HCMLP To Liability By Fraudulently Inducing An Investment From HarbourVest**

73. Dondero and Ellington also exposed HCMLP to substantial liability to third-party investors HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). At the same time that Dondero was surreptitiously transferring valuable rights associated with the Acis CLOs away from Acis in order to evade Terry's arbitration award, he and Ellington were using HCMLP to induce the HarbourVest Entities to purchase 49.9% of HCLOF—the owner of the equity tranche of the Acis CLOs—from CLO Holdco for approximately $75 million in cash, with a commitment to invest an additional $75 million in HCLOF.[13] In soliciting this investment, Dondero and Ellington failed to disclose material facts

[12] Dondero's litigation crusade against Terry and Acis continues to date. On May 14, 2021, NexPoint, acting under Dondero's direction, caused one of its managed retail funds, NSOF, to commence a lawsuit in the district court for the Southern District of New York against Acis, Terry, U.S. Bank, N.A., and Brigade, alleging that the Acis CLOs had been mismanaged. On May 20, 2021, NSOF then filed a motion in Acis's bankruptcy case, seeking a ruling that the complaint did not violate the injunction contained in Acis's plan of reorganization. On September 9, 2021, the bankruptcy court conducted a lengthy hearing, and on September 24, 2021, declined to issue the order requested by NSOF and held that NSOF must amend its complaint to comply with the plan injunction. On October 8, 2021, NSOF then filed a motion asking the Bankruptcy Court to reconsider its ruling, but withdrew the motion on December 1, 2021. NSOF filed an Amended Complaint in the SDNY action on November 23, 2021. Acis, U.S. Bank, N.A., Brigade, and HCLOF (as defendant intervenor) filed motions to dismiss, which were fully briefed in March 2022, and remain pending.

[13] CLO Holdco acquired Acis CLO equity tranches when the CLOs were launched and then transferred them to HCLOF in exchange for a 100% ownership interest in HCLOF after it was formed.

to HarbourVest regarding the Terry disputes and Acis frauds, thus exposing HCMLP to substantial and unnecessary liability.[14]

74. In inducing HarbourVest's investment, Dondero and Ellington, purportedly acting through HCMLP, made numerous misrepresentations and omissions, including: (1) failing to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million arbitration award against it, including by causing Acis to consummate a series of fraudulent transfers; (2) misrepresenting the reasons that Dondero changed the name of the holding company for the Acis CLOs from Acis Loan Funding, Ltd. ("ALF") to HCLOF immediately prior to the HCLOF Investment; and (3) expressing confidence in HCLOF's ability to reset or redeem the CLOs under its control, when in actuality Dondero's actions to evade Terry's arbitration award against Acis resulted in Acis's bankruptcy, and rendered the resets impossible.

75. Moreover, unbeknownst to HarbourVest, Dondero intended for CLO Holdco to use the $75 million that it received from HarbourVest to make investments in other Dondero-owned entities, including entities managed by NexPoint and HCMFA. Thus, the HarbourVest investment benefitted Dondero personally, but left HCMLP exposed to hundreds of millions of dollars in potential damages to HarbourVest.

### 3. Dondero And His Accomplices, Including Ellington and Leventon, Cause HCMLP To Engage In Misconduct That Increases Its Liability To UBS

76. In March 2017, the New York state court presiding over UBS's claims against HCMLP and the Fund Counterparties ruled that UBS's claims against the Fund Counterparties,

---

[14] HCLOF has never paid a management fee to HHCFA, a wholly-owned subsidiary of HCMLP that is managed and controlled by HCMLP and operated using HCMLP employees. Consequently, HCMLP has indirectly provided free investment management services to HCLOF since its inception.

and its fraudulent transfer claims against HCMLP, could proceed to trial.[15] Shortly thereafter, Dondero, Ellington, and Leventon, along with HCMLP employees Jean Paul Sevilla, Katie (Irving) Lucas, and Matthew DiOrio, took steps to transfer the Fund Counterparties' remaining assets to Sentinel Reinsurance, Ltd. ("Sentinel"), a Cayman Islands entity indirectly owned and controlled by Dondero and Ellington,[16] in order to ensure that such assets would be out of UBS's reach in the event that a judgment was entered in its favor.[17] In or around August 2017, Dondero, Ellington, Leventon, Sevilla, Lucas, and DiOrio orchestrated the surreptitious transfer of substantially all of the Fund Counterparties' assets—with a face amount of $300 million and a fair market value of at least $100 million—to Sentinel.

77. The pretextual justification for these transfers was to satisfy a $25 million premium on an "after the event" insurance policy issued by Sentinel that purportedly insured the Fund Counterparties' first $100 million of liability to UBS. The real goal of the transfer, however, was to drain the Fund Counterparties' assets and render the Fund Counterparties judgment-proof, while keeping the assets within Dondero's and Ellington's control. There is no legitimate explanation as to why the Fund Counterparties transferred assets worth at least four times the premium payment to Sentinel. And given that Dondero and Ellington indirectly own and control Sentinel, they personally and improperly benefitted from this overpayment.

---

15 UBS's claim against HCMLP for breach of the implied covenant of good faith and fair dealing was subsequently also permitted to proceed.

16 Sentinel was created in 2012 and is 70%-owned by Dondero and 30%-owned by Ellington through intermediate holding companies. Sentinel has no employees or physical office space. HCMLP employees, including Leventon, performed work on behalf of Sentinel.

17 In December 2017, Ellington caused Dilip Massand and DiOrio to be appointed as directors of Sentinel.

78. Moreover, Ellington and Leventon (along with Sevilla, Lucas, and DiOrio) actively concealed the transfer of assets and the existence of the purported insurance policy from the Independent Board, apparently in order to prevent the Fund Counterparties from making a claim under the policy. Indeed, Leventon, who was directly involved in the transfers to Sentinel, was tasked with educating the Independent Board about UBS's claim and the assets potentially available to satisfy it. In response, Leventon delivered an extensive—but intentionally misleading—presentation to the Independent Board that said nothing about the August 2017 asset transfer and the purported Sentinel insurance policy, and lied to HCMLP regarding the Fund Counterparties' assets. Additionally, around the same time that Ellington and Leventon were hiding this secret insurance policy from the Independent Board, (i) Ellington charged the policy for personal expenses in excess of $500,000 that bore no relation to the UBS litigation and provided no benefit whatsoever to the Fund Counterparties or HCMLP; and (ii) Ellington and Leventon, among others, entered into agreements whereby Sentinel agreed to pay attorneys' fees and expenses they incurred in connection with HCMLP's bankruptcy.

79. As a direct result of Ellington's and Leventon's fraudulent concealment of the transfers to Sentinel, HCMLP inadvertently made factually inaccurate statements to the Bankruptcy Court and incurred millions of dollars in additional fees litigating (rather than settling) with UBS. In March 2021, after the policy was uncovered through HCMLP's diligence (notwithstanding Ellington's and Leventon's cover-up), the CDO Fund made a claim on the policy. To date, Sentinel has refused to make any payments.

80. On February 10, 2020, the New York state court entered a judgment against the Fund Counterparties in connection with the phase one litigation, in the principal amount of $519,374,149, plus $523,016,882.79 in prejudgment interest, for an overall judgment of

$1,042,391,031.79. Trial on UBS's claims against HCMLP was still pending when HCMLP filed for bankruptcy on October 16, 2019 (as discussed *infra*).

**4. Dondero Causes HCMLP To Engage In Misconduct That Results In Liability To HERA And Patrick Daugherty**

81. HCMLP's poor performance during the 2008-09 financial crisis left it with insufficient available cash and assets to offer incentive-based compensation to key senior employees. After HCMLP defaulted on a credit facility with a group of unsecured banks, the lender group demanded a security interest in all HCMLP's assets, but permitted the creation of a retention program to stave off an exodus of employees. With the consent of the lenders, on June 23, 2009, HCMLP created Highland Employee Retention Assets LLC ("HERA"), an employee-owned (subject to a two-year vesting period) entity that served as a replacement for certain senior employees' deferred compensation, which had been previously-awarded but wiped out by the financial crisis. HCMLP contributed assets to HERA, which then distributed proceeds from time to time. Patrick Daugherty, a former senior HCMLP employee, was a director of HERA and its largest unitholder.

82. Dondero's relationship with Daugherty deteriorated, and Daugherty resigned from HCMLP in the fall of 2011. Instead of simply allowing HERA to pay Daugherty what he was owed, Dondero caused HCMLP to carry out his personal vendetta against Daugherty through years of spiteful, unnecessary litigation borne out of personal animosity. As a result of that litigation, HCMLP accrued (i) litigation expenses and pre- and post-judgment interest that exceeded the amounts that HERA owed Daugherty in the first place; and (ii) liability in connection with a jury verdict that HCMLP defamed Daugherty with malice and breached the implied covenant of good faith and fair dealing.

83. Moreover, Dondero, through HCMLP, engaged in an asset-stripping campaign designed to render HERA judgment-proof, further exposing HCMLP to liability and unnecessary legal costs. In furtherance of that scheme, Dondero caused: (i) HCMLP to buy out all HERA unitholders except for Daugherty; (ii) HERA's board to transfer its powers to Highland ERA Management, a newly formed entity for which Dondero served as president and sole member; and (iii) HERA to distribute substantially all of HERA's assets to HCMLP, while claiming that HCMLP would place Daugherty's interests in HERA into escrow.

84. When Daugherty demanded payment of his judgment from HERA, HERA claimed it had become insolvent, citing that it owed HCMLP more than $7.5 million for legal expenses—approximately $4.9 million of which HCMLP had written off because of "lack of collectability."

85. Daugherty then sued HCMLP, HERA, Highland ERA Management, and Dondero in the Delaware Chancery Court. A Vice Chancellor concluded that HCMLP, Dondero, and the other defendants (who were also controlled by Dondero) were "improperly withholding documents," that "there is a reasonable basis to believe" that they perpetrated a fraud—and solicited "the services of attorneys to aid in furtherance of that fraud"—as part of an effort to evade Daugherty's judgment during the pendency of his case. The Vice Chancellor concluded that "defendants, with [counsel's] advice and assistance, were never going to let the assets held in the escrow agreement to make their way to Daugherty."

86. In total, HCMLP suffered at least $10 million in harm as a result of Dondero's decision to launch a protracted and unnecessary war against Daugherty.

**E. Dondero, Ellington, and Leventon Cause HCMLP To Engage In Conduct That Results In An Arbitration Award Against It Of Approximately $190 Million And Forces HCMLP Into Bankruptcy**

87. Dondero, Ellington, and Leventon also engaged in misconduct relating to HCMLP managed funds Highland Offshore Partners L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Crusader Funds") that resulted in an arbitration award against HCMLP of approximately $190 million. HCMLP had placed the Crusader Funds into wind-down in October 2008. Investors in the funds subsequently commenced lawsuits alleging breach of fiduciary duty claims against HCMLP, based on allegations that Dondero had refused to make mandated distributions and honor redemption requests, and traded the funds' positions in a manner designed to render them illiquid in order to deter future redemptions, which led to multiple disputes among redeeming investors. Certain of these lawsuits were ultimately resolved in July 2011, when the parties entered into a Joint Plan of Distribution of the Crusader Fund and a Scheme of Arrangement for its creditors (together, the "Joint Plan and Scheme"). As part of the Joint Plan and Scheme, a committee referred to as the "Redeemer Committee" was elected from the Crusader Funds' investors to oversee HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors.

88. The peace would not last, however. On July 5, 2016, the Redeemer Committee (i) terminated HCMLP as investment manager; (ii) filed a complaint in Delaware Chancery Court against HCMLP seeking a limited status quo order, a declaration that the Redeemer Committee had "cause" to terminate HCMLP as manager, and a declaration that HCMLP had forfeited any right to indemnification as a result of its failure to distribute proceeds to investors of various funds; and (iii) commenced an arbitration proceeding (the "Redeemer Arbitration")

against HCMLP alleging that it had engaged in various forms of misconduct in its role as investment advisor. After two years of arbitration proceedings, the Redeemer Arbitration culminated in a nine-day evidentiary hearing in September 2018 that included testimony from eleven fact witnesses and four expert witnesses. On March 6, 2019, the arbitration panel issued an award in favor of the Redeemer Committee, which resulted in gross damages of $136.8 million and total damages (including interest) of $190.8 million. Ultimately, the panel awarded ten forms of damages: (1) the Deferred Fee Claim ($43,105,395); (2) the Distribution Fee Claim ($22,922,608); (3) the Taking of Plan Claims ($3,277,991); (4) the CLO Trades Claim ($685,195); (5) the Credit Suisse Claim ($3,660,130); (6) the UBS Claim ($2,600,968); (7) the Barclays Claim ($30,811,366); (8) the Legal Fees, Costs, and Expenses Claim ($11,351,850); (9) the Portfolio Company Award ($71,894,891); and (10) the Administrative Fees Award ($514, 164).

89. The claims that were asserted against HCMLP by the Redeemer Committee stemmed from the various breaches of fiduciary duty to the Crusader Funds that Dondero, Ellington, and Leventon caused HCMLP to commit. For example, the "Barclays Claim"—which gave rise to over $30 million in liability for HCMLP—arose out of Dondero, Ellington, and Leventon causing HCMLP to transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, after the Redeemer Committee had already refused to approve that transfer. In so doing, Dondero, Ellington, and Leventon caused HCMLP to violate the Joint Plan and Scheme and its fiduciary duties. Because of Dondero, Ellington, and Leventon's wrongful conduct, HCMLP was ordered to pay: (1) over $30 million on account of disgorged partnership interests; (2) additional sums for disgorgement

of distribution fees (that were included within the $22.9 million Distribution Fee Award); and (3) interest, fees, and expenses incurred in connection with the arbitration.

90. In addition, from December 2013 through January 2016, Dondero, Ellington, and Leventon caused HCMLP to purchase 28 Plan Claims from Crusader investors in violation of the Redeemer Committee's right of first refusal ("ROFR"). During this time, Leventon told multiple investors interested in possible transfers of their interests that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. Leventon also made affirmative misrepresentations to the Redeemer Committee to disguise the fact that HCMLP had purchased the Plan Claims. Pursuant to the arbitration award, HCMLP was required to transfer the 28 Plan Claims to the Redeemer Committee, and to disgorge to the Committee whatever financial benefits Highland obtained from the 28 transactions, plus interest at the rate of 9%, from the date of each purchase.

91. Dondero's, Ellington's, and Leventon's conduct also resulted in HCMLP becoming liable to the Redeemer Committee for over $71 million (the "Portfolio Company Claim") in connection with claims arising from a portfolio company that was owned, directly and indirectly, by HCMLP (the "Portfolio Company"). Some of the Portfolio Company's stock was owned by the Crusader Funds. Dondero, Ellington, and Leventon caused HCMLP to covertly purchase shares in the Portfolio Company from another fund that Dondero controlled at below-market prices, and failed to liquidate the Crusader Funds' shares in the Portfolio Company as their fiduciary duties required. Pursuant to the arbitration award, HCMLP was required to purchase the Crusader Funds' shares in the Portfolio Company at a fixed price of $48,070,407, and to pay pre-judgment interest that brought the total claim to $71,894,891.

92. Additionally, the Joint Plan and Scheme required HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete. Dondero, Ellington, and Leventon caused HCMLP to violate that provision of the Joint Plan and Scheme by causing HCMLP to surreptitiously transfer approximately $32 million in Deferred Fees from the Crusader Funds' accounts on January 21 and April 6, 2016. The arbitration panel ruled that as a consequence of Dondero's, Ellington's, and Leventon's blatant breach of the payment requirements of the Joint Plan and Scheme, HCMLP forfeited its right to these fees entirely.

93. The Redeemer Committee set a hearing in Delaware Chancery Court for October 8, 2019 to obtain entry of a judgment with respect to the award. The hearing was subsequently continued to October 16, 2019. HCMLP filed for bankruptcy on the day of oral arguments for the Redeemer Committee's motion to enforce the Award in Delaware Chancery Court.

### F. Dondero's Schemes Result In Hundreds Of Millions Of Dollars Of Liability For HCMLP

94. As noted, Dondero's schemes ultimately resulted in hundreds of millions of dollars of liability for HCMLP. As described below, the creditors that Dondero had sought to cheat and evade filed proofs of claim in HCMLP's bankruptcy proceeding, and HCMLP's management, burdened with Dondero's blatant misconduct (and that of Ellington, Leventon, and other of Dondero's loyalists), was forced to settle these claims for amounts that enabled HCMLP to escape the risk of even greater liability.

95. Additionally, HCMLP has incurred in excess of $40 million in professional fees in connection with the bankruptcy filing, which was necessitated solely as a result of Dondero's misconduct. HCMLP also incurred legal expenses for entities that HCMLP did not own, including several of the "lifeboats."

**1. HCMLP Incurs $125 Million In Liability To UBS As A Result Of Dondero's, Leventon's, and Ellington's Misconduct**

96. On June 26, 2020, UBS filed a proof of claim (the "UBS Claim") in HCMLP's bankruptcy proceeding for the full $1,039,957,799.44 of its judgment against the Fund Counterparties.[18] The UBS claim sought "damages arising from HCMLP's breach of the implied covenant of good faith and fair dealing, its specific role in directing the fraudulent transfers of assets involving HFP," and interest, punitive damages, and attorneys' fees.

97. In November 2020, the Court considered the value of the UBS Claim for purposes of plan voting. In connection therewith, the Court temporarily allowed the UBS Claim in the amount of $94,761,076. Of that amount, approximately $43 million related to transfers HCMLP caused to be made to one of HCMLP's managed funds, based on the Court's estimation that there was a 90% chance that UBS would prevail on that portion of its claim under either a fraudulent conveyance or breach of implied covenant theory.

98. Subsequently, HCMLP and UBS engaged in settlement discussions and mediation. Following mediation, the parties reached an initial settlement in principle, pursuant to which UBS would receive a $75 million unsecured claim, consisting of a $50 million Class 8 General Unsecured Claim and a $25 million Class 9 Subordinated General Unsecured Claim. That settlement was disclosed to the Court at the February 2, 2021 confirmation hearing. This settlement was in satisfaction of damages resulting from conduct that Dondero, Ellington, and Leventon perpetrated on behalf of HCMLP. But for that conduct, HCMLP would not have been liable to, or required to enter into the settlement with, UBS.

---

[18] The UBS Claim consists of two substantively identical claims: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG, London Branch.

99. While the preliminary settlement for the known misconduct of Dondero, Ellington, and Leventon was being finalized, the Independent Board learned that Dondero and Ellington had surreptitiously caused the Fund Counterparties to transfer their remaining assets to Sentinel, and had caused HCMLP to misrepresent to UBS that the Fund Counterparties had no assets prior to that transfer occurring. Purportedly acting on behalf of HCMLP, Dondero, Ellington, and Leventon had concealed this transfer from the Independent Board, while advising the Independent Board that the Fund Counterparties lacked any material assets. The Independent Board had communicated that information to UBS (and the Court) and negotiated with UBS on those bases.

100. When the Independent Board discovered that Dondero, Ellington, and Leventon engaged in a conspiracy to cover up the fraudulent Sentinel transfer, it disclosed the transfer to UBS. As a result, the parties reopened settlement discussions. Ultimately, in order to limit HCMLP's potential liability to UBS as a result of Dondero's, Leventon's, and Ellington's bad acts, HCMLP entered into a revised settlement with UBS that granted UBS a claim totaling $125 million, consisting of a $65 million Class 8 General Unsecured Claim and a $60 million Class 9 Subordinated Unsecured Claim. In addition to the increased settlement amount and litigation costs, HCMLP is required to expend up to $3 million (subject to reimbursement) pursuant to certain cooperation provisions contained in the settlement agreement with UBS as a result of the fraudulent Sentinel transfer. The Bankruptcy Court approved the UBS settlement on May 27, 2021.

### 2. HCMLP Incurs More Than $185 Million In Liability To The Redeemer Committee And Crusader Funds As A Result Of Dondero's Misconduct

101. On April 3, 2020, the Redeemer Committee filed a general unsecured claim in the amount of its $190,824,557.00 arbitration award, plus "post-petition interest, attorneys' fees, costs and other expenses that continue to accrue." Likewise, on April 3, 2020, the Crusader Funds filed a claim for $23.5 million, consisting of $8.2 million in management fees and $15.3 million in distribution fees. Faced with this potential liability, HCMLP entered into a settlement whereby, among other things: (i) the Redeemer Committee was granted an allowed general unsecured claim of $136,696,610.00; (ii) the Crusader Funds were granted an allowed general unsecured claim of $50,000.00; (iii) HCMLP and Eames each consented to the cancellation of interests they and the Charitable DAF held in the Crusader Funds that the arbitration panel had determined were wrongfully-acquired; (iv) HCMLP and Eames each acknowledged that they would not receive any portion of distributions reserved by the Crusader Funds, and HCMLP further acknowledged that it will not receive any future payments from the Crusader Funds in respect of any Deferred Fees, Distribution Fees, or Management Fees; and (v) HCMLP and the Redeemer Committee agreed to a form of amendment to the Portfolio Company's shareholders' agreement and to a process whereby HCMLP would use commercially reasonable efforts to monetize all Portfolio Company shares held by HCMLP, funds managed by HCMLP, and the Crusader Funds.[19] The Bankruptcy Court approved HCMLP's settlement with the Redeemer Committee and Crusader Funds on October 23, 2020.

---

[19] Because HCMLP did not have the money to purchase the shares, the Redeemer Committee and HCMLP agreed to treat the Portfolio Company's shares differently than the process required under the arbitration award. Rather than having HCMLP purchase the Crusader Funds' shares in the Portfolio Company for approximately $48 million, they agreed that the Crusader Funds would

### 3. HCMLP Incurs More Than $100 Million In Liability To Acis, Terry, And HarbourVest As A Result Of Dondero's Misconduct

102. Acis also filed proofs of claim against HCMLP, seeking, among other things, the amounts Dondero had caused HCMLP to overcharge Acis in order to diminish Terry's limited partner distributions from Acis, and damages arising from HCMLP's efforts to transfer assets out of Acis, in order to evade Terry's arbitration award and ensure that Dondero would benefit from the transferred assets. Terry and his wife also filed a proof of claim against HCMLP, alleging that HCMLP, acting through Dondero, had misappropriated assets in their retirement account. The Acis and Terry proofs of claim were settled in mediation after Dondero resigned from HCMLP. Pursuant to that settlement, Acis received a $23 million allowed claim against HCMLP, and HCMLP was required to pay (1) Terry and his wife $425,000 plus 10% interest to resolve the Terry's claim that HCMLP had misappropriated their retirement account;[20] (ii) Terry $355,000 in legal fees because of HCLOF's frivolous suit in Guernsey; and (iii) Acis an additional $97,000 for legal fees incurred defending another frivolous lawsuit initiated by Dondero.

103. On April 8, 2020, the HarbourVest entities filed proofs of claim against HCMLP (the "<u>HarbourVest Proofs of Claim</u>") alleging that HCMLP had fraudulently induced them into entering into the HCLOF Investment based on HCMLP's misrepresentations and omissions concerning certain material facts, including that HCMLP: (1) failed to disclose that Dondero intended to cause Acis to evade Terry's $7.9 million arbitration award; (2) failed to disclose that it orchestrated a series of fraudulent transfers to prevent Terry from collecting on his

---

retain their shares in the Portfolio Company and that the total damages award would be reduced by approximately $30.5 million to account for the perceived fair market value of those shares.

[20] Because of the interest component, HCMLP ultimately paid the Terrys approximately $1 million to compensate them for Dondero's theft of their retirement account.

arbitration award, and misrepresented the reasons for changing the portfolio manager for HCLOF immediately prior to HarbourVest's HCLOF Investment; (3) indicated that the dispute with Terry would not impact HCLOF's investment activities; and (4) falsely expressed confidence in HCLOF's ability to reset or redeem the CLOs under its control.

104. HarbourVest sought to rescind its HCLOF Investment and alleged damages in excess of $300 million. Ultimately, following Dondero's departure from HCMLP, the parties reached a resolution whereby HarbourVest agreed to transfer its interests in HCLOF to a new entity designated by HCMLP in exchange for a $45 million general unsecured claim and a $35 million subordinated general unsecured allowed claim. The value of the HCLOF interests that HarbourVest transferred to the HCMLP-designated entity was tens of millions of dollars less than the allowed amount of HarbourVest's claim against HCMLP.

### G. HCMLP Was Insolvent, Inadequately Capitalized, And/Or Intended To Incur Debts Beyond Its Ability To Pay Well Before The Redeemer Committee Arbitration Award Forced It Into Bankruptcy

105. The Redeemer Committee's $190 million arbitration award left HCMLP with no choice but to file for bankruptcy. But HCMLP was insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay well before the Redeemer Committee arbitration award was issued. As Dondero himself has acknowledged under oath, as a result of the economic recession of 2008 HCMLP "almost went under and . . . moved to a state of insolvency" from which HCMLP was still struggling to emerge in 2012.[21] Indeed, as shown below, a valuation of HCMLP's assets and liabilities shows that HCMLP was balance sheet insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay in

[21] Mar. 28, 2012 H'rg Tr. 62:06-10 (J. Dondero), *In the Matter of the Marriage of I.C. and Q.C.*, Cause No. 11-16417-Z (Tex. Dist. [256th Dist.]).

2011 and 2012, when Dondero created lifeboats NexPoint and HCMFA, and transferred certain of HCMLP's management contracts to HCMFA for no value. Contemporaneous valuations performed by the company itself corroborate this conclusion.

106. More specifically, these valuations show that when litigation liabilities resulting from claims by Barclays and UBS against HCMLP are taken into account, HCMLP was insolvent from no later than April 9, 2010 until no earlier than April 30, 2013.

| | Apr. 9, 2010 | Dec. 31, 2010 | Dec. 31, 2011 | Dec. 31, 2012 | Apr. 30, 2013 |
|---|---|---|---|---|---|
| Total Assets Less Financial Liabilities[22] | ($32M) | ($22) | $60M | $101M | $145M |
| Litigation Liabilities[23] | $365M | $365M | $365M | $145M | $145M |
| Net Value | ($397M) | ($387M) | ($305M) | ($44M) | ($1M) |

107. The creation of the lifeboats and subsequent transfer of management contracts (and business value) all but ensured HCMLP's demise. HCMLP's assets under management, operating income from its investment management business, and operating margins steadily declined, and almost no new third-party investor money came into the company. HCMLP continued to shoulder the burden of providing services to NexPoint and HCMFA without compensation. HCMLP's financial condition began to improve in late 2013, due largely to

[22] HCMLP's "Total Assets Less Financial Liabilities" is exclusive of litigation liabilities and is estimated as the sum of the enterprise value of the investment fund management business, the fair market value of HCMLP's investment portfolio, and the value of related parties notes receivable, less HCMLP's non-contingent financial liabilities. HCMLP's valuation is corroborated by valuations prepared by CBIZ, Inc. on behalf of HCMLP's general partner. Figures are rounded to the nearest million.

[23] Litigation liabilities are set at the values at which they were settled, or the values at which they were estimated by the Court in the course of the bankruptcy proceeding.

successful proprietary trading and overall improving market conditions, but those gains began to dissipate in 2015 due to Dondero's reckless trading.

108. By December 2016, the company was again firmly insolvent, inadequately capitalized, and/or unable to pay its debts as they came due, in large part because its CLOs were generating diminishing returns, and the company was earning only minimal fees for servicing other Dondero Entities rather than generating new business of its own, while continuing to bear significant employee expenses. HCMLP's financial condition deteriorated further between 2017 and 2019, as additional litigation claims were levied against the company, and it was forced to answer for the misconduct perpetrated in its name by Dondero and his loyalists.

109. Specifically, as shown below, when litigation liabilities resulting from claims by UBS, the Redeemer Committee, and Acis against HCMLP are taken into account in valuations prepared on HCMLP's behalf, HCMLP was insolvent from no later than December 31, 2016, until the date it filed for bankruptcy.

| | Dec. 19, 2016 | Dec. 31, 2017 | Dec. 31, 2018 | Oct. 16, 2019 |
|---|---|---|---|---|
| Total Assets Less Financial Liabilities[24] | $183M | $260M | $184M | $101M |
| Litigation Liabilities[25] | $212M | $365M | $365M | $365M |
| Net Value | ($29M) | ($105M) | ($181M) | ($264M) |

24 HCMLP's "Total Assets Less Financial Liabilities" is exclusive of litigation liabilities and is estimated as the sum of the enterprise value of the investment fund management business, the fair market value of HCMLP's investment portfolio, and the value of related parties notes receivable, less HCMLP's non-contingent financial liabilities. HCMLP's valuation is corroborated by valuations prepared by CBIZ, Inc. on behalf of HCMLP's general partner. Figures are rounded to the nearest million.

25 Litigation liabilities are set at the values at which they were settled, or the values at which they were estimated by the Court in the course of the bankruptcy proceeding.

### H. At All Time Relevant To This Amended Complaint, Dondero Hopelessly Commingled And Exploited Entities Within His Enterprise For His Own Personal Benefit

110. At all times relevant to this Amended Complaint, Dondero exploited HCMLP, Strand, and the various entities he controlled within the Highland empire for his own personal benefit, both directly and through other HCMLP fiduciaries whose loyalties ran to Dondero rather than HCMLP, and who aided Dondero in his various schemes. Dondero treated the elaborate corporate web he had created as a single integrated entity that existed solely to further his own self-enriching schemes, rather than as individual entities with their own respective stakeholders and corporate governance.

#### 1. Prior To Dondero's Resignation From Strand, Dondero Was The Alter Ego Of Strand

111. Dondero singularly dominated and controlled HCMLP and was its solitary decision-maker. Dondero made every material business, operational, management, and financial decision for HCMLP. Dondero exercised his complete control of HCMLP through HCMLP's general partner Strand, which Dondero similarly dominated and controlled. Dondero was Strand's 100% owner, sole director, and president between 1993 and 2020. For eight years he was also its secretary and only officer.

112. Strand did not even attempt to maintain the pretenses of observing corporate formalities. As an initial matter, Strand did not hold regular board meetings. Indeed, the Litigation Trustee, having reviewed HCMLP's books and records, has been unable to identify a single instance in which a Strand board meeting was held prior to the Petition Date. This is consistent with Dondero's own testimony in 2020 in an unrelated proceeding that he cannot recall ever attending a board meeting for Strand or seeing Strand board meeting minutes.

113. Although Strand's bylaws require annual meetings of stockholders, over the 26 years that Dondero controlled Strand, only six annual stockholder meetings were ever held, and no such meetings took place after 2005. The Litigation Trustee was able to identify only twelve instances of documented corporate action taken by the Strand board over the course of approximately 26 years, eight of which related to the appointment or removal of officers.

114. Dondero was the only officer of Strand between 1993 and 2001. Although Strand had certain elected officers between 2001 and 2019, they performed no duties in their capacities as officers of Strand and were appointed or fired from their roles based on their loyalty to, and standing with, Dondero. Indeed, when Dondero was asked under oath in 2020 about Strand's officers, he testified that he did not know if Strand even had officers, and stated that he was "not aware of [Strand] having any employees or active … governance." Moreover, he did not know whether Strand had a board of directors or if he was solely Strand's president.

**2. Dondero Routinely Commingled Entities And Employees Throughout The Dondero Corporate Web And Abused The Corporate Form**

115. As of the Petition Date, the Highland complex spanned more than 2,000 entities. For at least the last two decades, it has functioned largely as a single economic unit that was operated and controlled by Dondero, who abused his direct or indirect ownership stakes for his own personal benefit. Dondero directed the integrated enterprise himself, using friends, family members, and directors-for-hire that the Court has previously described as "nominal figureheads"[26] to carry out his will. As high-level HCMLP employees have testified under

[26] *See In re Acis Cap. Mgmt., L.P.*, No. 18-30264-SGJ-11, 2019 WL 417149, at *17 (Bankr. N.D. Tex. Jan. 31, 2019), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019), *appeal dismissed as moot sub nom. Matter of Acis Cap. Mgmt. G.P., L.L.C.*, 850 F. App'x 300 (5th Cir. 2021), and *aff'd sub nom. Matter of Acis Cap. Mgmt., L.P.*, 850 F. App'x 302 (5th Cir. 2021).

oath, Dondero was the "ultimate decision-maker" for "every [] entity in the firm and for the firm as a whole."

116. Dondero managed the entities as a single integrated unit. Internal business plans and projections were prepared in the aggregate across entities, including entities that were not owned by HCMLP, but were instead otherwise directly or indirectly owned by Dondero. Internal financial forecasts even projected AUM growth in non-HCMLP entities that was predicated upon HCMLP acting as support and service provider, even though HCMLP itself was effectively a melting ice-cube when those projections were made. Indeed, as far back as 2011, company projections provided to the valuation advisor CBIZ Valuation Group projected negative operating income for HCMLP.

117. Dondero used his domination of his web of entities, operated as a single unit, to facilitate his pillaging of HCMLP, moving HCMLP's assets and revenue out of reach of its creditors while preserving those funds and assets for his own use or for the benefit of other entities he created or controlled. As described above, Dondero operated NexPoint and HCMFA for the purpose of siphoning off HCMLP's revenue and value; in addition, he used HCMLP as NexPoint's and HCMFA's direct piggy-bank, transferring not only HCMLP's business and agreements, but also its cash, which was used to seed new funds and investment vehicles, among other things.

118. Dondero's control of the various entities within the Highland web was so pervasive that his own co-founder Okada remarked at one point in 2012, "I am not cool with you coming up with ideas, using Highland's cash flow to set them up, fund all their negative working capital and then somehow think the split shouldn't be 75 25 without some sort of negotiation and true up [(i.e., making new entities that Dondero owned entirely on his own)]."

Indeed, a 2016 draft accounting memo concluded that HCMLP, HCMFA, and NexPoint (and all of their subsidiaries) "are considered to be under common control … James Dondero controls all 3 of the entities." This conclusion accords with statements NexPoint's and HCMFA's own funds have made in public filings,[27] as well as the Bankruptcy Court's finding that they are both "controlled by Dondero."[28]

119. Dondero also funneled his own personal expenses through HCMLP, routinely seeking expense reimbursements from HCMLP in excess of $1 million per year. At Dondero's direction, HCMLP employed certain employees whose only responsibilities and obligations were to manage Dondero's and Okada's personal affairs and private business interests. For example, Melissa Schroth was employed by HCMLP, but her only duties were to serve as Dondero's and Okada's personal bookkeeper. Her duties involved no work for HCMLP, but rather concerned Dondero's and Okada's personal investments and entities, including but not limited to Dugaboy and Get Good. Dondero also used HCMLP and its employees for the benefit of other entities he dominated without adequate compensation to HCMLP—including for the benefit of NexPoint and HCMFA as described above, as well as for the benefit of his personal trusts. For example, Dondero used his domination of HCMLP to make its employee resources available to Dugaboy and Get Good at his sole discretion. HCMLP employees were involved

---

[27] *See*, *e.g.*, NexPoint Real Estate Strategies Fund, Prospectus (Form 497) (as filed Apr. 29, 2022) ("NexPoint Advisors, L.P. … is controlled by James Dondero by virtue of his control of its general partner, Nexpoint Advisors GP, LLC."); Highland Income Fund, Prospectus Supplement (To Prospectus dated July 1, 2019) (Form 497) (July 29, 2019) ("HCMFA is owned by Highland Capital Management Services, Inc. ("HCM Services") and its general partner, Strand Advisors XVI, Inc., of which James Dondero is the sole stockholder. HCM Services is controlled by Mr. Dondero and Mr. Mark Okada by virtue of their respective share ownership.").

[28] *See* Order Dismissing as Moot Debtor's Motion for a Mandatory Injunction, *Highland Capital Mgmt., L.P. v. Highland Capital Mgmt. Fund Advisors, L.P. (In re Highland Capital Mgmt., L.P.)*, Adv. Proc. No. 21-03010-sgj11 (Bankr. N.D. Tex. Feb. 24, 2021) (Docket No. 25).

in creating, managing, and providing accounting services to Dugaboy, and certain of those employees, including Melissa Schroth, performed work on behalf of Get Good in connection with Dondero's estate planning and transactions between Get Good and other Dondero Entities. Moreover, both Dugaboy and Get Good have acknowledged in the course of HCMLP's bankruptcy that HCMLP hosted their documents on its server. However, neither Dugaboy nor Get Good compensated HCMLP for the use of its employees or its resources.

120. This use of HCMLP's employees for Dondero's personal benefit continued even after the commencement of HCMLP's bankruptcy. For example, after the bankruptcy commenced, Schroth instructed Nancy Dondero to send a letter in her capacity as a trustee of Dugaboy instructing the Swiss entity Highland Capital Management AG ("HCM AG"), which is majority-owned by Dugaboy (which is ultimately owned and controlled by Dondero), to write off a liability that it owed to HCMLP for payments that HCMLP had made on its behalf. Schroth even ghost-wrote a letter for Nancy Dondero to send to HCM AG authorizing this theft. Likewise, Dondero frequently instructed HCMLP's employees to perform services in connection with Dondero's personal and business interests, which conferred no value on HCMLP.

121. Highland employees frequently did not know whether they or their colleagues were employees of HCMLP or another entity within the Dondero web. Employees shared the same office space in HCMLP's headquarters. Indeed, each of Strand, NexPoint, NexPoint GP, HCMFA, Dugaboy, CLO Holdco, the Highland Dallas Foundation, the Highland Santa Barbara Foundation, the Highland Kansas City Foundation, HFP, SAS, and Acis listed its business headquarters at this same address: 300 Crescent Court, Suite 700, Dallas, Texas 75201. Moreover, when employees of HCMLP performed services for other Dondero entities, they

sometimes did so pursuant to agreements that Dondero signed for both HCMLP, on the one hand, and the counterparty, on the other hand. In other instances, HCMLP's employees performed services for non-HCMLP entities without any formal agreements in place at all. For example, Leventon testified that he performed work for SAS "on and off" for approximately seven years (*e.g.*, in connection with whether to invest in a new litigation funding case), notwithstanding that he was never an employee of SAS and HCMLP did not have a shared services agreement with SAS.[29] Moreover, when shared services and advisory agreements were in place, HCMLP frequently charged Dondero's other entities below-market rates for use of HCMLP's employees and resources.

122. Additionally, Dondero delegated authority to his loyalists irrespective of their titles or roles. For example, Dondero delegated decision-making authority for Acis to Ellington, notwithstanding that he was not an officer, director, or employee of Acis. And Leventon testified that although he was an HCMLP employee, HCMLP could request that he perform legal services for any of the 2,000 entities in the Highland web.

123. Dondero would also use HCMLP as his own personal piggy-bank. For example, between January and August of 2018, Dondero borrowed $16,725,000 on four demand notes. Dondero remains obligated on three of the demand notes and maintains an outstanding principal

---

[29] Similarly, several HCMLP employees, including Ellington, Leventon, Katie Irving, and JP Sevilla, had SAS email addresses, and there were frequent meetings among HCMLP's legal department—including Ellington, Leventon, and Sevilla—and Dilip Massand in connection with SAS. SAS did not compensate any of these HCMLP employees for their work for SAS. Moreover, in 2014, when a telephone call was placed to the number listed on SAS's website, the call was routed to HCMLP's office in Dallas with a message that stated: "Thank you for calling SAS Asset Recovery. For reception press 0. For Scott [Ellington], press 1. For Dilip [Massand], press 2. For JP [Sevilla], press 3. For Tabor [Pittman, former HCMLP Associate GC], press 4. For Katie [Irving], press 5. For Isaac [Leventon], press 6. Thanks and have a good day."

balance of approximately $9 million. HCMLP has demanded payment on all of the outstanding demand notes, but to date, Dondero has failed to make any repayments on that debt.[30]

124. Dondero also effectively paid himself and Okada distributions from HCMLP through other Dondero Entities, including HCMS. Between 2013 and 2017, HCMS issued dozens of demand notes to HCMLP in return for tens of millions of dollars in cash, and between May 2017 through 2020, HCMS issued four additional promissory demand notes with an aggregate face amount of $900,000. Frequently, these notes functioned as disguised distributions to Dondero and Okada, by virtue of a "loan" from HCMLP to HCMS followed by a "loan" from HCMS to Dondero and Okada. As with other intercompany notes between HCMLP and other Dondero Entities, these notes had minimal covenants. Moreover, Dondero caused HCMLP to issue these loans to HCMS with minimal interest.

125. To take yet another example, Dondero exploited HCMLP's employees and capital in order to launch HCRE Partners, LLC ("HCRE"), another entity designed to evade HCMLP's creditors.[31] HCRE pursued financial and real estate investments, failing to pay

[30] In January 2021, HCMLP filed adversary proceedings against Dondero and four of his affiliated entities (HCMFA, NexPoint, HCRE, and HCMS) in the Bankruptcy Court to collect on these notes. *See*, *e.g.*, *Highland Capital Management, L.P. v. James Dondero*, Adv. Pro. 21-03003-sgj (Bankr. N.D. Tex. Jan. 22, 2021). Dondero and his affiliated entities have raised a series of frivolous defenses to repayment of the notes, including that Dugaboy—acting through Dondero's sister—agreed to forgive the notes as part of Dondero's compensation. As of December 2021, the defendants owed an aggregate of over $50 million in past-due principal and interest on the notes. In November 2021, HCMLP filed a second adversary proceeding against HCMFA to collect on additional notes. *See Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P.*, Adv. Pro. 21-03082-sgj. In this second notes litigation, HCMFA has raised a similarly frivolous defense.

[31] HCRE is 70% owned by Dugaboy, 25% owned by Highland Capital Management Real Estate Holdings I, LLC ("HCMRE I") (owned by a former HCMLP managing director) and 5% owned by Highland Capital Management Real Estate Holdings II, LLC ("HCMRE II") (owned by Ellington).

HCMLP any consideration for advisory, administrative, and other services HCMLP provided. Moreover, Dondero (1) caused HCMLP to loan HCRE tens of millions of dollars on terms that were unfair to HCMLP; (2) used the proceeds of those loans to pay approximately $32 million in distributions (between 2016 and 2020) to Dugaboy, Ellington, and another former HCMLP employee; and (3) caused HCRE to default on its debt to HCMLP and assert frivolous defenses to HCMLP's right to repayment. As of January 8, 2021, approximately $6.1 million in principal and interest was due and owing to HCMLP on HCRE notes.

126. As explained above, Dondero also used HCMLP to support the growth of lifeboats like NexPoint and HCMFA. Additionally, in December 2010, certain preferred tranches of CLOs managed by HCMLP and held by Highland CDO Holding Company, a portion of which was indirectly owned by HCMLP, were sold to CLO Holdco, a Cayman Islands entity then owned and controlled by a Dondero trust. CLO Holdco purported to pay approximately $39 million in return, but $33 million of that amount consisted of a note that was never repaid. The value of these preferred securities predictably skyrocketed soon thereafter, and generated substantial income that was used to benefit Dondero's lifeboats. An analysis of CLO Holdco's cash flows over time demonstrates that income generated from these assets was used to seed a variety of NexPoint-managed funds and entities, HCMFA-managed funds and entities, and Acis-managed CLOs and other vehicles—all for Dondero's benefit—rather than accruing in favor of HCMLP or its subsidiaries.

127. Dondero used HCMLP's funds to support other entities in his web as well. In or around 2013, HCM AG entered into a joint venture with a Brazilian entity named Brasilinvest Investimentos e Participacoes Ltda ("Brasilinvest Investimentos") for a shared interest in a Brazilian entity named Highland Capital Brasilinvest Gestora de Recursos, Ltda (a.k.a Highland

Capital Brasil Gestora de Recursos). With Dondero's approval, HCM AG acquired Brasilinvest Investimentos's shares in this joint venture through a $230,000 cash payment in October 2016. However, at Dondero's direction, the $230,000 was paid by HCMLP rather than HCM AG or Dugaboy.

128. Dondero did not bother to distinguish between himself and HCMLP. After Dondero was removed as HCMLP's Chief Executive Officer and President in January 2020, he continued using his HCMLP email account and continued working out of HCMLP's headquarters until his forced resignation in October 2020 and removal from HCMLP's premises in December 2020. When the Court entered an order restraining Dondero from communicating with HCMLP employees, Dondero flouted the order, including by communicating with Ellington and instructing Melissa Schroth (an HCMLP employee at the time) to resist Dugaboy-related document production requests, even though those documents were always kept on HCMLP's computer system. Likewise, a temporary restraining order entered by this Court prohibited Dondero from participating in, or encouraging others to participate in, any action that undermined decisions made by HCMLP's Chief Restructuring Officer, James Seery ("Seery"), regarding the disposition of HCMLP assets. Nevertheless, Dondero did so multiple times, including by contacting various employees and instructing them to act in a manner that was inconsistent with Seery's directions.

129. Dondero evinced no respect for HCMLP as an entity separate and apart from himself. Thus, he disposed of a cell phone that belonged to HCMLP that contained relevant data, likely resulting in the spoliation of valuable evidence that HCMLP could have used to pursue claims benefitting HCMLP. In addition, Dondero interfered with document productions of HCMLP and trespassed on HCMLP's property.

### I. Dondero And His Loyalists Also Engaged In Other Conduct That Harmed HCMLP

#### 1. Dondero And His Loyalists Fraudulently Transferred Assets To Themselves And Their Affiliated Entities

130. Dondero and his loyalists also engaged in other transactions that siphoned value from HCMLP to themselves. As described in greater detail below, these included (i) transfers of liquid assets for illiquid notes that could not have been monetized for the same value as the assets for which they were exchanged, (ii) limited partner distributions, and (iii) payments for services provided to other Dondero Entities rather than HCMLP.

(a) The Fraudulent CLO Holdco Transaction

131. On December 28, 2016, shortly after the Redeemer Committee commenced its Delaware state court action and arbitration against HCMLP, and while UBS's action against HCMLP was pending, Dondero, acting with substantial assistance from Scott, undertook a scheme whereby HCMLP transferred assets valued by the company at approximately $24 million through a series of related assignments (the "Transferred CLO Holdco Assets") to CLO Holdco, in exchange for an assignment from Get Good of an existing Dugaboy obligation (the "Dugaboy Note"), which was worth significantly less than the transferred assets (the "CLO Holdco Transaction").

132. Upon information and belief, Dondero consummated the CLO Holdco Transaction in order to claim a charitable deduction on his tax returns, and to place value out of his ex-wife's reach. Specifically, Dondero wanted to transfer assets out of Get Good so that they would not be available to his ex-wife, and to do so through a charitable donation so that he would get the added benefit of a tax deduction. Get Good, however, did not own enough assets that qualified for a tax-deductible charitable donation. Accordingly, Dondero caused Get Good

to exchange the Dugaboy Note, which did not qualify for a tax-deductible donation, for HCMLP's Transferred CLO Holdco Assets, which did. Dondero, acting with Scott's assistance, then caused the Transferred CLO Holdco Assets to be immediately transferred from Get Good to Highland Dallas, to the Charitable DAF, to the DAF, and ultimately to CLO Holdco. The CLO Holdco Transaction thus furthered Dondero's personal interests, but harmed HCMLP and its creditors by replacing liquid and liquidating assets with an illiquid note of significantly less value.

133. The Transferred CLO Holdco Assets consisted of: (1) $2,032,183.24 or potentially more in Series A Interests in Highland Capital Loan Fund, L.P., an HCMLP-managed hedge fund investing primarily in liquid loans; (2) a participation interest worth $8,710,000 or potentially more in call options of publicly-traded American Airlines Group, Inc. (the "AA Interests"); and (3) a participation interest in certain Highland Crusader Fund L.P. and Highland Crusader Fund II, Ltd. shares, as well as a tracking interest in certain participation shares of Highland Crusader Fund II, Ltd., which at the time of the transfer HCMLP valued at $12,625,395.44 (the "Crusader Interests"). The transfer of the Transferred CLO Holdco Assets was initiated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good. Pursuant to that agreement, the Transferred CLO Holdco Assets were received by Get Good.

134. Dondero caused HCMLP to transfer the Transferred CLO Holdco Assets to Get Good in exchange for the Dugaboy Note. While the face amount of the Dugaboy Note was equal to the reported value of the Transferred CLO Holdco Assets, in actuality, the value of the Dugaboy Note did not come close to the value of the Transferred CLO Holdco Assets. The interest rate on the Dugaboy Note was a paltry 2.75%. There was no security interest provided

in respect of the Dugaboy Note or other material covenants or lender protections other than rights to cost of collections. No payments of principal or interest were required on the note until 2036. And because Dugaboy was a completely private and opaque counterparty, there was no third-party market for the sale of the Dugaboy Note. Lastly, from a counterparty risk perspective, Dondero's control over the repayment of a note clearly does not ensure timely repayment without litigation, as evidenced by the several entities controlled by Dondero that are currently seeking to evade their unambiguous payment obligations on other notes owed to HCMLP, on frivolous grounds such as mistake and subsequent alleged oral agreements between Dondero and his sister. In the end, Dondero caused HCMLP to exchange valuable liquid or otherwise near-term liquidating assets for a paper-thin promise 20 years into the future.

135. Following Get Good's receipt of the Transferred CLO Holdco Assets, Scott—at Dondero's direction—immediately caused Get Good to donate the assets to Highland Dallas Foundation in his capacity as trustee of Get Good. Dondero and Scott caused the Highland Dallas Fund to immediately contribute the Transferred CLO Holdco Assets to DAF Holdco by unanimous written consent executed by Dondero, Scott, and Jalonick, each in their capacity as the directors of Highland Dallas Foundation. Following that transfer, through an omnibus assignment agreement, Scott caused DAF Holdco to transfer the Transferred CLO Holdco Assets to the DAF, which itself immediately transferred them to CLO Holdco. The DAF GP issued a written resolution, as general partner of the DAF and as 100% owner of CLO Holdco, contributing the Transferred CLO Holdco Assets to CLO Holdco. Scott again executed this document as managing member of DAF GP. As purported consideration for these transfers, the Highland Dallas Foundation, DAF Holdco, the DAF, and CLO Holdco all agreed to be fully bound by apparently unrelated "Multi Strat Governing Documents." Scott executed the

requisite consent documents on behalf of each entity, in his capacities as director of DAF Holdco, managing member of the DAF, and director of CLO Holdco. Upon information and belief, Scott consented to each step of the CLO Holdco Transaction on behalf of Get Good, DAF Holdco, the DAF, DAF GP, and CLO Holdco solely at Dondero's request, and without performing any independent analysis.

136. The structure of the CLO Holdco Transaction is set forth below in Figure 3.

**Figure 3.**




(b) <u>Fraudulent Distributions</u>

137. Notwithstanding HCMLP's limited liquidity and hundreds of millions of dollars in looming liabilities, Dondero caused HCMLP to make a series of equity distributions between 2010 and 2012, and 2015 and 2019, for Dondero's and Okada's ultimate benefit, and to the detriment of HCMLP's creditors. These distributions were made at a time when HCMLP was insolvent, inadequately capitalized, and/or intended to incur debts beyond its ability to pay, and

were intended to hinder, delay, and/or defraud creditors by siphoning value to limited partners that should have been preserved for creditors' benefit.

138. Although Dondero and Okada placed certain of their limited partnership interests in trusts that they ultimately owned or controlled, Dondero frequently disregarded corporate formalities, including with respect to limited partnership distributions. Until 2015, distributions were made to Dondero personally, notwithstanding that he owned HCMLP largely through certain trusts. Beginning in 2015, it appears that distributions were made directly to Strand and Dugaboy, *i.e.*, the Dondero Entities that actually held HCMLP limited partnership interests. As such, the distributions made to Dondero between April 9, 2010 and February 28, 2015 (identified below) were made for the benefit of Dondero, Dugaboy, and/or Strand. The distributions made after February 28, 2015, were, upon information and belief, made directly to the limited partnership interest holders, for the benefit of Dondero and Okada.

139. Likewise, until 2015, distributions were made to Okada individually, rather than HCMLP's limited partners MAP #1 and MAP #2. As such, the distributions made to Okada between April 9, 2010, and February 28, 2015, (identified below) were made for the benefit of Okada, MAP #1, and/or MAP #2. The distributions to Okada made after February 28, 2015, were broken out into three transfers in HCMLP's records, in amounts proportionate to the limited partnership interests of Okada, MAP #1, and MAP #2.

140. On or around April 9, 2010, HCMLP made distributions to Dondero and Okada, in the amounts of $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) and

$405,585.62 (two transfers of $375,000.00 and $30,585.62), respectively (the "April 9, 2010 Distributions").[32]

141. On or around April 13, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $649,318.45 and $216,439.49, respectively (the "April 13, 2011 Distributions").

142. On or around May 2, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $3,124,435.00 and $1,024,018.00, respectively (the "May 2, 2011 Distributions").

143. On or around September 13, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $5,351,316.00 and $1,705,813.00, respectively (the "September 13, 2011 Distributions").

144. On or around November 25, 2011, HCMLP made distributions to Dondero and Okada, in the amounts of $5,250,000.00 and $1,750,000.00, respectively (the "November 25, 2011 Distributions").

145. On or around February 22, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $3,000,000.00 and $1,000,000.00, respectively (the "February 22, 2012 Distributions").

146. On or around February 29, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $4,514,780.25 and $1,504,926.75, respectively (the "February 29, 2012 Distributions").

[32] Plaintiff's original Complaint referred to the distributions as being made on or around the dates reflected on HCMLP's general ledger. Plaintiffs have now located the bank transfer statements for each distribution, and use the bank transfer date instead. The distributions being challenged, however, have not changed.

147. On or around April 10, 2012, HCMLP made distributions to Dondero and Okada, in the amounts of $6,221,364.15 and $2,073,788.05, respectively (the "April 10, 2012 Distributions").

148. On or around April 9, 2013, HCMLP made distributions to Dondero and Okada, in the amounts of $25,375,083.16 and $8,440,148.31, respectively (the "April 9, 2013 Distributions").

149. On or around December 19, 2016, HCMLP made distributions to Hunter Mountain,[33] Dugaboy, and Strand, in the amounts of $4,769,570, $8,945, and $12,017, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $2,334, $470, and $201, respectively (the "December 19, 2016 Distributions").

150. On or around January 5, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $11,034,754, $20,694, and $27,803, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2,[34] in the amounts of $5,401, $1,087, and $466, respectively (the "January 5, 2017 Distributions").

---

[33] In December 2015, Dondero orchestrated two sequential transactions, whereby Hunter Mountain purchased virtually all of HCMLP's limited partnership interests in exchange for cash and notes (collectively, the "Hunter Mountain Transaction"). The effect of the Hunter Mountain Transaction was to consolidate over 99% of all existing limited partners' interests in HCMLP into a single entity, Hunter Mountain. Hunter Mountain is owned through a series of intermediate shell companies, and ultimately all economic interests are held in a series of tax-favored life insurance accounts at Crown Global Life Insurance Ltd. ("Crown Global"). On information and belief, these accounts were created by Dondero and Okada, who were the direct or indirect owners of nearly all of the Debtor's limited partner interests prior to the Hunter Mountain Transaction. Dondero orchestrated the Hunter Mountain Transaction in order to avail himself of personal tax benefits.

[34] At the time of the December 19, 2016 distributions and thereafter, Okada and two trusts (MAP #1 and MAP #2) established for the benefit of Okada's children and siblings held economic interests in HCMLP. HCMLP's accounting records indicate that distributions allocated to Okada, MAP #1, and MAP #2 were all made to a single account in Okada's name. Thus, with respect to this and subsequent, applicable distributions, Plaintiff pleads that they were made to or for the benefit of Okada, MAP #1, and MAP #2.

151. On or around February 7, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $7,169,970.00, $13,446.40, and $18,065.44, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $3,509.32, $706.19, and $302.65, respectively (the "February 7, 2017 Distributions").

152. On or around June 15, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $79,600.00, $149.28, and $200.56, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $38.96, $7.84, and $3.36, respectively (the "June 15, 2017 Distributions").

153. On or around December 21, 2017, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $2,651,675.00, $4,972,89, and $6,681.16, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $1,297.86, $261.17, and $111.93, respectively (the "December 21, 2017 Distributions").

154. On or around March 9, 2018, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $84,575.00, $158.61, and $213.10, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $41.40, $8.33, and $3.57, respectively (the "March 9, 2018 Distributions").

155. On or around December 19, 2018, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $4,930,722.50, $9,246.96, and $12,423.44, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $2,413.33, $485.64, and $208.13, respectively (the "December 19, 2018 Distributions").

156. On or around March 28, 2019, HCMLP made distributions to Hunter Mountain, Dugaboy, and Strand, in the amounts of $3,711,456.47, $6,960.38, and $9,351.38, respectively, and to or for the benefit of Okada, MAP #1, and MAP #2, in the amounts of $1,816.56, $365.55,

and $156.66, respectively (the "March 28, 2019 Distributions," and together with the April 9, 2010 Distributions, April 13, 2011 Distributions, May 2, 2011 Distributions, September 13, 2011 Distributions, November 25, 2011 Distributions, February 22, 2012 Distributions, February 29, 2021 Distributions, April 10, 2012 Distributions, April 9, 2013 Distributions, December 19, 2016 Distributions, January 5, 2017 Distributions, February 7, 2017 Distributions, June 15, 2017 Distributions, December 21, 2017 Distributions, March 9, 2018 Distributions, December 19, 2018 Distributions, March 28, 2019 Distributions, the "HCMLP Distributions").

157. All of these distributions were made at a time when HCMLP was insolvent and as part of a scheme to transfer HCMLP's value to Dondero and Okada and divert value away from HCMLP's current and potential future creditors. The March 28, 2019 Distributions, which were made shortly after the arbitration panel awarded the Redeemer Committee over $190 million, were the final distributions made by HCMLP. The distributions ceased at that time—the end result of HCMLP's valuable businesses being usurped by the "lifeboats" and a years-long effort to transfer HCMLP's remaining cash to its limited partners via distributions.

(c) Fraudulent Transfers To Massand

158. HCMLP also made payments of at least $519,000 per year to Massand Capital from November 2014 through 2019. On January 1, 2014, HCMLP entered into a one-year consulting agreement with Massand Inc., pursuant to which HCMLP agreed to pay Massand Inc. $25,000 per month in fees, $7,500 per month in "accommodations," $750 per month in cell phone expenses, and other "reasonable" expenses. Then, on January 5, 2015, HCMLP entered into a consulting agreement (together, the "Massand Consulting Agreements") on the same terms with Massand LLC, pursuant to which HCMLP agreed to pay Massand LLC $35,000 per

month in fees, $7,500 per month in "accommodations," $750 per month in cell phone expenses, and other "reasonable" expenses. In exchange, the Massand Consulting Agreements provided that HCMLP's Chairman, Dondero, and its General Counsel, Ellington, would assign certain unspecified "tasks" to Massand Capital.

159. Massand Capital's monthly invoices to HCMLP were consecutively numbered, indicating that Massand Capital had no customers other than HCMLP. Moreover, Massand Capital's invoices contained no information about the services it purportedly rendered to HCMLP.

160. The Massand Consulting Agreements noted that Massand Capital would be responsible for advising HCMLP on its "Investment Recovery Strategies business in the Countries of the Gulf Cooperation Council"—specifically Bahrain, Saudi Arabia, the United Arab Emirates, Kuwait, Qatar, and Oman. Based upon a review of information to date, it appears that Massand Capital provided no actual services to HCMLP, and that HCMLP did not have any "business" that was related to "investment recovery strategies."

161. Rather, Massand Capital appears to have provided services solely to SAS—a separate entity that was owned and controlled by Dondero and Ellington. The owner of Massand Capital, Dilip Massand, was assigned an SAS email address, was bestowed the title of "Managing Director" of SAS, and was involved in communications relating to SAS's claims purchase litigation financing business.[35] As set forth above, SAS was owned by Dondero and Ellington, not HCMLP.

[35] In a speaker profile in 2014, Dilip Massand was described as overseeing "the operations of SAS Asset Recovery in the Middle East."

162. Thus, based on the documents and information that Plaintiff has reviewed to date, Dondero caused HCMLP to pay millions of dollars in consulting fees to Massand Capital in exchange for no value to HCMLP, all solely to benefit other Dondero-controlled entities. HCMLP received no value for the payments that Dondero and Ellington directed to Massand Capital.

**J. Dondero And Ellington Breach Their Fiduciary Duties To HCMLP By Misappropriating Its Funds**

163. HCMLP owned a 97.5% interest in HE Capital 232 Phase I, LLC ("HE Capital 232"). In February 2018, HE Capital 232 and its wholly-owned subsidiary, HE Capital 232 Phase I Property, LLC ("HE Capital 232 Property"), sold real property in Arizona. Net of costs and expenses in connection with the transaction, HE Capital 232 was due $8,687,245.15. These proceeds were placed in an escrow account maintained by HCMLP's counsel, Wick Phillips Gould & Martin LLP ("Wick Phillips"), "pending distribution of the proceeds to the direct and indirect owners of interests in [HE Capital 232 Property]."

164. On March 2, 2018, Ellington directed Wick Phillips to disburse from the escrow account $4,510,000 to HCMLP and $1,200,000 to an HCMLP managed fund to pay down mezzanine debt. This left $2,977,245.15 in the escrow account that was due and owing to HCMLP. On information and belief, Dondero and Ellington directed Wick Phillips to keep these funds in the escrow account so that they could funnel the money to themselves. For three months, Wick Phillips requested disbursement instructions for the remaining funds from Ellington, but Ellington demurred while "waiting for answers from others so can tell you where to send." Upon information and belief, during this period, Ellington and Dondero were determining how to direct the funds to themselves.

165. On June 4, 2018, Ellington dropped HCMLP's Managing Director (Real Estate) from an email chain and directed Wick Phillips to disburse the remainder to an account in the name of MaplesFS—a fiduciary services company in the Cayman Islands acting as a payment agent—for further credit to Grey Royale Ltd., a Cayman Islands shell company owned and controlled by Dondero and Ellington. MaplesFS subsequently transferred the full amount to Grey Royale Ltd. A Wick Phillips employee commented that the payment to Grey Royale Ltd. was "pretty suspicious."

166. In September 2019, in connection with the preparation of HE Capital 232's tax return, HCMLP's Tax Director inquired about the missing funds owed to HCMLP as a result of the Arizona property sale. Ellington responded that the "facts as I know them" were that the approximately $3 million in missing HCMLP funds were "additional cost[s] of sale, reducing the gain," and "used to pay various legal expenses and other closing costs." Ellington did not disclose that he had directed that the funds be paid to a Cayman Islands shell company owned by Dondero and Ellington, which had no role in the real estate transaction and was not owed any legal expenses or closing costs.

167. Neither Dondero, Ellington, nor Grey Royale Ltd. were parties to the escrow agreement or had any legal claim to the proceeds of the real estate sale held by the escrow agent.

**K. Dondero Loyalists Receive Their Deferred Compensation By Engaging In The Tall Pine Transaction**

168. HCMLP employees other than Dondero also engaged in, and improperly benefited from, self-interested transactions and schemes involving HCMLP.

169. In early 2020, only months after the Petition Date, Ellington and Leventon formed a group of entities that have received millions of dollars of payments from four Dondero Entities pursuant to a services agreement dated March 13, 2020, among Tall Pine, NexBank,

DAF Holdco, NexPoint, and HCMFA (the "Tall Pine Services Agreement"). The Tall Pine scheme was an elaborate arrangement pursuant to which Dondero would be able to keep certain key employees, including Ellington and Leventon, loyal to Dondero during the bankruptcy. Through the Tall Pine scheme, Ellington and Leventon ensured that they would profit off their wrongdoing, and that Dondero would compensate them no matter what happened to HCMLP.

170. Pursuant to the Tall Pine Services Agreement, HCMLP employees, including Ellington and Leventon, would receive approximately $17 million through pass-through entities that they created and owned over the course of two years. When Tall Pine would receive a payment from any of the counterparties to the Tall Pine Services Agreement, Tall Pine contemporaneously transferred funds to Leventon's pass-through entity, Clairmont Holdings, LLC ("Clairmont"). Ellington, who owned Tall Pine, profited from the amounts that remained in Tall Pine after it had distributed sums to Clairmont and other pass-through entities controlled by HCMLP employees.

171. After the Petition Date, Dondero surreptitiously approved wire transfers from accounts held by NexPoint, NexBank, and the DAF to Tall Pine for the benefit of himself, Ellington, and Leventon. These payments were made to compensate Ellington and Leventon for the amounts that would have been paid to them in 2020 but for the Committee's objection. Ellington and Leventon did not disclose these payments to the Independent Board.

## V. CAUSES OF ACTION

### COUNT I
### Avoidance and Recovery of HCMLP Distributions as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law

*(Against Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain)*

172. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

173. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

174. As set forth below, HCMLP made the following HCMLP Distributions to or for the benefit of Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain.

| | **Dondero (for the benefit of Dondero, Strand, and/or Dugaboy)** | **Hunter Mountain** | **Dugaboy** | **Okada (for the benefit of Okada)** | **Okada (for the benefit of MAP #1)** | **Okada (for the benefit of MAP #2)** | **Strand** |
|---|---|---|---|---|---|---|---|
| April 9, 2010 Distributions | $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) | N/A | N/A | | $405,585.62 (two transfers of $375,000.00 and $30,585.62) | | N/A |
| April 13, 2011 Distributions | $649,318.45 | N/A | N/A | | $216,439.49 | | N/A |
| May 2, 2011 Distributions | $3,124,435.00 | N/A | N/A | | $1,024,018.00 | | N/A |
| September 13, 2011 Distributions | $5,351,316.00 | N/A | N/A | | $1,705,813.00 | | N/A |
| November 25, 2011 Distributions | $5,250,000.00 | N/A | N/A | | $1,750,000.00 | | N/A |
| February 22, 2012 Distributions | $3,000,000.00 | N/A | N/A | | $1,000,000.00 | | N/A |
| February 29, 2012 Distributions | $4,514,780.25 | N/A | N/A | | $1,504,926.75 | | N/A |
| April 10, 2012 Distributions | $6,221,364.15 | N/A | N/A | | $2,073,788.05 | | N/A |
| April 9, 2013 Distributions | $25,375,083.16 | N/A | N/A | | $8,440,148.31 | | N/A |
| December 19, 2016 Distributions | N/A | $4,769,570.00 | $8,945.00 | $2,334.00 | $470.00 | $201.00 | $12,017.00 |

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| January 5, 2017 Distributions | N/A | $11,034,754.00 | $20,694.00 | $5,401.00 | $1,087.00 | $466.00 | $27,803.00 |
| February 7, 2017 Distributions | N/A | $7,169,970.00 | $13,446.40 | $3,509.32 | $706.19 | $302.65 | $18,065.44 |
| June 15, 2017 Distributions | N/A | $79,600.00 | $149.28 | $38.96 | $7.84 | $3.36 | $200.56 |
| December 21, 2017 Distributions | N/A | $2,651,675.00 | $4,972.89 | $1,297.86 | $261.17 | $111.93 | $6,681.16 |
| March 9, 2018 Distributions | N/A | $84,575.00 | $158.61 | $41.40 | $8.33 | $3.57 | $213.10 |
| December 19, 2018 Distributions | N/A | $4,930,722.50 | $9,246.96 | $2,413.33 | $485.64 | $208.13 | $12,423.44 |
| March 28, 2019 Distributions | N/A | $3,711,456.47 | $6,960.38 | $1,816.56 | $365.55 | $156.66 | $9,351.38 |
| Total | $54,703,053.88 | $34,432,322.97 | $64,573.52 | $18,142,416.67 | | | $86,755.08 |
| Grand Total | $107,429,122.12 | | | | | | |

175. At the time of each HCMLP Distribution, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

176. HCMLP received less than reasonably equivalent value in exchange for each of HCMLP Distributions set forth above. Indeed, HCMLP received no value for HCMLP the Distributions, each of which was a gratuitous transfer from HCMLP, either to one of its limited partners or for the benefit of one of its limited partners and/or Dondero.

177. Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain did not receive HCMLP Distributions in good faith. To the contrary, at the times that Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain received each of HCMLP Distributions, they knew that HCMLP was balance sheet insolvent (or would be rendered balance sheet insolvent), inadequately capitalized, and/or unable to pay its debts as they came due. Each of these defendants was aware that Dondero had siphoned HCMLP's valuable assets and business opportunities after HCMLP had incurred substantial contingent liabilities. Moreover, each of these defendants was aware that HCMLP Distributions were yet another effort to siphon value from HCMLP to Dondero, Okada, and their affiliated entities at a time when HCMLP was insolvent, inadequately capitalized, and unable to pay its debts as they came due.

178. Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of distributions made to Hunter Mountain, given that Hunter Mountain transferred proceeds of such distributions to them.

179. Each HCMLP Distribution is voidable as a constructively fraudulent transfer. Accordingly, each HCMLP Distribution should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT II**
**Avoidance and Recovery of HCMLP Distributions as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain)*

180. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

181. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

182. As set forth below, HCMLP made the following HCMLP Distributions to or for the benefit of Dondero, Dugaboy, Okada, MAP #1, MAP #2, Strand, and Hunter Mountain.

| | **Dondero (for the benefit of Dondero, Strand, and/or Dugaboy)** | **Hunter Mountain** | **Dugaboy** | **Okada (for the benefit of Okada)** | **Okada (for the benefit of MAP #1)** | **Okada (for the benefit of MAP #2)** | **Strand** |
|---|---|---|---|---|---|---|---|
| April 9, 2010 Distributions | $1,216,756.87 (two transfers of $1,125,000.00 and $91,756.87) | N/A | N/A | $405,585.62 (two transfers of $375,000.00 and $30,585.62) | | | N/A |
| April 13, 2011 Distributions | $649,318.45 | N/A | N/A | $216,439.49 | | | N/A |
| May 2, 2011 Distributions | $3,124,435.00 | N/A | N/A | $1,024,018.00 | | | N/A |
| September 13, 2011 Distributions | $5,351,316.00 | N/A | N/A | $1,705,813.00 | | | N/A |
| November 25, 2011 Distributions | $5,250,000.00 | N/A | N/A | $1,750,000.00 | | | N/A |
| February 22, 2012 Distributions | $3,000,000.00 | N/A | N/A | $1,000,000.00 | | | N/A |
| February 29, 2012 Distributions | $4,514,780.25 | N/A | N/A | $1,504,926.75 | | | N/A |
| April 10, 2012 Distributions | $6,221,364.15 | N/A | N/A | $2,073,788.05 | | | N/A |
| April 9, 2013 Distributions | $25,375,083.16 | N/A | N/A | $8,440,148.31 | | | N/A |
| December 19, 2016 Distributions | N/A | $4,769,570.00 | $8,945.00 | $2,334.00 | $470.00 | $201.00 | $12,017.00 |

| | Dondero (for the benefit of Dondero, Strand, and/or Dugaboy) | Hunter Mountain | Dugaboy | Okada (for the benefit of Okada) | Okada (for the benefit of MAP #1) | Okada (for the benefit of MAP #2) | Strand |
|---|---|---|---|---|---|---|---|
| January 5, 2017 Distributions | N/A | $11,034,754.00 | $20,694.00 | $5,401.00 | $1,087.00 | $466.00 | $27,803.00 |
| February 7, 2017 Distributions | N/A | $7,169,970.00 | $13,446.40 | $3,509.32 | $706.19 | $302.65 | $18,065.44 |
| June 15, 2017 Distributions | N/A | $79,600.00 | $149.28 | $38.96 | $7.84 | $3.36 | $200.56 |
| December 21, 2017 Distributions | N/A | $2,651,675.00 | $4,972.89 | $1,297.86 | $261.17 | $111.93 | $6,681.16 |
| March 9, 2018 Distributions | N/A | $84,575.00 | $158.61 | $41.40 | $8.33 | $3.57 | $213.10 |
| December 19, 2018 Distributions | N/A | $4,930,722.50 | $9,246.96 | $2,413.33 | $485.64 | $208.13 | $12,423.44 |
| March 28, 2019 Distributions | N/A | $3,711,456.47 | $6,960.38 | $1,816.56 | $365.55 | $156.66 | $9,351.38 |
| Total | $54,703,053.88 | $34,432,322.97 | $64,573.52 | | $18,142,416.67 | | $86,755.08 |
| Grand Total | | | | $107,429,122.12 | | | |

183. Dondero was HCMLP's Chief Executive Officer, President, Co-Chief Investment Officer, and Co-Founder. Okada was HCMLP's Co-Chief Investment Officer and Co-Founder. Together, Dondero and Okada directly or indirectly owned substantially all of the equity interests in HCMLP, or were the beneficiaries of all distributions HCMLP made to its limited partners. Dondero exercised complete control over HCMLP, and Okada acquiesced to and profited from schemes orchestrated by Dondero to enrich HCMLP's direct and indirect owners.

184. To that end, Dondero caused HCMLP to make the HCMLP Distributions set forth above with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero and Okada were insiders of HCMLP;

(b) before HCMLP Distributions were made, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c) HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved both siphoning HCMLP's valuable business opportunities through newly-created "lifeboat" entities and siphoning HCMLP's value through HCMLP Distributions (among other means);

(d) HCMLP received less than reasonably equivalent value (and in fact, received zero consideration) in exchange for the HCMLP Distributions;

(e) at the time of each HCMLP Distribution, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(f) The initial recipients of the HCMLP Distributions were Dondero, Dugaboy, Okada, Strand, and Hunter Mountain, each of which was owned and/or controlled by Dondero and Okada;

(g) Dondero and Okada personally received certain HCMLP Distributions instead of HCMLP's limited partners Dugaboy, Strand, MAP #1, and MAP #2; and

(h) Dondero made HCMLP Distributions during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming

contingent liabilities, and effected the transfers in order to siphon value so that such value would not be available to satisfy HCMLP's creditors.

185. Dondero, Dugaboy, Okada, MAP #1, and MAP #2 were the beneficiaries of distributions made to Hunter Mountain, given that Hunter Mountain transferred proceeds of such distributions to them.

186. Each HCMLP Distribution is voidable as an intentionally fraudulent transfer. Accordingly, each of the HCMLP Distributions should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT III**
**Illegal Distributions Under Delaware Revised Uniform Limited Partnership Act**
*(Against Dondero, Dugaboy, Strand, and Hunter Mountain)*

187. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

188. The Delaware Revised Uniform Limited Partnership Act ("DRULPA") § 17-607(a) prohibits distributions "to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited partnership … exceed the fair value of the assets of the limited partnership[.]"

189. Under 17-607(b), "[a] limited partner who receives a distribution in violation of subsection (a) … and who knew at the time of the distribution that the distribution violated subsection (a) of this section, shall be liable to the limited partnership for the amount of the distribution."

190. As set forth below, between December 31, 2016 and the Petition Date, HCMLP made the following distributions to Hunter Mountain, Dugaboy, and Strand (the "Illegal Distributions").

| | **Hunter Mountain** | **Dugaboy** | **Strand** |
|---|---|---|---|
| December 31, 2016 Distributions | $4,769,570.00 | $8,945.00 | $12,017.00 |
| January 31, 2017 Distributions | $11,034,754.00 | $20,694.00 | $27,803.00 |
| February 28, 2017 Distributions | $7,169,970.00 | $13,446.40 | $18,065.44 |
| June 30, 2017 Distributions | $79,600.00 | $149.28 | $200.56 |
| December 31, 2017 Distributions | $2,651,675.00 | $4,972.89 | $6,681.16 |
| March 31, 2018 Distributions | $84,575.00 | $158.61 | $213.10 |
| December 31, 2018 Distributions | $4,930,722.50 | $9,246.96 | $12,423.44 |
| March 31, 2019 Distributions | $3,711,456.47 | $6,960.38 | $9,351.38 |
| Total | $34,432,322.97 | $64,573.52 | $86,755.08 |
| Grand Total | $34,583,651.57 | | |

191. Hunter Mountain, Dugaboy, and Strand knew that HCMLP made the Illegal Distributions at a time that its liabilities exceeded the fair value of its assets. As set forth herein and in the counts below, each of Hunter Mountain, Dugaboy, and Strand were the alter egos of Dondero. Even if Hunter Mountain, Dugaboy, or Strand were not the alter egos of Dondero, they would be imputed with Dondero's knowledge. Dondero was the sole owner of Strand. Likewise, Dondero created Hunter Mountain as a shell entity whose sole purpose was to purchase the majority of HCMLP's limited partnership interests from himself and his Dugaboy trust (among others). Through Hunter Mountain, Dondero continued to receive the economic

benefit of HCMLP's limited partnership distributions through distributions on notes that would be triggered by those Illegal Distributions made to Hunter Mountain.

192. Hunter Mountain, Dugaboy, and Strand are liable to HCMLP and its creditors for the full amount of the Illegal Distributions, plus interest.

**COUNT IV**
**Breach of Fiduciary Duty Arising Out Of Dondero's Lifeboat Scheme**
*(Against Dondero and Strand)*

193. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

194. During all periods relevant to the allegations set forth herein, Strand owed fiduciary duties to HCMLP in its capacity as HCMLP's general partner. Likewise, during all periods relevant to the allegations set forth herein, Dondero owed fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP and as an officer of HCMLP.

195. Neither the Litigation Trustee nor the Estate could have discovered the conduct by Dondero or Strand set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given Strand's and Dondero's fiduciary obligations, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal. By their nature, the breaches alleged herein were inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit. Dondero and Strand transferred HCMLP's valuable business to the lifeboat entities, including but not limited to NexPoint and HCMFA. Pursuant to the scheme, the lifeboats utilized HCMLP's employees to

perform management and advisory services that HCMLP had provided directly, and should have continued to provide directly. As a result of this scheme, HCMLP would perform the same services via the same employees, but would now either receive only a small fraction of the profits that were generated or, in some instances, provide these services at a loss because the service agreements between HCMLP and the lifeboats would not even cover HCMLP's costs of providing the services. The majority of profits were paid to the lifeboats, which were owned by Dondero and/or entities that he controlled, placing those profits beyond the reach of HCMLP's creditors.

196. Dondero and Strand willfully and wantonly orchestrated this scheme in bad faith in order to evade HCMLP's present and future creditors.

197. Strand was dominated and controlled by its sole owner, Dondero. Dondero also owned substantial economic interests in each of the lifeboats either directly or through entities that he owned and/or controlled. As such, Dondero appeared on both sides of the agreements and transactions entered into between HCMLP, on one hand, and NexPoint, HCMFA, Acis, and the other lifeboats, on the other hand.

198. The wrongful acts that Dondero and Strand committed in connection with the lifeboat scheme—including but not limited to funneling new business to the lifeboat entities and undercompensating HCMLP for the use of its employees—continued through the Petition Date. Likewise, injury to HCMLP—in the form of lost profits and misappropriation of its employees and resources—continued through the Petition Date.

199. HCMLP suffered tens or hundreds of millions of dollars of harm, as the result of Dondero's and Strand's breaches, in the form of lost management and advisory fee revenue that far exceeded the amounts that the lifeboats paid to HCMLP under their respective shared

services and other agreements. Between the date of its formation and the Petition Date, NexPoint earned approximately $120 million in advisory and administrative fees and approximately $50 million in profits. Between the date of its formation and the Petition Date, HCMFA earned approximately $150 million in advisory and administrative fees.

200. Strand and Dondero profited from their breaches of fiduciary duties in connection with their lifeboat scheme in violation of Delaware law. Strand and Dondero are liable to HCMLP for their breaches of fiduciary duty in connection with the lifeboat scheme in an amount to be proven at trial.

**COUNT V**
**Breach of Fiduciary Duty Arising Out Of Conduct That Resulted in HCMLP Liabilities To Third Parties**
*(Against Dondero, Strand, Ellington, and Leventon)*

201. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

202. During all periods relevant to the allegations set forth herein: (1) Strand owed fiduciary duties to HCMLP in its capacity as HCMLP's general partner; (2) Dondero owed fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP, and as an officer of HCMLP; (3) Ellington owed fiduciary duties to HCMLP in his capacity as HCMLP's Chief Legal Officer and General Counsel; and (4) Leventon owed fiduciary duties to HCMLP in his capacity as HCMLP's Assistant General Counsel.

203. Neither the Litigation Trustee nor the Estate could have discovered the conduct by Dondero, Strand, Ellington, or Leventon set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed by all these parties to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into

the breaches set out herein prior to Dondero's removal. By their nature, the breaches alleged herein were inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

204. Dondero (and in turn, Strand), Ellington, and Leventon each breached their fiduciary duties to HCMLP by engaging in willful and wanton misconduct that foreseeably resulted in liability to HCMLP. In total, these breaches resulted in more than $350 million in allowed claims against HCMLP. But for their breaches of fiduciary duty, either HCMLP never would have incurred these claims, or HCMLP would have resolved these claims for substantially lower amounts. These breaches resulted in millions of dollars to Dondero, Ellington, and Leventon, either directly, through transfers from HCMLP to entities owned in whole or in part by Dondero and Ellington, or indirectly, through compensation paid to Ellington and Leventon in exchange for their loyalty to Dondero in perpetrating schemes that breached their duties to HCMLP.

205. **<u>Liabilities to UBS.</u>** Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to incur substantial liability to UBS. Dondero exposed HCMLP and its subsidiaries to litigation against UBS that resulted in an adverse judgment that exceeded $1 billion. Among other things, acting through HCMLP, Dondero caused the Fund Counterparties to refuse to meet their obligations to UBS, and orchestrated transfers of more than $233 million of assets from HFP, exposing HCMLP to claims for fraudulent transfer, breach of the implied covenant of good faith and fair dealing, and extensive prejudgment interest and legal fees.

206. Then, in 2017, after a New York state court ruled that UBS's fraudulent transfer claims against HCMLP and claims against the Fund Counterparties could proceed to trial,

Dondero, Ellington, Leventon, Sevilla, Lucas, and DiOrio caused HCMLP, in its capacity as investment manager for the Fund Counterparties, to orchestrate the surreptitious transfer of assets worth at least $100 million to Sentinel, an entity located in the Cayman Islands that was indirectly owned and controlled by Dondero and Ellington. Neither HCMLP nor the Fund Counterparties received legitimate value in exchange for this transfer.

207. After the Petition Date, Dondero, Ellington, and Leventon actively concealed this transfer from the Independent Board, UBS, and the Bankruptcy Court. Ellington even went so far as to state in August 2020 that "[Leventon] and myself have spent in excess of 100 hours trying to piece together everything we can [about the Fund Counterparties' assets] to create a true and accurate document based record of what happened with these target entities['s assets]." Ellington made this statement knowing that the Fund Counterparties' assets had been transferred to an offshore entity he owned and controlled. When this transfer was uncovered, HCMLP was forced to increase the amount of its settlement with UBS from a total of $75 million in allowed claims to $125 million in allowed claims.

208. **Liabilities to Acis.** Dondero willfully and wantonly caused HCMLP to incur over $23 million in liability to Acis and Terry. As with NexPoint and HCMFA, Acis was originally created to perform management and advisory services that were previously provided by HCMLP. When Dondero's relationship with Terry deteriorated, Dondero set in motion a series of contentious litigation with Terry, which resulted in Terry obtaining a $7.95 million arbitration award against Acis.

209. Dondero then embarked on a crusade to ensure Terry would not collect from Acis. In connection therewith, Dondero acted through HCMLP to, among other things: (1) siphon assets from Acis, causing Terry to commence an involuntary bankruptcy against Acis

and causing HCMLP to lose its advisory and shared services contracts with Acis; (2) enter into costly, frivolous litigation with Terry in Guernsey, a "loser pays" jurisdiction; (3) convert the retirement accounts owned by Terry and his wife, leading to additional legal fees incurred in litigation in Texas state court; (4) violate injunctive provisions set forth in Acis's plan of reorganization, exposing HCMLP to additional liability; (5) enter into costly litigation with Acis's chapter 11 trustee in connection with Acis's bankruptcy case; and (6) mismanage Acis CLOs, exposing HCMLP to substantial liability in its capacity as advisor and fiduciary to Acis. As a result of these actions and the reputational harm they caused, it became impossible for HCMLP to launch another CLO either directly or indirectly.

210. In connection with his vendetta against Terry, Dondero willfully and wantonly subjected HCMLP to substantial liability to Acis and Terry, including by giving testimony at trial which, along with Leventon's testimony, was found "to be of questionable reliability" and structured "to convey plausible deniability." Ultimately, in order to avoid further liability to Terry and Acis, HCMLP settled those claims for more than $23 million pursuant to a settlement approved by this Court.

211. Beginning on October 24, 2017, four days after Terry's arbitration judgment was issued, Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to enter into numerous transactions to take control of Acis's business and strip it of assets so it could not pay the arbitration award. Ellington and Leventon implemented Dondero's directives and took the steps necessary to consummate the transactions.

212. Leventon willfully and wantonly helped to transfer value away from Acis in an attempt to make it judgment-proof. Among other things, Leventon assisted in the drafting and execution of the agreement that transferred Acis's interest in a note receivable from HCMLP,

which had a balance owing of over $9.5 million, to Cayman Island entity Highland CLO Management Ltd. just ten days after Terry obtained his arbitration award. The agreement recites that (1) HCMLP is no longer willing to continue providing support services to Acis; (2) Acis, therefore, can no longer fulfill its duties as a collateral manager; and (3) Highland CLO Management Ltd. agrees to step in to the collateral manager role. Given the timing of the assignment—just days after Terry's arbitration award—Leventon knew that it was part of a scheme to strip Acis of its assets, which ultimately resulted in millions of dollars of damage to HCMLP.

213. **<u>Liabilities to HarbourVest.</u>** Dondero and Ellington also willfully and wantonly caused harm to HCMLP by exposing it to substantial liability to HarbourVest. Dondero and Ellington, acting through HCMLP, fraudulently induced HarbourVest to purchase 49% of HCLOF from CLO Holdco for approximately $75 million in cash, with a commitment for an additional $75 million in the future, while concealing that Dondero was actively engaged in a campaign against Terry that would significantly impair the value of HarbourVest's investment. In addition, Dondero did not intend to use the $75 million that CLO Holdco received from HarbourVest to satisfy capital calls at HCLOF, and instead intended for CLO Holdco to use those funds as part of a scheme to infuse other Dondero Entities (including entities that benefitted the NexPoint and HCMFA lifeboats) with additional cash. Ultimately, HCMLP was forced to settle with HarbourVest by providing it with $80 million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to a new entity designated by HCMLP. But for Dondero's and Ellington's conduct, HCMLP would not have incurred the foregoing liabilities. As a result of their conduct, those interests in HCLOF were then worth tens of millions of dollars less than the $75 million HarbourVest paid to acquire them.

214. **Liabilities to Crusader Funds.** Dondero, Ellington, and Leventon willfully and wantonly caused HCMLP to incur substantial liability to the Redeemer Committee due to their conduct in connection with HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors. Among other things, Dondero, Ellington, and Leventon caused HCMLP to: (1) transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, Ltd., after the Redeemer Committee had refused to approve that transfer, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (2) purchase 28 Plan Claims for the benefit of HCMLP without the approval of the Redeemer Committee, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (3) covertly purchase the stock of the Portfolio Company and fail to liquidate the Crusader Funds' shares in the Portfolio Company, in violation of HCMLP's fiduciary duties; and (4) violate the provision of the Joint Plan and Scheme requiring HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete, causing HCMLP to forfeit its rights to those fees entirely. Both Ellington and Leventon provided false narratives and misrepresentations in furtherance of Dondero's harm to the Crusader Funds. The Redeemer Arbitration panel found, for example, that Leventon "was significantly involved in providing direction" to keep the Redeemer Committee in the dark and "was the principal instrument through which [certain] misrepresentation[s] and omission[s] were communicated." As a result of Dondero's, Ellington's, and Leventon's conduct, the Redeemer Committee received an arbitration award against HCMLP in excess of $190 million, and in HCMLP's bankruptcy, HCMLP agreed to pay over $136 million in connection therewith.

215. Beyond the direct losses identified in the preceding paragraphs, HCMLP suffered additional harm from the breaches of fiduciary duty committed by Dondero, Ellington,

Leventon and Strand. For example, the $190 million Redeemer arbitration award—which was itself caused by Dondero's, Ellington's, Leventon's and Strand's breaches of their fiduciary duty to HCMLP—caused HCMLP to file for bankruptcy. As of October 15, 2021, HCMLP had incurred in excess of $40 million in professional fees in connection with the bankruptcy. But for Dondero's, Ellington's, Leventon's, and Strand's willful and wanton misconduct, HCMLP would not have been obligated to pay any of these fees.

216. In light of the foregoing, Dondero, Strand, Ellington, and Leventon are liable for breaches of their fiduciary duties to HCMLP in an amount to be determined at trial.

**COUNT VI**
**Declaratory Judgment That Strand Is Liable For HCMLP's Debts In Its Capacity As HCMLP's General Partner**
*(Against Strand)*

217. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

218. Under DRULPA § 17-403(b), "a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law … to persons other than the partnership and the other partners." Moreover, "[e]xcept as provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law … to the partnership and to the other partners." *Id.*

219. Under Delaware Uniform Partnership Law ("DUPL") § 15-306(a), partners of a partnership "are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law."

220. During all periods relevant to the allegations set forth herein, Strand was the general partner of HCMLP. Moreover, Strand has not been relieved of its obligation to satisfy HCMLP's obligations by agreement or law.

221. Accordingly, under the operative partnership agreements and applicable law, Strand is liable to HCMLP and "to persons other than [HCMLP]" for the full amount of HCMLP's liabilities.

**COUNT VII**
**Declaratory Judgment That Dondero Is Liable For Strand's Debts As Strand's Alter Ego**
*(Against Dondero)*

222. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

223. Between the formation of Strand and the Petition Date, Dondero, Strand's sole equity owner, dominated and controlled Strand such that Dondero and Strand operated as a single economic entity. Although Strand was the general partner of HCMLP, Strand—as opposed to Dondero himself—rarely took any official corporate action. Between its formation and the Petition Date, Strand documented only 12 instances in which it took corporate action, eight of which related to the appointment or removal of officers.

224. Dondero was the only officer of Strand between 1993 and 2001. Although Strand elected certain officers between 2001 and the Petition Date, they performed no duties in their capacities as officers of Strand and were appointed or fired from their roles based on their loyalty to, and their current relationship with, Dondero. Dondero testified that he did not know whether Strand even had any officers, stating that he was "not aware of [Strand] ever having any employees or active … governance." Likewise, Dondero did not know whether Strand had a board of directors and whether he sat on Strand's board.

225. Strand did not observe corporate formalities. Based on a review of HCMLP's books and records, between the formation of Strand and the Petition Date, Strand never held a board meeting. Indeed, Dondero testified that he is not aware of attending a board meeting for Strand and does not recall ever seeing board minutes for Strand.

226. Strand did not comply with its own bylaws, which require annual meetings of stockholders.

227. Strand was a sham entity whose sole purpose was to serve as a vehicle through which Dondero could dominate and control HCMLP. Dondero used this abuse of the corporate form to facilitate his scheme to make HCMLP act contrary to its own interests and in favor of Dondero's interests by insulating assets from HCMLP's creditors, including those whose liabilities were the direct result of Dondero's own wrongdoing. As such, Dondero is Strand's alter ego, and the Court should pierce the corporate veil to hold Dondero liable for Strand's debts.

**COUNT VIII**
**Declaratory Judgment That Dondero and Strand Are Liable For HCMLP's Debts In Their Capacities As HCMLP's Alter Ego**
*(Against Dondero and Strand)*

228. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

229. Dondero, using his alter ego Strand, dominated and exercised total control over HCMLP through the Petition Date, such that Dondero, Strand, and HCMLP operated as a single economic entity. Dondero had total decision-making authority and governed HCMLP by decree—using the lack of an independent Strand to render HCMLP a mere instrumentality of Dondero. HCMLP had no independence and could not exercise any business discretion separate

and apart from Dondero, in service of his personal interests and the interests of his integrated web of entities.

230. Strand, like innumerable entities within Dondero's empire—including NexPoint GP, HCMFA, Dugaboy, CLO Holdco, Highland Dallas, Highland Santa Barbara, Highland Kansas City, HFP, and Acis—listed HCMLP's headquarters as its business address.

231. Dondero failed to observe corporate formalities with regard to HCMLP. Indeed, he did not distinguish between HCMLP and his personal interests and businesses. Dondero used HCMLP employees to service his own interests that were unrelated to HCMLP. For example, Dondero caused HCMLP to employ individuals to carry out roles serving Dondero personally. Such employees included Dondero's accountant, security guard, and landscaper. Dondero also frequently instructed HCMLP's legal department to perform legal services in connection with his own personal and business interests, which conferred no value on HCMLP.

232. Dondero used his domination and control over HCMLP to perpetrate numerous injustices, abuses, and frauds.

233. Dondero siphoned value from HCMLP to other entities he owned and controlled by causing HCMLP's employees and resources to be used for his lifeboat businesses. In connection with this fraudulent scheme to move assets out of the reach of HCMLP's creditors, Dondero exploited HCMLP by using its employees and resources for the benefit of other lifeboat entities, either at no cost to the lifeboats, at a loss to HCMLP, or at substantially below-market rates. In fact, HCMLP should have received all of the profits generated from the services performed by the lifeboats, which in fact were performed by HCMLP's employees. The purpose and effect of this scheme was to cause HCMLP to provide the employees and

infrastructure that were needed by Dondero's profitable business ventures, while also ensuring that HCMLP would remain cash poor and lack the funds to satisfy its own obligations.

234. Dondero caused HCMLP to enter into agreements, including the Massand Consulting Agreement, the object and purpose of which were to cause HCMLP to incur obligations for services that conferred benefits on Dondero, through benefits conferred to entities he owned other than HCMLP.

235. Dondero used his abusive domination and control to cause HCMLP's assets to be commingled with those of his other businesses, without observing corporate formalities. By commingling entities and using HCMLP's employees and resources to further his own personal goals, Dondero exposed HCMLP to hundreds of millions of dollars in liability to numerous parties, including UBS, Acis, Terry, HarbourVest, the Redeemer Committee, and the Crusader Funds.

236. By virtue of his complete control over HCMLP, Dondero caused HCMLP to willfully and wantonly breach contractual obligations and take measures to render HCMLP "judgment-proof." Ultimately, this brazen disregard for HCMLP as an independent entity with its own obligations rendered HCMLP insolvent, including by resulting in multiple adverse awards such as the $190 million arbitration award that caused HCMLP to file for bankruptcy.

237. Dondero further abused the corporate form to siphon assets from HCMLP by orchestrating intercompany transfers that were designed to siphon assets from HCMLP. For example, Dondero orchestrated the CLO Holdco Transaction, through which he caused HCMLP to transfer assets valued by the company at approximately $24 million through a series of entities he controlled in exchange for consideration that was worth a small fraction of the value of the transferred assets.

238. Because Dondero operated Strand and HCMLP as a single economic entity and used that domination to defraud HCMLP's creditors, Dondero and Strand are the alter egos of HCMLP and should be held liable for the full amount of HCMLP's obligations.

**COUNT IX**
**Declaratory Judgment That Dugaboy Is Liable For The Debts Of Dondero and HCMLP In Its Capacity As Dondero's Alter Ego**
*(Against Dugaboy)*

239. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

240. Dondero operated Dugaboy—Dondero's personal trust—as an extension of himself and his alter ego HCMLP. Dondero treated himself, Dugaboy, and HCMLP as a single economic entity. Dondero dominated and controlled Dugaboy. Under the terms of Dugaboy's trust agreement, Dondero has the power to remove trustees without cause—leverage that allowed him to control Dugaboy. Dondero appointed Scott, his longtime personal friend, as the trustee of Dugaboy, for the purpose of serving as a rubber stamp of approval for all transactions that Dondero (or HCMLP employees acting at Dondero's direction) presented to Scott.

241. Dondero treated Dugaboy as a vehicle for his own interests. For example, Dondero caused Dugaboy to falsely assert in HCMLP's notes litigation that Dugaboy, acting through Dondero's sister, Nancy Dondero, allegedly caused HCMLP to enter into an agreement whereby the notes owed to HCMLP by various Dondero Entities would be forgiven as compensation to Dondero upon satisfaction of certain conditions subsequent. Dondero also caused Dugaboy to help facilitate HCMLP's transfer of the Transferred CLO Holdco Assets to Get Good, by agreeing to provide the Dugaboy Note, purportedly but not actually equal to the value of the Transferred CLO Holdco Assets and with a paltry 2.75% interest rate and no security, covenants, lender protections provided to Dugaboy, or payments due until 2036.

242. Dondero disregarded corporate formalities between Dugaboy and HCMLP. Dondero used HCMLP employees, on HCMLP's payroll, to transact business on behalf of Dugaboy, without any compensation to HCMLP. Dondero used HCMLP employees for Dondero's personal estate planning and caused HCMLP to comingle Dugaboy's electronically stored information with HCMLP's data. Dugaboy shared its principal place of business, 300 Crescent Court, Suite 700, Dallas, Texas 75201, with HCMFA and other Dondero Entities.

243. With Dondero as the primary beneficiary of Dugaboy, there are no other innocent shareholders whose expectations could be impaired by holding Dugaboy liable for Dondero or HCMLP's debts. There are no innocent third-party creditors of Dugaboy who would be harmed by holding Dugaboy liable for Dondero's or HCMLP's debts.

244. Dugaboy is the alter ego of Dondero, and the Court should hold Dugaboy liable for Dondero's debts. Because Dondero is also HCMLP's alter ego, and because Dugaboy knowingly participated in Dondero's scheme to abuse the corporate form to defraud creditors, Dugaboy is also the alter ego of HCMLP and the Court should hold Dugaboy liable for the debts of HCMLP.

**COUNT X**
**Declaratory Judgment That NexPoint Is Liable**
**For The Debts Of Dondero and HCMLP As Their Alter Egos**
*(Against NexPoint)*

245. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

246. Dondero dominated and controlled NexPoint such that Dondero, NexPoint, and Dondero's alter ego HCMLP operated as a single economic entity. NexPoint is owned and controlled by Dondero through Dugaboy and NexPoint GP.

247. NexPoint knowingly participated in—and played a core role in accomplishing—Dondero's scheme to move HCMLP's assets out of reach of its creditors by operating NexPoint as a facade of HCMLP, in order to siphon profits away from HCMLP and to Dondero and other entities he controlled. Dondero and NexPoint acted together to place the profits that were generated from HCMLP's business and services beyond the reach of HCMLP's then present and future creditors.

248. Dondero disregarded the corporate formalities and the distinctions between himself, NexPoint, and HCMLP. Between 2012 and 2015, NexPoint had no employees of its own, and performed no business activities that were distinguishable from those performed by HCMLP. NexPoint shared its principal place of business, 300 Crescent Court, Suite 700, Dallas, Texas 75201, with HCMFA and other Dondero Entities. NexPoint was a facade of HCMLP that used HCMLP's employees to perform the same investment management and advisory services that HCMLP routinely performed. Dondero caused internal business plans and projections to be prepared as if these entities were part of a single economic unit.

249. For over one year, HCMLP performed all services for NexPoint without any sub-advisory or shared services agreements that even purported to compensate HCMLP for the use of its employees. Even after Dondero attempted to infuse this scheme with a patina of legitimacy by causing NexPoint to enter into agreements with HCMLP, they were structured to ensure that NexPoint retained the vast majority of profits for the work performed by HCMLP and its employees.

250. Dondero used NexPoint as a part of his scheme to extract value from HCMLP. Dondero caused HCMLP to fund NexPoint's operations, seed its investments, and provide a substantial amount of the capital that ultimately funded distributions NexPoint made to its

owner, Dugaboy. Transferring funds from HCMLP to NexPoint funded distributions by NexPoint to Dondero's alter ego Dugaboy, draining HCMLP's value to Dondero with NexPoint's knowledge and participation. Between 2012 and 2017, HCMLP loaned NexPoint approximately $30 million, and during that same period, NexPoint made limited partner distributions of approximately $34 million—99.9% of which were paid to Dugaboy. Distributions to Dugaboy were made at the direction of, and for the benefit of, Dondero.

251. Dondero and NexPoint worked together to further extract value from HCMLP by causing HCMLP to lend to NexPoint on terms entirely determined by Dondero. Dondero further caused HCMLP to enter into multiple agreements with NexPoint providing for forbearance and other relief. As of the Petition Date, NexPoint owed HCMLP approximately $23 million, and HCMLP is currently embroiled in litigation with Dondero and NexPoint following a payment default that occurred January 2021.

252. There are no other innocent shareholders whose expectations could be impaired by holding NexPoint liable for Dondero or HCMLP's debts. Similarly, there are no innocent third-party creditors of NexPoint who would be harmed by holding NexPoint liable for Dondero or HCMLP's debts.

253. NexPoint is the alter ego of Dondero and the Court should hold NexPoint liable for the debts of its ultimate shareholder Dondero. Because Dondero is also HCMLP's alter ego, and because NexPoint knowingly participated in Dondero's scheme to abuse the corporate form to defraud creditors, NexPoint is also alter ego of HCMLP and the Court should hold NexPoint liable for the debts of HCMLP.

**COUNT XI**
**Declaratory Judgment That HCMFA Is Liable**
**For The Debts Of Dondero and HCMLP As Their Alter Ego**
*(Against HCMFA)*

254. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

255. Dondero dominated and controlled HCMFA such that Dondero, HCMFA, and Dondero's alter ego HCMLP operated as a single economic entity. HCMFA is controlled by Dondero through its general partner, Strand Advisors XVI, Inc., which owns a 1% interest in HCMFA and is wholly-owned by Dondero. Dondero and Okada are the ultimate owners of the remaining stakes in HCMFA: HCMS owns an 89.6667% ownership interest in HCMFA, and is itself owned 75% by Dondero and 25% by Okada; the Okada Family Revocable Trust owns the remaining 9.3333% ownership interest in HCMFA. Dondero caused internal business plans and projections to be prepared as if these entities were part of a single economic unit.

256. HCMFA knowingly participated in—and played a key role in accomplishing—Dondero's scheme to move HCMLP's assets out of reach of its creditors by operating HCMFA as a facade of HCMLP, in order to siphon profits away from HCMLP and to Dondero directly or indirectly through other entities he controlled. Dondero and HCMFA acted together to place the profits that were generated from HCMLP's business and services beyond the reach of HCMLP's then present and future creditors.

257. Dondero disregarded the corporate formalities and the distinctions between HCMFA and HCMLP. HCMFA was a facade of HCMLP that used HCMLP's employees to perform the same investment management and advisory services that HCMLP routinely performed. Strand Advisors XVI, Inc., HCMFA's general partner, purports to be managed by six individuals, all but one of whom were previously on HCMLP's payroll. HCMFA shared its

principal place of business, 300 Crescent Court, Suite 700, Dallas, Texas 75201, with HCMFA and other Dondero Entities.

258. HCMFA was effectively a shell entity created to replace HCMLP as the new investment manager for open-ended retail investment funds. Agreements between HCMLP and HCMFA were structured to ensure that HCMFA retained the vast majority of profits for the work performed by HCMLP and its employees. To the extent that sub-advisory and shared services agreements existed between HCMLP and HCMFA, they existed to lend credibility to Dondero's fraudulent scheme to divert HCMLP's profits to himself and Okada through HCMFA.

259. Dondero used HCMFA as a part of his scheme to extract value from HCMLP. Dondero caused HCMLP to use its resources to support HCMFA. Between 2011 and 2019, HCMLP loaned HCMFA approximately $12 million; Dondero caused HCMLP to enter into multiple forbearances on HCMFA's debts. In May 2019, HCMLP loaned HCMFA an additional $7.4 million, and HCMFA again failed to repay. Dondero exerted his control and dominance of these entities to direct both sides of those agreements, with the knowing participation of HCMFA, to accomplish his own ultimate goal of siphoning value from HCMLP to insulate it from creditors.

260. There are no other innocent shareholders whose expectations could be impaired by holding HCMFA liable for Dondero or HCMLP's debts. Similarly, there are no innocent third-party creditors of HCMFA who would be harmed by holding NexPoint liable for Dondero or HCMLP's debts.

261. HCMFA is the alter ego of Dondero and the Court should hold HCMFA liable for Dondero's debts. Because Dondero is also HCMLP's alter ego, and because HCMFA

knowingly participated in Dondero's scheme to abuse of the corporate form to defraud creditors, HCMFA is also the alter ego of HCMLP and the Court should hold HCMFA liable for the debts of HCMLP.

**COUNT XII**
**Avoidance of Transfer of Management Agreements As Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against HCMFA and NexPoint)*

262. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

263. On the date of the Debtor's bankruptcy filing, the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

264. On December 15, 2011, HCMLP entered into a novation agreement, pursuant to which HCMFA became the investment advisor for Highland Credit Strategies Fund, Highland Floating Rate Opportunities Fund, the Highland Long/Short Equity Fund, the Highland Long/Short Healthcare Fund, and the Highland Special Situations Fund (collectively, the "Transferred Funds"). Dondero caused HCMLP to transfer these agreements to HCMFA as part of his scheme to evade HCMLP's creditors.

265. HCMLP received less than reasonably equivalent value in connection with the novation agreement. Prior to the transfer, HCMLP received management and advisory fees in return for the services that its employees performed for the Transferred Funds. After the transfer, HCMLP's employees provided the same services for the Transferred Funds, except that the vast majority of the profits were diverted to HCMFA following the extinguishment of HCMLP's credit facility.

266. At the time of the transfer, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

267. On June 13, 2012, Dondero caused HCMFA to transfer the Highland Credit Strategies Fund to the newly-created NexPoint, after which Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as NHF. The result of this transfer was simply to shift the management fees relating to NHF from one lifeboat entity to another.

268. The transfer of HCMLP's valuable management and advisory contracts with the Transferred Funds (the fair market value of which likely exceeded $25 million at the time of transfer) is voidable as constructively fraudulent against HCMFA and its subsequent transferee, NexPoint. Accordingly, these transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XIII**
**Avoidance of Transfer of Management Agreements As Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Other Applicable Law**
*(Against HCMFA and NexPoint)*

269. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

270. On the date of the Debtor's bankruptcy filing, the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count. On December 15, 2011, HCMLP entered into

a novation agreement, pursuant to which HCMFA became the investment advisor for the Transferred Funds. Dondero caused HCMLP to transfer these agreements to HCMFA as part of his scheme to evade HCMLP's creditors.

271. Dondero caused HCMLP to make the transfer with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero was an insider of HCMLP and HCMFA;

(b) before the transfer, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c) HCMLP, through Dondero, was engaged in a multi-faceted scheme to defraud HCMLP's creditors, which involved, among other things, causing HCMLP to transfer its valuable management contracts and business opportunities to newly-created "lifeboat" entities;

(d) at the time of the transfer, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e) Dondero caused HCMLP to make the transfer during a period when he believed the value of HCMLP may ultimately be distributed to its creditors, as a result of its looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's present and future creditors; and

(f) HCMLP did not receive reasonably equivalent value in return for transferring its valuable management and advisory contracts with the Transferred Funds to HCMFA.

272. On June 13, 2012, Dondero caused HCMFA to transfer the Highland Credit Strategies Fund to the newly-created NexPoint, after which Highland Credit Strategies Fund's name was changed to NexPoint Credit Strategies Fund, referred to herein as NHF. The result of this transfer was simply to shift the management fees relating to NHF from one lifeboat entity to another.

273. The transfer of HCMLP's valuable management and advisory contracts with the Transferred Funds is voidable as intentionally fraudulent against HCMFA and its subsequent transferee, NexPoint. Accordingly, these transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XIV**
**Breach of Fiduciary Duty In Connection With Fraudulent Transfers And Schemes**
*(Against Dondero, Strand, Ellington, and Okada)*

274. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

275. During all periods relevant to the allegations set forth herein: (1) Strand owed fiduciary duties to HCMLP in its capacity as HCMLP's general partner; (2) Dondero owed fiduciary duties to HCMLP by virtue of his control over Strand and HCMLP, and as an officer of HCMLP; (3) Ellington owed fiduciary duties to HCMLP in his capacity as HCMLP'S Chief Legal Officer and General Counsel; and (4) Okada owed fiduciary duties to HCMLP in his capacity as Chief Investment Officer.

276. Neither the Litigation Trustee nor the Estate could have discovered the conduct by Dondero, Strand, Ellington, or Okada set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed by all these parties to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal. By their nature, the breaches alleged herein were inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

277. Dondero and Ellington caused HCMLP to enter into the Massand Consulting Agreements, with the intent to have Massand Capital perform services for SAS, an entity that they surreptitiously created and owned. Likewise, Dondero and Ellington oversaw and approved the Massand Transfers. The payment obligations Dondero and Ellington caused HCMLP to incur, and the payments that Dondero and Ellington caused HCMLP to make, conferred no benefit on HCMLP. In addition, Dondero and Ellington caused HCMLP employees to perform work for SAS—at least seven HCMLP employees received SAS email addresses—without compensating HCMLP.

278. Likewise, Dondero orchestrated the fraudulent CLO Holdco Transaction, pursuant to which he (acting through Strand) siphoned valuable assets from HCMLP in return for illusory consideration, in the form of a note from Dugaboy, an entity that he controlled. Dondero siphoned these assets from HCMLP in order to benefit other entities that he owned and controlled, including CLO Holdco, NexPoint, and HCMFA.

279. Moreover, as part of his scheme to evade HCMLP's creditors, Dondero, acting through Strand, approved hundreds of millions of dollars of distributions from HCMLP at a time that Dondero believed HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

280. As Dondero's co-founder and HCMLP's Chief Investment Officer, Okada knew or willfully blinded himself to the fact that the HCMLP Distributions—including, but not limited to, the distributions made to Okada, MAP #1, and MAP #2—were made at times that HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

281. By willfully and wantonly not returning the distributions made to Okada, MAP #1, and MAP #2 that were made at times that Okada knew that HCMLP was insolvent, and knowingly permitting unlawful distributions to Dondero and his controlled entities, Okada breached his fiduciary duties to HCMLP.

282. Dondero and Okada further breached their fiduciary duties by using HCMLP employees for their own personal affairs and private business interests, on HCMLP's time and payroll.

283. Dondero and Ellington breached their fiduciary duties by diverting approximately $3 million that was held in escrow for HCMLP to an entity that they owned in the Cayman Islands.

284. By willfully and wantonly orchestrating these fraudulent transfers, Dondero, Strand, and Ellington breached their fiduciary duties to HCMLP.

**COUNT XV**
**Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing Participation in Breach of Fiduciary Duty under Texas Law**
*(Against NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, Highland Dallas)*

285. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

286. NexPoint and HCMFA aided and abetted the breaches of fiduciary duty committed by Dondero and Strand. NexPoint and HCMFA were each dominated and controlled by Dondero. As such, each of NexPoint and HCMFA knowingly participated in their breaches of their fiduciary duties to HCMLP. NexPoint and HCMFA knowingly participated in Dondero's scheme to divert HCMLP's valuable business into new "lifeboat" entities that he owned and controlled. The breaches of fiduciary duty that were aided and abetted by NexPoint and HCMFA caused tens of million (and potentially over one hundred million) of dollars in damage to HCMLP.

287. SAS, which was owned and controlled by Dondero and Ellington, knowingly participated in Dondero's and Ellington's breaches of their fiduciary duties in connection with the Massand Consulting Agreement and Massand Transfers. SAS was aware of the fiduciary duties that Dondero and Ellington owed to HCMLP as high ranking officers. SAS received the benefit of the services performed by Massand Capital, which Dondero and Ellington surreptitiously charged to HCMLP. The breaches of fiduciary duty that were aided and abetted by SAS caused millions of dollars of damage to HCMLP.

288. Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas aided and abetted Dondero's breach of fiduciary duties relating to the CLO Holdco Transaction. Scott—and in turn, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas—

knowingly participated in the scheme to transfer assets valued by the company at approximately $24 million to CLO Holdco in exchange for a note worth significantly less than the transferred assets. Scott either knew or willfully blinded himself to the fact that Dondero breached his fiduciary duties to HCMLP by orchestrating the CLO Holdco Transaction, as evidenced by, among other things, the low interest rate on the Dugaboy Note; the lack of security, material covenants; or other protections; the unfair repayment terms; and the fact that Dondero stood on both sides of the transaction. Moreover, Scott dutifully executed the necessary documentation in order to cause the Transferred CLO Holdco Assets to be transferred to Get Good, DAF Holdco, DAF, CLO Holdco, and Highland Dallas.

289. Neither the Litigation Trustee nor the Estate could have discovered the conduct set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal. By its nature, the conduct alleged herein was inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

**COUNT XVI**
**Civil Conspiracy to Breach Fiduciary Duties Under Texas Law**
*(Against Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, Highland Dallas)*

290. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

291. Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas conspired with Dondero to breach his fiduciary duties to HCMLP by intentionally siphoning assets away from HCMLP to evade HCMLP's creditors. To effectuate the conspiracy, Dondero, Ellington, and Leventon acted outside the scope of their HCMLP employments, as agents of the non-HCMLP entities they owned and controlled, and for their personal benefits.

292. Neither the Litigation Trustee nor the Estate could have discovered the conduct set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the breaches set out herein prior to Dondero's removal. By its nature, the conspiracy alleged herein was inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

293. Dondero, Ellington, and Leventon orchestrated myriad transactions to divert funds from HCMLP to Dondero and the entities that he owned and controlled, as well as to Ellington, Leventon, and the entities they owned and controlled. NexPoint and HCMFA took over valuable HCMLP management agreements and used HCMLP's employees to usurp HCMLP's business in return for little or no consideration to HCMLP. SAS—which is owned and controlled by Dondero and Ellington, who own 70% and 30% of the economic interests in SAS, respectively—received valuable services from Massand while HCMLP bore the expense. Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas participated in the

fraudulent CLO Holdco Transaction that siphoned valuable assets from HCMLP in return for patently insufficient consideration.

294. Ellington and Leventon understood that their conduct was directed at enriching themselves and Dondero at the expense of HCMLP, and each of them were compensated in excess of their HCMLP salaries by Dondero (sometimes via minority ownership in an entity, like Ellington's stake in SAS, and sometimes via complex, circuitous schemes like the Tall Pine arrangement) for their participation. NexPoint, HCMFA, and SAS—each of which was controlled by Dondero—likewise understood that their role in the conspiracy was to obtain value for Dondero at HCMLP's expense. Scott, too, understood that he was appointed to be a rubber-stamp for Dondero's self-interested schemes to siphon value from HCMLP and distribute it throughout the vast web of Dondero Entities. Scott acted on the basis of his longstanding loyalty to his "closest friend" Dondero and was compensated with "business gifts" for his service in furtherance of the conspiracy.

295. In furtherance of the conspiracy, Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, CLO Holdco, DAF Holdco, the DAF, Get Good, and Highland Dallas undertook, *inter alia*, the following schemes and overt acts:

(a) Dondero, NexPoint, and HCMFA conspired to perpetrate the lifeboat scheme in order to place valuable assets outside the reach of HCMLP's creditors, in violation of Dondero's fiduciary duties. NexPoint and HCMFA were each dominated and controlled by Dondero and, as such, they each consciously acted in furtherance of the conspiracy, including by transferring existing business to NexPoint and HCMFA, generating new business through NexPoint and HCMFA, and failing to compensate

HCMLP for the use of its employees and resources. NexPoint and HCMFA were aware that the lifeboat scheme caused substantial damages to HCMLP.

(b) Dondero, Ellington, and SAS caused HCMLP to enter into the fraudulent Massand Consulting Agreements, pursuant to which HCMLP paid Massand millions of dollars in return for services that were rendered for SAS, which Dondero and Ellington owned and controlled. Likewise, SAS acted in furtherance of the conspiracy by surreptitiously receiving the benefits from the Massand Consulting Agreements while HCMLP incurred the costs under those agreements. Each of Dondero, Ellington, and SAS were aware that causing HCMLP to pay SAS's expenses—for the benefit of SAS and its owners Dondero and Ellington—harmed HCMLP.

(c) Dondero, Scott, CLO Holdco, DAF Holdco, the DAF, Get Good, and Highland Dallas conspired to cause HCMLP to transfer valuable assets to CLO Holdco for less than reasonably equivalent value. Scott—and in turn, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas—consciously participated in the scheme to transfer assets valued by the company at approximately $24 million to CLO Holdco in exchange for a note worth significantly less than the transferred assets, including by executing the necessary documentation to cause the Transferred CLO Holdco Assets to be transferred to Get Good, DAF Holdco, DAF, CLO Holdco, and Highland Dallas. Each of Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas were aware that the CLO Holdco Transaction breached fiduciary duties to HCMLP, constituted a

fraudulent transfer, and harmed HCMLP by diverting valuable assets in exchange for the far less valuable Dugaboy Note.

(d) Ellington and Dondero conspired to disburse to a Cayman Islands shell company they owned and controlled nearly $3 million of escrowed proceeds rightfully owing to HCMLP.

(e) In furtherance of the conspiracy and to maintain loyalty to Dondero, Ellington and Leventon accepted benefits like minority ownership in entities (like Ellington's stake in SAS) and additional compensation via complex, circuitous schemes like the Tall Pine arrangement.

296. Each of Dondero, Ellington, Leventon, NexPoint, HCMFA, SAS, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas understood that his or its conduct was causing damage to HCMLP and that Dondero was breaching his fiduciary duties to HCMLP by orchestrating and participating in these transactions. The participants specifically intended to benefit themselves and Dondero at the expense of HCMLP, and agreed with Dondero to undertake acts in furtherance of the conspiracy notwithstanding the harm to HCMLP.

**COUNT XVII**
**Tortious Interference with Prospective Business Relations**
*(Against Dondero, NexPoint, and HCMFA)*

297. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

298. Dondero siphoned business away from HCMLP and its creditors through the creation of "lifeboats" owned and controlled by Dondero. The "lifeboats," which included

NexPoint and HCMFA, were companies set up to provide management services that HCMLP had previously been providing.

299. But for the actions of Dondero, NexPoint, and HCMFA, HCMLP would have continued to pursue the business opportunities that Dondero diverted to NexPoint and HCMFA. Indeed, NexPoint and HCMFA used HCMLP's employees, operated out of HCMLP's office, and performed the same advisory and administrative services for its managed funds that HCMLP had previously performed.

300. By using NexPoint and HCMFA as part of his lifeboat scheme, Dondero breached his fiduciary duties to HCMLP. In addition, Dondero breached his fiduciary duties to HCMLP by causing HCMLP to fraudulently transfer certain of its existing management contracts to NexPoint and HCMFA. NexPoint and HCMFA conspired with, and aided and abetted, Dondero's breaches of his fiduciary duties and HCMLP's fraudulent transfers.

301. Dondero, NexPoint, and HCMFA acted with a conscious desire to prevent HCMLP from continuing to directly manage the funds that were subsequently managed by NexPoint and HCMFA. Moreover, Dondero, NexPoint, and HCMFA knew that their interference in HCMLP's business relationships was certain to occur as a result of their conduct.

302. HCMLP suffered, at minimum, tens of millions of dollars in damage from Dondero's, NexPoint's, and HCMFA's tortious interference with its prospective business relations.

**COUNT XVIII**
**Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550 and Applicable State Law**
*(Against Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas Foundation)*

303. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

304. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

305. On December 28, 2016, HCMLP transferred to Get Good the Transferred CLO Holdco Assets, which were valued by the company at approximately $24 million. The transfer of the Transferred CLO Holdco Assets was effectuated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good.

306. As purported consideration for the Transferred CLO Holdco Assets, HCMLP received the Dugaboy Note, which was worth substantially less than the Transferred CLO Holdco Assets. The Dugaboy Note replaced HCMLP's liquid or liquidating assets with an illiquid, private loan on below market terms.

307. Immediately after HCMLP transferred the Transferred CLO Holdco Assets to Get Good, Dondero caused Get Good to transfer the Transferred CLO Holdco Assets to Highland Dallas by an exercise of discretion executed by Scott in his capacity as trustee of Get Good.

308. Immediately after the Transferred CLO Holdco Assets were transferred to Highland Dallas by Get Good, Dondero caused Highland Dallas to transfer the Transferred CLO Holdco Assets to DAF Holdco by unanimous written consent executed by Dondero, Scott, and Jalonick in their capacities as the sole directors of Highland Dallas.

309. Immediately after the Transferred CLO Holdco Assets were transferred to DAF Holdco by Highland Dallas, Dondero caused DAF Holdco, DAF, and CLO Holdco to enter into an omnibus assignment agreement, pursuant to which DAF Holdco transferred the Transferred CLO Holdco Assets to DAF, and DAF transferred the Transferred CLO Holdco Assets to CLO Holdco. Scott signed on behalf of each entity, as director of DAF Holdco, managing member of the DAF, and director of CLO Holdco. Scott also executed a written resolution by DAF GP, in his capacity as the managing member of the general partner of the DAF, effectuating the transfer of the Transferred CLO Holdco Assets to CLO Holdco (which was wholly-owned by the DAF).

310. Dondero directly or indirectly controlled each entity in the chain of transfers that together constitute the CLO Holdco Transaction. Dondero controlled each of Get Good, Highland Dallas, DAF Holdco, DAF, and CLO Holdco either along with or through Scott, who was Dondero's longtime friend, former roommate, loyalist, and fellow board member on multiple boards of directors.

311. At the time of the CLO Holdco Transaction, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

312. None of Get Good, DAF Holdco, the DAF, or CLO Holdco paid reasonably equivalent value for the Transferred CLO Holdco Assets, or received the Transferred CLO Holdco Assets in good faith.

313. At all relevant times, each of Get Good, DAF Holdco, the DAF, and CLO Holdco was aware that, pursuant to the CLO Holdco Transaction, HCMLP transferred its assets to CLO Holdco for less than reasonably equivalent value.

314. The CLO Holdco Transaction is voidable as constructively fraudulent transfers. Accordingly, the CLO Holdco Transaction should be set aside and avoided and Transferred CLO Holdco Assets should be recovered under 11 U.S.C. §§ 544 and 550 and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XIX**
**Avoidance of CLO Holdco Transfer and Recovery of Transferred CLO Holdco Assets as Intentionally Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550 and Applicable State Law**
*(Against Dondero, Scott, CLO Holdco, DAF Holdco, DAF, Get Good, and Highland Dallas Foundation)*

315. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

316. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

317. On December 28, 2016, HCMLP transferred to Get Good the Transferred CLO Holdco Assets, which the company valued at approximately $24 million. The transfer of the Transferred CLO Holdco Assets was effectuated pursuant to a Purchase and Sale Agreement executed by Dondero, on behalf of HCMLP, and Scott, on behalf of Get Good.

318. As purported consideration for the Transferred CLO Holdco Assets, HCMLP received the Dugaboy Note, which was worth substantially less than the Transferred CLO Holdco Assets. The Dugaboy Note replaced HCMLP's liquid or liquidating assets with an illiquid, private loan that was worth significantly less than the value of the transferred assets.

319. After HCMLP transferred the Transferred CLO Holdco Assets to Get Good, Dondero caused the assets to be transferred to Get Good, Highland Dallas, DAF Holdco, DAF, and CLO Holdco. Dondero effected each transfer through his direct or indirect control of each of these entities.

320. Dondero caused HCMLP to enter into the CLO Holdco Transaction with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero was an insider of HCMLP;

(b) Dondero controlled Get Good, the initial transferee, and each of the subsequent transferees, Highland Dallas, DAF Holdco, DAF, and CLO Holdco, through Scott;

(c) before the CLO Holdco Transaction, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(d) at the time of the CLO Holdco Transaction, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were

unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e) The CLO Holdco Transaction siphoned value away from HCMLP, so that such value would not be available to satisfy HCMLP's creditors; and

(f) The purported consideration for the Transferred CLO Holdco Assets, the Dugaboy Note, was worth less than the reasonably equivalent value of the Transferred CLO Holdco Assets, and replaced HCMLP's liquid or liquidating assets with an illiquid, private loan on below-market terms, the repayment of which was subject to Dondero's control.

321. None of Get Good, DAF Holdco, the DAF, or CLO Holdco paid reasonably equivalent value for the Transferred CLO Holdco Assets, or received the Transferred CLO Holdco Assets in good faith.

322. At all relevant times, each of Get Good, DAF Holdco, the DAF, and CLO Holdco was aware that the CLO Holdco Transaction transferred HCMLP's assets to CLO Holdco for less than reasonably equivalent value.

323. The CLO Holdco Transaction is voidable as an intentionally fraudulent transfer. Accordingly, the CLO Holdco Transaction should be set aside and avoided, and the Transferred CLO Holdco Assets should be recovered under 11 U.S.C. §§ 544 and 550 and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XX**
**Avoidance of Obligations Under Massand Consulting Agreement as Constructively Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand LLC)*

324. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

325. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

326. On January 5, 2015, HCMLP entered into a consulting agreement with Massand LLC. Pursuant to each agreement, HCMLP agreed to pay Massand Capital tens of thousands of dollars per month.

327. HCMLP received less than reasonably equivalent value in exchange for the payment obligations that it incurred under the Massand Consulting Agreements (and in fact, received zero value). Dondero and Ellington caused HCMLP to hire Massand Capital in order for Massand Capital to provide services to SAS, which conferred no benefit to HCMLP.

328. At the time it entered into the Massand Consulting Agreements, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

329. HCMLP's obligations incurred under the Massand Consulting Agreements are voidable as constructively fraudulent.

## COUNT XXI
**Avoidance of Obligations Under Massand Consulting Agreement as Intentionally Fraudulent Under 11 U.S.C. § 544, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand Capital)*

330. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

331. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

332. On January 1, 2014, HCMLP entered into a consulting agreement with Massand Inc. On January 5, 2015, HCMLP entered into a consulting agreement with Massand LLC. Pursuant to each agreement, HCMLP agreed to pay them tens of thousands of dollars per month.

333. Dondero caused HCMLP to enter into the Massand Consulting Agreements with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero was an insider of HCMLP;

(b) Dondero was an insider of SAS;

(c) Dondero benefitted from HCMLP's payments to Massand Capital because they conferred value on SAS, an entity that Dondero owned and controlled;

(d) before HCMLP entered into the Massand Consulting Agreements, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(e) HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved, among other things, causing HCMLP to incur obligations of other entities owned or controlled by Dondero, including SAS;

(f) at the time HCMLP entered into the consulting agreement with Massand LLC, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due; and

(g) Dondero caused HCMLP to enter into the Massand Consulting Agreements during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's creditors.

334. HCMLP's obligations incurred under the Massand Consulting Agreements are voidable as intentionally fraudulent.

**COUNT XXII**
**Avoidance and Recovery of Certain Massand Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand Capital, SAS, Dondero, and Ellington)*

335. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

336. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and

Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

337. HCMLP entered into the fraudulent Massand Consulting Agreements, pursuant to which HCMLP agreed to pay Massand Capital tens of thousands of dollars per month. The transfers from HCMLP to Massand Capital (the "Massand Transfers") are set forth below:

| Date | Amount | Date | Amount |
|---|---|---|---|
| January 3, 2017 | $49,644 | May 1, 2018 | $55,852 |
| February 1, 2017 | $55,691 | June 1, 2018 | $55,093 |
| March 3, 2017 | $47,929 | July 2, 2018 | $64,516 |
| April 3, 2017 | $57,563 | August 1, 2018 | $56,539 |
| May 1, 2017 | $57,861 | September 4, 2018 | $53,749 |
| June 1, 2017 | $60,814 | October 1, 2018 | $52,537 |
| July 3, 2017 | $51,974 | November 1, 2018 | $53,278 |
| August 1, 2017 | $58,074 | December 3, 2018 | $52,219 |
| September 5, 2017 | $50,371 | January 2, 2019 | $47,812 |
| October 2, 2017 | $53,016 | February 1, 2019 | $51,437 |
| November 1, 2017 | $59,971 | March 1, 2019 | $51,156 |
| December 1, 2017 | $56,031 | April 2, 2019 | $54,063 |
| January 2, 2018 | $52,894 | May 1, 2019 | $55,359 |
| February 1, 2018 | $51,378 | June 3, 2019 | $56,470 |
| March 1, 2018 | $54,396 | July 1, 2019 | $54,878 |
| April 3, 2018 | $54,538 | August 1, 2019 | $54,979 |
| | | Total | $1,742,082 |

338. HCMLP did not receive any consideration in exchange for its payments to Massand Capital. The consulting agreement between Massand Capital and HCMLP provided that Massand would be responsible for advising HCMLP on its "investment recovery strategies" business in certain countries where HCMLP did not have any business.

339. Rather, upon information and belief, Massand Capital provided services to SAS, a separate entity owned and controlled by Dondero. As such, HCMLP's transfers to Massand Capital were made for the benefit of SAS and Dondero.

340. Massand Capital's monthly invoices to HCMLP were consecutively numbered, indicating that Massand Capital had no customers other than HCMLP, and Massand Capital's invoices contained no information about the services it purportedly rendered to HCMLP.

341. At the time of each of the Massand Transfers, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

342. The Massand Transfers are voidable as constructively fraudulent transfers. Accordingly, the Massand Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XXIII**
**Avoidance and Recovery of Massand Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and Applicable State Law**
*(Against Massand Capital, SAS, Dondero, and Ellington)*

343. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

344. On the date of the Debtor's bankruptcy filing, (i) at least one or more unsecured creditors, including but not limited to UBS, the Redeemer Committee, Patrick Daugherty, and Acis, held an allowable claim other than one allowable under § 502(e), and could have sought under state law to avoid the transfers made on or after October 16, 2015, and (ii) the Internal Revenue Service held an allowable unsecured claim other than one allowable under § 502(e) and could have sought to avoid the transfers challenged in this Count.

345. On January 5, 2015, HCMLP entered into a fraudulent consulting agreement, pursuant to which HCMLP agreed to pay Massand Capital tens of thousands of dollars per month. The transfers from HCMLP to Massand Capital (the "Massand Transfers") are set forth below:

| Date | Amount | Date | Amount |
|---|---|---|---|
| January 3, 2017 | $49,644 | May 1, 2018 | $55,852 |
| February 1, 2017 | $55,691 | June 1, 2018 | $55,093 |
| March 3, 2017 | $47,929 | July 2, 2018 | $64,516 |
| April 3, 2017 | $57,563 | August 1, 2018 | $56,539 |
| May 1, 2017 | $57,861 | September 4, 2018 | $53,749 |
| June 1, 2017 | $60,814 | October 1, 2018 | $52,537 |
| July 3, 2017 | $51,974 | November 1, 2018 | $53,278 |
| August 1, 2017 | $58,074 | December 3, 2018 | $52,219 |
| September 5, 2017 | $50,371 | January 2, 2019 | $47,812 |
| October 2, 2017 | $53,016 | February 1, 2019 | $51,437 |
| November 1, 2017 | $59,971 | March 1, 2019 | $51,156 |
| December 1, 2017 | $56,031 | April 2, 2019 | $54,063 |
| January 2, 2018 | $52,894 | May 1, 2019 | $55,359 |
| February 1, 2018 | $51,378 | June 3, 2019 | $56,470 |
| March 1, 2018 | $54,396 | July 1, 2019 | $54,878 |

| Date | Amount | Date | Amount |
|---|---|---|---|
| April 3, 2018 | $54,538 | August 1, 2019 | $54,979 |
| | | Total | $1,742,082 |

346. Dondero caused HCMLP to make the Massand Transfers with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero was an insider of HCMLP and Massand Capital;

(b) before the Massand Transfers, HCMLP had been sued and Dondero believed HCMLP's legal exposure rendered it insolvent;

(c) HCMLP, through Dondero, was engaged in a multi-faceted scheme to defraud HCMLP's creditors, which involved, among other things, causing HCMLP to become an obligor on certain contracts, including the Massand Consulting Agreements, that did not confer value on HCMLP;

(d) at the time of the transfers to Massand LLC, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(e) Dondero caused HCMLP to make the Massand Transfers during a period when he believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to siphon value so that it would not be available to satisfy HCMLP's creditors; and

(f) The Massand Transfers were made for no consideration to HCMLP, and the services provided by Massand were made for the benefit of SAS, an entity that was not owned by HCMLP.

347. The Massand Transfers are voidable as intentionally fraudulent transfers. Accordingly, the Massand Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544 and 550, 26 U.S.C. § 6502, and applicable state law, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XXIV**
**Breach of Contract Arising Out of Hunter Mountain Note**
*(Against Hunter Mountain and Rand)*

348. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

349. On December 21, 2015, HCMLP and Hunter Mountain entered into the Hunter Mountain Note, pursuant to which Hunter Mountain agreed to pay HCMLP $63 million at an interest rate of 2.61% per annum.

350. Rand is a guarantor on the Hunter Mountain Note.

351. Pursuant to the Hunter Mountain Note, accrued interest and principal is due and payable in accordance with an amortization schedule attached to the note.

352. Hunter Mountain breached the Hunter Mountain Note by failing to make the payments due under the note on December 21, 2019 and December 21, 2020.

353. On May 3, 2021, HCMLP sent a demand letter to Hunter Mountain stating that the Hunter Mountain Note was in default and therefore, pursuant to the "Remedies" section of the note, all principal, interest, and any other amounts due and owing on the Hunter Mountain

Note are immediately due and payable. As of May 5, 2021, that amount was more than $72 million, with interest continuing to accrue.

354. The Hunter Mountain Note is currently in default. Pursuant to the Hunter Mountain Note, HCMLP is entitled to damages from Hunter Mountain and Rand in an amount equal to all unpaid principal and interest, in addition to HCMLP's cost of collection, including attorneys' fees.

**COUNT XXV**
**Conversion**
*(Against Dondero and Ellington)*

355. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

356. In February 2018, HE Capital 232 and its wholly-owned subsidiary, HE Capital 232 Property obtained the HE Capital 232 Proceeds and placed them in an escrow account maintained by HCMLP's counsel, Wick Phillips, "pending distribution of the proceeds to the direct and indirect interest owners in [HE Capital 232 Property]."

357. On March 2, 2018, Wick Phillips disbursed a portion of those funds from the escrow account. The Remaining HE Capital 232 Proceeds, worth approximately $2.98 million, were never disbursed to HCMLP.

358. HCMLP owned, had possession of (through its counsel Wick Phillips), or had entitlement to possession of the Remaining HE Capital 232 Proceeds.

359. The Remaining HE Capital 232 Proceeds had been held for safekeeping, were intended to be kept segregated, specific and identifiable money, in the form they were received, and not subject to a claim by anyone other than HCMLP.

360. Upon information and belief, Dondero and Ellington directed Wick Phillips to withhold the Remaining HE Capital 232 Proceeds in a scheme to funnel the money to themselves through shell companies that they owned in the Cayman Islands. Indeed, on June 4, 2018, at Ellington's direction, Wick Phillips disbursed the remainder of the proceeds to MapleFS, a fiduciary services company in the Cayman Islands, which subsequently transferred the full amount to Grey Royale Ltd., a Cayman Islands shell company owned and controlled by Dondero and Ellington.

361. Dondero's and Ellington's acts manifest a clear repudiation of HCMLP's rights in the Remaining HE Capital 232 Proceeds.

**COUNT XXVI**
**Unjust Enrichment or Money Had and Received**
*(Against Dondero)*

362. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

363. As set forth above, Dondero caused HCMLP to enter into numerous intercompany note transactions with other Dondero Entities in order to, among other things: (i) fund distributions to himself and his loyalists; (ii) inject funds into other entities he owns; and (iii) obtain personal tax benefits. Now, Dondero is actively spearheading an expensive, frivolous litigation campaign against HCMLP, through these same Dondero Entities, in order to avoid or delay their repayment obligations.

364. Dondero exploited HCMLP by using it to pursue goals that did not benefit HCMLP. Dondero orchestrated countless transactions and schemes designed to benefit himself and other Dondero Entities at the expense of HCMLP, including but not limited to: (i) the lifeboat scheme; (ii) distributions from HCMLP to himself and certain trusts he owned and

controlled during periods when HCMLP was insolvent; and (iii) intercompany transactions involving various Dondero Entities that distributed cash throughout his vast web of entities. Dondero unjustly profited from these schemes, either by directly transferring value to himself (*e.g.*, through distributions) or by using HCMLP's money to seed business activities and investments that would inure to his own personal benefit. Dondero diverted millions or tens of millions of dollars to himself, at HCMLP's expense.

365. Likewise, Dondero was willing to harm HCMLP even when it would seem economically irrational for him to do so, such as when he caused HCMLP to incur more in legal fees pursuing a vendetta against Daugherty than the total funds Daugherty was owed.

366. Dondero, together with Ellington, caused HCMLP's counsel to improperly divert approximately $3 million of HCMLP's cash being held in an escrow account to an entity that they owned and controlled in the Cayman Islands.

367. Dondero obtained personal services from individuals who were employed and paid by HCMLP, including with respect to private business ventures.

368. There was no valid express contract governing the subject matter of this dispute.

369. As a result of fraud, duress, or taking undue advantage of his own position of authority within HCMLP, Dondero holds or has held money that in equity and good conscience belongs to HCMLP, which unjustly enriched him and would be unconscionable to retain.

370. Plaintiff seeks restitution from Dondero and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by him as a result of the unjust conduct set forth above.

**COUNT XXVII**
**Unjust Enrichment or Money Had and Received**
*(Against Ellington and Leventon)*

371. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

372. Ellington and Leventon were employees of HCMLP who received millions of dollars in compensation. However, each of them understood and performed their duties as functionaries for Dondero. As such, both Ellington and Leventon subordinated the interests of HCMLP to the interests of Dondero, and actively participated in and implemented his schemes to divert value from HCMLP. Portions of Ellington's and Leventon's compensation, paid for by HCMLP, was consideration for their willingness to elevate Dondero's interests over those of HCMLP.

373. Together with Dondero, Ellington caused HCMLP's counsel to improperly divert approximately $3 million of HCMLP's cash being held in an escrow account to an entity that they owned and controlled in the Cayman Islands.

374. Ellington and Leventon engaged in willful and wanton misconduct that gave rise to more than $350 million in allowed claims against HCMLP. Among other things, Ellington and Leventon participated in the scheme to evade UBS collection efforts by fraudulently transferring assets to Sentinel.

375. There was no valid express contract governing the subject matter of this dispute.

376. As a result of fraud, duress, or taking undue advantage of their own positions of authority within HCMLP, Ellington and Leventon hold or have held money that in equity and good conscience belongs to HCMLP, which unjustly enriched them and would be unconscionable to retain.

377. Plaintiff seeks restitution from Ellington and Leventon and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

**COUNT XXVIII**
**Unjust Enrichment or Money Had and Received**
*(Against NexPoint and HCMFA)*

378. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

379. The lifeboat scheme was perpetrated primarily through NexPoint and HCMFA. NexPoint and HCMFA utilized HCMLP's employees to perform management and advisory services that HCMLP had directly provided, and should have continued to provide directly. Neither NexPoint nor HCMFA fairly compensated HCMLP for the use of its employees or resources.

380. HCMLP provided substantial financial support for NexPoint and HCMFA, including in the form of below-market note agreements. Both NexPoint and HCMFA have defaulted on their debts to HCMLP and are currently pursuing expensive, frivolous litigation against HCMLP in an effort to evade their payment obligations.

381. NexPoint and HCMFA were effectively HCMLP in disguise, conducting HCMLP's business, with HCMLP's employees, operating out of HCMLP's office, beginning with HCMLP's contracts.

382. Through their exploitation of HCMLP, NexPoint and HCMFA received tens or hundreds of millions of dollars of profits.

383. There was no valid express contract governing the subject matter of this dispute.

384. As a result of fraud, duress, or taking undue advantage of HCMLP, NexPoint and HCMFA hold or have held money that in equity and good conscience belongs to HCMLP, which unjustly enriched them and would be unconscionable to retain.

385. Plaintiff seeks restitution from NexPoint and HCMFA and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

**COUNT XXIX**
**Unjust Enrichment or Money Had and Received**
*(Against Massand Capital and SAS)*

386. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

387. Massand Capital received millions of dollars in payments from HCMLP under the Massand Consulting Agreements. Nevertheless, Massand Capital was aware that it would not and never intended to perform any services on behalf of HCMLP. Rather, Massand Capital was performing services on behalf of SAS, with HCMLP footing the bill. HCMLP received no benefit under the Massand Consulting Agreements.

388. Further, the value of the services provided to SAS were far less than HCMLP's payments, resulting in Massand receiving unearned profits to the tune of millions of dollars.

389. HCMLP employees performed work for SAS. Indeed, at least four HCMLP employees even received SAS email addresses. SAS did not compensate HCMLP for these services.

390. SAS has profited from the services performed by Massand Capital and from the use of HCMLP's employees and resources.

391. There was no valid express contract governing the subject matter of this dispute.

392. As a result of fraud, duress, or taking undue advantage of HCMLP, Massand and SAS hold or have held money that in equity and good conscience belongs to HCMLP, which unjustly enriched them and would be unconscionable to retain.

393. Plaintiff seeks restitution from Massand Capital and SAS and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by them as a result of the unjust conduct set forth above.

**COUNT XXX**
**Unjust Enrichment or Money Had and Received**
*(Against CLO Holdco)*

394. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

395. Dondero, acting through HCMLP, fraudulently induced HarbourVest to purchase 49% of HCLOF for approximately $75 million, with a commitment to fund an additional $75 million. CLO Holdco was the beneficiary of the funds invested by HarbourVest. HCMLP received no benefit from the HarbourVest investment. Nevertheless, HarbourVest filed a proof of claim against HCMLP for fraudulently inducing the HarbourVest investment, and HCMLP was ultimately forced to settle with HarbourVest by providing them with $80 million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to a new entity designated by HCMLP. As a result of Dondero's conduct, however, the HCLOF interests were then worth significantly less than the face amount of HarbourVest's allowed claim. HCMLP bore the consequences for Dondero and CLO Holdco in a scheme that deposited $75 million into the coffers of CLO Holdco.

396. CLO Holdco was aware that HarbourVest was fraudulently induced by Dondero to make the $75 million investment. Nonetheless, CLO Holdco said nothing to HarbourVest

and received their money, all while leaving HCMLP on the hook when HarbourVest ultimately filed their proof of claim.

397. There was no valid express contract governing the subject matter of this dispute.

398. As a result of fraud, duress, or taking undue advantage of HCMLP, CLO Holdco holds or has held money that in equity and good conscience belongs to HCMLP, which unjustly enriched it and would be unconscionable to retain

399. Plaintiff seeks restitution from CLO Holdco and an order from this Court disgorging all payments, transfers, profits, fees, benefits, incentives, and other things of value obtained by it as a result of its unjust receipt and use of the proceeds of the HarbourVest investment.

**COUNT XXXI**
**Avoidance and Recovery of the One-Year Transfers as Preferential Transfers under 11 U.S.C. §§ 547 and 550**
*(Against Dondero and Ellington)*

400. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

401. Dondero and Ellington are insiders of HCMLP.

402. As set forth below, within one year of the Petition Date, HCMLP made payments to Dondero of $4,753,911 and payments to Ellington of $318,893 (the "Alleged Expense Transfers" and the "March 28, 2019 Repayment Transfer," as set forth below, and collectively the "One-Year Transfers"):

| March 28, 2019 Repayment Transfer | | |
|---|---|---|
| Date | Transferee | Amount |
| March 28, 2019 | Dondero | $3,750,000 |
| Alleged Expense Transfers | | |
| Date | Transferee | Amount |
| October 31, 2018 | Dondero | $8,986 |

| | | |
|---|---|---|
| November 15, 2018 | Dondero | $65,078 |
| December 14, 2018 | Dondero | $115,481 |
| January 15, 2019 | Dondero | $96,786 |
| January 31, 2019 | Dondero | $38,628 |
| February 15, 2019 | Dondero | $42,435 |
| February 28, 2019 | Dondero | $19,063 |
| March 15, 2019 | Dondero | $50,771 |
| March 29, 2019 | Dondero | $21,935 |
| April 15, 2019 | Dondero | $60,191 |
| April 30, 2019 | Dondero | $7,164 |
| May 15, 2019 | Dondero | $89,257 |
| May 31, 2019 | Dondero | $38,804 |
| June 14, 2019 | Dondero | $82,710 |
| June 28, 2019 | Dondero | $7,605 |
| July 15, 2019 | Dondero | $47,006 |
| August 15, 2019 | Dondero | $85,059 |
| August 30, 2019 | Dondero | $12,714 |
| August 30, 2019 | Ellington | $205,788 |
| September 13, 2019 | Dondero | $56,763 |
| September 30, 2019 | Dondero | $24,498 |
| October 15, 2019 | Dondero | $32,977 |
| October 15, 2019 | Ellington | $113,105 |
| Total | Dondero | $4,753,911 |
| Total | Ellington | $318,893 |
| Grant Total | | $5,072,804 |

403. The One-Year Transfers were made on account of antecedent debt.

404. HCMLP was insolvent when each One-Year Transfer was made.

405. Each One-Year Transfer enabled Dondero and Ellington to receive more than they would have if (i) the One-Year Transfers had not been made; and (ii) Dondero and Ellington received payment on account of the debt paid by the One-Year Transfers to the extent provided by the Bankruptcy Code.

406. Each One-Year Transfer constitutes an avoidable preference pursuant to Section 547(b) of the Bankruptcy Code.

407. Plaintiff is entitled to an order and judgment under 11 U.S.C. §§ 547 and 550 that each of the One-Year Transfers is avoided and recoverable.

**COUNT XXXII**
**Avoidance and Recovery of the Alleged Expense Transfers as Constructive Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law**
*(Against Dondero and Ellington)*

408. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

409. To the extent the Alleged Expense Transfers do not constitute reimbursement for valid expenses, they constitute constructive fraudulent transfers that were made to or for the benefit of Dondero and Ellington.

410. At the time of each Alleged Expense Transfer, HCMLP was insolvent, was engaged or was about to engage in business or a transaction for which the remaining assets of HCMLP were unreasonably small in relation to the business or transaction, and/or believed or reasonably should have believed that HCMLP would incur debts beyond HCMLP's ability to pay as they became due.

411. HCMLP received less than reasonably equivalent value in exchange for each of the Alleged Expense Transfers. Indeed, HCMLP received no value for the Alleged Expense Transfers, each of which was a gratuitous transfer from HCMLP to or for the benefit of Dondero and Ellington.

412. Each Alleged Expense Transfer is voidable as a constructively fraudulent transfer. Accordingly, each Alleged Expense Transfer should be set aside, avoided, and recovered under 11 U.S.C. §§ 544, 548, and 550, and Delaware and Texas law, as applicable,

against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XXXIII**
**Avoidance and Recovery of the Alleged Expense Transfers as Intentional Fraudulent Transfers Under 11 U.S.C. §§ 544, 548, and 550, and Other Applicable Law**
*(Against Dondero and Ellington)*

413. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

414. To the extent the Alleged Expense Transfers do not constitute reimbursement for valid expenses, they constitute intentional fraudulent transfers that were made to or for the benefit of Dondero and Ellington.

415. Dondero was HCMLP's Chief Executive Officer, President, Co-Chief Investment Officer, and Co-Founder. Ellington was HCMLP's Chief Legal Officer and General Counsel until he was terminated for cause in January 2021 for acting in a manner adverse to HCMLP's interest. Dondero exercised complete control over HCMLP, and Ellington acquiesced to and profited from schemes orchestrated by Dondero to enrich Dondero, Ellington, and HCMLP's direct and indirect owners.

416. To that end, Dondero and Ellington caused HCMLP to make the Alleged Expense Transfers with actual intent to hinder, delay, and defraud HCMLP's creditors, which intent is demonstrated by, among other things, the following badges and direct indications of fraud:

(a) Dondero and Ellington were insiders of HCMLP;

(b) although Dondero and Ellington assert that the Alleged Expense Transfers constitute reimbursement for valid expenses, on information and belief, there is no factual basis for that assertion;

(c) before the Alleged Expense Transfers were made, HCMLP had been sued and Dondero and Ellington believed HCMLP's legal exposure rendered it insolvent;

(d) HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved both siphoning HCMLP's valuable business opportunities through newly-created "lifeboat" entities and siphoning HCMLP's value through HCMLP Distributions (among other means);

(e) HCMLP, through Dondero, was engaged in a multi-faceted scheme to remove assets from HCMLP and conceal them from HCMLP's creditors, which involved siphoning HCMLP's value through the Alleged Expense Transfers (among other means);

(f) HCMLP received less than reasonably equivalent value (and in fact, received zero consideration) in exchange for the Alleged Expense Transfers;

(g) at the time of each Alleged Expense Transfer, HCMLP (i) was insolvent, (ii) was engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and/or (iii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due;

(h) Dondero and Ellington made the Alleged Expense Transfers during a period when they believed HCMLP would be forced to file for bankruptcy as a result of looming contingent liabilities, and effected the transfers in order to

siphon value so that such value would not be available to satisfy HCMLP's creditors.

417. Each Alleged Expense Transfer is voidable as an intentionally fraudulent transfer. Accordingly, each of the Alleged Expense Transfers should be set aside, avoided, and recovered under 11 U.S.C. §§ 544, 548, and 550, and Delaware and Texas law, as applicable, against all initial and subsequent transferees and/or entities for whose benefit the transfers were made.

**COUNT XXXIV**
**Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing Participation in Breach of Fiduciary Duty under Texas Law Out Of Conduct That Resulted in HCMLP Liabilities**
*(Against Ellington and Leventon)*

418. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

419. Ellington and Leventon aided and abetted the breaches of fiduciary duty committed by Dondero and Strand that foreseeably resulted in liability to HCMLP. Ellington and Leventon knowingly participated in Dondero's schemes that foreseeably resulted in liability to HCMLP. In total, these breaches that were aided and abetted by Ellington and Leventon resulted in more than $350 million in allowed claims against HCMLP.

420. Neither the Litigation Trustee nor the Estate could have discovered the conduct by Ellington and Leventon set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the conduct set out herein prior to Dondero's removal. By its nature, the conduct alleged herein was inherently undiscoverable because of

the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

421. **Liabilities to UBS.** Ellington and Leventon aided and abetted Dondero in causing HCMLP to incur substantial liability to UBS. In 2017, after a New York state court ruled that UBS's fraudulent transfer claims against HCMLP and claims against the Fund Counterparties could proceed to trial, Ellington and Leventon aided Dondero in causing HCMLP, in its capacity as investment manager for the Fund Counterparties, to orchestrate a surreptitious transfer of more than $300 million in face amount of assets from the Fund Counterparties to Sentinel, an entity located in the Cayman Islands that was indirectly owned and controlled by Dondero and Ellington, ostensibly to pay a premium on the Sentinel insurance policy that was only $25 million. Ellington and Leventon knew or willfully blinded themselves to the fact that Dondero breached his fiduciary duties to HCMLP by orchestrating the transfer to Sentinel

422. After the Petition Date, Dondero, Ellington, and Leventon actively concealed this transfer from the Independent Board, UBS, and the Bankruptcy Court. When this transfer was uncovered, HCMLP was forced to increase the amount of its settlement with UBS from a total of $75 million in allowed claims to $125 million in allowed claims.

423. **Liabilities to Acis.** After the Terry arbitration award issued, Ellington and Leventon aided and abetted Dondero in causing HCMLP to enter into numerous transactions to take control of Acis's business and strip it of assets so it could not pay the arbitration award. Ellington and Leventon implemented Dondero's directives and took necessary steps to

consummate the transactions, knowingly or willfully blinding themselves to the fact that Dondero breached his fiduciary duties to HCMLP by stripping Acis of assets.

424. Leventon knowingly participated in the scheme to transfer value away from Acis in an attempt to make it judgment-proof. Among other things, Leventon assisted in the drafting and execution of the agreement, approved by Dondero in a breach of his fiduciary duty, that transferred Acis's interest in a note receivable from HCMLP, which had a balance owing of over $9.5 million, to Cayman Island entity Highland CLO Management Ltd. just ten days after Terry obtained his arbitration award. The agreement recites that (1) HCMLP is no longer willing to continue providing support services to Acis; (2) Acis, therefore, can no longer fulfill its duties as a collateral manager; and (3) Highland CLO Management Ltd. agrees to step in to the collateral manager role. Given the timing of the assignment—just days after Terry's arbitration award—Leventon knew that it was part of a scheme to strip Acis of its assets and a breach of Dondero's fiduciary duty, which ultimately resulted in millions of dollars of damage to HCMLP.

425. **Liabilities to HarbourVest.** Ellington also aided and abetted Dondero in causing harm to HCMLP by exposing it to substantial liability to HarbourVest. Ellington aided Dondero, acting through HCMLP, in fraudulently inducing HarbourVest to purchase 49% of HCLOF from CLO Holdco for approximately $75 million in cash, with a commitment for an additional $75 million in the future, while concealing that Dondero was actively engaged in a campaign against Terry that would significantly impair the value of HarbourVest's investment. In addition, Dondero did not intend to use the $75 million that CLO Holdco received from HarbourVest to satisfy capital calls at HCLOF, and instead intended for CLO Holdco to use those funds as part of a scheme to infuse other Dondero Entities (including entities that

benefitted the NexPoint and HCMFA lifeboats) with additional cash. Ultimately, HCMLP was forced to settle with HarbourVest by providing it with $80 million in allowed claims, in exchange for a transfer of HarbourVest's interests in HCLOF to an affiliate of HCMLP. As a result of Dondero's and Ellington's conduct, those interests in HCLOF were then worth tens of millions of dollars less than the $75 million HarbourVest paid to acquire them. Ellington either knew or willfully blinded himself to the fact that Dondero breach his fiduciary duties to HCMLP by fraudulently inducing HarbourVest to purchase 49% of HCLOF from CLO Holdco for approximately $75 million in cash.

426. **Liabilities to Crusader Funds.** Ellington and Leventon aided and abetted Dondero in causing HCMLP to incur substantial liability to the Redeemer Committee due to his conduct in connection with HCMLP's wind-down of the Crusader Funds and distribution of proceeds to investors. Among other things, Dondero, Ellington, and Leventon caused HCMLP to: (1) transfer Barclays' limited partnership interests in the Crusader Funds to HCMLP's wholly-owned affiliate, Eames, Ltd., after the Redeemer Committee had refused to approve that transfer, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (2) purchase 28 Plan Claims for the benefit of HCMLP without the approval of the Redeemer Committee, in violation of the Joint Plan and Scheme and HCMLP's fiduciary duties; (3) covertly purchase the stock of the Portfolio Company and fail to liquidate the Crusader Funds' shares in the Portfolio Company, in violation of HCMLP's fiduciary duties; and (4) violate the provision of the Joint Plan and Scheme requiring HCMLP to defer receipt of certain Deferred Fees until the liquidation of the Crusader Funds was complete, causing HCMLP to forfeit its rights to those fees entirely. Additionally, both Ellington and Leventon were active participants in Dondero's scheme; they both provided false narratives or misrepresentations in furtherance

of Dondero's harm to the Crusader Funds. The Redeemer Arbitration panel found, for example, that Leventon "was significantly involved in providing direction" to keep the Redeemer Committee in the dark and "was the principal instrument through which [certain] misrepresentation[s] and omission[s] were communicated." As a result of Dondero's, Ellington's, and Leventon's conduct, the Redeemer Committee received an arbitration award against HCMLP in excess of $190 million, and in HCMLP's bankruptcy, HCMLP agreed to pay over $136 million in connection therewith. Ellington and Leventon either knew or willfully blinded themselves to the fact that Dondero breached his duties to HCMLP through the foregoing acts.

427. Beyond the direct losses identified in the preceding paragraphs, HCMLP suffered additional harm from Ellington's and Leventon's aiding and abetting the breaches of fiduciary duty committed by Dondero and Strand. For example, the $190 million Redeemer arbitration award—which was itself caused by the Dondero's and Strand's breaches of their fiduciary duty to HCMLP and Ellington's and Leventon's aiding and abetting of those breaches—caused HCMLP to file for bankruptcy. As of October 15, 2021, HCMLP had incurred in excess of $40 million in professional fees in connection with the bankruptcy. Ellington and Leventon either knew or willfully blinded themselves to the fact that Dondero and Strand breached their fiduciary duties to HCMLP through their actions that led to the $190 million Redeemer arbitration award.

428. In light of the foregoing, Ellington and Leventon are liable for aiding and abetting Dondero's breaches of fiduciary duties to HCMLP in an amount to be determined at trial.

**COUNT XXXV**
**Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law or Knowing Participation in Breach of Fiduciary Duty under Texas Law In Connection With Fraudulent Transfers And Schemes**
*(Against Ellington and Okada)*

429. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

430. Neither the Litigation Trustee nor the Estate could have discovered the conduct by Ellington and Okada set out herein with reasonable diligence prior to Dondero's removal as Chief Executive Officer and President of HCMLP on January 9, 2020. Moreover, given the fiduciary obligations owed to HCMLP, neither the Estate nor the Litigation Trustee was able to inquire or was aware of the need to inquire into the conduct set out herein prior to Dondero's removal. By its nature, the conduct alleged herein was inherently undiscoverable because of the complete domination and control that Dondero exercised over HCMLP and the Dondero Entities, including but not limited to the complexity and opacity of the corporate structure he created and wielded for his own benefit.

431. Ellington aided and abetted Dondero in causing HCMLP to enter into the Massand Consulting Agreements. Likewise, Ellington aided and abetted Dondero in overseeing and approving the Massand Transfers. The payment obligations Dondero and Ellington caused HCMLP to incur, and the payments that Dondero and Ellington caused HCMLP to make, conferred no benefit on HCMLP. In addition, Ellington aided and abetted Dondero in causing HCMLP employees to perform work for SAS—at least seven HCMLP employees received SAS email addresses—without compensating HCMLP. Ellington either knew or willfully blinded himself to the fact that Dondero breached his fiduciary duties to HCMLP through the foregoing actions.

432. Moreover, as part of his scheme to evade HCMLP's creditors, Dondero, acting through Strand, approved hundreds of millions of dollars of distributions from HCMLP at a time that Dondero believed HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors.

433. As Dondero's co-founder and HCMLP's Chief Investment Officer, Okada knew or willfully blinded himself to the fact that the HCMLP Distributions—including the distributions made to Okada, MAP #1, and MAP #2—were made at times that HCMLP was insolvent and would not be able to satisfy its obligations to its present and future creditors. Okada either knew or willfully blinded himself to the fact that Dondero breached his fiduciary duties to HCMLP by approving hundreds of millions of dollars of distributions from HCMLP at a time HCMLP was insolvent.

**COUNT XXXVI**
**Disallowance or Subordination of Claims Under**
**Section 502 and 510 of the Bankruptcy Code**
*(Against CLO Holdco)*

434. Plaintiff repeats and realleges the allegations in all prior paragraphs as if fully set forth herein.

435. On April 8, 2020, CLO Holdco filed Claim No. 133 seeking approximately $11 million (the "CLO Holdco Claim"). The basis of the CLO Holdco Claim was that CLO Holdco purchased a participation interest in certain interests that HCMLP held in the Crusader Fund.

436. HCMLP acquired the interests in the Crusader Fund that are the subject of the CLO Holdco Claim in violation of the Joint Plan and Scheme. HCMLP released its claim on those interests in connection with HCMLP's settlement with the Redeemer Committee. Accordingly, CLO Holdco is not entitled to any value on account of the CLO Holdco Claim. In recognition of this fact, on October 21, 2020, CLO Holdco amended its claim to seek $0.

437. Additionally, CLO Holdco subsequently agreed to withdraw the CLO Holdco Claim. Nevertheless, CLO Holdco has failed to date to actually withdraw the claim, notwithstanding the Reorganized Debtor's request. Accordingly, out of an abundance of caution, and to the extent that CLO Holdco attempts to pursue the CLO Holdco Claim, the Litigation Trustee objects to the CLO Holdco Claim, and the CLO Holdco Claim should be disallowed in its entirety or subordinated.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court enter judgment in favor of Plaintiff and against Defendants as follows:

A. awarding Plaintiff damages against, and disgorgement and restitution from each Defendant in an amount to be determined at trial;

B. setting aside, avoiding, and granting recovery of the HCMLP Distributions;

C. setting aside, avoiding, and granting recovery of the CLO Holdco Transfer;

D. setting aside and avoiding the payment obligations under the Massand Consulting Agreement;

E. setting aside, avoiding, and granting recovery of the Massand Transfers;

F. setting aside and avoiding the transfers of management and advisory agreements to HCMFA and NexPoint;

G. setting aside, avoiding, and granting recovery of the One-Year Transfers;

H. disallowing or subordinating, to the extent applicable, the CLO Holdco Claim;

I. awarding Plaintiff pre- and post-judgment interest at the maximum rate permitted by law;

J. awarding Plaintiff his attorneys' fees, costs, and other expenses incurred in this action; and

K. awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: May 19, 2022
Dallas, Texas

Respectfully submitted,

SIDLEY AUSTIN LLP
/s/ *Paige Holden Montgomery*
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

-and-

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Susheel Kirpalani (admitted *pro hac vice*)
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
Benjamin I. Finestone (admitted *pro hac vice*)
Calli Ray (admitted *pro hac vice*)
Alexander J. Tschumi (admitted *pro hac vice*)
51 Madison Avenue
Floor 22
New York, NY 10010
Telephone: (212) 849-7000

*Counsel for the Litigation Trustee*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document was sent via electronic mail via the Court's ECF system to parties authorized to receive electronic notice in this case on May 19, 2022.

*/s/ Paige Holden Montgomery*
Paige Holden Montgomery

**EXHIBIT 6**

Digitally signed by Advance Performance Exponents Inc.
Date: 2025.11.06 12:59:46 -05:00
Reason: Apex Certified
Location: Apex


**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD OF 2025 ( )**

**IN THE MATTER OF SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD**

---

**WINDING UP PETITION**

---

**TO: The Grand Court of the Cayman Islands**

**THE HUMBLE PETITION** of the **Supporting Organisations** (as defined below) (the ***Petitioners***), in their capacity as members of Charitable DAF Holdco, Ltd (the ***LP***) (and indirectly by way of separate petition the Charitable DAF Fund, LP (the ***Fund***)) shows that:

## A INTRODUCTION

1. The Petitioners respectfully seek:

   (a) an order pursuant to section 92(e) of the Companies Act (2025 Revision) (the ***Act***) that the LP be wound up on the basis that it is just and equitable to do so; and

   (b) the appointment of Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard, Cricket Square, George Town, Grand Cayman, Cayman Islands as joint official liquidators (the ***JOLs***) of the Fund; and/or

   (c) such other orders as the Court considers to be appropriate.

**B** **<u>THE FUND</u>**

2. The Fund is a Cayman Islands limited partnership formed on 28 October 2011 (registration number 53083) whose registered office is Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

3. The Fund is governed by the Amended and Restated Limited Partnership Agreement dated 7 November 2011 (the ***ARLPA***).

4. The Fund invests in securities for the purpose of benefiting, directly and indirectly, its Supporting Organisations (as defined below) which support various charitable causes in the U.S., including education, veteran and first responder welfare, medical research, economic and community initiatives, and youth and family programs.

5. The LP is the sole limited partner of the Fund and is a Cayman Islands exempt company incorporated on 27 October 2011 (registration number 263805) whose registered office is Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

6. The LP is governed by the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (the ***Articles***).

7. The general partner of the Fund is (or at least was at the time of the Fund's formation and pursuant to the ARLPA) Charitable DAF GP, LLC (the ***GP***), a Delaware company incorporated on 25 October 2011, whose registered office is Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

*<u>Ownership and Management</u>*

8. The Fund was formed to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code (the* ***Code****) … for the economic benefit of the Limited Partner and its <u>Indirect Charitable Owners</u>*" (ARLPA, Recitals).

9. The Petitioners understand that exempt entities under section 501(c)(3) of the Code, commonly referred to as charitable organisations, must be operated exclusively for charitable purposes and not for the benefit of private interests. 'Supporting organizations' under section 509(a)(3) of the Code must carry out such exempt purposes by supporting *other* charities.

10. In this context:

(a) The LP holds ninety-nine percent (99%) of the economic interest in the Fund. The other one per cent (1%) in the Fund is held by the GP or its successor as GP.

(b) The LP issued 305 participation shares (the ***Participation Shares***) that are held by four Delaware corporate entities, namely: The Highland Dallas Foundation, Inc. (***HDF***), The Highland Kansas City Foundation, Inc. (***HKCF***), The Highland Santa Barbara Foundation, Inc. (***HSBF***), and The HCMLP Charitable Fund (***HCMLP***) (together, the ***Supporting Organisations***).

(c) Each Supporting Organisation provides funding to its respective U.S. charitable foundation (together, the ***Charities***) which are the ultimate beneficial owners of the Fund's entire economic interest.

(d) The LP also issued 100 management shares (the ***Management Shares***) which attach the only voting rights for all shareholders of the LP. The terms of the ARLPA and the Articles together grant complete management control of the Fund to the holder of the Management Shares, and the holder of the entire issued share capital in the GP (the ***Membership Interest***).

11. The Management Shares and the Membership Interest have at all material times been held by a single individual who, as a result, has sole control of the Fund structure (the ***Control Position***).

## C THE PETITIONERS

12. As stated above, the Petitioners (the Supporting Organisations) are non-profit charitable entities exempt from taxation under section 501(c)(3) of the \ Code and through the LP hold 99% of the economic interest in the Fund.

13. The Supporting Organisations provide funding directly to the Charities as follows:

(a) HDF holds 32.87% of the Participating Shares. HDF provides funding to The Dallas Foundation, a charitable entity established in Texas in 1929, which has awarded over $1 billion in grants and manages over $500 million in assets.

(b) HKCF holds 32.87% of the Participating Shares. HKCF provides funding to the Greater Kansas City Community Foundation, a charitable entity established in Kansas in 1978 which has awarded over $7 billion in grants and currently manages over $5 billion in assets.

(c) HSBF holds 32.787% of the Participating Shares. HSBF provides funding to the Santa Barbara Foundation, a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

(d) HCMLP holds 1.639% of the Participating Shares. HCMLP provides funding to the North Texas Community Foundation, which manages assets totaling $513 million and donated $38.9 million to local nonprofits in 2023.

14. Since the Fund's inception in 2011, through profits generated by the Fund the Supporting Organisations have granted over $42 million to charitable foundations and have funded $32 million in total commitments, including donations to 275 organisations, with average annual grant payments of $3.7 million.

## D BACKGROUND

15. The Fund was created in 2011 on the instructions of James Dondero. Mr Dondero is the President of NexPoint Advisors, L.P. (***NexPoint***), an alternative investment firm registered with the U.S. Securities and Exchange Commission (***SEC***), and the former President of Highland Capital Management, L.P. (***Highland***), also an SEC registered investment advisor which he founded in 1993. Mr Dondero is a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles he utilises to donate such funds to charitable organisations. Mr Dondero holds no ownership or control stake in the Fund or any related entities, although he sits on the boards of the Supporting Organisations.

16. From the Fund's formation until March 2021, the Control Position was held by Grant Scott. On 25 March 2021, Mr Scott: (i) resigned as director of the Fund and the LP, (ii) appointed Mark Patrick as director of the Fund and the LP, and (iii) transferred to Mr Patrick the Management Shares in the LP and Management Interest in the GP. Mr Patrick therefore assumed the Control Position from that date.

17. From 2008 to 2021, Mr Patrick was employed as tax counsel by Highland Capital Management, LP (***Highland***), an investment advisor founded by Mr Dondero. From March 2021 to October 2024, Mr Patrick was employed as tax counsel by Skyview Group (***Skyview***). In both positions, Mr Patrick acted as an advisor to Mr Dondero and entities owned or affiliated to him.

18. On 22 April 2021, Paul Murphy, a Cayman Islands resident, was appointed as director of the LP.

19. On 16 October 2019, Highland filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code in the Northern District of Texas (the ***Highland Bankruptcy***). The Highland Bankruptcy plan was confirmed in February 2021, and the estate remains open as it makes distributions to creditors.

## E EVENTS FOLLOWING MR PATRICK'S ASSUMPTION OF THE CONTROL POSITION

20. Since assuming the Control Position, Mr Patrick has used that position to advance his own interests to the detriment of the LP, the Fund, the Supporting Organisations and the Charities.

*Non-disclosure of personal interest in grant*

21. In June 2023, Mr Patrick made a request that the Highland Dallas Foundation (i.e. the Supporting

Organization that supports the Dallas Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, it was discovered that the directors of the entity were Mr Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr Patrick had made the grant request without disclosing his and/or his family's involvement.

22. The grant payment was authorised on 5 September 2023, but Mr Patrick was informed that further payments were unlikely.

*Attempt to obtain secret profit*

23. In September 2023, Mr Dondero was contacted by Kevin Cronin of Fortaris Capital Advisors (***Fortaris***), a firm providing litigation support and investigative services which, at the time, was engaged by the Fund on an unrelated matter.

24. Mr Cronin disclosed to Mr Dondero that Mr Patrick had approached him with a proposition whereby Mr Patrick (on behalf of the Fund) would engage an entity controlled by Mr Cronin (other than Fortaris) at a monthly fee of between US$25,000 and US$50,000, and that this fee would be split between Fortaris and Mr Patrick as a supplement to Mr Patrick's compensation.

25. Mr Cronin refused Mr Patrick's proposal.

26. Mr Patrick's attempt to obtain a secret, undisclosed personal profit from the Fund would, if successful, have constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. It was otherwise a breach of Mr Patrick's duties to the LP and, through the LP, to the Fund.

*Unauthorised use of MNPI / Insider Trading*

27. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (***MNPI***) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities and other laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (the ***Compliance Policy***). NexPoint and its affiliates, and Skyview, require their employees to abide by the Compliance Policy at all times and employees are required to confirm in writing each quarter that they will not use MNPI while trading. Mr Patrick completed an annual 2023, Q4 2023, Q1 2024 and Q2 2024 certifications, among others.

28. In late August 2024, Mr Patrick contacted the attorneys to the Dallas Foundation to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr Patrick through his employment at Skyview and constituted MNPI. On the basis of this MNPI, Mr Patrick advised the Dallas Foundation to

exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

29. Upon receipt of the allegations against Mr Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr Patrick's knowledge, so as to avoid potentially tipping off Mr Patrick. The investigation concluded that Mr Patrick's actions constituted a serious breach of his compliance and employee obligations and that Mr Patrick had attempted a serious breach of U.S. securities laws.

30. Mr Patrick resigned from Skyview immediately before the internal investigation was finalised. At the same time, he terminated the Fund's services agreement with Skyview. That termination was not in the interests of the Fund, was for Mr Patrick's own self-protection and was otherwise a breach of Mr Patrick's duties to the LP and, through the LP, to the Fund.

*Financial Irregularities in the Fund / Unexplained Expenditure*

31. A review of the Fund's financial records conducted by Skyview covering the calendar years ending 2018 to 2023 and the first half of 2024 showed significant increases in expenditures, notably:

(a) **Directors' fees**, which increased from US$40,000 in 2022 to almost US$600,000 in 2023, and in the first half of 2024 alone, increased further to around US$2.25 million; and

(b) **Expenses overall**, which for the first half of 2024 were around US$18.3 million, with a further US$18.6 million being spent in the calendar year 2023.

32. In October 2024, the Charities requested that Mr Patrick provide financial information about the Fund entities to seek to understand these increases in expenditures. This information was not provided.

33. In November 2024, Holland and Knight (***H&K***), the Charities' US attorneys, delivered a letter to Mr Murphy from the Charities advising that the Charities no longer had confidence in the governance of the Fund and considered that a reorganisation was required (the ***No Confidence Letter***). No response to the No Confidence Letter was received.

34. In January 2025, further correspondence was sent to Mr Patrick and Mr Murphy advising that a better understanding of the Fund's asset position was needed and expressing serious concern that the Charities' requests for information continued to be disregarded, reflecting an ongoing lack of transparency on the part of Mr Patrick and Mr Murphy. Mr Murphy responded via email to this request noting that he and Mr Patrick would "*present directly to the foundations/supporting organisations*" to address some of the concerns in the No Confidence Letter.

35. H&K responded to Mr Murphy's email noting, *inter alia*, that the Supporting Organisations had legitimate concerns and highlighted that "*the last information they received from in July of 2024, before Mr Patrick shut down [communication] showed that legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022*" (a 300% increase, if annualized) and "*director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024*" (a 12,400% increase, if annualized).

36. In February 2025, further correspondence was sent between H&K and Douglas Mancino (***Mr Mancino***) of Seyfarth Shaw LLP (***Seyfarth***), US counsel purporting to act for the Fund, whereby Seyfarth rejected the reported increases in legal and directors' fees and provided a valuation of the Fund from 2020 to support the suggestion that similar information was provided to the Charities when Mr Scott was in the Control Position. It is clear that Mr Patrick and/or Mr Murphy has instructed Seyfarth, purportedly on behalf of the Fund, to take a hostile, indignant and non-neutral stance when faced with reasonable requests on behalf of the Charities, as ultimate beneficiaries of the assets of the Fund. Such conduct is a breach of their duties to the LP and, through the LP, to the Fund.

37. H&K responded to Seyfarth that the Charities were becoming frustrated by the ongoing lack of transparency and refusal to respond to simple inquiries about the financial position and governance of the Fund. Seyfarth sent an email to H&K requesting available dates for Mr Murphy to make the promised presentation to the Charities. The next day, H&K suggested three potential dates/times for such a call between 26 March and 3 April 2025, but did not receive any response. On 3 April 2025, Seyfarth sent an email to H&K stating that they had just learned that a call was scheduled for the following day and seeking to reschedule. H&K responded that no such call had been arranged and queried the source of confusion. Seyfarth has made no further efforts to schedule the meeting, nor has it otherwise provided any of the requested financial information.

*Replacement of GP without notification*

38. In February 2025, H&K discovered that Mr Patrick had redomiciled and replaced the general partner of the Fund, without notice to the Charities, almost one year prior.

39. On 27 February 2024, CDH GP, Ltd (the ***New GP***) was incorporated in the Cayman Islands (registration number 407515) with its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

40. Mr Patrick is the sole director of the New GP.

*Sale of assets*

41. Following Mr Patrick's resignation from Skyview and his termination of Skyview's services agreement with the Fund, the Petitioners have become aware that assets of the Fund have been

sold without explanation, at values which appear to be below-market.

*Hunter Mountain*

42. In February 2025, an individual associated with Mr Patrick, Shawn Raver, asked for the in-bound wire instructions for one of Mr Dondero's affiliates that owned a position in a trust called Hunter Mountain. Hunter Mountain is an indirect majority owned subsidiary of the Fund and owns the majority of the distribution rights of the equity position in the Highland Bankruptcy. The residual value of the Highland estate should be distributed to Hunter Mountain at the close of the Highland Bankruptcy.

43. According to Hunter Mountain's own filings, this value has been calculated in excess of $100 million gross, with approximately $17 million net value. After additional inquiries from accounting staff, Mr Raver disclosed that the entire Hunter Mountain position had been sold, at potentially a substantial undervalue, to an unidentified party for $1 million. The Fund has not disclosed the identity of the purchaser. In the absence of a further or better explanation, there is the inference of self-dealing, fair dealing, no profit or conflict rules

*Atlas IDF, L.P.*

44. Atlas IDF, L.P. is a fund controlled by its general partner Atlas IDF GP, LLC, a wholly owned subsidiary of the Fund. The economic beneficiaries of Atlas IDF are the holders of annuity policies issued by Crown Global Insurance Company. The majority annuity policyholder is Empower Dallas Foundation (***EDF***), a charitable foundation for which Mr Dondero serves as President whose purpose is to benefit the Dallas Foundation.

45. On 20 February 2025, Mr Patrick in his capacity as the general partner of Atlas IDF GP, LLC, sent a letter to Crown Global Insurance advising of the intention to dissolve Atlas in accordance with the partnership agreement dated 30 November 2015 on the basis of:

(a) concerns about the long-term availability and viability of back-office support;

(b) unsuccessful efforts to sell the defaulted Notes issued by HCRE Partners (one of Mr Donero's affiliates) dated 7 May 2014 in the amount of $2.3M and 27 May 2014 in the amount of $5M, held by the Partnership; and

(c) the decision by an affiliate of the GP to purchase the Notes at a price above their appraised value of zero dollars to facilitate an orderly wind-up.

46. At the time, the amounts outstanding on the two Notes, including accumulated interest, were in excess of $13M. The intention was to sell the Notes collectively for $500,000. Mr Patrick launched litigation related to these Notes prior to the 20 February 2025 and attempted sale of the Notes to

an affiliate.

47. On 27 February 2025, H&K as counsel for EDF (the policyholder), sent an email to Crown Global advising that the foundation was gathering information and requested that Crown Global therefore withdraw its consent to the proposed sale of the Notes.

48. On 28 February 2025, Mr Patrick sent a further letter to Crown Global noting the revocation of consent to sell the Notes, and further noting that: "*in addition to the purchase of the "Notes" for $500,000, we also intend to include a provision in the purchase and sale documents that, if the Notes are repaid in full within 12 months, all amounts received (minus fees and expenses of collection and purchase price) will be remitted to you as the sole limited partner of Atlas IDF, LP*." The initial zero valuation and proposed $500,000 sale price is commercially unjustifiable.

*Attorney General Investigation*

49. The Petitioners have been informed that on 14 March 2025, the Texas Attorney General (***Texas AG***) commenced an investigation into Charitable DAF GP, LLC (the Fund's former general partner) in relation to the organisation, conduct and management of Charitable DAF GP, LLC, and its related entities.

50. It is understood that the Texas AG has the power to investigate a charity, should it deem necessary, to determine whether a charity is complying with Texas law.

51. The Charities have requested information about the investigation from the Texas AG, but do not have knowledge of any further details.

## F GROUNDS FOR WINDING UP

52. The Supporting Organizations bring this Petition based on the multiple concerns identified above about the governance of the LP and the Fund, including potential mismanagement of assets and/or use of assets for purposes other than to benefit and support the Charities, as the ultimate beneficial owners of the Fund's interest, in carrying out their charitable purposes, in accordance with the terms of the ARLPA, on the basis of a complete breakdown in confidence in the person in the Control Position.

53. Accordingly, the Petitioners seek a winding up of the LP on a just and equitable basis and in particular, without limitation, on the following grounds (each discussed in detail below):

(a) governance issues and mismanagement; and

(b) the need for an investigation into the recent activities and expenditure of the Fund; and

(c) justifiable loss of faith and confidence in the management of the Fund.

**F** **APPLICATION**

54. Given the above, the Petitioners seek an order that the LP be wound up pursuant to section 92(e) of the Act.

55. The Petitioners also seek an order appointing Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard, Cricket Square, George Town, Grand Cayman, Cayman Islands, as the joint official liquidators (***JOLs***) of the LP.

56. Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd:

(a) are “qualified insolvency practitioners” as defined in section 89 of the Act and as prescribed by Regulation 4 of the Insolvency Practitioners’ Regulations (2023 Consolidation) (***IPR***);

(b) meet the residency requirements contained in Regulation 5 of the IPR;

(c) meet the independence requirements prescribed by Regulation 6 of the IPR;

(d) meet the insurance requirements prescribed by Regulation 7 of the IPR and A&M holds a trade licence which authorises its staff to carry on business as professional insolvency practitioners; and

(e) consent to their appointment as official liquidators of the LP, if so appointed by the Court.

**YOUR PETITIONERS THEREFORE HUMBLY PRAY THAT** –

1. The LP be wound up by the Court in accordance with section 92(e) of the Act.

2. Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard, Cricket Square, George Town, Grand Cayman, Cayman Islands be appointed as the joint official liquidators (the ***JOLs***) of the LP.

3. The JOLs be authorized to act jointly and severally in their capacity as liquidators of the LP.

4. The JOLs shall not be required to give security for their appointment.

5. In addition to their powers prescribed in Part II of the Third Schedule to the Act, which are exercisable without sanction of this Honourable Court, the JOLs may also without further sanction or intervention from this Honourable Court exercise the following powers set out in Part I of the Third Schedule to the Act:

(a) The power to engage staff, agents and/or consultants (whether or not as employees of the LP) in the Cayman Islands and elsewhere to assist the JOLs in the performance of their

functions; and

(b) The power to engage attorneys and other professionally qualified persons in the Cayman Islands and elsewhere to assist the JOLs in the performance of their functions.

6. The JOLs be authorised to do any act or thing considered by them to be necessary or desirable in connection with the liquidation of the LP.

7. The JOLs' remuneration and expenses be paid out of the assets of the LP in accordance with section 109 of the Act, Part III of the Regulations, and CWR Order 20.

8. The costs of this Petition shall be paid out of the assets of the LP as an expense in the liquidation, such costs to be taxed if not agreed with the JOLs.

9. The JOLs shall be at liberty to apply to further directions concerning their functions and the exercise or the proposed exercise of their powers.

10. Such further or other orders and directions be made as the Court shall deem fit.

**AND** your Petitioners will ever pray etc.

Dated 10 April 2025

Johnstone Law

**Johnstone Law Ltd.**

**NOTE:** This Petition is intended to be served on:

**CHARITABLE DAF HOLDCO, LTD** at its registered office at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands

.

**THIS PETITION** was presented by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/00016**)

**NOTICE OF HEARING**

**TAKE NOTICE THAT** the hearing of this Petition will take place at the Law Courts, George Town, Grand Cayman, Cayman Islands on at am.

Any correspondence or communication with the Court related to the hearing of this Petition should be addresses to the Registrar of the Financial Services Division of the Grand Court at PO Box 495, George Town, Grand Cayman, KY1-1106, Cayman Islands.

**EXHIBIT 7**

Digitally signed by Advance Performance Exponents Inc
Date: 2025.04.16 20:39:55 -05:00
Reason: Apex Certified
Location: Apex



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. OF 2025 ( )**

**IN THE MATTER OF SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO LTD AND THE CHARITABLE DAF FUND LP**

---

**AFFIDAVIT OF JAMES DAVID DONDERO**

---

I, **JAMES DAVID DONDERO**, of 300 Crescent Court, Suite 700, Dallas, Texas, United States, 75201, **MAKE OATH AND SAY** as follows:

1. I am the President of NexPoint Advisors, L.P. (***NexPoint***), an investment advisor registered with the U.S. Securities and Exchange Commission (***SEC***). I am a Certified Public Accountant and Chartered Financial Analyst with over forty years of investment advisory experience managing billions of dollars of investments across various assets classes.

2. I make this affidavit in support of the petition (the ***Petition***) filed by the Supporting Organizations (as defined below) seeking the winding up on the just and equitable basis of Charitable DAF HoldCo, Ltd (the ***LP***) and the Charitable DAF Fund, LP (the ***Fund***) pursuant to section 92(e) of the Companies Act (2025 Revision) (the ***Act***) and Order 3, rule 3 of the Companies Winding Up Rules (2025 Consolidation) (the ***CWR***).

3. I make this affidavit from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

4. Now produced and shown to me and marked "**JDD-1**" is a bundle of true copy documents to which I refer in this affidavit. References to page numbers in this affidavit are references to that exhibit unless otherwise specified.

**BACKGROUND**

5. I founded NexPoint in 2012. NexPoint is an alternative investment firm, with a particular focus on investment in the real estate sector. NexPoint has assets under management exceeding US$16 billion in value.

6. I was formerly the President of Highland Capital Management, L.P. (***Highland***), also an SEC registered investment advisor which I founded in 1993. From that time until 2015, Highland was majority owned by me and/or my affiliates. In December 2015, I divested my majority stake of Highland (***2015 Transaction***). On 16 October 2019, Highland filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code (***Highland Bankruptcy***) in the Northern District of Texas. The Highland Bankruptcy plan was confirmed in February 2021, and the estate remains open as it makes distributions to creditors.

7. In February 2021, as part of the Highland Bankruptcy, the employment contracts of the majority of Highland's employees were terminated. Many of the former back-office employees of Highland thereafter became employees of a newly formed company called Skyview Group (***Skyview***) that provides middle and back-office services to various clients, including companies in which I hold an interest such as NexPoint.

**THE FUND**

8. In addition to my business interests, I am a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles I utilize to donate such funds to charitable organizations.

9. In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. In 2011, I requested the Donor Advised Fund (or DAF) to be formed and structured in a way that allowed these donations to be receipted and distributed to certain charitable foundations, as the ultimate beneficial owners of the Fund's economic interest. The structure proposed by the tax and legal advisors to effect this was for the Fund to have one limited partner (i.e. the LP) which would issue 'participation shares' to be held by certain charitable supporting organizations (together, the ***Supporting Organizations***) and in turn each of those entities would provide funding directly to certain charitable foundations in the U.S. (together, the ***Charities***).

10. The Amended and Restated Limited Partnership Agreement of the Fund dated 7 November 2011 (***ARLPA***), and the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (***Articles***), govern the Fund and its partners.

11. The LP holds 99% ninety-nine percent (99%) of the economic interest in the Fund. The remaining one percent (1%) is (or at least was as at the time of the Fund's formation) held by its general partner, Charitable DAF GP, LLC (the ***GP***), a Delaware company incorporated on 25 October 2011.

12. In addition to the Participation Shares, the LP issued 100 management shares (the ***Management Shares***) with the only voting rights for any and all shareholders in the LP. In essence, the Articles and ARLPA therefore grant complete control of the Fund structure to the holder of the Management Shares in the LP and the entirety of the issued share capital of the GP. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Fund structure (the ***Control Position***).

13. The ARLPA provides that the Fund was formed to make investments, directly or indirectly, on behalf of certain entities "*for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" and contemplates the engagement of investment (and other service) advisors to effect this. In this context, the Control Position is responsible for the governance and management functions of the Fund as required in order for the Fund to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support.

**GRANT SCOTT**

14. I initially selected Grant Scott for the Control Position, a person I have known for years who also has great integrity.

15. From 2010 until the 2015 Transaction, the Fund operated as a non-discretionary advised account of Highland, meaning Highland provided back-and-middle-office staff to the Fund and also provided recommendations regarding potential investments to Mr Scott as the Control Person. However, Mr Scott had complete discretion in adopting or rejecting the investment recommendations provided to the Fund by Highland. He also had final discretion over payments made by the Fund to third parties. In his position as the Control Person, Mr Scott was paid $60,000 USD per annum.

16. After the 2015 Transaction, my affiliates and I no longer owned a majority stake in Highland. Subsequently, I was advised that, as a result of the change of ownership, the Fund was permitted to enter into a paying Investment Advisory Agreement with Highland. This form of investment advisory agreement was in place from January 2017 until it was terminated effective March 2021.

**MARK PATRICK**

17. Mark Patrick was hired as Tax Counsel at Highland in 2008. His job duties included maximizing tax saving to Highland's limited partners, including me and my affiliates. In that role, Mr. Patrick directly represented me as my personal tax counsel. He represented me in tax efficiency planning and tax-deductible charitable giving, among other things. He provided the same services for various trusts and companies affiliated with me. Mr Patrick served that role at Highland from 2008 until his departure in February 2021.

18. In March 2021, Mr Patrick was hired by Skyview as Tax Counsel and continued to perform

substantially similar tax counsel duties for me. At Mr Patrick's request, his job title was changed to "Managing Director, Tax" in September 2021, although his role with respect to me and my affiliates remained substantially the same.

19. The legal structure of the Fund (including as regards its partners and ultimate beneficiaries as discussed above) was created in 2011 on the advice of Mr Patrick working with outside counsel. Mr Patrick advised me that, to avoid potential negative findings by the U.S. Internal Revenue Service, as the donor/grantor of assets to the Fund, I could not have any control over the Fund or its entities. I followed his advice as my tax counsel.

20. In March 2021, Mr Scott informed me that he wanted to resign from the Control Position. The Fund had become engaged in certain disputes arising from the Highland Bankruptcy, and he did not believe he was equipped to handle those disputes. Mr Patrick suggested to Mr Scott and me that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected the Fund. At the time, Mr Patrick was my attorney and Mr Scott was my trusted friend, and I was happy for Mr Scott to pass the Control Position to Mr Patrick.

21. On 25 March 2021, Mr Scott: (i) resigned as director of the LP, (ii) appointed Mr Patrick as director of the LP, and (iii) transferred to Mr Patrick the Management Shares for nominal consideration. Mr Patrick therefore assumed the Control Position from that date.

22. At some point, I understand that a person named Paul Murphy based in the Cayman Islands also was appointed as director to the LP and a portion of the Fund's subsidiaries, giving those entities two directors. However, I understand that in the event of a dissenting vote by Mr Murphy, Mr Patrick's vote counts as the tiebreaker for corporate voting.

**MR PATRICK'S CONTROL OF THE FUND**

23. In the initial period following Mr Patrick's assumption of the Control Position, there was no noticeable change in the management of the Fund. NexPoint provided, without charge, investment ideas to the Fund, as Highland previously had done, and Mr Patrick was free (as Mr Scott had been) to decide whether or not the Fund wished to follow NexPoint's recommendations. This approach was similar to the non-discretionary advised account status of the Fund prior to 2017.

24. Subsequently, however, communications between Mr Patrick and Skyview and me began to become less frequent, and over time I came to suspect that Mr Patrick was utilizing the Control Position not for the benefit of the Supporting Organizations, the Charities or the Fund, but rather for his own personal enrichment.

25. On 28 June 2023, Mr Patrick sent an email to Lauren Short, an employee of NexPoint, requesting that the Highland Dallas Foundation (i.e. the Supporting Organization that supports the Dallas

Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, Ms Short learned that the directors of the entity were Mr Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr Patrick had made the grant request without disclosing his and/or his family's involvement.

26. Ms Short discussed the matter with Mr Patrick, who did not provide many details, but said the non-profit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Ms Short understood that Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. While Ms Short inquired, there was no detail forthcoming as to whether or not Creative Hearts would be a pass-through donating the monies to other charities or would directly do any work with the trainers or speakers itself. There also was not clarity if Creative Hearts' members intended to take a salary from the grant. The grant payment was authorized on 5 September 2023, but Mr Patrick was informed that further payments were unlikely. I was informed of this process by Ms Short and her supervisor. Contemporaneously with the grant approval, my team also informed the Dallas Foundation of the situation.

27. As another example, in or around September 2023, I was contacted by Kevin Cronin of Fortaris Capital Advisors (***Fortaris***). Fortaris provides litigation support services including due diligence, internal investigations, fraud detection, asset verification and in-depth background checks. Mr Cronin is a former police sergeant and Special Agent with the Department of Homeland Security.

28. Fortaris was at the time engaged by the Fund in respect of an unrelated matter and Mr Cronin was known to me personally. In September 2023, Mr Cronin and I met, and he informed me that he had been approached by Mr Patrick with a proposition whereby Mr Patrick (on behalf of the Fund) would engage an entity controlled by Mr Cronin (other than Fortaris) at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr Patrick as a supplement to Mr Patrick's compensation. Mr Cronin informed me that he had asked Mr Patrick if this arrangement would amount to fraud, and that Mr Patrick's response had been: "*you can't steal from yourself.*"

29. Mr Cronin informed me that he understood from this statement that Mr Patrick believed he owned the Fund and could use the funds controlled by it however he pleased. Mr Cronin further informed me that he was uncomfortable about Mr Patrick's proposal and that he subsequently communicated this to Mr Patrick, Mr Patrick cut off all further communications between them.

30. Mr Cronin's allegations that Mr Patrick was seeking to make a secret, undisclosed personal profit from the Fund were extremely concerning. I have subsequently been informed by my U.S. attorneys that, had Mr Cronin agreed with this proposal, it would have likely constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. Shortly after Mr Cronin contacted me, I met with Mr Patrick and confronted him about the allegations, which he admitted to me were true. I informed the Supporting Organizations

about the matter and Mr Patrick's admission. However, at the time, both the Supporting Organizations and I were concerned that under the Articles, the Supporting Organizations did not have the power (in their capacity as Participating Shareholders) to limit Mr Patrick's powers or remove him from his position.

31. Given the situations described above, and the lack of communication about the Fund, I became increasingly concerned about Mr Patrick's management of the Fund, including the potential misuse and/or misappropriation of its assets. In June 2024 therefore I requested that my team at NexPoint analyze the financial information of the Fund that I had in my possession, covering the calendar years ending 2018 to 2023 and the first half of 2024. My team produced an annual expense summary of that information (the ***Expense Summary***) which indicated substantial increases in expenditures during Mr Patrick's tenure, particularly during early 2023 and mid-2024, as follows:

    (a) Directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased even further to around US$2.25 million in the first half of 2024 alone.

    (b) Expenses overall for the first half of 2024 were around US$18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

32. The Expense Summary reinforced my concern that Mr Patrick is using the Control Position for his own enrichment rather than to benefit the Supporting Organizations and the causes they support. I therefore directed my employees at NexPoint to provide the Expense Summary to the Supporting Organizations, and which they promptly did.

33. In August 2024, I became aware of yet another issue concerning Mr Patrick. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (***MNPI***) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (***Compliance Policy***). NexPoint and its affiliates, and Skyview, require their employees to abide by the Compliance Policy at all times and employees are required to confirm in writing on a quarterly basis that they will not use MNPI while trading. Mr Patrick completed the annual 2023, Q4 2023, Q1 2024, and Q2 2024 certifications, among others.

34. I was informed that my director of charitable giving had been contacted by Ms Diaz, the CEO of the Highland Dallas Foundation, Inc. (***Dallas Foundation***), one of the Charities. Ms Diaz stated that on 28 August 2024, Mr Patrick contacted the Dallas Foundation's attorney to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr Patrick through his employment at Skyview and constituted MNPI,

which is prohibited by U.S. securities laws from being disclosed and/or acted upon. On the basis of this MNPI, Mr Patrick advised the Dallas Foundation to exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

35. Upon receipt of the allegations against Mr Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr Patrick's knowledge, so as to avoid potentially tipping off Mr Patrick about the investigation. By the end of September 2024, the investigation was substantially complete, and the conclusion had been reached that Mr Patrick's actions constituted a serious breach of his compliance and employee obligations. On 1 October 2024, as part of the finalisation of the investigation report, Skyview's chief compliance officer interviewed Ms Diaz about the allegations against Mr Patrick, which I understand confirmed Skyview's conclusions. The final investigation report was issued on 11 October 2024 and concluded that Mr Patrick had attempted a serious breach of U.S. securities laws. A copy of the report and its attachments is at **page 1**.

36. On 2 October 2024, Mr Patrick abruptly resigned his position from Skyview and thereafter became openly hostile towards the Charities, my affiliated companies, and me. Although neither I nor anyone at Skyview has direct evidence of Mr Patrick having been tipped off about the investigation, the timing of his resignation causes me to conclude that Mr Patrick became aware of the investigation into his behaviour and resigned before the report was published.

37. On the same day that Mr Patrick resigned his position at Skyview, he also terminated Skyview's service agreement with the Fund, and as a result all legal, compliance, back office and other services provided to the Fund. Mr. Patrick and Mr. Murphy have stated that that they intend to take on the role of investment advisors for the Fund. I am not aware of Mr. Murphy's qualifications for this role, nor am I aware of any third-party investment advisor that has been retained by the Fund to fill this role. Based on my knowledge and expertise in investment management, and my sixteen years working with Mr Patrick as my counsel, I believe that Mr Patrick is a well-qualified tax counsel, but does not have the experience, training, or expertise to be an investment professional.

38. After his resignation from Skyview and the termination of Skyview's services agreement with the Fund, I have received repeated reports and evidence of Mr Patrick causing certain DAF entities to liquidate their assets, some at below-market value. For example, on 20 February 2025, Mr Patrick's subordinate Shawn Raver asked for the in-bound wire instructions for one of my affiliates that owned a position in a trust called Hunter Mountain. Hunter Mountain owns most of the distribution rights of the equity position in the Highland Bankruptcy, meaning most of the residual value of the estate should be distributed to Hunter Mountain at the close of the Highland Bankruptcy. According to

Hunter Mountain's own filings, this value has been calculated in excess of $100 million gross, with approximately $17 million net value.

39. After additional inquiries from accounting staff, Mr Raver disclosed that the entire Hunter Mountain position had been sold to an unidentified party for $1 million. The Fund has not disclosed the identity of the purchaser. I am familiar with the Highland Bankruptcy estate and there is no valuation, net, gross, or otherwise, that I can imagine that would support a $1 million sales price. Additionally, given my founding and my affiliates' ownership of Highland, Mr Patrick would know that I was one of a few natural buyers of the Hunter Mountain position. While Mr Patrick of course would not be obliged to sell Hunter Mountain to me, the fact that Mr Patrick authorized the sale of Hunter Mountain at a below-market value without even approaching a natural buyer indicates a non-market, non-fiduciary reason for the sale.

40. Atlas IDF, L.P. is a fund controlled by its general partner Atlas IDF GP, LLC, a wholly owned subsidiary of the DAF. The economic beneficiaries of Atlas IDF are the holders of annuity policies issued by Crown Global Insurance Company. The majority annuity policy holder is Empower Dallas Foundation, a charitable foundation for which I serve as President whose purpose is to benefit the Dallas Foundation.

41. On 20 February 2025, Mr Patrick in his capacity as the general partner of Atlas IDF GP, LLC, sent a letter to Crown Global Insurance advising of the intention to dissolve Atlas in accordance with the partnership agreement dated 30 November 2015 on the basis of (i) concerns about the long-term availability and viability of back-office support; (ii) unsuccessful efforts to sell the defaulted Notes issued by HCRE Partners (one of my affiliates) dated 7 May 2014 in the amount of $2,3M and 27 May 2014 in the amount of $5M, held by the Partnership; and (iii) the decision by an affiliate of the GP to purchase the Notes at a price above their appraised value of zero dollars to facilitate an orderly wind-up. At the time, the amounts outstanding on the two Notes, including accumulated interest, was in excess of $13M. The intention was to sell the Notes collectively for $500,000. Mr Patrick launched litigation related to these Notes prior to the 20 February 2025 attempted sale of the Notes to an affiliate.

42. On 27 February 2025, H&K as counsel for the Empower Dallas Foundation (the policyholder), sent an email to Crown Global advising that the foundation was gathering information and requested that Crown Global therefore withdraw its consent to the proposed sale of the Notes to CLO Holdco. On 28 February 2025, Mr Patrick sent a further letter to Crown Global noting the revocation of consent to sell the Notes, and noting that: "*in addition to the purchase of the "Notes" for $500,000, we also intend to include a provision in the purchase and sale documents that, if the Notes are repaid in full within 12 months, all amounts received (minus fees and expenses of collection and purchase price) will be remitted to you as the sole limited partner of Atlas IDF, LP.*" The initial zero valuation and

proposed $500,000 sale price was confusing given that HCRE Partners had offered to pay the full amounts due in an amortizing schedule. After the withholding of consent, the revised offer of 28 February 2025 still is confusing given that the amortization schedule is longer than 12 months.

**ATTORNEY GENERAL INVESTIGATION**

43. I have become aware that, on 14 March 2025, the Texas Attorney General (***Texas AG***) commenced an investigation into Charitable DAF GP, LLC (the Fund's former general partner) in relation to the organization, conduct and management of Charitable DAF GP, LLC, and its related entities.

44. I understand that the Texas AG has the power to investigate a charity, should it deem necessary, to determine whether a charity is complying with Texas law.

45. I understand that the Charities have requested information about the investigation from the Texas AG, but do not have knowledge of any further details.

**DONATIONS TO THE CHARITIES**

46. Until Mr Patrick's departure in October 2024, I regularly donated to through the Charities to the Fund as part of my charitable giving program. My affiliates and I, which donated through the Charities to the DAF entities in 2023 and in various years prior, and are the primary funding source for the Fund. As allowed pursuant to US law, I direct the Charities to utilize the Fund's assets to sponsor charitable causes I particularly value, including underprivileged youth education, cancer research, heart health, veterans' services, and local institutions such as zoos and museums. Though I wish to continue to support these charitable causes, I will not give any future donations through the Charities to the Fund while it is under Mr Patrick's management and/or control.

**FUNDING OF PROCEEDINGS**

47. As stated above, I do not hold a controlling interest in any of the Charities or the Supporting Organizations. However, I sit on the boards of the Supporting Organizations simply for the purpose of overseeing how the Charities are deploying the Fund's assets for charitable purposes, and the impact of those donations in the community. In this context, I became aware that the Supporting Organizations were meeting to vote on the decision to take legal action to take steps to preserve the assets of the Charities they exist to support. Given my connection with the Fund and personal relationship with Mr Patrick, I recused myself from that meeting and was not otherwise involved in the decision taken by the Supporting Organizations to commence these proceedings.

48. The Supporting Organizations approached me about the costs associated with legal action and their reticence to use funds that should and otherwise would be used for charitable purposes, and asked whether I would be prepared to fund the action personally. I agreed to do so. I have not and will not

at any time receive a benefit, nor do I have control of the proceedings, because of this funding arrangement. The Supporting Organizations have decision making authority in relation to these proceedings. My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support.

**SWORN** by the above named )
**JAMES DAVID DONDERO** )
This 9th day of April 2025 )
at 4:46 pm )

JAMES DAVID DONDERO

**BEFORE ME:**

Krystal Hughes
NOTARY PUBLIC

KRYSTAL HUGHES
Notary ID #129488160
My Commission Expires
July 12, 2025
NOTARY PUBLIC STATE OF TEXAS

THIS AFFIDAVIT was presented by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

**EXHIBIT 8**

Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
Crawford, Wishnew & Lang PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

Johnny Sutton
Ashcroft Sutton
919 Congress Avenue, Suite 1325
Austin, Texas 78701
(512) 370-1800 (phone)
(703) 247-5446 (fax)

jsutton@ashcroftlawfirm.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| *In re* | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor.[1] | § | |
| | § | |

**THE DUGABOY INVESTMENT TRUST'S MOTION TO STAY 9019 ORDER**

The Dugaboy Investment Trust ("Dugaboy") hereby files this Motion to Stay 9019 Order and would respectfully show the court the following:

[1] The *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., (As Modified)* [Dkt. 1808] ("*Plan*"), filed by Highland Capital Management, L.P. ("*HCMLP*") became effective on August 11, 2021 (the "*Effective Date*").



1934054250717000000000001
004233

## I. SUMMARY OF MOTION

1. On June 30, 2025, the Court signed its Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith ("9019 Order") [Dkt. No. 4297]. Dugaboy files this motion seeking a 90-day stay of the 9019 Order so that it and other parties can investigate the allegations made in the recently filed request for a stay of all Highland bankruptcy proceedings made by the Texas Attorney General, and the complaint (the "JOL Petition") the Joint Official Liquidators ("JOL") of Charitable DAF HoldCo LTD ("Holdco")filed on July 15, 2025, by. That Petition, annexed hereto as Exhibit A, outlines a massive fraudulent scheme.

2. According to the JOL Petition, Mark Patrick manipulated the ownership of the HMIT entities to convert $270 million of assets and pay himself and co-conspiring professionals millions that were supposed to be used for the benefit of the long-established charities, including assets Dugaboy and its beneficiary, James Dondero, contributed to the Charitable DAF for the benefit of the charities supported by Dugaboy. The Dallas Foundation, The Greater Kansas City Foundation, The Santa Barbara Foundation, and the Community Foundation of North Texas (the "Charities" or the "Participating Shareholders") were left with nothing in favor of a new entity with no track record or professional staff run out of Mr. Patrick's house.[2] This Court should stay any transfers of assets to the control of Mr. Patrick, given that his express instructions to create a web of new entities that were: "*Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection.*" JOL Petition ¶ 82. A clearer indication of an intention to abscond with assets could hardly be found.

[2] The interests of the charities are affected through supporting organizations who for ease of reference are included in the definition of "Charities" and "Participating Shareholders" for the purposes of this Motion.

3. The relief sought in this Motion is necessary to provide all stakeholders with time to investigate a motion under Rule 60 to vacate the 9019 Order (and all resulting orders, such as the dismissals effected as a result of the 9019 Order) in light of evidence suggesting that the settlement approved by this Court was a key element of the alleged fraudulent scheme. Transfers of assets to companies controlled by Mr. Patrick must be halted, lest those assets are moved to companies "hard to find or track."

## II. ARGUMENT

### A. The Court Enters the 9019 Order Over the Objection of Dugaboy

4. On May 19, 2025, a Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith [Docket No. 4216] (the "Motion") was filed by Highland Capital Management, L.P.'s ("Debtor" or "Highland"), the Highland Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust").

5. Over the objection of several parties, including Dugaboy, on June 30, 2025, the Court signed its Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith ("9019 Order") [Dkt. No. 4297].

6. At the hearing Dugaboy presented the Court with the letter request of the JOLs to stay the proceeding for 45 days pending their investigation, but the Court entered the 9019 Order. Transcript of Hearing on June 25, 2025 on 9019 Motion ("9019 Tr.") at 189:22-191:1.

### B. The JOL Files a Complaint Alleging Illegal Acts by Mr. Patrick

7. The JOL Petition makes serious allegations against Mr. Patrick.

8. Specifically, the Complaint alleges that Mr. Patrick, a director and sole Management Shareholder of HoldCo, unbeknownst to the Charities (holders of the Participating Shares of HoldCo)

: (1) caused HoldCo to assign its interest in certain assets to a Delaware limited liability company formed and controlled by Mr. Patrick; (2) caused HoldCo to issue Participating Shares to a Delaware company incorporated and controlled by Mr. Patrick; (3) caused the Delaware limited liability company to redeem HoldCo's membership interest; and (4) caused HoldCo to be placed into voluntary liquidation after making a final distribution to the Participating Shareholders in HoldCo. JOL Petition at ¶¶ 6-6.4. These machinations are referred to in the JOL Petition and herein as the "restructuring."

9. As the Complaint states, the restructuring was undertaken specifically to bring ownership of these assets, with a net value of $270 million (as of September 30, 2024), under Mr. Patrick's effective control, with the express purpose of leaving the Charities, as the original, and rightful, ultimate beneficiaries of the fund, with nothing. JOL Petition at ¶ 7. Mr. Patrick testified that the "entity in liquidation [Holdco] owns nothing," confirming the conversion at the hearing on the 9019 Motion. 9019 Tr. 185:18-24) (Dkt. No. 4296).

10. In short, the JOL Petition details how Mr. Patrick caused HoldCo, originally the sole limited partner of Charitable DAF Fund, LP (the "Fund"), to sell off the Fund, with its $270 million in assets for $1.6 million, using manipulated and fraudulent valuations. JOL Petition ¶¶ 136-150.

11. Showing just how difficult it was to achieve his false valuation, Mr. Patrick initially sought to have PwC, which had historically conducted valuations of the HoldCo's assets and which had as recently as late 2024 confirmed the $270 million valuation, conduct a post "restructuring" valuation that would discount the value of the assets sufficiently to justify the sale of the Fund for $1.6 million. JOL Petition ¶¶ 123-125. PwC refused, saying it did not see a basis for the proposed discount. JOL Petition ¶125.

12. Undeterred, Mr. Patrick and the professionals assisting him sought a valuation from FTI Consulting in London ("FTI"). Using the fact that the charities could not force distributions, FTI

authored a memo presuming one could assert a very small discount on the value of the Fund if the Charities were aligned with the Fund's mission, but a 95% discount if they were not. JOL Petition ¶¶ 126-128. Thus, if Mr. Patrick could arbitrarily say that the Funds were no longer aligned with the charities' missions (notwithstanding the fact that nothing had changed in the charities' missions) he could apparently say devalue the Fund. *Id.*

13. Indeed, the question Mr. Patrick's counsel posed to FTI was "would Mark still be able to shareholder structure to ensure the existing participating shareholders [the charities] got nothing?" JOL Petition ¶134. Ultimately, recognizing Mr. Patrick's clearly improper machinations, FTI refused to lift limits it had placed on use of its memo, cautioning Walkers, that its memo was "not a valuation" and could "not be used to support a transaction." JOL Petition ¶¶ 133, 135.

14. Thwarted by FTI, one of Mr. Patrick's United States counsel, Shields Legal, then asked a Dallas-based firm, Valuscope, to value the Fund, using a discounted cash flow ("DCF") analysis with a 99.2% discount for lack of control and an additional 20% discount for lack of marketability, with no justification for the use of a DCF analysis or either, let alone both, discounts. JOL Petition ¶¶ 139-45. This resulted in an astonishing purported 99.29% drop in the value of the assets in just a six-month period. On its face, this manipulation is fraudulent, but this is what was used to justify selling the Fund to an entity controlled by Mr. Patrick and owned by a new charity he owned and controlled for $1.6 million. That $1.6 million was distributed to the Charities, and then Mr. Patrick attempted to cover his tracks with an expedited voluntary liquidation process, controlled by Mr. Patrick's counsel with Kroll as the proposed liquidator, to sweep all of the wrongdoing under the rug. JOL Petition ¶ 151.

15. This effort was halted only because the Charities, not knowing of the pending liquidation effort, brought their own official liquidation proceeding in the Cayman Court. That

proceeding resulted in the JOL being appointed and Kroll and Walkers resigning as proposed liquidators and counsel. JOL Petition ¶ 152-54.

16. The JOL's investigation revealed that Mr. Patrick:

a. increased the Directors' fees from $40,000 per annum in 2022 to $600,000 in 2023 and to $2.25 million for just the first half of 2024. JOL Petition ¶ 85;

b. added a salary for himself of $850,000 a year in September 2024; and

c. added a provision for a "long term incentive" ("LTI") tied to the Funds returns (when he is not a registered investment advisor, or any sort of financial advisor, for that matter, but simply a tax lawyer). JOL Petition ¶ 86. The LTI was 7.5% of the Funds returns over 10%, with a provision allowing for a greater bonus the more he spent on legal fees. JOL Petition ¶ 86.3.

What's troubling is that the LTI created an incentive to increase legal spending through the proliferation of lawyers and lawsuits, thereby increasing legal expenses and Mr. Patrick's personal bonuses.

17. Less than a month later, Mr. Patrick also gave himself an LTI payment of $975,000 and an annual discretionary bonus for 2023 of 2.5 times his annual salary. JOL Petition ¶¶ 87.1-87.2. He also gave himself a retroactive LTI payment for the period March 2023 to March 2024 of $4.8 million and authorized additional annual and discretionary bonuses at his sole and absolute discretion. *Id*. By contrast, the prior the prior controlling shareholder and director of Holdco and the Fund, Grant Scott, during his entire tenure was paid $60,000 a year. JOL Petition ¶ 88.

18. As a result, the JOL Petition alleges that Mr. Patrick's acts constitute breaches of fiduciary duty and seek to have a receiver appointed. JOL Petition ¶¶ 160-81.

### C. The 9019 Order Should Be Reevaluated in Light of the Allegations in the JOL Complaint

19. These allegations are essential to evaluating or re-evaluating the 9019 Order for three primary reasons. ***First***, a change in control of HoldCo will affect not just HoldCo, but all the

companies owned and controlled by HoldCo, including Hunter Mountain and the entities that entered into the settlement agreement that is the subject of the 9019 Order.

20. The JOL, if they are able to rescind all of the restructuring, and on these facts it certainly appears that they will be able to do so, will be able to appoint new controlling persons in all the former subsidiaries. Then, under honest management, seeking the best for the Charities, the subsidiaries will determine what transactions to ratify and which to rescind or reform. This Court should stay the effectiveness of the 9019 Order to minimize what must be reformed or rescinded.

21. *Second*, the allegations in the JOL Petition set forth a pattern of behavior by Mr. Patrick with respect to these entities and his self-dealing that unquestionably leads to the conclusion that the same illegal behavior could well have taken place with respect to the 9019 Order and the related settlement agreement. The newly discovered communications detailed throughout the JOL Petition show the steps that Mr. Patrick engaged in to effectuate his scheme. The HMIT Settlement occurred over the same time period, making it a part of that scheme.

22. *Third*, showing a real danger of manufactured evidence being used to justify the ends desired, Mr. Patrick purported to justify his actions by contending that Mr. Dondero was imperiling the charities' 501(c)(3) status (JOL Petition ¶ 146.1), using an opinion of counsel that post-dated all of the planning for the restructuring (JOL Petition ¶ 146.5). Creating an echo chamber of evidence, he himself made false reports to the IRS to attempt to imperil the charities' tax-exempt status. JOL Petition ¶¶ 113, 146.4. These acts demonstrate that Mr. Patrick's actions and testimony with respect to the 9019 Order must be examined and evaluated.

**D. The Highland Entities Allowed These Illegal Acts to Proceed Uninvestigated**

23. It is also important to note the Highland Entities' role in allowing their 9019 Motion to proceed and the 9019 Order to be entered in light of the above. While the Highland Entities claim they performed due diligence with respect to the transactions at issue in the 9019 Order, including the

authority of Mr. Patrick, to agree to the settlement agreement (9019 Tr. 97:12-17) (Dkt. No. 4296), they did not know of the alleged improprieties raised above. Instead, they elected to look only at the organizational documents (9019 Tr. 98:6-23) and ignored the Cayman proceeding, Mr. Seery was "hesitant" to even say he was "generally" aware of the Cayman proceeding (9019 Tr. 98:24-99:1). Moreover, with respect to Mr. Dondero's complaints about what Mr. Patrick was doing to the Charities, counsel for the Highland Entities stated: "Mr. Patrick, I don't know what happened between him and Mr. Dondero. I don't care. I have no knowledge of that." (9019 61:25-62:1) (Dkt. No. 4296). The transcript evidences that the HCMLP entities ignored the Cayman proceeding to rush through the 9019 Settlement before evidence of the fraud could be presented to this Court.

**E. The Texas Attorney General Requests Additional Time to Investigate These Allegations**

24. On July 9, 2009, the Office of the Texas Attorney General wrote a letter to the Court asking the Court to enter a stay of this bankruptcy proceeding because it was investigating conduct allegedly taken by persons or entities in this bankruptcy proceeding. Dkt. No. 4308. Upon information and belief, Mr. Patrick and the entities he controls, as well as the 9019 Order, are the subject of this investigation. This request of the Texas Attorney General is consistent with what Dugaboy seeks by way of this motion and therefore Dugaboy urges the Court to follow this recommendation so that the Texas Attorney General will have an adequate opportunity to address the illegal and inequitable conduct by Mr. Patrick and his entities that are being investigated by the JOL.

25. These allegations rise to the level of a basis for a Federal Rule of Civil Procedure 60 motion seeking reconsideration of the 9019 Order based on newly discovered evidence. *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 638 (5th Cir. 2005) ("Rule 60(b)(2) provides that a court may relieve a party from a final judgment based on 'newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b). Rule 60(b)(3) provides for relief based on 'fraud . . . misrepresentation, or other misconduct of an adverse party,' and Rule

60(b)(6) further provides for relief based on 'any other reason justifying relief from the operation of the judgment.' The purpose of Rule 60(b) is to balance the principle of finality of a judgment with the interest of the court in seeing that justice is done in light of the facts.”). Entering a stay will preserve the status quo so that interested parties may conduct a sufficient investigation.

**F. The Court Has the Power to Stay the 9019 Order for 90 Days.**

26. Pursuant to Bankruptcy Code § 105(a), the Court “may issue any order . . . that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code].” 11 U.S.C. § 105(a). Moreover, the Supreme Court has held: [T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance. *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936).

27. This Court possesses broad discretion to grant stays, particularly where doing so is unlikely to cause harm to any other party. *See, e.g., Fishman Jackson PLLC v. Israely*, 180 F. Supp. 3d 476, 483 (N.D. Tex. 2016) (“Courts have ‘broad’ discretion to grant stay[s] . . . especially when there is not a ‘fair possibility’ that the stay ‘will work damage to someone else.’”); *In re Ramu Corp.*, 903 F.2d 312, 318 (5th Cir. 1990) (“The stay of a pending matter is ordinarily within the trial court’s wide discretion to control the course of litigation . . . . This authority has been held to provide the court the ‘general discretionary power to stay proceedings before it in control of its docket and in the interests of justice.’” (internal citations omitted)).

28. While stays should “not be immoderate or of an indefinite duration,” *Fishman*, 180 F. Supp. 3d at 483, courts routinely grant stays of six months where doing so promotes judicial efficiency. *See, e.g.*, *14th St. Props., LLC v. S. Fid. Ins. Co.*, No. CV 22-1593, 2023 WL 416317, at *1 (E.D. La. Jan. 26, 2023) (granting stay and administratively closing matter for six months due to

state insolvency proceedings); *Integrated Claims Sys., LLC v. Old Glory Ins. Co.*, No. 2:15CV-00412-JRG, 2020 WL 1027771, at *1 (E.D. Tex. Mar. 3, 2020) (granting motion to stay for six months); *Cleveland Air Serv., Inc. v. Pratt & Whitney Canada*, No. 4:13-CV-161-DMB-DAS, 2016 WL 4179987, at *2 n.3 (N.D. Miss. Aug. 5, 2016) (staying discovery for six months); *Maples v. Donzinger*, No. CIV.A. 13-223, 2014 WL 688965, at *2 (E.D. La. Feb. 21, 2014) (granting a six month stay).

29. Courts have also granted stays which may only be lifted by the parties after a determined time. *See, e.g., Scarborough v. Integricert, LLC*, No. 6-12-CV-00396, 2014 WL 12662272, at *3 (W.D. La. Apr. 4, 2014) ("Lastly, this Court's intention is not to stay the case for an indefinite period. To the contrary, the Court will issue a stay for a period of one-hundred and twenty days, at the end of which, either party may move to lift the stay upon a showing of good cause. Thus, the stay will not last for an 'indefinite' period such as Scarborough fears.").

30. Consistent with these authorities, the implementation of the 9019 Order should be stayed for 90 days in the interests of judicial economy and efficiency in order to allow Dugaboy and other interested parties sufficient time to investigate the allegations in the JOL Petition. A grant of the requested stay will enable the Court to fairly evaluate the putative settlement between the Highland Entities and the HMIT Entities.

31. Additionally, a stay will benefit the Highland Entities, the HMIT Entities, and estate stakeholders, not harm them. All parties undoubtedly want certainty regarding the legitimacy and future enforceability of their actions and bargains. For example, if the Cayman Proceeding determines that Mr. Patrick may retain his control position in the DAF and its subsidiaries, then such a decision would likely remove any additional obstacles to the HMIT settlement. By contrast, if the Cayman Proceeding subsequently determines that Mr. Patrick engaged in ultra vires acts or acted without

appropriate authority, that decision could throw the settlement, and all subsequent actions taken in furtherance of the settlement, into question.

32. In sum, the Court has broad discretion to enter a stay of not more than six months (and the requested 90 days is half of what other courts have allowed) - which is neither "immoderate" nor "of an indefinite duration.." *Fishman*, 180 F. Supp. 3d at 483; *see also McKnight v. Blanchard*, 667 F.2d 477, 479 (5th Cir. 1982) (vacating indefinite stay that could last for seven years or longer where trial court "gave no reason for such a protracted stay"). The requested stay serves the interests of judicial economy, ensures efficient management of this bankruptcy proceeding, and is in the best interests of the parties to the putative settlement and all remaining stakeholders.

33. Therefore, Dugaboy requests that the Court adhere to the request by the Texas Attorney General and stay the 9019 Order for 90 days so that these newly discovered allegations can be investigated by Dugaboy and other stakeholders and a determination can be made as to whether a FRCP 60 motion is necessary.

## III. CONCLUSION

For the foregoing reasons, Dugaboy requests that the Court stay the 9019 Order for 90 days.

Respectfully submitted,

By: /s/Michael J. Lang
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
Alexandra Ohlinger
Texas State Bar No. 24091423
aohlinger@cwl.law
Crawford, Wishnew & Lang PLLC
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

Johnny Sutton
Ashcroft Sutton
919 Congress Avenue, Suite 1325
Austin, Texas 78701
(512) 370-1800 (phone)
(703) 247-5446 (fax)
jsutton@ashcroftlawfirm.com

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 17, 2025, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/Michael J. Lang*________
Michael J. Lang

# EXHIBIT A

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 ( )**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

---

**WRIT OF SUMMONS**

---

TO: (1) **MARK ERIC PATRICK** of 6716 Glenhurst Drive, Dallas, Texas, 72554, United States of America

THIS WRIT was issued by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83527361)

(2) **PAUL MURPHY** of Windsor Village #24, South Church Street, Grand Cayman, Cayman Islands

(3) **CDMCFAD, LLC** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(4) **DFW CHARITABLE FOUNDATION** of c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 1980, United States of America

(5) **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

(6) **CLO HOLDCO, LTD.** of c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands

THIS WRIT OF SUMMONS has been issued against you by the above-named Plaintiff in respect of the claim set out on the next page.

Within 14 days after the service of this Writ on you, counting the day of service, or, if you are served out of the jurisdiction, within such other period of time as the Court may order, you must either satisfy the claim or return to the Registrar of the Financial Services Division, Court Office, PO Box 495, George Town, Grand Cayman, KY1-1106, Cayman Islands, the accompanying Acknowledgment of Service stating therein whether you intend to contest these proceedings.

If you fail to satisfy the claim or to return the Acknowledgment within the time stated, or if you return the Acknowledgment without stating therein an intention to contest the proceedings, the Plaintiff may proceed with the action and judgment may be entered against you forthwith without further notice.

Issued this 15th day of July 2025

NOTE - This Writ may not be served later than 4 calendar months (or, if leave is required to effect service out of the jurisdiction, 6 months) beginning with the date of issue unless renewed by order of the Court.

**IMPORTANT**

Directions for Acknowledgment of Service are given with the accompanying form

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 ( )**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

---

**STATEMENT OF CLAIM**

---

**INTRODUCTION**

1 The Plaintiff, Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "**Company**"), is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Ltd, 68 Fort Street, George Town, PO Box 31726, Grand

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Cayman KY1-1207. The authorised and issued share capital of the Company is divided into Participating Shares and Management Shares.

2 The Company was placed into court supervised liquidation and Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Limited were appointed as joint official liquidators (the "**JOLs**") pursuant to an order of this Honourable Court dated 6 May 2025.

3 The Company was, between November 2011 and 18 December 2024, the sole limited partner of Charitable DAF Fund, LP (the "**Fund**"). At all relevant times, the net asset value of the Fund's assets was c. US$270million.

4 The Fund is a Cayman Islands exempted limited partnership formed to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organisations in the U.S. namely The Dallas Foundation; the Greater Kansas City Community Foundation; the Santa Barbara Foundation and The Community Foundation of North Texas (the "**Charities**"). These charities are the owners or the ultimate beneficial owners of Participating Shares in the Company.

5 In March 2021, Mark Patrick (the "**First Defendant**") was appointed the sole director and registered as the sole Management Shareholder of the Company. In April 2021, Paul Murphy (the "**Second Defendant**") was appointed by the First Defendant as a second director of Holdco.

6 By virtue of a series of transactions or purported transactions between March 2024 and March 2025, unbeknownst to the holders of the Participating Shares (the "**Participating Shareholders**") of the Company, Mr Patrick caused:

6.1 the Company, with the agreement and concurrence of Mr Murphy, to assign its interest in the Fund to the Third Defendant, a Delaware limited liability company, formed in

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

December 2024 and controlled by Mr Patrick, in exchange for a membership interest in that entity;

6.2 the Company, with the agreement and concurrence of Mr Murphy, to issue and allot further Participating Shares (representing a majority of the issued participating share capital) to the Fourth Defendant, a Delaware company, incorporated in December 2024 and controlled by Mr Patrick;

6.3 the Third Defendant to redeem the Company's membership interest in the Third Defendant for a consideration of c. US$1.6 million, representing approximately 0.59% of the total net asset value of the assets held by the Fund; and

6.4 the Company, with the agreement and concurrence of Mr Murphy, to be placed into voluntary liquidation after having made a final distribution to all Original Participating Shareholders (defined below) in the Company of the proceeds of redemption,

collectively the "**Impugned Transactions**".

7 The First and Second Defendants effected the Impugned Transactions in breach of their fiduciary and other duties to the Company in order to bring ownership of the Fund and its assets, with a net value of c. US$270 million (as assessed at 30 September 2024), under Mr Patrick's effective control to the exclusion of the interests of the Charities. The Charities, as the original, and rightful, ultimate beneficiaries of the Fund, have been left with nothing.

8 Further, during the period March 2021 to June 2024, the First and Second Defendants, in breach of fiduciary duty, caused the Company to pay excessive fees and expenses to Mr Patrick.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**THE PARTIES**

<u>The Company</u>

9 The Company is a Cayman Islands exempted company, incorporated on 27 October 2011, having its registered office at HSM Corporate Services Limited, Ltd, 68 Fort Street, George Town, PO Box 31726, Grand Cayman, KY1-1207, Cayman Islands.

10 The directors of the Company are Mr Patrick (appointed on 25 March 2021) and Mr Murphy (appointed by Mr Patrick on 22 April 2021).

11 The Company has been governed by the following memorandum and articles of association from time to time:

11.1 The memorandum and articles of association dated 27 October 2011; and

11.2 The amended and restated memoranda and articles of association dated 19 January 2015; 24 January 2024; and 20 February 2025 respectively.

The Company remains governed by the memorandum and articles of association as amended and restated on 20 February 2025 (the "**Articles**") save that the Company reserves the right to challenge the validity of the Articles.

12 Save as set out above, the Company will rely on the Articles and all previous iterations for their applicable full terms and effect.

13 Pursuant to the Articles and at all relevant times, the authorised share capital of the Company was US$50,000 divided into 100 Management Shares of US$0.01 par value each and 4,999,900 Participating Shares of US$0.01 par value each.

14 The Articles (with reference to the defined term of 'Restricted Person') require that the Participating Shareholders must at all times qualify as a tax-exempt organisation pursuant to section 501(c)(3) of the United States Internal Revenue Code of 1986 ("**IRC**").

15 The Participating Shares do not have voting rights but confer the right to participate in the profits or assets of the Company including by way of the receipt of dividends (Article 12).

16 The Management Shares have voting rights but confer no other right to participate in the profits or assets of the Company (Article 11).

17 The Participating Shareholders therefore have the entirety of the economic interest in the Company, whereas the Management Shareholders have the control rights.

18 On 7 November 2011, the Company issued:

18.1 300 Participating Shares to The Highland Capital Management Partners Charitable Trust #2 ("**Trust #2**"); and

18.2 100 Management Shares to Grant Scott.

19 On 30 November 2011, Trust #2 transferred its 300 Participating Shares equally amongst:

19.1 Highland Kansas City Foundation, Inc.;

19.2 Highland Dallas Foundation, Inc.[1]; and

19.3 Highland Santa Barbara Foundation, Inc.,

collectively, the "**Supporting Organisations**".

---

[1]Since June 2024, Highland Dallas Foundation, Inc. has also done business as 'NexPoint Philanthropies Dallas, Inc.', per an Assumed Name Certificate filed with the Secretary of State of Texas.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

20 On 12 August 2015, the Company issued 5 Participating Shares to the Community Foundation of North Texas, ("**CFNT**", and together with the Supporting Organisations the "**Original Participating Shareholders**") for Highland Capital Management, L.P. Charitable Fund at CFNT.

21 On 25 March 2021, the Management Shares were transferred to Mr Patrick and he continues to hold these shares.

22 The Participating Shares held by the Original Participating Shareholders represented the entire issued Participating Share capital of the Company until 7 February 2025. On that date, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to issue 318 Participating Shares to the Fourth Defendant, DFW Charitable Foundation ("**DFW**"), significantly diluting the shareholdings of the Original Participating Shareholders and the indirect economic interest of the Charities.

23 Until 18 December 2024, the sole asset of the Company was its limited partnership interest in the Fund (the "**Partnership Interest**").

24 As a result of the Impugned Transactions, the Company now has no material assets.

<u>DFW</u>

25 DFW (the Fourth Defendant) is a non-profit non-stock corporation incorporated in Delaware on 9 December 2024, which is organised under the General Corporation Law of the State of Delaware exclusively for charitable purposes.

26 DFW is the majority Participating Shareholder of the Company by virtue of the purported share issuance on 7 February 2025, and Mr Patrick is its registered director, president and sole member.

The Fund

27 The Fund is a Cayman Islands exempted limited partnership formed on 28 October 2011 (registration no. 53083), having its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands.

28 The Fund is governed by the Second Amended and Restated Exempted Limited Partnership Agreement dated 11 March 2024 (the "**LPA**"). The initial exempted limited partnership agreement of the Fund was dated 25 October 2011, was amended and restated on 7 November 2011 and further amended on 26 July 2022 (with effect from 24 March 2021). The Company will rely on the LPA for its applicable full terms and effect.

29 Mr Patrick was instrumental in the establishment of the Company, the Fund and the Fund structure.

30 Until 18 December 2024, the Company was the sole limited partner of the Fund.

31 On 18 December 2024, Mr Patrick, with the agreement and concurrence of Mr Murphy, caused the Company to transfer its limited partnership interest to CDMCFAD, LLC ("**CDM**") (the Third Defendant) in exchange for a membership interest in CDM.

32 The original general partner of the Fund was Charitable DAF GP, LLC (the "**Original GP**"), a Delaware limited liability company registered as a foreign company in the Cayman Islands. The Original GP was the general partner from the Fund's formation until 7 March 2024.

33 On 7 March 2024, the Original GP was replaced by CDH GP, Ltd. (the "**New GP**") (the Fifth Defendant).

34 The sole asset of the Fund is its 100% shareholding in CLO HoldCo, Ltd. ("**CLO HoldCo**") (the Sixth Defendant), a Cayman Islands exempted company incorporated with limited liability,

having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

35 The assets of the Fund were valued at c. $270 million in September 2024.

The New GP

36 The New GP (the Fifth Defendant) is a Cayman Islands exempted company incorporated on 27 February 2024, having its registered office located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

37 Mr Patrick is the New GP's sole director and sole shareholder.

38 The New GP is a defendant to these proceedings in two capacities: (i) in its capacity as General Partner; and (ii) for and on behalf of the Fund in order to join the Fund as a defendant to these proceedings.

CDM

39 CDM (the Third Defendant) is a limited liability company incorporated in Delaware on 12 December 2024, having its registered address c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

40 CDM is governed by the terms of a Limited Liability Company Agreement dated 18 December 2024.

41 Since 18 December 2024, the primary asset of CDM has been the limited partnership interest in the Fund.

42 The sole manager of CDM is Mark Patrick.

43 From 18 December 2024 to 27 March 2025, the sole member of CDM was the Company.

44 On 27 March 2025, Mr Patrick caused CDM to redeem the Company and admit DFW as the sole participating member.

CLO HoldCo

45 CLO HoldCo (the Sixth Defendant) is a Cayman Islands exempted company incorporated on 13 December 2010, having its registered office address located at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands, and which is the Fund's main subsidiary.

46 The directors of CLO Holdco are Messrs Patrick and Murphy.

47 The sole shareholder of CLO Holdco is the Fund.

The Directors

*Mark Patrick*

48 Mr Patrick (the First Defendant) is a U.S. resident who is:

48.1 a director, holds the offices of (i) President, (ii) General Counsel, and (iii) Chief Investment Officer and is the current Management Shareholder of the Company;

48.2 the Manager of CDM (the Third Defendant);

48.3 the sole director and the sole member of DFW (the Fourth Defendant);

48.4 the sole director and sole shareholder of the New GP (the Fifth Defendant); and

48.5 a director of CLO HoldCo (the Sixth Defendant).

49 Mr Patrick was employed as tax counsel by Highland Capital Management, L.P. ("**Highland**") from 2008 to 2021 and as tax counsel by Highgate Consulting Group, Inc. d/b/a Skyview Group from March 2021 to October 2024.

*Paul Murphy*

50 Mr Murphy (the Second Defendant) is a Cayman Islands resident who is:

50.1 a director of the Company;

50.2 a director of CLO HoldCo (the Fifth Defendant); and

50.3 a director of various other entities in the Charitable DAF structure.[2]

51 Mr Patrick and Mr Murphy are referred to herein as the "**Directors**".

**THE CHARITABLE PURPOSE OF THE FUND**

52 The Fund was formed on 28 October 2011 at the instigation of Mr James Dondero, a U.S. resident and the founder of Highland to enable certain assets, held through the shares in CLO Holdco, to be donated to a charitable foundation.

53 Upon the formation of the Fund, the Company was admitted as a limited partner and, by way of capital contribution, contributed all of the outstanding equity interests in CLO HoldCo to the Fund.

54 The purpose of the Fund was to make investments for the ultimate benefit of the Original Participating Shareholders and the Charities:

[2]Mr Murphy was appointed to the board of directors of the following entities on 22 April 2021; Liberty CLO Holdco, Ltd., Liberty Sub, Ltd., HCT Holdco 2, Ltd. and MGM Studios Holdco, Ltd. at the same time as Charitable DAF HoldCo, Ltd and CLO HoldCo, Ltd.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

54.1 The recitals to the LPA of the Fund provide that the purpose of the Fund was to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code … for the economic benefit of the Limited Partner and its Indirect Charitable Owners*…".

54.2 Clause 1.3 of the LPA provides that "… *the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners*".

54.3 Clause 1.6(a) of the LPA provides that "*the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*".

54.4 "Indirect Charitable Owners" is defined in the LPA as "*the indirect equity owners of the Limited Partners which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.*" i.e., the Company's Participating Shareholders or the Charities.

54.5 Clause 4.2(a) of the LPA provides that "*Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses*…".

54.6 The LPA does not modify the statutory duty of the General Partner to act in good faith and in the interests of the Fund.

55 The Charities are the following four US charitable or non-profit foundations:

55.1 *The Dallas Foundation*: a charitable entity established in Texas in 1929 which has awarded over $1 billion in grants and manages over $500 million in assets.

55.2 *Greater Kansas City Community Foundation*: a charitable entity established in Missouri in 1978 which has awarded over $7 billion in grants and manages over $6 billion held in charitable funds.

55.3 *Santa Barbara Foundation*: a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

55.4 *North Texas Community Foundation*: which manages assets totalling $513 million and donated $38.9 million to local non-profits in 2023.

56 The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (the "**Supported Organisations**") hold their interests in the Company through their respective Supporting Organisation namely Highland Dallas Foundation, Inc. as the Supporting Organisation for The Dallas Foundation; Highland Kansas City Foundation, Inc. as the Supporting Organisation for the Greater Kansas City Community Foundation; Highland Santa Barbara Foundation, Inc as the Supporting Organisation for the Santa Barbara Foundation.

57 CFNT holds its Participating Shares in the Company directly.

**THE TAX STRUCTURE**

58 As a matter of U.S. tax law, in order for the Supported Organisations to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore corporate blocker entity, namely the Company:

58.1 S501(c)(3) of the IRC provides that charitable organisations which meet certain criteria are exempt from state and federal taxes except to the extent that it receives income classified as unrelated business taxable income ("**UBTI**"); and

58.2 the Supported Organisations and their Supporting Organisations meet the criteria of s501(c)(3). They are therefore generally exempt from U.S. state and federal taxes, with a few exceptions, including to the extent that they receive UBTI.

59 As a matter of U.S. tax law, at least a portion of income received directly from the Fund by the Supported Organisations would likely be considered UBTI.

60 In order to insulate the Supported Organisations from UBTI, instead of holding their interest in the Fund directly, they held through an offshore corporate blocker structure, namely the Company.

**THE SUPPORTED ORGANISATIONS CONTROL THE SUPPORTING ORGANISATIONS**

61 The Supporting Organisations were incorporated in Delaware by Mr Dondero on or about 22 November 2011 for the purpose of making charitable donations to their respective charity from the proceeds of dividends received by the Supporting Organisations from the Company.

62 Supporting organisations under the IRC are tax exempt charitable organisations that provide financial or operational support to one or more public charitable organisations (called "supported organisations"). Because of the link with the supported public charities, supporting organisations are classified as public charities themselves, as opposed to private foundations, despite the fact that a supporting organisation's sources of funding may be limited to a single individual, which would otherwise cause the entity to be classified as a private foundation.

63 Contributions to supporting organisations, as public charities, qualify for the highest tax deductibility thresholds under the IRC (up to 50% of the taxpayer's adjusted gross income, or

60%, in the case of cash gifts) instead of the substantially lower threshold for contributions to private foundations (30% of adjusted gross income, regardless of the character of the contribution).

64 The Supporting Organisations are "Type I" tax exempt organisations under the IRC which means they must be organised and operated exclusively to support and benefit their relevant charity and controlled by that charity:

64.1 S509(a)(3) of the IRC contains the qualifications for a "supporting organisation". Under that section, a supporting organisation is a tax-exempt entity that must be organised and then operate exclusively for either (i) the benefit of, (ii) to perform the functions of, or (iii) to carry out the purposes of one or more supported organisations. The supported organisations must also be s501(c)(3) entities;

64.2 There are three types of supporting organisations, known as “Type I”, “Type II” and “Type III”. S509(a)(3)(B)(i), (ii) and (iii) sets out the requirements for each “Type”, respectively;

64.3 S509(a)(3)(B)(i) provides that a Type I supporting organisation must be operated, supervised or controlled by the supported organisation; and

64.4 S509(a)(3)(C) provides that the supporting organisation may not be controlled by a disqualified person, other than the foundation managers and the supported organisation.

65 The Supporting Organisations are so controlled by the respective Supported Organisations.

66 The Supporting Organisations are governed by the terms of their respective Certificate of Incorporation and by-laws (the "**Bylaws**").

67 The Certificates of Incorporation provide (amongst other things) that:

67.1 the Supporting Organisation:

(a) is organised and shall be operated exclusively for charitable, educational and scientific purposes;

(b) is organised and operated exclusively to support and benefit the particular charity that controls it; and

(c) is a non-profit non-stock corporation and cannot issue any capital stock;

67.2 no part of the net earnings of the Supporting Organisation shall be distributable to the directors and officers of the Supporting Organisation or other private persons save that the Supporting Organisation can pay reasonable compensation for services rendered; and

67.3 net earnings can be used to make grants, loans and similar payments for charitable, educational and scientific purposes to benefit the relevant Supported Organisation.

68 The Bylaws provide that (amongst other things):

68.1 There are two classes of members of the Supporting Organisations with one member in each such class:

(a) the institutional member (the "**Institutional Member**") which shall be the Supported Organisation; and

(b) the individual member (the "**Individual Member**") which shall be Mr Dondero or an individual designated as the Individual Member in the Bylaws.

68.2 In terms of voting on a matter submitted to a vote of the members (except as otherwise provided in the Bylaws):

(a) the Institutional Member is entitled to two votes; and

(b) the Individual Member is entitled to one vote.

68.3 Institutional membership is not transferable or assignable.

68.4 Individual membership is transferable or assignable only upon approval of the Institutional Member.

68.5 Both the Institutional Member and the Individual Member must be present in person or by represented proxy to constitute a quorum at all meetings of members.

68.6 There shall be three directors of the board of the Supporting Organisation. Two directors shall be elected annually by the Institutional Member and one director shall be elected annually by the Individual Member.

69 The relationship between the Supporting Organisations and their respective Supported Organisation are governed by separate operating/legal relationship agreements (collectively "**Operating Agreements**"). These agreements provide, among other things, that:

69.1 the Supported Organisation will provide certain services to the Supporting Organisation;

69.2 the Supported Organisation will appoint two of the three directors of the Supporting Organisation as required by Bylaws; and

69.3 in consideration for the services provided by the Supported Organisation to the Supporting Organisation, the Supporting Organisation shall pay a fee to the Supported Organisation.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

70 Mr Dondero sits on the board of each of the Supporting Organisations with two other directors from each of the Supported Organisations respectively.

71 The relationships, rights and obligations created by and between the Supported Organisations and the Supporting Organisations pursuant to the agreements entered into between them were at all material times in summary that:

71.1 the Supported Organisations control the Supporting Organisations through their majority voting interest and their ability to elect a majority of the directors of the Supporting Organisations;

71.2 the Supporting Organisations support the Supported Organisations by way of making grants to them from time to time from their assets, including any dividends received from the Company;

71.3 the Supporting Organisations have no ability to pay dividends to any private person or make payments to their directors (save reasonable reimbursement for reasonable out-of-pocket expenses) and can only make grants to the relevant Charity in furtherance of their charitable purposes; and

71.4 while Mr Dondero sits on the board of the Supporting Organisations, he does not control them, as a supermajority of the votes are always held by the respective Charity.

72 The Company will rely on the Certificates of Incorporation, Bylaws, Operating Agreements and terms of the IRC for their applicable full terms and effect.

**THE CONTROL POSITION OF MR PATRICK OVER THE COMPANY AND THE FUND**

73 The terms of the LPA grant sole control over the management and distribution of the Fund's assets to the General Partner. The terms of the Articles grant sole control over the management and distribution of the Company's assets to the Management Shareholder.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

<u>The LPA</u>

73.1 Clause 1.12

(i) The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

73.2 Clause 1.6

*(i) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*

*(ii) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners*

*hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.*

The Articles

73.3 Article 11

*The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganization or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.*

73.4 Article 12

*Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.*

73.5 Article 13

*…the rights attached to any such Class may… only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes case at such a meeting.*

73.6 Article 84 (d)

*The office of Director shall be vacated if the Director…is removed from office by Ordinary Resolution.*

*The definition of Ordinary Resolution is a vote of the Management Shares.*

73.7 Article 99

*Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.*

73.8 Article 104

*Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.*

74 The Management Shares in the Company and the General Partner in the Fund have at all material times been held and/or controlled by a single individual who, as a result, has sole control of the Fund structure (the "**Control Position**"):

74.1 In or around November 2011:

(a) Grant Scott was appointed as the sole director and allotted the 100 Management Shares of the Company; and

(b) Grant Scott became the holder of the membership interest in the Original GP and was appointed the Manager thereof,

thereby assuming the Control Position from that date.

74.2 In or around 24 March 2021, Mr Scott:

(a) assigned 100% of the membership interest in the Original GP to Mr Patrick pursuant to an Assignment and Assumption of Membership Interests Agreement, which membership interest gave Mr Patrick the sole right to manage the Original GP;

(b) transferred to Mr Patrick the 100 Management Shares in the Company; and

(c) resigned as a director of the Company and resolved to appoint Mr Patrick as the sole director in his place.

74.3 On 25 March 2021, Mr Patrick was entered into the Company's Register of Members as the holder of the Management Shares.

74.4 Mr Patrick therefore assumed the Control Position from that date.

74.5 On 22 April 2021, Mr Patrick resolved to appoint Mr Murphy as a second director of the Company.

74.6 On 7 March 2024, by way of a Deed of Assignment and Assumption, Mr Patrick, as managing member of the Original GP, caused the Original GP to transfer its general partnership interest in the Fund to the New GP.

74.7 Mr Patrick is the sole shareholder and director of the New GP.

74.8 Mr Patrick therefore remains in the Control Position and was in such position at all relevant times since 25 March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

75 Further, the sole asset of the Fund is its shares in CLO Holdco (the Sixth Defendant). Mr Patrick and Mr Murphy are the directors of CLO Holdco and were appointed on 2 April 2021 and 22 April 2021 respectively.

76 The Control Position was not and is not a term of art but was nevertheless a legal and factual position:

76.1 where a single individual was the sole Management, and therefore voting, Shareholder of the Company;

76.2 where the same individual was a director of the Company;

76.3 where the same individual was the sole shareholder or controller of the General Partner;

76.4 where the same individual was a director of the General Partner;

76.5 where the same individual was in complete and effective control of at least the Company, of the General Partner, of the Fund and of CLO Holdco;

76.6 where the same individual was in effective sole control of all assets of the Fund;

76.7 where the same individual had no economic, residual, beneficial or winding up interest in assets of the Company;

76.8 where the same individual had no economic, residual, beneficial or winding up interest in assets of the General Partner;

76.9 where the same individual had no economic, residual, beneficial or winding up interest in assets of the Fund;

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

76.10 where the same individual was, irrespective of his or her formal positions, functions or duties, including as a director, acting as a trustee, fiduciary or in a trustee-like or fiduciary-like position with respect to the assets held by the Fund;

76.11 where the same individual was at all times acting solely for the benefit or the ultimate benefit of the Original Participating Shareholders and/or through them the Supported Organisations and/or through them the Charities; and

76.12 in the alternative to the plea directly above, where the duties otherwise owed by the same individual as a matter of law, including as a director, were affected and/or altered by the existence of the structure as pleaded above, including the facts and matters relating to the Control Position and including the fact that the structure as pleaded above was designed and intended to be solely for the benefit or the ultimate benefit of the Original Participating Shareholders, and/or through them the Charities.

**EVENTS RESULTING IN THE COMPANY HAVING NO MATERIAL ASSETS AND THE DILUTION OF THE SUPPORTING ORGANISATIONS' INTERESTS**

<u>Plan to defeat the interests of the Original Participating Shareholders</u>

77 On 9 November 2023, Shields Legal Group ("**Shields Legal**") (the U.S. attorneys for the Company) sent to Campbells LLP ("**Campbells**") (then Cayman Islands attorneys for the Company) a work plan (the "**Work Plan**") relevant to the Company, the Fund and CLO HoldCo.

78 It can be inferred, and is averred, that the purpose of the Work Plan and the subsequent advice and steps taken as detailed below was to seek to entrench Mr Patrick's Control Position and defeat the interests of the Original Participating Shareholders.

79 The Work Plan stated that (amongst other things):

79.1 the advice required related to "…*potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc*..."; and

79.2 "…*we may need to rely on opinions and memoranda in potential future disputes*..."

80 The Work Plan set out the issues on which the Directors sought advice, including among other things the following questions:

80.1 'Can the controlling person dilute shares, e.g., the Participation Shares?'

80.2 'Can the controlling person redeem shares, e.g., the Participation Shares?'

80.3 'Is there any Cayman law requirement that the Company distribute money upwards to the next level of entities (Highland Dallas Foundation, Inc. and others)?'

80.4 'Could the Company liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares worthless?'

80.5 'What can be done at this point to make [the share transfers in the Company from Mr Scott to Mr Patrick] bullet proof?'

81 The Directors were advised that any steps taken in relation to the proposed issuance of new Participating Shares and withholding dividends must be in compliance with their fiduciary duties and taken in the best interest of the Company:

81.1 On 8 January 2024, Walkers (Cayman) LLP ("**Walkers**") (also then Cayman Islands counsel for the Company) provided advice on issues set out in the Work Plan to the effect that (amongst other things)*:*

(a) the Directors have power under the Articles to issue new Participating Shares that dilute the current Participating Shareholders, but must consider their fiduciary duties (including the duty to act in the best interests of the Company) when issuing such shares;

(b) the Participating Shares are non-redeemable;

(c) while payment of a dividend or other distribution is at the discretion of the Directors, if the Company were to have distributable reserves available, there may be a question of whether the Directors would be acting in its best interests to not pay some dividend or distribution; and

(d) the Directors have fiduciary duties to the Company which are paramount when considering (i) making a distribution and (ii) the distributable reserves available from which to make payments; they must have regard to what is in the Company's best interests, its future cash requirements, and its present and future solvency.

82 In February 2024, without telling the Supporting Organisations or the Charities, Mr Patrick sought to form a new entity to replace the Original GP. On 5 February 2024, Walkers emailed Mr Patrick to ask whether that entity should be a Cayman LLC or an exempted company, to which he responded later that day: "*Doesn't matter to me. Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection*."

83 On 27 February 2024, without telling the Supporting Organisations or the Charities, the New GP (the Fifth Defendant) was incorporated in the Cayman Islands.

84 On 7 March 2024, Mr Patrick, in his capacity as Managing Member of the Original GP, and without telling the Supporting Organisations or the Charities, executed a written consent for the

transfer of the GP Interest to the New GP, thereby replacing the Fund's General Partner. The Supporting Organisations subsequently discovered this change only by chance in February 2025.

85 In or around August 2024, the Supporting Organisations were provided with a financial analysis (prepared by NexPoint Advisors LP) of the Fund's annual expenses which showed or appeared to show increases in expenditure, particularly as follows (and without prejudice to any further relevant facts and matters relating to Directors' fees or expenses):

85.1 directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 – and increased further to around US$2.25 million in the first half of 2024; and

85.2 expenses overall for the first half of 2024 were around US$18.3 million – almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

86 On 13 September 2024, without telling the Supporting Organisations or the Charities, the Directors resolved (amongst other things) with respect to Mr Patrick's compensation:

86.1 to increase Mr Patrick's salary to US$850,000 per annum;

86.2 include a long-term incentive ("**LTI**") tied to the Fund's returns, being 7.5% of annualised net fund returns in excess of 10% (capped at 25% annualised return); and

86.3 the Company should assess legal expenses attributable to investment which impacted the LTI compensation and then determine whether the LTI compensation should be increased.

87 On 1 October 2024, without telling the Supporting Organisations or the Charities:

87.1 the Directors resolved (amongst other things) that Mr Patrick would receive:

(a) an LTI payment of US$975,000; and

(b) an 'annual discretionary bonus' for 2023 at an amount of 2.5 times his base salary.

87.2 Previously, in or around October 2021, Mr Patrick had signed an 'employment agreement' for his position at the Company, for the period commencing 24 March 2021, which provides that Mr Patrick:

(a) shall receive a base salary of US$850,000;

(b) shall receive an LTI payment for the period 24 March 2021 to 24 March 2024 in the amount of US$4,759,000; and

(c) is eligible for both annual and discretionary bonuses as determined at the 'sole and absolute discretion of the Directors'.

88 Comparatively, Mr Scott's salary during his tenure in the Control Position was approximately US$60,000 per annum. Notwithstanding the above, the Supporting Organisations were not informed of these increases to the Directors' fees, remuneration and/or benefits.

89 In late October 2024, as a result of concerns arising from this additional expenditure, the Supporting Organisations requested that Mr Patrick provide relevant financial information for the Company and the Fund. Mr Patrick did not do so.

90 On 11 November 2024, Holland and Knight ("**H&K**"), U.S. attorneys for the Supporting Organisations, issued a letter to Mr Murphy advising that the Supporting Organisations no longer had confidence in the governance of the Company and/or the Fund and considered that a reorganisation of the governance structures was required to protect the charitable efforts of the Supporting Organisations (the "**No Confidence Letter**").

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

91 On 26 November 2024, Mr Patrick sought advice from Walkers as to whether the Company could issue further Participating Shares to a new non-profit organisation to dilute the Supporting Organisations so as to weaken any winding-up petition brought by the Supporting Organisations on just and equitable grounds. Mr Murphy wrote that:

> "*Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position by diluting them therefore the company should be wound up or an order made for change of management /revocation of the share issuances. It's a very difficult situation to get right without gifting them a potential ground…*"

92 On 27 November 2024, Walkers responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition will be taken into consideration and would likely help.

93 On 9 December 2024, DFW was incorporated as a non-profit non-stock company in Delaware, by or with the assistance of Mr Douglas Mancino, partner of U.S. firm, Seyfarth Shaw LLP ("**Seyfarth**"), who, worked alongside Mr Patrick in the establishment of the Company and the Fund structure. The sole member of DFW was and is Mr Patrick.

94 On 7 February 2025, 318 Participating Shares were issued to DFW.

95 On 20 February 2025, Mr Patrick as the Management Shareholder of the Company resolved to adopt the Amended and Restated Memorandum and Articles of Association dated 20 February 2025 which, among other things:

95.1 Amended the Memorandum at paragraph 3 to give the Company charitable objects;

95.2 Amended article 70 to introduce the concept of a Management Director (being a director holding the Management Share) and to weight the voting such that on all matters the Management Director had 10 votes and any other directors had 1 vote;

95.3 Deleted the previous articles 70 and 71 giving the right to appoint alternate directors and proxies. By email dated 27 February 2025, Walkers confirmed that the purpose of this deletion was to "*avoid the risk of 'outsiders' being brought into the fold*".

96 The Company reserves its position in respect of the validity of these amendments.

<u>The purported restructuring: Mr Patrick causes the assignment of the Partnership Interest to CDM</u>

97 On 12 December 2024, CDM was incorporated as a limited liability company in Delaware.

98 On 18 December 2024, without telling the Supporting Organisations or the Charities, the Directors of the Company resolved (the "**Transfer Resolutions**") to approve the transfer of the entirety of the Company's limited partnership interest in the Fund to CDM, in consideration for the contribution by the sole member of CDM of 100% of the membership interest in CDM. The Transfer Resolutions provide (amongst other things) that, based apparently on U.S. tax advice, the transfer of the limited partnership interest to CDM:

98.1 *"…would help insulate the DAF from exposure to [Dondero] and his entities who may be at risk of causing the [IRS] to revoke the tax-exempt status of one or more of the Participating Shareholders/supporting organizations which could imperil the assets of the Company*";

98.2 "*The IRS would look favorably upon any and all attempts for DAF to maintain its influence from what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement*";

98.3 As a Delaware limited liability company (CDM): "…*as permitted under the LLC Act, the terms of the LLC Agreement eliminate the fiduciary duties of the manager of the Transferee*".

99 On 18 December 2024, without telling the Supporting Organisations or the Charities, the Company, CDM and the New GP entered into a Deed of Assignment and Assumption (the "**Deed**") which was executed by Mr Patrick on behalf of each of (i) the Company in his capacity as Director; (ii) CDM in his capacity as Manager; and (iii) the New GP in his capacity as Director. Pursuant to the terms of the Deed:

99.1 The Company assigned its entire limited partnership interest in the Fund to CDM (the "**CDM Assignment**").

99.2 The New GP provided its written consent to the CDM Assignment and the admission of CDM as the new limited partner, in accordance with clause 1.11(a) of the LPA.

99.3 CDM agreed to exercise its reasonable best endeavours to ensure that 100% of the membership interest in CDM held by Mr Patrick would be transferred to the Company (the "**CDM Membership Interest**").

100 On 18 December 2024, the Company (as member) and Mr Patrick (as manager) entered into a Delaware law governed Limited Liability Company Agreement in respect of CDM (the "**LLC Agreement**").

101 The LLC Agreement, materially provides (amongst other things) that:

*"Fair Market Value shall have the meaning set forth in Section 6.9(b).*

*…*

*The initial Manager shall be Mark Patrick.*

*…*

*6.5 No Duties to the Company. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.*

*…*

*6.9 Valuation of Company Assets.*

*(a) General. The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.*

*(b) Binding Effect. The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.*

*…*

*7.3 Redemption. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the*

*Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal amount of the Fair Market Value of such Member's Interest being redeemed, as determined* by *the Manager in its sole discretion."*

102 The Company will rely on the terms of the LLC Agreement for their applicable full terms and effect.

103 The effect of these transactions was that:

103.1 CDM was inserted into the corporate structure below and as a subsidiary of the Company and would hold the entirety of the limited partnership interest in the Fund previously held by the Company; and

103.2 The Company would hold the entire membership interest in CDM, with the result that the Company's sole asset, having previously been its limited partnership interest in the Fund, was exchanged for the CDM Membership Interest

(the "**Restructuring**")

104 The Restructuring was at an undervalue and not in the interests of the Company (in that the CDM Membership Interest was less valuable than the limited partnership interest that the Company assigned to CDM) because (amongst other things)*:*

104.1 The General Partner owed fiduciary duties to the Company in the Fund, but the Manager (Mr Patrick) did not owe any fiduciary duties to CDM; and

104.2 The CDM Membership Interests were susceptible to being redeemed by Mr Patrick (as Manager) in his sole discretion and for any reason, for "fair market value" as defined by Article 6.9, i.e. a "good faith determination of the value".

105 On 3 April 2025, the Company obtained retrospective advice from Leading Counsel on the steps taken by the Company in December 2024 to effect the Restructuring and whether the transfer is "*open to challenge by the Participating Shareholders*", which advice:

105.1 refers to the justifications for the decisions taken as set out in the Restructuring Resolutions, and considers that, if called upon to justify the purpose of those decisions, the Directors would need to explain:

(a) how the penalisation or loss of tax-exempt status any of the current Participating Shareholders could have "*imperil[ed]*" the *"assets"* of the Company;

(b) the detrimental issues the Company was facing that the Directors believed would be mitigated by the interposition of CDM into the Fund structure; and

(c) how and/or why the Restructuring would (i) benefit the Company and (ii) reduce the influence of Mr Dondero; and

105.2 considers that a shareholder reviewing the reasons listed in the Restructuring Resolutions "*might suggest that the contents of the resolution are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board*".

<u>Persistent and continual lack of information for the Supporting Organisations</u>

106 On 23 January 2025, having received no response from Mr Murphy to the No-Confidence Letter, Julie Diaz, the CEO of The Dallas Foundation, sent Mr Patrick an email advising that the Supporting Organisations needed to better understand the Company's/Fund's asset position, and requesting certain information be provided by 10 February 2025.

107 Having received no response, on 28 January 2025, Ms Diaz sent a further email to the Directors expressing serious concern (i) that the Supporting Organisations' requests for information

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

continued to be disregarded, and (ii) about the ongoing lack of transparency on the part of the Directors.

108 On 30 January 2025, Mr Murphy replied to Ms Diaz stating that the Directors:

108.1 had not received the 23 January email – but understood the next step was for the Directors to "*present directly*" to the Supporting Organisations to address the No-Confidence Letter; and

108.2 are cooperating with the Supporting Organisations to provide additional information – but "*have no legal obligation to do so*" and such cooperation "*should not be construed as an implicit acknowledgement of any duty to continue providing information to you*".

109 On 31 January 2025, Mr Michael Stockham of H&K responded to Mr Murphy noting that he and Mr Patrick were fiduciaries, managing US$270 million in assets for the benefit of charities that support the most vulnerable (i.e. the Charities) and: *"[w]hatever your side's obvious antagonism to Mr Dondero, the fact remains that the underlying assets are ultimately for these charitable missions.*"

110 On 4 February 2025, Mr Murphy responded that while open to resolving the concerns, they (i.e. the Directors) were struggling to understand the Supporting Organisations' change in position.

111 On 7 February 2025, H&K responded that the Directors were fiduciaries in control of US$270 million for the benefit of charities: "*these monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed and … fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees*".

112 On 14 February 2025, H&K received a letter from Mr Mancino which rejected the accuracy of the reported increases in expenditure. On 27 February 2025, H&K responded that his clients

were frustrated by the lack of transparency and refusal to answer simple queries about the financial position. In response, Seyfarth sought available dates for Mr Murphy to make the promised presentation to the Supporting Organisations. H&K responded the next day with three potential dates/times for the proposed call between 26 March and 3 April 2025. Mr Mancino did not respond.

113 On 20 March 2025, Mr Mancino sent a letter purportedly on behalf of the Company to the IRS about alleged undue influence and control exercised over the Supporting Organisations by Mr Dondero. The letter makes serious and unsubstantiated allegations about the Supporting Organisations, absent evidential support, including that they each (i.e. all of them): "*operates for Mr Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of DAF Holdco to wrest control of DAF Holdco and its assets…*".

114 On 3 April 2025, Mr Mancino sent an email to H&K stating that he had just learned there was a call scheduled for the following day and seeking to reschedule. H&K responded that no such call had been arranged and queried the apparent source of confusion.

115 Mr Mancino, and Mr Patrick and Mr Murphy (each in part through Mr Mancino as an instructed attorney) acted in bad faith by maintaining a pretence of actual or potential cooperation with the Supporting Organisations when this was not the case, and by sending or causing to be sent the email of 20 March 2025 in secret:

115.1 four (4) months after the Directors and/or the Company transferred away the Company's interest in the Fund without telling the Supporting Organisations or the Charities;

115.2 two (2) months after the Directors and/or the Company diluted the existing Participating Shareholders without telling the Supporting Organisations or the Charities (see below);

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

115.3 one (1) week after the Directors and/or the Company redeemed the Company's interest in CDM without telling the Supporting Organisations or the Charities (see below);

115.4 one (1) day after the Directors placed the Company in voluntary liquidation, without telling the Supporting Organisations or the Charities.

Purported Share Issuance and allotment to DFW

116 In November 2024, without telling the Supporting Organisations or the Charities, the Directors began seeking advice from Walkers on whether the Company could issue new Participating Shares that would have the effect of diluting the existing Participating Shareholders - "*in light of a possible just and equitable winding up petition*" being filed by one of the Supporting Organisations.

117 On 7 February 2025, Walkers advised that, while there must be a corporate benefit to the exercise of the power, the Articles grant the Directors power to issue new shares that dilute the Participating Shareholders, and recommended the shares be issued sooner than later, and before any winding up petition was presented, since any alteration to the Company's membership made after the presentation of the petition would be void.

118 On 7 February 2025, without telling the Supporting Organisations or the Charities, the Directors resolved to issue 318 Participating Shares to DFW (the "**Share Issue Resolutions**"), resulting in DFW owning 51.04% of the Participating Shareholding and the dilution of the Supporting Organisations from an aggregate shareholding of 100% to 48.96% (the "**Share Issuance**"). The Share Issue Resolutions provided that:

118.1 Participating Shareholders had requested information and made false and misleading claims about the Company and its finances which the Directors believe were directed by Mr Dondero.

118.2 Based apparently on U.S. tax advice:

(a) There was a heightened risk the IRS could revoke the tax-exempt status of the Participating Shareholders which could imperil the status and assets of the Company.

(b) Increasing the number of Participating Shareholders would mitigate the undue influence and private inurement of Mr Dondero.

(c) The IRS would look favourably upon attempts by the Fund to maintain its independence from his (i.e. Mr Dondero's) attempts to use the Fund for his private benefit.

118.3 The Directors believed the Share Issuance to DFW would protect the Company and the Participating Shareholders and resolved that the Share Issuance to DFW be approved.

119 On 5 March 2025, Leading Counsel (Mr Tony Beswetherick KC) issued draft retrospective (but final) advice to the Company on the Share Issuance in which he opined (amongst other things) as follows:

119.1 where Articles confer a power on directors to issues shares, that power is a fiduciary one and must only be exercised for proper purposes; an issue of shares "…*deliberately aimed at altering the balance of power between*" is problematic; the power should not be exercised with a view to altering an existing balance of power, irrespective of whether the directors consider that doing so is in the interests of the company;

119.2 the effect of the Share Issuance was that, if there were to be a company meeting or proposal to approve a modification that affects the Participating Shareholders' rights,

the ability of the prior Participating Shareholders to vote down such a change was negatively affected (DFW now having over 50% of the total Participating Shares);

119.3 it is not immediately clear from the Share Issue Resolutions whether the justifications stated were actually relevant to the Directors' decision. If they were relevant, it is not explained why the issue of shares to DFW would prevent false claims being made by Mr Dondero; it may be that those matters are part of the context, rather than part of the reason for the decision; and

119.4 the Participating Shareholders might suggest the Share Issue Resolutions are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board.

Plan to redeem the Original Participating Shareholders

120 In January and February 2025, the Directors, in connection with a plan to try to redeem the Participating Shareholders and/or the CDM Membership Interest held by the Company, and without telling the Supporting Organisations or the Charities, sought to obtain an analysis of the fair market value of the Participation Shares, and the discount that should be applied to such valuation, given the limited rights conferred upon Participating Share under the Articles.

*Historic ValueScope Valuations*

121 At the request of the Company, ValueScope, Inc. ("**ValueScope**") conducted a series of valuation analyses of 100 Participation Shares on a net asset value ("**NAV**") basis between December 2020 and September 2024 to determine their fair market value ("**FMV**"). These valuations were apparently prepared for internal reporting purposes and apparently applied consistent methodologies throughout the period. The results of these valuations are summarised below:

| Valuation date | NAV | NAV Per Share | Combined Discounts | FMV Per Share | FMV (100 shares) |
|---|---|---|---|---|---|
| 31 December 2020 | $176.96M | $580,193 | 17.0% | $481,468 | $48,146,754 |
| 31 December 2021 | $243.19M | $797,343 | 11.6% | $705,210 | $70,521,019 |
| 31 December 2022 | $276.24M | $905,711 | 15.4% | $766,549 | $76,654,941 |
| 31 December 2023 | $277.57M | $910,076 | 14.0% | $782,847 | $78,284,712 |
| 30 September 2024 | $269.05M | $882,140 | 13.9% | $759,614 | $75,961,370 |

122 The final NAV-based valuation prepared by ValueScope prior to the Restructuring was dated 7 January 2025, and gave a valuation of 100 Participating Shares as at 30 September 2024 (the "**September 2024 Valuation**").

*PwC and FTI*

123 On 14 January 2025, Walkers inquired with PwC about a valuation of "*the shares of Charitable DAF Holdco*". In that email, Walkers, presumably on instructions from the Directors, listed the Supporting Organisations as "*potential adverse parties*".

124 On 7 February 2025, Walkers informed PwC that CDM had been inserted into the structure and requested that a second valuation be prepared of all the CDM Membership Interest, which valuation Walkers said was also to rely on the NAV as previously advised (rather than leaving

PwC to determine their own valuation methodology). PwC responded that their initial view is "*there is no meaningful difference*" between the two valuations requested - "*i.e. the economic interest in the underlying NAV still fully accrues to the participating shareholders*" - but that voting power/control remains with Mr Patrick (or with entities he controls). PwC asked for further information about what Mr Patrick was trying to achieve by the Restructuring to help them understand the valuation implications.

125 On 10 February 2025, PwC suggested a call with Walkers to discuss the second valuation, which call took place on 11 February 2025, and was also attended by Mr Patrick's '*onshore and Delaware counsel*'. Following that call, PwC declined to take on the instructions:

> *"... our view is that the new Delaware entity (CDMCFAD) effectively has full economic interest and control over the Fund, so we don't really see a basis for applying any discounts to the underlying Fund NAV for that entity. As it relates to the participating shareholders' interest in Charitable DAF Holdco, Ltd., we don't think we can reliably estimate the value/discount given the current fact pattern. While we could make hypothetical assumptions about how the articles may be interpreted, and/or how future cash flows may or may not be distributed, the impact on value is so substantial that we don't think it would be a meaningful exercise (i.e. we'd end up with the discount being 100% in one scenario, but 0% in another). On that basis, I don't think there is a fee / scope that can work for us currently."*

*The FTI Memo*

126 On 13 February 2025, without telling the Supporting Organisations or the Charities, the Company engaged FTI Consulting in London ("**FTI**") to advise on (i) the discount applicable (if any) to a valuation considering how the rights attached to Participation Shares differed from those typically associated with ordinary shares, and (ii) the impact of the existence of an additional share class (being the Management Shares held by Mr Patrick). FTI's engagement

letter also stated that "*The Memo will also include a valuation of the ordinary shares of CDMCFAD, LLC, the immediate subsidiary of Charitable DAF HoldCo*".

127 On 2 March 2025, FTI provided a draft memorandum to Walkers/the Company.

128 On 27 March 2025, FTI issued its final memorandum (the "**FTI Memo**"), which stated (amongst other things) that the rights of Participating Shares were extremely limited, and the potential distribution of cash was highly dependent on a member's alignment with the Fund's mission. The FTI Memo concluded that a "limited discount" for lack of control and marketability should be applied where a member is aligned with the Fund's mission (said to be close to the range concluded by ValueScope in its 7 January ValueScope Report, i.e. a discount of 13.9%), and a "high discount" of 95% where a member is not.

*Legal advice sought*

129 On 25 February 2025, without telling the Supporting Organisations or the Charities, the Directors sought advice from Walkers and Shields Legal on any powers under the Articles to enable the removal of the Supporting Organisations, including by (i) redemption of the Participating Shares (Art 14 and 28), (ii) a forced transfer of Participating Shares held by a Restricted Person (Art 21) (iii) or an alternative course whereby DFW repurchased the shares, which could then be cancelled, and new shares issued which are redeemable by the Company. Walkers advised that both redemption and forced transfers were not permitted but agreed with the alternative course involving DFW.

130 On 5 March 2025, as stated above, Leading Counsel provided retrospective advice to the Company regarding the Share Issuance, which also considered whether the Directors had power under the Articles to redeem the Participating Shares. Leading Counsel opined that they did not, on the basis that the Participating Shares were not issued as redeemable shares, and could not be redeemed unless there were a prior variation of the rights ascribed to them. That said, any proposal to vary the rights attached to the shares to make them redeemable would

support an argument "*that the [DFW Share Issue] was itself procured with a view, ultimately, to disenfranchising the pre-existing Participating Shareholders*".

131 On 17 March 2025, Mr Patrick wrote to Walkers in the following terms:

> *"Agree we need to finalise the [FTI valuation] reports …We should request any limits on use removed.*
>
> *We are seeking U.S. tax counsel to send emails to Paul and I that the non profits are Restricted Persons and/or best interests of the Company to have non dondero holders of its interests. After that, an alternative approach is to give them what they want – liquidate Holdco Ltd after its only investment is redeemed by the US. LLC pursuant to U.S. counsel advice above, that it's in the best interests of the Company to redeem all non-profits affiliated with Dondero. US LLC has same valuation conducted on its shares as the participation shares. so we would redeem the LLC interest, then distribute the proceeds out of Holdco Ltd., and file articles of Dissolution for Charitable daf Holdco Ltd before a wind up petition is filled. That would put us on the "high ground" to fight (rather the way this is currently heading in a defensive posture). they would have to scrap their wond up petition and fight for reinstatement, gripe about the valuations, and file fiduciary breach actions …*
>
> *We will stage this in light of the Doug letter, new advice of two separate U.S Tax counsel, and seeing how successful (or not) our outreach to the Texas attorney general office is.*
>
> *Note US LLC would make DFW its sole owner."*

132 The email of 19 March 2025 makes plain that the Directors, or at least Mr Patrick, intended to liquidate the Company without notice to the Supporting Organisations and to otherwise obstruct

the Supporting Organisations' ability to exercise any right to petition to wind up the Company on just and equitable grounds.

133 On 20 March 2025, Walkers provided comments on the FTI draft valuation, and FTI responded. These comments include, amongst other things:

> "Walkers: *It is stated at [3.2(2)] that "there is no overriding duty of DAF's Directors to act in the shareholders' interest. The Directors will act according to the best interest of the company, that is, to achieve the charitable causes that are aligned with DAF's mission". However, as a matter of Cayman law, directors owe duties to the company, and must act in its best interests [which are] generally regarded as the interests of the members as a whole, and in certain circumstances the objects of the company may be taken into account when determining what is in its best interests.*
>
> FTI: *Can you explain how it was in the interests of the company to materially dilute the existing shareholders*?
>
> …
>
> Walkers: *It is stated at [3.10] that "the Participating Shareholders do not have any rights to cause a liquidation/winding up of the company". However, the Participating Shareholders do have the right to seek a winding up of the company, as conferred upon them by the Companies Act (rather than the Articles).*
>
> FTI: *Why won't they just do this immediately and seek distributions? Isn't the ability to trigger a liquidation contradictory with point 1 which states "Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed*".
>
> …

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Walkers: *As per our comments, please could you delete references to our advice so as to avoid any potential arguments about waiver of privilege.*

FTI: *Your advice is important in us arriving at our conclusions. I understand from our legal team that we either (i) keep the reference to your advice or (ii) address the memo to you. Are you expecting there to be litigation in relation to the proposed transaction?*

…

Walkers: *Our client now seeks a valuation report which may, in connection with a proposed redemption of the membership interests in CDM, be disclosed to third parties and relied on to establish fair market value of both the membership interests in CDM, and in turn HoldCo.*

FTI: *This is a material change in the purpose and access rights of the report. Please provide more detail of the transaction. Is it the case that Mark will make CDM redeem the shares owned in by DAF? And who would you like to share the report with? And on what basis (e.g. non-reliance)? We also note our memo is not a valuation – it is a quantification of discounts given the rights of the participating shares. To do a valuation, we would need to do a more detailed exercise, including valuing the underlying assets."*

134 On 21 to 24 March 2025, FTI and Walkers had an exchange (amongst other things) as follows*:*

"FTI: *If the firm was wound down, would it result in distributions to the existing participating shareholders? Or would Mark still be able to shareholder structure to ensure the existing participating shareholders got nothing? Given they haven't received dividends since 2019, why haven't the participating shareholders triggered a wind down? If they can trigger a wind down and then in short order receive $300m of distributions, it does change things re discount.*

Walkers: *if HoldCo was wound up, the Participating Shareholders would receive distributions which would be made pari passu, and Mark (if he was the liquidator) would not be able to ensure the existing Participating Shareholders get nothing. Whilst the Participating Shareholders have the right to seek to wind up under the Companies Act, they need a proper basis to do so… We can only assume [they] have not commenced proceedings seeking to wind the company up because they do not have a proper basis on which to do so …*

…

FTI: *Would an absence of distributions be sufficient grounds to make an application to wind the company up? If the participating shareholders did make the application, would Mark be able to issue a vast number of shares to another party before the distributions were made thereby ensuring the existing shareholders received very little?*

Walkers: *A Participating Shareholder may consider an absence of distributions sufficient grounds for a winding up order on the just and equitable basis… But it is difficult for us to say whether that petition would be successful. If (a) a Participating Shareholder presented a petition; (b) new shares were purportedly issued; and (c) the Court then made a winding up order, the issue of the new shares would be void and not impact the amounts the Participating Shareholders would receive.*"

135 On 26 and 27 March 2025, FTI and Walkers had an exchange (amongst other things) as follows:

"Walkers: *We have discussed with our client and onshore counsel and set out some amendments in the attached. In addition, we note (1) we have not received any material addressing reliance on the memo by CDM; and (2) the "Limitations and restrictions" section still provides that the memo "should not be used to support a transaction". For*

*the memo to be useful in the circumstances, CDM [and HoldCo] need to be able to rely on it or a separate memo would need to be addressed to CDM on which it may rely. Further, both entities need to be able to rely on the memo(s) to support the proposed transaction.*

FTI: *What is the intention of adding that directors should act in the interests of future members? I am struggling to understand how a director could act in a manner which is beneficial for future shareholders which is not also helpful for existing shareholders.*

*The limitations in our note will remain. To do a valuation to support a transaction, we will need to do significantly more detailed work. This is an unusual/complicated situation. We are open to doing a fairness opinion on the transaction. But this will require approval from our risk committee and more information on the transaction and situation. We are happy for CDM to have our memo on a non-reliance basis. But this memo should not be used to support a transaction.*"

*March 2025 ValueScope Valuation*

136 Following the Restructuring, ValueScope was requested by Shields Legal, without telling the Supporting Organisations or the Charities, to prepare two valuation analyses:

136.1 100% Membership Interest in CDM; and

136.2 Certain Participating Shares of the Company as at 25 March 2025 (the "**March 2025 Valuation**").

137 The March 2025 Valuation had the same instructions, definition of value and scope of work as the September 2024 Valuation. Like the September 2024 Valuation, the March 2025 Valuation also referenced a 30 September 2024 balance sheet (and did not refer to any later analysis of

assets and liabilities). As shown below, the September 2024 Valuation and March 2025 Valuation produced very different results.

138 A comparative summary of the September 2024 and March 2025 Valuations is set out below:

| **Valuation Date** | **DLOC*** | **DLOM**** | **Valuation Basis** | **FMV (100 Shares)** |
|---|---|---|---|---|
| 30 September 2024 | 8.1% | 6.3% | NAV | $75,961,370 |
| 25 March 2025 | 99.2% | 20.00% | DCF*** | $536,784 |
| **Difference** | **+91.1%** | **+13.7%** | | **-$75,424,586** |

*DLOC – Discounted for Lack of Control

**DLOM – Discounted for Lack of Marketability

***DCF – Discounted Cash Flow

139 The March 2025 Valuation stated: "*for the valuation of non-controlling assets in holding companies such as DAF, the asset-based approach is most commonly used [as Valuescope had always done previously]. When applied to such companies, the approach consists of measuring the underlying net asset value of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity. However, in the case of the participation shares under consideration, the asset-based approach is not applicable. These shares do not confer control and only have a claim in respect of the underlying assets in a winding up.*"

140 ValueScope does not appear to have considered whether winding up was a possibility, and therefore, whether value could have been realised that way and by reference to NAV.

141 For reasons which are unclear to the Company, the March 2025 Valuation expressly rejected the asset-based (NAV) approach on the basis that the economic benefits of the Participating Shares in the Company were contingent on discretionary distributions by its manager. The report states.

> '*Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of these shares are contingent upon discretionary distributions by the director. As such, their value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality*'.

142 Accordingly, the methodology applied in the March 2025 Valuation was markedly different from the methodology applied in the September 2024 Valuation. Instead of relying on discounted net assets, the March 2025 Valuation:

142.1 applied a discounted cash flow ("**DCF**") methodology to estimate the present value of expected future distributions, rather than an asset-based approach, as had been applied in at least the past five annual valuations by ValueScope;

142.2 determined the FMV of 100 Participating Shares to be US$536,784;

142.3 applied a discount of 99.2% for DLOC; and

142.4 applied a discount of 20.00% for DLOM.

143 The DCF model is based on the present value of future distributions to the Company. ValueScope's report shows that these were estimated based on historic distributions themselves controlled by Mr Patrick.

144 Based on the valuations above, between 30 September 2024 and 25 March 2025, the FMV of 100 Participating Shares in the Company apparently declined from US$75,961,370 to US$536,784, representing a reduction in value of 99.29% in less than a six month period, in which the Restructuring occurred, attributable to a change in valuation basis (amongst other things) from NAV to DCF.

145 Furthermore, ValueScope does not appear to have sense-tested their valuation. Although they identified “total equity” of c. US$270 million and concluded that all of the Participation Shares had a value of only c. US$1.6 million, they did not address themselves to who benefitted from the residual value of c. US$268 million.

Admission and Redemption

146 On 27 March 2025, Mr Patrick, as manager of CDM, executed a written consent (the "**Manager Consent**") to (a) cause CDM to admit DFW as an additional member of CDM pursuant to the terms of an Admission and Amendment No.1 Agreement (the "**Admission Agreement**") and (b) redeem the CDM Membership Interest held by the Company pursuant to the terms of a Redemption and Amendment No. 2 Agreement (the "**Redemption Agreement**" and together with the Admission Agreement, the "**Restructure Agreements**"):

146.1 The recitals to the Manager Consent stated that the redemption of the Company's membership interest was justified by reason of alleged attempts by the Supporting Organisations to exert control, and the potential loss of their (i.e. the Supporting Organisations’) non-profit and tax-exempt status:

> *“… the Manager has formed the view that the Current Member, by virtue of being a member of the Company and having as Participating Shareholders the Highland Foundations, poses a material risk to the Company, its assets, and the Mission Statement of DAF due to, among other things, (i) officers and directors of the Highland Foundations seeking to assert dominion and control*

*over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii)*"

146.2 The Manager Consent further stated:

"*WHEREAS, in connection with the Restructure Agreements and the transactions contemplated thereby, the Manager (on behalf of the Company) obtained a valuation report of the membership interests of the Company from ValueScope and FTI Consulting, copies of which are attached hereto as Exhibit E, which valuation reports have informed the Manager the fair market value of the membership interests*"

146.3 Exhibits C and D to the Manager Consent are documents purportedly containing information regarding various alleged U.S. tax issues relating to the Company.

146.4 Exhibit C is the letter from Mr Mancino to the IRS dated 20 March 2025, in which Mr Mancino (amongst other things) stated:

(a) there has been "deterioration" of the Company's relationship with Highland Dallas Foundation, Inc. (**"HDF"**) due to the undue influence and control exercised over HDF by Mr Dondero.

(b) the information in the letter will demonstrate clearly that Mr Dondero's influence and control is an inappropriate donor relationship with representatives of the HDF who serve on the Board of Directors of and as officers of HDF.

(c) such undue influence and control potentially jeopardises the tax-exempt status of HDF as an organisation described in s.501(c)(3) and, at a minimum, causes it to fail to remain a supporting organisation described in s. 509(a)(3).

146.5 Exhibit D is an advice produced by Carrington Coleman (U.S. law firm) dated 25 March 2025 (the "**Carrington Advice**") which amongst other things:

(a) asserts that Mr Dondero has been attempting "*through his control of the Highland SOs, to exert dominion and control over the cash and property he previously donated to DAF and for which he claimed charitable deductions, all for his personal benefit.*"

(b) suggests that Mr Dondero was using the Company as his personal "*piggy bank*", and that it may be perceived by the IRS that the Fund has been or is his financial alter ego.

(c) concludes that "*the IRS will look favourably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by Dondero, and the entities controlled by him to use DAF for his private benefit and inurement.*"

146.6 Exhibit E contained two valuation reports:

(a) The first was a ValueScope valuation.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(b) The second is the FTI Memo referred to above, in which FTI expressly stated that the analysis in the FTI Memo should not be used in support of a transaction, but which Mr Patrick, in any event:

(i) expressly relied upon in the Manager Consent to determine the fair market value of the CDM Membership Interest and the basis for the redemption of the Company's interests; and

(ii) permitted Carrington Coleman to refer to and rely on in the FTI Memo (indeed, having provided the 27 March 2025 copy which was a draft copy only).

146.7 On 27 March 2025, without telling the Supporting Organisations or the Charities, Mr Patrick executed the:

(a) Admission Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192; and

(b) Redemption Agreement under which CDM redeemed the Company's membership interest in CDM for the same sum of US$1,637,192 (the "**Redemption Sum**").

147 On 27 March 2025, without telling the Supporting Organisations or the Charities, the Company entered into a letter agreement with CDM (the "**Letter Agreement**"), pursuant to which the Company assigned to CDM various contracts and agreements to which the Company was a party, listed in Schedule A to the Letter Agreement and CDM agreed to assume the liabilities and obligations in respect of those contracts.

148 On 2 April 2025, the Directors of the Company, by way of written resolution:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

148.1 Noted the redemption of the Company's membership interest in CDM for the Redemption Sum (the "**Redemption**").

148.2 Resolved to pay a dividend to the Original Participating Shareholders of US$1,612,192.01 in the amount of (i) US$528,587.54 with respect to each of HDF, Highland Kansas City Foundation, Inc. and Highland Santa Barbara Foundation, Inc.; and (ii) US$26,429.39 with respect to CFNT.

149 The substantive financial effect of the Redemption, under which DFW did or was committed to make a capital contribution equivalent to the Redemption Sum to CDM, and the CDM Membership Interest held by the Company were redeemed for the Redemption Sum, was that the Company's membership interest in CDM was purchased by or otherwise transferred to DFW for the Redemption Sum.

150 The substantive effect of the overall transaction or series of transactions pleaded above, including the Impugned Transactions already pleaded, was that:

150.1 The Company realised its interest in the Fund, which had a NAV of c. US$270 million, for c. US$1.6 million.

150.2 The Company made a distribution to the Original Participating Shareholders (c. US$1.6 million).

150.3 The Supporting Organisations and the Charities were actually or effectively divested of their indirect interest in the Fund, and the assets underlying the Fund; and

150.4 The Original Participating Shareholders were diluted from 100% of the economic interests in the Company to less than 50%.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Voluntary Liquidation and Supervision Order

151 On 2 April 2025, the Directors resolved, without telling the Supporting Organisations or the Charities, to place the Company into voluntary liquidation and appoint Mitchell Mansfield and William Clarke (the JVLs) of Kroll (Cayman) Ltd as voluntary liquidators.

152 However, unaware of the voluntary liquidation, on 10 April 2025, the Supporting Organisations presented a petition seeking the winding up of the Company on a just and equitable basis, under section 92(e) of the Companies Act (2025 Revision) (the "**J&E Petition**").

153 On 25 April 2025, Walkers and Shields Legal held a call to discuss the J&E Petition. Following that call, Mr Patrick wrote in an email that the "*message ideas*" "*for Monday*" were to "*poison the well*", by which he meant to create a negative impression of Mr Dondero in the eyes of the Court.

154 On 6 May 2025, Justice Jalil Asif KC made a supervision order, under which voluntary liquidation of the Company was to be continued under the supervision of the Court pursuant to s.131 of the Companies Act (As Revised), and the JOLs were appointed.

**OBLIGATIONS OWED BY THE DIRECTORS**

155 At all material times, the Directors, as directors, owed the following duties individually to the Company:

155.1 A fiduciary duty to act *bona fide* in what he considers to be the best interests of the Company (the "**Best Interests Duty**").

155.2 A fiduciary duty to exercise his powers for a proper purpose, and for the purposes for which they were conferred (the "**Proper Purpose Rule**").

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

155.3 A fiduciary duty not to place himself in a position where his personal interest actually or potentially conflicted with his duty of loyalty to the Company (the "**First No-Conflicts Duty**").

155.4 A fiduciary duty not to place himself in a position where his duty to another actually or potentially conflicted with his duty of loyalty to the Company (the "**Second No-Conflicts Duty**").

155.5 A fiduciary duty to not make an unauthorised profit from or by reason of his fiduciary position (the "**No Profit Duty**").

155.6 A fiduciary duty not to accrue or take a benefit or commercial opportunity from the Company without the full and informed consent of the Company (the "**No Self-Dealing Rule**").

155.7 A duty to exercise reasonable skill, care, and diligence in the performance of his role and function as director (the "**Reasonable Care Duty**").

156 With respect at least to Mr Patrick, his duties above and the standard to which he was obliged to comply with such duties are affected by being in the Control Position and the trustee or trustee-like position he occupied. Paragraph 76 above is also relied upon.

157 The Company reserves its position as to whether Mr Patrick, by reason of being in the Control Position and the trustee or trustee-like position he occupied, was an express or other trustee of the assets of the Fund for the Original Participating Shareholders and, through or in addition to them, the Charities.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**ATTRIBUTION OF KNOWLEDGE AND INTENTION**

158 As a matter of Cayman Islands law, Mr Patrick's intention and knowledge of facts and matters for all such purposes relevant to this claim is to be attributed to each of DFW, CDM, and the New GP on the basis of at least the following facts:

158.1 As regards DFW, Mr Patrick is listed under DFW's certificate of incorporation, dated 9 December 2024, as "the member of the corporation", and the Admission Agreement showed he served as its "President". Mr Patrick is also the registered director of DFW. Mr Patrick the agent of DFW, in which capacity Mr Patrick executed the Admission Agreement.

158.2 As regards CDM, Mr Patrick is described under the LLC Agreement as the "Manager" of CDM, in which role Mr Patrick was CDM's agent, and in which capacity he (i) executed the Deed of Assignment and Assumption on behalf of CDM, and (ii) executed a written 'Manager Consent' (the "**Manager Consent**") approving the Redemption and Admission Agreements; and executed the Redemption and Admission Agreements.

158.3 As regards the New GP, Mr Patrick was and remains its director, and therefore its agent (in which capacity, Mr Patrick executed the Deed of Assignment and Assumption on the New GP's behalf). Further, Mr Patrick is the sole shareholder of the New GP.

159 Further, if applicable, as a matter of the laws of the State of Delaware, Mr Patrick's knowledge and intention is to be attributed to DFW, CDM, and the New GP on a like basis.

**CLAIMS AGAINST THE DEFENDANTS**

Breaches of fiduciary and other duty

160 The First and Second Defendants, and each of them, in their capacity as a Director of the Company, acted in breach of their fiduciary and other duties to the Company as follows.

Restructuring, including the CDM Assignment

161 The Directors (and each of them), in procuring, directing or effecting the Restructuring as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring, directing or effecting the Restructuring as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

161.1 The Plaintiff relies on paragraphs 77 to 105 above.

161.2 With the assistance of Mr Mancino, Mr Patrick took steps to form CDM and appoint himself as Manager of CDM.

161.3 Mr Patrick designed and/or negotiated and/or directed and/or effected the Restructuring in his capacity as Director of the Company, Director of the New GP, and Manager of CDM, being each of the parties to the Deed, and signed the Deed on behalf of each party.

161.4 The Directors (and each of them) approved the transfer of the Company's entire limited partnership interest in the Fund (having net assets worth c. US$270 million) to CDM, a Delaware entity whose LLC Agreement excluded any fiduciary obligations owed by its Manager (i.e. Mr Patrick) to CDM itself or to its members; in exchange for membership interest in CDM, which interest was capable of being extinguished, by redemption, and for a "fair value", determined at the discretion of the Manager (i.e. Mr Patrick).

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

161.5 The Restructuring was of no benefit to the Company and not in its best interests, and Mr Patrick was subject to conflicts of interest (First and Second No-Conflicts Duties) and committed acts of self-dealing.

161.6 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known that the Company was proposing to exchange the Partnership Interest for a membership interest in CDM that was subject to redemption entirely at Mr Patrick's discretion, and for a "*fair value*" determined, in good faith, in his discretion.

(b) knew or ought to have known that the Company was therefore proposing to trade its Partnership Interest, which was not in practical terms defeasible, for an interest that could be extinguished: (i) at a time over which it had no control, (ii) for a price over which it had very limited control and (iii) for a potential valuation basis which excluded a net asset valuation of the assets held in the Fund.

(c) knew or ought to have known that the CDM Membership Interest was to be in a Delaware-incorporated company whose LLC Agreement excluded any fiduciary obligations owed by its Manager either to CDM itself or to its members and was therefore less valuable than the Partnership Interest.

(d) knew or ought to have known that the CDM Assignment was therefore a transaction at an undervalue.

161.7 It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from CDM without the full authorisation or full and informed consent of the Company.

161.8 Further, and in any event, the Directors (and each of them) acted when each of them:

(a) knew or ought to have known that the CDM Assignment was the first step in a series of connected future transactions, including those pursuant to the CDM Assignment, the Share Issuance, the Admission Agreement, the Redemption Agreement and the Redemption, under which the Directors were able to and ultimately did procure the redemption of the Company's CDM Membership Interest, thus extinguishing the Company's interest in the Fund, for an undervalue.

(b) knew or ought to have known that:

(i) the full terms and effect of the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

(ii) the full terms and effect the CDM Assignment was not a proper or proportionate response to any genuinely perceived risk to the Company, which was not itself a Donor Advised Fund and/or did not enjoy or require tax-exempt status under s.501(c)(3) of the U.S. Internal Revenue Code.

(iii) other approaches to address concerns with respect to the tax-exempt status of the HDF short of undertaking the Restructuring (and entering into the CDM Assignment) included notifying the HDF of the conflict and/or concerns and requesting it to remedy it or them.

(iv) even if the facts and matters alleged in relation to the HDF were correct, there was more than a possibility, after an extended passage of time and at least two levels of appeal, that a U.S. tax audit would result in an adverse determination with respect to the tax-exempt status of the HDF.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(v) the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

(c) knew or ought to have known that they were keeping the Restructuring, the CDM Assignment, CDM itself and all the surrounding circumstances secret from the Participating Shareholders.

162 By reason of the foregoing breaches of duty or any of them:

162.1 The CDM Assignment is void, alternatively voidable and hereby avoided.

162.2 CDM holds the Partnership Interest on trust or constructive trust for the Company.

162.3 CDM is required to re-transfer the Partnership Interest to the Company and account for any profits on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

<u>Share Issuance</u>

163 The Directors (and each of them), in procuring, directing or effecting the Share Issuance as set out above, acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring, directing or effecting the Share Issuance as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

163.1 The Plaintiff relies on paragraphs 77 to 84, 91 to 96 and 106 to 119 above.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

163.2 The Directors (and each of them) designed and/or engineered the Share Issuance, having sought legal advice in relation to the powers conferred on them as Directors of the Company, for the improper purpose of:

(a) diluting without any proper reason or corporate purpose the existing Participating Shareholders and/or depriving the ability of the Supporting Organisations to continue to comprise a majority of the Participating Shareholders.

(b) inserting DFW as a new Participating Shareholder, an entity under the sole control of Mr Patrick, to obstruct and/or prejudice and/or adversely affect the exercise of a Participating Shareholders' right to petition for the just and equitable winding-up of the Company.

163.3 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known the issue and allotment of shares at par to DFW was of no benefit to the Company.

(b) knew or ought to have known that the exercise of the power to issue shares and allot them to DFW was for the improper purpose of diluting the interest of the Original Participating Shareholders.

(c) knew or ought to have known that the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was a response to the prospect that the Supporting Organisations might present a petition for the winding-up of the Company on a just and equitable basis, as indeed they did on 10 April 2025 in ignorance of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(d) knew or ought to have known that the sole or primary purpose of the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW was to insert a new majority Participating Shareholder (under their or at least Mr Patrick's control) into the Company's share capital structure to (if they or at least Mr Patrick deemed fit) to oppose the actions of the Supporting Organisations and/or the Original Participating Shareholders, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

163.4 Mr Patrick designed and/or directed and/or effected the Share Issuance in his capacity as Director of the Company, even though he was 'President' of DFW and the sole member and the sole director of DFW.

163.5 It can be inferred, and is averred, that Mr Patrick was drawing fees or remuneration or emoluments or benefits from DFW (if not also from CDM) without the full authorisation or full and informed consent of the Company.

164 By reason of the foregoing breaches of duty or any of them:

164.1 the Share Issue Resolution and/or the Share Issuance or otherwise the issue and/or allotment of shares to DFW is void, alternatively voidable and hereby avoided.

164.2 DFW holds its shares on trust or constructive trust for the Company.

164.3 DFW is required to concur in the rescission of the allotment and to re-transfer its shares to the Company on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

164.4 The Company's register of shareholders shall be rectified accordingly.

Admission and Redemption

165 The Directors (and each of them), in procuring or entering into the Admission Agreement and the Redemption Agreement, and/or in procuring, directing or effecting the Redemption acted in breach of their duties to the Company, including the Best Interests Duty, the Proper Purpose Rule and the Reasonable Care Duty. Additionally, Mr Patrick, in procuring or entering into the Admission Agreement and the Redemption Agreement, or in procuring, directing or effecting the Redemption as set out above, acted in breach of his duties to the Company, including the No Self-Dealing Rule, No Profit Duty, and No-Conflicts Duty (First and Second No-Conflicts Duties).

PARTICULARS

165.1 The Plaintiff relies on paragraphs 120 to 150 above.

165.2 The Directors (and each of them) acted when each of them:

(a) knew or ought to have known that:

(i) proceeding on the basis of the Seyfarth/Mancino letter to the IRS dated 20 March 2025 was flawed or unreasonable.

(ii) proceeding was not a proper or proportionate response to any genuinely perceived risk about U.S. tax concerns.

(iii) the tax-exempt status of the HDF was of no concern or no reasonable concern to the Company.

(iv) proceeding on the basis of the March 2025 Valuation and the FTI Report was flawed in that: (i) the 99.2% discount in value proposed by the

ValueScope Report was a manifestly excessive discount, and resulted in the Company parting with its indirect ownership of 99% of the economic interest in the Fund (which had net assets worth c. US$270 million) for a mere US$1,637,192; and (ii) as pleaded above, the FTI Report expressly stated that *"this memo should not be used to support a transaction."*

(v) the Admission Agreement and the Redemption Agreement were steps in a series of connected transactions, including those pursuant to the CDM Assignment, the Share Issuance, under which the Directors were able to and ultimately did procure the extinguishment of the Company's interest in the Fund, through the redemption of the Company's membership interest in CDM, for an undervalue.

(b) knew or ought to have known that the sole or primary purpose of the Admission Agreement, the Redemption Agreement and the Redemption was to ensure that the Company was fully and finally deprived of an asset (its interest in the Fund) at an undervalue; and to enable a third party, DFW, controlled by Mr Patrick, to procure ownership of an interest in the Fund in complete replacement of the Company.

165.3 Mr Patrick designed and/or negotiated and/or directed and/or effected the Admission Agreement, the Redemption Agreement and the Redemption as Director of the Company, even though he was Manager of CDM and 'President' of DFW, sole member of CDM and sole member and sole director of DFW.

166 By reason of the foregoing breaches of duty or any of them:

166.1 DFW holds the CDM Membership Interest on trust or constructive trust for the Company.

166.2 DFW is required to concur in the transfer of the CDM Membership Interest to the Company or as the Company directs on the basis of such trust or constructive trust and/or on a restitutionary and/or on a proprietary basis.

<u>Further claims against Mr Murphy</u>

167 In respect of any breach of duty as set out above for which Mr Patrick alone is liable:

167.1 At all material times, Mr Murphy worked in close concert with Mr Patrick, including at his direction.

167.2 Mr Murphy knew or ought to have known all the facts and matters pleaded above as known or ought to have been known by Mr Patrick.

167.3 Mr Murphy knew or ought to have known of all the facts and matters pertaining to such breach or breaches by Mr Patrick.

167.4 Mr Murphy took no steps to stop Mr Patrick or to prevent or report the breach or breaches of duty by Mr Patrick.

167.5 Mr Murphy accepted and acquiesced in all steps and actions suggested, promoted or effected by Mr Patrick.

167.6 Mr Murphy accepted and acquiesced in the breach or breaches of duty by Mr Patrick.

167.7 As a consequence, Mr Murphy has acted in breach of his duties to the Company, including the Best Interests Duty and the Reasonable Care Duty.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Directors' Fees, Remuneration and Expenses

168 The Company is still unclear as to what precise fees or remuneration or emoluments or benefits were afforded to the Directors and from what source, and as to the proper expenses of the Company, in the period after March 2021 and thus reserves its position.

169 As is pleaded above in paragraphs 85 to 89, the Directors approved large increases for Mr Patrick's remuneration, benefits or emoluments: by around 1 October 2024, Mr Patrick's remuneration comprised a base salary of US$850,000, a bonus of 2.5 times that base salary, an LTI incentive payment of US$975,000; for the period March 2021 to March 2024, Mr Patrick was entitled to an aggregate LTI payment of US$4,759,000; and eligibility for discretionary and annual bonuses in addition, to be determined at the sole and absolute discretion of the Directors. By contrast, Mr Scott's annual salary and entire benefits during his tenure in the Control Position was US$60,000.

170 Insofar as the Directors (or each of them) approved of or procured any payment or benefit to or for Mr Patrick or Mr Murphy more than the sum of US$60,000 per annum each in respect of fees or remuneration or emoluments or benefits, such sum was excessive and conferred in breach of duty to the Company, including the Best Interests Duty, the Proper Purpose Rule, the first No-Conflicts Duty, the No Self-Dealing Rule and the Reasonable Care Duty.

171 Further, as is pleaded above, the Directors (or each of them) approved or caused the payment of considerable sums by way of expenses, amounting for example to US$18.3 million for the first half of 2024, and US$18.6 million spent over 2023. Such expenses may include the expenses incurred in effecting the transactions which are the subject matter of these proceedings. The reasonableness or *bona fides* of these expenses is not accepted by the Company.

172 The Company claims:

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

172.1 Full information, documents and discovery as to the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

172.2 Full information, documents and discovery as to expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

172.3 Repayment to the Company of all fees or remuneration or emoluments or benefits paid or claimed by Mr Patrick or Mr Murphy and each of them in excess of US$60,000 per annum; together with all improperly paid expenses caused or procured by Mr Patrick or Mr Murphy (or damages or equitable compensation in relation thereto).

Unlawful Means Conspiracy

173 The facts and matters pleaded above amount to an unlawful means conspiracy as follows:

173.1 It is unclear when the conspiracy began but it appears to have started by around the start of 2024.

173.2 The original conspirators were Mr Patrick and Mr Murphy. The Company is unaware of the circumstances in which Mr Patrick and Mr Murphy agreed or combined and is unable to plead further pending further information or discovery.

173.3 As they were incorporated and participated in the facts and matters pleaded above, the New GP, CDM and DFW joined the conspiracy but remain liable in damages for all losses, including prior to joining the conspiracy.

173.4 The conspiracy was a conspiracy to injure the Company.

173.5 The overt acts of the conspiracy were all the facts and matters pleaded above, including as breaches by Mr Patrick or Mr Murphy.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

173.6 The unlawful means of the conspiracy were all the facts and matters pleaded above as breaches of duty by Mr Patrick or Mr Murphy.

173.7 Each of the conspirators intended to injure the Company. This averment is an inference from all the facts and matters pleaded above.

173.8 As a consequence, the Company has suffered loss and damage, as a result of the Restructuring, the CDM Assignment, and the Admission and Redemption, and the combined effect thereof, as set out above.

Proprietary claim and/or unconscionable receipt

174 The facts and matters pleaded above give rise to claims by the Company for unconscionable receipt as follows:

174.1 CDM received the Company's Partnership Interest in the Fund under the CDM Assignment.

174.2 The knowledge of CDM was and is that of Mr Patrick.

174.3 The breaches of duty in relation to the CDM Assignment above are relied upon.

174.4 CDM knew that the CDM Assignment was at an undervalue and that causing or procuring the Company to enter into the CDM Assignment was a breach of fiduciary duty by Mr Patrick and/or Mr Murphy.

174.5 By reason of the foregoing, it is unconscionable for CDM to retain the Partnership Interest in the Fund and CDM is liable to account to the Company in equity, by restoring Partnership Interest in the Fund to the Company and/or accounting for any profits or otherwise accounting to the Company in equity.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Unjust Enrichment

175 In receiving the Company's Partnership Interest in the Fund, CDM was unjustly enriched at the Company's expense and is liable to the Company in restitution:

175.1 The Partnership Interest was transferred on the basis that there was a valid assignment agreement effecting that transfer.

175.2 That basis has totally failed, the CDM Assignment being either void, or avoided hereby.

Alter Ego and Lifting the Corporate Veil

176 In order to obtain the return to it of the Partnership Interest in the Fund, together with an Account of Profits, the Company does not need as a matter of law to make any allegation of "alter ego" or to lift the corporate veil in relation to CDM or DFW.

177 If, contrary to the paragraph above, the Company does so need, it makes the following allegations for the purposes of all relevant claims or causes of action set out above.

177.1 CDM is the "alter ego" of Mr Patrick.

177.2 DFW is the "alter ego" of Mr Patrick.

177.3 In relation to the receipt of any property by CDM directly or indirectly from the Company or the accrual of any profits or benefits by reason of such receipt, the corporate veil should be lifted, with the consequence that such receipt and such profits or benefits should be treated as those of Mr Patrick personally.

177.4 In relation to the receipt of any property by DFW directly or indirectly from the Company or the accrual of any profits or benefits by reason of such receipt, the corporate veil should be lifted, with the consequence that such receipt and such profits or benefits should be treated as those of Mr Patrick personally.

PARTICULARS

(a) In relation to CDM:

(i) Mr Patrick was and is the Manager. There are no other officers or managers.

(ii) Mr Patrick was and is the managing member.

(iii) CDM was incorporated at Mr Patrick's instigation in order to enter into the CDM Assignment or a transaction of like nature.

(iv) CDM's sole or primary purpose was to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company.

(v) CDM exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

(b) In relation to DFW:

(i) Mr Patrick was and is the 'President'. There are no other officers or managers.

(ii) Mr Patrick was and is the sole member.

(iii) Mr Patrick was and is the sole registered director.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(iv) DFW was incorporated at Mr Patrick's instigation in order to enter into a transaction whereby it would in effect take over the Company's interest in CDM pursuant to the CDM Assignment.

(v) DFW's sole or primary purpose was (i) to play a part in a scheme whereby Mr Patrick would obtain control of the Company's Partnership Interest in the Fund free of the Company, the Company's obligations towards the Supporting Organisations and (if the scheme succeeded) free of Mr Patrick's duties to the Company, (ii) to be the ultimate vehicle by which Mr Patrick would so control of the Company's Partnership Interest in the Fund and (iii) to be a newly-inserted majority Participating Shareholder (under at least Mr Patrick's control) in the Company's share capital structure to oppose the actions of the Supporting Organisations, both in relation to any potential contributories' winding-up petition and otherwise, and/or to obstruct and/or prejudice and/or adversely affect the exercise at any time of any rights of the Supporting Organisations as Participating Shareholders.

(vi) DFW exists and operates in order to conceal the identity of the true or real actor, namely Mr Patrick.

<u>Loss and Damage</u>

178 As a consequence of the above, the Company has suffered loss and damage, including but not limited to:

178.1 Its Partnership Interest in the Fund.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

178.2 The costs and expenses incurred in relation to the CDM Assignment, the Share Issuance, the Letter Agreement and the Redemption (including all legal or other advice taken in relation thereto).

178.3 Excessive Directors' fees or remuneration or emoluments or benefits.

178.4 Improper expenses (if any).

178.5 The lost opportunity cost of the Fund and its subsidiaries deploying such funds (as set out in (1), (2) and (3) above) elsewhere, and the consequent fall in value of the Company's interest in the Fund.

178.6 The legal and liquidation costs of investigating the conspiracy, and the costs of these proceedings.

**RESERVATION OF POSITION**

179 The Company and the JOLs (who direct the Company in bringing these proceedings) fully reserve their position to apply to amend this claim in any way or to bring fresh or further proceedings against any of the Defendants (whether in the Cayman Islands or elsewhere) in the name of the Company or in the name of the JOLs.

**OTHER**

180 CLO Holdco is joined as a party to these proceedings in order that, as the main subsidiary of the Fund, it may abide by any Order that the Court may make.

**INTEREST**

181 The Company claims interest pursuant to section 34 of the *Judicature Act (2021 Revision)* and the *Judgment Debts (Rates of Interest) Rules (2021 Revision)*, alternatively pursuant to the

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

Court's equitable jurisdiction, compounded in equity at quarterly rests, alternately at common law, for such period and at such rate as the Court thinks just.

**PRAYER FOR RELIEF**

In the premises, the Company claims:

(1) Damages or equitable compensation.

(2) Orders for restitution or disgorgement.

(3) Orders for the restoration of property to the Company.

(4) Interlocutory or final injunctions as may be necessary or appropriate.

(5) Orders for the appointment of a Receiver or Receivers, as may be necessary or appropriate.

(6) Orders for the provision of documents or information at an early interlocutory stage.

(7) Orders for the cancellation of the Share Issuance, as appropriate.

(8) Rectification of the register of the Company, as appropriate.

(9) Orders pursuant to s.99 of the Companies Act (as revised), as appropriate.

(10) An Account of the fees or remuneration or emoluments or benefits or expenses paid or claimed by Mr Patrick and Mr Murphy and each of them since March 2021.

(11) An Account of all expenses incurred by the Company or the Fund or any of the Fund's subsidiaries or investments since March 2021.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

(12) All other Accounts, including an Account of Profits, or Inquiries as may be necessary or appropriate; and further Orders to give effect to the outcome of such Accounts or Inquiries, including Orders for payment of sums to the Company.

(13) All such declarations as may be necessary or appropriate, including to give effect to the continuing interest of the Company in the Fund on the basis of a proprietary interest, trust, constructive trust or otherwise.

(14) All such other relief relating to the Impugned Transactions as may be necessary or appropriate.

(15) Interest as above.

(16) Further or other relief.

(17) Costs.

DATED this 15th day of July 2025

Maples and Calder (Cayman) LLP

---

**Maples and Calder (Cayman) LLP**

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**DIRECTIONS FOR ACKNOWLEDGMENT OF SERVICE**

**OF WRIT OF SUMMONS**

182 The accompanying form of Acknowledgment of Service should be completed by an Attorney acting on behalf of the Defendant or by the Defendant if acting in person.

After completion it must be delivered or sent by post to the Law Courts, PO Box 495G, George Town, Grand Cayman, KY1-1106, Cayman Islands.

183 A Defendant who states in the Defendant's Acknowledgment of Service that the Defendant intends to contest the proceedings must also serve a Defence on the Attorney for the Plaintiff (or on the Plaintiff if acting in person).

If a Statement of Claim is indorsed on the Writ (i.e. the words "Statement of Claim" appear on the top of page 2), the Defence must be served within 14 days after the time for acknowledging service of the Writ, unless in the meantime a summons for judgment is served on the Defendant.

If the Statement of Claim is not indorsed on the Writ, the Defence need not be served until 14 days after a Statement of Claim has been served on the Defendant.

If the Defendant fails to serve his Defence within the appropriate time, the Plaintiffs may enter judgment against the Defendant without further notice.

184 A Stay of Execution against the Defendant's goods may be applied for where the Defendant is unable to pay the money for which any judgment is entered. If a Defendant to an action for a debt or liquidated demand (i.e. a fixed sum) who does not intend to contest the proceedings

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiffs, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

states, in answer to Question 3 in the Acknowledgment of Service, that the Defendant intends to apply for a stay, execution will be stayed for 14 days after that Defendant's Acknowledgment, but the Defendant must, within that time, issue a Summons for a stay of execution, supported by an affidavit of the Defendant's means. The affidavit should state any offer which the Defendant desires to make for payment of the money by instalments or otherwise.

**See overleaf for Notes for Guidance**

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**Notes for Guidance**

1 Each Defendant (if there are more than one) is required to complete an Acknowledgment of Service and return it to the Courts Office.

2 For the purpose of calculating the period of 14 days for acknowledging service, a writ served on the Defendant personally is treated as having been served on the day it was delivered to the Defendant.

3 Where the Defendant is sued in a name different from the Defendant's own, the form must be completed by the Defendant with the addition in paragraph 1 of the words "sued as (the name stated on the Writ of Summons)".

4 Where the Defendant is a FIRM and an attorney is not instructed, the form must be completed by a PARTNER by name, with the addition in paragraph 1 of the description "Partner in the firm of (.......................................)" after that Partner's name.

5 Where the Defendant is sued as an individual TRADING IN A NAME OTHER THAN THAT PERSON'S OWN, the form must be completed by the Defendant with the addition in paragraph 1 of the description "trading as (...........................)" after that Defendant's name.

6 Where the Defendant is a LIMITED COMPANY the form must be completed by an Attorney or by someone authorised to act on behalf of the Company, but the Company can take no further step in the proceedings without an Attorney acting on its behalf.

7 Where the Defendant is a MINOR or a MENTAL PATIENT, the form must be completed by an Attorney acting for a guardian *ad litem*.

8 A Defendant acting in person may obtain help in completing the form at the Courts Office.

FILED by Maples and Calder (Cayman) LLP, attorneys for the Plaintiff, whose address for service is PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. (Ref: CJM/JRN/TQR/858403.000001/83559387)

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD OF 2025 ( )**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

**ACKNOWLEDGMENT OF SERVICE**

**OF WRIT OF SUMMONS**

If you intend to instruct an Attorney to act for you, give that Attorney this form IMMEDIATELY.

Important. Read the accompanying directions and notes for guidance carefully before completing this form. If any information required is omitted or given wrongly, THIS FORM MAY HAVE TO BE RETURNED.

Delay may result in judgment being entered against a Defendant whereby he may have to pay the costs of applying to set it aside.

1. State the full name of the Defendant by whom or on whose behalf the service of the Writ is being acknowledged.

2. State whether the Defendant intends to contest the proceedings (tick appropriate box)

☐ yes ☐ no

3. If the claim against the Defendant is for a debt or liquidated demand, AND the Defendant does not intend to contest the proceedings, state if the Defendant intends to apply for a stay of execution against any judgment entered by the Plaintiff (tick box)

☐yes ☐ no

Service of the Writ is acknowledged accordingly

(Signed).....................................................

Attorney for

**Notes on address for service**

Attorney: where the Defendant is represented by an attorney, state the attorney's place of business in the Cayman Islands. A Defendant may not act by a foreign attorney.

Defendant in person: where the Defendant is acting in person, the Defendant must give the Defendant's post office box number and the physical address of the Defendant's residence or, if the Defendant does not reside in the Cayman Islands, the Defendant must give an address in Grand Cayman where communications for the Defendant should be sent. In the case of a limited company, "residence" means its registered or principal office.

Indorsement by plaintiff's Attorney (or by plaintiff if suing in person) of that Plaintiff's name, address and reference, if any, in the box below.

Maples and Calder (Cayman) LLP
PO Box 309 Ugland House
Grand Cayman KY1-1104

Cayman Islands: CJM/JRN/LRA/TQR/858403-01

Indorsement by defendant's Attorney (or by defendant if suing in person) of that defendant's name, address and reference, if any, in the box below.

**EXHIBIT 9**

Grant Thornton

**Grant Thornton Specialist Services (Cayman) Limited**
2nd floor Century Yard,
Cricket Square,
PO Box 1044,
Grand Cayman, KY1-1102
Cayman Islands

T +1 (345) 949 8588
F +1 (345) 949 7120

# CHARITABLE DAF HOLDCO, LTD.

# (THE "COMPANY")

## GUIDANCE NOTES FOR MEMBERS OF THE LIQUIDATION COMMITTEE

Chartered Accountants. Grant Thornton Specialist Services (Cayman) Limited is a member firm of Grant Thornton International Ltd (GTIL) and a subsidiary of Grant Thornton UK LLP. GTIL and the member firms are not a worldwide partnership. Services are delivered by the member firms. GTIL and its member firms are not agents of, and do not obligate, one another and are not liable for one another's acts or omissions. Please see grantthornton.ky for further details. Subject to local regulations.

# CONTENTS

Introduction…………………………………………………………………………………..Page 3

Establishment of the Liquidation Committee…………………………………………………..Page 5

The JOLs' obligations to the Liquidation Committee……………………………………………Page 6

Proceedings of the Liquidation Committee………………………………………………………Page 6

Legal advice and counsel to the Liquidation Committee…………………………………..…Page 8

Expenses of Committee Members……………………………………………………………..….Page 8

Resignation and termination of membership…………………………………………………..Page 8

# INTRODUCTION

This guide has been produced to provide the Company's Liquidation Committee (the "**Committee**") with information in relation to:

- the duties and functions of the Committee;
- the rights of members of the Committee; and
- the procedural rules relating to Committee business.

The rules governing the procedures in relation to Liquidation Committees in the Cayman Islands is contained within Order 9 of the Companies Winding Up Rules (As Amended) (the "**Rules**").

### Liquidation

The term liquidation (also referred to as 'winding up') refers to a formal insolvency procedure whereby the Company's affairs are wound up. This entails realising the Company's assets and distributing such proceeds in a set order of priority. The Committee is kept apprised of the position regarding the realisation of the Company's assets via the Joint Official Liquidators' ("**JOLs**") reports to creditors or via regular written and verbal updates to the Committee.

### JOLs

The JOLs are appointed by the Court to administer the winding up and are officers of the Court. The Company's duly appointed JOLs are Margot MacInnis and Sandipan Bhowmik, both of Grant Thornton Specialist Services (Cayman) Ltd, 2nd floor, Century Yard, Cricket Square, PO Box 1044 Grand Cayman, KY1-1102, Cayman Islands.

### Liquidation Committee

The Committee in a liquidation is known as the 'Liquidation Committee'.

Prior to the establishment of the Committee, the JOLs will summarily determine whether in their opinion the company should be regarded as insolvent, solvent or of doubtful solvency. Their determination will be certified in the Companies Winding up Rules Form 13 which is filed in Court within 28 days of the date that the winding up Order is made. The Company has been certified as solvent by the JOLs.

The determination made by the JOLs defines how the membership of the Liquidation Committee should be comprised.

Insolvent

Where a company has been determined to be insolvent, the Liquidation Committee shall comprise between 3 and 5 creditors.

Doubtful solvency

Where a company has been determined to be of doubtful solvency, the Liquidation Committee shall comprise between 3 and 6 members, a majority of which shall be creditors and at least 1 of whom shall be a contributory.

Solvent

Where a company has been determined to be solvent, the Liquidation Committee shall comprise between 3 and 5 contributories.

**Reconstitution of the Committee**

If, during the course of the liquidation, the JOLs change their certification of the Company's solvency or insolvency determination (as the case may be), they shall take the following steps to reconstitute the Committee:

a) If the Company is certified to be solvent, any creditor members of the Committee shall automatically cease to be members and the JOLs shall convene a meeting of contributories for the purpose of electing new members from amongst the Company's contributories.

b) If the Company is certified to be insolvent, any contributory members of the Committee shall automatically cease to be members and the JOLs shall convene a meeting of creditors for the purpose of electing new members from amongst the Company's creditors.

c) If the Company is certified to be of doubtful solvency, any member of the Committee shall automatically cease to be members and the JOLs shall convene a meeting of creditors and contributories for the purpose of electing new members amongst both the Company's creditors and contributories.

Nothing in the Rule shall prevent the JOLs from convening a meeting in anticipation of changing their certification of the Company's insolvency or solvency (as the case may be).

**The Committee's responsibilities**

A Sounding Board

It should be noted that persons acting on the Committee are generally regarded as acting in the general interests of the class (creditors or contributories) that they are elected from. Their purpose is to act as a 'sounding board' and to give some guidance and direction on behalf of their class interest to the JOLs. The liquidation committee is not a forum for creditors to voice their disputes. As far as possible, members should disassociate themselves from their personal interests and if they believe they have a conflict in any particular decision, they should declare that immediately to the JOLs and any other Committee members. For example, conflicts of interest may occur when liquidation committee members are associated with, or connected to, litigation involving other creditors, the Company or which is commenced by the JOLs.

Views of the Committee

Whilst the JOLs would normally act in line with the decisions of the Committee, the duty to conduct the liquidation is theirs alone and it is possible that in exceptional circumstances, the JOLs may disregard the views of the Committee. A liquidation committee can guide but cannot compel an office holder in relation to the conduct of the insolvency proceeding where it is considered by an office holder not to be in the best interests of the Company to do so.

Remuneration

In addition, it is also the responsibility of the Committee to negotiate with the JOLs and agree the basis upon which the JOLs and their firms will be remunerated. Whilst it is for the Court to ultimately sanction the JOLs' fees, the JOLs may not make an application to the Court for approval of their remuneration without first seeking the Committee's approval of the basis and amount of their remuneration for which they intend to seek the Court's approval. The JOLs intend to send remuneration summaries to

the Committee on a monthly basis beginning from the end of July 2025, and seek approval of their fees at a meeting on a quarterly basis.

# ESTABLISHMENT OF THE LIQUIDATION COMMITTEE

The Rules assert that unless the Court directs otherwise, a Liquidation Committee must be established in respect of every company being wound up by the Court (i.e. every Official Liquidation).

Such a Liquidation Committee must be established at the first meeting of creditors (and/or meeting of contributories, as the case may be) and cannot act until the JOLs have issued a certificate of its due constitution. Corporate members must be represented by an individual who is duly authorised in writing.

Any creditor of the company (other than one whose debt is fully secured) is eligible to be a member of the Liquidation Committee, so long as:

- he has lodged a proof of his debt; and
- his proof has neither been wholly disallowed for voting purposes nor wholly rejected for the purposes of distribution or dividend.

No person shall on the same committee:

- be a member as both a creditor and a contributory;
- act at one and the same time as representative of more than one Committee member; or
- act both as member of the committee and representative of another Committee member.

If a corporate member of the Committee is put into liquidation under Cayman Islands' law or made the subject of a bankruptcy or reorganisation proceeding under the law of a foreign country, it shall continue to be a member of the Committee so long as the person appointed to deal with the affairs of that company consents to act as its representative.

### The Company's Liquidation Committee

The Company's Liquidation Committee was elected at the first meeting of contributories held on 9 July 2025, and is currently comprised of the following contributory members:

1. Julie Diaz, representing Highland Dallas Foundation, Inc., 3000 Pegasus Park Drive #930, Dallas, TX 75247 (jdiaz@dallasfoundation.org)

2. Deborah Wilkerson, representing Highland Kansas City Foundation, Inc.,1055 Broadway Blvd. #130, Kansas City, MO 64105 (wilkerson@growyourgiving.org)

3. Jacqueline M. Carrera, representing Highland Santa Barbara Foundation, Inc., 1111 Chapala Street, Santa Barbara, CA 93101 (jcarrera@sbfoundation.org)

4. Rose Bradshaw, representing North Texas Community Foundation, 7777 Main Street, Suite 2850, Fort Worth, TX 76102 (rbradshaw@northtexascf.org)

5. Jennier Colegate, representing DFW Charitable Foundation c/o Baker & Partners (Cayman) Limited, P.O. Box, 636, Buckingham Square, 720 West Bay Road, Cayman Islands, KY1-1107 (jennifercolegate@bakerandpartners.com)

The Liquidation Committee came into being and authorized to act from 21 July 2025, the date of the filing of the official liquidator's certificate with the Cayman Court.

# THE JOLS' OBLIGATIONS TO THE LIQUIDATION COMMITTEE

### Communication

The JOLs shall communicate with the Committee by whatever means is agreed between them. This may be in writing, telephone, fax, email or via a website.

### Reporting

The JOLs have a duty to report to the members of the Committee on all such matters as appear to them to be, or such matters as the members have indicated to the JOLs as being, of concern to them with respect to the winding up. Accordingly, the members of the Committee are able to input into all major decisions impacting the liquidation.

The JOLs need not comply with a request for information where it appears that:

- the request is frivolous or unreasonable;
- the cost of providing such information would be excessive with regard to the importance of the information; or
- there are insufficient assets to enable the JOLs to comply.

The JOLs shall provide each member of the Committee with a written report and accounts and convene a first meeting within 3 months of the Committee's establishment.

### Confidentiality

As a result of a member's participation in a Committee, the member will receive certain confidential information to assist in the Committee proceedings. Accordingly, members may be required to enter into appropriate non-disclosure agreements restricting the use of information the member receives during the course of the proceedings.

# PROCEEDINGS OF THE LIQUIDATION COMMITTEE

### Further meetings

After the first meeting has been convened and held, the JOLs shall convene further meetings:

- on such dates or at such intervals as may be resolved by the Committee;
- if so requested in writing by any two members of the Committee; and
- in any event, not less than once every 6 months.

**Form of meetings and notice periods**

A meeting may take the form of:

- a physical meeting at the JOLs' office, or such other place as may be resolved upon by the Committee, in which case 10 business days' notice is required (and any member who cannot attend in person must be allowed to participate by telephone); or
- a telephone conference call in which case the JOLs must give at least 5 business days' notice of the meeting.

**Attendance/Quorum**

One of the JOLs or a duly authorised and suitably experienced representative employed by the JOLs' firm shall attend every meeting of the Committee.

In order to be validly held, the quorum for a meeting shall be one of the JOLs (or theirrepresentative) and at least 2 Committee members.

The chairman of the meeting is normally one of the JOLs (or theirrepresentative), however the members may resolve that one of them should act as chairman.

**Agenda**

The JOLs shall prepare an agenda for each meeting which shall include:

- all the matters which the JOLs intend to put before the meeting;
- any matter which a Committee member intends to put before the meeting; and
- any resolutions which the JOLs or any Committee member intends to put to a vote.

**Voting/approval of resolutions**

Each member shall have one vote and a resolution is passed when a majority of members present or represented (either in person or by telephone) have voted in favour of it. If the Committee comprises both creditors and contributories, a resolution is passed only when a majority of the creditor members and a majority of contributory members present or represented (either in person or by telephone) have voted in favour of it.

Whenever the JOLs consider that it would be impractical or unnecessary to convene a meeting of the Committee for the purpose of considering any resolution, they may send a copy of it to each member, inviting them to deal with it as a written resolution, and it shall be treated as passed if every member of the Committee signs it within such period or by such deadline as may be specified by the JOLs.

**Minutes of the meeting**

The JOLs are responsible for taking minutes of the meeting, a draft of which shall be prepared and circulated to members within 14 days after the meeting.

# LEGAL ADVICE AND COUNSEL TO THE LIQUIDATION COMMITTEE

**Attorney/Counsel**

The Committee may resolve to appoint an attorney to give legal advice to the Committee, either generally or in respect of a specific issue arising in the liquidation.

**Legal fees and expenses**

The legal fees and expenses in relation to such advice shall be paid out of the assets of the Company as an expense of the liquidation. If the JOLs or a Committee member decides that the amount to be paid is excessive, they may require that such fees and expenses be taxed on an indemnity basis. Conversely, if the amount offered by the JOLs is considered inadequate, the attorney may require that his bill of costs be taxed. The JOLs have no authority to pay any amount in excess of that stated in any costs certificate.

# EXPENSES AND COMMITTEE MEMBERS

Committee members are not entitled to remuneration, however, travelling and/or telephone charges reasonably and properly incurred by Committee members or their representatives in attending meetings of the Committee shall be reimbursed by the JOLs out of the assets of the company. Other expenses incurred by members may be reimbursed but only with the prior approval of the JOLs and pursuant to a resolution of the Committee.

# RESIGNATION AND TERMINATION OF MEMBERSHIP

**Resignation**

A Committee member may resign from the Committee by delivering written notice to the JOLs by emailing: CDAF.Core@uk.gt.com.

**Termination**

A creditor's membership of the Committee is automatically terminated if:

- his proof of debt has been wholly rejected;
- his claim has been paid in full, or;
- he (or his representative) fails to attend 3 successive Committee meetings either in person or by telephone.

A contributory's membership of the Committee is automatically terminated if:

- he ceases to be a registered member of the Company; or
- the custodian or clearing house withdraws the certificate issued; or
- he (or his representative) fails to attend 3 successive Committee meetings either in person or by telephone.

### Removal

The Committee may resolve to remove a member by passing a resolution at a Committee meeting, provided that the member in question has been given at least 14 days prior notice. Either the JOLs or a Committee member may propose a removal resolution. It is not necessary to give any reasons for proposing a removal resolution, nor shall the Committee or the JOLs be required to give the former member any reasons for passing a removal resolution.

**Note: The above is a summary of the provisions for Liquidation Committees in Order 9 Companies Winding Up Rules (As Amended) in Cayman law, and is intended for guidance purposes only. It should not be regarded as definitive law or advice and if any creditor or member has any concerns about acting as a Committee member he or she should take his own independent legal advice.**

**EXHIBIT 10**

Digitally signed by Advance Performance Exponents Inc
Date: 2025.06.04 16:17:16 -05:00
Reason: Apex Certified
Location: Apex



**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO.: FSD 116 of 2025 (JAJ)**

**IN THE MATTER OF SECTION 110(3) OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

---

**FIRST AFFIDAVIT OF MARK ERIC PATRICK**

---

I, **MARK ERIC PATRICK**, of 6716 Glenhurst Drive, Dallas, Texas, United Sates of America, 75254, do say as follows:

1. I am a registered director, president and sole member of DFW Charitable Foundation, a Delaware 501(c)(3) nonprofit corporation (**DFW**). DFW is the majority Participating Shareholder of Charitable DAF Holdco, Ltd. (**Holdco** or **Company**) of which I am both a director and the sole Management Shareholder. The remaining Participating Shareholders of Holdco are Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., Highland Kansas City Foundation, Inc., and HCMLP Charitable Fund (collectively, **Highland Foundations** and also referred to as the **Supporting Organisations**).

2. In addition, I am the sole director of CDH GP Ltd. (**GP**), a Cayman Islands limited company incorporated in or around 7 February 2024 which is the general partner of Charitable DAF Fund LP (**DAF**).

3. This affidavit is provided pursuant to the Orders of Justice Asif KC handed down at the directions hearing on 23 May 2025 (**Directions Order**) made with respect to an

application of the joint official liquidators (**JOLs**) of Holdco issued by Summons dated 22 May 2025 (**JOLs Summons**), and amended as of 30 May 2025 seeking sanction from the Court for the engagement of Cayman attorneys, Cayman conflict counsel and US legal counsel (**Application**).

4. I am duly authorized to provide this affidavit for and on behalf of DFW to:

   (a) Oppose the engagement of Johnstone Law as Cayman Islands attorneys to the JOLs on the basis that Johnstone Law is subject to a conflict of interest;

   (b) Address the proposed appointment of Maples (**Maples**) as Cayman Islands conflict counsel to the JOLs; and

   (c) Oppose the engagement of US legal counsel pending determination of the Holdco estate, as addressed in section 60 herein.

5. In this affidavit I refer to the supervision hearing on 6 May 2025 (**Supervision Hearing**) at which this Honourable Court brought the voluntary liquidation of Holdco under its supervision on uncontested basis and refer to the order appointing the JOLs on 6 May 2025 as the **Appointment Order**.

6. The contents of this affidavit are, save where stated otherwise, within my own knowledge and are true. Where the contents of this statement are not within my own knowledge, they are true to the best of my knowledge and belief and I have indicated the source of my information. In making this affidavit I do not waive legal professional privilege in respect of any documents, information or advice referred to herein and no such waiver shall be implied.

7. There is now produced and shown to me a paginated bundle of documents marked "**MP1**". References in this affidavit are to pages in MP1 are in the form [**MP1/page number**]. The majority of the documents comprised in MP1 are materials that I and Mr Paul Murphy requested that our US attorneys compiled and made available in a data room to the JOLs following their appointment. As such, much of the material referred to in this affidavit is already and has been available since around

9 May 2025 to the JOLs. To illustrate this fact, I exhibit an index to the documents in the data room that was made available to the JOLs (**MP1/ page 1 - 3**).

8. I respond in this affidavit to the Second and Third Affidavits of Ms MacInnes dated 13 and 26 May 2025 respectively (**MacInnes 2** and **MacInnes 3** respectively), that were filed by the JOLs in support of the Application which I have reviewed. I have also reviewed the unsworn, undated and unsealed affidavit of Mr Andrew Johnstone of Johnstone Law (**Johnstone 1**) which was served on Baker and Partners (Cayman) Limited (**Baker & Partners**) as legal counsel to DFW on 26 May 2025. To the extent that any assertion made in Johnstone 1, MacInnes 2 or 3 go unanswered in this my first affidavit in these proceedings, that should not be taken as my agreement, acceptance or acquiescence of the position asserted by Ms MacInnes or Mr Johnstone.

9. There will be matters in this affidavit which relate to certain decisions and actions Mr Murphy and I have taken as directors of Holdco. I have noted that certain critical remarks have been made by Johnstone Law about the fact that I have a played a central role in controlling and managing several entities within the charitable structure of which the Company previously formed part. These remarks are unfounded in circumstances where the DAF Structure and the entities within it have always operated through a single human agent. This was by design so that Mr Dondero was able to draw on the economies of having a single point of contact across the entire structure. My role was exactly the same as that occupied by my predecessor, Mr Grant Scott, however my approach was and remains to ensure that each entity's role in the DAF Structure was professionally managed.

10. In light of the foregoing insofar as this affidavit deals with matters relating to my role in managing Holdco with Mr Murphy as well as other entities within the structure that is because of the architecture of the structure itself.

11. In light of the wider context in which the position of DFW should be considered, I have reviewed the evidence prepared by Johnstone Law in connection with the winding up of Holdco and filed on behalf of the Highland Foundations namely the

First Affidavit of Mr James Dondero filed on 16 April 2025 (**Dondero 1**), the First Affidavit of Ms Julie Diaz (**Ms Diaz**) filed on 16 April 2025 (**Diaz 1**) and the Second Affidavit of Ms Diaz filed on 29 April 2025 (**Diaz 2**), which was relied on by the Highland Foundations for the purposes of the Supervision Hearing. On my review I note there are a number of mischaracterisations and inaccuracies in the evidence relied on by the Highland Foundations.

12. These create an inaccurate picture of DAF, the DAF Structure (as defined below) and Mr Dondero's dealings with the same. To ensure the facts are accurately before the Court on these matters, and where not otherwise addressed in the content of my affidavit, I include in Sections E and F below specific responses to the inaccuracies set out in Dondero 1 and Diaz 1. I realise that the purpose of the Application is not to resolve complex issues of law or fact. However, I believe it is critical for this Honourable Court to have an understanding of the relevant contextual issues, even if disputed, in order to determine both the question of whether the proposed engagement of Johnstone Law will at the very least undermine the appearance of neutrality in dealing with these issues.

13. Equally, the objection of DFW to the engagement by the JOLs of US legal counsel at this juncture requires the Court to appreciate the facts and circumstances which required Mr Murphy and I to implement the DAF Restructuring (defined at paragraph 18 below).

14. This affidavit proceeds as follows:

    (a) Objections to the JOLs' Summons

    (b) Professional background and dealings with Holdco / DAF

    (c) Function of Holdco and DAF Structure

    (d) DAF as alter ego of Mr Dondero

    (e) Responses to First Affidavit of Ms Diaz

    (f) Responses to First Affidavit of Mr Dondero

**A. OBJECTION TO JOLS' SUMMONS**

15. In summary, DFW:

(a) Opposes the engagement of Johnstone Law as Cayman Islands attorneys to the JOLs on the basis that Johnstone Law is subject to a conflict of interest.

(b) Does not object to the proposed appointment of Maples (**Maples**) as Cayman Islands conflict counsel to the JOLs, subject to the conflict committee of Maples confirming that on considering the ability of Maples to act for the JOLs they gave specific consideration to the prospect that Maples would need to review and opine on the issuance

(c) Opposes the engagement of US legal counsel pending determination of the Holdco estate, as addressed in section 60 below.

16. DFW objects to the appointment of Johnstone Law as Cayman Islands legal counsel to the JOLs. This opposition is based on Johnstone Law's immediately prior engagement by the Highland Foundations in seeking the just and equitable winding up of Holdco and the appointment of provisional liquidators, on the erroneous basis that the DAF Restructuring was a fraudulent scheme which resulted in assets in excess of US$250 million in value being misappropriated from the Company, to the detriment of the Highland Foundations. For the avoidance of doubt and as explained in Section C of my confirmatory affidavit, the Highland Foundations never had a traditional ownership economic interest in the DAF and its assets; they only had a right to discretionary dividends if and when paid.

17. The Highland Foundations are companies that are owned and controlled by Mr Dondero who is the President, Individual Member and Director of each of the Highland Foundations. The complaints and allegations made by the Highland

Foundations and the arguments advanced on their behalf by Johnstone Law ignore the real prospect that it is Holdco which may have causes of action against the Highland Foundations and/or Mr Dondero, for the reasons articulated below (see also Section D).

18. At the Supervision Hearing the Highland Foundations, through Johnstone Law characterised the following steps as a fraudulent scheme:

    (a) The allotment of 318 Participating Shares in Holdco to DFW on 7 February 2025 which constituted DFW the single majority Participating Shareholder of Holdco.

    (b) On 27 March 2025, redeeming Holdco's interest in CDMCFAD LLC.

    (c) On 2 April 2025, distributing the proceeds of the aforementioned redemption to the Highland Foundations in their capacity as Participating Shareholders.

19. I refer to these steps collectively as the **DAF Restructuring**.

20. I reject any suggestion that the DAF Restructuring was improper, inappropriate or fraudulent. As I explain in further detail below, the DAF Restructuring was necessary to protect the DAF and its charitable intent from the retaliatory actions that can be traced back to Mr Murphy's and my refusal to accept Mr Dondero's demands to use the DAF's assets to invest in several opportunities that were inappropriate, arguably unlawful and to his personal benefit. I also discuss Mr Dondero's attempts to influence me to transfer approximately US $1.5 million to an offshore firm owned by Mr Dondero to settle outstanding legal fees which were not related to the DAF at paragraph 116(a) below.

21. For the avoidance of doubt and without waiving legal privilege, the DAF Restructuring and each of the steps forming that transaction, was / were undertaken with the benefit of thorough and extensive legal, tax and financial advice from third-party professionals and for the principal purposes of: (i) ensuring the DAF structure continues to fulfill its charitable purpose of supporting

community-focused, non-profit foundations; and (ii) protecting DAF and the DAF Structure from being used by Mr Dondero or attacked by his creditors as his *alter ego*.

22. As a result of Mr Dondero's conduct, the Highland Foundations may not retain their non-profit status under the laws of the US. According to tax advice I sought for and on behalf of Holdco, the Highland Foundations were susceptible to being found as the *alter ego* of Mr Dondero or facilitating other claims against entities within the DAF Structure based on *alter ego* theories which are set out further at Section D, paragraph 78 onwards and paragraphs 145 onwards of this affidavit. Significantly, the Highland Foundations may also have liability as co-conspirators if Mr Dondero is found to have used them in a way which contravenes the US Internal Revenue Code (**IRC**). It was in recognition of this risk that Participating Shares were issued to DFW. As stated in the resolutions authorizing the issuance and allotment to DFW, this was necessary to ensure that DAF could continue to further its charitable mission where, upon advice, it seemed the Highland Foundations could not. I refer to the first affidavit of My Murphy and to Section V(ii) which addresses the DWF share issuance.

*(i)* *<u>Objections to Johnstone Law on the basis of a conflict of interest</u>*

23. The question of Johnstone Law's ability to advise the JOLs independently and impartially was a matter I instructed counsel for DFW to raise at the Supervision Hearing. While I had not opposed the making of a supervision order, nor found at that stage there was a need to object to the appointment of Ms MacInnes or Mr Bhowmik as JOLs, it was my firm belief that due to Mr Johnstone's prior engagement for the Highland Foundations he and his firm would not be sufficiently independent to act as legal counsel to the JOLs. My reasonable belief was founded on both my prior experience of how Mr Dondero conducts his arrangements and litigates aggressively (I refer the Court to the examples of such behaviour in Section D *DAF As Alter Ego of Dondero* (below) and to Section IV of Mr Murphy's affidavit); and on the allegations of fraud and misconduct which have been central to the

applications persuade by the Dondero controlled and managed Highland Foundations.

24. At the Supervision Hearing, and as is set out in the letter from Baker & Partners to the JOLs dated 14 May 2025 and exhibited at **MP1/ pages 4 – 7** (**14 May Letter**), the pleadings before the Court charcterised the DAF Restructuring as a *“fraudulent Scheme”* and that the former directors (myself and Mr Murphy) appeared to be *“implementing a calculated and ultimately fraudulent scheme to dissipate the Company’s assets to prevent thorough independent investigation”*.

25. The pleadings prepared by Johnstone Law characterise the Highland Foundations as *“victims of the apparent fraud”* and, with specific regard to the skeleton argument that Johnstone Law filed in support of the *ex parte* application for the appointment of provisional liquidators, Johnstone Law addressed the proposition that *“There is no hard evidence of fraud or defalcation”* by clearly refuting that suggestion as *“not true”* and that *“it will not take the Court long to see that Mr Patrick and Mr Murphy’s blocking tactics hide more nefarious conduct”* (see 14 May Letter at **MP1/ pages 4 - 7**).

26. Johnstone Law also prepared and filed Diaz 2 which was given in support of the Highland Foundations application for the voluntary liquidation of the Company to be brought under the supervision of the Grand Court. In this respect, the terms of relief and basis for the need for supervision was allegedly due to a *“cloud hanging over Mr Patrick and Mr Murphy, as directors of Holdco”* (**Diaz 2, para 15(b)**). Ms Diaz goes on to incorrectly described the Highland Foundations / Supporting Organisations as *“the owners of 100% of the economic interest in the Company”* and that the need for supervision of the Grand Court is primarily for a *“(a) proper investigation” “…(e) into the allegations of misconduct on the part of the management of the company”* (**Diaz 2, para 15.(a), (e)**). Ultimately and as I consider to be indicated by the terms of the **Diaz 2 (paragraph (f)**, the case advanced by Johnstone Law for the Highland Foundations envisaged and anticipated that transactions undertaken by Holdco would likely need to be set aside.

27. While I was not present at the Supervision Hearing I am informed by and understand that in accordance with my instructions, counsel for DFW foreshadowed the potential conflict of interest at the Supervision Hearing. After the DAF Restructuring, and subject any claims accruing to the Company, Holdco has no or de minimis assets. The central issue in the liquidation of Holdco is whether the DAF Restructuring was lawfully carried out by myself and Mr Murphy acting in the best interests of Holdco and exercising our powers as directors for a proper purpose. It simply cannot be the case that Mr Johnstone can review the DAF Restructuring impartially and with a fair-mind having already formed the view that that transaction amounted to a calculated and fraudulent scheme.

28. From my consideration of **Johnstone 1 (paragraphs 14,15 and 17)** I understand that:

(a) Mr Johnstone appeared as legal counsel to the Highland Foundations at the Supervision Hearing,

(b) After Justice Asif KC made the Supervision Order the engagement of Johnstone Law was terminated and at the same time the Highland Foundations consented to the engagement of Johnstone Law by the JOLs.

(c) I understand that the engagement with the JOLs is dated 7 May 2025. Having read MacInnes 2 I understand that the letter of engagement was executed by the JOLs on 13 May 2025 (see **MM2/ page 4**).

(d) Mr Johnstone asserts that he "*no longer [has] obligations to the SOs (save for my ongoing duties of confidentiality), and as former client, rather than current clients*" (**Johnstone 1, paragraph 39**) and that there is no "*suggestion that in my capacity as attorney to the SOs, I obtained confidential information that would make it unfair for me to know represent the JOLs*" (**Johnstone 1, paragraph 40**).

29. As is discussed in detail in Section IV of Mr Murphy's affidavit and Section D below, it was necessary for Mr Murphy and I to implement the DAF Restructuring so as to preserve the DAF assets and charitable standing of the DAF Structure. Given the potential civil and criminal consequences which may befall Holdco, DAF and its assets there is a real possibility that on investigation into the restructuring claims of Holdco are identified against the Highland Foundations and / or Mr Dondero.

30. I believe it is highly likely that Mr Johnstone holds confidential information relating to the operations of the Highland Foundations (being owned and controlled entities of Mr Dondero) that are highly relevant to the central issue in the liquidation, as presented by the Highland Foundations themselves.

31. It appears that the very real potential for Mr Johnstone and his firm's duty of confidentiality to the Highland Foundations as former clients, to conflict with the obligations to their current clients the JOLs has not been addressed in the discussions between Johnstone Law and the Highland Foundations; nor between Johnstone Law and the JOLs.

32. Significantly Mr Johnstone is *"happy to confirm I have never been instructed by James Dondero and/or JP Seville"*. This statement itself may refer to the specific terms of any engagement letters entered into by Mr Johnstone and/or his law firm, however, Johnstone Law has recently been engaged by the Highland Foundations who are under the ownership and control of Mr Dondero in his capacities as the individual member, president, and director of each, not to mention the influence he may wield by promising additional donations. Furthermore, Mr Dondero has put in evidence for and on behalf of the Highland Foundations in support of the petition to wind up Holdco and it was in that engagement and in part on the evidence of Mr Dondero that Mr Johnstone formed the view that *"it appeared on the evidence available that a fraud had been perpetrated"* (**Johnstone 1, paragraph 35**). Furthermore, as I refer to in paragraph 187 below, there is reason to be concerned that Johnstone Law has been engaged by entities likely to be controlled, owned or associated with Mr Dondero.

33. Insofar as the question of Johnstone Law / Mr Johnstone's independence is addressed in MacInnes 2, Ms MacInnes does not confirm that the JOLs have made independent enquiry or sought the views of legal counsel on the issue of conflict, save for relying on the view of Mr Johnstone.

34. **Johnstone 1, paragraph 41** notes that Mr Johnstone is *"surprised"* that the engagement of his law firm has elicited such opposition from DFW because it is usual for attorneys who have previously acted for the petitioners to take on the role of advising the liquidators. Mr Johnstone explains *"This has the advantage that the attorneys already have considerable understanding of the case, and so do not approach the task from a 'standing start', which saves time and costs"*. This point is also supported at **paragraph 11(a) of MacInnes 2** where Ms MacInnes states it to be her professional experience that liquidators frequently engage the firm of attorneys who acted for the petitioner upon their appointment, and the mere fact that a firm has previously acted for a petitioner does not of itself provide a basis for asserting that a firm lacks independence.

35. I do not accept this is correct in the context of liquidations arising from the breakdown of a shareholder relationship as is the case with Holdco. This evidence disregards the complex issues which arise in the context of this matter. I am informed by Cayman counsel and understand this issue will be addressed in submissions that while that general position as stated in Johnstone 1 and MacInnes 2 may be true where the winding up petition is premised on an undisputed debt, the position here is markedly different. There is a clear and contentious dispute brought by the Highland Foundations in the terms of the just and equitable petition that was filed against Holdco.

36. Insofar as MacInnes 2 asserts that the JOLs have concluded that Johnstone Law is independent and that the position of DFW in objecting to their appointment is without substance I note that:

(a) It is Mr Johnstone himself who has informed the JOLs that his prior engagement by the Highland Foundations and that his own law firm had

no conflict in acting. The JOLs do not appear to have made independent enquiry into the potential conflict nor taken independent advice on the point (**Paragraphs 11(b)-(d) of MacInnes 2**).

(b) Johnstone Law has also confirmed that they *"have no preconceptions before accepting an engagement by the JOLS, and are not subject to any external pressure or influence"* (**paragraph 11(c) MacInnes 2**). However, it remains the case as per Mr Johnstone's own evidence that he is of the view that a fraud has been perpetrated and *that "that does appear to be an obvious explanation for what has occurred, and because those were my instructions"* (**Johnstone 1, paragraph 35**). I do not accept that fraud was the *"obvious explanation"* let alone a reasonable one had Mr Johnstone considered whether any underlying factual basis was reasonably credible. He does not appear to have considered the extraordinary legacy of the very person behind the Highland Foundations or the person funding his engagement, here Mr Dondero.

37. In the circumstances I fail to see how it could be considered reasonable or fair-minded (as **Johnstone 1 s**uggests at **paragraph 42**) for Johnstone Law's engagement to be sanctioned.

38. I am further informed by the Cayman attorneys to DFW that during the Supervision Hearing, Mr Johnstone submitted to the Court that the submissions of Baker & Partners with regard to the terms of Order ought not to be given weight because DFW is controlled by a person subject to investigation – that person being myself - and suggested I would seek to limit the powers of the liquidators. I refute the negative assertions that have been cast on my character advanced by Johnstone Law in written argument, and further at the Supervision Hearing. Additionally, recognizing that there is an investigation which needs to be conducted into the DAF Restructuring and its propriety, the conclusory view of Mr Johnstone that DFW's views should not be given weight because of that investigation itself indicates a

position of partiality which DFW believes requires that the JOLs have the benefit of independent, unconnected legal counsel.

39. The engagement of Johnstone Law specifically was not a matter that was before the Court at the Supervision Hearing. I understand from legal counsel to DFW that it was submitted at the Supervision Hearing that the identity of Cayman Islands attorneys for the JOLs was not then known, and that Reed Smith were identified during the Supervision Hearing as US legal counsel.

40. However, the terms of the Draft Supervision Order provided to the Court on 6 May 2025 did seek sanction for the JOLs to engage attorneys. I exhibit at **MP1/ page 9 - 11** a copy of the original draft order that was circulated on 6 May. It was this general sanction to engage attorneys that was denied and for which this Honourable Court directed the JOLs to make a sanction application for the specific firms to be engaged and the terms on which that engagement would proceed. Neither Johnstone 1 nor MacInnes 2 or 3 address the non-disclosure of Johnstone Law as proposed Cayman counsel to the JOLs. However, in the absence of independent legal counsel being identified I understand that (i) Johnstone Law's engagement with the Highland Foundations terminated after Supervision Hearing and (ii) Johnstone Law had issued a letter of engagement dated 7 May 2025 to Grant Thornton. There is a necessary inference that at the time of the Supervision Hearing Johnstone Law had been selected to act as Cayman legal counsel to the JOLs.

41. The concerns of DFW have been further compounded by steps immediately taken by the JOLs following their appointment.

42. Firstly, the clear overreach of their powers under the Appointment Order, insofar as the JOLs have sought to exercise authority and jurisdiction over entities which are neither Holdco, nor entities that are owned or controlled by Holdco. In this regard I refer to correspondence issued by the JOLs to Skyview Group (**Skyview,** legally incorporated as Highgate Consulting Group, Inc. and doing business as Skyview Group) dated 9 May 2025, in which the JOLs purported to have authority to request books and records from Skyview not only of Holdco but also to its current and

former subsidiaries (**Skyview Notice**). In doing so the JOLs also sought to exercise their powers in the jurisdiction of the United States where, I am informed by legal counsel, the JOLs have no legal standing or authority. A copy of the notice and correspondence issued to Skyview is exhibited at **MP1/ page 12 - 18**.

43. These steps are value destructive to DAF and its direct and indirect subsidiaries (**DAF Structure**) insofar as the JOLs have caused banks and other service providers to the DAF and related entities to freeze the operative accounts of the DAF. As an example, email correspondence from Hancock Whitney is exhibited at **MP1/ page 19 - 26**. In turn, this prevents DAF from operating its business (i) making (and receiving payments on) investments and (ii) carrying out its charitable purpose and fulfilling obligations which DAF has assumed to support selected charities.

44. Second, on 12 May 2025 Baker & Partners issued a letter to the JOLs identifying the impropriety and overreach of the requests set out in the Skyview Notice. No response to that correspondence has been received. I exhibit at **MP1/ page 27 – 29** a copy of the correspondence issued to the JOLs in response to the Skyview Notice.

45. Following the Supervision Hearing Mr Doug Mancino, a leading US tax attorney whose CV is exhibited at **MP1/ page 30 - 41**, informed me that he had agreed to a meeting with the JOLs. That meeting took place virtually on 12 May 2025 (**12 May Meeting**). I understand from Mr Mancino that Mr Johnstone of Johnstone Law was present at the virtual meeting. Mr Mancino also informed me that he was not informed during the call who Mr Johnstone was or in what capacity he was attending, that Mr Johnstone had represented (or was representing) the Highland Foundations, or that the JOLs had purported to engage Mr Johnstone as their counsel pursuant to a letter of engagement dated 7 May 2025 (despite the court requiring the JOLs to seek court approval for the appointment of legal counsel). I understand there to be a factual dispute relating to the 12 May Meeting and that Mr Mancino will directly address the assertion made in **MacInnes 3 (paragraph 12)** that at that meeting Mr Macino was informed that Mr Johnstone attended in his capacity as the JOLs' attorney.

46. On 14 May 2025, Baker & Partners wrote to ask who Mr Johnstone acted for while attending the 12 May Meeting. That same letter outlined to the JOLs the concern of DFW which arose from the representations made during the course of these proceedings by Mr Johnstone (see **MP1/ page 4 - 7**). As the letter of 12 May 2025 to the JOLs makes clear, DFW has serious and justifiable concerns that where conduct which Mr Johnstone has described as a fraudulent scheme are the very actions that will inevitably be investigated and considered by the JOLs, there is not only the appearance of a conflict but a serious question over the ability of Johnstone Law to impartially advise the JOLs on matters concerning the legality and propriety of the DAF Restructuring.

47. This extends to the very real possibility that on an independent and thorough investigation into the DAF Restructuring, causes of action may have accrued to HoldCo against the Highland Foundations and potentially Mr Dondero. DFW's position will be deeply prejudiced if the JOLs are unable or unwilling to act or even unable or unwilling to consider acting against the Highland Foundations and Mr Dondero. The timing of Johnstone Law's termination as counsel for the Highland Foundations as of 6 May, and appointment by the JOLs pursuant to a letter of engagement dated 7 May, in circumstances where Johnstone Law had already made accusations of fraud makes it difficult, if not impossible, to believe that Johnstone Law can advise the JOLs with a view to ensuring they investigate the affairs of Holdco fairly and independently.

48. Following the 12 May Meeting and the correspondence that was issued by Baker & Partners for DFW and on behalf of the Management Shareholder and directors by Kobre & Kim issued on 14 May 2025 (see **MP1/ page 42 - 44**) Johnstone Law made the Letter Application seeking the sanction of their appointment as legal counsel to the JOLs, without first seeking the formal views of DFW. I do not know if the Highland Foundations who are also participating shareholders of Holdco were notified.

49. I am informed by my legal counsel, without waiving privilege, that the usual course in making a sanction application is for the stakeholders of the liquidation to be

consulted with, and for a hearing to be set down for that application to be heard, including the views of stakeholders. While I also understand that there may be circumstances in which it may be appropriate to seek to have a sanction application determined on the papers, the views of the stakeholders interested in the application should provide their consent to proceeding with an application without sanction. The fact that the Court properly directed that DFW and all relevant stakeholders be given notice of the application and a hearing set down only indicates that this sanction application was not one suitable to be determined on the papers.

50. I note at **paragraph 20 of Johnstone 1** that the application for sanction of Johnstone Law was initially *"made by letter to the Court dated 14 May 2025 (**Letter Application**)"*. At the time of swearing this affidavit I understand that a copy of the Letter Application has been requested from Johnstone Law but not yet provided to DFW. I refer the Court to **MP1/ page 49 - 47** being a letter from Baker & Partners dated 20 May 2025 (**20 May Letter**) relating to the sanction application made by the JOLs and making specific requests for *"copies of all correspondence between Johnstone Law and the Grand Court regarding the proposed sanction application"*.

51. I note that **Johnstone 1 (at paragraph 55)** outlines requests for documents and information that were made by Baker & Partners in the 20 May Letter but lists only 3 or the 4 categories that were requested. Johnstone 1 makes no reference to the request that was made by Cayman counsel for DFW for a copy of Johnstone Law's correspondence with the Court, which would necessarily include the Letter Application.

52. Significantly, if the concerns of myself and Mr Murphy regarding Mr Dondero's dealings with DAF are found on an independent investigation to have been well founded, there is a real prospect that Holdco would have actions against the Petitioners in respect of distributions that were made which did not actually comply with the charitable purpose for which the assets of DAF ought to have been deployed. Even in the absence of such causes of action, if my concerns about Mr Dondero, the Highland Foundations are vindicated through an independent

investigation, the JOLs will be required to reach adverse conclusions about Johnstone Law's former clients. Given Johnstone Law at the very least holds confidential information about those parties, it is reasonable to infer that Johnstone Law will be strongly predisposed (or have the appearance of being strongly predisposed) towards their former clients. Indeed, Johnstone Law has already characterised his former clients as the *"victims of fraud."* (**Supplementary Skeleton Argument, 28 April 2025, para, 17**).

53. Once again, this raises a justifiable concern that Johnstone Law is not in a position to act independently in advising the JOLs to commence proceedings against the former clients of Johnstone Law or take adverse positions against them. Given the pervasive nature of the required investigation into the history of the DAF Structure, its connection with Mr Dondero and indeed DAF Restructuring, I do not see how the issue can be cured by the appointment of Maples as *ad hoc* conflict lawyers.

54. As I explain in further detail below a serious underlying concern of DFW as well as a concern Mr Murphy and I have held as directors appointed by the Management Shareholder to exercise its entitlements and functions, is that Mr Dondero historically misused DAF, the DAF Structure, and its assets for his own personal U.S. tax advantages and gain and intends to leverage the liquidation of Holdco to ultimately wrongfully require the DAF Structure and its assets.

55. Furthermore, I understand from the evidence filed by the Highland Foundations that Mr Dondero is funding the JOLs' fees and is privately financing these proceedings including meeting the fees of the Highland Foundations. In circumstances where Johnstone Law has been remunerated by Mr Dondero and indeed where they appear to have acted with certain entities associated with him, this inevitably gives rise to the real prospect that without instructing independent counsel, Johnstone Law and by extension the JOLs may not be in a position to reach fair and impartial findings against Mr Dondero or indeed the Highland Foundations with respect to any investigations of misuse or attempted misuse of the DAF Structure. Such findings would almost certainly be contrary to the position adopted by Johnstone Law on behalf of the Highland Foundations (and ultimately Mr Dondero).

56. Mr Dondero is a serial litigant. Since 2007 he has been locked in substantial litigation with UBS and since 2019 has been pervasively involved in the now infamous "Highland Bankruptcy" Chapter 11 proceeding in Texas. Mr Dondero is currently exposed to a summary judgment determination from the Southern District of New York which may imminently result in an award against him in the amount of US$1.2 billion (as more fully discussed below in paragraph 153). I believe the prospect of such a significant adverse judgment against Mr Dondero provides ample reason for him to seek to have the DAF Restructuring unwound and seek to control – directly or indirectly – that process. In simple terms Mr Dondero may need access to significant liquidity in the short term.

*(ii) Engagement of Maples*

57. I note from the Amended Summons provided by Johnstone Law on 26 May that the JOLs now seek sanction for the appointment of Maples as conflict legal counsel to the JOLs. As noted in **MacInnes 3 (paragraph 19-24)**, Maples were previously retained by the Company to provide advice in connection with the power and ability of the directors of Holdco to issue and allot shares in Holdco to DFW.

58. Given the centrality of the DAF Restructuring and the DFW share issuance to the liquidation of Holdco, I was concerned that Maples would be in a position of conflict to the extent that Maples were instructed by the JOLs to assess or impunge the validity and propriety of the issuance of shares from Holdco to DFW. However, I also understand from both the terms of MacInnes 3 that Maples have cleared conflicts and do not regard the previous, advice provided to the Company as presenting a conflict of interest.

59. In the circumstances, I on behalf of DFW would not object to the engagement of Maples by the JOLs providing confirmation could be provided that the conflict committee had, on considering the engagement for the JOLs, specifically addressed the ability of Maples to advise on the validity and propriety of the share issuance to DFW by Holdco.

*(iii) No requirement for US Counsel at this stage*

60. DFW objects to the application for sanction by the JOLs to engage US counsel at this juncture. As is accepted by the JOLs, Holdco presently holds no assets in Cayman or anywhere else.

61. The issues that are raised by the Highland Foundations and which have been assumed by the JOLs, concern the validity and potential ability to unwind the DAF Restructuring.

62. In due course DFW intends to seek a declaration as to the validity of the DAF Restructuring from this Honorable Court and to make that application within the liquidation. Until such time as a determination has been made that would result in assets being conveyed to the Holdco estate, DFW objects to the sanction and engagement of US counsel for the reason that it is neither proportionate nor necessary.

**B. PROFESSIONAL BACKGROUND AND DEALINGS WITH HOLDCO /DAF**

63. I am a US tax attorney and have practiced as US tax counsel from 1998 until 2008. I hold a bachelors degree from the University of Miami Herbert Business School (BBA, Finance, Cum Laude); an LLM in Taxation from the New York University School of Law and am a Juris Doctor from the Boston University (Cum Laude).

64. For a significant part of my career through until October 2024 I have been employed by companies connected with or controlled by Mr Dondero. From January 2008 to February 2021 I was employed as Tax Counsel by Highland Capital Management, L.P. (**Highland**). During my employment with Highland, I provided tax consulting advice to Highland and engaged outside tax lawyers to provide legal advice to Highland relating to the management of its tax liabilities and the ability to make use of tax efficient structures.

65. Contrary to the assertion made by Mr Dondero (**Dondero 1, paragraph 17**) I have not and did not represent Mr Dondero as his personal tax counsel while employed at Highland or at any time thereafter. During this time, I held a license to practice

law but my role within Highland was as a tax professional and not as an attorney and I was assigned to the tax department, not the legal department. To the extent that Mr Dondero required tax or trust advice in respect of his assets, external tax counsel were hired to fulfil that role. It is well understood in the U.S. that attorneys who are employed by a company represent the company and not its officers or directors.

66. Highland was an entity formerly owned and controlled by Mr Dondero, which was later placed into Chapter 11 Bankruptcy in the United States (**Highland Bankruptcy**). It is my understanding that the bankruptcy of Highland in 2019 was precipitated by Highland incurring significant exposure in what has been characterised as vexatious and oppressive litigation which Mr Dondero was instrumental in prosecuting. In particular in 2019 it was expected that a judgment would be made against Highland in favour of certain of its investors in the amount of US$189.3m. Highland was not in a position to satisfy this judgment and Mr Dondero placed the Company into Chapter 11. Following the collapse of Highland, Mr Dondero set up a new investment manager under the name NexPoint. Skyview was formed to provide back-office services to NexPoint and its managed funds.

67. I was employed by Skyview from March 2021 to October 2024.

68. I note that Mr Dondero refers to many of the former back-office employees of Highland becoming employees of the newly formed Skyview (**Dondero 1, paragraph 7**), Mr Dondero does not accurately describe the business of Skyview. From my time employed by Skyview I understand that almost all the clients of Skyview are entities owned and controlled by Mr Dondero.

69. Further, the Chief Executive Officer and owner of Skyview is Mr Scott Ellington, a longtime business associate of Mr Dondero and former General Counsel of Highland. During my employment at Skyview it was well understood by those working there including myself, that Mr Dondero had actual control of Skyview. By way of example, the compensation determination for all of Mr Dondero's companies' employees is carried out in January-to February. During this time the

Head of Human Resources and a member of the Executive Board of Skyview would attend Mr Dondero's office at the Crescent where he would set the pay of every Skyview employee.

70. I provided tax advice to Skyview. In September 2021 my title was formally changed from "Tax Counsel" to "Managing Director, Tax". I requested this title change to make it objectively clear that I was not providing any legal services for Skyview, Mr Dondero, nor any of Mr Dondero's companies, which met no resistance from Skyview.

71. Contrary to the assertions made in **Diaz 1, para 25(b)**) and **Dondero 1, para 18**, at no point during my tenure at Skyview was I retained by Mr Dondero to advise in respect of his personal tax liability. As with my employment at Highland, external legal counsel was engaged to advise Mr Dondero in respect of his personal tax affairs and trusts. I submitted my resignation to Skyview by letter dated 2 October 2024, a copy of which I exhibit at **MP1/ page 48**. The significance of my resignation which I explain in further detail below has a direct correlation to the rapid deterioration of the ensuing interactions with the Highland Foundations.

72. During the course of my employment with Highland I, along with outside advisor Mr Douglas Mancino (**Mr Mancino**), was instrumental in the establishment of Holdco, DAF and the DAF Structure. Mr Mancino and I exchanged a series of letters exhibited at **MP1/ pages 49 – 52, 53 – 55, 56 – 58 and 59 - 61** commissioned a memorandum exhibited at **MP1/ page 62 - 66** and had in-depth discussions regarding the most advantageous structures, compliance implications, and outreach to potential recipients of the Participating Shares. This runs contrary to **paragraph 9 of Dondero 1**, where Mr Dondero over-states his involvement in establishing the DAF.

73. Contrary to the assertions made at **paragraphs 8 and 9 of Dondero 1**, Mr Dondero does not have the ability to use or influence the DAF to donate to charitable organizations. Furthermore, DAF entities are all for-profit entities and to the best of my knowledge and belief, Mr Dondero has never donated to.

74. At best, Mr Dondero is an indirect donor to DAF. Specifically, Mr Dondero donated assets to Highland Capital Management Partners Charitable Trust #2 ("**Trust #2**"), which was a charitable remainder trust and was required by law to donate all its assets to a charity by a certain date. My understanding is that a few years later, Trust #2 placed all its assets to an entity it owned called CLO HoldCo, Ltd. Trust #2 then contributed CLO HoldCo, Ltd. to Charitable DAF HoldCo, Ltd. in exchange for 300 participating shares in Charitable DAF HoldCo, Ltd. Trust #2 in turn gifted these 300 participating shares to the Highland Foundations. Mr Dondero's "donation" was in fact to Trust #2[1]. I am also aware that Mr Dondero or his trusts have made other donations to Highland Dallas Foundation from my work at Highland and Skyview.

**C. FUNCTION OF HOLDCO AND DAF STRUCTURE**

75. The DAF Structure was established in late October 2011 to provide a permanent capital offshore structure that would manage assets on a long-term basis, during which it would make discretionary distributions to the benefit of various charitable entities and their charitable endeavors. The structure was established for the purpose of reorganizing investment assets from Trust#2 and distributing such assets to non-profits when the trust expired per its term, and reducing the burden to pay US federal tax. It was never an investment fund.

76. In my experience these structures serve to mitigate the tax exposure of assets under management, while also permitting any donors of assets to have non-binding input on the investment of such donations and charitable contributions to charitable entities. It is important to stress that these arrangements, to avoid material tax liability and violations of criminal tax laws, must be conducted at arm's length and with strict adherence to the principle that the donor must totally relinquish dominion and control over the contributed assets.

[1] In 2011, Mr Dondero also owned and controlled Charitable DAF GP, LLC, a Delaware limited liability company, which was the General Partner of Charitable DAF Fund, LP and effectively had control over the DAF Structure (other than Charitable DAF HoldCo, Ltd.). Mr Dondero could not maintain control of the General Partner because, in order for his charitable deduction that he obtained when he donated assets to Trust #2 to remain legally valid, he had to cede dominion and control of the transferred assets.

77. From my background as a tax professional advisor I am aware of the importance of avoiding inferences of "dominion and control". These derive from the fact that under U.S. tax law, when someone donates to charity, they must forfeit "dominion and control" of the donated assets, meaning the donor must completely and irrevocably transfer ownership and control of the property to the charity. To qualify for a charitable deduction, the donor cannot reclaim the property or dictate how it is used, directly or indirectly (such as with the DAF Structure). This includes relinquishing any power to change the use or disposition of the donated assets.

78. Furthermore, for the donation to be tax-deductible, the donor must (i) intend to permanently give up control of the property, (ii) transfer legal title and control of the property, (iii) deliver the property, and (iv) ensure the charity accepts the donation. I exhibit at **MP1/ page 16 - 83** a memorandum of advice prepared by Corrington for Holdco addressing the issue of dominon and control of assets provided to charity (**Carrington Memo**).

79. The charitable distributions to DAF were to be made through the Highland Foundations as the Supporting Organisations of the DAF Structure. I know from my involvement in establishing the DAF Structure that Mr Dondero is the President, Director, and Individual Member of each Supporting Organisation and wields further influence as a purported donor to the Highland Foundations. If, for example, the IRS were to make a finding that Mr Dondero never intended to part with dominion and control over the "gifts" he made to DAF, then they would likely disallow the income and gift tax deductions that he has benefited from and impose civil penalties, as outline in the Carrington Memo (ref to page in exhibit).

80. The charitable distributions made would be from the DAF through Supporting Organisations exempt from federal taxation under Section 501(c)(3) of the US IRC providing the DAF structure was administered and managed independently of any donor (including Mr Dondero's in his capacity as an indirect donor through the charitable remainder trust). At the time Mr Dondero and I discussed the establishment of the DAF Structure, I informed Mr Dondero that the structure required the complete divestiture of assets and that the terms of the DAF and its

related entities could not provide Mr Dondero with any dominion or control over the structure or the distributions made by DAF.

81. For example, when I articulated to Mr Dondero that the investment income reported to each of the foundations which held the DAF was US $22,875,944 to Highland Dallas Foundation, Inc.; US $22,961,382 to Highland Santa Barbara Foundation, Inc.; and US $22,883,319 to Highland Kansas City Foundation, Inc., Mr Dondero's response was "*They don't think of that money as their own do they???*". In fact, the Highland Foundations as Participating Shareholders were only entitled to cash distributions, if and when made. Following my review of this correspondence I was concerned that Mr Dondero had evaluated the prospects of DAF to advance financing to his current and future projects in a way which may be contrary to Mr Dondero relinquishing dominion and control in respect of the DAF Structure. A copy of this email exchange is exhibited at **MP1/ page 84 - 85**.

82. In fact, the Carrington Memo at **MP1/ page 76** advised that there was a "*significantly heightened risk that the IRS could severely penalize and/or revoke the tax-exempt status of one of more*" of the Supporting Organisations which could in turn imperil the status and assets of the DAF, for the reasons which I explain below.

83. My concerns which arose at a later date (again, the justifications for which are articulated more fully below) were that should Mr Dondero attempt, through his control of the Highland Foundations, to exert dominion and control over the cash and property that he previously (indirectly) donated to DAF (and for which I understand he claimed personal charitable deductions for U.S. tax purposes) and the IRS were to make that determination, then the IRS would likely disallow the income and gift tax deductions that Mr Dondero took, and impose civil penalties, such as, a penalty on underpayments under Code Section 6662 and potentially the civil fraud penalty authorized by Code Section 6663, as referred to in the Carrington Memo (insert page ref from exhibit).

84. In addition and as mentioned above, I understand that significant penalties can be imposed on self-dealings between a private foundation (such as each of the

Highland Foundations) and a “disqualified person”. The term disqualified person” includes an officer, director, or trustee of a foundation. Given Mr Dondero’s involvement with the Highland Foundations, and further to the evidence which I give below, by late 2024 I harbored concerns that the IRS may consider Mr Dondero to be a “disqualified person” with respect to each and every Highland Foundation, which could expose each of those entities to revocation by the IRS of its tax-exempt status and possible criminal prosecution.

85. To the extent that the DAF’s assets could have been used in such a way, my further concern was that creditors of Mr Dondero could view the DAF as Mr Dondero’s financial alter ego under U.S. law. In tun that could expose DAF and its assets to creditor claims unrelated to the DAF Structure. Such claims could risk depleting the pool of assets held by DAF, which would result in depriving current and future charities from the benefit of those assets. I note that significant amounts of DAF’s liquid assets are held in the U.S. and whilst I understand (without waiving privilege) that concepts of alter ego are different under Cayman Islands law, that would not prevent attachment of DAF’s assets held in the U.S.

86. Quite simply, the assertions made on behalf of the Highland Foundations by the evidence of Ms Diaz show a fundamental misunderstanding of the corporate structure and charitable purpose of DAF. Primarily, the Highland Foundations assume that DAF was a “consolidated entity” when in fact the fundamental scheme of the corporate group intentionally, and necessarily, delineated between control of and economic interest in the DAF Structure.

87. In this regard, Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011 with registration number 263805 (see **MP1/ page 86**). Since its incorporation and until the DAF Restructuring in March 2025 (discussed below) Holdco was the Limited Partner of DAF through which it indirectly owned the entities in the DAF Structure. However, Holdco did not hold voting, control, or management rights in respect of DAF. Its sole purpose was to act as a conduit through which discretionary, charitable donations would pass.

88. DAF, an exempted Cayman Islands limited partnership was controlled and operated by its former general partner, Charitable DAF GP, LLC (**Original GP**) between October 2011 through to the Restructuring. From February 2024 DAF has been operated by the GP. The Original GP was arranged in Delaware and also registered in the Cayman Islands under Part IX of the Companies Act (as revised). The control of the Original GP and the Replacement GP are also explained below.

89. The characterization by the Highland Foundations through the evidence of Ms Diaz of DAF as a 'Fund' (**Diaz 1, paragraph 12**) is therefore misleading and liable to create confusion. DAF is not an investment fund but is a charitable vehicle and properly understood, DAF:

(a) Did not solicit capital from investors;

(b) Had / has no subscription agreements through which interests are taken up. Notably, the Highland Foundations did not "subscribe" to DAF in the way, I am informed by counsel (without waiving privilege), commonly used by investment funds in the Cayman Islands, but were granted Participating Shares in Holdco by way of a gift at the inception of the DAF Structure.

(c) Holdco as Limited Partner had restrictive rights in its participation and management of DAF, including restricted rights to information.

(d) Had no entitlement to make capital calls against the Supporting Organisations or indeed against Holdco;

(e) Does not have a registered investment advisor;

(f) There are no investment hurdles or reporting requirements;

(g) There are no marketing brochures, private placement memorandums or other materials relating to solicitation for investments;

(h) The economic substance filing lists business of Holdco; and

(i) There is no wind down date or term within which shareholders are entitled as of right to distributions.

90. Accordingly, to describe DAF as a fund, as the JOLs, Mr Johnstone, Mr Dondero and MS Diaz assert, is incorrect. Holdco was a passive holder and would receive cash distributions from time to time but purposefully did not enjoy any governance or fixed economic rights over the entities comprising the DAF Structure.

91. The constitutional documents of Holdco and DAF maintained the necessary distinction between the economic interest in the DAF Structure and control over the same. In the evidence of Ms Diaz the Highland Foundations incorrectly rely on the Amended and Restated Memorandum and Articles of Association of Holdco dated 19 January 2015 (**2015 Articles**) (**Diaz 1, paragraph 15**). The Articles have been amended and restated twice since the 2015 Articles both as of 24 January 2024 and again since 20 February 2025 (**2025 Articles**). It is the 2025 Articles which regulate the affairs of Holdco and are exhibited at **MP1/ page 87 - 123**.

92. Notwithstanding that the Holdco constitution has been amended, the provisions relating to the rights and interest of the shareholders of Holdco have not been modified. Holdco has issued both Participating Shares and Management Shares. The interests and rights conferred by these shares maintain a distinction between control of Holdco and an economic interest in Holdco.

93. Management Shares are *"voting, non-participating share in the capital of"* Holdco *"that shall be non-redeemable at the option of the holder but redeemable by"* Holdco. As stipulated in Art. 11 of the 2025 Articles, the Management Shares *"shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of"* Holdco. Notably, Management Shares *"confer no other right to participate in the profits or assets of"* Holdco.

94. In contrast Participating Shares, being those held by the Highland Foundations, are *"a non-voting, participating non-redeemable share in the capital of"* Holdco. Specifically, Participating Shares confer the right upon the Participating Shareholders to participate in the profits or assets of Holdco in accordance with

the terms of the 2025 Articles (**Art. 12, 2025 Articles**), which is subject to the sole discretion of the Directors of Holdco.

95. The distinction between Management and Participating Shareholder rights is evident throughout the 2025 Articles:

(a) it is for the Directors of Holdco to exercise their sole discretion to consider if a dividend ought to be paid to the Participating Shareholders, or whether the available funds ought to be set aside as a reserve. The Participating Shareholders have no ability to vote on whether a distribution would be made from Holdco (**Arts 102, 105, 2025 Articles**).

(b) Participating Shares do not confer the right to remove or appoint directors to Holdco. The right to appoint Directors to Holdco is reserved for the Management Shareholder and Directors, whereas the ability to remove Directors of Holdco is limited solely to the Management Shareholder (**Arts 64, 65, 69, 2025 Articles**).

(c) The Directors of Holdco have discretion to issue further shares in Holdco, and by the 2025 Articles the dilution of the Participating Shares *"shall not be deemed to be materially adversely varied or abrogated by [the]…issue of further Participating Shares"* (**Arts 7, 14, 2025 Articles**).

(d) Participating Shares do not confer a general right to inspect any account or book or document of Holdco, except in very limited circumstances being if such a right is granted by law or the Directors of Holdco otherwise authorize such inspection (**Art 111, 2025 Articles**).

96. At the time the DAF Structure was being established the limited nature of the Participating Shareholders' rights caused some charities who may have benefitted from the structure to reject the proposed gift of Participating Shares. I travelled and met with various charities, including the Greater Houston Community Foundation and Communities Foundation of Texas. These charities carried out extensive due diligence on the Participating Shares and ultimately rejected the gift. These

charities determined that the shares did not confer sufficient economic rights to qualify as a gift because they provided only discretionary dividends, carried no liquidation rights, and were susceptible to being diluted at any point.

97. In contrast, the Dallas Foundation, the Great Kansas City Community Foundation and the Santa Barbara Foundation also undertook extensive due diligence and, through the Highland Foundations, accepted the Participating Shares by way of a gift in full knowledge of the very limited rights conferred by these shares. Having regard to **paragraph 20(b) of Diaz 1**, it appears that the Highland Foundations are seeking to assert some form of fixed or proprietary economic interests in DAF which they knew were at best (i) discretionary; (ii) subject to dilution; and (iii) not controlling rights. The assertion of the Highland Foundations in these respects are refuted. The Highland Foundations were cognizant of these limitations when they accepted the gift of Participating Shares. For example, I recall meeting with Mary Jalonick (now-retired former president of The Dallas Foundation, which is supported by the Highland Dallas Foundation, Inc.), who understood the limitations. The current effort by the Supporting Organisations therefore subverts the intention, understanding and terms of the agreement of the parties at the time the Particiapating Shares were gifted by the Company.

98. The Highland Foundations, Ms Diaz and Mr Dondero were and/or should each have been well aware of the ability of Holdco to issue new Participating Shares. In July 2015, I understand that Mr Dondero had encouraged Grant Scott to cause Holdco to issue 5 Participating Shares to Community Foundation of North Texas (now known as North Texas Community Foundation) in exchange for US$.05. A copy of the correspondence admitting North Texas Community Foundation as a Participating Shareholder is attached at **MP1/ page 120 - 128**. I am aware that Mr Dondero was frustrated with (what he considered to be) the "woke", liberal, California-based Santa Barbara Foundation and their priorities, so Mr Dondero and Lane Britian requested that I find a replacement charity. At the time, I spoke with the El Paso Foundation and the Miami Foundation, who both rejected the gift of Participating Shares. North Texas Community Foundation was willing to accept a modest number of shares (5) to be held in a donor-advised fund account.

99. I explained to Mr Dondero in November 2014 that the Highland Foundations did not think of DAF's assets as their own and understood they were only entitled to discretionary cash distributions, if and when made. A copy of the email correspondence is exhibited at **MP1/ page 84 - 85**.

100. The operations of DAF are regulated by the Second Amended and Restated Exempted Limited Partnership Agreement of DAF, dated 11 March 2024 (**Amended LPA**). Again, the Highland Foundations rely on an outdated version of the governance document for the DAF. A copy of the Amended LPA is exhibited at **MP1/ page 129 - 146**.

**D. DAF AS ALTER EGO OF JAMES DONDERO**

101. From October 2011 until March 2021, Mr Scott was Managing Member and Sole Member of the Original GP and was the holder of the Management Shares issued in Holdco. As such Mr Scott was the control person over DAF and the related structure (**Control Person**). The function of the Control Person was and is to ensure DAF made independent investment decisions for the ultimate benefit of charitable beneficiaries and the charities they support. From my professional experience and expertise I understood that if the Control Person fails to act independently, the charitable and tax-exempt status of the supporting organisations would be compromised. The mere illusion of lack of independence could also expose DAF and its assets to adverse tax treatment and penalties from the Internal Revenue Service as well as creditors and other adverse parties if independence were not maintained.

102. Prior to 2021 Mr Scott and Mr Dondero were longstanding friends and acquaintances. I am aware from my associations with both Mr Scott and Mr Dondero that they were college roommates and that Mr Scott acted as Best Man at Mr Dondero's wedding with Rebecca (Becky) Dondero in 2005, which ended in divorce and extensive public litigation all the way to the Supreme Court of Texas. Mr Scott and Mr Dondero continued to be friends following the divorce litigation.

103. In or around March 2021 I approached Mr Scott to assume the role as Control Person of the DAF. This required me to take on the directorship of the Original GP and be registered as holder of the Management Shares issued by Holdco. I assumed the role of Control Person as of 24 March 2021. Therefore, the concept of their being a sole human agent in control of the DAF is one that has represented the status quo since its inception in 2011. The aspersions and innuendos cast by Johnstone Law on behalf of the Highland Foundations and more recently the JOLs are therefore inappropriate and are also consistent with their prevailing inaccurate view that DAF should be regarded as a "consolidated entity."

104. At this time I understood from my conversations with Mr Scott that he and Mr Dondero had suffered a falling out because Mr Scott refused to take a step at the request of Mr Dondero which would have caused him to breach his fiduciary duties to DAF.

105. It is my understanding and belief that Mr Scott's refusal to act at the direction of Mr Dondero angered him and that, as a result of Mr Scott's opposition to Mr Dondero's instructions, Mr Dondero wanted Mr Scott to resign. I exhibit an email from Mr Scott to John Kane on 30 January 2021 at **MP1/ page 147** which, contrary to the assertion made by Mr Dondero at **paragraph 20** of **Dondero 1** that Mr Scott informed him that he wished to resign in March 2021, Mr Dondero and Mr Scott reached a mutual agreement on a call on 30 January 2021 that Mr Scott would resign as a result of being at a "*cross-roads*" with Mr Dondero. In fact, Mr Dondero had stated to Mr Scott that *"The releases and non objection to the plan was all Seery cared about … accusations of non independence was tweaking and always alleged against all trustees, very hard to prove … not a real threat but Seery got a lot for it, look what you signed*". Mr Scott is not prepared to provide me with a copy of the unredacted email due to privilege but has intimated that he would be prepared to give evidence in these proceedings. My understanding is that Mr Dondero did not have the power to remove Mr Scott from his position, but he nonetheless encouraged Mr Scott to resign because he was displeased that Mr Scott had done something to benefit Seery as outlined above (the Highland Capital Management, L.P. chief restructuring officer after Mr Dondero was ousted from Highland Capital Management).

106. The appointment and subsequent resignation of Mr Scott as described by Mr Dondero in **paragraphs 14 and 20-21** of **Dondero 1** is misleading. Contrary to the impression conveyed at **paragraph 14, Dondero 1** while Mr Dondero may have known and regarded Mr Scott for many years as a person of *"great integrity"* Mr Dondero did not select and nor could he select the Control Person of the DAF. To have such a level of decision-making in respect of the DAF Structure would have compromised the charitable standing and purpose of the structure from the outset.

107. At **paragraphs 20-21** of **Dondero 1**, Mr Dondero deposes that Mr Scott volunteered his resignation due to the fact that he was ill-equipped to handle various disputes which had arisen in connection with the Highland Bankruptcy proceedings on foot in the United States. Mr Dondero further and wrongly deposes to the effect that he was consulted on the transfer of Control Person from Mr Scott to myself, and that he was *"happy for Mr Scott to pass the Control Position"* to me.

108. For the avoidance of doubt, Mr Dondero was not consulted regarding my assumption as Control Person. This was a matter communicated by email between Mr Scott and myself. Mr Dondero learnt that I had been appointed as the Control Person on or after the relevant corporate transfers as of 25 March 2021. Once again, the impression wrongly conveyed by Mr Dondero is that the DAF and DAF Structure are subject to or under his control.

109. Mr Dondero's account of how I came to act as the Control Person in these proceedings directly contradicts testimony he gave under oath on June 1, 2021. In that testimony Mr Dondero testified to the fact that I had replaced Mr Scott a month after it happened and Mr Dondero did not know beforehand (see extracts from Mr Dondero's deposition dated 1 June 2021 at **MP1/ page 148 - 158**). Mr Dondero was clear that he learned of my appointment after the fact and that I was the one who told him. As set out in the transcript exhibited at **MP1/ page 149 - 150** Mr Dondero says, "*And unbeknownst to me, [Mark and Grant] agreed, and [Grant] sent over the appropriate documentation…and Grant signed it, and Mark Patrick became the trustee."* Mr Dondero goes on to say that, prior to learning about me taking over for

Grant Scott, Dondero had no knowledge discussions were underway pursuant to which that would occur.

110. After assuming the role of Control Person I quickly formed the belief that Mr Scott had created potential liabilities for DAF and the DAF Structure as a result of failing to manage DAF and its assets independently of Mr Dondero, particularly where I suspected that Mr Scott had simply been authorizing investments proposed by Mr Dondero without due consideration for their appropriateness or any financial due diligence.

111. As set out in my evidence below, I have good reason to consider these investments may in fact have been for Mr Dondero's personal benefit and/or to further Mr Dondero's commercial interests, which were not aligned with the best interests of DAF, or the charitable purposes it was intended to serve. In effect, during Mr Scott's tenure as Control Person both the Highland Foundations and DAF were in effect under the common control of Mr Dondero which enabled Mr Dondero to utilize DAF and its assets as a private line of credit. As examples, (i) NexBank Capital Inc. (**NexBank**), which is a privately held bank where Mr Dondero has a significant ownership interest, sold land to DAF for tax benefits to NexBank, emails of which are exhibited at **MP1/ PAGE 159 - 162** and (ii) Highland (then under the control of Mr Dondero) sold or caused to be sold so many assets to DAF that DAF had no money to fund other proposed Highland investments, emails of which are exhibited at **MP1/ page 163 - 168**.

112. I knew that should this be the case, this would have profound legal, compliance, and tax consequences for DAF and DAF's assets. I also became aware that Mr Scott's compensation for DAF was determined by Mr Dondero without consulting any compensation study or expert advice, a copy of which communication is exhibited at **MP1/ page 169 - 170**.

113. My concerns that Mr Scott may have come under pressure to authorize transactions which may not have been in the best interest of the DAF (but rather Mr Dondero) were duly reinforced when I was unduly pressured by Mr Dondero. In mid-

2024, Mr Dondero (via his employees at NexPoint) proposed various investment opportunities that involved using DAF's assets, which would have been to the benefit of Mr Dondero and/or his affiliates but which in my opinion were not suitable investment opportunities for DAF. These unsuitable investment opportunities included rescue financing for a NexPoint fund in connection with an SASB refinancing and a NexPoint-led Delaware Statutory Trust investment regarding storage facilities. In response to DAF turning down these investment opportunities, Mr Dondero (through his assistant) demanded in August 2024 that I meet him three times per week to discuss DAF management and investments. In accordance with my fiduciary duties to DAF, I refused these demands but strongly suspected Mr Dondero sought to exert control over DAF, contrary to its tax compliance requirements and charitable purpose.

114. My review of the investments and dispositions from DAF revealed that Mr Scott had historically approved every related party transaction between DAF and entities owned or controlled by Mr Dondero. If I were to characterise the history of the way in which Mr Dondero treated DAF and the DAF Structure from 2011 until my appointment in March 2021, Mr Dondero used DAF through influencing Mr Scott's position as Control Person to (i) generate income for Mr Dondero's commercial gain; (ii) provide liquidity to Mr Dondero and his affiliate entities to advance his commercial interests and/or to reduce the tax exposure of Mr Dondero affiliated entities; and (iii) take high risk positions for below market returns in order to generate significant profit for his affiliate entities whilst retaining the upside for Mr Dondero's affiliate entities and continuing to enjoy significant personal tax benefits.

115. With respect to point (i) above:

(a) I understand that Highland had previously charged investment manager fees to DAF. From my review of the investment management arrangement it does not appear that Mr Scott took any step during tenure as DAF's Control Person to independently review or assess the fees that were being charged to DAF.

(b) As mentioned above, NexPoint is an alternative investment firm founded by Mr Dondero in 2012 and in which Mr Dondero admits he holds an interest (**Dondero 1, paragraph 7**). I also recall in the first month of my tenure as DAF's Control Person, that Mr DC Sauter (general counsel of NexPoint) and Mr Isaac Leventon demanded DAF pay NexPoint a 2% base fee and 20% upside for managing DAF investments. I rejected this demand whilst fully appreciating that paying management fees would be a way for Mr Dondero to circumvent the "dominion and control" issues which would otherwise arise from a tax perspective. I was clear that my role as the DAF's Control Person was not to rubber-stamp Mr Dondero's proposals but rather to advocate for the DAF and its charitable purposes.

(c) When Mr Dondero or his entities needed capital and wanted to offload an illiquid or undesirable investment at a premium rate, such assets have been sold or donated to the DAF. By way of an example, the DAF currently has exposure of US $85 million to a syndicated debt facility where the borrower's sole investment is two wavelength spectrum licenses issued by the Federal Communications Commission. Such licenses are illiquid and speculative. In this case, I believe Mr Dondero (through both Highland and NexPoint entities) and his affiliates realised they were overleveraged in that investment and required DAF to buy it at par. I do not believe that DAF would be able to sell it at par because a maturity date extension signed in January 2025 required the borrower to pay steep fees and provide an increased interest rate, which are characteristic of troubled debt holdings.

116. With respect to point (ii) above:

(a) I recall that in November 2023, Mr Dondero attempted to exert influence over me as the Control Person, by asking me to transfer (on behalf of DAF) approximately US$1.5 million to offshore entities owned by Mr Dondero which I believed would be provided to Sentinel Reinsurance,

Ltd., a Cayman Islands limited company, (Sentinel) (or another entity above it in the Sentinel Structure) which I believe was then majority owned by Mr Dondero. I understand that the transfer was to settle the payment of outstanding legal fees which were wholly unrelated to DAF and its charitable purposes. The effect of this request would have meant that funds would be diverted from DAF and its charitable beneficiaries to further Mr Dondero's unrelated commercial interests. On the basis of advice received from Parsons McEntire McCleary PLLC and without waiving privilege, I determined the proposed transfer would be "impermissible and illegal" (as stated in the Carrington Memo at pages **MP1/ page 68**). It is important to note that at this time there were a number of outstanding lawsuits being conducted in the US in which the DAF Structure was being characterized as the alter ego of Mr Dondero. In accordance with my fiduciary obligations to DAF and in light of the real risk posed to the integrity of the DAF Structure by Mr Dondero's attempts to exert control, I refused to effect the transfer as directed.

(b) Similarly in the fiscal year 2024, I noted that Mr Dondero was experiencing liquidity issues and did not want Skyview Group to pay my bonus compensation. As such, Mr Dondero directed human resources at Skyview to email Shawn Raver (at the time, an independent consultant who helped me with DAF matters) and instruct him to have the DAF advance 90% of my bonus with Skyview paying the remaining 10%. Under this arrangement, such payments were likely characterized as director fees and is yet another example of how DAF was used by Mr Dondero to resolve third party liquidity issues.

(c) I understand that NexPoint (and other Dondero entities) had at various intervals sold to DAF its undesirable land situated in flood plains land and directed that investment funds related to Mr Dondero would sell other under or non-performing assets to the DAF to generate liquidity for Mr Dondero's entities. Again, the viability of these transactions does not appear to have been independently evaluated by Mr Scott in his

capacity as the Control Person. As a general matter, DAF's balance sheet was full of former NexPoint and other Mr Dondero-affiliated investments.

117. I also understand that Mr Dondero directed Mr Scott to send US $1 million of DAF funds to the Tall Pine Group, in order to pay Mr Dondero's affiliates (such as Mr Ellington and Isaac Leventon) their bonuses at a time when paying those bonuses was blocked by the US Courts in the Highland Bankruptcy (see an invoice issued by Tall Pine Group LLC issued on 3 April 2020 at **MP1/ page 171**). Mr Scott caused DAF to make the US $1 million payment, which was flagged in the Highland bankruptcy proceedings as part of a larger US $17 million fraudulent transfer (see **MP1/ page 172 - 305**). With respect to point (iii) above, examples of the value destructive dealings and transactions that were imposed on DAF are set out in a report prepared by ValueScope dated 20 November 2024 (**ValueScope Report**). The ValueScope Report is exhibited at **MP1/ page 307 - 315**.

118. In summary, I observed that NexPoint would devise a scheme whereby it needed capital to consummate an initial investment and would engage DAF to provide bridge financing in exchange for a fixed rate of return with no upside beyond the fixed rate of return or repayment timeline. Under this arrangement, NexPoint would retain the upside (typically the common equity interests) and DAF would receive a preferred equity that would be extinguished upon repayment with a fixed interest rate. From industry experience, I do not believe that other lenders would agree to transactions on these terms, which is why I believe NexPoint would attempt to solicit funding from DAF. In effect, the DAF provided access to millions of dollars of its own assets to support NexPoint's (and by extension Mr Dondero's) commercial ventures.

119. The ValueScope Report also provides an overview of transactions and events (in terms similar to those described above) concerning DAF, which includes reference to the:

(a) **The Campus at Legacy (TCAL) transaction** - This was characterised in the ValueScope Report as "NexPoint's request to DAF shifted US $45 million of downside risk to DAF, while NexPoint retained full upside. Development of TCAL would accrue significant benefits to NexPoint and Dondero by enhancing their adjacent Texas Research Quarter...project" (**TRQ**) (**MP1/ page 308**). By way of background:

(a) In September 2024, NexPoint requested that DAF acquire the TCAL property, which was advertised primarily as a land investment comprising approximately 80 acres, and featuring two office buildings generating approximately US $800,000 in annual net operating income at 59.4% occupancy.

(b) NexPoint had TCAL under contract for US $45 million and it was anticipated that the acquisition would close in November 2024. After closing, I understand (see **MP1/ page 308**) that NexPoint intended to control the TCAL property and gradually wind down the tenant leases, with a view to demolishing the site to construct new life science manufacturing facilities.

(c) TCAL would also be integrated into TRQ, a planned 135-acre life sciences innovation district centered around the former Electronic Data Systems campus in Plano, Texas, United States, which borders the TCAL property.

(d) I understand that NexPoint and its related entities owned substantial debt and equity interests in the TRQ properties.

(e) Due to insufficient cash flows generated from the office buildings on the TCAL property, DAF requested a two-year ground lease with NexPoint as the master tenant as part of the property acquisition. Additionally, DAF required that NexPoint be contractually obligated to purchase TCAL from DAF at the end of the ground lease and requested a security interest.

(f) However, NexPoint declined, which would have left DAF with full downside exposure and limited upside potential.

(b) **Preferred Dividend Financing**

(a) In August 2024, NexPoint approached DAF to provide NexPoint Storage Partners (**NSP**), which was managed by NexPoint Advisors, with US $11 million in unsecured financing. DAF was told that the funds were required as a bridge loan for the sale and refinancing of NSP properties. However, DAF learned after conducting some due diligence that the real use was to make a US $6.4 million payment on an upcoming preferred equity dividend payment NSP owed to an investor, Extra Space Storage. DAF ultimately turned down the deal, but this is another example of how Mr Dondero tried to use DAF as a personal banking facility to support his commercial ventures whilst I was the Control Person.

(b) I also understand from the ValueScope Report that there was a failure to reduce risk in the deal by providing collateral, reducing outstanding NexPoint DST exposure, or by providing any put options.

(c) The deal structure and the purpose for the funds also changed several times during the 2-week negotiation period.

**(c) Small Bay II DST bridge loan** – with respect to DST investments, the ValueScope Report states that: *"all three DST Investment made under prior leadership failed to be repaid from DST equity raise proceeds after full syndication, as opposed to full repayment on all new DST bridge loans that have been syndicated since Mark Patrick become the control person"* (see **MP1/ page 311**). By way of background and in relation to the Small Bay II DST bridge loan:

(a) In or around June 2024, Mr Dondero caused NexPoint to demand that DAF roll over its equity from a prior transaction while, simultaneously, Mr Dondero's trust, The Dugaboy Investment Trust (**Dugaboy**), (of which

Mr Dondero's family are the income beneficiaries and his sister, Nancy Dondero, is the trustee) which held a subordinate class of equity in the prior transaction, was paid at closing in full. In other words, Dugaboy received a payment in full despite being at a lower position in the payment waterfall, and DAF rolled over its investment. The return to Dugaboy was listed at US $13,650,280 and DAF rolled over two classes of equity totaling $6,404,958.

(b) As seen from the ValueScope Report, across the various investments DAF has made in NexPoint entities or NexPoint-related deals, DAF has also faced challenges in obtaining various repayments from NexPoint.

(c) These DST investments followed a similar pattern: DAF provided a DST bridge loan to ensure that the Delaware Statutory Trusts were adequately capitalised from inception, and DAF was to be repaid through the sale of trust equity interests to DST investors.

(d) However, NexPoint would regularly fall behind on these repayments to DAF by several months at a time (which were funds raised from investors). As a result, I negotiated a clause in the Small Bay II DST bridging loan agreement, which required NexPoint to pay DAF the funds that were raised within 5 business days (see an LLC Agreement of NREA SB II Holdings LLC dated 13 June 2024, exhibited at **MP1/ page 316 – 350, and page 319** which provides for the five business day window). Ultimately, Mr Dondero was upset over my handling of the transaction and exercising independence to act for the DAF, as DAF obtained multiple benefits and protections by fighting NexPoint on Small Bay II, as outlined in the ValueScope Report.

(e) At the date of the ValueScope Report, NexPoint had not made any repayments and had retained at least US $8.26 million in funds with respect to Small Bay II and US $0.7 million in funds with respect to Polo Glen DST (described below) that it was contractually obligated to pay to

DAF. In a settlement related to the Highland bankruptcy, I negotiated with Mr Dondero to cause Mr Dondero to release the US $8.26 million (as detailed further in HCLOM Claim Narrative at **MP1/ page 351 – 354)**.

**(d) Polo Glen DST**

(a) DAF made another bridge loan (which I refer to as the Polo Glen DST bridge loan) in December 2019 part of which, has remained unpaid for approximately five years.

(b) As far as I am aware, there remains about US $0.7 million which NexPoint has refused to repay to DAF, despite having collected enough in asset management and various other fees to honour the repayment.

(c) As further stated in the ValueScope Report, I also negotiated a put option to NexPoint and related parties in June 2024 as an option to reclaim the outstanding balance, which NexPoint failed to honour when it was exercised.

120. In this respect, and contrary to the perception which Mr Dondero seeks to convey in **Dondero 1**, Mr Dondero frequently sought to utilize DAF as a means of generating liquidity for his other commercial ventures which placed DAF and the DAF Structure at risk of being characterized as the alter ego of Mr Dondero. Not only does Mr Dondero seem to be ignorant of the risks he was creating for DAF and the untenable position he was creating for anyone occupying the Control Position, but to compound his flawed thinking, once I pushed back (with the approval of Mr Muphy as independent/oversight director) on his demands, he has proceeded to retaliate by actively taking adversarial position against me and Mr Murphy through the Highland Foundations. The JOLs do not seem to be remotely attuned to what is happening and have unconditionally adopted a position that can easily be traced back to Mr Dondero through the Highland Foundations for whom Johnstone Law has acted. DAF is further at risk of being found to be the alter ego of Mr Dondero's *alter ego* given how it has been utilised in legal proceedings arising from Mr Dondero's actions. As observed in the ValueScope Report: *"All DAF litigation arises*

*from Dondero. Dondero adversaries have sued DAF, claiming that DAF is an alter ego of Dondero and his various entities. Certain causes place all of DAF's assets at risk to Dondero creditors and aggrieved parties. DAF must vigorously defend itself and its assets, which can be costly and time-consuming"*. The extensive suits in which the DAF has been caught up are divided between those that are cases brought or initiated by adversaries of Dondero and those that were actions at the recommendation of Dondero (see **MP1/ page 313**).

121. DAF's participation in numerous litigious proceedings will also inevitably result in the depletion of DAF's assets, which is to the detriment of the charitable purposes that DAF is meant to support. Mr Dondero has also been described as a "vexatious litigant" due to numerous and frivolous lawsuits brought by him either directly or indirectly, as discussed further in Mr Murphy's First Affidavit filed which is also being filed in opposition to this sanction application.

122. For the Court's benefit, a summary of these proceedings are as follows:

***Turnover Proceedings - New York County Supreme Court (Index No 650744/23)***

123. This claim was brought by UBS Securities LLC and UBS AG London Branch (collectively, **UBS**) to collect on a $1.1 billion judgment UBS had obtained against various Dondero entities. The UBS claim against DAF related to assets acquired by CLO Holdco in December 2010. Mr Dondero is a defendant in these proceedings.

124. Only DAF was dismissed as a defendant in these proceedings by the New York Supreme Court for lack of personal jurisdiction over CLO Holdco. The lawsuit proceeds against the other defendants. Whilst that outcome was positive for DAF, as I have alluded to above insofar as DAF's assets are within the U.S. I understand that if DAF is found to be the alter ego of Mr Dondero, those assets may be at risk of attachment by UBS (see further below).

125. With respect to **paragraph 54** of **Diaz 1**, Ms Diaz omits the fact that Mr Dondero, together with various entities he owns, are being sued by UBS in this action for US $1.1 billion for, among other things, a Cayman Islands Monetary Authority-

regulated company issuing a fraudulent after-the-event insurance policy in order to move assets from an advised fund of Mr Dondero to his company, Sentinel. Mr Dondero's motion to dismiss and motion for discovery in that action were both recently denied, and proceedings have been fast tracked for summary judgment[2].

126. As such, Mr Dondero will soon face the prospect of having to find and possibly liquidate the necessary assets in order to satisfy a potential billion dollar judgment. This is an important fact to omit, especially where DAF has a significant value of assets under management, which Mr Dondero has repeatedly exploited or tried to exploit in the past, to DAF's actual or potential commercial detriment.

127. Should a judgment be made against Mr Dondero, there is a risk that DAF's assets could be paid for distribution to creditors and/or UBS, if (a) Mr Dondero assumes control of the DAF; or (b) should creditors successfully argue that the DAF is in fact Mr Dondero's financial alter ego. It is for these additional reasons that establishing independence between DAF and Mr Dondero was critically important to obtain.

***Turnover Proceedings - Bankruptcy Court, Northern District of Texas (Index No 20-03060)***

128. These proceedings were brought by Acis Capital Management (**Acis**) and Josh Terry (**Mr Terry**) as part of Acis Bankruptcy (**Acis Bankruptcy**).

129. An action against Mr Scott was also brought in the Acis Bankruptcy, and Mr Scott was indemnified by DAF as former Control Person.

***Declaratory Judgment - District Court, Southern District of New York (Index No 5. 21-11059)***

130. This action was brought by Mr Terry, a former business partner of Mr Dondero, alleging that DAF and CLO Holdco did not have standing to bring claims related to

[2] Please note that summary judgment in these proceedings could result in three different outcomes: (1) the Turnover Petition is granted and the property is delivered up to UBS; (2) the Turnover Petition is declined; or (3) the Court finds that there are facts at issue which would result in discovery being ordered and a hearing is listed.

Acis's management of assets held by Highland CLO Funding, Ltd. (of which CLO Holdco held a 49.015% interest).

131. Acis and Mr Terry sought this relief on the basis that, prior to my accession as DAF's Control Person, DAF had fallen into a pattern of commencing multiple lawsuits and then dismissing them before discovery commenced.

132. Notably, I understand that attempts to settle this litigation were hindered by Mr Dondero and / or NexPoint's involvement each of which was against any settlement because I believe they wanted the litigation against Mr Terry to continue.

***Derivative Action - Royal Court of Guernsey (Civil Number 2479)***

133. These proceedings were brought on behalf of a Guernsey domiciled entity called HCLOF seeking the distribution of cash being withheld from HCLOF by Acis , Mr Terry and U.S. Bank**, National Association.**

***Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (21-03073)***

134. The purpose of these proceedings was to seek an Order to reverse the cancellation of DAF's ownership interest in Highland Crusader Fund II, Ltd.

***Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (21-03076)***

135. In these proceedings, DAF was sued by the Litigation Trustee of the Chapter 11 Proceedings of Highland (**Highland Bankruptcy**) in connection with certain contributions received by DAF in 2016.

***Bankruptcy Litigation - Bankruptcy Court, Northern District of Texas (19-34054)***

136. These proceedings concerned general matters related to the Highland Bankruptcy, including recovery of redemptions payable that were withheld by Highland.

***General Litigation - District Court, Northern District of Texas (24-00498)***

137. This action (styled Highland Employee Retention Assets LLC v. James Dondero et. al.) was brought by Patrick Daugherty (former partner of Highland), who sued

Hunter Mountain Investment Trust, an entity managed by Rand Advisors, LLC, which is a DAF subsidiary, related to actions undertaken by Mr. Dondero.

***The Business Court of Texas First Division (25-BC01B-0004)***

138. Separately, Atlas IDF, LP, a Delaware limited partnership and, a DAF controlled entity, is suing an entity affiliated with Mr Dondero (NexPoint Real Estate Partners, LLC) and Dugaboy to collect on US $13 million in demand notes, which were guaranteed by Dugaboy (the validity of these guarantees is now being contested in litigation). I understand that through Deborah Dietsch-Perez (Mr Dondero's counsel), Mr Dondero has attempted to delay the hearing in that matter on the basis that he anticipates gaining control of DAF as a result of these Cayman liquidation proceedings (which would enable him to control Atlas in those proceedings). DAF performed a valuation study and discovered that the notes have a heavy discount due to concerns with collectability. In other words, the valuation experts were concerned that Mr Dondero would not pay his debts. Upon demand (with ten days' grace provided), they were not paid; given they are demand notes, that was a default.

139. Mr Dondero has since tried to acquire Atlas's demand notes for US $600,000 (see **MP1/ page 355 to 356**).

140. Atlas will continue to litigate against Mr Dondero for the collection of the demand notes in full.

***United States District Court for the Northern District of Texas, Dallas Division (3:25-cv-477)***

141. I am also aware of another example whereby Mr Dondero is utilising these Cayman liquidation proceedings in an attempt to delay collection efforts by DAF. In this case DAF is suing another entity affiliated with Mr Dondero to collect on a $1 million debt obligation. Mr Dondero controls an entity, Highland Capital Management Services, Inc., that defaulted on an approximately $1 million promissory note because Mr Dondero directed payment to a personal friend of his, Patrick McCabe (**Mr**

**McCabe**), who Mr Dondero may have believed that DAF owed money to, although I am not aware of any DAF obligation to or demand for payment from McCabe.

142. Broadly speaking, if Mr Dondero is successful at controlling the proceedings brought by DAF, I harbour concerns that he will direct the Highland Foundations to cease litigation and enter into settlements on terms that favour him. As a result, the Highland Foundations would provide Mr Dondero with an improper "private benefit" to the detriment of DAF.

143. Otherwise, I believe DAF has actively settled the other cases it had involvement with in 2025, and that its litigation expenses only relate to those cases mentioned above.

144. Shortly after my appointment as Control Person, Mr Dondero encouraged me to cause DAF to enter into litigation relating to Dondero's former company (Highland - in bankruptcy), which led to me being found liable for sanctions for breaching a gatekeeper order for filing a lawsuit recommended by Mr Dondero. This was later overturned by the U.S. 5th Circuit Court of Appeals. DAF and I were frequently referred to as:

(a) as an alter ego of Dondero,

(b) part of Dondero's web of entities, and

(c) under the direct control and influence of Dondero.

145. I also exhibit a letter from Seyfarth Shaw LLP to the IRS dated 20 March 2025 at **MP1/ page 357 - 374** (**Seyfarth Letter**), which notifies the IRS that Mr Dondero has an inappropriate donor relationship with representatives of the Highland Dallas Foundation (**HDF**), which is the Supporting Organization of the Dallas Foundation (which is a tax-exempt community foundation under US law, and whose president is Julie Diaz), which potentially jeopardizes the tax exempt status of HDF. Specifically, the Seyfarth Letter drew the IRS' attention to the fact that Mr Dondero

exerts direct control over HDF as a director, substantial contributor and president, and indirectly through his and his associates' influence over Highland Dallas' supported organization representatives on the HDF Board of Directors and the Dallas Foundation itself.

146. The Seyfarth Letter also provided the IRS with background on Holdco as HDF is a Participating Shareholder of Holdco, and ergo, Mr Dondero's attempts to control Holdco could have impacted HDF financially.

147. Having appreciated the precarious situation DAF and the DAF Structure had been placed in as a result of the conduct of Mr Dondero both generally and in exercising control over the structure, I immediately took the following actions to protect and mitigate against what I would characterise as "Dondero-recommended transactions":

(a) I hired independent law firms (law firms that had not been previously engaged by Mr Dondero) to negotiate with Mr Dondero's investment professionals and counterparty lawyers on every transaction. This is something which, to the best of my knowledge and belief, Mr Scott never did during the decade he acted as the Control Person.

(b) In order to verify any potential investment was properly underwritten, I hired and consulted with investment analysts such as ValueScope to make independent judgments before agreeing to a transaction. I believe that Mr Scott did not take steps to independently verify the potential investment opportunities presented to DAF by Mr Dondero. The ValueScope Report demonstrates the increased value and performance of DAF after I assumed the role of Control Person and retained investment analysts such as ValueScope to negotiate the financial terms for proposed transactions (see *Historical Performance*, ValueScope Report, **MP1/ page 310**). In particular the ValueScope Report notes that *"Under Mark Patrick's leadership, the DAF has delivered higher returns on bridge lending deals to NexPoint DSTs, all*

*while managing risks more effectively than in transactions executed before Mark took over"*.

(c) DAF retained Paul Murphy as an independent director of Holdco and other DAF entities.

(d) We adopted institutional grade investment committee guidelines.

(e) We formed an investment committee to advise on investments with best-in-class managers, including the former Head of Harvard's fixed income portfolio.

(f) By terminating Skyview Group's servicing contract, the DAF saved US $1 million annually in service fees.

148. I took these steps knowing that the IRS would look favourably on any and all attempts made by the DAF to maintain its independence from Mr Dondero under the circumstances.

149. However, I realized that, despite the protocols I had established early in 2021, as the variety of litigation against the DAF was filed (including also DAF's litigation against a Guernsey entity, HCLOF referred to above at [x]), that a common theme and refrain was clear: the DAF was regarded as Mr Dondero's alter ego regardless of my legitimate actions to establish systems and protocols to attenuate that conclusion.

150. Additionally, I followed the various legal actions by UBS against Dondero relating to the Sentinel Fraud (as defined below), and I realized by early 2023 that both the Kirschner complaint against the DAF and potentially a future and significant claim to be brought by UBS (which eventually materialized) could jeopardize the DAF's assets and expose them to Mr Dondero's creditors and adversaries.

151. It is important to ensure the Court is appraised on the prior business dealings of Mr Dondero insofar as they demonstrate that in conducting his business affairs, Mr Dondero has previously placed himself in positions of influence and control for the

purposes of personal gain through unlawful transaction. This is demonstrated by the adverse rulings that were made against Mr Dondero (amongst others) during the course of the bankruptcy of Sentinel (a Cayman Islands based reinsurance company which is ultimately owned by Mr Dondero and Mr Ellington).

152. In summary, UBS Securities LLC and UBS AG London Branch (**UBS Entities**) alleged that the specific transfers of assets to Sentinel during 2017 (set out and defined below as the **2017 Transfers**) were executed after the UBS Entities obtained an order for summary judgment against Highland and other entities owned or otherwise affiliated with Mr Dondero. I refer to case *UBS Secs. LLC v Highland Cap. Mgmt. , L.P. ,* (index No. 650097/2009) (Supreme Court of the State of New York, New York County) (the **Underlying Action**).

153. In the Turnover Petition (as defined below) the New York court accepted that the 2017 Transfers took place at a time when the named respondents in the Underlying Action anticipated a US $1.2 billion judgment against them. The judgment was awarded in UBS' favour in the Underlying Action, but since the entry of the judgment, UBS has only been able to collect a fraction of the interest (and none of the principal) on that judgment. The assets compromising the 2017 Transfers were transferred pursuant to an attendant Asset Purchase Agreement, as payment of the premium for an after-the-event insurance policy (the **ATE Policy**) to insure Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland CDO Holding Company against liability in the Underlying Action. It was also claimed that the ATE Policy was outside the usual course of business for Sentinel, as Sentinel had never previously issued this type of policy or one as large as the ATE Policy and would not have had the means to pay on the ATE Policy without the assets received following 2017 Transfers (the **Sentinel Fraud**).

154. In connection with the Sentinel Fraud, Stephanie Vitiello (author of the Vitiello memo) and other affiliates of Mr Dondero received an indemnity for their role in the Sentinel Fraud, a copy of which indemnity is attached at **MP1/ page 375 - 384**. It is my understanding that UBS's counsel also used this indemnity as evidence of

Stephanie Vitiello and other affiliates of Mr Dondero participating in the Sentinel Fraud.

155. In *UBS Securities LLC, UBS AG London Branch v. James Dondero, Scott Ellington, Highland COO Holding Company, Highland COO Opportunity Masters Fund, L.P., Highland Financial Partners, L.P., Highland Special Opportunities Holdings Company, CLO HoldCo, Ltd., Mainspring, Ltd., Motage Holdings, Ltd* (Index No. 6507 44/2023), the Supreme Court of the State of New York, New York County made a decision and order on 26 March 2025 (the **Turnover Petition**), finding that the Turnover Petition sufficiently alleged that:

(a) Mr Dondero and Mr Ellington undertook fraudulent conveyances under DCL 276, when they devised and implemented a scheme to move all the remaining assets of, but not limited to, Highland CDO Opportunity Master Fund, L.P., Highland Special Opportunities Holding Company and Highland Financial Partners, L.P. that could be subject to an impending judgment to Sentinel (the **2017 Transfers**). To the extent that Mr Dondero and Mr Ellington sought to dismiss these claims, their motions were denied.

(b) Mr Dondero was the alter ego of another corporate vehicle called Mainspring, Ltd and that it was sufficiently alleged that Mr Dondero "*used Mainspring to enter into fake service agreements in order to pay HCM [Highland Capital Management, L.P.] insiders bonuses that they were otherwise ineligible to receive in HCM's bankruptcy*" and "*used Mainspring to reward HCM employees who were loyal to him*".

(c) Mr Dondero "*used his dominance over Mainspring "to commit a fraud or wrong against the plaintiff, resulting in the plaintiff's injury"*", with respect to allegations that Mr Dondero used his position as the ultimate beneficial owner of Mainspring, "*to compel Sentinel to issue dividends, thereby draining assets that would have otherwise been available for collection by UBS*". To the extent that Mr Dondero pursued a motion to dismiss claims which sought to hold him liable as the alter ego of Mainspring, that motion was dismissed by the Court.

156. In 2022, at a hearing in the Bankruptcy Court for the Northern District of Texas, where the Sentinel fraud was discussed, Judge Stacey Jernigan (**Judge Jernigan**) noted that she may make a referral to the U.S. attorney given the criminal conduct by Mr Dondero, Mr Ellington, and others to fraudulently hide assets from UBS and lie about it. I exhibit at **MP1/ page 385 – 517,** HCMLP Motion to Withdraw, Case No. 19-34054-sgj-11, Adversary Proceeding 21-3020-sgj.

157. I am also aware that Mr Dondero has a hatred of Judge Jernigan, who has consistently ruled against Mr Dondero. I understand it has been reported that a SEC whistleblower complaint was made against Judge Jernigan and I believe Mr Dondero subsequently directed an employee of one of his entities, Lucy Bannon (who is also an officer of the Highland Dallas Foundation) to leak the SEC whistleblower complaint to the press so they would cover it (see **MP1/ page 670 – 677**).

158. The actions by UBS (which I anticipated) underscore the need for clear independence between Dondero, his entities and affiliates on the one hand, and the DAF, including Holdco on the other.

159. In the middle of 2023, DAF's exposure to Dondero owned and controlled investments exceeded US $100 million. I successfully worked to reduce this exposure throughout 2024. At the end of 2024, exposure was about US $8 million. It was my belief that this exposure posed a material risk to the DAF because it could be used as alter ego evidence. This risk is also reflected in the ValueScope Report.

160. My actions to reduce the DAF's exposure to Dondero owned and controlled investments from US $100 million to US $8 million in the span of 18 months required DAF to turn down multiple deal proposals from Mr Dondero and his entities. In turn this led to increasing frustration from Mr Dondero at the beginning and throughout this period.

161. I managed the DAF while balancing (i) the legal and compliance need to reduce exposure (based on advice of Mr Alex McGeoch and Mr Mancino) to Mr Dondero owned and controlled investments and (ii) avoiding upsetting Mr Dondero and his

affiliates as I was acutely aware of Mr Dondero's litigious nature and believed that Mr Dondero would stop paying amounts due on DAF investments if a clean break between Mr Dondero and DAF was implemented.

162. These concerns were clearly well founded. Immediately following my resignation from Skyview (which was made on advice (privilege in which is not waived) and in order to assert more independence from Mr Dondero to better protect the best interests of the DAF) Mr Dondero directed the entities he controlled to cease all payments to DAF, including US $8 million Mr Dondero owed on a deal called Small Bay II (referred above). In the following months, DAF sent letters attempting collection on three other investments. Mr Dondero has not met any of his obligations under them, requiring DAF to commence three lawsuits against Mr Dondero's entities for payment, each of which are ongoing.

163. Mr Dondero has, several times, commenced extensive, harassive litigation and/or engaged in other misconduct against his former employees and business partners. At **MP1/ page 553**, in the "Plaintiff Highland Employee Retention Assets LLC First Amended Complaint" records that Mr Dondero engaged in similar behavior against Joshua Terry, examples of Dondero and his affiliates' behavior is shown, which includes lying, fraud, and other types of misconduct and/or vexatious litigation against his former business partners Joshua Terry and Patrick Daugherty.

164. For the reasons set out herein, the background leading to the DAF restructuring is both factually and legally complex, as I understand counsel for DWF advanced at the Supervision Hearing.

## E. RESPONSES TO FIRST AFFIDAVITS OF MS DIAZ

165. Save where already covered above, I address inaccuracies in Diaz 1 below. Paragraph references in this section are to paragraphs in Diaz 1.

166. With respect to Ms Diaz's evidence, she is wrong to describe and refer to DAF as a Fund for the reasons set our section x to above.

167. With respect to **paragraph 27 of Diaz 1**, this statement is inaccurate and misleading. I had informed several people affiliated with Highland Dallas Foundation, including Lucy Bannon and Lauren Short (NexPoint employees involved in personal relationships and charitable giving) that my daughter had formed this charity and I had asked whether they could donate US $5,000. Furthermore, no director or officer of Creative HEARTS TX has received or will receive any compensation, as these roles are strictly voluntary.

168. I understand that Ms Bannon and Ms Short approached Mr Dondero and obtained his approval. Creative HEARTS TX was then added to the approved list of charities of the Highland Dallas Foundation, which I had not requested. However, these facts may not have been known to Ms Diaz at the time she swore Diaz 1 and I have done nothing ethically and legally wrong and/or inappropriate as Ms Diaz suggests.

169. With respect to paragraph 28, Fortaris is owned by Kevin Cronin, a private investigator used by Mr Dondero and a trusted advisor of Mr Dondero. As I explain further in this affidavit, Mr Dondero determined my compensation whilst I worked at Skyview. After I assumed the role of Control Person of DAF I performed my functions as an employee of Skyview and as Control Person simultaneously. Accordingly, I was concerned that Mr Dondero would attempt to exert influence over my actions at DAF by controlling my compensation received from Skyview.

170. My concerns were well founded in this regard. As mentioned above, the Court found that it was sufficiently alleged in the Turnover Petition that Mr Dondero had rewarded those who were loyal to him, which was suggestive that Mr Dondero had controlled remuneration as a means of leverage. I also exhibit at **,MP1/ page 708** a confidential update with respect to Mr Dondero's negotiations with the Santa Barbara Foundation (**SB Foundation**) which illustrates how Mr Dondero threatened to withdraw US $1 million of funding to the SB Foundation because it elected to reject channeling funds to causes identified by Mr Dondero in favour of community causes. In response to the threat of having funding withdrawn, SB Foundation

agreed that a full slate of grants would be presented that were desirable to Mr Dondero, and would be allocated to the US $1 million funding.

171. This emerging pattern of coercing others through financial control compounds my concerns that Mr Dondero may leverage the private funding which he is providing to run this liquidation, as a means of influencing the direction of the liquidation itself. He could do so by threatening to withhold funding (which the JOLs and their counsel depend on to cover their costs and expenses) from the JOLs and/or their counsel, thereby placing undue pressure on the JOLs and/or their counsel, which may affect the JOLs and/or their counsel's ability to conduct themselves impartially in this liquidation.

172. As previously mentioned, I had identified that it was imperative that DAF was and was seen to be operated independently from Mr Dondero. Given my employment at Skyview it was my view that I should be paid from DAF in respect of services I provided to DAF and its related entities as the Control Person. Not only would the compensation need to be provided independently of Skyview but the level of compensation would need to be based on an objective third party compensation valuation. An independent compensation review was provided for the role as Control Person. This was then independently verified by Mr Murphy.

173. Given my concerns that the influence and control that was being asserted by Mr Dondero over DAF may have given was giving rise to allegations of DAF being an alter ego of Mr Dondero, I sought to consider ways in which my remuneration in respect of DAF could properly be paid without being subject to Mr Dondero's oversight, precisely because of the alter ego risk. I recall having two brief telephone conversations with Mr Cronin, as I explored whether my compensation (which would be paid by DAF) could be routed through Fortaris. I believed that, given historical payments by Mr Dondero's entities to Mr Cronin and Fortaris, payments by DAF to Fortaris would not raise suspicion with the Skyview employees monitoring DAF's finances. I shared with Mr Cronin an organisational chart and legal advice from Alex McGeoch, a tax expert at Hunton Andrews Kurth LLP, asserting that DAF can independently compensate me.

174. My intention in raising this suggested compensation structure with Mr Cronin was to insulate DAF from potentially significant tax liabilities if the charitable structure of DAF was not operated separately from Mr Dondero. In any event, this arrangement did not come to fruition because Mr Cronin told Mr Dondero about my proposal. However, any actions I took in relation to Mr Cronin were taken in good faith.

175. I may have flippantly said something similar to Dondero 1 where Mr Cronin said "*you can't steal from yourself*". The context was that I was speaking to Mr Cronin and attempting to describe that, in my capacity as DAF's control person, I would be authorizing paying myself and that I was not "stealing" funds from anywhere. The basis for that statement was the written legal advice from Alex McGeoch (long-time DAF counsel) that I provided to Mr Cronin and attached at **MP1/ page 645**.

176. With respect to **paragraphs 29 to 30 of Diaz 1**, I believe that Mr Mancino did not mention material non-public information in his conversation with Mr Rosenberg and only mentioned the share price of NHT, which was public information of a public company. This did not constitute a MNPI and I note that Ms Diaz only says that it "could have" been. Counsel at Eversheds Sutherland, a respected firm with securities law expertise, concluded that the material shared was not MNPI and did not constitute a breach of Skyview's policies and procedures, a copy of which is attached at **MP1/ page 647 - 650**.

177. With respect to paragraphs 31 to 35, Mr Mancino sent Holland & Knight a letter on February 14, 2025 informing them the numbers, specifically that "millions in director fees", were incorrect. He also said that the legal fees (the vast majority were DAF expenses) did not exceed US $10 million in 2024 and that they would continue to fall in 2025 and 2026.

178. My compensation was based on my role as CEO, CIO, and GC of DAF, and not my sole role as a director. As such these fees have been misclassified as "Director fees". It was also calculated based on a third-party independent report which took into account compensation packages for similar roles and responsibilities. The

final decision to approve my compensation was reviewed by Mr Murphy, in his capacity as an independent director, following his consultation with the third party expert. My compensation was only made after Mr Murphy executed written resolutions taking into account all of the relevant matters.

179. Both Mr Dondero and Ms Diaz make much of my "irresponsible management" of DAF by spending too much on expenses. However, US $6 million of the alleged US $18.3 million in expenses are not in fact expenses. Rather, Mr Dondero purposefully omitted that there was also US $6.1 million in income from a NexPoint-led transaction that more than offset the US $6 million in expenses, so Mr Dondero falsely inflated the expense number by omitting the offsetting income and the net gain to DAF from the transaction and those expenses. These are lease payments a DAF subsidiary receives in connection with an investment led by Mr Dondero called Skorpios (also known as NexPoint Life Science III). DAF is both lessee and lessor and generates around US $6.1 million per year from the arrangement. As such, DAF nets a profit each year (US $127,937 in 2024 and US $131,775 is anticipated in 2025, increasing substantially each year and maxing out at $364,815 in year 14), which is reflected in the spreadsheet attached at **MP1/ page 651 - 669** and provided by NexPoint.

180. I also met with Ms Diaz and Torrey Littleton on October 10, 2024 and Ms Diaz did not raise any concerns with respect to those now raised in Diaz 1. At that meeting, I also suggested that I would like audited financials of DAF (which had never been provided before) within the next two years and I had hired a third party accounting service provider for that purpose. On the same day, I also had a phone call with Debbie Wilkerson, the CEO of the Highland Kansas City Foundation, Inc. who similarly did not raise any concerns with me. Furthermore, on November 20, 2024, ValueScope and Mr Mancino spent several hours presenting to Holland & Knight (counsel to the Highland Foundations) on the finances of DAF, its investments, and its outlook which I understand from discussing with ValueScope and Mr Mancino afterward was received very positively by Holland & Knight.

181. The next communication from the Highland Foundations that I received was the No Confidence Letter (as defined in Diaz 1) which was not actually received until December 2024 and left me in disbelief given that no questions or concerns had been raised with me previously. I was left confused why they had not voiced any concerns with me directly despite repeated affirmative outreach. Regardless, following the No Confidence Letter, on December 11, 2024, Mr Murphy presented to Holland & Knight regarding the DAF's corporate governance and investments, and which I understand was so well received, that Mr Murphy was invited by Michael Stockham, a partner at Holland & Knight, to provide the same presentation directly to the Highland foundation CEOs. The ValueScope Report also shows that the DAF had outperformed the S&P 500 during my tenure at DAF, and the Highland Foundations had been receiving quarterly financial updates from ValueScope for years.

182. With respect to paragraph 38, Ms Diaz had received an asset list via the ValueScope DAF quarterly financial update on January 7, 2025 and I found her request for the same information again on 23 January 2025 to feel quite orchestrated. Historically, these reports were the only information the Highland Foundations received and, in any event, exceeds what they are entitled to under the organizational documents given their status as passive discretionary holders.

183. With respect to paragraphs 46 to 49, the Highland Foundations were not entitled to notice but this change was done to use a Cayman (instead of Delaware) General Partner and to create more independence from Mr Dondero, for all the reasons above. I understand that under Cayman Islands law, a general partner of an exempted limited partnership must be a Cayman-registered entity whether as an exempted company or a company registered under Part IX of the Companies Act.

184. With respect to **paragraphs 50 to 52 of Diaz 1**, Ms Diaz omits to explain Highland Foundations' role in opening the Texas AG (as defined in Diaz 1) investigation but in any event, the Texas AG has taken no action outside of sending an initial letter to request that certain DAF entities preserve documents. I believe the Highland Foundations and Mr Dondero reached out to the Texas AG to open an investigation

and use that as a data point in this matter. Mr Dondero's propensity to abuse a "complaint" filing is well known. As an example, refer to the SEC whistleblower complaint against Judge Jernigan described at **MP1/ page 670 - 677**. DAF is actively attempting to cooperate with Texas AG, but the Texas AG has been non-responsive to repeated requests to meet with me and my advisors.

185. As such, there is no dispute between myself and Mr Dondero, but simply a dispute between Mr Dondero and the assets under DAF's management which he seeks to control. To illustrate that point, in November 2024, I was offered through Mr Dondero's attorneys at the Ashcroft Law Firm (and its partner Johnny Sutton), a Caribbean Island and large sums of money if I agreed to step down from the DAF during a call on 22 November 2024. It was also intimated to me by Ashcroft that this offer was also made on behalf of the Highland Foundations. I believe Mr Dondero's intention in causing his attorneys to propose this was to remove me and insert someone who would not second guess his investment recommendations and would permit Mr Dondero to again use DAF (as was the case under Mr Scott's tenure as Control Person) for Mr Dondero's personal benefit. Needless to say, I turned down Mr Dondero's offer.

186. For these reasons, it is vitally important that the JOLs obtain independent counsel to ensure they are properly and impartially advised. The central issues in this liquidation concern the actions I took, with Mr Muphy's oversight, to attenuate direct and indirect influences from Mr Dondero, including through his control of the Highland Foundations whom Johnstone Law previously represented.

187. Furthermore, I understand that Mr Andrew Johnstone of Johnstone Law contacted My Murphy on February 12, 2025, purporting to represent *"Charitable DAF Fund 2 LP (**DAF 2**)."* . I understand that Mr Murphy referred this enquiry to Walkers, who were legal counsel to Holdco and DAF at the relevant time.

188. The purpose of this unsolicited outreach was unclear but it is evident that Johnstone Law as DAF 2 lawyers wanted to discuss DAF's assets. Why they wanted to do so and to what end has never been revealed. Critically, even assuming DAF 2

was a legitimate entity (presumably another exempted limited partnership), there is nothing in Johnstone Law's email to indicate (a) who the general partner of DAF 2 was (b) who the limited partners of DAF 2 were and (c) what possible interest any of them would have in confidential information concerning the assets of DAF. As if these concerns were not concerning enough, it subsequently transpired that DAF 2 does not even exist.

189. Following an entity search, Walkers determined that DAF 2 did not exist. I understand that Walkers followed up with Johnstone Law to clarify which entity they represented and where it was domiciled. Johnstone failed to respond to repeated follow ups and failed to provide context. It is my belief that through Johnstone Law, as was the case with Ashcroft, Mr Dondero was seeking to access Mr Murphy as a director of Holdco with a view to exercising control over DAF and its assets.

**F. RESPONSES TO FIRST AFFIDAVIT OF MR DONERO**

190. With each section that to the extent I do not specifically respond to the assertions made in Dondero 1 above, I wish to address the inaccuracies of that evidence below. Paragraph references in this section are to references in Dondero 1.

191. With respect to **paragraph 13 of Dondero 1**, there are no restrictions in the organizational documents of DAF that prevent the admission of additional charitable beneficiaries. Furthermore, DAF exists to benefit charities, not only the Highland Foundations.

192. With respect to **paragraphs 29 to 30 of Dondero 1**, I own shares in Holdco in my personal capacity, and any reference to me owning the DAF would be a reference to my ownership of the GP and the HoldCo Management Shares. However, it is completely inaccurate to say that I could pay myself however I pleased; that represents a fundamental misunderstanding of exempted limited partnerships generally but also misunderstands the nature of the DAF structure. I expressed to Mr Dondero that DAF needs to independently determine the value of my services without Mr Dondero's input, or input from an entity controlled by Mr Dondero. My

reasons for this were to reduce any susceptibility to coercion from Mr Dondero (both directly and indirectly), which could have been exercised by interfering with my compensation, and create independence for DAF.

193. In relation to **paragraph 31 of Dondero 1**, it is highly unlikely that the expense summary could have been produced in June 2024 because, due to a lag in reporting times, June numbers would not have been available until later in the year. I received June 2024 numbers in October 2024.

194. With respect to **paragraph 35 of Donder 1**, the Vitiello memo **referred to in Dondero 1** correctly concludes that I did not engage in insider trading under U.S. securities laws. This is in relation to a put option that was not exercised under a contract. Failure to exercise the put option jeopardizes Highland Dallas Foundation's tax-exempt status and, according to the Seyfarth Letter at **MP1/ page 361**, may have been an attempt to protect Mr Dondero from having to address the precipitous fall in fair market value shortly after the gift was made, as there would have been a requirement to file Form 8282 "*Donee Information return*" that would have revealed this information.

195. By way of background with respect to the Put Option, and as explained in the Seyfarth Letter at **MP1/ page 360**:

> *Mr. Dondero's family trust, The Dugaboy Investment Trust ("Dugaboy"), a grantor trust, allegedly owns 99.9% of NexPoint Advisors. Mr. Dondero is the income beneficiary of Dugaboy and his sister, Nancy Dondero, is the family trustee of Dugaboy.*
>
> *One of the entities affiliated with and advised by NexPoint Advisors is NexPoint Hospitality Trust, an open-ended real estate investment trust (the "REIT") based in Ontario, Canada. The REIT was formed in 2018 for the purpose of acquiring and operating income-producing hotel properties in the United States. The REIT's investment interests (called "Units") were listed for public trading on the TSX Venture Exchange of the Toronto Stock Exchange ("TSXV").*

*Dugaboy contributed 1,500,000 Class B non-voting Units of the REIT to Highland Dallas on , December 24, 2019 and also granted Highland Dallas an "embedded" put option to sell them back to Dugaboy for $6.19 per share (the "Put Option"). The net asset value of the REIT as of December 24, 2019 was $6.19 per share. The Put Option is exercisable at any time prior to December 24, 2026...*

196. The Seyfarth Letter concluded that based on public filings with the U.S. Securities and Exchange Commission, REIT had approximately 29,353,66- Units, of which 82.52% were owned by entities affiliated or controlled by Mr Dondero. Furthermore, I understand that the REIT is to be dissolved which means that if the Put Option is not exercised before that point, then, according to the Seyfarth Letter, this will result in a US $9 million "*inappropriate windfall to both Dugaboy and Mr Dondero*".

197. As explained in the Seyfarth Letter at **MP1/ page 360**:

"*The significance of the Put Option at that time is that the Class B non-voting Units could be treated for valuation purposes as equivalent to the Class A voting Units, which were owned or controlled by Mr. Dondero. Therefore, for purposes of determining their fair market value on the date of the charitable contribution, the valuation firm could value them as if they were voting Units unreduced by a 2.9% discount for lack of control. That allowed Dugaboy to claim a charitable deduction in 2019 of $11,505,000, which we assume passed through to Mr. Dondero as the income beneficiary of Dugaboy*."

198. It was public information that NHT had declined from a price per unit of $7.67 in December 2019 (when the donation occurred) to $0.20 in August 2024, representing a 99.7% decline. In fact, whilst the figures quoted in the Seyfarth Letter vary slightly, it was calculated that as of 22 November 2024, 1,500,000 Units were only worth $22,500, which is less than 1% of the Put Option value of US $9,285,000. Additionally, NHT disclosed on August 2, 2024 (26 days before I spoke with the Dallas Foundation) in a document titled "Management's Discussion and Analysis

of Financial Condition and Results of Operations that there was "a potential risk about [its] ability to continue as a going concern and, therefore, realize its assets and discharge its liabilities in the normal course of business." A copy of the NHT disclosure is attached at **MP1/ page 678 - 707**. Therefore, the information I disclosed was not "material" or "non-public" and would not have resulted in a violation of U.S. securities laws even if traded upon by Highland Dallas Foundation. This is also confirmed by the Eversheds Memo exhibited at **MP1/ page 647 - 650**.

199. Furthermore, and with reference to the Seyfarth Letter, it is important to not lose sight of the fact that the Put Option was in effect an interest free loan of US$9,285,000 for Mr Dondero and Dugaboy while the Put Option remains outstanding and unexercised.

200. For the purpose of responding to the JOLs' sanctions applications, I do not expand here on the factual inconsistencies which I have identified between the Vitiello memo and Dondero 1 and Diaz 1, but reserve all my rights to do so during the course of these liquidation proceedings.

201. With respect to **paragraph 36 of Dondero 1**, my resignation was not abrupt. It was the culmination of actions I had been working toward to create independence between the DAF and Mr Dondero for almost two years. I was not aware of any investigation or any accusation of wrongdoing on my part. The Vitiello memo was finalized after my resignation, not before.

202. With respect to **paragraph 37 of Dondero 1**, the Skyview services agreement required 180 days' notice to terminate, and was not terminated effective until March 31, 2025. Whilst I have 4 years of investment management experience, DAF also has a wealth of other investment advisors, including:

(a) Investment committee

(b) Investment advisors

(c) Investment houses and banks with investment functions

(d) Real estate advisors

(e) Security and portfolio monitoring

203. With respect to **paragraphs 38 to 39 of Dondero 1**, Hunter Mountain's interest was sold to a DAF subsidiary based on an independent third-party valuation report and because it was sold to a DAF subsidiary, there was no dissipation of assets.

204. Furthermore, Mr Dondero's proposal that he is a potential buyer of Hunter Mountain is misleading. Mr Dondero's attorneys (Ms Dietsch-Perez at Stinson) have argued that Hunter Mountain owes Dugaboy and other trusts US $65 million in debt obligations. These debt obligations were released by the plain language of a settlement agreement entered into in 2022, although I understand that Mr Dondero disputes this. Given this dispute, it is doubtful whether Mr Dondero would have paid any meaningful amount for Hunter Mountain, outside of credit bidding the debt he believes he is owed.

205. As mentioned above, a valuation study was performed on the Hunter Mountain interests, and the purchase price is in accordance with this valuation study. The seller made an attempt to find other buyers by contacting distressed asset buyers, but there was little interest given that there was a contingent claim in the Highland Bankruptcy that would not be paid out until litigation ceased.

206. For the purpose of responding to the JOLs' sanctions applications, I do not expand further on the issue here but I again reserve all my rights to do so during the course of these liquidation proceedings.

**CONCLUSION**

207. For the reasons stated above, I respectfully request that the JOLs' sanction application is denied.

**SWORN** to at Wise Texas )
on this 4th day of June 2025 ) [signature]
) **MARK ERIC PATRICK**

**BEFORE ME:** [signature] 132662714
08/27/2028

**NOTARY PUBLIC**

Shannara Franzel
ID NUMBER
132662714
COMMISSION EXPIRES
August 27, 2028

Electronically signed and notarized online using the Proof platform.

**EXHIBIT 11**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
| | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Dallas, Texas<br>June 25, 2025<br>9:30 a.m. Docket |
| Reorganized Debtor. | ) | - MOTION TO EXTEND DURATION OF TRUSTS (4213)<br>- MOTION TO APPROVE SETTLEMENT (4216) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Highland Capital Management Claimant Trust: | John A. Morris<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7760 |
| For the Highland Capital Management Claimant Trust: | Hayley R. Winograd<br>Gregory V. Demo<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>1700 Broadway, 36th Floor<br>New York, NY 10019<br>(212) 561-7732 |
| For the Highland Capital Management Claimant Trust: | Jeffrey N. Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067<br>(310) 277-6910 |
| For Marc S. Kirschner, Litigation Trustee: | Robert Scott Loigman<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>295 5th Avenue<br>New York, NY 10016<br>(212) 849-7000 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For the Hunter Mountain Entities: | Louis M. Phillips<br>Amelia L. Hurt<br>KELLY HART & PITRE<br>301 Main Street, Suite 1600<br>Baton Rouge, LA 70801<br>(225) 381-9643 |
| For the Dugaboy Investment Trust: | Deborah Rose Deitsch-Perez<br>STINSON, LLP<br>2200 Ross Avenue, Suite 2900<br>Dallas, TX 75201<br>(214) 560-2201 |
| For the Dugaboy Investment Trust: | Michael Justin Lang<br>CRAWFORD WISHNEW & LANG, PLLC<br>1700 Pacific Avenue, Suite 2390<br>Dallas, TX 75201<br>(214) 817-4500 |
| For Crown Global Life Insurance, Ltd. and The Dallas Foundation: | David L. Curry, Jr.<br>OKIN ADAMS, LLP<br>1113 Vine Street, Suite 240<br>Houston, TX 77002<br>(713) 228-4100 |
| For Patrick Daugherty: | Andrew K. York<br>Drake Rayshell<br>Joshua Smeltzer<br>GRAY REED & MCGRAW, LLP<br>1601 Elm Street, Suite 4600<br>Dallas, TX 75201<br>(214) 954-4135 |
| For the U.S. Trustee: | Erin Marie Schmidt<br>OFFICE OF THE UNITED STATES TRUSTEE<br>1100 Commerce Street, Room 976<br>Dallas, TX 75242-1496<br>(214) 767-1075 |
| Recorded by: | Michael F. Edmond, Sr.<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street, 12th Floor<br>Dallas, TX 75242<br>(214) 753-2062 |

Transcribed by: Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

THE COURT: Okay.

MR. MORRIS: So, --

THE COURT: So how did you want to proceed?

MR. MORRIS: So, the way I propose to proceed, Your Honor, I have an opening statement to make --

THE COURT: Okay.

MR. MORRIS: -- with a PowerPoint presentation to present. I would propose that, as the Movant, I go first. Then we can hear from Dugaboy, we can hear from Mr. Daugherty, and then we can put Mr. Seery on the stand.

Assuming that there is no challenge to Mark Patrick's authority to enter into the settlement agreement on behalf of all of the HMIT entities, I would not plan on calling either Mr. Dondero or Ms. Deitsch-Perez, who are under subpoena here, because the challenge to authority was really coming from The Dallas Foundation. Their objection has now been withdrawn. So as long as Mr. Daugherty -- well, really, as long as Dugaboy doesn't challenge Mr. Patrick's authority to enter into the settlement agreement on behalf of the HMIT entities, I think we'll just put on the one witness and be done.

THE COURT: All right. Just so we know what lies ahead, --

MR. MORRIS: Uh-huh.

THE COURT: -- I don't think that Dugaboy objected to Mr. Patrick's authority. I do recall it was just The

Foundation.

MR. LANG: There was no objection on the -- there was no objection.

THE COURT: Okay. And same with Mr. Daugherty? No objection about the authority of Mark Patrick to enter into the settlement?

MR. YORK: There was no objection.

THE COURT: All right.

MR. MORRIS: All right. May I proceed?

THE COURT: You may proceed.

MR. MORRIS: Okay. So, may I approach, Your Honor? I've got a --

THE COURT: You may. Is this a PowerPoint? And everyone else has it, correct?

(Pause.)

THE COURT: You may proceed.

MR. MORRIS: Thank you, Your Honor. John Morris; Pachulski Stang Ziehl & Jones; for Highland Capital Management, LP and the Highland Claimant Trust.

Before I begin, Your Honor, I'd like to move my exhibits into evidence because I will be referring to them in my opening.

THE COURT: All right. So I think I said on Monday the first thing I was going to ask, and I've already blown that, was did you all have good faith discussions regarding

admission of each other's exhibits? And I did see Mr. Lang filed a day or two ago his list of objections. It looked like you were like you were down to about nine or eleven exhibits you were objecting to.

(Counsel confer.)

THE COURT: Out of 123 designations, which I think probably grew overnight to --

MR. MORRIS: Oh, okay. Well, --

MR. LANG: I just have to make clear for the record.

MR. MORRIS: You go ahead and do that.

MR. LANG: Your Honor, I've been told that Dugaboy does challenge the authority. It is not in our objection.

MR. PHILLIPS: It's not in his --

THE COURT: Well, can I ask why it was not in your objection?

MR. LANG: I do not know. I was not counsel of record when the objection was filed. I do not know what was known or not known at that time.

THE COURT: So, --

MR. LANG: So I guess we just seek leave to --

THE COURT: -- if you did not have him on -- was Mark Patrick on your exhibit list? I don't think he was, right?

MR. LANG: He was not.

THE COURT: Okay. So how would you address that? Again, we've had, I know, some back and forth over who was

going to represent Dugaboy on this matter.

MR. LANG: Yes.

THE COURT: I remember the substitutions and whatnot. But --

MR. LANG: We found out late last night that The Foundation was resolving their issue, and that kind of left us in a position.

THE COURT: So what are you saying? You all were relying on --

MR. LANG: Well, the issue had --

THE COURT: -- The Foundation to carry the flag on this one?

MR. LANG: They had raised the issue. They were pursuing the issue. We went through discovery and they were pursuing it. It was already in front of the Court.

THE COURT: All right. What would you like to say, Mr. Morris?

MR. MORRIS: Your Honor, this is more than disappointing. The fact of the matter is Mr. Dondero is funding both the Cayman Islands litigation as well as The Dallas Foundation's prosecution of the objection. The fact that The Dallas Foundation settled doesn't open the door to Mr. Dondero to assert objections that he's never asserted before.

I will tell you what will happen. If Your Honor allows

THE WITNESS: Okay.

BY MR. MORRIS:

Q And just to close the loop, Mr. Dondero, you fully funded The Dallas Foundation's objection, correct?

A And I made additional donations so that they could pursue bad actors and get their money back.

Q You funded the litigation so that The Dallas Foundation could pursue their objection, correct?

A I made additional donations so that they could get some assets back so that they could be a charity again and make donations.

Q Do you get a tax deduction for that donation?

A Yes.

Q Okay. That's nice.

Let's just finish up with the Joint Official Liquidators. Have you spoken to them?

A I do not believe so.

Q Has anybody acting on your behalf spoken with the Joint Official Liquidators?

A I don't know. I think the Joint Official Liquidators are an accounting firm. I think they're Grant Thornton. I think people have spoken to the attorneys down there, but I don't know -- I haven't spoken to Grant Thornton and I don't know if anybody else has.

Q Okay. Did you see the letter that your counsel marked as

**EXHIBIT 12**

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

QUINN EMANUEL URQUHART & SULLIVAN LLP
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as Litigation Trustee of The Highland Litigation Sub-Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | |

**HIGHLAND CAPITAL MANAGEMENT, L.P., THE HIGHLAND CLAIMANT TRUST AND HIGHLAND LITIGATION SUB-TRUST'S**

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

**RESPONSES AND OBJECTIONS TO DUGABOY INVESTMENT TRUST'S DISCOVERY RELATED TO RULE 9019 MOTION**

Highland Capital Management, L.P. ("HCMLP"), the Highland Claimant Trust (the "Claimant Trust") and the Highland Litigation Sub-Trust (the "Litigation Trust," and together with HCMLP and the Claimant Trust, the "Movants") hereby respond and object to *Dugaboy Investment Trust's Discovery Related to Rule 9019 Motion* (each, a "Request," and collectively, the "Requests"), served by the Dugaboy Investment Trust ("Dugaboy"). The Movants' responses and objections to the Requests (each, a "Response," and collectively, the "Responses") are made pursuant to Federal Rules of Civil Procedure ("FRCP") 26, 33, and 34, as made applicable in bankruptcy cases pursuant to Federal Rules of Bankruptcy Procedure 7026, 7033, and 7034.

**GENERAL OBJECTIONS**

Unless otherwise specified, the following general objections and caveats are applicable to each and every Response and are incorporated into each Response as though set forth in full:

1. The Movants object to the Requests to the extent they seek information or documents that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other privilege or immunity. The inadvertent disclosure or production of any document that is protected from discovery by any privilege or immunity shall not constitute a waiver of any such privilege or immunity. The Movants' agreement to produce documents shall be construed to mean non-privileged documents.

2. The Movants object to the Requests to the extent they request information that is not reasonably or readily available to it, in their possession, custody or control, or is more readily available to Dugaboy from another source or for which the burden of obtaining such information is not substantially greater for Dugaboy than it is for the Movants.

3. The Movants object to the Requests to the extent they call for legal

conclusions and/or legal analyses.

4. The Movants object to the Requests to the extent they seek information that is not relevant to the parties' claims or defenses or disproportionate to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

5. All specific responses to the Requests are provided without waiver of, and with express reservation of (a) all objections as to competency, relevancy, materiality, and admissibility of the responses and the subject matter thereof as evidence for any purpose in any further proceedings in this matter; (b) all privileges, including the attorney-client privilege and work product doctrine; (c) the right to object to the use of such responses, or the subject matter thereof, on any ground in any further proceeding in this action; and (d) the right to object on any ground at any time to a demand or request for further responses to these or any other discovery requests or other discovery proceedings.

6. The Movants object to the Requests to the extent they seek to expand on or conflict with Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and/or the Local Rules of the Bankruptcy Court for the Northern District of Texas.

7. The Movants object to the Requests to the extent they seek information to which Dugaboy is not entitled under the terms of the Plan or the Claimant Trust Agreement.

8. The Movants' agreement to produce documents with respect to a specific Request shall not be construed as a representation that such documents actually exist or are within the Movants' possession, custody or control.

9. These General Objections and Responses shall be deemed to be incorporated by reference into the Specific Responses and Objections set forth below.

## SPECIFIC RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST FOR PRODUCTION NO. 1:**

All communications between any of the Movants and the HMIT Entities (as defined in the Motion) related to the proposed Settlement Agreement (as referenced in the Motion).

**RESPONSE:**

Subject to the General Objections, the Movants will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 2:**

All communications between any of the Movants and any third-party related to the proposed Settlement Agreement.

**RESPONSE:**

Subject to the General Objections, the Movants will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 3:**

All drafts of the proposed Settlement Agreement.

**RESPONSE:**

Subject to the General Objections, the Movants will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 4:**

All documents supporting the allegation in Paragraph 21 of the Motion that "[i]f the Settlement Agreement is approved, the only unresolved Claims or Equity Interests will be the Daugherty Claim and the Class 11 Equity Interests asserted by two Dondero controlled entities—Dugaboy and Strand—that have no value but, if they did, their aggregate maximum value, if allowed, would not exceed approximately $1.7 million."

**RESPONSE**:

Subject to the General Objections, the Movants will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 5:**

All documents supporting the allegation in Paragraph 9 of the Motion that "[a]s of the Petition Date, HMIT's capital account balance on account of its Class B/C Interests was $394,630,871.53 (the "HMIT Capital Account Balance"), and the capital account for all Class A Interests in aggregate was $1,983,069.70.

**RESPONSE:**

Subject to the General Objections, the Movants will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request and refer to the information provided in Response to Request for Production No. 4.

**REQUEST FOR PRODUCTION NO. 6:**

All documents evidencing the "extensive arm's-length, good faith negotiations over the last several months [related to the proposed Settlement Agreement]" as referenced in Paragraph 20 of the Motion.

**RESPONSE:**

Subject to the General Objections, the Movants will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request and refer to the information provided in Responses to Request for Production Nos. 1 and 3.

**REQUEST FOR PRODUCTION NO. 7:**

All documents evidencing any efforts that the Movants examined the effect of the potential Settlement Agreement on any of the remaining creditors of the estate.

**RESPONSE:**

Subject to the General Objections, the Movants will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 8:**

All documents evidencing how HMIT's Capital Account Balance, as referenced in Paragraph 21 of the Motion, was calculated.

**RESPONSE:**

Subject to the General Objections, the Movants will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request and refer to the information provided in Response to Requests for Production Nos. 4 and 5.

**REQUEST FOR PRODUCTION NO. 9:**

All documents related to the Dugaboy Note, as referenced in paragraph 21 of the Motion, including any documents evidencing payments or amounts owed related to the Dugaboy Note.

**RESPONSE:**

The Movants object to Request No. 9 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defenses. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these Specific Objections, the Movants will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 10:**

Any documents used to answer the Interrogatories in these discovery requests.

**RESPONSE:**

The Movants object to Request No. 10 on the grounds that it is overly broad and unduly burdensome. Subject to the General Objections and these Specific Objections, the Movants will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 11:**

Documents sufficient to show the remaining unpaid amounts of allowed claims in Classes 8 and 9, as that term is defined in the Plan.

**RESPONSE:**

Subject to the General Objections, the Movants will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 12:**

Documents demonstrating any efforts by the Movants to sell or transfer the claims and causes of action that were asserted by the Litigation Trustee in the Amended Kirschner Complaint to any parties.

**RESPONSE:**

Subject to the General Objections, there are no documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 13:**

Documents demonstrating any efforts by the Movants to sell or transfer the Dugaboy Note to any parties.

**RESPONSE:**

Subject to the General Objections, the Movants will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request and refer to the information provided in Response to Request for Production No. 9.

**REQUEST FOR PRODUCTION NO. 14:**

Documents related to or identifying the value of any consideration received or exchanged as part of the proposed Settlement Agreement, including any communications related to the value of any such consideration.

**RESPONSE:**

Subject to the General Objections, the Movants will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request.

**RESPONSES AND OBJECTIONS TO INTERROGATORIES**

**INTERROGATORY NO. 1:**

Identify who negotiated the proposed Settlement Agreement on behalf of the Movants and the HMIT Entities and identify the dates of such negotiations.

**RESPONSE:**

The Settlement Agreement was negotiated by James P. Seery, Jr. on behalf of the Movants and Mark Patrick on behalf of the HMIT Entities over the course of multiple in-person, telephonic and video conference meetings, and exchanges of draft Settlement Agreements, commencing on or around April 3, 2025, the specific dates of which are reflected in the Movants' document production.

**INTERROGATORY NO. 2:**

Identify any efforts to analyze the "complexity, duration, and costs of [the Pending HMIT Litigation]," as stated in Paragraph 29 of the Motion.

**RESPONSE:**

Subject to the General Objections, the Movants refer to all court filings in connection with the Pending HMIT Litigation, including, but not limited to, the witness and exhibit lists in connection with the First Motion for Leave, the order denying the First Motion for Leave, the briefs filed in connection with the appeal, and the legal invoices of Movants' counsel in connection with such matters, all of which Movants will produce in response to the Requests for Production.

**INTERROGATORY NO. 3:**

Identify any efforts to sell or transfer the claims and causes of action that were asserted by the Litigation Trustee in the Amended Kirschner Complaint.

**RESPONSE:**

Except as contemplated by Settlement Agreement, the Movants have not attempted to sell or transfer the claims and causes of action that were asserted by the Litigation Trustee in the Amended Kirschner Complaint.

**INTERROGATORY NO. 4:**

Identify any efforts to sell or transfer the claims and causes of action that were asserted by the Litigation Trustee in the Amended Kirschner Complaint.

**RESPONSE:**

The Movants object to Interrogatory No. 4 on the grounds that it is identical to and duplicative of Interrogatory No. 3.

**INTERROGATORY NO. 5:**

Identify any efforts to sell or transfer the Dugaboy Note to any parties other than the HMIT Entities.

**RESPONSE:**

Subject to the General Objections, the Movants refer to the information provided in Response to Request for Production Nos. 9 and 13.

**INTERROGATORY NO. 6:**

Explain the basis for the Movants' contention in Paragraph 21 of the Motion that "the Daugherty Claim and the Class 11 Equity Interests asserted by two Dondero controlled entities—Dugaboy and Strand—[] have no value but, if they did, their aggregate maximum value, if allowed, would not exceed approximately $1.7 million."

**RESPONSE:**

Subject to the General Objections, the Movants refer to the information provided in Response to Request for Production Nos. 4 and 5.

**INTERROGATORY NO. 7:**

Identify all consideration received by any parties as part of the proposed Settlement Agreement and identify the monetary value of all non-monetary consideration received as part of the proposed Settlement Agreement.

**RESPONSE:**

Subject to the General Objections, in response to Interrogatory No. 7, the Movants refer to the Settlement Agreement, which sets forth all consideration received by any parties as part of the Settlement Agreement.

Dated: June 13, 2025

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com
hwinograd@pszjlaw.com

- and -

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

*/s/ Robert S. Loigman*
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

-and-

**SIDLEY AUSTIN LLP**

*/s/ Paige Holden Montgomery*
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as Litigation Trustee of the Highland Litigation Sub-Trust*

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

QUINN EMANUEL URQUHART & SULLIVAN LLP
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as Litigation Trustee of The Highland Litigation Sub-Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | ) | |

# THE HIGHLAND CLAIMANT TRUST AND HIGHLAND LITIGATION SUB-TRUST'S RESPONSES AND OBJECTIONS TO DUGABOY INVESTMENT TRUST'S FIRST SET OF DISCOVERY

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

The Highland Claimant Trust (the "Claimant Trust") and the Highland Litigation Sub-Trust (the "Litigation Trust," and together with the Claimant Trust, the "Trusts") hereby respond and object to *Dugaboy Investment Trust's First Set of Discovery* (each, a "Request," and collectively, the "Requests"),[2] served by the Dugaboy Investment Trust ("Dugaboy"). The Trusts' responses and objections to the Requests (each, a "Response," and collectively, the "Responses") are made pursuant to Federal Rules of Civil Procedure ("FRCP") 26, 33, and 34, as made applicable in bankruptcy cases pursuant to Federal Rules of Bankruptcy Procedure 7026, 7033, and 7034.

## GENERAL OBJECTIONS

Unless otherwise specified, the following general objections and caveats are applicable to each and every Response and are incorporated into each Response as though set forth in full:

1. These Responses are based upon information presently known and ascertained by the Trusts.

2. The Trusts object to the Requests to the extent they seek information or documents that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other privilege or immunity. The inadvertent disclosure or production of any document that is protected from discovery by any privilege or immunity shall not constitute a waiver of any such privilege or immunity. The Trusts' agreement to produce documents shall be construed to mean non-privileged documents.

3. The Trusts object to the Requests to the extent they request information that is not reasonably or readily available to them, in their possession, custody or control, or is more readily available to Dugaboy from another source or for which the burden of obtaining such information is not substantially greater for Dugaboy than it is for the Trusts.

[2] Capitalized terms not otherwise defined shall take on the meaning ascribed thereto in the Requests.

4. The Trusts object to the Requests to the extent they call for legal conclusions and/or legal analyses.

5. The Trusts object to the Requests to the extent they seek information that is not relevant to the parties' claims or defenses or not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

6. All specific responses to the Requests are provided without waiver of, and with express reservation of (a) all objections as to competency, relevancy, materiality, and admissibility of the responses or information disclosed in connection therewith, and the subject matter thereof, as evidence for any purpose in any further proceedings in this matter or other matters or discovery proceedings; (b) all privileges, including the attorney-client privilege and work product doctrine; (c) the right to object on any ground at any time to a demand or request for further responses or information relating thereto to these or any other discovery requests in any other matters or discovery proceedings; and (d) the right to assert any defense to any claim arising under or relating to a request for the disclosure of information produced in response to, or relating to, the Requests in any other matters.

7. The Trusts object to the Requests to the extent they seek to expand on or conflict with Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and/or the Local Rules of the Bankruptcy Court for the Northern District of Texas.

8. The Trusts' agreement to produce documents with respect to a specific Request shall not be construed as a representation that such documents actually exist or are within the Trusts' possession, custody or control.

9. The Trusts generally rely on the Plan, the Claimant Trust Agreement, and the Litigation Sub-Trust Agreement.

10. These General Objections and Responses shall be deemed to be incorporated by reference into the Specific Responses and Objections set forth below.

**SPECIFIC RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION OF DOCUMENTS**

**REQUEST FOR PRODUCTION NO. 1:**

Documents sufficient to show all money or payments made or transferred into or out of Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, or the Highland Indemnity Trust.

**RESPONSE:**

The Trusts object to Request No. 1 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defenses. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 2:**

Any documents used to answer the Interrogatories in Dugaboy's First Set of Discovery.

**RESPONSE:**

The Trusts object to Request No. 2 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defenses. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these Specific Objections, the Trusts will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 3:**

All correspondence related to any money or payments made or transferred into or out of Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, or the Highland Indemnity Trust.

**RESPONSE:**

The Trusts object to Request No. 3 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defenses. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 4**:

Documents sufficient to identify any assets currently held by Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, or the Highland Indemnity Trust.

**RESPONSE:**

The Trusts object to Request No. 4 on the grounds that it is not proportional to the needs of the case, and not relevant to the parties' claims or defenses. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these Specific Objections, the Trusts refer to, and incorporate by reference, their Response to Interrogatory No. 3, which includes a list of the assets of Highland Capital Management, L.P., the Highland Litigation Sub-Trust, the Highland Indemnity Trust, and the Highland Claimant Trust as of the most recent month end. *See* **Exhibit A**, attached hereto and included in the Trusts' production.

**REQUEST FOR PRODUCTION NO. 5**:

Documents sufficient to identify any expenses or liabilities (fixed or contingent) of Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, or the Highland Indemnity Trust.

**RESPONSE:**

The Trusts object to Request No. 5 on the grounds that it is vague and ambiguous, not relevant to the parties' claims or defenses, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1).

**REQUEST FOR PRODUCTION NO. 6**:

All documents supporting the allegations made in the motion of the Highland Claimant Trust and the Highland Litigation Sub-Trust for entry of an order further extending the duration of the Trusts through and including August 11, 2026 [Bankr. Dkt. 4213] ("Motion").

**RESPONSE:**

The Trusts object to Request No. 6 on the grounds that it is vague and ambiguous, not relevant to the parties' claims or defenses, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these Specific Objections, the Trusts will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request. In addition to these documents, the Trusts refer Dugaboy to the docket in the Bankruptcy Case, along with other publicly available documents from related adversary, civil, and appellate proceedings.

**REQUEST FOR PRODUCTION NO. 7:**

All documents supporting the allegation in paragraph 1 of the Motion, stating that "Since the Effective Date, the Trusts have successfully monetized most of the Claimant Trust's assets, made substantial distributions to beneficiaries with vested interests in the Claimant Trust, managed substantial litigation, funded the Indemnity Trust, and reduced staff and expenses commensurate with reduced operations."

**RESPONSE:**

The Trusts object to Request No. 7 on the grounds that it is vague and ambiguous, not relevant to the parties' claims or defenses, and not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these Specific Objections, the Trusts will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 8:**

All documents supporting the allegation in paragraph 2 of the Motion, stating that "Among other things, the Trusts must still monetize a limited number of assets, resolve one disputed claim, and settle or otherwise dispose of certain Estate Claims."

**RESPONSE:**

The Trusts object to Request No. 8 on the grounds that it is vague and ambiguous, not relevant to the parties' claims or defenses, and not proportional to the needs of the case. *See* Fed.

R. Civ. P. 26(b)(1). The Trusts further object to this Request to the extent that it is redundant to other Requests, including Request Nos. 4, 6, 7, 10, and 11. Subject to the General Objections and these Specific Objections, the Trusts refer to, and incorporate by reference, their Responses to Request No. 4 and Interrogatory Nos. 3 and 4, and will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 9**:

All documents supporting the allegation in paragraph 11 of the Motion, stating that "Among many other things, the Claimant Trust has successfully monetized most of its assets, managed substantial litigation, and made distributions to the Claimant Trust Beneficiaries substantially exceeding expectations."

**RESPONSE**:

The Trusts object to Request No. 9 on the ground that it is not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and this Specific Objection, the Trusts will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 10:**

All documents supporting the allegation in paragraph 12 of the Motion, stating that "For example, a limited number of assets remain to be monetized."

**RESPONSE:**

The Trusts object to Request No. 10 on the grounds that it is redundant to other Requests, including Request Nos. 4, 6, 7, and 8. Subject to the General Objections and these Specific Objections, the Trusts refer to, and incorporate by reference, their Response to Request No. 4 and Interrogatory No. 3, and will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 11:**

All documents supporting the allegation in paragraph 14 of the Motion, stating that "Ultimately, the Trusts cannot complete the forgoing tasks by August 11, 2025; an extension of the Trusts is therefore required."

**RESPONSE:**

The Trusts object to Request No. 11 on the ground that it is not proportional to the needs of the case. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and this Specific Objection, the Trusts refer to, and incorporate by reference, their Response to Request No. 4 and Interrogatory No. 3, and will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request.

**REQUEST FOR PRODUCTION NO. 12:**

All documents used to create the Post-Confirmation Reports for the Highland Claimant Trust or Highland Capital Management, L.P. filed with the United States Bankruptcy Court.

**RESPONSE:**

The Trusts object to Request No. 12 on the grounds that it is overly broad and unduly burdensome, and not relevant to the parties' claims or defenses. *See* Fed. R. Civ. P. 26(b)(1). The Trusts further object to this Request on the ground that it seeks information that is protected from discovery by the attorney-client privilege and the attorney work product doctrine.

**REQUEST FOR PRODUCTION NO. 13:**

Documents sufficient to show the remaining unpaid amounts of allowed claims in Class 9, as that term is defined in the Plan.

**RESPONSE:**

Subject to the General Objections, the Trusts will conduct a reasonable search for, and produce, non-privileged documents responsive to this Request.

**RESPONSES AND OBJECTIONS INTERROGATORIES**

**INTERROGATORY NO. 1:**

Identify any payments or distributions made by Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, or the Highland Indemnity Trust,

including the date of the payments or distributions, who the payments or distributions were made to, and any documents evidencing the payments or distributions.

**RESPONSE:**

The Trusts object to Interrogatory No. 1 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defenses. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these Specific Objections, the Trusts refer Dugaboy to the post-confirmation reports produced in response to the Requests for Production.

**INTERROGATORY NO. 2:**

Identify any payments or deposits of money made into the Highland Litigation Sub-Trust or the Highland Indemnity Trust, including the date of the payments or deposits, who made the payments or deposits, the reason the payments or deposits were made, and any documents evidencing the payments or deposits.

**RESPONSE:**

The Trusts object to Interrogatory No. 2 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defenses. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these Specific Objections, the Trusts refer Dugaboy to their Response to Interrogatory No. 3, which contains a list of the assets currently held by the Highland Litigation Sub-Trust.

**INTERROGATORY NO. 3:**

Identify any assets currently held by the Highland Litigation Sub-Trust or the Highland Indemnity Trust and identify the value of those assets.

**RESPONSE:**

The Trusts object to Interrogatory No. 3 on the grounds that it is not proportional to the needs of the case and not relevant to the parties' claims or defenses. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these Specific Objections, the Trusts refer Dugaboy to **Exhibit A** attached hereto and contained in the Trusts' production, which lists the assets of the

Highland Litigation Sub-Trust, Highland Capital Management, L.P., the Highland Claimant Trust, and the Highland Indemnity Trust.

**INTERROGATORY NO. 4:**

Identify any liabilities currently held by the Highland Litigation Sub-Trust or the Highland Indemnity Trust and identify the value of those assets.

**RESPONSE:**

The Trusts object to Interrogatory No. 4 on the grounds that it is vague and ambiguous, not proportional to the needs of the case, and not relevant to the parties' claims or defenses. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these Specific Objections, the Trusts refer Dugaboy to the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216], pursuant to which Highland seeks to enter into a settlement with Hunter Mountain Investment Trust (the "HMIT Settlement").

**INTERROGATORY NO. 5:**

Identify any efforts that have been undertaken to monetize all remaining of the assets of the Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, or the Highland Indemnity Trust, including, but not limited to, identifying the actions taken, the date of such actions, and the current status of the monetization efforts.

**RESPONSE:**

The Trusts object to Interrogatory No. 5 on the grounds that it is overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to the parties' claims or defenses. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these Specific Objections, the Trusts refer Dugaboy to, and incorporate by reference, the information provided in **Exhibit A**, attached hereto and contained in the Trusts' production in response to the Requests for Production. The Trusts further refer Dugaboy to the Caris Life Sciences, Inc. Form S-1 and Amendment No. 1 to Form S1, the Confidentiality and Nondisclosure Agreement related to the

"Korea" entity, the HCM Korea Overview presentations and "HC PEF Opportunity" slide deck, the Indicative Sales Agreement related to the SK Telecom CS T1 Co., Ltd. entity, and several documents related to the "Dugaboy Note", all of which are included in the Trusts' production.

**INTERROGATORY NO. 6:**

Identify any efforts that have been taken to monetize any remaining Class 8 or Class 9 claims or causes of action held by Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, or the Highland Indemnity Trust, including, but not limited to, identifying the actions taken, the date of such actions, and the current status of the monetization efforts.

**RESPONSE:**

The Trusts object to Interrogatory No. 6 on the grounds that it is nonsensical as drafted, overly broad, unduly burdensome, not proportional to the needs of the case, vague and ambiguous, and not relevant to the parties' claims or defenses. *See* Fed. R. Civ. P. 26(b)(1). Subject to the General Objections and these Specific Objections, the Trusts refer Dugaboy to their Response to Request for Production No. 9, the information provided in **Exhibit A**, and the HMIT Settlement.

**INTERROGATORY NO. 7:**

Identify the amounts of all reserves currently held in the Disputed Claims Reserve (as defined in the Claimant Trust Agreement).

**RESPONSE:**

Subject to the General Objection, in response to Interrogatory No. 7, the Trusts identify the following amounts as of May 31, 2025, which are materially unchanged since such date:

- Bank cash of $2,786.65

- Treasury bills maturing July 31, 2025 with a market value of $2,663,386.92

The Trusts further refer to the May 2025 brokerage statement produced in response to the Requests for Production.

Dated: June 13, 2025

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com
hwinograd@pszjlaw.com

- and -

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

*/s/ Robert S. Loigman*
Deborah J. Newman (admitted *pro hac vice*)
Robert S. Loigman (admitted *pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000

-and-

**SIDLEY AUSTIN LLP**

*/s/ Paige H. Montgomery*
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300

*Co-Counsel for Marc S. Kirschner, as Litigation Trustee of the Highland Litigation Sub-Trust*

**EXHIBIT A**
**Listing of remaining unliquidated/non-cash or treasury assets by entity [1]**
as of May 31, 2025

| Entity/description | Primary remaining barriers to disposal |
|---|---|
| Highland Claimant Trust | |
| LLC units of HCMLP Investments LLC (single member LLC and holder of shares of Highland CLO Funding, Ltd.) | Resolution of appeal in 2nd Circuit Dkt 25-643 (NexPoint/Acis) [2] |
| Highland Litigation Sub-Trust | Order approving settlement with Hunter Mountain Investment Trust |
| Highland Capital Management, LP | |
| Shares of Highland Capital Management Korea Limited ("HCMK") [3] | IPO and eventual sale of Caris Life Sciences, Inc. |
| Note due from HCMK | IPO and eventual sale of Caris Life Sciences, Inc. |
| Note due from Hunter Mountain Investment Trust | Order approving settlement with Hunter Mountain Investment Trust |
| Contractual right to receive percentage of Acis CLO 2015-6, Ltd. subordinated note payments made to Highland CLO Funding, Ltd. | Resolution of appeal in 2nd Circuit Dkt 25-643 (NexPoint/Acis) [2] |
| Shares of Highland CLO Funding, Ltd. | Resolution of appeal in 2nd Circuit Dkt 25-643 (NexPoint/Acis) [2] |
| Court award for sanctions for bad faith against NexPoint Real Estate Partners, LLC (fka HCRE Partners, LLC) | Resolution of appeal in N.D. Tex. Case No. 3:24-cv-01479-S |
| Highland Indemnity Trust | |
| Note due from The Dugaboy Investment Trust on participation from Highland Capital Management, LP | Order approving settlement with Hunter Mountain Investment Trust |
| Contingent right to receive funds resulting from settlement with Mark Okada | Order approving settlement with Hunter Mountain Investment Trust |
| Limited partnership interests of Highland Capital Management, LP | Liquidation and winding-up of Highland Capital Management, LP |
| LLC units of HCMLP GP LLC | Liquidation and winding-up of Highland Capital Management, LP |
| Highland Litigation Sub-Trust | |
| Estate Claims | Order approving settlement with Hunter Mountain Investment Trust |

[1] Does not include cash, restricted cash, or treasury holdings, nor does it include assets that are either diminimus in value or non-economic. The "Notes" described below accrue interest at various rates. Accrued, but unpaid interest with respect to these notes is also an asset for the entities.

[2] Appellants are NexPoint Diversified Real Estate Trust and NHF TRS, LLC. Appellees are Joshua N. Terry, Acis Capital Management, LP, and Brigade Capital Management, LP. Each of the Appellants had previously filed counterclaims against the Appellees in the Southern Disctrict of New York, alleging among other things, breach of fiduciary duty and mismanagement of the Acis CLOs. These claims were dismissed with the Court finding that the counterclaims were meritless and failed to state viable causes of action. The order dismissing the counterclaims is the subject of the on-going appeal, for which the opening brief of Appellants was filed June 6, 2025. Funds are currently reserved at Acis CLO 2015-6, Ltd., pending the resolution of the appeal. Highland CLO Funding, Ltd. as the approximately 87% holder of subordinated notes of Acis CLO 2015-6, Ltd., is the largest economic stakeholder in Acis CLO 2015-6, Ltd. Highland CLO Funding, Ltd. is also obligated to remit to Highland Capital Management, LP a percentage of any receipts received on account of the Acis CLO 2015-6, Ltd. subordinated notes.

[3] Highland Capital Management, LP owns 100% of the shares outstanding of HCMK. HCMK is a South Korea-domiciled entity that is the co-general partner and a limited partner of a private equity-style fund and related special purpose entities. Such entities hold minority interests in Caris Life Sciences, Inc., a US-based company that filed a registration statement on Form S-1 with the SEC on May 23, 2025, signifying its intention to go public with an initial public offering. The company has applied to list its shares on the Nasdaq Global Select Market under the ticker symbol "CAI".

**EXHIBIT 13**

Digitally signed by Advance Performance Exponents Inc
Date: 2025.05.02 11:03:34 -05:00
Reason: Apex Certified
Location: Apex



GRAND COURT
FINANCIAL SERVICES DIVISION
CAYMAN ISLANDS

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD**

---

**PETITION FOR COURT SUPERVISION**
**OF A VOLUNTARY LIQUIDATION**

---

**TO: THE GRAND COURT OF THE CAYMAN ISLANDS**

THE **HUMBLE PETITION** of (1) The Highland Dallas Foundation, Inc, (2) The Highland Kansas City Foundation, Inc, (3) The Highland Santa Barbara Foundation, Inc, (4) The HCMLP Charitable Fund (the ***Supporting Organisations*** or ***Petitioners***), in their capacity as members of Charitable DAF Holdco, Ltd (the ***Company*** or ***HoldCo***):

1. The purpose of this petition (the ***Supervision Application***) is to seek an order that the voluntary liquidation of the Company continue under the supervision of this Honourable Court pursuant to section 131 of the Companies Act (2025 Revision) (the ***Act***) and Order 15, Rule 3 of the Companies Winding Up Rules (2023 Consolidation) (the ***CWR***). The Company was placed into voluntary liquidation, and Mitchell Mansfield and William Clarke (together, the ***JVLs***) of Kroll (Cayman) Ltd, pursuant to written resolutions of the directors of the Company dated 2 April 2025.

2. The petitioning Supporting Organisations are non-profit charitable entities exempt from taxation under s.501(c)(3) of the US Internal Revenue Code who collectively hold (or in light of recent developments allegedly held) 100% of the Participating Shares in the Company. Holders of Participating Shares are entitled under the Company's Amended and Restated Memorandum and Articles of Association dated 20 February 2025 (the ***Articles***) to participate in the profits or assets of the Company but are not entitled to attend, to speak at, or to vote at general meetings. By contrast, holders of Management Shares are entitled to attend, to speak at and to vote at any general meeting, but have no right to participate in the profits or assets of the Company.

3. HoldCo is a Cayman Islands exempt company formed on 27 October 2011 (registration no. 263805) whose registered office is Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands. HoldCo is purportedly governed by the Articles.

4. HoldCo is (or at least was) the limited partner of Charitable DAF Fund, LP (the ***Fund***), a Cayman Islands limited partnership formed on 28 October 2011 (registration no. 53083) whose registered office is Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman, KY1-9010, Cayman Islands. The Fund is, to the best of the Petitioners' knowledge, governed by the Amended and Restated Limited Partnership Agreement dated 7 November 2011 (the ***ARLPA***).

5. This Petition refers to the Supporting Organisations' petition seeking the winding up of the Company on just and equitable grounds dated 10 April 2025 (the ***J&E Petition***), and the summons for the appointment of provisional liquidators dated 10 April 2025 (the ***PL Summons***), in Proceedings FSD. No. 99 of 2025, the latter of which is listed for hearing before this Honourable Court on 29 April 2025 (the ***Hearing***) – copies of which are at **Schedules A** and **B**, respectively.

**VOLUNTARY LIQUIDATION OF THE COMPANY**

6. On 23 April 2025 at 1:42pm, Johnstone Law (the Petitioners' attorneys) sent an email to Walkers (Cayman) LLP advising that they acted for the Supporting Organisations and seeking confirmation as to whether Walkers acted for and were instructed to accept service on the Company's behalf.

7. On 24 April 2025 at 11:35am, Walkers responded to Johnstone Law requesting confirmation of the nature of the proceeding to be served – but not addressing whether they acted for or had instructions to accept service on the Company's behalf. Johnstone Law replied that given their failure to respond the day prior, the papers would be served on HoldCo's registered office. That same day, copies of the Petition, the PL Summons and supporting materials were served on the Company's registered office.

8. On 25 April 2025, the Petitioners were preparing for the Hearing of the J&E Petition / PL Summons and in the course of finalising the hearing materials for delivery to the Court. At 3.32pm that day however Johnstone Law received a letter from Walkers (the ***Walkers Letter***) that stated *inter alia*:

   (a) On 2 April 2025, nearly four weeks ago: (i) HoldCo was placed into voluntary liquidation, and the JVLs appointed, by way of written resolutions of the directors, and (ii) the directors had executed a declaration of solvency with respect to the Company.

(b) On 14 April 2025, Gazette Issue No. 8/2025 (the ***Gazette***) was published, which included notice that the Company was placed into voluntary liquidation.

(c) Nothing in the Articles entitled the Petitioners to receive notice from the Company of its entry into Voluntary Liquidation, and "[*t]he fact should have been evident from a search of the Gazette prior to service, as per the enclosed notice*".

(d) As the Company was already in voluntary liquidation, the Petition and Summons were "*plainly redundant*" and should be withdrawn. If they were not withdrawn, this letter must be brought to the Court's attention at the Hearing, at which Walkers will appear for the Company and seek costs if appropriate.

9. Enclosed to the Walkers Letter were copies of the following:

(a) director resolutions dated 2 April 2025 (the ***Director Resolutions***);

(b) management shareholder resolution dated 2 April 2025;

(c) the JVLs' consents to act;

(d) declaration of solvency;

(e) the Gazette;

(f) the Articles;

(g) the Company's register of members as at 25 April 2025.

10. Although not stated anywhere in the Walkers Letter, the enclosures revealed the following matters, which were previously unknown to the Petitioners:

(a) On 7 February 2025, HoldCo allotted 318 participating shares to an entity named 'DFW Charitable Foundation' (***DFW***) – the effect being the substantial dilution of the Supporting Organisations' interest in the Company, from a cumulative holding of **100%** of the Participation Shares to **48.9%**. The Petitioners have since discovered that DFW is a Delaware company incorporated on 9 December 2024, registered to Mark Patrick's home address and Mark Patrick being the sole member. Mark Patrick is a director of and holds the Management Shares in HoldCo. DFW was purportedly granted charitable status by the State of Delaware on 7 February 2025, the same day it was allotted 318 participating shares in the Company.

(b) On 20 February 2025, HoldCo amended its Articles by way of special resolution, such special resolution passed solely by Mark Patrick.

(c) The Company's sole investment, being an interest in an entity by the name of CDMCFAD LLC was redeemed on 27 March 2025 and, on 2 April 2025, the proceeds available for distribution from this redemption were distributed in the amount of US$1,612,192 purportedly to HoldCo's participating shareholders;

(d) As at 2 April 2025, the Company has no assets.

11. On 27 April 2025, Johnstone Law responded to the Walkers Letter setting out the Petitioners' serious concerns arising from the matters disclosed therein, and stating *inter alia*:

(a) There can be no honest, reasonable or lawful justification or basis for the Company taking the steps it has, or for doing so without notifying and consulting the Petitioners in advance, and the subsequent failure to provide notice of such actions makes clear the information was deliberately withheld (supported further by the matters being disclosed only 1 clear working day before the Hearing).

(b) The steps were taken while the Supporting Organisations and HoldCo were engaged in correspondence about financial irregularities and lacking transparency on the part of the Company and its underlying interests. The failure of HoldCo (through its current directors or its US attorneys) to disclose this information in the course of that correspondence is proof of the utmost bad faith and deception on the part of HoldCo and its directors.

(c) The fact that the JVLs appointed by the Company have themselves taken no steps to inform the Supporting Organisations of such matters since their appointment causes them to conclude the JVLs lack sufficient independence required to protect the interests of the Supporting Organisations and the Company as a whole.

(d) The Walkers Letter makes it more, not less, essential that independent officer holders operating under the Court's supervision are appointed over the Company without delay. The Supporting Organisations will not withdraw the Petition or the PL Summons, but plan to issue or at least finalise additional proceedings on 28 April 2025, and to invite the Court to appoint Margot MacInnis and Sandipan Bhowmik as official liquidators of the Company at the Hearing – and seeking the Company's agreement by 12pm on 28 April 2025.

(e) The Supporting Organisations were, until 7 February 2025, and in law remain, owners of 99% of the economic interest in HoldCo. They do not approve of the purported share dilution nor the appointment of JVLs and their rights are fully reserved, and in the circumstances, it is inappropriate for assets of the Company, or any related entities, to be used for the purpose of payment of legal fees.

(f) A request for details of DFW, including when it was formed and received charitable status, the identity of its owners/controllers, its registered address and centre of operations.

(g) A request for confirmation by 8pm on 27 April 2025: (i) what has become of the Company's interest in the Fund, and (ii) to whom and in what amounts were the distributions referred to in the Director Resolutions transferred.

12. No response was received from Walkers by 8pm on 27 April 2025. At 9:16pm, Johnstone Law sent an email to Walkers noting the failure to provide the information and requesting that, in the circumstances and, if within their knowledge, the JVLs provide such information.

**NOTICE OF SUPERVISION APPLICATION**

13. In the circumstances, in particular that the Supporting Organisations (and purportedly DFW, although the Petitioners do not accept the validity of the share allotment to DFW) are the Company's only contributories – and given the clear evidence that the Supporting Organisations' interests in the Company have been diluted and the assets of the Company dissipated without notice or justification – the Petitioners respectfully request the Court exercise its discretion to dispense, as it is entitled to do, with the notice requirements in O.15 of the CWR.

**APPLICATION FOR SUPERVISION ORDER**

14. The Petitioners respectfully seek an Order from this Honourable Court that the voluntary liquidation of the Company continue under the supervision of the Court pursuant to section 131 of the Act, and that Margot MacInnis and Sandipan Bhowmik of Grant Thornton be appointed as joint official liquidators (together, the ***JOLs***) of the Company, for the following reasons:

(a) The making of a supervision order will allow the JOLs to conduct a proper investigation of the affairs of the Company and conduct an orderly winding up under the supervision of this Honourable Court for the benefit of all stakeholders.

(b) There is to say the least a large cloud hanging over Mr Patrick and Mr Murphy, as directors of HoldCo, who should not be allowed or entitled, irrespective of the professionalism of the JVLs, to retain the role and functions that directors normally retain attendant upon voluntary liquidations.

(c) The Supporting Organisations, as the owners of 100% of the economic interest in the Company (at least prior to the purported allotment of shares to DFW on 7 February 2025) should be entitled to choose the liquidator, or at least a liquidator not appointed by the directors, the conduct of whom has raised serious concerns even prior to the events disclosed in the Walkers Letter.

(d) Court supervision will result in an indisputably more effective, economic, and expeditious liquidation of the Company in the interests of the Supporting Organisations as contributories. Save in respect of any claim the Supporting Organisations save, there

does not appear to be any creditors.

(e) An investigation into the allegations of misconduct on the part of the management of the Company will be substantially expedited and more effective if conducted by official liquidators, who are not the same persons as the JVLs.

(f) Should an investigation identify transactions that should be set aside, or claims that should be advanced, whether against the directors of the Company or third parties, such actions are most appropriately and effectively undertaken by official liquidators, who are not the same persons as the JVLs.

(g) As the holder of the Management Shares in the Company (Mr Patrick) is resident in the US and as are many of the entities related to and with whom the Fund transacts, it is highly likely, if not certain, that the liquidators will need to instruct attorneys in the US, obtain recognition under chapter 15 of the US Bankruptcy Code, and commence proceedings in the US to recover any assets wrongfully dissipated. Such steps necessitate the liquidation being conducted under the supervision of the Court.

15. Ms MacInnis and Mr Bhowmik of Grant Thornton:

(a) are “qualified insolvency practitioners” as defined in s.89 of the Act and as prescribed by Regulation 4 of the Insolvency Practitioners’ Regulations (2023 Consolidation) (***IPR***);

(b) meet the residency requirements contained in Regulation 5, IPR;

(c) meet the independence requirements prescribed by Regulation 6, IPR;

(d) meet the insurance requirements prescribed by Regulation 7, IPR, and Grant Thornton holds a trade licence which authorises its staff to carry on business as professional insolvency practitioners; and

(e) consent to their appointment as official liquidators of the Company, if so appointed.

**YOUR PETITIONERS THEREFORE HUMBLY PRAY THAT:**

1. The voluntary liquidation of the Company be continued under the supervision of the Court pursuant to s.131 of the Act and O.15, r.8 of the CWR.

2. Margot MacInnis and Sandipan Bhowmik of Grant Thornton Specialist Services (Cayman) Ltd. of Second Floor, Century Yard, Cricket Square, George Town, Grand Cayman, Cayman Islands, be appointed as joint official liquidators (***JOLs***) of the Company pursuant to s.132 of the Act.

3. The JOLs have the power to act jointly and severally.

4. The JOLs shall not be required to give security for their appointment.

5. The JOLs be authorised pursuant to s.110(2)(a) of the Act, to jointly and severally exercise all of the powers specified in Part II of the Third Schedule to the Act..

6. The JOLs be authorised pursuant to s.110(2)(a) of the Act to exercise the following powers in Part I of the Third Schedule to the Act, without the further sanction or intervention of the Court:

a. The power to bring or defend any action or other legal proceeding in the name and on behalf of the company;

b. The power to carry on the business of the company so far as may be necessary for its beneficial winding up;

c. The power to compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the company and a contributory or alleged contributory or other debtor or person apprehending liability to the company.

d. The power to deal with all questions in any way relating to or affecting the assets or the winding up of the company, to take any security for the discharge of any such call, debt, liability or claim and to give a complete discharge in respect of it.

e. The power to engage staff, agents and/or consultants in the Cayman Islands and elsewhere to assist the JOLs in the performance of their functions; and

f. The power to engage attorneys and other professionally qualified persons in the Cayman Islands and elsewhere to assist the JOLs in the performance of their functions.

7. The JOLs be specifically authorised and entitled without the further sanction of the Court to undertake the following:

a. Presenting a petition for the winding up of the exempted limited partnership, Charitable DAF Fund, LP (the Fund).

b. Taking control of the Company's subsidiaries, joint ventures, investments, associated companies, businesses, or other entities (collectively referred to as the "Associated Companies") in which the Company holds an interest (or such shares of such Subsidiaries and/or Associated Companies as are owned directly or indirectly by the Company), in each case, wherever located, as the JOLs see fit. Additionally, to call or cause to be called meetings of such Subsidiaries and/or Associated Companies, and to sign resolutions (in accordance with the provisions of any relevant constitutional or related documentation of

such companies) and take such other steps, including applications to and communications with appropriate courts and/or regulators, as the JOLs consider necessary to appoint or remove directors, legal representatives, officers, and/or managers to or from such Subsidiaries and/or Associated Companies. In each case, take the necessary steps to ensure that the registered agents (or other equivalent corporate administrators) of such Subsidiaries or Associated Companies implement the changes to the boards of directors, legal representatives, officers, and/or managers of such companies or entities. This includes (without limitation) effecting changes to the company registers of such Subsidiaries or Associated Companies as may be deemed appropriate by the JOLs. Furthermore, to take such other actions in relation to all such Subsidiaries or Associated Companies as the JOLs see fit for the purpose of protecting the assets of the Company and managing its affairs (which, to avoid any doubt, shall include the assets and affairs of the Subsidiaries and Associated Companies).

c. Issuing and pursuing an application by summons for an order appointing themselves or other fit and proper persons as joint provisional liquidators of the Fund.

d. Locating and taking possession of and preserving all the Company's books, records and other papers (whether hard copy, digital or otherwise).

e. Identifying the nature and location of all property and assets which appear to belong to the Company.

f. Getting in or otherwise securing and protecting all such property and assets.

g. Investigating the costs and expenses incurred by the Company.

h. Identifying any creditors of the Company.

i. Investigating the promotion, business, dealings, and affairs of the Company.

j. Investigating whether the Company or the JOLs may have any claims (either in this jurisdiction or elsewhere) against any officer or employee or former officer or employee of the Company, or against any other person or persons.

k. Commencing and pursuing any such or other claims, if the JOLs are of the view that that is necessary or desirable in order to protect the ability of the Company or any liquidator of the Company to pursue any such claims or otherwise to preserve the value of any such claims.

l. Seeking registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the liquidation.

m. Carrying on the business of the Company so far that may be beneficial for the Company, its

creditors.

n. Being at liberty to complete or terminate any contracts or transactions entered into by the Company.

o. Retaining and operating the existing bank or other accounts of the Company and where necessary opening new accounts.

p. Taking control of or redirecting any email or other digital communication method used for the purposes of the Company's business or affairs.

q. Applying to the Court for directions, including on short notice, including for Orders to vary these powers and functions.

8. The Court dispenses with the requirement for this Supervision Application and the hearing of this Supervision Application to be advertised pursuant to O.15 of the CWR.

9. The JOLs' remuneration and expenses be paid out of the assets of the Company in accordance with s.109 of the Act, Part III of the Regulations, and O.20 of the CWR.

10. The costs of this Supervision Application shall be paid out of the assets of the Company as an expense in the liquidation, such costs to be taxed if not agreed with the JOLs.

11. The JVLs shall prepare a final report and accounts for the period from the commencement of the voluntary liquidation until the date of the supervision order, and deliver such report to the JOLs within 28 days of this Order.

12. Such further or other orders be made as the Court shall deem fit.

**AND** your Petitioner will ever pray etc.

Dated 28th April 2025

Johnstone Law

**Johnstone Law Ltd.**
Attorneys for the Petitioners

**THIS PETITION** was presented by Johnstone Law Ltd., attorneys for the Plaintiffs, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/00016**)

**NOTICE OF HEARING**

**TAKE NOTICE THAT** the hearing of this Petition will take place at the Law Courts, George Town, Grand Cayman, Cayman Islands on at am.

Any correspondence or communication with the Court relating to the hearing of this Petition should be addressed to the Registrar of the Financial Services Division of the Grand Court at PO Box 495, George Town, Grand Cayman KY1-1106, Cayman Islands; Tel: +1(345)949-4296.

**EXHIBIT 14**

FSD NO. 116 OF 2025 (JAJ)

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**
**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD**

**BEFORE THE HONOURABLE JUSTICE JALIL ASIF KC**
**IN CHAMBERS**

**6 MAY 2025**

**SUPERVISION ORDER**

**UPON** the petition filed on 2 May 2025 by (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund for an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd continue under the supervision of the Court pursuant to s.131 Companies Act (2025 Revision)

**AND UPON** hearing counsel for the Petitioners and counsel for DFW Charitable Foundation

**AND UPON** reading the petition herein, the affidavit of Julie Diaz and exhibit JD-2 sworn on 29 April 2025 and the affirmation of Rhiannon Zanetic and exhibit RMZ-1 signed (but not affirmed) on 29 April 2025

**AND UPON** reading the following documents filed in Cause FSD 2025-0099 (JAJ): the winding up petition filed on 10 April 2025, the first affidavit of Julie Diaz and exhibit JD-1 sworn on 10 April 2025, the affidavit of James Dondero and exhibit JDD-1 sworn on 9 April 2025 and the affidavit of Geoffrey Sykes and exhibit GS-1 sworn on 27 April 2025

**AND UPON** reading the affidavit of Margot Macinnis and exhibit MM-1 sworn on 28 April 2025 and the affidavit of Sandipan Bhowmik and exhibit SB-1 sworn on 28 April 2025 providing their consents to act as official liquidators of Charitable DAF HoldCo, Ltd

**IT IS HEREBY ORDERED that:**

1. The voluntary liquidation of Charitable DAF HoldCo, Ltd ("the Company") be continued under the supervision of the Court pursuant to s.131 of the Act and O.15, r.8 of the Companies Winding Up Rules (2023 Consolidation).

**THIS ORDER** was filed by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

2. The following persons are appointed as joint official liquidators of the Company:

| **Name** | **Address** | **Contact Details** |
|---|---|---|
| Margot MacInnis | Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands | +1 345 949 8588 margot.macinnis@uk.gt.com |
| Sandipan Bhowmik | | +1 345 949 8588 sandipan.bhowmik@uk.gt.com |

3. The joint official liquidators may act jointly and severally.

4. The joint official liquidators are not required to give security for their appointment.

5. The joint official liquidators are authorised to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:

   a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and

   b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

6. The joint official liquidators are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:

   a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

   b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

   c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

7. The Court dispenses with the requirement for the summons herein and the hearing of the summons to be advertised pursuant to CWR O.15.

8. The joint official liquidators' reasonable remuneration and expenses be paid out of the assets of the Company in accordance with s.109 of the Act, Part III of the Insolvency Practitioners Regulations and CWR O.20.

9. The joint voluntary liquidators shall prepare a final report and accounts for the period from the commencement of the voluntary liquidation until the date of this Order and shall deliver such report to the joint official liquidators within 28 days of this Order.

**THIS ORDER** was filed by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

GENERAL REGISTRY CAYMAN ISLANDS

10. The costs of this summons shall be paid out of the assets of the Company as an expense in the liquidation, such costs to be taxed on the indemnity basis if not agreed with the joint official liquidators.

**Dated 6 May 2025**
Filed 6 May 2025

______________________________________
**THE HONOURABLE JUSTICE JALIL ASIF KC**
**JUDGE OF THE GRAND COURT**

**THIS ORDER** was filed by Johnstone Law Ltd., attorneys for the Petitioners, whose address for service is Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman, KY1-1109, Cayman Islands (**Ref:AJ/RZ/0016**)

GENERAL REGISTRY CAYMAN ISLANDS


Filed: 09-May-2025 15:00 EST
Auth Code: C02067594574
www.verify.gov.ky File#: 263805

**EXHIBIT 15**

E-filed in the Office of the Clerk
for the Business Court of Texas
7/1/2025 9:35 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027

25-BC01B-0027
**CAUSE NO. ____________________**

| | |
|---|---|
| **THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC.,** | |
| *Plaintiffs*, | **IN THE TEXAS BUSINESS COURT** |
| **v.** | **1ST DIVISION** |
| **MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd.,** | **DALLAS, TEXAS** |
| *Defendants.* | |

**PLAINTIFFS' ORIGINAL PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**

**TO THE HONORABLE JUDGE OF SAID COURT:** The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc., (collectively, the "Plaintiffs" or "Supporting Organizations") file this Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Application for Appointment of Receiver, and in support thereof, respectfully show the Court as follows:

## I. PRELIMINARY STATEMENT

1.1 Defendant, Mark Patrick, through a host of corporate manipulations, took over $270 million in cash and assets that supported some of the most important community-based



Copy from re:SearchTX

charities in the country. In Patrick's own testimony from just last Wednesday, June 25th, the Supporting Organizations, plaintiffs here, were left with "nothing."[1]

1.2 Through the mechanism of Charitable DAF GP, LLC (organized in Delaware) and later via a secretly incorporated entity, CDH GP, Ltd., Mark Patrick held the sole control position of what was a $270 million charitable fund (Charitable DAF Fund, LP) that four charities and the Supporting Organizations relied on to perform vital and sustained philanthropic work in specific communities in the United States. Patrick flagrantly violated both his express and implied fiduciary duties to the Supporting Organizations. He did so in order to redirect the fund's beneficial ownership to a brand-new sham charitable organization controlled by him, DFW Charitable Foundation. These actions come against a backdrop and pattern of sustained self-aggrandizement by Patrick using the fund's resources and his technical authority over them. If the Defendants here are not immediately prevented from taking further adverse actions, then placed into receivership and subjected to judicial scrutiny, the Plaintiffs will be cut off from the lifeblood of their charitable work by the very person whose duty was to act in their interests. Accordingly, Plaintiffs seek a Temporary Restraining Order and Temporary Injunction freezing the funds, followed by the appointment of a Receiver over the funds and the organization holding them.

## II. DISCOVERY CONTROL PLAN AND MONETARY RELIEF

2.1 Plaintiffs intend that discovery be conducted under Level 2 as set forth in Rule 190.3 of the Texas Rules of Civil Procedure. Plaintiffs reserve the right to request to conduct discovery pursuant to "Level 3" as set forth in Rule 190 of the Texas Rules of Civil Procedure.

[1] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11 (App. Pg. 200)



Copy from re:SearchTX

2.2 Plaintiffs seek damages in excess of $5,000,000 exclusive of interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs.

## III. PARTIES

3.1 **The Highland Dallas Foundation, Inc. ("HDF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HDF provides funding to The Dallas Foundation, a Texas charitable entity established in 1929, which has awarded over $1 billion in charitable grants that support a broad range of public needs.

3.2 **The Highland Kansas City Foundation, Inc. ("HKCF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HKCF provides funding to the Greater Kansas City Community Foundation, established in 1978, which has awarded over $7 billion in in charitable grants that support a broad range of public needs.

3.3 **The Highland Santa Barbara Foundation, Inc. ("HSBF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HSBF provides funding to the Santa Barbara Foundation, established in 1928, that supports a broad range of public needs.

3.4 **DFW Charitable Foundation ("DFWCF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. It was organized on December 9, 2024, with Defendant Mark Patrick as DFWCF's sole member. It purports to be a nonprofit nonstock corporation serving exclusively charitable purposes. DFWCF is headquartered at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254. DFWCF maintains a registered office at Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801, where it may be served with process.


Copy from re:SearchTX

3.5 **Mark Patrick ("Patrick")** is an individual who resides in Texas and holds management control over the Fund structure, as explained more thoroughly below. Patrick resides and may be served with process at 6716 Glenhurst Drive, Dallas, Texas 75254, or served anywhere he may be found.

3.6 **CDMCFAD, LLC** is a Delaware limited liability company with headquarters at 6716 Glenhurst Drive, Dallas, Texas 75254. It may be served with process at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

3.7 **CDH GP, Ltd**. is a Cayman Island limited company with its registered office at Campbells Corporate Services Limited, Floor 4 Willow House, Cricket Square, Grand Cayman Ky1-9010. It may be served with process through Patrick, its 100% owner and sole director, at 6716 Glenhurst Drive, Dallas, Texas 75254, or anywhere he may be found.

3.8 **CHARITABLE DAF GP, LLC** is a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands. It may be served with process at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

## IV. JURISDICTION AND VENUE

4.1 Pursuant to Government Code § 25A.004, this Court has jurisdiction over this matter because the amount in controversy exceeds $5 million excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

- and is an action regarding the governance, governing documents, or internal affairs of organizations, namely Charitable DAF Fund, L.P., and DAF HoldCo, Ltd;


Copy from re:SearchTX

- and is an action by an owner of an organization, namely the Supporting Organizations as participating and beneficial owners of DAF HoldCo, Ltd and thereby Charitable DAF, L.P., and is brought against a controlling person and managerial official of the organization, namely Patrick, Charitable DAF, GP, LLC, CDH GP, Ltd and Patrick's controlled entities, DFWCF, and CDMCFAD, LLC; and alleges numerous fiduciary and other breaches of Patrick's, Charitable DAF, GP, LLC's, and CDH GP, Ltd's obligations in the capacity of a controlling person and managerial official of DAF HoldCo, Ltd and Charitable DAF, L.P.;
- and is an action alleging that Patrick, as a controlling person, and managerial official, with the entities he dominated and used, breached a duty owed to the Supporting Organizations as a controlling owner of DAF HoldCo, Ltd, CDMCFAD, LLC, and Charitable DAF, L.P., DFW Charitable Foundation by reason of the Patrick's status as an owner of management interests, controlling person, and managerial official, including the breach of a duty of loyalty and good faith.

4.2 The Court also has related supplemental jurisdiction per Government Code § 25A.004.

4.3 The Court also maintains plenary power to appoint a receiver under Texas Government Code § 24.003, Texas Civil Practice and Remedies Code § 64.001(a)(3), Texas Business and Organizations Code §§ 11.401 and 11.410, and through the Court's inherent powers at equity.

4.4 Personal jurisdiction is proper by Texas courts pursuant to Texas Civil Practice & Remedies Code § 17.042 because Defendants committed tortious actions, including Texas resident,


Copy from re:SearchTX

Mark Patrick, who improperly took approximately $270 million in value, and other conduct within Texas, incorporated herein, which are the subject of this Petition. Defendants are therefore subject to specific personal jurisdiction because of the complained-of acts that they committed in Texas. Defendants all have substantial business operations, assets, and other connections to Texas. Defendants are subject to general personal jurisdiction in Texas because they both reside in, and have continuous and systematic contacts with, Texas. Defendants have also consented to the jurisdiction of Texas courts.

4.5 Venue is proper in this county under Texas Civil Practice & Remedies Code § 15.002 because Defendant Patrick is a resident of Dallas County, Texas and Patrick undertook and directed a substantial portion of the complained-of acts in Dallas County, Texas. On information and belief, DFWCF, CDH GP, Ltd. and CDMCFAD are headquartered in Dallas County. Dallas County is within the 1st Division of the Texas Business Court.

## V. FACTUAL BACKGROUND

### A. *The Fund Structure*

5.1 James Dondero was the President of Highland Capital Management, L.P. ("**Highland**"), an SEC registered investment advisor. At Mr. Dondero's direction, in 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. The goal was to create a permanent, self-sustaining, self-governing charitable infrastructure to facilitate sustained philanthropic efforts in specific communities in the United States.

5.2 To that end, in 2011, "Charitable DAF Fund, L.P. ("**Charitable DAF Fund**") was formed to hold the donated assets.



Copy from re:SearchTX

5.3 The Charitable DAF Fund primarily holds assets through a wholly-owned subsidiary entity called CLO HoldCo, Ltd. (“**CLO HoldCo**”).

5.4 At the same time the Charitable DAF Fund was created, Charitable DAF HoldCo, Ltd (“**Charitable DAF HoldCo**”), a Cayman Islands entity, was also organized. Charitable DAF HoldCo held all of the economic interest in the Charitable DAF Fund. In other words, Charitable DAF HoldCo was the beneficial owner of all monies flowing from the assets held in the Charitable DAF Fund.

5.5 The ultimate purpose of forming Charitable DAF Fund and Charitable DAF HoldCo was to benefit certain, substantial regional nonprofit charities and their supporting organizations in California, Kansas, and Texas. Participating shares in Charitable DAF HoldCo were therefore issued to four Supporting Organizations, which were the ultimate beneficial owners of the assets held in the Charitable DAF Fund. Together, the four Supporting Organizations owned 100% of Charitable DAF HoldCo. The four Supporting Organization held their beneficial ownership in the assets of the Charitable DAF Fund by virtue of those Participating Shares in Charitable DAF HoldCo. Put simply: the four Supporting Organizations owned 100% of Charitable DAF HoldCo, which was the beneficial owner of all the assets in the Charitable DAF Fund. Three of the four Supporting Organizations are the Plaintiffs in this Lawsuit.

5.6 In turn and as intended, the funds provided to the Plaintiff Supporting Organizations from the Charitable DAF Fund empowered them to provide funding directly to charitable foundations in three regions of the United States. Specifically, The Dallas Foundation, The Greater Kansas City Community Foundation, and The Santa Barbara Foundation (together, the “**Charities**”) are each affiliated with one of the Supporting Organizations and receive regular grants for charitable work ultimately funded by Charitable DAF Fund.

5.7 Since the Charitable DAF Fund's inception, the Supporting Organizations have granted over $42 million to charitable organizations, including donations to 275 organizations, with average annual grant payments of $3.7 million. The Supporting Organizations and the charitable organizations perform irreplaceable philanthropic work in their respective communities, and do so in a steady, reliable manner that permits them to build progress on initiatives year after year.

**B. *Control of the Fund***

5.8 The founders of the Charitable DAF Fund and of Charitable DAF HoldCo wanted to ensure that the fund assets were professionally managed by experts. So, although the Supporting Organizations were the sole beneficiaries of the Charitable DAF Fund and together held all of the economic interest in it, management control of the Charitable DAF Fund and Charitable DAF HoldCo was vested not with those organizations but rather in "Management Shares," with general partner status. These "Management Shares" provided the only voting rights for any and all shareholders in Charitable DAF HoldCo. But they did not convey a right to any economic benefit of the assets in the Charitable DAF Fund, which belonged solely to the Supporting Organizations.

5.9 So, the "Management Shares" exercised control over the assets and over the operations of Charitable DAF HoldCo, even though they conveyed no economic benefit. In the interest of efficient management, the Management Shares and general partner status in the Charitable DAF Fund were concentrated in one person, the "**Control Position**." The Control Position was therefore responsible to manage the Charitable DAF Fund and Charitable DAF HoldCo for the economic benefit of their economic beneficiaries—the "Supporting Organizations," which held their "Participating Shares." The Control Position therefore owed the

Supporting Organizations fiduciary duties of candor, care, and loyalty, including a prohibition against any self-dealing.

5.10 In essence, the governing documents of Charitable DAF HoldCo grant complete control of Charitable DAF Fund structure to the holder of the 100 Management Shares in Charitable DAF HoldCo. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Charitable DAF Fund structure.

5.11 The Charitable DAF Fund, however, is also expressly, separately controlled by the Control Position. Similar to control over Charitable DAF HoldCo, control over the Charitable DAF Fund is separate from the beneficial economic ownership of the Charitable DAF Fund (which belongs entirely to the Supporting Organizations). Control over the Charitable DAF Fund was reposited in the Control Position through its complete ownership of a Delaware entity named Charitable DAF GP, LLC[2] (the "**Delaware GP**"). The Delaware GP was the managing general partner in the Charitable DAF Fund.

5.12 The Amended and Restated Limited Partnership Agreement of the Charitable DAF Fund, dated November 7, 2011 (the "**ARLPA**"), and the Amended and Restated Memorandum and Articles of Association of the LP dated January 19, 2015 ("**Articles**"), govern the Charitable DAF Fund and its partners. The ARLPA makes it clear the Control Position is to exercise his powers for the sole benefit of the Supporting Organizations.

5.13 For example, the Preamble to the ARLPA states: "WHEREAS, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code

[2] The Charitable DAF GP, LLC, held all the general partnership shares in Charitable DAF Fund, which provided all management control over the Charitable DAF Fund, but conveyed no beneficial economic interest.


Copy from re:SearchTX

of 1986, as amended and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein[.]"

5.14 Likewise, Section 1.3 (Purpose and Powers) states that the Control Position must manage the fund assets "*for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners*."[3]

5.15 Section 1.6 (Powers) likewise emphasizes: "[T]he General Partner [Control Position] . . . is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; *provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner*."[4]

5.16 The ARLPA thus provides that Charitable DAF Fund was formed to make investments, directly or indirectly, "for the economic benefit of the Limited Partner [DAF HoldCo] and its Indirect Charitable Owners" and contemplates the engagement of investment (and other service) advisors to achieve this. In this context, the Control Position is responsible for the governance and management functions of the Charitable DAF Fund as required for it to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support. The ARLPA is infused throughout with the singular command: The Control Position has great authority but is required to act with fidelity in exercising it for the benefit of the Supporting Organizations.

5.17 Grant Scott was initially selected for the Control Position. Mr. Scott was a longtime friend of Mr. Dondero's and a lawyer in North Carolina. Mr. Dondero knew and trusted Mr. Scott.

---

[3] Emphasis added.
[4] Emphasis added.


Copy from re:SearchTX

Mr. Scott effectively served the Supporting Organizations' charitable purposes in his role in the Control Position. For this, Mr. Scott received $60,000 in annual compensation—a compensation rate that remained unchanged for the better part of decade. During this time, the Supporting Organizations and their respective charitable foundations made great strides in creating philanthropic, and charitable, work that was efficient, that was steady and reliable, and that grew and built on their progress year after year.

**C. *Mark Patrick's Assumption of Control***

5.18 Highland filed for bankruptcy in October 2019 ("**Highland Bankruptcy**") and, as a result, the Charitable DAF Fund became engaged in certain disputes arising from the bankruptcy, increasing the time and responsibilities associated with the Control Position. Mr. Scott did not feel qualified to manage those disputes and decided to resign from the Control Position.

5.19 Mark Patrick, a tax attorney and employee of Mr. Dondero who had played a significant role in developing the overall Charitable DAF Fund structure while at Highland, suggested to Mr. Scott and Mr. Dondero that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected Charitable DAF Fund. At the time, Patrick was an employee of Mr. Dondero's enterprises and was serving as Mr. Dondero's attorney and Mr. Dondero had no objection to Mr. Scott transferring the Control Position to Patrick. As a result of his attorney and employee status, Mr. Patrick owed significant fiduciary duties to Mr. Dondero's entities and to the Charitable DAF Fund structure—fiduciary duties that he has violated in a series of self-serving and self-dealing transactions.

5.20 On March 25, 2021, Mr. Scott resigned and appointed Patrick as director of DAF HoldCo, transferring all his management shares and membership interest to Patrick for nominal consideration. Patrick therefore assumed the Control Position from that date. Patrick then hired


Copy from re:SearchTX

Paul Murphy, a Cayman Islands' director, to join him in his efforts to abscond with the $270 million in assets.

5.21 At the time Patrick assumed the Control Position, he was employed at Skyview Partners, a service organization that provided support primarily to Mr. Dondero and entities in which Mr. Dondero had an interest. As an employee of Skyview, he owed fiduciary duties to his employer.

**D. *Patrick's Breaches of Fiduciary Duty***

5.22 In 2023, while still employed by Dondero entities, and as the sole fiduciary for the Charitable DAF Fund and DAF HoldCo, Patrick initiated a two-year pattern of malfeasance all culminating in his current effort to abscond with $270 million. His initial small infidelities quickly blossomed into a brazen, fraudulent play for the Charitable DAF Fund and its $270 million in holdings, putting at risk the charitable works supported by the Supporting Organizations.

**E. *Undisclosed Self-Dealing***

5.23 In June 2023, Patrick requested that The Highland Dallas Foundation, Inc. direct $10,000 to Creative HEARTS TX, a non-profit entity formed on June 13, 2023. Patrick expected this to be an annually recurring donation. Patrick failed to disclose that he, his wife, and daughter were the directors of this entity, which had been created approximately two weeks earlier. The Highland Dallas Foundation, Inc. funded an initial $10,000 contribution but declined to commit to doing so annually.

**F. *Attempted Fraudulent Kickback Scheme***

5.24 In September 2023, Patrick approached Kevin Cronin, CEO of Fortaris Capital Advisors, proposing a fraudulent kickback scheme to personally benefit Patrick. Fortaris previously provided legitimate services to the Charitable DAF Fund. Now, Patrick proposed that


Copy from re:SearchTX

the Charitable DAF Fund engage a new vendor controlled by Mr. Cronin. Patrick proposed that the Charitable DAF Fund pay this sham vendor a monthly fee of $25,000-$50,000. The sham vendor, however, would not provide any services to the Charitable DAF Fund. Instead, Patrick expected to collect half of the fee as undisclosed supplemental compensation. That is, he expected to collect something for nothing in a classic fraud.

5.25 Mr. Cronin declined and relayed what occurred to Mr. Dondero. Mr Dondero then confronted Patrick, who admitted that what Mr. Cronin reported was true.

5.26 Mr. Dondero ensured that Supporting Organizations were also informed about Patrick's kickback scheme. Despite significant concern, the Supporting Organizations had doubts about whether, based on the governing documents and Patrick's positions, they could remove Patrick from the Control Position.

**G. *Insider Trading***

5.27 In August 2024, Patrick tried to capitalize on material non-public information obtained through his employment at Skyview to advise The Dallas Foundation to exercise a put option in a NexPoint affiliated asset, constituting attempted violations of U.S. securities laws. The Dallas Foundation declined to trade on Patrick's improper tip.

5.28 Skyview's compliance department conducted an internal investigation that concluded Patrick's actions constituted serious breaches of compliance obligations and attempted serious breaches of U.S. securities laws.

5.29 Patrick resigned from Skyview immediately before the investigation was finalized and simultaneously terminated the Charitable DAF Fund's services agreement with Skyview without justification and against the Charitable DAF Fund's interests.

**H. *Financial Irregularities and Lack of Transparency***


Copy from re:SearchTX

5.30 After resigning from Skyview, Patrick began shrouding the Charitable DAF Fund structure's overall financial reporting and communications to the point that the Supporting Organizations were essentially cut off from any view into the financial transactions and soundness of the fund. As of September 2024, the Charitable DAF Fund held approximately $270 million strictly for the financial benefit of the Supporting Organizations and ultimately their supported Charities.

5.31 But a review of the Charitable DAF Fund's last accessible financial records showed dramatic and unexplained increases in expenditures:

- Directors' fees increased from $40,000 in 2022 to almost $600,000 in 2023, and to approximately $2.25 million in the first half of 2024 alone (a 12,400% increase from 2022 if annualized).
- Legal expenses increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022 (a 300% increase if annualized).
- Overall expenses for the first half of 2024 were around $18.3 million, compared to $18.6 million for all of 2023.

5.32 Despite repeated requests from the Supporting Organizations and their counsel and counsel for the Charitable DAF Fund, Patrick and Murphy have ignored and refused to provide requested financial information or explanations for these dramatic expenditure increases.

5.33 Patrick must have personally benefited from the dramatic increases in director's fees and, given Patrick's prior attempt to implement a kickback scheme through Mr. Cronin, the other remarkable increases in expenses raise deep concerns about potential self-dealing.

**I. *Patrick Ignores the Supporting Organizations Concerns***



Copy from re:SearchTX

5.34 On November 11, 2024, given what the Supporting Organizations already knew, the three major Supporting Organizations drafted a letter to Murphy, the Cayman Islands director, stating that "we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "**DAF-related entities**"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable."[5]

5.35 The letter continued, "because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."[6]

5.36 Patrick and Murphy never responded to the letter, other than a threat that if the Supporting Organizations did not withdraw it, then Patrick and Murphy would embark on an effort at the Internal Revenue Service to revoke the Supporting Organizations' charitable status.

5.37 In January 2025, the Supporting Organizations demanded Patrick and Murphy provide clarity into the Charitable DAF Fund's financial position, expressing dismay that Patrick and Murphy continued to ignore their repeated requests for information. Murphy responded via email to this request stating that he and Patrick would "present directly to the foundations/supporting organi[z]ations" to address some of the concerns in the No Confidence Letter. Murphy never did.[7]

---

[5] *See* Ex. 4-A, Ltr. of Nov. 11, 2024 (Appx. Pg. 162-163)
[6] *Id.*
[7] *See* Ex. 4-B, Email chain ending Jan. 23, 2025 (Appx. Pg. 171)


Copy from re:SearchTX

5.38 Counsel for the Supporting Organizations and for the Charitable DAF Fund exchanged further communications, but Patrick, Murphy, and the Charitable DAF Fund's counsel never provided answers and information in response to the Supporting Organizations' basic requests. Instead, they wrapped all their future communications in half-truths and subterfuge.[8] At the same time, they offered the Supporting Organizations vague assurances that all their maneuvers were to improve the structure, focus, and performance of the fund, for the benefit of the Supporting Organizations.

5.39 The Charitable DAF Fund's counsel promised a meeting to address the Supporting Organizations' concerns, but after the Supporting Organizations' counsel suggested dates, the Charitable DAF Fund and its counsel delayed and delayed until it eventually went silent.[9]

5.40 In the interim, Patrick accelerated his multi-year fraud.

**J. *Dilution Scheme and Liquidation Maneuver***

5.41 Between December 2024 and the present, Patrick executed a series of moves to dilute the Supporting Organization's interests in the Charitable DAF Fund, and alienate those same assets entirely away from them. The purpose and result of Patrick's moves was to entirely eliminate the Supporting Organization's ownership of the Charitable DAF Fund assets. In short, he stole them.

5.42 In December 2024, Patrick formed new entities (as described below) with Patrick as the sole director. He then replaced the current entities holding and controlling the Charitable DAF Fund with his own entities, essentially transferring all ownership and control to himself in a brazen act of self-dealing. He never notified the Supporting Organizations of this massive

---

[8] *See* Exs. 4-A, Ltr. of Feb. 14, 2025 & Ex. 4-C Ltr. of Feb. 27, 2025 (Appx. Pg. 162-182).
[9] *See* Ex. 4-C, Email chain ending April 9, 2025 (Appx Pg. 179-182).


Copy from re:SearchTX

reorganization of the Charitable DAF Fund. Indeed, the Supporting Organizations found out about this monumental reorganization only when Patrick and his counsel had to admit it in a Cayman court as part of the Supporting Organization's successful effort to appoint Cayman Liquidators to unravel Patrick's fraud in that jurisdiction.

5.43 In a move that would make most fraudsters blanch, and certainly continued to violate all his fiduciary duties, on December 9, 2024, Patrick formed Defendant DFWCF (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation. Patrick named himself the Sham Charity's sole member and its registered address was Patrick's home. Patrick then issued his charity a fifty-one percent (51%) interest in the charitable assets. In essence, Patrick awarded himself the ability to distribute over half of the Charitable DAF Fund's $270 million in economic interest to his own entity, from his living room in Dallas.

5.44 Three days later, on December 12, 2024, Patrick incorporated CDMCFAD, LLC, a Delaware limited liability company.

5.45 In secret, and without notice to the Supporting Organizations, on December 18, 2024, Charitable DAF HoldCo transferred to CDMCFAD, LLC 100 percent of its interest in Charitable DAF Fund, and Charitable DAF HoldCo acquired 100 percent of the interest in CDMCFAD, LLC. As a result, CDMCFAD effectively was inserted as a blocking company in between Charitable DAF HoldCo, owned by the Supporting Organizations, and the Charitable DAF Fund itself (where the assets resided). Suddenly, the Supporting Organizations no longer held a 100 beneficial interest in the entity that held the assets of Charitable DAF Fund. Instead, Patrick ensured a different and new entity (CDMCFAD) held Charitable DAF Fund.

5.46 Patrick's fraud continued to evolve in February 2025. On February 7, 2025, again without notice to the Supporting Organizations, DAF HoldCo (in an *ultra vires act)* allotted 318


Copy from re:SearchTX

participating shares to DFWCF, the Sham Charity controlled by Patrick. This sham dilution reduced the Supporting Organizations' cumulative holding in Charitable DAF HoldCo from 100% of the participation shares to 48.9%. Following the new issuance: (i) HDFI's interest was diluted from 32.787% to 16.05%; (ii) HKCF's interest was diluted from 32.787% to 16.05%; (iii) HSBFI's interest was diluted from 32.787% to 16.05% and (iv) the HCMLP Charitable Fund's[10] interest was diluted from 1.639% to 0.80%. Said another way, Patrick absconded with over half of the participating interest of the Supporting Organizations and other charitable funds. Before, during, and after this action—and at all times it was contemplated and executed—Patrick and Charitable DAF HoldCo still owed fiduciary duties to the Supporting Organizations.

5.47 In February 2025, the Sham Charity acquired IRS 501(c)(3) tax exempt status. The By-Laws of the Charitable DAF Fund required that its limited partnership interests be owned by an entity with such tax-exempt status. Therefore, obtaining 501(c)(3) status for the Sham Charity was a necessary step to effectuate Patrick's complete control of the assets of Charitable DAF Fund.

5.48 On March 27, 2025, Patrick caused CDMCFAD (the holder of $270 million in assets) to issue shares to the Sham Charity, *and only to the Sham Charity*. He issued no shares in CDMCFAD to the Supporting Organizations. His fraudulent scam was nearly complete. Now, Patrick's Sham Charity controlled all the direct economic interest in the entity Patrick had inserted between Charitable DAF HoldCo and the assets in Charitable DAF Fund, and the Supporting Organizations were left out in the cold.

5.49 On April 2, 2025, Patrick caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million. That is, he exchanged $270 million for $1.6

[10] The HCMLP Charitable Fund is a separate charity which provides funding for the North Texas Community Foundation. While it is not a named plaintiff, the damages it incurred because of the acts of Patrick are notable and relevant to show Patrick's impact across the State of Texas.


Copy from re:SearchTX

million, a ridiculous transaction bereft of reasonably equivalent value.[11] After the transaction, Charitable DAF HoldCo purportedly had no assets and no remaining interest in Charitable DAF Fund. As a result, Patrick's Sham Charity, Defendant DFWCF, was the sole limited partner and beneficial owner of Charitable DAF Fund, through its now-100% ownership of CDMCFAD, and CDMCFAD's 100% ownership of the fund. This final step completely severed the Supporting Organizations and their nonprofit charities from the assets of the Charitable DAF Fund. In Patrick's own words under oath, "the entity in liquidation [Charitable DAF Holdco, Ltd.] owns nothing."[12]

5.50 Before the start of these self-dealing transactions, in October 2024, the Supporting Organizations owned 100% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Supporting Organizations owned Participation Shares worth zero. While Patrick allegedly distributed a paltry portion of $1.6 million to the Supporting Organizations, receipt of those funds has yet to be verified. Again, all of his self-dealing activity took place with no clarity or transparency. Patrick converted the Supporting Organizations' assets to Patrick's personal benefit and ownership, and violated his fiduciary duties of care, candor, and loyalty that he owed to the Supporting Organizations.

**K. *The Cayman Island Proceedings***

5.51 On April 2, 2025, again unbeknownst to the Supporting Organizations, Patrick placed DAF HoldCo into *voluntary* liquidation in the Cayman Islands through written resolutions of directors executed by Patrick, with joint voluntary liquidators appointed.

5.52 But the Supporting Organizations already did know: that Patrick had (1) actively thwarted all financial transparency; (2) refused to address the Supporting Organizations well-

---

[11] *See* Ex. 3, p. 5, Written Resolutions of the Directors of the Company dated 2 April 2025 (Appx. Pg. 102-103)
[12] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, CaseNo. 19-34054-sgj-11; (Appx. Pg. 200).


Copy from re:SearchTX

founded concerns including their expression of no-confidence; (3) engaged in a pattern of fraudulent self-dealing; (4) taken all participating ownership from the Supporting Organizations without any approval or appropriate compensation; and (5) and restructured the underlying funds. This was enough to convince the Supporting Organizations to take action.

5.53 The Supporting Organizations filed an *involuntary* Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.* Absent doing so, the Supporting Organizations would not have learned about Patrick's voluntary liquidation.

5.54 Cayman Islands counsel for the Supporting Organizations alleged essentially the same facts as recounted in this Petition before the Grand Court. However, Defendants DFWCF and CDMCFAD are Delaware-organized entities and were not expressly named in the Grand Court proceedings.

5.55 The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things[13]:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

[13] Ex. 8, Supervision Order (Appx. Pg. 244-246)


Copy from re:SearchTX

6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:

a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

5.56 While the Cayman Islands-appointed official liquidators now conduct their investigation of the assets and other matters pertaining to the Cayman Islands' proceedings, Defendants Patrick, DFWCF, and CDMCFAD (all sited in the United States, and more specifically Dallas County) remain in actual control and beneficial ownership of all assets that were held by the Charitable DAF Fund and DAF HoldCo. In the meantime, the rightful beneficial owners, the Supporting Organizations, are without the benefit of the considerable assets formerly held by the Charitable DAF Fund and without any insight into the current status and security of the assets. This not only damages the Supporting Organizations, but the charitable causes in their communities that rely on funding from the Charitable DAF Fund.

## VI. CAUSES OF ACTION

### Count I - Breach of Fiduciary Duty Against Patrick, CDH GP, Ltd., and Charitable DAF GP, LLC

6.1 Paragraphs 1.1 - 5.56 are incorporated as if fully restated herein.

6.2 In "a limited partnership, the general partner stands in the same fiduciary capacity to the limited partners as a trustee stands to the beneficiaries of a trust." *Hughes v. St. David's Support Corp.,* 944 S.W.2d 423, 425–26 (Tex. App.—Austin 1997, writ denied); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) (There "has never been any serious doubt that


Copy from re:SearchTX

the general partner of a Delaware limited partnership owes fiduciary duties."). Likewise, under traditional principles of equity, and various statutes generally hold that a manager of an LLC would qualify as a fiduciary of that LLC and its members. *Auriga Capital Corp. v. Gatz Properties,* 40 A.3d 839, 850 (Del. Ch. 2012), judgment entered sub nom. *Auriga Capital Corp. v. Gatz Properties, LLC* (Del. Ch. 2012), aff'd, 59 A.3d 1206 (Del. 2012); *Davis v. Crawford*, 700 S.W.3d 438, 449 (Tex. App.—Eastland 2024, no pet.) ("[T]he relationship between a managing member of an LLC and a nonmanaging member is similar to that of a general partner/limited partner relationship, and that such an arrangement thereby creates a fiduciary obligation on the part of the managing member.").

6.3 By virtue of Patrick's Control Positions related to the overall Charitable DAF Fund structure and specifically DAF HoldCo and the Charitable DAF Fund, Patrick owed fiduciary duties to the Plaintiffs.

6.4 Patrick breached his fiduciary duties to the Plaintiffs by stripping them of their legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.5 Patrick breached these duties through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.6 Patrick breached his fiduciary duties by mismanaging the Charitable DAF Fund's finances, and dramatically increasing director compensation to his own benefit.


Copy from re:SearchTX

6.7 Patrick breached his fiduciary duty by successfully soliciting a charitable contribution ultimately from a Supporting Organization to a charity controlled by Patrick and his immediate family without disclosing the relationship.

6.8 The actions incorporated herein have wrongfully deprived the Plaintiffs of substantial economic support and assets, harming, and threatening irreparable harm to, the Plaintiffs and the Charities that they support. Plaintiffs have suffered damages as a result of Patrick's breach of his fiduciary duties.

**Count II - Constructive Fraud Against Patrick**

6.9 Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.10 "Constructive fraud is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." *Hubbard v. Shankle*, 138 S.W.3d 474, 483 (Tex. App.—Fort Worth 2004, pet. denied). "[I]n a claim for constructive fraud, the actor's intent is irrelevant." *Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d 856, 879 (Tex. App.—El Paso 2021, pet. denied). "[C]onstructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Id.*

6.11 As a fiduciary, Patrick's conduct in diluting the Plaintiffs' interests, selling assets at below-market values to undisclosed parties, and liquidating DAF HoldCo and transferring its interests to the Sham Charity without notice constitutes constructive fraud.

6.12 Patrick injured public interests by his conduct. Plaintiffs have suffered damages as a result of Patrick's fraud.

**Count III - Unjust Enrichment Against Patrick, CDMCFAD, and DFWCF**

6.13 Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.


Copy from re:SearchTX

6.14 A claim of unjust enrichment applies when a party obtains "a benefit from another by fraud, duress, or the taking of an undue advantage." *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010)).

6.15 Patrick and DFWCF stripped the Plaintiffs of their rightful legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.16 Patrick and DFWCF took these interests and assets for their own benefit via fraud and taking undue advantage of the access available through the Control Positions and overlapping control with DFWCF.

6.17 Patrick also took undue advantage through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.18 Patrick and DFWCF have been unjustly enriched at the expense of the Plaintiffs. Plaintiffs have been damages by Patrick's unjust enrichment.

**Count IV – Conversion Against Patrick, CDMCFAD, and DFWCF**

6.19 Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.20 Conversion requires a showing that (1) the plaintiff owned, had legal possession, or was entitled to possession of the property, (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights, and (3) the defendant refused the plaintiff's demand for return of the property. *Automek, Inc. v. Orandy*, 105 S.W.3d 60, 63 (Tex. App.—Houston [1st Dist.] 2003, no pet.).


Copy from re:SearchTX

6.21 The Plaintiffs held legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.22 Patrick with DFWCF has unlawfully and without authorization, assumed and exercised dominion over the Plaintiffs' legal, equitable, and beneficial interests in the Charitable DAF Fund structure including their participation in DAF HoldCo, the Charitable DAF Fund, and Charitable DAF Fund assets through the dilution scheme that diverted all the legal and beneficial economic interests to Patrick's controlled entity, DFWCF.

6.23 The Plaintiffs requested distribution in kind of the Charitable DAF Fund structure assets, which Patrick and now, DFWCF, have ignored and refused. Plaintiffs have been damages as a result of these conversions.

**Count V – Imposition of Constructive Trust Against Patrick, CDMCFAD, and DFWCF**

6.24 Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.25 "A constructive trust is considered a legal fiction and is a creation of equity to prevent a wrongdoer from profiting from his wrongful acts." *In re Harding*, 563 S.W.3d 366, 372 (Tex. App.—Texarkana 2018, no pet.). "[T]o obtain a constructive trust, [a party] must prove: (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res." *Id.* (cleaned up).

6.26 Patrick through DFWCF has breached his fiduciary relationship with the Plaintiffs by converting legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit, resulting in the unjust enrichment of DFWCF and Patrick.


Copy from re:SearchTX

6.27 All the legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit in the overall Charitable DAF Fund structure should be imposed with a constructive trust running to the benefit of the Plaintiffs.

## VII. EMERGENCY APPLICATION FOR RECEIVERSHIP

7.1 Paragraphs 1.1 - 5.56 are incorporated as if fully restated herein.

7.2 The Plaintiffs seek the immediate appointment of a receiver over Defendants DFWCF and CDMCFAD, LLC (the "**Receivership Entities**") under three independent bases: Texas Civil Practice & Remedies Code §§ 64.001(a)(3), (7), Texas Business and Organizations Code § 11.410, and the Court's inherent equitable powers.

### A. *Texas Civil Practice & Remedies Code*

7.3 [U]nder section 64.001 of the Texas Civil Practice and Remedies Code ("**CPRC**"), a court may appoint a receiver in an action between "partners or others jointly owning or interested in any property or fund," CPRC §§ 64.001(a)(3) or "in any case in which a receiver may be appointed under the rules of equity." CPRC §§ 64.001(a)(7); *Elliott v. Weatherman*, 396 S.W.3d 224, 228 (Tex. App.—Austin 2013, no pet.).

7.4 A party with a probable interest or a right to the property or fund has standing to seek the appointment of a receiver. CPRC § 64.001(b). "[T]he property or fund must be in danger of being lost, removed, or materially injured." *Id.*

7.5 A probable interest exists by statute in actions between partners and in actions between joint owners of property. CPRC § 64.001(a)(3).

7.6 One purpose of a receivership is to preserve assets and resolve issues relating to an entity's affairs where there are allegations of fraud or improper activities. *See Floyd v. MMWKM*


Copy from re:SearchTX

*Advisors, LLC*, No. 05-23-00638-CV, 2024 WL 549036 at *2 (Tex. App. – Dallas 2024, pet. denied, reh'g denied).

**B. *Texas Business and Organizations Code***

7.7 Like CPRC § 64.001, a court that has subject matter jurisdiction over specific property of a domestic or foreign entity in Texas may appoint a receiver for that property in several scenarios, including an action between "partners or others jointly owning or interested in the property or fund." Tex. Bus. & Orgs. Code § 11.403(a)(3).

7.8 Additionally, under Section 11.410 of the Texas Business and Organizations Code ("TBOC"), a court may appoint a receiver for all of the property, in and outside Texas, of a foreign entity doing business in Texas and its business if the court determines, in accordance with the ordinary usages of equity, that circumstances exist that necessitate the appointment of a receiver even if a receiver has not been appointed by another court. TBOC § 11.410(a).

**C. *Rules of Equity***

7.9 In addition to specific statutory authority to appoint receivers, Texas courts retain inherent equitable power to do so. The CPRC, § 64.004 makes clear that the rules of equity control the appointment and power of a receiver unless inconsistent with a statutory provision.

**D. *Receivership Standards Under Texas Law and Equity***

7.10 "The appointment of a receiver lies within the sound discretion of the trial court." *In re Estate of Herring*, 983 S.W.2d 61, 65 (Tex. App.—Corpus Christi–Edinburg 1998, no pet.). "The appointment of a receiver, either as authorized by statute or usages of equity, will not be disturbed on appeal unless the record reveals a clear abuse of discretion." *O & G Carriers, Inc. v. Smith Energy 1986-A P'ship*, 826 S.W.2d 703, 706 (Tex. App.—Houston [1st Dist.] 1992, no writ).



Copy from re:SearchTX

7.11 The party submitting an application for appointment of a receiver bears the burden of proof to present evidence justifying the appointment. *Furgerson v. First Nat'l Bank*, 218 S.W.2d 1019, 1020 (Tex. Civ. App. – Texarkana 1949, no writ). The party can meet that burden by submitting a sworn verification supporting the claimed grounds for the appointment, *In re Estate of Herring*, 983 S.W.2d 61, 65 (Tex. App. – Corpus Christi 1999, no pet.), and a court may consider oral testimony as evidence in support of an application. *See Furgerson*, 218 S.W.2d at 1020.

7.12 An application seeking a receivership pursuant to a statutory provision must allege facts that meet the elements of the provision. *Associated Bankers Credit Co. v. Meis*, 456 S.W.2d 744, 748 (Tex. Civ. App. – Corpus Christi 1970, no writ). The facts alleged in the application will be construed as favorably as possible for the applicant. *Couch Mortgage Co. v. Roberts*, 544 S.W.2d 944, 946-47 (Tex. Civ. App. – Houston [1st Dist.], no writ).

7.13 Conduct that supports a cause of action for fraud or breach of fiduciary duties is often the same type of conduct that supports an application for a receivership. *Ritchie v. Rupe*, 443 S.W.3d 856, 873 (Tex. 2014).

### E. *The Supporting Organizations are entitled to the Emergency Appointment of a Receiver to Oversee the Receivership Entities*

7.14 The Plaintiffs have an ownership interest in their participating shares in DAF HoldCo and thereby its economic ownership of the Charitable DAF Fund and the assets that were rightfully held by the Charitable DAF Fund and entrusted to the control of Patrick.

7.15 Patrick wrongfully caused the Plaintiffs' participation shares to be diluted and then caused the Plaintiffs' beneficial economic interests in the Charitable DAF Fund structure to be wrongfully transferred to a collection of sham entities wholly dominated by Patrick.

7.16 Charitable DAF Fund was valued at $270 million as recently as September 2024. Now no assets remain in the Charitable DAF Fund structure. The Plaintiffs have not received any


Copy from re:SearchTX

just compensation, participation, or other consideration for the conversion of their substantial interests in the Charitable DAF Fund structure.

7.17 Receivership Entities now maintain complete management control and beneficial rights over the Charitable DAF Fund structure's substantial assets or otherwise possess those assets to the exclusion of Charitable DAF Fund.

7.18 Patrick dominates and controls the Receivership Entities. As shown, Patrick has demonstrated a pattern of selling assets at below-market values, attempting to engage in self-dealing transactions, transacting assets at non-market terms in potential self-dealing transactions, dramatically increasing internal and professional administrative expenses that burdens and dissipates charitable assets, and secreting his activities while controlling assets dedicated to charitable causes. To preserve assets from further dissipation, a receiver should replace Patrick's oversight of the Receivership Entities and their assets, which were wrongfully acquired and held.

7.19 The Plaintiffs have been stripped of access to the benefit of assets meant to support charitable causes, resulting in financial distress and immediately threatening planned and ongoing support of countless charities including education, medical research, and community initiatives.

7.20 The Plaintiffs have demonstrated a strong likelihood of success on their claims given the documented pattern of breaches, financial irregularities and successful litigation in the Cayman Islands.

7.21 The Plaintiffs have demonstrated a clear and compelling need for immediate court oversight to prevent further injury and preserve the charitable assets at risk due to Patrick's actions via the Receivership Entities.

7.22 The participating shares in DAF HoldCo as well as assets valued at $270 Million are in danger of being lost, removed, or materially injured and circumstances exist to necessitate


Copy from re:SearchTX

the appointment of a receiver to conserve the property, fund, and avoid further, irreparable harm to Plaintiffs.

7.23 Given Patrick's demonstrated and recent malfeasance using the Receivership Entities as tools of fraud, no other adequate remedy exists under law.

**Count VI – APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION PENDING APPROVAL OF RECEIVERSHIP**

8.1. Plaintiffs seek immediate injunctive relief preventing the Defendants from further use, transfer, dispersal, and/or alienation of the assets that were held in the Charitable DAF Fund as of the instant date of this filing, regardless of where they are presently held. If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment. This application is supported by the sworn declarations of Julie Diaz and James David Dondero.

8.2. A writ of injunction is proper where "the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant," or where "a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual," or where "irreparable injury to real or personal property is threatened, irrespective of any remedy at law." Tex. Civ. Prac. & Rem. Code § 65.011. "A temporary injunction pending trial on the merits 'may be and usually is issued in connection with any species of litigation where it is necessary to preserve the status quo pending a final adjudication of the rights of the parties.'" *Lometa Bancshares, Inc. v. Potts*, 952 S.W.2d 631, 633 (Tex. App.-Austin 1997) (*quoting Turcotte v. Alice Nat'l Bank*, 402 S.W.2d 894, 896 (Tex.1966)). "In cases like the present, an applicant for the writ must show (1) a probable right to


Copy from re:SearchTX

recover on the merits after final hearing and (2) a probable and irreparable injury unless the writ is issued." *Lometa*, 952 S.W.2d at 633 (citing Tex. Civ. Prac. & Rem. Code Ann. § 65.011 (West 1997); *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993); *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex.1968)).

8.3. Texas courts universally recognize that in cases where dispersal or liquidation of assets required to pay a judgment is likely, temporary injunctive relief is proper to preserve the status quo and ensure that the efficacy of ultimate relief for the Plaintiffs is not defeated by financial machinations while the case is pending. In other words, "the adequacy of an available legal remedy must be judged in the circumstances of the particular case[,]" and "[i]n such circumstances, any legal remedy by way of a judgment for money damages is properly viewed as inadequate on the ground that the funds may be reduced pending final hearing and thus be unavailable in their entirety[.]" *Lometa*, 952 S.W.2d at 633; *see also Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ); *Sonics Int'l Inc. v. Dorchester Enters*., 593 S.W.2d 390, 393 (Tex.Civ.App.—Dallas 1980, no writ*); Baucum v. Texam Oil Corp*., 423 S.W.2d 434, 442 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.).

8.4. The above authorities support the award of the temporary injunctive relief requested herein, because the assets formerly held in the Charitable DAF Fund for the benefit of the Plaintiffs are already being alienated from their beneficial owners and the conduct of Defendants demonstrates the likelihood of their continued transfer, alienation, expenditure, and dispersal while this case is pending and before the rights of the Plaintiffs to those funds can be vindicated.

8.5. Unless enjoined, Patrick and the other Defendants will cause and continue to cause irreparable harm to Plaintiffs for which there is no adequate remedy at law; including, without

limitation, the dispersal, expenditure, transfer, and further alienation of more than $270 Million that can never be replaced because the Defendants will lack the means to do so.

8.6. Plaintiffs will therefore suffer immediate and irreparable injury without adequate remedy at law if a Temporary Restraining Order ("**TRO**") is not granted against the Defendants. Accordingly, Plaintiffs request the Court issue a TRO that freeze:

(a) all assets that were held in the Charitable DAF Fund as of the instant date of this filing, and

(b) prohibiting Patrick and the other Defendants, or anyone acting in concert with them or at their direction, from any use, expenditure, transfer, dispersal, dilution, encumbrance, or alienation of any of those funds pending resolution of Plaintiff's Motion for Temporary Injunction.

8.7. The harm to Plaintiffs is imminent, and if the Court does not issue a TRO and injunctive relief, it will be irreparably injured, as set forth herein. Conversely, the granting of a TRO will merely require Defendants to refrain from doing anything with the funds for two weeks. If the Defendants prevail on the merits, the funds will still be available to them for their use in future. The balance of burdens thus strongly favors Plaintiffs, who stand to lose everything absent immediate injunctive relief—over Defendants, who will at most suffer a minor inconvenience if they ultimately prevail.

8.8. The issuance of injunctive relief will not disserve the public interest. Balancing the equities and other factors, including the significant potential for irreparable harm to the Plaintiffs and the lack of harm to Defendants due to the entry of a TRO, demonstrates that the relief will not disserve the public interest. Indeed, freezing the funds at issue in place to ensure that this fraudulent



Copy from re:SearchTX

scheme is not permitted consummation absent judicial scrutiny serves the public interest by protecting vital charitable interests.

8.9. A temporary restraining order is necessary to maintain the *status quo* during the pendency of this action. *See In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) ("defining the status quo as "the last, actual, peaceable, non-contested status which preceded the pending controversy.") The facts above establish the required elements for Plaintiffs to obtain a TRO against Defendant, specifically: (1) a cause of action against Defendants with a probable right to relief; (2) a probable, imminent, and irreparable injury to Plaintiffs in the interim; (3) the threatened injury outweighs any damage the injunction might cause the opposing party; and (4) the injunction will not disserve the public interest. *See Butnaru v. Ford Motor Co*., 84 S.W.3d 198. 204 (Tex. 2002).

**A. *Plaintiffs have a Probable Right to the Relief Sought in their Claims Against Defendants.***

8.10. Plaintiffs easily satisfy this test. Establishing a probable right to relief does not require the applicant for a TRO to establish that it will prevail at trial. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). Instead, this element requires only that the applicant allege a cause of action and present evidence that tends to sustain that cause of action. *See Miller Paper Co. v. Roberts Paper Co*., 901 S.W.2d 593, 597 (Tex. App.— Amarillo 1995, no writ). The cause of action itself need not involve permanent injunctive relief—the trial court "[has] discretion to preserve the status quo so long as [a movant] demonstrate[s] his probable right to recover damages." *Metcalfe*, 863 S.W.2d at 58; *see also Gryphon Master Fund, L.P. v. Path 1 Network Technologies, Inc*., No. 3:06 CV 0107 D, 2007 WL 1723703, at *5 (N.D. Tex., Jun. 14, 2007) (citing *Metcalfe*).

8.11. Plaintiffs have a probable right to the relief sought on its claims for breach of fiduciary duty, constructive fraud, unjust enrichment, and conversion. As alleged in more detail


Copy from re:SearchTX

above, Defendants have committed and continue to commit acts that have raided four vital charitable organizations of $270 Million that forms the lifeblood of vital philanthropic efforts relied upon by key communities across the nation. The evidence summarized herein thus establishes that these injuries arise as a direct result of Defendants' conduct.

**B. *Plaintiffs Will Suffer Immediate, Irreparable Injury in the Absence of a Temporary Restraining Order and Temporary Injunction.***

8.12. Plaintiffs will suffer immediate, irreparable injury in the absence of a temporary restraining order and temporary injunction, as summarized above. Plaintiffs will suffer precisely the sort of irreparable injuries Texas courts have sought to prevent by granting temporary injunctive relief. *Lometa*, 952 S.W.2d at 633; see also *Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ); *Sonics Int'l Inc. v. Dorchester Enters*., 593 S.W.2d 390, 393 (Tex.Civ.App.—Dallas 1980, no writ*); Baucum v. Texam Oil Corp*., 423 S.W.2d 434, 442 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.).

8.13. Plaintiffs have no adequate remedy at law. Without injunctive relief, the assets intended to benefit the Plaintiffs will be spent, dispersed, transferred, and alienated while this litigation unfolds. These losses, as well as others which will inevitably occur if Defendants are not enjoined, cannot be compensated in monetary terms once the funds are dispersed, and are the types of harm for which injunctive relief is particularly necessary and appropriate.

8.14. Accordingly, and in order to preserve the status quo during the pendency of this action, Defendants should be cited to appear and show cause why the funds at issue should not be frozen for the pendency of this Action, and why Defendants should not be temporarily restrained during the pendency of this action from directly or indirectly using, spending, transferring, encumbering, dispersing, or further alienating the funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing.



Copy from re:SearchTX

8.15. Plaintiffs seek a temporary restraining order and temporary injunction against Defendants freezing all funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing, and enjoining Defendants and any others acting by, for, or in concert with them, including but not limited to their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of the order by personal service or otherwise, from either directly or indirectly: spending, dispersing, using, encumbering, transferring, or alienating those funds and assets.

8.16. Plaintiffs further seeks a receivership over the funds and assets and the entities holding the funds and assets, whereupon the temporary injunctive relief sought here may properly expire because the assets will then be under the control of a receiver answering to this Court.

8.17. Plaintiffs is willing to post a bond in an amount directed by the Court.

## VIII. PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A. Appoint a receiver to take possession and control of all assets, properties, and operations of DFW Charitable Foundation and CDMCFAD, LLC;

B. Enjoin Defendants from further disposing of, transferring, encumbering, or dissipating any Charitable DAF Fund and DAF HoldCo assets;

C. Require the reversal of the dilution scheme and unauthorized asset transfers;

D. Impose a constructive trust over the res of DAF HoldCo, CDMCFAD, LLC and the Charitable DAF Fund wrongfully taken from the Plaintiffs;

E. Award actual damages in an amount to be proven at trial;

F. Award exemplary damages as permitted by law;

G. Award attorneys' fees and costs;

H. Grant such other and further relief as the Court deems just and proper.



Copy from re:SearchTX

Respectfully submitted,

**McCarty Law PLLC**

*/s/ Darren L. McCarty*
Darren L. McCarty
State Bar No. 24007631
darren@mccartylawpllc.com
316 West 12th Street
Suite 400
Austin, Texas 78701
512-827-2902

- and -

**DUANE MORRIS LLP**

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
100 Crescent Court, Suite 1200
Dallas, Texas 75201
(214) 257-7213 – Telephone
(214) 292-8442 – Facsimile

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by electronic means on this day, July 1, 2025, on all counsel or parties of record.

*/s/ Darren L. McCarty*
Darren L. McCarty



Copy from re:SearchTX

**VERIFICATION**

I, Julie Diaz, Vice President of Highland Dallas Foundation, Inc., and President of The Dallas Foundation, have read the above and foregoing Petition and the facts stated therein are true and correct to the best of my knowledge and belief.

Julie Diaz

My name is Julie Diaz, my date of birth is 3/23/64, and my address is 5711 Prestwick Lane Dallas. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Barnstable County, State of MA, on the 1 day of July, 2025

Julie Diaz



Copy from re:SearchTX

**The Business Court of Texas,**
**First Division**

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § | Cause No. ____________ |
| *Plaintiffs*, | § | |
| v. | § | |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd., | § | |
| *Defendants*. | § | |

## Table of Contents—Exhibits


| Exhibit | Document | Appx. Page Nos. |
|---|---|---|
| Exhibit 1-A | DFW Charitable Foundation Formation Documents (12/9/2024) | 40-42 |
| Exhibit 1-B | CDMCFAD, LLC Formation Documents (12/12/2024) | 43 |
| Exhibit 1-C | CDH GP, Ltd. Formation Documents | 44-45 |
| Exhibit 2-A | Nov. 7, 2011, Amended and Restated Exempted Limited Partnership Agreement | 46-66 |




Copy from re:SearchTX

| | | |
|---|---|---|
| Exhibit 2-B | Jan. 19, 2025, Amended and Restated Memorandum and Articles of Association | 67-96 |
| Exhibit 3 | Sykes Affidavit Exhibit GS-I | 97-161 |
| Exhibit 4-A | Nov. 11, 2024, No Confidence Letter | 162-163 |
| Exhibit 4-B | Jan. 23-Feb. 7, 2025, Emails Julie Diaz, Mark Partick, Paul Murphy, and Michael Stockham | 164-177 |
| Exhibit 4-C | Feb 14-April 3, 2025, Letters and Emails between David Rosenberg, Paul Murphy, Michael Stockham, and Douglas Mancino | 178-182 |
| Exhibit 5 | Hearing Transcript (Patrick Testimony) | 183-209 |
| Exhibit 6 | Dondero Declaration | 210-221 |
| Exhibit 7 | Diaz Declaration | 222-243 |
| Exhibit 8 | Supervision Order | 244-246 |




Copy from re:SearchTX

EXHIBIT
1-A

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:06 PM 12/09/2024
FILED 04:06 PM 12/09/2024
SR 20244432762 - File Number 10030937

# CERTIFICATE OF INCORPORATION
# OF
# DFW CHARITABLE FOUNDATION

a nonprofit nonstock corporation

## I.

The name of the Corporation is DFW Charitable Foundation.

## II.

The name of the incorporator is Douglas Mancino. The address of the incorporator is 2029 Century Park East, Suite 3500, Los Angeles, CA 90067.

## III.

The address of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

## IV.

A. The Corporation is a nonprofit nonstock corporation and is not organized for the private gain of any person. It is organized under the General Corporation Law of the State of Delaware ("DGCL") exclusively for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States internal revenue law (the "Code").

B. In furtherance of its purposes, the Corporation shall have all the general powers and privileges of a corporation granted by the DGCL, as now in effect or as may hereafter be amended, including the power to solicit grants and contributions to further its charitable purposes.

## V.

The Corporation shall not have any capital stock and the Corporation is not authorized . The member of the corporation is Mark Patrick. The rights and privileges of the member shall be set forth in the Corporation's bylaws, provided that the member shall not have a "membership interest" in the Corporation within the meaning of section 114(d)(2) of the DGCL.

## VI.

A. No part of the activities of the Corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation. The Corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of, or in opposition to, any candidate for public office.

B. Notwithstanding any other provision of this Certificate of Incorporation, the Corporation shall not directly or indirectly carry on any activity which would prevent it from obtaining exemption from Federal income taxation as a corporation described in section 501(c)(3) of the Code, or cause it to lose such exempt status, or carry on any activity not permitted to be carried on by a corporation, contributions to which are deductible under section 170(c)(2) of the Code.

**VII.**

The property of the Corporation is irrevocably dedicated to charitable purposes, and no part of the net income or assets of the Corporation shall ever inure to the benefit of any director, officer, or member thereof or to the benefit of any private person. Upon the dissolution or winding up of the Corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of the Corporation shall be distributed to a nonprofit fund, foundation, or corporation which is organized and operated exclusively for charitable purposes and which has established its tax-exempt status under section 501(c)(3) of the Code.

**VIII.**

A director or officer of the Corporation shall not be liable to the Corporation for monetary damages for breach of fiduciary duty as a director or officer, except for liability: (a) for any breach of the director's or officer's duty of loyalty to the Corporation or its members, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, or (c) for any transaction from which the director or officer derived any improper personal benefit. If the DGCL is amended after adoption of this Article VIII to authorize Corporation action further eliminating or limiting the personal liability of directors or officers, then the liability of a director or officer of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any repeal or modification of the foregoing provisions of this Article VIII shall not adversely affect any right or protection of a director or officer of the Corporation existing at the time, or increase the liability of any director or officer of the Corporation with respect to any acts or omissions of such director or officer occurring prior to such repeal or modification.

**IX.**

The Corporation shall, to the maximum extent permitted from time to time under the law of the State of Delaware, indemnify and upon request shall advance expenses to any person who is or was a party or is threatened to be made a party to any threatened, pending or completed action, suit, proceeding or claim, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was or has agreed to be a member or director or officer of the Corporation, or while the person is or was serving at the request of the Corporation as a director, officer, partner, trustee, employee or agent of any corporation, limited liability company, partnership, joint venture, trust or other entity, against expenses (including reasonable attorneys' fees and expenses), judgments, fines, penalties and amounts paid in settlement incurred in connection with the investigation, preparation to defend, or defense of such action, suit, proceeding or claim; provided however that: (a) the foregoing shall not require the Corporation to indemnify, or advance expenses to, any member or director or officer in connection with any



Copy from re:SearchTX

action, suit, proceeding or claim initiated by or on behalf of such member or director or officer, or any against the Corporation initiated by or on behalf of such member or director or officer; and (b) a member or director or officer seeking indemnification under this Article IX shall execute a written undertaking (reasonably acceptable to the Corporation) to repay the Corporation any expense or other amounts advanced and/or paid to such member or director or officer under this Article IX in the event that it is ultimately determined that such member or director or officer is not entitled to be indemnified by the Corporation. Such indemnification shall not be exclusive of other indemnification rights arising under any bylaw, agreement, vote of directors or member or otherwise and shall inure to the benefit of the heirs and legal representatives of such person. Any person seeking such indemnification under this Article IX shall be deemed to have met the standard of conduct required for such indemnification unless the contrary shall be established. Any repeal or modification of the foregoing provisions of this Article IX shall not adversely affect any right or protection of a member or director or officer of the Corporation with respect to any acts or omissions of such member or director or officer occurring prior to such repeal or modification.

**IN WITNESS WHEREOF**, this Certificate of Incorporation has been executed by its incorporator this 9th day of December, 2024.

/s/ Douglas Mancino
Douglas Mancino, Incorporator

EXHIBIT 1-B

# CERTIFICATE OF FORMATION

# OF

# CDMCFAD, LLC

This Certificate of Formation of CDMCFAD, LLC (the "Company"), is being duly executed and filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 *Del. C.* § 18-101 *et seq.*) (the "Act").

1. Name. The name of the limited liability company formed hereby is CDMCFAD, LLC.

2. Registered Office. The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

3. Registered Agent. The name and address of the registered agent for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation in accordance with the Act.

[signature]

Name: Mark Patrick
Authorized Person

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:33 AM 12/12/2024
FILED 11:33 AM 12/12/2024
SR 20244471736 - File Number 10035168

4930-4296-2948\1





Copy from re:SearchTX

EXHIBIT
1-C

HE HATH FOUNDED IT UPON THE SEAS

# Search Report

| | |
|---|---|
| **Entity Name :** | CDH GP, Ltd. |
| **Jurisdiction :** | Cayman Islands |
| **Registration Number :** | 407515 |
| **Registration Date :** | 27th February 2024 |
| **Entity Type :** | EXEMPT |
| **Registered Office :** | CAMPBELLS CORPORATE SERVICES LIMITED<br>Floor 4<br>Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands |
| **Initial Subscriber:** | |
| **Authorised Share Capital:** | CI$41,000.00 |
| **Nature of Business:** | General Partner |
| **Financial Year End:** | 31st December |

| | |
|---|---|
| **Status :** | ACTIVE |
| **Status Date :** | 27th February 2024 |

- INFORMATION REGARDING THE CORPORATE RECORDS AND REGISTERS ARE NOT AVAILABLE FOR PUBLIC INSPECTION
- THIS REPORT DOES NOT CONFIRM THE ENTITY IS IN GOOD STANDING

Authorisation Code : 379989138381
www.verify.gov.ky
10 February 2025



Copy from re:SearchTX

# Director Details

Entity Name: **CDH GP, LTD.**

**Director Name**

| |
|---|
| Mark E. Patrick |



Copy from re:SearchTX

EXHIBIT
2-A

**DATED NOVEMBER 7, 2011**

**AMENDED AND RESTATED**

**EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF**

**CHARITABLE DAF FUND, LP**

---

**WARNING**

**THE TAKING OR SENDING BY ANY PERSON OF AN ORIGINAL OF THIS DOCUMENT INTO THE CAYMAN ISLANDS MAY GIVE RISE TO THE IMPOSITION OF CAYMAN ISLANDS STAMP DUTY**



Copy from re:SearchTX

# TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| ARTICLE I | GENERAL PROVISIONS; COMPENSATION AND EXPENSES | 2 |
| 1.1 | Continuation | 2 |
| 1.2 | Name | 2 |
| 1.3 | Purpose and Powers | 2 |
| 1.4 | Registered Office | 2 |
| 1.5 | Partners | 2 |
| 1.6 | Powers. | 2 |
| 1.7 | Term | 3 |
| 1.8 | Admission of New Partners | 3 |
| 1.9 | Taxable Year | 3 |
| 1.10 | Liability of Partners | 3 |
| 1.11 | Limitation on Assignability of Partners' Interests. | 3 |
| 1.12 | Definitions | 4 |
| 1.13 | Service Providers | 4 |
| 1.14 | Partnership Expenses | 4 |
| 1.15 | Withdrawal of Initial Limited Partner | 5 |
| ARTICLE II | POWERS | 5 |
| 2.1 | Partnership Powers | 5 |
| 2.2 | Rights, Powers, Limitations on Liability and Indemnification of General Partner. | 6 |
| ARTICLE III | CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES | 9 |
| 3.1 | Capital Contributions. | 9 |
| 3.2 | Capital Account; Allocation of Profits and Losses. | 9 |
| ARTICLE IV | LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWALS FROM CAPITAL ACCOUNT | 9 |
| 4.1 | Legal Interest | 9 |
| 4.2 | Distributions. | 10 |
| 4.3 | Withdrawal | 10 |
| ARTICLE V | DURATION OF PARTNERSHIP | 10 |
| 5.1 | Termination | 10 |
| 5.2 | Winding Up | 11 |
| ARTICLE VI | MISCELLANEOUS | 11 |
| 6.1 | Tax Matters Partner | 11 |
| 6.2 | Right to Hire | 11 |
| 6.3 | Applicable Law, etc | 12 |
| 6.4 | Power of Attorney | 12 |
| 6.5 | Tax Elections Under the Internal Revenue Code | 12 |
| 6.6 | Amendments to Partnership Agreement | 12 |



Copy from re:SearchTX

6.7 Investment Representation ....................13
6.8 Notices ....................13
6.9 General Partner Determinations ....................14
6.10 Dispute Resolution ....................14
6.11 Successors and Assigns ....................16
6.12 Severability ....................16
6.13 No Third Party Rights ....................16
6.14 No Right to Partition ....................16



Copy from re:SearchTX

**AMENDED AND RESTATED
EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF
CHARITABLE DAF FUND, LP**

**THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT** (the "**Agreement**") is made on November 7, 2011

**BETWEEN**

(1) Charitable DAF GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as general partner (the "**General Partner**"); and

(2) Charitable DAF HoldCo, Ltd, a Cayman Islands exempted Company having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as limited partner (the "**Limited Partner**"); and

(3) Each individual, partnership, corporation, limited liability company, trust or other entity (each, a "**Person**") admitted as a limited partner or general partner (collectively, the "**Partners**") of the Partnership (as defined below) in accordance with this Agreement, including any Persons hereafter admitted as Partners in accordance with this Agreement and excluding any Persons who cease to be Partners in accordance with this Agreement; and

(4) Walkers Nominees Limited having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman, KY1-9005, Cayman Islands as the initial limited partner (the "**Initial Limited Partner**") solely for the purposes of withdrawing as such.

**WHEREAS**, Charitable DAF Fund, LP (the "**Partnership**") was formed and registered as an exempted limited partnership pursuant to and in accordance with the Exempted Limited Partnership Law (as amended) of the Cayman Islands (the "**Law**"), and since its formation has been governed by the Initial Limited Partnership Agreement of the Partnership, dated October 25, 2011 (the "**Initial Agreement**"); and

**WHEREAS**, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein; and

**WHEREAS**, the parties hereto wish to amend and restate the Initial Agreement in its entirety and enter into this Agreement.



Copy from re:SearchTX

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby adopt this Agreement to be their Limited Partnership Agreement, as follows:

**IT IS AGREED:**

## ARTICLE I
## GENERAL PROVISIONS; COMPENSATION AND EXPENSES

1.1 Continuation. The parties hereto continue the Partnership as an exempted limited partnership formed on October 25, 2011 pursuant to the Law.

1.2 Name. The business of the Partnership shall be carried on under the name of Charitable DAF Fund, LP.

1.3 Purpose and Powers. The purpose of the Partnership shall be to invest and trade, directly or indirectly, in securities of all types and other investment vehicles and instruments. At least initially, a majority of the Partnership's assets shall be invested in shares of CLO HoldCo, Ltd., a Cayman Islands exempted company ("**CLO HoldCo**"), but the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.

1.4 Registered Office. The registered office of the Partnership is c/o Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands.

1.5 Partners. The name and addresses of the Partners are as follows:

| **Name** | **Address** |
|---|---|
| Charitable DAF GP, LLC | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |
| Charitable DAF HoldCo Ltd<br>(Limited Partner) | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |

1.6 Powers.

(a) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and



Copy from re:SearchTX

obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.

(b) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

1.7 Term. The Partnership was established on October 25, 2011 and shall continue until terminated in accordance with this Agreement or any amendment or modification thereof.

1.8 Admission of New Partners. The General Partner may at any time admit one or more new Partners on such terms as it may determine in its sole discretion; provided that any such new Limited Partner shall have as its equity owners solely Indirect Charitable Owners.

1.9 Taxable Year. The Taxable Year of the Partnership shall be a calendar fiscal year, or such other fiscal year as the General Partner shall determine in their sole discretion from time to time.

1.10 Liability of Partners.

(a) The General Partner shall be liable for all of the debts, liabilities and obligations of the Partnership.

(b) Except to the extent otherwise required by law or this Agreement, a Limited Partner shall not be personally liable for any obligations of the Partnership to third parties nor for the return of any distributions from the Partnership to the Limited Partner. A Limited Partner may be liable for the tax audit and related expenses referred to in Section 6.1.

1.11 Limitation on Assignability of Partners' Interests.

(a) A Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner. Any attempted assignment or substitution not made in accordance with this section shall be void *ab initio*.



Copy from re:SearchTX

(b) The General Partner may not assign their interests in the Partnership to any entity that is not under common control with the General Partner without the consent of a majority-in-interest of the Limited Partners. Notwithstanding the foregoing, the General Partner may freely assign their economic interest in the Partnership in whole or in part.

1.12 Definitions. For the purpose of this Agreement, unless the context otherwise requires:

(a) General Partner. The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

(b) Indirect Charitable Owners. The term "**Indirect Charitable Owner**" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

(c) Limited Partner. The term "**Limited Partner**" shall refer to Charitable DAF HoldCo Ltd (and each person subsequently admitted as a limited partner by the General Partner pursuant to the terms of this Agreement).

(d) Partner. The term "**Partner**" shall refer to the General Partner or the Limited Partner.

1.13 Service Providers. The General Partner may engage one or more Persons to act, or remove any one or more Persons from so acting, as service providers to the Company (including, without limitation, as manager, administrator, custodian, registrar and transfer agent, investment manager, investment adviser, sponsor and/or prime broker, auditors and legal counsel to the Partnership) in its sole discretion; provided, that any compensation paid to any such service provider that is affiliated with the General Partner shall be in an amount customary for services of a similar nature.

1.14 Partnership Expenses. The Partnership will bear its own operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees (if any), taxes, research costs, legal and accounting expenses and other operating expenses. In addition, the Partnership will bear its pro rata share of CLO HoldCo's operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees, taxes, research costs, legal and accounting expenses and other operating expenses. The Partnership will also bear (or reimburse the General Partner for) its organizational fees and expenses. To the extent the Partnership shares trading expenses with other accounts that may be managed by the General Partner or any affiliates, it will bear a proportionate share of the associated costs. In no event shall the General Partner receive any compensation from the Partnership.



Copy from re:SearchTX

1.15 Withdrawal of Initial Limited Partner. The Initial Limited Partner hereby withdraws as a limited partner immediately following the admission of the Limited Partners and thereafter shall have no further rights, liabilities or obligations under or in respect of this Agreement in its capacity as Initial Limited Partner.

## ARTICLE II
## POWERS

2.1 Partnership Powers. The Partnership shall have the following powers:

(a) To purchase, sell, invest and trade, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, syndicated debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; statutory claims; royalty claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (all such items being called herein a "**Financial Instruments**"), and to sell Financial Instruments short and cover such sales;



Copy from re:SearchTX

(b) To possess, transfer, mortgage, pledge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Financial Interests held or owned by the Partnership with the ultimate objective of the preservation, protection, improvement and enhancement in value thereof and to hold such Financial Interests in the name of the Partnership, in the name of any securities broker or firm, in the name of any nominee of such firm, or in the name of any other nominee or any other street name, or any combination thereof;

(c) To lend, either with or without security, any Financial Instruments, funds or other properties of the Partnership, including by entering into reverse repurchase agreements, and, from time to time, undertake leverage on behalf of the Partnership;

(d) To borrow or raise moneys and, from time to time, without limit as to amount, to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any of the foregoing instruments and of the interest thereon by mortgage upon or pledge, conveyance or assignment in trust of the whole or any part of the property of the Partnership, whether at the time owned or thereafter acquired, and to sell, pledge or otherwise dispose of such bonds or other obligations of the Partnership for its purposes;

(e) To have and maintain one or more offices within or without the Cayman Islands and in connection therewith to rent or acquire office space, engage personnel and do such other acts and things as may be necessary or advisable in connection with the maintenance of such office or offices;

(f) To open, maintain and close bank accounts and brokerage accounts, including the power to draw checks or other orders for the payment of monies; and

(g) To enter into, make and perform all contracts, agreements and other undertakings as may be necessary or advisable or incidental to the carrying out of the foregoing objects and purposes.

2.2 Rights, Powers, Limitations on Liability and Indemnification of General Partner.

(a) Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the General Partner, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including members of any committee and parties acting as agents for the execution of transactions) (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be subject to the provisions of this Section.

(b) To the fullest extent permitted by law, no Covered Person shall be liable to the Partnership or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the



Copy from re:SearchTX

business of the Partnership, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Partnership, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Partnership whom such Covered Person believes is authorized to make such suggestions on behalf of the Partnership, (iii) any act or omission by the Partnership, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Partnership selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c) Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Partnership or in furtherance of the business of the Partnership in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d) To the fullest extent permitted by law, the Partnership shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Partnership, any investment made under or in connection with this Agreement, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Partnership, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or gross negligence.

(e) Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

(f) The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may



Copy from re:SearchTX

otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

(g) The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h) **Notwithstanding anything in this Agreement to the contrary, the aggregate maximum amount that a Covered Person may be liable to the Partnership and/or any of the Partners pursuant to this Agreement shall, to the extent not prohibited by law, never exceed the amount of management and incentive fees received by such Covered Person from the Partnership under this Agreement prior to the date that the acts or omissions giving rise to a claim for indemnification or liability shall have occurred. In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits. No Covered Person shall incur any liability for interest on any monies at any time received by such Covered Person or any investment loss or other charge resulting therefrom with respect to amounts invested hereunder.**

(i) **<u>WAIVER OF CONSUMER RIGHTS</u>: The Partnership and each of the Limited Partners waive all of their respective rights, if any, under the Deceptive Trade Practices-Consumer Protection Act, Section 17.41 et seq., Texas Business & Commerce Code ("DTPA"), a law that gives consumers special rights and protections. After consultation with an attorney of Partnership's own selection, Partnership voluntarily consents to this waiver. This waiver includes any right to recover attorneys' fees under the DTPA. Further, Partnership waives all of its rights to any and all protections afforded by any other state or federal Consumer Protection Acts, including the recovery of attorneys' fees.**

(j) No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Covered Person, the Partnership (and not the applicable Covered Person) shall be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence or reckless or intentional misconduct of any Covered Person. Given the volume of transactions executed on behalf of the Partnership, Limited Partners acknowledge that trading errors (and similar errors) will occur and that the Partnership shall be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Covered Person.

(k) This Section 2.2 shall survive a Limited Partner's withdrawal as a limited partner of the Partnership and any termination of this Agreement.



Copy from re:SearchTX

## ARTICLE III
## CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES

3.1 Capital Contributions.

(a) Each Partner has made the capital contributions to the Partnership in the amount set forth in the records of the Partnership. The Limited Partner has contributed to the Partnership all of the outstanding equity interests of CLO HoldCo.

3.2 Capital Account; Allocation of Profits and Losses.

(a) There shall be established for each Partner on the books of the Partnership as of the first day of the fiscal period during which such Partner was admitted to the Partnership a capital account for such Partner in an amount equal to his capital contribution to the Partnership.

(b) Since the General Partner's capital account and contributions shall be the minimum required by Law, all income, deductions, gains, losses and credits of the Partnership shall be allocated shall be for the benefit of the Limited Partner, except as may otherwise be required by law. In the event any valuation of assets is necessary or appropriate, the General Partner shall determine such value in any reasonable manner determined by the General Partner in its sole discretion consistent with relevant accounting principles and applicable law.

(c) For purposes of determining the share of any items allocated to any period during the relevant Taxable Year of the Partnership, such shares shall be determined by the General Partner using any method permitted by the Code and the regulations thereunder. All allocations to be made by the General Partner may be overridden if necessary to comply with the Code, the regulations thereunder or other applicable law.

(d) To the extent that the Partnership pays withholding taxes as to a Partner, such amounts shall be charged to the applicable Partner's capital account; provided, however, that any such amounts may be treated as an advance to the Partner with interest to be charged to that Partner's capital account at a rate determined by the General Partner.

(e) Each Partner agrees not to treat, on any tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with treatment of such item by the Partnership.

## ARTICLE IV
## LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWALS FROM CAPITAL ACCOUNT

4.1 Legal Interest. Each Partner shall have and own during any Taxable Year an undivided interest in the Partnership equal to his opening capital account for such period.



Copy from re:SearchTX

4.2 Distributions.

(a) Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses. In determining the amount of cash or securities available for distribution, the General Partner may retain reasonable reserves in such amounts as it determines may be necessary to cover expenses, contingencies and losses. Notwithstanding the foregoing, distributions made in connection with a sale of all or substantially all of the Partnership's assets or a liquidation of the Partnership shall be made in accordance with the capital account balances of the Partners within the time period set forth in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(3).

(b) The General Partner may withhold and pay over to the U.S. Internal Revenue Service (or any other relevant taxing authority) such amounts as the Partnership is required to withhold or pay over, pursuant to the Code or any other applicable law, on account of a Partner's distributive share of the Partnership's items of gross income, income or gain.

For purposes of this Agreement, any taxes so withheld or paid over by the Partnership with respect to a Partner's distributive share of the Partnership's gross income, income or gain shall be deemed to be a distribution or payment to such Partner, reducing the amount otherwise distributable to such Partner pursuant to this Agreement and reducing the capital account of such Partner. If the amount of such taxes is greater than any such distributable amounts, then such Partner and any successor to such Partner's interest shall pay the amount of such excess to the Partnership, as a contribution to the capital of the Partnership.

4.3 Withdrawal. Without the consent of the General Partner, no Partner may withdraw as a Partner or make withdrawals from such Partner's capital account. In the event the General Partner permits any such withdrawal, the withdrawal shall be on such terms and conditions as the General Partner shall determine in its sole discretion. The General Partner may terminate all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall be directly or indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code.

## ARTICLE V
## DURATION OF PARTNERSHIP

5.1 Termination. The Partnership shall be required to be wound up and dissolved upon:

(a) the service of a notice by the General Partner on the other Partners requiring that the Partnership be wound up and dissolved; or



Copy from re:SearchTX

(b) the withdrawal by or resignation of the General Partner as general partner of the Partnership; or

(c) the withdrawal of all Limited Partners.

Upon the occurrence of any such event, the Partnership's affairs shall be wound up by the General Partner or such other Person as the General Partner shall appoint.

5.2 Winding Up. Upon the Partnership being required to be wound up and dissolved, the General Partner shall proceed with the liquidation and distribution of the assets of the Partnership, and upon completion of the winding up of the Partnership, shall have the authority to and shall execute and file a dissolution notice and such other documents required to effect the dissolution and termination of the Partnership in accordance with the Law. Before the distribution of all the assets of the Partnership, the business of the Partnership and the affairs of the Partners, as such, shall continue to be governed by this Agreement. The winding up of the Partnership and payment of creditors shall be effected in accordance with the Law.

## ARTICLE VI
## MISCELLANEOUS

6.1 Tax Matters Partner. The General Partner shall at all times constitute, and have full powers and responsibilities, as the Tax Matters Partner of the Partnership. In the event the Partnership shall be the subject of an income tax audit by any Federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and his decision shall be final and binding upon, the Partnership and each Partner thereof, and the Tax Matters Partner shall be indemnified and held harmless by the Partnership and each Partner for any action so taken by him in good faith. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership to the extent of available Partnership funds, and any excess shall be paid by the Partners individually in proportion to their percentage interests in the Partnership.

6.2 Right to Hire.

(a) Nothing herein shall preclude the General Partner from engaging on behalf of the Partnership the services of any person or firm, whether or not affiliated with the General Partner, including the General Partner, to render for compensation such services to the Partnership as may be necessary to implement the business purposes of the Partnership.

(b) Each of the Partners consents that the General Partner, the Investment Manager or any Limited Partner or any affiliate (as defined in the Securities Act of 1933, as amended, and the regulations thereunder) of any of them, including without limitation the investment manager of the CLO HoldCo, may engage in or possess an interest in directly or indirectly, any other present or future business venture of any nature or description for his own account, independently or with others,



Copy from re:SearchTX

including but not limited to, any aspect of the securities business or any other business engaged in by the Partnership, and may become the general partner in other partnerships; and neither the Partnership nor any Partner shall have any rights in or to such independent venture or the income or profits derived therefrom.

(c) The General Partner, the Investment Manager and any affiliate or employee of such General Partner or Investment Manager, may hereafter render investment advisory services to other investors with respect to, and/or may own, purchase or sell, securities or other interests in property the same as or similar to those which the General Partner may purchase, hold or sell on behalf of the Partnership.

6.3 Applicable Law, etc. This Limited Partnership Agreement: (i) shall be binding on the executors, administrators, estates, heirs and legal successors of the Partners; (ii) shall be governed by, and construed in accordance with, the laws of the Cayman Islands; and (iii) may be executed in more than one counterpart with the same effect as if the parties executing the several counterparts had all executed one counterpart as of the day and year first above written; provided, however, that in the aggregate, they shall have been signed by all of the Partners. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural as the identity of the person may require. The term "gross negligence" and its cognates shall be interpreted in accordance with the laws of the State of Delaware.

6.4 Power of Attorney. Each of the undersigned does hereby constitute and appoint the General Partner, with full power of substitution, his true and lawful representative and attorney in-fact, in his name, place and stead to make, execute, sign and file this Agreement and any amendment to this Agreement authorized by the terms of this Agreement, and all such other instruments, documents and certificates (and any amendments thereto) which may from time to time be required by the laws of the Cayman Islands, the United States of America, or any state in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid and subsisting existence of the Partnership and to take any further action that the General Partner considers advisable in its sole discretion in connection with the exercise of its authority pursuant to this Agreement. This power of attorney is intended to secure an interest in property and, in addition, the obligations of each relevant Limited Partner under this Agreement and shall be irrevocable.

6.5 Tax Elections Under the Internal Revenue Code. The General Partner shall have the authority to make all tax elections and determinations on behalf of the Partnership under the Internal Revenue Code, the regulations promulgated thereunder or other applicable law to effect any elections, determinations or capital allocations.

6.6 Amendments to Partnership Agreement. The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the consent of the General Partner together with the consent of a majority in interest of the Limited Partners, insofar as is consistent with the laws governing this Agreement. Notwithstanding the foregoing, the General Partner shall have the right to effect



Copy from re:SearchTX

amendments to this Agreement without the consent of any Limited Partner, including without limitation, to reflect: a change in the location of the Partnership's principal place of business; a change in the registered office or registered agent; a change in the name of the Partnership; admission of Partners in accordance with this Agreement; a change that is necessary to qualify the Partnership as a limited partnership under the laws of any state or that is necessary or advisable in the opinion of the Tax Matters Partner to ensure that the Partnership will not be treated as an association taxable as a corporation for Federal income tax purposes; a change of the provisions relating to the management fee or other compensation to the Investment Manager or the General Partner so that such provisions conform to any applicable requirements of the U.S. Securities and Exchange Commission and other regulatory authorities; a change (i) that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state agency or contained in any Federal or state statute, compliance with any of which the General Partner deems to be in the best interests of the Partnership and the Limited Partners, (ii) that is required or contemplated by this Agreement, or (iii) that is necessary or desirable to implement new regulations published by the Internal Revenue Service with respect to partnership allocations of income, gain, loss, deduction and credit; a change to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provision with respect to the matters or questions arising under this Agreement which will not be inconsistent with the provisions hereof; or a change that does not adversely affect the Limited Partners in any material respect; *provided, that* in no event shall the General Partner effect any amendment to this Agreement that has the effect of giving the General Partner any economic benefits in the assets of the Partnership; *provided further, that* the General Partner shall give notice to the Limited Partners of any such amendment.

6.7 Investment Representation. Each Partner hereby acknowledges and represents that it acquired its interest in the Partnership for investment purposes only and not with a view to its resale or distribution.

6.8 Notices. All notices, requests or approvals that any party hereto is required or desires to give to any Partner or to the Partnership shall be in writing signed by or on behalf of the party giving the same and delivered personally or sent overnight express mail by a reputable private carrier or by prepaid registered or certified mail, return receipt requested, addressed (i) to the Limited Partner at the addresses set forth beneath his signature to this Agreement; (ii) to the Partnership at the principal place of business of the Partnership with a copy of each such notice sent simultaneously to the General Partner and the Investment Manager at Nextbank Tower, 13455 Noel Road, 8th Floor, Dallas, Texas 75240; or (iii) to the respective party at such other address or addresses as the party may specify from time to time in a writing given to the Partnership in the manner provided in this Section 6.8 of ARTICLE VI. Notice shall be deemed to have been duly given and received (i) on the date of delivery, if personally delivered, (ii) on the next business day subsequent to sending by overnight express mail as aforesaid, or (iii) on the third day subsequent to mailing if mailed as aforesaid; provided that any withdrawal notices shall not be deemed to have been given until actually received by the Partnership.



Copy from re:SearchTX

6.9 General Partner Determinations. Any determinations or calculations made by the General Partner shall, if made in good faith and in the absence of manifest error, be binding upon the Partnership and its Limited Partners.

6.10 Dispute Resolution. The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with the Agreement or otherwise involving the Partnership, its Partners and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation.

(1) Any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

(2) The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(3) The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

(4) Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

(b) Arbitration. If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**"). In the event of a conflict, the provisions of this document will control.

(1) The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the



Copy from re:SearchTX

Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however*, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a state arbitration act preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(2) The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(3) The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive.

(4) No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The



Copy from re:SearchTX

total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(5) All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(6) The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

6.11 Successors and Assigns. Subject to the limitations set forth in Section 1.11, this Agreement shall inure to the benefit of and be binding upon the parties and to their respective heirs, executors, administrators, successors and permitted assigns. For the avoidance of doubt, any Limited Partner who becomes a former Limited Partner shall remain bound to all terms and conditions of this Agreement.

6.12 Severability. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of the Agreement.

6.13 No Third Party Rights. Except for rights expressly granted hereunder to the Covered Persons, this Agreement is intended solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto.

6.14 No Right to Partition. Each of the Partners, on behalf of themselves and their shareholders, partners, principals, members, successors and assigns, if any and as permitted hereunder, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held.



Copy from re:SearchTX

**SIGNATURE PAGE FOR AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP**

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: ______________________________
James D. Dondero
Managing Member

Witnessed By: ______________________

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:

By: ______________________________
Name: Grant Scott
Title: Director

Witnessed By: ______________________

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:

By: ______________________________
Name:
Title:

Witnessed by: ______________________



Copy from re:SearchTX

**SIGNATURE PAGE FOR AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP**

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: ______________________________
James D. Dondero
Managing Member

Witnessed By: ______________________

LIMITED PARTNERSHIP:

CHARITABLE DAF HOLDCO, LTD:

By: ______________________________
Name: Grant Scott
Title: Director

Witnessed By: Candi L Riggs
Candi L. Riggs

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:

By: ______________________________
Name: ROD PALMER
Title:

Witnessed by: Gráinne O Leary

EXHIBIT 2-B

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)

WALKERS

190 Elgin Avenue, George Town
Grand Cayman KY1-9001, Cayman Islands
T +1 345 949 0100 F +1 345 949 7886 www.walkersglobal.com

REF: SSJ/VT/H0851-120776

AMER_Docs 11255406.3 H0851.120776

GENERAL REGISTRY CAYMAN ISLANDS

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

MEMORANDUM OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

**(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)**

1. The name of the company is Charitable DAF HoldCo, Ltd (the "**Company**").

2. The registered office of the Company will be situated at the offices of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



GENERAL REGISTRY CAYMAN ISLANDS

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*



Copy from re:SearchTX

TABLE OF CONTENTS


| CLAUSE | PAGE |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 4 |
| SHARES | 4 |
| MANAGEMENT SHARES | 5 |
| PARTICIPATING SHARES | 6 |
| MODIFICATION OF RIGHTS | 6 |
| CERTIFICATES | 7 |
| FRACTIONAL SHARES | 7 |
| TRANSFER OF SHARES | 7 |
| TRANSMISSION OF SHARES | 7 |
| ALTERATION OF SHARE CAPITAL | 8 |
| REDEMPTION, PURCHASE AND SURRENDER OF SHARES | 8 |
| TREASURY SHARES | 9 |
| GENERAL MEETINGS | 9 |
| NOTICE OF GENERAL MEETINGS | 10 |
| PROCEEDINGS AT GENERAL MEETINGS | 10 |
| VOTES OF SHAREHOLDERS | 11 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 12 |
| DIRECTORS | 12 |
| ALTERNATE DIRECTOR | 13 |
| POWERS AND DUTIES OF DIRECTORS | 13 |
| BORROWING POWERS OF DIRECTORS | 15 |




AMER_Docs 11255406.3 H0851.120776

GENERAL REGISTRY CAYMAN ISLANDS

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

THE SEAL ..... 15
DISQUALIFICATION OF DIRECTORS ..... 15
PROCEEDINGS OF DIRECTORS ..... 16
DIVIDENDS ..... 18
ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION ..... 18
CAPITALISATION OF RESERVES ..... 19
SHARE PREMIUM ACCOUNT ..... 20
NOTICES ..... 20
NON-RECOGNITION OF TRUSTS ..... 21
WINDING UP ..... 21
AMENDMENT OF ARTICLES OF ASSOCIATION ..... 22
CLOSING OF REGISTER OR FIXING RECORD DATE ..... 22
REGISTRATION BY WAY OF CONTINUATION ..... 22
MERGERS AND CONSOLIDATION ..... 22
DISCLOSURE ..... 23
INDEMNITY ..... 23
DISPUTE RESOLUTION ..... 24



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

**(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)**

**TABLE A**

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

**INTERPRETATION**

1. In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Law**" means the Companies Law (as amended) of the Cayman Islands.

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Law and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.



GENERAL REGISTRY CAYMAN ISLANDS

Uploaded: 27-Jan-2015 16:49 EST

Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

"**Office**" means the registered office of the Company as required by the Law.

"**Ordinary Resolution**" means a resolution:

(a) passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Law and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "**Participating Shares**" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Law and these Articles, means the Register maintained by the Company pursuant to the Law and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law and includes any Branch Register(s) established by the Company in accordance with the Law.

"**Restricted Person**" means any Person holding Participating Shares:

(a) in breach of the law or requirements of any country or governmental authority;

(b) that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the US Internal Revenue Code of 1986, as amended (the "**Code**") or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c) in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.





GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a) passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a) words importing the singular number shall include the plural number and vice versa;

(b) words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c) the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d) reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e) reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

(f) reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

(g) reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

2. Subject to the preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

3. The business of the Company may be commenced at any time after incorporation.

4. The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5. The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6. The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Law and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Law, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Law.

**SHARES**

7. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

(b) grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions,

GENERAL REGISTRY CAYMAN ISLANDS





Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST





Copy from re:SearchTX

preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

**MANAGEMENT SHARES**

11. The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.

12. Any Management Shares held by Grant Scott will be automatically redeemed by the Company upon his death or upon the Company receiving written notice from two board certified physicians confirming that he is of unsound mind or otherwise incapacitated ("**Automatic Redemption**").

13. If at the time of an Automatic Redemption, Grant Scott is the sole Director of the Company, such office will be automatically vacated by Grant Scott.

14. Upon an Automatic Redemption, the Company shall issue 100 Management Shares to a successor management shareholder ("**Successor Management Shareholder**") designated by James Dondero ("**Designator**"), or, if he is unable or declines to act, by an individual or individuals designated by James Dondero ("**Successor Designator**"), in either case within 15 days of the Automatic Redemption. If the Designator is:

    (a) deceased and has not named a Successor Designator, or if each named Successor Designator is unable or declines to act, the designation of the Successor Management Shareholder shall be made in accordance with the provisions of the Designator's will, or if his will contains no such provisions, by the qualified personal representative of his estate (the "**Designator's Personal Representative**"); or

    (b) otherwise incapacitated and has not previously designated a Successor Designator, or if each named Successor Designator is unable or declines to act, the designation of the Successor Management Shareholder shall be made by the Designator's attorney-in-fact appointed for such purpose, under a valid, effective power of attorney instrument (the "**Designator's Attorney**").

15. Any designation of a Successor Management Shareholder must be notified to the Company in writing and signed by either the Designator, the Successor Designator, the Designator's Personal Representative, or the Designator's Attorney, as appropriate, and accompanied by a consent to become a Shareholder signed by the Successor Management Shareholder ("**Issue Notice**"). The issue of the 100 Management Shares to the Successor Management Shareholder shall take effect upon receipt by the Company of the Issue Notice and the Register will be updated accordingly.



GENERAL REGISTRY CAYMAN ISLANDS

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

16. The Designator may name a Successor Designator (including an individual, or a series of individuals) at any time pursuant to a written notice delivered to the Company during his lifetime or by a provision in his will. Each Successor Designator upon succeeding and replacing the Designator or a prior Successor Designator, may in the same manner as set out above, designate an individual, or a series of individuals, to succeed him as Successor Designator. In the event of a conflict between such instruments, the one bearing the latest date shall control. A Successor Designator will assume such office upon consenting to so act.

17. The Successor Management Shareholder may not be a "disqualified person" (as that term is defined in Section 4946 of the United States Internal Revenue Code of 1986, as amended), other than a foundation manager, with respect to Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., or Highland Kansas City Foundation, Inc.

18. In connection with the appointment of the Successor Management Shareholder, the Company and its registered office service provider will be entitled to rely on the advice of counsel confirming that the designation of the Successor Management Shareholder has been made in accordance with the procedures set out in these Articles.

**PARTICIPATING SHARES**

19. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

**MODIFICATION OF RIGHTS**

20. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

21. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.





GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

## CERTIFICATES

22. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

23. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

## TRANSFER OF SHARES

24. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

25. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

26. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

27. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

28. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

## TRANSMISSION OF SHARES

29. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

30. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person





GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

31. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

**ALTERATION OF SHARE CAPITAL**

32. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

33. The Company may by Ordinary Resolution:

(a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

34. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

**REDEMPTION, PURCHASE AND SURRENDER OF SHARES**

35. Subject to the Law, the Company may:

(a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;

(b) purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c) make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law; and

(d) accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.



GENERAL REGISTRY CAYMAN ISLANDS

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

36. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

37. The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

38. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

**TREASURY SHARES**

39. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Law. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

40. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

41. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

(a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

(b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Law, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.

42. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

**GENERAL MEETINGS**

43. The Directors may, whenever they think fit, convene a general meeting of the Company.

44. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

45. General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least ten percent of the paid up voting share capital of the Company deposited at the Office specifying the



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

46. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

47. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

48. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

49. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

50. No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

51. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

52. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.



GENERAL REGISTRY CAYMAN ISLANDS

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

53. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

54. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

55. The chairman may adjourn a meeting from time to time and from place to place either:

(a) with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting); or

(b) without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

(i) secure the orderly conduct or proceedings of the meeting; or

(ii) give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

56. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

57. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

58. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

59. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

## VOTES OF SHAREHOLDERS

60. On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of

GENERAL REGISTRY CAYMAN ISLANDS



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

61. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

62. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

63. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

64. On a poll votes may be given either personally or by proxy.

65. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

66. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

67. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

68. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

69. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

70. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

## DIRECTORS

71. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.



GENERAL REGISTRY CAYMAN ISLANDS

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

72. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

73. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

74. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

75. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

76. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

77. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

**ALTERNATE DIRECTOR**

78. Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be deemed to be an officer of the Company solely as a result of his appointment as an alternate. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

79. Any Director may appoint any Person , whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

**POWERS AND DUTIES OF DIRECTORS**

80. Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.



GENERAL REGISTRY CAYMAN ISLANDS

*Uploaded: 27-Jan-2015 16:49 EST*
*Filed: 04-Feb-2015 09:13 EST*



Copy from re:SearchTX

81. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

82. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

83. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

84. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

85. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

86. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

87. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

GENERAL REGISTRY CAYMAN ISLANDS



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

88. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

## BORROWING POWERS OF DIRECTORS

89. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

## THE SEAL

90. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

91. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

92. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DISQUALIFICATION OF DIRECTORS

93. The office of Director shall be vacated, if the Director:

(a) becomes bankrupt or makes any arrangement or composition with his creditors;

(b) dies or is found to be or becomes of unsound mind;

(c) resigns his office by notice in writing to the Company;

(d) is removed from office by Ordinary Resolution;

(e) is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number); or



GENERAL REGISTRY CAYMAN ISLANDS

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

(f) is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

## PROCEEDINGS OF DIRECTORS

94. The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

95. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

96. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one. A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

97. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

98. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

99. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.



GENERAL REGISTRY CAYMAN ISLANDS

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

100. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a) all appointments of officers made by the Directors;

(b) the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c) all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

101. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

102. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

103. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

104. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

105. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

106. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

107. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

## DIVIDENDS

108. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Law and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

109. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

110. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

111. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

112. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

113. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

114. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

115. No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

116. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

117. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

118. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

119. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

120. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

**CAPITALISATION OF RESERVES**

121. Subject to the Law and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii) paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares,



GENERAL REGISTRY CAYMAN ISLANDS

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

**SHARE PREMIUM ACCOUNT**

122. The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

123. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

**NOTICES**

124. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

125. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

126. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.



GENERAL REGISTRY CAYMAN ISLANDS

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

127. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

128. Notice of every general meeting of the Company shall be given to:

(a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

**NON-RECOGNITION OF TRUSTS**

129. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

**WINDING UP**

130. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

131. Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

(a) first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

(b) second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

132. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

**AMENDMENT OF ARTICLES OF ASSOCIATION**

133. Subject to the Law and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

**CLOSING OF REGISTER OR FIXING RECORD DATE**

134. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

135. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

136. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

**REGISTRATION BY WAY OF CONTINUATION**

137. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

**MERGERS AND CONSOLIDATION**

138. The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Law.

GENERAL REGISTRY CAYMAN ISLANDS



Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

**DISCLOSURE**

139. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

**INDEMNITY**

140. To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or Gross Negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

141. Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

142. To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

143. Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.





GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST





Copy from re:SearchTX

144. The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

## DISPUTE RESOLUTION

145. The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation:

(i) any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

(ii) the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

(iii) the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

(iv) each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties,

(b) Arbitration:

if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in these Articles and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

(i) the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any



GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however*, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii) the arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii) the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv) no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted;

(v) all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a





GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST





Copy from re:SearchTX

reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi) the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.



GENERAL REGISTRY CAYMAN ISLANDS

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST



Copy from re:SearchTX

EXHIBIT
3

1. Defendant
2. Geoffrey Sykes
3. First Affidavit
4. Exhibit "GS-1"
5. 27 April 2025

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 99 OF 2025 (JAJ)**

**IN THE MATTER OF:** **SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF:** **CHARITABLE DAF HOLDCO, LTD (IN VOLUNATRY LIQUIDATION)**

**BETWEEN**

**(1) THE HIGHLAND DALLAS FOUNDATION, INC.**
**(2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.**
**(3) THE HIGHLAND SANTA BARBARA FOUNDATION, INC.**
**(4) THE HCMLP CHARITABLE FUND**

**PLAINTIFFS**

**and**

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION)**

**DEFENDANT**

THIS IS EXHIBIT "**GS-1**" TO THE AFFIDAVIT OF

**GEOFFREY SYKES**

SWORN BEFORE ME THIS 27TH DAY OF APRIL 2025

**Fiona MacAdam**
**Notary Public in and for the Cayman Islands**
**My commission expires January 31, 2026**
**Date:** 27 April 2025.

**NOTARY PUBLIC**

JOHNSTONE
LAW

24 April 2025

Charitable DAF HoldCo Ltd
c/o Campbells Corporate Services Limited
Floor 4, Willow House, Cricket Square
Grand Cayman, KY1-9010
Cayman Islands

Dear Sir or Madam

**In the matter of Charitable DAF HoldCo Ltd | FSD No. 99 of 2025 | Service of Documents**

We act for the participating shareholders of the Charitable DAF HoldCo Ltd (***Company***), namely: (i) Highland Dallas Foundation, Inc., (ii) Highland Kansas City Foundation, Inc., (iii) Highland Santa Barbara Foundation, Inc., and (iv) HCMLP Charitable Fund (***Supporting Organisations***) which presented a winding up petition in relation to the Company (***Petition***), and a summons dated 10 April 2025 (***Summons***).

The Summons is listed for hearing before Justice Asif at 2pm on 28 April 2025.

Please find enclosed by way of service copies of the following:

1. The Petition (including Notice of Hearing)
2. The Summons
3. Affirmation of Julie Diaz and Exhibit JD-1
4. Affirmation of James Dondero and Exhibit JDD-1
5. Consent to act of Margot MacInnis and Exhibit MM-1
6. Consent to act of Sandipan Bhowmik and Exhibit SB-1

*Acknowledgment of Service*

I ________________________________ am duly authorised to accept service of the enclosed documents, which were served at _______ pm on 24 April 2025.

__________________________________

**Signed**

If you have any questions in relation to the above, please contact our office.

Yours faithfully

Johnstone Law

**Johnstone Law**

Walkers

**BY EMAIL**

25 April 2025

Our Ref: PP/PA/187150

Johnstone Law
10 Market Street, PO Box 926
Grand Cayman KY1-9006

Dear Mr Johnstone

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")**

1. We act as Cayman Islands counsel to the Company.

2. We refer to the documents served yesterday by your firm on the Company at its registered office, which include a winding up petition ("**Petition**"), an application for the appointment of provisional liquidators ("**PL Application**"), and a cover letter of service ("**Service Letter**").

**The Company is already in Voluntary Liquidation**

3. Please note the following (all documents enclosed):

   (a) On 29 March 2025, Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd executed a consent to act as joint voluntary liquidators of the Company ("**JVLs**").

   (b) On 2 April 2025: (i) the directors of the Company executed written resolutions including to recommend to the management shareholder that the Company be wound up voluntarily and the JVLs be appointed; (ii) the management shareholder executed special resolutions that the Company be wound up voluntarily and the JVLs be appointed; and (iii) the directors of the Company executed a declaration of solvency.

   (c) On 14 April 2025, Gazette Issue No. 8/2025 was published, which included notice that on 2 April 2025 the Company was placed into Voluntary Liquidation and the JVLs appointed.

4. Further, please see enclosed:

   (a) The current Memorandum and Articles of the Company, dated 20 February 2025 ("**M&A**").



Copy from re:SearchTX

(b) The current Register of Members of the Company, dated 25 April 2025.

(c) An email chain between your firm and our firm dated 23-24 April 2025.

5. As outlined above, the Company is in Voluntary Liquidation.

6. That fact should have been evident from a search of the Gazette prior to service, as per the enclosed notice referred to at paragraph 3(c) above.

7. Further, the email chain referred to at paragraph 4(c) above is all that we received from your firm by way of pre-action correspondence. We enquired as to the nature of the proceedings to be served, and had we been informed that it was a winding up petition and application for the appointment of provisional liquidators (rather than simply that the proceedings were in the process of being served on the Company's registered office), we would have informed you that the Company was already in Voluntary Liquidation.

8. There is nothing in the M&A which entitles your clients to receive notice from the Company of its entry into Voluntary Liquidation.

**The appropriate course of action**

9. As the Company is already in Voluntary Liquidation, the Petition and PL Application are plainly redundant, and we invite your clients to withdraw them without delay.

10. If the JVLs (or your clients) consider it appropriate that the Voluntary Liquidation be brought under the supervision of the court, any of them may make an application for a supervision order pursuant to the Companies Act section 131. If your clients would like to discuss such an application with the JVLs, including in respect of funding, please let us know.

11. In the event that the Petition and PL Application are not withdrawn, or at the very least the hearing of the PL Application (which we understand from your firm's Service Letter is listed on Monday 28 April 2025 at 2pm) is not adjourned, this letter must be brought to the attention of the Court, and we will appear on behalf of the Company.

12. If it becomes appropriate to do so, we will put this letter before the Court including on the question of costs.

Yours faithfully

*Walkers (Cayman) LLP*

**WALKERS (CAYMAN) LLP**

Direct Tel: +1 345 914 6365
Email: Barnaby.Gowrie@walkersglobal.com



Copy from re:SearchTX

**THE COMPANIES ACT (AS AMENDED)**

**JOINT VOLUNTARY LIQUIDATORS' CONSENT TO ACT**

**CHARITABLE DAF HOLDCO, LTD. (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")**

**REGISTRATION NO: 263805**

To: The Registrar of Companies

**TAKE NOTICE** that we, Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands, hereby consent to act as Joint Voluntary Liquidators of the above-named Company with effect from the commencement of the liquidation.

**DATED** this 29th day of March, 2025.

______________________________

**Mitchell Mansfield**
**Joint Voluntary Liquidator**

E: mitchell.mansfield@kroll.com
T: +1 345 743 8805

______________________________

**William Clarke**
**Joint Voluntary Liquidator**

E: will.clarke@kroll.com
T: +1 345 623 9905



Copy from re:SearchTX

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE**
**DIRECTORS OF THE COMPANY DATED 2 APRIL 2025**

Capitalised terms used herein shall have the meaning ascribed to such terms in the Company's Amended and Restated Memorandum and Articles of Association (as adopted by Special Resolution dated 20 February 2025), unless the context otherwise requires.

The undersigned, being all the Directors of the Company for the time being, hereby take the following actions and adopt the following resolutions.

**1. VOLUNTARY LIQUIDATION**

1.1 **IT IS NOTED** that:

(a) the Company's sole investment, being 100% of the limited liability company interests in CDMCFAD, LLC, a Delaware limited liability company, was redeemed on 27 March 2025 (the "**CDMCFAD Redemption**");

(b) proceeds lawfully available for distribution from the CDMCFAD Redemption in the amount of $1,612,192 were distributed to holders of Participating Shares of the Company by way of a cash dividend paid on April 2;

(c) the Company will not be engaging in any further business or investment activity and the operations of the Company have been fully wound down;

(d) the Company has no assets and no liabilities;

(e) in the circumstances, there is no reason for the Company to continue as a going concern and the Directors are of the view that the Company should therefore be wound up voluntarily;

(f) Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands have indicated that they consent to act as joint voluntary liquidators of the Company (the "**JVLs**") if so appointed;

(g) the Directors have received and reviewed a liquidation proposal from the JVLs, together with its terms and conditions (the "**Liquidation Proposal**");

(h) the Directors have conducted a full enquiry into the Company's affairs and to the best of the Directors' knowledge and belief the Company will be able to pay its debts in full together with interest at the prescribed rate within twelve-month period from the commencement of the voluntary winding up; and

(i) the Directors have received a form of the declaration of solvency for execution pursuant to section 124 of the Companies Act (as amended) (the "**Declaration of Solvency**").

1.2 **IT IS RESOLVED** that:

(a) the Liquidation Proposal be approved;

(b) the Directors recommend to Mark Patrick, being the only Shareholder having the right to receive notice of, attend, speak at and vote at general meetings of the Company, that:

(i) the Company be wound up voluntarily; and

(ii) Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd be appointed as the JVLs of the Company; and

(c) if the Company is wound up voluntarily, each Director execute the Declaration of Solvency.

**2. GENERAL AUTHORISATION**

2.1 **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, any Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively), and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

**3. RATIFICATION OF PRIOR ACTIONS**

3.1 **IT IS RESOLVED** that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.

Mark Patrick
**Director**

Paul Murphy
**Director**

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

---

**WRITTEN RESOLUTIONS OF THE SOLE VOTING SHAREHOLDER OF THE COMPANY DATED 2 APRIL 2025**

---

Capitalised terms used herein shall have the meaning ascribed to such terms in the Company's Amended and Restated Memorandum and Articles of Association (as adopted by Special Resolution dated 20 February 2025) (the "**Articles**"), unless the context otherwise requires.

The undersigned, being the only Shareholder of the Company having the right to receive notice of, attend, speak at and vote at general meetings and having considered the written resolutions of the Directors dated 2 April 2025 which state that the Directors recommend that the Company be wound up voluntarily and that Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands be appointed as the joint voluntary liquidators of the Company (the "**JVLs**"), hereby consents to the following actions and adopts the resolutions set out below.

**1. VOLUNTARY LIQUIDATION**

1.1 **IT IS RESOLVED BY SPECIAL RESOLUTION** that:

(a) the Company be wound up voluntarily; and

(b) Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd be appointed as the JVLs of the Company.

1.2 **IT IS RESOLVED BY ORDINARY RESOLUTION** that:

(a) the JVLs be authorised, in accordance with Article 123 of the Articles, to divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for that purpose, set such value as they deem fair upon any property to be divided as aforesaid and may determine how such division will be carried out as between the Participating Shareholders or different Classes; and

(b) the JVLs shall have the power to retain the Company's administrator, manager or such other person as determined by the JVLs to assist them in discharging any registration and notification obligations and any obligation to complete the Company's final filings and retain records pursuant to the US Foreign Account Tax Compliance Act and/or Common Reporting Standard and/or Economic Substance Reporting.

[signature]

Mark Patrick



Copy from re:SearchTX

**THE COMPANIES ACT (AS AMENDED)**

**DECLARATION OF SOLVENCY**

**CHARITABLE DAF HOLDCO, LTD. (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")**

**REGISTRATION NO: 263805**

We, Mark Patrick and Paul Murphy, being the Directors of the Company do solemnly and sincerely declare that we have made a full inquiry into the affairs of the Company and that, having done so, we believe that the Company will be able to pay its debts in full, together with interest at the prescribed rate within a period of twelve (12) months from the commencement of the winding up.

**Mark Patrick**
6716 Glenhurst Drive, Dallas, Texas, TX 75254, United States
Date of signature: 4/2/2025
Date of appointment as Director: 25 March 2021

**Paul Murphy**
Windsor Village, Unit 24, South Sound, Grand Cayman, Cayman Islands
Date of signature: 2nd April 2025
Date of appointment as Director: 22 April 2021





Copy from re:SearchTX

**Contacts for enquiries:**
Bryce Doran or Zhouming Kang
Telephones: (345) 949 7576 or +852 2583 1167
Emails: BDoran@RHRestructuring.com
or zhouming.kang@acclime.com

**GATN FINANCE LIMITED**
**Notice of Voluntary Winding Up (O.13, r.2)**
**(In Voluntary Liquidation)**
**The Companies Act (As Amended)**

TAKE NOTICE that the above-named Company was put into liquidation on 2 April 2025 by a special resolution passed at an extraordinary meeting of the Company held on 2 April 2025.

AND FURTHER TAKE NOTICE that Westport Services Ltd., of PO Box 1111, Century Yard, Cricket Square, Grand Cayman, KY1-1102 Cayman Islands, has been appointed Voluntary Liquidator of the Company.

Creditors of the company are to prove their debts or claims on or before 7 May 2025and to establish any title they may have under The Companies Act (as amended), or be excluded from the benefit of any distribution made before such debts are proved or from objecting to the distribution.

**Date of liquidation: 2 April 2025**

WESTPORT SERVICES LTD.
Voluntary Liquidator

**Officer for enquiries:**
Name: Colin Eastburn-Mallory
Telephone: (345) 949 5122
c/o Paget-Brown Financial Services Limited
P.O. Box 1111
Century Yard, Cricket Square
Grand Cayman KY1-1102
Cayman Islands
Tel: 345 949 5122

**AMP FUNDING LIMITED**
**(In Voluntary Liquidation)**
**The Companies Act (As Amended)**
**Notice of Voluntary Winding Up (O.13, r.2)**

TAKE NOTICE that the above-named Company was put into liquidation on 2 April 2025 by a special resolution passed at an extraordinary meeting of the Company held on 2 April 2025.

AND FURTHER TAKE NOTICE that Westport Services Ltd., of PO Box 1111, Century Yard, Cricket Square, Grand Cayman KY1-1102, Cayman Islands, has been appointed Voluntary Liquidator of the Company.

Creditors of the company are to prove their debts or claims on or before 7 May 2025and to establish any title they may have under The Companies Act (as amended), or be excluded from the benefit of any distribution made before such debts are proved or from objecting to the distribution.

**Date of liquidation: 2 April 2025**

WESTPORT SERVICES LTD.
Voluntary Liquidator

**Officer for enquiries:**
Name: Colin Eastburn-Mallory
Telephone: (345) 949 5122
c/o Paget-Brown Financial Services Limited
P.O. Box 1111
Century Yard, Cricket Square
Grand Cayman KY1-1102
Cayman Islands
Tel: 345 949 5122

**CHARITABLE DAF HOLDCO, LTD.**
**(In Voluntary Liquidation)**
**("The Company")**
**The Companies Act (As Amended)**
**Notice Of Voluntary Winding Up**
**Registration No: 263805**

TAKE NOTICE that the Company was put into liquidation on 2 April 2025 by a special resolution passed by written resolution of the sole voting shareholder of the Company, executed on 2 April 2025.

AND FURTHER TAKE NOTICE that Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands, have been appointed as joint voluntary liquidators of the Company.

AND NOTICE IS HEREBY GIVEN that creditors of the Company are to prove their debts or claims within 21 days of the publication of this notice and to establish any title they may have under the Companies Act (as amended) by sending their names, addresses and the particulars of their debts or claims to the undersigned, or in default thereof they will be excluded from the benefit of


Copy from re:SearchTX

any distribution made before such debts and/or claims are proved or from objecting to the distribution.

**Dated this 14th day of April 2025**

MITCHELL MANSFIELD AND WILLIAM CLARKE
Joint Voluntary Liquidators

**Contact for enquiries:**
William Clarke
Strathvale House, 3rd Floor
90 North Church Street
George Town
Grand Cayman KY1-1204
Cayman Islands
E: will.clarke@kroll.com
T: +1 345 623 9905

**Address for service:**
Kroll (Cayman) Ltd
Strathvale House, 3rd Floor
90 North Church Street
George Town
Grand Cayman, KY1-1204
Cayman Islands

**AARO DIRECTIONAL CRYPTO MULTIFUND LIMITED**
**(In Voluntary Liquidation)**
**(the Company)**
**Notice Of Voluntary Winding Up**
**Registration No: 390083**

TAKE NOTICE that the Company was placed into voluntary liquidation on 28 March 2025 by a special resolution passed by written resolution of the voting shareholder of the Company.

AND FURTHER TAKE NOTICE that R&H Restructuring VL Services Ltd. of Windward 1, Regatta Office Park, PO Box 897, Grand Cayman KY1-1103, Cayman Islands has been appointed voluntary liquidator of the Company.

AND NOTICE IS HEREBY GIVEN that creditors of the Company are to prove their debts or claims within 21 days of the publication of this notice to establish any title they may have under the Companies Act (as revised) by sending their names, addresses and the particulars of their debts or claims to the undersigned, or in default thereof they will be excluded from the benefit of any distribution made before such debts and/or claims are proved or from objecting to the distribution.

**Dated: 03 April 2025**

OWEN WALKER
Authorised signatory for and on behalf of
R&H Restructuring VL Services, Ltd.
Voluntary Liquidator

MARTIN TROTT
Authorised signatory for and on behalf of
R&H Restructuring VL Services, Ltd.
Voluntary Liquidator

**Contact for Enquiries:**
Robert Knight
Telephone: +1 (345) 949 7576
Email: RKnight@RHRestructuring.com

**XP PHALANX CT FUND**
**(In Voluntary Liquidation)**
**(the "Company")**
**The Companies Act (as amended)**
**Notice of Voluntary Winding Up**
**Registration No: 391110**

TAKE NOTICE that the above-named Company was put into liquidation on 26 March 2025 by a Special Resolution passed by the sole voting shareholder by way of a written resolution in lieu of a meeting.

AND FURTHER TAKE NOTICE that FFP Limited of 2nd Floor Harbour Centre, 159 Mary Street, George Town, Grand Cayman, Cayman Islands has been appointed Voluntary Liquidator of the Company.

CREDITORS OF THE COMPANY are to prove their debts or claims within 21 days of the publication of this notice, and to establish any title they may have under the Companies Act (as amended) or are to be excluded from the benefit of any distribution made before the debts are proved or from objecting to the distribution.

**Dated this 3rd day of April 2025**

FFP LIMITED
Voluntary Liquidator

**Contact for enquiries:**
James Allen
FFP Limited
2nd Floor Harbour Centre
159 Mary Street
George Town, Grand Cayman
Cayman Islands


Copy from re:SearchTX

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

Campbells

Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

campbellslegal.com

(14133-42760)



GENERAL REGISTRY CAYMAN ISLANDS

004560

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX
35631852.5.C8689.187150

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

1. The name of the Company is Charitable DAF HoldCo, Ltd.

2. The registered office of the Company will be situated at the offices of Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are:

   (a) to benefit community-focused non-profit foundations established or located anywhere in the world or for the purposes recognised as charitable, as the Directors may from time to time determine, in furtherance of the following mission statement: "Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference"; and

   (b) to do all such things in the opinion of the Directors are or may be incidental or conducive to the above objects or any part of them.

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Companies Act (as amended) of the Cayman Islands (the "**Act**").

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power



Copy from re:SearchTX

to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Act to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

## TABLE OF CONTENTS

**CLAUSE** **PAGE**


| | |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 5 |
| SHARES | 6 |
| MANAGEMENT SHARES | 6 |
| PARTICIPATING SHARES | 7 |
| MODIFICATION OF RIGHTS | 7 |
| CERTIFICATES | 7 |
| FRACTIONAL SHARES | 7 |
| TRANSFER OF SHARES | 8 |
| TRANSMISSION OF SHARES | 8 |
| ALTERATION OF SHARE CAPITAL | 9 |
| REDEMPTION, PURCHASE AND SURRENDER OF SHARES | 9 |
| TREASURY SHARES | 10 |
| GENERAL MEETINGS | 11 |
| NOTICE OF GENERAL MEETINGS | 11 |
| PROCEEDINGS AT GENERAL MEETINGS | 11 |
| VOTES OF SHAREHOLDERS | 13 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 14 |
| DIRECTORS | 14 |
| POWERS AND DUTIES OF DIRECTORS | 15 |




GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

BORROWING POWERS OF DIRECTORS .......... 17
THE SEAL .......... 17
DISQUALIFICATION OF DIRECTORS .......... 17
PROCEEDINGS OF DIRECTORS .......... 18
DIVIDENDS .......... 21
ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION .......... 21
CAPITALISATION OF RESERVES .......... 22
SHARE PREMIUM ACCOUNT .......... 23
NOTICES .......... 23
NON-RECOGNITION OF TRUSTS .......... 24
WINDING UP .......... 25
AMENDMENT OF ARTICLES OF ASSOCIATION .......... 25
CLOSING OF REGISTER OR FIXING RECORD DATE .......... 25
REGISTRATION BYWAY OF CONTINUATION .......... 26
MERGERS AND CONSOLIDATION .......... 26
DISCLOSURE .......... 26
INDEMNITY .......... 27
DISPUTE RESOLUTION .......... 28
AEOI .......... 30



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

Copy from re:SearchTX

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

**TABLE A**

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Act shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

**INTERPRETATION**

1. In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Act**" means the Companies Act (as amended) of the Cayman Islands.

"**AEOI**" means:

(i) sections 1471 to 1474 of the Code and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

(ii) the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters - the Common Reporting Standard and any associated guidance;

(iii) any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in



004565 Filed: 21-Feb-2025 09:26 EST Auth Code: E90228166495
www.verify.gov.ky File#: 263805
GENERAL REGISTRY CAYMAN ISLANDS
Copy from re:SearchTX

order to comply with, facilitate, supplement or implement the legislation, regulations or guidance described in sub-paragraphs (i) and (ii); and

(iv) any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs.

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Code**" means the US Internal Revenue Code of 1986, as amended.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Electronic Record**" has the same meaning as in the Electronic Transactions Act.

"**Electronic Transactions Act**" means the Electronic Transactions Act (as amended) of the Cayman Islands.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Management Director**" means a director of the Company holding a Management Share (as defined below).

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Act and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Material Transaction**" means any transaction (or series of connected transactions), including an acquisition, distribution, investment or divestiture by the Company, for the aggregate amount in excess of $250,000;

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

"**Office**" means the registered office of the Company as required by the Act.

"**Ordinary Resolution**" means a resolution:

(a) passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

Copy from re:SearchTX

poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Act and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "Participating Shares" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Act and these Articles, means the Register maintained by the Company pursuant to the Act and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Act and includes any Branch Register(s) established by the Company in accordance with the Act.

"**Restricted Person**" means any Person holding Participating Shares:

(a) in breach of the law or requirements of any country or governmental authority;

(b) that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the Code or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c) in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.



GENERAL REGISTRY CAYMAN ISLANDS

004567 Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber.

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Act.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Act, being a resolution:

(a) passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" and "**US**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a) words importing the singular number shall include the plural number and vice versa;

(b) words importing the masculine gender only shall include the feminine gender and any Person as the context may require;



GENERAL REGISTRY CAYMAN ISLANDS

004568

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

(c) the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d) reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e) reference to a statutory enactment shall include reference to any amendment or re- enactment thereof for the time being in force;

(f) reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case;

(g) reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another;

(h) any requirements as to execution or signature under the Articles including the execution of the Articles themselves can be satisfied in the form of an electronic signature as defined in the Electronic Transactions Act; and

(i) sections 8 and 19(3) of the Electronic Transactions Act shall not apply.

2. Subject to the preceding Articles, any words defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

3. The business of the Company may be commenced at any time after incorporation.

4. The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5. The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6. The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Act and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may


GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805
Copy from re:SearchTX

keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Act, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Act.

**SHARES**

7. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

(b) and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

**MANAGEMENT SHARES**

11. The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.



GENERAL REGISTRY CAYMAN ISLANDS

004570 Filed: 11-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

## PARTICIPATING SHARES

12. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

## MODIFICATION OF RIGHTS

13. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

14. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.

## CERTIFICATES

15. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

16. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.


GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805
Copy from re:SearchTX

**TRANSFER OF SHARES**

17. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

18. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

19. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

20. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

21. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

**TRANSMISSION OF SHARES**

22. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

23. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the



GENERAL REGISTRY CAYMAN ISLANDS

Copy from re:SearchTX

Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

24. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

**ALTERATION OF SHARE CAPITAL**

25. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

26. The Company may by Ordinary Resolution:

(a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

27. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

**REDEMPTION, PURCHASE AND SURRENDER OF SHARES**

28. Subject to the Act, the Company may:

(a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;


Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

Copy from re:SearchTX

(b) purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c) make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Act; and

(d) accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.

29. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

30. The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

31. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

**TREASURY SHARES**

32. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Act. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

33. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

34. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

(a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

(b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Act, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.



GENERAL REGISTRY CAYMAN ISLANDS

004574 Filed: 21-Feb-2025 09:26 EST Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

35. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

**GENERAL MEETINGS**

36. The Directors may, whenever they think fit, convene a general meeting of the Company.

37. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

38. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

**NOTICE OF GENERAL MEETINGS**

39. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

40. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

**PROCEEDINGS AT GENERAL MEETINGS**

41. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

42. No business shall be transacted at any general meeting unless a quorum of Shareholders Is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles,



GENERAL REGISTRY CAYMAN ISLANDS

004575 Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

43. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

44. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

45. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

46. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

47. The chairman may adjourn a meeting from time to time and from place to place either:

(a) with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting): or

(b) without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

(i) secure the orderly conduct or proceedings of the meeting; or

(ii) give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

48. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded



GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

49. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

50. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

51. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

**VOTES OF SHAREHOLDERS**

52. On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

53. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

54. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

55. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

56. On a poll votes may be given either personally or by proxy.

57. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.



GENERAL REGISTRY CAYMAN ISLANDS

004577 Filed: 21-Feb-2025 09:26 EST Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

58. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

59. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

60. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

61. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at genera! meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

**CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS**

62. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

**DIRECTORS**

63. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

64. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

65. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

66. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

67. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

68. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.



GENERAL REGISTRY CAYMAN ISLANDS

004578

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

69. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

70. The Management Director shall be entitled to cast ten (10) votes on all matters and each other Director shall be entitled to cast one (1) vote. Such voting powers shall apply to voting in any committee or subcommittee of the Board. Every reference in these Articles to a majority or other proportion of the Directors, including for purposes of determining a quorum, shall refer to a majority or other proportion of the votes of the Directors then in office.

**POWERS AND DUTIES OF DIRECTORS**

71. Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

72. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or



GENERAL REGISTRY CAYMAN ISLANDS

Filed: 11-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

Copy from re:SearchTX

by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

73. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

74. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

75. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

76. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

77. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

78. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and


GENERAL REGISTRY CAYMAN ISLANDS
Filed: 11-Feb-2025 09:26 EST
Auth Code: E90228166495

Copy from re:SearchTX

may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

79. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

**BORROWING POWERS OF DIRECTORS**

80. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

**THE SEAL**

81. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

82. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

83. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

**DISQUALIFICATION OF DIRECTORS**

84. The office of Director shall be vacated, if the Director:

(a) becomes bankrupt or makes any arrangement or composition with his creditors;



GENERAL REGISTRY CAYMAN ISLANDS
004581 Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805
Copy from re:SearchTX

(b) dies or is found to be or becomes of unsound mind;

(c) resigns his office by notice in writing to the Company;

(d) is removed from office by Ordinary Resolution;

(e) is removed from office by notice addressed to him at his last known address and signed by ail of his co-Directors (not being less than two in number); or

(f) is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

**PROCEEDINGS OF DIRECTORS**

85. The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

86. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

87. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two which must include the Management Director, and if there be one Director the quorum shall be one.

88. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

89. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director


GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805
Copy from re:SearchTX

shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

90. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

91. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a) all appointments of officers made by the Directors;

(b) the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c) all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

92. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

93. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be, shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors. Notwithstanding anything to the contrary herein, a resolution in writing signed by all the Directors in respect of a Material Transaction must be duly notarized by a notary public.

94. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

Copy from re:SearchTX

95. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

96. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

97. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

98. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.



GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

**DIVIDENDS**

99. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

100. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

101. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

102. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

103. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

104. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

105. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

106. No dividend shall bear interest against the Company.

**ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION**

107. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.



GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

108. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

109. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

110. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

111. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Act and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

## CAPITALISATION OF RESERVES

112. Subject to the Act and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii) paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or



GENERAL REGISTRY CAYMAN ISLANDS

004586 Filed: 21-Feb-2025 09:26 EST Auth Code: E90228166495

Copy from re:SearchTX

www.verify.gov.ky File#: 263805

debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of ail the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares, and any such agreement made under this authority being effective and binding on all those Shareholders; and

(iii) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

**SHARE PREMIUM ACCOUNT**

113. The Directors shall in accordance with the Act establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

114. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Act, out of capital.

**NOTICES**

115. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

116. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.



GENERAL REGISTRY CAYMAN ISLANDS

004587 Filed: 21-Feb-2025 09:26 EST Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

117. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

118. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

119. Notice of every general meeting of the Company shall be given to:

(a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

**NON-RECOGNITION OF TRUSTS**

120. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial



GENERAL REGISTRY CAYMAN ISLANDS

004588

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

interest in any Share or (except only as otherwise provided by these Articles or as the Act requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

**WINDING UP**

121. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

122. Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

(a) first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

(b) second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

123. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

**AMENDMENT OF ARTICLES OF ASSOCIATION**

124. Subject to the Act and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

**CLOSING OF REGISTER OR FIXING RECORD DATE**

125. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of,



GENERAL REGISTRY CAYMAN ISLANDS

004589 Filed: 11-Feb-2025 09:26 EST Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

126. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

127. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BYWAY OF CONTINUATION

128. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## MERGERS AND CONSOLIDATION

129. The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Act.

## DISCLOSURE

130. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.



GENERAL REGISTRY CAYMAN ISLANDS

004590

Filed: 11-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

## INDEMNITY

131. To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "Covered Person" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes wilful misconduct or Gross Negligence by such Covered Person (as determined by a non-appeaiable judgment of a court of competent jurisdiction).

132. Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

133. To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

134. Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.


GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805
Copy from re:SearchTX

135. The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

## DISPUTE RESOLUTION

136. Subject to the prior written consent of all parties involved in the Dispute (as defined below) to such dispute resolution procedures, the following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, a trustee appointed to represent the Company on claims derivative of the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation:

(i) subject to the prior written consent of all parties involved in the Dispute, any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

(ii) the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

(iii) the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

(iv) each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties,

(b) Arbitration:

Subject to the prior written consent of all parties involved in the Dispute to such dispute resolution procedure, if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be administered by JAMS/Endispute pursuant to JAMS' Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

(i) the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805
Copy from re:SearchTX

concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, provided, however, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii) the arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrators) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii) the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv) no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty- five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non- parties, shall not be permitted;

(v) all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable


GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495
Copy from re:SearchTX

opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi) the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

(c) Notwithstanding anything to the contrary herein, for greater certainty, in accordance with the terms herein, if all parties involved in the Dispute do not provide written consent to following the mediation and/or arbitration provisions herein, a party shall maintain its right to pursue his/her/its Dispute in court.

**AEOI**

137. Notwithstanding any other Article, in order to comply with AEOI, any Director shall be entitled to release and/or disclose on behalf of the Company to the Cayman Islands Tax Information Authority or equivalent authority (the "**TIA**") and any other foreign government body as required by AEOI, any information in its or its agents' or delegates' possession regarding a Member including, without limitation, financial information concerning the Member's investment in the Company, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Member. Any such Director may also authorise any third party agent, including but not limited to, the Investment Manager or Administrator, to release and/or disclose such information on behalf of the Company.

138. In order to comply with AEOI and, if necessary, to reduce or eliminate any risk that the Company or its Members are subject to withholding taxes pursuant to AEOI or incur any costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) (together, "**costs**") associated with AEOI, the Directors may cause the Company to undertake any of the following actions:

(a) compulsorily redeem any or all of the Shares held by a Member either (i) where the Member fails to provide (in a timely manner) to the Company, or any agent or delegate of the Company, including but not limited to, the Investment Manager or the Administrator, any information requested by the Company or such agent or delegate pursuant to AEOI; or (ii) where there has otherwise been non-compliance by the Company with AEOI whether caused, directly or indirectly, by the action or inaction of such Member, or any related person, or otherwise;

(b) deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

(i) comply with any applicable requirement to apply and collect withholding tax pursuant to AEOI;

(ii) allocate to a Member an amount equal to any withholding tax imposed on the Company as a result of the Member's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Company with AEOI;


GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805
Copy from re:SearchTX

(iii) ensure that any AEOI related costs are recovered from the Member(s) whose action or inaction (directly or indirectly, including the action or inaction of any person related to such Member) gave rise or contributed to such costs.

139. In order to give effect to the requirements imposed upon the Company by AEOI, as well as any of the actions contemplated by Articles 138(a) and 139(b), the Directors may undertake any of the following actions:

(a) create separate classes and/or series of Shares ("**AEOI Shares**"), with such rights and terms as the Directors may in their sole discretion determine, and following the compulsory redemption of some or all of a Member's Shares may immediately apply such redemption proceeds in subscribing for such number of AEOI Shares as the Directors determine;

(b) may re-name any number of Shares (whether issued or unissued) as AEOI Shares, create a Separate Account with respect to such AEOI Shares and apply any AEOI related costs or withholding taxes to such Separate Account;

(c) allocate any AEOI costs or withholding tax among Separate Accounts on a basis determined solely by the Directors; and

(d) adjust the Net Asset Value per Share of any relevant Shares (including any AEOI Share).



GENERAL REGISTRY CAYMAN ISLANDS

004595

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

**Annexure**

**Fiscal Year**

The fiscal year of the Company ends on the 31st day of December in each year, unless the Directors prescribe some other period therefor.



GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

Copy from re:SearchTX

Register of Members of

**Charitable DAF HoldCo, Ltd**

**Registration No: 263805**

**Share Class: Management**

**Authorised Capital of USD 1.00 divided into 100.00 Management shares of par value USD 0.01 each**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **WNL Limited**<br>190 Elgin Avenue<br>George Town<br>Grand Cayman KY1-9001<br>Cayman Islands | 7-Nov-2011 | | 1.00 | 0.01 | In Full | 7-Nov-2011 : Allotment of 1.00 Management share(s) | 7-Nov-2011 | 1.00 | | 0.00 | 7-Nov-2011 : Repurchase of 1.00 Management share(s) |
| 2 | **Grant James Scott**<br>Highland Capital Managment, L.P.<br>13455 Noel Road, Suite 800<br>Dallas, TX 75240<br>USA | 7-Nov-2011 | | 100.00 | 1.00 | In Full | 7-Nov-2011 : Allotment of 100.00 Management share(s) | 25-Mar-2021 | 100.00 | | 0.00 | 25-Mar-2021 : Transfer of 100.00 Management share(s) to Mark E. Patrick |
| 3 | **Mark E. Patrick**<br>6716 Glenhurst Dr<br>Dallas, TX 75254<br>USA | 25-Mar-2021 | | 100.00 | 1.00 | In Full | 25-Mar-2021 : Transfer of 100.00 Management share(s) to Mark E. Patrick | | 0.00 | | 100.00 | |

Notes

1 *Where there is only one class of shares in issue, all issued shares carry equal (and unconditional) voting rights. Unless shares are described as "Non-Voting" they carry voting rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). Where shares are described as "Non-Voting" this designates that they do not carry rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). All shares carry unconditional voting rights, save where shares are described as "conditional" which designates that they only carry rights to vote at general meetings in certain circumstances.*


Copy from re:SearchTX

Register of Members of

**Charitable DAF HoldCo, Ltd**

**Registration No: 263805**

**Summary**

| Name | Number and Class of Shares Held | |
|---|---|---|
| Mark E. Patrick | 100.00 | Management |
| | | |
| **Total Management Shares outstanding: 100.00** | | |
| **Total Management Shares remaining unissued: 0.00** | | |



Copy from re:SearchTX

Register of Members of

**Charitable DAF HoldCo, Ltd**

**Registration No: 263805**

**Share Class: Participating**

**Authorised Capital of USD 49,999.00 divided into 4,999,900.00 Participating shares of par value USD 0.01 each**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **The Highland Capital Management Partners CharitableTrust #2**<br>Highland Capital Management, L.P<br>13455 Noel Rd, Suite 800<br>TX 75240<br>Dallas Texas<br>USA | 7-Nov-2011 | | 300.00 | 3.00 | In Full | 7-Nov-2011 : Allotment of 300.00 Participating share(s) | 30-Nov-2011 | 300.00 | | 0.00 | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Kansas City Foundation, Inc<br>30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Dallas Foundation, Inc<br>30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Santa Barbara Foundation, Inc |
| 2 | **Highland Kansas City Foundation, Inc**<br>- | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Kansas City Foundation, Inc | | 0.00 | | 100.00 | |
| 3 | **Highland Dallas Foundation, Inc**<br>- | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Dallas Foundation, Inc | | 0.00 | | 100.00 | |
| 4 | **Highland Santa Barbara Foundation, Inc**<br>- | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Santa Barbara Foundation, Inc | | 0.00 | | 100.00 | |


Copy from re:SearchTX

Register of Members of

**Charitable DAF HoldCo, Ltd**

**Registration No: 263805**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | **Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT** 306 W. 7th St., Suite 1045 Forth Worth TX 76102 USA | 13-Aug-2015 | | 5.00 | 0.05 | In Full | 13-Aug-2015 : Allotment of 5.00 Participating share(s) | | 0.00 | | 5.00 | |
| 6 | **DFW Charitable Foundation** The Corporation Trust Company 1209 Orange Street Wilmington, DE 19801 United States | 7-Feb-2025 | | 318.00 | 3.18 | In Full | 7-Feb-2025 : Allotment of 318.00 Participating share(s) | | 0.00 | | 318.00 | |

Notes

1 *Where there is only one class of shares in issue, all issued shares carry equal (and unconditional) voting rights. Unless shares are described as "Non-Voting" they carry voting rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). Where shares are described as "Non-Voting" this designates that they do not carry rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). All shares carry unconditional voting rights, save where shares are described as "conditional" which designates that they only carry rights to vote at general meetings in certain circumstances.*

**Summary**

| Name | Number and Class of Shares Held | |
|---|---|---|
| Highland Kansas City Foundation, Inc | 100.00 | Participating |
| Highland Dallas Foundation, Inc | 100.00 | Participating |
| Highland Santa Barbara Foundation, Inc | 100.00 | Participating |
| Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT | 5.00 | Participating |
| DFW Charitable Foundation | 318.00 | Participating |
| **Total Participating Shares outstanding: 623.00** | | |
| **Total Participating Shares remaining unissued: 4,999,277.00** | | |

**Geoffrey Sykes**

**From:** Andrew Johnstone <aj@j-law.ky>
**Sent:** 24 April 2025 11:46 AM
**To:** Geoffrey Sykes; Barnaby Gowrie
**Cc:** Rhiannon Zanetic; Philip Aubry; Nicholas Geldard; Chris Beck
**Subject:** Re: Charitable DAF HoldCo, Ltd [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoff

Given your failure to respond yesterday, we are in the course of serving on Charitable DAF HoldCo Ltd at its registered office.

Best

AJ

**Andrew Johnstone**
Founder | Partner

JL

**+1 (345) 929-3000**
www.j-law.ky | LinkedIn
**Johnstone Law**, 10 Market Street, PO Box 926
Grand Cayman, KY1-9006, Cayman Islands

*This email and any attachments transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender immediately and delete the email from your system. Any unauthorised use, distribution, or copying of this email is strictly prohibited.*

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 24 April 2025 11:35
**To:** Andrew Johnstone <aj@j-law.ky>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Rhiannon Zanetic <rz@j-law.ky>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Nicholas Geldard <ng@j-law.ky>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd [WALKERS-AMER_DOCS.FID2294181]

Dear Mr Johnstone

Please could you confirm the nature of the proceeding to be served.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Andrew Johnstone <aj@j-law.ky>
**Sent:** 23 April 2025 13:42
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Rhiannon Zanetic <rz@j-law.ky>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Nicholas Geldard <ng@j-law.ky>
**Subject:** Charitable DAF HoldCo, Ltd

**[this message is from an external sender]**

---

Dear Colleagues

We act for the Participating Shareholders of Charitable DAF HoldCo, Ltd (the ***Company***).

Please can you confirm whether you are instructed to act for and accept service on behalf of the Company.

Best

AJ

**Andrew Johnstone**
Founder | Partner

JL

**+1 (345) 929-3000**
**www.j-law.ky** | **LinkedIn**
**Johnstone Law**, 10 Market Street, PO Box 926
Grand Cayman, KY1-9006, Cayman Islands

*This email and any attachments transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender immediately and delete the email from your system. Any unauthorised use, distribution, or copying of this email is strictly prohibited.*

---

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

---

**Geoffrey Sykes**

**From:** Brandon R. Schaller <bschaller@shieldsle al.co >
**Sent:** 24 April 2025 4:52 PM
**To:** Barnaby Gowrie; Philip Aubry; Geoffrey Sykes; Chris Beck
**Cc:** patrick@dafholdco.co ; Paul Murphy; sra er@dafholdco.co ; Bart Hi ins
**Subject:** FW: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID4882 2]
**tt c ments:** 2025 24 04 - Charitable DAF HoldCo Ltd. ip

**m ort nce:** Hi h

**[this message is from an external sender]**

FYI

?

| 469.726.3055
| bschaller@shieldslegal.com
___ | _________ | ______

**From:** Matheo Vinciullo | Campbells <MVinciullo@campbellslegal.com>
**Sent:** Thursday, April 24, 2025 4:45 PM
**To:** Michelle Richie | Campbells <MRichie@campbellslegal.com>; Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID488232]
**Importance:** High

CAUTION: This email originated from outside of the organization.

All

Johnstone law, who are acting for the participating shareholders of Charitable DAF HoldCo Ltd, served the following documents this afternoon (via Campbells, as we remain Charitable DAF's registered office):

- A Petition seeking orders that Charitable DAF be wound up and that joint official liquidators be appointed.
- A Summons seeking an order appointing joint provisional liquidators over Charitable DAF.
- Supporting affirmations of Julie Diaz (of The Dallas Foundation) and James Dondero.
- Consent to acts as a liquidator from Margot MacInnis and Sandipan Bhowmik, both of Grant Thornton.

The Summons seeking the appointment of joint provisional liquidators over Charitable DAF has been listed for hearing before Justice Asif at 2pm on **Monday, 28 April 2025**.

We will forward copies of the attached materials to Kroll, as the voluntary liquidators of Charitable DAF. Our understanding is that Kroll will be taking point on next steps as the voluntary liquidators, but we will review and are available to assist. We will also forward these materials onto Walkers, who have requested a copy.

Kind regards


Copy from re:SearchTX

**Matheo Vinciullo**
Associate

E mvinciullo@campbellslegal.com
T +1 345 949 2648 D +1 345 914 6931 C +1 345 327 6931

**Campbells LLP**
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010, Cayman Islands
campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG

This email including any attachments are strictly private and confidential. It is solely for the use of the intended recipient(s) and may contain confidential and privileged information. Internet email is not a secure communications medium and may contain viruses. All work carried out by us is sub ect to our standard terms and conditions (click here to view) unless other terms and conditions are agreed in writing between you and us. The Campbells Group is deemed not to be the author, editor or publisher of personal messages, which fall outside the scope of any individual's employment. Thank you.

---

**From:** Michelle Richie | Campbells <MRichie@campbellslegal.com>
**Sent:** Thursday, April 24, 2025 1:00 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>; Matheo Vinciullo | Campbells <MVinciullo@campbellslegal.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID488232]

Brandon

We have not received anything as yet but will provide copies when we do. We have received a similar request from Walkers attached. Do we have authorisation to provide the same to them?

**Michelle Richie**
Partner

E mrichie@campbellslegal.com
T +1 345 949 2648 D +1 345 914 6933 C +1 345 525 6933

**Campbells LLP**
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010, Cayman Islands
campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** Thursday, April 24, 2025 12:48 PM
**To:** Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Michelle Richie | Campbells <MRichie@campbellslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** Charitable DAF HoldCo, Ltd.

**EXTERNAL EMAIL: This email originated from outside of Campbells.**

---

Campbells team,

We heard that Johnstone law is attempting service on Charitable DAF HoldCo, Ltd. as its registered office. Can you please advise if you have received anything, and if not, provide us a copy when you do?

Thanks,
Brandon

16400 Dallas Parkway, Suite 300
Dallas, TX 75248

| 469.726.3055
| bschaller@shieldslegal.com

This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message. You should not copy it or disclose its contents to any other person. Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses. This e-mail message does not contain or constitute legal advice and/or federal tax advice. The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

**Geoffrey Sykes**

**From:** Mark Patrick < patrick@dafholdco.co >
**Sent:** 2 April 2025 12:51 AM
**To:** Mansfield, Mitchell
**Cc:** Paul Murphy
**Subject:** oluntary Li uidators

**[this message is from an external sender]**

Dear Voluntary Liquidators

I write to you in my capacity as the management shareholder and director of the company. My fellow director, Paul Murphy, is copied to this email and agrees with its contents.

Please note the following:

The management shareholder of the company and its directors intend in providing cooperation to the voluntary liquidators in accordance with Cayman law.
The management shareholder has no intention of taking any steps to remove the voluntary liquidators from office.
Assuming the voluntary liquidators consider it appropriate having consulted with relevant stakeholders of the company, the management shareholder and the directors have no objections to the voluntary liquidators making the necessary court application to have the voluntary liquidation brought under the supervision of the Cayman Court.
If you have any questions, please do not hesitate to contact me.

Kind regards.

Mark Patrick
Management Shareholder


Copy from re:SearchTX





Copy from re:SearchTX



1. Defendant
2. Geoffrey Sykes
3. First Affidavit
4. Exhibit "GS-1"
5. 27 April 2025

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 99 OF 2025 (JAJ)**

**IN THE MATTER OF:** **SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF:** **CHARITABLE DAF HOLDCO, LTD (IN VOLUNATRY LIQUIDATION)**

**BETWEEN**

**(1) THE HIGHLAND DALLAS FOUNDATION, INC.**

**(2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.**

**(3) THE HIGHLAND SANTA BARBARA FOUNDATION, INC.**

**(4) THE HCMLP CHARITABLE FUND**

**PLAINTIFFS**

**and**

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION)**

**DEFENDANT**

---

**FIRST AFFIDAVIT OF GEOFFREY SYKES**

---



Copy from re:SearchTX

I, **GEOFFREY SYKES**, of 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands being duly sworn **MAKE OATH and SAY** as follows:

**Preliminary**

1. I am an Attorney-at-Law and Associate in the Insolvency and Dispute Resolution Group at Walkers (Cayman) LLP ("**Walkers**"), and I act for Charitable DAF HoldCo, Ltd (in Voluntary Liquidation) (the "**Company**").

2. I make this Affidavit in response to the winding up petition by which Cause No. FSD 99 of 2025 was commenced, and the summons listed in that proceeding seeking, among other things, "*An order appointing joint provisional liquidators over Charitable DAF HoldCo*…".

3. There is now shown to me a bundle of documents marked Exhibit "**GS-1**" and references to page numbers herein are to pages of that Exhibit. For the avoidance of doubt, no privilege is waived by the inclusion of the information set out herein.

4. Save where the contrary is stated to be the case, the facts and matters to which I depose are within my own knowledge and are true. Where the facts and matters are not within my own knowledge, they derive from my instructions by the company, acting either through its directors or the Joint Voluntary Liquidators (defined below) as the case may be at the relevant time, or I identify the source of my knowledge and confirm that those facts and matters are true to the best of my knowledge and belief.

**Recent events and documents**

5. On 24 April 2025, Johnstone Law served on the Company at its registered office a bundle of documents including the winding up petition and the summons referred to above. A copy of the cover letter to this bundle of documents is at


Copy from re:SearchTX

**page 1** (noting that the remainder of the documents will already be before the Court).

6. On 25 April 2025, Walkers sent to Johnstone Law a letter enclosing the following documents:

(a) A consent to act as joint voluntary liquidators of the Company by Mitchell Mansfield and William Clarke of Kroll Cayman Ltd (the "**Joint Voluntary Liquidators**"), dated 29 March 2025;

(b) Written resolutions of the directors of the Company including to recommend to the management shareholder that the Company be wound up voluntarily and the Joint Voluntary Liquidators be appointed, dated 2 April 2025;

(c) Special resolutions of the management shareholder of the Company that the Company be wound up voluntarily and the Joint Voluntary Liquidators be appointed, dated 2 April 2025;

(d) A declaration of solvency by the directors of the Company, dated 2 April 2025;

(e) An extract from Gazette Issue No. 8/2025, which includes notice that on 2 April 2025 the Company was placed into Voluntary Liquidation and the Joint Voluntary Liquidators were appointed, dated 14 April 2025;

(f) The current Memorandum and Articles of the Company, dated 20 February 2025;

(g) The current Register of Members of the Company, dated 25 April 2025; and


Copy from re:SearchTX

(h) An email chain between Walkers and Johnstone law, dated 23-24 April 2025.

7. That letter and its enclosures are at **pages 2 – 53**.

8. On 24 April 2025, emails were exchanged between Campbells LLP as the registered office of the Company, and Shields Legal (acting for the directors of the Company), in respect of the bundle of documents served by Johnstone Law. A copy of that email chain is at **pages 54 – 56**.

9. On 27 April 2025, Mark Patrick (in his capacity as the management shareholder and a director of the Company) sent an email to the Joint Voluntary Liquidators in respect of the joint voluntary liquidation. A copy of that email is at **page 57**.

10. A copy of the structure chart of the Company prior to 27 March 2025 is at **page 58**. A copy of the current structure chart Company as of 27 March 2025 is at **page 59**.

**SWORN** at George Town, )
Grand Cayman )
on the 27th day of April 2025 )
before me )

**GEOFFREY SYKES**

**NOTARY PUBLIC**

**Fiona MacAdam**
**Notary Public in and for the Cayman Islands**
**My commission expires January 31, 2026**
**Date:** 27th April 2025

This **AFFIDAVIT** is filed by Walkers (Cayman) LLP, Attorneys-at-Law, 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands, for the Applicant whose address for service is care of said Attorneys-at-Law.

1. Defendant
2. Geoffrey Sykes
3. First Affidavit
4. Exhibit "GS-1"
5. 27 April 2025

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 99 OF 2025 (JAJ)**

**IN THE MATTER OF:** **SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF:** **CHARITABLE DAF HOLDCO, LTD (IN VOLUNATRY LIQUIDATION)**

**BETWEEN**

**(1) THE HIGHLAND DALLAS FOUNDATION, INC.**
**(2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.**
**(3) THE HIGHLAND SANTA BARBARA FOUNDATION, INC.**
**(4) THE HCMLP CHARITABLE FUND**

**PLAINTIFFS**

**and**

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION)**

**DEFENDANT**

THIS IS EXHIBIT "**GS-1**" TO THE AFFIDAVIT OF

**GEOFFREY SYKES**

SWORN BEFORE ME THIS 27TH DAY OF APRIL 2025

**Fiona MacAdam**
**Notary Public in and for the Cayman Islands**
**My commission expires January 31, 2026**
**Date:** 27 April 2025.

[signature]

**NOTARY PUBLIC**

EXHIBIT
4-A

November 11, 2024

**From**: Highland Dallas Foundation, Inc.
Highland Kansas City Foundation, Inc.
Highland Santa Barbara Foundation, Inc.

**To**: Mr. Paul Murphy
Director of Charitable DAF HoldCo, Ltd.
and Charitable DAF Holdings Corp.
paul@gkmanagement.com.ky

Dear Mr. Murphy:

We write to you collectively on behalf of the following organizations:

1. Highland Dallas Foundation, Inc., a participation shareholder in Charitable DAF HoldCo, Ltd., of which you are a director along with Mark Patrick. As you know, Mr. Patrick also is the managing member of the Charitable DAF GP, LLC, which governs the related Charitable DAF Fund, LP.

2. Highland Kansas City Foundation, Inc., also a participation shareholder in Charitable DAF HoldCo, Ltd.

3. Highland Santa Barbara Foundation, Inc., also a participation shareholder in Charitable DAF Holdco, Ltd.

Highland Dallas Foundation, Inc is a supporting organization of The Dallas Foundation. Highland Kansas City Foundation, Inc. is a supporting organization of Greater Kansas City Community Foundation. Highland Santa Barbara Foundation, Inc. is a supporting organization of Santa Barbara Foundation. The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (collectively the "Foundations") have worked closely with their respective supporting organizations named above to award grants and funding to a wide range of charitable causes that have made tangible, lasting impacts on the communities they serve. Our primary commitment has been, and always will be, our concern for the community, respect for donors, thoughtful giving, and careful investing—core values that have guided each of us throughout our existence.

With these core values and with the well-being of these Foundations in mind, we write you to voice that we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "DAF-related entities"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable. Recently, various competing constituencies provided the Foundations with conflicting information related to the operations and financial inner



Copy from re:SearchTX

workings of the DAF-related entities. This conflicting information raises significant concerns about how the corpus of these funds is administered and spent. The Foundations have no real pathway to verify the information as the current governance structures prevent them from receiving such information, and indeed, efforts to secure additional information have been rebuffed. As a result, these recent submissions demonstrate that the current governance structure is ill-equipped to address such allegations and provide sufficient protection to the economic funds that support so many charitable efforts.

Further, because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities.

Thank you for your attention to this matter. Our counsel with the law firm of Holland & Knight LLP is copied on this letter should you have any questions.

Sincerely yours,

HIGHLAND DALLAS FOUNDATION, INC.

Signed by:

By: ______________________

8C324EA989434F3...

Julie Diaz
Vice President

HIGHLAND KANSAS CITY FOUNDATION, INC.

DocuSigned by:

By: Deborah L Wilkerson

71ED433BB136439...

Debbie Wilkerson
Vice President

HIGHLAND SANTA BARBARA FOUNDATION, INC.

DocuSigned by:

By: Jackie Carrera

66D757ACD1A1461...

Jacqueline M. Carrera
Secretary and Treasurer

cc: David M. Rosenberg
(via email at david.rosenberg@hklaw.com)

Michael Stockham
(via email at michael.stockham@hklaw.com)



Copy from re:SearchTX

EXHIBIT
4-B

**nnon net c**

**Subject:** [E ERNAL]-RE: DAFHoldCo infor ation re uest

**From:** Michael.Stockham@hklaw.com
**Date:** February 7, 2025 at 12:43:56 PM CST
**To:** Paul Murphy <paul@gkmanagement.com.ky>, Julie Diaz <jdiaz@dallasfoundation.org>, mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>, Jackie Carrera <jcarrera@sbfoundation.org>, David.Rosenberg@hklaw.com, DMancino@seyfarth.com
**Subject: [EXTERNAL]-RE: DAFHoldCo information request**

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Paul-

I appreciate your email, and your willingness to find a framework to resolve the concerns, but am flummoxed by your, "struggle" to understand our growing frustration.

I do not believe it should be difficult to comprehend the request for transparency around $270 million dollars you control as a fiduciary for the benefit of charities in Dallas, Kansas City, and Santa Barbara. Indeed, these odd legal and rhetorical machinations of yours and Mr. Patrick miss the point. These monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed, and—among other things—creating a lasting impact on young minds by fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees. If I'm wrong, please educate me.

Your failure to be forthcoming about the underlying assets, the investment philosophy of the fund, and the "revised" governance, have caused me to start digging. I am not only a lawyer but also a Certified Fraud Examiner and a Certified Compliance & Ethics



Copy from re:SearchTX

Professional, and what I have found is nothing short of alarming.

> As I mentioned, director fees for 2024 appeared to be on track to exceed $5 million, which was an over 12,000 percent increase—up from zero. It is hard to fathom what you and Mr. Patrick have changed or contributed to the funds to warrant such a drastic change in director fees. I could be wrong, but if so, then tell me why. What is the dramatic value add?
>
> As I understand it, the annualized expenses of the funds were on pace to outstrip the actual return on the investments. So I am at a loss as to how you can justify running the fund at a loss while apparently paying the directors handsomely and freezing Supporting Organizations (the shareholders) out of basic information.

On November 6, 2024, we had an introductory video call with Doug Mancino, who announced himself as Compliance Counsel. But no details of the assets or financial condition of the funds were communicated.

On November 20, 2024, we had another video call with folks from your side, including ValueScope, and it was informative; however, the thrust of the presentation was why you refused proposed investments from NexPoint. It had nothing to do with the underlying assets and financial conditions of the fund. This was perplexing as ValueScope has been the valuation firm for the fund for years; yet they were silent about the condition of the fund.

On December 11, 2024, we had a video call with you, Doug Mancino, and your Cayman counsel. The thrust of that discussion was your vision of running the fund more as an institutional investment vehicle and a promise to provide financial information in the future. But the presentation again lacked any information on the underlying assets and financial conditions of the fund. It did, however, include a discussion that the Supporting Orgs had no right to information under the structure of the funds.

Shortly after the December 11 call, we received your first demand to withdraw our concerns about the governance of the funds, and it also advanced that if the Supporting Organizations wanted more


Copy from re:SearchTX

transparency they must sign a non-disclosure agreement with a liquidated damages clause. Which is, quite frankly, ridiculous.

In sum, and as I understand the thread running through the communications, your continuing posture is the following. The Supporting Orgs have no right to information. And, if the Supporting Organizations want more information, they must both recant their governance concerns and then sign the NDA. Those are both coercive non-starters. Again, if I'm wrong please tell me how.

Finally, and this I find perhaps the most egregious, I just discovered through my own research that Mark Patrick cancelled the Delaware charter of Charitable DAF GP, LLC on October 30, 2024 and rechartered it in Cayman. I can find no legitimate reason to recharter the general partner, and instead believe it to be a move to further insulate Mr. Patrick's and your actions by retreating from jurisdiction in the United States and offshore the entity in its entirety. If I've misunderstood, please let me know in detail how, but I remain skeptical. Further, in the calls listed above, not one representative from your side spoke up to explain, or even mention, the rechartering of the general partner. That is a striking repeated omission.

So the change of tone should not provide any struggle to puzzle through. Over the last three months, you have not provided any information about the assets and financial health of the fund. You have demanded that information only flows under an NDA with liquidated damages. You continually issue a veiled threat that information is a privilege not a right under the agreements. Expenses have gone through the roof, and the governance has been changed to further insulate it in a foreign jurisdiction. To say the least, I see red flags all over this situation, but have not received any facts, yet, that tell me they are unwarranted.

If I'm wrong, fine. It won't be the first time. But this also isn't my first rodeo, and the way to diffuse this is through immediate full transparency and facts. So if I've misunderstood, and your intent is to provide a fully transparent briefing to the Supporting Organizations without coercive caveats, then we stand ready to have that conversation after receiving the basic financial information requested by Julie Diaz in her January 23, 2025 email.


Copy from re:SearchTX

**Michael Stockham, JD, CFE, CCEP** | M

Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435
michael.stockham@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**Licensed to practice law in Texas, Kansas, and New York*
*CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com*
*CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org*

---

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Tuesday, February 4, 2025 9:31 AM
**To:** Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

*[External email]*

**From:** Michael.Stockham@hklaw.com
<Michael.Stockham@hklaw.com>
**Sent:** Friday, January 31, 2025 3:32 PM
**To:** Paul Murphy <paul@gkmanagement.com.ky>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; David.Rosenberg@hklaw.com; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

Paul-

I have added Doug Mancino to this email chain, as you are represented by counsel, I believe it appropriate to loop him in for this communication. I also told you that I had a tendency toward the blunt.

I am appalled by your response. As fiduciaries, you and Mr. Patrick manage $270 million in assets for the benefit of charities that support the most vulnerable in their communities. Whatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions. And your focus and mission should be not only to ensure the success of the investments, but transparency to the ultimate beneficiaries. The assets are for their benefit, not Mr. Dondero, not Mr. Patrick, and not you.

The Supporting Organizations have legitimate concerns. The last information they received from SEI in July of 2024 — before Mr. Patrick shut down that line of communication and information — showed legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022. If annualized, and at that pace, legal expenses appeared to be on path to exceed $12 million for 2024. That's a 300% increase. Director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024. Again, annualized, these fees are on a path to exceed $5 million in 2024. That is a 12,400% increase. Yet, no information has been provided by you


Copy from re:SearchTX

and Mr. Patrick, no clarity given. It appears that total expenses for 2024, if annualized, were on pace to exceed $36 million. Even if you earned a return of 10 percent on the $270 million invested, the fund would be at $11 million of negative revenue for 2024. If the information we received is wrong, then please explain why, and provide the detailed information to disabuse us of these concerns. But telling us we have no legal right to the answers is not workable.

Upon Mr. Patrick taking control, you and he should have immediately engaged with the Supporting Organizations to explain the transition, your plans, and how the assets are being managed. I would have thought that a fiduciary would have engaged in a campaign of maximum transparency and disclosure. Instead, as to the actual financial condition of the assets, you have been opaque at best and purposefully elusive at worse, and your email below retreats into statements about having no legal obligation to disclose the activities of the funds. And it seems to condition further transparency on the Supporting Organizations recanting their earlier expressed concerns. I think you should reconsider such an entrenchment.

The Supporting Organizations have no interest in the animosity or dysfunction between Mr. Patrick and Mr. Dondero. What they do have an interest in, is an active campaign by you and Mr. Patrick to continue to manage the assets in a shroud of mystery, dripping out details and information whenever you deem it appropriate. To do so simply proves our concerns that the governance structure of these entities is broken.

Yes, it is true that we have been in discussions for months about transparency, and you provided some information. However, what has been ignored are the repeated requests for a simple set of financials. But how hard is it to create a short PowerPoint on the current state of financial statements, a simple diagram of the alleged new governance structure (who are the advisory board members?), your visions for the funds, and then provide a one-hour briefing to the Supporting Organizations? If you are truly managing the funds to the institutional-investor standards represented in our call, these details should be at your fingertips. Yet somehow this has all devolved into delays and posturing related to the dust up between Messrs. Dondero and Patrick.

That type of myopic thinking is not appropriate in this situation. The Supporting Organizations deserve


Copy from re:SearchTX

answers, and the transparency needs to happen sooner rather than later. And, the answer you provided, which essentially said that you can tell the organizations to pound sand and they should be grateful for the information you do provide, is not acceptable.

**Michael Stockham, JD, CFE, CCEP** | M

Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435
michael.stockham@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**Licensed to practice law in Texas, Kansas, and New York*
*CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com*
*CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org*

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Thursday, January 30, 2025 12:13 PM
**To:** Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

*[External email]*

**28 January Email**

**11 November Letter**

,

Copy from re:SearchTX

**Paul Murphy**
**G.K. Management Limited**
P.O. Box 10729
Suite 1, Artemis House
67 Fort Street
Grand Cayman KY1-1007
Cayman Islands
**Phone:** +1 345 946 3459
**Mobile:** +1 345 324 1121
**Fax:** +1 345 946 3493
**E-mail :** paul@gkmanagement.com.ky



Copy from re:SearchTX

**From:** Julie Diaz <jdiaz@dallasfoundation.org>
**Sent:** Tuesday, January 28, 2025 9:14 PM
**To:** Mark Patrick <MPatrick@CharitableDAF.com>; Paul Murphy <paul@gkmanagement.com.ky>
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Michael.Stockham@hklaw.com; Rosenberg, David M (DFW - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

Mark and Paul-

We have great concern that our reasonable requests below have not been acknowledged. This failure to provide the courtesy of a response continues a pattern of a lack of communication and transparency as to assets and financials of DAF HoldCo under your stewardship. These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Supporting Organizations so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the assets further.

---

**From:** Julie Diaz
**Sent:** Thursday, January 23, 2025 9:45 AM
**To:** MPatrick@CharitableDAF.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>
**Subject:** DAFHoldCo information request

Hi Mark –

Since we spoke last fall, the three CEOs from Santa Barbara, Kansas City, and Dallas community foundations (copied here) were discussing our plans for 2025 and wanted to reach out to you to check in on the DAFHoldCo. We have been discussing the need for a better understanding of the assets and thought it would be helpful if you could provide us with several detailed reports now that the new structure is in place.

Specifically, could you send:

**Income Statements for the last for years**: A complete set of income statements (or profit and loss statements) for the last four fiscal years (2021-2024), including any supplemental notes or breakdowns that provide insight into revenue streams and expenses

**Listing of Underlying Assets**: A detailed listing of the underlying assets held by DAF HoldCo, including both tangible and intangible assets. This should include any real estate, investments, intellectual property, or other significant assets that contribute to the company's operations or value.

**Audited Financial Statements**: The most recent audited financial statements for DAFHoldCo, including the balance sheet, statement of cash flows, and any related auditor's reports. Please include any supplementary schedules or disclosures that are typically associated with these statements.

**Current Structure of DAFHoldCo Operations:** An up-to-date organizational chart or structural overview detailing the key divisions, subsidiaries, and any relevant operational or financial entities that comprise the DAFHoldCo structure, including any significant changes that may have occurred over the last few years.

As you can appreciate, our job as leaders of our respective community foundations is to ensure proper stewardship of the charitable assets that are owned by our organizations. We are grateful for the decade plus of charitable investments that we have been able to make from the proceeds of the DAFHoldCo and would like to have confidence that this vehicle will continue to grow and make


Copy from re:SearchTX

additional meaningful contributions to our respective communities.

Please let us know your ability to get this information to us by Feb. 10, 2025.

Thank you and happy New Year.

---

**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

---

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything



Copy from re:SearchTX

in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.

**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

<~WRD0000.jpg> <~WRD0000.jpg> <~WRD0000.jpg>

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities") Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by other than intended recipients is prohibited. If received in error, please immediately delete this email from your computer, destroy any hard copies and notify the sender. NexPoint Securities archives email, which are subject to review by NexPoint Securities and various regulators. This email is for informational purposes only and is not an offer, recommendation or solicitation to purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes no representation about the accuracy or completeness of information herein. Past performance is not indicative of future returns. Investments may lose money and such investment losses are not insured.

DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

---

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Skyview Group. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Skyview Group.

EXHIBIT
4-C

February 27, 2025

Via Email: dmancino@seyfarth.com

Douglas M. Mancino, Esq.
Seyfarth Shaw LLP
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021

Re: Charitable DAF Holdco, Ltd. ("Charitable DAF")

Doug-

I received your letter dated February 14, 2025. I apologize if you believe my previous emails to be "over the top." However, what you perceive as "hostility" is nothing more than frustration at the circuitous dialogue and veiled threats we receive in response to simple and repeated requests for transparency as to the finances and governance of Charitable DAF. So far, our specific concerns have been met with denials but no real data on the particular issues raised. In a world where Messrs. Dondero and Patrick appear to be feuding, the Supporting Organizations can, at best, adopt a position of "trust but verify." They will, therefore, continue to push for transparency.

Further, the frustration you perceive arises from comments in many of the communications we have received from you and your clients attempting to position the Supporting Organizations as being manipulated by Mr. Dondero. The Supporting Organizations are nobody's patsy, proxy, or puppet. To suggest otherwise insults the intellect and professionalism of the executive leadership at each of the Supporting Organizations.

Paul Murphy continues to assert that he is ready to present to the Supporting Organizations and clear up all the misunderstandings. You know our concerns; let us get to it. Please propose dates in the next two weeks on which Paul is ready to present to, and answer questions from, the Supporting Organizations.

Sincerely yours,

Michael W. Stockham

cc: David Rosenberg



Copy from re:SearchTX

**nnon net c**

| | |
|---|---|
| **From:** | Da id.Rosenber @hklaw.co |
| **Sent:** | 18 March 2025 09:2 |
| **To:** | Mancino, Dou las; Michael.Stockha @hklaw.co |
| **Cc:** | Paul Murphy |
| **Subject:** | RE: Can you et e a couple of dates for Paul Murphy to ake a presentation to your three clients We would like to do this as soon as practicable. hanks for your attention to this. |

Doug, we are available on:

Wednesday March 26, after 4:00 p.m. U.S. Central Daylight Time.

Monday, March 31, until 12:00 p.m. U.S. Central Daylight Time.

Thursday, April 3 until 12:00 p.m. U.S. Central Daylight Time.

**David Rosenberg | Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | www.hklaw.com

Add to address book | View professional biography

**From:** Mancino, Douglas
**Sent:** Monday, March 17, 2025 1:00 PM
**To:** Rosenberg, David M (DAL - X61508) ; Stockham, Michael W (DAL - X62515)
**Cc:** Paul Murphy
**Subject:** Can you get me a couple of dates for Paul Murphy to make a presentation to your three clients? We would like to do this as soon as practicable. Thanks for your attention to this.

Doug

**Douglas Mancino** (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326
DMancino@seyfarth.com | www.seyfarth.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.


Copy from re:SearchTX

nnon net c

|  |  |
|---|---|
| **From:** | Da id.Rosenber @hklaw.co |
| **Sent:** | 0 April 2025 09:51 |
| **To:** | Mancino, Dou las |
| **Cc:** | Michael.Stockha @hklaw.co ; Paul Murphy |
| **Subject:** | RE: Zoo call with Paul Murphy |

Doug, no such call is on our calendar, so I am not sure of the source of the confusion. We will circle back with our clients and provide some windows starting on April 16.

I wish your wife the best of health with her back. Thanks.

David Rosenberg | Holland & Knight
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas Texas 75201 Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | https://urldefense.proofpoint.com/v2/url?u=http-3A__www.hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=dUaYK7RyBQ-__Uvhuz_UbZY9LLgA8fqgfSQfMU9IREk&e=

-----Original Message-----
From: Mancino, Douglas <DMancino@seyfarth.com>
Sent: Thursday, April 3, 2025 9:47 AM
To: Rosenberg, David M (DAL - X61508) <https://urldefense.proofpoint.com/v2/url?u=http-3A__David.Rosenberg-40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=dK186X1LRwbLe82XNr4DiwVprLY83NgIEL5KUk2L9wM&e=>
Cc: Stockham, Michael W (DAL - X62515) <https://urldefense.proofpoint.com/v2/url?u=http-3A__Michael.Stockham-40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpSNaOg8_Sk5D&s=H8AOyc2PQyRIKod6ljjomBwRDxne7__BsTh9i-RGFDY&e=>; Paul Murphy <paul@gkmanagement.com.ky>
Subject: Zoom call with Paul Murphy

Good morning. I just learned there is a call scheduled with Paul Murphy tomorrow that I do not have on my calendar. Did I miss an evite? If so I apologize.
I need to be on any such call. I am unavailable tomorrow as I am in Miami for a wedding. I am in New Zealand next week leaving on April 7th and returning on April 14th. I have to take my wife for CT scans of her back on the 15th so the zoom meeting can be rescheduled on the 16th or thereafter but I need to be on the zoom call.
Let me know what dates work for your clients.
Sorry for any inconvenience
Doug

Sent from my iPhone

Douglas Mancino (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326 DMancino@seyfarth.com |


Copy from re:SearchTX

---------------------------------------------
CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.
---------------------------------------------

**Rosenberg, David M (DAL - X61508)**

| | |
|---|---|
| **From:** | Rosenberg, David M (DAL - X61508) |
| **Sent:** | Wednesday, April 9, 2025 11:40 AM |
| **To:** | Mancino, Douglas |
| **Cc:** | Stockham, Michael W (DAL - X62515) |
| **Subject:** | RE: Zoom call with Paul Murphy |

Doug, here is our availability beginning April 16 and for the next week:

April 16 - available after 2:30 p.m.

April 17 - available between 10:00 a.m. and noon and after 1:30 p.m.

April 21 - generally available after 1:30 p.m.

April 22 - available after 2:00 p.m.

April 23 - generally available except between 11:00 a.m. and 12:30 p.m.

All times are CDT. Thanks.

David Rosenberg | Holland & Knight
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas Texas 75201 Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | www.hklaw.com

-----Original Message-----
From: Mancino, Douglas <DMancino@seyfarth.com>
Sent: Thursday, April 3, 2025 9:47 AM
To: Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>
Cc: Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Paul Murphy <paul@gkmanagement.com.ky>
Subject: Zoom call with Paul Murphy

Good morning. I just learned there is a call scheduled with Paul Murphy tomorrow that I do not have on my calendar.
Did I miss an evite? If so I apologize.
I need to be on any such call. I am unavailable tomorrow as I am in Miami for a wedding. I am in New Zealand next week leaving on April 7th and returning on April 14th. I have to take my wife for CT scans of her back on the 15th so the zoom meeting can be rescheduled on the 16th or thereafter but I need to be on the zoom call.
Let me know what dates work for your clients.
Sorry for any inconvenience
Doug

Sent from my iPhone

Douglas Mancino (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326 DMancino@seyfarth.com |


Copy from re:SearchTX

EXHIBIT 5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: | **Case No. 19-34054-sgj-11** Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., Reorganized Debtor. | Dallas, Texas June 25, 2025 9:30 a.m. Docket |
| | - MOTION TO EXTEND DURATION OF TRUSTS (4213) - MOTION TO APPROVE SETTLEMENT (4216) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Highland Capital Management Claimant Trust: | John A. Morris<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7760 |
| For the Highland Capital Management Claimant Trust: | Hayley R. Winograd<br>Gregory V. Demo<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>1700 Broadway, 36th Floor<br>New York, NY 10019<br>(212) 561-7732 |
| For the Highland Capital Management Claimant Trust: | Jeffrey N. Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067<br>(310) 277-6910 |
| For Marc S. Kirschner, Litigation Trustee: | Robert Scott Loigman<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>295 5th Avenue<br>New York, NY 10016<br>(212) 849-7000 |



Copy from re:SearchTX

APPEARANCES, cont'd.:

| | |
|---|---|
| For the Hunter Mountain Entities: | Louis M. Phillips<br>Amelia L. Hurt<br>KELLY HART & PITRE<br>301 Main Street, Suite 1600<br>Baton Rouge, LA 70801<br>(225) 381-9643 |
| For the Dugaboy Investment Trust: | Deborah Rose Deitsch-Perez<br>STINSON, LLP<br>2200 Ross Avenue, Suite 2900<br>Dallas, TX 75201<br>(214) 560-2201 |
| For the Dugaboy Investment Trust: | Michael Justin Lang<br>CRAWFORD WISHNEW & LANG, PLLC<br>1700 Pacific Avenue, Suite 2390<br>Dallas, TX 75201<br>(214) 817-4500 |
| For Crown Global Life Insurance, Ltd. and The Dallas Foundation: | David L. Curry, Jr.<br>OKIN ADAMS, LLP<br>1113 Vine Street, Suite 240<br>Houston, TX 77002<br>(713) 228-4100 |
| For Patrick Daugherty: | Andrew K. York<br>Drake Rayshell<br>Joshua Smeltzer<br>GRAY REED & MCGRAW, LLP<br>1601 Elm Street, Suite 4600<br>Dallas, TX 75201<br>(214) 954-4135 |
| For the U.S. Trustee: | Erin Marie Schmidt<br>OFFICE OF THE UNITED STATES TRUSTEE<br>1100 Commerce Street, Room 976<br>Dallas, TX 75242-1496<br>(214) 767-1075 |
| Recorded by: | Michael F. Edmond, Sr.<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street, 12th Floor<br>Dallas, TX 75242<br>(214) 753-2062 |





Copy from re:SearchTX

Transcribed by: Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording; transcript produced by transcription service.





Copy from re:SearchTX

THE WITNESS: My bad.

THE COURT: -- call my attention to it when you find it.

THE WITNESS: All right.

(The witness steps down.)

THE COURT: All right. Your next witness?

MR. YORK: I believe we're calling Mark Patrick.

THE COURT: All right, Mr. Patrick. All right. Please raise your right hand.

MARK PATRICK, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

THE COURT: All right. Please be seated.

And, Courtney, you're going to start the clock going. I show 2:12. I don't know if my clock's right.

You may proceed.

MR. LANG: And, Your Honor, may I hand the witness -- this is from Mr. Morris' opening. May I use this as Exhibit 3?

THE COURT: Oh, okay. You're talking about the back page of his PowerPoint?

MR. LANG: Yes. Org chart.

THE COURT: Yes. I've got it in front of me. And for the record, I'm going to put this PowerPoint, even though it's not an exhibit *per se*, as a demonstrative aid in the file for this matter. And so it's the last item of the Highland PowerPoint. All right.



Copy from re:SearchTX

MR. LANG: Yes.

DIRECT EXAMINATION

BY MR. LANG:

Q Mr. Patrick, does this Hunter Mountain Investment Trust org chart that I just handed you accurately reflect the structure of the Hunter Mountain Investment Trust ownership today?

A Just give me a few moments to review.

Q Sure.

MR. LEWIS: Your Honor, I had mentioned early on that we object to this whole line of questioning because it's outside the scope of the objection of Dugaboy. And I don't want to interrupt, but I want to make sure that my objection is continuing, because this has nothing to do with the objection presented by Dugaboy.

THE COURT: All right.

MR. PHILLIPS: So we object to the question.

THE COURT: Okay. So the record will reflect basically a running objection from Hunter Mountain?

MR. PHILLIPS: We would appreciate that, Your Honor.

THE COURT: Okay. In light of the failure of Dugaboy to disclose Mark Patrick as a witness, as well as the failure to challenge in a written objection his authority. Okay. So I recognized that this was quite a persuasive objection, but given the magnitude, I would say, of what is going on here,



Copy from re:SearchTX

potentially a settlement that could come very close to ending this long-running plan implementation process, I'm erring, if it's an error, I'm erring on the side of allowing this. All right. But you have a running objection that the record will reflect if one day there is an appeal.

MR. MORRIS: And, Your Honor, the Highland Claimant Trust and the Highland Litigation Subtrust and Highland Capital Management, LP join Mr. Phillips' objection.

THE COURT: Okay. Understood.

MR. PHILLIPS: Thank you very much, Your Honor.

THE COURT: All right.

BY MR. LANG:

Q Mr. Patrick, have you had time to study this Hunter Mountain Investment Trust org chart?

A Yes, I have.

Q And does this accurately show the ownership structure for Hunter Mountain Investment Trust today?

A I'm not sure, without reviewing the underlying corporate documents on some of these entities that you have listed here.

Q Did you help prepare this chart?

A No.

Q No? Okay. So Hunter Mountain Investment Trust is owned by Beacon Mountain, LLC, correct?

A Yes.

Q And Beacon Mountain, LLC is owned by CLO Holdco, LLC,



Copy from re:SearchTX

correct?
A Correct.
Q And CLO Holdco, LLC is owned by CLO Holdco, Limited?
A That's correct.
Q And CLO Holdco, Limited is owned by Charitable DAF Fund, LP?
A Correct.
Q And Charitable DAF Fund 1, LP is owned by CDMC FAD, LLC?
A The ultimate beneficial owner is DFW Charitable Foundation. To my -- to the best of my recollection, I would say that appears accurate. I'm just not a hundred percent.
Q Okay. And --
A But I am a hundred percent that DFW Charitable Foundation is the ultimate beneficial owner. And I'm a hundred percent that Dugaboy Investment Trust has no interest in it. And I'm also a hundred percent that The Dallas Foundation or any --
MR. LANG: Judge, I haven't asked --
THE WITNESS: -- or any other nonprofit has any --
MR. LANG: -- any of these questions.
THE COURT: Okay. There's an objection, nonresponsive. I sustain.
BY MR. LANG:
Q Mr. Patrick, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct?
A (Pause.) I'm just waiting for a relevancy. I don't


Copy from re:SearchTX

understand how that's relevant to my authority --

THE COURT: Okay. You're not allowed to make a relevancy objection. Okay.

MR. PHILLIPS: Your Honor, I think the problem is that, if I could, we have made an objection. And our objection, our running objection is founded on relevancy and founded on improper process. So I would like to just tell the Court, and so my client representative can hear it, that the fact that I'm not standing up every time there's a problematic question, --

THE COURT: Okay.

MR. PHILLIPS: -- because every question is problematic, my objection is being maintained to every question that's being asked.

THE COURT: Okay. You understand that, right?

THE WITNESS: I --

THE COURT: There's a running relevancy objection. You're the witness. You can't make the objection. But it's on the record for whatever use it might have down the road.

MR. PHILLIPS: I have objected to every question that's coming in connection with this line of questioning on the basis of relevance.

THE COURT: I got it. I think we all have it.

MR. PHILLIPS: I'm just --

MR. LANG: Understood.


Copy from re:SearchTX

THE COURT: Yes. And you're thinking he's eating into your 30 minutes?

MR. LANG: Yes.

THE COURT: Okay. We've got it.

THE CLERK: I stopped the time.

MR. LANG: So -- thank you.

THE COURT: Did you stop the time for a minute?

THE CLERK: Yes, I did.

MR. LANG: Thank you.

THE COURT: Okay.

BY MR. LANG:

Q So, to my question, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct? Charitable DAF Holdco, Limited?

A And where is that on the chart?

Q I'm asking, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, Limited.

A Can you show me a corporate document so I know the precise corporation you're referring to?

Q You're the -- you are the manager of -- or the control person of CDHGP Limited, correct?

A Again, I'd have to refresh my recollection, but I am the control person over CDMC.

Q Okay. And CDMC --

A As well as Charitable DAF Fund. I'll represent that to



Copy from re:SearchTX

you.

Q Okay. Was there a transaction in December of 2024 where Charitable DAF Holdco, Limited sold its interest or transferred its interest in Charitable DAF Fund, LP to CDMC FAD, LLC?

A I know you're trying to help other litigation and --

MR. PHILLIPS: Mark.

THE COURT: Okay. Nonresponsive.

THE WITNESS: Your Honor, he's using your time to fish for other litigation to support that --

THE COURT: Okay. Okay. We have a running objection to relevance. I'm going to say that one more time. Okay. Just answer the question as best you can.

THE WITNESS: I'd have to review the corporate documents to refresh my recollection for that time period.

BY MR. LANG:

Q Up until December of 2024, Charitable DAF Fund, LP was owned 100 percent by Charitable DAF Holdco, Limited, wasn't it?

A I don't know what entity you're referring to without a refreshment of corporate documents of that entity. There could be a lot of entities called that.

Q You're aware that there is a proceeding in the Caymans investigating the December 2024 transaction that sold -- where Charitable DAF Holdco, Limited sold its interest in -- and or



Copy from re:SearchTX

transferred its interest in Charitable DAF Fund, LP to CDMC FAD, LLC?

A There are several parts to that question. So the answer is no.

Q Are you aware of a proceeding pending in the Caymans involving Charitable DAF Holdco, Limited?

A Again, I don't know what entity you're referring to. Show me a -- show me a corporate document.

MR. LANG: Your Honor, this was on the Foundation's exhibit list. We cross-designated any document designated as an exhibit by any other party in this case. And I'd like to hand this to the witness.

MR. MORRIS: Which exhibit is it?

THE COURT: Which is -- yes.

MR. LANG: It was on the -- it was on the DAF -- or, the Foundation's exhibit list.

MR. MORRIS: They haven't been admitted into evidence and they've withdrawn their objection. We object, Your Honor.

THE COURT: Yes, they've not been admitted.

MR. LANG: Okay. Well, can I --

MR. PHILLIPS: We object to that, Your Honor. We object to any witness --

MR. LANG: We cross-designated every --

THE COURT: I already discussed at the beginning what we were admitting and that was not disclosed.





Copy from re:SearchTX

MR. LANG: Okay.

THE COURT: As I recall, I said you've only designated the plan and settlement agreement, and the answer was yes.

MR. LANG: Okay.

BY MR. LANG:

Q And we're aware that the Joint Official -- are you aware that there is a Joint Official Liquidator appointed over a Charitable DAF entity in the Cayman Islands?

MR. PHILLIPS: Objection to form.

THE WITNESS: Again, without more specific --

THE COURT: Overruled. Yes.

THE WITNESS: -- specificity, there could be a thousand different actions that you're referring to, in my mind.

BY MR. LANG:

Q Are you aware that the Joint Official Liquidators in the Caymans are investigating transactions involving Charitable DAF Fund, LP and Charitable DAF Holdco, Limited?

A Again, again, I don't specifically know what you're referring to.

MR. PHILLIPS: Your Honor, may I -- excuse me. I don't know that my running objection includes an objection to form for each of the questions. This objection is to form of the questions about, quote, --


Copy from re:SearchTX

THE COURT: What's wrong with the form?

MR. PHILLIPS: -- investigation.

THE COURT: What is wrong with the form of that question? I'm not clear.

MR. PHILLIPS: My objection to form is that the question is an open-ended question with an undefined term, investigation.

THE COURT: Overruled. I don't think that's a vague term. So you may answer.

THE WITNESS: If you show me some document, some complaint or something, I'll be very happy to verify whatever questions related to that. But just giving me verbal words of entities and names and actions, I don't know precisely what you are talking about.

BY MR. LANG:

Q Mr. Patrick, who set up the entities in the Hunter Mountain Investment Trust org chart that is sitting in front of you?

A I'm sorry. Repeat the question?

Q Who set up the various entities that are in the org chart that is on your -- on the stand?

MR. PHILLIPS: Objection to form. Set up. What does that mean?

THE WITNESS: It -- yeah, it's very --

THE COURT: I think we know what it means. Creating,



Copy from re:SearchTX

perhaps.

BY MR. LANG:

Q Created?

A Who? Are you asking if I created it?

Q Did you participate in creating them?

A Did I participate? In which ones?

Q CDMC FAD, LLC.

A What do you mean by participate?

Q Were you involved in creating -- did you initiate the creation of CDMC FAD, LLC?

A Lawyers were.

Q Did you engage in any capacity on behalf of any entity? Were you involved in engaging the lawyers to set up CDMC FAD, LLC?

A Yes, I engaged lawyers to set up entities.

MR. LANG: Objection. Nonresponsive.

THE COURT: Sustained.

MR. LANG: Did you --

THE COURT: He asked about this one particular entity, I think.

BY MR. LANG:

Q Did you --

A Which entity, again, did you ask?

Q CDMC FAD, LLC.

A Yes, I believe I hired a lawyer.



Copy from re:SearchTX

Q And when did CDMC FAD, LLC become a hundred percent owner of Charitable DAF Fund, LP?
A Around the end of March of 2025. I believe.
Q And were you involved in the transaction between -- in which CDMC FAD, LLC obtained a hundred percent interest in Charitable DAF Fund, LP?
A What do you mean by involved? How?

THE COURT: Okay. I can see what's happening here or I have an impression of what's happening here. I feel like you're slowing down this process where I've given 30 minutes to this lawyer. Okay? And I feel like you're feigning confusion. I don't mean to be insulting, but that's how it comes across. Okay? So I need you to speed up your answers and not be confused about things you shouldn't be confused about. Okay?

THE WITNESS: Okay.

THE COURT: I feel like it's late 1980s *Dondi*. Does anyone know what I mean by that? Okay. We've been there, done that, in the federal courts, and we don't like the looking at -- you're not looking up at the ceiling. That's what they did in *Dondi*. Confusion. Delay. Okay?

So I don't mean to chastise you. I'm just telling you that you're going to make us be here a lot longer, and nobody wants that, because I will give him extra time for this. Okay?


Copy from re:SearchTX

THE WITNESS: Understood.
THE COURT: Thank you.
BY MR. LANG:
Q Okay. So you were involved in the transaction in which CDMC FAD, LLC acquired 100 percent ownership interest in Charitable DAF Fund, LP in or around March of 2025, correct?
A Correct.
Q Who did CDMC FAD, LLC obtain its interests in Charitable DAF Fund, LP from in March of 2025?
A From an -- from an entity called Charitable DAF Holdco, Ltd.
Q Charitable DAF Holdco, Ltd., the entity that I asked about earlier, correct?
A Of the same name.
Q Yes. And Charitable DAF Holdco, Ltd. has had Joint Liquidated -- Liquidators, Joint Official Liquidators appointed over it in the Cayman Islands, correct?
A Yes.
Q And those Joint Official Liquidators were appointed over Charitable DAF Holdco, Limited in or around May 6th, 2025?
A In May is what I recall.
MR. LANG: Your Honor, we'll pass the witness.
THE COURT: All right. Do we have any questions?
MR. YORK: No questions, Your Honor.
THE COURT: Okay. Any cross?


Copy from re:SearchTX

MR. MORRIS: Just briefly, Your Honor.

CROSS-EXAMINATION

BY MR. MORRIS:

Q Mr. Patrick, do you know who initiated the proceedings to get the appointment of the Joint Official Liquidators in the Cayman Islands?

A The director and myself, we initially filed for a voluntary joint liquidation in May.

Q And did there come a time when the Cayman court appointed the Joint Official Liquidators?

A Yes.

Q Do you know who asked the court to appoint the Joint Official Liquidators?

A We did, as well as other -- it was an agreement with the participation holders of that entity.

Q And who are the participation holders of that entity?

A It was the DFW Charitable Foundation as a 51 percent holder as well as the Highland Dallas Foundation, Highland Santa Barbara Foundation, and the Highland Kansas City Foundation.

Q And those three foundations that you just mentioned, do you know who controls them?

A Jim Dondero.

Q Is it your understanding that Mr. Dondero was funding the litigation in the Cayman Islands?



Copy from re:SearchTX

A Yes.
Q The Joint Official Liquidators, are you aware of any statement that they've ever made that you are not authorized to act on behalf of any of the HMIT entities?
A Yeah, they've never made a statement that I'm not authorized to act under any of those entities.
Q Okay. Did you receive a letter last night that was purportedly authored by the Joint Official Liquidators?
A Yes.
Q Did you review that letter?
A Yes.
Q Did that letter refer to today's hearing?
A Yes.
Q Are you aware of the Joint Official Liquidators making any appearance in this proceeding?
A No, I'm not aware they made any appearance in this proceeding.
Q Based on your recollection of the contents of that letter, did the Joint Official Liquidators challenge your authority to enter into the settlement agreement on behalf of the HMIT entities?
A No, they did not, because there's no ownership interest.
Q Okay. And what do you mean by that?
A The entity in liquidation owns nothing. And the DFW Charitable Foundation is the ultimate beneficial owner.


Copy from re:SearchTX

Q Are you aware that The Dallas Foundation filed an objection to the settlement agreement on behalf of Empower Dallas Foundation, the Okada Family Foundation, and Crown Global?
A Yes.
Q Are you aware that that objection was withdrawn?
A Yes.
Q Was the withdrawal of that objection the product of negotiations that your counsel had with lawyers for The Dallas Foundation and Crown Global?
A Yes, it was.
Q Did The Dallas Foundation or Crown Global require you to surrender your control position of the HMIT entities as a condition to the withdrawal of their objection?
A To give up my control? No.
Q They didn't ask you to do that, did they?
A No. No.
Q You are the control person for each of the HMIT entities that are party to the settlement agreement, correct?
A That is correct.
Q Are you aware of any requirement in any of the governance documents --
MR. CURRY: Your Honor, I'm not questioning, but I'm going to object to the line of questioning here about what was asked and what was not received into negotiations, because,


Copy from re:SearchTX

frankly, you're getting an imperfect picture there. And I don't think it should be misrepresented. The communications didn't happen with Mr. Patrick.

THE COURT: Okay. I don't know if that objection was a confidential settlement communications.

MR. CURRY: It's a combination of foundation and that he's going into confidential settlement discussions.

MR. MORRIS: Your Honor, it's a very simple question. I'll ask it again.

THE COURT: Okay. We'll let --

BY MR. MORRIS:

Q To the best of best of your knowledge, Mr. Patrick, did The Dallas Foundation or any of the entities on whose behalf it filed its objection require you to surrender your position as the control person of the HMIT entities in exchange for the withdrawal of their objection?

A No, they did not.

Q Thank you. Are you aware -- are you familiar with the governance documents for the HMIT entities?

A Yes, I am.

Q Are you aware of any restriction on your ability to act on behalf of those HMIT entities with respect to -- withdrawn. Are you required to obtain the consent of anyone in order to enter into the settlement agreement on behalf of the HMIT entities?



Copy from re:SearchTX

A No, I am not. I'm the sole authority and control person for that entity.
Q And do you believe that you're entering into the settlement agreement on behalf of the HMIT entities in good faith?
A Yes, I do.
Q Have you received legal counsel before entering into the agreement?
A Yes, I have.
Q Do you believe that you've negotiated the best terms that you could get on behalf of the HMIT entities?
A Yes, I do.
Q Do you believe that you received the information that you believed you required in order to make an informed decision before you entered into the settlement agreement on behalf of the HMIT entities?
A Yes, I did.
MR. MORRIS: I have no further questions, Your Honor.
THE COURT: All right. Mr. Phillips, anything from you?
MR. PHILLIPS: No questions.
THE COURT: Okay. Any redirect?
MR. LANG: Briefly.
THE COURT: Uh-huh.
MR. LANG: Your Honor, because they mentioned the



Copy from re:SearchTX

letter of last night from Grant Thornton, the Liquidators, I'm going to offer that into evidence as the letter that we talked about this morning. But Mr. Morris directly asked him if he reviewed it and asked him questions about it.

THE COURT: Response?

MR. MORRIS: No objection, Your Honor. Go right ahead.

THE COURT: I'll admit it.

MR. LANG: This is --

THE COURT: Do I have it in my notebook?

MR. LANG: -- Dugaboy --

THE COURT: Okay.

REDIRECT EXAMINATION

BY MR. LANG:

Q Mr. Patrick, I've handed you --

THE COURT: We're going to call this Dugaboy 3?

MR. LANG: Dugaboy 3.

THE COURT: Okay.

(Dugaboy Investment Trust's Exhibit 3 is admitted into evidence.)

BY MR. LANG:

Q Mr. Patrick, I've handed you a letter. It's from Grant Thornton dated June 24th, 2025. Do you see that?

A Yes.

Q And is this a true and correct copy of the letter that you



Copy from re:SearchTX

received or that you reviewed from the Joint Liquidators that you referred to in your answers to Mr. Morris' questions?

A Well, it's a PDF. I mean, I'm assuming it's from the Official Liquidators.

Q But this is the letter you were referring to in your testimony a few minutes ago?

A Yes.

Q And do you see on the second paragraph it says that, on May 6th, 2025, the Grand Court of Cayman Islands Financial Services Division appointed Margot MacInnis and Sandipan Bhowmik, each of Grant Thornton Special Services (Cayman) Limited, as the Joint Official Liquidators of the company. Do you see that?

A Yes.

Q And do you see on the second page, it says: Since our appointment, we have been diligently investigating these transactions, including a corporate transaction that occurred in or around December 2024 where the company transferred a hundred percent of its interest in the Fund to CDMC FAD, LLC, which resulted in the company being the sole member of CDM and subsequent redemptions of the company's interests in CDM.

Do you see that?

A Yes.

Q Is that your understanding of what is happening in the Caymans right now, is investigating these transactions?


Copy from re:SearchTX

A Correct.

MR. LANG: Pass the witness.

MR. MORRIS: May I just have that letter, please?

THE COURT: Any recross?

MR. MORRIS: Yeah, just real brief.

RECROSS-EXAMINATION

BY MR. MORRIS:

Q None of the transactions that you were just asked about has anything to do with any of the HMIT entities, correct?

A That's absolutely correct.

Q Okay. And now that we have the letter in the record, if you could look at the third paragraph. Do you see --

A Yeah.

Q Do you see it refers to the Highland Dallas Foundation, Highland Santa Barbara Foundation, and Highland Kansas City Foundation?

A Yes.

Q Are those the three entities that you referred to earlier that are, to the best of your understanding, controlled by Mr. Dondero?

A Yes.

Q Okay. And this is the letter that you said you reviewed and concluded that the Joint Official Liquidators weren't challenging your authority to enter into the agreement on behalf of the HMIT entities; do I have that right?


Copy from re:SearchTX

A Yes. Yes, you do.

MR. MORRIS: I have no further questions, Your Honor.

THE COURT: Okay. I have a question or two.

EXAMINATION BY THE COURT

THE COURT: And again, I apologize if I sounded harsh earlier. I recognize different people present different ways when they testify. It just appeared to me that maybe we were slowing things down unnecessarily. All right?

THE WITNESS: I apologize, too. I'm just a little emotionally upset they're using this proceeding for a benefit someplace else.

THE COURT: Okay. My question, very general question: Do you think this settlement is fair and equitable as far as HMIT is concerned?

THE WITNESS: Absolutely.

THE COURT: And could you tell me why?

THE WITNESS: Yeah. There was no obvious pathway for HMIT to, in my mind, to receive the residual interest of the bankruptcy estate without a settlement with the Debtor. Otherwise, it just seemed to me that it would go on forever. And then I balanced that against the existing litigation and the probability of the outcome weighted against the costs, and determined that it made sense from HMIT's perspective to enter into the settlement agreement.

THE COURT: Okay. And you understand that, as part





Copy from re:SearchTX

of this, you're giving up some litigation claims that have been waged now for a couple of years or more?

THE WITNESS: That is correct, but I'm also receiving the Kirschner Litigation, which I did negotiate to receive.

THE COURT: Okay. And there was a note that the estate -- I've heard it called at some point the $57 million note that HMIT owed Highland, a December 2015 note -- that basically gets credited against the capital account. You understand that?

THE WITNESS: Yes, I do.

THE COURT: Okay. And then you understand that if I approve this deal, I'm not sure why there's going to be $500,000 to HMIT and then also another $10 million to HMIT, but subsequent payments could get held up if there are litigation threats to the Highland Claimant Trust. You understand that, correct?

THE WITNESS: Yes, I do.

THE COURT: Okay. I just, I have to ask. I'm confused about what's going on here. I thought that -- well, let me just ask this: Would you consider yourself crossways with Mr. Dondero now?

THE WITNESS: No, but I'll answer the question. Upon advice of counsel, I quit Skyview Group. And upon advice of counsel, I terminated the back office services that Skyview Group was providing to the DAF.





Copy from re:SearchTX

THE COURT: Okay. Well, you said you're getting maybe a little emotional because of other litigation. I'm just trying -- I don't understand what all that other --

THE WITNESS: Unrelated -- well, unrelated to that. They're clearly trying to use this forum to benefit their Cayman actions. They hired U.S. counsel called Reed Smith, and they've been begging for an organization chart to issue a variety of frivolous lawsuits against the operating DAF entities. So I do apologize, but that's a little upsetting to me because I know we're going to -- that I've just fed them a list of targets in another unrelated matter.

THE COURT: Okay. Reed Smith. Here we go again with -- they've made an appearance for Mr. Seery in this litigation.

MR. MORRIS: Exactly. And we have raised that issue.

THE COURT: Okay.

MR. MORRIS: And I'm surprised to hear that they think they still have the ability to do this. But we will pursue that later.

THE COURT: Okay. All right. I had nothing further. Thank you, Mr. Patrick.

(The witness steps down.)

THE COURT: All right. So where are we now? I said that, again, just trying to balance the playing field, if Dugaboy was given the ability to question Mr. Patrick, then I



Copy from re:SearchTX

EXHIBIT 6

**CAUSE NO. ____________________**

| | |
|---|---|
| **THE HIGHLAND DALLAS FOUNDATION, INC., et al.,**<br><br>*Plaintiffs*,<br><br>**v.**<br><br>**MARK PATRICK, et al.,**<br><br>*Defendants.* | **IN THE TEXAS BUSINESS COURT**<br><br>**1ST DIVISION**<br><br>**DALLAS, TEXAS** |

## DECLARATION OF JAMES DAVID DONDERO

I, **JAMES DAVID DONDERO**, of 300 Crescent Court, Suite 700, Dallas, Texas, United States, 75201, DECLARE under penalty of perjury:

1. I am the President of NexPoint Advisors, L.P. (***NexPoint***), an investment advisor registered with the U.S. Securities and Exchange Commission (***SEC***). I am a Certified Public Accountant and Chartered Financial Analyst with over forty years of investment advisory experience managing billions of dollars of investments across various assets classes.

2. I make this declaration from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

3. I founded NexPoint in 2012. NexPoint is an alternative investment firm, with a particular focus on investment in the real estate sector. NexPoint has assets under management exceeding $16 billion in value. I was formerly the President of Highland Capital Management, L.P. (***Highland***), also an SEC registered investment advisor which I founded in 1993. From that time until 2015, Highland was majority owned by me and/or



Copy from re:SearchTX

my affiliates. In December 2015, I divested my majority stake of Highland (***2015 Transaction***).

**THE FUND**

4. In addition to my business interests, I am a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles I utilize to donate such funds to charitable organizations.

5. In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. In 2011, I requested the Donor Advised Fund (or DAF) to be formed and structured in a way that allowed these donations to be receipted and distributed to certain charitable foundations, as the ultimate beneficial owners of the Fund's economic interest. The structure proposed by the tax and legal advisors to effect this was for the Fund to have one limited partner (i.e. the LP) which would issue 'participation shares' to be held by certain charitable supporting organizations (together, the ***Supporting Organizations***) and in turn each of those entities would provide funding directly to certain charitable foundations in the U.S. (together, the ***Charities***).

6. The Amended and Restated Limited Partnership Agreement of the Fund dated 7 November 2011 (***ARLPA***), and the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (***Articles***), govern the Fund and its partners.

7. The LP held 100% of the economic interest in the Fund. The Fund's general partner, Charitable DAF GP, LLC (the ***GP***), a Delaware company incorporated on 25 October 2011, held management shares.

8. The LP issued 100 management shares (the ***Management Shares***) with the only voting rights for any and all shareholders in the LP. In essence, the Articles and ARLPA therefore grant complete control of the Fund structure to the holder of the Management Shares in


Copy from re:SearchTX

the LP and the entirety of the issued share capital of the GP. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Fund structure (the ***Control Position***).

9. The ARLPA provides that the Fund was formed to make investments, directly or indirectly, on behalf of certain entities "*for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" and contemplates the engagement of investment (and other service) advisors to effect this. In this context, the Control Position is responsible for the governance and management functions of the Fund as required in order for the Fund to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support.

10. The governing documents of the Fund plainly state in multiple places that all of the powers of the Control Position exist solely for the purpose of benefitting the Supporting Organizations and their Charities. This ubiquitous language was created for an express purpose. The expectation by the founders of the Fund (myself included) at the time it was formed was that the governing documents would ensure that the Control Position would be bound through his or her fiduciary obligations to safeguard and advance the interests of the charitable organizations that held actual beneficial ownership of the Fund.

**GRANT SCOTT**

11. I initially selected Grant Scott for the Control Position, a person I have known for years who also has great integrity.

12. From 2010 until the 2015 Transaction, the Fund operated as a non-discretionary advised account of Highland, meaning Highland provided back-and-middle-office staff to the Fund and also provided recommendations regarding potential investments to Mr. Scott as the Control Person. However, Mr. Scott had complete discretion in adopting or rejecting the


Copy from re:SearchTX

investment recommendations provided to the Fund by Highland. He also had final discretion over payments made by the Fund to third parties. In his position as the Control Person, Mr. Scott was paid $60,000 per annum.

13. After the 2015 Transaction, my affiliates and I no longer owned a majority stake in Highland. Subsequently, I was advised that, as a result of the change of ownership, the Fund was permitted to enter into a paying Investment Advisory Agreement with Highland. This form of investment advisory agreement was in place from January 2017 until it was terminated effective March 2021.

**MARK PATRICK**

14. Mark Patrick was hired as Tax Counsel at Highland in 2008. His job duties included maximizing tax saving to Highland's limited partners, including me and my affiliates. In that role, Mr. Patrick directly represented me as my personal tax counsel. He represented me in tax efficiency planning and tax- deductible charitable giving, among other things. He provided the same services for various trusts and companies affiliated with me. Mr. Patrick served that role at Highland from 2008 until his departure in February 2021.

15. In March 2021, Mr. Patrick was hired by Skyview as Tax Counsel and continued to perform substantially similar tax counsel duties for me. At Mr. Patrick's request, his job title was changed to "Managing Director, Tax" in September 2021, although his role with respect to me and my affiliates remained substantially the same.

16. The legal structure of the Fund (including as regards its partners and ultimate beneficiaries as discussed above) was created in 2011 on the advice of Mr. Patrick working with outside counsel. Mr. Patrick advised me that, to avoid potential negative findings by the U.S. Internal Revenue Service, as the donor/grantor of assets to the Fund, I could not have any control over the Fund or its entities. I followed his advice as my tax counsel.

17. In March 2021, Mr. Scott informed me that he wanted to resign from the Control Position. The Fund had become engaged in certain disputes arising from the bankruptcy of Highland filed in 2019, and he did not believe he was equipped to handle those disputes. Mr. Patrick suggested to Mr. Scott and me that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected the Fund. At the time, Mr. Patrick was my attorney and Mr. Scott was my trusted friend, and I was happy for Mr. Scott to pass the Control Position to Mr. Patrick.

18. On 25 March 2021, Mr. Scott: (i) resigned as director of the LP, (ii) appointed Mr. Patrick as director of the LP, and (iii) transferred to Mr. Patrick the Management Shares for nominal consideration. Mr. Patrick therefore assumed the Control Position from that date.

19. At some point, I understand that a person named Paul Murphy based in the Cayman Islands also was appointed as director to the LP and a portion of the Fund's subsidiaries, giving those entities two directors. However, I understand that in the event of a dissenting vote by Mr. Murphy, Mr. Patrick's vote counts as the tiebreaker for corporate voting.

**MR. PATRICK'S CONTROL OF THE FUND**

20. In the initial period following Mr. Patrick's assumption of the Control Position, there was no noticeable change in the management of the Fund. NexPoint provided, without charge, investment ideas to the Fund, as Highland previously had done, and Mr. Patrick was free (as Mr. Scott had been) to decide whether or not the Fund wished to follow NexPoint's recommendations. This approach was similar to the non-discretionary advised account status of the Fund prior to 2017.

21. Subsequently, however, communications between Mr. Patrick, Skyview, and me began to become less frequent, and over time I came to suspect that Mr. Patrick was utilizing the Control Position not for the benefit of the Supporting Organizations, the Charities or the


Copy from re:SearchTX

Fund, but rather for his own personal enrichment.

22. On 28 June 2023, Mr. Patrick sent an email to Lauren Short, an employee of NexPoint, requesting that the Highland Dallas Foundation (i.e. the Supporting Organization that supports the Dallas Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, Ms. Short learned that the directors of the entity were Mr. Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr. Patrick had made the grant request without disclosing his and/or his family's involvement.

23. Ms. Short discussed the matter with Mr. Patrick, who did not provide many details, but said the non-profit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Ms. Short understood that Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. While Ms. Short inquired, there was no detail forthcoming as to whether or not Creative Hearts would be a pass-through donating the monies to other charities or would directly do any work with the trainers or speakers itself. There also was not clarity if Creative Hearts' members intended to take a salary from the grant. The grant payment was authorized on September 5, 2023, but Mr. Patrick was informed that further payments were unlikely. I was informed of this process by Ms. Short and her supervisor. Contemporaneously with the grant approval, my team also informed the Dallas Foundation of the situation.

24. As another example, in or around September 2023, I was contacted by Kevin Cronin of Fortaris Capital Advisors (***Fortaris***). Fortaris provides litigation support services including due diligence, internal investigations, fraud detection, asset verification and in-depth background checks. Mr. Cronin is a former police sergeant and Special Agent with the Department of Homeland Security.


Copy from re:SearchTX

25. Fortaris was at the time engaged by the Fund in respect of an unrelated matter and Mr. Cronin was known to me personally. In September 2023, Mr. Cronin and I met, and he informed me that he had been approached by Mr. Patrick with a proposition whereby Mr. Patrick (on behalf of the Fund) would engage an entity controlled by Mr. Cronin (other than Fortaris) at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr. Patrick as a supplement to Mr. Patrick's compensation. Mr. Cronin informed me that he had asked Mr. Patrick if this arrangement would amount to fraud, and that Mr. Patrick's response had been: "*you can't steal from yourself*."

26. Mr. Cronin informed me that he understood from this statement that Mr. Patrick believed he owned the Fund and could use the funds controlled by it however he pleased. Mr. Cronin further informed me that he was uncomfortable about Mr. Patrick's proposal and that he subsequently communicated this to Mr. Patrick, whereupon Mr. Patrick cut off all further communications between them.

27. Mr. Cronin's allegations that Mr. Patrick was seeking to make a secret, undisclosed personal profit from the Fund were extremely concerning. I have subsequently been informed by my attorneys in the United States that, had Mr. Cronin agreed with this proposal, it would have likely constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. Shortly after Mr. Cronin contacted me, I met with Mr. Patrick and confronted him about the allegations, which he admitted to me were true. I informed the Supporting Organizations about the matter and Mr. Patrick's admission. However, at the time, both the Supporting Organizations and I were concerned that under the Articles, the Supporting Organizations did not have the power (in their capacity as Participating Shareholders) to limit Mr. Patrick's powers or remove him from his position.

28. Given the situations described above, and the lack of communication about the Fund, I became increasingly concerned about Mr. Patrick's management of the Fund, including the potential misuse and/or misappropriation of its assets. In June 2024 therefore I requested that my team at NexPoint analyze the financial information of the Fund that I had in my possession, covering the calendar years ending 2018 to 2023 and the first half of 2024. My team produced an annual expense summary of that information (the ***Expense Summary***) which indicated substantial increases in expenditures during Mr. Patrick's tenure, particularly during early 2023 and mid-2024, as follows:

(a) Directors' fees increased from around $40,000 in 2022 to almost $600,000 in 2023 – and increased even further to around $2.25 million in the first half of 2024 alone.

(b) Expenses overall for the first half of 2024 were around $18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. $18.6 million).

29. The Expense Summary reinforced my concern that Mr. Patrick is using the Control Position for his own enrichment rather than to benefit the Supporting Organizations and the causes they support. I therefore directed my employees at NexPoint to provide the Expense Summary to the Supporting Organizations, and which they promptly did.

30. In August 2024, I became aware of yet another issue concerning Mr. Patrick. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (***MNPI***) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (***Compliance Policy***). NexPoint and its affiliates, and Skyview, require their employees to abide by the



Copy from re:SearchTX

Compliance Policy at all times and employees are required to confirm in writing on a quarterly basis that they will not use MNPI while trading. Mr. Patrick completed the annual 2023, Q4 2023, Q1 2024, and Q2 2024 certifications, among others.

31. I was informed that my director of charitable giving had been contacted by Ms. Diaz, the CEO of the Highland Dallas Foundation, Inc. (***Dallas Foundation***), one of the Charities. Ms. Diaz stated that on August 28, 2024, Mr. Patrick contacted the Dallas Foundation's attorney to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr. Patrick through his employment at Skyview and constituted MNPI, which is prohibited by U.S. securities laws from being disclosed and/or acted upon. On the basis of this MNPI, Mr. Patrick advised the Dallas Foundation to exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr. Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr. Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

32. Upon receipt of the allegations against Mr. Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr. Patrick's knowledge, so as to avoid potentially tipping off Mr. Patrick about the investigation. By the end of September 2024, the investigation was substantially complete, and the conclusion had been reached that Mr. Patrick's actions constituted a serious breach of his compliance and employee obligations. On October 1, 2024, as part of the finalization of the investigation report, Skyview's chief compliance officer interviewed Ms. Diaz about the allegations against Mr. Patrick, which I understand confirmed Skyview's conclusions. The final investigation report was issued on October 11,


Copy from re:SearchTX

2024 and concluded that Mr. Patrick had attempted a serious breach of U.S. securities laws.

33. On October 2, 2024, Mr. Patrick abruptly resigned his position from Skyview and thereafter became openly hostile towards the Charities, my affiliated companies, and me. Although neither I nor anyone at Skyview has direct evidence of Mr. Patrick having been tipped off about the investigation, the timing of his resignation causes me to conclude that Mr. Patrick became aware of the investigation into his behavior and resigned before the report was published.

34. On the same day that Mr. Patrick resigned his position at Skyview, he also terminated Skyview's service agreement with the Fund, and as a result all legal, compliance, back office and other services provided to the Fund. Mr. Patrick and Mr. Murphy have stated that that they intend to take on the role of investment advisors for the Fund. I am not aware of Mr. Murphy's qualifications for this role, nor am I aware of any third-party investment advisor that has been retained by the Fund to fill this role. Based on my knowledge and expertise in investment management, and my sixteen years working with Mr. Patrick as my counsel, I believe that Mr. Patrick is a well-qualified tax counsel, but does not have the experience, training, or expertise to be an investment professional.

**FUNDING OF PROCEEDINGS**

35. As stated above, I do not hold a controlling interest in any of the Charities or the Supporting Organizations. However, I sit on the boards of the Supporting Organizations for the purpose of understanding how the Charities are deploying the Fund's assets for charitable purposes, and the impact of those donations in the community. I am only one of three votes, and the other two votes on each board are held by the respective Charity. Historically, the boards have had no hesitation in exercising their powers to chart


Copy from re:SearchTX

independent courses even if those decisions differ from my preferences.

36. The Supporting Organizations approached me about the costs associated with legal action and their reticence to use funds that should and otherwise would be used for charitable purposes, and asked whether I would be prepared to fund the action personally. I agreed to do so. I have not and will not at any time receive a benefit, nor do I have control of the proceedings, because of this funding arrangement. The Supporting Organizations have decision making authority in relation to these proceedings. My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support.

***************REMAINER OF PAGE INTENTIONALLY LEFT BLANK***************



Copy from re:SearchTX

My name is James David Dondero, my date of birth is June 29, 1962, and my address is 300 Crecent Court, Dallas, Texas 75201. I declare under penalty of perjury that the foregoing is true and correct. Executed in Dallas County, State of Texas, on the 1st day of July 2025.

**JAMES DAVID DONDERO**


Copy from re:SearchTX

EXHIBIT
7

**CAUSE NO. ____________________**

| | |
|---|---|
| **THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC.,** | |
| *Plaintiffs*, | **IN THE TEXAS BUSINESS COURT** |
| **v.** | |
| **MARK PATRICK and DFW CHARITABLE FOUNDATION,CDMCFAD, LLC, CDH GP, Ltd., and CHARITABLE DAF FUND, LP** | **1ST DIVISION** |
| *Defendants.* | **DALLAS, TEXAS** |

**DECLARATION OF JULIE DIAZ**

I, **JULIE DIAZ**, of 3000 Pegasus Park Dr, Suite 930, Dallas, Texas 75247, declare under penalty of perjury as follows:

1. I am the President and Chief Executive Officer of The Dallas Foundation, an exempt charitable organization based in Dallas, Texas which partners with donors and works with the community to support various philanthropic causes in Greater Dallas.

2. I am also a Director of the Highland Dallas Foundation Inc., an exempt charitable entity incorporated in Delaware as a supporting organization to provide funding directly to The Dallas Foundation.

3. I make this declaration from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.



Copy from re:SearchTX

4. This Declaration is presented in support of Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver in the above-captioned case. I verify that, to the best of my knowledge, information, and belief, the statements in it are true.

**PROFESSIONAL EXPERIENCE**

5. I hold a Bachelor's Degree in Arts Management from Salem College, and a Masters Degree in Business Administration from Boston University.

6. I joined The Dallas Foundation in 2019 as Vice President, Philanthropic Partnerships. I was appointed as President and CEO in 2024.

7. I have extensive nonprofit experience in strategy, governance, and revenue growth, having led resource development teams at the Perot Museum, Greenhill School and Southern Methodist University, and having held leadership roles at the Philadelphia Orchestra, the Boston Symphony Orchestra, and GBH Public Television and Radio in Boston.

8. I am an active member of The Dallas Assembly and Charter 100, organizations which champion collaboration in community development and philanthropy.

9. I also served in 2018 as an adjunct professor at SMU Meadows School for the Arts.

**THE FUND**

10. The Fund is a Cayman Islands limited partnership formed on 28 October 2011 (registration number 53083) whose registered office is Walkers Corporate Services Ltd, Walker House, 87 Mary St, George Town, Grand Cayman, KY1-9005, Cayman Islands.

11. The Fund is governed by the Amended and Restated Limited Partnership Agreement dated 7 November 2011 (the ***ARLPA***).

12. From approximately its inception until approximately March 2025, the sole limited partner of the Fund (the LP) was a Cayman Islands exempt company incorporated on 27 October 2011


Copy from re:SearchTX

(registration number 263805) called Charitable DAF Holdco, Ltd.

13. The LP is governed by the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (the ***Articles*****).**

14. The general partner of the Fund is (or at least was at the time of the Fund's formation and pursuant to the ARLPA) Charitable DAF GP, LLC (the ***GP***), a Delaware company incorporated on 25 October 2011.

<u>Ownership and Management</u>

15. The Fund was formed to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code (the* ***Code****) … for the economic benefit of the Limited Partner and its <u>Indirect Charitable Owners</u>*" (ARLPA, Recitals).

16. From my experience in nonprofit entities, I understand that exempt entities under section 501(c)(3) of the Code, commonly referred to as charitable organizations, must be operated exclusively for charitable purposes and not for the benefit of private interests. 'Supporting organizations' under section 509(a)(3) of the Code must carry out such exempt purposes by supporting *other* charities. The relationship between a supporting organization and its supported charity is sometimes described as similar to that of a parent and subsidiary.

17. In this context:

(a) The LP holds or held all of the economic interest in the Fund. The GP held control shares, but had no economic interest.

(b) The LP issued 305 participation shares (the ***Participation Shares***), 300 of which are held by three Delaware corporate entities (together, the ***Supporting Organizations*** and/or ***Petitioners***). Each Supporting Organization provides funding to its respective U.S.-charitable foundation (together, the ***Charities***) which are the ultimate beneficial


Copy from re:SearchTX

owners of the Fund's entire economic interest. These Supporting Organizations are the Plaintiffs in the above-captioned litigation.

(c) The LP also issued 100 management shares (the ***Management Shares***) which attach the only voting rights for all shareholders of the LP. The terms of the ARLPA and the Articles together grant complete management control of the Fund to the holder of the Management Shares, and the entire issued share capital in the GP (the ***Membership Interest***).

18. The Management Shares and Membership Interest have at all material times been held by a single individual who as a result has substantial control of the Fund structure (the ***Control Position***). In this regard, the relevant terms of the ARLPA and Articles are as follows.

(a) **The ARLPA**

Clause 1.12

(a) The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

(b) The term "**Indirect Charitable Owner**" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

Clause 1.6

(a) Subject to the terms and conditions of this Agreement, the General Partner shall have


Copy from re:SearchTX

full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; *provided, however the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*

(b) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

(b) **The Articles**

Article 11

The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganization or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. <u>*Management Shares confer no other right to participate*</u>


Copy from re:SearchTX

*in the profits or assets of the Company*.

Article 19

Participating Shares … shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

**SUPPORTING ORGANIZATIONS**

19. The Supporting Organizations provide funding directly to the Charities as follows:

(a) Prior to the events at issue in this Action, The Highland Dallas Foundation, Inc. (***HDF***) held 32.87% of the Participating Shares. HDF provides funding to The Dallas Foundation, a charitable entity established in Texas in 1929, which has awarded over $1.2 billion in charitable grants that support a broad range of public needs and manages over $650 million in assets.

(b) Prior to the events at issue in this Action, The Highland Kansas City Foundation, Inc. (***HKCF***) held 32.87% of the Participating Shares. HKCF provides funding to the Greater Kansas City Community Foundation, a charitable entity established in Kansas in 1978 which has awarded over $7 billion in grants that support a broad range of public needs and currently manages over $5 billion in assets.

(c) Prior to the events at issue in this Action, The Highland Santa Barbara Foundation, Inc. (***HSBF***) held 32.787% of the Participating Shares. HSBF provides funding to the Santa Barbara Foundation, a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

(d) Prior to the events at issue in this Action, HCMLP Charitable Fund (***HCMLP***) held 1.639% of the Participating Shares. HCMLP provides funding to the North Texas Community Foundation, which manages assets totaling $513 million that support a broad


Copy from re:SearchTX

range of public needs and donated $38.9 million to local nonprofits in 2023.

20. Since the Fund's inception in 2011, the Supporting Organizations have granted over $42 million to charitable foundations and have funded $32 million in total commitments, including donations to 275 organisations, with average annual grant payments of $3.7 million.

## BACKGROUND

21. As stated in paragraph 6 above, I joined The Dallas Foundation in 2019 and do not therefore have direct personal knowledge of any factual matters, including regarding the formation of the Fund and/or the Fund's operations, prior to that time. I understand these matters are covered in the declaration of James Dondero.

22. A summary of those matters that I understand to be most relevant to this application are accurately summarized as follows:

(a) **Control Position**. From the Fund's formation until March 2021, the Control Position was held by Grant Scott. On 25 March 2021, Mr. Scott: (i) resigned as director of the Fund and LP (ii) appointed Mark Patrick as director of the Fund and LP; and (iii) transferred to Mr. Patrick the Management Shares in the LP and Management Interest in the GP for nominal consideration. Mr. Patrick therefore assumed the Control Position from that date.

(b) **Mark Patrick**. From 2008 to 2021, Mr. Patrick was employed as tax counsel by Highland Capital Management, LP (***Highland***), an investment advisor founded by Mr. Dondero. From March 2021 to October 2024, Mr. Patrick was employed as tax counsel at Skyview Group (***Skyview***). In both positions, Mr. Patrick acted as an advisor to Mr. Dondero. Mr. Patrick played a significant role in developing the overall Charitable DAF Fund structure.

## CONCERNS ABOUT MR. PATRICK'S CONDUCT

23. I became aware that in June 2023, Mr. Patrick made a grant request to the Highland Dallas Foundation in relation to 'Creative HEARTS TX', an entity of which Mr. Patrick and his family



Copy from re:SearchTX

were directors, without disclosing this information. I became aware of this situation contemporaneously with its occurrence and it caused me concern regarding Mr. Patrick.

24. I understand from the Dondero Declaration (not my personal knowledge) that in September 2023, Mr. Patrick approached Kevin Cronin of Fortaris with a proposition whereby Mr. Patrick (on behalf of the Fund) would engage an entity controlled by Mr. Cronin at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr. Patrick. I became aware of this situation shortly after its occurrence and it caused me concern regarding Mr. Patrick.

25. In August 2024, I personally became aware of the potential disclosure of material non-public information (***MNPI***) to the Highland Dallas Foundation (***HDF***). On 28 August 2024, I was informed by David Rosenberg of Holland & Knight (***H&K***), the Charities' US-attorneys, that Mr. Douglas Mancino, an attorney with Seyfarth Shaw LLP (***Seyfarth***) in Los Angeles, California, had called Mr. Rosenberg, identified himself as Mr. Patrick's "*outside compliance counsel*" and recommended that Mr. Rosenberg advise HDF to exercise put-options over units it holds in the NexPoint Hospitality Trust (***NHT***). Mr. Rosenberg reported this to me. I was very concerned by this information and therefore immediately contacted Lucy Bannon, an employee of NexPoint and someone I have known in a professional capacity for many years, to inform her of the situation.

26. I have since become aware through my position at The Dallas Foundation and role as a board member of HDF, that the information Mr. Mancino provided to H&K could have constituted MNPI. This matter is discussed in more detail in paragraphs 33-35 of Dondero 1.

**<u>FINANCIAL IRREGULARITIES</u>**

27. In or around August 2024, NexPoint provided the Charities with a financial analysis of the Fund's annual expenses (the ***Expense Summary***) which appeared to indicate substantial


Copy from re:SearchTX

increases in expenditures in recent years.

28. As stated in paragraph 31 of Dondero 1, the Expense Summary indicated as follows:

(a) Directors' fees increased from US$40,000 in 2022 to almost US$600,000 in 2023, and in the first half of 2024 alone, directors' fees increased further to around US$2.25 million.

(b) Expenses overall for the first half of 2024 were around US$18.3 million – roughly the same amount had been spent in2023 (i.e. US$18.6 million). I was not aware of any basis for this extraordinary legal expenditure in a period of just 18 months.

29. The Charities were concerned by the Expense Summary and considered it was necessary to seek to verify and/or understand the apparent increases in expenditure. Accordingly, in October 2024, the Charities made a reasonable request to Mr. Patrick for financial information about the Fund, which Mr. Patrick failed to provide at that time, or any time thereafter.

30. On 11 November 2024, the Charities' US-attorneys, Holland & Knight (***H&K***), conveyed a letter to Mr. Murphy from the Charities (the ***No Confidence Letter***) advising that the Charities no longer have confidence in the governance of the Fund and consider a reorganization is required:

> "Recently, various competing constituencies provided the Foundations with conflicting information related to the operations and financial inner workings of the DAF-related entities. This conflicting information raises significant concerns about how the corpus of these funds is administered and spent. **The Foundations have no real pathway to verify the information as the current governance structures prevent them from receiving such information, and indeed, efforts to secure additional information have been rebuffed**. **As a result, these recent submissions demonstrate that the current governance structure is ill-equipped to address such allegations and provide sufficient protection to the economic funds that support so many charitable efforts**.


Copy from re:SearchTX

Further, because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."

31. The Charities did not receive a response to the No Confidence Letter. Accordingly, on 23 January 2025, I sent an email to Mr. Murphy (a director that Mr. Patrick appointed in the Cayman Islands) stating that the Charities wished to better understand the Fund's asset position and requesting that the Fund provide certain information by 10 February 2025, including: (i) income statements for the past four years, (ii) listing of underlying assets, (iii) audited financial statements, and (iv) the current structure of the LP's operations.

32. On 28 January 2025, I sent a further email to Mr. Patrick and Mr. Murphy expressing serious concern that the Charities' requests continued to be disregarded, reflecting an ongoing lack of transparency about the Fund:

"...These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Supporting Organizations so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the


Copy from re:SearchTX

assets further".

33. On 30 January 2025, I received a response from Mr. Murphy stating that neither he nor Mr. Patrick received my 23 January 2025 email, and that he understood the next step was that he and Mr. Patrick would "present directly to the foundations/supporting organizations" to address some of the concerns in the No Confidence Letter:

> "…**we have some growing concern around the content and circumstances your email of 23 January 2025, specifically that it might be interpreted as a premise to attempt to inappropriately exercise control over DAF HoldCo and/or its assets.** As a reminder, when the participating shares in DAF HoldCo were issued to the supporting organizations, there was no conveyance of voting rights or control, and it has always been well understood that such shares did not convey voting rights or control … any attempt to exert control of DAF HoldCo or its assets by James Dondero would be both inappropriate, unlawful and inconsistent with DAF HoldCo's charitable mission. We are deeply concerned that this outreach, which began following Mark's resignation from Skyview in October 2024, may be the supporting organizations acting as proxy for Mr. Dondero …
>
> …**We note that your communications to date contain several misstatements of fact and we reject all of your allegations**. DAF HoldCo holds itself to the highest standards in achieving its goal of maximizing returns in risk-adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF HoldCo's independence and are advised by best-in-class, independent experts.
>
> **Whilst we are cooperating with the foundations/supporting organizations to provide additional information we have no legal obligation to do so** (which is not disputed).



Copy from re:SearchTX

In no way should our cooperation be construed as an implicit acknowledgment of any duty to continue providing information to you or as a waiver of any DAF HoldCo's rights and remedies."

34. I understand (and as stated in paragraph 12 of Dondero 1) the Control Position to be responsible for governance and management functions to enable the Fund to carry out its sole purpose of benefiting its ultimate beneficial owners (i.e. the Charities). In this context, the Charities were very surprised and concerned by Mr. Patrick and Mr. Murphy's responses to requests for information and the lack of transparency regarding the Fund's financial position. It remains unclear to the Charities the basis upon which access to such information was (and continues to be) restricted.

35. On 31 January 2025, H&K responded to Mr. Murphy's email as follows:

"As fiduciaries, you and Mr. Patrick manage $270 million in assets for the benefit of charities that support the most vulnerable in their communities. Whatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions

...

The Supporting Organizations have legitimate concerns. The last information they received from SEI in July of 2024, before Mr. Patrick shut down [communication] **showed legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022.** If annualized, and at that pace, legal expenses appeared to be on path to exceed $12 million for 2024. That's a 300% increase. **Director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024.** Again, annualized, these fees are on a path to exceed $5 million in 2024. That is a 12,400% increase. **Yet, no information has been provided by you and Mr. Patrick,**



Copy from re:SearchTX

**no clarity given.** It appears that total expenses for 2024, if annualized, were on pace to exceed $36 million. Even if you earned a return of 10% on the $270 million invested, the fund would be at $11 million of negative revenue for 2024. **If the information we received is wrong, then please explain why, and provide the detailed information to disabuse us of these concerns**…

36. On 4 February 2025, Mr. Murphy responded that while open to resolving the concerns, they were struggling to understand the Charities' change in position.

37. On 7 February 2025, H&K responded as follows:

"I do not believe it should be difficult to comprehend the request for transparency around $270 million dollars you control as a fiduciary for the benefit of charities in Dallas, Kansas City, and Santa Barbara. Indeed, these odd legal and rhetorical machinations of yours and Mr. Patrick miss the point. These monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed, and—among other things—creating a lasting impact on young minds by fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees.

…

Over the last three months, you have not provided any information about the assets and financial health of the fund. You have demanded that information only flows under an NDA with liquidated damages. You continually issue a veiled threat that information is a privilege not a right under the agreements. Expenses have gone through the roof, and the governance has been changed to further insulate it in a foreign jurisdiction. To say the least, I see red flags all over this situation, but have not received any facts, yet, that tell me they are unwarranted."

38. On 14 February 2025, H&K received a fax from Seyfarth which rejected the reported increases



Copy from re:SearchTX

in legal and directors' fees and sent a further email on 18 February 2025 which attached a valuation of the Fund from 2020 in support of his suggestion that similar information was provided to the Charities when Mr. Scott was in the Control Position. Copies are at **Tabs 15** and **16**, respectively.

39. On 27 February 2025, H&K responded to Seyfarth that the Charities were becoming frustrated by the ongoing lack of transparency and refusal to respond to simple inquiries about the financial position and governance of the Fund.

40. On 17 March 2025, Seyfarth sent an email to H&K requesting available dates for Mr. Murphy to make a presentation to the Charities. The next day, H&K suggested three potential dates/times for such a call between 26 March and 3 April 2025, but did not receive any response. On 3 April 2025, Seyfarth replied, stating they had just learned of a call arranged for the following day, and seeking to reschedule. H&K responded that they had no knowledge of the purported call and would revert with available dates from 16 April 2025. On 9 April 2025, HK responded with its availability.

41. At the date of this declaration, none of the financial information requested by the Charities has been provided by Mr. Patrick or Mr. Murphy.

**MR. PATRICK DILUTES THE SUPPORTING ORGANIZATION'S INTERESTS IN THE CHARITABLE DAF FUND.**

42. I am aware that between December 2024 and the present, Mr. Patrick executed a series of moves to dilute the Supporting Organization's interests in the Charitable DAF Fund and then to entirely alienate those assets. Mr. Patrick's acted to eliminate the Supporting Organization's ownership of the Charitable DAF Fund assets, while awarding ownership to at least one purported charitable entity that he personally controls.

43. I have come to know now that Mr. Patrick held the controlling general partner shares in the



Copy from re:SearchTX

Charitable DAF Fund via the Delaware GP. Without any prior notice or even disclosure to the Supporting Organizations, in February 2024, Mr. Patrick incorporated CDH GP, Ltd in the Cayman Islands, with Mr. Patrick as the sole director. He used this newly created Cayman Islands entity to replace and redomicile Delaware GP. CDH GP became the general partner holding all the controlling shares in the DAF Fund. The Supporting Organizations only found out about the replacement and redomicile of the Delaware GP in February 2025, through independent investigation.

44. On December 9, 2024, Mr. Patrick created Defendant DFWCF (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation. Mr. Patrick was named the Sham Charity's sole member and sole director; its registered address is Mr. Patrick's home address. The apparent purpose and the clear effect of forming DFWCF was to create a facsimile of the Charitable DAF Fund beneficiaries—the nonprofit charities and their Supporting Organizations—but in the form of a "charitable" entity controlled by Mr. Patrick.

45. I learned that Mr. Patrick later incorporated CDMCFAD, LLC, a Delaware limited liability company.

46. Without notice to the Supporting Organizations or to me, on December 18, 2024, Charitable DAF HoldCo transferred to CDMCFAD, LLC 100% of its interest in Charitable DAF Fund, and Charitable DAF HoldCo acquired 100% of the interest in CDMCFAD, LLC. The Supporting Organizations' technical interest was in Charitable DAF Holdco. As a result, CDMCFAD effectively was inserted as a company in between Charitable DAF HoldCo, owned by the Supporting Organizations, and the Charitable DAF Fund itself (where the assets resided). Suddenly, the Supporting Organizations no longer held a 100 beneficial interest in the entity that held the assets in Charitable DAF Fund. Instead, a different and new entity (CDMCFAD) held the assets in Charitable DAF Fund; the Supporting Organizations only held shares in an


Copy from re:SearchTX

entity (Charitable DAF Holdco) that notionally held that new entity.

47. On February 7, 2025, again without notice to the Supporting Organizations or to me, DAF HoldCo allotted 318 participating shares to DFWCF, the Sham Charity controlled by Mr. Patrick himself. This dilution reduced the Supporting Organizations' cumulative holding in Charitable DAF Holdco from 100% of the participation shares to 48.9%. Following the new issuance: (i) HDFI's interest was diluted from 32.787% to 16.05%; (ii) HKCF's interest was diluted from 32.787% to 16.05%; and (iii) HSBFI's interest was diluted from 32.787% to 16.05%.

48. I now know that in February 2025, the Sham Charity acquired IRS 501(c)(3) tax exempt status. The By-Laws of the Charitable DAF Fund required that its limited partnership interests be owned by an entity with such tax-exempt status. Therefore, obtaining 501(c)(3) status for the Sham Charity was a necessary step to effectuate Mr. Patrick's complete control of the assets of DAF Fund.

49. And I now know that on March 27, 2025, Mr. Patrick caused CDMCFAD to issue shares to the Sham Charity, and only to the Sham Charity. None of the Supporting Organizations were issued shares in CDMDFAD. Now, the sham charity controlled by Mr. Patrick held a direct economic interest in the entity that Mr. Patrick had newly inserted between Charitable DAF Holdco and the assets in Charitable DAF Fund. Meanwhile, the two direct beneficial owners of CDMCFAD were (1) Charitable DAF Holdco—in which the Supporting Organizations still held a minority beneficial interest; and (2) Mr. Patrick's new sham charity, which he controlled.

50. On April 2, 2025, Mr. Patrick caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million, after which Charitable DAF Holdco purportedly had no assets and no remaining interest in Charitable DAF Fund at all. Needless to say, a one-time $1.6 Million payment for the release of the beneficial ownership of more than


Copy from re:SearchTX

$270 Million in the Fund—held entirely for the benefit of the Supporting Organizations as late as December 2024—is not an exchange that I or any other person with fiduciary loyalty to the Supporting Organizations would ever have approved, had we known it was happening at the time. As a result, Mr. Patrick's Sham Charity, Defendant DFWCF, was the sole remaining limited partner and beneficial owner of Charitable DAF Fund, through its 100% ownership of the fund by CDMCFAD. The effect of this final step was to consummate the complete severance of the Supporting Organizations and their nonprofit charities from the assets of the Charitable DAF Fund.

51. Before the start of these self-dealing transactions, in October 2024, the Supporting Organizations owned more than 98% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Supporting Organizations owned Participation Shares worth zero. While Mr. Patrick purportedly caused $1.6 million to be distributed to the Supporting Organizations receipt of those funds have yet to be verified.

**REPLACEMENT OF GP**

52. For the first time, in February 2025, I learned that Mr. Patrick had redomiciled and replaced the general partner of the Fund, without notice to the Charities, almost one year prior. This information was, I understand, obtained via background checks into the various parties.

53. I understand that on 27 February 2024, CDH GP, Ltd (the ***New GP***) was incorporated in the Cayman Islands (registration number 407515) with its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

54. I also understand that Mr. Patrick is the sole director of the New GP.

55. It is unclear to the Charities on what basis Mr. Patrick and/or Mr. Murphy removed and redomiciled the general partner of the Fund, nor the reason the Charities were not notified of


Copy from re:SearchTX

this change.

## PURPOSE OF APPLICATION

56. It is clear the Fund's assets are being diminished for the benefit of Mr. Patrick and Mr. Murphy; and in any case, the Defendants in this Action are engaged in a series of secretive transactions intended to completely alienate from the Supporting Organizations more than $270 Million that was held for their benefit, and upon which their charitable activities depend. These are the sole motivations of the Charities in bringing this application.

57. Unless enjoined, Mr. Patrick and the other Defendants will cause and continue to cause irreparable harm to the Charities including, without limitation, the dispersal, expenditure, transfer, and further alienation of more than $250 Million that can never be replaced because the Defendants lack the means. In addition to the permanent loss of funds in the future, the immediate continuation of key programs at the Charities is imperiled by the conduct at issue here and the reality that the Charities, as of this moment, are cut off from the funds intended for their support. Moreover, the conduct of the Defendants to date creates a pattern suggesting that further creative transfers, alienation, spending, and dissipation of the monies in the fund are likely to be imminent. If this happens, it is likely they will never be recovered.

58. The harm to the Charities is imminent if the Defendants are not enjoined. Enjoining the Defendants will merely require them to refrain from doing anything with the Funds for two weeks. If the Defendants are not acting adversely to the Charities, the Funds will still be available to them for their use in future. The Charities suffer a greater burden as they stand to lose everything.

59. Enjoining the Defendants will not disserve the public interest as without the injunction, there is significant potential for irreparable harm to the Charities and the Defendants will not be harmed


Copy from re:SearchTX

if enjoined. Freezing the funds to ensure that Mr. Patrick's scheme is not hurting charitable interests vital to key communities serves the public interest.

**ARGUMENTS THAT MAY BE MADE BY THE RESPONDENT**

60. I draw attention to the following matters which the Defendants may raise by way of attempted defense against the application.

61. The Defendants may assert (as they have repeatedly suggested in correspondence) that the Charities are acting on the instructions of Mr. Dondero and that we are being used as a proxy for his own disputes with Mr. Patrick. Any suggestion of that nature is entirely rejected. On the contrary, the Charities have at all times taken steps to independently verify information provided to them by Mr. Dondero and entities associated with him, have taken advice solely from their own attorneys in the US and Cayman, and have required Mr. Dondero to recuse himself from board meetings of the Supporting Organisations at which decisions as to whether to bring these proceedings were discussed. The Charities have no interest in any dispute there may be between Mr. Patrick and Mr. Dondero.

62. The Defendants also may assert that the Charities are not entitled to any information regarding the Fund, and that the structure was designed specifically to exclude the Charities from information or control rights. Whether that is true or not, the Charities are the sole economic beneficiaries of the Fund's activities, and Defendants owed and owe them fiduciary duties of care, loyalty, and candor. If the Fund is being used for a purpose other than that for which it was established, that cannot be allowed to continue to the detriment of the charitable causes and in violation of those duties. The Fund would otherwise be an unsupervised vehicle susceptible to being used for the wishes and benefit of the individual holding the Control Position, to the detriment of the Charities and the express purposes of the governing documents.


Copy from re:SearchTX

63. The Defendants may deny that the expenditures are as significant as that appearing from the documents. If that is the case, the Defendants have had ample opportunity to correct this, but have chosen not to do so.

64. I am not aware of any other points that the Defendants have made or alluded to in correspondence which could materially affect this application.

## THE CAYMAN ISLANDS PROCEEDINGS

65. Given Patrick's pattern of malfeasance the Supporting Organizations filed an involuntary Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.*

66. Cayman Islands counsel for the Supporting Organizations alleged essentially the same facts as recounted in this Petition before the Grand Court. However, DFWCF as a Delaware entity was not expressly named in the Grand Court proceedings.

67. The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.
>
> 6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:


Copy from re:SearchTX

a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

68. While the Cayman Islands appointed official liquidators now conduct their investigation of the assets and other matters pertaining to the Cayman Islands' proceedings, Defendants Patrick and DFWCF (all sited in the United States, and more specifically Dallas County) remain in actual control and beneficial ownership of all assets that were held by the DAF Fund and DAF HoldCo. In the meantime, the Supporting Organizations, are without the benefit of the considerable assets formerly held by the DAF Fund and without any insight into the current status and security of the assets. This not only damages the Supporting Organizations, but the charitable causes in their communities that relief on funding from the DAF Fund.

69. Further, while Defendants Patrick and DFWCF wrongfully remain in control of the participation shares that rightfully belong to the Supporting Organizations, the Defendants wrongfully hold a seat on the liquidators' committee.

**ORDERS SOUGHT**

70. Given the refusal of the Defendants to answer legitimate questions raised by the Charities and the weight of evidence that suggests that the Defendants are dealing with or spending the assets of the Fund in a manner that is not in the best interest of the Charities, the Charities respectfully seek orders placing the Fund, its Limited Partner, and its General Partner under the control of an independent Receiver who can investigate the affairs of the Fund and the decisions taken by management, and manage those affairs for the benefit of the intended beneficiaries, under the supervision of the Court. The Charities have no confidence in the current management to provide this information themselves without independent oversight.

71. Until such time as a Receiver may be appointed, the Charities further seek a temporary


Copy from re:SearchTX

restraining order and temporary injunction to prevent the Defendants from the use, transfer, dispersal, and/or alienation of any interests or assets, regardless of where they are presently held. If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment.

My name is Julie Diaz, my date of birth is 3/23/64, and my address is 5711 Prestwick Lane Dallas, TX 75252. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Barnstable County, State of MA,

on the 1 day of July, 2025.

/s/ Julie Diaz
**JULIE DIAZ**





Copy from re:SearchTX

EXHIBIT
8

GRAND COURT
FINANCIAL SERVICES DIVISION
CAYMAN ISLANDS

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**
**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD**

**BEFORE THE HONOURABLE JUSTICE JALIL ASIF KC**
**IN CHAMBERS**

**6 MAY 2025**

## SUPERVISION ORDER

**UPON** the petition filed on 2 May 2025 by (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund for an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd continue under the supervision of the Court pursuant to s.131 Companies Act (2025 Revision)

**AND UPON** hearing counsel for the Petitioners and counsel for DFW Charitable Foundation

**AND UPON** reading the petition herein, the affidavit of Julie Diaz and exhibit JD-2 sworn on 29 April 2025 and the affirmation of Rhiannon Zanetic and exhibit RMZ-1 signed (but not affirmed) on 29 April 2025

**AND UPON** reading the following documents filed in Cause FSD 2025-0099 (JAJ): the winding up petition filed on 10 April 2025, the first affidavit of Julie Diaz and exhibit JD-1 sworn on 10 April 2025, the affidavit of James Dondero and exhibit JDD-1 sworn on 9 April 2025 and the affidavit of Geoffrey Sykes and exhibit GS-1 sworn on 27 April 2025

**AND UPON** reading the affidavit of Margot Macinnis and exhibit MM-1 sworn on 28 April 2025 and the affidavit of Sandipan Bhowmik and exhibit SB-1 sworn on 28 April 2025 providing their consents to act as official liquidators of Charitable DAF HoldCo, Ltd

**IT IS HEREBY ORDERED that:**

1. The voluntary liquidation of Charitable DAF HoldCo, Ltd ("the Company") be continued under the supervision of the Court pursuant to s.131 of the Act and O.15, r.8 of the Companies Winding Up Rules (2023 Consolidation).


Copy from re:SearchTX

2. The following persons are appointed as joint official liquidators of the Company:

| Name | Address | Contact Details |
|---|---|---|
| Margot MacInnis | Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands | +1 345 949 8588<br>margot.macinnis@uk.gt.com |
| Sandipan Bhowmik | | +1 345 949 8588<br>sandipan.bhowmik@uk.gt.com |

3. The joint official liquidators may act jointly and severally.

4. The joint official liquidators are not required to give security for their appointment.

5. The joint official liquidators are authorised to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:

   a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and

   b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

6. The joint official liquidators are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:

   a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

   b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

   c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

7. The Court dispenses with the requirement for the summons herein and the hearing of the summons to be advertised pursuant to CWR O.15.

8. The joint official liquidators' reasonable remuneration and expenses be paid out of the assets of the Company in accordance with s.109 of the Act, Part III of the Insolvency Practitioners Regulations and CWR O.20.

9. The joint voluntary liquidators shall prepare a final report and accounts for the period from the commencement of the voluntary liquidation until the date of this Order and shall deliver such report to the joint official liquidators within 28 days of this Order.


Copy from re:SearchTX

10. The costs of this summons shall be paid out of the assets of the Company as an expense in the liquidation, such costs to be taxed on the indemnity basis if not agreed with the joint official liquidators.

**Dated 6 May 2025**
Filed 6 May 2025

______________________________________
**THE HONOURABLE JUSTICE JALIL ASIF KC**
**JUDGE OF THE GRAND COURT**


Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 102670163
Filing Code Description: Petition
Filing Description: PLAINTIFFS ORIGINAL PETITION, APPLICATION FOR TRO AND TEMPORARY INJUNCTION, AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER
Status as of 7/2/2025 8:08 AM CST

Associated Case Party: The Highland Dallas Foundation, Inc.

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Dylan JAnderson | | DJAnderson@duanemorris.com | 7/1/2025 9:35:25 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 7/1/2025 9:35:25 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 7/1/2025 9:35:25 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 7/1/2025 9:35:25 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 7/1/2025 9:35:25 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 7/1/2025 9:35:25 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 7/1/2025 9:35:25 PM | SENT |
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 7/1/2025 9:35:25 PM | SENT |



Copy from re:SearchTX

**EXHIBIT 16**

FILED IN
BUSINESS COURT OF TEXAS
BEVERLY CRUMLEY, CLERK
ENTERED
9/18/2025

The Business Court of Texas,
1st Division

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC.; THE HIGHLAND KANSAS CITY FOUNDATION, INC.; and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., *Plaintiffs* | §<br>§<br>§<br>§<br>§<br>§<br>§ | |
| v. | § | Cause No. 25-BC01B-0027 |
| MARK PATRICK and DFW CHARITABLE FOUNDATION; CDMCFAD, LLC; CHARITABLE DAF GP, LLC; and CDH GP, LTD., *Defendants* | §<br>§<br>§<br>§<br>§ | |

**ORDER**

Before the court are

1. Defendants' July 14, 2025, Motion to Dismiss and Plea to the Jurisdiction;

2. Plaintiffs' July 21, 2025, Response to Defendants' Motion to Dismiss and Plea to the Jurisdiction;



Copy from re:SearchTX

3. Defendants' July 25, 2025, Reply in Support of their Motion to Dismiss and Plea to the Jurisdiction;

4. Plaintiffs' July 30, 2025, Surreply to Defendants' Motion to Dismiss and Plea to the Jurisdiction;

5. Defendants' August 11, 2025, Supplemental Brief and Alternative Motion to Abate;

6. Plaintiffs' August 18, 2025, Response to Defendants' Supplemental Brief and Alternative Motion to Abate;

7. Defendants' August 21, 2025, Reply in Support of their Supplemental Brief and Alternative Motion to Abate; and

8. Plaintiffs' August 25, 2025, Sur-reply to Defendants' Supplemental Brief and Alternative Motion to Abate.

Having considered the pleadings, motions, party submissions, and oral arguments, the court makes the following findings and conclusions:

1. Plaintiffs have constitutional standing to assert their claims because they allege an injury to themselves. Additionally, the court has statutory jurisdiction under Texas Government Code § 25A.004(b). Therefore, Defendants' Motion to Dismiss and Plea to the Jurisdiction based on those premises is denied. These are not rulings on (i) the validity of plaintiffs'



Copy from re:SearchTX

causes of action; (ii) whether plaintiffs are proper parties to assert those causes of action; or (iii) whether all necessary parties are before the court.

2. The court does not at this time decide whether plaintiffs have the legal capacity to assert their causes of action because defendants have not filed a verified denial raising a lack of capacity defense. *See* TEX. R. CIV. P. 93(1).

3. Charitable DAF HoldCo, Ltd.'s joint official liquidators (JOLs) are necessary parties under Texas Rule of Civil Procedure 39(a), they are not parties to this case, and the court cannot provide complete relief in their absence. Accordingly, this case should be abated until when the JOLs become parties, voluntarily or involuntarily.

4. Any further filings must be made by leave of court.

So ORDERED.

BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED: September 18, 2025



Copy from re:SearchTX

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 105799881
Filing Code Description: No Fee Documents
Filing Description: Order
Status as of 9/18/2025 4:53 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 9/18/2025 4:45:45 PM | SENT |
| Brent M.Rubin | | brubin@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Joshua D.Kipp | | jkipp@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 9/18/2025 4:45:45 PM | SENT |
| Elizabeth Perez | | EPerez@duanemorris.com | 9/18/2025 4:45:45 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 9/18/2025 4:45:45 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 9/18/2025 4:45:45 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 9/18/2025 4:45:45 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 9/18/2025 4:45:45 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 9/18/2025 4:45:45 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 9/18/2025 4:45:45 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 9/18/2025 4:45:45 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 9/18/2025 4:45:45 PM | SENT |



Copy from re:SearchTX

**EXHIBIT 17**

Digitally signed by Advance Performance Exponents Inc.
Date: 2025.07.21 17:28:26 -05:00
Reason: Apex Certified
Location: Apex



**CWR Form No 15**

**Liquidator's Certificate (Composition of Liquidation Committee) (O. 9, r. 1)**

THE COMPANIES LAW

OFFICIAL LIQUIDATOR'S CERTIFICATE

COMPOSITION OF LIQUIDATION COMMITTEE

Charitable DAF HoldCo, Ltd. (In Official liquidation)

Grand Court FSD Cause No. 116 of 2025

The Official Liquidator hereby certifies that a liquidation committee has been constituted on the basis that he has determined the Company to be solvent for the purposes of section 110(4) of the Companies Law and CWR Order 9 and that the following contributories have been appointed:

1. Julie Diaz, representing Highland Dallas Foundation, Inc., 3000 Pegasus Park Drive #930, Dallas, TX 75247 (jdiaz@dallasfoundation.org)

2. Deborah Wilkerson, representing Highland Kansas City Foundation, Inc.,1055 Broadway Blvd. #130, Kansas City, MO 64105 (wilkerson@growyourgiving.org)

3. Jacqueline M. Carrera, representing Highland Santa Barbara Foundation, Inc., 1111 Chapala Street, Santa Barbara, CA 93101 (jcarrera@sbfoundation.org)

4. Rose Bradshaw, representing North Texas Community Foundation, 7777 Main Street, Suite 2850, Fort Worth, TX 76102 (rbradshaw@northtexascf.org)

5. Jennier Colegate, representing DFW Charitable Foundation c/o Baker & Partners (Cayman) Limited, P.O. Box, 636, Buckingham Square, 720 West Bay Road, Cayman Islands, KY1-1107 (jennifercolegate@bakerandpartners.com)

Dated this 21st day of July 2025.

Margot MacInnis – Joint Official Liquidator of Charitable DAF HoldCo, Ltd. (In Official Liquidation)
Grant Thornton Specialist Services (Cayman) Ltd
2nd floor, Century Yard, Cricket Square
PO Box 1044, Grand Cayman, Cayman Islands KY1-1102
Contact: +1 345 949 7100

**EXHIBIT 18**

Matthew S. Okin
Texas Bar No. 00784695
David L. Curry, Jr.
Texas Bar No. 24065107
Okin Adams Bartlett Curry LLP
1113 Vine Street, Suite 240
Houston, Texas 77002
Tel: (713) 228-4100
Fax: (346) 247-7158
mokin@okinadams.com
dcurry@okinadams.com

ATTORNEYS FOR THE DALLAS FOUNDATION AND
CROWN GLOBAL LIFE INSURANCE, LTD.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.,** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**OBJECTION OF THE DALLAS FOUNDATION AND CROWN GLOBAL LIFE INSURANCE, LTD TO MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**
[Related Docket No. 4216]

The Dallas Foundation (the "Foundation"), on behalf of Empower Dallas Foundation ("EDF") and The Okada Family Foundation (the "Okada Foundation"), and Crown Global Life Insurance, Ltd. ("Crown,"), not individually, but solely in respect of Segregated Accounts 30218 & 30219 (the "Segregated Accounts") hereby file this objection (the "Objection") to the Motion (the "9019 Motion") for entry of an order pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") filed on behalf of Highland Capital Management, L.P., the

reorganized debtor (the "Debtor" or "Highland," as applicable) in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust" and together with Highland and the Claimant Trust, the "Movants"), and respectfully states as follows:

## I. PRELIMINARY STATEMENT

1. Through the Motion, the Movants seek approval of a settlement agreement (the "Settlement") purportedly entered into by Movants with Hunter Mountain Investment Trust ("HMIT"), Beacon Mountain LLC ("Beacon Mountain"), Rand Advisors, LLC ("Rand Advisors"), Rand PE Fund I, LP ("Rand PE Fund"), Rand PE Fund Management, LLC ("Rand GP"), Atlas IDF, LP ("Atlas IDF"), and Atlas IDF GP, LLC ("Atlas GP" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP, and Atlas IDF, the "HMIT Entities"), which Movants describe as "one of the most significant developments in the long-running Highland Bankruptcy Case." *Motion*, p. 3. As described by Movants, the significance of the settlement rests in the belief that it will bring to an end "protracted and value-destructive litigation that has impeded the Highland Entities' ability to distribute their assets to their constituents and fully implement the Plan." *Id.*

2. Unfortunately, unbeknownst to the Movants, the Settlement is potentially tainted by the actions of Mark Patrick, the apparent sole manager and director of the HMIT Entities. Specifically, upon information and belief, Mr. Patrick illicitly restructured the ownership of the HMIT Entities in a manner that seems to facilitate the diversion of millions of dollars in assets from the charitable entities that are the beneficial owners of the HMIT Entities. As set forth herein, given the actions of Mr. Patrick and the pending proceedings related thereto, rather than

provide the peace sought by Movants, approval of and consummation of the Settlement will most likely result in further litigation both before this Court and in jurisdictions outside of the United States.

3. Further, as set forth in more detail herein, the alleged actions of Mr. Patrick, taken in his capacity as the sole manager or officer of various entities within the charitable organization structure supported by the HMIT Entities and their assets, along with the timing of the Settlement, all establish a cloud of suspicion over the HMIT Entities' entry into the Settlement. Upon information and belief, under the structure illicitly put in place by Mr. Patrick, more than half of the proceeds of the Settlement will flow to an entity formed very recently by Mr. Patrick and based out his personal home, rather than to the Charitable Entities (defined below) who should be receiving such proceeds. Approval of the Settlement would, therefore, also be inequitable at this time.

4. For these reasons, as more fully set forth herein, the 9019 Motion should be denied.

## II.
## FACTUAL BACKGROUND

5. The lengthy procedural history of this Bankruptcy Case has been well documented in numerous prior pleadings and orders from this Court and is, therefore, not repeated herein. Moreover, the Beneficial Owners do not at this time have sufficient information to either admit or deny the procedural or background allegations set forth in the Motion but admit that those certain publicly available pleadings and orders referenced were filed or entered, as the case may be, on the dates and in the proceedings set forth in the Motion.

## A. The Foundation is a Beneficial Owner of the HMIT Entities

6. The HMIT Entities, and their assets, are held and managed for distribution to certain charitable organizations through a Donor Advised Fund (a "DAF") established at the direction of James Dondero in 2011.[1] The DAF was structured as a limited partnership and registered under the name The Charitable DAF Fund, L.P. (the "Fund"). The formation documents for the Fund make clear its charitable purposes and further establish that, while certain non-voting limited partnership interests were nominally held by the Supporting Organizations (defined below), the Charitable Entities (defined below) that they supported were the actual indirect, beneficial owners of the Fund.

7. Specifically, the recitals set forth in its partnership agreement provide that:

> the [Fund] was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "Code") and the parties hereto desire for the [Fund] to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein.

*Amended and Restated Exempted Limited Partnership Agreement of The Charitable DAF Fund, LP*, p. 1. Further, the "Purpose and Powers" of the Fund include investment: "in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners." *Id.*, at p. 2, Art. 1.3.

8. Lastly, the partnership agreement specifically provides that the Charitable Entities are: "the indirect equity owners of the Limited Partners, which shall at all times be entities or Organisations exempt from taxation under Section 501(c)(3) of the Code or entities or

[1] As originally structured, the HMIT Entities were wholly owned by their sole member, Charitable DAF Holdings Corp., which is, in turn, indirectly owned by the Fund.

Organisations whose sole beneficiaries are entities or Organisations exempt from taxation under Section 501(c)(3) of the Code." *Id*. at p. 4, Art. 1.12(b).

9. As a beneficial owner of the HMIT Entities, approval of the Settlement will have a direct, pecuniary impact upon the Charitable Entities, including the Foundation. This is because, as a result of actions believed to have illicitly taken by Mr. Patrick, a significant portion of the economic interests derived by the HMIT Entities from the Settlement will flow to Mr. Patrick rather than the Charitable Entities for whose benefit the Fund was established.

**B. The Original Structure and Management of the Fund**

10. To achieve certain desired tax treatments, the Fund, a Cayman Islands exempted limited partnership, was structured with a single limited partner, Charitable DAF Holdco, Ltd ("Holdco"), holding 99% of the economic interests in the Fund. Holdco, in turn, was owned through the issuance of participation shares (the "Participation Shares") to: (i) Highland Dallas Foundation, Inc. ("HDFI") (32.787%) for the benefit of the Foundation; (ii) Highland Kansas City Foundation, Inc. ("HKCF") (32.787%) for the benefit of Greater Kansas City Community Foundation ("GKCC Foundation"); (iii) Highland Santa Barbara Foundation, Inc. ("HSBFI") (32.787%) for the benefit of Santa Barbara Foundation ("SB Foundation"); and (iv) HCMLP Charitable Fund ("HCMLP," and, with HDFI, HKCF, and HSBFI, the "Supporting Organizations") (1.639%) for the benefit of The Community Foundation of North Texas ("CFNT," and, with the Foundation, the GKCC Foundation, and the SB Foundation, the "Charitable Entities").

11. The general partner of the Fund, as originally established, Charitable DAF GP, LLC (the "Original GP"), a Delaware limited liability company, held the remaining de minimis economic interest in the Fund. Additionally, to achieve the desired tax treatment as referenced

above, the Fund issued to the Orignial GP 100 management shares (the "Management Shares") representing the only voting rights for any and all shareholders. In essence, this structure granted complete control of the Fund to the holder of the Management Shares, which shares have at all material times been held by a single individual as the manager of the Original GP. As a result, the manager of the general partner has substantial control over the entire Fund structure (the "Control Position"). From the inception of the Fund until March 25, 2021, the Control Position was held by Grant Scott.

**C. Change of Control in 2021 and Resulting Concerns Regarding Mr. Patrick**

12. In March 2021, Mr. Scott indicated his desire to retire from the Control Position. Mr. Patrick offered himself as a replacement to both Mr. Dondero and Mr. Scott. Mr. Patrick had been employed by the Debtor as tax counsel since 2008.[2] He had also provided personal tax advice to Mr. Dondero. Significantly, Mr. Patrick was intimately involved in the creation of the Fund in 2011, including providing advice as to the Fund's structure and in drafting the Fund's governing documents. He was at the time clearly an individual trusted by both Mr. Dondero and Mr. Scott to oversee the DAF and its charitable purposes. Thus, on March 25, 2021, Mr. Scott transferred the Management Shares, and the shares held in Holdco, to Mr. Patrick.

13. There was, initially, no noticeable change in the Fund's management following the transfer to Mr. Patrick. Over time, however, communications from Mr. Patrick and the Fund became less frequent and less substantive when provided. Further, through the Supporting Organizations, the Foundation and Crown became aware that Mr. Patrick had taken or had attempted to take various actions that appeared to be in conflict with the duties owed to the

[2] In February 2021, as part of this Bankruptcy Case, the employment contracts of many of Highland's employees, including Mr. Patrick, were terminated. Mr. Patrick, along with many other of the former back-office employees of the Debtor thereafter became employees of a newly formed company, Skyview Group ("Skyview"), that provides middle and back-office services to various clients.

Charitable Entities as beneficial owners of the Fund. Finally, an initial investigation into these alleged improper actions highlighted a substantial and sudden increase in the costs and expenses borne by the Fund.

*i.* *Mr. Patrick attempts to direct charitable funds to benefit his own family.*

14. An early example of these concerns occurred in June 2023. On June 28, 2023, Mr. Patrick attempted to have HDFI "*direct $10,000"* to Creative HEARTS TX ("CHTX"), a non-profit entity formed just two weeks earlier. Following due diligence, it was discovered that the directors of the CHTX were Mr. Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr. Patrick did not initially disclose either his or his family's involvement with CHTX.

15. When questioned regarding the nature of CHTX and his family's involvement Mr. Patrick represented that the nonprofit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Upon information and belief, Mr. Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. The grant payment to CHTX was authorized on September 5, 2023, but Mr. Patrick was informed that further payments were unlikely.

*ii.* *Mr. Patrick resigns amidst insider trading concerns.*

16. In August 2024, additional concerns arose regarding Mr. Patrick when he attempted to provide advice to the Foundation regarding an asset held directly by the Foundation (the asset in question was held separately from the Fund). Upon information and belief, the information provided was obtained by Mr. Patrick through his employment at Skyview and constituted material non-public information ("MNPI"). On the basis of this MNPI, Mr. Patrick advised the Foundation to exercise a put option it held in the subject asset. Uncomfortable with

the nature of the information provided and the "tip" from Mr. Patrick, the Foundation notified Skyview of Mr. Patrick's actions and declined to act upon Mr. Patrick's advice.

17. On October 2, 2024, while his actions were being reviewed by Skyview's internal compliance department, Mr. Patrick abruptly resigned from his position at Skyview. On the same day, Mr. Patrick also terminated Skyview's service agreement with the Fund.

*iii.* *Diversion of assets through the creation of new entities.*

18. Through the Control Position, Mr. Patrick also manages the HMIT Entities, including Atlas IDF and its general partner, Atlas GP, which itself is a wholly owned subsidiary of the Fund. The economic beneficiaries of Atlas IDF are EDF and the Okada Foundation as the holders of annuity policies issued by Crown.

19. On February 20, 2025, Mr. Patrick in his capacity as the general partner of Atlas GP, sent a letter to Crown advising of the intention to dissolve Atlas IDF in accordance with the partnership agreement dated November 30, 2015, on the basis of (i) concerns about the long-term availability and viability of back-office support; (ii) unsuccessful efforts to sell certain defaulted Notes (the "HCRE Notes") issued by HCRE Partners (a Dondero affiliate) dated May 7, 2014, in the amount of $2,300,000.00, and May 27, 2014, in the amount of $5,000,000, which notes were held by Atlas IDF; and (iii) the decision by an affiliate of Atlas GP to purchase the HCRE Notes at a price above their appraised value of zero dollars to facilitate an orderly wind-up. At the time, the amounts outstanding on the HCRE Notes, including accumulated interest, was in excess of $13,000,000. The stated intention was to sell the HCRE Notes collectively for $500,000.

20. Crown initially provided consent to the sale and liquidation, but withdrew said consent on February 28, 2025, after being advised of the potential misconduct by Mr. Patrick. That same day, Mr. Patrick sent a further letter to Crown Global responding to the revocation of

consent, and noting that: "*in addition to the purchase of the 'Notes' for $500,000, we also intend to include a provision in the purchase and sale documents that, if the Notes are repaid in full within 12 months, all amounts received (minus fees and expenses of collection and purchase price) will be remitted to you as the sole limited partner of Atlas IDF, LP.*"

21. At the time that Mr. Patrick attempted to sell the HCRE Notes, upon information and belief, HCRE had proposed to cure its default and repay the HCRE Notes in full pursuant to a revised amortization schedule. As such, the initial zero valuation and proposed $500,000 sale price disclosed to Crown is troubling. More troubling, however, is the fact that the proposed amortization schedule extends beyond 12 months. In other words, Mr. Patrick's proposed "fix" – i.e. sharing upside in the event the HCRE Notes were repaid within one year – was carefully tailored to give the appearance of addressing Crown's concerns even though Mr. Patrick already knew that the repayment would not occur within the 12 month period.

**D. <u>The Cayman Insolvency Proceedings</u>**

22. In or around October 2024, the Charitable Entities, acting through counsel and the Supporting Organizations, requested that Mr. Patrick provide financial information explaining certain significant increases in the costs charged to the Fund.[3] In November 2024, having not received any of the requested financial information, the Charitable Entities delivered a letter of no confidence to Mr. Patrick requesting a formal reorganization of the Fund. No response to the no confidence letter was received.

[3] For example, directors' fees increased from $40,000 in 2022 to almost $600,000 in 2023 –and increased even further to around $2.25 million in the first half of 2024 alone. Expenses overall for the first half of 2024 were around $18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. $18.6 million).

23. In January 2025, the Charitable Entities again reached out to Mr. Patrick and invited him to provide a presentation directly to the Charitable Entities and/or the Supporting Organizations to address the concerns raised in the no confidence letter.

24. In February 2025, the Supporting Organizations and the Charitable Entities learned that, almost a year earlier, Mr. Patrick had secretly redomiciled and replaced the Original GP. Specifically, on February 27, 2024, Mr. Patrick caused the formation of CDH GP, Ltd (the "New GP"), which was incorporated in the Caymen Islands (registration number 407515) with its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands. Mark Patrick is the sole director of the New GP.

25. In light of the mounting concerns regarding Mr. Patrick's actions, the Supporting Organizations, as holders of the Participation Shares, filed a petition (the "Cayman Petition") in the Cayman Islands requesting that the Fund be liquidated under the supervision of the Cayman Islands court and the appointment of joint official liquidators.

26. The Cayman Petition was served on the Fund on April 24, 2025. The next day, April 25, 2025, counsel purporting to act on behalf of the Fund responded by correspondence to counsel for the petitioning Supporting Organizations. Through this correspondence, the Supporting Organizations and the Charitable Entities that they serve learned for the first time that Mr. Patrick had engaged Kroll Cayman Ltd ("Kroll") to commence a liquidation of the Fund.

27. The Supporting Organizations and Charitable Entities further learned that Mr. Patrick had caused the issuance of new Participation Interests, representing 51.04% of the resulting total of issued Participation Interests, to an entity named DFW Charitable Foundation (the "MP Charity"). The issuance of these new Participation Interests resulted in substantial

dilution of the interests beneficially held by the Charitable Entities such that, following the new issuance: (i) HDFI's interest was diluted from 32.787% to 16.05%; (ii) HKCF's interest was diluted from 32.787% to 16.05%; (iii) HSBFI's interest was diluted from 32.787% to 16.05%; and (iv) HCMLP's interest was diluted from 1.639% to 0.80%.

28. Publicly available records indicate that the MP Charity was formed in December 2024 and is based out of Mr. Patrick's home.

29. Additionally, the Supporting Organizations and the Charitable Entities learned that Mr. Patrick had caused the formation of another new entity, CDMCFAD, LLC ("CDMCFAD"), which was secretly inserted into the charitable organization structure. CDMCFAD is nominally a new wholly-owned subsidiary of the Fund, though, like the MP Charity, it is based out of Mr. Patrick's home. Upon information and belief, Mr. Patrick then caused the Fund to transfer its 100% interests in Charitable DAF Fund, LP to CDMCFAD. On March 27, 2025, the Fund's interest in CDMCFAD was purportedly redeemed for proceeds totaling $1,612,192.00 to be distributed to the Fund's participating interest holders.

30. In light of the existing liquidation and with these newly discovered facts, the Supporting Organizations amended their Cayman Petition to request that liquidation of the Fund continue under the supervision of the Cayman courts and that new independent, joint official liquidators be appointed to replace Kroll.

31. Following a hearing to consider the amended Cayman petition, the Cayman court entered its Supervision Order on May 6, 2025, and appointed Margo MacInnis and Sandipan Bhowmik as Joint Official Liquidators.[4]

[4] Mr. Patrick's chosen liquidators, Kroll, withdrew their consent to nomination prior to a May 5, 2025, hearing to consider the amended petition.

## III. OBJECTION

32. Against this backdrop, the proposed Settlement is problematic for a number of reasons. First, the Settlement purports to have been entered into on May 19, 2025, less than two weeks after entry of the Supervision Order by the Cayman court. Unfortunately, it does not appear, however, that Joint Official Liquidators are parties to or have authorized the Settlement. As a result, it is unclear whether Mr. Patrick had the requisite corporate authority to cause the HMIT Entities to enter into the Settlement. Indeed, many of Mr. Patrick's actions, including the insertion of newly created entities into the Fund's structure for the apparent purpose of diverting charitable assets will now be subject to the scrutiny of an independent, court appointed fiduciary and may be subject to claw back or other avoidance actions in the Cayman liquidation or such other tribunal as has jurisdiction.

33. In the event that it is ultimately determined that Mr. Patrick has acted against the fiduciary duties owed to the Fund, the Supporting Organizations, and the Charitable Entities, and the transfers of interests to Mr. Patrick's newly created companies are avoided, the validity of the Settlement will be in question. Thus, even if approved by this Court, consummation of the Settlement is not likely to buy the peace the Debtor now seeks.

34. Additionally, while Mr. Patrick may nominally be the sole manager of each of the HMIT Entities at this time, there is ample evidence that Mr. Patrick has acted and is acting well outside the scope of his authority and fiduciary obligations. Indeed, in light of the above, there is reason to suspect that the HMIT Entities' entry into the Settlement will further a scheme to wrongfully divert charitable funds from their intended beneficiaries. Under such circumstances, approval of the Settlement would be wholly inequitable.

35. For these reasons, the 9019 Motion should be denied.

## IV.
## ALTERNATIVE RELIEF

36. Alternatively, the Foundation and Crown respectfully request a continuance of the hearing to consider the 9019 Motion, which is currently scheduled for June 25, 2025. As noted above, upon becoming aware of the allegations discussed herein, the Supporting Organizations and Charitable Entities acted diligently to bring their concerns before a court of competent jurisdiction in the Cayman Islands. The Cayman court has granted relief in the form of the Supervision Order and the appointment of the JOLs. The JOLs, however, have held their positions for just over one month. Given the significance of the proposed Settlement to this bankruptcy estate, a short continuance to ensure that the Settlement is not being entered into improperly, without authority, and will not result in further, likely avoidable litigation, would benefit all parties in interest.

## V.
## CONCLUSION

37. In sum, the Foundation and Crown have received credible evidence that substantial charitable assets have been and are still being diverted from their benefit. The facts and circumstances set forth herein show that, at a minimum, there is good cause to suspect that entry into the Settlement by the HMIT Entities is but another attempt or the conclusion of an existing attempt to divert said charitable assets from their rightful recipients. Further, under these facts and circumstances, there is good cause to suspect that Mr. Patrick lacked the requisite corporate authority to enter into the Settlement or that any apparent authority he holds results from improper actions subject to avoidance and clawback. Under such circumstances, approval and consummation of the Settlement will not result in a cessation of litigation but will instead

result in more litigation across multiple forums. For these reasons, the Foundation and Crown, each a beneficial owner of the HMIT Entities, respectfully request that the 9019 Motion be denied.

## VI. PRAYER

WHEREFORE, for the reasons stated above, The Dallas Foundation and Crown Global Insurance, Ltd., request that this Court enter an order (i) denying the 9019 Motion; or, in the alternative, continuing the hearing set for June 25, 2025; and (ii) granting such other and further relief as the Court may deem just and proper.

Respectfully submitted on this 9th day of June 2025.

**OKIN ADAMS BARTLETT CURRY LLP**

By: /s/ *David L. Curry, Jr.*

Matthew S. Okin
Texas Bar No. 00784695
David L. Curry, Jr.
Texas Bar No. 24065107
1113 Vine Street, Suite 240
Houston, Texas 77002
Tel: (713) 228-4100
Fax: (346) 247-7158
Email: mokin@okinadams.com
Email: dcurry@okinadams.com

**ATTORNEYS FOR THE DALLAS FOUNDATION AND CROWN GLOBAL LIFE INSURANCE, LTD.**

**CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2025, a true and correct copy of this document, with all exhibits, was served via the Court's CM/ECF system to all parties consenting to service through the same.

By: */s/ David L. Curry, Jr.*
David L. Curry, Jr.

**EXHIBIT 19**

Gregory G. Hesse, Esq.
State Bar No. 09549419
HUNTON ANDREWS KURTH, LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202-2799
Telephone: (214) 979-3000
Telecopy: (214) 880-0011

**ATTORNEYS FOR DUGABOY INVESTMENT TRUST**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| *In re* | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor.[1] | § | |

**DUGABOY INVESTMENT TRUST'S DISCOVERY RELATED TO RULE 9019 MOTION**

Dugaboy Investment Trust ("Dugaboy"), by and through undersigned counsel, hereby serves the following First Set of Discovery upon Movants Highland Capital Management, L.P. ("HCMLP" or "Debtor"), Highland Claimant Trust ("Claimant Trust") and the Highland Litigation Sub-Trust ("Litigation Trust," and together with the Claimant Trust, the "Trusts," together with HCMLP, the "Movants"), with respect to the Movants' *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Dkt. 4216] ("Motion") and requests that the Movants respond to such discovery requests within the time required by the applicable Federal Rules of Bankruptcy Procedure and Federal Rules of Civil Procedure, and that the Movants produce for inspection and copying the documents described below at the offices of counsel identified below.

[1] The *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., (As Modified)* [Dkt. 1808] ("*Plan*"), filed by Highland Capital Management, L.P. ("*HCMLP*") became effective on August 11, 2021 (the "*Effective Date*").

## REQUESTS FOR PRODUCTION INSTRUCTIONS

1. Dugaboy seeks production of the documents set forth in the numbered requests below that are in the Movants' possession, custody, or control.

2. All electronically stored information shall be produced in a format mutually agreed upon by the parties or ordered by the Court.

3. Each document must be produced in its entirety (including all attachments) and without deletion or excisions, regardless of whether You consider the entire document or only parts thereof to be relevant or responsive to these requests. If you contend that any document or thing cannot be produced in full, produce it to the extent possible, indicating which document or portion of that document is being withheld and the reason it is being withheld. For any document withheld or redacted, in whole or in part, based on a clam of privilege or work product protection, You shall comply with Fed. R. Civ. P. 26(b)(5)(A). Any privilege log shall be produced in a format and according to a schedule mutually agreed upon the parties or ordered by the Court. Any purportedly privileged document containing non-privileged material must be produced, redacting only the portion purportedly privileged. If you file a timely objection to any portion of a request, definition, or instruction, documents responsive to the remaining portion are to be produced.

4. Documents not otherwise responsive to a discovery request shall be produced if such documents relate to the documents which are called for by this discovery request, or if such documents are attached to documents called for by a discovery request and constitute routine transmittal memoranda, letters, comments, evaluations, or similar materials.

5. Any alteration of a responsive document, including any marginal notes, handwritten notes, underlining, date stamps, received stamps, endorsed or filed stamps, drafts, revisions, modifications, and other versions of a final document is a separate and distinct document and it must be produced.

6. All documents shall be produced in a file folder, envelope, or other container in which the documents are kept or maintained by the Movants. If, for any reason, the container cannot be produced, produce copies of all labels or other identifying marks. Documents shall be produced in such fashion as to identify the department, branch, or office in whose possession it was located and, where applicable, the natural person in whose possession it was found and the business address of each document's custodian(s).

7. If any responsive document is believed to have existed but no longer exists or is otherwise unavailable, describe the document, the reason for its loss, destruction, or unavailability, and provide the name of each person believed by the Movants to have present possession, custody, or control of the original and any copy thereof (if applicable). If no document responsive to a request exists, please so state in the Movants' response.

8. These document requests are continuing and therefore require the Movants (or any person acting on the Movants' behalf) to furnish supplemental responses whenever the Movants (or any person acting on the Movants' behalf) obtains additional information called for by the request. Each supplemental response shall be served on Dugaboy no later than thirty (30) days after the discovery the additional information.

9. Capitalized terms not otherwise defined herein shall have their meanings as set forth in the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) (the "Plan"), and the associated Plan Documents giving meaning and effect to the Plan.

**REQUEST FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1:**

All communications between any of the Movants and the HMIT Entities (as defined in the Motion) related to the proposed Settlement Agreement (as referenced in the Motion).

**REQUEST FOR PRODUCTION NO. 2:**

All communications between any of the Movants and any third-party related to the proposed Settlement Agreement.

**REQUEST FOR PRODUCTION NO. 3:**

All drafts of the proposed Settlement Agreement.

**REQUEST FOR PRODUCTION NO. 4:**

All documents supporting the allegation in Paragraph 21 of the Motion that "[i]f the Settlement Agreement is approved, the only unresolved Claims or Equity Interests will be the Daugherty Claim and the Class 11 Equity Interests asserted by two Dondero controlled entities—Dugaboy and Strand—that have no value but, if they did, their aggregate maximum value, if allowed, would not exceed approximately $1.7 million."

**REQUEST FOR PRODUCTION NO. 5:**

All documents supporting the allegation in Paragraph 9 of the Motion that "[a]s of the Petition Date, HMIT's capital account balance on account of its Class B/C Interests was $394,630,871.53 (the "HMIT Capital Account Balance"), and the capital account for all Class A Interests in aggregate was $1,983,069.70.

**REQUEST FOR PRODUCTION NO. 6:**

All documents evidencing the "extensive arm's-length, good faith negotiations over the last several months [related to the proposed Settlement Agreement]" as referenced in Paragraph 20 of the Motion.

**REQUEST FOR PRODUCTION NO. 7:**

All documents evidencing any efforts that the Movants examined the effect of the potential Settlement Agreement on any of the remaining creditors of the estate.

**REQUEST FOR PRODUCTION NO. 8:**

All documents evidencing how HMIT's Capital Account Balance, as referenced in Paragraph 21 of the Motion, was calculated.

**REQUEST FOR PRODUCTION NO. 9:**

All documents related to the Dugaboy Note, as referenced in paragraph 21 of the Motion, including any documents evidencing payments or amounts owed related to the Dugaboy Note.

**REQUEST FOR PRODUCTION NO. 10:**

Any documents used to answer the Interrogatories in these discovery requests.

**REQUEST FOR PRODUCTION NO. 11:**

Documents sufficient to show the remaining unpaid amounts of allowed claims in Classes 8 and 9, as that term is defined in the Plan.

**REQUEST FOR PRODUCTION NO. 12:**

Documents demonstrating any efforts by the Movants to sell or transfer the claims and causes of action that were asserted by the Litigation Trustee in the Amended Kirschner Complaint to any parties.

**REQUEST FOR PRODUCTION NO. 13:**

Documents demonstrating any efforts by the Movants to sell or transfer the Dugaboy Note to any parties.

**REQUEST FOR PRODUCTION NO. 14:**

Documents related to or identifying the value of any consideration received or exchanged as part of the proposed Settlement Agreement, including any communications related to the value of any such consideration.

**INTERROGATORY INSTRUCTIONS**

1. Each Interrogatory shall be answered fully and separately. Interrogatories shall not be combined for the purpose of supplying a common answer thereto, but answers may be supplied by reference to the answer to another interrogatory.

2. Where an Interrogatory cannot be answered in full, state why, and furnish all available information.

3. Whenever the name or identity of a person is requested, state the full name and the home and business address of such person.

4. When knowledge or information in the possession of a party is requested, such request includes knowledge of the party's agents, representatives and, unless privileged, attorneys.

5. Whenever a document is cited in support of a response, identify the specific language in such document which the Movants contend provides support for the Movants' response.

6. These Interrogatories shall be deemed to be continuing, so as to require supplemental answers should the party on whom these Interrogatories are propounded obtain information responsive to these Interrogatories which has not previously been supplied. Such supplemental answers shall be served before trial and within a reasonable time after the information is obtained. The date such additional information was obtained shall be disclosed, and the identity of the source of the additional information shall be specified.

7. If the Movants claim a privilege as to any requested information, specify the privilege claimed, the Communication (as defined below) or other matter as to which such claim is made, the subject of the Communication or other matter and the basis which Defendants assert the claim of privilege.

## INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify who negotiated the proposed Settlement Agreement on behalf of the Movants and the HMIT Entities and identify the dates of such negotiations.

**ANSWER:**

**INTERROGATORY NO. 2:**

Identify any efforts to analyze the "complexity, duration, and costs of [the Pending HMIT Litigation]," as stated in Paragraph 29 of the Motion.

**ANSWER:**

**INTERROGATORY NO. 3:**

Identify any efforts to sell or transfer the claims and causes of action that were asserted by the Litigation Trustee in the Amended Kirschner Complaint.

**ANSWER:**

**INTERROGATORY NO. 4:**

Identify any efforts to sell or transfer the claims and causes of action that were asserted by the Litigation Trustee in the Amended Kirschner Complaint.

**ANSWER:**

**INTERROGATORY NO. 5:**

Identify any efforts to sell or transfer the Dugaboy Note to any parties other than the HMIT Entities.

**ANSWER:**

**INTERROGATORY NO. 6:**

Explain the basis for the Movants' contention in Paragraph 21 of the Motion that "the Daugherty Claim and the Class 11 Equity Interests asserted by two Dondero controlled entities—Dugaboy and Strand—[] have no value but, if they did, their aggregate maximum value, if allowed, would not exceed approximately $1.7 million."

**ANSWER:**

**INTERROGATORY NO. 7:**

Identify all consideration received by any parties as part of the proposed Settlement Agreement and identify the monetary value of all non-monetary consideration received as part of the proposed Settlement Agreement.

**ANSWER:**

**HUNTON ANDREWS KURTH LLP**

By: /s/ *Gregory G. Hesse*
Gregory G. Hesse (Texas Bar No.09549419)
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202-2799
Telephone: (214) 979-3000
Telecopy: (214) 880-0011
GHesse@hunton.com

**ATTORNEYS FOR DUGABOY INVESTMENT TRUST**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on June 10, 2025, a true and correct copy of this document was served via email to the following parties.

**Counsel for Highland Capital Management, LP and the Highland Claimant Trust:**

Jeffrey N. Pomerantz – jpomerantz@pszjlaw.com
John A. Morris – jmorris@pszjlaw.com
Gregory V. Demo – gdemo@pszjlaw.com
Hayley R. Winograd – hwinograd@pszjlaw.com
Melissa S. Hayward – mhayward@haywardfirm.com
Zachery Z. Annable – zannable@Haywardfirm.com

**Counsel for Marc S. Kirschner as Litigation Trustee of the Highland Litigation Sub-Trust:**

Deborah J. Newman - deborahnewman@quinnemanuel.com
Robert S. Loigman - robertloigman@quinnemanuel.com

/s/ *Gregory G. Hesse*
Gregory G. Hesse

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz
John A. Morris
Gregory V. Demo
Jordan A. Kroop
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

HAYWARD PLLC
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |

**HIGHLAND CAPITAL MANAGEMENT, L.P. AND THE HIGHLAND CLAIMANT TRUST'S OBJECTION TO DUGABOY'S MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE [DOCKET NO. 4513]**

# TABLE OF CONTENTS

Page

SUMMARY OF HIGHLAND'S ARGUMENT ..... 1

PROCEDURAL BACKGROUND AND FACTS ..... 7

A. Primer on People and Entities Referred to in the Motion ..... 7

B. Highland Seeks Approval of the 9019 Settlement ..... 9

C. Objections and Extensive Discovery ..... 10

D. The Dallas Foundation Withdraws Its Objection: Dugaboy Challenges Patrick's Authority for the First Time at Trial ..... 12

E. Patrick was Authorized to Act on the HMIT Entities' Behalf ..... 13

1. Documentary Evidence Established Patrick's Authority ..... 13

2. Dugaboy and Dondero Repeatedly Validated and Ratified Patrick's Authority ..... 14

3. The Dondero Foundations Seek Injunctive Relief and a Receiver to Replace Patrick as the DAF Entities' Control Person ..... 16

4. No One Has Ever Sought to Remove Patrick as the HMIT Entities' Control Person ..... 17

F. Correcting Dugaboy's Misstatements and Omissions ..... 18

1. No "New Evidence" Exists for Purposes of Rule 60 ..... 18

2. Dugaboy was Not Prevented from Preparing for Trial ..... 23

3. Dugaboy Failed to Disclose the Adverse and Dispositive Decision from the Cayman Court ..... 23

4. Dugaboy Failed to Disclose that the Dondero Foundations Serve on the Liquidation Committee in the Cayman Proceeding and Had Complete Access to all Information in the Cayman Islands ..... 25

5. Recusal, Which Dugaboy Grossly Misrepresents, is Irrelevant ..... 26

6. The Allegations of Fraud, Even if True, are Irrelevant ..... 27

ARGUMENT ..... 29

A. Rule 60(b) Relief is Unwarranted ..... 29

1. Legal Standard ..... 29

2. There is No "Newly Discovered Evidence" as Required Under Rule 60(b)(2) ..... 30

3. No Opposing Party Committed Fraud as Required Under Rule 60(b)(3) ..... 35

4. No Extraordinary Circumstances Exist as Required Under Rule 60(b)(6) ..... 39

B. Chief Judge Jernigan's Voluntary Recusal Provides No Valid Basis to Vacate the 9019 Settlement Order (or Anything Else) ..... 40

C. This Court Lacks Jurisdiction to Grant the Motion But Can—and Should—Deny It ..... 46

CONCLUSION ..... 50

# TABLE OF AUTHORITIES

**Page**

## CASES


*Ackermann v. United States*,
340 U.S. 193 (1950) ........ 44

*Blom Bank SAL v. Honickman,*
605 U.S. 204 (2025) ........ 39

*Blue Diamond Coal Co. v. Trs. of UMWA Combined Benefit Fund*,
249 F.3d 519 (6th Cir. 2001) ........ 30

*Canale v. Manco Power Sports, LLC,*
2010 WL 2771871 (S.D.N.Y. July 13, 2010) ........ 29

*Dondero v. Jernigan*,
2025 WL 1122466 (5th Cir. Apr. 16, 2025) ........ 42, 43

*Dugaboy Inv. Tr. v. Highland Cap. Mgmt., L.P.*,
2022 U.S. Dist. LEXIS 172351 (N.D. Tex. Sept. 22, 2022) ........ 2

*Edward H. Bohlin Co., Inc. v. The Banning Co., Inc.*,
6 F.3d 350 (5th Cir. 1993) ........ 30

*Garcia v. Davis*,
2018 WL 6305591 (N.D. Tex. Dec. 3, 2018) ........ 29

*Gen. Universal Sys., Inc. v. Lee*,
379 F.3d 131 (5th Cir. 2004) ........ 31, 32, 35

*Geron v. Holding Capital Grp., Inc. (In re PBS Foods, LLC)*,
549 B.R. 586 (Bankr. S.D.N.Y. 2016) ........ 47, 48

*Goldstein v. MCI WorldCom*,
340 F.3d 238 (5th Cir. 2003) ........ 31

*Gov't Fin. Servs. One Ltd. P'ship v. Peyton Place, Inc.*,
62 F.3d 767 (5th Cir. 1995) ........ 33, 39

*Griggs v. Provident Consumer Discount Co.,*
459 U.S. 56 (1982) ........ 46

*Halliburton Energy Servs., Inc. v. NL Indus.*,
618 F. Supp. 2d 614 (S.D. Tex. 2009) ........ 30, 35

*Hesling v. CSX Transp., Inc.*,
396 F.3d 632 (5th Cir. 2005) ........ 31, 36, 39, 40

*Hess v. Cockrell*,
281 F.3d 212 (5th Cir. 2002) ..................................................................... 29

*In re Coffman*,
271 B.R. 492 (Bankr. N.D. Tex. 2002)........................................................ 39

*In re Garcia*,
756 F. App'x 391 (5th Cir. 2018) ................................................................ 29

*In re Highland Cap. Mgmt., L.P.*,
No. 21-10449 (5th Cir. Sept. 7, 2022) ......................................................... 18

*In re Highland Dall. Found., Inc.*,
2026 Tex. App. LEXIS 1769 (Texas, 15th Dist. 2026) .................................. 17

*In re Pettle*,
410 F.3d 189 (5th Cir. 2005) ..................................................................... 30

*In re South*,
647 B.R. 535 (Bankr. E.D. Tex. 2023) ........................................................ 30

*In re Waldrup*,
2025 WL 2900358 (Bankr. S.D. Tex. Oct. 10, 2025)...................................... 36

*In re Wigington*,
2021 WL 2134651 (Bankr. E.D. Tex. May 25, 2021)...................................... 30

*Info-Hold, Inc. v. Sound Merch., Inc.*,
538 F.3d 448 (6th Cir. 2008) ..................................................................... 30

*Latshaw v. Trainer Wortham & Co., Inc.*,
452 F.3d 1097 (9th Cir. 2006) .............................................................. 37, 38

*Leaman v. Ohio Dep't of Mental Retardation & Dev. Disabilities*,
825 F.2d 946 (6th Cir. 1987) ..................................................................... 44

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
838 F.2d 1287 (D.C. Cir. 1988).................................................................. 44

*Liljeberg v. Health Serv. Acquisition Corp.*,
486 U.S. 847 (1988)............................................................................ 44, 45

*Longden v. Sunderman*,
979 F.2d 1095 (5th Cir. 1992) .............................................................. 33, 39

*Millenkamp Cattle, Inc., v. E. Valley Dev., LLC (In re Millenkamp Cattle, Inc.)*,
2025 Bankr. LEXIS 1987 (Bankr. D. Ida. Aug. 19, 2025) ............................... 47

*Nat'l Credit Union Admin. Bd. v. Gray*,
1 F.3d 262 (4th Cir.1993) ......................................................................... 39

*Nat'l Labor Relations Bd. v. Jacob E. Decker and Sons,*
569 F.2d 357 (5th Cir. 1978) ..................................................................... 31

*New York City Dev. Corp. v. Hart*,
796 F.2d 976 (7th Cir. 1986) .......... 44

*Optimal Health Care Services, Inc. v. Travelers Ins. Co.*,
801 F. Supp. 1558 (E.D. Tex. 1992) .......... 36

*Parker v. Wal-Mart Stores, Inc.*,
251 F.R.D. 222 (S.D. Miss. 2008), *aff'd,* 464 F. App'x 224 (5th Cir. 2010) .......... 31

*Patterson v. Mobil Oil Corp.*,
335 F.2d 476 (5th Cir. 2003) .......... 44

*Rozier v. Ford Motor Co.*,
573 F.2d 1332 (5th Cir. 1978) .......... 36

*Sensley v. Albritton*,
385 F.3d 591 (5th Cir. 2004) .......... 45

*Sherman v. Verizon Virginia, Inc*., 220 F.R.D. 260 (E.D. Va. 2002), aff'd in part, dismissed in part, 55 F. App'x 136 (4th Cir. 2003) .......... 37

*Tate v. Valero Servs., Inc.*,
2019 WL 6117793 (E.D. La. Nov. 18, 2019) .......... 37

*Trans Mississippi Corp. v. United States*,
494 F.2d 770 (5th Cir.1974) .......... 31

*United States v. Hitchmon,*
602 F.2d 689 (5th Cir. 1979) .......... 46

*United States v. Murphy*,
768 F.2d 1518 (7th Cir. 1985) .......... 44

**STATUTES**

11 U.S.C. § 363(m) .......... 46

28 U.S.C. § 455(a) .......... 44

**OTHER AUTHORITIES**

Collier on Bankruptcy (16th ed.), ¶ 8008.01 .......... 46

*In re Compl. Of Jud. Misconduct Under The Jud. Improvements Act Of 2002*,
No. 05-26-90042 (5th Cir. Dec. 29, 2025 .......... 41

**RULES**

Fed. R. Bankr. P. 7023 .......... 31, 32, 33

Fed. R. Bankr. P. 8008 .......... 46

Fed. R. Civ. P. 59 .......... 3, 31, 32

Fed. R. Civ. P. 59(b) .......... 5, 18, 31, 33

Fed. R. Civ. P. 60(b)(1) .......... 29

Fed. R. Civ. P. 60(b)(2) .......... *passim*

Fed. R. Civ. P. 60(b)(3) .......... *passim*

Fed. R. Civ. P. 60(b)(6) .......... *passim*

Fed. R. Civ. P. 62.1(a) .......... 46

Highland Capital Management, L.P., the reorganized debtor in the above-captioned chapter 11 case (the "**Bankruptcy Case**"), and the Highland Claimant Trust (together, "**Highland**") objects to all relief sought in the *Motion for Relief from Order and Motion to Vacate* (Doc 4513, the "**Motion**")[1] filed by The Dugaboy Investment Trust ("**Dugaboy**") and states respectfully:

**SUMMARY OF HIGHLAND'S ARGUMENT**

1. Dugaboy[2] knows it has no "newly discovered evidence" or, for that matter, *any* evidence of fraud related to the 9019 Settlement. Dugaboy knows that none of the allegations it makes about breaches of fiduciary duty in the Cayman Islands involve Highland, any HMIT Entity, the 9019 Settlement, or even Dugaboy itself.[3] And Dugaboy knows—and knew when it filed its Motion—that the Grand Court of the Cayman Islands had already rejected its allegations in a written judgment in the Cayman Proceeding,[4] a judgment Dugaboy failed to disclose to this Court. The Motion is nothing more than a cynical attempt to relitigate issues and allegations that have already been fully considered by this Court (and some by other courts).

2. James Dondero is a desperate man. Having stiffed multiple people and entities out of hundreds of millions of dollars, he caused Highland to file for bankruptcy protection in 2019. Then, after Dondero failed to coerce the same creditors to capitulate to his demands, this Court

---

[1] Capitalized terms used but not defined in this objection retain the meanings given to them in the Motion and the *Settlement Agreement and General Release* (Doc. 4255, Ex.1, the "**9019 Settlement**"), as applicable.

[2] There is no meaningful distinction between Dugaboy and Dondero; it's just one of the weapons he controls. *See, e.g.*, *Dugaboy Investment Trust v. Highland Capital Management, L.P.; Highland Claimant Trust,* No. 25-10999, 5th Cir., March 17, 2026 ("Dugaboy Investment Trust—controlled by HCM co-founder … James Dondero"); Motion at 1, 6 ("The Movant represents James Dondero"; "Dondero's affiliates (including Dugaboy)").

[3] Dugaboy has no interest in any entity against whom any "fraud" has been alleged. Except for the Dallas Foundation, which withdrew its objection with prejudice, no entity with even an arguable interest in the alleged fraud has ever appeared before this Court or challenged the 9019 Settlement.

[4] "**Cayman Proceeding**" refers to the Cayman Islands Official Liquidation proceeding in the Grand Court of the Cayman Islands (Cause No. FSD 201 OF 2025) for Charitable DAF Holdco, Ltd., a Cayman Islands exempted company ("**DAF Holdco**") which is not a party to the 9019 Settlement.

confirmed an otherwise consensual plan over his objections in a confirmation order the Fifth Circuit affirmed in nearly all respects. Dondero threatened Highland's independent fiduciaries in writing and he and his entities spent the next five years making good on those threats. He launched a series of increasingly caustic and baseless charges against Highland, none of which was ever validated. After a former employee, Mark Patrick, who has had full authority and control over DAF[5] for more than five years and all HMIT Entities for nearly four years, chose to exercise that authority over the HMIT Entities independent of Dondero's meddling and settle with Highland, Dugaboy objected. Following this Court's approval of the 9019 Settlement, Dugaboy appealed and then filed a Motion to Stay the 9019 Settlement Order. This Court denied the Motion to Stay but Dugaboy (naturally) appealed that too. And now, Dondero, using Dugaboy, cannot resist trying once again to "bamboozle" this Court.[6]

3. Indisputably, Patrick has completely controlled the HMIT Entities since 2022.[7] HMIT was originally formed as part of a tax scheme under which Dondero wanted to maintain "control" but legally could not for tax reasons. In early 2025, Patrick, after previously using his control to attempt to sue Highland and its fiduciaries in this Court, exercised his authority by choosing peace over Dondero's never-ending desire for more value-destructive conflict and resolved all HMIT disputes with Highland by entering into the 9019 Settlement. This Court

[5] "**DAF**" refers to, collectively, Charitable DAF Fund, L.P., a Cayman Islands exempted limited partnership ("**DAF Fund**"), Charitable DAF GP, LLC, a Delaware limited liability company, CLO Holdco, Ltd., a Cayman Islands exempted company ("**CLO Holdco**"), and Liberty CLO Holdco, Ltd., a Cayman Islands exempted company ("**Liberty CLO Holdco**"). None of the entities that comprise DAF Holdco or DAF are parties to the 9019 Settlement.

[6] *Dugaboy Inv. Tr. v. Highland Cap. Mgmt., L.P.*, 2022 U.S. Dist. LEXIS 172351, at *12 (N.D. Tex. Sept. 22, 2022)("In their [Dugaboy and Dondero's Get Good Trust] zeal to bamboozle this Court, the Trusts omit one crucial fact."((Starr, J.).

[7] Among its dizzying dump of contradictory assertions, Dugaboy admits Patrick has been the sole administrator with full authority and control over HMIT since August 12, 2022. *See, e.g.*, Motion at 3; *see also* Appellant The Dugaboy Investment Trust's Opening Brief, Case No. 3:25-cv-01876-K, N.D. Tex., Nov. 26, 2025, at 9 n.7 ("As Mark Patrick admitted at the hearing, he controls HMIT").

approved the 9019 Settlement last June, a settlement even Dondero implicitly concedes was in the estate's best interests and satisfies Bankruptcy Rule 9019.

4. Dondero and his proxies have challenged Patrick in this Court and three others over alleged conduct that is entirely unrelated to Highland, the HMIT Entities, or the 9019 Settlement. And in response to the 9019 Settlement, Dondero and his proxies have now separately challenged or sought to impede implementation of the 9019 Settlement four different times. While doing so betrays Dondero's desperation, certain indisputable facts show that the Motion was filed in bad faith with an intent to deceive this Court, including:

- Despite focusing nearly all its attention on the Cayman Proceeding, Dugaboy failed to disclose that on February 10, 2026, following a two-day hearing in December 2025, the Grand Court of the Cayman Islands issued an exhaustive written opinion rejecting virtually all Dondero's claims (which were based on the same evidence Dugaboy offers here)—and, because a draft of the opinion was distributed on January 28, 2026, Dondero knew of the Cayman court's decision ***before*** Dugaboy filed this Motion.

- Dugaboy failed to disclose that on July 1, 2025—just one day after this Court entered the 9019 Settlement Order—The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. (collectively, the "**Dondero Foundations**") filed a Petition in the Texas Business Court seeking injunctive relief against Patrick, and the appointment of a receiver, based on the same allegations presented in the Cayman Islands and the Motion, and that the case was abated for failure of the Dondero Foundations to join indispensable parties, the Cayman-appointed JOLs (after the Dondero Foundations entered into a Rule 11 Agreement that left Patrick's control intact).

- Dugaboy failed to disclose that the Dondero Foundations are members of the Liquidation Committee in the Cayman Proceeding and therefore had contemporaneous access to all the information filed in the Cayman Islands and that was otherwise in the JOLs' possession.

- Dugaboy failed to disclose that, before July 28, 2025 (the deadline for filing a motion for a new trial under Fed. R. Civ. P. 59), Dondero caused the same allegations of wrongdoing to be repackaged and asserted against Patrick in this Court, the Cayman Islands, the Texas Business Court, and the United States Bankruptcy Court for the District of Delaware.

- Dugaboy failed to disclose that The Dallas Foundation (the entity whose interests Dugaboy purportedly seeks to protect) (a) settled its disputes with Patrick as the HMIT Entities' control person and withdrew with prejudice its objection to the 9019 Settlement, (b) explicitly agreed that the 9019 Settlement barred The Dallas Foundation from asserting any Claim against any of the Highland Released Parties by, through, or under, including derivatively, any HMIT Entity (c) admitted under oath that it knew of no facts suggesting that Patrick lacked authority to enter into the 9019 Settlement on behalf of the HMIT Entities, and (d) has never taken any affirmative action against Patrick in his capacity as the HMIT Entities' control person.

- Dugaboy failed to disclose that Dondero and his affiliates have fully funded (on a tax-deductible basis) all of The Dallas Foundation's now-withdrawn litigation opposing the 9019 Settlement in this Court and all of the Dondero Foundations' and the Cayman-appointed JOLs' litigation against Patrick in the Cayman Islands, the Texas Business Court, and the United States Bankruptcy Court for the District of Delaware **on a for-profit basis.**

- The JOLs never objected to the 9019 Settlement, never appeared in Highland's bankruptcy case, never intervened in the Texas Business Court, never alleged that Patrick engaged in any wrongdoing with respect to any HMIT Entity, and never took any action against Patrick in his capacity as the HMIT Entities' control person.[8]

- Dugaboy failed to disclose that, in 2025, before *and* after the 9019 Settlement Order was entered, Dondero or his affiliates signed at least seven different agreements and stipulations with Patrick, acting on behalf of entities he controlled (including HMIT affiliates), thus validating and ratifying Patrick's apparent and actual authority to act for those entities.

- Dugaboy failed to disclose that on or about December 30, 2025, Dugaboy recognized the transfer of the Dugaboy Note (defined below) from Highland to HMIT pursuant to the 9019 Settlement as well as Patrick's continuing control of HMIT by paying HMIT the $1.357 million in principal and interest then due on the Dugaboy Note.

5. Against this backdrop, Dugaboy seeks to use Rule 60 to vacate this Court's order approving the 9019 Settlement and on the utterly baseless assertion that Judge Jernigan's recent

---

[8] In fact, in many dozens of places in multiple pleadings, the JOLs (and Dugaboy) admit that Patrick controls the DAF entities that are the subject of the Cayman Proceeding. *See, e.g.*, The Dugaboy Investment Trust's Motion for Stay of 9019 Order, Doc. 4326, Ex. A. ("**JOL Writ**"), ¶¶ 74.3–74.4 ("Mr. Patrick therefore assumed the Control Position [with respect to DAF Holdco and DAF] from [25 March 2021]." The JOL Writ does not mention **any** of the HMIT Entities.

and voluntary recusal is grounds for reviewing the entire bankruptcy case—and it seeks such relief even though its appeal of the 9019 Settlement Order is fully briefed and pending before Judge Kinkeade in the District Court. The Motion is beyond meritless.

6. First, no "new evidence" exists warranting vacatur of the 9019 Settlement Order. Based on the unambiguous terms of Rule 60(b)(2), "newly discovery evidence" is limited to evidence "that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Because the 9019 Settlement Order was entered on June 30, 2025, Dugaboy had until July 28, 2025, to move for a new trial. In a transparent attempt to obfuscate the facts and its decision not to seek a new trial under Rule 59(b), Dugaboy dumped hundreds of exhibits spanning thousands of pages on the Court's docket, most of which lacked any description. To aid the Court, Highland created an index of Dugaboy's exhibits.[9] A quick review of Dugaboy's Index shows that nearly all Dugaboy's documents existed before July 28, 2025, and were either in Dugaboy's possession or could have been obtained with reasonable diligence.[10] The balance was *created* after July 28, 2025, and therefore cannot constitute "newly discovery evidence" for purposes of Rule 60(b)(2). And Dugaboy has not (because it cannot) identified any exhibits or information that would have produced a different result if presented to this Court before it entered the 9019 Settlement Order. Dugaboy's reliance on Rule 60(b)(2) is unavailing.[11]

---

[9] *See Declaration of John A. Morris in Support of Highland's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate [Doc 4513]* filed contemporaneously with this Objection ("Morris Dec."), Morris Dec. Exh A ("Dugaboy's Index").

[10] When Dugaboy objected to the Settlement Motion, it initiated a contested matter and gained all rights of discovery under Federal Rule of Bankruptcy Procedure 9014(c). Consequently, there is *nothing* Dugaboy learned after filing its objection that could not have been obtained "with reasonable diligence" in the discovery process had Dugaboy chosen to request it.

[11] Notably, Dugaboy never bothered to specifically identify the so-called "newly discovery" evidence or file a declaration explaining why such supposedly "newly discovered" evidence could not have been obtained with "reasonable diligence" or how it would have changed this Court's consideration of the 9019 Settlement. In response to Highland's discovery request seeking confirmation as to what specific "newly discovered evidence" Dugaboy was relying on in support of its 60(b) Motion, Dugaboy simply reproduced the identical bundle of exhibits it had previously filed – virtually all of which predate July 28, 2025, the deadline for seeking a new trial.

7. Second, Dugaboy fares no better in its empty allegations of fraud. For purposes of Rule 60(b)(3), "fraud" refers to fraud in the legal process concerning the challenged order or judgment, not some claim of fraud in transactions by separate entities that are not parties to the 9019 Settlement and that is the subject of a foreign proceeding wholly unrelated to the order at issue. Here, Dugaboy alleges no fraud by Highland (the "opposing party" for purposes of Rule 60(b)(3)) against either Dugaboy or this Court. Dugaboy (and The Dallas Foundation, the only party to actually question Patrick's authority to enter into the 9019 Settlement prior to withdrawing its objection with prejudice) conducted full discovery, including receiving over 4,000 documents and complete answers to interrogatories and taking *four* depositions of Highland and HMIT representatives (including Patrick). Dugaboy never moved to compel any withheld discovery or lodged any complaint about the discovery provided or the substance of the testimony or Seery or Patrick. Dugaboy has offered this Court nothing but a handful of belated gripes about Patrick's purported lack of responsiveness to a few questions. Those complaints, even if true, had no impact on Dugaboy's ability to fully and fairly present its case at the 9019 Hearing and it does not come close to meeting the high bar of proving fraud in the legal process by "clear and convincing evidence" for purposes of Rule 60(b)(3).

8. Third, Dugaboy offers no "extraordinary circumstances" or anything else justifying relief under Rule 60(b)(6). In fact, Dugaboy's shameful, calculated failure to disclose the adverse Cayman Islands decision should alone mandate denial of the Motion. The interests of justice, including the need for finality, weigh heavily *against* giving Dugaboy a "do over" simply because it failed to impede the 9019 Settlement the first three times. And Dugaboy's insistence that it is fighting for "charities" is nonsense.[12] Rather, Dugaboy is fighting as the former holder of a

[12] There is no reason The Dallas Foundation, the Greater Kansas City Community Foundation, or the Santa Barbara Foundation could not have initiated litigation in their own name. After all, The Dallas Foundation did so when

0.1866% prepetition limited partnership interest in Highland who fully understands (because its counsel admitted it) that unless the 9019 Settlement Order is overturned, the Highland case will effectively be over leaving Dondero with no path to seek his baseless retribution against Highland's fiduciaries and stakeholders.

9. Finally, Dugaboy bizarrely clings to "recusal" as a basis to re-open the Highland bankruptcy case despite knowing that the Fifth Circuit issued *three* separate decisions denying its recusal appeals (and the United States Supreme Court did so twice) without ever finding that Judge Jernigan was biased or prejudiced or should be recused. Judge Jernigan's voluntary recusal (while still maintaining she was impartial) changes nothing. In light of the Fifth Circuit's final judgments, this Court lacks jurisdiction to fashion any relief based on the false allegations previously presented and rejected—including the books.

## PROCEDURAL BACKGROUND AND FACTS

10. Because Dugaboy throws so much at this Court in an attempt to obfuscate and confuse, Highland provides here a straightforward, objective, and confirmable recitation of facts.

### A. Primer on People and Entities Referred to in the Motion

11. Although certainly not exhaustive,[13] the following identifies and describes some of the entities and their control individuals relevant to the Motion:

- Highland: Co-founded and controlled by Dondero from inception in 1997 until January 2020, when Dondero voluntarily ceded control to an independent board pursuant to a Court-approved agreement. On August 11, 2021, Highland's Plan went effective and reorganized Highland emerged along with the newly formed Highland Claimant Trust.

---

opposing the 9019 Settlement Motion, before effectively consenting to the 9019 Settlement in the withdrawal of its objection. These foundations' decision to sit on the sidelines speaks for itself.

[13] *See* Doc. 2547, *Response and Disclosures Related to the Court's Order Requiring Disclosures,* dated July 9, 2021, along with a supplement dated July 12, 2021, at Doc 2556, for disclosures related to entities in the "DAF" structure. *See* Doc. 2541 and amendments at Docs 2545 and 2549 for similar disclosures related to Dugaboy.

- HMIT: Hunter Mountain Investment Trust was formed in 2015 by John Honis, Dondero's long-time friend and former employee, as part of a highly complex, tax-driven series of transactions designed to shield Dondero's Highland-generated income from taxes. (Mot. at 7) The transactions resulted in HMIT holding 99.50% of the limited partnership interests in Highland (100% of the Class B/C interests which are senior to the *de minimis* Class A interest under the Highland Plan). (Am. Compl. & Obj. to Claims, *Kirschner v. Dondero*, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex.), Dkt. 158 ¶ 27.) Honis had full authority and control of HMIT and the other HMIT Entities, which he voluntarily transferred to Patrick in August 2022 while Patrick was still effectively under Dondero's employ.

- Dugaboy: Formed in 2010 and controlled by Dondero with his sister, Nancy, serving as the titular trustee. Following the 2015 transactions involving HMIT described above, Dugaboy retained only a 0.1866% Class A limited partnership interest in Highland. Additionally, as of the date of the 9019 Settlement, Dugaboy was an obligor on a long-dated promissory note owed to Highland (the "Dugaboy Note"), which was sold to HMIT under the 9019 Settlement. Dugaboy is one of the defendants in an action originally commenced in this Court by the Highland Litigation Trustee. (Am. Compl. & Obj. to Claims, *Kirschner v. Dondero*, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex.), Doc. 158) That action was also transferred to HMIT under the 9019 Settlement. Although that action continues with HMIT as plaintiff, Highland and the Highland Litigation Trustee are no longer involved.

- The Dondero Foundations: Formed in 2011 and effectively controlled by Dondero as their founder, director, president, and principal officer. (Morris Dec. Ex. B (JOL Writ and Statement of Claim) ¶ 61.) The Dondero Foundations organizationally sit below larger foundations, like The Dallas Foundation. (Doc. 4521, Ex. E (Winding Up Petition) ¶¶ 12–13.) Each of the Dondero Foundations have three board members, one of which is Dondero and the other two are associated with the larger foundations. (Morris Dec. Ex. B (JOL Writ and Statement of Claim) ¶ 70.) Dondero is also the president of each Dondero Foundations and its largest, if not only, funder, and each is a member of the Cayman Islands Liquidation Committee for DAF Holdco. (Doc. 4534, Ex E (DAF Holdco Guidance Notes for Members of the Liquidation Committee).)

- DAF Holdco: Tax-blocker shell entity Dondero set up in 2011, now the subject of the Cayman Proceeding. (Doc. 4521, Ex. E (Winding Up Petition) ¶¶ 2, 5, 15; Doc. 4255, Ex. 119 (Dondero Apr. 2025 Aff.) ¶ 9; Morris Dec. Ex. C (Cayman Decision) ¶¶ 24–30.) For both tax and continuing Dondero "control" objectives, DAF Holdco issued non-voting Participating Shares to the Dondero Foundations. (Doc. 4521, Ex. E (Winding Up Petition) at ¶ 10(b); Doc. 4255, Ex. 119 (Dondero April 2025 Affidavit) at ¶ 19) Those Participating Shares were potentially entitled to discretionary distributions from DAF Fund, in which DAF Holdco held non-voting limited partnership interests. (Doc. 4521, Ex E (Winding Up Petition) ¶ 2) But such distributions, if any, were at the sole discretion of DAF Fund's general partner. (Morris Dec. Ex. C (Cayman Decision) at ¶¶ 108(7), 147–48.) Holders of the

Participating Shares do not have, and have never had, any governance, management, information, or control rights over DAF or the DAF Fund. (*Id.* ¶¶ 160–61) Complete control (the "**Control Person**") of (i) DAF Holdco is vested in the owner of the Management Shares of DAF Holdco, and (ii) DAF Fund is vested in the owner of the general partner of the DAF Fund. (Doc. 4521, Ex. E (Winding Up Petition) ¶¶ 10(d), 11; Ex. __ (Dondero Apr. 2025 Aff.) ¶ 12.) The Control Person was initially an individual named Grant Scott, a long-time friend of Dondero who was the best man at Dondero's first wedding. (Doc. 4521, Ex. E (Winding Up Petition) ¶ 16; Doc. 4255, Ex 119 (Dondero Apr. 2025 Aff.) ¶ 15.) Scott voluntarily transferred ownership of the Management Shares and the DAF Fund's general partner to Patrick in March 2021, while Patrick was still effectively under Dondero's employ, making Patrick the Control Person over DAF Holdco as well as DAF and DAF Fund and its subsidiaries. (Doc. 4521, Ex. E (Winding Up Petition) ¶ 16; Doc. 4255, Ex. 119 (Dondero Apr. 2025 Aff.) ¶¶ 17–18, 20–21.)

- <u>Mark Patrick</u>: a Highland tax department employee from approximately 2008 to early 2021. (Doc. 4255, Ex. 119 (Dondero Apr. 2025 Aff.) ¶ 17.) In 2021, Patrick continued his employment at an entity called Skyview, which provides "back office" (tax, legal, accounting, etc.) services to Dondero-controlled entities, including the entities in the DAF structure, just as Highland did before its Plan was confirmed. (*Id.* ¶ 18; Morris Dec. Ex. D (Patrick June 2025 Aff.) ¶¶ 66–70.) In late 2024, Patrick resigned from Skyview and ceased his affiliations with Dondero, including terminating applicable service agreements between the DAF entities he controlled and Skyview. (Morris Dec. Ex. D (Patrick June 2025 Aff.) ¶¶ 71, 147(f).)

### B. Highland Seeks Approval of the 9019 Settlement

12. On May 19, 2025, Highland signed and moved[14] for this Court's approval of the 9019 Settlement with HMIT, the holder of the Class 10 fulcrum contingent trust interest that effectively determines whether subordinated Class 11 contingent trust interest holders (including Dugaboy) will ever receive a distribution from the Highland estate.[15] The 9019 Settlement was straightforward: Highland sold or transferred certain assets to HMIT and promised certain conditional future cash payments on account of its Class 10 interest; HMIT agreed to dismiss all pending litigation with prejudice and provide certain "Litigation Protections" to Highland; and the

[14] Doc. 4216.

[15] Dugaboy's Class 11 interest was always *de minimus*, contingent, and unvested. In fact, the Fifth Circuit has dismissed Dugaboy from several appeals for lack of standing, citing only the remote, speculative possibility that Dugaboy retains any cognizable pecuniary interest in the outcome of this Chapter 11 case.

parties agreed to liquidate and allow HMIT's Class 10 interest in a fixed amount.[16] As this Court observed when approving the 9019 Settlement, "the evidence was very thorough in showing that the compromise is a product of good faith and arm's-length negotiations … it's fair and equitable and in the best interest of the estate and within the range of reasonableness, given due regard for all of the expense, delay and likelihood of success … it looks like Hunter Mountain is getting a lot."[17]

13. As the Court undoubtedly appreciates, approval of a settlement under Bankruptcy Rule 9019 requires the movant to satisfy but a modest standard. This Court already found that Highland easily met that standard and approved the 9019 Settlement in an order that is now on appeal at the District Court. Nothing in the Motion challenges this Court's findings that Highland and the 9019 Settlement satisfied Rule 9019 approval standards.

**C. Objections and Extensive Discovery**

14. Three objections were filed challenging the proposed 9019 Settlement: (1) Patrick Daugherty objected based on his contention that the 9019 Settlement violated the absolute priority rule with respect to his fully reserved claim;[18] (2) The Dallas Foundation (and Crown Global) objected based on allegations that Patrick had somehow breached his fiduciary duties to them and engaged in self-dealing and other fraudulent conduct in connection with DAF Holdco, citing the Cayman Proceeding;[19] and (3) Dugaboy objected arguing that (a) the 9019 Settlement supposedly violated the Plan, (b) the proposed releases were overbroad, and (c) Highland had not presented sufficient evidence to support the 9019 Settlement's approval under Bankruptcy Rule 9019.

[16] Since entry of the 9019 Order, the 9019 Settlement has been fully consummated: the assets sold to HMIT have been transferred; the litigations have been dismissed with prejudice; the allowed Class 10 interests have received initial distributions; and Class 9 holders have received additional distributions.

[17] Doc. 4513, Ex. 23 (Hearing Transcript) at 256:3–5, 10–13, 258:5.

[18] Doc. 4229.

[19] Doc. 4231.

Critically, Dugaboy *did not object on ground that Patrick lacked authority* to act for the settling HMIT Entities or otherwise engaged in allegedly wrongful conduct—only The Dallas Foundation objected on that basis.[20]

15. The parties engaged in extensive discovery. Dugaboy served document requests and interrogatories on Highland. Within days, Highland provided substantive written responses and produced over 4,000 of pages of documents, including all communications and information exchanged between representatives of Highland and HMIT before the 9019 Settlement was executed.[21] Dugaboy never objected to Highland's responses or document productions on any grounds and, for reasons known only to it, never served its own written discovery on HMIT.

16. Dugaboy also took four depositions: (1) James P. Seery, Jr. ("**Seery**") Highland's CEO and the Highland Claimant Trustee; (2) David Klos, a Highland representative; (3) Sean Raver ("**Raver**"), an HMIT representative; and (4) Mark Patrick, the Administrator of HMIT and the control person for all the HMIT Entities.[22] In turn, Highland deposed Julie Diaz and Torrey Littleton,[23] executives at The Dallas Foundation, who each admitted that Patrick controlled HMIT and that they had *no evidence* of wrongdoing by Highland.[24]

17. Dugaboy never moved to compel additional discovery, never objected to the answers provided by any of the four witnesses it chose to depose, and never contended during Patrick's or Raver's depositions or at trial that Patrick (Dugaboy did not call Raver to the stand) had failed to respond fairly to Dugaboy's questions.

---

[20] Doc. 4230.

[21] *See* Doc. 4280, Exhibits 2–57.

[22] *See* Doc. 4243, Doc 4244, Doc. 4245, and Doc. 4259, respectively (Dugaboy's deposition notices).

[23] *See* Doc. 4261 and Doc. 4264, respectively (Highland's deposition notices).

[24] Doc. 4251, Ex. F (Diaz deposition transcript) at 47:11—21, 57:12—19, 71:16—72:2; Doc. 4251, Ex. C (Littleton deposition transcript) at 50:8—57:8, 64:13—66:17, 68:21—70:9. Diaz and Littleton are also officers of one of the Dondero Foundations.

**D. The Dallas Foundation Withdraws Its Objection: Dugaboy Challenges Patrick's Authority for the First Time at Trial**

18. On the eve of the hearing, The Dallas Foundation—the purported economic beneficiary of HMIT and the only party to formally object to the 9019 Settlement based on Patrick's conduct or alleged deficiencies in his authority—resolved its disputes with HMIT, acknowledged that Patrick controlled the HMIT Entities and had authority to enter into the 9019 Settlement on their behalf, and withdrew its objection to the 9019 Settlement with prejudice, explicitly barring itself from asserting any claims against any Highland Released Party (as defined in in the 9019 Settlement) by, through, or under (including derivatively) any HMIT Entity.[25]

19. Dugaboy and Daugherty, on the other hand, pressed their objections. Just before the trial began, in response to the Court's pointed inquiry, Dugaboy's counsel confirmed that Dugaboy *was not challenging* Patrick's authority to enter into the 9019 Settlement on HMIT's behalf.[26] But several minutes later, after speaking with a visibly agitated Dondero, Dugaboy's counsel abruptly changed course and announced that Dugaboy would, for the first time, challenge Patrick's authority to act for HMIT.[27]

20. After asking rhetorically whether it would be an abuse of discretion to permit Dugaboy to change its position (and notwithstanding the supposed bias repeatedly alleged by Dugaboy), Judge Jernigan allowed Dugaboy to proceed with its newly-adopted argument.[28] Yet,

---

[25] *See* Doc. 4282 (*Stipulation Withdrawing Objection Of the Dallas Foundation And Crown Global Life Insurance, Ltd. for Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. §363 Approving Settlement with HMIT Entities and Authorizing Actions Consistent Therewith*); *see also* Doc. 4291 (Order approving stipulation between The Dallas Foundation and HMIT).

[26] This is important because, as discussed below, Dugaboy took this position *already knowing* what it now claims it didn't know at the time.

[27] Doc. 4296, Ex. 23 (June 25, 2025 hearing transcript) at 31:11-32:8 (Dugaboy representing that it was *not* challenging Patrick's authority), 33:11-43:3 (Dugaboy abruptly changing course and arguing over whether and how it should be permitted to do so).

[28] The in-hearing about-face epitomizes well the game of "whack-a-mole" that Highland has been forced to play throughout this case and in the more than 60 appeals Dondero entities have taken from this Court's orders in this case.

despite having the benefit of discovery, including the discovery obtained by The Dallas Foundation on issues pertaining to Patrick's authority, the evidence remained unchanged and unequivocal: Patrick was indisputably the duly authorized administrator of HMIT possessed with full authority to bind HMIT and the other HMIT Entities to the 9019 Settlement with Highland.[29]

**E. Patrick was Authorized to Act on the HMIT Entities' Behalf**

21. Extensive facts and circumstances conclusively demonstrate that Patrick was authorized to negotiate, execute, and consummate the 9019 Settlement on the HMIT Entities' behalf. In fact, Dondero and The Dallas Foundation have repeatedly admitted as much.[30]

**1. Documentary Evidence Established Patrick's Authority**

22. Documentary evidence admitted at trial proved that Patrick was indisputably authorized to act for the HMIT Entities for all purposes, including entering into the 9019 Settlement.[31] Dugaboy's repeated allegations that Patrick lacked such authority are both factually wrong and legally deficient.

23. HMIT is a Delaware statutory trust created and governed by the *Trust Agreement* dated December 17, 2015, between Beacon Mountain, LLC as sponsor, John Honis, as administrator, and Wilmington Trust, N.A. as Delaware trustee (the "**Trust Agreement**").[32] Section 7 of the Trust Agreement expressly delegates to the administrator the exclusive right to

---

[29] Highland describes below how Dugaboy and other Dondero-controlled entities have, since then, ratified and acknowledged Patrick's authority to act for the HMIT Entities in other forums.

[30] *See*, *e.g.*, Doc. 4231 (Dallas Foundation Objection) ¶18 ("Through the Control Position, Mr. Patrick also manages the HMIT Entities . . ."); Doc. 4255, Ex. 119 (Dondero Affidavit) ¶¶ 40–41 (acknowledging Patrick's control as general partner of Atlas IDF, GP, LLC, an HMIT affiliate); Doc. 4521, Ex. F (Diaz Transcript) at 47:11–21, 57:12–19 (admitting that Patrick controls Rand and Diaz is unaware of any facts suggesting that Patrick lacked authority to enter into the Settlement on behalf of the HMIT Entities); Doc. 4521, Ex. C (Littleton Transcript) at 50:8–57:8 (admitting that Patrick was not required to obtain the consent of The Dallas Foundation, the Dondero Foundations, or Crown Global before entering into the 9019 Settlement).

[31] Doc. 4255, Exhibits 70–104.

[32] Doc. 4255, Ex. 70 (*Trust Agreement* dated December 17, 2015).

"settle, compromise, submit to arbitration, or submit to any court having jurisdiction in the matter any matters in dispute …"

24. No one disputes that, on August 12, 2022, Patrick replaced Honis as HMIT's administrator with all rights, powers, and interests appurtenant to that position.[33] Since that time, no one has ever sought Patrick's removal as HMIT's administrator and Patrick's authority as HMIT's administrator has never been challenged. Consequently, Patrick has solely controlled HMIT since that time and possesses and has exercised full authority under the Trust Agreement—including the authority vested in him under Section 7 to settle and compromise any claims asserted by or against HMIT. To argue otherwise is to lie.[34]

### 2. Dugaboy and Dondero Repeatedly Validated and Ratified Patrick's Authority

25. While contending in this Court that Patrick has engaged in wrongdoing that somehow impairs his authority to act on behalf of the HMIT Entities or the DAF Entities, Dugaboy and other Dondero-controlled entities have, when it suits them, openly and repeatedly recognized Patrick's authority and control over such entities and their affiliates both before and after the 9019 Settlement Order was entered. For example:

- On January 10, 2025, Dondero (as President of Highland CLO Management, Ltd.) and Patrick (as HMIT's administrator) executed an *Intercreditor and Participation Agreement* resolving a dispute over who controlled HMIT.[35]

[33] Doc. 4255, Ex. 75 (Hunter Mountain Investment Trust Appointment of Successor Administrator, dated August 12, 2022). In addition to HMIT, on August 1, 2022, Honis voluntarily transferred ownership and control of Atlas IDF GP, LLC, Rand PE Fund Management, LLC, and Rand Advisors, LLC to a Patrick-controlled affiliate, thus giving Patrick complete authority and control over every HMIT Entity.

[34] Under the 9019 Settlement, Patrick authorized HMIT to resolve litigation that was either initiated jointly with Dugaboy or that Dugaboy otherwise supported. *See* Doc. 4255, Ex. 1 at 6–7 (Settlement Agreement and General Release, definition of "Pending Litigation").

[35] Doc. 4255, Ex. 69. This agreement was executed after Patrick learned that Dondero had usurped Patrick's authority by having Dondero's counsel sign another agreement on HMIT's behalf without seeking or obtaining Patrick's prior approval. Dondero knew of Patrick's supposed wrongdoing when he entered into this agreement. *See* Doc. 4255, Ex. 119 (Affidavit of Dondero in Cayman Proceeding) ¶¶20-33.

- On the same day, another Dondero-controlled entity entered into a remittance agreement with Patrick (on behalf of DAF Holdco and another DAF Entity) that caused the Dondero-controlled entity to remit approximately $8.3 million to the Patrick-controlled entities.[36]

- On July 11, 2025, the Dondero Foundations and Patrick, acting on behalf of DAF Fund and certain of its affiliates (including certain entities Dondero alleges were created as part of Patrick's fraudulent scheme), entered into a "Rule 11 agreement" under which the Dondero Foundations' claims for the appointment of a receiver and other injunctive relief were resolved with Patrick's retaining control of all entities.[37]

- On September 30, 2025, NexBank (the Dondero-owned Texas bank) and MidWave Wireless Inc. (a portfolio company owned by multiple Dondero-managed funds), and DAF entity CLO Holdco executed an amendment to a credit agreement. A NexBank representative signed as Administrative Agent and Patrick signed on behalf of CLO Holdco.[38]

- On December 3, 2025, Patrick, acting on behalf of DAF entity Liberty CLO Holdco and Dugaboy entered into a *Stipulation* settling a dispute whereby Liberty CLO Holdco withdrew its Complaint with prejudice with Patrick retaining full authority over Liberty CLO Holdco.[39]

- On December 8, 2025, Patrick, acting on behalf of Atlas IDF, L.P. (an HMIT Entity), and NexPoint Real Estate Partners ("NREP", an entity owned and controlled by Dugaboy) entered into an *Agreed Final Judgment* under which NREP agreed to pay Atlas IDF over $14 million as the guarantor of certain defaulted promissory notes.[40]

- On or about December 30, 2025, Dugaboy recognized the 9019 Settlement transfer of the Dugaboy Note from Highland to HMIT as well as Patrick's control of HMIT by paying HMIT the $1.357 million in principal and interest then due on the Dugaboy Note.

26. Thus, despite baselessly challenging Patrick's authority in this Court, Dugaboy and Dondero have no qualms about engaging with Patrick on behalf of the DAF as well as the very same HMIT Entities that are the subject of the Motion. They have repeatedly validated and ratified

[36] Morris Dec. Ex. E.

[37] Morris Dec. Ex. F.

[38] Morris Dec. Ex. G.

[39] Morris Dec. Ex. H.

[40] Morris Dec. Ex. I.

Patrick's control over those entities and their affiliates. It apparently only becomes a problem when Highland contracts with those entities and those agreements thwart Dondero's ceaseless litigation campaign.

### 3. The Dondero Foundations Seek Injunctive Relief and a Receiver to Replace Patrick as the DAF Entities' Control Person

27. The very next day after this Court entered the 9019 Settlement Order, Dondero opened another front in his assault against Patrick. On July 1, 2025, the Dondero Foundations sued Patrick and certain of his affiliates (collectively, the "**DAF Parties**") in the Texas Business Court, First Division, Case No. 25BC01B-0027 (the "**Dondero Foundations' Action**"), asserting a variety of claims and asking the court to impose a constructive trust and appoint a receiver over certain DAF Parties. The Dondero Foundations' Action included, among other things, another affidavit from Dondero.[41] By their own admission, the Dondero Foundations' arguments were premised on the "same facts" used to support the Dondero Foundations' winding-up petition and supervision application in the Cayman Islands and The Dallas Foundation's objection to the 9019 Settlement Motion (i.e., Patrick's alleged misuse of corporate authority in the management and restructuring of DAF Holdco).[42] In fact, Dondero's affidavit in the Dondero Foundations' Action is largely cut and pasted, verbatim, from his prior affidavit filed on April 16, 2025, in the Cayman Islands in support of winding up DAF Holdco.[43]

28. With notice of the JOLs' Chapter 15 petition filed in the District of Delaware on July 21, 2025, the Texas Business Court abated the Dondero Foundations' Action on September

[41] Doc 4251, Ex. H, Ex. 6 (Dondero affidavit (7/1/25).

[42] Doc. 4521, Ex. H (Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver) ¶ 5.54 ("Cayman Islands counsel for the Supporting Organizations alleged essentially the same facts as recounted in this Petition before the Grand Court").

[43] *Compare* April 16, 2025 Affidavit of Dondero in Cayman Proceeding, Doc. 4255, Ex. 119, *with* July 1, 2025 Affidavit of Dondero in Dondero Foundation Action. He even left in the European style dates in certain paragraphs. *See, e.g.,* Doc. 4251, Ex. H, Ex. 6, ¶¶ 6, 7, 18, and 22.

18, 2025, finding the JOLs were "necessary parties" under applicable law and that abatement was required until the JOLs "become parties, voluntarily or involuntarily."[44] The Dondero Foundations subsequently moved to reconsider the September order, which the Texas court denied,[45] finding that, if they held any claims at all, the Dondero Foundations held only derivative claims against the DAF Parties, which could not be asserted without the JOLs' joinder, and re-affirmed its decision abating the Dondero Foundations Action.[46] Importantly, the Dondero Foundations entered a Rule 11 Agreement immediately after the filing of the petition initiating the Dondero Foundations' Action, that left Patrick's control intact, which remains in effect.[47]

29. To state the obvious, Patrick remains in control of the DAF Parties (and DAF) despite the Dondero Foundations' Action. The HMIT Entities—which, again, were never mentioned in the Dondero Foundations' petition in the Dondero Foundations' Action or in Dondero's affidavit—also remain under Patrick's control. Patrick remained unsullied by any court's finding that he engaged in any wrongdoing at any time.

### 4. No One Has Ever Sought to Remove Patrick as the HMIT Entities' Control Person

30. For all of Dugaboy's bluster, it is indisputable that the JOLs (appointed as liquidators solely over DAF Holdco) have *never objected* to the 9019 Settlement nor have they ever appeared in this bankruptcy case. This remains true despite the supposed "newly discovered evidence" that Dugaboy pretends exists; indeed, to the best of Highland's knowledge, the JOLs

[44] *Order*, dated September 18, 2025, ¶ 3.

[45] *Order*, dated October 31, 2025, ¶ 1 ("The court (i) grants plaintiffs' October 22, 2025, Motion for Leave to File Motion for Reconsideration as to Complete Relief, (ii) deems plaintiffs' Motion for Reconsideration filed, and (iii) denies the same").

[46] Refusing to relent in the face of two failures, the Dondero Foundations subsequently sought a writ of mandamus, which was denied on February 24, 2026. *In re Highland Dall. Found., Inc.*, 2026 Tex. App. LEXIS 1769 (Texas, 15th Dist. 2026).

[47] Morris Dec. Ex. F, Rule 11 Agreement, ¶7.

have never sought any relief in any court pertaining to the 9019 Settlement or Patrick's authority over the HMIT Entities. Nor have they alleged that Patrick engaged in *any* wrongdoing with respect to Highland, the HMIT Entities, or the 9019 Settlement.[48]

31. Indeed, *no one* has ever sought to remove Patrick as HMIT's administrator or as the authorized representative of any of the HMIT Entities. *No one* (other than Dugaboy, baselessly, in the Motion) has ever contended that Patrick breached his fiduciary duties or otherwise engaged in wrongdoing as HMIT's administrator, the control person of the other HMIT Entities, or in connection with the 9019 Settlement.

**F. Correcting Dugaboy's Misstatements and Omissions**

32. In its hopeless effort to meet the exacting Rule 60 standard for vacating the 9019 Settlement Order, Dugaboy indulges in the same type of blunderbuss approach the Fifth Circuit chastised it for,[49] layering false statements, mischaracterizations, and material omissions of fact in a motion filled with "sound and fury, signifying nothing."[50]

**1. No "New Evidence" Exists for Purposes of Rule 60**

33. Dugaboy has buried the Court in paper in an obvious attempt to obscure that no "new evidence" exists for purposes of Rule 60. Under Rule 60(b)(2), "newly discovered evidence" is evidence that "could not have been discovered in time to move for a new trial," within 28 days after the entry of judgment; here, July 28, 2025.[51]

---

[48] The JOLs have indicated that their claims against Patrick have nothing to do with Highland or the 9019 Settlement by advising the Delaware banktupcy court that: "The JOLs believe the the Cayman Court is the appropriate forum to adjudicate causes of action that belong to [DAF Holdco] as asserted in the [Cayman Proceeding]." (Morris Dec. Ex. J (Ch. 15 Verified Petition) at ¶ 99).

[49] *In re Highland Cap. Mgmt., L.P.*, No. 21-10449, at 16 (5th Cir. Sept. 7, 2022).

[50] Shakespeare, *Macbeth,* Act V, Scene 5.

[51] Here, the Judgment was entered on June 30, 2025 (Doc. 4297), so the deadline for a new trial under Rule 59(b) was July 28, 2025.

34. On February 9, 2025, Dugaboy filed 54 exhibits spanning more than 1,100 pages with an index that omitted dates for many of the exhibits.[52] On February 27, 2025, Dugaboy dumped a 1,789-page "supplement" of over 100 additional exhibits—with no cover sheet, no index, and no explanation of any kind.[53] To bring clarity to Dugaboy's curated chaos, and for the Court's convenience, Highland prepared Dugaboy's Index, including available dates.[54] Dugaboy's Index shows that virtually every document existed and was either already in Dugaboy's possession or, with reasonable diligence, could have been obtained before July 28, 2025. The same substantive allegations concerning Patrick's supposed misconduct with respect to DAF Holdco and the DAF entities (none of whom are party to the 9019 Settlement) were pressed in various forms to four different courts before July 28, 2025, and can all be found in the following documents (collectively, the "**Lead Documents**"):

- *Affidavit of James David Dondero*, sworn to on April 16, 2025, and filed in the Grand Court of the Cayman Islands (the "**Dondero Affidavit**").[55]
- *The Winding Up Petition* filed by the Dondero Foundations in the Grand Court of the Cayman Islands on April 23, 2025 (the "**Winding Up Petition**").[56]
- The Dondero Foundations' *Petition for Court Supervision of a Voluntary Liquidation of DAF Holdco* and the JOL's appointment on May 2, 2025 (the "**Supervision Application**").[57]
- The Dallas Foundation's objection to the 9019 Settlement filed on June 9, 2025 (the "**Dallas Foundation Objection**").[58]

[52] Doc. 4513.
[53] Doc. 4521. *See also* Doc 4525 (more unorganized exhibits spanning about 130 pages filed under seal).
[54] Morris Dec. Ex.A.
[55] Doc. 4255, Ex. 119.
[56] Doc. 4521, Ex. E.
[57] Doc. 4521, Ex. G, Ex. 67.
[58] Doc. 4231.

- The depositions of Messrs. Patrick and Raver (the "**Patrick Deposition**" and the "**Raver Deposition**", as applicable).[59]

- Highland's Court-admitted Exhibits[60]

- The 9019 Hearing Transcript[61]

- The Dondero Foundations' *Original Petition, Application for Temporary Restraining Order and Temporary Injunction and Emergency Request for Appointment of Receiver* filed in the Texas Business Court on July 1, 2025 (the "**Dondero Foundations' Action**").[62]

- The *Writ of Summons and Statement of Claim* filed by the JOLs in the Grand Court of the Cayman Islands on July 15, 2025 (defined above as the "**JOL Writ**").[63]

- Dugaboy's *Motion to Stay 9019 Order* filed in this Court on July 17, 2025,[64] denied by this Court in a 16-page *Memorandum Opinion and Order* on July 21, 2025 (the "**Motion to Stay**").[65]

- The *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "**Ch. 15 Petition**") and the accompanying *Declaration of Margot MacInnis* (including 94 exhibits), sworn to on July 21, 2025, and filed in United States Bankruptcy Court for the District of Delaware (the "**July 2025 MacInnis Declaration**").[66]

35. Based on the Lead Documents alone, Dugaboy knew everything it claims only now to have "discovered" regarding Patrick's alleged fraud, self-dealing, and breaches of fiduciary duty in connection with the "restructuring" of DAF Holdco, *which does not even involve HMIT or any HMIT Entity.*

---

[59] Doc. 4513, Ex. 49 (Patrick Deposition); Morris Dec. Ex. K (Raver Deposition).

[60] Doc. 4255.

[61] Doc. 4269.

[62] Doc. 4521, Ex. H.

[63] Doc. 4326, Ex. A.

[64] Doc. 4326.

[65] Doc. 4333.

[66] Doc. 4521, Ex. G (including the 94 exhibits).

36. In addition to the Lead Documents, the following chart briefly summarizes certain facts that Dugaboy now pretends it was unaware of but which were all known to Dugaboy before July 28, 2025, and therefore cannot constitute "newly discovered" evidence:[67]

| **Alleged "New" Information** | **How Dugaboy / Dondero Already Knew** (not exhaustive) | **By when?** |
|---|---|---|
| Patrick has controlled DAF Entities since 2021 | • Dondero Affidavit of April 16, 2025<br>• Winding Up Petition of April 23, 2025<br>• Dallas Foundation Objection of June 9, 2025<br>• Dondero Foundations Action of July 1, 2025<br>• 2021 CLOH SH Resolutions of April 2, 2021[68]<br>• DAF GP Assignment and DAF Holdco Share Transfer of March 24, 2021[69] | March 2021 |
| Patrick has controlled HMIT Entities since 2022 | • Dondero Affidavit of April 16, 2025<br>• Dallas Foundation Objection of June 9, 2025<br>• Membership Interest Purchase Agreement of August 1, 2022[70]<br>• Atlas GP, Rand Advisors, and Rand GP Consents of October 13, 2022[71]<br>• HMIT Appointment of August 12, 2022[72] | August 2022 |
| CDH GP replaced DAF GP as general partner of DAF Fund | • Winding Up Petition of April 23, 2025<br>• Dallas Foundation Objection of June 9, 2025<br>• Raver Deposition of June 20, 2025<br>• Foundations Action of July 1, 2025<br>• JOL Writ of July 15, 2025<br>• Chapter 15 Petition of July 21, 2025 | April 2025 |
| DFW Foundation was formed by Patrick with Patrick as its sole member | • Supervision Application of May 2, 2025<br>• Dallas Foundation Objection of June 9, 2025<br>• Foundations Action of July 1, 2025<br>• JOL Writ of July 15, 2025<br>• Dugaboy Stay Motion of July 17 2025<br>• Ch. 15 Petition of July 21, 2025 | May 2025 |
| DAF Holdco issued participating shares to DFW Foundation, diluting supporting organizations | • Supervision Application of May 2, 2025<br>• Dallas Foundation Objection of June 9, 2025<br>• Raver Deposition of June 20, 2025<br>• Dondero Foundations Action of July 1, 2025<br>• JOL Writ of July 15, 2025<br>• Ch. 15 Petition of July 21, 2025 | May 2025 |

[67] In the interests of brevity, Highland has omitted citations to dozens of court-filed documents and other authenticated documents substantiating the contents of the following chart.

[68] Doc. 2547, Ex. 29.

[69] Doc. 2547, Ex. 15, 27.

[70] Doc. 4255, Ex. 86.

[71] Doc. 4255, Ex. 82, 87, 88.

[72] Doc. 4255, Ex. 75.

| Alleged "New" Information | How Dugaboy / Dondero Already Knew (not exhaustive) | By when? |
|---|---|---|
| DAF Holdco transferred DAF Fund to CDM, CDM redeemed DAF Holdco, supporting organizations left with no remaining interest in DAF Fund | • Supervision Application of May 2, 2025<br>• Dallas Foundation Objection of June 9, 2025<br>• Patrick Deposition of June 23, 2025<br>• Raver Deposition of June 20, 2025<br>• 9019 Hearing Transcript<br>• Dondero Foundations Action of July 1, 2025<br>• JOL Writ of July 15, 2025<br>• Ch. 15 Petition of July 21, 2025 | May 2025 |
| Beacon Mountain (and HMIT indirectly) was sold to CLOH,[73] Patrick controlled CLOH, DFW Foundation is ultimate owner | • Dondero Affidavit of April 16, 2025<br>• Winding Up Petition of April 23, 2025<br>• Dallas Foundation Objection of June 9, 2025<br>• Raver Deposition of June 20, 2025<br>• Patrick Deposition of June 23, 2025<br>• Littleton Deposition of June 23, 2025<br>• Highland Ex. 95[74]<br>• 9019 Hearing Transcript; Highland Demonstrative[75]<br>• Email of March 12, 2025<br>• Beacon Mountain Second Amended and Restated LLC Agreement of February 12, 2025 | April 2025 |
| Atlas IDF placed into dissolution | • Dondero Affidavit of April 16, 2025<br>• Winding Up Petition of April 23, 2025<br>• Dallas Foundation Objection of June 9, 2025 | April 2025 |
| Allegations re DAF directors' fees, expenses, and remuneration | • Dondero Affidavit of April 16, 2025<br>• Winding Up Petition of April 23, 2025<br>• Dallas Foundation Objection of June 9, 2025<br>• Foundations Action of July 1, 2025<br>• JOL Writ of July 15, 2025<br>• Ch. 15 Petition of July 21, 2025 | April 2025 |
| Allegations re Creative HEARTS TX donation | • Dondero Affidavit of April 16, 2025<br>• Winding Up Petition of April 23, 2025<br>• Dallas Foundation Objection of June 9, 2025<br>• Dondero Foundations Action of July 1, 2025 | April 2025 |
| Allegations re proposed fee split with Cronin/Fortaris Capital Advisors | • Dondero Affidavit of April 16, 2025<br>• Winding Up Petition of April 23, 2025<br>• Dallas Foundation Objection of June 9, 2025<br>• Dondero Foundations Action of July 1, 2025 | April 2025 |

[73] CLOH refers to CLO Holdco LLC (Delaware), the parent of Beacon Mountain LLC (Delaware) which is an HMIT Entity.

[74] Doc. 4255.

[75] Doc. 4296 (9019 Hearing Transcript; Morris Dec. Ex. L at Slide 9 (Highland Rule 9019 Presentation presented as a demonstrative exhibit at the 9019 Hearing).

**2. Dugaboy was Not Prevented from Preparing for Trial**

37. Dugaboy contends for the first time here that it was denied discovery. That contention is risibly **false**.

38. Dugaboy never challenged any of the documents or information Highland promptly produced in response to Dugaboy's document requests (Highland produced over 4,000 pages of documents) and interrogatories. Neither did Dugaboy challenge any of Patrick's or Raver's answers in their depositions other than a few immaterial answers. In fact, any fair reading of Patrick's deposition transcript shows that he answered all substantive questions put to him, including who owned HMIT and who controlled all of HMIT's affiliates. And those answers were consistent with Raver's deposition testimony. Dugaboy's own counsel elicited this same testimony at trial. Dugaboy cannot dispute that it never objected to Patrick's or Raver's answers during the depositions or the trial or lodged any complaint of any kind that Dugaboy was somehow unable to get information it believed it needed to pursue its objection.[76]

**3. Dugaboy Failed to Disclose the Adverse and Dispositive Decision from the Cayman Court**

39. While imploring this Court to hold approval of the 9019 Settlement in abeyance while the Cayman Proceeding "played out," Dugaboy deliberately failed to tell this Court those proceedings *had already* played out and that the JOLs and the Dondero Foundations lost. A lie of omission is no less a lie.

[76] Although Dugaboy moved for a "stay" on July 17, 2025, based on the JOL Writ filed in the Cayman Proceeding two days earlier, this Court denied that stay because, among other reasons, it reaffirmed that (i) the Settlement Agreement was fair and equitable, within the range of reasonableness, and in the best interests of Highland's estate being administered under a confirmed plan by disinterested fiduciaries; (ii) Patrick controlled the HMIT Entities; (iii) The Dallas Foundation withdrew its objection to the Settlement with prejudice; and (iv) nothing about the Court's issuance of the Settlement Order affected the Cayman Proceeding or any other investigation. Even when given an opportunity to allege evidence so much as *implying* that the Cayman Proceeding was at all related to HMIT or Patrick's authority over HMIT, Dugaboy failed. And it failed because no such evidence exists. **There is no connection between the DAF Holdco liquidation and the 9019 Settlement or the HMIT Entities.**

40. On February 10, 2026, following a two-day hearing in December 2025, the Grand Court of the Cayman Islands issued a 56-page written judgment (the "**Cayman Decision**") rejecting virtually all of the claims asserted in the JOL Writ filed on July 15, 2025.[77] The Cayman Decision, like the JOLs' pleadings, **never mentions HMIT (or any other HMIT Entity) or the 9019 Settlement**. In detailed findings, the Cayman court denied the JOLs' motion for a proprietary injunction, made substantial findings in Patrick's favor, and affirmed Patrick's past and continued control of the entities and assets in question.[78] Among other findings, the Cayman court expressly found that DAF Holdco, the sole entity over which the JOLs have been appointed as liquidators, had no control over any of the entities or assets that Patrick controls.[79] It remains true that the Cayman Proceeding has nothing to do with HMIT or the other HMIT Entities, nothing to do with Highland, and nothing to do with the 9019 Settlement.

41. Disturbingly, Dugaboy possessed an advance draft of the Cayman Decision before filing the Motion but failed to disclose its existence or contents to this Court. Having pleaded with this Court to wait for the JOLs to complete their investigation, and for the Cayman Proceeding to be completed before ruling on the 9019 Settlement Motion, Dugaboy's failure to disclose that the JOLs' investigation was complete and that the Cayman court issued an adverse ruling is unethical and an abuse of process for which Dugaboy and its counsel should be held to account.

---

[77] Morris Dec. Ex. B (JOL Writ) and C (Cayman Decision).

[78] The Cayman court did leave open the modest possibility for a potential claim for monetary damages for breach of fiduciary duty, but stated any damages would be paid from the DAF Fund's assets, not Patrick.

[79] "The Court has carefully considered whether [DAF Holdco], as a limited partner in the [DAF] Fund, has a proprietary interest as a limited partner which would entitle it to be protected by way of the injunction sought and/or an indirect beneficial interest in the underlying assets of the [DAF] Fund. The Court answers both of these questions in the negative." Morris Dec. Ex. C (Cayman Decision) at ¶¶130–31) "The limited partnership interest in this case is not a proprietary interest in the assets themselves but the right to be considered for potential distributions which [DAF Holdco] then passes on to the Charities. The Court is not satisfied in this case that there is a real prospect of showing that [DAF Holdco] has a legitimate proprietary claim to legal or beneficial ownership of the assets it seeks to injunct." (Morris Dec. Ex. C (Cayman Decision) at ¶¶139–40) "The Court has concluded that the Fund structure in this case gave [DAF Holdco] and its Participating Shareholders no rights of legal or beneficial ownership or indeed control with regard to [DAF Fund] and its assets." (Morris Dec. Ex. C (Cayman Decision) at ¶185).

### 4. Dugaboy Failed to Disclose that the Dondero Foundations Serve on the Liquidation Committee in the Cayman Proceeding and Had Complete Access to all Information in the Cayman Islands

42. Dugaboy and Dondero knew, but failed to disclose in their Motion, that the Dondero Foundations have served on the Liquidation Committee of DAF Holdco as part of the Cayman Proceeding since July 2025,[80] and falsely suggest that they just recently discovered information emanating from the Cayman Islands. Nonsense.

43. As members of the DAF Holdco Liquidation Committee, the Dondero Foundations had access to—or with reasonable diligence, could have had access to—all information in the Cayman Proceeding, including the information in the JOLs' possession and information supposedly filed under seal.

44. Dondero is funding the JOLs litigation directly and indirectly through Crossvine which has rights to Cayman Proceeding pleadings. As the Cayman court noted: "Crossvine is apparently 'incorporated for the purpose of ultimately Mr. Dondero…funding the liquidation of [CLO Holdco] and the JOLs pursing the [Cayman Proceeding]'"[81]

45. Thus, nothing learned in the Cayman Islands could possibly constitute "newly discovered" evidence because Dondero—as both Dugaboy's control person and lifetime beneficiary and the Dondero Foundations' benefactor, Board member, president and principal officer, and litigation funder, and the funder of the Cayman Proceeding—knew or could have known it all contemporaneously.

---

[80] Morris Dec. Ex. M.

[81] Morris Dec. Ex. C (Cayman Decision) ¶72. "Crossvine" is Crossvine Litigation Funding LLC, an entity formed by Dondero's longtime henchman, Scott Ellington (Highland's pre-petition general counsel), to fund the Cayman Proceeding and actions against Patrick.

### 5. Recusal, Which Dugaboy Grossly Misrepresents, is Irrelevant

46. Dugaboy has proved itself incapable of filing a single pleading in any federal court without harping on about how Judge Jernigan should have recused (ostensibly) at the outset of the Chapter 11 Case in 2019 (ignoring, among other inconvenient facts, that Dondero did not even seek recusal for the first time until March 2021, after Highland's plan was confirmed). At this point, Dugaboy's insistence on pressing the recusal issue is not just tiresome and bemusing; it's dishonest.

47. Recusal is exquisitely irrelevant and appeal after unsuccessful appeal should have chastened Dugaboy by now. But Dugaboy persists, doing the same thing over and over again while hoping for a different result. Only by mischaracterizing or ignoring the tortured history of its *five failed recusal motions* can Dugaboy manage to thrust the issue once more into the breach. The indisputable facts remain these:

- The Fifth Circuit has *thrice* rejected Dugaboy's attempts to recuse Judge Jernigan;
- The Fifth Circuit rejected, in excruciating, excoriating detail, every single instance of purported bias that Dugaboy and Dondero have alleged against Judge Jernigan;
- The District Court dismissed Dugaboy's latest recusal-related appeal, making it the seventh time Dugaboy has failed to persuade an appellate court that Judge Jernigan should be recused;
- Without exception, federal courts throughout the Fifth Circuit have repeatedly affirmed scores of Judge Jernigan's rulings in more than *five dozen* appeals Dondero entities have taken in this one bankruptcy case;
- After orchestrating spurious private ethics complaints by his own employees against Judge Jernigan, Dondero *still* failed to persuade Fifth Circuit Chief Judge Elrod that Judge Jernigan had done anything warranting recusal.[82]

[82] With no finding of wrongdoing and scarce little left of the Highland bankruptcy case, Judge Jernigan voluntarily recused herself for reasons she has not publicly disclosed.

48. None of this recusal nonsense matters in the least. Given that the matter has been fully and finally litigated without any finding of bias or prejudice, there is simply no legal basis—and, unsurprisingly, Dugaboy cites none—that authorizes this Court to revisit any of Judge Jernigan's prior orders or judgments on the allegation of bias, let alone through a Rule 60 motion challenging a specific order that ***no party objected to on the grounds of bias***. Not only did Dugaboy fail to preserve any argument pertaining to recusal before or during the trial, and not only did Dugaboy fail to even *mention* some concern regarding bias on the record of the trial, Dugaboy also fails now to cite any basis in law or equity to relitigate *any* part of the Highland case (much less all of it) through a Rule 60 motion, whether based on recusal or not.[83]

### 6. The Allegations of Fraud, Even if True, are Irrelevant

49. Aside from Dugaboy's utter failure to satisfy any standard for relief under Rule 60 as a matter of law, the intentionally confusing splatter of allegations set forth in the Motion, even if true, are entirely irrelevant to the 9019 Settlement.

50. Dugaboy's allegations have nothing to do with how Patrick obtained or maintained authority and control over the HMIT Entities—Patrick obtained that authority and control from John Honis in a voluntary transaction that was consummated nearly four years ago in August of 2022.

51. Dugaboy's allegations have nothing to do with how Patrick exercised that authority and control in entering into the 9019 Settlement—irrespective of the "DAF restructuring," no consent from any other person or entity (other than Patrick) was ever required to enter into 9019 Settlement on behalf of the HMIT Entities, including, without limitation, The Dallas Foundation, Crown Global, any Dondero Foundation, any DAF Entity, DAF Holdco, the JOLs, or Dondero or

[83] Highland reserves its right to object to all evidence Dugaboy attempts to introduce in the hearing on the Motion on all grounds, including relevance.

Dugaboy. That was true before the "DAF restructuring" and it remained true after the "DAF restructuring." Simply put, the "DAF restructuring" did not create, limit, or modify Patrick's authority and control over the HMIT Entities in any way—and Dugaboy has not and cannot establish otherwise.

52. The assertion that Patrick lacked authority or control over the HMIT Entities or the DAF Entities is contradicted by the nature of the actual claims brought by the JOLs in the Cayman Proceeding and the Dondero Foundations in the Texas Business Court. At its heart, these are claims that Patrick breached fiduciary duties that arise directly from the very control position that Dugaboy now tries to question. Even theoretically, Patrick could not have breached any duty in the manner Dugaboy alleges unless he also had the control position over DAF and DAF Holdco – without the control position there would be no duty for Patrick to breach. And, again, the complaint of how Patrick exercised that control of DAF has nothing to do with his clear authority over the HMIT Entities and their execution and consummation of the 9019 Settlement.

53. Likewise, any complaint by Dugaboy regarding the terms of the 9019 Settlement is completely undercut by the public disclosure and Court approval of those terms. The record of the 9019 Hearing shows that the 9019 Settlement was negotiated at arm's-length in good faith by willing, sophisticated participants with sophisticated advisors. Approval of the 9019 Settlement was sought on regular and proper notice. Objectors were given full and fair disclosure and the opportunity to take discovery, cross-examine witnesses and present their objections at a full-day evidentiary hearing. This Court issued detailed findings of fact and conclusions of law in connection with the 9019 Order. Even The Dallas Foundation withdrew its objection with prejudice and consented to the 9019 Settlement. There is simply no reason whatsoever to vacate the 9019 Order.

## ARGUMENT

54. The sole legal basis Dugaboy relies on for a reconsideration (or vacatur) of this Court's approval of the 9019 Settlement is Federal Rule of Civil Procedure 60—specifically, Rule 60(b)(2), (3), and (6)—incorporated into this Chapter 11 case via Bankruptcy Rule 9024. Rule 60 provides Dugaboy no basis for relief from the 9019 Settlement Order under the incontrovertible facts and circumstances presented here. There is no newly discovered evidence. There was no fraud by Highland that precluded Dugaboy from fairly objecting to the 9019 Settlement Motion. There were no extraordinary circumstances justifying a new challenge to the 9019 Settlement Order. Reconsidering, vacating, vitiating (or whatever verb Dugaboy wishes to use) the 9019 Settlement Order on this record is unwarranted and should be denied.

### A. Rule 60(b) Relief is Unwarranted

#### 1. Legal Standard

55. Motions for relief from judgment under Rule 60(b) are disfavored and rarely granted. The Fifth Circuit requires "extraordinary circumstances" for relief under Rule 60(b) and holds that such motions should be granted "only if extraordinary circumstances are present."[84] Rule 60(b) empowers a court to grant relief from a "final judgment, order, or proceeding" for, among others, the following reasons: newly discovered evidence; fraud, misrepresentation, or misconduct by an opposing party; or "any other reason that justifies relief."[85] The Fifth Circuit has identified numerous considerations that guide a court's evaluation of a Rule 60(b) motion, including that (i) final judgments should not lightly be disturbed; (ii) the Rule 60(b) motion is not

---

[84] *Hess v. Cockrell*, 281 F.3d 212, 216 (5th Cir. 2002); *see also Garcia v. Davis*, 2018 WL 6305591, at *9 (N.D. Tex. Dec. 3, 2018), *aff'd sub nom. In re Garcia*, 756 F. App'x 391 (5th Cir. 2018) (same); *Canale v. Manco Power Sports, LLC*, 2010 WL 2771871, at *2 (S.D.N.Y. July 13, 2010) ("Motions for relief under Rule 60(b) are disfavored, and are reserved for exceptional cases").

[85] *See* Fed. R. Civ. P. 60(b)(1), (2), (6).

to be used as a substitute for appeal; and (iii) whether the motion was made within a reasonable time.[86]

56. "[R]elief under Rule 60(b) is circumscribed by public policy favoring finality of judgments and termination of litigation."[87] "The party seeking relief under Rule 60(b) bears the burden of establishing the grounds for such relief by clear and convincing evidence."[88] Courts have broad discretion to deny motions for relief under Rule 60(b), deferring to the original order's apparent validity "to ensure that 60(b) motions do not undermine the requirement of a timely appeal"[89] (such as the one Dugaboy has already taken and fully briefed).

57. Dugaboy fails to meet its heavy burden of demonstrating the extraordinary relief it seeks. Dugaboy does not and cannot identify any newly discovered evidence, required for relief under Rule 60(b)(2). Dugaboy does not and cannot identify any instance of fraud by Highland as the opposing party, required for relief under Rule 60(b)(3). And Dugaboy does not and cannot identify any extraordinary circumstances present here that would warrant extraordinary relief under Rule 60(b)(6). Despite its dizzying length and density, the Motion does not come close to substantiating any basis for relief under Rule 60(b). It should be denied.

**2. There is No "Newly Discovered Evidence" as Required Under Rule 60(b)(2)**

58. Dugaboy has not offered any "newly discovered evidence" sufficient to warrant relief under Rule 60(b)(2). To obtain Rule 60(b)(2) relief, a movant must: (1) come forward with

---

[86] *See, e.g., Edward H. Bohlin Co., Inc. v. The Banning Co., Inc.*, 6 F.3d 350, 356 (5th Cir. 1993).

[87] *In re South*, 647 B.R. 535, 537 (Bankr. E.D. Tex. 2023) (quoting *Blue Diamond Coal Co. v. Trs. of UMWA Combined Benefit Fund*, 249 F.3d 519, 524 (6th Cir. 2001)); *In re Wigington*, 2021 WL 2134651 at *3 (Bankr. E.D. Tex. May 25, 2021); *see also Halliburton Energy Servs., Inc. v. NL Indus.*, 618 F. Supp. 2d 614, 620 (S.D. Tex. 2009) ("Relief under Rule 60(b) is an extraordinary remedy; 'the desire for a judicial process that is predictable mandates caution in reopening judgments'") (quoting *In re Pettle,* 410 F.3d 189, 191 (5th Cir. 2005)).

[88] *Info-Hold, Inc. v. Sound Merch., Inc.*, 538 F.3d 448, 454 (6th Cir. 2008) (citations omitted).

[89] *Halliburton Energy*, 618 F. Supp. 2d at 620.

newly discovered evidence that it could not have discovered had it "exercised due diligence" within the time for seeking a new trial under Rule 59(b); and (2) show that the newly discovered evidence is "material and controlling and clearly would have produced a different result if present before the original judgment."[90] A judgment should not and will not be reopened if the evidence is merely cumulative or impeaching and would not have changed the result.[91] "[N]ewly discovered evidence must be in existence at the time of [the final judgment] and not discovered until after [the final judgment]."[92]

59. Here, all the information (and almost every summarizing document) Dugaboy relies on for its Motion were known to Dugaboy before trial and certainly within the time to seek a new trial under Rule 59 and Bankruptcy Rule 9023. If any "evidence" was truly discovered after then, it (a) did not exist at the time of trial, (b) could have been discovered by Dugaboy with reasonable diligence in time to seek a new trial, or (c) is cumulative of facts already known, immaterial, and would not have produced a different outcome on the 9019 Settlement Motion.

60. **First**, all the factual allegations Dugaboy includes in its Motion were known by Dugaboy and specifically pled in this Court and other courts before the Rule 59 / Bankruptcy Rule 7023 deadline to seek a new trial. (*see supra* ¶36 (chart)) Some of Dugaboy's purported "new" evidence are documents that did not even exist when this Court considered the 9019 Settlement at trial on June 25, 2025. For instance, Dugaboy now maintains that the "first real evidence" about Patrick's alleged fraud is contained in the JOL Writ filed on July 15, 2025, in the Cayman

[90] *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 639 (5th Cir. 2005) (quoting *Goldstein v. MCI WorldCom*, 340 F.3d 238, 257 (5th Cir. 2003)).

[91] *See Trans Mississippi Corp. v. United States*, 494 F.2d 770, 773 (5th Cir.1974).

[92] *Parker v. Wal-Mart Stores, Inc.*, 251 F.R.D. 222, 226 (S.D. Miss. 2008), *aff'd,* 464 F. App'x 224 (5th Cir. 2010) (internal quotations omitted); *see also Nat'l Labor Relations Bd. v. Jacob E. Decker and Sons,* 569 F.2d 357, 364 (5th Cir. 1978) ("There can be no Rule 60(b)(2) relief for evidence which has only come into existence after the trial is over, for the obvious reason that to allow such a procedure could mean the perpetual continuation of all trials"); *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 158 (5th Cir. 2004) (same).

Proceeding.[93] While that contention is false inasmuch as the JOL Writ largely repackages assertions already alleged before trial, (i) evidence that only came into existence after the trial cannot constitute "newly discovered" evidence for purposes of Rule 60(b)(2) and (ii) all of the information set forth therein was clearly known by Dugaboy prior to the deadline to seek a new trial. Dugaboy further relies on several other documents that likewise did not exist at the time of trial and also simply regurgitate allegations against Patrick that have nothing to do with his authority over the HMIT Entities or the 9019 Settlement.[94] For this reason alone, the Motion should be denied.[95]

61. None of these documents constitutes "newly discovered evidence" within the meaning of Rule 60(b)(2). None of these documents support the Motion or meet the exacting standard required for the extraordinary relief described in Rule 60(b). One could be surprised that the more than one thousand pages of Cayman Proceeding exhibits attached by Dugaboy to its 50-page Motion contain nothing new and nothing relevant to the 9019 Settlement or the parties to it. Yet here we are.

62. **Second**, the other evidence Dugaboy relies on was already in Dugaboy's possession or could have been obtained through reasonable diligence in time to file a motion for a new trial under Rule 59 and Bankruptcy Rule 7023.[96] As described above, Dugaboy and The Dallas Foundation took extensive discovery in preparation for trial, discovery that Highland complied

[93] Motion at 27–28, citing Caymans Ex. B, Statement of Claim.

[94] *See, e.g.*, Cayman Ex. G (MacInnis Aff., created July 21, 2025); Cayman Ex. I (MacInnis Aff. 3, created November 2025).

[95] *See Gen. Universal Sys.* 379 F.3d at 158 (affirming denial of Rule 60(b)(2) motion where "the newly discovered evidence was not available at the time of trial: Parkin's statement occurred in a hearing held on November 16, 2001, and Davis's report was prepared on November 1, 2001. These statements, then, were created after the entry of final judgment on September 27, 2001").

[96] *See, e.g.*, Caymans Ex. A (First Patrick Aff., created on June 4, in connection with the Cayman Proceeding); Cayman Ex. MM-3 (attachments to MacInnis Aff. 3).

with completely and promptly without objection. The Dondero Foundations sit on the liquidation committee in the Cayman Proceeding and, upon information and belief, received (or with reasonable diligence, could have received) all documents filed there. Although Dugaboy already knew everything at the time of trial, if something was missing, Dugaboy is not entitled to benefit because its discovery requests were deficient and Dugaboy failed to exercise reasonable diligence to obtain purportedly relevant documents during discovery and the new trial period following this Court's entry of the 9019 Settlement Order.[97]

63. Since Dugaboy possessed the full substance of the purportedly "new" information within the new trial period under Bankruptcy Rule 7023, none of it would help Dugaboy advance its Motion under Rule 60(b) because any new evidence discovered within "28 days after the entry of judgment" must be brought as a motion for new trial under Rule 59(b) and cannot be brought as a Rule 60(b) motion.[98] All Dugaboy's purportedly "new" evidence was available to Dugaboy within 28 days of this Court's entry of the 9019 Settlement Order. Dugaboy could have tried to bring a Rule 59 motion for a new trial. Dugaboy did not. It cannot use a Rule 60(b) motion to earn relief it already declined by choosing not to file an appropriate motion under an appropriate rule.

64. **Third**, Dugaboy has also failed to show that any information discovered after trial is "material" and would have changed the trial's result. In fact, the exact opposite is true. As set forth above, both the evidence adduced at trial and the separate and unrelated Cayman Proceeding demonstrate unequivocally that Patrick possessed all the authority required to enter into the 9019

---

[97] *See Gov't Fin. Servs. One Ltd. P'ship v. Peyton Place, Inc.*, 62 F.3d 767, 771 (5th Cir. 1995) (affirming denial of Rule 60(b)(2) motion where movant "failed to demonstrate to the district court that it could not have obtained the information before or during the trial even if it had exercised due diligence."); *Longden v. Sunderman*, 979 F.2d 1095, 1103 (5th Cir. 1992) ("it is apparent that the district court was within its discretion in finding that Massie did not exercise due diligence in discovering the evidence. Massie claimed that a 25 day search after the May 1 hearing finally produced the evidence, but due diligence before the hearing must be shown").

[98] *See* Wright & Miller § 2859.

Settlement. For instance, the ample evidence admitted into the record at trial indisputably proved that Patrick had full authority to act for HMIT and the other HMIT Entities for all purposes, including entering into the 9019 Settlement. As noted above, Dondero and his affiliates also repeatedly ratified Patrick's authority to act on behalf of the HMIT Entities, the DAF entities, and their affiliates. In separate proceedings including the Cayman Proceeding and the Foundations Action, allegations of wrongdoing against Patrick were resolved in Patrick's favor; Patrick has remained in control of the HMIT Entities without challenge, unsullied by any court's finding that he engaged in any wrongdoing at any time. And after a full two-day hearing, the Cayman court dispelled any notion that Patrick lacked authority over the DAF entities he controls. There was never even an assertion in the Cayman Proceeding that Patrick does not have full control of the HMIT Entities or even that the Cayman Proceedings had anything at all to do with HMIT, Patrick's authority over HMIT, or the 9019 Settlement. The total amount and weight of evidence in both this Court's trial and unrelated proceedings here and abroad directly contradict Dugaboy's strident but baseless assertion that Patrick somehow lacked authority to enter into the 9019 Settlement.

65. And this Court has already said so. In denying Dugaboy's prior stay motion, this Court ruled that "***whatever the misdeeds may or not be of Mark Patrick, they are not sufficiently intertwined with the Highland bankruptcy estate (or the Settlement Agreement) …***"[99] The Court continued, correctly noting that "Mark Patrick is merely a signatory for a counter-party to a settlement agreement with the bankruptcy estate [HMIT]."[100] In deciding whether to approve the 9019 Settlement, the Court considered whether it was "fair and equitable, within the range of reasonableness, and in the best interests of the Highland bankruptcy estate," under Bankruptcy

[99] Stay Order at 4 (emphasis in original).
[100] *Id.*

Rule 9019, ultimately stating that "the parties have other avenues to address any malfeasance of Mark Patrick vis-à-vis the liquidation proceedings involving the Cayman Islands Charitable Foundation Structure."[101]

66. Accordingly, Dugaboy cannot show (and has not shown) either that its new "evidence" is newly discovered for purposes of Rule 60(b)(2), material to the issues raised at trial, or that it would have altered the Court's decision to approve the 9019 Settlement. When courts see facts like these, they deny Rule 60(b) motions.[102] This Court should do precisely that.

67. For all these same reasons, the purportedly "new" allegations Dugaboy cites are merely cumulative of prior evidence known to Dugaboy.[103] This type of cumulative, impeaching evidence is not the type sufficient to warrant the extraordinary relief available to more deserving movants than Dugaboy under Rule 60(b)(2).[104] The Motion fails to substantiate a basis for relief under Rule 60(b)(2). It should be denied.

**3. No Opposing Party Committed Fraud as Required Under Rule 60(b)(3)**

68. Dugaboy likewise fails to show relief is warranted under Rule 60(b)(3), which provides that a court may relieve a party from final judgment based on "fraud ... misrepresentation, or misconduct by an opposing party[.]" A party making a Rule 60(b)(3) motion must establish, by

---

[101] *Id.*

[102] *See, e.g., Gen. Universal*, 379 F.3d at 158 (affirming district court's denial of Rule 60(b)(2) motion where "GUS has not shown either that the evidence is material or that it would have produced a different result in the original case. Indeed, the precise opposite is apparent. As noted above, GUS's infringement claims were dismissed because GUS failed to provide evidence of substantial similarity. Parkin's and Davis's bare statements do nothing to unsettle this holding").

[103] *See, e.g.*, Motion at 28 (vaguely asserting that Patrick's alleged misconduct was further "unearthed" by the JOLs in December 2025 filings); Motion at 33 (only "the *scope* of Patrick's misconduct was unknown before the hearing on Highland's 9019 Motion"); Motion at 34 (contending that the "flames of the misconduct" were revealed by successive later filings in July and December of 2025, (Br. at 34)).

[104] *See Halliburton Energy*, 618 F. Supp. at 650 (finding party failed to meet its burden under Rule 60(b)(2) because it "has not shown that these documents would have done anything more than add to the list of conflicting evidence the panel examined," previously, and therefore "has not shown that the newly submitted documents are material, not merely cumulative or impeaching, or would have changed the result in the arbitration or confirmation proceedings").

clear and convincing evidence: "(1) that the adverse party engaged in fraud or other misconduct, and (2) that this misconduct prevented the moving party from fully and fairly presenting [her] case."[105] The Fifth Circuit maintains that, under Rule 60(b)(3), a movant must prove fraud by clear and convincing evidence: "This subsection of [Rule 60] is aimed at judgments which were unfairly obtained, not at those which are factually incorrect."[106]

69. Dugaboy's nebulous claims that Patrick's "fraud" and other misconduct in connection with the DAF and HMIT restructurings—even if true (and no court has ever found them to be true)—do not and cannot warrant vacating the 9019 Settlement Order under Rule 60(b)(3).

70. **First**, as discussed above, the Cayman Islands court rejected the same arguments and evidence Dugaboy asserts here and affirmatively determined that Patrick had and continues to have full authority and control over all the DAF entities other than DAF Holdco. The JOLs sought to gain control over the Cayman Island DAF entities for which Patrick is the control person and were denied. While Dugaboy relies on the purported "new evidence" from the Cayman Proceeding, it deviously **withheld the Cayman Island court decision from this Court**.[107] Dugaboy thus fails to establish, by clear and convincing evidence—by *any* evidence—that Patrick or anyone else involved in the 9019 Settlement committed fraud, let alone fraud that prevented Dugaboy from fairly and fully prosecuting its opposition to the 9019 Settlement.

71. **Second**, and more fundamentally, even if Dugaboy could show that Patrick committed some sort of fraud in relations to the DAF and HMIT restructurings, Patrick was not

---

[105] *In re Waldrup*, 2025 WL 2900358, at *3 (Bankr. S.D. Tex. Oct. 10, 2025) (quoting *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 641 (5th Cir. 2005)).

[106] *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978); *see also Optimal Health Care Services, Inc. v. Travelers Ins. Co.*, 801 F. Supp. 1558, 1561 (E.D. Tex. 1992).

[107] Making Dugaboy's accusation of fraud against others particularly rich.

the "opposing party" at trial within the meaning of Rule 60(b)(3)—Highland was. Nowhere in the Motion and nowhere in the thousands of pages of irrelevant arcana attached to the Motion does Dugaboy accuse Highland of withholding evidence, opposing or even delaying response to discovery requests, misrepresenting facts, omitting information, or anything else that could even arguably be considered "fraud" for purposes of Rule 60(b)(3). Even if Patrick had engaged in fraud in some fashion and even if Dugaboy did not already know about everything by the time of trial (it did), none of that would suffice to satisfy Rule 60(b)(3)'s requirement that the fraud must be perpetrated by the *opposing party*. To obtain relief under Rule 60(b)(3), Dugaboy would have had to demonstrate that Highland, as the opposing party,[108] engaged in fraud or other misconduct that prevented Dugaboy from fully and fairly presenting its case. It didn't. It can't. Highland did nothing of the sort.

72. **Third**, Dugaboy now asserts that Patrick somehow defrauded the beneficiary of HMIT (not Dugaboy) and did so in his *individual* capacity. It hardly bears noting that Patrick was not a party to the 9019 Settlement, not a party to any of the litigations and claims it settled, and not a party to the 9019 Settlement Motion. Again, this Court has already noted that Patrick was "merely a signatory for a counter-party to a settlement agreement with the bankruptcy estate . . ."[109] For this additional reason, Rule 60(b)(3) relief is unwarranted.[110]

---

[108] Even if, under an unreasonably charitable reading of the Motion, Dugaboy substantiated fraud perpetrated by HMIT, that would amount to nothing useful for Rule 60(b)(3) purposes because, again, HMIT was not the opposing party at trial—Highland was. Anyway, the actions complained of were unrelated to the Settlement.

[109] Stay Order at 4.

[110] *See Tate v. Valero Servs., Inc.*, 2019 WL 6117793 (E.D. La. Nov. 18, 2019) (denying Rule 60(b)(3) motion where movant alleged fraud against his union, which was not a party to the case); *Latshaw v. Trainer Wortham & Co., Inc.*, 452 F.3d 1097 (9th Cir. 2006) (denying plaintiff relief from judgment entered upon her acceptance of an offer of judgment on the ground of fraud, based on her attorney's alleged conduct in erroneously advising her that she could be liable for defendant's attorney fees if she refused the offer and that both her counsel would withdraw if she refused the offer, as the alleged frauds did not adversely affect the opposing party, as required by Rule 60(b)(3), and holding "in order to prevail on a Rule 60(b)(3) motion, *the defendants* must have committed the fraud at issue") (emphasis added); *Sherman v. Verizon Virginia, Inc.*, 220 F.R.D. 260 (E.D. Va. 2002), aff'd in part, dismissed in part, 55 F. App'x 136 (4th Cir. 2003) (denying plaintiff's Rule 60(b)(3) motion based on attorney misconduct in part because the

73. **Fourth**, Dugaboy has failed to show by clear and convincing evidence that any of Patrick's actions—however distasteful Dugaboy imagines them to be—prevented it from fairly presenting its case at the trial in this Court. Dugaboy propounded extensive discovery, took several depositions, and received many thousands of pages of documents in immediate response to Dugaboy's requests. No party objected to any of it. Dugaboy was always in complete control of what information and documents it sought and whether the responses it received were adequate. Significantly, this Court even permitted Dugaboy to spend considerable time a trial urging an objection to the 9019 Settlement of the basis of Patrick's authority despite that Dugaboy did not include any such arguments in its written objection to the 9019 Settlement Motion and *confirmed to the Court at trial that it was **not** challenging Patrick's authority* (as The Dallas Foundation previously had). Dugaboy proceeded with that argument only after an agitated Dondero upbraided his own counsel. This Court would have been well within its discretion to preclude Dugaboy from pursuing at trial an issue it had not preserved in its pleading and had previously foresworn at the beginning of the trial. Nonetheless, the Court granted Dugaboy wide leeway to challenge the 9019 Settlement based on arguments pertaining to Patrick's authority to bind HMIT. Dugaboy had a full and fair opportunity to present that case despite Dugaboy not deserving that opportunity. Dugaboy's case was unpersuasive and did not prevail. None of that remotely constitutes a basis for Rule 60(b)(3) relief.

74. **Fifth,** all the conduct Dugaboy alleges to be fraudulent, even if true, has absolutely nothing to do with Highland, the 9019 Settlement, how Patrick came to control the HMIT Entities, or how Patrick exercised his authority to enter into the 9019 Settlement. Further, Dugaboy has no

plaintiff's former counsel was not an "adverse party" within the meaning of Rule 60(b)(3), and the attorney's alleged shortcomings could not support a claim for relief under that provision—only fraud, misrepresentation, or misconduct by the defendant (the actual adverse party) would qualify); *Latshaw v. Trainer Wortham & Co.*, 452 F.3d 1097, 1102 (9th Cir. 2006) (alleged fraud by 60(b)(3) movant's attorney could not satisfy the adverse party requirement).

interest in any of the DAF entities or the HMIT Entities and seems to be complaining solely on behalf of The Dallas Foundation, which consented to the 9019 Settlement when it withdrew its objection with prejudice. Moreover, any documents Dugaboy uncovered after the trial could have been obtained by it with reasonable diligence, and would not have altered this Court's ultimate determination, anyway.[111] Accordingly, Dugaboy fails to meet its heavy burden of demonstrating that Rule 60(b)(3) relief is proper.

#### 4. No Extraordinary Circumstances Exist as Required Under Rule 60(b)(6)

75. Finally, Dugaboy fails to establish that extraordinary circumstances warrant relief under the "catchall" provision of Rule 60(b)(6). Although Rule 60(b)(6) may be a "grand reservoir of equitable power to do justice in a particular case when relief is not warranted by the preceding clauses … Relief under this section is granted only if extraordinary circumstances are present."[112] A request for relief under Rule 60(b)(6) "is considered extraordinary and is only to be invoked upon a showing of exceptional circumstances."[113] Moreover, "the reason for relief set forth under 60(b)(6) cannot be the reason for relief sought under another subsection of 60(b)."[114]

---

[111] *See Diaz,* 46 F.3d at 497 (affirming Rule 60(b)(3) denial because appellant had "independent access" to information allegedly withheld from her, information was not "under the exclusive control of the Appellees," and it was "likely that a more focused effort by Appellant could have uncovered th[e] evidence prior to trial"); *Peyton Place*, 62 F.3d at 773 (affirming district court's denial of Rule 60(b)(3) motion where movant's assertions in support of motion were based on speculation, and "[movant] did not provide the district court with clear and convincing evidence that the RTC's failure to produce any of these documents prevented it from fully and fairly presenting its case."); *Longden*, 979 F.2d at 1103 ("Upon thorough examination of the entire record, including what Massie characterized as credible evidence for her Rule 60(b) motion, this court agrees with the district court's finding of no clear and convincing proof of perjury. Thus, it was well within the district court's discretion to conclude that the evidence proffered by Massie simply was not credible.").

[112] *Peyton Place*, 62 F.3d at 773–74 (quotations and citations omitted).

[113] *In re Coffman*, 271 B.R. 492, 498 (Bankr. N.D. Tex. 2002) (quoting *Nat'l Credit Union Admin. Bd. v. Gray*, 1 F.3d 262, 266 (4th Cir.1993)) (internal quotations omitted).

[114] *Blom Bank SAL v. Honickman,* 605 U.S. 204 (2025); *Hesling*, 396 F.3d at 643.

76. Dugaboy half-heartedly refers to "this Court's equitable purpose and powers"[115] but cannot identify any "extraordinary circumstances" warranting relief under Rule 60(b)(6). Instead, Dugaboy rehearses the same conclusory, unsupported, and baseless assertions in support of its request for relief under other subsections of Rule 60(b), something the Fifth Circuit has specifically held to be insufficient.[116] For this reason alone, Dugaboy fails to meet its burden of demonstrating the exceptional circumstances warranting Rule 60(b)(6) relief. But even if Dugaboy could distinguish the grounds sought for relief under Rule 60(b)(6) from its other arguments, it is still not entitled to relief for all the reasons set forth above. Dugaboy's conclusory, unproven, spurious assertions that Patrick committed fraud in respect of Cayman Islands DAF Entities and was therefore somehow not authorized to act on the HMIT Entities' behalf is belied by the record. There is no newly discovered evidence that would constitute exceptional circumstances. There was no fraud or misconduct by Highland preventing Dugaboy from fully and fairly trying its case that would constitute exceptional circumstances. There was no relationship between the Cayman Island proceedings, on the one hand, and the 9019 Settlement or this Chapter 11 case, on the other hand, that would constitute exceptional circumstances. The only exceptional thing here is Dugaboy's shameless obstinacy in bringing the Motion in the first place.

## B. Chief Judge Jernigan's Voluntary Recusal Provides No Valid Basis to Vacate the 9019 Settlement Order (or Anything Else)

77. Dugaboy's request to vacate the 9019 Settlement Order on the ground that it was issued by a judge who "lacked the authority to enter it"[117] is equally unsupported and belied by the record. In support of its argument, Dugaboy maintains that the Fifth Circuit took "corrective action

[115] Motion at 42–43.

[116] *See Hesling*, 396 F.3d at 643 ("Hesling cannot obtain relief under 60(b)(6) where the allegations of fraud or misconduct are essentially the identical grounds for relief sought under her 60(b)(3) motion").

[117] Motion at 43.

to recuse the predecessor judge from the case going forward."[118] The Fifth Circuit did no such thing. Dugaboy, by advancing this appalling argument, again distinguishes itself for its unhinged litigiousness. Any other litigant with even a shred of respect for this Court would be too ashamed to misrepresent so wildly a written action by an appellate court.

78. This Court can easily gather on its own what really happened. In December 2025, Chief Judge Jernigan voluntarily "recused herself from all matters related to the company's case that are currently pending before her," which Chief Judge Elrod of the Fifth Circuit stated "**should not be interpreted as an opinion or reflection on the merits of judge's prior decision not to recuse, which has been addressed by the Fifth Circuit**," or "**the validity of any decision, ruling, or order that she has issued in any judicial proceeding**."[119] Judge Elrod did ***not***, as Dugaboy dishonestly asserts, "arrang[e] for extensive 'corrective action,' including the predecessor judge's recusal from this case," "impos[e] the corrective action of recusal," "tak[e] corrective action to recuse the predecessor judge from the case going forward," or "effect[] a recusal of the predecessor judge as 'corrective action' for books she authored."[120] In reality, Chief Judge Elrod held that the specious allegations of judicial misconduct "need not be decided" because Chief Judge Jernigan **voluntarily** "recused herself."[121] The Judicial Council Opinion was **not** an order to recuse Judge Jernigan under Section 455 and was in no way "corrective action" for Jernigan's alleged violation of judicial ethics. Dugaboy's attempts to persuade this Court that Judge Elrod said and did things she didn't say and didn't do only demonstrates Dugaboy's vindictive desperation to interfere with the final stages of this Chapter 11 case.

---

[118] *Id.* (citing *In re Compl. Of Jud. Misconduct Under The Jud. Improvements Act Of 2002*, No. 05-26-90042 (5th Cir. Dec. 29, 2025 (the "**Judicial Council Opinion**")).

[119] Judicial Council Opinion at 6 and n.3 (emphasis added); *see also* Docs. 4491, 4509, 4514.

[120] Motion at 30–31, 43–45 (italics in original).

[121] Judicial Council Opinion at 6.

79. Dugaboy's assertion that the 9019 Settlement Order should be vacated on the ground that, when it was issued, Judge Jernigan "should have recused herself"[122] is both undermined by the record and procedurally improper. As this Court, the District Court, and the Fifth Circuit have held numerous times, Judge Jernigan *never* had a duty to recuse herself under Section 455. Dondero and Dugaboy have filed **five** failed recusal motions. The Fifth Circuit has rejected **three times** Dugaboy's attempts to recuse Judge Jernigan and the Supreme Court has denied Dugaboy's petitions for certiorari on the second of those Fifth Circuit rulings. Dugaboy's most recent recusal-related appeal was dismissed by the District Court. Federal courts throughout the Fifth Circuit have repeatedly affirmed scores of Judge Jernigan's rulings in more than **five dozen** appeals Dondero entities have taken in this one bankruptcy case. And as reflected in the Judicial Council Opinion, despite having orchestrated five separate secret ethics complaints to be filed by his employees and cronies, Dondero even failed to persuade Fifth Circuit Chief Judge Elrod that Judge Jernigan had done anything warranting recusal. Nevertheless, Dugaboy spends nearly seven pages of its Motion rehashing these same tired, vanquished arguments relating to Judge Jernigan's alleged "bias" and "impartiality." This Court should countenance none of it. Dugaboy now effectively seeks reconsideration of Judge Jernigan's many rulings denying motions to recuse based on her unrelated novels—rulings never reversed or even questioned on appeal in the District Court or the Fifth Circuit—denials that constitute law of the case.

80. As the Fifth Circuit noted, Dondero and various parties he controls, including Dugaboy, have been unsuccessfully trying to disqualify Chief Judge Jernigan for years.[123] When Dugaboy and related "Dondero Parties" first raised "accusations regarding her two published

---

[122] Motion at 44.

[123] *See Dondero v. Jernigan*, 2025 WL 1122466, at *2 (5th Cir. Apr. 16, 2025).

novels," "Chief Judge Jernigan stated that her novels 'are not about Dondero or the hedge fund industry in general' and declined to recuse on that basis."[124] Indeed, even while recusing herself, Chief Judge Jernigan "remain[ed] steadfast that she has no basis or animus against any party in any matter pending before her."[125] Dugaboy and the related "Dondero Parties" then "filed a petition for writ of mandamus in the district court seeking an order directing Chief Judge Jernigan to recuse herself," and the "district court denied the petition," after which Dugaboy and the related "Dondero Parties" filed a mandamus petition in the Fifth Circuit. It, too, was denied.[126]

81. The Fifth Circuit specifically rejected the same purported "parallels between the books and [this] case" that Dugaboy again advances here, noting that both the Fifth Circuit and the "district court emphasized [that] the novels are fiction," also crediting Chief Judge Jernigan's explanation that "the books are largely about other topics."[127] Thus, the Fifth Circuit concluded that "whether a reasonable reader and observer of these proceeding could question Chief Judge Jernigan's impartiality in this case is debatable," which is "insufficient" to warrant "a recusal order."[128] Judge Jernigan did not have a duty to recuse. That is law of the case. Dugaboy's attempt to vacate the 9019 Settlement Order on recusal grounds should be denied.

82. Even if Chief Judge Jernigan's novels had militated toward recusal (and any fair reading shows they don't, vacating the 9019 Settlement Order—or any other orders entered in this

[124] *Id.*

[125] Judicial Council Opinion at 6.

[126] *Dondero*, 2025 WL 1122466, *3.

[127] *Id.* at *7. For example, the "hedge fund manager character who the Dondero Parties believe is patterned on Dondero is an individual who fakes his own suicide after linking up with Mexican drug cartels—far from the real-life James Dondero." *Id.*

[128] *Id.* Dugaboy latches on to one isolated piece of dicta—"'[d]ue to the similarities between the characters in Chief Judge Jernigan's novel and the litigants currently before her in court, a strong **argument could be made** that she had a duty to recuse.'" Motion at 48 (quoting *Dondero*, 2025 WL 1122466, at *7) (emphasis in Motion). The fact that an "argument could be made" by a motivated attorney in no way suggests that "the standard of review" of mandamus petitions was "the only thing keeping the recusal decision from already having been reversed on mandamus." (Motion at 49). The entire argument is sophistry.

case over the last six years—would be unwarranted, to say the least. Generally, "recusals are prospective only and do not invalidate prior judicial actions."[129] Yet Dugaboy asks this Court to do something both legally ludicrous and practically impossible: retroactively invalidate this entire Chapter 11 case based on Dondero's fancifully imagined "circumstances compromising the appearance of her partiality" under 28 U.S.C. § 455(a) arising from Judge Jerigan's publication of a novel in March 2022, and to "address the consequences of these circumstances going backward."[130] The very notion is as preposterous as it is legally baseless.

83. Irrespective of whether Judge Jernigan's novels violated § 455(a)—and three separate courts, including the Fifth Circuit, have held that they did not—the Supreme Court has clarified that "There need not be a draconian remedy for every violation of § 455(a)."[131] To the contrary, the Fifth Circuit has warned that "the public may be more inclined to lose faith in the system if this court were to mindlessly vacate [prior] rulings" after a recusal.[132]

84. The Supreme Court has expressly held that "Section 455 does not, on its own, authorize the reopening of closed litigation."[133] Rather, a party must bring a motion under Rule 60(b)(6) based on the alleged violation of § 455(a), which "should only be applied in 'extraordinary circumstances.'"[134] The Supreme Court set forth three factors for courts to consider on such a motion: (1) "the risk of injustice to the parties in the particular case"; (2) "the risk that

---

[129] *Leaman v. Ohio Dep't of Mental Retardation & Dev. Disabilities*, 825 F.2d 946, 949 (6th Cir. 1987) (citing *United States v. Murphy*, 768 F.2d 1518, 1541 (7th Cir. 1985); *see also Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C. Cir. 1988) ("A motion for recusal based upon the appearance of impropriety can have only prospective effect") (citing *Murphy*, 768 F.2d at 1539); *New York City Dev. Corp. v. Hart*, 796 F.2d 976, 979 (7th Cir. 1986) ("recusal under § 455(a) runs prospectively only, so that all orders entered before the district judge removes himself (or the court of appeals issues a writ of mandamus) stand").

[130] Motion at 43.

[131] *Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 862 (1988).

[132] *Patterson v. Mobil Oil Corp.*, 335 F.2d 476, 486 (5th Cir. 2003).

[133] *Liljeberg*, 486 U.S. at 863.

[134] *Id.* at 863–64 (quoting *Ackermann v. United States*, 340 U.S. 193, 199–200 (1950)).

denial of relief will produce injustice in other cases"; and (3) "the risk of undermining the public's confidence in the judicial process."[135] The Fifth Circuit directs courts to construe the *Liljeberg* factors narrowly: "the search is for a risk substantially out of the ordinary."[136] None of these factors applies here.

85. Dugaboy does not even attempt to argue that the first and second *Liljeberg* factors are satisfied. Nor can it. Dugaboy also does not and cannot explain how Chief Judge Jernigan's novels with purported similarities to *this case* could "produce injustice in *other cases*."[137] Instead, Dugaboy focuses exclusively on the third *Liljeberg* factor, arguing that Chief Judge Jernigan's novels "might reasonably cause an objective observer to question [her] impartiality."[138] But the Fifth Circuit requires this Court to "ask how these facts would appear to a well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person."[139] Applying this objective standard, Dugaboy's argument fails here just as it has previously failed at the Fifth Circuit. Imagined similarities between a litigant and a character in a work of fiction is simply not the type of circumstance warranting the extraordinary remedy of vacating prior orders.

86. It's time for all this recusal twaddle to end. How many appellate courts have to rebuke them before Dondero and Dugaboy stop trying to undo a six-year Chapter 11 case that successfully restructured over a billion dollars of litigation claims (held by real creditors, which do not include Dugaboy or Dondero) by clinging to inane recusal arguments?

---

[135] *Id.* at 864.

[136] *Sensley v. Albritton*, 385 F.3d 591, 599 (5th Cir. 2004).

[137] *Liljeberg*, 486 U.S. at 864 (emphasis added).

[138] Motion at 44 (quoting *Liljeberg*, 486 U.S. at 865).

[139] *Sensley*, 385 F.3d at 599. There are certainly less apt descriptions of Dondero than "hypersensitive, cynical, and suspicious."

### C. This Court Lacks Jurisdiction to Grant the Motion But Can—and Should—Deny It

87. Dugaboy has already appealed the 9019 Settlement Order. That appeal, before Judge Kinkeade in the District Court, has been fully briefed and, additionally, features Highland's motion to dismiss the appeal as statutorily moot under Bankruptcy Code § 363(m). Because the 9019 Settlement Order is currently on appeal—and was when Dugaboy filed its Motion—Fed. R. Civ. P. 62.1(a) provides that this Court "lacks authority to grant" Dugaboy's motion "because an appeal has been docketed and is pending." Under Rule 62.1(a), "the court may (1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue."[140]

88. Bankruptcy Rule 8008(a) largely incorporates the Rule 62.1 approach to bankruptcy appeals. The rule "provides a procedure for the issuance of an indicative ruling when a bankruptcy court determines that, because of a pending appeal, the court lacks jurisdiction to grant a request for relief that the court concludes is meritorious or raises a substantial issue."[141] It applies "when a post judgment motion—such as a motion for relief from judgment under Civil Rule 60(b) made more than 14 days after entry of the judgment which does not suspend the time for filing a notice of appeal is made in the bankruptcy court at a time when a pending appeal has deprived the bankruptcy court of jurisdiction to decide the motion."[142]

---

[140] Federal case law has long taken this approach. *See, e.g., Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58 (1982) (filing of notice of appeal is event of "jurisdictional significance" because it confers jurisdiction on court of appeals and "divests the district court of its control over those aspects of the case involved in the appeal"); *United States v. Hitchmon,* 602 F.2d 689, 692 (5th Cir. 1979) ("The filing of a timely and sufficient notice of appeal transfers jurisdiction over matters involved in the appeal from the district court to the court of appeals. The district court is divested of jurisdiction to take any action with regard to the matter except in aid of the appeal").

[141] Fed. R. Bankr. P. 8008 Advisory Committee Note to 2014 Amendment.

[142] Collier on Bankruptcy (16th ed.), ¶ 8008.01.

89. "If a motion is made in the bankruptcy court for relief that it lacks authority to grant because of an appeal that has been docketed and is pending in a district court, bankruptcy appellate panel, or court of appeals, the bankruptcy court may … **deny the motion** … No remand or permission of the appellate tribunal where the appeal is pending is necessary for the bankruptcy court to deny the motion, and in such a case the indicative-ruling procedure set forth in Rule 8008 is inapplicable. **The ability to deny meritless motions enables the bankruptcy court to screen out frivolous attempts to invoke the indicative-ruling procedur**e."[143]

90. This jibes with Bankruptcy Rule 9024 itself, which incorporates Rule 60 but also provides, in clause (b), that "Rule 8008 governs postjudgment motion practice after an appeal has been docketed and is pending." Bankruptcy courts, particularly, have noted that a pending appeal divests the bankruptcy court of jurisdiction to grant motions for reconsideration or other relief under Rule 60 and Bankruptcy Rule 9024.[144]

91. Thus, this Court may only consider the Motion under Bankruptcy Rule 8008 because Dugaboy's appeal of the 9019 Settlement Order, which is fully briefed and pending, has removed jurisdiction from the Court to grant the Motion. In this limited context, this Court should follow the example set by the Bankruptcy Court in the Southern District of New York in *Geron v. Holding Capital Grp., Inc.*[145] The *Geron* case presents strikingly similar circumstances to those now before this Court.

92. There, the debtor's landlord filed a motion under Bankruptcy Rule 9024 (which incorporates Rule 60) for relief from the bankruptcy court's order approving a settlement of an

---

[143] *Id.*, ¶ 8008.02 (emphasis added).

[144] *See, e.g., Millenkamp Cattle, Inc., v. E. Valley Dev., LLC (In re Millenkamp Cattle, Inc.)*, 2025 Bankr. LEXIS 1987 (Bankr. D. Ida. Aug. 19, 2025).

[145] *Geron v. Holding Capital Grp., Inc. (In re PBS Foods, LLC)*, 549 B.R. 586 (Bankr. S.D.N.Y. 2016).

adversary proceeding under Bankruptcy Rule 9019, alleging "newly discovered evidence" under Rule 60(b)(2), factual misrepresentations under Rule 60(b)(3), and extraordinary circumstances under Rule 60(b)(5).[146] The landlord had already appealed that settlement order and the appeal remained pending when the Rule 60 motion was filed.[147] The bankruptcy court considered the motion under Bankruptcy Rule 8008(a) and, after determining that (a) the "new" evidence was not sufficiently "probative of matters relevant to" the hearing on the settlement and that "it [was] unlikely that [the bankruptcy judge] would have attached much, if any, significant to [it] had the Landlord offered [it] in opposition to the" settlement motion, (b) "the Trustee did not misrepresent facts to the Court, and … did not deliberately withhold the New Documents from the Landlord," and (c) the landlord's argument under Rule 60(b)(6) "is merely restating the Landlord's alleged grounds for relief under Rules 60(b)(2) and (3)," the bankruptcy court denied the motion.[148]

93. This case is eerily similar to *Geron.* Here, as there, Dugaboy has made a Bankruptcy Rule 9024 motion for relief from this Court's order approving the 9019 Settlement. Here, as there, Dugaboy has alleged "newly discovered" evidence under Rule 60(b)(2). Here, as there, Dugaboy has alleged "fraud" under Rule 60(b)(3)—although, unlike there, Dugaboy has *not* even alleged fraud by an opposing party or in connection with its ability to pursue its objection to the 9019 Settlement. Here, as there, Dugaboy has reiterated its bases from its Rule 60(b)(2) and (3) arguments in support of its Rule 60(b)(6) arguments. And here, as there, Dugaboy cannot persuade the bankruptcy court that any of the alleged bases for relief exist.

94. This Court should follow the *Geron* court's example in nearly identical circumstances. Although this Court—just as the bankruptcy court in *Geron*—lacks jurisdiction to

---

[146] *Id.* at 589.
[147] *Id.* at 590.
[148] *Id.* at 598–606.

*grant* the Motion because the 9019 Settlement Order is subject to a pending appeal, it can and should do here what the *Geron* court did there: **deny the Motion as meritless**.

**CONCLUSION**

For the reasons stated above, Highland respectfully urges the Court to deny the Motion.

April 3, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Jordan A. Kroop (NY Bar No. 2680882)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*