**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P.

§
§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§
vs. §

3:26-CV-02496-D

**Highland Capital Management, L.P., et al**-Appellee
§
§

**[4689] Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026**

**APPELLANT RECORD**

**VOLUME 9**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02496-D<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4698] on July 24, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689] now files this *Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the Court's June 15, 2026 Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate?

2. Did the Bankruptcy Court err in finding Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate ("Dugaboy's Motion") [Docket No. 4684] was "without merit?"

3. Did the Bankruptcy Court err in denying Dugaboy's Motion without a full record, including that Dugaboy was not allowed to file a reply brief and was not granted a hearing?

4. Did the Bankruptcy Court err in denying Dugaboy the opportunity to file a reply brief to Highland's Opposition to Dugaboy's Motion, including that Dugaboy indicated a date certain for filing a reply?

5. Did the Bankruptcy Court err in finding Dugaboy's Motion was "without merit" without granting a hearing?

6. Did the Bankruptcy Court err by summarily denying Dugaboy's Motion without explaining its reasoning for the denial?

7. Did the Bankruptcy Court err in failing to consider Dugaboy's Notice of Intervening Event?

8. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(2) when it determined that it had not manifestly erred in deciding the evidence of Mark Patrick's misconduct contained in the Cayman Islands proceeding was not "newly discovered" even though that information was not contained in James Dondero's affidavit executed April 16, 2025?

9. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant

to Rule 60(b)(2) when it determined it had not manifestly erred in deciding the Dondero Affidavit indicated information gained in the Cayman Islands proceedings was not "newly discovered" despite the fact the Affidavit lacked any evidence of the restructuring discovered in the Cayman Islands proceedings?

10. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding on the grounds that Rule 60(b)(3) purportedly requires fraud or misconduct to have occurred in the judicial proceeding itself?

11. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding that Highland did not provide misleading or incomplete answers during the discovery of Mark Patrick's misconduct and resulting lack of authority to negotiate the Rule 9019 settlement agreement from Dugaboy leading to the Rule 9019 Order?

12. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding that Dugaboy had not presented a basis for relief under Rule 60(b)(6) that was separate from the grounds presented for Rule 60(b)(2) and Rule 60(b)(3)?

13. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding on the grounds that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain?

14. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of the Bankruptcy Court's special responsibility to monitor arrangements and settlements made between Highland's appointed managers and third parties?

15. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of its manifest error in failing to consider the Bankruptcy Court's role as a court of equity and responsibility to prevent misconduct before it, such as Mark Patrick's use of stolen assets in the 9019 Settlement?

16. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

Vol. 1 000001 – 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4698] filed by Appellant;

000010 2. The Bankruptcy Court's July 10, 2026 *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000012 4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 2 000648 thru Vol. 3 | 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| Vol. 4 001843 | 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |
| | | | |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 4 001845 thru vol 6 | 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol 7 003634 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003647 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003650 + 003651 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003652 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003663 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003667 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003670 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |

| Vol. 7 | **Date Filed** | **Docket No.** | **Description/Docket Text** |
|---|---|---|---|
| 003709 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004733 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol. 8 004790 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol 9 005207 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005209 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005217 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 9 | | | Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 005222 | 04/07/2026 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 005225 | 04/07/2026 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 005227 | 04/10/2026 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 005229 | 04/16/2026 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 005233 | 04/17/2026 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol 9 | | Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| 04/17/2026 005330 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| Vol 10 04/21/2026 005590 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/22/2026 005594 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/22/2026 005615 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 04/22/2026 005682 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 10 | | | Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| 005692 | 04/22/2026 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 005705 | 04/24/2026 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 005726 | 04/24/2026 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 005727 | 04/25/2026 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005729 | 04/27/2026 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 005737 | 04/28/2026 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |

vol. 11

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 04/28/2026 005746 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005755 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005761 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/29/2026 005767 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 04/29/2026 005776 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 04/29/2026 005783 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| Vol. 10 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| 005785 | 04/29/2026 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005787 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005794 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005796 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005798 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005801 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005884 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005902 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005905 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005907 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11 | | | Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005913 | 05/06/2026 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005920 | 05/06/2026 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005927 | 05/06/2026 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 005929 | 05/07/2026 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005936 | 05/08/2026 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 005939 | 05/08/2026 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 005942 | 05/08/2026 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 005945 | 05/08/2026 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol. 12 006100 Thru Vol 21 | 05/08/2026 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and* |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | *Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| 10).22 008156 | 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 008172 | 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 008188 | 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). ~~(Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery)~~ |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 22 008256 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008293 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008429 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008465 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008472 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008916 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| VOL 25 009554 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| VOL. 26 009868 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| VOL 27 010229 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| VOL. 28 010538 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 28 | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| 05/11/2026 010664 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29 05/11/2026 010736 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol 30 05/11/2026 011150 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol 31 05/11/2026 011734 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol 32 05/11/2026 013203 Thru Vol 33 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34 05/11/2026 014888 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol 35 015349 | 05/11/2026 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 015505 | 05/11/2026 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 015506 | 05/12/2026 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 015538 | 05/12/2026 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 015565 | 05/12/2026 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 015566 | 05/15/2026 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36 015569 | 05/18/2026 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol 37 015996 | 05/18/2026 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 016008 | 05/19/2026 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 016079 | 05/20/2026 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 016082 – 016084 | 05/20/2026 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 016085 | 05/21/2026 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 016134 | 05/21/2026 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 37 | | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| 016135 | 05/23/2026 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 016233 | 05/28/2026 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 016490 | 06/15/2026 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s)4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 016504 | 06/15/2026 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| Vol. 39 016505 | 06/29/2026 | 4684 | (162 pgs; 2 docs) Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Appendix) (Edney, Michael) |
| 016667 | 06/29/2026 | 4685 | (7 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s)4679 Order on motion to reconsider). Appellant Designation due by 07/13/2026. (Attachments: # 1 Exhibit)(Edney, Michael) |
| 016674 | 07/06/2026 | 4687 | (32 pgs; 2 docs) Response opposed to (related document(s): 4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 016706 | 07/09/2026 | 4688 | (23 pgs; 2 docs) Notice of Intent to Reply and Request for Hearing on Its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 39 | | | (Attachments: # 1 Appendix)). (Attachments: # 1 Attachment A) (Edney, Michael) |
| 016729 | 07/10/2026 | 4689 | (2 pgs) Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026. (Okafor, M.) Modified text on 7/10/2026 (mdo). |
| 016731 | 07/13/2026 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |
| 016733 | 07/24/2026 | 4698 | (9 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)(Edney, Michael) |
| 016742 | 07/28/2026 | 4704 | (5 pgs) DISTRICT COURT Notice of docketing notice of appeal. Civil Action Number: 3:26-cv-02496-E. (RE: related document(s)4698 Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court;

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J"); and

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No.

4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: August 7, 2026

Respectfully submitted,

/s/ *Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**COUNSEL FOR THE HMIT ENTITIES**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | **Re: Docket No. 4513** |

**JOINDER TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S OBJECTION TO DUGABOY'S MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE [DOC 4513]**

Hunter Mountain Investment Trust ("HMIT"), Beacon Mountain LLC ("Beacon Mountain"), Rand Advisors, LLC ("Rand Advisors"), Rand PE Fund I, LP ("Rand PE Fund"), Rand PE Fund Management, LLC ("Rand GP"), Atlas IDF, LP ("Atlas IDF"), and Atlas IDF GP, LLC ("Atlas GP" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP, and

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

Atlas IDF, the "HMIT Entities"); hereby submit this *Joinder* (the "Joinder") to the *Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate* [Dkt. No. 4535] (the "Objection"). The HMIT Entities adopt the briefing in the Objection for all purposes and respectfully request for the reasons set forth in the Objection that this Court deny the *Motion for Relief From Order and Motion to Vacat*e [Dkt. No. 4513] in its entirety.

Respectfully Submitted:

**KELLY HART PITRE**

*/s/ Louis M. Phillips*______
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

***Counsel for the HMIT Entities***

**CERTIFICATE OF SERVICE**

I, undersigned counsel, hereby certify that a copy of the forgoing was served on all parties receiving notice in this chapter 11 case through this Court's CM/ECF System on this April 3, 2026.

*/s/ Louis M. Phillips*______
Louis M. Phillips (#10505)

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**COUNSEL FOR CLO HOLDCO, LTD. AND THE LAW FIRMS**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | |

**MOTION TO QUASH REQUESTS FOR PRODUCTION OF DOCUMENTS SERVED IMPROPERLY**

CLO Holdco, Ltd. ("CLO Holdco"); Shields Legal Group, P.C. ("Shields"); and Kelly Hart & Hallman LP ("Kelly Hart," with Shields, the "Law Firms") hereby submit this *Motion to Quash* (the "Motion to Quash"). CLO HoldCo and the Law Firms (together, the "Moving Parties") were not properly served with subpoenas for document production (the "Requests") by Dugaboy

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

Investment Trust ("Dugaboy") in connection with the *Motion to Reconsider the 9019 Order* [Dkt. No. 4513] (the "Rule 60(b) Motion"). Thus, the Moving Parties move to quash the Requests.

## RELEVANT FACTUAL BACKGROUND

1. The Rule 60(b) Motion concerns the reconsideration of that certain settlement pursuant to rule 9019 of the Fed. R. Bankr. P. 9019 settlement (the "9019 Settlement") between and among Highland Capital Management, L.P. ("HCMLP"), the Highland Claimant Trust (the "Claimant Trust"), the Highland Litigation Sub-Trust (the "Litigation Sub-Trust"), and the Highland Indemnity Trust (the "Indemnity Trust", and together with Highland, the Claimant Trust and the Litigation Sub-Trust, the "Highland Entities"), on the one hand, and Hunter Mountain Investment Trust ("HMIT"), Beacon Mountain LLC ("Beacon Mountain"), Rand Advisors, LLC ("Rand Advisors"), Rand PE Fund I, LP ("Rand PE Fund"), Rand PE Fund Management, LLC ("Rand GP"), Atlas IDF, LP, ("Atlas IDF"), Atlas IDF GP, LLC, ("Atlas GP" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP, Atlas IDF, the "HMIT Entities") on the other.

2. The HMIT Entities were represented by Kelly Hart in connection with the 9019 Settlement contested matter (the "9019 Matter").

3. Kelly Hart has represented CLO HoldCo in other contested matters and adversary proceedings related to the above-captioned bankruptcy case (the "Bankruptcy Case"), but CLO HoldCo was not party to the 9019 Settlement.

4. The 9019 Settlement provided that a cash payment to HMIT was to be made care of a subsidiary of CLO HoldCo. 9019 Settlement, ¶3. Additionally, CLO HoldCo was a joining party to that certain Confidentiality Agreement that many parties executed to facilitate settlement negotiations. *See*. Dkt. No. 4255-6.

5. But CLO HoldCo was *not* a party to the 9019 Settlement and did not appear in connection with the 9019 Matter through Kelly Hart or other counsel.

6. Shields did not represent any of the HMIT Entities in connection with the 9019 Matter nor otherwise appear as counsel in the Bankruptcy Case.

7. On March 23, 2026, undersigned counsel received requests for production via email purportedly addressed to CLO HoldCo through undersigned counsel (Exhibit A) containing seventy-four (74); and Kelly Hart (Exhibit B), containing seventy-seven (77) of document requests

8. Kelly Hart is not authorized to accept service via email on behalf of CLO HoldCo in the 9019 Matter.

9. The attorneys of Kelly Hart who received the Requests are not the agents for service of Kelly Hart, nor have they otherwise indicated to Dugaboy or anyone else that they would or even could accept service on Kelly Hart's behalf.

10. Shields likewise received requests for production via email on March 23, 2026 (Exhibit C, Exhibits A-B (the "Shields Requests").

11. The attorneys of Shields who received the Requests have never indicated to Dugaboy that they would or even could accept service on Shiels' behalf of email transmitted requests for production of documents or of subpoenas.

**BASIS FOR MOTION TO QUASH**

12. By filing this Motion to Quash, the Moving Parties expressly do not waive service defects.

13. The Moving Parties are not parties to the 9019 Mater and must be served with a subpoena pursuant to rule 45 of the Federal Rules of Civil Procedure ("Rule 45").

14. Rule 9016 of the Federal Rules of Bankruptcy Procedure ("Rule 9016") applies Rule 45 to bankruptcy cases.

15. The Requests themselves specifically state they are propounded pursuant to Rule 9016.

16. Rule 9076-1 of this Northern District of Texas Local Bankruptcy Rules specifically *prohibit* the service of a subpoena under Fed. R. Bankr. P. 9016 via electronic transmission, and the Moving Parties here submit that in the circumstances here (purported respondents who are not parties to the 9019 Settlement or to the motion before the Court), this Rule more forcefully precludes the service of requests for production via email without consent.

17. The Moving Parties have not and do not consent to service of either document requests or a subpoena via electronic means.

18. Thus, the Moving Parties timely file this Motion to Quash based upon the defects in service. *See* Fed. R. Civ. P. 45(d)(2)(B).

19. In so doing, the Moving Parties expressly reserve their rights to lodge such substantive objections and move for a protective order to the extent these service defects are cured or the Motion to Quash overruled.[2]

## CONCLUSION

20. The Moving Parties specifically move this Court for entry of an order finding that sending the Requests via email as described herein is not proper service of the Requests and that the Requests be quashed.

*[signature block on next page]*

[2] Specifically, this Court will consider the propriety of such extensive discovery requests in connection with the *Motion for Protective Order against the Dugaboy Investment Trust's Discovery Truste's Discovery Request*s [Dkt. No. 4533] (the "Motion for Protective Order") filed by HCMLP. The Moving Parties believe it is premature to join in a substantive request for protective order as in fact they have not been served so cannot be involved in the proceedings involving the Motion for Protective Order. But the Moving Parties reserve all rights.

Respectfully Submitted:

**KELLY HART PITRE**

*/s/ Louis M. Phillips*_____
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com
***Counsel for CLO HoldCo, Ltd. and the Firms for the limited purpose of this Motion to Quash***

## CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that a copy of the forgoing was served on all parties receiving notice in this chapter 11 case through this Court's CM/ECF System on this April 6, 2026.

*/s/ Louis M. Phillips*_____
Louis M. Phillips (#10505)

## CERTIFICATE OF CONFERENCE

I, undersigned counsel, hereby certify that prior to filing the forgoing, I emailed counsel for Dugaboy to ask for a withdraw of the Requests for improper service. Dugaboy has declined to withdraw the Requests.

*/s/ Louis M. Phillips*_____
Louis M. Phillips (#10505)

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |

**ORDER QUASHING REQUESTS**

Having considered that certain *Motion to Quash* (the "Motion to Quash")[2] filed by CLO Holdco, Ltd. ("CLO Holdco"); Shields Legal Group, P.C. ("Shields"); and Kelly Hart & Hallman LP ("Kelly Hart," with Shields, the "Law Firms") regarding those certain document production (the "Requests") by Dugaboy Investment Trust ("Dugaboy") in connection with the 9019 Motion,

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein take their meaning from the Motion to Quash.

and having determined that CLO HoldCo and the Law Firms were not properly served with the Requests by Dugaboy,

**IT IS ORDERED THAT** the Motion to Quash is **GRANTED**.

**IT IS FURTHER ORDERED THAT** CLO HoldCo and the Law Firms shall have no obligations regarding the Requests to respond, object, or otherwise unless and until the Requests are properly served.

**IT IS FURTHER ORDERED THAT** CLO HoldCo and the Law Firms shall have all rights to object, move for a protective order, join in the Motion for Protective Order or otherwise if the Requests are subsequently properly served.

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**COUNSEL FOR THE HMIT ENTITIES AND VALUESCOPE**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| Debtor. | ) | **Re: Docket No. 4533** |

**JOINDER TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR A PROTECTIVE ORDER AGAINST THE DUGABOY INVESTMENT TRUST'S DISCOVERY REQUESTS**

Hunter Mountain Investment Trust ("HMIT"), Beacon Mountain LLC ("Beacon Mountain"), Rand Advisors, LLC ("Rand Advisors"), Rand PE Fund I, LP ("Rand PE Fund"), Rand PE Fund Management, LLC ("Rand GP" with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, the "HMIT Entities") and ValueScope, LLC ("ValueScope"); hereby submit this *Joinder* (the

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

"Joinder") to the *Motion for Protective Order against the Dugaboy Investment Trust's Discovery Truste's Discovery Requests* [Dkt. No. 4533] (the "Motion for Protective Order"). The HMIT Entities (other than HMIT) and ValueScope were each served with subpoenas for document production (the "Requests") by Dugaboy Investment Trust ("Dugaboy") in connection with the *Motion to Reconsider the 9019 Order* [Dkt. No. 4513] (the "Rule 60(b) Motion").[2]

**A. Joinder in the Motion for Protective Order.**

1. The Joining Parties join and adopt the motion for Protective Order and the briefing therein for all purposes and respectfully request for the reasons set forth in the Motion for Protective Order that this Court enter an order protecting against Dugaboy's efforts to take discovery in connection with its Rule 60(b) Motion, including its Requests, Subpoenas, and deposition requests.

**B. Additional Objections**

2. The Joining Parties also specifically object to the definitions of terms in the Requests that appear to make the particular respondent responsible for the production of documents in control, possession, or custody of others.

3. For instance, Dugaboy sent requests to Beacon Mountain asking for "All Documents evidencing any Communications between any HMIT Entity representative and any Highland Entity representative regarding the terms of the Settlement Agreement." "HMIT Entity" is defined to mean "collectively to Hunter Mountain Investment Trust and Beacon Mountain, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf." But Dugaboy never served Requests on HMIT.

---

2 See Exhibit A – Document Subpoenas to HMIT Entities and ValueScope in globo.

4. So it appears that Dugaboy is attempting to seek discovery from HMIT through Beacon Mountain.

5. Likewise, Dugaboy sent requests to Rand Advisors, seeking "All Documents and Communications exchanged between any Highland Party and any Rand Party prior to execution of the Settlement Agreement relating to or evidencing legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any changes thereto." "Rand Party" is defined to "mean "collectively to Rand PE Fund I, LP, Rand Advisors, LLC, and Rand PE Fund Management, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf." Again, Dugaboy seeks discovery from Rand Advisors of all other Rand Party documents.

6. To the extent the Requests seek to expand the obligation to produce documents beyond those in each person's possession, custody, or control, the Requests are for these additional reasons improper.

7. Further, of note, ValueScope is not a party to the 9019 Settlement and is not a party to the Bankruptcy Case. Dugaboy had every opportunity to pursue discovery from ValueScope in 2025. Mr. Patrick's retention of ValueScope has been publicly disclosed throughout this case, since at least 2021. *See* Transcript, June 8, 2021, Case No. 19-34054.[3]

8. Dugaboy deposed both Mr. Patrick and Mr. Shawn Raver with respect to the 9019 Motion, yet never sought any information regarding or information from ValueScope.

---

[3] In June 2021, Mr. Patrick was asked if he was solely responsible for making all investment decisions with respect to a $200 million charitable fund, to which he testified, "Yes, but I get some help. I've engaged an outside third party called ValueScope, and they have been as -- effectively working as a "gatekeeper" for me, and I look to them for investment guidance and advice…" Id. at 102:19-25.

9. While the Motion for Protective Order aptly sets forth the problematic procedure before the Court (i.e. that Dugaboy could have and did in fact already engage in extensive discovery related to the 9019 Motion but now seeks to re-do and expand the discovery it could have done prior to entry of the 9019 Order through the Rule 60(b) Motion), these issues are magnified as they apply to a true third party like ValueScope.

10. The Joining Parties reserve all further rights to object to the substance of the Requests if such Requests are determined by this Court to be proper in the context of the Rule 60(b) Motion.

## CONCLUSION

11. The Joining Parties join in the Motion for Protective Order and respectfully request for the reasons set forth in the Motion for Protective Order that this Court enter an order protecting against Dugaboy's efforts to take discovery in connection with its Rule 60(b) Motion.

Respectfully Submitted:

**KELLY HART PITRE**

*/s/ Louis M. Phillips*
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

***Counsel for the HMIT Entities and ValueScope***

**CERTIFICATE OF SERVICE**

I, undersigned counsel, hereby certify that a copy of the forgoing was served on all parties receiving notice in this chapter 11 case through this Court's CM/ECF System on this April 6, 2026.

*/s/ Louis M. Phillips*_____
Louis M. Phillips (#10505)

**CERTIFICATE OF CONFERENCE**

I, undersigned counsel, hereby certify that prior to filing the forgoing, I emailed counsel for Dugaboy to note the Joining Parties' Joinder. Given the filing of the Motion for Protective Order, it is clear that further conference would be futile at this juncture.

*/s/ Louis M. Phillips*_____
Louis M. Phillips (#10505)

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910

WILLKIE FARR & GALLAGHER LLP
Mark T. Stancil (admitted *pro hac vice*)
mstancil@willkie.com
Joshua S. Levy (admitted *pro hac vice*)
jlevy@willkie.com
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000

HAYWARD PLLC
Melissa S. Hayward (Texas Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (Texas Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |

**NOTICE OF HEARING ON HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR A PROTECTIVE ORDER AGAINST THE DUGABOY INVESTMENT TRUST'S DISCOVERY REQUESTS**

**PLEASE TAKE NOTICE** that the following matter has been scheduled for hearing on **Friday, April 24, 2026, at 9:30 a.m. (Central Time)** (the "Hearing"):

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 6333 E. Mockingbird Lane, Suite 147 #5045, Dallas, TX 75214.

1. *Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests* [Docket No. 4533] (the "Motion").

The Hearing on the Motion will be held via WebEx videoconference before The Honorable Brad W. Odell, United States Bankruptcy Judge. The WebEx attendance information will be posted to the Court's website, www.txnb.uscourts.gov, under Judge Odell's Hearing Dates and Calendar tab prior to the Hearing.

[*Remainder of Page Intentionally Blank*]

Dated: April 7, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Hayley R. Winograd (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
hwinograd@pszjlaw.com

-and-

**WILLKIE FARR & GALLAGHER LLP**
Mark T. Stancil (admitted *pro hac vice*)
Joshua S. Levy (admitted *pro hac vice*)
1875 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 303-1000
Email: mstancil@willkie.com
jlevy@willkie.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**COUNSEL FOR CLO HOLDCO, LTD. AND THE LAW FIRMS**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,[1]<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |

# NOTICE OF HEARING ON MOTION TO QUASH REQUESTS FOR PRODUCTION OF DOCUMENTS SERVED IMPROPERLY

**PLEASE TAKE NOTICE** that the following matter has been scheduled for hearing on **Friday, April 24, 2026, at 9:30 a.m. (Central Time)** (the "Hearing"):

1. *Motion To Quash Requests For Production Of Documents Served Improperly* [Docket No. 4538] (the "Motion") filed by CLO Holdco, Ltd.; Shields Legal Group, P.C.; and Kelly Hart & Hallman LP ("Movers")

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 6333 E. Mockingbird Lane, Suite 147 #5045, Dallas, TX 75214.

The Hearing on the Motion will be held via WebEx videoconference before The Honorable Brad W. Odell, United States Bankruptcy Judge. The WebEx attendance information will be posted to the Court's website, www.txnb.uscourts.gov, under Judge Odell's Hearing Dates and Calendar tab prior to the Hearing.

By agreement of the parties, Dugaboy Investment Trust shall file its response to the Motion by April 15, 2026 and Movers shall file any reply in support of the Motion by April 17, 2026.

Dated: April 7, 2026

Respectfully Submitted:
**KELLY HART PITRE**

***/s/ Louis M. Phillips***
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

***Counsel for CLO HoldCo, Ltd. and the Firms for the limited purpose of this Motion to Quash***

**CERTIFICATE OF SERVICE**

I, undersigned counsel, hereby certify that a copy of the forgoing was served on all parties receiving notice in this chapter 11 case through this Court's CM/ECF System on this April 7, 2026.

***/s/ Louis M. Phillips***
Louis M. Phillips (#10505)

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 10, 2026**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054-sgj11** |
| | § | |
| | § | |
| **Debtor.** | § | |

**ORDER**

On March 3, 2026, the Court entered an order setting a hearing for April 27, 2026, to consider the *Motion for Relief from Order and Motion to Vacate* (the "Motion for Relief") filed by The Dugaboy Investment Trust ("Dugaboy") [Dkt. No. 4513].[1] The parties agree to reschedule the April 27, 2026, hearing. It is, therefore,

ORDERED that the April 27, 2026, hearing on the Motion for Relief is rescheduled to commence on May 11, 2026, at 9:00 am, at the George Mahon Federal Building, 1205 Texas Avenue, Room 314, Lubbock, Texas; it is further

ORDERED that all discovery related to the Motion for Relief, unless otherwise agreed by the parties, must be completed no later than May 1, 2026. All

[1] All "Dkt. No." references herein are to the above-captioned case.

restrictions related to discovery that were previously agreed to by the parties, which were stated in the Court's March 3 Order [Dkt. No. 4528], and subject to the Court's resolution of *Highland Capital Management, L.P.'s Motion for a Protective Order Against the Dugaboy Investment Trust's Discovery Requests* ("Motion for Protective Order") [Dkt. No. 4533] and the *Motion to Quash Requests for Production of Documents Served Improperly* ("Motion to Quash") [Dkt. No. 4538], remain unchanged; it is further

ORDERED that Dugaboy shall, no later than May 8, 2026, file a reply, if any, in support of the Motion for Relief; it is further

ORDERED that Dugaboy shall no later than April 17, 2026, file its oppositions to the Motion for Protective Order and Motion to Quash. Any replies in support of the Motion for Protective Order or Motion to Quash must be filed no later than April 22, 2026; it is further

ORDERED that all parties must file and exchange witness and exhibit lists, and all exhibits, in accordance with Judge Odell's "Judge-Specific Guidelines," which are located at: https://www.txnb.uscourts.gov/content/judge-brad-w-odell; it is further

ORDERED that the Court will consider any requests to amend the deadlines set forth herein only upon motion and for good cause shown; and it is finally

ORDERED that the Court retains jurisdiction to interpret and enforce this Order.

### End of Order ###

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**COUNSEL FOR SHIELDS LEGAL GROUP, P.C.
AND KELLY HART & HALLMAN LP**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| Debtor. | ) | **Re: Docket Nos. 4538,§ 4533** |

**SUPPLEMENT TO MOTION TO QUASH AND JOINDER TO HIGHLAND CAPITAL MANAGEMENT, L.P.'S MOTION FOR A PROTECTIVE ORDER AGAINST THE DUGABOY INVESTMENT TRUST'S DISCOVERY REQUESTS**

Shields Legal Group, P.C. ("Shields"); and Kelly Hart & Hallman LP ("Kelly Hart," with Shields, the "Law Firms") hereby submit this (i) *Supplement* (the "Supplement") to the *Motion to Quash* (the "Motion to Quash") [Dkt. No. 4538] filed by the Law Firms and (ii) *Joinder* (the

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

"Joinder") to the *Motion for Protective Order against the Dugaboy Investment Trust's Discovery Truste's Discovery Request*s [Dkt. No. 4533] (the "Motion for Protective Order").

**SUPPLEMENTAL ARGUMENTS**

1. In the Motion to Quash, the Law Firms (along with co-movant CLO HoldCo, Ltd.) moved for an order quashing the requests for document production (the "Requests") by Dugaboy Investment Trust ("Dugaboy") in connection with the *Motion to Reconsider the 9019 Order* [Dkt. No. 4513] (the "Rule 60(b) Motion") because the Requests were sent via email, not by service of a subpoena pursuant to Fed. R. Civ. P. 45. In the Motion to Quash, the Law Firms specifically state that they:

> reserve their rights to lodge such substantive objections and move for a protective order to the extent these service defects are cured or the Motion to Quash overruled.
>
> Specifically, this Court will consider the propriety of such extensive discovery requests in connection with the Motion for Protective Order against the Dugaboy Investment Trust's Discovery Truste's Discovery Requests [Dkt. No. 4533] (the "Motion for Protective Order") filed by HCMLP. The Moving Parties believe it is premature to join in a substantive request for protective order as in fact they have not been served so cannot be involved in the proceedings involving the Motion for Protective Order. But the Moving Parties reserve all rights.

Motion to Quash, ¶19.

2. After the filing of the Motion to Quash, on or about April 9, 2026, the Law Firms were each served with a subpoena by Dugaboy pursuant to Fed. R. Civ. P. 45.

3. Thus, in keeping with their reservation, the Law Firms expressly join in and adopt the arguments set forth in the Motion for Protective Order.

4. Further, the subpoenas to and served upon the Law Firms state that the requested documents must be provided to counsel for Dugaboy **on May 11, 2026 by 5:00 p.m. CST**.

5. This Court has set a hearing on the Dugaboy Rule 60(b)(6) Motion for May 11, 2026 at 9:00 a.m., and ordered that all discovery related to the Rule 60(b) Motion be completed no later than May 1, 2026. Dkt. No. 4547.

6. Therefore, the requests are impermissible and clearly not designed to obtain discoverable information relating to the Rule 60(b) Motion because they are returnable *after* the close of discovery and even *after* the scheduled hearing on the Rule 60(b)(6) Motion. Thus, there is simply no reason for the Law Firms to spend time and effort in responding to the Served Requests when the documents produced necessarily will not be used in the connection with the Rule 60(b) Motion.

7. Further, and as covered by the Motion for Protective Order, the subpoenas to and served upon the Law Firms in effect request the entire client files of the Law Firms, and as such are clearly improper.

8. The Law Firms likewise oppose any attempt by Dugaboy to rely on its own inability to comply with Fed. R. Civ. P. 45 in the first instance, and to serve subpoenas with a proper return date (or of a proper scope) once it learned of the necessity of a subpoena from the Motion to Quash, as cause or basis for any extension of the hearing date or discovery deadlines set by this Court. *See S&W Enters., LLC v. SouthTrust Bank of Ala.*, NA, 315 F.3d 533, 535 (5th Cir. 2003) ("good cause standard requires the party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension"). Improper transmission of improper discovery followed up with improper subpoenas with an improper return date (after the scheduled hearing), cannot be due diligence.

## CONCLUSION

9. Thus, for the reasons stated in the Motion for Protective Order, as supplemented by this Supplement, the Served Requests must be quashed.

Respectfully Submitted:

**KELLY HART PITRE**

*/s/ Louis M. Phillips*
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

***Counsel for the Law Firms***

## CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that a copy of the forgoing was served on all parties receiving notice in this chapter 11 case through this Court's CM/ECF System on this April 16, 2026.

*/s/ Louis M. Phillips*
Louis M. Phillips (#10505)

## CERTIFICATE OF CONFERENCE

Given the filing of the Motion for Protective Order and various other discovery disputes before this Court, it is clear that further conference would be futile at this juncture. The Law Firms reached out to counsel for Dugaboy who agreed that the meet and confer requirements had been met.

*/s/ Louis M. Phillips*
Louis M. Phillips (#10505)

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S RESPONSE IN OPPOSITION TO THE MOVING PARTIES' MOTION TO QUASH REQUESTS FOR PRODUCTION OF DOCUMENTS SERVED IMPROPERLY**

The Dugaboy Investment Trust ("Dugaboy") files this Response in Opposition to the Moving Parties'[1] Motion to Quash Requests For Production of Documents Served Improperly (Dkt. No. 4538), as supplemented by the Moving Parties' Supplement to the Motion to Quash (Dkt. No. 4549), and respectfully shows the Court as follows.

The Court should deny the Motion to Quash as moot. The Moving Parties' sole complaint is that Dugaboy served its document requests by email to counsel of record in accordance with standard practice for discovery between parties and to avoid the expense of formal process.[2] *WSOU Investments LLC v. ZTE Corp.,* 2022 WL 3108557, at *6 (W.D. Tex. Aug. 4, 2022) (scolding the parties for "disputing the adequacy of service and wastefully rais[ing] the cost of litigation" instead of accepting service).

The Moving Parties chose to refuse service, and Dugaboy does not dispute they were within their rights under the Federal Rules to do so. But the consequence of that choice left Dugaboy with no choice but to pursue formal service under Federal Rule of Civil Procedure 45 and Federal Bankruptcy Rule of Procedure 9016. Dugaboy has already effected that service. *See* Ex. A (proof of service on Kelly Hart), Ex. B (proof of service on Shields), and Ex. C (proof of service on CLO Holdco). This moots the Moving Parties' objections to email service and thus leaves nothing for the Court to decide. The Court should therefore deny the Motion as moot.

The Moving Parties' April 16, 2026 Supplement to their Motion to Quash (Dkt. No. 4549) does nothing to save the Motion from mootness. Contrary to their suggestion, this Court's April 10, 2026 Order (Dkt. 4547) does not preclude the parties from continuing discovery past May 1,

[1] The "Moving Parties" are CLO Holdco, Ltd. ("CLO Holdco"); Shields Legal Group, P.C. ("Shields"); and Kelly Hart & Hallman LP ("Kelly Hart," with Shields, the "Law Firms"). *See* Dkt. 4538 (Motion) and 4549 (Supplement to Motion).

[2] *See* Dkt. 4538, Motion to Quash Exhibits A (requests to CLO Holdco), B (requests to Kelly Hart), and C (requests to Shields).

2026, to the extent they can do so by agreement. *See id*. at 1 ("[A]ll discovery related to the Motion for Relief, ***unless otherwise agreed by the parties***, must be completed no later than May 1, 2026.") (emphasis added). But the Moving Parties have made no effort to meet and confer with Dugaboy about the timing or scope of the requested discovery and instead have simply raced to the Court.

Finally, to the extent the Moving Parties have joined in the arguments and objections asserted by Highland Capital Management, L.P. in its Motion for Protective Order (Dkt. 4533; *see* Joinder at Dkt. 4540), Dugaboy addresses those issues in its contemporaneously filed Response to Highland's Motion.

For the foregoing reasons, Dugaboy respectfully requests that the Court deny the Moving Parties' Motion to Quash as moot.

Dated: April 17, 2026

Respectfully submitted,

*<u>/s/ Geoffrey S. Harper</u>*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 17, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE**
**NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | **19-BK-34054 (SGJ)** |
| **Reorganized Debtor.** | § | |
| | § | |
| | § | |
| | § | |

## RETURN OF SERVICE

Came to my hand on **Thursday, April 9, 2026 at 9:30 AM,**
Executed at: **201 MAIN STREET, STE 2000, ARLINGTON, TX 76012**
at **12:10 PM,** on **Thursday, April 9, 2026**, by delivering to the within named:

**KELLY HART & HALLMAN, LLP**

By personally delivering to its **Partner, DEREK ANDERSON**
a true copy of this

**THE DUGABOY INVESTMENT TRUST'S NOTICE OF SUBPOENA TO KELLY HART & HALLMAN LLP and SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION with ATTACHMENT A**

having first endorsed thereon the date of the delivery.

I am a person not less than eighteen (18) years of age and I am competent to make this oath. I am a resident of the State of Texas. I have personal knowledge of the facts and statements contained herein and aver that each is true and correct. I am not a party to nor related or affiliated with any party to this suit. I have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude. I am familiar with the Texas Rules of Civil Procedure, and the Texas Civil Practice and Remedies Codes as they apply to service of process. I am certified by the Judicial Branch Certification Commission to deliver citations and other notices from any District, County and Justice Courts in and for the State of Texas in compliance with rule 103 and 501.2 of the TRCP."

**My name is Danny L. Haney, I am at least 18 years old, and my business address is 5470 L.B.J. Freeway, Dallas, Texas, 75240 in the county of Dallas, United States of America. I declare under penalty of perjury that the foregoing is true and correct.**

Executed in Dallas County, State of Texas, on Sunday, April 12, 2026

**By:** ______________________________
**Danny L. Haney - PSC 566 - Exp 03/31/28**
**served-sd@proceedlegal.com**

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | ) | |

**THE DUGABOY INVESTMENT TRUST'S**
**NOTICE OF SUBPOENA TO KELLY HART & HALLMAN LLP**

PLEASE TAKE NOTICE that, under Federal Rule of Bankruptcy Procedure 9016, which incorporates Federal Rule of Civil Procedure 45, The Dugaboy Investment Trust ("Dugaboy"), by and through its counsel, requests documents from non-party Kelly Hart & Hallman LLP ("Kelly Hart") under the attached Subpoena. The materials requested in Exhibit A are to be produced under the enclosed document subpoena by 5:00 p.m. local time on May 11, 2026 at King & Spalding, LLP, 2601 Olive Street, Suite 2300, Dallas, Texas 75201.

If Kelly Hart has retained counsel to assist with responding to this Subpoena, please notify us immediately and provide counsel's name, firm, address, telephone number, and email address so that we may direct correspondence accordingly.

Dated: April 9, 2026

*/s/ Geoffrey S. Harper*
**Geoffrey S. Harper**
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600
(214) 764-4601 (fax)

**John Michael Gaddis**
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

I certify that on April 9, 2026, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

In re: Highland Capital Management, L.P. (Debtor)

*Plaintiff*

v.

Civil Action No. 19-bk-34054 (SGJ)

*Defendant*

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Marianne M. Auld, Partner In Charge, Kelly Hart & Hallman LLP, 201 Main Street, Suite 2500, Fort Worth, TX 76012

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A - The Dugaboy Investment Trust's First Set of Requests for Production of Documents to Kelly Hart & Hallman LLP

| Place: King & Spalding LLP, 2601 Olive Street, Suite 2300, Dallas, TX 75201 | Date and Time: 05/11/2026 5:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 04/09/2026

*CLERK OF COURT*

OR

Geoffrey S. Harper

*Signature of Clerk or Deputy Clerk* — *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* The Dugaboy Investment Trust, who issues or requests this subpoena, are:

Geoffrey S. Harper, King & Spalding LLP, 2601 Olive Street, Suite 2300, Dallas, TX 75201, 214-763-6894, gharper@kslaw.com

**Notice to the person who issues or requests this subpoena**

A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 19-bk-34054 (SGJ)

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ____________________
on *(date)* __________ .

☐ I served the subpoena by delivering a copy to the named person as follows: ____________________

____________________ on *(date)* __________ ; or

☐ I returned the subpoena unexecuted because: ____________________
____________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of
$ __________ .

My fees are $ __________ for travel and $ __________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: __________

____________________
*Server's signature*

____________________
*Printed name and title*

____________________
*Server's address*

Additional information regarding attempted service, etc.:

RETURN / AFFIDAVIT
PROOF / ATTACHED

RETURN / AFFIDAVIT
PROOF / ATTACHED

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| **Reorganized Debtor** | § | **Case No. 19-34054-sgj11** |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

**RETURN OF SERVICE**

Came to my hand on **Thursday, April 9, 2026 at 9:20 AM,**
Executed at: **16400 DALLAS PARKWAY, STE 300, DALLAS, TX 75248**
at **10:21 AM,** on **Thursday, April 9, 2026,**
by delivering to the within named:

**SHIELDS LEGAL GROUP, P.C.**

By personally delivering to Registered Agent**, JAMES D. SHIELDS** a true copy of this

**THE DUGABOY INVESTMENT TRUST'S NOTICE OF SUBPOENA TO SHIELDS LEGAL GROUP, P.C. and SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION with ATTACHMENT A**

having first endorsed thereon the date of the delivery.

I am a person not less than eighteen (18) years of age and I am competent to make this oath. I am a resident of the State of Texas. I have personal knowledge of the facts and statements contained herein and aver that each is true and correct. I am not a party to nor related or affiliated with any party to this suit. I have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude.

**My name is Adil Tadli, I am at least 18 years old, and my business address is 5470 L.B.J. Freeway, Dallas, Texas, 75240 in the county of Dallas, United States of America. I declare under penalty of perjury that the foregoing is true and correct.**

Executed in Dallas County, State of Texas, on Friday, April 10, 2026

**By:**______________________________
**Adil Tadli - PSC 1206 - Exp 05/31/26**
**served-sd@proceedlegal.com**

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Reorganized Debtor. | Chapter 11<br><br>Case No. 19-34054-sgj11 |

**THE DUGABOY INVESTMENT TRUST'S**
**<u>NOTICE OF SUBPOENA TO SHIELDS LEGAL GROUP P.C.</u>**

PLEASE TAKE NOTICE that, under Federal Rule of Bankruptcy Procedure 9016, which incorporates Federal Rule of Civil Procedure 45, The Dugaboy Investment Trust ("Dugaboy"), by and through its counsel, requests documents from non-party Shields Legal Group P.C. ("Shields") under the attached Subpoena. The materials requested in Exhibit A are to be produced under the enclosed document subpoena by 5:00 p.m. local time on May 11, 2026 at King & Spalding, LLP, 2601 Olive Street, Suite 2300, Dallas, Texas 75201.

If Shields has retained counsel to assist with responding to this Subpoena, please notify us immediately and provide counsel's name, firm, address, telephone number, and email address so that we may direct correspondence accordingly.

Dated: April 9, 2026

*/s/ Geoffrey S. Harper*
**Geoffrey S. Harper**
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600
(214) 764-4601 (fax)

**John Michael Gaddis**
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

I certify that on April 9, 2026, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

In re: Highland Capital Management, L.P. (Debtor)
*Plaintiff*
v.
*Defendant*

Civil Action No. 19-bk-34054 (SGJ)

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: James D. Shields, Registered Agent, Shields Legal Group P.C., 16400 Dallas Parkway, Suite 300, Dallas, TX 75248

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A - The Dugaboy Investment Trust's First Set of Requests for Production of Documents to Shields Legal Group P.C.

| Place: King & Spalding LLP, 2601 Olive Street, Suite 2300, Dallas, TX 75201 | Date and Time: 05/11/2026 5:00 pm |
|---|---|

❒ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 04/09/2026

*CLERK OF COURT*

*Signature of Clerk or Deputy Clerk*

OR

Geoffrey S. Harper
*Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* The Dugaboy Investment Trust, who issues or requests this subpoena, are:

Geoffrey S. Harper, King & Spalding LLP, 2601 Olive Street, Suite 2300, Dallas, TX 75201, 214-763-6894, gharper@kslaw.com

**Notice to the person who issues or requests this subpoena**

A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 19-bk-34054 (SGJ)

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ____________ .

❐ I served the subpoena by delivering a copy to the named person as follows: ______________________
______________________________________________ on *(date)* ____________ ; or

❐ I returned the subpoena unexecuted because: ______________________
______________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of
$ ____________ .

My fees are $ ____________ for travel and $ ____________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO SHIELDS LEGAL GROUP P.C.**

**To:** Shields Legal Group P.C., by and through their Registered Agent, James D. Shields, jshields@shieldslegal.com, Shields Legal Group, 16400 Dallas Parkway, Suite 300, Dallas, TX 75248

Interested Party The Dugaboy Investment Trust ("Dugaboy") serves this First Set of Requests for Production of Documents to Shields Legal Group P.C. ("Shields"), pursuant to Rule 34 of the Federal Rules of Civil Procedure, which is incorporated into bankruptcy proceedings by Federal Rules of Bankruptcy Procedure 7034 and 9014(c)(1). Shields must respond to these Requests for Production within thirty (30) days of service. We ask that You produce documents at the offices of King & Spalding, 2601 Olive Street, Suite 2300, Dallas, TX 75201, or by electronic production in a mutually agreed format.

## INSTRUCTIONS

1. In responding to these Requests, You must furnish all information that is available to You, that is within Your possession, custody, or control, or that is subject to Your reasonable inquiry, including information in the possession of Your attorneys, accountants, advisors, representatives, agents, or other persons directly or indirectly employed by, or connected with, You or Your attorneys, and anyone else otherwise subject to Your control. All Documents that respond, in

whole or in part, to any portion of the Requests below shall be produced in their entirety, including all attachments and enclosures.

2. The relevant time period for documents responsive to these Requests, unless otherwise specified in an individual Request, is the period beginning on the earlier of October 1, 2024, or such date as identified in response to Request No. 1,[1] through the present.

3. To the extent that the below Requests include requests for paper records, such paper records shall be scanned or otherwise converted into electronic form from paper documents in the following format:

(a) All documents shall be scanned to single page Group 4, TIFF format, at least 300 dpi and 8½ x 11 inch page size, except for documents requiring higher resolution or different page size.

(b) In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). The Parties will make their best efforts to have their vendors unitize documents correctly and will commit to address situations where there are improperly unitized documents. For documents found in folders or other containers with labels, tabs, or other identifying information, such labels and tabs shall be scanned where practicable. Pages with Post-it notes shall be scanned both with and without the Post-it, with the image of the page with the Post-it preceding the image of the page without the Post-it.

[1] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

(c) Productions of the images shall be made using an image load file (.OPT or .LFP) and a delimited database/metadata load file (.DAT). Each image file should have a unique file name which shall be the Bates number of the page.

(d) The following objective coding fields should be provided, if applicable:

(1) beginning Bates number;

(2) ending Bates number;

(3) beginning attachment Bates number;

(4) ending attachment Bates number;

(5) page count; and

(6) source location/custodian.

(e) Document level OCR should be provided as a separate text file. The file name of each text file should correspond to the file name of the first image file of the document with which it is associated. The text files will not contain the redacted portions of the documents. OCR software should be set to the highest quality setting during processing. For documents in foreign languages, the OCR shall be performed using an OCR tool and settings suitable for the particular byte or multi-byte languages.

4. To the extent that the below Requests include requests for electronically stored information ("ESI"), all ESI shall be produced in TIFF format according to the following specifications:

(a) All TIFF formatted documents will be single page, Group 4 TIFF at 300 x 300 dpi resolution and 8½ x 11 inch page size, except for documents requiring different resolution or page size.

(b) An image load file, in standard Opticon format, showing the Bates number of each page and the appropriate unitization of the documents, will accompany all document images.

(c) Each imaged version of an electronic document will be created directly from the original electronic document.

(d) TIFFs shall be produced as black and white, single-page TIFF images in accordance with the technical specifications set out above. Word documents that have tracked changes or comments shall be produced in color. In addition, upon written request that identifies a reasonable number of individual documents at issue by Bates number, a party shall produce color images for those documents. Documents produced in color shall be produced as single page, 300 DPI, color JPG images with the quality setting of 75% or higher.

(e) All TIFF files are to be provided with an accompanying searchable text (.TXT) file extracted from the native, electronic file (not generated as an OCR file from the TIFF image(s)), and such text files shall contain the full text extraction. To the extent reasonably feasible, extracted text shall provide all comments, tracked changes, speaker's notes, and text from hidden worksheets, slides, columns, and rows. In the case of files with redacted text, OCR'ed text of the redacted documents may be provided in lieu of extracted text. OCR software should be set to the highest quality setting during processing.

5. To the extent reasonably feasible, all Documents produced shall be produced with metadata and attachments intact. The term "metadata" means all information describing the history, tracking, or management of an electronic document including, but not limited to, the date(s) the document was created, modified, accessed, or distributed; the author(s) and all recipient(s) of the

document; the file's name; the file's location (e.g., directory structure or pathname); the file format or file type; and the file size. For comparison purposes and to ensure authenticity, where documents are produced in native format, such documents shall also be produced in the ESI format described in Instruction No. 3, unless otherwise agreed by the parties.

6. Should You object to any Request, You must specifically and in detail state the grounds and reasons for the objection, and state in detail the part of the language of the Request to which You object, and state which part of the Request, if any, You are answering.

7. Under the Crime-Fraud Exception and Subject-Matter Waiver, items which would typically be privileged are not privileged in this matter. The Fifth Circuit recognizes the Crime-Fraud Exception to privilege, under which attorney-client communications and/or work product materials are not privileged if "the client consults an attorney for advice that will assist the client in carrying out a contemplated illegal or fraudulent scheme." *Lewis v. Crochet*, 105 F.4th 272, 282 (5th Cir. 2024) (quoting *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1242 (5th Cir. 1982)). The exception applies where (1) a crime or fraud was impending or continuing at the time of the communication, and (2) the communications or work product at issue were in furtherance of that criminal or fraudulent activity. *See In re E.E.O.C.*, 207 F. App'x 426, 434 (5th Cir. 2006). Dugaboy reasonably believes, and has evidence to support, that certain communications and work product it seeks were intended to further continuing or future criminal or fraudulent activity and are therefore not privileged.

Likewise, Subject-Matter Waiver under Federal Rule of Evidence 502(a) provides that disclosure of certain information in a federal proceeding waives privilege for related information when (1) the waiver was intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) the disclosed and undisclosed

communications and work product "ought in fairness to be considered together." Fed. R. Evid. 502(a); *see also Crider Inc. v. Silgan Containers LLC*, 2023 WL 479094, at *22 (N.D. Tex. Jan. 13, 2023). Any communications or work product that would otherwise be privileged, but concern the same subject matter intentionally disclosed by Mark Patrick in his affidavits or testimony in this Proceeding or Related Proceedings fall under this exception, and privilege has been waived.

Accordingly, under these exceptions and waivers, You must produce documents that would typically be privileged as they relate to (1) any fraudulent activity that counsel was involved in or knew of, or (2) any privileged conversation or information that has already been disclosed elsewhere in this litigation.

If You still contend that any Documents sought by the Requests are privileged or otherwise protected from discovery, You must nevertheless identify for each Document withheld:

(a) the legal basis for withholding the Document;

(b) the person asserting any claim of privilege and/or protection;

(c) a description and identification of the requested Document sufficient to frame an appropriate demand for the Document and a motion to compel disclosure thereof, setting forth at least the following:

(i) the author and/or signatory of the Document withheld;

(ii) the date of the Document withheld;

(iii) all addressees and/or recipients of the Document withheld; and

(iv) the subject matter and circumstances under which the Document withheld was created in sufficient detail to ascertain applicability of such privilege or other legal basis.

8. Notwithstanding a claim that a portion of a Document is privileged or otherwise protected from disclosure, any such Document must be produced with the portion claimed to be protected excised.

9. If You contend that any Request is ambiguous or unclear, contact undersigned counsel as soon as possible so that the Request can be clarified to avoid unnecessary delays in discovery.

10. These Requests are continuing in nature. Any Documents located, created, or obtained subsequent to the Documents provided in response to these Requests and that should have been produced had they been known shall be promptly supplied by supplemental responses whenever You find, locate, or acquire such Documents. You are required to supplement and correct Your answers and responses on a timely basis.

## DEFINITIONS

As used herein, the terms listed below shall be defined as follows. Insofar as a term is not explicitly defined, the meaning to be used is the commonly accepted definition of the term. Notwithstanding any definition set forth below, each word, term, or phrase used in these Requests is intended to have the broadest meaning permitted under applicable rules. The following terms are to be given their ascribed definitions:

### A. Proceedings

1. The term "this Proceeding" or "this Litigation" or "Main Case" refers to the main bankruptcy proceeding *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

2. The term "Related Proceedings" includes all other legal proceedings or actions involving or related to Highland, HMIT, and persons, parties, or entities involved with or affected by the Settlement, specifically including but not limited to the Cayman Islands Proceedings, the Chapter

15 proceeding in the United States Bankruptcy Court for the District of Delaware, and the Texas Business Court proceeding, as well as any bankruptcy adversary proceedings before the United States Bankruptcy Court for the Northern District of Texas that are separate from the Main Case.

**B. Parties and Individuals**

1. The term "You" or "Your" refers to Kelly Hart & Hellman LLP and Shields Law Group, collectively or individually, as well as their agents, attorneys, accountants, advisors, representatives, or any other individual(s) or entity(ies) acting or authorized to act on behalf of them, and any related companies, divisions, or subsidiaries, past or present, including, without limitation, the directors, officers, employees, agents, or attorneys thereof, as well as any predecessors-in-interest or successors-in-interest.
2. The term "Patrick" refers to Mark Eric Patrick.
3. The term "Dondero" refers to James Dondero.
4. The term "Okada" refers to Mark Okada.
5. The term "Seery" or "Claimant Trustee" refers to James P. Seery, Jr.
6. The term "Kirschner" or "Litigation Trustee" refers to Marc S. Kirschner.
7. The term "Murphy" refers to Paul Murphy.
8. The term "Scott" refers to Grant Scott.
9. The term "Cronin" refers to Kevin Cronin.
10. The term "Honis" refers to John Honis.
11. The term "Raver" refers to Shawn Raver.

**C. Highland Entities and Related Trusts**

12. The term "Highland" or "Highland Capital Management" refers to Highland Capital Management, L.P., a Dallas-based, Delaware-domiciled investment advisor, and the Debtor in the matter *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

13. The term "Highland Entities" or "Highland Entity" refers collectively to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

14. The term "Highland Claimant Trust" refers to the entity created under the Plan to hold, monetize, and distribute the assets of Highland's estate.

15. The term "Highland Litigation Sub-Trust" or "Litigation Sub-Trust" refers to the trust created under the Plan for the purpose of pursuing litigation claims on behalf of the Highland estate.

16. The term "Highland Indemnity Trust" or "Indemnity Trust" refers to the trust created under the Plan to hold assets for the purpose of indemnification obligations arising out of the Highland estate.

17. The term "Highland Party" or "Highland Parties" refers to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, the Highland Indemnity Trust, and each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, and subsidiaries, and any persons or entities acting or authorized to act on their behalf.

**D. HMIT Entities and Related Parties**

1. The term "HMIT Entities" refers collectively to Hunter Mountain Investment Trust and Beacon Mountain, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "HMIT Parties" refers broadly to the HMIT Entities, Mark Patrick, and any related decision maker with respect to the HMIT Entities, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

3. The term "Hunter Mountain" or "HMIT" refers to Hunter Mountain Investment Trust.

4. The term "Beacon Mountain" refers to Beacon Mountain, LLC.

5. The term "Beacon Hunter" refers to Beacon Hunter, LLC.

**E. Rand Entities**

1. The term "Rand Parties" or "Rand Entities" refers collectively to Rand PE Fund I, LP, Rand Advisors, LLC, and Rand PE Fund Management, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "Rand Fund" or "Rand PE Fund" refers to Rand PE Fund I, LP.

3. The term "Rand Advisors" refers to Rand Advisors, LLC, an SEC-registered investment advisor that served as the investment adviser to Rand PE Fund I, LP.

4. The term "Rand PE Fund Management" refers to Rand PE Fund Management, LLC.

**F. DAF Entities and Related Structures**

1. The term "DAF" or "Charitable DAF Holdco" refers to Charitable DAF Holdco, Ltd.

2. The term "DAF Fund" or "Charitable DAF Fund" refers to Charitable DAF Fund, LP.

3. The term "DAF GP" or "Charitable DAF GP" refers to Charitable DAF GP, LLC.

4. The term "DAF Structure" refers to the overall donor-advised fund investment vehicle and its constituent entities, including Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, and any entity holding ownership or management interests therein or formed in connection therewith, including any entities created as part of the restructuring of the DAF.

5. The term "DAF Entities" refers collectively to Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, CDH GP, Ltd., CDMCFAD, LLC, DFW Charitable Foundation, CLO Holdco, LLC, and any other entity formed, restructured, or otherwise created in connection with or derived from the DAF Structure, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

6. The terms "New GP" or "CDH GP" refer to CDH GP, Ltd.

7. The term "CDMCFAD" or "DAF 2.0" refers to CDMCFAD, LLC.

8. The term "DFW Charitable Foundation" or "DFW Foundation" refers to DFW Charitable Foundation.

9. The term "CLO Holdco" refers to CLO Holdco, LLC.

**G. Charitable and Donor Entities**

1. The terms "The Dallas Foundation" or "Dallas Foundation" refer to The Dallas Foundation.

2. The term "Crown Global" refers to Crown Global Life Insurance, Ltd.

3. The terms "Empower" or "Empower Dallas" refer to Empower Dallas.

4. The term "Okada Foundation" refers to the Okada Foundation.

5. The term "Charitable Beneficiaries" or "Charities" refers collectively to The Dallas Foundation, Crown Global Life Insurance, Ltd., Empower Dallas, the Okada Foundation, and any other charitable organization or foundation that held beneficial ownership in the DAF Structure through participation shares or annuity policies.

6. The term "Highland Dallas Foundation" refers to Highland Dallas Foundation, Inc.

7. The term "Highland Santa Barbara Foundation" refers to Highland Santa Barbara Foundation, Inc.

8. The term "Highland Kansas City Foundation" refers to Highland Kansas City Foundation, Inc.

9. The term "Participation Shares" refers to the shares in Charitable DAF Holdco, Ltd. held by the Charitable Foundations through which the Foundations held beneficial ownership in the DAF Structure.

**H. Other Entities**

1. The term "Dugaboy" refers to The Dugaboy Investment Trust.

2. The term "Strand" or "Strand Advisors" refers to Strand Advisors, Inc.

3. The terms "Atlas Fund" or "Atlas IDF" refers to Atlas IDF, LP.

4. The terms "Skyview" or "Skyview Group" refers to The Skyview Group.

5. The term "Fortaris" or "Fortaris Capital Advisors" refers to Fortaris Capital Advisors.

6. The term "ValueScope" refers to ValueScope, LLC.

7. The term "Celia Holdco" refers to Celia Holdco LLC.

8. The terms "Creative Hearts" or "Creative Hearts TX" refer to Creative Hearts TX.

**I. Law Firms**

1. The term "Kelly Hart" refers to Kelly Hart & Hallman LLP, or any predecessor or successor firm or any associated attorney.

2. The term "Shields Law Group" refers to Shields Law Group, P.C., or any predecessor or successor firm or any associated attorney.

**J. Litigation, Settlement, and Bankruptcy Terms**

1. The term "Highland Bankruptcy" refers to the Chapter 11 bankruptcy case titled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj, pending in the United States Bankruptcy Court for the Northern District of Texas.

2. The term "Settlement Agreement" refers to each and every discussion or negotiation of settlement or iteration of the settlement agreement between the Highland Entities and the HMIT Entities, together with all exhibits, schedules, appendices, and ancillary documents, and including any preliminary drafts, associated documents, and communications related thereto.

3. The term "Settlement Agreement & General Release" or "9019 Settlement" refers to the Settlement Agreement & General Release dated May 19, 2025, by and among the Highland Entities and the HMIT Entities, as approved by the Court, together with all exhibits, schedules, appendices, and ancillary documents.

4. The term "9019 Motion" refers to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, filed on May 19, 2025 (Bankr. Dkt. 4217).

5. The term "Rule 9019 Settlement Order" refers to the Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, entered on June 30, 2025 (Bankr. Dkt. 4297).

6. The term "Kirschner Litigation" or "Kirschner Claims" or "Transferred Claims" refers to the 36-count adversary complaint filed by Marc A. Kirschner, as Litigation Trustee, styled Kirschner v. Dondero, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex. Oct. 15, 2021), together with any amended, supplemental, or related pleadings, and the claims asserted therein.

7. The term "Plan" refers to Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization (as Modified), confirmed on February 22, 2021.

8. The term "Confirmation Order" refers to the Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.

9. The term "Class 10" refers to the class of claims under the Plan designated as "Class 10 Claims" and consisting of the claim held by Hunter Mountain Investment Trust as a holder of pre-bankruptcy Class B and C limited partnership interests in Highland.

10. The term "Class 11" refers to the class of claims under the Plan designated as "Class 11 Claims" and consisting of the claim held by other equity holders holding pre-bankruptcy Class A limited partnership interests in Highland.

11. The term "Class 10 Interest" or "HMIT Class 10 Interest" refers to Hunter Mountain Investment Trust's allowed Class 10 claim in the amount of $336,940,230.58 as set forth in the Settlement Agreement and associated Order.

12. The term "Contingent Claimant Trust Interests" refers to the interests given to the former equity holders under the Plan in the Highland Claimant Trust, which were to vest only upon certification by the Claimant Trustee that all unsecured creditors had been paid in full with interest.

13. The term "Work Plan" refers to the plan or plans prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities.

14. The term "Withdrawal Stipulation" refers to the Stipulation Withdrawing Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd. to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith (Bankr. Dkt. 4291).

15. The term "Dugaboy Note" refers to the promissory note dated May 31, 2017, in the original amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

16. The term "Texas Business Court Proceeding" or "Business Court Proceeding" refers to Case No. 25-BC01B-0027 filed in the Texas Business Court, First Division on July 1, 2025, and captioned *The Highland Dallas Foundation, Inc. ,The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. vs. DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC,CDH GP, Ltd., and Mark Patrick.*

**K. Cayman Islands Proceedings**

1. The terms "Cayman Islands Proceeding(s)" or "Cayman Proceeding" refer collectively to all judicial proceedings in the Cayman Islands relating to Charitable DAF Holdco, Ltd. or any DAF Entity, including (a) the voluntary liquidation filed by Patrick on April 2, 2025; (b) the winding up petition filed by the charitable owners on April 23, 2025 (No. FSD 99 of 2025 (JAJ)); (c) the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators on July

15, 2025 (No. FSD 201 of 2025); and (d) all related proceedings, investigations, hearings, orders, and filings.

2. The term "Joint Official Liquidators" or "JOLs" refers to the court-appointed liquidators designated by the Cayman Islands court on or about May 6, 2025 to oversee the DAF's operations.

3. The term "Statement of Claim" refers to the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators in the Cayman Islands Proceeding on July 15, 2025.

4. The term "Chapter 15 Petition" refers to the petition filed by the Joint Official Liquidators in the United States Bankruptcy Court for the District of Delaware on July 21, 2025.

5. The term "Patrick-Cronin Proposal" refers to the proposal made by Mark Patrick to Kevin Cronin, a principal of Fortaris Capital Advisors, to make and split monthly payments to the DAF, as referenced in Paragraph 173 of the Third Affidavit of Mark Patrick.

**L. General Discovery Terms**

1. The term "Document" or "Documents" is used in its broadest possible sense and refers, without limitation, to anything upon which any expression, communication, or representation has been recorded by any means. The term includes, but is not limited to: correspondence, emails, text messages, instant messages, messages/posts on social media, handwritten notes, photographs, working papers, any drafts of documents (preliminary, intermediate, and/or final), memoranda, contracts/agreements, tapes, business records, financial records, charts, notes, records of any sort of meetings, reports of telephone or other oral conversations, calendars (whether hardcopy or electronic, including desk calendars, phone calendars, or other calendars using software or an application), appointment books, audio or video tape recordings, information on computer disc/card/drive, computer entries that can be retrieved electronically, databases, and all other writings and recordings of every kind that are in Your actual or constructive possession, custody,

or control. The term includes, but is not limited to, drafts and copies of any documents, whether identical to the original or different from the original because of notes, comments, highlighting, edits, any other alterations made on such copies, indications that said copies were sent to different individuals than were the originals, or any other reason.

2. The term "Communication" or "Communications" means any transmission of information in any context or situation by or between two or more Persons by any means or medium whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically, or digitally, or on tape, either orally or in writing, including, but not limited to, conversations, correspondence, emails, text messages, instant messages, social media communications, telexes, facsimile transmissions, telecopies, recordings in any medium of oral, written, or typed communication, telephone or message logs, notes or memoranda relating to written or oral communications, and any translation thereof.

3. The terms "Person" or "Entity" and their plural forms mean natural persons, proprietorships, partnerships, firms, trusts, estates, companies, corporations, public corporations, sole practitioners, municipal corporations, federal, state, and local governments, all departments and agencies thereof, any other governmental agencies, subdivisions, groups, associations, or organizations, or any other entity, whether foreign or domestic.

4. The term "thing" means any tangible item, including without limitation, models, prototypes, and samples of any device or apparatus or product.

5. The terms "concerning," "regarding," "referring to," "related to," or "relating to" shall be construed in the broadest possible sense, and shall mean without limitation and whether in whole or in part: referring to, constituting, bearing upon, commenting upon, reflecting, evidencing, pertaining to, describing, depicting, consisting of, containing, comprising, embodying, identifying,

stating, discussing, analyzing, studying, summarizing, dealing with, relating to, or having any logical or factual connection whatsoever with the subject addressed.

6. The terms "state" or "describe" mean to fully elucidate by reference to underlying facts rather than by reference to ultimate facts or conclusions of fact or law; where applicable, to particularize as to time, place, and manner; and to set forth all relevant facts necessary to complete the understanding of the act, process, event, or thing in question.

7. The term "Relevant Period" refers to the period beginning on the earlier of January 1, 2025, or such date as identified in Response to Request No. 1,[2] through the present.

8. The present tense includes the past and future tenses.

9. The singular includes the plural, and the plural includes the singular.

10. Words in the masculine, feminine, and neutral form shall include each of the other genders.

11. Whenever used herein, "and" may be understood to mean "or" and vice versa whenever such construction results in a broader request for information.

12. "All" means "any and all" and "any" means "any and all."

13. "Including" means "including but not limited to."

14. The term "identify" means and requires You to:

(a) With reference to an individual, state his or her full name and last known residential address, business address, telephone and/or facsimile number, the name and address of his or her employer, the individual's job title or job responsibilities, and his or her relationship to You;

[2] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

(b) With reference to a company or organization, state the entity's full legal name, business addresses, telephone number, and a person with whom You had direct contact within that entity;

(c) With reference to a document, describe the document, state the date when the document was created, name the creator of the document, and name each person to whom the document was sent;

(d) With reference to an oral communication, provide the date(s) of the communication, the names and addresses of all parties, when the communication occurred, the place(s) where the communication took place, the subject matter of the communication, and the general substance of the communication; and

(e) With reference to an occurrence or event, provide the date and location of the occurrence or event, the identity of each person involved in the occurrence or event, the subject matter discussed, and the identity of any document that records, refers to, or relates to such occurrence or event.

## DOCUMENT REQUESTS

**REQUEST NO. 1:** All Documents and Communications between or among Highland Capital Management, L.P. (or its representatives, including James P. Seery, Jr. or the Claimant Trustee) and any of the HMIT Entities concerning the 9019 Settlement, including but not limited to draft agreements, term sheets, and settlement proposals, and including Documents sufficient to show the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement.

**RESPONSE:**

**REQUEST NO. 2:** All Documents and Communications relating to, referencing, or reflecting due diligence performed by any HMIT Entity prior to the execution of the Settlement Agreement and General Release dated May 19, 2025, including any analysis of whether execution of the Settlement Agreement violated any other agreements, contracts, or fiduciary duties.

**RESPONSE:**

**REQUEST NO. 3:** All Documents evidencing any Communications between any HMIT Entity representative and any Highland Entity representative regarding the terms of the Settlement Agreement.

**RESPONSE:**

**REQUEST NO. 4:** All Documents constituting or relating to the Representations and Warranties in paragraph 13 of the Settlement Agreement & General Release, including any documents that support, substantiate, or were relied upon in making such representations.

**RESPONSE:**

**REQUEST NO. 5:** All Documents relating to the Claimant Trustee's evaluation of the 9019 Settlement, including any analyses of the settlement's fairness, the value of the claims being released, and any Communications with Patrick or the HMIT Entities regarding Settlement terms.

**RESPONSE:**

**REQUEST NO. 6:** All Documents and Communications relating to, referencing, or reflecting the consideration received by Hunter Mountain Investment Trust in exchange for entering into the Settlement Agreement & General Release dated May 19, 2025, including any valuations, appraisals, or analyses of the value received.

**RESPONSE:**

**REQUEST NO. 7:** All Documents and Communications relating to, referencing, or reflecting negotiations over the terms of the Settlement Agreement & General Release, including the cash payment to HMIT, the allowance of the HMIT Class 10 Interest, and the transfer of the Kirschner Claims.

**RESPONSE:**

**REQUEST NO. 8:** All Documents evidencing any Communications with Highland Capital Management, L.P., or any Highland Entity relating to, referencing, or reflecting any plan or strategy by Mark Patrick regarding a potential settlement of Hunter Mountain Investment Trust's claims.

**RESPONSE:**

**REQUEST NO. 9:** All Documents and Communications reflecting any due diligence conducted by You or on Your behalf regarding the authority of Mark Patrick to enter into the Settlement Agreement on behalf of the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 10:** All Documents and Communications, including billing records, invoices, and engagement letters, between You and Kelly Hart & Hallman LLP (or any predecessor or successor firm or any associated attorney) relating to work involving the Settlement Agreement, the 9019 Motion, or the HMIT Entities, the DAF Entities, or any restructuring of such entities.[3]

**RESPONSE:**

**REQUEST NO. 11:** All Documents and Communications, including billing records, invoices, and engagement letters, between You and Shields Law Group, P.C. (or any associated attorney) relating to work involving (a) the DAF Structure, Hunter Mountain Investment Trust, the formation or restructuring of any DAF Entity or HMIT Entity; (b) the separation of DAF assets from the charitable beneficiaries; or (c) the "Work Plan" for restructuring.[4]

**RESPONSE:**

**REQUEST NO. 12:** All Communications between You and any third party relating to the Settlement Agreement, the 9019 Motion, or the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 13:** All Documents reflecting Highland Capital Management, L.P.'s knowledge of (a) the restructuring of the DAF Entities; (b) the sale of Beacon Mountain to CLO Holdco, LLC; (c) any change in the beneficial ownership of Hunter Mountain; or (d) any investigation of Patrick by the Cayman Islands court, the Texas Attorney General, or any other governmental authority.

**RESPONSE:**

**REQUEST NO. 14:** All Communications between Highland Capital Management, L.P. and any of the following regarding the 9019 Settlement or any restructuring of the HMIT Entities or DAF Entities: The Dallas Foundation, Crown Global Life Insurance, Ltd., the Texas Attorney General, or any Cayman Islands governmental or judicial authority.

**RESPONSE:**

**REQUEST NO. 15:** All bank statements, brokerage statements, investment account statements, balance sheets, financial statements, and accounting records for the following: Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco, LLC; CDMCFAD, LLC; Charitable DAF Holdco, Ltd.; Charitable DAF Fund, LP; DFW Charitable Foundation; and any other DAF entity, including consolidated and entity-level statements.

---

[3] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[4] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**RESPONSE:**

**REQUEST NO. 16:** All Documents and Communications relating to any transfer of any interests in Hunter Mountain Investment Trust, Beacon Mountain, LLC, CLO Holdco, LLC, CDMCFAD, LLC, and DFW Charitable Foundation, including but not limited to assignment agreements, contribution agreements, and corporate resolutions approving transfers.

**RESPONSE:**

**REQUEST NO. 17:** All Communications between Patrick and any financial advisor regarding the valuation of the charitable owners' membership interests or any DAF Entity assets.

**RESPONSE:**

**REQUEST NO. 18:** All Communications between You and Charitable DAF Fund, LP regarding the estimated or actual value of the Highland Capital Management, L.P. estate.

**RESPONSE:**

**REQUEST NO. 19:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Highland Capital Management, L.P. estate.

**RESPONSE:**

**REQUEST NO. 20:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Class 10 and Class 11 claims in the Highland Bankruptcy.

**RESPONSE:**

**REQUEST NO. 21:** All Documents and Communications sufficient to show the fair market value of Charitable DAF Fund, LP or its assets as of March 2025.

**RESPONSE:**

**REQUEST NO. 22:** All Documents and Communications referencing, relating to, or reflecting the valuation that resulted in the charitable owners receiving approximately $1.6 million for their direct or indirect interests in CDMCFAD and/or Charitable DAF Fund, LP in or around March 2025, including the redemption agreement and any valuation supporting such redemption.

**RESPONSE:**

**REQUEST NO. 23:** All Documents and Communications, including communications with counsel,[5] relating to the formation, incorporation, organization, or structuring of CDMCFAD, LLC (also known as "DAF 2.0"), including but not limited to articles of organization, operating agreements, corporate resolutions, board minutes, and all amendments thereto.

**RESPONSE:**

**REQUEST NO. 24:** All Documents relating to the limited liability company agreement for CDMCFAD, LLC, including provisions relating to (a) fiduciary duties; (b) Patrick's powers and discretion; and (c) the valuation and redemption of member interests.

**RESPONSE:**

**REQUEST NO. 25:** All Documents relating to the formation, organization, or structuring of DFW Charitable Foundation, including articles of incorporation, bylaws, board minutes, member lists, and any charitable activities undertaken by said entity.

**RESPONSE:**

**REQUEST NO. 26:** All Documents and Communications related to or evidencing the knowledge of any Highland Party about DFW Charitable Foundation, including, but not limited to, the identity of the officers, directors, agents, or other persons with authority over DFW Charitable Foundation, the economic beneficiaries of DFW Charitable Foundation, and any payments made by DFW Charitable Foundation or any of its subsidiaries to Patrick.

**RESPONSE:**

**REQUEST NO. 27:** All Documents relating to the formation of CDH GP, Ltd., including any documents reflecting (a) Patrick's role or authority in the entity; (b) the replacement of Charitable DAF GP, LLC as the general partner of Charitable DAF Fund, LP; and (c) any Communications discussing the purpose of such replacement.

**RESPONSE:**

**REQUEST NO. 28:** All Documents relating to any transfer of assets from Charitable DAF Holdco, Ltd. or Charitable DAF Fund, LP to CDMCFAD, LLC or any entity controlled by Patrick, including the assignment of limited partnership interests referenced in the Statement of Claim filed in the Cayman Islands.

**RESPONSE:**

**REQUEST NO. 29:** All Documents and Communications sufficient to show when Hunter Mountain Investment Trust or any HMIT Party first received any indication, analysis, projection, or belief that the Class 10 or Class 11 claims would have net value available for distribution,

---

[5] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

including the timing of such indication, the basis therefor, and any valuations, projections, or analyses supporting such indication

**RESPONSE:**

**REQUEST NO. 30:** All Documents and Communications sufficient to show the original purpose and stated objectives of the 2015 sale of Highland Capital Management, L.P. equity holders' equity stake to Hunter Mountain Investment Trust, including any term sheets, memoranda, presentations, tax advice, or planning documents.

**RESPONSE:**

**REQUEST NO. 31:** All Documents and Communications regarding the reasons behind the equity ownership allocation reflected in Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization, including the allocation of (i) 99.5% to Hunter Mountain Investment Trust; (ii) 0.1866% to The Dugaboy Investment Trust; (iii) 0.0627% to Mark Okada and associated family trusts; and (iv) 0.25% to Strand Advisors, Inc.

**RESPONSE:**

**REQUEST NO. 32:** All Documents and Communications relating to, referencing, or reflecting any tax benefit, tax efficiency, or charitable purpose associated with the restructuring of Highland Capital Management, L.P. ownership in 2015.

**RESPONSE:**

**REQUEST NO. 33:** All Documents and Communications sufficient to show the circumstances surrounding Mark Patrick becoming the administrator of Hunter Mountain Investment Trust in 2022, including any appointment documents, resolutions, consents, correspondence, or agreements.

**RESPONSE:**

**REQUEST NO. 34:** All Documents and Communications sufficient to show the basis for, approval of, and payment of any bonuses to Mark Patrick in September 2024 and October 2024, including any written agreements, board resolutions, or documentation of performance metrics.

**RESPONSE:**

**REQUEST NO. 35:** All Documents relating to Paul Murphy's role, authority, and compensation in connection with any DAF Entity, including (a) any agreement or arrangement governing Murphy's compensation; (b) any revision or amendment to Murphy's compensation plan, including any revision backdating payments to the beginning of 2025 that provided for $500,000 in fees triggered when injunctions are sought against the DAF; and (c) any Communications between Patrick and Murphy regarding the DAF restructuring, the 9019 Settlement, or the transfer of DAF assets.

**RESPONSE:**

**REQUEST NO. 36:** All Documents relating to any Communications between Patrick and the charitable beneficiaries (The Dallas Foundation, Crown Global, Empower Dallas, or the Okada Foundation) from November 2024 through April 2025, including the "no confidence" letter sent by the charities in November 2024.

**RESPONSE:**

**REQUEST NO. 37:** All Communications between You and Highland Dallas Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

**REQUEST NO. 38:** All Communications between You and Highland Santa Barbara Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

**REQUEST NO. 39:** All Communications between You and Highland Kansas City Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

**REQUEST NO. 40:** All Communications between You and The Dallas Foundation from January 1, 2021, to the present regarding the DAF Structure, Hunter Mountain Investment Trust, or the Settlement Agreement and General Release.

**RESPONSE:**

**REQUEST NO. 41:** All Documents and Communications reflecting, referencing, or relating to any inquiries, questions, or requests for information from Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., Highland Kansas City Foundation, Inc., or The Dallas Foundation regarding (a) the DAF Structure, (b) DAF assets, (c) distributions to charitable beneficiaries, (d) Mark Patrick's compensation, or (e) corporate restructuring.

**RESPONSE:**

**REQUEST NO. 42:** All Documents and Communications relating to, referencing, or reflecting the valuation of Highland Capital Management, L.P., or its assets.

**RESPONSE:**

**REQUEST NO. 43:** All Documents and Communications relating to, referencing, or reflecting Highland Capital Management, L.P.'s financial condition, including any monthly operating reports or quarterly operating reports.

**RESPONSE:**

**REQUEST NO. 44:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for any bankruptcy professional, creditor, or equity holder.[6]

**RESPONSE:**

**REQUEST NO. 45:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[7]

**RESPONSE:**

**REQUEST NO. 46:** All Documents and Communications relating to any valuation of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[8]

**RESPONSE:**

**REQUEST NO. 47:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC reflecting any analysis or determination regarding the

---

[6] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[7] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[8] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 48:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 49:** All Communications between You and Charitable DAF Fund, LP reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 50:** All Communications between You and Charitable DAF Fund, LP regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 51:** All Communications between You and Hunter Mountain Investment Trust reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 52:** All Communications between You and Hunter Mountain Investment Trust regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 53:** All Documents and Communications relating to, referencing, or reflecting efforts by any HMIT Entity to obtain updated financial reporting from Highland Capital Management, L.P., or its bankruptcy professionals during the bankruptcy proceedings.

**RESPONSE:**

**REQUEST NO. 54:** All Documents reflecting the "Work Plan" prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities, including any instructions to create entities that were "hard to find or track."[9]

**RESPONSE:**

**REQUEST NO. 55:** All Documents and Communications between Mark Patrick and any attorney or law firm from January 1, 2023, to the present regarding corporate restructuring, entity formation, or changes to the governance of the DAF Structure, including any "work plans" or engagement letters.[10]

**RESPONSE:**

**REQUEST NO. 56:** All Documents and Communications relating to, referencing, or reflecting the formation of any new entity within, related to, or derived from the DAF Structure from January 1, 2023, to the present, including DFW Charitable Foundation, CDMCFAD, LLC, and CDH GP, Ltd.[11]

**RESPONSE:**

**REQUEST NO. 57:** All Documents and Communications between any attorney or law firm and Mark Patrick relating to the creation of new corporate entities within the DAF Structure.[12]

**RESPONSE:**

---

[9] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[10] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[11] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[12] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 58**: All Documents relating to Mark Patrick's authority to act on behalf of Rand Advisors, LLC, Rand PE Fund I, LP, or any HMIT Entity, including any power of attorney, board resolutions, or operating agreement provisions granting such authority.

**RESPONSE:**

**REQUEST NO. 59:** All Documents relating to any change in the ownership, management, or control of Hunter Mountain Investment Trust, Beacon Mountain LLC, or any entity in the Hunter Mountain ownership chain from January 1, 2024 to the present.

**RESPONSE:**

**REQUEST NO. 60**: All organizational charts reflecting the corporate structure of (a) the DAF Entities; (b) the HMIT Entities; and (c) any entities through which Patrick directly or indirectly held an interest in Hunter Mountain, for any time during the Relevant Period.

**RESPONSE:**

**REQUEST NO. 61:** All documents and communications relating to, referencing, or reflecting the sale of Rand PE Fund I, LP's investment in Beacon Mountain, LLC in or around February 2025, including any purchase agreements, valuations, appraisals, or closing documents.

**RESPONSE:**

**REQUEST NO. 62**: All Documents relating to the transition of management of Rand PE Fund I, LP from John Honis to Patrick or any Patrick-controlled entity, including any Communications with investors or regulatory authorities regarding such transition.

**RESPONSE:**

**REQUEST NO. 63**: All audit reports, financial statements, and quarterly or annual reports for Rand PE Fund I, LP from January 1, 2023 to the present, including the 2024 audit issued on or about June 26, 2025.

**RESPONSE:**

**REQUEST NO. 64:** All Documents relating to the sale of Beacon Mountain LLC (or its interest in Hunter Mountain Investment Trust) to CLO Holdco, LLC, including but not limited to the purchase agreement, any valuations, closing documents, and wire transfer records.

**RESPONSE:**

**REQUEST NO. 65**: All Documents relating to any consent (or lack thereof) from Crown Global Life Insurance, Ltd., The Dallas Foundation, or Atlas IDF, LP regarding the sale of Beacon Mountain's interest in Hunter Mountain to CLO Holdco, LLC or any Patrick-controlled entity.

**RESPONSE:**

**REQUEST NO. 66**: All Documents relating to compliance (or non-compliance) with Section 3.01(b) of the Amended and Restated Limited Partnership Agreement of Atlas Fund, which prohibits Rand Fund from selling Hunter Mountain to an affiliate of Patrick without investor consent.

**RESPONSE:**

**REQUEST NO. 67:** All Documents and Communications relating to any notice or other information given to investors in Rand PE Fund I, LP (including any 4% minority investor) from January 1, 2025, to the present regarding the sale of Beacon Mountain, LLC's interest in HMIT, or any distribution relating thereto, including the February 20, 2025 notice referenced in Dugaboy's Motion for Reconsideration.

**RESPONSE:**

**REQUEST NO. 68:** All Documents and Communications sufficient to show the basis for the $1 million valuation of Beacon Mountain, LLC's interest in Hunter Mountain Investment Trust in or around February 2025, including any valuation reports, appraisals, financial analyses, or Communications with ValueScope, LLC or any other valuation firm concerning such valuation.

**RESPONSE:**

**REQUEST NO. 69:** All Documents, correspondence, engagement letters, contracts, or agreements between You and ValueScope, LLC (or any other valuation firm) relating to the valuation of any interest, holding in, or security issued by any of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate.

**RESPONSE:**

**REQUEST NO. 70:** All draft and final valuation reports, memoranda, models, or analyses prepared by ValueScope, LLC relating to Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to the

valuation of the Participation Shares; and any Communications challenging or questioning the valuation methodology or conclusions.

**RESPONSE:**

**REQUEST NO. 71:** All Documents relating to the methodology used in any valuation of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to instructions received regarding methodology, communications discussing the change from net asset value methodology to discounted cash flow methodology, supporting calculations, assumptions, and comparable transactions or valuations.

**RESPONSE:**

**REQUEST NO. 72:** All Documents and Communications related to the identity, ownership structure, principals, managers, or beneficial owners of Celia Holdco LLC.

**RESPONSE:**

**REQUEST NO. 73:** All Documents relating to the voluntary liquidation of Charitable DAF Holdco, Ltd. filed on April 2, 2025 in the Cayman Islands, including the petition, any supporting documents, and Communications regarding the decision to initiate liquidation.

**RESPONSE:**

**REQUEST NO. 74**: All Documents produced to or received from the Joint Official Liquidators of Charitable DAF Holdco, Ltd. in connection with their investigation of Patrick's activities.

**RESPONSE:**

**REQUEST NO. 75**: All Documents relating to any actions taken by Patrick or Murphy in response to the investigative efforts of the Joint Official Liquidators in the Cayman Islands, including any expenditures of DAF assets for legal fees or other expenses incurred in opposing such efforts.[13]

**RESPONSE:**

[13] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 76**: All Documents relating to Creative Hearts TX, including (a) its formation documents; (b) the involvement of Patrick, his wife, or his daughter with the entity; and (c) any donations or payments made to it by any DAF Entity.[14]

**RESPONSE:**

**REQUEST NO. 77**: All Documents relating to the Patrick-Cronin Proposal.

**RESPONSE:**

Dated: April 9, 2026

*/s/ Geoffrey S. Harper*
**Geoffrey S. Harper**
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

**John Michael Gaddis**
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

[14] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege does not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

## CERTIFICATE OF SERVICE

I certify that on April 9, 2026, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

*_/s/ Geoffrey S. Harper_*
Geoffrey S. Harper

# EXHIBIT C

# UNITED STATES BANKRUPTCY COURT
## FOR THE
## NORTHERN DISTRICT OF TEXAS - DALLAS DIVISION

| | | |
|---|---|---|
| **In re: HIGHLAND CAPITAL MANAGEMENT, L.P.,**<br><br>**Reorganized Debtor** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Civil Action No. <u>19-bk-34054 (SGJ)</u>** |

## RETURN OF SERVICE

Came to my hand on **Wednesday, April 15, 2026 at 9:45 AM,**
Executed at: **3102 MAPLE AVENUE, SUITE 400, DALLAS, TX 75201**
at **12:42 PM,** on **Wednesday, April 15, 2026**, by delivering to the within named:

**CLO HOLDCO, LTD.**

By personally delivering to **Counsel of Record, MAZIN A. SBAITI**

a true copy of this

**THE DUGABOY INVESTMENT TRUST'S NOTICE OF SUBPOENA TO CLO HOLDCO, LTD. and SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION with ATTACHMENT A**

having first endorsed thereon the date of the delivery.

I am a person not less than eighteen (18) years of age and I am competent to make this oath. I am a resident of the State of Texas. I have personal knowledge of the facts and statements contained herein and aver that each is true and correct. I am not a party to nor related or affiliated with any party to this suit. I have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude.

**My name is Ernesto Martin Herrera, I am at least 18 years old, and my business address is 5470 L.B.J. Freeway, Dallas, Texas, 75240 in the county of Dallas, United States of America. I declare under penalty of perjury that the foregoing is true and correct.**

Executed in Dallas County, State of Texas, on Thursday, April 16, 2026

**By:** ______________________________
**Ernesto Martin Herrera - PSC 4418 - Exp 11/30/27**
**served-sd@proceedlegal.com**

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |

**THE DUGABOY INVESTMENT TRUST'S**
**NOTICE OF SUBPOENA TO CLO HOLDCO, LTD.**

PLEASE TAKE NOTICE that, under Federal Rule of Bankruptcy Procedure 9016, which incorporates Federal Rule of Civil Procedure 45, The Dugaboy Investment Trust ("Dugaboy"), by and through its counsel, requests documents from non-party CLO Holdco, Ltd. ("CLO Holdco") under the attached Subpoena. The materials requested in Attachment A are to be produced under the enclosed document subpoena by 5:00 p.m. local time on May 15, 2026 at King & Spalding, LLP, 2601 Olive Street, Suite 2300, Dallas, Texas 75201.

It is our understanding that CLO Holdco's corporate status has been forfeited. We respectfully request that you advise whether you are authorized to accept service on behalf of CLO Holdco. If you are not authorized to accept service, please identify the appropriate party or agent who is able to accept service on CLO Holdco's behalf. Additionally, if CLO Holdco has retained counsel to assist with responding to this Subpoena, please notify us immediately and provide counsel's name, firm, address, telephone number, and email address so that we may direct correspondence accordingly.

Dated: April 15, 2026

*/s/ Geoffrey S. Harper*
**Geoffrey S. Harper**
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600
(214) 764-4601 (fax)

**John Michael Gaddis**
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

I certify that on April 15, 2026, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

| | | |
|---|---|---|
| In re: Highland Capital Management, L.P. (Debtor)<br>*Plaintiff*<br>v.<br><br>*Defendant* | )<br>)<br>)<br>)<br>)<br>) | Civil Action No. 19-bk-34054 (SGJ) |

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

To: Mark Patrick, as Registered Agent of CLO HoldCo, Ltd., by and through his counsel of record, Mazin A. Sbaiti and Jonathan Bridges, JPMorgan Chase Tower, 2200 Ross Avenue, Suite 4900W, Dallas, TX 75201

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A - The Dugaboy Investment Trust's First Set of Requests for Production of Documents to CLO Holdco, Ltd.

| Place: King & Spalding LLP, 2601 Olive Street, Suite 2300, Dallas, TX 75201 | Date and Time: 05/15/2026 5:00 pm |
|---|---|

❒ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 04/15/2026

*CLERK OF COURT*

OR

Geoffrey S. Harper

*Signature of Clerk or Deputy Clerk* — *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* The Dugaboy Investment Trust, who issues or requests this subpoena, are:

Geoffrey S. Harper, King & Spalding LLP, 2601 Olive Street, Suite 2300, Dallas, TX 75201, 214-763-6894, gharper@kslaw.com

**Notice to the person who issues or requests this subpoena**

A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 19-bk-34054 (SGJ)

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ____________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ______________
______________________________________________
______________________________ on *(date)* ____________ ; or

❒ I returned the subpoena unexecuted because: ______________________
______________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of
$ ____________ .

My fees are $ ________ for travel and $ ________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________ ______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S FIRST SET**
**OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO MARK PATRICK**

**To:** Mark Patrick, by and through his counsel of record, Erik S. Jaffe, ejaffe@schaerr-jaffe.com, **Schaerr Jaffe LLP**, 1717 K Street NW, Suite 900, Washington, DC 20006; Mazin A. Sbaiti, mas@sbaitilaw.com, **Sbaiti & Company PLLC**, JPMorgan Chase Tower, 2200 Ross Avenue, Suite 4900W, Dallas, TX 75201

Interested Party The Dugaboy Investment Trust ("Dugaboy") serves this First Set of Requests for Production of Documents to Mark Patrick ("Patrick"), pursuant to Rule 34 of the Federal Rules of Civil Procedure, which is incorporated into bankruptcy proceedings by Federal Rules of Bankruptcy Procedure 7034 and 9014(c)(1). Patrick must respond to these Requests for Production within thirty (30) days of service. We ask that You produce documents at the offices of King & Spalding, 2601 Olive Street, Suite 2300, Dallas, TX 75201, or by electronic production in a mutually agreed format.

**INSTRUCTIONS**

1. In responding to these Requests, You must furnish all information that is available to You, that is within Your possession, custody, or control, or that is subject to Your reasonable inquiry, including information in the possession of Your attorneys, accountants, advisors, representatives, agents, or other persons directly or indirectly employed by, or connected with, You or Your

attorneys, and anyone else otherwise subject to Your control. All Documents that respond, in whole or in part, to any portion of the Requests below shall be produced in their entirety, including all attachments and enclosures.

2. The relevant time period for documents responsive to these Requests, unless otherwise specified in an individual Request, is the period beginning on the earlier of October 1, 2024, or such date as identified in response to Request No. 1,[1] through the present.

3. To the extent that the below Requests include requests for paper records, such paper records shall be scanned or otherwise converted into electronic form from paper documents in the following format:

(a) All documents shall be scanned to single page Group 4, TIFF format, at least 300 dpi and 8½ x 11 inch page size, except for documents requiring higher resolution or different page size.

(b) In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). The Parties will make their best efforts to have their vendors unitize documents correctly and will commit to address situations where there are improperly unitized documents. For documents found in folders or other containers with labels, tabs, or other identifying information, such labels and tabs shall be scanned where practicable. Pages with Post-it notes shall be scanned both with and without the Post-it, with the image of the page with the Post-it preceding the image of the page without the Post-it.

[1] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

(c) Productions of the images shall be made using an image load file (.OPT or .LFP) and a delimited database/metadata load file (.DAT). Each image file should have a unique file name which shall be the Bates number of the page.

(d) The following objective coding fields should be provided, if applicable:

(1) beginning Bates number;

(2) ending Bates number;

(3) beginning attachment Bates number;

(4) ending attachment Bates number;

(5) page count; and

(6) source location/custodian.

(e) Document level OCR should be provided as a separate text file. The file name of each text file should correspond to the file name of the first image file of the document with which it is associated. The text files will not contain the redacted portions of the documents. OCR software should be set to the highest quality setting during processing. For documents in foreign languages, the OCR shall be performed using an OCR tool and settings suitable for the particular byte or multi-byte languages.

4. To the extent that the below Requests include requests for electronically stored information ("ESI"), all ESI shall be produced in TIFF format according to the following specifications:

(a) All TIFF formatted documents will be single page, Group 4 TIFF at 300 x 300 dpi resolution and 8½ x 11 inch page size, except for documents requiring different resolution or page size.

(b) An image load file, in standard Opticon format, showing the Bates number of each page and the appropriate unitization of the documents, will accompany all document images.

(c) Each imaged version of an electronic document will be created directly from the original electronic document.

(d) TIFFs shall be produced as black and white, single-page TIFF images in accordance with the technical specifications set out above. Word documents that have tracked changes or comments shall be produced in color. In addition, upon written request that identifies a reasonable number of individual documents at issue by Bates number, a party shall produce color images for those documents. Documents produced in color shall be produced as single page, 300 DPI, color JPG images with the quality setting of 75% or higher.

(e) All TIFF files are to be provided with an accompanying searchable text (.TXT) file extracted from the native, electronic file (not generated as an OCR file from the TIFF image(s)), and such text files shall contain the full text extraction. To the extent reasonably feasible, extracted text shall provide all comments, tracked changes, speaker's notes, and text from hidden worksheets, slides, columns, and rows. In the case of files with redacted text, OCR'ed text of the redacted documents may be provided in lieu of extracted text. OCR software should be set to the highest quality setting during processing.

5. To the extent reasonably feasible, all Documents produced shall be produced with metadata and attachments intact. The term "metadata" means all information describing the history, tracking, or management of an electronic document including, but not limited to, the date(s) the document was created, modified, accessed, or distributed; the author(s) and all recipient(s) of the

document; the file's name; the file's location (e.g., directory structure or pathname); the file format or file type; and the file size. For comparison purposes and to ensure authenticity, where documents are produced in native format, such documents shall also be produced in the ESI format described in Instruction No. 3, unless otherwise agreed by the parties.

6. Should You object to any Request, You must specifically and in detail state the grounds and reasons for the objection, and state in detail the part of the language of the Request to which You object, and state which part of the Request, if any, You are answering.

7. Under the Crime-Fraud Exception and Subject-Matter Waiver, items which would typically be privileged are not privileged in this matter. The Fifth Circuit recognizes the Crime-Fraud Exception to privilege, under which attorney-client communications and/or work product materials are not privileged if "the client consults an attorney for advice that will assist the client in carrying out a contemplated illegal or fraudulent scheme." *Lewis v. Crochet*, 105 F.4th 272, 282 (5th Cir. 2024) (quoting *In re Int'l Sys. & Controls Corp. Sec. Litig*., 693 F.2d 1235, 1242 (5th Cir. 1982)). The exception applies where (1) a crime or fraud was impending or continuing at the time of the communication, and (2) the communications or work product at issue were in furtherance of that criminal or fraudulent activity. *See In re E.E.O.C.*, 207 F. App'x 426, 434 (5th Cir. 2006). Dugaboy reasonably believes, and has evidence to support, that certain communications and work product it seeks were intended to further continuing or future criminal or fraudulent activity and are therefore not privileged.

Likewise, Subject-Matter Waiver under Federal Rule of Evidence 502(a) provides that disclosure of certain information in a federal proceeding waives privilege for related information when (1) the waiver was intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) the disclosed and undisclosed

communications and work product "ought in fairness to be considered together." Fed. R. Evid. 502(a); *see also Crider Inc. v. Silgan Containers LLC*, 2023 WL 479094, at *22 (N.D. Tex. Jan. 13, 2023). Any communications or work product that would otherwise be privileged, but concern the same subject matter intentionally disclosed by Mark Patrick in his affidavits or testimony in this Proceeding or Related Proceedings fall under this exception, and privilege has been waived.

Accordingly, under these exceptions and waivers, You must produce documents that would typically be privileged as they relate to (1) any fraudulent activity that counsel was involved in or knew of, or (2) any privileged conversation or information that has already been disclosed elsewhere in this litigation.

If You still contend that any Documents sought by the Requests are privileged or otherwise protected from discovery, You must nevertheless identify for each Document withheld:

(a) the legal basis for withholding the Document;

(b) the person asserting any claim of privilege and/or protection;

(c) a description and identification of the requested Document sufficient to frame an appropriate demand for the Document and a motion to compel disclosure thereof, setting forth at least the following:

(i) the author and/or signatory of the Document withheld;

(ii) the date of the Document withheld;

(iii) all addressees and/or recipients of the Document withheld; and

(iv) the subject matter and circumstances under which the Document withheld was created in sufficient detail to ascertain applicability of such privilege or other legal basis.

8. Notwithstanding a claim that a portion of a Document is privileged or otherwise protected from disclosure, any such Document must be produced with the portion claimed to be protected excised.

9. If You contend that any Request is ambiguous or unclear, contact undersigned counsel as soon as possible so that the Request can be clarified to avoid unnecessary delays in discovery.

10. These Requests are continuing in nature. Any Documents located, created, or obtained subsequent to the Documents provided in response to these Requests and that should have been produced had they been known shall be promptly supplied by supplemental responses whenever You find, locate, or acquire such Documents. You are required to supplement and correct Your answers and responses on a timely basis.

**DEFINITIONS**

As used herein, the terms listed below shall be defined as follows. Insofar as a term is not explicitly defined, the meaning to be used is the commonly accepted definition of the term. Notwithstanding any definition set forth below, each word, term, or phrase used in these Requests is intended to have the broadest meaning permitted under applicable rules. The following terms are to be given their ascribed definitions:

**A. Proceedings**

1. The term "this Proceeding" or "this Litigation" or "Main Case" refers to the main bankruptcy proceeding *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

2. The term "Related Proceedings" includes all other legal proceedings or actions involving or related to Highland, HMIT, and persons, parties, or entities involved with or affected by the Settlement, specifically including but not limited to the Cayman Islands Proceedings, the Chapter

15 proceeding in the United States Bankruptcy Court for the District of Delaware, and the Texas Business Court proceeding, as well as any bankruptcy adversary proceedings before the United States Bankruptcy Court for the Northern District of Texas that are separate from the Main Case.

**B. Parties and Individuals**

1. The term "You" or "Your" refers to Mark Patrick, as well as his agents, attorneys, accountants, advisors, representatives, or any other individual(s) or entity(ies) acting or authorized to act on behalf of him, and any related companies, divisions, or subsidiaries, past or present, including, without limitation, the directors, officers, employees, agents, or attorneys thereof, as well as any predecessors-in-interest or successors-in-interest.

2. The term "Patrick" refers to Mark Eric Patrick.

3. The term "Dondero" refers to James Dondero.

4. The term "Okada" refers to Mark Okada.

5. The term "Seery" or "Claimant Trustee" refers to James P. Seery, Jr.

6. The term "Kirschner" or "Litigation Trustee" refers to Marc S. Kirschner.

7. The term "Murphy" refers to Paul Murphy.

8. The term "Scott" refers to Grant Scott.

9. The term "Cronin" refers to Kevin Cronin.

10. The term "Honis" refers to John Honis.

11. The term "Raver" refers to Shawn Raver.

**C. Highland Entities and Related Trusts**

12. The term "Highland" or "Highland Capital Management" refers to Highland Capital Management, L.P., a Dallas-based, Delaware-domiciled investment advisor, and the Debtor in the

matter *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

13. The term "Highland Entities" or "Highland Entity" refers collectively to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

14. The term "Highland Claimant Trust" refers to the entity created under the Plan to hold, monetize, and distribute the assets of Highland's estate.

15. The term "Highland Litigation Sub-Trust" or "Litigation Sub-Trust" refers to the trust created under the Plan for the purpose of pursuing litigation claims on behalf of the Highland estate.

16. The term "Highland Indemnity Trust" or "Indemnity Trust" refers to the trust created under the Plan to hold assets for the purpose of indemnification obligations arising out of the Highland estate.

17. The term "Highland Party" or "Highland Parties" refers to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, the Highland Indemnity Trust, and each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, and subsidiaries, and any persons or entities acting or authorized to act on their behalf.

**D. HMIT Entities and Related Parties**

1. The term "HMIT Entities" refers collectively to Hunter Mountain Investment Trust and Beacon Mountain, LLC, together with each of their respective officers, directors, managers,

general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "HMIT Parties" refers broadly to the HMIT Entities, Mark Patrick, and any related decision maker with respect to the HMIT Entities, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

3. The term "Hunter Mountain" or "HMIT" refers to Hunter Mountain Investment Trust.

4. The term "Beacon Mountain" refers to Beacon Mountain, LLC.

5. The term "Beacon Hunter" refers to Beacon Hunter, LLC.

**E. Rand Entities**

1. The term "Rand Parties" or "Rand Entities" refers collectively to Rand PE Fund I, LP, Rand Advisors, LLC, and Rand PE Fund Management, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "Rand Fund" or "Rand PE Fund" refers to Rand PE Fund I, LP.

3. The term "Rand Advisors" refers to Rand Advisors, LLC, an SEC-registered investment advisor that served as the investment adviser to Rand PE Fund I, LP.

4. The term "Rand PE Fund Management" refers to Rand PE Fund Management, LLC.

**F. DAF Entities and Related Structures**

1. The term "DAF" or "Charitable DAF Holdco" refers to Charitable DAF Holdco, Ltd.

2. The term "DAF Fund" or "Charitable DAF Fund" refers to Charitable DAF Fund, LP.

3. The term "DAF GP" or "Charitable DAF GP" refers to Charitable DAF GP, LLC.

4. The term "DAF Structure" refers to the overall donor-advised fund investment vehicle and its constituent entities, including Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, and any entity holding ownership or management interests therein or formed in connection therewith, including any entities created as part of the restructuring of the DAF.

5. The term "DAF Entities" refers collectively to Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, CDH GP, Ltd., CDMCFAD, LLC, DFW Charitable Foundation, CLO Holdco, LLC, and any other entity formed, restructured, or otherwise created in connection with or derived from the DAF Structure, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

6. The terms "New GP" or "CDH GP" refer to CDH GP, Ltd.

7. The term "CDMCFAD" or "DAF 2.0" refers to CDMCFAD, LLC.

8. The term "DFW Charitable Foundation" or "DFW Foundation" refers to DFW Charitable Foundation.

9. The term "CLO Holdco" refers to CLO Holdco, LLC.

**G. Charitable and Donor Entities**

1. The terms "The Dallas Foundation" or "Dallas Foundation" refer to The Dallas Foundation.

2. The term "Crown Global" refers to Crown Global Life Insurance, Ltd.

3. The terms "Empower" or "Empower Dallas" refer to Empower Dallas.

4. The term "Okada Foundation" refers to the Okada Foundation.

5. The term "Charitable Beneficiaries" or "Charities" refers collectively to The Dallas Foundation, Crown Global Life Insurance, Ltd., Empower Dallas, the Okada Foundation, and any

other charitable organization or foundation that held beneficial ownership in the DAF Structure through participation shares or annuity policies.

6. The term "Highland Dallas Foundation" refers to Highland Dallas Foundation, Inc.

7. The term "Highland Santa Barbara Foundation" refers to Highland Santa Barbara Foundation, Inc.

8. The term "Highland Kansas City Foundation" refers to Highland Kansas City Foundation, Inc.

9. The term "Participation Shares" refers to the shares in Charitable DAF Holdco, Ltd. held by the Charitable Foundations through which the Foundations held beneficial ownership in the DAF Structure.

**H. Other Entities**

1. The term "Dugaboy" refers to The Dugaboy Investment Trust.
2. The term "Strand" or "Strand Advisors" refers to Strand Advisors, Inc.
3. The terms "Atlas Fund" or "Atlas IDF" refers to Atlas IDF, LP.
4. The terms "Skyview" or "Skyview Group" refer to The Skyview Group.
5. The term "Fortaris" or "Fortaris Capital Advisors" refers to Fortaris Capital Advisors.
6. The term "ValueScope" refers to ValueScope, LLC.
7. The term "Celia Holdco" refers to Celia Holdco LLC.
8. The terms "Creative Hearts" or "Creative Hearts TX" refer to Creative Hearts TX.

**I. Law Firms**

1. The term "Kelly Hart" refers to Kelly Hart & Hallman LLP, or any predecessor or successor firm or any associated attorney.

2. The term "Shields Law Group" refers to Shields Law Group, P.C., or any predecessor or successor firm or any associated attorney.

**J. Litigation, Settlement, and Bankruptcy Terms**

1. The term "Highland Bankruptcy" refers to the Chapter 11 bankruptcy case titled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj, pending in the United States Bankruptcy Court for the Northern District of Texas.

2. The term "Settlement Agreement" refers to each and every discussion or negotiation of settlement or iteration of the settlement agreement between the Highland Entities and the HMIT Entities, together with all exhibits, schedules, appendices, and ancillary documents, and including any preliminary drafts, associated documents, and communications related thereto.

3. The term "Settlement Agreement & General Release" or "9019 Settlement" refers to the Settlement Agreement & General Release dated May 19, 2025, by and among the Highland Entities and the HMIT Entities, as approved by the Court, together with all exhibits, schedules, appendices, and ancillary documents.

4. The term "9019 Motion" refers to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, filed on May 19, 2025 (Bankr. Dkt. 4217).

5. The term "Rule 9019 Settlement Order" refers to the Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, entered on June 30, 2025 (Bankr. Dkt. 4297).

6. The term "Kirschner Litigation" or "Kirschner Claims" or "Transferred Claims" refers to the 36-count adversary complaint filed by Marc A. Kirschner, as Litigation Trustee, styled

Kirschner v. Dondero, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex. Oct. 15, 2021), together with any amended, supplemental, or related pleadings, and the claims asserted therein.

7. The term "Plan" refers to Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization (as Modified), confirmed on February 22, 2021.

8. The term "Confirmation Order" refers to the Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.

9. The term "Class 10" refers to the class of claims under the Plan designated as "Class 10 Claims" and consisting of the claim held by Hunter Mountain Investment Trust as a holder of pre-bankruptcy Class B and C limited partnership interests in Highland.

10. The term "Class 11" refers to the class of claims under the Plan designated as "Class 11 Claims" and consisting of the claim held by other equity holders holding pre-bankruptcy Class A limited partnership interests in Highland.

11. The term "Class 10 Interest" or "HMIT Class 10 Interest" refers to Hunter Mountain Investment Trust's allowed Class 10 claim in the amount of $336,940,230.58 as set forth in the Settlement Agreement and associated Order.

12. The term "Contingent Claimant Trust Interests" refers to the interests given to the former equity holders under the Plan in the Highland Claimant Trust, which were to vest only upon certification by the Claimant Trustee that all unsecured creditors had been paid in full with interest.

13. The term "Work Plan" refers to the plan or plans prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities.

14. The term "Withdrawal Stipulation" refers to the Stipulation Withdrawing Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd. to the Motion for Entry of an Order

Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith (Bankr. Dkt. 4291).

15. The term "Dugaboy Note" refers to the promissory note dated May 31, 2017, in the original amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

16. The term "Texas Business Court Proceeding" or "Business Court Proceeding" refers to Case No. 25-BC01B-0027 filed in the Texas Business Court, First Division on July 1, 2025, and captioned *The Highland Dallas Foundation, Inc. ,The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. vs. DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC,CDH GP, Ltd., and Mark Patrick*.

**K. Cayman Islands Proceedings**

1. The terms "Cayman Islands Proceeding(s)" or "Cayman Proceeding" refer collectively to all judicial proceedings in the Cayman Islands relating to Charitable DAF Holdco, Ltd. or any DAF Entity, including (a) the voluntary liquidation filed by Patrick on April 2, 2025; (b) the winding up petition filed by the charitable owners on April 23, 2025 (No. FSD 99 of 2025 (JAJ)); (c) the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators on July 15, 2025 (No. FSD 201 of 2025); and (d) all related proceedings, investigations, hearings, orders, and filings.

2. The term "Joint Official Liquidators" or "JOLs" refers to the court-appointed liquidators designated by the Cayman Islands court on or about May 6, 2025 to oversee the DAF's operations.

3. The term "Statement of Claim" refers to the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators in the Cayman Islands Proceeding on July 15, 2025.

4. The term “Chapter 15 Petition” refers to the petition filed by the Joint Official Liquidators in the United States Bankruptcy Court for the District of Delaware on July 21, 2025.

5. The term “Patrick-Cronin Proposal” refers to the proposal made by Mark Patrick to Kevin Cronin, a principal of Fortaris Capital Advisors, to make and split monthly payments to the DAF, as referenced in Paragraph 173 of the Third Affidavit of Mark Patrick.

**L. General Discovery Terms**

1. The term “Document” or “Documents” is used in its broadest possible sense and refers, without limitation, to anything upon which any expression, communication, or representation has been recorded by any means. The term includes, but is not limited to: correspondence, emails, text messages, instant messages, messages/posts on social media, handwritten notes, photographs, working papers, any drafts of documents (preliminary, intermediate, and/or final), memoranda, contracts/agreements, tapes, business records, financial records, charts, notes, records of any sort of meetings, reports of telephone or other oral conversations, calendars (whether hardcopy or electronic, including desk calendars, phone calendars, or other calendars using software or an application), appointment books, audio or video tape recordings, information on computer disc/card/drive, computer entries that can be retrieved electronically, databases, and all other writings and recordings of every kind that are in Your actual or constructive possession, custody, or control. The term includes, but is not limited to, drafts and copies of any documents, whether identical to the original or different from the original because of notes, comments, highlighting, edits, any other alterations made on such copies, indications that said copies were sent to different individuals than were the originals, or any other reason.

2. The term “Communication” or “Communications” means any transmission of information in any context or situation by or between two or more Persons by any means or medium

whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically, or digitally, or on tape, either orally or in writing, including, but not limited to, conversations, correspondence, emails, text messages, instant messages, social media communications, telexes, facsimile transmissions, telecopies, recordings in any medium of oral, written, or typed communication, telephone or message logs, notes or memoranda relating to written or oral communications, and any translation thereof.

3. The terms "Person" or "Entity" and their plural forms mean natural persons, proprietorships, partnerships, firms, trusts, estates, companies, corporations, public corporations, sole practitioners, municipal corporations, federal, state, and local governments, all departments and agencies thereof, any other governmental agencies, subdivisions, groups, associations, or organizations, or any other entity, whether foreign or domestic.

4. The term "thing" means any tangible item, including without limitation, models, prototypes, and samples of any device or apparatus or product.

5. The terms "concerning," "regarding," "referring to," "related to," or "relating to" shall be construed in the broadest possible sense, and shall mean without limitation and whether in whole or in part: referring to, constituting, bearing upon, commenting upon, reflecting, evidencing, pertaining to, describing, depicting, consisting of, containing, comprising, embodying, identifying, stating, discussing, analyzing, studying, summarizing, dealing with, relating to, or having any logical or factual connection whatsoever with the subject addressed.

6. The terms "state" or "describe" mean to fully elucidate by reference to underlying facts rather than by reference to ultimate facts or conclusions of fact or law; where applicable, to particularize as to time, place, and manner; and to set forth all relevant facts necessary to complete the understanding of the act, process, event, or thing in question.

7. The term "Relevant Period" refers to the period beginning on the earlier of January 1, 2025, or such date as identified in Response to Request No. 1,[2] through the present.

8. The present tense includes the past and future tenses.

9. The singular includes the plural, and the plural includes the singular.

10. Words in the masculine, feminine, and neutral form shall include each of the other genders.

11. Whenever used herein, "and" may be understood to mean "or" and vice versa whenever such construction results in a broader request for information.

12. "All" means "any and all" and "any" means "any and all."

13. "Including" means "including but not limited to."

14. The term "identify" means and requires You to:

(a) With reference to an individual, state his or her full name and last known residential address, business address, telephone and/or facsimile number, the name and address of his or her employer, the individual's job title or job responsibilities, and his or her relationship to You;

(b) With reference to a company or organization, state the entity's full legal name, business addresses, telephone number, and a person with whom You had direct contact within that entity;

(c) With reference to a document, describe the document, state the date when the document was created, name the creator of the document, and name each person to whom the document was sent;

(d) With reference to an oral communication, provide the date(s) of the communication, the names and addresses of all parties, when the communication occurred, the place(s)

---

[2] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

where the communication took place, the subject matter of the communication, and the general substance of the communication; and

(e) With reference to an occurrence or event, provide the date and location of the occurrence or event, the identity of each person involved in the occurrence or event, the subject matter discussed, and the identity of any document that records, refers to, or relates to such occurrence or event.

## DOCUMENT REQUESTS

**REQUEST NO. 1:** All Documents and Communications between or among Highland Capital Management, L.P. (or its representatives, including James P. Seery, Jr. or the Claimant Trustee) and any of the HMIT Entities concerning the 9019 Settlement, including but not limited to draft agreements, term sheets, and settlement proposals, and including Documents sufficient to show the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement.

**RESPONSE:**

**REQUEST NO. 2:** All Documents and Communications sufficient to show that the Settlement Agreement & General Release, by and among the Highland Entities and the HMIT Entities, was executed by persons with full power and authority to bind each HMIT Entity party thereto, including any board resolutions, corporate authorizations, consents, or approvals obtained prior to execution.

**RESPONSE:**

**REQUEST NO. 3**: All Documents relating to due diligence performed by Highland Capital Management, L.P. (or its representatives) concerning (a) the authority of Mark Patrick or any other person to bind the HMIT Entities to the 9019 Settlement; (b) the ownership structure of the HMIT Entities; or (c) any corporate restructuring of the HMIT Entities or the DAF Entities.

**RESPONSE:**

**REQUEST NO. 4**: All Documents and Communications exchanged between any Highland Party and any HMIT Entity prior to execution of the Settlement Agreement relating to or evidencing legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any changes thereto.

**RESPONSE:**

**REQUEST NO. 5:** All Documents and Communications exchanged between any Highland Party and any Rand Party prior to execution of the Settlement Agreement relating to or evidencing legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any changes thereto.

**RESPONSE:**

**REQUEST NO. 6:** All Documents and Communications exchanged between any Highland Party and any person or party prior to execution of the Settlement Agreement relating to or evidencing any change in legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any transaction related thereto.

**RESPONSE:**

**REQUEST NO. 7:** All Documents and Communications exchanged between any Highland Party and any person or party prior to execution of the Settlement Agreement relating to CLO Holdco, LLC, including, but not limited to, its formation, purpose, officers, members, managers, and participation or role in any transaction.

**RESPONSE:**

**REQUEST NO. 8:** All Documents and Communications relating to, referencing, or reflecting due diligence performed by any HMIT Entity prior to the execution of the Settlement Agreement and General Release dated May 19, 2025, including any analysis of whether execution of the Settlement Agreement violated any other agreements, contracts, or fiduciary duties.

**RESPONSE:**

**REQUEST NO. 9:** All Documents evidencing any Communications between any HMIT Entity representative and any Highland Entity representative regarding the terms of the Settlement Agreement.

**RESPONSE:**

**REQUEST NO. 10:** All Documents constituting or relating to the Representations and Warranties in paragraph 13 of the Settlement Agreement & General Release, including any documents that support, substantiate, or were relied upon in making such representations.

**RESPONSE:**

**REQUEST NO. 11:** All Documents relating to the Claimant Trustee's evaluation of the 9019 Settlement, including any analyses of the settlement's fairness, the value of the claims being released, and any Communications with Patrick or the HMIT Entities regarding Settlement terms.

**RESPONSE:**

**REQUEST NO. 12:** All Documents and Communications relating to, referencing, or reflecting the consideration received by Hunter Mountain Investment Trust in exchange for entering into the Settlement Agreement & General Release dated May 19, 2025, including any valuations, appraisals, or analyses of the value received.

**RESPONSE:**

**REQUEST NO. 13:** All Documents and Communications relating to, referencing, or reflecting negotiations over the terms of the Settlement Agreement & General Release, including the cash payment to HMIT, the allowance of the HMIT Class 10 Interest, and the transfer of the Kirschner Claims.

**RESPONSE:**

**REQUEST NO. 14:** All Documents and Communications sufficient to show the reason or rationale for the HMIT Entities' agreement to transfer or relinquish litigation rights previously asserted against Highland Entities in exchange for the consideration set forth in the Settlement Agreement.

**RESPONSE:**

**REQUEST NO. 15:** All Documents relating to the transfer of the Kirschner Litigation claims to the HMIT Entities pursuant to the 9019 Settlement, including any Communications discussing the strategic purpose, value, or intended use of such claims.

**RESPONSE:**

**REQUEST NO. 16:** All Documents relating to any litigation commenced or actions taken by Patrick or any HMIT Entity using the Kirschner Litigation claims obtained through the 9019 Settlement, including the filing styled *Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver*, No. 25-BC01B-0027 (July 1, 2025).

**RESPONSE:**

**REQUEST NO. 17:** All Documents evidencing any Communications with Highland Capital Management, L.P., or any Highland Entity relating to, referencing, or reflecting any plan or strategy by Mark Patrick regarding a potential settlement of Hunter Mountain Investment Trust's claims.

**RESPONSE:**

**REQUEST NO. 18:** All Communications between You and Highland Capital Management, L.P., or any Highland Entity regarding the Settlement Agreement & General Release.

**RESPONSE:**

**REQUEST NO. 19:** All Communications between You and James P. Seery, Jr., in any capacity.

**RESPONSE:**

**REQUEST NO. 20:** All Communications between You and Marc S. Kirschner, in any capacity.

**RESPONSE:**

**REQUEST NO. 21:** All Documents and Communications reflecting any due diligence conducted by You or on Your behalf regarding the authority of Mark Patrick to enter into the Settlement Agreement on behalf of the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 22:** All Documents and Communications, including billing records, invoices, and engagement letters, between You and Kelly Hart & Hallman LLP (or any predecessor or successor firm or any associated attorney) relating to work involving the Settlement Agreement, the 9019 Motion, or the HMIT Entities, the DAF Entities, or any restructuring of such entities.[3]

**RESPONSE:**

**REQUEST NO. 23:** All Documents and Communications, including billing records, invoices, and engagement letters, between You and Shields Law Group, P.C. (or any associated attorney) relating to work involving (a) the DAF Structure, Hunter Mountain Investment Trust, the formation or restructuring of any DAF Entity or HMIT Entity; (b) the separation of DAF assets from the charitable beneficiaries; or (c) the "Work Plan" for restructuring.[4]

**RESPONSE:**

**REQUEST NO. 24:** All Communications between You and any third party relating to the Settlement Agreement, the 9019 Motion, or the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 25:** All Documents relating to the current value of the Highland Claimant Trust, including any reports, analyses, or projections of Highland's remaining assets, estimated distributions to claimants, and any anticipated residual value available for Class 10 and Class 11 interest holders.

---

[3] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[4] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**RESPONSE:**

**REQUEST NO. 26:** All Documents relating to any payments made or to be made pursuant to the 9019 Settlement, including the $500,000 lump-sum payment, the $10 million initial distribution, and any subsequent distributions, including wire transfer records, bank statements, and any documents reflecting the disposition of such funds.

**RESPONSE:**

**REQUEST NO. 27:** All Documents reflecting Highland Capital Management, L.P.'s knowledge of (a) the restructuring of the DAF Entities; (b) the sale of Beacon Mountain to CLO Holdco, LLC; (c) any change in the beneficial ownership of Hunter Mountain; or (d) any investigation of Patrick by the Cayman Islands court, the Texas Attorney General, or any other governmental authority.

**RESPONSE:**

**REQUEST NO. 28:** All Communications between Highland Capital Management, L.P. and any of the following regarding the 9019 Settlement or any restructuring of the HMIT Entities or DAF Entities: The Dallas Foundation, Crown Global Life Insurance, Ltd., the Texas Attorney General, or any Cayman Islands governmental or judicial authority.

**RESPONSE:**

**REQUEST NO. 29:** All Documents relating to the Stipulation Withdrawing Objection of The Dallas Foundation and Crown Global, including all Communications between Highland and The Dallas Foundation regarding the terms thereof.

**RESPONSE:**

**REQUEST NO. 30:** All bank statements, brokerage statements, investment account statements, balance sheets, financial statements, and accounting records for the following: Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco, LLC; CDMCFAD, LLC; Charitable DAF Holdco, Ltd.; Charitable DAF Fund, LP; DFW Charitable Foundation; and any other DAF entity, including consolidated and entity-level statements.

**RESPONSE:**

**REQUEST NO. 31:** All Documents and Communications relating to any transfer of any interests in Hunter Mountain Investment Trust, Beacon Mountain, LLC, CLO Holdco, LLC, CDMCFAD, LLC, and DFW Charitable Foundation, including but not limited to assignment agreements, contribution agreements, and corporate resolutions approving transfers.

**RESPONSE:**

**REQUEST NO. 32:** All Communications between Patrick and any financial advisor regarding the valuation of the charitable owners' membership interests or any DAF Entity assets.

**RESPONSE:**

**REQUEST NO. 33:** All Communications between You and Charitable DAF Fund, LP regarding the estimated or actual value of the Highland Capital Management, L.P. estate.

**RESPONSE:**

**REQUEST NO. 34:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Highland Capital Management, L.P. estate.

**RESPONSE:**

**REQUEST NO. 35:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Class 10 and Class 11 claims in the Highland Bankruptcy.

**RESPONSE:**

**REQUEST NO. 36:** All Documents and Communications sufficient to show the fair market value of Charitable DAF Fund, LP or its assets as of March 2025.

**RESPONSE:**

**REQUEST NO. 37:** All Documents and Communications referencing, relating to, or reflecting the valuation that resulted in the charitable owners receiving approximately $1.6 million for their direct or indirect interests in CDMCFAD and/or Charitable DAF Fund, LP in or around March 2025, including the redemption agreement and any valuation supporting such redemption.

**RESPONSE:**

**REQUEST NO. 38:** All Documents and Communications, including communications with counsel,[5] relating to the formation, incorporation, organization, or structuring of CDMCFAD, LLC (also known as "DAF 2.0”), including but not limited to articles of organization, operating agreements, corporate resolutions, board minutes, and all amendments thereto.

**RESPONSE:**

**REQUEST NO. 39:** All Documents relating to the limited liability company agreement for CDMCFAD, LLC, including provisions relating to (a) fiduciary duties; (b) Patrick’s powers and discretion; and (c) the valuation and redemption of member interests.

**RESPONSE:**

---

[5] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 40:** All Documents relating to the formation, organization, or structuring of DFW Charitable Foundation, including articles of incorporation, bylaws, board minutes, member lists, and any charitable activities undertaken by said entity.

**RESPONSE:**

**REQUEST NO. 41:** All Documents and Communications related to or evidencing the knowledge of any Highland Party about DFW Charitable Foundation, including, but not limited to, the identity of the officers, directors, agents, or other persons with authority over DFW Charitable Foundation, the economic beneficiaries of DFW Charitable Foundation, and any payments made by DFW Charitable Foundation or any of its subsidiaries to Patrick.

**RESPONSE:**

**REQUEST NO. 42:** All Documents relating to the formation of CDH GP, Ltd., including any documents reflecting (a) Patrick's role or authority in the entity; (b) the replacement of Charitable DAF GP, LLC as the general partner of Charitable DAF Fund, LP; and (c) any Communications discussing the purpose of such replacement.

**RESPONSE:**

**REQUEST NO. 43:** All Documents relating to any transfer of assets from Charitable DAF Holdco, Ltd. or Charitable DAF Fund, LP to CDMCFAD, LLC or any entity controlled by Patrick, including the assignment of limited partnership interests referenced in the Statement of Claim filed in the Cayman Islands.

**RESPONSE:**

**REQUEST NO. 44:** All Documents and Communications sufficient to show when Hunter Mountain Investment Trust or any HMIT Party first received any indication, analysis, projection, or belief that the Class 10 or Class 11 claims would have net value available for distribution, including the timing of such indication, the basis therefor, and any valuations, projections, or analyses supporting such indication

**RESPONSE:**

**REQUEST NO. 45:** All Documents and Communications sufficient to show the original purpose and stated objectives of the 2015 sale of Highland Capital Management, L.P. equity holders' equity stake to Hunter Mountain Investment Trust, including any term sheets, memoranda, presentations, tax advice, or planning documents.

**RESPONSE:**

**REQUEST NO. 46:** All Documents and Communications regarding the reasons behind the equity ownership allocation reflected in Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization, including the allocation of (i) 99.5% to Hunter Mountain Investment Trust; (ii)

0.1866% to The Dugaboy Investment Trust; (iii) 0.0627% to Mark Okada and associated family trusts; and (iv) 0.25% to Strand Advisors, Inc.

**RESPONSE:**

**REQUEST NO. 47:** All Documents and Communications relating to, referencing, or reflecting any tax benefit, tax efficiency, or charitable purpose associated with the restructuring of Highland Capital Management, L.P. ownership in 2015.

**RESPONSE:**

**REQUEST NO. 48:** All Documents and Communications sufficient to show the circumstances surrounding Mark Patrick becoming the administrator of Hunter Mountain Investment Trust in 2022, including any appointment documents, resolutions, consents, correspondence, or agreements.

**RESPONSE:**

**REQUEST NO. 49:** All Documents and Communications relating to the transfer of management shares and ownership of Charitable DAF Fund, LP's general partner from Grant Scott to Mark Patrick in or around April 2021, including (a) any agreements governing the transfer; (b) any conditions or limitations on Patrick's authority; (c) any fiduciary duty obligations assumed by Patrick; (d) any Communications between Scott, Patrick, and the charitable owners regarding the transition; and (e) the consideration, if any, received by Grant Scott in exchange for such transfer.

**RESPONSE:**

**REQUEST NO. 50:** All Documents and Communications relating to, referencing, or reflecting any compensation, benefits, director fees, bonuses, or other remuneration paid to Grant Scott during his tenure as administrator or control person of the DAF Structure from 2011 through 2021.

**RESPONSE:**

**REQUEST NO. 51:** All Documents and Communications relating to, referencing, or reflecting any bonuses, compensation, director fees, or other remuneration paid to Mark Patrick from January 1, 2021, to the present from Hunter Mountain Investment Trust or any affiliated entity.

**RESPONSE:**

**REQUEST NO. 52:** All Documents and Communications relating to, referencing, or reflecting any bonuses, compensation, director fees, or other remuneration paid to Mark Patrick from January 1, 2021, to the present from DFW Charitable Foundation or any affiliated entity.

**RESPONSE:**

**REQUEST NO. 53:** All Documents and Communications relating to, referencing, or reflecting any bonuses, compensation, director fees, or other remuneration paid to Mark Patrick from January

1, 2021, to the present from Charitable DAF HoldCo, Ltd., Charitable DAF Fund, LP, or any affiliated entity within the DAF Structure.

**RESPONSE:**

**REQUEST NO. 54:** All Documents and Communications sufficient to show the basis for, approval of, and payment of director fees to Mark Patrick in each of 2022, 2023, 2024, and 2025, including any compensation studies, benchmarking reports, board approvals, or third-party assessments.

**RESPONSE:**

**REQUEST NO. 55:** All Documents and Communications sufficient to show the basis for, approval of, and payment of any bonuses to Mark Patrick in September 2024 and October 2024, including any written agreements, board resolutions, or documentation of performance metrics.

**RESPONSE:**

**REQUEST NO. 56:** All Documents relating to Mark Patrick's deposition testimony on June 23, 2025, including any preparation materials, Communications with counsel regarding anticipated questions, and documents reviewed in preparation for the deposition.[6]

**RESPONSE:**

**REQUEST NO. 57:** All Documents relating to Paul Murphy's role, authority, and compensation in connection with any DAF Entity, including (a) any agreement or arrangement governing Murphy's compensation; (b) any revision or amendment to Murphy's compensation plan, including any revision backdating payments to the beginning of 2025 that provided for $500,000 in fees triggered when injunctions are sought against the DAF; and (c) any Communications between Patrick and Murphy regarding the DAF restructuring, the 9019 Settlement, or the transfer of DAF assets.

**RESPONSE:**

**REQUEST NO. 58:** All Documents relating to indemnification payments or requests for indemnification made by or on behalf of Mark Patrick or Paul Murphy from any DAF Entity for legal fees or other expenses.

**RESPONSE:**

**REQUEST NO. 59:** All Documents relating to any Communications between Patrick and the charitable beneficiaries (The Dallas Foundation, Crown Global, Empower Dallas, or the Okada

---

[6] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

Foundation) from November 2024 through April 2025, including the "no confidence" letter sent by the charities in November 2024.

**RESPONSE:**

**REQUEST NO. 60:** All Communications between You and Highland Dallas Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

**REQUEST NO. 61:** All Communications between You and Highland Santa Barbara Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

**REQUEST NO. 62:** All Communications between You and Highland Kansas City Foundation, Inc. from January 1, 2021, to the present regarding the DAF Structure, its assets, investments, distributions, or management.

**RESPONSE:**

**REQUEST NO. 63:** All Communications between You and The Dallas Foundation from January 1, 2021, to the present regarding the DAF Structure, Hunter Mountain Investment Trust, or the Settlement Agreement and General Release.

**RESPONSE:**

**REQUEST NO. 64:** All Documents and Communications reflecting, referencing, or relating to any inquiries, questions, or requests for information from Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., Highland Kansas City Foundation, Inc., or The Dallas Foundation regarding (a) the DAF Structure, (b) DAF assets, (c) distributions to charitable beneficiaries, (d) Mark Patrick's compensation, or (e) corporate restructuring.

**RESPONSE:**

**REQUEST NO. 65:** All Documents and Communications sufficient to show the conversion of the charitable trust originally formed in 2006 into a donor-advised fund investment vehicle for

long-term charitable endeavors in or around October 2011, including any organizational documents, trust amendments, partnership agreements, or memoranda.[7]

**RESPONSE:**

**REQUEST NO. 66:** All Documents and Communications relating to, referencing, or reflecting the original structure and purpose of the donor-advised fund created in October 2011, including any tax opinions, IRS determination letters, or legal memoranda.[8]

**RESPONSE:**

**REQUEST NO. 67:** All Documents and Communications relating to, referencing, or reflecting the valuation of Highland Capital Management, L.P., or its assets.

**RESPONSE:**

**REQUEST NO. 68:** All Documents and Communications relating to, referencing, or reflecting Highland Capital Management, L.P.'s financial condition, including any monthly operating reports or quarterly operating reports.

**RESPONSE:**

**REQUEST NO. 69:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for any bankruptcy professional, creditor, or equity holder.[9]

**RESPONSE:**

**REQUEST NO. 70:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports

---

[7] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[8] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[9] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[10]

**RESPONSE:**

**REQUEST NO. 71:** All Documents and Communications relating to any valuation of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[11]

**RESPONSE:**

**REQUEST NO. 72:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 73:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 74:** All Communications between You and Charitable DAF Fund, LP reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 75:** All Communications between You and Charitable DAF Fund, LP regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

---

[10] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[11] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**RESPONSE:**

**REQUEST NO. 76:** All Communications between You and Hunter Mountain Investment Trust reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 77:** All Communications between You and Hunter Mountain Investment Trust regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 78:** All Documents and Communications relating to, referencing, or reflecting efforts by any HMIT Entity to obtain updated financial reporting from Highland Capital Management, L.P., or its bankruptcy professionals during the bankruptcy proceedings.

**RESPONSE:**

**REQUEST NO. 79:** All Documents reflecting the "Work Plan" prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities, including any instructions to create entities that were "hard to find or track."[12]

**RESPONSE:**

**REQUEST NO. 80:** All Documents and Communications between Mark Patrick and any attorney or law firm from January 1, 2023, to the present regarding corporate restructuring, entity formation, or changes to the governance of the DAF Structure, including any "work plans" or engagement letters.[13]

**RESPONSE:**

[12] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[13] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**REQUEST NO. 81:** All Documents and Communications relating to, referencing, or reflecting the formation of any new entity within, related to, or derived from the DAF Structure from January 1, 2023, to the present, including DFW Charitable Foundation, CDMCFAD, LLC, and CDH GP, Ltd.[14]

**RESPONSE:**

**REQUEST NO. 82:** All Documents and Communications between any attorney or law firm and Mark Patrick relating to the creation of new corporate entities within the DAF Structure.[15]

**RESPONSE:**

**REQUEST NO. 83**: All Documents relating to Mark Patrick's authority to act on behalf of Rand Advisors, LLC, Rand PE Fund I, LP, or any HMIT Entity, including any power of attorney, board resolutions, or operating agreement provisions granting such authority.

**RESPONSE:**

**REQUEST NO. 84:** All Documents relating to any change in the ownership, management, or control of Hunter Mountain Investment Trust, Beacon Mountain LLC, or any entity in the Hunter Mountain ownership chain from January 1, 2024 to the present.

**RESPONSE:**

**REQUEST NO. 85**: All organizational charts reflecting the corporate structure of (a) the DAF Entities; (b) the HMIT Entities; and (c) any entities through which Patrick directly or indirectly held an interest in Hunter Mountain, for any time during the Relevant Period.

**RESPONSE:**

**REQUEST NO. 86:** All documents and communications relating to, referencing, or reflecting the sale of Rand PE Fund I, LP's investment in Beacon Mountain, LLC in or around February 2025, including any purchase agreements, valuations, appraisals, or closing documents.

---

[14] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[15] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**RESPONSE:**

**REQUEST NO. 87**: All Documents relating to the transition of management of Rand PE Fund I, LP from John Honis to Patrick or any Patrick-controlled entity, including any Communications with investors or regulatory authorities regarding such transition.

**RESPONSE:**

**REQUEST NO. 88**: All audit reports, financial statements, and quarterly or annual reports for Rand PE Fund I, LP from January 1, 2023 to the present, including the 2024 audit issued on or about June 26, 2025.

**RESPONSE:**

**REQUEST NO. 89:** All Documents relating to the sale of Beacon Mountain LLC (or its interest in Hunter Mountain Investment Trust) to CLO Holdco, LLC, including but not limited to the purchase agreement, any valuations, closing documents, and wire transfer records.

**RESPONSE:**

**REQUEST NO. 90**: All Documents relating to any consent (or lack thereof) from Crown Global Life Insurance, Ltd., The Dallas Foundation, or Atlas IDF, LP regarding the sale of Beacon Mountain's interest in Hunter Mountain to CLO Holdco, LLC or any Patrick-controlled entity.

**RESPONSE:**

**REQUEST NO. 91**: All Documents relating to compliance (or non-compliance) with Section 3.01(b) of the Amended and Restated Limited Partnership Agreement of Atlas Fund, which prohibits Rand Fund from selling Hunter Mountain to an affiliate of Patrick without investor consent.

**RESPONSE:**

**REQUEST NO. 92:** All Documents and Communications relating to any notice or other information given to investors in Rand PE Fund I, LP (including any 4% minority investor) from January 1, 2025, to the present regarding the sale of Beacon Mountain, LLC's interest in HMIT, or any distribution relating thereto, including the February 20, 2025 notice referenced in Dugaboy's Motion for Reconsideration.

**RESPONSE:**

**REQUEST NO. 93:** All Documents and Communications sufficient to show the basis for the $1 million valuation of Beacon Mountain, LLC's interest in Hunter Mountain Investment Trust in or around February 2025, including any valuation reports, appraisals, financial analyses, or Communications with ValueScope, LLC or any other valuation firm concerning such valuation.

**RESPONSE:**

**REQUEST NO. 94:** All Documents, correspondence, engagement letters, contracts, or agreements between You and ValueScope, LLC (or any other valuation firm) relating to the valuation of any interest, holding in, or security issued by any of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate.

**RESPONSE:**

**REQUEST NO. 95:** All draft and final valuation reports, memoranda, models, or analyses prepared by ValueScope, LLC relating to Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to the valuation of the Participation Shares; and any Communications challenging or questioning the valuation methodology or conclusions.

**RESPONSE:**

**REQUEST NO. 96:** All Documents relating to the methodology used in any valuation of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to instructions received regarding methodology, communications discussing the change from net asset value methodology to discounted cash flow methodology, supporting calculations, assumptions, and comparable transactions or valuations.

**RESPONSE:**

**REQUEST NO. 97:** All Documents and Communications related to the identity, ownership structure, principals, managers, or beneficial owners of Celia Holdco LLC.

**RESPONSE:**

**REQUEST NO. 98:** All Documents relating to the voluntary liquidation of Charitable DAF Holdco, Ltd. filed on April 2, 2025 in the Cayman Islands, including the petition, any supporting documents, and Communications regarding the decision to initiate liquidation.

**RESPONSE:**

**REQUEST NO. 99**: All Documents produced to or received from the Joint Official Liquidators of Charitable DAF Holdco, Ltd. in connection with their investigation of Patrick's activities.

**RESPONSE:**

**REQUEST NO. 100**: All Documents relating to any actions taken by Patrick or Murphy in response to the investigative efforts of the Joint Official Liquidators in the Cayman Islands, including any expenditures of DAF assets for legal fees or other expenses incurred in opposing such efforts.[16]

**RESPONSE:**

**REQUEST NO. 101**: All Documents relating to Creative Hearts TX, including (a) its formation documents; (b) the involvement of Patrick, his wife, or his daughter with the entity; and (c) any donations or payments made to it by any DAF Entity.[17]

**RESPONSE:**

**REQUEST NO. 102**: All Documents relating to the Patrick-Cronin Proposal.

**RESPONSE:**

---

[16] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[17] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

Case 3:26-cv-02496-D Document 17-9 Filed 05/08/26 Page 146 of 407 PageID 5874

Dated: March 23, 2026

*/s/ Geoffrey S. Harper*
**Geoffrey S. Harper**
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

**John Michael Gaddis**
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

I certify that on March 23, 2026, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

***Via Electronic Mail:***

Erik S. Jaffe (ejaffe@schaerr-jaffe.com)
**Schaerr Jaffe LLP**
1717 K Street NW, Suite 900
Washington, DC 20006

Mazin A. Sbaiti (mas@sbaitilaw.com)
**Sbaiti & Company PLLC**
JPMorgan Chase Tower
2200 Ross Avenue, Suite 4900W
Dallas, TX 75201

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S RESPONSE OPPOSING HIGHLAND CLAIMANT TRUST'S MOTION FOR PROTECTIVE ORDER AGAINST DUGABOY'S DISCOVERY REQUESTS**

# TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. BACKGROUND AND PROCEDURAL HISTORY ..... 2

A. Dugaboy Files Its 60(b) Motion on the Court's 9019 Decision. ..... 2

B. Dugaboy and Highland Negotiate a 60(b) Schedule, Including Discovery ..... 4

C. Highland Serves Discovery, and Dugaboy Produces Documents on Schedule; Dugaboy Serves its Discovery, and Highland Moves for a Protective Order ..... 6

III. ARGUMENT ..... 8

A. Highland's Motion Rests on Misrepresentations that Should Give This Court Serious Pause ..... 8

1. Highland Mischaracterizes the Cayman Court's Injunction Ruling ..... 8

2. Highland Omits the Pending Texas Fraud Claims ..... 10

B. Highland's Discovery Gamesmanship Has Prejudiced Dugaboy, Which Complied With the Discovery Highland Now Seeks to Block ..... 11

1. The Scheduling Order Contemplates Reciprocal Discovery ..... 12

2. Highland Strategically Delayed its Motion Until After Receiving Dugaboy's Document Production ..... 13

3. Highland Failed to Confer in Good Faith as Required by the Rules ..... 14

4. Dugaboy Has Been Prejudiced ..... 15

C. Dugaboy Is Entitled to Discovery For Its 60(b) Motion ..... 15

D. Dugaboy's Requests Are Relevant, Not Duplicative, and Otherwise Proper ..... 18

1. Dugaboy's Requests Are Relevant to the Issues in its 60(b) Motion ..... 19

2. Dugaboy's Requests Are Not Duplicative ..... 21

3. Dugaboy's Requests Are Not Overbroad ..... 22

4. Dugaboy Has Properly Raised Its Crime-Fraud Exception and Subject-Matter Waiver Arguments ..... 23

i. The Crime Fraud Exception ..... 23

ii. Subject Matter Waiver ..... 25

5. Dugaboy's discovery requests are for a proper purpose ..... 27

E. Dugaboy's Third-Party Discovery is Proper. ..... 28

IV. CONCLUSION ..... 29

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ATC Media, LLC v. Michaels Stores, Inc.*,
2023 WL 5538996 (N.D. Tex. Aug. 28, 2023) ....................22

*In re BNP Petroleum Corp.*,
No. 09-20206, 2013 WL 5493125 (Bankr. S.D. Tex. Oct. 1, 2013) ....................16

*Cadence Bank v. Bridgelink Eng'g LLC*,
2024 WL 6893273 (N.D. Tex. Dec. 16, 2024) ....................21

*Carpenter v. Twin City Fire Ins. Co.*,
2024 WL 947589 (N.D. Tex. Mar. 4, 2024) ....................22

*Cazorla v. Koch Foods of Miss., L.L.C.*,
838 F.3d 540 (5th Cir. 2016) ....................15, 28

*Charitable DAF HoldCo, Ltd. (In Official Liquidation) v. Mark Eric Patrick et al.*,
CICS Civil Appeal No. 3 of 2026, Cause No. FSD 201 of 2025 (RPJ) (Cayman Is. Ct. App. Mar. 3, 2026) ....................18

*Charitable DAF Holdco, Ltd. (In Official Liquidation) v. Patrick*,
FSD No. 201 of 2025 (RPJ), [2026] CIGC (FSD) 9 (Grand Ct. Cayman Is. Feb. 10, 2026) ....................3, 8

*Compass Bank v. Shamgochian*,
287 F.R.D. 397 (S.D. Tex. 2012) ....................14

*Data Treasury Corp. v. Wells Fargo & Co.*,
2009 WL 10679940 (E.D. Tex. Nov. 13, 2009) ....................26

*Diamant v. Sheldon L. Pollack Corp.*,
216 B.R. 589 (Bankr. S.D. Tex. 1995) ....................25

*In re E.E.O.C.*,
207 F. App'x 426 (5th Cir. 2006) ....................24

*Eubank v. Lockhart Indep. Sch. Dist.*,
2016 WL 11214437 (W.D. Tex. Nov. 8, 2016) ....................21

*In re Ferro Corp. Deriv. Litig.*,
511 F.3d 611 (6th Cir. 2008) ....................17

*Flashmark Tech. LLC v. GTECH Corp.*,
2007 WL 9724333 (E.D. Tex. Aug. 1, 2007) ....................26

*Goodson v. Nasco Healthcare, Inc.*,
2025 WL 2322793 (N.D. Tex. Aug. 12, 2025) ....................23

*In re Grand Jury Subpoenas*,
561 F.3d 408 (5th Cir. 2009) ....................24, 25

*Halliburton Energy Servs., Inc. v. NL Indus.*,
618 F. Supp. 2d 614 (S.D. Tex. 2009) ....................16

*Heller v. City of Dallas*,
303 F.R.D. 466 (N.D. Tex. 2014) ....................22

*Herr v. Elos Env't, LLC*,
No. CV 25-387, 2025 WL 2644774 (E.D. La. Sept. 15, 2025) ....................18

*Hy-Ko Prods. Co. LLC v. Hillman Grp., Inc.*,
2022 WL 507486 (E.D. Tex. Feb. 18, 2022) ....................22

*Lewis v. Crochet*,
105 F.4th 272 (5th Cir. 2024) ....................23

*McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*,
2016 WL 3033544 (N.D. Tex. May 26, 2016) ....................28

*Merrill v. Waffle House, Inc.*,
227 F.R.D. 467 (N.D. Tex. 2005) ....................19

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978) ....................19

*Rabo Agrtfinance, Inc. v. Terra XXI Ltd.*,
2007 WL 9717595 (N.D. Tex. Feb. 14, 2007) ....................22

*Reyna v. Lloyds*,
2015 WL 12940021 (S.D. Tex. Jan. 8, 2015) ....................22

*In re Rigby*,
199 B.R. 358 (E.D. Tex. 1995) ....................25

*RLIS, Inc. v. Cerner Corp.*,
2014 WL 12599509 (S.D. Tex. Dec. 24, 2014) ....................26, 27

*Samsung Elecs. Am. Inc. v. Chung*,
325 F.R.D. 578 (N.D. Tex. 2017) ....................15

*Sanders v. MoneyGram International, Inc.*,
2024 WL 5430194 (N.D. Tex. June 27, 2024) ....................23

*The Highland Dallas Found., Inc. v. Patrick*,
No. 25-BC01B-0027 (Tex. Bus. Ct. Oct. 31, 2025) .......... 10

*In re Washington Prime Group, Inc.*,
2024 WL 4615552 (S.D. Tex. Oct. 29, 2024) .......... 26

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) .......... 17

Fed. R. Civ. P. 26(b)(1) .......... 19

Fed. R. Civ. P. 26(c)(1) .......... 15, 28

Fed. R. Civ. P. 37(a)(1) .......... 14

Fed. R. Civ. P. 60(b) .......... *passim*

Fed. R. Civ. P. 60(b)(3) .......... 19

Fed. R. Civ. P. 60(b)(6) .......... 17

Fed. R. Evid. 502(a) .......... 25, 27

The Dugaboy Investment Trust ("Dugaboy") files this Response in Opposition to Highland Capital Management Trust's ("Highland") Motion for a Protective Order Against Dugaboy's Discovery Requests (Dkt. No. 4533) and respectfully shows the Court as follows.

## I. INTRODUCTION

Highland's Motion for Protective Order ("Highland's Motion," "Motion," or "Mot.") asks this Court to block *all* discovery in connection with Dugaboy's Rule 60(b) Motion (the "60(b) Motion" or "Dkt. 4513"). Dkt. 4533 at 5 ("This Court should therefore enter a protective order stopping Dugaboy from taking *any* discovery in connection with its Rule 60(b) Motion.") (emphasis in original). But Highland's Motion rests on misrepresentations and half-truths that should give this Court serious pause about its position—and, indeed, about the lengths Highland will go to avoid scrutiny of the circumstances surrounding the 9019 Settlement.[1]

Highland tells this Court that the Cayman court "dismissed the claims of fraud" against Patrick. That is false—the court merely denied an additional layer of interim injunctive relief beyond that already provided by the Texas Business Court, while finding the fraud claims sufficient to proceed to trial. Highland also tells this Court that discovery is categorically improper. Yet Highland itself negotiated and agreed to a scheduling order which expressly contemplated discovery, served its own discovery requests on Dugaboy, and only then—after receiving the benefit of Dugaboy's document production—moved for a protective order to spare itself from having to reciprocate. Highland tells this Court that Dugaboy has not made a prima facie showing

[1] The "9019 Settlement" refers to the Settlement Agreement & General Release dated May 19, 2025, between Highland and the HMIT Entities and approved by the Court on June 30, 2025. Dkt. 9019 Motion, 4216; Order Approving Settlement, Dkt. 4297. The 9019 Settlement resolved all pending litigation among the parties, transferred cash and other assets (including live claims) to HMIT, and exchanged mutual releases. It was procured by fraud because Mark Patrick, who executed the agreement as the sole manager of the HMIT Entities, secretly restructured the DAF entities' corporate structure to seize personal control over approximately $270 million in charitable assets. He concealed his scheme from the Court, the charitable beneficiaries, and all other parties to the settlement. Dugaboy's 60(b) Motion, Dkt. 4513.

of fraud, but the record evidences Mark Patrick's fraudulent acts, and that the 9019 Settlement was the product of that fraud.

Highland next throws every possible objection at Dugaboy's discovery requests, calling them irrelevant, overbroad, duplicative, and improper. Yet Highland never engaged in the ordinary process of resolving discovery disputes. It did not confer with Dugaboy's counsel in good faith, did not attempt to narrow the scope of discovery, and did not work through specific objections before seeking court intervention. Instead, Highland bypassed that process entirely, demanding that this Court categorically block *all* discovery rather than addressing individual requests through the normal good faith negotiation to avoid the needless consumption of judicial resources that the Federal Rules and customary practice in every federal court in the country contemplate. This all-or-nothing approach underscores that Highland's objections are baseless and pretextual. At every turn, Highland asks this Court to deny reality and prevent discovery into what Highland knew, when it knew it, and how this knowledge impacts the 9019 Settlement. The Court should ignore Highland's misdirection and deny Highland's Motion in its entirety.

## II. BACKGROUND AND PROCEDURAL HISTORY

### A. Dugaboy Files Its 60(b) Motion on the Court's 9019 Decision.

As documented in Dugaboy's 60(b) Motion (Dkt. 4513), Mark Patrick, a fiduciary of Hunter Mountain Investment Trust and related entities ("Hunter Mountain"), orchestrated a fraudulent scheme to seize control of approximately $270 million in charitable assets held in a donor-advised fund structure. Patrick secretly restructured these entities, awarded himself more than $11 million in compensation in late 2024 alone for what was never a full-time job, and then caused Hunter Mountain's beneficial interest to be sold to an entity he controlled for just $1 million.

With the DAF and Hunter Mountain under his control, Patrick approached Highland to

settle Hunter Mountain's stake in the Highland bankruptcy estate. On May 19, 2025, Highland filed the 9019 Motion. 9019 Motion, Dkt. 4216. Dugaboy and other parties objected, with The Dallas Foundation and Crown Global Life Insurance specifically warning that "the Settlement is potentially tainted by the actions of Mark Patrick." Charities' Obj., Dkt. 4231. Despite these objections, the Court approved the 9019 Settlement on June 30, 2025. Dkt. 4297.

Critical evidence of the full scope of Patrick's fraud emerged only after that approval. On July 15, 2025, joint official liquidators ("JOLs") appointed in the Cayman Islands filed a Statement of Claim revealing that Patrick had fraudulently absconded with $270 million in charitable assets. Further filings in December 2025 disclosed that Patrick took more than $13 million in fees in 2024 and 2025 and provided additional evidence of Patrick's fraud and other misconduct. These fraud claims remain pending and unresolved, contrary to Highland's repeated and false assertion that the Cayman court "dismissed the claims of fraud" against Patrick. Mot. at 15, 19; *Charitable DAF Holdco, Ltd. (In Official Liquidation) v. Patrick*, FSD No. 201 of 2025 (RPJ), [2026] CIGC (FSD) 9, ¶¶ 246–47 (Grand Ct. Cayman Is. Feb. 10, 2026).

With the collective weight of this emerging evidence showing misconduct impossible to ignore, Dugaboy filed its Rule 60(b) Motion on February 9, 2026, seeking to vacate the Settlement Order. Dkt. 4513. Relevant to Dugaboy's claims (and central to the present discovery dispute) is Dugaboy's reasonable belief[2] that Highland knew about Patrick's scheme at the time of the

[2] Several facts support this inference, including but not limited to the following. The Settlement occurred during the same period as Patrick's alleged fraudulent restructuring, "making it part of that scheme." Dkt. 4326, ¶ 21. Before the settlement was approved, The Dallas Foundation and Crown Global warned that "the Settlement is potentially tainted by the actions of Mark Patrick" and that "there is reason to suspect that the HMIT Entities' entry into the Settlement will further a scheme to wrongfully divert charitable funds from their intended beneficiaries." Dkt. 4231, ¶¶ 2–3, 32–34. Highland's due diligence was deliberately limited in that it looked "only at the organizational documents," and its counsel stated: "Mr. Patrick, I don't know what happened between him and Mr. Dondero. I don't care. I have no knowledge of that." Dkt. 4326, ¶ 23 (citing 9019 Tr. At 61:26–62:1, 97:12–17, 98:6–99:1 (Dkt. 4296)). And Highland vigorously opposed requests from the liquidators in the Cayman Islands investigating Patrick's behavior to wait even a few

Settlement and colluded with Patrick to effectuate it anyway. Discovery is necessary to prove what Highland knew and when.

**B. Dugaboy and Highland Negotiate a 60(b) Schedule, Including Discovery**

After Dugaboy filed its 60(b) Motion, Highland's counsel contacted Dugaboy's counsel requesting an extension of Highland's response deadline from March 3 to April 3, 2026, citing travel and other professional commitments. Ex. 1, Email from J. Morris to M. Gaddis (Feb. 13, 2026). Dugaboy did not oppose the request and agreed to the extension in good faith. *Id.*

The parties then engaged in extensive discussions about the appropriate schedule for conducting discovery, briefing, and hearing the 60(b) Motion. Dugaboy's counsel proposed a schedule with Highland's response due April 3, Dugaboy's reply due April 17, and a hearing on any mutually convenient date after April 24. Ex. 2, Email from M. Gaddis to J. Morris (Feb. 18, 2026). Highland's counsel asked whether Dugaboy intended to call witnesses, reserving its potential objection to presenting testimony on a motion for reconsideration. Ex. 3, Email from J. Morris to M. Gaddis (Feb. 20, 2026). But Highland's counsel also suggested building in time for depositions, stating that "Highland sought to depose Dugaboy's witnesses, if any, so that Highland could find out the factual bases for the motion before the hearing." Ex. 11, Email from J. Morris to M. Gaddis (Mar. 2, 2026). Highland's counsel proposed a final schedule including Highland's objection by April 3, exchange of witness designations, depositions of up to two per side during

---

weeks so the Court could have the benefit of the information in its report. *Id.* (citing 9019 Tr. at 189:22–191:1). Collectively, the evidence suggests that Highland had a sense of what was coming and pushed its foot down hard on the accelerator to finalize the settlement before more the iceberg of Patrick's misconduct was revealed. After all, the claims of Hunter Mountain that Highland was seeking to settle risked revealing irregularities, shortcomings, and misconduct on the part of Highland's bankruptcy managers. In short, Highland "ignored the Cayman proceeding to rush through the 9019 Settlement before evidence of the fraud could be presented to this Court." *Id.* (citing 9019 Tr. At 61:26–62:1, 97:12–17, 98:6–99:1 (Dkt. 4296)).

the week of April 6, Dugaboy's reply by April 24, and a hearing between April 27 and May 8. Ex. 4, Email from J. Morris to M. Gaddis (Feb. 25, 2026).

This was of a piece with Highland's conduct throughout this bankruptcy, with Highland seeking discovery and depositions from anyone who objected to the bankruptcy manager's proposed course of action. Indeed, when century-old charity, the Dallas Foundation, objected to the 9019 settlement that is the subject of the pending motion practice, Highland demanded its chief executive's deposition, on a Sunday with a couple days' notice. Charities' Obj., Dkt. 4231. (It was after this incredibly unpleasant deposition that the Foundation was bullied into setting aside its objection). In short, Highland has jammed discovery into just about every motion process throughout this bankruptcy. This one included, except Highland is arguing that only it gets the benefit of discovery for this motion. It is not credible for Highland to argue that the current motion is the exception in the bankruptcy for which discovery is not appropriate or (even less credibly) that the discovery on this motion should be unilateral for Highland alone to take.

After further lengthy negotiations, the parties filed, and the Court entered, an Agreed Joint Order setting the schedule for briefing and hearing Dugaboy's 60(b) Motion. Dkt. 4528 (entered Mar. 4, 2026).[3] That Order:

(1) Set Highland's opposition deadline for April 3, 2026;

(2) Allowed for discovery "subject to the Parties' respective reservation of the right to object to any depositions or written discovery sought by the other party";

(3) Provided that the parties would disclose witnesses by April 6, 2026; and

[3] This Order was superseded by the Court's April 10, 2026 Order, Dkt. 4547, which preserved the parties' earlier discovery agreements. Dugaboy discusses the March 4 order here because it was the most recent schedule on which the parties agreed.

(4) Provided that each party could depose up to three witnesses during the week of April 5, extendable to the week of April 13 if necessary.

*Id.* The Agreed Order and the preceding communications between counsel explicitly contemplated that the parties would engage in reciprocal discovery as part of the 60(b) proceedings.

**C. Highland Serves Discovery, and Dugaboy Produces Documents on Schedule; Dugaboy Serves its Discovery, and Highland Moves for a Protective Order**

On February 26, 2026, Highland served Dugaboy with requests for production of documents. Ex. 8, Email from J. Morris to M. Gaddis (Feb. 26, 2026). Dugaboy responded on time with an extension production of documents. On March 23, 2026, Dugaboy served its First Set of Requests for Production of Documents on Highland. Ex. 5, Dugaboy's First Set of RFPs. Dugaboy also served subpoenas on various knowledgeable non-debtor entities and law firms, seeking documents relevant to Patrick's fraud and its connection to the 9019 Settlement. Dugaboy also disclosed its intention to take three depositions as permitted by the Agreed Order: Mark Patrick for an eight-hour deposition, and James Seery and Paul Murphy for four-hour depositions each. *See* Ex. 6, Email from M. Gaddis to J. Morris (Mar. 30, 2026).

Highland refused to produce any documents or even suggest a meet and confer. Just two days after Dugaboy served its requests, Highland's counsel declared that the requests were "not proper for a variety of reasons, not least because Dugaboy has not established a prima facie case in support of its motion." Ex. 7, Email from J. Morris to S. Rose (Mar. 25, 2026). Highland's counsel announced it intended to file a motion for a protective order and proposed a briefing schedule that would not conclude until just days before the hearing.[4] *Id.*

---

[4] The hearing on Dugaboy's Rule 60(b) motion was set for April 27, 2026. On March 25, 2026, Highland's counsel proposed a briefing schedule under which Highland would file its motion for protective order on April 2, Dugaboy's response would be due April 16, and Highland's reply would be due April 21, just six days before the hearing. Ex. 7, Email from J. Morris to M. Gaddis (Mar. 25, 2026).

While Highland categorically refused to respond to Dugaboy's discovery, it simultaneously demanded that Dugaboy respond to Highland's discovery requests. Highland itself served a discovery request on Dugaboy seeking, among other things, confirmation as to what specific "newly discovered evidence" Dugaboy relies on in support of its 60(b) Motion. *See* Ex. 8, Highland's Discovery Requests. Rather than stonewall as Highland did toward Dugaboy's requests, Dugaboy responded and produced responsive documents. Dugaboy's counsel confirmed that Dugaboy would "respond to Highland's RFPs and begin production of additional responsive documents (to the extent Dugaboy has any) on a rolling basis," with any supplemental production to "be completed no later than the deadline for the parties to file exhibit lists and exchange exhibits." Ex. 9, Email from M. Gaddis to J. Morris (Mar. 30, 2026). Dugaboy produced responsive materials while Highland produced nothing in return. Ex. 10, Dugaboy's Discovery Responses.

Highland's about-face is brazen. Highland's own counsel proposed building deposition time into the negotiated schedule, stating that it wanted to depose Dugaboy's witnesses to "find out the factual bases for the motion." *See* Ex. 11, Email from J. Morris to M. Gaddis (Mar. 2, 2026). The Court's March 4, 2026 Agreed Order contemplated discovery by both parties. But the moment Dugaboy sought to exercise that same right, Highland moved to shut it down while still demanding Dugaboy produce documents to Highland. Highland wants discovery to be a one-way street.

On April 1, 2026, Highland filed its Motion for Protective Order seeking to block all of Dugaboy's discovery. Dkt. 4533. As shown below, Highland has not shown good cause for such a sweeping protective order, Dugaboy has made the required prima facie showing of fraud, and Dugaboy's requests are relevant, proportional, and proper.

## III. ARGUMENT

Highland's Motion fails at every level. It rests on misrepresentations about the Cayman Islands ruling and omissions about pending fraud claims in the Texas Business Court. It ignores that Highland itself negotiated a scheduling order contemplating mutual discovery, accepted Dugaboy's document production, and only then moved to block all reciprocal discovery. It further cannot overcome the fact that Dugaboy has made a prima facie showing of fraud entitling it to discovery. And the objections Highland raises are garden-variety discovery disputes should have been preceded by Highland identifying them to Dugaboy and a meet and confer process to narrow them for the Court and that do not warrant a blanket protective order.

### A. Highland's Motion Rests on Misrepresentations that Should Give This Court Serious Pause

Highland asks this Court to shut down discovery based on representations about the Cayman Islands ruling and the Texas Business Court proceedings that are, at best, misleading. A closer look reveals a pattern. Highland consistently overstates these rulings while omitting the findings that undermine its position.

#### 1. Highland Mischaracterizes the Cayman Court's Injunction Ruling

On February 10, 2026, the Grand Court of the Cayman Islands denied the Joint Official Liquidators' application for a proprietary injunction[5] against Patrick and related defendants in addition to the injunction entered by the Dallas Business Court ordering a stop to Patrick's asset

[5] *See* Ex. 4 to Highland's Motion, Dkt. 4534-4 *Charitable DAF Holdco, Ltd. (In Official Liquidation) v. Patrick*, FSD No. 201 of 2025 (RPJ), [2026] CIGC (FSD) 9 (Grand Ct. Cayman Is. Feb. 10, 2026); Ex. 13, Letter from Zachery Z. Annable, Counsel for Highland Capital Mgmt., L.P., to Karen Mitchell, Clerk of the Court, U.S. Dist. Ct. for the N. Dist. of Tex., Re: Supplemental Authority Submitted Under Bankruptcy Rule 8014(f) (Feb. 13, 2026), *In re* Case No. 3:25-cv-01876-K, ECF No. 62; Ex. 12, Letter from Geoffrey Harper, Counsel for The Dugaboy Inv. Tr., to Karen Mitchell, Clerk of the Court, U.S. Dist. Ct. for the N. Dist. of Tex., Re: Response to Supplemental Authority Submitted Under Bankruptcy Rule 8014(f) (Feb. 20, 2026), *In re* Case No. 3:25-cv-01876-K, ECF No. 65.

transfers.[6] Highland seized on that ruling, filing it as supplemental authority in a pending appeal before Judge Kinkeade and claiming the Cayman Court vindicated Patrick. But Highland's account cherry-picks from the decision while ignoring nearly all the court's key findings. Highland asserts that the Cayman Court "dismissed the claims of fraud" against Patrick and "rejected" the fraud theory. Mot. at 15, 19, 21. That is false. The Cayman Court expressly found the allegations against Patrick present "a serious issue to be tried" and that the JOLs have "a real, as opposed to a fanciful, prospect of success at trial." Cayman Court's Injunction Ruling, Dkt. 4534-4 ¶¶ 253, 255. The Court found that "[t]he principal allegation is a serious one, namely that [Patrick and the Directors] have stripped [DAF HoldCo] of its only asset so as to seize control and enrich themselves" and concluded that the JOLs "have a case which [Patrick and Murphy] need to answer." *Id.* ¶¶ 246, 254. The Court stated these allegations "will be properly investigated at trial." *Id.* ¶ 247. The ruling says the opposite of what Highland claims.

The Cayman Court declined to impose an injunction not because the fraud claims lacked merit, but because the Texas Rule 11 Agreement already protected the assets during the pendency of the Cayman proceedings. *Id.* ¶ 240. As that court explained, "there is nothing to suggest . . . that the assets will be dealt with adversely" given that the parties had agreed to preserve the status quo with remedies available in Texas if any party breached. *Id.* The Cayman Court made clear that the fraud allegations "will be fully explored throughout the proceedings." *Id.* Highland's characterization of this ruling as a "failure" or "dismissal" is a misrepresentation and one that Dugaboy's February 20, 2026 letter expressly called out more than a month before Highland repeated it in this Motion. Letter from Geoffrey Harper, Ex. 12.

---

[6] The Cayman Court held that there was already an injunction in place against Patrick and that the applicant lacked a proprietary interest in the fund's assets sufficient to support such extraordinary interim relief.

Highland also suggests that Dugaboy was somehow aware of this Cayman decision before it filed its Rule 60(b) motion and intentionally omitted a discussion of it. Mot., at 3. Again, not so. What Highland cites to is a notation in the Cayman decision that a draft was made available to the parties in the Cayman case prior to the public release of the decision *after* the Rule 60(b) filing. Dugaboy is not a party to the Cayman case. Patrick and the Liquidators are. And Dugaboy found out about the decision with the rest of the world. If Highland knew earlier, that is only an indication of its active concert with Patrick to address allegations of Patrick's misconduct.

**2. Highland Omits the Pending Texas Fraud Claims**

Highland also omits the Texas Business Court proceedings concerning the same Patrick misconduct. *See The Highland Dallas Found., Inc. v. Patrick*, No. 25-BC01B-0027 (Tex. Bus. Ct.). The claims pending against Patrick include common-law fraud, fraud by nondisclosure, breach of fiduciary duty, constructive fraud, unjust enrichment, conversion, and the imposition of a constructive trust—all arising from Patrick's alleged scheme to strip the Charities of approximately $270 million in charitable assets. Pls.' 2d Am. Pet. ¶¶ 6.1–6.51 (Sept. 2, 2025). When the Highland Foundations sought a temporary restraining order to freeze assets, the CDM Entities[7] entered into a Rule 11 Agreement providing voluntary undertakings rather than face court-ordered relief. The Business Court *subsequently* abated the case pending joinder of the Cayman JOLs as indispensable parties, but it did not dismiss the underlying claims. Order Granting Abatement at 1–2, *The Highland Dallas Found., Inc. v. Patrick*, No. 25-BC01B-0027 (Tex. Bus. Ct. Oct. 31, 2025). The fraud claims against Patrick remain pending. Both here and in the Caymans, Highland's selective presentation of procedural posture is designed to create the false impression that Patrick has been

[7] The "CDM Entities" refers to CDMCFAD, LLC and its affiliated entities within the Charitable DAF fund structure, including CDH GP, Ltd., Charitable DAF Fund, LP, CLO HoldCo, Ltd., and related subsidiaries, all managed by Mark Patrick. *See* Dkt. 4326 at Annexure 1.

exonerated. He has not.

Highland's misrepresentations extend beyond these rulings. Highland claims Dugaboy "launched" its discovery demands unilaterally. Mot. at 4. But this ignores the extensive scheduling negotiations between counsel and the Agreed Scheduling Order that expressly contemplated discovery. *See* Dkt. 4528. Highland also complains that Dugaboy's requests seek documents about the 9019 Settlement rather than the underlying fraud. Mot. 22. But Dugaboy's theory is that the Settlement was procured through Patrick's fraud and Highland knew or should have known about it. 60(b) Motion, Dkt. 4513. Discovery into the 9019 Settlement is discovery into the fraud.

Highland's misrepresentations go to the heart of its Motion. Highland asks this Court to shut down discovery based on the premise that there is no credible basis for Dugaboy's fraud allegations. But evidence that Highland itself submitted to this Court says otherwise. As explained, the Cayman Court found the fraud allegations present "a serious issue to be tried" with a "real prospect of success," and the Texas Business Court proceedings remain pending with claims of common-law fraud, breach of fiduciary duty, and constructive trust against Patrick. Dkt. 4534-4. Far from supporting Highland's request for a blanket protective order, these proceedings confirm that Dugaboy's discovery requests are directed at legitimate, unresolved questions about Patrick's conduct and about what Highland knew.

### B. Highland's Discovery Gamesmanship Has Prejudiced Dugaboy, Which Complied With the Discovery Highland Now Seeks to Block

Highland negotiated a scheduling order that expressly contemplated mutual discovery, served its own discovery requests on Dugaboy, and accepted Dugaboy's document production. Only then, after securing the benefit of Dugaboy's compliance, did Highland move to block all reciprocal discovery. This is gamesmanship, not a good-faith dispute over the scope of discovery.

### 1. The Scheduling Order Contemplates Reciprocal Discovery

The Court's April 10, 2026 Order confirms that discovery related to the Motion for Relief "must be completed no later than May 1, 2026" and that "[a]ll restrictions related to discovery that were previously agreed to by the parties, which were stated in the Court's March 3 Order [Dkt. 4528] . . . remain unchanged." Order, Dkt. 4547. The prior March 4, 2026 Agreed Order expressly contemplated that both parties would participate in mutual discovery. Dkt. 4528. Highland now seeks a protective order that would give it the benefit of Dugaboy's discovery responses while denying Dugaboy any reciprocal right to obtain documents or depose witnesses. The one-sided approach is inconsistent with the Agreed Order and with Highland's own conduct in negotiating that Order. Highland cannot have it both ways. It cannot accept Dugaboy's document production while simultaneously arguing that Dugaboy should receive nothing in return.

The March 4 Agreed Order, which Highland itself negotiated, expressly provided that "[a]ll discovery is subject to the Parties' reservation of the right" to object. Dkt. 4528, ¶ 3. This presupposes both parties would engage in discovery with the right to raise specific objections, not to block discovery entirely. If the parties intended to foreclose all discovery by Dugaboy, the Agreed Order drafted by Highland would have said so. The Court's April 10 Order confirms this framework remains in place, subject only to its resolution of Highland's Motion for Protective Order. Dkt. 4547.

The Agreed Order further provided that "each party is allowed to depose three witnesses." Dkt. 4528, ¶ 6. "Each party" means both parties. Highland seeks to rewrite that language so that only Highland may take depositions and receive productions. That is not what the parties agreed and the Court approved. The Agreed Order also provides that "[t]he Parties must . . . exchange exhibits, no later than seven (7) days before the hearing Date." Dkt. 4528 ¶ 9. "Parties" is plural. The Order contemplates a mutual exchange by both sides, not a one-way transfer from Dugaboy

to Highland. Highland's Motion would transform a reciprocal process into an asymmetric one in which Highland receives discovery, but Dugaboy receives nothing. The Court should not permit Highland to rewrite the agreed framework after the fact.

**2. Highland Strategically Delayed its Motion Until After Receiving Dugaboy's Document Production**

The timing of Highland's Motion reveals its true purpose. Highland did not move for a protective order when the Agreed Scheduling Order was entered on March 4, 2026. Nor did Highland move for a protective order when Dugaboy served its Requests for Production on Highland on March 24, 2026, or when it served its own Requests on Dugaboy on February 26, 2026. Ex. 14, S. Rose Email serving Dugaboy Requests for Production to J. Morris (March 23, 2026); Ex. 15, S. Rose Email to J. Morris with First Batch of Documents Responsive to Highland's Requests for Production (March 30, 2026). Instead, Highland waited until after Dugaboy began producing documents in response to Highland's discovery requests to file its Motion seeking to block all discovery in the opposite direction.

Dugaboy relied on the Agreed Scheduling Order and the framework contemplating mutual discovery. On March 30, 2026, Dugaboy responded to Highland's Requests for Production and began producing responsive documents on a rolling basis. In that same communication, Dugaboy disclosed that it intended to depose Mark Patrick for its eight-hour deposition, and James Seery and Paul Murphy for its two four-hour depositions, as the Agreed Order permitted. Ex. 6, M. Gaddis Email to J. Morris (March 30, 2026); Agreed Scheduling Order, Dkt. 4528. After Dugaboy had begun its production and identified its intended deponents, Highland filed its Motion seeking to shut down Dugaboy's discovery entirely.

The timing of Highland's Motion is troubling. Although Highland had expressed uncertainty about whether discovery was appropriate, it nonetheless negotiated the March 4

Agreed Scheduling Order, obtained Dugaboy's agreement to participate in rolling discovery, and received the benefit of Dugaboy's document production—all while intending to seek a protective order that would deny Dugaboy any reciprocal discovery. This Court should not countenance such gamesmanship.

Highland's objection to any discovery at all should be deemed waived. Highland moved for discovery first, by serving its own Requests for Production. Having chosen to invoke the discovery process, Highland cannot now argue that discovery is categorically improper.

### 3. Highland Failed to Confer in Good Faith as Required by the Rules

Highland did not engage in any effort to confer with its opponent and narrow any discovery disputes between the parties. Highland demands that Dugaboy receive no discovery whatsoever. Dkt. 4533 at 31. When one party's position is that the opposing party should receive no discovery at all, meaningful compromise is impossible. A discussion on discovery requires compromise when conducted in good faith. *Compass Bank v. Shamgochian*, 287 F.R.D. 397, 399 (S.D. Tex. 2012). Highland's repeated attempts to manufacture urgency through arbitrary response deadlines and threats to run to the Court were not conducive to good-faith compromise.[8] *See id.* at 399 ("Plaintiff's single letter unilaterally identifying flaws in [d]efendant's discovery requests and setting an arbitrary response deadline for [d]efendant would seem to be inadequate, as it does not equate to a good faith conferral or attempt to confer."). Highland's all-or-nothing position demonstrates that it never meaningfully attempted to confer with Dugaboy to resolve the dispute. *Id.* at 399 (explaining that Fed. R. Civ. P. 37(a)(1) "demands that the moving party . . . have in

[8] *See, e.g.*, Ex. 18, Morris to Gaddis April 8, 2026 at 6:14 p.m. ("We'll give you until noon tomorrow as a courtesy, but we'll reach out to the court if we don't hear from you."); Ex. 18, Morris to Gaddis April 9, 2026 at 1:51pm ("Mike, what is happening? Last call."); Ex. 19, Morris to Gaddis and Harper April 9, 2026 at 7:12pm ("This job is hard enough without this. I'll be contacting the court first thing in the morning. If you have anything to say before then, let me know.").

good faith conferred or attempted to confer with the opposing party regarding the discovery dispute"). And Highland's now more granular additional objections to certain aspects of discovery requests were surfaced only in the Motion, not even in any summary writing to Dugaboy, much less any effort to meaningfully confer.

**4. Dugaboy Has Been Prejudiced**

Dugaboy has been prejudiced by Highland's conduct. In reliance on the March 4, 2026, Agreed Order and its framework contemplating mutual discovery, Dugaboy responded to Highland's Requests for Production on March 30, 2026, producing 3,260 pages of responsive documents with additional productions to come on a rolling basis. Dugaboy also disclosed its intended deponents. Highland now has the benefit of Dugaboy's discovery responses, witness identifications, and document production. If the Court grants Highland's Motion, Highland will have secured one-way discovery while giving nothing in return. That is manifestly unfair.

**C. Dugaboy Is Entitled to Discovery For Its 60(b) Motion**

To obtain a protective order under Rule 26(c)(1), Highland must show "good cause" through "a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." *Cazorla v. Koch Foods of Miss., L.L.C.*, 838 F.3d 540, 549 (5th Cir. 2016). Highland must also "show specifically *how each discovery request is not relevant or otherwise objectionable*." *Samsung Elecs. Am. Inc. v. Chung*, 325 F.R.D. 578, 593 (N.D. Tex. 2017) (emphasis added). Highland has done neither. Rather than addressing specific requests, Highland seeks a blanket order blocking all discovery. But if Highland believes particular requests are objectionable, the proper course is to object and, if necessary, seek targeted relief but not to attempt a complete shutdown of Dugaboy's discovery.

Highland overstates the law when it implies that courts categorically do not permit discovery after judgment. *See* Mot. at 17–18. Post-judgment discovery into alleged fraud is

permitted upon "at least some showing of fraud." *Halliburton Energy Servs., Inc. v. NL Indus.*, 618 F. Supp. 2d 614, 654 (S.D. Tex. 2009). Highland concedes as much. Mot. at 19. The question, then, is whether Dugaboy has made that showing. It has.

Dugaboy has satisfied the required prima facie showing of fraud through the extensive exhibits filed with its Rule 60(b) Motion, including evidence of Patrick's restructuring the DAF entities, allegations by the JOLs in the Cayman proceedings, and the findings of the Texas Attorney General. 60(b) Motion at 27–29, 33–42, Dkt. 4513.[9] Thus, *Halliburton*, which Highland cites heavily, does not support Highland's position. In that case, unlike here, there was "no showing of fraud." 618 F. Supp. 2d at 655.

Because it cannot legitimately argue that the evidence does not meet the threshold showing of fraud, Highland selectively ignores the evidence and argues that the Court should not consider it. Highland also conflates the prima facie threshold with the ultimate merits. But at this stage, Dugaboy need only demonstrate enough to justify further inquiry, which it has amply done.

*First*, Highland argues that Dugaboy's evidence is not "newly discovered" because it was "readily available or discoverable within the 28-day period following the Court's 9019 Order." Mot. at 18. Highland goes further, claiming that Dugaboy "already knew all of the purportedly 'new' evidence" because "the Dondero Foundations were on the liquidation committee of DAF Holdco" and therefore "had full access to all of the information obtained by the JOLs." *Id*. at 18–19. This argument fails for multiple reasons. The 9019 Order that Dugaboy challenges was entered on June 25, 2025. And as Dugaboy explained in its Rule 60(b) motion, evidence came out after the 9019 hearing, notwithstanding diligent inquiry, because of Patrick's own obfuscation. 60(b)

[9] "In applying the 'colorable claim' or 'prima facie' standard, courts have considered the briefing on the merits and the evidence in the record to determine whether the claim has merit." *In re BNP Petroleum Corp.*, No. 09-20206, 2013 WL 5493125, at *4 (Bankr. S.D. Tex. Oct. 1, 2013).

Motion at 39, Dkt. 4513. Other evidence of the fraud arose after July 2025 and was not available until December 2025 because proceedings in the Cayman Islands investigating Patrick's and his associates' malfeasance were subject to a protective order until then. *Id.* at 28–29; *see also id.* at 39–40. Highland does not grapple with the evidence of Patrick's fraudulent acts that did not come out until July 2025. *See supra* Section II.A. Nor does Highland acknowledge that several pieces of evidence were not available *to Dugaboy* until December 2025. Despite arguing that Dugaboy knew all of the information before December 2025 because "the Dondero Foundations were on the liquidation committee of DAF Holdco," Highland cites *no authority* supporting that the Dondero Foundations' purported knowledge via membership on the liquidation committee can be imputed to Dugaboy, particularly in light of the Cayman protective order, nor does it cite any evidence showing Dugaboy had actual knowledge of this information.[10] *See* Mot. at 18–19.[11]

*Second*, Highland misrepresents the Cayman Court's ruling as a rejection of the fraud claims. Mot. at 15, 19. As demonstrated above, Highland's representations are false. *See supra* Section III.A.1. The Cayman Court found "a serious issue to be tried" and concluded the JOLs have "a real, as opposed to a fanciful, prospect of success at trial." Dkt. 4534-4 ¶¶ 253, 255. Highland's reliance on that ruling to argue Dugaboy lacks a prima facie showing of fraud is thus backwards. The Cayman Court's own findings support Dugaboy, not Highland.[12]

---

[10] Importantly, Dugaboy is not a member of the liquidation committee. The supporting organizations that hold the participation shares in DAF Holdco are. And the counsel of those organizations have stated that they were specifically instructed not to share any nonpublic information with Mr. Dondero or those associated with him and did not. Mr. Dondero and Dugaboy read the findings of the Liquidators when they were filed and got access to supporting declarations filed under seal in the Caymans weeks or months later.

[11] Highland's citations to *In re Ferro Corp. Deriv. Litig.*, 511 F.3d 611 (6th Cir. 2008), Mot. at 4–5, 18, are inapposite. In that case, the court affirmed dismissal of a complaint under Rule 12(b)(6) and the denial of a Rule 60(b)(6) motion because the plaintiff failed to proffer any 'exceptional or extraordinary' circumstances, which would justify relief under Rule 60(b)(6)." *Ferro,* 511 F.3d at 623–24.

[12] The Cayman Court has granted interim relief reinstating the asset preservation and disclosure requirements that were previously in place pending the determination of the appeal. *See* Summons,

*Third,* in arguing that there is no evidence that the challenged 9019 Order was procured by fraud, misrepresentation, or misconduct, Highland misses the point of Dugaboy's arguments. *See* Mot. at 20. As Dugaboy demonstrated in its Rule 60(b) motion, the evidence shows that "Patrick remained in his position only because of fraudulent efforts to cover up his misconduct and that, indeed, he was seeking the settlement to deter investigation into it," and therefore, the settlement was not entered into "without collusion or fraud [and] in good faith," as the predecessor judge had determined. 60(b) Motion at 34, Dkt. 4513. Highland's assertion that Patrick's transactions "have nothing to do with Highland, Dugaboy, the 9019 Settlement . . .or the manner in which Patrick exercised such authority and control in entering into the 9019 Settlement," ignores entirely the actual substance of Dugaboy's argument.[13]

**D. Dugaboy's Requests Are Relevant, Not Duplicative, and Otherwise Proper**

Highland throws a kitchen sink of objections at Dugaboy's Requests—relevance, overbreadth, duplication, privilege—but none warrant a blanket protective order. These are garden-variety discovery objections that Highland could have raised in the ordinary course by serving responses and objections to individual requests. Instead, Highland skipped that process entirely, never conferred with Dugaboy in good faith, and ran straight to the Court demanding that all discovery be shut down. And it seeks a one-sided discovery process, where Highland is the only one who gets to make an inquiry, obtain documents or ask a question. That is not how discovery disputes are resolved. As shown below, Dugaboy's Requests are relevant, not

*Charitable DAF HoldCo, Ltd. (In Official Liquidation) v. Mark Eric Patrick et al.*, CICS Civil Appeal No. 3 of 2026, Cause No. FSD 201 of 2025 (RPJ) (Cayman Is. Ct. App. Mar. 3, 2026).

[13] This discovery dispute should not be used to resolve the substantive question of whether the new evidence Dugaboy pleads meets the rehearing standard laid out in its 60(b) Motion. *Herr v. Elos Env't, LLC*, No. CV 25-387, 2025 WL 2644774, at *2 (E.D. La. Sept. 15, 2025) ("[T]he court does not determine the merits of the case in the context of a discovery dispute. Rather, the issue in context of a discovery dispute is whether the evidence sought falls within the scope of discovery (i.e., is relevant to any claim or defense), not whether one party's legal position prevails over another.").

duplicative, and otherwise proper. This Court should deny Highland's Motion.

**1. Dugaboy's Requests Are Relevant to the Issues in its 60(b) Motion**

Highland argues that Dugaboy's requests are irrelevant because they focus on the 9019 Settlement rather than the alleged DAF restructuring fraud. Mot. at 22. Not only does it inexplicably ignore the Requests that *do* go directly to the DAF restructuring fraud—such as RFPs 23, 27, and 28—this argument misunderstands the basis for the Rule 60(b) Motion. Dugaboy's contention is that the 9019 Settlement was procured through misrepresentation and concealment by Patrick (acting through HMIT) regarding the restructuring of the DAF Entities, which directly affected Patrick's authority, the propriety and fairness of the Settlement, and the value of the Settlement to the estate. Documents about the negotiation, execution, and background diligence of the 9019 Settlement go to whether the Order was "procured by fraud, misrepresentation, or misconduct"—the precise standard under Rule 60(b)(3).

Under Rule 26(b)(1), a party may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Relevance is broadly construed; "[r]elevant information encompasses 'any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'" *Merrill v. Waffle House, Inc.*, 227 F.R.D. 467, 470 (N.D. Tex. 2005) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, (1978)). Doubts about relevance should be resolved in favor of permitting discovery, and "[u]nless it is clear that the information sought can have no possible bearing on the claim or defense of a party, the request for discovery should be allowed." *Id*. Highland has not shown, and cannot show, that it is "clear" that Dugaboy's requested discovery has "no possible bearing" on its 60(b) Motion.

Looking at the Requests alongside the issues raised in Dugaboy's 60(b) Motion shows that Dugaboy's Requests are relevant. For instance, Dugaboy argues in its 60(b) Motion that the

Settlement was not negotiated "without collusion or fraud [and] in good faith," as the Bankruptcy Court previously found. 60(b) Motion at 34, Dkt. 4513. Discovery into the communications and negotiations between Highland and the HMIT Entities (Requests 1, 9, 13, 18, 24) is directly relevant to testing whether Highland knew or should have known of Patrick's misconduct at the time it negotiated the Settlement. Additionally, the 60(b) Motion's core allegations concern Patrick's secret restructuring of the DAF and HMIT ownership. *See* 60(b) Motion at 13–22, Dkt. 4513. Requests 4, 5, and 6 seek Highland's documents about changes in ownership or control of any HMIT Entity before the Settlement, which go to what Highland knew about these restructurings when it agreed to settle. Request 27 asks what Highland knew about the DAF restructuring, the sale of Beacon Mountain to CLO Holdco, changes in HMIT's beneficial ownership, and any governmental investigations of Patrick. This directly tracks the 60(b) motion's argument that "representatives of Highland repeatedly suggested at the hearing . . . that the DAF and Hunter Mountain structures were entirely separate," but that this was "untrue," as well as whether the Settlement was in fact not obtained through collusion. 60(b) Motion at 28, Dkt. 4513.

Dugaboy need not march through every Request. The examples above demonstrate that Dugaboy's discovery targets evidence central to its 60(b) Motion: whether the Settlement was procured by fraud, executed by a party lacking authority, and approved under false circumstances. If Highland believes particular Requests are not relevant, it can object in the ordinary course. It does not need a protective order.

In any event, this argument that certain requests to Highland do not directly inquire about the fraud, underscores the absolute, conceded proprietary of the discovery requests to Patrick and his associated entities. Importantly, some of Patrick's entities joined this motion, and Highland's relevance argument only reinforces that discovery against Patrick and his entities are wholly

appropriate.

### 2. Dugaboy's Requests Are Not Duplicative

Highland claims Dugaboy's Requests are duplicative of prior discovery. They are not. Highland's June 2025 production occurred before the fraud allegations surfaced. Dugaboy's current Requests target different subjects including what Highland knew about the DAF restructuring, Patrick's authority, and any concealment. The Requests also refer to different time periods, including documents created after the 9019 Order. This is new ground, not a rehash.

The two sets of discovery requests share a common core subject (the 9019 Settlement between Highland and HMIT) but they differ significantly in scope, specificity, and subject matter, with Dugaboy's new Requests touching on a variety of topics not addressed whatsoever in its previous requests. Dugaboy's prior requests were narrowly focused on the terms of the proposed Settlement Agreement, the negotiations leading to it, and the consideration exchanged. *See generally* Ex. 16, Dugaboy's Discovery Requests (served June 10, 2025). Dugaboy's new Requests inquire into areas not previously addressed, including, most prominently, Patrick's authority to bind the HMIT Entities, the ownership and restructuring of the DAF Entities, and the Cayman Islands Proceedings. *See generally* Ex. 5, Dugaboy's Discovery Requests (served Mar. 23, 2026).

While some thematic overlap exists, courts distinguish between discovery that is "unreasonably cumulative or duplicative" and requests that "overlap in order to capture all relevant documents or information." *Cadence Bank v. Bridgelink Eng'g LLC*, 2024 WL 6893273, at *5 (N.D. Tex. Dec. 16, 2024) (quoting *Eubank v. Lockhart Indep. Sch. Dist.*, 2016 WL 11214437, at *2 (W.D. Tex. Nov. 8, 2016)). Dugaboy's Requests fall into the latter category. They target new subjects, new time periods, and new legal theories. If Highland believes any particular Request is duplicative, it can object.

### 3. Dugaboy's Requests Are Not Overbroad

In a statement that is itself ironically far overbroad, Highland insists Dugaboy's Requests are improper because they are "vastly overbroad." Mot. at 26. But Highland cherry-picks two broad Requests (Nos. 19 and 24)—out of 55—while ignoring that the majority of Dugaboy's Requests are targeted and specific. Because Highland, as the party resisting discovery, must show "*specifically* how *each* interrogatory or document request is overly broad," the Court should evaluate only the two Requests for which Highland has raised any specific arguments about overbreadth. *See Heller v. City of Dallas*, 303 F.R.D. 466, 490 (N.D. Tex. 2014) (emphasis added).

For Request No. 24, one of the two Requests Highland specifically complains of, it explains only that the Request "again includes privileged communications with attorneys." Mot. at 27. Highland does not further explain why the Request is overbroad. A request is not overbroad simply because it may encompass privileged information. *See Carpenter v. Twin City Fire Ins. Co*., 2024 WL 947589, at *3 (N.D. Tex. Mar. 4, 2024) (holding that certain complained-of requests were not overbroad, but may include privileged documents that could simply be withheld as needed). Nor are requests overbroad simply because they use the terms "all" or "any" and the like. *See ATC Media, LLC v. Michaels Stores, Inc*., 2023 WL 5538996, at *3 (N.D. Tex. Aug. 28, 2023).

To the extent any individual Requests are overbroad, the proper remedy is to narrow them, not to enter a blanket protective order barring all discovery. Discovery rules must "be accorded a broad and liberal treatment to effect their purpose of adequately informing the litigants in civil trials." *Reyna v. Lloyds*, 2015 WL 12940021, at *2 (S.D. Tex. Jan. 8, 2015). Courts in the Fifth Circuit have recognized the "traditional wide latitude of discovery" and the "general tenet that discovery should be pursued and produced liberally." *See, e.g., Rabo Agrtfinance, Inc. v. Terra XXI Ltd*., 2007 WL 9717595, at *1 (N.D. Tex. Feb. 14, 2007); *Hy-Ko Prods. Co. LLC v. Hillman Grp., Inc*., 2022 WL 507486, at *2 (E.D. Tex. Feb. 18, 2022).

Courts have discretion to either narrow overbroad requests or issue a protective order. *See Sanders v. MoneyGram International, Inc.*, 2024 WL 5430194, at *2 (N.D. Tex. June 27, 2024); *Goodson v. Nasco Healthcare, Inc.*, 2025 WL 2322793, at *2 (N.D. Tex. Aug. 12, 2025). But a court must remain mindful that discovery should be "widely" and "liberally" permitted. Even if a court chooses to issue a protective order, that does not necessarily require, nor even typically entail, a full prohibition of discovery determined to be overbroad, although that is what Highland seeks here. In issuing a protective order, a court can "forbid certain disclosures, specify the terms for disclosure, forbid inquiry into certain matters, or limit the scope of disclosure to certain matters." *Goodson,* 2025 WL 2322793, at *2. Here, a blanket prohibition on discovery would be neither proportional nor consistent with the "broad and liberal treatment" courts are required to accord the discovery rules. Should the Court agree with Highland that Requests No. 19 and 24 are in fact overbroad, the Court should use its discretion to narrow those Requests only, rather than issue the full protective order sought by Highland.

**4. Dugaboy Has Properly Raised Its Crime-Fraud Exception and Subject-Matter Waiver Arguments**

To the extent that any documents sought by Dugaboy regarding Patrick's fraudulent acts would ordinarily be privileged as either attorney-client communications or attorney work product, such privilege has been waived. Dugaboy's crime-fraud exception and subject-matter waiver arguments are properly raised and supported by evidence of Patrick's misconduct or prior disclosures, which Highland's own exhibits corroborate.

*i. The Crime Fraud Exception*

The Fifth Circuit recognizes the crime-fraud exception to privilege, under which attorney-client communications are not privileged if "the client consults an attorney for advice that will assist the client in carrying out a contemplated illegal or fraudulent scheme." *Lewis v. Crochet*, 105

F.4th 272, 282 (5th Cir. 2024). The exception applies when (1) a crime or fraud was impending or continuing at the time of the communication, and (2) the communications or work product at issue were in furtherance of that criminal or fraudulent activity. *See In re E.E.O.C.*, 207 F. App'x 426, 434 (5th Cir. 2006).

Dugaboy has evidence to support that certain communications and work product sought were intended to further Patrick's fraudulent and criminal transfer of assets and corporate restructuring for his own gain and are therefore not privileged. Patrick has previously stated that the DAF Restructuring at issue in Dugaboy's 60(b) Motion was conducted with the assistance and advice of counsel. *See, e.g.*, Ex. 17, 2d Aff. of Mark Patrick. Patrick and Highland have likewise confirmed that counsel were involved in the 9019 Settlement, which Dugaboy alleges was part of the overarching scheme for Patrick to steal the DAF assets. *See, e.g.*, Mot. to Approve 9019 Settlement at ¶ 20, Dkt. 4216 (". . .[Highland and HMIT] and their counsel engaged in extensive arm's-length, good faith negotiations over the last several months."). Accordingly, to the extent any advice of counsel implicates this fraudulent scheme, including the role of the 9019 Settlement in the scheme, that advice is not privileged under the crime-fraud exception.

The crime-fraud exception has been recognized in cases with similar facts as those here. In *In re Grand Jury Subpoenas*, the Fifth Circuit affirmed the district court's decision that the crime-fraud exception applied to work product and communications in furtherance of a scheme where the attorneys retained "helped them to establish various offshore trusts, corporations, and accounts, purportedly designed to help them escape taxes on their compensation." 561 F.3d 408, 409 (5th Cir. 2009). The court explained that the so-called "foreign trust scheme" was fraudulent because "appellants transferred assets to foreign 'trusts,' taking advantage of the tax consequences of the transfers, but—in a crucial misstep—without surrendering control or enjoyment of the assets." *Id.*

The court added that the attorneys retained for the transaction were complicit in the fraudulent activity, as "their involvement and its necessity are undoubted, quite clearly demanded by the sophisticated, large-scale scheme, which required high legal maintenance." *Id.* The documents in *In re Grand Jury Subpoenas*, like those here, involved counsel complicit in hiding, consolidating, or otherwise fraudulently transferring assets.

Other similar cases involving alleged schemes to improperly hide or transfer assets have also resulted in rulings that the crime-fraud exception applied to what would otherwise be privileged attorney communications or work product. *See, e.g., In re Rigby*, 199 B.R. 358, 360 (E.D. Tex. 1995) (crime-fraud exception applied to attorney-client communications where counsel had assisted client in transferring assets to keep them out of the reach of the IRS, while simultaneously reaching a settlement with the IRS implicating those same assets); *Diamant v. Sheldon L. Pollack Corp.*, 216 B.R. 589, 592 (Bankr. S.D. Tex. 1995) (crime-fraud exception applied when a Debtor transferred "considerable assets" to multiple entities, beyond the reach of the Debtor's creditors, and the movant "at least raised the inference that the transfers may have been fraudulent," permitting the movant to discover documents that "tend to prove fraudulent intent" that would otherwise be protected by attorney-client privilege).

*ii. Subject Matter Waiver*

The subject matter waiver doctrine likewise applies to some of Dugaboy's Requests. Under Fed. R. Evid. 502(a), a party waives privilege when it discloses privileged information "in a federal proceeding or to a federal office or agency," and that waiver extends to other privileged information when "(1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together." While Rule 502(a) does not require "a showing of subjective intent to waive privilege," it does require that the disclosing party "knew or should have known" that the disclosed

communication or work product was privileged. *See In re Washington Prime Group, Inc.*, 2024 WL 4615552, at *8 (S.D. Tex. Oct. 29, 2024). Privileged documents on the same subject matters "ought in fairness to be considered together" when "a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner." *RLIS, Inc. v. Cerner Corp.*, 2014 WL 12599509, at *1 (S.D. Tex. Dec. 24, 2014). There is not a brightline rule for when a party can be said to have unfairly inserted selected privileged information into the litigation; the court simply examines the circumstances and evaluates whether further disclosure would "level the playing field" or instead give the requesting party "an unjustified advantage." *See Data Treasury Corp. v. Wells Fargo & Co.*, 2009 WL 10679940, at *3 (E.D. Tex. Nov. 13, 2009).

Patrick made multiple disclosures of privileged communications and work product in the Cayman Islands proceeding. For instance, Patrick revealed that his attorneys advised him on "the most advantageous tax and corporate structures, compliance implications, and outreach to potential recipients of the Company's Participating Shares," the "DFW Share Issuance," and that the "DAF Restructuring was in the best interest of the DAF Structure," and further shared information about legal memoranda such as the Shields Legal Group "Work Plan" involving "memorandums and opinions relating to potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc." Ex. 17, 2d Aff. of Mark Patrick at ¶19, ¶55, ¶149, and ¶49. These disclosures waive privilege not only as to the specific documents or communications disclosed, but also as to all other documents and communications on the issue of the DAF restructuring, which Dugaboy seeks in its Requests. *See Flashmark Tech. LLC v. GTECH Corp.,* 2007 WL 9724333, at *3–*4 (E.D. Tex. Aug. 1, 2007) (ordering plaintiff to produce all documents "relating to the same subject matter of the testing of accused products" because privilege had been waived as to that subject matter).

Patrick's disclosures were intentional under Fifth Circuit law. *See RLIS*, 2014 WL 12599509, at *1 ("While Rule 502(a) 'does not require a showing of subjective intent to waive privilege,' it does require 'that the disclosing party knew or should have known [the communication] was privileged.'") (internal citation omitted) (alteration in original). Patrick knew or should have known the communications and work product he discussed were privileged because they contained or reflected legal advice provided by counsel. In Request Nos. 3, 22, 23, 27, and 28, Dugaboy seeks other documents and communications on the same subject matter—the advice provided to Patrick by counsel about whether, why, and how to restructure the DAF. This waiver should apply to the other documents and communications on the same subject matter because it would be unfair to Dugaboy for Patrick to intentionally disclose communications and work product favoring his position on the issue of the DAF restructuring while withholding as privileged any potentially unfavorable documents on the same issue. This risks exactly the misleading and lopsided view of the advice provided that the waiver rule is designed to prohibit.

Despite Highland's unsupported assertions, Dugaboy has successfully shown that certain documents sought are not privileged based on either (or, in some instances, both) the crime-fraud exception or the subject matter waiver doctrine. Thus Highland's assertion that Dugaboy seeks privileged information fails and a protective order is not warranted on privilege grounds.

**5. *Dugaboy's discovery requests are for a proper purpose***

The record contradicts Highland's argument that Dugaboy served its requests for "improper purposes." As discussed in Section II.B. *supra*, Highland suggested during its negotiations with Dugaboy on the Agreed Scheduling Order that the parties would undergo discovery as part of the 60(b)-briefing process. Ex. 4, Email from J. Morris to M. Gaddis (Feb. 25, 2026). It is disingenuous for Highland to argue that Dugaboy served Requests for harassment or delay when Highland itself participated in the discovery conversations. Furthermore, Highland

itself has taken discovery for the 60(b) briefing—in response to which Dugaboy already produced documents—but Highland does not seem to consider its own discovery requests improperly served for delay and harassment. *See generally* Ex. 8, Highland's 60(b) Discovery Requests served Feb. 26, 2026. Dugaboy served discovery promptly after the scheduling framework was in place, and as discussed above, its Requests are relevant, not duplicative, not overbroad, and are otherwise proper. Highland has no basis to complain of improper purpose.

**E. Dugaboy's Third-Party Discovery is Proper.**

Highland's conclusory objections to Dugaboy's third-party subpoenas and deposition requests fall far short. Highland argues they are improper for "the same reasons" it asserts the Requests are improper. Mot. at 7, 29–30. That is not a "particular and specific demonstration of fact," but the kind of "stereotyped and conclusory statement" that fails to satisfy Highland's burden under Rule 26(c)(1). *Cazorla*, 838 F.3d at 549. As shown above, Highland's objections to Dugaboy's Requests lack merit. *See supra* Section III.D. The same is true of its objections to the subpoenas and depositions.

Highland's reliance on *McKinney/Pearl* is misplaced. That case concerns subpoenas for *depositions* of counsel, which are not at issue here. *See McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*, 2016 WL 3033544, at *5–*6 (N.D. Tex. May 26, 2016). Dugaboy served subpoenas duces tecum on Kelly Hart & Hallman *seeking documents*, not depositions. And as discussed above, the attorney-client privilege does not shield these documents due to the crime-fraud exception or subject-matter waiver. *See supra* Section III.D.1.

Highland's objections to Dugaboy's proposed depositions are equally meritless. Highland complains about the requested deposition times—eight hours for Patrick and four hours each for Seery and Murphy. Mot. at 29–30. But those are exactly what the parties agreed to in the Agreed Scheduling Order. Dkt. 4528. Highland cannot now complain about terms it negotiated. As for

Murphy's Cayman location, that is a logistical issue for Dugaboy rather than a burden on Highland. And Highland's argument that depositions are "unduly costly and time-consuming" rings hollow when Highland itself has requested to depose both James Dondero and Nancy Dondero. Ex. 18, Email from J. Morris to M. Gaddis (Apr. 9, 2026). Highland cannot have it both ways.

## IV. CONCLUSION

For the reasons above, Dugaboy respectfully requests that the Court deny Highland's Motion for a Protective Order.

Dated: April 17, 2026

Respectfully submitted,

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 17, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

# EXHIBIT 1

[redacted]

---

**From:** John A. Morris
**Sent:** Friday, February 13, 2026 5:56 PM
**To:** Gaddis, Mike <mgaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Geoffrey Harper <gharper@kslaw.com>
**Subject:** FW: 19-34054-sgj11 Order to set hearing

Mike,

I am out of the country (with Jeff Pomerantz) and will not return until February 22 and have a few significant matters to attend to after I return, including the opposition to a Fifth Circuit appeal by NexPoint on March 5 and a mediation in another matter on March 13.

Please let me know if Dugaboy will agree to extend from March 3 to April 3 Highland's time to respond to the Motion for Reconsideration.

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

PSZJ
Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** BKECF_LiveDB@txnb.uscourts.gov <BKECF_LiveDB@txnb.uscourts.gov>
**Sent:** Friday, February 13, 2026 5:13 PM
**To:** Courtmail@txnb.uscourts.gov
**Subject:** 19-34054-sgj11 Order to set hearing

*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer.**

**PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30-page limit do not apply.**

**U.S. Bankruptcy Court**

**Northern District of Texas**

Notice of Electronic Filing

The following transaction was received from mdo entered on 2/13/2026 at 10:13 AM CST and filed on 2/13/2026

**Case Name:** Highland Capital Management, L.P.
**Case Number:** 19-34054-sgj11
**Document Number:** 4515

**Docket Text:**
Order setting hearing on Motion to reconsider (RE: related document(s)[4513] Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for [4513], Entered on 2/13/2026 (Okafor, M.)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**DAL--Highland_Capital_-_Order_setting_hearing_on_motion_to_reconsider.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1017686615 [Date=2/13/2026] [FileNumber=52914135-0] [48e9e71b4640aac607d308b2e0e8ef164caf553ec868bdabc971dc0a26304f91c7 76c59fc2a76cd379f45cdbe2542a2d49621727a801b0409f3e6629d19debf3]]

**19-34054-sgj11 Notice will be electronically mailed to:**

David G. Adams on behalf of Creditor United States (IRS)
david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;david.adams4@usdoj.gov;brooke.lewis@usdoj.gov;CaseView.ECF@usdoj.gov

Joseph Y. Ahmad on behalf of Creditor Acis Capital Management GP, LLC
wsmalley@azalaw.com, sbates@azalaw.com;ahernandez@azalaw.com

Michael P. Aigen on behalf of Creditor Hunter Mountain Investment Trust
michael.aigen@stinson.com

Michael P. Aigen on behalf of Creditor The Dugaboy Investment Trust
michael.aigen@stinson.com

Michael P. Aigen on behalf of Defendant HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC)
michael.aigen@stinson.com

# EXHIBIT 2

[redacted]

**From:** Gaddis, Mike <MGaddis@winston.com>
**Sent:** Wednesday, February 18, 2026 9:47 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Geoffrey Harper <gharper@kslaw.com>; Louis M. Phillips <louis.phillips@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>; Gaddis, Mike <MGaddis@winston.com>
**Subject:** RE: 19-34054-sgj11 Order to set hearing

John,

Here is a proposed schedule. This is not set in stone and we're happy to discuss if you have other dates in mind.

- Highland's response will be due April 3.
- Dugaboy's reply will be due April 17 (two weeks after your response and at least one week before the hearing).
- Both parties to file witness/exhibit lists and exchange exhibits one week before the hearing.
- Hearing date: Any mutually convenient and court-available date starting from April 24 (i.e., at least one week after our reply). Geoff has good availability from April 24 through May 8.

Yours,

WINSTON & STRAWN LLP

MICHAEL GADDIS
OF COUNSEL

T +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

[redacted]

# EXHIBIT 3

[redacted]

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Friday, February 20, 2026 2:14 AM
**To:** Gaddis, Mike <MGaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Geoffrey Harper <gharper@kslaw.com>; Louis M. Phillips <louis.phillips@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>
**Subject:** FW: 19-34054-sgj11 Order to set hearing

Mike,

I have some questions.

1. I understand the Judge set a deadline for the filing of W&E lists, but does Dugaboy intend to call any witnesses in support of its motion? Highland reserves the right to object to the presentation of more testimony on a Motion for Reconsideration, but please identify all such witnesses, if any, so Highland has a reasonable opportunity to depose them.

2. Dugaboy's reply should be filed after depositions (if any) are completed. So, while the two-week period may be fine, it depends on whether and how many witnesses Dugaboy intends to call and whether third parties file joinders or otherwise seek to participate in the adjudication of the Motion.

Please respond at your earliest convenience.

John
**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

# EXHIBIT 4

**From:** John A. Morris
**To:** Gaddis, Mike
**Cc:** jpomerantz; jkroop; hwinograd; Mark T. Stancil (mstancil@willkie.com); "Louis M. Phillips"; Geoffrey Harper
**Subject:** FW: 19-34054-sgj11 Order to set hearing
**Date:** Wednesday, February 25, 2026 3:33:43 PM
**Attachments:** image001.png
image003.jpg

---

Mike,

Please consider the following:

April 3 Highland Objection

Exchange witness designations (if any)

4/5-10 Depositions (up to two per side)

April 24 Dugaboy Reply

4/27 to 5/8 One day hearing TBD by Court's availability w/ W&E lists filed a week before the hearing date

Please let us know if that works.

Thanks,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

Los Angeles | New York | Wilmington, DE | Houston | San Francisco

[redacted]

# EXHIBIT 5

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO HIGHLAND CAPITAL MANAGEMENT, LP**

**To:** Highland Capital Management, LP, by and through its counsel of record, Jeffrey N. Pomerantz, jpoerantz@pszjlaw.com, John A. Morris, jmorris@pszjlaw.com, Gregory V. Demo, gdemo@pszjlaw.com, Hayley R. Winograd, hwinograd@pszjlaw.com, **Pachulski Stang Ziehl & Jones LLP**, 10100 Santa Monica Blvd, 13th Floor, Los Angeles, CA 90067 and Melissa S. Hayward, mhayward@haywardfirm.com, Zachary Z. Annable, zannable@haywardfirm.com, **Hayward PLLC**, 10501 N. Central Expressway, Suite 106, Dallas, TX 75231

Interested Party The Dugaboy Investment Trust ("Dugaboy") serves this First Set of Requests for Production of Documents to Highland Capital Management, LP ("Highland"), pursuant to Rule 34 of the Federal Rules of Civil Procedure, which is incorporated into bankruptcy proceedings by Federal Rules of Bankruptcy Procedure 7034 and 9014(c)(1). Highland must respond to these Requests for Production within thirty (30) days of service. We ask that You produce documents at the offices of King & Spalding, 2601 Olive Street, Suite 2300, Dallas, TX 75201, or by electronic production in a mutually agreed format.

**INSTRUCTIONS**

1. In responding to these Requests, You must furnish all information that is available to You, that is within Your possession, custody, or control, or that is subject to Your reasonable inquiry,

including information in the possession of Your attorneys, accountants, advisors, representatives, agents, or other persons directly or indirectly employed by, or connected with, You or Your attorneys, and anyone else otherwise subject to Your control. All Documents that respond, in whole or in part, to any portion of the Requests below shall be produced in their entirety, including all attachments and enclosures.

2. The relevant time period for documents responsive to these Requests, unless otherwise specified in an individual Request, is the period beginning on the earlier of October 1, 2024, or such date as identified in response to Request No. 1,[1] through the present.

3. To the extent that the below Requests include requests for paper records, such paper records shall be scanned or otherwise converted into electronic form from paper documents in the following format:

(a) All documents shall be scanned to single page Group 4, TIFF format, at least 300 dpi and 8½ x 11 inch page size, except for documents requiring higher resolution or different page size.

(b) In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). The Parties will make their best efforts to have their vendors unitize documents correctly and will commit to address situations where there are improperly unitized documents. For documents found in folders or other containers with labels, tabs, or other identifying information, such labels and tabs shall be scanned where practicable. Pages with Post-it notes shall be scanned both with and

[1] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

without the Post-it, with the image of the page with the Post-it preceding the image of the page without the Post-it.

(c) Productions of the images shall be made using an image load file (.OPT or .LFP) and a delimited database/metadata load file (.DAT). Each image file should have a unique file name which shall be the Bates number of the page.

(d) The following objective coding fields should be provided, if applicable:

(1) beginning Bates number;

(2) ending Bates number;

(3) beginning attachment Bates number;

(4) ending attachment Bates number;

(5) page count; and

(6) source location/custodian.

(e) Document level OCR should be provided as a separate text file. The file name of each text file should correspond to the file name of the first image file of the document with which it is associated. The text files will not contain the redacted portions of the documents. OCR software should be set to the highest quality setting during processing. For documents in foreign languages, the OCR shall be performed using an OCR tool and settings suitable for the particular byte or multi-byte languages.

4. To the extent that the below Requests include requests for electronically stored information ("ESI"), all ESI shall be produced in TIFF format according to the following specifications:

(a) All TIFF formatted documents will be single page, Group 4 TIFF at 300 x 300 dpi resolution and 8½ x 11 inch page size, except for documents requiring different resolution or page size.

(b) An image load file, in standard Opticon format, showing the Bates number of each page and the appropriate unitization of the documents, will accompany all document images.

(c) Each imaged version of an electronic document will be created directly from the original electronic document.

(d) TIFFs shall be produced as black and white, single-page TIFF images in accordance with the technical specifications set out above. Word documents that have tracked changes or comments shall be produced in color. In addition, upon written request that identifies a reasonable number of individual documents at issue by Bates number, a party shall produce color images for those documents. Documents produced in color shall be produced as single page, 300 DPI, color JPG images with the quality setting of 75% or higher.

(e) All TIFF files are to be provided with an accompanying searchable text (.TXT) file extracted from the native, electronic file (not generated as an OCR file from the TIFF image(s)), and such text files shall contain the full text extraction. To the extent reasonably feasible, extracted text shall provide all comments, tracked changes, speaker's notes, and text from hidden worksheets, slides, columns, and rows. In the case of files with redacted text, OCR'ed text of the redacted documents may be provided in lieu of extracted text. OCR software should be set to the highest quality setting during processing.

5. To the extent reasonably feasible, all Documents produced shall be produced with metadata and attachments intact. The term "metadata" means all information describing the history, tracking, or management of an electronic document including, but not limited to, the date(s) the document was created, modified, accessed, or distributed; the author(s) and all recipient(s) of the document; the file's name; the file's location (e.g., directory structure or pathname); the file format or file type; and the file size. For comparison purposes and to ensure authenticity, where documents are produced in native format, such documents shall also be produced in the ESI format described in Instruction No. 3, unless otherwise agreed by the parties.

6. Should You object to any Request, You must specifically and in detail state the grounds and reasons for the objection, and state in detail the part of the language of the Request to which You object, and state which part of the Request, if any, You are answering.

7. Under the Crime-Fraud Exception and Subject-Matter Waiver, items which would typically be privileged are not privileged in this matter. The Fifth Circuit recognizes the Crime-Fraud Exception to privilege, under which attorney-client communications and/or work product materials are not privileged if "the client consults an attorney for advice that will assist the client in carrying out a contemplated illegal or fraudulent scheme." *Lewis v. Crochet*, 105 F.4th 272, 282 (5th Cir. 2024) (quoting *In re Int'l Sys. & Controls Corp. Sec. Litig.*, 693 F.2d 1235, 1242 (5th Cir. 1982)). The exception applies where (1) a crime or fraud was impending or continuing at the time of the communication, and (2) the communications or work product at issue were in furtherance of that criminal or fraudulent activity. *See In re E.E.O.C.*, 207 F. App'x 426, 434 (5th Cir. 2006). Dugaboy reasonably believes, and has evidence to support, that certain communications and work product it seeks were intended to further continuing or future criminal or fraudulent activity and are therefore not privileged.

Likewise, Subject-Matter Waiver under Federal Rule of Evidence 502(a) provides that disclosure of certain information in a federal proceeding waives privilege for related information when (1) the waiver was intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) the disclosed and undisclosed communications and work product "ought in fairness to be considered together." Fed. R. Evid. 502(a); *see also Crider Inc. v. Silgan Containers LLC*, 2023 WL 479094, at *22 (N.D. Tex. Jan. 13, 2023). Any communications or work product that would otherwise be privileged, but concern the same subject matter intentionally disclosed by Mark Patrick in his affidavits or testimony in this Proceeding or Related Proceedings fall under this exception, and privilege has been waived.

Accordingly, under these exceptions and waivers, You must produce documents that would typically be privileged as they relate to (1) any fraudulent activity that counsel was involved in or knew of, or (2) any privileged conversation or information that has already been disclosed elsewhere in this litigation.

If You still contend that any Documents sought by the Requests are privileged or otherwise protected from discovery, You must nevertheless identify for each Document withheld:

(a) the legal basis for withholding the Document;

(b) the person asserting any claim of privilege and/or protection;

(c) a description and identification of the requested Document sufficient to frame an appropriate demand for the Document and a motion to compel disclosure thereof, setting forth at least the following:

(i) the author and/or signatory of the Document withheld;

(ii) the date of the Document withheld;

(iii) all addressees and/or recipients of the Document withheld; and

(iv) the subject matter and circumstances under which the Document withheld was created in sufficient detail to ascertain applicability of such privilege or other legal basis.

8. Notwithstanding a claim that a portion of a Document is privileged or otherwise protected from disclosure, any such Document must be produced with the portion claimed to be protected excised.

9. If You contend that any Request is ambiguous or unclear, contact undersigned counsel as soon as possible so that the Request can be clarified to avoid unnecessary delays in discovery.

10. These Requests are continuing in nature. Any Documents located, created, or obtained subsequent to the Documents provided in response to these Requests and that should have been produced had they been known shall be promptly supplied by supplemental responses whenever You find, locate, or acquire such Documents. You are required to supplement and correct Your answers and responses on a timely basis.

**DEFINITIONS**

As used herein, the terms listed below shall be defined as follows. Insofar as a term is not explicitly defined, the meaning to be used is the commonly accepted definition of the term. Notwithstanding any definition set forth below, each word, term, or phrase used in these Requests is intended to have the broadest meaning permitted under applicable rules. The following terms are to be given their ascribed definitions:

**A. Proceedings**

1. The term "this Proceeding" or "this Litigation" or "Main Case" refers to the main bankruptcy proceeding *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

2. The term "Related Proceedings" includes all other legal proceedings or actions involving or related to Highland, HMIT, and persons, parties, or entities involved with or affected by the Settlement, specifically including but not limited to the Cayman Islands Proceedings, the Chapter 15 proceeding in the United States Bankruptcy Court for the District of Delaware, and the Texas Business Court proceeding, as well as any bankruptcy adversary proceedings before the United States Bankruptcy Court for the Northern District of Texas that are separate from the Main Case.

**B. Parties and Individuals**

1. The term "You" or "Your" refers to Highland Capital Management, LP, as well as its agents, attorneys, accountants, advisors, representatives, or any other individual(s) or entity(ies) acting or authorized to act on behalf of it, and any related companies, divisions, or subsidiaries, past or present, including, without limitation, the directors, officers, employees, agents, or attorneys thereof, as well as any predecessors-in-interest or successors-in-interest.

2. The term "Patrick" refers to Mark Eric Patrick.

3. The term "Dondero" refers to James Dondero.

4. The term "Okada" refers to Mark Okada.

5. The term "Seery" or "Claimant Trustee" refers to James P. Seery, Jr.

6. The term "Kirschner" or "Litigation Trustee" refers to Marc S. Kirschner.

7. The term "Murphy" refers to Paul Murphy.

8. The term "Scott" refers to Grant Scott.

9. The term "Cronin" refers to Kevin Cronin.

10. The term "Honis" refers to John Honis.

11. The term "Raver" refers to Shawn Raver.

**C. Highland Entities and Related Trusts**

12. The term "Highland" or "Highland Capital Management" refers to Highland Capital Management, L.P., a Dallas-based, Delaware-domiciled investment advisor, and the Debtor in the matter *In re Highland Capital Management*, Case No. 19-34054, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

13. The term "Highland Entities" or "Highland Entity" refers collectively to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, and the Highland Indemnity Trust, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

14. The term "Highland Claimant Trust" refers to the entity created under the Plan to hold, monetize, and distribute the assets of Highland's estate.

15. The term "Highland Litigation Sub-Trust" or "Litigation Sub-Trust" refers to the trust created under the Plan for the purpose of pursuing litigation claims on behalf of the Highland estate.

16. The term "Highland Indemnity Trust" or "Indemnity Trust" refers to the trust created under the Plan to hold assets for the purpose of indemnification obligations arising out of the Highland estate.

17. The term "Highland Party" or "Highland Parties" refers to Highland Capital Management, L.P., the Highland Claimant Trust, the Highland Litigation Sub-Trust, the Highland Indemnity Trust, and each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, and subsidiaries, and any persons or entities acting or authorized to act on their behalf.

**D. HMIT Entities and Related Parties**

1. The term "HMIT Entities" refers collectively to Hunter Mountain Investment Trust and Beacon Mountain, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "HMIT Parties" refers broadly to the HMIT Entities, Mark Patrick, and any related decision maker with respect to the HMIT Entities, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

3. The term "Hunter Mountain" or "HMIT" refers to Hunter Mountain Investment Trust.

4. The term "Beacon Mountain" refers to Beacon Mountain, LLC.

5. The term "Beacon Hunter" refers to Beacon Hunter, LLC.

**E. Rand Entities**

1. The term "Rand Parties" or "Rand Entities" refers collectively to Rand PE Fund I, LP, Rand Advisors, LLC, and Rand PE Fund Management, LLC, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

2. The term "Rand Fund" or "Rand PE Fund" refers to Rand PE Fund I, LP.

3. The term "Rand Advisors" refers to Rand Advisors, LLC, an SEC-registered investment advisor that served as the investment adviser to Rand PE Fund I, LP.

4. The term "Rand PE Fund Management" refers to Rand PE Fund Management, LLC.

**F. DAF Entities and Related Structures**

1. The term "DAF" or "Charitable DAF Holdco" refers to Charitable DAF Holdco, Ltd.

2. The term "DAF Fund" or "Charitable DAF Fund" refers to Charitable DAF Fund, LP.

3. The term "DAF GP" or "Charitable DAF GP" refers to Charitable DAF GP, LLC.

4. The term "DAF Structure" refers to the overall donor-advised fund investment vehicle and its constituent entities, including Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, and any entity holding ownership or management interests therein or formed in connection therewith, including any entities created as part of the restructuring of the DAF.

5. The term "DAF Entities" refers collectively to Charitable DAF Holdco, Ltd., Charitable DAF Fund, LP, Charitable DAF GP, LLC, CDH GP, Ltd., CDMCFAD, LLC, DFW Charitable Foundation, CLO Holdco, LLC, and any other entity formed, restructured, or otherwise created in connection with or derived from the DAF Structure, together with each of their respective officers, directors, managers, general partners, agents, attorneys, affiliates, parents, subsidiaries, and any persons or entities acting or authorized to act on their behalf.

6. The terms "New GP" or "CDH GP" refer to CDH GP, Ltd.

7. The term "CDMCFAD" or "DAF 2.0" refers to CDMCFAD, LLC.

8. The term "DFW Charitable Foundation" or "DFW Foundation" refers to DFW Charitable Foundation.

9. The term "CLO Holdco" refers to CLO Holdco, LLC.

**G. Charitable and Donor Entities**

1. The terms "The Dallas Foundation" or "Dallas Foundation" refer to The Dallas Foundation.

2. The term "Crown Global" refers to Crown Global Life Insurance, Ltd.

3. The terms "Empower" or "Empower Dallas" refer to Empower Dallas.

4. The term "Okada Foundation" refers to the Okada Foundation.

5. The term "Charitable Beneficiaries" or "Charities" refers collectively to The Dallas Foundation, Crown Global Life Insurance, Ltd., Empower Dallas, the Okada Foundation, and any other charitable organization or foundation that held beneficial ownership in the DAF Structure through participation shares or annuity policies.

6. The term "Highland Dallas Foundation" refers to Highland Dallas Foundation, Inc.

7. The term "Highland Santa Barbara Foundation" refers to Highland Santa Barbara Foundation, Inc.

8. The term "Highland Kansas City Foundation" refers to Highland Kansas City Foundation, Inc.

9. The term "Participation Shares" refers to the shares in Charitable DAF Holdco, Ltd. held by the Charitable Foundations through which the Foundations held beneficial ownership in the DAF Structure.

**H. Other Entities**

1. The term "Dugaboy" refers to The Dugaboy Investment Trust.

2. The term "Strand" or "Strand Advisors" refers to Strand Advisors, Inc.

3. The terms "Atlas Fund" or "Atlas IDF" refers to Atlas IDF, LP.

4. The terms "Skyview" or "Skyview Group" refers to The Skyview Group.

5. The term "Fortaris" or "Fortaris Capital Advisors" refers to Fortaris Capital Advisors.

6. The term "ValueScope" refers to ValueScope, LLC.

7. The term "Celia Holdco" refers to Celia Holdco LLC.

8. The terms "Creative Hearts" or "Creative Hearts TX" refer to Creative Hearts TX.

**I. Law Firms**

1. The term "Kelly Hart" refers to Kelly Hart & Hallman LLP, or any predecessor or successor firm or any associated attorney.

2. The term "Shields Law Group" refers to Shields Law Group, P.C., or any predecessor or successor firm or any associated attorney.

**J. Litigation, Settlement, and Bankruptcy Terms**

1. The term "Highland Bankruptcy" refers to the Chapter 11 bankruptcy case titled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj, pending in the United States Bankruptcy Court for the Northern District of Texas.

2. The term "Settlement Agreement" refers to each and every discussion or negotiation of settlement or iteration of the settlement agreement between the Highland Entities and the HMIT Entities, together with all exhibits, schedules, appendices, and ancillary documents, and including any preliminary drafts, associated documents, and communications related thereto.

3. The term "Settlement Agreement & General Release" or "9019 Settlement" refers to the Settlement Agreement & General Release dated May 19, 2025, by and among the Highland Entities and the HMIT Entities, as approved by the Court, together with all exhibits, schedules, appendices, and ancillary documents.

4. The term "9019 Motion" refers to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith, filed on May 19, 2025 (Bankr. Dkt. 4217).

5. The term "Rule 9019 Settlement Order" refers to the Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith, entered on June 30, 2025 (Bankr. Dkt. 4297).

6. The term "Kirschner Litigation" or "Kirschner Claims" or "Transferred Claims" refers to the 36-count adversary complaint filed by Marc A. Kirschner, as Litigation Trustee, styled Kirschner v. Dondero, Adv. Proc. No. 21-03076-sgj (Bankr. N.D. Tex. Oct. 15, 2021), together with any amended, supplemental, or related pleadings, and the claims asserted therein.

7. The term "Plan" refers to Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization (as Modified), confirmed on February 22, 2021.

8. The term "Confirmation Order" refers to the Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.

9. The term "Class 10" refers to the class of claims under the Plan designated as "Class 10 Claims" and consisting of the claim held by Hunter Mountain Investment Trust as a holder of pre-bankruptcy Class B and C limited partnership interests in Highland.

10. The term "Class 11" refers to the class of claims under the Plan designated as "Class 11 Claims" and consisting of the claim held by other equity holders holding pre-bankruptcy Class A limited partnership interests in Highland.

11. The term "Class 10 Interest" or "HMIT Class 10 Interest" refers to Hunter Mountain Investment Trust's allowed Class 10 claim in the amount of $336,940,230.58 as set forth in the Settlement Agreement and associated Order.

12. The term "Contingent Claimant Trust Interests" refers to the interests given to the former equity holders under the Plan in the Highland Claimant Trust, which were to vest only upon certification by the Claimant Trustee that all unsecured creditors had been paid in full with interest.

13. The term "Work Plan" refers to the plan or plans prepared by or at the direction of The Shields Law Group or any other counsel for Patrick relating to restructuring the DAF Entities.

14. The term "Withdrawal Stipulation" refers to the Stipulation Withdrawing Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd. to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith (Bankr. Dkt. 4291).

15. The term "Dugaboy Note" refers to the promissory note dated May 31, 2017, in the original amount of $24,268,621.69, from The Dugaboy Investment Trust, as Maker, and Highland Capital Management, L.P. and The Get Good Non-Exempt Trust, collectively as Payee.

16. The term "Texas Business Court Proceeding" or "Business Court Proceeding" refers to Case No. 25-BC01B-0027 filed in the Texas Business Court, First Division on July 1, 2025, and captioned *The Highland Dallas Foundation, Inc. ,The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. vs. DFW Charitable Foundation, CDMCFAD, LLC, Charitable DAF GP, LLC,CDH GP, Ltd., and Mark Patrick.*

**K. Cayman Islands Proceedings**

1. The terms "Cayman Islands Proceeding(s)" or "Cayman Proceeding" refer collectively to all judicial proceedings in the Cayman Islands relating to Charitable DAF Holdco, Ltd. or any DAF Entity, including (a) the voluntary liquidation filed by Patrick on April 2, 2025; (b) the winding up petition filed by the charitable owners on April 23, 2025 (No. FSD 99 of 2025 (JAJ)); (c) the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators on July

15, 2025 (No. FSD 201 of 2025); and (d) all related proceedings, investigations, hearings, orders, and filings.

2. The term "Joint Official Liquidators" or "JOLs" refers to the court-appointed liquidators designated by the Cayman Islands court on or about May 6, 2025 to oversee the DAF's operations.

3. The term "Statement of Claim" refers to the Writ of Summons and Statement of Claim filed by the Joint Official Liquidators in the Cayman Islands Proceeding on July 15, 2025.

4. The term "Chapter 15 Petition" refers to the petition filed by the Joint Official Liquidators in the United States Bankruptcy Court for the District of Delaware on July 21, 2025.

5. The term "Patrick-Cronin Proposal" refers to the proposal made by Mark Patrick to Kevin Cronin, a principal of Fortaris Capital Advisors, to make and split monthly payments to the DAF, as referenced in Paragraph 173 of the Third Affidavit of Mark Patrick.

**L. General Discovery Terms**

1. The term "Document" or "Documents" is used in its broadest possible sense and refers, without limitation, to anything upon which any expression, communication, or representation has been recorded by any means. The term includes, but is not limited to: correspondence, emails, text messages, instant messages, messages/posts on social media, handwritten notes, photographs, working papers, any drafts of documents (preliminary, intermediate, and/or final), memoranda, contracts/agreements, tapes, business records, financial records, charts, notes, records of any sort of meetings, reports of telephone or other oral conversations, calendars (whether hardcopy or electronic, including desk calendars, phone calendars, or other calendars using software or an application), appointment books, audio or video tape recordings, information on computer disc/card/drive, computer entries that can be retrieved electronically, databases, and all other writings and recordings of every kind that are in Your actual or constructive possession, custody,

or control. The term includes, but is not limited to, drafts and copies of any documents, whether identical to the original or different from the original because of notes, comments, highlighting, edits, any other alterations made on such copies, indications that said copies were sent to different individuals than were the originals, or any other reason.

2. The term "Communication" or "Communications" means any transmission of information in any context or situation by or between two or more Persons by any means or medium whatsoever, whether in the form of an original, a draft, or a copy, whether stored in hard copy, electronically, or digitally, or on tape, either orally or in writing, including, but not limited to, conversations, correspondence, emails, text messages, instant messages, social media communications, telexes, facsimile transmissions, telecopies, recordings in any medium of oral, written, or typed communication, telephone or message logs, notes or memoranda relating to written or oral communications, and any translation thereof.

3. The terms "Person" or "Entity" and their plural forms mean natural persons, proprietorships, partnerships, firms, trusts, estates, companies, corporations, public corporations, sole practitioners, municipal corporations, federal, state, and local governments, all departments and agencies thereof, any other governmental agencies, subdivisions, groups, associations, or organizations, or any other entity, whether foreign or domestic.

4. The term "thing" means any tangible item, including without limitation, models, prototypes, and samples of any device or apparatus or product.

5. The terms "concerning," "regarding," "referring to," "related to," or "relating to" shall be construed in the broadest possible sense, and shall mean without limitation and whether in whole or in part: referring to, constituting, bearing upon, commenting upon, reflecting, evidencing, pertaining to, describing, depicting, consisting of, containing, comprising, embodying, identifying,

stating, discussing, analyzing, studying, summarizing, dealing with, relating to, or having any logical or factual connection whatsoever with the subject addressed.

6. The terms "state" or "describe" mean to fully elucidate by reference to underlying facts rather than by reference to ultimate facts or conclusions of fact or law; where applicable, to particularize as to time, place, and manner; and to set forth all relevant facts necessary to complete the understanding of the act, process, event, or thing in question.

7. The term "Relevant Period" refers to the period beginning on the earlier of January 1, 2025, or such date as identified in Response to Request No. 1,[2] through the present.

8. The present tense includes the past and future tenses.

9. The singular includes the plural, and the plural includes the singular.

10. Words in the masculine, feminine, and neutral form shall include each of the other genders.

11. Whenever used herein, "and" may be understood to mean "or" and vice versa whenever such construction results in a broader request for information.

12. "All" means "any and all" and "any" means "any and all."

13. "Including" means "including but not limited to."

14. The term "identify" means and requires You to:

(a) With reference to an individual, state his or her full name and last known residential address, business address, telephone and/or facsimile number, the name and address of his or her employer, the individual's job title or job responsibilities, and his or her relationship to You;

[2] *I.e.*, "the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement."

(b) With reference to a company or organization, state the entity's full legal name, business addresses, telephone number, and a person with whom You had direct contact within that entity;

(c) With reference to a document, describe the document, state the date when the document was created, name the creator of the document, and name each person to whom the document was sent;

(d) With reference to an oral communication, provide the date(s) of the communication, the names and addresses of all parties, when the communication occurred, the place(s) where the communication took place, the subject matter of the communication, and the general substance of the communication; and

(e) With reference to an occurrence or event, provide the date and location of the occurrence or event, the identity of each person involved in the occurrence or event, the subject matter discussed, and the identity of any document that records, refers to, or relates to such occurrence or event.

## DOCUMENT REQUESTS

**REQUEST NO. 1:** All Documents and Communications between or among Highland Capital Management, L.P. (or its representatives, including James P. Seery, Jr. or the Claimant Trustee) and any of the HMIT Entities concerning the 9019 Settlement, including but not limited to draft agreements, term sheets, and settlement proposals, and including Documents sufficient to show the first date on which any HMIT Entity communicated with any Highland Entity regarding Settlement.

**RESPONSE:**

**REQUEST NO. 2:** All Documents and Communications sufficient to show that the Settlement Agreement & General Release, by and among the Highland Entities and the HMIT Entities, was executed by persons with full power and authority to bind each HMIT Entity party thereto, including any board resolutions, corporate authorizations, consents, or approvals obtained prior to execution.

**RESPONSE:**

**REQUEST NO. 3**: All Documents relating to due diligence performed by Highland Capital Management, L.P. (or its representatives) concerning (a) the authority of Mark Patrick or any other person to bind the HMIT Entities to the 9019 Settlement; (b) the ownership structure of the HMIT Entities; or (c) any corporate restructuring of the HMIT Entities or the DAF Entities.

**RESPONSE:**

**REQUEST NO. 4**: All Documents and Communications exchanged between any Highland Party and any HMIT Entity prior to execution of the Settlement Agreement relating to or evidencing legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any changes thereto.

**RESPONSE:**

**REQUEST NO. 5:** All Documents and Communications exchanged between any Highland Party and any Rand Party prior to execution of the Settlement Agreement relating to or evidencing legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any changes thereto.

**RESPONSE:**

**REQUEST NO. 6:** All Documents and Communications exchanged between any Highland Party and any person or party prior to execution of the Settlement Agreement relating to or evidencing any change in legal ownership, economic beneficial ownership, or legal control of any HMIT Entity, including any transaction related thereto.

**RESPONSE:**

**REQUEST NO. 7:** All Documents and Communications exchanged between any Highland Party and any person or party prior to execution of the Settlement Agreement relating to CLO Holdco, LLC, including, but not limited to, its formation, purpose, officers, members, managers, and participation or role in any transaction.

**RESPONSE:**

**REQUEST NO. 8:** All Documents and Communications relating to, referencing, or reflecting due diligence performed by any HMIT Entity prior to the execution of the Settlement Agreement and

General Release dated May 19, 2025, including any analysis of whether execution of the Settlement Agreement violated any other agreements, contracts, or fiduciary duties.

**RESPONSE:**

**REQUEST NO. 9:** All Documents evidencing any Communications between any HMIT Entity representative and any Highland Entity representative regarding the terms of the Settlement Agreement.

**RESPONSE:**

**REQUEST NO. 10:** All Documents constituting or relating to the Representations and Warranties in paragraph 13 of the Settlement Agreement & General Release, including any documents that support, substantiate, or were relied upon in making such representations.

**RESPONSE:**

**REQUEST NO. 11:** All Documents relating to the Claimant Trustee's evaluation of the 9019 Settlement, including any analyses of the settlement's fairness, the value of the claims being released, and any Communications with Patrick or the HMIT Entities regarding Settlement terms.

**RESPONSE:**

**REQUEST NO. 12:** All Documents and Communications relating to, referencing, or reflecting the consideration received by Hunter Mountain Investment Trust in exchange for entering into the Settlement Agreement & General Release dated May 19, 2025, including any valuations, appraisals, or analyses of the value received.

**RESPONSE:**

**REQUEST NO. 13:** All Documents and Communications relating to, referencing, or reflecting negotiations over the terms of the Settlement Agreement & General Release, including the cash payment to HMIT, the allowance of the HMIT Class 10 Interest, and the transfer of the Kirschner Claims.

**RESPONSE:**

**REQUEST NO. 14:** All Documents and Communications sufficient to show the reason or rationale for the HMIT Entities' agreement to transfer or relinquish litigation rights previously asserted against Highland Entities in exchange for the consideration set forth in the Settlement Agreement.

**RESPONSE:**

**REQUEST NO. 15:** All Documents relating to the transfer of the Kirschner Litigation claims to the HMIT Entities pursuant to the 9019 Settlement, including any Communications discussing the strategic purpose, value, or intended use of such claims.

**RESPONSE:**

**REQUEST NO. 16:** All Documents relating to any litigation commenced or actions taken by Patrick or any HMIT Entity using the Kirschner Litigation claims obtained through the 9019 Settlement, including the filing styled *Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver*, No. 25-BC01B-0027 (July 1, 2025).

**RESPONSE:**

**REQUEST NO. 17:** All Documents evidencing any Communications with Highland Capital Management, L.P., or any Highland Entity relating to, referencing, or reflecting any plan or strategy by Mark Patrick regarding a potential settlement of Hunter Mountain Investment Trust's claims.

**RESPONSE:**

**REQUEST NO. 18:** All Communications between You and Highland Capital Management, L.P., or any Highland Entity regarding the Settlement Agreement & General Release.

**RESPONSE:**

**REQUEST NO. 19:** All Communications between You and James P. Seery, Jr., in any capacity.

**RESPONSE:**

**REQUEST NO. 20:** All Communications between You and Marc S. Kirschner, in any capacity.

**RESPONSE:**

**REQUEST NO. 21:** All Documents and Communications reflecting any due diligence conducted by You or on Your behalf regarding the authority of Mark Patrick to enter into the Settlement Agreement on behalf of the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 22:** All Documents and Communications, including billing records, invoices, and engagement letters, between You and Kelly Hart & Hallman LLP (or any predecessor or successor

firm or any associated attorney) relating to work involving the Settlement Agreement, the 9019 Motion, or the HMIT Entities, the DAF Entities, or any restructuring of such entities.[3]

**RESPONSE:**

**REQUEST NO. 23:** All Documents and Communications, including billing records, invoices, and engagement letters, between You and Shields Law Group, P.C. (or any associated attorney) relating to work involving (a) the DAF Structure, Hunter Mountain Investment Trust, the formation or restructuring of any DAF Entity or HMIT Entity; (b) the separation of DAF assets from the charitable beneficiaries; or (c) the "Work Plan" for restructuring.[4]

**RESPONSE:**

**REQUEST NO. 24:** All Communications between You and any third party relating to the Settlement Agreement, the 9019 Motion, or the HMIT Entities.

**RESPONSE:**

**REQUEST NO. 25:** All Documents relating to the current value of the Highland Claimant Trust, including any reports, analyses, or projections of Highland's remaining assets, estimated distributions to claimants, and any anticipated residual value available for Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 26:** All Documents relating to any payments made or to be made pursuant to the 9019 Settlement, including the $500,000 lump-sum payment, the $10 million initial distribution, and any subsequent distributions, including wire transfer records, bank statements, and any documents reflecting the disposition of such funds.

**RESPONSE:**

**REQUEST NO. 27:** All Documents reflecting Highland Capital Management, L.P.'s knowledge of (a) the restructuring of the DAF Entities; (b) the sale of Beacon Mountain to CLO Holdco, LLC; (c) any change in the beneficial ownership of Hunter Mountain; or (d) any investigation of Patrick by the Cayman Islands court, the Texas Attorney General, or any other governmental authority.

**RESPONSE:**

**REQUEST NO. 28:** All Communications between Highland Capital Management, L.P. and any of the following regarding the 9019 Settlement or any restructuring of the HMIT Entities or DAF

---

[3] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[4] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

Entities: The Dallas Foundation, Crown Global Life Insurance, Ltd., the Texas Attorney General, or any Cayman Islands governmental or judicial authority.

**RESPONSE:**

**REQUEST NO. 29:** All Documents relating to the Stipulation Withdrawing Objection of The Dallas Foundation and Crown Global, including all Communications between Highland and The Dallas Foundation regarding the terms thereof.

**RESPONSE:**

**REQUEST NO. 30:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Highland Capital Management, L.P. estate.

**RESPONSE:**

**REQUEST NO. 31:** All Communications between You and Hunter Mountain Investment Trust regarding the estimated or actual value of the Class 10 and Class 11 claims in the Highland Bankruptcy.

**RESPONSE:**

**REQUEST NO. 32:** All Documents and Communications related to or evidencing the knowledge of any Highland Party about DFW Charitable Foundation, including, but not limited to, the identity of the officers, directors, agents, or other persons with authority over DFW Charitable Foundation, the economic beneficiaries of DFW Charitable Foundation, and any payments made by DFW Charitable Foundation or any of its subsidiaries to Patrick.

**RESPONSE:**

**REQUEST NO. 33:** All Documents and Communications sufficient to show when Hunter Mountain Investment Trust or any HMIT Party first received any indication, analysis, projection, or belief that the Class 10 or Class 11 claims would have net value available for distribution, including the timing of such indication, the basis therefor, and any valuations, projections, or analyses supporting such indication

**RESPONSE:**

**REQUEST NO. 34:** All Documents and Communications sufficient to show the original purpose and stated objectives of the 2015 sale of Highland Capital Management, L.P. equity holders' equity stake to Hunter Mountain Investment Trust, including any term sheets, memoranda, presentations, tax advice, or planning documents.

**RESPONSE:**

**REQUEST NO. 35:** All Documents and Communications regarding the reasons behind the equity ownership allocation reflected in Highland Capital Management, L.P.'s Fifth Amended Plan of Reorganization, including the allocation of (i) 99.5% to Hunter Mountain Investment Trust; (ii)

0.1866% to The Dugaboy Investment Trust; (iii) 0.0627% to Mark Okada and associated family trusts; and (iv) 0.25% to Strand Advisors, Inc.

**RESPONSE:**

**REQUEST NO. 36:** All Documents and Communications relating to, referencing, or reflecting any tax benefit, tax efficiency, or charitable purpose associated with the restructuring of Highland Capital Management, L.P. ownership in 2015.

**RESPONSE:**

**REQUEST NO. 37:** All Documents and Communications sufficient to show the conversion of the charitable trust originally formed in 2006 into a donor-advised fund investment vehicle for long-term charitable endeavors in or around October 2011, including any organizational documents, trust amendments, partnership agreements, or memoranda.[5]

**RESPONSE:**

**REQUEST NO. 38:** All Documents and Communications relating to, referencing, or reflecting the original structure and purpose of the donor-advised fund created in October 2011, including any tax opinions, IRS determination letters, or legal memoranda.[6]

**RESPONSE:**

**REQUEST NO. 39:** All Documents and Communications relating to, referencing, or reflecting the valuation of Highland Capital Management, L.P., or its assets.

**RESPONSE:**

**REQUEST NO. 40:** All Documents and Communications relating to, referencing, or reflecting Highland Capital Management, L.P.'s financial condition, including any monthly operating reports or quarterly operating reports.

**RESPONSE:**

**REQUEST NO. 41:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for any bankruptcy professional, creditor, or equity holder.[7]

---

[5] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[6] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[7] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**RESPONSE:**

**REQUEST NO. 42:** All Documents and Communications relating to the alleged insolvency of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[8]

**RESPONSE:**

**REQUEST NO. 43:** All Documents and Communications relating to any valuation of Highland Capital Management, L.P., including any analyses, memoranda, presentations, or reports prepared by or for Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC.[9]

**RESPONSE:**

**REQUEST NO. 44:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 45:** All Communications between You and Rand Advisors, LLC, Rand PE Fund I, LP, or Rand PE Fund Management, LLC regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 46:** All Communications between You and Charitable DAF Fund, LP reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 47:** All Communications between You and Charitable DAF Fund, LP regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

---

[8] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

[9] For the avoidance of doubt, this Request explicitly seeks Documents and Communications for which attorney-client privilege and/or work product privilege do not apply due to the Crime-Fraud Exception and/or Subject-Matter Waiver. *See* Instruction No. 7.

**RESPONSE:**

**REQUEST NO. 48:** All Communications between You and Hunter Mountain Investment Trust reflecting any analysis or determination regarding the sufficiency of the net assets of the Highland Capital Management, L.P. estate to make payments to HMIT's Class 10 and Class 11 interest holders.

**RESPONSE:**

**REQUEST NO. 49:** All Communications between You and Hunter Mountain Investment Trust regarding any actual or contemplated payments from the net assets of the Highland Capital Management, L.P. estate to HMIT's Class 10 and Class 11 interest holders, including the calculation of such payments and the source of funds.

**RESPONSE:**

**REQUEST NO. 50:** All Documents and Communications relating to, referencing, or reflecting efforts by any HMIT Entity to obtain updated financial reporting from Highland Capital Management, L.P., or its bankruptcy professionals during the bankruptcy proceedings.

**RESPONSE:**

**REQUEST NO. 51**: All organizational charts reflecting the corporate structure of (a) the DAF Entities; (b) the HMIT Entities; and (c) any entities through which Patrick directly or indirectly held an interest in Hunter Mountain, for any time during the Relevant Period.

**RESPONSE:**

**REQUEST NO. 52**: All audit reports, financial statements, and quarterly or annual reports for Rand PE Fund I, LP from January 1, 2023 to the present, including the 2024 audit issued on or about June 26, 2025.

**RESPONSE:**

**REQUEST NO. 53:** All Documents, correspondence, engagement letters, contracts, or agreements between You and ValueScope, LLC (or any other valuation firm) relating to the valuation of any interest, holding in, or security issued by any of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate.

**RESPONSE:**

**REQUEST NO. 54:** All draft and final valuation reports, memoranda, models, or analyses prepared by ValueScope, LLC relating to Beacon Hunter, LLC; Hunter Mountain Investment

Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any DAF Entity; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to the valuation of the Participation Shares; and any Communications challenging or questioning the valuation methodology or conclusions.

**RESPONSE:**

**REQUEST NO. 55:** All Documents relating to the methodology used in any valuation of Beacon Hunter, LLC; Hunter Mountain Investment Trust; Beacon Mountain, LLC; CLO Holdco LLC; or any participation or interest in Highland Capital Management, LP's bankruptcy estate, including but not limited to instructions received regarding methodology, communications discussing the change from net asset value methodology to discounted cash flow methodology, supporting calculations, assumptions, and comparable transactions or valuations.

**RESPONSE:**

Dated: March 23, 2026

/s/ Geoffrey S. Harper
**Geoffrey S. Harper**
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

**John Michael Gaddis**
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

I certify that on March 23, 2026, a true and correct copy of the foregoing document was served upon counsel of record in accordance with the Federal Rules of Civil Procedure.

***Via Electronic Mail:***

Jeffrey N. Pomerantz (jpoerantz@pszjlaw.com)
John A. Morris (jmorris@pszjlaw.com)
Gregory V. Demo (gdemo@pszjlaw.com)
Hayley R. Winograd (hwinograd@pszjlaw.com)
**Pachulski Stang Ziehl & Jones LLP**
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067

Melissa S. Hayward (mhayward@haywardfirm.com)
Zachary Z. Annable (zannable@haywardfirm.com)
**Hayward PLLC**
10501 N. Central Expressway, Suite 106
Dallas, TX 75231

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

# EXHIBIT 6

[redacted]

**From:** Gaddis, Mike <MGaddis@winston.com>
**Sent:** Monday, March 30, 2026 1:35 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Sandi Staskus <sstaskus@kslaw.com>; Louis M. Phillips <louis.phillips@kellyhart.com>; Miller, Zoey Elizabeth <ZMiller@winston.com>; Sydney Rose <srose@kslaw.com>; Gaddis, Mike <MGaddis@winston.com>
**Subject:** RE: Highland: Meet and Confer on Motion for Protective Order

John,

Thank you for your proposal. We obviously disagree with your contention that our RFPs are in any way improper, and we will oppose your motion for a protective order. That said, we agree we should set a briefing schedule that makes sense for both the depositions and the hearing.

Unfortunately, we cannot agree to your proposed briefing schedule because even if the Court denies your motion, the timing will make it effectively impossible for us to use any resulting discovery materials in either the depositions (currently set for the weeks of April 6–10 and/or 13–17) or the hearing (currently set for April 27). You have Highland's reply brief due just six days before the hearing, and there's no guarantee how quickly Judge Odell will rule or that he will make any ruling in advance of the hearing. A process that denies us meaningful relief even if we succeed in defeating your motion is not a fair process.

We believe the best path forward is to ask the Court to postpone both the depositions and the hearing until a reasonable time after it rules on your Motion for Protective Order. That way (1) you get a fair opportunity to make your argument that there should be no written discovery, and (2) if the Court disagrees and allows discovery, both parties have sufficient time to obtain and use the resulting documents in preparation for their depositions and the hearing. Here is a proposed

schedule to that end:

- March 30: Dugaboy will respond to Highland's RFPs and begin production of additional responsive documents (to the extent Dugaboy has any) on a rolling basis. Any such supplemental production will be completed no later than the deadline for the parties to file exhibit lists and exchange exhibits. That deadline is seven days before the hearing, which is April 20 under the current schedule and would be pushed back to mid-May under the proposed schedule outlined below.
- April 2: Highland to file its Motion for Protective Order (as per your proposed schedule).
- April 2: Current deadline for Highland's response to Dugaboy's Rule 60(b) motion. We won't object if you want to push this back a couple weeks.
- April 3: Highland to disclose names of witnesses it intends to depose. To aid in your planning, Dugaboy hereby discloses that it will depose Mark Patrick for its eight-hour deposition, and James Seery and Paul Murphy for its two four-hour depositions.
- April 16: Dugaboy to file its response to the Motion for Protective Order.
- April 21: Highland to file its reply in support of its Motion for Protective Order.
  - Depending on when and how the Court rules on the Motion for Protective Order, Highland will produce responsive documents during the last week of April and/or first week of May.
  - Meanwhile (as discussed above) Dugaboy will continue its production on a rolling basis to the extent it obtains any additional responsive documents not already produced.
- First and second weeks of May: The parties will conduct their depositions as previously agreed.
- At least one week after the conclusion of depositions, and several days in advance of the hearing date, Dugaboy will file its reply in support of its Rule 60(b) motion. This reply is currently due April 24 and would be pushed back to sometime in late May under the proposed schedule depending on when the hearing is set.
- One week before the hearing date: Deadline for the parties to file witness and exhibit lists with the Court and exchange exhibits. Any supplemental document production by either side must be completed no later than this date. The exhibit-list deadline is currently April 20 and under the proposed schedule would be pushed back to sometime in late May depending on when the hearing is set.
- The hearing on Dugaboy's Rule 60(b) motion will be reset to a date convenient for the Court and the parties, probably during the last week of May and/or first week of June.

These are suggestions and not set in stone. If you have other ideas we're happy to discuss. We look forward to your thoughts.

Yours,

**MICHAEL GADDIS**
OF COUNSEL

**T** +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

[redacted]

# EXHIBIT 7

**From:** John A. Morris
**To:** Sydney Rose
**Cc:** Jeff Pomerantz; Hayley R. Winograd; Zachery Annable; Geoffrey Harper; Gaddis, Mike; Sandi Staskus; Louis M. Phillips
**Subject:** Highland: Meet and Confer on Motion for Protective Order
**Date:** Wednesday, March 25, 2026 2:10:57 PM
**Attachments:** image001.jpg

---

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

Sydney:

I write regarding Dugaboy's requests for production, which you emailed early yesterday morning.

We have reviewed the RFPs and do not believe they are proper for a variety of reasons, not least because Dugaboy has not established a prima facie case in support of its motion. Accordingly, we intend to file a motion for a protective order, and we believe it makes sense to work out a briefing schedule that provides the Court time to decide the motion sufficiently in advance of the April 27 hearing date so that we can all prepare accordingly. To that end, we propose the following:

Highland's Motion: Thursday, 4/2 (9 days from service of RFPs)
HMIT Response: Thursday, 4/16 (14 days from motion)
Highland Reply: Tuesday, 4/21 (5 days from response)

Please let us know if this schedule would work for you, or whether you'd like to discuss anything else regarding the above.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

Los Angeles | New York | Wilmington, DE | Houston | San Francisco

# EXHIBIT 8

**From:** Gaddis, Mike
**To:** jmorris
**Cc:** jpomerantz; hwinograd; Geoffrey Harper; Gaddis, Mike
**Subject:** RE: Highland: Document Requests (Dugaboy Motion to Vacate)
**Date:** Thursday, February 26, 2026 5:24:35 PM
**Attachments:** image002.png
image001.png

---

Thanks, John. I will circulate to the team and get back to you with any questions.

Yours,

**MICHAEL GADDIS**
OF COUNSEL

**T** +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

---

**From:** John A. Morris
**Sent:** Thursday, February 26, 2026 4:36 PM
**To:** Gaddis, Mike
**Cc:** Jeff Pomerantz ; Hayley R. Winograd ; 'Geoffrey Harper'
**Subject:** Highland: Document Requests (Dugaboy Motion to Vacate)

Mike,

Please see the attached and let us know if you have any questions.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

Los Angeles | New York | Wilmington, DE | Houston | San Francisco

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) *(admitted pro hac vice)*
Jordan A. Kroop (AZ Bar No. 018825) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |

**HIGHLAND CAPITAL MANAGEMENT, L.P.'S REQUESTS FOR THE PRODUCTION OF DOCUMENTS DIRECTED TO THE DUGABOY INVESTMENT TRUST**

**PLEASE TAKE NOTICE** that pursuant to Federal Rules of Bankruptcy Procedure 7026 and 7034, incorporating by reference Federal Rules of Civil Procedure 26 and 34, Highland Capital Management, L.P., the reorganized debtor in the above-referenced bankruptcy case ("Highland"), hereby demands that The Dugaboy Investment Trust ("Dugaboy") produce for

[1] The Debtor's last four digits of its taxpayer identification number are (6725). he headquarters and service address for Highland is 6333 E. Mockingbird Lane, Suite 147 #5045, Dallas, TX 75214.

inspection and copying all non-privileged documents responsive to the requests below (the "Requests"), on or before **March 30, 2026, by 5:00 p.m. Central Time** in connection with the litigation concerning *Dugaboy's Motion for Relief From Order and Motion to Vacate* [Docket No. 4513] (the "Motion").

## INSTRUCTIONS

1. For each Document (as defined below) withheld by reason of a claim of privilege, provide a privilege log identifying such Document together with: (a) the date of the Document; (b) the identity of the author or preparer; (c) the identity of each person who was sent or furnished with the Document or who received or had possession or custody of the document; (d) a description of the Document, including identification of any attachments or appendices; (e) a statement of the basis of the claim of privilege; and (f) the paragraph of this request to which the document is responsive. In the case of Documents concerning a meeting or conversation, identify all participants in the meeting or conversation.

2. Each Document shall be produced in a fashion that indicates clearly the file in which it was located.

3. If a Document cannot be produced in full, produce it to the extent possible, identify the portion that cannot be produced, and specify the reasons for Your (as defined below) inability to produce the remainder.

4. You are required to produce ESI (as defined below) in searchable form on DVDs, CD-ROMs or other media to be mutually agreed by the parties.

5. Documents may be produced in paper format or electronically. If Documents are produced electronically, or if any ESI is produced, the following formatting should be used:

- Use .tif format for all Documents that were not originally in Excel format, in which case, use .xls or .xlsx format;
- If possible, without creating undue delay, please produce Documents in Summation-ready DVDs, CD-ROMs or other media to be mutually agreed by the parties with .tiff and text format, and with a Summation load file; and
- Transmit electronic Documents or ESI on DVDs, CD-ROMs or other media to be mutually agreed by the parties or use an ftp site upload.

6. These Requests shall be deemed continuing and supplemental answers shall be required if You directly or indirectly obtain further information after Your initial response to these Requests as required by Fed. R. Bank. P. 7026(e).

7. The use of either the singular or plural shall not be deemed a limitation. The use of the singular includes the plural, and vice versa.

8. Any Document that contains any comment, notation, addition, insertion or marking of any type or kind which is not part of another Document, is to be considered a separate Document.

**DEFINITIONS**

1. "Communications" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and includes all oral and written communications of any nature, type or kind including, but not limited to, any ESI (and any attachments thereto), Documents, telephone conversations, text messages, discussions, meetings, facsimiles, e-mails, pagers, memoranda, and any other medium through which any information is conveyed or transmitted.

2. "Concern" or "Concerning" means and includes relating to, constituting, defining, evidencing, mentioning, containing, describing, discussing, embodying, reflecting, edifying, analyzing, stating, referring to, dealing with, or in any way pertaining to the subject matter.

3. "Document" means and includes all written, recorded, transcribed or graphic matter of every nature, type and kind, however and by whoever produced, reproduced, disseminated or made. This includes, but is not limited to, Communications, ESI, "writings" as defined by Rule 1001 of the Federal Rules of Evidence, copies or drafts, and any tangible or intangible thing or item that contains any information. Any Document that contains any comment, notation, addition, insertion or marking of any type or kind which is not part of another Document, is to be considered a separate Document.

4. "ESI" has the meaning ascribed to it in Federal Rules of Civil Procedure 16, 26, and 34(a).

5. "You" or "Your" means The Dugaboy Investment Trust and any person or entity authorized to act on its behalf.

## DOCUMENT REQUESTS

**Request No. 1:**

1. Concerning the Motion, all Documents and Communications that You contend constitute "newly discovery evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial." *See* Fed. R. Civ. Pro. 59(b).

**Request No. 2:**

2. Concerning the Motion, all Documents and Communications that You contend Concern "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party" for purposes of Fed. R. Civ. Pro. 60(b)(3).

Dated: February [ ], 2026

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 266326)
Jordan A. Kroop (AZ Bar No. 018825)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
jkroop@pszjlaw.com
hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**
*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

# EXHIBIT 9

**From:** Gaddis, Mike
**To:** John A. Morris
**Cc:** Jeff Pomerantz; Hayley R. Winograd; Zachery Annable; Geoffrey Harper; Sandi Staskus; Louis M. Phillips; Miller, Zoey Elizabeth; Sydney Rose; Gaddis, Mike
**Subject:** RE: Highland: Meet and Confer on Motion for Protective Order
**Date:** Monday, March 30, 2026 12:36:05 PM
**Attachments:** image002.png
image003.png

CAUTION: **MAIL FROM OUTSIDE THE FIRM**

John,

Thank you for your proposal. We obviously disagree with your contention that our RFPs are in any way improper, and we will oppose your motion for a protective order. That said, we agree we should set a briefing schedule that makes sense for both the depositions and the hearing.

Unfortunately, we cannot agree to your proposed briefing schedule because even if the Court denies your motion, the timing will make it effectively impossible for us to use any resulting discovery materials in either the depositions (currently set for the weeks of April 6–10 and/or 13–17) or the hearing (currently set for April 27). You have Highland's reply brief due just six days before the hearing, and there's no guarantee how quickly Judge Odell will rule or that he will make any ruling in advance of the hearing. A process that denies us meaningful relief even if we succeed in defeating your motion is not a fair process.

We believe the best path forward is to ask the Court to postpone both the depositions and the hearing until a reasonable time after it rules on your Motion for Protective Order. That way (1) you get a fair opportunity to make your argument that there should be no written discovery, and (2) if the Court disagrees and allows discovery, both parties have sufficient time to obtain and use the resulting documents in preparation for their depositions and the hearing. Here is a proposed schedule to that end:

- March 30: Dugaboy will respond to Highland's RFPs and begin production of additional responsive documents (to the extent Dugaboy has any) on a rolling basis. Any such supplemental production will be completed no later than the deadline for the parties to file exhibit lists and exchange exhibits. That deadline is seven days before the hearing, which is April 20 under the current schedule and would be pushed back to mid-May under the proposed schedule outlined below.

- April 2: Highland to file its Motion for Protective Order (as per your proposed schedule).

- April 2: Current deadline for Highland's response to Dugaboy's Rule 60(b) motion. We won't object if you want to push this back a couple weeks.

- April 3: Highland to disclose names of witnesses it intends to depose. To aid in your planning,

Dugaboy hereby discloses that it will depose Mark Patrick for its eight-hour deposition, and James Seery and Paul Murphy for its two four-hour depositions.

- April 16: Dugaboy to file its response to the Motion for Protective Order.

- April 21: Highland to file its reply in support of its Motion for Protective Order.

  - Depending on when and how the Court rules on the Motion for Protective Order, Highland will produce responsive documents during the last week of April and/or first week of May.

  - Meanwhile (as discussed above) Dugaboy will continue its production on a rolling basis to the extent it obtains any additional responsive documents not already produced.

- First and second weeks of May: The parties will conduct their depositions as previously agreed.

- At least one week after the conclusion of depositions, and several days in advance of the hearing date, Dugaboy will file its reply in support of its Rule 60(b) motion. This reply is currently due April 24 and would be pushed back to sometime in late May under the proposed schedule depending on when the hearing is set.

- One week before the hearing date: Deadline for the parties to file witness and exhibit lists with the Court and exchange exhibits. Any supplemental document production by either side must be completed no later than this date. The exhibit-list deadline is currently April 20 and under the proposed schedule would be pushed back to sometime in late May depending on when the hearing is set.

- The hearing on Dugaboy's Rule 60(b) motion will be reset to a date convenient for the Court and the parties, probably during the last week of May and/or first week of June.

These are suggestions and not set in stone. If you have other ideas we're happy to discuss. We look forward to your thoughts.

Yours,

WINSTON & STRAWN LLP

MICHAEL GADDIS
OF COUNSEL

**T** +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

**From:** Sydney Rose <SRose@kslaw.com>
**Sent:** Thursday, March 26, 2026 9:36 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Gaddis, Mike <MGaddis@winston.com>; Sandi Staskus <sstaskus@kslaw.com>; Louis M. Phillips <louis.phillips@kellyhart.com>
**Subject:** RE: Highland: Meet and Confer on Motion for Protective Order

Thank you for confirming.

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Thursday, March 26, 2026 9:35 AM
**To:** Sydney Rose <SRose@kslaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Gaddis, Mike <mgaddis@winston.com>; Sandi Staskus <sstaskus@kslaw.com>; Louis M. Phillips <louis.phillips@kellyhart.com>
**Subject:** RE: Highland: Meet and Confer on Motion for Protective Order

CAUTION: **MAIL FROM OUTSIDE THE FIRM**

Yes, we received your first email 59 minutes before midnight, Central Time, and the revised e-mail 19 minutes before midnight Central Time.

Yes, I meant “Dugaboy” in the response date.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

PSZJ
Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Sydney Rose <SRose@kslaw.com>
**Sent:** Thursday, March 26, 2026 10:29 AM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Gaddis, Mike <mgaddis@winston.com>; Sandi Staskus <sstaskus@kslaw.com>; Louis M. Phillips <louis.phillips@kellyhart.com>
**Subject:** RE: Highland: Meet and Confer on Motion for Protective Order

Hi John,

We have received your proposed schedule and will discuss it with our team and get back to you shortly.

In the meantime, would you please confirm that you received these RFPs on Monday, 3/23 according to the Court's time zone?

Also, in the schedule below did you mean "Dugaboy's Response: Thursday, 4/16"?

Thank you for your prompt reply,
Sydney

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, March 25, 2026 2:11 PM
**To:** Sydney Rose <SRose@kslaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Hayley R. Winograd <hwinograd@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Gaddis, Mike <mgaddis@winston.com>; Sandi Staskus <sstaskus@kslaw.com>; Louis M. Phillips <louis.phillips@kellyhart.com>
**Subject:** Highland: Meet and Confer on Motion for Protective Order

| CAUTION: **MAIL FROM OUTSIDE THE FIRM** |
| --- |

Sydney:

I write regarding Dugaboy's requests for production, which you emailed early yesterday morning.

We have reviewed the RFPs and do not believe they are proper for a variety of reasons, not least because Dugaboy has not established a prima facie case in support of its motion. Accordingly, we intend to file a motion for a protective order, and we believe it makes sense to work out a briefing schedule that provides the Court time to decide the motion sufficiently in advance of the April 27 hearing date so that we can all prepare accordingly. To that end, we propose the following:

Highland's Motion: Thursday, 4/2 (9 days from service of RFPs)
HMIT Response: Thursday, 4/16 (14 days from motion)
Highland Reply: Tuesday, 4/21 (5 days from response)

Please let us know if this schedule would work for you, or whether you'd like to discuss anything else regarding the above.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

PSZJ
Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

King & Spalding Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message or attachments and we ask that you please comply with any additional instructions from the sender regarding deletion of messages or attachments sent in error. Click here to view our Privacy Notice.

---

The contents of this message may be privileged and confidential. If this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without

the permission of the author. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under applicable tax laws and regulations.

# EXHIBIT 10

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

**DUGABOY INVESTMENT TRUST'S OBJECTIONS AND RESPONSES TO HIGHLAND CAPITAL MANAGEMENT'S REQUESTS FOR PRODUCTION**

Pursuant to Federal Rules of Bankruptcy Procedure 7026 and 7034, Interested Party The Dugaboy Investment Trust ("Dugaboy") serves its objections and responses to Debtor Highland Capital Management, L.P.'s ("Highland") Requests for Production.

Dated: March 30, 2026

*/s/ Geoffrey S. Harper*
**Geoffrey S. Harper**
Texas Bar No. 00795408
gharper@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

**John Michael Gaddis**
Texas Bar No. 24069747
mgaddis@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**DUGABOY'S RESERVATION OF RIGHTS**

1. Dugaboy provides these objections and responses without waiving or intending to waive, and, on the contrary, preserving and intending to preserve:
   a. all objections as to competency, relevancy, materiality, privilege, and admissibility as evidence for any purpose of the responses or subject matter thereof, in any subsequent proceedings in, or at the trial of, this or any action;
   b. the right to object on any ground to the use of any said responses or the subject matter thereof in any subsequent proceeding in, or at the trial of, this or any other action;
   c. the right to object on any ground at any time to a request for further responses to these or any other discovery requests involving or related to the subject matter of the Requests responded to herein; and
   d. the right at any time to supplement, amend, correct, add to, or clarify any of the responses provided herein and to redact any documents produced.

2. In objecting and responding to these Requests, Dugaboy does not admit, concede or acquiesce in the accuracy of any definitions of terms or descriptions of any facts, events, pleadings or documents contained in the Requests. Dugaboy specifically does not waive its objections to any definition as vague or overbroad and reserves the right to define terms differently and/or more specifically from the manner in which they are defined in the Requests.

3. In each and every response where Dugaboy interposes an objection, such objection shall be construed to preserve all of Dugaboy's rights to enter similar objections as to any future supplemental response to the Requests. Moreover, a failure to object herein shall not constitute a waiver of any objections that Dugaboy may interpose as to future supplemental responses.

4. Any agreement by Dugaboy to produce any documents or categories of documents does not necessarily mean that any document or documents exist or are in Dugaboy's possession, custody or control that are responsive to the Requests. To the contrary, any such agreement is subject to the existence of such documents.

5. Dugaboy objects to the Requests to the extent they seek documents or information protected from disclosure by the attorney–client privilege, the attorney work-product doctrine, or any other applicable privilege or protection. Dugaboy further objects to the extent the Requests seek disclosure of counsel's mental impressions, legal theories, litigation strategy, or other opinion work product, which are afforded heightened protection and will not be produced. Dugaboy will not produce privileged or protected materials.

6. Unintentional production or disclosure of information or documents otherwise protected from discovery under the attorney-client privilege, the work product doctrine or any other applicable privilege, immunity or protection from disclosure shall not constitute a waiver of such privilege, immunity or protection, either generally or specifically, with respect to such document or any other document, or with respect to the subject matter thereof, and Dugaboy reserves the right to request the return of any such documents and all copies

thereof and to object to the use of any such documents at any time in this action or any other litigation, proceeding or action.

7. These responses are based upon Dugaboy's knowledge, information, understanding and belief as of the date hereof, and are made subject to the general and specific objections below. Dugaboy expressly reserves the right to supplement any responses provided below at a later date as further information is discovered. Any failure to object herein shall not constitute a waiver of any objection that Dugaboy may interpose as to any future supplemental response.

8. To the extent Dugaboy is willing to produce any particular documents or group of documents, this does not constitute an admission or acknowledgement that the related Request is proper, that such documents or groups of documents are relevant to the claims or defenses, proportional to the needs of the case, admissible or otherwise within the proper bounds of discovery, or that requests for similar documents will be treated in a similar fashion.

9. Dugaboy reserves the right to produce documents responsive to the Requests on a rolling basis.

10. Documents produced in response to the Requests shall be produced in accordance with any Protective Order (the "Protective Order") that governs confidentiality in this action, or related actions or agreements implicating these same documents, and on the express condition that such documents will be afforded confidential treatment, as designated, under the terms of any such Protective Order.

## GENERAL OBJECTIONS

Dugaboy's specific objections set forth below are in addition to the incorporated objections set forth in this section (the "General Objections"). Dugaboy expressly incorporates the following General Objections to each and every response below, which shall have the same force and effect as if set forth in full in each of Dugaboy's Objections and Responses below. Accordingly, these General Objections form a part of the Objections and Responses to the Requests, and each and every request for information contained therein. Thus, the absence of a reference to a General Objection should not be construed as a waiver of the Incorporated Objections as to a specific Request.

1. Dugaboy objects to the Requests as an improper means to compel Dugaboy to prematurely disclose its hearing evidence weeks in advance of the court-ordered deadline to file and exchange exhibit lists.

2. Dugaboy objects to the Instructions, Definitions, and Requests to the extent they are overly broad, unduly burdensome, and harassing.

3. Dugaboy objects to the Instructions, Definitions, and Requests to the extent they purport to impose any requirement or discovery obligation on Dugaboy other than those set forth in the Federal Rules of Civil Procedure and the applicable rules of this Court.

5. Dugaboy objects to the Instructions, Definitions, and Requests to the extent they seek information or documents regarding matters that are neither relevant to the claims or defenses of any party nor proportional to the needs of the action.

6. Dugaboy objects to the Requests to the extent they seek information that is a matter of public record equally accessible and/or ascertainable to Plaintiff or otherwise can be obtained from a source other than Dugaboy; including, but not limited to, information that is already filed in this matter, in particular as exhibits to Dugaboy's Motion For Relief From Order and Motion to Vacate (the "60b Motion").

**SPECIFIC OBJECTIONS AND RESPONSES**

**REQUEST NO. 1:**

Concerning the Motion, all Documents and Communications that You contend constitute "newly discovery [*sic*] evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial." See Fed. R. Civ. Pro. 59(b).

**RESPONSE:**

Dugaboy incorporates its General Objections to the extent applicable. Dugaboy further objects to this Request as unduly burdensome and duplicative, on the basis that it seeks documents already filed by Dugaboy in its Rule 60(b) Motion. Dugaboy also objects to this Request as irrelevant to the extent it improperly invokes the standard for a new trial under Fed. R. Civ. P. 59(b), given that Dugaboy is not seeking a "new trial" and has not invoked Rule 59(b) as grounds for the relief it seeks under Rule 60(b). Dugaboy further objects to the Request because it calls for a legal conclusion and thus attorney work product. Subject to and without waiving the foregoing objections, Dugaboy will produce documents that came into its possession after the Bankruptcy Court's June 30, 2025 order approving the Rule 9019 settlement that support vacating the order in question.

Dugaboy reserves all rights to supplement this Response, is producing responsive documents today, and will continue to do so on a rolling basis. To the extent Dugaboy identifies additional responsive documents it intends to use at the Rule 60(b) hearing, if any, Dugaboy will supplement these Responses no later than the deadline for the Parties to file and serve exhibit lists and exchange exhibits.

**REQUEST NO. 2:**

Concerning the Motion, all Documents and Communications that You contend Concern "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party" for purposes of Fed. R. Civ. Pro. 60(b)(3).

**RESPONSE:**

Dugaboy incorporates its General Objections to the extent applicable. Dugaboy further objects to this Request as unduly burdensome and duplicative, on the basis that it seeks documents already filed by Dugaboy in its Rule 60b Motion to Vacate. Dugaboy further objects on grounds that the Request calls for a legal conclusion and thus attorney work product. Subject to and without waiving the foregoing objections, Dugaboy will produce documents that show fraud, misrepresentation, and/or misconduct by Hunter Mountain Investment Trust, Mark Patrick, and the debtor and its representatives to the extent such fraud, misrepresentation, and/or misconduct led to the order challenged in the Rule 60(b) motion to vacate.

Dugaboy reserves all rights to supplement this Response, is producing responsive documents today, and will continue to do so on a rolling basis. To the extent Dugaboy identifies additional responsive documents it intends to use at the Rule 60(b) hearing, if any, Dugaboy will supplement these Responses no later than the deadline for the Parties to file and serve exhibit lists and exchange exhibits.

Dated: March 30, 2026

Respectfully submitted,
*/s/ Geoffrey S. Harper*
Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
King & Spalding LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
Winston & Strawn LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
(214) 453-6500
(214) 453-6400 (fax)

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on March 30, 2026, a true and correct copy of this document was served by electronic mail as follows:

Jeffrey N. Pomerantz (jpoerantz@pszjlaw.com)
John A. Morris (jmorris@pszjlaw.com)
Jordan A. Kroop (jkroop@pzjlaw.com)
Gregory V. Demo (gdemo@pszjlaw.com)
Hayley R. Winograd (hwinograd@pszjlaw.com)
**Pachulski Stang Ziehl & Jones LLP**
10100 Santa Monica Blvd, 13th Floor
Los Angeles, CA 90067

Melissa S. Hayward (mhayward@haywardfirm.com)
Zachary Z. Annable (zannable@haywardfirm.com)
**Hayward PLLC**
10501 N. Central Expressway, Suite 106
Dallas, TX 75231

*/s/ Geoffrey S. Harper*
Geoffrey S. Harper

# EXHIBIT 11

**From:** John A. Morris
**To:** Gaddis, Mike
**Cc:** jpomerantz; jkroop; hwinograd; Mark T. Stancil (mstancil@willkie.com); "Louis M. Phillips"; Geoffrey Harper
**Subject:** FW: 19-34054-sgj11 Order to set hearing
**Date:** Monday, March 2, 2026 8:58:27 AM
**Attachments:** image001.png
image003.jpg
image002.png

---

Mike.

1. Moving the date for witness designations to April 6 is fine.
2. While we question the need for three witnesses, Highland won't object provided (a) we maintain the April 24 deadline for Dugaboy's reply, and (b) limit depositions to four hours of testimony.
3. We're confused by your third point. Originally, Highland sought to depose Dugaboy's witnesses, if any, so that Highland could find out the factual bases for the motion before the hearing. But since Dugaboy's motion is based on "newly discovered evidence" and fraud, and Dugaboy presumably had the evidence to support its motion when it was filed, we didn't anticipate that Dugaboy would seek to take affirmative discovery; indeed, we don't believe Dugaboy can use the discovery process to seek evidence to support a motion under Rule 60. Rather than debate the point, we would like to secure the schedule subject to a reservation of everyone's right to object to discovery by means of a motion to quash or otherwise (having said that, if Dugaboy wants to take the deposition of Highland's principal, we'll make him available at a mutually agreeable time).

Please let us know if that's acceptable. If so, please prepare a draft unopposed motion to adjust the schedule.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

Los Angeles | New York | Wilmington, DE | Houston | San Francisco

# EXHIBIT 12

KING & SPALDING

King & Spalding LLP
2601 Olive Street
Suite 2300
Dallas, Texas 75201

Tel: +1 214 764 4600
Fax: +1 214 764 4601
kslaw.com

Geoffrey Harper
Counsel
Direct Dial: +1 214 764 4453
gharper@kslaw.com

February 20, 2026

Karen Mitchell
Clerk of the Court
United States District Court
1100 Commerce Street, Room 1452
Dallas, Texas 75242

**Re: Case No. 3:25-cv-01876-K; In Response to Supplemental authority submitted under Bankruptcy Rule 8014(f)**

To the Honorable Court,

Highland's cursory account of the Cayman court decision reveals almost nothing and ignores nearly all that court's key rulings. Most importantly, the action in the Caymans against Mark Patrick and other defendants is far from over and will proceed to trial. The court determined the case "**has a real, as opposed to a fanciful, prospect of success at trial**." Cayman Decision 255.

The court declined the Liquidators' request for an extraordinary and severe interim injunction that would have effectively "lock[ed] down" Charitable DAF's normal operations and barred it from making charitable donations, *id*. 108(6), concluding damages will be an adequate remedy if the JOLs prevail at trial. *Id*. 213.

The Cayman Decision in no way exonerates Patrick. To the contrary, the court was "persuaded that there is a serious issue to be tried" regarding Patrick and fellow director Paul Murphy breached their fiduciary duties in restructuring the charitable entities and concluded that Charitable DAF and the JOLs "have a case which [Patrick and Murphy] need to answer." *Id*. 253–54. The court found it particularly troubling that "these complex transactions were undertaken in secret without notifying the Original Participating Shareholders . . . and in effect presented them with a *fait accompli*." *Id*. ? 252. The court concluded that the JOLs' central allegation—that Patrick and Murphy "stripped the Company of its only asset so as to seize control and enrich themselves"— is "a serious one" warranting trial. *Id*. 246.

Furthermore, the lack of reference to HMIT in the Liquidators' pleadings is both unsurprising

and insignificant given Patrick's own testimony that he controlled both HMIT and Charitable DAF through a series of intermediate entities. Dkt. 52 at 9 n.7; Dkt. 59 at 8.

In sum, the Cayman court made no merits determination and offers no support for Highland's position in this Appeal. Nothing in its Decision contradicts or undermines the arguments in Dugaboy's briefing.

Sincerely,

/s/ Geoffrey Harper
Geoffrey Harper
Counsel

# EXHIBIT 13

HAYWARD
PLLC

10501 N. CENTRAL EXPRESSWAY
SUITE 106 DALLAS, TX 75231
972.755.7100 (MAIN/FAX)
WWW.HAYWARDFIRM.COM

*ZACHERY Z. ANNABLE*
*972.755.7108 (DIRECT)*
*ZANNABLE@HAYWARDFIRM.COM*

February 13, 2026

Karen Mitchell
Clerk of the Court
United States District Court
1100 Commerce Street, Room 1452
Dallas, Texas 75242

**Re: Case No. 3:25-cv-01876-K; Supplemental authority submitted under Bankruptcy Rule 8014(f)**

To the Honorable Court:

Dugaboy contends that Mark Patrick's documented control of the HMIT Entities—Highland's counterparty in the Settlement—was at issue in the unrelated Cayman Proceedings and that one of Dugaboy's "primary issues on appeal" was its claim that the Bankruptcy Court erred by failing to adjourn the Hearing pending the outcome of the Cayman Proceedings. In response, Highland established that these contentions are false and meritless. Doc 54 at 10–12. In reply, Dugaboy continued to insist otherwise. Doc 59 at 4–8.

On February 10, 2026, the Grand Court of the Cayman Islands issued the attached decision (the "**Cayman Decision**") showing that Highland and the Bankruptcy Court are right and Dugaboy is wrong. The Cayman Decision, like the JOLs' pleadings, **never mentions HMIT (or any other HMIT Entity) or the Settlement**. In detailed findings after a two-day hearing, the Cayman court denied the JOLs' motion for an injunction, made substantial findings in Mr. Patrick's favor, and affirmed Mr. Patrick's past and continued control of the entities and assets in question. Among other findings, the Cayman court expressly found that the company now managed by the JOLs had no control over any of the entities or assets that Mr. Patrick controls. It remains true that the Cayman Proceedings have nothing to do with HMIT, nothing to do with Highland, and nothing to do with the Settlement.

Sincerely,

Zachery Z. Annable

*Counsel for Highland Capital Management, L.P., and the Highland Claimant Trust*

Attachment

cc: Geoffrey S. Harper
John Michael Gaddis
Andrew K. York
Drake M. Rayshell
Jason S. Brookner
Joshua David Smeltzer
William Nelson Drabble

**NEUTRAL CITATION NUMBER: [2026] CIGC (FSD) 9**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. FSD 201 OF 2025 (RPJ)**

**IN THE MATTER OF THE GRAND COURT ACT**

**B E T W E E N:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

**Plaintiff/Applicant**

**- AND -**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD**

**Defendants/Respondents**

| | |
|---|---|
| **Before:** | The Hon. Raj Parker |
| **Heard:** | 15 and 16 December 2025 |
| **Appearances:** | Andrew Ayres KC with Caroline Moran, Luke Armitage and Alasdair Munro of Maples and Calder (Cayman) LLP on behalf of the Company |
| | Andrew Scott KC with Mark Goodman, Ronan O'Doherty and George Connolly of Campbells LLP on behalf of the 1st, 3rd, 5th and 6th Defendants |
| | David Quest KC with Peter Tyers-Smith and Daniel Mills of Kobre & Kim (Cayman) on behalf of the 2nd Defendant |
| | Jennifer Colegate with Fleur O'Driscoll and Nia Statham of Baker & Partners (Cayman) Limited on behalf of the 4th Defendant |

**Draft judgment circulated:** 28 January 2026

**Judgment delivered:** 10 February 2026

*Proprietary injunction - jurisdiction - s.11 of the Grand Court Act (2015 Revision) - O.29, r.1 and r.2 of the Grand Court Rules - test for grant of injunction - serious issue to be tried - nature of proprietary interest - discretion - cross undertaking in damages - fortification - charitable fund structure - Cayman Islands exempted limited company in structure to make charitable distributions for US tax reasons to US charities - reorganisation by directors of fund structure - transference of limited partnership interest without notification to supporting organisations - claims of improper purpose to gain control - claims of excessive remuneration against directors - alleged transactions at undervalue.*

*Introduction*

1. Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "Company") is a Cayman Islands exempted company. It applies[1] for a proprietary injunction restraining the disposal of and dealing with assets over which the Company asserts a proprietary claim.

2. The application arises from transactions procured by the First and Second Defendants (Mr Mark Patrick and Mr Paul Murphy, collectively "the Directors" and D1 and D2) in alleged breach of fiduciary duties owed to the Company.

3. Four parties addressed the Court over a two-day hearing. Mr Andrew Ayres KC represented the Company, Mr Andrew Scott KC represented D1, D3, D5 and D6 (the "CDM Defendants" or "CDM Entities"), Mr David Quest KC represented D2 ("Mr Murphy"), and Ms Jennifer Colegate represented D4 ("DFW").

4. All of the Defendants contested the application on various grounds. The affidavits and exhibits submitted on the application are voluminous.[2]

5. In a nutshell the Company's claim alleges that unlawful steps were taken by the Directors to divest the Company of its sole asset, which is a limited partnership interest (the "Partnership

[1] *By summons dated 15 July 2025 as amended on 4 December 2025.*
[2] *Including: First Affidavit of Margot MacInnis; Third Affidavit of Margot MacInnis; Second Affidavit of Mark Eric Patrick; Third Affidavit of Mark Eric Patrick; First Affidavit of Paul Murphy; First Affidavit of Alexander L. Reid; First Affidavit of Douglas Mancino; First Affidavit of Marvin Bradford Bedingfield.*

Interest") in a Cayman Islands exempted limited partnership, Charitable DAF Fund, LP (the "Fund").

6. The Company alleges that control of the Partnership Interest of the Company was transferred to D3 and/or D4, entities under Mr Patrick's sole control and ownership, for a gross undervalue of c.US$ 1.6 million in March 2025.

7. The Company points to the fact that the Fund's net asset value was estimated at c.US$ 270 million in September 2024.

8. The joint official liquidators ("JOLs")[3], who bring the claim on behalf of the Company, are concerned that the Directors remain in control of the relevant assets and that the Company has been divested of its control of the Fund. They are concerned that value has been lost and will continue to be lost while the Directors enrich themselves by paying themselves what the JOLs say are 'vast and unjustifiable' fees and by the expenditure of large sums under the guise of 'ordinary business expenses'.

*Factual Background*

*The Fund*

9. The factual background to the Fund's establishment and the transfer of the Partnership Interest is explained in the First Affidavit of Margot MacInnis sworn 15 July 2025 ("MacInnis 1"). The following is a summary of the relevant structures and transactions which show how this worked.

10. The Fund is a Cayman Islands exempted limited partnership formed to invest and manage assets for the benefit or ultimate benefit of certain registered charitable organisations in the US.

11. The Fund is governed by the Second Amended and Restated Exempted Limited Partnership Agreement dated 11 March 2024 (the "ARLPA").

12. The Fund was formed in 2011 at the instigation of Mr James Dondero, a U.S. resident and the founder of Highland Capital Management, L.P. ("Highland"), to enable certain assets to be donated to those registered charitable organisations.

---

[3] *Appointed on 6 May 2025.*

13. The Fund's sole asset is or was its single share, comprising 100% of the issued share capital in CLO HoldCo, Ltd (D6).

*The Company*

14. The Company, until recently the Fund's sole limited partner, and owner of the 99% Partnership Interest, was incorporated in the Cayman Islands on 7 November 2011.

15. The Company's share capital is divided into Participating Shares and Management Shares[4]:

(1) The entirety of the Participating Shares were, from 2011 to 2024, held by four non-profit U.S. companies[5] (the "Original Participating Shareholders") that act as "Supporting Organisations" to US charities (the "Charities").[6] Each is a charitable entity exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code of 1986 (the "IR Code"). Mr Dondero was (and remains) involved at board level with these Supporting Organisations, but according to Ms MacInnis he does not control them. The Defendants say that he does own and in effect controls them.

(2) The Management Shares were initially held by a Mr Grant Scott, but were transferred to Mr Patrick on 25 March 2021, on which date Mr Patrick was also appointed to replace Mr Scott as sole director of the Company.

16. On 22 April 2021, Mr Patrick, as Management Shareholder, appointed Mr Murphy as a director of the Company. Mr Murphy is resident in the Cayman Islands.

17. The Company's Memorandum and Articles of Association[7] provide that Management Shareholders had the right to receive notice of, and to attend, to speak at and to vote at, any general meeting of the Company, but no right to participate in the profits or assets of the Company (Article 11).

---

[4] *Authorised share capital of US$50,000 divided into 100 Management Shares of US$0.01 par value each and 4,999,900 Participating Shares of US$0.01 par value each.*
[5] *Highland Dallas Foundation, Inc, Highland Santa Barbara Foundation Inc, Highland Kansas City Foundation Inc (together the "Highland Foundations"), and subsequently Community Foundation of North Texas ("CFNT").*
[6] *Save that CFNT an underlying charity, has no "Supporting Organisation" and holds its shares in the Company directly.*
[7] *The memorandum and articles of association dated 27 October 2011; and the amended and restated memoranda and articles of association dated 19 January 2015; 24 January 2024; and 20 February 2025 respectively.*

18. The Participating Shareholders have no right to vote at Company meetings, but did have rights in a winding up or repayment of capital and the right to participate in the profits or assets of the Company by way of dividend in accordance with Article 12.

19. The Participating Shareholders therefore have the economic interest in the Company, whereas the Management Shareholders have the control rights.

20. The Company was placed into voluntary liquidation by directors' resolution on 2 April 2025.

*The General Partner of the Fund*

21. Under the ARLPA, sole control over the management and distribution of the Fund's assets was granted to the Fund's general partner. From its formation until 7 March 2024, the Fund's General Partner was Charitable DAF GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands (the "Original GP"). On 25 March 2021, the same date he appointed Mr Patrick sole director of the Company, and transferred his 100 Management Shares to him, Mr Scott also transferred to Mr Patrick the entire issued share capital in the Original GP. On 7 March 2024, the Original GP was replaced by CDH GP, Ltd, a Cayman Islands incorporated company (D5 and the "New GP"), of which Mr Patrick is sole shareholder and director.

*Charitable Purpose and Tax Considerations*

*The Fund's Purpose*

22. The purpose of the Fund was to make investments for the ultimate benefit of the Charities which the Supporting Organisations supported.

23. The Charities are the following four U.S. charitable or non-profit organisations:

(1) *The Dallas Foundation*: a charitable entity established in Texas in 1929 which has awarded over US$1 billion in grants and manages over US$500 million in assets.

(2) *Greater Kansas City Community Foundation*: a charitable entity established in Missouri in 1978 which has awarded over US$7 billion in grants and manages over US$6 billion held in charitable funds.

(3) *Santa Barbara Foundation*: a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over US$800 million.

(4) *North Texas Community Foundation*: which manages assets totalling US$513 million and donated US$38.9 million to local non-profits in 2023.

*The Tax Structure*[8]

24. As a matter of US tax law, in order for the Charities to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore 'corporate blocker', i.e. the Company.

25. Section 501(c)(3) of the IR Code provides that charitable organisations which meet certain criteria are exempt from state and federal taxes except to the extent that they receive income classified as unrelated business taxable income ("UBTI").

26. Section 509 of the IR Code defines the term "supporting organisation" as a tax-exempt entity that must be organised and then operate exclusively either (i) for the benefit of, (ii) to perform the functions of, or (iii) to carry out the purposes of, one or more supported organisations (the Charities). The supported organisations must also be s501(c)(3) entities.

27. Both the Charities and the Supporting Organisations apparently meet the criteria of s501(c)(3), and are therefore exempt from US state and federal taxes save to the extent that they receive UBTI.

28. Apparently as a matter of US tax law, some income received directly from the Fund by the Charities would likely be considered UBTI.

29. In order to 'insulate' the Charities from UBTI, instead of holding their interest in the Fund directly, the Supporting Organisations hold their interest through an 'offshore corporate blocker' structure, i.e. the Company.

30. The purpose of inserting the Company into the structure was that any tax that was due from these investments would be paid at the Company level, and the proceeds would then be distributed to the Supporting Organisations and then to the Charities free of any tax liability.

---

[8] *See affidavit of Marvin Bradford Bedingfield.*

*Company Submission on this Structure*

31. The Company argues that:

(1) The Supporting Organisations (the four non-profit US companies who were the original Participating Shareholders) and the Charities hold or ultimately hold the real economic interest in the Fund;

(2) They are not merely discretionary beneficiaries whom the Fund may or may not choose to confer a benefit on, but the ultimate owners of the Fund, albeit through the Company as a tax filter, and with the Fund having its own discretion as to how to manage its investments; and

(3) The fact that the GP had a discretion as to whether to make any distribution to any of the Participating Shareholders does not change this analysis.

*Relationship between Supporting Organisations and the Charities*

32. As to the relationship between the Supporting Organisations and the Charities:

(1) The Supported Organisations (Charities) are said to control the Supporting Organisations (Participating Shareholders) through their majority voting interest and their ability to elect a majority of the directors of the Supporting Organisations (Participating Shareholders);

(2) The Supporting Organisations (Participating Shareholders) support the Supported Organisations (Charities) by way of paying fees (i.e. making grants) to them from time to time from their assets, including any dividends received from the Company;

(3) The Supporting Organisations (Participating Shareholders) have no ability to pay dividends to any private person or make payments to their directors (save reasonable reimbursement for reasonable out-of-pocket expenses) and can only make grants to their relevant Charity in furtherance of their charitable purposes; and

(4) Whilst Mr Dondero sits on the board of the Supporting Organisations (Participating Shareholders), he does not control them, as a supermajority of the votes are always held by the respective Charity.

33. As described above, the structure was set up to make discretionary distributions to qualifying tax exempt organisations under Section 501(c)(3) of the IR Code. US tax rules apparently require donors to cede 'dominion and control' over contributed assets and for donees to be genuinely independent from donor influence.[9]

*Mr Patrick's Role*

34. Mr Patrick is a US attorney and was employed as tax counsel by Highland from 2008 to 2021, and as tax counsel by Highland Consulting Group, Inc. d/b/a Skyview Group from March 2021 to October 2024. Highland is a group of companies set up by Mr Dondero. Mr Patrick was instrumental in the creation of the Fund in 2011; in particular, he advised on the tax structure of using an offshore 'blocker' company.

35. From March 2021, Mr Patrick was the sole director of the Company, and holder of the 100 Management Shares in it, and the sole director and shareholder in the Fund's general partner (as at March 2021, the Original GP). Mr Patrick occupied a position informally termed "the Control Position", the effect of which was that Mr Patrick was in effective sole control of the limited partner (i.e. the Company), the general partner (the Original GP), and was therefore in effective sole control of the Fund and all its assets, albeit, according to the Company, with no economic, residual, beneficial or winding up interest in either the Company or the Original GP.

*Directors' Fees and Expenditure*

36. The Company says that the Fund's annual expenses showed increases in expenditure which show:

(1) Directors' fees increased from around US$40,000 in 2022 to almost US$600,000 in 2023 and increased further to around US$2.25 million in the first half of 2024; and

(2) Expenses overall for the first half of 2024 were around US$18.3 million, almost the same amount spent over the entire course of 2023 (i.e. US$18.6 million).

[9] *Patrick 2 section D, Reid 1 and Mancino 1.*

37. As is explained in MacInnis 1,[10] in October 2024, Mr Patrick executed an employment agreement, under which he was entitled to receive a base salary of US$850,000; a long-term incentive plan payment for the period 24 March 2021 to 24 March 2024 in the amount of US$4,759,000; and is eligible for both annual and discretionary bonuses as determined at the sole and absolute discretion of the Directors.

38. The Company points to Mr Grant Scott's salary during his previous tenure which, by contrast, was approximately US$60,000 per annum, and says Mr Patrick's remuneration and benefits are 'grossly excessive'.

*The Divestiture of the Company's Limited Partnership Interest in the Fund*

*Supporting Organisations' Concerns*

39. In late October 2024, as a result of concerns arising from the expenditure by the Directors on fees and expenses, the Supporting Organisations asked for financial information from Mr Patrick.

40. On 11 November 2024, Holland and Knight, U.S. attorneys for the Supporting Organisations, sent a letter to Mr Murphy advising that they no longer had confidence in the governance of the Company and/or the Fund and considered that a reorganisation of the governance structures was required to protect the charitable efforts of the Supporting Organisations.

41. On 26 November 2024, Mr Patrick sought advice from Walkers (Cayman) LLP ("Walkers"), then Cayman attorneys to the Company, as to whether the Company could issue further Participating Shares to a new non-profit organisation to dilute the Supporting Organisations and insert a new member able to oppose a potential winding up petition brought by the Supporting Organisations on just and equitable grounds.

42. On 27 November 2024, Walkers responded to the Directors confirming that, if other shareholders were to oppose an equitable winding up, such opposition would be taken into consideration and would likely help any efforts Mr Patrick might make to resist such a winding up.

---

[10] *At §49.*

*The Reorganisation*

43. The Company relies on the following steps taken by the Defendants, each without informing the Supporting Organisations or the Charities.

*CDM*

44. On 18 December 2024, the Directors passed a resolution (the "18 December Resolution"), under which:

> "*In connection with a corporate restructure of the Company's group, the Company proposes to transfer, convey, assign or otherwise contribute to CDMCFAD, LLC, a Delaware limited liability company (the "Transferee"), 100% of the Company's interests in CHARITABLE DAF FUND, LP, an exempted limited partnership established in the Cayman Islands (the "Partnership") in consideration for the contribution by the sole member of the Transferee of 100% of the issued and outstanding limited liability company interests in the Transferee (the "Transfer"*).

45. The 18 December Resolution also provided that (based apparently on US tax advice) the proposed assignment of the Partnership Interest to D3, CDM (the "CDM Assignment"):

> *"… would help insulate the DAF from exposure to [Dondero] and his entities … who may be at risk of causing the [IRS] to revoke the tax-exempt status of one or more of the participating shareholders/supporting organizations, which could imperil the assets of the DAF";* and that
>
> *"The IRS would look favorably upon any and all attempts for DAF to maintain its influence from 'what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement'".*

46. This resolution was given effect by way of a Deed of Assignment and Assumption of the same date which was executed by Mr Patrick on behalf of each of: (i) the Company, in his capacity as Director; (ii) CDM, in his capacity as Manager; and (iii) the New GP, in his capacity as Director (a position which the Company says gives rise to an irreconcilable conflict of interest).

47. CDM is a Delaware limited liability company. Its Certificate of Formation, dated 12 December 2024, is signed by Mr Patrick, who is CDM's sole member.

48. Also on 18 December 2024, the Company (as member) and Mr Patrick (as manager) entered into a Delaware law governed Limited Liability Company Agreement in respect of CDM (the "LLC Agreement").

49. The LLC Agreement provides that:

> "*Fair Market Value shall have the meaning set forth in Section 6.9(b).*
>
> …
>
> *The initial Manager shall be Mark Patrick.*
>
> …
>
> *6.5 No Duties to the Company. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.*
>
> …
>
> *6.9 Valuation of Company Assets.*
>
> *(a) General. The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.*
>
> *(b) Binding Effect. The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.*
>
> …
>
> *7.3 Redemption. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal*

*amount of the Fair Market Value of such Member's Interest being redeemed, as determined by the Manager in its sole discretion."*

50. The Company says the effect of these changes was that:

(1) CDM was inserted into the corporate structure and as a subsidiary of the Company and would hold the Partnership Interest (previously held by the Company);

(2) The Company would hold the entire membership interest in CDM, with the result that the Company's sole asset, having previously been the Partnership Interest, was exchanged for its membership of CDM (the "Company's CDM Membership"); and

(3) The Company's CDM Membership was inherently fragile as it was held in a company that (by a combination of Delaware law and the LLC Agreement) was owed no fiduciary duties by its manager, Mr Patrick; and subject to redemption at any time of Mr Patrick's choosing, and for any price of Mr Patrick's choosing, subject to the 'good faith' proviso at paragraph 6.9(a) of the LLC Agreement.

*New Shares to DFW*

51. In February 2025, the Directors again sought advice from Walkers on whether the Company could issue new Participating Shares that would have the effect of diluting the existing Participating Shareholders, *"in light of a possible just and equitable winding up petition"* being filed by one of the Supporting Organisations.

52. On 7 February 2025, the Company's board passed a resolution (the "Share Issuance Resolution") approving a proposed share issue of 318 Participating Shares, of a nominal or par value of US$0.01 each as fully paid up, to D4, DFW. Paragraph 5.2 of the Share Issuance Resolution noted that "*following the Share Issuance, DFW shall own 51.04% of the issued Participating Shares of the Company*."

53. DFW is, according to its Certificate of Incorporation, a Delaware non-profit non-stock corporation. It is organised under the General Corporation Law of the State of Delaware exclusively for charitable purposes, incorporated on 9 December 2024, and was incorporated by Mr Douglas Mancino, then a partner at Seyfarth Shaw, a U.S. law firm apparently engaged by the Fund. The sole member of DFW is Mr Patrick.

54. The Share Issuance Resolution stated that the Directors believed the issuance of shares to DFW was justified as a means of protecting the Company, because:

(1) There was a heightened risk that the IRS could revoke the tax-exempt status of the Participating Shareholders which could imperil the status and assets of the Company;

(2) Increasing the number of Participating Shareholders would mitigate the undue influence and private inurement of Mr Dondero; and

(3) The IRS would look favourably upon attempts by the Fund to maintain its independence from his (i.e. Mr Dondero's) attempts to use the Fund for his private benefit.

55. The Company says the effect of the Share Issuance Resolution was to remove the majority that was held by the Original Participating Shareholders, and to dilute their shareholding into a minority stake. DFW (D4) now holds 51% of the Participating Shares.

*The Admission and Redemption*

56. On 27 March 2025, the Company entered into a letter agreement with CDM, pursuant to which it was agreed that CDM would redeem the Company's CDM Membership, and CDM would admit DFW to membership of CDM, with DFW obtaining membership in it.

57. On 27 March 2025, Mr Patrick executed:

(1) Admission and Amendment No.1 Agreement between CDM and DFW under which DFW was admitted as a member of CDM, in consideration for a capital contribution of US$1,637,192; and

(2) Admission and Amendment No.2 Agreement under which CDM redeemed (the "Redemption") the Company's CDM Membership for the same sum of US$1,637,192 (the "Redemption Sum").

58. On the same day, Mr Patrick executed a written consent (the "Manager Consent") to the Admission and Redemption, on behalf of CDM, under which the Admission and Redemption was justified by reference to Participating Shareholders allegedly posing a material risk to the Company, due to:

"*among other things, (i) officers and directors of the Highland Foundations seeking to assert dominion and control over the assets of DAF (through the Current Member), despite no legal ability to do so under the Current Member's organizational documents and despite the potential illegality (as demonstrated by tax counsel to DAF—see Exhibits C and D) of doing so, (ii) the potential loss of the non-profit status of the Highland Foundations due to their actions, among others, described in clause (i), and (iii) the potential loss of the tax-exempt status which the Highland Foundations currently enjoy and which is central to the mission of DAF, as a result of the factors including those described in clauses (i) and (ii).*"

59. The Company says that the substantive financial effect of the Redemption, under which DFW paid the Redemption Sum to CDM, and the Company's CDM Membership was redeemed for the Redemption Sum, was that the Company's CDM Membership was purchased by or otherwise transferred to DFW for the Redemption Sum.

*Effect of the Reorganisation*

60. The Company says that the result of these transactions, all done 'in secret', is that:

(1) The Company realised its interest in the Fund, which it says had a Net Asset Value ("NAV") of c.US$269.1m, for only US$1.6m;

(2) The Company made a distribution to Participating Shareholders (c.US$1.6m);

(3) The Supporting Organisations and the Charities were divested of their indirect interest in the Fund, and the assets underlying the Fund; and

(4) The Original Participating Shareholders were diluted from 100% of the economic interests in the Company to less than 50%.

*The Issue of Control*

61. The Company argues that:

(1) the Company, in its role as tax blocker and which formerly held a very valuable interest in the Fund, no longer has that interest or anything like proper value in exchange for it;

(2) the Charities have been completely disconnected from the Fund and structure which was set up to produce capital and income for their activities; and

(3) Mr Patrick remains in control of the Fund and its assets but in a way and pursuant to a structure which has no supervision by the Charities or the Supporting Organisations, and nor do they have any economic interest in it.[11]

62. The Defendants in answer broadly say that:

(1) It is because of Mr Dondero's historic intermeddling and wrongdoing that the Control Person for the DAF structure, D1 (Mr Patrick), acted to reorganise the DAF structure to protect it from Mr Dondero's predations and the risks these posed to its assets and charitable mission, in the sole service of which the Company existed;

(2) Mr Patrick took this protective restructuring action together with the other director of the Company, D2 (Mr Murphy), in good faith, believing it to be in the best interest of the Company, and acting with the benefit of legal and tax advice from an array of respected advisors in this jurisdiction and in the US;[12] and

(3) CDM redeemed the Company's membership interest for fair market value, and the Company paid dividends with the proceeds to its Participating Shareholders.

63. Mr Patrick and Mr Murphy vehemently deny, for the reasons set out in detail in their affidavit evidence, that the restructuring was done in breach of their fiduciary duties to the Company or that they are in any other way in breach as alleged by the Company.

64. Mr Ayres KC for the Company described the reason given for the restructuring as a bogus reason. It has never been properly explained how the assets of the Fund might be imperilled by Mr Dondero.

---

[11] *The claims are pleaded in the Statement of Claim dated 15 July 2025 and amended on 15 October 2025.*
[12] *Including Walkers (Cayman) LLP ("Walkers"), Maples & Calder (Cayman) LLP ("Maples") and Campbells LLP in the Cayman Islands, Shields Legal Group, Carrington Coleman & Sloman & Blumenthal, L.L.P, Dorsey & Whitney and others in the US, and Tony Beswetherick KC in the UK.*

*The Interim Undertakings and Disclosure*

65. The JOLs originally requested urgent injunctive relief last year and the application was listed for 31 July 2025, the last day of term. In the event there was a compromise, the hearing was adjourned and a series of undertakings (the "Interim Undertakings") were given by the Defendants pending the determination of this application.

66. In outline, the effect of the Interim Undertakings was as follows:

(1) Pending the determination of this application, the Defendants and the CDM Entities undertook not to deal with or dispose of any assets of the CDM Entities other than in the ordinary course of business;

(2) The Defendants undertook not to dispose of or diminish the value of their, or any, interest in the Fund other than in the ordinary course of business;

(3) The Defendants and the CDM Entities were not prohibited from making payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor which is required, either in the ordinary course of business, or in respect of their reasonable legal fees and expenses in connection with these proceedings or the official liquidation of Charitable DAF HoldCo, Ltd (in Official Liquidation) FSD 116 of 2025 (JAJ) (the "Liquidation Proceedings"), or the related Chapter 15 recognition application commenced by the JOLs; and

(4) The Defendants were to provide a retrospective notification of transactions below US$50,000, and agreed to give 7 days' notice of any transactions above US$50,000.

*The JOLs' Continuing Concerns about the Interim Undertakings*

67. The JOLs say that the Interim Undertakings, although not adequate for the long-term because there is no ability to prevent any inappropriate or suspicious transactions, were agreed out of a desire for a pragmatic compromise to adjourn a hearing on the last day of the summer term.

68. They say that the Interim Undertakings were expressed to apply only until the determination of the present application (as opposed to through to trial), and the Defendants expressly agreed as part of the Interim Undertakings that the issue of whether they are permitted to use funds that

derive directly or indirectly from the Partnership Interest to pay their legal fees and other service providers will be determined as part of this application.

69. The JOLs are also concerned that the 'ordinary course of business' exception to the prohibition contained in the Interim Undertakings is susceptible to exploitation by Mr Patrick and Mr Murphy because they are likely to say that their 'exorbitant' fees are paid in the ordinary course of business, and are also concerned that the legal fees that have been incurred by the Defendants so far are excessive.[13]

*JOLs' Legal Fees - Funding Agreement*

70. In July 2025, the JOLs filed an *ex parte* sanction application in the Liquidation Proceedings seeking approval to enter a funding agreement (the "Funding Agreement") with an entity named Crossvine Litigation Funding LLC ("Crossvine"), a special purpose vehicle whose managers are Mr Scott Ellington and Mr Michael McDonald. Mr Ellington is apparently a longtime business associate of Mr Dondero.

71. On 5 September 2025, the JOLs notified DFW (D4) (but apparently none of the other Defendants) that they had exhausted the litigation funding provided by Crossvine.

72. Crossvine is apparently:

> "*incorporated for the purpose of ultimately Mr Dondero … funding the liquidation of the Company and the JOLs pursuing the Proposed Proceedings"*[14]

73. As to the arrangements with Crossvine, the CDM Defendants maintain that through the Company, the JOLs are asserting proprietary claims over assets of the CDM Entities that include causes of action and litigation receivables which would inure to the benefit of the liquidation estate, and those causes of action and litigation receivables are, in many cases, directly adverse to the interests of Messrs Dondero and Ellington.

74. The CDM Defendants believe this constitutes an unacceptable conflict of interest, as does the profit Mr Dondero stands to make on any sums advanced under the Funding Agreement.

*Disclosure*

---

[13] *Amounting to, as far as the JOLs are aware, at least US$4,256,882 (MacInnis 3, §111).*
[14] *MacInnis 6, §11.*

75. The JOLs also complain that the disclosure provided by the Defendants under the Interim Undertakings has been deficient. The disclosure deficiencies are described in the detailed chronology referred to at §106 of MacInnis 3. It is not necessary to set them out. They are denied by the Defendants.

76. The JOLs are of the view that no exercise has been undertaken to determine where the assets of the Fund and each of its subsidiaries are held, which raises a wider question about how Mr Patrick has performed his duties to manage the Fund, receiving large fees for doing so, without proper information concerning the Fund's assets. This again is denied by the Defendants, particularly the CDM Defendants.

77. The JOLs say Mr Patrick's attempt to justify his approach at Patrick 2 §151, is cursory and unconvincing.[15]

78. The JOLs argue that the objection is not that consolidated balance sheets were provided, but that there was a failure to provide more detailed, entity-by-entity disclosure that would provide the JOLs with proper visibility into the Fund's asset position.

79. The CDM Defendants respond that the DAF structure historically produced consolidated balance sheets and accompanying quarterly valuation materials. That was always what was provided to the Supporting Organisations and was given to the JOLs immediately following entry into the Interim Undertakings on 31 July 2025.[16]

*The Relevant Law*

*Proprietary Injunction*

80. It is important to emphasise that this is an application for a proprietary injunction. It is not an application for *Mareva* style relief which would require a risk of dissipation and which would normally include an ordinary course of business exception. A proprietary injunction would not usually provide such an exception.

[15] *"...as the DAF Structure prepares consolidated financial materials in the ordinary course, I believe that these allegations are incorrect".*
[16] *They add that once the JOLs requested entity specific financials (which go beyond the existing consolidated records), the CDM Defendants engaged an external accounting firm, Armanino LLC, to prepare entity-level financial information at year-end 31 December 2024, and subsequently as at 30 June 2025.*

*Jurisdiction*

81. The Court's power to grant such relief arises under s.11 of the Grand Court Act (2015 Revision) in conjunction with O.29, r.1 and r.2 of the Grand Court Rules (2023 Revision) ("GCR").

*"Section 11.*

*(1) The Court shall be a superior court of record and, in addition to any jurisdiction heretofore exercised by the Court or conferred by this or any other law for the time being in force in the Islands, shall possess and exercise, subject to this and any other law, the like jurisdiction within the Islands which is vested in or capable of being exercised in England by-*

*(a) Her Majesty's High Court of Justice; and*
*(b) the Divisional Courts of that Court, as constituted by the Senior Courts Act, 1981, and any Act of the Parliament of the United Kingdom amending or replacing that Act.*

*Application for injunction (O.29, r.1)*

*1. (1) An application for the grant of an injunction may be made by any party to a cause or matter before or after the trial of the cause or matter, whether or not a claim for the injunction was included in that party's writ, originating summons, counterclaim or third party notice, as the case may be.*

*(2) Where the applicant is the plaintiff and the case is one of urgency such application may be ex parte on affidavit but, except as aforesaid, such application must be made by motion or summons."*

82. A key feature of the jurisdiction is that a proprietary injunction is only available where the plaintiff can maintain a *prima facie* proprietary claim to the assets which are the subject of the injunction.

§28-199 of Grant and Mumford on Civil Fraud (1st ed) ("Civil Fraud") states:

*"Accordingly, where a claimant asserts a claim in specie to relevant property that claimant can apply to the court for an interim injunction aimed at preserving in the hands of the defendant that property on the basis that at trial the claimant will seek a*

*remedy which involves the return of that property to the claimant. The term "proprietary injunction" is used to describe the type of injunction issued by the court in response to such a claim."*

*Test*

83. In deciding whether to grant a proprietary injunction, the Court applies the principles of *American Cyanamid v Ethicon Ltd [1975] AC 396.*[17]

84. In applying those principles, the applicant must establish three general matters:

(1) There is a serious issue to be tried on the merits;

(2) The balance of convenience is in favour of the grant of an injunction; and

(3) It is just and convenient to grant the injunction.

85. This Court, in *In Frabran Holdings Limited and Ors. -v- Daventree Trustees Limited and Ors,*[18] ("*Daventree Trustees*") confirmed the application of the *American Cyanamid* principles to proprietary injunctions, and stated at §154:

*"In applications for proprietary injunctions, the matter is one for the discretion of the court. On ordinary principles, a plaintiff beneficiary would have to show:*

*a) a prima facie case the property is his,*

*b) a serious issue to be tried that the trust property is in danger pending the hearing of his claim,*

*c) that damages would not be an adequate remedy,*

*d) that the balance of convenience favours the grant of an injunction,*

---

[17] *Polly Peck International plc v Nadir [1992] 4 All ER 769 at 784G-H.; In Ascentra Holdings Inc (in OL) v Yoshida [2024 (1) CILR 409] at §96 (Parker J).*
[18] *Parker J (Unreported, 17 January 2024).*

e) *and that it is just and convenient to order an injunction.*"[19]

86. In a recent case Ramsay-Hale CJ helpfully set out the scope of the Court's power to order proprietary injunctions[20] at §29:

*"The scope of the Court's power to make property preservation orders pursuant to GCR O.29, r.2(1) is usefully summarized in the White Book:*

i. *the source of the Court's power is the inherent jurisdiction of the Court to secure by orders the just and proper trial of the issues: see White Book note 29/8A/2;*

ii. *the Court may only make an order in relation to property "which is the subject-matter of the cause or matter or as to which any question may arise therein." The property must be bona fide the subject-matter of the action: see note 29/8A/7;*

iii. *the order may be granted even where the party against whom it is sought has a proprietary interest in it. An order should not be refused merely because the defendant claims that he has a discretionary power to determine whether or not the property should be preserved and how it should be preserved, when one of the issues in the case is whether or not the power is untrammelled by a duty to the plaintiff to preserve the property: Johnson v Tobacco Leaf Marketing Board [1967] VR 427."*

*Serious Issue to be Tried*

87. The Company must show a serious issue to be tried that it has a specific proprietary interest in the asset under consideration i.e. the Partnership Interest. The test is whether the claim has a real (as opposed to a fanciful) prospect of success which would withstand a reverse summary judgment application.

88. As the Court said in *Ascentra*:[21]

---

[19] *See also Smellie CJ in Classroom Investments Inc v China Hospitals Inc [2015] (1) CILR 451 at §§50-57.*
[20] *Lakeshore Biopharma Co Ltd [2025] CIGC (FSD) 24 ("Lakeshore") Ramsay-Hale CJ.*
[21] *Ascentra Holdings, Inc (in official liquidation) v Yoshida [2024 (1) CILR 409] Parker J.*

> "*97. The company must show a serious issue to be tried, i.e., that there is a "real, as opposed to a fanciful, prospect of success on the claim." This is lower than the "good arguable case" threshold that applies in freezing injunction cases. A serious issue to be tried has to be shown on the evidence, not by mere assertion or allegation.*
>
> *98. Further, it follows from the nature of a proprietary injunction that the serious issue to be tried should be in respect of facts which, if proven, would afford the claimant a proprietary remedy."*

*Balance of Convenience*

89. If a properly arguable claim to a proprietary interest is established, it may well be the case that damages will not be an adequate remedy if the property is dealt with pending trial, and so the balance of convenience will generally be in favour of the applicant.[22]

90. As Flaux J said in *Madoff Securities v Raven [2011] EHWC 3102 (Comm)* at §140, once a sufficiently arguable proprietary case has been established, arguments by respondents that '"*it would be frightfully inconvenient to tell you what I've done with your money or to be prevented from continuing to use it" when, on this hypothesis [the respondent] should not have had the money in the first place, do not cut much ice*".

91. Whilst the Court will not enquire too closely into the merits at this stage, where the scales are evenly balanced in relation to the balance of convenience, the Court can take into account the relative strengths of the parties' cases.[23]

92. As to the exercise of discretion, the court said in *Ascentra* at §124:

> *"The question in relation to this issue is which course is likely to involve the least risk of injustice or irremediable prejudice to one party or the other. The analysis will include the prejudice to the company if no injunction is granted, or to the defendants if it is, the likelihood of such prejudice actually occurring, the extent to which it may be compensated by an award of damages or enforcement of the cross-undertaking, the likelihood of either party being able to satisfy such an award, and the likelihood that the injunction will turn out to have been wrongly granted or withheld."*

---

[22] *Grant and Mumford (eds), Civil Fraud: Law, Practice, & Procedure ("Civil Fraud") at 28-206.*
[23] *Polly Peck International plc v Nadir [1992] 4 All ER 769 at 784G–784H.*

93. For the Court to exercise its discretion in all the circumstances of the case, the effect of the injunction must be examined to ensure that it is in the interests of justice overall and does not work unfairly, oppressively or is granted without good cause. The court must assess whether granting or refusing to grant an injunction is more likely to produce a just result.

94. As Lord Hoffmann said as to the purpose and effect of interim injunctions:

> *"It is often said that the purpose of an interlocutory injunction is to preserve the status quo, but it is of course impossible to stop the world pending trial. The court may order a defendant to do something or not to do something else, but such restrictions on the defendant's freedom of action will have consequences, for him and for others, which a court has to take into account. The purpose of such an injunction is to improve the chances of the court being able to do justice after a determination of the merits at the trial. At the interlocutory stage, the court must therefore assess whether granting or withholding an injunction is more likely to produce a just result…that means that if damages will be an adequate remedy for the plaintiff, there are no grounds for interference with the defendant's freedom of action by the grant of an injunction..."*[24]

*Just and Convenient*

95. Generally speaking where the Court finds that the balance of convenience favours the grant of the injunction, it would be unlikely that the Court found that it was not just and convenient to grant the injunction.[25]

*Use of Funds for Ordinary Course Business Purposes*

96. In *Polly Peck International plc v Nadir,* Scott LJ commented that a proprietary injunction "*would not be subject to provisos enabling the use of the money for normal business purposes, or for the payment of legal fees, or the like*".[26]

97. The rationale for this is that the applicant has established that the particular asset in question arguably belongs to him and so the question is whether the respondent should be permitted to use assets which may turn out to be the applicant's for any of those purposes.

---

[24] *National Commercial Bank of Jamaica v Olint Corp Ltd [2009] UKPC 16, at §16.*
[25] *Ascentra ibid, §150.*
[26] *Page 784.*

98. Therefore, in the case of a proprietary injunction, if ordered, whilst there is no presumption in favour of the exceptions for such payments being included in a proprietary order, the defendants may show (and the burden is on them) that it is nonetheless appropriate for any expenditure from the injuncted assets to be permitted.[27]

99. This issue was further examined in *Marino v FM Capital Partners [2016] EWCA Civ 1301* per Sales LJ at §23:

> "*Lewison J (as he then was) in Independent Trustee Services Ltd v GP Noble Trustees Ltd [2009] EWHC 161 (Ch) helpfully summarised the proper approach at para. [6] by setting out the four questions which should be addressed: (1) does the claimant have an arguable proprietary claim to the funds in issue? (2) if yes, does the defendant have arguable grounds for denying that claim? (3) if yes, has the defendant demonstrated that without the release of the funds in issue he cannot effectively defend the proceedings (or, it may be added, meet his legitimate living expenses)? (4) if yes, where does the balance of justice lie as between, on the one hand, permitting the defendant to expend funds which might belong to the claimant and, on the other hand, refusing to allow the defendant to expend funds which might belong to it?"*

*Legal Expenses*

100. Similarly, if there is an argument that provision for legal expenses is to be carved out from the injunction, the defendants will need to satisfy the court that they have no other source of funding available apart from the disputed funds, and that the balance of prejudice comes down in their favour.[28]

101. Further, Miles J in *AB v CD [2023] EWHC 2419 (Ch)* at §43 noted that the balancing exercise must be carried out in relation to "*all relevant circumstances",* and that *'[t]he court will "act cautiously so as to ensure that the funds are not wasted", which may be achieved by "limiting the amount …even if that may cause a defendant to reassess how to pursue her case or to consider alternative funding models*"'.

---

[27] *Civil Fraud ibid at 32-059 to 32-060.*
[28] *Ascentra ibid, §151.*

*Ancillary Disclosure*

102. Ancillary to freezing and proprietary jurisdiction, it is well established that the Court has jurisdiction to require respondents to provide disclosure.

103. In the context of proprietary injunctions, it is legitimate for such disclosure orders to be aimed at establishing the whereabouts of missing funds, as opposed to merely policing the terms of the order.

104. As the editors of Civil Fraud point out at 29-028 to 29-029:

> "*The court's approach is epitomised in the famous dictum of Templeman LJ in Mediterranea Raffineria Siciliana Petroli SpA v Mabanaft GmbH:*
>
> > *"A court of equity has never hesitated to use the strongest powers to protect and preserve a trust fund in interlocutory proceedings on the basis that, if the trust fund disappears by the time the action comes to trial, equity will have been invoked in vain."*
>
> *The disclosure typically ordered in such a case is categorically different to a normal asset disclosure order. What the court is here doing is requiring the respondent to identify the current location and status of assets, or their proceeds, to which the claimant lays claim, even if they are no longer in the possession of the respondent and regardless of whether the respondent himself claims ownership of the assets…*"

*Cross-Undertakings and Fortification*

105. The court will normally require a cross undertaking in damages as the price for interfering with the defendant's freedom before they have been found liable for anything and to indemnify the defendants for any damage found wrongfully to have been caused to them by the injunction, if they ultimately prevailed at trial.[29]

---

[29] *Kelly v Fujigmo Limited [2012] (2) CILR 222 Smellie CJ at §13; JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev [2015] EWCA 139 at §68.*

106. This would be the usual order to achieve justice at the trial.[30] There are rare exceptions where the court has waived or limited the size of the cross undertaking required, but there would have to be a good reason not to make the usual order, for example where the applicant's inability to provide the undertaking has been caused by the wrongful conduct of the defendants or where there is no practical possibility of damage being suffered. The mere fact that the claim is being brought by liquidators of an insolvent company does not lead to the conclusion that a cross undertaking should be capped.[31]

*Fortification*

107. Assuming that the defendants can show:

(1) on a good arguable case basis, that the injunction will cause them loss; and

(2) that the party offering the cross undertaking will not be good for the money absent fortification,[32]

the approach is for the Court to make an intelligent estimate of the likely amount of any loss which might be suffered by the applicant for fortification by reason of making the interim order, and assess whether the making of the interim order is or was a cause without which the relevant loss would not be or would not have been suffered.[33]

*D1, D3, D5 and D6 (CDM Defendants) Arguments in Outline*

108. The following represents a summary of the points Mr Andrew Scott KC made on behalf of the CDM Defendants:

(1) Mr Patrick and Mr Murphy vehemently deny that there has been any breach of their fiduciary duties to the Company for the reasons set out in their affidavit evidence;

---

[30] *Hoffmann-La Roche & Co. A.G. v Trade & Indus. [1975] AC 295 at §361 (Lord Diplock), cited by the Cayman Islands Court of Appeal in Ennismore Fund Management Ltd v Fenris Consulting Limited [2020] (2) CILR 147 at §37.*
[31] *Re IAHP Group Holdings Limited; Bucknall v Rizvi [2025] EWHC 2069 (Ch) per Mellor J at §87.*
[32] *Omni Bridgeway (Fund 5) Cayman Invt Limited v Bugsby Property LLC & Anor [2024] Costs LR 405 per Jacobs J at §9.*
[33] *Daventree Trustees at §162.*

(2) The proprietary injunction sought, in respect of the limited partnership interest (the Partnership Interest) held by CDM is too wide and would restrain dealings with partnership assets of the Fund to which the Company has no pleaded proprietary claim;

(3) There is no legal basis for such a claim under the Exempted Limited Partnership Act (as amended) ("ELP Act") or the ARLPA;[34]

(4) The relevant assets are held by the general partner on statutory trust for the partnership and not by or for any limited partner;

(5) Even if there were a proprietary interest in the limited partnership, it is of no economic value to the Company, being a right to be considered by the general partner for discretionary charitable distributions for the benefit of qualifying Indirect Charitable Owners, and so any loss would fall on those owners, not the Company, and being financial in nature it could be adequately compensated in damages;

(6) The effect of the relief sought would be to 'lock down' the Fund and the CDM Entities and place their operations under the control of the JOLs, which is not justified. It would restrain the CDM Defendants from conducting their lawful business operations in the ordinary course, impairing their ability to make distributions to charitable causes;

(7) The Company's only rights as the former limited partner of the Fund were to be considered for discretionary distributions at the sole discretion of the general partner[35], and there is no justification for the JOLs taking such control;

(8) The Company's purpose and role within the DAF structure was to facilitate charitable distributions to qualifying non-profit organisations. It did not exist to operate or transact business as a commercial entity or to benefit its Participating Shareholders;[36]

---

*[34] The limited partnership interest is a bundle of contractual and /or statutory rights not a proprietary interest in the Fund's assets.*
*[35] See Article 4.2 of the ARLPA. The ARLPA also confirms that: (i) the General Partner has full, exclusive and complete discretion to manage the DAF's affairs and assets (Article 1.6(a)); (ii) Limited Partners do not participate in management and have no power to bind the DAF (Article 1.6(b)); (iii) distributions are at the General Partner's discretion (Article 4.2(a)); and (iv) partners renounce any right to partition partnership property (Article 6.14).*
*[36] See Asif J's comments at the June 2024 sanction hearing in the Liquidation Proceedings: "this structure is unlike the majority of funds in that there is no right to receive dividends. So it's purely discretionary, it's almost like a discretionary trust" and "could, for example, be set up as a foundation company."*

(9) The JOLs are being funded by Mr Dondero (who allegedly has a history of dishonesty and vexatious litigation) through a funding vehicle, Crossvine, established for his benefit, which has opaque financial standing;

(10) The reason Mr Patrick acted in late 2024 and 2025 to restructure was to protect the Fund from Mr Dondero's predations and the risks[37] that these posed to its assets and charitable mission;

(11) Both Mr Patrick and Mr Murphy carried out the restructuring in good faith believing it to be in the best interests of the Company having taken legal and tax advice from respected advisers in this jurisdiction and in the US;[38]

(12) When Mr Patrick and Mr Murphy caused the Company to assign the Partnership Interest as part of the DAF restructuring, they did so in good faith, in the best interests of the Company, and for valuable consideration in the form of the Company's CDM Membership. They likewise acted when the Company's CDM Membership was redeemed. The Company was paid US$1,637,192 upon redemption, a fair market valuation supported at the time by two independent valuation exercises (by ValueScope and FTI) and subsequently confirmed by a third independent firm, Weaver & Tidwell LLP ("Weaver").[39] Having received the fair market value of its CDM membership interest, the Company immediately distributed those proceeds to the Original Participating Shareholders;

(13) Having carried out the restructuring, there is no realistic risk that CDM will dispose of or diminish the value of the Partnership Interest now that it has been put beyond Mr Dondero's reach;

---

[37] *An illustration of that exposure is, according to the CDM Defendants, the litigation that UBS pursued in the US Courts against Mr Dondero and entities with which he was affiliated or controlled (the "UBS Litigation"). On 8 February 2023, UBS filed a Special Turnover Petition whereby, apparently, it sought to challenge as fraudulent certain transactions by which attempts were made to put assets beyond UBS's reach and to affix liability to the entities involved on the basis that they were the "alter egos" of Mr Dondero. One such transaction involved D6 ("CLO HoldCo"), one of the holding companies within the DAF Structure, which was joined as a defendant to the petition. UBS alleged that "CLO HoldCo is a wholly owned subsidiary of [the DAF] which Dondero indirectly controls and has funded from personal assets, his family trusts, and HCM". Mr Patrick and Mr Murphy were able to settle UBS's claims and secure broad releases for the benefit of CLO HoldCo and other CDM Entities. The CDM Defendants say that UBS were willing to settle and provide releases as they were satisfied that CLO HoldCo and the CDM Entities were no longer aligned with Mr Dondero.*

[38] *The decision-making is recorded in the Company board resolutions dated 18 December 2024,7 February 2025 and 2 April 2025.*

[39] *See Patrick 2 at §81.*

(14) The relief sought would risk causing irremediable harm to the Fund, the CDM Entities, and their ongoing businesses, impairing the charitable mission they support by US$126.7 million[40]. The JOLs are unwilling or unable to offer a properly fortified cross undertaking in damages in respect of this risk and so the balance of convenience weighs decisively against granting the injunctive relief;

(15) The imposition of an injunction stands to benefit Mr Dondero, and Mr Ellington personally. For example, it would prevent the CDM Entities from pursuing valuable litigation claims which are adverse to their interests (claims which, taking the JOLs' pleaded case at its height, would otherwise inure to the benefit of the liquidation estate); and

(16) There is no basis for a proprietary injunction against Mr Patrick in respect of his properly incurred, approved and documented salary and bonus payments or the two pieces of US real estate referred to in the pleaded case, as he was paid by other entities within the structure, not the Company, and it has no pleaded proprietary claim to those assets or any *prima facie* case that they belong to it.[41]

*Constructive Trust*

109. The CDM Defendants also argue that there is also no arguable proprietary case available to the JOLs that:

(1) CDM holds its limited partnership interest in the Fund on constructive trust for the Company; or

(2) DFW holds the Participating Shares issued to it on constructive trust for the Company; or

(3) DFW holds its membership interest in CDM on constructive trust for the Company.

---

[40] *As set out in the Damages Report from ValueScope.*
[41] *Mr Patrick is a US citizen who lawfully purchased these assets with remuneration received from his employment by US entities.*

*No Assets at Risk*

110. The CDM Defendants argue that even if any of the proprietary claims were sustainable, they would not support the extraordinary relief sought, where the JOLs have had the benefit of the Interim Undertakings, which have 'held the ring' in a manner that is just and convenient and which has allowed the Fund and the CDM Entities to further their charitable mission in the ordinary course of their business.

111. The CDM Defendants say that the criticisms the JOLs advance[42] are not a fair reflection of how they have worked in practice and that there has been no exploitation of the ordinary course of business exception as alleged. The CDM Defendants also say the JOLs have had ample opportunity to police and if required prevent suspicious transactions of which there have been none.

*Remuneration*

112. They strongly refute the criticisms regarding the alleged excessive remuneration received by Mr Patrick and Mr Murphy[43] and rely, in respect of Mr Patrick's remuneration, on the compensation benchmarking work done by Mercer, a global consulting firm, and by the remuneration/compensation committee.

113. They also rely on the fact that the JOLs have not filed expert evidence which challenges Mercer's recommendations. They point out that the comparisons the JOLs make with Mr Grant Scott's historical remuneration are inappropriate for a number of reasons, not least that Mr Scott's role was fundamentally different in scope, complexity and exposure to Mr Patrick's. They say that Mr Scott only passively managed the structure, outsourcing management of the assets and investment decisions to entities owned or controlled by Mr Dondero, who then charged significant investment management and advisory fees.[44]

*Modified Undertakings*

114. The CDM Defendants refer to the modified set of undertakings that they offered on 24 November 2025, to last until the determination of the trial, subject to the provision of appropriate fortification of the cross undertaking, which the JOLs refused.

---

[42] *See MacInnis 3.*
[43] *See in detail Patrick 2 and Murphy 1.*
[44] *Estimated at approximately US$30 million between 2014 and 2020, Patrick 2 at §137.*

115. As to the modified undertakings offered, Mr Ayres KC explained the objection taken by the JOLs, in particular to the suggestions which now said that the CDM Entities would only be obliged to give 7 days' notice of transactions above US$100,000 (as opposed to US$50,000) and that no disclosure was required of payments made by the CDM Entities to Mr Patrick and Mr Murphy above US$50,000 where the payments were contractual salary or bonus entitlements accrued in the ordinary course.

116. Mr Andrew Scott KC argued that if the Court were minded to grant some form of injunctive relief, it should be the minimum necessary to maintain the *status quo* pending trial and any order should be modelled on these undertakings.

117. He argued that the JOLs' criticisms regarding the Interim Undertakings' apparent 'inadequacies' and lack of protection are overblown. He submitted that the JOLs have not shown any irreparable harm to the Company or that there is any real risk that the assets would be adversely dealt with.

*Texas Proceedings*

118. Reference was made to Texas proceedings which it is necessary to briefly describe.

119. The Highland Foundations applied in July 2025 to obtain a Temporary Restraining Order that would have 'locked down' the DAF structure.

120. In the Texas Petition, the Highland Foundations sought (among other things) the imposition of a constructive trust over all assets, interests, and property of, and immediate injunctive relief to freeze all assets held in, the Fund. The Highland Foundations alleged that Mr Patrick owed them fiduciary duties which were breached in the restructuring that he organised.

121. The CDM Defendants point out that the Judge in the Texas proceedings observed to the Highland Foundations at the hearing that:

> "*I'm struggling to find evidence in the record that there is an immediate threat of irreparable harm. It appears that the $270 million is gone. Your concern is you don't want to confirm it away. But I'm not seeing anything in the record to indicate to me that there is an immediate threat of that*".

122. The matter was settled (by the Rule 11 Agreement) upon the CDM Entities giving undertakings on 11 July 2025.

123. Mr Scott KC invited the Court to endorse the Texas court's recognition that there was no risk of irremediable harm. Particularly in the light of the Rule 11 Agreement in Texas where undertakings were given not to make payments other than in the ordinary course of business, for investments and monies to be kept in the entities which they currently resided in, and for there to be no further change in the corporate structure. Subject to that the Fund and its assets could be operated in the ordinary course.

124. Mr Ayres KC pointed out that these proceedings did not concern the Company, the relief sought was not refused and the agreement made was outside the JOLs' control.

125. Mr Scott KC urged the Court to have regard to the effect of an injunction which would:

(1) cause serious and irreversible prejudice to the CDM Defendants by restraining them from conducting their lawful business operations and impairing their ability to make distributions to charitable causes; and

(2) benefit Mr Dondero and Mr Ellington personally. It would, he said, prevent the CDM Entities from pursuing valuable litigation claims which were adverse to their personal interests which would be otherwise for the benefit of the liquidation estate, and it would also benefit them personally as they would gain from any uplift of sums advanced under the funding agreement.

*Legal Fees*

126. The CDM Defendants argue that the JOLs' criticism of the amount of legal fees expended was misplaced because such fees were caused by the JOLs' litigation tactics in the U.S. and Cayman, for example their conduct of the sanction application in June 2025 which resulted in indemnity costs of *circa* US$1m being awarded against them in favour of DFW and Mr Patrick.

*D2 Submissions in Outline*

127. Mr David Quest KC's submissions included the following points on behalf of Mr Murphy:

(1) There is no adequately pleaded case or serious issue to be tried on the evidence that the payment of remuneration to Mr Murphy amounted to a breach of fiduciary duty;

(2) There is no tracing claim that money paid to him by way of remuneration would justify a proprietary, as opposed to a personal, claim against him;

(3) If there were any such case, the proper plaintiff would be the corporate entity that made the payment and the Company did not make any payment. The Company does not have and never has had its own source of liquidity given its purpose as a blocker for UBTI;[45]

(4) The Company has no proprietary claim to the assets of the Fund and less so to the assets held by subsidiaries of the Fund because its limited partnership interest only gave it an entitlement to be considered for discretionary charitable distributions, not for its own account but for the account of the appropriately qualified charities;

(5) The Terms of the ARLPA[46] made clear that the Company had no entitlement to remain an object of the charitable purposes of the Fund and, unlike a shareholder, never had any right to exercise managerial control over the Fund assets;

(6) Pursuant to section 16(1) of the ELP Act, the general partner of the Fund held its sole asset (the shares in CLO HoldCo) on trust for the Fund in accordance with the ARLPA;[47]

(7) Damages would be an adequate remedy if liability were established at trial and so the balance of convenience is against any proprietary injunctive relief;

(8) If an injunction were granted against Mr Murphy, the assets in question would have a maximum value of US$900,000[48] which is insignificant compared to the value of the overall claim (c.US$270m); and

---

[45] *Patrick 1, §30-31.*
[46] *LPA 2011 cl.4.3 and LPA 2024 cl.16.*
[47] *Section 16: "(1) Any rights or property of every description of the exempted limited partnership, including all choses in action and any right to make capital calls and receive the proceeds thereof that is conveyed to or vested in or held on behalf of any one or more of the general partners or which is conveyed into or vested in the name of the exempted limited partnership shall be held or deemed to be held by the general partner and if more than one then by the general partners jointly, upon trust as an asset of the exempted limited partnership in accordance with the terms of the partnership agreement".*
[48] *Although he has been spending money on outgoings: Murphy 1, §§84-87.*

(9) An injunction would be highly invasive and prejudicial to Mr Murphy as it would freeze most of his liquid assets and the bank accounts into which his salary and bonus were paid.

*DFW (being the majority Participating Shareholder of the Company) (D4) Submissions in Outline*

128. The only liquid assets which DFW holds are the discretionary distributions it receives through its limited partnership membership in CDM (the "CDM Interest"). It also has 51% of the Participating Shares of DFW in the Company.

129. Ms Jennifer Colegate's submissions included the following points:

(1) The property in the hands of DFW was not property which could be followed or traced from the Company to DFW, and as such cannot be the subject of a constructive trust;

(2) There is no basis for restitution as between DFW and the Company in respect of the CDM Interest because the interest conferred on DFW has not been done so at the expense of the Company - it was redeemed for value;

(3) Damages would be an adequate remedy if the redemption was found at trial to be for insufficient consideration;

(4) There is no serious issue to be tried as to the Company having a proprietary interest under Cayman law in the CDM Interest and it is not pleaded how agreements governed by the laws of Delaware would support the imposition of a proprietary injunction;

(5) The Company does not and cannot as a matter of law hold title to its own shares and cannot assert a constructive trust over shares it has issued;

(6) There is no risk of DFW disposing of any assets and DFW has no intention to do so;

(7) An injunction would prevent DFW from making charitable distributions to charities in accordance with the Fund's charitable purposes; and

(8) DFW should be allowed to defray necessary legal costs from funds available to it via CDM.

***Decision***

*Is there a serious issue to be tried that the Company has a proprietary interest in the asset(s) over which an injunction is sought to be imposed?*

130. The Court has carefully considered whether the Company, as a limited partner in the Fund, has a proprietary interest as a limited partner which would entitle it to be protected by way of the injunction sought and/or an indirect beneficial interest in the underlying assets of the Fund.

131. The Court answers both of these questions in the negative.

132. Taking a step back, wide interim proprietary injunctive relief with similarly broad orders for asset disclosure are sought by the Company which would require (among other things) each Defendant to:

> *"preserve and… not in any way dispose of, deal with, encumber, transfer or diminish the value of… any interest… in Charitable DAF Fund, LP… the Fund Entities… and/or any assets of the Fund",*

with no exceptions for ordinary course dealings.

133. The Court accepts the Defendants' submissions that it would restrain dealings with partnership assets of the Fund to which the Company has no pleaded proprietary claim which may be because, under Cayman law, the assets are held by the general partner on statutory trust for the partnership and not by or for any limited partner.

134. An Exempted Limited Partnership ("ELP") under Cayman law is different from an ordinary partnership and a registered company. It has no legal personality.

135. The property and rights of an ELP are held on trust by the general partner as an asset of the partnership in accordance with the terms of the partnership agreement.[49]

136. The limited partners do not own those assets, whether legally or beneficially. They instead have contractual rights under the ARLPA and statutory rights under the ELP Act. Those rights do not in the Court's view found a seriously arguable proprietary claim to partnership assets.

---

[49] *Section 16(1) of the ELP Act.*

137. Notwithstanding this, a limited partner may be said to have a 'proprietary interest' in the partnership assets,[50] a concept which Mr Ayres KC relied upon.

138. However, in the same way beneficiaries under a discretionary trust may have a 'proprietary interest' in the trust assets and their interests are to be considered.

139. The limited partnership interest in this case is not a proprietary interest in the assets themselves but the right to be considered for potential distributions[51] which the Company then passes on to the Charities.

140. The Court is not satisfied in this case that there is a real prospect of showing that the Company has a legitimate proprietary claim to legal or beneficial ownership of the assets it seeks to injunct.

141. The Court has examined the particular features of the legal structure of the ELP and the terms of the relevant partnership agreement to ascertain the extent and nature of any proprietary claim and entitlement of the limited partner.[52]

142. The recitals to the ARLPA provide that the purpose of the Fund was to:

> "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code ... for the economic benefit of* ***the Limited Partner and its Indirect Charitable Owners****...*". (emphasis added)

143. Clause 1.3 of the ARLPA provides that:

> "*... the Partnership may make investments in other types of securities, investment vehicles and instruments* ***in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners*****"**. (emphasis added)

---

[50] *Aquapoint LP (in Official Liquidation) v Fan [2025] UKPC 56 per Lord Richards at §48: this view was expressed in the context of a winding up petition appeal, not a proprietary injunction case.*
[51] *Y v R [2018] 1 CILR 1 Mangatal J at §59 and §§66-68 and JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev (CA) [2016] 1 WLR 160.*
[52] *The legal interest of the limited partner is expressed in the partnership agreement to be an ownership interest equal to each limited partner's opening capital account: clause 4.1 of the ARLPA.*

144. "*Indirect Charitable Owners*" is defined in clause 1.12 of the ARLPA as:

> "***the indirect equity owners of the Limited Partners****, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.*" (emphasis added)

145. Clause 4.2(a) of the ARLPA provides that:

> "*Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash* ***and the needs of the Indirect Charitable Owners of the Limited Partner*** *for funds to cover their administrative and operating expenses…*". (emphasis added)

146. The particular position and purpose of the Company in the structure gives it no proprietary claim to the assets of the Fund or the assets held by the subsidiaries of the Fund.

147. The Company's limited partnership interest only gave it an entitlement to be considered for discretionary distributions, not for its own account, but for the account of the appropriately qualified charities.

148. It is true that the Original Participating Shareholders had the right to be considered for a dividend from the Company (Article 12), but the purpose of the Fund was to make charitable distributions to the relevant Charities through the Company which was given no ownership rights and, in the Court's view, was not entitled to be an object of the charitable purposes of the Fund.

149. Mr Ayres KC submitted that clause 4.2 of the ARLPA is expressed in mandatory terms with regard to distributions, but reading the clause as a whole, together with the ARLPA, it is clear that discretion was left to the general partner after first taking into consideration available cash and the needs of the Indirect Charitable Owners.

150. It also appears from Mr Patrick's evidence[53] that the distributions which the Company made to each of the Supporting Organisations were not linked to the number of Participating Shares

---

[53] *Patrick 2, §§66-67.*

held by each organisation, but on a predetermined formula primarily linked to the Company's NAV. This is set out by Mr Patrick in an excel spreadsheet.

151. The Participating Shareholders did not receive a *pro rata* distribution or dividend from the Company and instead their annual distribution was dependent on the contractual terms which governed the relationship between each of these Supporting Organisations and their underlying Charities which are, as an average, set out in Mr Patrick's evidence:

> "§68 *These distributions were, on average, c.US$160,000 per annum for Highland Kansas City, c.US$280,000 per annum for Highland Dallas, and c.US$60,000 per annum for Highland Santa Barbara. In addition, CFNT was paid $100,000 per year annually in the fourth quarter of each year."*

152. This is further support for the Court's view, on a proper analysis, that the Company has no legal or beneficial claim to own assets of the Fund or the CDM Entities.

153. This also accords with the Mission Statement adopted by the Company and its objects.

154. The Mission Statement, adopted by the Company by way of written resolution of the Directors on 3 December 2024, stated:

> *'1. ADOPTION OF COMPANY MISSION STATEMENT.*
>
> *1.1 NOTED THAT:*
>
> *(a) The Company wishes to adopt a mission statement to clearly outline the purpose and objectives of the Company.*
>
> *(b) Based on the Company's operating history (which includes significant donations to various charities) and the reason for establishing the Company, the Company wishes to adopt the following mission statement:*
>
> *"Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference." ("Mission Statement")'*

155. The Court finds that this accords with the purpose of the Fund structure, which is to support the Fund's charitable mission, and that the assets are assets of the Fund which are held by the general partner on statutory trust in accordance with the ELP Act and the ARLPA.

156. Moreover, by clause 4.3 of the ARLPA, the general partner can terminate the limited partner's interest in its sole discretion and apparently at will. The limited partner has no entrenched rights.

157. Clause 4.3 of the ARLPA provides that:

> "*The General Partner may require the withdrawal of all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall be directly or indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code.*"

158. The following clauses also make clear that the Company is to be considered for distributions at the general partner's sole discretion, not for its own account, but for the benefit of the Supporting Organisations insofar as they qualified as Indirect Charitable Owners.

159. As the Court has found, that is not a proprietary right to the Fund's assets, but is a limited right consistent with the role of the Company to act as a tax blocker and conduit for charitable distributions.

160. Clause 1.6 (GP powers) of the ARLPA provides that:

> *(a) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs* ***and fulfill the purposes of the Partnership****;*[54] *provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner. (emphasis added)*

---

[54] *i.e. principally to benefit the Indirect Charitable Owners.*

> (b) *Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement."*

161. In addition, in keeping with the limited rights afforded, Clause 6.14 of the ARLPA provides that all Partners:

> "*renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek to bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held*".

*Koza*[55]*,Gill and Kaur, and Bourlakova*

162. Mr Ayres KC sought to rely on the English Court of Appeal's decision in *Koza* and the subsequent decisions which considered *Koza* to persuade the Court that a proprietary claim was justified in this case. The Court has carefully considered these decisions and the helpful submissions of both Mr Ayres KC and Mr Scott KC.

163. The Court has concluded that there is good reason not to follow each of these decisions in the way that Mr Ayres KC suggested the Court should. To explain why the court has decided not to follow them in the way Mr Ayres KC suggested, it is necessary to give short explanations and analysis.

164. The *Koza* case was principally concerned with the *Mareva* jurisdiction (freezing orders) of the English court, not the proprietary injunction jurisdiction.

165. One of the issues considered by the Court of Appeal was whether the court had jurisdiction to make the injunction regardless of whether there had been a breach of an undertaking given to

---

[55] *[2020] EWCA Civ 1018.*

the court. The Court of Appeal decided that there was such jurisdiction and Lord Justice Popplewell gave the leading judgment:

*"67 Although at first sight it might seem surprising that the jurisdiction to make ancillary orders to enforce or render effective undertakings can be invoked when it is not, and never will be, definitively established that the threatened conduct is a breach of the undertaking, and there is no decided case revealed by counsel's researches in which it has been exercised in such circumstances, it seems to me that it is consistent with established principle and practice that such jurisdiction exists and can be exercised in such circumstances.*

*68 The starting point is that where the court has by injunction restrained conduct in general terms, the ancillary jurisdiction permits the grant of a further injunction to restrain something specific which is within the scope of the general restraint.* ***This is a common feature of freezing orders****."*(emphasis added)

166. Popplewell LJ made the distinction between the freezing order jurisdiction and a proprietary claim to assets which he described as founding a principled basis for preserving those assets pending trial:[56]

*"82 I would also accept the existence of this alternative jurisdictional basis for the injunction granted by the judge. Where there is a dispute over control of a company the court may make interim orders,* ***including freezing orders, whose purpose is to preserve the value of the company in favour of a party who has a legitimate interest in preserving its value.*** *(emphasis added)*

*83 Section 37(1) of the Senior Courts Act 1981 is in very wide terms. ... Where a claimant has a proprietary claim to assets, there is obviously a principled basis for preserving those assets pending trial, and a proprietary freezing order is commonly granted in such circumstances.* ***In the present case Koza Altin has no proprietary claim as such to the assets in question: the funding will be from assets owned by its subsidiary, Koza Ltd. However, a parent company does have an interest in the use by its subsidiary of the latter's assets because such use affects the value of its shareholding in the subsidiary, and such***

[56] *§§82-83.*

***interest is proprietary in nature because the shareholding is a species of property.*** *It is, therefore, in accordance with principle that the court's wide jurisdiction under section 37 should be exercisable to protect such a proprietary interest in appropriate circumstances.* ***Koza Altin's proprietary interest in preserving the value of Koza Ltd's assets, and the consequent value of its own shareholding, is a legitimate interest which is capable of justifying protection by the grant of a freezing order****. It is a separate question whether the circumstances justify the grant of such an injunction in any particular case; but the existence of a power to grant it is consistent with principle."* (emphasis added)

167. As to the freezing order jurisdiction, the court needed to determine whether there was a real risk that the alleged expenditure at issue in breach of undertaking would be an unjustified dissipation of assets otherwise than in the ordinary and proper course of Koza Ltd's business.

168. In the Court's view, the *Koza* decision does not assist Mr Ayres KC in relation to the jurisdiction to grant the proprietary injunction in this case, where the facts are very different.

*Gill and Kaur*[57]

169. In this case the respondents to the injunctions did not appear and were unrepresented. Bryan J had heard no opposition to the injunctions and said, purporting to apply *Koza,* at § 40:

"*In order to obtain a proprietary injunction, it is not necessary for the applicant to have a direct proprietary claim to the assets themselves."*

170. The Court finds this to be unpersuasive authority in the circumstances in which the Judge made that comment, against the jurisprudence to the contrary which requires a proprietary claim to the assets themselves.

[57] *[2025] EWHC 156 (Comm).*

*Bourlakova*[58]

171. This, unlike *Koza* and *Gill and Kaur, was* a proprietary injunction case where the claimant sought injunctions to restrain dealings with the company's assets pending trial. The claimants claimed to be shareholders of the relevant companies.

172. However, the judge in that case, Smith J, was not being asked to order an injunction which would prevent the companies from continuing in the ordinary course of their business. That is unusual for a proprietary injunction case, which unlike the freezing order jurisdiction, does not require a real risk of dissipation of assets and would normally not allow an ordinary course of business exception because the assets themselves are claimed to be owned by the applicant.

173. Smith J took *Koza* to establish that a proprietary injunction could be made to restrain the company from dealing with assets without the need for any proprietary claim and without the need to show any risk of unjustified dissipation.[59]

174. With respect to the Judge, this Court does not accept that the analysis he makes of Popplewell LJ's judgment in *Koza* is correct.

175. Popplewell LJ found on the particular facts of that case that the parent had an interest in the use by its subsidiary of the subsidiary's assets, even though it did not have a proprietary claim to those assets, because he found that such use affected the value of its shareholding in the subsidiary, and such an interest is proprietary in nature because the shareholding was a species of property.

176. Popplewell LJ, however, was dealing with a freezing order which could still be made provided its requirements were met in relation to a real risk of dissipation.

177. In any event, *Bourlakova* can also be distinguished on the facts.

178. An ordinary course exception is applied for in this case which concerns a limited partner interest in a Fund, not a shareholder's interest in a Company.

---

[58] *[2025] EWHC 1792 (Ch).*
[59] *§§140-144.*

*Lakeshore*[60]

179. Even if it could be said that the rights of the Company in this case, as a limited partner in the Fund, are somehow analogous to a shareholder's rights in the above three cases (which the Court doubts), the Court could not grant a proprietary injunction if there is no *prima facie* ownership interest in the relevant assets sought to be injuncted.

180. This issue was considered by the Chief Justice in *Lakeshore.* In that case a displaced shareholder sought a proprietary injunction against a company in respect of the company's assets. This was refused on the basis that there was no good claim to beneficial ownership of those assets and the shareholder rights asserted in that case did not found a basis for proprietary injunctive relief.

181. The Court held that a proprietary claim is one where the claimant asserts a legal or beneficial interest in an asset and that the asset must be specific and ascertained, citing Gee Commercial Injunctions (7th Ed.) at 2-026.[61]

182. The Court noted that a company's shareholders have no proprietary interest in its assets.

183. This Court accepts the reasoning in that case and applies it to this application.

*Valuation Issues*

184. The Court has also reviewed the detailed advice of Mr Beswetherick KC who advised the Company that the Company's objects, revised in line with the Mission Statement, could not realistically be challenged by the Participating Shareholders.[62]

185. The Court has concluded that the Fund structure in this case gave the Company and its Participating Shareholders no rights of legal or beneficial ownership or indeed control with regard to the Fund and its assets.

186. There is evidence that other charitable entities were unwilling to accept 'a gift of Participating Shares' on this basis:

---

[60] *[2025] CIGC (FSD) 24.*
[61] *§61 and see §§62-69.*
[62] *See §§56-60.*

> *"[t]hese charities carried out extensive due diligence on the Participating Shares and ultimately rejected the gift. These charities determined that the shares did not confer sufficient economic rights to qualify as a gift because they provided only discretionary dividends, carried no liquidation rights, and were susceptible to being diluted at any point"*.[63]

187. As borne out by the valuations conducted in this case, this outcome was of more limited economic value to the Company as a limited partner in the Fund than an asset valuation of the Fund's assets.

188. Having considered the Company's arguments and evidence, the Court takes the view that there is no good reason to impugn ValueScope's assessments of the CDM Interest,[64] or to second guess the FTI report[65] (which considered appropriate discounts in relation to the Participating Shares), and/or the Weaver fairness opinion.

189. The Court is unpersuaded on this application that the transactions undertaken were at an undervalue. The JOLs have adduced no valuation evidence.

*What Rights did the Company have as a Limited Partner in the Fund?*

190. The Court accepts Mr Scott KC's submissions that the Company's rights as a limited partner in this structure were not typical of those in a commercial Cayman investment fund. The Fund was not an investment vehicle for limited partners on commercial terms as is usually the case.[66]

191. Unlike a limited partnership agreement used for commercial investment purposes, the ARLPA did not have the usual provisions relating to, for example: the limited partners' capital commitments; investment objectives; carried interest and distributions; and investment periods. The Fund did not solicit capital from investors. There are no subscription agreements through which interests are taken up as the Supporting Organisations did not make any capital commitments. The Fund was not able to make capital calls against the Supporting Organisations or against the Company.[67]

---

[63] *Patrick Liquidation 1 at §96.*
[64] *7 January and 26 March 2025.*
[65] *27 March 2025.*
[66] *Patrick 1, §§89-99.*
[67] *Patrick 2, §63(d).*

192. Rather, the ARLPA reflects the charitable purpose of the Fund which was to benefit a defined class of qualifying beneficiaries, namely the Indirect Charitable Owners.[68]

193. As stated above, the Court agrees with the Defendants' submissions that the Company only had the right to be considered for discretionary distributions by the general partner at the partnership level and by the Directors at the Company level (by way of dividend).[69]

194. As a matter of US tax law, in order for the Charities to benefit from distributions from the Fund in a tax efficient manner, it was necessary for them to hold their interests through an offshore 'corporate blocker', i.e. the Company. The Company was constituted in a form to facilitate the surrender of ownership and control.

195. It did not hold any assets or cash reserves.[70]

196. It is clear having reviewed the Memorandum and Articles of the Company that the Participating Shareholders (who paid no money for their shares) had no control or ownership rights in the Fund's assets.

197. The Court accepts Mr Scott KC's submission that any economic rights that the Company may have had[71] were satisfied when the Company was voluntarily wound up after the restructuring had taken place.

*The Company's Pleaded Proprietary Claims against CDM and DFW*

198. The claims are in respect of:

(1) the limited partnership interest held by CDM;

(2) the participating shares held by DFW; and

(3) the membership interest in CDM also held by DFW.

199. They are all pleaded to arise from the restructuring on the basis of a constructive trust.

---

*[68] Murphy 1, §28.*
*[69] That is the basis on which ValueScope, FTI and Weaver produced the US$1.6 million valuation.*
*[70] Patrick 1, §31.*
*[71] Under Article 12 "The participating shares shall confer upon the shareholders rights in a winding up of repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles."*

200. The Court, consistent with its findings in relation to the proprietary injunction analysis, finds that those claims raise no serious issue to be tried. The Court finds that there is no seriously arguable case that the Participating Shares held by DFW and the CDM Interest also held by DFW were assets owned legally or beneficially by the Company. No constructive trust arises absent a proprietary interest.[72]

201. The Court is also unpersuaded that there is a real risk that those assets will be diminished or otherwise unlawfully dealt with (see below).

*The Injunction against Mr Patrick*

*The Corporate Entity which made the Remuneration Payments*

202. The Court has reviewed the relevant evidence and the pleadings. The Court takes the provisional view that the sums paid to Mr Patrick as remuneration for his work did not come from Company funds or assets.

203. Whilst there are Company board resolutions in respect of the payments, other companies in the structure actually paid Mr Patrick on behalf of the Company.[73] This may give rise to a proprietary tracing claim by the Company, but there is no seriously arguable case that the payments represent assets which belong to the Company.

*Excessive Remuneration*

204. The Company says in contrast to Mr Scott, who was paid US$60,000 per annum, Mr Patrick awarded himself sums comprising a base salary of US$850,000, a bonus of 2.5 times that base salary, and a long-term incentive ("LTI") payment of US$975,000. For the period March 2021 to March 2024, Mr Patrick was entitled to an aggregate LTI payment of US$4,759,000.

205. From disclosure provided pursuant to the Interim Undertakings, the JOLs say that Mr Patrick received, by way of director's fees, a total of US$10,548,778 in 2024 and US$3,325,000 in the first six months of 2025.[74]

---

[72] *Foskett v McKeown [2001] 1 AC 102.*
[73] *They seem to have been paid by Liberty CLO HoldCo, Ltd, CLO HoldCo Ltd, and Charitable DAF Holdings Corp.*
[74] *MacInnis 3, §52.*

206. Having reviewed the affidavit evidence on this question including the detailed report dated 26 August 2024 from Mercer, the Court finds that there is no serious issue to be tried that this remuneration was excessive and in breach of his duty to the Company.

207. If there were any such irregularity in Mr Patrick's remuneration, the Articles contain an indemnity for officers for conduct short of bad faith.

208. The remuneration levels were the subject of professional advice. Mercer undertook benchmarking and market research which considered the complexity of Mr Patrick's role and the value of the Fund's assets and holdings.

209. The JOLs and the Company have not provided any expert evidence to gainsay Mercer's view.

210. In addition, the remuneration was structured in accordance with legal advice including the establishment of a remuneration committee.

211. Mr Patrick's second affidavit and Mr Murphy's first affidavit set out in some detail the demands of the role of being a Director, their own expertise, and the level of risk involved, particularly in relation to the extensive litigation involving the Fund. Apparently, Mr Murphy was unable to obtain directors and officers insurance given the history of claims made by Mr Dondero.

212. It may be said that as a matter of common sense the Court should objectively assess whether the amounts paid were excessive.

213. Even if there was a seriously arguable case that these amounts were excessive from that point of view and Mr Patrick acted in breach of duty (in bad faith) in relation to his remuneration, the Court finds that this is not a proprietary claim of the Company and is a claim for which damages would be an adequate remedy.

214. The court finds that there is no serious issue to be tried that a proprietary claim lies against the Texas and Missouri properties such that would justify a proprietary injunction restraining the disposition of these properties. The Court accepts Mr Scott KC's submission that there is no pleaded proprietary claim to these specific properties and there is no *prima facie* case that the Company owns those properties or that they are the traceable proceeds of anything belonging to it.

215. There is insufficient evidence that the alleged excess remuneration was used to purchase these properties.

*The Injunction against Mr Murphy*

216. Mr Ayres KC made clear that as Mr Murphy still plays a role in the Fund and the Company, the JOLs apply to injunct him in respect of all the Fund entities.

217. However, it is undisputed, on the evidence before the court, that Mr Murphy does not hold any interest in the Fund or in its limited or general partner and has no shareholding or any other interest in any of the companies connected with the Fund.

218. The Company's proprietary claim concerns only money that was paid to him as remuneration under his director's service agreements.

219. The Court takes the view that the damages and compensation claimed based on his participation in the restructuring are not proprietary claims in nature.

220. Having reviewed Mr Murphy's affidavit evidence,[75] the levels of remuneration he received (which is not contradicted) do not seem to the Court to be excessive in the circumstances. They are within the margin of appreciation in respect of commercial decisions such as risk and reward relating to remuneration.

221. In 2024, Mr Murphy was paid a total of US$466,667[76] including a bonus of US$250,000 in recognition of his:

> "*contribution to the increased independence of the Company"* and *"input in responding to the Supporting Organisations' behaviour in November/December*".

222. The Company says that this appears to be a reward for Mr Murphy's actions in supporting the restructuring and therefore the Company claims to recover this sum.

223. Mr Murphy was also paid US$500,000[77] in fees payable in monthly instalments and backdated to 1 January 2025, to be paid in advance:

---

[75] *Murphy 1, §§48-78.*
[76] *MacInnis 3, §§64-66, §74.*
[77] *On or after 12 May 2025: Murphy 1, §72.*

"*in circumstances where the Companies may have an inability to discharge their financial obligations to [Mr Murphy], for example, where freezing injunctions or temporary restraining orders may be sought against the Companies*".

224. The Court accepts that the comparison made by the Company with the salary paid to Mr Grant Scott is not apposite given the complex and contentious issues that Mr Murphy had to deal with and the professional services he provided.

225. Moreover Mr Patrick, and not Mr Murphy, replaced Mr Scott. Mr Scott had been the sole Management Shareholder of the Company. Mr Murphy's role was newly created.

226. A second director was appointed because entities in the Fund had become involved in US Chapter 11 proceedings (including proceedings for contempt of court) and proceedings brought by UBS in respect of a judgment exceeding US$1 billion. It was considered that there was an urgent need to appoint a robust independent director with litigation experience.[78]

227. Mr Grant Scott was a close personal friend of Mr Dondero, and was:

"*a patent lawyer with no experience in finance or running charitable organisations, who was Mr. Dondero's long-time friend, college housemate and best man at his wedding".*[79]

228. Mr Dondero's deposition evidence in the Highland Capital Chapter 11 bankruptcy proceedings (in Texas) given on 1 June 2021 shows that Mr Scott was not fulfilling a serious role and reveals the difficulties in identifying anyone prepared to take on his position without sufficient protections.

229. Mr Quest KC emphasised that Mr Murphy is a professional independent director with (by 2021) 17 years of relevant legal, financial services, and asset-management experience.

230. The Court is not persuaded that the payment of his remuneration gave rise to an actionable breach of fiduciary duty.

231. Moreover, there is no pleaded case of fraud or wilful default against him or any deliberate decision by him to act in breach of his fiduciary duty. There is also no evidence that would

---

[78] *Murphy 1, §35.6.*
[79] *As noted by Judge Jernigan in the US civil contempt proceedings.*

support an allegation of fraud or wilful default against Mr Murphy, or which would support any allegation of relevant actual knowledge.

232. The Court does not however agree with Mr Quest KC that there is no evidence to support the suggestion that Mr Murphy was paid in return for his agreement to the course of action that Mr Patrick took in relation to the restructuring.[80] The timing of the payment of US$250,000 and the reason given for it, raise a plausible inference.

233. However, the Court is of the view that in the light of the *'Directors liability and indemnity'* provisions of his service agreement,[81] there is no serious issue to be tried.

234. The Court accepts Mr Ayres KC's point that he does not need in his pleading to anticipate defences which may or may not be run. However, the evidence does not show a serious issue to be tried against the liability and indemnity protection.

235. In addition, the Company did not pay Mr Murphy. The Court is not persuaded that the Company owned the funds that were paid to Mr Murphy or that it had a proprietary interest in the remuneration paid by CLO HoldCo (D6) to Mr Murphy. The Company as a limited partner had no control over CLO HoldCo (D6).

236. The balance of convenience is firmly against granting a proprietary injunction against Mr Murphy. The injunction sought against him is not against any identifiable fund over which any proprietary claim by the Company could be made. Even if there were such an identifiable fund, if the injunction were to be granted, it would give Mr Murphy a difficult task to comply with.

237. The remuneration was paid into Mr Murphy's bank accounts. If an order was made against him, he would be left having to work out which monies he still had (and from a proportion of his remuneration said to be excessive over 4 ½ years) or which may be received from any assets of the Fund, at the risk of committal for breach. No tracing claim is pleaded. This ambiguity would be a reason as a matter of discretion to refuse to make the injunction against him.[82]

238. The Court accepts Mr Quest KC's cogent submissions that it is hard to see any benefit to the Company and the JOLs in the injunction application against Mr Murphy not to diminish assets, and there is real potential oppression to Mr Murphy in seeking to comply with the injunction sought.

[80] *Company written argument, §128.*
[81] *See clause 6 of the April 2021 Directors Services Agreement.*
[82] *Vestey Foods UK Ltd v Cox [2018] EWHC 3466 (Ch).*

*The Balance of Convenience Generally*

*Assets in Danger*

239. Had the Court been persuaded that there was a serious issue to be tried in relation to the proprietary interest of the Company and there was a legitimate juridical basis to grant a proprietary injunction, it would not have granted the injunction against any of the Defendants because it is not persuaded that there is a real risk that the assets are in danger.

240. There is no good reason to believe that the relevant assets will be adversely dealt with given the evidence that the Court has considered on this application, and following the undertakings in July 2025 and suggested in November 2025, as well as the Texas Rule 11 Agreement.

241. Having considered the affidavit evidence and submissions made, the Court is unpersuaded that the ordinary course of business exception poses any real risk to the Fund or to the Company.

242. The Court has concluded that the course which is likely to involve the least risk of injustice is not to grant the injunction.

*Lock Down and Transference of Control to JOLs*

243. The balance of convenience would also come down firmly in favour of the Defendants because the effect of the relief if granted would be to lock down the charitable activities of the Fund and place it under the control of the JOLs, which the Court regards as unjustified at this interlocutory stage.

244. The Court is not persuaded that the carve outs for specific projects proposed by the JOLs remedy the issue.

245. There is on the other hand no real risk of irremediable prejudice to the Company and the JOLs if the injunction is refused.

*Serious Issue to be Tried on the Restructuring*

246. The question whether the allegations made against the Directors are true or not will be properly investigated at trial. The principal allegation is a serious one, namely that they have stripped

the Company of its only asset so as to seize control and enrich themselves without the scrutiny of the Supporting Organisations.

247. They each vehemently deny these allegations and give reasons for the reorganisation which will need to be investigated at trial. There is a mass of contemporaneous documentary material to consider including legal and professional advice provided at the time. The Defendants say that it is inherently improbable that all of these advisers were wrong and that the restructuring was invalid or illegal and that the Directors knew this to be the case at the time.

248. No doubt the allegations the Defendants make that the Highland Foundations, which Mr Dondero controlled as Participating Shareholders, were used as vehicles to exert influence over the assets and operations of the Fund, inconsistently with its purpose and exposing it and its assets to litigation in which he was personally involved, will also be examined in detail at trial.[83]

249. All of the evidence will be properly tested at trial against the contemporaneous material so that a conclusion may be drawn as to whether the Directors took the decisions they did because they believed them to be in the best interests of the Company, as they say, or whether they are in breach of fiduciary duty as the JOLs and the Company say.

250. It is clear that Mr Dondero and his affiliates have a long history of contention with Mr Patrick and the Fund. The Court also notes that the Defendants say that Mr Dondero is the primary stakeholder in the liquidation, is funding it, and has a considerable personal stake in the claims being advanced by the Company, as well as the standing to benefit from any recoveries made pursuant to the funding agreement with Crossvine.

251. The Court has carefully considered the actions taken by the Directors, the advice sought and given, and the justifications put forward for the actions that were undertaken. The time when these actions were undertaken coincides with when the Supporting Organisations (Participating Shareholders) were getting increasingly concerned about the conduct of the Directors.

252. The Court has also taken into account the Company's point that these complex transactions were undertaken in secret without notifying the Original Participating Shareholders (Supporting Organisations) and in effect presented them with a *fait accompli*.

[83] *Patrick 1 Liquidation, §§101-164 and Patrick 2, §§26-43*

253. The Court has been persuaded that the Company and JOLs have a case which the Directors need to answer in relation to the divestiture of the Company's limited partner interest in the Fund which does withstand a reverse summary judgment application.

254. Weighing all of these points at this stage with a necessarily incomplete picture, the Court is persuaded that there is a serious issue to be tried as to whether the Directors acted in breach of duty in undertaking the restructuring.

255. The Court expresses no view as to whether that case is likely to succeed or not at this stage, merely that it has cleared the relatively low bar of having a real, as opposed to a fanciful, prospect of success at trial.

256. That finding does not change the analysis or outcome on this application and in particular does not affect the Court's view on the balance of convenience and the exercise of its discretion generally.

257. The Company's interest at stake is not proprietary, is of no economic value to the Company which has not already been reimbursed, and was a right to be considered by the general partner for discretionary charitable distributions for the Indirect Charitable Owners. Any loss would be felt by those owners and could be compensated by an award of damages which could be met from the Fund's assets.

*Cross Undertaking*

258. There is a further important reason why the Court, even had it been persuaded that there was a juridical basis to grant a proprietary injunction, would not have done so.

259. Given the wide nature of the injunction applied for and the significant costs which the Defendants would need to spend to comply with it, the absence of a secure cross undertaking is a good reason to not grant the injunction.

260. The default position is that an applicant for an interim injunction is required to give a cross undertaking in damages. This is not a case where it would be right to waive the cross undertaking required.

261. The Court has concluded that if the injunction were granted, significant loss would be likely to be caused to the Fund and its charitable recipients. There might also be business related and reputational impacts on individuals, including most obviously the Directors, which may be hard to quantify.

*Fortification*

262. The Court has also concluded in its discretion that this is a proper case for fortification. The JOLs themselves are not offering a cross undertaking and yet ask for wide ranging relief and further disclosure orders.

263. The Court is not persuaded that Crossvine, which is put forward to provide a cross undertaking, would be good to make up the likely loss sustained if it was to be found that the injunction had been wrongly granted.

264. The Defendants say Crossvine is controlled by Messrs Dondero and Ellington, both of whom are involved in the UBS Litigation in the US where it is alleged that Mr Dondero has an outstanding judgment against him of more than US$1.2 billion.

265. There is scant material on this application as to the nature, extent and location of Crossvine's assets. Apparently, the original funding Crossvine agreed has been exhausted.

266. The Defendants point out that an indemnity costs order[84] that was made against the Company as part of a June sanction application in the Liquidation Proceedings has not been complied with.

267. The Defendants have a good arguable case that there is a real risk that Crossvine, on the present evidence available, will not be good for the money.

268. Mr Ayres KC argued that the evidence from ValueScope suggesting potential damage to the Fund of c.US$127m if the injunction is granted is flawed because they had been involved in justifying the redemption of the Company's interest in CDM and so were not able to provide objective and independent evidence to the Court by way of the Damages Report. The Court does not agree.

---

[84] *Said to be circa US$1 million.*

269. An intelligent estimate of the loss is, in the Court's view, in the region of the ValueScope Damages Report. There is a real need for fortification in this case and none is offered. That in itself is a powerful factor against the granting of the proprietary injunction sought on the balance of convenience.

*Conclusion*

270. For these reasons, the Court refuses to make an order in the terms of the amended injunction summons filed on 4 December 2025.



**THE HON. JUSTICE RAJ PARKER**
**JUDGE OF THE GRAND COURT**

# EXHIBIT 14

**From:** Sydney Rose
**To:** louis.phillips@kellyhart.com; amelia.hurt@kellyhart.com; hugh.connor@kellyhart.com; michael.anderson@kellyhart.com; katherine.hopkins@kellyhart.com; jmorris@pszjlaw.com
**Cc:** Gaddis, Mike; Sandi Staskus; Geoffrey Harper
**Subject:** RFP to Highland Capital Management, LP, In re Highland Capital Management, No. 19-34054
**Date:** Monday, March 23, 2026 11:40:53 PM
**Attachments:** image001.png
Highland_HCM LP RFPs_03.23.2026.pdf

---

All,

Please find enclosed The Dugaboy Investment Trust's First Requests for Production of Documents, served pursuant to Federal Rule of Bankruptcy Procedure 9014(c) and Federal Rules of Civil Procedure 26 and 34, as incorporated therein.

**Please confirm that you will search the emails of James P. Seery and Richard M. Pachulski in response to these Requests**.

These Requests are served in connection with the above‑referenced matter. Please produce responsive, non‑privileged documents within the time prescribed by the applicable rules. To the extent any documents are withheld on the basis of privilege or work‑product protection (and are not excluded from such privilege or protection based on the Crime-Fraud Exception and/or Subject Matter Waiver), please provide a privilege log consistent with the Federal Rules of Civil Procedure and applicable bankruptcy rules.

Nothing in these Requests is intended to, nor should it be construed to, waive any rights, objections, or privileges of the Dugaboy Investment Trust, all of which are expressly reserved.

If you believe that any aspect of these Requests warrants discussion regarding scope, timing, or form of production, please let me know and we can confer.

Sincerely,

Sydney Rose

**Sydney Rose**
*Associate*

T: +1 214 764 4471 | srose@kslaw.com

King & Spalding LLP
2601 Olive Street
Suite 2300
Dallas, Texas 75201

K&S King & Spalding

kslaw.com

# EXHIBIT 15

**From:** Sydney Rose
**To:** jpomerantz; jmorris; jkroop; hwinograd; gdemo; mhayward; zannable
**Cc:** zmiller; Gaddis, Mike; Sandi Staskus; medney
**Subject:** The Dugaboy Investment Trust"s Responses to Highland"s Requests for Production
**Date:** Monday, March 30, 2026 4:37:09 PM
**Attachments:** image001.png
image002.png
Dugaboy Responses to Highland"s Requests for Production 3.30.2026.pdf
How to Access Your Shared Files-Guide for Clients.pdf

All,

Attached are the Dugaboy Investment Trust's Responses to Highland Capital Management, L.P.'s Requests for the Production of Documents. The production can be found at the share link below.

Shared w Counsel

Thank you,
Sydney Rose

**Sydney Rose**
*Associate*

T: +1 214 764 4471 | srose@kslaw.com

King & Spalding LLP
2601 Olive Street
Suite 2300
Dallas, Texas 75201

K&S King & Spalding

kslaw.com

# EXHIBIT 16

Gregory G. Hesse, Esq.
State Bar No. 09549419
HUNTON ANDREWS KURTH, LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202-2799
Telephone: (214) 979-3000
Telecopy: (214) 880-0011

**ATTORNEYS FOR DUGABOY INVESTMENT TRUST**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| *In re* | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor.[1] | § | |

**DUGABOY INVESTMENT TRUST'S DISCOVERY RELATED TO RULE 9019 MOTION**

Dugaboy Investment Trust ("Dugaboy"), by and through undersigned counsel, hereby serves the following First Set of Discovery upon Movants Highland Capital Management, L.P. ("HCMLP" or "Debtor"), Highland Claimant Trust ("Claimant Trust") and the Highland Litigation Sub-Trust ("Litigation Trust," and together with the Claimant Trust, the "Trusts," together with HCMLP, the "Movants"), with respect to the Movants' *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Dkt. 4216] ("Motion") and requests that the Movants respond to such discovery requests within the time required by the applicable Federal Rules of Bankruptcy Procedure and Federal Rules of Civil Procedure, and that the Movants produce for inspection and copying the documents described below at the offices of counsel identified below.

[1] The *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P., (As Modified)* [Dkt. 1808] ("*Plan*"), filed by Highland Capital Management, L.P. ("*HCMLP*") became effective on August 11, 2021 (the "*Effective Date*").

**REQUESTS FOR PRODUCTION INSTRUCTIONS**

1. Dugaboy seeks production of the documents set forth in the numbered requests below that are in the Movants' possession, custody, or control.

2. All electronically stored information shall be produced in a format mutually agreed upon by the parties or ordered by the Court.

3. Each document must be produced in its entirety (including all attachments) and without deletion or excisions, regardless of whether You consider the entire document or only parts thereof to be relevant or responsive to these requests. If you contend that any document or thing cannot be produced in full, produce it to the extent possible, indicating which document or portion of that document is being withheld and the reason it is being withheld. For any document withheld or redacted, in whole or in part, based on a clam of privilege or work product protection, You shall comply with Fed. R. Civ. P. 26(b)(5)(A). Any privilege log shall be produced in a format and according to a schedule mutually agreed upon the parties or ordered by the Court. Any purportedly privileged document containing non-privileged material must be produced, redacting only the portion purportedly privileged. If you file a timely objection to any portion of a request, definition, or instruction, documents responsive to the remaining portion are to be produced.

4. Documents not otherwise responsive to a discovery request shall be produced if such documents relate to the documents which are called for by this discovery request, or if such documents are attached to documents called for by a discovery request and constitute routine transmittal memoranda, letters, comments, evaluations, or similar materials.

5. Any alteration of a responsive document, including any marginal notes, handwritten notes, underlining, date stamps, received stamps, endorsed or filed stamps, drafts, revisions, modifications, and other versions of a final document is a separate and distinct document and it must be produced.

6. All documents shall be produced in a file folder, envelope, or other container in which the documents are kept or maintained by the Movants. If, for any reason, the container cannot be produced, produce copies of all labels or other identifying marks. Documents shall be produced in such fashion as to identify the department, branch, or office in whose possession it was located and, where applicable, the natural person in whose possession it was found and the business address of each document's custodian(s).

7. If any responsive document is believed to have existed but no longer exists or is otherwise unavailable, describe the document, the reason for its loss, destruction, or unavailability, and provide the name of each person believed by the Movants to have present possession, custody, or control of the original and any copy thereof (if applicable). If no document responsive to a request exists, please so state in the Movants' response.

8. These document requests are continuing and therefore require the Movants (or any person acting on the Movants' behalf) to furnish supplemental responses whenever the Movants (or any person acting on the Movants' behalf) obtains additional information called for by the request. Each supplemental response shall be served on Dugaboy no later than thirty (30) days after the discovery the additional information.

9. Capitalized terms not otherwise defined herein shall have their meanings as set forth in the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) (the "Plan"), and the associated Plan Documents giving meaning and effect to the Plan.

**REQUEST FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1:**

All communications between any of the Movants and the HMIT Entities (as defined in the Motion) related to the proposed Settlement Agreement (as referenced in the Motion).

**REQUEST FOR PRODUCTION NO. 2:**

All communications between any of the Movants and any third-party related to the proposed Settlement Agreement.

**REQUEST FOR PRODUCTION NO. 3:**

All drafts of the proposed Settlement Agreement.

**REQUEST FOR PRODUCTION NO. 4:**

All documents supporting the allegation in Paragraph 21 of the Motion that "[i]f the Settlement Agreement is approved, the only unresolved Claims or Equity Interests will be the Daugherty Claim and the Class 11 Equity Interests asserted by two Dondero controlled entities—Dugaboy and Strand—that have no value but, if they did, their aggregate maximum value, if allowed, would not exceed approximately $1.7 million."

**REQUEST FOR PRODUCTION NO. 5:**

All documents supporting the allegation in Paragraph 9 of the Motion that "[a]s of the Petition Date, HMIT's capital account balance on account of its Class B/C Interests was $394,630,871.53 (the "HMIT Capital Account Balance"), and the capital account for all Class A Interests in aggregate was $1,983,069.70.

**REQUEST FOR PRODUCTION NO. 6:**

All documents evidencing the "extensive arm's-length, good faith negotiations over the last several months [related to the proposed Settlement Agreement]" as referenced in Paragraph 20 of the Motion.

**REQUEST FOR PRODUCTION NO. 7:**

All documents evidencing any efforts that the Movants examined the effect of the potential Settlement Agreement on any of the remaining creditors of the estate.

**REQUEST FOR PRODUCTION NO. 8:**

All documents evidencing how HMIT's Capital Account Balance, as referenced in Paragraph 21 of the Motion, was calculated.

**REQUEST FOR PRODUCTION NO. 9:**

All documents related to the Dugaboy Note, as referenced in paragraph 21 of the Motion, including any documents evidencing payments or amounts owed related to the Dugaboy Note.

**REQUEST FOR PRODUCTION NO. 10:**

Any documents used to answer the Interrogatories in these discovery requests.

**REQUEST FOR PRODUCTION NO. 11:**

Documents sufficient to show the remaining unpaid amounts of allowed claims in Classes 8 and 9, as that term is defined in the Plan.

**REQUEST FOR PRODUCTION NO. 12:**

Documents demonstrating any efforts by the Movants to sell or transfer the claims and causes of action that were asserted by the Litigation Trustee in the Amended Kirschner Complaint to any parties.

**REQUEST FOR PRODUCTION NO. 13:**

Documents demonstrating any efforts by the Movants to sell or transfer the Dugaboy Note to any parties.

**REQUEST FOR PRODUCTION NO. 14:**

Documents related to or identifying the value of any consideration received or exchanged as part of the proposed Settlement Agreement, including any communications related to the value of any such consideration.

**INTERROGATORY INSTRUCTIONS**

1. Each Interrogatory shall be answered fully and separately. Interrogatories shall not be combined for the purpose of supplying a common answer thereto, but answers may be supplied by reference to the answer to another interrogatory.

2. Where an Interrogatory cannot be answered in full, state why, and furnish all available information.

3. Whenever the name or identity of a person is requested, state the full name and the home and business address of such person.

4. When knowledge or information in the possession of a party is requested, such request includes knowledge of the party's agents, representatives and, unless privileged, attorneys.

5. Whenever a document is cited in support of a response, identify the specific language in such document which the Movants contend provides support for the Movants' response.

6. These Interrogatories shall be deemed to be continuing, so as to require supplemental answers should the party on whom these Interrogatories are propounded obtain information responsive to these Interrogatories which has not previously been supplied. Such supplemental answers shall be served before trial and within a reasonable time after the information is obtained. The date such additional information was obtained shall be disclosed, and the identity of the source of the additional information shall be specified.

7. If the Movants claim a privilege as to any requested information, specify the privilege claimed, the Communication (as defined below) or other matter as to which such claim is made, the subject of the Communication or other matter and the basis which Defendants assert the claim of privilege.

**INTERROGATORIES**

**INTERROGATORY NO. 1:**

Identify who negotiated the proposed Settlement Agreement on behalf of the Movants and the HMIT Entities and identify the dates of such negotiations.

**ANSWER:**

**INTERROGATORY NO. 2:**

Identify any efforts to analyze the "complexity, duration, and costs of [the Pending HMIT Litigation]," as stated in Paragraph 29 of the Motion.

**ANSWER:**

**INTERROGATORY NO. 3:**

Identify any efforts to sell or transfer the claims and causes of action that were asserted by the Litigation Trustee in the Amended Kirschner Complaint.

**ANSWER:**

**INTERROGATORY NO. 4:**

Identify any efforts to sell or transfer the claims and causes of action that were asserted by the Litigation Trustee in the Amended Kirschner Complaint.

**ANSWER:**

**INTERROGATORY NO. 5:**

Identify any efforts to sell or transfer the Dugaboy Note to any parties other than the HMIT Entities.

**ANSWER:**

**INTERROGATORY NO. 6:**

Explain the basis for the Movants' contention in Paragraph 21 of the Motion that "the Daugherty Claim and the Class 11 Equity Interests asserted by two Dondero controlled entities—Dugaboy and Strand—[] have no value but, if they did, their aggregate maximum value, if allowed, would not exceed approximately $1.7 million."

**ANSWER:**

**INTERROGATORY NO. 7:**

Identify all consideration received by any parties as part of the proposed Settlement Agreement and identify the monetary value of all non-monetary consideration received as part of the proposed Settlement Agreement.

**ANSWER:**

**HUNTON ANDREWS KURTH LLP**

By: /s/ *Gregory G. Hesse*

Gregory G. Hesse (Texas Bar No.09549419)
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202-2799
Telephone: (214) 979-3000
Telecopy: (214) 880-0011
GHesse@hunton.com

**ATTORNEYS FOR DUGABOY INVESTMENT TRUST**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 10, 2025, a true and correct copy of this document was served via email to the following parties.

**Counsel for Highland Capital Management, LP and the Highland Claimant Trust:**

Jeffrey N. Pomerantz – jpomerantz@pszjlaw.com
John A. Morris – jmorris@pszjlaw.com
Gregory V. Demo – gdemo@pszjlaw.com
Hayley R. Winograd – hwinograd@pszjlaw.com
Melissa S. Hayward – mhayward@haywardfirm.com
Zachery Z. Annable – zannable@Haywardfirm.com

**Counsel for Marc S. Kirschner as Litigation Trustee of the Highland Litigation Sub-Trust:**

Deborah J. Newman - deborahnewman@quinnemanuel.com
Robert S. Loigman - robertloigman@quinnemanuel.com

/s/ *Gregory G. Hesse*
Gregory G. Hesse

# EXHIBIT 17

Digitally signed by Advance Performance Exponents Inc.
Reason: Apex Certified

GRAND COURT
FINANCIAL SERVICES DIVISION
CAYMAN ISLANDS

**Mark E. Patrick**
**Second Affidavit**
**17 October 2025**
**Exhibit MEP-2**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**CAUSE NO: FSD 201 OF 2025 (RPJ)**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

1) **MARK ERIC PATRICK**
2) **PAUL MURPHY**
3) **CDMCFAD, LLC**
4) **DFW CHARITABLE FOUNDATION**
5) **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**
6) **CLO HOLDCO, LTD.**

Defendants

---

**SECOND AFFIDAVIT OF MARK ERIC PATRICK**

---

I**, Mark Eric Patrick,** of 6716 Glenhurst Drive, Dallas, Texas, 75254 do say as follows:

1. I am a former director and the sole holder of the management share (the "**Management Shareholder**") of the Plaintiff, Charitable DAF Holdco, Ltd (the "**Company**"). I am also:

   a) The manager of CDMCFAD, LLC ("**CDM**") (the Third Defendant), a limited liability company incorporated in Delaware on 12 December 2024;

This **Summons** was filed by Campbells LLP, Attorneys-at-Law for First, Third, Fifth and Sixth Defendants, whose address for service is Floor 4 Willow House, Cricket Square, George Town, Grand Cayman (Ref: MGM/ROD/18955-44959).

b) The sole director and sole shareholder of CDH GP, Ltd (the "**GP**") (the Fifth Defendant), a Cayman Islands exempted limited company incorporated on 27 February 2024, which is the general partner of Charitable DAF Fund, LP (the "**DAF**");

c) A director of CLO Holdco, Ltd ("**CLO**") (the Sixth Defendant), a Cayman Islands exempted limited company incorporated on 13 December 2010, whose sole shareholder is the DAF; and

d) A director, the president and the sole member of DFW Charitable Foundation, a non-profit corporation incorporated in Delaware on 9 December 2024 under section 501(c)(3) of the Internal Revenue Code of 1986 ("**DFW**") (the Fourth Defendant). DFW is organised under the General Corporation Law of the State of Delaware exclusively for charitable purposes and is the majority Participating Shareholder of the Company.

2. The Company was placed into voluntary liquidation on 2 April 2025 and Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd. were appointed joint voluntary liquidators (the "**JVLs**"). Following the the appointment of the JVLs, on 28 April 2025, certain of the Participating Shareholders of the Company (described below as the Highland Foundations) represented by Johnstone Law presented a petition with Cause No. 99 of 2025 (JAJ) seeking to have the Company wound up on just and equitable grounds. As the Company was already in voluntary liquidation, this petition was otiose and a further petition with Cause No. 116 of 2025 (JAJ) (the "**Liquidation Proceedings**") was presented which sought to have the liquidation of the Company continue under the supervision of the Court (the "**Supervision Application**") pursuant to section 131 of the Cayman Islands Companies Act (2025 Revision) (the "**Act**"). Neither I, nor DFW (the majority Participating Shareholder) opposed the Supervision Application and, by an order dated 6 May 2025 (the "**Appointment Order**"), Margot MacInnis and Sandipan Bhowmilk of Grant Thornton Specialist Services (Cayman) Limited were appointed as joint official liquidators of the Company (the "**JOLs**").

3. The facts and matters in this affidavit are based on my personal knowledge and are true and correct. Where the facts and matters in this affidavit are not within my own knowledge I state the source of such facts and matters and confirm that they are true to the best of my knowledge,



Filed by Campbells LLP, Attorneys-at-Law for and on behalf of the First, Third, Fifth and Sixth Defendants, whose address for service is Floor 4 Willow House, Cricket Square, George Town, Grand Cayman (Ref: MGM/ROD/18955-44959)
DocID

information and belief. I do not legal professional privilege in any advice referred to herein, and no such waiver is intended or to be implied.

4. There is now produced and shown to me a paginated bundle of true copy documents marked "Exhibit MEP-2" to which I refer in this affidavit. Page references below are to pages of **Exhibit MEP-2**, unless otherwise stated.

5. I make this affidavit on my own behalf, as well as on behalf of the First, Third, Fifth and Sixth Defendants (together, the "**CDM Defendants**"), in response to the summons dated 15 July 2025 filed by the JOLs (the "**Injunction Application**"), which was supported by the First affidavit of Margot MacInnis also dated 15 July 2025 ("**MacInnis 1**"). The Injunction Application seeks orders for injunctive relief and ancillary disclosure orders against the Defendants to a Writ of Summons and Statement of Claim filed by the JOLs, for and on behalf of the Company, in these proceedings on 15 July 2025 (the "**Writ**").

6. As is clear from the Writ and MacInnis 1, these proceedings stem from a series of transactions entered into as part of a restructuring of the Company's position in the DAF charitable structure (the "**DAF Restructuring**"). The DAF Restructuring was implemented by me, in my capacity as a director and the sole Management Shareholder of the Company, and my co-director, Paul Murphy ("**Mr Murphy**").

7. In the Writ and the Injunction Application, the JOLs allege that the DAF Restructuring formed part of an improper scheme to misappropriate the assets of the DAF and its related entities. This is incorrect. As explained below, I implemented the DAF Restructuring in good faith, with the benefit of advice from experienced and independent legal and professional advisers, and it was implemented both to safeguard the assets of the DAF Structure (defined below) from improper interference, and to preserve its charitable mission by ensuring continued discretionary distributions to qualifying tax-exempt charitable organizations.

8. The steps undertaken as part of the DAF Restructuring, and the rationale for them, were explained in detail in the following affidavits filed in the Liquidations Proceedings:

a) My first affidavit dated 4 June 2025 sworn in my capacity as director and sole member of DFW ("**Patrick 1**");

b) My second affidavit dated 4 June 2025 sworn in my capacity as the Management Shareholder of the Company ("**Patrick 2**"); and

c) Paul Murphy's affidavit dated 4 June 2025 sworn in his capacity as director of the Company ("**Murphy 1**").

(collectively the "**Liquidation Affidavits**")

9. The Liquidation Affidavits were filed in advance of the JOLs' 24 June 2025 application for sanction to engage Cayman Islands and US legal counsel (the "**June Sanction Application**"). As is clear from the Liquidation Affidavits, the Company, and the DAF Structure (defined below) have a long and complicated history linked to Mr James Dondero ("**Mr Dondero**").

10. Given the overlapping issues, and in order to streamline this affidavit and minimise the duplication of documents which will be before the Court at the hearing of the Injunction Application, I refer herein to various averments made in Liquidation Affidavits, and to documents exhibited in those affidavits. I am informed by my legal counsel that these materials will be available to the Court at the hearing of the Injunction Application. I also refer to certain documents which were exhibited to MacInnis 1 where I refer to specific page numbers in **Exhibit MM-1**.

11. This affidavit proceeds as follows:

**A.** Background to DAF Structure
**B.** Personal background and implementation of the DAF Structure
**C.** Evidence of Mr Mancino and Mr Reid
**D.** 'Control Person' and ceding of 'dominion and control'
**E.** The DAF Restructuring
**F.** The Liquidation Proceedings
**G.** Protocol Correspondence

**H.** HMIT Settlement and related correspondence

**I.** Texas TRO Motion / Rule 11 Agreement

**J.** Funding of liquidation

**K.** Inaccuracies in MacInnis 1

**L.** The Undertakings

**M.** The Injunction Application

**N.** Conclusion

**A. Background to the DAF Structure**

12. The Company and the DAF were part of a larger group of entities (collectively the "**DAF Structure**") which were established in late October 2011 to provide a permanent capital structure that would manage assets while making discretionary distributions to the benefit of various qualifying tax - exempt charitable organizations. According to its 'Mission Statement', the mission of the DAF Structure is to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*". A copy of the board resolutions of the Company which formally adopt the Mission Statement, along with the accompanying investment guidelines, appear at **pages 1 to 9 of MEP-2**.

13. The DAF is a Cayman Islands limited partnership formed on 28 October 2011 (registration number 53083) whose registered office is Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands. Since its incorporation and until the DAF Restructuring in March 2025, the Company was the limited partner of the DAF, through which it held an indirect interest in, and acted as a conduit for, discretionary charitable distributions from entities within the DAF Structure. However, the Company did not hold voting, control or management rights in respect of the DAF or the operating entities within the DAF Structure. Rather, its sole purpose was to act as a 'blocker' for US tax purposes, and the vehicle through which discretionary cash distributions would pass to qualifying tax- exempt charitable organizations. This is explained in more detail in Section D of Reid 1 (defined below). A structure chart of the DAF Structure, both before and after the DAF Restructuring, is at **pages 10 to 12 of MEP-2**.

14. The purpose and effect of the DAF Structure was that the income of its various operating entities (collectively referred to as the "**CDM Entities**") were fed upstream to the DAF, which would make discretionary distributions to the Company for the ultimate benefit of its 'Participating Shareholders', who were required to be qualifying charitable organizations which were exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code of 1986 (the "**Code**").

15. When the DAF Structure was established in 2011, the Company's Participating Shareholders became Highland Dallas Foundation, Inc. ("**Highland Dallas**"), Highland Santa Barbara Foundation, Inc. ("**Highland Santa Barbara**"), and Highland Kansas City Foundation, Inc. ("**Highland Kansas City**") (collectively, the "**Highland Foundations**") who were each issued 100 Participating Shares. Each of these are companies that are owned and/or controlled by Mr Dondero, who is the President, Individual Member and Director of each. In 2015, the Community Foundation of North Texas ("**CFNT**" and together with Highland Foundations, the "**Supporting Organizations**") was added as a Participating Shareholder and issued five Participating Shares through a traditional donor advised fund account in the name of Mr Dondero's company at the time, Highland Capital Management, L.P. ("**Highland**") (see Section C of Reid 1 for an overview of traditional donor advised funds).

**B. Personal background and implementation of the DAF Structure**

16. I hold a bachelor's degree from the University of Miami Herbert Business School (BBA, Finance, Cum Laude); an LLM in Taxation from the New York University School of Law and am a Juris Doctor from the Boston University (Cum Laude). I subsequently qualified as a tax attorney and spent a significant part of my career, until October 2024, working at companies connected with or controlled by Mr Dondero. I was employed as Tax Counsel by Highland between January 2008 and February 2021 during which time I provided tax consulting advice and worked with external tax professionals in order to manage Highland's tax liabilities and make use of tax efficient structures.

17. Highland, an entity formerly owned and controlled by Mr Dondero, was subsequently placed into Chapter 11 bankruptcy proceedings in the United States (the "**Highland Bankruptcy**"). The bankruptcy, which commenced in 2019, was precipitated by Highland's substantial exposure

arising from litigation which has been characterized in various Court filings in the USA as vexatious and oppressive, and in which Mr Dondero played a central role. In particular, after several adverse judgments were made against Highland in various sets of proceedings which it was unable to satisfy, Mr Dondero caused the company to enter Chapter 11. One such set pf proceedings is the ongoing legal action taken by UBS Securities LLC ("**UBS**") which has spanned more than a decade and resulted UBS being awarded a judgment of more than US$1 billion against Mr Dondero, Mr Scott Ellington,[1] and entities related to them. These proceedings remain ongoing and UBS are currently seeking summary judgment against these parties in an amount of approximately US1.2 billion (the "**UBS Litigation**").

18. Leaving aside the UBS Litigation, the Highland Bankruptcy has spawned a multitude of litigation in the USA across Federal, District, and Appeals Courts, as well as the Supreme Court. Recent judgments delivered by the US Court of Appeals for the Fifth Circuit in proceedings relating to the Highland Bankruptcy provide a useful insight into Mr Dondero's modus operandi and the difficulties faced by the Highland Bankruptcy Trustee since the Highland Bankruptcy commenced. In the background section to a judgment delivered by that Court in July 2024, it observed that "*Highland's organizational structure encompasses up to 2,000 other investment entities. Although most are neither in bankruptcy nor subsidiaries of Highland, they share various service agreements with Highland. Through these agreements, Highland (with its own employees and property) has provided resources such as fund managers, legal and accounting services, information technology support, office space, and other overhead for the related entities. The bankruptcy court observed that many of these related entities "appear to be under the de facto control of Mr. Dondero,"who acts as the president and portfolio manager for many of them. Even after his resignation, Dondero continued managing these affiliates, most notably NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P*" (**pages 103 to 104 of MEP-2**). That judgment was delivered in the context of an appeal against a contempt and temporary restraining order ("**TRO**") entered against Mr Dondero in the Highland Bankruptcy for continued interference in Highland's operations. The appeal was rejected and the bankruptcy court's decision was upheld. The Liquidation Affidavits provide more detail regarding the Highland Bankruptcy and the various sets of proceedings it has spawned, see for example paragraph 35 of Murphy 1.

[1] Mr Ellington, a longtime associate of Mr Dondero, is one of the principles of Crossvine Litigation Funding LLC, a special purpose vehicle established to fund the JOLs and this litigation for the ultimate benefit of Mr Dondero. See Section J below.

19. During my employment with Highland, I worked closely with a highly regarded external tax advisor named Mr Douglas Mancino (**Mr Mancino**) and, together, we were instrumental in establishing the Company, the DAF, and the DAF Structure. In Patrick 1, I exhibited some of my extensive correspondence with Mr Mancino between 2011 and 2013 (see for example pages 49 to 61 of Exhibit MP-1 to Patrick 1)[2] in which he advised on the most advantageous tax and corporate structures, compliance implications, and outreach to potential recipients of the Company's Participating Shares. As appears from this correspondence, and a subsequent memorandum of advice which is exhibited at pages 62 to 66 of Exhibit MP-1 to Patrick 1,[3] an overarching consideration when structuring and staffing the DAF, the Company and the Highland Foundations, was "*to avoid a potential IRS argument that Mr Dondero would have indirect de facto control over the three supporting organizations* [i.e. the Highland Foundations] *as prohibited by section 509(a)(3)*". As explained in Section E below, this was precisely the concern which ultimately led to the DAF Restructuring.

20. Following the collapse of Highland, Mr Dondero established a new investment management business under the name NexPoint Advisors L.P. ("**NexPoint**").[4] The 'Skyview Group', legally incorporated as Highgate Consulting Group Inc. ("**Skyview**"), was subsequently incorporated to provide back-office services to NexPoint and the funds it manages, including certain of the CDM Entities. Although the Chief Executive Officer and 'owner' of Skyview is Mr Scott Ellington, a longtime business associate of Mr Dondero and former General Counsel of Highland (who is now funding the liquidation, see Section J below), it was well known by those working at Skyview, including myself, that Mr Dondero had actual control of the company. I was employed by Skyview from March 2021 to October 2024.

21. While many of the precipitating events leading to the current conflict began in or around 2023, I believe they reached a 'breaking point' when I submitted my resignation from Skyview on 2 October 2024 and terminated the valuable services agreement which Skyview had with many of the CDM Entities and for which Skyview were paid significant fees (see paragraph 137 below).

---

[2] For convenience, where I refer to documents which were exhibited to the Liquidation Affidavits, I include a footnote with the bundle reference from the hearing bundles filed with the Court ahead of the adjourned Injunction Application on 31 July 2025 (in the form bundle/tab/page). This document is at Bundle **E/4/406-418**.
[3] E/4/419-423
[4] See the judicial commentary from the US Court of Appeals for the Fifth Circuit relating to NexPoint at paragraph 18.

22. Following my resignation from Skyview, there was also a noticeable and rapid deterioration in relations between Mr Murphy and I, as the directors of the Company, and the Highland Foundations. I believe this is because, despite the JOLs' attempts to portray the Highland Foundations as independent of Mr Dondero in MacInnis 1, he continues to exert significant control over them, to the point where they have demonstrated a willingness to put Mr Dondero's interests above their own fiduciary duties to the charitable entities they are supposed to serve (see paragraph 120 below regarding the CC Proposal).

**C. Evidence of Mr Mancino and Mr Reid**

23. Given his expertise and close involvement with the DAF Structure, Mr Mancino began preparing an affidavit on an urgent basis following service of the Injunction Application on 15 July 2025. On 30 July 2025, Mr Mancino finalized this affidavit, which was intended to address what he considered fundamental errors in MacInnis 1 and to explain his dealings with the Highland Foundations during the period leading to the DAF Restructuring. As the Injunction Application was adjourned by consent on 31 July 2025 upon undertakings being entered into, his affidavit was not then filed.

24. Following the adjournment, Mr Mancino intended to update his affidavit and address the issues raised therein in greater detail, with the benefit of additional time. Unfortunately, shortly thereafter he contracted Covid-19, was hospitalized, and, shortly after his release, sadly passed away on 10 September 2025. Given his expertise and institutional knowledge of the DAF Structure, I believe Mr Mancino's evidence will be of substantial assistance to the Court. Accordingly, his affidavit dated 30 July 2025 is now being filed in these proceedings and is referred to herein as "**Mancino 1**".

25. Shortly before his death, Mr Mancino engaged another senior tax attorney, Mr Alexander Reid ("**Mr Reid**") who also specializes in advising United States tax-exempt and nonprofit organizations, to succeed him as the DAF Structure's specialist tax adviser. I understand that Mr Mancino shared his files relating to the Company and the DAF Structure with Mr Reid. Mr Reid has now prepared an affidavit ("**Reid 1**") which provides the historical background to the implementation of the DAF Structure and responds to certain averments in MacInnis 1 that he believes are incorrect as a matter of United States tax law.

**D. 'Control Person' and ceding of 'dominion and control'**

26. As explained at Section C of Patrick 1 and paragraphs 30 to 37 in Reid 1, a fundamental principle of U.S. tax law is that, for a charitable donation to qualify for favorable tax, the donor, who is considered a 'Disqualified Person' treatment under the Code, must completely and irrevocably relinquish "dominion and control" over the donated assets. This requires a permanent transfer of ownership and authority to a qualifying tax-exempt charitable entity, free from any direct or indirect influence by the donor, and the donor must not retain the ability to determine or alter how the assets are used. Failure to observe this requirement risks disallowance of charitable deductions, the imposition of civil penalties, and potential criminal liability. As noted at paragraph 65 below, this is why Mr Dondero ceded control of the Original GP (defined below).

27. In the case of the DAF Structure and the Highland Foundations, having consulted with and received advice from Mr Mancino, I had made clear to Mr Dondero that compliance with the applicable U.S. tax codes required the complete divestiture of the donated assets and management's independence from any donor involvement. Notwithstanding these requirements, Mr Dondero retained positions of authority as President, Director, and Individual Member of each Highland Foundation, and exercised further influence as a donor. His comments in correspondence with me - such as querying whether the Highland Foundation "*think of that money as their own*" (**page 154 of MEP-2**) - indicated a continued perception of personal entitlement to the funds, inconsistent with a genuine relinquishment of control.

28. This conduct created a significantly heightened risk, as identified in the Carrington Coleman Memo (exhibited at **pages 940 to 956 of MM-1**), that the Internal Revenue Service ("**IRS**") could determine that Mr Dondero had not truly divested himself of the donated assets. Such a finding would likely result in the denial of claimed income and gift tax deductions, the imposition of substantial civil penalties (including underpayment and civil fraud penalties), and would threaten the tax-exempt status of the Highland Foundations. It would also render them "Restricted Persons" under the Company's Articles of Association (**pages 117 to 153 of MEP-2**) because either: (a) they were no longer compliant with section 501(3)(c) of the Code; or (b) were acting in a manner that might cause the Company to incur liability or loss (**see page 124 of MEP-2**). Moreover, by maintaining control over these entities and their assets, Mr Dondero risked the

DAF being treated as his financial 'alter ego', exposing its assets to creditor claims and undermining their intended charitable purpose (see paragraph 40 of Reid 1).

29. From its inception in October 2011 until March 2021, Mr Grant Scott was the sole Management Shareholder of the Company and the sole member of Charitable DAF GP, LLC, the original General Partner of the DAF (the "**Original GP**"). Mr Scott was therefore the original 'Control Person' of the DAF and the wider DAF Structure, a position which I have held since March 2021. The function of the Control Person is to ensure the DAF makes independent investment decisions for the ultimate benefit of qualifying section 501(3)(c) compliant charitable beneficiaries and the charities they support. I understood from my professional experience and expertise, as well as legal and professional advice received from independent advisers such as Mr Mancino, that if the Control Person fails to act independently, the charitable and tax-exempt status of the supporting organizations can be compromised.

30. Mr Dondero and Mr Scott have a longstanding relationship. They were former college roommates, and Mr Scott was best man at Mr Dondero's wedding. Accordingly, given that Mr Scott was a close personal friend of Mr Dondero, I believe it is unsurprising that he was handpicked to be the Control Person. However, Mr Scott did not have the relevant experience to serve as the Control Person for the DAF Structure. Consistently with that, Mr Scott was described in pleadings submitted in the UBS Litigation as "a *patent lawyer with no experience in finance or running charitable organisations*", and an "*empty suit*" put in place by Mr Dondero to "*solidify his control*" over the DAF (page 25 of Exhibit MPMS-1 to Patrick 2)[5].

31. I was approached by Mr Scott to assume the role of Control Person of the DAF Structure in or around March 2021. At the time, I understood from Mr Scott that he had fallen out with Mr Dondero after refusing to obey an instruction from him which would have caused Mr Scott to breach his fiduciary duties to the DAF. However, as explained in Patrick 1, Mr Dondero was not involved with, nor was he consulted regarding, my assumption of the role of Control Person for the DAF Structure.

32. Assuming the role of Control Person required me to take on the directorship of the Original GP, and to become the sole Management Shareholder of the Company. This occurred in or around

[5] **E/3/79.**

24 March 2021. Shortly after assuming this position, I formed the belief that Mr Scott had not only failed to properly manage (and maximise) the assets of the DAF and the DAF Structure, but had in fact created potential liabilities by failing to manage the assets of the DAF independently of Mr Dondero. In particular, I suspected that Mr Scott had simply been authorizing investments proposed by Mr Dondero without any consideration of their appropriateness or any financial due diligence.

33. As explained in Patrick 1, upon assuming the role of Control Person of the DAF Structure, I began to review the investments and dispositions made by, and on behalf of, the DAF during Mr Scott's tenure as Control Person. I concluded that, historically, Mr Scott had approved every related-party transaction between the DAF and entities owned or controlled by Mr Dondero. In my assessment, from 2011 until my appointment in March 2021, Mr Dondero utilised the DAF Structure - by influencing Mr Scott in his capacity as Control Person - in order to:

(a) generate income for Mr Dondero's own commercial benefit;

(b) provide liquidity (usually on an emergency basis with almost no notice or transparency) to Mr Dondero and his affiliated entities so as to advance their commercial interests and/or reduce their tax exposure; and

(c) cause the DAF Structure to take high-risk positions for below-market returns, thereby generating substantial profits for Mr Dondero and his affiliated entities, while retaining the upside for those entities and continuing to derive significant personal tax advantages.

34. These conclusions were borne out by the subsequent actions of Mr Dondero and his affiliates. In or around November 2023, Mr Dondero asked me to transfer approximately US$1.5 million of the DAF's assets to offshore entities owned by Mr Dondero. I understand that these funds were intended for Sentinel Reinsurance Ltd., a Cayman Islands limited company, ("**Sentinel**") (or another entity related to Sentinel) which I believe was majority owned and controlled by Mr Dondero and Mr Ellington. Sentinel was a Cayman Islands licensed reinsurance company which was accused of issuing a fraudulent after the event insurance policy in order to move assets out



Filed by Campbells LLP, Attorneys-at-Law for and on behalf of the First, Third, Fifth and Sixth Defendants, whose address for service is Floor 4 Willow House, Cricket Square, George Town, Grand Cayman (Ref: MGM/ROD/18955-44959)
DocID

of the reach of creditors of Mr Dondero and Mr Ellington.[6] Following these allegations, CIMA began investigating Sentinel, finding that no one at Sentinel could rationalize the transfer of assets in exchange for the policy or the post-issuance adjustments of policy premiums without an adjustment in policy limits. Mr Dondero and Mr Ellington ultimately caused Sentinel to settle with UBS and exchange various assets for releases.

35. I understand that the funds I was asked to transfer to Sentinel were to settle the payment of Mr Dondero and Mr Ellington's outstanding legal fees relating to the UBS Litigation, and were wholly unrelated to the DAF Structure and its charitable mission. This request would have diverted funds from the DAF Structure and its charitable mission to further Mr Dondero's unrelated commercial interests. On the basis of advice received from US counsel, and without waiving privilege, I determined the proposed transfer constituted a breach of my fiduciary obligations and was "*impermissible and illegal*" (as stated in the Carrington Coleman Memo at **page 941 of MM-1**)[7]. Accordingly, having concluded that Mr Dondero's ongoing attempts to exert control posed a real risk to the integrity of the DAF Structure, I refused to effect the transfer of funds to Sentinel as requested.

36. Further examples of the value destructive and self-serving transactions that were imposed on the DAF and the DAF Structure by Mr Dondero and Mr Scott are set out in a report prepared by ValueScope dated 20 November 2024, exhibited at **pages 156 to 165 of MEP-2**. Many of the transactions listed in this report, which ultimately benefited Mr Dondero and related entities to the detriment of the DAF Structure, are summarized at paragraphs 111 to 119 of Patrick 1 and, accordingly, I do not propose to explain them again here.

37. As well as questionable transactions and improper interference from Mr Dondero and related entities, another important consideration at this time was the sheer volume of ongoing lawsuits involving Mr Dondero and, in some cases, certain of the CDM Entities, whether due to actions by Mr Dondero's adversaries against the CDM Entities, actions encouraged by Mr Dondero, or actions taken to establish independence from Mr Dondero (see, for example, slides 8 and 9 of the 20 November 2024 ValueScope Presentation at **pages 163 to 164 of MEP-2**).

---

[6] I believe that Mr Dondero's use of insurance policies underwritten by companies he or his affiliates control is of particular relevance given the JOLs' indication that they are in the process of obtaining an ATE insurance policy in response to the Security for Costs Application filed by the CDM Defendants.
[7] **B/1/941.**

38. A prime example of this is the ongoing UBS Litigation, whereby Mr Dondero and entities controlled by him and Mr Ellington are expected to have a collection action to enforce a US$1.2 billion judgment entered against them. CLO, the Sixth Defendant, was originally a defendant in the UBS Litigation because of its prior affiliation with Mr. Dondero. This caused Mr Murphy and I to be concerned that UBS (and/or other creditors) might seek collection from the DAF Structure on the basis that it constituted the 'alter ego' of Mr Dondero, and, as outlined in Murphy 1, was an important consideration when evaluating the DAF Restructuring.[8]

39. Mr Dondero has been described as a "*serial litigator*" and "*transparently vexatious*" by the United States Court of Appeals for the Fifth Circuit (see **pages 240 to 250 of Exhibit MPMS-1 to Patrick 2**),[9] and this is borne out by the fact that he has been involved in over 50 lawsuits and appeals over the past 15 years (see **pages 286 to 292 of Exhibit MPMS-1 to Patrick 2**)[10]. I discuss some of the many court proceedings involving Mr Dondero, or entities related to him, at paragraphs 121 to 142 of Patrick 1.

40. The claims detailed in a complaint dated 15 October 2021 prepared by the Litigation Trustee of the Highland Bankruptcy (the "**Kirschner Claims**") and exhibited at **pages 179 to 312 of MEP-2** are of particular relevance. Not only do these proceedings exemplify Mr Dondero's pattern of control over, and misappropriation of, the assets of the DAF, they also demonstrate the clear and obvious harm which his actions have caused the DAF Structure.

41. The Kirschner Claims were brought by the Litigation Trustee in the Highland Bankruptcy following a detailed investigation into Mr Dondero and his associates and allege extensive fraudulent conduct. The Kirschner Claims seek the recovery of hundreds of millions of dollars

[8] Mr Murphy and I recently negotiated a settlement agreement with UBS, executed on 19 September 2025, whereby, in exchange for a small prepayment of sums already due to UBS under a loan note maturing on 23 December 2025, CLO received a 10% discount on the total sums due under the loan note (a discount of approximately US$4.5 million) and, more importantly in the context of UBS' potential 'alter ego' claims, broad releases from UBS of CLO and other CDM Entities. The JOLs subsequently wrote to Campbells on 29 September 2025 alleging that payments of any sums due under the UBS settlement agreement constituted a breach of the Undertakings (defined below), in spite of the fact that they represented payment of a genuine, pre-existing debt and stood to benefit the DAF Structure. Campbells responded on 30 September 2025, and copies of this correspondence and the UBS settlement agreement are at **pages 177 to 178, 166 to 167, and 168 to 176 of MEP-2**.
[9] **E/3/294-304.** In the context of a long running recusal action taken by him against the Judge presiding over the Highland Bankruptcy.
[10] **E/3/340-346.**

which was misappropriated by Mr Dondero and others, including Mr Ellington. The Company, the DAF, and CLO (the Sixth Defendant) were named as defendants to the Kirschner Claims based on conduct directed by Mr Scott, in his capacity as the former Control Person of the DAF Structure. However, the Company, the DAF, and CLO were ultimately dismissed as defendants to the Kirschner Claims when they were acquired by an entity within the DAF Structure.

42. The Kirschner Claims allege that Mr Dondero operated Highland and over 2,000 affiliated entities "*for his own personal benefit*" (**page 224 of MEP-2**), "*directed the integrated the enterprise himself, using friends, family members, and directors-for-hire*" (**page 225 of MEP-2**), and used Highland "*as his own personal piggy-bank*" (**page 228 of MEP-2**).

43. Based on my dealings with Mr Dondero, I believe the findings of the Highland Bankruptcy Litigation Trustee in the Kirschner Claims accurately demonstrate his propensity to exert influence over, and derive profit from, entities which are supposed to be independent of him, and are indicative of his actions and conduct in relation to the DAF Structure. However, the Kirschner Claims are also significant given that, as noted above, an entity within the DAF Structure has now acquired the benefit of those claims, which, if successful, could result in significant recoveries against Mr Dondero, Mr Ellington and others, directly benefiting the DAF Structure and, if the JOLs are successful, the liquidation estate. This issue is addressed in further detail at Section H below.

**E. The DAF Restructuring**

44. For the reasons outlined above, and as explained at Section V of Murphy 1, the restructuring of the Company and the DAF Structure was a conscious decision made by Mr Murphy and me, in our capacity as directors of the Company, in order to comply with the objects if the Company[11] and protect the assets of the DAF from anticipated (and now actual) attempts to bring the DAF's assets within the control of Mr Dondero and entities affiliated to him. Briefly, the primary motivations for the DAF Restructuring, defined as the 'Dondero Concerns' in Murphy 1, were:

[11] See, for example, paragraph 3 of the Company's Memorandum of Association which adopts the Mission Statement and permits the Company "*to do all such things* [that] *in the opinion of the Directors are or may be incidental or conducive to*" the Mission Statement (**page 118 of MEP-2**).

(a) The risks posed to the DAF Structure, and the potential for criminal and civil sanctions, as a result of Mr Dondero's ongoing attempts to exert "dominion and control" over the assets of the DAF Structure (see Mr Mancino's letter to the IRS dated 20 March 2025 at pages 957 to 973 of MM-1, and Exhibit B to Mancino 1);

(b) That actions taken by Mr Dondero and the Highland Foundations in relation to the DAF's assets would significantly increase the likelihood of UBS and other creditors pursuing claims against the Company and the CDM Entities on the basis that they were "alter egos" of Mr Dondero;

(c) The belief that Mr Dondero was attempting to misappropriate the assets of the DAF Structure and use it "*as his own personal piggy-bank*" in order to (i) help satisfy his creditors (including UBS), and (ii) bring to an end actions commenced by certain CDM Entities which are adverse to him or related entities against (e.g. the Kirshner Claims); and

(d) Mr Dondero's demands that assets from the DAF Structure be used to make investments which stood to benefit him and entities related to him with little or no corresponding benefit to the DAF Structure.

45. In the light of these serious and well-founded concerns, Mr Murphy and I began to work on formulating measures which would protect the DAF Structure from Mr Dondero's improper influence and control. I firmly believe that the steps undertaken as part of the DAF Restructuring were necessary to protect the DAF and its charitable mission from the very real and serious risk of civil and/or criminal sanctions for breaches of US tax law, as well as from retaliatory actions by Mr Dondero which I believe can be traced back to myself and Mr Murphy's refusal to accept his demands to use the assets of the DAF Structure for his personal benefit.

46. The DAF Restructuring consisted of four primary steps:

(a) I would resign from my position at Skyview and the Company would terminate its services agreement with them, thereby creating independence between the DAF

Structure/CDM Entities, Mr Murphy, and myself on the one hand, and the Skyview Group on the other;

(b) The formation of CDM (the Third Defendant) which acquired the Company's interest in the DAF in exchange for the 100% membership interest in CDM on 18 December 2024, and through which the Company held an indirect interest in the DAF until 27 March 2025 (the "**CDM Restructuring**");

(c) The allotment of 318 Participating Shares to DFW on 7 February 2025 such that DFW became the holder of 51% of the Participating Shares of the Company (the "**DFW Share Issuance**"); and

(d) The redemption of the Company's interest in CDM for fair market value on 27 March 2025, and the final distribution to the Highland Foundations (the "**Redemption**"), following which the Company was placed into voluntary liquidation.

47. Based on my experience working with Mr Dondero and my familiarity with his conduct in prior matters, I anticipated that the DAF Restructuring would be opposed by him and/or the Highland Foundations at his direction. My expectation was grounded not in any view that the DAF Restructuring was unlawful or improper, but in my observation that Mr Dondero has historically initiated or directed litigation in circumstances where actions were not aligned with his interests, regardless of how frivolous or vexatious the claims. As set out in Murphy 1, the Supreme Court of the United States, in a judgment delivered in the Highland Bankruptcy, described Highland as having a "*litigation culture*," which made it difficult for the reorganized entity to secure independent board members and a Chief Restructuring Officer, noting that *"it was not easy to get such highly qualified persons to serve as independent board members"* because of Highland's *"culture of constant litigation*." and because they "*were worried about getting sued* ***no matter how defensible their efforts***" (emphasis added) (exhibited at **page 638 of Exhibit PM-1 of Murphy 1**)[12]. Mr Murphy also addresses this issue at Section V of his first affidavit in these proceedings dated 18 September 2025 where he refers to what has become known as the "Dondero exclusion" in the insurance industry.

[12] **E/5/1706.**

48. This is the precise reason that Mr Murphy and I, as directors of the Company and other entities within the DAF Structure, sought the advice of experienced, highly competent and independent advisors in the lead up to the DAF Restructuring and, based on that advice, formed the view that the DAF Restructuring was in the best interest of the Company and the DAF Structure.

49. At paragraph 76.3 of the MacInnis 1, the JOLs refer to a 'Work Plan' sent to Campbells LLP ("**Campbells**") on 9 November 2023 by the Company's US counsel, Shields Legal Group, and assert that this evidences a plan to misappropriate the Company's interest in the DAF. In fact, the Work Plan sought "*memorandums and opinions relating to potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc.*" (**pages 1433 to 1434 of MM-1**). I believe this is entirely consistent with the concerns I outline above and consistent with prudent governance in a contentious environment. In addition, the timing of the Work Plan coincided with Mr Dondero's improper request in November 2023 to transfer assets of the DAF Structure to Sentinel. Following this request, I concluded that proactive steps were required to (i) protect the DAF and the DAF Structure from improper interference by Mr Dondero, and (ii) ensure the continued operation of the DAF Structure so that it could fulfil its charitable purpose, as set out in its Mission Statement, and continue supporting qualifying tax-exempt charitable organizations which were compliant with section 501(c)(3) of the Code.

<u>Resignation from Skyview and subsequent events</u>

50. As noted at paragraphs 21 and 22 above, I resigned from Skyview on 2 October 2024 and terminated the various services agreements which Skyview had with many of the CDM Entities, and for which the Skyview were paid significant fees (see paragraph 137 below). Over the following days and weeks, I met with representatives of the Highland Foundations, including Julie Diaz, the President of Highland Dallas (see paragraphs 102, 103 and 118 below), to assure them that charitable distributions would continue to be made to the Highland Foundations and that they would continue to receive the DAF's quarterly valuation reports which were prepared by ValueScope. These meetings were cordial, and at no point did the Highland Foundations raise any concerns regarding their distributions, the DAF Structure, or its finances.

51. Shortly after my resignation, and without my knowledge, one of Mr Dondero's associates contacted a service provider of the DAF and obtained detailed financial information relating to



Filed by Campbells LLP, Attorneys-at-Law for and on behalf of the First, Third, Fifth and Sixth Defendants, whose address for service is Floor 4 Willow House, Cricket Square, George Town, Grand Cayman (Ref: MGM/ROD/18955-44959)
DocID
#3330705v6

the DAF Structure. I believe that this information was then distorted and presented to the Highland Foundations as part of a calculated effort to create discord among them. By way of example, the 2024 director fees, 2024 legal expenses, and overall expenses were presented as being far higher than the true amounts.[13] Overall expenses were represented as $18.3 million, but $6 million of this was offset by $6.1 million of income, which means Skyview falsely represented the numbers by at least one third, and the director fees and legal expense numbers were also falsely inflated. Tellingly, Skyview, which was one of the DAF's service providers prior to my resignation, had access to the DAF's actual finances. I consider it significant that these alleged 'concerns' regarding the expenditure of the DAF Structure were not raised with the Highland Foundations until after my resignation from Skyview.

52. On or around 20 November 2024, I instructed Mr Mancino and ValueScope to present to the Highland Foundations in order to highlight to the damage being caused to the Company and the DAF's charitable purpose by Mr Dondero's continued overreach, in terms of exposure to Mr Dondero's investment positions and litigation risk, and the potential tax implications for the Highland Foundations, on account of Mr Dondero's improper influence.

53. On or around 22 November 2024, Ashcroft Sutton Reyes LLC ("**Ashcroft**"), a U.S. law firm that represents Mr Dondero in his personal capacity, as well as several of his family trusts, contacted the Company's U.S attorneys, Carrington Coleman, purportedly to express concerns regarding alleged mismanagement of the Company. However, on this call, Ashcroft indicated that Mr Dondero would be willing to offer me an "*exit ramp with significant comp and releases*" and that Mr Dondero wanted to move quickly. I regarded that as an improper attempt to induce me to disregard the best interest of the DAF Structure and its charitable purposes. I believe that these improper offers of cash and inducements were made because Mr Dondero was beginning to realize that, with Skyview no longer providing services, and entities within the DAF Structure declining to pursue unfavorable related party transactions, he could no longer exert control and influence over the DAF Structure and use it as his "*personal piggy bank*".

54. In the meantime, Holland & Knight ("**H&K**") legal counsel for the Highland Foundations, sent a letter dated 11 November 2024 (but received later, as I explain below), purportedly signed on behalf of the Highland Foundations, to Mr Murphy. The letter expressed concern regarding the

[13] See paragraph 138 below, this is an allegation which the JOLs repeat at paragraph 51 of MacInnis 1.

governance of the Company and requested that the DAF Structure be equitably wound up (this is referred to in MacInnis 1 as the '**No Confidence Letter**').

55. However, despite being dated 11 November 2024, the No Confidence Letter was not received by Mr Murphy until 6 December 2024. Accordingly, the assertion at paragraph 37 of MacInnis 1 that I sought advice from Walkers regarding the DFW Share Issuance as a result of having received the No Confidence Letter is incorrect. As explained above, Mr Murphy and I were by that stage already in the process of obtaining independent legal and professional advice in order to safeguard the assets and charitable mission of the DAF Structure.

56. The Carrington Coleman Memo (**pages 940 to 956 of MM-1**) summarizes all of the events which followed my resignation from Skyview and includes a chronology at Exhibit C (**pages 952 to 955 of MM-1**). As is clear from that summary, the No Confidence Letter was dated three days after DAF declined to enter what is described as the 'TCAL Transaction'. This transaction, and several others which stood to benefit NexPoint or other entities related to Mr Dondero to the detriment of the DAF Structure, are described in detail at paragraph 119 of Patrick 1. The TCAL Transaction would effectively have shifted approximately US$45 million of risk to the DAF Structure while NexPoint and Dondero-related entities stood to reap the benefits for themselves based on their ownership of an adjacent property. Again, I do not believe that the timing of the No Confidence Letter was coincidental. Having tendered my resignation from Skyview and refused to enter into a transaction that stood to benefit him personally, I believe Mr Dondero began to use his influence over the Highland Foundations in an effort to remove me as the Control Person and to wrest control of the assets of the DAF Structure. The No Confidence Letter was part of that.

57. On 11 December 2024, Mr Murphy and Mr Mancino met with Highland Foundations legal counsel, H&K, and gave a presentation which, as noted in the introduction, was "*intended to give beneficiaries of the Charitable DAF Holdco, Ltd an insight into the leadership and governance of the charity since the appointment of Mark Patrick and* [Paul Murphy] *as directors in 2021*". This presentation outlined: (i) the legacy issues facing the Company on account of Mr Dondero's improper influence and involvement of the CDM Entities in litigation, (ii) how Mr Murphy and I had attempted to resolve those issues, and (iii) what we hoped the future of the Company would involve. This meeting is addressed at paragraphs 65 to 69 of Murphy 1 and, for convenience a copy of the presentation is exhibited at **pages 313 to 321 of MEP-2**. The meeting was also

attended by attorneys from Walkers (Cayman) LLP ("**Walkers**") (counsel for the Company at that time), although, as noted at paragraph 69 of Murphy 1, H&K pre-empted Walkers by acknowledging the very limited rights attaching to the Participating Shares at the meeting. This is also addressed at paragraph 11 of Mancino 1.

The CDM Restructuring

58. Although Mr Murphy and Mr Mancino reported to me that the meeting with H&K went well, we nevertheless considered it prudent to take steps to insulate the DAF and its assets from any attempt by Mr Dondero, through the Highland Foundations, to wrest control of the Company and the DAF Structure. Accordingly, on 12 December 2024, CDM was formed. The intention was that CDM would be inserted into the DAF Structure between the Company and the DAF as a pre-emptive measure to enhance governance, mitigate alter-ego risk, and preserve compliance with U.S. charitable-tax requirements by guarding against improper interference by Mr Dondero. Advice on the use of a Delaware limited liability company was obtained from Dorsey & Whitney and is exhibited at **page 48 of Exhibit PM-1 to Murphy 1**.[14]

59. Mr Mancino continued to liaise with the H&K following the 11 December 2024 meeting with a view to improving relations between the parties. However, it became increasingly clear that the Highland Foundations were adopting a hostile position and seemed determined to impugn my and Mr Murphy's management of the Company. Mr Mancino exchanged several emails and letters with H&K during this period, culminating in his letter dated 14 February 2025. In this letter, Mr Mancino addressed the Highland Foundation's incorrect assertions regarding director fees and legal expenditure, the provision of financial information to the Highland Foundations, and flagged his concerns regarding Mr Dondero's influence and control over the Highland Foundations which placed them at risk of being considered 'Restricted Persons' under the Company's Articles of Association (the "**Articles**"). A copy of Mr Mancino's letter to H&K dated 14 February 2025 is at **pages 322 to 323 of MEP-2**.

60. Having received no response to Mr Mancino's letter, Mr Murphy and I concluded that it would be prudent to implement the CDM Restructuring. Accordingly, on 18 December 2024, the Company, CDM and the GP executed a Deed of Assignment and Assumption, the effect of which was to transfer the Company's interest in the DAF to CDM, with the Company obtaining 100% of

[14] **E/5/1116.**

the membership interest in CDM. However, it is important to note that, at that time of the transfer, the Company continued to hold its interest in the DAF, albeit indirectly, and continued to serve as the channel through which charitable distributions would be made to qualifying tax-exempt organizations. The only difference was that CDM was inserted into the corporate structure between the Company and the DAF.

61. Copies of the Deed of Assignment and Assumption, the resolution authorizing it, and the LLC Agreement are exhibited at pages 454 to 494 of MM-1. The legal advice which the Company received in respect of the CDM Restructuring is recorded in the resolution. As noted therein, and as explained above, the CDM Restructuring was implemented to, *inter alia*:

*(a)* *"help insulate the DAF from exposure to James Dondero and his entities…who may be at risk of causing the IRS to revoke the tax-exempt status of one of more of the participating shareholders / supporting organizations which could imperil the assets of the DAF;*

*(b)* *…help reduce the influence of Dondero and, as such, broaden the charitable scope of DAF for its benefit and the benefit of the public;*

*(c)* *The IRS would look favorably upon any and all attempts for DAF to maintain its influence from "what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement"; and*

(d) *Further, due to Dondero's attempts to control the DAF and its assets, DAF runs an increased risk of being embroiled in litigation directed against Dondero and his entities*" (**pages 455 and 456 of MM-1**).

<u>Discretionary Nature of Participating Shares</u>

62. Before addressing the DFW Share Issuance, it is necessary to explain the discretionary nature of the Participating Shareholders' interest in the Company

63. The JOLs use the 'Fund' when referring to Charitable DAF Fund, LP. However, as addressed in Reid 1, it is important to note that the DAF is not an investment fund in the traditional sense, but is a charitable vehicle. For example:

(a) The DAF does not solicit capital from investors;

(b) The DAF has no subscription agreements through which interests are taken up.[15] Instead the Highland Foundations were each granted 100 Participating Shares in the Company in 2011 by way of a charitable gift for $.01 per share, with CFNT also gifted five Participating shares in 2015;

(c) The Company, as limited partner, had restrictive rights in its participating and management of the DAF, including restrictive rights to information;

(d) The DAF has no entitlement to make capital calls against the Supporting Organisations or against the Company; and

(e) The DAF does not have a registered investment advisor and does not produce marketing brochures, private placement memorandums or other materials relating to solicitation for investments.

64. The discretionary nature of the Company's interest in the DAF is clear from Section 4.2(a) of the Second Amended and Restated Exempted Limited Partnership Agreement dated 11 March 2024 (the "**ARLPA**") which provides that "*Distributions shall be made to the Limited Partner* [which, at the time, was the Company] *at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses*…." (**page 334 of MEP-2**).

65. Prior to the implementation of the ARLPA, the Original GP was a Delaware limited liability company, which was originally owned and controlled by Mr Dondero. However, as the General Partner of the DAF effectively controlled the DAF Structure, Mr Dondero could not maintain control of the Original GP as it would have invalidated the charitable deductions and tax benefits that he obtained when he consummated the original, legally required, contribution of assets to

[15] The Supporting Organisations did not undertake a capital commitment and thereby "subscribe" in the manner of a traditional private equity or investment fund.

Highland Capital Management Partners Charitable Trust #2 (see section D of Reid 1). In order for such donations to remain legally valid, the donor must cede dominion and control of the transferred assets. Mr Dondero's prior ownership of and control of the Original GP, and the risk posed to CLO and other CDM Entities due to their affiliation with Mr Dondero (including potential alter ego claims), was the primary reason for restructuring the Original GP.

66. A further example of the discretionary, non-traditional nature of the 'fund' interest which each of the Participating Shareholders held through the Company is the historic distributions which the Company made to each of the Supporting Organizations. Rather than being linked to the number of participating shares each Supporting Organization held, these distributions were made to Participating Shareholders based on pre-determined formulae, primarily linked to the Company's Net Asset Value ("**NAV**"). These formulae, and the quarterly distributions made by the Company to the Participating Shareholders from 2017 and Q3 2024, are evidenced in the excel sheet titled "DAF Trustee Fees" appearing at **page 342 of MEP-2**.

67. As is clear from these distributions, despite each of the Highland Foundations owning 100 participating shares in the Company, they did not receive a pro-rata distribution or dividend from the Company. Instead, the quantum of their annual distributions was dependent on the contractual terms which governed the relationship between each of the Highland Foundations and their underlying charities. These documents, defined in paragraph 18.5 of MacInnis 1 as a 'Legal Relationship Agreement' for Highland Kansas City (**pages 130 to 132 of MM-1**) and 'Operating Agreements' for Highland Dallas (**pages 133 to 140 of MM-1**) and Highland Santa Barbara (**pages 141 to 147 of MM-1**), prescribed the 'annual fees' which each of the Highland Foundations were to pay their underlying charities. These agreements provided for the following 'annual fees' (or distributions) to be paid by the Highland Foundations to the charities:

(a) **Highland Kansas City** was to pay the Greater Kansas City Community Foundation an annual 'fee' equal to the greater of US$62,500 or 0.25% (25 basis points) of the DAF's underlying NAV in addition to out of pocket expenses (where, as was the case, the Fund has assets of more than $7million);

(b) **Highland Dallas** was to pay the Dallas Foundation one quarter of 0.25% (25 basis points annually) of the DAF's underlying NAV for the prior quarter which was to be payable



Filed by Campbells LLP, Attorneys-at-Law for and on behalf of the First, Third, Fifth and Sixth Defendants, whose address for service is Floor 4 Willow House, Cricket Square, George Town, Grand Cayman (Ref: MGM/ROD/18955-44959)
DocID

quarterly (i.e. 0.0625% or 6.25 basis points quarterly) as well as out of pocket expenses; and

(c) **Highland Santa Barbara** was to pay the Santa Barbara Foundation the below fees paid quarterly in accordance with its previous quarter's NAV:

i. 1% (100 basis points) on the first $3M;
ii. .75% (75 basis points) on the next $2M;
iii. .50% (50 basis points) on the next $5M; and
iv. .25% (25 basis points) on all amounts over $10 million.

68. As the 'DAF Trustee Fees' excel evidences, the annual support fees listed above, which were to be paid by the Highland Foundations to their underlying charities, represented the distributions which were made to the Highland Foundations by the Company each year. These distributions were, on average, c.US$160,000 per annum for Highland Kansas City, c.US$280,000 per annum for Highland Dallas, and c.US$60,000 per annum for Highland Santa Barbara. In addition, CFNT was paid $100,000 per year annually in the fourth quarter of each year.

69. For the reasons explained above, distributions to the Supporting Organizations were paused after paying regularly scheduled distributions in January 2025. However, representatives of the DAF Structure have repeatedly offered to meet with members of the Highland Foundations with a view to resuming these distributions (see for example paragraph 120 below in relation to the CC Proposal, and paragraph 103 in relation to the HMIT Term Sheet signed by Ms Diaz following the Highland Foundation's objection to the HMIT Settlement).

70. The discretionary nature of the interest held by the Participating Shareholders was commented upon by Mr Justice Asif KC at the June Sanction Application. In his remarks, he likened the Company to a discretionary trust and observed that it could have been established as a foundation company (**pages 26 to 27 of MEP-2**). I respectfully agree with this observation. The purpose of the DAF since its inception has always been to make discretionary charitable distributions to qualifying non-profit organizations and all of the steps undertaken by me in my capacity as 'Control Person' of the DAF Structure, including the DAF Restructuring, were aimed at safeguarding this purpose.

The DFW Share Issuance

71. As noted at paragraph 42 of MacInnis 1, around 22 November 2024, Mr Murphy and I began to seek advice from Walkers (the Company's previous legal counsel) regarding the issuance of new Participating Shares. Copies of our email correspondence with Walkers are exhibited at **pages 448 to 453 of MM-1**. The email chain indicates the concerns that we had at the time given our dealings with the Highland Foundations and the reasonable and prudent steps we were taking with the assistance of legal counsel to address them. Because of our concerns that the Highland Foundations lack of independence from Mr Dondero made them 'Restricted Persons' under the Company's Articles, we asked Walkers to review the Company's constitutional documents and provide their views on the appropriateness of the Company issuing new Participating Shares to a newly incorporated, and suitably independent, section 501(c)(3) tax-exempt charitable organization. This would have the effect of diluting the holdings of the Highland Foundations and safeguarding the DAF's charitable mission.

72. Walkers' analysis is at **pages 349 to 368 of MEP-2**, and is clear and, as far as I am aware, uncontested. On any view of the Company's Articles, the Supporting Organizations, being holders of Participating Shares only, held no real economic interest in the Company. Their rights were expressly to be limited to the repayment of capital (which they did not contribute) and the right to participate in the profits of the Company (article 12, **page 128 of MEP-2**). However, the directors at all times retained absolute discretion as regards distribution of profits (see article 104, **page 142 of MEP-2**). It is clear from Walkers' analysis, and from the above section outlining the discretionary nature of their interest, that the Participating Shareholders did not have the right to: (i) cause or vote on distributions, (ii) pro rata distributions based on their shareholding, or (iii) annual or timed distributions (**page 354 of MEP-2**).

73. Further, as regards the issuance of new shares, the Articles permitted the creation and/or, allotment of unissued, Participating Shares by the Directors (articles 7 and 14, **pages 118 to 119 and 128 of MEP-2**). The Articles did not confer on Participating Shareholders any: (i) pre-emption rights, (ii) the right to vote on the issuance of further Participating Shares, or (iii) the right to receive notice of any such issuance. Mr Murphy and I also obtained advice from Walkers regarding the DFW Share Issuance which confirmed that the Company's Articles granted the directors the power to issue new Participating Shares. A copy of this advice, in the form of a draft memorandum dated February 2025, is at **page 495 of MM-1**.

74. Walkers' analysis was also confirmed by Maples & Calder (Cayman) LLP ("**Maples**"), current counsel for the JOLs. Maples were engaged by the Company on or around 13 December 2024 to provide advice in respect of the DAF's limited partnership agreement and proposed amendments to the Company's Articles. On 30 January 2025, Shields Legal Group asked Maples if the directors had the power to authorize the issuance of new shares and, if so, the reasons they could cite for doing so. Maples, agreeing with Walkers' analysis, highlighted article 7 of the Company's amended Articles and advised that: "*Article 7(a) of the M&A provides that the directors may issue, allot and dispose of shares (which include participating shares) to such persons and on such terms as they may determine. As such, the director(s) of the company would just need to pass a resolution (whether at a duly convened board meeting or pursuant to written resolutions) authorising the issue of the shares and the applicable updates to the register of members*". When asked to advise further on the reasons that the Directors of the Company may need to issue shares, Maples noted that "*the directors do not need a reason to issue the shares if the shares are being issued for consideration (for example, cash or another sort of asset being contributed to the company)…I should also note that the shares can be issued at par (i.e., US$0.01) or at a premium*" (see **pages 369 to 370 of MEP-2**).

75. I understand that the ARLPA similarly permits the addition of new charitable beneficiaries beyond the Supporting Organizations. The Participating Shareholders are not particularized in the ARLPA and are referred to only as "*the indirect equity owners of the Limited Partners* [which at that point was the Company]*, which shall at all times be entities or organizations exempt from taxation under Section 50l(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code*" (**page 329 of MEP-2**). This is why, based on legal and other professional advice (including from Mr Mancino), DFW was incorporated as a section 501(c)(3) compliant company under the Code to serve as the new 'indirect charitable owner' or conduit through which the DAF could make charitable distributions and realise its charitable mission, free from the improper and harmful interference of Mr Dondero and the Highland Foundations, which I believed had become 'Restricted Persons' under the Company's Articles on account of his influence over them.

76. That the Company was entitled to issue new Participating Shares and include new qualifying tax-exempt charitable organizations as beneficiaries reflected the purpose for which it was

operated: namely, to serve the DAF Structure and its charitable mission. As explained above and at paragraph 11.4 of MacInnis 1, in or around 2015, CFNT were allotted five Participating Shares and began to a receive a discretionary distribution of US$100,000 per year from the Company. This share issuance to CFNT occurred when Mr Scott was the Control Person and, as far as I am aware, was never questioned or challenged, presumably because it was done at the direction of Mr Dondero.

77. Following the execution of the Deed of Assignment and Assumption on 18 December 2024, relations with the Highland Foundations continued to deteriorate. On 6 January 2025, Carrington Coleman received an email from Ashcroft, stated to be on behalf of Mr Dondero as "*a grantor and advisor to Charitable DAF Fund, L.P and its related entities*". The email stated that the "Charities" – which were defined as the Highland Foundations - had lost "*confidence in the management and governance of the Charitable DAF*". It repeated the calls in the No Confidence Letter for the DAF Structure to be equitably wound up and the assets distributed to the "Charities". A copy of this email was exhibited at pages 64 to 65 of PM-1.[16]

78. An important point that bears repeating, and which underscores what I believe to be the deliberate conflation between Mr Dondero and the Highland Foundations, is that, to the best of my knowledge and belief, Ashcroft are Mr Dondero's personal attorneys and do not represent the Highland Foundations. Following receipt of this email, Mr Murphy and I formed the view that Mr Dondero was continuing to drive the Highland Foundations' position and was seeking to exert improper control and influence over the assets of the DAF Structure. This view was reinforced throughout January and early February, during which Mr Murphy was on the receiving end of increasingly fractious correspondence with H&K and the Highland Foundations. That correspondence is summarised in the timeline at Exhibit C to the Carrington Coleman Memo (**page 952 to 955 of MM-1**), and at paragraphs 84 to 97 of Murphy 1.

79. This is the backdrop against which Mr Murphy and I, guided by the advice of legal and other professional advisers, completed the DFW Share Issuance on 7 February 2025, and allotted 318 Participating Shares to DFW. A copy of the resolution approving the DFW Share Issuance, which explains in detail the rationale for this action, is exhibited at **pages 500 to 524 of MM-1**.

[16] **E/5/1132-1133.**

The Redemption

80. Following the DFW Share Issuance, relations with the Highland Foundations continued in the same strained manner. Mr Murphy provides a detailed chronology of this period at paragraphs 98 to 124 of Murphy 1, which I do not propose to repeat here. Ultimately, after several months of interactions with the Highland Foundations that seemed to only deepen the impasse between the parties - and during which no charitable distributions were made - Mr Murphy and I concluded, following legal and other professional advice (all of which has been provided to the JOLs), that the most appropriate course of action was to remove the Company from the DAF Structure. As Mr Murphy notes in Murphy 1, this step did not adversely affect the DAF's charitable mission. On the contrary, it furthered it. The step was intended to ensure the continuation of the DAF Structure's charitable mission through DFW, free from the improper influence and interference of Mr Dondero and the risk of risk of civil and/or criminal sanctions for breaches of US tax law.

81. Prior to the Redemption, the Company engaged two separate and independent valuation firms to provide advice regarding the value of the Company's interest in CDM and, consequently, the value of the Supporting Organizations' Participating Shares. The two firms were FTI and ValueScope. They concluded that the DAF's NAV was not a suitable method to value the Participating Shares. They reached that conclusion following discussions with Cayman counsel (Walkers), Delaware counsel (Dorsey & Whitney), and Mr Murphy and me, and following a review of the historical dividend and financial data. Both FTI and ValueScope observed that the Participating Shares held very limited rights given that (and among other things) they are non-voting shares, which could be diluted at any time by the allotment of new Participating Shares, and the holders of such shares are only entitled to discretionary distributions under the Articles which are not guaranteed and can only be made at the sole discretion of the directors. This is consistent with the historical understanding of the Highland Foundations regarding the value and rights of the Participating Shares, as acknowledged by H&K at their 11 December 2024 meeting with Mr Murphy, and as addressed above and in paragraphs 97 and 98 Patrick 1.

82. At paragraph 55.2 of MacInnis 1, she refers to a ValueScope report dated 11 April 2024 which values 100 Participating Shares in the Company as at 31 December 2023 (**pages 751 to 809 of MM-1**). However, as the first paragraph of this report makes clear; "*This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be*

*inferred*". The purpose of the quarterly ValueScope reports was to inform the Management Shareholder of the undiscounted NAV of the DAF in order to help the Management Shareholder calculate the discretionary distributions to be made to the Participating Shareholders. The Management Shareholder, when making a discretionary distribution, would provide this report on a non-use, non-reliance basis (as expressly described in the ValueScope reports) to the Participating Shareholders for their reference in understanding the decision-making process.

83. Having considered the ValueScope report dated 26 March 2025 (**page 865 of MM-1**) and the FTI opinion dated 27 March 2025 (**page 974 of MM-1**), and in my capacity as manager of CDM, I determined that, for the reasons outlined in this affidavit (and recorded in the written consent I provided, at page 532 of MM-1), DFW should be admitted as a new member entitled to 50% of the membership interests of CDM for $1,637,192. Immediately following DFW's admission, the Company's membership in CDM was redeemed for $1,637,192, and DFW became CDM's sole member. The Company and CDM then executed a Letter Agreement under which CDM undertook the obligations of various agreements for which the Company could possibly be liable. To the best of my knowledge and belief, all engagement agreements identified in the Letter Agreement had been discharged. However, as noted therein, CDM would bear responsibility for the agreements identified, and any other contracts that, in CDM's discretion, were necessary to achieve a solvent liquidation of the Company.

84. Following the Redemption, on 30 May 2025, CDM obtained a fairness opinion from a tax, assurance and advisory firm called Weaver & Tidwell LLP ("**Weaver**"). A copy of the Weaver fairness opinion is at **pages 382 to 384 of MEP-2**. Weaver were tasked with considering the fairness of the compensation issued to the Participating Shareholders following the Redemption. Weaver's fairness opinion concurred with ValueScope and FTI's conclusions, and goes further by indicating that the Redemption was fair consideration for the Company's equity interest in CDM. A copy of the Weaver Opinion was provided to the JOLs on 1 July 2025. The JOLs have had access to Weaver's fairness opinion since then but fail to make any mention of it in MacInnis 1, or in their *ex parte* application in the Liquidation Proceedings seeking leave to bring the within proceedings, notwithstanding its relevance to the substance or otherwise of the claims asserted in the Writ.

85. Following the Redemption, on 2 April 2025, the Company was placed into voluntary liquidation and JVLs were appointed. A detailed explanation of the steps leading to the voluntary liquidation of the Company is provided at paragraphs 98 to 124 of Murphy 1 and I do not propose to address this further here. I believe that all these steps were undertaken in accordance with legal and other professional advice and the Company's constitutional documents.

**F. The Liquidation Proceedings**

81. Following the commencement of the voluntary liquidation, Johnstone Law issued a petition, supported by the Highland Foundations, seeking the winding up of the Company and the DAF on just and equitable grounds, and a summons seeking the appointment of provisional liquidators to both entities (the "**J&E Application**"). The J&E Application was supported by affidavits from Mr Dondero and Ms Diaz, the President of Highland Dallas. These affidavits pressed the narrative presented by the Highland Foundations in November and December 2024 and painted an inaccurate picture of the DAF Structure and the DAF Restructuring premised on unsubstantiated and false allegations about my and Mr Murphy's management of the Company and the DAF Structure.

82. However, as the Company was already in voluntary liquidation, Johnstone Law subsequently issued the Supervision Application which was listed before Mr Justice Asif KC on 6 May 2025. Mr Murphy and I did not oppose the Supervision Application or the appointment of the JOLs. However, we did object to the appointment of Johnstone Law as counsel for the JOLs on the basis of our prior dealings with them and their engagement by Mr Dondero and the Highland Foundations in the J&E Petition, during which they had advanced serious and unsubstantiated allegations of fraud against Mr Murphy and me.

83. Notwithstanding our objections, the JOLs signed an engagement letter with Johnstone Law on 7 May 2025. This emerged on 21 May 2025 when DFW's counsel, Baker & Partners, discovered that the JOLs had attempted to have Johnstone Law appointed 'on the papers' by way of a letter application to Mr Justice Asif KC in the Liquidation Proceedings. A detailed chronology of the correspondence between the parties, and the worsening relations with the JOLs - which I believe can be directly traced to the JOLs' insistence on using legal counsel who had at least a perception of bias - is set out at paragraphs 155 to 198 in Murphy 1.

84. The JOLs' insistence on engaging Johnstone Law culminated in the June Sanction Application, whereby the JOLs' sought sanction to engage that firm as Cayman Islands legal counsel, and Reed Smith as US legal counsel. However, in the lead up to the hearing, and after the Liquidation Affidavits had been filed, the JOLs twice amended their summons, first to propose engaging Maples as conflict counsel before, on the eve of the June Sanction Hearing, abandoning their application to engage Johnstone Law and instead proposing that Maples be appointed as sole Cayman Islands legal counsel (something which had been repeatedly suggested in *inter partes* correspondence). The JOLs' change in approach took place after significant costs were incurred by all parties. I understand that the JOLs' conduct in this regard was one of the considerations which resulted in an indemnity costs order being made against them in respect of the costs of the June Sanction Application.

85. At the hearing of the June Sanction Application, given that the central issue between the parties was no longer in dispute, much of the hearing was spent discussing, (i) the summons dated 9 June 2025 filed by DFW pursuant to Order 11, rule 3 of the Companies Winding Up Rules (2023 Revision) ("**CWR**") seeking a judicial determination on the validity (or not) of the DAF Restructuring on an *inter partes* basis between the relevant parties (i.e. the Highland Foundations, DFW and the former directors) (the "**DFW Summons**"), (ii) the CDM Entities' offer to enter into a draft financial reporting protocol ("**Protocol**"), and (iii) the funding of the liquidation (see Section J below).

86. Having consulted with legal counsel and reviewed the relevant sections of the transcript from the June Sanction Application (exhibited at **pages 13 to 101 of MEP-2**), I believe that the following passages are notable, particularly (a) and (b) in circumstances where the JOLs sought leave to commence the Writ and Injunction Application on 4 July 2025, barely one week after the June Sanction Application:

(a) The JOLs' counsel, when addressing the Court noted "*The liquidators are not saying that there has been a fraud and they're not saying that the company definitely has a proprietary claim to any assets. They're saying that there needs to be an investigation*

*because the facts are complicated, not straightforward and they need to be understood."*[17]

(b) In the context of the Protocol discussions, Mr Justice Asif KC, who I believe had read the Liquidation Affidavits and had seen an earlier draft of the Protocol, observed that "*something along the lines of the protocol that is floating around seeks a sensible way forward*" (**page 54 of MEP-2**); and

(c) In the context of the addition of new charitable beneficiaries, His Lordship remarked "*the class of potential charities who could benefit is not closed. It could always be expanded by the director's company allotting shares to a new charity or to a new and intermediate entity for the benefit of a charity…..it looks as if to qualify to become a shareholder, you must be someone who satisfies 501(c)3… Which means essentially you have to be a charity…. So it is, and I think I'm right, as I described it a moment ago, that the class of charities who can benefit is not closed. But you have to be a charity to be considered to be added as essentially a potential beneficiary under that structure."* (**pages 83 to 84 of MEP-2**).

87. Before the June Sanction Application, on 9 June 2025, DFW issued the DFW Summons. As is clear from the Writ, MacInnis 1 and the foregoing, the course of these proceedings and the liquidation of the Company is entirely dependent on the legality and validity of the DAF Restructuring, which the Highland Foundations allege was improper. I understand that the DFW Summons seeks to have this issue determined on an *inter partes* basis between the relevant parties, namely the Highland Foundations, DFW, and myself and Mr Murphy as former directors of the Company. Given the significant costs incurred in the Liquidation Proceedings and these proceedings, both by the JOLs and the stakeholders, I believe this is a sensible approach. It was for this reason that the Directions Summons filed by the CDM Defendants in these proceedings on 21 July 2025 (the "**Directions Summons**") sought to have the Injunction Application and the DFW Summons timetabled and heard together.

[17] It appears the JOLs conducted these investigations, determined that they did indeed have proprietary claim, and were able to draft the necessary application in the nine days following the June Sanction Application.

88. The CDM Entities also issued a summons dated 18 June 2025 seeking to vary certain provisions of the Appointment Order which permitted the JOLs to take steps against the DAF "*if so advised*" without seeking sanction from the Court (the "**Variation Summons**"). On the basis that these provisions are inappropriate and contrary to Cayman Islands law, Campbells wrote several times to the JOLs and/or Johnstone Law requesting their consent to vary the Appointment Order, but they refused. This necessitated the issuance of the Variation Summons, which remains pending before Mr Justice Asif KC in the Liquidation Proceedings.[18] The JOLs subsequently appeared on an *ex parte* basis before Mr Justice Asif KC on 14 July 2025 to seek sanction to commence the present proceeding. That appears to acknowledge that we were correct to file the Variation Summons and that the JOLs should have consented to a variation of the Appointment Order. The parties are currently corresponding regarding the costs of the Variation Summons.

## G. Protocol Correspondence

89. Following their appointment on 16 May 2025, Campbells wrote to the JOLs in relation to paragraphs 6(a) and (b) of the Appointment Order (which were the subject of the Variation Summons (**pages 1,093 to 1,095 of MM-1**). The letter made clear that the DAF and the related CDM Entities were continuing to operate in furtherance of their charitable purposes, but offered to enter into a financial reporting protocol "*in an effort to assuage any concerns the JOLs may have regarding the commercial activities of the Fund and the risk of dissipation of assets outside of the ordinary course of business*".

90. By letter dated 22 May 2025, Johnstone Law responded on behalf of the JOLs noting that they "*sought assurances regarding the assets under the control of your client*s". However, they did not engage with, or refer to, the CDM Entities' offer to enter into the Protocol with the JOLs.

91. By letter dated 30 May 2025 (**pages 1,098 to 1,112 of MM-1**), in a proactive effort to appease the JOLs and allay any misplaced concerns that assets may be dissipated, Campbells wrote to the JOLs enclosing a draft Protocol whereby the CDM Entities agreed to operate and conduct

---

[18] I understand the parties agree that it will no longer require a substantive hearing.

business in accordance with the Mission Statement.[19] In addition, the draft Protocol offered to provide, *inter alia*, the following financial and transactional information to the JOLs:

(a) a report listing all transactions undertaken by the DAF, or any of the CDM Entities, since 27 March 2025 which exceed US$5,000,000;

(b) a 'business plan' explaining the ordinary day to day business of DAF;

(c) a monthly transactions report so that the JOLs' would have oversight of the DAF's investment activity and financial performance, and the steps being taken by the directors in the ordinary course of business (similar to paragraph 6 of the undertakings provided to the Court by way of the Consent Order dated 31 July 2025); and

(d) advance notice of any single transaction exceeding US$5,000,000, or any series of transactions in an aggregate amount exceeding US$5,000,000 (save for transactions in the ordinary course of business involving or related to the renumeration of employees, officers and directors, agents, advisors and / or service providers).

92. Campbells noted in that letter that the CDM Entities were offering the protocol of their own volition to ensure that the continued operation of the DAF Structure so that it could continue "*to make investments on behalf of, and to support charitable causes"* (**page 1,101 of MM-1**). I understand that Johnstone Law responded on 5 June 2025 but did not engage substantively with the Protocol and did not provide any mark-up or comments (**pages 1,113 to 1,116 of MM-1**).

93. On 9 June 2025, Campbells sent a revised version of the Protocol which made further concessions, including removing the financial threshold for the historical transaction report referred to at paragraph 91(a) above, and reducing the threshold for the provision of advance notice to transactions exceeding $1 million. This letter reiterated the CDM Entities' belief that "*the appropriate course of action is for the JOLs to engage on the terms of the protocol, which will appease any concerns they may have regarding the dissipation or misuse of the* DAF*'s assets*

[19] See paragraph 12 above - the Mission Statement of the DAF Structure is to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*".

*outside of the ordinary course of business during the currency of the liquidation*" (**pages 1,117 to 1,124 of MM-1**).

94. On 19 June 2025, Campbells received a letter from Maples, who I understand were at that point representing the JOLs (despite the fact that the JOLs did not drop their application to appoint Johnstone Law until the morning of the June Sanction Application on 24 June 2025). This letter engaged substantively for the first time with the Protocol which had been offered by Campbells, although it proposed substantial amendments which, in my belief, were neither necessary nor appropriate (the "**JOLs' Protocol**") (**pages 1,125 to 1,136 of MM-1**). The JOLs' Protocol sought similar restrictions and controls to those which were originally sought in the Injunction Application. Maples letter asserted that such restrictions were "*necessary and justified in the present circumstances*". However, the timing of the JOLs request was curious given that these restrictions would interfere with the CDM Entities ability to transact and conduct business in the ordinary course days before the HMIT Settlement Motion (defined below) was scheduled to be heard (see Section H below).

95. By letter dated 29 June 2024 (**pages 1,137 to 1,170 of MM-1**), Campbells responded to the JOLs' 19 June letter and addressed why the JOLs' Protocol was inappropriate and unwarranted. The letter highlighted the difficulties that the JOLs' Protocol would cause to the ongoing operation of the DAF Structure. However, in a further effort to appease the JOLs, I instructed Campbells to offer a revised Protocol which (i) provided for Armanino LLC, an independent and internationally recognized accountancy firm, to oversee the financial reporting and accounting analysis required by the Protocol, (ii) offered to extend the lookback period for the historical reporting to the date when Skyview ceased provided services, (iii) agreed to provide the information the JOLs' had requested be included in the monthly and historical transactions reports in the JOLs' Protocol, and (iv) reduced the value threshold for the provision of advance notice from US$1m to US$250,000. However, Campbells received no response to their 29 June letter and that the Writ and the Injunction Application were subsequently served on 15 June 2025.

## H. HMIT Settlement and related correspondence

96. In their letter dated 30 May 2025, the JOLs, for the first time, referred obliquely to a transaction involving Hunter Mountain Investment Trust ("**HMIT**") and asserted that no transactions

involving the DAF's assets should be undertaken due to their purported proprietary claims over all such assets. In their subsequent 5 June 2025 letter (**pages 1,113 to 1,116 of MM-1**), the JOLs explain this transaction, and their concerns, in more detail.

97. The transaction to which the JOLs were referring involved a settlement agreement entered into in the Highland Bankruptcy, pursuant to which HMIT (an entity within the DAF Structure) would acquire the rights to receive, *inter alia*, the following (the "**HMIT Settlement**"):

a) A cash payment in the amount of $10,000,000;

b) A promissory note payable by The Dugaboy Investment Trust ("**Dugaboy**") (the personal family trust of Mr Dondero) in an original principal amount of US$24,268,621.69

c) Future cash payments as provided therein; and

d) The assignment of approximately US$300 million in legal claims consisting of the rights to pursue the Kirschner Claims, including actions against Mr Dondero, Mr Ellington and entities owned, controlled or affiliated with them.

98. The HMIT Settlement required approval from the judge in charge of the Highland Bankruptcy and a settlement motion was scheduled on 25 June 2025 (the "**HMIT Settlement Motion**").

99. I was surprised that the JOLs' 5 June letter raised concerns about the HMIT Settlement given that the transaction stood to benefit the DAF Structure and accordingly, taking their purported proprietary claims at their highest, the liquidation estate. The 5 June letter revealed that the JOLs had obtained a copy of the HMIT Settlement and criticized the CDM Entities for not providing notice or seeking approval to enter into the HMIT Settlement.

100. In their letter dated 9 June 2025, Campbells, on behalf of the CDM Entities (**pages 388 to 391 of MEP-2**) replied as follows:

"*Your reference to the so-called HMIT transaction is vague, speculative, and appears to rely on materials filed in separate bankruptcy proceedings in the United States concerning entities related to Mr James Dondero (the individual who swore evidence in support of FSD No. 99 seeking to have the Company and the Fund wound up on a just and equitable basis and who*

*agreed to fund those proceedings). Given the assertions in your letter alleging the JOLs have received minimal cooperation, it is curious that you have such detailed knowledge of a transaction undertaken by entities which the JOLs have no interest in. Please confirm the source of this information.*

*Further, it is clear that the Settlement Agreement benefits the HMIT Entities (as defined in your letter) and, accordingly, there is no question that assets of the CDM entities are being dissipated or misused. Taking your unfounded assertions in relation to the proprietary claims at their height, the HMIT transaction would inure to the benefit of the liquidation estate. It is perhaps telling that it is our understanding the HMIT transaction does not benefit Mr Dondero and his broader interests. In the circumstances, we do not understand why the JOLs would not support the HMIT transaction even if a proprietary claim has not been established."*

101. Mr Dondero, or entities connected to him, had already attempted to intervene and delay the approval of the HMIT Settlement. As deposed to at paragraphs 75 to 80 of Murphy 1, in November 2024, HCLOM (an entity controlled by Mr Dondero) sought to intervene in the Highland Bankruptcy in order to dilute recoveries due to HMIT. I believe that the dilution of these recoveries was attempted improperly to exert financial pressure on HMIT and limit its ability to contest arbitral proceedings commenced by Dugaboy in respect of a promissory note in the amount of US$62.6 million.

102. In addition, on 9 June 2025, Dugaboy sought an adjournment and the Dallas Foundation Inc. (the supported organisation of Highland Dallas) filed an objection to the HMIT Settlement. Ms Julie Diaz, the President and Chief Executive Officer of The Dallas Foundation - who swore an affidavit in support of the J&E Application - was deposed for the purpose of their objection. In her deposition, Ms Diaz revealed, *inter alia*, that: (i) she did not know the lawful basis upon which The Dallas Foundation could object to the HMIT Settlement (page 156 of Exhibit AP-1 to the First Affidavit of Arthur Quentin Jeremy Preget dated 25 July 2025), (ii) she did not know the parties to HMIT Settlement which she, apparently, had recommended the Dallas Foundation object to (page 113 of Exhibit AP-1), and (iii) she had no basis for the assertion that I was acting outside my authority by entering into the HMIT Settlement (page 160 of Exhibit AP-1).

103. Following her deposition, Ms Diaz on behalf of the Dallas Foundation and other entities referred to as the 'Foundation Parties', agreed to withdraw the objection to the HMIT Settlement and entered into a stipulation and binding term sheet (the "**HMIT Term Sheet**") with entities related to HMIT (pages 560 to 570 of Exhibit AP-1). By the HMIT Term Sheet, the Dallas Foundation withdrew its objection to the HMIT Settlement Motion and agreed to meet with Mr Shawn Raver, the COO of the DAF Structure, with a view to the creation of new qualifying section 501(3)(c) compliant charitable beneficiaries and the resumption of charitable distributions to entities and organizations which were free from the influence and/or control of Mr Dondero (see paragraph 120 below, a similar offer was made to the Highland Foundations in the form of the CC Proposal). In particular, the HMIT Term Sheet provided for Mr Raver to:

(a) review the current DAF Structure with The Dallas Foundation;

(b) provide a projected quarterly expense budget to the Foundation Parties (as defined therein);

(c) provide expense reporting every forty-five (45) days, commencing 5 August 2025; and

(d) show and present a balance sheet for the DAF as of 30 September 2024, 31 December 2024, and 31 March 2025, including transfers of assets among entities within the DAF corporate structure.

104. Mr Raver prepared the necessary balance sheets in anticipation of the meeting with Ms Diaz, as prescribed by the HMIT Term Sheet. However, on 1 July 2025, the Highland Foundations filed a petition in the Texas Business Court (the "**Texas Petition**") seeking a temporary restraining order (the "**Texas TRO Motion**") against the First, Third, Fourth and Fifth Defendants as well as the Original GP (see Section I below). Notwithstanding this apparent lack of good faith and contravention of the spirit of the HMIT Term Sheet, the meeting between Mr Raver and Ms Diaz took place via Zoom on 2 July 2025, during which Mr Raver shared detailed financial information with her, including, *inter alia*, the information set out above and details of all transfers of assets out of the DAF Structure as well as additional, more recent financial information that was not required to be disclosed.

105. Immediately following the June Sanction Application, on the evening of 24 June 2025, the JOLs sent a letter to Mr Marc Kirschner and Mr James Seery, the litigation trustees (the "**Trustees**") of

the Highland Bankruptcy. A copy of this letter is at **pages 392 to 394 of MEP-2**. The letter requested an adjournment of the HMIT Settlement Motion to afford the JOLs additional time to progress their investigations of the HMIT Entities, or alternatively, that the Trustees defer making distributions to the HMIT Entities to allow the JOLs time to carry out investigations "*without the risk of asset dissipation in connection with protocol discussions*" The letter noted that "(t)*he JOLs are keen to enter into a protocol arrangement with Mr. Patrick and certain entities under his control to, among other things, implement reasonable procedures to mitigate the risk of asset dissipation while the JOLs' investigation progresses*". However, I understand that, by the date of this letter, the JOLs had failed to engage with two separate versions of a Protocol pursuant to which the CDM Entities were offering to provide documentary evidence that they were not dissipating assets outside of the ordinary course of business.

106. I believe it is telling that, at the commencement of the HMIT Settlement Motion, despite the fact that the letter was addressed to the Trustees only, Mr Dondero's counsel (Mr Dondero was acting through his trust, Dugaboy) immediately referred to the letter in a further attempt to have the HMIT Settlement Motion adjourned[20] (Dugaboy had already made several attempts to have the HMIT Settlement adjourned). However, notwithstanding the JOLs' late interference, the HMIT Settlement was approved by the Highland Bankruptcy judge. Campbells' 29 June 2025 letter (**pages 1,137 to 1,145 of MM-1**) addressed the JOLs' attempted interference with the HMIT Settlement and suggested that Mr Dondero's use of the JOLs' letter leads to the inescapable impression that this was the true purpose of the letter.

107. Mr Dondero then attempted to use these proceedings in yet a further attempt to adjourn the HMIT Settlement. On 17 July 2025, Dugaboy filed a motion in the Highland Bankruptcy seeking, once again, to stay the HMIT Settlement (pages 649 to 744 of Exhibit AP-1). The motion - filed just two days after the issuance of the Writ - relies heavily on the Writ itself and on the allegations made in MacInnis 1. I do not believe that this is a coincidence. In my opinion, it heightens concerns regarding the independence of the JOLs and whether their actions are being influenced by the interests of Mr Dondero, even where such actions may prejudice the estate they are charged with protecting.

[20] See the extract from the transcript of the HMIT Settlement Motion which is at page 321 of Exhibit AP-1.

**I. Texas TRO Motion / Rule 11 Agreement**

108. As noted, the Texas Petition was filed by the Highland Foundations on 1 July 2025 and they are seeking, among other relief, the imposition of a constructive trust over all assets, interests, and property of, and immediate injunctive relief to freeze all assets held in, the DAF. The Texas TRO Motion was subsequently listed for an emergency hearing on 2 July 2025 (the same day that Mr Raver met with Ms Diaz of Highland Dallas and shared detailed financial information with a view to re-commencing charitable distributions to the Dallas Foundation and other supported organizations.

109. Without any waiver of privilege, I understand from legal counsel that it is highly irregular that the Highland Foundations, having petitioned for the Company's liquidation in the Cayman Islands, are simultaneously pursuing proprietary claims to the DAF and its assets in the Texas Petition, while purporting to support the JOLs' alleged proprietary claim in the Cayman Islands. Notwithstanding, at the hearing of the Texas TRO Motion the Highland Foundations failed to persuade the Texas Court that there was any real risk of irreparable harm or dissipation of assets, with the Judge expressly stating that he did not consider there to be a real risk of irreparable harm or dissipation of assets: "*I'm struggling to find evidence in the record that there is an immediate threat of irreparable harm. It appears that the $270 million is gone.*[21] *Your concern is you don't want to move further* [sic.] *away.*[22] *But I'm not seeing anything in the record to indicate to me that there is an immediate threat of that*" (page 612 of Exhibit AP-1).

110. However, notwithstanding this clear indication that the Judge did not see a proper basis to grant a temporary restraining order, I and the other defendants to the Texas Petition voluntarily entered into a binding agreement, to be entered on the court record, whereby we agreed to the following (the "**Rule 11 Agreement**"):

---

[21] Being the value that the Highland Foundations assigned to their interest in the DAF.

[22] The words which appear in the uncorrected transcript are "*confirm it away*", rather than "*move further away*", which is an error and it is clear from the full context of the Judge's remark that he was referring to the risk of further movement or dissipation of the US$270m, concluding that there was and is no immediate threat of that occurring.

(a) not to transfer, conceal, withdraw, alienate, redeem, expend, encumber, disperse, or otherwise dispose of any and all funds, assets, receivables, or shares outside of the ordinary course of business;

(b) not to take any action to increase the remuneration paid to any employee of the CDM Entities;

(c) not to take any action to dissolve, wind-down, liquidate, or otherwise alter the corporate standing of the CDM Entities;

(d) not to take any action to modify or alter the corporate governance of the CDM Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

(e) not to take any action to sell, exchange, or dispossess any asset of one of the CDM Entities unless (i) the sale is to a bona third party purchaser for reasonably equivalent value, (ii) except in the case of marketable securities, the bona fide purchaser is made aware of this Protocol, and (iii) the proceeds from that sale, exchange, or disposition remain owned by the CDM Entities; and

(f) not to alter, conceal, or destroy any business records concerning the Defendants, including any transfers of funds, assets, receivables, or shares to the Defendants;

111. As is clear from the foregoing, the Rule 11 Agreement confirms that both I and the CDM Entities will continue to conduct ourselves in the ordinary course of business, providing the Highland Foundations and the JOLs with assurance that there will be no misappropriation or dissipation of assets. It is notable that, during the hearing of the Texas TRO Motion, the Judge recognized that the Highland Foundations' complaints appeared to relate solely to the DAF Restructuring, and there was no evidence, nor was the Judge persuaded, that there was any immediate risk to the assets of the DAF Structure. Nevertheless, I was satisfied that providing the Rule 11 Agreement was appropriate, as the DAF and the DAF Structure were, and continue to be, operated in the ordinary course following the DAF Restructuring. This is why, as far back as 16 May 2025, I instructed Campbells to offer the JOLs a financial reporting Protocol to facilitate transparency

and oversight. Unfortunately, despite this proactive step, the JOLs failed to meaningfully engage regarding the Protocol before commencing these proceedings.

**J. Funding of liquidation**

112. Mr Dondero, in his affidavit filed in support of the J&E Application, confirmed that he had agreed to fund the costs of the liquidation. Based on my past experience with Mr Dondero, and given the influence he exerts over the Highland Foundations and his repeated attempts to assert control over the DAF Structure, I was concerned that he would use his funding of the liquidation to impugn my management of the DAF Structure and to challenge the legality and validity of the DAF Restructuring in order to assert control over the assets of the DAF. I believe that his funding of the liquidation presents a clear conflict of interest, given, *inter alia*, that Mr Dondero is an interested party and a defendant in multiple lawsuits involving entities within the DAF Structure.

113. Accordingly, the identity of the funder has always been a critical issue and was addressed at length during the hearing of the June Sanction Application. Notwithstanding this, the JOLs consistently declined to confirm how, or by whom, the liquidation was being funded, asserting at the June Sanction Application that it was not certain Mr Dondero would provide funding (**page 88 of MEP-2**). This lack of transparency persisted despite the fact that, two days earlier, Ms Diaz had confirmed under oath in her deposition dated 22 June 2025 that Mr Dondero was indeed funding both the Cayman liquidation and the Dallas Foundation's objection to the HMIT Settlement (page 126 of Exhibit AP-1). The JOLs' refusal to acknowledge this funding only heightened my concern that Mr Dondero could improperly influence the proceedings to the detriment of the DAF and the DAF Structure's charitable mission.

114. I understand that on 4 July 2025, the JOLs filed an ex parte sanction application seeking approval to enter a funding agreement (the "**Funding Agreement**") with an entity named Crossvine Litigation Funding LLC ("**Crossvine**"), a special purpose vehicle whose managers are Mr Scott Ellington and Michael McDonald. This is the same Mr Ellington referred to above who is a long-time business associate of Mr Dondero and who operated Skyview on his behalf. He is also the same individual against whom summary judgment in the sum of approximately US$1.2 billon is pending in the UBS Litigation

(alongside Mr Dondero). Mr Ellington, together with entities related to him, is also extensively named in the Kirschner Claims as an alleged wrongdoer and is a target of the recovery proceedings which will be pursued by HMIT now that the HMIT Settlement has been approved.

115. The funding application was supported by the sixth affidavit of Ms MacInnis dated 11 July 2025 ("**MacInnis 6**") which, at paragraph 11, notes that Crossvine "*is a special purpose vehicle incorporated for the purpose of ultimately Mr Dondero (through the structure outlines above) funding the liquidation of the Company and the JOLs pursuing the Proposed Proceedings*". Further, paragraph 9.2 of the funding agreement grants wide ranging information rights to Crossvine with respect to the progress of these proceedings, including, inter alia, "*access to all non-privileged information and Documents*".

116. The JOLs are asserting proprietary claims over assets that include causes of action and litigation receivables which would inure to the benefit the liquidation estate, and those causes of action and litigation receivables are, in many cases, adverse to the interests of the funders. This, in my view, amounts to a clear conflict of interest. In particular, I believe that the JOLs' obligation to disclose confidential information about these potentially adverse causes of action and litigation receivables to the individuals behind Crossvine is untenable.

117. I understand that it has recently come to light in correspondence sent by Maples to DFW in the Liquidation Proceedings on 5 September 2025 that, per their letter (which appears at **pages 395 to 405 of MEP-2**): "*the initial funding provided by Crossvine has been exhausted*" and "*the JOLs are in advanced discussions with several third-party funders to obtain funding through to the completion of the FSD Proceedings*" (see **page 401 of MEP-2**). If true, this is a significant development which if particular concern to me. I do not believe there was any suggestion in MacInnis 6 that Crossvine were only providing preliminary or 'initial funding'. The exhaustion of the Company's funding significantly increases the CDM Defendants' concerns that the Company will not be able to pay any adverse costs order in these proceedings. In addition, the CDM Defendants have no information or transparency relating to, the financial standing of Crossvine, which appears, from the description provided in MacInnis 6, to have been structured so as to

be a special purpose bankruptcy remote vehicle which, by the JOLs' own admission, is not a traditional third-party funder and appears to have been incorporated solely to fund the Writ and Injunction Application. In light of these concerns, the CDM Defendants issued a summons dated 12 September 2025 seeking security for their costs of these proceedings, including the Injunction Application (the "**Security for Costs Application**").

**K. Inaccuracies in MacInnis 1**

Mr Dondero's Influence over the Highland Foundations

118. In paragraphs 12 to 22 of MacInnis 1, the JOLs attempt to distance Mr Dondero from the Highland Foundations, pointing out that he only controls one third of the board of directors' voting rights. However, Ms MacInnis ignores the fact that Mr Dondero is also the President of each of the Highland Foundations. Pursuant to the By-laws of the Highland Foundation, which are exhibited to MacInnis 1 and referred to at paragraphs 18.1 and 18.6**,** the President is also the Chief Executive Officer of each of the Highland Foundations and has all powers that are delegated by the Board of Directors. I understand, based on advice from Delaware counsel, that under the governing law of the Highland Foundations, an officer, including the President, may cause a corporation (including the Highland Foundations) to take a wide variety of actions, including bringing lawsuits. That Mr Dondero caused Highland Dallas to take certain actions (which were detrimental to the DAF Structure) appears to be borne out in Ms Diaz' testimony in support of The Dallas Foundation's objection to the HMIT Settlement. At her deposition, Ms. Diaz could not articulate: (i) who the parties to the HMIT Settlement were (page 113 of Exhibit AP-1), (ii) who came up with the idea to object to the HMIT Settlement (page 122 of Exhibit AP-1), or (iv) what was objectionable about it (page 156 of Exhibit AP-1).

119. As noted above, the Highland Foundations were the incumbent section 501(3)(c) compliant qualifying organizations through which the underlying charitable foundations were supported (along with CFNT), with the terms of each charitable foundation's annual distributions from the Company provided for in the Legal Relationship Agreement or Operating Agreements they entered into with the Suppporting Organizations.[23] In my experience, Mr Dondero is able to exert significant influence over the underlying charitable foundations through his control of the

---

[23] Not on the basis of grants made by the Supporting Organizations to the charities "*from time to time from any dividends received from the Company*" as asserted at paragraph 22.1 of MacInnis 1.

Highland Foundations (which he was instrumental in establishing). On several occasions, I witnessed Mr Dondero promise additional financial donations to the Highland Foundations in an attempt to extract favors from them, including tax write-offs that benefited him personally. My concerns as the Company's director stemmed from the influence Mr Dondero wields over the Highland Foundations, which I believed categorized them as 'Restricted Persons' under the Company's Articles, as well as his attempts to influence the businesses and transactions of the DAF Structure in order to benefit personally.

120. These concerns are illustrated by the Highland Foundations' failure to meaningfully engage with recent correspondence from the CDM Defendants' counsel in the Texas Petition, Carrington, Coleman, Sloman & Blumenthal, L.L.P. ("**CCS&B**"). By letter dated 11 August 2025, CCS&B wrote to counsel for the Highland Foundations in a good-faith effort to resolve the disputed issues between the parties and to avoid the considerable burden and expense of litigating substantially the same matters in parallel in Texas and the Cayman Islands. A copy of CCS&B's letter and the enclosed term sheet the (together the "**CC Proposal**") is at **pages 406 to 411 of MEP-2**. Despite the obvious benefits of the proposal and the opportunity to avoid duplicative litigation costs, the Highland Foundations did not substantively engage with the offer

121. The CC Proposal offered to "*not only restore the limited rights and economic interests previously enjoyed by the Foundations, but to improve them materially.*" The enclosed term sheet proposed that:

(a) the Highland Foundations would receive participation and/or membership interests in CDM or another entity created to hold a limited partner interest in the DAF (subject to the Foundations maintaining tax-exempt status under section 501(c)(3) of the Code);

(b) the Highland Foundations would receive annual distributions based on an agreed percentage of the DAF's assets, with a commitment that such distributions would exceed the average distributions paid in the previous three years;

(c) the Highland Foundations would be paid the quarterly distributions they would have received in Q4 2024 and Q1 and Q2 2025 had the DAF Restructuring not occurred;

(d) the DAF would indemnify the Highland Foundations and advance defense costs for any claims brought by Mr Dondero and/or his affiliates against the Highland Foundations as retaliation for agreeing to the term sheet; and

(e) the DAF would prepare and provide to the Highland Foundations quarterly unaudited financial statements and annual audited financial statements.

122. The only condition of the CC Proposal was that Mr Dondero and related parties, defined in the term sheet as the "Dondero Parties," would be barred from holding any board, membership, ownership, or officer position in any of the Highland Foundations or any new section 501(c)(3) organization established as a beneficiary of the DAF, and they could not be retained in any advisory capacity by such entities. This guardrail was essential and designed to protect the charitable structure from the very influence that has jeopardized the Highland Foundations' independence and tax-exempt status, while otherwise placing them in a materially better position than they were in before the DAF Restructuring.

123. As the CC Proposal was clearly in the best interests of the underlying charitable organizations, I hoped it would be accepted and that the Highland Foundations would work with Mr Murphy and me to bring an end to the costly and unnecessary litigation that was draining the DAF Structure's assets and distracting it from its charitable mission. Following receipt of the CC Proposal, counsel for the Highland Foundations indicated they were amenable to scheduling a mediation to discuss the term sheet and said they would consider dates. However, no dates or availability were ever provided. Despite CCS&B's follow-up efforts, the CC Proposal could not be progressed and no definitive response has been received. However, for the avoidance of doubt, the CC Proposal remains open if the Highland Foundations are willing to engage in good faith with a view to ending the ongoing litigation and restoring charitable distributions.

124. I believe that their failure to engage with CC Proposal is a clear example of the Highland Foundations placing Mr Dondero's interests above their own and those of the charities they are supposed to serve. The CC Proposal would have restored the Highland Foundations' entitlement to receive discretionary distributions from the DAF, and placed them in a materially better position than they were in before the DAF Restructuring, while also resolving the costly and distracting litigation they commenced, ostensibly to have their 'interest' in the DAF restored. The only proviso was that they sever ties with Mr. Dondero and his related entities. They were

unwilling to do so. In my view, that speaks volumes and confirms why we were correct to regard the Highland Foundations as "Restricted Persons" under the Company's Articles, which is ultimately why Mr. Murphy and I implemented the DAF Restructuring

The JOLs' mischaracterization of CDM Entities as 'passive'

125. At paragraph 27 of MacInnis 1, the JOLs state that the assets and/or holdings of the CDM Entities are "*mostly passive investment vehicles holding a mix of assets, including cash, promissory notes, shares in Nexpoint entities, publicly traded stock, real estate, receivables/proceeds from litigation proceedings, receivable amounts from brokers, dividends due, and amounts due from affiliates*". While the nature of the assets held by the CDM Entities is largely correct, the CDM Entities are not "*mostly passive investment vehicles*" as stated in MacInnis 1. Rather, the CDM Entities are actively managed by me with the aim of maximizing returns for the charitable beneficiaries, with the primary business lines consisting of:[24]

(a) Investment management business with over US$100 million in assets under management which is owned by the DAF, but which handles and invests money from external investors;

(b) Real estate development;

(c) Litigation receivables (e.g. the Kirschner Claims); and

(d) Active portfolio management, including several large positions (largest being US$90 million).

126. As noted in MacInnis 1, one of the key pillars of the DAF Structure's investment strategy at present involves litigation receivables and choses in action. Paragraph 29.1 of MacInnis 1 provides examples of some of the choses in action which are held by the CDM Entities and, as is clear from these examples, many of these proceedings involve entities related to or owned by Mr Dondero (e.g. Mr Dondero's sister Nancy Dondero, The Dugaboy Investment Trust, NexPoint and various Highland entities). These claims, coupled with the Kirschner Claims detailed above, have the potential to yield substantial recoveries for the DAF Structure. This is another reason

[24] These business lines, and the scope of my role as the Control Person of the DAF Structure, are referred to in the Mercer Report, which appears at **pages 988 to 1007 of MM-1: B/1/988-1007**.

why Mr Dondero's funding of the litigation, together with the JOLs' adoption of positions which potentially value-destructive, gives rise to serious concerns regarding conflicts of interest.

127. While litigation receivables and choses in action are one element of the CDM Entities' active business, they are part of the ordinary course of the CDM Entities' business and require active management by me. Another primary business line of the DAF Structure is real estate development. The CDM Entities have several valuable real estate investments which are actively managed by me and which have the potential to realize substantial profits for the DAF Structure. The CDM Entities have expended significant time and resources on some of these developments, which are in advanced stages of planning following consultation with local councils, planning departments and governmental agencies.

128. Following service of the Injunction Application and the JOLs' incorrect representation of the CDM Entities as "*mostly passive investment vehicles*", I engaged ValueScope to prepare a report assessing the financial impact likely to be suffered in the event the injunction sought by the JOLs' is granted (the "**Damages Report**") (**pages 412 to 415 of MEP-2**). As set out in the Damages Report, ValueScope were retained to opine on the economic loss that would be suffered by CDM (the Third Defendant) and related entities within the DAF Structure if the Injunction Application were granted. The report notes the DAF Structure's "*role as an active operating company focused on developing and monetizing its holdings*" and concludes that losses of up to US$126,700,000 can be expected if an injunction is granted. This estimate reflects damages associated solely with the CDM Entities' investment activities and does not consider potential loss relating to litigation claims owned by the CDM Entities (e.g. the Kirschner Claims which are worth as much as US$300 million to the DAF Structure).

129. Due to the highly confidential and commercially sensitive nature of the Damages Report, and the CDM Entities' concerns regarding the disclosure of confidential information to the Highland Foundations (who sit on the liquidation committee of the Company) and Mr Dondero, the executive summary of the Damages Report has been exhibited herewith with minor redactions. However, I have instructed Campbells to seek appropriate undertakings as to confidentiality from the JOLs and, if received, we can provide a complete unredacted copy of the full Damages Report to the JOLs.

<u>The Remuneration Transactions</u>

130. Paragraphs 49 to 51, and 78 of MacInnis 1 detail what are described as the 'Renumeration of Transactions'. These allegations appear to represent the JOLs' principal concerns regarding the alleged misappropriation of the DAF's assets and the asserted need for urgent injunctive relief. However, they reflect the unsubstantiated concerns that I previously addressed in Patrick 1. Although the JOLs briefly refer to the Mercer Report at paragraphs 64 and 78 of MacInnis 1, they make no attempt to engage with the substance of the report or its methodology, and instead present my remuneration as evidence of misappropriation of the assets of the DAF Structure without any objective assessment or engagement with the facts.

131. As explained in Patrick 1, I believe I followed best practice by commissioning an independent, third-party assessment of the appropriate compensation for my role as Control Person of the DAF Structure, which was also reviewed by Mr Murphy. Given our well-founded concern that Mr Dondero might seek to impugn our management of the DAF Structure as part of his usual litigation strategy, the CDM Entities engaged Mercer LLP - an internationally recognised and independent global consulting firm with extensive experience preparing objective benchmarking reports for charitable organisations and the IRS - to conduct a rigorous, independent assessment of my compensation. This ensured that the evaluation was unbiased, robust, and defensible.

132. As part of their findings, Mercer noted "*the complexity of* [my] *current role, with the incumbent serving in multiple different capacities*" including Chief Executive Officer and Chief Investment Officers of the DAF Structure, head of legal - "*handling complex and contentious litigation, asset recover and complex tax structures – some stemming from the Highland Capital Management Bankruptcy*" - and head of compliance, navigating compliance requirements across several jurisdictions (**pages 988 to 996 of MM-1**). Mercer assessed my compensation by reference to the median remuneration of executives in similar roles and sectors, and recommended a base salary targeted at the top quartile of the relevant market "*given the complexity of* [my] *role*".

133. Mercer also recommended a long-term incentive package which was tied to net fund returns in excess of 10%. I believe it is reasonable and appropriate that my incentive

plan is tied to the performance of the DAF Structure. It is important to note also that, not only would the improved performance of the DAF Structure stand to benefit me, it would also benefit the Highland Foundations and the underlying charities whose charitable distributions under the respective Legal Relationship Agreement and Operating Agreements were linked to the Company's NAV (see paragraph 67 and the DAF Trustee Fees excel at **page 342 of MEP-2**).

134. Upon my assumption of the Control Person position in 2021, the DAF Structure immediately began to see a significant improvement in its financial performance. This is clear from the ValueScope report dated 20 November 2024, which shows the financial performance and returns made by the DAF Structure under my stewardship consistently beat returns made by the S&P 500 (**page 160 of MEP-2**). This is in stark contrast to the performance of the DAF Structure during Mr Scott's tenure as the Control Person.

135. Paragraph 50 of MacInnis 1 contrasts my remuneration as Control Person to that of my predecessor, Mr Scott, presumably in an attempt to represent my remuneration as excessive and to impugn the compensation package which was independently assessed by Mercer. However, as addressed above as well as in Liquidation Affidavits, Mr Scott did not perform the same functions in his tenure as the Control Person of the DAF Structure and was instead a close personal friend of Mr Dondero who was handpicked by him to be the Control Person on that basis.

136. Further, as I stated at paragraph 110 of Patrick 1, after assuming the role of Control Person, I formed the belief that "*Mr Scott had created potential liabilities for* [the DAF] *and the DAF Structure as a result of failing to manage* [the DAF] *and its assets independently of Mr Dondero, particularly where I suspected that Mr Scott had simply been authorizing investments proposed by Mr Dondero without due consideration for their appropriateness or any financial due diligence*".

137. I have since been able to conduct an analysis regarding the level of mismanagement during Mr Scott's tenure as Control Person and the associated cost to the DAF Structure. Between 2014 and 2020, the DAF Structure paid approximately US$28.5

million to entities related to Mr Dondero for investment management services,[25] and a further US$2.35 million in respect of management fees to Dondero-related investment funds. A copy of this analysis is at **pages 422 to 423 of MEP-2**. The level of these related party fees were alluded to in Campbells' 21 July letter (at **pages 416 to 421 of MEP-2**) where they responded to allegations regarding my remuneration package by noting that "*even a cursory investigation by the JOLs would have revealed that Mr Patrick's remuneration is a fraction of the millions of dollars extracted from the DAF corporate structure by 'investment advisors' associated with Mr. Dondero and the Supporting Organisations during Mr. Scott's tenure in the same role*" (see **page 419 of MEP-2**).

138. Similarly, at paragraph 51 of MacInnis 1, the JOLs misrepresent the level of expenses for the first half of 2024 and simply repeat the false assertions made by Mr Dondero and Ms Diaz in their affidavits filed in support of the J&E Application. These allegations were specifically addressed at paragraphs 177 and 179 of Patrick 1 but the JOLs have conveniently chosen to ignore my explanation. As stated therein, Mr Mancino sent a letter to H&K on 14 February 2025 explaining these inaccurate calculations (see **pages 322 to 323 of MEP-2**). Further, the alleged US$18.3 million in expenses have been deliberately misrepresented by Mr Dondero purposefully omitting a US$6.1 million income from a NexPoint-related transaction. The excel which evidences these lease payments to one of the CDM Entities was exhibited in an excel document prepared by NexPoint which was exhibited at pages 651 to 669 of Exhibit MP-1 to Patrick 1.[26]

<u>Impact on charities</u>

139. At paragraphs 53 and 54 of MacInnis 1, the JOLs highlight their concerns regarding the potential impact of the DAF Restructuring on the charities and the "*hole in the charities balance sheet*" it has allegedly caused. However, this ignores the reality of the interest which the charities, via the Highland Foundations, held by virtue of their ownership of the Company's Participating Shares. As explained above, Participating Shares had no real economic benefit and only entitled the holder to discretionary distributions which were at the sole discretion of the directors. This was also explained at paragraphs 96 and 97 of Patrick 1 where I noted that several charities, having carried out extensive due diligence on the Participating Shares, determined that they did not

[25] This information was provided by the litigation trustee of Highland who has access to all of the relevant books and records.
[26] **E/4/1008-1026.**

confer sufficient economic rights as they provided only discretionary dividends, had no liquidation rights, and could be diluted at any point. Insofar as the nature of the charities' interest in the Participating Shares was not accurately recorded in their accounts, this has nothing to do with the DAF Restructuring.

140. In any event, if the Highland Foundations genuinely had genuine concerns about their balance sheets and wished to ensure the resumption of distributions from the DAF and the restoration of the status quo pre-DAF Restructuring, they could have meaningfully engaged with the CC Proposal (which remains open). Despite indicating they would consider mediation dates, no dates or availability were ever provided, and there has been no substantive engagement with the proposal from the Highland Foundations. I believe that this supports the clear inference that the Highland Foundations are willing to put Mr Dondero's interests above their own and unwilling to sever ties with, or operate independently of, Mr Dondero.

**L. The Undertakings**

141. Following service of the Writ and Injunction Application, Campbells wrote to the JOLs by letter dated 21 July 2025 in which they foreshadowed the Directions Summons (**pages 416 to 421 of MEP-2**). The letter noted the lack of any satisfactory explanation as to why there was a genuine urgency arising from a risk of misappropriation or dissipation - particularly in light of the existing Rule 11 Agreement and the CDM Entities' repeated offers to enter into a Protocol. In the circumstances, the letter concluded that the only inference which could be drawn was that "*the unsustainable assertions of urgency are made in the hope of gaining a perceived strategic advantage in the contemplated litigation*". Soon after, the CDM Defendants filed the Directions Summons in which they undertook to the Court to abide the same conditions as the Rule 11 Agreement (paragraph 110 above) and not to dissipate assets outside the ordinary course of business.

142. Following the filing of the Directions Summons, the JOLs, by letter dated 23 July 2025, indicated that they would be willing to agree an adjournment of the Injunction Application if the Defendants agreed to the revised form of undertakings which introduced three new requirements: (i) that the CDM Defendants and the CDM Entities provide advance notice of all transactions over US$10,000 and await approval from the JOLs before proceeding; (ii) that they provide monthly transaction reports and balance sheets; and (iii) that they

consent to the entry of an order in the Chapter 15 proceedings filed by the JOLs on 21 July 2025. It is worth noting that items (i) and (ii) were already included in the Protocol offered to the JOLs. With respect to (i), every iteration of the Protocol prepared by the CDM Entities provided for the delivery of monthly reports and balance sheets. With respect to (ii), every iteration of the CDM Defendants' Protocol offered to provide advance notice of transactions to the JOLs, with the 29 June version proposing that a threshold of US$250,000 would be a more appropriate level for such notice.

143. Campbells responded on 24 July 2025 (**pages 456 to 461 of MEP-2**), enclosing an amended set of undertakings which incorporated most of the JOLs' requests. However, for the reasons explained at paragraphs 18 to 25 of that letter, I was reluctant to agree to undertakings that would require the JOLs to approve transactions entered into by the CDM Entities, and which necessitated a wait of up to seven days when the JOLs considered whether or not to approve these transactions. As noted above, the JOLs appear to labour under the mistaken belief that the CDM Entities are 'mostly passive investment vehicles.' As is clear from the Damages Report, the JOLs' unwarranted interference in the business activities of the CDM Entities would have seriously detrimental consequences.

144. Following several more rounds of correspondence between Campbells and Maples, late on the evening before the 31 July 2025 hearing of the Injunction Application, the JOLs agreed to accept the asset preservation and financial reporting undertakings (the "**Undertakings**") which are recorded in the Consent Order dated 31 July 2025 (the "**Consent Order**") (**pages 462 to 477 of MEP-2**). As noted, the Undertakings reflect the asset preservation and 'ordinary course' agreement which I and the CDM Entities voluntarily proffered to the Highland Foundations via the Rule 11 Agreement, as well as the provision of advance notice of transactions greater than US$50,000, monthly transaction reports, and an agreement to consult with the JOLs and respond to any questions they have regarding any transactions entered into by the CDM Entities (all of which were conditions of the Protocol, albeit with different financial thresholds, in the various iterations which were offered to the JOLs from 30 May 2025). In the circumstances, I believe that the parties incurred significant unnecessary costs as a result of JOLs' refusal to meaningfully or constructively engage with the CDM

Defendants on the Protocol when it was first offered and by instead issuing the Injunction Application and pushing to have it heard on an *ex parte* on notice basis on 31 July 2025.

145. As with the Rule 11 Agreement, given the CDM Entities are operating in the ordinary course of business and have nothing to hide, I was happy to provide the asset preservation and financial reporting aspects of the Undertakings. However, as explained above and in Campbells' 24 July letter, I did not think it was reasonable to put the continued operation of the various CDM Entities at risk of harm by permitting the JOLs' to hold-up legitimate ordinary course business transactions, including payments relating to legal and professional fees which are in the ordinary course of business, or which are necessitated by litigation involving the JOLs and/or the Highland Foundations (including, *inter alia*, these proceedings, the Liquidation Proceedings, the Texas Petition, and the Chapter 15 petition filed by the JOLs in respect of the liquidation (collectively referred to as "**Highland Litigation**")). Paragraph 5 of the Undertakings (at Schedule A of the Consent Order) is the product of negotiations between the parties on this issue (**pages 466 to 467 of MEP-2**).

146. Paragraph 5 of the Undertakings permits ordinary course payments to professional service providers, as well as payments of reasonable legal fees and expenses in connection with the Highland Litigation. However, the JOLs originally contended that the CDM Entities should not be permitted to pay any legal fees from funds they allege derive from their limited partnership interest in the DAF. Ultimately, it was agreed that the issue of whether the Defendants are permitted to use such funds to pay professional fees will be determined at the hearing of the Injunction Application. In the meantime, the CDM Entities are providing full financial reporting to the JOLs pursuant to paragraph 6 of the Undertakings, which includes all legal and professional fees.

147. I believe that the JOLs' position regarding the payment of the CDM Entities' legal and professional fees is illogical and evidences the weaknesses in their alleged proprietary claim. Some of the limitations in the JOLs' position as it relates to this point were highlighted at paragraph 9 of a letter dated 8 September 2025 sent by Campbells to Maples (**pages 478 to 480 of MEP-2**). The letter notes the following in respect of the JOLs' position on the CDM Entities' legal fees:

"*…you clients cannot claim to own assets held by a company in which they might hold an interest. At most they have an indirect right to receive any surplus. Any interest your clients claim is subordinate to operating costs, including legal costs. If your clients were to succeed at trial (which, as noted above, we firmly believe they will not), it would only recover the money expended on legal costs if it was able to establish a breach of fiduciary duty by the director(s) which was actuated by bad faith. Where the directors of each company, acting with the benefit of legal advice (with respect to which privilege is not waived), have concluded that it is in the interests of the company to defend the Proceedings, there is no real prospect of such a claim succeeding. The CDM Defendants infer that the attempt to further restrict expenditure on legal costs is an attempt to secure a perceived strategic advantage and will not accept any undertakings which unduly restricts their ability to defend the Proceedings. It goes without saying that the legal costs being incurred - which are necessitated by the claims brought by your clients - are reasonable and proportionate having regard to the complexity of the Proceedings and the value of the assets in dispute. Your clients' criticisms in that regard are not accepted*".

148. As to the issue of whether or not I, in my capacity as a former director of the Company and a director and/or officer of other CDM Defendants, am entitled to an indemnity from the assets of the Company and/or certain of the CDM Entities, the relevant documentation is unequivocal. Clause 4.9 of my executive employment agreement with the Company expressly indemnifies me "*against any liabilities, costs, claims, and expenses, including all costs and expenses incurred in defense of any Proceeding (including attorneys' fees)*" (**page 483 of MEP-2**). Articles 131 to 135 of the Company's Articles (**pages 148 to 149 of MEP-2**) also indemnify officers of the Company in respect of any proceeding relating to the Company unless the officers' conduct constitutes wilful misconduct or gross negligence.

149. The constitutional documents for the other CDM Defendants also provide similar indemnities. For example, see Articles 138 and 139 of CLO's (the Sixth Defendant) Articles of Association at **pages 528 to 529 of MEP-2**, and clause 2.2 of the ARLPA at **pages 331 to 333 of MEP-2** in respect of my indemnity from the GP (the Fifth

Defendant). I understand that such indemnities are standard, and necessary in order to secure officers for entities which may become involved in contentious litigation. This is directly applicable to Mr Murphy and me who, acting on legal and other professional advice, believed that the DAF Restructuring was in the best interests of the DAF Structure. However, we also knew that, given Mr Dondero's propensity to aggressively litigate, it was highly likely our actions would result in litigation, which is what ultimately transpired. [27] I understand this Honourable Court may be asked to scrutinize my conduct in the performance of my duties as an officer of the CDM Defendants. As explained in this affidavit and the Liquidation Affidavits, I believe that at all times I acted in accordance with independent professional advice and in the best interests of the Company and the DAF Structure.

150. The other contentious issue in the Undertakings was the JOL's insistence that I and Mr Murphy be subject to the same asset preservation and financial reporting obligations as the Third to Sixth (i.e. corporate) Defendants. This would have required us to provide full monthly financial reports to the JOLs detailing every aspect of our personal expenditure, such as grocery shopping, travel expenses, entertainment etc. Quite apart from being unduly burdensome and invasive, I believe that this is inappropriate and unreasonable where there is no evidence we have received or misappropriated any assets from the DAF Structure, apart from our directors' remuneration (which was approved by the relevant companies with the benefit of expert advice). Ultimately, it was agreed that the granular financial reporting provided for at paragraph 6 of the Undertakings would not apply to Mr Murphy and I, but we agreed to provide advance notice and an explanation of any transaction, or series of transactions, we make in our personal capacity which exceeds US$100,000. While I believe this requirement is also inappropriate and unreasonable for the same reasons, I was willing to provide this undertaking as a temporary measure pending the hearing of the Injunction Application in order to appease the JOLs.

151. At various stages since the parties entered into the Consent Order, the JOLs have accused the CDM Entities of breaching the Undertakings by failing to provide granular and entity specific balance sheets for each of the CDM Entities. These allegations were

[27] This is particularly relevant in light of the "Dondero exclusion" referred to at paragraph 47 above and explained in more details at Section V of Mr Murphy's 18 September 2025 affidavit in these proceedings.

particularised in a letter from Maples to Campbells dated 30 September 2025 (**pages 532 to 534 of MEP-2**). However, as the DAF Structure prepares consolidated financial materials in the ordinary course, I believe that these allegations are incorrect. In actual fact, the CDM Entities have gone beyond what is required by the Undertakings. Mr Raver, the COO of the DAF Structure, is in constant contact with the JOLs and, in the spirit of cooperation and transparency, has arranged the provision of additional, entity specific materials wherever possible. These allegations, and the efforts made by Mr Raver to cooperate with the JOLs, are addressed in a letter from Campbells to Maples dated 7 October 2025 which is at **pages 535 to 537 of MEP-2**.

## M. The Injunction Application

152. I understand from legal counsel that the necessary legal elements which must be satisfied in order for the Court to consider granting injunctive relief are those which were outlined in paragraph 91 of MacInnis 1. I further understand that these will be addressed by legal counsel in legal submissions in due course. However, I believe the following points in particular may be relevant to those elements, along with the background matters set out above.

Serious Issue to be Tried

153. The JOLs' assert that because Mr Justice Asif KC granted sanction for the JOLs to issue the proceedings this element of the test is satisfied. I understand that, following a request from DFW, the JOLs provided a copy of the fifth affidavit Ms MacInnis dated 10 July 2025 ("**MacInnis 5**") pursuant to which they sought sanction from Mr Justice Asif KC in the Liquidation Proceedings to issue the Writ and Injunction Application.

154. I am advised that the applicant in an *ex parte* application has a duty of full and frank disclosure. However, based on my review of MacInnis 5, I find it surprising that there was no mention of the DFW Summons. Given it also requests a judicial determination on the validity of DAF Restructuring and was filed in the Liquidation Proceedings, I believe that it should have been mentioned by the JOLs in their evidence. I also note that there was very limited reference to the *inter partes* correspondence regarding the Protocol.

155. MacInnis 5 makes many of the same arguments as MacInnis 1 in respect of the DAF Restructuring and the interest held by the Participating Shareholders. However, as detailed above, to the best of my knowledge and belief, many of the arguments made by the JOLs in MacInnis 1 are incorrect, particularly as regards the nature of the interest which the Participating Shareholders held in the Company, and the proprietary interest they claim to have in the assets of the DAF.

156. As my legal counsel will address in due course, any proprietary claim which the JOLs' may have would necessarily be confined to the limited partner interest in the DAF formerly held by the Company. The Company had no interest in (and the JOLs could have no proprietary claim to) the assets of the DAF itself, including any interests that the DAF held or holds in other companies, or the assets of those companies.

Damages would not be an adequate remedy

157. The JOLs' assert at paragraph 91.3 of MacInnis 1 that damages would not be adequate remedy and that only an order restoring the Company's purported property will suffice. I respectfully disagree: any potential loss or harm suffered by the Participating Shareholders if the injunction is refused, would be purely financial in nature and readily quantifiable by reference to the predetermined formulae set out in the DAF Trustee Fee excel referred to at paragraph 67 above. As such, any such loss could be adequately compensated by an award of damages in due course.

158. At paragraph 91.4 of MacInnis 1 the JOLs express concern that the Supporting Organizations and the charities "*may be unable to achieve their charitable objectives as effectively or at all*". This ignores the binding agreement set out in the HMIT Term Sheet which Ms Diaz of the Dallas Foundation reneged on (see paragraph 103 above), as well as the CC Proposal which not only offered to restore the Highland Foundations charitable distributions, but to increase them if they agreed to sever ties with Mr Dondero (see paragraph 120 above).

Balance of Convenience

159. I believe that on any objective assessment, the balance of convenience is best achieved by refusing the unnecessary and unjustified injunctive relief sought by the JOLs.

160. Paragraph 91.5 of MacInnis 1 is simply incorrect. The JOLs admit at paragraph 27 that they have only "*undertaken preliminary research and do not yet have a full picture*" of the business and investment activities of the DAF Structure. Their incorrect assertion that an injunction would not hinder the operation of the DAF Structure reveals a fundamental misunderstanding of the operation of the CDM Entities. As noted at paragraphs 125 to 129 above, the CDM Entities are not "*passive investment vehicles*"; they are actively managed. The injunction sought by the JOLs would seriously and unjustifiably interfere with that management. Any interference with the operation of these businesses has the potential to cause serious and irreparable harm to the CDM Entities.

161. As noted in the Damages Report and explained at paragraph 128, a conservative estimate of the harm which would be caused to the CDM Entities were the injunction to be granted, excluding the valuable litigation receivables which are owned by the CDM Entities, stands at approximately US$126,700,000. Conversely, the JOLs have not been able to articulate or demonstrate any irreparable harm or prejudice they would suffer if the injunction is not granted. I understand that, even on their own case, any alleged harm that may be caused to the Highland Foundations is purely financial in nature and compensable in damages.

162. Additionally, the assets of the DAF Structure have remained static since the DAF Restructuring and no attempt has been made to further transfer the assets. To the contrary, the CDM Entities have, since May 2025, repeatedly confirmed that they would operate in the ordinary course of business and offered a financial reporting protocol to the JOLs. This offer has essentially now been formalised in the Undertakings which were recorded in the Consent Order. The JOLs now have full visibility over the financial position of the DAF Structure, and Mr Raver is actively cooperating with them to respond to any queries they may have in respect of individual transactions.

163. Accordingly, I believe that the balance of convenience clearly favours refusing to grant an injunction where damages are an adequate remedy and where, for the reasons listed above, the risk of granting an injunction outweighs the risk of not granting an injunction.

Cross-undertaking in damages

164. At paragraph 91.14 of MacInnis 1, the JOLs state that they are content to provide the cross-undertaking in damages, but that their starting position is that the cross-undertaking should not be required. Campbells wrote to the JOLs regarding the cross-undertaking in damages on 23 July 2025 noting that the proposed cross-undertaking provided for in the draft order accompanying the Injunction Application - which expressly excluded the Defendants - was wholly inadequate. Further, given Mr Dondero had deposed that he was funding the liquidation, and knowing he is the subject of several suits and actions in the USA, Campbells' letter requested that the JOLs confirm who would be providing the cross-undertaking, and the form and amount of fortification they were prepared to offer (**pages 538 to 541 of MEP-2**).

165. The JOLs responded on 25 July 2025 (**pages 542 to 544 of MEP-2**) asserting that their proposed cross-undertaking was appropriate in circumstances where (i) the JOLs are acting in the public interest where the ultimate beneficiaries are charities, and (ii) the CDM Entities had failed to provide evidence of the prejudice they may suffer. The Damages Report addresses the latter. As regards the former, given that DFW was incorporated as new qualifying section 501(3)(c) compliant charitable organization in order to maintain the integrity of the DAF Structure's charitable mission, there is no significant public interest issue engaged in the proceedings and the dispute is commercial in nature. It is also noteworthy that the JOLs, while claiming to act in the public interest, have issued proceedings against DFW, a registered section 501(3)(c) compliant charitable organization and the vehicle through which the DAF Structure is currently making charitable donations.

166. The JOLs' 25 July letter also enclosed a copy of MacInnis 6 and revealed the existence of the Funding Agreement for the first time, stating that pursuant to clause 7 of the agreement Crossvine agrees to meet the reasonable costs of any innocent third parties affected by the Injunction Application, as well as to provide security for any cross-undertaking ordered by the Court.

167. I understand that this will be a matter for legal submission. However, I have serious concerns regarding the ability of the JOLs or Crossvine to satisfy an award of damages if the injunction is granted and it later transpires that it should not have been. So far as I am aware, the JOLs have no assets of their own with which to satisfy an award of damages and Crossvine is a bankruptcy

remote special purpose vehicle which has provided no information of its assets. So far as it concerns Mr Ellington and Mr Dondero, who stand behind Crossvine, neither has offered a cross-undertaking in damages or offered any fortification. Even if they were willing to do so, I have serious doubts about the ability of Messrs Ellington and Dondero to satisfy any award of damages. As far as I am aware, the Court has no visibility into the financial position of those individuals.

168. In addition, and as noted at paragraph 117 above, I understand that the JOLs' have recently confirmed that the funding provided by Crossvine has been exhausted. This reinforces the serious concerns that I have regarding Crossvine's willingness and ability to meet the any cross-undertaking in damages. Pursuant to clause 7 of the Funding Agreement, Crossvine agreed to provide any cross-undertaking in damages which is required in these proceedings. I am advised that, despite the apparent 'exhaustion' of the Crossvine's funding, they have ongoing obligations under the Funding Agreement which provides at clause 11 that the agreement will only terminate upon the later of the conclusion of the liquidation or the repayment of all funds to Crossvine. However, in light of the latest developments regarding the cessation of Crossvine's funding, the CDM Defendants have no confidence that Crossvine would be able to provide security for any cross-undertaking ordered by the Court.

Fortification of Cross-Undertaking

169. In light of the foregoing, I respectfully submit that no interim relief should be granted in any case unless and until the JOLs' cross-undertaking in damages is fortified by real, liquid security. The Damages Report quantifies losses of approximately US$126.7 million in respect of investment activities alone if an injunction were imposed. That figure excludes substantial additional exposure tied to litigation receivables, including the Kirschner Claims, and consequential losses from disruption to development and investment pipelines. Any fortification must therefore be calibrated to cover, at a minimum, the US$126.7 million quantified loss, together with a reasonable buffer for interest, adverse costs, and foreseeable consequential loss.

170. The need for fortification is particularly acute given: (i) the JOLs' recent correspondence indicating that Crossvine's "initial" funding has been exhausted; (ii) the opaque financial standing of Crossvine as a bankruptcy remote special purpose vehicle associated with Messrs Dondero and Ellington; and (iii) the very real credit risk posed by the significant adverse exposures faced

by those individuals and their affiliates, including the UBS Litigation and other proceedings referenced above. Against that backdrop, a bare undertaking from the JOLs or from Crossvine provides no meaningful protection to the Defendants or the operating businesses within the DAF Structure.

171. I believe that, in order to ensure the cross undertaking has real value, the Court should require fortification in one or more of the following forms: (i) a cash deposit in a segregated escrow account under the control of the Grand Court of the Cayman Islands; (ii) an irrevocable on demand guarantee from a Class A bank carrying on business and regulated in the Cayman Islands; or (iii) an ATE insurance policy that meets minimum anti avoidance, capital adequacy and credit rating requirements. As regards the latter, any ATE policy should, at a minimum, include: robust non-avoidance provisions; a prohibition on rescission for innocent non-disclosure; non-vitiation clauses to protect insured defendants; evidence of independent (non-related party) underwriting and reinsurance; and a requirement that the insurer (and any reinsurer) is well capitalised and rated at least A by a recognised ratings agency.

172. I believe these requirements are necessary because there is a demonstrable risk that policies procured or backed by Mr Dondero and his affiliates lack commercial substance. As explained earlier in this affidavit, Mr Dondero has previously used reinsurance companies he controls to underwrite questionable policies, including the Sentinel arrangements referred to at paragraph 34 above. That history underscores why only third party, arm's length ATE policies from well capitalised, highly rated carriers with independent reinsurance should be acceptable.

173. Absent such fortification, I am advised that the balance of convenience weighs decisively against granting the injunction. The JOLs' asserted harms are, on their case, purely financial and compensable by damages; by contrast, the Defendants face immediate and material operating losses across investment and development pipelines if restrained, as independently quantified in the Damages Report. Where the applicant's funding is uncertain and its proposed undertaking is of doubtful value, the Court should either refuse relief or, at the very least, condition any interim order on provision of the forms of fortification described above, to be put in place within a short, defined period, failing which the injunction should be stayed or discharged.

174. For completeness, I believe that any fortification should expressly extend to adverse costs orders made in these proceedings and to any orders made by the Court in respect of the cross

undertaking. Given the JOLs' reliance on external funding to prosecute multiple, concurrent proceedings (including these proceedings, the Liquidation Proceedings, and US Chapter 15 proceedings), it is both just and prudent that adequate funds (or equivalent real security or compliant ATE coverage) are ring fenced now to protect the Defendants against the real risk of uncompensated prejudice. Fortification should also require full disclosure on affidavit of the identity and financial standing of any provider of security, together with copies of any relevant policy, guarantee or escrow documentation.

175. In summary, if the Court is minded to grant any interim relief, the order should provide that the JOLs' cross undertaking in damages be fortified, at a minimum, to the US$126.7 million quantified in the Damages Report, plus a reasonable allowance for interest, adverse costs and foreseeable consequential loss, by way of: (i) escrowed cash under the control of the Court; (ii) a Class A Cayman bank on demand guarantee; or (iii) compliant ATE insurance incorporating the anti-avoidance, capital and rating protections specified above. The order should further provide that fortification be put in place within seven days of any order made on foot of the JOLs' Injunction Application. Failing timely provision of such fortification, the Injunction Application should be refused (or any interim order made should be stayed or discharged).



Filed by Campbells LLP, Attorneys-at-Law for and on behalf of the First, Third, Fifth and Sixth Defendants, whose address for service is Floor 4 Willow House, Cricket Square, George Town, Grand Cayman (Ref: MGM/ROD/18955-44959)
DocID

#3330705v6

**N. Conclusion**

176. For the reasons set out above, the CDM Defendants respectfully request that the Court refuse the JOLs' Injunction Application.

Sworn at )
This 17th day of October 2025 )
Before me: )
)
)

**Notary Public** Risa Brana

**Mark Patrick**

Miami-Dade Florida

Date of grant of Commission:
Unknown

Commission Expiry Date:
04/12/2028

RISA BRANA
Notary Public - State of Florida
Commission # HH501559
Expires on April 12, 2028

Notarized remotely online using communication technology via Proof.



Filed by Campbells LLP, Attorneys-at-Law for and on behalf of the First, Third, Fifth and Sixth Defendants, whose address for service is Floor 4 Willow House, Cricket Square, George Town, Grand Cayman (Ref: MGM/ROD/18955-44959)
DocID

# EXHIBIT 18

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Thursday, April 9, 2026 2:13 PM
**To:** Gaddis, Mike <MGaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; 'Louis M. Phillips' <louis.phillips@kellyhart.com>; Amelia L. Hurt <amelia.hurt@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>; Levy, Joshua S. <jlevy@willkie.com>
**Subject:** RE: Highland: Scheduling Order (PSZJ comments)

OK; we're going to file our form by COB if we don't reach an agreement by then.

On the topic of depositions, I'll take Nancy and Jim on any of the six days from April 29 to May 4, in either order. Please propose times and dates by the end of this week.

Also, you must let me know if Dugaboy is calling anyone on its case-in-chief other than the people now designated for deposition—it's the very issue that started us down this path a month ago.

Highland reserves all rights.

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

PSZJ
Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Gaddis, Mike <MGaddis@winston.com>
**Sent:** Thursday, April 9, 2026 3:01 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Gaddis, Mike <MGaddis@winston.com>; 'Louis M. Phillips' <louis.phillips@kellyhart.com>; Amelia L. Hurt <amelia.hurt@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>; Levy, Joshua S. <jlevy@willkie.com>
**Subject:** RE: Highland: Scheduling Order (PSZJ comments)

John,

Leaving aside the Dondero depositions (which we're still running down), we will get you an answer on your other proposed changes shortly.

Yours,

WINSTON & STRAWN LLP

MICHAEL GADDIS
OF COUNSEL

T +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Thursday, April 9, 2026 1:51 PM
**To:** Gaddis, Mike <MGaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; 'Louis M. Phillips' <louis.phillips@kellyhart.com>; Amelia L. Hurt <amelia.hurt@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>; Levy, Joshua S. <jlevy@willkie.com>
**Subject:** RE: Highland: Scheduling Order (PSZJ comments)

Mike, what is happening?

Last call.

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

PSZJ
Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** John A. Morris
**Sent:** Thursday, April 9, 2026 6:13 AM
**To:** Gaddis, Mike <MGaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; 'Louis M. Phillips' <louis.phillips@kellyhart.com>; Amelia L. Hurt <amelia.hurt@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>; Levy, Joshua S. <jlevy@willkie.com>
**Subject:** RE: Highland: Scheduling Order (PSZJ comments)

No problem.

A scheduling stipulation, which will be filed with an agreed motion (like the one we filed at Docket No. 4526), is different than a Notice of Hearing, which includes Webex instructions (like we filed at Docket No.

4544).

As the movant on the Motion to Vacate, you should prepare the Notice of Hearing (although we can and will if it's not on file today).

We took the lead and revised the scheduling stipulation. If you want us to prepare the agreed motion (referred to below), let us know and we can do that, too.

We just want it all done today.

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

PSZJ
Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Gaddis, Mike <MGaddis@winston.com>
**Sent:** Wednesday, April 8, 2026 8:47 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; 'Louis M. Phillips' <louis.phillips@kellyhart.com>; Amelia L. Hurt <amelia.hurt@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>; Levy, Joshua S. <jlevy@willkie.com>; Gaddis, Mike <MGaddis@winston.com>
**Subject:** RE: Highland: Scheduling Order (PSZJ comments)

John,

Any holdup is no doubt the result of brain damage on my part. I figured we would reach agreement on the contents of the scheduling order and then file everything together. I skimmed our recent emails and didn't see that we discussed filing anything separately or earlier (though maybe we did and I missed it). Yesterday morning's email from Judge Odell's deputy seems to contemplate that we should first agree on all the deadlines (as we've been trying to do the last few days) and then file everything together:

> "To reset the hearing on the Motion to Reconsider [Doc #4513], please file an agreed motion to set the hearing on May 11, 2026 at 9:00 AM in Lubbock (1205 Texas Avenue, Room 314, Lubbock, Texas 79401) and include any corresponding deadlines for discovery and briefing."

But whether I'm right or wrong on that no longer matters, because (with the exception of the Dondero deposition dates which may take longer to confirm) I think we're very close to agreement and should be able to file tomorrow. So we will review your latest proposed edits and get back to you, in the morning if possible or else early afternoon, and then we'll draft up whatever we need and get it on file.

Yours,

WINSTON & STRAWN LLP

MICHAEL GADDIS
OF COUNSEL

T +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, April 8, 2026 6:14 PM
**To:** Gaddis, Mike <MGaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; 'Louis M. Phillips' <louis.phillips@kellyhart.com>; Amelia L. Hurt <amelia.hurt@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>; Levy, Joshua S. <jlevy@willkie.com>; Gaddis, Mike <MGaddis@winston.com>
**Subject:** Re: Highland: Scheduling Order (PSZJ comments)

It's odd that it takes days to respond but what is the hold up on filing the Notice of Hearing?

We'll give you until noon tomorrow as a courtesy, but we'll reach out to the court if we don't hear from you.

Thanks,

John

Get Outlook for iOS

---

**From:** Gaddis, Mike <MGaddis@winston.com>
**Sent:** Wednesday, April 8, 2026 7:01:54 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; 'Louis M. Phillips' <louis.phillips@kellyhart.com>; Amelia L. Hurt <amelia.hurt@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>; Levy, Joshua S. <jlevy@willkie.com>; Gaddis, Mike <MGaddis@winston.com>
**Subject:** RE: Highland: Scheduling Order (PSZJ comments)

John,

Thanks for your note. Geoff will not be able to review until later this evening, and of course we'll need to check with the client on those deposition dates. We will try to get back to you tomorrow.

Yours,

WINSTON & STRAWN LLP

MICHAEL GADDIS
OF COUNSEL

T +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, April 8, 2026 6:54 AM
**To:** Gaddis, Mike <MGaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; 'Louis M. Phillips' <louis.phillips@kellyhart.com>; Amelia L. Hurt <amelia.hurt@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>; Levy, Joshua S. <jlevy@willkie.com>
**Subject:** Highland: Scheduling Order (PSZJ comments)

Mike,

Thank you for your comments.

Attached is a revised version marked to show the changes Highland accepts.

A few notes:

- Highland (and Louis' clients) expect to complete document production, if required, by April 28. But we need to retain the common concept of "substantial completion" to avoid disputes. While I don't think its necessary, if you want to build in a reservation of rights to seek relief upon good cause shown, please draft the language.
- We've compromised on the period for depositions but because of other commitments and to the extent the Court permits depositions, I want to take Nancy Dondero's deposition on May 1 and Jim Dondero's deposition on any day out of May 2-4. Please check their schedules now so we can secure the dates.
- We've changed the date for W&E lists to May 8 as you requested, but we'll highlight that for the Court because my understanding is the Judge usually requires W&E lists seven days in advance (so it will subject the Court's approval).

Please let us know if this works.

Regards,

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

PSZJ
Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

The contents of this message may be privileged and confidential. If this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under applicable tax laws and regulations.

---

King & Spalding Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message or attachments and we ask that you please comply with any additional instructions from the sender regarding deletion of messages or attachments sent in error. Click here to view our Privacy Notice.

# EXHIBIT 19

**From:** John A. Morris
**To:** Geoffrey Harper; Gaddis, Mike
**Subject:** Re: Highland: Scheduling Order (PSZJ comments)
**Date:** Thursday, April 9, 2026 7:12:14 PM
**Attachments:** image002.png

---

This job is hard enough without this.

I'll be contacting the court first thing in the morning.

If you have anything to say before then, let me know.

Get Outlook for iOS

---

**From:** Geoffrey Harper
**Sent:** Thursday, April 9, 2026 7:43:45 PM
**To:** Gaddis, Mike ; John A. Morris
**Subject:** Re: Highland: Scheduling Order (PSZJ comments)

With apologies, we are not driving this train.

**Geoffrey Harper**
*Counsel*

T: + 1 214 764 4453 | M: + 1 214 763 6894 | gharper@kslaw.com | Bio | vCard

---

**From:** Gaddis, Mike
**Sent:** Thursday, April 9, 2026 5:11 PM
**To:** jmorris
**Cc:** jpomerantz ; jkroop ; zannable ; Geoffrey Harper ; 'Louis M. Phillips' ; Gaddis, Mike ; Amelia L. Hurt ; Mark T. Stancil (mstancil@willkie.com) ; Levy, Joshua S.
**Subject:** RE: Highland: Scheduling Order (PSZJ comments)

**CAUTION: MAIL FROM OUTSIDE THE FIRM**

John, FYI I'm in touch with someone who has authority and we are making some changes that may be substantial. I will try to get these to you as soon as possible, but I cannot promise exactly how long it will take. A filing this evening is probably not realistic. I will let you know as soon as I know more.

MICHAEL GADDIS
OF COUNSEL

**T** +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

---

**From:** Gaddis, Mike
**Sent:** Thursday, April 9, 2026 2:28 PM
**To:** 'John A. Morris'
**Cc:** Jeff Pomerantz ; Jordan A. Kroop ; Zachery Annable ; Geoffrey Harper ; 'Louis M. Phillips' ; Amelia L. Hurt ; Mark

T. Stancil (mstancil@willkie.com) ; Levy, Joshua S. ; Gaddis, Mike
**Subject:** RE: Highland: Scheduling Order (PSZJ comments)

John,

Assuming you mean close of business in the court's time zone, we will get back to you before then. I do appreciate your flexibility on the deposition dates which will make things easier.

Yours,

**MICHAEL GADDIS**
OF COUNSEL

**T** +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Thursday, April 9, 2026 2:13 PM
**To:** Gaddis, Mike <MGaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; 'Louis M. Phillips' <louis.phillips@kellyhart.com>; Amelia L. Hurt <amelia.hurt@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>; Levy, Joshua S. <jlevy@willkie.com>
**Subject:** RE: Highland: Scheduling Order (PSZJ comments)

OK; we're going to file our form by COB if we don't reach an agreement by then.

On the topic of depositions, I'll take Nancy and Jim on any of the six days from April 29 to May 4, in either order. Please propose times and dates by the end of this week.

Also, you must let me know if Dugaboy is calling anyone on its case-in-chief other than the people now designated for deposition—it's the very issue that started us down this path a month ago.

Highland reserves all rights.

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** Gaddis, Mike <MGaddis@winston.com>
**Sent:** Thursday, April 9, 2026 3:01 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; Gaddis, Mike <MGaddis@winston.com>; 'Louis M. Phillips' <louis.phillips@kellyhart.com>; Amelia L. Hurt <amelia.hurt@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>; Levy, Joshua S. <jlevy@willkie.com>
**Subject:** RE: Highland: Scheduling Order (PSZJ comments)

John,

Leaving aside the Dondero depositions (which we're still running down), we will get you an answer on your other

proposed changes shortly.

Yours,

**MICHAEL GADDIS**
OF COUNSEL

**T** +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Thursday, April 9, 2026 1:51 PM
**To:** Gaddis, Mike <MGaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; 'Louis M. Phillips' <louis.phillips@kellyhart.com>; Amelia L. Hurt <amelia.hurt@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>; Levy, Joshua S. <jlevy@willkie.com>
**Subject:** RE: Highland: Scheduling Order (PSZJ comments)

Mike, what is happening?

Last call.

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

**From:** John A. Morris
**Sent:** Thursday, April 9, 2026 6:13 AM
**To:** Gaddis, Mike <MGaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; 'Louis M. Phillips' <louis.phillips@kellyhart.com>; Amelia L. Hurt <amelia.hurt@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>; Levy, Joshua S. <jlevy@willkie.com>
**Subject:** RE: Highland: Scheduling Order (PSZJ comments)

No problem.

A scheduling stipulation, which will be filed with an agreed motion (like the one we filed at Docket No. 4526), is different than a Notice of Hearing, which includes Webex instructions (like we filed at Docket No. 4544).

As the movant on the Motion to Vacate, you should prepare the Notice of Hearing (although we can and will if it's not on file today).

We took the lead and revised the scheduling stipulation. If you want us to prepare the agreed motion (referred to below), let us know and we can do that, too.

We just want it all done today.

John

**John A. Morris**
Pachulski Stang Ziehl & Jones LLP

Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

Los Angeles | New York | Wilmington, DE | Houston | San Francisco

**From:** Gaddis, Mike <MGaddis@winston.com>
**Sent:** Wednesday, April 8, 2026 8:47 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; 'Louis M. Phillips' <louis.phillips@kellyhart.com>; Amelia L. Hurt <amelia.hurt@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>; Levy, Joshua S. <jlevy@willkie.com>; Gaddis, Mike <MGaddis@winston.com>
**Subject:** RE: Highland: Scheduling Order (PSZJ comments)

John,

Any holdup is no doubt the result of brain damage on my part. I figured we would reach agreement on the contents of the scheduling order and then file everything together. I skimmed our recent emails and didn't see that we discussed filing anything separately or earlier (though maybe we did and I missed it). Yesterday morning's email from Judge Odell's deputy seems to contemplate that we should first agree on all the deadlines (as we've been trying to do the last few days) and then file everything together:

> "To reset the hearing on the Motion to Reconsider [Doc #4513], please file an agreed motion to set the hearing on May 11, 2026 at 9:00 AM in Lubbock (1205 Texas Avenue, Room 314, Lubbock, Texas 79401) and include any corresponding deadlines for discovery and briefing."

But whether I'm right or wrong on that no longer matters, because (with the exception of the Dondero deposition dates which may take longer to confirm) I think we're very close to agreement and should be able to file tomorrow. So we will review your latest proposed edits and get back to you, in the morning if possible or else early afternoon, and then we'll draft up whatever we need and get it on file.

Yours,

**MICHAEL GADDIS**
OF COUNSEL

**T** +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, April 8, 2026 6:14 PM
**To:** Gaddis, Mike <MGaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; 'Louis M. Phillips' <louis.phillips@kellyhart.com>; Amelia L. Hurt <amelia.hurt@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>; Levy, Joshua S. <jlevy@willkie.com>; Gaddis, Mike <MGaddis@winston.com>
**Subject:** Re: Highland: Scheduling Order (PSZJ comments)

It's odd that it takes days to respond but what is the hold up on filing the Notice of Hearing?

We'll give you until noon tomorrow as a courtesy, but we'll reach out to the court if we don't hear from you.

Thanks,

John

Get Outlook for iOS

---

**From:** Gaddis, Mike <MGaddis@winston.com>
**Sent:** Wednesday, April 8, 2026 7:01:54 PM
**To:** John A. Morris <jmorris@pszjlaw.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; 'Louis M. Phillips' <louis.phillips@kellyhart.com>; Amelia L. Hurt <amelia.hurt@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>; Levy, Joshua S. <jlevy@willkie.com>; Gaddis, Mike <MGaddis@winston.com>
**Subject:** RE: Highland: Scheduling Order (PSZJ comments)

John,

Thanks for your note. Geoff will not be able to review until later this evening, and of course we'll need to check with the client on those deposition dates. We will try to get back to you tomorrow.

Yours,

MICHAEL GADDIS
OF COUNSEL

T +1 (214) 453-6466
mgaddis@winston.com

*Admitted to practice in Texas*

---

**From:** John A. Morris <jmorris@pszjlaw.com>
**Sent:** Wednesday, April 8, 2026 6:54 AM
**To:** Gaddis, Mike <MGaddis@winston.com>
**Cc:** Jeff Pomerantz <jpomerantz@pszjlaw.com>; Jordan A. Kroop <Jkroop@pszjlaw.com>; Zachery Annable <zannable@haywardfirm.com>; Geoffrey Harper <gharper@kslaw.com>; 'Louis M. Phillips' <louis.phillips@kellyhart.com>; Amelia L. Hurt <amelia.hurt@kellyhart.com>; Mark T. Stancil (mstancil@willkie.com) <mstancil@willkie.com>; Levy, Joshua S. <jlevy@willkie.com>
**Subject:** Highland: Scheduling Order (PSZJ comments)

Mike,

Thank you for your comments.

Attached is a revised version marked to show the changes Highland accepts.

A few notes:

- Highland (and Louis' clients) expect to complete document production, if required, by April 28. But we need to retain the common concept of "substantial completion" to avoid disputes. While I don't think its necessary, if you want to build in a reservation of rights to seek relief upon good cause shown, please draft the language.
- We've compromised on the period for depositions but because of other commitments and to the extent the Court permits depositions, I want to take Nancy Dondero's deposition on May 1 and Jim Dondero's deposition on any day out of May 2-4. Please check their schedules now so we can secure the dates.
- We've changed the date for W&E lists to May 8 as you requested, but we'll highlight that for the Court because my understanding is the Judge usually requires W&E lists seven days in advance (so it will subject the Court's approval).

Please let us know if this works.

Regards,

John
**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

Los Angeles | New York | Wilmington, DE | Houston | San Francisco

---

The contents of this message may be privileged and confidential. If this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under applicable tax laws and regulations.

---

King & Spalding Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy, or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately by e-mail and delete all copies of the message or attachments and we ask that you please comply with any additional instructions from the sender regarding deletion of messages or attachments sent in error. Click here to view our Privacy Notice.