**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P.

§

§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§

vs. §

3:26-CV-02496-D

**Highland Capital Management, L.P., et al**-Appellee

§

§

**[4689] Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026**

**APPELLANT RECORD**

**VOLUME 12**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02496-D<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4698] on July 24, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689] now files this *Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the Court's June 15, 2026 Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate?

2. Did the Bankruptcy Court err in finding Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate ("Dugaboy's Motion") [Docket No. 4684] was "without merit?"

3. Did the Bankruptcy Court err in denying Dugaboy's Motion without a full record, including that Dugaboy was not allowed to file a reply brief and was not granted a hearing?

4. Did the Bankruptcy Court err in denying Dugaboy the opportunity to file a reply brief to Highland's Opposition to Dugaboy's Motion, including that Dugaboy indicated a date certain for filing a reply?

5. Did the Bankruptcy Court err in finding Dugaboy's Motion was "without merit" without granting a hearing?

6. Did the Bankruptcy Court err by summarily denying Dugaboy's Motion without explaining its reasoning for the denial?

7. Did the Bankruptcy Court err in failing to consider Dugaboy's Notice of Intervening Event?

8. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(2) when it determined that it had not manifestly erred in deciding the evidence of Mark Patrick's misconduct contained in the Cayman Islands proceeding was not "newly discovered" even though that information was not contained in James Dondero's affidavit executed April 16, 2025?

9. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant

to Rule 60(b)(2) when it determined it had not manifestly erred in deciding the Dondero Affidavit indicated information gained in the Cayman Islands proceedings was not "newly discovered" despite the fact the Affidavit lacked any evidence of the restructuring discovered in the Cayman Islands proceedings?

10. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding on the grounds that Rule 60(b)(3) purportedly requires fraud or misconduct to have occurred in the judicial proceeding itself?

11. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding that Highland did not provide misleading or incomplete answers during the discovery of Mark Patrick's misconduct and resulting lack of authority to negotiate the Rule 9019 settlement agreement from Dugaboy leading to the Rule 9019 Order?

12. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding that Dugaboy had not presented a basis for relief under Rule 60(b)(6) that was separate from the grounds presented for Rule 60(b)(2) and Rule 60(b)(3)?

13. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding on the grounds that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain?

14. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of the Bankruptcy Court's special responsibility to monitor arrangements and settlements made between Highland's appointed managers and third parties?

15. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of its manifest error in failing to consider the Bankruptcy Court's role as a court of equity and responsibility to prevent misconduct before it, such as Mark Patrick's use of stolen assets in the 9019 Settlement?

16. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4698] filed by Appellant;

2. The Bankruptcy Court's July 10, 2026 *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 4 001845 thru vol 6 | 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol 7 003634 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003647 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003650 & 003651 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003652 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003663 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003667 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003670 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 7 003709 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004733 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol. 8 004790 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol 9 005207 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005209 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005217 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| vol 9 | | Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 04/07/2026<br>005222 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 04/07/2026<br>005225 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 04/10/2026<br>005227 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 04/16/2026<br>005229 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/17/2026<br>005233 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol 9 | | | Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| 005330 | 04/17/2026 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| vol 10 005590 | 04/21/2026 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 005594 | 04/22/2026 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005615 | 04/22/2026 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 005682 | 04/22/2026 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 10 | | | Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| 005692 | 04/22/2026 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 005705 | 04/24/2026 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 005726 | 04/24/2026 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 005727 | 04/25/2026 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005729 | 04/27/2026 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 005737 | 04/28/2026 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| | | | |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11 005746 | 04/28/2026 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 005755 | 04/28/2026 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005761 | 04/28/2026 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005767 | 04/29/2026 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 005776 | 04/29/2026 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 005783 | 04/29/2026 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| Vol. 10 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| 005785 | 04/29/2026 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005787 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005794 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005796 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005798 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005801 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005884 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005902 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005905 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005907 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11 | | | Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005913 | 05/06/2026 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005920 | 05/06/2026 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005927 | 05/06/2026 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 005929 | 05/07/2026 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005936 | 05/08/2026 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 005939 | 05/08/2026 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 005942 | 05/08/2026 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 005945 | 05/08/2026 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol. 12 006100 Thru Vol 21 | 05/08/2026 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and* |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | *Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| 10).22 008156 | 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 008172 | 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 008188 | 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). ~~(Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery)~~ |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 22 008256 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008293 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008429 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008465 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008472 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008916 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| Vol 25 009554 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| Vol. 26 009868 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| Vol. 27 010229 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| Vol. 28 010538 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| Vol. 28 010664 05/11/2026 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29 010736 05/11/2026 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol 30 011150 05/11/2026 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol 31 011734 05/11/2026 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol 32 013203 Thru Vol 33 05/11/2026 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34 014888 05/11/2026 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol 35 015349 | 05/11/2026 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 015505 | 05/11/2026 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 015506 | 05/12/2026 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 015538 | 05/12/2026 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 015565 | 05/12/2026 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 015566 | 05/15/2026 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36 015569 | 05/18/2026 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| Date Filed | Docket No. | Description/Docket Text |
| --- | --- | --- |
| | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol 37 05/18/2026 015996 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 05/19/2026 016008 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 05/20/2026 016079 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 05/20/2026 016082 – 016084 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 05/21/2026 016085 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 05/21/2026 016134 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 37 | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| 05/23/2026<br>016135 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38<br>05/28/2026<br>016233 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 06/15/2026<br>016490 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s)4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 06/15/2026<br>016504 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| Vol. 39<br>06/29/2026<br>016505 | 4684 | (162 pgs; 2 docs) Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Appendix) (Edney, Michael) |
| 06/29/2026<br>016667 | 4685 | (7 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s)4679 Order on motion to reconsider). Appellant Designation due by 07/13/2026. (Attachments: # 1 Exhibit)(Edney, Michael) |
| 07/06/2026<br>016674 | 4687 | (32 pgs; 2 docs) Response opposed to (related document(s): 4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 07/09/2026<br>016706 | 4688 | (23 pgs; 2 docs) Notice of Intent to Reply and Request for Hearing on Its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| vol. 39 | | (Attachments: # 1 Appendix)). (Attachments: # 1 Attachment A) (Edney, Michael) |
| 07/10/2026 016729 | 4689 | (2 pgs) Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026. (Okafor, M.) Modified text on 7/10/2026 (mdo). |
| 07/13/2026 016731 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |
| 07/24/2026 016733 | 4698 | (9 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)(Edney, Michael) |
| 07/28/2026 016742 | 4704 | (5 pgs) DISTRICT COURT Notice of docketing notice of appeal. Civil Action Number: 3:26-cv-02496-E. (RE: related document(s)4698 Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court;

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J"); and

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No.

4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Case 19-34054-sgj11 Doc 4707 Filed 08/07/26 Entered 08/07/26 19:37:31 Desc
Main Document Page 22 of 23

Dated: August 7, 2026

Respectfully submitted,

/s/ *Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760

WILLKIE FARR & GALLAGHER LLP
Mark T. Stancil (admitted *pro hac vice*)
Joshua S. Levy (admitted *pro hac vice*)
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000
mstancil@willkie.com
jlevy@willkie.com

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expwy., Ste. 106
Dallas, TX 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | |
| | § | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | § | |
| | § | |

# HIGHLAND CAPITAL MANAGEMENT, L.P. AND THE HIGHLAND CLAIMANT TRUST'S WITNESS AND EXHIBIT LIST WITH RESPECT TO HEARING TO BE HELD ON MAY 11, 2026

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The service address for the Reorganized Debtor is 6333 Mockingbird Ln., Ste 147 #5045, Dallas, Texas 75214.

Highland Capital Management, L.P., the reorganized debtor in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the Highland Claimant Trust (together, "Highland"), by and through its undersigned counsel, submits the following witness and exhibit list with respect to the *Motion for Relief from Order and Motion to Vacate* [Docket No. 4513] ("Motion for Relief") filed by The Dugaboy Investment Trust ("Dugaboy") which the Court has set for hearing on May 11, 2026 at 9:00 a.m. (Central Time) (the "Hearing") at the George Mahon Federal Building, 1205 Texas Avenue, Room 314, Lubbock, Texas 79401.

**A. Witnesses:**

1. James Dondero;
2. James P. Seery, Jr.;
3. Nancy Dondero, as Trustee to The Dugaboy Investment Trust;
4. Mark Patrick;
5. Any witness identified by or called by any other party; and
6. Any witness necessary for rebuttal.

**B. Exhibits:**

| Number | Exhibit | HCMLP Prior W&E Ref.[2] | Offered | Admitted |
|---|---|---|---|---|
| **A.** | **Patrick Authority** | | | |
| 1. | Trust Agreement of Hunter Mountain dated December 17, 2015 [HCMLPHMIT00004103-HCMLPHMIT00004114] | 70 | | |

[2] Highland's Witness and Exhibit List for the June 25, 2025 hearing (the "9019 Hearing") on the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4216] can be found at Docket No. 4255 and as further amended at Docket Nos. 4277 and 4280. Exhibit reference is to the exhibit list (and copies of the exhibits themselves) found at Docket No. 4255 unless otherwise noted.

| Number | Exhibit | HCMLP Prior W&E Ref.[2] | Offered | Admitted |
|---|---|---|---|---|
| 2. | HMIT Appointment of Successor Administrator dated 8/12/2022 [HCMLPHMIT00003872] | 75 | | |
| 3. | Amended and Restated Limited Liability Company Agreement of Beacon Mountain LLC dated September 24, 2015 [HCMLPHMIT00004115-HCMLPHMIT00004123] | 94 | | |
| 4. | Second Amended and Restated Limited Liability Company Agreement of Beacon Mountain LLC dated February 12, 2025 | 95 | | |
| 5. | Membership Interest Purchase Agreement, dated February 12, 2025, between Rand PE Fund I, L.P. and CLO Holdco, LLC | | | |
| 6. | Membership Interest Purchase Agreement Rand Advisors dated August 1, 2022 [HCMLPHMIT00004202-HCMLPHMIT00004215] | 86 | | |
| 7. | Limited Liability Company Agreement of Atlas IDF GP, LLC dated October 29, 2015 [HCMLPHMIT00003511-HCMLPHMIT00003517] | 73 | | |
| 8. | Amended and Restated Company Agreement of Atlas IDF GP, LLC dated August 8, 2022 [HCMLPHMIT00004127-HCMLPHMIT00004151] | 83 | | |
| 9. | Member and Manager Consent of Atlas IDF GP, LLC dated October 13, 2022 [HCMLPHMIT00004124-HCMLPHMIT00004126] | 82 | | |
| 10. | Limited Liability Company Agreement of Rand PE Fund Management, LLC dated October 29, 2015 [HCMLPHMIT00003873-HCMLPHMIT00003879] | 76 | | |
| 11. | Amended and Restated Company Agreement of Rand PE Fund Management, LLC dated August 1, 2022 [HCMLPHMIT00004177-HCMLPHMIT00004201] | 85 | | |
| 12. | Member and Manager Consent of Rand PE Fund Management, LLC dated October 13, 2022 [HCMLPHMIT00004219-HCMLPHMIT00004221] | 88 | | |
| 13. | Limited Liability Company Agreement of Rand Advisors, LLC dated August 28, 2013 [HCMLPHMIT00003880-HCMLPHMIT00003886] | 77 | | |

| Number | Exhibit | HCMLP Prior W&E Ref.[2] | Offered | Admitted |
|---|---|---|---|---|
| 14. | Amended and Restated Company Agreement of Rand Advisors, LLC dated August 1, 2022 [HCMLPHMIT00004152-HCMLPHMIT00004176] | 84 | | |
| 15. | Member and Manager Consent of Rand Advisors, LLC dated October 13, 2022 [HCMLPHMIT00004216-HCMLPHMIT00004218] | 87 | | |
| 16. | 3/17/2025 Rand Advisors Form ADV [HCMLPHMIT00003465-HCMLPHMIT00003493] | 89 | | |
| 17. | Agreement of Limited Partnership of Rand PE Fund I, L.P. dated October 29, 2015 [HCMLPHMIT00003887-HCMLPHMIT00003893] | 78 | | |
| 18. | Rand PE Fund I, LP Offering Series 1 Limited Partnership Interests dated November 30, 2015 [HCMLPHMIT00004024-HCMLPHMIT00004095] | 81 | | |
| 19. | Rand PE Fund I, L.P. SEC Form D dated February 24, 2025 [HCMLPHMIT00004096-HCMLPHMIT00004100] | 93 | | |
| 20. | Amended and Restated Limited Partnership Agreement of Atlas IDF, LP dated November 30, 2015 [HCMLPHMIT00003894-HCMLPHMIT00003928] | 79 | | |
| 21. | Atlas IDF, LP Offering of Series 1 Limited Partnership Interests dated November 30, 2015 [HCMLPHMIT00003929-HCMLPHMIT00004023] | 80 | | |
| 22. | Atlas IDF LP SEC Form D dated February 24, 2025 [HCMLPHMIT00003518-HCMLPHMIT00003522] | 92 | | |
| 23. | Atlas IDF, LP Subscription 12/21/2015 (signature pages only) | 90 | | |
| 24. | Atlas IDF, LP Subscription 12/23/2015 (signature page only) | 91 | | |
| 25. | Crown Global Rand Participation Agreement (Executed) | 102 | | |
| 26. | Crown Global DVA Policy 30218 (signed) | 98 | | |

| Number | Exhibit | HCMLP Prior W&E Ref.[2] | Offered | Admitted |
|---|---|---|---|---|
| 27. | Crown Global DVA Termsheet 30218 | 99 | | |
| 28. | Crown Global DVA Policy 30219 (signed) | 100 | | |
| 29. | Crown Global DVA Termsheet 30219 | 101 | | |
| 30. | Bylaws of The Okada Family Foundation, Inc. (final version) | 96 | | |
| 31. | Bylaws of Empower Dallas Foundation, Inc. | 97 | | |
| 32. | S&G HMIT Opinion Rep Letter dated January 29, 2016 | 103 | | |
| 33. | S&G HMIT Opinion dated January 29, 2016 | 104 | | |
| 34. | HOLDCO Responses and Disclosures Related to the Court's Order Requiring Disclosures [Docket No. 2547] HCMLPHMIT00003523-HCMLPHMIT00003828] | 74 | | |
| 35. | Show Cause Hearing Transcript June 8, 2021 [HCMLPHMIT00002716-HCMLPHMIT00003013] | 71 | | |
| 36. | HMIT Hearing Transcript June 8, 2023 [HCMLPHMIT00003014-HCMLPHMIT00003402] | 72 | | |
| **B.** | **Validation of Patrick's Authority** | | | |
| 37. | *Remittance Agreement* between the NexPoint Small Bay and Charitable DAF and Liberty CLO Holdco, Ltd. (as those terms are defined), dated January 10, 2025 [Docket No. 4536-E] | 22 | | |
| 38. | Intercreditor and Participation Agreement with HCLOM dated January 10, 2025 [HCMLPHMIT00003868-HCMLPHMIT00003871] | 13 | | |

| Number | Exhibit | HCMLP Prior W&E Ref.[2] | Offered | Admitted |
|---|---|---|---|---|
| 39. | *Stipulation Withdrawing Objection of the Dallas Foundation and Crown Global Life Insurance, Ltd. to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement With the HMIT Entities and Authorizing Actions Consistent Therewith* dated June 27, 2025 [Docket No. 4291] | | | |
| 40. | The Rule 11 Agreement filed in the TX Business Court on July 13, 2025 [Docket No. 4356-F] | | | |
| 41. | *Consent Order in In re Charitable DAF Holdco, Ltd.*, entered by the Grand Court of the Cayman Islands Financial Services Division on July 31, 2025 [Docket No. 4556-20] | | | |
| 42. | *Order* in *The Highland Dallas Foundation, Inc., et al. v. Patrick, et al.*, No. 25-BC01B-0027, filed in the Texas Business Court, 1st Division on September 18, 2025 [Docket No. 4534-16] | | | |
| 43. | An amendment to a loan agreement executed by, among others, certain Dondero-controlled entities and CLO Holdco, Ltd., dated September 30, 2025 [Docket No. 4536-G] | | | |
| 44. | *Stipulation [Proposed] Order of Dismissal With Prejudice* between Liberty CLO HoldCo, Ltd. and Dugaboy and others aligned with or controlled by Dondero, dated December 3, 2025 [Docket No. 4536-H] | | | |
| 45. | *Agreed Final Judgment* between Atlas IDF, LP (an HMIT affiliate) and certain Dondero-controlled entities, dated December 8, 2025 [Docket No. 4536-I] | | | |
| **C.** | **<u>Dugaboy's Knowledge of the Principal Allegations Against Patrick</u>** | | | |
| 46. | Excerpts of Returns of Organizations Exempt from Income Tax filed on IRS Form 990, dated 2024, for the Highland Dallas Foundation Inc., the Highland Kansas City Foundation Inc., and the Highland Santa Barbara Foundation Inc. [Docket No. 4556-21] | | | |
| 47. | The *Winding Up Petition in In re Charitable DAF Holdco, Ltd.*, filed in the Grand Court of the Cayman Islands Financial Services Division on April 16, 2025 [Docket No. 4534-6] | | | |

| Number | Exhibit | HCMLP Prior W&E Ref.[2] | Offered | Admitted |
|---|---|---|---|---|
| 48. | The *Affidavit of James David Dondero*, notarized on April 9, 2025 and filed in support of the *Winding Up Petition in In re Charitable DAF Holdco, Ltd*., filed in the Grand Court of the Cayman Islands Financial Services Division on April 16, 2025 [Docket No. 4534-7] | 119 | | |
| 49. | *Petition for Court Supervision of a Voluntary Liquidation in In re Charitable DAF Holdco, Ltd*., filed in the Grand Court of the Cayman Islands Financial Services Division on May 2, 2025 [Docket No. 4534-13] | | | |
| 50. | *Order Granting Petition for Court Supervision of a Voluntary Liquidation in In re Charitable DAF Holdco, Ltd*., entered in the Grand Court of the Cayman Islands Financial Services Division on May 6, 2025 [Docket No. 4534-14] | | | |
| 51. | The *Affidavit of Mark Eric Patrick*, notarized on June 4, 2025, in *In re Charitable DAF Holdco, Ltd*. and filed in the Grand Court of the Cayman Islands Financial Services Division on June 4, 2025 [Docket No. 4534-10] | | | |
| 52. | *Objection of The Dallas Foundation and Crown Global Life Insurance, Ltd to Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Docket No. 4231], filed in the United States Bankruptcy Court for the Northern District of Texas on June 9, 2025 [Docket No. 4534-18] | | | |
| 53. | *Dugaboy Investment Trust's Discovery Related to Rule 9019 Motion* in the above-captioned bankruptcy case, dated June 10, 2025 [Docket No. 4534-19] | | | |
| 54. | *Highland Capital Management, L.P., the Highland Claimant Trust, and the Highland Litigation Sub-Trust's Responses and Objections to Dugaboy's Discovery Related to Rule 9019* Motion, dated June 13, 2025 [Docket No. 4534-12] | | | |
| 55. | Deposition transcript of Shawn Raver dated June 20, 2025 | | | |

| Number | Exhibit | HCMLP Prior W&E Ref.[2] | Offered | Admitted |
|---|---|---|---|---|
| 56. | Deposition transcript of Julie Diaz dated June 22, 2025 | 124 (at Dkt. 4277) | | |
| 57. | Deposition transcript of Torrey Littleton dated June 22, 2025 | 125 (at Dkt. 4277) | | |
| 58. | Deposition Transcript of Mark Patrick dated June 23, 2025 | | | |
| 59. | The transcript of the June 25, 2025 hearing in the United States Bankruptcy Court for the Northern District of Texas on the *Motion for an Order Further Extending Duration of Trusts* [Docket No. 4213] and *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith [Docket No. 4216]* [Docket No. 4534-11] | | | |
| 60. | Highland Rule 9019 Presentation dated June 25, 2025 [Docket No. 4536-L] | L (at Dkt. 4536)[3] | | |
| 61. | *Declaration of James David Dondero* filed in the Texas Business Court, Dallas, Texas and dated July 1, 2025 [Case No. 19-34054, [Docket No. 4521-H-6] | | | |
| 62. | *Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver in The Highland Dallas Foundation, Inc., et al. v. Patrick, et al.*, No. 25-BC01B-0027, filed in the Texas Business Court, 1st Division on July 1, 2025 [Docket No. 4534-15] | | | |
| 63. | *JOL Writ of Summons and Statement of Claim*, filed in the Cayman Proceeding on July 15, 2025 [Docket No. 4536-B] | | | |
| 64. | *The Dugaboy Investment Trust's Motion to Stay 9019 Order* [Docket No. 4326] and accompanying exhibits, filed in the United States Bankruptcy Court for the Northern District of Texas on July 17, 2025 [Docket No. 4326] | | | |

[3] This demonstrative was used at the 9019 Hearing on June 25, 2025 and admitted into evidence at the request of Mr. Lang, Dugaboy's attorney. *See* June 25, 2025 transcript (Exhibit 62) at 171:15-25.

| Number | Exhibit | HCMLP Prior W&E Ref.[2] | Offered | Admitted |
|---|---|---|---|---|
| 65. | *Memorandum Opinion and Order Regarding Stay Requests [Addressing DE ##4326 & 4308]* (Denying Stay) dated July 21, 2025 [Docket No. 4333] | | | |
| 66. | Charitable DAF Holdco, Ltd. Guidance Notes for Members of the Liquidation Committee (not dated) [Docket No. 4534-9] | | | |
| 67. | CWR Form No. 15, Liquidator's Certificate (Composition of Liquidation Committee) (O. 9, r. 1) in the Grand Court of the Cayman Islands Financial Services Division, dated July 21, 2025 [Docket No. 4534-17] | | | |
| 68. | *Verified Petition for (I) Recognition of Foreign Main Proceeding, (II) Recognition of Foreign Representatives, and (III) Related Relief Under Chapter 15 of the Bankruptcy Court, filed in the United States District Court for the District of* Delaware, dated July 21, 2025 [Docket No. 4536-J] | | | |
| 69. | *Declaration of Margot MacInnis*, sworn to on July 21, 2025, and filed in the United States Bankruptcy Court for the District of Delaware in connection with the Ch. 15 Recognition Petition [Docket 4521-6 (Exhibit G)] | | | |
| 70. | *Third Affidavit of Margot MacInnis* filed in Grand Court of the Cayman Islands November 2025 (Under Seal) | | | |
| **D.** | **<u>The Cayman Court Rejects the Dondero Foundation's Fraud Claims</u>** | | | |
| 71. | Letter from Maples and Calder (Cayman) LLP to Karen Hoskins, Personal Assistant to the Hon. Justice Raj Parker of the Grand Court of the Cayman Islands Financial Services Division, dated February 3, 2026 [Docket No. 4556-22] | | | |
| 72. | *Judgment in In re Charitable DAF Holdco, Ltd.*, filed in the Grand Court of the Cayman Islands Financial Services Division on February 10, 2026 [Docket No. 4534-4] | | | |
| **E.** | **<u>Other</u>** | | | |
| 73. | Settlement Agreement and General Release dated May 19, 2025 [Docket No. 4217-7] | 1 | | |

| Number | Exhibit | HCMLP Prior W&E Ref.[2] | Offered | Admitted |
|---|---|---|---|---|
| 74. | *Notice of Appeal of Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* dated July 15, 2025 [Docket No. 4311] | | | |
| 75. | Dugaboy's Index (compiled from all documents Dugaboy filed at Docket Nos. 4513 and 4521), a document prepared by professionals employed by my firm at my direction dated April 3, 2026 [Docket No. 4536-A] | | | |
| 76. | Executed Withdrawal Letters – Dolomiti and Hakusan dated February 6, 2025 | | | |
| 77. | Deposition Transcript of James Dondero dated May 8, 2026 | | | |
| 78. | *Highland Capital Management, L.P.'s Requests for the Production of Documents Directed to the Dugaboy Investment Trust* dated February 2026 [Dkt 4551-8] | | | |
| 79. | Membership Interest Purchase Agreement, dated August 1, 2022 by and among John Honis, as seller, DAF Holdings Corp., as buyer, and CLO Holdco, Ltd., as guarantor | | | |
| 80. | Amended and Restated Limited Partnership Agreement of Rand PE Fund, dated as of November 30, 2015 | | | |
| 81. | Investment Management Agreement, dated as of November 30, 2015, by and among Rand Advisors and Atlas IDF | | | |
| 82. | Investment Management Agreement, dated as of November 30, 2015, by and among Rand Advisors and Rand PE Fund | | | |
| 83. | Assignment and Assumption of Membership Interest Agreement, dated March 24, 2021, between Grant J. Scott and Mark E. Patrick | | | |
| 84. | Amended and Restated Limited Liability Company Agreement of DAF GP, dated as of January 1, 2012 | | | |
| 85. | Second Amended and Restated Exempted Limited Partnership Agreement of DAF Fund, dated March 11, 2024 | | | |

| Number | Exhibit | HCMLP Prior W&E Ref.[2] | Offered | Admitted |
|---|---|---|---|---|
| 86. | Contribution and Assignment Agreement, dated April 27, 2023, by and among DAF Fund, CLO Holdco, Ltd, Liberty CLO Holdco, Ltd., and DAF Holdings Corp. | | | |
| 87. | Highland Demonstrative Exhibit: Highland's Slide Deck for Hearing on Motion for Relief from Order and Motion to Vacate | | | |
| 88. | Any document entered or filed in Highland Capital Management, L.P.'s chapter 11 Bankruptcy Case or any associated contested matter or adversary proceeding, including any exhibits thereto | | | |
| 89. | All exhibits necessary for impeachment and/or rebuttal purposes | | | |
| 90. | All exhibits identified by or offered by any other party at the Hearing | | | |

[*Remainder of Page Intentionally Blank*]

Dated: May 8, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (admitted *pro hac vice*)
John A. Morris (admitted *pro hac vice*)
Gregory V. Demo (admitted *pro hac vice*)
Jordan A. Kroop (admitted *pro hac vice*)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com

**WILLKIE FARR & GALLAGHER LLP**

Mark T. Stancil (admitted *pro hac vice*)
Joshua S. Levy (admitted *pro hac vice*)
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000
mstancil@willkie.com
jlevy@willkie.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expwy., Ste. 106
Dallas, TX 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust*

**EXHIBIT 1**

# TRUST AGREEMENT

This Trust Agreement is dated as of December 17, 2015 (this "Trust Agreement"), between Beacon Mountain, LLC, a Delaware limited liability company, as sponsor (in such capacity, the "Sponsor"), John Honis as administrator (in such capacity, the "Administrator"), and Wilmington Trust, National Association, a national banking association, as Delaware trustee (the Delaware Trustee").

1. Definitions. Certain capitalized terms used in this Trust Agreement shall have the respective meaning assigned to them in this Section 1. All references herein to "the Agreement" or "this Agreement" are to this Trust Agreement as it may be amended and supplemented from time to time, and all references herein to Articles, Sections and subsections are to Articles, Sections and subsections of this Trust Agreement unless otherwise specified.

"Account" means the trust account or other account established by the Administrator in the name of the Trust for the benefit of the Sponsor at any financial institution selected from time to time by the Administrator in his sole and absolute discretion.

"Delaware Act" means the Delaware Statutory Trust Act, Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. § 3801 et seq.

"Honis Cause" means conduct by Honis, in any capacity, amounting to (i) Honis's conviction or plea of nolo contendere for any criminal offense; (ii) dishonesty, fraud, willful misconduct, unlawful discrimination, bad faith or theft on the part of Honis that is injurious to any of the Applicable Entities; (iii) Honis's using for his own benefit any confidential or proprietary information of any of the Applicable Entities, or willfully or negligently divulging any such information to third parties without the prior written consent of the Partnership, in each case, other than as provided herein; (iv) a breach or violation of the terms of this Agreement or other agreement to which Honis or any of his Affiliates and any of the Applicable Entities are party in any manner that adversely affects any of the Applicable Entities; or (v) a breach of fiduciary duties. Any determination of whether conduct constitutes Honis Cause pursuant to this Agreement shall be made in the reasonable discretion of the Partnership, shall be made in good faith and shall be binding upon all parties affected thereby.

"Honis Trigger Event" means, with respect to Honis or any of his Affiliates, (i) the Bankruptcy of Honis; (ii) the death of Honis; (iii) the Disability of Honis; (iv) any conduct by Honis amounting to Honis Cause; (v) the termination of Honis's employment with, or the failure of Honis to be actively engaged in the management of, Rand Advisors; (vi) a change in the ownership of Rand Advisors, such that Honis fails to retain, directly or indirectly, majority voting control of Rand Advisors; (vii) a sale of all or substantially all of the assets of Rand Advisors; or (viii) the termination of this Agreement pursuant to Section 16. Honis agrees to give the Partnership ten (10) days' written notice of his Bankruptcy. "Limited Partnership" means Highland Capital Management, L.P., a Delaware limited partnership.

"Limited Partnership Agreement" means the Agreement of Limited Partnership of Highland Capital Management, L.P., as amended from time to time.

"Limited Partner Interests" means limited partner interests in the Limited Partnership.

"Person" means any individual or any corporation, association, partnership, limited liability company, joint venture, business trust, trust, organization, governmental entity or other entity of any kind.

"Trust" means the Delaware statutory trust established and governed by this Trust Agreement.

"Trust Property" means all Limited Partnership Interests and all amounts in the Account, unless and until any of such Limited Partnership Interests are disposed of in accordance with this Trust Agreement.

2. Scope. This Trust Agreement governs the Trust and the disposition of all Trust Property, including amounts in the Account or otherwise held by the Trust now existing or hereafter arising. Each of the Sponsor, the Administrator and the Delaware Trustee hereby acknowledges that the Trust Property shall be held in trust for Beacon Mountain LLC under Delaware law solely for the use and purposes set forth herein.

3. Name; Certificate of Trust. The Trust shall be known as "HUNTER MOUNTAIN INVESTMENT TRUST", in which name the Administrator may conduct the business of the Trust, make and execute contracts and other instruments on behalf of the Trust and sue and be sued on behalf of the Trust, to the extent herein provided. The Delaware Trustee is authorized and directed to file a Certificate of Trust of the Trust with the Office of the Secretary of State of the State of Delaware in accordance with the applicable provisions of the Delaware Act. It is the intention of the parties hereto that the Trust created hereby constitute a statutory trust under the Delaware Act and that this Trust Agreement constitute the governing instrument of the Trust.

4. Account Establishment. The Administrator shall establish and control the Account. The Account shall include Trust Property and may include other assets in the sole discretion of the Administrator.

5. Beneficial Owner; Liability of Beneficial Owner. The beneficial owner of the trust shall be Beacon Mountain LLC. Beacon Mountain LLC, as beneficial owner of the Trust, shall be entitled to the same limitation of liability extended to stockholders of private corporations for profit organized under the General Corporation Laws of the State of Delaware.

6. Title to Trust Property. Legal title to all Trust Property, including the Account, shall be vested at all times in the Trust as a separate legal entity, except where applicable law in any jurisdiction requires title to any part of the Trust Property or the Account, to be vested in a trustee or trustees, in which case title shall may be vested in a trustee, a co-trustee and/or a separate trustee, as the case may be, as selected by the Administrator. Title to Trust Property shall not be vested in the name of the Delaware Trustee without the Delaware Trustee's prior written consent.

7. Purpose and Powers of the Trust; Administrator's Powers. The Trust shall have the power and authority (i) to accept funds and other assets, (ii) to contribute or otherwise transfer funds and other assets to the Account, (iii) to acquire Limited Partnership Interests from (a) the limited partners of the Limited Partnership and (b) the Limited Partnership, in each case, with funds in the Account or other sources of funds, including through the incurrence of debt, and to hold such Limited Partnership Interests in the Account or otherwise and (iv) to dispose of or otherwise allocate such Limited Partnership Interests pursuant to and accordance with the terms and conditions of the Limited Partnership Agreement. The Administrator shall pursuant to Section 3806(b)(7) of the Delaware Act have the power and authority, and shall be duly authorized, from time to time, in his sole discretion to manage the business and affairs of the Trust, and to take the actions described in (i) through (iv) on behalf of the Trust. The Administrator shall have all additional powers and authority necessary or desirable, in the sole discretion of the Sponsor, for prompt and effective administration of the Trust created hereunder, unless the particular power or authority is specifically denied by this Trust Agreement. The Administrator shall also have the power to settle, compromise, submit to arbitration, or submit to any court having jurisdiction in the matter any matters in dispute.

8. Fiduciary Duties of Administrator. (a) The Administrator is authorized to acquire and retain the Limited Partnership Interests in accordance with the terms of this Trust Agreement without regard to any law limiting the nature of investments of fiduciaries.

(b) The Administrator agrees to perform his duties under this Trust Agreement in good faith and in the best interests of the Trust, but only upon the express terms of this Trust Agreement. To the fullest extent permitted by law, the Administrator shall have all implied duties (including fiduciary duties) or liabilities existing at law or in equity with respect to the Trust. For the avoidance of doubt, to the fullest extent permitted by law, no Person other than the Administrator (including any such Person that may control or be under common control with the Administrator) shall have any duties (including fiduciary duties) or liabilities at law or in equity to the Trust, any beneficial owner or any other Person.

(c) To the extent that, at law or in equity, the Administrator has duties (including fiduciary duties) and liabilities relating thereto to the Trust or to any other Person, the Administrator shall not be liable to the Trust or to any other Person for his good faith reliance on the provisions of this Trust Agreement.

(d) Unless otherwise expressly provided herein:

(i) whenever a conflict of interest exists or arises between the Administrator or any of its affiliates, on the one hand, and the Trust or the beneficial owner, on the other hand; or

(ii) whenever this Trust Agreement or any other agreement contemplated herein or therein provides that the Administrator shall act in a manner that is, or provides terms that are, fair and reasonable to the Trust or the beneficial owner,

the Administrator shall resolve such conflict of interest, take such action or provide such terms, considering in each case solely the interests of the Trust and the beneficial owner.

(e) Notwithstanding any other provision of this Trust Agreement or otherwise applicable law, whenever in this Trust Agreement the Administrator is permitted or required to make a decision:

(i) in his "discretion" or under a grant of similar authority, the Administrator shall be entitled to consider such interests and factors as it desires, including its own interest, and, to the fullest extent permitted by applicable law, shall have no duty or obligation to give any consideration to any interest of or factors affecting the Trust or any other Person; or

(ii) in his "good faith" or under another express standard, the Administrator shall act under such express standard and shall not be subject to any other or different standard. The term "good faith" as used in this Trust Agreement shall mean subjective good faith as such term is understood and interpreted under Delaware law.

(f) The Administrator and any of his affiliates may engage in or possess an interest in other profit-seeking or business ventures of any nature or description, independently or with others, whether or not such ventures are competitive with the Trust and the doctrine of corporate opportunity, or any analogous doctrine, shall not apply to the Administrator. The Administrator insofar as he acquires knowledge of a potential transaction, agreement, arrangement or other matter that may be an opportunity for the Trust shall not have any duty to communicate or offer such opportunity to the Trust, and the Administrator shall not be liable to the Trust or to the beneficial owners for breach of any fiduciary or other duty by reason of the fact that the Administrator pursues or acquires for, or directs such opportunity to another Person or does not communicate such opportunity or information to the Trust. Neither the Trust nor any beneficial owner shall have any rights or obligations by virtue of this Trust Agreement or the trust relationship created hereby in or to such independent ventures or the income or profits or losses derived therefrom, and the pursuit of such ventures, even if competitive with the activities of the Trust, shall not be deemed wrongful or improper. The Administrator may engage or be interested in any financial or other transaction with the Trust or any affiliate of the Trust, or may act as depositary for, trustee or agent for, or act on any committee or body of holders of, securities or other obligations of the Trust or its affiliates.

9. Recordkeeping and Accounting. The Administrator shall maintain appropriate records in which he shall record the Trust Property and the acquisition and disposition of Limited Partnership Interests.

10. Tax Treatment. The Sponsor and the Administrator acknowledge and agree that for United States Federal Income Tax purposes (i) the Trust shall be disregarded as an entity for federal income tax purposes. The Administrator shall comply with the information reporting requirements applicable to the Trust under the Internal Revenue Code and prepare and furnish to Beacon Mountain LLC any appropriate Internal Revenue Service forms required to be provided to Beacon Mountain LLC as beneficial owner of the Trust.

11. No Other Interests

(a) The Sponsor acknowledges that it has no rights or claims to specific Trust Property, including funds in the Account, and otherwise has no interest in the Trust Property or the Account other than a beneficial interest in the Trust Property and the Account.

(b) The Administrator acknowledges that he has no right, title, or interest in the Trust, the Trust Property, or the Account in his personal capacity and has no beneficial interest in the Trust.

12. Compensation: Administrator Liability. The Administrator shall not receive any compensation for his role as Administrator. Nothing herein shall be construed to limit the Administrator's ability to receive compensation pursuant to other agreements for services he may provide other than his role as Administrator. The Administrator shall be indemnified, defended and held harmless by the Trust for any liability incurred by him while acting hereunder, and shall not be liable to the Trust or the Sponsor, except for a breach of his fiduciary duties hereunder, his own bad faith, willful misconduct or gross negligence in the performance of his express duties under this Trust Agreement.

13. Amendment. The Administrator, solely with the consent of the beneficial owner, shall have the right at any time or times to amend or supplement the provisions of this Trust Agreement, in each case by a writing or writings signed by the Administrator; provided that no such amendment shall be permitted if it would subject any amount held hereunder to any right, charge, security interest, lien or claim by, of or for the benefit of any creditor or creditors of the Sponsor or its subsidiaries and affiliates in its corporate or personal capacity. If any such amendment or supplement affects the rights, immunities or obligations of the Delaware Trustee, the Administrator shall be required to obtain the prior written consent of the Delaware Trustee.

14. Duration. The Trust shall be perpetual unless otherwise dissolved and terminated pursuant to paragraph 15 below.

15. Termination. The Administrator shall have the power solely upon the prior written consent of the beneficial owner to dissolve the Trust and to distribute all Trust Property held in the Account to, or for the benefit of, such persons (including the Sponsor) as the Administrator shall determine in his sole discretion and after satisfying the claims and obligations of the Trust in accordance with the Delaware Act. Following any such dissolution, the Administrator shall proceed to wind up the affairs of the Trust in an orderly manner and within a reasonable period of time considering relevant circumstances and shall have the powers necessary to wind up the Trust's affairs, including but not limited to the power to fulfill or discharge the contracts of the Trust, collect its assets, sell, convey, exchange or otherwise dispose of all or any part of the remaining property of the Trust to one or more Persons at public or private sale (for consideration which may consist in whole or part of cash, securities or other property of any kind), discharge or pay its liabilities, defend or prosecute suits or administrative proceedings and do all other acts appropriate to the winding up and liquidation of the property and affairs of the Trust. After paying or making reasonable provision for the payment of all claims and obligations of the Trust as required by the Delaware Act, and upon receipt of such releases, indemnities or like documentation as the Administrator may reasonably deem necessary

for the protection of the Administrator, the Administrator shall distribute the remaining property of the Trust as contemplated by this Trust Agreement. Upon the completion of winding up, the Trust shall terminate and the Administrator shall provide written notice directing the Delaware Trustee to file an appropriate form of Certificate of Cancellation to be filed in the Office of the Secretary of State of the State of Delaware by the Delaware Trustee.

16. Removal of Administrator. Upon any Honis Trigger Event, the Administrator shall immediately be removed without any action by the Delaware Trustee or any other party.

17. Successor Administrator. The Administrator may resign as Administrator hereunder, without leave of court, at any time, and, in such event, the Adminstrator shall appoint a successor Administrator unless, prior to the effective date of his resignation, the Administrator dissolves the Trust in accordance with paragraph 15 above. Any appointment of a successor Administrator shall be in writing signed by the appointing Administrator, or by a duly authorized officer or officers of the appointing Administrator, if an entity. Whenever this Trust Agreement refers to the Administrator, such reference shall include any successor Administrator appointed under this paragraph. All powers hereby granted to the Administrator shall be exercisable by any successor Administrator, and each successor Administrator shall be deemed to have assumed the duties hereby undertaken by the Administrator.

Upon the termination of the Administrator in accordance with paragraph 16 above, Beacon Mountain, LLC shall appoint a successor Administrator within a reasonable period of time.

The Administrator shall not be required to furnish any bond or surety. No one dealing with the Administrator need inquire concerning the validity of anything the Administrator purports to do or see to the application of any money paid upon the Administrator's order.

18. Delaware Trustee.

(a) For purposes of satisfying Sections 3807 of the Delaware Act, during the existence of the Trust, there shall at all times be a "Delaware Trustee" hereunder who shall, in the case of a natural person, be a person who is a resident of the State of Delaware, or, in all other cases, is a trustee with its principal place of business in the State of Delaware. The Delaware Trustee shall not have any duties (including fiduciary duties) or liabilities except to the extent and for the limited purposes described in this paragraph. Accordingly, no reference in this Trust Agreement to the "Administrator" shall include, or be deemed to refer to, the Delaware Trustee. The sole power and duty of the Delaware Trustee shall be to accept service of process in accordance with Section 3804 of the Delaware Act and to execute and deliver for filing all documents required to be filed with the State of Delaware as required by the Delaware Act.

(b) The Sponsor and the Administrator hereby appoint Wilmington Trust, National Association as the initial Delaware Trustee. The initial Delaware Trustee and any successor Delaware Trustee may resign and may be removed by the Sponsor then serving for any reason, with or without cause. If the Delaware Trustee resigns or is removed, or if there is no Delaware Trustee serving at any time for any other reason, the Administrator shall appoint a successor Delaware Trustee who qualifies under the terms of this paragraph 18. Upon each

appointment of a successor Delaware Trustee, the Administrator shall cause an amendment to the Certificate of Trust of the Trust that reflects such change to be filed with the Secretary of State of the State of Delaware in accordance with the Delaware Act.

(c) By its execution hereof, the Delaware Trustee accepts its appointment hereunder. Except as otherwise expressly required by clause (a) above, the Delaware Trustee shall not have any duty or liability with respect to the administration of the Trust, the investment of the Trust Property or the payment of any distributions of income or principal to the beneficial owners.

(d) The Delaware Trustee shall not be liable for the acts or omissions of the Administrator, nor shall the Delaware Trustee be liable for supervising or monitoring the performance of or performing the duties and obligations of the Administrator, the Sponsor or the Trust under this Trust Agreement or any other document. The Delaware Trustee shall not be personally liable under any circumstances, except for its own willful misconduct, bad faith or gross negligence in the performance of its express duties under this Trust Agreement. In particular, but not by way of limitation:

(i) the Delaware Trustee shall not be personally liable for any error of judgment made in good faith, except to the extent such error of judgment constitutes gross negligence on its part;

(ii) no provision of this Trust Agreement shall require the Delaware Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder, if the Delaware Trustee shall have reasonable grounds for believing that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(iii) under no circumstances shall the Delaware Trustee be personally liable for any representation, warranty, covenant, agreement, or indebtedness of the Trust;

(iv) the Delaware Trustee shall not be personally responsible for or in respect of the validity or sufficiency of this Trust Agreement or for the due execution hereof by the Sponsor or the Administrator;

(v) the Delaware Trustee shall incur no liability to anyone in acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, bond or other document or paper reasonably believed by it to be genuine and reasonably believed by it to be signed by the proper party or parties. The Delaware Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect. As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein, the Delaware Trustee may for all purposes hereof rely on a certificate, signed by the Administrator, as to such fact or matter, and such certificate shall constitute full protection to the Delaware Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon;

(vi) in the exercise or administration of the Trust hereunder, the Delaware Trustee (a) may act directly or through agents or attorneys pursuant to agreements entered into with any of them, and the Delaware Trustee shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by the Delaware Trustee in good faith and with due care and (b) may consult with counsel, accountants and other skilled persons to be selected by it in good faith and with due care and employed by it, and it shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel, accountants or other skilled persons; and

(vii) except as expressly provided in this Section, in accepting and performing the Trust hereby created the Delaware Trustee acts solely as Delaware Trustee hereunder and not in its individual capacity, and all Persons having any claim against the Delaware Trustee by reason of the transactions contemplated by this Trust Agreement or the Trust Agreement shall look only to the Trust's property for payment or satisfaction thereof.

(e) The Delaware Trustee (or any successor Delaware Trustee) shall be entitled to receive compensation from the Sponsor or from the Trust for its services in accordance with such fee agreements and schedules as shall have been separately agreed to from time to time by the Delaware Trustee and the Sponsor. The Delaware Trustee may consult with counsel (who may be counsel for the Sponsor or for the Delaware Trustee). The reasonable legal fees incurred in connection with such consultation shall be reimbursed to the Delaware Trustee pursuant to this Section, provided that no such fees shall be payable to the extent that they are incurred as a result of the Delaware Trustee`s gross negligence, bad faith or willful misconduct.

(f) The Delaware Trustee shall serve for the duration of the Trust and until the earlier of (i) the effective date of the Delaware Trustee's resignation, or (ii) the effective date of the removal of the Delaware Trustee. The Delaware Trustee may resign at any time by giving thirty (30) days written notice to the Administrator; provided, however, said resignation shall not be effective until such time as a successor Delaware Trustee has accepted such appointment. The Delaware Trustee may be removed at any time by the Administrator by providing thirty (30) days written notice to the Delaware Trustee; provided, however, such removal shall not be effective until such time as a successor Delaware Trustee has accepted such appointment. Upon the resignation or removal of the Delaware Trustee, the Administrator shall appoint a successor Delaware Trustee. If no successor Delaware Trustee shall have been appointed and shall have accepted such appointment within forty five (45) days after the giving of such notice of resignation or removal, the Delaware Trustee may, at the expense of the Sponsor, petition any court of competent jurisdiction for the appointment of a successor Delaware Trustee. Any successor Delaware Trustee appointed pursuant to this Section shall be eligible to act in such capacity in accordance with this Trust Agreement and, following compliance with this Section, shall become fully vested with the rights, powers, duties and obligations of its predecessor under this Trust Agreement, with like effect as if originally named as Delaware Trustee.

(g) The Delaware Trustee or any officer, affiliate, director, employee, or agent of the Delaware Trustee (each an "Indemnified Person") shall be entitled to indemnification from the Sponsor, to the fullest extent permitted by law, from and against any and all losses, claims, actions, suits, taxes, damages, reasonable expenses, and liabilities (including liabilities under state or federal securities laws) of any kind and nature whatsoever (collectively, "Expenses"), to

the extent that such Expenses arise out of or are imposed upon or asserted against such Indemnified Persons with respect to the creation, operation or termination of the Trust, the execution, delivery or performance of this Trust Agreement or the transactions contemplated hereby; provided, however, that the Sponsor shall not be required to indemnify any Indemnified Person for any Expenses which are a result of the willful misconduct, bad faith or gross negligence of such Indemnified Person. The obligations of the Sponsor to indemnify the Indemnified Persons as provided herein shall survive the termination of this Trust Agreement and the resignation or removal of the Delaware Trustee.

(h) The Delaware Trustee shall not be obligated to give any bond or other security for the performance of any of its duties hereunder.

19. Waiver of Jury Trial. THE PARTIES HERETO HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO A TRIAL BY JURY IN ANY LITIGATION RELATING TO ANY CLAIM ARISING HEREUNDER OR RELATED HERETO.

20. Governing Law. The validity and construction of this Trust Agreement and all amendments hereto shall be governed by the laws of the State of Delaware, and the rights of all parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof; provided, however, that the parties hereto intend that the provisions hereof shall control over any contrary or limiting statutory or common law of the State of Delaware (other than the Delaware Act) and that, to the maximum extent permitted by applicable law, there shall not be applicable to the Trust, the Sponsor, or the Delaware Trustee any provision of the laws (statutory or common) of the State of Delaware (other than the Delaware Act) pertaining to trusts which relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents, or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property, (d) fees or other sums payable to trustees, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Sponsor or the Delaware Trustee set forth or referenced in this Trust Agreement. Sections 3540, 3542 and 3561 of Title 12 of the Delaware Code shall not apply to the Trust.

21. Exclusive Jurisdiction. Each of the parties hereto, to the fullest extent permitted by law, (i) irrevocably agrees that any claims, suits, actions or proceedings arising out of or relating in any way to this Agreement (including any claims, suits or actions to interpret, apply or enforce (A) the provisions of this Agreement or (B) the duties, obligations or liabilities of the Sponsor, the Administrator and the Delaware Trustee, or (C) the rights or powers of, or

restrictions on, the Trust, Sponsor, the Delaware Trustee or the Administrator, or (D) any provision of the Delaware Act, or (E) any other instrument, document, agreement or certificate contemplated by any provision of the Delaware Act relating to the Trust (regardless of whether such claims, suits, actions or proceedings (x) sound in contract, tort, fraud or otherwise, (y) are based on common law, statutory, equitable, legal or other grounds, or (z) are derivative or direct claims)), shall be exclusively brought in the Court of Chancery of the State of Delaware or, if such court does not have subject matter jurisdiction thereof, any other court in the State of Delaware with subject matter jurisdiction, (ii) irrevocably submits to the exclusive jurisdiction of such courts in connection with any such claim, suit, action or proceeding, (iii) irrevocably agrees not to, and waives any right to, assert in any such claim, suit, action or proceeding that (A) it is not personally subject to the jurisdiction of such courts or any other court to which proceedings in such courts may be appealed, (B) such claim, suit, action or proceeding is brought in an inconvenient forum, or (C) the venue of such claim, suit, action or proceeding is improper, (iv) expressly waives any requirement for the posting of a bond by a party bringing such claim, suit, action or proceeding, and (v) consents to process being served in any such claim, suit, action or proceeding by mailing, certified mail, return receipt requested, a copy thereof to such party at the address set forth in the books and records of the Trust, and agrees that such service shall constitute good and sufficient service of process and notice thereof; provided, nothing in clause (v) hereof shall affect or limit any right to serve process in any other manner permitted by law.

22. Application to Successors. This Trust Agreement shall extend to and be binding upon the successors, executors, administrators and assigns of each of the Sponsor, the Delaware Trustee and the Administrator.

23. Transfer of Beneficial Ownership. Beacon Mountain LLC shall be the sole beneficial owner of the Trust to the extent provided herein and the interests of Beacon Mountain LLC hereunder shall not be represented by a certificate. To the fullest extent permitted by law, the beneficial interest of Beacon Mountain LLC in the Trust may not be offered, sold, transferred, pledged, hypothecated or otherwise disposed of.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

BEACON MOUNTAIN, LLC, as Sponsor

By: ______________________
Name: John Honis
Title: President

JOHN HONIS, as Administrator

______________________
1-11-16

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Delaware Trustee

By: ______________________
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

BEACON MOUNTAIN, LLC, as Sponsor

By:____________________________
Name: John Honis
Title: President

JOHN HONIS, as Administrator

____________________________

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Delaware Trustee

By:____________________________
Name: Jennifer A. Luce
Title: Vice President

**EXHIBIT 2**

HUNTER MOUNTAIN INVESTMENT TRUST

APPOINTMENT OF SUCCESSOR ADMINISTRATOR

August 12, 2022

Reference is made to that certain Trust Agreement of Hunter Mountain Investment Trust dated December 17, 2015 (the "Trust Agreement"). Capitalized terms not otherwise defined shall have the meaning given them in the Trust Agreement. Pursuant to section 16 of the Trust Agreement, upon the occurrence of a Honis Trigger Event, the current Administrator is immediately removed. Pursuant to that certain Membership Interest Purchase Agreement dated August 1, 2022 ("MIPA"), by and among John Honis (as "Seller"), Rand Advisors Holding Corp., a Delaware corporation (as "Buyer"), and CLO Holdco, Ltd., a Cayman limited company (as "Guarantor"), the Buyer acquired all the membership interests in, and therefore voting control of, Rand Advisors, LLC ("Rand"). A Honis Trigger Event under the Trust Agreement includes a change in ownership of Rand, such that John Honis fails to retain majority voting control.

Pursuant to section 17 of the Trust Agreement, upon the occurrence of a Honis Trigger Event and the immediate removal of John Honis as Administrator, Beacon Mountain, LLC ("Beacon") shall appoint a successor Administrator. Accordingly, Beacon hereby appoints Mark E. Patrick as Administrator of Hunter Mountain Investment Trust, effective as of the date first written above.

BEACON MOUNTAIN, LLC, a Delaware limited liability company
By: Rand PE Fund I, L.P., its sole member
By: Rand PE Fund Management, LLC, its general partner
By: Rand Advisors Holding Corp., its sole member

By:____________________________________
Name: Mark Patrick
Title: President

**EXHIBIT**

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT
OF
BEACON MOUNTAIN LLC

This Amended and Restated Limited Liability Company Agreement (this "Agreement"), dated as of the 24th day of September, 2015, has been entered into by Rand PE Fund I, L.P. – Series 1 (the "Member"). The Member's LLC Interest (as hereinafter defined) is as set forth on Schedule A hereto.

**WHEREAS**, the initial Limited Liability Company Agreement, also dated as of the 24th day of September, 2015 ("Initial Agreement"), contained a scrivener's error with respect to the name of the single member of the Company (as defined below).

**NOW, THEREFORE**, in consideration of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Initial Agreement is hereby amended and restated in its entirety to read as follows:

1. Name, Business, Address and Registered Agent.

(a) The Member hereby acknowledges that a limited liability company under the name of "Beacon Mountain LLC" (the "Company") was formed under the Delaware Limited Liability Company Act (the "Act") for the purpose of engaging in any business of any kind necessary to, in connection with, related to or incidental to such purposes as the Member shall from time to time deem desirable.

(b) The principal office of the Company shall be at such place as the Member may from time to time designate.

(c) The initial registered office of the Company for purposes of the Act shall be at 1675 South State Street, Suite B, in the City of Dover, County of Kent, Delaware 19901. The initial registered agent of the Company for purposes of the Act shall be Capitol Services, Inc., whose business office is identical to the Company's registered office.

2. Member. The sole responsibility for managing the business and affairs of the Company, except as otherwise provided herein or in the Act, shall be vested in the Member. Except as expressly provided herein, voting power shall be vested solely in the Member, and all matters requiring a vote pursuant to this Agreement or the Act shall be determined by the vote of the Member and the Member may act by written consent.

3. Officers.

(a) Election of Officers; Term. Officers, including assistant and subordinate officers, may from time to time be appointed by the Member. All officers shall hold office until their successors are appointed by the Member. Any two or more offices may be combined in the same person as the Member may determine. No officer may act in more than one capacity where the action of two or more officers is required.

(b) Removal of Officers; Vacancies. Any officer of the Company may be removed summarily with or without cause, at any time, by the Member. Vacancies may be filled by the Member.

(c) Duties. The officers of the Company shall have only such powers and duties as are from time to time conferred by the Member in writing or as are set forth in writing and executed by either of the President or the Secretary. The Member shall determine the compensation of all officers of the Company.

4. Term. The term of the Company shall be perpetual, except that the Company shall be dissolved upon the first to occur of any of the following events:

(a) The election of the Member to dissolve and terminate the Company;

(b) At any time there are no remaining members, except as may be avoided pursuant to §18-801(a)(4) of the Act;

(c) The entry of a decree of judicial dissolution under §18-802 of the Act; or

(d) Automatic cancellation of the Company's certificate of formation pursuant to §18-1108 of the Act.

5. Capital. The Member may contribute such capital, in cash or other property, as it so chooses in its sole discretion. No capital contributions shall be required unless the Member consents thereto in writing, in its sole and absolute discretion.

6. Bank Accounts. The President and the Secretary and any other officer, including any assistant or subordinate officer, as may be authorized to do so in writing by either of the President or the Secretary, are authorized to open commercial banking accounts for and in the name of the Company throughout the United States, at any time and from time to time, and to deposit to the credit of the Company in such banking accounts any monies, checks, drafts, orders or other commercial paper payable to the Company, and from time to time to withdraw all or any part of the funds on deposit in the name of the Company by check drawn in the name of the Company and signed by such officer.

7. Voting of Shares. Unless otherwise provided by written resolution of the Member, either of the President or the Secretary may from time to time appoint an attorney or attorneys or agent or agents of the Company, in the name and on behalf of the Company, to cast the vote which the Company may be entitled to cast as a stockholder or otherwise in any corporation, partnership, limited liability company, joint venture or any other entity, any of whose securities may be held by the Company, at meetings of the holders of the shares or other securities of such entity or to consent in writing to any action by any such entity. Such officer shall instruct the person or persons so appointed as to the manner of casting such votes or giving such consent and may execute or cause to be executed on behalf of the Company such written proxies, consents, waivers or other instruments as may be necessary or proper in the premises. In lieu of such appointment, either of the President or the Secretary may himself attend any meetings of the holders of the shares or other securities of any such entity and there vote or

exercise any or all power of the Company as the holder of such shares or other securities of such entity or consent in writing to any action by any such entity.

8. Distributions. Any cash or other property of the Company not required for the operation of the Company shall be distributable to the Member at such times and in such amounts as determined by the Member.

9. Certificates; "Opt-In" to Article 8; Transferability of Interests.

(a) The Company may issue one or more certificates evidencing the limited liability company interests in the Company ("LLC Interest") in the form attached hereto as Exhibit A. Certificates shall be executed on behalf of the Company by one of its executive officers. The Member hereby agrees that the LLC Interest held by such Member shall be treated as a "security" for purposes of and shall be governed by Article 8 of the Delaware Uniform Commercial Code--Investment Securities, as amended from time to time.

(b) The Member may transfer, sell, assign, mortgage, grant a lien on, give or otherwise dispose of, whether voluntarily or by operation of law, at judicial sale or otherwise, all or any part of its LLC Interest in the Company; provided, however, that there shall not at any time be more than one member until this Agreement is amended to provide generally (in addition to Section 12 hereof) for having more than one member. If, in connection with any such transfer, less than 100% of the LLC Interest of the transferor member is transferred, then this Agreement shall be amended to include appropriate provisions, including those relating to partnership accounting and tax issues, necessary to address the fact that the Company has more than one member.

10. Liquidation. Any net proceeds from the sale, exchange or other disposition (including a disposition pursuant to foreclosure or deed in lieu of foreclosure) of the assets of the Company following the dissolution of the Company shall be distributed to the Member.

11. Other Activities. The Member may engage in or possess any interest in another venture or business of any nature or description, independently or with others.

12. Tax Classification. The Member intends that the Company be disregarded for U.S. federal income tax purposes as long as there is only one member, and that if there is ever more than one member or more than one owner of the Company as determined for U.S. federal income tax purposes, that the Company be classified as a partnership for U.S. federal income tax purposes and this Agreement shall be interpreted accordingly.

13. Limited Liability. The Member shall not have any personal obligation for any debts, obligations or liabilities of the Company, whether arising in contract, tort or otherwise, solely by reason of being a Member, except as provided under the Act.

14. Exculpation; Indemnification.

(a) Except as otherwise provided by any written employment, consulting or similar agreement, if applicable, or unless otherwise expressly required by law, no officer or member of the Company (including any former executive officer or member) (each such person

referred to herein as a "Covered Person") shall have any liability to the Company or to any member for any loss suffered by the Company or any member which arises out of any act or omission or alleged act or omission of the Covered Person in the Covered Person's capacity as a Covered Person to the extent the Covered Person acted in good faith and to the extent such course of conduct did not constitute willful misconduct or gross negligence of the Covered Person. Each Covered Person shall be indemnified by the Company against any losses, judgments, liabilities, claims, damages, costs, expenses (including reasonable legal fees and other expenses actually incurred in investigating or defending against any such losses, judgments, liabilities or claims and expenses actually incurred enforcing this Agreement) and amounts paid in settlement of any claim (approved in advance and in good faith by the Member) sustained by any of them by reason of any act or omission or alleged act or omission in connection with the activities of the Company (including any subsidiaries thereof) unless there is a final judicial determination by a court of competent jurisdiction to which all rights of appeal have been exhausted or expired that the same were the result of bad faith, willful misconduct or gross negligence of the Covered Person. The Covered Person may rely in good faith upon the advice of legal counsel.

(b) To the extent available on commercially reasonable terms, the Company may purchase, at the Company's expense, insurance (including without limitation, liability insurance policies and errors and omissions policies) to cover any liabilities covered by this Section 14 in such amount and with such deductibles as the Company may determine; provided, however, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person. Any such insurance may extend beyond the termination of the Company for a commercially reasonable period. The Company shall be subrogated to the Covered Person's rights under such indemnification or insurance. If any Covered Person recovers any amounts in respect of any such liabilities from insurance coverage or any third party source, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to it by the Company in respect of such liabilities. The Company shall not incur the cost of that portion of any insurance, other than public liability insurance, which insures any party against any liability the indemnification of which is herein prohibited.

(c) The Company may, as determined in good faith by the Member, pay the legal fees and other expenses reasonably incurred by any Covered Person hereunder in connection with any proceeding in advance of the final disposition of such proceeding, so long as the Company receives a written undertaking, in form and content approved by the Company's counsel, by such Covered Person to repay the full amount advanced if there is a final judicial determination by a court of competent jurisdiction, as to which all rights of appeal have been exhausted or expired, that such Covered Person did not satisfy the standards which entitle it to indemnification pursuant to the terms of this Section 14.

(d) The right of indemnification hereby provided shall not be exclusive of, and shall not affect, any other rights to which any Covered Person may be entitled. Nothing contained in this Section 14 shall limit any lawful rights to indemnification existing independently of this Section 14.

(e) The indemnification rights provided by this Section 14 shall not be construed to increase the liability of the Member.

(f) The indemnification rights provided by this Section 14 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

(g) The provisions of this Section 14 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 14 and regardless of any subsequent amendment to this Agreement; provided, however, that no such amendment shall reduce or restrict the extent to which the indemnification provisions of this Section 14 apply to actions taken or omissions made or alleged actions taken or omissions made prior to the date of such amendment.

(h) If deemed appropriate or necessary by the Member, the Company may establish reserves, escrow accounts or similar accounts to fund its obligations under this Section 14.

(i) The provisions of this Section 14 shall survive the termination or dissolution of the Company.

15. No Third Party Beneficiary. No creditor or other third party having dealings with the Company shall have the right to enforce the right or obligation of the Member to make capital contributions or loans or to pursue any other right or remedy hereunder or at law or in equity, it being understood and agreed that the provisions of this Agreement shall be solely for the benefit of, and may be enforced solely by, the Member, the Covered Persons (to the extent granted herein) and the Company and their respective successors and permitted assigns.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned member has executed this Amended and Restated Limited Liability Company Agreement as of the date first set forth above.

RAND PE FUND I, L.P. – Series 1

By: RAND PE FUND MANAGEMENT, LLC
Its: General Partner

By: ____________________
Its: MANAGING MEMBER

**SCHEDULE A**

**MEMBER**

| **Member** | **LLC Interest** |
|---|---|
| Rand PE Fund I, L.P. – Series 1 | 100% |

**EXHIBIT A**

**CERTIFICATE NO. __**

**CERTIFICATE OF LLC INTEREST**

**of**

**BEACON MOUNTAIN LLC**

**A Delaware Limited Liability Company**

This Certificate of LLC Interest (this "Certificate") is issued and shall be held subject to the provisions of the Certificate of Formation of Beacon Mountain, LLC, a limited liability company organized under the laws of the State of Delaware (the "Company"), filed on September ___, 2015 with the Secretary of State of the State of Delaware, and the Limited Liability Company Agreement of the Company, dated as of September ___, 2015, as each may be amended from time to time.

This Certificate of LLC Interest certifies that ______________________, a Member of the Company, is the registered holder of ___% of the "LLC Interest" (as such term is defined in the above-referenced Limited Liability Company Agreement) of the Company, which LLC Interest shall be transferable only on the books of the Company by the holder hereof in person or by a duly authorized attorney upon surrender of this Certificate with a proper endorsement.

***SEE RESTRICTIONS ON REVERSE SIDE.***

IN WITNESS WHEREOF, the Company has caused this Certificate to be signed by its duly authorized officer as of the ____ day of ______________, 2___.

BEACON MOUNTAIN LLC

By:_________________________________
Name: ______________________________
Title: _______________________________

**[REVERSE SIDE OF CERTIFICATE]**

**BEACON MOUNTAIN LLC**

For value received, the undersigned hereby sells, assigns, and transfers to ______________________________ and its successors and assigns, ___% of the LLC Interest of Beacon Mountain LLC standing in the name of ____________________, on the books of said limited liability company represented by certificate No. ____ and does hereby irrevocably constitute and appoint ___________________________, and its successors and assigns, attorney to transfer said interests on the books of the limited liability company with full power of substitution.

Dated: ___________________

____________________________________________

By: ________________________________________
Name: ______________________________________
Title: ______________________________________

THE LLC INTEREST REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY STATE SECURITIES ACT OR OTHER SIMILAR STATUTE IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS. WITHOUT SUCH REGISTRATION, THE SALE, PLEDGE OR OTHER TRANSFER OF THIS LLC INTEREST IS RESTRICTED, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL, SATISFACTORY TO THE COMPANY AND ITS COUNSEL, THAT REGISTRATION IS NOT REQUIRED FOR THE TRANSFER, OR SUCH OTHER EVIDENCE SATISFACTORY TO THE COMPANY THAT THE TRANSFER IS NOT IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAW. THE SALE, PLEDGE OR OTHER TRANSFER OF THIS LLC INTEREST IS ALSO SUBJECT TO THE RESTRICTIONS SET FORTH IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, WHICH MAY BE AMENDED FROM TIME TO TIME.

**EXHIBIT**

# SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF BEACON MOUNTAIN LLC

This Amended and Restated Limited Liability Company Agreement (this "Agreement"), dated as of the 12th day of February, 2025 (the "Effective Date"), has been entered into by CLO Holdco, LLC (the "Member"). The Member's LLC Interest (as hereinafter defined) is as set forth on Schedule A hereto.

**WHEREAS**, the initial Limited Liability Company Agreement (the "Initial Agreement") and the Amended and Restated Limited Liability Company Agreement (the "A&R Agreement"), were each dated as of the 24th day of September, 2015; and

WHEREAS, the Member acquired all the membership interests in the Company from Rand PE Fund I, L.P., as of the Effective Date, and desires to amend and restate the A&R Agreement;

**NOW, THEREFORE**, in consideration of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the A&R Agreement is hereby amended and restated in its entirety to read as follows:

1. Name, Business, Address and Registered Agent.

(a) The Member hereby acknowledges that a limited liability company under the name of "Beacon Mountain LLC" (the "Company") was formed under the Delaware Limited Liability Company Act (the "Act") for the purpose of engaging in any business of any kind necessary to, in connection with, related to or incidental to such purposes as the Member shall from time to time deem desirable.

(b) The principal office of the Company shall be at such place as the Member may from time to time designate.

(c) The initial registered office of the Company for purposes of the Act shall be at 1675 South State Street, Suite B, in the City of Dover, County of Kent, Delaware 19901. The initial registered agent of the Company for purposes of the Act shall be Capitol Services, Inc., whose business office is identical to the Company's registered office.

2. Member. The sole responsibility for managing the business and affairs of the Company, except as otherwise provided herein or in the Act, shall be vested in the Member. Except as expressly provided herein, voting power shall be vested solely in the Member, and all matters requiring a vote pursuant to this Agreement or the Act shall be determined by the vote of the Member and the Member may act by written consent.

3. Officers.

(a) Election of Officers; Term. Officers, including assistant and subordinate officers, may from time to time be appointed by the Member. All officers shall hold office until their successors are appointed by the Member. Any two or more offices may be combined in the same person as the Member may determine. No officer may act in more than one capacity where the action of two or more officers is required.

(b) Removal of Officers; Vacancies. Any officer of the Company may be removed summarily with or without cause, at any time, by the Member. Vacancies may be filled by the Member.

(c) Duties. The officers of the Company shall have only such powers and duties as are from time to time conferred by the Member in writing or as are set forth in writing and executed by either of the President or the Secretary. The Member shall determine the compensation of all officers of the Company.

4. Term. The term of the Company shall be perpetual, except that the Company shall be dissolved upon the first to occur of any of the following events:

(a) The election of the Member to dissolve and terminate the Company;

(b) At any time there are no remaining members, except as may be avoided pursuant to §18-801(a)(4) of the Act;

(c) The entry of a decree of judicial dissolution under §18-802 of the Act; or

(d) Automatic cancellation of the Company's certificate of formation pursuant to §18-1108 of the Act.

5. Capital. The Member may contribute such capital, in cash or other property, as it so chooses in its sole discretion. No capital contributions shall be required unless the Member consents thereto in writing, in its sole and absolute discretion.

6. Bank Accounts. The President and the Secretary and any other officer, including any assistant or subordinate officer, as may be authorized to do so in writing by either of the President or the Secretary, are authorized to open commercial banking accounts for and in the name of the Company throughout the United States, at any time and from time to time, and to deposit to the credit of the Company in such banking accounts any monies, checks, drafts, orders or other commercial paper payable to the Company, and from time to time to withdraw all or any part of the funds on deposit in the name of the Company by check drawn in the name of the Company and signed by such officer.

7. Voting of Shares. Unless otherwise provided by written resolution of the Member, either of the President or the Secretary may from time to time appoint an attorney or attorneys or agent or agents of the Company, in the name and on behalf of the Company, to cast the vote which the Company may be entitled to cast as a stockholder or otherwise in any corporation, partnership,

limited liability company, joint venture or any other entity, any of whose securities may be held by the Company, at meetings of the holders of the shares or other securities of such entity or to consent in writing to any action by any such entity. Such officer shall instruct the person or persons so appointed as to the manner of casting such votes or giving such consent and may execute or cause to be executed on behalf of the Company such written proxies, consents, waivers or other instruments as may be necessary or proper in the premises. In lieu of such appointment, either of the President or the Secretary may himself attend any meetings of the holders of the shares or other securities of any such entity and there vote or exercise any or all power of the Company as the holder of such shares or other securities of such entity or consent in writing to any action by any such entity.

8. Distributions. Any cash or other property of the Company not required for the operation of the Company shall be distributable to the Member at such times and in such amounts as determined by the Member.

9. Certificates; "Opt-In" to Article 8; Transferability of Interests.

(a) The Company may issue one or more certificates evidencing the limited liability company interests in the Company ("LLC Interest") in the form attached hereto as Exhibit A. Certificates shall be executed on behalf of the Company by one of its executive officers. The Member hereby agrees that the LLC Interest held by such Member shall be treated as a "security" for purposes of and shall be governed by Article 8 of the Delaware Uniform Commercial Code--Investment Securities, as amended from time to time.

(b) The Member may transfer, sell, assign, mortgage, grant a lien on, give or otherwise dispose of, whether voluntarily or by operation of law, at judicial sale or otherwise, all or any part of its LLC Interest in the Company; provided, however, that there shall not at any time be more than one member until this Agreement is amended to provide generally (in addition to Section 12 hereof) for having more than one member. If, in connection with any such transfer, less than 100% of the LLC Interest of the transferor member is transferred, then this Agreement shall be amended to include appropriate provisions, including those relating to partnership accounting and tax issues, necessary to address the fact that the Company has more than one member.

10. Liquidation. Any net proceeds from the sale, exchange or other disposition (including a disposition pursuant to foreclosure or deed in lieu of foreclosure) of the assets of the Company following the dissolution of the Company shall be distributed to the Member.

11. Other Activities. The Member may engage in or possess any interest in another venture or business of any nature or description, independently or with others.

12. Tax Classification. The Member intends that the Company be disregarded for U.S. federal income tax purposes as long as there is only one member, and that if there is ever more than one member or more than one owner of the Company as determined for U.S. federal income tax purposes, that the Company be classified as a partnership for U.S. federal income tax purposes and this Agreement shall be interpreted accordingly.

13. Limited Liability. The Member shall not have any personal obligation for any debts, obligations or liabilities of the Company, whether arising in contract, tort or otherwise, solely by reason of being a Member, except as provided under the Act.

14. Exculpation; Indemnification.

(a) Except as otherwise provided by any written employment, consulting or similar agreement, if applicable, or unless otherwise expressly required by law, no officer or member of the Company (including any former executive officer or member) (each such person referred to herein as a "Covered Person") shall have any liability to the Company or to any member for any loss suffered by the Company or any member which arises out of any act or omission or alleged act or omission of the Covered Person in the Covered Person's capacity as a Covered Person to the extent the Covered Person acted in good faith and to the extent such course of conduct did not constitute willful misconduct or gross negligence of the Covered Person. Each Covered Person shall be indemnified by the Company against any losses, judgments, liabilities, claims, damages, costs, expenses (including reasonable legal fees and other expenses actually incurred in investigating or defending against any such losses, judgments, liabilities or claims and expenses actually incurred enforcing this Agreement) and amounts paid in settlement of any claim (approved in advance and in good faith by the Member) sustained by any of them by reason of any act or omission or alleged act or omission in connection with the activities of the Company (including any subsidiaries thereof) unless there is a final judicial determination by a court of competent jurisdiction to which all rights of appeal have been exhausted or expired that the same were the result of bad faith, willful misconduct or gross negligence of the Covered Person. The Covered Person may rely in good faith upon the advice of legal counsel.

(b) To the extent available on commercially reasonable terms, the Company may purchase, at the Company's expense, insurance (including without limitation, liability insurance policies and errors and omissions policies) to cover any liabilities covered by this Section 14 in such amount and with such deductibles as the Company may determine; provided, however, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person. Any such insurance may extend beyond the termination of the Company for a commercially reasonable period. The Company shall be subrogated to the Covered Person's rights under such indemnification or insurance. If any Covered Person recovers any amounts in respect of any such liabilities from insurance coverage or any third party source, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to it by the Company in respect of such liabilities. The Company shall not incur the cost of that portion of any insurance, other than public liability insurance, which insures any party against any liability the indemnification of which is herein prohibited.

(c) The Company may, as determined in good faith by the Member, pay the legal fees and other expenses reasonably incurred by any Covered Person hereunder in connection with any proceeding in advance of the final disposition of such proceeding, so long as the Company receives a written undertaking, in form and content approved by the Company's counsel, by such Covered Person to repay the full amount advanced if there is a final judicial determination by a court of competent jurisdiction, as to which all rights of appeal have been exhausted or expired,

that such Covered Person did not satisfy the standards which entitle it to indemnification pursuant to the terms of this Section 14.

(d) The right of indemnification hereby provided shall not be exclusive of, and shall not affect, any other rights to which any Covered Person may be entitled. Nothing contained in this Section 14 shall limit any lawful rights to indemnification existing independently of this Section 14.

(e) The indemnification rights provided by this Section 14 shall not be construed to increase the liability of the Member.

(f) The indemnification rights provided by this Section 14 shall inure to the benefit of the heirs, executors, administrators, successors and assigns of each Covered Person.

(g) The provisions of this Section 14 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 14 and regardless of any subsequent amendment to this Agreement; provided, however, that no such amendment shall reduce or restrict the extent to which the indemnification provisions of this Section 14 apply to actions taken or omissions made or alleged actions taken or omissions made prior to the date of such amendment.

(h) If deemed appropriate or necessary by the Member, the Company may establish reserves, escrow accounts or similar accounts to fund its obligations under this Section 14.

(i) The provisions of this Section 14 shall survive the termination or dissolution of the Company.

15. No Third Party Beneficiary. No creditor or other third party having dealings with the Company shall have the right to enforce the right or obligation of the Member to make capital contributions or loans or to pursue any other right or remedy hereunder or at law or in equity, it being understood and agreed that the provisions of this Agreement shall be solely for the benefit of, and may be enforced solely by, the Member, the Covered Persons (to the extent granted herein) and the Company and their respective successors and permitted assigns.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned member has executed this Second Amended and Restated Limited Liability Company Agreement as of the date first set forth above.

CLO HOLDCO, LLC, a Delaware limited liability company

By:______________________________
Mark Patrick
Manager

**SCHEDULE A**

**MEMBER**

| **Member** | **LLC Interest** |
| --- | --- |
| CLO Holdco, LLC | 100% |

**EXHIBIT A**

**CERTIFICATE NO. __**

**CERTIFICATE OF LLC INTEREST**

**of**

**BEACON MOUNTAIN LLC**

**A Delaware Limited Liability Company**

This Certificate of LLC Interest (this "Certificate") is issued and shall be held subject to the provisions of the Certificate of Formation of Beacon Mountain, LLC, a limited liability company organized under the laws of the State of Delaware (the "Company"), filed on September ___, 2015 with the Secretary of State of the State of Delaware, and the Limited Liability Company Agreement of the Company, dated as of September ___, 2015, as each may be amended from time to time.

This Certificate of LLC Interest certifies that ________________________, a Member of the Company, is the registered holder of ___% of the "LLC Interest" (as such term is defined in the above-referenced Limited Liability Company Agreement) of the Company, which LLC Interest shall be transferable only on the books of the Company by the holder hereof in person or by a duly authorized attorney upon surrender of this Certificate with a proper endorsement.

***SEE RESTRICTIONS ON REVERSE SIDE.***

IN WITNESS WHEREOF, the Company has caused this Certificate to be signed by its duly authorized officer as of the ____ day of ______________, 2___.

BEACON MOUNTAIN LLC

By: ______________________________________
Name: ____________________________________
Title: _____________________________________

**[REVERSE SIDE OF CERTIFICATE]**

**BEACON MOUNTAIN LLC**

For value received, the undersigned hereby sells, assigns, and transfers to ______________________________ and its successors and assigns, ___% of the LLC Interest of Beacon Mountain LLC standing in the name of ___________________, on the books of said limited liability company represented by certificate No. ____ and does hereby irrevocably constitute and appoint __________________________, and its successors and assigns, attorney to transfer said interests on the books of the limited liability company with full power of substitution.

Dated: ___________________

_________________________________________

By: _______________________________________
Name: ____________________________________
Title: _______________________________

THE LLC INTEREST REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY STATE SECURITIES ACT OR OTHER SIMILAR STATUTE IN RELIANCE UPON EXEMPTIONS UNDER THOSE ACTS.
WITHOUT SUCH REGISTRATION, THE SALE, PLEDGE OR OTHER TRANSFER OF THIS LLC INTEREST IS RESTRICTED, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL, SATISFACTORY TO THE COMPANY AND ITS COUNSEL, THAT REGISTRATION IS NOT REQUIRED FOR THE TRANSFER, OR SUCH OTHER EVIDENCE SATISFACTORY TO THE COMPANY THAT THE TRANSFER IS NOT IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES LAW. THE SALE, PLEDGE OR OTHER TRANSFER OF THIS LLC INTEREST IS ALSO SUBJECT TO THE RESTRICTIONS SET FORTH IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, WHICH MAY BE AMENDED FROM TIME TO TIME.

**EXHIBIT**

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**"), dated as of February 12, 2025, is entered into between RAND PE FUND I, L.P., a Delaware limited partnership ("**Seller**") and CLO HOLDCO, LLC, a Delaware limited liability company ("**Buyer**").

## RECITALS

(A) WHEREAS, Seller owns all of the issued and outstanding membership interests (the "**Membership Interests**"), of BEACON MOUNTAIN, LLC, a Delaware limited liability company (the "**Company**"); and

(B) WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Membership Interests, subject to the terms and conditions set forth herein.

(C) NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01 Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing (as defined herein), Seller shall sell to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title, and interest in and to the Membership Interests, free and clear of any mortgage, pledge, lien, charge, security interest, claim, or other encumbrance ("**Encumbrance**"), for the consideration specified in Section 1.02.

**Section 1.02 Purchase Price.** The aggregate purchase price for the Membership Interests shall be $1,000,000.00 (the "**Purchase Price**"). The Buyer shall pay the Purchase Price to Seller at the Closing (as defined herein) in cash, by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth on Schedule 1.02 hereto.

**Section 1.03 Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place simultaneously with the execution of this Agreement on the date of this Agreement (the "**Closing Date**") remotely by exchange of documents and signatures (or their electronic counterparts). The consummation of the transactions contemplated by this Agreement shall be deemed to occur at noon on the Closing Date.

**Section 1.04 Transfer Taxes.** Buyer shall pay, and shall reimburse Seller for, any sales, use or transfer taxes, documentary charges, recording fees or similar taxes, charges, fees, or expenses, if any, that become due and payable as a result of the transactions contemplated by this Agreement.

**Section 1.05 Withholding Taxes.** Buyer shall be entitled to deduct and withhold from amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted and withheld under applicable law. Buyer shall provide Seller with written notice of its

intent to withhold prior to the Closing with a written explanation substantiating the requirement to deduct or withhold, and the parties shall use commercially reasonable efforts to cooperate to mitigate or eliminate any such withholding to the maximum extent permitted by law. dTo the extent that amounts are so withheld and paid over to the appropriate tax authority by the Buyer, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the person in respect of which such deduction and withholding was made.

**Section 1.06 Allocation of Company Income and Loss.** Buyer and Seller shall request that the Company allocate all items of Company income, gain, loss, deduction, or credit attributable to the Membership Interests for the taxable year of the Closing based on a closing of the Company's books as of the Closing Date.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this ARTICLE II are true and correct as of the date hereof. For purposes of this Article II, "Seller's knowledge," "knowledge of Seller," and any similar phrases shall mean the actual knowledge of those persons listed on Schedule 2 of the Schedules.

**Section 2.01 Organization and Authority of Seller; Enforceability.** Seller is a limited partnership duly organized, validly existing and in good standing under the laws of the state of Delaware. Seller has full limited partnership power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery, and performance by Seller of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited partnership action on the part of Seller. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Seller, and (assuming due authorization, execution, and delivery by Buyer) this Agreement and the documents to be delivered hereunder constitute legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity.

**Section 2.02 No Conflicts; Consents.** The execution, delivery, and performance by Seller of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of limited partnership, limited partnership agreement, or other organizational documents of Seller; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule, or regulation applicable to Seller, except where the violation or conflict would not, individually or in the aggregate, have a material adverse effect on Seller's ability to consummate the transactions contemplated hereby on a timely basis; (c) conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which Seller is a party, except where the conflict, violation, default, termination, cancellation, modification, or acceleration would not, individually or in the aggregate, have a

material adverse effect on Seller's ability to consummate the transactions contemplated hereby on a timely basis; (d) result in any violation, conflict with or constitute a default under the Company's organizational documents (the "**Beacon Organizational Documents**"); or (e) result in the creation or imposition of any Encumbrance on the Membership Interests. No consent, approval, waiver, or authorization is required to be obtained by Seller from any person or entity (including any governmental authority) in connection with the execution, delivery, and performance by Seller of this Agreement and the consummation of the transactions contemplated hereby, except such consents, approvals, waivers, or authorizations which would not, in the aggregate, have a material adverse effect on the Seller's ability to consummate the transactions contemplated hereby on a timely basis.

**Section 2.03 Legal Proceedings.** There is no claim, action, suit, proceeding or governmental investigation ("**Action**") of any nature pending or, to Seller's knowledge, threatened against or by Seller (a) relating to or affecting the Membership Interests; or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement, except any Actions that would not, individually or in the aggregate, have a material adverse effect on Seller's ability to consummate the transactions contemplated hereby on a timely basis. To Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

**Section 2.04 Financial Statements.** True, correct, and complete copies of any financial statements requested by the Buyer (collectively, the "**Financial Statements**") have been provided to Buyer. To Seller's Knowledge, the Financial Statements, if any, are true, correct, and complete.

**Section 2.05 Ownership of Membership Interests.**

(a) Seller is the sole legal, beneficial, record, and equitable owner of the Membership Interests, free and clear of all Encumbrances whatsoever.

(b) To Seller's Knowledge, the Membership Interests were issued in compliance with applicable laws. To Seller's Knowledge, the Membership Interests were not issued in violation of the organizational documents of the Company or any other agreement, arrangement, or commitment to which Seller or the Company is a party and are not subject to or in violation of any preemptive or similar rights of any Person.

(c) Other than the organizational documents of the Company, there are no voting trusts, proxies, or other agreements or understandings in effect with respect to the voting or transfer of any of the Membership Interests.

**Section 2.06 Beacon Organizational Documents.** The Seller has provided Buyer a true, correct, and complete copy (including all amendments and modifications) of the Beacon Organizational Documents, which agreement is in full force and effect and is the only agreement in effect with respect to the matters described therein.

**Section 2.07 Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

**Section 2.08 Non-Foreign Status.** Seller is not a foreign person as defined in Treasury Regulations Section 1.1446(f)-1(b)(4) or Section 1.1445-2.

**Section 2.09 No Other Representations or Warranties.** Except for the representations and warranties contained in this ARTICLE II, neither Seller nor any partner, director, officer, employee, or agent of Seller has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this ARTICLE III are true and correct as of the date hereof. For purposes of this ARTICLE III, "Buyer's knowledge," "knowledge of Buyer" and any similar phrases shall mean the actual knowledge of those persons listed on Schedule 3 hereto.

**Section 3.01 Organization and Authority of Buyer; Enforceability.** Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the state of Delaware. Buyer has full limited liability company power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery, and performance by Buyer of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of Buyer. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution, and delivery by Seller) this Agreement and the documents to be delivered hereunder constitute legal, valid, and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms, except as may be limited by any bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other similar laws affecting the enforcement of creditors' rights generally or by general principles of equity.

**Section 3.02 No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the certificate of formation, LLC agreement or other organizational documents of Buyer; or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule, or regulation applicable to Buyer, except where the violation or conflict would not, individually or in the aggregate, have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby on a timely basis. No consent, approval, waiver, or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery, and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby, except such consents, approvals, waivers, or authorizations which would not, in the aggregate, have a material adverse effect on the Buyer's ability to consummate the transactions contemplated hereby on a timely basis.

**Section 3.03 Investment Purpose.** Buyer is acquiring the Membership Interests solely for its own account for investment purposes and not with a view to, or for offer or sale in

connection with, any distribution thereof. Buyer acknowledges that the Membership Interests are not registered under the Securities Act of 1933, as amended, or any state securities laws, and that the Membership Interests may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable.

**Section 3.04 Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section 3.05 Legal Proceedings.** There is no Action pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement, except any Actions that would not, individually or in the aggregate, have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby on a timely basis. To Buyer's knowledge, no event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

**Section 3.06 Buyer's Assumption of Risk and Liabilities.** Buyer acknowledges and agrees that it is purchasing the Membership Interests in the Company on an "as-is, where-is" basis, with all faults and conditions, whether known or unknown. Buyer further acknowledges that it has conducted its own due diligence and waives any claim against Seller for any matters arising out of or related to the Company's operations, liabilities, or legal compliance, whether arising before or after the Closing Date. Buyer assumes all risks and liabilities associated with the ownership of the Membership Interests, including but not limited to any regulatory, tax, financial, or legal claims or disputes that may arise in the future whether at law or in equity. In the event that any claim, lawsuit, or governmental investigation or action is initiated against Seller related to the Company or the transactions contemplated herein, Buyer shall, at its own cost and expense, take all commercially reasonable actions to resolve such claims and shall be solely responsible for any associated costs, judgments, settlements, or penalties. Seller shall have no obligation to participate in such proceedings and shall be released from any liability related thereto.

## ARTICLE IV
## CLOSING DELIVERIES

**Section 4.01 Seller's Deliveries.** At the Closing, Seller shall deliver to Buyer the following:

(a) an assignment of the Membership Interests to Buyer in substantially the form attached hereto as Exhibit A (the "**Assignment**"), executed by Seller.

(b) A certificate of the Secretary or Assistant Secretary (or equivalent officer) of Seller certifying as to (i) the resolutions of the board of directors (or equivalent managing body) of Seller, duly adopted and in effect, which authorize the execution, delivery, and performance of this Agreement and the transactions contemplated hereby, and (ii) the names and signatures of the officers of Seller authorized to sign this Agreement and the documents to be delivered hereunder.

**Section 4.02 Buyer's Deliveries.** At the Closing, Buyer shall deliver the following to Seller:

(a) The Purchase Price.

(b) The Assignment, executed by Buyer.

(c) A certificate of the Secretary or Assistant Secretary (or equivalent officer) of Buyer certifying as to (i) the resolutions of the board of directors (or equivalent managing body) of Buyer, duly adopted and in effect, which authorize the execution, delivery, and performance of this Agreement and the transactions contemplated hereby, and (ii) the names and signatures of the officers of Buyer authorized to sign this Agreement and the documents to be delivered hereunder.

## ARTICLE V
## NO INDEMNIFICATION

**Section 5.01 No Indemnification.** The parties acknowledge and agree that there shall be no indemnification obligation on behalf of either party in connection with this Agreement, the representations, warranties, and covenants contained herein, or any of the instruments or documents delivered in connection with this Agreement.

**Section 5.02 Exclusive Remedies.** The parties acknowledge and agree that following the closing, the provisions of this ARTICLE V shall be their exclusive remedy for any and all claims relating to the subject matter of this Agreement or any of the other documents to be delivered hereunder, except for claims arising from intentional fraud on the part of a party hereto in connection with the transactions contemplated by this Agreement.

## ARTICLE VI
## MISCELLANEOUS

**Section 6.01 Expenses.** Except as otherwise provided in Section 1.04, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 6.02 Further Assurances.** Following the Closing, each of the parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

**Section 6.03 Notices.** All notices, requests, consents, claims, demands, waivers, and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient

or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 6.03):

| | |
|---|---|
| If to Seller: | Rand PE Fund Management, LLC<br>6716 Glenhurst Drive<br>Dallas, TX 75254<br>E-mail: MPatrick@randadvisors.com<br>Attention: Mark Patrick |
| If to Buyer: | CLO HoldCo, LLC<br>6716 Glenhurst Drive<br>Dallas, TX 75254<br>E-mail: mpatrick@dafholdco.com<br>Attention: Mark Patrick |

**Section 6.04 Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 6.05 Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the parties hereto shall negotiate in good faith to modify the Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 6.06 Entire Agreement.** This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in documents to be delivered hereunder, the Exhibits and Schedules (other than an exception expressly set forth as such in the Schedules), the statements in the body of this Agreement will control.

**Section 6.07 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 6.08 No Third-Party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 6.09 Amendment and Modification.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

**Section 6.10 Waiver.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

**Section 6.11 Governing Law.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Texas without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction).

**Section 6.12 Submission to Jurisdiction.** Any legal suit, action, or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of Texas in each case located in the city of Dallas and county of Dallas, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding.

**Section 6.13 Waiver of Jury Trial.** Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

**Section 6.14 Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity. Each party hereto (i) agrees that it shall not oppose the granting of such specific performance or relief and (ii) hereby irrevocably waives any requirements for the security or posting of any bond in connection with such relief.

**Section 6.15 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail, or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

RAND PE FUND I, L.P.,
a Delaware limited partnership

By: Rand PE Fund Management, LLC
Its: General Partner

By ____________________
Name: Mark Patrick
Title: Authorized Signatory

CLO HOLDCO, LLC,
a Delaware limited liability company

By ____________________
Name: Mark Patrick
Title: Director of the Manager, CDH GP, Ltd.

Schedule 1.02
[Included]

Schedule 2

1. Mark Patrick
2. Shawn Raver

Schedule 3

1. Mark Patrick
2. Shawn Raver

Exhibit A

Assignment of Membership Interests

[See attached]

## Assignment of Membership Interest

This Assignment of Membership Interest (this "**Assignment**") is entered into as of February 12, 2025, by and between RAND PE FUND I, L.P., a Delaware limited partnership ("**Assignor**"), and CLO HOLDCO, LLC, a Delaware limited liability company ("**Assignee**").

## RECITALS

WHEREAS, Assignor owns, beneficially and of record, 100% of the issued and outstanding membership interests (including all voting, consent, and economic rights associated with such membership interests, the "**Membership Interests**") of BEACON MOUNTAIN, LLC, a Delaware limited liability company (the "**Company**");

WHEREAS, Assignor and Assignee have entered into that certain Membership Interest Purchase Agreement, dated February 12, 2025 (the "**Purchase Agreement**"), pursuant to which, among other things, Assignor has agreed to sell, assign, and transfer all of its right, title, and interest in and to, and Assignee has agreed to accept, the Membership Interests; and

WHEREAS, in order to effect the sale, transfer, and assignment of the Membership Interests to Assignee, Assignor and Assignee are executing and delivering this Assignment.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Assignment. Assignor hereby sells, assigns, and transfers to Assignee, and Assignee hereby accepts, all of Assignor's right, title, and interest in and to the Membership Interests.

2. Terms of the Purchase Agreement. This Assignment is made in accordance with, and is subject to, the terms and conditions of the Purchase Agreement. Nothing in this Assignment, express or implied, is intended to or shall be construed to modify, expand, or limit any of the terms of the Purchase Agreement. Assignor and Assignee acknowledge and agree that no representations and warranties are made in this Assignment. The representations, warranties, covenants, and agreements contained in the Purchase Agreement shall not be superseded by this Assignment but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern.

3. Definitions. All capitalized terms used in this Assignment but not otherwise defined herein are given the meanings set forth in the Purchase Agreement.

4. Further Assurances. Each of Assignee and Assignor shall execute and deliver, at the reasonable request of the other party hereto, such additional documents, instruments, conveyances, and assurances and take such further actions as such other party may reasonably request to carry out the provisions hereof and give effect to the transactions contemplated by this Assignment.

5. Successors and Assigns. This Assignment shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

6. Amendment and Modifications. This Assignment may not be amended or modified in any manner other than by a written agreement signed by the party to be charged.

7. Governing Law. This Assignment shall be governed by and construed in accordance with the internal laws of the State of Texas without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction).

8. Counterparts. This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Assignment delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Assignment.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Assignee and Assignor have executed this Assignment as of the date set out above.

RAND PE FUND I, L.P.,
a Delaware limited partnership

By: Rand PE Fund Management, LLC
Its: General Partner

By: ____________________
Name: Mark Patrick
Title: Authorized Signatory

CLO HOLDCO, LLC,
a Delaware limited liability company

By: ____________________
Name: Mark Patrick
Title: Director of the Manager, CDH GP, Ltd.

**EXHIBIT**

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**"), dated as August 1, 2022, is entered into by and among JOHN HONIS ("**Seller**"), RAND ADVISORS HOLDING CORP., a Delaware corporation ("**Buyer**"), and CLO HOLDCO, LTD. a Cayman limited company (the "**Guarantor**").

## RECITALS

WHEREAS, Seller owns one hundred (100%) percent of the issued and outstanding membership interests, (the "**Interests**") of each of Atlas IDF GP, LLC, a Delaware limited liability company ("**Atlas GP**"), Rand PE Fund Management, LLC, a Delaware limited liability company ("**Rand GP**") and Rand Advisors, LLC, a Delaware limited liability company ("**Advisor**", and together with Atlas GP and Rand GP, each a "**Company**" and collectively, the "**Companies**");

WHEREAS, the Companies collectively manage certain private investment funds, including two (2) insurance-dedicated funds ("**IDFs**") and one (1) one private equity fund that one of the IDFs invests in (collectively, the "**Client Funds**");

WHEREAS, in addition to the foregoing with respect to the Client Funds, Advisor acts as the investment sub-advisor to Rand Advisors Series I Insurance Fund of SALI Multi-Series Fund, L.P., a Delaware series limited partnership (such, product, the "***SALI Fund***");

WHEREAS, Rand GP as the general partner of Rand PE Fund I, LP, ("**Rand LP**") manages: a) Rand LP; b) Rand LP's wholly owned subsidiary Beacon Mountain, LLC ("**Beacon**"); and c) Beacon's sponsorship and administration of the Hunter Mountain Investment Trust ("**HMIT**", and together with Rand LP and Beacon, the "**Managed Companies**"); and

WHEREAS, Seller wishes to sell to Buyer, and Buyer wishes to purchase from Seller, the Interests, subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01 Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell to Buyer, and Buyer shall purchase from Seller, the Interests, free and clear of any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment or other similar encumbrance. In connection with such sale of the Interests, Seller acknowledges that he retains no rights to any commissions or other compensation or consideration from (a) any Company, (b) any of the Client Funds, (c) the SALI Fund, (d) any of the Managed Funds, and/or (e) any person or entity affiliated with any of the foregoing, that has not been paid as of the Closing.

**Section 1.02 Purchase Price.** The purchase price payable by Buyer for the Interests shall be equal to One Million One Hundred Twenty Thousand ($1,120,000.00) Dollars (the "**Purchase Price**"). The Purchase Price shall be due and payable in sixteen (16) equal quarterly installments of Seventy Thousand ($70,000.00) Dollars (each, an "**Installment Payment**") with the first Installment Payment payable on the Closing Date and subsequent Installment Payments made quarterly thereafter on March 31, June 30, September 30 and December 31 of each calendar year until the Purchase Price has been paid in full; *provided*, *however*, that if any Installment Payment is due and owing on a day that is not a Business Bay, such Installment Payment shall be paid on the next Business Day. For purposes of this Agreement, the term "Business Day" means any day except a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close in New York, New York. Each Installment Payment shall be paid to Seller pursuant to the wiring instructions provided in writing at least two (2) days prior to Closing; *provided* that Seller may provide alternative wiring instructions in writing at least two (2) days prior to any Installment Payment.

## ARTICLE II
## CLOSING

**Section 2.01 Closing.** The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place electronically as of the Effective Date, with the parties executing and exchanging all material closing documents by counterpart, as applicable, on the date that all deliverables pursuant to Sections 2.02 and 2.03 have been delivered, or at such other time, date or place as Seller and Buyer may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "**Closing Date**".

**Section 2.02 Seller Closing Deliverables.** At the Closing, Seller shall deliver to Buyer the following:

**(a)** The resignation letter, resigning in all capacities from each of the Companies.

**(b)** The independent contractor agreement, by and between Seller and Buyer, dated as of the date hereof (the "**Independent Contractor Agreement**"), countersigned by Seller.

**(c)** The books and records of the Companies.

**Section 2.03 Buyer's Deliveries.** At the Closing, Buyer shall deliver the following to Seller:

**(a)** The Purchase Price.

**(b)** The Independent Contractor Agreement, countersigned by Buyer.

**(c)** Evidence of compliance with Section 5.01(b).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that the statements contained in this ARTICLE III are true and correct as of the date hereof.

**Section 3.01 Organization and Authority of Seller.** Seller is a natural person and resident of the State of New York. Seller has all necessary authority to enter into this Agreement, to carry out his obligations hereunder and to consummate the transactions contemplated hereby. This Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 3.02 Organization, Authority, Qualification and Ownership of the Companies.** Each Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it is currently conducted. Each Company is duly licensed or qualified to do business and is in good standing in each jurisdiction where the operation of its business as currently conducted makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not have a material adverse effect. Seller is the sole owner and member of each Company.

**Section 3.03 Employment Matters.** Seller is the only employee of each of the Companies.

**Section 3.04 Title to Interests.** Seller has exclusive and valid title to all of the Interests, with the absolute right to sell, assign and transfer the same to Buyer free and clear of all liens, pledges, security interests and encumbrances. Seller has not assigned, transferred or sold any rights, options or other benefits associated with the Interests. Further, Seller represents and warrants that the assets of the Companies are free and clear of any and all liens, pledges, security interests and other encumbrances.

**Section 3.05 No Restrictions Against Sale.** Seller has full right, power and authority to sell the Interests to Buyer as provided in this Agreement without obtaining the consent or approval of any creditor, third party or governmental body.

**Section 3.06 Intentionally Blank**

**Section 3.07 No Other Representations and Warranties.** Except for the representations and warranties contained in this ARTICLE III, none of Seller, the Companies or any other person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller or any Company, including any representation or warranty as to the accuracy or completeness of any information regarding the Companies furnished or made available to Buyer as to the future revenue, profitability or success of each Company, or any representation or warranty arising from statute or otherwise in law.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this Article IV are true and correct as of the date hereof.

**Section 4.01 Organization and Authority of Buyer.** Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has all necessary corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by Buyer of this Agreement, the performance by Buyer of its obligations hereunder, and the consummation by Buyer of the transactions contemplated hereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights generally and by general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 4.02 No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with any provision of the certificate of incorporation or by-laws of Buyer; (b) violate or conflict with any provision of any law or governmental order applicable to Buyer; (c) require the consent, notice or other action by any person under, violate or conflict with, or result in the acceleration of any agreement to which Buyer is a party; or (d) require any consent, permit, governmental order, filing or notice from, with or to any governmental authority; except, in the cases of clauses (b) and (c), where the violation, conflict, acceleration or failure to obtain consent or give notice would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby and, in the case of clause (d), where such consent, permit, governmental order, filing or notice which, in the aggregate, would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

**Section 4.03 Legal Proceedings.** There are no actions pending or, to Buyer's knowledge, threatened against or by Buyer or any of its affiliates that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

**Section 4.04 Buyer Acknowledgement of SALI Agreement and CG Agreement.** Buyer acknowledges the obligations of (i) the Advisor pursuant to the Subadvisor Agreement dated September 25, 2013 between the Advisor and SALI Fund Management, LLC (the **"SALI Agreement"**) and (ii) Atlas IDF, LP and the Advisor pursuant to the Participation Agreement dated as of November 30, 2015 among Crown Global Life Insurance Ltd., Atlas IDF, LP and the Advisor (the **"CG Agreement"**). The purchase and sale of the Interests pursuant to this Agreement will not cause a violation of either Exhibit C to the SALI Agreement or Schedule D to the CG Agreement ("**Schedule D**").

**Section 4.05 Independent Investigation.** Buyer has conducted its own independent investigation, review and analysis of Seller, the Companies, the Managed Companies, the Client Funds and the SALI Fund, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records and other documents and data of Seller, the Companies, the Managed Companies, the Client Funds and the SALI Fund for such purpose. Buyer represents and warrants that it is aware that the Companies are involved in multiple litigations, the ultimate liability under such litigations may not be quantified and accepts any risk related thereto. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in ARTICLE III of this Agreement; and (b) none of Seller, any Company or any other person has made any representation or warranty as to Seller, any Company, any Managed Company, any Client Funds, the SALI Fund or this Agreement, except as expressly set forth in ARTICLE III of this Agreement.

## ARTICLE V
## COVENANTS

**Section 5.01 Director, Manager and Officer Indemnification Liability.**

**(a)** Buyer agrees that all rights to indemnification, advancement of expenses and exculpation by each Company now existing in favor of each person who is now, or has been at any time prior to the date hereof, an officer, manager, member or director of such Company, in each case as in effect on the date of this Agreement, or pursuant to any other agreements in effect on the date hereof, shall survive the Closing Date and shall continue in full force and effect in accordance with their respective terms.

**(b)** Each Company shall, and Buyer shall cause each Company to (i) maintain in effect for a period of six (6) years after the Closing Date the current policies of Investment Adviser and Fund Professional and Directors and Officers Liability Insurance (or similar policy) maintained by each Company immediately prior to the Closing Date (provided that each Company may substitute policies, of at least the same coverage and amounts and containing terms and conditions that are not less advantageous to the directors, members, managers and officers of such Company when compared to the insurance maintained by such Company as of the date hereof), or (ii) obtain as of the Closing Date "tail" insurance policies with a claims period of six (6) years from the

Closing Date with at least the same coverage and amounts, and containing terms and conditions that are not less advantageous to the mangers and officers of such Company, in each case with respect to claims arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement). The parties acknowledge and agree that the coverages required by this Section 5.01(b) shall not be required to cover the Excluded Claims referenced in Section 5.04 hereinafter.

**(c)** The obligations of Buyer and each Company under this Section 5.01 shall not be terminated or modified in such a manner as to adversely affect Seller.

**(d)** In the event that Buyer, any Company or any of their respective successors or assigns (i) consolidates with or merges into any other person and shall not be the continuing or surviving corporation or entity in such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any person, then, and in either such case, proper provision shall be made so that the successors and assigns of Buyer or such Company, as the case may be, shall assume all of the obligations set forth in this Section 5.01.

**Section 5.02 Further Assurances.** Following the Closing:

**(a)** each of the parties hereto shall, and shall cause their respective affiliates to, execute and deliver such additional documents and instruments and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

**(b)** The parties agree that certain matters in which any of the Affected Parties will be involved may necessitate Seller's cooperation in the future. Accordingly, for any reason, to the extent requested by any of the Affected Parties or their representatives and/or agents, Seller shall reasonably cooperate with the Affected Parties in connection with any matters in which any of the Affected Parties asserts that Seller's assistance is necessary, including, but not limited to, the Kirschner Litigation, the HCMLP Bankruptcy, and any other disputes; provided that, any of the Affected Parties shall make reasonable efforts to minimize disruption of Seller's other activities. The respective Affected Parties shall reimburse Seller for reasonable expenses incurred in connection with such reasonable cooperation and, to the extent that Seller is required to spend substantial time on such matters, the respective Affected Parties shall compensate Seller at an hourly rate of $350.00 per hour. Such reasonable cooperation shall include, but is not limited to, providing interviews, truthful testimony, documents, assistance, information, and executing and returning documents related to any litigation or disputes in which any of the Affected Parties is involved, including, but not limited to, the Kirschner Litigation and/or the HCMLP Bankruptcy and any disputes related thereto. "Affected Parties" shall collectively mean Buyer, Companies, Client Funds, SALI Fund and Managed Companies.

**(c)** Additionally, Seller agrees that he will not voluntarily provide reasonable assistance to or cooperate with any party that has any adverse interests to any of the Affected Parties without prior written consent from the respective Affected Parties, and Seller will notify the Affected Parties if any third-party seeks such reasonable assistance or cooperation from Seller. Any failure to comply with this clause by Seller shall constitute a material breach of this Agreement. Seller shall not, except as required by law, disclose to any third party this Agreement, its terms and particularly this cooperation clause. If, at any time, Seller is ordered or subpoenaed by any court, regulator, agency, or legislative body to disclose, or is served with a subpoena or discovery request seeking or requiring disclosure of, this Agreement or any of its terms, Seller shall so notify the Affected Parties at least two (2) business days in advance of the time for compliance with the order, subpoena or discovery request.

**Section 5.03 Transfer Taxes.** All transfer, documentary, sales, use, stamp, registration, value added and other such taxes and fees (including any penalties and interest) incurred in connection with this Agreement shall be borne and paid by Buyer when due. Buyer shall, at its own expense, timely file any tax return or other document with respect to such taxes or fees (and Seller shall cooperate with respect thereto as necessary).

**Section 5.04 Release.** Effective as of the Closing, (i) Buyer shall, (ii) Buyer shall cause the Companies, (iii) Buyer shall cause the Companies to cause the Client Funds, and (iv) Buyer shall cause the Companies to cause the Managed Companies (together, the "**Buyer Releasors**") generally, irrevocably, unconditionally and completely to release and forever discharge Seller and his partners, affiliates, employees, consultants, counsel and agents, and the counsel, consultants and agents of the Companies, the Managed Companies, and the Client Funds (each, a "**Seller Releasee**" and collectively, the "**Seller Releasees**") from, and irrevocably, unconditionally and completely to waive and relinquish each and all past, present and future disputes, claims, controversies, demands, rights, obligations, liabilities, actions and causes of action of every kind and nature, including any unknown, unsuspected or undisclosed claim (collectively "**Claims**"), that the Buyer Releasors may have had in the past, may now have or may have in the future against any of the Seller Releasees and has arisen or arises directly or indirectly out of, or relates directly or indirectly to, this Agreement and the transactions contemplated hereby, or the operation of the Companies, the Managed Companies, the SALI Fund or the Client Funds, other than any claim that Buyer may have against any of the Seller Releasees that arises under this Agreement. Buyer Releasors, acknowledges that the laws of many states provide substantially the following: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR." The Buyer Releasors acknowledge that such provisions are designed to protect a party from waiving claims which it does not know exist or may exist. Nonetheless, the Buyer Releasors, agree that, effective as of the Closing, the Companies, the Client Funds and the Managed Companies shall be deemed to waive any such provision. Buyer shall not permit any Company, Client Fund or Managed Company to institute, solicit or encourage, or participate, assist or cooperate in, any legal proceeding based upon, arising out of, or relating to any of the disputes, claims, controversies, demands, rights,

obligations, liabilities, actions and causes of action waived under this Section 5.04. Notwithstanding the foregoing, the parties acknowledge and agrees that the Claims released by this Section 5.04 shall not include any and all Claims that are found by a court of competent jurisdiction to be a result of a Seller Releasees fraud, gross negligence or willful misconduct (each an "**Excluded Claim**" and/or collectively, the "**Excluded Claims**").

**Section 5.05 Guaranty.**

**(a)** The Guarantor hereby irrevocably and unconditionally guarantees to Seller full and punctual performance of and compliance with all of Buyer's obligations pursuant to this Agreement. The guaranty set forth in this Section 5.05(a) is an absolute, present, primary and continuing guaranty of performance, payment and compliance. The Guarantor acknowledges and agrees that upon any default by Buyer, Seller shall not be obligated to first attempt enforcement against Buyer. The Guarantor hereby waives any and all defenses to enforcement of the guaranty set forth in this Section 5.05(a), now existing or hereafter arising, which may be available to guarantors, sureties and other secondary parties at law or in equity. The Guarantor further agrees to pay all reasonable costs and expenses, including reasonable attorney fees and related costs, incurred by any Seller Releasee in enforcing the guaranty set forth in this Section 5.05(a).

**(b)** The Guarantor represents and warrants to Seller that (i) the execution and delivery of this Agreement, and the Guarantor's performance under this Agreement, including the Guarantor's performance under this Section 5.05, does not violate any law, decree or contractual restriction binding on the Guarantor, (ii) this Agreement has been duly executed and delivered by the Guarantor and constitutes the valid and legally binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditor's rights generally and general principles of equity and (iii) the Guarantor has the financial capacity necessary to perform its obligations under the guaranty set forth in Section 5.05(a).

**Section 5.06 Ownership of Work Product of the Companies.** Seller hereby agrees that all work product, designs, graphics, processes, trade secrets, proprietary information and confidential investor information of the Companies, that is not (i) generally available to the public other than by virtue of a disclosure by Seller after the Closing Date and in violation of this Agreement or (ii) independently developed by Seller from sources not known by Seller to be bound by an obligation of confidentiality to the Companies (collectively, "**Confidential Information**") and shall remain the property of the applicable Company without any further act on Seller's or any Company's part, and that Seller shall not have any past, current or future copyright, trademark right, intellectual property right, property interest and/or any other right, title or interest in such Confidential Information. Seller acknowledges and agrees that all right, title and interest in such Confidential Information, including, without limitation, all conceivable intellectual property rights, including, without limitation, all copyrights, trademarks, service marks, patents, and discoveries shall remain the property of the applicable Company on and after the Closing Date. Notwithstanding anything in this Section 5.06 or otherwise in this Agreement

to the contrary, Seller may retain the phone that he used in the management and ownership of the Companies as his own personal property, and all "personal" information/data on such phone shall not constitute Confidential Information.

**Section 5.07 Client Information**. Seller hereby covenants and agrees at all times following the execution hereof to hold in strictest confidence, and not to use (for himself or for any other person), or to disclose to any person, firm or entity, any such Confidential Information. The provisions of this Section 5.07 shall survive the execution hereof.

**Section 5.08 Buyer Obligations Pursuant to CG Agreement**. Buyer covenants and agrees to ensure that after the Closing, either (x) Buyer and each person that would be an "Adviser Party" within the meaning of Schedule D immediately after the Closing is not affiliated with any "Policy Party" within the meaning of Schedule D or (y) each such person that would be such an Adviser Party immediately after the closing and that is affiliated with any such Policy Party has established or will establish procedures pursuant to a legally binding written agreement to prevent any communication prohibited by Schedule D.

**Section 5.09 Managed Companies Counsel**. Buyer expressly acknowledges that counsel who have appeared for or represented the Managed Companies prior to the execution of this Agreement shall withdraw as counsel from any existing litigation and shall be replaced by counsel of Buyer's choice or designation. The Managed Companies existing counsel shall cooperate with Buyer's designated replacement counsel in all respects, including filing any necessary pleadings or motions with the applicable court and turning over all documents, correspondence or other work product heretofore generated in connection with any such existing litigation to Buyer's designated replacement counsel; *provided* that Buyer acknowledges existing counsel may retain one copy of each such document, correspondence or work product for record keeping purposes.

## ARTICLE VI
## INDEMNIFICATION AND OTHER REMEDIES

**Section 6.01 Indemnification by Buyer.** Buyer shall defend and indemnify each Seller Releasee against, and hold each Seller Releasee harmless from, all Claims (other than Excluded Claims), including those related to Seller's ownership of the Interests or any actions or inaction by any Company, any Managed Company, any Client Fund or the SALI Fund.

**Section 6.02 Indemnification by Seller.** Seller shall have no obligations of indemnification with respect to any Claims (other than Excluded Claims), including those related to this Agreement or the transactions contemplated hereby.

**Section 6.03** Intentionally Blank

**Section 6.04 Exclusive Remedies.** The parties acknowledge and agree that their sole and exclusive remedy with respect to any and all Claims for any breach of any representation,

warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement shall be pursuant to the indemnification provisions set forth in this ARTICLE VI. In furtherance of the foregoing, each party hereby waives, to the fullest extent permitted under law, any and all rights, claims and causes of action for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their affiliates arising under or based upon any law, except pursuant to the indemnification and other provisions set forth in this ARTICLE VI. Nothing in this Section 6.04 shall limit any person's right to seek and obtain any equitable relief to which such person shall be entitled or to seek any remedy on account of any fraud by any party hereto. The provisions of this Articles VI shall survive the execution hereof.

## ARTICLE VII
## MISCELLANEOUS

**Section 7.01 Expenses.** All costs and expenses incurred in connection with the preparation and negotiation of this Agreement and the transactions contemplated hereby shall be paid by Buyer at Closing.

**Section 7.02 Notices.** All notices, claims, demands and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by email of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the second day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid, if sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 7.02):

**If to Seller:**

John Honis
42 Regatta View Drive
Saratoga Springs, NY 12866
Email: jwhonis@icloud.com

with a copy (which shall not constitute notice) to:

Sadis & Goldberg LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176
Attn: Steven Huttler
Email: SHuttler@sadis.com

**If to Buyer:**

Rand Advisors Holding Corp.
6716 Glenhurst Dr.
Dallas, TX 75254

Email: mpatricktax1040@gmail.com
Attention: Mark Patrick

with a copy (which shall not constitute notice) to:

Leggett Clemons Crandall, PLLC
5700 Granite Parkway, Ste. 950
Plano, TX 75024
Email: sclemons@lcclawfirm.com
Attention: Steve H. Clemons

**Section 7.03 Interpretation; Headings.** This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 7.04 Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement.

**Section 7.05 Entire Agreement.** This Agreement constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersedes all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter.

**Section 7.06 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign its rights or obligations hereunder without the prior written consent of the other parties. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 7.07 Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No failure to exercise or delay in exercising, any right or remedy arising from this Agreement shall operate or be construed as a waiver thereof. No single or partial exercise of any right or remedy hereunder shall preclude any other or further exercise thereof or the exercise of any other right or remedy.

**Section 7.08 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

**(a)** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware any other jurisdiction).

**(b)** ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF DELAWARE, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**(c)** EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.08(c).

**Section 7.09 Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

**Section 7.10 AS-IS, WHERE-IS.** Except as expressly set forth in this Agreement to the contrary, Buyer is expressly purchasing the Interests "AS-IS, WHERE-IS, AND WITH ALL FAULTS" with respect to all facts, circumstances, conditions, and defects, and Seller has no obligation to determine or correct any such facts, circumstances, conditions, or defects or to compensate Buyer for same. Except as expressly set forth in this Agreement, Seller has specifically bargained for the assumption by Buyer of all responsibility to investigate Seller, the Companies, the Client Funds, the SALI Fund, the Managed Companies and the Interests, and of all risk of adverse conditions and has structured the Purchase Price and other terms of this Agreement in consideration thereof. Except for the representations set forth in ARTICLE III, Buyer is and will be relying strictly and solely on its own inspections and examinations and the advice and counsel of its own consultants, agents, legal counsel, and officers. Except as set forth

in ARTICLE III and otherwise in this Agreement, Buyer assumes the full risk of any loss or damage occasioned by any fact, circumstance, condition, or defect pertaining to Seller, any Company, any Client Fund, the SALI Fund, any Managed Company or the Interests. The provisions of this Section 7.10 shall survive the Closing and shall not be deemed to have merged into any of the documents executed or delivered at the Closing.

**Section 7.11 Specific Performance**. The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 7.12 Privileges; Conflicts**. It is acknowledged by each of the parties hereto that the Seller has retained Sadis & Goldberg LLP ("**Sadis**") to act as their counsel in connection with the transactions contemplated hereby and that Sadis has not acted as counsel for Buyer, any Company, any Client Fund, SALI Fund, any Managed Company or any of their respective affiliates in connection with the transactions contemplated hereby and that no other party has the status of a client of Sadis for conflict of interest or any other purposes as a result thereof. Buyer hereby agrees that, in the event that a dispute arises between Buyer or any of its affiliates (including, after the Closing, the Companies) and the Seller or any of his affiliates, Sadis may represent the Seller or any such affiliate in such dispute even though the interests of the Seller or such affiliate may be directly adverse to Buyer or any of its affiliates (including, after the Closing, the Companies), and even though Sadis may have represented such Company in a matter substantially related to such dispute, or may be handling ongoing matters for the Companies, and Buyer and the Companies hereby waive, on behalf of themselves and each of their affiliates, any claim they have or may have that Sadis has a conflict of interest in connection with, or is otherwise prohibited from engaging in, such representation. Buyer further agrees that, as to all communications among Sadis, Seller, any Company, or their respective affiliates that relate in any way to the transactions contemplated by this Agreement, the attorney-client privilege, the expectation of client confidence and all other rights to any evidentiary privilege belong to Seller and may be controlled by Seller and shall not pass to or be claimed by Buyer, any Company or their affiliates. Buyer agrees to take, and to cause its affiliates to take, all reasonable steps necessary to implement the intent of this Section 7.12. Buyer and Seller further agree that Sadis and its partners and employees are third-party beneficiaries of this Section 7.12.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the date first written above.

**SELLER**:

JOHN HONIS

**BUYER**:

RAND ADVISORS HOLDING CORP

By____________________
Name: Mark Patrick
Title: Director

**GUARANTOR**:

CLO HOLDCO, LTD.,
a Cayman limited company

By____________________
Name: Mark Patrick
Title: Director

**EXHIBIT**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**ATLAS IDF GP, LLC**

This Limited Liability Company Agreement (this "**Agreement**") of Atlas IDF GP, LLC (the "**Company**") is entered into as of October 29, 2015 by and between the Company and John Honis (the "**Managing Member**", and collectively with any individuals and/or entities who subsequently become members of the Company in the future in accordance with the terms hereof, "**Members**"), pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del.C. § 18-101, et seq.), as amended from time to time (the "**Act**").

**Section 1** **Name**. The name of the limited liability company governed hereby is Atlas IDF GP, LLC.

**Section 2** **Certificates**. The Managing Member, as an authorized person within the meaning of the Act, has executed, delivered and filed the certificate of formation of the Company (the "**Certificate of Formation**") with the Secretary of State of the State of Delaware on October 29, 2015. Upon the execution of this Agreement, the Managing Member shall thereafter be designated as an authorized person within the meaning of the Act. Hereafter, the Managing Member shall have the power to execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

**Section 3** **Purpose**. The Company was formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in all lawful activities for which limited liability companies may be formed under the Act, including, without limitation of the foregoing, serving as the general partner of Atlas IDF, LP, a Delaware limited partnership.

**Section 4** **Powers**. The Company shall have the power to do any and all acts reasonably necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose and business described herein and for the protection and benefit of the Company, and shall have, without limitation, any and all of the powers that may be exercised on behalf of the Company by the Managing Member pursuant to this Agreement.

**Section 5** **Principal Business Office**. The principal place of business and office of the Company shall be located at, and the Company's business shall be conducted from 87 Railroad Place, Suite 403, Saratoga Springs, NY 12866, or elsewhere as the Managing Member may from time to time determine.

**Section 6** **Registered Office**. The address of the registered office of the Company in the State of Delaware is: c/o Stellar Corporate Services LLC, 3500 South DuPont Highway, County of Kent, Dover, Delaware 19901.

**Section 7** **Registered Agent**. The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is: c/o Stellar Corporate Services LLC, 3500 South DuPont Highway, County of Kent, Dover, Delaware 19901.

**Section 8** **Members**. The names, the nature of the interests held, the mailing addresses, the initial capital contributions and the Percentage Interests (as defined below) of the Members are as set

forth in **Schedule A** attached hereto.

**Section 9** **Term**. The term of the Company commenced on the date of filing of the Certificate of Formation in accordance with the Act and shall continue until dissolution of the Company in accordance with **Section 23** of this Agreement.

**Section 10** **Limited Liability**. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and none of the Members, any Officer (as hereinafter defined), employee or agent of the Company (including a person having more than one such capacity) shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of acting in such capacity.

**Section 11** **Initial Capital Contributions**. Each Member is deemed admitted as a Member of the Company upon his, her or its execution and delivery of this Agreement. The initial capital contributions of the Members are set forth on **Schedule A** attached hereto.

**Section 12** **Additional Capital Contributions**. The Members are not required to make any capital contributions to the Company beyond their initial capital contributions, unless otherwise determined by the Managing Member.

**Section 13** **Capital Accounts**. Separate capital accounts shall be maintained for each Member on the books of the Company, which accounts shall set forth the capital of such Member in the Company. Each capital account shall be adjusted to reflect such Member's share of allocations and distributions as provided in **Sections 14 and 15** of this Agreement, and any additional capital contributions to the Company or withdrawals of capital from the Company. Such capital accounts shall further be adjusted to conform to the Treasury Regs. under Section 704(b) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), as interpreted in good faith by the Managing Member.

**Section 14** **Allocations of Profit and Loss**. All items of income, gain, loss, deduction and credit shall be allocated among the Members in accordance with their percentage interests as set forth on **Schedule A** attached hereto ("**Percentage Interests**").

**Section 15** **Distributions**. Distributions shall be made to the Members at such times and in such amounts as may be determined in the sole discretion of the Managing Member. Distributions shall be allocated among the Members in accordance with their Percentage Interests. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Members on account of their interest in the Company if such distribution would violate Section 18-607 of the Act or other applicable law.

**Section 16** **Management**.

(a) The business and affairs of the Company shall be managed by the Managing Member. Subject to the express limitations contained in any provision of this Agreement, the Managing Member shall have complete and absolute control of the affairs and business of the Company, and the Managing Member shall possess all powers necessary, convenient or appropriate to carrying out the purposes and business of the Company, including, without limitation, doing all things and taking all actions necessary to carrying out the terms and provisions of this Agreement.

(b) Subject to the rights and powers of the Managing Member and the limitations thereon contained herein, the Managing Member may delegate to any person any or all of his powers,

rights and obligations under this Agreement, and the Managing Member may appoint, contract or otherwise deal with any person to perform any acts or services for the Company as the Managing Member may reasonably determine.

(c) No Member (other than the Managing Member) shall participate in the management or control of the business of, or shall have any rights or powers with respect to, the Company except those expressly granted to it by, or pursuant to the terms of, this Agreement, or those conferred on it by law.

(d) The Managing Member shall hold office until the earliest to occur of his death, disability or other inability to act in such capacity, at which time a successor Managing Member may be appointed by Members owning at least a majority of the Percentage Interests.

**Section 17** <u>**Officers**</u>. The Managing Member may, from time to time as he deems advisable, appoint officers of the Company (the "<u>**Officers**</u>") and assign in writing titles (including, without limitation, President, Vice President, Secretary and Treasurer) to any such person. Unless the Managing Member decides otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. Any delegation pursuant to this <u>**Section 17**</u> may be revoked at any time by the Managing Member.

**Section 18** <u>**Other Business**</u>. The Members (including, for the avoidance of doubt, the Managing Member) may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others. Neither the Company nor any other Member shall have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

**Section 19** <u>**Exculpation and Indemnification**</u>. The Managing Member shall not be liable to the Company or to the other Members for any action taken or omitted to be taken in connection with the business or affairs of the Company, so long as he acted in good faith and is not found to be guilty of gross negligence or willful misconduct with respect thereto, as determined by a final non-appealable decision of a court of competent jurisdiction. To the fullest extent permitted by law, the Company agrees to indemnify and hold harmless: (i) the Managing Member, and (ii) in the discretion of the Managing Member, the Company's managers, shareholders, partners, officers, employees, agents and affiliates and/or the other Members (each, an "<u>**Indemnified Party**</u>") from and against any and all claims, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding related to any action taken or omitted to be taken by any of them in connection with the business and affairs of the Company (including the settlement of any such claim or legal proceeding); *provided, however*, that the party against whom the claim is made or legal proceeding is directed is not guilty of gross negligence or willful misconduct, as determined by a final non-appealable decision of a court of competent jurisdiction. Any indemnity under this <u>**Section 19**</u> shall be provided out of and to the extent of Company assets only, and no Member (including the Managing Member) shall have personal liability on account thereof.

**Section 20** <u>**Admission of Additional Members**</u>. Additional Members may be admitted to the Company only with the written consent of the Managing Member. The capital contribution required of, and the Percentage Interests assigned to, such newly-admitted Member shall be determined by the Managing Member.

**Section 21** <u>**Effect of Bankruptcy, Dissolution, Death or Incompetence of a Member**</u>. The bankruptcy, dissolution, death or disability of a Member, or an adjudication that such Member is

incompetent (a Member experiencing any such event, a "**Disabled Member**"), shall not cause the termination or dissolution of the Company, and the business of the Company shall continue. If a Member is dissolved or becomes bankrupt, the trustee or receiver of such Disabled Member's estate or, if a Member dies, such Disabled Member's executor, administrator or trustee, or, if such Member is adjudicated incompetent, such Disabled Member's committee, guardian or conservator, or the personal representative of such Disabled Member, as applicable, shall have the rights of such Disabled Member for the purposes of settling or managing such Disabled Member's estate or property and such power as the Disabled Member possessed to dispose of all or any part of such Member's interest in the Company, and to join with any assignee in satisfying conditions precedent to the admission of the assignee as a substitute Member.

**Section 22** **Assignments**. A Member may not transfer, assign, pledge or hypothecate, in whole or in part, his, her or its limited liability company interest without the prior written consent of the Managing Member.

**Section 23** **Dissolution**.

(a) The Company shall dissolve, and its affairs shall be wound-up upon the first to occur of the following: (i) the written consent of the Managing Member; (ii) the death, disability, bankruptcy or withdrawal of the Managing Member, in the event no successor managing member is appointed pursuant to **Section 16(d)**; and (iii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

(b) In the event of dissolution, the Company shall conduct only such activities as are necessary to wind-up its affairs (including the sale of the assets of the Company in an orderly manner).

**Section 24** **Tax Matters Partner**. John Honis shall be the tax matters partner within the meaning of Section 6231(a)(7) of the Code. All expenses incurred by the tax matters partner in connection with his duties as tax matters partner shall be expenses of the Company.

**Section 25** **Elections**. The Managing Member shall determine the accounting methods and conventions under the tax laws of any and all applicable jurisdictions as to the treatment of income, gain, loss, deduction and credit of the Company or any other method or procedure related to the preparation of such tax returns. The Managing Member may cause the Company to make or refrain from making any and all elections permitted by such tax laws, and the Managing Member shall not be liable for any consequences to any previously admitted or subsequently admitted Members resulting from making or failing to make any such elections.

**Section 26** **Separability of Provisions**. Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

**Section 27** **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement.

**Section 28** **Entire Agreement**. This Agreement constitutes the entire agreement of the Members with respect to the subject matter hereof and shall supersede all prior and contemporaneous agreements, understandings and discussions with respect thereto.

**Section 29** **Governing Law, Personal Jurisdiction and Venue**. The parties acknowledge and agree that any claim, controversy, dispute or action relating in any way to this Agreement or the subject matter of this Agreement shall be governed solely by the laws of the State of Delaware, without regard to any conflict of laws doctrines. The parties irrevocably consent to and submit to being served with legal process issued from the state and federal courts located in the State of New York and irrevocably consent to the exclusive personal jurisdiction of the federal and state courts situated in the State of New York. The parties irrevocably waive any objections to the personal jurisdiction of these courts. The federal and state courts of the State of New York in New York County shall have sole and exclusive jurisdiction over any and all claims, controversies, disputes and actions which in any way relate to this Agreement or the subject matter of this Agreement. Any such claim, controversy, dispute or action must first be brought in the federal court of the State of New York in New York County, unless the federal courts do not have subject matter jurisdiction as a matter of law, in which case it must first be brought in the Commercial Division of the New York State Supreme Court in New York County (and can only proceed in New York County outside the Commercial Division if the Commercial Division rejects it). The parties also irrevocably waive any objections that these courts constitute an oppressive, unfair, or inconvenient forum and agree not to seek to change venue on these grounds or any other grounds.

**Section 30** **Amendments**. This Agreement may be modified, altered, supplemented or amended in the sole discretion of the Managing Member.

[*remainder of page intentionally left blank*]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement as of the date first written above.

THE COMPANY:

ATLAS IDF GP, LLC

By: __________________
Name: John Honis
Title: Managing Member

MANAGING MEMBER:

__________________
Name: John Honis

**Schedule A**

**Members of Atlas IDF GP, LLC**

**As of October 29, 2015**

| NAME | NATURE OF INTEREST | MAILING ADDRESS | INITIAL CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|---|---|
| John Honis | Managing Member | 87 Railroad Place, Suite 403<br>Saratoga Springs, NY 12866 | $100 | 100% |

**EXHIBIT**

AMENDED AND RESTATED COMPANY AGREEMENT

*of*

ATLAS IDF GP, LLC

A Delaware Limited Liability Company

**AMENDED AND RESTATED COMPANY AGREEMENT**

***of***

**ATLAS IDF GP, LLC**

**A Delaware Limited Liability Company**

This AMENDED AND RESTATED COMPANY AGREEMENT (collectively, the “Agreement,” which shall include all amendments and exhibits hereto) dated effective as of the 1st day of August, 2022 (the “Effective Date”), are entered into by and among those Persons executing the signature page hereto as the Members of ATLAS IDF GP, LLC, a Delaware limited liability company (the “Company”). All capitalized terms not defined in the instance of first usage shall have the respective meanings associated with such terms in Section 1.04 below.

**ARTICLE I**

**INTRODUCTION**

1.01 Formation of Limited Liability Company The Company was formed by the filing of the Certificate of Formation (the “Certificate”) with the Secretary of State of Delaware on the October 29, 2015. The Company's business shall be conducted under the name “ATLAS IDF GP, LLC” until such time as the Members shall hereafter designate otherwise and file amendments to the Certificate in accordance with applicable law. This Agreement amends and replaces, in its entirety, all prior governing agreements for the Company, including any and all amendments thereto.

This Agreement is subject to, and governed by, the Delaware laws governing limited liability companies (the “DELAWARE LAWS”) and the Certificate. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the DELAWARE LAWS or the provisions of the Certificate, such provisions of the DELAWARE LAWS or the Certificate, as the case may be, will be controlling.

1.02 Registered Office and Agent The registered office and registered agent of the Company initially shall be as set forth in the Certificate and may be changed from time to time by the appropriate filing by the Company in the office of the Secretary of State of Delaware.

1.03 Other Offices The Company may also have offices at such other places, both within and without the State of Delaware, as the Board of Managers may from time to time determine or the business of the Company may require.

1.04 Defined Terms The terms used in this Agreement with their initial letter capitalized shall, unless the context requires otherwise, have the meanings specified in this Section 1.04. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires. When used in this Agreement, the following terms shall have the meanings set forth below:

(a) "DELAWARE LAWS" shall mean the Delaware laws governing limited liability companies, as the same may be amended from time to time.

(b) “Affiliate” shall mean, as to any Person, any Person controlled by, controlling, or under common control with such Person, and, in the case of a Person who is an individual, a member of the family of such individual consisting of a spouse, sibling, in-law, lineal descendant, or ancestor (including by adoption). For purposes of this definition, “control” (including the terms “controlling”, “controlled by” and “under common control with”) of a Person means the possession, directly or indirectly, alone or in concert with others, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, by contract or otherwise, and no Person shall be deemed in control of another solely by virtue of being a director, officer or holder of voting securities of any entity. A Person shall be presumed to control any partnership of which such Person is a general partner.

(c) "Bankruptcy" shall mean, and a Member shall be deemed a "Bankrupt Member," upon (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any Debtor Relief Laws; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member's affairs; (iv) the filing of a petition in any involuntary bankruptcy case, which petition remains undismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator, or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(d) "Book Depreciation" for any asset shall mean for any Fiscal Year or other period an amount that bears the same ratio to the Book Value of that asset at the beginning of such Fiscal Year or other period as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for that asset for such year or other period bears to the adjusted tax basis of that asset at the beginning of such year or other period. If the federal income tax depreciation, amortization, or other cost recovery deduction allowable for any asset for such year or other period is zero, then Book Depreciation for that asset shall be determined with reference to such beginning Book Value using any reasonable method selected by the Board of Managers.

(e) "Book Value" shall mean for any asset the asset's adjusted tax basis, except as follows:

(i) the initial Book Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Board of Managers;

(ii) the Book Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board of Managers, as of one of the following times: (1) on the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; (2) on the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an Interest in the Company if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; and (3) on the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations;

(iii) the Book Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(iv) the Book Values of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Treasury Regulations and Section 8.02(d) hereof; provided, however, that Book Values shall not be adjusted pursuant to this Section 1.04(e)(iv) to the extent the Board of Managers determines that an adjustment pursuant to Section 1.04(e)(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.04(e)(iv); and

(v) if the Book Value of an asset has been determined or adjusted pursuant to Section 1.04(e)(i),1.04(e)(ii), or 1.04(e)(iv) hereof, such Book Value shall thereafter be adjusted by the Book Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(f) "Capital Contribution" shall mean the total value of cash and Book Value (except as otherwise herein provided) of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, attached hereto and incorporated herein for all purposes, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any

prior Member for the interest of such then Member, reduced by any distribution to such Member in return of its capital as contemplated herein.

(g) "Class A Interest" shall refer to the Interest of a Class A Member in the Profits, Losses, Distributable Cash, and assets upon liquidation of the Company as described in this Agreement.

(h) "Class A Members" shall mean those Persons listed on Exhibit A and designated as "Class A Members." The Class A Members shall have such additional rights as a Member as are specifically described and granted in Exhibit A, as amended from time to time.

(i) Intentionally Blank.

(j) Intentionally Blank.

(k) "Code" shall mean the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

(l) "Company" shall refer to the limited liability company created by virtue of the Certificate and this Agreement and any successor in interest.

(m) "Debtor Relief Laws" shall mean any federal or state bankruptcy, insolvency, or similar laws generally affecting the rights of creditors and the relief of debtors now or hereafter in effect.

(n) Intentionally Blank.

(o) "Distributable Cash" of the Company shall mean all cash funds of the Company on hand from time to time (other than cash funds obtained as Capital Contributions by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time; (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time; and (iii) provision for a working cash reserve in accordance with Section 8.07 below.

(p) "Fiscal Year" shall mean the calendar year.

(q) "Former Member" shall mean a member that causes a Dissolution Event.

(r) "Interest" in the Company shall mean the entire ownership interest of a Member in the Company at any particular time, including such Member's Capital Account, allocable share of Profits, Losses, and Distributable Cash, and the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

(s) Intentionally Blank

(t) "Manager" shall mean an individual elected to the Board of Managers of the Company pursuant to Sections 3.02 and 3.04 below.

(u) "Member(s)" shall mean all Members admitted to the Company hereafter as Members who shall consent to the terms hereof and shall be admitted pursuant to the provisions hereof. The names, business or residence addresses, Capital Contributions, Percentage Interest, and class of Interest of the Members shall be set forth on Exhibit B, attached hereto and incorporated herein by reference. Reference to a "Member" shall be to any one of the Members.

(v) "Percentage Interest" of a Member shall mean the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit B, as such percentage may be adjusted from time to time pursuant to the terms hereof.

(w) "Person" shall mean any individual, corporation, partnership, limited liability company or partnership, association, organization, trust, estate, or other entity.

(x) "Pro Rata Part" shall mean the percentage expression of a fraction the numerator of which is a Member's respective Percentage Interest and the denominator of which is the aggregate Percentage Interests of all Members involved in the respective transaction or having a respective right or option.

(y) "Profits" and "Losses" shall mean, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i) income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this Section 1.04(y) shall be added to such taxable income or loss;

(ii) any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits and Losses pursuant to this Section 1.04(y), shall be subtracted from such taxable income or loss;

(iii) if the Book Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) or Section 1.04(e)(iii), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

(iv) gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(v) in lieu of the deduction for depreciation, cost recovery, or amortization taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation; and

(vi) notwithstanding any other provision of this Section 1.04(y), any items that are specially allocated pursuant to Section 8.02 or Section 8.03 shall not be taken into account in computing Profits and Losses.

(z) "Regulatory Allocations" shall mean the special allocations of items of income, gain, loss, and deduction, if any, set forth in Section 8.02 hereof.

(aa) "Transfer" or "Transferred" shall mean the sale, assignment, conveyance, gift, bequest, devise, transfer under the rules of intestate succession, pledge, mortgage, or other encumbrance. In addition, the term "Transfer" or "Transferred" shall mean an "ownership change" of a Member as defined in Section 382(g) of the Code in effect as of the Effective Date, except that the term "Member" shall be substituted for "shareholder" wherever it appears.

(bb) "Treasury Regulations" shall mean regulations issued by the Department of the Treasury interpreting the Code.

(cc) "Unanimous Consent" shall mean the written consent of all of the then Members of the Company.

## ARTICLE II

## MEMBERS AND MEMBERSHIP INTERESTS

2.01 Members. The Members of the Company shall be those Persons listed on Exhibit B. Except as otherwise may be provided in Exhibit A or Exhibit B, and except as provided in Section 7.05 below, a Person may be admitted as a Member to the Company only upon the affirmative vote of the Managers, plus one or more Members whose Percentage Interests total more than fifty percent (50%); provided, however, that no Person will be recognized as a Member of the

Company until he/she shall have executed this Agreement, or a counterpart hereto, and agrees to be bound by all of the terms and conditions hereof.

2.02 Annual Meetings An annual meeting of the Members of the Company shall be held during each calendar year on such date and at such time as shall be designated from time to time by the Board of Managers and stated in the notice of the meeting, and if a legal holiday, then on the next business day following, at the time specified in the notice of the meeting. At such meeting, the Members shall elect Managers and transact such other business as may properly be brought before the meeting.

2.03 Special Meetings A special meeting of the Members may be called at any time by the President, the Board of Managers, or one or more Members whose Percentage Interests total at least 10%. Only such business shall be transacted at a special meeting as may be stated or indicated in the notice of such meeting.

2.04 Place of Meetings The annual meeting of Members may be held at any place within or without the State of Delaware as may be designated by the Board of Managers. Special meetings of Members may be held at any place within or without the State of Delaware as may be designated by the person or persons calling such special meeting as provided in Section 2.03. If no place for a meeting is designated, it shall be held at the registered office of the Company.

2.05 Notice. Written or printed notice stating the place, day, and hour of each meeting of Members and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 10 days or more than 50 days before the date of the meeting, either personally or by mail, by or at the direction of the President, the Secretary, or the person calling the meeting, to each Member of record entitled to vote at such meeting.

2.06 Voting List At least 10 days before each meeting of Members, the Secretary shall prepare a complete list of Members entitled to vote at such meeting, arranged in alphabetical order, including the address of each Member and the number of voting Interests held by each Member. For a period of 10 days prior to such meeting, such list shall be kept on file at the registered office of the Company and shall be subject to inspection by any Member during usual business hours. Such list shall be produced at such meeting, and at all times during such meeting shall be subject to inspection by any Member. The membership interest transfer books shall be prima facie evidence as to who are the Members entitled to examine such list or membership interest transfer books.

2.07 Voting of Interests. Interests held by the Company in treasury, Interests owned by a Person the majority of the voting interests of which are owned or controlled by the Company, and Interests held by the Company in a fiduciary capacity shall not be Interests entitled to vote or to be counted in determining the total number of outstanding Interests of the Company. Interests held by an administrator, executor, guardian, or conservator may be voted by him or her, either in person or by proxy, without transfer of such Interests into his or her name so long as such Interests form a part of the estate and are in the possession of the estate being served by him or her. Interests standing in the name of a trustee may be voted by him or her, either in person or by proxy, only after the Interests have been transferred into his or her name as trustee. Interests standing in the name of a receiver may be voted by such receiver, and Interests held by or under the control of a receiver may be voted by such receiver without transfer of such Interests into his or her name if authority to do so is contained in the court order by which such receiver was appointed. Interests standing in the name of another domestic or foreign corporation of any type or kind may be voted by such officer, agent, or proxy as the bylaws of such corporation may provide or, in the absence of such provision, as the board of directors of such corporation may by resolution determine. A Member whose Interests are pledged shall be entitled to vote such Interests until they have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote such Interests.

2.08 Quorum. The presence in person or by proxy of one or more Members whose Percentage Interests total more than fifty percent (50%) shall constitute a quorum at any meeting of Members, except as otherwise provided by law, the Certificate, or this Agreement. At any reconvening of an adjourned meeting at which a quorum shall be present or represented, any business may be transacted that could have been transacted at the original meeting if a quorum had been present or represented.

2.09 Vote; Withdrawal of Quorum. If a quorum is present in person or represented by proxy at any meeting, except as otherwise may be provided in Exhibit A or Exhibit B, the vote of one or more Members whose Percentage Interests total more than fifty percent (50%) of all Members, whether or not they are present in person or represented by proxy, shall decide any question brought before such meeting, unless the question is one on which, by express provision of law, the

Certificate, or this Agreement a different vote is required, in which event such express provision shall govern and control the decision of such question. The Members present at a duly convened meeting may continue to transact business until adjournment, notwithstanding any withdrawal of Members that may leave less than a quorum remaining.

2.10 Method of Voting; Proxies. Except as otherwise may be provided in Exhibit A or Exhibit B, each Member shall be entitled to that number of votes on each matter submitted to the Members for their vote equal to such Member's Percentage Interest multiplied by 100. At any meeting of Members, every Member having the right to vote may vote either in person or by a proxy executed in writing by the Member or by his duly authorized attorney-in-fact. Each such proxy shall be filed with the Secretary of the Company before or at the time of the meeting. No proxy shall be valid after 11 months from the date of its execution, unless otherwise provided in the proxy. If no date is stated on a proxy, such proxy shall be presumed to have been executed on the date of the meeting at which it is to be voted. Each proxy shall be revocable unless expressly provided therein to be irrevocable or unless otherwise made irrevocable by law.

2.11 Closing of Transfer Books; Record Date . For the purpose of determining Members entitled to notice of, or to vote at, any meeting of Members or any reconvening thereof, or entitled to receive payment of any distribution, or in order to make a determination of Members for any other proper purpose, the Board of Managers may provide that the membership interest transfer books of the Company shall be closed for a stated period but not to exceed in any event 50 days. If the membership interest transfer books are closed for the purpose of determining Members entitled to notice of, or to vote at, a meeting of Members, such books shall be closed for at least 10 days immediately preceding such meeting. In lieu of closing the membership interest transfer books, the Board of Managers may fix in advance a date as the record date for any such determination of Members, such date in any case to be not more than 50 days and not less than 10 days prior to the date on which the particular action requiring such determination of Members is to be taken. If the membership interest transfer books are not closed and if no record date is fixed for the determination of Members entitled to notice of, or to vote at, a meeting of Members or entitled to receive payment of a distribution, the date on which the notice of the meeting is to be mailed or the date on which the resolution of the Board of Managers declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members.

2.12 Presiding Officials at Meetings The President shall preside at, and the Secretary shall prepare minutes of, each meeting of Members, and in the absence of either such officer, his other duties shall be performed by some person appointed at the meeting.

## ARTICLE III

## MANAGERS

3.01 Management. The business and affairs of the Company shall be managed EXCLUSIVELY by the Board of Managers. Subject to the restrictions imposed by law, the Certificate, or this Agreement, the Board of Managers may exercise all the powers of the Company.

3.02 Number; Election; Term; Qualification. The first Board of Managers shall consist of the number of Managers named in the Certificate and or otherwise in the Company documents. Thereafter, except as otherwise may be restricted by this Agreement, the number of Managers that shall constitute the entire Board of Managers shall be determined by resolution of the Board of Managers at any meeting thereof or by the Members at any meeting thereof, but shall never be less than one (1). At each annual meeting of Members, Managers shall be elected to hold office until the next annual meeting of Members and until their successors are elected and qualified. No Manager need be a Member, a resident of the State of Delaware, or a citizen of the United States.

3.03 Removal Except as otherwise may be provided by the Members, at any meeting of Members called expressly for that purpose, any Manager or the entire Board of Managers may be removed, with or without cause, by a vote of one or more Members whose Percentage Interests total more than fifty percent (50%).

3.04 Change in Number; Vacancies. No decrease in the number of Managers constituting the entire Board of Managers shall have the effect of shortening the term of any incumbent Manager. In the case of any increase in the number of Managers, or in the case of the death, retirement, resignation, or removal of a Manager, the vacancies to be filled by such increase or death, retirement, resignation, or removal may be filled by (a) the Board of Managers for a term of office

continuing only until the next election of one or more Managers by the Members; or (b) the Members at any annual or special meeting of the Members. A Manager elected to fill a vacancy shall be elected to serve for the unexpired term of his predecessor in office.

3.05 Place of Meetings . The Board of Managers may hold its meetings in such place or places, including by telephonic or other electronic method of communication, within or without the State of Delaware as the Board of Managers may from time to time determine.

3.06 First Meeting . Each newly elected Board of Managers may hold its first meeting, if a quorum is present, for the purpose of organization and the transaction of business immediately after and at the same place as the annual meeting of Members, and no notice of such meeting shall be necessary.

3.07 Regular Meetings . Regular meetings of the Board of Managers may be held without notice at such times and places, including by telephonic or other electronic method of communication, as may be designated from time to time by resolution of the Board of Managers and communicated to all Managers. Regular meetings of the Board of Managers may be held when and if needed, and no more than one regular meeting of the Board of Managers shall be required in any calendar year.

3.08 Special Meetings . A special meeting of the Board of Managers shall be held whenever called by any Manager at such time and place, including by telephonic or other electronic method of communication, as such Manager shall designate in the notice of such special meeting. The Manager calling any special meeting shall cause notice of such special meeting to be given to each Manager at least 24 hours before such special meeting. Neither the business to be transacted at, nor the purpose of, any special meeting of the Board of Managers need be specified in the notice or waiver of notice of any special meeting.

3.09 Quorum; Vote . At all meetings of the Board of Managers, a majority of the Managers fixed in the manner provided in this Agreement shall constitute a quorum for the transaction of business. If a quorum is not present at a meeting, a majority of the Managers present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present. The vote of a majority of the Managers present at a meeting at which a quorum is in attendance shall be the act of the Board of Managers, unless the vote of a different number is required by law, the Certificate, or this Agreement.

3.10 Procedure; Minutes . At meetings of the Board of Managers, business shall be transacted in such order as the Board of Managers may determine from time to time. The Board of Managers shall appoint at each meeting a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting that shall be delivered to the Secretary of the Company for placement in the minute book of the Company.

3.11 Presumption of Assent . A Manager of the Company who is present at any meeting of the Board of Managers at which action on any matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof, or shall forward any dissent by certified or registered mail to the Secretary of the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

3.12 Compensation . Except as otherwise may be restricted in this Agreement, Managers, in their capacity as Managers, may receive, by resolution of the Board of Managers, a stated salary or a fixed sum and expenses of attendance, if any, for attending meetings of the Board of Managers. No Manager shall be precluded from serving the Company in any other capacity or receiving compensation therefor.

## ARTICLE IV

## COMMITTEES

4.01 Designation . The Board of Managers may, by a resolution adopted by a majority of the entire Board of Managers, designate executive and other committees.

4.02 Number; Qualification; Term . Each committee shall consist of one or more Managers appointed by resolution adopted by a majority of the entire Board of Managers. The number of committee members may be increased or decreased from time to time by resolution adopted by a majority of the entire Board of Managers. Each committee member shall serve as such until the expiration of his term as a Manager or his earlier resignation, unless sooner removed as a committee member or as a Manager.

4.03 Authority . The executive committee, to the extent provided in the resolution establishing such committee, shall have and may exercise all of the authority of the Board of Managers in the management of the business and affairs of the Company. Each other committee, to the extent expressly provided for in the resolution establishing such committee, shall have and may exercise all of the authority of the Board of Managers in such other matters and affairs concerning the Company. However, no committee shall have the authority of the Board of Managers in reference to any of the following:

(a) amending the Certificate;

(b) approving a plan of merger or consolidation;

(c) recommending to the Members the sale, lease, or exchange of all or substantially all of the property and assets of the Company other than in the usual and regular course of its business;

(d) recommending to the Members a voluntary dissolution of the Company or a liquidation thereof;

(e) filling vacancies in, or removing members of, the Board of Managers or of any committee thereof;

(f) filling any vacancy to be filled by reason of an increase in the number of Managers;

(g) electing or removing officers or committee members;

(h) fixing the compensation of any committee member; or

(i) altering or repealing any resolution of the Board of Managers that, by its term, provides that it shall not be amendable or repealable.

4.04 Committee Changes . The Board of Managers shall have the power at any time to fill vacancies in, to change the Membership of, and to discharge any committee. However, a committee member may be removed by the Board of Managers only if, in the judgment of the Board of Managers, the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

4.05 Regular Meetings . Regular meetings of any committee may be held without notice at such times and places, including by telephonic or other electronic methods of communication, as may be designated from time to time by resolution of the committee and communicated to all committee members.

4.06 Special Meetings . A special meeting of any committee may be held whenever called by any committee member at such time and place, including by telephonic or other electronic methods of communication, as such committee member shall designate in the notice of such special meeting. The committee member calling any special meeting shall cause notice of such special meeting to be given to each committee member at least 24 hours before such special meeting. Neither the business to be transacted at, nor the purpose of, any special meeting of any committee need be specified in the notice or waiver of notice of any special meeting.

4.07 Quorum; Majority Vote . At all meetings of any committee, a majority of the number of committee members designated by the Board of Managers shall constitute a quorum for the transaction of business. If a quorum is not present at a meeting of any committee, a majority of the committee members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present. The vote of a majority of the committee members present at any meeting at which a quorum is in attendance shall be the act of a committee, unless the vote of a different number is required by law, the Certificate, or this Agreement.

4.08 Minutes . Each committee shall cause minutes of its proceedings to be prepared and shall report the same to the Board of Managers. The minutes of the proceedings of each committee shall be delivered to the Secretary of the Company for placement in the minute books of the Company.

4.09 Compensation . Except as otherwise may be restricted in this Agreement, committee members may, by resolution of the Board of Managers, be allowed a stated salary or a fixed sum and expenses of attendance, if any, for attending any committee meetings.

4.10 Responsibility . The designation of any committee and the delegation of authority to it shall not operate to relieve the Board of Managers or any Manager of any responsibility imposed upon it or such Manager by law.

## ARTICLE V

## GENERAL PROVISIONS RELATING TO MEETINGS

5.01 Notice Whenever by law, the Certificate, or this Agreement notice is required to be given to any Member, Manager, or committee member and no provision is made as to how such notice shall be given, it shall be construed to mean that notice may be given either (a) in person; (b) in writing, by mail; (c) by telegram, telex, cable, telecopy or facsimile transmission, or similar means; or (d) by any other method permitted by law. Any notice required or permitted to be given hereunder (other than personal notice) shall be addressed to such Member, Manager, or committee member at his address as it appears on the books on the Company or, in the case of a Member, on the membership interest transfer records of the Company or at such other place as such Member, Manager, or committee member is known to be at the time notice is mailed or transmitted. Any notice required or permitted to be given by mail shall be deemed to be delivered and given at the time when such notice is deposited in the United States mail, postage prepaid. Any notice required or permitted to be given by telegram, telex, cable, telecopy or facsimile transmission, or similar means shall be deemed to be delivered and given at the time transmitted.

5.02 Waiver of Notice . Whenever by law, the Certificate, or this Agreement any notice is required to be given to any Member, Manager, or committee member of the Company, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time notice should have been given, shall be equivalent to the giving of such notice. Attendance of a Manager or Member at a meeting shall constitute a waiver of notice of such meeting, except where a Manager or Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.03 Telephone and Similar Meetings Members, Managers, or committee members may participate in and hold a meeting by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other. Participation in such a meeting shall constitute presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.04 Action Without Meeting . Any action that may be taken, or is required by law, the Certificate, or this Agreement to be taken at a meeting of the Members, the Board of Managers, or a committee thereof may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the Members owning the required Percentage Interests of all Members (as set forth herein for the respective action or decision), a majority of the Managers or committee members, as the case may be, entitled to vote with respect to the subject matter thereof, and such consent shall have the same force and effect as a vote of such Members, Managers, or committee members, as the case may be, and may be stated as such in any document filed with the Secretary of State of Delaware or in any certificate or other document delivered to any person. The consent may be in one or more counterparts so long as each Member, Manager, or committee member signs one of the counterparts. The signed consent shall be placed in the minute books of the Company.

## ARTICLE VI

## OFFICERS AND OTHER AGENTS

6.01 Number; Titles; Election; Term The Company shall have a president, one or more vice presidents (and, in the case of each vice president, with such descriptive title, if any, as the Board of Managers shall determine), a secretary, a treasurer, and such officers and agents as the Board of Managers may deem desirable. The Board of Managers shall elect a president, vice president, treasurer, and secretary at its first meeting at which a quorum shall be present after the annual meeting of Members or whenever a vacancy exists. The Board of Managers then, or from time to time, may also elect or appoint one or more other officers or agents as it shall deem advisable. Except as otherwise may be provided by separate agreement, each officer and agent shall hold office for the term for which he is elected or appointed and until his successor has been elected or appointed and qualified. Unless otherwise provided in the resolution of the Board of Managers electing or appointing an officer or agent, his term of office shall extend to and expire at the meeting of the Board of Managers following the next annual meeting of Members or, if earlier, at his death, resignation, or removal. Any two or more offices may be held by the same person. No officer or agent need be a Member, a Manager, a resident of the State of Delaware, or a citizen of the United States.

6.02 Removal . Any officer or agent elected or appointed by the Board of Managers may be removed by a majority of the Board of Managers only if, in the judgment of a majority of the Board of Managers, the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Election or appointment of an officer or agent shall not of itself create contract rights.

6.03 Vacancies . Any vacancy occurring in any office of the Company may be filled by the Board of Managers.

6.04 Authority . Officers shall have such authority and perform such duties in the management of the Company as are provided in this Agreement or as may be determined by resolution of the Board of Managers not inconsistent with this Agreement.

6.05 Compensation . Except as otherwise may be provided by separate agreement, the compensation, if any, of officers or any salaried employee shall be fixed, increased, or decreased from time to time by the Board of Managers, provided, however, that the Board of Managers may by resolution delegate to any one or more officers of the Company the authority to fix such compensation.

6.06 Chairman of the Board . The Chairman of the Board, if any, shall be an officer of the Company and, subject to the direction of the Board of Managers, shall perform such executive, supervisory, and management functions and duties as may be assigned to him from time to time by the Board of Managers.

6.07 President, CEO and COO . The Board of Managers may designate and appoint a President, CEO and/or COO, with rights, duties and responsibilities established by the Board of Managers.

6.08 Vice Presidents . Each Vice President shall have such powers and duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President and (in the order as designated by the Board of Managers, or in the absence of such designation, as determined by the length of time each has held the office of Vice President continuously) shall exercise the powers of the President during that officer's absence or inability to act.

6.09 Treasurer . The Treasurer shall have custody of the Company's funds and securities, shall keep full and accurate accounts of receipts and disbursements, and shall deposit all moneys and valuable effects in the name and to the credit of the Company in such depository or depositories as may be designated by the Board of Managers. The Treasurer shall audit all payrolls and vouchers of the Company; shall receive, audit, and consolidate all operating and financial statements of the Company and its various departments; shall supervise the accounting and auditing practices of the Company; and shall have charge of matters relating to taxation. Additionally, the Treasurer shall have the power to endorse for deposit, collection, or otherwise all checks, drafts, notes, bills of exchange, and other commercial paper payable to the Company and to give proper receipts and discharges for all payments to the Company. The Treasurer shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

6.10 Assistant Treasurers . Each Assistant Treasurer shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President. The Assistant Treasurers (in the order as designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Treasurer continuously) shall exercise the powers of the Treasurer.

6.11 Secretary . The Secretary shall maintain minutes of all meetings of the Board of Managers, of any committee, and of the Members, or consents in lieu of such minutes, in the Company's minute books, and shall cause notice of such meetings to be given when requested by any person authorized to call such meetings. The Secretary may sign with the President, in the name of the Company, all contracts of the Company and affix the seal of the Company thereto. The Secretary shall have charge of the certificate books, membership interest transfer books, and other documents as the Board of Managers may direct, all of which shall at all reasonable times be open to inspection by any Manager at the office of the Company during normal business hours. The Secretary shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

6.12 Assistant Secretaries . Each Assistant Secretary shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President. The Assistant Secretaries (in the order designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Secretary continuously) shall exercise the powers of the Secretary during that officer's absence or inability to act.

## ARTICLE VII

## CAPITALIZATION AND CAPITAL ACCOUNTS

7.01 Capital Contributions . The Capital Contributions of the Members, as set forth in the books and records of the Company, shall be paid or transferred to the Company in cash and/or property on the terms and in the manner specified by the Board of Managers. No Member shall be entitled to make any additional Capital Contributions except as provided in Section 7.02 and 7.03 below.

7.02 Additional Capital Contributions . If the Board of Managers determine that additional capital is required for the purposes of the Company, as set forth herein, the Board of Managers may notify the Members of the need for such additional capital and shall state the specific purposes for which the call for such additional capital is being made. Thereupon, all Members shall have the right (but not the obligation) to make additional Capital Contributions in cash and/or property to the Company aggregating the amount of additional capital needed by the Company in the proportion of their respective Percentage Interests in the Company at the time notice is given. The Board of Managers shall use the additional capital so contributed solely for the purposes stated in the notice to the Members.

7.03 Failure to Make Additional Capital Contributions . If any Member chooses not to contribute its share of the additional capital needed by the Company within 14 days after notice is given to the Members of the need for such additional capital (a "Non-Contributing Member"), then the other Members shall be entitled (but not obligated) to contribute the share of such Non-Contributing Member (such Members being referred to as "Contributing Members") of the additional capital needed pro rata according to such Contributing Members' Percentage Interests at such time or such other share as otherwise agreed upon by the Contributing Members.

7.04 Effect of Failure to Make Additional Capital Contributions . In the event of a Non-Contributing Member, the Percentage Interests of all of the Members shall be recomputed on the following basis: Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member plus the additional Capital Contribution, if any, made by such Member pursuant to Sections 7.02 and 7.03 above, and the denominator of which is the total Capital Contributions of all of the Members plus the additional Capital Contributions made by all of the Members pursuant to Sections 7.02 and 7.03 above.

7.05 Recapitalization by Admission of Additional Members . If additional capital is required for the purposes of the Company as set forth herein and the Board of Managers is unable to finance such capital needs by borrowing the required amounts or through notice to the existing Members of the necessity for additional Capital Contributions as provided in Section 7.02 and 7.03 above, the Board of Managers shall have the right to admit additional Members to the Company, upon receiving the other approvals required herein. Following the admission of one or more new Members, the Percentage Interest of each Member, including the newly admitted Member(s), shall be computed as follows: Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member and the denominator of which is the total Capital Contributions of all of the Members, including the newly admitted Members.

7.06 Maintenance of Capital Accounts . The Company shall maintain for each Member a separate Capital Account in accordance with this Section 7.06, which shall control the allocation of Profits and Losses and the division of assets upon liquidation of the Company as provided in Section 12.01. Each Capital Account shall be maintained in accordance with the following provisions:

(a) a Member's Capital Account shall initially be zero and shall be increased by the cash amount or Book Value of any property contributed by such Member to the Company pursuant to this Agreement, such Member's allocable share of Profits and any items in the nature of income or gains that are specially allocated to such Member pursuant to Section 8.02 and Section 8.03 hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

(b) such Capital Account shall be decreased by the cash amount or Book Value of any property distributed to such Member pursuant to this Agreement, such Member's allocable share of Losses and any items in the nature of deductions or losses that are specially allocated to such Member pursuant to Section 8.02 and Section 8.03 hereof, and the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company; and

(c) if all or a portion of an Interest in the Company is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest, provided, however, that if the Transfer causes a termination of the Company under Code Section 708(b)(1)(B), the assets of the Company shall be deemed to have been distributed to the Members (including the transferee of the Interest) in liquidation of the Company and recontributed by such Members and transferees in reconstitution of the Company. Such deemed liquidation and reconstitution shall not cause the Company to be dissolved and/or reconstituted for purposes other than maintenance of the Capital Accounts and federal income tax.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Board of Managers determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Board of Managers may authorize such modifications, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Sections 8.06 and 12.01 hereof.

7.07 Negative Capital Accounts . If any Member has a deficit balance in its Capital Account, such Member shall have no obligation to restore such negative balance or to make any Capital Contribution to the Company by reason thereof, and such negative balance shall not be considered an asset of the Company or of any Member.

7.08 Interest . No interest shall be paid by the Company on Capital Contributions or on balances in Capital Accounts.

7.09 No Withdrawal . No Member shall be entitled to withdraw any part of his Capital Contribution or his Capital Account or to receive any distribution from the Company, except as provided in Sections 11.02 and 12.01 of this Agreement.

7.10 Loans From Members . Loans by a Member to the Company shall not be considered Capital Contributions.

## ARTICLE VIII

## ALLOCATIONS AND DISTRIBUTIONS

8.01 Allocation of Profits and Losses.

(a) Allocation of Profits. Except as provided on any Exhibit hereto, after giving effect to the allocations set forth in Section 8.02 and Section 8.03, and after giving effect to all distributions of cash or property (other than cash or

property to be distributed pursuant to Section 12.01), Profits for any Fiscal Year shall be allocated to the Members in the following manner:

(i) first, to each Member with a negative balance in its Capital Account, pro rata in accordance with such negative Capital Account balances, until such negative Capital Account balances have been eliminated;

(ii) next, to all of the Members in accordance with their respective Percentage Interests.

(b) Allocation of Losses. Except as provided in any Exhibit hereto, after giving effect to the allocations set forth in Section 8.02 and Section 8.03, Losses for any Fiscal Year shall be allocated to the Members in the following manner:

(i) to all of the Members in accordance with their respective Percentage Interests.

8.02 Special Allocations of Profits and Losses .

(a) Minimum Gain Chargeback–Company Nonrecourse Liabilities. If there is a net decrease in Company minimum gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) to the Members in the amounts and manner described in Treasury Regulations Section 1.704-2(f) and (j)(2)(i) and (ii), subject to the exemptions set forth in Treasury Regulations Section 1.704-2(f)(2), (3), (4) and (5). This Section 8.02(a) is intended to comply with the minimum gain chargeback requirement set forth in Treasury Regulations Section 1.704-2(f) relating to Company nonrecourse liabilities, as defined in Treasury Regulations Section 1.704-2(b)(3) and shall be so interpreted.

(b) Minimum Gain Chargeback–Member Nonrecourse Debt. If there is a net decrease in Member minimum gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) as quickly as possible to those Members who had a share of the Member minimum gain determined pursuant to Treasury Regulations Section 1.704-2(i)(5) in the amounts and manner described in Treasury Regulations Sections 1.704-2(i)(4), (j)(2)(ii), and (j)(2)(iii). This Section 8.02(b) is intended to comply with the minimum gain chargeback requirement set forth in Treasury Regulations Section 1.704-2(i)(4) relating to Member nonrecourse debt, as defined in Treasury Regulations Section 1.704-2(b)(4) and shall be so interpreted.

(c) Qualified Income Offset. If, after applying Section 8.02(a) and Section 8.02(b), any Member has an adjusted Capital Account deficit, items of Company income and gain shall be specially allocated (on a gross basis) to each such Member in an amount and manner sufficient to eliminate the adjusted Capital Account deficit of such Member as quickly as possible. This Section 8.02(c) is intended to comply with the "qualified income offset" requirement set for the in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be so interpreted.

(d) Optional Basis Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken in to account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

(f) Partner Nonrecourse Deductions. Partner Nonrecourse Deductions shall be allocated pursuant to Treasury Regulations Section 1.704-2(b)(4) and (i)(1) to the Member who bears the economic risk of loss with respect to such deductions.

8.03 Curative Allocations . The Regulatory Allocations are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 8.03. Therefore, notwithstanding any other provisions of this Article VIII, the Board of Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 8.01(a) and Section 8.01(b) hereof.

8.04 Tax Allocations: Code Section 704(c) .

(a) In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value.

(b) If the Book Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

(c) Any elections or other decisions relating to such allocation shall be made by the Board of Managers. Allocations pursuant to this Section 8.04 are solely for purposes of federal, state, and local taxes and shall not affect or in any way be taken into account in computing any Member's Capital Account, or share of Profits, Losses, and other items or distribution pursuant to any provision of this Agreement.

8.05 Other Allocation Rules .

(a) For purposes of determining the Profits, Losses, or any other item allocable to any period, Profits, Losses, and any such other item shall be determined on a daily, monthly, or other basis, as determined by the Board of Managers using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(b) For federal income tax purposes, every item of income, gain, loss, and deduction shall be allocated among the Members in accordance with the allocations under Sections 8.01, 8.02, 8.03, and 8.04.

(c) The Members are aware of the income tax consequences of the allocations made by this Article VIII and hereby agree to be bound by the provisions of this Article VIII in reporting their shares of Company income and loss for income tax purposes.

(d) It is intended that the allocations in Sections 8.01, 8.02, 8.03, and 8.04 hereof effect an allocation for federal income tax purposes consistent with Section 704 of the Code and comply with any limitations or restrictions therein.

8.06 Distributions of Distributable Cash . Except as otherwise may be provided in this Agreement, the Board of Managers shall cause the Company to make distributions of Distributable Cash at such intervals and in such amounts as the Board of Managers in its sole discretion shall determine by majority vote. Distributions of Distributable Cash shall be made to all of the Members in accordance with their respective Percentage Interests.

8.07 Working Cash Reserve . The Board of Managers may from time to time establish a working cash reserve for capital expenditures, unforeseen contingencies, projected operating deficits, and other corporate purposes and may increase or decrease the amount in such reserve in its business judgment.

## ARTICLE IX

## CERTIFICATES

9.01 Certificated and Uncertificated Interests. The membership interests of the Company may be either certificated interests or uncertificated interests. As used herein, the term "certificated interests" means Interests represented by instruments in bearer or registered form, and the term "uncertificated interests" means Interests not represented by such instruments and the transfers of which are registered upon books maintained for that purpose by or on behalf of the Company.

9.02 Certificates for Certificated Interests . The certificates for certificated interests shall be in such form as shall be approved by the Board of Managers in conformity with law. The certificates shall be consecutively numbered, shall be entered as they are issued in the books of the Company or in the records of the Company's designated transfer agent, if any, and shall state the Member's name, the class of Interests, the Percentage Interest that such Interest represents, and such

other matters as may be required by law. The certificates shall be signed by the President or any Vice President and also by the Secretary, an Assistant Secretary, or any other officer, and may be sealed with the seal of the Company or a facsimile thereof. If any certificate is countersigned by a transfer agent or registered by a registrar, either of which is other than the Company itself or an employee of the Company, the signatures of the foregoing officers may be a facsimile.

9.03 Lost, Stolen, or Destroyed Certificates . The Company shall issue a new certificate in place of any certificate for Interests previously issued if the registered owner of the certificate satisfies the following requirements:

(a) the registered owner makes proof in affidavit form that a previously issued certificate for Interests has been lost, destroyed, or stolen;

(b) the registered owner requests the issuance of a new certificate before the Company has notice that the certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(c) the registered owner gives a bond in such form, and with such surety or sureties, with fixed or open penalty, as the Board of Managers may direct, in its discretion, to indemnify the Company (and its transfer agent and registrar, if any) against any claim that may be made on account of the alleged loss, destruction, or theft of the certificate; and

(d) the registered owner satisfies any other reasonable requirements imposed by the Board of Managers.

When a certificate has been lost, destroyed, or stolen and the Member of record fails to notify the Company within a reasonable time after he has notice of it, if the Company registers a transfer of the Interests represented by the certificate before receiving such notification, the Member of record is precluded from making any claim against the Company for the transfer or for a new certificate.

9.04 Transfer of Interests . Interests of the Company shall be transferable only on the books of the Company by the Members thereof in person or by their duly authorized attorneys or legal representatives, but only as authorized in this COMPANY AGREEMENT. With respect to certificated interests, upon surrender to the Company or the transfer agent of the Company of a certificate representing Interests duly endorsed or accompanied by proper evidence of succession, assignment, or authority to transfer, the Company or its agent shall issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction upon its books. With respect to uncertificated interests, upon delivery to the Company of proper evidence of succession, assignment, or authority to transfer, the Company or its agent shall record the transaction upon its books.

9.05 Registered Members . The Company shall be entitled to treat the Member of record as the Member in fact of any Interests and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Interests on the part of any other Person, whether or not it shall have actual or other notice thereof, except as otherwise provided by law.

9.06 Legends . If the Company is authorized to issue Interests of more than one class, each certificate representing Interests issued by the Company (a) shall conspicuously set forth on the face or back of the certificate a full statement of all of the designations, preferences, limitations, and relative rights of the Interests of each class authorized to be issued; or (b) shall conspicuously state on the face or back of the certificate that (i) such a statement is set forth in the Certificate on file in the office of the Secretary of State or in this Agreement; and (ii) the Company will furnish a copy of such statements to the record holder of the certificate without charge on written request to the Company at its principal place of business or registered office.

If the Company issues any Interests that are not registered under the Securities Act of 1933, the transfer of any such interests shall be restricted in accordance with an appropriate legend.

In the event any restriction on the transfer, or registration of the transfer, of Interests shall be imposed or agreed to by the Company, each certificate representing Interests so restricted (a) shall conspicuously set forth a full or summary statement of the restriction on the face of the certificate; (b) shall set forth such statement on the back of the certificate and conspicuously refer to the same on the face of the certificate; or (c) shall conspicuously state on the face or back of the certificate that such a restriction exists pursuant to a specified document and (i) that the Company will furnish to the record holder of the certificate without charge upon written request to the Company at its principal place of business or registered

office a copy of the specified document; or (ii) if such document is one required or permitted by law to be and has been filed, that such specified document is on file in the office of the Secretary of State and contains a full statement of such restriction.

## ARTICLE X

## ACCOUNTING AND RECORDS

10.01 Records and Accounting . The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal income tax purposes. The books and records of the Company shall reflect all Company transactions and shall be appropriate and adequate for the Company's business.

10.02 Access to Accounting Records . All books and records of the Company shall be maintained at any office of the Company or at the Company's principal place of business, and each Member owning a Percentage Interest of at least ten percent (10%), and his duly authorized representative, shall have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

10.03 Annual and Tax Information . The Company shall deliver to each Member within 90 days after the end of each Fiscal Year all information necessary for the preparation of such Member's federal income tax return. The Company shall prepare, within 120 days after the end of each Fiscal Year, a financial report of the Company for such Fiscal Year, containing a statement of the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

10.04 Accounting Decisions . All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Board of Managers. The Members may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

10.05 Federal Income Tax Elections . The Company may make all elections for federal income tax purposes, including, but not limited to, the following:

(a) to the extent permitted by applicable law and regulations, the election to use an accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b) in case of a transfer of all or part of the Interest of any Member, the election pursuant to Section 734, 743, and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE XI

## CHANGES IN MEMBERS

The provisions of this Article XI are subject to, and may be superceded by, one or more separate agreements entered into by and among one or more Members. The provisions of this Article XI shall continue to control with respect to matters not covered by, or Members not parties to, such agreement(s).

11.01 Intentionally Blank .

11.02 Transfer and Assignment of Members' Interest . Except as approved by the Manager, plus a Member or Members owning a Percentage Interest greater than fifty percent (50%), no Member shall be entitled to Transfer any part of its Interest in the Company. The Company and, if applicable, the remaining Members shall be entitled to match the terms of the proposed Transfer, with consideration being only set forth in traditional monetary terms. If the Company and the remaining Members fail to match the proposed Transfer with regard to the purchase of the entire Interest, or portion thereof, the Member proposing to make the Transfer may move forward with the proposed Transfer. Transfers in violation of this Section 11.02 shall be effective only to the extent set forth in Section 11.05(b) hereof.

11.03 Further Restrictions on Transfer . No Member shall Transfer any part of his Interest in the Company: (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged, when added to the total of all other Interests to be sold or exchanged in the preceding 12 consecutive months prior thereto, would result in the termination of the Company under Code Section 708.

11.04 Substitute Members . A transferee shall have the right to become a substitute Member if (a) the requirements of Section 11.02 and 11.03 hereof are met; (b) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement; and (c) such person pays any reasonable expenses in connection with his or her admission as a Member.

11.05 Effect of Transfer .

(a) Any permitted Transfer of all or any portion of a Member's Interest in the Company will take effect on the first day of the month following receipt by the Members of written notice of Transfer. Any transferee of an Interest in the Company shall take subject to the restrictions on Transfer imposed by this Agreement.

(b) Upon any Transfer of a Member's Interest in the Company in violation of this Agreement, and if such Member's Interest is not purchased pursuant to Section 11.01, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee shall be entitled to receive only the allocable share of Profits, Losses, Distributive Cash, and other items to which the transferor of such Interest in the Company would otherwise be entitled.

11.06 No Dissolution or Withdrawal: Advanced Consent . Upon the occurrence of a Dissolution Event with regard to a respective Member, all remaining Members shall be deemed to automatically consent to the continuation of the business of the Company. By executing this Agreement, however, all Members hereby consent that they shall not voluntarily cause a Dissolution Event or demand the return of Member's capital. If any Member shall breach the agreement represented by this Section 11.06, the agreement of such breaching Member shall not be specifically performable, but shall be actionable for damages, and shall be deemed an offer of the Interest of such breaching Member for sale pursuant hereto. The parties agree that a reasonable approximation of the damage that the Company shall experience due to breach hereof is 20% of the value of the breaching Member's Interest, or as otherwise set forth herein (whichever is greater), which shall be deducted from any payments to such Member upon dissolution or purchase of such Member's Interest hereunder. The value of the breaching Member's Interest shall be determined pursuant to Section 11.01, to which value the said discount may then be applied in determining payments due to the breaching Member pursuant to the deemed offer of sale occurring under this Section 11.06.

## ARTICLE XII

## TERMINATION

12.01 Termination of the Company .

(a) The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following events:

(i) a determination by the Managers, plus the Unanimous Consent of the Members that the Company should be dissolved;

(ii) a sale of all or substantially all of the assets of the Company;

(iii) the expiration of the Company’s term as stated in its Certificate; or

(iv) at such earlier time as provided by applicable law.

(b) In settling accounts of the Company after dissolution, the liabilities of the Company shall be entitled to payment and the assets of the Company remaining thereafter shall be distributed to the Members in the following order, all as required by the DELAWARE LAWS:

(i) those to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their Capital Contributions;

(ii) to the Members, pro rata, in accordance with the positive balances, if any, in their Capital Accounts; and

(iii) to the Members in proportion to their relative Percentage Interests.

## ARTICLE XIII

## INDEMNIFICATION

13.01 Indemnification of Members, Managers, and Other Persons .

(a) To the greatest extent not inconsistent with the laws and public policies of Delaware, the Company shall indemnify any Member, Manager, or officer of the Company made a party to any proceeding because such individual is or was a Member, Manager, or officer of the Company (an "Indemnitee"), as a matter of right, against all liability incurred by such individual in connection with any proceeding; provided that it shall be determined in the specific case in accordance with subsection (d) of this Section 13.01 that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section 13.01. The Company shall advance, pay for, or reimburse the reasonable expenses incurred by an Indemnitee in connection with any such proceeding in advance of final disposition thereof if (i) the Indemnitee furnishes the Company a written affirmation of the Indemnitee's good faith belief that he or she has met the standard of conduct for indemnification described in subsection (c) of this Section 13.01; (ii) the Indemnitee furnishes the Company a written undertaking, executed personally or on such Indemnitee's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct; and (iii) a determination is made in accordance with subsection (d) that based upon facts then known to those making the determination, indemnification would not be precluded under this Section 13.01. The undertaking described in subsection (a)(ii) above must be a general obligation of the Indemnitee, subject to such reasonable limitations as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company shall indemnify an Indemnitee who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section 13.01. Upon demand by an Indemnitee for indemnification or advancement of expenses, as the case may be, the Company shall expeditiously determine whether the Indemnitee is entitled thereto in accordance with this Section 13.01. The indemnification and advancement of expenses provided for under this Section 13.01 shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section 13.01.

(b) The Company shall have the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member, Manager, or officer of the Company.

(c) Indemnification is permissible under this Section 13.01 only if (i) the Indemnitee conducted himself in good faith; (ii) he or she reasonably believed that his conduct was in, or at least not opposed to, the Company's best interest; (iii) in the case of any criminal proceeding, he or she had no reasonable cause to believe his conduct was unlawful; and (iv) such Indemnitee is not adjudged in any such proceeding to be liable for gross negligence or willful misconduct in the performance of duty. The termination of a proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the Indemnitee did not meet the standard of conduct described in this subsection (c).

(d) A determination as to whether indemnification or advancement of expenses is permissible shall be made by any one of the following procedures:

(i) by the Board of Managers or by a majority vote consisting of Members not at the time parties to the proceeding; or

(ii) by special legal counsel selected by the Members in the manner prescribed in subsection (d)(i) above.

(e) An Indemnitee of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving notice the court considers necessary, may order indemnification if it determines:

(i) in a proceeding in which the Indemnitee is wholly successful, on the merits or otherwise, the Indemnitee is entitled to indemnification under this Section 13.01, in which case the court shall order the Company to pay the Indemnitee his or her reasonable expenses incurred to obtain such court ordered indemnification; or

(ii) the Indemnitee is fairly and reasonably entitled to indemnification in view of all the relevant circumstances, whether or not the Indemnitee met the standard of conduct set forth in subsection (c) of this Section 13.01.

(f) Indemnification shall also be provided for an Indemnitee's conduct with respect to an employee benefit plan if the individual reasonably believed his or her conduct to be in the interests of the participants in and beneficiaries of plan.

(g) Nothing contained in this Section 13.01 shall limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member, Manager, or officer of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise, whether for profit or not. Nothing contained in this Section 13.01 shall limit the ability of the Company to otherwise indemnify or advance expenses to any individual. It is the intent of this Section 13.01 to provide indemnification to Indemnitees to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section 13.01. Indemnification shall be provided in accordance with this Section 13.01 irrespective of the nature of the legal or equitable theory upon which a claim is made, including, without limitation, negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h) For purposes of this Section 13.01:

(i) The term "expenses" includes all direct and indirect costs (including, without limitation, counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement, or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section 13.01, applicable law, or otherwise.

(ii) The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii) The term "party" includes an individual who was, is, or is threatened to be made a named defendant or respondent in a proceeding.

(iv) The term "proceeding" means any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal.

(v) The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this Section 13.01, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

## ARTICLE XIV

## MISCELLANEOUS

14.01 Complete Agreement . This Agreement, the Certificate, and all other organizational documents signed by all of the Members constitute the complete and exclusive statement of agreement among the Members with respect to the matters herein. This Agreement and the Certificate replace and supersede all prior agreements by and among the Members or any of them, and no representation, statement, or condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or have any force or effect whatsoever.

14.02 Governing Law . This Agreement and the rights of the parties hereunder will be governed by, interpreted, and enforced in accordance with the laws of the State of Delaware.

14.03 Binding Effect . Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective distributes, successors, and assigns.

14.04 Terms . Common nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require. Any reference to the DELAWARE LAWS, the Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

14.05 Headings . All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

14.06 Severability . If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

14.07 Multiple Counterparts . This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument. However, in making proof hereof it will be necessary to produce only one copy hereof signed by the party to be charged.

14.08 Additional Documents and Acts . Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

14.09 No Third-Party Beneficiary . This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

14.10 References to this Agreement . Numbered or lettered articles, sections, and subsections herein contained refer to articles, sections, and subsections of this Agreement unless otherwise expressly stated.

14.11 Notices . Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member at the address specified in Exhibit B hereto. Any Member or the Company may, at any time by giving five days' prior written notice to the other Members and the Company, designate any other address in substitution of the foregoing address to which such notice will be given.

14.12 Amendments . Except as otherwise may be provided in this Agreement, all amendments to this Agreement must be approved by the Managers, plus one or more Members whose aggregate Percentage Interests total more than fifty percent (50%).

14.13 Title to Company Property . Legal title to all property of the Company will be held and conveyed in the name of the Company.

14.14 Reliance on Authority of Person Signing Agreement . In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual; or (b) be required to see to the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

14.15 S-Corp Election. In the event the Company elects to be treated as a S-Corporation for federal tax purposes, the provisions in this Company Agreement addressing tax treatment shall be automatically amended and modified as required in order to pertain to a S-corporation.

14.16 Company Indemnification. In the event any Member is personally liable for any debt or obligations associated with a Company asset, then the Company agrees to indemnify such Member for any such debt or obligation in excess of his or her proportionate amount of such debt or obligation that he/she is required to pay or perform, as measured by the Percentage Interest of the Members, except as otherwise agreed by the Members.

***14.17 Management by Members. The Certificate of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers. As a result, if such is the case and the Certificate is not amended to reflect management by managers, this Agreement shall be interpreted in such a manner that all references herein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President.***

IN WITNESS WHEREOF, the Members have executed this Agreement to be effective as of the date first written above.

**THE MEMBER (OR MANAGING MEMBER)**

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By: ______________________________
Mark Patrick, Director and President

**EXHIBIT A**

THE CLASS A MEMBERS AND INTERESTS

The sole Class A Member shall be RAND ADVISORS HOLDING CORP., a Delaware corporation, and it shall own the Percentage Interest set forth on Exhibit "B" hereto. In addition to such other rights as a Member described in this Agreement, the holders of record of the Class A Interests shall have no additional rights.

**EXHIBIT B**

The Members

| Members and Addresses | Date Admitted | Class A Interest | Percentage Interest |
|---|---|---|---|
| RAND ADVISORS HOLDING CORP.<br>2101 Cedar Springs Road<br>Suite 1200, Dallas, TX 75201<br>Attn: Mark Patrick | 8/1/2022 | 100% | 100% |

**EXHIBIT**

MEMBER AND MANAGER CONSENT
OF
ATLAS IDF GP, LLC

October 13, 2022

THE UNDERSIGNED sole member (the “M r”) and sole manager (the “M r”) of ATLAS IDF GP, LLC, a Delaware limited liability company (the “ r r r”), the general partner of ATLAS IDF, LP, a Delaware limited partnership (the “ r r ”), acting pursuant to the Delaware Limited Liability Company Act and the Amended and Restated Company Agreement of the General Partner, do hereby consent and agree, to take the following actions and adopt the following resolutions:

RESOLVED, that pursuant to that certain Membership Interest Purchase Agreement dated as August 1, 2022 (the “Purchase Agreement”), by and among JOHN HONIS (as “Seller”), the Sole Member (as “Buyer”), and CLO HOLDCO, LTD. a Cayman limited company (as “Guarantor”), the Sole Member purchased from Seller all of the issued and outstanding membership interests in the General Partner;

RESOLVED, that the following individual be, and hereby is, duly appointed and qualified to hold the office(s) set forth next to his name, and shall serve in such capacity until such person’s successor(s) shall have been duly appointed and qualified, or until his earlier resignation or removal (each, an “ r”):

| | |
|---|---|
| Mark Patrick | Sole Manager, President, Secretary and Treasurer |

RESOLVED, that the certificate of formation of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers. As a result, if such is the case and the certificate is not amended to reflect management by managers, the Company and all governing documents shall be interpreted in such a manner that all references therein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President;

RESOLVED FURTHER, that any individual previously appointed as a manager and/or as an officer of the General Partner but not named above is hereby removed from the office of the General Partner;

RESOLVED FURTHER, that each Officer and manager is hereby, authorized, empowered and directed, in the name and on behalf of the General Partner and the Partnership, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions;

RESOLVED FURTHER, that that all authorized acts and deeds of the Officers, managers and agents on behalf of the General Partner and/or the Partnership prior to the date

hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the acts and deeds of the General Partner and/or the Partnership; and

RESOLVED FURTHER, that the foregoing authorization shall remain in effect until further written notice from the General Partner.

*[Signature Page to Follow]*

IN WITNESS WHEREOF, the undersigned Sole Member and Sole Manager have executed this Consent to be effective as of the date first set forth above.

MEMBER

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By:__________________________________
Mark Patrick, Sole Director

SOLE MANAGER

___________________________________
Mark Patrick

**EXHIBIT**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**RAND PE FUND MANAGEMENT, LLC**

This Limited Liability Company Agreement (this "**Agreement**") of Rand PE Fund Management, LLC (the "**Company**") is entered into as of October 29, 2015 by and between the Company and John Honis (the "**Managing Member**", and collectively with any individuals and/or entities who subsequently become members of the Company in the future in accordance with the terms hereof, "**Members**"), pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del.C. § 18-101, et seq.), as amended from time to time (the "**Act**").

**Section 1** **Name**. The name of the limited liability company governed hereby is Rand PE Fund Management, LLC.

**Section 2** **Certificates**. The Managing Member, as an authorized person within the meaning of the Act, has executed, delivered and filed the certificate of formation of the Company (the "**Certificate of Formation**") with the Secretary of State of the State of Delaware on September 18, 2015. Upon the execution of this Agreement, the Managing Member shall thereafter be designated as an authorized person within the meaning of the Act. Hereafter, the Managing Member shall have the power to execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

**Section 3** **Purpose**. The Company was formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in all lawful activities for which limited liability companies may be formed under the Act, including, without limitation of the foregoing, serving as the general partner of Rand PE Fund I, L.P., a Delaware limited partnership.

**Section 4** **Powers**. The Company shall have the power to do any and all acts reasonably necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purpose and business described herein and for the protection and benefit of the Company, and shall have, without limitation, any and all of the powers that may be exercised on behalf of the Company by the Managing Member pursuant to this Agreement.

**Section 5** **Principal Business Office**. The principal place of business and office of the Company shall be located at, and the Company's business shall be conducted from 87 Railroad Place, Suite 403, Saratoga Springs, NY 12866, or elsewhere as the Managing Member may from time to time determine.

**Section 6** **Registered Office**. As of the date hereof, the address of the registered office of the Company in the State of Delaware is: c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801.

**Section 7** **Registered Agent**. As of the date hereof, the name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is: The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware 19801.

**Section 8** **Members**. The names, the nature of the interests held, the mailing addresses, the

initial capital contributions and the Percentage Interests (as defined below) of the Members are as set forth in **Schedule A** attached hereto.

**Section 9** **Term**. The term of the Company commenced on the date of filing of the Certificate of Formation in accordance with the Act and shall continue until dissolution of the Company in accordance with **Section 23** of this Agreement.

**Section 10** **Limited Liability**. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and none of the Members, any Officer (as hereinafter defined), employee or agent of the Company (including a person having more than one such capacity) shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of acting in such capacity.

**Section 11** **Initial Capital Contributions**. Each Member is deemed admitted as a Member of the Company upon his, her or its execution and delivery of this Agreement. The initial capital contributions of the Members are set forth on **Schedule A** attached hereto.

**Section 12** **Additional Capital Contributions**. The Members are not required to make any capital contributions to the Company beyond their initial capital contributions, unless otherwise determined by the Managing Member.

**Section 13** **Capital Accounts**. Separate capital accounts shall be maintained for each Member on the books of the Company, which accounts shall set forth the capital of such Member in the Company. Each capital account shall be adjusted to reflect such Member's share of allocations and distributions as provided in **Sections 14 and 15** of this Agreement, and any additional capital contributions to the Company or withdrawals of capital from the Company. Such capital accounts shall further be adjusted to conform to the Treasury Regs. under Section 704(b) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), as interpreted in good faith by the Managing Member.

**Section 14** **Allocations of Profit and Loss**. All items of income, gain, loss, deduction and credit shall be allocated among the Members in accordance with their percentage interests as set forth on **Schedule A** attached hereto ("**Percentage Interests**").

**Section 15** **Distributions**. Distributions shall be made to the Members at such times and in such amounts as may be determined in the sole discretion of the Managing Member. Distributions shall be allocated among the Members in accordance with their Percentage Interests. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Members on account of their interest in the Company if such distribution would violate Section 18-607 of the Act or other applicable law.

**Section 16** **Management**.

(a) The business and affairs of the Company shall be managed by the Managing Member. Subject to the express limitations contained in any provision of this Agreement, the Managing Member shall have complete and absolute control of the affairs and business of the Company, and the Managing Member shall possess all powers necessary, convenient or appropriate to carrying out the purposes and business of the Company, including, without limitation, doing all things and taking all actions necessary to carrying out the terms and provisions of this Agreement.

(b) Subject to the rights and powers of the Managing Member and the limitations

thereon contained herein, the Managing Member may delegate to any person any or all of his powers, rights and obligations under this Agreement, and the Managing Member may appoint, contract or otherwise deal with any person to perform any acts or services for the Company as the Managing Member may reasonably determine.

(c) No Member (other than the Managing Member) shall participate in the management or control of the business of, or shall have any rights or powers with respect to, the Company except those expressly granted to it by, or pursuant to the terms of, this Agreement, or those conferred on it by law.

(d) The Managing Member shall hold office until the earliest to occur of his death, disability or other inability to act in such capacity, at which time a successor Managing Member may be appointed by Members owning at least a majority of the Percentage Interests.

**Section 17** **Officers**. The Managing Member may, from time to time as he deems advisable, appoint officers of the Company (the "**Officers**") and assign in writing titles (including, without limitation, President, Vice President, Secretary and Treasurer) to any such person. Unless the Managing Member decides otherwise, if the title is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. Any delegation pursuant to this **Section 17** may be revoked at any time by the Managing Member.

**Section 18** **Other Business**. The Members (including, for the avoidance of doubt, the Managing Member) may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others. Neither the Company nor any other Member shall have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

**Section 19** **Exculpation and Indemnification**. The Managing Member shall not be liable to the Company or to the other Members for any action taken or omitted to be taken in connection with the business or affairs of the Company, so long as he acted in good faith and is not found to be guilty of gross negligence or willful misconduct with respect thereto, as determined by a final non-appealable decision of a court of competent jurisdiction. To the fullest extent permitted by law, the Company agrees to indemnify and hold harmless: (i) the Managing Member, and (ii) in the discretion of the Managing Member, the Company's managers, shareholders, partners, officers, employees, agents and affiliates and/or the other Members (each, an "**Indemnified Party**") from and against any and all claims, actions, demands, losses, costs, expenses (including attorneys' fees and other expenses of litigation), damages, penalties or interest, as a result of any claim or legal proceeding related to any action taken or omitted to be taken by any of them in connection with the business and affairs of the Company (including the settlement of any such claim or legal proceeding); *provided, however*, that the party against whom the claim is made or legal proceeding is directed is not guilty of gross negligence or willful misconduct, as determined by a final non-appealable decision of a court of competent jurisdiction. Any indemnity under this **Section 19** shall be provided out of and to the extent of Company assets only, and no Member (including the Managing Member) shall have personal liability on account thereof.

**Section 20** **Admission of Additional Members**. Additional Members may be admitted to the Company only with the written consent of the Managing Member. The capital contribution required of, and the Percentage Interests assigned to, such newly-admitted Member shall be determined by the Managing Member.

**Section 21** **Effect of Bankruptcy, Dissolution, Death or Incompetence of a Member**.

The bankruptcy, dissolution, death or disability of a Member, or an adjudication that such Member is incompetent (a Member experiencing any such event, a "**Disabled Member**"), shall not cause the termination or dissolution of the Company, and the business of the Company shall continue. If a Member is dissolved or becomes bankrupt, the trustee or receiver of such Disabled Member's estate or, if a Member dies, such Disabled Member's executor, administrator or trustee, or, if such Member is adjudicated incompetent, such Disabled Member's committee, guardian or conservator, or the personal representative of such Disabled Member, as applicable, shall have the rights of such Disabled Member for the purposes of settling or managing such Disabled Member's estate or property and such power as the Disabled Member possessed to dispose of all or any part of such Member's interest in the Company, and to join with any assignee in satisfying conditions precedent to the admission of the assignee as a substitute Member.

**Section 22** **Assignments**. A Member may not transfer, assign, pledge or hypothecate, in whole or in part, his, her or its limited liability company interest without the prior written consent of the Managing Member.

**Section 23** **Dissolution**.

(a) The Company shall dissolve, and its affairs shall be wound-up upon the first to occur of the following: (i) the written consent of the Managing Member; (ii) the death, disability, bankruptcy or withdrawal of the Managing Member, in the event no successor managing member is appointed pursuant to **Section 16(d)**; and (iii) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

(b) In the event of dissolution, the Company shall conduct only such activities as are necessary to wind-up its affairs (including the sale of the assets of the Company in an orderly manner).

**Section 24** **Tax Matters Partner**. John Honis shall be the tax matters partner within the meaning of Section 6231(a)(7) of the Code. All expenses incurred by the tax matters partner in connection with his duties as tax matters partner shall be expenses of the Company.

**Section 25** **Elections**. The Managing Member shall determine the accounting methods and conventions under the tax laws of any and all applicable jurisdictions as to the treatment of income, gain, loss, deduction and credit of the Company or any other method or procedure related to the preparation of such tax returns. The Managing Member may cause the Company to make or refrain from making any and all elections permitted by such tax laws, and the Managing Member shall not be liable for any consequences to any previously admitted or subsequently admitted Members resulting from making or failing to make any such elections.

**Section 26** **Separability of Provisions**. Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

**Section 27** **Counterparts**. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement.

**Section 28** **Entire Agreement**. This Agreement constitutes the entire agreement of the Members with respect to the subject matter hereof and shall supersede all prior and contemporaneous agreements, understandings and discussions with respect thereto.

**Section 29** **Governing Law, Personal Jurisdiction and Venue**. The parties acknowledge and agree that any claim, controversy, dispute or action relating in any way to this Agreement or the subject matter of this Agreement shall be governed solely by the laws of the State of Delaware, without regard to any conflict of laws doctrines. The parties irrevocably consent to and submit to being served with legal process issued from the state and federal courts located in the State of New York and irrevocably consent to the exclusive personal jurisdiction of the federal and state courts situated in the State of New York. The parties irrevocably waive any objections to the personal jurisdiction of these courts. The federal and state courts of the State of New York in New York County shall have sole and exclusive jurisdiction over any and all claims, controversies, disputes and actions which in any way relate to this Agreement or the subject matter of this Agreement. Any such claim, controversy, dispute or action must first be brought in the federal court of the State of New York in New York County, unless the federal courts do not have subject matter jurisdiction as a matter of law, in which case it must first be brought in the Commercial Division of the New York State Supreme Court in New York County (and can only proceed in New York County outside the Commercial Division if the Commercial Division rejects it). The parties also irrevocably waive any objections that these courts constitute an oppressive, unfair, or inconvenient forum and agree not to seek to change venue on these grounds or any other grounds.

**Section 30** **Amendments**. This Agreement may be modified, altered, supplemented or amended in the sole discretion of the Managing Member.

[*remainder of page intentionally left blank*]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement as of the date first written above.

THE COMPANY:

RAND PE FUND MANAGEMENT, LLC

By: ____________________
Name: John Honis
Title: Managing Member

MANAGING MEMBER:

____________________
Name: John Honis

**<u>Schedule A</u>**

**Members of Rand PE Fund Management, LLC**

**As of October 29, 2015**

| NAME | NATURE OF INTEREST | MAILING ADDRESS | INITIAL CAPITAL CONTRIBUTION | PERCENTAGE INTEREST |
|---|---|---|---|---|
| John Honis | Managing Member | 87 Railroad Place, Suite 403<br><br>Saratoga Springs, NY 12866 | $100 | 100% |

**EXHIBIT**

AMENDED AND RESTATED COMPANY AGREEMENT

*of*

RAND PE FUND MANAGEMENT, LLC

A Delaware Limited Liability Company

**AMENDED AND RESTATED COMPANY AGREEMENT**

***of***

**RAND PE FUND MANAGEMENT, LLC**

**A Delaware Limited Liability Company**

This AMENDED AND RESTATED COMPANY AGREEMENT (collectively, the "Agreement," which shall include all amendments and exhibits hereto) dated effective as of the 1st day of August, 2022 (the "Effective Date"), are entered into by and among those Persons executing the signature page hereto as the Members of RAND PE FUND MANAGEMENT, LLC, a Delaware limited liability company (the "Company"). All capitalized terms not defined in the instance of first usage shall have the respective meanings associated with such terms in Section 1.04 below.

**ARTICLE I**

**INTRODUCTION**

1.01 Formation of Limited Liability Company The Company was formed by the filing of the Certificate of Formation (the "Certificate") with the Secretary of State of Delaware on the September 18, 2015. The Company's business shall be conducted under the name "RAND PE FUND MANAGEMENT, LLC" until such time as the Members shall hereafter designate otherwise and file amendments to the Certificate in accordance with applicable law. This Agreement amends and replaces, in its entirety, all prior governing agreements for the Company, including any and all amendments thereto.

This Agreement is subject to, and governed by, the Delaware laws governing limited liability companies (the "DELAWARE LAWS") and the Certificate. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the DELAWARE LAWS or the provisions of the Certificate, such provisions of the DELAWARE LAWS or the Certificate, as the case may be, will be controlling.

1.02 Registered Office and Agent The registered office and registered agent of the Company initially shall be as set forth in the Certificate and may be changed from time to time by the appropriate filing by the Company in the office of the Secretary of State of Delaware.

1.03 Other Offices The Company may also have offices at such other places, both within and without the State of Delaware, as the Board of Managers may from time to time determine or the business of the Company may require.

1.04 Defined Terms The terms used in this Agreement with their initial letter capitalized shall, unless the context requires otherwise, have the meanings specified in this Section 1.04. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires. When used in this Agreement, the following terms shall have the meanings set forth below:

(a) "DELAWARE LAWS" shall mean the Delaware laws governing limited liability companies, as the same may be amended from time to time.

(b) "Affiliate" shall mean, as to any Person, any Person controlled by, controlling, or under common control with such Person, and, in the case of a Person who is an individual, a member of the family of such individual consisting of a spouse, sibling, in-law, lineal descendant, or ancestor (including by adoption). For purposes of this definition, "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, directly or indirectly, alone or in concert with others, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, by contract or otherwise, and no Person shall be deemed in control of another solely by virtue of being a director, officer or holder of voting securities of any entity. A Person shall be presumed to control any partnership of which such Person is a general partner.

(c) "Bankruptcy" shall mean, and a Member shall be deemed a "Bankrupt Member," upon (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any Debtor Relief Laws; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member's affairs; (iv) the filing of a petition in any involuntary bankruptcy case, which petition remains undismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator, or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(d) "Book Depreciation" for any asset shall mean for any Fiscal Year or other period an amount that bears the same ratio to the Book Value of that asset at the beginning of such Fiscal Year or other period as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for that asset for such year or other period bears to the adjusted tax basis of that asset at the beginning of such year or other period. If the federal income tax depreciation, amortization, or other cost recovery deduction allowable for any asset for such year or other period is zero, then Book Depreciation for that asset shall be determined with reference to such beginning Book Value using any reasonable method selected by the Board of Managers.

(e) "Book Value" shall mean for any asset the asset's adjusted tax basis, except as follows:

(i) the initial Book Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Board of Managers;

(ii) the Book Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board of Managers, as of one of the following times: (1) on the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; (2) on the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an Interest in the Company if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; and (3) on the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations;

(iii) the Book Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(iv) the Book Values of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Treasury Regulations and Section 8.02(d) hereof; provided, however, that Book Values shall not be adjusted pursuant to this Section 1.04(e)(iv) to the extent the Board of Managers determines that an adjustment pursuant to Section 1.04(e)(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.04(e)(iv); and

(v) if the Book Value of an asset has been determined or adjusted pursuant to Section 1.04(e)(i),1.04(e)(ii), or 1.04(e)(iv) hereof, such Book Value shall thereafter be adjusted by the Book Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(f) "Capital Contribution" shall mean the total value of cash and Book Value (except as otherwise herein provided) of property contributed and agreed to be contributed to the Company by each Member, as shown in <u>Exhibit A</u>, attached hereto and incorporated herein for all purposes, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any

prior Member for the interest of such then Member, reduced by any distribution to such Member in return of its capital as contemplated herein.

(g) "Class A Interest" shall refer to the Interest of a Class A Member in the Profits, Losses, Distributable Cash, and assets upon liquidation of the Company as described in this Agreement.

(h) "Class A Members" shall mean those Persons listed on Exhibit A and designated as "Class A Members." The Class A Members shall have such additional rights as a Member as are specifically described and granted in Exhibit A, as amended from time to time.

(i) Intentionally Blank.

(j) Intentionally Blank.

(k) "Code" shall mean the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

(l) "Company" shall refer to the limited liability company created by virtue of the Certificate and this Agreement and any successor in interest.

(m) "Debtor Relief Laws" shall mean any federal or state bankruptcy, insolvency, or similar laws generally affecting the rights of creditors and the relief of debtors now or hereafter in effect.

(n) Intentionally Blank.

(o) "Distributable Cash" of the Company shall mean all cash funds of the Company on hand from time to time (other than cash funds obtained as Capital Contributions by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time; (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time; and (iii) provision for a working cash reserve in accordance with Section 8.07 below.

(p) "Fiscal Year" shall mean the calendar year.

(q) "Former Member" shall mean a member that causes a Dissolution Event.

(r) "Interest" in the Company shall mean the entire ownership interest of a Member in the Company at any particular time, including such Member's Capital Account, allocable share of Profits, Losses, and Distributable Cash, and the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

(s) Intentionally Blank

(t) "Manager" shall mean an individual elected to the Board of Managers of the Company pursuant to Sections 3.02 and 3.04 below.

(u) "Member(s)" shall mean all Members admitted to the Company hereafter as Members who shall consent to the terms hereof and shall be admitted pursuant to the provisions hereof. The names, business or residence addresses, Capital Contributions, Percentage Interest, and class of Interest of the Members shall be set forth on Exhibit B, attached hereto and incorporated herein by reference. Reference to a "Member" shall be to any one of the Members.

(v) "Percentage Interest" of a Member shall mean the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit B, as such percentage may be adjusted from time to time pursuant to the terms hereof.

(w) "Person" shall mean any individual, corporation, partnership, limited liability company or partnership, association, organization, trust, estate, or other entity.

(x) "Pro Rata Part" shall mean the percentage expression of a fraction the numerator of which is a Member's respective Percentage Interest and the denominator of which is the aggregate Percentage Interests of all Members involved in the respective transaction or having a respective right or option.

(y) "Profits" and "Losses" shall mean, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i) income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this Section 1.04(y) shall be added to such taxable income or loss;

(ii) any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits and Losses pursuant to this Section 1.04(y), shall be subtracted from such taxable income or loss;

(iii) if the Book Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) or Section 1.04(e)(iii), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

(iv) gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(v) in lieu of the deduction for depreciation, cost recovery, or amortization taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation; and

(vi) notwithstanding any other provision of this Section 1.04(y), any items that are specially allocated pursuant to Section 8.02 or Section 8.03 shall not be taken into account in computing Profits and Losses.

(z) "Regulatory Allocations" shall mean the special allocations of items of income, gain, loss, and deduction, if any, set forth in Section 8.02 hereof.

(aa) "Transfer" or "Transferred" shall mean the sale, assignment, conveyance, gift, bequest, devise, transfer under the rules of intestate succession, pledge, mortgage, or other encumbrance. In addition, the term "Transfer" or "Transferred" shall mean an "ownership change" of a Member as defined in Section 382(g) of the Code in effect as of the Effective Date, except that the term "Member" shall be substituted for "shareholder" wherever it appears.

(bb) "Treasury Regulations" shall mean regulations issued by the Department of the Treasury interpreting the Code.

(cc) "Unanimous Consent" shall mean the written consent of all of the then Members of the Company.

## ARTICLE II

## MEMBERS AND MEMBERSHIP INTERESTS

2.01 Members. The Members of the Company shall be those Persons listed on Exhibit B. Except as otherwise may be provided in Exhibit A or Exhibit B, and except as provided in Section 7.05 below, a Person may be admitted as a Member to the Company only upon the affirmative vote of the Managers, plus one or more Members whose Percentage Interests total more than fifty percent (50%); provided, however, that no Person will be recognized as a Member of the

Company until he/she shall have executed this Agreement, or a counterpart hereto, and agrees to be bound by all of the terms and conditions hereof.

2.02 Annual Meetings An annual meeting of the Members of the Company shall be held during each calendar year on such date and at such time as shall be designated from time to time by the Board of Managers and stated in the notice of the meeting, and if a legal holiday, then on the next business day following, at the time specified in the notice of the meeting. At such meeting, the Members shall elect Managers and transact such other business as may properly be brought before the meeting.

2.03 Special Meetings A special meeting of the Members may be called at any time by the President, the Board of Managers, or one or more Members whose Percentage Interests total at least 10%. Only such business shall be transacted at a special meeting as may be stated or indicated in the notice of such meeting.

2.04 Place of Meetings The annual meeting of Members may be held at any place within or without the State of Delaware as may be designated by the Board of Managers. Special meetings of Members may be held at any place within or without the State of Delaware as may be designated by the person or persons calling such special meeting as provided in Section 2.03. If no place for a meeting is designated, it shall be held at the registered office of the Company.

2.05 Notice. Written or printed notice stating the place, day, and hour of each meeting of Members and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 10 days or more than 50 days before the date of the meeting, either personally or by mail, by or at the direction of the President, the Secretary, or the person calling the meeting, to each Member of record entitled to vote at such meeting.

2.06 Voting List At least 10 days before each meeting of Members, the Secretary shall prepare a complete list of Members entitled to vote at such meeting, arranged in alphabetical order, including the address of each Member and the number of voting Interests held by each Member. For a period of 10 days prior to such meeting, such list shall be kept on file at the registered office of the Company and shall be subject to inspection by any Member during usual business hours. Such list shall be produced at such meeting, and at all times during such meeting shall be subject to inspection by any Member. The membership interest transfer books shall be prima facie evidence as to who are the Members entitled to examine such list or membership interest transfer books.

2.07 Voting of Interests. Interests held by the Company in treasury, Interests owned by a Person the majority of the voting interests of which are owned or controlled by the Company, and Interests held by the Company in a fiduciary capacity shall not be Interests entitled to vote or to be counted in determining the total number of outstanding Interests of the Company. Interests held by an administrator, executor, guardian, or conservator may be voted by him or her, either in person or by proxy, without transfer of such Interests into his or her name so long as such Interests form a part of the estate and are in the possession of the estate being served by him or her. Interests standing in the name of a trustee may be voted by him or her, either in person or by proxy, only after the Interests have been transferred into his or her name as trustee. Interests standing in the name of a receiver may be voted by such receiver, and Interests held by or under the control of a receiver may be voted by such receiver without transfer of such Interests into his or her name if authority to do so is contained in the court order by which such receiver was appointed. Interests standing in the name of another domestic or foreign corporation of any type or kind may be voted by such officer, agent, or proxy as the bylaws of such corporation may provide or, in the absence of such provision, as the board of directors of such corporation may by resolution determine. A Member whose Interests are pledged shall be entitled to vote such Interests until they have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote such Interests.

2.08 Quorum. The presence in person or by proxy of one or more Members whose Percentage Interests total more than fifty percent (50%) shall constitute a quorum at any meeting of Members, except as otherwise provided by law, the Certificate, or this Agreement. At any reconvening of an adjourned meeting at which a quorum shall be present or represented, any business may be transacted that could have been transacted at the original meeting if a quorum had been present or represented.

2.09 Vote; Withdrawal of Quorum. If a quorum is present in person or represented by proxy at any meeting, except as otherwise may be provided in Exhibit A or Exhibit B, the vote of one or more Members whose Percentage Interests total more than fifty percent (50%) of all Members, whether or not they are present in person or represented by proxy, shall decide any question brought before such meeting, unless the question is one on which, by express provision of law, the

Certificate, or this Agreement a different vote is required, in which event such express provision shall govern and control the decision of such question. The Members present at a duly convened meeting may continue to transact business until adjournment, notwithstanding any withdrawal of Members that may leave less than a quorum remaining.

2.10 Method of Voting; Proxies. Except as otherwise may be provided in Exhibit A or Exhibit B, each Member shall be entitled to that number of votes on each matter submitted to the Members for their vote equal to such Member's Percentage Interest multiplied by 100. At any meeting of Members, every Member having the right to vote may vote either in person or by a proxy executed in writing by the Member or by his duly authorized attorney-in-fact. Each such proxy shall be filed with the Secretary of the Company before or at the time of the meeting. No proxy shall be valid after 11 months from the date of its execution, unless otherwise provided in the proxy. If no date is stated on a proxy, such proxy shall be presumed to have been executed on the date of the meeting at which it is to be voted. Each proxy shall be revocable unless expressly provided therein to be irrevocable or unless otherwise made irrevocable by law.

2.11 Closing of Transfer Books; Record Date . For the purpose of determining Members entitled to notice of, or to vote at, any meeting of Members or any reconvening thereof, or entitled to receive payment of any distribution, or in order to make a determination of Members for any other proper purpose, the Board of Managers may provide that the membership interest transfer books of the Company shall be closed for a stated period but not to exceed in any event 50 days. If the membership interest transfer books are closed for the purpose of determining Members entitled to notice of, or to vote at, a meeting of Members, such books shall be closed for at least 10 days immediately preceding such meeting. In lieu of closing the membership interest transfer books, the Board of Managers may fix in advance a date as the record date for any such determination of Members, such date in any case to be not more than 50 days and not less than 10 days prior to the date on which the particular action requiring such determination of Members is to be taken. If the membership interest transfer books are not closed and if no record date is fixed for the determination of Members entitled to notice of, or to vote at, a meeting of Members or entitled to receive payment of a distribution, the date on which the notice of the meeting is to be mailed or the date on which the resolution of the Board of Managers declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members.

2.12 Presiding Officials at Meetings The President shall preside at, and the Secretary shall prepare minutes of, each meeting of Members, and in the absence of either such officer, his other duties shall be performed by some person appointed at the meeting.

## ARTICLE III

## MANAGERS

3.01 Management. The business and affairs of the Company shall be managed EXCLUSIVELY by the Board of Managers. Subject to the restrictions imposed by law, the Certificate, or this Agreement, the Board of Managers may exercise all the powers of the Company.

3.02 Number; Election; Term; Qualification. The first Board of Managers shall consist of the number of Managers named in the Certificate and or otherwise in the Company documents. Thereafter, except as otherwise may be restricted by this Agreement, the number of Managers that shall constitute the entire Board of Managers shall be determined by resolution of the Board of Managers at any meeting thereof or by the Members at any meeting thereof, but shall never be less than one (1). At each annual meeting of Members, Managers shall be elected to hold office until the next annual meeting of Members and until their successors are elected and qualified. No Manager need be a Member, a resident of the State of Delaware, or a citizen of the United States.

3.03 Removal Except as otherwise may be provided by the Members, at any meeting of Members called expressly for that purpose, any Manager or the entire Board of Managers may be removed, with or without cause, by a vote of one or more Members whose Percentage Interests total more than fifty percent (50%).

3.04 Change in Number; Vacancies. No decrease in the number of Managers constituting the entire Board of Managers shall have the effect of shortening the term of any incumbent Manager. In the case of any increase in the number of Managers, or in the case of the death, retirement, resignation, or removal of a Manager, the vacancies to be filled by such increase or death, retirement, resignation, or removal may be filled by (a) the Board of Managers for a term of office

continuing only until the next election of one or more Managers by the Members; or (b) the Members at any annual or special meeting of the Members. A Manager elected to fill a vacancy shall be elected to serve for the unexpired term of his predecessor in office.

3.05 Place of Meetings . The Board of Managers may hold its meetings in such place or places, including by telephonic or other electronic method of communication, within or without the State of Delaware as the Board of Managers may from time to time determine.

3.06 First Meeting . Each newly elected Board of Managers may hold its first meeting, if a quorum is present, for the purpose of organization and the transaction of business immediately after and at the same place as the annual meeting of Members, and no notice of such meeting shall be necessary.

3.07 Regular Meetings . Regular meetings of the Board of Managers may be held without notice at such times and places, including by telephonic or other electronic method of communication, as may be designated from time to time by resolution of the Board of Managers and communicated to all Managers. Regular meetings of the Board of Managers may be held when and if needed, and no more than one regular meeting of the Board of Managers shall be required in any calendar year.

3.08 Special Meetings . A special meeting of the Board of Managers shall be held whenever called by any Manager at such time and place, including by telephonic or other electronic method of communication, as such Manager shall designate in the notice of such special meeting. The Manager calling any special meeting shall cause notice of such special meeting to be given to each Manager at least 24 hours before such special meeting. Neither the business to be transacted at, nor the purpose of, any special meeting of the Board of Managers need be specified in the notice or waiver of notice of any special meeting.

3.09 Quorum; Vote . At all meetings of the Board of Managers, a majority of the Managers fixed in the manner provided in this Agreement shall constitute a quorum for the transaction of business. If a quorum is not present at a meeting, a majority of the Managers present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present. The vote of a majority of the Managers present at a meeting at which a quorum is in attendance shall be the act of the Board of Managers, unless the vote of a different number is required by law, the Certificate, or this Agreement.

3.10 Procedure; Minutes . At meetings of the Board of Managers, business shall be transacted in such order as the Board of Managers may determine from time to time. The Board of Managers shall appoint at each meeting a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting that shall be delivered to the Secretary of the Company for placement in the minute book of the Company.

3.11 Presumption of Assent . A Manager of the Company who is present at any meeting of the Board of Managers at which action on any matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof, or shall forward any dissent by certified or registered mail to the Secretary of the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

3.12 Compensation . Except as otherwise may be restricted in this Agreement, Managers, in their capacity as Managers, may receive, by resolution of the Board of Managers, a stated salary or a fixed sum and expenses of attendance, if any, for attending meetings of the Board of Managers. No Manager shall be precluded from serving the Company in any other capacity or receiving compensation therefor.

## ARTICLE IV

## COMMITTEES

4.01 Designation . The Board of Managers may, by a resolution adopted by a majority of the entire Board of Managers, designate executive and other committees.

4.02 Number; Qualification; Term . Each committee shall consist of one or more Managers appointed by resolution adopted by a majority of the entire Board of Managers. The number of committee members may be increased or decreased from time to time by resolution adopted by a majority of the entire Board of Managers. Each committee member shall serve as such until the expiration of his term as a Manager or his earlier resignation, unless sooner removed as a committee member or as a Manager.

4.03 Authority . The executive committee, to the extent provided in the resolution establishing such committee, shall have and may exercise all of the authority of the Board of Managers in the management of the business and affairs of the Company. Each other committee, to the extent expressly provided for in the resolution establishing such committee, shall have and may exercise all of the authority of the Board of Managers in such other matters and affairs concerning the Company. However, no committee shall have the authority of the Board of Managers in reference to any of the following:

(a) amending the Certificate;

(b) approving a plan of merger or consolidation;

(c) recommending to the Members the sale, lease, or exchange of all or substantially all of the property and assets of the Company other than in the usual and regular course of its business;

(d) recommending to the Members a voluntary dissolution of the Company or a liquidation thereof;

(e) filling vacancies in, or removing members of, the Board of Managers or of any committee thereof;

(f) filling any vacancy to be filled by reason of an increase in the number of Managers;

(g) electing or removing officers or committee members;

(h) fixing the compensation of any committee member; or

(i) altering or repealing any resolution of the Board of Managers that, by its term, provides that it shall not be amendable or repealable.

4.04 Committee Changes . The Board of Managers shall have the power at any time to fill vacancies in, to change the Membership of, and to discharge any committee. However, a committee member may be removed by the Board of Managers only if, in the judgment of the Board of Managers, the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

4.05 Regular Meetings . Regular meetings of any committee may be held without notice at such times and places, including by telephonic or other electronic methods of communication, as may be designated from time to time by resolution of the committee and communicated to all committee members.

4.06 Special Meetings . A special meeting of any committee may be held whenever called by any committee member at such time and place, including by telephonic or other electronic methods of communication, as such committee member shall designate in the notice of such special meeting. The committee member calling any special meeting shall cause notice of such special meeting to be given to each committee member at least 24 hours before such special meeting. Neither the business to be transacted at, nor the purpose of, any special meeting of any committee need be specified in the notice or waiver of notice of any special meeting.

4.07 Quorum; Majority Vote . At all meetings of any committee, a majority of the number of committee members designated by the Board of Managers shall constitute a quorum for the transaction of business. If a quorum is not present at a meeting of any committee, a majority of the committee members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present. The vote of a majority of the committee members present at any meeting at which a quorum is in attendance shall be the act of a committee, unless the vote of a different number is required by law, the Certificate, or this Agreement.

4.08 Minutes . Each committee shall cause minutes of its proceedings to be prepared and shall report the same to the Board of Managers. The minutes of the proceedings of each committee shall be delivered to the Secretary of the Company for placement in the minute books of the Company.

4.09 Compensation . Except as otherwise may be restricted in this Agreement, committee members may, by resolution of the Board of Managers, be allowed a stated salary or a fixed sum and expenses of attendance, if any, for attending any committee meetings.

4.10 Responsibility . The designation of any committee and the delegation of authority to it shall not operate to relieve the Board of Managers or any Manager of any responsibility imposed upon it or such Manager by law.

## ARTICLE V

## GENERAL PROVISIONS RELATING TO MEETINGS

5.01 Notice Whenever by law, the Certificate, or this Agreement notice is required to be given to any Member, Manager, or committee member and no provision is made as to how such notice shall be given, it shall be construed to mean that notice may be given either (a) in person; (b) in writing, by mail; (c) by telegram, telex, cable, telecopy or facsimile transmission, or similar means; or (d) by any other method permitted by law. Any notice required or permitted to be given hereunder (other than personal notice) shall be addressed to such Member, Manager, or committee member at his address as it appears on the books on the Company or, in the case of a Member, on the membership interest transfer records of the Company or at such other place as such Member, Manager, or committee member is known to be at the time notice is mailed or transmitted. Any notice required or permitted to be given by mail shall be deemed to be delivered and given at the time when such notice is deposited in the United States mail, postage prepaid. Any notice required or permitted to be given by telegram, telex, cable, telecopy or facsimile transmission, or similar means shall be deemed to be delivered and given at the time transmitted.

5.02 Waiver of Notice . Whenever by law, the Certificate, or this Agreement any notice is required to be given to any Member, Manager, or committee member of the Company, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time notice should have been given, shall be equivalent to the giving of such notice. Attendance of a Manager or Member at a meeting shall constitute a waiver of notice of such meeting, except where a Manager or Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.03 Telephone and Similar Meetings Members, Managers, or committee members may participate in and hold a meeting by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other. Participation in such a meeting shall constitute presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.04 Action Without Meeting . Any action that may be taken, or is required by law, the Certificate, or this Agreement to be taken at a meeting of the Members, the Board of Managers, or a committee thereof may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the Members owning the required Percentage Interests of all Members (as set forth herein for the respective action or decision), a majority of the Managers or committee members, as the case may be, entitled to vote with respect to the subject matter thereof, and such consent shall have the same force and effect as a vote of such Members, Managers, or committee members, as the case may be, and may be stated as such in any document filed with the Secretary of State of Delaware or in any certificate or other document delivered to any person. The consent may be in one or more counterparts so long as each Member, Manager, or committee member signs one of the counterparts. The signed consent shall be placed in the minute books of the Company.

## ARTICLE VI

## OFFICERS AND OTHER AGENTS

6.01 Number; Titles; Election; Term The Company shall have a president, one or more vice presidents (and, in the case of each vice president, with such descriptive title, if any, as the Board of Managers shall determine), a secretary, a treasurer, and such officers and agents as the Board of Managers may deem desirable. The Board of Managers shall elect a president, vice president, treasurer, and secretary at its first meeting at which a quorum shall be present after the annual meeting of Members or whenever a vacancy exists. The Board of Managers then, or from time to time, may also elect or appoint one or more other officers or agents as it shall deem advisable. Except as otherwise may be provided by separate agreement, each officer and agent shall hold office for the term for which he is elected or appointed and until his successor has been elected or appointed and qualified. Unless otherwise provided in the resolution of the Board of Managers electing or appointing an officer or agent, his term of office shall extend to and expire at the meeting of the Board of Managers following the next annual meeting of Members or, if earlier, at his death, resignation, or removal. Any two or more offices may be held by the same person. No officer or agent need be a Member, a Manager, a resident of the State of Delaware, or a citizen of the United States.

6.02 Removal . Any officer or agent elected or appointed by the Board of Managers may be removed by a majority of the Board of Managers only if, in the judgment of a majority of the Board of Managers, the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Election or appointment of an officer or agent shall not of itself create contract rights.

6.03 Vacancies . Any vacancy occurring in any office of the Company may be filled by the Board of Managers.

6.04 Authority . Officers shall have such authority and perform such duties in the management of the Company as are provided in this Agreement or as may be determined by resolution of the Board of Managers not inconsistent with this Agreement.

6.05 Compensation . Except as otherwise may be provided by separate agreement, the compensation, if any, of officers or any salaried employee shall be fixed, increased, or decreased from time to time by the Board of Managers, provided, however, that the Board of Managers may by resolution delegate to any one or more officers of the Company the authority to fix such compensation.

6.06 Chairman of the Board . The Chairman of the Board, if any, shall be an officer of the Company and, subject to the direction of the Board of Managers, shall perform such executive, supervisory, and management functions and duties as may be assigned to him from time to time by the Board of Managers.

6.07 President, CEO and COO . The Board of Managers may designate and appoint a President, CEO and/or COO, with rights, duties and responsibilities established by the Board of Managers.

6.08 Vice Presidents . Each Vice President shall have such powers and duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President and (in the order as designated by the Board of Managers, or in the absence of such designation, as determined by the length of time each has held the office of Vice President continuously) shall exercise the powers of the President during that officer's absence or inability to act.

6.09 Treasurer . The Treasurer shall have custody of the Company's funds and securities, shall keep full and accurate accounts of receipts and disbursements, and shall deposit all moneys and valuable effects in the name and to the credit of the Company in such depository or depositories as may be designated by the Board of Managers. The Treasurer shall audit all payrolls and vouchers of the Company; shall receive, audit, and consolidate all operating and financial statements of the Company and its various departments; shall supervise the accounting and auditing practices of the Company; and shall have charge of matters relating to taxation. Additionally, the Treasurer shall have the power to endorse for deposit, collection, or otherwise all checks, drafts, notes, bills of exchange, and other commercial paper payable to the Company and to give proper receipts and discharges for all payments to the Company. The Treasurer shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

6.10 Assistant Treasurers . Each Assistant Treasurer shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President. The Assistant Treasurers (in the order as designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Treasurer continuously) shall exercise the powers of the Treasurer.

6.11 Secretary . The Secretary shall maintain minutes of all meetings of the Board of Managers, of any committee, and of the Members, or consents in lieu of such minutes, in the Company's minute books, and shall cause notice of such meetings to be given when requested by any person authorized to call such meetings. The Secretary may sign with the President, in the name of the Company, all contracts of the Company and affix the seal of the Company thereto. The Secretary shall have charge of the certificate books, membership interest transfer books, and other documents as the Board of Managers may direct, all of which shall at all reasonable times be open to inspection by any Manager at the office of the Company during normal business hours. The Secretary shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

6.12 Assistant Secretaries . Each Assistant Secretary shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President. The Assistant Secretaries (in the order designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Secretary continuously) shall exercise the powers of the Secretary during that officer's absence or inability to act.

## ARTICLE VII

## CAPITALIZATION AND CAPITAL ACCOUNTS

7.01 Capital Contributions . The Capital Contributions of the Members, as set forth in the books and records of the Company, shall be paid or transferred to the Company in cash and/or property on the terms and in the manner specified by the Board of Managers. No Member shall be entitled to make any additional Capital Contributions except as provided in Section 7.02 and 7.03 below.

7.02 Additional Capital Contributions . If the Board of Managers determine that additional capital is required for the purposes of the Company, as set forth herein, the Board of Managers may notify the Members of the need for such additional capital and shall state the specific purposes for which the call for such additional capital is being made. Thereupon, all Members shall have the right (but not the obligation) to make additional Capital Contributions in cash and/or property to the Company aggregating the amount of additional capital needed by the Company in the proportion of their respective Percentage Interests in the Company at the time notice is given. The Board of Managers shall use the additional capital so contributed solely for the purposes stated in the notice to the Members.

7.03 Failure to Make Additional Capital Contributions . If any Member chooses not to contribute its share of the additional capital needed by the Company within 14 days after notice is given to the Members of the need for such additional capital (a "Non-Contributing Member"), then the other Members shall be entitled (but not obligated) to contribute the share of such Non-Contributing Member (such Members being referred to as "Contributing Members") of the additional capital needed pro rata according to such Contributing Members' Percentage Interests at such time or such other share as otherwise agreed upon by the Contributing Members.

7.04 Effect of Failure to Make Additional Capital Contributions . In the event of a Non-Contributing Member, the Percentage Interests of all of the Members shall be recomputed on the following basis: Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member plus the additional Capital Contribution, if any, made by such Member pursuant to Sections 7.02 and 7.03 above, and the denominator of which is the total Capital Contributions of all of the Members plus the additional Capital Contributions made by all of the Members pursuant to Sections 7.02 and 7.03 above.

7.05 Recapitalization by Admission of Additional Members . If additional capital is required for the purposes of the Company as set forth herein and the Board of Managers is unable to finance such capital needs by borrowing the required amounts or through notice to the existing Members of the necessity for additional Capital Contributions as provided in Section 7.02 and 7.03 above, the Board of Managers shall have the right to admit additional Members to the Company, upon receiving the other approvals required herein. Following the admission of one or more new Members, the Percentage Interest of each Member, including the newly admitted Member(s), shall be computed as follows: Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member and the denominator of which is the total Capital Contributions of all of the Members, including the newly admitted Members.

7.06 Maintenance of Capital Accounts . The Company shall maintain for each Member a separate Capital Account in accordance with this Section 7.06, which shall control the allocation of Profits and Losses and the division of assets upon liquidation of the Company as provided in Section 12.01. Each Capital Account shall be maintained in accordance with the following provisions:

(a) a Member's Capital Account shall initially be zero and shall be increased by the cash amount or Book Value of any property contributed by such Member to the Company pursuant to this Agreement, such Member's allocable share of Profits and any items in the nature of income or gains that are specially allocated to such Member pursuant to Section 8.02 and Section 8.03 hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

(b) such Capital Account shall be decreased by the cash amount or Book Value of any property distributed to such Member pursuant to this Agreement, such Member's allocable share of Losses and any items in the nature of deductions or losses that are specially allocated to such Member pursuant to Section 8.02 and Section 8.03 hereof, and the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company; and

(c) if all or a portion of an Interest in the Company is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest, provided, however, that if the Transfer causes a termination of the Company under Code Section 708(b)(1)(B), the assets of the Company shall be deemed to have been distributed to the Members (including the transferee of the Interest) in liquidation of the Company and recontributed by such Members and transferees in reconstitution of the Company. Such deemed liquidation and reconstitution shall not cause the Company to be dissolved and/or reconstituted for purposes other than maintenance of the Capital Accounts and federal income tax.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Board of Managers determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Board of Managers may authorize such modifications, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Sections 8.06 and 12.01 hereof.

7.07 Negative Capital Accounts . If any Member has a deficit balance in its Capital Account, such Member shall have no obligation to restore such negative balance or to make any Capital Contribution to the Company by reason thereof, and such negative balance shall not be considered an asset of the Company or of any Member.

7.08 Interest . No interest shall be paid by the Company on Capital Contributions or on balances in Capital Accounts.

7.09 No Withdrawal . No Member shall be entitled to withdraw any part of his Capital Contribution or his Capital Account or to receive any distribution from the Company, except as provided in Sections 11.02 and 12.01 of this Agreement.

7.10 Loans From Members . Loans by a Member to the Company shall not be considered Capital Contributions.

## ARTICLE VIII

## ALLOCATIONS AND DISTRIBUTIONS

8.01 Allocation of Profits and Losses.

(a) Allocation of Profits. Except as provided on any Exhibit hereto, after giving effect to the allocations set forth in Section 8.02 and Section 8.03, and after giving effect to all distributions of cash or property (other than cash or

property to be distributed pursuant to Section 12.01), Profits for any Fiscal Year shall be allocated to the Members in the following manner:

(i) first, to each Member with a negative balance in its Capital Account, pro rata in accordance with such negative Capital Account balances, until such negative Capital Account balances have been eliminated;

(ii) next, to all of the Members in accordance with their respective Percentage Interests.

(b) Allocation of Losses. Except as provided in any Exhibit hereto, after giving effect to the allocations set forth in Section 8.02 and Section 8.03, Losses for any Fiscal Year shall be allocated to the Members in the following manner:

(i) to all of the Members in accordance with their respective Percentage Interests.

8.02 Special Allocations of Profits and Losses .

(a) Minimum Gain Chargeback–Company Nonrecourse Liabilities. If there is a net decrease in Company minimum gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) to the Members in the amounts and manner described in Treasury Regulations Section 1.704-2(f) and (j)(2)(i) and (ii), subject to the exemptions set forth in Treasury Regulations Section 1.704-2(f)(2), (3), (4) and (5). This Section 8.02(a) is intended to comply with the minimum gain chargeback requirement set forth in Treasury Regulations Section 1.704-2(f) relating to Company nonrecourse liabilities, as defined in Treasury Regulations Section 1.704-2(b)(3) and shall be so interpreted.

(b) Minimum Gain Chargeback–Member Nonrecourse Debt. If there is a net decrease in Member minimum gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) as quickly as possible to those Members who had a share of the Member minimum gain determined pursuant to Treasury Regulations Section 1.704-2(i)(5) in the amounts and manner described in Treasury Regulations Sections 1.704-2(i)(4), (j)(2)(ii), and (j)(2)(iii). This Section 8.02(b) is intended to comply with the minimum gain chargeback requirement set forth in Treasury Regulations Section 1.704-2(i)(4) relating to Member nonrecourse debt, as defined in Treasury Regulations Section 1.704-2(b)(4) and shall be so interpreted.

(c) Qualified Income Offset. If, after applying Section 8.02(a) and Section 8.02(b), any Member has an adjusted Capital Account deficit, items of Company income and gain shall be specially allocated (on a gross basis) to each such Member in an amount and manner sufficient to eliminate the adjusted Capital Account deficit of such Member as quickly as possible. This Section 8.02(c) is intended to comply with the "qualified income offset" requirement set for the in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be so interpreted.

(d) Optional Basis Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken in to account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

(f) Partner Nonrecourse Deductions. Partner Nonrecourse Deductions shall be allocated pursuant to Treasury Regulations Section 1.704-2(b)(4) and (i)(1) to the Member who bears the economic risk of loss with respect to such deductions.

8.03 Curative Allocations . The Regulatory Allocations are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 8.03. Therefore, notwithstanding any other provisions of this Article VIII, the Board of Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 8.01(a) and Section 8.01(b) hereof.

8.04 Tax Allocations: Code Section 704(c) .

(a) In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value.

(b) If the Book Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

(c) Any elections or other decisions relating to such allocation shall be made by the Board of Managers. Allocations pursuant to this Section 8.04 are solely for purposes of federal, state, and local taxes and shall not affect or in any way be taken into account in computing any Member's Capital Account, or share of Profits, Losses, and other items or distribution pursuant to any provision of this Agreement.

8.05 Other Allocation Rules .

(a) For purposes of determining the Profits, Losses, or any other item allocable to any period, Profits, Losses, and any such other item shall be determined on a daily, monthly, or other basis, as determined by the Board of Managers using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(b) For federal income tax purposes, every item of income, gain, loss, and deduction shall be allocated among the Members in accordance with the allocations under Sections 8.01, 8.02, 8.03, and 8.04.

(c) The Members are aware of the income tax consequences of the allocations made by this Article VIII and hereby agree to be bound by the provisions of this Article VIII in reporting their shares of Company income and loss for income tax purposes.

(d) It is intended that the allocations in Sections 8.01, 8.02, 8.03, and 8.04 hereof effect an allocation for federal income tax purposes consistent with Section 704 of the Code and comply with any limitations or restrictions therein.

8.06 Distributions of Distributable Cash . Except as otherwise may be provided in this Agreement, the Board of Managers shall cause the Company to make distributions of Distributable Cash at such intervals and in such amounts as the Board of Managers in its sole discretion shall determine by majority vote. Distributions of Distributable Cash shall be made to all of the Members in accordance with their respective Percentage Interests.

8.07 Working Cash Reserve . The Board of Managers may from time to time establish a working cash reserve for capital expenditures, unforeseen contingencies, projected operating deficits, and other corporate purposes and may increase or decrease the amount in such reserve in its business judgment.

## ARTICLE IX

## CERTIFICATES

9.01 Certificated and Uncertificated Interests. The membership interests of the Company may be either certificated interests or uncertificated interests. As used herein, the term "certificated interests" means Interests represented by instruments in bearer or registered form, and the term "uncertificated interests" means Interests not represented by such instruments and the transfers of which are registered upon books maintained for that purpose by or on behalf of the Company.

9.02 Certificates for Certificated Interests . The certificates for certificated interests shall be in such form as shall be approved by the Board of Managers in conformity with law. The certificates shall be consecutively numbered, shall be entered as they are issued in the books of the Company or in the records of the Company's designated transfer agent, if any, and shall state the Member's name, the class of Interests, the Percentage Interest that such Interest represents, and such

other matters as may be required by law. The certificates shall be signed by the President or any Vice President and also by the Secretary, an Assistant Secretary, or any other officer, and may be sealed with the seal of the Company or a facsimile thereof. If any certificate is countersigned by a transfer agent or registered by a registrar, either of which is other than the Company itself or an employee of the Company, the signatures of the foregoing officers may be a facsimile.

9.03 Lost, Stolen, or Destroyed Certificates . The Company shall issue a new certificate in place of any certificate for Interests previously issued if the registered owner of the certificate satisfies the following requirements:

(a) the registered owner makes proof in affidavit form that a previously issued certificate for Interests has been lost, destroyed, or stolen;

(b) the registered owner requests the issuance of a new certificate before the Company has notice that the certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(c) the registered owner gives a bond in such form, and with such surety or sureties, with fixed or open penalty, as the Board of Managers may direct, in its discretion, to indemnify the Company (and its transfer agent and registrar, if any) against any claim that may be made on account of the alleged loss, destruction, or theft of the certificate; and

(d) the registered owner satisfies any other reasonable requirements imposed by the Board of Managers.

When a certificate has been lost, destroyed, or stolen and the Member of record fails to notify the Company within a reasonable time after he has notice of it, if the Company registers a transfer of the Interests represented by the certificate before receiving such notification, the Member of record is precluded from making any claim against the Company for the transfer or for a new certificate.

9.04 Transfer of Interests . Interests of the Company shall be transferable only on the books of the Company by the Members thereof in person or by their duly authorized attorneys or legal representatives, but only as authorized in this COMPANY AGREEMENT. With respect to certificated interests, upon surrender to the Company or the transfer agent of the Company of a certificate representing Interests duly endorsed or accompanied by proper evidence of succession, assignment, or authority to transfer, the Company or its agent shall issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction upon its books. With respect to uncertificated interests, upon delivery to the Company of proper evidence of succession, assignment, or authority to transfer, the Company or its agent shall record the transaction upon its books.

9.05 Registered Members . The Company shall be entitled to treat the Member of record as the Member in fact of any Interests and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Interests on the part of any other Person, whether or not it shall have actual or other notice thereof, except as otherwise provided by law.

9.06 Legends . If the Company is authorized to issue Interests of more than one class, each certificate representing Interests issued by the Company (a) shall conspicuously set forth on the face or back of the certificate a full statement of all of the designations, preferences, limitations, and relative rights of the Interests of each class authorized to be issued; or (b) shall conspicuously state on the face or back of the certificate that (i) such a statement is set forth in the Certificate on file in the office of the Secretary of State or in this Agreement; and (ii) the Company will furnish a copy of such statements to the record holder of the certificate without charge on written request to the Company at its principal place of business or registered office.

If the Company issues any Interests that are not registered under the Securities Act of 1933, the transfer of any such interests shall be restricted in accordance with an appropriate legend.

In the event any restriction on the transfer, or registration of the transfer, of Interests shall be imposed or agreed to by the Company, each certificate representing Interests so restricted (a) shall conspicuously set forth a full or summary statement of the restriction on the face of the certificate; (b) shall set forth such statement on the back of the certificate and conspicuously refer to the same on the face of the certificate; or (c) shall conspicuously state on the face or back of the certificate that such a restriction exists pursuant to a specified document and (i) that the Company will furnish to the record holder of the certificate without charge upon written request to the Company at its principal place of business or registered

office a copy of the specified document; or (ii) if such document is one required or permitted by law to be and has been filed, that such specified document is on file in the office of the Secretary of State and contains a full statement of such restriction.

## ARTICLE X

## ACCOUNTING AND RECORDS

10.01 Records and Accounting . The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal income tax purposes. The books and records of the Company shall reflect all Company transactions and shall be appropriate and adequate for the Company's business.

10.02 Access to Accounting Records . All books and records of the Company shall be maintained at any office of the Company or at the Company's principal place of business, and each Member owning a Percentage Interest of at least ten percent (10%), and his duly authorized representative, shall have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

10.03 Annual and Tax Information . The Company shall deliver to each Member within 90 days after the end of each Fiscal Year all information necessary for the preparation of such Member's federal income tax return. The Company shall prepare, within 120 days after the end of each Fiscal Year, a financial report of the Company for such Fiscal Year, containing a statement of the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

10.04 Accounting Decisions . All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Board of Managers. The Members may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

10.05 Federal Income Tax Elections . The Company may make all elections for federal income tax purposes, including, but not limited to, the following:

(a) to the extent permitted by applicable law and regulations, the election to use an accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b) in case of a transfer of all or part of the Interest of any Member, the election pursuant to Section 734, 743, and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE XI

## CHANGES IN MEMBERS

The provisions of this Article XI are subject to, and may be superceded by, one or more separate agreements entered into by and among one or more Members. The provisions of this Article XI shall continue to control with respect to matters not covered by, or Members not parties to, such agreement(s).

11.01 Intentionally Blank .

11.02 Transfer and Assignment of Members' Interest . Except as approved by the Manager, plus a Member or Members owning a Percentage Interest greater than fifty percent (50%), no Member shall be entitled to Transfer any part of its Interest in the Company. The Company and, if applicable, the remaining Members shall be entitled to match the terms of the proposed Transfer, with consideration being only set forth in traditional monetary terms. If the Company and the remaining Members fail to match the proposed Transfer with regard to the purchase of the entire Interest, or portion thereof, the Member proposing to make the Transfer may move forward with the proposed Transfer. Transfers in violation of this Section 11.02 shall be effective only to the extent set forth in Section 11.05(b) hereof.

11.03 Further Restrictions on Transfer . No Member shall Transfer any part of his Interest in the Company: (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged, when added to the total of all other Interests to be sold or exchanged in the preceding 12 consecutive months prior thereto, would result in the termination of the Company under Code Section 708.

11.04 Substitute Members . A transferee shall have the right to become a substitute Member if (a) the requirements of Section 11.02 and 11.03 hereof are met; (b) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement; and (c) such person pays any reasonable expenses in connection with his or her admission as a Member.

11.05 Effect of Transfer .

(a) Any permitted Transfer of all or any portion of a Member's Interest in the Company will take effect on the first day of the month following receipt by the Members of written notice of Transfer. Any transferee of an Interest in the Company shall take subject to the restrictions on Transfer imposed by this Agreement.

(b) Upon any Transfer of a Member's Interest in the Company in violation of this Agreement, and if such Member's Interest is not purchased pursuant to Section 11.01, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee shall be entitled to receive only the allocable share of Profits, Losses, Distributive Cash, and other items to which the transferor of such Interest in the Company would otherwise be entitled.

11.06 No Dissolution or Withdrawal: Advanced Consent . Upon the occurrence of a Dissolution Event with regard to a respective Member, all remaining Members shall be deemed to automatically consent to the continuation of the business of the Company. By executing this Agreement, however, all Members hereby consent that they shall not voluntarily cause a Dissolution Event or demand the return of Member's capital. If any Member shall breach the agreement represented by this Section 11.06, the agreement of such breaching Member shall not be specifically performable, but shall be actionable for damages, and shall be deemed an offer of the Interest of such breaching Member for sale pursuant hereto. The parties agree that a reasonable approximation of the damage that the Company shall experience due to breach hereof is 20% of the value of the breaching Member's Interest, or as otherwise set forth herein (whichever is greater), which shall be deducted from any payments to such Member upon dissolution or purchase of such Member's Interest hereunder. The value of the breaching Member's Interest shall be determined pursuant to Section 11.01, to which value the said discount may then be applied in determining payments due to the breaching Member pursuant to the deemed offer of sale occurring under this Section 11.06.

## ARTICLE XII

## TERMINATION

12.01 Termination of the Company .

(a) The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following events:

(i) a determination by the Managers, plus the Unanimous Consent of the Members that the Company should be dissolved;

(ii) a sale of all or substantially all of the assets of the Company;

(iii) the expiration of the Company’s term as stated in its Certificate; or

(iv) at such earlier time as provided by applicable law.

(b) In settling accounts of the Company after dissolution, the liabilities of the Company shall be entitled to payment and the assets of the Company remaining thereafter shall be distributed to the Members in the following order, all as required by the DELAWARE LAWS:

(i) those to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their Capital Contributions;

(ii) to the Members, pro rata, in accordance with the positive balances, if any, in their Capital Accounts; and

(iii) to the Members in proportion to their relative Percentage Interests.

## ARTICLE XIII

## INDEMNIFICATION

13.01 Indemnification of Members, Managers, and Other Persons .

(a) To the greatest extent not inconsistent with the laws and public policies of Delaware, the Company shall indemnify any Member, Manager, or officer of the Company made a party to any proceeding because such individual is or was a Member, Manager, or officer of the Company (an "Indemnitee"), as a matter of right, against all liability incurred by such individual in connection with any proceeding; provided that it shall be determined in the specific case in accordance with subsection (d) of this Section 13.01 that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section 13.01. The Company shall advance, pay for, or reimburse the reasonable expenses incurred by an Indemnitee in connection with any such proceeding in advance of final disposition thereof if (i) the Indemnitee furnishes the Company a written affirmation of the Indemnitee's good faith belief that he or she has met the standard of conduct for indemnification described in subsection (c) of this Section 13.01; (ii) the Indemnitee furnishes the Company a written undertaking, executed personally or on such Indemnitee's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct; and (iii) a determination is made in accordance with subsection (d) that based upon facts then known to those making the determination, indemnification would not be precluded under this Section 13.01. The undertaking described in subsection (a)(ii) above must be a general obligation of the Indemnitee, subject to such reasonable limitations as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company shall indemnify an Indemnitee who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section 13.01. Upon demand by an Indemnitee for indemnification or advancement of expenses, as the case may be, the Company shall expeditiously determine whether the Indemnitee is entitled thereto in accordance with this Section 13.01. The indemnification and advancement of expenses provided for under this Section 13.01 shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section 13.01.

(b) The Company shall have the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member, Manager, or officer of the Company.

(c) Indemnification is permissible under this Section 13.01 only if (i) the Indemnitee conducted himself in good faith; (ii) he or she reasonably believed that his conduct was in, or at least not opposed to, the Company's best interest; (iii) in the case of any criminal proceeding, he or she had no reasonable cause to believe his conduct was unlawful; and (iv) such Indemnitee is not adjudged in any such proceeding to be liable for gross negligence or willful misconduct in the performance of duty. The termination of a proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the Indemnitee did not meet the standard of conduct described in this subsection (c).

(d) A determination as to whether indemnification or advancement of expenses is permissible shall be made by any one of the following procedures:

(i) by the Board of Managers or by a majority vote consisting of Members not at the time parties to the proceeding; or

(ii) by special legal counsel selected by the Members in the manner prescribed in subsection (d)(i) above.

(e) An Indemnitee of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving notice the court considers necessary, may order indemnification if it determines:

(i) in a proceeding in which the Indemnitee is wholly successful, on the merits or otherwise, the Indemnitee is entitled to indemnification under this Section 13.01, in which case the court shall order the Company to pay the Indemnitee his or her reasonable expenses incurred to obtain such court ordered indemnification; or

(ii) the Indemnitee is fairly and reasonably entitled to indemnification in view of all the relevant circumstances, whether or not the Indemnitee met the standard of conduct set forth in subsection (c) of this Section 13.01.

(f) Indemnification shall also be provided for an Indemnitee's conduct with respect to an employee benefit plan if the individual reasonably believed his or her conduct to be in the interests of the participants in and beneficiaries of plan.

(g) Nothing contained in this Section 13.01 shall limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member, Manager, or officer of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise, whether for profit or not. Nothing contained in this Section 13.01 shall limit the ability of the Company to otherwise indemnify or advance expenses to any individual. It is the intent of this Section 13.01 to provide indemnification to Indemnitees to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section 13.01. Indemnification shall be provided in accordance with this Section 13.01 irrespective of the nature of the legal or equitable theory upon which a claim is made, including, without limitation, negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h) For purposes of this Section 13.01:

(i) The term "expenses" includes all direct and indirect costs (including, without limitation, counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement, or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section 13.01, applicable law, or otherwise.

(ii) The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii) The term "party" includes an individual who was, is, or is threatened to be made a named defendant or respondent in a proceeding.

(iv) The term "proceeding" means any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal.

(v) The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this Section 13.01, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

## ARTICLE XIV

## MISCELLANEOUS

14.01 Complete Agreement. This Agreement, the Certificate, and all other organizational documents signed by all of the Members constitute the complete and exclusive statement of agreement among the Members with respect to the matters herein. This Agreement and the Certificate replace and supersede all prior agreements by and among the Members or any of them, and no representation, statement, or condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or have any force or effect whatsoever.

14.02 Governing Law. This Agreement and the rights of the parties hereunder will be governed by, interpreted, and enforced in accordance with the laws of the State of Delaware.

14.03 Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective distributes, successors, and assigns.

14.04 Terms. Common nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require. Any reference to the DELAWARE LAWS, the Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

14.05 Headings. All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

14.06 Severability. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

14.07 Multiple Counterparts. This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument. However, in making proof hereof it will be necessary to produce only one copy hereof signed by the party to be charged.

14.08 Additional Documents and Acts. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

14.09 No Third-Party Beneficiary. This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

14.10 References to this Agreement. Numbered or lettered articles, sections, and subsections herein contained refer to articles, sections, and subsections of this Agreement unless otherwise expressly stated.

14.11 Notices. Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member at the address specified in Exhibit B hereto. Any Member or the Company may, at any time by giving five days' prior written notice to the other Members and the Company, designate any other address in substitution of the foregoing address to which such notice will be given.

14.12 Amendments . Except as otherwise may be provided in this Agreement, all amendments to this Agreement must be approved by the Managers, plus one or more Members whose aggregate Percentage Interests total more than fifty percent (50%).

14.13 Title to Company Property . Legal title to all property of the Company will be held and conveyed in the name of the Company.

14.14 Reliance on Authority of Person Signing Agreement . In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual; or (b) be required to see to the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

14.15 S-Corp Election. In the event the Company elects to be treated as a S-Corporation for federal tax purposes, the provisions in this Company Agreement addressing tax treatment shall be automatically amended and modified as required in order to pertain to a S-corporation.

14.16 Company Indemnification. In the event any Member is personally liable for any debt or obligations associated with a Company asset, then the Company agrees to indemnify such Member for any such debt or obligation in excess of his or her proportionate amount of such debt or obligation that he/she is required to pay or perform, as measured by the Percentage Interest of the Members, except as otherwise agreed by the Members.

***14.17 Management by Members. The Certificate of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers. As a result, if such is the case and the Certificate is not amended to reflect management by managers, this Agreement shall be interpreted in such a manner that all references herein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President.***

IN WITNESS WHEREOF, the Members have executed this Agreement to be effective as of the date first written above.

**THE MEMBER (OR MANAGING MEMBER)**

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By: ______________________________
Mark Patrick, Director and President

**EXHIBIT A**

THE CLASS A MEMBERS AND INTERESTS

The sole Class A Member shall be RAND ADVISORS HOLDING CORP., a Delaware corporation, and it shall own the Percentage Interest set forth on Exhibit "B" hereto. In addition to such other rights as a Member described in this Agreement, the holders of record of the Class A Interests shall have no additional rights.

**EXHIBIT B**

The Members

| Members and Addresses | Date Admitted | Class A Interest | Percentage Interest |
|---|---|---|---|
| RAND ADVISORS<br>HOLDING CORP.<br>2101 Cedar Springs Road<br>Suite 1200, Dallas, TX 75201<br>Attn: Mark Patrick | 8/1/2022 | 100% | 100% |

**EXHIBIT 2**

MEMBER AND MANAGER CONSENT
OF
RAND PE FUND MANAGEMENT, LLC

October 13, 2022

THE UNDERSIGNED sole member (the “M r”) and sole manager (the “M r”) of RAND PE FUND MANAGEMENT, LLC, a Delaware limited liability company (the “ r r”), the general partner of RAND PE FUND I, L.P., a Delaware limited partnership (the “ r r ”), acting pursuant to the Delaware Limited Liability Company Act and the Amended and Restated Company Agreement of the General Partner, do hereby consent and agree, to take the following actions and adopt the following resolutions:

RESOLVED, that pursuant to that certain Membership Interest Purchase Agreement dated as August 1, 2022 (the “Purchase Agreement”), by and among JOHN HONIS (as “Seller”), the Sole Member (as “Buyer”), and CLO HOLDCO, LTD. a Cayman limited company (as “Guarantor”), the Sole Member purchased from Seller all of the issued and outstanding membership interests in the General Partner;

RESOLVED, that the following individual be, and hereby is, duly appointed and qualified to hold the office(s) set forth next to his name, and shall serve in such capacity until such person’s successor(s) shall have been duly appointed and qualified, or until his earlier resignation or removal (each, an “ r”):

| | |
|---|---|
| Mark Patrick | Sole Manager, President, Secretary and Treasurer |

RESOLVED, that the certificate of formation of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers. As a result, if such is the case and the certificate is not amended to reflect management by managers, the Company and all governing documents shall be interpreted in such a manner that all references therein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President;

RESOLVED FURTHER, that any individual previously appointed as a manager and/or as an officer of the General Partner but not named above is hereby removed from the office of the General Partner;

RESOLVED FURTHER, that each Officer and manager is hereby, authorized, empowered and directed, in the name and on behalf of the General Partner and the Partnership, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions;

RESOLVED FURTHER, that that all authorized acts and deeds of the Officers, managers and agents on behalf of the General Partner and/or the Partnership prior to the date

hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the acts and deeds of the General Partner and/or the Partnership; and

RESOLVED FURTHER, that the foregoing authorization shall remain in effect until further written notice from the General Partner.

*[Signature Page to Follow]*

IN WITNESS WHEREOF, the undersigned Sole Member and Sole Manager have executed this Consent to be effective as of the date first set forth above.

MEMBER

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By:______________________________
Mark Patrick, Sole Director

SOLE MANAGER

______________________________
Mark Patrick

**EXHIBIT**

# LIMITED LIABILITY COMPANY AGREEMENT OF RAND ADVISORS, LLC

This LIMITED LIABILITY COMPANY AGREEMENT (this "***Agreement***") is entered into as of the 28th day of August, 2013 by John Honis, an individual (the "***Member***"), as the sole member of Rand Advisors, LLC, a limited liability company formed pursuant to the Delaware Limited Liability Company Act (the "***Act***"). The Member desires to form a limited liability company pursuant to the Act upon the following terms and conditions:

## ARTICLE 1
## NAME, REGISTERED AGENT AND OFFICES

The name of the Company is Rand Advisors, LLC (the "***Company***"). Its registered office in the State of Delaware is 1209 Orange Street, Wilmington, Delaware 19801, in the County of New Castle. The name of its registered agent at such address is The Corporation Trust Company. The principal office of the Company shall be located at such place within or without the State of Delaware, and the Company shall maintain such records as the Member shall determine from time to time. The Company may have such other offices as the Member may designate from time to time.

## ARTICLE 2
## BUSINESS, PURPOSE, AND TERM OF COMPANY

Section 2.1 Purposes. The purpose of the Company shall be to do all such things for which limited liability companies may be formed under the Act.

Section 2.2 Term. The term of the Company shall commence on the date the Certificate of Formation is filed with the Delaware Secretary of State in accordance with the provisions *of* the Act and shall continue on a perpetual basis unless dissolved pursuant to ARTICLE 6 of this Agreement. Matt McGraner is hereby designed as an "Authorized Person" for the purpose of executing the Certificate of Formation and arranging for its filing.

Section 2.3 Powers. In addition to the purpose set forth in Section 2.1 above, the Company shall have the power:

(a) to conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any state, territory, district or possession of the United States, or in any foreign country that may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

(b) to acquire, by purchase, mortgage, lease, contribution of property or otherwise, and to own, hold, operate, maintain, finance, improve, lease, sell, convey, mortgage, transfer or dispose of any real or personal property that may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

(c) to enter into, perform and carry out contracts of any kind, including, without limitation, contracts with the Member or any person or other entity that directly or indirectly controls, is controlled by, or is under common control with the Member, or any agent of the Company necessary to, in connection with, convenient to, or incidental to, the accomplishment of the purpose of the Company;

(d) to lend or borrow money and to invest its funds;

(e) to sue and be sued;

(f) to appoint employees and fix their compensation;

(g) to indemnify any person; and

(h) to guarantee obligations of an affiliate or subsidiary.

**ARTICLE 3**
**CAPITAL CONTRIBUTIONS**

Section 3.1 Capital Contribution by Members. Upon the formation of the Company, the Member shall not be required to make a Capital Contribution. Capital Contributions shall be made from time to time as the Member shall determine.

Section 3.2 Capital Accounts. A Capital Account shall be maintained for the Member to which shall be credited (i) the Member’s Capital Contributions, if any and (ii) all Company revenues. The Capital Account shall be debited with (i) all costs, expenses, and losses of the Company and (ii) the amount of any distributions (including return of capital) made to the Member. No interest shall be paid on the Member’s Capital Account.

**ARTICLE 4**
**ALLOCATIONS OF PROFITS AND DISTRIBUTIONS**

Section 4.1 Allocation of Profits and Losses. All profits and losses of the Company shall be allocated to the Member.

Section 4.2 Allocation of Distributions. All distributions of cash or other assets of the Company shall be made to the Member when and as determined by the Member.

**ARTICLE 5**
**MANAGEMENT OF THE COMPANY**

Section 5.1 General. The Member shall be the Managing Member and shall be responsible for the management of the Company. The Managing Member shall have the right, power and authority to manage, direct and control all of the business and affairs of the Company, to transact business on behalf of the Company, to sign for the Company or on behalf of the Company or otherwise to bind the Company.

Section 5.2 Delegation of Powers of Managing Member. The Managing Member shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to delegate the management, control, administration, and operation of the business and affairs of the Company or the custody of the Company's assets for all purposes stated in this Agreement. Such delegation shall be as provided in such documentation as the Managing Member shall determine. Any such delegation shall not cause the Managing Member to cease to be the Managing Member.

Section 5.3 Officers. The Managing Member may appoint individuals with or without such titles as it may elect, including the titles of President, Vice President, Treasurer, and Secretary, to act on behalf of the Company with such power and authority as the Managing Member may delegate in writing to any such persons.

Section 5.4 Powers of Managing Member. The Managing Member shall have the right, power and authority, in the management of the business and affairs of the Company, to do or cause to be done any and all acts deemed by the Managing Member to be necessary or appropriate to effectuate the business, purposes and objectives of the Company at the expense of the Company, including but not limited to the execution of all documents or instruments in all matters necessary, desirable, convenient or incidental to the purpose of the Company or the making of investments of Company funds.

Section 5.5 Reliance by Third Parties. Any person or entity dealing with the Company may rely on a certificate signed by the Managing Member as to:

(a) the identity of the Managing Member;

(b) the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Managing Member or are in any matter germane to the affairs of the Company;

(c) the persons who or entities which are authorized to execute and deliver any instrument or document of or on behalf of the Company; or

(d) any act or failure to act by the Company or as to any other matter whatsoever involving the Company.

Section 5.6 Actions Requiring Member Approval. Notwithstanding any other provision of this Agreement, the written consent of the Member shall be required to approve the following matters:

(a) the dissolution or winding up of the Company;

(b) the merger or consolidation of the Company;

(c) the sale, transfer, contribution, exchange, mortgage, pledge, encumbrance, lease or other disposition or transfer of all or substantially all of the assets of the Company;

(d) the declaration of any distributions by the Company; and

(e) amendments to this Agreement.

## ARTICLE 6
## DISSOLUTION

The Company shall be dissolved, and shall terminate and wind up its affairs, upon the first to occur of the following:

(a) the determination by the Member to dissolve the Company; or

(b) the entry of a decree of judicial dissolution pursuant to Section 18.802 of the Act.

## ARTICLE 7
## GOVERNING LAW AND JURISDICTION

This Agreement, including its existence, validity, construction and operating effect, and the rights of each of the parties hereto, shall be governed by and construed in accordance with the laws of the State of Delaware (without regard to principles of conflicts of laws).

## ARTICLE 8
## INDEMNIFICATION

Section 8.1 Indemnification and Liability.

(a) To the maximum extent permitted by applicable law, the Managing Member shall not be liable to the Company or any other third party (i) for mistakes of judgment, (ii) for any act or omission suffered or taken by it, or (iii) for losses due to any such mistakes, action or inaction.

(b) Except as may be restricted by applicable law, the Managing Member shall not be liable for and the Company shall indemnify the Managing Member against, and agrees to hold the Managing Member harmless from, all liabilities and claims (including reasonable attorney's fees and expenses in defending against such liabilities and claims) against the Managing Member, arising from the Managing Member's performance of its duties in conformance with the terms of this Agreement.

(c) The Managing Member may consult with legal counsel or accountants selected by the Managing Member and, to the maximum extent permitted by applicable law, any action or omission suffered or taken in good faith in reliance and in accordance with the written opinion or advice of any such counsel or accountants (provided such counsel or accountants have been selected with reasonable care) shall be fully protected and justified with respect to the action or omission so suffered or taken.

(d) The Company shall also have the power to indemnify the Trustee to the extent, and under the conditions and terms, as may be provided in the Trust Agreement.

## ARTICLE 9
## ASSIGNMENT OF INTERESTS

The Member may Transfer all or part of its Membership Interest in the Company.

## ARTICLE 10
## WINDING UP AND DISTRIBUTION OF ASSETS

Section 10.1 Winding Up. If the Company is dissolved, the Member shall wind up the affairs of the Company.

Section 10.2 Distribution of Assets. Upon the winding up of the Company, subject to the provisions of the Act, the Member shall pay or make reasonable provision to pay all claims and obligations of the Company, including all costs and expenses of the liquidation and all contingent, conditional or unmatured claims and obligations that are known to the Member but for which the identity of the claimant is unknown. If there are sufficient assets, such claims and obligations shall be paid in full and any such provision shall be made in full. If there are insufficient assets, such claims and obligations shall be paid or provided for according to their priority and, among claims and obligations of equal priority, ratably to the extent of assets available therefore. Any remaining assets shall be distributed to the Member.

## ARTICLE 11
## DEFINITIONS

As used herein, the following terms shall have the indicated definitions.

"***Act***" means the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq., as may be amended from time to time.

"***Agreement***" means this Limited Liability Company Agreement, as may be amended from time to time.

"***Capital Account***" means a separate accounting maintained with respect to the Member pursuant to section 3.2 of this Agreement.

"***Capital Contribution***" means the contribution by the Member to capital of the Company.

"***Certificate of Formation***" means the Certificate of Formation of the Company as filed with the Delaware Secretary of State on August 27, 2013, as the same may be amended from time to time.

"***Company***" means Rand Advisors, LLC, a Delaware limited liability company.

"***Managing Member***" means the Member.

"***Member***" means John Honis, an individual.

"***Membership Interest***" means the ownership interest of the Member in the Company, including any and all rights, powers, benefits, duties or obligations conferred or imposed on the Member under the Act or this Agreement.

"***Transfer***" means a transfer, assignment, pledge or encumbrance relative to any Membership Interest in the Company.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the Member has executed and delivered this Agreement the day and year first above written.

SOLE MEMBER

JOHN HONIS

**EXHIBIT**

AMENDED AND RESTATED COMPANY AGREEMENT

*of*

RAND ADVISORS, LLC

A Delaware Limited Liability Company

**AMENDED AND RESTATED COMPANY AGREEMENT**

***of***

**RAND ADVISORS, LLC**

**A Delaware Limited Liability Company**

This AMENDED AND RESTATED COMPANY AGREEMENT (collectively, the "Agreement," which shall include all amendments and exhibits hereto) dated effective as of the 1st day of August, 2022 (the "Effective Date"), are entered into by and among those Persons executing the signature page hereto as the Members of RAND ADVISORS, LLC, a Delaware limited liability company (the "Company"). All capitalized terms not defined in the instance of first usage shall have the respective meanings associated with such terms in Section 1.04 below.

**ARTICLE I**

**INTRODUCTION**

1.01 Formation of Limited Liability Company The Company was formed by the filing of the Certificate of Formation (the "Certificate") with the Secretary of State of Delaware on the August 27, 2013. The Company's business shall be conducted under the name "RAND ADVISORS, LLC" until such time as the Members shall hereafter designate otherwise and file amendments to the Certificate in accordance with applicable law. This Agreement amends and replaces, in its entirety, all prior governing agreements for the Company, including but not limited to that certain Amended and Restated Limited Liability Company Agreement dated March 1, 2016, and any and all amendments thereto.

This Agreement is subject to, and governed by, the Delaware laws governing limited liability companies (the "DELAWARE LAWS") and the Certificate. In the event of a direct conflict between the provisions of this Agreement and the mandatory provisions of the DELAWARE LAWS or the provisions of the Certificate, such provisions of the DELAWARE LAWS or the Certificate, as the case may be, will be controlling.

1.02 Registered Office and Agent The registered office and registered agent of the Company initially shall be as set forth in the Certificate and may be changed from time to time by the appropriate filing by the Company in the office of the Secretary of State of Delaware.

1.03 Other Offices The Company may also have offices at such other places, both within and without the State of Delaware, as the Board of Managers may from time to time determine or the business of the Company may require.

1.04 Defined Terms The terms used in this Agreement with their initial letter capitalized shall, unless the context requires otherwise, have the meanings specified in this Section 1.04. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, as the context requires. When used in this Agreement, the following terms shall have the meanings set forth below:

(a) "DELAWARE LAWS" shall mean the Delaware laws governing limited liability companies, as the same may be amended from time to time.

(b) "Affiliate" shall mean, as to any Person, any Person controlled by, controlling, or under common control with such Person, and, in the case of a Person who is an individual, a member of the family of such individual consisting of a spouse, sibling, in-law, lineal descendant, or ancestor (including by adoption). For purposes of this definition, "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, directly or indirectly, alone or in concert with others, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of securities, by contract or otherwise, and no Person shall be deemed in control of another solely by virtue of being a director, officer or holder of voting securities of any entity. A Person shall be presumed to control any partnership of which such Person is a general partner.

(c) "Bankruptcy" shall mean, and a Member shall be deemed a "Bankrupt Member," upon (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any Debtor Relief Laws; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member's affairs; (iv) the filing of a petition in any involuntary bankruptcy case, which petition remains undismissed for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator, or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(d) "Book Depreciation" for any asset shall mean for any Fiscal Year or other period an amount that bears the same ratio to the Book Value of that asset at the beginning of such Fiscal Year or other period as the federal income tax depreciation, amortization, or other cost recovery deduction allowable for that asset for such year or other period bears to the adjusted tax basis of that asset at the beginning of such year or other period. If the federal income tax depreciation, amortization, or other cost recovery deduction allowable for any asset for such year or other period is zero, then Book Depreciation for that asset shall be determined with reference to such beginning Book Value using any reasonable method selected by the Board of Managers.

(e) "Book Value" shall mean for any asset the asset's adjusted tax basis, except as follows:

(i) the initial Book Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the Board of Managers;

(ii) the Book Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board of Managers, as of one of the following times: (1) on the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; (2) on the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an Interest in the Company if the Board of Managers reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; and (3) on the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations;

(iii) the Book Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution;

(iv) the Book Values of Company assets shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Treasury Regulations and Section 8.02(d) hereof; provided, however, that Book Values shall not be adjusted pursuant to this Section 1.04(e)(iv) to the extent the Board of Managers determines that an adjustment pursuant to Section 1.04(e)(ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 1.04(e)(iv); and

(v) if the Book Value of an asset has been determined or adjusted pursuant to Section 1.04(e)(i),1.04(e)(ii), or 1.04(e)(iv) hereof, such Book Value shall thereafter be adjusted by the Book Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

(f) "Capital Contribution" shall mean the total value of cash and Book Value (except as otherwise herein provided) of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, attached hereto and incorporated herein for all purposes, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any

prior Member for the interest of such then Member, reduced by any distribution to such Member in return of its capital as contemplated herein.

(g) "Class A Interest" shall refer to the Interest of a Class A Member in the Profits, Losses, Distributable Cash, and assets upon liquidation of the Company as described in this Agreement.

(h) "Class A Members" shall mean those Persons listed on Exhibit A and designated as "Class A Members." The Class A Members shall have such additional rights as a Member as are specifically described and granted in Exhibit A, as amended from time to time.

(i) Intentionally Blank.

(j) Intentionally Blank.

(k) "Code" shall mean the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

(l) "Company" shall refer to the limited liability company created by virtue of the Certificate and this Agreement and any successor in interest.

(m) "Debtor Relief Laws" shall mean any federal or state bankruptcy, insolvency, or similar laws generally affecting the rights of creditors and the relief of debtors now or hereafter in effect.

(n) Intentionally Blank.

(o) "Distributable Cash" of the Company shall mean all cash funds of the Company on hand from time to time (other than cash funds obtained as Capital Contributions by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time; (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time; and (iii) provision for a working cash reserve in accordance with Section 8.07 below.

(p) "Fiscal Year" shall mean the calendar year.

(q) "Former Member" shall mean a member that causes a Dissolution Event.

(r) "Interest" in the Company shall mean the entire ownership interest of a Member in the Company at any particular time, including such Member's Capital Account, allocable share of Profits, Losses, and Distributable Cash, and the right of such Member to any and all benefits to which a Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

(s) Intentionally Blank

(t) "Manager" shall mean an individual elected to the Board of Managers of the Company pursuant to Sections 3.02 and 3.04 below.

(u) "Member(s)" shall mean all Members admitted to the Company hereafter as Members who shall consent to the terms hereof and shall be admitted pursuant to the provisions hereof. The names, business or residence addresses, Capital Contributions, Percentage Interest, and class of Interest of the Members shall be set forth on Exhibit B, attached hereto and incorporated herein by reference. Reference to a "Member" shall be to any one of the Members.

(v) "Percentage Interest" of a Member shall mean the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit B, as such percentage may be adjusted from time to time pursuant to the terms hereof.

(w) "Person" shall mean any individual, corporation, partnership, limited liability company or partnership, association, organization, trust, estate, or other entity.

(x) "Pro Rata Part" shall mean the percentage expression of a fraction the numerator of which is a Member's respective Percentage Interest and the denominator of which is the aggregate Percentage Interests of all Members involved in the respective transaction or having a respective right or option.

(y) "Profits" and "Losses" shall mean, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i) income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to this Section 1.04(y) shall be added to such taxable income or loss;

(ii) any expenditures of the Company described in Code Section 705(a)(2)(B), or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Profits and Losses pursuant to this Section 1.04(y), shall be subtracted from such taxable income or loss;

(iii) if the Book Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) or Section 1.04(e)(iii), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

(iv) gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(v) in lieu of the deduction for depreciation, cost recovery, or amortization taken into account in computing such taxable income or loss, there shall be taken into account Book Depreciation; and

(vi) notwithstanding any other provision of this Section 1.04(y), any items that are specially allocated pursuant to Section 8.02 or Section 8.03 shall not be taken into account in computing Profits and Losses.

(z) "Regulatory Allocations" shall mean the special allocations of items of income, gain, loss, and deduction, if any, set forth in Section 8.02 hereof.

(aa) "Transfer" or "Transferred" shall mean the sale, assignment, conveyance, gift, bequest, devise, transfer under the rules of intestate succession, pledge, mortgage, or other encumbrance. In addition, the term "Transfer" or "Transferred" shall mean an "ownership change" of a Member as defined in Section 382(g) of the Code in effect as of the Effective Date, except that the term "Member" shall be substituted for "shareholder" wherever it appears.

(bb) "Treasury Regulations" shall mean regulations issued by the Department of the Treasury interpreting the Code.

(cc) "Unanimous Consent" shall mean the written consent of all of the then Members of the Company.

## ARTICLE II

## MEMBERS AND MEMBERSHIP INTERESTS

2.01 Members. The Members of the Company shall be those Persons listed on Exhibit B. Except as otherwise may be provided in Exhibit A or Exhibit B, and except as provided in Section 7.05 below, a Person may be admitted as a Member to the Company only upon the affirmative vote of the Managers, plus one or more Members whose Percentage Interests total more than fifty percent (50%); provided, however, that no Person will be recognized as a Member of the

Company until he/she shall have executed this Agreement, or a counterpart hereto, and agrees to be bound by all of the terms and conditions hereof.

2.02 Annual Meetings An annual meeting of the Members of the Company shall be held during each calendar year on such date and at such time as shall be designated from time to time by the Board of Managers and stated in the notice of the meeting, and if a legal holiday, then on the next business day following, at the time specified in the notice of the meeting. At such meeting, the Members shall elect Managers and transact such other business as may properly be brought before the meeting.

2.03 Special Meetings A special meeting of the Members may be called at any time by the President, the Board of Managers, or one or more Members whose Percentage Interests total at least 10%. Only such business shall be transacted at a special meeting as may be stated or indicated in the notice of such meeting.

2.04 Place of Meetings The annual meeting of Members may be held at any place within or without the State of Delaware as may be designated by the Board of Managers. Special meetings of Members may be held at any place within or without the State of Delaware as may be designated by the person or persons calling such special meeting as provided in Section 2.03. If no place for a meeting is designated, it shall be held at the registered office of the Company.

2.05 Notice. Written or printed notice stating the place, day, and hour of each meeting of Members and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 10 days or more than 50 days before the date of the meeting, either personally or by mail, by or at the direction of the President, the Secretary, or the person calling the meeting, to each Member of record entitled to vote at such meeting.

2.06 Voting List At least 10 days before each meeting of Members, the Secretary shall prepare a complete list of Members entitled to vote at such meeting, arranged in alphabetical order, including the address of each Member and the number of voting Interests held by each Member. For a period of 10 days prior to such meeting, such list shall be kept on file at the registered office of the Company and shall be subject to inspection by any Member during usual business hours. Such list shall be produced at such meeting, and at all times during such meeting shall be subject to inspection by any Member. The membership interest transfer books shall be prima facie evidence as to who are the Members entitled to examine such list or membership interest transfer books.

2.07 Voting of Interests. Interests held by the Company in treasury, Interests owned by a Person the majority of the voting interests of which are owned or controlled by the Company, and Interests held by the Company in a fiduciary capacity shall not be Interests entitled to vote or to be counted in determining the total number of outstanding Interests of the Company. Interests held by an administrator, executor, guardian, or conservator may be voted by him or her, either in person or by proxy, without transfer of such Interests into his or her name so long as such Interests form a part of the estate and are in the possession of the estate being served by him or her. Interests standing in the name of a trustee may be voted by him or her, either in person or by proxy, only after the Interests have been transferred into his or her name as trustee. Interests standing in the name of a receiver may be voted by such receiver, and Interests held by or under the control of a receiver may be voted by such receiver without transfer of such Interests into his or her name if authority to do so is contained in the court order by which such receiver was appointed. Interests standing in the name of another domestic or foreign corporation of any type or kind may be voted by such officer, agent, or proxy as the bylaws of such corporation may provide or, in the absence of such provision, as the board of directors of such corporation may by resolution determine. A Member whose Interests are pledged shall be entitled to vote such Interests until they have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote such Interests.

2.08 Quorum. The presence in person or by proxy of one or more Members whose Percentage Interests total more than fifty percent (50%) shall constitute a quorum at any meeting of Members, except as otherwise provided by law, the Certificate, or this Agreement. At any reconvening of an adjourned meeting at which a quorum shall be present or represented, any business may be transacted that could have been transacted at the original meeting if a quorum had been present or represented.

2.09 Vote; Withdrawal of Quorum. If a quorum is present in person or represented by proxy at any meeting, except as otherwise may be provided in Exhibit A or Exhibit B, the vote of one or more Members whose Percentage Interests total more than fifty percent (50%) of all Members, whether or not they are present in person or represented by proxy, shall decide any question brought before such meeting, unless the question is one on which, by express provision of law, the

Certificate, or this Agreement a different vote is required, in which event such express provision shall govern and control the decision of such question. The Members present at a duly convened meeting may continue to transact business until adjournment, notwithstanding any withdrawal of Members that may leave less than a quorum remaining.

2.10 Method of Voting; Proxies. Except as otherwise may be provided in Exhibit A or Exhibit B, each Member shall be entitled to that number of votes on each matter submitted to the Members for their vote equal to such Member's Percentage Interest multiplied by 100. At any meeting of Members, every Member having the right to vote may vote either in person or by a proxy executed in writing by the Member or by his duly authorized attorney-in-fact. Each such proxy shall be filed with the Secretary of the Company before or at the time of the meeting. No proxy shall be valid after 11 months from the date of its execution, unless otherwise provided in the proxy. If no date is stated on a proxy, such proxy shall be presumed to have been executed on the date of the meeting at which it is to be voted. Each proxy shall be revocable unless expressly provided therein to be irrevocable or unless otherwise made irrevocable by law.

2.11 Closing of Transfer Books; Record Date . For the purpose of determining Members entitled to notice of, or to vote at, any meeting of Members or any reconvening thereof, or entitled to receive payment of any distribution, or in order to make a determination of Members for any other proper purpose, the Board of Managers may provide that the membership interest transfer books of the Company shall be closed for a stated period but not to exceed in any event 50 days. If the membership interest transfer books are closed for the purpose of determining Members entitled to notice of, or to vote at, a meeting of Members, such books shall be closed for at least 10 days immediately preceding such meeting. In lieu of closing the membership interest transfer books, the Board of Managers may fix in advance a date as the record date for any such determination of Members, such date in any case to be not more than 50 days and not less than 10 days prior to the date on which the particular action requiring such determination of Members is to be taken. If the membership interest transfer books are not closed and if no record date is fixed for the determination of Members entitled to notice of, or to vote at, a meeting of Members or entitled to receive payment of a distribution, the date on which the notice of the meeting is to be mailed or the date on which the resolution of the Board of Managers declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members.

2.12 Presiding Officials at Meetings The President shall preside at, and the Secretary shall prepare minutes of, each meeting of Members, and in the absence of either such officer, his other duties shall be performed by some person appointed at the meeting.

## ARTICLE III

## MANAGERS

3.01 Management. The business and affairs of the Company shall be managed EXCLUSIVELY by the Board of Managers. Subject to the restrictions imposed by law, the Certificate, or this Agreement, the Board of Managers may exercise all the powers of the Company.

3.02 Number; Election; Term; Qualification. The first Board of Managers shall consist of the number of Managers named in the Certificate and or otherwise in the Company documents. Thereafter, except as otherwise may be restricted by this Agreement, the number of Managers that shall constitute the entire Board of Managers shall be determined by resolution of the Board of Managers at any meeting thereof or by the Members at any meeting thereof, but shall never be less than one (1). At each annual meeting of Members, Managers shall be elected to hold office until the next annual meeting of Members and until their successors are elected and qualified. No Manager need be a Member, a resident of the State of Delaware, or a citizen of the United States.

3.03 Removal Except as otherwise may be provided by the Members, at any meeting of Members called expressly for that purpose, any Manager or the entire Board of Managers may be removed, with or without cause, by a vote of one or more Members whose Percentage Interests total more than fifty percent (50%).

3.04 Change in Number; Vacancies. No decrease in the number of Managers constituting the entire Board of Managers shall have the effect of shortening the term of any incumbent Manager. In the case of any increase in the number of Managers, or in the case of the death, retirement, resignation, or removal of a Manager, the vacancies to be filled by such increase or death, retirement, resignation, or removal may be filled by (a) the Board of Managers for a term of office

continuing only until the next election of one or more Managers by the Members; or (b) the Members at any annual or special meeting of the Members. A Manager elected to fill a vacancy shall be elected to serve for the unexpired term of his predecessor in office.

3.05 Place of Meetings . The Board of Managers may hold its meetings in such place or places, including by telephonic or other electronic method of communication, within or without the State of Delaware as the Board of Managers may from time to time determine.

3.06 First Meeting . Each newly elected Board of Managers may hold its first meeting, if a quorum is present, for the purpose of organization and the transaction of business immediately after and at the same place as the annual meeting of Members, and no notice of such meeting shall be necessary.

3.07 Regular Meetings . Regular meetings of the Board of Managers may be held without notice at such times and places, including by telephonic or other electronic method of communication, as may be designated from time to time by resolution of the Board of Managers and communicated to all Managers. Regular meetings of the Board of Managers may be held when and if needed, and no more than one regular meeting of the Board of Managers shall be required in any calendar year.

3.08 Special Meetings . A special meeting of the Board of Managers shall be held whenever called by any Manager at such time and place, including by telephonic or other electronic method of communication, as such Manager shall designate in the notice of such special meeting. The Manager calling any special meeting shall cause notice of such special meeting to be given to each Manager at least 24 hours before such special meeting. Neither the business to be transacted at, nor the purpose of, any special meeting of the Board of Managers need be specified in the notice or waiver of notice of any special meeting.

3.09 Quorum; Vote . At all meetings of the Board of Managers, a majority of the Managers fixed in the manner provided in this Agreement shall constitute a quorum for the transaction of business. If a quorum is not present at a meeting, a majority of the Managers present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present. The vote of a majority of the Managers present at a meeting at which a quorum is in attendance shall be the act of the Board of Managers, unless the vote of a different number is required by law, the Certificate, or this Agreement.

3.10 Procedure; Minutes . At meetings of the Board of Managers, business shall be transacted in such order as the Board of Managers may determine from time to time. The Board of Managers shall appoint at each meeting a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting that shall be delivered to the Secretary of the Company for placement in the minute book of the Company.

3.11 Presumption of Assent . A Manager of the Company who is present at any meeting of the Board of Managers at which action on any matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof, or shall forward any dissent by certified or registered mail to the Secretary of the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

3.12 Compensation . Except as otherwise may be restricted in this Agreement, Managers, in their capacity as Managers, may receive, by resolution of the Board of Managers, a stated salary or a fixed sum and expenses of attendance, if any, for attending meetings of the Board of Managers. No Manager shall be precluded from serving the Company in any other capacity or receiving compensation therefor.

## ARTICLE IV

## COMMITTEES

4.01 Designation . The Board of Managers may, by a resolution adopted by a majority of the entire Board of Managers, designate executive and other committees.

4.02 Number; Qualification; Term . Each committee shall consist of one or more Managers appointed by resolution adopted by a majority of the entire Board of Managers. The number of committee members may be increased or decreased from time to time by resolution adopted by a majority of the entire Board of Managers. Each committee member shall serve as such until the expiration of his term as a Manager or his earlier resignation, unless sooner removed as a committee member or as a Manager.

4.03 Authority . The executive committee, to the extent provided in the resolution establishing such committee, shall have and may exercise all of the authority of the Board of Managers in the management of the business and affairs of the Company. Each other committee, to the extent expressly provided for in the resolution establishing such committee, shall have and may exercise all of the authority of the Board of Managers in such other matters and affairs concerning the Company. However, no committee shall have the authority of the Board of Managers in reference to any of the following:

(a) amending the Certificate;

(b) approving a plan of merger or consolidation;

(c) recommending to the Members the sale, lease, or exchange of all or substantially all of the property and assets of the Company other than in the usual and regular course of its business;

(d) recommending to the Members a voluntary dissolution of the Company or a liquidation thereof;

(e) filling vacancies in, or removing members of, the Board of Managers or of any committee thereof;

(f) filling any vacancy to be filled by reason of an increase in the number of Managers;

(g) electing or removing officers or committee members;

(h) fixing the compensation of any committee member; or

(i) altering or repealing any resolution of the Board of Managers that, by its term, provides that it shall not be amendable or repealable.

4.04 Committee Changes . The Board of Managers shall have the power at any time to fill vacancies in, to change the Membership of, and to discharge any committee. However, a committee member may be removed by the Board of Managers only if, in the judgment of the Board of Managers, the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.

4.05 Regular Meetings . Regular meetings of any committee may be held without notice at such times and places, including by telephonic or other electronic methods of communication, as may be designated from time to time by resolution of the committee and communicated to all committee members.

4.06 Special Meetings . A special meeting of any committee may be held whenever called by any committee member at such time and place, including by telephonic or other electronic methods of communication, as such committee member shall designate in the notice of such special meeting. The committee member calling any special meeting shall cause notice of such special meeting to be given to each committee member at least 24 hours before such special meeting. Neither the business to be transacted at, nor the purpose of, any special meeting of any committee need be specified in the notice or waiver of notice of any special meeting.

4.07 Quorum; Majority Vote . At all meetings of any committee, a majority of the number of committee members designated by the Board of Managers shall constitute a quorum for the transaction of business. If a quorum is not present at a meeting of any committee, a majority of the committee members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present. The vote of a majority of the committee members present at any meeting at which a quorum is in attendance shall be the act of a committee, unless the vote of a different number is required by law, the Certificate, or this Agreement.

4.08 Minutes . Each committee shall cause minutes of its proceedings to be prepared and shall report the same to the Board of Managers. The minutes of the proceedings of each committee shall be delivered to the Secretary of the Company for placement in the minute books of the Company.

4.09 Compensation . Except as otherwise may be restricted in this Agreement, committee members may, by resolution of the Board of Managers, be allowed a stated salary or a fixed sum and expenses of attendance, if any, for attending any committee meetings.

4.10 Responsibility . The designation of any committee and the delegation of authority to it shall not operate to relieve the Board of Managers or any Manager of any responsibility imposed upon it or such Manager by law.

## ARTICLE V

## GENERAL PROVISIONS RELATING TO MEETINGS

5.01 Notice Whenever by law, the Certificate, or this Agreement notice is required to be given to any Member, Manager, or committee member and no provision is made as to how such notice shall be given, it shall be construed to mean that notice may be given either (a) in person; (b) in writing, by mail; (c) by telegram, telex, cable, telecopy or facsimile transmission, or similar means; or (d) by any other method permitted by law. Any notice required or permitted to be given hereunder (other than personal notice) shall be addressed to such Member, Manager, or committee member at his address as it appears on the books on the Company or, in the case of a Member, on the membership interest transfer records of the Company or at such other place as such Member, Manager, or committee member is known to be at the time notice is mailed or transmitted. Any notice required or permitted to be given by mail shall be deemed to be delivered and given at the time when such notice is deposited in the United States mail, postage prepaid. Any notice required or permitted to be given by telegram, telex, cable, telecopy or facsimile transmission, or similar means shall be deemed to be delivered and given at the time transmitted.

5.02 Waiver of Notice . Whenever by law, the Certificate, or this Agreement any notice is required to be given to any Member, Manager, or committee member of the Company, a waiver thereof in writing signed by the person or persons entitled to such notice, whether before or after the time notice should have been given, shall be equivalent to the giving of such notice. Attendance of a Manager or Member at a meeting shall constitute a waiver of notice of such meeting, except where a Manager or Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.03 Telephone and Similar Meetings Members, Managers, or committee members may participate in and hold a meeting by means of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other. Participation in such a meeting shall constitute presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

5.04 Action Without Meeting . Any action that may be taken, or is required by law, the Certificate, or this Agreement to be taken at a meeting of the Members, the Board of Managers, or a committee thereof may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by the Members owning the required Percentage Interests of all Members (as set forth herein for the respective action or decision), a majority of the Managers or committee members, as the case may be, entitled to vote with respect to the subject matter thereof, and such consent shall have the same force and effect as a vote of such Members, Managers, or committee members, as the case may be, and may be stated as such in any document filed with the Secretary of State of Delaware or in any certificate or other document delivered to any person. The consent may be in one or more counterparts so long as each Member, Manager, or committee member signs one of the counterparts. The signed consent shall be placed in the minute books of the Company.

## ARTICLE VI

## OFFICERS AND OTHER AGENTS

6.01 Number; Titles; Election; Term The Company shall have a president, one or more vice presidents (and, in the case of each vice president, with such descriptive title, if any, as the Board of Managers shall determine), a secretary, a treasurer, and such officers and agents as the Board of Managers may deem desirable. The Board of Managers shall elect a president, vice president, treasurer, and secretary at its first meeting at which a quorum shall be present after the annual meeting of Members or whenever a vacancy exists. The Board of Managers then, or from time to time, may also elect or appoint one or more other officers or agents as it shall deem advisable. Except as otherwise may be provided by separate agreement, each officer and agent shall hold office for the term for which he is elected or appointed and until his successor has been elected or appointed and qualified. Unless otherwise provided in the resolution of the Board of Managers electing or appointing an officer or agent, his term of office shall extend to and expire at the meeting of the Board of Managers following the next annual meeting of Members or, if earlier, at his death, resignation, or removal. Any two or more offices may be held by the same person. No officer or agent need be a Member, a Manager, a resident of the State of Delaware, or a citizen of the United States.

6.02 Removal . Any officer or agent elected or appointed by the Board of Managers may be removed by a majority of the Board of Managers only if, in the judgment of a majority of the Board of Managers, the best interests of the Company will be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed. Election or appointment of an officer or agent shall not of itself create contract rights.

6.03 Vacancies . Any vacancy occurring in any office of the Company may be filled by the Board of Managers.

6.04 Authority . Officers shall have such authority and perform such duties in the management of the Company as are provided in this Agreement or as may be determined by resolution of the Board of Managers not inconsistent with this Agreement.

6.05 Compensation . Except as otherwise may be provided by separate agreement, the compensation, if any, of officers or any salaried employee shall be fixed, increased, or decreased from time to time by the Board of Managers, provided, however, that the Board of Managers may by resolution delegate to any one or more officers of the Company the authority to fix such compensation.

6.06 Chairman of the Board . The Chairman of the Board, if any, shall be an officer of the Company and, subject to the direction of the Board of Managers, shall perform such executive, supervisory, and management functions and duties as may be assigned to him from time to time by the Board of Managers.

6.07 President, CEO and COO . The Board of Managers may designate and appoint a President, CEO and/or COO, with rights, duties and responsibilities established by the Board of Managers.

6.08 Vice Presidents . Each Vice President shall have such powers and duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President and (in the order as designated by the Board of Managers, or in the absence of such designation, as determined by the length of time each has held the office of Vice President continuously) shall exercise the powers of the President during that officer's absence or inability to act.

6.09 Treasurer . The Treasurer shall have custody of the Company's funds and securities, shall keep full and accurate accounts of receipts and disbursements, and shall deposit all moneys and valuable effects in the name and to the credit of the Company in such depository or depositories as may be designated by the Board of Managers. The Treasurer shall audit all payrolls and vouchers of the Company; shall receive, audit, and consolidate all operating and financial statements of the Company and its various departments; shall supervise the accounting and auditing practices of the Company; and shall have charge of matters relating to taxation. Additionally, the Treasurer shall have the power to endorse for deposit, collection, or otherwise all checks, drafts, notes, bills of exchange, and other commercial paper payable to the Company and to give proper receipts and discharges for all payments to the Company. The Treasurer shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

6.10 Assistant Treasurers . Each Assistant Treasurer shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President. The Assistant Treasurers (in the order as designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Treasurer continuously) shall exercise the powers of the Treasurer.

6.11 Secretary . The Secretary shall maintain minutes of all meetings of the Board of Managers, of any committee, and of the Members, or consents in lieu of such minutes, in the Company's minute books, and shall cause notice of such meetings to be given when requested by any person authorized to call such meetings. The Secretary may sign with the President, in the name of the Company, all contracts of the Company and affix the seal of the Company thereto. The Secretary shall have charge of the certificate books, membership interest transfer books, and other documents as the Board of Managers may direct, all of which shall at all reasonable times be open to inspection by any Manager at the office of the Company during normal business hours. The Secretary shall perform such other duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President.

6.12 Assistant Secretaries . Each Assistant Secretary shall perform such duties as may be prescribed from time to time by the Board of Managers or as may be delegated from time to time by the President. The Assistant Secretaries (in the order designated by the Board of Managers or, in the absence of such designation, as determined by the length of time each has held the office of Assistant Secretary continuously) shall exercise the powers of the Secretary during that officer's absence or inability to act.

## ARTICLE VII

## CAPITALIZATION AND CAPITAL ACCOUNTS

7.01 Capital Contributions . The Capital Contributions of the Members, as set forth in the books and records of the Company, shall be paid or transferred to the Company in cash and/or property on the terms and in the manner specified by the Board of Managers. No Member shall be entitled to make any additional Capital Contributions except as provided in Section 7.02 and 7.03 below.

7.02 Additional Capital Contributions . If the Board of Managers determine that additional capital is required for the purposes of the Company, as set forth herein, the Board of Managers may notify the Members of the need for such additional capital and shall state the specific purposes for which the call for such additional capital is being made. Thereupon, all Members shall have the right (but not the obligation) to make additional Capital Contributions in cash and/or property to the Company aggregating the amount of additional capital needed by the Company in the proportion of their respective Percentage Interests in the Company at the time notice is given. The Board of Managers shall use the additional capital so contributed solely for the purposes stated in the notice to the Members.

7.03 Failure to Make Additional Capital Contributions . If any Member chooses not to contribute its share of the additional capital needed by the Company within 14 days after notice is given to the Members of the need for such additional capital (a “Non-Contributing Member”), then the other Members shall be entitled (but not obligated) to contribute the share of such Non-Contributing Member (such Members being referred to as “Contributing Members”) of the additional capital needed pro rata according to such Contributing Members' Percentage Interests at such time or such other share as otherwise agreed upon by the Contributing Members.

7.04 Effect of Failure to Make Additional Capital Contributions . In the event of a Non-Contributing Member, the Percentage Interests of all of the Members shall be recomputed on the following basis: Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member plus the additional Capital Contribution, if any, made by such Member pursuant to Sections 7.02 and 7.03 above, and the denominator of which is the total Capital Contributions of all of the Members plus the additional Capital Contributions made by all of the Members pursuant to Sections 7.02 and 7.03 above.

7.05 Recapitalization by Admission of Additional Members . If additional capital is required for the purposes of the Company as set forth herein and the Board of Managers is unable to finance such capital needs by borrowing the required amounts or through notice to the existing Members of the necessity for additional Capital Contributions as provided in Section 7.02 and 7.03 above, the Board of Managers shall have the right to admit additional Members to the Company, upon receiving the other approvals required herein. Following the admission of one or more new Members, the Percentage Interest of each Member, including the newly admitted Member(s), shall be computed as follows: Each Member's Percentage Interest immediately following the computation shall equal the percentage expression of a fraction, the numerator of which is the total Capital Contributions of such Member and the denominator of which is the total Capital Contributions of all of the Members, including the newly admitted Members.

7.06 Maintenance of Capital Accounts . The Company shall maintain for each Member a separate Capital Account in accordance with this Section 7.06, which shall control the allocation of Profits and Losses and the division of assets upon liquidation of the Company as provided in Section 12.01. Each Capital Account shall be maintained in accordance with the following provisions:

(a) a Member's Capital Account shall initially be zero and shall be increased by the cash amount or Book Value of any property contributed by such Member to the Company pursuant to this Agreement, such Member's allocable share of Profits and any items in the nature of income or gains that are specially allocated to such Member pursuant to Section 8.02 and Section 8.03 hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member;

(b) such Capital Account shall be decreased by the cash amount or Book Value of any property distributed to such Member pursuant to this Agreement, such Member's allocable share of Losses and any items in the nature of deductions or losses that are specially allocated to such Member pursuant to Section 8.02 and Section 8.03 hereof, and the amount of any liabilities of the Member assumed by the Company or which are secured by any property contributed by such Member to the Company; and

(c) if all or a portion of an Interest in the Company is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest, provided, however, that if the Transfer causes a termination of the Company under Code Section 708(b)(1)(B), the assets of the Company shall be deemed to have been distributed to the Members (including the transferee of the Interest) in liquidation of the Company and recontributed by such Members and transferees in reconstitution of the Company. Such deemed liquidation and reconstitution shall not cause the Company to be dissolved and/or reconstituted for purposes other than maintenance of the Capital Accounts and federal income tax.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Board of Managers determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Board of Managers may authorize such modifications, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Sections 8.06 and 12.01 hereof.

7.07 Negative Capital Accounts . If any Member has a deficit balance in its Capital Account, such Member shall have no obligation to restore such negative balance or to make any Capital Contribution to the Company by reason thereof, and such negative balance shall not be considered an asset of the Company or of any Member.

7.08 Interest . No interest shall be paid by the Company on Capital Contributions or on balances in Capital Accounts.

7.09 No Withdrawal . No Member shall be entitled to withdraw any part of his Capital Contribution or his Capital Account or to receive any distribution from the Company, except as provided in Sections 11.02 and 12.01 of this Agreement.

7.10 Loans From Members . Loans by a Member to the Company shall not be considered Capital Contributions.

## ARTICLE VIII

## ALLOCATIONS AND DISTRIBUTIONS

8.01 Allocation of Profits and Losses.

(a) Allocation of Profits. Except as provided on any Exhibit hereto, after giving effect to the allocations set forth in Section 8.02 and Section 8.03, and after giving effect to all distributions of cash or property (other than cash or

property to be distributed pursuant to Section 12.01), Profits for any Fiscal Year shall be allocated to the Members in the following manner:

(i) first, to each Member with a negative balance in its Capital Account, pro rata in accordance with such negative Capital Account balances, until such negative Capital Account balances have been eliminated;

(ii) next, to all of the Members in accordance with their respective Percentage Interests.

(b) Allocation of Losses. Except as provided in any Exhibit hereto, after giving effect to the allocations set forth in Section 8.02 and Section 8.03, Losses for any Fiscal Year shall be allocated to the Members in the following manner:

(i) to all of the Members in accordance with their respective Percentage Interests.

8.02 Special Allocations of Profits and Losses .

(a) Minimum Gain Chargeback–Company Nonrecourse Liabilities. If there is a net decrease in Company minimum gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) to the Members in the amounts and manner described in Treasury Regulations Section 1.704-2(f) and (j)(2)(i) and (ii), subject to the exemptions set forth in Treasury Regulations Section 1.704-2(f)(2), (3), (4) and (5). This Section 8.02(a) is intended to comply with the minimum gain chargeback requirement set forth in Treasury Regulations Section 1.704-2(f) relating to Company nonrecourse liabilities, as defined in Treasury Regulations Section 1.704-2(b)(3) and shall be so interpreted.

(b) Minimum Gain Chargeback–Member Nonrecourse Debt. If there is a net decrease in Member minimum gain during any Fiscal Year, certain items of income and gain shall be allocated (on a gross basis) as quickly as possible to those Members who had a share of the Member minimum gain determined pursuant to Treasury Regulations Section 1.704-2(i)(5) in the amounts and manner described in Treasury Regulations Sections 1.704-2(i)(4), (j)(2)(ii), and (j)(2)(iii). This Section 8.02(b) is intended to comply with the minimum gain chargeback requirement set forth in Treasury Regulations Section 1.704-2(i)(4) relating to Member nonrecourse debt, as defined in Treasury Regulations Section 1.704-2(b)(4) and shall be so interpreted.

(c) Qualified Income Offset. If, after applying Section 8.02(a) and Section 8.02(b), any Member has an adjusted Capital Account deficit, items of Company income and gain shall be specially allocated (on a gross basis) to each such Member in an amount and manner sufficient to eliminate the adjusted Capital Account deficit of such Member as quickly as possible. This Section 8.02(c) is intended to comply with the “qualified income offset” requirement set for the in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be so interpreted.

(d) Optional Basis Adjustments. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Sections 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken in to account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations.

(f) Partner Nonrecourse Deductions. Partner Nonrecourse Deductions shall be allocated pursuant to Treasury Regulations Section 1.704-2(b)(4) and (i)(1) to the Member who bears the economic risk of loss with respect to such deductions.

8.03 Curative Allocations . The Regulatory Allocations are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 8.03. Therefore, notwithstanding any other provisions of this Article VIII, the Board of Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member’s Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Section 8.01(a) and Section 8.01(b) hereof.

8.04 Tax Allocations: Code Section 704(c) .

(a) In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Book Value.

(b) If the Book Value of any Company asset is adjusted pursuant to Section 1.04(e)(ii) hereof, subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c) and the Treasury Regulations thereunder.

(c) Any elections or other decisions relating to such allocation shall be made by the Board of Managers. Allocations pursuant to this Section 8.04 are solely for purposes of federal, state, and local taxes and shall not affect or in any way be taken into account in computing any Member's Capital Account, or share of Profits, Losses, and other items or distribution pursuant to any provision of this Agreement.

8.05 Other Allocation Rules .

(a) For purposes of determining the Profits, Losses, or any other item allocable to any period, Profits, Losses, and any such other item shall be determined on a daily, monthly, or other basis, as determined by the Board of Managers using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(b) For federal income tax purposes, every item of income, gain, loss, and deduction shall be allocated among the Members in accordance with the allocations under Sections 8.01, 8.02, 8.03, and 8.04.

(c) The Members are aware of the income tax consequences of the allocations made by this Article VIII and hereby agree to be bound by the provisions of this Article VIII in reporting their shares of Company income and loss for income tax purposes.

(d) It is intended that the allocations in Sections 8.01, 8.02, 8.03, and 8.04 hereof effect an allocation for federal income tax purposes consistent with Section 704 of the Code and comply with any limitations or restrictions therein.

8.06 Distributions of Distributable Cash . Except as otherwise may be provided in this Agreement, the Board of Managers shall cause the Company to make distributions of Distributable Cash at such intervals and in such amounts as the Board of Managers in its sole discretion shall determine by majority vote. Distributions of Distributable Cash shall be made to all of the Members in accordance with their respective Percentage Interests.

8.07 Working Cash Reserve . The Board of Managers may from time to time establish a working cash reserve for capital expenditures, unforeseen contingencies, projected operating deficits, and other corporate purposes and may increase or decrease the amount in such reserve in its business judgment.

## ARTICLE IX

## CERTIFICATES

9.01 Certificated and Uncertificated Interests. The membership interests of the Company may be either certificated interests or uncertificated interests. As used herein, the term "certificated interests" means Interests represented by instruments in bearer or registered form, and the term "uncertificated interests" means Interests not represented by such instruments and the transfers of which are registered upon books maintained for that purpose by or on behalf of the Company.

9.02 Certificates for Certificated Interests . The certificates for certificated interests shall be in such form as shall be approved by the Board of Managers in conformity with law. The certificates shall be consecutively numbered, shall be entered as they are issued in the books of the Company or in the records of the Company's designated transfer agent, if any, and shall state the Member's name, the class of Interests, the Percentage Interest that such Interest represents, and such

other matters as may be required by law. The certificates shall be signed by the President or any Vice President and also by the Secretary, an Assistant Secretary, or any other officer, and may be sealed with the seal of the Company or a facsimile thereof. If any certificate is countersigned by a transfer agent or registered by a registrar, either of which is other than the Company itself or an employee of the Company, the signatures of the foregoing officers may be a facsimile.

9.03 Lost, Stolen, or Destroyed Certificates . The Company shall issue a new certificate in place of any certificate for Interests previously issued if the registered owner of the certificate satisfies the following requirements:

(a) the registered owner makes proof in affidavit form that a previously issued certificate for Interests has been lost, destroyed, or stolen;

(b) the registered owner requests the issuance of a new certificate before the Company has notice that the certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

(c) the registered owner gives a bond in such form, and with such surety or sureties, with fixed or open penalty, as the Board of Managers may direct, in its discretion, to indemnify the Company (and its transfer agent and registrar, if any) against any claim that may be made on account of the alleged loss, destruction, or theft of the certificate; and

(d) the registered owner satisfies any other reasonable requirements imposed by the Board of Managers.

When a certificate has been lost, destroyed, or stolen and the Member of record fails to notify the Company within a reasonable time after he has notice of it, if the Company registers a transfer of the Interests represented by the certificate before receiving such notification, the Member of record is precluded from making any claim against the Company for the transfer or for a new certificate.

9.04 Transfer of Interests . Interests of the Company shall be transferable only on the books of the Company by the Members thereof in person or by their duly authorized attorneys or legal representatives, but only as authorized in this COMPANY AGREEMENT. With respect to certificated interests, upon surrender to the Company or the transfer agent of the Company of a certificate representing Interests duly endorsed or accompanied by proper evidence of succession, assignment, or authority to transfer, the Company or its agent shall issue a new certificate to the person entitled thereto, cancel the old certificate, and record the transaction upon its books. With respect to uncertificated interests, upon delivery to the Company of proper evidence of succession, assignment, or authority to transfer, the Company or its agent shall record the transaction upon its books.

9.05 Registered Members . The Company shall be entitled to treat the Member of record as the Member in fact of any Interests and, accordingly, shall not be bound to recognize any equitable or other claim to or interest in such Interests on the part of any other Person, whether or not it shall have actual or other notice thereof, except as otherwise provided by law.

9.06 Legends . If the Company is authorized to issue Interests of more than one class, each certificate representing Interests issued by the Company (a) shall conspicuously set forth on the face or back of the certificate a full statement of all of the designations, preferences, limitations, and relative rights of the Interests of each class authorized to be issued; or (b) shall conspicuously state on the face or back of the certificate that (i) such a statement is set forth in the Certificate on file in the office of the Secretary of State or in this Agreement; and (ii) the Company will furnish a copy of such statements to the record holder of the certificate without charge on written request to the Company at its principal place of business or registered office.

If the Company issues any Interests that are not registered under the Securities Act of 1933, the transfer of any such interests shall be restricted in accordance with an appropriate legend.

In the event any restriction on the transfer, or registration of the transfer, of Interests shall be imposed or agreed to by the Company, each certificate representing Interests so restricted (a) shall conspicuously set forth a full or summary statement of the restriction on the face of the certificate; (b) shall set forth such statement on the back of the certificate and conspicuously refer to the same on the face of the certificate; or (c) shall conspicuously state on the face or back of the certificate that such a restriction exists pursuant to a specified document and (i) that the Company will furnish to the record holder of the certificate without charge upon written request to the Company at its principal place of business or registered

office a copy of the specified document; or (ii) if such document is one required or permitted by law to be and has been filed, that such specified document is on file in the office of the Secretary of State and contains a full statement of such restriction.

## ARTICLE X

## ACCOUNTING AND RECORDS

10.01 Records and Accounting . The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal income tax purposes. The books and records of the Company shall reflect all Company transactions and shall be appropriate and adequate for the Company's business.

10.02 Access to Accounting Records . All books and records of the Company shall be maintained at any office of the Company or at the Company's principal place of business, and each Member owning a Percentage Interest of at least ten percent (10%), and his duly authorized representative, shall have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

10.03 Annual and Tax Information . The Company shall deliver to each Member within 90 days after the end of each Fiscal Year all information necessary for the preparation of such Member's federal income tax return. The Company shall prepare, within 120 days after the end of each Fiscal Year, a financial report of the Company for such Fiscal Year, containing a statement of the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

10.04 Accounting Decisions . All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Board of Managers. The Members may rely upon the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal income tax purposes.

10.05 Federal Income Tax Elections . The Company may make all elections for federal income tax purposes, including, but not limited to, the following:

(a) to the extent permitted by applicable law and regulations, the election to use an accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b) in case of a transfer of all or part of the Interest of any Member, the election pursuant to Section 734, 743, and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE XI

## CHANGES IN MEMBERS

The provisions of this Article XI are subject to, and may be superceded by, one or more separate agreements entered into by and among one or more Members. The provisions of this Article XI shall continue to control with respect to matters not covered by, or Members not parties to, such agreement(s).

11.01 Intentionally Blank .

11.02 Transfer and Assignment of Members' Interest . Except as approved by the Manager, plus a Member or Members owning a Percentage Interest greater than fifty percent (50%), no Member shall be entitled to Transfer any part of its Interest in the Company. The Company and, if applicable, the remaining Members shall be entitled to match the terms of the proposed Transfer, with consideration being only set forth in traditional monetary terms. If the Company and the remaining Members fail to match the proposed Transfer with regard to the purchase of the entire Interest, or portion thereof, the Member proposing to make the Transfer may move forward with the proposed Transfer. Transfers in violation of this Section 11.02 shall be effective only to the extent set forth in Section 11.05(b) hereof.

11.03 Further Restrictions on Transfer . No Member shall Transfer any part of his Interest in the Company: (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged, when added to the total of all other Interests to be sold or exchanged in the preceding 12 consecutive months prior thereto, would result in the termination of the Company under Code Section 708.

11.04 Substitute Members . A transferee shall have the right to become a substitute Member if (a) the requirements of Section 11.02 and 11.03 hereof are met; (b) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement; and (c) such person pays any reasonable expenses in connection with his or her admission as a Member.

11.05 Effect of Transfer .

(a) Any permitted Transfer of all or any portion of a Member's Interest in the Company will take effect on the first day of the month following receipt by the Members of written notice of Transfer. Any transferee of an Interest in the Company shall take subject to the restrictions on Transfer imposed by this Agreement.

(b) Upon any Transfer of a Member's Interest in the Company in violation of this Agreement, and if such Member's Interest is not purchased pursuant to Section 11.01, the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee shall be entitled to receive only the allocable share of Profits, Losses, Distributive Cash, and other items to which the transferor of such Interest in the Company would otherwise be entitled.

11.06 No Dissolution or Withdrawal: Advanced Consent . Upon the occurrence of a Dissolution Event with regard to a respective Member, all remaining Members shall be deemed to automatically consent to the continuation of the business of the Company. By executing this Agreement, however, all Members hereby consent that they shall not voluntarily cause a Dissolution Event or demand the return of Member's capital. If any Member shall breach the agreement represented by this Section 11.06, the agreement of such breaching Member shall not be specifically performable, but shall be actionable for damages, and shall be deemed an offer of the Interest of such breaching Member for sale pursuant hereto. The parties agree that a reasonable approximation of the damage that the Company shall experience due to breach hereof is 20% of the value of the breaching Member's Interest, or as otherwise set forth herein (whichever is greater), which shall be deducted from any payments to such Member upon dissolution or purchase of such Member's Interest hereunder. The value of the breaching Member's Interest shall be determined pursuant to Section 11.01, to which value the said discount may then be applied in determining payments due to the breaching Member pursuant to the deemed offer of sale occurring under this Section 11.06.

## ARTICLE XII

## TERMINATION

12.01 Termination of the Company .

(a) The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of the following events:

(i) a determination by the Managers, plus the Unanimous Consent of the Members that the Company should be dissolved;

(ii) a sale of all or substantially all of the assets of the Company;

(iii) the expiration of the Company’s term as stated in its Certificate; or

(iv) at such earlier time as provided by applicable law.

(b) In settling accounts of the Company after dissolution, the liabilities of the Company shall be entitled to payment and the assets of the Company remaining thereafter shall be distributed to the Members in the following order, all as required by the DELAWARE LAWS:

(i) those to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their Capital Contributions;

(ii) to the Members, pro rata, in accordance with the positive balances, if any, in their Capital Accounts; and

(iii) to the Members in proportion to their relative Percentage Interests.

## ARTICLE XIII

## INDEMNIFICATION

13.01 Indemnification of Members, Managers, and Other Persons .

(a) To the greatest extent not inconsistent with the laws and public policies of Delaware, the Company shall indemnify any Member, Manager, or officer of the Company made a party to any proceeding because such individual is or was a Member, Manager, or officer of the Company (an "Indemnitee"), as a matter of right, against all liability incurred by such individual in connection with any proceeding; provided that it shall be determined in the specific case in accordance with subsection (d) of this Section 13.01 that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section 13.01. The Company shall advance, pay for, or reimburse the reasonable expenses incurred by an Indemnitee in connection with any such proceeding in advance of final disposition thereof if (i) the Indemnitee furnishes the Company a written affirmation of the Indemnitee's good faith belief that he or she has met the standard of conduct for indemnification described in subsection (c) of this Section 13.01; (ii) the Indemnitee furnishes the Company a written undertaking, executed personally or on such Indemnitee's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct; and (iii) a determination is made in accordance with subsection (d) that based upon facts then known to those making the determination, indemnification would not be precluded under this Section 13.01. The undertaking described in subsection (a)(ii) above must be a general obligation of the Indemnitee, subject to such reasonable limitations as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company shall indemnify an Indemnitee who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section 13.01. Upon demand by an Indemnitee for indemnification or advancement of expenses, as the case may be, the Company shall expeditiously determine whether the Indemnitee is entitled thereto in accordance with this Section 13.01. The indemnification and advancement of expenses provided for under this Section 13.01 shall be applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section 13.01.

(b) The Company shall have the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member, Manager, or officer of the Company.

(c) Indemnification is permissible under this Section 13.01 only if (i) the Indemnitee conducted himself in good faith; (ii) he or she reasonably believed that his conduct was in, or at least not opposed to, the Company's best interest; (iii) in the case of any criminal proceeding, he or she had no reasonable cause to believe his conduct was unlawful; and (iv) such Indemnitee is not adjudged in any such proceeding to be liable for gross negligence or willful misconduct in the performance of duty. The termination of a proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent is not, of itself, determinative that the Indemnitee did not meet the standard of conduct described in this subsection (c).

(d) A determination as to whether indemnification or advancement of expenses is permissible shall be made by any one of the following procedures:

(i) by the Board of Managers or by a majority vote consisting of Members not at the time parties to the proceeding; or

(ii) by special legal counsel selected by the Members in the manner prescribed in subsection (d)(i) above.

(e) An Indemnitee of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving notice the court considers necessary, may order indemnification if it determines:

(i) in a proceeding in which the Indemnitee is wholly successful, on the merits or otherwise, the Indemnitee is entitled to indemnification under this Section 13.01, in which case the court shall order the Company to pay the Indemnitee his or her reasonable expenses incurred to obtain such court ordered indemnification; or

(ii) the Indemnitee is fairly and reasonably entitled to indemnification in view of all the relevant circumstances, whether or not the Indemnitee met the standard of conduct set forth in subsection (c) of this Section 13.01.

(f) Indemnification shall also be provided for an Indemnitee's conduct with respect to an employee benefit plan if the individual reasonably believed his or her conduct to be in the interests of the participants in and beneficiaries of plan.

(g) Nothing contained in this Section 13.01 shall limit or preclude the exercise or be deemed exclusive of any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member, Manager, or officer of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise, whether for profit or not. Nothing contained in this Section 13.01 shall limit the ability of the Company to otherwise indemnify or advance expenses to any individual. It is the intent of this Section 13.01 to provide indemnification to Indemnitees to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section 13.01. Indemnification shall be provided in accordance with this Section 13.01 irrespective of the nature of the legal or equitable theory upon which a claim is made, including, without limitation, negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h) For purposes of this Section 13.01:

(i) The term "expenses" includes all direct and indirect costs (including, without limitation, counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement, or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section 13.01, applicable law, or otherwise.

(ii) The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii) The term "party" includes an individual who was, is, or is threatened to be made a named defendant or respondent in a proceeding.

(iv) The term "proceeding" means any threatened, pending, or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative and whether formal or informal.

(v) The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this Section 13.01, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

## ARTICLE XIV

## MISCELLANEOUS

14.01 Complete Agreement . This Agreement, the Certificate, and all other organizational documents signed by all of the Members constitute the complete and exclusive statement of agreement among the Members with respect to the matters herein. This Agreement and the Certificate replace and supersede all prior agreements by and among the Members or any of them, and no representation, statement, or condition or warranty not contained in this Agreement or the Certificate will be binding on the Members or have any force or effect whatsoever.

14.02 Governing Law . This Agreement and the rights of the parties hereunder will be governed by, interpreted, and enforced in accordance with the laws of the State of Delaware.

14.03 Binding Effect . Subject to the provisions of this Agreement relating to transferability, this Agreement will be binding upon and inure to the benefit of the Members, and their respective distributes, successors, and assigns.

14.04 Terms . Common nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require. Any reference to the DELAWARE LAWS, the Code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

14.05 Headings . All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

14.06 Severability . If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of such illegal, invalid, or unenforceable provision, there will be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid, and enforceable.

14.07 Multiple Counterparts . This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument. However, in making proof hereof it will be necessary to produce only one copy hereof signed by the party to be charged.

14.08 Additional Documents and Acts . Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

14.09 No Third-Party Beneficiary . This Agreement is made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns subject to the express provisions hereof relating to successors and assigns, and no other person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

14.10 References to this Agreement . Numbered or lettered articles, sections, and subsections herein contained refer to articles, sections, and subsections of this Agreement unless otherwise expressly stated.

14.11 Notices . Any notice to be given or to be served upon the Company or any party hereto in connection with this Agreement must be in writing and will be deemed to have been given and received when delivered to the address specified by the party to receive the notice. Such notices will be given to a Member at the address specified in Exhibit B hereto. Any Member or the Company may, at any time by giving five days' prior written notice to the other Members and the Company, designate any other address in substitution of the foregoing address to which such notice will be given.

14.12 Amendments . Except as otherwise may be provided in this Agreement, all amendments to this Agreement must be approved by the Managers, plus one or more Members whose aggregate Percentage Interests total more than fifty percent (50%).

14.13 Title to Company Property . Legal title to all property of the Company will be held and conveyed in the name of the Company.

14.14 Reliance on Authority of Person Signing Agreement . In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such entity or to determine any fact or circumstance bearing upon the existence of the authority of such individual; or (b) be required to see to the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such entity.

14.15 S-Corp Election. In the event the Company elects to be treated as a S-Corporation for federal tax purposes, the provisions in this Company Agreement addressing tax treatment shall be automatically amended and modified as required in order to pertain to a S-corporation.

14.16 Company Indemnification. In the event any Member is personally liable for any debt or obligations associated with a Company asset, then the Company agrees to indemnify such Member for any such debt or obligation in excess of his or her proportionate amount of such debt or obligation that he/she is required to pay or perform, as measured by the Percentage Interest of the Members, except as otherwise agreed by the Members.

***14.17 Management by Members. The Certificate of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers. As a result, if such is the case and the Certificate is not amended to reflect management by managers, this Agreement shall be interpreted in such a manner that all references herein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President.***

IN WITNESS WHEREOF, the Members have executed this Agreement to be effective as of the date first written above.

**THE MEMBER (OR MANAGING MEMBER)**

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By: ______________________________
Mark Patrick, Director and President

## <u>EXHIBIT A</u>

THE CLASS A MEMBERS AND INTERESTS

The sole Class A Member shall be RAND ADVISORS HOLDING CORP., a Delaware corporation, and it shall own the Percentage Interest set forth on <u>Exhibit "B"</u> hereto. In addition to such other rights as a Member described in this Agreement, the holders of record of the Class A Interests shall have no additional rights.

**EXHIBIT B**

The Members

| Members and Addresses | Date Admitted | Class A Interest | Percentage Interest |
|---|---|---|---|
| RAND ADVISORS HOLDING CORP.<br>2101 Cedar Springs Road<br>Suite 1200, Dallas, TX 75201<br>Attn: Mark Patrick | 8/1/2022 | 100% | 100% |

**EXHIBIT**

MEMBER AND MANAGER CONSENT
OF
RAND ADVISORS, LLC

October 13, 2022

THE UNDERSIGNED sole member (the “M r”) and sole manager (the “M r”) of RAND ADVISORS, LLC, a Delaware limited liability company (the “ ”), acting pursuant to the Delaware Limited Liability Company Act, do hereby consent and agree, to take the following actions and adopt the following resolutions:

RESOLVED, that pursuant to that certain Membership Interest Purchase Agreement dated as August 1, 2022 (the “Purchase Agreement”), by and among JOHN HONIS (as “Seller”), the Sole Member (as “Buyer”), and CLO HOLDCO, LTD. a Cayman limited company (as “Guarantor”), the Sole Member purchased from Seller all of the issued and outstanding membership interests in the Company;

RESOLVED, that the following individual be, and hereby is, duly appointed and qualified to hold the office(s) set forth next to his name, and shall serve in such capacity until such person’s successor(s) shall have been duly appointed and qualified, or until his earlier resignation or removal (each, an “ r”):

| | |
|---|---|
| Mark Patrick | Sole Manager, President, Secretary and Treasurer |

RESOLVED, that the certificate of formation of the Company and other Company documents/agreements on file and/or executed by the Member may reflect management by members, and not management by managers. As a result, if such is the case and the certificate is not amended to reflect management by managers, the Company and all governing documents shall be interpreted in such a manner that all references therein to a Manager, or Managers or Board of Managers, shall be referring to the managing member(s), and as of the Effective Date hereof, since the sole member is Rand Advisors Holding Corp., a Delaware corporation, all decisions shall be made by such member, with Mark Patrick as the Director and President;

RESOLVED FURTHER, that any individual previously appointed as a manager and/or as an officer of the Company but not named above is hereby removed from the office of the Company;

RESOLVED FURTHER, that each Officer and manager is hereby, authorized, empowered and directed, in the name and on behalf of the Company, to do and perform all acts and deeds, to execute and deliver all documents, instruments and other agreements, to waive any and all conditions and do all things necessary or helpful to carry out and comply with the terms and provisions of the foregoing resolutions;

RESOLVED FURTHER, that that all authorized acts and deeds of the Officers, managers and agents on behalf of the Company prior to the date hereof shall be, and they hereby are, in all respects, ratified, approved, confirmed and adopted as the acts and deeds of the Company; and

RESOLVED FURTHER, that the foregoing authorization shall remain in effect until further written notice from the Company.

*[Signature Page to Follow]*

IN WITNESS WHEREOF, the undersigned Sole Member and Sole Manager have executed this Consent to be effective as of the date first set forth above.

SOLE MEMBER

RAND ADVISORS HOLDING CORP.,
a Delaware corporation

By:____________________________
Mark Patrick, Sole Director

SOLE MANAGER

____________________________
Mark Patrick

*Signature Page*

**EXHIBIT**

# FORM ADV

**UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND REPORT BY EXEMPT REPORTING ADVISERS**

| | |
|---|---|
| **Primary Business Name: RAND ADVISORS, LLC** | **CRD Number: 172839** |
| **Annual Amendment - All Sections** | **Rev. 10/2021** |
| **3/17/2025 8:51:05 AM** | |

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 4.

**Item 1 Identifying Information**

Responses to this Item tell us who you are, where you are doing business, and how we can contact you. If you are filing an *umbrella registration*, the information in Item 1 should be provided for the *filing adviser* only. General Instruction 5 provides information to assist you with filing an *umbrella registration*.

A. Your full legal name (if you are a sole proprietor, your last, first, and middle names):
**RAND ADVISORS, LLC**

B. (1) Name under which you primarily conduct your advisory business, if different from Item 1.A.
**RAND ADVISORS, LLC**

*List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

(2) If you are using this Form ADV to register more than one investment adviser under an *umbrella registration*, check this box ☐

*If you check this box, complete a Schedule R for each relying adviser.*

C. If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.(1)), enter the new name and specify whether the name change is of
☐ your legal name or ☐ your primary business name:

D. (1) If you are registered with the SEC as an investment adviser, your SEC file number: **801-80265**

(2) If you report to the SEC as an *exempt reporting adviser*, your SEC file number:

(3) If you have one or more Central Index Key numbers assigned by the SEC ("CIK Numbers"), all of your CIK numbers:

| CIK Number |
|---|
| 1660386 |
| 1660401 |

E. (1) If you have a number ("*CRD* Number") assigned by the *FINRA's CRD* system or by the IARD system, your *CRD* number: **172839**

*If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

(2) If you have additional *CRD* Numbers, your additional *CRD* numbers:

No Information Filed

F. *Principal Office and Place of Business*

(1) Address (do not use a P.O. Box):

| | | | |
|---|---|---|---|
| Number and Street 1: | | Number and Street 2: | |
| 2101 CEDAR SPRINGS ROAD | | SUITE 1200 | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| DALLAS | Texas | United States | 75201 |

If this address is a private residence, check this box: ☐

*List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for SEC registration, if you are registered only with the SEC, or if you are reporting to the SEC as an exempt reporting adviser, list the largest twenty-five offices in terms of numbers of employees as of the end of your most recently completed fiscal year.*

(2) Days of week that you normally conduct business at your *principal office and place of business:*
◉ Monday - Friday ○ Other:

Normal business hours at this location:
9AM-5PM

(3) Telephone number at this location:
214-908-8130

(4) Facsimile number at this location, if any:

214-550-4459

(5) What is the total number of offices, other than your *principal office and place of business*, at which you conduct investment advisory business as of the end of your most recently completed fiscal year?

0

G. Mailing address, if different from your *principal office and place of business* address:

Number and Street 1: Number and Street 2:
City: State: Country: ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

H. If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

Number and Street 1: Number and Street 2:
City: State: Country: ZIP+4/Postal Code:

| | Yes | No |
|---|---|---|
| I. Do you have one or more websites or accounts on publicly available social media platforms (including, but not limited to, Twitter, Facebook and LinkedIn)? | ◉ | ○ |

*If "yes," list all firm website addresses and the address for each of the firm's accounts on publicly available social media platforms on* Section 1.I. of Schedule D. *If a website address serves as a portal through which to access other information you have published on the web, you may list the portal without listing addresses for all of the other information. You may need to list more than one portal address. Do not provide the addresses of websites or accounts on publicly available social media platforms where you do not control the content. Do not provide the individual electronic mail (e-mail) addresses of employees or the addresses of employee accounts on publicly available social media platforms.*

J. Chief Compliance Officer

(1) Provide the name and contact information of your Chief Compliance Officer. If you are an *exempt reporting adviser*, you must provide the contact information for your Chief Compliance Officer, if you have one. If not, you must complete Item 1.K. below.

Name: Other titles, if any:
Telephone number: Facsimile number, if any:
Number and Street 1: Number and Street 2:
City: State: Country: ZIP+4/Postal Code:

Electronic mail (e-mail) address, if Chief Compliance Officer has one:

(2) If your Chief Compliance Officer is compensated or employed by any *person* other than you, a *related person* or an investment company registered under the Investment Company Act of 1940 that you advise for providing chief compliance officer services to you, provide the *person's* name and IRS Employer Identification Number (if any):

Name:
IRS Employer Identification Number:

K. Additional Regulatory Contact Person: If a person other than the Chief Compliance Officer is authorized to receive information and respond to questions about this Form ADV, you may provide that information here.

Name: Titles:
Telephone number: Facsimile number, if any:
Number and Street 1: Number and Street 2:
City: State: Country: ZIP+4/Postal Code:

Electronic mail (e-mail) address, if contact person has one:

| | Yes | No |
|---|---|---|
| L. Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*? | ◉ | ○ |

*If "yes," complete* Section 1.L. of Schedule D.

| | Yes | No |
|---|---|---|
| M. Are you registered with a *foreign financial regulatory authority*? | ○ | ◉ |

*Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes," complete* Section 1.M. of Schedule D.

| | Yes | No |
|---|---|---|
| N. Are you a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934? | ○ | ◉ |

| | Yes | No |
|---|---|---|
| O. Did you have $1 billion or more in assets on the last day of your most recent fiscal year? | ○ | ◉ |

If yes, what is the approximate amount of your assets:

- ○ $1 billion to less than $10 billion
- ○ $10 billion to less than $50 billion
- ○ $50 billion or more

*For purposes of Item 1.O. only, "assets" refers to your total assets, rather than the assets you manage on behalf of clients. Determine your total assets using the total assets shown on the balance sheet for your most recent fiscal year end.*

P. Provide your *Legal Entity Identifier* if you have one:

A *legal entity identifier* is a unique number that companies use to identify each other in the financial marketplace. You may not have a *legal entity identifier*.

**SECTION 1.B. Other Business Names**

No Information Filed

**SECTION 1.F. Other Offices**

No Information Filed

**SECTION 1.I. Website Addresses**

List your website addresses, including addresses for accounts on publicly available social media platforms where you control the content (including, but not limited to, Twitter, Facebook and/or LinkedIn). You must complete a separate Schedule D Section 1.I. for each website or account on a publicly available social media platform.

Address of Website/Account on Publicly Available Social Media Platform: HTTP://WWW.RANDADVISORS.COM/

**SECTION 1.L. Location of Books and Records**

Complete the following information for each location at which you keep your books and records, other than your *principal office and place of business*. You must complete a separate Schedule D, Section 1.L. for each location.

Name of entity where books and records are kept:
HIGHGATE CONSULTING GROUP INC

| Number and Street 1: | | Number and Street 2: | |
|---|---|---|---|
| 2101 CEDAR SPRINGS RD | | SUITE 1200 | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| DALLAS | Texas | United States | 75201 |

If this address is a private residence, check this box: ☐

| Telephone Number: | Facsimile number, if any: |
|---|---|
| 214-550-4459 | |

This is (check one):
- ○ one of your branch offices or affiliates.
- ◉ a third-party unaffiliated recordkeeper.
- ○ other.

Briefly describe the books and records kept at this location.
ALL BOOKS AND RECORDS OF THE ADVISER

**SECTION 1.M. Registration with Foreign Financial Regulatory Authorities**

No Information Filed



**Item 2 SEC Registration/Reporting**

Responses to this Item help us (and you) determine whether you are eligible to register with the SEC. Complete this Item 2.A. only if you are applying for SEC registration or submitting an *annual updating amendment* to your SEC registration. If you are filing an *umbrella registration*, the information in Item 2 should be provided for the *filing adviser* only.

A. To register (or remain registered) with the SEC, you must check **at least one** of the Items 2.A.(1) through 2.A.(12), below. If you are submitting an *annual updating amendment* to your SEC registration and you are no longer eligible to register with the SEC, check Item 2.A.(13). Part 1A Instruction 2 provides information to help you determine whether you may affirmatively respond to each of these items.

You (the adviser):

☑ (1) are a **large advisory firm** that either:

(a) has regulatory assets under management of $100 million (in U.S. dollars) or more; or

(b) has regulatory assets under management of $90 million (in U.S. dollars) or more at the time of filing its most recent *annual updating amendment* and is registered with the SEC;

☐ (2) are a **mid-sized advisory firm** that has regulatory assets under management of $25 million (in U.S. dollars) or more but less than $100 million (in U.S. dollars) and you are either:

(a) not required to be registered as an adviser with the *state securities authority* of the state where you maintain your *principal office and place of business*; or

(b) not subject to examination by the *state securities authority* of the state where you maintain your *principal office and place of business*;

*Click HERE for a list of states in which an investment adviser, if registered, would not be subject to examination by the state securities authority.*

(3) Reserved

☐ (4) have your *principal office and place of business* **outside the United States**;

☐ (5) are **an investment adviser (or subadviser) to an investment company** registered under the Investment Company Act of 1940;

☐ (6) are **an investment adviser to a company which has elected to be a business development company** pursuant to section 54 of the Investment Company Act of 1940 and has not withdrawn the election, and you have at least $25 million of regulatory assets under management;

☐ (7) are a **pension consultant** with respect to assets of plans having an aggregate value of at least $200,000,000 that qualifies for the exemption in rule 203A-2(a);

☐ (8) are a **related adviser** under rule 203A-2(b) that *controls*, is *controlled* by, or is under common *control* with, an investment adviser that is registered with the SEC, and your *principal office and place of business* is the same as the registered adviser;

*If you check this box, complete Section 2.A.(8) of Schedule D.*

☐ (9) are an **adviser** relying on rule 203A-2(c) because you **expect to be eligible for SEC registration within 120 days;**

*If you check this box, complete Section 2.A.(9) of Schedule D.*

☐ (10) are a **multi-state adviser** that is required to register in 15 or more states and is relying on rule 203A-2(d);

*If you check this box, complete Section 2.A.(10) of Schedule D.*

☐ (11) are an **Internet adviser** relying on rule 203A-2(e);

*If you check this box, complete Section 2.A.(11) of Schedule D.*

☐ (12) have **received an SEC order** exempting you from the prohibition against registration with the SEC;

*If you check this box, complete Section 2.A.(12) of Schedule D.*

☐ (13) are **no longer eligible** to remain registered with the SEC.

***State Securities Authority Notice Filings* and State Reporting by *Exempt Reporting Advisers***

C. Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings*. In addition, *exempt reporting advisers* may be required to provide *state securities authorities* with a copy of reports and any amendments they file with the SEC. If this is an initial application or report, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to direct your *notice filings* or reports to additional state(s), check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to your registration to stop your *notice filings* or reports from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

Jurisdictions

| | | | |
|---|---|---|---|
| ☐ AL | ☐ IL | ☐ NE | ☐ SC |
| ☐ AK | ☐ IN | ☐ NV | ☐ SD |
| ☐ AZ | ☐ IA | ☐ NH | ☐ TN |
| ☐ AR | ☐ KS | ☐ NJ | ☑ TX |

| | | | |
|---|---|---|---|
| ☐ CA | ☐ KY | ☐ NM | ☐ UT |
| ☐ CO | ☐ LA | ☑ NY | ☐ VT |
| ☐ CT | ☐ ME | ☐ NC | ☐ VI |
| ☐ DE | ☐ MD | ☐ ND | ☐ VA |
| ☐ DC | ☐ MA | ☐ OH | ☐ WA |
| ☐ FL | ☐ MI | ☐ OK | ☐ WV |
| ☐ GA | ☐ MN | ☐ OR | ☐ WI |
| ☐ GU | ☐ MS | ☐ PA | ☐ WY |
| ☐ HI | ☐ MO | ☐ PR | |
| ☐ ID | ☐ MT | ☐ RI | |

*If you are amending your registration to stop your notice filings or reports from going to a state that currently receives them and you do not want to pay that state's notice filing or report filing fee for the coming year, your amendment must be filed before the end of the year (December 31).*

**SECTION 2.A.(8) Related Adviser**

If you are relying on the exemption in rule 203A-2(b) from the prohibition on registration because you *control*, are *controlled* by, or are under common *control* with an investment adviser that is registered with the SEC and your *principal office and place of business* is the same as that of the registered adviser, provide the following information:

Name of Registered Investment Adviser

*CRD* Number of Registered Investment Adviser

SEC Number of Registered Investment Adviser
-

**SECTION 2.A.(9) Investment Adviser Expecting to be Eligible for Commission Registration within 120 Days**

If you are relying on rule 203A-2(c), the exemption from the prohibition on registration available to an adviser that expects to be eligible for SEC registration within 120 days, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations. You must make both of these representations:

☐ I am not registered or required to be registered with the SEC or a *state securities authority* and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.

☐ I undertake to withdraw from SEC registration if, on the 120th day after my registration with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from registering with the SEC.

**SECTION 2.A.(10) Multi-State Adviser**

If you are relying on rule 203A-2(d), the multi-state adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations.

If you are applying for registration as an investment adviser with the SEC, you must make both of these representations:

☐ I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 15 or more states to register as an investment adviser with the *state securities authorities* in those states.

☐ I undertake to withdraw from SEC registration if I file an amendment to this registration indicating that I would be required by the laws of fewer than 15 states to register as an investment adviser with the *state securities authorities* of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

☐ Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 15 states to register as an investment adviser with the *state securities authorities* in those states.

**SECTION 2.A.(11) Internet Adviser**

If you are relying on rule 203A-2(e), the Internet adviser exemption from the prohibition on registration, you are required to make a representation about your eligibility for SEC registration. By checking the appropriate box, you will be deemed to have made the required representation.

If you are applying for registration as an investment adviser with the SEC or changing your existing Item 2 response regarding your eligibility for SEC registration, you must make this representation:

☐ I will provide investment advice on an ongoing basis to more than one client exclusively through an *operational interactive website*.

If you are filing an annual updating amendment to your existing registration and are continuing to rely on the Internet adviser exemption for SEC registration, you must make this representation:

☐ I have provided and will continue to provide investment advice on an ongoing basis to more than one client exclusively through an *operational interactive website*.

**SECTION 2.A.(12) SEC Exemptive *Order***

If you are relying upon an SEC *order* exempting you from the prohibition on registration, provide the following information:

Application Number:
803-

Date of *order*:

**Item 3 Form of Organization**

If you are filing an *umbrella registration*, the information in Item 3 should be provided for the *filing adviser* only.

A. How are you organized?

- ○ Corporation
- ○ Sole Proprietorship
- ○ Limited Liability Partnership (LLP)
- ○ Partnership
- ◉ Limited Liability Company (LLC)
- ○ Limited Partnership (LP)
- ○ Other (specify):

*If you are changing your response to this Item, see Part 1A Instruction 4.*

B. In what month does your fiscal year end each year?
DECEMBER

C. Under the laws of what state or country are you organized?

| State | Country |
|---|---|
| Delaware | United States |

*If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor, provide the name of the state or country where you reside.*

*If you are changing your response to this Item, see Part 1A Instruction 4.*

**Item 4 Successions**

| | Yes | No |
|---|---|---|
| A. Are you, at the time of this filing, succeeding to the business of a registered investment adviser, including, for example, a change of your structure or legal status (e.g., form of organization or state of incorporation)? | ○ | ◉ |

*If "yes", complete Item 4.B. and Section 4 of Schedule D.*

B. Date of Succession: (MM/DD/YYYY)

*If you have already reported this succession on a previous Form ADV filing, do not report the succession again. Instead, check "No." See Part 1A Instruction 4.*

**SECTION 4 Successions**

No Information Filed

**Item 5 Information About Your Advisory Business - Employees, Clients, and Compensation**

Responses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use when making regulatory policy. Part 1A Instruction 5.a. provides additional guidance to newly formed advisers for completing this Item 5.

***Employees***

*If you are organized as a sole proprietorship, include yourself as an employee in your responses to Item 5.A. and Items 5.B.(1), (2), (3), (4), and (5). If an employee performs more than one function, you should count that employee in each of your responses to Items 5.B.(1), (2), (3), (4), and (5).*