**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P**.**

§
§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§
vs. §

3:26-CV-02496-D

**Highland Capital Management, L.P., et al**-Appellee
§
§

**[4689] Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026**

**APPELLANT RECORD**

**VOLUME 14**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br><br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02496-D<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4698] on July 24, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689] now files this *Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the Court's June 15, 2026 Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate?

2. Did the Bankruptcy Court err in finding Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate ("Dugaboy's Motion") [Docket No. 4684] was "without merit?"

3. Did the Bankruptcy Court err in denying Dugaboy's Motion without a full record, including that Dugaboy was not allowed to file a reply brief and was not granted a hearing?

4. Did the Bankruptcy Court err in denying Dugaboy the opportunity to file a reply brief to Highland's Opposition to Dugaboy's Motion, including that Dugaboy indicated a date certain for filing a reply?

5. Did the Bankruptcy Court err in finding Dugaboy's Motion was "without merit" without granting a hearing?

6. Did the Bankruptcy Court err by summarily denying Dugaboy's Motion without explaining its reasoning for the denial?

7. Did the Bankruptcy Court err in failing to consider Dugaboy's Notice of Intervening Event?

8. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(2) when it determined that it had not manifestly erred in deciding the evidence of Mark Patrick's misconduct contained in the Cayman Islands proceeding was not "newly discovered" even though that information was not contained in James Dondero's affidavit executed April 16, 2025?

9. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant

to Rule 60(b)(2) when it determined it had not manifestly erred in deciding the Dondero Affidavit indicated information gained in the Cayman Islands proceedings was not "newly discovered" despite the fact the Affidavit lacked any evidence of the restructuring discovered in the Cayman Islands proceedings?

10. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding on the grounds that Rule 60(b)(3) purportedly requires fraud or misconduct to have occurred in the judicial proceeding itself?

11. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding that Highland did not provide misleading or incomplete answers during the discovery of Mark Patrick's misconduct and resulting lack of authority to negotiate the Rule 9019 settlement agreement from Dugaboy leading to the Rule 9019 Order?

12. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding that Dugaboy had not presented a basis for relief under Rule 60(b)(6) that was separate from the grounds presented for Rule 60(b)(2) and Rule 60(b)(3)?

13. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding on the grounds that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain?

14. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of the Bankruptcy Court's special responsibility to monitor arrangements and settlements made between Highland's appointed managers and third parties?

15. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of its manifest error in failing to consider the Bankruptcy Court's role as a court of equity and responsibility to prevent misconduct before it, such as Mark Patrick's use of stolen assets in the 9019 Settlement?

16. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

Vol. 1 000001 – 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4698] filed by Appellant;

000010 2. The Bankruptcy Court's July 10, 2026 *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000012 4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 2 000648 thru Vol. 3 | 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| Vol. 4 001843 | 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 4 001845 thru vol 6 | 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol 7 003634 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003647 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003650 + 003651 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003652 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003663 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003667 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003670 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 7 | | | |
| 003709 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004733 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol. 8 004790 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol 9 005207 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005209 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005217 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| vol 9 | | Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 04/07/2026 005222 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 04/07/2026 005225 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 04/10/2026 005227 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 04/16/2026 005229 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/17/2026 005233 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol 9 | | Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| 04/17/2026 005330 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| Vol 10 04/21/2026 005590 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/22/2026 005594 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/22/2026 005615 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 04/22/2026 005682 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 10 | | | Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| 005692 | 04/22/2026 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 005705 | 04/24/2026 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 005726 | 04/24/2026 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 005727 | 04/25/2026 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005729 | 04/27/2026 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 005737 | 04/28/2026 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |

vol. II

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 04/28/2026 005746 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005755 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005761 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/29/2026 005767 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 04/29/2026 005776 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 04/29/2026 005783 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 10 | | | |
| 005785 | 04/29/2026 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005787 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005794 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005796 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005798 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005801 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005884 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005902 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005905 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005907 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11 | | | Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005913 | 05/06/2026 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005920 | 05/06/2026 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005927 | 05/06/2026 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 005929 | 05/07/2026 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005936 | 05/08/2026 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 005939 | 05/08/2026 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 005942 | 05/08/2026 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 005945 | 05/08/2026 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol. 12 006100 Thru Vol 21 | 05/08/2026 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and* |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | *Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| 10). 22 008156 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 008172 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 008188 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 22 008256 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008293 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008429 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008465 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008472 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008916 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| Vol 25 009554 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| Vol. 26 009868 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| Vol 27 010229 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| Vol. 28 010538 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| Vol. 28 010664 | 05/11/2026 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29 010736 | 05/11/2026 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol 30 011150 | 05/11/2026 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol 31 011734 | 05/11/2026 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol 32 013203 Thru Vol 33 | 05/11/2026 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34 014888 | 05/11/2026 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol 35 05/11/2026 015349 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 05/11/2026 015505 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 05/12/2026 015506 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 05/12/2026 015538 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 05/12/2026 015565 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 05/15/2026 015566 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36 05/18/2026 015569 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol 37 05/18/2026 015996 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 05/19/2026 016008 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 05/20/2026 016079 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 05/20/2026 016082 – 016084 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 05/21/2026 016085 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 05/21/2026 016134 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 37 | | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| 016135 | 05/23/2026 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 016233 | 05/28/2026 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 016490 | 06/15/2026 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s)4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 016504 | 06/15/2026 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| Vol. 39 016505 | 06/29/2026 | 4684 | (162 pgs; 2 docs) Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Appendix) (Edney, Michael) |
| 016667 | 06/29/2026 | 4685 | (7 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s)4679 Order on motion to reconsider). Appellant Designation due by 07/13/2026. (Attachments: # 1 Exhibit)(Edney, Michael) |
| 016674 | 07/06/2026 | 4687 | (32 pgs; 2 docs) Response opposed to (related document(s): 4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 016706 | 07/09/2026 | 4688 | (23 pgs; 2 docs) Notice of Intent to Reply and Request for Hearing on Its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 39 | | | (Attachments: # 1 Appendix)). (Attachments: # 1 Attachment A) (Edney, Michael) |
| 016729 | 07/10/2026 | 4689 | (2 pgs) Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026. (Okafor, M.) Modified text on 7/10/2026 (mdo). |
| 016731 | 07/13/2026 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |
| 016733 | 07/24/2026 | 4698 | (9 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)(Edney, Michael) |
| 016742 | 07/28/2026 | 4704 | (5 pgs) DISTRICT COURT Notice of docketing notice of appeal. Civil Action Number: 3:26-cv-02496-E. (RE: related document(s)4698 Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court;

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J"); and

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No.

4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: August 7, 2026

Respectfully submitted,

/s/ *Michael J. Edney*

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

If the amount of leverage which the Partnership may have outstanding at any one time is large in relation to its capital, fluctuations in the market value of the Partnership's portfolio will have disproportionately large effects in relation to the Partnership's capital and the possibilities for profit and the risk of loss will therefore be increased. Any investment gains made with the additional leverage will generally cause the Net Asset Value of the Partnership to rise more rapidly than would otherwise be the case. Conversely, if the investment performance of the leveraged capital fails to cover its cost to the Partnership, the Net Asset Value of the Partnership will generally decline faster than would otherwise be the case.

Certain of the Partnership's trading and investment activities in securities and other financial instruments may be subject to Federal Reserve Board margin requirements, which are computed each day. When the market value of a particular open position changes to a point where the margin on deposit does not satisfy maintenance margin requirements, a "margin call" on the customer is made. If the customer does not deposit additional funds with the broker to meet the margin call within a reasonable time, the customer's position may be closed out. In the event of a precipitous drop in the value of the assets managed by the Partnership, the Partnership might not be able to liquidate assets quickly enough to pay off the margin debt and might suffer mandatory liquidation of positions in a declining market at relatively low prices, incurring substantial losses. With respect to the Partnership's trading activities, the Partnership, and not the Limited Partners personally, will be subject to margin calls.

Overall, the use of leverage, while providing the opportunity for a higher return on investments, also increases the volatility of such investments and the risk of loss.

**Options and Other Derivative Instruments.** The Investment Manager may invest, from time to time, a portion of the Partnership's assets in options and derivative instruments, including buying and writing puts and calls on some of the securities held by the Partnership. The prices of many derivative instruments, including many options and swaps, are highly volatile. The value of options and swap agreements depend primarily upon the price of the securities, indexes, currencies or other instruments underlying them. Price movements of options contracts and payments pursuant to swap agreements are also influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies. The Partnership is also subject to the risk of the failure of any of the exchanges on which its positions trade or of their clearinghouses or of counterparties. The cost of options is related, in part, to the degree of volatility of the underlying securities, currencies or other assets. Accordingly, options on highly volatile securities, currencies or other assets may be more expensive than options on other investments.

Put options and call options typically have similar structural characteristics and operational mechanics regardless of the underlying instrument or asset on which they are purchased or sold. A put option gives the purchaser of the option, upon payment of a premium, the right to sell, and the writer the obligation to buy, the underlying security, index, currency or other instrument or asset at the exercise price. A call option, upon payment of a premium, gives the purchaser of the option the right to buy, and the seller the obligation to sell, the underlying instrument or asset at the exercise price.

If a put or call option purchased by the Partnership were permitted to expire without being sold or exercised, the Partnership would lose the entire premium it paid for the option. The risk involved in writing a put option is that there could be a decrease in the market value of the underlying instrument or asset caused by rising interest rates or other factors. If this occurred, the option could be exercised and the underlying instrument or asset would then be sold to the Partnership at a higher price than its current market value. The risk involved in writing a call option is that there could be an increase in the market value of the underlying instrument or asset caused by declining interest rates or other factors. If this occurred, the option could be exercised and the underlying instrument or asset would then be sold by the Partnership at a lower price than its current market value.

Purchasing and writing put and call options and, in particular, writing "uncovered" options

are highly specialized activities and entail greater than ordinary investment risks. In particular, the writer of an uncovered call option assumes the risk of a theoretically unlimited increase in the market price of the underlying instrument or asset above the exercise price of the option. This risk is enhanced if the instrument or asset being sold short is highly volatile and there is a significant outstanding short interest. These conditions exist in the stocks of many companies. The instrument or asset necessary to satisfy the exercise of the call option may be unavailable for purchase except at much higher prices. Purchasing instruments or assets to satisfy the exercise of the call option can itself cause the price of the instruments or assets to rise further, sometimes by a significant amount, thereby exacerbating the loss. Accordingly, the sale of an uncovered call option could result in a loss by the Partnership of all or a substantial portion of its assets.

Swaps and certain options and other custom instruments are subject to the risk of non-performance by the counterparty, including risks relating to the financial soundness and creditworthiness of the counterparty.

**Hedging Transactions**. Investments in financial instruments such as options and interest rate swaps, caps and floors, and other derivatives are commonly utilized by investment funds to hedge against fluctuations in the relative values of its portfolio positions as a result of changes in currency exchange rates, interest rates and/or the equity markets or sectors thereof. Any hedging against a decline in the value of portfolio positions does not eliminate fluctuations in the values of portfolio positions or prevent losses if the values of such positions decline, but establishes other positions designed to gain from those same developments, thus moderating the decline in the portfolio positions' value. Such hedging transactions also limit the opportunity for gain if the value of the portfolio positions should increase. Moreover, it may not be possible for the Partnership to hedge against a fluctuation at a price sufficient to protect the Partnership's assets from the decline in value of the portfolio positions anticipated as a result of such fluctuations. For example, the cost of options is related, in part, to the degree of volatility of the underlying instruments or assets. Accordingly, options on highly volatile instruments or assets may be more expensive than options on other instruments or assets and of limited utility in hedging against fluctuations in their prices.

The Investment Manager is not obligated to establish hedges for portfolio positions and may not do so. To the extent that hedges are implemented, their success is dependent on the Investment Manager's ability to correctly predict movements in the direction of currency and interest rates and the equity markets or sectors thereof.

**Market or Interest Rate Risk**. The Partnership may, from time to time, invest in fixed income securities and instruments. The price of most fixed income securities move in the opposite direction of the change in interest rates. For example, as interest rates rise, the prices of fixed income securities fall. If the Partnership holds a fixed income security to maturity, the change in its price before maturity may have little impact on the Partnership's performance. However, if the Partnership has to sell the fixed income security before the maturity date, an increase in interest rates could result in a loss to the Partnership.

**Callable Securities**. Many bonds, including agency, corporate and municipal bonds, and mortgage-backed securities, sometimes contain a provision that allows the issuer to "call" (i.e., redeem) all or part of the issue before the bond's maturity date. The issuer usually retains this right to refinance the bond in the future if market interest rates decline below the coupon rate on the outstanding debt security. From the investor's perspective, there are three disadvantages to the call provision. First, the cash flow pattern of a callable bond is not known with certainty. Second, because the issuer will call the bonds when interest rates have dropped, the Partnership is exposed to reinvestment rate risk – the Partnership will have to reinvest the proceeds received when the bond is called at lower interest rates. Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

**Maturity Risk**. In certain situations, the Partnership may purchase a bond of a given maturity as an alternative to another bond of a different maturity. Ordinarily, under these

circumstances, the Partnership will make an adjustment to account for the interest rate risk differential in the two bonds. This adjustment, however, makes an assumption about how the interest rates at different maturities will move. To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk. Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

**Inflation Risk.** Inflation risk results from the variation in the value of cash flows from a fixed income security or instrument due to inflation, as measured in terms of purchasing power. For example, if the Partnership purchases a 5-year bond with a coupon rate of 5%, but the rate of inflation is 6%, then the purchasing power of the cash flow has declined. For all but inflation-linked bonds, adjustable bonds or floating rate bonds, the Partnership is exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security. To the extent that interest rates reflect the expected inflation rate, floating rate bonds have a lower level of inflation risk.

**Downgrades in Fixed Income Debt Securities**. Unless required by applicable law, the Partnership is not required to sell or dispose of any debt security that either loses its rating or has its rating reduced after the Partnership purchases such security.

**Investments in Non-U.S. Investments**. From time to time, the Investment Manager may invest and trade a portion of the Partnership's assets in non-U.S. securities and other assets (through ADRs and otherwise), which will give rise to risks relating to political, social and economic developments abroad, as well as risks resulting from the differences between the regulations to which U.S. and non-U.S. issuers and markets are subject. Such risks may include:

- Political or social instability, the seizure by foreign governments of company assets, acts of war or terrorism, withholding taxes on dividends and interest, high or confiscatory tax levels, and limitations on the use or transfer of portfolio assets.
- Enforcing legal rights in some foreign countries is difficult, costly and slow, and there are sometimes special problems enforcing claims against foreign governments.
- Non-U.S. securities and other assets often trade in currencies other than the U.S. dollar, and the Partnership may directly hold foreign currencies and purchase and sell foreign currencies through forward exchange contracts. Changes in currency exchange rates will affect the Partnership's Net Asset Value, the value of dividends and interest earned, and gains and losses realized on the sale of investments. An increase in the strength of the U.S. dollar relative to these other currencies may cause the value of the Partnership's investments to decline. Some foreign currencies are particularly volatile. Foreign governments may intervene in the currency markets, causing a decline in value or liquidity of the Partnership's foreign currency holdings. If the Partnership enters into forward foreign currency exchange contracts for hedging purposes, it may lose the benefits of advantageous changes in exchange rates. On the other hand, if the Partnership enters forward contracts for the purpose of increasing return, it may sustain losses.
- Non-U.S. securities and other markets may be less liquid, more volatile and less closely supervised by the government than in the United States. Foreign countries often lack uniform accounting, auditing and financial reporting standards, and there may be less public information about the operations of issuers in such markets.

**Risks Associated with ADRs**. The Partnership may purchase ADRs, which are certificates evidencing ownership of shares of a non-U.S. issuer, acting as alternatives to directly purchasing the underlying non-U.S. securities in their national markets and currencies. Such investments are subject to many of the risks associated with investing directly in non-U.S. securities. These risks include the political and economic risks of the underlying issuer's country, as well as, in the case of depositary receipts traded on non-U.S. markets, foreign exchange risk. ADRs may be sponsored or unsponsored. Unsponsored ADRs are established without the participation of the issuer. In addition, unsponsored ADRs may involve higher expenses, may not carry pass-through voting or

other shareholder rights, and may be less liquid. The performance of ADRs may be different from the performance of the ordinary shares of the non-U.S. issuers to which they relate.

**Emerging Markets**. The Partnership may invest a portion of its assets in investments related to emerging market countries. The securities markets of emerging market countries as a whole have been volatile and the loans and securities of issuers in emerging markets tend to be subject to abrupt or erratic price movements. Investing a significant portion of the Partnership's assets in issuers in emerging markets will make the Partnership susceptible to a greater degree than otherwise would be the case to factors affecting emerging markets in general and issuers in emerging markets included in the Partnership's portfolio in particular, and may increase the volatility of the value of the Partnership's portfolio investments. The economies of these markets may differ significantly from the economies of certain developed countries in such respects as gross domestic product or gross national product, rate of inflation, currency depreciation, capital reinvestment, resource self-sufficiency, structural unemployment and balance of payments position. In particular, these economies frequently experience high levels of inflation. In addition, such countries may have: (1) restrictive national policies that limit the Partnership's investment opportunities; (2) limited information about their issuers; (3) a general lack of uniform accounting, auditing and financial reporting standards, auditing practices and requirements compared to the standards of developed countries; (4) less governmental supervision and regulation of business and industry practices, securities exchanges, brokers and listed companies; (5) economic developments that may be slowed or reversed by unanticipated political or social events in such countries; and (6) a lack of capital market structure or market-oriented economy.

Systemic and market factors may affect the acquisition, payment for or ownership of investments including: (a) the prevalence of crime and corruption; (b) the inaccuracy or unreliability of business and financial information; (c) the instability or volatility of: (i) banking and financial systems, or the absence or inadequacy of an infrastructure to support such systems, (ii) custody and settlement infrastructure of the market in which such investments are traded and held, and (iii) the acts, omissions and operation of any securities depository; (d) the risk of the bankruptcy or insolvency of banking agents, counterparties to cash and securities transactions, registrars or transfer agents; and (e) the existence of market conditions that prevent the orderly execution or settlement of transactions or that affect the value of assets. Different clearance and settlement procedures may prevent the Partnership from making intended security purchases causing the Partnership to miss attractive investment opportunities, possibly resulting in either losses to or contract claims against the Partnership. The investment markets of many of the countries in which the Partnership may invest may also be smaller, less liquid, and subject to greater price volatility than developed markets. The Partnership's assets may be denominated in a variety of currencies subject to changes in currency exchange rates and in exchange control regulations.

**Volatility of Currency Prices**. In general, price movements of currencies are difficult to predict accurately because they are influenced by, among other things, changing supply and demand relationships; governmental, trade, fiscal, monetary and exchange control programs and policies; national and international political and economic events; and changes in interest rates. Governments from time to time intervene in certain markets in order to influence prices directly.

**Currency Control**. It is sometimes the case that governments alter the exchange rate policy of a currency without advance notice, and it may not always be possible to foresee a change in policy.

**Exchange Rate Fluctuations**. Investments that are denominated in a foreign currency are subject to the risk that the value of a particular currency will change in relation to one or more other currencies. The Partnership intends to value its holdings and to make distributions in U.S. dollars. Thus, changes in currency exchange rates adverse to the U.S. dollar may affect adversely the value of such holdings. Among the factors that may affect currency values are trade balances, the appropriateness of interest rates, the shape of the yield curve, the degree of central bank independence and credibility, differences in relative values of similar assets in different currencies, long-term opportunities for

investment and capital appreciation and political developments.

**Risks of Trading Futures**. The Investment Manager is eligible to trade a limited amount of commodities or financial futures on behalf of the Partnership under a provision in the CEA that provides an exemption from registration as a commodity pool operator. Trading futures is a highly risky strategy. Whenever the Partnership purchases a particular future, there is a possibility that the Partnership may sustain a total loss of its purchase price. The equity values of leveraged positions using futures are, in general, much more volatile than the prices of securities, such as stocks and bonds. As a result, the risk of loss in trading futures is substantially greater than in trading those securities. The prices of futures react strongly to the prices of the underlying commodities. The prices of these underlying products, in turn, rise and fall based on changes in interest rates, international balances of trade, changes in governments, wars, weather events and a host of other factors that are entirely beyond the Investment Manager's control and very difficult (and perhaps impossible) to predict.

**Forward Trading**. Forward contracts and options thereon, unlike futures contracts, are not traded on exchanges and are not standardized; rather, banks and dealers act as principals in these markets, negotiating each transaction on an individual basis. Forward and "cash" trading is substantially unregulated; there is no limitation on daily price movements and speculative position limits are not applicable. The principals who deal in the forward markets are not required to continue to make markets in the currencies or commodities they trade and these markets can experience periods of illiquidity, sometimes of significant duration. There have been periods during which certain participants in these markets have refused to quote prices for certain currencies or commodities or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell. Disruptions can occur in any market traded by the Partnership due to unusual trading volume, political intervention or other factors. The imposition of controls by governmental authorities might also limit such forward trading to less than that which the Investment Manager would otherwise recommend, to the possible detriment of the Partnership. Market illiquidity or disruption could result in major losses to the Partnership.

**Over-the-Counter-Trading**. Financial instruments that may be purchased or sold by the Partnership may include instruments not traded on an exchange. The risk of nonperformance by the obligor on such an instrument may be greater and the ease with which the Partnership can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument. In addition, significant disparities may exist between "bid" and "asked" prices for financial instruments that are not traded on an exchange. Financial instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

To the extent that the Partnership engages in these transactions, the Partnership must rely on the creditworthiness of its counterparty. In certain instances, counterparty or credit risk is affected by the lack of a central clearinghouse for foreign exchange trades. To reduce their credit risk exposure, the Partnership may trade in the forward foreign currency market through money center banks and leading brokerage firms.

**Position Limits**. Position limits imposed by various regulators or regulations may also limit the Partnership's ability to affect desired trades. Position limits are the maximum amounts of gross, net long or net short positions that any one person or entity may own or control in a particular financial instrument. All positions owned or controlled by the same person or entity, even if in different accounts, may be aggregated for purposes of determining whether the applicable position limits have been exceeded. Thus, even if the Partnership does not intend to exceed applicable position limits, it is possible that different accounts managed by the Investment Manager or its affiliates may be aggregated. If at any time positions managed by the Investment Manager were to exceed applicable position limits, the Investment Manager would be required to liquidate positions, which might include positions of the Partnership, to the extent necessary to come within those limits. Further, to avoid exceeding the position limits, the Partnership might have to forego

or modify certain of its contemplated trades.

**Risk of Default or Bankruptcy of Third Parties**. The Partnership may engage in transactions in securities and other financial instruments and assets that involve counterparties. Under certain conditions, the Partnership could suffer losses if a counterparty to a transaction were to default or if the market for certain securities or other financial instruments or assets were to become illiquid. In addition, the Partnership could suffer losses if there were a default or bankruptcy by certain other third parties, including brokerage firms and banks with which the Partnership does business, or to which securities or other financial instruments or assets have been entrusted for custodial purposes.

**Custody and Brokerage Risk**. There are risks involved in dealing with the custodians or other brokers who settle Partnership trades. The Partnership maintains custody accounts with the Custodian. Although the Investment Manager generally monitors both the Introducing Broker and the Custodian and believes they are appropriate service providers, there is no guarantee that such service providers, or any other introducing broker and/or clearing broker and custodian that the Partnership may use from time to time, will not become bankrupt or insolvent. While both the U.S. Bankruptcy Code, as amended, and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a bankruptcy, insolvency, failure, or liquidation of a broker-dealer, there is no certainty that, in the event of a failure of a broker-dealer that has custody of Partnership assets, the Partnership would not incur losses due to its assets being unavailable for a period of time, the ultimate receipt of less than full recovery of its assets, or both.

The Partnership and/or the Custodian may appoint sub-custodians in certain non-U.S. jurisdictions to hold the assets of the Partnership. The Custodian may not be responsible for cash or assets which are held by sub-custodians in certain non-U.S. jurisdictions, nor for any losses suffered by the Partnership as a result of the bankruptcy or insolvency of any such sub-custodian. The Partnership may therefore have a potential exposure on the default of any sub-custodian and, as a result, many of the protections that would normally be provided to a fund by a custodian may not be available to the Partnership. Under certain circumstances, including certain transactions where the Partnership's assets are pledged as collateral for leverage from a non-broker-dealer custodian or a non-broker-dealer affiliate of the Custodian, or where the Partnership's assets are held at a non-U.S. custodian, the securities and other assets deposited with the custodian or broker may not be clearly identified as being assets of the Partnership and hence the Partnership could be exposed to a credit risk with regard to such parties. Custody services in certain non-U.S. jurisdictions remain undeveloped and, accordingly, there is a transaction and custody risk of dealing in certain non-U.S. jurisdictions. Given the undeveloped state of regulations on custodial activities and bankruptcy, insolvency, or mismanagement in certain non-U.S. jurisdictions, the ability of the Partnership to recover assets held by a sub-custodian in the event of the sub-custodian's bankruptcy or insolvency could be in doubt, as the Partnership may be subject to significantly less favorable laws than many of the protections that would be available under U.S. laws. In addition, there may be practical or time problems associated with enforcing the Partnership's rights to its assets in the case of a bankruptcy or insolvency of any such party.

**Temporary Defensive Investments**. If warranted under certain economic or market conditions or for other reasons, the Investment Manager may temporarily invest up to 100% of the Partnership's assets outside the scope of its principal investment focus in U.S. government securities, such as Treasury bills, notes and bonds, cash, money-market funds, certificates of deposit, time deposits, bankers' acceptances and other short-term debt instruments bearing a reasonable rate of interest. In such circumstances, the Partnership may not achieve its investment objectives.

**Other Instruments**. The Partnership may take advantage of opportunities with respect to certain other instruments that are not presently contemplated for use or that are currently not available, but that may be developed, to the extent such opportunities are both consistent with the investment objective of the Partnership and legally permissible. Special risks may apply to instruments that are invested in by the Partnership in the future that cannot be determined at this time or until such instruments are developed or invested

in by the Partnership.

**Specific Risks Associated with Investing in Bank Loans**

You should note that certain of the following risk factors specifically applicable with respect to Bank Loans have been discussed under "—Market Risks—General" above and are included in this sub-section for ease of reference.

**Senior Loans Risk**. Senior loans are usually rated below investment grade or may also be unrated. As a result, the risks associated with senior loans are similar to the risks of below investment grade fixed income instruments, although senior loans are senior and secured in contrast to other below investment grade fixed income instruments, which are often subordinated or unsecured. Investment in senior loans rated below investment grade is considered speculative because of the credit risk of their issuers. Such companies are more likely than investment grade issuers to default on their payments of interest and principal owed to the Partnership, and such defaults could have a materially adverse effect on the Partnership's performance. An economic downturn would generally lead to a higher non-payment rate, and a senior loan may lose significant market value before a default occurs. Moreover, any specific collateral used to secure a senior loan may decline in value or become illiquid, which would adversely affect the senior loan's value. Senior loans are subject to a number of risks described elsewhere in this Memorandum, including liquidity risk and the risk of investing in below investment grade fixed income instruments.

There may be less readily available and reliable information about most senior loans than is the case for many other types of securities, including securities issued in transactions registered under the Securities Act or registered under the Exchange Act. As a result, the Investment Manager will rely primarily on its own evaluation of a borrower's credit quality rather than on any available independent sources. Therefore, the Partnership will be particularly dependent on the analytical abilities of the Investment Manager.

In general, the secondary trading market for senior loans is not well developed. No active trading market may exist for certain senior loans, which may make it difficult to value them. Illiquidity and adverse market conditions may mean that the Partnership may not be able to sell senior loans quickly or at a fair price. To the extent that a secondary market does exist for certain senior loans the market for them may be subject to irregular trading activity, wide bid/ask spreads and extended trade settlement periods.

**Variable Interest Rate Risk**. Because senior loans with floating or variable rates reset their interest rates periodically, changes in prevailing interest rates can be expected to cause some fluctuations in the value of the Partnership's investments. Similarly, a sudden and significant increase in market interest rates may cause a decline in the value of the Partnership's investments. In addition, senior loans or similar securities may allow the borrower or issuer to opt between LIBOR-based interest rates and interest rates based on bank prime rates, which may have an impact on value of the Partnership's investments.

**Bank Loans**. The Partnership's investment program will include investments in significant amounts of Bank Loans and participations. These obligations are subject to unique risks, including: (i) the possible invalidation of an investment transaction as a fraudulent conveyance under relevant creditors' rights laws; (ii) so-called lender-liability claims by the issuer of the obligations; (iii) environmental liabilities that may arise with respect to collateral securing the obligations; and (iv) limitations on the ability of the Partnership to directly enforce its rights with respect to participations. In analyzing each Bank Loan or participation, the Investment Manager compares the relative significance of the risks against the expected benefits of the investment. Successful claims by third parties arising from these and other risks will be borne by the Partnership.

**DIP Loans**. From time to time, the Partnership may invest in loans to companies that have filed for protection under Chapter 11 of the U.S. Bankruptcy Code, as amended. DIP loans are typically asset-based, revolving working-capital facilities put into place at the outset of a Chapter 11 bankruptcy to provide both immediate cash as well as ongoing

working capital during the reorganization process. Such loans are risky and present significant exposure for default risk to the Partnership.

**Adjustments to Terms of Investments**. The terms and conditions of loan agreements and related assignments may be amended, modified or waived only by the agreement of the lenders. Generally, any such agreement must include a majority or a super majority (measured by outstanding loans or commitments) or, in certain circumstances, a unanimous vote of the lenders. Consequently, the terms and conditions of the payment obligation arising from loan agreements could be modified, amended or waived in a manner contrary to the preferences of the Partnership if a sufficient number of the other lenders concurred with such modification, amendment or waiver. There can be no assurance that any obligations arising from a loan agreement will maintain the terms and conditions to which the Partnership originally agreed.

The exercise of remedies may also be subject to the vote of a specified percentage of the lenders thereunder. The Investment Manager will have the authority to cause the Partnership to consent to certain amendments, waivers or modifications to the Partnership's investments requested by obligors or the lead agents for loan syndication agreements. The Investment Manager may, in accordance with its investment management standards, cause the Partnership to extend or defer the maturity, adjust the outstanding balance of any investment, reduce or forgive interest or fees, release material collateral or guarantees, or otherwise amend, modify or waive the terms of any related loan agreement, including the payment terms thereunder. The Investment Manager will make such determinations in accordance with its investment management standards. Any amendment, waiver or modification of the terms of an investment could adversely impact the Partnership's investment returns.

**Prepayments**. Certain of the Partnership's investments may be prepaid more quickly than expected. Prepayment rates are influenced by changes in interest rates and a variety of economic, geographic and other factors beyond the Partnership's control and consequently cannot be predicted with certainty. Early prepayments give rise to increased re-investment risk, as the Partnership might realize excess cash earlier than it expected. If the Partnership is unable to reinvest the principle portion of a prepayment in a new investment with an expected rate of return at least equal to that of the investment repaid, this may reduce the Partnership's net investment income and, consequently, could have an adverse impact on the Partnership's ability to make distributions.

**Investments in Loans Secured by Real Estate**. While direct real estate investment is not intended to be the focus of the Partnership, it is possible that, from time to time, the Partnership may, as a result of default, foreclosure or otherwise, hold real estate assets. Special risks associated with such investments include changes in the general economic climate or local conditions (such as an oversupply of space or a reduction in demand for space), competition based on rental rates, attractiveness and location of the properties, changes in the financial condition of tenants, and changes in operating costs. Real estate values are also affected by such factors as government regulations (including those governing usage, improvements, zoning and taxes), interest rate levels, the availability of financing, and potential liability under changing environmental and other laws. Of particular concern may be those mortgaged properties which are, or have been, the site of manufacturing, industrial or disposal activity. Such environmental risks may give rise to a diminution in the value of property (including real property securing any portfolio investment) or liability for cleanup costs or other remedial actions, which liability could exceed the value of such property or the principal balance of the related portfolio investment. In certain circumstances, a lender may choose not to foreclose on contaminated property rather than risk incurring liability for remedial actions.

**Environmental Hazards**. Under environmental laws enacted by the United States and the various states, owners of property may be liable for the cleanup and removal of hazardous substances even where the owner was not responsible for placing the hazardous substances on the property or where the property was contaminated prior to the time the owner took title. The kinds of hazardous substances for which liability may be incurred include, among other things, chemicals and other materials commonly used by

small businesses and manufacturing operations. The costs of removal and clean-up of hazardous substances and wastes can be extremely expensive and, in some cases, can exceed the value of a property. If any property acquired by the Partnership through foreclosure or otherwise subsequently were found to have an environmental problem, such acquiring entity could incur substantial costs and suffer a complete loss of its investment in such property as well as of other assets. Similarly, real estate is subject to loss due to so-called "special hazards" (e.g., floods, earthquakes and hurricanes). It may be impractical or impossible to fully insure against such events and, should such an event occur, the Partnership could incur substantial costs and suffer a loss of its investment in such property.

**Fraud**. Of paramount concern in lending is the possibility of material misrepresentation or omission on the part of the borrower. Such inaccuracy or incompleteness may adversely affect the valuation of the collateral underlying the loans or may adversely affect the ability of the Partnership to perfect or effectuate a lien on the collateral securing the loan. The Partnership will rely upon the accuracy and completeness of representations made by borrowers to the extent reasonable, but cannot guarantee such accuracy or completeness. Under certain circumstances, payments to the Partnership may be reclaimed if any such payment or distribution is later determined to have been a fraudulent conveyance or a preferential payment.

**Debt Securities**. The Partnership intends to invest in bonds or other fixed income securities, including, without limitation, commercial paper and "higher yielding" (and, therefore, higher risk) debt securities. It is likely that a major economic recession could disrupt severely the market for such securities and may have an adverse impact on the value of such securities. In addition, it is likely that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default for such securities.

**Investing in High Yield Securities**. The Partnership intends to invest in high-yield securities. Such securities are generally not exchange traded and, as a result, these instruments trade in the over-the-counter marketplace, which is less transparent than the exchange-traded marketplace. In addition, the Partnership will invest in bonds of issuers that do not have publicly traded equity securities, making it more difficult to hedge the risks associated with such investments. High-yield securities face ongoing uncertainties and exposure to adverse business, financial or economic conditions which could lead to the issuer's inability to meet timely interest and principal payments. The market values of certain of these lower- rated and unrated debt securities tend to reflect individual corporate developments to a greater extent than do higher-rated securities which react primarily to fluctuations in the general level of interest rates, and tend to be more sensitive to economic conditions than are higher-rated securities. Companies that issue such securities are often highly leveraged and may not have available to them more traditional methods of financing. It is possible that a major economic recession could disrupt severely the market for such securities and may have an adverse impact on the value of such securities. In addition, it is possible that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default of such securities.

**Timing Risk**. Many agency, corporate and municipal bonds, and all mortgage-backed securities, contain a provision that allows the issuer to "call" all or part of the issue before the bond's maturity date. The issuer usually retains the right to refinance the bond in the future if market interest rates decline below the coupon rate. There are three disadvantages to the call provision. First, the cash flow pattern of a callable bond is not known with certainty. Second, because the issuer will call the bonds when interest rates have dropped, the Partnership is exposed to reinvestment rate risk, i.e., the Partnership will have to reinvest the proceeds received when the bond is called at lower interest rates. Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

**Maturity Risk**. In certain situations, the Partnership may purchase a bond of a given maturity as an alternative to another bond of a different maturity. Ordinarily, under these

circumstances, the Partnership will make an adjustment to account for the differential interest rate risks in the two bonds. This adjustment, however, makes an assumption about how the interest rates at different maturities will move. To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk. Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

**Revolving Credit Facilities**. From time to time the Partnership may incur contingent liabilities in connection with an investment. For example, the Partnership may purchase from a lender a revolving credit facility that has not yet been fully drawn. If the borrower subsequently draws down on the facility, the Partnership would be obligated to fund the amounts due.

**Investments in Stressed Debt**. The Partnership is authorized to invest in securities and other obligations of stressed issuers. Stressed issuers are issuers that are not yet deemed distressed or bankrupt and whose debt securities are trading at a discount to par, but not yet at distressed levels. An example would be an issuer that is in technical default of its credit agreement, or undergoing strategic or operational changes, which results in market pricing uncertainty.

**Investments in Distressed Securities**. The Partnership may invest in securities and obligations of issuers in weak financial condition, experiencing poor operating results, having substantial capital needs or negative net worth, facing special competitive or product obsolescence problems, including companies involved in bankruptcy or other reorganization and liquidation proceedings. These securities are likely to be particularly risky investments although they also may offer the potential for correspondingly high returns. Among the risks inherent in investments in troubled entities is the fact that it frequently may be difficult to obtain information as to the true condition of such issuers. Such investments may also be adversely affected by laws relating to, among other things, fraudulent transfers and other voidable transfers or payments, lender liability and the bankruptcy court's power to disallow, reduce, subordinate or disenfranchise particular claims. Such companies' securities may be considered speculative, and the ability of such companies to pay their debts on schedule could be affected by adverse interest rate movements, changes in the general economic climate, economic factors affecting a particular industry or specific developments within such companies. In addition, there is no minimum credit standard that is a prerequisite to the Partnership's investment in any instrument, and a significant portion of the obligations and securities in which the Partnership invests may be less than investment grade. The level of analytical sophistication, both financial and legal, necessary for successful investment in companies experiencing significant business and financial difficulties is unusually high. There is no assurance that the Investment Manager will correctly evaluate the value of the assets collateralizing the Partnership's loans or the prospects for a successful reorganization or similar action. In any reorganization or liquidation proceeding relating to a company in which the Partnership invests, the Partnership may lose its entire investment, may be required to accept cash or securities with a value less than the Partnership's original investment and/or may be required to accept payment over an extended period of time. Under such circumstances, the returns generated from the Partnership's investments may not compensate the Limited Partners adequately for the risks assumed. In liquidation (both in and out of bankruptcy) and other forms of corporate reorganization, there exists the risk that the reorganization either will be unsuccessful (due to, for example, failure to obtain requisite approvals), will be delayed (for example, until various liabilities, actual or contingent, have been satisfied) or will result in a distribution of cash or a new security the value of which will be less than the purchase price to the Partnership of the security in respect to which such distribution was made.

**Troubled Origination**. The investments chosen by the Investment Manager may have been originated by financial institutions or other entities that are, or may in the future be, insolvent, in serious financial difficulty, or no longer in existence. As a result, the standards by which such investments were originated, the recourse to the selling institution, or the standards by which such investments are being serviced or operated

may be adversely affected.

**Issuer Default Risk; Negative Loan Performance**. There are varying sources of statistical default and recovery rate data for commercial loans and numerous methods for measuring default and recovery rates. The levels of defaults and delinquencies with respect to loans have been increasing, and slowing economic activity continues to contribute to a decline in overall credit quality. The historical performance of the loan market is not necessarily indicative of its future performance, and there is no way to determine whether such trends in the credit markets will improve or worsen in the future.

A substantial portion of the Partnership's income is expected to be derived, directly or indirectly, from repayments of principal and interest received in respect of debt securities. A wide range of factors may adversely affect an obligor's ability to make repayments, including: adverse changes in the financial condition of such obligor or the industries or regions in which it operates; the obligor's exposure to counterparty risk; systemic risk in the financial system and settlement; changes in law or taxation; changes in governmental regulations or other policies; natural disasters; terrorism; social unrest, civil disturbances; or general economic conditions. Default rates tend to accelerate during economic downturns. A continuing decreased ability of borrowers to obtain refinancing may result in a further economic decline that could delay an economic recovery and cause a further deterioration in loan performance generally.

To the extent that the Partnership invests in debt securities secured by collateral, there can be no assurance that the liquidation of any collateral securing any of the Partnership's investments would satisfy the borrower's obligation in the event of non-payment of scheduled interest or principal payments, or that the collateral could be readily liquidated. In the event of bankruptcy or insolvency of a borrower, the Partnership could experience delays or limitations with respect to its ability to realize the benefits of the collateral securing such investment. The collateral securing an investment may lose all or substantially all of its value in the event of the bankruptcy or insolvency of a borrower.

Any defaults will have a negative impact on the value of the Partnership's investments and may reduce the return that such Partnership receives from its investments in certain circumstances. While some amount of defaults is expected to occur in the Partnership's portfolio, in the event that the Partnership elects to apply leverage to an investment, defaults in or declines in the value of the portfolio investments in excess of these expected amounts may result in breaches of covenants under applicable financing arrangements, triggering credit enhancement requirements or accelerated repayment provisions and, if not cured within the relevant grace periods, permitting the finance provider to enforce its security over all the assets of the Partnership.

In the case of debt ranking equally with the loans or debt securities in which the Partnership invests, the Partnership would have to share on an equal basis any distributions with other creditors holding such debt in the event of an insolvency, liquidation, dissolution, reorganization or bankruptcy of the relevant company's debt securities. Each jurisdiction in which the Partnership invests has its own insolvency laws. As a result, investments in similarly situated companies in different jurisdictions may confer different rights in the event of insolvency.

**Nature of Reorganization Proceedings**. The Partnership will hold debt of companies and may, under certain circumstances, hold equity of companies as a result of the recapitalization or restructuring of debt obligations. Investments in the debt or equity of companies involved in reorganization proceedings typically entail a number of risks that do not normally apply to investments in financially sound companies. For example, if the Investment Manager's evaluation of the anticipated outcome of a reorganization or the timing of such outcome should prove incorrect, the Partnership could experience losses. A wide variety of considerations make any evaluation of the outcome of an investment in such a company uncertain. Such considerations include, for example, the possibility of litigation between the participants in a reorganization or liquidation proceeding or a requirement to obtain mandatory or discretionary consents from various governmental authorities or others. The uncertainties inherent in evaluating such investments may be

increased by legal and practical considerations which limit the access of the Investment Manager to reliable and timely information concerning material developments affecting a company, or which cause lengthy delays in the completion of a reorganization or liquidation proceeding. Competition from other investors may also render it difficult or impossible for the Partnership to achieve intended results or promptly effect transactions.

**Insolvency and Enforceability of Security**. The Partnership's investments may be secured by mortgages, charges, pledges, liens or other security interests. Depending on the jurisdiction in which such security interests are created, enforcement of such security interests may be a complicated and difficult process. For example, enforcement of security interests in certain jurisdictions may require a court order and a sale of the secured property through public bidding or auction. In addition, some jurisdictions grant courts the power to declare security interest arrangements to be void if they deem the security interest to be excessive.

**Risks Associated with Bankruptcy Cases**. Many of the events within a bankruptcy case are adversarial and often beyond the control of the creditors. While creditors generally are afforded an opportunity to object to significant actions, there can be no assurance that a bankruptcy court would not approve actions which may be contrary to the interests of the Partnership. Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such if they are considered to have taken over management and functional operating control of a debtor.

Generally, the duration of a bankruptcy case can only be roughly estimated. The reorganization of a company usually involves the development and negotiation of a plan of reorganization, plan approval by creditors and confirmation by the bankruptcy court. This process can involve substantial legal, professional and administrative costs to the company and the Partnership; it is subject to unpredictable and lengthy delays; and during the process the company's competitive position may erode, key management may depart and the company may not be able to invest adequately. In some cases, the company may not be able to reorganize and may be required to liquidate assets. Although the Partnership intends to invest primarily in debt, the debt of companies in financial reorganization will, in most cases, not pay current interest, may not accrue interest during reorganization and may be adversely affected by an erosion of the issuer's fundamental value. Such investments can result in a total loss of principal.

U.S. bankruptcy law permits the classification of "substantially similar" claims in determining the classification of claims in a reorganization for purpose of voting on a plan of reorganization. Because the standard for classification is vague, there exists a significant risk that the Partnership's influence with respect to a class of securities can be lost by the inflation of the number and the amount of claims in, or other gerrymandering of, the class. In addition, certain administrative costs and claims that have priority by law over the claims of certain creditors (for example, claims for taxes) may be quite high.

Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such when they take over management and functional operating control of a debtor. In those cases where the Partnership, by virtue of such action, is found to exercise "domination and control" of a debtor, the Partnership may lose its priority if the debtor can demonstrate that its business was adversely impacted or other creditors and equity holders were harmed by the Partnership.

The Partnership may invest in companies based outside the United States. Investment in the debt of financially distressed companies domiciled outside the United States involves additional risks. Bankruptcy law and process may differ substantially from that in the United States, resulting in greater uncertainty as to the rights of creditors, the enforceability of such rights, reorganization timing and the classification, seniority and treatment of claims. In certain developing countries, although bankruptcy laws have been enacted, the process for reorganization remains highly uncertain.

The Investment Manager, on behalf of the Partnership, may elect to serve on creditors' committees, equity holders' committees or other groups to ensure preservation or

enhancement of the Partnership position as a creditor or equity holder. A member of any such committee or group may owe certain obligations generally to all parties similarly situated that the committee represents. If the Investment Manager concludes that its obligations owed to the other parties as a committee or group member conflict with its duties owed to the Partnership, it will resign from that committee or group, and the Partnership may not realize the benefits, if any, of participation on the committee or group. In addition, and also as discussed above, if the Partnership is represented on a committee or group, it may be restricted or prohibited under applicable law from disposing of or increasing its investments in such company while it continues to be represented on such committee or group.

The Partnership may purchase creditor claims subsequent to the commencement of a bankruptcy case. Under judicial decisions, it is possible that such purchase may be disallowed by the bankruptcy court if the court determines that the purchaser has taken unfair advantage of an unsophisticated seller, which may result in the rescission of the transaction (presumably at the original purchase price) or forfeiture by the purchaser.

**Equitable Subordination**. Under common law principles that in some cases form the basis for lender liability claims, if a lender (a) intentionally takes an action that results in the undercapitalization of a borrower or issuer to the detriment of other creditors of such borrower or issuer, (b) engages in other inequitable conduct to the detriment of such other creditors, (c) engages in fraud with respect to, or makes misrepresentations to, such other creditors or (d) uses its influence as a stockholder to dominate or control a borrower or issuer to the detriment of other creditors of such borrower or issuer, a court may elect to subordinate the claim of the offending lender or bondholder to the claims of the disadvantaged creditor or creditors (a remedy called "equitable subordination"). The Partnership does not intend to engage in conduct that would form the basis for a successful cause of action based upon the equitable subordination doctrine; however, because of the nature of the debt obligations, the Partnership may be subject to claims from creditors of an obligor that debt obligations of such obligor which are held by the issuer should be equitably subordinated.

**Liability Following the Disposal of Investments**. While the Partnership may hold certain of its investments to maturity, the Partnership may dispose of investments in some circumstances prior to termination and, in connection therewith, may be required to pay damages to the extent that any representations or warranties given in connection with such investments turn out to be inaccurate. The Partnership may become involved in disputes or litigation concerning such representations and warranties and may be required to make payments to third parties as a result of such disputes or litigation. In the event that the Partnership does not have cash available to conduct such litigation or make such payments, it may be forced to sell investments to obtain funds. Such sales may be effected on unsatisfactory terms.

**Potential Involvement in Litigation**. In the event that the Partnership holds investments in distressed investments, there is a possibility that the Investment Manager may participate in restructuring activities, it is possible that the Partnership may become involved in litigation respecting creditor disputes and similar issues among classes of claimants. Litigation entails expense and the possibility of counterclaims against the Partnership and the Investment Manager and ultimately judgments may be rendered against the Partnership for which the Partnership does not carry insurance.

**Specific Risks Associated with Investing in CLOs**

You should note that certain of the following risk factors specifically applicable with respect to CLOs have been discussed under "—Market Risks—General" above and are included in this sub-section for ease of reference.

**Dependence Upon Other Unrelated Managers**. The success of a CLO may depend on the management talents and efforts of one person or a small group of persons whose management could adversely affect the CLO and, accordingly, the Partnership as an

investor in such CLO. Given that the Investment Manager will not have an active role in the management of these CLOs, the return on the Partnership's investments in such CLOs will depend on the performance of unrelated managers.

**Multiple Levels of Fees**. The Partnership and the CLOs are expected to impose management fees, administrative fees, and/or transaction-based fees. This may result in greater expense than if Limited Partners were able to invest directly in the CLOs or underlying investments. Limited Partners should take into account that the return on their investment will be reduced to the extent of both levels of fees. The general partner or manager of a CLO may receive the economic benefit of certain fees from its portfolio companies for services and in connection with unconsummated transactions (*e.g.*, break-up, placement, monitoring, directors', organizational and set-up fees and financial advisory fees). Additionally, some of the CLOs may invest themselves in underlying hedge funds or CLOs. In such case, additional management costs and other administrative expenses may be incurred.

**Limited Diversification**. CLOs may invest in concentrated portfolios of assets. The concentration of an underlying portfolio in any one obligor would subject the related CLO Securities to a greater degree of risk with respect to defaults by such obligor and the concentration of a portfolio in any one industry would subject the related CLOs to a greater degree of risk with respect to economic downturns relating to such industry. The Partnership may have a concentrated exposure to CLOs of a particular type of CLO.

**CLO Embedded Leverage Risk**. The Partnership's participation in CLOs involves varying amounts of leverage. Leverage is embedded in all classes of a CLO other than the most senior tranche. If the Partnership retains either the most or one of the most subordinate tranches of the CLO's securities, it will hold the most leveraged investment in the CLO. While leverage presents opportunities for increasing the Partnership's total return, it has the effect of potentially increasing losses as well. Accordingly, any event which adversely affects the value of an investment in a CLO would be magnified to the extent such CLO is leveraged. The cumulative effect of the use of leverage by a CLO in a market that moves adversely to the CLO's investments could result in a substantial loss to the CLO which would be greater than if the CLO were not leveraged. The borrowing arrangements of CLOs will contain events of default that, under certain circumstances, could result in early amortization or in the acceleration of the maturities of these obligations. In the event of acceleration of the borrowing arrangements of a CLO, in whole or in part, it may be required to dispose of all or a significant portion of its investments. Such a forced disposal of securities could result in realization of value of such investments significantly below the anticipated market values for such securities. When the Partnership invests in derivative transactions, it may also gain leverage through such derivative transactions, which will expose the Partnership to a greater risk of loss.

**Risks of Investment Focus**. The Partnership's portfolio may consist of CLO Securities. CLO Securities are subject to, among other risks, credit, liquidity and interest rate risks.

The value of the CLO Securities that the Partnership may own generally will fluctuate with, among other things, the financial condition of the obligors or issuers of the CLO Securities' underlying portfolio of assets ("**CLO Collateral**"), general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry and changes in prevailing interest rates. CLO Securities are issued on a non-recourse basis and holders of CLO Securities must rely solely on distributions on the CLO Collateral or proceeds thereof for payment in respect thereof. If distributions on the CLO Collateral are insufficient to make payments on the CLO Securities, no other assets will be available for payment of the deficiency and following realization of the CLO Securities, the obligations of such issuer to pay such deficiency generally will be extinguished.

Issuers of CLO Securities may acquire interests in loans and other debt obligations by way of sale, assignment or participation. The purchaser of an assignment typically succeeds to all the rights and obligations of the assigning institution and becomes a lender under the credit agreement with respect to the loan or debt obligation; however, its rights can be more restricted than those of the assigning institution. CLO Collateral may consist

of corporate loans, leveraged loans and other instruments, which often are rated below investment grade (or of equivalent credit quality). Loans may be unsecured and may be subordinated to certain other obligations of the issuer thereof. The lower ratings of below investment grade loans reflect a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of the related issuer or obligor to make payments of principal or interest. Such investments may be speculative.

**Interest Rate Mismatch**. CLOs may be subject to interest rate risk. The CLO Collateral of an issuer of a CLO may bear interest at a fixed or floating rate, while the CLO Debt may bear interest at a floating or fixed rate. As a result, there could be a floating/fixed rate or basis mismatch between such CLO Debt and the CLO Collateral which bears interest at a fixed rate ("**Fixed Rate Assets**"), and there may be a timing mismatch between such CLO Debt and the assets that are not Fixed Rate Assets ("**Floating Rate Assets**"). In addition, the interest rate on Floating Rate Assets may adjust more frequently or less frequently, on different dates and based on different indices than the interest rates on the CLO Debt. As a result of such mismatches, an increase or decrease in the level of the floating rate indices could adversely impact the ability to make payments on such CLO Debt or Equity. Although many CLOs attempt to hedge this interest rate risk, the hedges may not eliminate this risk and payments by the CLO under the hedges may significantly reduce the distributions on the CLO securities. In addition, these hedges may have additional risks, such as counterparty risk, that are not present without these hedges.

**Lower Credit Quality Securities**. There are no restrictions on the credit quality of the investments of the Partnership. CLO Securities in which the Partnership will invest may have no ratings or may be deemed by rating agencies to have substantial vulnerability to default in payment of interest and/or principal and have the lowest quality ratings. The Partnership may purchase CLO Securities which have ratings that have been downgraded or placed on "credit watch" for future downgrading. Lower rated and unrated securities in which the Partnership may invest have large uncertainties or major risk exposures to adverse conditions and are considered to be predominantly speculative and may become a defaulted asset for a variety of reasons. Generally, such securities offer a higher return potential than higher rated securities, but involve greater volatility of price and greater risk of loss of income and principal.

The market values of certain of these securities (such as subordinated securities) also tend to be more sensitive to changes in economic conditions than higher rated securities. The value of leveraged loans and other assets underlying a CLO may also be affected by changes in the market's perception of the entity issuing or guaranteeing them, or by changes in government regulations and tax policies. Additionally, loans and interests in loans have significant liquidity and market value risks since they are not generally traded in organized exchange markets but are traded by banks and other institutional investors engaged in loan syndications. Because loans are privately syndicated and loan agreements are privately negotiated and customized, loans are not purchased or sold as easily as publicly traded securities. In addition, historically the trading volume in the loan market has been small relative to the high-yield debt securities market, and such illiquidity has been exacerbated during the current liquidity crisis.

Leveraged loans have historically experienced greater default rates than has been the case for investment grade securities. There can be no assurance as to the levels of defaults and/or recoveries that may be experienced on the assets underlying CLO Securities.

In general, the ratings of nationally recognized rating organizations represent the opinions of such agencies as to the quality of securities that they rate. Such ratings may be used by the Investment Manager as an initial basis for the selection of portfolio securities. Such ratings, however, are relative and subjective; they are not absolute standards of quality and do not evaluate the market value risk of the securities. Such ratings also do not reflect macroeconomic or systematic risk, including the risk of increased illiquidity in the credit markets. It is also possible that a rating agency might not change its rating of a particular issue on a timely basis to reflect subsequent events.

**Defaulted Assets Underlying CLO Securities**. If the assets underlying a CLO Security become defaulted assets, such defaulted assets may become subject to either substantial workout negotiations or restructuring, which may entail, among other things, a substantial reduction in the interest rate, a substantial write-down of principal, and a substantial change in the terms, conditions and covenants with respect to such defaulted asset. In addition, such negotiations or restructuring may be quite extensive and protracted over time, and therefore may result in substantial uncertainty with respect to the ultimate recovery on such defaulted asset. The liquidity for defaulted assets may be limited, and to the extent that defaulted assets are sold, it is highly unlikely that the proceeds from such sale will be equal to the amount of unpaid principal and interest thereon. Furthermore, there can be no assurance that the ultimate recovery on any defaulted assets will be at least equal to either the minimum recovery rate assumed by any rating agency that rates the notes of the CLO security. Therefore, if any CLO security has defaulted assets which correspond to the exposure of the Partnership's interest in the CLO security, the Partnership may be adversely affected.

There exist significant additional risks for CLO Securities and investors in such securities in the event of a liquidity crisis. Those risks include, among others, (i) the likelihood that the issuer of the CLO Security will find it harder to sell any of its assets in the secondary market, thus rendering it more difficult to dispose of assets which it has the discretion to manage, including credit risk obligations, credit improved obligations or defaulted obligations, (ii) the possibility that the price at which assets can be sold by the issuer of the CLO Security will have deteriorated from their effective purchase price and (iii) the increased illiquidity of the notes issued by the CLO Security. These additional risks may affect the returns on the investments in the Partnership's portfolio.

**Subordination of CLO Debt**. The Partnership's portfolio may subordinate CLO Debt. Subordinate CLO Debt generally is fully subordinated to the related CLO senior tranches. Thus, some of the investments of the Partnership in a CLO may rank behind other creditors of the CLO. To the extent that any losses are incurred by a CLO in respect of its related CLO Collateral, such losses are likely to be borne first by the holders of the related CLO Equity, next by the holders of any related subordinated CLO debt and finally by the holders of the related CLO senior tranches. In addition, if an event of default occurs under the governing instrument or underlying investment, as long as any CLO senior tranches are outstanding, the holders thereof generally are likely to be entitled to determine the remedies to be exercised under the instrument governing the CLO. Remedies pursued by such holders could be adverse to the interests of the holders of any related subordinated CLO Debt. Investments of the Partnership may be the first to absorb any losses by the CLO on its underlying portfolio. This may result in losses on the invested proceeds of the Partnership and could result in the complete loss of invested proceeds.

**Mandatory Redemption of CLO Senior Tranches and CLO Debt**. Under certain circumstances, cash flows from CLO Collateral that otherwise would have been paid to the holders of any related CLO Debt will be used to redeem the related CLO senior tranches. This could result in an elimination, deferral or reduction in the interest payments, principal repayments or other payments made to the holders of such CLO Debt, which could adversely impact the returns to the holders of such CLO Debt.

**Optional Redemption of CLO Senior Tranches and CLO Debt**. An optional redemption by a CLO of its securities and, in particular, the exercise of rights by the holders of one or more classes of its securities (or the requisite percentages thereof) so as to effect any such optional redemption, could require the collateral or portfolio manager of the related CLO to liquidate positions more rapidly than would otherwise be desirable, which is likely to materially and adversely affect the realized value of the items of CLO Collateral sold (and which in turn is likely to materially and adversely impact the holders of any related CLO securities, including the Partnership). As a result of any such rapid liquidation of a CLO, a holder of the related CLO securities (including the Partnership) could lose all or a substantial portion of its investment in such CLO securities.

**Insolvency Risks**. Various laws enacted for the protection of creditors may apply to the issuers of the CLO Collateral (solely for purposes of this risk factor, an "**Insolvent Company**"). The information in this paragraph and the following paragraph is applicable

with respect to U.S. issuers of CLO Collateral. Insolvency considerations may differ with respect to non-U.S. issuers of CLO Collateral. If a court in a lawsuit brought by an unpaid creditor or representative of creditors of an Insolvent Company, such as a trustee in bankruptcy, were to find that the issuer did not receive fair consideration or reasonably equivalent value for incurring the indebtedness constituting the CLO or CLO Collateral (as applicable) and, after giving effect to such indebtedness, the Insolvent Company (i) was insolvent, (ii) was engaged in a business for which the remaining assets of the Insolvent Company constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court could determine to invalidate, in whole or in part, such indebtedness as a fraudulent conveyance, to subordinate such indebtedness to existing or future creditors of the Insolvent Company or to recover amounts previously paid by such issuer in satisfaction of such indebtedness. The measure of insolvency for purposes of the foregoing will vary. Generally, an Insolvent Company would be considered insolvent at a particular time if the sum of its debts were then greater than all of its property at a fair valuation or if the present fair saleable value of its assets were then less than the amount that would be required to pay its probable liabilities on its existing debts as they became absolute and matured. There can be no assurance as to what standard a court would apply in order to determine whether the Insolvent Company was "insolvent" after giving effect to the incurrence of the indebtedness constituting the CLO or CLO Collateral (as applicable) or that, regardless of the method of valuation, a court would not determine that the Insolvent Company was "insolvent" upon giving effect to such incurrence. In addition, in the event of the insolvency of an Insolvent Company, payments made on such CLO or CLO Collateral (as applicable) could be subject to avoidance as a "preference" if made within a certain period of time (which may be as long as one year) before insolvency.

In general, if payments on a CLO or CLO Collateral (as applicable) are avoidable, whether as fraudulent conveyances or preferences, such payments can be recaptured either from the initial recipient (such as the Partnership) or from subsequent transferees of such payments (such as the Limited Partners). However, a court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any such payment from a Limited Partner only to the extent that such court has jurisdiction over such holder or its assets. Moreover, it is likely that avoidable payments could not be recaptured directly from a holder that has given value in exchange for its interest, in good faith and without knowledge that the payments were avoidable. Nevertheless, there can be no assurance that a Limited Partner will be able to avoid recapture on this or any other basis.

The preceding discussion is based upon principles of United States federal and state laws. Insofar as the Partnership's portfolio consists of the obligations of non-United States obligors, the laws of certain foreign jurisdictions may provide for avoidance remedies under factual circumstances similar to those described above or under different circumstances, with consequences that may or may not be analogous to those described above under United States Federal and state laws.

**"Widening" Risk**. For reasons not necessarily attributable to any of the risks set forth herein (for example, supply/demand imbalances or other market forces), the prices of the CLO Securities in which the Partnership invests may decline substantially. In particular, purchasing assets at what may appear to be "undervalued" levels is no guarantee that these assets will not be trading at even lower levels at a time of valuation or at the time of sale. It may not be possible to predict, or to hedge against, such "spread widening" risk.

**There Is Limited Disclosure about the CLO Securities and the Underlying CLO Collateral in this Memorandum**. The Investment Manager will not be required to provide the investors in the Partnership with financial or other information (which may include material non-public information) it receives related to the CLO Securities. The Investment Manager also may not disclose to investors notices the Investment Manager receives and it will not have any obligation to keep investors informed as to defaults in the CLO Securities, failure by the Partnership to receive any payment of principal, interest, or other amounts or to disclose the portfolio or the decisions of which CLO Securities were not purchased in general to any investor. In addition, the investors will not have any right to inspect any records relating to the CLO Securities, and the Investment Manager will not be obligated to disclose any further information or evidence regarding the existence or

terms of, or the identity of any obligor on, any CLO Securities.

**Impact of the Volcker Rule on the Liquidity of the Notes.** Section 619 of the Dodd-Frank Act added a provision, commonly referred to (together with the final regulations with respect thereto adopted on December 10, 2013) as the Volcker Rule, to federal banking laws to generally prohibit various covered banking entities from engaging in proprietary trading or acquiring or retaining an ownership interest in "covered funds" which generally include, sponsoring or having certain relationships with a hedge fund or private equity fund (defined in final regulations adopted on December 10, 2013 as any entity relying on Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act to be exempt from registration under the Investment Company Act), subject to certain exemptions. The Volcker Rule also provides for certain supervised nonbank financial companies that engage in such activities or have such interests or relationships to be subject to additional capital requirements, quantitative limits or other restrictions. The conformance period for the Volcker Rule has been extended to July 21, 2015, and to July 21, 2017 for CLOs. Certain CLOs may be considered "covered funds" under the Volcker rule and therefore the most senior tranche of the CLO may be a restricted security for various banking and nonbanking entities. This may restrict the liquidity of certain non-Volcker compliant CLOs in the future and may affect the Partnership's ability to liquidate these positions on a timely basis.

**Specific Risks Associated with Investing in Portfolio Funds and Illiquid Investments**

You should note that certain of the following risk factors specifically applicable with respect to Portfolio Funds and Illiquid Investments have been discussed under "—Market Risks—General" above and are included in this sub-section for ease of reference.

**Special Situations**. The Portfolio Funds may invest in companies involved in (or the target of) acquisition attempts or tender offers or in companies involved in work-outs, liquidations, spin-offs, reorganizations, bankruptcies and similar transactions. In any investment opportunity involving any such type of special situation, there exists the risk that the contemplated transaction either will be unsuccessful, take considerable time or result in a distribution of cash or a new security the value of which will be less than the purchase price to the Portfolio Funds of the security or other financial instrument in respect of which such distribution is received. Similarly, if an anticipated transaction does not in fact occur, the Partnership may be required to sell its investment at a loss. In connection with such transaction (or otherwise), the Portfolio Funds may purchase securities on a when-issued basis, which means that delivery and payment take place sometime after the date of the commitment to purchase and are often conditioned upon the occurrence of a subsequent event, such as approval and consummation of a merger, reorganization or debt restructuring. The purchase price and/or interest create receivable with respect to a when-issue security are fixed when the Partnership enters into the commitment. Such securities are subject to changes in market value prior to their delivery. Because there is substantial uncertainty concerning the outcome of transactions involving companies in which the Portfolio Funds may invest, there is a potential risk of loss by a Portfolio Fund of its entire investment in such companies.

**Alternative Investments.** In the alternative asset class, the Investment Manager may invest assets of the Partnership in other pooled investment vehicles managed by the Investment Manager. The pooled investment vehicles managed by the Investment Manager may follow a variety of investment strategies including investments in commodities, managed futures, inflation-adjusted bonds, global real estate, "hedge fund strategies", which may be broadly characterized as "hedge funds", and mezzanine debt or Illiquid Investments.

**Withdrawal Considerations**. The Partnership may be subject to withdrawal restrictions of the individual Portfolio Fund(s) in which it will invest. In addition, the Partnership is permitted to invest in Illiquid Investments. There is no market for the Interests, and no market is expected to develop. Therefore, in certain circumstances, the Partnership may not be able to withdraw invested assets from a particular Portfolio Fund or with respect to Illiquid Investments at a time that would be most advantageous to the Partnership or at a time that would allow the Partnership to comply with its withdrawal obligations to its

Limited Partners. In this regard, the General Partner has the right to suspend in whole or in part certain withdrawal rights of the Limited Partners to the extent that the Partnership is unable to obtain liquidity from its investments in one or more of the Portfolio Funds. The illiquidity of Illiquid Investments and restrictions on withdrawals at the level of the individual Portfolio Funds could have a material adverse effect on the Partnership, as well as the ability of the Limited Partners to liquidate their investments in the Partnership during permitted withdrawal periods. Consequently, Limited Partners may be unable to liquidate their Interests except by withdrawing from the Partnership in accordance with the terms of this Memorandum, and, even in such event, payment of withdrawal proceeds may be delayed for a significant period of time. One or more affiliates of the Investment Manager may serve as general partner or manager of such Portfolio Funds, and will not be required to liquidate Portfolio Fund investments other than when they determine such liquidation is advisable or appropriate in their sole discretion, without regard to withdrawal provisions applicable to the Partnership. Limited Partners may be unable to liquidate their investment promptly in the event of an emergency or for any other reason.

**High Growth Industry Related Risks.** Portfolio Funds may have significant investments in the securities of high growth companies (e.g., technology, communications and healthcare). It is noted that these securities may be very volatile. In addition, these companies may face undeveloped or limited markets, have limited products, have no proven profit-making history, may operate at a loss or with substantial variations in operating results from period to period, have limited access to capital and/or be in the developmental stages of their businesses, have limited ability to protect their rights to certain patents, copyrights, trademarks and other trade secrets, or be otherwise adversely affected by the extremely competitive markets in which many of their competitors operate.

**Risk of Illiquid Investments.** Illiquid Investments involve a high degree of financial risk. There can be no assurance that Illiquid Investments will be profitable or that substantial losses will not occur. The companies in which the Illiquid Investments will invest are often dependent on the skills of a small number of executives and are vulnerable to changes in technology, fluctuations in demand for their products, changing interest rates and other factors. There can also be no assurance that the Illiquid Investments will be repaid, be able to sell or otherwise liquidate their investments at the optimal time or price. Therefore, there can be no assurance that the rate of return objectives of the Illiquid Investments will be realized or that there will be any return of capital to the Limited Partners.

**Illiquid and Long-Term Investments.** It is anticipated that there will be a significant period of time before certain Illiquid Investments will have completed their investments. Such investments may take several years from the date of initial investment to reach a state of maturity when realization of the investment can be achieved. Although investments by Illiquid Investments occasionally may generate some current income, private investment transaction structures typically will not provide for liquidity of the Illiquid Investment's investment prior to that time. The return of capital and the realization of gains, if any, from such investment will generally occur only upon the partial or complete disposition or refinancing of the investment. In light of the foregoing, it is likely that no significant return from the disposition of Illiquid Investment's underlying investments will occur for a substantial period of time from the commencement of the Illiquid Investment's operations. It is unlikely that there will be a public market for the securities held by the Illiquid Investment and/or its portfolio companies at the time of their acquisition. The Illiquid Investment generally will not be able to sell its securities publicly unless the issuer has consummated a public offering of its securities and such offered securities are registered under applicable securities laws, unless an exemption from such registration requirements is available. In addition, in some cases, the Partnership may be prohibited by contract from selling certain securities for a period of time and, as a result, may not be permitted to sell an underlying investment at a time it might otherwise desire to do so. Further, disposition of such investments may require a lengthy time period or may result in distributions in kind to investors.

**Investments in Less Established Companies.** The Partnership may invest a portion of its assets in the securities of less established companies, or early stage companies. Investments in such early stage companies may involve greater risks than those generally associated with investments in more established companies. For instance, less

established companies tend to have smaller capitalizations and fewer resources and, therefore, are often more vulnerable to financial failure. Such companies also may have shorter operating histories on which to judge future performance and in many cases, if operating, will have negative cash flow. In the case of start-up enterprises, such companies may not have significant or any operating revenues. In addition, less mature companies could be more susceptible to irregular accounting or other fraudulent practices. Furthermore, to the extent there is any public market for the securities held by the Illiquid Investment, securities of less established companies may be subject to more abrupt and erratic market price movements than those of larger, more established companies.

Some of the investments expected to be made by an Illiquid Investment would be considered highly speculative and may result in the loss of the Special Situation Investment's entire investment therein. There can be no assurance that any such losses will be offset by gains (if any) realized on the Illiquid Investment's other investments.

**Investments in Restructurings or Underperforming Companies.** The Partnership may make investments in companies that are experiencing or are expected to experience financial difficulties, which such companies may never overcome. Such investments could, in certain circumstances, subject the Partnership to additional potential liabilities, which may exceed the value of the Partnership's original investment therein. Such investments of the Partnership could also be subject to federal bankruptcy law and state fraudulent transfer laws, which may vary from state to state, if the securities relating to such investments were issued with the intent of hindering, delaying or defrauding creditors or, in certain circumstances, if the issuer receives less than reasonably equivalent value or fair consideration in return for issuing such securities. If such investments constitute debt and such debt is used for a buyout of shareholders, this risk is greater than if the debt proceeds are used for day-to-day operations or organic growth. If a court were to find that the issuance of the securities was a fraudulent transfer or conveyance, the court could void the payment obligations under the securities, further subordinate the securities to other existing and future indebtedness of the issuer or require the Partnership to repay any amounts received by it with respect to the securities. In the event of a finding that a fraudulent transfer or conveyance occurred, the Partnership may not receive any repayment on the securities.

Under the Bankruptcy Code, a lender that has inappropriately exercised control of the management and policies of a company may have its claims against the company subordinated or disallowed, or may be found liable for damages suffered by parties as a result of such actions. In addition, under certain circumstances, payments to the Partnership and distributions by the Partnership ion Investment to its limited partners may be reclaimed if any such payment or distribution is later determined to have been a fraudulent conveyance or a preferential payment. Such debt may also be disallowed or subordinated to the claims of other creditors if the Partnership is found to have engaged in other inequitable conduct resulting in harm to other parties. The Partnership's underlying investment may be treated as equity if it is deemed to be a contribution to capital, or if the Partnership attempts to control the outcome of the business affairs of a company prior to its filing under the Bankruptcy Code. While the Partnership will attempt to avoid taking the types of action that would lead to such liability, there can be no assurance that such claims will not be asserted or that the Partnership will be able successfully to defend against them.

## REGULATORY AND TAX RISKS

**General Regulatory Risks**. Statutes, regulations and policies are continually under review by the U.S. Congress and state legislatures and federal and state regulatory agencies. The introduction of new legislation or amendments to existing legislation and regulations (including changes in how they are interpreted or implemented) by governments, the decisions of courts and tribunals and the rulings and decisions of regulatory authorities, can adversely impact the Partnership's returns. The regulatory environment for private investment funds is evolving, and changes in the regulation of these funds may adversely affect the value of investments held by the Partnership, the cost of compliance with applicable regulations, and the ability of the Partnership to obtain the leverage it might otherwise obtain or to pursue its trading strategies.

**Regulatory Risks Related to the Highland Transaction**. In connection with the Highland Transaction (if consummated), there can be no assurance that such transaction (if consummated) will not result in adverse regulatory consequences (including, without limitation, being characterized as a "change of control" under applicable laws), even though the Highland Transaction only contemplates the acquisition of non-voting limited partnership interests in Highland.

**Strategy Restrictions**. Certain institutions may be restricted from directly utilizing investment strategies of the type in which the Partnership may engage. Such institutions, including entities subject to ERISA, should consult their own advisors, counsel and accountants to determine what restrictions may apply and whether an investment in the Partnership is appropriate.

**Trading Limitations**. For all securities, instruments and/or assets listed on an exchange, including options listed on a public exchange, the exchange generally has the right to suspend or limit trading under certain circumstances. Such suspensions or limits could render certain strategies difficult to complete or continue and subject the Partnership to loss. Also, such a suspension could render it impossible for the Investment Manager to liquidate positions and thereby expose the Partnership to potential losses relating thereto.

**Limited Regulatory Oversight**. The Partnership's investments are not supervised or monitored by any regulatory authority. The Partnership is not registered as an "investment company" under the Investment Company Act. Although the Investment Manager is registered as an investment adviser with the SEC, neither the General Partner nor the Investment Manager is registered as a commodity pool operator, pursuant to an exemption provided under Rule 4.13(a)(3) of the CEA. Consequently, Limited Partners will not benefit from some of the protections afforded by these statutes, including oversight by the Commodity Futures Trading Commission.

**Prevention of Money Laundering and Terrorism.** The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended (the "**USA PATRIOT Act**"), signed into law on and effective as of October 26, 2001, requires that financial institutions, a term that includes banks, broker-dealers and investment companies, establish and maintain compliance programs to guard against money laundering activities. The USA PATRIOT Act requires the Secretary of the U.S. Treasury ("**Treasury**") to prescribe regulations in connection with anti- money laundering policies of financial institutions. The U.S. Federal Reserve Board, the Treasury and the SEC are currently studying what types of investment vehicles should be required to adopt anti-money laundering procedures, and it is unclear at this time whether such procedures will apply to pooled investment vehicles such as the Partnership. Future rules and regulations regarding money laundering or proceeds of crime could regulate the Partnership. In addition, in April 2000, the Treasury Department published proposed regulations that would require certain investment advisors to establish an anti-money laundering program. It is possible that there could be promulgated legislation or regulations that would require the Partnership or its affiliates, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to investors in the Interests. Such legislation and/or regulations could require the Partnership to implement additional restrictions on the transfer of the Interests. The Partnership reserves the right to request such information as is necessary to verify the identity of investors in the Interests, and the source of the payment of subscription monies, or as is necessary to comply with any customer identification programs required by Financial Crimes Enforcement Network and/or the SEC or such information as may be required in order for the Partnership to discharge its obligations under the laws of the Cayman Islands (including pursuant to the Proceeds of Criminal Conduct Law (2005 Revision)). In the event of delay or failure by the applicant to produce any information required for verification purposes, an application for or transfer of the Interests and the subscription monies relating thereto may be refused.

**Recent Developments in the Financial Services Industry.** Recent developments in the U.S. financial markets have heightened the risks associated with the investment activities and operations of hedge funds, including without limitation, those resulting from a

substantial reduction in the availability of credit and the increased cost of short-term credit, a decrease in market liquidity and an increased risk of insolvency of brokers and other counterparties. In addition, in July of 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act ("**Dodd-Frank**") was passed which imposes many new requirements and restrictions on the financial services industry that may likely affect the business, operations and performance of hedge funds, such as increased reporting requirements, limitations on certain trading activity and regulatory oversight by different agencies, such as the newly created Financial Stability Oversight Counsel. Even with the passage of Dodd-Frank, the implications of its passage for the hedge fund industry as a whole still remain somewhat unclear. The hedge fund industry may continue to be adversely affected by the recent developments in the financial markets in the U.S. and abroad, and any future legal, regulatory, or governmental action and developments in such financial markets and the broader U.S. economy could have an adverse effect on the Partnership or the Partnership's business, operations and performance.

**Enhanced Regulation of Swaps.** The Wall Street Transparency and Accountability Act of 2010 (the "**WSTAA**") will, subject to exceptions for certain hedgers, (1) require swaps accepted for clearing by a derivatives clearing organization (a "**DCO**") or for trading through a designated contract market or swaps-execution facility to be so cleared and traded, (2) require margin for almost all swap transactions, (3) subject traders with a "substantial position" in swaps to registration and regulation requirements as a "major swap participant" or "swap dealer", and (4) impose position limits on swaps either individually or in the aggregate with respect to positions in commodity-futures contracts. Due to the new requirements imposed by the WSTAA, the Partnership may experience increased transaction costs to pay for the clearing, execution and segregation obligations. In addition, margin requirements may increase once margin is set by DCOs with input from the CFTC, which may limit the Partnership's ability to engage in leverage and limit the Partnership's return. The application of position limits to swap contracts may also limit the Partnership's ability to concentrate in any particular contract or exposure to an underlying commodity and may negatively impact the Partnership's ability to take advantage of current market trends or conditions. Any tightening in the market for swaps may significantly impact the Partnership and its returns. In addition, if the Partnership were deemed to be a swap dealer or a major swap participant under WSTAA, the Partnership may be required to register with the CFTC and would be subject to a number of regulatory requirements that would significantly impact the Partnership's legal obligations and its returns.

**Tax Risk**. The tax aspects of an investment in the Partnership are complicated and each investor should have them reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles. The Partnership is not intended and should not be expected to provide any tax shelter, but is organized as a limited partnership to avoid corporate taxation and to permit any distributions it might make to be made without being taxed as dividends. No assurance can be given that legislative, administrative or judicial changes will not occur which will alter, either prospectively or retroactively, the tax considerations or risk factors discussed in this Memorandum.

The tax consequences to a Limited Partner of an investment in the Partnership are uncertain. A significant portion of the Partnership is expected to be invested in illiquid Portfolio Funds and/or Illiquid Investments. Such investments are often structured as "pass through" entities for tax purposes and therefore may generate significant taxable income to the Limited Partners without any corresponding liquidity from such investments. As a result, an investment in the Partnership may be unsuitable for those investors that do not receive a corresponding deduction for such allocated income.

Neither the General Partner nor the Investment Manager makes any representations or warranties regarding any tax matters. Prospective investors are strongly urged to consult their own tax advisors regarding the U.S. federal, state and local and non-U.S. tax consequences to them arising from an investment in the Partnership, and should rely on the advice of their own tax advisors with respect to the possible impact on its investment in the Partnership of any future legislation or administrative or judicial action. You should review the section entitled "TAXATION" for a more complete discussion of certain of the

tax risks inherent in the acquisition of Interests.

**Tax-Exempt Entities**. Certain prospective Limited Partners may be subject to federal and state laws, rules and regulations that may regulate their participation in the Partnership, or their engaging, directly or indirectly through an investment in the Partnership, in investment strategies of the types that the Partnership utilizes from time to time. Tax-exempt entities should consider the applicability to them of the provisions relating to UBTI (as defined below). Investments in the Partnership by entities subject to ERISA and other tax-exempt entities require special consideration. See "ERISA CONSIDERATIONS" and "TAXATION—Tax-Exempt Investors".

**Diversification**. The tax benefits of the Policies may not be available in the event that the methodology used by the Partnership does not satisfy the diversification rules as described under "TAXATION" herein, including the risk that, if the Partnership fails to meet such diversification rules, owners of Policies funded by a Separate Account that is treated as holding interests in the Partnership would be subject to current taxation on the annual earnings of the Separate Account.

**Diversification of Contracts**. Interests in the Partnership will be held only by variable contract separate asset accounts of Insurance Companies and state and local governmental pension plans, §529 plans, and private sector qualified pension or retirement plans, as generally described in Treasury Regulation 1.817-5(f)(3). Variable contract separate asset accounts are subject to certain investment diversification requirements (the "**Diversification Rules**") of Section 817(h) of the Code and the Regulations with respect to assets held in such separate accounts. These rules apply to the investments made by separate accounts (such separate accounts are referred to as "segregated asset accounts") that are used to fund benefits under Policies that are "variable contracts" within the meaning of Section 817(d) of the Code, other than "pension plan contracts."

For purposes of satisfying the Diversification Rules, the assets of the Partnership must be invested in securities such that no more than 55% of total assets of the Partnership may be invested in the securities of any one (1) issuer, no more than 70% of total assets of the Partnership may be invested in the securities of any two (2) issuers, no more than 80% of total assets of the Partnership may be invested in the securities of any three (3) issuers, and no more than 90% of total assets of the Partnership may be invested in the securities of any four (4) issuers. For purposes of these Diversification Rules, all securities of the same issuer are treated as a single investment and in the case of government securities, each government agency or instrumentality is treated as a separate issuer. Thus, all securities issued by the Treasury would be considered a single investment, but securities issued by the Federal Home Loan Banks would be considered a separate investment from Treasury securities. The assets of the Partnership will be invested in compliance with these rules.

Under a "look-through" rule established by the IRS, if: (i) all Interests of the Partnership are held by one or more segregated asset accounts of Insurance Companies (other than Interests held by persons listed in §1.817-5(f)(3) of the Regulations) and (ii) public access to the Partnership is available exclusively through the purchase of a variable contract as defined in Section 817(d) of the Code, then the test for diversification is made by looking to the assets held by the Partnership. So long as the Partnership is subject to the "look-through" rule, Interests in the Partnership will not constitute a single investment for purposes of the Diversification Rules. For purposes of applying such Diversification Rules, the Partnership's investment on behalf of Series 1 in the PE Portfolio Fund will be treated as a single asset, since the "look-through" rule will not apply to the PE Portfolio Fund.

In the event that the Partnership fails to satisfy the look-through requirements of the Diversification Rules, any Policy based on a segregated asset account that has invested in the Partnership may not be treated as a life insurance or annuity contract for federal income tax purposes. For this purpose, a Policy is based on a segregated asset account if amounts received under such Policy, or earnings thereon, are allocated to such segregated asset account. If a Policy is no longer treated as a life insurance or annuity

contract, then the owner of the Policy would be subject to current taxation on the income on the Policy for taxable years in which such failure occurs, and thereafter. If the Policy is a life insurance or annuity contract under local law, however, then certain amounts paid as death benefits will be treated as amounts paid under a life insurance or annuity contract for federal income tax purposes. If the failure to meet the Diversification Rules is shown to be inadvertent, the Insurance Company that issued the Policy is permitted to bring the segregated asset account into compliance with those rules. In such cases, the Diversification Rules contemplate adjustments or the payment of a "toll charge" for the period during which the account failed to meet the Diversification Rules. Accordingly, compliance with the Diversification Rules, as they may be modified from time to time, is important and will be carefully monitored by the Investment Manager. Compliance with the Diversification Rules may have the effect of reducing the return of the Partnership, as the investments and strategies utilized by the Investment Manager may be different from what the Investment Manager might otherwise believe to be desirable.

**Investor Control**. The Partnership is an insurance-dedicated investment fund. In certain circumstances, the owner of a variable life insurance or annuity contract invested in a Separate Account may, for federal income tax purposes, be considered the owner of the assets of the Separate Account that funds the variable contract under an "investor control" theory. Each Policy Owner should consult his or her own tax advisors regarding the "investor control" theory and the particular tax risks, if any, posed by the Policy Owner's selection of the Partnership as his or her investment option under a related Policy.

Policy Owners have no right to communicate with or direct the investment policies or decisions of the General Partner, any administrator, Investment Manager, or Investment Manager relating in any way to the Partnership. For purposes of this Memorandum, the term Policy Owner includes: (i) any trustees of a Policy Owner; (ii) any Policy beneficiaries; (iii) any affiliated person (as this term is defined in Section 2(a)(3) of the Investment Company Act) of the foregoing persons; or (iv) any person that represents the Policy Owner.

There is not, nor shall there be, a pre-arranged binding agreement between the General Partner, the Administrator and the Investment Manager, on the one hand, and any Policy Owner, on the other hand, relating to the investments of the Partnership. Furthermore, Limited Partners have no right or power to take part in the management of the Partnership.

None of the Partnership, the General Partner, the Investment Manager or any of the Investment Manager Affiliates will be held responsible to any Limited Partner or Policy Owner for any loss, damage, liability or expense resulting from a violation of the "investor control" theory to the extent such violation is attributable to conduct of a Policy Owner.

Policy Owners should consult their own tax advisors regarding the "investor control" theory.

**This Memorandum Intended for Limited Partners**. This Memorandum does not address the tax treatment afforded by Policy Owners. Policy Owners should refer to their insurance contract and related explanatory materials for such a discussion. The Limited Partners are the owners of Interests in the Interests. Policy Owners are not Limited Partners of the Partnership and do not have rights as such.

**Accounting Rules**. The Partnership's assets and liabilities are valued in accordance with the Partnership Agreement. However, for purposes of preparing the Partnership's annual audited financial statements, which are prepared in accordance with GAAP, certain of the Partnership's assets and liabilities may be valued in a manner that, while consistent with GAAP, may be different from the manner in which such assets are valued in accordance with the valuation policies set forth in the Partnership Agreement.

The General Partner may at any time choose to change the Partnership's accounting guidelines from GAAP to the IFRS. In such event, the financial performance of the Partnership, as determined under IFRS, may vary from those determined under GAAP.

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Limited Partners.

**No Obligation of Full-Time Service**. None of the General Partner, the Investment Manager, the Principal or any of the Investment Manager Affiliates has any obligation to devote its full time to the business of the Partnership. Each is only required to devote such time to the Partnership as the General Partner deems necessary to accomplish the purposes of the Partnership, and each may engage in other business activities, including competing ventures and/or unrelated employment, which may result in various conflicts of interest between such persons and the Partnership.

**Services to Affiliated Funds**. In addition to managing the Partnership and its investments, each of the General Partner, the Investment Manager, the Principal and the Investment Manager Affiliates may provide investment management and other services to other parties and may manage and/or establish Affiliated Funds in the future, including those that may employ an investment program and strategy similar to that of the Partnership. Specifically, as of the date hereof: (i) the Investment Manager acts as the investment manager to the PE Portfolio Fund that: (x) is expected to initially invest in the Highland Transaction, if any, and (y) will potentially make investments in the future in other private transactions similar to the Highland Transaction; (ii) Rand PE Fund Management, LLC, a Delaware limited liability company and an affiliate of the General Partner and the Investment Manager, is the general partner of the PE Portfolio Fund; (iii) the Principal is the managing member and controlling person of Rand PE Fund Management, LLC. As such, the Investment Manager and the Principal owe fiduciary duties to different investment vehicles, which may conflict with each other; and (iv) the Investment Manager acts as the investment subadvisor to a series of SALI Multi-Series Fund, L.P., a Delaware "series" limited partnership, and provides certain discretionary investment advisory or consulting services to such series.

The investments made by Affiliated Funds that may be managed by the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates in the future may compete with investments for the Partnership's account, and the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates may decide to invest the funds of these Affiliated Funds rather than the assets of the Partnership in a particular security or strategy. In addition, the Investment Manager and/or such other persons will determine the allocation of funds by and among the Partnership and the Affiliated Funds to investment strategies and techniques on whatever basis they decide is appropriate or desirable in their sole and absolute discretion. The records of these Affiliated Funds will not be made available to Limited Partners. Nonetheless, in the event that certain securities, instruments and other assets are suitable for acquisition by the Partnership and by other accounts managed by the General Partner, the Investment Manager, the Principal or the Investment Manager Affiliates, and the Investment Manager or such other persons are not able to acquire the desired aggregate amount of such securities, instruments and other assets on terms and conditions which they deem advisable, the Investment Manager and such persons will endeavor in good faith to allocate the limited amount of such investment opportunities among the various accounts for which they consider to be suitable.

**Certain Potential Conflicts Between the Principal and Highland Related to the Series 1 Interests**. The Principal was previously a Partner and Co-Head of Private Equity at Highland, an investment manager with significant assets under management located in Dallas, Texas. Although Mr. Honis has retired from that position, he still currently serves on: (x) the Board of Trustees for each of Highland's affiliated registered investment companies, and receives compensation in connection with each of the foregoing, and (y) the Board of Directors for American HomePatient, Inc. and Turtle Bay Resort, LLC, which are portfolio companies of investment funds operated by Highland, and receives compensation in connection with each of the foregoing. Additionally, as part of his retirement, Mr. Honis has received or is in the process of receiving payments in the total

amount of approximately $3 million from certain affiliates of Highland.

In addition, pursuant to the Shared Services Agreement, Highland serves as the Shared Services Provider, which provides the Investment Manager and the Partnership with certain administrative, information technology, accounting, tax, back-office and other services. In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement.

Further, the Investment Manager and Highland have had preliminary discussions concerning the potential acquisition of all or substantially all of the non-voting limited partnership interests in Highland for the first series of the PE Portfolio Fund (such purchases or other acquisitions, if any, collectively, the "**Highland Transaction**"). Although, as of the date hereof, the PE Portfolio Fund and Highland have not actively negotiated documentation for the legal and economic terms of the Highland Transaction (and there can be no assurances that such transaction will be consummated), it is nonetheless the intention of such parties that the transaction should come about.

In light of the foregoing, the Principal, and indirectly the Investment Manager, are in a position of conflict with respect to the ultimate decision by the Partnership regarding whether it pursues the Highland Transaction, and under what terms (if any) it agrees to participate in any such transaction.

Also see "—Potential Directorship Positions; Other Roles" herein.

**Highland Transaction; Limited Control**. If the Highland Transaction is consummated, it is currently contemplated that the PE Portfolio Fund would acquire only limited partnership interests in Highland. As with investments in non-controlling interests in other partnerships, the Highland Transaction may involve special risks associated with the possibility that the controlling principals of Highland may: (i) have economic or business interests or goals that are inconsistent with those of the PE Portfolio Fund and therefore the Partnership, (ii) take actions contrary to the instructions or requests of the PE Portfolio Fund or contrary to the PE Portfolio Fund's policies or objectives, (iii) be unable or unwilling to fulfill its obligations under the organizational/governing documents, and/or (iv) experience financial difficulties. The occurrence of such problems could have a material adverse effect on the business and prospects of the PE Portfolio Fund's investment in the Highland Transaction and may affect management decisions and exit strategies in a manner adverse to the PE Portfolio Fund's and the Partnership's interests.

**Conflicts Related to Shared Services Provider**. The Investment Manager has certain affiliated entities that may provide services with respect to the Partnership, the Portfolio Funds (generally and the PE Portfolio Fund specifically) and certain investments held by the Partnership. The Shared Services Provider may provide services for the benefit of the Partnership under the Shared Services Agreement and/or may incur reimbursable expenses on behalf of the Partnership and/or the Investment Manager. In addition, the Shared Services Provider may be (but, as of the date hereof, is not) engaged by the Partnership to act as the Partnership's Administrator, pursuant to a separate Administration Agreement. The Principal is a former Partner and former Co-Head of Private Equity of the Shared Services Provider.

**Potential Directorship Positions; Other Roles**. The Investment Manager Affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Partnership or other entities that operate in the same or a related line of business as the Partnership, for other clients managed by the Investment Manager or any of the Investment Manager Affiliates, or for any Portfolio Fund or portfolio company of the Partnership, and the Partnership shall have no right to any such fees. In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Partnership. Also see "—Certain Potential Conflicts Between the Principal and Highland Related to the Series 1 Interests" herein.

The Investment Manager and/or the Investment Manager Affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of investments purchased by the Partnership. Such transactions are on an arm's-length basis and may be subject to arm's-length fees. There is no expectation for preferential access to transactions involving investments that are underwritten, originated, arranged or placed by the Investment Manager and/or the Investment Manager Affiliates and the Partnership shall not have any right to any such fees.

**Potential Cross-Trades**. The Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Partnership and another client advised by it or any of its affiliates. The Investment Manager may engage in a client cross-transaction involving the Partnership any time that the Investment Manager believes such transaction to be fair to the Partnership and such other client. By purchasing an Interest in the Partnership, a Limited Partner is deemed to have consented to such client cross-transactions between the Partnership and another client of the Investment Manager or one of its affiliates.

**Diverse Limited Partners**. The Limited Partners may include taxable and tax-exempt entities and persons or entities resident of or organized in various jurisdictions. As a result, conflicts of interest may arise in connection with decisions made by the General Partner that may be more beneficial for one type of Limited Partner than for another. In making such decisions, the General Partner intends to consider the investment objectives of the Partnership as a whole, not the investment objectives of any Limited Partner individually.

**Soft Dollars.** The General Partner and the Investment Manager may be offered soft dollars in the form of research and brokerage and other products or services, which may be utilized by the General Partner, the Investment Manager and their respective affiliates in connection with the services they offer to clients other than the Partnership. The use of soft dollars presents the Investment Manager with potential conflicts of interest and may provide the Investment Manager with incentives to: (i) use certain brokers who may provide certain soft dollar benefits that other brokers may not, without regard to its obligations to the Partnership (including, without limitation, its best execution obligations); or (ii) trade more actively in order to generate more soft dollars and thereby reduce its expenses.

**Referral of Investors**. The General Partner and/or the Investment Manager may sell Interests through broker-dealers and pay a marketing fee or commission in connection with such activities, including ongoing payments, at the General Partner's or the Investment Manager's own expense. The General Partner and/or the Investment Manager may also deduct a percentage of the amount invested by a Limited Partner in the Partnership to pay sales fees or charges, on a fully disclosed basis, to a broker-dealer based upon the capital contribution of such Limited Partner introduced to the Partnership by such broker-dealer. Any such sales fees or charges would be assessed against the referred Limited Partner and would reduce the amount actually invested by such Limited Partner in the Partnership. Such broker-dealers may have a conflict of interest in advising prospective investors to purchase Interests, as the broker-dealers are often only compensated upon the investment of the prospective investors.

**Lack of Separate Representation; Potential Conflicts of Counsel**. Neither the Partnership Agreement nor any of the agreements, contracts and arrangements between the Partnership, on the one hand, and the General Partner or the Investment Manager, on the other hand, were or will be the result of arm's-length negotiations. The attorneys, accountants and others who have performed services for the Partnership in connection with this offering, and who will perform services for the Partnership in the future, have been and will be selected by the General Partner. No independent counsel has been retained to represent the interests of prospective investors or Limited Partners. You are therefore urged to consult your own counsel as to the terms and provisions of the Partnership Agreement and all subscription and other related documents.

In addition, Sadis & Goldberg LLP has represented Highland and affiliates at different

times over a period lasting over a decade. It is currently expected that Sadis & Goldberg LLP will represent the General Partner, the Investment Manager, the Principal and certain of their respective affiliates in connection with the establishment of the Partnership and the PE Portfolio Fund, the possible consummation of the Highland Transaction, and certain related matters. The Principal and his affiliates are aware of the representation by Sadis & Goldberg LLP of Highland and affiliates.

**Valuation of Assets**. The Administrator will calculate the net asset value of the Partnership (based upon information provided by the Investment Manager). In the case of investments in Portfolio Funds that are not readily marketable, the net asset value calculation provided by the relevant managers (or any affiliates or service providers thereof) of those Portfolio Funds will generally be used in determining the Partnership's Net Asset Value. Such calculations could be incorrect, delayed or subject to significant adjustments, any of which events could adversely affect the valuation of the Partnership's investments. The Investment Manager intends to engage an independent third-party valuation agent (in addition to the Administrator) to appraise the Partnership's interests in Illiquid Investments, including, without limitation, the PE Portfolio Fund; *provided* that, if the PE Portfolio Fund engages its own independent third-party valuation agent, the Partnership may rely on such valuation of any investment in the PE Portfolio Fund. If the Investment Manager determines, in its sole discretion, that the valuation of any security, commodity, option or other financial instrument pursuant to the valuation methodologies described herein does not fairly represent its market value, the Investment Manager will value such security, option or other financial instrument as it reasonably determines. Likewise, any securities, commodities, options and other financial instruments that have no public market, investments in other asset classes (including those in Side Pocket Accounts), and all other assets of the Partnership for which a valuation methodology is not specified, will be valued by the Investment Manager in a manner determined in good faith to reflect their fair market value. The Investment Manager has a conflict of interest in that it will receive a higher Management Fee if the Partnership's assets are given a favorable valuation. See "SUMMARY OF OFFERING AND PARTNERSHIP TERMS—Determination of Net Asset Value".

**The foregoing list of risk factors and conflicts of interest does not purport to be a complete enumeration or explanation of the risks and conflicts of interest involved in an investment in the Partnership. Offerees should read this entire Memorandum and the Partnership Agreement and consult with their own advisors before deciding to purchase Interests.**

## ERISA CONSIDERATIONS

An investment of benefit plan assets in the Partnership may raise issues under ERISA and the Code. ERISA and the Code impose certain duties on persons who are fiduciaries of a Plan (as defined below) and prohibit certain transactions involving the assets of a Plan and its fiduciaries or other interested parties. Under ERISA and the Code, any person who exercises any discretionary authority or control over the administration of a Plan or the management or disposition of the assets of a Plan, or who renders investment advice for a fee or other compensation to a Plan, is generally considered to be a fiduciary of the Plan.

In considering an investment in the Partnership of a portion of the assets of any employee benefit plan (including a "**Keogh**" plan) subject to the fiduciary and prohibited transaction provisions of ERISA or the Code or similar provisions under applicable state law (collectively, a "**Plan**"), a Plan fiduciary should determine, in light of the risks and limited liquidity inherent in an investment in the Partnership, whether the investment is in accordance with the documents and instruments governing the Plan and the applicable provisions of ERISA or similar law relating to a fiduciary's duties to the Plan. Furthermore, absent an exemption, the fiduciaries of a Plan should not purchase Interests with the assets of any Plan if the Investment Manager or any affiliate thereof is a fiduciary or other "party in interest" or "disqualified person" (collectively, a "**party in interest**") with respect to such Plan.

### PLAN ASSETS

Regulations promulgated under ERISA by the U.S. Department of Labor ("**Plan Asset Regulations**") generally provide that when a Plan subject to Title I of ERISA or Section 4975 of the Code acquires an equity interest in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established either that equity participation in the entity by "benefit plan investors" is not "significant" or that the entity is an "operating company", in each case as defined in the Plan Asset Regulations. The Interests will not constitute "publicly offered" securities or securities issued by an investment company registered under the Investment Company Act, and it is not expected that the Partnership will qualify as an "operating company" under the Plan Asset Regulations. For purposes of the Plan Asset Regulations, equity participation in an entity by benefit plan investors will not be "significant" so long as they own, in the aggregate less than 25%, directly or indirectly, of the value of each class of such entity's equity. For purposes of such calculation, equity interests held by persons (other than a benefit plan investor) with discretionary authority or control over the assets of the entity or who provide investment advice for a fee (direct or indirect) with respect to such assets, and any affiliates thereof, are disregarded. For purposes of this 25% test ("**Benefit Plan Investor Test**"), "benefit plan investors" include: employee benefit plans subject to the provisions of Part 4 of Title I of ERISA and plans subject to Section 4975 of the Code, including "Keogh" plans and individual retirement accounts ("**IRAs**"). The following are not included in the definition of benefit plan investor: employee benefit plans maintained outside the U.S. by foreign companies that cover non-U.S. persons, governmental plans, and certain church plans. Thus, absent satisfaction of another exception under the Plan Asset Regulations, if 25% or more of the value of any class of Interests in the Partnership were owned by benefit plan investors, an undivided interest in each of the underlying assets of the Partnership would be deemed to be "plan assets" of any Plan subject to Title I of ERISA or Section 4975 of the Code that invested in the Partnership.

Consequently, the General Partner intends to use reasonable efforts either (i) to prohibit plans subject to Title I of ERISA or Section 4975 of the Code from investing in the Partnership or (ii) to provide that investment by "benefit plan investors" in the Partnership will not be "significant" for purposes of the Plan Asset Regulations by limiting equity participation by benefit plan investors in the Partnership to less than 25% of the value of each class of Interests in the Partnership as described above. However, each Plan fiduciary should be aware that even if the Partnership were to avoid plan asset status

under the Benefit Plan Investor Test at the time a Plan acquires Interests in the Partnership, the exemption could become unavailable at a later date as a result, for example, of subsequent transfers or withdrawals of Interests in the Partnership, and that Interests held by benefit plan investors may be subject to mandatory withdrawal in such event in order for the Partnership to continue to avoid plan asset status under the Benefit Plan Investor Test.

Furthermore, there can be no assurance that notwithstanding the reasonable efforts of the Partnership, the Partnership will satisfy the Benefit Plan Investor Test, that the structure of particular investments of the Partnership will otherwise satisfy the Plan Asset Regulations or that the underlying assets of the Partnership will not otherwise be deemed to include ERISA plan assets.

## Plan Asset Consequences

If the assets of the Partnership were deemed to be "plan assets" under ERISA, (i) the prudence and other fiduciary responsibility standards of ERISA would extend to investments made by the Partnership and (ii) certain transactions in which the Partnership might seek to engage could constitute "prohibited transactions" under ERISA and the Code. If a prohibited transaction occurs for which no exemption is available, the Investment Manager and any other fiduciary that has engaged in the prohibited transaction could be required (x) to restore to the Plan any profit realized on the transaction and (y) to reimburse the Plan for any losses suffered by the Plan as a result of the investment. In addition, each party in interest involved could be subject to an excise tax equal to 15% of the amount involved in the prohibited transaction for each year the transaction continues and, unless the transaction is corrected within statutorily required periods, to an additional tax of 100%. Plan fiduciaries that decide to invest in the Partnership could, under certain circumstances, be liable for prohibited transactions or other violations as a result of their investment in the Partnership or as co-fiduciaries for actions taken by or on behalf of the Partnership or the Investment Manager. With respect to an IRA that invests in the Partnership, the occurrence of a prohibited transaction involving the individual who established the IRA, or his or her beneficiaries, could cause the IRA to lose its tax-exempt status.

Under the Partnership Agreement, the General Partner has the power to take certain actions to avoid having the assets of the Partnership characterized as plan assets, including, without limitation, the right to refuse a subscription, exclude a Limited Partner from an investment or to compulsorily redeem a Limited Partner's Interests in the Partnership. While the General Partner does not expect that it will need to exercise such power, it cannot give any assurance that such power will not be exercised.

**Each Plan fiduciary should consult its own legal advisor concerning the considerations discussed above before making an investment in the Partnership.**

**Prospective investors are advised that: (i) any U.S. federal tax advice contained herein, including any opinion of counsel referred to herein, is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding U.S. federal tax penalties that may be imposed on the taxpayer; (ii) any such advice is written to support the promotion or marketing of the transactions described herein (or in any such opinion of counsel); and (iii) each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

## INTRODUCTION

The following is a summary of certain aspects of the taxation of the Partnership and its Partners, which should be considered by a potential purchaser of an Interest in the Partnership. A complete discussion of all tax aspects of an investment in the Partnership is beyond the scope of this Memorandum. The following summary is only intended to identify and discuss certain salient issues.

This summary of certain tax considerations applicable to the Partnership is considered to be a correct interpretation of existing laws and regulations in force on the date of this Memorandum. No assurance can be given that changes in existing laws or regulations or their interpretation will not occur after the date of this Memorandum or that any such future guidance or interpretation will not be applied retroactively.

**The following summary is not intended as a substitute for careful tax planning. The tax matters relating to the Partnership are complex and are subject to varying interpretations. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Partners will vary with the particular circumstances of each Partner. Accordingly, each prospective investor must consult with and rely solely on his or its professional tax advisors with respect to the tax results of the investor's investment in the Partnership. In no event will the General Partner, its affiliates, counsel or other professional advisors be liable to any Limited Partner for any federal, state, local or other tax consequences of an investment in the Partnership, whether or not such consequences are as described below.**

## CLASSIFICATION OF THE PARTNERSHIP

Under the provisions of the Code and the Treasury Regulations promulgated thereunder ("**Regulations**"), as in effect on the date of this Memorandum, so long as the Partnership complies with the Partnership Agreement, the Partnership should be classified for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

The Partnership has been formed under the Delaware Act as a series limited partnership and may offering its Interests in multiple separate Series. Under the provisions of the Code and the Regulations, as in effect on the date of this Memorandum, so long as the Partnership complies with the Partnership Agreement and the Delaware Act, each Series of Interests in the Partnership should be classified for U.S. federal income tax purposes as equity interests in a separate partnership and not as equity interests in an association taxable as a corporation.

The Partnership has not sought and will not seek a ruling from the Internal Revenue Service ("**IRS**") with respect to its status as a partnership. If a Series of Interests in the Partnership should be classified as an association taxable as a corporation (e.g., as a result of a change in law or a material change in facts), the taxable income of the Partnership allocable to such Series would be subject to corporate income taxation; and distributions from the Partnership to the Limited Partners owning Interests in such Series would be treated as dividend income when received by such Limited Partners to the extent of the current or accumulated earnings and profits of the Partnership allocable to

such Series. Furthermore, the Insurance Company Limited Partners would lose their look-through treatment for the purposes of complying with the diversification requirements imposed by Section 817(h) of the Code.

Certain partnerships may be taxable as corporations for U.S. federal income tax purposes under the publicly traded partnership rules set forth in the Code and the Regulations, and a Series of the Partnership may not qualify for one of the safe harbors under the Regulations if such Series has more than 100 Partners. The Partnership expects that, under the facts and circumstances test set forth in the Regulations, the Interests will not be readily tradable on a secondary market (or the substantial equivalent thereof) and therefore, the Series partnerships will not be treated as publicly traded partnerships under the Regulations. It is assumed in the following discussion of tax considerations that each Series of the Partnership will be treated as a partnership for U.S. federal income tax purposes.

Unless otherwise indicated, references in the discussion below to the tax consequences of the "Partnership's" investments, activities, income and expenses refer to the investments, activities, income and expenses attributable to each Series that is treated as a separate tax partnership. Prospective investors should note that each Series will issue its annual Schedule K-1 tax reporting form to its Partners. Therefore, investors that own Interests in more than one Series will receive separate Schedule K-1 reporting forms for each Series in which the investor is treated as owning an equity interest.

## TAXATION OF PARTNERSHIP OPERATIONS

As a partnership, the Partnership is not itself subject to U.S. federal income tax but will file an annual partnership information return with the IRS. Each Limited Partner, in computing his own federal income tax liability for a taxable year, is required to take into account such Partner's distributive share of the Partnership's net long-term capital gain or loss, net short-term capital gain or loss, net ordinary income or loss and any separately stated income items, deductions and credits for the taxable year of the Partnership that ends with or within such Partner's taxable year. The Partnership may utilize a variety of investment and trading strategies, which produce both short-term and long-term capital gain (or loss), as well as ordinary income (or loss). The Partnership will send annually to each Limited Partner a Schedule K-1 form reporting such Partner's distributive share of the Partnership items of income, gain, loss, deduction and credit. The Partnership intends to use the calendar year as its taxable year unless a different fiscal year is required under the Code.

Each Limited Partner will be subject to tax, and liable for such tax, on such Partner's distributive share of the Partnership's taxable income regardless of whether the Limited Partner has received or will receive any distribution of cash from the Partnership. Thus, in any particular year, a Limited Partner's distributive share of taxable income from the Partnership (and, generally, the taxes imposed on that income) could exceed the amount of cash, if any, such Limited Partner received or is entitled to withdraw from the Partnership.

Under Section 704 of the Code, a Limited Partner's distributive share of any Partnership item of income, gain, loss, deduction or credit is governed by the Partnership Agreement unless the allocation provided by the Partnership Agreement does not have "substantial economic effect". The Regulations promulgated under Section 704(b) of the Code provide certain "safe harbors" with respect to allocations, which, under the Regulations, will be deemed to have substantial economic effect. The validity of an allocation which does not satisfy any of the "safe harbors" of these Regulations is determined by taking into account all facts and circumstances relating to the economic arrangements among the Partners. While no assurance can be given, the allocations provided by the Partnership Agreement should have substantial economic effect and should be sustained under the facts and circumstances test. However, if it were determined by the IRS or otherwise that the allocations provided in the Partnership Agreement with respect to a particular item do not have substantial economic effect, each Limited Partner's distributive share of that item would be determined for tax purposes in accordance with that Limited Partner's interest in the Partnership, taking into account all facts and circumstances.

Cash distributions and withdrawals, to the extent they do not exceed a Limited Partner's tax basis in such Partner's interest in the Partnership, should not result in taxable gain to that Limited Partner, but reduce the tax basis in the Interest by the amount distributed or withdrawn. Cash distributed to a Limited Partner in excess of the tax basis of his or its Interest is generally taxable either as capital gain or ordinary income, depending on the circumstances. A distribution of property other than cash generally will not result in taxable income or loss to the Limited Partner to whom it is distributed until such time that the property is sold.

For financial statement presentation and capital account maintenance purposes, all securities held by the Partnership will be marked-to-market at the end of each relevant accounting period and the net gain or loss from marking to market will be reported as income or loss. This treatment differs from the general tax rule applicable to many securities transactions that a transaction does not result in gain or loss until it is closed by an actual sale or other disposition. The divergence between such accounting and tax treatments frequently may result in substantial variation between financial statement income (or loss) and taxable income (or loss) reported by the Partnership.

The income tax treatment of the Partnership will depend upon the tax treatment of the Portfolio Funds in which the Partnership invests.

The Partnership expects to be treated as engaged in a trade or business by reason of its anticipated investment, on behalf of Series 1, in the PE Portfolio Fund, which will own equity interests in one or more business partnerships. The Partnership may also engage in other trade or business activities, either directly or through investments in portfolio partnerships. Prospective investors that are U.S. tax-exempt entities should consider the impact of UBTI on an investment in the Partnership. See "—Tax-Exempt Investors" below.

The Partnership will also engage in investing and trading securities for its own account. Accordingly, a portion of the Partnership's direct and indirect expenses are expected to be deductible as trade or business expenses under Section 162 of the Code. Certain other expenses may be classified as Section 212 investment expenses, which, for certain types of Limited Partners, including trusts, would be classified as miscellaneous itemized deductions. Prospective investors that are classified as trusts for U.S. federal income tax purposes should consult their tax advisors concerning the limitations in the Code on deductions for miscellaneous itemized deductions.

## LIMITATIONS ON LOSSES AND DEDUCTIONS

**In General.** A Limited Partner is not permitted to deduct Partnership losses that exceed the Partner's adjusted tax basis in its Interest at the end of the year in which such loss is incurred. A Limited Partner's basis for its Interest is generally equal the amount of such Partner's cash contributions made to the Partnership, increased by (i) the Partner's allocable share of Partnership taxable income, (ii) the Partner's allocable share of Partnership tax-exempt income, and (iii) the Partner's allocable share of nonrecourse liabilities of the Partnership (if any); and decreased by (w) the Limited Partner's allocable share of Partnership taxable losses and non-deductible expenses, (x) any distributions of cash received by the Limited Partner from the Partnership, (y) the tax basis of any property distributed by the Partnership to such Partner and (z) any decrease in the Partner's share of Partnership nonrecourse liabilities (if any). There are several other Code provisions that may limit the ability of a Limited Partner to claim deductions attributable to an investment in the Partnership. The most significant of these limitations are discussed below.

**At Risk Limitations**. Section 465 of the Code limits certain taxpayers' losses from certain activities to the amount they are "at risk" in the activities. Taxpayers subject to the "at risk" rules are non-corporate taxpayers, including trusts, and certain closely-held corporations. The activities subject to the "at risk" limitations include all activities in which the Partnership expects to engage. A Partner subject to the "at risk" rules will not be permitted to deduct in any year losses arising from its interest in the Partnership to the extent that the losses exceed the amount it is considered to have "at risk" in the

Partnership at the close of that year.

A taxpayer is considered to be "at risk" in any activity to the extent of his cash contribution to the activity, his basis in other property contributed to the activity and his personal liability for repayments of amounts borrowed for use in the activity. With respect to amounts borrowed for use in the activity, the taxpayer is not considered to be "at risk" even if he is personally liable for repayment if the borrowing was from a person who has an "interest" in the activity other than an interest as a creditor. Even if a taxpayer is personally liable for repayment of amounts borrowed for use in the activity, and even if the amount borrowed is borrowed from a person whose only interest in the activity is an interest as a creditor, a taxpayer will not be considered "at risk" in the activity to the extent his investment in the activity is protected against loss through guarantees, stop loss agreements, or other similar arrangements.

Each Limited Partner will be at risk initially for the amount of his capital contribution. A Partner's amount "at risk" will be increased by his distributive share of income from the Partnership and will be decreased by his distributive share of losses from the Partnership and distributions to him. If a Partner's amount "at risk" decreases to zero, he can take no further losses until he has an "at risk" amount to cover the losses. A Partner is subject to a recapture of losses previously allowed to the extent that his amount "at risk" is reduced below zero (limited to loss amounts previously allowed to the Partner over any amounts previously recaptured).

**Investment Interest Limitations**. To the extent that the Partnership incurs interest expense or short sale expenses, a non-corporate Limited Partner, including a trust, will likely be subject to the "investment interest expense" limitations of Section 163(d) of the Code. Investment interest expense includes (i) interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment and (ii) any amounts deductible in connection with a short sale. The deduction for investment interest expense is limited to the taxpayer's net investment income for the taxable year; i.e., the excess of investment income over investment expenses. Excess investment interest expense that is disallowed is not lost permanently but may be carried forward to succeeding years subject to the Section 163(d) limitation. Net capital gain (i.e., net long-term capital gain over net short-term capital loss) on property held for investment and qualified dividends are only included in investment income to the extent that the taxpayer elects to subject some or all of such gain or dividend income to taxation at ordinary income tax rates. The Section 163(d) limitations will apply at the Partner level with regard to the Partner's distributive share of the Partnership's interest expense.

To the extent that the Partnership is treated as engaged in a trade or business by reason of being deemed a trader, a non-corporate Limited Partner's share of the Partnership's interest expense from such trading activity would retain its character as investment interest subject to the Section 163(d) investment income limitation, but the allowable investment interest deduction would be deducted "above the line" in determining adjusted gross income and therefore fully deductible, rather than being treated as an itemized deduction.

Section 265(a)(2) of the Code disallows any deduction for interest paid by a taxpayer on indebtedness incurred or continued for the purpose of purchasing or carrying tax-exempt obligations. The IRS has announced that such purpose will be deemed to exist with respect to indebtedness incurred to finance a "portfolio investment", and that a limited partnership interest will be regarded as a "portfolio investment". Therefore, if the Partnership holds tax-exempt obligations, the IRS might take the position that all or part of the interest expense incurred by a Limited Partner in connection with the purchase of such Partner's Interest should be viewed as incurred to enable such Limited Partner to continue carrying tax-exempt obligations, and that such Limited Partner should not be allowed to deduct all or a portion of such interest.

**Itemized Deduction Limitations**. Under Section 67 of the Code, for non-corporate taxpayers, including trusts, certain miscellaneous itemized deductions are allowable only to the extent they exceed a "floor" amount equal to 2% of the taxpayer's adjusted gross income ("**2% Floor**"). To the extent that the Partnership's operations do not constitute a

trade or business within the meaning of Section 162 and other provisions of the Code, a non-corporate Limited Partner's distributive share of the Partnership's investment expenses, other than investment interest expense, would be deductible only as miscellaneous itemized deductions, subject to the 2% Floor. Moreover, a non-corporate taxpayer's investment expenses that are miscellaneous itemized deductions are also not deductible in calculating the taxpayer's alternative minimum tax liability.

Capital losses generally may be deducted only to the extent of capital gains, except for non-corporate taxpayers who are allowed to deduct $3,000 of excess capital losses per year against ordinary income. Corporate taxpayers may carry back unused capital losses for three years and may carry forward such losses for five years; non-corporate taxpayers may not carry back unused capital losses but may carry forward unused capital losses indefinitely.

## ADDITIONAL TAX ISSUES

Gain or loss from a short sale of property is generally considered as capital gain or loss to the extent that the property used to close the short sale constitutes a capital asset in the Partnership's hands.

The "wash sale" rules of Section 1091 of the Code disallow any deduction for losses arising from the sale or other disposition of "stock or securities", where, within a period beginning 30 days before such sale or disposition and ending 30 days afterwards, the taxpayer acquires "substantially identical" stocks of securities by purchase or by an exchange on which the entire amount of gain or loss is recognized. This disallowance rule also applies where, within such 61-day period, the taxpayer enters into a contract or option to acquire substantially identical stock or securities. Thus, if the Partnership were to engage in such a "wash sale" transaction, the Partners would not be able to recognize their distributive share of any loss realized in connection with such sale in the current year.

**Currency Fluctuations - "Section 988" Gains and Losses.** To the extent that the Partnership's investments are made in securities denominated in a foreign currency, gain or loss realized by the Partnership frequently will be affected by the fluctuation in the value of such foreign currencies relative to the value of the U.S. dollar. Generally, gains or losses with respect to the Partnership's investments in common stock of foreign issuers will be taxed as capital gains or losses at the time of the Partnership's sale of such stock. However, under Section 988 of the Code, gains or losses of the Partnership on the acquisition or disposition of foreign currency (i.e., the purchase of foreign currency and subsequent use of such currency to acquire stock) will be treated as ordinary income or loss. Moreover, under Section 988, gains and losses from disposition of debt securities denominated in a foreign currency that are attributable to the fluctuations in such currency between the date of acquisition of the debt security and the date of its disposition will be treated as ordinary income or loss. Since the Code provides limitations on the ability of taxpayers to deduct capital losses against ordinary income, a Partner's share of capital losses realized by the Partnership on sale of foreign securities would not be available to offset the Partner's share of ordinary income realized by the Partnership on its currency hedging transactions.

The Partnership may acquire foreign currency forward contracts, enter into foreign currency futures contracts and acquire put and call options on foreign currencies. Generally, foreign currency regulated futures contracts and option contracts that qualify as "Section 1256 contracts" will not be subject to ordinary income and loss treatment under Section 988. However, if the Partnership acquires currency futures contracts or options contracts that are not Section 1256 contracts, or any currency forward contracts, any gain or loss realized by the Partnership with respect to such instruments will be ordinary income or loss, unless (i) the contract is a capital asset in the hands of the Partnership and is not part of a straddle transaction and (ii) the Partnership makes an election (by the close of the day the transaction is entered into) to treat the gain or loss attributable to such contract as capital gain or loss.

The taxation of debt obligations under the Code is complex; the following discussion is intended to provide only a general description of these rules. Generally, interest income and income items similar to stated interest, such as original issue discount (in general, the

annual portion of the discount on original issuance of debt obligations issued for less than their stated principal amount) and market discount (the amount by which debt obligations are acquired in the secondary market for less than their principal) are treated as items of ordinary income. Generally, debt obligations that are disposed of in a taxable transaction for an amount greater than their adjusted cost basis give rise to capital gain, which will be long-term if the debt obligation is held for longer than one year, and short-term, if held for a period of one year or less. Generally, debt obligations that are disposed of in a taxable transaction for an amount less than their adjusted cost basis give rise to capital loss, which will be long-term if the debt obligation is held for longer than one year, and short-term if held for a period of one year or less. In the event that any such debt obligations are not held as capital assets, such dispositions will generally give rise to ordinary gain or loss, as the case may be.

Section 1259 of the Code requires that the Partnership recognize gain on the constructive sale of any appreciated financial position in stock, a partnership interest, or certain debt instruments. A constructive sale of an appreciated financial position occurs if, among other things, the Partnership enters into (1) a short sale of the same or substantially identical property (a transaction commonly known as a “short sale against the box”), (2) an offsetting notional principal contract with respect to the same or substantially identical property, or (3) a futures or forward contract to deliver the same or substantially identical property. Exceptions to the foregoing apply to certain transactions closed within 30 days after the close of the taxable year if the underlying appreciated financial position remains “unhedged” for at least 60 days thereafter, and to transactions involving certain contracts to sell stock, debt instruments, or partnership interests if the contract settles within one year.

The IRS may treat certain positions in securities held (directly or indirectly) by a Partner and its indirect interest in similar securities held by the Partnership as “straddles” for federal income tax purposes. The application of the "straddle" rules in such a case could affect a Partner's holding period for the securities involved and may defer the recognition of losses with respect to such securities. In addition, if either of the Partner's positions in such a transaction is an “appreciated financial position”, application of the “straddle” rules may trigger a constructive sale of that position under the rules described above.

Section 1258 of the Code recharacterizes capital gain from a “conversion transaction” as ordinary income, with certain limitations. Conversion transactions are defined as transactions in which substantially all the expected return is attributable to the time value of money and either: (a) the transaction consists of the acquisition of property by the taxpayer and a substantially contemporaneous agreement to sell the same or substantially identical property in the future; (b) the transaction qualifies as a “straddle” (within the meaning of Section 1092(c) of the Code); (c) the transaction is one that was marketed or sold to the taxpayer on the basis that it would have the economic characteristics of a loan but the interest-like return would be taxed as capital gain; or (d) the transaction is described as a conversion transaction in the Regulations. The amount of gain so recharacterized will not exceed the amount of interest that would have accrued on the taxpayers' net investment for the relevant period at a yield equal to 120% of the “applicable rate”.

## INVESTMENTS IN NON-U.S. CORPORATIONS

The Partnership may invest in certain foreign corporations that will be classified as “passive foreign investment companies” (“**PFICs**”) for U.S. tax purposes. Under the PFIC rules, unless the Partnership makes one of the elections described below, any gain realized by the Partnership on the sale or disposition of stock in a PFIC that is allocable to Partners that are U.S. Persons (as defined in the Code) will be treated as ordinary income and will be subject to U.S. federal income tax as if (i) the gain had been realized ratably over the Partnership’s holding period and (ii) the amount deemed realized had been subject to tax in each year of that holding period at the highest applicable federal income tax rate; in addition, an interest charge at the rate generally applicable to underpayments of federal income tax will be imposed on the amount. Further, any “excess distributions” from a PFIC (as defined in the Regulations) are treated as ordinary income (regardless of their original character) and subject to this deferred tax and interest charge.

Provided the PFIC complies with certain reporting requirements, the Partnership may elect to have the PFIC treated as a "qualified electing fund", in which case the Partnership would include annually in its gross income its *pro rata* share of the PFIC's net ordinary income and net realized capital gains, whether or not such amounts are actually distributed to the Partnership. Generally, any net operating losses or net capital losses of the PFIC will not pass through to the Partnership and will not offset any ordinary income or capital gains of the PFIC reportable to the Partnership in subsequent years. Alternatively, the Partnership could elect to "mark-to-market" stock in certain PFICs if such stock is considered "marketable stock" under the Code, and thereby avoid being subject to the deferred tax and interest charge discussed above. However, there can be no assurance that the Partnership will be able to make either of these elections with respect to any PFICs in which it invests. Further, Limited Partners may be subject to IRS reporting requirements with respect to the Partnership's investments in PFICs.

The Partnership may also invest in certain foreign corporations that will be considered "controlled foreign corporations" ("**CFCs**") for U.S. tax purposes. A CFC is a non-U.S. corporation in which certain U.S. shareholders own, directly or indirectly, more than 50% of either the total voting power of all classes of stock entitled to vote or the total value of all classes of stock. Under the CFC rules, certain U.S. shareholders are subject to U.S. federal income tax on certain types of income (generally passive income) realized by the CFC regardless of whether any amounts are distributed from the CFC to such U.S. shareholder. Further, such U.S. shareholders may be subject to IRS reporting requirements with respect to investments in CFCs.

In addition, if the Partnership invests in stock of foreign corporations that become PFICs or CFCs after the Partnership has made such investment, this may also result in adverse tax consequences for the Limited Partners that are U.S. Persons and may subject them to IRS reporting requirements with respect to such investments.

## TAX-EXEMPT INVESTORS

If the Partnership derives income which would be considered "unrelated business taxable income" (as defined in Section 512 of the Code) ("**UBTI**"), if derived directly by a Limited Partner that is a qualified retirement plan or other organization exempt from tax under Sections 401 or 501(a) of the Code or an individual retirement account ("**IRA**") exempt under Section 408(e) of the Code (each, a "**Tax-Exempt Entity**"), such Limited Partner's allocable share of such Partnership income would be subject to tax. A Tax-Exempt Entity which is subject to tax on its allocable share of the Partnership's UBTI, including an IRA, may also be subject to the alternative minimum tax with respect to items of tax preference which enter into the computation of UBTI.

UBTI is generally the excess of gross income from any unrelated trade or business conducted by a Tax-Exempt Entity (or by a partnership of which the Tax-Exempt Entity is a member) over the deductions attributable to such trade or business. UBTI generally does not include certain passive income, including dividends, interest, annuities, royalties and gain or loss from the disposition of property held for investment, unless such income items are debt-financed income (as discussed below).

While UBTI itself is taxable, the receipt of UBTI by a Tax-Exempt Entity generally has no effect upon that entity's tax-exempt status or upon the exemption from tax of its other income. However, for certain types of Tax-Exempt Entities, the receipt of any UBTI may have extremely adverse consequences. In particular, for charitable remainder trusts (as defined under Section 664 of the Code), the receipt of any taxable income from UBTI during a taxable year will result in the imposition of an excise tax equal to the amount of such UBTI.

A Tax-Exempt Entity also includes in its UBTI its "unrelated debt-financed income" (and its allocable share of the "unrelated debt-financed income" of any partnership in which it invests) pursuant to Section 514 of the Code. In general, unrelated debt-financed income consists of: (i) income derived by a Tax-Exempt Entity (directly or through a partnership) from income producing property with respect to which there is "acquisition indebtedness"

at any time during the taxable year; and (ii) gains derived by a Tax-Exempt Entity (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness". Acquisition indebtedness is generally defined as debt incurred to purchase or carry an investment. Such income and gains derived by a Tax-Exempt Entity from the ownership and sale of debt-financed property are taxable in the proportion to which such property is financed by acquisition indebtedness during the relevant period of time.

**Income From the Partnership's Private Equity Investments**. The Investment Manager will invest a substantial portion of the Partnership's Series 1 assets in the PE Portfolio Fund, and such partnership expects to invest in equity interests of other partnerships which will be engaged in business activities. It is anticipated that such portfolio companies may also use borrowed funds to acquire property. Accordingly, Limited Partners that are Tax-Exempt Entities should anticipate that a substantial portion, and possibly all, of their distributive share of the Partnership's net income realized from ownership of equity interests in such portfolio companies, including gain realized upon sales of such equity investments, will be subject to federal income tax as UBTI.

**Income From the Partnership's Other Activities**. The Investment Manager expects that the Partnership will incur indebtedness in connection with its operations from time to time. The law is not entirely clear regarding the appropriate method to be used to determine what portion of a tax-exempt Limited Partner's share of the Partnership's income is attributable to debt financing and therefore constitutes "debt-financed income". Accordingly while the Partnership will compute each tax-exempt Limited Partner's share of "debt-financed income" from the Partnership in a manner which the Partnership considers to be reasonable, there can be no assurance that the IRS will accept the method of computation used by the Partnership.

Tax-exempt Limited Partners will also realize UBTI if the Partnership acquires equity interests of publicly traded partnerships or private partnerships that are engaged in trade or business activities or the Partnership directly carries on other trade or business activities (other than as a securities trader).

## OTHER TAXES

Partners may be subject to other taxes, such as the alternative minimum tax, state and local income taxes, and estate, inheritance or intangible property taxes that may be imposed by various jurisdictions. Each prospective investor should consider the potential consequences of such taxes due to an investment in the Partnership. It is the responsibility of each prospective investor to become satisfied as to the legal and tax consequences of an investment in the Partnership under state law, including the laws of the state(s) of its, his or her domicile and residence, by obtaining advice from such investor's own tax advisors, and to file all appropriate tax returns that may be required.

Income received by the Partnership from sources within non-U.S. countries may be subject to withholding and other taxes imposed by such countries. Each Partner may be entitled either to deduct (as an itemized deduction) such Partner's proportionate share of the non-U.S. taxes of the Partnership in computing such Partner's taxable income or to use the amount as a foreign tax credit against his or its U.S. federal income tax liability, subject to limitations. Generally, a credit for non-U.S. taxes is subject to the limitation that it may not exceed the taxpayer's U.S. tax attributable to his or its non-U.S. source taxable income. With respect to Partners that are U.S. Persons: (i) certain currency fluctuation gains, including fluctuation gains from non-U.S.-Dollar-denominated debt securities, receivables and payables, will be treated as ordinary income derived from U.S. sources; and (ii) Partnership gains from the sale of securities also will be treated as derived from U.S. sources. The limitation on the foreign tax credit is applied separately to non-U.S. source passive income (as defined for purposes of the foreign tax credit), including the non-U.S. source passive income realized by the Partnership. The foreign tax credit limitation rules do not apply to certain electing individual taxpayers who have limited creditable non-U.S. taxes and no non-U.S. source income other than passive investment-type income. The foreign tax credit generally is eliminated with respect to non-U.S. taxes withheld on income and gain if the Partnership fails to satisfy minimum holding period

requirements with respect to the property giving rise to the income and gain.

## TAX ELECTIONS; RETURNS; TAX AUDITS

If the General Partner determines that the Partnership is treated as a securities trader for federal income tax purposes, the General Partner may cause the Partnership to elect to "mark-to-market" its securities at the end of each taxable year, in which case such securities would be treated for federal income tax purposes as though sold for fair market value on the last business day of such taxable year. Such an election under Code Section 475(f) would apply to the taxable year for which made and all subsequent taxable years unless revoked with the consent of the IRS. If the Partnership were to make such an election, all or a portion of the Partnership's gains and losses would be considered ordinary income or loss, rather than capital gain or loss. Since for federal income tax purposes capital losses generally may be deducted only against capital gains, a Limited Partner may be unable to deduct capital losses realized from other investments and transactions in a taxable year against his share of the Partnership's income.

The Code provides for optional adjustments to the basis of partnership property upon distributions of partnership property to a partner and transfers of partnership interests (including by reason of death); provided that a partnership election has been made pursuant to Section 754 of the Code. Under the Partnership Agreement, the General Partner, in its sole discretion, may cause the Partnership to make such an election. Any such election, once made, cannot be revoked without the IRS's consent. The General Partner also has the authority and sole discretion to make or refrain from making other tax elections that are available to the Partnership.

Additionally, even if a partnership has not made a Section 754 election, Section 743 of the Code provides for a mandatory basis adjustment to partnership property on certain transfers of partnership interests (including transfers by reason of death), if the partnership has a "substantial built-in loss" immediately after such transfer. A partnership is treated as having a "substantial built-in loss" if the partnership's adjusted basis in partnership property exceeds the property's fair market value by more than $250,000. Section 734 of the Code also provides for mandatory basis adjustments in the case of certain property distributions to partners. Such Code provisions could cause the Partnership to decrease the basis of its remaining assets in such circumstances.

The General Partner will decide how to report partnership items on the Partnership's tax returns and all Limited Partners are required to treat such tax items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. Since the Partnership may engage in transactions whose treatment for tax purposes is not clear, there is a risk that a claim of tax liability could be asserted against the Partnership or its Partners. In the event that the income tax returns of the Partnership are audited by the IRS, the tax treatment of Partnership income and deductions generally is determined at the partnership level in a single proceeding rather than by individual audits of the Partners. As the "Tax Matters Partner", the General Partner has considerable authority to make decisions affecting the tax treatment and procedural rights of all Partners. In addition, the Tax Matters Partner has the authority to bind certain Partners to settlement agreements and the right on behalf of all Partners to extend the statute of limitations relating to the Partners' tax liabilities with respect to Partnership items. The General Partner may, in its sole discretion, consult with, and rely upon, the Partnership's auditors and their determinations or advice as to tax and/or accounting matters.

It is possible that the Partnership and or certain transactions executed by the Partnership would be subject to tax shelter disclosure registration and listing requirements under applicable U.S. tax laws and regulations.

**PFIC Reporting**. The Code provides that each U.S. Person (as defined herein) that is a direct or indirect shareholder of a PFIC (generally, an investment corporation organized under the laws of a foreign jurisdiction) is required to file an annual information return containing such information as the IRS may require. Limited Partners would be indirect shareholders of stock in any PFICs owned by the Partnership, and would satisfy such filing requirement (if applicable to such Partner) by completing a copy of IRS Form 8621

for the reportable PFIC investment and submitting such forms to the IRS with the Partner's federal income tax return.

**FATCA Withholding and Compliance**. The provisions of the Code known as the Foreign Account Tax Compliance Act ("**FATCA**") provide that a 30% withholding tax will be imposed on payments of U.S.-source dividends and interest (and certain other items of U.S.-source income) to certain foreign financial entities, and beginning on January 1, 2017 with regard to other withholdable payments (including gross proceeds from the sale of property that give rise to U.S.-source, interest or dividends), unless the foreign financial entity has registered with the IRS and agreed to provide specified U.S. tax information concerning "specified U.S. persons" that own interests in the foreign entity. The Partnership is a withholding agent with respect to such withholding taxes that may be imposed on any of its Partners. U.S. and non-U.S. Partners will be required to furnish appropriate documentation certifying as to their U.S. or non-U.S. tax status, together with such other additional tax information as the Partnership may from time to time request. Limited Partners that are "non-financial foreign entities" (as defined in Code Section 1472) are required to certify whether they have any "substantial United States owners" and, if so, to disclose the identity and tax identification numbers of such persons to the Partnership. Failure to provide such information may subject a Limited Partner to withholding taxes or mandatory withdrawal of its entire interest in the Partnership. Limited Partners are encouraged to consult with their own tax advisors regarding the possible impact of the FATCA legislation on their investment in the Partnership.

## OTHER MATTERS

The Partnership may incur certain expenses in connection with its organization and the marketing of the Interests. Amounts paid or incurred to organize the Partnership are being amortized, for tax purposes, over a period of 180 months from the date the Partnership commenced operations. Amounts paid or incurred to market interests in a partnership (marketing and syndication expenses) are not deductible or amortizable.

## SPECIAL CONSIDERATIONS FOR PARTNERS THAT ARE NOT U.S. PERSONS

A "**U.S. Person**" is (a) a citizen or resident of the United States, (b) a corporation, partnership, or other entity organized under the laws of the United States, any state, or the District of Columbia, other than a partnership that is not treated as a U.S. Person under the Regulations, (c) an estate whose income is subject to United States income tax, regardless of its source, or (d) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. Persons have the authority to control all substantial decisions of the trust. In addition, to the extent provided in the Regulations, "U.S. Person" includes certain trusts in existence on August 20, 1996, and treated as U.S. Persons prior to such date, that have elected to be treated as U.S. Persons. Partners that are not U.S. Persons are referred to below as "non-U.S. Partners".

**Taxation of Effectively Connected Income**. The Partnership expects to be treated for U.S. tax purposes as being engaged in the conduct of a U.S. trade or business. As a result, non-U.S. Limited Partners that acquire interests in the Partnership will generally be treated as being engaged in the conduct of a U.S. trade or business. Thus, each non-U.S. Limited Partner will be subject to U.S. federal income taxation, at graduated rates, on its distributive share of the Partnership's income, gain or loss (whether ordinary or capital) that is effectively connected with the conduct of the Partnership's U.S. trade or business ("**ECI**"). Such Limited Partners will be required to file annual U.S. federal income tax returns with respect to such ECI, and the Partnership will be required to withhold and remit to the U.S. Treasury a portion of the non-U.S. Limited Partner's distributive share of such ECI. The Limited Partner would be entitled to claim a credit on his U.S. federal income tax return for the amount withheld by the Partnership with respect to such ECI. Non-U.S. Limited Partners may also be required to file applicable state and local tax returns in jurisdictions in which the Partnership is engaged in business or in which its real property interests are located.

**U.S. Branch Profits Tax**. In the case of a Limited Partner that is a non-U.S. corporation, in addition to the regular corporate income tax that must be paid on its ECI, the Code provides for an additional 30% "branch profits" tax. The branch profits tax is 30% (or lower rate permitted by tax treaty) of the foreign corporation's "dividend equivalent amount". This is the amount of the foreign corporation's effectively connected after-tax earnings that are not reinvested in a U.S. trade or business by the end of the tax year or disinvested in a later tax year. Certain income tax treaties may reduce or eliminate the branch profits tax; however, under certain circumstances, the branch profits tax may override income tax treaty benefits.

**FIRPTA**. The Foreign Investment in Real Property Tax Act of 1980, as amended ("**FIRPTA**"), imposes a tax on gain realized on disposition by a foreign person of a "U.S. real property interest" ("**USRPI**") by treating such gain as ECI, generally giving rise to the tax consequences described above. A USRPI includes a direct investment in U.S. real estate and buildings and also investments in stock and certain types of debt interests of a U.S. corporation that is classified as a "U.S. real property holding corporation" (as defined in the Code). A USRPI held by a partnership is deemed to be held proportionately by its partners.

**Taxation of Non-ECI**. The Partnership also expects to realize certain types of periodic income from U.S. sources (e.g., dividends and certain types of interest) which are not classified as ECI. Each non-U.S. Limited Partner will be subject to a flat 30% withholding tax on its allocable share of the gross amount of such income. Such withholding tax is sometimes reduced or eliminated by an applicable income tax treaty, provided that the proper certification is provided by the non-U.S. Limited Partner when necessary. The applicable IRS form or forms (W-8 series) should be submitted to the Partnership by each non-U.S. Limited Partner at the time such Limited Partner acquires an Interest in the Partnership, and should be resubmitted every three years thereafter (or earlier, if the information on such form changes before such date).

**Disposition of Partnership Interests**. A non-U.S. Limited Partner that disposes of its Interest in the Partnership, by sale or otherwise, may be subject to U.S. federal income

taxation on such disposition. A transferee of an Interest in the Partnership may be required to deduct and withhold a tax equal to 10% of the gross amount realized on such disposition. Any amount so withheld can be applied as a credit against the U.S. federal income tax liability of the non-U.S. Limited Partner and can be recovered as a refund in the event of overpayment.

**U.S. Estate and Gift Taxation of Interests**. Non-U.S. Limited Partners that are individuals should also be aware that Interests in the Partnership will be treated as U.S. situs property by reason of the Partnership's ownership of U.S. real property interests, and thus subject to U.S. estate taxation upon the death on a non-U.S. individual owner, or U.S. gift taxation upon a donative transfer of such Interest.

## STATE TAXATION

In addition to the federal income tax consequences described above, prospective investors should consider potential state tax consequences of an investment in the Partnership. No attempt is made herein to provide a discussion of such state tax consequences. State laws often differ from federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. A Partner's distributive share of the taxable income or loss of the Partnership generally will be required to be included in determining the Partner's reportable income for state tax purposes in the jurisdiction in which such Partner a resident. Each prospective investor must consult such investor's own tax advisors regarding such state tax consequences.

## FUTURE TAX LEGISLATION

Future amendments to the Code, other legislation, new or amended Regulations, administrative rulings or guidance by the IRS, or judicial decisions may adversely affect the federal income tax aspects of an investment in the Partnership, with or without advance notice, and retroactively or prospectively.

**EXHIBIT 22**

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM D

## Notice of Exempt Offering of Securities

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden hours per response: | 4.00 |

## 1. Issuer's Identity

CIK (Filer ID Number)

0001660386

Previous Names: [X] None

Name of Issuer

Atlas IDF, LP

Jurisdiction of Incorporation/Organization

DELAWARE

Year of Incorporation/Organization

- [X] Over Five Years Ago
- [ ] Within Last Five Years (Specify Year)
- [ ] Yet to Be Formed

Entity Type

- [ ] Corporation
- [X] Limited Partnership
- [ ] Limited Liability Company
- [ ] General Partnership
- [ ] Business Trust
- [ ] Other (Specify)

## 2. Principal Place of Business and Contact Information

Name of Issuer

Atlas IDF, LP

| Street Address 1 | Street Address 2 |
|---|---|
| C/O ATLAS IDF GP, LLC | 2101 CEDAR SPRINGS ROAD, SUITE 1200 |

| City | State/Province/Country | ZIP/PostalCode | Phone Number of Issuer |
|---|---|---|---|
| DALLAS | TEXAS | 75201 | (214) 288-9555 |

## 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|
| Atlas IDF GP, LLC | N/A | |

| Street Address 1 | Street Address 2 |
|---|---|
| 2101 Cedar Springs Road | Suite 1200 |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Dallas | TEXAS | 75201 |

Relationship: [ ] Executive Officer [ ] Director [X] Promoter

Clarification of Response (if Necessary):

The Issuer's General Partner

| Last Name | First Name | Middle Name |
|---|---|---|

Patrick Mark

| Street Address 1 | Street Address 2 | |
|---|---|---|
| c/o Atlas IDF GP, LLC | 2101 Cedar Springs Road, Suite 1200 | |
| City | State/Province/Country | ZIP/PostalCode |
| Dallas | TEXAS | 75201 |

Relationship: [X] Executive Officer [ ] Director [ ] Promoter

Clarification of Response (if Necessary):

Controlling Person

## 4. Industry Group

- [ ] Agriculture
- Banking & Financial Services
  - [ ] Commercial Banking
  - [ ] Insurance
  - [ ] Investing
  - [ ] Investment Banking
  - [X] Pooled Investment Fund
    - [X] Hedge Fund
    - [ ] Private Equity Fund
    - [ ] Venture Capital Fund
    - [ ] Other Investment Fund
    - Is the issuer registered as an investment company under the Investment Company Act of 1940?
      [ ] Yes [X] No
  - [ ] Other Banking & Financial Services
- [ ] Business Services
- Energy
  - [ ] Coal Mining
  - [ ] Electric Utilities
  - [ ] Energy Conservation
  - [ ] Environmental Services
  - [ ] Oil & Gas
  - [ ] Other Energy
- Health Care
  - [ ] Biotechnology
  - [ ] Health Insurance
  - [ ] Hospitals & Physicians
  - [ ] Pharmaceuticals
  - [ ] Other Health Care
- [ ] Manufacturing
- Real Estate
  - [ ] Commercial
  - [ ] Construction
  - [ ] REITS & Finance
  - [ ] Residential
  - [ ] Other Real Estate
- [ ] Retailing
- [ ] Restaurants
- Technology
  - [ ] Computers
  - [ ] Telecommunications
  - [ ] Other Technology
- Travel
  - [ ] Airlines & Airports
  - [ ] Lodging & Conventions
  - [ ] Tourism & Travel Services
  - [ ] Other Travel
- [ ] Other

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| [ ] No Revenues | | [ ] No Aggregate Net Asset Value |
| [ ] $1 - $1,000,000 | | [ ] $1 - $5,000,000 |

| | |
|---|---|
| ☐ $1,000,001 - $5,000,000 | ☐ $5,000,001 - $25,000,000 |
| ☐ $5,000,001 - $25,000,000 | ☐ $25,000,001 - $50,000,000 |
| ☐ $25,000,001 - $100,000,000 | ☐ $50,000,001 - $100,000,000 |
| ☐ Over $100,000,000 | ☐ Over $100,000,000 |
| ☐ Decline to Disclose | ☒ Decline to Disclose |
| ☐ Not Applicable | ☐ Not Applicable |

**6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)**

☒ Investment Company Act Section 3(c)

| | | |
|---|---|---|
| ☐ Rule 504(b)(1) (not (i), (ii) or (iii)) | ☐ Section 3(c)(1) | ☐ Section 3(c)(9) |
| ☐ Rule 504 (b)(1)(i) | ☐ Section 3(c)(2) | ☐ Section 3(c)(10) |
| ☐ Rule 504 (b)(1)(ii) | ☐ Section 3(c)(3) | ☐ Section 3(c)(11) |
| ☐ Rule 504 (b)(1)(iii) | ☐ Section 3(c)(4) | ☐ Section 3(c)(12) |
| ☒ Rule 506(b) | ☐ Section 3(c)(5) | ☐ Section 3(c)(13) |
| ☐ Rule 506(c) | ☐ Section 3(c)(6) | ☐ Section 3(c)(14) |
| ☐ Securities Act Section 4(a)(5) | ☒ Section 3(c)(7) | |

**7. Type of Filing**

☐ New Notice Date of First Sale 2015-12-15 ☐ First Sale Yet to Occur
☒ Amendment

**8. Duration of Offering**

Does the Issuer intend this offering to last more than one year? ☒ Yes ☐ No

**9. Type(s) of Securities Offered (select all that apply)**

| | |
|---|---|
| ☐ Equity | ☒ Pooled Investment Fund Interests |
| ☐ Debt | ☐ Tenant-in-Common Securities |
| ☐ Option, Warrant or Other Right to Acquire Another Security | ☐ Mineral Property Securities |
| ☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security | ☐ Other (describe) |

**10. Business Combination Transaction**

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer? ☐ Yes ☒ No

Clarification of Response (if Necessary):

**11. Minimum Investment**

Minimum investment accepted from any outside investor $500,000 USD

**12. Sales Compensation**

Recipient | Recipient CRD Number [X] None

(Associated) Broker or Dealer [X] None | (Associated) Broker or Dealer CRD Number [X] None

Street Address 1 | Street Address 2

City | State/Province/Country | ZIP/Postal Code

State(s) of Solicitation (select all that apply)
Check "All States" or check individual States [ ] All States [ ] Foreign/non-US

**13. Offering and Sales Amounts**

Total Offering Amount USD or [X] Indefinite

Total Amount Sold $37,975,518 USD

Total Remaining to be Sold USD or [X] Indefinite

Clarification of Response (if Necessary):

**14. Investors**

[ ] Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: 3

**15. Sales Commissions & Finder's Fees Expenses**

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD [X] Estimate

Finders' Fees $0 USD [X] Estimate

Clarification of Response (if Necessary):

**16. Use of Proceeds**

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD [X] Estimate

Clarification of Response (if Necessary):

Atlas IDF GP, LLC and/or its affiliates receive customary management fees, as described in the Issuer's Confidential Private Placement Memorandum.

**Signature and Submission**

**Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.**

**Terms of Submission**

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*
- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the issuer maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persons may accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in any Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, if the action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.
- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| Atlas IDF, LP | /s/ Mark Patrick | Mark Patrick | Controlling Person | 2025-02-24 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

**EXHIBIT 2**

## SIGNATURE PAGE

This page constitutes the signature page for the Subscription Agreement, the Prospective Investor Questionnaire and the Partnership Agreement, and execution of this signature page constitutes execution of each.

IN WITNESS WHEREOF, the Subscriber has executed this Subscription Agreement, the Prospective Investor Questionnaire and the Partnership Agreement this 21 day of December, 2015.

$ 7,000,000.
Capital Contribution

Series 1

**For Individuals:**

Name of Prospective Investor (print or type)

(Signature)

Name of Joint Prospective Investor (print or type)
(if applicable)

(Joint Signature, if applicable)

**For Entities:**

Atlas IDF, LP
Name of Prospective Investor (print or type)

By: [signature]
(Signature)

Name: John Honis
Title: Managing Member of GP

(Name and Initials of IRA custodian, if applicable)

$ 7,000,000.
Capital Contribution Accepted
Series 1

Accepted and Agreed, as of Dec 21, 2015:

**RAND PE FUND I, L.P.**
By: Rand PE Fund Management, LLC, as its general partner
(acting severally in the name of and for the account of each individual Series)

By: [signature]
Name: John Honis
Title: Managing Member

Form **W-9**
(Rev. December 2014)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

**Give Form to the requester. Do not send to the IRS.**

*See Specific Instructions on page 2. Print or type*

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

2 Business name/disregarded entity name, if different from above
Atlas IDF, LP

3 Check appropriate box for federal tax classification; check only **one** of the following seven boxes:
☐ Individual/sole proprietor or single-member LLC ☐ C Corporation ☐ S Corporation ☒ Partnership ☐ Trust/estate
☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶
**Note.** For a single-member LLC that is disregarded, do not check LLC; check the appropriate box in the line above for the tax classification of the single-member owner.
☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):
Exempt payee code (if any)
Exemption from FATCA reporting code (if any)
*(Applies to accounts maintained outside the U.S.)*

5 Address (number, street, and apt. or suite no.)
87 Railroad Place - Suite 403

Requester's name and address (optional)

6 City, state, and ZIP code
Saratoga Springs, NY 12866

7 List account number(s) here (optional)

## Part I Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** If the account is in more than one name, see the instructions for line 1 and the chart on page 4 for guidelines on whose number to enter.

**Social security number**
☐☐☐ - ☐☐ - ☐☐☐☐

**or**

**Employer identification number**
47 - 5455343

## Part II Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 3.

**Sign Here** **Signature of U.S. person** ▶ [signature] **Date** ▶ 12/21/15

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments**. Information about developments affecting Form W-9 (such as legislation enacted after we release it) is at *www.irs.gov/fw9*.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following:

- Form 1099-INT (interest earned or paid)
- Form 1099-DIV (dividends, including those from stocks or mutual funds)
- Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
- Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
- Form 1099-S (proceeds from real estate transactions)
- Form 1099-K (merchant card and third party network transactions)
- Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
- Form 1099-C (canceled debt)
- Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

*If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding.* See *What is backup withholding?* on page 2.

By signing the filled-out form, you:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),
2. Certify that you are not subject to backup withholding, or
3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income, and
4. Certify that FATCA code(s) entered on this form (if any) indicating that you are exempt from the FATCA reporting, is correct. See *What is FATCA reporting?* on page 2 for further information.

## PART I – SUBSCRIBER INFORMATION PAGE

Subscriber Name: ______________________

-or-

Entity Name: Atlas IDF, LP

Joint Subscriber Name (if necessary): ______________

Subscriber Social Security/Tax ID No.: 47-5455343

Joint Subscriber Social Security/Tax ID No. (if necessary): ______________

Subscriber Date of Birth/Date of Incorporation or Formation: Oct 2015

Joint Subscriber Date of Birth/Date of Incorporation or Formation (if necessary): ______________

State, or if not in the U.S., Country in which the Subscription Agreement was signed: New York

**Residence (for individuals) or Principal Place of Business (for entities) (May not be a P.O. Box):**

Address: 87 Railroad Place
Suite 403

City: Saratoga State: NY Zip: 12866

Country: U.S.

Telephone: 214-335-7969

Facsimile: ______________

Email: JHsaNiz@RandAdvisors.com

**Mailing Address (if other than above)**

Address: ______________________

City: __________ State: ______ Zip: _____

Country: __________

Telephone: ______________

Facsimile: ______________

Email: ______________

**Subscriber Type:**

☐ Individual ☐ Joint Tenants with Right of Survivorship ☐ Trust ☒ Partnership ☐ Corporation ☐ LLC

☐ IRA (Self-directed) ☐ IRA (Custodian) ☐ Tenants in Common ☐ Other: __________

If through a custodian, please provide details:

______________

☐ Community Property (Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington or Wisconsin). ***PLEASE NOTE: if you are married and live in a community property state, both you and your spouse must sign the Signature Page to the Subscription Agreement.***

**Series of Interests:**
Please indicate which Series of Interests you are subscribing for:

☒ Series 1 Interests

*Prior to selecting a Series of Interests, Subscribers are advised to review the detailed descriptions of the rights and obligations applicable to such Series of Interests, which are set forth in the Memorandum (and/or a supplement to any such document), the Partnership Agreement and/or this Agreement.*

**Form PF Investor Type:**

Under the reporting requirements on Form PF (Reporting Form for Investment Advisers to Private Funds and Certain Commodity Pool Operators and Commodity Trading Advisors), a reporting entity must organize its investors by certain specified investor groups set forth in Form PF. Accordingly, please check below the investor type that best describes the Subscriber. (*If the Subscriber is acting as trustee, agent, representative or nominee for a beneficial owner, please check the item that best describes the beneficial owner.*)

***Please check one***:

- ☐ Individual that is a United States person[4] (or a trust of such a person)
- ☐ Individual that is not a United States person (or a trust of such a person)
- ☐ Broker-dealer
- ☐ Insurance company
- ☐ Investment company registered with the SEC
- ☒ Private fund[5]
- ☐ Non-profit
- ☐ Pension plan (other than a governmental pension plan)
- ☐ Banking or thrift institution (proprietary)
- ☐ State or municipal government entity (other than a governmental pension plan)
- ☐ State or municipal government pension plan
- ☐ Sovereign wealth fund or foreign official institution
- ☐ Investor that is not a United States person and about which the foregoing beneficial ownership information is not known and cannot reasonably be obtained because the beneficial interest is held through a chain involving one or more third-party intermediaries
- ☐ Other (*please specify*): ____________________

**Payment Information:**

Please insert your payment information. Please note **you must wire the payment from an account in your name**.

Bank Name: BBVA Compass
Bank ABA#: 062001186
City/State/Country: Dallas, TX
Account Name: Atlas IDF, LP
Account #: 6733738776

Swift Code*: ____________________
For Further Credit to: ____________________
Account Name: ____________________
Account #: ____________________

* Required for U.S. dollar wire transfer to non-U.S. banks. Please contact your bank for more information.

**Was the Subscriber referred to the Partnership by a placement agent?**

☐ Yes ☒ No

If yes, please provide the name of placement agent: ____________________

**COMMUNICATIONS TO SUBSCRIBER:**

**Please send all communications to (please check one):**

☒ Residence or Principal Place of Business

[4] For purposes of Form PF, the term "United States person" has the meaning provided in Rule 203(m)-1 under the Advisers Act, which includes any natural person that is resident in the United States.
[5] For purposes of Form PF, the term "private fund" means any issuer that would be an investment company as defined in Section 3 of the Investment Company Act, but for Section 3(c)(1) or 3(c)(7) thereof.

☒ Mailing Address

**Duplicate communications should be sent to an authorized representative as follows (complete if desired; otherwise, leave blank):**

Name: ______________________

Address: ______________________

______________________

______________________

Facsimile: ______________________

Email: ______________________

**Preferred Methods of Communication**: Choose ***one*** for the Subscriber and ***one*** for the authorized representative whose address appears immediately above, if any; ***Note***: each of the Partnership, the Administrator, the Investment Manager, and the General Partner is permitted to send notices and other information relating to the Subscriber's investment in the Partnership in any manner it chooses but will send notices and other information by the method selected below if possible and may charge a related fee to the Subscriber in connection therewith.

| | Mail | Facsimile | Email/Web-based Delivery |
|---|---|---|---|
| Subscriber | ☐ | ☐ | ☒ |
| Authorized Representative | ☐ | ☐ | ☐ |

**Electronic Delivery of Reports and Other Communications:**

If you elected "Email/Web-based Delivery" above, at their discretion, the Partnership, the Administrator, the Investment Manager and/or the General Partner may provide to you (or your authorized representative) statements, reports and other communications relating to the Partnership and/or your investment in the Partnership in electronic form, such as email.

Do you consent to the sending of such statements, reports and other communications regarding the Partnership and your investment in the Partnership (including Net Asset Value information, subscription and withdrawal activity, and annual and other updates of the Partnership's consumer privacy policies and procedures) exclusively in electronic form without separate mailing of paper copies?

☒ Yes ☐ No

By consenting you also acknowledge that emails from the Partnership, the Administrator, the Investment Manager and/or the General Partner may be accessed by recipients other than you and may be interfered with, may contain computer viruses or other defects and may not be successfully replicated on other systems. The Partnership, the Administrator, the Investment Manager and the General Partner each give no warranties in relation to these matters. If you have any doubts about the authenticity of an email purportedly sent by the Partnership, the Administrator, the Investment Manager and/or the General Partner, please contact the purported sender immediately.

**Schedule K-1s:**

The annual Schedule K-1 statement will be sent to the Subscriber in physical form unless the Subscriber consents below to receive it electronically. Does the Subscriber grant permission for the annual Schedule K-1 to be sent electronically?

☒ Yes ☐ No

Please note that this choice will apply until the Subscriber informs the Administrator that it is electing to alter such permission, which the Subscriber is able to do at any time by contacting the Administrator and in such contact specifying the effective date of the new election. The Administrator will confirm the receipt of the Subscriber's

change in election and will specify the date on which such change will take effect. If the Subscriber has chosen to receive the Schedule K-1 electronically, a paper copy can be obtained by contacting the Administrator, and such a request will NOT alter the election noted above. The Schedule K-1s will only be sent for those periods for which the Subscriber was an investor in the Partnership. Subscribers should note that the electronic versions of the Schedule K-1 will be sent as Microsoft Word documents or .pdf files and that the Schedule K-1 may be required to be printed by the Subscriber for the purpose of attaching it to the Subscriber's federal, state and/or local income tax returns, if required by applicable law.

**Compliance with the PATRIOT Act:**

To comply with applicable anti-money laundering/OFAC rules and regulations, you and/or the institution remitting payment are required to provide the following payment information:

1. Name of the bank from which your payment to the Partnership is being wired (the "**Wiring Bank**")?

   BBVA Compass

2. Is the Wiring Bank located in the United States or another "**FATF Member**"[6]?

   ☒ Yes ☐ No

   If **yes**, please answer question 3 below.

   If **no**, please provide the information described in Footnote 7 below and contact the Administrator.[7]

3. Are you a customer of the Wiring Bank?

Yes

[6] As of November 1, 2015, members of the Financial Action Task Force on Money Laundering (each, an "**FATF Member**") include: Argentina; Australia; Austria; Belgium; Brazil; Canada; China; Denmark; the European Commission; Finland; France; Germany; Greece; the Gulf Co-operation Council; Hong Kong, China; Iceland; India; Ireland; Italy; Japan; the Kingdom of the Netherlands (including the Netherlands, Aruba, Curaçao and Saint Maarten); Luxembourg; Mexico; New Zealand; Norway; Portugal; the Republic of Korea; the Russian Federation; Singapore; South Africa; Spain; Sweden; Switzerland; Turkey; the United Kingdom; and the United States. This list may be expanded, from time to time, to include future FATF Members and FATF-compliant countries, as appropriate.

[7] Subscribers who responded "no" to question 2 or 3 of "Compliance with the PATRIOT Act" above must provide the following additional information and materials to the Administrator, and contact the Administrator to obtain further anti-money laundering schedules:

For Individual Investors: (i) a government-issued form of picture identification (*e.g.*, passport or driver's license); and (ii) proof of the individual's current address (*e.g.*, current utility bill), if not included in the form of picture identification.

For Funds-of-Funds or Entities that Invest on Behalf of Third Parties Not Located in the United States or Other FATF Members: (i) a certificate of due formation and organization and continued authorization to conduct business in the jurisdiction of its organization (*e.g.*, certificate of good standing); (ii) an incumbency certificate attesting to the title of the individual executing the Subscription Agreement on behalf of the prospective Subscriber; (iii) a completed form certifying that the entity has adequate anti-money laundering policies and procedures in place that are consistent with the PATRIOT Act, OFAC and other relevant federal, state or foreign anti-money laundering laws and regulations; and (iv) a letter of reference from a local office of a reputable bank or brokerage firm which is incorporated, or has its principal place of business located, in the United States or other FATF Member certifying that the prospective Subscriber (*i.e.*, the fund-of-funds or the entity investing on behalf of third parties) has maintained an account at such bank/brokerage firm for a length of time and containing a statement affirming the prospective Subscriber's integrity.

For All Other Entity Subscribers: (i) a certificate of due formation and organization and continued authorization to conduct business in the jurisdiction of its organization (*e.g.*, certificate of good standing); (ii) an incumbency certificate attesting to the title of the individual executing the Subscription Agreement on behalf of the prospective Subscriber; (iii) a letter of reference from a local office of a reputable bank or brokerage firm which is incorporated, or has its principal place of business located, in the United States or other FATF Member certifying that the prospective Subscriber has maintained an account at such bank/brokerage firm for a length of time and containing a statement affirming the prospective Subscriber's integrity; (iv) if the prospective Subscriber is a privately-held entity, a completed form listing the name of each person who directly, or indirectly through intermediaries, is the beneficial owner of 25% or more of any voting or non-voting class of equity interests of the prospective Subscriber; and (v) if the prospective Subscriber is a trust, a list of current beneficiaries of the trust that have, directly or indirectly, 25% or more of any interest in the trust, the settlors or grantors of the trust, and the trustees.

☒ Yes ☐ No

If **yes**, the information described in Footnote 7 below is not required.

If **no**, please provide the information described in Footnote 7 below and contact the Administrator.

## PART III – TO BE COMPLETED BY IRAS (OTHER THAN SELF-DIRECTED IRAS), KEOGHS, CORPORATIONS, LIMITED LIABILITY COMPANIES, PARTNERSHIPS, TRUSTS AND OTHER ENTITIES

**A.** ***General Information***

**6.** Is the Subscriber subscribing for an Interest as agent, nominee, trustee or otherwise on behalf of, for the account of or jointly with any other person or entity?

☐ Yes ☒ No

**7.** Will any other person or persons have a beneficial interest in the Interest acquired (other than as a shareholder, partner, member, trust beneficiary or other beneficial owner of equity interests in the Subscriber)?

☐ Yes ☒ No

**8.** Does the Subscriber control, or is the Subscriber controlled by or under common control with, any other existing or prospective investor in the Partnership?

☐ Yes ☒ No

*PLEASE NOTE: If any of the above questions were answered "Yes", please provide identifying information or contact the Administrator.*

**9.** Legal form of the Subscriber: LP

**10.** U.S. state or foreign jurisdiction in which the Subscriber was incorporated or formed: Delaware

**11.** Date of incorporation or formation of the Subscriber: Oct 2015

**12.** Is the Subscriber in any way affiliated with the General Partner or the Partnership?

☒ Yes ☐ No

If yes, please describe the relationship below.

Fund managed by the same General Partner as the Partnership

**13.** Is the Subscriber in any way affiliated with a senior foreign government, political or military official, or an immediate family member or close associate of such person (a "*politically exposed person*")?

☐ Yes ☒ No

If yes, (a) which government? ______

(b) what position in the government? ______

(c) if an immediate family member or close associate of a politically exposed person, what relationship to the politically exposed person? ______

**14.** Authorized individual who is executing the Subscription Agreement on behalf of the investing entity is:

Name: John Horn

Current position or title: Managing member of the General ~~Partnership~~ Partner

Telephone number: 214-335-7969

Facsimile number: ____
Email: JHONID@RANDADVISORS.COM

**B.** ***Subscriber Qualification***

**1.** **Accredited Investor.** Interests will be sold only to investors who are "*accredited investors*" (as defined in Rule 501 of Regulation D promulgated under the Securities Act). Please indicate the basis of "*accredited investor*" status of the Subscriber by checking the applicable statement or statements.

☒ The Subscriber has total assets in excess of $5,000,000, was not formed for the purpose of investing in the Partnership and is one of the following:

- a corporation
- a partnership
- a limited liability company
- a business trust
- a tax-exempt organization described in Section 501(c)(3) of the Code.

☐ The Subscriber is a personal (non-business) trust, other than an employee benefit trust, with total assets in excess of $5,000,000 which was not formed for the purpose of investing in the Partnership and whose decision to invest in the Partnership has been directed by a person who has such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of the investment.

☐ The Subscriber is licensed, or subject to supervision, by U.S. federal or state examining authorities as a "*bank*", "*savings and loan association*", "*insurance company*", or "*small business investment company*" (as such terms are used and defined in 17 CFR §230.501(a)) or is an account for which a bank or savings and loan association is subscribing in a fiduciary capacity.

☐ The Subscriber is registered with the SEC as a broker or dealer or an investment company, or has elected to be treated or qualifies as a "*business development company*" (within the meaning of Section 2(a)(48) of the Investment Company Act or Section 202(a)(22) of the Advisers Act).

☐ The Subscriber is an employee benefit plan within the meaning of ERISA (including an IRA), which satisfies at least one of the following conditions:

__ it has total assets in excess of $5,000,000; or

__ the investment decision is being made by a plan fiduciary which is a bank, savings and loan association, insurance company or registered investment adviser; or

__ it is a self-directed plan (i.e., a tax-qualified defined contribution plan in which a participant may exercise control over the investment of assets credited to the participant's account) and the decision to invest is made by those participants investing, and each such participant qualifies as an accredited investor.

☐ The Subscriber is an employee benefit plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions, which has total assets in excess of $5,000,000.

☐ The Subscriber is an entity in which all of the equity owners are at least one of the following: (a) natural persons who are "accredited investors", (b) grantor trusts where the individual grantors are "accredited investors" or (c) non-natural persons described above.

If the Subscriber does not qualify in any accredited investor category above (and is not a natural person or grantor trust), please indicate this in the space provided below.

☐ The Subscriber does not qualify in any of the above accredited investor categories.

2. **Qualified Client.** Interests will be sold only to investors who are "*qualified clients*" (as defined in Rule 205-3 promulgated under the Advisers Act). Please indicate the basis of "*qualified client*" status of the Subscriber by checking the applicable statement or statements.

(a) Is the Subscriber an entity with net assets at the time of entering into the Subscription Agreement exceeding $2,000,000?

☐ Yes ☐ No

(b) Is the Subscriber an entity that has at least $1,000,000 under the management of the Investment Manager immediately after entering into the Subscription Agreement?

☐ Yes ☐ No

(c) Is the Subscriber a "*qualified purchaser*" as defined in Section 2(a)(51)(A) of the Investment Company Act at the time of entering into the Subscription Agreement?

☒ Yes ☐ No

If the Subscriber does not qualify in any qualified client category above (and is not a natural person or grantor trust), please indicate this in the space provided below.

☐ The Subscriber does not qualify in any of the above qualified client categories.

3. **Qualified Purchaser.** The Partnership intends to claim exemption from registration under the Investment Company Act in reliance on Section 3(c)(7) thereof, and accordingly Interests will be sold only to investors who are "*qualified purchasers*" (as defined in Section 2(a)(51) of the Investment Company Act). Please indicate the basis of "*qualified purchaser*" status of the Subscriber by checking the applicable statement or statements. In connection therewith, **the Subscriber must read Annexes B and C to these Subscription Documents** for the definition of "*investments*" and for information regarding the valuation of "*investments,*" respectively.

☐ (a) A company, partnership or trust that owns not less than $5,000,000 in "*investments*" and that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations or trusts established by or for the benefit of such persons.

☐ (b) A trust that is not covered by (a) above as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is a person described in clause (a), (c), (d) or (e) hereof (or under Part II, Section (B)(3) above).

☐ (c) An entity, acting for its own account or the accounts of other qualified purchasers, which, in the aggregate, owns and invests on a discretionary basis not less than $25,000,000 in "*investments.*"

☐ (d) A qualified institutional buyer as defined in paragraph (a) of Rule 144A under the Securities Act, acting for its own account, the account of another qualified institutional buyer, or the account of a qualified purchaser; *provided* that: (i) a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least $25,000,000 in securities of issuers that are not affiliated persons of the dealer and (ii) a plan referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan, will not be deemed to be acting for its own account if investment decisions with respect to the plan are made by the beneficiaries of the plan, except with respect to investment decisions made solely by the fiduciary, trustee or sponsor of such plan.

☒ (e) An entity, each beneficial owner of which is a qualified purchaser. ***PLEASE NOTE:* This certification does not apply to beneficiaries of an irrevocable trust.**

If the Subscriber does not qualify in a qualified purchaser category above (and is not a natural person or grantor trust), please indicate this in the space provided below.

☐ The Subscriber does not qualify in any of the above qualified purchaser categories.

**4. Supplemental Data**

(a) Was the Subscriber organized or reorganized for the specific purpose of acquiring Interests in the Partnership?

☐ Yes ☒ No

*PLEASE NOTE: If the answer to question 4(a) is "Yes", each person who is an equity owner of the Subscriber must complete a copy of the Prospective Investor Questionnaire as if such person were directly purchasing an Interest.*

(b) With respect to its acquisition of the Interests, is the Subscriber a participant-directed defined contribution plan (such as a 401(k) plan), or a partnership or other investment vehicle (1) in which its partners or participants have or will have any discretion as to their level of investment in the Subscriber or in investments made by the Subscriber (including the Subscriber's investment in an Interest), or (2) that is otherwise an entity managed to facilitate the individual decisions of its beneficial owners to invest in the Partnership?

☐ Yes ☒ No

(c) Will the Subscriber, at any time, invest more than 40% of the Subscriber's assets in the Partnership?

☒ Yes ☐ No

**5. ERISA and Tax-Exempt Information**

(a) Is the Subscriber a pension, profit-sharing, annuity or employee benefit plan (a "**Plan**") described in ERISA, whether or not subject to ERISA, or a "*plan*" (as defined in Section 4975(e)(i) of the Code), or is the Subscriber an entity whose underlying assets include Plan assets by reason of a Plan's investment in the Subscriber?

☐ Yes ☒ No

If the answer to question 5(a) is "No", please skip to question 4(b) below.

If the answer to question 5(a) is "*Yes*", is the Subscriber subject to ERISA?

☐ Yes ☐ No

If the answer to question 5(a) is "*Yes*", is the Subscriber a "*governmental plan*" (as defined in Section 3(32) of ERISA) or a "*church plan*" (as defined in Section 3(33) of ERISA)?

☐ Yes ☐ No

(b) Is the Subscriber a partnership, a limited liability company, an S Corporation, trust or other pass-through entity?

☒ Yes ☐ No

If the answer to question 5(b) is "*Yes*", please supply the approximate percentage of ERISA plan assets to be invested in the Partnership by the Subscriber as compared to the total assets of such Subscriber?

0 % John Howke

Please identify a contact for confirmation

If the answer to question 5(b) is "*Yes*", please provide the approximate percentage of ERISA plan assets to be invested in the Partnership as compared with the total assets of the ERISA plan sponsor 0 %

If the answer to question 5(b) is "*Yes*", please provide the percentage of assets of such entity that constitute "plan assets" as defined in DOL Reg. Sec. 2510.3-101.

0 %

(c) If the Subscriber is subscribing as a trustee or custodian for an IRA, is the Subscriber a qualified IRA custodian or trustee?

☐ Yes ☒ No ☐ N/A

(d) If applicable, if the Subscriber is an IRA, the IRA beneficiary must complete the Subscription Agreement. The IRA custodian must approve the Subscription Agreement and retain legal title of the Interest for the benefit of the IRA beneficiary. By initialing on the line below, the Subscriber represents that the IRA custodian has approved the Subscription Agreement and will retain legal title of the Interest for the benefit of the IRA beneficiary.

Initial _______ Name of IRA Custodian (Note: cannot be an individual) _______

**6. Bank Holding Company Act Information**

Does the Subscriber wish to be treated as if it were subject to the Bank Holding Company Act of 1956, as amended from time to time ("**BHCA**")?

☐ Yes ☒ No

By checking "*Yes*", the Subscriber acknowledges and agrees that the Partnership shall not be deemed to be providing any legal advice to Limited Partners that are subject to the BHCA and that all such Limited Partners should consult their own counsel regarding an investment in the Partnership.

**7. Tax Information**

(a) Is the Subscriber a "*United States person*" as defined in Section 7701(a)(30) of the Code and the regulations promulgated thereunder?[10]

☒ Yes ☐ No

If the answer to question 7(a) is "*Yes*", has the Subscriber included a fully executed Form W-9 with this Prospective Investor Questionnaire?

[10] As per Section 7701(a)(30) of the Code and the regulations promulgated thereunder, "United States person" means (i) a citizen or resident of the United States, (ii) a U.S. partnership, (iii) a U.S. corporation, (iv) any estate (other than a non-United States estate, within the meaning of Section 7701(a)(31) of the Code), (v) any trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust, or (vi) any trust which has elected to be taxed as a trust described in (v).

☒ Yes ☐ No

If the answer to question 7(a) is "No", has the Subscriber included a fully executed Form W-8BEN, Form W-8BEN-E, Form W-8ECI, Form W-8IMY or Form W-8EXP, as applicable, with this Prospective Investor Questionnaire?

☐ Yes ☐ No

(b) Please provide the Subscriber's U.S. state or foreign country of residence for tax purposes:

Delaware

(c) The Subscriber reports income for federal income tax purposes on the following basis:

☒ calendar year taxable year;

☐ other taxable year (please specify):____________________________; or

☐ N/A

(d) Is the Subscriber exempt from U.S. federal income tax (e.g., a qualified employee benefit plan or trust, retirement account, charitable remainder trust, or a charitable foundation or other tax-exempt organization described in Section 501(c)(3) of the Code)?

☐ Yes ☐ No ☐N/A

(e) Is the Subscriber treated as a "disregarded entity" for U.S. federal income tax purposes?

☐ Yes ☐ No

If the answer to question 7(e) is "No", pleas skip to question 7(f) below.

If the answer to question 7(e) is "*Yes*", is the owner of the Subscriber a "*United States person*"?

☐ Yes ☐ No

If the answer to the previous question is "*Yes*", please provide a fully executed Form W-9.

If the answer to the previous question is "No", please provide a fully executed Form W-8BEN, Form W-8BEN-E, Form W-8ECI, Form W-8IMY or Form W-8EXP, as applicable.

(f) Is the Subscriber a "*simple trust*" or a "*grantor trust*" for U.S. federal income tax purposes?

☐ Yes ☐ No

If the answer to question 7(f) is "Yes", please provide a fully executed Form W-9 or Form W-8BEN, Form W-8BEN-E, Form W-8ECI, Form W-8IMY or Form W-8EXP, as applicable, with respect to the persons who are subject to U.S. federal income tax on the trust's income.

(g) Is the Subscriber a "*grantor trust*", "*S Corporation*" or an entity treated as a partnership for U.S. federal income tax purposes?

☐ Yes ☐ No

[*remainder of page intentionally left blank*]

## PART IV—NEW ISSUES CERTIFICATION TO BE COMPLETED BY ALL SUBSCRIBERS

The Subscriber must complete this Certification in order for the Partnership to be able to determine the extent to which the Subscriber may participate in "new issue" securities in accordance with Rule 5130 (the "**New Issues Rule**") of the Securities Offering and Trading Standards and Practices of FINRA. If the Subscriber is a corporation, partnership, limited liability company, trust or any other entity or a nominee for another person, the person completing this Certification with respect to the Subscriber *must* be a person authorized to represent the beneficial owner(s) of the Subscriber, or a bank, foreign bank, broker-dealer, investment adviser or other conduit acting on behalf of the beneficial owner(s) of the Subscriber.

INSTRUCTIONS: Each Subscriber must complete this Certification by checking the box next to all applicable categories under Section A below to determine whether the Subscriber is a restricted person under the New Issues Rule (a "**Restricted Person**") or indicating that none of the Restricted Person categories apply to it and the Subscriber is eligible to participate in new issues. A Subscriber that is an entity and that is also a Restricted Person under Section A may still be able to participate fully in new issue investments if it indicates in Section B that it is also an exempted entity (an "**Exempted Entity**"). Accordingly, each such Subscriber should check the box next to any applicable categories under Section B to determine whether or not the Subscriber is an Exempted Entity.

If the Subscriber is a corporation, partnership, limited liability company, trust or any other entity (including a hedge fund, fund-of-funds, investment partnership or any other collective investment vehicle, or a broker-dealer organized as an investment fund) (any of the foregoing, an "**Entity Investor**"), such Entity Investor must complete the certification of beneficial ownership in Section C. Based on such information and the size of the investment by such Entity Investor in the Partnership, such Entity Investor may be deemed to be a Restricted Person with respect to the entirety of its investment in the Partnership or any portion thereof (such determination of Restricted Person status by the Partnership shall be final and conclusive).

☒ *The Subscriber does not wish to participate in new issues and will be deemed a Restricted Person.* If this box is checked, no further responses to Section A, B or C are necessary.

**A. Determination of Restricted Person Status.** Please check all appropriate boxes.

The Subscriber is:

☐ (i) a broker-dealer;

☐ (ii) an officer, director, general partner, associated person[11] or employee of a broker-dealer (other than a limited business broker-dealer)[12];

☐ (iii) an agent of a broker-dealer (other than a limited business broker-dealer) that is engaged in the investment banking or securities business;

☐ (iv) an immediate family member[13] of a person described in (ii) or (iii) above. Under certain circumstances, a Subscriber who checks this box may be able to participate in new issue investments. The Partnership may request additional information in order to determine the eligibility of a Subscriber under this Restricted Person category;

---

[11] A person "associated with" a broker-dealer includes any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a broker-dealer, or any partner, director, officer or sole proprietor of a broker-dealer.

[12] A "limited business broker-dealer" is any broker-dealer whose authorization to engage in the securities business is limited solely to the purchase and sale of investment company/variable contracts securities and direct participation program securities.

[13] The term "immediate family" includes the Subscriber's: (i) parents, (ii) mother-in-law or father-in-law, (iii) husband or wife, (iv) brother or sister, (v) brother-in-law or sister-in-law, (vi) son-in-law or daughter-in-law, (vii) children, and (viii) any other person who is supported, directly or indirectly, to a material extent by an officer, director, general partner, employee, agent of a broker-dealer or person associated with a broker-dealer.

☐ (v) a finder or any person acting in a fiduciary capacity to a managing underwriter, including, but not limited to, attorneys, accountants and financial consultants. Notwithstanding the foregoing, a Subscriber who is a finder or fiduciary but who is not acting in such capacity with respect to the security being offered, may be able to participate in new issue investments, and, accordingly, the Partnership may request additional information from a Subscriber who checks this box in order to determine the Subscriber's eligibility under this Restricted Person category;

☐ (vi) a person who has authority to buy or sell securities for a bank, savings and loan institution, insurance company, investment company, investment advisor or collective investment account[14] (including a private investment vehicle such as a hedge fund);

☐ (vii) an immediate family member of a person described in (v) or (vi) above who materially supports[15], or receives material support from, the Subscriber;

☐ (viii) a person listed or required to be listed in Schedule A, B or C of a Form BD (other than with respect to a limited business broker-dealer), except persons whose listing on Schedule A, B or C is related to a person identified by an ownership code of less than 10% on Schedule A;

☐ (ix) a person that (A) directly or indirectly owns 10% or more of a public reporting company listed, or required to be listed, in Schedule A of a Form BD, or (B) directly or indirectly owns 25% or more of a public reporting company listed, or required to be listed in Schedule B of a Form BD, in each case (A) or (B), other than a reporting company that is listed on a national securities exchange, or other than with respect to a limited business broker/dealer;

☐ (x) an immediate family member of a person described in (viii) or (ix) above. Under certain circumstances, a Subscriber who checks this box may be able to participate in new issue investments. The Partnership may request additional information in order to determine the eligibility of a Subscriber under this Restricted Person category; or

☐ (xi) any entity (including a corporation, partnership, limited liability company, trust or other entity) in which any person or persons listed in (i)-(x) above has a beneficial interest[16].

☐ None of the above categories apply and the Subscriber is eligible to participate in new issue securities.

---

[14] A "collective investment account" is any hedge fund, investment corporation, or any other collective investment vehicle that is engaged primarily in the purchase and/or sale of securities. Investment clubs (groups of individuals who pool their money to invest in stock or other securities and who are collectively responsible for making investment decisions) and family investment vehicles (legal entities that are beneficially owned solely by immediate family members (as defined above)) are not considered collective investment accounts.

[15] The term "material support" means directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household are deemed to materially support each other.

[16] The term "beneficial interest" means any economic interest such as the right to share in gains or losses. The initial receipt of a management or performance-based fee for operating a collective investment account, or other fee for acting in a fiduciary capacity, is not considered a beneficial interest in the account; however, if such payments are accumulated and subsequently invested into the account (as a deferred fee arrangement or otherwise), they would constitute a beneficial interest in that account.

**B. Determination of Exempted Entity Status.** A Subscriber that is an entity and that is also a Restricted Person under Section A may still be able to participate fully in new issue investments, whether directly or through an account in which such Subscriber has a beneficial interest, if it indicates below that it is also an Exempted Entity. Please check all appropriate boxes.

The Subscriber is:

☐ (i) a publicly-traded entity (other than a broker-dealer or an affiliate of a broker-dealer, where such broker-dealer is authorized to engage in the public offering of new issues either as a selling group member or underwriter) that is listed on a national securities exchange, or is a foreign issuer whose securities meet the quantitative designation criteria for listing on a national securities exchange;

☐ (ii) an investment company registered under the Investment Company Act;

☐ (iii) an investment company organized under the laws of a foreign jurisdiction and:

(a) the investment company is listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority; and

(b) no person owning more than 5% of the shares of the investment company is a Restricted Person;

☐ (iv) (A) an employee benefit plan under ERISA that is qualified under Section 401(a) of the Code and that is not sponsored solely by a broker-dealer, (B) a state or municipal government benefits plan that is subject to state and/or municipal regulation or (C) a church plan under Section 414(e) of the Code;

☐ (v) a tax-exempt charitable organization under Section 501(c)(3) of the Code;

☐ (vi) a common trust fund or similar fund as described in Section 3(a)(12)(A)(iii) of the Exchange Act, and the fund

(a) has investments from 1,000 or more accounts, and

(b) does not limit beneficial interests in the fund principally to trust accounts of Restricted Persons;

☐ (vii) an insurance company general, separate or investment account, and

(a) the account is funded by premiums from 1,000 or more policyholders, or, if a general account, the insurance company has 1,000 or more policyholders, and

(b) the insurance company does not limit the policyholders whose premiums are used to fund the account principally to Restricted Persons, or, if a general account, the insurance company does not limit its policyholders principally to Restricted Persons; or

☐ (viii) an entity (including a private investment vehicle, such as a hedge fund or fund of hedge funds) (a) in which the beneficial interests of Restricted Persons do not exceed in the aggregate 10% of such entity, or (b) that limits participation in New Issue profits by Restricted Persons to not more than 10% of the profits from New Issues.

**C. Determination of Beneficial Ownership.**

If the box for (viii) in Section B above is checked, please specify the current percentage of the net profits from New Issues allocable to beneficial owners of such entity who are Restricted Persons:

______%

[*remainder of page intentionally left blank*]

## PART V—SPINNING PROHIBITION CERTIFICATION TO BE COMPLETED BY ALL SUBSCRIBERS

The Subscriber must complete this Certification in order for the Partnership to be able to determine the extent to which the Subscriber may participate in "new issue" securities in accordance with FINRA Rule 5131(b) (the "**Spinning Prohibition Rule**"), which prohibits a FINRA member who provides investment banking services from allocating new issues to accounts in which officers and directors of certain current, former or prospective investment banking clients have an interest. To enable the Partnership to purchase new issues, the Partnership must determine whether the Subscriber is an executive officer or director or person materially supported by an executive officer or director of a public company or a "covered non-public company" under the Spinning Prohibition Rule. Please note that the Spinning Prohibition Rule (FINRA Rule 5131(b)) is in addition to, not a replacement of, the New Issues Rule (FINRA Rule 5130) covered in Part IV of this Questionnaire.

If the Subscriber is a corporation, partnership, limited liability company, trust or any other entity or a nominee for another person, the person completing this Certification with respect to the Subscriber *must* be a person authorized to represent the beneficial owner(s) of the Subscriber, or a bank, foreign bank, broker-dealer, investment adviser or other conduit acting on behalf of the beneficial owner(s) of the Subscriber.

INSTRUCTIONS: Each Subscriber must complete this Certification by checking the box next to all applicable categories under Section A below to determine whether the Subscriber is a restricted investor under the Spinning Prohibition Rule (a "**Restricted Investor**"), or indicating that none of the Restricted Investor categories apply to it and that the Subscriber is eligible to participate in new issues. A Subscriber that is an entity which is deemed a Restricted Investor under Section A may still be able to participate in new issues if it indicates in Section B below that it is an unrestricted investor under the Spinning Prohibition Rule (an "**Unrestricted Investor**").

☒ *The Subscriber does not wish to participate in new issues and will be deemed a Restricted Investor.* If this box is checked, no further responses to Section A or B are necessary.

**A. Determination of Restricted Investor Status.** Please check all appropriate boxes.

The Subscriber is:

☐ (i) an executive officer or director of a public company[17] or a covered non-public company[18].

If this box is checked, please provide the name and ticker symbol (where applicable) of each such company (include additional sheets if necessary):

________________________________________

________________________________________

________________________________________

☐ (ii) a person who receives material support[19] from an executive officer or director of a public company or a covered non-public company.

If this box is checked, please provide the name and ticker symbol (where applicable) of each such company (include additional sheets if necessary):

________________________________________

[17] A "public company" is any company that is registered under Section 12 of the Exchange Act, or files periodic reports pursuant to Section 15(d) of the Exchange Act.

[18] A "covered non-public company" is any non-public company satisfying the following criteria: (i) income of at least $1 million in the last fiscal year or in two of the last three fiscal years and shareholders' equity of at least $15 million; (ii) shareholders' equity of at least $30 million and a two-year operating history; or (iii) total assets and total revenue of at least $75 million in the latest fiscal year or in two of the last three fiscal years.

[19] The term "material support" means directly or indirectly providing more than 25% of a person's income in the prior calendar year. Persons living in the same household are deemed to be providing each other with material support.

______________________________

______________________________

☐ (iii) an entity (including a corporation, partnership, limited liability company, trust or other entity) in which a person or persons listed in (i) and (ii) above has a beneficial interest[20] (each such person, a "**Restricted Participant**").

If this box is checked, please indicate the company or companies (and ticker symbol(s) where applicable) on whose behalf such executive officers or directors serve and the percentage share of profits or losses attributable to new issues to be received by all Restricted Participants related to each company (include additional sheets if necessary):

| Name and ticker symbol of each such company: | Share of profits: |
|---|---|
| ______________ | ______________ |
| ______________ | ______________ |
| ______________ | ______________ |

☐ (iv) None of the above categories apply and the Subscriber is not a Restricted Investor and is eligible to participate in new issues. The Subscriber does not need to complete Section B below.

**B. Determination of Unrestricted Investor Status.** A Subscriber that is an entity which is deemed a Restricted Investor under Section A may still be able to participate in new issues if it indicates below that it is also an Unrestricted Investor. Please check all appropriate boxes.

The Subscriber is:

☐ (i) an entity (including a corporation, partnership, limited liability company, trust or other entity) in which a Restricted Participant(s) has/have a beneficial interest, but the Subscriber hereby represents and warrants that such Restricted Participant(s) affiliated with the same public company or covered non-public company in aggregate (as to each such public company or covered non-public company) is/are allocated no more than 25% of any profits or losses attributable to new issues received by the Subscriber.

If this box is checked, please indicate the company or companies (and ticker symbol(s) where applicable) on whose behalf such executive officers or directors serve and the percentage share of profits or losses attributable to new issues to be received by all Restricted Participants related to each company (include additional sheets if necessary):

| Name and ticker symbol of each such company: | Share of profits: |
|---|---|
| ______________ | ______________ |
| ______________ | ______________ |
| ______________ | ______________ |

☐ (ii) a publicly-traded entity (other than a broker-dealer or an affiliate of a broker-dealer, where such broker-dealer is authorized to engage in the public offering of new issues either as a selling group member or underwriter) that is listed on a national securities exchange, or is a foreign issuer whose securities meet the quantitative designation criteria for listing on a national securities exchange;

[20] The term "beneficial interest" means any economic interest such as the right to share in gains or losses. The initial receipt of a management or performance-based fee for operating a collective investment account, or other fee for acting in a fiduciary capacity, is not considered a beneficial interest in the account; however, if such payments are accumulated and subsequently invested into the account (as a deferred fee arrangement or otherwise), they would constitute a beneficial interest in that account.

☐ (iii) an investment company registered under the Investment Company Act;

☐ (iv) an investment company organized under the laws of a foreign jurisdiction and:

(a) the investment company is listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority; and

(b) no person owning more than 5% of the shares of the investment company is a Restricted Person;

☐ (v) (A) an employee benefit plan under ERISA that is qualified under Section 401(a) of the Code and that is not sponsored solely by a broker-dealer, (B) a state or municipal government benefits plan that is subject to state and/or municipal regulation or (C) a church plan under Section 414(e) of the Code;

☐ (vi) a tax-exempt charitable organization under Section 501(c)(3) of the Code;

☐ (vii) a common trust fund or similar fund as described in Section 3(a)(12)(A)(iii) of the Exchange Act, and the fund

(a) has investments from 1,000 or more accounts, and

(b) does not limit beneficial interests in the fund principally to trust accounts of Restricted Persons; or

☐ (viii) an insurance company general, separate or investment account, and

(a) the account is funded by premiums from 1,000 or more policyholders, or, if a general account, the insurance company has 1,000 or more policyholders, and

(b) the insurance company does not limit the policyholders whose premiums are used to fund the account principally to Restricted Persons, or, if a general account, the insurance company does not limit its policyholders principally to Restricted Persons.

[*remainder of page intentionally left blank*]

**EXHIBIT 2**

## ADDITIONAL CONTRIBUTION FORM

Rand PE Fund I, L.P.
c/o Administrator
[address to be provided upon request]

Dear Sir or Madam:

The undersigned hereby wishes to make an additional capital contribution ("**Additional Capital Contribution**") to Rand PE Fund I, L.P., a Delaware limited partnership (the "**Partnership**"). Subject to the discretion of the Partnership's general partner, Rand PE Fund Management, LLC, a Delaware limited liability company (the "**General Partner**"), to accept a lower amount, the minimum Additional Capital Contribution is $500,000. The amount of the undersigned's Additional Capital Contribution to Series 1 is: $ 9,253,000.

The undersigned acknowledges and agrees that: (i) the undersigned is making the Additional Capital Contribution on the terms and conditions contained in the Subscription Agreement, dated 12/21/15, previously executed by the undersigned and accepted by the General Partner (the "**Subscription Agreement**"); (ii) the representations of the undersigned contained in the Subscription Agreement are true and correct in all material respects as of the date set forth below; (iii) the undersigned has complied in all material respects through the date set forth below with all covenants contained in the Subscription Agreement; and (iv) the information provided by the undersigned in the Prospective Investor Questionnaire submitted with the Subscription Agreement is true and correct as of the date set forth below. **THE UNDERSIGNED AGREES TO NOTIFY THE PARTNERSHIP PROMPTLY SHOULD THERE BE ANY CHANGE IN ANY OF THE FOREGOING INFORMATION.**

**Dated:** Dec 23, 2015

**For Individuals:**

____________________
Name of Investor (print or type)

____________________
(Signature)

____________________
Name of Joint Investor (print or type) (if applicable)

____________________
(Joint Signature, if applicable)

**For Entities:**

Atlas IDF, LP
Name of Investor (print or type)

By: [signature]
(Signature)

Name: John Honis
Title: Managing Member of the General Partner
(Name and Initials of IRA custodian, if applicable)

**FOR INTERNAL USE ONLY:**

$ 9,253,000.00
Additional Capital Contribution Accepted

Accepted and Agreed, as of Dec 23, 2015.

**RAND PE FUND I, L.P.**
By: Rand PE Fund Management, LLC, as its general partner
(acting severally in the name of and for the account of each individual Series)

By: [signature]
Name: John Honis
Title: Managing Member

**EXHIBIT 2**

# PARTICIPATION AGREEMENT

among

**CROWN GLOBAL LIFE INSURANCE LTD.**

and

**CROWN GLOBAL LIFE INSURANCE LTD.** acting on behalf of each its Separate Accounts set out in Schedule A hereto as may be amended from time to time

and

**ATLAS IDF, LP**

and

**RAND ADVISORS, LLC**

**Dated as of**

**November 30, 2015**

# TABLE OF CONTENTS


Page

ARTICLE I. CERTAIN DEFINITIONS ....1

ARTICLE II. SALE AND WITHDRAWAL OF INTERESTS ....3

ARTICLE III. NET ASSET VALUE ....5

ARTICLE IV. REPRESENTATIONS, WARRANTIES AND COVENANTS ....6

ARTICLE V. INVESTMENT RESTRICTIONS; INFORMATION AND REPORTS; OTHER OBLIGATIONS ....122

ARTICLE VI. EXPENSES. ....13

ARTICLE VII. INDEMNIFICATION ....13

ARTICLE VIII. TERMINATION ....15

ARTICLE IX. NOTICES, REQUESTS OR CONSENTS ....16

ARTICLE X. PRIVACY OBLIGATIONS ....16

ARTICLE XI. MISCELLANEOUS ....17

**THIS PARTICIPATION AGREEMENT** (this "**Agreement**") is made and entered into by and among **CROWN GLOBAL LIFE INSURANCE LTD.** ("**CGLI**"), a Bermuda exempted company registered as a long term Class C insurer, the Company on behalf of each of its separate accounts (and subaccounts, if any, thereof) set forth on Schedule A hereto ("**Schedule A Separate Accounts**" and together with CGIL, the "**Company**"), as the same may be amended from time to time, **ATLAS IDF, LP**, a Delaware limited partnership (the "**Fund**"), and **RAND ADVISORS, LLC**, a Delaware limited liability company (the "**Adviser**") (collectively, the "**Parties**" and each, a "**Party**"), and shall be effective as of the date set forth on the counterpart signature page hereto.

**WITNESSETH:**

**WHEREAS**, the Fund was organized as a private investment vehicle and is offering its limited partnership interests ("**Interests**") to Eligible Insurance Funds and to separate accounts, or subaccounts thereof, that fund Variable Contracts offered by Eligible Insurance Companies, as such terms are defined below;

**WHEREAS**, the offering and sale of Interests will be exempt from registration or qualification under the U.S. Securities Act of 1933, as amended (the "**1933 Act**");

**WHEREAS**, the Company has established a Separate Account, and may in the future establish additional Separate Accounts (and subaccounts thereof) to hold one or more Interests; and

**WHEREAS**, the Company desires to purchase, and the Fund desires to issue, Interests in accordance with this Agreement.

**NOW, THEREFORE**, the Parties agree as follows:

## ARTICLE I. CERTAIN DEFINITIONS

**1.1** "**Business Day**" means each day the NYSE is open for regular trading, unless defined differently on Schedule A-2 hereto.

**1.2** "**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

**1.3** "**Company Contracts**" means those Variable Contracts issued by the Company and listed on Schedule A hereto, as the same may be amended from time to time.

**1.4** "**Compliant Seed Investment**" means an investment in the Fund by the Adviser made in compliance with the Tax Requirements.

**1.5** "**Confidential Information**" as used in this provision means any term of this Agreement, any transaction in connection with this Agreement, and any other non-public information concerning the Parties and their respective businesses and affiliates that may be acquired by reason of this Agreement or any transaction in connection therewith, but shall not include any information that is in or has entered the public domain other than due to a breach of Section 10 hereof.

**1.6** "**Contract PPM**" means offering memorandum, including any amendment, supplement or addendum thereto, as amended from time to time, utilized in connection with the offering of the Company Contracts.

1.7 "**Customer Information**" means any "non-public personal information" (as defined in Regulation S-P of the U.S. Securities and Exchange Commission (the "**SEC**")) about a Policy Owner or prospective Policy Owner. Customer Information includes, but is not limited to, a Policy Owner's (or prospective Policy Owner's) name, social security number and health and financial information.

1.8 "**Eligible Insurance Company**" means a life insurance company that is taxed as a U.S. life insurance company under Subchapter L of the Code and is eligible to purchase and hold Interests under the Tax Requirements.

1.9 "**Eligible Insurance Fund**" means a regulated investment company, real estate investment trust, limited liability company, limited partnership or trust that is eligible to purchase and hold Interests under the Tax Requirements and is in compliance with Revenue Ruling 2005-7.

1.10 "**Fund PPM**" means offering memorandum, including any amendment, supplement or addendum thereto, as amended from time to time, provided by the Fund or the Adviser to the Company in connection with the offering of Interests.

1.11 "**Fund Agreements**" means the Operating Agreement and the subscription documents of the Fund.

1.12 "**Fund Reports**" shall have the meaning set forth in Section 5.2(b) hereof.

1.13 "**Interest Owner**" means (a) any Eligible Insurance Fund that and (b) any separate account (or a subaccount thereof) of an Eligible Insurance Company on behalf of which the Eligible Insurance Company has invested in one or more Interests.

1.14 "**Operating Agreement**" means the Fund's amended and restated limited partnership agreement dated as of the date set forth on Schedule A-2 hereto.

1.15 "**Policy Owner**" means the owner of a Company Contract.

1.16 "**Policy Representative**" means any agent or representative of a Policy Owner, the grantor or beneficiary of any Policy Owner that is a trust, or any agent or representative of such grantor or beneficiary.

1.17 "**Privacy Law**" means any applicable privacy law.

1.18 "**Sales Literature**" means (i) the Fund PPM and reports provided to the Company by the Fund or the Adviser, (ii) any written or other communication distributed or made available to existing or potential investors or their agents or employees, including brochures, circulars, research reports, market letters, form letters, seminar texts, or reprints of or excerpts from any other advertisement, sales literature, or published article, with respect to the Fund, and (iii) any other material regarding the Fund constituting sales literature or advertising, including all offering materials.

1.19 "**Separate Accounts**" means those separate accounts (or subaccounts thereof) established by the Company for the purpose of holding one or more Interests and listed on

Schedule A hereto, as the same may be amended from time to time. Each Separate Account shall be a separate and distinct owner of Interest(s).

**1.20** "**Tax Requirements**" means the requirements of Section 817(h) of the Code, Regulations 1.817-5 thereunder and any amendments or successor provisions thereto.

**1.21** "**Valuation Date**" means the last Business Day of each calendar month.

**1.22** "**Variable Contract**" means a variable life insurance policy, variable annuity policy or other variable insurance policy that is characterized as a "variable contract" under Section 817(d) of the Code.

## ARTICLE II. SALE AND WITHDRAWAL OF INTERESTS

**2.1 Offering and Sale of Interests.**

**(a)** Subject to Section 8.2 and subject to and on the terms of the Fund PPM, the Fund may offer Interests for purchase in any amount by the Company on behalf of the Separate Accounts, subject to the minimum initial investment amount set forth on Schedule A-2 hereto. The Fund may accept additional capital contributions in any amount, subject to the minimum additional investment amount set forth on Schedule A-2 hereto. Capital contributions will be accepted as of the first Business Day of each calendar month or quarter (as specified on Schedule A-2 hereto) (each, a "**Subscription Date**"). The Company shall notify the Adviser of its intent to purchase Interests by providing notice no later than the date and time set forth on Schedule A-2 hereto. The Company shall complete and send to the Fund the Subscription Form set forth in Appendix A. The Company shall not be required to enter into any agreement other than this Agreement and the Fund Agreements in order to purchase Interests.

**(b)** The Fund may suspend or discontinue its offering of Interests solely in conformity with the Fund PPM upon at least the number of days' prior written notice to the Company set forth on Schedule A-2 hereto.

**(c)** The issuance and transfer of Interests shall be by book entry only, and certificates therefor shall not be issued to the Company or the Separate Accounts.

**2.2 Payment for Interests.** The Company shall transmit by wire transfer federal funds in the amount of the purchased Interests to be received by the Fund no later than the date and time set forth on Schedule A-2 hereto. Federal funds received after that time and date shall be held in a subscription account of the Fund's custodian until the next Subscription Date or returned to the Company upon its request.

**2.3 Withdrawal of Interests.**

**(a) General Withdrawal Terms.** Any withdrawal request shall specify the number and value of the Interest(s) to be withdrawn, shall not be less than the amount set forth on Schedule A-2 hereto and shall be subject to any other requirements set forth on Schedule A-2 hereto. Any partial withdrawal of Interest(s) that leaves the value of the Interest(s) held by a Separate Account at less than the amount set forth on Schedule A-2 hereto as of the date of withdrawal shall be deemed a complete withdrawal. (See Appendix

B for Withdrawal Form.) The terms of this Section 2.3(a) shall apply unless otherwise provided in Sections 2.3(b) through 2.3(f) or on Schedule A-2 hereto.

**(b) Standard Withdrawals.** Subject to Section 2.3(f), the Company will be permitted to redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Standard Withdrawal Request**") as of the last day of any calendar month or quarter as set forth on Schedule A-2 hereto (each, a "**Standard Withdrawal Date**") following the lock-up period set forth on Schedule A-2 hereto. The Adviser may waive the notice period in its discretion. The withdrawal proceeds in connection with a Standard Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

**(c) Death Benefit Withdrawals.** Subject to Section 2.3(f), with respect to withdrawals required for the payment of a death benefit, the Company may redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Death Benefit Withdrawal Request**") as of the last day of any calendar month (each, a "**Death Benefit Withdrawal Date**"). The Adviser may waive the notice period in its discretion. The withdrawal proceeds in connection with a Death Benefit Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

**(d) Special Withdrawals.** Subject to Section 2.3(f), with respect to withdrawals required for the payment of any insurance charges and/or expenses of the Company Contracts or as otherwise agreed upon by the Adviser, the Company may redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Special Withdrawal Request**") as of the last day of any calendar month (each, a "**Special Withdrawal Date**"). The Adviser may waive the notice period in its discretion. The withdrawal proceeds in connection with a Special Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

**(e) Withdrawal Events.** Subject to Section 2.3(f), the Company may redeem for cash Interests if any of the following events ("**Withdrawal Events**") occur: (i) the Fund fails to comply with the Tax Requirements, and such noncompliance cannot be cured in a reasonable period of time pursuant to the regulations and proceedings of the U.S. Department of the Treasury (the "**Treasury**") and the U.S. Internal Revenue Service; or (ii) there is a violation of the requirements set forth on Schedule D hereto. The Adviser shall notify the Company as soon as any Withdrawal Event occurs. Upon the occurrence of a Withdrawal Event, the Company may redeem its Interests as of the last day of any calendar month (each, an "**Event Withdrawal Date**") upon not less than 30 days' prior written notice to the Adviser (each such notice an "**Event Withdrawal Request**"). Upon an Event Withdrawal Request, the Fund shall pay 100% of the withdrawal proceeds within 30 days following the Event Withdrawal Date. Event Withdrawal Requests shall not be subject to any lock-up withdrawal requests.

**(f) Limitations on Withdrawal Rights Granted Hereunder.** Notwithstanding the foregoing provisions of this Section 2.3, and any other terms of this Agreement, if the

Adviser determines that compliance with any of the withdrawal and payment rights granted pursuant to this Section 2.3 or any other provisions of this Agreement shall (i) cause it or the Fund to fail to adhere to the Tax Requirements, or (ii) require it to liquidate any asset which is then illiquid and/or part of a Side Pocket Account (as defined in the Operating Agreement), then it may defer such compliance until such failure or requirement shall no longer exist; *provided* that for so long as (x) such condition continues and (y) the Company shall not be receiving payment of any insurance charges and/or expenses of the Company Contracts as a result of such delayed compliance, the Adviser agrees that it shall defer its fees pursuant to Operating Agreement, and such amounts otherwise payable to the Adviser shall instead be paid by the Fund to the Company for such insurance charges and/or expenses.

**2.4 Payment of Withdrawal Proceeds.**

**(a) Payment of Withdrawal Proceeds Generally.** Subject always to any liquidity limitations set out in the Fund PPM, the Fund shall transfer to the Company, or to any person designated by the Company in writing, any withdrawal proceeds via wire transfer in the form of federal funds.

**(b) Payment of Withdrawal Proceeds In-Kind.** The Fund may, but only if permitted by applicable law and in conformity with the Operating Agreement and the Fund PPM, transfer in-kind interests in an underlying investment of the Fund to (i) the Company and/or the Separate Accounts in full or partial satisfaction of any withdrawal request, or (ii) a Policy Owner in full or partial satisfaction of a full or partial surrender of a Company Contract, or to a beneficiary under a Company Contract in full or partial satisfaction of a death benefit payment under such Company Contract; provided, however, that such transfer to a Policy Owner is conducted as a transaction exempt from registration under the 1933 Act. For the avoidance of doubt, notwithstanding the foregoing, the provisions of this Section 2.4(b) shall be subject to the limitations on liquidity and withdrawals, and terms therein on payments with withdrawal proceeds (including, in particular, the payment of withdrawal proceeds in-kind) set forth in in the Fund Agreements.

**2.5 Company Contracts.** The Fund and the Adviser acknowledge and agree that, subject to each Company Contract, CGLI shall have the exclusive right, in its sole discretion, to suspend the offer or sale of any of the Company Contracts or to reject any application for the purchase of any Company Contract.

## ARTICLE III. NET ASSET VALUE

**3.1 NAV Generally.** The Fund shall determine its net asset value (the "**NAV**") on each Valuation Date in the manner prescribed in the Operating Agreement and the Fund PPM. The Adviser shall make the NAV available to the Company in an electronic data file in a format specified by the Company, and shall do so as soon as reasonably practicable after each Valuation Date, and in any event no later than the date and time set forth on Schedule A-2 hereto.

**3.2 Adjustments.** The NAV information provided pursuant to Section 3.1 hereof may be based on estimated values and/or values determined by the Adviser acting in good faith and using reasonable judgment ("**Reasonable Valuations**"), and prospective adjustments shall be made, if necessary, to correct the NAV within a reasonable period of time after the Fund or

the Adviser is in receipt of the Fund's audited financials. No retroactive adjustments shall be made.

## ARTICLE IV. REPRESENTATIONS, WARRANTIES AND COVENANTS

**4.1 Representations, Warranties and Covenants of the Company.** The Company represents and warrants to, and for the benefit of, and covenants and agrees with the Fund and the Adviser that:

**(a)** CGLI is an Eligible Insurance Company that is duly organized, validly existing and in good standing under the laws of Bermuda.

**(b)** The Separate Account(s) are legally and validly established segregated asset accounts (or subaccounts thereof) under the laws of Bermuda (including, without limitation the Bermuda Insurance Act 1978, as amended ("Bermuda Insurance Act") and related rules and regulations and any Bermuda private act to which CGLI or the Separate Accounts are subject), applicable state insurance and tax laws and regulations, and were established by CGIL to set aside and invest premiums attributable to Company Contracts.

**(c)** CGLI has the power and is duly qualified and has all necessary licences, consents, permits and authorities necessary (including those referred to in paragraph 4.1(a) above) to offer and sell the Company Contracts and for the Company to purchase the Interests, all of which are valid and subsisting.

**(d)** The Company shall be an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the 1933 Act (an "**Accredited Investor**"), a "qualified client" within the meaning of Rule 205-3 promulgated under the U.S. Investment Advisers Act of 1940, as amended, and a "qualified purchaser" within the meaning of Section 2(a)(51) of the U.S. Investment Company Act of 1940, as amended (a "**Qualified Purchaser**"; such statute, the "**1940 Act**").

**(e)** The Company Contracts shall be offered and sold, and the Contract PPM and the Fund PPM shall be disseminated to prospective or existing Policy Owners, in compliance in all material respects with all applicable Bermuda, U.S. and other foreign securities, commodities, tax and insurance laws and regulations.

**(f)** CGLI shall sell Company Contracts only to persons that CGLI or its agents reasonably believe to be Accredited Investors and Qualified Purchasers.

**(g)** The Company Contracts shall be treated as Variable Contracts under the Code, provided that the Fund and the Adviser comply with all of the terms of the Operating Agreement and this Agreement, and CGLI shall promptly notify the Fund and the Adviser in writing upon forming a reasonable belief that the Company Contracts will or may no longer qualify for such treatment.

**(h)** The Separate Accounts shall not be subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("**ERISA**").

**(i)** The Contract PPM does not contain any untrue statement of material fact, other than with respect to information provided in writing by the Fund or the Adviser for

inclusion in the Contract PPM. For the avoidance of doubt, the Company is not representing whether the Contract PPM meets the full standards of disclosure contemplated under the 1933 Act, and the U.S. Securities and Exchange Act, as amended, for issuers registered under such Acts, or for issuers that are not so registered.

**(j)** The Company shall not disseminate any information, or make any representation or statement, to any person concerning the offer or sale of Interests or the Company Contracts other than the information, representations and statements contained in the Contract PPM, the Fund PPM, Fund Reports, or any Sales Literature approved by the Adviser for such purposes. This Section 4.1(j) shall not in any way restrict the right of the Company to disseminate materials (such as illustrations) describing the Company, its operations and its products, as well as those materials describing the insurance industry and insurance products generally.

**(k)** The Company shall establish and implement policies and procedures reasonably designed to discharge its obligations under applicable federal laws and regulations regarding money laundering, including, but not limited the Company's Know Your Client (KYC) and due diligence requirements under the Bermuda Proceeds of Crime (Anti-Money Laundering and Anti-Terrorist Financing) Regulations 2008, as amended the regulations of the Treasury and the Executive Orders related to the Treasury's Office of Foreign Assets Control ("**OFAC**"; and, together, the "**AML Procedures**"). The Fund and the Adviser acknowledge that in connection with, and as a complement to its own AML Procedures, where permitted by applicable law, the Company shall be entitled to rely on AML Procedures implemented by third parties with respect to Policy Owners; provided that such acknowledgement shall not limit any rights of the Fund or the advisor relating to AML under the Fund Agreements.

The Company's AML Procedures shall include those reasonably designed to ensure the accuracy of the following representations of the Company:

(i) the identity of each purchaser of a Company Contract has been established by evidence that the Company reasonably believes is genuine;

(ii) the Company reasonably believes that no premium funds tendered for the purchase of a Company Contract are derived directly or indirectly from activities that may contravene relevant U.S. federal or state, or international, laws or regulations related to money laundering; and

(iii) unless the Fund, in its sole discretion, lawfully waives such a requirement, CGIL shall not issue a Variable Contract to any person or entity that the Company reasonably believes, at the time of the possible purchase of the Company Contract, to be:

1. a country, territory, organization, person or entity named in OFAC's List of Specially Designated Nationals and Blocked Persons, as such list may be amended from time to time;

2. a person or entity that resides or has a place of business in a country or territory named on an OFAC list, or that is designated as a

"Non-Cooperative Jurisdiction" by the Financial Action Task Force on Money Laundering, or whose premium funds tendered for the acquisition of a Company Contract are transferred from or through any such country or territory;

3. a "foreign shell bank" as such term is defined in 31 U.S.C. § 5318(j) and Treasury regulations thereunder;

4. a person or entity that resides in, or is organized under, the laws of a jurisdiction designated by the Secretary of the Treasury as a "jurisdiction of primary money laundering concern" pursuant to 31 U.S.C. § 5318A; or

5. a "senior foreign political figure," or a "family member" or "close associate" of a senior foreign political figure as such terms are defined in the *Guidance on Enhanced Scrutiny for Transactions that May Involve the Proceeds of Foreign Official Corruption* issued by the Treasury, unless CGIL has diligently scrutinized the proposed purchase of the Company Contract by or for the benefit of such person and has determined to permit such purchase.

**(l)** The Company shall promptly notify the Fund and the Adviser of any change in the information set forth in this Section 4.1.

**(m)** The Company is not aware of any conflict between this Agreement and any law or regulation to which it may be subject (including under any Bermuda private act).

**4.2 Of the Fund.** The Fund represents and warrants to, and for the benefit of, and covenants and agrees with the Company that:

**(a)** The Fund has been established under the laws of the jurisdiction of its formation and is in good standing thereunder, and qualifies for the exclusion from the definition of "investment company" provided by Section 3(c)(7) of the 1940 Act.

**(b)** The Interests shall be offered and sold in compliance in all material respects with all applicable federal and state laws and regulations.

**(c)** None of the Fund; any predecessor of the Fund; any affiliated issuer of the Fund; any director, executive officer, other officer who is participating in the offering of interests in the Fund, general partner or managing member of the Fund; any beneficial owner of 20% or more of the Fund's outstanding voting equity securities (calculated on the basis of voting power); any promoter connected with the Fund in any capacity; the Adviser; any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of interests in the Fund (a "**Solicitor**"); any general partner or managing member of the Adviser or a Solicitor; or any director, executive officer or other officer who is participating in the offering of interests in the Fund of the Adviser or a Solicitor or general partner or managing member of the Adviser or a Solicitor is subject to any event listed in Rule 506(d)(1).

**(d)** The Fund shall offer and sell Interests only to Eligible Insurance Funds and Eligible Insurance Companies that have certified that they (i) are Accredited Investors and

Qualified Purchasers and (ii) will purchase and hold Interests, directly or indirectly, solely for the benefit of policy owners that they reasonably believe are Accredited Investors and Qualified Purchasers; provided, however, that the Fund may offer and sell Interests to employee benefit plans and other funds subject to ERISA and/or Section 4975 of the Code that meet the requirements of clause (i). Further, the Fund shall, with the exception of any Compliant Seed Investment, issue Interests only to Eligible Insurance Funds and Eligible Insurance Companies with which it has entered into an agreement containing provisions substantially similar to those provisions of this Agreement listed on Schedule A-2 hereto.

**(e)** The Fund shall invest, hold and dispose of its assets in compliance with the Tax Requirements. The Fund or the Adviser shall promptly notify the Company upon forming a reasonable belief that the Fund has ceased, or may cease, to comply with the Tax Requirements, and shall cure any non-conformance within the period for cure afforded by Regulations 1.817-5. The Fund and the Adviser acknowledge that the Fund's compliance with the Tax Requirements is material to their performance under this Agreement.

**(f)** The Fund shall be operated so as to maintain its treatment for U.S. federal income tax purposes as a partnership, or if there is only one Interest Owner, a disregarded entity, under the Code, and the Fund or the Adviser shall promptly notify the Company upon forming a reasonable belief that the Fund has ceased, or may cease, to qualify for such tax treatment.

**(g)** The Fund, the Adviser and their respective officers, directors, employees, principals, affiliates and other representatives shall comply with the requirements set forth on Schedule D hereto so as to prevent any Policy Owner from having "incidents of control" under the Investor Control Doctrine (as defined on Schedule D hereto).

**(h)** The Fund's assets shall be invested in compliance with the investment restrictions set forth on Schedule B hereto, as the same may be modified from time to time pursuant to Section 5.1.

**(i)** The Adviser is and will exercise commercially reasonable best efforts to remain registered with the SEC as an investment adviser; provided that the Adviser shall be deemed to be so registered if it qualifies as a "relying" Adviser. If the Adviser applies to withdraw its registration, the Adviser shall notify the Company at least thirty (30) days prior to the intended effective date of its withdrawal.

**(j)** The Adviser is exempt from registration as a commodity pool operator ("**CPO**") pursuant to CFTC Rule 4.13(a)(3) and shall notify the Company as soon as reasonably practicable upon forming a reasonable belief that such exempt status will change.

**(k)** The Adviser shall have the sole discretionary authority over the Fund's investments and shall manage the Fund in accordance with the Operating Agreement and the Fund PPM; provided that, for the avoidance of doubt, the Fund may invest in Portfolio Funds (as defined in the Fund PPM) and the like, in the manner contemplated in the Fund PPM.

**(l)** The Fund PPM does not contain any untrue statement of material fact, other than with respect to information provided in writing by the Company for inclusion in the Fund PPM. For the avoidance of doubt, the Fund is not representing whether the Fund PPM

meets the full standards of disclosure contemplated under the 1933 Act, and the U.S. Securities and Exchange Act, as amended, for issuers registered under such Acts, or for issuers that are not so registered.

**(m)** No material change shall be made to the Operating Agreement or the Fund PPM (e.g., a change to the Fund's investment objective or strategies) without at least thirty (30) days' prior notice to the Company. Any updates thereto shall be promptly delivered to the Company.

**(n)** Subject to Section 4.1(k), the Fund shall be responsible for anti-money laundering compliance related to its activities, and shall maintain and implement policies and procedures reasonably designed to discharge its obligations under applicable federal laws and regulations regarding money laundering, including, but not limited to, the USA PATRIOT Act of 2001, the regulations of the Treasury and the Executive Orders related to OFAC; provided that for the avoidance of doubt the Fund may delegate such compliance in a manner that is substantially consistent with standard practices of private investment funds in the U.S.

**(o)** The Company shall be provided the most recent audited financial statements of the Fund as soon as reasonably practicable after they become available.

**(p)** Neither the Fund nor the Adviser shall disseminate any information, or make any representation or statement, to any person concerning the Company or the Company Contracts other than the information, representations and statements contained in the Contract PPM, the Fund PPM, any Sales Literature approved by the Company pursuant to Section 5.3, or available in the public domain.

**(q)** Unless the Company otherwise consents, the Fund and the Adviser shall use its commercially reasonable best efforts to ensure that all communications related specifically to the Company Contracts, shall only be between the Company and a Policy Owner or Policy Representative.

**(r)** The Fund shall maintain and implement commercially reasonable procedures to safeguard the confidentiality and integrity of their records with respect to the Fund and the Company.

**(s)** The Fund shall promptly notify the Company upon any change to a service provider to the Company.

**(t)** The Fund is not aware of any conflict between this Agreement and any law or other obligation to which it or the Advisor may not be subject.

**(u)** The Fund shall promptly notify the Company of any change in the information set forth in this Section 4.2.

**(v)** The Fund shall not invest in a "passive foreign investment company" (a "**PFIC**") as defined in Section 1297(a) of the Code unless, prior to making such investment, the Fund has certified to the Company that (i) such PFIC will comply with the requirements of Section 1295(a)(2) of the Code and the Treasury regulations thereunder (e.g., that the PFIC provide its "qualifying electing fund" ("**QEF**") shareholders with a PFIC Annual

Information Statement) or (ii) the Fund will provide information reasonably equivalent to the information contained in a PFIC Annual Information Statement. If the Fund or the Company determines that a PFIC is not in compliance with its QEF reporting requirements, the Fund shall take any steps necessary to cause the PFIC to comply therewith.

**4.3 Of the Adviser.** The Adviser represents, warrants and covenants to the Company that the Adviser shall use reasonable efforts to provide the Company with any information concerning the Adviser that the Company requires in making any filings with any government authority having regulatory authority over the Company.

**4.4 Mutual Representations, Warranties and Covenants.** Each of the Company and the Fund hereto represents and warrants to, and for the benefit of, and covenants and agrees with the other Parties that:

**(a)** it shall use reasonable efforts to cooperate with each other Party and any governmental authority in respect of any such authority's investigation or inquiry concerning this Agreement or any of the transactions contemplated hereby;

**(b)** the Adviser and the Company are not in an affiliate or agency relationship;

**(c)** upon reasonable notice, the execution and delivery of this Agreement and the consummation of the transactions contemplated herein (i) have been duly authorized by all necessary corporate or other formal action by such Party and, when executed and delivered, this Agreement shall be a valid and binding obligation upon such Party enforceable in accordance with its terms; and (ii) the transactions contemplated thereto do not and will not violate, conflict with or constitute a default under any requirement of any law or any regulation of Bermuda, the U.S. or otherwise (including, without limitation, any Bermuda private act);

**(d)** except as otherwise set forth herein, the provisions of this Agreement shall be deemed to control in the case of any conflict between the provisions of this Agreement and the provisions of the Fund PPM, Operating Agreement, or any other agreement entered into between the Company and the Fund or the Adviser;

**(e)** the Operating Agreement and the Fund PPM, as currently in effect, shall have been delivered to the Company prior to the signing of this Agreement; and

**(f)** the representations, warranties and covenants contained in this Agreement and the Fund Agreements (collectively, the "**Party Documents**") are the only representations, warranties and covenants that have been made by any Party to any other Party, and in entering into this Agreement, each Party has relied solely on the information contained in the Party Documents or that it obtained by its own independent investigation.

**4.5 Duration.** The representations, warranties and covenants contained in this Article IV shall be deemed continuing at all times until the termination of this Agreement.

## ARTICLE V. INVESTMENT RESTRICTIONS; INFORMATION AND REPORTS; OTHER OBLIGATIONS

**5.1 Revision of Investment Restrictions.** The investment restrictions of the Company are as set forth on Schedule B hereto. The Company shall be permitted to request a change in such investment restrictions only if such change is necessitated by a change in the laws, regulations or interpretations thereof to which the Company is subject. The Company shall make a request for a change in its investment restrictions in writing to the Fund and the Adviser. If the Adviser determines in its absolute discretion that causing the Fund to comply with the revised investment restrictions proposed by the Company is in the best interests of the Interest Owners, the Parties shall amend Schedule B hereto accordingly. If the Adviser determines otherwise, it shall notify the Company within thirty (30) days of such determination.

**5.2 Provision of Reports and Information.** The Company shall provide to the Adviser, upon request, a specimen copy of the Contract PPM and each Company Contract. The Fund shall on a timely basis provide to the Company the following without charge:

**(a)** a current copy of the Fund PPM (and any amendment or supplement thereto) in any form the Company may reasonably request;

**(b)** electronic copies of those reports and other communications that the Fund provides to its Interest Owners, including its periodic performance reports (collectively, the "**Fund Reports**");

**(c)** any reports and information that the Company requires as a U.S. taxpayer; and

**(d)** any other documents that the Company may reasonably request of the Fund, including, but not limited to, its governing instruments, tax reports, marketing materials, and any government filings and updates and amendments thereto, including, but not limited to, the Adviser's Form ADV; provided that neither the Fund nor the Adviser need supply any agreements or documents of the Fund or the Adviser that are confidential.

**5.3 Review of Sales Literature.** Neither the Fund, the Adviser nor any person acting on their behalf shall use any Sales Literature in which the Company is named without the consent of the Company which shall not be unreasonably withheld or delayed.

**5.4 Distribution of Certain Information by the Company.** The Company shall be permitted, without further review or consent of the Fund or the Adviser, to deliver to Policy Owners, prospective Policy Owners, and their agents and representatives, the Fund PPM (and any amendments or supplements thereto), Fund Reports and any Sales Literature approved for such purposes by the Adviser.

**5.5 Provision of Information Prior to Signing of Agreement.** Prior to signing this Agreement, the Adviser has provided the Company with its most recent Form ADV, and any amendments thereto, as filed with the SEC.

Prior to signing this Agreement, the Fund or the Adviser has provided the Company with (a) the name and address of the Fund's independent auditor(s) and (b) upon the Company's

request, a consent and authorization for the Company to contact the auditor(s) for information reasonably required about the auditor(s) and its/their relationship with the Fund and the Adviser. At any time the Fund retains a different independent auditor, the Fund or the Adviser shall provide the Company with the same consent and authorization upon request. For avoidance of doubt, the Company shall not be entitled to obtain access to the Fund's books and records pursuant to this Section 5.5.

Prior to signing this Agreement, CGIL has provided the Fund with its Class C certificate of registration issued to it by the Bermuda Monetary Authority and any directions and/or approvals relating to it issued by the Bermuda Monetary Authority pursuant to the Bermuda Insurance Act.

**5.6 Certification of Investment Diversification.** As soon as reasonably practicable after the end of each calendar quarter, but in no event later than the number of days after the end of such calendar quarter set forth on Schedule A-2 hereto, the Adviser shall deliver to the Company a written certification in the form of Schedule C hereto.

## ARTICLE VI. EXPENSES

**6.1 Expenses Borne by the Company.** The Company shall bear all of the costs incurred in connection with the (i) filing and qualification of the Company Contracts under any applicable state insurance or securities laws; (ii) preparation of the Contract PPM and any other necessary disclosure documents or regulatory filings with respect to the Company Contracts or the Separate Accounts; (iii) preparation and dissemination to Policy Owners of Fund Reports and of all statements, notices or other documents required by applicable federal and state laws and regulations; (iv) dissemination of the Fund PPM to Policy Owners and prospective Policy Owners; and (v) performance of its obligations under this Agreement.

**6.2 Expenses Borne by the Fund.** The Fund shall bear all of the costs incurred in connection with the offering and sale of Interests to Interest Owners and the performance of its obligations under this Agreement, in addition to the other expenses it bears pursuant to the Operating Agreement and the Fund PPM.

## ARTICLE VII. INDEMNIFICATION

**7.1 Indemnification of Fund Parties.** The Company shall indemnify and hold harmless the Fund and the Adviser (collectively, the "**Fund Parties**" and each, a "**Fund Party**"), against any and all claims, losses, damages or expenses, including without limitation any judgment, settlement, reasonable attorney's and accountant's fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding (collectively, "**Claims**" and each, a "**Claim**"); provided, however, that a Fund Party shall be entitled to indemnification in respect of a Claim only if:

**(a)** the Claim does not arise out of its or another Fund Party's willful misfeasance, bad faith, gross negligence or breach of, or material failure to fulfill any of its representations, warranties or covenants contained herein, and

**(b)** the Claim arises out of, or is based upon, one of the following:

(i) the Company's fraud, willful default or gross negligence in performing its obligations under this Agreement; or

(ii) the Company's breach of, or material failure to fulfill, any representation, warranty, or covenant contained herein, or any material misrepresentation in connection therewith.

**7.2 Indemnification of Company Parties.** The Fund shall indemnify and hold harmless the Company and the Separate Accounts (collectively, the "**Company Parties**" and each, a "**Company Party**"), against any and all Claims; provided, however, that a Company Party shall be entitled to indemnification in respect of a Claim only if:

**(a)** the Claim does not arise out of its or another Company Party's willful misfeasance, bad faith, gross negligence or breach of, or material failure to fulfill to satisfy any of its representations, warranties or covenants contained herein, and

**(b)** the Claim arises out of, or is based upon, one of the following:

(i) the fraud, willful default or gross negligence of a Fund Party in performing its obligations under this Agreement; or

(ii) the breach of, or material failure to fulfill, by any Fund Party any representation, warranty, or covenant contained herein, or any material misrepresentation in connection therewith.

**7.3 Other Indemnification Provisions.** No indemnification, hold harmless, limitation of liability or similar provision in the Fund's Certificate of Formation, the Operating Agreement or any agreement to which the Fund or the Adviser is a party shall preclude or serve as a defense to the indemnification by the Fund of a Company Party pursuant to Section 7.2.

**7.4 Notice of Claim of Indemnification.** A Fund Party or Company Party seeking indemnification under this Article VII (an "**Indemnified Party**") shall give the Party obliged to provide indemnification under this Article VII (an "**Indemnifying Party**") written notice within a reasonable time after the Indemnified Party receives notice of a Claim; provided, however, that a failure to provide, or delay in providing, such notice shall not relieve the Indemnifying Party of any obligation it may have under this Article VII to indemnify the Indemnified Party, unless such failure or delay is the sole or primary cause of the Indemnifying Party's inability to effectively defend against the Claim and materially disadvantages the Indemnifying Party.

**7.5 Assumption of or Participation in Defense Against Claims.** In any situation where an Indemnified Person is directly involved in defending against a Claim, an Indemnifying Party shall be entitled to, at its own expense, (i) participate in the defense of the Claim or (ii) assume the defense against the Claim with counsel reasonably satisfactory to the Indemnified Party. If the Indemnifying Party elects to assume the defense of a Claim, the Indemnifying Party shall, after notice to the Indemnified Party of such election, have no obligation to bear any subsequent fees and expenses independently incurred by the Indemnified Party in connection with the defense of the Claim (excluding reasonable costs of investigation), except that the Indemnifying Party shall be liable for reasonable fees and expenses associated with additional counsel retained by the Indemnified Party where the Indemnifying Party and the Indemnified

Person are both parties to the Claim and their representation by the same counsel would be inappropriate due to an actual or potential conflict of interests. Any assumption or participation in the defense of a Claim pursuant to this Section 7.5 shall not be construed as, or be deemed to create a presumption or inference of, an admission of liability or responsibility by the Indemnifying Party, and shall not estop or otherwise limit the Indemnifying Party from contesting liability in respect of the Claim.

**7.6 Settlements.** An Indemnifying Party shall not be obliged to indemnify an Indemnified Party for the settlement of any Claim that is effected without the former's prior written consent. An Indemnifying Party may settle any Claim on behalf of an Indemnified Party without the Indemnified Party's consent; provided, however, that the settlement involves solely the payment of damages, such damages are fully paid and results in a total release of the Indemnified Party from the Claim. To the extent that its consent to a settlement is required, an Indemnified Party shall not unreasonably withhold its consent to any settlement not involving injunctive relief.

**7.7 Successors.** A successor to any Party shall be entitled to all of the benefits, and shall be subject to the burdens, of this Article VII.

**7.8 Survival.** This Article VII shall survive the termination of this Agreement including, without limitation, a termination by reason of the breach or alleged breach of any representation, warranty or covenant of this Agreement.

## ARTICLE VIII. TERMINATION

**8.1 Termination Generally.** Except as otherwise set forth in this Article VIII, no term of this Agreement shall terminate until the Separate Accounts no longer hold any Interests.

**8.2 Effectiveness of Termination of Offering Obligation.** A termination of the Offering Obligation pursuant to Section 8.2(a) shall take effect immediately. A termination pursuant to Section 8.2(b), (c), (d), (e) or (f) shall be effective immediately after the Fund provides notice to the Company of such termination.

**8.3 Mandatory Withdrawal.** The Fund shall have the right to require the Company, upon at least the number of days' prior written notice to the Company set forth on Schedule A-2 hereto, to redeem any Interest(s) attributable to any Company Contract that ceases to qualify as a Variable Contract or that the Fund reasonably believes will fail to so qualify. The timing of such mandatory withdrawal shall be specified in the Fund's notice to the Company and shall be determined with reference to Section 817(h) of the Code.

**8.4 Termination by Company.** Notwithstanding anything in this Agreement to the contrary, either the Fund or the Company may terminate this Agreement immediately and without penalty to such party:

> **(a)** from the date hereof until November 30, 2017, upon at least 30 days' prior written notice to the Fund and the Adviser, or
>
> **(b)** if the Fund or the Adviser has materially breached a representation, warranty or covenant under this Agreement and has failed to cure such breach after being given a reasonable opportunity to cure; provided, however, that the Company need not provide the

Fund or the Adviser a reasonable opportunity to cure if the material breach may, in the Company's reasonable judgment, materially and adversely affect the Company or any of its Separate Accounts or Company Contracts, or any regulatory authority, including, but not limited to, the SEC and any state regulatory authority, has instituted a formal proceeding against the Fund or the Adviser, and the anticipated outcome of such proceeding would, in the Company's reasonable judgment, materially impair the Fund's or the Adviser's ability to perform its obligations under this Agreement or under the Operating Agreement.

## ARTICLE IX. NOTICES, REQUESTS OR CONSENTS

**9.1** Any notice, consent, request or other communication required or permitted by this Agreement (a "**Communication**") to the Fund or the Adviser shall be sent to its address set forth on Schedule A-2 hereto or such other address as the Fund or the Adviser shall designate in writing to the other Parties. Any Communication to the Company required or permitted by this Agreement shall be sent to the address set forth below. Every Communication shall be in writing; shall be sent by registered or certified U.S. mail with return receipt requested, by overnight delivery with a nationally recognized courier, or by electronically transmitted facsimile or other electronic transmission, including electronic mail, with confirmed electronic receipt; and shall be effective upon the earlier of actual receipt and the 10th Business Day after sending.

| | |
|---|---|
| **If to the Company**: | Crown Global Life Insurance Ltd.<br>Canon's Court<br>22 Victoria Street<br>Hamilton HM 12<br>Bermuda |
| With a copy to: | Crown Global Life Insurance (Cayman) Ltd<br>Landmark Square, 2nd Floor<br>64 Earth Close, SMB, P.O. Box 10467<br>Grand Cayman KY1-1004<br>Cayman Islands |

**9.2** Each Party may rely conclusively upon, and shall not incur any liability for any action taken in reliance upon, any Communication that it reasonably believes, in good faith, to be genuine and properly authorized by another Party.

## ARTICLE X. PRIVACY OBLIGATIONS

**10.1** The Company is, and each of the Fund and the Adviser may be, a financial institution subject to Privacy Law. To the extent that a Party is subject to Privacy Law, it shall not use or disclose any Customer Information received from another Party unless such use or disclosure is:

**(a)** required by law, regulation or rule, or permitted by Privacy Law;

**(b)** necessary to carry out the purposes for which the Party was given the Customer Information; or

**(c)** authorized by the express written consent of the Policy Owner or prospective Policy Owner to which the Customer Information relates, where such consent specifies the purposes for which such Customer Information may be used or disclosed.

**10.2** Each Party shall establish and maintain safeguards against any unauthorized access to, or destruction, loss or alteration of, any Customer Information in its possession or control, which safeguards must be at least as rigorous as those the Party uses to secure its own information of a similar nature.

**10.3** Notwithstanding anything in this Agreement to the contrary, including Section 11.7, each Party is expressly authorized hereby to disclose to any person, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated herein and all materials related thereto that are or were provided to such Party.

**10.4** Each Party agrees to keep confidential any Confidential Information that such Party may acquire as a result of this Agreement or any transaction in connection therewith and to ensure that no such Confidential Information is disclosed to or utilized by any of such Party's affiliates or any of its or their respective officers, directors, employees, agents or other representatives (each, a "**Relevant Person**") except for the purpose of permitting a Party to perform its obligations and/or enforce such Party's rights under this Agreement, the Fund Agreements or any transaction in connection therewith or pursuant to this Section 10 and Section 11.4 hereof.

## ARTICLE XI. MISCELLANEOUS

**11.1 Governing Law.** It is the intention of the Parties that the internal laws of Bermuda, as the same may be amended from time to time, shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the Parties.

**11.2 Entire Agreement.** This Agreement, together with any amendments hereto and any other agreements referred to herein (including, without limitation, the Fund Agreements), shall constitute the entire agreement among the Parties with respect to the subject matter hereof, and shall supersede any prior agreement or understanding, oral or written, among the Parties with respect to the subject matter hereof.

**11.3 Waiver.** A Party's failure to insist, or delay in insisting, upon another Party's performance of any term of this Agreement shall not be construed as a waiver of the performance of such term.

**11.4 Access to Books and Records.** Each Party shall, upon request, provide each other Party and any governmental authority with reasonable access to its books and records to the extent that such request relates to a governmental authority's investigation or inquiry concerning this Agreement or any of the transactions contemplated herein. To the extent permitted by applicable law, the access provided pursuant to this Section 11.4 shall not extend to any attorney work product or information protected by the attorney-client privilege.

**11.5 Assignment.** No Party shall assign any right or obligation under this Agreement to a third party without the prior written consent of all of the Parties, which consent shall not be unreasonably withheld. Notwithstanding the previous sentence, the Company may assign,

without the consent of the Fund or the Adviser, any right or obligation under this Agreement to another insurance company that controls, is controlled by or under common control with the Company; provided, however, that the Company provides the Fund and the Adviser with notice as soon as reasonably practicable after such assignment.

**11.6 Third-Party Beneficiary.** This Agreement is not intended to and shall not convey any rights to persons not party to this Agreement.

**11.7 Confidentiality.** No Party shall disclose the terms of this Agreement to any persons not party to this Agreement, except that a Party may disclose the terms of this Agreement to comply with a legal or regulatory requirement or request, or to its representatives where such disclosure is necessary to the Party's performance of its obligations under this Agreement; provided that the Company agrees and acknowledges the disclosures concerning the subject matter hereof set forth in the Fund PPM, and disclosures of a similar nature.

**11.8 Amendment.** No amendment or modification to this Agreement shall be binding upon any Party unless reduced to a writing signed by all of the Parties.

**11.9 Rights and Remedies.** The rights, remedies and obligations contained in this Agreement are in addition to any and all rights, remedies and obligations, at law or in equity, to which the Parties are entitled under state and federal laws.

**11.10 Severability.** In the event that any provision of this Agreement shall be declared invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of the other provisions of this Agreement, it being hereby agreed that such provisions are severable and that this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

**11.11 Headings.** The headings in this Agreement are inserted for convenience of reference only and shall not be considered part of this Agreement or affect this Agreement's interpretation.

**11.12 Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and which together shall constitute one and the same instrument.

**SIGNATURE PAGE FOLLOWS**

IN WITNESS WHEREOF, each of the Parties hereto has caused this Participation Agreement to be executed in its name and on its behalf by its duly authorized representative hereto as of November 30, 2015.

**CROWN GLOBAL LIFE INSURANCE LTD.,**

By: [signature]

Name: TERRIA GODWIN

Title: Director

By: [signature]

Name: Avi Hasen

Title: Director

**CROWN GLOBAL LIFE INSURANCE LTD.**, on behalf of each of its Separate Accounts, as set out in Schedule A hereto as may be amended from time to time.

By: [signature]

Name: TERRIA GODWIN

Title: Director

By: [signature]

Name: Avi Hasen

Title: Director

**ATLAS IDF, LP**

By: Atlas IDF GP, LLC, it general partner

By: [signature]

Name: John Harris

Title: Managing Member

**RAND ADVISORS, LLC**

By: [signature]

Name: John Harris

Title: Managing Member

# SCHEDULE A

As of November 30, 2015

## SEPARATE ACCOUNTS AND ASSOCIATED POLICIES

| No. | Name of Separate Account and each Subaccount, if any, thereof: | Form Nos. of Policies Funded by Separate Account: |
|---|---|---|
| | | |

**SCHEDULE A-2**
**As of November 30, 2015**

**SUPPLEMENT TO PARTICIPATION AGREEMENT**

FUND: Atlas IDF, LP
ADVISER: Rand Advisors, LLC

To the extent that the information below is also provided in the Fund PPM or the Operating Agreement, the parties agree that the information below is the same as the information contained in the Fund PPM or Operating Agreement and is provided for ease of reference.

| | |
|---|---|
| **Section 1.2**<br>"Business Day" | No change to standard definition. |
| **Section 1.13**<br>"Operating Agreement" | Dated as of November 30, 2015. |
| **Section 2.1(a)**<br>Minimum Initial and Additional Investment Amounts / Notice of Intent to Purchase / "Subscription Date" | Minimum initial investment amount: $500,000 or as otherwise consented to in writing by Adviser<br><br>Minimum additional investment amount: $500,000, or as determined by the Adviser in its sole discretion.<br><br>The Company shall notify the Adviser of its intent to purchase Interests by providing notice no later than 12:00 am Eastern time on the 3rd Business Day prior to the relevant Subscription Day.<br><br>The Subscription Date shall be the first Business Day of each calendar month. |
| **Section 2.1(b)**<br>Suspension or Discontinuation of Offering | The Fund may suspend or discontinue its offering of Interests at the discretion of the Adviser upon at least **30** Business Days' prior written notice to the Company. |
| **Section 2.2**<br>Payment for Interests | The Company shall transmit by wire transfer federal funds in the amount of the purchased Interests to be received by the Fund no later than 5:00pm Eastern time on the 3rd Business Day prior to the relevant Subscription Day. |
| **Section 2.3(a)**<br>General Withdrawal Terms | <u>Minimum withdrawal amount</u>: $100,000<br><br>Any partial withdrawal of Interest(s) that leaves the value of the Interest(s) held by a Separate Account at less than $500,000 as of the date of withdrawal shall be deemed a complete withdrawal.<br><br><u>Payment of Withdrawal Proceeds</u>: For the avoidance of doubt, such withdrawals may be satisfied by payments in kind in accordance with the terms of this Agreement. |
| **Section 2.3(b)**<br>Standard Withdrawals | <u>Notice Period</u>: 91 days<br><br><u>Standard Withdrawal Date</u>: Last day of each calendar quarter. |

| | |
|---|---|
| | Lock-up Period: 12 months.<br><br>Payment of Withdrawal Proceeds: 90% of the withdrawal proceeds shall be paid within 90 days following the Standard Withdrawal Date. The balance of the amount payable upon such withdrawal will be paid, without interest, within 90 days after completion of the audited financial statements for the fiscal year in which the withdrawal occurs.<br><br>Payment of Withdrawal Proceeds: For the avoidance of doubt, such withdrawals may be satisfied by payments in kind in accordance with the terms of this Agreement. |
| **Section 2.3(c)**<br>Death Benefit Withdrawals | Notice Period: 91 days prior to Death Benefit Withdrawal Date on prior written notice to the Adviser.<br><br>Death Benefit Withdrawal Date: Last day of any calendar quarter.<br><br>Payment of Withdrawal Proceeds: 100% of the withdrawal proceeds shall be paid as soon as reasonably practicable, but in no case more than 330 days following the Death Benefit Withdrawal Date. For the avoidance of doubt, such withdrawals may be satisfied by payments in kind. |
| **Section 2.3(d)**<br>Special Withdrawals | Notice Period: 91 days prior to a Special Withdrawal Date prior written notice to the Adviser.<br><br>Special Withdrawal Date: Last day of each calendar quarter.<br><br>Payment of Withdrawal Proceeds: 100% of the withdrawal proceeds shall be paid within 90 days following the Special Withdrawal Date. |
| **Section 3.1**<br>NAV Generally | The Adviser shall make the NAV available to the Company no later than 12am Eastern time on the 20th Business Day following each Valuation Date. |
| **Section 4.3(a)**<br>Errors and Omissions Insurance Policy | The Fund shall obtain commercially reasonable coverage in favor of the Adviser, within a reasonable period following the execution of this Agreement. |
| **Section 5.6**<br>Certification of Investment Diversification | The Adviser shall deliver the certification required by Section 5.6 no later than 20 Business Days after the end of the calendar quarter following the quarter to which such certification relates. |
| **Section 8.4**<br>Mandatory Withdrawal | The Fund must provide the Company with at least 5 days' prior written notice of a Mandatory Withdrawal. |
| **Section 9.1**<br>Notices, Consents, Requests or Other Communications | **If to the Fund:**<br>Atlas IDF, LP<br>c/o Atlas IDF GP, LLC<br>87 Railroad Place, Suite 403<br>Saratoga Springs, New York 12866<br><br>**If to the Adviser:**<br>Rand Advisors, LLC<br>87 Railroad Place, Suite 403<br>Saratoga Springs, New York 12866 |

**SCHEDULE B**
**As of November 30, 2015**

**INVESTMENT RESTRICTIONS**

The Company will not participate in the allocation of gains or losses derived from "New Issues" as defined in the Rules of the U.S. Financial Industry Regulatory Authority ("**FINRA**"), except that the Fund, in its sole discretion, may allocate de minimis levels of such gains or losses in a manner consistent with applicable FINRA Rules.

## SCHEDULE C

## FORM OF COMPLIANCE CERTIFICATION

This compliance certificate ("**Compliance Certificate**") is given by Rand Advisors, LLC, as the adviser (the "**Adviser**") of Atlas IDF, LP (the "**Fund**"), pursuant to Section 5.6 of that Participation Agreement, dated as of November 30, 2015, among the Fund, the Adviser, Crown Global Life Insurance Ltd. ("**CGLI**"), a Bermuda exempted company registered as a long term Class C insurer, the Company (on behalf of each of its separate accounts (and subaccounts, if any, thereof) set forth on Schedule A of the Participation Agreement (as defined below), as such Schedule A may be amended from time to time) ("**Schedule A Separate Accounts**" and together with CGIL, the "**Company**")), as the same may be amended, restated, supplemented or otherwise modified from time to time (the "**Participation Agreement**"). Capitalized terms used, but not defined, in this Compliance Certificate shall have the meanings set forth in the Participation Agreement.

By executing this Compliance Certificate, the Adviser certifies that, as of the calendar quarter ended **[**March 31/June 30/September 30/December 31**]**, 201[-]:

1. The Fund's assets have been invested in compliance with the diversification requirements of Regulations 1.817-5(b) under the Code.

a. No more than 55% of the value of the total assets of the Fund is represented by any one investment;

b. No more than 70% of the value of the total assets of the Fund is represented by any two investments;

c. No more than 80% of the value of the total assets of the Fund is represented by any three investments; and

d. No more than 90% of the value of the total assets of the Fund is represented by any four investments.

| **Diversification Test** | **Name of Issuer** | **% of Total Assets** | **Cum %** | **Test** |
|---|---|---|---|---|
| Largest Issuer | [Issuer one] | x.xx% | x.xx% | < 55% TA |
| Second Largest Issuer | [Issuer two] | x.xx% | x.xx% | < 70% TA |
| Third Largest Issuer | [Issuer three] | x.xx% | x.xx% | < 80% TA |
| Fourth Largest Issuer | [Issuer four] | x.xx% | x.xx% | < 90% TA |

2. If the Fund relied on the "look through" provision of Regulation 1.817-5(f), the investments of any underlying investment vehicle must be sufficiently diverse to permit the Fund to comply with the diversification requirements of Regulation 1.817-5(b).

3. The Adviser has in all respects complied with the requirements set forth on Schedule D to the Participation Agreement.

4. The Adviser has reviewed the foregoing statements and certifies that they are true and correct.

IN WITNESS WHEREOF, the Adviser has caused this Compliance Certificate to be executed by one of its authorized officers this ____ day of ________________, 201__.

**Rand Advisors, LLC**

Authorized Signature: ____________________________

Name: ____________________________

## SCHEDULE D

## INVESTOR CONTROL REQUIREMENTS

The Adviser and each of its officers, employees, agents, affiliates or sub-advisers that is in any capacity responsible for, or involved in the determination of, the Fund's investments or investment objective, strategies or policies (each, an "**Adviser Party**"), shall not take any action that would cause any Policy Owner or Policy Representative (together with such Policy Owner, a "**Policy Party**") to be deemed to have such incidents of control as would cause the Fund's income and gains to be currently taxable to the Policy Owner pursuant to the "Investor Control Doctrine" as set forth in Revenue Rulings 77-85, 80-274, 81-225, 82-54, 2003-91, 2003-92, or 2007-7, or described in other materials published by the U.S. Department of the Treasury or the U.S. Internal Revenue Service. In seeking to ensure that no Policy Party is deemed to have incidents of control, each Adviser Party shall at all times act in compliance with the requirements of this Schedule D, as set forth below:

1. All decisions involving the investment of the Fund's assets shall be made by the relevant Adviser Party in its sole and absolute discretion, without any direct or indirect input from any Policy Party.

2. No Adviser Party shall enter into, directly or indirectly, any agreement, plan or other arrangement, whether written or otherwise, with a Policy Party regarding (i) the Fund's investments or investment objective, strategies or policies; (ii) the availability of the Fund as an investment option under the Policy Owner's policy; or (iii) the assets to be held by the Fund.

3. To the extent that the Adviser provides information (i) to a prospective Policy Owner or representative thereof as part of a direct or indirect sale of a Variable Contract, or (ii) to the Company for the Company to communicate with a Policy Party, any Adviser Party may describe: (a) the past performance of the Fund or related performance information with respect to the Fund; (b) its general view of market and industry trends (e.g., its belief that interest rates will rise in the short-term or that technology stocks are over-valued); (c) the background, education and past employment of its staff, including the performance of other funds under its management; and (d) other due diligence information that the Adviser generally provides to prospective investors with respect to the Adviser's other funds and accounts so long as such information does not relate to the quality or rate of return of any investment or group of investments of the Fund.

4. Without limiting the foregoing, no Adviser Party shall knowingly discuss, communicate or solicit in any manner, whether directly or indirectly, the views of any Policy Party on the current or future investments, objectives, strategies or policies of the Fund, either in general or specific terms.

5. No Adviser Party shall at any time be affiliated with a Policy Party; provided, however, that an Adviser Party may maintain such an affiliation if it establishes, pursuant to a legally binding written agreement, procedures to prevent any communication prohibited by this Schedule D.

6. The Company understands that the Adviser provides investment management services to a variety of clients outside the context of Variable Contracts. The Company further understands that the Adviser may provide such services to clients that are Policy Parties. The Adviser recognizes that these relationships could present an opportunity for a Policy Party to communicate with any Adviser Party concerning the Fund in a manner prohibited by this Schedule D. The Adviser shall take appropriate steps to comply with this Schedule D in the context of any such relationships.

# APPENDIX A

**Instructions:**

A completed and signed copy of the Subscription Form must be delivered by electronic mail to:

jhonis@randadvisors.com

**Payment Instructions for Subscription:**

All contributions should be made by wire transfer to the following account:

[bank name/address]
ABA:
ABA:
For the account of:

Account No.:
For further credit to the account of: [ ]
Account No.: [ ]
Ref: [subscriber's name]

After you have given your bank these wire instructions, please notify the Fund of the exact amount and date of your wire using the contact information above. Doing so will help us identify your payment and credit it to the appropriate account.

**APPENDIX A (Continued)**
**SUBSCRIPTION FORM**
**FOR ATLAS IDF, LP**

**Subscriber's Name:**

Crown Global Life Insurance Ltd. on Behalf of Separate Account ________, ________ Division [Fund #].

**Tax I.D. Number:** ________________

**Type of entity (check one):**
☐ *Corporation*
☐ *Other (________________)*

**Subscription Amount in US $** ____________ **Policy/Series Identifier (if any):** ____________
☐ *Initial Subscription (minimum US $[_____])**
☐ *Additional Subscription (minimum US $[_____])**

**Date of Investment:** ___/___/___

**Subscriber's Domicile Address:**
Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

*Contact Name:* [________________]
*Tel:* [________________]
*Fax:* [________________]
*E-Mail:* [________________]

**Subscriber's Mailing Address:**
Landmark Square, 2nd Floor
64 Earth Close
P.O. Box 10467
Grand Cayman KY1-1004
Cayman Islands

*Contact Name:* [________________]
*Tel:* [________________]
*Fax:* [________________]
*E-Mail* [________________]

* Each subscription shall be treated as a separate Interest/Capital Account.

---

**Subscriber's Wiring Instructions from which funds will originate:**
*Bank* ____________________
*ABA #* ____________________
*For the Account of* ____________________
*Account #:* ____________________
*Reference:* ____________________

CROWN GLOBAL LIFE INSURANCE LTD., on behalf of itself and each of the Accounts named above.

| | |
|---|---|
| By: ____________________________ | By: ____________________________ |
| Name: | Name: |
| Title: | Title: |

________________
Date of Execution

**APPENDIX B**
**WITHDRAWAL FORM**
**FOR ATLAS IDF, LP**

Date:____________

To:

[Tel.: ]
[Fax: ]
Attn: [contact name]

The undersigned hereby requests to redeem the amounts specified below on the next available date following the Fund's receipt of this Withdrawal Request.

**Subscriber's Name:**

____Crown Global Life Insurance Ltd.______ on Behalf of Separate Account _________, __________ Division [Fund #].

**Policy/Series Identifier (if any):** ________________________

**Withdrawal Amount:**
☐ *Full Withdrawal*
☐ *Partial Withdrawal* – Amount in US$* ________________________
*(minimum US $100,000)*

**Type of Withdrawal:**
☐ *Standard Withdrawal* ☐ *Special Withdrawal*
☐ *Death Benefit Withdrawal* ☐ *Event Withdrawal*

**Date of Withdrawal** ___/___/___

**Subscriber's Domicile Address:**
Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

*Contact Name:* [____________________]
*Tel:* [____________________]
*Fax:* [____________________]
*E-Mail:* [____________________]
*Crown Global Life Insurance Ltd.*

**Subscriber's Mailing Address:**
Landmark Square, 2nd Floor
64 Earth Close
P.O. Box 10467
Grand Cayman KY1-1004
Cayman Islands

*Contact Name:* [____________________]
*Tel:* [____________________]
*Fax:* [____________________]
*E-Mail* [____________________]

* Any partial withdrawal of Interest(s) that leaves the value of the Interest(s) held by an Account at less than **$500,000** as of the date of withdrawal shall be deemed a complete withdrawal.

---

**Subscriber's Wiring Instructions from which funds will originate:**
*Bank* ________________________
*ABA #* ________________________
*For the Account of* ________________________
*Account #:* ________________________
*Reference:* ________________________

CROWN GLOBAL LIFE INSURANCE LTD., on behalf of itself and each of the Accounts named above.

| | |
|---|---|
| By: ______________________________ | By: ______________________________ |
| Name: | Name: |
| Title: | Title: |

_________________

Date of Execution

**EXHIBIT 2**

CROWNGLOBAL
INSURANCE

Deferred Variable Annuity Policy

**This Policy is a Deferred Variable Annuity (DVA) Policy. This Policy is Non-Participating.** Crown Global Life Insurance Ltd., a Bermuda Class C insurance company, will pay, subject to the provisions of this Policy, the Annuity Payments to the Beneficiaries as provided by this Policy, provided that the Policy is In Force.

Signed for the Insurer at its Home Office located at Hamilton, Bermuda on the Issue Date.

12/15/15 Ken Goertzen, [signature]

12/16/15 Tanita Burke, [signature]

**THIS IS A LEGAL CONTRACT.**
**PLEASE READ IT CAREFULLY.**

THE INSURER IS INCORPORATED IN BERMUDA AND IS REGISTERED AS A CLASS C INSURER IN BERMUDA PERMITTING IT TO WRITE DEFERRED VARIABLE ANNUITY POLICIES AND CONDUCT OTHER LONG-TERM INSURANCE BUSINESS. THE INSURER IS NOT AUTHORIZED IN ANY JURISDICTION OTHER THAN BERMUDA TO CARRY ON ANY INSURANCE BUSINESS. POLICY ACCOUNT VALUES UNDER THIS POLICY ARE BASED ON THE INVESTMENT EXPERIENCE OF A SEPARATE ACCOUNT ESTABLISHED UNDER THIS POLICY AND THE PRIVATE ACT. THE POLICY ACCOUNT VALUES UNDER THIS POLICY MAY INCREASE OR DECREASE IN AMOUNT. INVESTMENTS OF FUNDS HELD IN THE SEPARATE ACCOUNT MAY BE MADE IN NON-U.S. INVESTMENTS AS WELL AS U.S. INVESTMENTS. THE ASSETS IN THE SEPARATE ACCOUNT MAY BE ADVERSELY AFFECTED BY CHANGES IN FOREIGN GOVERNMENTS, AND OTHER ECONOMIC AND POLITICAL EVENTS, WHICH MIGHT NOT AFFECT U.S. INVESTMENTS OR ENTITIES, AND BY FLUCTUATIONS IN THE ENTITIES, AND BY FLUCTUATIONS IN THE VALUE OF FOREIGN CURRENCY.

Crown Global
Life Insurance Ltd.

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

*continued on next page*

CROWNGLOBAL
INSURANCE

Deferred Variable
Annuity Policy

Crown Global
Life Insurance Ltd.

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

THIS POLICY CANNOT BE TRANSFERRED, ASSIGNED, HYPOTHECATED, OR PLEDGED, WITHOUT THE INSURER'S PRIOR WRITTEN CONSENT, WHICH THE INSURER MAY WITHHOLD IN ITS SOLE AND ABSOLUTE DISCRETION. THIS POLICY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER U.S. FEDERAL OR STATE SECURITIES LAWS OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND, THEREFORE, CANNOT BE TRANSFERRED UNLESS SO REGISTERED OR UNLESS SUCH REGISTRATION IS NOT REQUIRED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THIS POLICY IS AN APPROPRIATE INVESTMENT ONLY FOR PURCHASERS WHO ARE QUALIFIED PURCHASERS WITHIN THE MEANING OF THE U.S. INVESTMENT COMPANY ACT OF 1940 AND ACCREDITED INVESTORS WITHIN THE MEANING OF RULE 501(a) OF REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933. THIS POLICY IS ALSO APPROPRIATE ONLY FOR SOPHISTICATED PURCHASERS WHO, AMONG OTHER THINGS, HAVE NO NEED FOR ACCESS TO AMOUNTS DESCRIBED IN THE POLICY. ADDITIONAL INFORMATION ON THE RISKS OF PURCHASING A POLICY APPEARS IN THE CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, AS AMENDED THROUGH THE DATE HEREOF, DESCRIBING THE POLICY.

**THE INSURER MAKES NO REPRESENTATION AS TO THE TAX TREATMENT OF THIS POLICY FOR U.S. FEDERAL INCOME TAX PURPOSES OR FOR THE PURPOSES OF THE TAX LAWS OF ANY OTHER JURISDICTION. NO REPRESENTATION IS MADE THAT A PROPOSED POLICYHOLDER WOULD NOT BE SUBJECT TO AUDIT OR EXAMINATION BY THE TAX AUTHORITIES OF ANY JURISDICTION AS A RESULT OF PURCHASING A POLICY.**

**NO REPRESENTATION IS MADE REGARDING THE LIKELIHOOD THAT THE CURRENT U.S. FEDERAL INCOME TAX LAWS, REGULATIONS AND OFFICIAL INTERPRETATIONS OF THE LAW MAY BE CHANGED IN THE FUTURE. IT IS POSSIBLE THAT SUCH CHANGES COULD OCCUR, AND THAT SUCH CHANGES COULD APPLY TO THE POLICY, AND COULD APPLY RETROACTIVELY. THE INSURER HAS RESERVED THE RIGHT IN ITS SOLE AND ABSOLUTE DISCRETION TO MAKE CHANGES TO THE POLICY THAT IT DEEMS NECESSARY TO PRESERVE THE EXPECTED TAX CONSEQUENCES OF THE OWNERSHIP OF THE POLICY AS A RESULT OF CHANGES IN THE LAWS OF THE U.S. OR ANY OTHER JURISDICTION.**

CROWN GLOBAL INSURANCE

# Policy Data Page

## General Policy Data

**All amounts expressed in "$" or "dollars" are in United States dollars**

| | |
|---|---|
| Proposed Policyholder: | Proposed Annuitant: |
| Empower Dallas Foundation, Inc | Grant Scott |
| Proposed Annuitant's Date of Birth: | Gender: |
| 29 May, 1962 | Male |
| Policy Effective Date: 10 Dec, 2015 | Issue Date: 10 Dec, 2015 |

Annuity Starting Date: Deferred

until Annuitant's 85th birthday

at the latest

| Beneficiary: | Beneficiary Interest | Revocable/Irrevocable? |
|---|---|---|
| Empower Dallas Foundation, Inc | 100% | Irrevocable |

Separate Account number : 30218

**Premium Amounts**

| | |
|---|---|
| Initial Premium: | $ 15,903,108.54 |
| Premium Limit: | n/a |
| Premium Deposit: | n/a |

Net Premiums will be deposited to the Separate Account established by the Insurer with respect to the Policy.

CROWNGLOBAL INSURANCE

# Policy Data Page

## Initial Allocation of Payments to Investment Options

| Investment Options | Initial Allocation |
|---|---|
| 1. IDF: Atlas IDF, LP/ Rand Advisors LLC | 100% |

Custodian Bank: n/a

Investment Manager: n/a

# Policy Data Page

## Policy Fees and Charges

| Charge | Due Date | Amount of Charge |
|---|---|---|
| Policy Administration Fee | In equal installments in advance on each Liquidity Date | $2,900 per annum |
| Agreed Upon Procedures Fee | Annually | As charged by the outside auditors, currently $1,975. |
| DAC Charges | Each date the Insurer receives a Premium | 0.25% of the amount of Premium payment. *See* Section 9.2 of the Policy. |
| Management & Expense Fee | In advance on each Liquidity Date | The following annual rates expressed as a percentage of the Policy Account Value:<br><br>0.45% p.a $10mm of Premium<br><br>0.35% p.a. $11-20mm of Premium<br><br>0.25% p.a. $21mm+of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm<br><br>(adjusted for additional premium payments and withdrawals, as applicable)<br><br>*See* Section 9.3 of the Policy. |
| Policy Set-Up Deposit | Upon submission of the completed Annuity Application Form. | N/A |
| Acceptance Fee | Each date the Insurer receives a Premium payment | Zero |
| Taxes | When paid by the Insurer or its affiliate | *See* Section 9.7 of the Policy. |

## Table of Contents


General Policy Data ..... 3
Initial Allocation of Payments to Investment Options ..... 4
Policy Fees and Charges ..... 5

**Article I General Provisions ..... 15**
Section 1.1 Consideration ..... 15
Section 1.2 Entire Policy ..... 15
Section 1.3 Survival of Representations, Warrants, Covenants ..... 15
Section 1.4 Amendment or Modification ..... 15
Section 1.5 Misstatement of Age ..... 15
Section 1.6 Non-Participating Policy ..... 16
Section 1.7 Ownership of Assets ..... 16
Section 1.8 Rule of Construction ..... 16
Section 1.9 Governing Law ..... 16
Section 1.10 Effective Date of Coverage ..... 16

**Article II Premium Provisions ..... 17**
Section 2.1 Premiums ..... 17
Section 2.2 Insurer's Right to Refuse Premiums ..... 17
Section 2.3 Nonpayment of Premium ..... 18

**Article III Termination Provisions ..... 19**
Section 3.1 Insurer's Cancellation Rights ..... 19
Section 3.2 Reinstatement ..... 20

**Article IV Premium Investment; Policy Account Values ..... 21**
Section 4.1 The Separate Account ..... 21
Section 4.2 Premiums ..... 21
Section 4.3 Allocations to Investment Options ..... 21
Section 4.4 Compliance with Investor Control Rules ..... 22
Section 4.5 Changes in Allocations to Investment Options ..... 23
Section 4.6 Responsibility for Selecting Investment Options ..... 23
Section 4.7 Appointment of Investment Manager and Custodian Bank ..... 24
Section 4.8 Timing of Allocations ..... 24
Section 4.9 Investment of Separate Account Assets ..... 24
Section 4.10 Request for Extension of Investment Rights With Respect to Adequate Diversification ..... 26
Section 4.11 Changes in Investment Options ..... 26

Section 4.12 Policy Account Value ........ 27

**Article V Transfers Among Investment Options ........ 28**

Section 5.1 General ........ 28

Section 5.2 Conditions on Transfer ........ 28

Section 5.3 Liability ........ 29

Section 5.4 Limits on Right of Transfer ........ 29

**Article VI Annuity Provisions ........ 30**

Section 6.1 Annuity Payments ........ 30

Section 6.2 Annuity Percentage ........ 30

Section 6.3 No Guaranteed Payments ........ 30

Section 6.4 Annuity Starting Date ........ 31

Section 6.5 Change of Annuity Starting Date ........ 31

Section 6.6 Annuity Income Options ........ 31

Section 6.7 Maturity Payment ........ 32

**Article VII Loan Provisions ........ 33**

Section 7.1 Policy Loans ........ 33

**Article VIII Surrender Provisions ........ 34**

Section 8.1 General ........ 34

Section 8.2 Full Surrender ........ 34

Section 8.3 Partial Surrender ........ 34

**Article IX Policy Fees and Charges ........ 36**

Section 9.1 Policy Administration Fee ........ 36

Section 9.2 DAC Charges ........ 36

Section 9.3 Management & Expense Fee ........ 36

Section 9.4 Policy Set-Up Deposit ........ 36

Section 9.5 Acceptance Fee ........ 36

Section 9.6 Surrender Charge ........ 37

Section 9.7 Taxes ........ 37

Section 9.8 Agreed Upon Procedures Fee ........ 37

Section 9.9 Deductions for Fees and Charges ........ 37

Section 9.10 Custodian Bank and Investment Manager Fees ........ 37

**Article X Death Benefit Provisions ........ 39**

Section 10.1 Death Benefit ........ 39

Section 10.2 Due Proof of Death ........ 40

**Article XI Owner, Beneficiary, Assignment ....................41**
Section 11.1 Proposed Policyholder .................... 41
Section 11.2 Change of Proposed Policyholder .................... 41
Section 11.3 Proposed Annuitant .................... 41
Section 11.4 Change of Proposed Annuitant .................... 41
Section 11.5 Beneficiary .................... 42
Section 11.6 Change of Beneficiary .................... 42
Section 11.7 Assignment .................... 42

**Article XII Other General Provisions ....................44**
Section 12.1 Periodic Reports .................... 44
Section 12.2 Currency and Place of Payment .................... 44
Section 12.3 Notices, Requests and Elections .................... 44
Section 12.4 Policy Settlement .................... 45
Section 12.5 Deferment .................... 45
Section 12.6 Incontestability .................... 45
Section 12.7 Policyholder Information .................... 46
Section 12.8 Tax Matters .................... 46
Section 12.9 Limitation on Liability of Insurer .................... 47

## Definitions

**Acceptance Fee** – The fee deducted by the Insurer as stated in the Policy Data Page and described in Section 9.5.

**Accredited Investor** – An "accredited investor" as defined in Rule 501(a) under Regulation D of the Securities Act.

**Age** – A Proposed Annuitant or Proposed Joint Annuitant's age on their last birthday.

**Agreed Upon Procedures ("AUP") Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.8.

**Annuity Application Form** – The annuity application provided by the Insurer as completed and signed by the Proposed Policyholder.

**Annuity Payments** – The benefits payable to the Beneficiary under Section 6.1 of this Policy (each an "Annuity Payment").

**Annuity Starting Date** – The date on which Annuity Payments under Section 6.4 of this Policy commence.

**Beneficiary** – The persons or entities designated as such on the Annuity Application Form, as amended from time to time, by the Proposed Policyholder, who is entitled to receive Annuity Payments under the Policy, and distributions following the death of the Proposed Policyholder as applicable, in accordance with the terms of the Policy.

**Business Day** – Any day on which banks in the U.S. and Bermuda are open for business.

**Claim Date** – The date on which the Insurer receives written notice and due proof of death of the Proposed Annuitant (or the survivor of the Proposed Joint Annuitants) in accordance with Section 10.2 at the Insurer's Home Office.

**Code** – The U.S. Internal Revenue Code of 1986, as amended.

**Confidential Private Placement Memorandum** – The confidential private placement memorandum describing the Policy including all schedules, appendices, attachments,

exhibits, amendments and supplements thereto, as amended and restated from time to time.

**Contestable Period** – The period of time described in Section 12.6 which extends for two (2) years from the Issue Date during the lifetime of the Proposed Annuitant.

**DAC Charges** – The amount deducted by the Insurer as set forth in the Policy Data Page and described in Section 9.2.

**Death Benefit** – The death benefit calculated and payable under the provisions of Article X of this Policy.

**Fees and Charges** – Any applicable fees and charges due under the Policy including, without limitation, the Policy Administration Fee, the DAC Charges, the Management & Expense Fee, the Acceptance Fee, Taxes, and the Agreed Upon Procedures Fee.

**FINMA** – The Swiss Financial Market Supervisory Authority.

**Full Surrender** – A Surrender pursuant to Section 8.2.

**Grace Period** – A period of thirty days following the date on which the Insurer makes available to the Proposed Policyholder information indicating that (i) the Policy Account Value is less than $250,000, or (ii) the Policy Account Value is insufficient to pay the Fees and Charges due under the Policy without the Policy Account Value becoming less than $250,000 following payment of such Fees and Charges.

**Home Office** – The Insurer's office in Hamilton, Bermuda. The Insurer's mailing address is Crown Global Life Insurance Ltd., Canon's Court, 22 Victoria Street, Hamilton HM 12, Bermuda, email: info@crownglobalinsurance.com, facsimile: +1-345-945-6121.

**IDF** – An insurance dedicated fund.

**In Force** – A condition that the Policy has not terminated.

**Initial Premium** – The first Premium payment by the Proposed Policyholder as shown on the Policy Data Page.

**Insurance Dedicated Fund** – An Investment Option involving investment in an investment fund generally formed as a limited partnership or limited liability company

(i) which is intended to operate as an insurance dedicated fund (an "IDF") and (ii) investment in which is available only to a U.S. or non-U.S. insurance company that regularly engages in the sale of life insurance policies and annuity policies in the ordinary course of its business and is acquiring interests in the IDF to hold in a Separate Account established in connection with a Policy and not as part of the general assets of the insurance company.

**Insurer** – Crown Global Life Insurance Ltd. The Insurer has elected under Code section 953(d) to be treated as a U.S. domestic corporation for U.S. federal income tax purposes.

**Investment Adviser Act** – The U.S. Investment Adviser Act of 1940, as amended.

**Investment Company Act** – The U.S. Investment Company Act of 1940, as amended.

**Investment Option** – A separate investment option consisting of all or a portion of the assets held in a Separate Account and managed by the investment manager identified therein directly or through an IDF.

**IRS** – The U.S. Internal Revenue Service.

**Issue Date** – The issue date of the Policy as stated on the Policy Data Page.

**Joint Life Annuity** – An annuity issued on the life of two Proposed Annuitants and under which payments continue as long as either Proposed Annuitant is alive.

**Liquid Asset Subaccount** – A Subaccount of the Separate Account, the funds in which are primarily invested in interest-bearing commercial bank accounts.

**Liquidity Date** – The last Business Day of each calendar quarter.

**Managed Subaccount** – An Investment Option where assets held in a Subaccount are managed by an investment manager unrelated to the Insurer. For the avoidance of doubt, a Managed Subaccount does not include an IDF.

**Management & Expense Fee** – The Management & Expense Fee as stated on the Policy Data Page and described in Section 9.3.

**Minimum Liquid Asset Allocation** – An amount not in excess of the expected annual Fees and Charges related to the Policy that the Insurer may place in the Liquid Asset Subaccount.

**Net Premium** – A Premium payment less applicable Fees and Charges, including, without limitation, the Acceptance Fee set forth on the Policy Data Page and described in Section 9.5.

**Next Available Liquidity Date** – For any specified day, the Liquidity Date on or next following the 100th calendar day following the specified day.

**Partial Surrender** – A Surrender pursuant to Section 8.3.

**Policy** – This Deferred Variable Annuity (DVA) Policy offered by the Insurer.

**Policy Account Value** – The net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid Fees or Charges.

**Policy Administration Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.1.

**Policy Anniversary** – The anniversary of the Policy Effective Date.

**Policy Data Page** – The pages of this Policy titled "Policy Data Page." The Insurer will reissue these pages by means of an endorsement whenever the information on the Policy Data Page is amended, in accordance with the Policy.

**Policy Effective Date** – The "Policy Effective Date" of this Policy as stated on the Policy Data Page.

**Policy Set-Up Deposit** – A non-refundable screening deposit due upon submission of the completed Annuity Application Form as stated on the Policy Data Page and described in Section 9.4.

**Policy Year** – Any one year period beginning on the Policy Effective Date or a Policy Anniversary and ending on the day before the next Policy Anniversary.

**Premiums** – The Initial Premium and any subsequent Premiums paid to the Insurer under this Policy.

**Private Act** – The private act entitled "The Scottish Annuity & Life International Insurance Company (Bermuda) Ltd. Consolidation and Amendment Act 2001," as amended and consolidated from time to time.

**Proposed Annuitant** – The individual whose life is used to determine the duration of the period during which the Annuity Payments will be paid by the Insurer.

**Proposed Joint Annuitants** – Each Proposed Annuitant (each being a "Proposed Joint Annuitant") when a second Proposed Annuitant is designated under the Policy and a Joint Life Annuity is selected. Each Proposed Annuitant, including the second Proposed Annuitant, is to generally be designated by the Proposed Policyholder in the Annuity Application Form but may be designated by the Proposed Policyholder after the Issue Date with the consent of the Insurer. The second named Proposed Annuitant shall be designated as the Proposed Joint Annuitant by the Proposed Policyholder in the Annuity Application Form and reflected as such on the Policy Data Page.

**Proposed Policyholder** – Proposed Policyholder means the individual or entity that proposes or is considering the purchase of a Policy pursuant to the Confidential Private Placement Memorandum. This term shall include a person who has become an actual policyholder through the purchase of a Policy or pursuant to a change made pursuant to Section 11.2.

**Qualified Purchaser** – A Qualified Purchaser within the meaning of Section 2(a)(51) of the Investment Company Act.

**SEC** – The U.S. Securities and Exchange Commission.

**Securities Act** – The U.S. Securities Act of 1933, as amended.

**Separate Account** – A separate investment account established by the Insurer for this Policy pursuant to the terms hereof, and Bermuda law (including the Private Act), the assets of which can be used for the sole purpose of paying claims under this Policy. A Separate Account is not a legal entity under Bermuda law and any references to the Separate Account performing any tasks means the Insurer in respect of the Separate Account.

**Single Life Annuity** – An annuity measured by the life of a single Proposed Annuitant.

**Subaccount** – A subaccount established by the Insurer as a bookkeeping entry within the Separate Account.

**Surrender** – A surrender under Article VIII including a Full Surrender under Section 8.2 and a Partial Surrender under Section 8.3.

**Taxes** – The taxes defined in Section 9.7 of this Policy.

**Unscheduled Premium** – Any Premium payment other than the Initial Premium or a Premium scheduled on the Policy Data Page or as set forth in an endorsement or attachment to the Policy.

**U.S. Treasury Regulations** – The U.S. Treasury regulations promulgated under the Code, as amended.

## Article I General Provisions

### Section 1.1 Consideration

This Policy is issued in consideration of the payment of the Initial Premium.

### Section 1.2 Entire Policy

This Policy, any endorsements or riders, and the Annuity Application Form constitute the entire contract between the Proposed Policyholder and the Insurer. The Proposed Policyholder, on behalf of the Proposed Policyholder, the Proposed Annuitant, and the Beneficiaries represents, acknowledges, and agrees that the Insurer has relied, and is entitled to rely, upon the accuracy of the information and statements made in the Annuity Application Form in deciding to issue this Policy.

### Section 1.3 Survival of Representations, Warrants, Covenants

The representations, warrants, covenants, and other statements made in the Annuity Application Form are incorporated herein by reference and shall survive the execution of this Policy.

### Section 1.4 Amendment or Modification

The Insurer cannot modify the Policy without the Proposed Policyholder's consent, provided that, the Insurer may take any action it deems necessary in order to preserve the U.S. tax treatment of the Policy without the Proposed Policyholder's consent, so long as the Insurer provides 90 days prior notice of any such proposed action to the Proposed Policyholder and discusses with the Proposed Policyholder the legal basis for such change.

### Section 1.5 Misstatement of Age

If the Age of any Proposed Annuitant or Proposed Joint Annuitant is misstated on the Annuity Application Form, the Insurer will adjust the Annuity Payments to reflect the correct Age. Any amount that the Insurer has overpaid as a result of any such misstatement shall be deducted from future Annuity Payments made under the Policy. The Insurer will require due proof of the Age or survival of any person on

whose continued life any payment or benefit under the Policy is dependent. It is the Proposed Policyholder's obligation to provide proof that is satisfactory to the Insurer.

**Section 1.6 Non-Participating Policy**

This Policy is non-participating, which means that the Proposed Policyholder will not share in the Insurer's profits or surplus earnings and that the Insurer will not pay dividends on this Policy.

**Section 1.7 Ownership of Assets**

Assets held in the Separate Account are the sole property of the Insurer. The Proposed Policyholder will have no direct proprietary interest in the assets held in any separate account, including, without limitation, the Separate Account with respect to this Policy.

**Section 1.8 Rule of Construction**

For purposes of this Policy, the period denoted by the phrase "prior to a Liquidity Date" shall include the Liquidity Date.

**Section 1.9 Governing Law**

The Policy will be governed by the laws of Bermuda without regard to its conflict of laws principles, including without limitation, the Private Act and the Life Insurance Act, 1978 as may be amended from time to time.

**Section 1.10 Effective Date of Coverage**

Coverage of the Proposed Annuitants under this Policy will begin on the Policy Effective Date.

## Article II Premium Provisions

### Section 2.1 Premiums

The minimum Initial Premium payable under the Policy is $2 million. Such minimum may be met by aggregating Policies having initial Premiums of $1 million each and purchased by the same Proposed Policyholder. The Insurer has not placed a limitation on the maximum amount of Premiums that may be contributed by a Proposed Policyholder. Subject to Section 2.2, additional Premium Payments may be made at any time and from time to time as the Proposed Policyholder's financial situation permits, provided that the minimum additional Premium Payment may not be less than the minimum Unscheduled Premium.

The Initial Premium is due on the Issue Date. Premiums must be paid or mailed from outside the U.S. to the Insurer at its Home Office. Upon request, a receipt will be provided at the Insurer's Home Office (or other non-U.S. jurisdiction designated by the Insurer from time to time).

No Initial Premium or additional Premium payments may be made from the U.S. by any Proposed Policyholder (nor will the same be accepted by the Insurer) if said Proposed Policyholder is in the U.S. at the time the decision to make said Premium payment occurs. Further, the Proposed Policyholder may not direct that a Premium payment be made while the Proposed Policyholder is in the U.S. even if the Premium payment is made from outside the U.S.

Premium payments are generally to be made in U.S. Dollars. The Insurer may, in its sole and absolute discretion, accept certain in-kind asset contributions as Premium payments. The Insurer may reject in-kind asset contributions in its sole and absolute discretion.

### Section 2.2 Insurer's Right to Refuse Premiums

The Insurer reserves the right to refuse Premiums and to return Premiums with interest if such Premiums would adversely affect the U.S. tax consequences the Policy is intended to provide or the tax consequences under the laws of any other applicable jurisdiction.

The Insurer reserves the right not to accept any Premium payments from a Proposed Policyholder who ceases to be a Qualified Purchaser or an Accredited Investor. The Insurer may require any Proposed Policyholder to provide confirmation of the Proposed Policyholder's status as a Qualified Purchaser or an Accredited Investor before accepting any additional Premium payments. However, subject to any other limitation set forth in this Section 2.2, Premium payments during a Policy Year that do not exceed the sum of expected Fees and Charges under the Policy for the Policy Year will be accepted.

**Section 2.3 Nonpayment of Premium**

If no Premiums are paid after the Initial Premium, the Policy will continue In Force as long as the Policy Account Value is sufficient to pay any applicable Fees and Charges and, following the payment of such Fees and Charges, the Policy Account Value is $500,000 or more.

## Article III Termination Provisions

### Section 3.1 Insurer's Cancellation Rights

The Insurer may, in its sole and absolute discretion, cancel the Policy and distribute the Policy Account Value to the Proposed Policyholder if:

1. The Policy Account Value is less than $250,000 at the end of any calendar quarter prior to the Annuity Starting Date but following the Insurer's acceptance of the Initial Premium payment, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity; or

2. The continuing existence of the Policy would require the Insurer, the Policy or the Separate Account backing the Policy to register, or make information filings, with the SEC under the Securities Act, the U.S. Investment Company Act, the U.S. Investment Adviser Act, each as amended from time to time, or the securities laws of any jurisdiction in which the Insurer, the Policy or the Separate Account is not currently registered or required to make information filings; or

3. The Proposed Policyholder or the Proposed Annuitant (or any Proposed Joint Annuitant) changes his or her country of residence for tax, securities regulation, or other purposes; or

4. Subject to the provisions of section 12.6 of the Policy, any declaration in the Annuity Application Form is not exact, truthful, and complete in all material respects; or

5. If the Proposed Policyholder fails to comply with the terms of any of the covenants or declarations made in the Annuity Application Form.

Prior to the Policy termination, the Insurer will provide 90 day notice of such termination to the Proposed Policyholder, which notice shall include the reason for such termination. The Insurer will pay to the Proposed Policyholder the amount, if any, of the Policy Account Value determined as of the Next Available Liquidity Date. Surrender charges will not apply.

**Section 3.2 Reinstatement**

If the Policy terminates as the result of the expiration of a Grace Period, it may not be reinstated unless reinstatement is required by Bermuda law.

## Article IV Premium Investment; Policy Account Values

### Section 4.1 The Separate Account

The Insurer will establish a Separate Account pursuant to the terms of the Private Act to hold assets that fund obligations arising under each Policy issued by it together with any supplementary contracts hereunder and certain other funds. Income, gains, or losses of each Separate Account are credited to or charged against the assets held in such Separate Account, without regard to other income, gains, or losses of any other Separate Account or business of the Insurer. Under the terms of this Policy and the laws of Bermuda, assets allocated or credited to each Separate Account are the property of the Insurer and the Proposed Policyholder has no direct proprietary interest in such assets.

### Section 4.2 Premiums

Net Premiums received by the Insurer with respect to the Policy will be credited to the related Separate Account. To the extent that Premiums are insufficient to pay all Fees and Charges due to the Insurer under the Policy, the Insurer will deduct Fees and Charges from the Separate Account.

Amounts payable to the Proposed Policyholder or any Beneficiary under the Policy will be made by the Insurer from the related Separate Account to the Proposed Policyholder or Beneficiary in accordance with the terms of this Policy. The Insurer will establish Subaccounts within the Separate Account for each Investment Option selected by the Proposed Policyholder. Each Subaccount will correspond to an Investment Option. The Insurer may from time to time change the Investment Options and investment managers available to Proposed Policyholders, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer’s investment management or similar agreement with such investment manager).

### Section 4.3 Allocations to Investment Options

On the Annuity Application Form, the Proposed Policyholder will designate the initial allocation of Net Premiums among the available Investment Options and on each Liquidity Date a Proposed Policyholder’s Net Premiums will be allocated among the

Investment Options according to the allocation percentages selected. Allocation percentages must be zero or a whole number not less than ten nor greater than 100. The sum of the allocation percentages must equal 100. The Insurer will document the initial allocation on the Policy Data Page. The Insurer has reserved the right to require allocation of an amount equal to the expected aggregate quarterly Fees and Charges related to the Policy to the Liquid Asset Subaccount before application of the allocation percentages designated by the Proposed Policyholder. In addition, the Insurer may transfer amounts from other Investment Options and Subaccounts to the Liquid Asset Subaccount equal to the expected quarterly Fees and Charges.

The specific Investment Options can generally be divided into two categories: IDFs and Managed Subaccounts. The Insurer is not obligated to offer both IDFs and Managed Subaccounts as Investment Options at any time. Accordingly, at any given time only one of these types of Investment Options may be available.

The Insurer and its affiliates make no recommendations, and provide no investment advice, as to the selection of, and allocations to, Investment Options. The Insurer has not evaluated any of the investment manager's investment performance and makes no recommendation regarding the selection of any investment manager or any IDF. The Insurer does not act as a custodian of cash or investments held in the Separate Account.

**Section 4.4 Compliance with Investor Control Rules**

The Proposed Policyholder agrees that, except for the selection of the allocation of Separate Account assets among Investment Options as contemplated in Section 4.3, and changes to such allocations as contemplated in Section 4.5, it will not select, identify or recommend, nor will it contact any investment manager for the purpose of influencing, any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount, including, without limitation, an investment manager with respect to an IDF in which funds held in a particular Subaccount are invested.

A Proposed Policyholder may not have direct contact or communicate with the investment manager of either an IDF or a Managed Subaccount and may not directly participate in the management of the Separate Account or any IDF or Managed Subaccount.

**Section 4.5 Changes in Allocations to Investment Options**

The Proposed Policyholder may, at quarterly intervals, reallocate funds among then available Investment Options but may do so no more than twice per calendar year. If a change in allocation percentages requires a transfer of funds between Investment Options, there may be a delay after the Separate Account receives the proceeds from one Investment Option until the next date on which it is possible to reinvest the funds in a different Investment Option. During this delay period (which may be up to one calendar quarter), funds will be invested in the Liquid Asset Subaccount. The Proposed Policyholder acknowledges that this delay may result in the funds having a lower return for this period.

In the event of such a delay, the funds from the liquidated investments will be invested in the Liquid Asset Subaccount until the next Liquidity Date at which time the funds will be re-allocated (together with any related earnings) to the applicable Subaccount originally designated by the Proposed Policyholder for the transfer.

Unless and until the Proposed Policyholder notifies the Insurer in writing of a new Net Premium allocation, the Net Premium allocations as specified in “Initial Allocation of Payment to Investment Options” on the Policy Data Page will continue to apply to any additional Premium payments.

**Section 4.6 Responsibility for Selecting Investment Options**

The Insurer does not and will not make any recommendation as to the Proposed Policyholder’s selection or retention of investment managers, allocation of assets among Subaccounts, Investment Options, or investments in particular securities or categories of securities, nor will it evaluate the investment performance of any investment manager. Inclusion of an Investment Option shall not be deemed to be a recommendation of that investment or as an indication that such an investment is suitable for the Proposed Policyholder.

Each Proposed Policyholder acknowledges, represents, warrants, and covenants that it is solely responsible for determining for themselves whether a particular Investment Option is suitable in light of their individual situations. The Insurer and its affiliates make no recommendations, and provide no advice, as to the selection of Investment Options and provide no warranty, representation, or indemnity with respect to the

performance of any Investment Option. Each Proposed Policyholder should consult his or her personal financial advisor concerning Premium allocations.

**Section 4.7 Appointment of Investment Manager and Custodian Bank**

The Insurer shall have the right, exercisable in its sole and absolute discretion, to appoint, change, or remove the investment manager and custodian bank with respect to each Investment Option or Separate Account, provided that an investment manager shall only be removed for cause (as described in the Insurer's investment management or similar agreement with such investment manager). A Proposed Policyholder may recommend to the Insurer one or more investment managers or custodian banks who meet the Insurer's general requirements after the initial policy date, but the Insurer may accept or reject such recommendation in its sole and absolute discretion.

**Section 4.8 Timing of Allocations**

The Insurer will allocate the Proposed Policyholder's Net Premiums among one or more Investment Options in the percentages specified on the Policy Data Page, as amended from time to time at the written request of the Proposed Policyholder, within two business days following the date the Insurer receives the Net Premiums. Net Premiums received and which are to be allocated to an Investment Option will be initially invested in the Liquid Asset Subaccount and subsequently allocated (together with any related earnings) within two business days to the applicable Investment Option (subject to deferral due to liquidity constraints imposed by the applicable investment manager or IDF and subject to such provisions as to valuation and unit calculation as may be specified by the applicable investment manager).

**Section 4.9 Investment of Separate Account Assets**

The Insurer will require each investment manager with respect to a portfolio of an IDF or Managed Account held in the Separate Account and the investment manager of each investment fund or other investment fund in which the assets of the Separate Account are invested, to comply with the following:

1. Investment of assets held in each Subaccount will be sufficiently diversified to comply with the requirements of U.S. Treasury Regulation section 1.817-5(b). Assets of any investment fund relying upon a "look-through" basis for purposes

of meeting such diversification requirements will themselves be sufficiently diversified so as to allow the Subaccount to comply with such requirements.

2. The investment manager and its employees who are responsible for investment decisions will not accept investment recommendations or make any investment decisions regarding the direct or indirect investment of Separate Account assets based, in whole or in part, on information regarding any investment or group of investments received from any Proposed Policyholder or any representative or adviser of a Proposed Policyholder.

3. No Proposed Policyholder (or any representative or adviser of a Proposed Policyholder) will have the right or be permitted to select or identify any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount.

4. The investment manager will not commit to invest assets of any Subaccount (or of any underlying investment fund or Managed Account in which a Subaccount has invested directly or indirectly) in mutual funds or other collective investment funds or publicly available investment products (including, without limitation, market-linked deposits and flexible deposits) managed, advised and/or distributed by the investment manager or its affiliates and will only do so if (a) in the investment manager's sole judgment at the time the investment is made, such fund or product is appropriate within the investment objectives and policies of the Subaccount fund or Managed Account and (b) no more than 55% of the assets on an initial purchase basis (excluding market value increases) of the Subaccount fund or Managed Account are invested in such funds or products at any time. Subject to the foregoing, for the avoidance of doubt, assets may be invested in an IDF.

5. In accordance with Section 4.4, except for general descriptions of the investment policies of the Investment Options, there will not be any direct or indirect prearrangement, plan or agreement between any Proposed Policyholder (or any Proposed Policyholder's advisers or representatives) and the investment manager (or any of its employees) regarding the investments to be made directly or indirectly by any Subaccount.

**Section 4.10** **Request for Extension of Investment Rights With Respect to Adequate Diversification**

A Proposed Policyholder may make a request for an extension of the Proposed Policyholder's investment rights described in Section 4.4 and partial or complete release of the investment manager's obligations in Section 4.9 to adequately diversify the assets held in the Separate Account by delivering a written request to the Insurer's Home Office expressing a specific desire for the same. The Insurer may grant or deny such requests in its sole and absolute discretion, for any reason or for no reason whatsoever. Any such request must be approved by the Insurer in writing (and, in the case of an IDF, may also require the consent of the IDF). Absent written approval of the request, the request shall be deemed to have been denied.

The Insurer expresses no opinion and makes no representations or warranties regarding the tax consequences under the laws of the U.S. or any other jurisdiction of the Insurer's decision to grant such requests. By making such a request, a Proposed Policyholder waives any claim against the Insurer, its shareholders, directors, officers, employees, agents or affiliates on behalf of the Proposed Policyholder, any Beneficiaries or any other person for any loss from the Insurer's decision to grant or deny the Proposed Policyholder's request and agrees to hold harmless hereunder the Insurer and its shareholders, directors, officers, employees, agents or affiliates for any such loss.

**Section 4.11** **Changes in Investment Options**

The Insurer at any time may add additional Investment Options, remove or restrict existing Investment Options, or add or eliminate an investment manager subject to any required regulatory approval, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager). If an Investment Option is removed or restricted or an investment manager is terminated, the Insurer may eliminate the Investment Option as an option for future Premium payments or transfers and may also transfer funds from the Subaccount in which assets invested in the terminated Investment Option were held, to the Liquid Asset Subaccount. An affected Proposed Policyholder may submit instructions to adjust the allocation of Net Premiums among the remaining Investment Options, without charge, for a period of 60 days following receipt of the Insurer's notice of any

such termination. The Insurer will implement those instructions on the Next Available Liquidity Date after receipt.

**Section 4.12 Policy Account Value**

The Policy Account Value is equal to the net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid fees or expenses. The Insurer will determine the Policy Account Value on each Liquidity Date. The Separate Account value will increase or decrease, depending upon the investment experience of the related Subaccounts.

Assets allocated or credited to a Separate Account may be commingled with assets allocated or credited to another Separate Account for purposes of investment. In such circumstances, the Insurer may determine the Policy Account Value of each such Separate Account by the use of accumulation units, which are calculated separately with respect to each commingled investment. The accumulation unit value for each commingled investment will vary to reflect the investment experience of the assets invested therein.

The value of an accumulation unit will be determined on each Liquidity Date. When a commingled investment is made, the Insurer will credit the Separate Account with a number of accumulation units determined by dividing the amount of the investment by the value of the accumulation unit. When assets allocated or credited to a Separate Account are withdrawn from an investment, the accumulation units are reduced.

## Article V Transfers Among Investment Options

### Section 5.1 General

The Proposed Policyholder may request one transfer among Investment Options per calendar quarter, but no more than twice per calendar year.

### Section 5.2 Conditions on Transfer

To effect any transfer, the Proposed Policyholder must submit a transfer request to the Insurer. All transfers are subject to the following conditions:

1. Any applicable Fees and Charges will be deducted from the Subaccount or from the amount which is transferred.

2. Transfers will be effected within 60 days following receipt by the Insurer of a transfer request. Actual settlement of a disposition or redemption from the relevant Subaccount, and reinvestment of the proceeds may be delayed as described below.

3. Any transfer request must clearly specify: (a) the amount which is to be transferred; and (b) the Subaccounts which are to be affected.

4. Payments to effect a transfer are subject to the disbursement rules and restrictions of the Subaccount(s).

5. The minimum amount that may be transferred in a single transfer will be the lesser of $250,000 or the entire interest in a Subaccount.

6. No transfer may be made from the Liquid Asset Subaccount if the amount remaining therein would not equal or exceed the Minimum Liquid Asset Allocation.

7. In the case of an IDF, any additional conditions set forth in the governing documents in the IDF must be satisfied.

**Section 5.3 Liability**

Neither the Insurer nor any of the Insurer's affiliates will be liable for any losses incurred as a result of transfers made in accordance with a Proposed Policyholder's transfer request including lower returns which may result.

**Section 5.4 Limits on Right of Transfer**

The Insurer may in its sole and absolute discretion defer the right of transfer for any period when it reasonably determines that additional time is necessary to obtain sufficient cash to make the transfer payments. Additional limitations on transfer may be imposed under the terms of any IDF in which assets held in a Separate Account are invested. For the avoidance of doubt, a transfer described in this Section 5.4 is a situation where a change from one Investment Option to another Investment Option occurs.

CROWNGLOBAL INSURANCE

## Article VI Annuity Provisions

### Section 6.1 Annuity Payments

The Insurer will make periodic payments to the Beneficiaries beginning on the Annuity Starting Date and continuing thereafter on each Policy Anniversary to an account located outside the U.S. The amount of each Annuity Payment will equal the product of the applicable Annuity Percentage and the Policy Account Value (determined as of the end of the calendar quarter immediately preceding each Annuity Payment) and will vary depending upon the investment experience of the Investment Options in which the Separate Account assets are invested and the age of the Proposed Annuitant.

### Section 6.2 Annuity Percentage

The Annuity Percentages are listed in the Appendix I to this Policy. The applicable Annuity Percentage will, depend upon the benefit option selected by the Policyholder. In the case of a Single Life Annuity, the Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants. The Annuity Percentage is adjusted for each Annuity Payment.

### Section 6.3 No Guaranteed Payments

The Policy Account Value, and thus, the Annuity Payments may increase or decrease depending upon the investment experience of the Investment Options selected by the Proposed Policyholder. The sole source for the payment of the Annuity Payments are the assets held in the Separate Account backing the Policy. The Policy does not provide for guaranteed annuity or death benefits. All payments, including upon the death of the Proposed Policyholder or Proposed Annuitant (or Proposed Joint Annuitants) are strictly limited to the assets held in the Separate Account backing the Policy and no Annuity Payments or any other payments under the Policy are payable from any other source.

**Section 6.4** **Annuity Starting Date**

The Annuity Starting Date must be on the first day of a calendar quarter and may not be later than the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty-fifth (85th) birthday. If the Proposed Policyholder has not chosen an Annuity Starting Date, then the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty- fifth (85th) birthday shall be the Annuity Starting Date.

**Section 6.5** **Change of Annuity Starting Date**

The Proposed Policyholder may change the Annuity Starting Date prior to the then current Annuity Starting Date by delivering a written notice to the Insurer. The new Annuity Starting Date may not be before the Next Available Liquidity Date for any Investment Option under the Policy as of the date the Insurer receives the notice from the Proposed Policyholder, and may not be later than the first day of the calendar month following the Proposed Annuitant's 85th birthday. Distributions must commence after the Annuity Starting Date in accordance with requirements under the Code.

**Section 6.6** **Annuity Income Options**

Two (2) basic benefit options are offered under the Policy: (i) a Single Life Annuity, and (ii) a Joint Life Annuity. The benefit option may be changed by the Proposed Policyholder; however, no such change may be made at any time on or after the Annuity Starting Date. A Policyholder may change the selection of any benefit option by giving the Insurer at least thirty (30) calendar days' written notice prior to the Annuity Starting Date from outside the U.S.

In the case of a Single Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants.

Under both basic benefit options, the amount of each annual Annuity Payment made on or after the Annuity Starting Date will vary in accordance with the age of the Proposed Annuitant (or Proposed Joint Annuitant(s)) and the investment performance of the assets held in the Separate Account and shall be computed by the Insurer's

actuary each year (and recomputed on the annual anniversary date each year thereafter) by multiplying the applicable Annuity Percentage in the Annuity Percentage Table attached as Appendix I to this Policy by the then current Policy Account Value as of the Annuity Starting Date and predetermined on the annual anniversary date each year thereafter. If the Policy Account Value is zero, then all payments will cease. All Annuity Payments shall be made to an account outside the U.S. The Insurer may consider the adoption of additional benefit options at the request of a Proposed Policyholder.

**Section 6.7 Maturity Payment**

Upon the death of the Proposed Annuitant (or survivor of the Proposed Joint Annuitants), the Insurer will pay to the Beneficiaries, or their successors as Beneficiaries, as the case may be, the balance of the Policy Account Value.

## Article VII Loan Provisions

### Section 7.1 Policy Loans

The Proposed Policyholder shall have no guaranteed rights or privileges with respect to loans under a Policy. The Insurer may, in its sole and absolute discretion consider whether to facilitate a Proposed Policyholder's request to pledge a Policy as collateral security for a loan to be made by the Insurer or institutional or other third party lenders. A pledge of a Policy as collateral security for a loan may be effected only with the prior written consent of the Insurer, which may be granted or denied in the Insurer's sole and absolute discretion.

## Article VIII Surrender Provisions

### Section 8.1 General

At any time after the Issue Date and prior to the Annuity Starting Date, the Proposed Policyholder may request one or more withdrawals under the Policy from the Separate Account in the form of a Partial Surrender. Withdrawals are possible up to 100% of the Policy Account Value. Should the Policy Account Value be equal to or less than $250,000, the Policy will lapse. The rights of a Proposed Policyholder to make a Surrender under the Policy shall be subject to the consent of all Beneficiaries who have been irrevocably designated by the Proposed Policyholder under the Policy. Subject to this Article VIII, the Proposed Policyholder may Surrender the Policy, in whole or in part, by filing a written request with the Insurer at the Insurer's Home Office at any time during the lifetime of the Proposed Annuitant. The Policy Account Value which is the subject of the Surrender will be determined as of the Next Available Liquidity Date occurring after the Insurer receives the request to Surrender.

Although the amount of the Surrender proceeds will be determined as of the Next Available Liquidity Date after receipt of the Surrender request, the Insurer will use reasonable efforts to pay Surrender proceeds as soon as practicable whether on a Liquidity Date or another date (subject to such liquidity constraints and provisions as to valuation and unit calculation as may be specified by the investment manager of the applicable Investment Option).

### Section 8.2 Full Surrender

If the Proposed Policyholder requests a Full Surrender of the Policy Account Value of the Policy, the Policy will terminate on the date the Proposed Policyholder submits its Surrender request in accordance with Section 12.3.

### Section 8.3 Partial Surrender

The Proposed Policyholder may request a Partial Surrender of the Policy for up to and including 90% of the Policy Account Value of the Policy. No more than one Partial Surrender may be requested by the Proposed Policyholder during each quarter of a Policy Year. As provided in Section 3.1, any Partial Surrender that causes the Policy Account Value to be reduced to an amount that is less than

$250,000 may be deemed by the Insurer to be a request for Full Surrender and if so deemed will cause the Policy to be terminated, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity. If the Policy Account Value is reduced to an amount that is less than $250,000, then the Insurer shall have the right, exercisable in its sole and absolute discretion, to treat a Partial Surrender request as a Full Surrender request.

Each Partial Surrender will reduce the Policy Account Value and the amount of any Annuity Payment to be paid after the Annuity Starting Date. An amendment to the Policy will be sent to the Proposed Policyholder outside the U.S. for countersignature upon any request for a Partial Surrender under the Policy. Said amendment shall become a part of the Policy.

## Article IX Policy Fees and Charges

### Section 9.1 Policy Administration Fee

The Insurer will deduct the Policy Administration Fee from the Separate Account as set forth in the Policy Data Page for general administrative expenses.

### Section 9.2 DAC Charges

The amount deducted by the Insurer as set forth on the Policy Data Page to pay for the costs imposed by virtue of the treatment of certain deferred acquisition costs for U.S. federal income tax purposes under section 848 of the Code. The amount of the DAC Charge as set forth on the Policy Data Page shall be adjusted to reflect any change in the applicable U.S. federal income tax rate. The Insurer shall provide the Proposed Policyholder notice of any change in the DAC Charge.

### Section 9.3 Management & Expense Fee

The Insurer will deduct the Management & Expense Fee from the Separate Account. The Management & Expense Fee is an on-going insurance administration fee described on the Policy Data Page.

### Section 9.4 Policy Set-Up Deposit

The Policy Set-Up Deposit is due to the Insurer as set forth on the Policy Data Page upon submission of the completed Annuity Application Form by the Proposed Policyholder. The Policy Set-Up Deposit will be paid into the General Account of the Insurer. Upon issuing the Policy, an amount equal to the Policy Set-Up Deposit will be used to offset the Acceptance Fee. If for any reason, a Policy is not issued, the Insurer will retain the Policy Set-Up Deposit to cover medical, underwriting, administration and any other costs incurred by the Insurer in the processing of the application.

### Section 9.5 Acceptance Fee

The Insurer will deduct the Acceptance Fee set forth in the Policy Data Page on each date the Insurer receives a Premium payment.

**Section 9.6 Surrender Charge**

Surrender charges will not apply to this Policy.

**Section 9.7 Taxes**

The Insurer will deduct only those Taxes (as defined below) paid by the Insurer or its affiliates to any governmental entity that relate to the Policy or the related Separate Account. These taxes (the "Taxes") exclusively include withholding taxes, excise taxes, sales taxes, stamp taxes, value added taxes, state taxes imposed on the Insurer or its affiliates, and taxes imposed on Subpart F income of a Separate Account attributable to its investment in a controlled foreign corporation, as well as the deferred tax amount and any interest charge or other taxes imposed on the investments of a Separate Account in a passive foreign investment company, or under the corresponding tax laws of other jurisdictions.

The Insurer may, in its sole and absolute discretion, pay Taxes when due and deduct such amounts from the Separate Account at a later date. The Insurer will, in its absolute discretion, determine when Taxes have resulted from the investment experience of any Subaccount or receipt by the Insurer of Premiums.

**Section 9.8 Agreed Upon Procedures Fee**

The Insurer will deduct the Agreed Upon Procedures Fee from the Separate Account if the Proposed Policyholder instructs the Insurer to engage a third party audit firm to review charges and provide an Agreed Upon Procedures (AUP) report.

**Section 9.9 Deductions for Fees and Charges**

The Fees and Charges are paid to the Insurer under the Policy initially by making deductions from Premiums and then by making deductions from the Separate Account. To the extent that the Insurer deducts Fees and Charges from the Separate Account, amounts will be deducted first from the Liquid Asset Subaccount and then from the Subaccounts pursuant to the terms of the Policy.

**Section 9.10 Custodian Bank and Investment Manager Fees**

Each custodian bank and investment manager will separately deduct any applicable fees charged by it from any Separate Account or Investment Option for which it is acting as custodian or investment manager, as the case may be. The fees of the

custodian bank and investment manager are calculated on an individual basis and may vary depending upon the investment manager and Investment Option(s) selected by the Proposed Policyholder. The list of investment managers and custodians retained by the Insurer is available from the Insurer upon request.

## Article X Death Benefit Provisions

### Section 10.1 Death Benefit

If all Beneficiaries and any alternative Beneficiaries predecease the Proposed Policyholder and Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected), then the benefits payable under the Policy to the Beneficiaries or alternative Beneficiaries shall be paid to the Proposed Policyholder until the first to die of the Proposed Policyholder or Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected).

If none of the Beneficiaries or alternative Beneficiaries survives the Proposed Annuitant(s), then the Policy Account Value shall be paid to the Proposed Policyholder upon the Proposed Annuitant's death (or survivor of the Proposed Joint Annuitants' death, in the case where a Joint Life Annuity benefit option is selected).

If the Proposed Policyholder is not living at the time any benefit under the Policy is payable to the Proposed Policyholder, then such benefit shall be paid to the Proposed Policyholder's estate, if then open, or if not then to his heirs *per stirpes*, in accordance with the laws of succession in the jurisdiction of the Proposed Policyholder's last known domicile on the date of the Proposed Policyholder's death.

If the Proposed Policyholder is not an individual, then the Proposed Annuitant (or the younger of the Proposed Joint Annuitants or the survivor of the Proposed Joint Annuitants) shall be recognized as the "primary Proposed Annuitant" and treated as the Proposed Policyholder of the Policy. Any change in the designation of such Proposed Annuitant (or Proposed Joint Annuitant) following the Issue Date (in the case where the Proposed Policyholder is not an individual) shall be treated as the death of the Proposed Policyholder.

If the Proposed Policyholder dies prior to the "annuity starting date" (defined under Code Section 72(c)(4) as the first day of the first period for which an amount is received as an annuity under the contract; such definition possibly differing from the Annuity Starting Date designated under the Policy), then the Proposed Policyholder's entire interest in the Policy shall be distributed to the Beneficiaries within five (5) years from the date of the Proposed Policyholder's death, unless the Beneficiaries

elect to receive such interest in distributions made over their life or lives (or over a period not extending beyond their respective life expectancies), and such distributions begin within one (1) year from the date of the Proposed Policyholder's death. Any such election must be made in writing and received by the Insurer at the Insurer's Home Office within 180 calendar days from the date of the Proposed Policyholder's death.

If the Proposed Policyholder dies on or after the "annuity starting date" (as defined under Code Section 72(c)(4)) and before the entire interest in the Policy has been distributed, the remaining portion of the Policy Account Value shall be distributed to the Beneficiaries at least as rapidly as under the method of distributions being used as of the date of the Proposed Policyholder's death.

Notwithstanding any provision of the Policy, all Death Benefits must be distributed in compliance with the provision of section 72(s) of the Code. Death Benefits payable hereunder will be includible in the gross income of the Beneficiary.

### Section 10.2 Due Proof of Death

Due proof of death is one of the following received at the Insurer's Home Office in a form satisfactory to the Insurer in its absolute discretion:

1. A certified copy of a death certificate;
2. A certified copy of a decree of a court of competent jurisdiction as to the finding of death; or
3. Any other proof of death satisfactory to the Insurer.

## Article XI Owner, Beneficiary, Assignment

### Section 11.1 Proposed Policyholder

The Proposed Policyholder is the person so named on the Policy Data Page or his or her assignee in accordance with a valid assignment as provided in Section 11.2.

Under Bermuda law, the Proposed Policyholder or his personal representative, trustee in bankruptcy or legal assignee will be the owner of the rights to payments under the Policy. While the Proposed Policyholder is alive, all rights in the Policy belong to the Proposed Policyholder and may be exercised without the consent of any Beneficiary, provided that, once an irrevocable designation of Beneficiary is filed, changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary. All of the Proposed Policyholder's rights in the Policy belong to the estate of the Proposed Policyholder if the Proposed Policyholder dies before the Proposed Annuitant. Joint ownership is permitted.

### Section 11.2 Change of Proposed Policyholder

The Proposed Policyholder may change the ownership of the Policy by submitting a request to the Insurer's Home Office and obtaining written approval of the Insurer. Any approved change will take effect on the date specified in the approval.

### Section 11.3 Proposed Annuitant

The Proposed Policyholder has the right to designate one Proposed Annuitant or two Proposed Joint Annuitants. The Proposed Annuitants or Proposed Joint Annuitants will be as stated in the Annuity Application Form, unless otherwise endorsed at issue or subsequently changed.

### Section 11.4 Change of Proposed Annuitant

Each Proposed Policyholder will have the right to designate and in some cases change the Proposed Annuitant or Proposed Joint Annuitant.

**Section 11.5 Beneficiary**

The Proposed Policyholder shall initially designate one or more Beneficiaries on the Policy Data Page. All designations of Beneficiaries are revocable unless specified as irrevocable by the Proposed Policyholder. Once an irrevocable designation of Beneficiary is filed, any changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary under the Policy.

**Section 11.6 Change of Beneficiary**

Except in the case of an irrevocable Beneficiary, the Proposed Policyholder may change the Beneficiaries by filing a written request from outside the U.S. with the Insurer at its Home Office at any time prior to the Annuity Starting Date. In the case of an irrevocable Beneficiary, the consent of the irrevocable Beneficiary to the change is also required. The change will take effect as of the date the notice is received by the Insurer subject to any payment made or action taken by the Insurer before the Insurer receives the document at its Home Office. A new Beneficiary designation will automatically revoke all prior designations (except an irrevocable Beneficiary designation where the consent of the irrevocable Beneficiary has not been obtained). The Insurer will not be liable for any payment made or action taken before the effective date of the change of Beneficiary.

**Section 11.7 Assignment**

The Proposed Policyholder may transfer, assign, or pledge the Policy or any of their rights under the Policy, including a Section 1035 exchange of the Policy with another carrier, without the prior written consent of the Insurer, provided that the Policy may not be assigned unless (i) it is registered under the U.S. federal securities and/or state securities laws or the securities laws of any other jurisdiction unless such registration is not required or an exemption from registration is available and (ii) the assignee is a Qualified Purchaser and Accredited Investor. The Insurer may require satisfactory evidence as to the non-applicability of any such registration requirement or the availability of an exemption from any applicable registration requirement and the Insurer may in its discretion for this purpose request, at the transferor's expense, a favourable legal opinion from transferor's counsel that the provisions of this Section 11.7 have been met.

The Insurer represents and warrants that, subject to the foregoing, it will fully cooperate with any assignment, transfer or exchange, including a "1035" exchange of the Policy with another carrier and will cooperate to exchange underlying IDFs or sub-accounts with such carrier. Failure by the Insurer to cooperate with the Proposed Policyholder in a proposed 1035 exchange or other transfer, assignment, or pledge of the Policy or any of the Proposed Policyholder's rights under the Policy, such failure to cooperate as determined by a final judgement in a Bermuda court or other court of relevant jurisdiction, among any other injunctive or other relief resulting therefrom, will result in liquidated damages to the Proposed Policyholder equal to the sum of the (a) then Policy Account Value and (b) any fees or charges, including Management and Expense Fees, accruing during the period that the non-cooperation (as determined by the a Bermuda court or other court of relevant jurisdiction) exists and is continuing, and the Insurer shall be strictly liable for payment of such amount to the Proposed Policyholder. For the avoidance of doubt, the Proposed Policyholder shall be entitled to its Policy Account Value separate from the liquidated damages amount provided for herein. The Proposed Policyholder (x) acknowledges that the Insurer's ordinary and customary process for 1035 exchanges includes obtaining satisfactory assurance from the transferor of compliance with relevant tax and disclosure laws with respect to the Policy and indemnification from the new carrier regarding any tax obligations relating to the Policy and (y) agrees that following the Insurer's 1035 exchange process will not be considered to be a failure to cooperate by the Insurer.

## Article XII Other General Provisions

### Section 12.1 Periodic Reports

The Insurer will make available to the Proposed Policyholder, for every calendar quarter or portion thereof during which the Policy is In Force, a report that shows activity in the Proposed Policyholder's Separate Account. The Proposed Policyholder expressly authorizes the Insurer to rely upon the information or valuations provided by the selected investment manager and custodian without further inquiry or verification of any kind, nature, or description. Each quarterly statement will set forth the Policy Account Value less applicable expenses and charges at the beginning and end of the reporting period and aggregate adjustments to the same throughout. These quarterly statements shall be made available to the Proposed Policyholder at the Insurer's Home Office. The Insurer will forward annual Separate Account statements to an address of the Proposed Policyholder outside of the U.S. if a request to do so is made by the Proposed Policyholder in writing and delivered to the Insurer's Home Office.

### Section 12.2 Currency and Place of Payment

All transactions between the Proposed Policyholder and the Insurer will be made in U.S. dollars unless otherwise confirmed by the Insurer in writing. All Payments will be made outside the U.S.

### Section 12.3 Notices, Requests and Elections

To be effective, all notices, requests, and elections the Proposed Policyholder makes under the Policy must be in writing, signed by the Proposed Policyholder or sent electronically or via facsimile by the Proposed Policyholder and received by the Insurer. Unless otherwise provided, all notices, requests and elections will be effective when received by the Insurer. Notices, requests and elections may be made by the Proposed Policyholder under the Policy in writing, signed by the Policyholder, sent by facsimile or electronic communication and received by the Insurer at its Home Office or administrative office, provided that the Insurer will not be liable for following instructions communicated by facsimile or electronically and, provided further that acceptance of facsimile or electronic communication by the Insurer will not impose any requirement on the Insurer to employ any procedures to confirm that instructions

received by facsimile communication are genuine. Any notice or report required to be given by the Insurer to the Proposed Policyholder or any other person will be deemed given when sent to such person or such person's authorized representative.

**Section 12.4 Policy Settlement**

Prior to any payment of a Death Benefit, due certified proof of death must be submitted to the Insurer.

**Section 12.5 Deferment**

The Insurer will execute allowable requests for a transfer, Full Surrender or Partial Surrender by the Proposed Policyholder within 60 days of a request. Such requests may require conversion of certain Investment Option assets to cash or in-kind distributions, where possible. This may take longer than 60 days for a variety of reasons, including underlying restrictions on redemptions of assets held pursuant to an Investment Option. In such cases, the Insurer will take reasonable steps to comply with such requests at the earliest time possible. The foregoing will be subject to time restrictions within the Insurance Dedicated Fund purchased by a Subaccount.

**Section 12.6 Incontestability**

Except as expressly provided in the Policy, the Insurer will not contest the validity of the Policy for misstatement, misrepresentation or non-disclosure after the Policy has been In Force for two years from the Issue Date during the lifetime of the Proposed Annuitant. The Policy will be voidable in the event of fraud at any time. If the validity of the Policy is so contested, then (1) the Insurer's obligation to pay Annuity Payments under the Policy will terminate as of the date the Insurer discovers such misstatement, misrepresentation or non-disclosure, and (2) the Policy Account Value will be determined as of the Next Available Liquidity Date occurring after the Insurer discovers such misstatement, misrepresentation or non-disclosure and returned to the Proposed Policyholder or the Beneficiaries within 90 days. The Insurer will notify the Proposed Policyholder that the Policy is so terminated and such notice will include the date of termination. The return of the Policy Account Value will be in full and final satisfaction of all the Insurer's obligations under the Policy. Following the return of the Policy Account Value, the Policy will be void.

**Section 12.7 Policyholder Information**

The Insurer may disclose Policyholder information to third parties such as banks or independent asset managers. Specifically with respect to banking relationships in Switzerland and in accordance with FINMA Newsletter 18 (2010) "handling of Life insurance with separately managed accounts/portfolios" dated December 20, 2010, the Insurer may disclose Policyholder or source of funding information to banking partners including Policyholder name, date of birth, nationality and address. In any event, the Insurer may be required to confirm in accordance with FINMA Newsletter 18 (2010) that the insurance product related to account openings is set up as a life insurance product according to the legal provisions, including provisions concerning biometric risks, of the Insurer's domicile.

Each U.S. person who has a financial interest in or signature or other authority over any foreign financial accounts, including bank, securities, or other types of financial accounts, in a foreign country, if the aggregate value of these financial accounts exceeds $10,000 at any time during the calendar year, must report that relationship each calendar year by filing Form TD F 90-22.1 (Report of Foreign Bank and Financial Accounts), commonly referred to as an "FBAR", with the Department of the Treasury on or before June 30 of the succeeding year. In addition, and irrespective of the independent FBAR filing obligations that a Proposed Policyholder (or its owner) who is a U.S. person may have, U.S. person directors, officers, or employees of the Insurer who have signature authority over the Separate Account, Subaccounts, or other accounts with respect to the Policy would need to file an FBAR with respect to such accounts and so will the Insurer itself as a U.S. Person with a financial interest in such accounts. On the basis of such filings, the IRS could request information with respect to such filings and the Proposed Policyholder acknowledges that the Insurer may provide such FBAR-related information to the IRS if requested to do so.

**Section 12.8 Tax Matters**

The Proposed Policyholder acknowledges that he or she is responsible for complying with all tax reporting, filing and payment obligations with respect to this Policy in any jurisdiction in which the Proposed Policyholder is subject to tax. The Proposed Policyholder must consult its own tax advisor with respect to such obligations. The Insurer has not provided, and shall have no responsibility for providing, advice to the Proposed Policyholder with respect to such issues.

**Section 12.9** **Limitation on Liability of Insurer**

**THE LIABILITY OF THE INSURER FOR BENEFITS UNDER THE POLICY OR FOR ANY LOSS OR OTHER DAMAGES WITH RESPECT TO THE POLICY IS LIMITED TO THE POLICY ACCOUNT VALUE.**

## Appendix I - Annuity Percentage Table

| Annuitant's Age | Life Expectancy | Annuity Percentage | Annuitant's Age | Life Expectancy | Annuity Percentage |
|---|---|---|---|---|---|
| 10 | 86.2 | 1.1601% | 63 | 33.9 | 2.9499% |
| 11 | 85.2 | 1.1737% | 64 | 33.0 | 3.0303% |
| 12 | 84.2 | 1.1876% | 65 | 32.0 | 3.1250% |
| 13 | 83.2 | 1.2019% | 66 | 31.1 | 3.2154% |
| 14 | 82.2 | 1.2165% | 67 | 30.2 | 3.3113% |
| 15 | 81.2 | 1.2315% | 68 | 29.2 | 3.4247% |
| 16 | 80.2 | 1.2469% | 69 | 28.3 | 3.5336% |
| 17 | 79.2 | 1.2626% | 70 | 27.4 | 3.6496% |
| 18 | 78.2 | 1.2788% | 71 | 26.5 | 3.7736% |
| 19 | 77.3 | 1.2937% | 72 | 25.6 | 3.9063% |
| 20 | 76.3 | 1.3106% | 73 | 24.7 | 4.0486% |
| 21 | 75.3 | 1.3280% | 74 | 23.8 | 4.2017% |
| 22 | 74.3 | 1.3459% | 75 | 22.9 | 4.3668% |
| 23 | 73.3 | 1.3643% | 76 | 22.0 | 4.5455% |
| 24 | 72.3 | 1.3831% | 77 | 21.2 | 4.7170% |
| 25 | 71.3 | 1.4025% | 78 | 20.3 | 4.9261% |
| 26 | 70.3 | 1.4225% | 79 | 19.5 | 5.1282% |
| 27 | 69.3 | 1.4430% | 80 | 18.7 | 5.3476% |
| 28 | 68.3 | 1.4641% | 81 | 17.9 | 5.5866% |
| 29 | 67.3 | 1.4859% | 82 | 17.1 | 5.8480% |
| 30 | 66.3 | 1.5083% | 83 | 16.3 | 6.1350% |
| 31 | 65.3 | 1.5314% | 84 | 15.5 | 6.4516% |
| 32 | 64.3 | 1.5552% | 85 | 14.8 | 6.7568% |
| 33 | 63.3 | 1.5798% | 86 | 14.1 | 7.0922% |
| 34 | 62.3 | 1.6051% | 87 | 13.4 | 7.4627% |
| 35 | 61.4 | 1.6287% | 88 | 12.7 | 7.8740% |
| 36 | 60.4 | 1.6556% | 89 | 12.0 | 8.3333% |
| 37 | 59.4 | 1.6835% | 90 | 11.4 | 8.7719% |
| 38 | 58.4 | 1.7123% | 91 | 10.8 | 9.2593% |
| 39 | 57.4 | 1.7422% | 92 | 10.2 | 9.8039% |
| 40 | 56.4 | 1.7730% | 93 | 9.6 | 10.4167% |
| 41 | 55.4 | 1.8051% | 94 | 9.1 | 10.9890% |
| 42 | 54.4 | 1.8382% | 95 | 8.6 | 11.6279% |
| 43 | 53.4 | 1.8727% | 96 | 8.1 | 12.3457% |
| 44 | 52.4 | 1.9084% | 97 | 7.6 | 13.1579% |
| 45 | 51.5 | 1.9417% | 98 | 7.1 | 14.0845% |
| 46 | 50.5 | 1.9802% | 99 | 6.7 | 14.9254% |
| 47 | 49.5 | 2.0202% | 100 | 6.3 | 15.8730% |
| 48 | 48.5 | 2.0619% | 101 | 5.9 | 16.9492% |
| 49 | 47.5 | 2.1053% | 102 | 5.5 | 18.1818% |
| 50 | 46.5 | 2.1505% | 103 | 5.2 | 19.2308% |
| 51 | 45.5 | 2.1978% | 104 | 4.9 | 20.4082% |
| 52 | 44.6 | 2.2422% | 105 | 4.5 | 22.2222% |
| 53 | 43.6 | 2.2936% | 106 | 4.2 | 23.8095% |
| 54 | 42.6 | 2.3474% | 107 | 3.9 | 25.6410% |
| 55 | 40.6 | 2.4631% | 108 | 3.7 | 27.0270% |
| 56 | 40.7 | 2.4570% | 109 | 3.4 | 29.4118% |
| 57 | 39.7 | 2.5189% | 110 | 3.1 | 32.2581% |
| 58 | 38.7 | 2.5840% | 111 | 2.9 | 34.4828% |
| 59 | 37.8 | 2.6455% | 112 | 2.6 | 38.4615% |
| 60 | 35.8 | 2.7933% | 113 | 2.4 | 41.6667% |
| 61 | 35.8 | 2.7933% | 114 | 2.1 | 47.6190% |
| 62 | 34.9 | 2.8653% | 115 | 1.9 | 52.6316% |

**EXHIBIT 2**

CROWNGLOBAL
INSURANCE

# TERMSHEET

| | | |
|---|---|---|
| Policy Number | : | # 30218 Separate Account |
| Policyholder | : | Empower Dallas Foundation, Inc |
| Annuitant | : | Grant Scott |
| Beneficiary | : | Empower Dallas Foundation, Inc |
| Premiums planned | : | Approx. US$ 20'000'000 |
| Premium Date | : | TBA |
| Policy Date | : | TBA |
| Policy Type | : | Deferred Variable Annuity (DVA) |
| Issuing Company | : | Crown Global Life Insurance Ltd., Bermuda (953d) |
| Custodian Bank | : | n/a |
| Account/Portfolio Number | : | n/a |
| Investment Manager | : | n/a |
| Asset Allocation/Investment Profile | : | IDF: Atlas IDF, LP/ Rand Advisors LLC |
| Investment of Funds Model: | : | n/a |
| Acceptance Fee | : | Zero |
| Mgmt. & Expense Fee | : | 0.45% p.a $10mm of Premium<br>0.35% p.a. $11-20mm of Premium<br>0.25% p.a. $21mm+ of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm. |
| Policy Administration Fee | : | US$ 2,900 p.a. |
| DAC Tax | : | 0.25% of all premium payments |
| Federal Excise Tax – 1% of Premium | : | n/a |
| Surrender Charge | : | US$ 5'000 |
| Policy Audit (optional) | : | US$ 1'975 p.a. |

Place, Date GRAND CAYMAN, DEC 9TH 2015.

Signature [signature]

Policyholder

006655

**EXHIBIT 2**

CROWN GLOBAL
INSURANCE

Deferred Variable Annuity Policy

**This Policy is a Deferred Variable Annuity (DVA) Policy. This Policy is Non-Participating.** Crown Global Life Insurance Ltd., a Bermuda Class C insurance company, will pay, subject to the provisions of this Policy, the Annuity Payments to the Beneficiaries as provided by this Policy, provided that the Policy is In Force.

Signed for the Insurer at its Home Office located at Hamilton, Bermuda on the Issue Date.

12/15/15 Ken Greertsen, [signature]

12/16/15 Janita Burke, [signature]

**THIS IS A LEGAL CONTRACT.**
**PLEASE READ IT CAREFULLY.**

THE INSURER IS INCORPORATED IN BERMUDA AND IS REGISTERED AS A CLASS C INSURER IN BERMUDA PERMITTING IT TO WRITE DEFERRED VARIABLE ANNUITY POLICIES AND CONDUCT OTHER LONG-TERM INSURANCE BUSINESS. THE INSURER IS NOT AUTHORIZED IN ANY JURISDICTION OTHER THAN BERMUDA TO CARRY ON ANY INSURANCE BUSINESS. POLICY ACCOUNT VALUES UNDER THIS POLICY ARE BASED ON THE INVESTMENT EXPERIENCE OF A SEPARATE ACCOUNT ESTABLISHED UNDER THIS POLICY AND THE PRIVATE ACT. THE POLICY ACCOUNT VALUES UNDER THIS POLICY MAY INCREASE OR DECREASE IN AMOUNT. INVESTMENTS OF FUNDS HELD IN THE SEPARATE ACCOUNT MAY BE MADE IN NON-U.S. INVESTMENTS AS WELL AS U.S. INVESTMENTS. THE ASSETS IN THE SEPARATE ACCOUNT MAY BE ADVERSELY AFFECTED BY CHANGES IN FOREIGN GOVERNMENTS, AND OTHER ECONOMIC AND POLITICAL EVENTS, WHICH MIGHT NOT AFFECT U.S. INVESTMENTS OR ENTITIES, AND BY FLUCTUATIONS IN THE ENTITIES, AND BY FLUCTUATIONS IN THE VALUE OF FOREIGN CURRENCY.

Crown Global
Life Insurance Ltd.

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

*continued on next page*

CROWNGLOBAL
INSURANCE

Deferred Variable Annuity Policy

Crown Global Life Insurance Ltd.

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

THIS POLICY CANNOT BE TRANSFERRED, ASSIGNED, HYPOTHECATED, OR PLEDGED, WITHOUT THE INSURER'S PRIOR WRITTEN CONSENT, WHICH THE INSURER MAY WITHHOLD IN ITS SOLE AND ABSOLUTE DISCRETION. THIS POLICY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER U.S. FEDERAL OR STATE SECURITIES LAWS OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND, THEREFORE, CANNOT BE TRANSFERRED UNLESS SO REGISTERED OR UNLESS SUCH REGISTRATION IS NOT REQUIRED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THIS POLICY IS AN APPROPRIATE INVESTMENT ONLY FOR PURCHASERS WHO ARE QUALIFIED PURCHASERS WITHIN THE MEANING OF THE U.S. INVESTMENT COMPANY ACT OF 1940 AND ACCREDITED INVESTORS WITHIN THE MEANING OF RULE 501(a) OF REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933. THIS POLICY IS ALSO APPROPRIATE ONLY FOR SOPHISTICATED PURCHASERS WHO, AMONG OTHER THINGS, HAVE NO NEED FOR ACCESS TO AMOUNTS DESCRIBED IN THE POLICY. ADDITIONAL INFORMATION ON THE RISKS OF PURCHASING A POLICY APPEARS IN THE CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, AS AMENDED THROUGH THE DATE HEREOF, DESCRIBING THE POLICY.

**THE INSURER MAKES NO REPRESENTATION AS TO THE TAX TREATMENT OF THIS POLICY FOR U.S. FEDERAL INCOME TAX PURPOSES OR FOR THE PURPOSES OF THE TAX LAWS OF ANY OTHER JURISDICTION. NO REPRESENTATION IS MADE THAT A PROPOSED POLICYHOLDER WOULD NOT BE SUBJECT TO AUDIT OR EXAMINATION BY THE TAX AUTHORITIES OF ANY JURISDICTION AS A RESULT OF PURCHASING A POLICY.**

**NO REPRESENTATION IS MADE REGARDING THE LIKELIHOOD THAT THE CURRENT U.S. FEDERAL INCOME TAX LAWS, REGULATIONS AND OFFICIAL INTERPRETATIONS OF THE LAW MAY BE CHANGED IN THE FUTURE. IT IS POSSIBLE THAT SUCH CHANGES COULD OCCUR, AND THAT SUCH CHANGES COULD APPLY TO THE POLICY, AND COULD APPLY RETROACTIVELY. THE INSURER HAS RESERVED THE RIGHT IN ITS SOLE AND ABSOLUTE DISCRETION TO MAKE CHANGES TO THE POLICY THAT IT DEEMS NECESSARY TO PRESERVE THE EXPECTED TAX CONSEQUENCES OF THE OWNERSHIP OF THE POLICY AS A RESULT OF CHANGES IN THE LAWS OF THE U.S. OR ANY OTHER JURISDICTION.**

CROWNGLOBAL
INSURANCE

# Policy Data Page

## General Policy Data

**All amounts expressed in "$" or "dollars" are in United States dollars**

| | |
|---|---|
| Proposed Policyholder: | Proposed Annuitant: |
| The Okada Family Foundation, Inc | Mark Okada |
| Proposed Annuitant's Date of Birth: | Gender: |
| 11 May, 1962 | Male |
| Policy Effective Date: 11 Dec, 2015 | Issue Date: 11 Dec, 2015 |
| Annuity Starting Date: Deferred until Annuitant's 85th birthday | |

| Beneficiary: | Beneficiary Interest | Revocable/Irrevocable? |
|---|---|---|
| The Okada Family Foundation, Inc | 100% | Irrevocable |

Separate Account number : 30219

**Premium Amounts**

| | |
|---|---|
| Initial Premium: | $ 5,301,065.12 |
| Premium Limit: | n/a |
| Premium Deposit: | n/a |

Net Premiums will be deposited to the Separate Account established by the Insurer with respect to the Policy.

CROWNGLOBAL INSURANCE

## Policy Data Page

### Initial Allocation of Payments to Investment Options

| Investment Options | Initial Allocation |
|---|---|
| 1. IDF: Atlas IDF, LP/ Rand Advisors LLC | 100% |

Custodian Bank: n/a

Investment Manager: n/a

CROWNGLOBAL INSURANCE

# Policy Data Page

## Policy Fees and Charges

| Charge | Due Date | Amount of Charge |
|---|---|---|
| Policy Administration Fee | In equal installments in advance on each Liquidity Date | $2,900 per annum |
| Agreed Upon Procedures Fee | Annually | As charged by the outside auditors, currently $1,975. |
| DAC Charges | Each date the Insurer receives a Premium | 0.25% of the amount of Premium payment. *See* Section 9.2 of the Policy. |
| Management & Expense Fee | In advance on each Liquidity Date | The following annual rates expressed as a percentage of the Policy Account Value:<br><br>0.45% p.a $10mm of Premium<br><br>0.35% p.a. $11-20mm of Premium<br><br>0.25% p.a. $21mm+of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm<br><br>(adjusted for additional premium payments and withdrawals, as applicable)<br><br>*See* Section 9.3 of the Policy. |
| Policy Set-Up Deposit | Upon submission of the completed Annuity Application Form. | N/A |
| Acceptance Fee | Each date the Insurer receives a Premium payment | Zero |
| Taxes | When paid by the Insurer or its affiliate | *See* Section 9.7 of the Policy. |

## Table of Contents

General Policy Data ........ 3
Initial Allocation of Payments to Investment Options ........ 4
Policy Fees and Charges ........ 5

**Article I General Provisions ........ 15**
Section 1.1 Consideration ........ 15
Section 1.2 Entire Policy ........ 15
Section 1.3 Survival of Representations, Warrants, Covenants ........ 15
Section 1.4 Amendment or Modification ........ 15
Section 1.5 Misstatement of Age ........ 15
Section 1.6 Non-Participating Policy ........ 16
Section 1.7 Ownership of Assets ........ 16
Section 1.8 Rule of Construction ........ 16
Section 1.9 Governing Law ........ 16
Section 1.10 Effective Date of Coverage ........ 16

**Article II Premium Provisions ........ 17**
Section 2.1 Premiums ........ 17
Section 2.2 Insurer's Right to Refuse Premiums ........ 17
Section 2.3 Nonpayment of Premium ........ 18

**Article III Termination Provisions ........ 19**
Section 3.1 Insurer's Cancellation Rights ........ 19
Section 3.2 Reinstatement ........ 20

**Article IV Premium Investment; Policy Account Values ........ 21**
Section 4.1 The Separate Account ........ 21
Section 4.2 Premiums ........ 21
Section 4.3 Allocations to Investment Options ........ 21
Section 4.4 Compliance with Investor Control Rules ........ 22
Section 4.5 Changes in Allocations to Investment Options ........ 23
Section 4.6 Responsibility for Selecting Investment Options ........ 23
Section 4.7 Appointment of Investment Manager and Custodian Bank ........ 24
Section 4.8 Timing of Allocations ........ 24
Section 4.9 Investment of Separate Account Assets ........ 24
Section 4.10 Request for Extension of Investment Rights With Respect to Adequate Diversification ........ 26
Section 4.11 Changes in Investment Options ........ 26

Section 4.12 Policy Account Value ........ 27

**Article V Transfers Among Investment Options ........ 28**

Section 5.1 General ........ 28
Section 5.2 Conditions on Transfer ........ 28
Section 5.3 Liability ........ 29
Section 5.4 Limits on Right of Transfer ........ 29

**Article VI Annuity Provisions ........ 30**

Section 6.1 Annuity Payments ........ 30
Section 6.2 Annuity Percentage ........ 30
Section 6.3 No Guaranteed Payments ........ 30
Section 6.4 Annuity Starting Date ........ 31
Section 6.5 Change of Annuity Starting Date ........ 31
Section 6.6 Annuity Income Options ........ 31
Section 6.7 Maturity Payment ........ 32

**Article VII Loan Provisions ........ 33**

Section 7.1 Policy Loans ........ 33

**Article VIII Surrender Provisions ........ 34**

Section 8.1 General ........ 34
Section 8.2 Full Surrender ........ 34
Section 8.3 Partial Surrender ........ 34

**Article IX Policy Fees and Charges ........ 36**

Section 9.1 Policy Administration Fee ........ 36
Section 9.2 DAC Charges ........ 36
Section 9.3 Management & Expense Fee ........ 36
Section 9.4 Policy Set-Up Deposit ........ 36
Section 9.5 Acceptance Fee ........ 36
Section 9.6 Surrender Charge ........ 37
Section 9.7 Taxes ........ 37
Section 9.8 Agreed Upon Procedures Fee ........ 37
Section 9.9 Deductions for Fees and Charges ........ 37
Section 9.10 Custodian Bank and Investment Manager Fees ........ 37

**Article X Death Benefit Provisions ........ 39**

Section 10.1 Death Benefit ........ 39
Section 10.2 Due Proof of Death ........ 40

**Article XI Owner, Beneficiary, Assignment ..........41**
Section 11.1 Proposed Policyholder .......... 41
Section 11.2 Change of Proposed Policyholder .......... 41
Section 11.3 Proposed Annuitant .......... 41
Section 11.4 Change of Proposed Annuitant .......... 41
Section 11.5 Beneficiary .......... 42
Section 11.6 Change of Beneficiary .......... 42
Section 11.7 Assignment .......... 42

**Article XII Other General Provisions ..........44**
Section 12.1 Periodic Reports .......... 44
Section 12.2 Currency and Place of Payment .......... 44
Section 12.3 Notices, Requests and Elections .......... 44
Section 12.4 Policy Settlement .......... 45
Section 12.5 Deferment .......... 45
Section 12.6 Incontestability .......... 45
Section 12.7 Policyholder Information .......... 46
Section 12.8 Tax Matters .......... 46
Section 12.9 Limitation on Liability of Insurer .......... 47

## Definitions

**Acceptance Fee** – The fee deducted by the Insurer as stated in the Policy Data Page and described in Section 9.5.

**Accredited Investor** – An "accredited investor" as defined in Rule 501(a) under Regulation D of the Securities Act.

**Age** – A Proposed Annuitant or Proposed Joint Annuitant's age on their last birthday.

**Agreed Upon Procedures ("AUP") Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.8.

**Annuity Application Form** – The annuity application provided by the Insurer as completed and signed by the Proposed Policyholder.

**Annuity Payments** – The benefits payable to the Beneficiary under Section 6.1 of this Policy (each an "Annuity Payment").

**Annuity Starting Date** – The date on which Annuity Payments under Section 6.4 of this Policy commence.

**Beneficiary** – The persons or entities designated as such on the Annuity Application Form, as amended from time to time, by the Proposed Policyholder, who is entitled to receive Annuity Payments under the Policy, and distributions following the death of the Proposed Policyholder as applicable, in accordance with the terms of the Policy.

**Business Day** – Any day on which banks in the U.S. and Bermuda are open for business.

**Claim Date** – The date on which the Insurer receives written notice and due proof of death of the Proposed Annuitant (or the survivor of the Proposed Joint Annuitants) in accordance with Section 10.2 at the Insurer's Home Office.

**Code** – The U.S. Internal Revenue Code of 1986, as amended.

**Confidential Private Placement Memorandum** – The confidential private placement memorandum describing the Policy including all schedules, appendices, attachments,

exhibits, amendments and supplements thereto, as amended and restated from time to time.

**Contestable Period** – The period of time described in Section 12.6 which extends for two (2) years from the Issue Date during the lifetime of the Proposed Annuitant.

**DAC Charges** – The amount deducted by the Insurer as set forth in the Policy Data Page and described in Section 9.2.

**Death Benefit** – The death benefit calculated and payable under the provisions of Article X of this Policy.

**Fees and Charges** – Any applicable fees and charges due under the Policy including, without limitation, the Policy Administration Fee, the DAC Charges, the Management & Expense Fee, the Acceptance Fee, Taxes, and the Agreed Upon Procedures Fee.

**FINMA** – The Swiss Financial Market Supervisory Authority.

**Full Surrender** – A Surrender pursuant to Section 8.2.

**Grace Period** – A period of thirty days following the date on which the Insurer makes available to the Proposed Policyholder information indicating that (i) the Policy Account Value is less than $250,000, or (ii) the Policy Account Value is insufficient to pay the Fees and Charges due under the Policy without the Policy Account Value becoming less than $250,000 following payment of such Fees and Charges.

**Home Office** – The Insurer's office in Hamilton, Bermuda. The Insurer's mailing address is Crown Global Life Insurance Ltd., Canon's Court, 22 Victoria Street, Hamilton HM 12, Bermuda, email: info@crownglobalinsurance.com, facsimile: +1-345-945-6121.

**IDF** – An insurance dedicated fund.

**In Force** – A condition that the Policy has not terminated.

**Initial Premium** – The first Premium payment by the Proposed Policyholder as shown on the Policy Data Page.

**Insurance Dedicated Fund** – An Investment Option involving investment in an investment fund generally formed as a limited partnership or limited liability company

(i) which is intended to operate as an insurance dedicated fund (an "IDF") and (ii) investment in which is available only to a U.S. or non-U.S. insurance company that regularly engages in the sale of life insurance policies and annuity policies in the ordinary course of its business and is acquiring interests in the IDF to hold in a Separate Account established in connection with a Policy and not as part of the general assets of the insurance company.

**Insurer** – Crown Global Life Insurance Ltd. The Insurer has elected under Code section 953(d) to be treated as a U.S. domestic corporation for U.S. federal income tax purposes.

**Investment Adviser Act** – The U.S. Investment Adviser Act of 1940, as amended.

**Investment Company Act** – The U.S. Investment Company Act of 1940, as amended.

**Investment Option** – A separate investment option consisting of all or a portion of the assets held in a Separate Account and managed by the investment manager identified therein directly or through an IDF.

**IRS** – The U.S. Internal Revenue Service.

**Issue Date** – The issue date of the Policy as stated on the Policy Data Page.

**Joint Life Annuity** – An annuity issued on the life of two Proposed Annuitants and under which payments continue as long as either Proposed Annuitant is alive.

**Liquid Asset Subaccount** – A Subaccount of the Separate Account, the funds in which are primarily invested in interest-bearing commercial bank accounts.

**Liquidity Date** – The last Business Day of each calendar quarter.

**Managed Subaccount** – An Investment Option where assets held in a Subaccount are managed by an investment manager unrelated to the Insurer. For the avoidance of doubt, a Managed Subaccount does not include an IDF.

**Management & Expense Fee** – The Management & Expense Fee as stated on the Policy Data Page and described in Section 9.3.

**Minimum Liquid Asset Allocation** – An amount not in excess of the expected annual Fees and Charges related to the Policy that the Insurer may place in the Liquid Asset Subaccount.

**Net Premium** – A Premium payment less applicable Fees and Charges, including, without limitation, the Acceptance Fee set forth on the Policy Data Page and described in Section 9.5.

**Next Available Liquidity Date** – For any specified day, the Liquidity Date on or next following the 100th calendar day following the specified day.

**Partial Surrender** – A Surrender pursuant to Section 8.3.

**Policy** – This Deferred Variable Annuity (DVA) Policy offered by the Insurer.

**Policy Account Value** – The net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid Fees or Charges.

**Policy Administration Fee** – The fee deducted by the Insurer as stated on the Policy Data Page and described in Section 9.1.

**Policy Anniversary** – The anniversary of the Policy Effective Date.

**Policy Data Page** – The pages of this Policy titled "Policy Data Page." The Insurer will reissue these pages by means of an endorsement whenever the information on the Policy Data Page is amended, in accordance with the Policy.

**Policy Effective Date** – The "Policy Effective Date" of this Policy as stated on the Policy Data Page.

**Policy Set-Up Deposit** – A non-refundable screening deposit due upon submission of the completed Annuity Application Form as stated on the Policy Data Page and described in Section 9.4.

**Policy Year** – Any one year period beginning on the Policy Effective Date or a Policy Anniversary and ending on the day before the next Policy Anniversary.

**Premiums** – The Initial Premium and any subsequent Premiums paid to the Insurer under this Policy.

**Private Act** – The private act entitled "The Scottish Annuity & Life International Insurance Company (Bermuda) Ltd. Consolidation and Amendment Act 2001," as amended and consolidated from time to time.

**Proposed Annuitant** – The individual whose life is used to determine the duration of the period during which the Annuity Payments will be paid by the Insurer.

**Proposed Joint Annuitants** – Each Proposed Annuitant (each being a "Proposed Joint Annuitant") when a second Proposed Annuitant is designated under the Policy and a Joint Life Annuity is selected. Each Proposed Annuitant, including the second Proposed Annuitant, is to generally be designated by the Proposed Policyholder in the Annuity Application Form but may be designated by the Proposed Policyholder after the Issue Date with the consent of the Insurer. The second named Proposed Annuitant shall be designated as the Proposed Joint Annuitant by the Proposed Policyholder in the Annuity Application Form and reflected as such on the Policy Data Page.

**Proposed Policyholder** – Proposed Policyholder means the individual or entity that proposes or is considering the purchase of a Policy pursuant to the Confidential Private Placement Memorandum. This term shall include a person who has become an actual policyholder through the purchase of a Policy or pursuant to a change made pursuant to Section 11.2.

**Qualified Purchaser** – A Qualified Purchaser within the meaning of Section 2(a)(51) of the Investment Company Act.

**SEC** – The U.S. Securities and Exchange Commission.

**Securities Act** – The U.S. Securities Act of 1933, as amended.

**Separate Account** – A separate investment account established by the Insurer for this Policy pursuant to the terms hereof, and Bermuda law (including the Private Act), the assets of which can be used for the sole purpose of paying claims under this Policy. A Separate Account is not a legal entity under Bermuda law and any references to the Separate Account performing any tasks means the Insurer in respect of the Separate Account.

**Single Life Annuity** – An annuity measured by the life of a single Proposed Annuitant.

**Subaccount** – A subaccount established by the Insurer as a bookkeeping entry within the Separate Account.

**Surrender** – A surrender under Article VIII including a Full Surrender under Section 8.2 and a Partial Surrender under Section 8.3.

**Taxes** – The taxes defined in Section 9.7 of this Policy.

**Unscheduled Premium** – Any Premium payment other than the Initial Premium or a Premium scheduled on the Policy Data Page or as set forth in an endorsement or attachment to the Policy.

**U.S. Treasury Regulations** – The U.S. Treasury regulations promulgated under the Code, as amended.

## Article I General Provisions

### Section 1.1 Consideration

This Policy is issued in consideration of the payment of the Initial Premium.

### Section 1.2 Entire Policy

This Policy, any endorsements or riders, and the Annuity Application Form constitute the entire contract between the Proposed Policyholder and the Insurer. The Proposed Policyholder, on behalf of the Proposed Policyholder, the Proposed Annuitant, and the Beneficiaries represents, acknowledges, and agrees that the Insurer has relied, and is entitled to rely, upon the accuracy of the information and statements made in the Annuity Application Form in deciding to issue this Policy.

### Section 1.3 Survival of Representations, Warrants, Covenants

The representations, warrants, covenants, and other statements made in the Annuity Application Form are incorporated herein by reference and shall survive the execution of this Policy.

### Section 1.4 Amendment or Modification

The Insurer cannot modify the Policy without the Proposed Policyholder’s consent, provided that, the Insurer may take any action it deems necessary in order to preserve the U.S. tax treatment of the Policy without the Proposed Policyholder’s consent, so long as the Insurer provides 90 days prior notice of any such proposed action to the Proposed Policyholder and discusses with the Proposed Policyholder the legal basis for such change.

### Section 1.5 Misstatement of Age

If the Age of any Proposed Annuitant or Proposed Joint Annuitant is misstated on the Annuity Application Form, the Insurer will adjust the Annuity Payments to reflect the correct Age. Any amount that the Insurer has overpaid as a result of any such misstatement shall be deducted from future Annuity Payments made under the Policy. The Insurer will require due proof of the Age or survival of any person on

whose continued life any payment or benefit under the Policy is dependent. It is the Proposed Policyholder's obligation to provide proof that is satisfactory to the Insurer.

### Section 1.6 Non-Participating Policy

This Policy is non-participating, which means that the Proposed Policyholder will not share in the Insurer's profits or surplus earnings and that the Insurer will not pay dividends on this Policy.

### Section 1.7 Ownership of Assets

Assets held in the Separate Account are the sole property of the Insurer. The Proposed Policyholder will have no direct proprietary interest in the assets held in any separate account, including, without limitation, the Separate Account with respect to this Policy.

### Section 1.8 Rule of Construction

For purposes of this Policy, the period denoted by the phrase "prior to a Liquidity Date" shall include the Liquidity Date.

### Section 1.9 Governing Law

The Policy will be governed by the laws of Bermuda without regard to its conflict of laws principles, including without limitation, the Private Act and the Life Insurance Act, 1978 as may be amended from time to time.

### Section 1.10 Effective Date of Coverage

Coverage of the Proposed Annuitants under this Policy will begin on the Policy Effective Date.

## Article II Premium Provisions

### Section 2.1 Premiums

The minimum Initial Premium payable under the Policy is $2 million. Such minimum may be met by aggregating Policies having initial Premiums of $1 million each and purchased by the same Proposed Policyholder. The Insurer has not placed a limitation on the maximum amount of Premiums that may be contributed by a Proposed Policyholder. Subject to Section 2.2, additional Premium Payments may be made at any time and from time to time as the Proposed Policyholder's financial situation permits, provided that the minimum additional Premium Payment may not be less than the minimum Unscheduled Premium.

The Initial Premium is due on the Issue Date. Premiums must be paid or mailed from outside the U.S. to the Insurer at its Home Office. Upon request, a receipt will be provided at the Insurer's Home Office (or other non-U.S. jurisdiction designated by the Insurer from time to time).

No Initial Premium or additional Premium payments may be made from the U.S. by any Proposed Policyholder (nor will the same be accepted by the Insurer) if said Proposed Policyholder is in the U.S. at the time the decision to make said Premium payment occurs. Further, the Proposed Policyholder may not direct that a Premium payment be made while the Proposed Policyholder is in the U.S. even if the Premium payment is made from outside the U.S.

Premium payments are generally to be made in U.S. Dollars. The Insurer may, in its sole and absolute discretion, accept certain in-kind asset contributions as Premium payments. The Insurer may reject in-kind asset contributions in its sole and absolute discretion.

### Section 2.2 Insurer's Right to Refuse Premiums

The Insurer reserves the right to refuse Premiums and to return Premiums with interest if such Premiums would adversely affect the U.S. tax consequences the Policy is intended to provide or the tax consequences under the laws of any other applicable jurisdiction.

The Insurer reserves the right not to accept any Premium payments from a Proposed Policyholder who ceases to be a Qualified Purchaser or an Accredited Investor. The Insurer may require any Proposed Policyholder to provide confirmation of the Proposed Policyholder's status as a Qualified Purchaser or an Accredited Investor before accepting any additional Premium payments. However, subject to any other limitation set forth in this Section 2.2, Premium payments during a Policy Year that do not exceed the sum of expected Fees and Charges under the Policy for the Policy Year will be accepted.

**Section 2.3 Nonpayment of Premium**

If no Premiums are paid after the Initial Premium, the Policy will continue In Force as long as the Policy Account Value is sufficient to pay any applicable Fees and Charges and, following the payment of such Fees and Charges, the Policy Account Value is $500,000 or more.

## Article III Termination Provisions

### Section 3.1 Insurer's Cancellation Rights

The Insurer may, in its sole and absolute discretion, cancel the Policy and distribute the Policy Account Value to the Proposed Policyholder if:

1. The Policy Account Value is less than $250,000 at the end of any calendar quarter prior to the Annuity Starting Date but following the Insurer's acceptance of the Initial Premium payment, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity; or

2. The continuing existence of the Policy would require the Insurer, the Policy or the Separate Account backing the Policy to register, or make information filings, with the SEC under the Securities Act, the U.S. Investment Company Act, the U.S. Investment Adviser Act, each as amended from time to time, or the securities laws of any jurisdiction in which the Insurer, the Policy or the Separate Account is not currently registered or required to make information filings; or

3. The Proposed Policyholder or the Proposed Annuitant (or any Proposed Joint Annuitant) changes his or her country of residence for tax, securities regulation, or other purposes; or

4. Subject to the provisions of section 12.6 of the Policy, any declaration in the Annuity Application Form is not exact, truthful, and complete in all material respects; or

5. If the Proposed Policyholder fails to comply with the terms of any of the covenants or declarations made in the Annuity Application Form.

Prior to the Policy termination, the Insurer will provide 90 day notice of such termination to the Proposed Policyholder, which notice shall include the reason for such termination. The Insurer will pay to the Proposed Policyholder the amount, if any, of the Policy Account Value determined as of the Next Available Liquidity Date. Surrender charges will not apply.

**Section 3.2 Reinstatement**

If the Policy terminates as the result of the expiration of a Grace Period, it may not be reinstated unless reinstatement is required by Bermuda law.

## Article IV Premium Investment; Policy Account Values

### Section 4.1 The Separate Account

The Insurer will establish a Separate Account pursuant to the terms of the Private Act to hold assets that fund obligations arising under each Policy issued by it together with any supplementary contracts hereunder and certain other funds. Income, gains, or losses of each Separate Account are credited to or charged against the assets held in such Separate Account, without regard to other income, gains, or losses of any other Separate Account or business of the Insurer. Under the terms of this Policy and the laws of Bermuda, assets allocated or credited to each Separate Account are the property of the Insurer and the Proposed Policyholder has no direct proprietary interest in such assets.

### Section 4.2 Premiums

Net Premiums received by the Insurer with respect to the Policy will be credited to the related Separate Account. To the extent that Premiums are insufficient to pay all Fees and Charges due to the Insurer under the Policy, the Insurer will deduct Fees and Charges from the Separate Account.

Amounts payable to the Proposed Policyholder or any Beneficiary under the Policy will be made by the Insurer from the related Separate Account to the Proposed Policyholder or Beneficiary in accordance with the terms of this Policy. The Insurer will establish Subaccounts within the Separate Account for each Investment Option selected by the Proposed Policyholder. Each Subaccount will correspond to an Investment Option. The Insurer may from time to time change the Investment Options and investment managers available to Proposed Policyholders, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager).

### Section 4.3 Allocations to Investment Options

On the Annuity Application Form, the Proposed Policyholder will designate the initial allocation of Net Premiums among the available Investment Options and on each Liquidity Date a Proposed Policyholder's Net Premiums will be allocated among the

Investment Options according to the allocation percentages selected. Allocation percentages must be zero or a whole number not less than ten nor greater than 100. The sum of the allocation percentages must equal 100. The Insurer will document the initial allocation on the Policy Data Page. The Insurer has reserved the right to require allocation of an amount equal to the expected aggregate quarterly Fees and Charges related to the Policy to the Liquid Asset Subaccount before application of the allocation percentages designated by the Proposed Policyholder. In addition, the Insurer may transfer amounts from other Investment Options and Subaccounts to the Liquid Asset Subaccount equal to the expected quarterly Fees and Charges.

The specific Investment Options can generally be divided into two categories: IDFs and Managed Subaccounts. The Insurer is not obligated to offer both IDFs and Managed Subaccounts as Investment Options at any time. Accordingly, at any given time only one of these types of Investment Options may be available.

The Insurer and its affiliates make no recommendations, and provide no investment advice, as to the selection of, and allocations to, Investment Options. The Insurer has not evaluated any of the investment manager's investment performance and makes no recommendation regarding the selection of any investment manager or any IDF. The Insurer does not act as a custodian of cash or investments held in the Separate Account.

**Section 4.4 Compliance with Investor Control Rules**

The Proposed Policyholder agrees that, except for the selection of the allocation of Separate Account assets among Investment Options as contemplated in Section 4.3, and changes to such allocations as contemplated in Section 4.5, it will not select, identify or recommend, nor will it contact any investment manager for the purpose of influencing, any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount, including, without limitation, an investment manager with respect to an IDF in which funds held in a particular Subaccount are invested.

A Proposed Policyholder may not have direct contact or communicate with the investment manager of either an IDF or a Managed Subaccount and may not directly participate in the management of the Separate Account or any IDF or Managed Subaccount.

**Section 4.5 Changes in Allocations to Investment Options**

The Proposed Policyholder may, at quarterly intervals, reallocate funds among then available Investment Options but may do so no more than twice per calendar year. If a change in allocation percentages requires a transfer of funds between Investment Options, there may be a delay after the Separate Account receives the proceeds from one Investment Option until the next date on which it is possible to reinvest the funds in a different Investment Option. During this delay period (which may be up to one calendar quarter), funds will be invested in the Liquid Asset Subaccount. The Proposed Policyholder acknowledges that this delay may result in the funds having a lower return for this period.

In the event of such a delay, the funds from the liquidated investments will be invested in the Liquid Asset Subaccount until the next Liquidity Date at which time the funds will be re-allocated (together with any related earnings) to the applicable Subaccount originally designated by the Proposed Policyholder for the transfer.

Unless and until the Proposed Policyholder notifies the Insurer in writing of a new Net Premium allocation, the Net Premium allocations as specified in "Initial Allocation of Payment to Investment Options" on the Policy Data Page will continue to apply to any additional Premium payments.

**Section 4.6 Responsibility for Selecting Investment Options**

The Insurer does not and will not make any recommendation as to the Proposed Policyholder's selection or retention of investment managers, allocation of assets among Subaccounts, Investment Options, or investments in particular securities or categories of securities, nor will it evaluate the investment performance of any investment manager. Inclusion of an Investment Option shall not be deemed to be a recommendation of that investment or as an indication that such an investment is suitable for the Proposed Policyholder.

Each Proposed Policyholder acknowledges, represents, warrants, and covenants that it is solely responsible for determining for themselves whether a particular Investment Option is suitable in light of their individual situations. The Insurer and its affiliates make no recommendations, and provide no advice, as to the selection of Investment Options and provide no warranty, representation, or indemnity with respect to the

performance of any Investment Option. Each Proposed Policyholder should consult his or her personal financial advisor concerning Premium allocations.

**Section 4.7 Appointment of Investment Manager and Custodian Bank**

The Insurer shall have the right, exercisable in its sole and absolute discretion, to appoint, change, or remove the investment manager and custodian bank with respect to each Investment Option or Separate Account, provided that an investment manager shall only be removed for cause (as described in the Insurer's investment management or similar agreement with such investment manager). A Proposed Policyholder may recommend to the Insurer one or more investment managers or custodian banks who meet the Insurer's general requirements after the initial policy date, but the Insurer may accept or reject such recommendation in its sole and absolute discretion.

**Section 4.8 Timing of Allocations**

The Insurer will allocate the Proposed Policyholder's Net Premiums among one or more Investment Options in the percentages specified on the Policy Data Page, as amended from time to time at the written request of the Proposed Policyholder, within two business days following the date the Insurer receives the Net Premiums. Net Premiums received and which are to be allocated to an Investment Option will be initially invested in the Liquid Asset Subaccount and subsequently allocated (together with any related earnings) within two business days to the applicable Investment Option (subject to deferral due to liquidity constraints imposed by the applicable investment manager or IDF and subject to such provisions as to valuation and unit calculation as may be specified by the applicable investment manager).

**Section 4.9 Investment of Separate Account Assets**

The Insurer will require each investment manager with respect to a portfolio of an IDF or Managed Account held in the Separate Account and the investment manager of each investment fund or other investment fund in which the assets of the Separate Account are invested, to comply with the following:

1. Investment of assets held in each Subaccount will be sufficiently diversified to comply with the requirements of U.S. Treasury Regulation section 1.817-5(b). Assets of any investment fund relying upon a "look-through" basis for purposes

of meeting such diversification requirements will themselves be sufficiently diversified so as to allow the Subaccount to comply with such requirements.

2. The investment manager and its employees who are responsible for investment decisions will not accept investment recommendations or make any investment decisions regarding the direct or indirect investment of Separate Account assets based, in whole or in part, on information regarding any investment or group of investments received from any Proposed Policyholder or any representative or adviser of a Proposed Policyholder.

3. No Proposed Policyholder (or any representative or adviser of a Proposed Policyholder) will have the right or be permitted to select or identify any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount.

4. The investment manager will not commit to invest assets of any Subaccount (or of any underlying investment fund or Managed Account in which a Subaccount has invested directly or indirectly) in mutual funds or other collective investment funds or publicly available investment products (including, without limitation, market-linked deposits and flexible deposits) managed, advised and/or distributed by the investment manager or its affiliates and will only do so if (a) in the investment manager's sole judgment at the time the investment is made, such fund or product is appropriate within the investment objectives and policies of the Subaccount fund or Managed Account and (b) no more than 55% of the assets on an initial purchase basis (excluding market value increases) of the Subaccount fund or Managed Account are invested in such funds or products at any time. Subject to the foregoing, for the avoidance of doubt, assets may be invested in an IDF.

5. In accordance with Section 4.4, except for general descriptions of the investment policies of the Investment Options, there will not be any direct or indirect prearrangement, plan or agreement between any Proposed Policyholder (or any Proposed Policyholder's advisers or representatives) and the investment manager (or any of its employees) regarding the investments to be made directly or indirectly by any Subaccount.

**Section 4.10 Request for Extension of Investment Rights With Respect to Adequate Diversification**

A Proposed Policyholder may make a request for an extension of the Proposed Policyholder's investment rights described in Section 4.4 and partial or complete release of the investment manager's obligations in Section 4.9 to adequately diversify the assets held in the Separate Account by delivering a written request to the Insurer's Home Office expressing a specific desire for the same. The Insurer may grant or deny such requests in its sole and absolute discretion, for any reason or for no reason whatsoever. Any such request must be approved by the Insurer in writing (and, in the case of an IDF, may also require the consent of the IDF). Absent written approval of the request, the request shall be deemed to have been denied.

The Insurer expresses no opinion and makes no representations or warranties regarding the tax consequences under the laws of the U.S. or any other jurisdiction of the Insurer's decision to grant such requests. By making such a request, a Proposed Policyholder waives any claim against the Insurer, its shareholders, directors, officers, employees, agents or affiliates on behalf of the Proposed Policyholder, any Beneficiaries or any other person for any loss from the Insurer's decision to grant or deny the Proposed Policyholder's request and agrees to hold harmless hereunder the Insurer and its shareholders, directors, officers, employees, agents or affiliates for any such loss.

**Section 4.11 Changes in Investment Options**

The Insurer at any time may add additional Investment Options, remove or restrict existing Investment Options, or add or eliminate an investment manager subject to any required regulatory approval, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager). If an Investment Option is removed or restricted or an investment manager is terminated, the Insurer may eliminate the Investment Option as an option for future Premium payments or transfers and may also transfer funds from the Subaccount in which assets invested in the terminated Investment Option were held, to the Liquid Asset Subaccount. An affected Proposed Policyholder may submit instructions to adjust the allocation of Net Premiums among the remaining Investment Options, without charge, for a period of 60 days following receipt of the Insurer's notice of any

such termination. The Insurer will implement those instructions on the Next Available Liquidity Date after receipt.

**Section 4.12 Policy Account Value**

The Policy Account Value is equal to the net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid fees or expenses. The Insurer will determine the Policy Account Value on each Liquidity Date. The Separate Account value will increase or decrease, depending upon the investment experience of the related Subaccounts.

Assets allocated or credited to a Separate Account may be commingled with assets allocated or credited to another Separate Account for purposes of investment. In such circumstances, the Insurer may determine the Policy Account Value of each such Separate Account by the use of accumulation units, which are calculated separately with respect to each commingled investment. The accumulation unit value for each commingled investment will vary to reflect the investment experience of the assets invested therein.

The value of an accumulation unit will be determined on each Liquidity Date. When a commingled investment is made, the Insurer will credit the Separate Account with a number of accumulation units determined by dividing the amount of the investment by the value of the accumulation unit. When assets allocated or credited to a Separate Account are withdrawn from an investment, the accumulation units are reduced.

## Article V Transfers Among Investment Options

### Section 5.1 General

The Proposed Policyholder may request one transfer among Investment Options per calendar quarter, but no more than twice per calendar year.

### Section 5.2 Conditions on Transfer

To effect any transfer, the Proposed Policyholder must submit a transfer request to the Insurer. All transfers are subject to the following conditions:

1. Any applicable Fees and Charges will be deducted from the Subaccount or from the amount which is transferred.
2. Transfers will be effected within 60 days following receipt by the Insurer of a transfer request. Actual settlement of a disposition or redemption from the relevant Subaccount, and reinvestment of the proceeds may be delayed as described below.
3. Any transfer request must clearly specify: (a) the amount which is to be transferred; and (b) the Subaccounts which are to be affected.
4. Payments to effect a transfer are subject to the disbursement rules and restrictions of the Subaccount(s).
5. The minimum amount that may be transferred in a single transfer will be the lesser of $250,000 or the entire interest in a Subaccount.
6. No transfer may be made from the Liquid Asset Subaccount if the amount remaining therein would not equal or exceed the Minimum Liquid Asset Allocation.
7. In the case of an IDF, any additional conditions set forth in the governing documents in the IDF must be satisfied.

**Section 5.3 Liability**

Neither the Insurer nor any of the Insurer's affiliates will be liable for any losses incurred as a result of transfers made in accordance with a Proposed Policyholder's transfer request including lower returns which may result.

**Section 5.4 Limits on Right of Transfer**

The Insurer may in its sole and absolute discretion defer the right of transfer for any period when it reasonably determines that additional time is necessary to obtain sufficient cash to make the transfer payments. Additional limitations on transfer may be imposed under the terms of any IDF in which assets held in a Separate Account are invested. For the avoidance of doubt, a transfer described in this Section 5.4 is a situation where a change from one Investment Option to another Investment Option occurs.

## Article VI Annuity Provisions

### Section 6.1 Annuity Payments

The Insurer will make periodic payments to the Beneficiaries beginning on the Annuity Starting Date and continuing thereafter on each Policy Anniversary to an account located outside the U.S. The amount of each Annuity Payment will equal the product of the applicable Annuity Percentage and the Policy Account Value (determined as of the end of the calendar quarter immediately preceding each Annuity Payment) and will vary depending upon the investment experience of the Investment Options in which the Separate Account assets are invested and the age of the Proposed Annuitant.

### Section 6.2 Annuity Percentage

The Annuity Percentages are listed in the Appendix I to this Policy. The applicable Annuity Percentage will, depend upon the benefit option selected by the Policyholder. In the case of a Single Life Annuity, the Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants. The Annuity Percentage is adjusted for each Annuity Payment.

### Section 6.3 No Guaranteed Payments

The Policy Account Value, and thus, the Annuity Payments may increase or decrease depending upon the investment experience of the Investment Options selected by the Proposed Policyholder. The sole source for the payment of the Annuity Payments are the assets held in the Separate Account backing the Policy. The Policy does not provide for guaranteed annuity or death benefits. All payments, including upon the death of the Proposed Policyholder or Proposed Annuitant (or Proposed Joint Annuitants) are strictly limited to the assets held in the Separate Account backing the Policy and no Annuity Payments or any other payments under the Policy are payable from any other source.

**Section 6.4 Annuity Starting Date**

The Annuity Starting Date must be on the first day of a calendar quarter and may not be later than the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty-fifth (85th) birthday. If the Proposed Policyholder has not chosen an Annuity Starting Date, then the first day of the calendar quarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant's or surviving Proposed Joint Annuitant's) eighty-fifth (85th) birthday shall be the Annuity Starting Date.

**Section 6.5 Change of Annuity Starting Date**

The Proposed Policyholder may change the Annuity Starting Date prior to the then current Annuity Starting Date by delivering a written notice to the Insurer. The new Annuity Starting Date may not be before the Next Available Liquidity Date for any Investment Option under the Policy as of the date the Insurer receives the notice from the Proposed Policyholder, and may not be later than the first day of the calendar month following the Proposed Annuitant's 85th birthday. Distributions must commence after the Annuity Starting Date in accordance with requirements under the Code.

**Section 6.6 Annuity Income Options**

Two (2) basic benefit options are offered under the Policy: (i) a Single Life Annuity, and (ii) a Joint Life Annuity. The benefit option may be changed by the Proposed Policyholder; however, no such change may be made at any time on or after the Annuity Starting Date. A Policyholder may change the selection of any benefit option by giving the Insurer at least thirty (30) calendar days' written notice prior to the Annuity Starting Date from outside the U.S.

In the case of a Single Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants.

Under both basic benefit options, the amount of each annual Annuity Payment made on or after the Annuity Starting Date will vary in accordance with the age of the Proposed Annuitant (or Proposed Joint Annuitant(s)) and the investment performance of the assets held in the Separate Account and shall be computed by the Insurer's

actuary each year (and recomputed on the annual anniversary date each year thereafter) by multiplying the applicable Annuity Percentage in the Annuity Percentage Table attached as Appendix I to this Policy by the then current Policy Account Value as of the Annuity Starting Date and predetermined on the annual anniversary date each year thereafter. If the Policy Account Value is zero, then all payments will cease. All Annuity Payments shall be made to an account outside the U.S. The Insurer may consider the adoption of additional benefit options at the request of a Proposed Policyholder.

### Section 6.7 Maturity Payment

Upon the death of the Proposed Annuitant (or survivor of the Proposed Joint Annuitants), the Insurer will pay to the Beneficiaries, or their successors as Beneficiaries, as the case may be, the balance of the Policy Account Value.

## Article VII Loan Provisions

### Section 7.1 Policy Loans

The Proposed Policyholder shall have no guaranteed rights or privileges with respect to loans under a Policy. The Insurer may, in its sole and absolute discretion consider whether to facilitate a Proposed Policyholder's request to pledge a Policy as collateral security for a loan to be made by the Insurer or institutional or other third party lenders. A pledge of a Policy as collateral security for a loan may be effected only with the prior written consent of the Insurer, which may be granted or denied in the Insurer's sole and absolute discretion.

## Article VIII Surrender Provisions

### Section 8.1 General

At any time after the Issue Date and prior to the Annuity Starting Date, the Proposed Policyholder may request one or more withdrawals under the Policy from the Separate Account in the form of a Partial Surrender. Withdrawals are possible up to 100% of the Policy Account Value. Should the Policy Account Value be equal to or less than $250,000, the Policy will lapse. The rights of a Proposed Policyholder to make a Surrender under the Policy shall be subject to the consent of all Beneficiaries who have been irrevocably designated by the Proposed Policyholder under the Policy. Subject to this Article VIII, the Proposed Policyholder may Surrender the Policy, in whole or in part, by filing a written request with the Insurer at the Insurer's Home Office at any time during the lifetime of the Proposed Annuitant. The Policy Account Value which is the subject of the Surrender will be determined as of the Next Available Liquidity Date occurring after the Insurer receives the request to Surrender.

Although the amount of the Surrender proceeds will be determined as of the Next Available Liquidity Date after receipt of the Surrender request, the Insurer will use reasonable efforts to pay Surrender proceeds as soon as practicable whether on a Liquidity Date or another date (subject to such liquidity constraints and provisions as to valuation and unit calculation as may be specified by the investment manager of the applicable Investment Option).

### Section 8.2 Full Surrender

If the Proposed Policyholder requests a Full Surrender of the Policy Account Value of the Policy, the Policy will terminate on the date the Proposed Policyholder submits its Surrender request in accordance with Section 12.3.

### Section 8.3 Partial Surrender

The Proposed Policyholder may request a Partial Surrender of the Policy for up to and including 90% of the Policy Account Value of the Policy. No more than one Partial Surrender may be requested by the Proposed Policyholder during each quarter of a Policy Year. As provided in Section 3.1, any Partial Surrender that causes the Policy Account Value to be reduced to an amount that is less than

$250,000 may be deemed by the Insurer to be a request for Full Surrender and if so deemed will cause the Policy to be terminated, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity. If the Policy Account Value is reduced to an amount that is less than $250,000, then the Insurer shall have the right, exercisable in its sole and absolute discretion, to treat a Partial Surrender request as a Full Surrender request.

Each Partial Surrender will reduce the Policy Account Value and the amount of any Annuity Payment to be paid after the Annuity Starting Date. An amendment to the Policy will be sent to the Proposed Policyholder outside the U.S. for countersignature upon any request for a Partial Surrender under the Policy. Said amendment shall become a part of the Policy.

## Article IX Policy Fees and Charges

### Section 9.1 Policy Administration Fee

The Insurer will deduct the Policy Administration Fee from the Separate Account as set forth in the Policy Data Page for general administrative expenses.

### Section 9.2 DAC Charges

The amount deducted by the Insurer as set forth on the Policy Data Page to pay for the costs imposed by virtue of the treatment of certain deferred acquisition costs for U.S. federal income tax purposes under section 848 of the Code. The amount of the DAC Charge as set forth on the Policy Data Page shall be adjusted to reflect any change in the applicable U.S. federal income tax rate. The Insurer shall provide the Proposed Policyholder notice of any change in the DAC Charge.

### Section 9.3 Management & Expense Fee

The Insurer will deduct the Management & Expense Fee from the Separate Account. The Management & Expense Fee is an on-going insurance administration fee described on the Policy Data Page.

### Section 9.4 Policy Set-Up Deposit

The Policy Set-Up Deposit is due to the Insurer as set forth on the Policy Data Page upon submission of the completed Annuity Application Form by the Proposed Policyholder. The Policy Set-Up Deposit will be paid into the General Account of the Insurer. Upon issuing the Policy, an amount equal to the Policy Set-Up Deposit will be used to offset the Acceptance Fee. If for any reason, a Policy is not issued, the Insurer will retain the Policy Set-Up Deposit to cover medical, underwriting, administration and any other costs incurred by the Insurer in the processing of the application.

### Section 9.5 Acceptance Fee

The Insurer will deduct the Acceptance Fee set forth in the Policy Data Page on each date the Insurer receives a Premium payment.

**Section 9.6 Surrender Charge**

Surrender charges will not apply to this Policy.

**Section 9.7 Taxes**

The Insurer will deduct only those Taxes (as defined below) paid by the Insurer or its affiliates to any governmental entity that relate to the Policy or the related Separate Account. These taxes (the "Taxes") exclusively include withholding taxes, excise taxes, sales taxes, stamp taxes, value added taxes, state taxes imposed on the Insurer or its affiliates, and taxes imposed on Subpart F income of a Separate Account attributable to its investment in a controlled foreign corporation, as well as the deferred tax amount and any interest charge or other taxes imposed on the investments of a Separate Account in a passive foreign investment company, or under the corresponding tax laws of other jurisdictions.

The Insurer may, in its sole and absolute discretion, pay Taxes when due and deduct such amounts from the Separate Account at a later date. The Insurer will, in its absolute discretion, determine when Taxes have resulted from the investment experience of any Subaccount or receipt by the Insurer of Premiums.

**Section 9.8 Agreed Upon Procedures Fee**

The Insurer will deduct the Agreed Upon Procedures Fee from the Separate Account if the Proposed Policyholder instructs the Insurer to engage a third party audit firm to review charges and provide an Agreed Upon Procedures (AUP) report.

**Section 9.9 Deductions for Fees and Charges**

The Fees and Charges are paid to the Insurer under the Policy initially by making deductions from Premiums and then by making deductions from the Separate Account. To the extent that the Insurer deducts Fees and Charges from the Separate Account, amounts will be deducted first from the Liquid Asset Subaccount and then from the Subaccounts pursuant to the terms of the Policy.

**Section 9.10 Custodian Bank and Investment Manager Fees**

Each custodian bank and investment manager will separately deduct any applicable fees charged by it from any Separate Account or Investment Option for which it is acting as custodian or investment manager, as the case may be. The fees of the

custodian bank and investment manager are calculated on an individual basis and may vary depending upon the investment manager and Investment Option(s) selected by the Proposed Policyholder. The list of investment managers and custodians retained by the Insurer is available from the Insurer upon request.

## Article X Death Benefit Provisions

### Section 10.1 Death Benefit

If all Beneficiaries and any alternative Beneficiaries predecease the Proposed Policyholder and Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected), then the benefits payable under the Policy to the Beneficiaries or alternative Beneficiaries shall be paid to the Proposed Policyholder until the first to die of the Proposed Policyholder or Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected).

If none of the Beneficiaries or alternative Beneficiaries survives the Proposed Annuitant(s), then the Policy Account Value shall be paid to the Proposed Policyholder upon the Proposed Annuitant's death (or survivor of the Proposed Joint Annuitants' death, in the case where a Joint Life Annuity benefit option is selected).

If the Proposed Policyholder is not living at the time any benefit under the Policy is payable to the Proposed Policyholder, then such benefit shall be paid to the Proposed Policyholder's estate, if then open, or if not then to his heirs *per stirpes*, in accordance with the laws of succession in the jurisdiction of the Proposed Policyholder's last known domicile on the date of the Proposed Policyholder's death.

If the Proposed Policyholder is not an individual, then the Proposed Annuitant (or the younger of the Proposed Joint Annuitants or the survivor of the Proposed Joint Annuitants) shall be recognized as the "primary Proposed Annuitant" and treated as the Proposed Policyholder of the Policy. Any change in the designation of such Proposed Annuitant (or Proposed Joint Annuitant) following the Issue Date (in the case where the Proposed Policyholder is not an individual) shall be treated as the death of the Proposed Policyholder.

If the Proposed Policyholder dies prior to the "annuity starting date" (defined under Code Section 72(c)(4) as the first day of the first period for which an amount is received as an annuity under the contract; such definition possibly differing from the Annuity Starting Date designated under the Policy), then the Proposed Policyholder's entire interest in the Policy shall be distributed to the Beneficiaries within five (5) years from the date of the Proposed Policyholder's death, unless the Beneficiaries

elect to receive such interest in distributions made over their life or lives (or over a period not extending beyond their respective life expectancies), and such distributions begin within one (1) year from the date of the Proposed Policyholder's death. Any such election must be made in writing and received by the Insurer at the Insurer's Home Office within 180 calendar days from the date of the Proposed Policyholder's death.

If the Proposed Policyholder dies on or after the "annuity starting date" (as defined under Code Section 72(c)(4)) and before the entire interest in the Policy has been distributed, the remaining portion of the Policy Account Value shall be distributed to the Beneficiaries at least as rapidly as under the method of distributions being used as of the date of the Proposed Policyholder's death.

Notwithstanding any provision of the Policy, all Death Benefits must be distributed in compliance with the provision of section 72(s) of the Code. Death Benefits payable hereunder will be includible in the gross income of the Beneficiary.

**Section 10.2 Due Proof of Death**

Due proof of death is one of the following received at the Insurer's Home Office in a form satisfactory to the Insurer in its absolute discretion:

1. A certified copy of a death certificate;
2. A certified copy of a decree of a court of competent jurisdiction as to the finding of death; or
3. Any other proof of death satisfactory to the Insurer.

## Article XI Owner, Beneficiary, Assignment

### Section 11.1 Proposed Policyholder

The Proposed Policyholder is the person so named on the Policy Data Page or his or her assignee in accordance with a valid assignment as provided in Section 11.2.

Under Bermuda law, the Proposed Policyholder or his personal representative, trustee in bankruptcy or legal assignee will be the owner of the rights to payments under the Policy. While the Proposed Policyholder is alive, all rights in the Policy belong to the Proposed Policyholder and may be exercised without the consent of any Beneficiary, provided that, once an irrevocable designation of Beneficiary is filed, changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary. All of the Proposed Policyholder's rights in the Policy belong to the estate of the Proposed Policyholder if the Proposed Policyholder dies before the Proposed Annuitant. Joint ownership is permitted.

### Section 11.2 Change of Proposed Policyholder

The Proposed Policyholder may change the ownership of the Policy by submitting a request to the Insurer's Home Office and obtaining written approval of the Insurer. Any approved change will take effect on the date specified in the approval.

### Section 11.3 Proposed Annuitant

The Proposed Policyholder has the right to designate one Proposed Annuitant or two Proposed Joint Annuitants. The Proposed Annuitants or Proposed Joint Annuitants will be as stated in the Annuity Application Form, unless otherwise endorsed at issue or subsequently changed.

### Section 11.4 Change of Proposed Annuitant

Each Proposed Policyholder will have the right to designate and in some cases change the Proposed Annuitant or Proposed Joint Annuitant.

**Section 11.5 Beneficiary**

The Proposed Policyholder shall initially designate one or more Beneficiaries on the Policy Data Page. All designations of Beneficiaries are revocable unless specified as irrevocable by the Proposed Policyholder. Once an irrevocable designation of Beneficiary is filed, any changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary under the Policy.

**Section 11.6 Change of Beneficiary**

Except in the case of an irrevocable Beneficiary, the Proposed Policyholder may change the Beneficiaries by filing a written request from outside the U.S. with the Insurer at its Home Office at any time prior to the Annuity Starting Date. In the case of an irrevocable Beneficiary, the consent of the irrevocable Beneficiary to the change is also required. The change will take effect as of the date the notice is received by the Insurer subject to any payment made or action taken by the Insurer before the Insurer receives the document at its Home Office. A new Beneficiary designation will automatically revoke all prior designations (except an irrevocable Beneficiary designation where the consent of the irrevocable Beneficiary has not been obtained). The Insurer will not be liable for any payment made or action taken before the effective date of the change of Beneficiary.

**Section 11.7 Assignment**

The Proposed Policyholder may transfer, assign, or pledge the Policy or any of their rights under the Policy, including a Section 1035 exchange of the Policy with another carrier, without the prior written consent of the Insurer, provided that the Policy may not be assigned unless (i) it is registered under the U.S. federal securities and/or state securities laws or the securities laws of any other jurisdiction unless such registration is not required or an exemption from registration is available and (ii) the assignee is a Qualified Purchaser and Accredited Investor. The Insurer may require satisfactory evidence as to the non-applicability of any such registration requirement or the availability of an exemption from any applicable registration requirement and the Insurer may in its discretion for this purpose request, at the transferor's expense, a favourable legal opinion from transferor's counsel that the provisions of this Section 11.7 have been met.

The Insurer represents and warrants that, subject to the foregoing, it will fully cooperate with any assignment, transfer or exchange, including a "1035" exchange of the Policy with another carrier and will cooperate to exchange underlying IDFs or sub-accounts with such carrier. Failure by the Insurer to cooperate with the Proposed Policyholder in a proposed 1035 exchange or other transfer, assignment, or pledge of the Policy or any of the Proposed Policyholder's rights under the Policy, such failure to cooperate as determined by a final judgement in a Bermuda court or other court of relevant jurisdiction, among any other injunctive or other relief resulting therefrom, will result in liquidated damages to the Proposed Policyholder equal to the sum of the (a) then Policy Account Value and (b) any fees or charges, including Management and Expense Fees, accruing during the period that the non-cooperation (as determined by the a Bermuda court or other court of relevant jurisdiction) exists and is continuing, and the Insurer shall be strictly liable for payment of such amount to the Proposed Policyholder. For the avoidance of doubt, the Proposed Policyholder shall be entitled to its Policy Account Value separate from the liquidated damages amount provided for herein. The Proposed Policyholder (x) acknowledges that the Insurer's ordinary and customary process for 1035 exchanges includes obtaining satisfactory assurance from the transferor of compliance with relevant tax and disclosure laws with respect to the Policy and indemnification from the new carrier regarding any tax obligations relating to the Policy and (y) agrees that following the Insurer's 1035 exchange process will not be considered to be a failure to cooperate by the Insurer.