**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P**.**

§
§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§
vs. §

3:26-CV-02496-D

**Highland Capital Management, L.P., et al**-Appellee
§
§

**[4689] Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026**

**APPELLANT RECORD**

**VOLUME 15**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02496-D<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4698] on July 24, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689] now files this *Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the Court's June 15, 2026 Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate?

2. Did the Bankruptcy Court err in finding Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate ("Dugaboy's Motion") [Docket No. 4684] was "without merit?"

3. Did the Bankruptcy Court err in denying Dugaboy's Motion without a full record, including that Dugaboy was not allowed to file a reply brief and was not granted a hearing?

4. Did the Bankruptcy Court err in denying Dugaboy the opportunity to file a reply brief to Highland's Opposition to Dugaboy's Motion, including that Dugaboy indicated a date certain for filing a reply?

5. Did the Bankruptcy Court err in finding Dugaboy's Motion was "without merit" without granting a hearing?

6. Did the Bankruptcy Court err by summarily denying Dugaboy's Motion without explaining its reasoning for the denial?

7. Did the Bankruptcy Court err in failing to consider Dugaboy's Notice of Intervening Event?

8. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(2) when it determined that it had not manifestly erred in deciding the evidence of Mark Patrick's misconduct contained in the Cayman Islands proceeding was not "newly discovered" even though that information was not contained in James Dondero's affidavit executed April 16, 2025?

9. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant

to Rule 60(b)(2) when it determined it had not manifestly erred in deciding the Dondero Affidavit indicated information gained in the Cayman Islands proceedings was not "newly discovered" despite the fact the Affidavit lacked any evidence of the restructuring discovered in the Cayman Islands proceedings?

10. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding on the grounds that Rule 60(b)(3) purportedly requires fraud or misconduct to have occurred in the judicial proceeding itself?

11. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding that Highland did not provide misleading or incomplete answers during the discovery of Mark Patrick's misconduct and resulting lack of authority to negotiate the Rule 9019 settlement agreement from Dugaboy leading to the Rule 9019 Order?

12. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding that Dugaboy had not presented a basis for relief under Rule 60(b)(6) that was separate from the grounds presented for Rule 60(b)(2) and Rule 60(b)(3)?

13. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding on the grounds that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain?

14. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of the Bankruptcy Court's special responsibility to monitor arrangements and settlements made between Highland's appointed managers and third parties?

15. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of its manifest error in failing to consider the Bankruptcy Court's role as a court of equity and responsibility to prevent misconduct before it, such as Mark Patrick's use of stolen assets in the 9019 Settlement?

16. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

Vol. 1 000001 – 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4698] filed by Appellant;

000010 2. The Bankruptcy Court's July 10, 2026 *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000012 4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 2 000648 thru Vol. 3 | 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| Vol. 4 001843 | 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 4 001845 thru vol 6 | 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol 7 003634 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003647 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003650 & 003651 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003652 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003663 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003667 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003670 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 7 003709 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004733 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol. 8 004790 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol 9 005207 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005209 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005217 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| vol 9 | | Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 04/07/2026 005222 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 04/07/2026 005225 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 04/10/2026 005227 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 04/16/2026 005229 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/17/2026 005233 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., |

| | **Date Filed** | **Docket No.** | **Description/Docket Text** |
|---|---|---|---|
| Vol 9 | | | Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| 005330 | 04/17/2026 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| Vol 10 005590 | 04/21/2026 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 005594 | 04/22/2026 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005615 | 04/22/2026 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 005682 | 04/22/2026 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol 10 | | Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| 04/22/2026 005692 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 04/24/2026 005705 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 04/24/2026 005726 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 04/25/2026 005727 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/27/2026 005729 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 04/28/2026 005737 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |

| Vol. 11 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| 005746 | 04/28/2026 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 005755 | 04/28/2026 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005761 | 04/28/2026 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005767 | 04/29/2026 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held*)Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 005776 | 04/29/2026 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 005783 | 04/29/2026 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| Vol. 10 | **Date Filed** | **Docket No.** | **Description/Docket Text** |
|---|---|---|---|
| 005785 | 04/29/2026 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005787 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005794 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005796 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005798 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005801 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005884 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005902 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005905 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005907 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund |

| Vol. 11 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005913 | 05/06/2026 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005920 | 05/06/2026 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005927 | 05/06/2026 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 005929 | 05/07/2026 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005936 | 05/08/2026 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 005939 | 05/08/2026 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 005942 | 05/08/2026 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 005945 | 05/08/2026 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol. 12 006100 Thru Vol 21 | 05/08/2026 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and* |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | *Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| 10). 22 008156 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 008172 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 008188 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery) |

Case 19-34054-sgj11 Doc 4707 Filed 08/07/26 Entered 08/07/26 19:37:31 Desc Main Document Page 14 of 23

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 22 008256 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008293 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008429 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008465 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008472 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| vol. 24 008916 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| Vol 25 009554 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| Vol. 26 009868 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| Vol 27 010229 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| Vol. 28 010538 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

Case 19-34054-sgj11 Doc 4707 Filed 08/07/26 Entered 08/07/26 19:37:31 Desc
Main Document Page 16 of 23

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| Vol. 28 010664 05/11/2026 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29 010736 05/11/2026 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol 30 011150 05/11/2026 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol 31 011734 05/11/2026 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol 32 013203 thru Vol 33 05/11/2026 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34 014888 05/11/2026 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol 35 05/11/2026 015349 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 05/11/2026 015505 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 05/12/2026 015506 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 05/12/2026 015538 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 05/12/2026 015565 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 05/15/2026 015566 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36 05/18/2026 015569 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol 37 015996 | 05/18/2026 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 016008 | 05/19/2026 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 016079 | 05/20/2026 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 016082 – 016084 | 05/20/2026 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 016085 | 05/21/2026 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 016134 | 05/21/2026 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 37 | | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| 016135 | 05/23/2026 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 016233 | 05/28/2026 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 016490 | 06/15/2026 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s)4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 016504 | 06/15/2026 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| Vol. 39 016505 | 06/29/2026 | 4684 | (162 pgs; 2 docs) Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Appendix) (Edney, Michael) |
| 016667 | 06/29/2026 | 4685 | (7 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s)4679 Order on motion to reconsider). Appellant Designation due by 07/13/2026. (Attachments: # 1 Exhibit)(Edney, Michael) |
| 016674 | 07/06/2026 | 4687 | (32 pgs; 2 docs) Response opposed to (related document(s): 4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 016706 | 07/09/2026 | 4688 | (23 pgs; 2 docs) Notice of Intent to Reply and Request for Hearing on Its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| vol. 39 | | (Attachments: # 1 Appendix)). (Attachments: # 1 Attachment A) (Edney, Michael) |
| 07/10/2026 016729 | 4689 | (2 pgs) Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026. (Okafor, M.) Modified text on 7/10/2026 (mdo). |
| 07/13/2026 016731 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |
| 07/24/2026 016733 | 4698 | (9 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)(Edney, Michael) |
| 07/28/2026 016742 | 4704 | (5 pgs) DISTRICT COURT Notice of docketing notice of appeal. Civil Action Number: 3:26-cv-02496-E. (RE: related document(s)4698 Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court;

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J"); and

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No.

4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: August 7, 2026

Respectfully submitted,

*/s/ Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

## Article XII Other General Provisions

### Section 12.1 Periodic Reports

The Insurer will make available to the Proposed Policyholder, for every calendar quarter or portion thereof during which the Policy is In Force, a report that shows activity in the Proposed Policyholder's Separate Account. The Proposed Policyholder expressly authorizes the Insurer to rely upon the information or valuations provided by the selected investment manager and custodian without further inquiry or verification of any kind, nature, or description. Each quarterly statement will set forth the Policy Account Value less applicable expenses and charges at the beginning and end of the reporting period and aggregate adjustments to the same throughout. These quarterly statements shall be made available to the Proposed Policyholder at the Insurer's Home Office. The Insurer will forward annual Separate Account statements to an address of the Proposed Policyholder outside of the U.S. if a request to do so is made by the Proposed Policyholder in writing and delivered to the Insurer's Home Office.

### Section 12.2 Currency and Place of Payment

All transactions between the Proposed Policyholder and the Insurer will be made in U.S. dollars unless otherwise confirmed by the Insurer in writing. All Payments will be made outside the U.S.

### Section 12.3 Notices, Requests and Elections

To be effective, all notices, requests, and elections the Proposed Policyholder makes under the Policy must be in writing, signed by the Proposed Policyholder or sent electronically or via facsimile by the Proposed Policyholder and received by the Insurer. Unless otherwise provided, all notices, requests and elections will be effective when received by the Insurer. Notices, requests and elections may be made by the Proposed Policyholder under the Policy in writing, signed by the Policyholder, sent by facsimile or electronic communication and received by the Insurer at its Home Office or administrative office, provided that the Insurer will not be liable for following instructions communicated by facsimile or electronically and, provided further that acceptance of facsimile or electronic communication by the Insurer will not impose any requirement on the Insurer to employ any procedures to confirm that instructions

received by facsimile communication are genuine. Any notice or report required to be given by the Insurer to the Proposed Policyholder or any other person will be deemed given when sent to such person or such person's authorized representative.

**Section 12.4 Policy Settlement**

Prior to any payment of a Death Benefit, due certified proof of death must be submitted to the Insurer.

**Section 12.5 Deferment**

The Insurer will execute allowable requests for a transfer, Full Surrender or Partial Surrender by the Proposed Policyholder within 60 days of a request. Such requests may require conversion of certain Investment Option assets to cash or in-kind distributions, where possible. This may take longer than 60 days for a variety of reasons, including underlying restrictions on redemptions of assets held pursuant to an Investment Option. In such cases, the Insurer will take reasonable steps to comply with such requests at the earliest time possible. The foregoing will be subject to time restrictions within the Insurance Dedicated Fund purchased by a Subaccount.

**Section 12.6 Incontestability**

Except as expressly provided in the Policy, the Insurer will not contest the validity of the Policy for misstatement, misrepresentation or non-disclosure after the Policy has been In Force for two years from the Issue Date during the lifetime of the Proposed Annuitant. The Policy will be voidable in the event of fraud at any time. If the validity of the Policy is so contested, then (1) the Insurer's obligation to pay Annuity Payments under the Policy will terminate as of the date the Insurer discovers such misstatement, misrepresentation or non-disclosure, and (2) the Policy Account Value will be determined as of the Next Available Liquidity Date occurring after the Insurer discovers such misstatement, misrepresentation or non-disclosure and returned to the Proposed Policyholder or the Beneficiaries within 90 days. The Insurer will notify the Proposed Policyholder that the Policy is so terminated and such notice will include the date of termination. The return of the Policy Account Value will be in full and final satisfaction of all the Insurer's obligations under the Policy. Following the return of the Policy Account Value, the Policy will be void.

**Section 12.7 Policyholder Information**

The Insurer may disclose Policyholder information to third parties such as banks or independent asset managers. Specifically with respect to banking relationships in Switzerland and in accordance with FINMA Newsletter 18 (2010) "handling of Life insurance with separately managed accounts/portfolios" dated December 20, 2010, the Insurer may disclose Policyholder or source of funding information to banking partners including Policyholder name, date of birth, nationality and address. In any event, the Insurer may be required to confirm in accordance with FINMA Newsletter 18 (2010) that the insurance product related to account openings is set up as a life insurance product according to the legal provisions, including provisions concerning biometric risks, of the Insurer's domicile.

Each U.S. person who has a financial interest in or signature or other authority over any foreign financial accounts, including bank, securities, or other types of financial accounts, in a foreign country, if the aggregate value of these financial accounts exceeds $10,000 at any time during the calendar year, must report that relationship each calendar year by filing Form TD F 90-22.1 (Report of Foreign Bank and Financial Accounts), commonly referred to as an "FBAR", with the Department of the Treasury on or before June 30 of the succeeding year. In addition, and irrespective of the independent FBAR filing obligations that a Proposed Policyholder (or its owner) who is a U.S. person may have, U.S. person directors, officers, or employees of the Insurer who have signature authority over the Separate Account, Subaccounts, or other accounts with respect to the Policy would need to file an FBAR with respect to such accounts and so will the Insurer itself as a U.S. Person with a financial interest in such accounts. On the basis of such filings, the IRS could request information with respect to such filings and the Proposed Policyholder acknowledges that the Insurer may provide such FBAR-related information to the IRS if requested to do so.

**Section 12.8 Tax Matters**

The Proposed Policyholder acknowledges that he or she is responsible for complying with all tax reporting, filing and payment obligations with respect to this Policy in any jurisdiction in which the Proposed Policyholder is subject to tax. The Proposed Policyholder must consult its own tax advisor with respect to such obligations. The Insurer has not provided, and shall have no responsibility for providing, advice to the Proposed Policyholder with respect to such issues.

**Section 12.9** **Limitation on Liability of Insurer**

**THE LIABILITY OF THE INSURER FOR BENEFITS UNDER THE POLICY OR FOR ANY LOSS OR OTHER DAMAGES WITH RESPECT TO THE POLICY IS LIMITED TO THE POLICY ACCOUNT VALUE.**

## Appendix I - Annuity Percentage Table

| Annuitant's Age | Life Expectancy | Annuity Percentage | Annuitant's Age | Life Expectancy | Annuity Percentage |
|---|---|---|---|---|---|
| 10 | 86.2 | 1.1601% | 63 | 33.9 | 2.9499% |
| 11 | 85.2 | 1.1737% | 64 | 33.0 | 3.0303% |
| 12 | 84.2 | 1.1876% | 65 | 32.0 | 3.1250% |
| 13 | 83.2 | 1.2019% | 66 | 31.1 | 3.2154% |
| 14 | 82.2 | 1.2165% | 67 | 30.2 | 3.3113% |
| 15 | 81.2 | 1.2315% | 68 | 29.2 | 3.4247% |
| 16 | 80.2 | 1.2469% | 69 | 28.3 | 3.5336% |
| 17 | 79.2 | 1.2626% | 70 | 27.4 | 3.6496% |
| 18 | 78.2 | 1.2788% | 71 | 26.5 | 3.7736% |
| 19 | 77.3 | 1.2937% | 72 | 25.6 | 3.9063% |
| 20 | 76.3 | 1.3106% | 73 | 24.7 | 4.0486% |
| 21 | 75.3 | 1.3280% | 74 | 23.8 | 4.2017% |
| 22 | 74.3 | 1.3459% | 75 | 22.9 | 4.3668% |
| 23 | 73.3 | 1.3643% | 76 | 22.0 | 4.5455% |
| 24 | 72.3 | 1.3831% | 77 | 21.2 | 4.7170% |
| 25 | 71.3 | 1.4025% | 78 | 20.3 | 4.9261% |
| 26 | 70.3 | 1.4225% | 79 | 19.5 | 5.1282% |
| 27 | 69.3 | 1.4430% | 80 | 18.7 | 5.3476% |
| 28 | 68.3 | 1.4641% | 81 | 17.9 | 5.5866% |
| 29 | 67.3 | 1.4859% | 82 | 17.1 | 5.8480% |
| 30 | 66.3 | 1.5083% | 83 | 16.3 | 6.1350% |
| 31 | 65.3 | 1.5314% | 84 | 15.5 | 6.4516% |
| 32 | 64.3 | 1.5552% | 85 | 14.8 | 6.7568% |
| 33 | 63.3 | 1.5798% | 86 | 14.1 | 7.0922% |
| 34 | 62.3 | 1.6051% | 87 | 13.4 | 7.4627% |
| 35 | 61.4 | 1.6287% | 88 | 12.7 | 7.8740% |
| 36 | 60.4 | 1.6556% | 89 | 12.0 | 8.3333% |
| 37 | 59.4 | 1.6835% | 90 | 11.4 | 8.7719% |
| 38 | 58.4 | 1.7123% | 91 | 10.8 | 9.2593% |
| 39 | 57.4 | 1.7422% | 92 | 10.2 | 9.8039% |
| 40 | 56.4 | 1.7730% | 93 | 9.6 | 10.4167% |
| 41 | 55.4 | 1.8051% | 94 | 9.1 | 10.9890% |
| 42 | 54.4 | 1.8382% | 95 | 8.6 | 11.6279% |
| 43 | 53.4 | 1.8727% | 96 | 8.1 | 12.3457% |
| 44 | 52.4 | 1.9084% | 97 | 7.6 | 13.1579% |
| 45 | 51.5 | 1.9417% | 98 | 7.1 | 14.0845% |
| 46 | 50.5 | 1.9802% | 99 | 6.7 | 14.9254% |
| 47 | 49.5 | 2.0202% | 100 | 6.3 | 15.8730% |
| 48 | 48.5 | 2.0619% | 101 | 5.9 | 16.9492% |
| 49 | 47.5 | 2.1053% | 102 | 5.5 | 18.1818% |
| 50 | 46.5 | 2.1505% | 103 | 5.2 | 19.2308% |
| 51 | 45.5 | 2.1978% | 104 | 4.9 | 20.4082% |
| 52 | 44.6 | 2.2422% | 105 | 4.5 | 22.2222% |
| 53 | 43.6 | 2.2936% | 106 | 4.2 | 23.8095% |
| 54 | 42.6 | 2.3474% | 107 | 3.9 | 25.6410% |
| 55 | 40.6 | 2.4631% | 108 | 3.7 | 27.0270% |
| 56 | 40.7 | 2.4570% | 109 | 3.4 | 29.4118% |
| 57 | 39.7 | 2.5189% | 110 | 3.1 | 32.2581% |
| 58 | 38.7 | 2.5840% | 111 | 2.9 | 34.4828% |
| 59 | 37.8 | 2.6455% | 112 | 2.6 | 38.4615% |
| 60 | 35.8 | 2.7933% | 113 | 2.4 | 41.6667% |
| 61 | 35.8 | 2.7933% | 114 | 2.1 | 47.6190% |
| 62 | 34.9 | 2.8653% | 115 | 1.9 | 52.6316% |

**EXHIBIT 29**

CROWN GLOBAL
INSURANCE

# TERMSHEET

| | | |
|---|---|---|
| Policy Number | : | # 30219 Separate Account |
| Policyholder | : | The Okada Family Foundation, Inc |
| Annuitant | : | Mark Okada |
| Beneficiary | : | The Okada Family Foundation, Inc |
| Premiums planned | : | Approx. US$ 20'000'000 |
| Premium Date | : | TBA |
| Policy Date | : | TBA |
| Policy Type | : | Deferred Variable Annuity (DVA) |
| Issuing Company | : | Crown Global Life Insurance Ltd., Bermuda (953d) |
| Custodian Bank | : | n/a |
| Account/Portfolio Number | : | n/a |
| Investment Manager | : | n/a |
| Asset Allocation/Investment Profile | : | IDF: Atlas IDF, LP/ Rand Advisors LLC |
| Investment of Funds Model: | : | n/a |
| Acceptance Fee | : | Zero |
| Mgmt. & Expense Fee | : | 0.45% p.a $10mm of Premium<br>0.35% p.a. $11-20mm of Premium<br>0.25% p.a. $21mm+ of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm. |
| Policy Administration Fee | : | US$ 2,900 p.a. |
| DAC Tax | : | 0.25% of all premium payments |
| Federal Excise Tax – 1% of Premium | : | n/a |
| Surrender Charge | : | US$ 5'000 |
| Policy Audit (optional) | : | US$ 1'975 p.a. |

Place, Date GRAND CAYMAN, DEC 9TH 2015.

Signature [signature]

Policyholder

**EXHIBIT**

# BYLAWS

# OF

# THE OKADA FAMILY FOUNDATION, INC.

# TABLE OF CONTENTS

**Page**


ARTICLE I. OFFICES....1

Section 1.1 Registered Office....1
Section 1.2 Other Offices....1

ARTICLE II. MEMBERSHIP....1

Section 2.1 Classes and Number....1
Section 2.2 Voting....1
Section 2.3 Transfer of Membership....1
Section 2.4 Resignation of Member....2
Section 2.5 Place of Meetings....2
Section 2.6 Annual Meetings....2
Section 2.7 Special Meetings....2
Section 2.8 Notice of Meetings of Members....2
Section 2.9 Quorum....3
Section 2.10 Voting....3
Section 2.11 Proxies....3
Section 2.12 Action by Written Consent....3
Section 2.13 Control of Investments....3

ARTICLE III. DIRECTORS....4

Section 3.1 General Powers....4
Section 3.2 Number of Directors....4
Section 3.3 Vacancies....4
Section 3.4 Place of Meetings....5
Section 3.5 Committees of Directors....5
Section 3.6 Compensation of Directors....5
Section 3.7 Annual Meeting....5
Section 3.8 Additional Regular Meetings....5
Section 3.9 Special Meetings....5
Section 3.10 Method and Timing of Notice....5
Section 3.11 Purpose not Required in Notice....6
Section 3.12 Waiver of Notice....6
Section 3.13 Action by Written Consent....6
Section 3.14 Validation of Action by Consent....6
Section 3.15 Quorum and Manner of Acting....6
Section 3.16 Resignation and Removal of Directors....7

ARTICLE IV. OFFICERS....7

Section 4.1 Officers....7
Section 4.2 Election, Term of Office and Eligibility....7
Section 4.3 Subordinate Officers....7

Section 4.4 Removal ..... 7
Section 4.5 The President and Co-President ..... 7
Section 4.6 The Secretary ..... 8
Section 4.7 The Assistant Secretaries ..... 8
Section 4.8 Chairman and Co-Chairs ..... 8
Section 4.9 The Chief Financial Officer ..... 8
Section 4.10 The Assistant Chief Financial Officers ..... 9
Section 4.11 Delegation of Duties ..... 9

ARTICLE V. BOOKS AND RECORDS ..... 9

Section 5.1 Location ..... 9
Section 5.2 Inspection ..... 9

ARTICLE VI. MISCELLANEOUS PROVISIONS ..... 9

Section 6.1 Fiscal Year ..... 9
Section 6.2 Depositories ..... 9
Section 6.3 Checks, Drafts and Notes ..... 10
Section 6.4 Contracts and Other Instruments ..... 10
Section 6.5 Conflicts of Interest ..... 10
Section 6.6 Waivers of Notice ..... 10
Section 6.7 Ownership Interests in Other Entities ..... 10
Section 6.8 Indemnification ..... 11
Section 6.9 Amendment of Bylaws ..... 12

BYLAWS

OF

THE OKADA FAMILY FOUNDATION, INC.

**ARTICLE I.**

**OFFICES**

Section 1.1 Registered Office. The registered office of THE OKADA FAMILY FOUNDATION, INC. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2 Other Offices. The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

**ARTICLE II.**

**MEMBERSHIP**

Section 2.1 Classes and Number. The Corporation shall have two classes of members and one member in each such class: the Institutional Member, which shall be The Dallas Foundation, and the Individual Member, which shall be Mark Okada or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2 Voting. Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members, In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3 Transfer of Membership. Institutional Membership in the Corporation is not transferable or assignable. The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member. Subject to the approval of the Institutional Member, Mr. Okada, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the

death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4 Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5 Place of Meetings. All meetings of the members be held shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6 Annual Meetings. Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2015, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7 Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall he called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8 Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the

telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9 Quorum. Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. lf, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting, if the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10 Voting. When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11 Proxies. At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.12. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting,

Section 2.13 Control of Investments. Notwithstanding any other provision contained in these Bylaws to the contrary, the Institutional Member shall have the sole and exclusive power and authority to direct the management and investment of the assets of the Corporation. Such power and authority shall be exercised by the Institutional Member in its sole discretion and shall be separate and independent of any power and authority of the Board of Directors and officers of

the Corporation which have no power or authority with respect to the matters delegated hereby to the Institutional Member with respect to investments. Such power and authority of the Institutional Member shall include, but not be limited to: [a] the power to purchase, sell and retain assets of the Corporation; [b] the power to exercise voting, subscription, conversion, redemption, withdrawal, cancellation, option and similar rights with respect to such assets; [c] the power to participate in and consent to any voting trust, reorganization, merger, dissolution or other action affecting any such property; [d] the power to acquire life insurance policies, annuities, and/or other insurance or similar products (including the exercise or non-exercise or any rights, or the prosecution or defense of any disputes with the issuer or other parties regarding legal, regulatory, contractual, or other matters, arising under or relating to such products) and [e] the power to direct, and delegate to, the officers of the Corporation the taking of such acts and the execution of such documents as may be necessary to effectuate the decisions of the Institutional Member with respect to investments. The Corporation shall furnish the Institutional Member with such information as is necessary or desirable for it to fulfill its responsibilities. The Corporation shall furnish the Institutional Member with such clerical and other assistance as the Institutional Member may need to carry out its powers and authority. The Institutional Member shall advise the Board of Directors periodically of the investments of the assets of the Corporation and changes thereto. The Institutional Member shall have the sole power to retain investment advisors and custodians to assist it in carrying out its powers and authority under this Section 2.13 and it may delegate to any such investment advisors and custodians any and all such powers and authority subject to limitations on such delegation provided under the law, if any. The Corporation shall be responsible for all costs and expenses incurred by the Institutional Member in carrying out its powers and authority under this Section 2.13.

## ARTICLE III.

## DIRECTORS

Section 3.1 General Powers. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2 Number of Directors. The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3 Vacancies. If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual

Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4 Place of Meetings. The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5 Committees of Directors. The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6 Compensation of Directors. Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7 Annual Meeting. The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8 Additional Regular Meetings. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9 Special Meetings. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days' notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10 Method and Timing of Notice. Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered

personally, or (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation. If mailed, such notice shall he deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number.

Section 3.11 Purpose not Required in Notice. Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12 Waiver of Notice. Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall he deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14 Validation of Action by Consent. All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15 Quorum and Manner of Acting. A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall he the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such

participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16 Resignation and Removal of Directors. Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

## ARTICLE IV.

## OFFICERS

Section 4.1 Officers. The officers of the Corporation shall include a President and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

Section 4.2 Election, Term of Office and Eligibility. The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3 Subordinate Officers. The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4 Removal. The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5 The President and The Co-Presidents. The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the

Corporation. In general the President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors. A second person may be appointed by the Board of Directors having the same duties and powers as provided for under this Section 4.5, and in the case of such an appointment, each person serving pursuant to this Section 4.5 shall be referred to as Co-President. When Co-Presidents are serving either Co-President may act alone without the concurrence of the other Co-President. Should the Co-Presidents disagree as to the taking or not taking of an action provided for by this Section 4.5, then the Members shall decide whether to take or not take such action.

Section 4.6 The Secretary. The Secretary shall:

(a) keep the minutes of the meetings of the members and of the Board of Directors;

(b) see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c) be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d) in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7 The Assistant Secretaries. If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4,3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8 Chairman and Co-Chairs. The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time. A second person may be appointed by the Board of Directors having the same duties and powers as provided for under this Section 4.8, and in the case of such an appointment, each person serving pursuant to this Section 4.8 shall be referred to as a Co-Chair. When Co-Chairs are serving either Co-Chair may act alone without the concurrence of the other Co-Chair.

Section 4.9 The Chief Financial Officer. The Chief Financial Officer, if any, shall:

(a) receive and he responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the

Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b) render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c) in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10 The Assistant Chief Financial Officers. If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief' Financial Officer.

Section 4.11 Delegation of Duties. In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V.

## BOOKS AND RECORDS

Section 5.1 Location. The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2 Inspection. The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI.

## MISCELLANEOUS PROVISIONS

Section 6.1 Fiscal Year. The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2 Depositories. The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3 Checks, Drafts and Notes. All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4 Contracts and Other Instruments. The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances,

Section 6.5 Conflicts of Interest. No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment. All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

Section 6.6 Waivers of Notice. Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members. Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7 Ownership Interests in Other Entities. Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or

by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8 Indemnification.

(a) Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all, costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking. by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b) If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea

of nolo contendere or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct,

(c) The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d) The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e) To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f) Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g) The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9 Amendment of Bylaws. Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors to the extent such alteration or amendment expressly states that it can only be altered or amended by the members.

* * * * *

The undersigned, being the duly elected and qualifying Secretary of the Corporation, hereby certifies that the foregoing initial Bylaws of the Corporation were duly adopted by the Board of Directors of the Corporation by unanimous written consent on March 9, 2015.



Digitally signed by Gary Garcia
DN: cn=Gary Garcia, o=The Dallas Foundation, ou, email=gwgarcia@dallasfoundation.org, c=US
Date: 2015.03.09 16:09:08 -05'00'

Gary W. Garcia, Secretary

**EXHIBIT 31**

# BYLAWS

# OF

# EMPOWER DALLAS FOUNDATION, INC.

## TABLE OF CONTENTS

**Page**

ARTICLE I. OFFICES....1

Section 1.1 Registered Office....1
Section 1.2 Other Offices....1

ARTICLE II. MEMBERSHIP....1

Section 2.1 Classes and Number....1
Section 2.2 Voting....1
Section 2.3 Transfer of Membership....1
Section 2.4 Resignation of Member....2
Section 2.5 Place of Meetings....2
Section 2.6 Annual Meetings....2
Section 2.7 Special Meetings....2
Section 2.8 Notice of Meetings of Members....2
Section 2.9 Quorum....3
Section 2.10 Voting....3
Section 2.11 Proxies....3
Section 2.12 Action by Written Consent....3
Section 2.13 Control of Investments....3

ARTICLE III. DIRECTORS....4

Section 3.1 General Powers....4
Section 3.2 Number of Directors....4
Section 3.3 Vacancies....4
Section 3.4 Place of Meetings....5
Section 3.5 Committees of Directors....5
Section 3.6 Compensation of Directors....5
Section 3.7 Annual Meeting....5
Section 3.8 Additional Regular Meetings....5
Section 3.9 Special Meetings....5
Section 3.10 Method and Timing of Notice....5
Section 3.11 Purpose not Required in Notice....6
Section 3.12 Waiver of Notice....6
Section 3.13 Action by Written Consent....6
Section 3.14 Validation of Action by Consent....6
Section 3.15 Quorum and Manner of Acting....6
Section 3.16 Resignation and Removal of Directors....7

ARTICLE IV. OFFICERS....7

Section 4.1 Officers....7
Section 4.2 Election, Term of Office and Eligibility....7
Section 4.3 Subordinate Officers....7

Section 4.4 Removal ....... 7
Section 4.5 The President ....... 7
Section 4.6 The Secretary ....... 8
Section 4.7 The Assistant Secretaries ....... 8
Section 4.8 Chairman ....... 8
Section 4.9 The Chief Financial Officer ....... 8
Section 4.10 The Assistant Chief Financial Officers ....... 9
Section 4.11 Delegation of Duties ....... 9

ARTICLE V. BOOKS AND RECORDS ....... 9

Section 5.1 Location ....... 9
Section 5.2 Inspection ....... 9

ARTICLE VI. MISCELLANEOUS PROVISIONS ....... 9

Section 6.1 Fiscal Year ....... 9
Section 6.2 Depositories ....... 9
Section 6.3 Checks, Drafts and Notes ....... 9
Section 6.4 Contracts and Other Instruments ....... 9
Section 6.5 Conflicts of Interest ....... 10
Section 6.6 Waivers of Notice ....... 10
Section 6.7 Ownership Interests in Other Entities ....... 10
Section 6.8 Indemnification ....... 10
Section 6.9 Amendment of Bylaws ....... 12

BYLAWS

OF

EMPOWER DALLAS FOUNDATION, INC.

## ARTICLE I.

## OFFICES

Section 1.1 Registered Office. The registered office of EMPOWER DALLAS FOUNDATION, INC. (the "Corporation") shall be maintained in the County of New Castle, State of Delaware, and the registered agent in charge thereof is The Corporation Trust Company.

Section 1.2 Other Offices. The Corporation may also have an office in the City of Dallas, State of Texas, and also offices at such other places as the Board of Directors may from time to time determine or the business of the Corporation may require.

## ARTICLE II.

## MEMBERSHIP

Section 2.1 Classes and Number. The Corporation shall have two classes of members and one member in each such class: the Institutional Member, which shall be The Dallas Foundation, and the Individual Member, which shall be Grant Scott or an individual designated as the Individual Member in accordance with these Bylaws.

Section 2.2 Voting. Except as otherwise provided in these Bylaws, the Institutional Member shall be entitled to two (2) votes upon each matter submitted to a vote of the members, and the Individual Member shall be entitled to one (1) vote upon each matter submitted to a vote of the members, In addition to any voting rights provided in these Bylaws, members shall be entitled to vote upon any matter with respect to which the General Corporation Law of the State of Delaware, or its successor statute, as amended (the "Law"), requires a vote of the members.

