**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P.

§
§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§
vs. §

3:26-CV-02496-D

**Highland Capital Management, L.P., et al**-Appellee

§
§

**[4689] Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026**

**APPELLANT RECORD**

**VOLUME 17**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02496-D<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4698] on July 24, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689] now files this *Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the Court's June 15, 2026 Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate?

2. Did the Bankruptcy Court err in finding Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate ("Dugaboy's Motion") [Docket No. 4684] was "without merit?"

3. Did the Bankruptcy Court err in denying Dugaboy's Motion without a full record, including that Dugaboy was not allowed to file a reply brief and was not granted a hearing?

4. Did the Bankruptcy Court err in denying Dugaboy the opportunity to file a reply brief to Highland's Opposition to Dugaboy's Motion, including that Dugaboy indicated a date certain for filing a reply?

5. Did the Bankruptcy Court err in finding Dugaboy's Motion was "without merit" without granting a hearing?

6. Did the Bankruptcy Court err by summarily denying Dugaboy's Motion without explaining its reasoning for the denial?

7. Did the Bankruptcy Court err in failing to consider Dugaboy's Notice of Intervening Event?

8. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(2) when it determined that it had not manifestly erred in deciding the evidence of Mark Patrick's misconduct contained in the Cayman Islands proceeding was not "newly discovered" even though that information was not contained in James Dondero's affidavit executed April 16, 2025?

9. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant

to Rule 60(b)(2) when it determined it had not manifestly erred in deciding the Dondero Affidavit indicated information gained in the Cayman Islands proceedings was not "newly discovered" despite the fact the Affidavit lacked any evidence of the restructuring discovered in the Cayman Islands proceedings?

10. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding on the grounds that Rule 60(b)(3) purportedly requires fraud or misconduct to have occurred in the judicial proceeding itself?

11. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding that Highland did not provide misleading or incomplete answers during the discovery of Mark Patrick's misconduct and resulting lack of authority to negotiate the Rule 9019 settlement agreement from Dugaboy leading to the Rule 9019 Order?

12. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding that Dugaboy had not presented a basis for relief under Rule 60(b)(6) that was separate from the grounds presented for Rule 60(b)(2) and Rule 60(b)(3)?

13. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding on the grounds that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain?

14. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of the Bankruptcy Court's special responsibility to monitor arrangements and settlements made between Highland's appointed managers and third parties?

15. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of its manifest error in failing to consider the Bankruptcy Court's role as a court of equity and responsibility to prevent misconduct before it, such as Mark Patrick's use of stolen assets in the 9019 Settlement?

16. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

Vol. 1 000001 – 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4698] filed by Appellant;

000010 2. The Bankruptcy Court's July 10, 2026 *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000012 4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 2 000648 thru Vol. 3 | 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| Vol. 4 001843 | 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 4 001845 thru vol 6 | 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol 7 003634 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003647 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003650 + 003651 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003652 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003663 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003667 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003670 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 7<br>003709 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004733 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol. 8<br>004790 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol 9<br>005207 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005209 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005217 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol 9 | | | Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 005222 | 04/07/2026 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 005225 | 04/07/2026 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 005227 | 04/10/2026 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 005229 | 04/16/2026 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 005233 | 04/17/2026 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| vol 9 | | Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| 04/17/2026 005330 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| vol 10 04/21/2026 005590 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/22/2026 005594 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/22/2026 005615 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 04/22/2026 005682 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol 10 | | Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| 04/22/2026 005692 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 04/24/2026 005705 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 04/24/2026 005726 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 04/25/2026 005727 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/27/2026 005729 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 04/28/2026 005737 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11<br>005746 | 04/28/2026 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 005755 | 04/28/2026 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005761 | 04/28/2026 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005767 | 04/29/2026 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held*)Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 005776 | 04/29/2026 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 005783 | 04/29/2026 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| Vol. 10 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| 005785 | 04/29/2026 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005787 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005794 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005796 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005798 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005801 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005884 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005902 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005905 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005907 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund |

vol. 11

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 05/06/2026 005913 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/06/2026 005920 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/06/2026 005927 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 05/07/2026 005929 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/08/2026 005936 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 05/08/2026 005939 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 05/08/2026 005942 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 05/08/2026 005945 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| vol. 12 05/08/2026 006100 Thru Vol 21 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and* |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | *Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| 10). 22 008156 | 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 008172 | 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 008188 | 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| VOL 22 0008256 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 0008293 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 0008429 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 0008465 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| VOL. 23 0008472 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| VOL. 24 0008916 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| Vol 25 009554 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| Vol. 26 009868 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| Vol. 27 010229 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| Vol. 28 010538 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 28 | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| 05/11/2026<br>010664 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29<br>05/11/2026<br>010736 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol 30<br>05/11/2026<br>011150 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol 31<br>05/11/2026<br>011734 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol 32<br>05/11/2026<br>013203<br>Thru Vol 33 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34<br>05/11/2026<br>014888 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol 35 05/11/2026<br>015349 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 05/11/2026<br>015505 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 05/12/2026<br>015506 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 05/12/2026<br>015538 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 05/12/2026<br>015565 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 05/15/2026<br>015566 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36 05/18/2026<br>015569 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol 37 015996 05/18/2026 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 016008 05/19/2026 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 016079 05/20/2026 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 016082 – 016084 05/20/2026 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 016085 05/21/2026 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 016134 05/21/2026 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 37 | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| 016135 05/23/2026 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 016233 05/28/2026 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 016490 06/15/2026 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s)4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 016504 06/15/2026 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| Vol. 39 016505 06/29/2026 | 4684 | (162 pgs; 2 docs) Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Appendix) (Edney, Michael) |
| 016667 06/29/2026 | 4685 | (7 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s)4679 Order on motion to reconsider). Appellant Designation due by 07/13/2026. (Attachments: # 1 Exhibit)(Edney, Michael) |
| 016674 07/06/2026 | 4687 | (32 pgs; 2 docs) Response opposed to (related document(s): 4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 016706 07/09/2026 | 4688 | (23 pgs; 2 docs) Notice of Intent to Reply and Request for Hearing on Its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 39 | | (Attachments: # 1 Appendix)). (Attachments: # 1 Attachment A) (Edney, Michael) |
| 07/10/2026<br>016729 | 4689 | (2 pgs) Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026. (Okafor, M.) Modified text on 7/10/2026 (mdo). |
| 07/13/2026<br>016731 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |
| 07/24/2026<br>016733 | 4698 | (9 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)(Edney, Michael) |
| 07/28/2026<br>016742 | 4704 | (5 pgs) DISTRICT COURT Notice of docketing notice of appeal. Civil Action Number: 3:26-cv-02496-E. (RE: related document(s)4698 Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court;

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J"); and

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No.

4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: August 7, 2026

Respectfully submitted,

/s/ *Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

HUNTON& WILLIAMS

HUNTON & WILLIAMS LLP
FOUNTAIN PLACE
1445 ROSS AVENUE
SUITE 3700
DALLAS, TEXAS 75202-2799

TEL 214 • 979 • 3000
FAX 214 • 880 • 0011

ANDREW W. LAWRENCE
DIRECT DIAL: 214 • 979 • 3052
EMAIL: alawrence@hunton.com

FILE NO: 78673.000002

November 9, 2011

Deborah L. Wilkerson
General Counsel
Greater Kansas City Community Foundation
9001 W. 110th Street, Suite 220
Overland Park, KS 66210

***Via E-Mail***

Re: Highland Capital Management Partners Charitable Trust #2

Dear Debbie:

In accordance with your request during our telephone conversation last week, the paragraphs below describe briefly the proposed distribution of assets from Highland Capital Management Partners Charitable Trust #2 (the "Trust") to a to-be-formed supporting organization (i.e., Highland Kansas City Foundation, Inc.) with respect to which the Greater Kansas City Community Foundation ("GKCCF") is the supported organization.

1. The Trust. As you know, James Dondero, as the Settlor, and Grant Scott, as the Trustee, established the Trust by a trust agreement dated December 1, 2006 (the "Trust Agreement"). Under the terms of the Trust Agreement, Mr. Dondero, as Settlor, is entitled to name remainder beneficiaries and substitute new remainder beneficiaries from time to time until the remainder interest is ultimately distributed.

2. Assets of the Trust/Cayman Islands Company. The remainder interest will be comprised solely of one hundred percent (100%) of the non-voting shares (the "Shares") of Charitable DAF HoldCo, Ltd., a Cayman Islands corporation ("HoldCo"). Highland Kansas City Foundation, Inc. will receive one-third (1/3) of the Shares. HoldCo will own one hundred percent (100%) of the limited partner interests in Charitable DAF Fund, LP, a Cayman Island limited partnership, which, in turn, will own one hundred percent (100%) of the shares of CLO Holdco, Ltd., a Cayman Islands exempted company, which, in turn, owns minority equity interests in Cayman Islands investment companies that own portfolios of debt instruments issued by various public companies.

HUNTON & WILLIAMS

November 9, 2011
Page 2

3. The Supporting Organizations. Mr. Dondero intends to name as the remainder beneficiaries of the Trust three supporting organizations (each an "SO", collectively, the "SOs"), each of which will support one of three separate community foundations. Each SO will receive an equal number of HoldCo Shares. Highland Capital Management, L.P. currently receives management fees from the companies that own the corporate debt portfolios and will continue to receive those fees under existing agreements with those companies after the Holdco Shares are transferred to the SOs.

4. Use of Multiple Supporting Organizations. Rather than the remainder interest being distributed in its entirety to just one or two SOs, the remainder interest is being distributed in equal shares to the three SOs out of an abundance of caution in light of the excess benefit transaction rules under Section 4958(c)(3) of the Code, such that no SO will own more than fifty percent (50%) of the stock of HoldCo.

Please let me know if you have additional questions regarding this matter.

Very truly yours,

Andrew W. Lawrence

AWL/bt

cc: Alexander G. McGeoch, Esq.
Douglas M. Mancino, Esq.

# EXHIBIT 27

**CHARITABLE DAF HOLDCO, LTD**

**(the "Company")**

**SHARE TRANSFER FORM**

**Dated 29 March 2021**

I, **Grant James Scott** (the "**Transferor**"), for good and valuable consideration received by me from **Mark E. Patrick** (the "**Transferee**"), do hereby:

1. transfer to the Transferee 100 Management Shares (the "**Shares**") for the par value of $0.01 each standing in my name in the register of members of the Company to hold unto the Transferee, his executors, administrators and assigns, subject to the several conditions on which I held the same at the time of execution of this Share Transfer Form; and

2. consent that my name remains on the register of the Company until such time as the Company enters the Transferee's name in the register of the Company.

**SIGNED** by **TRANSFEROR**: )
)
Name: Grant J. Scott

And the Transferee does hereby agree to take the Shares subject to the same conditions.

**SIGNED** by **TRANSFEREE**: )
)
Name: Mark E. Patrick



078673.0000002 EMF_US 84436263v1

PATRICK_000005

007159
HCMLPHMIT00003749

# EXHIBIT 28

**CHARITABLE DAF HOLDCO, LTD**
**(THE "COMPANY")**

---

**WRITTEN RESOLUTIONS OF THE SOLE DIRECTOR**
**OF THE COMPANY DATED** March 25 **2021**

---

**1. SHARE TRANSFER**

1.1 **IT IS NOTED** that the Director has received a duly executed share transfer form relating to the transfer by Grant James Scott of 100 Management Shares to Mark E. Patrick

1.2 **IT IS RESOLVED** that:

(a) the following share transfer (the "**Transfer**") be and is hereby ratified, confirmed and approved:

| TRANSFEROR | TRANSFEREE | NO OF SHARES | DATE OF TRANSFER |
|---|---|---|---|
| Grant James Scott | Mark E. Patrick | 100 Management Shares | 24 March 2021 |

(b) the Company's registered office provider be instructed to update the Register of Members of the Company to reflect the Transfer.

**2. GENERAL AUTHORISATION**

2.1 **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, the Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as the Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

**3. RATIFICATION OF PRIOR ACTIONS**

3.1 **IT IS RESOLVED** that any and all actions of the Company, or of the Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, the Director prior to such action being taken.

These written resolutions are signed by the sole Director of the Company.

Mark Patrick

**Mark E. Patrick**

# EXHIBIT 29

CLO HOLDCO, LTD.
(THE "COMPANY")

---

**WRITTEN SHAREHOLDER RESOLUTIONS OF THE SOLE SHAREHOLDER OF THE COMPANY MADE ON April 2 2021**

---

The undersigned, being the sole holder of Shares of the Company having the right to receive notice of, attend and vote at general meetings hereby resolves the following shareholder resolutions.

**1. REMOVAL OF DIRECTOR AND APPOINTMENT OF NEW DIRECTOR**

1.1 **IT IS RESOLVED** by ordinary resolutions that:

(a) Grant James Scott be and is hereby removed as a Director of the Company with effect from the date of these resolutions,

(b) Mark E. Patrick be and is hereby appointed as a Director of the Company with effect from the date of these resolutions until such time as such Director resigns or is removed or otherwise disqualified in accordance with the Articles of Association of the Company;

(c) the Register of Directors of the Company be amended to note the removal of the Director and the appointment of the new Director, all as set out in these resolutions; and

(d) the Company's registered office be and is hereby instructed to notify the Registrar of Companies in the Cayman Islands of the removal of Mark E. Patrick as a Director of the Company and the appointment of Grant James Scott as a Director of the Company.

BY [signature]
Mark E. Patrick for and on behalf of

Charitable DAF GP, LLC, the general partner of Charitable DAF Fund, L.P.

# EXHIBIT 30

**THE COMPANIES LISTED IN THE ATTACHED SCHEDULE**
**(EACH A "COMPANY" AND TOGETHER THE "COMPANIES")**

---

**WRITTEN RESOLUTIONS OF THE SOLE DIRECTOR**
**OF EACH COMPANY DATED** April 22, **2021**

---

**1. APPOINTMENT OF DIRECTOR**

1.1 **IT IS NOTED** that the Directors wish to appoint Paul Murphy as a Director of each Company with effect from the date of these resolutions and that such proposed Director has indicated a willingness to hold such office and has executed a letter of consent and/or a services agreement in relation thereto (such appointment, the "**Director's Appointment**").

1.2 **IT IS RESOLVED** that:

(a) the Director's Appointment be and is hereby approved with effect from the date of these resolutions until such time as the Director resigns or is removed from office in accordance with the Articles of Association of each Company; and

(b) the registered office service provider be and is hereby instructed to update the Register of Directors of each Company and to make the necessary filings with the Registrar of Companies to reflect the Director's Appointment.

**2. GENERAL AUTHORISATION**

2.1 **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, the Director or any officer or (if applicable) any attorney or duly authorised signatory of each Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of each Company, to do such further acts and things as the Director or any officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of each Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

**3. RATIFICATION OF PRIOR ACTIONS**

3.1 **IT IS RESOLVED** that any and all actions of each Company, or of the Director or any officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, the Director prior to such action being taken.

[*Remainder of page left blank intentionally*]

These written resolutions are signed by the sole Director of the Company.

**Mark E. Patrick**

**Schedule**
**(*List of Companies*)**

**Charitable DAF HoldCo, Ltd.**

**CLO HoldCo, Ltd.**

**Liberty CLO Holdco, Ltd.**

**Liberty Sub, Ltd.**

**HCT Holdco 2, Ltd.**

**MGM Studios Holdco, Ltd.**

# EXHIBIT 31

# Charitable Giving Overview

GRANT SUMMARY : 2012-2020

The following provides an overview of philanthropic activities across the group of charitable entities that operate as supporting organizations to community foundation: the Highland Dallas Foundation, Inc., the Highland Santa Barbara Foundation, Inc., and the Highland Kansas City Foundation, Inc. (together the "Supporting Organizations" or "we").

Each of the entities within the Supporting Organizations has its own independent board, which provides oversight for the organization's grantmaking activity.

Data represents activity between January 1, 2012, and December 31, 2020 unless otherwise noted.

# Highlights

| | |
|---|---|
| $42M+ | Since 2012, the Supporting Organizations have committed over $42 million to nonprofit organizations operating across a range of issue areas. |
| $32M+ | We have funded over $32 million of our total commitments; remaining commitments are comprised of future scheduled installments of multiyear grants. |
| $3.7M | Average annual grant payments total $3.7 million. |
| 275+ | The Supporting Organizations have made donations to more than 275 individual organizations. |
| 2029 | Through our multiyear grants we have over $10 million in funds committed through 2029. |

GRANTS OVERVIEW

# Total committed: $42.7 million[1]

The Supporting Organizations have committed **$42,688,403** in grants to nonprofits across a range of issue areas, with a focus on:

- civic and cultural institutions in the Dallas-Ft. Worth area;
- education;
- support for military, veterans, and first responders;
- health and medical research;
- economic and community development initiatives; and
- youth and family.

GRANT COMMITMENTS BY ISSUE AREA[2]




1 As of 12/31/2020. Figures rounded to the nearest hundred thousand. 2 Represents amount committed in grants since 2012 (inclusive of funded and unfunded commitments). Unfunded commitments represent installment payments for multiyear grants to be paid at future dates following a schedule included in the grant agreement. Issue areas defined by HCP. Grants categorized by purpose and/or use of funds. "Other" category inclusive of grants related to the following issue areas: Animals & Environments; Arts, Culture & Humanities; Faith-Based Causes; and Global Affairs.

GRANTS OVERVIEW

# Total funded: $32.5 million[1]

The Supporting Organizations have funded **$32,548,403** in grants, representing payments made directly to nonprofit organizations that are improving lives and addressing pressing issues in our local community—and beyond.

GRANTS FUNDED BY ISSUE AREA[2]




1. As of 12/31/2020. Figures rounded to the nearest hundred thousand. 2. Represents amount committed in grants since 2012 (inclusive of funded and unfunded commitments). Unfunded commitments represent installment payments for multiyear grants to be paid at future dates following a schedule included in the grant agreement. Issue areas defined by HCP. Grants categorized by purpose and/or use of funds. "Other" category inclusive of grants related to the following issue areas: Animals & Environments; Arts, Culture & Humanities; Faith-Based Causes; and Global Affairs.

GRANTS OVERVIEW

# Average annual funding: $3.7 million[1]

TOTAL GRANT PAYMENTS ($M)[2]




1. As of 12/31/2020. Figures rounded to the nearest hundred thousand. 2. Represents amount paid in grants and/or grant installments during each calendar year. Not inclusive of grants committed but not funded.

GRANTS OVERVIEW

# Highlights of grants' impact

## Supporting 4,000 military and law enforcement members

Grants to the Center for BrainHealth helped provide training and other programming to members of the military, veterans, and local law enforcement that aims to improve the cognitive health—all at no cost.

## Providing a path to safety for 11,000 victims of family violence

Grants to The Family Place helped the organization serve more than 11,000 clients in 2019, including providing more than 62,000 days of Emergency Shelter.

## Enabling 1.2M visitors to make memorable experiences with wildlife

Grants funding the construction of the new hippo exhibit and providing support for the organization's membership program helped the Dallas Zoo draw a record-breaking 1.2 million visitors in 2017.

## Supporting and defending 8,000 abused children

Grants to the Dallas Children's Advocacy Center helped the organization serve over 8,000 children who have been abused each year,

## Providing educational opportunities for 600 low-income students in southeast Dallas

Grants to expand the Cristo Rey Dallas campus in Pleasant Grove enable the school to accommodate up to 600 students. 95% of CRD students are the first in their families to attend college, and with a 100% college acceptance rate, the expansion will help create an estimated 570 first-generation college students every four years.

GRANT HIGHLIGHT

# Dallas Zoo

### About the Dallas Zoo

The Dallas Zoological Society (the "Zoo"), the largest zoological park in Texas, has become a staple in the Dallas community over its 130-year history. Home to over 430 different species, the Dallas Zoo engages and educates visitors, while seeking to create a better world for animals.

### Promoting Visitor Engagement: Grant to Support Zoo Membership

The Supporting Organizations have supported the Zoo's membership program since 2014 through a series of multiyear grants that help the Dallas Zoo continue to reach new audiences. In the first full year of the grant, the Zoo welcomed a record 600,000 guests, and that number has steadily increased since. With our support, the Zoo continues to find new ways to deliver unforgettable experiences. As a result, it regularly ranks in the top-10 zoos in the U.S. by USA Today.

### Increasing Community Access: Grant to Support Discounted Admission

The Supporting Organizations pursue grant opportunities that increase community access to local civic and cultural institutions. With this goal, we expanded our support of the Zoo in 2017 to include the annual sponsorship of the "Penguin Days" program. The grant enables the Zoo to reduce the price of general admission to $7 on select days from December-February, making the Zoo more accessible to the North Texas Community and allowing families who might not otherwise visit the Zoo to do so in an affordable way.

### Opening a New Exhibit: Grant to Support Construction of an Educational/Event Space at the Hippo Exhibit

The Zoo announced in early 2016 that it was planning to break ground on a new exhibit that would bring hippos to the Zoo for the first time in 16 years. The project also marked the first major exhibit opening at the Zoo since 2010. The Supporting Organizations contributed to this project through a grant that helped establish a 4,485-square-foot indoor/outdoor multipurpose event space, which engages visitors in interactive activities that further the Zoo's animal education mission. Currently, the space is a walkthrough exhibit highlighting conservation efforts of hippo habitats around the world. This exhibit helped increase attendance to a record-breaking 1.2 million visitors in 2017.

Issue Area: **Civic & Cultural Institutions**

GRANT HIGHLIGHT

# George W. Bush Presidential Center

### About the George W. Bush Presidential Center

The George W. Bush Presidential Center (the "Bush Center") is comprised of the George W. Bush Presidential Library and Museum, which houses the official records of the presidency of George W. Bush, and the George W. Bush Institute, an action-oriented, nonpartisan policy organization. Through these dual operations, the Bush Center works to both preserve history and shape the future. The Bush Center is uniquely equipped to promote leadership development, advance policy initiatives, and inspire action on a local, national, and global scale. Its work covers three major Impact Centers: Domestic Excellence; Global Leadership; and Engagement. Through these Impact Centers, the Bush Center is dedicated to solving some of today's most pressing challenges.

### Driving a Local Institution's Ambitious Global Agenda: Grant Supporting the Construction of the Bush Center in Dallas

In 2008, the Bush Center officially selected Dallas as its permanent home, announcing plans to construct its building on the campus of SMU. The Supporting Organizations helped make the vision of the Bush Center's Dallas home a reality, making a grant to help complete construction and design for the building. On May 1, 2013, the Bush Center opened its doors to the public. In its first five years after opening, the Bush Center welcomed over $1.6 million visitors.

### Securing a Legacy and Driving Engagement: Grant Supporting the Center's Long-term Operations and Engagement Agenda

In 2018, the Bush Center launched an important fundraising initiative to ensure its mission endures for generations to come. With its "A Charge to Keep" capital campaign, the Bush Center aimed to raise funds that would sustain its operations beyond the lifetimes of President and Mrs. Bush.

