**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P**.**

§
§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§
vs. §

3:26-CV-02496-D

**Highland Capital Management, L.P., et al**-Appellee

§
§

**[4689] Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026**

**APPELLANT RECORD**

**VOLUME 20**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02496-D<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4698] on July 24, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689] now files this *Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the Court's June 15, 2026 Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate?

2. Did the Bankruptcy Court err in finding Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate ("Dugaboy's Motion") [Docket No. 4684] was "without merit?"

3. Did the Bankruptcy Court err in denying Dugaboy's Motion without a full record, including that Dugaboy was not allowed to file a reply brief and was not granted a hearing?

4. Did the Bankruptcy Court err in denying Dugaboy the opportunity to file a reply brief to Highland's Opposition to Dugaboy's Motion, including that Dugaboy indicated a date certain for filing a reply?

5. Did the Bankruptcy Court err in finding Dugaboy's Motion was "without merit" without granting a hearing?

6. Did the Bankruptcy Court err by summarily denying Dugaboy's Motion without explaining its reasoning for the denial?

7. Did the Bankruptcy Court err in failing to consider Dugaboy's Notice of Intervening Event?

8. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(2) when it determined that it had not manifestly erred in deciding the evidence of Mark Patrick's misconduct contained in the Cayman Islands proceeding was not "newly discovered" even though that information was not contained in James Dondero's affidavit executed April 16, 2025?

9. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant

to Rule 60(b)(2) when it determined it had not manifestly erred in deciding the Dondero Affidavit indicated information gained in the Cayman Islands proceedings was not "newly discovered" despite the fact the Affidavit lacked any evidence of the restructuring discovered in the Cayman Islands proceedings?

10. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding on the grounds that Rule 60(b)(3) purportedly requires fraud or misconduct to have occurred in the judicial proceeding itself?

11. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding that Highland did not provide misleading or incomplete answers during the discovery of Mark Patrick's misconduct and resulting lack of authority to negotiate the Rule 9019 settlement agreement from Dugaboy leading to the Rule 9019 Order?

12. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding that Dugaboy had not presented a basis for relief under Rule 60(b)(6) that was separate from the grounds presented for Rule 60(b)(2) and Rule 60(b)(3)?

13. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding on the grounds that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain?

14. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of the Bankruptcy Court's special responsibility to monitor arrangements and settlements made between Highland's appointed managers and third parties?

15. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of its manifest error in failing to consider the Bankruptcy Court's role as a court of equity and responsibility to prevent misconduct before it, such as Mark Patrick's use of stolen assets in the 9019 Settlement?

16. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

Vol. 1 000001 – 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4698] filed by Appellant;

000010 2. The Bankruptcy Court's July 10, 2026 *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000012 4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 2 000648 thru Vol. 3 | 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| Vol. 4 001843 | 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 4 001845 thru Vol 6 | 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol 7 003634 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003647 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003650 + 003651 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003652 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003663 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003667 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003670 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 7 003709 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004733 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol. 8 004790 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol 9 005207 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005209 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005217 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| vol 9 | | Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 04/07/2026 005222 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 04/07/2026 005225 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 04/10/2026 005227 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 04/16/2026 005229 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/17/2026 005233 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol 9 | | Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| 04/17/2026 005330 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| Vol 10 04/21/2026 005590 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/22/2026 005594 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/22/2026 005615 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 04/22/2026 005682 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol 10 | | Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| 04/22/2026<br>005692 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 04/24/2026<br>005705 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 04/24/2026<br>005726 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 04/25/2026<br>005727 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/27/2026<br>005729 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 04/28/2026<br>005737 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |

Vol. 11

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 04/28/2026<br>005746 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 04/28/2026<br>005755 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/28/2026<br>005761 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/29/2026<br>005767 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 04/29/2026<br>005776 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 04/29/2026<br>005783 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 10 005785 | 04/29/2026 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005787 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005794 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005796 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005798 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005801 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005884 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005902 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005905 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005907 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund |

Vol. 11

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 05/06/2026 005913 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/06/2026 005920 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/06/2026 005927 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 05/07/2026 005929 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/08/2026 005936 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 05/08/2026 005939 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 05/08/2026 005942 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 05/08/2026 005945 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol. 12 05/08/2026 006100 Thru Vol 21 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and* |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | *Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery) |

Vol. 22 008156
008172
008188

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 22 008256 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008293 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008429 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008465 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008472 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008916 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| Vol 25 009554 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| Vol. 26 009868 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| Vol. 27 010229 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| Vol. 28 010538 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| Vol. 28<br>05/11/2026<br>010664 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29<br>05/11/2026<br>010736 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol 30<br>05/11/2026<br>011150 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol 31<br>05/11/2026<br>011734 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol 32<br>05/11/2026<br>013203<br>Thru Vol 33 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34<br>05/11/2026<br>014888 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol 35 015349 05/11/2026 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 05/11/2026 015505 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 05/12/2026 015506 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 05/12/2026 015538 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 05/12/2026 015565 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 05/15/2026 015566 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36 015569 05/18/2026 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol 37 05/18/2026 015996 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 05/19/2026 016008 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 05/20/2026 016079 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 05/20/2026 016082 – 016084 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 05/21/2026 016085 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 05/21/2026 016134 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 37 | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| 05/23/2026 016135 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 05/28/2026 016233 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 06/15/2026 016490 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s)4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 06/15/2026 016504 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| Vol. 39 06/29/2026 016505 | 4684 | (162 pgs; 2 docs) Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Appendix) (Edney, Michael) |
| 06/29/2026 016667 | 4685 | (7 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s)4679 Order on motion to reconsider). Appellant Designation due by 07/13/2026. (Attachments: # 1 Exhibit)(Edney, Michael) |
| 07/06/2026 016674 | 4687 | (32 pgs; 2 docs) Response opposed to (related document(s): 4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 07/09/2026 016706 | 4688 | (23 pgs; 2 docs) Notice of Intent to Reply and Request for Hearing on Its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 39 | | (Attachments: # 1 Appendix)). (Attachments: # 1 Attachment A) (Edney, Michael) |
| 07/10/2026 016729 | 4689 | (2 pgs) Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026. (Okafor, M.) Modified text on 7/10/2026 (mdo). |
| 07/13/2026 016731 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |
| 07/24/2026 016733 | 4698 | (9 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)(Edney, Michael) |
| 07/28/2026 016742 | 4704 | (5 pgs) DISTRICT COURT Notice of docketing notice of appeal. Civil Action Number: 3:26-cv-02496-E. (RE: related document(s)4698 Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court;

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J"); and

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No.

4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: August 7, 2026

Respectfully submitted,

*/s/ Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

A I see what it says, yes.
Q Okay. And you did not think that that was material nonpublic information?
A No, I did not.
Q When he indicated that Amazon and Apple were actively diligencing -- are diligencing in the data room, both continue to express material interest, coming from a member of the board of directors of MGM, you did not think that was material nonpublic information?
A I did not, no.
Q You know the difference between a newspaper article or a media article that discusses rumors of a possible sale and the difference between that and a member of the board of directors saying that a sale is going to occur? You understand the difference between the two?
A Between the two things you just outlined?
Q Yes.
A Yes. One you said a sale is going to occur, and the other you said a media report. But it would depend on what's in the media report. Some media reports are pure speculation. Others have a lot of detail, and they clearly came from an inside source, and that's why the market moves on them.
Q Okay. So what you're suggesting to me, that there was some indication in the media press before you received this email suggesting that there was actually going to be a sale in

the first quarter of 2021?
A I don't know if it had a first-quarter event in it, but certainly it was clear from the media reports and the actual quotes from Kevin Ulrich of Anchorage, who was the chairman at MGM, that a transaction had to take place very quickly. And in fact, the transaction did not take place in the first quarter.
Q Okay. So you -- when you received this particular email, you did not think that it was requiring any additional protection at -- in any way? Is that what you're suggesting to this Court?
A That the email required additional protection?
Q That you didn't take additional steps to make sure that it was maintained on the restricted list.
A It was already on the restricted list, so there was no change.
Q Was it --
A I --
MR. MORRIS: Hold on. Let him finish.
BY MR. MCENTIRE:
A I was suspicious when I got the email, but I didn't think I had to do anything else than the steps I told you I just took.
Q Yeah, I'm not asking whether you were suspicious or not. My question's a little bit different. You understand that MGM

was taken off your restricted list in April of 2021?

A I understand that that's what you've recently shown me. I wasn't aware of that fact or I didn't have a recollection of that fact, but certainly April of 2021 would be beyond the first quarter. Mr. Dondero was not an employee, an affiliate, subject to a contractual relationship. He had no duty to Highland and Highland had no duty to him. And in fact, it was quite antagonistic by that time. So it would be appropriate to take MGM off the restricted list at the end of that time.

Q Well, hopefully you won't take this as argumentative, but I object as nonresponsive. That really wasn't my question. Okay? My question --

THE COURT: Sustained.

BY MR. MCENTIRE:

Q -- is a little bit different. As far as you were concerned, MGM was on the restricted list and stayed on the restricted list all the way until the public announcement in May of 2021?

A That's not true.

Q When did you first become aware it was taken off the restricted list?

A I didn't -- I wasn't aware that it had come off the restricted list. I would have assumed it would have been off the restricted list once Mr. Dondero had been severed from Highland.

Q I see. Now, Mr. Dondero has relayed a conversation that he had with Mr. Patel and Mr. Linn, suggesting that they were particularly optimistic about MGM based upon what you told them.
A I --
Q Let me finish. If that occurred, are you suggesting that that is a lie?
A Two things. One is I don't think he actually testified to that. I think he said he had a conversation with Mr. Patel. Then he had a different conversation with Mr. Linn, and a subsequent conversation with Mr. Linn. So the way he laid it out were multiple conversations.
Q Agreed.
A I don't -- I don't know which one you're talking about.
Q Mr. Dondero testified that Mr. Patel was particularly optimistic about the investment because of what he had learned from Mr. -- from you about MGM.

MR. MORRIS: I dispute that characterization. Why can't he just ask the question?

MR. MCENTIRE: That is my question. If that --

THE COURT: What is the question? I'm not sure I hear the question.

MR. MCENTIRE: I'm getting lost because I'm getting interrupted. I'll try to rephrase it again.

MR. MORRIS: It's my first objection.

MR. MCENTIRE: And I --

THE COURT: Go ahead.

MR. MCENTIRE: I'm just going to rephrase, Your Honor.

THE COURT: Just rephrase your question.

MR. MCENTIRE: Thank you.

BY MR. MCENTIRE:

Q Mr. Dondero has testified that Farallon advised him in May of 2021 that they were optimistic about MGM based upon what you told them. Assuming that to be the case, do you deny that happened?

A I do deny that happened. Because I can't -- I don't know what Farallon told him, but I never told Farallon anything. And a conversation on May 28th, after the May 26th announcement that MGM was going through, might make people optimistic that it could go through, but there was a very difficult FTC process that MGM would have to go through.

Q And I'm referring to that. If Farallon stated that they were optimistic about MGM based upon what you had told them, --

A That would not be true.

Q -- that would be false?

A That would not be true.

Q And is Mr. Dondero says that's what Farallon told them, that would also be false?

A That's correct.
Q So we have your statement, we have what may be Farallon's statement, and we have what Mr. Dondero believes may have been Farallon's statement, and you're saying the latter two are just not true?
A I didn't have a conversation with Farallon about MGM that -- that I recall --
Q Well, you're on the witness stand.
A -- virtually at any time.
Q You're on the witness stand.
A Oh, I'm aware of where I am sitting.
Q Yeah. Good. We've got that cleared up. Now, are you suggesting that -- that you may not specifically recall this conversation?
A No, I am not saying that at all. After May 26th, when the MGM announcement was made and it was public, I may have had conversations with a number of people about MGM.
Q Well, let's make sure the record is clear. Did you call Farallon on May 26th and say, hey, did you know that MGM just sold?
A No, I don't recall any such conversation, and I wouldn't have had to, since it was in the paper.
Q I'm not talking about what's in the paper. I'm talking about conversations between you and Farallon.
A Yeah. I don't recall having a conversation with Farallon

on May 26th.
Q How about May 27th?
A Not that I recall, no.
Q How about May 28th?
A Not that I recall off the top of my head.
Q And we understand that that's the day that Mr. Dondero actually had his conversation that he's reported, at least, with Farallon. Do you recall that?
A That's what he claims, yes.
Q You were with a company called River -- you're a lawyer, correct?
A I am. I'm in retired status.
Q Okay. I wish I was.
A It's simply retiring your license and not having to take the CLE.
Q Understood. Now, you were with a company called River Birch?
A Yes.
Q And from River Birch, you went to Guggenheim Securities?
A That's correct.
Q At Guggenheim Securities, did you go to Farallon and meet with Mr. Patel in their offices in San Francisco?
A I believe we did, yes.
Q You call it a meet-and-greet?
A I do, yes.

Q That was in 2017?
A 2017, 2018. I'm not exactly sure when it was.
Q And one of the purposes of meet-and-greet is to solicit business or to see if a business opportunity -- see if it exists?
A That's not correct, no.
Q What is a meet-and-greet for, then?
A It's to meet the people at the fund and to greet the people at the fund. Introduce them to other people in your firm.
Q Just because it's going to be fun, or does it have a business angle to it?
A Oh, it hopefully will be fun, yes, but it's done in order to build a relationship over time. You're not in there soliciting business. If you do that, you won't do very well.
Q Okay. Fair enough. So you're there trying to develop a relationship with Farallon?
A Guggenheim was, yes.
Q And you were part of it?
A That's correct.
Q And what was your job at Guggenheim?
A I was co-head of credit.
Q Is that a fairly significant position at Guggenheim?
A Not really, no.
Q It's not significant at all?

A No.
Q All right.
A Which is why --
Q Well, you left --
A Which is why they don't have that business.
Q Okay. So is that why you left Guggenheim?
A It -- I did, yeah. It wasn't a good fit for either Guggenheim or for me, because it really wasn't something --
Q When did you --
A -- that they were set up to do.
Q -- leave Guggenheim?
A In 2019.
Q And then you went back to Farallon to meet with them again, did you not?
A I met with Farallon while I was in San Francisco with my wife.
Q Okay. Did you call ahead to arrange the meeting, or was it just a --
A I --
Q -- a blind call?
A I did call ahead, yes.
Q A cold call, I guess, is the word -- the phrase that they use. Okay. So -- and was that a meet-and-greet?
A That was again, yes.
Q Again, what were you trying to do? Develop a relationship

with Farallon?

A I was trying to catch up with them after having met them previously. And that was just Raj Patel. And this one I also met Michael Linn.

Q Okay. What kind of business were you in when you met with them the second time?

A I wasn't doing anything.

Q What were you hoping to do?

A I was hoping to get back into the investing side of the business, from running a credit-type lending business at Guggenheim, which is what they tried to do and it didn't work out. And I wanted to get back to what I was doing more at River Birch, but I was looking at other opportunities, whatever came along.

Q Well, what were the different options that you were looking at?

A I was looking at potentially getting back into investing, joining potentially a restructuring firm, any options like that. I was not looking to become a lawyer again.

Q And why would meeting and greeting with Farallon fit in within that scenario, the strategic scenarios that you've just discussed?

A They're a giant hedge fund.

Q A giant hedge fund?

A Yes.

Q And so it would be good to have a relationship with a giant hedge fund, wouldn't it?
A And to know what their thinking of the markets, where the opportunity set might be, who they are dealing with and interacting with. Those are -- those are valuable things to know over time.
Q And --
A And you need to maintain those relationships in order to be --
Q Sure.
A -- part of any business.
Q Sure. These meet-and-greets can actually evolve and provide relationship benefits, correct?
A I don't -- I'm not sure what you mean by relationship benefits.
Q Sloppy words for -- on my part. They can evolve into something that is a meaningful relationship?
A They could over time, yes.
Q And we know that after you became the CEO of Highland Capital that you received a call from, was it Farallon, to congratulate you on your appointment?
A It was an email.
Q And that was in the summer of 2020, shortly after your meet-and-greet out in San Francisco?
A Your calendar's a bit off, but it was in June of 2020, so

that would have been more than shortly after, but yes.
Q Okay. And who contacted you to congratulate you on your appointment?
A This was my appointment as an independent director. I had not yet been appointed as CEO or CRO. This was in June of 2020, and it was Michael Linn.
Q Michael Linn? Was it a telephone call?
A I think 30 seconds ago I said it was an email.
Q Fair enough. Do you still have that email?
A I do, yes.
Q Okay. He contacted you again, "he" being Michael Linn, he contacted you again in January of 2021, did he not?
A That's correct, yes.
Q He wanted to see if he could get involved somehow in the Highland bankruptcy?
A Well, he congratulated -- he didn't congratulate -- he wished me a happy new year, and he basically said it looks like you're -- again, he's following the case -- it looks like you're doing good work. Is there any way for us to get involved? We're interested in claims or buying assets.
Q Okay. And Stonehill. Now, you know the founder of Stonehill, do you not?
A No, I don't know him. I've met him several times.
Q Doesn't he come by and stop in and talk with you when you're in Stonehill's offices? And that's happened recently?

A Your use of the plural is incorrect, and you know that from the deposition. I was in Stonehill's office one time, and I was in a meeting with Mr. Stern. We ended up having a board meeting from Stonehill's office with the other participants on video, and Mr. Motulsky came in and said hello.
Q All right. And who's Mr. Motulsky?
A He's the founder of Stonehill.
Q I see. And did you know Mr. Motulsky before that?
A I'd interacted with Mr. Motulsky over the years at -- mostly at industry-type functions.
Q Okay. Now, Stonehill is also a hedge fund?
A Yes.
Q Are they different than Farallon in that regard, or similar?
A I don't know as much about what their business is. They certainly do a direct lending component, so I know that they -- they will do some direct lending, which I don't think is something Farallon really does. Farallon is much bigger, as I understand it, but I don't really know the size of Stonehill.
Q Okay.
A I know they're not a $50 billion fund like Farallon.
Q And do you know Mr. Stern at Farallon?
A I now know him, yes, because he was -- he's really the representative on the -- no, he's not the representative on

the board, but he is the one who manages the Stonehill and Jessup positions for Stonehill.

Q Well, we know that after you were CEO of Highland, you also got a text message, correct, a text message from someone at Stonehill, correct?

A Mr. Stern sent me a text message reintroducing himself -- I don't know if it was re- or just introducing -- and sent me his email and asked me to contact him about the case. This was at the end of February/beginning of March 2021, after the confirmation order.

Q Okay. After the -- after the confirmation order?

A Yes.

Q I believe the confirmation order -- I may be wrong -- I thought it was like the 21st, 22nd, somewhere in there. Does that sound right to you?

A Yes.

Q Okay. So, shortly after confirmation, then, Farallon calls you to congratulate you and wants to see how they can get involved?

A No. There was no congratulations there. Shortly after the confirmation order, which I believe was at least a week to ten days after confirmation, I got the communication from Mr. Stern to try to connect about the case.

Q All right.

A He's at Stonehill, not Farallon.

Q Correct. Now, --
A You said Farallon.
Q I misspoke, then. Thank you for correcting me. Let's talk about -- you live in New York?
A I do.
Q You're involved with a charity called Team Rubicon?
A Yes.
Q And Team Rubicon is a -- is that a veterans-type charity?
A Yeah. It's a veteran-led organization, and what it does is connects veterans to disasters. And mostly in the U.S., but also all over. So if there's a flood, if there's a hurricane, if there's an earthquake, veterans who have been trained in -- by the military in ready response and really being able to handle themselves when things are bad are deployed to help the communities that are hit. So I think that Team Rubicon likes to think, you know, on your worst day they're your best friend.
Q So you're -- are you on the board?
A No, I'm not.
Q You're on the Host Committee?
A I was on the Host Committee last year, and I'll be on the Host Committee this year.
Q Okay. And you have charity events?
A We have a charity event, yes.
Q Okay. And the purpose of the charity event is to raise a

bunch of money?
A That's correct.
Q Okay. Have you been successful in the past?
A I do my best. Team Rubicon is a big organization. It's done very well raising money. It doesn't have an endowment. The founder's theory was that if people give us money, we're supposed to spend it on helping other people. And so each year it has to raise more money.
Q And Stonehill has been -- has contributed to your charity?
A I believe Stonehill, one or two years, and I should know this, and I didn't look it up after our deposition, gave $10,000.
Q Okay. Maybe once, maybe twice?
A Maybe twice.
Q Okay.
A I hope more.
Q Okay. And they also attend your -- your actual charity events, do they not?
A No.
Q All right. They just give money?
A That's right. And the Mike Stern who's on the board of Team Rubicon is not the Mike Stern who is at Stonehill. It's an older gentleman who's in Texas who just happens to give a lot of money to --
Q All right.

A -- Team Rubicon.
Q You also represented Blockbuster. Take that back. Were you the lawyer or the attorney representing the Creditors Committee, the UCC, in the *Blockbuster* bankruptcy?
A No, I was not.
Q Tell me what your capacity was.
A I represented a group of bondholders, secured bondholders. So I represented the group.
Q And was Stonehill a member of that group?
A Not that I recall, but your pleadings seem to indicate that they were. So if they were, they were a small participant. The largest participant was Carl Icahn, who owned about 30 percent of it. Then the others who were big were DK, Davidson Kempner, Monarch, Owl Creek. Those were the big players.
Q Well, --
A When Carl Icahn is in your group, you remember that.
Q Yeah, well, Carl Icahn is not here. We're talking about Stonehill right now.
A And I said I don't remember them actually being a part of it. If they were, --
Q Okay. Well, let me -- let me give you what I'm going to mark as Exhibit 80. That's your name at the top, right?
(Hunter Mountain Investment Trust's Exhibit 80 is marked for identification.)

A That's correct, yes.
Q You were at the time with Sidley & Austin?
A That's correct, yes.
Q This is *In re Blockbuster*.
MR. MCENTIRE: Scroll down, please.
BY MR. MCENTIRE:
Q And steering group of senior -- involves -- well, let's count them. Let's see. One, two, three, four, five. Five entities comprising the backstop lenders. Is that correct?
A I think that's the steering group. So, in order to represent the group, you need to try to assemble a large-enough group that it's material to the company. And then the company, if you're -- particularly if you're over 50 percent, will pay the fees of the group. And you don't represent any individual member of the group. I've never represented Carl Icahn. I represent the group. And if folks want to stay in the group, they can stay. If they want to trade out of the group, they do. And the company will generally continue to pay the fees, and you represent the group so long as you have a controlling interest in the -- whatever the issue is.
Q Well, that's interesting, because now what you're telling me is that this group right here, this is kind of like the executive committee of the group.
A No, it's called the steering group, and it doesn't necessarily --

Q That's fine.
A Well, it's not an executive committee. It doesn't necessarily include just the largest. Some large holders won't be on it. The largest holders here by a long shot were Icahn, who --
Q I'm not talking about --
A -- unloaded, as I say, over 30 percent. Monarch, Owl Creek, and I just don't recall Stonehill being a part of it.
Q I'm not really interested in Carl Icahn. I just want to establish this is a steering group in which you were the lead counsel and Blockbuster was on it. Is that correct?
A Yes.
Q Excuse me. Not Blockbuster.
A I'm sorry.
Q Stonehill.
A No, it's the Blockbuster case in 2010, and Stonehill was apparently on it, but I just don't have a recollection of their involvement.
Q All right. So when Mr. -- who sent you the text message in February of 2021 from Stonehill?
A Michael Stern.
Q And had you actually met him before?
A I think I had, but we didn't know each --
Q All right.
A You know, we certainly didn't know each other, we'd never

worked on anything together, but I --

Q Do you have all your text messages from that period of time, that first quarter of 2021?

A I believe I do, yes.

Q They're saved?

A Yes.

Q Okay. When did the automatic delete button on your cell phone start?

MR. STANCIL: Your Honor, objection. We've covered this this morning. I believe this is a motion coming down the pike, and I thought we had -- thought we had had tabled this preservation issue.

MR. MCENTIRE: This has a direct bearing on his communications with Farallon and Stonehill in this period of time, Your Honor. We have one text message that he's identified, and I have a right to examine whether there are others. Or if not, why not.

MR. STANCIL: Your Honor, he's --

MR. MCENTIRE: That's a legitimate -- I'm not finished. That's a legitimate area of inquiry in this examination.

MR. STANCIL: He's testified he has them all. Your Honor did not order document discovery. I think that's it for purposes of today's hearing, Your Honor.

THE COURT: Okay. I sustain the objection.

BY MR. MCENTIRE:
Q After this text message that you received from Stonehill in February 2021, did you have any follow-up?
A Well, his text message, I don't recall what it said other than I was -- I do recall that he gave me his email address, because I didn't have it. And we just didn't know each other well enough. But we definitely had follow -up. He wanted to talk to me, and at some point we talked.
Q And when did you talk?
A I'm sorry?
Q When did you talk?
A When? I -- it was at the, initially, end of February, beginning of March. So it would have been somewhere in that -- in that time period.
Q End of February, beginning of March? And we also know that you next talked to Farallon, according to your testimony, and they advised you they had already purchased all their claims as of March 15, correct?
A On March 15th, they sent me an email that said they had purchased an interest in claims, and --
Q So -- go ahead.
A I'm not finished. And then at some point after that, we arranged a quick discussion, because that was a curious --
Q I want to assure you I will always let you finish.
A Thank you very much.