Section 2.3 Transfer of Membership. Institutional Membership in the Corporation is not transferable or assignable. The Individual Membership is transferable or assignable as provided herein only upon the approval of the Institutional Member, with such approval not to be unreasonably withheld by the Institutional Member. Subject to the approval of the Institutional Member, Mr. Scott, as the initial Individual Member, may at any time pursuant to a written notice delivered to the Institutional Member during his lifetime or by a provision in his Will or other testamentary document, transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the death or failure to act of a current or future Individual Member. Each successor Individual Member shall succeed to the rights of the initial Individual Member. Subject to the approval of the Institutional Member, each successor Individual Member may in the same manner transfer his Individual Member interest to an individual, or designate an individual, or series of individuals, to whom such Individual Member interest is to be transferred upon the occurrence of a future contingency, such as the

death or failure to act of a current or future Individual Member. In the event of a conflict between such transfer documents, the one bearing the latest date shall control. Each Individual Member may at any time revoke his transfer document that is to be effective in the future, in whole or in part, by written notice delivered to the Institutional Member. If at any time an Individual Member shall be disabled and no transfer of such member's interest is to occur as a result of such disability in accordance with the foregoing provisions of this Section, then such member's attorney-in-fact under a valid, effective power of attorney instrument may act for such member hereunder. In the event of the death of an Individual Member, such member's personal representative of his estate, or trustee of a trust to which the Individual Member transferred his interest, may, if necessary, act as the Individual Member hereunder until such time as the Individual Member interest is transferred from the estate or trust.

Section 2.4 Resignation of Member. A member may resign at any time upon written notice to the Secretary.

Section 2.5 Place of Meetings. All meetings of the members be held shall by means of remote communication as authorized by the Law, unless the Board of Directors decides to hold such a meeting by another permitted means.

Section 2.6 Annual Meetings. Except as otherwise provided by these Bylaws, annual meeting of the members, commencing with the year 2015, shall be held at such date and time in the month of December as shall be provided by resolution of the Board of Directors, at which the members shall elect a Board of Directors, and transact such other business as may properly be brought before the meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.7 Special Meetings. Special meetings of the members, for any purpose or purposes, unless otherwise prescribed by the Law or by the Certificate of Incorporation, may be called by the President and shall he called by the Secretary at the request of a majority of the Board of Directors, or at the request in writing of a member entitled to vote at such meeting. Such request shall state the purpose or purposes of the proposed meeting. The Secretary shall provide notice of each such meeting to each member consistent with the requirements of Section 2.8 below.

Section 2.8 Notice of Meetings of Members. When notice is required to be given for a meeting of the members, such notice shall specify the date, time, and location of the meeting and shall be given to each member at least ten (10) days prior to the meeting (at least three (3) days in the case of a special meeting). Notice shall be given (a) by written notice delivered personally, (b) by written notice sent by mail, email, or facsimile to the member's mailing address, email address, or facsimile number as shown by the records of the Corporation, or (c) by telephone. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number. If delivered by telephone, such notice shall be deemed to be given at the time the

telephone message shall reach and be communicated to a responsible individual at the phone number listed for a member's residence or place of business.

Section 2.9 Quorum. Both the Institutional Member and the Individual Member must be present in person or represented by proxy in order to constitute a quorum at all meetings of the members for the transaction of business, except as otherwise required by Law, the Certificate of Incorporation or these Bylaws. lf, however, such quorum shall not be present or represented at any meeting of the members, the member entitled to vote thereat, present in person or represented by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting, of the place, date and hour of the adjourned meeting, until a quorum shall be present or represented by proxy. At the adjourned meeting at which a quorum shall be present or represented by proxy, the Corporation may transact any business which might have been transacted at the original meeting, if the adjournment is for more than 30 days, a notice of the adjourned meeting shall be given to each member of record entitled to vote at the meeting.

Section 2.10 Voting. When a quorum is present at any meeting, the vote of a majority of the number of votes held by the members, present in person or represented by proxy, shall be the act of the members, unless the act of a greater number is required by Law or expressly by these Bylaws.

Section 2.11 Proxies. At any meeting of the members, any member entitled to vote, consent or approve any action or matter may do so in person or by proxy authorized by an instrument in writing or by a transmission permitted by law. Any member represented by proxy shall be counted as present at such meeting for all purposes. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission created pursuant to these Bylaws may be substituted or used in lieu of the original writing or transmission that could be used, provided that the copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.12 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the members may be taken without a meeting, without prior notice and without taking a vote if a consent or consents in writing, setting forth the action so taken, are signed by the member(s) holding the number of votes necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 2.12. Prompt notice of the taking of an action by the members without a meeting by less than unanimous written consent shall be given to each member who did not consent in writing to the action. Each such consent must state the date of each member's signature. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the members at an actual meeting,

Section 2.13 Control of Investments. Notwithstanding any other provision contained in these Bylaws to the contrary, the Institutional Member shall have the sole and exclusive power and authority to direct the management and investment of the assets of the Corporation. Such power and authority shall be exercised by the Institutional Member in its sole discretion and shall be separate and independent of any power and authority of the Board of Directors and officers of

the Corporation which have no power or authority with respect to the matters delegated hereby to the Institutional Member with respect to investments. Such power and authority of the Institutional Member shall include, but not be limited to: [a] the power to purchase, sell and retain assets of the Corporation; [b] the power to exercise voting, subscription, conversion, redemption, withdrawal, cancellation, option and similar rights with respect to such assets; [c] the power to participate in and consent to any voting trust, reorganization, merger, dissolution or other action affecting any such property; [d] the power to acquire life insurance policies, annuities, and/or other insurance or similar products (including the exercise or non-exercise or any rights, or the prosecution or defense of any disputes with the issuer or other parties regarding legal, regulatory, contractual, or other matters, arising under or relating to such products) and [e] the power to direct, and delegate to, the officers of the Corporation the taking of such acts and the execution of such documents as may be necessary to effectuate the decisions of the Institutional Member with respect to investments. The Corporation shall furnish the Institutional Member with such information as is necessary or desirable for it to fulfill its responsibilities. The Corporation shall furnish the Institutional Member with such clerical and other assistance as the Institutional Member may need to carry out its powers and authority. The Institutional Member shall advise the Board of Directors periodically of the investments of the assets of the Corporation and changes thereto. The Institutional Member shall have the sole power to retain investment advisors and custodians to assist it in carrying out its powers and authority under this Section 2.13 and it may delegate to any such investment advisors and custodians any and all such powers and authority subject to limitations on such delegation provided under the law, if any. The Corporation shall be responsible for all costs and expenses incurred by the Institutional Member in carrying out its powers and authority under this Section 2.13.

## ARTICLE III.

## DIRECTORS

Section 3.1 General Powers. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, which may exercise all such powers of the Corporation and do all such acts and things as are not by the Law, the Certificate of Incorporation or these Bylaws directed or required to be exercised or done by the members, so long as the exercise of such powers and doing of such acts are consistent with the Corporation's prescribed purposes.

Section 3.2 Number of Directors. The number of Directors that shall constitute the Board of Directors shall be three (3). Two (2) Directors (the "Institutional Directors") shall be elected annually by the institutional Member and one (1) Director (the "Individual Director") shall be elected annually by the Individual Member. Each Director shall hold office until such Director's successor is elected and qualified or until such Director's earlier death, resignation, retirement, disqualification or removal.

Section 3.3 Vacancies. If the office of any Director becomes vacant by reason of death, resignation, retirement, disqualification, removal from office, or otherwise, then (i) with respect to a vacancy of an Institutional Director seat, the Institutional Member shall elect a person to fill such vacancy, and (ii) with respect to a vacancy of an Individual Director seat, the Individual Member shall elect a person to fill such vacancy. If at any time there is no Individual

Member who is able to fill a vacancy of an Individual Director seat, then the Institutional Member shall elect a successor Individual Director. Each Director elected to fill a vacancy shall hold office for the unexpired term of such Director's predecessor in office.

Section 3.4 Place of Meetings. The Board of Directors may hold its meetings outside of the State of Delaware, at the office of the Corporation or at such other places as they may from time to time determine, or as shall be fixed in the respective notices or waivers of notice of such meetings.

Section 3.5 Committees of Directors. The Corporation shall have no committees unless the Board of Directors, by resolution or resolutions passed by the unanimous vote of the Board, designates one or more committees.

Section 3.6 Compensation of Directors. Except to the extent prohibited by section 4958(c)(3) of the Internal Revenue Code of 1986 (the "Code"), Directors, as such, may receive such stated salary for their services and/or such fixed sums and expenses for attendance at each regular or special meeting of the Board of Directors as may be established by resolution of the Board; provided that nothing contained in this Section shall be construed to preclude any Director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 3.7 Annual Meeting. The annual meeting of the Board of Directors shall be held at such place and at such time as may be determined by the Board of Directors. If the date, time and location of the annual meeting are specified by a resolution adopted by the Board of Directors, no further notice of such annual meeting shall be required. If the date, time and location of an annual meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.8 Additional Regular Meetings. The Board of Directors may hold additional regular meetings for the purpose of taking any action and conducting any business that may properly come before the Board of Directors. If the date, time and location of the regular meeting are specified by a resolution adopted by the Board of Directors, no further notice of such regular meeting shall be required. If the date, time and location of a regular meeting are specified in another manner, then notice shall be provided consistent with the requirements of Section 3.10 below.

Section 3.9 Special Meetings. Special meetings of the Board of Directors may be held at any time on the call of the President or at the request in writing of any one or more Directors upon not less than three (3) days' notice to each director. The person or persons calling a special meeting of the Board of Directors shall fix a date, time and location for holding such special meeting, which shall be specified in a notice provided for such special meeting consistent with the requirements of Section 3.10 below.

Section 3.10 Method and Timing of Notice. Unless otherwise provided herein, when notice is required to be given for a meeting of the Board of Directors, such notice shall be given to each Director at least ten (10) days prior to the meeting. Any notice given herein shall specify the date, time, and location of the meeting. Notice shall be given (a) by written notice delivered

personally, or (b) by written notice sent by mail, email, or facsimile to the Director's mailing address, email address, or facsimile number as shown by the records of the Corporation. If mailed, such notice shall he deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice is delivered by email, such notice shall be deemed to be delivered when the email is sent, provided that the sender does not subsequently receive notice that the email transmission was not delivered to the designated email address. If delivered by facsimile, such notice shall be deemed to be delivered when the facsimile transmission indicates that the facsimile has been sent without error to the designated facsimile number.

Section 3.11 Purpose not Required in Notice. Unless specifically required by the Law or these Bylaws for a particular action, the purpose of and business to be transacted at a meeting need not be specified in the notice of such meeting or in a waiver of notice of such meeting.

Section 3.12 Waiver of Notice. Any Director may waive notice of any meeting by a writing signed by the Director, whether signed before or after the holding of such meeting, and such signed written waiver shall he deemed the equivalent of the Director having received notice. A Director's attendance at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business of such meeting on the ground that the meeting is not lawfully called or convened.

Section 3.13 Action by Written Consent. Any action required to be, or which may be, voted on, consented to or approved by the Board of Directors may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, are signed by all of the then-serving Directors. A consent transmitted by electronic transmission shall be deemed to be written and signed for purposes of this Section 3.13. Such consent shall be placed in the minute book of the Corporation, and shall have the same force and effect as if approved by vote of the Board of Directors at an actual meeting.

Section 3.14 Validation of Action by Consent. All actions taken at a meeting of the Board of Directors which is not regularly called or noticed shall be valid as if taken at a meeting regularly called and noticed if each Director either consents in writing or is present at such meeting and does not object to the meeting being held. At such meeting any business may be transacted which is not excepted from the written consent or which is not objected to at such meeting for want of notice. If any meeting of the Board of Directors is irregular for want of notice, the proceedings of such meeting may be ratified, approved and rendered valid, and the irregularity or defect therein waived, by a writing signed by all Directors, provided a quorum was present at such meeting.

Section 3.15 Quorum and Manner of Acting. A quorum for the transaction of business at any meeting of the Board of Directors shall consist of a majority of the then serving Directors. Except as otherwise provided by the Law, the Certificate of Incorporation or these Bylaws, the vote of a majority of the Directors present at any meeting at which a quorum is present shall he the act of the Board of Directors. Any Director may participate in a meeting of the Board of Directors or committee by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such

participation shall constitute presence in person at the meeting. In the absence of a quorum, a majority of the Directors present may adjourn the meeting from time to time until a quorum shall be present. Notice of any adjourned meeting need not be given, except that notice shall be given to all Directors if the adjournment is for more than thirty days.

Section 3.16 Resignation and Removal of Directors. Each Director may resign at any time by written notice delivered to the member that appointed such Director and to the President and Secretary of the Corporation. A resignation is effective when the resignation is delivered unless the resignation specifies a later effective date or an effective date determined upon the happening of an event or events. A resignation that is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. The Institutional Member may remove an Institutional Director at any time, with or without cause. The Individual Member may remove an Individual Director at any time, with or without cause.

## ARTICLE IV.

## OFFICERS

Section 4.1 Officers. The officers of the Corporation shall include a President and a Secretary, and may include a Chairman and a Chief Financial Officer. A person may hold multiple offices.

Section 4.2 Election, Term of Office and Eligibility. The officers of the Corporation shall be elected annually by the Board of Directors at its annual meeting or at a special meeting held in lieu thereof Each officer, except such officers as may be appointed in accordance with the provisions of Section 4.3, shall hold office until such officer's successor shall have been duly elected and qualified or until such officer's death, resignation or removal. None of the officers other than the Chairman need be members of the Board of Directors.

Section 4.3 Subordinate Officers. The Board of Directors may appoint such Vice Presidents, Assistant Secretaries, Assistant Chief Financial Officers, Controller and other officers, and such agents as the Board may determine, to hold office for such period and with such authority and to perform such duties as the Board of Directors may from time to time determine. The Board of Directors may, by specific resolution, empower the President or another officer of the Corporation to appoint any such subordinate officers or agents.

Section 4.4 Removal. The President, the Secretary, the Chairman and/or the Chief Financial Officer may be removed at any time by the Board of Directors with or without cause. Any subordinate officer appointed pursuant to Section 4.3 may be removed at any time, with or without cause, by the Board of Directors or by the person holding the officer position by which the subordinate officer was appointed.

Section 4.5 The President. The President shall be the chief executive officer of the Corporation. He or she shall have executive authority to see that all orders and resolutions of the Board of Directors are carried into effect and, subject to the control vested in the Board of Directors by the Law, the Certificate of Incorporation, or these Bylaws, shall administer and be responsible for the management of the business and affairs of the Corporation. In general the

President shall perform all duties incident to the office of the President and such other duties as from time to time may be assigned to him or her by the Board of Directors.

Section 4.6 The Secretary. The Secretary shall:

(a) keep the minutes of the meetings of the members and of the Board of Directors;

(b) see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law;

(c) be custodian of the records and of the seal of the Corporation and see that the seal or a facsimile or equivalent thereof is affixed to or reproduced on all documents, the execution of which on behalf of the Corporation under its seal is duly authorized; and

(d) in general, perform all duties incident to the office of Secretary, and such other duties as are provided by these Bylaws and as from time to time are assigned to him or her by the Board of Directors or by the President of the Corporation.

Section 4.7 The Assistant Secretaries. If one or more Assistant Secretaries shall be appointed pursuant to the provisions of Section 4,3 respecting subordinate officers, then, at the request of the Secretary, or in his or her absence or disability, the Assistant Secretary designated by the Secretary (or in the absence of such designations, then any one of such Assistant Secretaries) shall perform the duties of the Secretary and when so acting shall have all the powers of, and be subject to all the restrictions upon, the Secretary.

Section 4.8 Chairman. The Chairman, if any, shall preside when present at meetings of the Board of Directors; advise and counsel the other officers of the Corporation; and shall perform such other duties as may be prescribed by the Board of Directors from time to time.

Section 4.9 The Chief Financial Officer. The Chief Financial Officer, if any, shall:

(a) receive and he responsible for all funds of and securities owned or held by the Corporation and, in connection therewith, among other things: keep or cause to be kept full and accurate records and accounts for the Corporation; deposit or cause to be deposited to the credit of the Corporation all moneys, funds and securities so received in such bank or other depository as the Board of Directors or an officer designated by the Board may from time to time establish; and disburse or supervise the disbursement of the funds of the Corporation as may be properly authorized;

(b) render to the Board of Directors at any meeting thereof, or from time to time whenever the Board of Directors or the chief executive officer of the Corporation may require, financial and other appropriate reports on the condition of the Corporation; and

(c) in general, perform all the duties incident to the office of Chief Financial Officer and such other duties as from time to time may be assigned to the Chief Financial Officer by the Board of Directors or by the chief executive officer of the Corporation.

Section 4.10 The Assistant Chief Financial Officers. If one or more Assistant Chief Financial Officers shall be appointed pursuant to the provisions of Section 4.3 respecting subordinate officers, then, at the request of the Chief Financial Officer, or in the Chief Financial Officer's absence or disability, the Assistant Chief Financial Officer designated by the Chief Financial Officer (or in the absence of such designation, then any one of such Assistant Chief Financial Officers) shall perform all the duties of the Chief Financial Officer and when so acting shall have all the powers of and be subject to all the restrictions upon, the Chief' Financial Officer.

Section 4.11 Delegation of Duties. In case of the absence of any officer of the Corporation or for any other reason which may seem sufficient to the Board of Directors, the Board of Directors may, for the time being, delegate his powers and duties, or any of them, to any other officer or to any director.

## ARTICLE V.

## BOOKS AND RECORDS

Section 5.1 Location. The books, accounts and records of the Corporation may be kept at such place or places within or without the State of Delaware as the Board of Directors may from time to time determine.

Section 5.2 Inspection. The books, accounts, and records of the Corporation shall be open to inspection at all times by any member and by any member of the Board of Directors.

## ARTICLE VI.

## MISCELLANEOUS PROVISIONS

Section 6.1 Fiscal Year. The fiscal year of the Corporation shall be the calendar year unless changed by the Board of Directors.

Section 6.2 Depositories. The Board of Directors or an officer designated by the Board shall appoint banks, trust companies, or other depositories in which shall be deposited from time to time the money or securities of the Corporation.

Section 6.3 Checks, Drafts and Notes. All checks, drafts, or other orders for the payment of money and all notes or other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer or officers or agent or agents as shall from time to time be designated by resolution of the Board of Directors or by an officer appointed by the Board of Directors.

Section 6.4 Contracts and Other Instruments. The Board of Directors may authorize any officer, agent or agents to enter into any contract or execute and deliver any instrument in the name and on behalf of the Corporation and such authority may be general or confined to specific instances,

Section 6.5 Conflicts of Interest. No contract or agreement may be entered into by and between the corporation and any of the following: (a) a Director, officer, or employee of the corporation (hereinafter an "Insider"); or (b) any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless (i) the transaction is approved in accordance with Section 144 of the Delaware General Corporation Law to the extent such provision is applicable to the transaction; and (ii) if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the corporation within the meaning of Section 4958 of the Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption safe harbor" provisions set forth in the regulations promulgated under Section 4958 of the Code or (y) the Board of Directors determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination; provided, however, that the following contracts and agreements shall not be subject to the foregoing prohibition: a gratuitous transfer of assets or promise to transfer assets to the corporation of any kind, including but not limited to, (i) a gift annuity, charitable remainder trust, charitable lead trust or similar split-interest arrangement which benefits both the Insider and the corporation; or (ii) a loan, lease, agreement of sale or purchase, pledge, guarantee, assumption of liability, bailment, or consignment. All Insiders shall, as a condition of qualifying and continuing to qualify as a Director, officer, and/or employee of the corporation, abide by such conflict of interest policies as the Board of Directors may adopt from time to time.

Section 6.6 Waivers of Notice. Whenever any notice is required to be given under the provisions of the Law or of the Certificate of Incorporation or of these Bylaws, a waiver thereof in writing signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the members. Directors or members of a committee of directors need be specified in any written waiver of notice.

Section 6.7 Ownership Interests in Other Entities. Any ownership interests (e.g., shares of stock in any other corporation which may from time to time be held by this Corporation) may be represented and voted at any meeting of owners of such entity by the President, or by any other person or persons thereunto authorized by the Board of Directors, or by any proxy designated by written instrument of appointment executed in the name of this Corporation by its President.

Section 6.8 Indemnification.

(a) Each person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "proceeding"), by reason of the fact that the person is or was a Director or officer of the Corporation or is or was a Director or officer of the Corporation who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, shall be indemnified and held

harmless by the Corporation to the fullest extent authorized by the laws of Delaware as the same now or may hereafter exist (but, in the case of any change, only to the extent that such change authorizes the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such change) against all, costs, charges, expenses, liabilities and losses (including attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) reasonably incurred or suffered by such person in connection therewith and such indemnification shall continue as to a person who has ceased to be a Director or officer and shall inure to the benefit of the person's heirs, executors and administrators. The right to indemnification conferred in this Section shall be a contract right and shall include the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking. by or on behalf of such director or officer, to repay all amounts so advanced if it shall ultimately be determined that the director or officer is not entitled to be indemnified under this Section or otherwise. The Corporation may, by action of its Board of Directors, provide indemnification to employees and agents of the Corporation with the same scope and effect as the foregoing indemnification of Directors and officers.

(b) If a claim under subsection (a) of this Section is not paid in full by the Corporation within thirty days after a written claim has been received by the Corporation, the claimant may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall also be entitled to be paid the expense of prosecuting such claim. It shall be a defense to any action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking has been tendered to the Corporation) that the claimant has failed to meet a standard of conduct which makes it permissible under Delaware law for the Corporation to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its members) to have made a determination prior to the commencement of such action that indemnification of the claimant is permissible in the circumstances because the claimant has met such standard of conduct, nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its members) that the claimant has not met such standard of conduct, nor the termination of any proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall be a defense to the action or create a presumption that the claimant has failed to meet the required standard of conduct,

(c) The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Section shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Certificate of incorporation, these Bylaws, agreement, vote of members or disinterested Directors or otherwise.

(d) The Corporation may maintain insurance, at its expense, to protect itself and any Director, member, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense,

liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(e) To the extent that any Director, officer, employee or agent of the Corporation is by reason of such position, or a position with another entity at the request of the Corporation, a witness in any proceeding, such person shall be indemnified against all costs and expenses actually and reasonably incurred by such person or on such person's behalf in connection therewith.

(f) Any amendment, repeal or modification of any provision of this Section by the members or the Directors of the Corporation shall not adversely affect any right or protection of a Director or officer of the Corporation existing at the time of such amendment, repeal or modification.

(g) The provisions of this Section 6.7, and the limitations on liability and indemnification provided in such Section, shall survive the winding up and termination of the Corporation to the extent permitted by applicable law.

Section 6.9 Amendment of Bylaws. Only the members, by the affirmative unanimous vote of the members entitled to vote, may adopt, amend, or repeal these Bylaws, and alterations or amendments of these Bylaws made by the members shall not be altered or amended by the Board of Directors to the extent such alteration or amendment expressly states that it can only be altered or amended by the members.

* * * * *

The undersigned, being the duly elected and qualifying Secretary of the Corporation, hereby certifies that the foregoing initial Bylaws of the Corporation were duly adopted by the Board of Directors of the Corporation by unanimous written consent on March 9, 2015.

Digitally signed by Gary Garcia
DN: cn=Gary Garcia, o=The Dallas Foundation, ou, email=gwgarcia@dallasfoundation.org, c=US
Date: 2015.03.09 15:47:15 -05'00'

Gary W. Garcia, Secretary



010036 000016 14282559.2

006739

**EXHIBIT 3**

**CERTIFICATE OF HIGHLAND CAPITAL MANAGEMENT, LP**

Reference is hereby made to that certain U.S. federal income tax opinion, dated January 29, 2016 (the "**Tax Opinion**"), attached hereto as Exhibit A, which Highland Capital Management, L.P. ("**HCM**") has requested from Sadis & Goldberg LLP ("**S&G**") to provide to HCM regarding certain U.S. federal income tax issues described in Part IV of such Tax Opinion. Each term herein with an initial capital not required by standard capitalization rules is a defined term, and each such term not parenthetically defined herein shall have the meaning ascribed to it in the Tax Opinion.

HCM acknowledges and understands that S&G is relying upon the validity of each of the statements set forth below as the factual basis for the conclusions expressed in the Tax Opinion and that any inaccuracy in the matters set forth herein could adversely affect the conclusions in such Tax Opinion.

Pursuant to the foregoing, HCM hereby represents, warrants, covenants and certifies, after reasonable investigation and review and consultation as appropriate, as follows:

1. The Statement of Facts set forth in Part II of the Tax Opinion is accurate and complete in all material respects. The Assumptions Made set forth in Part III of the Tax Opinion are believed by HCM to be reasonable, and to the extent that factual matters appear in Part III, they are accurate.

2. We have reviewed the Tax Opinion attached as Exhibit A hereto and, to the best of our knowledge, information and belief, there are no additional facts, conditions or circumstances which should have been disclosed to S&G for purposes of preparing this Tax Opinion.

3. S&G has been provided with true, correct and complete copies of the Relevant Documents as well as any other documents provided to S&G in connection with its services in connection with the Tax Opinion (collectively, "**Opinion Documents**"). Except to the extent made clear in the Opinion Documents themselves, each of the Opinion Documents has not been further amended, altered, modified, or restated and, to the extent that such document is an agreement, is in full force and effect on the date hereof and has been at all times since the date of such amendments. No resolution, proceeding or other action has been taken for the further amendment, alteration, modification or restatement of such Opinion Documents.

[Signature Page follows.]

IN WITNESS WHEREOF, HCM has executed this Certificate under seal by its duly authorized representative as of January 29, 2016.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: Strand Advisors, Inc.

Its: General Partner

By: ______________________

Name and Title:
James Dondero, President

**EXHIBIT 33**

www.sglawyers.com

SadisGoldberg LLP

January 29, 2016

Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas, Texas 75201

Dear Sirs:

You have requested our ("our", "we" or "Sadis & Goldberg LLP" as the context may require) opinion concerning certain U.S. federal income tax issues relating to investments made by two tax-exempt supporting organizations identified herein in variable annuity contracts issued by Crown Global Life Insurance Ltd. under the facts discussed below.

Part I of this letter describes our factual investigation. Part II of this letter sets forth a statement of the relevant facts which you have reviewed and confirmed to us to be accurate and complete in all material respects. Part III of this letter then lists certain assumptions that you have authorized us to make in rendering our opinion, and which you have confirmed are correct and reasonable, and Part IV of this letter states the opinion that is being requested. In Part V of this letter, we describe the relevant U.S. federal income tax provisions, rulings of the Internal Revenue Service and relevant tax cases relating to the opinion requested. Part VI of this letter sets forth our opinion, together with your permitted use of and reliance on this opinion letter.

## I. FACTUAL INVESTIGATION

**For purposes of rendering the opinions expressed below, we have been furnished and have reviewed the following documentation (the "Relevant Documents"):**

1. The Okada Family Foundation, Inc. certificate of incorporation filed on February 10, 2015.

2. The Okada Family Foundation, Inc. bylaws dated March 9, 2015.

3. The Okada Family Foundation, Inc. draft IRS Form 1023 - Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code.

4. The Supporting Organization Operating Agreement entered into between The Okada Family Foundation, Inc. and The Dallas Foundation.

5. Empower Dallas Foundation, Inc. certificate of incorporation filed on February 10, 2015.

6. Empower Dallas Foundation, Inc. bylaws dated March 9, 2015.

7. Empower Dallas Foundation, Inc. draft IRS Form 1023 - Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code.

8. The Supporting Organization Operating Agreement entered into between Empower Dallas Foundation, Inc. and The Dallas Foundation.



551 Fifth Avenue, 21st Floor New York, NY 10176 (t) 212.947.3793 (f) 212.947.37[illegible]

9. Mark Okada 12/08/2015 donation of $5,345,021.50 to The Okada Family Foundation Inc. Nexbank Statement Transaction entries from 11/10/2015 to 12/10/2015

10. Mark Okada 12/22/2015 donation of $2,138,333.33 to The Okada Family Foundation Inc. Nexbank Statement Transaction entries from 11/28/2015 to 12/28/2015

11. Jim Dondero 12/08/2015 donation of $16,034.978.50 to Empower Dallas Foundation, Inc. Nexbank Statement Transaction entries from 11/10/2015 to 12/10/2015

12. Jim Dondero 12/22/2015 donation of $6,415,000 to Empower Dallas Foundation, Inc. Nexbank Statement Transaction entries from 11/28/2015 to 12/28/2015

13. The Okada Family Foundation, Inc. Unanimous Written Consent of Directors in Lieu of Special Meeting, December 9th, 2015.

14. Empower Dallas Foundation, Inc. Unanimous Written Consent of Directors in Lieu of Special Meeting, December 9th, 2015.

15. The Okada Family Foundation, Inc.: Crown Global Due Diligence Declaration Signed 12/09/2015

16. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy #30219, effective December 11, 2015

17. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy #30219, Term Sheet 12/09/2015

18. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Application Form, 12/09/2015

19. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy FATCA Waiver, 12/09/2015

20. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy Structure Chart 12/09/2015

21. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: JPM Growth Series Supplement

22. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: JPM Hedge Series Supplement

23. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: Limited Power of Attorney, 12/09/2015

24. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: Atlas IDF, LP, Private Placement Memorandum

25. The Okada Family Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: Rand PE Fund I, LP, Private Placement Memorandum

26. The Okada Family Foundation, Inc.: Nexbank Wire Transfer Department: $5,301,065.12 wire premium to Crown Global on 12/10/2015

27. The Okada Family Foundation, Inc.: Nexbank Transaction detail entries from 11/28/2015 to 12/28/2015 for additional wire premium to Crown Global of $2,117,423.00 on 12/22/2015.

28. The Empower Dallas Foundation, Inc.: Crown Global Due Diligence Declaration Signed 12/09/2015

29. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy #30218, effective December 11, 2015

30. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy #30218, Term Sheet 12/09/2015

31. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Application Form, 12/09/2015

32. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy FATCA Waiver, 12/09/2015

33. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy Structure Chart 12/09/2015

34. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: JPM Growth Series Supplement

35. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: JPM Hedge Series Supplement

36. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: Limited Power of Attorney, 12/09/2015

37. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: Atlas IDF, LP, Private Placement Memorandum

38. The Empower Dallas Foundation, Inc.: Crown Global Deferred Variable Annuity Policy: Rand PE Fund I, LP, Private Placement Memorandum

39. The Empower Dallas Foundation, Inc.: Nexbank Wire Transfer Department: $15,903,108.54 wire premium to Crown Global on 12/10/2015

40. Empower Dallas Foundation, Inc.: Nexbank Transaction Account detail from 11/28/2015 to 12/28/2015 indicating wire of $6,352,270 for additional premium to Crown Global on 12/22/2015

41. Back Office Shared Services Agreement by and among Highland Capital Management, L.P. and Rand Advisors, LLC dated October 10, 2013.

42. Amendment to Back Office Shared Services Agreement between Highland Capital Management, L.P. and Rand Advisors, LLC dated October 14, 2014.

43. Contribution Agreement between Highland Capital Management, L.P. and Hunter Mountain Investment Trust, dated December 21, 2015

44. Third Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. dated December 21st, 2015

45. Partnership Interest Purchase Agreement among The Dugaboy Investment Trust, The Mark and Pamela Okada Family Trust-Exempt Trust #1, The Mark and Pamela Okada Family Trust-Exempt Trust #2, Mark K. Okada, and Hunter Mountain Investment Trust, dated December 24, 2015

46. Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P. dated December 24th, 2015.

We are not aware of any documents other than the Relevant Documents that would alter our conclusions. We have assumed the genuineness of all signatures, the legal capacity of natural persons, the authenticity of all documents submitted to us as originals and the conformity with original documents of all documents submitted to us as copies, the fact that each party to an agreement has the power and capacity to execute, deliver and perform all obligations under such documents, the due authorization of all requisite action with respect to such documents (including the execution and delivery thereof) by each party thereto, and the validity and binding effect of such documents upon each party. We have also assumed that all factual assertions in the Relevant Documents are accurate and complete in all material respects. We have no reason to believe that any of the foregoing assumptions are unreasonable.

**II. STATEMENT OF FACTS**

A. The Dallas Foundation ("TDF") is a Texas non-profit corporation exempt from federal income taxation under Section 501(c)(3) of the U.S. Internal Revenue Code, as amended ("Code"), and a public charity described in Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Code.

B. The principal objective of TDF is to solicit, receive and accept property to be administered, used and applied for charitable purposes, primarily, but not exclusively in or for the benefit of Dallas County, Texas. TDF is not controlled by James Dondero, Mark Okada or Highland Capital Management, L.P.

C. Empower Dallas Foundation, Inc. ("Supporting Organization #1") is a Delaware non-profit non-stock charitable corporation which has been established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of TDF.

D. The Okada Family Foundation, Inc. ("Supporting Organization #2") is a Delaware non-profit non-stock charitable corporation which has been established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of TDF.