The Supporting Organizations made a grant to help ensure the Bush Center can continue its important work well into the future. The grant specifically focused on the public speaker series, Engage at the Bush Center. The series brings newsmakers, thought leaders, and authors to the Bush Center for thought-provoking panel discussions and keynote conversations that allow guests to connect with the Bush Center in a meaningful way and dive deeper into many of today's most pressing policy areas and issues.

Issue Area: **Civic & Cultural Institutions**

GRANT HIGHLIGHT

# Perot Museum

### About the Perot Museum

The Perot Museum of Nature and Science (the "Perot") promotes science and education in the North Texas community through hands-on exhibits, educator resources, unique films, and other special programming that engages audiences of all ages.

**Helping Establish a World Class Museum in Downtown Dallas: Grant to Support Construction of the New Perot Museum:**

With support from Dallas' philanthropic community, the Perot Museum opened a new building in December 2012. With its bold architectural design, it quickly became a fixture in its new location in Dallas' Victory Park. The project also sparked a renewed commitment to inspire minds and improve community achievement, giving rise to new initiatives that promote science learning.

The Supporting Organizations contributed to the project by issuing a challenge grant, which matched donations, inciting additional giving and helping complete the project's capital campaign. Since then, we have contributed additional funding to support ongoing educational programming, special exhibitions, and community engagement initiatives.

**Increasing Community Access: Grant to Support the Perot's Traveling Exhibition Programs**

In 2014, the Supporting Organizations began issuing a series of grants to support the traveling exhibitions program. The initial exhibition, the "The World's Largest Dinosaurs" exhibition, educated audiences on the gigantic sauropods that once roamed the earth, drawing nearly 200,000 visitors to the museum. Since then, our grants have made possible the many captivating exhibitions that have been hosted by the Perot, covering a range of subject areas. With two special exhibitions held each year, the grants enable the museum to deliver new experiences that give visitors a reason to keep coming back and serve as a complement to the museum's 11 permanent exhibit halls. The program draws exhibitions from around the globe to the Perot, providing the North Texas community with access to world-class educational experiences. All the special exhibition grants include funding that allows the Perot to make all traveling exhibitions bilingual (with programming in both English and Spanish). These exhibits have helped increase community access to the North Texas Hispanic population.

Issue Area: **Civic & Cultural Institutions**

GRANT HIGHLIGHT

# Cristo Rey Dallas

## About Cristo Rey Dallas

Cristo Rey Dallas College Prep ("CRD") is a private, independent Catholic high school located in the Pleasant Grove area of Southeast Dallas. The Cristo Rey Network's formula for success is a proven, revolutionary model of college preparatory high school curriculum accessible to those of limited financial resources. It integrates rigorous college preparatory academics with professional work experience through the Corporate Work Study Program—a key component of the fiscal sustainability of the Cristo Rey model. Through the Work Study Program, students work in a professional setting five days per month to earn the majority of their tuition. The 144 job partners include some of Dallas's most prominent companies.

*The Cristo Rey model is proven, with 100% of graduates gaining acceptance to a two- or four-year college and 90% matriculating. For students in Pleasant Grove—where only 4% of the population graduated from college—CRD offers access and opportunity that can change their trajectory.*

## Building Space for Innovation: Grant to Support CRD Campus Expansion and Renovations

The 30th school in the nationwide Cristo Rey network, CRD opened in August 2015, operating out of an old elementary school and aging gymnasium. They quickly outgrew the space and had to begin turning away prospective students. In 2019, CRD launched a $15 million capital campaign to expand the campus, adding new academic and athletic buildings and conducting much needed renovations on the existing buildings.

The Supporting Organizations issued the campaign's lead grant, helping build a new 37,000 sq. ft. Innovation Center, which boasts spaces for fine arts and counseling. The campaign also created a new cafeteria and gymnasium, as well as a new soccer field – something the school never had before. The new buildings opened in time for the 2020 school year.

The Supporting Organizations also helped provide space for CRD students off campus in a centrally located office building near Downtown Dallas. The space gave students a place to study and complete work study programs that were moved to Work From Home due to the pandemic.

Issue Area: **Education & Research**

GRANT HIGHLIGHT

# Education Is Freedom

### About Education Is Freedom

Education Is Freedom ("EIF") is committed to transforming students' lives through education. With a focus on college planning, the organization provides underserved students in the North Texas community with a range of resources to ensure every student has the opportunity to pursue a college education.

EIF's higher education advisors work onsite at public high schools across the region, helping students and their families navigate the college process. In 20XX, EIF helped high school seniors complete 21,000 college applications and receive over $132 million in scholarships.

In addition to their college planning initiatives, EIF operates a number of supplementary programs to enhance access to postsecondary education and promote workforce readiness.

### Developing a Skilled and Educated Workforce: Grant Supporting the Mayor's Intern Fellows Program

In 2008, EIF worked with the Mayor's Office to create the Mayor's Intern Fellows Program ("MIFP"), an initiative to provide workforce readiness. The program provides Dallas high school students with internship opportunities at local companies, nonprofits, and government entities. Through the eight-week, paid internship, students gain real-world experience and insight into the professional opportunities available to them. Not only does the program prepare students for future careers, but it also connects local businesses with the future workforce, promoting collaboration to strengthen the pipeline of talent.

The Supporting Organizations have issued grants to EIF to support the MIFP. The grants have helped EIF put on the program's annual Job Fair. Held in the spring, the Job Fair provides an opportunity for students to interview with prospective employers in the hopes of securing an internship for the summer. Education Is Freedom conducts extensive training with the students throughout the program, offering workshops and coaching on everything from interview preparation to professional etiquette.

In 2018, over 2,400 students from 52 high schools applied for the program. Of those applicants, 1,050 were selected to attend the Job Fair. At the 2018 Job Fair, over 200 employers from across the Dallas-Fort Worth region interviewed internship candidates, ultimately offering positions to 395 students for the summer. In addition to the Job Fair, our grants have funded internships at various nonprofit partners, covering the cost for organizations that might not otherwise be able to hire paid interns.

Issue Area: **Education & Research**

GRANT HIGHLIGHT

# SMU Tower Center

### About the SMU Tower Scholars Program

The Southern Methodist University ("SMU") Tower Scholars Program provides top undergraduate students with an opportunity to integrate public policy and international affairs into their studies through a dedicated curriculum of academic coursework and real-world experiences. Students in the program receive a minor in public policy and international affairs, offered through SMU's John Goodwin Tower Center for Political Studies (the "Tower Center").

> "*The Tower Scholar Program's resources and curriculum allow me to not only learn public policy principles through lectures, but also gain tactile experience with practicums and classes taught by policy practitioners. Without this program, I would have been unable to experience and explore my interest in public policy.*"
>
> *– Tower Scholar, Class of 2020*

**Investing in the Next Generation of Policymakers: Grant to Endow the Tower Scholars Undergraduate Program at SMU**

In 2014, the Supporting Organizations worked with the Tower Center to create a dedicated undergraduate program that carries out the center's mission of bridging the gap between the scholarship and practice of politics and striving to inspire ethical public service. The grant established an endowment that provides long-term funding for the Tower Scholars Program.

A hallmark of the program is its interdisciplinary focus. Over 75% of the Tower Scholars either earned or are pursuing more than one major–and that is in addition to the minor they earn in the program. Outside the classroom, each student is involved in multiple on-campus organizations, many in leadership positions.

The Supporting Organizations' grant makes possible the unique academic experiences–from meeting with global leaders, to working on real policy issues for major corporations–offered to the Tower Scholars. The program accepts 10 students each year, and recently welcomed its eighth cohort.

Issue Area: **Education & Research**

HCMLPHMIT00003771

GRANT HIGHLIGHT

# Center for BrainHealth

### About the Center for BrainHealth

The Center for BrainHealth ("CBH"), part of The University of Texas at Dallas, is a research institute committed to enhancing, protecting and restoring brain health across the lifespan. CBH is composed of independent labs that are responsible for more than 60 fully funded research projects that investigate brain health, injury, and disease. Many of the center's programs use functional and structural neuroimaging techniques to better understand the neurobiology supporting cognition and emotion in health and disease. Areas of research include addiction, aging, Alzheimer's disease, autism, multiple sclerosis, social cognition, and traumatic brain injuries.

**Applying Innovative Research to Improve the Lives of Post-9/11 Veterans and First Responders: Grant Supporting the Warriors Program Through the Brain Performance Institute**

In 2015, CBH broke ground on new building dedicated to translating leading-edge science to scalable solutions for the public at large. Through construction of the Brain Performance Institute, CBH sought to extend the reach and applications of its research, providing solutions to the public to maximize brain performance in health, injury, and disease.

The Supporting Organizations made a grant to help fund the construction of the Brain Performance Institute and expand CBH's Warrior Initiative, which that focused on translating research into cognitive therapies for former military personnel. The Warrior Initiative was established to provide high performance brain training to current and former military service men and women and their families.

The goal of the Warrior Initiative program is to arm veteran and active-duty service members with the necessary tools to achieve successful, enriching, and fulfilling lives by proactively optimizing brain performance, building resilience in cognitive brain function, and reversing losses in cognitive capacity. The program was expanded in 2016 to support first responders, specifically focusing on local law enforcement.

The grant help create a space in the Brain Performance Institute building specifically for veterans, first responders, and their families, where these groups are able to come together in a safe, relaxing environment and get to know other members of service before and after training sessions.

Issue Area: **Military, Veterans & First Responders**

GRANT HIGHLIGHT

# Friends of the Dallas Police

### About Friends of the Dallas Police

The Friends of Dallas Police was founded in 1982 to recognize the commitment that the employees of the Dallas Police Department make to better the city and its residents' quality of life. The organization's mission is to raise and provide funds to be used to host a major awards banquet each year honoring Dallas Police Department personnel for outstanding performance in the line of duty. Over the years, approximately 4,400 awards have been presented to officers and civilian staff, and more than $43,000 in educational scholarships have been awarded to their children.

### Helping Show Appreciation and Recognition to Local Law Enforcement: Grant Supporting the Annual Awards Program

The Supporting Organizations have provided grants to help the Friends of the Dallas Police show appreciation to the men and women of the Dallas Police Department who risk their lives every day to make Dallas a safer city. Our grants have helped fund the annual awards event hosted by the Friends of the Dallas Police, which honors and recognizes outstanding employees throughout the Dallas Police Department.

Through our grants, the Supporting Organizations have facilitated the production of the annual awards program, enabled sworn and non-sworn employees and their spouses to attend the event, and provided educational sponsorships for children of police officers.

The Supporting Organizations have also drawn on its philanthropic network to provide gifts to award recipients and their families, including tickets to visit organizations like the Dallas Zoo, George W. Bush Presidential Center, and Perot Museum.

Issue Area: **Military, Veterans & First Responders**

GRANT HIGHLIGHT

# Snowball Express

### About Snowball Express

Snowball Express (now part of the Gary Sinise Foundation) serves the children of fallen military heroes. By providing events and other experiences in a stress-free environment, the organization is creating a community to learn, grow, and make lasting memories with new friends.

The organization hosts an annual five-day experience for 1,750+ children of the fallen and their surviving parent or guardian. As a therapeutic retreat with a blend of fun and inspiring programs, these families can lean on their peers for support. The organization also hosts community-driven events for these families all year long. From baseball games, to arts and educational opportunities, to camping trips, the events strengthen the local networks of Gold Star families, helping children and surviving spouses to build bonds with the only people who can truly understand their loss: each other.

### Supporting Families of Fallen Service Members: Grant to Support Programming for Gold Star Children

In 2014, Myles Eckert, the nine-year-old son of U.S. Army Sergeant was killed in Iraq on active duty, gave a $20 bill that he found to a veteran in a pay-it-forward act of kindness towards our military. Myles's story was shared widely online, and the gift quickly received national attention.

In honor of Myles Eckert's gift, the Supporting Organizations issued a challenge grant to Snowball Express to support the organization's programming for children that have lost one or both parents during active service.

The grant inspired significant giving from individuals and organizations around the world, enabling Snowball Express to expand its services for Gold Star children and their families.

Snowball Express used the proceeds from the challenge grant to provide services to over 8,000 Gold Star children in 2014–almost 6,000 more than the year before and a new record for the organization.

Issue Area: **Military, Veterans & First Responders**

GRANT HIGHLIGHT

# Dallas Children's Advocacy Center

### About Dallas Children's Advocacy Center

Dallas Children's Advocacy Center ("DCAC") is the only agency of its kind in Dallas County, working in agreement with public and private agencies to investigate, prosecute, and provide healing services for child abuse cases in Dallas County. DCAC reduces the re-victimization of the child, removes barriers to investigation and treatment, and enhances criminal prosecution with its distinctive multidisciplinary approach to these complex and severe cases.

**Fostering Crucial Collaboration: Grant to Support DCAC's Operations and Strengthen Collaboration Among Agencies Involved in Child Abuse Cases**

The Supporting Organizations have been a longtime partner of the Dallas Children's Advocacy Center ("DCAC"), issuing annual grants that provide funding for a range of operating costs. The grants help DCAC serve over 8,000 children (and their non-offending family members) each year who were sexually abused, severely physically abused, or who had witnessed a violent crime. DCAC's average client is a 9-year-old girl, sexually abused by someone she knows and trusts.

The grants also support DCAC in its efforts to foster crucial collaboration across government agencies and other organizations involved in child abuse cases. The DCAC building houses the Child Abuse Unit of the Dallas Police Department, six units of CPS, and a Dallas County Assistant District Attorney. Having all of these professionals under one roof drives collaboration and communication in the very sensitive cases that DCAC coordinates.

Not only have the Supporting Organizations been a long-time financial supporter of DCAC, we have also provided support in other ways, leveraging connections with our network of nonprofit partners. Most recently, we worked with the Dallas Zoo to provide animal encounter demonstrations during DCAC's summer camps, which serve as a way to deliver ongoing support to—and help build a community for—children who have experienced trauma.

Issue Area: **Youth & Family**

GRANT HIGHLIGHT

# The Family Place

### About The Family Place

The Family Place was founded in 1978 and has grown to become the largest family violence prevention agency in North Texas, providing shelter and assistance to victims across the region along with counseling and education. Since its founding, the organization has served over 839,000 clients through counseling, shelter, and hotline responses.

In 2019, The Family Place served nearly 12,000 clients, providing over 62,000 days of emergency shelter, over 36,000 days of transitional housing, and over 18,000 hours of counseling to nonresidential clients, and over 8,000 hours of counseling to batterers. All services are in Spanish and in English.

### Providing Support for Victims of Family Violence Across North Texas

The Family Place empowers victims of family violence by providing safe housing, counseling, and skills that create independence while building community engagement and advocating for social change to stop family violence.

While The Family Place supports clients in several different ways, its Residential Services, which provide safe shelter for families affected by violence, are one of crucial components of its work. These services include the Emergency Shelter Services, which provide immediate shelter for families escaping abuse, and the Supportive Living Program, which provides long-term housing for families as they rebuild their lives. Not only does the organization provide necessities like food, clothing, and transportation, but it also offers childcare, legal services, counseling, and case management.

As The Family Place expanded, its Residential Services were constrained by the capacity of its emergency shelters, and at many times the organization had to house clients in hotels and other temporary housing in order to meet demand.

In 2016, the Supporting Organizations issued a challenge grant to help The Family Place build a new shelter facility to expand its Residential Services. The new facility provides space and support services for over 2,000 victims per year. It also includes onsite Medical and Dental Clinics and even an Animal Kennel so families can bring their beloved pets with them to safety. The shelter has been operating at full capacity since October 2017. With the new facility, The Family Place now has three emergency shelters, providing 177 shelter beds each night, and three counseling centers.

Issue Area: **Youth & Family**

# EXHIBIT 32

*the family place*
*Where family violence stops*

BOARD OF DIRECTORS
PRESIDENT
Harold Ginsburg
TREASURER
Wes McCown
SECRETARY
Thomas McCollum
V.P. COMMUNITY ENGAGEMENT
Clarisa Lindenmeyer
V.P. DEVELOPMENT
Lindsay Jacaman
V.P. FACILITIES
Jim Buddrus
V.P. HUMAN CAPITAL
David Oliver
V.P. LONG RANGE PLANNING
Radhika Zaveri
V.P. NOMINATIONS
Belinda Griffin
V.P. PUBLIC AFFAIRS
Delia Jasso
GENERAL COUNSEL
Kristin Bauer
Eric White

Sandra Aguirre
Lisa Armstrong
Mandy Austin
Steven Bauer
Melinda Bell
Laurie Berger
Nancy Bierman
Julie Bosche
Eric Chandler
Kerry Cole
Nicole Collins
Barbara Durham
Monika Flood
Theresa Flores
Beth Garvey
Lauran Goldberg
Carlos Gonzalez-Jaime
Michelle Goolsby
Rhonda Green
Tasha Grinnell
Johnese Howard
Stacee Johnson-Williams
Linda Knox
Holly Krug
Emily Maduro
Margo McClinton Staglin
Mary McNulty
Sam Megally
Aaliyah Miranda
Mike Montgomery
Tiffany Moon
Elizabeth Soab
Nathaniel St. Clair
Kristen Sanger
Ryan Scripps
Carol Seay
Lisa Singleton
Ghousuddin Syed
Jill Tananbaum
Samantha Wortley
Ana Yoder

Chief Executive Officer
Paige Flink

July 7, 2021

To Whom It May Concern:

I am pleased to write this letter outlining the relationship between The Family Place and the Highland Dallas Foundation. The Family Place empowers victims of family violence by providing safe housing, counseling and skills that create independence while building community engagement and advocating for social change to stop family violence. Our agency provides emergency shelter, individual and group counseling, case management, transitional housing as well as other essential services to help those seeking refuge from family violence. The Family Place provides free, comprehensive services in both Spanish and English that prevent violence and fully support women, children, and men on their path from fear to safety.

In 2020, The Family Place successfully navigated through COVID-19 and the barriers it presented, serving 11,933 unduplicated clients across our programs. Our emergency shelters served 678 women, 886 children and 58 men for a total of 62,118 shelter nights. 98% of our shelter clients did not return to their abuser after exiting one of our shelters. In our counseling programs, we served 2,258 clients, an 11.5% increase over 2019. 98% of our counseling clients reported feeling safer after attending counseling at The Family Place. At our on-site medical and dental clinics, we treated 778 clients and referred 571 clients to more intensive medical and dental services.

The Highland Dallas Foundation has been a long-standing partner with The Family Place in providing services to domestic violence clients. In 2016, The Family Place launched a 5-year, $16.5 million dollar capital campaign to build a new facility specifically designed to provide all necessary services for victims seeking shelter and counseling. The Family Place successfully reached our capital campaign goal due in large part to the commitment of a $1 million matching grant by the Highland Dallas Foundation. In December 2016, the Highland Dallas Foundation donated $13,950 for Christmas gifts for our clients. In 2017, when the Highland Hippo Hut was opened at the Dallas Zoo, the Highland Dallas Foundation generously invited our shelter clients to a special Mother's Day luncheon.

The collaboration between the Highland Dallas Foundation and The Family Place has been instrumental in providing community exposure and awareness of domestic violence in our community as well as providing essential services to family violence victims. With our new facility, completed in 2017, The Family Place has been able to expand programs and execute on the long-range plans developed for these programs. For victims of family violence, The Family Place is the Dallas area's leading organization delivering proven programs that address emotional and physical abuse and incest. Without the ongoing support of the Highland Dallas Foundation, The Family Place would not be able to successfully serve our domestic violence clients who are in desperate need of support.

Sincerely,

Paige Flink

Paige Flink
CEO, The Family Place

P.O Box 7999
Dallas, Texas 75209
214 559 2170
fax 214 443 7797
www.familyplace.org

# EXHIBIT 33

CRISTO REY
DALLAS COLLEGE PREP
9701 San Leon Ave. Dallas, TX 75217

**Cristo Rey Dallas Update**

Cristo Rey Dallas (CRD) is incredibly grateful for the gifts from Highland Dallas Foundation, Inc. CRD is excited to have the Highland Capital Academic Center and the NexBank Gymnasium in the Innovation Center on our campus. These naming rights were given as the result of a donation that Highland Dallas Foundation, Inc.made to our Innovation Center Capital Campaign. These facilities truly impact our students and allow us to provide our services to our population of 465 students.

CRD also receives support from Highland Dallas Foundation, Inc. through the Corporate Work Study Program (CWSP). Cornerstone Healthcare and NexBank both currently have one job team (a team of 4 students) that work in their offices. In the upcoming year, NexBank will host two teams of students. One team is funded through the gift from Highland Dallas Foundation, Inc. and the other is supported by NexBank. The work study program allows students to earn about 60% percent of their tuition to CRD, and the involvement in the work study program makes such a difference in the lives of the 8 students that work in those businesses.

Finally, CRD is incredibly thankful for the remote workspace at Cityplace Tower. CWSP has been greatly affected by COVID-19. This year, many partners were unable to host students in their offices. The space at Cityplace Tower allows 30 students to work remotely for their job partners each day which means that about 120 students benefit from the offices each week. Without this space, CRD would not have the capacity to allow these students to work remotely.

The support of Highland Dallas Foundation, Inc. has meant so much to us at CRD. We are so appreciative, and we look forward to continuing our partnership for many years.

# EXHIBIT 34

Dallas Children's Advocacy Center
PROVIDING JUSTICE • RESTORING HOPE

**Dallas Children's Advocacy Center (DCAC)**
**Partnership with Highland Dallas Foundation, Inc.**

**Organization Mission and History**
The mission of DCAC is *to improve the lives of abused children in Dallas County and to provide national leadership on child abuse issues*. Since opening its doors in 1991, DCAC has served more than 60,000 of the most severely abused children and their non-offending family members in Dallas County. In FY2021, DCAC will serve 8,400 children and their non-offending family members.

DCAC was created to coordinate the investigation of child abuse cases that rise to the criminal level in a seamless, collaborative process. We facilitate a coordinated approach to child abuse cases that results in more successful investigation and prosecution outcomes and provides a less traumatic response to child victims and families. DCAC partners with 39 organizations to form a Multidisciplinary Team (MDT) that includes medical, legal, and law enforcement and is designed to ensure child clients receive the appropriate services for healing and safety.

In 2015 DCAC's Partner Relations Team began reading all reports of abuse and neglect made to DFPS in Dallas County as part of a state-wide effort to ensure every child who needs services from a children's advocacy center (CAC) gets them. In FY2019 we read 28,131 reports of child abuse for Dallas County. At the beginning of March 2020 before COVID-19 safety measures were implemented, we had experienced a 15% increase in the number of cases read. While case reports went down during quarantine, we have projected and experienced a dramatic increase in cases; at the end of February 2021, we had experienced a 35% increase in cases read year-over-year.