Q Unlike others. So, with that said, Mr. Seery, can you identify -- let me back up. Was there a data room set up at Highland Capital for claims investors to come in and look at data?
A No, there was not.
Q Are you aware, sitting here today, that Farallon did any due diligence in connection with its investment in the claims it purchased that are at issue in this proceeding?
A I have indication that they did some, yes. I don't know how much they did.
Q What is the indication?
A In the email in June of 2020, Mr. Linn said that he and his associate were following the case, thought it was -- that's the one that congratulated me on being an independent director, and that they were paying attention to the case. And it -- I don't recall the exact other items in there, but it was clear that they were following the Highland matter. And then in the email in January 2021, he also indicated that they'd been following the case further, and said, Looks like you have things well in hand, or something to that effect. So --
Q Do you have that email, too? Have you saved that email?
A They're all saved, yeah.
Q Okay. So let's talk about that. But you had no data room that would allow them to come in and actually investigate the

underlying assets. Is that correct?
A Not in respect of anybody trying to buy claims. We did have a data room with respect to financing.
Q Please listen to my question. I'll get to it. Data room for claims investors. There was no data room set up on or before March 15 to allow Farallon to come in and investigate its investment in this claim?
A That's correct.
Q There was no data room set up prior to March 15 to allow Stonehill to come in and investigate its investment in the claims it purchased. Is that correct?
A That's correct.
Q Can you identify any due diligence, sitting here today -- let me back up. You heard Mr. Dondero's testimony about portfolio companies, correct?
A Yes.
Q Portfolio companies are companies in which Highland Capital has an interest that actually have separate and distinct management. Is that correct?
A Generally. And it -- I disagree with some of his testimony, but generally that's correct, yes.
Q Well, okay. Let's just take on the part that you agree with. With regard to those portfolio companies, was there anything that was disclosed in the Highland publicly-available financials that would allowed a detailed analysis of

Highland's investments in each of those portfolio companies?
A I don't know. Certainly, in the four or five sets of projections that were filed, there were financial projections. I'm not sure exactly what was included in each one or in the disclosure statement.
Q Fair enough. Well, I'll represent to you I don't think there's detailed information on each individual portfolio company.
MR. MORRIS: Your Honor, he's not here to testify. I move to strike.
MR. MCENTIRE: Okay.
THE COURT: Sustained.
BY MR. MCENTIRE:
Q In that regard, Mr. Seery, can you identify what Farallon did to investigate the underlying asset value of any of these portfolio companies?
A I don't have any knowledge as to what Farallon did before it bought claims.
Q Can you identify what due diligence Stonehill did to investigate the underlying asset value in any of these portfolio companies?
A I don't -- I mean, in connection with claims purchasing, I have no idea what Stonehill did.
Q Now, I understand that you solicited -- perhaps I don't recall correctly. Did you solicit both Farallon and Stonehill

to participate in a bid to provide exit financing?
A I don't think that's fair. I solicited Farallon because I knew they already owned claims. Stonehill reached out to me, and that was one of the things they were interested in doing, if there was financing needs.
Q Okay.
A And at the time they reached out, which was right after confirmation -- right after confirmation and the confirmation order, we didn't know what our needs would be. We didn't really, at the early stage, think we needed exit financing. When we looked at some of the difficulty we were going to have -- for example, collecting notes and realizing on assets -- we realized that we were going to need some exit financing in order to have enough money to support the enterprise to monetize the assets.
Q And I think you used the -- I think the phrase you used, you are the straw man or a straw man bid? Is that what you called it the other day?
A We did. You set up a very typical competitive process to do exit financing.
Q And what was the --
A And what -- well, I --
Q -- suggest --
A I was going to get to your straw man. And one of the things you do is you assess what the market's going to look

like, what you think the market looks like, what you think a financing would be good for the enterprise, the flexibility you need, how you'd structure it. And then you put that out to prospective lenders and say, Here's our straw man. This is what we'd like you to consider in terms of financing. And then they do their work and come back. And they can either say, that looks great, or we have a totally different idea of what the financing might be, or some other combination of those things.

Q Mr. Seery, thank you for that answer, but I need to ask you to do me a favor. I'm on the clock, and so I'd just like to get my questions out, if you'd try to respond. Okay?

A Uh-huh.

Q Because your answers, as long as they may be, are impacting me a little bit.

So let me ask this question. In the straw man proposal that you put out for bid, what was the suggested interest rate?

A You know, you asked me that the other day, and I think I was slightly off. So it -- and I -- but I did tell you that it depended. There was -- I don't recall what the rate was, but it starts -- if everybody wants to put out money -- and I apologize for the length of the answer -- they look and they say, well, what if I get paid back in six months? Nobody wants to do that. So, duration makes a difference. So

there's an interest rate. There's upfront fees. There's often exit fees. And sometimes there's other amounts. So, our -- my recollection is that our straw man was somewhere in the low teens on the high end, and then closer to high single-digits on the low end. Something in that range.

Q And Farallon indicated to you they were not interested, correct?

A No, not exactly. What Farallon said was they didn't -- they signed an NDA because we invited them in. We invited in six folks. Five signed NDAs. Two of the -- I invited in Farallon. I invited in Stonehill. Well, Stonehill called me. I invited in Contrarian because they had bought claims. And then two lenders that I knew. And Farallon did the work and came back and said, this isn't really what we do. And the other guys, you're telling me, which I was, that other people are more competitive. And so it's not really what we do, we don't think the returns are good enough, but if you need us, because now they're already invested in the claims, call us.

Q Okay.

MR. MCENTIRE: And again, I'll object as nonresponsive. Your Honor, that was a very long answer talking about a lot of other entities. My only question was what the interest rate was.

MR. MORRIS: Your Honor, we oppose the motion to strike. I think it's --

MR. MCENTIRE: No, I didn't strike it. I said -- my objection was nonresponsive. I will now follow it up with a motion to strike his answer.

THE COURT: Overruled. Okay.

BY MR. MCENTIRE:

Q Mr. Seery, you just told us that the interest rate was in the high single digits to in the 12 and 13 percent range.

A No, I was giving you the all-in return for the lender. That's a very different --

Q All-in return?

A -- thing for the -- than an interest rate.

Q That's even better.

A And it depended on the time.

Q Fair enough.

Q So if -- the shorter the duration, the higher the effective return, because he's not getting the return for as long a period of time. If I have $100 million and I get 10 percent, I get just $10 million. But if I have that out for $3 million, I've earned $30 million. So maybe that gets squeezed in the longer it's out.

Q And Farallon said that the interest rate or the return rate was not what they were looking for?

A They indicated two things. I believe I've said this several times. One is they said, this isn't really what we do, a $50-ish million dollar loan to do an exit. But we're in

the case. If you need us, call us. Included in that was, it doesn't look attractive enough to us because you're telling me other guys are more competitive.
Q Okay. And do you know what kind of rate of return they were going to get on the investment of the -- on the claims at a 71 percent projected return rate?
A If we only hit the plan, Farallon's two purchases, based on the numbers you get -- you gave, over a two-year period, would be 38.9 percent.
Q Okay, but we're going to talk about that in a second. Okay. How much -- how much did Farallon actually invest?
A I'd have to look back at your numbers. They're in your pleading. I don't know what they actually paid. I just have it from your pleading.
Q Okay. And do you have paperwork that -- can you (inaudible) calculation here?
A I have a calculator that, when I looked at your numbers, I ran that, and I --
Q I see. All right.
A I'm able to remember certain things.
Q So, so if it's projected that the internal rate of return is only six percent, do you disagree with that?
A A hundred percent disagree. There's -- that's virtually impossible.
Q Okay.

A And that's, by the way, for hitting the plan.
Q I'm sorry?
A That's for hitting the 70 -- the 71-and-change percent.
Q I want to ask you a question about that. The 71-percent-and-change --
A Uh-huh.
Q -- that came out of the plan for Class 8, --
A Yes.
Q -- that was for Class 8, correct?
A Correct.
Q There was zero expected return to Class 9, correct?
A That's correct. They would only get upside, and I think it says in the projections, based upon our view at the time, litigation that could ensue, and that was part of the plan.
Q And as I understand it, that 71-and-some-change --
A Uh-huh.
Q -- projected return rate never changed from the date of confirmation all the way up to the effective date. Am I correct?
A The -- we didn't change the projections that we'd filed with the plan because the plan was confirmed. We didn't need to change the projections that were filed with the plan.
Q The NDAs, as you understand it, can you tell me specifically when the NDAs were signed?
A I know it's the first week of April to the second week of

April. Blue Torch may have signed -- who actually ended up doing the financing -- they may have signed it a week or so before. They'd been around offering financing a number of times in the past.

Q Fair enough. But we know that you understood as of March 15th that Farallon had already made their investments? I mean, claims?

A That's what they told me in that email, yes.

Q Okay. When did Stonehill sign the NDA?

A In and around the same time.

Q But you don't know when Stonehill actually purchased their claims?

A I don't know exactly when. I know generally that by the end of April, early May, they were -- they were the holder of the Redeemer claim. And --

(Interruption.)

A -- I can't remember whether it was from them or whether it was from --

Q Did you ever communicate with Stonehill during the time that they were doing their due diligence on the exit financing?

A Yes.

Q Okay. Did they come to your offices?

A I don't know if we were back yet. I think we were back, but I don't recall them coming to our offices. I think it was

all virtual. It's early '21, so there would have been vaccines. It would have been very -- very -- I don't recall them coming to the offices at that time.
Q But just to be clear, you don't know, you can't give the Court a date when Stonehill actually completed their investments in either Redeemer or HarbourVest?
A No, I don't. I don't know. Did -- just --
Q That was my question.
A When you say Redeemer or HarbourVest, they never bought HarbourVest.
Q It was just Redeemer?
A Correct.
Q All right. You understand that Muck is an entity, a special-purpose entity created by Farallon?
A That's my understanding, yes.
Q And you understand Jessup is a special-purpose entity created by Stonehill?
A That's my understanding, yes.
Q Muck and Jessup are both on the Oversight Committee?
A They are. They -- those entities are the --
Q Is it the Oversight Committee or the Oversight Board?
A Same thing.
Q Fair enough.
A I'll consider them the same.
Q And there's a third member, too, correct?

A That's correct.
Q Okay.
A Independent member.
Q Okay. So you have a three-person board; is that right?
A That's correct.
Q And one of their jobs is to make decisions concerning your compensation?
A The structure of the Claimant Trust Agreement provides that I'm to negotiate with the -- either the Committee or the Oversight Board. And the compensation in the Claimant Trust Agreement is a base salary of $150,000, which is -- a month, which is the same as the one in the case, plus severance, plus a success fee. And it's very specific that that will be negotiated by the -- either the Committee or then the Oversight Board.
Q And Michael Linn, who Mr. Dondero has referred to, he's actually on the Oversight Board, is he not?
A He's the Muck representative on the Oversight Board.
Q All right.
A Yes.
Q If I understand it correctly, you are currently receiving, as the Trustee, $150,000 a month. Is that correct?
A That's incorrect.
Q What are you receiving?
A I receive $150,000 a month as the Trustee and the CEO of

Highland Capital.
Q Well, --
A So I have --
Q -- fair enough.
A I have both roles. The Trustee, for example, doesn't manage the team, they actually work for Highland Capital, and I'm the CEO of Highland Capital.
Q There was some suggestion that the $150,000 was something that the Court had passed upon prior to the effective date or part of the plan. This is a separate negotiated item that you -- that you allegedly negotiated that was awarded to you post-effective date, correct?
A That's false.
Q Okay. So the $150,000 had a discount that was supposed to drop down to $75,000 after a period of time. That never happened, did it?
A The -- you seem to be mixing concepts. But the $150,000 a month was set by the plan and the -- and the Claimant Trust Agreement as the "base salary." That wasn't going to move. When we -- it never was supposed to move.

When I began negotiating with the Oversight Board for the success fee, they pushed back and said, we would like that to step down. So in our -- I did not say, oh, that's a great idea. We ended up negotiating, and they included a provision that we would renegotiate depending on the level of work.

That's one of the provisions.
Q Okay. But renegotiate down to $75,000 after a period of time, but that never happened?
A Initially, I believe it was supposed to step down to $75,000 automatic, subject to renegotiation that it go back up, not a structure that I particularly liked. And since then, we've negotiated on that point.
Q So you currently are making $150,000 a month?
A That's correct.
Q How often do you come to Dallas?
A Usually I'm here at least once a month. Usually it's between two and four days.
Q Okay. And you have a staff here in Dallas at Highland Capital, correct?
A Yes.
Q How many people?
A Eleven.
Q Eleven people?
A Uh-huh.
Q Working full-time?
A Yes.
Q And you're still making $1.8 million a year?
A Yes.
Q You also have a bonus structure, correct?
A That's correct.

Q And that's performance-based?
A That's correct.
MR. MCENTIRE: Can you pull up the agreement please? Okay.
(Pause.)
BY MR. MCENTIRE:
Q All right. Do you see --
MR. MCENTIRE: We're having technical difficulty here.
BY MR. MCENTIRE:
Q All right. Can you identify this document?
MR. MCENTIRE: What exhibit number is this?
MR. MILLER: 28.
BY MR. MCENTIRE:
Q Exhibit 28.
MR. MCENTIRE: I believe this is already in evidence.
THE COURT: Hunter Mountain Exhibit 28?
MR. MCENTIRE: Yes, Your Honor.
THE COURT: Okay.
BY MR. MCENTIRE:
Q This is the memorandum of agreement. Do you see that?
A Yes.
Q On the third line, it says -- and your name is identified here. You're the Claimant Trustee, correct?
A Claimant Trustee/CEO.

Q Engaged in robust, arm's length, and good-faith negotiations regarding the incentive compensation program.
As part of this robust, arm's length, and good-faith negotiation, did you personally conduct any independent search in the marketplace?
A I did -- what do you mean by search in the marketplace?
Q Well, did you try to do a market study? I asked that question in your deposition.
A I didn't know if you were asking a different question.
Q Same question.
A You mean market study on compensation?
Q Yes.
A No, I did not.
Q Are you aware of whether or not any member of the Oversight Board or Oversight Committee did a market study?
A On compensation?
Q On compensation.
A I'm not aware that they did one, no.
Q So this robust, arm's length, and good-faith negotiation, as far as you know, is divorced from any market study database or -- or methods. Is that correct?
A I don't believe that's correct, no.
Q I see. So did -- was any third-party consultant hired?
A Not by me or Highland or the Trust, no.
Q All right.

MR. MCENTIRE: Can you scroll down a little bit, please?

BY MR. MCENTIRE:

Q You signed this agreement, correct?

A Yes.

Q And we have Michael Linn signing on behalf of Muck, who also is with Farallon, correct?

A That's correct.

MR. MCENTIRE: Scroll down.

BY MR. MCENTIRE:

Q And by the way, this is a heavily-redacted document. The redactions deal with what?

A The redactions deal with the portion that would go to the team as opposed to going to me.

Q Are we talking about the 11-member team?

A Correct.

MR. MCENTIRE: Can you scroll down? Stop. Go back.

BY MR. MCENTIRE:

Q So we have the assumed allowed claim amounts under Section D. Do you see that?

A Yes.

Q Class 9, $98 million and some change. Class 8, $295 million and some change. Then we go into the incentive payment tiers. Do you see that?

A Yes.

Q What's the purpose of the tiers?

A The purpose of the tiers was to set additional compensation so that, the more recovery, the higher the compensation. So, below Tier 1, there was really effectively no bonus, is my recollection. And then in each tier there would be a percentage.

So the first tier is $10 million. There would be a percentage of that $10 million that could be allocated for bonus. Then in the next tier it would be $56 million. A portion of that would be allocated for bonus. And it's weighted more heavily to the higher-recovery tiers, meaning it incentivizes both me and the team to try to reach deeper into Class 8 and Class 9 and get higher recoveries.

Q Okay. So the idea is, the more difficult it is to get the recoveries, the higher percentage you should get, because if you're successful then you should be rewarded accordingly? Is that kind of how it works?

A I'm not sure if difficult is the term, but it's a combination of both expertise, difficulty, and time.

MR. MCENTIRE: All right. Can you scroll down, please? Next page.

BY MR. MCENTIRE:

Q And here are your actual tier participations. They go -- you said basically nothing Tier 1, up through 6 percent. So Tier 1 is the 71 percent, right?

A It's .72 percent, and it's of the -- that's the first piece. You have to get to Tier 1. So if we had not -- I believe it's structured is if we don't get to Tier 1, for example, we don't hit the plan, right around the plan number of 71-and-change cents, then there wouldn't -- there wouldn't be upside.

So it was very much structured in a way that you had to perform. And then the better the performance, the bigger the percentages of the tier.

Q So, in theory, Mr. Seery, by the time you get down to Tier 4 and Tier 5, it's a little bit less certain that you're ever going to get there. Is that right?

A Well, out of the gate, going deeper was uncertain. It's a question of being able to execute well on the assets and being able to control the costs and being able to make distributions. It wasn't based on what we just got for the assets. It's actually based on actual distributions --

Q I understand that.

A -- to Class 8 and 9 claimants.

Q I understand that. And the idea is, is that it take a lot more effort -- the theory was it might take a lot more effort to get all the way to the bottom of Tier 5 to pay all the Class 9 claims, right?

A And maybe a little luck.

Q Yeah. And Class 10 is not even factored into this, is it?

A No, it is not.
Q And so you didn't consider Class 10. You stopped at Tier 5?
A That's correct.
Q So your entitlement to a 6 percent return, or a 6 percent bonus on the recoveries, you say it's there to incentivize you. You didn't expect that to actually happen, did you, when you signed this? Is that your testimony?
MR. STANCIL: I object to the form of the question. It mischaracterizes the agreement.
BY MR. MCENTIRE:
Q You didn't expect it to happen, did you, sir?
THE WITNESS: Well, the six --
THE COURT: Wait. I'm sorry. Could you rephrase the question?
MR. MCENTIRE: Sure.
BY MR. MCENTIRE:
Q Are you telling the judge that you really didn't expect that to happen and that's why you were entitled to a higher percentage?
A No. We didn't expect to reach Class 9 and go deep into Class 9, but we certainly held out the possibility that we could. And it's not six percent. It's six percent of the increment. These are cumulative. So you get .72 of Tier 1. You get 1.17 of Tier 2. And you can add those, and you earn

them when you've actually made the distribution, but you don't get paid until you get all your distribution or we're relatively done or there's a renegotiation. Because the Committee wanted to make sure that I didn't say, hey, I hit Tier 3, time to go, I got a better job.

Q So, Mr. Seery, if Farallon told Mr. Dondero that they wouldn't sell basically at any price because you said it was too valuable, and they rejected a 40 or 50 percent premium, if they said that, is that -- is that a lie?

A That I -- rephrase that, please. I don't -- didn't quite understand your question.

Q Yeah. You've heard the testimony that Farallon, Michael Linn, told Mr. Dondero that they were not going to sell their claim at any amount because you had told them it was too valuable. Is that a lie?

A I think that's -- yeah, I don't think that's true.

Q Okay. And obviously, if they're not going to be willing to sell at any amount, they must be pretty certain they're going to hit Tier 5. Would that just be a lie?

A That -- that conversation was before this negotiation. That -- there's no -- they could not have had any expectation, either when they had that conversation in May or when we had this discussion that I was going to hit Tier 5 and I hadn't hit Tier 5. And the idea that they wouldn't sell at any price is complete utter nonsense, because they're capped on what

they can get.
Q So if -- sure. Okay. So, but if Farallon told --
A But that's what you said.
Q If Farallon told Mr. Dondero that they wouldn't even sell at 130 percent of the purchase price because you told them it would be too valuable, is that a lie?
A I never told them it would be too valuable. I don't -- I don't know any of the other parts that you're saying, the 130 percent of an unknown number, some guess number that Mr. Dondero had. I never told them it would be too valuable. That would be their own assessment of where we were at the end of May 2021.
Q If they said that you told them not to sell, that it was too valuable, is that a lie?
A That's untrue, yes.
Q If they told him -- if they told him that he told you -- that you told them it was too valuable because of MGM, is that a lie?
A Yes.
Q How many shares of stock did Highland Capital own?
MR. MCENTIRE: Well, one second. What is my time? How much time do I have?
THE CLERK: Right now you're at --
MR. MCENTIRE: So I'm almost two and a half hours in?
THE CLERK: Just about. A little under.

BY MR. MCENTIRE:
Q I'm going to have to speed up here, Mr. Seery.
THE COURT: A little under two and a half, you said.
BY MR. MCENTIRE:
Q Mr. Seery, I want to make sure. Highland Capital owns interests in the CLOs. What is the CLOs' stake in the MGM stock, or what was it?
A Highland Capital does not own any interest in any of the CLOs it manages. It has a fee stream, and it can have certain deferred fees that it can get, but it didn't own any interest in any of the CLOs that it managed.
Q Fair enough. How about the portfolio companies?
A Did Highland Capital own interests in the portfolio companies?
Q Yes.
A Some of the ones Mr. Dondero listed, but they weren't portfolio companies. So he said OmniMax, but we didn't have any management of OmniMax. We just had debt that converted to equity, but we didn't control the -- the thing. That was during the case, the company.
Q Did Multistrat have an interest in MGM?
A Multistrat owned MGM, yes.
Q Okay. And did your company, Highland Capital -- your company -- Highland Capital have an interest in Multistrat?
A Highland Capital owns 57 percent of Multistrat, yes.

Q And did Highland Capital have an interest in any other portfolio companies that have an interest in -- had a stake in MGM?
A RCP. Restoration Capital Partners.
Q And do you recall what the value of that was?
A It shifted over time. I don't -- I don't know what time you're talking about.
Q And isn't it true that 90 percent of all the securities that Highland Capital owned at the time that the sale went public was roughly 90 percent of all of Highland Capital's securities?
MR. STANCIL: Objection, Your Honor. I don't know what that question is asking.
THE COURT: I don't understand it, either. Could you rephrase?
MR. MCENTIRE: I'll try to.
BY MR. MCENTIRE:
Q At the time that the announcement was made about Amazon buying MGM in May of 2021, what percentage of all the securities did MGM comprise of the securities that were owned by Highland Capital?
A Of the securities that were directly owned by Highland Capital, it may have been -- I'm thinking of public or semi-public securities, the 150,000 or 170,000 that we had that were subject to the Frontier lien. Might have been almost all

of the securities that we owned. It wasn't -- it was a good position, but it wasn't a huge driver for the directly-owned shares. There was more value in the Multistrat and the RCP.

Q What percent of shares of all --

MR. STANCIL: Your Honor, I'm sorry, I'm having trouble hearing the end of Mr. Seery's answers. So I know it's not his --

THE WITNESS: I'm sorry.

THE COURT: Okay. If you could make sure you speak into the mic.

THE WITNESS: Yeah. I'm sorry.

MR. STANCIL: I'm having trouble with Mr. McEntire talking over the end of Mr. Seery's answers.

THE COURT: Ah.

MR. STANCIL: I'm having trouble following.

THE COURT: Okay.

MR. STANCIL: I apologize.

THE COURT: Okay. Could you --

MR. MCENTIRE: I didn't know I was doing that.

THE COURT: Well, --

MR. MCENTIRE: I'll try to do better.

BY MR. MCENTIRE:

Q Mr. Seery, of all the stock that Highland Capital owned in May of 2021, what percentage of that was (inaudible) stock?

A Hopefully this is clear. Highland Capital did not own a

lot of stock. Highland Capital did have a direct ownership interest in MGM, so that might have been the vast majority of the stock that Highland Capital owned. It did own interest in other entities, like its investment in RCP or its investment in Multistrat. But of the stock that it owned directly, that was probably it, and that's the one that was liened up to Frontier.

Q Mr. Seery, did Highland Capital own approximately 170,000 shares of MGM stock in May of 2021?

A Yes. You -- I'm sorry. You asked me what percentage, and I think I said roughly that amount of stock liened up to Frontier, and that that might have been almost all of the stock we owned.

Q Does Highland Capital own a direct interest in HCLOF?

A In HC --

Q HCLOF?

A HCLOF? Yes. Highland Capital owns a small direct interest, and a large indirect interest which we got through the settlement with HarbourVest.

Q And the entity in which you acquired the indirect interest, what's the name of that entity?

A I don't recall. It's a -- it's a single-shell special-purpose entity that we own all of it and it has no other assets.

Q And just to make sure that the record is clear, you deny

under oath that HCLOF has any interest -- or had any interest in MGM stock?
A HCLOF has never owned MGM stock and still doesn't own MGM stock. It's never owned it.
Q Um, --
A At least -- at least, as long as I've been in this case.
MR. MCENTIRE: One second, Your Honor, please.
(Pause.)
MR. MCENTIRE: I'm going to have to pass the witness because of time sensitivities, Your Honor, so I'll pass the witness at this time.
THE COURT: Okay. Cross?

CROSS-EXAMINATION

BY MR. MORRIS:
Q Mr. Seery?
A Yes, sir.
Q You just covered a lot of what we would have covered, so I want to be really, really quick here. Okay? We're not covering old ground. Let's just start with the HarbourVest settlement. Do you recall that Mr. Dondero sent the email to you on December 17th?
A Yes.
Q Okay. When did you reach the agreement with HarbourVest on the settlement?
A December 10th.

Q Okay.

MR. MCENTIRE: Your Honor, I'd like to move into evidence Exhibit 31. Actually, let me lay a foundation first. Can you give the witness --

MR. MCENTIRE: Is this a new exhibit?

MR. MORRIS: No. It's Exhibit 31.

MR. MCENTIRE: Can I see it, Tim, please?

MR. MORRIS: It's in your box.

MR. MCENTIRE: Give me a minute.

MR. MORRIS: Uh-huh.

THE COURT: Okay. We're about to focus on Highland Exhibit what?

MR. MORRIS: 31.

THE COURT: Okay.

MR. MORRIS: Do you have it, Your Honor?

THE COURT: I do.

BY MR. MORRIS:

Q Do you have it, Mr. Seery?

A I do, yes.

MR. MORRIS: Do you have it, sir?

MR. MCENTIRE: I do. Thank you.

MR. MORRIS: Okay.

BY MR. MORRIS:

Q Can you just tell the Court what this is?

A This is an email chain. It starts from me to the other

independent directors, copying counsel, to outline the terms of the HarbourVest settlement that I had just made the offer to HarbourVest to settle on these terms on December 8th. And this was the product of a number of negotiations that had taken place over the prior weeks, and this was the final offer that I was making to them to settle.

Q Directing your attention to the bottom of the first page, the first email dated December 8, 2020 at 6:46 p.m., can you just read the first sentence out loud.

A I lost -- you lost me.

Q That begins, "As discussed yesterday."

A Oh. "As discussed yesterday, after consultation with John Morris" -- that would be you -- "regarding litigation risks, this evening I made an offer" -- it says "and," but it should have said "an" -- "offer to HarbourVest to settle their claims. The following are the proposed terms."

Q Okay. Just stop right there. And you were -- this is the report that you gave to the independent directors?

A The other independent directors.

Q Right.

A I was also one.

Q Right. And did Mr. Dubel respond?

A He did, yes.

Q And can you just describe briefly what your understanding was of his response?

A Dubel responds a couple hours after I sent the original email: "Jim, this basically looks like a $10 million -- net $10 million payment to HV." That's HarbourVest. "Is that correct? Does the 72-cent recovery include the $22-1/2 million that we get from the transfer of HCLOF interests? Remind me again, post-effective date, who is managing HCLOF?"

So I think my understanding was Mr. Dubel was querying me on some of the terms that I had set forth here, including that the value of the claim in our estimation was going to be about $9.9 million, meaning they would have a $45 million senior claim, a $35 million junior claim, and we thought, based on the values we had then, it was going to pay out about $9.9 million.

Q Okay. And was this offer accepted?

A Yes, it was.

Q When was it accepted?