E. Supporting Organization #1 and Supporting Organization #2 each expect to obtain a determination letter from the U.S. Internal Revenue Service ("IRS") that each such Supporting Organization,

respectively, is a tax-exempt organization described in Section 501(c)(3) of the Code and a "Type I" supporting organization described in Section 509(a)(3) of the Code. For the avoidance of doubt, such tax-exempt status is expected to be effective retroactively to the date of each Supporting Organization's formation, respectively.

F. As a result of qualifying as Type I supporting organizations under Section 509(a)(3) of the Code, Supporting Organization #1 and Supporting Organization #2 will each be exempted from private foundation status under Section 509(a) of the Code.

G. Mary M. Jalonick is the President and Chief Executive Officer of TDF, and is the Incorporator of both Supporting Organization #1 and Supporting Organization #2.[1]

H. Supporting Organization #1 has been formed at the request of James Dondero. On December 8, 2015, Mr. Dondero contributed $16,034,978.50 to Supporting Organization #1. On December 22, 2015, Mr. Dondero contributed $6,415,000 to Supporting Organization #1. At the present time, Mr. Dondero is the only contributor to Supporting Organization #1. Although Mr. Dondero made a recommendation to the Board as to how the Board should invest such contributions (as described below), the Board of Supporting Organization #1 is not contractually obligated to follow the investment recommendations of Mr. Dondero at the time such contributions are made or at any later date.

I. Supporting Organization #2 has been formed at the request of Mark Okada. On December 8, 2015, Mr. Okada contributed $5,345,021.50 to Supporting Organization #2. On December 22, 2015 Mr. Okada contributed $2,138,333.33 to Supporting Organization #2. Although Mr. Okada made a recommendation to the Board as to how such contributions should be invested (as described below), the Board of Supporting Organization #2 is not contractually obligated to follow the investment recommendations of Mr. Okada at the time such contributions are made or at any later date.

J. Under the relevant governing documents, TDF has total control over both Supporting Organization #1 and Supporting Organization #2, as the institutional member ("Institutional Member") of each Supporting Organization. The Institutional Member appoints the majority of each Supporting Organization's Board of Directors. The Board of Directors of each Supporting Organization appoints the officers of the Supporting Organization. The officers of each Supporting Organization can be removed with or without cause by the Board of Directors of such Supporting Organization.

K. Supporting Organization #1 currently has a three-person Board of Directors. Mary M. Jalonick and Gary W. Garcia are the institutional directors ("Institutional Directors") of the Board of Supporting Organization #1. Gary W. Garcia currently serves as Senior Director of Development of TDF. The third member of the Board is W. Grant Scott II. Mr. Scott is an attorney engaged in private practice at Myers Bigel Sibley Sajovec, P.A. in Raleigh, North Carolina and knows Mr. Dondero from college.

L. Supporting Organization #2 also currently has a three-person Board of Directors. Mary M. Jalonick and Gary W. Garcia are the Institutional Directors. Mark Okada is the third member of the Board.

M. Mr. Dondero has recommended to the Board of Supporting Organization #1 that it invest its assets

[1] See Dallas Foundation's web page for background: www.dallasfoundation.org.

in a private placement deferred variable annuity policy ( referred to herein as a "Variable Contract" or "Deferred Variable Annuity Policy") to be issued by Crown Global Life Insurance Ltd., a Bermuda-based insurance company ("Crown Global") that is a life insurance company within the meaning of the Code. Mr. Okada has made the same investment recommendation to the Board of Supporting Organization #2. However, the Boards of each Supporting Organization are not bound by those recommendations, and retain the authority to reallocate premiums or assets to different IDFs or managed accounts available under the Crown Global Variable Contracts.

N. Crown Global maintains a segregated asset account ("Separate Account") pursuant to Bermuda law to hold assets that fund obligations arising under each Variable Contract issued by it. Under the terms of the Contracts and Bermuda law, assets allocated or credited to each Separate Account are the property of the insurance company and the policyholder has no direct proprietary interest in such assets. Rather, the Supporting Organizations have only a contractual claim against Crown Global to collect cash from Crown Global in the form of annuity payments or other withdrawals available under the Variable Contract. The performance of the investments held in the applicable Separate Account provide the measure for the economic return to the investor in the Variable Contract. The Crown Global Variable Contracts purchased by the Supporting Organizations provided that the investor was permitted to choose among certain "insurance dedicated funds" ("IDF" as further defined below) and managed accounts selected by Crown Global as available investments that could be held in the Separate Account identified in the Contract. One such IDF that was designated by Crown Global as an available investment option that the investors in the Variable Contract were permitted to select is Atlas IDF, LP ("Atlas IDF"), a newly formed Delaware "series" limited partnership managed by Rand Advisors, LLC ("Rand Advisors"). The Variable Contract also lists two other IDFs as investment options which the policyholder is able to select, JP Morgan Access Growth Strategies Insurance Fund, and JP Morgan Hedge Growth Strategies Insurance Fund. None of the IDFs or other managed funds available under the Variable Contracts will be funds that are offered to the general public under the IRS rulings discussed herein.

O. The Variable Contract does not immediately payout distributions in accordance with a distribution schedule. The policyholders, Supporting Organization #1 and Supporting Organization #2 have the ability to make partial(s) or a full surrender of the Variable Contract at quarterly intervals, subject to applicable surrender charges. Further, as policyholders, Supporting Organization #1 and Supporting Organization #2 can decide at quarterly intervals (but no more than twice per calendar year) to reallocate funds from one investment option provided under the Variable Contract to another investment option offered by Crown Global under the Variable Contract.

P. Crown Global, in its sole and exclusive discretion, can determine the investment offering within its offered insurance products and is under no legal requirement to make any particular offering of an investment strategy currently or in the future or to maintain an investment strategy offering. Crown Global, in its sole and absolute discretion, can terminate or remove an investment offering at any time in the future. All decisions as to the choice of IDFs or managed accounts that are made available for selection by the investor in the Variable Contract are made by Crown Global in its sole and absolute discretion. Mr. Dondero recommended to the Board of Supporting Organization #1 that it select Atlas IDF as the measuring investment under its Variable Contract. Mr. Okada made the same investment recommendations to the Board of Supporting Organization #2 as those made by Mr. Dondero to Supporting Organization #1.

Q. On December 9, 2015, the Directors of Supporting Organization #1 and Supporting Organization #2 each unanimously approved resolutions authorizing the acquisition by the Supporting Organization

of the Deferred Variable Annuity Policy from Crown Global, and authorized the officers of the Supporting Organization to take any and all further actions to carry out such acquisition.

R. On December 10, 2015, Supporting Organization #1 wired an initial premium to Crown Global of $15,903,108.54 with respect to the Variable Contract. On December 22, 2015, Supporting Organization #1 wired additional premium of $6,352,270 to Crown Global with respect to the Variable Contract.

S. Effective December 11th, 2015, Crown Global issued Deferred Variable Annuity Policy #30218 to Supporting Organization #1. Supporting Organization #1 is named the policyholder and irrevocably the sole beneficiary of the Variable Contract.

T. On December 10, 2015, Supporting Organization #2 wired an initial premium to Crown Global of $5,301,065.12 with respect to the Variable Contract. On December 22, 2015, Supporting Organization #2 wired additional premium of $2,117,423.00 to Crown Global with respect to the Variable Contract.

U. Effective December 11th, 2015, Crown Global issued Deferred Variable Annuity Policy #30219 to Supporting Organization #2. Supporting Organization #2 is named the policyholder and irrevocably the sole beneficiary of the Variable Contract.

V. Crown Global is a subsidiary of Crown Global Insurance Group and is not affiliated with or controlled by Mr. Dondero or Mr. Okada, or Highland Capital Management, L.P. ("Highland"), which is the business conducted by Messrs. Dondero and Okada. Highland is an investment manager business, with significant assets under management, located in Dallas, Texas. Crown Global has made an election under the Code to be treated as a domestic life insurance company.

W. In addition to acting as the investment manager of Atlas IDF, Rand Advisors will also act as the investment manager of Rand PE Fund I, L.P., a Delaware "series" limited partnership private investment fund ("PE Portfolio Fund"), to which Atlas IDF will initially allocate 55% of its investment portfolio and which: (x) is expected to initially invest in the Highland Transaction (as defined below), and (y) will potentially make investments in other private equity transactions. The Supporting Organizations have not been offered the opportunity to invest directly in the PE Portfolio Fund, and Crown Global has not designated the PE Fund as an available investment option for inclusion in a Separate Account with respect to the Variable Contracts purchased by the Supporting Organizations.

X. Atlas IDF has been organized by Rand Advisors as an "insurance-dedicated fund" (i.e., an investment fund that only admits institutional investors that are insurance companies and certain other eligible investors described in Treasury Regulation section 1.817(h)-5(f)(3)). The confidential private placement memorandum of Atlas IDF provides that Series 1 of Atlas IDF will invest: (x) approximately 45% of its portfolio in traded assets (including, without limitation, distressed debt instruments), to be selected and managed by Rand Advisors, and (y) approximately (but not more than) 55% of its portfolio in private equity investments, to be selected and managed by Rand Advisors. The percentage of Atlas IDF's assets invested in specific private equity investments is not fixed, and is subject to change by Rand Advisors. However, Atlas IDF is required to satisfy the portfolio diversification requirements set forth in Section 1.817-5(b)(1) of the Treasury Regulations.

Y. At the outset, Crown Global will be the only insurance company owning a limited partnership interest in Atlas IDF. However, the governing documents of Atlas IDF permit other insurance companies to invest directly in Atlas IDF on behalf of their separate accounts established in connection with variable annuities and insurance contracts. Thus, Interests in Atlas IDF are not being offered for sale to the "general public" (within the meaning of IRS Rulings and Regulations discussed below), and thus such other investors could invest in Atlas IDF only indirectly by purchasing a Variable Contract from Crown Global (if Crown Global were to make the Atlas IDF available as an eligible investment). The PE Portfolio Fund in which Atlas IDF will invest is not an IDF. PE Portfolio Fund will have other direct investors that are not affiliates of Crown Global. Rand Advisors anticipates that it will market PE Portfolio Fund, or subsequent series thereof, to other investors in the future.

Z. Rand Advisors is owned and controlled by John Honis. In addition, Mr. Honis owns and controls the general partner entities of Atlas IDF and PE Portfolio Fund. Mr. Honis has over 25 years of investment management and business experience, and is not controlled by Highland, nor by Mr. Dondero, nor Mr. Okada.

AA. Mr. Honis was previously a Partner and Head of Private Equity at Highland. Although Mr. Honis has retired from that position, he still currently serves on: (x) the Board of Trustees for each of Highland's affiliated registered investment companies, and receives compensation in connection with each of the foregoing, and (y) the Board of Directors for American HomePatient, Inc. and Turtle Bay Resort, LLC, which are portfolio companies for investment funds operated by Highland, and receives compensation in connection with each of the foregoing. Mr. Honis does not currently own any limited partnership interests in Highland and does not have any direct share in the profits or revenues of such company. However, as part of his retirement, Mr. Honis is in the process of receiving payments in the total amount of $3 million from certain affiliates of Highland.

BB. The governing documents of Atlas IDF require such fund to comply with the portfolio diversification requirements in Section 817(h) of the Code. Similarly, the Variable Contracts each require the Separate Accounts established in connection with such Contracts to satisfy such portfolio diversification requirements. Each of the Variable Contracts specifically provides that the policyholder is not permitted to have direct contact with the investment manager of any IDF or managed subaccount held in the Separate Account and may not participate in the management of the Separate Account or any IDF or managed subaccount.

CC. It was anticipated solely among Rand Advisors, Strand Advisors (the General Partner of Highland Capital Management), James Dondero, and Mark Okada that the first series of PE Portfolio Fund would acquire all or substantially all of the non-voting limited partnership interests in Highland from Highland, including newly-issued limited partnership interests, or from trusts or other affiliates of Mr. Dondero or Mr. Okada (collectively, the "Highland Transaction"). Although with respect to any trusts, the Trustees would have to evaluate and approve any transaction independently and during the time of the relevant acquisition. During this time, the PE Portfolio Fund and Highland did not negotiate documentation for the legal terms of the Highland Transaction. Further, there was no assurances that such transaction would be consummated as it was understood that it would have to be negotiated, the respective parties had not made any offer (and would not until after the PE Portfolio Fund had assets), and that all parties would be separately represented by legal counsel. It was nonetheless the intention of such parties that the

transaction should come about.

DD. At the time that the Supporting Organizations acquired their ownership interests in their Variable Contracts and had selected the Rand IDF as to investment to be held in the Separate Account, PE Portfolio Fund had not entered into a binding contract to acquire the previously described limited partnership interests in Highland, and the Institutional Members of the Boards of the Supporting Organizations did not have any knowledge of the terms of the investment subsequently made by the Rand PE Fund in Highland.

EE. On December 21, 2015, as part of the Highland Transaction, Hunter Mountain Investment Trust (a special purpose vehicle of PE Portfolio Fund) acquired through a contribution of cash and note, newly issued limited partnership interests in Highland Capital Management, L.P.

FF. On December 24, 2015, as part of the Highland Transaction, Hunter Mountain Investment Trust acquired through purchase from trusts affiliated with Mr. Dondero and Mr. Okada, and Mr. Okada individually, newly reclassified limited partnership interests in Highland Capital Management, L.P.

GG. Hunter Mountain Investment Trust's acquisition of substantially all the interests in Highland Capital Management, L.P. was at a substantial discount to book value. The substantial discount offered reflects the overall donative intent of Mr. Dondero and Mr. Okada to engage in the transaction.

HH. The Variable Contract/Separate Account structure may provide a federal income tax advantage to the Supporting Organizations if the income realized by such Supporting Organizations as a result of ownership of their Variable Contracts would not be treated as taxable unrelated business taxable income ("UBTI") under the Code. In contrast, if either Supporting Organization were to acquire a direct ownership interest in an investment partnership such as Atlas IDF, such Supporting Organization would almost certainly realize taxable UBTI if Atlas IDF owned, directly, or through other partnerships, equity interests in business partnerships (such as Highland) or debt-financed assets.

II. The Variable Contract/Separate Account structure may also provide state and local tax advantages to the Supporting Organizations since the structure enables the Supporting Organizations to avoid being treated as engaged in business in the states and localities in which the underlying portfolio companies that are partnerships are engaged in business.

JJ. Crown Global has represented that (1) it qualifies as a life insurance company under the Code; (2) it has made an effective election to be treated as a domestic corporation for U.S. federal income tax purposes; and (3) the terms of the Variable Contracts to be purchased by the Supporting Organizations would meet the requirements of Section 72 of the Code to be treated as annuity contracts under such Code Section if such Contracts were held by a "natural person" (within the meaning of Code Section 72(u)).

KK. Mr. Dondero and Mr. Okada (the "Donors") are entering into the transactions described herein based on a donative intent to provide funds to be used by TDF, a public charity.

LL. Prior to making any investments in the Variable Contracts to be issued by Crown Global, the Dallas Foundation had their independent financial consultant evaluate John Honis, as an investment

manager acting through Rand Advisors, and the proposed investment strategy offered by him through an insurance dedicated fund that combined a private equity and liquid investment strategy for the Supporting Organizations.

MM. The Dallas Foundation's independent financial consultant recommended to The Dallas Foundation that such investment strategies used by John Honis would be a prudent investment by each of the Supporting Organizations through a deferred variable contract policy issued by an insurance company.

NN. Prior to making any investments in the Variable Contracts to be issued by Crown Global, the Board of each Supporting Organization received (1) the confidential private placement memorandum prepared by Crown Global with respect to the Variable Contracts, and (2) the confidential private placement memorandum detailing the terms of the Atlas IDF.

OO. The decision made by each Board to invest in its Variable Contract and to designate the Atlas IDF as the designated investment to be made by the Separate Account of Crown Global were made on the basis of the anticipated investment returns on the underlying investments that will be made and managed by Rand Advisors.

## III. ASSUMPTIONS MADE

You have authorized us to make the following assumptions for the purpose of rendering our opinion stated herein:

A. Mr. Honis will manage the investments of Rand IDF and the PE Portfolio Fund in order to provide attractive returns to the current and future investors in such funds. Mr. Honis' performance will affect his ability to attract additional investors to such funds (including separate series funds) as well as any other funds subsequently managed by Rand Advisors.

B. Atlas IDF will, at all times, comply with the applicable diversification requirements under Section 817(h) of the Code. In order to achieve such compliance, Atlas IDF will restrict the ownership of equity interests in Atlas IDF to those investors described in Treasury Regulation 1.817-5(f).

C. The Boards of the Supporting Organizations will control any decisions made to be made as the owner of the Variable Contract, including any decisions to withdraw funds from the Variable Contract, to move funds from Atlas IDF to other investments that Crown Global may offer under the Variable Contract, or to invest additional funds of the Supporting Organization in Atlas IDF through the Variable Contract.

D. Highland is a successful investment management firm and it would be able to raise additional capital from other sources if it chose to do so.

E. The intentions of the parties are that, for federal income tax purposes,: (1) Crown Global will at all times be treated as the owner of the limited partnership interests in Atlas IDF that provide an

economic return for the Variable Contracts owned by the Supporting Organizations; (2) each Supporting Organization will be treated as the owner of its Variable Contract; (3) Mr. Dondero and Mr. Okada will each be treated as having made charitable contributions in cash to their Supporting Organizations in the amounts described in the facts above; (4) any sales of partnership interests in Highland by Mr. Dondero or Mr. Okada, any trust established by M. Dondero or Mr. Okada or any related party to such Donors, to the PE Portfolio Fund will be treated as sales occurring between the applicable seller and the PE Portfolio Fund.

F. Neither Supporting Organization will incur "acquisition indebtedness" within the meaning of Section 514 of the Code with respect to its Variable Contract at any time.

## IV. REQUESTED OPINIONS

You have asked us to render an opinion on the following issues:

1. Whether the Internal Revenue Service could successfully contend that, under the facts and assumptions described above, the owners of the Variable Contracts, i.e., the two Supporting Organizations, are to be treated as owners for federal income tax purposes of the underlying investments held in the Crown Global Separate Accounts established in connection with such Variable Contracts.

2. Whether the income realized by the Supporting Organizations from their investment in the Variable Contracts will be exempt from the tax imposed under Section 511 of the Code on the "unrelated business taxable income" of tax-exempt entities described in Section 511(a).

## V. LEGAL ANALYSIS

### Tax Benefits for Tax-Exempt Organizations Investing in Variable Annuity Contracts

U.S. tax-exempt entities described in Section 501 of the Code, such as the Supporting Organizations, are subject to federal income tax on their unrelated business taxable income (UBTI). UBTI is defined in Section 512 as income from a "trade or business" that is regularly carried on by the tax-exempt organization, or a partnership in which it a partner, and which is not substantially related to the exempt organization's exempt purpose or function. UBTI also includes income from "debt-financed property" as defined in Section 514. Debt-financed property is property held to produce income with respect to which "acquisition indebtedness" exists at any time in the taxable year (or, if the property is sold or disposed during the year, with respect to which there was any acquisition indebtedness at any time during the 12-month period ending on the date of such disposition).

Section 512(b)(1) specifically exempts "annuities" from UBTI, along with other notable categories of investment income, including interest, dividends, capital gains and rent from real property. However, the specific statutory exemptions from UBTI do not apply to the extent such income items are unrelated debt-financed income under Code Section 514. Where debt-financed property is involved, UBTI includes the income from the property multiplied by its "debt-basis percentage" (a percentage equal to "average acquisition indebtedness" divided by "average adjusted basis").

The term "annuities" is not defined in Section 512 or the Treasury regulations ("Regulations") thereunder. There is also no comprehensive definition of annuity or "annuity contract' in Section 72 (governing tax treatment of distributions from life insurance and annuity contracts) or elsewhere in the Code. The Regulations under Section 72 provide that an annuity contract that is subject to the rules of Section 72 includes a contract that is recognizable as an annuity under the "customary" practices of life insurance companies. See Treas. Reg. Section 1.72-2(a)(1). Under Section 72, if the entire value of an annuity contract is applied to a stream of periodic payments, each of these payments will be partly included in income and (because of nondeductible premium payments) partly excludible as a return of capital, pursuant to an "exclusion ratio". Under Section 72(e)(2)(A), any non-annuity amount received under an annuity contract (including withdrawals and partial surrenders) on or after the "annuity starting date" are treated as "gross income". Any non-annuity amounts received **before** the annuity starting date may be treated as gross income or a return of the policyholder's investment in the contract under rules set forth in Section 72(e)(3).

**Tax Status of Separate Accounts**. Life insurance companies have segregated asset accounts that are created and regulated under the laws of various states or foreign jurisdictions. These accounts are typically formed for the purpose of segregating assets attributable to variable life insurance contracts, variable annuities and group contracts from the general assets of the life insurance company. In Revenue Ruling 78-204, the IRS ruled that a segregated asset account established by a life insurance company is not an organization that can be taxed separately from the insurance company. The Ruling states that if a segregated asset account holds assets pursuant to contracts described in former Code section 801(g)(1) (which includes variable annuity contracts or contracts with reserves based on a segregated asset account), it is taxed as part of the insurance company.

**Code Section 817: Statutory Diversification Requirements**. To discourage consumer use of various insurance type products as investment vehicles, Congress in 1984 granted the Treasury authority to prescribe diversification standards for the investment of variable contract assets held in segregated asset accounts. The legislative history states the Congress's goal in so doing was "to deny annuity or life insurance treatment for investments that are publicly available to investors and investments which are made, in effect, at the direction of the investor." *H.R. Conf. Rep. No. 98-561, at p. 1055 (1984)*.

Under the Treasury Regulations, a separate account will be considered adequately diversified if no more than 55% of the total value of the account is represented by any one investment; no more than 70% of the total value of the account is represented by any two investments; no more than 80% of the total value is represented by any three investments; and no more than 90% of the total value is represented by any four investments. Treas. Regs. Sec. 1.817-5(b)(1).

For purposes of testing diversification, Section 817(h)(4) and Section 1.817-5(f) of the Regulations provide a look through for assets held in certain investment entities, including partnerships, trusts and investment companies, provided that the beneficial interest in the investment entity are held by one or more segregated asset accounts of one or more insurance companies, and public access to such investment entity is available exclusively (except as otherwise permitted by Regs. Sec. 1.817-5(f)(3)) through the purchase of a variable contract. As previously discussed, the Separate Accounts established in connection with the Variable Contracts are expected to satisfy the diversification

requirements of Code Section 817. In order to satisfy the diversification requirements, Atlas IDF will satisfy the requirements of the Section 817 regulations to qualify for "look through" treatment.

**A. <u>INVESTOR CONTROL ISSUES</u>.**

In the 1970's the IRS grew concerned that taxpayers were avoiding federal income tax by "wrapping" their investments in "investment annuity contracts" which created the possibility of major tax shelter abuse. Such transactions were structured as follows: Each investment annuity contract paid an annuity based on the investment return and market value of the contract's segregated asset account. A third party custodian, typically a bank, held and invested the segregated account's assets according to the annuity owner's directions. In response to such transactions, the IRS issued four revenue rulings between 1977 and 1982 describing the circumstances in which owners of variable annuity contracts or variable life insurance contracts would be treated and taxed as owners of the underlying assets because of their control of the investments. The revenue rulings applied to variable annuity contracts and variable life insurance contracts the federal income tax principle that a person other than the person holding legal title to the property is treated as the owner for tax purposes if that other person possesses the "benefit and burdens" or "incidents of ownership" of such property. See generally *Commissioner v. Sunnen*, 33 U.S. (1948); *Helvering v. Clifford*, 309 U.S. 331 (1940); *Corliss v. Bowers*, 281 U.S. 376 (1930).

**Revenue Ruling 77-85**. This Ruling concludes that the annuity owner is, for federal income tax purposes, the owner of the separate account assets under the following conditions:

1. the annuity owner controls the investment of the separate account assets;
2. the annuity has the power to vote any securities in the account; and
3. the annuity owner can withdraw any or all of the assets at any time.

**Revenue Ruling 80-274**. The second Ruling similarly concludes that the investor in the annuity contract was treated as the owner of a bank certificate of deposit (CD) underlying a variable annuity contract when the contract owner transferred the CD to the life insurance company in exchange for the variable annuity contract and the insurance company is expected to hold the CD for the investor's benefit.

**Revenue Ruling 81-225**. This Ruling applies the investor control principle to five different situations, and thus is considered the most important ruling on the principle. In four of the fact patterns considered, the annuity owner- not the insurance company- is considered the owner of the mutual fund investments underlying the annuity contract because the mutual fund investments were available for direct purchase by the general public. In the fifth fact pattern, the insurance company, rather than the annuity owner, is considered the owner of the mutual fund investments because such shares were not available for direct purchase by the general public; they were only available through the purchase of a variable contract. The Ruling states that in factual situations one through four, the insurance company is "little more than a conduit between the policyholders and their mutual fund shares."

**Revenue Ruling 82-54**. In this fourth "investor control" Ruling, the annuity owners direct the insurance company to invest in shares of any or all of three mutual funds that are **not** available to the public. One mutual fund invests primarily in common stocks, another in bonds, and the third in money market

instruments. The investors chose the original allocation of the investments among the three funds and have the unlimited right reallocate before the annuity contract's maturity date. The IRS held that the annuity owners' ability to choose the contract's investments did not constitute sufficient control to cause them to be treated as owners of the mutual fund shares. In its analysis, the IRS reiterated its position in Revenue Ruling 81-225 that public availability of investments will cause annuity owners to be treated as owners of the underlying mutual fund shares.

**Christoffersen v. United States**. In 1984, the United States Court of Appeals for the Eighth Circuit upheld the IRS's investor control theory of Revenue Ruling 81-225 in *Christoffersen v. United States*. The taxpayers in *Christoffersen* had purchased a variable annuity contract that reflected the investment return and market value of the insurance company's separate account assets. The taxpayers had the power to direct the investment of premiums in any one or all of six publicly available mutual funds, to reallocate their investment among such funds at any time, to make withdrawals, to surrender the contract, and to apply the contract's accumulated value to provide annuity payments.

**Post-Christoffersen Legislation**. After the Eighth Circuit Court's decision in the *Christoffersen* case, the Congress enacted Code section 817, which aims to discourage use of variable annuities and life insurance primarily as investment vehicles. Before the issuance of further revenue rulings in 2003 (discussed below), some commentators had suggested that the enactment of the diversification requirements under Code section 817(h) (and other measures) effectively rendered *Christoffersen* (and Revenue Ruling 81-225) obsolete. This view was supported by language in the General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 ("DEFRA Blue Book") indicating that the Congress introduced the diversification requirements in Section 817(h) to address any and all concerns with respect to investor control of assets underlying insurance company variable contracts. The Joint Committee on Taxation wrote the following:

> In authorizing Treasury to prescribe diversification standards, the Congress intended that the standards be designed to deny annuity or life insurance treatment for investments that are publicly available to investors and investments which are made, in effect, at the direction of the investor.

When the Treasury issued its proposed regulations under Code section 817(h), it sidestepped the investor control issue. In its preamble to such regulations, the Treasury expressly noted that the regulations "do not provide guidance concerning the circumstances in which investor control of the investments of a segregated asset account may cause the investor, rather than the insurance company, to be treated as the owner of the asset in the account." The preamble further stated that guidance on investor control issues would be provided in separate regulations or rulings.

**Revenue Rulings 2003-91 and 2003-92**. The subsequent major guidance issued by the IRS on the investor control issues with respect to variable contracts was in the form of two revenue rulings issued in 2003. Revenue Ruling 2003-91 involved a life insurance company that offered variable life insurance and variable annuity contracts. The assets that funded the contracts were held in a separate account that was divided into various sub-accounts. Each sub-account offered a different strategy. Under the facts of this ruling, an individual purchased a life insurance contract and at the time of purchase, the

holder specified the allocation of premiums paid among the sub-accounts. The investments could be reallocated, at the direction of the holder, among the twelve sub-accounts, each representing a different investment strategy, at any time. Investment in the sub-accounts was available solely through the purchase of the insurance contract.

All decisions concerning the choice of the investment adviser, and any changes with respect to the sub-accounts offered, were made by the insurance company in its sole and absolute discretion. No arrangement, plan, contract, or agreement exists between the contract holder and the insurance company or between the contract holder and the investment advisor regarding the specific investments or investment objective of the sub-accounts. The contract holder could not communicate directly or indirectly with the insurance company concerning the selection or substitution of the investment advisor or other managers of the account or sub-accounts. The contract holder had no legal, equitable, direct, or indirect interest in any of the assets held by a sub-account; rather the contract holder had only a contractual claim against the insurance company to collect cash from the insurance company in the form of death benefits, or cash surrender values under the contract. Revenue Ruling 2003-91 concluded that the holder of a variable contract under such facts was not the owner of the assets that funded the variable contract for federal income tax purposes because the holder did not have direct or indirect control over the separate account.

Revenue Ruling 2003-92 clarified and amplified Revenue Ruling 81-22, by stating that a variable contract holder was the owner of interests in an unregistered partnership (e.g., a hedge fund or private equity fund) where the interests in such partnership were not available exclusively through the purchase of a life insurance policy or annuity contract. In effect this Ruling confirmed the position taken by the IRS in private letter rulings that the term "general public" included individuals purchasing partnership interests in private placement transactions. More recently, the IRS has confirmed that the fact that a similar fund is available to the public will not cause the fund held by the insurance company's separate account to be treated as being publicly available. See, e.g., Private Letter Ruling 20147007 (April 25, 2014).

**Webber v. Commissioner.** On June 30, 2015, the Tax Court issued a 92-page opinion in the case of *Webber v. Commissioner* affirming the enforceability of the IRS' investor control doctrine. Mr. Webber was a venture capital investor and private equity fund manager who established a grantor trust to purchase private placement variable life insurance policies insuring the lives of two elderly relatives. The policies were purchased from a Cayman life insurance company and the taxpayer and his family members were listed as the beneficiaries. The premiums paid for each policy, after deduction of a mortality risk premium and other applicable charges, were placed in a separate account underlying the policy. The Tax Court summarized the investor control doctrine[2] as follows:

> The "investor control" doctrine posits that, if a policyholder has sufficient "incidents of ownership" over the assets in a separate account underlying a variable life insurance or annuity policy, the policyholder rather than the insurance company will be considered the owner of those assets for Federal income tax purposes. The critical "incident of ownership" that emerges from these rulings is the power to decide what specific

---

[2] *Webber v. Com'r,* 144 T.C. No. 17 (2015), at pp. 55-56.

> investments will be held in the account. . . . Other "incidents of ownership" emerging from these rulings include the powers to vote securities in the separate account; to exercise other rights or options relative to these investments; to extract money from the account by withdrawal or otherwise; and to derive, in other ways, what the Supreme Court has termed "effective benefit" from the underlying assets.

The assets in these separate accounts purchased investments in startup companies which, as the Tax Court noted, the taxpayer was intimately familiar with, and also in which he invested personally and through the funds he managed. After examining the facts, including thousands of emails sent by Webber to parties acting as his agent with "recommendations" that were routinely followed by the "investment managers" of the accounts, the Tax Court determined that the taxpayer effectively dictated both the companies in which the separate accounts would invest and all actions taken with respect to these investments.

The IRS cited the "investor control" doctrine and other principles, and concluded that the taxpayer had retained sufficient control and incidents of ownership over the assets in the separate accounts to be treated as their owner for federal income tax purposes. The IRS thus treated the taxpayer as having received the dividends, interest, capital gains, and other income realized by the separate accounts. The IRS also assessed accuracy related penalties on the taxpayer under Code section 6662.

The Tax Court held that the IRS' pronouncements enunciating the investor control doctrine are entitled to deference and weight and that Webber "retained control and incidents of ownership over the assets" and was therefore "taxable on the income earned on those assets during the taxable years at issue." In holding that the taxpayer was the owner of investments held under the variable annuity contract , as contract owner, the taxpayer had (a) unfettered ability to select investments for the separate accounts under the contract, and neither the issuer nor the investment manager of the separate account exercised any independent investment discretion, (b) dictated all actions the separate account took with respect to ongoing investments,[3] (c) had numerous ways to extract cash from the contract without a surrender of the contract[4] and without loans against the contract, and he frequently exercised such power (e.g., by selling assets to the separate accounts, by borrowing money from the separate accounts, and by having the separate account make investments that generated liquidity for the taxpayer), and (d) derived other economic benefits, including causing the separate accounts to make investments that were used for personal pleasure by the taxpayer (including a winery, a Big Sur resort, and a Canadian hunting lodge), that discharged the contract owner's personal commitments, and that bolstered investments held by the taxpayer outside the contract.

Consequently, the Tax Court upheld the IRS' deficiency determinations for the most part but concluded that the taxpayer as not liable for the penalty assessments (even though the taxpayer was widely believed by tax advisors to have flagrantly disregarded the most minimal of standards to avoid investor control). The facts described herein concerning the investments made by the Supporting Organizations

---

[3] Giving the contract owner SEC-mandated voting rights with respect to underlying investments is not sufficient to establish investor control. Rev. Rul. 81-225, 1981-2 C.B. 12.