In addition to supportive services provided by the MDT, DCAC also provides the following Core Programs at no cost to our clients. Please note, for the second half of FY2020, DCAC provided therapy and family advocacy services via a HIPPA-approved telehealth platform, Doxy.me. Forensic interviews were always conducted on-site during quarantine. Below you will find details and outcomes for FY 2020.

***Forensic Interview Program***
Trained DCAC forensic interviewers conduct interviews of children, both as a first step in the child's healing process and as a vital component of the investigation and prosecution of alleged perpetrators. The result is a legally defensible investigative interview of each alleged child victim. During FY2020, DCAC conducted 1,921 forensic interviews.

***Family Advocacy Program***
The Family Advocacy Team is committed to helping each family navigate the complex process of investigation, prosecution and healing after a child makes an outcry of abuse. The team helps the family learn about their rights and resources available to them during crisis as well as provides tangible, critical needs items like clothing, toiletries, and financial assistance on an as-needed basis. During FY 2020, the Family Advocacy Program supported 7,431 children and their non-offending family members.

***Evidence-Based Therapy Program***

Dallas Children's Advocacy Center™
PROVIDING JUSTICE • RESTORING HOPE

The Evidence-Based Therapy Program provides clients and their non-offending caregivers with cutting-edge, no-cost therapeutic services. Treatment is informed by an initial assessment to enhance engagement between families and therapists toward the recovery of children. When clients are assessed at the end of treatment, over 70% report a reduction in trauma symptoms. During FY 2020, the DCAC Therapy Program provided services to 2,498 clients.

***Education Program***

DCAC has pioneered a comprehensive, multi-part training curriculum that provides holistic responses to Texas child abuse reporting laws. In the past year, 100,405 people were educated in our curriculum by means of in-person instruction or online learning. In addition to our cutting-edge curriculum, we also host a Lecture Series at the Center. Lecture Series topics are designed to provide continuing education for medical, legal, clinical, law enforcement and other children's advocacy professionals. Since the start of the pandemic, we moved all lecture series' online; we continue to provide this education virtually and as such have discovered we can reach even more professional.

**Partnership with Highland Dallas Foundation, Inc.**

Since 2016, Highland Dallas Foundation, Inc. has supported DCAC through yearly, general operating investments towards our mission. We have received over $85,000 over the past five years through sponsorship of our Art for Advocacy event as well as from a golf tournament where DCAC was the dedicated beneficiary. This funding has been critical to the sustainability of our programs and each dollar allows us to serve our clients with transformative services at no cost to them. Alongside the financial commitment, Highland Dallas Foundation, Inc. has gone above and beyond in introducing us to additional community advocates who individually support our efforts as well. The ripple effect of our partnership with Highland Dallas Foundation, Inc. is invaluable and for that we are so grateful.

# EXHIBIT 35

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P. and CLO HOLDCO, LTD.,** *directly and derivatively,* | § | |
| *Plaintiffs,* | § | |
| **v.** | § | **Cause No.** ______________ |
| **HIGHLAND CAPITAL MANAGEMENT, L.P. , HIGHLAND HCF ADVISOR, LTD., and HIGHLAND CLO FUNDING, LTD.,** *nominally,* | § | |
| *Defendants.* | § | |

---

## ORIGINAL COMPLAINT

---

**I.**

## INTRODUCTION

This action arises out of the acts and omissions of Defendant Highland Capital Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd. ("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF") (HCM and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions which have recently come to light reveal breaches of fiduciary duty, a pattern of violations of the Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement, among others, which have caused and/or likely will cause Plaintiffs damages.

[1] https://adviserinfo.sec.gov/firm/summary/110126

At all relevant times, HCM was headed by CEO and potential party James P. Seery ("Seery"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## PARTIES

**1.** Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

**2.** Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

**3.** Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

**4.** Defendant Highland HCF Advisor, Ltd. is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

**5.** Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

**6.** Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

# III.

## JURISDICTION AND VENUE

**7.** This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.** Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.** Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

# IV.

## RELEVANT BACKGROUND

### *HCLOF IS FORMED*

**10.** Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.** Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

**12.** At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

**13.** On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

**14.** Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

**15.** On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

**The Harbourvest Settlement with Highland Capital Management in Bankruptcy**

**16.** On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

**17.** The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

**18.** Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

**19.** Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

**20.** Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

**21.** In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054, Doc. 1057.

**22.** The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

**23.** Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

**24.** HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

**25.** Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

**26.** While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million). Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

**27.** In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values were starting to recover.

**28.** HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $<u>15 million</u>, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

**29.** On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

**30.** HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

**31.** On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

**32.** An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

**33.** As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

**34.** HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

**35.** Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

**36.** At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

**37.** It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

**38.** On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

**39.** The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

**40.** Typically, the value of the securities reflected by a market price quote.

**41.** However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

**42.** There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

**43.** Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

**44.** Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

**45.** It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

**46.** For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

**47.** Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

**48.** Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth—Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

**49.** Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

**50.** Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

**51.** That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

**52.** The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

**53.** Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

**54.** HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### *Breaches of Fiduciary Duty*

**55.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

**56.** HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

**57.** The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

**58.** HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

**59.** In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

**60.** The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

**61.** While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

**62.** HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

**63.** As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

**64.** The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

**65.** This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

**66.** The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

**67.** The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

**68.** HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

**69.** This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

**70.** It also violated HCM's own internal policies and procedures.

**71.** Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

**72.** HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

**73.** HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

**74.** In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[6]

**75.** At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

**76.** Defendant's principal, Seery, testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper diligence and information that was plainly available.

**77.** Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

**78.** Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equatization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

**79.** Seery's knowledge is imputed to HCM.

**80.** Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

**81.** As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

**82.** Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

**83.** Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

**84.** Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

**85.** In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

**86.** Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

**87.** What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

**88.** Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

**89.** For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

**90.** HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

**91.** Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

**SECOND CAUSE OF ACTION**
***Breach of HCLOF Company Agreement***
**(By Holdco against HCLOF, HCM and HCFA)**

**92.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

**93.** On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

**94.** The Company Agreement governs the rights and duties of the members of HCLOF.

**95.** Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

**96.** Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

**97.** The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

**98.** Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

**99.** Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

**100.** Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

**101.** No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

**102.** Plaintiff is entitled to specific performance or, alternatively, disgorgement, constructive trust, damages, attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
***Negligence***
**(By the DAF and CLO Holdco against HCM and HCFA)**

**103.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**104.** Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

**105.** Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

**106.** Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

**107.** It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

**108.** It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

**109.** It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

**110.** Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

**111.** Defendants' negligence foreseeably and directly caused Plaintiff harm.

**112.** Plaintiff is thus entitled to damages.

**FOURTH CAUSE OF ACTION**
***Racketeering Influenced Corrupt Organizations Act***
**(CLO Holdco and DAF against HCM)**

**113.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**114.** Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

**115.** HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

**116.** The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

**117.** Defendants injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

**118.** HCM operated in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

**119.** In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

**120.** On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

**121.** On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

**122.** Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

**123.** However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

**124.** The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

**125.** On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

**126.** In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the Adviser's Act.

**127.** Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company. The news of the MGM purchase should have caused Seery to revalue the HCLOF investment in MGM.

**128.** In or around October 2020, Seery (who controls the Board of CSS Medical) was pursuing "equatization" of CSS Medical's debt, which would have increased the value of certain securities by 25%. In several communications through the U.S. interstate wires and/or mails, and with Plaintiffs, and the several communications with Harbourvest during the negotiations of the settlement, Seery failed to disclose these changes which were responsible in part for the ever-growing value of the HCLOF CLO portfolio.

**129.** Seery was at all relevant times operating as an agent of HCM.

**130.** This series of related violations of the wire fraud, mail fraud, and securities fraud laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000 payday under the confirmation agreement.

**131.** The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

**132.** Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

**133.** Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

**FIFTH CAUSE OF ACTION**
***Tortious Interference***
**(CLO Holdco against HCM)**

**134.** Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

**135.** At all relevant times, HCM owned a 0.6% interest in HCLOF.

**136.** At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

**137.** Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

**138.** HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

**139.** HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

**140.** But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

**141.** Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## JURY DEMAND

**142.** Plaintiff demands trial by jury on all claims so triable.

## VII.

## PRAYER FOR RELIEF

**143.** Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

a. Actual damages;

b. Disgorgement;

c. Treble damages;

d. Exemplary and punitive damages;

e. Attorneys' fees and costs as allowed by common law, statute or contract;

f. A constructive trust to avoid dissipation of assets;

g. All such other relief to which Plaintiff is justly entitled.

Dated: April 12, 2021

Respectfully submitted,

**SBAITI & COMPANY PLLC**

*/s/ Mazin A. Sbaiti*
**Mazin A. Sbaiti**
Texas Bar No. 24058096
**Jonathan Bridges**
Texas Bar No. 24028835
JPMorgan Chase Tower
2200 Ross Avenue – Suite 4900W
Dallas, TX 75201
T: (214) 432-2899
F: (214) 853-4367
E: mas@sbaitilaw.com
jeb@sbaitilaw.com

**Counsel for Plaintiffs**

# EXHIBIT 36

intertrust
GROUP

Registration No.: **249232**
Client No.: **KY057017**

REGISTER OF DIRECTORS
FOR:
**CLO HOLDCO, LTD.**

| **Name & Address** | **Office Held** | **Date of Appointment** | **Date of Resignation** |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 17 Dec 2010 | 17 Dec 2010 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 17 Dec 2010 | 24 Mar 2021 |
| **Mark E. Patrick**<br>. | Director | 24 Mar 2021 | 31 Mar 2021 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 31 Mar 2021 | 02 Apr 2021 |
| **Mark E. Patrick**<br>. | Director | 02 Apr 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

# EXHIBIT 37

intertrust GROUP

Registration No.: **263805**
Client No.: **KY059904**

REGISTER OF DIRECTORS
FOR:
**CHARITABLE DAF HOLDCO, LTD**

| **Name & Address** | **Office Held** | **Date of Appointment** | **Date of Resignation** |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 04 Nov 2011 | 04 Nov 2011 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 04 Nov 2011 | 25 Mar 2021 |
| **Patrick Mark**<br>Highland Capital Management, L.P.; 13455 Noel Rd, Suite 800; Dallas; TX 75240; USA. | Director | 25 Mar 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

# EXHIBIT 38

intertrust GROUP

Registration No.: **269389**
Date of Incorporation: **6 June 2012**
Client No.: **KY061847**

REGISTER OF MEMBERS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

Share Class: **Ordinary**
Nominal Value: **USD 0.01**
Voting Rights: Yes
Conditional: No

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **WNL Limited** Walkers Corporate Services Limited Walker House 87 Mary Street George Town Grand Cayman KY1-9005 Cayman Islands | 6 Jun 2012 | Allotment | 1.00 | 6 Jun 2012 : Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 26 Jun 2012 : Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 26 Jun 2012 | | | | |
| | | | | | | Nil | Nil | 26 Jun 2012 |
| **CLO HOLDCO, LTD.** Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 26 Jun 2012 | Transfer | 1.00 | 26 Jun 2012 : Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 26 Jun 2012 | No Cert | | | |
| | | | | | | 100 | 1.00 | |

Notes:

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

intertrust
GROUP

Registration No.: **269389**
Date of Incorporation: **6 June 2012**
Client No.: **KY061847**

REGISTER OF MEMBERS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

# EXHIBIT 39

intertrust GROUP

Registration No.: **269389**
Client No.: **KY061847**

REGISTER OF DIRECTORS
FOR:
**LIBERTY CLO HOLDCO, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 26 Jun 2012 | 26 Jun 2012 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 26 Jun 2012 | 24 Mar 2021 |
| **Mark E. Patrick**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 24 Mar 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |

Date printed: 19 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

HCMLPHMIT00003819

# EXHIBIT 40

intertrust
GROUP

Registration No.: **293607**
Client No.: **KY073541**

REGISTER OF DIRECTORS
FOR:
**MGM STUDIOS HOLDCO, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited**<br>190 Elgin Avenue; George Town; Grand Cayman KY1-9001; Cayman Islands. | Director | 12 Nov 2014 | 12 Nov 2014 |
| **Grant James Scott**<br>Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 12 Nov 2014 | 24 Mar 2021 |
| **Mark E. Patrick**<br>. | Director | 24 Mar 2021 | |
| **Paul Murphy**<br>Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL. | Director | 22 Apr 2021 | |

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

# EXHIBIT 41

intertrust GROUP

Registration No.: **293607**
Date of Incorporation: **12 November 2014**
Client No.: **KY073541**

REGISTER OF MEMBERS
FOR:
**MGM STUDIOS HOLDCO, LTD.**

Share Class: **Ordinary**
Nominal Value: **USD 0.01**
Voting Rights: Yes
Conditional: No

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **WNL Limited**<br>190 Elgin Avenue<br>George Town<br>Grand Cayman KY1-9001<br>Cayman Islands | 12 Nov 2014 | Allotment | 1.00 | 12 Nov 2014: Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 12 Nov 2014: Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 12 Nov 2014 | | | | |
| | | | | | | Nil | Nil | 12 Nov 2014 |
| **CLO HOLDCO, LTD.**<br>Intertrust Corporate Services (Cayman) Limited<br>One Nexus Way<br>Camana Bay<br>Grand Cayman KY1-9005<br>Cayman Islands | 12 Nov 2014 | Transfer | 1.00 | 12 Nov 2014: Transfer of 1.0 Ordinary share(s) from WNL Limited to CLO HOLDCO, LTD. pursuant to resolutions dated 12 Nov 2014 | No Cert | | | |
| | | | | | | 100 | 1.00 | |

Notes:

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

[1 / 1]

HCMLPHMIT00003823

# EXHIBIT 42

intertrust GROUP

Registration No.: **249848**
Client No.: **KY058111**

REGISTER OF DIRECTORS
FOR:
**HCT HOLDCO 2, LTD.**

| Name & Address | Office Held | Date of Appointment | Date of Resignation |
|---|---|---|---|
| **WNL Limited** Walkers Corporate Services Limited; Walker House; 87 Mary Street; George Town; Grand Cayman KY1-9005; Cayman Islands. | Director | 30 Dec 2010 | 30 Dec 2010 |
| **Grant James Scott** Highland Capital Managment, L.P.; 13455 Noel Road, Suite 800; Dallas; Texas 75240; USA. | Director | 30 Dec 2010 | 24 Mar 2021 |
| **Mark E. Patrick** . | Director | 24 Mar 2021 | |
| **Paul Murphy** Coutil Jacques; Les Gravees, St Peter Port; Guernsey; Guernsey, C.I. GY1 1RL | Director | 22 Apr 2021 | |

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

# EXHIBIT 43

intertrust GROUP

Registration No.: **249848**
Date of Incorporation: **29 December 2010**
Client No.: **KY058111**

REGISTER OF MEMBERS
FOR:
**HCT HOLDCO 2, LTD.**

Share Class: **Ordinary**
Nominal Value: **USD 1.00**
Voting Rights: Yes
Conditional: No

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| **WNL Limited**<br>Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005<br>Cayman Islands | 29 Dec 2010 | Allotment | 1.00 | 29 Dec 2010: Subscriber's share issued by operation of law on registration | No Cert | | | |
| | | Transfer | (1.00) | 30 Dec 2010: Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 30 Dec 2010 | | | | |
| | | | | | | Nil | Nil | 30 Dec 2010 |
| **Highland Capital Management Partners, Charitable Trust #2**<br>13455 Noel Road<br>Suite 800<br>Dallas TX 75240<br>USA | 30 Dec 2010 | Transfer | 1.00 | 30 Dec 2010: Transfer of 1.0 Ordinary share(s) from WNL Limited to Highland Capital Management Partners, Charitable Trust #2 pursuant to resolutions dated 30 Dec 2010 | No Cert | | | |
| | | Transfer | (1.00) | 24 Oct 2011: Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CLO HOLDCO, LTD. pursuant to resolutions dated Contribution | | | | |

Date printed: 21 May, 2021

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED



HCMLPHMIT00003827

intertrust GROUP

Registration No.: **249848**
Date of Incorporation: **29 December 2010**
Client No.: **KY058111**

REGISTER OF MEMBERS
FOR:
**HCT HOLDCO 2, LTD.**

| Member Name & Address | Date Entered as a Member | Transaction Type | Number of Shares | Notes | Cert # | % Paid | Total Share Holding | Date Ceased to be a Member |
|---|---|---|---|---|---|---|---|---|
| | | | | Agreement | | | | |
| | | | | | | Nil | Nil | 24 Oct 2011 |
| **CLO HOLDCO, LTD.** Intertrust Corporate Services (Cayman) Limited One Nexus Way Camana Bay Grand Cayman KY1-9005 Cayman Islands | 24 Oct 2011 | Transfer | 1.00 | 24 Oct 2011: Transfer of 1.0 Ordinary share(s) from Highland Capital Management Partners, Charitable Trust #2 to CLO HOLDCO, LTD. pursuant to resolutions dated Contribution Agreement | No Cert | | | |
| | | | | | | 100 | 1.00 | |

Notes:

| |
|---|
| |

Date printed: 21 May, 2021

[2 / 2]

INTERTRUST CORPORATE SERVICES (CAYMAN) LIMITED

HCMLPHMIT00003828

**EXHIBIT 35**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.,<br><br>Debtor. | **Case No. 19-34054-sgj-11**<br>Chapter 11<br><br>Dallas, Texas<br>Tuesday, June 8, 2021<br>9:30 a.m. Docket<br><br>- SHOW CAUSE HEARING (2255)<br>- MOTION TO MODIFY ORDER AUTHORIZING RETENTION OF JAMES SEERY (2248)<br>- MOTION FOR ORDER FURTHER EXTENDING THE PERIOD WITHIN WHICH DEBTOR MAY REMOVE ACTIONS (2304) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jeffrey Nathan Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067-4003<br>(310) 277-6910 |
| For the Debtor: | John A. Morris<br>Gregory V. Demo<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7700 |
| For the Debtor: | Zachery Z. Annable<br>HAYWARD & ASSOCIATES, PLLC<br>10501 N. Central Expressway, Suite 106<br>Dallas, TX 75231<br>(972) 755-7104 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For the Charitable DAF, CLO Holdco, Show Cause Respondents, Movants, and Sbaiti & Company: | Mazin A. Sbaiti<br>Jonathan E. Bridges<br>SBAITI & COMPANY, PLLC<br>Chase Tower<br>2200 Ross Avenue, Suite 4900W<br>Dallas, TX 75201<br>(214) 432-2899 |
| For Mark Patrick: | Louis M. Phillips<br>KELLY, HART & HALLMAN, LLP<br>301 Main Street, Suite 1600<br>Baton Rouge, LA 70801<br>(225) 338-5308 |
| For Mark Patrick: | Michael D. Anderson<br>KELLY, HART & HALLMAN, LLP<br>201 Main Street, Suite 2500<br>Fort Worth, TX 76102<br>(817) 332-2500 |
| For James Dondero: | Clay M. Taylor<br>Will Howell<br>BONDS ELLIS EPPICH SCHAFER JONES, LLP<br>420 Throckmorton Street, Suite 1000<br>Fort Worth, TX 76102<br>(817) 405-6900 |
| For the Official Committee of Unsecured Creditors: | Matthew A. Clemente<br>SIDLEY AUSTIN, LLP<br>One South Dearborn Street<br>Chicago, IL 60603<br>(312) 853-7539 |
| For the Official Committee of Unsecured Creditors: | Paige Holden Montgomery<br>SIDLEY AUSTIN, LLP<br>2021 McKinney Avenue, Suite 2000<br>Dallas, TX 75201<br>(214) 981-3300 |
| Recorded by: | Michael F. Edmond, Sr.<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street, 12th Floor<br>Dallas, TX 75242<br>(214) 753-2062 |

Transcribed by: Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

DALLAS, TEXAS - JUNE 8, 2021 - 9:30 A.M.

THE COURT: All right. We have settings in Highland this morning. We have three settings. We have the show cause hearing with regard to a lawsuit filed in the District Court. We have a couple of more, I would say, ministerial matters, although I think we do have objections. I know we have objections. We have a motion to extend the removal period in this case as well as a motion to modify the order authorizing Mr. Seery's retention.

So let's go ahead and start out by getting appearances from the lawyers who are participating today. I'll get those now.

MR. MORRIS: Good morning, Your Honor.

THE COURT: Good morning.

MR. MORRIS: John Morris from Pachulski, Stang, Ziehl & Jones for the Debtor. I'm joined with me this morning by my colleagues, Jeffrey Pomerantz, Greg Demo, and Zachery Annable.

THE COURT: Okay.

MR. MORRIS: We do have a proposal on how to proceed today, a substantial portion of which is in agreement with the Respondents.

THE COURT: Okay.

MR. MORRIS: So, at the appropriate time, I'd be happy to present that to the Court.

THE COURT: All right. Well, let's get all the

appearances and then I'll hear from you on that.

MR. SBAITI: Your Honor, my name is -- would you like me to approach, Your Honor?

THE COURT: Yes, please.

MR. SBAITI: It's my first time appearing in Bankruptcy Court, Your Honor. My name is Mazin Sbaiti. I'm here on behalf of the charitable DAF Fund, CLO Holdco, and the Respondents to the show cause hearing. We are also representing them as the Movants on the motion to modify the Court's order appointing Mr. Seery.

THE COURT: All right. Thank you.

MR. BRIDGES: Jonathan Bridges, Your Honor, with Mr. Sbaiti, also representing the Charitable DAF and CLO Holdco, as well as our firm that is named in the show cause order.

THE COURT: Okay.

MR. BRIDGES: Thank you, Your Honor.

THE COURT: Thank you.

MR. PHILLIPS: Good morning, Your Honor. Louis M. Phillips from Kelly Hart Hallman here on behalf of Mark Patrick in the show cause matter. I'm joined with my colleague Michael Anderson from the Kelly Hart firm here in Fort Worth. And that's the matter that we're involved in, the show cause auction.

THE COURT: All right. Thank you, Mr. Phillips.

MR. TAYLOR: Good morning, Your Honor. Clay Taylor

of Bonds Ellis Eppich Schafer Jones here on behalf of Jim Dondero. I have Mr. Will Howell here with me from my firm.

THE COURT: All right. Thank you.

MR. CLEMENTE: Good morning, Your Honor. Matthew Clemente from Sidley Austin on behalf of the Committee. I'm here with my partner, Paige Montgomery.

THE COURT: Okay. Thank you.

MR. CLEMENTE: Good morning.

THE COURT: All right. Just to remind people, we do have participants on the WebEx, but in setting the hearing I made clear that participants today needed to be here live in the courtroom. So the WebEx participants are going to be only observers.

We have a camera on the screen here that is poised to capture both the lawyer podium as well as the witness box, and then another camera on the bench.

So, please be mindful. We want the lawyers to speak from the podium so that they are captured and heard by the WebEx. And so hopefully we don't have any cords you will trip over. We've worked hard to make it easy to maneuver around the courtroom.

All right. So, Mr. Morris, you had a proposal on how we would approach this today?