A I think I just said. On -- on December 10th.

Q Okay. And did the terms that you described for the other independent directors on December 8th, did they change in any way at all from that reflected in this email until the time we got to the 9019 hearing?

A Not at all, no.

Q Okay. I see that you mention in here that you -- it says, quote, "The interests have a marked value of $22-1/2 million, according to Hunter Covitz." Do you see that?

A That's correct, yes.
Q Who's Hunter Covitz?
A Hunter Covitz was a Highland employee. He ran the structured products business. So he was responsible for making sure that the CLO we managed, which was AC7, was compliant and was -- with the indentures. He also was responsible for monitoring the -- what we call the 1.0 CLOs, even though they weren't really CLOs, they were more like closed-in funds. And he also kept track of the Acis -- CLOs that HCLOF had an interest in that were managed by Acis.
Q Okay. And do you recall how he conveyed to you the NAV?
A Well, I talked to him numerous times, so this wasn't our -- I didn't just call him up at the end and say, what's the NAV? I had had discussions with him while I was negotiating with HarbourVest. And at some point, he or someone -- he told me the amount, and at some point he gave me a NAV statement that actually showed the NAV of HCLOF, which at 11/30 was roughly $45 million.
Q Okay. Can you turn to Exhibit 31-A, the next document in the binder?
A Mine's completely blacked out.
THE COURT: I'm sorry, what number?
MR. MORRIS: 31-A.
THE COURT: Oh.
MR. MORRIS: And the first two pages are redacted

just because they're not relevant and they're business information.

BY MR. MORRIS:

Q But can you turn to the last page, sir?

A Yes.

Q Can you tell the judge what this is?

A So this is a net asset value statement from HCLOF. That's Highland CLO Funding, Limited. That's the Guernsey entity that -- that held these interests. And this is a net asset amount, and it shows what the net -- what the net asset value is as of this time on a carryforward basis of $45.191 million.

Q Okay. And where did you get this document?

A I believe I got it from Covitz. It's generated by an entity called Elysium, which is the fund administrator for HCLOF, and I believe they're out of Guernsey.

Q And did you rely on this document in setting the proposal to HarbourVest?

A Well, both the conversations with Covitz and the document. And frankly, HarbourVest got the same documents because they were -- they held a membership interest in HCLOF. So he -- Michael Pugatch knew what the NAV was.

Q And would Mr. Dondero or entities controlled by him who also have interests in HCLOF, is it your understanding that they would have also had this document available?

A All members would --

MR. MCENTIRE: Excuse me. Excuse me. I object to that question, the question being "and the entities controlled by Mr. Dondero." There's no foundation for this witness to answer a question like that.
BY MR. MORRIS:
Q Who else owned --
THE COURT: Sustained.
BY MR. MORRIS:
Q -- an interest in HCLOF?
THE COURT: Go ahead.
THE WITNESS: It would have been DAF.
BY MR. MORRIS:
Q The DAF?
A Yeah.
Q Okay. Let's just ask this question. Is it your understanding that these NAV valuation reports were made to all holders of interests in HCLOF?
A Yes. And that would include the DAF. And I did leave off that there were three former Highland employees long gone, or at least not around at this point, who also owned very small interests, and they would have gotten those statements as well.
Q And does HCLOF also produce audited financial statements?
A It does, yes.
Q Can you go to Exhibit 60, please?

A Six zero?
Q Yes, sir. A couple of questions here. Is this a document that Highland would have received in the ordinary course of business?
A Yes, it is.
Q Okay. And what is the NAV depicted on this page as of the end of the year 2020?
A Well, you have to look through it, because this document is actually dated 4/21/21, --
Q Okay.
A -- which you can see on Page 10 where it's signed. And that shows a net asset value of $50.4 million as of 12/31/21. 12/20. I'm sorry. And -- but it wasn't prepared until -- the audits aren't done and we don't get this document until after the directors sign off in April.
Q Okay.

MR. MORRIS: And Your Honor, I move for the admission into evidence of these three HarbourVest-related documents, 30, 31-A, and 60.

MR. MCENTIRE: No objection.

THE COURT: They're admitted.

MR. MORRIS: Okay.

(Debtors' Exhibits 30, 31-A, and 60 are received into evidence.)

BY MR. MORRIS:

Q Okay. Let me move on. We've seen Mr. Dondero's email today. You've seen that before, correct?
A Yes.
Q Okay. What was your reaction when you got it?
A I was highly suspicious.
Q Why is that?
A Well, not to replow too much old ground, but this came after he threatened me. He threatened me in writing. I'd never been threatened in my career. I've never heard of anyone else in this business who's been threatened in their career. So anything I would get from him, I was going to be highly suspicious.

It also followed the imposition of a TRO for interfering with the business. He knew what was in the TRO and he knew what it applied to, and it restricted him from communicating with me or any of the other independent directors without Pachulski being on it.

Furthermore, Pachulski had advised Mr. Dondero's counsel that not only could they not communicate with us, if they wanted to communicate they had to prescreen the topics.

And how do we know that? Because Dondero filed a motion to modify the TRO. And that was all before this email.

In addition, that followed the termination of the shared service arrangements, the approval of the disclosure statement, and the demand to collect on the demand notes that

Mr. Dondero and his entities were liable for.

So at that point, he'd been interfering with the business, he had threatened me, he was subject to a TRO, and I got this email and I was highly suspicious.

Q Did you ever share this email with anybody at Farallon?

A No.

Q Did you ever share this email with anybody at Stonehill?

A No. And just to be clear, not just the email, the contents. Never discussed it with them.

Q That was going to be my next question. Did you ever share any information about MGM with anybody?

MR. MCENTIRE: Objection. Leading.

MR. MORRIS: I'm asking the question.

MR. MCENTIRE: No, you're leading.

MR. MORRIS: This is the whole --

MR. MCENTIRE: You're leading the witness.

THE COURT: Overruled. Finish the question.

BY MR. MORRIS:

Q Did you ever share any information concerning with MGM with anybody at Stonehill before you learned that they had purchased claims?

MR. MCENTIRE: Objection. Leading.

THE COURT: Overruled.

THE WITNESS: No. No, I did not.

BY MR. MORRIS:

Q Did you ever share any information with anybody at Farallon concerning MGM before you learned that they purchased their claims?

MR. MCENTIRE: Objection. Leading.

THE WITNESS: No, I did not.

THE COURT: Overruled.

THE WITNESS: I'm sorry.

(Pause.)

THE WITNESS: You know, you just asked me something about Stonehill.

THE COURT: No.

THE WITNESS: I'm sorry.

BY MR. MORRIS:

Q Yeah. No question.

A I wanted to clarify one.

Q What did you want to clarify, sir?

A Certainly didn't share anything about this email, any of the contents of it. I don't know if I ever -- I don't know exactly when Stonehill bought their claims, and they were subject to the NDA to do the financing process. So I know when Farallon told me they had bought their claims and I know we never had any discussions at all before they acquired their claims, and I don't know when Stonehill got those -- their claims, so I don't know when -- what was in the data room or what -- what might have been discussed about MGM while they

were under an NDA.
Q Okay.
A But certainly nothing -- I never shared the contents of this email, the substance of this email, the email at all. That's what I wanted to clarify.
Q What data room are you talking about, sir?
A This was the data room related to the exit financing where we sought exit financing and ultimately got exit financing from Blue Torch Capital.
Q And who put together the data room?
A DSI, which was our financial consultants, and our finance team.
Q And why did you -- did you delegate responsibility for creating the data room to DSI and the members of your team you just identified?
A Yeah, of course.
Q How come?
A I don't really know how to put together a data room.
Q Did you -- did you direct them to put anything in the data room?
A Not specifically. We had a deck that we -- that certainly I worked on and commented on, which would have been a general overview of the -- of the post-reorganized Highland and the -- and the -- and the Claimant Trust. So I certainly commented on that. But the specific information in the data room, I

don't -- I never looked at it. I don't know what it is.
Q How many -- how many entities who were participating in the exit facility process wound up making bids or offers?
A There were five that signed NDAs. Three provided substantive proposals. One was verbal. That was Bardin Hill, who'd been contacting me throughout the case, and they do this kind of financing, and they submitted a competitive bid. Stonehill in writing, and then amended, a more aggressive one, in writing. And Blue Torch probably three, and the most aggressive.
Q And did you give the -- did you give the opportunity to your age-old friends at Stonehill?
A They're not my age-old friends. And no, they lost. They were second, they were close, it was a good real proposal, but they didn't win.
Q So, --
A Blue Torch won.
Q So is it fair to say that you -- did you pick the best proposal that you thought provided the best value for the company that you were managing?

MR. MCENTIRE: Your Honor, again, for the last ten minutes, we've had nothing but leading questions. And it just is --

MR. MORRIS: Fine. Happy to --

THE COURT: Sustained. Rephrase.

BY MR. MORRIS:
Q Why did you pick Stone -- why did you pick Blue -- Blue-?
A Blue Torch.
Q Blue Torch, over the other bids?
A It was the best bid. So, structurally, it was the least expensive, although they were extremely close. I had a lot of confidence in Blue Torch because this type of financing is what they do. And while you can never have a hundred percent confidence that if somebody goes through the -- this is an LOI, right, so this is a letter of intent. When they go further, they may -- they may not complete it. But I had a high degree of confidence that they would get there, because, again, that's what they do. And they were the -- they were just the better bid.
Q Okay. Do you recall that in Mr. Dondero's notes he wrote down that he was told that Farallon had purchased their claims in February or March?
A I saw that on what he claimed, yes.
Q And is that consistent with what you were told by Farallon in March?
A They told me they acquired the claims -- they had acquired the claims on March 15th, by email. I don't know if they acquired them in February or March. Or even January. I know they said they had them on March 15.
Q Did you ever speak with Farallon about anything having to

do with the purchase of their claims?

MR. MCENTIRE: Objection. Leading.

THE COURT: Overruled.

THE WITNESS: Not -- not before they sent me that email.

MR. MORRIS: I apologize. Withdrawn.

BY MR. MORRIS:

Q Before -- before learning of their purchase, had you had any discussions with them about potential claim purchases?

MR. MCENTIRE: Objection.

THE WITNESS: No.

MR. MCENTIRE: Leading.

THE WITNESS: I'm sorry.

THE COURT: Overruled.

THE WITNESS: No, I didn't.

BY MR. MORRIS:

Q Okay. Before you learned that Stonehill had purchased claims in the Highland bankruptcy, had you ever had any conversation with them about the potential purchase of claims?

MR. MCENTIRE: Objection. Leading.

THE WITNESS: No, I don't -- I don't --

THE COURT: Overruled.

THE WITNESS: I'm sorry. I don't -- I don't believe so, no.

BY MR. MORRIS:

Q Do you have any knowledge at all as to how the sellers went about selling their claims?
A I have some knowledge now, post-effective date, that I believe I have some understanding, but not a great one.
Q Did you ever communicate with any of the sellers about the potential sale of their claims prior to the time their claims were sold?
MR. MCENTIRE: Objection. Leading.
THE COURT: Overruled.
THE WITNESS: I did have a conversation with Eric Felton who was the Redeemer representative on the Creditors' Committee. And it came out of one of the emails I got. I think it indicated that --
MR. MCENTIRE: Objection, hearsay, Your Honor. I mean, hearsay, Your Honor.
THE COURT: Okay.
MR. MCENTIRE: It's hearsay.
THE COURT: Okay. He's about to say something that's hearsay is the objection. Any response?
MR. MORRIS: I'm not offering it for the truth of the matter asserted. I'm offering it for Mr. Seery's state of mind and the extent of his communications. How about that?
MR. MCENTIRE: I don't see how you could offer it for anything other than for the truth of the matter asserted. It's coming from a third party, so I object to hearsay.

MR. MORRIS: Okay. You know what? We --

BY MR. MORRIS:

Q Other than the one conversation --

THE COURT: Are you withdrawing the question or do I need --

MR. MORRIS: Yeah. This is just --

THE COURT: Okay. You're withdrawing the question.

MR. MORRIS: I'll withdraw the question.

THE COURT: Okay.

BY MR. MORRIS:

Q Other than the one conversation with Mr. Felton, did you ever have a conversation with any seller prior to the time you learned that Farallon or Stonehill --

MR. MCENTIRE: Objection. Leading.

BY MR. MORRIS:

Q -- purchased the claims?

THE COURT: Overruled.

THE WITNESS: No.

BY MR. MORRIS:

Q Did you play any role in facilitating or recommending to Farallon or Muck that it purchase claims?

MR. MCENTIRE: Objection. Leading.

THE COURT: Overruled.

THE WITNESS: No. None whatsoever.

BY MR. MORRIS:

Q Did you play any role in facilitating or recommending that Stonehill or Jessup purchase claims?
A No.
MR. MCENTIRE: Objection. Leading.
THE COURT: Overruled.
THE WITNESS: I'm sorry.
BY MR. MORRIS:
Q All right. Let's just finish up with compensation. Can you go to Exhibit 41, please? Can you just identify that document for the Court?
A This is the -- it's a memorandum agreement that sits on top of an outline. It is the December 2 incentive compensation agreed terms for Highland Capital --
Q Okay.
A -- and the Trust.
Q And when was this signed?
A It would have been -- the date is December 6th.
Q And --
A 2021. I'm sorry.
Q Okay. And when did you and the Committee members begin discussing your compensation package?
A Shortly after the effective date, which was August 11, 2021.
Q And were there any negotiations during that intervening three- or four-month period?

A Considerable negotiations during that period, yes.

Q Can you go to the last page of Exhibit 41? Can you describe that for the Court? I know it's hard to read, but --

A I --

Q -- the numbers don't matter so much as the infor... you know, just, can you just describe --

A Yeah.

Q -- what's being conveyed?

A So it's very hard to read, but it says -- because it's small -- Seery Proposal 1, Oversight Counter 1, Seery Proposal 2, Oversight Counter 2, and then it continues down. My recollection is that we had four or five rounds of back-and-forth that were meaningful. But it -- but it even took a detour in the middle, because it started with my proposal, which was pretty robust, and their response to me that they didn't like the structure or the amount, and so then we started talking about that. And then they -- after we were kind of hitting numbers and structure at the same time, they came back to me and said, stop, we've got to agree on the structure before we agree on the amounts.

MR. MCENTIRE: Your Honor, I'm going to object as it's hearsay and move to strike. This is -- he's not talking about the document. He's talking about something outside of the four corners of the document. I object to hearsay.

MR. MORRIS: Hearsay? There's no statement.

THE COURT: There was --

MR. MORRIS: It's a description of what happened.

MR. MCENTIRE: But he's actually referring to statements in his substantive comments.

THE COURT: Overruled. Okay.

MR. MORRIS: I move for the admission into evidence of Exhibit 41.

THE COURT: Any objection?

MR. MCENTIRE: That's the memorandum agreement, Mr. Morris? Is that it?

MR. MORRIS: Yes, sir.

MR. MCENTIRE: No objection.

THE COURT: Admitted.

(Debtors' Exhibit 41 is received into evidence.)

BY MR. MORRIS:

Q Can we go backwards to Exhibit 39, please? Can you describe for the Court what that is?

A This is a redacted copy of minutes of the board meeting on August 21 -- 26, 2021.

Q And there's a lot of stuff redacted there. Do you have an understanding as to why there is redactions?

A It would have nothing to do with these issues that we're discussing or the alleged *quid pro quo*.

Q Okay. Can you just read out loud the last portion that's unredacted on the second page, beginning with "Mr. Seery

reviewed"?

A It actually says, "Mr. Seery also presented the board with an overview of his incentive compensation program proposal, which would include not only Mr. Seery but the current HCMLP team. The terms and structure of the proposal had been previewed with the board in prior operating models presented by Mr. Seery. Mr. Seery reviewed the proposal and stated his view that the proposal was market-based and was designed to align incentive between himself and the HCMLP team on the one hand and the Claimant Trust beneficiaries on the other. The board asked questions regarding the proposal and determined that it would consider the proposal and revert to Mr. Seery with a counterproposal."

Q All right. When you were -- when you were shown one of these documents before, you were asked to identify Mr. Linn, but you weren't asked about the others. Do you see Richard Katz there?

A Yes.

Q Who's that?

A He's the independent member.

Q Did he play any role in the negotiation of your compensation package?

A Yes. He was actively involved.

Q Okay. And how about Mr. Provost? Who's he?

A He is the Jessup person. Jessup is the board member.

He's their representative on the board.

Q Okay.

MR. MORRIS: And I move for admission into evidence of Exhibit 39.

MR. MCENTIRE: No objection, Your Honor.

THE COURT: Admitted.

(Debtors' Exhibit 39 is received into evidence.)

BY MR. MORRIS:

Q Let's go to Exhibit 40, please. Can you just describe for the Court what that is?

A This is a subsequent board meeting minutes, August 30, 2021.

Q And can you just read into the record -- why are there redactions?

A Again, they would -- if there are redactions, it would have nothing to do with the issues that are being brought up in this motion.

Q And can you just read into the record the paragraph beginning, "Mr. Katz"?

A "Mr. Katz began the meeting by walking the Oversight Board and Mr. Seery through the Oversight Board's counterproposal to the HCMLP incentive compensation proposal, including the review of the spreadsheet and summary of the counterproposal. Discussion was joined by Mr. Linn and Mr. Stern. Mr. Seery asked numerous questions and received detailed responses from

the Oversight Board. Mr. Seery and the Oversight Board agreed to continue the discussion and negotiations regarding the proposed incentive compensation plan for the Claimant Trustee and the -- and the HCMLP."

Q So they didn't accept your original proposal that you made in the earlier document?

A They did not.

Q Okay. And did negotiations continue?

A They did, yes.

MR. MORRIS: Before we go on, I move for admission into evidence Exhibit 40.

THE COURT: Any --

MR. MCENTIRE: No objection.

THE COURT: It's admitted.

(Debtors' Exhibit 40 is received into evidence.)

BY MR. MORRIS:

Q Can you go to Exhibit 59, please? Can you describe for the Court what this is?

A This is an email string between me and the Oversight Board regarding the compensation proposal.

Q Okay. And directing your attention to the bottom, I guess, of the second page, there is an email from Mr. Katz dated October 26. Do you see that?

A At the bottom of the second -- oh, yes, yes.

Q Okay. Can you just read the sentence at the bottom of the

page beginning "We propose"?

MR. MCENTIRE: Well, Your Honor, I would, first of all, object to him just reading from the document until it's been put into evidence.

THE COURT: I'm sorry, say again?

MR. MCENTIRE: I would object to Exhibit --

THE COURT: We can't pick things up on the record when you don't speak in a mic.

MR. MCENTIRE: I object to him simply reading from the document before the document is offered into evidence.

MR. MORRIS: Okay.

MR. MCENTIRE: Accepted into evidence.

MR. MORRIS: Sure. I'd move it into evidence.

MR. MCENTIRE: I object as hearsay.

MR. MORRIS: This is a present sense recollection -- recorded. It's a clear business record. It's a negotiation that's happening over time. Mr. Seery is here to answer any questions about authenticity.

MR. MCENTIRE: Well, first of all, it's an email string involving communications with third parties. That's hearsay in and of itself. And it's not been established that this is a business record. And Mr. Morris's statements to that effect, frankly, don't carry his burden. There's internal hearsay contained throughout the document, Your Honor, even if it is a business record.

MR. MORRIS: Your Honor, just to be clear, let me respond.

THE COURT: Uh-huh.

MR. MORRIS: Exceptions to hearsay rule. 803(1) present sense impression; (2) -- (3) existing mental impression, state of mind about motive, (5) recorded recollection, (6) records of regularly-conducted activity, or Federal Rule of Evidence 807, residual exception for trustworthy and probative evidence. I'll take any of them.

MR. MCENTIRE: None of them apply.

MR. MORRIS: Okay.

THE COURT: Okay. Overruled.

MR. MORRIS: Thank you.

THE COURT: I admit it. 59's admitted.

(Debtors' Exhibit 59 is received into evidence.)

BY MR. MORRIS:

Q Can you just read that last sentence at the bottom of that page?

A This is from Rich Katz to me.

Q Uh-huh.

A (reading) We propose doing this in two stages. First, we'd like to come to agreement on structural, underscored, elements of the ICP.

ICP means incentive compensation program or plan.

Only after we'd done that, when the board had greater

understanding of what plan they were pricing, would we haggle out the specific numbers, underscore, tier attachment points, and percentage participation in each tier.

Q Okay. And going to the right-hand part of that, do you see where it says, Salary J.S. Only?

A Yes.

Q Can you just, you know, generally describe for the Court what the debate is or the negotiation that's happening on that particular point?

A Well, this was brought up earlier. The salary was $150,000 a month. That was the same salary that I'd had during the case that was approved by the Court. It had been approved by the Committee, approved by the other independent members. That was continuing. It was also contained as an actual base salary in the plan and the Claimant Trust Agreement, and they were never amended.

The Committee came back to me and said, we'd like that to step down. And they'd like it to step down on a definitive specific schedule, because they had a view that that would incentivize me to work faster to make distributions before the stepdown and that I wouldn't linger in the role. And the yellow --

Q Can you just read the yellow out loud?

A That's --

Q Read the whole thing.

A That's my response.
Q Read the whole thing.
A (reading) Based on the required expertise, volume, and personal risk of the work today, I do not think that any formulaic reduction in base comp is appropriate. With the complexity and amount of issues that I have to manage on a daily basis, I currently do not have capacity to take on significant outside work. Of course, things can change. If they do, I am open to discussing reduction in the base. I have no interest in sitting around doing nothing, having no risk, and collecting the full base compensation. We can include prefatory language and an agreement to revisit our terms, but I do not see an avenue to set parameters to lock in an agreement for the future at this time.
And then there's another paragraph on severance.
Q You can stop there.
MR. MORRIS: I have no further questions.
THE COURT: All right. Pass the witness.
MR. MCENTIRE: Do you have any questions?
A VOICE: No.
MR. MCENTIRE: Okay. How much time do I have, please?
THE CLERK: So, the limit is at two hours and 32 minutes.
MR. MCENTIRE: All right.

REDIRECT EXAMINATION

BY MR. MCENTIRE:

Q Just a couple questions very quickly, Mr. Seery. Highland Capital Management paid HarbourVest cash as part of the settlement, correct?

A That's incorrect.

Q There was no cash component at all?

A There was not.

Q And in connection with the HarbourVest settlement, HarbourVest transferred an interest in HCLOF to Highland Capital or an entity affiliated with Highland Capital; is that not correct?

A That's correct.

Q And that -- that entity -- and HCLOF, and HCLOF had an interest in various CLOs, correct?

MR. MORRIS: Your Honor, I object. This is beyond the scope of my cross, or redirect, however you prefer.

MR. MCENTIRE: Well, you spent a lot of time on HarbourVest. I'm just trying to clear it up.

MR. MORRIS: I didn't say the word CLO. I did not say the word CLO.

THE COURT: Overruled. He can go there.

If you'd please move the mic towards your voice.

BY MR. MCENTIRE:

Q And HCLOF had an interest in various CLOs, correct?

A I believe it had an interest in five CLOs. Oh, that's not true. It had an interest in five of the 1.0 CLOs. It also owned one hundred -- basically, somewhere between 87 and a hundred percent of Acis 3, 4, 5, 6, and 7, which is about a billion dollars of CLOs to 10 (inaudible) leveraged vehicles, and they owned basically all the equity, so that was the driver of the value.
Q And various entities that were -- I mean, some of these various CLOs had an interest in MGM stock, correct?
A The 1. -- the Highland 1.0s did. The value drivers I just described -- Acis 3, 4, 5, 6, and 7 -- had no interest in MGM.
Q But one of them did have an interest in MGM?
A That's not correct.
Q What did you just say?
A 3, 4, 5, 6, and 7 did not have any interest in MGM.
Q Were there any CLOs that had an interest in MGM?
A Some of the 1.0 CLOs did, --
Q I see.
A -- yes.

MR. MCENTIRE: Pass the witness.

MR. MORRIS: No further questions.

THE COURT: Mr. Seery, I want to ask you one thing.

THE WITNESS: Yes, Your Honor.

EXAMINATION BY THE COURT

THE COURT: We dance around it a lot. The Highland

ownership of MGM stock. If think -- if you could confirm I've heard this correct -- you said Highland itself owned 170,000 shares that were subject to a Frontier Bank lien?

THE WITNESS: Yes, Your Honor. I believe that's the right amount. So, Highland directly owned about 170,000 shares. Those were liened up to Frontier. They were -- they were never transferred. Highland never sold any MGM stock.

THE COURT: Okay. So Frontier still holds it or what?

THE WITNESS: No. In fact, post-effective -- I believe it was post-effective date, and with cash generated, we -- we paid off the Frontier loan, --

THE COURT: Uh-huh.

THE WITNESS: -- released that lien, and then we held those shares in MGM until the merger was consummated.

THE COURT: Okay.

THE WITNESS: So we tendered our shares into the -- into the merger and got the merger consideration, which was cash.

THE COURT: Okay. And so there was that. But other than that, you said Highland owned 50 percent of Multistrat, which owned some MGM stock?

THE WITNESS: Multistrat had a -- I don't recall the amount, but a material amount of MGM stock. That also -- so, Highland owned 57 percent of Multistrat. Is also the manager

of Multistrat.

THE COURT: Uh-huh.

THE WITNESS: Multistrat did not sell any MGM stock. It also tendered them into the merger as well.

THE COURT: Okay. And then you said Highland owned some percentage of Restoration --

THE WITNESS: Restorations Capital Partners.

THE COURT: -- Capital Partners, which owned some MGM stock?

THE WITNESS: Similarly, Highland is the manager of what we call RCP. RCP owned a material amount of MGM stock. RCP did not sell any MGM stock. However, in 2019, you'll recall that Mr. Dondero sold $125 million of stock postpetition out of RCP. It was MGM stock. He sold it back to MGM. We had a -- we had a hearing on it, because subsequently the Independent Board learned about it, the Committee learned about it, they had not -- it had not been disclosed, but there was a -- what we thought was a binding agreement with MGM, and MGM indicated that they were going to hold us to it, and so we had a hearing about approving that transaction. The Committee was not happy.

THE COURT: Okay. I'm fuzzy on when that was. You said?

THE WITNESS: That would have been in early 2020, probably April-ish timeframe.

THE COURT: Okay.

MR. MORRIS: Your Honor?

THE WITNESS: The transaction was in November, I believe.

MR. MORRIS: If it's helpful, Your Honor, you can find it at Docket 487.

THE COURT: Okay.

MR. MORRIS: I think that's the objection from the Committee where the issue was -- comes up at least at one time.