[4] The contract owner's right to surrender the contract is not sufficient to establish investor control. Rev. Rul. 81-225, 1981-2 C.B. 12.

in the Variable Contracts issued by Crown Global in no way resemble the facts considered by the court in the *Webber* case.

**Application of the Investor Control Precedents to the Variable Contracts.**

Both Supporting Organizations certificates of incorporation state in the "Second" clause:

"The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit The Dallas Foundation, a Texas nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by The Dallas Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. . . . [T]he corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code."

The "Second" paragraph quoted from each certificate of incorporation is clear that the respective Supporting Organization is formed to operate exclusively "to support and benefit" The Dallas Foundation. Further the "Eighth" paragraph of the certificate of incorporation for each Supporting Organization indicates that upon its dissolution, all of its assets are to be distributed to The Dallas Foundation.

Each Supporting Organization will be classified as a "Tier 1" supporting organization for federal income tax purposes. A "Tier 1" Supporting Organization, from time to time, will provide its supported organization, The Dallas Foundation, distributions of cash. The IRS web page describes the relationship as:

"**Type I.** A Type I supporting organization must be operated, supervised or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. The relationship between the supported organization(s) and the supporting organization is sometimes described as ***similar to a parent-subsidiary relationship***. (emphasis added.)"[5]

Section 2.13 "Control of Investments" within the bylaws of each Supporting Organization provide that The Dallas Foundation, as Institutional Member, "shall have the sole and exclusive power and authority to direct the management and investment of the assets" of each Supporting Organization. This power affirmatively rests exclusively in the hands of The Dallas Foundation's Institutional Members and no other officer or director of the respective Supporting Organization. This mandate is reflected in the bylaws' Section 2.13 as:

"Such power and authority shall be exercised by the Institutional Member in its sole discretion and shall be separate and independent of any power and authority of the Board of Directors and officers of the

[5]See, https://www.irs.gov/Charities-&-Non-Profits/Charitable-Organizations/Supporting-Organizations-Requirements-and-Types

Corporation ***which have no power or authority*** with respect to the matters delegated hereby to the Institutional Member with respect to investments" (emphasis added).

Therefore, the Supporting Organizations' Individual Directors and officers, including Grant Scott or Mark Okada, have no power or authority with respect to matters assigned to The Dallas Foundation with respect the decision to purchase the Variable Contracts.

This power within Section 2.13(d) vested with the Institutional Member includes control of decisions with respect to:

"the power to acquire life insurance policies, annuities, and/or other insurance or similar products (including the exercise or non-exercise or any rights, or the prosecution or defense of any disputes with the issuer or other parties regarding legal, regulatory, contractual, or other matters, arising under or relating to such products) ..."

Section 2.13(e) of the bylaws extends the power to the Institutional Members to include:

"the power to direct, and delegate to, the officers of the Corporation the taking of such acts and the execution of such documents as may be necessary to effectuate the decisions of the Institutional Member with respect to investments."

The Dallas Foundation holds the Institutional Member seats on the board of the Supporting Organizations per Section 2.1 of the respective bylaws. The Dallas Foundation has appointed as Directors Gary W. Garcia and Mary M. Jalonick per the respective "Statement of Incorporator."

Thus, the corporate provisions for each Supporting Organization's certificate of incorporation and bylaws is absolutely clear that The Dallas Foundation controls all of the respective Supporting Organization's activities, including investments, purchases of the Variable Contracts, grants, and operating costs and expenses, and is entitled solely and exclusively to the economic benefit of such Supporting Organization's investments, including from the Variable Contracts.

Supporting Organization #1 received a donation of cash of $16,034,978.50 on December 8, 2015 from Mr. Dondero. Supporting Organization #2 received a donation of cash of $5,345,021.50 from Mr. Okada on December 8, 2015. After the cash donation was made, the Board of Directors of each Supporting Organization authorized the purchase of a Variable Contract offered by Crown Global through a Resolution of Unanimous Consent on December 9, 2015. Effective December 11, 2015, Crown Global issued Variable Contracts #30218 and #30219 to Supporting Organization #1 and Supporting Organization #2, respectively. The Variable Contracts offered investment opportunities in three Insurance Dedicated Funds, including Atlas IDF. The Dallas Foundation, acting as the Institutional Board member of each Supporting Organization, directed the premiums to be allocated 100% to Atlas IDF.

Each Variable Contract, in the respective "Policy Data Page" to the Deferred Variable Annuity Policy, indicates under "Beneficiary" the sole beneficiary as the respective purchasing Supporting Organization #1 and Supporting Organization #2, and such designation is "irrevocable".

Therefore, it is without question that the investment decision to purchase the Variable Contract and allocate the premium to Atlas IDF was made by The Dallas Foundation. Through this decision by The Dallas Foundation, the investment performance of Atlas IDF will accrete to each respective Supporting Organization, and therefore, ultimately, to The Dallas Foundation. Ultimately, The Dallas Foundation will solely and exclusively derive any and all of the economic benefits from the Variable Contracts issued by Crown Global. Concomitantly, neither the Donors nor the Donors' agents, affiliates, related parties etc. derive any of the economic benefits from the Variable Contract's performance through the investment decisions made by Rand Advisors within Atlas IDF.

Each Variable Contract policy provides in Sections 4.5 and 5.1 the allowance that the Supporting Organization can reallocate funds, at quarterly intervals (but no more than twice per calendar year), among the available investment options provided in the Contract. Therefore, The Dallas Foundation, should it no longer want exposure to Atlas IDF, has the right to reallocate funds to another investment offering.

Crown Global, through Sections 4.7 and 4.11 of each Variable Contract policy, has the sole and absolute discretion to terminate Atlas IDF as an investment offering available to each Supporting Organization. Each Supporting Organization has the right to fully or partially surrender the Variable Contract back to Crown Global, in accordance with Sections 8.2 and 8.3 of the policies. No more than one partial surrender may be requested by the policyholder during each quarter of a policy year.

As discussed above, Atlas IDF will qualify for look through treatment for purposes of satisfying the diversification requirements of Section 817 of the Code. In order to qualify for such look through treatment, it is essential to conclude that the equity interests in the Rand IDF have not been offered to the "general public". Since the offering documents for the Rand IDF provide for such restricted access to the fund, we have assumed that the Rand IDF has satisfied, and will continue to satisfy this requirement.

The PPM for Atlas IDF provides that approximately 45 percent of its assets will be invested in a portfolio of high yield debt instruments and other securities selected by, and managed by the investment manager of the IDF, Rand Advisors. Under the governing documents of the Variable Contracts and the Atlas IDF, the Supporting Organizations are not provided with any opportunities to participate in any purchase or sale or other investment decisions made with respect to the IDF's debt portfolio, and we have been instructed to assume that the Supporting Organizations and their agents will not attempt to do so.

The PPM for Atlas IDF further provides that approximately (but no more than) 55 percent of the IDF's portfolio will be invested in private equity investments through an investment made by the IDF in the Rand PE Fund 1. Although it was anticipated that the Rand PE Fund would seek to make an investment in limited partnership interests in Highland, the terms of such investment were negotiated by Rand Advisors, as investment manager of the PE Fund, the Supporting Organizations were not provided with any opportunity to participate in such negotiations, and in fact purchased their Variable Contracts before any such investment in Highland was made by the PE Fund. There was no guarantee that the Highland investment would in fact be made and there was no provision for unwinding the investment by

Crown Global in Atlas IDF or the investments made by each Supporting Organization in its Variable Contract if such were the case.

Further, the governing documents of the Rand PE Fund provide that all investment decisions with respect to such Fund are to be made by Rand Advisors, and we have been instructed to assume that the Supporting Organizations and their agents will not attempt to participate in such decisions. The owners of the Variable Contracts will not have the ability to exercise any voting rights with respect to securities held by the Atlas IDF or Rand PE Fund, and such owners of the Variable Contracts will not have the ability to require any distributions by the insurance company pursuant to withdrawal rights in such contracts to be made in kind rather than in cash. Due to the nature of the illiquid private equity investments in the Separate Accounts, the Variable Contracts contain certain limitations on the ability of the owners of such contracts to withdraw funds.

On December 21, 2015, Rand Advisor's special purpose vehicle, Hunter Mountain Investment Trust, controlled by the Rand PE Fund, executed a Contribution Agreement with Highland Capital Management. L.P., in exchange for newly-issued limited partnership interests in Highland Capital Management, L.P. (the "Contribution Transaction"). On December 24, 2015, Rand Advisor's special purpose vehicle, Hunter Mountain Investment Trust, controlled by the Rand PE Fund, executed a Purchase and Sale Agreement to acquire interests in Highland Capital Management, L.P. from The Dugaboy Investment Trust, The Mark and Pamela Okada Family Trust-Exempt Trust #1, The Mark and Pamela Okada Family Trust-Exempt Trust #2, and Mark K. Okada (the "Purchase Transaction" and together with the Contribution Transaction, the "Highland Transaction").

The Highland Transaction was negotiated between Rand Advisors and the respective Highland counterparties and their legal representatives. Prior to consummation of the Highland Transaction, neither The Dallas Foundation nor the Supporting Organizations directed, compelled, or caused Rand Advisors to make the investment in the Highland Transaction.

The investor control doctrine was created to prevent the policyholder or beneficiary of an insurance product that qualifies under Section 72 of the Code from directly or indirectly making investment decisions with respect to the investment assets within the insurance product. The concern was that policyholders and beneficiaries should not be able to direct the investments and receive the economic benefit of those directions within an insurance product. That is the fundamental principle laid out in in the recent Tax Court case of *Webber v. Commissioner*.

Therefore, applying that *Webber* principle of the investor control doctrine to the Highland Transaction, it is not a legally significant fact that the Donors to each of the Supporting Organization are also participants in the Highland Transaction because the beneficiary of the economics from the investment performance of the Variable Contracts are not the Donors but rather are the Supporting Organizations and ultimately The Dallas Foundation.

As further support for our view, Rand Advisors made the independent investment decision to participate and negotiate the Highland Transaction. Moreover, it is clear that Rand Advisors was not taking directions nor compelled by The Dallas Foundation or the Supporting Organizations to enter into the Highland Transaction. Accordingly, there is no way the Highland Transaction can in any way be

characterized as "control" by The Dallas Foundation or the Supporting Organizations over the investment activities of Atlas IDF and its respective investment accounts.

The facts and circumstances of the purchase of the Variable Contracts by the Supporting Organizations support the conclusion that Crown Global is the owner of Atlas IDF and its investments, and that the Supporting Organizations will not be treated as the owner of the investments. The facts present none of the factors that the Tax Court found determinative in *Webber*. In particular:

- Neither The Dallas Foundation nor the Supporting Organizations have any ability to select investments in Atlas IDF held by the Variable Contracts;
- Neither The Dallas Foundation nor the Supporting Organizations have any ability to vote securities owned by Atlas IDF or the ability to exercise other options with respect to such investments;
- Other than the right to partially or fully surrender the Variable Contracts, the Supporting Organizations cannot withdraw funds indirectly out of the Variable Contracts. In particular, neither The Dallas Foundation nor the Supporting Organizations can cause Atlas IDF to purchase assets from The Dallas Foundation or the Supporting Organizations. Nor can The Dallas Foundation or the Supporting Organizations borrow funds from Atlas IDF or otherwise engage in any transaction with Atlas IDF.

In addition, the facts and circumstances closely track the facts and circumstances of Revenue Ruling 2003-91's safe harbor provisions. In addition to the facts recited above:

- There is no arrangement, plan, contract, or agreement between The Dallas Foundation or the Supporting Organizations and Crown Global or Rand Advisers as to the investments to be held in Atlas IDF.
- The Dallas Foundation and the Supporting Organizations have no right to, and will not, communicate with any investment officer of Crown Global or its affiliates or with any Investment Manager regarding the selection, quality, or rate of return of any specific investment or group of investments held in Atlas IDF.
- The Dallas Foundation and the Supporting Organizations have no legal, equitable, direct, or indirect interest in any of the assets held by Atlas IDF. Rather the Supporting Organizations only have a contractual claim against Crown Global to collect cash from the Variable Contracts.
- All decisions concerning the choice of Insurance Dedicated Fund offerings, or any of Crown Global's investment officers involved in the investment activities of any Insurance Dedicated Fund, are made by Crown Global in its sole and absolute discretion.[6]

---

[6] See also, P.L.R. 9752061 (Dec. 24,1997) ("Policyholder influence over the way the investments are managed will be limited to selecting an investment manager from a pool of investment managers whose credentials have been evaluated and approved by Taxpayer. These investment managers may be recommended to Taxpayer by one or more Policyholders. Taxpayer will be under no obligation to approve any such recommendations. Moreover, once Policyholder makes an initial selection, the investment manager can only be changed by Taxpayer and not by Policyholder"; Taxpayer (the issuing insurance company) was held to be the owner of the assets held under the contract).

- Neither The Dallas Foundation nor the Supporting Organizations have any right to, and will not, communicate with Crown Global concerning the selection or substitution of any investment manager or insurance dedicated fund involved in the investment activities of Atlas IDF.

In sum, based upon these facts, we believe that the Supporting Organizations will not be treated as the owners of the investments and other assets held in the Separate Accounts, since the Supporting Organizations will not have the types of control which the IRS has viewed as essential in order to apply the investor control doctrine to make another person other that the holder of the assets (i.e., the insurance company) the owner for tax purposes.

B. **UNRELATED BUSINESS TAXABLE INCOME ISSUES FOR INVESTORS IN DEFERRED VARIABLE ANNUITY CONTRACTS**.

As discussed above, we have reached the conclusion that under the facts and assumptions set forth herein, for federal income tax purposes, the insurance company should be treated as the owner of the assets in the Separate Account (i.e., the equity interests in the Rand IDF), and each of the Supporting Organizations should be treated as owners of their respective Variable Contract. We have also been instructed to assume that neither Supporting Organization has, or will ever, incur "acquisition indebtedness" with respect to its Variable Contract.

**Possible Application of Section 72(u) of the Code**. In 1986, Congress was concerned that employers were utilizing deferred annuity contracts to fund nonqualified deferred compensation arrangements on a tax-favored basis, and that this was acting as a disincentive to employers to fund benefits through qualified retirement plans. Section 72(u) was added to the Code to curtail such activity. The legislative history to section 72(u) states:

> The committee believes that the present-law rules relating to deferred annuity contracts present an opportunity for employers to fund, on a tax-favored basis, significant amounts of deferred compensation for employees. This favorable tax treatment may create a disincentive for employers to provide benefits to employees under qualified pension plans, which are subject to significantly greater restrictions.[7]

Section 72(u) states, in relevant part, that "any annuity contract" owned by "a person who is not a natural person" (e.g., a corporation) shall not be treated as an annuity contract for purposes of the income tax provisions of the Code (Sections 1-1563, known as Subtitle A), other than Subchapter L (i.e., Sections 801-848 relating to insurance companies). The effect of this rule was to eliminate the deferral of income tax for the corporate investor in the contract on the "inside buildup" income of the annuity contract. If a non-natural person does hold an annuity contract and no exception applies, then Section 72(u)(1)(B) provides that the "income of the contract" for any taxable year is "ordinary income" that the owner is treated as receiving or accruing during that taxable year.

[7] S. Rep. No. 99-313, at 567 (1986).

**Exemptions under Section 72(u)**. We would also note that the drafters of Section 72(u) also inserted some specific exemptions in Section 72(u)(3). For example, Section 72(u)(3)(B) provides that Section 72(u) does not apply to any annuity contract held under a qualified plan described in Section 401(a) of the Code or an "individual retirement plan" (i.e., individual retirement accounts and individual retirement annuities described in Section 7701(a)(37)). Section 72(u) also contains an exemption for "immediate annuities" held by any non-natural person. The inclusion of these exemptions indicates that Section 72(u) is designed to eliminate the tax deferral benefit that taxable corporations could derive from investments in deferred annuity contracts. We are not aware of any policy reason why a deferred annuity contract held by a qualified plan or an IRA should be exempted from Section 72(u) but one held by a tax-exempt corporation should be covered, and we have found nothing in the brief legislative history of this Code provision that addresses this issue. Consequently, the failure of the drafters to include an exemption from Section 72(u) for other tax-exempt entities that are not qualified plans or IRAs appears to be an oversight or drafting error.

**Definition of "Income on the Contract".** Section 72(u) provides its own special definition of "income on the contract" in Section 72(u)(2). Such income is defined as the *excess of* (1) the sum of the "net surrender value' of the contract at the close of the taxable year plus all distributions under the contract received during the taxable year or any prior taxable year, *over* (2) the sum of premiums paid on the contract (net of dividends) plus all amounts includible in income for prior taxable years under Section 72(u). It is significant that the income to be recognized by the owner of the annuity contract is the net change in value of the contract rather than the actual net income realized by the separate account of the insurance company that has issued the annuity contract backed by the separate account. In effect, Section 72(u) does **not** provide for income taxation of the holder of the contract as if the contract owner owned the underlying assets in the insurance company's separate account.

The Supporting Organizations are corporations, and thus non-natural persons within the meaning of Section 72(u). Section 512(b), which contains a specific exclusion from UBTI for "annuities" is in Subtitle A of the Code. Thus, the Section 72(u) could be interpreted to provide that the UBTI exclusion for "annuities" would not apply to a tax-exempt corporation that owned a variable annuity contract. We have found no evidence in the legislative history that would indicate that Section 72(u) was intended to change the character of the income recognized by tax-exempt corporations that owned variable annuity contracts. Even if the specific exclusion from UBTI for "annuities" were held inapplicable to the income derived by the Supporting Organizations from the Variable Contracts, there are alternative provisions of the tax law that could be cited to support an exclusion of the income from such Contracts from UBTI.

**Treasury Regulations Defining Investment Income Excluded from UBTI.** Section 512(b) of the Code states that certain income items, including "annuities", interest, dividends, royalties, real property rents and gains realized on sale, exchange or disposition of property (other than inventory or property held primarily for sale to customers in the ordinary course of a trade or business) are specifically excluded from UBTI. Congress subsequently amended Section 512(b)(1) to add "payments with respect to securities loans" and "amounts received or accrued as consideration for entering into agreements to make loans" to the list of items excluded from UBTI. In the 1990's there were many new types of financial instruments, including equity swaps and total return swaps, that were made available and tax counsel sought advice from the Treasury for further clarification of the UBTI rules for investments made

by tax-exempt entities in such financial instruments. In 1992, the Treasury amended Section 1.512(b)-1 of the Regulations to provide that the specific exclusion from UBTI in Section 512(b)(1) also applies to "income from notional principal contracts" (as defined in the Regulations) and "other substantially similar income from ordinary and routine investments to the extent determined by the Commissioner…."

Thus, it can be argued that the income required to be recognized by a Supporting Organization under Section 72(u) as a result of its investment in the Variable Contract could still qualify for exclusion under this Treasury Regulation as "substantially similar income from ordinary and routine investments". We have found no revenue ruling or case which has addressed this issue. We would note, however, that Section 72(u) by its terms is only applicable to "annuity contracts". Thus, if the Supporting Organizations had instead purchased variable life insurance policies, Section 72(u), by its terms, would not be applicable. If Congress intended to eliminate the UBTI exemptions applicable to tax-exempt corporations that invested in variable contracts, it is unclear why the Section 72(u) provision by its terms is only applicable to "annuities" and not variable life insurance policies.

**Unrelated Trade or Business.**

The tax on UBTI was passed into law to rectify situations where an exempt organization could engage in any trade or business, secure in the knowledge that the profits generated from such trade or businesses would not be subject to tax, assuming the funds from such trade or business were received by the exempt organization. As stated in the House Committee Report:

> The problem at which the tax on unrelated business income is directed here is primarily that of unfair competition. The tax-free status of these section 101 organizations enables them to use their profits tax-free to expand operations, while their competitors can expand only with the profits remaining after taxes. Also, a number of examples have arisen where these organizations have, in effect, used their tax exemption to buy an ordinary business.[8]

Under Section 511 of the Code, gross income of a tax-exempt organization will be treated as UBTI if:

1. It is income from a "trade or business";
2. The trade or business" is "regularly carried on" by the organization or a partnership in which it is a member; and
3. The conduct of the "trade or business" is not substantially related to the purposes of the organization.

In order for the IRS to assert that some or all of the income from Variable Contracts constitutes UBTI, the IRS will need to establish that some or all of the income from the Variable Contracts is "trade or business" income. Thus, unless the Variable Contracts were deemed to be partnership interests, or the

[8] H. Rep't No. 2319, 81st Cong., 2d Sess. 33-37 (1950).

activity of acquiring such Variable Contracts were deemed to be a business activity, the income items recognized by the Supporting Organizations would not be treated as UBTI.

In general, a trade or business for UBTI purposes is based on Section 162 principles, and is viewed as an activity that produces income from the sale of a product or performance of services. In a 1969 Revenue Ruling, the IRS held that a tax-exempt entity's investment in insurance and annuity contracts was not a business activity. See Revenue Ruling 69-74. The IRS will not be able to establish an unrelated trade or business with respect to either Supporting Organization. The Variable Contracts are contractual entitlements only, and any economics paid or accrued are paid or accrued with respect to such contract.

As discussed in detail in this letter, we do not believe that the Supporting Organizations could be treated as the tax owners of the underlying partnership investments of the Separate Accounts under the IRS's "investor control" doctrine discussed in detail above. The facts and assumptions described above do not support treating the Supporting Organizations as partners in the Atlas IDF, the Rand PE Fund or the underlying Highland limited partnership.

**Code Section 514(g) Amendment**. Section 72(u) was added to the Code in 1986. Two years **earlier**, Congress had amended Code Section 514 (by adding a new subsection (g)) to specifically grant regulatory authority to the Treasury to issue regulations "necessary or appropriate" to prevent the avoidance of the debt-financed income rules through the use of "segregated asset accounts". The legislative history of the 1984 legislation specifically states that such regulations, if issued, shall only apply prospectively. We have found no reference to the 1984 amendment to Section 514 in the legislative history of Section 72(u). As of the date of this letter, the Treasury has not issued any proposed regulations to implement Section 514(g). Further, there have been no regulations issued or proposed under Section 72(u).

**Private Letter Rulings under Section 72(u).** There are two IRS private letter rulings, published in 2002 and 1997, that appear to have addressed the tax treatment of tax-exempt corporations that have made investments in variable annuities backed by separate accounts that held UBTI generating assets. PLR 20020647 (dated Nov. 13, 2001); PLR 9708022 (dated Nov. 26, 1996). These PLRs focus on the application of Section 72(u) and the use of group annuity contracts (GACs) purchased by a foundation or endowment (i.e., a non-natural person). The underlying investment of the GAC was a real estate partnership (presumably funded with debt financing). The PLRs state that while the GAC was subject to Section 72(u) in the hands of the tax-exempt organizations, the annuity continued to be treated as a valid variable contract under Section 817(d) of the Code. As a result of Section 72(u) being applicable, the life insurer would issue a Form 1099 to the endowment or foundation for any current income required to be recognized by reason of Section 72(u).

The tax issue is the character of the income to such tax-exempt entities. The two letter rulings, state, in essence, that in the view that the contract's status as an annuity contract under Subchapter L of the Code (relating to insurance company taxation), "the tax treatment of the contract holder under Section 72(u)(1)(A) does not preclude the contract from satisfying the requirements of Section 817(d)(2)(A) for purposes of determining the taxpayer's income." As such, the rulings conclude that the contracts do provide for the "payment of annuities." This would support the conclusion that the "income on the

contract" received by the Supporting Organizations constitutes "annuity" income and therefore does not constitute UBTI. It is our understanding the counsel for insurance companies generally are of the view that such PLRs support the position that the character of the contract holder's income is "annuity" income or other investment income exempt from UBTI despite the fact that the GAC is subject to Section 72(u).

In addition, another private letter ruling, published in 1990, supports the contention that the income reportable by each Supporting Organization does not constitute UBTI. In PLR 9009047, a trust was requesting a ruling that it qualified as a charitable remainder unitrust. The trustee of the trust intended to invest all the trust's assets in a deferred annuity contract. The ruling acknowledges that the annuity contract to be acquired by the trust will be subject to Code section 72(u) because the trust is not a natural person and the trust is not holding the annuity as an agent for a natural person. The ruling concludes that the trust will qualify as a charitable remainder unitrust and therefore the trust "will be exempt from taxes imposed by subtitle A of the Code unless it has any unrelated business taxable income as defined in section 512 of the Code and the regulations applicable thereto." Immediately thereafter, the ruling states that the trust will include in its ordinary income for any tax year the "income on the [annuity] contract" in accordance with Code section 72(u). This again supports the conclusion that amounts reportable by a tax-exempt organization with respect to an annuity contract will not constitute UBTI.[9]

Private letter rulings of this type are issued to a particular taxpayer in response to a request from the taxpayer for an interpretation of the tax law to a particular set of facts. PLRs may not be cited as precedent and generally may not be relied upon by as taxpayer other than the taxpayer which applied for and received the PLR. However, PLRs are typically viewed by tax counsel as indicative of the interpretations of the tax law that IRS personnel would likely apply to other taxpayers with the same issue.

**Mark to Market Taxation of an Annuity Contract under Section 72(u) Supports Exclusion from UBTI.** Even if the "income on the contract" that will be reported to each Supporting Organization is not considered an amount from an annuity because of Code section 72(u), alternative arguments exist that support the contention that the "income on the contract" does not constitute UBTI.

As discussed above, the "income on the contract" that will be reportable to each Supporting Organization will represent the increase in value of the assets underlying the Variable Contracts. The manner in which the contract owner's annual income inclusion is calculated under Section 72(u) resembles a mark-to-market approach to determining the investor's gain from ownership of the contract during the applicable taxable year. Essentially, the "income on the contract" represents the amount that would be realized if all the assets underlying the Separate Accounts were sold for their fair market value at the close of each taxable year. As noted above, Section 512(b)(5) contains a broad exemption from UBTI for gains realized on sales, exchanges or "other dispositions" of property (other

---

[9] This conclusion is also supported by commentators. *See* Zaritsky, Lane & Danforth, Federal Income Taxation of Estates and Trusts, §14.03[6][a][iv] ("Because the income option CRUT is tax exempt, no tax is due on the current accumulations").

than inventory or dealer assets). Furthermore, gain realized by tax-exempt investors under the mark-to-market rules of Code Section 1256 are entitled to the UBTI exclusion provided by Section 512(b)(5).

The UBTI exclusion does not apply to gains or losses from the sale, exchange, or other disposition of property that is (i) stock in trade or other property of a kind which would properly be included in the inventory of the organization if on hand at the close of the taxable year, or (ii) property held primarily for sale to customers in the ordinary course of the trade or business. The investments underlying the Variable Contracts should not constitute inventory or property held primarily for sale to customers in the ordinary course of a trade or business. Accordingly, even if the "income on the contract" does not constitute annuity income, it is analogous to gains from the sale, exchange or other disposition of property that is not inventory or held for sale to customers, which is excluded from UBTI.

**Notional Principal Contract or Other Ordinary or Routine Investment Income.** Additionally, each Supporting Organization is an owner of an investment contract issued by Crown Global. Even if such contract is excluded from being treated as an annuity contract under the literal reading of Section 72(u), such contract more closely resembles a "notional principal contract" or "other ordinary or routine investment" referred to in the exclusions from UBTI of Section 1.512(b)-1(a) of the Regulations.

**Failure to Qualify for the Section 512(b)(1) Exclusion Does Not Result in UBTI.** Section 512(b) provides a special exclusion for certain types of investment income, but the failure to qualify for the specific exclusions in such Section does not automatically result in UBTI classification for the income items. Section 72(u) provides that the income to be recognized by the non-natural owner of the annuity account is treated as "ordinary income". Ordinary income is not of necessity characterized as UBTI; interest income, royalties and real property rents, for example, are also items of ordinary income that qualify for exemption from UBTI.

**There is No Federal Income Tax Authority to Support an IRS Position that the Income from the Variable Contracts is UBTI.**

Unable to find an unrelated trade or business upon which to base a conclusion that the Supporting Organizations receive UBTI (as discussed above), the IRS would need to develop a legal theory that the character of trade or business income that flows to Crown Global maintains its character as the income (i.e., UBTI) received by the Supporting Organizations. The IRS would encounter at least three problems with any such legal theory.

First, corporate entities similar to Crown Global are regularly used to "block" a tax-exempt organization from receiving UBTI. Under this planning technique, the corporate blocker reports any income that would have been UBTI if received directly by the tax-exempt on its own corporate tax return. Any amounts distributed by such corporation to its shareholder are generally dividend income, which is excluded from UBTI.[10] In this instance, any trade or business income will be reported by Crown Global on its own federal income tax return. Therefore, any amounts received by the Supporting Organizations should be classified as a dividend or other distribution that would not constitute UBTI.

[10] Code § 512(b)(1).

Second, the Variable Contracts are similar to a derivative contract, as both are contractual obligations between two unrelated parties who both rely on other party's credit quality and risk, which may be significantly different than the risk profile of the reference assets underlying the contract. Further, one party to the contract typically "hedges" its obligations, similar to Crown Global hedging its obligations by purchasing interests in Atlas IDF, L.P.[11] Derivative financial instruments are regularly used to convert or block certain types of income to the desired derivative income by changing the legal relationship and risks from holding the investments directly versus obtaining a counterparty's promise to return similar economics.

Similar examples are found in the context of FIRPTA assets[12] and a foreign investor investing in U.S. assets indirectly through derivative contracts. With respect to FIRPTA, foreign investors can avoid the application of FIRPTA withholding by acquiring a synthetic long position in U.S. real estate through a derivative product. The IRS has concluded that this type of position is not a U.S. real property interest that would be subject to FIRPTA withholding.[13] Another example is a foreign investor gaining exposure to U.S. investment assets by entering into a derivative contract with a foreign counterparty bank. The foreign bank will acquire the investment assets. From the foreign investor's standpoint, the derivative contract converts U.S. source income on the U.S. investment assets into foreign source income, thereby avoiding exposure to U.S. income tax or withholding tax.[14]

The above examples demonstrate that federal tax laws respect the difference between holding a certain investment asset directly and another where one has economic exposure to the investment asset indirectly through a contractual promise by a counterparty. These examples are closely analogous, if not nearly identical, to the issuance of a variable annuity contract by a life insurance company that provides the investor a return measured by a Separate Account owned by the insurance company. The only difference is that the contractual relationship is also regulated under an insurance regime.

Third, an IRS legal theory that some portion of the Variable Contract's income is UBTI would expose a significant flaw. Such a legal theory would require that the same amount of income be taxed twice, without reduction for the amount paid by the first party. Specifically, the income from the Variable Contract is reported on Crown Global's U.S. federal income tax return. To then require the Supporting Organizations to also report such income as UBTI would be axiomatic to tax law principles of not taxing different taxpayers on the same income received. Even double tax regimes, such as the corporate income and dividend tax, do not tax the same amount of income to two different taxpayers twice. Rather, first the corporate earnings are taxed at a corporate rate; then the corporation only has the after-tax dollars to distribute to shareholders in the form of a dividend.

---

[11] Generally, it does not make a difference from a tax perspective if one of the parties to the derivative is fully hedged or is not, or actually owns the referenced assets. The income from the derivative contract is not treated for tax purposes as income on the underlying referenced investment assets. *See* Rubinger, Jeffrey, *IRS Rules Total Return Swap Tied to Real Estate Index Is Not Subject to FIRPTA,* Journal of Taxation (Sept. 2008).

[12] FIRPTA refers to the provisions of the Code added by the Foreign Investment in Real Property Tax Act of 1980 (FIRPTA), which impose federal income tax on foreign persons disposing of United States real property interests.

[13] Rev. Rul. 2008-31, 2008-26 I.R.B.1180.

[14] Treas. Reg. § 1.863-7(b)(1).

**A Possible Legal Theory Available to Support a UBTI Position by the IRS Would Be to Disregard the Variable Contracts Issued by Crown Global as Shams**

The discussion above indicates that the IRS would not have a strong legal basis to support the position that the Variable Contract income is UBTI. Therefore, the only plausible legal theory the IRS could assert to cause the underlying UBTI earned within a Variable Contract flow directly to a Supporting Organization would be to make a sham transaction (*i.e.*, economic substance) argument. Under such an argument, the IRS would treat each Supporting Organization as direct investors in Atlas IDF and ignore, for tax purposes, Crown Global and its contractual relationship with each Supporting Organization. As discussed below, the IRS will encounter substantial factual hurdles to overcome before it could successfully apply such a legal theory to the Variable Contracts in order to treat any underlying UBTI received by Crown Global as taxable to the Supporting Organizations.