MR. MORRIS: I do, Your Honor. And it's rather brief, but I think it makes a lot of sense.

There are three motions on the calendar for today, --

THE COURT: Uh-huh.

MR. MORRIS: -- only one of which required the personal appearance of certain parties.

THE COURT: Uh-huh.

MR. MORRIS: And for that reason, and because, frankly, it was the first of the three motions filed, we believe that that ought to go first.

THE COURT: Okay.

MR. MORRIS: And then it can be followed by the motion for reconsideration of the July order, assuming time permits, and then the motion to extend the removal deadline.

And with respect to the contempt motion, Your Honor, the parties have agreed that each side shall have a maximum of three hours to make opening statements, closing arguments, direct and cross-examination of witnesses.

You know, I did point out to them that from time to time Your Honor has used the Court's discretion to adjust the time --

THE COURT: Uh-huh.

MR. MORRIS: -- if the Court is making inquiries, and I guess we'll deal with that matter as it comes. But as a general matter, that is what we've agreed to. And I would propose that, unless anybody has any objections, that we just proceed on that basis.

THE COURT: Okay.

MR. MORRIS: And I could -- I could go right forward.

THE COURT: So, three hours in the aggregate?

MR. MORRIS: Uh-huh.

THE COURT: It doesn't matter how people spend it -- with argument, examination, cross -- three hours in the aggregate?

MR. MORRIS: Correct.

THE COURT: Okay. So, Nate, you'll be the timer on that.

MR. MORRIS: Yeah. We thought it was very important to get this done today, with people coming in from out of town.

THE COURT: Okay. Sounds fine.

MR. MORRIS: So does the Court want to inquire if anybody has any questions or comments?

THE COURT: I do. Well, I see Mr. Bridges getting up. You confirm that that's agreeable?

MR. BRIDGES: Thank you, Your Honor. Yes, that's agreeable. We have one slight difference in our proposal. We would suggest to Your Honor that the motion for modification, if Your Honor decides our way, would moot the entire motion for contempt. And we'd suggest, if that possibility is realistic, that we would go first with that motion, perhaps obviate having to have the evidence presented and the lengthy

hearing.

The motion for modification, Your Honor, asks the Court to reconsider -- to modify that order because of jurisdictional and other shortcomings in it that make the order unenforceable. And because that's the order that is the subject of the contempt motion, we'd ask Your Honor to consider putting that motion first.

THE COURT: Okay. Or second? Ahead of the contempt matter?

MR. BRIDGES: Ahead of the contempt matter, --

THE COURT: Uh-huh.

MR. BRIDGES: -- because it has a possibility --

THE COURT: We have the removal matter, which I think is the shortest. All right.

MR. BRIDGES: No objection to that, Your Honor. That's correct.

THE COURT: Okay. So, Mr. Morris, that's fine by you?

MR. MORRIS: Your Honor, that doesn't make a lot of sense to us. We don't believe there's any basis for the Court to reconsider, modify, or amend in any way the July order. But even if we were wrong about that, that would not retroactively validate conduct which was otherwise wrongful at the time it was committed.

The contempt motion needs to go first. The other motion

will have no impact on whether or not there is a finding of contempt of court.

THE COURT: All right. And update me on this. There was something filed yesterday, a notice of a proposed form of order that the Debtor had proposed, that I think was not agreed to, where there would be a change about any action that goes forward, the cause of action would be in the sole jurisdiction of the Court, and you all agreed to change that part of the order, correct?

MR. MORRIS: So, just as a division of labor for Your Honor, I'm doing the contempt motion.

THE COURT: Okay. That's Mr. Pomerantz's?

MR. MORRIS: Mr. Pomerantz is going to take care of that.

MR. POMERANTZ: Yes, Your Honor. Good morning. Good to see you again.

THE COURT: Good to see you.

MR. POMERANTZ: Yes, Your Honor, that's correct. If Your Honor recalls, there's really three aspects of the January 9th and the July 16th order. First, requiring people to come to Bankruptcy Court before commencing or pursuing an action. Second, for the Bankruptcy Court to have the sole and exclusive authority to determine whether the claim is a colorable claim of willful negligence or gross misconduct. And then third, if Your Honor passed the claim through the

gate, whether you would have jurisdiction.

In Your Honor's January 9th and July 16th orders, you said you would have exclusive jurisdiction. In the motion for reconsideration, and particularly the reply, Movants said, if you just change that and say that if passes through the gate that you'd have jurisdiction only to the extent you would otherwise have it, that would resolve the motion, in the same way that the plan of reorganization was amended.

We proposed that. They rejected it. We put it before Your Honor. So we believe that it moots out a good portion -- actually, we think it should moot out the entire motion. They obviously disagree. But we definitely agree it moots out the most significant portion of their motion, which is that Your Honor would take jurisdiction to adjudicate a matter on an exclusive basis when you might not otherwise have jurisdiction on an exclusive basis.

THE COURT: Okay. Well, --

MR. BRIDGES: Your Honor, may I respond to that?

THE COURT: You may. And --

MR. BRIDGES: Thank you, Your Honor.

THE COURT: -- why -- could you clarify why you think it would moot out the entire show cause matter? I wouldn't be retroactively changing my order. Is that what you're proposing?

MR. BRIDGES: Your Honor, with all respect, we

believe the order is defective and unenforceable and has to be modified in order to fix it. And because of the defects, we're -- we're actually arguing, Your Honor, that it is unenforceable in a contempt proceeding. That is exactly what our argument is.

THE COURT: Okay. I think I'm getting way farther down this road than maybe I want to right now. But I guess here's the elephant in the room, I feel like: *Republic Supply versus Shoaf.*

MR. BRIDGES: Uh-huh.

THE COURT: The U.S. Supreme Court *Espinosa* case, for that matter. If I accept your argument that maybe there was a flaw in those orders, that maybe they went too far, don't you have a problem with those two cases?

MR. BRIDGES: Your --

THE COURT: The orders weren't appealed.

MR. BRIDGES: I understand completely, Your Honor.

THE COURT: Uh-huh.

MR. BRIDGES: And I think the answer is no because of the *Applewood* case from the Fifth Circuit. The *Applewood* case cited in our reply brief explains that in order for an order, a final order of the Bankruptcy Court to have exculpatory effect, in order for it to release claims, for example, that the claims at issue must be enumerated in the order. It's not enough to have a blanket statement like the order, the July

order has, like the January order has, saying that Mr. Seery's claims -- claims cannot be brought against him for ordinary negligence at all. The -- Your Honor, we're delving into my argument.

THE COURT: Okay.

MR. BRIDGES: And I was hoping to do this on a preliminary basis.

THE COURT: Right.

MR. BRIDGES: I don't mean to bog you down with that. But Your Honor, no, mandatory authority from the Fifth Circuit after *Shoaf* limits *Shoaf's* application and says that it does not extinguish the claims that are not specifically enumerated in the order. And the reason for that is because it doesn't give the kind of notice to the parties that they would need to make an appearance and object to those orders at the time. It actually helps to stem the amount of litigation at the time rather than to encourage it.

THE COURT: All right. Well, you'll get your opportunity to make your full argument on this. But I'm not convinced, preliminarily, at least, to affect my decision on the sequence, okay? So even if it potentially wastes time under your view of the law, I am going to do the removal matter first -- the extension of time request, I should say -- and then the show cause and then the motion to modify. And I realize, those last two matters, everything is kind of

interrelated. All right?

MR. BRIDGES: Yes, Your Honor.

THE COURT: All right. So, with that decided, is there a desire on the part of the lawyers to make opening statements, or shall we just go to the motions? And, of course, people can use their three hours for oral argument, however much they want to use for oral argument.

MR. MORRIS: Your Honor, the -- to be clear, the six-hour time limit only applies to the contempt proceeding.

THE COURT: Oh, yes. Yes. Uh-huh.

MR. MORRIS: And I do want to make an opening statement.

THE COURT: Okay.

MR. MORRIS: So, as the Movant, I'd like to go first.

THE COURT: You want to make opening statements?

MR. BRIDGES: Yes. Yes, Your Honor.

THE COURT: Okay. Okay.

MR. BRIDGES: I believe we've got a PowerPoint prepared that I think can lay out our side of it.

THE COURT: Okay.

MR. BRIDGES: I don't think we're participating in the motion to extend the removal time.

THE COURT: Okay.

MR. BRIDGES: That's going first.

THE COURT: All right.

MR. BRIDGES: So we'll wait until that is --

THE COURT: Well, so we don't get confused on the timing, let's just do the motion to extend right now. And I think we only had one objection. As Mr. Sbaiti just pointed out, they're not objecting on that one. We have a Dondero objection. So let's, without starting the timer, hear that one. Okay?

MR. DEMO: Good morning, Your Honor. Greg Demo; Pachulski, Stang, Ziehl & Jones.

THE COURT: Good morning.

MR. DEMO: I'll be arguing the removal motion and then turn it over.

It's fairly basic and straightforward, Your Honor. We're asking for a further extension of the statutory deadline to remove cases until December 14th, 2021. The deadline is procedural only. As Your Honor is well aware, there's a lot of moving parts in this case. You know, we don't know to this date, really, the full universe of what could actually be out there. So we're just asking for a short extension of the removal period to cover through December.

I know that there was an objection from Mr. Dondero. I know that he argues that 9006 does not allow us to extend that deadline past the effective date of the plan, and he cites one case for that purpose, which is *Health Support*. I think it's out of Florida. That case dealt with the extension of the

two-year extension of the statute of limitations and was very clear that you can't use 9 --

THE COURT: You mean the 546 deadline?

MR. BRIDGES: Yes. Yes.

THE COURT: Okay.

MR. BRIDGES: That you can't use 9006 to extend non-bankruptcy deadlines. That's not what we're doing here, Your Honor. We're using 9006 to extend the bankruptcy deadline to remove the cases.

THE COURT: Uh-huh.

MR. DEMO: And we'd just ask Your Honor for the extension through December.

THE COURT: Okay. I'll hear Mr. Dondero's counsel.

MR. HOWELL: Good morning, Judge. Will Howell for Mr. Dondero.

So, the argument here is not that the Court can't do this. I was just pointing that there is an outside limit to what we're doing. And so if you look at the cases that the Debtor cites in support of this motion, the one that is most apt was when Judge Nelms did a fourth extension of time. But those were all 90-day extensions. Here, we're in a situation where the Debtor is asking for a fourth 180-day extension of time, and this is really where the, you know, objection came -- or, the response in opposition came from. They specifically asked that it be without prejudice to further extensions.

And so, at some point, you know, does 9006 have an outside limit? You know, do we need to see some sort of a light at the end of the tunnel here?

So we would ask that the motion, at a minimum, be denied in part with respect to this open-ended request for extension beyond two years for a 90-day period. The other cases that they cite, they have one extension here, one extension there, 120 days here, but not 180 days after 180 days after 180 days, and then asking specifically for without prejudice to further extensions beyond two years. So that's -- that's where this comes from.

THE COURT: All right. Do you think it matters that this is a very complex case?

MR. BRIDGES: I --

THE COURT: There's litigation here, there, and everywhere.

MR. HOWELL: I also think, you know, *Mirant* was complex. I think *Pilgrim's Pride* was complex. I think, you know, it is not out of bounds for the Court to grant a fourth extension.

THE COURT: Uh-huh.

MR. BRIDGES: But to -- you know, at some point -- you know, maybe the Court could grant a 90-day extension and make them come back a little more frequently to kind of corral this thing, rather than just saying "This grant of 180 days,

the fourth time, is going to be without prejudice to further extensions." It just gets kind of large.

THE COURT: Okay. Mr. Demo, your motion. You get the last word.

MR. DEMO: Your Honor, I mean, it is without prejudice for further extensions, but that doesn't mean that Your Honor is granting the further extensions now. It means we'll have to come back. We'll have to make our case for why an extension is necessary. And, you know, if Your Honor doesn't want to give us another extension past December 2021, Your Honor doesn't have to. This is not an order saying that it's a limitless grant.

You know, I'd also ask, you know, quite honestly, why Mr. Dondero has such an issue with this. He hasn't said that any of these cases involve him. He hasn't given any reasons why this affects him. He hasn't given any reason why this damages him at all. So I do, I guess, wonder as an initial matter kind of why we're here, you know, why we're responding to Mr. Dondero's request, when that request really has no impact on him.

And then, Your Honor, to the extent that you are inclined to limit this, I would say, you know, we would ask for a reasonable extension of time. We do think an extension of time, because of the complexity of this case, through December is warranted. But if Your Honor for some reason does agree

that a shorter extension is necessary under 9006 -- I don't think it is -- we'd just ask that Your Honor grant us leave to come back for further extensions of time.

THE COURT: Okay. All right. I will -- I'll grant a 90-day extension, without prejudice for further extensions.

MR. DEMO: Thank you, Your Honor.

THE COURT: Maybe in 90 days we'll be farther down the road and we won't need any more extensions, but you'll have the ability to argue for more if you think it's really necessary. All right. So that will bring us to around September 14th, I guess.

All right. Well, let's go ahead and hear opening statements with regard to the show cause matter. And again, if you want to roll in arguments about the -- well, no, you said the six hours only applies to show cause, so we'll not hear opening statements with regard to the Seery retention modification, just show cause.

MR. MORRIS: All right. Before I begin, Your Honor, I have a small deck to guide --

THE COURT: Okay.

MR. MORRIS: -- to guide my opening statement.

THE COURT: All right.

MR. MORRIS: Can I approach the bench?

THE COURT: You may. And is your legal assistant going to share her content --

MR. MORRIS: Yes.

THE COURT: -- so people on the WebEx will see? Okay.

MR. MORRIS: That's the intention, Your Honor.

THE COURT: Okay.

MR. MORRIS: All right. Are you ready for me to proceed?

THE COURT: I am. And obviously, everyone has a copy?

MR. MORRIS: Yes.

THE COURT: Your opponents have a copy of this?

MR. MORRIS: Yep.

THE COURT: Okay. Although we hope to see it on the screen.

OPENING STATEMENT ON BEHALF OF THE DEBTOR

MR. MORRIS: Good morning, Your Honor. John Morris; Pachulski, Stang, Ziehl & Jones; for the Debtor.

We're here today on the Debtor's motion to hold certain entities and individuals in contempt of court for violating a very clear and specific court order. I hope to be relatively brief in my opening here, Your Honor, and I'd like to begin where I think we must, and that is, how do we -- how do we prove this and what do we have to prove?

The elements of a claim for contempt of court are really rather straightforward. The Movant must establish by clear

and convincing evidence three things.

THE COURT: Let me stop you and stop the clock. We're not seeing the shared content.

MR. MORRIS: Uh-huh.

THE COURT: Did you want her to go ahead and share her content?

MR. MORRIS: I did.

THE COURT: Okay.

MR. MORRIS: I was hoping that she'd do that.

THE COURT: All right. It says it's receiving content.

MR. MORRIS: There we go. It's on my screen, anyway.

THE COURT: Oh, here it is. I don't know why it's not on my Polycom. Can you all see it out there?

(Chorus of affirmative replies.)

THE COURT: Okay. Very good.

MR. MORRIS: Okay.

THE COURT: You may proceed.

MR. MORRIS: Thank you, Your Honor.

So, there's three elements to the cause of action for contempt, for civil contempt. We have to prove by clear and convincing evidence that a court order was in effect; that the order required certain conduct by the Respondents; and that the Respondent failed to comply with the Court's order.

We've cited in the footnote the applicable case law from

the Fifth Circuit, and I don't believe that there's any dispute that is indeed the legal standard.

The intent of the Respondents as to liability is completely irrelevant. It doesn't matter if they thought they were doing the right thing. It doesn't matter if they believed in their heart of hearts that the court order was invalid. These are the three elements, and we will be able to establish these elements not by clear and convincing evidence, but if we ever had to, beyond reasonable doubt.

If we can go to the next slide, please.

We begin with the Court's order, the Court's July 9 order. And that order states very clearly what conduct was required. And the conduct that was required was that no entity could commence or pursue -- those are really the magic words -- commence or pursue a claim against Mr. Seery without the Bankruptcy Court doing certain things. And we've referred to this as the gatekeeper. And the only question I believe the Court has to ask today is whether the Respondents commenced or pursued a claim against Mr. Seery without seeking Bankruptcy Court approval, as set forth in this order.

I'll dispute that there's anything ambiguous about this. I'll dispute that it could not be clearer what conduct was prohibited. It could not be clearer. The only question is whether the conduct constitutes the pursuit of a claim.

Let's see what they did. If we could go to the next

slide. There will be no dispute about what they did. And what they did is, a week after filing a lawsuit against the Debtor and two others arising out of the HarbourVest settlement, a settlement that this Court approved, after notice and a hearing and participation by the Respondents, after they had the opportunity to take discovery, after they had the opportunity to examine Mr. Seery about the value of HarbourVest's interest in HCLOF, after all of that, they brought a lawsuit after Mr. Patrick took control of the DAF and CLO Holdco. And that lawsuit related to nothing but the HarbourVest suit, and it named in Paragraph 2, right up above, Mr. Seery as a potential party. And a week later, Your Honor, they filed what we call the Seery Motion, and it was a motion for leave to amend their complaint to add Mr. Seery as a defendant.

We believe that that clearly violates the Court's July 7 order. And indeed, again, these are facts. They're not -- they're not in dispute. Just look at the first sentence of their motion. The purpose of the motion was to name James Seery as a defendant. That was the purpose of the motion. And the way that they made the motion, Your Honor -- and these are undisputed facts -- the way they made the motion, Your Honor, shows contemptuous intent. We don't have to prove intent, but I think it might be relevant when you get to remedies. Okay?

And so how do I -- why do I say that? Because they made this motion, Your Honor, and they didn't have to. Everybody knows that under Rule 15 they could have amended the complaint if they wanted to. If they wanted to, they didn't need the Court's permission. What they wanted to do was try to get the District Court to do what they knew they couldn't. And that's contemptuous.

And they did it, Your Honor, without notice to the Debtor. Even after the Debtor had accepted service of the complaint, even after we told them, if you go down this path, we're going to file a motion for contempt, they did it anyway. They didn't serve the Debtor. They didn't give the Debtor a courtesy copy. They didn't notify the Debtor. The only thing that happened was the next day, when the District Court dismissed it without prejudice, they sent us a copy of that notice. And within three days, we were here.

A court order was in effect. Mr. Patrick is going to admit to that. There's not going to be any dispute about that. The order required that the Respondents come to this Court before they pursue a claim against Mr. Seery, and they failed to comply with that order. The facts, again -- if we can go to the next slide. We can look at some of the detail, because the timeline is mindboggling.

Mr. Patrick became the Plaintiffs' authorized representative on March 24th. And folks, when I took their

depositions, weren't specific about dates, and that's why some of the entries here refer to sometime after, but there's no question that the order of events is as presented here and as the evidence will show today.

The evidence will show that sometime after Patrick became the Plaintiffs' authorized representative, Mr. Dondero informed Mr. Patrick that Highland had usurped an investment opportunity from the Plaintiffs. Mr. Patrick is going to testify to that. Mr. Patrick is also going to testify that, without prompting, without making a request, D.C. Sauter, the general counsel of NexPoint Advisors, recommended the Sbaiti firm to Mr. Patrick. Mr. Patrick considered nobody else.

Mr. Patrick retained the Sbaiti firm in April. In other words, within 12 days of the filing of the complaint. They're retained and they conduct an investigation. You're going to hear the assertion of the attorney-client and the common interest privilege every time I ask Mr. Dondero what he and Mr. Sbaiti talked about and whether they talked about naming Jim Seery as a defendant. But with Patrick's authorization, the Sbaiti firm filed the complaint on April 12th, just days after they were retained.

It's like a -- it's an enormous complaint. I don't know how they did that so quickly. But in any event, the important point is that they all worked together. None of this happened until Mr. Patrick became the authorized representative.

Mr. Patrick is going to tell you, Your Honor, he's going to tell you that he had no knowledge of any wrongdoing by Mr. Seery prior to the time he assumed the rein of the DAF and the CLO Holdco. He had no knowledge, Your Honor, of any claims that the DAF and CLO Holdco had against the Debtor until he became the Plaintiffs' authorized representative and Mr. Dondero spoke to him.

If we can flip to the next page. Mr. Dondero has effective control of the DAF. He has effective control of CLO Holdco. You're going to be bombarded with corporate documents today, because they're going to show you -- and they want you to respect the corporate form, they really want you to follow the rules and respect the corporate form, because only Mr. Scott was responsible for the DAF and CLO Holdco until he handed the reins on March 24th to Mr. Patrick. Mr. Dondero has nothing to do with this. He's going to tell you. He's going to tell you he had nothing to do with the selection of Mr. Patrick as Mr. Scott's replacement.

The facts are going to show otherwise, Your Honor. The DAF is a $200 million charitable organization that is funded almost exclusively with assets derived from Highland or Mr. Dondero or the Get Good Trust or the Dugaboy Trust. The evidence is going to show that at all times these entities had shared services agreements and investment advisory agreements with HCMLP. The evidence will show that HCMLP at all times

was controlled by Mr. Dondero.

And it made sense. The guy put in an awful lot of money for charitable usage. Is he really just going to say, I don't really care who runs it? The evidence is going to show that between October 2020 and January 2021, Grant Scott actually exercised independence. Grant Scott was Mr. Dondero's childhood friend. They went to UVA together. They were roommates. Mr. Scott was the best man at Mr. Dondero's wedding. But we were now in bankruptcy court. We're now in the fishbowl. And I will -- this may be a little argument, but there's no disputing the facts that Mr. Scott acted independently, and he paid the price for it. Mr. Scott did it three times.

He did it when he amended CLO Holdco's proof of claim to take it down to zero. He did it again after he withdrew the objection to the HarbourVest settlement motion. And he did it again when he settled the lawsuit that the Debtors had brought against CLO Holdco. And that -- and on each of those three occasions, the evidence will show that Mr. Scott did not communicate with Mr. Dondero in advance, that Mr. Dondero found out about these acts of independence after the fact, and that each time he found out about it he had a little conversation with Mr. Scott.

Mr. Dondero is going to tell you about it, and he's going to tell you that he told Mr. Scott each act was inappropriate.

You may have heard that word before. Each act was not in the best interests of the DAF.

The last of those conversations happened either on or just after January 26th. And by January 31st, Mr. Scott gave notice of his resignation. And you're going to see that notice of resignation. And he asks for releases.

Mr. Patrick becomes, almost two months later, the successor to Mr. Scott. Mr. Dondero is going to say he has no idea how that happened. He was just told after the fact that Mr. Patrick and Mr. Scott had an agreement. He's going to tell you they had an agreement and he just heard about it afterwards. He didn't really -- for two months, I guess, he sat there after Mr. Scott told him that he wanted out and did nothing to try to find out who's going to take control of my charitable foundation with $200 million. He wasn't interested.