THE COURT: Okay. And then I think this is the last category I heard, that HCM and its specially-created sub owned just over 50 percent of HCLOF, and it in turn owns interest in a lot of CLOs, and a few of those, what you call the 1.0 CLOs, did own some MGM stock?

THE WITNESS: That's correct. So if you look on the audited financials that we had introduced into evidence, you'll see actually every asset that HCLOF owns. There's no MGM in there. It does own interest. There were minority interests in five or six of the 1.0 CLOs. Grayson, Greenbrier, Gleneagles, Brentwood, Liberty, and one other. And it had interest in those, but it never owned any MGM stock and it never traded any MGM stock. It didn't own any.

THE COURT: All right. Did I cover the universe of what MGM stock was owned by Highland or something Highland had

an interest in?

THE WITNESS: Yeah. So, the ones that HCLOF had an interest in that I just listed, those -- Jasper was the other one. I apologize. The -- they owned -- they owned MGM stock among their other -- they had a lot of other assets. The other CLOs, the 1.0 CLOs that Highland had, every one of them owned MGM stock. None of them sold or bought any stock. Those all tendered into the merger as well. Highland did not own any interest in any of those entities.

THE COURT: Uh-huh.

THE WITNESS: It just managed them.

THE COURT: Okay. And this is my last question. Someone brought up or it came up today that exactly two years ago today -- I didn't remember we were on an anniversary of that -- but was when we had a hearing, and I think it was a contempt hearing, but I had, I guess, read in the media, like many other human beings, an article about the MGM-Amazon transaction, and I had said I had hope in my heart and brain that this could be an impetus or a triggering event for maybe a settlement. And that was kind of quickly pooh-poohed, if you will.

Remind me why I was quickly persuaded, oh well, I guess that's not going to happen. I just can't remember what I heard that day.

THE WITNESS: Well, it was widely known that

Highland, meaning not the 171,000 --

THE COURT: Uh-huh.

THE WITNESS: -- but the entities that Highland or related entities, including DAF, the other Dondero entities, controlled a lot of Highland stock, as even Mr. Dondero said between Anchorage --

THE COURT: You mean MGM?

THE WITNESS: MGM, I'm sorry. Between -- there were only five major holders. There was the two we just mentioned and Davidson Kempner and Monarch and Owl Creek, and just a few other big holders.

And so Your Honor would have learned it from the case, but you also would have learned it from the paper, that any time a holder is mentioned, it's first Anchorage, because they owned the biggest piece, and Kevin Ulrich, who was the chairman of Anchorage, was also the chairman of MGM. And then Highland was always mentioned.

The reason that it didn't have some great amount of capital that went on to Highland, although there was money from RCP and there was money from MGM, is Highland doesn't own the stock that's -- or interests in the 1.0 CLOs that owned all of it. We just manage it.

THE COURT: Uh-huh.

THE WITNESS: And that goes to various other entities, including, in large part, to Dondero entities. So

there wasn't a big windfall to Highland from that.

The possibility of some upside from HCLOF, because it owned small interests in those five, there was some value in that, but a lot of it got tied up in the litigation that other entities, Dondero entities, are bringing against U.S. Bank and Acis, which has tied up everything in that -- those distributions.

THE COURT: Okay. All right. Thank you. You are excused from the stand.

THE WITNESS: Thank you, Your Honor.

MR. STANCIL: I owe you a docket number, Your Honor. You said don't let us leave before we give you a docket number for that second contempt order. We promised to come back. It was #2660.

THE COURT: Okay. Got it.

MR. STANCIL: Which -- did we move that into evidence?

MR. MORRIS: No. We asked the Court to take judicial notice.

THE COURT: I will take judicial notice of 2660, --

MR. STANCIL: Thank you, Your Honor.

THE COURT: -- I already said. Thank you.

THE WITNESS: Thank you, Your Honor.

THE COURT: You're excused.

(The witness steps down.)

THE COURT: All right. Are you going to have any other evidence, Mr. McEntire?

MR. MCENTIRE: Your Honor, as I respond to your question, I think we have 30 -- approximately 30 minutes left.

THE CLERK: Twenty-six, yes.

MR. MCENTIRE: Twenty-six. We do have another witness. We also have a closing final argument. And we also have an opportunity -- we want to reserve an opportunity for our experts that is still under advisement.

So my first action would be to ask for an extension of time, or we would like to add to our time limit. Instead of just three hours, we'd like to increase the time so we can accomplish all these things.

I mean, if the Court is unwilling to give us additional time, then I will be forced not to call another witness. I will move to a very short final argument. I need to preserve some time for my experts, should you allow them to testify.

THE COURT: Well, --

MR. MORRIS: May I respond?

THE COURT: -- you don't have to preserve time. I'm either going to allow you to put on your experts, and we said 30 minutes/30 minutes, --

MR. MORRIS: That was what I was going to say, Your Honor.

THE COURT: Okay.

MR. MORRIS: There's no prejudice here. Nobody's being harmed. There's no appellate issue. I thought we were really clear. Everybody gets their three hours today. We will file our reply brief on Monday. The Court will determine both whether it needs to hear expert testimony and whether or not our motion should be sustained. If the Court denies the motion, we'll take a couple of depositions and each side will get whatever period of time the Court orders.

But, you know, the attempts to create an appellate record are just -- you know, that's not -- there's no issue here. He can -- he's got 26 minutes. He can put on his witness, he can make his closing in the 26 minutes that they've always had.

THE COURT: All right. Well, we have --

MR. MCENTIRE: May I caucus? May I caucus very quickly, Your Honor?

THE COURT: Okay. Uh-huh. And while you're caucusing, we have our game plan on the experts. We know how that's going to happen. And I'm not extending the three hours.

MR. MORRIS: (sotto voce) We have 62 minutes?

(Pause.)

MR. MCENTIRE: Your Honor, accordingly, I'll just -- we'll move into a final argument at this time.

THE COURT: Okay. So you rest?

MR. MCENTIRE: I rest.

THE COURT: All right.

MR. MORRIS: We call Mark Patrick.

THE COURT: All right. Mr. Patrick, you've been called to the witness stand.

MR. MORRIS: I just need to find my examination notes. Just give me one moment, please.

THE COURT: All right. Please raise your right hand. Could you remain standing, please.

(The witness is sworn.)

THE COURT: All right. You may be seated.

MARK PATRICK, DEBTORS' WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MORRIS:

Q Hi, Mr. Patrick.

A Hello.

Q Did you ever meet with anybody at the Texas State Securities Board?

A No.

Q Do you know if -- do you know anybody who ever met with anybody at the Texas State Securities Board concerning Highland?

A Yes.

Q And who met with the Texas State Securities Board concerning Highland?

A Ronnie (phonetic) Patel.

Q And is that a lawyer?
A Yes.
Q Do you know who retained Mr. -- that lawyer?
A Yes.
Q Who retained that lawyer?
A The DAF, the Charitable DAF Fund. Or one of its entities.
Q Okay. And is it your understanding that the DAF Fund or one of its charitable entities filed a complaint with the Texas State Securities Board?
A Yes.
Q Okay. Thank you very much. Does Hunter Mountain owe any money to Mr. Dondero?
A No.
Q Is there a promissory note that's outstanding that Mr. Dondero has pursuant to which Hunter Mountain owes him $60-plus million?
A No.
Q Who created Hunter Mountain?
A Well, I don't recall specifically. I just recall the facts that, when Hunter Mountain was created, Thomas Surgent, the chief compliance officer of Highland Capital Management, who was representing the Dugaboy Investment Trust as well as Highland Capital legally with respect to that transaction, requested to Rand that the Hunter Mountain Investment Trust be created for purposes of Highland filing its ADV with the SEC.

It was my understanding that when the ADV would be filed, sort of the ownership change would -- chain would stop at Hunter Mountain.

Q Okay. Dugaboy is Mr. Dondero's family trust, correct?

A No. But I'll help you along. Just please use the full name of the trust.

Q If I refer to the Trust, will you know that that's -- is that for the Hunter Mountain Investment Trust, or do you want me to use trust --

A There's no entity called Dugaboy. Just Dugaboy. There's not.

Q Okay.

A It's a shorthand. I'm --

Q Okay. I'll refer to Dugaboy then, okay?

A What are we referring to?

Q The trust known as Dugaboy.

A Okay. Fair enough. Go ahead.

Q Okay. Did Dugaboy contribute a portion of its ownership interest in Highland to the Highland -- to the Hunter Mountain Investment Trust?

A Contribute? No.

Q Did it transfer?

A Yes.

Q And did it receive in exchange a promissory note from Hunter Mountain?

A Yes, it did.
Q Okay. And Mr. Dondero is the lifetime beneficiary of Dugaboy, correct?
A Yes and no. It's a placeholder -- a placeholder provision that's never been used.

MR. MCCLEARY: Your Honor, pardon me. Pardon me. Objection, relevance, Your Honor.

THE COURT: Relevance?

MR. MORRIS: This is -- we've been told so many times that Mr. Dondero has no interest in this case, he has nothing to do with Hunter Mountain. He's the lifetime beneficiary of Dugaboy. And if I --

THE WITNESS: That provision has never been invoked. He's received no money through that provision.

THE COURT: Okay. Just wait. We're resolving --

MR. MORRIS: Right.

THE COURT: -- an objection at the moment.

BY MR. MORRIS:
Q Can we turn to Exhibit 51?

THE COURT: I'm still working on the objection.

MR. MORRIS: I'm going to try and lay a foundation. Okay?

THE COURT: Okay. So he's withdrawing the question.

MR. MCCLEARY: He's withdrawing the question? Okay.

THE COURT: Okay.

BY MR. MORRIS:
Q You have a binder in front of you, sir. Can you go to Exhibit 51?
THE COURT: And this is Highland's Exhibit 51?
MR. MORRIS: Yeah.
THE COURT: Okay.
BY MR. MORRIS:
Q And is that a promissory note that was made --
A Yes, it is.
Q -- that was made by Hunter Mountain in favor of Dugaboy back in 2015?
MR. MCCLEARY: Objection, relevance, Your Honor.
MR. MORRIS: I'm trying to connect Mr. Dondero to Hunter Mountain.
THE COURT: Okay. Overruled.
THE WITNESS: Yeah. It's a secured promissory note with the amount of approximately $62.6 million signed by Beacon Mountain, LLC, --
MR. MORRIS: Uh-huh.
THE WITNESS: -- as administrator for Hunter Mountain Investment Trust.
BY MR. MORRIS:
Q Okay. And as the -- what's your role with Hunter Mountain today?
A And it's in favor, just to answer your question, it's in

favor of the Dugaboy Investment Trust. That's where I was just being a little stickler --
Q I appreciate that.
A -- previously. Sorry.
Q I do.
A Okay. What is your question?
Q What's your role with Hunter Mountain today?
A I am the administrator.
Q When did you become the administrator?
A On or about August of 2022.
Q Okay. How did you become the administrator?
A Through the acquisition of Rand Advisors.
Q And does Hunter Mountain have any employees?
A No.
Q Does it have any operations?
A No.
Q Does it generate any revenue?
A Not -- not currently.
Q Okay. Did it generate any revenue in 2022?
A No.
Q Does it own any assets?
A Yes.
Q What does it own?
A It has -- it's my understanding it has a contingent beneficiary interest in the Claimants Trust.

Q And that's the only asset it has, right?
A Correct.
Q So that if it -- if that interest has no value, then Hunter Mountain has no ability to pay the Dugaboy note. Fair?
A (sotto voce) If that interest has no value?
That is correct.
Q Okay.
MR. MORRIS: I move Exhibit 51 into evidence.
MR. MCCLEARY: Your Honor, relevance. Objection.
THE COURT: Your response?
MR. MORRIS: Mr. Dondero desperately needs Hunter Mountain to win in this lawsuit because otherwise his family trust will get nothing on this $63 million note.
THE COURT: Okay. Overrule the objection. It's admitted.
(Debtors' Exhibit 51 is received into evidence.)
BY MR. MORRIS:
Q Neither you or any representative of Hunter Mountain has ever spoken with any representative of Farallon, correct?
A Correct.
Q Neither you nor any representative of Hunter Mountain has ever spoken with anybody at Stonehill, correct?
A Correct.
Q You have -- neither you nor Hunter Mountain have any personal knowledge about a *quid pro quo*, correct?

A (sotto voce) Nor Hunter Mountain have any personal knowledge about a *quid pro quo*.
Correct.
Q Neither you nor anybody at Hunter Mountain have any personal knowledge about how Mr. Seery's compensation package was determined, correct?
A Correct.
Q Neither you nor anybody at Hunter Mountain had any knowledge about the terms of Mr. Seery's compensation package until the Highland parties voluntarily disclosed that in opposition to the Hunter Mountain motion, correct?
A No. I --
MR. STANCIL: Objection, relevance, Your Honor.
THE COURT: Overruled.
THE WITNESS: No. I seem to -- I seem to have an awareness that the performance fee was amended at a certain time post-confirmation, or, you know, around the confirmation time period. And so that's with respect to the compensation. I -- just myself.
BY MR. MORRIS:
Q Can you tell Judge Jernigan everything you know or everything you knew before receiving Highland's opposition to this motion about Mr. Seery's compensation as the CEO of the Reorganized Debtor at the Claimant Trustee?
MR. MCCLEARY: Objection, Your Honor. That's

overboard and an unclear question.

THE COURT: Overruled. He's gone through some specific things now. I guess he's just trying to encompass anything we haven't covered.

THE WITNESS: Yeah. I had a -- I personally had a general understanding that Mr. Seery's compensation changed after the claims trading to put in a performance-based-type measure. But I do recall that it was always very -- it was unclear exactly the terms.

BY MR. MORRIS:

Q Okay. Did you learn anything else?

A Such as?

Q Just, did you ever learn anything else about Mr. Seery's compensation package that you haven't testified to yet?

MR. STANCIL: Your Honor, objection. Vague.

THE COURT: Overruled.

THE WITNESS: No.

BY MR. MORRIS:

Q Okay. Neither you nor Hunter Mountain has any personal knowledge whatsoever about any due diligence that Stonehill did in connection with the purchase of claims, correct?

MR. MCCLEARY: Your Honor, he's getting into allegations in the complaint which involve attorney work product, so we object on the basis of invading the attorney work product.

THE COURT: Overruled.

THE WITNESS: Can you restate the question again?

BY MR. MORRIS:

Q Yes, sir. Neither you nor Hunter Mountain have any personal knowledge as to what due diligence Stonehill did before purchasing its claims in this case, correct?

MR. MCCLEARY: Objection. Attorney work product. Invasion of that. Could I --

THE COURT: I just ruled.

MR. MCCLEARY: I understand.

THE COURT: I just --

MR. MCCLEARY: Could I have a running objection to this line of questioning on that basis, Your Honor, invasion of attorney work product?

THE COURT: Why don't you explain why it's attorney work product. I'm missing --

MR. MCCLEARY: Because they might -- he would have knowledge from the efforts and investigation through attorneys in the case. I assume he's not asking -- you can't separate that, potentially. So he's getting into attorney work product.

MR. MORRIS: I'm asking for facts.

THE COURT: He's asking for facts. I overrule.

BY MR. MORRIS:

Q Can you answer the question, sir?

A Yeah. I'm not aware -- I'm not personally aware of how much work Farallon did, or Stonehill.

Q You have no knowledge whatsoever about the diligence Stonehill did before purchasing its claims, correct?

A Well, I would generalize now is that they did nothing.

Q And that's on the basis of Mr. Dondero's testimony, correct?

A I would just call it on a basis of our general inquiry, which would be including, in part, Mr. Dondero's testimony.

Q What else are you relying upon for your conclusion that you just described other than Mr. Dondero's? What other facts?

A Yeah, we -- yeah, we have not uncovered any facts that indicated that they did conduct any due diligence of any sort.

Q Okay. And are you -- do you have any personal knowledge as to what Farallon did in connection with its due diligence prior to buying its claim?

A Yeah. We have not been able to find any facts that would suggest that Farallon conducted any due diligence of any kind.

Q Okay.

MR. MORRIS: One second, Your Honor.

(Pause.)

BY MR. MORRIS:

Q Who's paying Hunter Mountain's legal fees?

A Hunter Mountain is paying -- is legally obligated and

paying its own legal fees.
Q If it generates no income and its only assets is the interest in Highland, where is it getting the funds to pay legal fees?
MR. MCCLEARY: Objection, Your Honor. This is irrelevant and invades the attorney-client privilege.
MR. STANCIL: Your Honor, I'm happy to read a Fifth Circuit case that says the identity of a third-party payer of attorneys' fees is not privileged. I would refer them to *In re Grand Jury Subpoena*, 913 F.2d 1118, a 1990 Fifth Circuit case. I can read from Judge Jones' opinion, but you tell me how much you want to hear on this.
THE COURT: Okay. I overrule your objection. He can answer.
THE WITNESS: There is a settlement agreement by Hunter Mountain Investment Trust as well as the Dugaboy Investment Trust that provides for the payment of attorney fees.
MR. MORRIS: No further questions, Your Honor.
THE COURT: Okay. Cross?
MR. MCCLEARY: Yes, Your Honor, briefly.

CROSS-EXAMINATION

BY MR. MCCLEARY:
Q Mr. Patrick, how would you describe Mr. Dondero's relationship with Hunter Mountain Investment Trust today?

A None.
Q You were asked some -- let me ask you about litigation, and litigation involving the sub-trust. Has Hunter Mountain been involved in litigation with Mr. Kirschner?
A Yes.
Q Okay. And what is your understanding of Mr. Kirschner's role?
MR. MORRIS: Your Honor, while I would love for them to continue --
MR. MCCLEARY: He's the --
MR. MORRIS: -- to use their time, I object that it's beyond the scope of my examination. They passed on the witness. They rested their case. He should be limited to the scope of my inquiry.
THE COURT: Okay. How does this tie to direct?
MR. MCCLEARY: Your Honor, it -- just very generally. This is --
THE COURT: Okay. I need to know how it ties to the direct.
MR. MCCLEARY: This doesn't tie directly to the direct, Your Honor.
THE COURT: Then it's beyond the scope, you acknowledge?
MR. MCCLEARY: Yes, Your Honor.
THE COURT: Okay. Sustained, then.

MR. MCCLEARY: Okay.

BY MR. MCCLEARY:

Q Mr. Patrick, has Hunter Mountain Investment filed any litigation as a plaintiff other than its efforts to be a plaintiff in this lawsuit and its action as a petitioner in the Rule 201 matter earlier this year in Dallas state court?

A The 202.

Q 202, yes.

A No, it has not.

Q All right. And then it's -- has it been a party, then, to any other litigation other than the efforts to file this action, the Rule 202 action, and has it been a defendant in any lawsuits?

A To my understanding, no.

Q Is it involved as a defendant in the Kirschner litigation?

A Yes.

Q Mr. Kirschner is suing Hunter Mountain; is that correct?

A That is correct.

Q Okay. So, is Hunter Mountain a vexatious litigant?

MR. MORRIS: Objection, Your Honor. This is now really beyond the scope. We're not doing -- this is -- we're not doing it. I'm not letting -- because there's a vexatious litigant motion pending now in the district court right now before Judge Starr. This has nothing to do with anything I asked.

THE COURT: Okay.

MR. MCCLEARY: They're trying to draw --

THE COURT: You've already asked him is it a party in any other litigation besides the 202 and this attempted one, so where are we going with this?

MR. MCCLEARY: Well, they're just trying to draw Mr. Dondero into this and -- this vexatious litigant argument, and we're just developing the fact that obviously Hunter Mountain has only filed -- attempting to file this action and a Rule 202 proceeding. So they're not involved in a lot of litigation and they're not a vexatious litigant.

THE COURT: Okay. I think I'll sustain that and we can just move on.

MR. MCCLEARY: Okay. Then I'll pass the witness. Thank you, Your Honor.

THE COURT: Okay. Any redirect?

MR. MORRIS: No, thank you, Your Honor.

THE COURT: All right. You are excused, Mr. Patrick.

(The witness steps down.)

THE COURT: Anything else?

MR. MORRIS: Just a time check for both sides and let's get to closings.

THE COURT: Okay. Caroline?

THE CLERK: Movant has 23 minutes left and the Respondents have 47.

THE COURT: 23 and 47. Any other evidence from the Respondents?

MR. MORRIS: That is a fair question.

(Discussion.)

MR. MCCLEARY: Your Honor, I just want to confirm that all the exhibits that they did not object to have been admitted into evidence.

THE COURT: All right. Well, let me --

MR. MCCLEARY: We do offer them.

MR. MORRIS: Oh.

THE COURT: Hang on.

MR. MORRIS: Did I get Exhibit 45, Your Honor?

THE COURT: Just a moment. I'm doing two things at once here. 45 is in.

MR. MORRIS: Okay.

THE COURT: All right. On HMIT's exhibits, okay, first, as we all know, 29 through 52 are carried until -- if we have another hearing with the experts.

(HMIT's Exhibits 29 through 52 carried.)

THE COURT: I'm showing we have -- and speak up if anyone questions this -- I show that we have Hunter Mountain Exhibits 3 and 4, and then 7 through 10, 12 through 23, and 26 through 38, and 53 through 57, 64, 65, and then 67 through seventy --

(HMIT's Exhibits 3, 4, 7-10, 12-23, 26-38, 53-57, 64, 65,

67-70 are received into evidence.)

MR. MCCLEARY: Your Honor, I apologize. From 36 -- 26 to 32 are in?

THE COURT: I believe that was part of the stipulation, Mr. Morris, right?

MR. MCCLEARY: Yes.

MR. MORRIS: I think that's right.

THE COURT: Okay.

MR. MORRIS: We really didn't object to very many.

THE COURT: Yes.

MR. MCCLEARY: That would be 25, too. That would include 25?

MR. STANCIL: No. Objection. 25 is not --

THE COURT: It's not admitted.

MR. STANCIL: It's not in evidence.

THE COURT: 25 and 24 were not admitted.

MR. MORRIS: Correct. Those are my emails.

THE COURT: Okay. So --

MR. MCCLEARY: 25 is an article.

THE COURT: Your 25 was John Morris Email Re: Text Messages dated March 10, 2023.

MR. MCCLEARY: Okay.

THE COURT: Okay. I can't remember where I left off. I think I left off -- I'll just repeat after the expert exhibits that are carried. I've admitted 53 through 57. I

have admitted 64, 65, 67 through 71.

(HMIT's Exhibit 71 is received into evidence.)

Now, I'm not sure if I ended up admitting 72. That was the articles. I can't remember if you stipulated on that finally.

MR. MORRIS: I said they --

MR. MCCLEARY: They had no objection.

MR. MORRIS: -- they come in --

THE COURT: Not for the truth of the matter asserted.

MR. MORRIS: -- self -- exactly.

THE COURT: Okay.

MR. MORRIS: Self-authenticating.

THE COURT: So 72 is in.

MR. MCCLEARY: Okay.

(HMIT's Exhibit 72 is received into evidence.)

THE COURT: Then we had some pleadings. I think 73, 74, 75 are in, but again, not for the truth of the matter asserted in any advocacy on 73 and 74. And then 77, 78, 79 are in. And that's it.

(HMIT's Exhibits 73, 74, 75, 77, 78, and 79 are received into evidence.)

MS. DEITSCH-PEREZ: Your Honor, I didn't make an appearance, but I was taking notes (inaudible).

MR. MCCLEARY: Your Honor, I believe 80 should be in.

MR. MORRIS: No objection to 80. It's on our -- it's

part of our Exhibit 5.

THE COURT: Okay. 80 is in. Admitted.

(HMIT's exhibit 80 is received into evidence.)

MR. MORRIS: Yeah. That's really Section A of that thing that I gave you this morning.

THE COURT: If Ms. Deitsch-Perez wants to consult with the Hunter Mountain lawyers, she can. I don't know --

MR. MORRIS: Can I go through quickly mine, Your Honor? Because we actually never had the opportunity to put our exhibits in.

THE COURT: Okay. Let's make sure we're to --

MR. MORRIS: Okay. I'm sorry. I'm sorry.

THE COURT: -- closure on the Hunter Mountain exhibits.

MR. MORRIS: I'm sorry.

THE COURT: Anything I said that you disagree with? I don't think --

(Pause.)

THE COURT: Okay. Let's hurry up. What is the controversy?

A VOICE: Roger? The Court's addressing you.

MR. MCCLEARY: Oh. Excuse me, Your Honor. So, just a little unclear of whether you have Exhibits 21 through 25 admitted.

THE COURT: I have 21, 22, and 23. Not 24. Not 25.

Okay. Anything else?
MR. MCCLEARY: Okay. Then we do offer 24 and 25.
THE COURT: You offered them. I did not admit them.
MR. MCCLEARY: Okay. 76. I believe -- was that -- you're carrying?
MS. DEITSCH-PEREZ: Carried.
MR. MCCLEARY: You're carrying that?
THE COURT: Okay. I carried that and --
MR. MCCLEARY: It's part of the expert issue.
THE COURT: Okay. Yes, part of the expert. So it's carried.
(HMIT's Exhibit 76 is carried.)
(Pause.)
MR. MCCLEARY: I understand you've admitted 53 through 83, although some of them have now not been approved.
THE COURT: All right. Well, we need to clarify. 58 through 63, you think you offered them and I admitted them, but not for the truth? I remember that being discussed for 58 through 63. Are you actually offering them?
MR. MCCLEARY: Yes. 58 through 63.
THE COURT: All right. And Mr. Morris, you ultimately agreed that yes, but not for the truth of the matter asserted?
MR. MORRIS: That's right, Your Honor.
THE COURT: Okay. So they are admitted. Okay.

(HMIT's Exhibits 58 through 63 are received into evidence.)

THE COURT: And then there was an objection to the Mark Patrick declaration for the same thing, not for the truth of the matter asserted.

MR. MORRIS: Exactly.

THE COURT: But you agree as long as it's --

MR. MORRIS: Correct.

THE COURT: Okay. So what that means is, to recap, 53 through 75 are admitted, although some of those are only -- they're not for the truth of the matter asserted. And then 77 through 80 are admitted. Okay?

MR. MCCLEARY: And 76? We offered 76.

THE COURT: That's -- we carried it. We carried it. It relates to the expert.

MR. MCCLEARY: Carried it.

(Pause.)

MR. MCCLEARY: Thank you, Your Honor.

THE COURT: Okay. Now let's straighten out Highland's exhibits. So, I'm showing 1 through 16 have been admitted, and then 25 through 31-A?

MR. MORRIS: 25 through 31-A?

THE COURT: I'm sorry. Yes. 25 through 31-A.

MR. MORRIS: Okay.