The focus of the sham transaction doctrine is to determine whether a transaction has economic effects other than the creation of tax benefits.[15] Courts have stated that a multi-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, containing tax-independent considerations, and not structured solely by tax-avoidance features should be respected.[16] Furthermore, "the existence of a tax benefit resulting from a transaction does not automatically make it a sham as long as the transaction is imbued with tax-independent considerations."[17] If an investment is one for which Congress has specifically bestowed a tax incentive, the investment, if imbued with economic substance, will not be considered a sham merely because the taxpayer could not expect profits apart from tax benefits.[18]

The transactions between each Supporting Organization and Crown Global, as represented, appear to have ample economic substance and are far from empty transactions entered into solely to generate tax benefits. In fact, the following facts support the assertion that the transactions between the Supporting Organizations and Crown Global have economic substance and are not "shams":

- Crown Global is a Bermuda-based insurance company subject to the insurance laws of Bermuda;
- Crown Global was not formed solely for the purpose of entering into the transactions; rather it has been existence for many years prior to issuing the Variable Contracts;
- Crown Global has customers beyond the Supporting Organizations;
- Crown Global continues to market a variety of insurance-based products;
- Crown Global has employees who are undertaking the respective roles befitting an insurance company, according to its website;
- The Variable Contracts were negotiated between Crown Global and each Supporting Organization with specified pricing and contractual terms being agreed upon;

---

[15] *Kirchman v. Com'r,* 862 F.2d 1486, 1492 (11th Cir. 1989).
[16] *Frank Lyon Co. v. United States,* 435 U.S. 561, 583-84 (1978).
[17] *Holladay v. Com'r,* 649 F.2d 1176, 1179 (5th Cir. 1981).
[18] Bittker & Lokken: Federal Taxation of Income, Estates, and Gifts, § 4.3.4A. *But see In re CM Holdings, Inc.,* 301 F.3d 96, 105 (3rd Cir. 2002) ("Choosing a tax-favored investment vehicle is fine, but engaging in an empty transaction that shuffles payments for the sole purpose of generating a deduction is not.")

- Crown Global received a premium for each Variable Contract which was deposited in accounts owned and controlled by Crown Global;
- Crown Global's fee charged within the Variable Contracts is based upon the value of the respective Variable Contracts and not upon any anticipated tax benefits;
- Crown Global's fee appears commensurate with fees charged by other insurers;
- Presumably, Crown Global will continue to operate as an insurance company after any termination of the Variable Contracts;
- Each Supporting Organization's creation and existence is not transitory;
- Crown Global negotiated and entered into a Participation Agreement with the investment manager for Atlas IDF; and
- Crown Global received the Atlas IDF Private Placement Memorandum and completed the applicable subscription documents when Crown Global received a premium that was allocated to Atlas IDF.

Based upon such facts, a court would likely determine that Crown Global (a) is a real third-party insurance company, independently owned, and not affiliated with the Supporting Organizations (or their respective principals and agents) in any form, (b) has many customers, (c) operates in a regulatory environment and that it offers a variety of insurance products, and (d) it was not formed for the specific purpose of entering into the transactions. The Variable Contracts were intended to comply with the insurance regulatory laws governing Crown Global. Any conflicts between Crown Global and each Supporting Organization would have to be resolved under the terms of the respective Variable Contracts. Each Supporting Organization has no legal rights normally associated with a subscriber to the Atlas IDF. Nor have the Supporting Organizations completed subscription documents with Atlas IDF. Rather, Crown Global invested the premium received from each Supporting Organization in Atlas IDF, and has all the rights and entitlements normally associated with an investor in entities similar to Atlas IDF.

The foregoing demonstrates that a court would likely reject the application of the sham transaction or economic substance doctrine to the Variable Contracts issued by Crown Global to each Supporting Organization, and therefore reject any assertion that any UBTI realized with respect to the assets held in the Separate Account referenced in the Variable Contract should flow to the Supporting Organization. Rather, the IRS would have to address analogous legal positions directly adverse to such an assertion.

**Overall Conclusion with Respect to UBTI.**

After reviewing the respective legal authorities, arguments, and positions that the IRS could attempt to assert, we believe there are at least three supportive arguments, when considered together and presented to a court, to support our opinion. These supportive arguments are as follow: (1) the Variable Contracts income would not generate UBTI to the Supporting Organizations because such income is annuity income; 2) if the "income on the contract" was not considered annuity income, but rather (a) income reported on a "mark to market" method (which represents the changes in value of the Variable Contracts on year over year basis), (b) income from a notional principal contract, or (c) income from ordinary and routine investments, such "income on the contract" would still not be UBTI; and 3) IRS

would have little, if any, legal support for its position supporting UBTI inclusion by the Supporting Organizations but rather have adverse legal authorities in other financial contexts.

Therefore, we feel that if challenged by the IRS, each of Supporting Organization #1 and Supporting Organization #2 would have a more likely than not (a greater than 50% chance of success) in a court of law, to uphold the position that any income from the Variable Contracts reported by each Supporting Organization would not be UBTI income.

Although we have reached this level of opinion, it is not to suggest that the likelihood of success is not much greater than may be indicated by our opinion level, but rather, reflects only upon the lack of direct legal precedents which we can refer for giving our opinion. If the IRS were to litigate this position, we would anticipate that the taxpayer would likely win, and that legal authority would exist, such that if at that time we would have been able to reach a higher opinion level. We reiterate that our opinion is a very strong "more likely than not" level of opinion.

**VI. OPINION RENDERED**

Based upon the accuracy of the statement of facts contained herein and the assumptions set forth above, and the legal analysis set forth above it is our opinion that:

1. If the Internal Revenue Service were to assert, in reliance on the "investor control doctrine", as currently interpreted, that Supporting Organization #1 and Supporting Organization #2 should be treated as the owners, for federal income tax purposes, of the investments held in the Separate Accounts of Crown Global associated with the Variable Contracts owned by Supporting Organization #1 and Supporting Organization #2, a court should conclude that such investor control doctrine should not apply to Supporting Organization #1 and Supporting Organization #2 (a confidence level that there is a greater than 50% likelihood that the position will be upheld by a court if challenged by the Internal Revenue Service), but rather, for federal income tax purposes, a court should conclude Crown Global is the owner of the investments held in such Separate Accounts, including without limitation, to those investments held in Atlas IDF (a confidence level that there is a greater than 50% likelihood that the position will be upheld by a court if challenged by the Internal Revenue Service).

2. It is more likely than not (*i.e.*, a greater than 50% likelihood) that the position that the income realized by the Supporting Organization #1 and Supporting Organization #2 from their ownership of the Variable Contracts will not be classified as unrelated business table income within the meaning of Section 511 of the Code, will be upheld by a court if challenged by the Internal Revenue Service.

************

The legal opinion expressed above is subject to the assumptions, exceptions, restrictions, and qualifications stated herein as well as the following qualifications and limitations:

1. **This letter and the legal opinion contained herein are limited to the matters expressly set forth herein, and no legal opinion shall be implied or may be inferred beyond the matters expressly so stated. As such,**

**(a) The opinion is limited to the specific federal tax issues addressed herein;**

**(b) Additional issues may exist that could affect the federal income tax treatment of matters that are the subject of this opinion and this opinion does not provide a conclusion with respect to any additional issues; and**

**(c) With respect to any significant federal tax issues outside the limited scope of this opinion, this opinion was not written, and cannot be used by the taxpayer, for the purpose of avoiding penalties that may be imposed by the taxpayer.**

2. The legal opinion set forth herein represents our best professional judgment and is not a guarantee or warranty of any of the matters discussed herein.

3. This letter and the legal opinion expressed herein are rendered as of the date hereof, and are based upon relevant provisions of the Code and the Treasury regulations thereunder, and upon relevant judicial precedents and other authorities, as they exist as of the date of this legal opinion. These authorities are subject to change at any time, and if they do change, it may be necessary to re-examine this legal opinion. In that regard, we expressly disclaim any undertaking to advise you of any changes in applicable law, facts or any other matters that may come to our attention after the date hereof which may alter, in whole or in part, the legal opinion expressed herein. In addition, the legal opinion expressed in this letter is based solely on the accuracy of the facts and assumptions expressly stated herein, and the conclusions, statements and views expressed herein cannot be relied on, and may change, if any of the facts or assumptions described herein are, or later become, inaccurate or incomplete in any respect.

4. This letter communicates legal advice, and has been prepared in anticipation of potential litigation concerning the tax consequences described herein. It is intended that this letter be protected from discovery under the attorney-client privilege and work product doctrine to the extent provided by law. Disclosure of this letter and the information communicated in it should be carefully controlled so that disclosure is not made in a manner that will invalidate the protected status of the information.

5. We confirm that there is no limitation on the disclosure by you or any other parties to the transaction discussed of the tax treatment or tax structure as described in this letter. The implications of any such disclosure on attorney-client privilege or other applicable legal protections should be carefully considered prior to any such disclosure.

This letter may be relied upon by the addressee only and may not be relied upon by, nor may copies be delivered to, any other person without our prior written consent.

Very truly yours,

Sadis & Goldberg LLP

**EXHIBIT 34**

**KELLY HART PITRE**
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Telecopier: (817) 878-9280

**COUNSEL FOR CLO HOLDCO, LTD., CHARITABLE DAF FUND, LP AND HIGHLAND DALLAS FOUNDATION, INC.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 19-34054-sgj11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Chapter 11** |
| | § | |
| **Debtor** | § | **Relates to Dkt. No. 2460** |

**RESPONSE AND DISCLOSURES RELATED TO THE COURT'S ORDER REQUIRING DISCLOSURES**

CLO HoldCo, Ltd. ("CLO HoldCo"), Charitable DAF Fund, LP ("DAF Fund"), Highland Dallas Foundation, Inc., ("Highland Dallas Foundation," collectively, the "Charitable Respondents"), [1] file this *Response* ("Response") and submit these *Disclosures* ("Disclosures") to comply with the Court's *sua sponte Order Requiring Disclosures* (Dkt. No. 2460) (the "Disclosures Order").

1 CLO Holdco and Highland Dallas Foundation have filed a *Motion to Withdraw the Reference* in Adversary Case No. 20-03195 (the "Adversary Proceeding"), at Dkt. No. 24 (in the Adversary Proceeding), and neither the fact nor content of this Response is intended to be nor shall be deemed a waiver of their right to a trial by jury on all claims asserted in the Adversary Proceeding nor consent to the entry of final orders in the Adversary Proceeding by the Bankruptcy Court. DAF Fund is also a defendant in the Adversary Proceeding but has not been served. Neither the fact nor content of this Response by DAF Fund is intended to be nor shall be deemed: a waiver of service requirements in the Adversary Proceeding; acceptance of service of citation or summons in the Adversary Proceeding; waiver of its right to a trial by jury on all claims in the Adversary Proceeding (if ever served), nor consent to the entry of final orders in the Adversary Proceeding by the Bankruptcy Court (again, if ever served). The Charitable Respondents submit this Response in the Bankruptcy Case solely because the Court has ordered them to do so, and because they have appeared before this Court previously.

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... I

TABLE OF AUTHORITIES .......... II

PRELIMINARY STATEMENT .......... 1

PROCEDURAL HISTORY .......... 4

RESPONSE .......... 7

I. The Charitable Respondents are independently owned and controlled charitable organizations. .......... 7

a) CLO HoldCo .......... 9
b) DAF Fund .......... 9
c) DAF Holdco .......... 10
d) DAF GP .......... 11
e) The Supporting Organizations .......... 11
f) Mr. Patrick's role .......... 15

II. The Charitable Respondents have donated tens of millions of dollars to charitable causes .......... 16

III. CLO HoldCo and DAF Fund may be creditors of the Debtor .......... 18

IV. The Disclosures Order is procedurally improper and the Court has no power to institute *sua sponte* investigations into hypothetical standing .......... 20

a) The Court does not have the power to require non-parties to provide it with disclosures. .......... 20
b) The Court's *sua sponte* investigation into hypothetical standing is improper. .......... 22
c) The Disclosures Order is not just improper, it is prejudicial. .......... 26

CONCLUSION .......... 28

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baum v. Blue Moon Ventures, LLC*,
513 F.3d 181 (5th Cir. 2008) ....................26

*Berry v. CIGNA/RSI-CIGNA*,
975 F.2d 1188 (5th Cir. 1992) ....................21

*Brackeen v. Haaland*,
994 F.3d 249 (5th Cir. 2021) ....................24

*Castro v. United States*,
540 U.S. 375, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003) ....................23

*In re Delta Underground Storage Co., Inc.*,
165 B.R. 596 (Bankr. S.D. Miss. 1994) ....................25

*Franklin v. Laughlin*,
No. SA-10-CV-1027 XR, 2011 WL 598489 (W.D. Tex. Jan. 13, 2011) ....................26

*In re Friede Goldman Halter Inc.*,
600 B.R. 526 (Bankr. S.D. Miss. 2019) ....................25

*Greenlaw v. United States*,
554 U.S. 237 (2008) ....................23

*NASCO, Inc. v. Calcasieu Television & Radio, Inc.*,
894 F.2d 696 (5th Cir.1990) ....................22

*Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*,
2 F.3d 1397 (5th Cir. 1993) ....................21, 22

*Navtech US Surveyors USSA Inc. v. Boat/Us Inc.*,
No. 219CV184FTM99MRM, 2019 WL 3219667 (M.D. Fla. July 17, 2019) ....................24

*In re Saldana*,
531 B.R. 141 (Bankr. N.D. Tex.), *aff'd in part, remanded in part*, 534 B.R. 678 (N.D. Tex. 2015) ....................22

*Sanchez-Llamas v. Oregon*,
548 U.S. 331 (2006) ....................23

*Simon v. Taylor*,
794 F. App'x 703 (10th Cir. 2019) ....................23

*Thompson v. Gonzales*,
No. 1:15-CV-301-LJO-EPG, 2016 WL 5404436 (E.D. Cal. Sept. 27, 2016) ....................... 22

*Uberoi v. Labarga*,
769 F. App'x 692 (11th Cir. 2019) ....................... 24

*United States v. Sineneng-Smith*,
140 S. Ct. 1575 (2020) ....................... 23

*Matter of Ward*,
978 F.3d 298 (5th Cir. 2020) ....................... 21

*Wood v. Milyard*,
566 U.S. 463 (2012) ....................... 23

**Statutes**

11 U.S.C. § 101(10) ....................... 20

11 U.S.C. § 105 ....................... 5, 20, 21, 24

**Other Authorities**

Adam Milani & Michael Smith, *Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts*, 69 TENN. L. REV. 245 (2002) ....................... 23

Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General Statutory and Constitutional Theory*, 41 WM. & MARY L. REV. 743, 832 (2000) ....................... 24

Ralph Brubaker, *Of State Sovereign Immunity and Prospective Remedies: The Bankruptcy Discharge As Statutory Ex Parte Young Relief*, 76 AM. BANKR. L.J. 461, 563 (2002) ....................... 24

## PRELIMINARY STATEMENT

1. CLO HoldCo, DAF Fund, and Highland Dallas Foundation have each previously filed pleadings in this Court and are, at least arguably, parties to the Bankruptcy Case. As set forth herein, several targets of the Court's Disclosures Order have never made an appearance before this Court including Charitable DAF Holdco, Ltd.[2] ("DAF Holdco"), Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara Foundation"), and Highland Kansas City Foundation, Inc. ("Highland Kansas City Foundation," collectively with DAF Holdco and Highland Santa Barbara Foundation, the "Non-Party Targets").[3] The Court does not have the power to order a non-party to produce documents nor undertake *sua sponte* investigations, particularly into non-parties. The fact that these entities are non-parties and at the same time targets, is telling. Further the Non-Party Targets have not been served with the Disclosures Order.

2. Neither the Charitable Respondents nor undersigned counsel are authorized to make appearances for the Non-Party Targets, and the Non-Party Targets are not by this Response submitting themselves to this Court's jurisdiction. The Charitable Respondents file this Response and submit these Disclosures solely on their own behalf and neither they nor undersigned counsel are appearing for or on behalf of the Non-Party Targets. Nonetheless, much of the Disclosures provided by the Charitable Respondents on their own behalf will be informative regarding the Non-Party Targets. Further, the Non-Party Targets have provided limited authorization for the

---

[2] Undersigned counsel has been retained to represent DAF Holdco; however, DAF Holdco has never made an appearance in this bankruptcy case and has not been served in the Adversary Proceeding. Nor has DAF Holdco been served with this Disclosures Order. DAF Holdco has not authorized undersigned counsel to accept service nor to make an appearance for it in this Bankruptcy Case.

[3] The Highland Dallas Foundation, the Highland Santa Barbara Foundation, and the Highland Kansas City Foundation are sometimes also referred to as "Supporting Organizations."

Charitable Respondents, through Mr. Mark Patrick ("Patrick"), to provide the information to the Court that is submitted by the Charitable Respondents in this Response.

3. Further, the Disclosures Order does not mention the third-party foundation level entities included in the Structure Chart (*infra*) ("Foundations"); however, these Foundations have provided the Charitable Respondents with documents and important information regarding their charitable giving structures and the supporting organizations include the Highland Dallas Foundation and the supporting organizations that are Non-Party Targets. The fact and content of this Response is not intended to be nor shall be deemed to be an appearance by these Foundations in this Bankruptcy Case, nor submission by them to this Court's jurisdiction. The Charitable Respondents file this Response and submit these Disclosures solely on their own behalf and neither they nor undersigned counsel are appearing for or on behalf of the Foundations.

4. Patrick has provided a declaration regarding the information provided by and/or about the Foundations and the Supporting Organizations, and as provided herein within the Disclosures. As well, he has reviewed the Response and Disclosures. *See* **Exhibit 1** [Mark Patrick Declaration]

5. As set forth herein, contrary to the Court's unsupported and highly prejudicial *sua sponte* assertions that the Charitable Respondents and Non-Party Targets "appear to be under the *de facto* control of Mr. Dondero," the Charitable Respondents and Non-Party Targets (along with the Foundations) make up a legal and viable charitable giving structure, established through a non-byzantine set of entities that has committed over $42 million in grants, and funded $32.5 million, to nonprofits across a wide-range of issues including education, support of military, veterans, and first-responders, and victims of family violence and child abuse. With respect to Mr. Dondero, of course he is involved, personally in the capacity as the Donor personality. In addition, as disclosed

within the Disclosures, he holds positions within the Supporting Organizations, which are subject to the authority of the Foundations they support. As well, and as established by Mr. Patrick's uncontroverted testimony before this Court, Mr. Dondero currently acts as an unpaid investment advisor to CLO HoldCo and DAF Fund. However, as will be shown Mr. Dondero is not in "de facto" or legal control of the Charitable Respondents nor the Non-Party Targets (nor the Foundations).

6. The Charitable Respondents take the time to refute the Court's assertions in the Disclosures Order because not only are they factually inaccurate—which will be shown herein and through the submitted Disclosures—but worse, these *sua sponte* findings bear directly upon the causes of action asserted by Official Committee of Unsecured Creditors (the "Committee") against CLO HoldCo, DAF Holdco, DAF Fund, and Highland Dallas Foundation (the "Charitable Defendants") in Adversary Proceeding No. 20-03195 (the "Adversary Proceeding"). While there are several motions to withdraw the reference pending in the Adversary Proceeding, this Court should, at an absolute minimum, refrain from espousing, *sua sponte*, any "findings" or "conclusions" that in fact are indistinguishable from allegations made in conclusory fashion (much like the Court's expositions) by a plaintiff party in litigation currently pending in this Court. Such an "approach" to exercise of the judicial function (under the notion of maintaining the Court's docket) is, frankly, not recognizable as a constitutional approach to exercise of judicial power. This Court, it appears has become litigant, investigator and decider, far outside the scope of case or controversy. Through its assertions the Court appears to have decided integral issues in the Adversary Proceeding *sua sponte* without considering any evidence nor offering the Charitable Defendants any opportunity to present their case, and all this notwithstanding pending motions to

withdraw reference (that the Court has previously stayed over the objection of the Charitable Defendant movers).

## PROCEDURAL HISTORY

7. As the Court is aware, there was a show cause hearing on June 8, 2021 (the "Show Cause Hearing") related to the lawsuit filed by CLO HoldCo and DAF Fund against the Debtor captioned *Charitable DAF Fund, L.P. et al. v. Highland Capital Management, L.P. et al.*, case no. 21-cv-00842, pending in the United States District Court for the Northern District of Texas (the "District Court Suit"). In the District Court Suit, the plaintiffs filed a motion to amend their complaint (the "Seery Motion"), and thereafter, the Court issued what it titled: *Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Dkt. No. 2255] (the "Show Cause Order") to determine if the "Violators" should be held in contempt of court for filing the Seery Motion. The Court ordered the "Violators," as defined by the Court, including CLO HoldCo and DAF Fund, those persons who authorized the filing of the Seery Motion and the District Court Suit (and the law firm representing the plaintiffs), along with Mr. Dondero, to appear at the Show Cause Hearing.

8. Patrick identified himself as the person who authorized the filing of the Seery Motion and the District Court Suit and identified that he was vested with such authority by virtue of his position as the director CLO HoldCo and control person of DAF Fund. *See* Response, Dkt. No. 2309. The Debtor undertook extensive discovery related to the Show Cause Hearing with the express purpose of attempting to prove that despite Mr. Patrick authorizing the filings and being the control person of the plaintiffs, Mr. Dondero should nonetheless be held in contempt.

9. Therefore, at the Show Cause Hearing, the respondents, including Patrick, introduced evidence reflecting the structure of the Charitable Respondents,[4] the ownership of the Charitable Respondents,[5] and the controlling entities/persons of the Charitable Respondents.[6] At the Show Cause Hearing, Patrick further provided extensive testimony regarding the creation, structure, organization, purpose, and control of the Charitable Respondents. *See* **Exhibit 2** [Transcript, June 8, 2021 Hearing, Excerpts].

10. On June 17, 2021, the Court issued its Disclosures Order *sua sponte* pursuant to Section 105 of the Bankruptcy Code and its "inherent ability to efficiently monitor its docket and evaluate standing of parties who ask for relief in the [Bankruptcy Case]." Disclosures Order, p. 1.

11. Importantly, the Disclosures Order does not relate to and was not issued in connection with any contested matter or adversary proceeding before the Bankruptcy Court. Instead, the Court states that the Disclosures Order is "in furtherance of [its] desire to be more clear about the standing of various of these entities, and to assess whether their interests may be sufficiently aligned, in some circumstances, so as to require joint pleadings." Disclosures Order, p. 12. As such, the Court appears to be attempting to ascertain some sort of generalized standing where there is no proceeding before it and contemplating the issuance of pre-filing injunctions against the Charitable Respondents and Non-Party Targets.

12. Based on the forgoing, the Disclosures Order requires numerous parties (whether before the Court or not), including the Charitable Respondents and Non-Party Targets, to file a notice in the Bankruptcy Case disclosing: (a) who owns the entity (showing percentages); (b)

---

[4] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 1)

[5] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 9, 10, 11, 12, 15, 16, 17, 18, 19, 20)

[6] Exhibit and Witness List, Dkt. No. 2411 (Exhibit 3, 4, ,5, 6, 7, 8, 29)

whether Mr. Dondero or his family trusts have either a direct or indirect ownership interest in the entity and, if so, what percentage of ultimate ownership; (c) who are the officers, directors, managers and/or trustees of the Non-Debtor Dondero-Related Entity (this itself looks to be a determination by this Court of "relationship" with damaging consequences); and (d) whether the entity is a creditor of the Debtor (explaining in reasonable detail the amount and substance of its claims).

13. The Disclosures Order does not even pretend to be concerned with such mundane matters as proper service, or the right of parties not before the Court, even if creditors, to remain outside the Court. Certainly the Court does not exhibit a glimpse of concern about possible limitations upon the judicial power to compel parties to appear before it. Because of its assertions concerning Mr. Dondero's "de facto control" of third party entities (again, outside of any pending case or controversy and in fact contrary to evidence put before the Court), the Court has (i) dispensed with case or controversy boundaries, and (ii) sent its Disclosures Order into the universe as an all-powerful compulsion imposed upon entities that have never made appearance before the Court - all without service. All because this Court has concluded that these third parties are controlled by Mr. Dondero, and because this Court has power over Mr. Dondero, it need not think twice about its power over any entity it has determined (without ground) to be controlled by Mr. Dondero because such party may have some relation to Mr. Dondero.

14. As mentioned above, the Charitable Respondents are responding. But the entities outside the scope of the Court's authority are not appearing in Response. As set forth below, the Charitable Respondents believe this Response and the Disclosures provided herein are sufficient and compliant. The Charitable Respondents reserve all rights.

## RESPONSE

15. The Charitable Respondents file their Response to the Disclosures Order to comply with it, but with full reservations concerning the propriety of such a *sua sponte* investigation into standing where there is no proceeding before the Court and the prospective issuance of pre-filing injunctions against parties who have never participated in the Bankruptcy Case (i.e. the Non-Party Targets), or have only do so on a limited basis or were compelled to by order of the Court (i.e. the Charitable Respondents).

16. The Charitable Respondents have already provided the Debtor and the Court with much of the information ordered by the Court, and do so again and more robustly herein, to show to the Court that the Charitable Respondents are not "under the *de facto* control of Mr. Dondero" and its directors do not act "at Mr. Dondero's direction." *See* Disclosures Order, pp. 5, 11.

17. The Charitable Respondents, however, take this opportunity to correct any misunderstanding regarding their structure and control, while noting and reserving all rights regarding the impropriety of such prejudicial *sua sponte* assertions.

### I. The Charitable Respondents are independently owned and controlled charitable organizations.

18. The best starting point to understand the structure of the Charitable Respondents is the Structure Chart attached hereto as **<u>Exhibit 3</u>** ["Structure Chart"]. For ease of reference, the Structure Chart is reproduced as follows:




19. Second, the Charitable Respondents provide the Court with a legal memorandum of Kenneth K. Bezozo, a partner with Haynes and Boone, LLP, determined by the Charitable Respondents to be a legal expert in the field of taxation and organizational structures. *See* **Exhibit 4** [Kenneth K. Bezozo Memorandum]. As the Bezozo Memorandum explains, the Structure Chart and the entity structure of which the Charitable Respondents are a part (along with the Supporting Organizations and the Foundations) is a structure including offshore entities that is a typical industry standard investment structure to facilitate tax-exempt ownership and charitable giving. Given that the structure employed is in fact, within the tax-exempt, charitable entity structures neither unusual nor exotic, the Charitable Respondents submit that contrary to the jargon appropriated by the Court from the Committee and the Debtor and its counsel, this structure is not at all "Byzantine."

**The Entities**

**a) CLO HoldCo**

20. As the Structure Chart reflects, CLO HoldCo is a company limited by shares incorporated in the Cayman Islands. *See* **Exhibit 5** [Certificate of Incorporation - CLO HoldCo, Ltd.]. CLO HoldCo was incorporated in 2010. *See* **Exhibit 6** [Memorandum of Association of CLO HoldCo, Ltd.]. CLO HoldCo is managed and controlled by directors who are appointed by resolution of shareholders of CLO HoldCo. *See* Memorandum of Association of CLO HoldCo, Ltd., p. 11-12 ("Directors"). The Directors are currently Mr. Patrick and Mr. Paul Murphy. *See* **Exhibit 36** [CLO HoldCo - Register of Directors].

21. CLO HoldCo is owned by the holder of its sole share. The sole shareholder of CLO HoldCo was previously DAF Holdco who contributed the share on November 7, 2011 to DAF Fund. *See* **Exhibit 7** [Ordinary Share Registry - CLO HoldCo]. Therefore, CLO HoldCo is wholly owned by DAF Fund.[7]

**b) DAF Fund**

22. DAF Fund is a limited partnership organized under the laws of the Cayman Islands. *See* **Exhibit 8** [Certificate of Registration of Exempted Limited Partnership - DAF Fund]. Pursuant to the *Amended and Restated Exempted Limited Partnership Agreement dated November 7, 2011* (the "DAF Fund LP Agreement"), DAF Holdco is the limited partner of the DAF Fund and the Charitable DAF GP, LLC ("DAF GP") is the general partner. *See* **Exhibit 9** [DAF Fund

---

7 While not appearing on the Structure Chart, nor made subject of the Disclosures Order, there are subsidiaries of CLO HoldCo as well, and these are named, with corresponding ownership and director exhibits identified as follows: (i) Liberty CLO Holdco, Ltd. (*see* **Exhibits 38 and 39** [Register of Directors and Share Register]); (ii) MGM Studios HoldCo, Ltd. (*see* **Exhibits 40 and 41** [Register of Directors and Share Register]); (iii) HCT HoldCo 2, Ltd. (*see* **Exhibits 42 and 43** [Register of Directors and Share Register]). Note, Dondero holds no directorship or ownership.

LP Agreement]. Pursuant to the terms of the DAF Fund LP Agreement, DAF Holdco contributed its equity interest in CLO HoldCo to DAF Fund pursuant to a Contribution and Transfer Agreement dated November 7, 2011. Ordinary Share Class Transfers - CLO HoldCo; DAF Fund LP Agreement, ¶3.1.

23. The express purpose of DAF Fund is and always was to invest and trade in securities of all type and other investment vehicles for the purpose of befitting, direct and indirectly, the indirect equity owners of DAF Holdco, which were required to be Section 501(c)(3) of the IRS Code entities or organizations or have sole beneficiaries which are entities or organizations exempt from taxation under Section 501(c)(3) of the IRS Code. *See* DAF Fund LP Agreement, ¶1.3.

24. Because DAF Fund is a limited partnership, the DAF GP has the exclusive and complete discretion in the management and control of the DAF Fund. DAF Fund LP Agreement, ¶1.6, **Exhibit 10** [DAF Fund General Partner Register].

**c) DAF Holdco**

25. DAF Holdco is a company limited by shares incorporated under the laws of the Cayman Islands. See **Exhibit 11** [Amended and Restated Memorandum of Association of DAF Holdco]. DAF Holdco's equity ownership consists of holders of Management and Participating Shares. *Id.* The Management Shares confer no right to participate in profits but rather to manage DAF Holdco, whereas Participating Shares confer the right to participate in profits or assets but not management rights. *Id.*

26. The Management Shares of DAF Holdco were allotted to Grant Scott ("Scott") in 2011 but as will be discussed herein, were transferred to Patrick in 2021. *See* **Exhibit 12** [Register of Management Shares DAF Holdco]. The Directors are currently Mr. Patrick and Mr. Paul Murphy. *See* **Exhibit 37** [DAF Holdco - Register of Directors]. The Participating Shares of DAF

Holdco are held by the "Supporting Organizations," which are Highland Kanas City Foundation [32.78%], Highland Dallas Foundation [32.78%], Highland Santa Barbara Foundation [32.78%], and Highland Community Foundation of North Texas [1.63%].[8] *See* **Exhibit 13** [Register of Participating Shares DAF Holdco].

27. As set forth in the DAF Fund LP Agreement, DAF Fund's investments are for the benefit of the equity owners of DAF Holdco which were required to be non-profit organizations. The Supporting Organizations are those non-profit organizations.

**d) DAF GP**

28. DAF GP is a limited liability company organized under the laws of Delaware. *See* **Exhibit 14** [Certificate of Formation of DAF GP]. Again, DAF GP is the general partner of DAF Fund who manages and controls DAF Fund. Prior to March 2021, 100% of the limited liability company interests in the DAF GP (the "DAF GP Membership Interests") were held by Mr. Scott. Mr. Scott transferred all of the DAF GP Membership Interests to Mr. Patrick. **Exhibit 15** [Assignment and Assumption of Membership Interests Agreement Dated March 24, 2021].

29. As shown by the Exhibits hereto, Dondero holds no ownership, officer, or director status in any of: CLO HoldCo; DAF Fund; DAF HoldCo; or DAF GP.

**e) The Supporting Organizations**

30. As mentioned, the Supporting Organizations are Highland Dallas Foundation, Highland Kansas City Foundation, Highland Santa Barbara Foundation, and Highland Community Foundation of North Texas. These Supporting Organizations were established by the Foundations.

---

[8] The Court has not included Highland Community Foundation of North Texas in its Disclosures Order.

- **Highland Dallas Foundation**

31. Highland Dallas Foundation is a corporation incorporated in 2011 under the laws of Delaware. **Exhibit 16** [HDF Certificate of Incorporation]. The Highland Dallas Foundation was and is organized and operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the IRS Code. **Exhibit 17** [IRS Determination - HDF].

32. The Highland Dallas Foundation supports and benefits the Dallas Foundation. *See* HDF Certificate of Incorporation, **Exhibit 18** [Narrative Description of Activities]. The Dallas Foundation is a third-party and is the oldest community foundation in Texas.