But here's the thing, Your Honor. If we go to the next slide. Let's see what Mr. Scott said at his deposition last week. Question, "Do you know who selected Mark?" Answer, "I do not." Question, "Do you know how Mark was selected?" Mark is a reference to Mark Patrick. "I do not." "Did you ever ask Mark how he was selected?" "I did not." "Did you ever ask Mark who selected him?" "I did not." "Did you ever ask anybody at any time how Mr. Patrick was selected to succeed you?" "No, I did not." "Did you ever ask anybody at any time

as to who made the decision to select Mr. Patrick to succeed you?" "No, I did not."

So I don't know what happened between Mr. Patrick and Mr. Dondero when Mr. Patrick supposedly told Mr. Dondero that there was an agreement with Mr. Scott, but that is news to Mr. Scott. He had no idea.

Your Honor, we are going to prove by clear and convincing evidence that each of the Respondents violated a very clear and specific court order. And unless the Court has any other questions, I'll stop for now.

THE COURT: No questions.

MR. MORRIS: Thank you, Your Honor.

THE COURT: All right. Who is making the argument for the Respondents?

MR. SBAITI: Your Honor, I am. I'm just trying to put the PowerPoint up on the WebEx.

THE COURT: Okay.

MR. SBAITI: Sorry about that.

MR. MORRIS: Your Honor, I'll try not to make this a practice, but can I inquire as to how much time I used?

THE COURT: Oh. Nate?

THE CLERK: About thirteen minutes.

THE COURT: Thirteen minutes?

MR. MORRIS: Thank you very much.

THE COURT: Okay. All right.

MR. SBAITI: Your Honor, our PowerPoint is a little bit longer than that one. May I approach with a copy?

THE COURT: You may. Uh-huh.

(Pause.)

MR. SBAITI: Your Honor, it does feel good to be back in the courtroom.

THE COURT: Okay.

MR. SBAITI: It's been a long time.

THE COURT: Yes. For us, too.

MR. SBAITI: Jut wish it wasn't under a circumstance where someone is trying to sanction me.

But we're going to be dividing up this oral argument a little bit. Also, to just kind of break up a little bit of the monotony, because I think we have a lot to cover at the opening stage of this. And I'll try to be as expeditious as I can be.

OPENING STATEMENT ON BEHALF OF THE SHOW CAUSE RESPONDENTS

MR. SBAITI: Your Honor, the thing we -- the thing we open with is the due process issue that we raised in our brief. And where this really arises from is the Court's show cause order calls us violators before we've had a chance to respond to the allegations and before we've obviously been able to approach this hearing. And the word violators means something to us, Your Honor, because I've been a lawyer for a long time, my partner has been a lawyer for a long time, our

clients have never been sanctioned, we've never been sanctioned, and for us to be labeled violators first by counsel and then in a court order makes us wonder whether or not this process is already prejudged or predetermined.

THE COURT: I actually want to address that. Turn off the clock.

Just so you know, I looked this up a while back, because we gave a bankruptcy judges panel at some CLE. The average bankruptcy judge in our district, back when I looked, signs over 200 orders a week.

MR. SBAITI: Sure.

THE COURT: Many of those -- in fact, most of them -- are submitted by lawyers. So, you know, a big chunk of my week is signing orders. And I obviously give more scrutiny to those that are substantive in nature. Okay? If someone submits to me a 50-page debtor-in-possession financing order, I will look at that much more carefully than what I consider a mere procedural order setting a hearing.

So I regret that that word was used, but I can assure you I fairly quickly set that -- signed that, I should say -- regarding it as a merely procedural order setting a hearing. Okay? So it's as simple as that. There was no hmm, I like that word, violator. I had a stack, if you will, an electronic stack of probably 200 orders in front of me the day I signed that. Okay?

So, if that makes anyone feel any better, I don't know, but that's the reality.

Okay. You can start the clock again.

MR. SBAITI: And I appreciate Your Honor saying that. It does make us feel better, both about where the -- the genesis of the order and the impact and its reflection on what Your Honor thinks in terms of going into this.

The other thing that obviously raised concerns, and I assume this comes from the same place, was four days ahead of that order counsel told us the Court was going to order everyone to be in person, and they had advance notice of that, and we weren't sure how they had advance notice of that. I guess they assumed --

THE COURT: I can assure you right here on the record I never had ex parte communications with any lawyer in this case, on this matter or any other matter. Okay? Again, those are pretty strong words to venture out there with, which your pleading did venture out there with those words.

My courtroom deputy, Traci, I think answers her phone 24 hours a day. So I'm quite sure she had communications with the lawyers about this, just like she probably had communications with you and your firm and every other firm in this case. Okay?

MR. SBAITI: Like I said, Your Honor, we appreciated what Your Honor -- appreciate what Your Honor said, but that

issue obviously stuck out -- stuck out to us, in combination. So I'll move on from that issue.

This has to do with the lawsuit that was filed, and the lawsuit, the genesis of the lawsuit, I think it's important to say, because the argument has been raised in the briefing and we wanted to address it upfront, why the lawsuit comes about. And it comes about because of the Advisers Act and the responsibilities that the Debtor has to the assets of the funds that it manages. And the Advisers Act imposes a duty not only on Highland but obviously on its control people and its supervised people. And the lawsuit has to do with HCLOF, which is what HarbourVest owned a piece of. And Highland, as the advisor to HCLOF and the advisor to the DAF, owed fiduciary duties to CLO Holdco, which is the DAF's holding entity of its assets in HCLOF, but Highland Capital was also an advisor, a registered investment advisor to the DAF directly at the time. And so those federally-imposed fiduciary duties lie at the crux of that lawsuit.

Moving on, Mr. Seery testified at the hearing that was in this Court to be -- to get him appointed, and this was Exhibit 2 that was presented by the Debtor, and on Page 16 at the bottom he says -- of the transcript, he says, I think, from a high level, the best way to think about the Debtor is that it's a registered investment advisor. As a registered investment advisor, which is really any advisor of third-party

money over $25 million, it has to register with the SEC, and it manages funds in many different ways.

In the middle of the next page he says, In addition, the Debtor manages about $2 billion, $2 billion in total managed assets, around $2 billion in CLO assets, and then other securities, which are hedge funds -- other entities, rather, which are hedge funds or PE style. Private equity style.

On Page 23 towards the bottom he says, As I said, the Investment Advisers Act puts a fiduciary duty on Highland Capital to discharge its duty to the investors. So while we have duties to the estate, we also have duties, as I mentioned in my last testimony, to each of the investors in the funds. CLO Holdco would be an investor in one of those funds, HCLOF.

He goes on to say, Some of them are related parties, and those are a little bit easier. Some of them are owned by Highland. HCLOF was not owned by Highland. But there are third-party investors in these funds who have no relation whatsoever to Highland, and we owe them a fiduciary duty both to manage their assets prudently but also to seek to maximize value.

Now, the lawsuit alleges that Seery testified that the HarbourVest portion of Highland CLO Funding was worth $22-1/2 million. Now, Mr. Morris wants the Court to hinge on the fact that, well, no one asked him whether he was lying. But that's not really the standard, and it certainly isn't the standard

when someone's an investment advisor and owes fiduciary duties, which include fiduciary duties to be transparent with your investors.

It also includes fiduciary duties not to self-deal.

The lawsuit also alleges that, in reality, those assets were worth double that -- double that amount at the time. We found out just, you know, in late March/early April that a third -- from a third party who had access to the underlying valuations at the time that those values were actually double and that there was a misrepresentation, giving rise to the lawsuit. That change in circumstance is the key issue behind the lawsuit.

We allege that Mr. Seery and the Debtor, as RIAs, had a duty to not self-deal and be fully transparent with that information, and we think both of those things were violated under the Advisers Act.

We don't allege that the HarbourVest settlement should be undone or unwound. We can't unscramble that egg. We do seek damages, as I believe is our right, arising out of the wrongdoing and the process of pushing forth the settlement.

I think one of the allegations in the actual motion for the show cause order was that this was going to undo all of the hard work that Court had done and basically unwind and try to re-piece Humpty Dumpty back together again. But that's simply not the case. Nowhere in our allegations or in the

relief that we request are we trying to undo the HarbourVest settlement as such.

Now, whether the lawsuit should be dismissed under the affirmative defenses that they bring up -- res judicata, waiver, release -- all of those are questionable under the Advisers Act, given the change of circumstance, and therefore are also questions on the merits. They don't go to the colorability of the underlying claims in and of themselves, which I think is important.

So we asked for leave to amend from the Court. And what they want us to do, Your Honor, is they want to sanction us for asking. They're saying asking for leave to amend is the same thing as pursuing a claim. And I'll get to the specifics on that in a little bit. But that's the frame. Can we be sanctioned for asking a court, any court, even if it's the wrong court, for permission to bring the lawsuit? They don't cite a single case that says that that, in and of itself, is sanctionable conduct, us asking.

So I'd like to introduce some of the Respondents.

Your Honor, may I have one of these waters?

THE COURT: Certainly.

MR. SBAITI: Thank you.

THE COURT: That's why they're there, by the way.

MR. SBAITI: I didn't know if they belonged to somebody else.

THE COURT: We've scattered water bottles around for people.

MR. SBAITI: I appreciate it. Thank you, Your Honor.

THE COURT: So if you see these little ones, that's for anyone.

MR. SBAITI: So, this is an org chart, and you'll see it as -- the exhibits that the Debtor's going to bring up. And when we talk about the DAF, Your Honor -- I don't know if that's visible to you. We're on Slide 19, if you're looking at it on paper. There's a little number at the lower right-hand corner. The charitable DAF GP, LLP and then the Charitable DAF Holdco, Ltd. together are the principles of the Charitable DAF Fund, LP. And so when we refer to the DAF or the Charitable DAF, that's really the entity structure that we're referring to. And then the GP and Holdco Ltd. have a managing member. It used to be Grant Scott at the time this was done. Today, it's Mr. Mark Patrick, who's in the room, sitting next to Mr. Bridges.

The DAF is a charitable fund. It's funded over $32 million, as the evidence will show, including Dallas-Fort Worth organizations, The Family Place, Dallas Children's Advocacy, Center for Brain Health, the Crystal Ray Initiative, Friends of the Dallas Police, Snowball Express, various community and education initiatives, Dallas Arts, museums, the Perot Museum, Dallas Zoo. That evidence is undisputed, Your

Honor. The DAF is a real fund. It is a real charitable fund. It does real good in the community.

Now, Respondents -- Holdco, which you will see at the bottom of that chart, is essentially the investment arm. There are assets that the DAF owns in various pots, and Holdco is the actual business engine that generates the money from those assets that then -- that then gets passed up to the charitable -- the four charitable foundations at the top.

I'll go back to Slide 21. And if you look at the top, Your Honor, the Dallas Foundation, Greater Kansas City Community, Santa Barbara Foundation, The Community Foundation of North Texas: Those are the charities that then themselves bestow the funds onto the actual recipients. So the money flows up as dividends or distributions, and then gets contributed.

CLO Holdco invests those assets, and it's an important part of the business model, so that you're not sending out principal. It's the money that CLO makes, the profits, if you will, that it is able to generate that gets donated and makes its way into the community.

So there's an important feature to the structure in that it has to be able to generate money. It's not just money that sits there and waits to be distributed. There's active investing going on.

Mr. Mark Patrick owns the control shares of the entities

comprising the DAF and CLO Holdco, as I showed you, and the beneficiary charitable foundations hold what we call beneficial interests, where they just get money. They don't have a vote.

Mr. Patrick cares about the public service the DAF engages in. He's been an advisor to the DAF, CLO Holdco, and its predecessor, Mr. Scott, since its inception. He receives no compensation for the job he's doing today. And you'll hear how he became -- how he inured to the control position of the DAF and CLO Holdco from him, but it doesn't involve Mr. Dondero, and the absence of someone saying that it did, I think, is going to be striking by the end of the presentation of evidence.

Their only argument against you, Your Honor, is going to be you just can't believe them. But not believing witnesses is not a substitute for the lack of affirmative evidence.

Mr. Patrick has said all along he authorized the filing of the motion for leave to add Mr. Seery to the lawsuit in District Court. He doesn't believe the motion to amend violated this Court's orders, for the reasons stated in our responsive filings to the motions for contempt and show cause order. That's why he authorized it.

My firm, Sbaiti & Company, we're a small Dallas litigation boutique retained by the DAF and CLO Holdco to file the lawsuit. We did an investigation. I'm tickled to death that

Mr. Morris loved our complaint so much and gave us the compliment that we got it done in a short amount of time, but we did get it done in a short amount of time, because, in the end, it's a rather simple issue, as I was able to lay it out in about three or four bullet points in a previous slide.

The written aspect of that doesn't take that long, as Your Honor knows, but the idea that there's a suspicion that we didn't write it or someone else wrote it and ghost-wrote it and gave it to us, which I think is the insinuation he was making, is completely unfounded. There's no evidence of that.

We carefully read Your Honor's orders. We developed a good-faith basis, as required by Rule 11, that the lawsuit and the motion to add Mr. Seery were not filed in bad faith or for an improper purpose. We don't think they're frivolous. We don't think they're in violation of Your Honor's orders, given the current state of the law.

Mr. Dondero is one of the settlors of the CRT, of the Charitable Remainder Trust that ultimately provided assets to CLO Holdco and the DAF. He does care about the DAF's mission. I think Mr. Morris hit the nail on the head. Of course Mr. Dondero cares about what happens to it. He's one of the settlors, and it was his funds that initially were put into it, so he's allowed to care. And I don't think him caring is insidious, and him caring doesn't mean he has control and doesn't mean he's the driving force behind some insidious

conspiracy that they're trying to insinuate exists.

He is an advisor to the DAF and CLO Holdco. It is a lot of money and it needs advice, and he's an advisor to Mr. Patrick. We don't run away from any of those facts, Your Honor.

We also don't run away from the fact that he was the source of some of the information that came in to that complaint and that he relayed some of that information. The content, we do claim work product privilege and attorney-client privilege, because he's an agent of our client, and as lawyers doing an investigation, the content of our communications is protected under the attorney-client and work product privileges, as well as the joint interest privilege. But the fact that we admit that those communications happened, we're not running away from that fact.

So, what does he have to do with this? It's interesting that that opening argument you just heard spent about three minutes on contempt and the other fourteen or fifteen minutes or so on Mr. Dondero. And only on Mr. Dondero. There's a negative halo effect, I believe, that they're trying to get this Court to abide by. They want to inflame Your Honor and hopefully capture -- cultivate and then capitalize on whatever antipathy you might have for Mr. Dondero, and then sweep us all in under that umbrella and sanction everybody just because he had some involvement.

But whatever involvement he has, which we admit he had some involvement in helping us marshal the facts, that's not a basis for us to be sanctioned if there isn't an actual sanctionable conduct that -- as we say there isn't.

We think there's an ulterior motive. That's why Mr. Morris just announced to Your Honor, Mr. Dondero controls it all. The ulterior motive, I believe, is, down the line, when they want to argue some kind of alter ego theory, they want to lay that foundation here. I don't think this is the appropriate time for that foundation, and I don't think any of the information and the evidence they're trying to marshal in front of you is really going to be relevant to the very specific question that's before Your Honor: Does our motion asking the District Court to add Mr. Seery violate your order, or violate it in a way that can be -- that we can be sanctioned for? We don't believe it violates it.

So, the three core standards that have to be met. First of all, civil contempt requires a valid, enforceable order. It's not debatable and it's not -- I don't think that's a shocking statement. Then they have to have clear and convincing evidence of a violation of a specific unambiguous term therein. Mr. Morris wants his version of the word pursue to be unambiguous, and I think the word pursue is unambiguous. But the way he wants you to construe it makes it completely ambiguous, and we'll -- I'll get to that in a moment.

Now, for sanctioning counsel, the Fifth Circuit has held you have to find bad faith. We're adjudged under a slightly separate standard under the Fifth Circuit law. So the contempt motion, though, to the extent it seeks to impose double and treble attorney's fees, those are in punitive fines. They are not compensatory. So criminal contempt standards are raised, and so they have to show a violation in bad faith. In other words, our arguments that we're making have to be bad faith, not simply that we're wrong, and they have to show beyond a reasonable doubt, usually in front of a jury. The U.S. Supreme Court explained the difference and the different procedural protections that have to be involved if they're really going to seek double and treble compensatory damages.

Now, he's right. Saying we intended -- saying that we didn't mean to violate it isn't necessarily a defense. But what you're actually going to hear from him is the opposite argument, that even though we didn't violate it, we wanted to. That's what he says. That's why he quoted you the opening section of our motion asking for permission to sue Mr. Seery, because that's a statement of purpose. And he says you should sanction them right there. That's literally what he said. It's right there, their purpose. If intent is irrelevant to them, it's irrelevant as to us. The fact that we wanted to sue Seery is fully admitted. We don't deny the fact that we

believe Mr. Seery should be a defendant in this lawsuit. But the fact that we didn't sue him is why we didn't violate the order. And they can't say that the fact that we eventually wanted to sue him means we did violate the order. That door swings both ways, Your Honor.

We don't think any element is met. The order, while writ large, prohibits suing Mr. Seery without permission, and we did not sue James Seery, pure and simple. The July 12 -- 14th, 2020 order purports to reserve exclusively to this Court that which, according to the statutes and the case law, we believe the Court can't exclusively reserve to itself. And Your Honor, the order prohibits commencing and pursuing a claim against Jim Seery without coming here first to decide the colorability of such a claim.

They, I believe, admit that we didn't commence a claim against Jim Seery. I think they've admitted that now. So now we're talking about what does pursue mean? We didn't pursue a claim against Jim Seery. Is asking for leave to bring suit the same thing as pursuing a claim? That's the question that's really before Your Honor. Lawyers never talk of pursuing a claim that hasn't been filed. We don't say, I'm pursuing a claim and I'm going to file it next week or next year. Usually, that type of language is in an order, because when the order happens, there may already be claims against Mr. Seery. And so the pursuit of claim is supposed to attack

those cases, to come here and show colorability, presumably, before they continue on with those lawsuits. It doesn't mean asking for permission.

If it did mean asking for permission, then complying with Your Honor's order would be a violation. If the motion for leave is a violation because it is pursuing a claim, if I had filed that motion in this Court, it would still be pursuing a claim without Your Honor's permission. I'd have to get permission just to ask for permission. It puts us in this endless loop of, well, if asking for permission is pursuing a claim, and pursuing a claim is without permission violates the Court's order, we'd always be in violation of the Court's order just for asking, just for following Your Honor's edict.

THE COURT: I'm just, I'm going to interject. You were supposed to, under the order, file a motion in this Court.

MR. SBAITI: I understand that, Your Honor, and I think that we can get to the specifics on why we disagree with how the motion went, Your Honor. We hadn't sued Mr. Seery. So as long as we dealt with the order, which is what our position is, then we don't believe we violated the order.

THE COURT: You think the order was ambiguous, requiring a motion to be filed in the Bankruptcy Court?

MR. SBAITI: Your Honor, what we believe is that the order was ambiguous in terms of whether us asking for

permission in the District Court was in and of itself a violation of the order. We don't think it was. Actually, we don't think the order's ambiguous to that extent. The second we file a suit against Mr. Seery and we don't have some resolution of the issue, then I think the question of sanctionability comes in. But we never filed suit, Your Honor.

The Court doesn't say I can't seek permission in the District Court or that we can't go to the District Court with -- which has general jurisdiction over this case, and has jurisdiction, we believe, over the actual case and controversy that's being raised. But the idea of pursuit being a violation of the order, of the letter of that order, is nonsensical under that, it leads to an absurd result, and it's plainly vague and ambiguous, Your Honor.

Asking Judge Boyle or asking a District Court for permission is not a violation of this Court's order, not the way it was written and not -- and I don't even believe it was a violation necessarily of the Court's -- of the language that the Court has. We -- it doesn't unambiguously prevent us from asking the District Court for leave.

The Court's order yesterday, Your Honor, applied this very rule. The TRO -- you said the TRO did not specifically state, Turn your cell phone over. And you denied motion for sanctions on that. That's basically the argument we're making

here, Your Honor. We think that was the correct ruling, and we think the same type of ruling applies here.

Your order yesterday also determined that the Court ultimately believes that hiring lawyers to file motions should not be viewed as having crossed the line into contemptuous behavior. That's essentially the argument they want you to buy, that there's somehow a vindictiveness behind this and an insidious plan to violate court orders, Your Honor. We don't have any evidence of that.

THE COURT: Okay. Take the words vindictiveness and insidious out of the equation. That's making things personal, and I don't like that. The key is the literal wording of the order, is it not?

MR. SBAITI: Your Honor, the key, I believe, is the --

THE COURT: No entity may commence or pursue a cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court first determining, after notice, that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery and specifically authorizing such entity to bring such a claim. So I'm trying to understand why you argue that filing a motion asking the District Court for permission is not inconsistent

with this order.

MR. SBAITI: Because it's not commencing a claim, Your Honor. It's not commencing a claim against him.

THE COURT: Okay. So is your argument that if Judge Boyle authorizes amendment of the pleading to add Mr. Seery and then you do it, at that point they may have grounds for a motion for contempt, but not yet, because she has not actually granted your motion?

MR. SBAITI: Correct, Your Honor. I mean, in a nutshell. In fact, that's one of -- I think that's probably our next argument. We think, in a sense, this argument is incredibly premature. There is three ways that this -- well, I'd like to address this, so I've got -- I've got a diagram that I think will actually help elucidate what our thought process was.

There's three things she could have done. She could have referred -- referred it to Your Honor, which is what we expected was likely to happen.

THE COURT: But you didn't file a motion for referral of the motion before her.

MR. SBAITI: Well, no, I don't mean in respect of enforcing the reference. The referral we thought was most likely going to happen because it's an associated case, and we actually put those orders in front of her, so we expected that those orders would end up -- that the question would

ultimately end up in front of Your Honor on that basis.

She could have denied our motion outright, in which case we haven't filed a claim, we haven't violated it, or she could have granted our motion and done one of two things. She could have granted it to the extent that she thought leave would be proper but then referred it down, or she could have decided -- taken the decision as the court with general jurisdiction and simply decided it all on her own. She had all of those options, Your Honor, and none of them results in a claim being commenced or pursued without the leave of this Court, if leave is absolutely necessary, Your Honor. And that's the point that we were trying to make.

Your Honor, the -- there's -- you know, there's no evidence that, absent an order from a court with jurisdiction, that we were going to file a claim against Mr. Seery, that we were going to commence or pursue a claim against Mr. Seery. We were cognizant of Your Honor's order. We considered that. And the reason we filed them the way we did is because, according to the statutes and the case law, this is the type of case that would be subject to a mandatory withdrawal of the reference.