THE COURT: And then 34. And then 39, 40, 41, and

then 45. 51, 59, and 60.

MR. MORRIS: Okay. So I'm going to do my best not to burden the Court. I'm trying to focus. We move for the admission into evidence of Exhibit 32, which is Mr. Dondero's objection to the HarbourVest settlement. And the reason that we're offering it is because he made no mention of any concern at all that the settlement implicated material nonpublic inside information.

THE COURT: All right. Any objection?

MR. MCCLEARY: 32?

THE COURT: Uh-huh.

MR. MCCLEARY: Yes, Your Honor. Relevance and hearsay.

THE COURT: Overruled. And I can take judicial notice of it in any event.

(Debtors' Exhibit 32 is received into evidence.)

MR. MORRIS: We move for the admission into evidence of Exhibit 33, which is the recent letter from the Texas State Securities Board declining to take any action after conducting an investigation of the Dugaboy complaint.

THE COURT: Okay. Any objection?

MR. MCCLEARY: We object on the grounds of relevance, 403, hearsay, and authenticity, Your Honor.

And I also, I think it's important that the decision by a regulatory body has no bearing on this cause of action or the

colorability of this claim, and the Texas State Securities Board will tell you that. This is completely and utterly irrelevant to your inquiry, Your Honor.

THE COURT: Okay. I overrule the relevance objection. Certainly, it goes to colorability. It's some evidence. It's some evidence. A regulatory body did not choose to go forward --

MR. MCCLEARY: But that could be for --

THE COURT: -- on the complaint.

MR. MCCLEARY: That could be for reasons entirely unrelated.

THE COURT: True, true. It's some evidence.

MR. MORRIS: That's speculation.

MR. MCCLEARY: Not for this.

THE COURT: But what is the authenticity objection?

MR. MCCLEARY: Well, there's no demonstration. I don't believe they sponsored that with anyone.

THE COURT: Pardon? Say again?

MR. MCCLEARY: They didn't sponsor that with anyone.

MR. MORRIS: Your Honor, I actually -- if they really put me to it, because I was reading the Rules of Evidence in the wee hours of the morning, I am certain that there's an exception for government documents and government statements and government decisions.

MR. STANCIL: Your Honor, as to its authenticity, I

could produce a witness from Highland who said they got it, if that's really what we're doing. That it's the letter, they got it from the TSSB, if we're really doing authenticity.

MR. MCENTIRE: Well, first of all, it's hearsay and there is no authenticity issue and it's irrelevant. I understand --

MR. STANCIL: What is the authenticity issue, Mr. McEntire?

THE COURT: I'm trying to understand the authenticity issue. You think this is a --

MR. STANCIL: Do you think it's a real letter or a fake letter?

MR. MCENTIRE: Well, first of all, I'm going to address the Court and not you, okay?

Your Honor, --

THE COURT: Well, address by speaking in a --

MR. MCENTIRE: Yeah. Thank you.

THE COURT: Okay. I'm just saving the court reporter from grief, okay?

MR. MCENTIRE: It is hearsay, and it is hearsay that is calculated to be misrepresented or mischaracterized because it's utter speculation as to the basis for their decision. And if it's -- utter speculation is the basis of your decision, it has no reason to come in. There's no --

THE COURT: What you're telling me, it goes to the

weight of the evidence. Okay?

MR. MCENTIRE: Your Honor, --

THE COURT: Okay. You're not telling me it's inadmissible hearsay.

MR. MCENTIRE: Well, it is inadmissible hearsay.

MR. MORRIS: Can I just, for one second?

THE COURT: Please.

MR. MORRIS: Paragraph 34 of their motion, Your Honor. Quote, "The Court also should be aware that the Texas State Securities Board opened an investigation into the subject matter of the insider tradings at issue, and this investigation has not been closed. The continuing nature of this investigation underscores HMIT's position that the claims described in the attached adversary proceeding are plausible and certainly far more than merely colorable."

They used the investigation to try to convince you that their claims are colorable, and now we have a letter saying there's nothing.

THE COURT: Okay. You want to explain that to me?

MR. MCENTIRE: Well, we put no evidence in, in this proceeding --

THE COURT: You put what?

MR. MCENTIRE: We have put no evidence in, in this proceeding, --

THE COURT: You filed a pleading under Rule 11

suggesting this was highly relevant, right?

MR. MCENTIRE: We filed a motion. Yes, we did.

THE COURT: Under Rule 11.

MR. MCENTIRE: Yes. Of course we did.

THE COURT: Okay.

MR. MCENTIRE: Of course we did.

THE COURT: Suggesting this Texas State Securities Board complaint and investigation was highly relevant.

MR. MCENTIRE: The fact that it had opened an investigation and was conducting an investigation is irrelevant. Its decision to stop the investigation without further elaboration or clarification, this is why it calls for utter speculation.

MR. MORRIS: Your --

THE COURT: Okay. Do you have the hearsay exception that applies? I'm looking at my evidence rules right now for the government record or public record. Is it 803(8) that we need to have addressed here?

MR. STANCIL: 803(8), Your Honor.

A VOICE: Yeah, public records.

THE COURT: Okay.

MR. STANCIL: Public record. Sets out --

THE COURT: Public records, 803(8), hearsay exception. Moreover, you pled allegations suggesting this investigation was really relevant. So I overrule your

objection, and so that means 33 is admitted.

(Debtors' Exhibit 33 is received into evidence.)

MR. MORRIS: Thank you, Your Honor. I continue. Exhibit 36 --

MR. MCENTIRE: Which one was that?

MR. MORRIS: That was 33.

So now we're up to 36, Your Honor. I'm going to skip some of these.

THE COURT: Okay.

MR. MORRIS: But this is just the Court's order approving Mr. Seery's original --

THE COURT: I'm waiting for any objection for the record. Do we have an objection, Mr. McCleary?

MR. MCCLEARY: 36, relevance, Your Honor.

MR. MORRIS: The relevance is that this Court approved without objection Mr. Seery's compensation package in an amount that included a base salary of $150,000, which the Claimant Purchasers and the independent director saw fit to continue.

THE COURT: Objection overruled. It's admitted.

(Debtors' Exhibit 36 is received into evidence.)

MR. MORRIS: I think 38 may be on their list. Yeah, 38 is in as their 26, right? So that should be admitted.

THE COURT: Admitted.

(Debtors' Exhibit 38 is received into evidence.)

MR. MCCLEARY: If it's on our list, we agree.

THE COURT: Okay. It's admitted.

MR. MORRIS: That's it, Your Honor.

THE COURT: Okay. Do you all need a five-minute break before we do closing arguments?

MR. MORRIS: I'd be grateful.

THE COURT: Okay.

MR. MCCLEARY: Yes, Your Honor. Thank you.

THE COURT: Will do.

THE CLERK: All rise

(A recess ensued from 5:49 p.m. to 5:57 p.m.)

THE CLERK: All rise.

THE COURT: All right. Please be seated.

We're back on the record in the Highland matter. Closing arguments. Just for everyone's benefit, time -- you said 47 minutes and 23 minutes back several minutes ago, and then we had all the housekeeping stuff. So I'm not sure if that's where we are right now or if --

MR. MCENTIRE: I'm waiting for my monitor guy to be here.

THE COURT: Okay. Okay.

So Caroline, is it still 47 and 23?

THE CLERK: Yes.

THE COURT: That's when we started the housekeeping stuff.

MR. MCENTIRE: So 27 minutes?

THE COURT: Twenty-three.

THE CLERK: Twenty-three.

MR. MCENTIRE: Twenty-three? Can I get a five-minute warning, please? Would you pull up the PowerPoint? And let's go to Slide 39.

May I proceed, Your Honor?

THE COURT: You may.

CLOSING ARGUMENT ON BEHALF OF HUNTER MOUNTAIN INVESTMENT TRUST

MR. MCENTIRE: So, before I go to the PowerPoint, I'd like to kind of give a high-altitude overview of the situation as I see it from the evidence perspective. We don't believe this should have been an evidentiary hearing. Evidence has been allowed.

We had a situation where, if you believe Mr. Dondero's testimony as contrasted with Mr. Seery's testimony, you have a credibility issue. So the Court is now conducting an inquiry presumably on the basis in part on the credibility of witnesses. And if you engage -- and if you want to indulge that type of inquiry, the credibility of witnesses, without allowing the Plaintiff in this case or the Movant in this case to conduct some level of meaningful discovery, I would suggest we have been deprived of due process, because without documents to test Mr. Seery's statements, we are being deprived of something that's basically very fundamental in our

judicial process.

And therefore, it underscores our argument and our rationale why this shouldn't be an evidentiary hearing, because I don't believe the Court can consider credibility issues.

We have, on the one hand, unequivocal notes from Mr. Dondero prepared contemporaneously that would suggest that someone admitted to him and stated to him that they did in fact obtain material nonpublic information. Mr. Seery says that didn't happen. I specifically said, is that a lie? Yes, it's not true. Well, that's a real problem, because that's not the criteria that this Court should use for determining whether we have a colorable claim. A colorable claim is whether there is some possibility. It's something less, even less stringent than a 12(b)(6) standard, plausibility. We have that.

If you look at our pleadings, we have set forth all of the facts we need, all the elements we need to establish a trade on material inside information, nonpublic information. We have evidence -- we have allegations that there was no due diligence. And Farallon's lawyer stood up here -- well, I'm not going to really address that today. But if there was any day to address it, it was today. We have no evidence to suggest they did do due diligence. Even Mr. Seery said, I don't know what due diligence they did. We have evidence to

suggest that the only due diligence they did was to talk to Mr. Seery, who has told -- who told them that this is very valuable, don't -- this is a really good -- a good investment here, it's a lot better than the 71 percent that's on our disclosures.

And Judge, that evidence supports the colorability of the claim. And if you go down the pathway of saying, well, I'm not sure about Mr. Dondero because he had been held in contempt two years ago, that's a real problem. That's a problem for this Court. And I'm going to suggest that's why this should have been a four-corners deliberation. Even Farallon and Stonehill suggest this should be a four-corners deliberation.

We have evidence now of no due diligence. We have evidence before you that suggests that they did learn about MGM before the announcement date. We have evidence that Mr. Seery did trade on -- did -- was aware and received information of material nonpublic information. And for him, a CEO of his reputed stature, to sit here and say that was not material and that was nonpublic defies common sense. It defies reasonableness. That goes to credibility.

Mr. Dondero's notes speak volumes. The trades themselves speak volumes. Mr. Dondero established that the interest -- return of interest here is to be less than one -- it's in the one digits, and hedge funds trade in the 30, 40, 50 percent

range. Well, if that's the case, we have Farallon walking away from a return on the exit financing of 13 percent, and that wasn't good enough for him. How could six percent be good enough for him? There's something missing here. There's something not right.

And we're entitled to get our lawsuit on file and do some discovery. And if they want to do a 12(b)(6), they do a 12(b)(6). If they want to do a Rule 56 after discovery, they could do a Rule 56, all in this Court. But to address this threshold issue now based upon this, what happened here today, is a fundamental denial of due process.

I'd like to go to my pleadings.

Can you go to Slide 39, please?

First of all, let there be no doubt -- 39. Slide 39. 38. 38, please.

We can plead on information and belief. We have a right to plead on information and belief. And the Fifth Circuit -- that is an acknowledged procedural practice in the Fifth Circuit. And if some of our allegations are based upon information and belief, so be it. The test here is not at this stage. The test here is whether I have sufficient factual allegations, whether on information and belief or otherwise, to satisfy at most a plausibility standard. That's it.

And if they want to challenge us at a later date, they

can. Rule 56. 12(b)(6). Or standing. But we have standing. We have standing. We have standing under Delaware law. We're a contingent beneficial interest that has standing under Delaware law and all other law. All -- even Texas agrees that a contingent interest has standing, an inchoate interest as Mr. Seery described. A property interest. You have property interest, you have standing.

THE COURT: Let me ask you.

And Caroline, turn the clock off when the Court interrupts.

Just so you know, I mean, my analysis here is standing first. Does your client have standing? Because we all know that's a subject matter jurisdiction inquiry and I have to explore that first. And then I've said many times the legal standard question for colorability. That's kind of the second place I go --

MR. MCENTIRE: Sure.

THE COURT: -- if I find there's standing. But can you tell me, have there been appellate decisions that are relevant today on standing? Contrary to what people may expect, I don't follow every appellate decision from every appeal in the Highland case. Okay? I wait until I get a mandate --

MR. MCENTIRE: Sure.

THE COURT: -- to where I have to act on something.

MR. MCENTIRE: Sure.

THE COURT: So I feel like I've learned at some point that some either district judge or Fifth Circuit said some party didn't have standing. And I don't know if it was Hunter Mountain or some other trust.

MR. MCENTIRE: Not --

THE COURT: And is there anything they said that, if it wasn't Hunter Mountain, could be relevant here?

MR. MCENTIRE: I hope somebody kicks me if I'm wrong, what I'm about to say. I'm not aware of any such issue --

THE COURT: Okay.

MR. MCENTIRE: -- dealing with Hunter Mountain Investment Trust. I am not.

THE COURT: But any other party that might somehow bear on this case?

MR. MORRIS: I apologize, Your Honor, I was distracted. For which issue?

THE COURT: Standing. Because I was saying my first thing I've got to tackle in ruling on this is standing of Hunter Mountain. And I seem to remember learning that either the district court on an appeal or the Fifth Circuit on some appeal from Highland --

MR. MORRIS: Correct.

THE COURT: -- said some party didn't have standing.

MR. MORRIS: Correct.

THE COURT: And I don't know if it was --

MR. MORRIS: Dugaboy on the 2015.3, for sure, was a Fifth Circuit standing decision.

THE COURT: Okay.

MR. MORRIS: I think there was a district court order that preceded that.

THE COURT: Okay.

MR. MORRIS: That was the subject of the appeal.

THE COURT: The Dugaboy --

MR. MORRIS: 2015.3.

THE COURT: -- motion to require those --

MR. MORRIS: Yeah.

THE COURT: -- 2015.3 statements. Okay.

MR. MCENTIRE: So what we have here -- we can go back on the clock if you'd like.

THE COURT: Yes, please.

MR. MCENTIRE: How much time do I have?

THE CLERK: You have just under 16 minutes.

MR. MCENTIRE: Sixteen? Okay. Give me a two-minute warning. Sorry.

Your Honor, what we have here --

THE COURT: I don't think the U.S. Supreme Court justices will give you a two-minute warning, but maybe I'm wrong.

MR. MCENTIRE: Would you give me a two-minute

warning, please?

THE COURT: And I'm sure not a Supreme Court justice.

MR. MCENTIRE: What we have here is we have a 99.5 percent equity interest that has now been relegated to a category of contingent interest, which we don't believe we should be, and that's part of our declaratory judgment relief we're asking for, which we have standing to do that at a minimum because we want to be treated like a Class 9.

If they want to treat us like a Class 10, I have an argument for that, and it's more than colorable. It's persuasive. It's -- it is a winning argument. And that is we do have standing in our individual capacity, and we have given you a whole bunch of cases in our PowerPoint, or we will give you a whole bunch of cases in our PowerPoint and in our briefing to support that.

We also have given you Delaware case law that says we have standing under Delaware trust law to bring a derivative action against the Trustee. We have done everything appropriate here.

We have the -- a demand upon Seery obviously would be futile to prosecute the claim. A demand upon the Oversight Board would be futile to make a demand on Muck and Jessup, because they're Defendants and they're SPEs of Farallon and Stonehill. And a demand upon Mr. Kirschner would be futile. They suggest that there's an assignment of some sort, but that

would be a modification -- of the claims over to the Litigation Trust, but that would be a modification of the plan.

There's been no assignment of this claim, or these claims, to the Litigation Trust Trustee. But even if there had been, we pled that in the alternative as well. And it would be futile to make a demand on Mr. Kirschner because he's suing Hunter Mountain.

So we are an appropriate party. The only, then, issue becomes whether or not we have standing under Delaware law to bring a derivative action. And we have briefed that and we -- and that's included in our PowerPoint. The answer is yes.

I'd like to go briefly to Page -- next slide.

In our factual section, we set forth why this investment would defy any kind of rational economic sense in the absence of material nonpublic information as a factual allegation supported by data, supported by dates, supported by time.

Based upon that, we also have allegations that are framed around the admissions that Mr. Michael Linn provided. We have allegations that he turned down a 30 or 40 percent premium in our petition. We have allegations that they admitted that they did no due diligence. We have allegations that they admitted that they got material -- basically information about MGM.

And again, it's not all about MGM. It's about the values

of all the portfolio companies. They want to make it about MGM. If they do, we win. But it's much broader than that.

And we have standing to bring this claim because if we're right Mr. Seery will have to return excess compensation and the Claims Purchasers will have to disgorge. And that's going to help not just Hunter Mountain. That's going to help other creditors who haven't been paid yet.

So this is not exclusively -- Hunter Mountain would substantially benefit. I'm not suggesting otherwise. But it also benefits innocent stakeholders other than Hunter Mountain. And that's why we are an appropriate party. We don't have a conflict of interest to bring this. Everybody on their side of the table does. There's no one else who could bring this.

Your Honor, it's very clear when the trades took place. We give dates and times. It's very clear that -- next slide, 40. It's very clear that their investment was over $160 million. If it isn't, I don't see any denials. All we got today was a lame statement from the lawyer saying we're not here today to deny this.

MR. MORRIS: I'm offended.

THE COURT: He's offended by being called lame.

MR. MCENTIRE: Not you lame personally.

MR. MORRIS: Oh, thanks for the clarification.

THE COURT: Okay.

MR. MCENTIRE: A lame statement by you. In fact, it wasn't even you, so --

In any event, Your Honor, --

MR. MORRIS: I've been called worse.

MR. MCENTIRE: -- the point being is that there was no -- there's not -- never been an attempt to deny the factual allegations in our pleadings dealing with Farallon and Stonehill. None at all.

And so -- not that that's ultimately relevant, because that's an evidentiary issue outside of the four corners of our pleading, but it does -- it just stands out and screams. It screams. And it screams volumes.

So right, now based upon our pleadings -- we even plead in Paragraph 42, Paragraph 42, exactly what they invested. This is what you have before you. No one has disputed it. It's in the four corners of our pleading. We've got dates, times, amounts. We have admissions to Mr. -- well, we have admissions from Michael Linn, Paragraph 47. We have -- we do plead upon information and belief the *quid pro quo* on compensation. And frankly, the evidence here today is that the compensation is excessive. And the experts will further confirm that it is excessive. $1.8 million with a bonus program in place to pay him another $8, $9, $10 million, when in fact the risks don't exist and there's no uncertainty and therefore the percentages make no sense. That's --

THE COURT: What do you mean, the risks don't exist and there is no uncertainty?

MR. MCENTIRE: If Mr. Seery is telling Farallon and Stonehill don't sell, this could be really valuable, it's inconsistent with the notion that the schedule and the performance -- performance schedule in the compensation agreement is rationally justified. Because if it's really certain or it's likely you're going to make a lot of money, there's no reason to give him six percent to incentivize him because it's already a done deal.

And the whole point here is that I scratch your back, you scratch mine. They make a lot of money on their deal and he gets a lot of money on the backside post-effective date. Post-effective date.

Next slide, 49.

It would have been impossible, based upon the publicly-available information in Paragraph 49, impossible for Stonehill and Farallon, in the absence of inside information, to forecast any significant profit when they made their investments. It's not possible. Because given the amount of the Claim 8 and Claim 9 claims -- they actually invested in Claim 9 with a zero return. It's projected to be a negative result. On Claim 8, even if you allocate their entire purchase price to Claim 8, they're going to get something less than a 10 percent return paid out over a couple years. Nobody

invests that kind of money in an unsecured creditor asset that hasn't been collateralized. There's something wrong here.

And we have a right to have our day in court to show that. We have our right to take a true deposition of Mr. Seery with documents. We have a right to take Farallon and Stonehill's deposition with documents. And we have tried to get information and we have been turned down at every turn. We have a right to have our day in court, Your Honor.

We have allegations of excessive compensation. I know Mr. Morris suggested the other day that we didn't have any such allegations. They're here. The whole idea here is that Mr. Seery would really profit on the backside. And, you know, he actually testified, I believe -- I won't do that because that's outside the four corners of our pleading. But the -- there is a *quid pro quo*. We allege there's a *quid pro quo* upon information and belief. And we also allege willfully and knowingly, we allege conduct that falls clearly within the exceptions.

None of this -- none of these claims were released. Mr. Seery's not an exculpated party in the context of how we -- proposing to sue him here. None of the protected parties, to the extent that Muck and Jessup claim to be protected parties, they're not protected here, because all of the claims we're making are on the basis of willful misconduct and bad faith, which are the standards that they used and incorporated in the

plan and in the gatekeeper provisions.

How much time do I have?

THE CLERK: Right now you have --

MR. MCENTIRE: Thirty seconds?

THE CLERK: -- seven minutes left.

MR. MCENTIRE: Okay. Next slide, please.

Mr. Seery has admitted that he has a duty to avoid self-dealing. We allege that he did self-deal. There is clearly a relationship. We have a right to explore the depths of that relationship. Well, already we know there is a relationship. We have investments in charities, contributions to charities, meet-and-greets, congratulatory emails. It's not as if Farallon and Stonehill are strangers, or Mr. Seery's a stranger to them. It's not like that at all. They contacted him to get involved.

And by placing -- by acquiring these claims -- and by the way, this is the most significant trading activity in your bankruptcy, in this bankruptcy proceeding. Post-confirmation. Post-confirmation. By acquiring these claims, they were guaranteed to be put onto the Oversight Board. By acquiring these claims, they were guaranteed to be put in a position -- into a position where they would adjust, monitor, compensate Mr. Seery. That's the terms of the Claimant Trust. Those are the terms.

And it's interesting, because one of the amendments that's

in evidence to the plan, I think it's either the third or the fourth amendment, that came out of nowhere right before confirmation, they changed the structure of the Claimant Trust to go off a standard base pay and added in a bonus structure at the last minute. That's evidence.

Mr. Seery has acknowledged, we have alleged he had duties to avoid self-dealing, to always look out for the best interests of the estate, to avoid conflicts of interest. Well, here, to the extent that there is a *quid pro quo*, he is self-dealing and he has injured the Reorganized Debtor and he's injured the Claimant Trust, because that's just less money.

And we also allege, Your Honor, it's also an allegation that --

THE COURT: And let me ask, the sole injury here is compensation was more than it would have been if not for the sale of the claims to Farallon and Stonehill --

MR. MCENTIRE: That's one of the injuries.

THE COURT: -- and therefore less money at the end of the day for creditors and ultimately Hunter Mountain?

MR. MCENTIRE: Yes. And we also allege that, as part of this arrangement, conspiracy, as we allege conspiracy, we have seen over $200 million flow out of the coffers of this estate in the form of --

THE COURT: What do you mean, as a result of the

alleged conspiracy? What do you mean?

MR. MCENTIRE: A delay, a postponement, making long-term payouts, keeping the litigation alive. They actually suggested to Mr. Linn, don't settle these claims, don't sell out, because this is asset-backed, and we also have claims. And so --

THE COURT: Wait, what? Say again?

MR. MCENTIRE: One of the things that Mr. Linn told Mr. Dondero, according to Mr. Dondero's notes, is we have -- this is very valuable, we're buying assets and we're buying into claims, the litigation claims that are being asserted in this bankruptcy proceeding.

THE COURT: Yes. Got it.

MR. MCENTIRE: Yeah. And so the whole idea here is, is that people are funneling money in and taking money out of the coffers of this estate to fuel future litigation in order to have a bigger payday at the end for Class 8 and Class 9. That's exactly what those notes suggest.

THE COURT: I don't understand the correlation. What correlation are you making? Because of the claims being purchased, what?

MR. MCENTIRE: The claims being purchased allow Muck and Jessup to be in a position to award compensation. We've talked about that.

THE COURT: I got that.

MR. MCENTIRE: That's one type of injury. The other injury is, and we have alleged it, is the fact that these claims become very valuable not only because they're asset-backed but because also the litigation claims that Mr. Kirschner is prosecuting.

THE COURT: But how does the purchase of the claims impact that? They were allowed claims at certain amounts before, and after the purchase they're still allowed claims.

MR. MCENTIRE: Mr. Seery is telling them that, basically, this is our plan, this is what we're doing, this is --

THE COURT: That was the plan of reorganization that was confirmed by the Court. I don't get how something changed. I'm trying to get to what are the injuries that your client has suffered. And I get the compensation argument you're making, but I don't get the rest of it.

MR. MCENTIRE: If Mr. Dondero had been in a position, or one of his entities had been in a position, or even Hunter Mountain, and I'm not sure why Hunter Mountain -- be in a position to have acquired the claims, then we would -- this bankruptcy wouldn't even be in existence anymore. It'd be over. All creditors would be paid. It would be done. Be over. And that is an allegation we have made --

THE COURT: How do I know that?

MR. MCENTIRE: Because all the creditors would have

been paid off.

THE COURT: How do I know, if he would have purchased the claims, that's what would have happened?

MR. MCENTIRE: Well, that's what he testified to today here. I don't want to get off on a rabbit trail.

THE COURT: I'm trying to understand the injury, --

MR. MCENTIRE: Sure. I understand.

THE COURT: -- because that's part of my analysis here.

MR. MCENTIRE: The focus, the focus is on the compensation. And once they aid and abet, once they aid and abet a breach of fiduciary duties, they are subject to disgorgement, and disgorgement of all of their ill-gotten gains. And the ill-gotten gains are now well over -- approaching over $100,000 million.

THE COURT: How do you get to that number?

MR. MCENTIRE: Easily. We know how much they purchased, which has never been denied. We know how much has been distributed to Class 8. And we know what percentage of Class 8 they own. They own about 95 percent of all Class 8 claims. So if $270,000 million has been distributed to Class 8, they got 90 percent of that, 95 percent of it has already gone to them, Farallon and Stonehill.

THE COURT: But it would have gone to the sellers of the claims as well. I'm trying to make the connection.

MR. MCENTIRE: That's not the injury. The injury is what -- that is a consequence of their conduct. The injury is the compensation. All right? That's a distinct injury. They are subject to disgorgement as a consequence because they have done wrong, and the law should not tolerate -- should not tolerate and allow wrongdoers to get away. And that's where the unjust enrichment and disgorge --

THE COURT: And what are your best cases for that, that they would have to disgorge --

MR. MCENTIRE: We have cited --

THE COURT: -- the Purchasers would have to disgorge --

MR. MCENTIRE: We have cited cases in our brief.

THE COURT: I'm asking you now to --

MR. MCENTIRE: I don't have them in front of me right this second. But an aider and abettor --

THE COURT: The *CVC* case, is that your best case?