33. As set forth in the attached letter from the President and Chief Executive Officer of the Dallas Foundation, the Dallas Foundation is a Texas nonprofit corporation, and is the successor in interest to Dallas Community Trust, a charitable trust which was formed in 1929. **Exhibit 19** [reserved for supplementation]. The Dallas Foundation has hundreds of donors with whom it works regularly to make charitable grants supporting numerous worthy causes and regularly utilizes donor-advised funds and supporting organizations to carry out its charitable mission. *Id.*

34. The Highland Dallas Foundation is a membership corporation, and its members have the ultimate authority to elect its Board of Directors. *Id.* **Exhibit 20** [HDF Bylaws]. The Highland Dallas Foundation has two (2) classes of members, an "Institutional Member" (the TDF), and an "Individual Member" (Mr. Dondero). *Id.*

35. The Institutional Member has two (2) votes and the Individual Member has only one (1) vote on any matter submitted to the members. *Id.* Further, the Institutional Member elects two (2) of Highland Dallas Foundation's three (3) directors, and the Individual Member elects one (1) director. *Id.* The Board of Directors of Highland Dallas Foundation consists of Mr. Dondero, Julie Diaz (Chief Philanthropic Partnerships Officer of TDF) and Matthew Randazzo (President

& Chief Executive Officer of Dallas Foundation). Mr. Dondero serves as President, Mr. Randazzo serves as Vice President and Ms. Diaz serves as Secretary and Treasurer.

36. So while Mr. Dondero is a member with some level of influence within the Highland Dallas Foundation, he has 1/3 of the voting power, where TDF employees have 2/3 of voting power.

37. The Highland Dallas Foundation is an independent supporting organization of the Dallas Foundation. While Mr. Dondero is on the Board of Directors and is President of the Highland Dallas Foundation, it cannot be said to be "under the control" (de facto or otherwise) of Mr. Dondero, because of the control of the Board of Directors held by the Dallas Foundation.

- **Highland Santa Barbara Foundation**

38. The Highland Santa Barbara Foundation was formed in November 2011 as a Delaware nonprofit nonstock corporate to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of Santa Barbara Foundation. See **Exhibit 21** [HSBF Certificate of Incorporation]; **Exhibit 22** [IRS Determination - HSBF].

39. The Santa Barbara Foundation is a third-party community foundation incorporated in 1928 as a nonprofit corporation to enrich the lives of the people of Santa Barbara County through philanthropy. **Exhibit 23** [SBF Letter Overview]. The Santa Barbara Foundation funds a wide range of initiatives, projects, and organizations and has supported nearly every Santa Barbara County nonprofit organization and essential community sproject during its 93-year history. *Id.*

40. Similarly to the Dallas Foundation, the Santa Barbara Foundation works with entities organized under Section 509(a)(3) of IRS Code as supporting organizations to Santa Barbara Foundation for the specific and primary purpose of benefiting, performing functions of,

and engaging in activities consistent with Santa Barbara Foundation's charitable purposes. *Id.* Highland Santa Barbara Foundation is one such supporting organization. *Id.*

41. Again as is common amongst supporting organizations, Highland Santa Barbara Foundation has two classes of members, institutional and individual, and one member in each class. *Id.*, *see also* Bylaws HSBF. Santa Barbara Foundation is the institutional member and Mr. Dondero is the individual member. Highland Santa Barbara Foundation has three directors, two elected by SBF and one elected by Mr. Dondero. The president, secretary, and any other officers of HSBF are elected by the three directors. *Id.* The directors are Mr. Dondero, Jacqueline M. Carrera (President & CEO of SBF), and Arnold Brier (Santa Barbara County community volunteer). Currently, Mr. Dondero serves as President, Jacqueline M. Carrera as Vice President, and the Secretary position is vacant pending board of directors election.

42. Again, while Mr. Dondero positions in the Highland Santa Barbara Foundation, it is certainly not under his "de facto" control, nor do the other directors and officers act under Mr. Dondero's direction. The Highland Santa Barbara Foundation is an independent supporting organization of the Santa Barbara Foundation, and is controlled by the Santa Barbara Foundation. Imputing a lack of independence based on what is a typical structure for supporting organization management sets a unwarrantable precedent for charitable organizations.

- **Highland Kansas City Foundation**

43. Highland Kansas City Foundation was and is organized and operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the IRS Code, and to support and benefit the Greater Kansas City Community Foundation ("GKCCF"). *See* **Exhibit 24** [GKCCF Certificate of Formation].

44. The Greater Kansas City Community Foundation was created in 1978 and manages over $4 billion in assets, and again uses donor-advised funds and supporting organizations. *See* **Exhibit 25** [GKCCF Letter]. As explained by the President & CEO of Greater Kansas City Community Foundation, Highland Kansas City Foundation is one of 18 supporting organizations that Greater Kansas City Community Foundation works with. *Id.*

45. Highland Kansas City Foundation has two classes of members, institutional and individual, and one member in each class. *See* **Exhibit 26** [Bylaws HKCF]. Greater Kansas City Community Foundation is the institutional member and Mr. Dondero is the individual member.

46. The Directors of Highland Kansas City Foundation are: Brenda Chumley (Senior Vice President of Greater Kansas City Community Foundation), Mr. Dondero, and Deborah Wilkerson (the President & CEO of Greater Kansas City Community Foundation). The Highland Kansas City Foundation has not named officers. All three directors approve grants by unanimous consent.

**f) Mr. Patrick's role**

47. Prior to March 24, 2021, Mr. Scott was the holder of Management Shares in the DAF Holdco. On March 24, 2021, Mr. Scott executed the *Share Transfer Form*, in which he transferred the management shares in DAF Holdco to Mr. Patrick. **Exhibit 27** [Share Transfer Form]. Further on March 24, 2021, Mr. Scott and Mr. Patrick entered into that certain *Assignment and Assumption of Membership Interest* whereby Mr. Scott assigned and Mr. Patrick assumed one hundred percent of the limited liability company interest in the DAF GP. *See* Assignment and Assumption Agreement.

48. As the holder of the management shares in DAF Holdco, Mr. Patrick executed a resolution removing Mr. Scott as Director and appointing Mr. Patrick as Director. **Exhibit 28** [March 25 Resolution - DAF Holdco].

49. On April 2, 2021, Mr. Patrick, as holder of one hundred percent of the interest in DAF GP, executed the shareholder resolution removing Mr. Scott as Director of CLO HoldCo and appointing Mr. Patrick as director. **Exhibit 29** [April 2 Resolution - CLO HoldCo].

50. While on paper the switch from Mr. Scott to Mr. Patrick was completed, it became obvious that this switch would be practically more complicated. Therefore, there was a transitional period wherein Mr. Scott had to continue to authorize certain actions with Mr. Patrick assisting him. As of the date of filing, Mr. Scott no longer has authority/ control over the Charitable Respondents.

51. After Mr. Patrick's appointment, he determined that given the breadth of issues facing the Charitable Respondents, including but not limited to the Adversary Proceeding, it would be in the best interest of DAF Holdco, CLO HoldCo and others for another director to be appointed. As such, on April 22, 2021, Paul Murphy was appointed a director of DAF Holdco and CLO HoldCo. **Exhibit 30** [Written Resolution - Murphy].

## II. The Charitable Respondents have donated tens of millions of dollars to charitable causes

52. The Court included the Charitable Respondents and Non-Party Targets as part of what it terms — borrowing from the Committee's verbiage in the Adversary Proceeding — Mr. Dondero's "byzantine" empire and made *sua sponte* assertions regarding their lack of independence and Mr. Dondero's "de facto" control. Again, as will be set forth herein, these findings are procedurally improper and highly prejudicial to the Charitable Defendants. But most importantly, they are wrong.

53. The Charitable Respondents are part of a charitable structure that donates tens of millions of dollars to charitable causes focusing on education; support for military, veterans, and

first responders; health and medical research; economic and community development initiatives; and youth and family. *See* **Exhibit 31** [Charitable Giving Overview, Grant Summary: 2012-2020].

54. Since 2012, the Supporting Organizations have committed over $42 million to nonprofit organizations, and have funded $32 million of the total commitments (with the remaining commitments being comprised of future scheduled installments). *Id.*

55. The Supporting Organizations' charitable giving has made a tangible impact on some of the most vulnerable including grants to the Dallas Children's Advocacy Center which serves over 8,000 abused children a year and The Family Place which serves more than 11,000 victims of family violence. *Id.* The CEO of The Family Place has submitted a letter in support which is attached hereto as **Exhibit 32** [The Family Place Letter]. The Family Place empowers victims of family violence by providing safe housing and counseling, and identifies its partnership with the Highland Dallas Foundation as "instrumental" in providing community exposure and awareness of domestic violence as well as providing essential services to family violence victims. *Id.* As stated by the CEO, The Family Violence Place would not be able to successfully serve its domestic violence clients without this support.

56. Cristo Rey Dallas also submitted a letter in support of the Highland Dallas Foundation which is submitted herewith as **Exhibit 33** [Cristo Rey Letter]. Cristo Rey Dallas provides college preparatory high school curriculum accessible to those of limited financial resources. Highland Dallas Foundation provided impactful donations which allow Crito Rey Dallas to provide services to its 465 students, including funding work study programs and remote work places during COVID-19 pandemic. *Id.*

57. Dallas Children's Advocacy Center submitted a letter in support of the Highland Dallas Foundation which is submitted herewith as **Exhibit 34** [DCAC Letter]. Dallas Children's

Advocacy Center's mission is to improve the lives of abused children in Dallas County and to provide national leadership on child abuse issues. *Id.* Highland Dallas Foundation has robustly supported this mission since 2016, including providing funding that has been critical to the sustainability of its programs. *Id.*

58. The Supporting Organizations' grants to the Center for BrainHealth helped provide and training other programming to members of the military, veterans, and local law enforcements to improve their congestive health. *See* Charitable Giving Overview.

59. The Friends of the Dallas Police grants show appreciation to men and women who risk their lives every day to make Dallas a safer city and the Supporting Organizations have funded awards programs and educational sponsorships for children of police officers. *Id.*

60. The Charitable Respondents invite the Court, and others who have characterized the Supporting Organizations as mere "puppets" of Mr. Dondero, to review the Charitable Giving Overview provided herewith as well as the letters in support from The Family Place, Cristo Rey Dallas, Dallas Children's Advocacy Center, the Santa Barbara Foundation, and the Highland Kansas City Foundation. The Charitable Respondents have and will continue to make meaningful impacts on the communities they serve through the tens of millions of dollars of philanthropic giving they facilitate.

## III. CLO HoldCo and DAF Fund may be creditors of the Debtor

61. In the Disclosures Order, the Court requires all entities to state whether the entity is a creditor of the Debtor and explain in reasonable detail the amount and substance of its claims. Disclosures Order, p. 13.

62. All claims bar dates have long since passed [*see* General Claims Bar Date Order [Dkt. No. 498].

63. The Court states that CLO HoldCo filed two proofs of claim. Disclosures Order, p. 11. This is not correct. CLO HoldCo filed a proof of claim on April 8, 2020 [Proof of Claim No. 133] and on October 21, 2021, CLO HoldCo amended that same proof of claim [Proof of Claim No. 198] (the "Amended Proof of Claim"). In the Amended Proof of Claim, CLO HoldCo explained that as a result of certain proceedings that effectuated a termination of the Debtor's participation interests in the funds referred to in the CLO HoldCo proof of claim, such termination served to cancel the CLO HoldCo interests, as well, as the CLO HoldCo interests were in effect derivative of the Debtor's interests. Accordingly, the Amended Proof of Claim reflected that the CLO HoldCo claim was reduced to $0.00, and therefore resolved.

64. The Court stated in the Disclosures Order that it was unaware of whether DAF Holdco, DAF Fund, Highland Dallas Foundation, Highland Santa Barbara Foundation, or Highland Kansas City Foundation filed proofs of claims (notwithstanding this "uncertainty" the Court deemed it appropriate nevertheless to try to compel appearance). Disclosures Order, p. 11. A review of the Court's Claims Register and that of the Debtor's claims and noticing agent reflects that none of these entities filed proofs of claim against the Debtor.

65. Therefore, none of the Charitable Respondents are pre-petition creditors of the Debtor, as the claims bar date has long since passed and no claims were filed which have not been fully resolved.

66. It is unclear from the Disclosures Order whether the Court is referring to the term "creditor" as defined in section 101(10) of the Bankruptcy Code or using creditor as a lay term. If it is the former, the Charitable Respondents are not creditors of the Debtor. *See* 11 U.S.C. § 101(10) (defining a "creditor" an entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor).

67. As the Court is aware from the Show Cause Hearing, CLO HoldCo and DAF Fund filed the District Court Suit against the Debtor. The causes of action asserted by CLO HoldCo and DAF Fund arose after the order for relief. **Exhibit 35** [Complaint]. The substance of these claims is set forth in the Complaint.

## IV. The Disclosures Order is procedurally improper and the Court has no power to institute *sua sponte* investigations into hypothetical standing.

68. The Charitable Defendants have fully complied with the Court's Disclosures Order and provided the Court with complete information regarding: (a) who owns each entity, (b) whether Mr. Donerdo or his family trusts have direct or indirect ownership, (c) who the officers, directors, and managers are, and (d) whether the entity is a creditor of the Debtor. The Charitable Defendants have done so because they were expressly ordered by the Court do; however, the Disclosures Order is procedurally improper and highly prejudicial.

### a) The Court does not have the power to require non-parties to provide it with disclosures.

69. The Charitable Defendants are those named entities who have made appearances before this Court. The Court does not have the power to order production or disclosures from non-parties including the Non-Party Targets.

70. In the Disclosures Order, the Court states that the order is issued "*sua sponte* pursuant to Section 105 of the Bankruptcy Code and the court's inherent ability to efficiently monitor its docket and evaluate the standing of parties who ask for relief in the above-referenced case." Disclosures Order, p. 1. But yet, the Disclosures Order goes on to target entities who have never asked for the relief in the Bankruptcy Case.

71. Of course, it is undisputed that the Court has the inherent power to manage its own docket "to ensure the orderly and expeditious disposition of cases." *Berry v. CIGNA/RSI-CIGNA*, 975 F.2d 1188, 1191 (5th Cir. 1992) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31

(1962)). But this inherent authority is limited, as is the Court's authority pursuant to section 105 of the Bankruptcy Code. *Matter of Ward*, 978 F.3d 298, 303 (5th Cir. 2020) (noting that "the powers afforded to bankruptcy courts pursuant to § 105, however, are not unlimited").

72. In *Energy Gathering*, the Fifth Circuit considered whether the district court could *sua sponte* order a party's attorney, a non-party to the case, to produce documents. *See Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1412 (5th Cir. 1993). In that case, the district court found that the attorney had purposefully withheld documents from the court, and "ordered [him] to produce every document in his possession relating to [his client] or business he had done with [his client]." *Id.* at 1404. The district court did not explain the source of its perceived authority to do so. *See id.* at 1405.

73. On appeal by the attorney, the plaintiffs asserted that the district court had the inherent authority to order him to produce documents. *Id.* at 1406. The Fifth Circuit disagreed with the plaintiffs. *See id.* at 1408-09. Specifically addressing whether the district court had the inherent authority to issue its order, the Fifth Circuit acknowledged that the district court had certain limited power "to conduct discovery not recognized by rule or statute," observing that federal courts "possess[ ] all of the common law equity tools of a Chancery Court (subject, of course, to congressional limitation) to process litigation to a just and equitable conclusion." *Id.* at 1409. The Fifth Circuit suggested that the district court had the inherent authority to order the attorney to produce documents—if at all—under its power to issue a "bill of discovery," a common law "chancery tool" that the Supreme Court has described as "the forerunner of all modern discovery procedures." *Id.* at 1409. But recognizing that bills of discovery "could not be used to obtain documents (or other discovery) from someone who was not a party," the Fifth Circuit

therefore concluded that district courts do not have the inherent authority to order non-parties to produce discovery. *Id.*

74. Important here, the Fifth Circuit noted the impropriety of the *sua sponte* investigation by the district court. *Id.* at 1411 (noting "factors [that] contribute to the order's unreasonableness" as being the *sua sponte* nature of the order and that the "court engaged in a fishing expedition"). Expressly relying upon the *Energy Gathering* opinion, the court in *Thompson v. Gonzales* determined that the court lacked inherent authority to order disclosures from non-parties. *Thompson v. Gonzales*, No. 1:15-CV-301-LJO-EPG, 2016 WL 5404436, at *8 (E.D. Cal. Sept. 27, 2016).

**b) The Court's *sua sponte* investigation into hypothetical standing is improper.**

75. As the Fifth Circuit noted in *Energy Gatherings* and this Court and others numerous have many times since, inherent authority "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir.1990); *In re Saldana*, 531 B.R. 141, 166 (Bankr. N.D. Tex.), *aff'd in part, remanded in part*, 534 B.R. 678 (N.D. Tex. 2015).

76. Here, the Court has launched a *sua sponte* investigation into parties under the stated purpose of evaluating their hypothetical standing.

77. The American adversarial system differs from its European (and other) inquisitorial counterparts in that its central features are "party presentation of evidence and arguments" for resolution before a "neutral and passive decision maker[]." Adam Milani & Michael Smith, *Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts*, 69 TENN. L. REV. 245, 272 & n.143 (2002); *see also United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020); *Greenlaw v. United States*, 554 U.S. 237, 243 (2008); *Wood v. Milyard*, 566 U.S. 463, 472 (2012).

78. The judge "does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 356 (2006) (quotation omitted). Thus,"[i]t is normally incumbent on each party to prove its claims," and a *sua sponte* investigation upsets the normal burden of persuasion between the parties." Domitille Baizeau and Tessa Hayes, *The Arbitral Tribunal's Duty and Power to Address Corruption Sua Sponte*, in Andrea Menaker (ed), International Arbitration and the Rule of Law: Contribution and Conformity, ICCA Congress Series, Volume 19, pp. 225 -265.

79. Thus, federal courts have been instructed to restrain from conducting such an inquest which is antithetical to the American adversarial system. *Simon v. Taylor*, 794 F. App'x 703, 718 (10th Cir. 2019) (noting that scientific evidence involving environmental contamination from the district court's own *sua sponte* investigation cannot be considered); *Wood*, 566 U.S. at 472 ("federal court does not have carte blanche to depart from the principle of party presentation basic to our adversary system"); *Castro v. United States*, 540 U.S. 375, 381–383, 124 S.Ct. 786, 157 L.Ed.2d 778 (2003).

80. The Court asserts that it launched its investigation because standing is an issue of subject matter jurisdiction and that it must gain "clarity" with regard to standing. Disclosures Order, p. 2. But what the Court proposes to do is render an impermissible advisory opinion on the hypothetical standing of the various entities, including some of have never filed a pleading in the Bankruptcy Case. How can this Court have blanket power to compel investigation of entities that have never made appearances before the Court, or that have only been made parties because they have been sued, on the purported ground it needs to investigate standing? As shown here, it cannot.

81. A bankruptcy case itself is not a justiciable controversy; rather, it is the individual proceedings (contested matters or adversary proceedings) which create a justiciable case or controversy.[9] Here, there is no proceeding, and instead, the Court expressly stated that it will determine standing *sua sponte* pursuant to section 105 of the Bankruptcy Code. While this general rule of justiciablity standing alone would prohibit such a determination, evaluating a party's hypothetical standing absent a justiciable controversy is acutely problematic. *See Uberoi v. Labarga*, 769 F. App'x 692, 697 (11th Cir. 2019) ("The Court should not speculate concerning the existence of standing."); *Navtech US Surveyors USSA Inc. v. Boat/Us Inc.*, No. 219CV184FTM99MRM, 2019 WL 3219667, at *2 (M.D. Fla. July 17, 2019) (noting that advisory opinions on standing are improper).

82. This is because "standing is not dispensed in gross," rather, standing must be established for each claim a party seeks to press and for each form of relief that is sought. *Brackeen v. Haaland*, 994 F.3d 249, 291 (5th Cir. 2021) (quoting *Town of Chester v. Laroe Estates, Inc.*, –— U.S. ——, 137 S. Ct. 1645, 1650, 198 L.Ed.2d 64 (2017) and *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008)).

83. This is rule is no less applicable in a bankruptcy case. The Bankruptcy Code does not define "party in interest," offering instead a non-exclusive list of who "may raise and may appear and be heard on any issue" in cases under chapter 11. *In re Friede Goldman Halter Inc.*,

---

[9] Ralph Brubaker, *On the Nature of Federal Bankruptcy Jurisdiction: A General Statutory and Constitutional Theory*, 41 WM. & MARY L. REV. 743, 832 (2000); Ralph Brubaker, *Of State Sovereign Immunity and Prospective Remedies: The Bankruptcy Discharge As Statutory Ex Parte Young Relief*, 76 AM. BANKR. L.J. 461, 563 (2002) (explaining that: "the appropriate constitutional explanation for the entirety of federal bankruptcy jurisdiction materializes only when one recognizes that the fundamental jurisdictional unit in bankruptcy is an individual bankruptcy 'proceeding' raising a justiciable controversy between adverse parties.").

600 B.R. 526, 530–31 (Bankr. S.D. Miss. 2019). "The lack of definition was intentional." *In re Delta Underground Storage Co., Inc.*, 165 B.R. 596, 598 (Bankr. S.D. Miss. 1994).

84. Congress' failure to define a party in interest specifically was discussed by both Senator DeConcini and Representative Edwards during the proceedings preceding the enactment of the Code. Senator DeConcini stated:

> Rules of bankruptcy procedure or court decisions will determine who is a party in interest **<u>for the particular purposes of the provision in question.</u>**' 124 Cong.Rec. § 12407 (daily ed. Oct. 6, 1978).... Party in interest is an expandable concept **<u>depending on the particular factual context in which it is applied</u>**.

*Id.* (citing *In re North American Oil & Gas, Inc.*, 130 B.R. 473, 479 (Bankr.W.D.Tex.1990)) (emphasis added). Congress has thus expressly directed that standing in a bankruptcy case must be determined in the particular proceeding before the bankruptcy court.

85. But here, there is no "particular purpose" or "particular factual context" in which this Court can properly evaluate party in interest standing. Instead, it appears that the Court proposes to render an advisory opinion on the named entities' standing to file pleadings without any requisite justiciable controversy before it. But none of this makes sense, with respect to entities not before the Court or only before the Court in capacity as defendants. In fact the Disclosures Order appears to be more of an investigation to find evidence that the Court could point to as supporting its assertions about Dondero's *de facto* control.

86. Additionally, the Court further states that beyond determining the hypothetical standing of such parties, it also must "ascertain whether their interests are sufficiently aligned such that the parties might be required to file joint pleadings hence forth, rather than each file pleadings that are similar in content." Disclosures Order, p. 1. What the Court is describing are pre-filing injunctions, which "are an extreme remedy" that courts should not issue "with undue haste because such sanctions can tread on a litigant's due process right of access to the courts." *Franklin v.*

*Laughlin*, No. SA-10-CV-1027 XR, 2011 WL 598489, at *7 (W.D. Tex. Jan. 13, 2011), *report and recommendation adopted*, No. SA-10-CV-1027-XR, 2011 WL 672328 (W.D. Tex. Feb. 15, 2011).

87. Specifically, the Fifth Circuit has explained that:

> "In determining whether it should impose a pre-filing injunction or should modify an existing injunction to deter vexatious filings, a court must weigh all the relevant circumstances. Four factors must be specifically considered: (1) the party's history of litigation, in particular whether he has filed vexatious, harassing, or duplicative lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or simply intended to harass; (3) the extent of the burden on the courts and other parties resulting from the party's filings; and (4) the adequacy of alternative sanctions.

*Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008).

88. What is more, this purported reason makes no sense, as multiple entities the Court seeks to compel have never made an appearance and the Court has no basis to even suspect that they might make an appearance. With respect to parties who have filed pleadings, for example the Charitable Defendants, the Court already knows that Highland Dallas Foundation and CLO HoldCo have filed joint pleadings within the Adversary Proceeding (a single motion to dismiss for failure to state claims and a single motion to withdraw reference). The Non-Party Targets are nowhere to be found within the Bankruptcy Case or any proceedings before the Court; yet the Court must conduct an investigation into these entities to see whether to compel the filing of joint pleadings? Cannot be.

**c) The Disclosures Order is not just improper, it is prejudicial.**

89. As this Court is aware, the Charitable Defendants are defendants in the Adversary Proceeding instituted by the Committee (DAF Fund and DAF Holdco are also defendants, though yet unserved—despite the Adversary Proceeding being pending for over 6 months). Central to the Committee's claims against the Charitable Defendants are the conclusions posing as allegation(s)

that the Charitable Defendants are part of civil conspiracy to fraudulently transaction assets out of the estate orchestrated by Mr. Dondero whom the Committee characterized as: standing on top of byzantine empire, moving assets and funds from one entity to another to meet various needs. *See* Adversary Proceeding, Dkt. No. 6, ¶2. (Sounds familiar).

90. In the Disclosures Order, the Court, seemingly already deciding this highly disputed issue in the Adversary Proceeding (which is not even a dispute—CLO HoldCo and Highland Dallas Foundation have filed a (joint) motion to dismiss under Rule 7012 for failure to state a claim), as it borrows the Committee's "byzantine" characterization and states that the targets of its Disclosures Order "appear to be under the *de facto* control of Mr. Dondero" and that the DAF Fund's decisions are "presumably at Mr. Dondero's direction." (the word "byzantine" is a much overworked word within this Bankruptcy Case, and its proceedings, pleadings, and orders of this Court). Disclosures Order, pp. 5, 11. This constitutes direct, specific, and express pre-judgment by this Court, and, of course, has tainted the Adversary Proceeding.

91. First and foremost, as shown herein, these assertions/findings are wrong. The Charitable Respondents and Non-Party Targets comprise an independent charitable giving structure that has facilitated the donation of tens of millions of dollars to important philanthropic causes. They are not under the *de facto* control of Mr. Dondero nor does Mr. Dondero direct their decisions—though like any donor would expect, Mr. Dondero has some say in the causes which the Supporting Organizations donate to.

92. But the fact that the Court has made these assertions/findings *sua sponte* outside of the Adversary Proceeding (or any case or controversy), when it has no authority to adjudicate the Adversary Proceeding (that is the subject of a motion to withdraw reference), is highly prejudicial to the Charitable Defendants. This Court, in its assumed posture as investigative body as well as

prosecutor and decider, has given cover to the utterly conclusory assertions of the Committee, and has, practically, joined the Committee as a plaintiff.

93. At an absolute minimum, the Court should refrain from deciding or even commenting upon contested issues of law and fact *sua sponte* outside of the Adversary Proceeding, and should retract its supposed findings (issued under the transparently incorrect suggestion of its power to manage its own docket [by pre-screening parties for standing????? - again, the case law cited above shows this is not proper]). The Charitable Respondents urge the Court, particularly after reviewing the information and documents provided in this Response and Disclosures, to reconsider such findings, and respectfully request that this Court retract its Disclosure Order or at least the problematic content therein.

**CONCLUSION**

By this Response and the Disclosures, the Charitable Respondents have fully complied with this Court's Disclosures Order, but have done so with the express reservations concerning the impropriety of the Disclosures Order and the non-appearance or submission by the Non-Party Targets. But most important to the Charitable Respondents is that the Court closely review this Response and Disclosures and reconsider its assumptions/assertions/findings/conclusion that the Charitable Respondents are under the *de facto* control of or act at the direction of Mr. Dondero. The Charitable Respondents are real, independent charitable giving vehicles that have affected, very positively, the lives of countless people through the tens of millions of dollars donated to important philanthropic causes.

[***signature block on following page***]

**Respectfully submitted:**

**KELLY HART PITRE**

***/s/ Louis M. Phillips***
**Louis M. Phillips (#10505)**
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com

Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com

and

**KELLY HART & HALLMAN**
Hugh G. Connor II
State Bar No. 00787272
hugh.connor@kellyhart.com
Michael D. Anderson
State Bar No. 24031699
michael.anderson@kellyhart.com
Katherine T. Hopkins
Texas Bar No. 24070737
katherine.hopkins@kellyhart.com
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: (817) 332-2500

## CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that a true and correct copy of the above and foregoing document and all attachments thereto were sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on this July 9, 2021.

***/s/ Louis M. Phillips***
Louis M. Phillips

# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 19-34054-sgj11** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | **Chapter 11** |
| | § | |
| **Debtor** | § | **Relates to Dkt. No. 2460** |

**Declaration of Mark Patrick**

I, Mark Patrick, hereby declare as follows:

1. My name is Mark Patrick, and I am over the age of 21. I have personal knowledge of the facts set forth herein, and make this declaration pursuant to 28 U.S.C. § 1746.

2. I am a Director of Charitable DAF Holdco, Ltd. and the managing member of the sole general partner of Charitable DAF Fund, L.P. (Charitable DAF Holdco, Ltd. and Charitable DAF Fund, L.P., and their direct and indirect subsidiaries will be referred to herein as the "DAF"). A more robust discussion of these entities and their interrelation is set forth in the Response and Disclosures (defined herein).

3. I appreciate the opportunity to describe the important charitable work the DAF is doing through its charitable beneficiaries.

4. Since its inception in 2012, the DAF has had a significant impact in the communities where the supporting organizations that are the DAF's beneficiaries deploy their capital. In fact, such supporting organizations have funded more than $32 million in charitable contributions to numerous non-profit organizations. The DAF's charitable commitments are in excess of $42 million. The non-profit organizations that have received support from the DAF include The Family Place, which provides emergency shelter to those in need, and the Dallas Children's Advocacy Center, which serves the needs of abused and neglected children. A more

detailed summary of the DAF's charitable impact is an exhibit filed with the Response and Disclosures referenced herein.

5. I ultimately agreed to take on the roles I currently hold with the DAF because I believe in the causes the DAF is supporting. In college, I was a guardian ad litem for abused and neglected children. I have seen firsthand how the DAF is helping people every day who are struggling with abuse or difficult life situations. I have visited the Cristo Rey Dallas school campus, where low income and disadvantaged children are receiving a high-quality education that they otherwise would likely not receive.

6. The actions taken by me on behalf of the DAF in connection with the bankruptcy case of Highland Capital Management, L.P., and the lawsuit I authorized to be filed on behalf of CLO Holdco, Ltd. and DAF Fund against Highland Capital Management, L.P., were done so the DAF can continue to support these worthy causes. I am only trying to protect the DAF's investments, which are the source of the millions in charitable contributions the DAF has made over the past decade.

7. My actions aren't taken under the direction of James Dondero, or to somehow protect a direct or indirect economic benefit Mr. Dondero receives from the DAF. As the Response and Disclosures set forth in greater detail, Mr. Dondero has no direct or indirect economic ownership in the DAF.

8. My concern in vigorously pursuing claims for the DAF, or defending claims against the DAF, is to protect the DAF's investments from being taken by creditors who have no credible basis to obtain such investments.

9. I have been provided with and reviewed this Court's Order Requiring Disclosures (the "Disclosures Order").

10. In my capacity with the DAF, I assisted counsel in preparing the Response and Disclosures related to the Disclosures Order on behalf of CLO Holdco, Ltd., Charitable DAF Fund, L.P., and Highland Dallas Foundation, Inc. (the "Response and Disclosures," and capitalized terms used herein which are not otherwise defined are as defined in the Response and Disclosures).