And so there's this paradox that arises, Your Honor. And the paradox that arises is that we show up and immediately go, well, we need to be back in the District Court. So we filed our motion there, and I don't think that was contemptuous, it

wasn't intended to be contemptuous of the Court, but we showed the orders to the Court, made the same arguments that we have been making here, that we believe that there's problems with the order, we believe the order oversteps its jurisdiction and maybe is unenforceable, and it's up to that District Court, as it has been in almost all of these other gatekeeper order cases that get filed. None of them result in sanctions, Your Honor. What they result in is a District Court deciding, well, either they refer it or they decide I don't need to refer it. But I don't think that that is the same thing as commencing or pursuing a claim in the end, Your Honor, because all we did was ask for permission, and permission could have been denied or granted or granted in part.

Your Honor, they haven't cited an injury. You've heard the testimony, Your Honor, that they -- the first time they knew we had filed a motion -- which I don't understand why that's the first time they knew we had filed a motion; we told them we were going to file the motion -- was when I forwarded an email saying that it's been denied without prejudice, Your Honor. Well, that means they didn't have to do any work to respond to the motion. They didn't have to do any work to do any of the other things.

And one hundred percent of the damages that they're going to say they incurred is the litigation of this contempt hearing or this sanction motion, as opposed to some other

simpler remedy, like going in to Judge Boyle and saying, Your Honor, all that needs to go, which is what they eventually did. But they would have had to incur those costs anyway because they're now moving to enforce the reference. They filed a 12(b)(6). That briefing would have existed regardless of whether or not we had filed our motion, regardless of whether the sanctions hearing had commenced.

Your Honor, I'm going to let my partner, Mr. Bridges, address this part of it, if I could. I think that gets into more of the questions that you asked, and I think he can answer them a lot better than I can.

THE COURT: Okay.

MR. SBAITI: Thank you.

THE COURT: That's fine.

MR. BRIDGES: Thank you, Your Honor. And I do want to address pointedly the questions that you're asking. First, though, I was hoping to back up to some preliminary remarks that you made and say that I find the 200 orders a week just mindboggling. It amazes me, and puts the entire hearing in a different perspective for me. I'm grateful that you shared that with us.

Your expression of regret about naming us violators was very meaningful to me. It causes me -- well, the strong words in our brief were mine. I wrote them. And your expression of regret causes me to regret some of those words. I'm hopeful

that you can understand, at least in part, our reaction out of concern.

And Your Honor, it's awkward for me to talk about problems with your order, and that's the task that's come to me, to list and talk through four of them and why we think they put us in a really awkward position in deciding what to do in this case, in the filing of it, in where we filed it, and in how we sought leave to go forward against Mr. Seery. That was awkward and difficult for us, and I'm hopeful that I can explain that and that you'll understand, if I'm blunt about problems with the order, that I mean it very respectfully. Two hundred orders a week is still very difficult for me to get my mind around.

The four issues in the order start with the gatekeeping. Then, secondly, in the preliminary remarks, I made mention of the *Applewood* case and the notice that the order releases some claims. Its effect of --

THE COURT: And by the way, I mean, you might elaborate on the facts and holding of *Applewood*, because I came into this thinking *Republic Supply v. Shoaf*, and for that matter, as I said, *Espinosa*, were much more germane. And so, you know, you'll have to elaborate on *Applewood*. I remember that case, but it's just not one people cite as frequently as those two.

MR. BRIDGES: Yes, Your Honor. And our reply brief

devotes a page to the case, and I'm hopeful that I can remember it well enough to give you what you're looking for about it, but I would point you to our reply brief on that topic as well.

The *Shoaf* case that *Applewood* quotes from and distinguishes and expressly limits, the *Shoaf* case actually has been cautioned and limited and distinguished numerous times, if you Shepardize it, and the *Applewood* case is the leading case, and it also is from the Fifth Circuit, that describes and cabins the effects of *Shoaf*. And in *Applewood*, what happened is a bankruptcy confirmation order became final with releases in it, and the court held that exculpatory orders in a final order from the Bankruptcy Court do not have res judicata effect and do not release claims unless those claims are enumerated in the exculpatory order. And --

THE COURT: Okay. So it was about specificity more than anything else, right?

MR. BRIDGES: Yes, Your Honor. It was a --

THE COURT: Okay.

MR. BRIDGES: -- a blanket release, a blanket --

THE COURT: Okay.

MR. BRIDGES: -- exculpatory order that didn't specify what claims were released by what parties, and therefore the parties didn't have the requisite notice.

In my mind, Your Honor, it's comparable to the Texas

Supreme Court's holdings on what's required in a settlement release in terms of a disclaimer of reliance, --

THE COURT: Okay. But, again, --

MR. BRIDGES: -- that if you aren't --

THE COURT: -- it's about specificity --

MR. BRIDGES: Yes, Your Honor.

THE COURT: -- more than anything else? And then we've got the U.S. Supreme Court *Espinosa* case subsequent.

MR. BRIDGES: Okay. Your Honor, I'm not sure what *Espinosa* you're referring to. Can you tell me why that applies?

THE COURT: Well, it was a confirmation order. It was in a Chapter 13 context. And there were provisions that operated to discharge student loan debt, --

MR. BRIDGES: Uh-huh.

THE COURT: -- which, of course, cannot be discharged without a 523 action, a separate adversary proceeding. Nevertheless, the confirmation order operated to do what 523 suggests you cannot do, discharge student loan debt through a plan confirmation order.

The U.S. Supreme Court says, well, that's unfortunate that the confirmation order did something which it doesn't look like you can do, but no one ever objected or appealed. That's my recollection of *Espinosa*. So it seems to be the same holding as *Republic Supply v. Shoaf*. And what I -- why I

asked you to elaborate on *Applewood* is because it does seem to deal with the specificity of the order versus the enforceability, no?

MR. BRIDGES: Your Honor, if it's not obvious already, I'm not prepared to argue *Espinosa*. And your explanation of it is very helpful to me. I think you're right that the specificity issue from *Applewood* is what we're relying on. And it sounds like --

THE COURT: Okay. So, that being the case, how was this order not specific? Okay?

MR. BRIDGES: That's easy, Your Honor, because it doesn't say which parties are releasing which claims. And what we're talking specifically about there -- as we go through the order, I can show you the language -- but what we're talking about specifically are the ordinary negligence and breach of fiduciary duty claims that your order doesn't provide for at all. Rather, it says colorability of gross negligence or willful wrongdoing, if I remember the words precisely, that's what must be shown to pursue a case -- a cause of action against Mr. Seery, thereby -- thereby indicating that claims for mere negligence, not gross negligence, or breach of fiduciary duty, which is an even lesser standard, that those claims are prohibited entirely.

And by having that kind of general all-encompassing release or exculpation for potential liability involving

negligence, and most importantly, fiduciary duty breach under the Advisers Act, that that kind of exculpation under *Applewood* is not enforceable and has no res judicata effect because it wasn't -- those claims weren't enumerated in the order.

That for it to have the intended exculpatory effect, if that was what was intended, that the fiduciary duty claims and the parties who those claims may belong to would have to have been enumerated.

And indeed, that kind of specificity, what was required in *Applewood*, isn't even possible for a claim that hasn't yet occurred for future conduct. It's not possible to enumerate the details, any details, of a future claim, because the underlying act -- if the underlying basis, facts for that claim, haven't yet happened. It's something to happen in the future.

And here, that's what we're dealing with. We're dealing with conduct that took place well after the January and July 2020 orders that had that exculpatory effect. Is -- is that clear?

THE COURT: Understood.

MR. BRIDGES: Thank you, Your Honor. So, the four areas of the order, the four functions that the order does that are problematic to us that led us to do what we have done are the gatekeeping function; the release; the fact that by

stating sole jurisdiction, that it had a jurisdiction-stripping effect; and then, finally, jurisdiction asserting, where, respectfully, Your Honor, we think to some extent the order goes beyond what this Court's jurisdiction is. And so that not only claiming exclusive jurisdiction, but claiming jurisdiction over all actions against Mr. Seery, as described in the order, is going too far.

And those are the four issues I want to talk about one at a time, and here -- I went two screens instead of one. There we go. And here's the order. I have numbered the highlights here out of sequence because this is the sequence that I wish to talk about them and that I think their significance to our decision applies.

Before we get into the words of this July 16, 2020 order, I want to mention the January order as well. Although the motion for contempt recites both orders, we don't actually think the January order applies to us, because our lawsuit against Mr. Seery is not about his role as a director at Strand in any way. We didn't make an issue of that, other than in a footnote in our brief, because we don't think that distinction matters much since the orders essentially say the same things.

I'm not sure that it matters whether we have potentially violated one order or two. If Your Honor finds we've violated one, I think we're on the hook regardless. If Your Honor

finds that we didn't violate the July order, I don't think you will find that we violated the January order, either. So my focus is on the July order.

The gatekeeping function comes from the preliminary language about commencing or pursuing a claim or cause of action against Mr. Seery. And it says what you want us to do first before bringing such a claim.

The second issue of the release comes a little bit later. It's the colorable claim of willful misconduct or gross negligence language. In other words, because only claims of willful misconduct or gross negligence can pass the bar, can pass muster under this order, that lesser claims -- ordinary negligence and breach of fiduciary duty -- that those claims are released by this order. That's the second argument.

Third is your reference to sole jurisdiction and the effect that that has of attempting to say that other courts, courts of original jurisdiction, do not have jurisdiction because it solely resides here. That's the third thing I want to address.

And then the fourth is the notion that we have to come to this Court first for any action that fits the description of an action against Mr. Seery, when some actions are, through acts of Congress, removed from what this Court has the power to address. Under 157(d) of Title 28, Your Honor, there are some kinds of actions which withdrawal of the reference is

mandatory, and therefore this court lacks jurisdiction to address those.

And so those are the four issues I want to tackle, starting with the first, the gatekeeping. Your Honor, Section 28 -- Section 959 of Title 28 appears to be precisely on point. It calls -- it is called by some courts an exception to the Barton Doctrine, which we believe is the only basis, the Barton Doctrine, for this Court to claim that it has jurisdiction or sole jurisdiction and can require us to come here first. We think the Barton Doctrine is the only basis for that. We haven't seen anything in the briefing from opposing counsel indicating there was another basis for it. We think we're talking about the Barton Doctrine here as the basis for that.

959 is exception to the Barton Doctrine, and we think it explicitly authorizes what we have done.

Secondly, Your Honor, the order, the gatekeeping functions of the order are too broad because of its incorporation of the jurisdictional problems and the release problem that we'll talk about later. But for problem number one, the key issue that we're talking about is 959 as an exception to the Barton Doctrine. And I went the wrong way.

THE COURT: So, we could go down a lot of rabbit trails today, and I'm going to try not to do that, but are you saying the very common practice of having gatekeeping

provisions in Chapter 11 cases is just defective law under 28 U.S.C. § 959(a)?

MR. BRIDGES: Can I say yes and no?

THE COURT: Okay.

MR. BRIDGES: Yes, to some extent, for some claims. No as to other claims to another extent. We are not saying gatekeeping orders are altogether wrong, --

THE COURT: Okay.

MR. BRIDGES: -- no.

THE COURT: Okay.

MR. BRIDGES: There are problems with gatekeeping orders that do more than what the law, Section 959 in particular, allows them to do.

THE COURT: Okay. Be more explicit. I'm not -- I think you're saying, no, except when certain situations exist, but I don't know what the certain situations are.

MR. BRIDGES: And Your Honor, you're exactly right. It's complicated, and it takes a long explanation. Let me start --

THE COURT: Okay. I really want to know, --

MR. BRIDGES: Yeah, me, too.

THE COURT: -- since I do these all the time, and most of my colleagues do.

MR. BRIDGES: Thank you, Your Honor. And 959 is on the screen. Managers of any property --

THE COURT: Uh-huh.

MR. BRIDGES: -- is what we're talking about, including debtors in possession. Now, it starts off by saying trustees, receivers. I mean, this is exactly what the Barton Doctrine is about, right? We're talking about trustees and receivers, but not just them. We're also talking about managers of any property, including debtors in possession, --

THE COURT: Uh-huh.

MR. BRIDGES: -- may be sued without leave of the court appointing that. That's contrary to the Barton Doctrine so far.

With respect to what I've numbered five here -- these numbers are mine -- the quote is directly verbatim out of the U.S. Code, but the numbering one through five is mine. With respect to what acts or transactions in carrying on business connected with such property.

And so, Your Honor, what we're talking about isn't Barton Doctrine is inapplicable, or you can't have a gatekeeping order for any claims, but it's about managers of property. And one of the hornbook examples of this is the grocery store that files for bankruptcy and then, when --

THE COURT: Slip-and-fall.

MR. BRIDGES: You've got it, Your Honor.

THE COURT: Uh-huh.

MR. BRIDGES: And because they're managing property,

--

THE COURT: So your cause of action, if it went forward, is the equivalent of a slip-and-fall --

MR. BRIDGES: Yes, Your Honor.

THE COURT: -- in a grocery store?

MR. BRIDGES: Yes, Your Honor.

THE COURT: Okay. Let me skip ahead. What about the last sentence of 959(a)?

MR. BRIDGES: 959(b)? Or 959(a)?

THE COURT: No, of 959(a).

MR. BRIDGES: What we're looking at here?

THE COURT: That's the sentence that I have always thought was one justification for a gatekeeper provision. And I know, you know, a lot of others feel the same.

MR. BRIDGES: Are we talking about what I have listed in number five here?

THE COURT: No. I'm talking about the last sentence of 959(a). Such actions, okay, shall be subject to the general equity power of such court, you know, meaning the Bankruptcy Court, so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to a trial by jury.

Isn't that one of the provisions that lawyers sometimes rely on in arguing a gatekeeper provision is appropriate?

MR. BRIDGES: Certain --

THE COURT: You, Bankruptcy Judge, have the power, the general equity power, so far as the same may be necessary to the ends of justice?

MR. BRIDGES: Your Honor, you bet. Absolutely, there is equitable power to do more. There's no doubt that there are reliance -- there is reliance on that in many instances. So I'm not sure -- I'm not sure I'm responding to your point.

THE COURT: Well, again, I think this is the third or fourth argument down the line that really you start with in the analytical framework here, but I guess I'm just saying I always thought a gatekeeping provision was consistent, entirely consistent with 28 U.S.C. § 959(a), the last sentence.

MR. BRIDGES: When you're dealing --

THE COURT: You disagree with that?

MR. BRIDGES: I do, Your Honor.

THE COURT: Okay.

MR. BRIDGES: And it's not that the Court lacks equitable powers to do more. It's that those equitable powers are affected by when management of other parties, third parties' property is at issue.

What we're talking about is similar to yesterday's contempt order. When you set the basis of describing what it is that Highland's business is, that they're a registered investment advisor in the business of buying, selling, and

managing assets -- assets, of course, are property, and that property is not just Highland's, but it's third-party property, as if a railroad loses luggage belonging to its customers. Rather than the railroad with a trustee appointed having mismanaged railroad property, we're talking about third-party property here, third-party property that belongs to the CLOs, about a billion dollars of assets in these CLO SPEs that Highland manages.

And again, the slide that Mr. Sbaiti showed you showing Highland, yes, they manage their own assets, the assets of the Debtor, but also of the third parties, including the Charitable DAF and CLO Holdco, and that the Advisers Act imposes fiduciary duties on them that are unwaivable when they're doing that.

In *Anderson*, the Fifth Circuit called 959 an exception to the rule requiring court's permission for leave to sue. In *Hoffman v. City of San Diego* much more recently, relying on this statute again, the court rejected a *Barton* challenge and called it a statutory exception. And in *Barton* itself, from a century ago, the U.S. Supreme Court even acknowledged there that where a receiver misappropriated the property of another -- not the debtor's property, the property of another -- that the receiver could still be sued personally, without leave of court.

Absent *Barton*, absent applicability of the Barton

Doctrine, Your Honor, the gatekeeper order is problematic.

*Barton* applies where a court has appointed a trustee, and I don't think, Your Honor, under the circumstances in this case, that it is fair to say Mr. Seery was appointed, as opposed to approved by this Court. And it involves a trustee's actions under the powers conferred on him. The Barton Doctrine is not about a broader exculpation of the trustee.

Here, what the Debtor asked for in its motion for approval, approval of hiring Mr. Seery, what it asked for specifically in the motion was that the Court not interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and asking the Court to uphold the board's decision to appoint Mr. Seery as the CEO as long as they are attributable to any rationale business purpose.

At the hearing, Your Honor, at the hearing, we've quoted your comments saying that the evidence amply shows a sound business justification and reasonable business judgment on the part of the Debtor in proposing that Mr. Seery be CEO and CRO. Your Honor, respectfully, those words don't sound like the judge using its discretion to choose -- appoint a trustee. They sound like the Court exercising deference to the business judgment of a business. And appropriately so. We don't have trouble with application of the business judgment rule. Our problem is with application of it and the Barton Doctrine.

Those two do not go together. A trustee has protection because it's acting under color of the court that appointed it. A court that merely deferred to someone else's appointment, that's not what the Barton Doctrine is about. The Barton Doctrine is about the court's function that the trustee takes on, not deference to the business judgment of the debtor in possession or the other fiduciary appointed by the court.

Problem one was the gatekeeping. Problem two is about the release and the *Applewood* case. Your Honor, again, ordinary negligence and ordinary fiduciary duty breaches do not rise to the level of gross negligence and willful misconduct. And because of that, the language of this order appears to be barring them entirely. No entity may bring a lawsuit against Mr. Seery in certain circumstances without the Bankruptcy Court doing what? Determining that the cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery.

A breach of fiduciary duty under the Advisers Act can be unintentional, it can fall short of gross negligence by miles, and to exculpate Mr. Seery from those kinds of claims entirely is to make him no longer a fiduciary. A fiduciary duty that is unenforceable makes someone not a fiduciary. That's plainly not what Mr. Seery thinks his role is. It's inconsistent with the Advisers Act. And Your Honor, the

notion that he would not owe his clients fiduciary duties as he manages their assets would require disclosures under the SEC regulations. It creates all kinds of problems to state that a fiduciary under the Advisers Act does not have enforceable fiduciary duties. The order appears to be releasing all of those. But for *Applewood's* specificity requirement, it would be doing that.

As an asset manager under the Advisers Act, Mr. Seery is managing assets belonging to CLO Holdco and The Charitable DAF. That's precisely what the District Court action is about, those fiduciary duties. And Mr. Seery, in describing these recently in testimony here -- forgive me for reading through this, Your Honor, but it is pretty short -- Mr. Seery testifies, I think, from a high level, the best way to think about the Debtor is that it's a registered investment advisor. As a registered investment advisor, which is really any advisor of third-party money over $25 million, it has to register with the SEC and it manages funds in many different ways. The Debtor manages approximately $200 million current values -- it was more than that of the start of the case -- of its own assets.

I'm pausing there, Your Honor. $200 million of its own assets, but we're about to talk about third-party assets.

It doesn't have to be a registered investment advisor for those assets, but it does manage its own assets, which include

directly-owned securities, loans, from mostly related entities but not all, and investments in certain funds, which it also manages.

And then here it comes: In addition, the manager -- the Debtor manages about roughly $2 billion, $2 billion in total managed assets, around $2 billion in CLO assets, and then other entities, which are hedge funds or PE style.

We also had to get a very good understanding of each of the funds that we manage. And as I said, the Investment Advisers Act puts a fiduciary duty on Highland Capital to discharge its duty to the investors. So while we have duties to the estate, we also have duties, as I mentioned in my last testimony, to each of the investors in the funds.

Now, some of them are related parties, and those are a little bit easier. Some of them are owned by Highland. But there are third-party investors in these funds who have no relation whatsoever to Highland, and we owe them a fiduciary duty both to manage their assets prudently but also to seek to manage -- maximize value.

Those duties do not require -- requires the opposite of what I mean. They don't merely require avoiding gross negligence or willful wrongdoing. When you're managing assets of others, the fiduciary duties that you owe are far stricter than that. The highest duty known to law is a fiduciary duty.

The order is inconsistent with that testimony,

acknowledging the fiduciary duties owed to The Charitable DAF and to CLO Holdco. It appears to release the Debtor -- maybe not the Debtor. My slide may be wrong about that. It appears to release Seery from having to uphold these duties.

In addition to problems with the gatekeeping under the Barton Doctrine, in addition to the release problem and *Applewood* and the unwaivable fiduciary duties under the Advisers Act, there's also a problem with telling other courts that they lack jurisdiction. Your Honor knows bankruptcy court law -- bankruptcy -- and the Bankruptcy Code far better than I do, I'm certain. But a first principle, I believe, of bankruptcy law is that this Court's jurisdiction is derivative of the District Court's. And the only doctrine I've heard of that can allow this Court to exercise exclusive jurisdiction of the District Court that it sits in is the Barton Doctrine, which, again, is very problematic to apply in this case, for the reasons we've discussed already.

By claiming to have -- by stating in the order that this Court has sole jurisdiction, it appears to either be inclusive of the District Court, which I understand Your Honor doesn't think her order can be read that way, but if it's not read that way, then it results in telling the District Court that it doesn't have the original jurisdiction that Congress has given it. And that's problematic in the order as well.

THE COURT: Let me ask you. If you think the word

"power" had been used, or "authority," versus "jurisdiction," that would have cured it?

MR. BRIDGES: I think there would still have been other problems. Would it have cured this? I don't think so, Your Honor, because, again, I think the only basis for that power is the Barton Doctrine.

THE COURT: Okay.

MR. BRIDGES: To listen to opposing counsel, you'd think that our jurisdictional argument was entirely about the jurisdiction stripping. It's not. Frankly, Your Honor, that's maybe even a lesser point. A key problem here to is the assertion of jurisdiction, not over any of the claims, but over all of the claims, because of 157(d), Your Honor, because some claims, some causes of action, have been put outside the reach of bankruptcy, the Bankruptcy Court, and those actions may in some instances fit within your description of the cases that are precluded here.

That's a problem jurisdictionally with this Court's ability to say it retains jurisdiction or that it has, that it asserts jurisdiction. Over what? Any kind of claim or cause of action against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor.

Some claims that fit into that bucket also fit into the description in 157(d) of cases that require both consideration

of bankruptcy law and federal laws affecting interstate commerce or regulating it. Right? Some cases must fall into -- under 157(d), despite having something to do with Mr. Seery's role as a chief executive officer. And Your Honor, the Advisers Act fiduciary duty claims asserted by Respondents in the District Court are such claims. They cannot be decided without considering the Advisers Act.

There are also RICO claims that, of course, require consideration of the RICO statute. But the Advisers Act claims absolutely require consideration of both bankruptcy law and this Court's order exonerating -- exculpating Mr. Seery from some liability, in addition to the unwaivable fiduciary duties imposed by the Advisers Act.

The assertion of jurisdiction here blanketed, in a blanket manner, over all claims against Mr. Seery in any way related to his CEO role is a 157(d) problem that the order has no -- has no solution for and we see no way around. 157(d) requires withdrawal of the reference, makes it mandatory, when a case requires considerations of federal law implicating interstate commerce.