MR. MCENTIRE: I don't have the cases in front of me. I can say this, that the case law is robust, and I can supply you --

THE COURT: It is not robust. That's why I'm asking you to zero in. I read your *CVC* case from the Third Circuit, and I'm wondering, is that your strongest case?

MR. MCENTIRE: No. I think we -- I think we have a lot of strong cases. I'm not sure that it is the strongest.

THE COURT: Tell me which ones, so I --

MR. MCENTIRE: Ma'am, I just said I don't have it in front of me. If you'll look --

THE COURT: Okay. Well, this is closing argument where you present law in support of your position.

MR. MCENTIRE: Well, actually, I'm arguing facts right now. But Your Honor, what I want to tell you is if you'd like me to submit a letter brief on that, I will.

THE COURT: No.

MR. MCENTIRE: Okay. Then I won't. It's in my brief. All of our authorities are in the brief.

In conclusion, --

THE COURT: Okay. So that was the *CVC* case from the Third Circuit which dealt with an insider who purchased claims, statutory insider, a board member, a 28-percent equity owner, who purchased claims during the case to be in a position to file a competing plan and didn't disclose to the board or file a 3001(e) notice. Okay. There was -- claims shouldn't be allowed at more than what the purchaser paid for it.

MR. MCENTIRE: Okay.

THE COURT: Okay. I'm asking you, is that your best case? Because you also cited *Adelphia*, which seemed kind of factually off the mark. And so I really --

MR. MCENTIRE: I -- I'm sorry, --

THE COURT: I need to know, because I've made clear from the beginning, --

MR. MCENTIRE: Yes.

THE COURT: -- I'm struggling with how is there a cause of action related to claims trading.

MR. MCENTIRE: (chuckles)

THE COURT: I don't know why you're giggling. This is --

MR. MCENTIRE: No, I'm not. But --

THE COURT: -- serious stuff. Okay?

MR. MCENTIRE: Agreed. Agreed.

THE COURT: A bankruptcy estate is being charged ka-ching, ka-ching -- not bankruptcy estate -- the post-confirmation trust. Ka-ching, ka-ching, ka-ching. So this is serious stuff.

MR. MCENTIRE: Agreed.

THE COURT: I need to, you know, colorable claim.

MR. MCENTIRE: Agreed.

THE COURT: Colorable claim.

MR. MCENTIRE: Agreed.

THE COURT: Even if plausibility is the standard, which I've expressed my doubt about that, how do you have a plausible claim? What is your best case?

MR. MCENTIRE: Okay. This --

THE COURT: Just to recap what I'm focused on,

purchaser and seller, okay? I can see where breach of contract, maybe some sort of torts between those two. Okay. I can see where the U.S. Trustee, the SEC, I don't know, the Texas State Securities Board, they might get concerned about allegations of insider trading and there might be a regulatory action. But the estate? Again, the post-confirmation trust --

MR. MCENTIRE: Okay.

THE COURT: -- and a contingent beneficiary. I'm trying to understand what is the best legal authority that might support a colorable claim. And we talked about the *CVC* case and *Adelphia*. I'm trying to figure out what are other cases you think I should really hone in on to understand this.

MR. MCENTIRE: All right. At the very beginning this morning, during my opening statement, I had said this is not your typical claims-handling case, because I recall from our last conference you asked that question a couple of times. This is not your typical claims-handling case. And it's not a typical claims-handling case because we have a fiduciary that we claim breached his duties that were owed to the estate. And he self-dealt. And he -- this has nothing to do with the plan. This has something to do with what Mr. Seery did outside the corners of the plan. Perhaps he used the plan expediently. He self-dealt.

That's why this is not just between a seller and a buyer

of a claim. That's number one.

We have been denied an opportunity to discover the communications between the sellers and the buyers, and my guess is we have big boy agreements that prevent the sellers from ever coming back at anybody for fraud. My expectation, that's the case. We should have a right to go explore that. So that's why they're not here.

THE COURT: Why? I mean, what would that tell you? What would that tell you?

MR. MCENTIRE: That --

THE COURT: If there's a big boy agreement, if there's not, what --

MR. MCENTIRE: It would tell us --

THE COURT: -- consequence would that have for this --

MR. MCENTIRE: It would tell us --

THE COURT: -- proposed lawsuit?

MR. MCENTIRE: It would answer Mr. Morris's question that he's raised several times, this is the seller's issue, this is not -- this is not the Hunter Mountain's issue. It is Hunter Mountain's issue. Hunter Mountain as an equity interest-holder should be in a position to be certified as a Class 9 beneficiary now pursuant to our declaratory judgment action. That's number one.

Number two. As a contingent beneficiary, it is entitled

to protect its interests and bring suits if it sees that something has happened that is incorrect and is a tort involving the Reorganized Debtor and the Claimant Trust. That is the nature and the essence of our claim.

And as a consequence, the aiders and abettors should not be allowed to walk away unharmed. They should be required to disgorge their ill-gotten profits. And that calculation is easily done, as I've just demonstrated.

Your Honor, that's all I have. Thank you very much.

THE COURT: Thank you.

MR. MCENTIRE: And we talked -- we'd need an opportunity to argue on the issue of experts, because -- whether you're just going to take it under advisement, I'm not sure how you're going to handle that.

THE COURT: I'm going to read the pleadings and then I'm going to let you all know are we coming back for another day.

MR. MCENTIRE: Thank you.

THE COURT: All right. Who is making the closing argument -- do we have three closing arguments?

MR. STANCIL: Yes.

MR. MCILWAIN: We're going to do it in reverse order.

MR. MORRIS: Reverse order in.

THE COURT: Okay. Reverse order of --

MR. STANCIL: Keep it interesting.

MR. MORRIS: I think I was last on the opening.

THE COURT: -- importance?

(Laughter.)

THE COURT: No. Just kidding. Just kidding.

MR. MORRIS: We're assuming you remember what the original order was.

MR. STANCIL: Yeah, right, right.

MR. MORRIS: It was so many hours ago.

THE COURT: Okay. Oh, so many hours ago.

MR. MCILWAIN: I think I was referred to earlier as the lame lawyer.

THE COURT: Oh, you were. I think --

MR. MCILWAIN: So I'll start. I think --

THE COURT: I think you --

MR. MCILWAIN: Or maybe it was the lame argument, whatever. Whatever.

THE COURT: I think you were the lame one.

CLOSING ARGUMENT ON BEHALF OF THE CLAIM PURCHASERS

MR. MCILWAIN: Your Honor, Brent McIlwain here for the Claim Purchasers.

Let me start, I guess, by saying I understand now why Hunter Mountain did not want to put on evidence, because the evidence that they put on, frankly, made their case much worse.

As we argued or we stated in the opening statement, our

position is that you can look within the four corners of this document and determine that there is no plausible or colorable claim. What the evidence showed is that Mr. Dondero allegedly had a call with one -- with Farallon, not with Stonehill, with Farallon, Farallon wouldn't tell him what they paid, Farallon did not accept an offer of 130 or 140 percent of whatever they paid for the claim, and he thinks they did no due diligence, right? He had nothing in his notes about MGM. So he can say that he thought that they were positive because of MGM, but it's certainly not -- I don't think the Court should take that evidence with any credibility.

But interestingly, what Mr. Dondero says is, well, how do you know how much they paid for these claims? He goes, well, there was a market for the claims, right? They were all trading at 50 or 60 cents. But yet no one would ever buy these claims without any due diligence because the projections in the plan indicate that they wouldn't -- they wouldn't get a return.

Well, if there's a market for the claims and he's willing to pay 30 or 40 percent more than whatever someone purchased, certainly there is a market for the claims. And he is the only one, frankly, that had inside information. That's why he was willing to maybe pay more.

Or, alternatively, the case that you were describing before, Mr. Dondero maybe wanted to buy the claims so he could

control the case, right, so he could dismiss any litigation that was pending against himself so he could avoid the ire of the estate that is aimed at him.

It also -- the Court's inquiry as to what the injury is I think is precisely on point. The only injury offered at this point really is that somehow my client's agreed-to higher compensation that is reasonable or appropriate in return for some inside information on claims that were allegedly trading at 50 or 60 cents in any instance. And what the evidence showed is that, one, Mr. Dondero never had any information about that, about the compensation that Seery is receiving when this complaint was filed, when this motion for leave was filed.

And so if you judge the complaint within the four corners, there is no -- there is no *quid pro quo*, right? Because he says, well, there's obviously something up here because they wouldn't have bought these claims without due diligence, and they must have agreed to higher compensation, and that's why it all happened. And if we throw all this out here, then we'll get to do the discovery that we wanted to do.

Importantly, if you look at his notes, right, the first thing that's written down is discovery to follow, because that's how he operates. That's how a serial litigator operates. Discovery to follow so that I can pay you back for not selling your claim to me. Right? So I can't control the

world, so I can't control this case, you're going to pay. And we're all paying. Every one of us here. Right? There's 15 lawyers in the courtroom and probably 10 on the phone, right? We're all paying.

And so when Mr. McEntire says I'm not getting my day in court, we've had an entire day in court. We've had three hearings to decide what this hearing is going to be. And he's gotten more than his day in court for, frankly, what is word salad. This complaint doesn't pass any test, whether it's 12(b)(6) or under the *Barton* Doctrine. It's simply allegations that are thrown out there, and they're saying, so that we can do more discovery to determine if we actually have allegations. Because they want to continue to harass people, they want to continue to be a thorn in everyone's side, so that perhaps they can avoid further litigation against Mr. Dondero or they can convince somebody to settle with Mr. Dondero.

It doesn't make any sense, Your Honor, and this is exactly why there is a gatekeeper provision, right. That's why the Court imposed this.

And you ask yourself, why would someone sell these claims? Obviously, the sellers of the claims have not shown up. Whether they're big boy, it doesn't matter, because the Court and this estate had nothing to do with those sales. But they haven't shown back up. I can -- I can venture a guess why, if

I was involved with Mr. Dondero, I would sell my claim, right? Because I wouldn't have to be here. And that's exactly why the Court should not authorize this complaint to be filed and the gatekeeper provision of the order should prevent it. And frankly, this should be shut down and we should not have to have continued litigation over experts, or anything else, for that matter. And frankly, we should just be able to go on and let Mr. Seery do his job.

Because I think the evidence was pretty clear that his compensation is reasonable and it was in line, frankly, with what he was making before. And candidly -- and maybe it's because Mr. McEntire is not involved in bankruptcy cases, but this is similar compensation that I see in numerous cases, and it's tiered to incentivize Mr. Seery to do his job, and he's doing his job.

So, with that, Your Honor, I'll cede the rest of the time to the other parties.

THE COURT: Okay. Thank you.

CLOSING ARGUMENT ON BEHALF OF JAMES P. SEERY, JR.

MR. STANCIL: Thank you, Your Honor. I'm going to focus -- and I'm going to put my little clock up so Mr. Morris doesn't, you know, give me the hook here.

THE COURT: Okay.

MR. STANCIL: But first --

THE COURT: Next time we're all here, maybe I'll have

one of those red, what do you call them, the buzzer.

MR. STANCIL: Oh, the big light?

THE COURT: The red light.

MR. STANCIL: We used to joke that the judge I clerked for wished he had a trapdoor and he could just pull the lever when it was done.

THE COURT: Okay.

(Laughter.)

MR. STANCIL: Maybe I shouldn't have put that in your head.

THE COURT: Who was that? Are we going to say who that was?

MR. STANCIL: So Your Honor, I'm going to try to set the legal framework. I'm going to ask you -- and I think we have our -- we have the deck. It's the little -- if we could put that up and start on Slide 2.

I'd like to address what standard applies, and then I'd like to spend a few minutes asking Your Honor again not only to rule on multiple alternative grounds, but also I'd like to walk through what if you did this on a pure 12(b)(6), because it's going to collapse.

So, well, we'll just jump in. I said at the beginning that we know that the question here is not what does the word colorable mean in isolation. We wouldn't do that in any context. We would always look and see what the operative

language here is in the Court's confirmation order. So the question is, what did the Court mean, it must represent a colorable claim?

So we mentioned before Paragraph 80 of the confirmation order. That cites *Barton*. It cites the vexatious litigant cases. I've not heard one word from Mr. McEntire answering how it can be that we're here on a sub-12(b)(6) standard he now says when the Court articulated this legal authority and this legal basis in the confirmation order. If he believed that, the time to make that argument was on the confirmation appeal, and that's over.

But let me then say, how did we get, how did the Court get to Paragraph 80? Well, that came after a series of factual findings in the confirmation order -- in fact, actually, Josh, do you have the hard copy of this?

MR. LEVY: Yeah.

MR. STANCIL: If I could hand that to the Court.

May I approach, Your Honor?

THE COURT: You may. Thanks.

MR. STANCIL: And I don't propose to go through every slide, Your Honor.

THE COURT: Okay.

MR. STANCIL: But if you could turn to Slide #5. This is Paragraph 77 of the Court's confirmation order. Factual support for gatekeeper provision.

MR. MCENTIRE: Excuse me. May I have a copy? I can't see it.

THE COURT: Oh.

MR. LEVY: Oh, yeah, sure, sure.

MR. STANCIL: And can we get a copy of yours as well, --

MR. MCENTIRE: Sure.

MR. STANCIL: -- while we're at it? Thanks.

The facts supporting the need for the gatekeeper provision are as follows. I will not read them all, but if you scroll about eight lines down, it says, During the last several months, Mr. Dondero and the Dondero-related entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor. And then there are six separate enumerated examples of that.

Paragraph 78 on the next slide. Findings regarding Dondero postpetition litigation. The Bankruptcy Court finds that the Dondero postpetition litigation was a result of Mr. Dondero failing to obtain creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's credible testimony, that if Mr. Dondero's plan proposal was not accepted he would, quote, burn down the place.

Next slide. This is Paragraph 79. Necessity of the

gatekeeper provision. If you would just skim to the bottom of that first column, it says, Approval of the gatekeeper provision will prevent baseless litigation designed merely to harass the post-confirmation entities charged with monetizing the Debtors' assets for the benefit of its economic constituents, will avoid abuse of the court system and preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants.

And then came Paragraph 80, which we've just discussed. With respect, Your Honor, the question is, what is the meaning of Paragraph 80? And in context, following those paragraphs regarding vexatious litigation and abuse of litigation, it is simply implausible to suggest that colorability is a sub-12(b)(6) standard.

And that is Mr. McEntire's contention today, that the gatekeeping order is actually lower than the threshold that every other litigant faces. Everyone else has to file a claim, pass a 12(b)(6), and on they go to get to discovery. Mr. McEntire believes that the gatekeeping order imposes less than that on him, and then he's treated just like everybody else. It makes no sense whatsoever.

So I'll skip Slides 8 and 9, Your Honor, but that's where the Fifth Circuit described the gatekeeping orders, affirmed them in relevant part, citing *Barton*. There is no mystery here.

If you could flip, Your Honor, to Slide 10 very briefly. We've talked about this case a little bit in one of our status hearings, *In re Vistacare Group*. This is the leading case that describes what it is that one does under a *Barton* analysis, and it says that the trustee must make a -- pardon me -- a party seeking leave to sue a trustee must make a *prima facie* case against the trustee, showing that its claim is not without foundation. A *prima facie* case is more than a 12(b)(6).

And I would direct Your Honor to the language in the third bullet. It involves a greater degree of flexibility than a Rule 12(b)(6) motion to dismiss because the bankruptcy court, which, given its familiarity with the underlying facts and the parties, is uniquely situated to determine whether a claim against the trustee has merit. Boy howdy, are we -- I'm sorry. My kids are going to tease me for that.

But this -- no case has ever proved the wisdom of that statement, Your Honor. We are here, and the Court is all too familiar with the facts and the parties of this case. And we're not here on an adversary proceeding. We're here on a contested matter. And Your Honor has the authority on any contested matter to take evidence, and a broad, broad discretion as to what evidence is appropriate to meet that standard.

So we have laid out briefly in Slide 11 what -- why we

believe that -- or how we believe that the *prima facie* showing would work. And in short -- and maybe this will help us going forward -- we believe that if they make -- if a party seeking relief under the gatekeeping order says things, we have the right to rebut them, like in a burden-shifting or a burden of production -- pardon me -- analysis. So you can say that the sun rises in the west, but we can bring in evidence to say it doesn't, it rises in the east. And that's the plausibility threshold.

And here, and if Your Honor would flip to the next slide, I'm not sure it's entirely fair to say, even after they have purported to withdraw their evidence, that they've really done so. And we disagreed with Mr. McEntire, and advised him of such leading up to this hearing, that we do not agree that his redactions fully excise all of the evidentiary assertions from his motion.

And I'll just pick one example here on Slide 12. On the left is Paragraph 32 of the motion for leave prior to the purported withdrawal. On the right is Paragraph 32 after the withdrawal. Your Honor will see all they've withdrawn are the citations. It's verbatim. It's the same allegations. And they have argued various facts and put them in evidence. So even if it were true, and it's not, but even if it were true that all you get here is a 12(b)(6) ruling in the ordinary case if you put no evidence in dispute, they forfeited that

right by putting these facts and evidence in dispute in their motion.

The fact that they have withdrawn evidentiary support for their evidentiary assertions does not relieve them of the reality that they have made all sorts of factual arguments in their motion for leave, and as a contested matter we have the right to address it.

I'm proposing, Your Honor, unless you have questions on the cases on 13, 14, those are the cases where we have described the hearings that have been held under *Vistacare* and *Foster*, and I know more about the down-in-the-weeds of *Foster* than I ever cared to, but I don't want to repeat what's in our briefs.

If Your Honor is willing to flip to Page 15, this is an argument I've alluded to briefly, but boy, we don't hear -- we have not heard a single thing as to what function the gatekeeper serves, particularly in context of Your Honor's factual findings in the confirmation order, if all it means is 12(b)(6) or lower. It just, it's an unanswerable point that they just persist in ignoring.

But I'd like to address very briefly that third bullet, because at various times and in their brief they have cited, Hunter Mountain has cited, down here we call it *Louisiana World*, I think in the Second Circuit we call it *STN*, but this UCC derivative standing. There are, in fact, two elements one

has to pass for that, and that's a different context. The first is colorability as it's used in that context, and that is often a 12(b)(6) standard in that context. But still to have standing, to bring that claim on behalf of the estate, you have to show a cost-benefit analysis. As we've heard today, we've probably spent more in legal fees today, or over the last three months, than the purportedly excessive compensation to Mr. Seery. And so I would respectfully submit, if we were here on a *Louisiana World* or *STN* hearing, this would be an open-and-shut case just as well.

So if I could, Your Honor, if you are willing to jump ahead to Slide 17, I'd like to ask you -- and I do want to address the standing jurisdictional question a little bit.

THE COURT: Okay.

MR. STANCIL: Not to get into the weeds of standing, because I think we have briefed that out the wazoo in our papers, and I read this morning -- I think it was this morning -- from the Claimant Trust Agreement, which says they're not a beneficial interest.

But my understanding is that Article III standing, whether there is a theoretical injury in any way, that is -- that goes to Your Honor's subject matter jurisdiction under Article III, but that is not true of statutory standing under Delaware law or prudential standing. Those are -- those go to basically whether they state a claim.

So, Your Honor, I believe, can -- and I've confessed to my colleague that the only way I remember this is I screwed it up really, really badly when I was clerking years ago -- but I believe Your Honor can, and in this case should, rule on the standing ground in the alternative. Not on the Article III. Article III is binary. They either have it or they don't. But on the statutory standing, you can say -- I think you can hold that they do not have standing under Delaware law to pursue the claim, but even if they do have standing, and then reach the remainder.

And we know we're headed for appeal. We've heard -- pretty much two-thirds of the time this morning has been laying the groundwork for an appeal. And we would only like -- we would like to make sure that we give the Fifth Circuit a fulsome record.

So I would like to ask Your Honor to flip to Page 19. And this is really the end of, I think, what we need to do. So, Your Honor, what if we were here just on 12(b)(6)? So we've got a *quid*, we've got a *pro*, we've got a *quo*. They fail at each turn. Let me spend most of my time on the *quid*. I'll let the documents of which the Court can take judicial notice speak for themselves. I will let the bare-bones nature of the assertion -- and it's okay to put in a complaint something on information and belief, but you still have to pass *Iqbal* and *Twombly*. I can't say upon information and belief that I was

denied a starting position on the Knicks, right? I would like to believe that's the case, but it still has to be a plausible allegation.

Let's look at this chart. And this chart is taken right out of our brief. These are their numbers. This is at the bottom. And I want to -- I would like to take head-on this proposition that this is not a rational investment on their numbers.

So let's take the Stonehill purchase of Redeemer. They paid $78 million to earn a projected profit, according to the November 30 disclosure statement, of $19.71 million. By my arithmetic, that is a return of 25.27 percent. Even by Mr. Dondero's lights, that's a pretty good return.

I'm going to come back to why that's not the end of the return, but let's look at the Farallon purchase of Acis. Spent $8 million. Projected profit, $8.4 million. I'll take 105 percent return any day.

Let's look at the Farallon purchase of HarbourVest. Purchase price, $27 million. Projected profit, $5.09 million. That is -- oh, I can't read my own writing anymore -- I think that is 18.85 percent. I would again gladly take that every day of the week, whether it's a distressed asset or otherwise.

But let me make one really important point that Mr. Dondero obfuscated, Mr. McEntire does not acknowledge, and it is just a fact. These are projected profits if all Mr. Seery

does is hit the plan. November 30, 2021. If he does no better than what he thought these assets were worth then, this is the expected return. So for those trades that we've talked about, that's a slam dunk even on that.

But let's look about -- we'll talk about upside. Because, as Your Honor knows from doing bankruptcy cases, upside, it's all about upside for people who are purchasing claims. So it isn't just that their returns were capped at these already-ample percentages. If Class 8, for example, of Redeemer paid out in full, they would be making not -- oh, gosh, I'm not sure I should do this on the fly -- but they'd be recovering $137 million on the Class 8 claim, not the $97.71 million. So there's another $40 million of upside.

Even if it's a low-probability event, that's a -- hedge funds do that all day every day.

Same here with Acis. Paid $8 million, expected $16.4 million, but they could get up to $23 million.

Now, we've heard so much about how Class 9 was worthless, worthless, worthless. No, it's not. There's always the potential for upside. Paid $27 million. Could recover $45 million just on Class 8. Could recover another $35 million on Class 9. They could recover $80 million on a $27 million purchase. Now, the probability of that is complicated, but it's not zero. We know that it's not zero. All we've heard from them today is that Mr. Seery is -- could pay off 8 and 9

in full. So I don't think that is even remotely plausible.

Let's talk briefly about UBS. They like to talk about UBS for the projected profit of $3.61 million in loss. But that was -- that's in August, and that claim trades.

So a couple of things that happened between the November 30 disclosure statement setting that projected value and the purchase of the UBS claim in August. Number one is we are nine, ten months past the worst of COVID. And Your Honor could take judicial notice of massive market movements just if you do nothing.

We don't need to get to that, because we talked all morning about MGM. May 26th, it's announced publicly. May 26, 2021.

So the notion that a purchaser of a UBS claim in the summer of 2021, after this MGM transaction is announced, would think, you know what, I think these claims are only worth what they were worth back in November, is not plausible.

And so this is why the comparisons to the debt, the exit financing, well, 12 percent. That's a 12 percent capped return. We're talking here about returns of 25 percent, 105 percent, 18.85 percent, just based on projections at the -- sort of in the darkest days post-COVID.

So it's not plausible. If a court were looking at this just under the 12(b)(6) standard, we would be -- we'd be dismissing this claim as well. And we really -- respectfully,

Your Honor, we need that ruling. We think we need that ruling so that whatever the -- whatever they may say the standard is in the Fifth Circuit, we only have to go one time. And we really believe that we're entitled to that.

I'll let Your Honor -- I will just stand on the deck and our briefs on the *pro* and the *quo*. But meet-and-greets, these are just conclusory allegations in the complaint. He says they worked -- that he worked for them 10 or 15 years ago, which some of that's not even true, but even if it were all true, if I were beholden to every client I've met at a schmooze fest or everybody I worked for in a group 20 years ago or 15 years ago, you know, I would be incapable of operating without a conflict of interest. And it's just not plausible. This is something that needs to go.

Unless the Court has questions, I will cede the remainder of our time to Mr. Morris.

THE COURT: No questions. Thank you.

CLOSING ARGUMENT ON BEHALF OF THE REORGANIZED DEBTOR

MR. MORRIS: Thank you so much, Your Honor, for your patience. It's been a very long day. I am very grateful that we're going to finish today.

As I said at the beginning, I believe this exercise, as difficult as it may have been, is so important and so vital, preserving this estate and what's left of it.

The gatekeeper exists for very important reasons. Your

Honor made those findings in her order that has been upheld on appeal. And we're here to make sure that frivolous litigation is not commenced against my clients, or, frankly, against Stonehill and Farallon, given their capacity as Claimant Oversight Board members.

Hunter Mountain confuses argument with facts. There's no facts here to support anything, and that's what the gatekeeper is about. The gatekeeper is making sure that there's a good-faith basis to pursue claims. And as Mr. Stancil points out, it is certainly acceptable to state things upon information and belief. But the point of the gatekeeper is if somebody says -- not somebody says -- somebody offers proof that those beliefs are wrong, you no longer have a plausible claim. And that's why we thought it was so important to go through this exercise today. Because the facts show that their beliefs are simply wrong, and the entire complaint is based on their beliefs.

There is zero evidence concerning the compensation other than their belief that the compensation is excessive. The case is over. Like, you could stop there. I'm going to go through a bunch of things that -- you could stop there.

I want to actually begin backwards, though, in time, with the HarbourVest settlement. Right? After two years of litigation and re-litigation and re-litigation of the HarbourVest settlement, the claims of insider trading, finally

the Court has before it admissible indisputable evidence that Mr. Seery negotiated the terms of the HarbourVest settlement before he ever got this notorious email from Mr. Dondero. That should be a finding of fact in Your Honor's order and it should never be -- nobody should ever make that allegation again. It's over. You have the documents. You have the email from Mr. Seery to the board, here are the terms, and those are the terms Your Honor approved.

And there's more. Because this is so important for us, because we're tired of being accused of wrongdoing. We're tired of being falsely accused of wrongdoing.

$22-1/2 million. That's the valuation Mr. Seery put on it. You can see that he's doing it to his Independent Board colleagues, copying his lawyers. He's telling them where he got it, from Hunter Covitz. The evidence is now in the record. It came from a regularly-published NAV report from November 30th. It was seven days old. It can never be disputed again that $22.5 million was a fair value, not based on some subjective view of Mr. Seery but based on the person who gave him the report that everybody relies upon that Mr. Dondero got.