11. With respect to the documents and Exhibits provided by the Foundations about the Supporting Organizations and Non-Party Targets I or those acting under my direction dealt with the Foundations to obtain such information. Multiple Exhibits have already been provided as evidence to the Bankruptcy Court at the Show Cause Hearing. I have reviewed the exhibits to the Response and Disclosures and affirm that the Exhibits provided about the Charitable Respondents are true and correct copies of what each document is identified as in the Response and Disclosures. With respect to the documents and Exhibits provided by the Foundations, I affirm, upon information and belief that these Exhibits are true and correct copies of what each document is identified as in the Response and Disclosures. As I am not a person with authority over the Supporting Organizations I cannot identify such documents and Exhibits of my own personal knowledge, but am satisfied that I can upon information and belief

12. I have reviewed the Response and Disclosures and certify that the factual recitations therein are accurate.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.**

**Executed on July 9, 2021**

[signature]

**Mark Patrick**

# EXHIBIT 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Debtor. | **Case No. 19-34054-sgj-11**<br>Chapter 11<br><br>Dallas, Texas<br>Tuesday, June 8, 2021<br>9:30 a.m. Docket<br><br>- SHOW CAUSE HEARING (2255)<br>- MOTION TO MODIFY ORDER AUTHORIZING RETENTION OF JAMES SEERY (2248)<br>- MOTION FOR ORDER FURTHER EXTENDING THE PERIOD WITHIN WHICH DEBTOR MAY REMOVE ACTIONS (2304) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jeffrey Nathan Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067-4003<br>(310) 277-6910 |
| For the Debtor: | John A. Morris<br>Gregory V. Demo<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7700 |
| For the Debtor: | Zachery Z. Annable<br>HAYWARD & ASSOCIATES, PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, TX 75231<br>(972) 755-7104 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For the Charitable DAF, CLO Holdco, Show Cause Respondents, Movants, and Sbaiti & Company: | Mazin A. Sbaiti<br>Jonathan E. Bridges<br>SBAITI & COMPANY, PLLC<br>Chase Tower<br>2200 Ross Avenue, Suite 4900W<br>Dallas, TX 75201<br>(214) 432-2899 |
| For Mark Patrick: | Louis M. Phillips<br>KELLY, HART & HALLMAN, LLP<br>301 Main Street, Suite 1600<br>Baton Rouge, LA 70801<br>(225) 338-5308 |
| For Mark Patrick: | Michael D. Anderson<br>KELLY, HART & HALLMAN, LLP<br>201 Main Street, Suite 2500<br>Fort Worth, TX 76102<br>(817) 332-2500 |
| For James Dondero: | Clay M. Taylor<br>Will Howell<br>BONDS ELLIS EPPICH SCHAFER JONES, LLP<br>420 Throckmorton Street, Suite 1000<br>Fort Worth, TX 76102<br>(817) 405-6900 |
| For the Official Committee of Unsecured Creditors: | Matthew A. Clemente<br>SIDLEY AUSTIN, LLP<br>One South Dearborn Street<br>Chicago, IL 60603<br>(312) 853-7539 |
| For the Official Committee of Unsecured Creditors: | Paige Holden Montgomery<br>SIDLEY AUSTIN, LLP<br>2021 McKinney Avenue, Suite 2000<br>Dallas, TX 75201<br>(214) 981-3300 |
| Recorded by: | Michael F. Edmond, Sr.<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street, 12th Floor<br>Dallas, TX 75242<br>(214) 753-2062 |

Transcribed by: Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

Q Was there any effort whatsoever to hide the prior order of the Bankruptcy Court?
A No.
MR. ANDERSON: Pass the witness.
THE COURT: Okay. Other examination?
MR. SBAITI: Yes, Your Honor. Just a couple of questions.

CROSS-EXAMINATION

BY MR. SBAITI:
Q Do you mind flipping to Exhibit 25, which I believe is the org chart, the one that you were looking at before?
A Okay.
Q It'll still be in --
A Okay. Yeah.
Q -- the defense binder. No reason to swap out right now.
A I've got the right binders. Some of them are repeatable exhibits, so --
Q Yeah.
A -- I have to grab the right binder. Yes.
Q As this org chart would sit today, is the only difference that Grant Scott's name would instead be Mark Patrick?
A Yes.
Q Was there ever a period of time where Jim Dondero's name would sit instead of Grant Scott's name prior?
A Yes, originally, when this -- yes.

Q So did Mr. Dondero both have the control shares of the GP, LLC and DAF Holdco Limited?
A No, I believe not. I believe he only held the Charitable DAF GP interest and that Mr. Scott at all times held the Charitable DAF Holdco, LTD interest, until he decided to transfer it to me.
Q Can you just tell us how Mr. Scott came to hold the control shares of the Charitable DAF Holdco, LTD?
A When he was the independent trustee of the Charitable Remainder Trust, he caused that -- the creation of that entity, and that's how he became in receipt of those management shares.
Q And does the Charitable DAF GP, LLC have any control over Charitable DAF Fund, LP's actions or activities?
A Yes, it does.
Q What kind of control is that?
A I would describe complete control. It's the managing member of that entity and can -- and effectively owns, you know, the hundred percent interest in the respective subsidiaries, and so the control follows down.
Q And when did Mr. Scott replace Mr. Dondero as the GP -- managing member of the GP?
A Well, I think as the -- and Mr. Morris had shown me with respect to that transfer occurring on March 2012.
Q So nine years ago?

A Yes.
Q Does Mr. Dondero today exercise any control over the activities of the DAF Charitable -- the Charitable DAF, GP or the Charitable DAF Holdco, LTD?
A No.
Q Is he a board member of sorts for either of those entities?
A No.
Q Is he a board members of CLO Holdco?
A No.
Q Does he have any decision-making authority at CLO Holdco?
A None.
Q The decision to authorize the lawsuit and the decision to authorize the motion that you've been asked about, who made that authorization?
A I did.
Q Did you have to ask for anyone's permission?
A No.

MR. SBAITI: No more questions, Your Honor.

THE COURT: Okay. Any -- I guess Mr. Taylor, no. All right. Any redirect?

REDIRECT EXAMINATION

BY MR. MORRIS:

Q Since becoming the authorized representative of the Plaintiffs, have you ever made a decision on behalf of those

entities that Mr. Dondero disagreed with?

A I have made decisions that were adverse to Mr. Dondero's financial -- financial decision. I mean, financial interests. Whether he disagreed with them or not, I don't -- he has not communicated them to me. But they have been adverse, at least two very strong instances.

Q Have you ever -- have you ever talked to him about making a decision that would be adverse to his interests? Did he tell -- did --

A I didn't -- I don't -- I did not discuss with him prior to making the decisions that I made that were adverse to his economic interests.

MR. MORRIS: Okay. No further questions, Your Honor.

THE COURT: Any further examination? Recross on that redirect?

MR. ANDERSON: No further questions.

MR. SBAITI: No further questions, Your Honor.

MR. ANDERSON: Sorry.

THE COURT: Nothing?

MR. ANDERSON: I think we're good.

THE COURT: Okay. I have one question, Mr. Patrick. My brain sometimes goes in weird directions.

EXAMINATION BY THE COURT

THE COURT: I'm just curious. What are these Cayman Island entities, charitable organizations formed in the Cayman

THE COURT: Uh-huh.

THE WITNESS: The offshore master fund structure typically will have two different types of -- they call it foreign feeder funds. One foreign feeder fund is meant to accommodate foreign investors; the other foreign feeder fund is meant to accommodate U.S. tax-exempt investors.

Why, why is it structured that way? In order to avoid something called -- I was trying not to be wonkish -- UBTI. That's, let's see, Un -- Unrelated Trader Business Income. I probably have that slightly wrong. But it's essentially, it's a means to avoid active business income, which includes debt finance income, which is what these CLOs tend to be, that would throw off income that would be taxable normally if the exempts did not go through this foreign blocker, and it converts that UBTI income -- it's called (inaudible) income -- into passive income that flows -- that flows up to the charities.

And so it's very typical that you'll have a U.S. tax-exempt investor, when they make an investment in a fund, prefer to go through an offshore feeder fund, which is actually Charitable DAF Holdco, LTD. That's essentially what, from a tax perspective, represents as a UBTI blocker entity. And then you have the offshore investments being held offshore because there's a variety of safe harbors where the receipt of interest, the portfolio interest exception, is not taxable.

The creation of capital gains or losses under the -- they call it the trading, 864(b) trading safe harbor, is not taxable. So that's why you'll find these structures operating offshore to rely on those safe harbor provisions as well as -- as well as what I indicated with respect to the two type blocker entities. It's very typical and industry practice to organize these way. And so when this was set --

THE COURT: It's very typical in the charitable world to --

THE WITNESS: In the investment management --

THE COURT: -- form this way?

THE WITNESS: In the investment management world, when you have charitable entities that are taking some exposure to assets that are levered, to set this structure up in this way. It was modeled after -- they just call them offshore master fund structures. They're known as Mickey Mouse structures, where you'll have U.S. investors --

THE COURT: Yes. I -- yes, I --

THE WITNESS: -- enter through a U.S. partnership, and the foreign investors enter through a blocker.

THE COURT: It was really just the charitable aspect of this that I was --

THE WITNESS: Yeah. Yeah.

THE COURT: -- getting at.

THE WITNESS: Yeah. No, but I'm just trying to

emphasize if --

THE COURT: All right. It's --

THE WITNESS: Yeah.

THE COURT: -- neither here nor there. All right.

MR. SBAITI: Your Honor, may I ask a slightly clarifying leading question on that, because I think I understand what he was trying to say, just for the record?

THE COURT: Well, --

MR. MORRIS: I object.

THE COURT: -- I tell you what. Anyone who wants to ask one follow-up question on the judge's question can do so. Okay? You can go first.

MR. SBAITI: I'll approach, Your Honor.

THE COURT: Okay.

RECROSS-EXAMINATION

BY MR. SBAITI:

Q Would it be a fair summary of what you were saying a minute ago that the reason the bottom end of that structure is offshore is so that it doesn't get taxed before the money reaches the charities on the U.S. side?

A Tax -- it converts the nature of the income that is being thrown off by the investments so that it becomes a tax friendly income to the tax-exempt entity. Passive income. That's --

Q So, essentially, --

THE COURT: Okay. Okay.
MR. SBAITI: -- so it doesn't get taxed before it hits the --
THE COURT: I said one question.
MR. SBAITI: Sorry, Your Honor.
THE COURT: Okay. He answered it.
MR. PHILLIPS: And I have one question, Your Honor
THE COURT: Okay.
MR. PHILLIPS: I don't know if I need to ask this question, but I'd rather not ask you if I need to ask it.
THE COURT: Go ahead.
MR. PHILLIPS: But if I do, you know, I could --
THE COURT: Go ahead.
MR. PHILLIPS: Well, okay.

RECROSS-EXAMINATION

BY MR. PHILLIPS:
Q We've talked about the offshore structure. Are the foundations in the top two tiers of the organizational chart offshore entities?
A No.
Q They're --
A They're onshore entities. They're tax-exempt entities.
Q Thank you.
A The investments are offshore.
Q Thank you.

# EXHIBIT 3

Charitable DAF/CLO HoldCo
Structure Chart



# EXHIBIT 4

# MEMORANDUM

**Date: July 9, 2021**

**To: Mark Patrick**

**Company: Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd.**

**From: Haynes and Boone, LLP, by Kenneth Bezozo**

**Subject: Donor Advised Funds ("*DAFs*"), Sponsoring Organizations and Supporting Organizations -- The Reasons for Making Investments in Offshore Jurisdictions**

---

1. ***What are Donor Advised Funds, Sponsoring Organizations and Supporting Organizations?***

A donor advised fund, or DAF, is a separately managed charitable investment account established by a donor within a public charity (a section 501(c)(3) organization), which is generally referred to as a sponsor. Sponsors may include a community foundation, university, religious organization, or financial institution. The donor (or the donor's designee) typically maintains certain advisory privileges over the DAF funds or account – specifically with respect to charities that should receive donations, although the DAF account is fully and completely owned and controlled by the sponsor.

In some cases, a sponsor can create as a subsidiary a "supporting organization" which also is a Section 501(c)(3) public charity. A supporting organization is a separate entity controlled by the sponsor through its ability to elect a majority of the supporting organization's governing board. Because of this control, a supporting organization is treated financially as part of a consolidated unit with the sponsor.

Here, for example, The Dallas Foundation formed, and owns and controls, a supporting organization named Highland Dallas Foundation, Inc. ("***Highland Dallas Foundation***") to assist The Dallas Foundation in carrying out its charitable mission in helping support a wide variety of community affairs. Donations were made to the Highland Dallas Foundation as both the sponsor and the supporting organization. The Highland Dallas Foundation from time to time makes distributions of funds to The Dallas Foundation which in turn makes further distributions to local public charities. ***Exhibit 1*** attached shows these above-described entities, as well as other entities referenced herein that are pertinent to this donor advised fund.

2. ***How Does a Donor Establish a DAF Account?***

To establish a DAF fund or account, a donor must make an irrevocable contribution of assets, such as cash, stock or securities or other business or financial assets, to a sponsoring public charity. The donor's contribution is recorded and recognized as a donation to the sponsoring

public charity of the DAF. A donor can make additional contributions to the sponsoring organization whenever they choose.

Because a contribution to a sponsoring organization is, for tax purposes, the equivalent of a contribution to a public charity and because the donor gets an immediate tax benefit for the contribution, the contribution, when made, is permanent and irrevocable. This is true even though the donor contribution to the sponsoring organization is in an account that grows tax-free and the donor has advisory rights as to where to invest the assets and donations made from these assets.

Here, the Highland Dallas Foundation is the sponsor of the DAF account which it fully owns and controls. Although the donor has advisory rights regarding investments and donations to charities (by way of a board seat he fills in the supporting organization), the Highland Dallas Foundation has full authority and control over all such decision-making.

3. ***What Type of Investments Can be Made by a Sponsor/Supporting Organization?***

A sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are able to invest in a wide variety of assets including, but not limited to, marketable securities, financial assets, businesses, real estate, private equity and hedge funds. But because the sponsor and supporting organization are both public charities that are tax-exempt organizations, their investments must take into account all laws that could possibly effect their tax-exempt status.

a. ***Can a Sponsor and its Supporting Organization Invest in a Hedge Fund, Private Equity Fund or Similar Investment Vehicle?***

The short answer is yes, but as stated above, a sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are both public charities that are tax-exempt organizations. As a strong general rule, a tax-exempt organization will avoid any investments that will subject it to federal or state taxes. A tax-exempt organization is generally exempt from all federal and state taxes except to the extent it receives income classified as unrelated business taxable income (UBTI), which would be taxed at a 21% rate. The term "unrelated business taxable income" generally means the income derived from an unrelated trade or business regularly conducted by the tax-exempt organization. UBTI also can arise from the receipt of income from debt-financed investments, which is why hedge and private equity funds generally utilize a special investment structure to ensure tax-exempt investors do not have UBTI.

To prevent UBTI from flowing through to a tax-exempt organization, a corporation can be utilized to "block" this income at the corporate level, which is accomplished by having a corporation interposed between the tax-exempt organization and the hedge fund, such as The Charitable DAF Holdco, Ltd. (a corporate blocker) from the Charitable DAF Fund, L.P. Using a structure in this manner is often described as using a "blocker" because the UBTI is blocked out and does not flow through to the tax-exempt investor. Instead, the UBTI is included in the income of, and subject to tax in, the blocker corporation. The blocker corporation thereafter distributes the income to the tax-exempt

investor through the payment of dividends which are not UBTI and therefore not taxable to a tax-exempt organization.

Although using a domestic corporate blocker can avoid the problem of having UBTI passed through to a tax-exempt sponsor or its supporting organization, a U.S.-based blocker corporation will be required to pay corporate and state-level income tax on the income they receive from an investment fund.

b. ***Are There Particular Jurisdictions in Which Hedge and Private Equity Funds form Investment Partnerships and Blocker Corporations for their tax-exempt investors?***

It is common for hedge and private equity funds that have tax-exempt investors such as The Dallas Foundation and Highland Dallas Foundation to utilize an offshore structure to form its investment partnership. In addition, these funds may form offshore blocker corporations as well as for other reasons including the ability to make non-U.S. investments or U.S. investments that do not give rise to U.S. tax for foreign investors (i.e., U.S. investments that do not cause the investor to be "engaged in a U.S. trade or business.") Jurisdictions such as Bermuda and the Cayman Islands are typically used because those countries do not have an income tax regime.

By utilizing an offshore structure with corporate blockers, hedge and private equity funds can ensure their tax-exempt investors will not receive any UBTI from investments held by The Dallas Foundation or Highland Dallas Foundation. In addition, to the extent the sole source of UBTI is through debt financing (which is often the case in a hedge fund), then using an offshore corporate blocker can eliminate this type of UBTI (because the debt financing will not flow through the corporate blocker to taint the income received by the tax-exempt investor). This allows the sponsor (i.e., Highland Dallas Foundation), as well as any other charities that receive distributions from Highland Dallas Foundation or The Dallas Foundation, to receive the largest possible distributions.

Utilizing an offshore structure for hedge and private equity funds in the manner described above for tax-exempt investors is a best practice used by many U.S. law firms representing U.S. hedge and private equity funds. In fact, if a U.S. law firm didn't use offshore blockers in the manner described above, it could be considered a poor practice.

In summary, using an offshore blocker corporation, such as Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd., for many hedge funds minimizes taxes and increases the net after-tax cash flow to the tax-exempt investors because investments grow tax-free, giving a sponsor, such as Highland Dallas Foundation, the potential to create even more capital for philanthropic giving.

4. ***Who Has Control and Authority over the Assets Held by the Sponsor?***

Because a DAF is an account within a sponsor organization, the sponsoring organization has full, complete and final control over the funds in the DAF, which is the case here with the sponsor, the Highland Dallas Foundation. Although the supporting organization permits the donor or the donor's designee to recommend how funds should be invested and how funds should be

distributed to other public charities, Highland Dallas Foundation must approve any investments and all distributions to charities.

In this case, the donor of the charitable DAF, or his designee, is able to appoint a representative to the board of the Highland Dallas Foundation, which allows the donor to recommend investments or distributions to charitable organizations, i.e., organizations that are tax-exempt under Internal Revenue Code section 501(c)(3) and classified as public charities under Internal Revenue Code section 509(a). But the donor (or the donor's designee) only has advisory privileges over making investments and the distribution of funds.

5. ***What Are the Benefits to a Donor of a Contribution to a DAF account?***

A DAF account allows a donor who makes an irrevocable charitable contribution to the DAF account to receive an immediate tax deduction, and with the ability to recommend distributions be made by the sponsor to specific charities either presently or in the future. Also, if the donor contributes certain appreciated assets to the DAF account, such as stock or securities, the donor avoids the recognition of any gain in these appreciated assets. This is a significant additional benefit to donors made available in the Internal Revenue Code.

The DAF assets that are not immediately distributed to charities are then invested and depending on the type of investments and the jurisdiction in what the investments are made, the assets may grow tax-free.

**Exhibit 1**

**Charitable DAF/CLO Holdco Structure Chart**



# EXHIBIT 5

*WK–249232*

# *Certificate Of Incorporation*

*I, **V. DAPHENE WHITELOCKE** Assistant Registrar of Companies of the Cayman Islands DO HEREBY CERTIFY, pursuant to the Companies Law CAP. 22, that all requirements of the said Law in respect of registration were complied with by*

**CLO HoldCo, Ltd.**

*an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect from the 13th day of December Two Thousand Ten*

*Given under my hand and Seal at George Town in the Island of Grand Cayman this 13th day of December Two Thousand Ten*

REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS

**Assistant Registrar of Companies,**
**Cayman Islands.**

PATRICK_000039

HCMLPHMIT00003582

# EXHIBIT 6

**THE COMPANIES LAW (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**

**OF**

# CLO HOLDCO, LTD.

WALKERS

Walker House, 87 Mary Street, George Town
Grand Cayman KY1-9001, Cayman Islands
T 345 949 0100 F 345 949 7886 www.walkersglobal.com

**REF: VC/CM/99957**

REGISTERED AND FILED AS NO 249232 THIS 13th DAY OF December, 2010
Asst. Registrar of Companies Cayman Islands

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

MEMORANDUM OF ASSOCIATION

OF

# CLO HOLDCO, LTD.

1. The name of the company is CLO HoldCo, Ltd. (the "**Company**").

2. The registered office of the Company will be situated at the offices of **Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands** or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is **US$50,000.00** divided into **50,000** shares of a nominal or par value of **US$1.00 each** provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.

REGISTRAR OF COMPANIES EXEMPTED CAYMAN ISLANDS

The undersigned, whose name, address and description are set out below, wishes the Company to be incorporated as a company in the Cayman Islands in accordance with this Memorandum of Association, and agrees to take the number of shares in the capital of the Company as set out opposite the undersigned's name.

| NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER | NUMBER OF SHARES TAKEN BY SUBSCRIBER |
|---|---|
| Walkers Nominees Limited, 87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands | ONE SHARE |

(Sgd) Virginia Czarnocki

Virginia Czarnocki
as Authorised Signatory of Walkers Nominees Limited

Dated: 13 December 2010

(Sgd) Carol MacDonald
Signature of Witness

Name: Carol MacDonald

Address: 87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands

Occupation: Secretary

CERTIFIED TO BE A TRUE AND CORRECT COPY
SIG. [signature]
V. Daphene Whitelocke
Assistant Registrar
Date. 13th December, 2010

REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS

## TABLE OF CONTENTS

**CLAUSE** **PAGE**


TABLE A ..... 1

INTERPRETATION ..... 1

PRELIMINARY ..... 3

SHARES ..... 3

MODIFICATION OF RIGHTS ..... 4

CERTIFICATES ..... 4

FRACTIONAL SHARES ..... 4

LIEN ..... 5

CALLS ON SHARES ..... 5

FORFEITURE OF SHARES ..... 6

TRANSFER OF SHARES ..... 7

TRANSMISSION OF SHARES ..... 7

ALTERATION OF SHARE CAPITAL ..... 7

REDEMPTION AND PURCHASE OF SHARES ..... 8

GENERAL MEETINGS ..... 8

NOTICE OF GENERAL MEETINGS ..... 9

PROCEEDINGS AT GENERAL MEETINGS ..... 9

VOTES OF SHAREHOLDERS ..... 10

CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS ..... 11

DIRECTORS ..... 11

ALTERNATE DIRECTOR OR PROXY ..... 12

POWERS AND DUTIES OF DIRECTORS ..... 12

BORROWING POWERS OF DIRECTORS ..... 13

THE SEAL ..... 14

DISQUALIFICATION OF DIRECTORS ..... 14

PROCEEDINGS OF DIRECTORS ..... 14
DIVIDENDS ..... 16
ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION ..... 17
CAPITALISATION OF RESERVES ..... 17
SHARE PREMIUM ACCOUNT ..... 18
NOTICES ..... 18
INDEMNITY ..... 19
NON-RECOGNITION OF TRUSTS ..... 20
WINDING UP ..... 20
AMENDMENT OF ARTICLES OF ASSOCIATION ..... 21
CLOSING OF REGISTER OR FIXING RECORD DATE ..... 21
REGISTRATION BY WAY OF CONTINUATION ..... 21
DISCLOSURE ..... 21

1 23 10 48 57 62 GRAND CAYMAN 03.12.10 CAYMAN ISLANDS
CAYMAN ISLANDS ≡,000,002 GOVERNMENT STAMP DUTY PB01006

REGISTERED AND FILED, AS NO: 249232 THIS 15th DAY OF December, 2010
Asst. Registrar of Companies Cayman Islands

COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

ARTICLES OF ASSOCIATION

OF

# CLO HOLDCO, LTD.

## TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to CLO HoldCo, Ltd. (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

## INTERPRETATION

1. In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time;

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company;

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof;

"**Law**" means the Companies Law (as amended) of the Cayman Islands;

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time;

"**Office**" means the registered office of the Company as required by the Law;

"**Ordinary Resolution**" means a resolution:

(a) passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and

REGISTRAR OF COMPANIES EXEMPTED CAYMAN ISLANDS

where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed;

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up;

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires;

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law;

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof;

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company;

"**Share**" means a share in the capital of the Company. All references to "Shares" herein shall be deemed to be Shares of any or all Classes as the context may require. For the avoidance of doubt in these Articles the expression "Share" shall include a fraction of a Share;

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber;

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Law;

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means; and

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a) passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

2. In these Articles, save where the context requires otherwise:

(a) words importing the singular number shall include the plural number and vice versa;

(b) words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c) the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d) reference to a dollar or dollars (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e) reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;

(f) reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

(g) reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

3. Subject to the last two preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

4. The business of the Company may be commenced at any time after incorporation.

5. The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

6. The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

7. The Directors shall keep, or cause to be kept, the Register at such place as the Directors may from time to time determine and, in the absence of any such determination, the Register shall be kept at the Office.

**SHARES**

8. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

(b) grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

9. The Directors may authorise the division of Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors.

10. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

11. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MODIFICATION OF RIGHTS

12. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Shares of the relevant Class, or with the sanction of a resolution passed at a separate meeting of the holders of the Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that all such Classes would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes.

13. The rights conferred upon the holders of the Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Shares of any Class by the Company.

## CERTIFICATES

14. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

15. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or

par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

**LIEN**

16. The Company has a first and paramount lien on every Share (whether or not fully paid) for all amounts (whether presently payable or not) payable at a fixed time or called in respect of that Share. The Company also has a first and paramount lien on every Share registered in the name of a Person indebted or under liability to the Company (whether he is the sole registered holder of a Share or one of two or more joint holders) for all amounts owing by him or his estate to the Company (whether or not presently payable). The Directors may at any time declare a Share to be wholly or in part exempt from the provisions of this Article. The Company's lien on a Share extends to any amount payable in respect of it.

17. The Company may sell, in such manner as the Directors in their absolute discretion think fit, any Share on which the Company has a lien, but no sale shall be made unless an amount in respect of which the lien exists is presently payable nor until the expiration of fourteen days after a notice in writing, demanding payment of such part of the amount in respect of which the lien exists as is presently payable, has been given to the registered holder for the time being of the Share, or the Persons entitled thereto by reason of his death or bankruptcy.

18. For giving effect to any such sale the Directors may authorise some Person to transfer the Shares sold to the purchaser thereof. The purchaser shall be registered as the holder of the Shares comprised in any such transfer and he shall not be bound to see to the application of the purchase money, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the sale.

19. The proceeds of the sale after deduction of expenses, fees and commission incurred by the Company shall be received by the Company and applied in payment of such part of the amount in respect of which the lien exists as is presently payable, and the residue shall (subject to a like lien for sums not presently payable as existed upon the Shares prior to the sale) be paid to the Person entitled to the Shares immediately prior to the sale.

**CALLS ON SHARES**

20. The Directors may from time to time make calls upon the Shareholders in respect of any moneys unpaid on their Shares, and each Shareholder shall (subject to receiving at least fourteen days' notice specifying the time or times of payment) pay to the Company at the time or times so specified the amount called on such Shares.

21. The joint holders of a Share shall be jointly and severally liable to pay calls in respect thereof.

22. If a sum called in respect of a Share is not paid before or on the day appointed for payment thereof, the Person from whom the sum is due shall pay interest upon the sum at the rate of eight percent per annum from the day appointed for the payment thereof to the time of the actual payment, but the Directors shall be at liberty to waive payment of that interest wholly or in part.

23. The provisions of these Articles as to the liability of joint holders and as to payment of interest shall apply in the case of non-payment of any sum which, by the terms of issue of a Share,

becomes payable at a fixed time, whether on account of the amount of the Share, or by way of premium, as if the same had become payable by virtue of a call duly made and notified.

24. The Directors may make arrangements on the issue of partly paid Shares for a difference between the Shareholders, or the particular Shares, in the amount of calls to be paid and in the times of payment.

25. The Directors may, if they think fit, receive from any Shareholder willing to advance the same all or any part of the moneys uncalled and unpaid upon any partly paid Shares held by him, and upon all or any of the moneys so advanced may (until the same would, but for such advance, become presently payable) pay interest at such rate (not exceeding without the sanction of an Ordinary Resolution, eight percent per annum) as may be agreed upon between the Shareholder paying the sum in advance and the Directors.

**FORFEITURE OF SHARES**

26. If a Shareholder fails to pay any call or instalment of a call in respect of partly paid Shares on the day appointed for payment, the Directors may, at any time thereafter during such time as any part of such call or instalment remains unpaid, serve a notice on him requiring payment of so much of the call or instalment as is unpaid, together with any interest which may have accrued.

27. The notice shall name a further day (not earlier than the expiration of fourteen days from the date of the notice) on or before which the payment required by the notice is to be made, and shall state that in the event of non-payment at or before the time appointed the Shares in respect of which the call was made will be liable to be forfeited.

28. If the requirements of any such notice as aforesaid are not complied with, any Share in respect of which the notice has been given may at any time thereafter, before the payment required by notice has been made, be forfeited by a resolution of the Directors to that effect.

29. A forfeited Share may be sold or otherwise disposed of on such terms and in such manner as the Directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the Directors think fit.

30. A Person whose Shares have been forfeited shall cease to be a Shareholder in respect of the forfeited Shares, but shall, notwithstanding, remain liable to pay to the Company all moneys which at the date of forfeiture were payable by him to the Company in respect of the Shares forfeited, but his liability shall cease if and when the Company receives payment in full of the amount unpaid on the Shares forfeited.

31. A statutory declaration in writing that the declarant is a Director, and that a Share has been duly forfeited on a date stated in the declaration, shall be conclusive evidence of the facts in the declaration as against all Persons claiming to be entitled to the Share.

32. The Company may receive the consideration, if any, given for a Share on any sale or disposition thereof pursuant to the provisions of these Articles as to forfeiture and may execute a transfer of the Share in favour of the Person to whom the Share is sold or disposed of and that Person shall be registered as the holder of the Share, and shall not be bound to see to the application of the purchase money, if any, nor shall his title to the Shares be affected by any irregularity or invalidity in the proceedings in reference to the disposition or sale.

33. The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which by the terms of issue of a Share becomes due and payable, whether on account of the

amount of the Share, or by way of premium, as if the same had been payable by virtue of a call duly made and notified.

## TRANSFER OF SHARES

34. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

35. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor.

36. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

37. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

## TRANSMISSION OF SHARES

38. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased survivor, shall be the only Person recognised by the Company as having any title to the Share.

39. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

40. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

41. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

42. The Company may by Ordinary Resolution:

(a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

43. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

**REDEMPTION AND PURCHASE OF SHARES**

44. Subject to the Law, the Company may:

(a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may, before the issue of such Shares, determine;

(b) purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder; and

(c) make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law, including out of its capital, profits or the proceeds of a fresh issue of Shares.

45. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

46. The redemption or purchase of any Share shall not be deemed to give rise to the redemption or purchase of any other Share.

47. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

**GENERAL MEETINGS**

48. The Directors may, whenever they think fit, convene a general meeting of the Company.

49. General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least ten percent of the paid up voting share capital of the Company deposited at the Office specifying the objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later

than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

50. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

**NOTICE OF GENERAL MEETINGS**

51. At least seven days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

52. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

**PROCEEDINGS AT GENERAL MEETINGS**

53. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, the appointment and removal of Directors and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

54. No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

55. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

56. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

57. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

58. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

59. The chairman may with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting) adjourn a meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given as in the case of an original meeting. Save as aforesaid it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

60. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason, upon notice in writing to Shareholders. A postponement may be for a stated period of any length or indefinitely as the Directors may determine.

61. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

62. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

63. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

64. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

## VOTES OF SHAREHOLDERS

65. Subject to any rights and restrictions for the time being attached to any Share, on a show of hands every Shareholder present in person and every Person representing a Shareholder by proxy shall, at a general meeting of the Company, each have one vote and on a poll every Shareholder and every Person representing a Shareholder by proxy shall have one vote for each Share of which he or the Person represented by proxy is the holder.

66. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

67. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

68. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

69. On a poll votes may be given either personally or by proxy.

70. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

71. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

72. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

73. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

74. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

75. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

## DIRECTORS

76. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

77. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

78. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

79. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

80. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

81. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

82. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

**ALTERNATE DIRECTOR OR PROXY**

83. Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be an officer of the Company. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

84. Any Director may appoint any Person , whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

**POWERS AND DUTIES OF DIRECTORS**

85. Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

86. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution. The Directors may also appoint one or more of their

number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

87. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

88. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

89. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

90. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article .

91. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

92. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

93. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

**BORROWING POWERS OF DIRECTORS**

94. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

## THE SEAL

95. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

96. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

97. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DISQUALIFICATION OF DIRECTORS

98. The office of Director shall be vacated, if the Director:

(a) becomes bankrupt or makes any arrangement or composition with his creditors;

(b) dies or is found to be or becomes of unsound mind;

(c) resigns his office by notice in writing to the Company;

(d) is removed from office by Ordinary Resolution;

(e) is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number); or

(f) is removed from office pursuant to any other provision of these Articles.

## PROCEEDINGS OF DIRECTORS

99. The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit . Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

100. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication

equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

101. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one. A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

102. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

103. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

104. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

105. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a) all appointments of officers made by the Directors;

(b) the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c) all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

106. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

107. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

108. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

109. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

110. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

111. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

112. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

## DIVIDENDS

113. Subject to any rights and restrictions for the time being attached to any Shares, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

114. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

115. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

116. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

117. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

118. Subject to any rights and restrictions for the time being attached to any Shares, all dividends shall be declared and paid according to the amounts paid up on the Shares, but if and for so long as nothing is paid up on any of the Shares dividends may be declared and paid according to the par value of the Shares.

119. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

120. No dividend shall bear interest against the Company.

**ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION**

121. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

122. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

123. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

124. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

125. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

**CAPITALISATION OF RESERVES**

126. Subject to the Law, the Directors may, with the authority of an Ordinary Resolution:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Shares held by them respectively, or

(ii) paying up in full unissued Shares or debentures of a nominal amount equal to that sum,

and allot the Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Shares,

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e) generally do all acts and things required to give effect to the resolution.