Your Honor, we think we had to do it the way we did, filing in the District Court instead of filing here, in order to preserve our jurisdictional arguments. To come to this Court with a motion and then what? Immediately file a motion to withdraw the reference on our own motion here? To come

here and ask for a decision on colorability, when first colorability would exclude the claims that we're trying to bring, at least some of them, the mere negligence, mere fiduciary duty breaches, because they don't rise to the level necessarily of gross negligence or willful wrongdoing.

Your Honor, coming here and asking this Court to rule on that may well have waived our jurisdictional objections. Coming here to this Court and doing that and immediately filing a motion --

THE COURT: I don't get it.

MR. BRIDGES: The ordinary --

THE COURT: Subject matter jurisdiction, if it's a problem, it's not waivable.

MR. BRIDGES: The ordinary issue -- the ordinary waiver rule, Your Honor, is that when you come and ask for a court to rule on something, that you waive your right to -- to later -- you're estopped judicially from taking the contrary position.

THE COURT: Okay. Well, again, I don't get it. If you filed your motion and I ruled in a way you didn't like, you would appeal to the District Court.

MR. BRIDGES: Yes, Your Honor. An appeal to the District Court, we would be entitled to do. I understand, no matter what happens here, we can appeal to the District Court. That's different from whether or not, by coming here first,

have we waived or have we created an estoppel situation, in terms of arguing jurisdiction.

THE COURT: Okay.

MR. BRIDGES: Because of the problems with the order, we thought we were in a situation where coming here would waive rights that we could avoid waiving by asking in the District Court.

In other words, there was a jurisdictional paradox: How does a party ask a court to do something it believes the court lacks the power to do? That's the spot we found ourselves in. What were we supposed to do?

Your Honor, it is definitely a complex case. And coming into this matter with over 2,000 filings on the docket before I had ever heard of Highland was a very daunting thing, coming into this case. And whether or not there's something that we missed is certainly possible, but these orders that are the subject of the contempt motion, these orders are not things that we overlooked. These are things that we studied carefully, that we did not ignore or have disdain for, but that affected and changed our actions.

And in the Slide #3 from Mr. Morris's -- from Mr. Morris's presentation, in his third slide, he quotes from the first page of our motion for leave, the motion that he says exhibits our contemptuous behavior.

The second paragraph is kind of tiny print there, Your

Honor, and it's not highlighted, but I'd like to read it. Seery is not named in the original complaint, but this is only out of an abundance of caution due to the Bankruptcy Court in HCM's pending Chapter 11 proceeding having issued an order prohibiting the filing of any causes of action against Seery in any way related to his role at HCM, subject to certain prerequisites. In that order, the Bankruptcy Court also asserts sole jurisdiction over all such causes of action.

Your Honor, our intent was not to violate the order. Our intent was to be cautious about how we proceeded, to fully disclose what we were doing, and to do it in a District Court that absolutely could refer the matter here to this Court for a decision, but to do it in a way that didn't waive our jurisdictional arguments, that didn't waive our arguments regarding the release of the very claims we were trying to bring, by first having to prove that they were colorful claims of willful misconduct or gross negligence, when we were trying to assert claims that weren't willful negligence or gross -- gross negligence or willful misconduct. That was what I was trying to say.

Your Honor, this was not disregard of your order. If we're wrong on the law, we're wrong on the law, but it's not that we disregarded your order or lacked respect for it. We disclosed it.

Mr. Morris has argued in the briefs that we attempted to

do this on an ex parte basis. Your Honor, we did not attempt to do this on an ex parte basis. And if there are errors, they probably are mine. I know one error is mine. On the civil cover sheet in the filing in the District Court, I noted and passed on that we should check the box for related case and list this case on there. I did not follow up to make sure that it happened, and administratively, it didn't happen. We did not check the box on the civil cover sheet. Mr. Morris is correct that we failed to do that. He's incorrect that that was sneaky or intentional. It was my error, having noticed it but not followed up.

Your Honor, similarly, the argument that we didn't serve them with the motion I think is disingenuous. What happened, Your Honor, is that counsel for the Debtor had agreed to accept service of the complaint itself against the Debtor before the motion for leave, and after accepting service, I was under the impression that they'd be monitoring the docket, especially when I emailed them, informed them that we were filing the motion for leave to amend, because I was required to submit a certificate of conference on that motion. I informed them in a polite email. The polite email is not quoted in their brief. It is included in the record, and it's quoted in full in our brief.

The email exchange indicates to them, Thank you for pointing out the Court's orders. We've carefully studied them

and we don't think what we're doing is a violation of those orders.

That we didn't serve them is because we thought they already knew that the motion was coming and would be monitoring the docket, and we didn't know which lawyers they were going to have make an appearance in that case, so we wouldn't have known who to serve. But if not serving them -- first, the Rules do not require that service. But if not serving them out of politeness --

THE COURT: Mr. Morris is standing up. Did --

MR. MORRIS: I move to strike all of this, Your Honor. If Counsel wants to take the stand and raise his hand, he should testify under oath. I'm just going to leave it at that. He's not on their witness list.

THE COURT: All right. I overrule. You can continue.

MR. BRIDGES: Thank you, Your Honor.

If failure to serve them was an error, it was mine. I know of no rule that requires it.

THE COURT: Can I ask you, you were talking about the cover sheet mistake in not checking the box. What about your jurisdictional statement in the actual complaint not mentioning 28 U.S.C. § 1334 as a possible basis for subject matter jurisdiction? Do you think that was a mistake as well, or was that purposeful, not necessary?

MR. BRIDGES: Candidly, Your Honor, standing here right now, I have no recollection whatsoever of it.

THE COURT: You mention 28 U.S.C. § 1331, and then 1367 supplemental jurisdiction, but you don't mention 1334.

MR. BRIDGES: I suspect it's true, but Mr. Sbaiti would have written that.

THE COURT: Okay.

MR. BRIDGES: I have no recollection of --

THE COURT: Okay.

MR. BRIDGES: -- making any decision at all --

THE COURT: All right.

MR. BRIDGES: -- with regards to that.

THE COURT: Okay.

MR. BRIDGES: Your Honor, you've been very patient with a very long opening argument, and I'm very grateful for that. Please know that we take this Court's order seriously. We voluntarily appeared here before the Court ordered us to do so by filing our motion asking for a modification of the order we're accused now of having been in violation of.

And the last thing I'd like to say, Your Honor, Mr. Morris's brief claims that the first he knew of the motion, the motion seeking leave to add Mr. Seery to the District Court claim, the first he knew of that was when Mr. Sbaiti forwarded him the District Court's order dismissing that motion, denying that motion without prejudice.

Your Honor, in a civil contempt proceeding, where the issue is compensating, not punishing, if the aggrieved party didn't even know about the action until it had been denied by the District Court, we submit that there can be no harm from that having taken place.

That's all I have for opening. Thank you, Your Honor.

THE COURT: All right. Thank you.

Before we give you a time check, do we have other opening statements?

MR. ANDERSON: Yes. Yes, Your Honor. Michael Anderson on behalf of Mr. Patrick. If we need to take a break, that's fine, too.

THE COURT: Well, how long do you plan to use?

MR. ANDERSON: No more than ten minutes, for sure.

THE COURT: Let's go ahead and do that, and then we'll take a break.

MR. POMERANTZ: Your Honor, after, I would ask the opportunity to respond to Mr. Bridges' argument. Probably another ten minutes.

THE COURT: All right. Let's go ahead and take a ten-minute break. And Mr. Taylor, you're going to have something, because you --

MR. TAYLOR: Five.

THE COURT: Okay. We'll take a ten-minute break. And Nate, can you give them a time?

THE CLERK: I'm showing it was about 59-1/2 minutes.

THE COURT: Fifty-nine and a half? And is that subtracting some for my questioning?

THE CLERK: I stopped whenever you talked, maybe a little over --

THE COURT: Okay. So he stopped it whenever I asked questions and you answered, so 59 minutes has been used by the Respondents.

All right. We'll take a ten-minute break. We'll come back at 11:35.

THE CLERK: All rise.

(A recess ensued from 11:25 a.m. to 11:37 a.m.)

THE COURT: All right. We're going back on the record in the Highland matter. We have further opening statements. Counsel, you may proceed.

OPENING STATEMENT ON BEHALF OF MARK PATRICK, RESPONDENT

MR. ANDERSON: Thank you. May it please the Court, Counsel. Michael Anderson on behalf of Respondent, Mark Patrick.

Your Honor, after listening to this and looking at the filings in this case, this issue of whether there's contempt -- and I would argue there's not -- is ripe for decision. We have no real undisputed facts for purposes of the contempt issue. We have your Court's July order, the subject of Mr. Bridge's arguments. We have the Plaintiffs in the underlying

lawsuit at issue. They commenced the lawsuit in April of this year. There's absolutely nothing improper about that filing. It's not subject to the contempt. A week later, there is a motion for leave to add Mr. Seery. That's the issue. There's no dispute over that. There's no dispute that Mr. Patrick authorized the filing of the motion for leave.

And so then the question becomes we look at the Court's July order, did a motion for leave, did that violate the terms of the order? The motion for leave is not commencing a lawsuit. It's also not pursuing a claim, because whether or not the Court grants the motion, denies the motion, or whatever the Court does, nothing happened, because the day after the motion for leave was filed it was dismissed *sua sponte* without prejudice because not all parties had been served in the case.

It was permission asked one day. The matter was mooted the following day by the District Court. And so that is completely undisputed.

And so the question is, is asking permission, is that commence? I think everybody says there's no way that's commencing a lawsuit because you have asked permission. The question, then, is it pursuing a claim? And the argument, well, no, that's not pursuing a claim; it's asking permission.

And I think it's also important to note that when the motion for leave was filed, there were no secrets there. I

mean, I'm coming in this after the fact, representing Mr. Patrick. You look at a motion for leave, and right there on Page 1 it talks about Your Honor's order. Page 2, it quotes the order and it gives the reasons, there's arguments being made as to why that order doesn't bar adding Mr. Seery as a defendant in the lawsuit, many of the arguments that Mr. Bridges made.

So that's where we are. And so when I hear, hey, we've got six hours, three hours and three hours, and we're going to split this up, you know, maybe too simplistic from Fort Worth, but I'm like, wait a second, this is all undisputed. It's totally undisputed. The -- whether or not the prior order is enforceable or not enforceable, those are all legal arguments. You know, no witnesses are necessary for that. And as I understood, right before we broke, counsel stood up and he's going to do what generally doesn't happen in opening statements, which is respond to opening statements, which shows that that's a legal issue.

And so it really does come down to undisputed facts. There's no testimony. No -- nothing is necessary. And a lot of what this comes down to is the old statement, you know, is it better to ask forgiveness or permission? And usually that statement comes up when somebody has already done something: Hey, I'm going to go do it anyway and I'll ask for forgiveness later. Well, what the Plaintiffs in the underlying case did

was ask permission. Motion for leave. That is not contemptuous. And there's literally no damages. As was pointed out, by the time counsel found out, it had already been dismissed.

The last thing I want to point out, Your Honor, is that the argument from opposing counsel was, well, under Rule 15 of the Federal Rules of Civil Procedure, since parties hadn't answered yet, the Plaintiffs in the underlying case could have just simply added Mr. Seery as a defendant and moved on that way, but then that would be another ball of wax and then we would be addressing issues as far as whether or not there is a violation of the Court's order, notwithstanding Mr. Bridge's arguments. But then we would have those issues. But that's not what happened. Everybody knows that's not what happened. It was a motion for leave that was resolved the following day.

And so, Your Honor, for those reasons, and those undisputed reasons, we would request that the Court at the end of this hearing deny the request for sanctions and a contempt finding against our client, Mr. Patrick.

Mr. Phillips is going to address one brief issue bankruptcy-wise I believe that was raised earlier.

THE COURT: Okay. Mr. Phillips?

MR. PHILLIPS: Your Honor, thank you very much. Louis M. Phillips on behalf of Mark Patrick.

The only thing that I would point out, Your Honor, and I'm

going to do -- try to simplistically, because that's about the level at which I operate, boil down the questions about the order.

This order was an employment order. The problem that Mr. Bridges has elucidated to Your Honor is that the precise effect, one of the precise effects of that order is to bar the claims of third parties that arise into the future on the basis of the employment of Mr. Seery, because the order required that all claims asserting gross negligence or willful misconduct need to be brought before you to determine that they're colorable.

One question I have is, does it apply to the lawsuit that was filed? Doesn't apply unless the effect of the order was to release those claims and preclude any party from bringing those claims at all. And while you can say correctly that this Court issues gatekeeper orders all of the time, one thing I cannot imagine that you would say is that in employment orders you release claims of third parties existing and as may arise in the future that could be brought against the party employed to be a CRO of a debtor, who, by his own testimony, says we do all kinds of stuff in the billions of dollars for third parties that we owe fiduciary duties to.

There's no way, Your Honor, that you were considering your July order to bar third-party claims arising from breach of fiduciary duties by Mr. Seery to third parties who held third-

party claims that did not involve some assertion that, in his capacity as CRO, he was in some way acting within the scope of his authority as CRO for the Debtor and yet committed negligence against the Debtor.

Now, if the order was asserting that you know what a lot of people in this courtroom know, that the standard of liability for a CRO doing work for a debtor, just like the standard of liability for the president of a corporation or an officer of the corporation, is as long as you're within the course and scope of your employment, your actions for the corporation have -- can -- the corporation takes care of you because there's no personal claim unless you're outside the scope, and you're outside the scope if you commit gross negligence or willful misconduct.

That, if you're restating the standard of care and standard of liability for a CRO, we have no problem with that, because Mr. Patrick did not authorize a cause of action arising against Mr. Seery against the Debtors for damage to the Debtors. He authorized the filing of a complaint in the District Court with jurisdiction for a third-party claim for breach of a fiduciary duty to a third party that Mr. Seery admits he owes, and then sought leave because they didn't understand the order that Your Honor issued. It couldn't have been to release the breach of fiduciary duty claims that wouldn't rise to gross negligence or willful misconduct, it

couldn't be that, but it might be. But if it did, under an employment order? That's very different from *Espinosa*, that's very different from *Shoaf*, when you're at the end of a case in a confirmation of a plan and you're talking about matters arising in the past.

This order, if it has the effect it could be read to have, precludes any third party from asserting a breach of fiduciary duty against Seery for actions that violate the duty to that third party, when Seery's biggest job, it looks to us like, is running third-party money. That could not have been what Your Honor was thinking.

And so all I'm pointing out is I'm trying to distill down. The lawsuit doesn't involve gross negligence or willful misconduct allegations. It involves breach of fiduciary duty, breach of the Advisers Act, et cetera, et cetera. Mr. Patrick authorized that lawsuit.

Now, what we're here for today is to determine whether the complaint, which was not against the Debtor -- which was not against Seery, the motion for leave, which did not -- all they did was ask for permission, not forgiveness. And we can't understand how the Debtor should be saying, all they had to do was amend. Well, if they amended, would we be in hotter water than we are today for asking for permission to sue? I think we would have been, that should have been the prescribed course, when we are more concerned and we are more risk-averse

by asking for leave rather than just amending by right. Absolutely, that makes no sense. We can't be held to be more contemptuous because we asked for permission, when we could have just sued him, because they're saying asking for permission was wrong. Certainly, suing him would have been wrong. That would have been easier.

THE COURT: But Mr. Phillips, the issue is you all didn't come to the Bankruptcy Court and ask permission.

MR. PHILLIPS: Look at your order, Your Honor.

THE COURT: It's right in front of me.

MR. PHILLIPS: Right. That order either doesn't apply to the claims that were brought or it released the claims that were brought. That's our point. It couldn't have released them. Does it apply to them? Thank you.

THE COURT: Okay. Mr. Taylor?

MR. TAYLOR: Good morning.

THE COURT: Good morning.

OPENING STATEMENT ON BEHALF OF JAMES DONDERO

MR. TAYLOR: Your Honor, Clay Taylor on behalf of Jim Dondero. I'll be very brief because I know we've already spent a lot of time on opening argument. But I do think it is appropriate to, one, first look at who brought the lawsuit, CLO Holdco & DAF. That was authorized -- it's undisputed it was authorized by Mr. Patrick. There is no dispute about that. There's no dispute who the Plaintiffs are. But yet my

client is up here as an alleged violator.

I think it's very clear, as all the parties have said, there's no dispute as to there's an order, there was a complaint, and there was a motion for leave.

It seems to me that the rest of the evidentiary hearing that you may be about to go through is going to be about pin the blame on Mr. Dondero. It is undisputed that he is not a control person for the DAF or CLO Holdco. The only type of evidence you will hear is going to be insinuation that he somehow controls Mr. Patrick and used to control Mr. Scott. There will be no direct evidence that he authorized this or that he's the control person and the proper corporate authorized representative that signed off on the --

It seems to me, Your Honor, first of all, that's a discrete issue that should be able to be decided separately from this, and the first gating issue is, was there indeed a violation of this Court's order? It would seem to me that there is no disputes about those facts and that we should bifurcate that, and if you then find that there is a violation and find that there is any even need to move into who the alleged violators are, that then we could have that evidentiary portion. But there is no reason to do that now before there's even been found to be a violation.

THE COURT: All right. Thank you.

All right. Well, someone made the point rebuttals in

opening statements are not very common, --

MR. POMERANTZ: Your -- Your --

THE COURT: -- but you can use your three hours however you want.

OPENING STATEMENT ON BEHALF OF THE DEBTOR

MR. POMERANTZ: Your Honor, I didn't intend to stand up.

THE COURT: Okay.

MR. POMERANTZ: I also didn't intend to have the motion to modify the sealing order presented to Your Honor, which it was in the course of that opening argument. And despite your comments at the beginning of the hearing, the Movants have taken Your Honor down a series of rabbit holes that have really no relevance to the contempt motion. And notwithstanding, as I said, your ruling that basically the contempt would go first and the modification would go second, there they were, persistent in making all the arguments why this Court should modify the order.

They're just really trying to obfuscate the simple issue that Mr. Morris presented and raised at the beginning of the hearing: Did they violate the order by pursuing a claim? We think the answer is undoubtedly yes.

I'm not going to try to address each of the issues they raised in connection with the modification motion in detail. I have a lengthy presentation. I'll do it at the appropriate

time. But there are a few issues I want to address. I want to address one of the last points Mr. Bridges raised first. If they thought that the order was a problem, they could have filed their motion to modify that order before Your Honor. They could have had that heard first. There was no statute of limitations issue in connection with the HarbourVest matter. They could have come to Your Honor to do that. But no, they didn't. They went to the District Court first, and it was only after we filed our contempt motion that they came back and said, well, Your Honor, you should modify the order. Their argument that if they did that there would have been waiver and estoppel is just an after-the-fact justification for what they did and what they tried to do, which was unsuccessful. They tried to have the District Court make the decision.

And why? Your Honor, they've filed motions to recuse before Your Honor. They -- they -- it's no secret the disdain they have for Your Honor's rulings as it relates to them. They wanted to be out of this courtroom and in another courtroom.

And their belated argument, Mr. Bridges falling on the sword, that they failed to check the box, inadvertent, it's on me, it's very curious. Because if they had done so and had referred to the correct 1334 jurisdictional predicate, as Your Honor had mentioned, the complaint would have been referred to

this Court and the entire trajectory of the proceedings would have been different. They would have had the opportunity to take their shot to go to District Court and argue that your order didn't apply.

Your Honor, they say the January 9th order is not relevant. It is entirely relevant. It covered the independent directors and their agents. Yes, Mr. Seery is an independent director, but he was also an agent of the independent directors and carried out the duties. You heard argument at the July 16th hearing that Mr. Seery had been acting as the chief executive officer for several months. And why is it important? Mr. Bridges said, well, if we violated one order, we violated the other. It's important because, Your Honor, number one, Mr. Dondero supported that order. We would never have had an independent board in this case if Mr. Dondero, the decision-making -- of the Debtor at that time, supported that order and supported the exculpations that are now claimed to have been invalid.

And also Your Honor heard testimony at the confirmation hearing that the independent directors would never have taken this job, would never have taken this job because of the potential for litigation, litigation that we've now had to endure for several months. So to come back 16 months later and say, well, you know, you couldn't really exculpate them, it's really an employment order: It was an employment order.

They know it. We know it. Your Honor knows it. It was a resolution of corporate governance issues that changed the whole trajectory of the case, and luckily it -- luckily, Your Honor approved it.

The question just is whether they violated the order, period. And I'll have a lot to say about res judicata, but I won't go in too much in detail, but I will just briefly address their arguments. They're correct and the Court is correct that there's a difference between *Applewood* and *Shoaf*. And Your Honor got the exact difference. In one case, a release was not specific, *Applewood*. In one case it was. *Shoaf* hasn't been discredited by *Applewood*. It was different facts. In fact, *Shoaf* relied on two Supreme Court cases, the *Stoll* case and the *Chicot* case, both for the propositions that a court that enters an order, a clear order, even if it didn't have jurisdiction, that cannot be attacked in res judicata. So here what we have is clear, unambiguous, you come to this Court before commencing or pursuing a claim. That's the clarity. The focus on the releases, that's not what we're here for today, that's not what we're here for on a contempt motion, on whether the release covered them or it didn't cover them. We're here on the clear issue of did they violate the language, and we submit that they did.

And similarly, *Espinosa* applies. Your Honor, just to quote some language, "Appellees could have moved to remand the

action to state court after it improperly -- after its improper removal to the federal court or challenge the district court's exercise in jurisdiction on direct appeal. Because they did neither, they are now barred by principles of res judicata."

Res judicata actually does apply, and I will speak about it in much more detail in the modification motion.

With respect to *Barton*, Your Honor, we disagree with their argument that Mr. Seery is not a court-appointed agent. We've briefed it extensively in our motion to modify. *Barton* applies to debtors in possession. *Barton* applies to general partners of the debtor. *Barton* applies to chief restructuring orders -- officers who are approved by the debtor. And it applies to general counsel who are appointed by the chief restructuring order. Officer.

So the argument that *Barton* is somehow inapplicable is just wrong. Your Honor knows that. Your Honor has written extensively on *Barton* in connection with your *Ondova* opinion.

Some of the argument about 959 is all wrong, as well. Your Honor got it right that 959 applies to slip-and-fall cases or torts, injuries to parties that are strangers to this process. There is a legion of cases that I will cite to Your Honor in connection with argument. 959 does not apply here. There's nothing more core to this case than the transactions surrounding the resolution of the HarbourVest claims.

We also disagree, Your Honor, that the complaint is subject to mandatory withdrawal of the reference. We've -- one of our exhibits in the motion to modify is our motion to enforce the reference. We think Movants have it completely wrong. This is not the type of case that will be subject to withdrawal -- mandatory withdrawal of the reference, and in any event, for this contempt motion, it's irrelevant.

And they argue -- one of the other points Mr. Bridges raises is that, because this Court would not have had jurisdiction under 157 because of the mandatory withdrawal, then Your Honor could not legally act as a gatekeeper. But they haven't addressed *Villegas v. Schmidt*. We've raised it throughout this case. And again, in these series of pleadings, they don't even address it. And *Villegas v. Schmidt* was a *Barton* case. It was a *Barton* case where the -- where the argument was that *Barton* does not apply because it's a *Stern* claim and the Bankruptcy Court would not have jurisdiction. And *Villegas* said no, it does apply. And Your Honor even cited that in your *Ondova* case. And why does it apply? Because there's nothing inconsistent with a Bankruptcy Court having exclusive decision to make a *Barton* determination.

In fact, in that case *Villegas* said, you can't go to the District Court for that decision, it is the Bankruptcy Court's decision.

So, again, it's a red herring, Your Honor. Your Honor had the ability to act as an exclusive gatekeeper for these types of actions.

With that, Your Honor, I'll leave the rest of my argument for the next motion.

THE COURT: All right. Thanks.

All right. Nate, let's give everyone their time.

THE CLERK: That was just about eight and a half additional from the Debtor, and then altogether the other ones were just shy of fourteen minutes. Thirteen minutes and fifty seconds for the other three combined. Do you want me to --

THE COURT: Yes, I meant for Debtor combined versus --

THE CLERK: Oh. Oh.

THE COURT: Respondents combined.

THE CLERK: So that would be twenty one and a half the Debtor. Let me do the math on the other one. Be an hour twelve minutes and fifty seconds for --

THE COURT: Okay. All right. Got that? Debtors used a total of twenty one and a half minutes; Responders have used an hour twelve minutes and fifty seconds.

All right. Mr. Morris, you may call your first witness.

MR. MORRIS: Thank you very much, Your Honor. The Debtor calls Mark Patrick.

THE COURT: All right. Mr. Patrick? Please approach

our witness stand and I'll swear you in. Please raise your right hand.

(The witness is sworn.)

THE COURT: All right. Please take a seat.

MARK PATRICK, DEBTOR'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MORRIS:

Q Good afternoon, Mr. Patrick.

A Good afternoon.

Q Can you hear me okay?

A Yes, I can.

Q Okay. You have before you several sets of binders. They're rather large. But when I deposed you on Friday, we did that virtually. Now, I may direct you specifically to one of the binders or one of the documents from time to time, so I just wanted you to know that those were in front of you and that I may be doing that.

Mr. Patrick, since March 1st, 2001 [sic], you've been employed by Highland Consultants, right?

A I believe the name is Highgate Consultants doing business as Skyview Group.

Q Okay. And that's an entity that was created by certain former Highland employees, correct?

A That is my understanding, correct.

Q And your understanding is that Mr. Dondero doesn't have an

ownership interest in that entity, correct?
A That he does not. That is correct.
Q And your understanding is that he's not an employee of that -- of Skyview, correct?
A That is correct.
Q Prior to joining Skyview on March 1st, you had worked at Highland Capital Management, LP for about 13 years, correct?
A Correct.
Q Joining in, I believe, early 2008?
A Correct.
Q Okay. I'm going to refer to Highland Capital Management, LP from time to time as HCMLP. Is that okay?
A Yes.
Q While at HCMLP, you served as a tax counselor, correct?
A No, I would like to distinguish that. I did have the title tax counsel. However, essentially all my activities were in a non-lawyer capacity, being the client representative. I would engage other outside law firms to provide legal advice.
Q Okay. So you are an attorney, correct?
A Yes, I am.
Q But essentially everything you did at Highland during your 13 years was in a non-lawyer capacity, correct?
A Correct.
Q In fact, you didn't even work in the legal department; is

that right?

A That is correct. I worked for the tax department.

Q Okay. Let's talk about how you became the authorized representative of the Plaintiffs. You are, in fact, authorized representative today of CLO Holdco, Ltd. and Charitable DAF, LP, correct?

A Charitable DAF Fund, LP. Correct.

Q And those are the two entities that filed the complaint in the United States District Court against the Debtor and two other entities, correct?

A Correct.

Q And may I refer to those two entities going forward as the Plaintiffs?

A Yes.

Q You became the authorized representative of the Plaintiffs on March 24th, 2021, the day you and Mr. Scott executed certain transfer documents, correct?

A Correct.

Q And you had no authority to act on behalf of either of the Plaintiffs before March 24th, correct?

A Correct.

Q The DAF controls about $200 million in assets, correct?

A The Plaintiffs, you mean? CLO Holdco and Charitable DAF Fund, LP.

Q Yes.

A Around there.
Q Okay. Let me try and just ask that again, and thank you for correcting me. To the best of your knowledge, the Plaintiffs control about $200 million in assets, correct?
A Net assets, correct.
Q Okay. And that asset base is derived largely from HCMLP, Mr. Dondero, or Mr. Dondero's trusts, correct?
A Can you restate that question again, Mr. Morris?
Q Sure. The asset base that you just referred to is derived largely from HCMLP, Mr. Dondero, or donor trusts?
A The way I would characterize it -- you're using the word derived. I would characterize it with respect to certain charitable donations --
Q Uh-huh.
A -- that were -- that were made at certain time periods, where the donors gave up complete dominion and control over the respective assets and at that time claimed a federal income tax deduction for that.
I do -- I do believe that, as far as the donor group, as you specified, Highland Capital Management, I recall, provided a donation to a Charitable Remainder Trust that eventually had expired and that eventually such assets went into the supporting organizations. And then I do believe Mr. Dondero also contributed to the Charitable Remainder Trust No. 2, which seeded substantial amounts of the original assets that

were eventually composed of the $200 million. And then from time to time I do believe that Mr. Dondero's trusts made charitable donations to their respective supporting organizations.

Q Okay. Thank you.

A Is that responsive?

Q It is. It's very responsive. Thank you very much. So, to the best of your knowledge, the charitable donations that were made that form the bases of the assets came from those three -- primarily from those three sources, correct?

A Well, you know, there's two different trusts. There's the Dugaboy Trust and the Get Good Trust.

Q Okay.

A Then you have Mr. Dondero and Highland Capital Management. So I would say four sources.

Q Okay. All right. Thank you. Prior to assuming your role as the authorized representative of the Plaintiff, you had never had meaningful responsibility for making investment decisions, correct?

A I'm sorry. You kind of talk a little bit fast. Please slow it down --

Q That's okay.

A -- and restate it. Thank you.

Q And I appreciate that. And any time you don't understand what I'm saying or I speak too fast, please do exactly what

you're doing. You're doing fine.

Prior to assuming your role as the authorized representative of the Plaintiffs, you never had any meaningful responsibility making investment decisions. Is that correct?

A To whom?

Q For anybody.

A Well, during my deposition, I believe I testified that I make investment decisions with respect to my family. Family and friends come to me and they ask me for investment decisions. I was -- in my deposition, I indicated to you that I was a board member of a nonprofit called the 500, Inc. They had received a donation of stock in Yahoo!, and the members there looked to me for financial guidance. As an undergrad at the University of Miami, I was a -- I was a finance major, and so I do have a variety of background with respect to investments.

Q Okay. So you told me that from time to time friends and family members come to you for investing advice. Is that right?

A That is correct.

Q And when you were a young lawyer you were on the board of a nonprofit that received a donation of Yahoo! stock and the board looked to you for guidance. Is that correct?

THE COURT: Just a moment. I think there's an objection.

MR. MORRIS: Uh-huh.

THE COURT: Go ahead.

MR. ANDERSON: So far -- relevance, Your Honor. This is way out of the bounds of the contempt proceeding. You know, what he did as a young person with Yahoo! stock. We're here to -- he authorized the lawsuit. They filed the lawsuit. That's it. Getting into all this peripheral stuff is completely irrelevant.

THE COURT: Your response?

MR. MORRIS: My response, Your Honor, is very simple. Mr. Patrick assumed responsibility, and you're going to be told that he exercised full and complete authority over a $200 million fund that was created by Mr. Dondero, --

THE COURT: Okay.

MR. MORRIS: -- that funds -- that is funded virtually by Mr. Dondero, and for which -- Mr. Patrick is a lovely man, and I don't mean to disparage him at all -- but he has no meaningful experience in investing at all.

THE COURT: All right. Counsel, I overrule. I think there's potential relevance.

And may I remind people that when you're back at counsel table, please make sure you speak your objections into the microphone. Thank you.

BY MR. MORRIS:

Q When you were a young lawyer, sir, you were on the board

of a nonprofit that received a donation of Yahoo! stock and the board looked to you for guidance, correct?
A Yes, correct.
Q And -- but during your 13 years at Highland, you never had formal responsibility for making investment decisions, correct?
A That is correct.
Q Yeah. In fact, other than investment opportunities that you personally presented where you served as a co-decider, you never had any responsibility or authority to make investment decisions on behalf of HCMLP or any of its affiliated entities, correct?
A That is correct.
Q And at least during your deposition, you couldn't identify a single opportunity where you actually had the authority and did authorize the execution of a transaction on behalf of HCMLP or any of its affiliates, correct?
A Correct.
Q And yet today you are now solely responsible for making all investment decisions with respect to a $200 million charitable fund, correct?
A Yes, but I get some help. I've engaged an outside third party called ValueScope, and they have been as -- effectively working as a "gatekeeper" for me, and I look to them for investment guidance and advice, and I informally look to Mr.

Dondero since the time period of when I took control on March 24th for any questions I may have with respect to the portfolio. So I don't feel like I'm all by myself in making decisions.

Q Okay. I didn't mean to suggest that you were, sir, and I apologize if you took it that way. I was just asking the question, you are the person now solely responsible for making the investment decisions, correct?

A Yes.

Q Okay. Let's talk about the circumstances that led to the filing of the complaint for a bit. On April 12, 2021, you caused the Plaintiffs to commence an action against HCMLP and two other entities, correct?

A Correct.

Q Okay. One of the binders -- you've got a couple of binders in front of you. If you look at the bottom, one of them says Volume 1 of 2, Exhibits 1 through 18. And if you could grab that one and turn to Exhibit 12. Do you have that, sir?

A It says -- it says the original complaint. Is that the right one?

Q That is the right one. And just as I said when we were doing this virtually last Friday, if I ask you a question about a particular document, you should always feel free to review as much of the document as you think you need to

competently and fully answer the question. Okay?
A Okay. Thank you.
Q All right. You instructed the Sbaiti firm to file that complaint on behalf of the Plaintiffs, correct?
A Correct.
Q And to the best of your recollection, the Plaintiffs returned -- retained the Sbaiti firm in April, correct?
A Correct.
Q So the Sbaiti firm was retained no more than twelve days before the complaint was filed, correct?
A Correct.
Q You personally retained the Sbaiti firm, correct?
A Correct.
Q And the idea of filing this complaint originated with the Sbaiti firm, correct?
A Correct.
Q Before filing -- withdrawn. Before becoming the Plaintiffs' authorized representative, you hadn't had any communications with anyone about potential claims that might be brought against the Debtor arising out of the HarbourVest settlement, correct?
A That is correct.
Q Now, after you became the Plaintiffs' authorized representative, Mr. Dondero communicated with the Sbaiti firm about the complaint that's marked as Exhibit 12, correct?

A Yes. After he brought certain information to myself and then that I engaged the Sbaiti firm to launch an investigation, I also wanted Mr. Dondero to work with the Sbaiti firm with respect to their investigation of the underlying facts.
Q Okay. Mr. Dondero did not discuss the complaint with you, but he did communicate with the Sbaiti firm about the complaint, correct?
A I believe -- yeah. I heard you slip in at the end "the complaint." I know he communicated with the Sbaiti firm. I can't -- I can't say what he said or didn't say with respect to the -- the actual complaint.
Q Okay. But Mr. Dondero got involved in the process initially when he brought some information to your attention concerning the HarbourVest transaction, correct?
A Correct.
Q And he came to you with the HarbourVest information after you assumed your role as the authorized representative of the Plaintiffs on March 24th, correct?
A That is correct.
Q At the time he came to you, you did not have any specific knowledge about the HarbourVest transaction, correct?
A I did not have specific knowledge with respect to the allegations that were laid out and the facts with respect to the original complaint. I think I had just had a general

awareness that there was a HarbourVest something or other, but the specific aspects of it, I was unaware.

Q Okay. And you had no reason to believe that Mr. Seery had done anything wrong with respect to the HarbourVest transaction at the time you became the Plaintiffs' authorized representative, correct?

A That is correct.

Q But you recall very specifically that some time after March 24th Mr. Dondero told you that an investment opportunity was essentially usurped or taken away, to the Plaintiffs' harm and for the benefit of HCMLP, correct?

A That is correct.

Q And after Mr. Dondero brought this information to your attention, you hired the Sbaiti firm to launch an investigation into the facts, correct?

A Correct.

Q You had never worked with the Sbaiti firm before, correct?

A That is correct.

Q And you had hired many firms as a tax counselor at HCMLP, but not the Sbaiti firm until now. Correct?

A That is correct.

Q You got to the Sbaiti firm through a recommendation from D.C. Sauter, correct?

A Correct.

Q Mr. Sauter is the in-house counsel, the in-house general

counsel at NexPoint Advisors, correct?
A Correct.
Q You didn't ask Mr. Sauter for a recommendation for a lawyer; he just volunteered that you should use the Sbaiti firm. Correct?
A That is correct.
Q And you never used -- considered using another firm, did you?
A When they were presented to me, they appeared to have all the sufficient skills necessary to undertake this action, and so I don't recall interviewing any other firms.
Q Okay. Now, after bringing the matter to your action, Mr. Dondero communicated directly with the Sbaiti firm in relation to the investigation that was being undertaken. Correct?
A That is correct.
Q But you weren't privy to the communications between Mr. Dondero and the Sbaiti firm, correct?
A I did not participate in those conversations as the -- what I, again, considered Mr. Dondero as the investment advisor to the portfolio, and he was very versant in the assets. I wanted him to participate in the investigation that the Sbaiti firm was undertaking prior to the filing of this complaint.
Q Let's talk for a minute about the notion of Mr. Dondero being the investment advisor. Until recently, the entity

known as the DAF had an investment advisory committee with HC -- an investment advisory agreement with HCMLP. Correct?

A It's my understanding that the investment advisory agreement existed with the Plaintiffs, CLO Holdco, as well as Charitable DAF Fund, LP, up and to the end of February, throughout the HarbourVest transaction.

Q Okay. And since February, the Plaintiffs do not have an investment advisory agreement with anybody, correct?

A That is correct.

Q Okay. So Mr. Dondero, if he serves as an investment advisor, it's on an informal basis. Is that fair?

A After I took control, he serves as an informal investment advisor.

Q Okay. So there's no contract that you're aware of between either of the Plaintiffs and Mr. Dondero pursuant to which he is authorized to act as the investment advisor for the Plaintiffs, correct?

A That is correct.

Q Okay. When you communicated with Grant Scott -- withdrawn. You know who Grant Scott is, right?

A Yes, I do.

Q He's the gentleman who preceded you as the authorized representative of the Plaintiffs, correct?

A Yes.

Q Okay. You communicated with Mr. Scott from time to time

during February and March 2021, correct?
A February and March are the dates? Yes.
Q Yeah. And from February 1st until March 21st -- well, withdrawn. Prior to March 24th, 2021, Mr. Scott was the Plaintiffs' authorized representative, correct?
A Correct.
Q And you have no recollection of discussing with Mr. Scott at any time prior to March 24th any aspect of the HarbourVest settlement with Mr. Scott. Correct?
A Correct.
Q And you have no recollection of discussing whether the Plaintiffs had potential claims that might be brought against the Debtor. Correct? Withdrawn. Let me ask a better question.
You have no recollection of discussing with Mr. Scott at any time prior to March 24th whether the Plaintiffs had potential claims against the Debtor. Correct?
A That is correct.
Q You and Mr. Scott never discussed whether either of -- either of the Plaintiffs had potential claims against Mr. Seery. Correct?
A Correct.
Q Okay. At the time that you became their authorized representative, you had no knowledge that the Plaintiffs would be filing a complaint against the Debtors relating to the

HarbourVest settlement less than three weeks later, correct?
A That is correct.
Q Okay. Now, if you look at Page 2 of the complaint, you'll see at the top it refers to Mr. Seery as a potential party. Do you see that?
A Yes, I do.
Q Okay. You don't know why Mr. Seery was named -- withdrawn. You don't know why Mr. Seery was not named as a defendant in the complaint, correct?
A No, I -- that's correct. I do not know why he was not named. That's in the purview of the Sbaiti firm.
Q Okay. And the Sbaiti firm also made the decision to name Mr. Seery on Page 2 there as a potential party when drafting the complaint, correct?
A That's what the document says.
Q And you weren't involved in the decision to identify Mr. Seery as a potential party, correct?
A That is correct. Again, I rely on the law firm to decide what parties to bring a suit to -- against.
Q Okay. Okay. Do you recall the other day we talked about a document called the July order?
A Yes.
Q Okay. That's in -- that's in Tab 16 in your binder, if you can turn to that. And take a moment to look at it, if you'd like. And my first question is simply whether this is

the July order, as you understand it.

(Pause.)

A Yes, it is. I was just looking for the gatekeeper provision. It looks like it's Paragraph 5. So, --

Q Okay. Thank you for that. About a week after the complaint was filed, you authorized the Plaintiffs to file a motion in the District Court for leave to amend the Plaintiffs' complaint to add Mr. Seery as a defendant. Correct?

A I authorized the filing of a motion in Federal District Court that would ask the Federal District Court whether or not Jim Seery could be named in the original complaint with respect to the gatekeeper provision cited in that motion and with respect to the arguments that were made in that motion.

Q Okay. Just to be clear, if you turn to Exhibit 17, the next tab, --

A I'm here.

Q -- do you see that document is called Plaintiffs' Motion for Leave to File First Amended Complaint?

A Yes.

Q And that's the document that you authorized the Plaintiffs to file on or about April 19th, correct?

A Correct.

Q Okay. And can we refer to that document as the motion to amend?

A Yes.
Q Okay. You were aware of the July order at Tab 16 before you authorized the filing of the motion to amend. Correct?
A Yes, because it's cited in the motion itself.
Q Okay. And at the time that you authorized the filing of the motion to amend, you understood that the July order was still in effect. Correct?
A Yes, because it was referenced in the motion, so my assumption would be it would still be in effect.
Q Okay. Before the motion to amend was filed, you're -- you are aware that my firm and the Sbaiti firm communicated by email about the propriety of filing the motion to amend?
A Before it was filed? Communications between your firm and the Sbaiti firm? I would have to have my recollection refreshed.
Q I'll just ask the question a different way. Did you know before you authorized the filing of the motion to amend that my firm and the Sbaiti firm had engaged in an email exchange about the propriety of filing the motion to amend in the District Court?
A It's my recollection -- and again, I could be wrong here -- but I thought the email exchange occurred after the fact, not before. But again, I -- I just --
Q Okay. In any event, on April 19th, the motion to amend was filed. Correct?

A Correct.
Q That's the document that is Exhibit 17. And you personally authorized the Sbaiti firm to file the motion to amend on behalf of the Plaintiffs, correct?
A Correct.
Q And you authorized the filing of the motion to amend with knowledge -- withdrawn.
Can you read the first sentence of the motion to amend out loud, please?
A Yeah. (reading) Plaintiffs submit this motion under Rule 15 of the Federal Rules of Civil Procedure for one purpose: to name as defendant one James P. Seery, Jr., the CEO of defendant Highland Capital Management, LP (HCM) and the chief perpetrator of the wrongdoing that forms the basis of the Plaintiffs' causes of action.
Q And does that fairly state the purpose of the motion?
MR. SBAITI: Objection, Your Honor. Asks him to make a legal conclusion about the purpose of the legal motion filed in court that he didn't draft.
THE COURT: Okay. I overrule. You can answer if you have an answer.
THE WITNESS: It's always been my general understanding that the purpose of filing this motion was to go to the Federal District Court and ask that Court of reference to this Court whether or not Mr. Seery could be named with

respect to the original complaint, citing again the gatekeeper provisions and citing the various arguments that we've heard much earlier.

BY MR. MORRIS:

Q Okay. You personally didn't learn anything between April 9th, when the complaint was filed, and April 19th, when the motion to amend was filed, that caused you to authorize the filing of the motion to amend, correct?

A That is correct.

Q In fact, you relied on the Sbaiti firm with respect to decisions concerning the timing of the motion to amend. Correct?

A Correct.

Q And you had no knowledge of whether anyone acting on behalf of the Plaintiffs ever served the Debtor with a copy of the motion to amend. Correct?

A Yes. I have no knowledge.

Q Okay. And you have no knowledge that the Sbaiti firm ever provided my firm with a copy of the motion to amend. Correct?

A I cannot recall one way or another.

Q Okay. You never instructed anyone on behalf -- acting on behalf of the Plaintiffs to inform the Debtor that the motion to amend had been filed, correct?

A That is correct.

Q And that's because you relied on the Sbaiti firm on

procedural issues, correct?
A That is correct.
Q You didn't consider waiting until the Debtor --
(Interruption.)
Q -- had appeared in the action before authorizing the filing of the motion --
A Yeah, --
THE COURT: Yes. Y'all are being a little bit loud. Okay.
A VOICE: Sorry.
MR. MORRIS: No problem.
MR. PHILLIPS: I've heard that before, Your Honor, and I apologize.
THE COURT: I bet you have. Thank you.
MR. MORRIS: Admonish Mr. Phillips, please.
THE COURT: Okay.
MR. MORRIS: He's always the wild card.
MR. PHILLIPS: I admonish --
MR. MORRIS: He's always the wild card.
MR. PHILLIPS: I admonish myself.
THE COURT: All right. I think he got the message. Continue.
BY MR. MORRIS:
Q You didn't consider waiting until the Debtor had appeared in the action before filing the motion to amend, correct?

A Again, I am the client and I rely upon the law firm that's engaged with respect to making legal decisions as to the timing and notice and appearance and what have you. I'm a tax lawyer.

Q Okay. You wanted the District Court to grant the relief that the Plaintiffs were seeking. Correct?

A I wanted the District Court to consider, under the gatekeeper provisions of this Court, whether or not Mr. Seery could be named in the original complaint. That's -- that, from my perspective, is what was desired.

Q All right. You wanted the District Court to grant the relief that the Plaintiffs were seeking, correct?

MR. SBAITI: Objection, Your Honor. Asked and answered.

THE COURT: Overruled.

THE WITNESS: Again, I would characterize this motion as not necessarily asking for specific relief, but asking the Federal District Court whether or not, under the gatekeeper provision, that Mr. Seery could be named on there. What happens after that would be a second step. So I kind of -- I dispute that characterization.

BY MR. MORRIS:

Q All right. I'm going to cross my fingers and hope that Ms. Canty is on the line, and I would ask her to put up Page 57 from Mr. Patrick's deposition transcript.