And it was ratified yet again in the audited financial statements that came out, and it shows for the period ending -- this is Exhibit 60, I believe -- for the period ending December 31, 2020, $50 million. Okay, so it went up a few

million dollars in December.

This is their case? This is the case? Your Honor I know is still working on the motion to dismiss. That's Mark Patrick, right? That's the complaint that he brought. That's what this is about. I don't mean to confuse the issue, but it's time to put this stuff to rest, because it's wrong. Mr. Dondero has lost and he's got to get over it at some point.

But here's the best piece of evidence about this whole shenanigans about MGM being inside information. Mr. Dondero filed a 15-page objection to the HarbourVest settlement and didn't say a word about it. How is that possible? Six days before the settlement, he sends this email. Two weeks later, in January, he files a 15-page objection and doesn't mention anything about insider trading, MGM, or any wrongdoing by Mr. Seery. In fact, he argues the exact opposite, that Mr. Seery cut a bad deal. How is that possible? This is a plausible claim?

It gets better, or worse, depending on your point of view. CLO Holdco filed an objection and they said they're entitled to buy the asset. This is Mr. Dondero's, you know, operating arm of the DAF. They lost -- they actually had an honorable person who concluded, I don't really have that right. But these are the claims that Mr. Patrick is asserting, and he asserted them on April -- in April, before the MGM deal was announced. Right? And Your Honor found, and that's why it

was so important for the Court to take judicial notice of the second contempt order, because Mr. Dondero was intimately involved in bringing those claims and in bringing those claims against -- or trying to bring those claims against Mr. Seery, in violating of the gatekeeper. This is all tied together.

I have to tell you, I don't know why we're not doing Rule 11. Forget about colorable claims. This is a fraud on the Court. It really is. And I don't know when it's going to stop. I'd love to move on with my life, to be honest with you.

The tender offer. He's out there doing a tender offer benefitting as the fund that he manages acquires more shares and his interest goes up and the value goes up with all these MGM holdings. Really? And he's going to accuse Mr. Seery of wrongdoing?

There was one point of Mr. Dondero's testimony that made my heart skip a beat. It's when he referred to the need to get discovery. And why did it skip a beat? Because he actually had a moment of candor where he admitted that the notion that Mr. Seery gave them material nonpublic inside information was his thought. It's not anything that Farallon ever told him. And then it spins and it spins and it spins, and finally when he gets to the fifth version of his sworn statement MGM suddenly appears. It's not right. Colorable claims? Fraudulent claims.

What's the undisputed evidence right now? I'll take Mr. Dondero at his word that Mr. Patel told him that Farallon bought the claims in February or March. How did they reconcile that with the undisputed testimony that Mr. Seery thereafter invited Farallon to participate in the exit financing? And they signed an NDA in early April. Why would you sign an NDA if you already got inside information? Who would do that? What would be the purpose of that?

How do you reconcile the fact that, according to Mr. Dondero, the claims were already in Farallon's pocket when they signed an NDA to get information for an exit facility. Is that plausible?

We've heard Mr. McEntire say a bunch of times it's much broader than MGM. Not only not a scintilla of evidence, but no substantive allegation. Again, confusing argument with facts. Because he had -- yes, Mr. Seery had access to inside information relative to Highland. He's the CEO. But where is the evidence that he shared anything with anybody? There is nothing.

Mr. Dondero admitted in his motion -- in a moment of candor, he said that's what he concluded based on the fact that Mr. Patel supposedly told him, I bought because Seery told me to. He made the inference. No evidence. Nothing.

They're bringing this case for the benefit of innocent parties? These people have told you time and again that

assets exceed liabilities. What innocent parties? Where are they and how come they're not -- let's get to that point, too. Because they're saying, oh, Mr. Seery is, like, just not declaring the end of this. Seriously? How much do they think Mr. Seery should reserve for indemnification claims as we do trials like this with a mountain of lawyers billing $800, $1,500 an hour? Seriously? Mr. Seery is somehow acting in bad faith by not declaring the end of this case? How much is he supposed to reserve? They keep skipping over that. We'll talk about that in the mediation motion. We'll talk about that in the Hunter Mountain motion in July. Who's prosecuting that? Mr. Dondero's lawyer. I know there's a really big separation between Hunter Mountain and Mr. Dondero, but Stinson is prosecuting that claim on behalf of Hunter Mountain when they're seeking information.

And they complain about the legal fees? We've put our pens down. Kirschner put his pens down. We put down the claim objection. What we're doing is defense at this point.

We're awaiting the ruling on the notes litigation, and we will very much prosecute the vexatious litigant motion if Judge Starr grants the pending motion to exceed the page limit that's been out there for months. I'm not sure what's happening there. We'll do that for sure. But otherwise, we're just playing defense.

We're here today because they've made a motion, a motion

that lacks any good-faith basis whatsoever. And that's why today was so important, so the Court could hear the witnesses. They could -- the Court -- I mean, think about it. Texas State Securities Board. The audacity of saying that somehow a letter from the Texas State Securities Board saying they're taking no action after conducting an investigation of Dugaboy's claim of insider trading is irrelevant? Like, what?

I've told you before, all we do is play Whack-A-Mole. Whack-A-Mole. They make an argument, we prove it's frivolous, so they just make a new argument. Their pleading says their claims are colorable because there's an open investigation. Now there's no investigation and they say that's irrelevant. How can they say that with a straight face? I couldn't.

I want to talk about Mr. Seery. I want to finish with my Mr. Seery. I may not use all my time. We can go home early.

(Laughter.)

THE COURT: It's past early.

MR. MORRIS: But this guy has worked doggedly, Your Honor, and I will defend him until the end of time. He's a man who has so far exceeded expectations. And they're saying he's not -- he's overpaid? The guy is overpaid? When he's into Class 9? When he's being pursued with these frivolous claims? Every day he's being attacked. How much do they think he should be paid? I would have loved to -- I hope -- no, I don't hope. I don't think there's any reason to hear

expert testimony. I think Your Honor should exercise -- the Court should exercise its discretion and say there's no need, the Court doesn't need to hear expert testimony.

But if we do, I'll be delighted to hear their expert's view on what Mr. Seery -- if it's not $8.8 million for all these years, what should it be, after he takes an estate from 71 percent on the 8s to, according to them, assets exceed liabilities, 9s are paid in full?

You know what? If they put their pens down, maybe there would be a conversation. But as long as we keep doing this ridiculous, baseless, frivolous litigation, Mr. Seery is going to conserve resources, because he's got to pay people like me to defend him and to defend the estate. This is a preview of what we'll talk about at the mediation motion. He's doing a great job. He's devoting his life to it. He has no other income. He's got no other job. It's wrong.

The claims are not only not colorable, they are frivolous. I ask the Court to stop this in its tracks right now.

Thank you very much.

THE COURT: Thank you.

All right. Is there any time for the Movant to have the last word, which we usually give the Movant the last word.

THE CLERK: The Movant, I think, has a little under -- maybe about a minute left.

THE COURT: Anything you want to say in a minute?

MR. MCENTIRE: Yes, just I'll take 30 seconds. How is that?

THE COURT: Okay.

REBUTTAL CLOSING ARGUMENT ON BEHALF OF HUNTER MOUNTAIN

MR. MCENTIRE: I just want to direct your attention to our reply brief, specific paragraphs that address your question about authorities. We do cite several cases on Page 41, 40 and 41, dealing with the issue of unjust enrichment. That's it.

Thank you, Your Honor, very much.

THE COURT: Okay. Thank you. Unjust enrichment?

MR. MCENTIRE: Disgorgement.

THE COURT: Okay. But I was really, you know, claims trading in the bankruptcy context, just your best --

MR. MCENTIRE: Well, I think the cases that you identified were our best cases. The --

THE COURT: Okay.

MR. MCENTIRE: -- *Adelphia* and the other cases.

THE COURT: All right. Well, --

MR. MCENTIRE: There are other cases, Your Honor, in different contexts. There's also the *Washington Mutual* case dealing with equitable disallowance. There's also the *Mobile Steel* case, a Fifth Circuit --

THE COURT: *Mobile Steel*? Oh, my goodness. Okay.

MR. MCENTIRE: Okay. All right.

THE COURT: 1968? Or no. That doesn't mean it isn't still quoted often, but --

MR. MCENTIRE: Those would also be relevant.

THE COURT: Equitable subordination --

MR. MCENTIRE: Yes, ma'am.

THE COURT: -- when there's bad acts.

MR. MCENTIRE: And Footnote #10 in the *Mobile Steel* case. That is relevant, too. Just, --

THE COURT: Okay.

MR. MCENTIRE: Thank you.

THE COURT: All right. So I gave a deadline of Monday, right, --

MR. STANCIL: Yes.

THE COURT: -- to reply to the response to the motion in limine?

MR. STANCIL: Yes, Your Honor. Do you want time before you leave for the day? I mean, it's not going to be that long, so 4:00 o'clock Monday? Does that work for you?

THE COURT: I don't care. I probably won't start looking at it until the next day.

MR. STANCIL: But I will -- I'll just reserve and so I don't have my associates --

THE COURT: Yes. I think these days midnight, 11:59 p.m., is what lawyers tend to want.

MR. STANCIL: Oh, not this lawyer.

THE COURT: Oh, well, okay. Okay. So I'll just have to look at this, and probably by Friday of next week I will reach out through Traci and let you know what my decision is on whether we're going to have another day of just 30 minutes, 30 minutes of experts.

MR. MCENTIRE: Your Honor, another housekeeping matter. You'd wanted a copy of our PowerPoint, --

THE COURT: Yes.

MR. MCENTIRE: -- which I'm pleased to give you. We found a typo that we can correct electronically on the version I showed.

THE COURT: Uh-huh.

MR. MCENTIRE: I likely will send that to you and I can copy opposing counsel. Is that --

THE COURT: Okay. Send it to Traci Ellison, my courtroom deputy.

MR. MCENTIRE: All right.

THE COURT: And she'll --

MR. MCENTIRE: We'll do that first thing in the morning.

THE COURT: Okay.

MR. MCENTIRE: So you'll have a copy --

MR. STANCIL: Can we get the hard copy that -- from today, though?

MR. MCENTIRE: No, that had a typo on it. I really

don't want to share it. We fixed it.

THE COURT: What? I'm sorry, what?

MR. MORRIS: That's fine.

MR. STANCIL: Never mind.

THE COURT: Do I not need to know?

MR. STANCIL: Let's all go home.

THE COURT: Okay. And then my last question is -- and there was a mention of the CLO Holdco lawsuit, where there's a pending motion to dismiss. There's an opinion I'm writing well underway. I just keep getting sidetracked by other things. Imagine that. So I know that people are wanting to get an answer to that. So, trust me, it's going to get done here pretty soon.

You mentioned Brantley Starr. I mean, it is not my role to pick up the phone and call him and say hey, --

MR. MCENTIRE: No, I wasn't suggesting that.

THE COURT: -- District Judge, get busy on that.

MR. MCENTIRE: Yeah.

THE COURT: But I'll at least tell you, I know the man seems to have more jury trials than any judge I've seen in this building, so I suspect he's working late hours trying to get things done.

MR. MCENTIRE: Yeah.

THE COURT: What do we have upcoming? We have what you called the mediation motion. When is that set?

MR. MORRIS: June 26.

THE COURT: June 26th. Be here before we know it.

MR. MORRIS: Yeah. And just to keep the Court informed, the Movant's reply was due today. We gave them a week extension. They asked earlier today. I saw in my email we gave them. So I think you should expect the reply on the 15th. The hearing is the 26th, and that's not in person.

THE COURT: Okay. Well, I'm very interested to dive into those pleadings. I knew the motion was coming because one of the lawyers said at a prior hearing it would be coming. So I haven't read any of those pleadings, but, well, I'm just very interested to hear how this plays out. I mean, I've said it before.

MR. MORRIS: Uh-huh.

THE COURT: We had global mediation in summer of 2020. We had two very fine mediators. We had a heck of a lot settled, to my amazement. But we're now way down the road and whole lot of money has been eaten up fighting lots of stuff. I mean, it would have to be pens down. There's an enormous amount out there that would have to be part of it, and I just don't know if everyone is fully appreciating that. I hope they are. Anyone listening. We're really, really far down the road now, and there's just how many appeals? Someone at one time told me there were 26. I bet it's more than that by now.

MR. MORRIS: I think that's right. I think we argued on Monday, what is it, the sixth of nine appeals in the Fifth Circuit. And we've got, you know, a cert petition that we're waiting to hear from on the Supreme Court. And yeah, there's still a couple dozen matters in the district court.

THE COURT: Okay.

MR. MORRIS: Not one of them, not one of them we're prosecuting, with the exception of waiting on the Court to rule on the Report and Recommendation on the notes litigation and vexatious litigant. We are not the plaintiff, movant, in anything.

THE COURT: We've got adversaries. The Reports and Recommendations. That's just made everything go a lot slower. But all right. So we have that. And anything else coming up?

MR. MORRIS: I think on July 11th maybe there is a hearing scheduled on Hunter Mountain. If you recall, Hunter Mountain had that valuation motion last year that you denied on the grounds that they didn't have a legal right to valuation information. They made a motion earlier this year for leave to file an adversary proceeding to assert an equitable claim and some other declaratory relief, is my recollection.

While we filed an opposition, we didn't oppose the relief requested, so that motion got resolved. They have filed an adversary proceeding. And I think, if I remember correctly,

our response to the complaint, maybe that's what due. Oh, the 11th is a status conference. It could be a status conference, maybe to set a scheduling order.

THE COURT: Okay.

MR. MORRIS: But that's it. I think that's the only thing on the calendar.

THE COURT: That's a lot.

MR. MCENTIRE: Thank you.

THE COURT: Anything else? Okay.

MR. STANCIL: Thank you, Your Honor.

MR. MORRIS: Thank you, Your Honor.

THE CLERK: All rise.

(Proceedings concluded at 7:18 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **06/12/2023**

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

INDEX

PROCEEDINGS 3

OPENING STATEMENTS

- By Mr. McEntire 67
- By Mr. Morris 90
- By Mr. Stancil 102
- By Mr. McIlwain 106

WITNESSES

Hunter Mountain Investment Trust's Witnesses

James David Dondero
- Direct Examination by Mr. McEntire 112
  *Voir Dire* Examination by Mr. Morris 144
- Cross-Examination by Mr. Morris 158
- Redirect Examination by Mr. McEntire 201
- Recross-Examination by Mr. Morris 208

James P. Seery
- Direct Examination by Mr. McEntire 211
- Cross-Examination by Mr. Morris 265
- Redirect Examination by Mr. McEntire 292
- Examination by the Court 293

Debtors' Witnesses

Mark Patrick
- Direct Examination by Mr. Morris 302
- Cross-Examination by Mr. McCleary 313

EXHIBITS

HMIT's Exhibits

Certain Exhibits Received 33-40

HMIT's Exhibit 3 Received 317
HMIT's Exhibit 4 Received 317
HMIT's Exhibit 4 Received 140/149
HMIT's Exhibits 7-10 Received 317
HMIT's Exhibits 12-23 Received 317
HMIT's Exhibits 26-38 Received 317
HMIT's Exhibits 29-52 Carried 317

INDEX
Page 2


HMIT'S Exhibits, cont'd.

| | |
|---|---|
| HMIT's Exhibits 39-62 | Carried 37 |
| HMIT's Exhibits 53-57 | Received 317 |
| HMIT's Exhibits 58-63 | Received 321 |
| HMIT's Exhibit 64 | Received 317 |
| HMIT's Exhibit 65 | Received 317 |
| HMIT's Exhibits 67-70 | Received 317 |
| HMIT's Exhibit 71 | Received 318 |
| HMIT's Exhibit 72 | Received 319 |
| HMIT's Exhibit 73 | Received 319 |
| HMIT's Exhibit 74 | Received 319 |
| HMIT's Exhibit 75 | Received 319 |
| HMIT's Exhibit 76 | Carried 37/321 |
| HMIT's Exhibit 77 | Received 319 |
| HMIT's Exhibit 78 | Received 319 |
| HMIT's Exhibit 79 | Received 319 |
| HMIT's Exhibit 80 | Marked 234 Received 320 |

Debtors' Exhibits

| | |
|---|---|
| Debtors' Exhibit 2 | Received 44 |
| Debtors' Exhibit 3 | Received 54 |
| Debtors' Exhibit 4 | Received 54 |
| Debtors' Exhibit 5 | Received 54 |
| Debtors' Exhibit 6 | Received 55 |
| Debtors' Exhibit 7 | Received 56 |
| Debtors' Exhibit 8 | Received 57 |
| Debtors' Exhibit 9 | Received 54 |
| Debtors' Exhibit 10 | Received 58 |
| Debtors' Exhibit 11 | Received 44 |
| Debtors' Exhibit 12 | Received 60 |
| Debtors' Exhibit 13 | Received 60 |
| Debtors' Exhibit 14 | Received 63 |
| Debtors' Exhibit 15 | Received 64 |
| Debtors' Exhibits 25-30 | Received 65 |
| Debtors' Exhibit 30 | Received 272 |
| Debtors' Exhibit 31-A | Received 272 |
| Debtors' Exhibit 32 | Received 323 |
| Debtors' Exhibit 33 | Received 327 |
| Debtors' Exhibit 34 | Received 44/65 |
| Debtors' Exhibit 36 | Received 328 |

INDEX
Page 3

Debtors' Exhibits, cont'd.


| | | |
|---|---|---|
| Debtors' Exhibit 38 | Received | 44/328 |
| Debtors' Exhibit 39 | Received | 44/286 |
| Debtors' Exhibit 40 | Received | 44/287 |
| Debtors' Exhibit 41 | Received | 44/284 |
| Debtors' Exhibit 42 | Received | 44 |
| Debtors' Exhibit 45 | Received | 174 |
| Debtors' Exhibit 46 | Received | 44 |
| Debtors' Exhibit 51 | Received | 308 |
| Debtors' Exhibit 59 | Received | 289 |
| Debtors' Exhibit 60 | Received | 272 |
| Debtors' Exhibit 100 | Marked | 179 |

Judicial Notice to be Taken 175

CLOSING ARGUMENTS

- By Mr. McEntire 329
- By Mr. McIlwain 354
- By Mr. Stancil 358
- By Mr. Morris 371
- By Mr. McEntire 379

RULINGS

HMIT's Motion for Leave to File Verified Adversary Proceeding (3699) - *Taken Under Advisement* 382

END OF PROCEEDINGS 386

INDEX 387-389

**EXHIBIT 38**

# INTERCREDITOR AND PARTICIPATION AGREEMENT

This Intercreditor and Participation Agreement (the "Agreement") is entered into as of January 10, 2025 (the "Effective Date") by and between Highland CLO Management, Ltd. (together with its successors and assigns in such capacities, "HCLOM Ltd.") and Hunter Mountain Investment Trust (together with its successors and assigns in such capacities, "HMIT"). HCLOM Ltd. and HMIT are each referred to herein individually as a "Party" and jointly as the "Parties."

## RECITALS

WHEREAS, on September 22, 2020, Highland Capital Management, L.P. filed a Notice of Filing of Debtor's Amended Schedules in its pending Chapter 11 Case No. 19-34054-sgj11 (the "Bankruptcy Case") in which it, among other things, scheduled a creditor's claim by HCLOM Ltd. (the "HCLOM Claim"); and

WHEREAS, on December 27, 2024, the Bankruptcy Court entered a Stipulated and Agreed Order Resolving (A) HCLOM, Ltd.'s Scheduled Claims 3.65 and 3.66; and (B) Highland Capital Management, L.P.'s (1) Objection and (2) Motion for a Bad Faith Finding and an Award of Attorneys' Fees Against HCLOM, Ltd. and James Dondero in Connection Therewith [Docket Nos. 3657, 4176] in the Bankruptcy Case (the "Stipulation and Agreed Order"); and

WHEREAS, the Stipulation and Agreed Order converted the HCLOM Claim to a Class 10 interest/claim (as such is defined in Article III.H. ¶ 10 of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) in the Bankruptcy Case) (the "Plan") in the amount of $10,140,633.26; and

WHEREAS, the Parties have agreed to certain rights and priorities solely as between themselves regarding HCLOM Ltd.'s participation in the payment of Class 10 interests/claims;

THEREFORE, for and in consideration of the promises, covenants, conditions, stipulations, benefits, and obligations described and provided herein, the sufficiency and adequacy of which is expressly hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1. **HMIT Payment Obligation to HCLOM Ltd.** Upon HMIT's receipt of distributions on account of its Class 10 interest/claim (the "Distributions"), HMIT will pay to HCLOM Ltd. an amount equal to five percent (5%) of the funds received by HMIT within two (2) business days after receipt of indefeasible funds by HMIT (the "HMIT Payment Obligation"). HMIT shall be entitled to deduct from the Distributions the fees and expenses billed by Kelly Hart Hallman, LLP which directly relate to the Stipulation and Agreed Order or this Agreement (the "HMIT Expenses") until all HMIT Expenses are paid in full.

2. **No Additional Duties to HCLOM Ltd.** HMIT shall retain and have the sole discretion to act with respect to its Class 10 interest/claim, and shall owe no additional duties to HCLOM Ltd. or any other person or entity, including without limitation, with respect to (i) the amount of Distributions or recovery by HMIT on account of its Class 10 interests/claims,

(ii) the amount of Distributions that could be received by any holder of Class 10 interests/claims, (iii) the rights of any holder of Class 10 interests/claims, or (iv) any pleading or document that could or should be filed in any way related to the Bankruptcy Case, the Plan, or the HMIT Class 10 interests/claims.

3. **No Liens or Encumbrances**. HMIT will not take any action that could reasonably be expected to encumber HMIT's Class 10 interests/claims, limit or affect HMIT's right or ability to fulfil and perform the HMIT Payment Obligation, or limit or affect HCLOM Ltd.'s right to receive the Distributions.

4. **This Agreement Supersedes the Effects of the Stipulated and Agreed Order Among the Parties**. HCLOM acknowledges and agrees that, notwithstanding the Stipulated and Agreed Order, the terms of this Agreement amends and supersedes the effect of the Stipulation and Agreed Order as between the Parties and HCLOM's rights to payment under the Plan are limited solely to the HMIT Payment Obligation.

5. **Non-Interference; No Cause of Action**. Notwithstanding Paragraph 3, HCLOM will not have any rights to object to or otherwise interfere with the rights of HMIT as a holder of Class 10 interest to reach a settlement with Highland Capital Management, LP ("Highland"). HCLOM acknowledges that it shall have no right to notice or approval of such a settlement nor will it have any cause of action against HMIT arising out of any such settlement.

6. **Remittance Agreement**. The Parties acknowledge that contemporaneously herewith NREA SB II Holdings, LLC (together with its successors and assigns in such capacities, "NexPoint Small Bay."), Charitable DAF Holdings Corp. (together with its successors and assigns in such capacities, "Charitable DAF"), and Liberty CLO Holdco, Ltd. (together with its successors and assigns in such capacities, "Liberty CLO") have entered into that certain Remittance Agreement effective January 10, 2025 (the "Remittance Agreement"). HCLOM agrees that if NexPoint Small Bay fails to make the DAF Bridge Equity Payment (as defined in the Remittance Agreement) pursuant to the terms of the Remittance Agreement, HMIT will have no obligations to make the HMIT Payment Obligation, and HMIT shall not receive any distribution from HMIT or any other party related to any Class 10 interest/claim. Notwithstanding any failure of NexPoint Small Bay to adhere to the terms of the Remittance Agreement, HCLOM acknowledges that by executing this Agreement, it shall have no other recourse or rights to payment under the Plan other than the terms of this Agreement.

7. **Choice of Law; Jurisdiction; Venue**. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to conflict of law provisions. Each Party to hereby consents and agrees that the courts located in Texas shall have sole and exclusive jurisdiction to hear and determine any claims or disputes between the parties pertaining to this Agreement or to any matter arising out of or relating to this Agreement. Each Party expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and each Party hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or *forum non conveniens*.

8. **Amendments; Waivers**. No amendment, modification, or waiver of any of the provisions of this Agreement shall be deemed to be made unless the same shall be in writing signed on behalf of each Party, and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the Party making such waiver or the obligations of the other Party in any other respect or at any other time.

9. **Binding Effect**. Except as otherwise expressly provided herein, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Parties and their respective successors, assigns, executors, representatives, and administrators.

10. **Entire Agreement**. The Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters, which the parties acknowledge have been merged into this Agreement.

11. **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument. Signature by facsimile or other similar electronic transmission shall have the same force and effect as an original signature.

IN WITNESS WHEREOF, the Parties have executed this Intercreditor and Participation Agreement as of the Effective Date set forth above and in the capacities set forth below.

HIGHLAND CLO MANAGEMENT, LTD.

By: [signature]
Name: James Dondero
Title: President

HUNTER MOUNTAIN INVESTMENT TRUST

By: [signature]
Name: Mark Patrick
Title: Administrator

**EXHIBIT 3**

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 27, 2025**

**United States Bankruptcy Judge**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | **Re: Docket No. 4231** |

**STIPULATION WITHDRAWING OBJECTION OF THE DALLAS FOUNDATION AND CROWN GLOBAL LIFE INSURANCE, LTD TO MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363 APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

‘ This stipulation (the "Stipulation") is made by and among Hunter Mountain Investment Trust ("HMIT"), Beacon Mountain LLC ("Beacon Mountain"), Rand Advisors, LLC ("Rand Advisors"), Rand PE Fund I, LP ("Rand PE Fund"), Rand PE Fund Management, LLC ("Rand

[1] Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.



1934054250627000000000002
007934

GP"), Atlas IDF, LP ("Atlas IDF"), and Atlas IDF GP, LLC ("Atlas GP" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP, and Atlas IDF, the "HMIT Entities"); The Dallas Foundation (the "Foundation"), Empower Dallas Foundation ("EDF"), the Okada Family Foundation ("Okada Family Foundation"), and Crown Global Life Insurance, Ltd. ("Crown," and with the Foundation, EDF, and the Okada Family Foundation, the "Foundation Parties"); Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland," as applicable) in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"), by and through their respective undersign counsel.

## RECITALS

**WHEREAS**, on May 19, 2025, the Movants filed that certain *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Dkt. No. 4216] (the "9019 Motion");

**WHEREAS**, on June 9, 2025, the Foundation Parties filed that certain *Objection* [Dkt. No. 4231] to the 9019 Motion (the "Foundation Objection");

**WHEREAS**, on June 24, 2025, the Foundation Parties and the HMIT Entities entered into that certain *Settlement Term Sheet* which is annexed hereto as Attachment 1 to this Stipulation (the "Term Sheet");

**NOW, WHEREFORE, IT IS HEREBY JOINTLY STIPULATED AND AGREED** as follows:

1. The Foundation Parties withdraw the Foundation Objection with prejudice in accordance with the terms of the Term Sheet annexed hereto as **Attachment 1**.

2. The Foundation Parties, the HMIT Entities, and the Movants agree that the following language shall be contained in the proposed order on the 9019 Motion:

Notwithstanding anything in the Settlement Agreement or the 9019 Order to the contrary, none of the Dallas Foundation, EDF, Okada Family, or Crown (the "Foundation Parties") are or will be included in the definitions of HMIT Releasors or Highland Releasors. For the avoidance of doubt, however, any attempt by the Foundation Parties to assert a Claim against a HMIT Released Party by, through, or under, including derivatively, a Highland Entity, or against a Highland Released Party by, through, or under, including derivatively, a HMIT Entity is barred by this Order and the Settlement Agreement.

Respectfully Submitted:

**KELLY HART PITRE**

*/s/ Louis M. Phillips*_____
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com
***Counsel for the HMIT Entities***

and

**OKIN ADAMS BARTLETT CURRY LLP**
*By: /s/ David L. Curry*______
Matthew S. Okin
Texas Bar No. 00784695
David L. Curry, Jr.
Texas Bar No. 24065107
1113 Vine Street, Suite 240
Houston, Texas 77002
Telephone: (713) 28-4100
Facsimile: (346)247-7158

Email: mokin@okinadams.com
dcurry@okinadams.com
**ATTORNEYS FOR THE DALLAS FOUNDATION AND CROWN GLOBAL LIFE INSURANCE, LTD.**

and

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/John A. Morris* __________
Jeffrey N. Pomerantz (admitted pro hac vice)
John A. Morris (admitted pro hac vice)
Gregory V. Demo (admitted pro hac vice)
Jordan A. Kroop (admitted pro hac vice)
Hayley R. Winograd (admitted pro hac vice)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com
hwinograd@pszjlaw.com
- and -

**HAYWARD PLLC**
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110
***Counsel for Highland Capital Management, L.P. and the Highland Claimant Trust***

and

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
*/s/ Robert S. Loigman*___________
Deborah J. Newman (admitted pro hac vice)
Robert S. Loigman (admitted pro hac vice)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
-and SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
***Co-Counsel for Marc S. Kirschner, as Litigation Trustee of the Highland Litigation Sub-Trust***

## CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that a copy of the forgoing was served on all parties receiving notice in this chapter 11 case through this Court's CM/ECF System on this June 25, 2025.

*/s/ Louis M. Phillips*_____
Louis M. Phillips (#10505)

Attachment 1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**BINDING TERM SHEET**

This Summary of Terms and Conditions (this "Term Sheet") outlines certain agreements by and between the HMIT Entities,[1] on the one hand, and The Dallas Foundation (the "Foundation"), Empower Dallas Foundation ("EDF"), the Okada Family Foundation ("Okada Family Foundation"), and Crown Global Life Insurance, Ltd. ("Crown," and with the Foundation, EDF, and the Okada Family Trust, the "Foundation Parties") resolving that Objection (the "Objection") of The Dallas Foundation and Crown Global Life Insurance, Ltd to Motion for Enry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement With the HMIT Entities and Authorizing Actions Consistent Therewith [ECF No. 4216] (the "9019 Motion").

| | |
|---|---|
| **Clarification of 9019 Settlement Releases:** | The parties have agreed to include language in any order granting the 9019 Motion clarifying the scope of releases as to the Foundation Parties. |
| **Initial Settlement Payments to HMIT:** | The HMIT Parties agree that the Cash Payment and the Initial Interim Distribution (the "Initial Settlement Payments") shall be made as provided in the Settlement Agreement and shall be held in accordance with the terms of this agreement. The HMIT Entities agree that the Initial Settlement Payments shall only be used to pay ordinary expenses of the HMIT entities in the nature of legal expenses and ordinary customary general expenses (the "Expenses"). At the Dallas Foundation Meeting (defined below), the HMIT Parties shall provide a projected quarterly expense budget to the Foundation Parties and shall continue to provide expense reporting reflecting the paid Expenses every forty-five (45) days, commencing August 5, 2025 (relating to Expenses paid June 15, 2025 to July 31, 2025). Such Expenses and the reports are "Information" within the meaning of this Agreement subject to the restrictions herein. Notwithstanding the foregoing, the HMIT Parties shall hold, in accordance with this Agreement, not less than $7,500,000.00 of the Initial Settlement |

[1] Capitalized terms not defined herein shall have the meanings set forth in the 9019 Motion or 9019 Order.

| | |
|---|---|
| | Payments actually received for a period of not less than thirty (30) calendar days following receipt of the Initial Settlement Payments.<br><br>The HMIT Parties agree that the Initial Settlement Payments (less Expenses) shall be held in an account held by HMIT or CLO HoldCo LLC to be identified by the HMIT Parties. In identifying such account, the HMIT Parties shall provide the account number, the account name, and account location (institution name and location). |
| **HMIT Meeting with The Dallas Foundation:** | Mr. Shawn Raver, as representative of HMIT, will, as soon as is practicable, but no later than July 7, 2025 meet in person at a location mutually agreed upon (the "DF Meeting") with the Dallas Foundation and will review the current "DAF" structure, with an eye to commencing negotiations with DF about the use of current support organization(s) or the creation of new support organizations to support the DF and as appropriate the other Foundations mentioned above (the "Resolution"). Mr. Mark Patrick may attend the DF Meeting either in person or virtually. As used herein, the term "DAF" shall mean the historical corporate structure of Charitable DAF Holdco, LTD, its parents and subsidiaries, in existence as of January 1, 2024, and any changes thereto, including any changes described in that matter before the Grand Court of the Cayman Island – Financial Services Division, Cause No: FSD 99 of 2025 (JAJ).<br><br>At the DF Meeting, which will be a confidential settlement meeting covered by any and all state, federal, and international confidentiality statutes, laws, customs, etc., with all parties to agreeing that no information ("Information") shared at the meeting can be shared further by any person or entity outside of the group participating at the meeting, except as otherwise provided herein. Prior to the Initial Meeting, the HMIT Parties and Foundation Parties may, but shall not be required as a pre-condition of the Initial Meeting, enter into such confidentiality agreements as may be agreed upon by the parties. Nothing in this agreement shall, however, preclude a party from disclosing Information pursuant to a subpoena, or other such legal compulsion or seeking information through subpoena within a proceeding in a tribunal of competent jurisdiction.<br><br>At the DF Meeting, Mr. Raver will show and present the participants with a balance sheet for the DAF as of 9/30/2024, 12/31/2024, and 3/31/2025. For the avoidance of doubt, such accounting shall include an accounting of any transfer assets from an entity within the DAF structure during the periods covered by the balance sheets to any another entity, including another entity within the DAF structure. |

| | |
|---|---|
| | At any time after the DF Meeting, either the HMIT Parties or Foundation Parties may declare an impasse (an "Impasse") in negotiations in writing delivered to the parties.<br><br>Unless an Impasse is declared following the DF Meeting, Mark Patrick agrees to meet with the Dallas Foundation and the other Supporting Organizations, or the Foundations they support, with an eye to furthering negotiations on the proposed Resolution.<br><br>If an acceptable Resolution is agreed upon, Mr. Patrick, the Supporting Organization, and Dallas Foundation shall jointly request a meeting with the JOLs and the DF, with a view toward winding up the liquidation proceedings of Charitable DAF Holdco, Ltd., including not seeking any equitable wind up of Charitable DAF Fund, LP., all of which should be able to be accomplished expeditiously in the event of agreements hoped to be achieved upon the meeting described above. |
| **Resolution of the Objection:** | In return for the foregoing, TDF and Crown Global agree to withdraw their objection to the 9019 Motion, in all capacities in which their objection has been filed, and to withdraw the notice of deposition of Mark Patrick.<br><br>The parties further agree that this Term Sheet shall be included as an attachment to the 9019 Order, and the terms of this Agreement enforceable in the Bankruptcy Court and the Bankruptcy Court shall maintain concurrent jurisdiction to resolve any dispute arising therefrom. |

Dated: June 24, 2025

The Dallas Foundation

[signature]

Julie Diaz, Chief Executive Officer

The HMIT Entities

______________________________

Mark Patrick

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | |
| | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**BINDING TERM SHEET**

This Summary of Terms and Conditions (this "Term Sheet") outlines certain agreements by and between the HMIT Entities,[1] on the one hand, and The Dallas Foundation (the "Foundation"), Empower Dallas Foundation ("EDF"), the Okada Family Foundation ("Okada Family Foundation"), and Crown Global Life Insurance, Ltd. ("Crown," and with the Foundation, EDF, and the Okada Family Foundation, the "Foundation Parties") resolving that Objection (the "Objection") of The Dallas Foundation and Crown Global Life Insurance, Ltd to Motion for Enry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement With the HMIT Entities and Authorizing Actions Consistent Therewith [ECF No. 4216] (the "9019 Motion").

| | |
|---|---|
| **Clarification of 9019 Settlement Releases:** | The parties have agreed to include language in any order granting the 9019 Motion clarifying the scope of releases as to the Foundation Parties. |
| **Initial Settlement Payments to HMIT:** | The HMIT Parties agree that the Cash Payment and the Initial Interim Distribution (the "Initial Settlement Payments") shall be made as provided in the Settlement Agreement and shall be held in accordance with the terms of this agreement. The HMIT Entities agree that the Initial Settlement Payments shall only be used to pay ordinary expenses of the HMIT entities in the nature of legal expenses and ordinary customary general expenses (the "Expenses"). At the Dallas Foundation Meeting (defined below), the HMIT Parties shall provide a projected quarterly expense budget to the Foundation Parties and shall continue to provide expense reporting reflecting the paid Expenses every forty-five (45) days, commencing August 5, 2025 (relating to Expenses paid June 15, 2025 to July 31, 2025). Such Expenses and the reports are "Information" within the meaning of this Agreement subject to the restrictions herein. Notwithstanding the foregoing, the HMIT Parties shall hold, in accordance with this Agreement, not less than $7,500,000.00 of the Initial Settlement |

[1] Capitalized terms not defined herein shall have the meanings set forth in the 9019 Motion or 9019 Order.

| | |
|---|---|
| | Payments actually received for a period of not less than thirty (30) calendar days following receipt of the Initial Settlement Payments.<br><br>The HMIT Parties agree that the Initial Settlement Payments (less Expenses) shall be held in an account held by HMIT or CLO HoldCo LLC to be identified by the HMIT Parties. In identifying such account, the HMIT Parties shall provide the account number, the account name, and account location (institution name and location). |
| **HMIT Meeting with The Dallas Foundation:** | Mr. Shawn Raver, as representative of HMIT, will, as soon as is practicable, but no later than July 7, 2025 meet in person at a location mutually agreed upon (the "DF Meeting") with the Dallas Foundation and will review the current "DAF" structure, with an eye to commencing negotiations with DF about the use of current support organization(s) or the creation of new support organizations to support the DF and as appropriate the other Foundations mentioned above (the "Resolution"). Mr. Mark Patrick may attend the DF Meeting either in person or virtually. As used herein, the term "DAF" shall mean the historical corporate structure of Charitable DAF Holdco, LTD, its parents and subsidiaries, in existence as of January 1, 2024, and any changes thereto, including any changes described in that matter before the Grand Court of the Cayman Island – Financial Services Division, Cause No: FSD 99 of 2025 (JAJ).<br><br>At the DF Meeting, which will be a confidential settlement meeting covered by any and all state, federal, and international confidentiality statutes, laws, customs, etc., with all parties to agreeing that no information ("Information") shared at the meeting can be shared further by any person or entity outside of the group participating at the meeting, except as otherwise provided herein. Prior to the Initial Meeting, the HMIT Parties and Foundation Parties may, but shall not be required as a pre-condition of the Initial Meeting, enter into such confidentiality agreements as may be agreed upon by the parties. Nothing in this agreement shall, however, preclude a party from disclosing Information pursuant to a subpoena, or other such legal compulsion or seeking information through subpoena within a proceeding in a tribunal of competent jurisdiction.<br><br>At the DF Meeting, Mr. Raver will show and present the participants with a balance sheet for the DAF as of 9/30/2024, 12/31/2024, and 3/31/2025. For the avoidance of doubt, such accounting shall include an accounting of any transfer assets from an entity within the DAF structure during the periods covered by the balance sheets to any another entity, including another entity within the DAF structure. |

| | |
|---|---|
| | At any time after the DF Meeting, either the HMIT Parties or Foundation Parties may declare an impasse (an "Impasse") in negotiations in writing delivered to the parties.<br><br>Unless an Impasse is declared following the DF Meeting, Mark Patrick agrees to meet with the Dallas Foundation and the other Supporting Organizations, or the Foundations they support, with an eye to furthering negotiations on the proposed Resolution.<br><br>If an acceptable Resolution is agreed upon, Mr. Patrick, the Supporting Organization, and Dallas Foundation shall jointly request a meeting with the JOLs and the DF, with a view toward winding up the liquidation proceedings of Charitable DAF Holdco, Ltd., including not seeking any equitable wind up of Charitable DAF Fund, LP., all of which should be able to be accomplished expeditiously in the event of agreements hoped to be achieved upon the meeting described above. |
| **Resolution of the Objection:** | In return for the foregoing, TDF and Crown Global agree to withdraw their objection to the 9019 Motion, in all capacities in which their objection has been filed, and to withdraw the notice of deposition of Mark Patrick.<br><br>The parties further agree that this Term Sheet shall be included as an attachment to the 9019 Order, and the terms of this Agreement enforceable in the Bankruptcy Court and the Bankruptcy Court shall maintain concurrent jurisdiction to resolve any dispute arising therefrom. |

Dated: June 24, 2025

The Dallas Foundation

____________________________

Julie Diaz, Chief Executive Officer

The HMIT Entities

[signature]

Mark Patrick

**EXHIBIT**

E-filed in the Office of the Clerk
for the Business Court of Texas
7/13/2025 5:09 PM
Accepted by: Alexis Jennings
Case Number: 25-BC01B-0027

NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
BOSTON
HOUSTON
DALLAS
FORT WORTH
AUSTIN

DuaneMorris®

*FIRM and AFFILIATE OFFICES*

JOSEPH M. COX
PARTNER
DIRECT DIAL: +1 214 257 7252
PERSONAL FAX: +1 214 853 9480
*E-MAIL:* JMCox@duanemorris.com

*www.duanemorris.com*

HANOI
HO CHI MINH CITY
SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NORTH JERSEY
LAS VEGAS
SOUTH JERSEY
SYDNEY
MYANMAR

ALLIANCES IN MEXICO

July 11, 2025

Mr. Brian Shaw
Carrington, Coleman, Sloman, & Blumenthal
901 Main Street, Suite 5500
Dallas, Texas 75202
bshaw@ccsb.com

*Sent via email*

**Re: The Highland Dallas Foundation, Inc, et al v. Mark Patrick, et al,**
**Cause No. 25-BC01B-0027**
**Rule 11 Agreement**

Dear Mr. Shaw:

Pursuant to Texas Rule of Civil Procedure 11, the parties in this matter The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. (collectively "Plaintiffs"), and Mark Patrick, DFW Charitable Foundation, CDMCFAD, LLC, and CDH GP, Ltd. (collectively "Defendants"), agree to the following:

(1) The "Covered Entities" as referred to herein is defined to include collectively Charitable DAF Fund, LP and/or any of its subsidiaries, the DFW Charitable Foundation and/or any of its subsidiaries, CDMCFAD, LLC and/or any of its subsidiaries, and/or any of its subsidiaries, and CDH GP, Ltd. and/or any of its subsidiaries.

(2) Defendants shall have until Monday, July 14, 2025, to file a challenge to the court's jurisdiction (the "Plea").

(3) Plaintiffs shall have until Monday, July 21, 2025, to file a response to the Plea.

(4) Defendants shall have until Thursday, July 24, 2025, to file a reply to the Plea.

(5) The Parties agree to the following limits on discovery prior to any hearing on Plaintiffs' application for temporary injunction/appointment of receiver (the "Temporary Injunction")

in this matter (these limits shall have no effect on any discovery conducted after the Temporary Injunction is decided):

a. Plaintiffs and Defendants each (not per party) may serve 25 requests for production to the other, may serve 5 interrogatories, may serve 10 requests for admission, and may take 3 depositions (2 of which shall be limited to 3 hours, and one of which shall be limited to 6 hours, the selection of the witness for the six hour deposition to be determined by the party seeking the deposition).

b. The Parties shall serve all discovery requests no later than Wednesday, July 16, 2025.

c. Responses to the written discovery and substantial completion of related any related document production shall be served as follows: (1) if the Court denies the Plea as to any Defendant, seven business days after the Court order denying the Plea is entered; (2) if the Court grants the Plea as to all Defendants, then responses to written discovery shall not be due, if at all, until seven business days after the Court's order granting the Plea is reversed or overturned.

Depositions shall take place within seven days after the written discovery responses and documents are served as set forth in c. above.

(6) If the Court denies the Plea, the Temporary Injunction shall be heard as reasonably practicable after the ruling, unless stayed by an appellate court. If the Plea is granted, but is later reversed or overturned, the same timelines for discovery provided in (5) above shall be followed and the Parties shall then seek to expeditiously set a hearing before the Court.

(7) Pending the Court's decision on the Temporary Injunction or grant of the Plea relating to the Temporary Injunction or Plea), the Covered Entities and their respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for any Covered Entity, agree:

a. not to transfer, conceal, withdraw, alienate, redeem, expend, encumber, disperse, or otherwise dispose of any and all funds, assets, receivables, or shares outside of the ordinary course of business;

b. not take any action to increase the compensation paid to any employee of the Covered Entities;

c. not to take any action to dissolve, winddown, liquidate, or otherwise alter the corporate standing of Covered Entities;

d. not to take any action to modify or alter the corporate governance of the Covered Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

e. not to take any action to sell, exchange, or dispossess any asset of one of the Covered Entities unless (i) the sale is to a bona third party purchaser for reasonably equivalent value, (ii) except in the case of marketable securities, the bona fide



Copy from re:SearchTX

DuaneMorris



purchaser is made aware of this Rule 11 Agreement, and (iii) the proceeds from that sale, exchange, or disposition remain owned by the Covered Entities;

f. not to alter, conceal, or destroy any business records concerning the Defendants, including any transfers of funds, assets, receivables, or shares to the Defendants;

(8) This Agreement shall be filed with the Court and, as provided in the first sentence of this letter, constitutes an enforceable agreement pursuant to Texas Rule of Civil Procedure 11. This Agreement shall expire and be of no force or effect on the earlier of (a) thirty days after a final order of the Court dismissing this case or (b) the Court's ruling on Plaintiffs' current request for a temporary injunction (or as subsequently amended). This does not prevent a party from requesting that a court of appeals issue an order to keep this Rule 11 Agreement in place during the pendency of such appeal or any objection to such request.

If the terms above accurately reflect our agreement, please acknowledge your agreement by signing below.

Best regards.

Sincerely,

Joseph M. Cox

AGREED TO FORM AND CONTENT:

Brian Shaw, Counsel for Defendants

JMC/kr
cc: (all via email)
Darren McCarty, Esq.
Craig Warner, Esq.
Clients



Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Craig Warner on behalf of Craig Warner
Bar No. 24084158
CMWarner@duanemorris.com
Envelope ID: 103064824
Filing Code Description: Notice
Filing Description: Rule 11 Agreement
Status as of 7/14/2025 9:38 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Darren McCarty | 24007631 | darren@mccartylawpllc.com | 7/13/2025 5:09:31 PM | SENT |
| Monica G.Gaudioso | | mgaudioso@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Jason E.Boatright | | JEBoatright@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Brian P.Shaw | | bshaw@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Angie Barrera | | abarrera@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Craig M.Warner | | CMWarner@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Judy Garrison | | jgarrison@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Sherry Stewart | | sstewart@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Joseph MCox | | JMCox@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Benjamin Warden | | BWarden@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Andrea Reed | | areed@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Katherine Ramos | | KRamos@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| James Billingsley | | JBillingsley@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Dylan JAnderson | | DJAnderson@duanemorris.com | 7/13/2025 5:09:31 PM | SENT |
| Rhonda LThomas | | rthomas@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Emily Owen | | eowen@ccsb.com | 7/13/2025 5:09:31 PM | SENT |
| Business Court 1B | | BCDivision1B@txcourts.gov | 7/13/2025 5:09:31 PM | SENT |



Copy from re:SearchTX

**EXHIBIT**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 (RPJ)**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

**(1) MARK ERIC PATRICK**

**(2) PAUL MURPHY**

**(3) CDMCFAD, LLC**

**(4) DFW CHARITABLE FOUNDATION**

**(5) CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**

**(6) CLO HOLDCO, LTD.**

Defendants

---

## CONSENT ORDER

---

**UPON** the Plaintiff's Summons dated 15 July 2025 (the "**Injunction Summons**")

**AND UPON** the First, Third, Fifth, and Sixth Defendants' Summons of dated 21 July 2025 (the "**Directions Summons**")

**AND UPON** the parties listed therein giving to the Court the undertakings recorded in Schedule A to this Order

**AND UPON** the Injunction Summons and the Directions Summons being listed for hearing on 31 July 2025 before the Honourable Justice Parker

**IT IS ORDERED BY CONSENT** that:

1 The Injunction Summons shall be adjourned and listed for hearing on the first available date after 18 September 2025 (the "**Hearing**").

2 The time estimate for the Hearing shall be 2 days.

3 Directions for evidence in the Injunction Summons shall be as follows:

(a) The Defendants shall file and serve any evidence in answer by 4.30pm on 28 August 2025;

(b) The Plaintiff shall (if so advised) serve any evidence in reply by 4.30pm on 11 September 2025.

4 The Plaintiff shall file an agreed hearing bundle for the Hearing in electronic form by 4pm on the date which is 12 days before the date of the hearing (once listed).

5 The parties shall file and exchange skeleton arguments by 4pm on the date which is 7 days before the date of the hearing (once listed).

6 Costs of the Injunction Summons and the Directions Summons are reserved.

7 Liberty to apply.

DATED this 31 day of July 2025

FILED this 31 day of July 2025

[signature]

**THE HONOURABLE JUSTICE PARKER**
**JUDGE OF THE GRAND COURT**

Approved as to form and content:

Maples and Calder (Cayman) LLP

**Maples and Calder (Cayman) LLP**

Attorneys for the Plaintiff

Campbells LLP

**Campbells LLP**

Attorneys for the First, Third, Fifth and Sixth Defendants

Kobre & Kim (Cayman)

**Kobre & Kim**

Attorneys for the Second Defendant

Baker & Partners (Cayman) Limited

**Baker & Partners LLP**

Attorneys for the Fourth Defendant

**Schedule A**

Undertakings given by the Defendants

1 Pending the determination of the JOLs' Summons, the Defendants[1], and the related entities listed in Schedule B hereto (the "**CDM Entities**") and their respective agents, servants, employees, and representatives, agree and undertake to:

(a) not to transfer, conceal, withdraw, alienate, redeem, expend, encumber, disperse, or otherwise dispose of any and all funds, assets, receivables, or shares of the CDM Entities outside of the ordinary course of business;

(b) not to take any action to increase the remuneration paid to any employee, manager or director of the CDM Entities;

(c) not to take any action to dissolve, wind-down, liquidate, or otherwise alter the corporate standing of the CDM Entities;

(d) not to take any action to modify or alter the corporate governance of the CDM Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

(e) not to take any action to sell, exchange, or dispossess any asset of one of the CDM Entities unless (i) the sale is to a bona fide third-party purchaser for reasonably equivalent value, (ii) except in the case of marketable securities, the bona fide purchaser is made aware of this undertaking, and (iii) the proceeds from that sale, exchange, or disposition remain owned by the CDM Entities; and

(f) not to alter, conceal, or destroy any business records concerning the Defendants or the CDM Entities, including any transfers of funds, assets, receivables, or shares to or from the Defendants or CDM Entities.

2 Further, and to the extent not addressed by the foregoing, the Defendants and the CDM Entities undertake and agree that:

[1] Being the First Defendant, Mark Patrick; the Second Defendant, Paul Murphy; the Third Defendant, CDMCFAD, LLC; the Fourth Defendant, DFW Charitable Foundation; the Fifth Defendant, CDH GP, Ltd. as general partner for and on behalf of Charitable DAF Fund, LP, and in its capacity as general partner; and the Sixth Defendant, CLO HoldCo, Ltd.

(a) they will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest (of whatsoever nature), whether held directly or indirectly, in Charitable DAF Fund, LP (the "**Fund**"), and/or the CDM Entities and/or any assets of the Fund other than in the ordinary course of business; and

(b) they shall not do anything to cause, procure, incite, promote or assist a breach by any other party of this undertaking.

3 From the date of this undertaking to the date of the determination of the JOLs' Summons, the Third, Fourth, Fifth and Sixth Defendants (the "**CDM Defendants**") and the CDM Entities will give 7 days' written notice to the JOLs of any payment or transaction of any nature (or series of related payments or transactions) they propose to make at or above US$50,000. Such notice must include full supporting information and documentation as well as an explanation of the rationale for the transaction.

4 From the date of this undertaking to the date of the determination of the JOLs' Summons, the First Defendant and the Second Defendant will give 7 days' written notice to the JOLs of any payment or transaction of any nature (or series of related payments or transactions) they propose to make at or above US$100,000. Such notice must include full supporting information and documentation as well as an explanation of the rationale for the transaction.

5 If the JOLs have any queries regarding a transaction (or series of related payments or transactions) and whether it is in the ordinary course of the CDM Defendants' or the CDM Entities' business, the CDM Defendants and the CDM Entities undertake to consult with the JOLs and to provide clarification. For the avoidance of doubt, nothing in this undertaking shall prohibit the Defendants and the CDM Entities from making payments to any attorney, lawyer, third party consultant, accountant, or external professional services advisor which is required, either in the ordinary course of business, or in respect of their reasonable legal fees and expenses in connection with these proceedings or the official liquidation of Charitable DAF Holdco, Ltd (In Official Liquidation) [FSD 116 of 2025 (JAJ)], or the Chapter 15 Case (defined below). All such transactions of the CDM Defendants and the CDM Entities will be provided for in the monthly transactions report pursuant to paragraph 6 of this undertaking. However, the Defendants agree that the issue of whether