**SHARE PREMIUM ACCOUNT**

127. The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share .

128. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

**NOTICES**

129. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the

purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

130. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

131. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

132. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

133. Notice of every general meeting of the Company shall be given to:

(a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

**INDEMNITY**

134. Every Director (including for the purposes of this Article any alternate Director appointed pursuant to the provisions of these Articles), Secretary, assistant Secretary, or other officer for the time being and from time to time of the Company (but not including the Company's auditors) and the personal representatives of the same (each an "**Indemnified Person**") shall be indemnified and

secured harmless against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by such Indemnified Person, other than by reason of such Indemnified Person's own dishonesty, wilful default or fraud, in or about the conduct of the Company's business or affairs (including as a result of any mistake of judgment) or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by such Indemnified Person in defending (whether successfully or otherwise) any civil proceedings concerning the Company or its affairs in any court whether in the Cayman Islands or elsewhere.

135. No Indemnified Person shall be liable:

(a) for the acts, receipts, neglects, defaults or omissions of any other Director or officer or agent of the Company; or

(b) for any loss on account of defect of title to any property of the Company; or

(c) on account of the insufficiency of any security in or upon which any money of the Company shall be invested; or

(d) for any loss incurred through any bank, broker or other similar Person; or

(e) for any loss occasioned by any negligence, default, breach of duty, breach of trust, error of judgement or oversight on such Indemnified Person's part; or

(f) for any loss, damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers, authorities, or discretions of such Indemnified Person's office or in relation thereto;

unless the same shall happen through such Indemnified Person's own dishonesty, wilful default or fraud.

**NON-RECOGNITION OF TRUSTS**

136. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

**WINDING UP**

137. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

138. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such assets in

trustees upon such trusts for the benefit of the Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

## AMENDMENT OF ARTICLES OF ASSOCIATION

139. Subject to the Law and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

## CLOSING OF REGISTER OR FIXING RECORD DATE

140. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

141. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

142. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BY WAY OF CONTINUATION

143. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## DISCLOSURE

144. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial

authority, or to any stock exchange on which the Shares may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

**NAME, ADDRESS AND DESCRIPTION OF SUBSCRIBER**

Walkers Nominees Limited, 87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands

(Sgd) Virginia Czarnocki
Virginia Czarnocki
as Authorised Signatory for and on behalf of Walkers Nominees Limited

Dated: 13 December 2010

(Sgd) Carol MacDonald
Signature of Witness

Name: Carol MacDonald

Address 87 Mary Street, George Town, Grand Cayman KY1-9001, Cayman Islands

Occupation: Secretary

CERTIFIED TO BE A TRUE AND CORRECT COPY
SIG.
V. Daphene Whitelocke
Assistant Registrar
Date. 13th December, 2010

REGISTRAR OF COMPANIES
EXEMPTED
CAYMAN ISLANDS

# EXHIBIT 7

intertrust GROUP

Registration No.: **249232**
Date of Incorporation: **13 December 2010**
Client No.: **KY057017**

REGISTER OF MEMBERS
FOR:
**CLO HOLDCO, LTD.**

Share Class: **Ordinary**
Nominal Value: **USD 1.00**
Voting Rights: Yes
Conditional: No

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005<br>Cayman Islands | 13 Dec 2010 | Allotment | 1.00 | 13 Dec 2010 : Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 17 Dec 2010 : Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 17 Dec 2010 | | | | |
| | | | | | | Nil | Nil | 17 Dec 2010 |
| **Highland Capital Management Partners, Charitable Trust #2**<br>13455 Noel Road<br>Suite 800<br>Dallas TX 75240<br>USA | 17 Dec 2010 | Transfer | 1.00 | 17 Dec 2010 : Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 17 Dec 2010 | No Cert | | | |
| | | Transfer | (1.00) | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CHARITABLE DAF HOLDCO, LTD | | | | |

intertrust GROUP

Registration No.: **249232**
Date of Incorporation: **13 December 2010**
Client No.: **KY057017**

REGISTER OF MEMBERS
FOR:
**CLO HOLDCO, LTD.**

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| | | | | pursuant to Contribution and Tranfser Agreement dated 7 Nov 2011 | | | | |
| | | | | | | Nil | Nil | 7 Nov 2011 |
| **CHARITABLE DAF FUND, LP**<br>Intertrust Corporate Services (Cayman) Limited<br>One Nexus Way<br>Camana Bay<br>Grand Cayman KY1-9005<br>Cayman Islands | 7 Nov 2011 | Transfer | 1.00 | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from CHARITABLE DAF HOLDCO, LTD to CHARITABLE DAF FUND, LP pursuant to Contribution and Transfer Agreement dated 7 Nov 2011 | No Cert | | | |
| | | | | | | 100 | 1.00 | |
| **CHARITABLE DAF HOLDCO, LTD**<br>Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005<br>Cayman Islands | 7 Nov 2011 | Transfer | 1.00 | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CHARITABLE DAF HOLDCO, LTD pursuant to Contribution and Tranfser Agreement dated 7 Nov 2011 | No Cert | | | |
| | | Transfer | (1.00) | 7 Nov 2011 : Transfer of 1.0 Ordinary share(s) from CHARITABLE DAF HOLDCO, LTD to CHARITABLE DAF FUND, LP pursuant to Contribution and Transfer Agreement dated 7 Nov 2011 | | | | |
| | | | | | | Nil | Nil | 7 Nov 2011 |

intertrust
GROUP

Registration No.: **249232**
Date of Incorporation: **13 December 2010**
Client No.: **KY057017**

REGISTER OF MEMBERS
FOR:
**CLO HOLDCO, LTD.**

Notes:

| |
|---|
| |

# EXHIBIT 8

*WK-53083*

# *Certificate of Registration of Exempted Limited Partnership*

*I, **JOY A. RANKINE** Assistant Registrar of Exempted Limited Partnership in the Cayman Islands DO HEREBY CERTIFY, pursuant to the Exempted Limited Partnership Law, 1991 that all the requisitions of the said Law in respect of registration were complied with by*

**Charitable DAF Fund, LP**

*an Exempted Limited Partnership registered in the Cayman Islands on the 28th day of October Two Thousand Eleven*

*Given under my hand and Seal at George Town in the Island of Grand Cayman this 28th day of October Two Thousand Eleven*

REGISTRAR OF LIMITED PARTNERSHIPS EXEMPTED CAYMAN ISLANDS

**Assistant Registrar of Exempted Limited Partnership**
**Cayman Islands.**

# EXHIBIT 9

**DATED NOVEMBER 7, 2011**

# AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP

---

**WARNING**

**THE TAKING OR SENDING BY ANY PERSON OF AN ORIGINAL OF THIS DOCUMENT INTO THE CAYMAN ISLANDS MAY GIVE RISE TO THE IMPOSITION OF CAYMAN ISLANDS STAMP DUTY**

**TABLE OF CONTENTS**

| | | PAGE |
|---|---|---|
| ARTICLE I | GENERAL PROVISIONS; COMPENSATION AND EXPENSES | 2 |
| 1.1 | Continuation | 2 |
| 1.2 | Name | 2 |
| 1.3 | Purpose and Powers | 2 |
| 1.4 | Registered Office | 2 |
| 1.5 | Partners | 2 |
| 1.6 | Powers. | 2 |
| 1.7 | Term | 3 |
| 1.8 | Admission of New Partners | 3 |
| 1.9 | Taxable Year | 3 |
| 1.10 | Liability of Partners | 3 |
| 1.11 | Limitation on Assignability of Partners' Interests. | 3 |
| 1.12 | Definitions | 4 |
| 1.13 | Service Providers | 4 |
| 1.14 | Partnership Expenses | 4 |
| 1.15 | Withdrawal of Initial Limited Partner | 5 |
| ARTICLE II | POWERS | 5 |
| 2.1 | Partnership Powers | 5 |
| 2.2 | Rights, Powers, Limitations on Liability and Indemnification of General Partner. | 6 |
| ARTICLE III | CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES | 9 |
| 3.1 | Capital Contributions. | 9 |
| 3.2 | Capital Account; Allocation of Profits and Losses. | 9 |
| ARTICLE IV | LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWALS FROM CAPITAL ACCOUNT | 9 |
| 4.1 | Legal Interest | 9 |
| 4.2 | Distributions. | 10 |
| 4.3 | Withdrawal | 10 |
| ARTICLE V | DURATION OF PARTNERSHIP | 10 |
| 5.1 | Termination | 10 |
| 5.2 | Winding Up | 11 |
| ARTICLE VI | MISCELLANEOUS | 11 |
| 6.1 | Tax Matters Partner | 11 |
| 6.2 | Right to Hire | 11 |
| 6.3 | Applicable Law, etc | 12 |
| 6.4 | Power of Attorney | 12 |
| 6.5 | Tax Elections Under the Internal Revenue Code | 12 |
| 6.6 | Amendments to Partnership Agreement | 12 |

6.7 Investment Representation ....................13
6.8 Notices ....................13
6.9 General Partner Determinations ....................14
6.10 Dispute Resolution ....................14
6.11 Successors and Assigns ....................16
6.12 Severability ....................16
6.13 No Third Party Rights ....................16
6.14 No Right to Partition ....................16

# AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP

**THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT** (the "**Agreement**") is made on November 7, 2011

**BETWEEN**

(1) Charitable DAF GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as general partner (the "**General Partner**"); and

(2) Charitable DAF HoldCo, Ltd, a Cayman Islands exempted Company having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as limited partner (the "**Limited Partner**"); and

(3) Each individual, partnership, corporation, limited liability company, trust or other entity (each, a "**Person**") admitted as a limited partner or general partner (collectively, the "**Partners**") of the Partnership (as defined below) in accordance with this Agreement, including any Persons hereafter admitted as Partners in accordance with this Agreement and excluding any Persons who cease to be Partners in accordance with this Agreement; and

(4) Walkers Nominees Limited having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman, KY1-9005, Cayman Islands as the initial limited partner (the "**Initial Limited Partner**") solely for the purposes of withdrawing as such.

**WHEREAS**, Charitable DAF Fund, LP (the "**Partnership**") was formed and registered as an exempted limited partnership pursuant to and in accordance with the Exempted Limited Partnership Law (as amended) of the Cayman Islands (the "**Law**"), and since its formation has been governed by the Initial Limited Partnership Agreement of the Partnership, dated October 25, 2011 (the "**Initial Agreement**"); and

**WHEREAS**, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein; and

**WHEREAS**, the parties hereto wish to amend and restate the Initial Agreement in its entirety and enter into this Agreement.

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby adopt this Agreement to be their Limited Partnership Agreement, as follows:

**IT IS AGREED:**

**ARTICLE I**
**GENERAL PROVISIONS; COMPENSATION AND EXPENSES**

1.1 Continuation. The parties hereto continue the Partnership as an exempted limited partnership formed on October 25, 2011 pursuant to the Law.

1.2 Name. The business of the Partnership shall be carried on under the name of Charitable DAF Fund, LP.

1.3 Purpose and Powers. The purpose of the Partnership shall be to invest and trade, directly or indirectly, in securities of all types and other investment vehicles and instruments. At least initially, a majority of the Partnership's assets shall be invested in shares of CLO HoldCo, Ltd., a Cayman Islands exempted company ("**CLO HoldCo**"), but the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.

1.4 Registered Office. The registered office of the Partnership is c/o Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands.

1.5 Partners. The name and addresses of the Partners are as follows:

| **Name** | **Address** |
|---|---|
| Charitable DAF GP, LLC | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |
| Charitable DAF HoldCo Ltd<br>(Limited Partner) | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |

1.6 Powers.

(a) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and

obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.

(b) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

1.7 Term. The Partnership was established on October 25, 2011 and shall continue until terminated in accordance with this Agreement or any amendment or modification thereof.

1.8 Admission of New Partners. The General Partner may at any time admit one or more new Partners on such terms as it may determine in its sole discretion; provided that any such new Limited Partner shall have as its equity owners solely Indirect Charitable Owners.

1.9 Taxable Year. The Taxable Year of the Partnership shall be a calendar fiscal year, or such other fiscal year as the General Partner shall determine in their sole discretion from time to time.

1.10 Liability of Partners.

(a) The General Partner shall be liable for all of the debts, liabilities and obligations of the Partnership.

(b) Except to the extent otherwise required by law or this Agreement, a Limited Partner shall not be personally liable for any obligations of the Partnership to third parties nor for the return of any distributions from the Partnership to the Limited Partner. A Limited Partner may be liable for the tax audit and related expenses referred to in Section 6.1.

1.11 Limitation on Assignability of Partners' Interests.

(a) A Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner. Any attempted assignment or substitution not made in accordance with this section shall be void *ab initio*.

(b) The General Partner may not assign their interests in the Partnership to any entity that is not under common control with the General Partner without the consent of a majority-in-interest of the Limited Partners. Notwithstanding the foregoing, the General Partner may freely assign their economic interest in the Partnership in whole or in part.

1.12 Definitions. For the purpose of this Agreement, unless the context otherwise requires:

(a) General Partner. The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

(b) Indirect Charitable Owners. The term "**Indirect Charitable Owner**" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

(c) Limited Partner. The term "**Limited Partner**" shall refer to Charitable DAF HoldCo Ltd (and each person subsequently admitted as a limited partner by the General Partner pursuant to the terms of this Agreement).

(d) Partner. The term "**Partner**" shall refer to the General Partner or the Limited Partner.

1.13 Service Providers. The General Partner may engage one or more Persons to act, or remove any one or more Persons from so acting, as service providers to the Company (including, without limitation, as manager, administrator, custodian, registrar and transfer agent, investment manager, investment adviser, sponsor and/or prime broker, auditors and legal counsel to the Partnership) in its sole discretion; provided, that any compensation paid to any such service provider that is affiliated with the General Partner shall be in an amount customary for services of a similar nature.

1.14 Partnership Expenses. The Partnership will bear its own operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees (if any), taxes, research costs, legal and accounting expenses and other operating expenses. In addition, the Partnership will bear its pro rata share of CLO HoldCo's operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees, taxes, research costs, legal and accounting expenses and other operating expenses. The Partnership will also bear (or reimburse the General Partner for) its organizational fees and expenses. To the extent the Partnership shares trading expenses with other accounts that may be managed by the General Partner or any affiliates, it will bear a proportionate share of the associated costs. In no event shall the General Partner receive any compensation from the Partnership.

1.15 Withdrawal of Initial Limited Partner. The Initial Limited Partner hereby withdraws as a limited partner immediately following the admission of the Limited Partners and thereafter shall have no further rights, liabilities or obligations under or in respect of this Agreement in its capacity as Initial Limited Partner.

## ARTICLE II
## POWERS

2.1 Partnership Powers. The Partnership shall have the following powers:

(a) To purchase, sell, invest and trade, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, syndicated debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; statutory claims; royalty claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (all such items being called herein a "**Financial Instruments**"), and to sell Financial Instruments short and cover such sales;

(b) To possess, transfer, mortgage, pledge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Financial Interests held or owned by the Partnership with the ultimate objective of the preservation, protection, improvement and enhancement in value thereof and to hold such Financial Interests in the name of the Partnership, in the name of any securities broker or firm, in the name of any nominee of such firm, or in the name of any other nominee or any other street name, or any combination thereof;

(c) To lend, either with or without security, any Financial Instruments, funds or other properties of the Partnership, including by entering into reverse repurchase agreements, and, from time to time, undertake leverage on behalf of the Partnership;

(d) To borrow or raise moneys and, from time to time, without limit as to amount, to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any of the foregoing instruments and of the interest thereon by mortgage upon or pledge, conveyance or assignment in trust of the whole or any part of the property of the Partnership, whether at the time owned or thereafter acquired, and to sell, pledge or otherwise dispose of such bonds or other obligations of the Partnership for its purposes;

(e) To have and maintain one or more offices within or without the Cayman Islands and in connection therewith to rent or acquire office space, engage personnel and do such other acts and things as may be necessary or advisable in connection with the maintenance of such office or offices;

(f) To open, maintain and close bank accounts and brokerage accounts, including the power to draw checks or other orders for the payment of monies; and

(g) To enter into, make and perform all contracts, agreements and other undertakings as may be necessary or advisable or incidental to the carrying out of the foregoing objects and purposes.

2.2 Rights, Powers, Limitations on Liability and Indemnification of General Partner.

(a) Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the General Partner, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including members of any committee and parties acting as agents for the execution of transactions) (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be subject to the provisions of this Section.

(b) To the fullest extent permitted by law, no Covered Person shall be liable to the Partnership or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the

business of the Partnership, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Partnership, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Partnership whom such Covered Person believes is authorized to make such suggestions on behalf of the Partnership, (iii) any act or omission by the Partnership, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Partnership selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c) Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Partnership or in furtherance of the business of the Partnership in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d) To the fullest extent permitted by law, the Partnership shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Partnership, any investment made under or in connection with this Agreement, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Partnership, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or gross negligence.

(e) Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

(f) The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may

otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

(g) The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h) **Notwithstanding anything in this Agreement to the contrary, the aggregate maximum amount that a Covered Person may be liable to the Partnership and/or any of the Partners pursuant to this Agreement shall, to the extent not prohibited by law, never exceed the amount of management and incentive fees received by such Covered Person from the Partnership under this Agreement prior to the date that the acts or omissions giving rise to a claim for indemnification or liability shall have occurred. In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits. No Covered Person shall incur any liability for interest on any monies at any time received by such Covered Person or any investment loss or other charge resulting therefrom with respect to amounts invested hereunder.**

(i) **WAIVER OF CONSUMER RIGHTS: The Partnership and each of the Limited Partners waive all of their respective rights, if any, under the Deceptive Trade Practices-Consumer Protection Act, Section 17.41 et seq., Texas Business & Commerce Code ("DTPA"), a law that gives consumers special rights and protections. After consultation with an attorney of Partnership's own selection, Partnership voluntarily consents to this waiver. This waiver includes any right to recover attorneys' fees under the DTPA. Further, Partnership waives all of its rights to any and all protections afforded by any other state or federal Consumer Protection Acts, including the recovery of attorneys' fees.**

(j) No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Covered Person, the Partnership (and not the applicable Covered Person) shall be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence or reckless or intentional misconduct of any Covered Person. Given the volume of transactions executed on behalf of the Partnership, Limited Partners acknowledge that trading errors (and similar errors) will occur and that the Partnership shall be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Covered Person.

(k) This Section 2.2 shall survive a Limited Partner's withdrawal as a limited partner of the Partnership and any termination of this Agreement.

## ARTICLE III
## CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES

3.1 Capital Contributions.

(a) Each Partner has made the capital contributions to the Partnership in the amount set forth in the records of the Partnership. The Limited Partner has contributed to the Partnership all of the outstanding equity interests of CLO HoldCo.

3.2 Capital Account; Allocation of Profits and Losses.

(a) There shall be established for each Partner on the books of the Partnership as of the first day of the fiscal period during which such Partner was admitted to the Partnership a capital account for such Partner in an amount equal to his capital contribution to the Partnership.

(b) Since the General Partner's capital account and contributions shall be the minimum required by Law, all income, deductions, gains, losses and credits of the Partnership shall be allocated shall be for the benefit of the Limited Partner, except as may otherwise be required by law. In the event any valuation of assets is necessary or appropriate, the General Partner shall determine such value in any reasonable manner determined by the General Partner in its sole discretion consistent with relevant accounting principles and applicable law.

(c) For purposes of determining the share of any items allocated to any period during the relevant Taxable Year of the Partnership, such shares shall be determined by the General Partner using any method permitted by the Code and the regulations thereunder. All allocations to be made by the General Partner may be overridden if necessary to comply with the Code, the regulations thereunder or other applicable law.

(d) To the extent that the Partnership pays withholding taxes as to a Partner, such amounts shall be charged to the applicable Partner's capital account; provided, however, that any such amounts may be treated as an advance to the Partner with interest to be charged to that Partner's capital account at a rate determined by the General Partner.

(e) Each Partner agrees not to treat, on any tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with treatment of such item by the Partnership.

## ARTICLE IV
## LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWALS FROM CAPITAL ACCOUNT

4.1 Legal Interest. Each Partner shall have and own during any Taxable Year an undivided interest in the Partnership equal to his opening capital account for such period.

4.2 Distributions.

(a) Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses. In determining the amount of cash or securities available for distribution, the General Partner may retain reasonable reserves in such amounts as it determines may be necessary to cover expenses, contingencies and losses. Notwithstanding the foregoing, distributions made in connection with a sale of all or substantially all of the Partnership's assets or a liquidation of the Partnership shall be made in accordance with the capital account balances of the Partners within the time period set forth in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(3).

(b) The General Partner may withhold and pay over to the U.S. Internal Revenue Service (or any other relevant taxing authority) such amounts as the Partnership is required to withhold or pay over, pursuant to the Code or any other applicable law, on account of a Partner's distributive share of the Partnership's items of gross income, income or gain.

For purposes of this Agreement, any taxes so withheld or paid over by the Partnership with respect to a Partner's distributive share of the Partnership's gross income, income or gain shall be deemed to be a distribution or payment to such Partner, reducing the amount otherwise distributable to such Partner pursuant to this Agreement and reducing the capital account of such Partner. If the amount of such taxes is greater than any such distributable amounts, then such Partner and any successor to such Partner's interest shall pay the amount of such excess to the Partnership, as a contribution to the capital of the Partnership.

4.3 Withdrawal. Without the consent of the General Partner, no Partner may withdraw as a Partner or make withdrawals from such Partner's capital account. In the event the General Partner permits any such withdrawal, the withdrawal shall be on such terms and conditions as the General Partner shall determine in its sole discretion. The General Partner may terminate all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall be directly or indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code.

## ARTICLE V
## DURATION OF PARTNERSHIP

5.1 Termination. The Partnership shall be required to be wound up and dissolved upon:

(a) the service of a notice by the General Partner on the other Partners requiring that the Partnership be wound up and dissolved; or

(b) the withdrawal by or resignation of the General Partner as general partner of the Partnership; or

(c) the withdrawal of all Limited Partners.

Upon the occurrence of any such event, the Partnership's affairs shall be wound up by the General Partner or such other Person as the General Partner shall appoint.

5.2 Winding Up. Upon the Partnership being required to be wound up and dissolved, the General Partner shall proceed with the liquidation and distribution of the assets of the Partnership, and upon completion of the winding up of the Partnership, shall have the authority to and shall execute and file a dissolution notice and such other documents required to effect the dissolution and termination of the Partnership in accordance with the Law. Before the distribution of all the assets of the Partnership, the business of the Partnership and the affairs of the Partners, as such, shall continue to be governed by this Agreement. The winding up of the Partnership and payment of creditors shall be effected in accordance with the Law.

## ARTICLE VI
## MISCELLANEOUS

6.1 Tax Matters Partner. The General Partner shall at all times constitute, and have full powers and responsibilities, as the Tax Matters Partner of the Partnership. In the event the Partnership shall be the subject of an income tax audit by any Federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and his decision shall be final and binding upon, the Partnership and each Partner thereof, and the Tax Matters Partner shall be indemnified and held harmless by the Partnership and each Partner for any action so taken by him in good faith. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership to the extent of available Partnership funds, and any excess shall be paid by the Partners individually in proportion to their percentage interests in the Partnership.

6.2 Right to Hire.

(a) Nothing herein shall preclude the General Partner from engaging on behalf of the Partnership the services of any person or firm, whether or not affiliated with the General Partner, including the General Partner, to render for compensation such services to the Partnership as may be necessary to implement the business purposes of the Partnership.

(b) Each of the Partners consents that the General Partner, the Investment Manager or any Limited Partner or any affiliate (as defined in the Securities Act of 1933, as amended, and the regulations thereunder) of any of them, including without limitation the investment manager of the CLO HoldCo, may engage in or possess an interest in directly or indirectly, any other present or future business venture of any nature or description for his own account, independently or with others,

including but not limited to, any aspect of the securities business or any other business engaged in by the Partnership, and may become the general partner in other partnerships; and neither the Partnership nor any Partner shall have any rights in or to such independent venture or the income or profits derived therefrom.

(c) The General Partner, the Investment Manager and any affiliate or employee of such General Partner or Investment Manager, may hereafter render investment advisory services to other investors with respect to, and/or may own, purchase or sell, securities or other interests in property the same as or similar to those which the General Partner may purchase, hold or sell on behalf of the Partnership.

6.3 Applicable Law, etc. This Limited Partnership Agreement: (i) shall be binding on the executors, administrators, estates, heirs and legal successors of the Partners; (ii) shall be governed by, and construed in accordance with, the laws of the Cayman Islands; and (iii) may be executed in more than one counterpart with the same effect as if the parties executing the several counterparts had all executed one counterpart as of the day and year first above written; provided, however, that in the aggregate, they shall have been signed by all of the Partners. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural as the identity of the person may require. The term "gross negligence" and its cognates shall be interpreted in accordance with the laws of the State of Delaware.

6.4 Power of Attorney. Each of the undersigned does hereby constitute and appoint the General Partner, with full power of substitution, his true and lawful representative and attorney in-fact, in his name, place and stead to make, execute, sign and file this Agreement and any amendment to this Agreement authorized by the terms of this Agreement, and all such other instruments, documents and certificates (and any amendments thereto) which may from time to time be required by the laws of the Cayman Islands, the United States of America, or any state in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid and subsisting existence of the Partnership and to take any further action that the General Partner considers advisable in its sole discretion in connection with the exercise of its authority pursuant to this Agreement. This power of attorney is intended to secure an interest in property and, in addition, the obligations of each relevant Limited Partner under this Agreement and shall be irrevocable.

6.5 Tax Elections Under the Internal Revenue Code. The General Partner shall have the authority to make all tax elections and determinations on behalf of the Partnership under the Internal Revenue Code, the regulations promulgated thereunder or other applicable law to effect any elections, determinations or capital allocations.

6.6 Amendments to Partnership Agreement. The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the consent of the General Partner together with the consent of a majority in interest of the Limited Partners, insofar as is consistent with the laws governing this Agreement. Notwithstanding the foregoing, the General Partner shall have the right to effect

amendments to this Agreement without the consent of any Limited Partner, including without limitation, to reflect: a change in the location of the Partnership's principal place of business; a change in the registered office or registered agent; a change in the name of the Partnership; admission of Partners in accordance with this Agreement; a change that is necessary to qualify the Partnership as a limited partnership under the laws of any state or that is necessary or advisable in the opinion of the Tax Matters Partner to ensure that the Partnership will not be treated as an association taxable as a corporation for Federal income tax purposes; a change of the provisions relating to the management fee or other compensation to the Investment Manager or the General Partner so that such provisions conform to any applicable requirements of the U.S. Securities and Exchange Commission and other regulatory authorities; a change (i) that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state agency or contained in any Federal or state statute, compliance with any of which the General Partner deems to be in the best interests of the Partnership and the Limited Partners, (ii) that is required or contemplated by this Agreement, or (iii) that is necessary or desirable to implement new regulations published by the Internal Revenue Service with respect to partnership allocations of income, gain, loss, deduction and credit; a change to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provision with respect to the matters or questions arising under this Agreement which will not be inconsistent with the provisions hereof; or a change that does not adversely affect the Limited Partners in any material respect; *provided, that* in no event shall the General Partner effect any amendment to this Agreement that has the effect of giving the General Partner any economic benefits in the assets of the Partnership; *provided further, that* the General Partner shall give notice to the Limited Partners of any such amendment.

6.7 Investment Representation. Each Partner hereby acknowledges and represents that it acquired its interest in the Partnership for investment purposes only and not with a view to its resale or distribution.

6.8 Notices. All notices, requests or approvals that any party hereto is required or desires to give to any Partner or to the Partnership shall be in writing signed by or on behalf of the party giving the same and delivered personally or sent overnight express mail by a reputable private carrier or by prepaid registered or certified mail, return receipt requested, addressed (i) to the Limited Partner at the addresses set forth beneath his signature to this Agreement; (ii) to the Partnership at the principal place of business of the Partnership with a copy of each such notice sent simultaneously to the General Partner and the Investment Manager at Nextbank Tower, 13455 Noel Road, 8th Floor, Dallas, Texas 75240; or (iii) to the respective party at such other address or addresses as the party may specify from time to time in a writing given to the Partnership in the manner provided in this Section 6.8 of ARTICLE VI. Notice shall be deemed to have been duly given and received (i) on the date of delivery, if personally delivered, (ii) on the next business day subsequent to sending by overnight express mail as aforesaid, or (iii) on the third day subsequent to mailing if mailed as aforesaid; provided that any withdrawal notices shall not be deemed to have been given until actually received by the Partnership.

6.9 General Partner Determinations. Any determinations or calculations made by the General Partner shall, if made in good faith and in the absence of manifest error, be binding upon the Partnership and its Limited Partners.

6.10 Dispute Resolution. The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with the Agreement or otherwise involving the Partnership, its Partners and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation.

(1) Any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

(2) The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(3) The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

(4) Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

(b) Arbitration. If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**"). In the event of a conflict, the provisions of this document will control.

(1) The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the

Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however*, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a state arbitration act preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(2) The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(3) The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive.

(4) No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The

total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(5) All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(6) The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

6.11 Successors and Assigns. Subject to the limitations set forth in Section 1.11, this Agreement shall inure to the benefit of and be binding upon the parties and to their respective heirs, executors, administrators, successors and permitted assigns. For the avoidance of doubt, any Limited Partner who becomes a former Limited Partner shall remain bound to all terms and conditions of this Agreement.

6.12 Severability. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of the Agreement.

6.13 No Third Party Rights. Except for rights expressly granted hereunder to the Covered Persons, this Agreement is intended solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto.

6.14 No Right to Partition. Each of the Partners, on behalf of themselves and their shareholders, partners, principals, members, successors and assigns, if any and as permitted hereunder, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held.

**SIGNATURE PAGE FOR AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP**

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: ______________________
James D. Dondero
Managing Member

Witnessed By: ______________________

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:

By: ______________________
Name: Grant Scott
Title: Director

Witnessed By: ______________________

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:

By: ______________________
Name:
Title:

Witnessed by: ______________________

**SIGNATURE PAGE FOR AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP**

**IN WITNESS WHEREOF,** the undersigned have executed this Amended and Restated Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: ______________________________
James D. Dondero
Managing Member

Witnessed By: ____________________

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:

By: ______________________________
Name: Grant Scott
Title: Director

Witnessed By: Candi L. Riggs

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:

By: ______________________________
Name: ROD PALMER
Title:

Witnessed by: Gráinne Ó Gay

# EXHIBIT 10

intertrust GROUP

Registration No.: **53083**
Date of Incorporation: **28 October 2011**
Client No.: **KY059900**

REGISTER OF MEMBERS
FOR:
**CHARITABLE DAF FUND, LP**

Share Class: **General Partner**
Nominal Value: **USD 0.00**
Voting Rights: Yes
Conditional: NO

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **CHARITABLE DAF GP, LLC** The Corporation Trust Company Corporation Trust Center 1209 Orange St New Castle 19801 Wilmington DE USA | 25 Oct 2011 | New Partner | 1.00 | 25 Oct 2011 : Initial Exempted Limited Partnership Agreement dated 25 Oct 2011 | No Cert | | | |
| | | | | | | Nil | 1.00 | |

Notes:

| |
|---|
| |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

PATRICK_000016

HCMLPHMIT00003641

# EXHIBIT 11

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)

WALKERS

190 Elgin Avenue, George Town
Grand Cayman KY1-9001, Cayman Islands
T +1 345 949 0100 F +1 345 949 7886 www.walkersglobal.com

REF: SSJ/VT/H0851-120776

GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

**THE COMPANIES LAW (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**OF**

# CHARITABLE DAF HOLDCO, LTD

**(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)**

1. The name of the company is Charitable DAF HoldCo, Ltd (the "**Company**").

2. The registered office of the Company will be situated at the offices of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**").

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



GENERAL REGISTRY CAYMAN ISLANDS

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

TABLE OF CONTENTS

| CLAUSE | PAGE |
| --- | --- |
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 4 |
| SHARES | 4 |
| MANAGEMENT SHARES | 5 |
| PARTICIPATING SHARES | 6 |
| MODIFICATION OF RIGHTS | 6 |
| CERTIFICATES | 7 |
| FRACTIONAL SHARES | 7 |
| TRANSFER OF SHARES | 7 |
| TRANSMISSION OF SHARES | 7 |
| ALTERATION OF SHARE CAPITAL | 8 |
| REDEMPTION, PURCHASE AND SURRENDER OF SHARES | 8 |
| TREASURY SHARES | 9 |
| GENERAL MEETINGS | 9 |
| NOTICE OF GENERAL MEETINGS | 10 |
| PROCEEDINGS AT GENERAL MEETINGS | 10 |
| VOTES OF SHAREHOLDERS | 11 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 12 |
| DIRECTORS | 12 |
| ALTERNATE DIRECTOR | 13 |
| POWERS AND DUTIES OF DIRECTORS | 13 |
| BORROWING POWERS OF DIRECTORS | 15 |

GENERAL REGISTRY CAYMAN ISLANDS
Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST