**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P.

§
§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§
vs. §

3:26-CV-02496-D

**Highland Capital Management, L.P., et al**-Appellee
§
§

**[4689] Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026**

**APPELLANT RECORD**

**VOLUME 24**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02496-D<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4698] on July 24, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689] now files this *Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the Court's June 15, 2026 Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate?

2. Did the Bankruptcy Court err in finding Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate ("Dugaboy's Motion") [Docket No. 4684] was "without merit?"

3. Did the Bankruptcy Court err in denying Dugaboy's Motion without a full record, including that Dugaboy was not allowed to file a reply brief and was not granted a hearing?

4. Did the Bankruptcy Court err in denying Dugaboy the opportunity to file a reply brief to Highland's Opposition to Dugaboy's Motion, including that Dugaboy indicated a date certain for filing a reply?

5. Did the Bankruptcy Court err in finding Dugaboy's Motion was "without merit" without granting a hearing?

6. Did the Bankruptcy Court err by summarily denying Dugaboy's Motion without explaining its reasoning for the denial?

7. Did the Bankruptcy Court err in failing to consider Dugaboy's Notice of Intervening Event?

8. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(2) when it determined that it had not manifestly erred in deciding the evidence of Mark Patrick's misconduct contained in the Cayman Islands proceeding was not "newly discovered" even though that information was not contained in James Dondero's affidavit executed April 16, 2025?

9. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant

to Rule 60(b)(2) when it determined it had not manifestly erred in deciding the Dondero Affidavit indicated information gained in the Cayman Islands proceedings was not "newly discovered" despite the fact the Affidavit lacked any evidence of the restructuring discovered in the Cayman Islands proceedings?

10. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding on the grounds that Rule 60(b)(3) purportedly requires fraud or misconduct to have occurred in the judicial proceeding itself?

11. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding that Highland did not provide misleading or incomplete answers during the discovery of Mark Patrick's misconduct and resulting lack of authority to negotiate the Rule 9019 settlement agreement from Dugaboy leading to the Rule 9019 Order?

12. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding that Dugaboy had not presented a basis for relief under Rule 60(b)(6) that was separate from the grounds presented for Rule 60(b)(2) and Rule 60(b)(3)?

13. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding on the grounds that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain?

14. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of the Bankruptcy Court's special responsibility to monitor arrangements and settlements made between Highland's appointed managers and third parties?

15. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of its manifest error in failing to consider the Bankruptcy Court's role as a court of equity and responsibility to prevent misconduct before it, such as Mark Patrick's use of stolen assets in the 9019 Settlement?

16. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

## DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

Vol. 1 000001 – 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4698] filed by Appellant;

000010 2. The Bankruptcy Court's July 10, 2026 *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000012 4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

Vol. 2

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |

000648 thru Vol 3

Vol. 4 001843

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 4 001845 thru vol 6 | 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol 7 003634 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003647 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003650 & 003651 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003652 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003663 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003667 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003670 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 7 003709 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004733 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol. 8 004790 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol 9 005207 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005209 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005217 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| vol 9 | | Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 04/07/2026 005222 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 04/07/2026 005225 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 04/10/2026 005227 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 04/16/2026 005229 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/17/2026 005233 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 9 | | | Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| 005330 | 04/17/2026 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| Vol 10 005590 | 04/21/2026 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 005594 | 04/22/2026 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005615 | 04/22/2026 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 005682 | 04/22/2026 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 10 | | | Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| 005692 | 04/22/2026 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 005705 | 04/24/2026 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 005726 | 04/24/2026 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 005727 | 04/25/2026 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005729 | 04/27/2026 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 005737 | 04/28/2026 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |

vol. 11

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 04/28/2026 005746 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005755 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/28/2026 005761 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 04/29/2026 005767 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 04/29/2026 005776 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 04/29/2026 005783 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| Vol. 10 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| 005785 | 04/29/2026 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005787 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005794 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005796 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005798 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005801 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005884 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005902 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005905 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005907 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11 | | | Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005913 | 05/06/2026 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005920 | 05/06/2026 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005927 | 05/06/2026 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 005929 | 05/07/2026 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005936 | 05/08/2026 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 005939 | 05/08/2026 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 005942 | 05/08/2026 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 005945 | 05/08/2026 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol. 12 006100 Thru Vol 21 | 05/08/2026 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and* |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | *Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| 10). 22 008156 | 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 008172 | 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 008188 | 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). ~~(Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery)~~ |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 22 008256 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008293 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008429 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008465 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008472 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008916 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| Vol 25 009554 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| Vol. 26 009868 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| Vol 27 010229 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| Vol. 28 010538 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 28 | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| 05/11/2026 010664 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29 05/11/2026 010736 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol 30 05/11/2026 011150 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol 31 05/11/2026 011734 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol 32 05/11/2026 013203 Thru Vol 33 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34 05/11/2026 014888 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol 35 05/11/2026 015349 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 05/11/2026 015505 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 05/12/2026 015506 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 05/12/2026 015538 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 05/12/2026 015565 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 05/15/2026 015566 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36 05/18/2026 015569 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol 37 05/18/2026 015996 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 05/19/2026 016008 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 05/20/2026 016079 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 05/20/2026 016082 – 016084 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 05/21/2026 016085 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 05/21/2026 016134 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 37 | | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| 016135 | 05/23/2026 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 016233 | 05/28/2026 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 016490 | 06/15/2026 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s)4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 016504 | 06/15/2026 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| Vol. 39 016505 | 06/29/2026 | 4684 | (162 pgs; 2 docs) Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Appendix) (Edney, Michael) |
| 016667 | 06/29/2026 | 4685 | (7 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s)4679 Order on motion to reconsider). Appellant Designation due by 07/13/2026. (Attachments: # 1 Exhibit)(Edney, Michael) |
| 016674 | 07/06/2026 | 4687 | (32 pgs; 2 docs) Response opposed to (related document(s): 4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 016706 | 07/09/2026 | 4688 | (23 pgs; 2 docs) Notice of Intent to Reply and Request for Hearing on Its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| vol. 39 | | (Attachments: # 1 Appendix)). (Attachments: # 1 Attachment A) (Edney, Michael) |
| 07/10/2026 016729 | 4689 | (2 pgs) Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026. (Okafor, M.) Modified text on 7/10/2026 (mdo). |
| 07/13/2026 016731 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |
| 07/24/2026 016733 | 4698 | (9 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)(Edney, Michael) |
| 07/28/2026 016742 | 4704 | (5 pgs) DISTRICT COURT Notice of docketing notice of appeal. Civil Action Number: 3:26-cv-02496-E. (RE: related document(s)4698 Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court;

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J"); and

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No.

4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: August 7, 2026

Respectfully submitted,

*/s/ Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S THIRD AMENDED**
**EXHIBIT LIST FOR THE MAY 11, 2026 HEARING**

COMES NOW, The Dugaboy Investment Trust ("Dugaboy") and files this Exhibit List for the May 11, 2026 Hearing in the Bankruptcy Case.

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 1 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | HCM-D10000002-HCM-D10000013 |
| 2 | Settlement Agreement and General Release | 000813-000836 |
| 3 | 6/4/2024 First Affidavit of Mark Patrick | Dkt. 401-2 (21-03076-sgj) |
| 4 | 7/21/2025 [4-33] Original DAF Org Chart | Dkt. 4-33 (25-11376-BLS) |
| 5 | 7/11/2011 Amended and Restated Exempted Limited Partnership Agreement of Charitable DAF Fund, LP | Dkt. 4-36 (25-11376-BLS) |
| 6 | 2/20/2025 Amended and Restated Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd. | Dkt. 4-06 (25-11376-BLS) |
| 7 | 11/9/2023 Shields Work Plan Memorandum | |
| 8 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 9 | 12/12/2024 Certificate of Formation of CDFMCAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 10 | 12/18/2024 Charitable DAF HoldCo, Ltd. Unanimous Written Resolutions of all of the Directors of the Company | Dkt. 4-45 (25-11376-BLS) |
| 11 | 9/30/2024 Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 12 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 13 | 3/27/2025 CDMCFAD, LLC Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 14 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D100000330 |
| 15 | 2/12/2025 Membership Interest Purchase Agreement | HCM-D10000021-HCM-D10000036 |
| 16 | 2/12/2025 Member Consent of Beacon Mountain | HCM-D10000019-HCM-D10000020 |
| 17 | 11/30/2015 Amended and Restated Limited Partnership Agreement of Atlas IDF, LP | |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 18 | 6/26/2025 Audit of RAND PE Fund I, LP | HMIT_Entities_000022-HMIT_Entities_000039 |
| 19 | 3/6/2024 DAF Structure Chart in 2024 and 2025 | |
| 20 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | |
| 21 | 12/2015-8/2022 Rand Structure Chart | |
| 22 | 2/12/2025 Feb. and May 2025 Rand Structure Chart | |
| 23 | 10/15/2019 Empower Dallas Foundation, Inc. Partial Surrender Request | |
| 24 | 2/22/2021 Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief | Dkt. 1943 (19-34054-sgj11) |
| 25 | 4/8/2025 Email regarding Settlement Agreement | HCMLPHMIT00000656-HCMLPHMIT00000661 |
| 26 | 12/16/2015 Crown Global Deferred Variable Annuity Policy for Empower Dallas Foundation, Inc. | |
| 27 | 11/30/2015 Participation Agreement between Crown Global Life Insurance Ltd. and Other Entities | |
| 28 | 9/12/2025 First Affidavit of Mark Eric Patrick | |
| 29 | 10/21/2025 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 9/30/2025 | Dkt. 4438 (19-34054-sgj11) |
| 30 | 10/21/2025 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 9/30/2025 | Dkt. 4439 (19-34054-sgj11) |
| 31 | 1/21/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 12/31/2025 | Dkt. 4503 (19-34054-sgj11) |
| 32 | 1/21/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 12/31/2025 | Dkt. 4504 (19-34054-sgj11) |
| 33 | 4/20/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 3/31/2026 | Dkt. 4552 (19-34054-sgj11) |
| 34 | 4/20/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 3/31/2026 | Dkt. 4553 (19-34054-sgj11) |
| 35 | 6/25/2025 Hearing Transcript for Case No. 19-34054-sgj-11 | |
| 36 | 4/16/2025 Affidavit of James David Dondero | Dkt. 4534-7 (19-34054-sgj11) |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 37 | 6/9/2025 Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 USC § 363 Approving Settlement with the HMIT Entities | Dkt. 4230 (19-34054-sgj11) |
| 38 | HMIT Structure as of 8/12/2022 – 2/12/2025 | |
| 39 | 2/6/2025 Letter to Dolomiti LLC re Notice of Your Withdrawal from Rand PE Fund I, L.P. | |
| 40 | 2024 Tax Form 990 – Highland Dallas Foundation Inc. | Dkt. 4556-2 (19-34054-sgj11) |
| 41 | 3/27/2025 Admission and Amendment to No. 1 Agreement | Dkt. 4-54 (25-11376-BLS) |
| 42 | 12/12/2024 Certificate of Formation of CDMCFAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 43 | 2/7/2015 Unanimous Written Resolutions of the Board of Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-22 (25-11376-BLS) |
| 44 | 12/18/2024 Unanimous Written Resolutions of all of the Directors of the Company passed on 18 December 2024 in accordance with the Articles of Association of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-45 (25-11376-BLS) |
| 45 | 4/2/2025 Written Resolutions of the Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-47 (25-11376-BLS) |
| 46 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 47 | 7/21/2025 Defendants' Motion to Dismiss and Plea to the Jurisdiction filed in Cause No. 25-BC-01B-0027, The Highland Foundation, Inc. et al. v. Mark Patrick, et al., The Business Court of Texas, First Division | Dkt. 4-91 (25-11376-BLS) |
| 48 | 3/27/2025 Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 49 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 50 | 9/30/2024 Valuation Analysis of 100 Participation Shars of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 51 | 3/7/2024 Written Consent of the Managing Member of Charitable DAF GP, LLC | Dkt. 4-38 (25-11376-BLS) |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 52 | 6/9/2025 Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000001-HCM-D10000001 |
| 53 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) on December 17, 2015 | HCM-D10000002-HCM-D10000013 |
| 54 | Email chain regarding the sale of Class C limited partnership interests from Highland Capital Management, L.P. to Hunter Mountain Investment Trust. Mark Patrick | HCM-D10000014-HCM-D10000015 |
| 55 | Email from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer. | HCM-D10000016-HCM-D10000016 |
| 56 | Email chain from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer | HCM-D10000017-HCM-D10000018 |
| 57 | CLO Holdco, LLC's purchase of all membership interests in Beacon Mountain, LLC from Rand PE Fund I, L.P. | HCM-D10000019-HCM-D10000020 |
| 58 | Membership Interest Purchase Agreement - | HCM-D10000021-HCM-D10000036 |
| 59 | Organizational structure of HMIT entities before and after February 12, 2025. | HCM-D10000037-HCM-D10000038 |
| 60 | Investment Management Agreement -establishes Rand Advisors, LLC as the investment manager for Atlas IDF, LP. | HCM-D10000039-HCM-D10000045 |
| 61 | Investment Management Agreement - establishes Rand Advisors, LLC as the investment manager for Rand PE Fund I, L.P. | HCM-D10000046-HCM-D10000052 |
| 62 | Register of Members for CLO Holdco, Ltd. | HCM-D10000053-HCM-D10000055 |
| 63 | Unanimous Written Consent - executed by Mark Patrick as sole director of Rand Advisors Holding Corp. | HCM-D10000056-HCM-D10000069 |
| 64 | Charitable DAF Fund, LP transferred DAF Holdings stock to CLO HoldCo, Ltd | HCM-D10000070-HCM-D10000072 |
| 65 | Register of Members for Liberty CLO Holdco, Ltd. CLO Holdco, Ltd. | HCM-D10000073-HCM-D10000073 |
| 66 | Limited Liability Company Agreement - establishing Liberty CLO Holdco, LLC as a Delaware limited liability company. | HCM-D10000074-HCM-D10000090 |
| 67 | Register for CDH GP, Ltd. | HCM-D10000091-HCM-D10000091 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 68 | Register of Members for CDH GP, Ltd. | HCM-D10000092-HCM-D10000092 |
| 69 | Register for CLO HoldCo, Ltd. | HCM-D10000093-HCM-D10000094 |
| 70 | Register of General Partners for Charitable DAF Fund, LP. | HCM-D10000095-HCM-D10000095 |
| 71 | Register of Limited Partners for Charitable DAF Fund, LP | HCM-D10000096-HCM-D10000096 |
| 72 | Limited Liability Company Agreement for CDMCFAD, LLC. | HCM-D10000097-HCM-D10000124 |
| 73 | Collation of various documents including resolutions from CDMCFAD, LLC, and a March 2025 letter from Seyfarth Shaw LLP to the IRS reporting potential tax violations by Highland Dallas Foundation, Inc. (Jim Dondero). | HCM-D10000125-HCM-D10000251 |
| 74 | Letter from three Highland foundations to Paul Murphy | HCM-D10000264-HCM-D10000265 |
| 75 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000266-HCM-D10000267 |
| 76 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000268-HCM-D10000269 |
| 77 | Email chain between K. Hendrix and J. Seery, et al. | HCM-D10000270-HCM-D10000271 |
| 78 | Email chain James Seery to Mark Patrick and Shawn Raver | HCM-D10000272-HCM-D10000272 |
| 79 | Email chain from Shawn Raver to J. Seery, et al. | HCM-D10000273-HCM-D10000273 |
| 80 | Email chain from M. Tax to S. Raver, et al. | HCM-D10000274-HCM-D10000274 |
| 81 | Email chain from K. Hendrix to S. Raver, et al. | HCM-D10000275-HCM-D10000276 |
| 82 | Email chain from S. Raver to K. Hendrix, et al. | HCM-D10000277-HCM-D10000278 |
| 83 | Email chain from S. Raver to M. Tax, et al. | HCM-D10000279-HCM-D10000280 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 84 | Note Elevation and Assignment Agreement | HCM-D10000281- HCM-D10000301 |
| 85 | Email from A. Hurt to T. Cournoyer, et al. | HCM-D10000302- HCM-D10000303 |
| 86 | Letter to Dugaboy Investment Trust | HCM-D10000304- HCM-D10000308 |
| 87 | Claims Assignment Agreement | HCM-D10000309- HCM-D10000315 |
| 88 | Email from David Klos at Highland Capital Management to James Seery | HCM-D10000316- HCM-D10000316 |
| 89 | Trust Agreement establishes the Hunter Mountain Investment Trust on December 17, 2015 | HCM-D10000317- HCM-D10000328 |
| 90 | Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000329- HCM-D10000329 |
| 91 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D10000330- HCM-D10000330 |
| 92 | Email from K. Hendrix to A. Gunther, et al. | HCM-D10000331- HCM-D10000332 |
| 93 | Email from K. Hendrix to D. Klos, et al. | HCM-D10000333- HCM-D10000334 |
| 94 | Letter from Campbells LLP to James Seery (CEO of Highland Capital Management, L.P.) and Marc Kirschner | HCM-D10000335- HCM-D10000338 |
| 95 | Email chain from A. Kapuria to S. Raver, et al. | HMIT_Entities_000001- HMIT_Entities_000006 |
| 96 | Email chain from K. Jackson to S. Raver, et al. | HMIT_Entities_000007- HMIT_Entities_000010 |
| 97 | Email chain from S. Reynolds to S. Raver, et al. | HMIT_Entities_000011- HMIT_Entities_000015 |
| 98 | Email from Chris Rice to K. Jackson, et al. | HMIT_Entities_000016- HMIT_Entities_000020 |
| 99 | Email from Chris Rice to S. Raver, et al. | HMIT Entities 000021- HMIT Entities 000021 |
| 100 | Audited financial statements for Rand PE Fund I, L.P. | HMIT_Entities_000022- HMIT_Entities_000039 |
| 101 | Email chain from K. Jackson to S. Raver | HMIT_Entities_000040- HMIT_Entities_000043 |
| 102 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000044- HMIT_Entities_000047 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 103 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities_000048-HMIT Entities 000051 |
| 104 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000052-HMIT_Entities_000054 |
| 105 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000055-HMIT Entities 000057 |
| 106 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000058-HMIT Entities 000058 |
| 107 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000059-HMIT Entities 000059 |
| 108 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000060-HMIT_Entities_000060 |
| 109 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000061-HMIT Entities 000061 |
| 110 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000062-HMIT Entities 000063 |
| 111 | Email chain between Crown Global Insurance and Rand Advisors | HMIT_Entities_000064-HMIT_Entities_000065 |
| 112 | Email from Robert Kipp to M. Patrick, et al. | HMIT Entities 000066-HMIT Entities 000066 |
| 113 | Email chain from A. Gunther to S. Raver, et al. | HMIT Entities 000067-HMIT Entities 000070 |
| 114 | Email chain from S. Raver to A. Gunther, et al. | HMIT_Entities_000071-HMIT_Entities_000074 |
| 115 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000075-HMIT_Entities_000076 |
| 116 | Email chain from S. Raver to J. Seery, et al. | HMIT Entities 000077-HMIT Entities 000078 |
| 117 | Email from C. Rice to S. Raver, et al. | HMIT Entities_000079-HMIT Entities_000079 |
| 118 | Bloomberg invoice | HMIT Entities 000080-HMIT Entities 000080 |
| 119 | Email thread with S&P Global | HMIT_Entities_000081-HMIT_Entities_000083 |
| 120 | S&P Global invoice | HMIT Entities_000084-HMIT Entities_000084 |
| 121 | Email exchange between auditors Chris Rice (NexPoint Services) and Patrick Casale (Cohen & Co) | HMIT Entities_000085-HMIT Entities_000086 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 122 | Financial statement audit | HMIT_Entities_000087-HMIT_Entities_000103 |
| 123 | Email chain C. Rice to S. Raver | HMIT_Entities_000104-HMIT_Entities_000114 |
| 124 | Email chain from S. Raver to C. Rice | HMIT_Entities_000115-HMIT_Entities_000124 |
| 125 | Email from K. Longwell to M. Tax, et al. | HMIT Entities_000125-HMIT Entities_000125 |
| 126 | Civil Investigative Demand issued by the Texas Attorney General's Office to Hunter Mountain Investment Trust (HMIT) on July 14, 2025 | HMIT_Entities_000126-HMIT_Entities_000133 |
| 127 | Email from K. Longwell to M. Tax, et al. | HMIT Entities 000134-HMIT Entities 000134 |
| 128 | Dkt. 23, Notice of Hearing dated 8/27/2025 | HMIT_Entities_000135-HMIT_Entities_000254 |
| 129 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000260-HMIT_Entities_000261 |
| 130 | Email chain from D. Klos to K. Hendrix, et al. | HMIT_Entities_000262-HMIT_Entities_000263 |
| 131 | Email chain from M. Tax to J. Seery, et al. | HMIT_Entities_000264-HMIT_Entities_000264 |
| 132 | Email chain from K. Hendrix to S. Raver, et al. | HMIT_Entities_000265-HMIT_Entities_000266 |
| 133 | Email chain from K. Hendrix to A. Gunther, et al. | HMIT_Entities_000267-HMIT_Entities_000268 |
| 134 | DAF entity structure | VALUESCOPE 000001-VALUESCOPE 000001 |
| 135 | DAF/Rand entity structure | VALUESCOPE_000002-VALUESCOPE_000002 |
| 136 | Law firm forwards legal filing to Mark Patrick (DAF HoldCo) re Chapter 15 filing | VALUESCOPE_000003-VALUESCOPE_000007 |
| 137 | Chapter 15 Petition filing | VALUESCOPE_000008-VALUESCOPE_000026 |
| 138 | Charitable DAF Org structure | VALUESCOPE_000027-VALUESCOPE_000027 |
| 139 | Letter from Reed Smith LLP | VALUESCOPE_000028-VALUESCOPE_000029 |
| 140 | ValueScope, LLC Response | VALUESCOPE_000030-VALUESCOPE_000030 |
| 141 | Certificate of Incorporation, Charitable DAF HoldCo, Ltd. | TDIT004698 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 142 | Legal Relationship Agreement, Highland Kansas City Foundation | TDIT003396–TDIT003398 |
| 143 | Supporting Organization Operating Agreement - Highland Dallas Foundation, Inc. | TDIT003399–TDIT003406 |
| 144 | Supporting Organization Operating Agreement - Highland Santa Barbara Foundation, Inc. | TDIT003407–TDIT003413 |
| 145 | Letter - Highland Dallas Foundation, Inc. | TDIT003389–TDIT003390 |
| 146 | Letter - Highland Santa Barbara Foundation, Inc. | TDIT003391–TDIT003393 |
| 147 | Letter - Highland Kansas City Foundation, Inc. | TDIT003394–TDIT003395 |
| 148 | Employment Agreement - Mark Patrick | TDIT003971–TDIT003988 |
| 149 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011256–TDIT011268 |
| 150 | Memo - Harneys (H&B) | TDIT004274–TDIT004278 |
| 151 | Invoice - G.K. Management Limited | TDIT011038–TDIT011039 |
| 152 | Invoice - G.K. Management Limited | TDIT011040 |
| 153 | Invoice - G.K. Management Limited | TDIT011041 |
| 154 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011058–TDIT011062 |
| 155 | Certificate of Incorporation - Highland Kansas City Foundation, Inc. | TDIT003304–TDIT003306 |
| 156 | Certificate of Incorporation - Highland Dallas Foundation, Inc. | TDIT003326–TDIT003328 |
| 157 | Certificate of Incorporation - Highland Santa Barbara Foundation, Inc. | TDIT003344–TDIT003346 |
| 158 | Invoice - G.K. Management Limited | TDIT011042–TDIT011043 |
| 159 | Invoice - G.K. Management Limited | TDIT011044–TDIT011045 |
| 160 | Invoice - G.K. Management Limited | TDIT011046–TDIT011047 |
| 161 | Invoice - G.K. Management Limited | TDIT011048–TDIT011049 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 162 | Invoice - G.K. Management Limited | TDIT011050–TDIT011051 |
| 163 | Invoice - G.K. Management Limited | TDIT011052–TDIT011053 |
| 164 | Invoice - G.K. Management Limited | TDIT011054–TDIT011055 |
| 165 | Expense Reimbursement - G.K. Management Limited | TDIT011056–TDIT011057 |
| 166 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011088–TDIT011092 |
| 167 | Memorandum – Work Plan - Shields Legal Group | TDIT004699–TDIT004706 |
| 168 | Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT011093–TDIT011128 |
| 169 | Email - Shields Legal Group | TDIT003704 |
| 170 | Limited Partnership Agreement - Charitable DAF Fund, LP | TDIT003414–TDIT003431 |
| 171 | ValueScope Report - ValueScope, Inc. | TDIT004017–TDIT004075 |
| 172 | Expense Report - CLO HoldCo, Ltd. | TDIT003432–TDIT003435 |
| 173 | Audited Financial Statements - Highland Santa Barbara Foundation, Inc. | TDIT003989–TDIT004016 |
| 174 | Resolution of the Directors - Mark Patrick | TDIT003961–TDIT003962 |
| 175 | Resolution of the Directors - Mark Patrick | TDIT003963–TDIT003970 |
| 176 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011129–TDIT011136 |
| 177 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011137–TDIT011150 |
| 178 | Letter - Highland Dallas Foundation, Inc. | TDIT003707–TDIT003708 |
| 179 | Email - Paul Murphy | TDIT003709–TDIT003713 |
| 180 | Email - Walkers | TDIT003714–TDIT003719 |
| 181 | Certificate of Incorporation - DFW Charitable Foundation | TDIT003701–TDIT003703 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 182 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011151–TDIT011164 |
| 183 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011165–TDIT011170 |
| 184 | Resolution - Charitable DAF HoldCo, Ltd. | TDIT003720–TDIT003726 |
| 185 | Assignment - Charitable DAF HoldCo, Ltd. | TDIT003727–TDIT003732 |
| 186 | Agreement - CDMCFAD, LLC | TDIT003733–TDIT003760 |
| 187 | Email - David N. Corkern | TDIT003791–TDIT003792 |
| 188 | ValueScope Report - ValueScope, LLC | TDIT004076–TDIT004130 |
| 189 | Draft Legal Advice - Walkers | TDIT003761–TDIT003765 |
| 190 | Share Issuance Resolution - Charitable DAF HoldCo, Ltd. | TDIT003766–TDIT003790 |
| 191 | Email - PricewaterhouseCoopers (PwC) | TDIT004305–TDIT004323 |
| 192 | Memorandum and Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT003267–TDIT003303 |
| 193 | Form ADV - Rand Advisors, LLC | TDIT003646–TDIT003674 |
| 194 | Brochure - Rand Advisors, LLC | TDIT003675–TDIT003700 |
| 195 | Email - Mark Patrick | TDIT004324–TDIT004340 |
| 196 | ValueScope Report - ValueScope, LLC | TDIT004131–TDIT004205 |
| 197 | Email - FTI Consulting | TDIT004341–TDIT004358 |
| 198 | Director Services Agreement - CDMCFAD, LLC | TDIT011171–TDIT011185 |
| 199 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003955–TDIT003957 |
| 200 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003958–TDIT003959 |
| 201 | Prospectus - NexPoint Real Estate Strategies Fund | TDIT003463–TDIT003599 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 202 | Proxy Statement - NexPoint Capital, Inc. | TDIT003440–TDIT003462 |
| 203 | Written Resolution - CLO HoldCo, Ltd. | TDIT011196–TDIT011197 |
| 204 | Texas Petition - Highland Dallas Foundation, Inc. | TDIT004443–TDIT004688 |
| 205 | Rule 11 Agreement - Highland Dallas Foundation, Inc. | TDIT004693–TDIT004695 |
| 206 | Exhibit Index to Affidavit - Margot MacInnis | TDIT003261-TDIT004712 |
| 207 | Affidavit - Jim Dondero Dugaboy Investment Trust | TDIT004713-TDIT004778 |
| 208 | Texas Petition (Amended) - Highland Dallas Foundation, Inc. | TDIT006527–TDIT006580 |
| 209 | Liquidator's Certificate - Margot MacInnis (JOL) | TDIT006492 |
| 210 | Form ADV - Mark Patrick, Rand PE Fund | TDIT006581-TDIT006609 |
| 211 | Affidavit & Exhibit Index - Margot MacInnis | TDIT004967-TDIT006484 |
| 212 | Affidavit & Exhibit Index | TDIT006485-TDIT006580 |
| 213 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011394-TDIT011405 |
| 214 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011382-TDIT011393 |
| 215 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011425-TDIT011443 |
| 216 | Objection filed by Highland Dallas Foundation, Inc. Grant James Scott III | TDIT011444-TDIT011475 |
| 217 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011476-TDIT011509 |
| 218 | Supplemental Declaration - DFW Charitable Foundation CDMCFAD LLC | TDIT004869-TDIT004945 |
| 219 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) | TDIT006664-TDIT006675 |
| 220 | Affirmation by Mark Patrick | TDIT010529-TDIT010532 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 221 | Operating agreement between Highland Dallas Foundation, Inc. and The Dallas Foundation. | TDIT011406-TDIT011406 |
| 222 | Email exchange between Michael Stockham and Paul Murphy | TDIT010831-TDIT010840 |
| 223 | Form ADV Instructions - None | TDIT006628-TDIT006663 |
| 224 | Declaration by Caroline Maron | TDIT004846-TDIT004868 |
| 225 | Email from Louis M. Phillips requesting execution of two letters with attached documents | TDIT011318-TDIT011323 |
| 226 | Auditor's Report - Highland Capital Management L.P. | TDIT006610-TDIT006627 |
| 227 | Email chain from March 2025 | TDIT011407-TDIT011424 |
| 228 | Amended and Restated Limited Partnership Agreement - Atlas IDF LP | TDIT004779-TDIT004812 |
| 229 | Participation Agreement establishes the framework for Crown Global Life Insurance Ltd to purchase | TDIT004813-TDIT004845 |
| 230 | Investment Management Agreement - Rand PE Fund I | TDIT004946-TDIT004952 |
| 231 | Investment Management Agreement - Rand PE Fund I, L.P. | TDIT004953-TDIT004959 |
| 232 | Limited Partnership Agreement - Rand PE Fund | TDIT004960-TDIT004966 |
| 233 | By-Laws - Highland Kansas City Foundation, Inc. | TDIT003307–TDIT003325 |
| 234 | By-Laws - Highland Dallas Foundation, Inc. | TDIT003329–TDIT003343 |
| 235 | By-Laws - Highland Santa Barbara Foundation, Inc. | TDIT003347–TDIT003361 |
| 236 | Organizational Procedures - Greater Kansas City Community Foundation | TDIT003362–TDIT003388 |
| 237 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003705 |
| 238 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003706 |
| 239 | Expenses Table - Charitable DAF HoldCo, Ltd. | TDIT003960 |
| 240 | Delaware Division of Corporations Search Results - DFW Charitable Foundation | TDIT004696 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 241 | Delaware Division of Corporations Search Results - CDMCFAD, LLC | TDIT004697 |
| 242 | Demonstrative: DAF-Rand Structure Chart | |
| 243 | Certificate of Incorporation of CDH GP, Ltd. | Dkt. 4-95 (25-11376-BLS) |

Dugaboy also reserves the right to introduce any exhibit designated by any other party, to supplement and/or amend its Exhibit List, to introduce any rebuttal exhibits, and to not use any such exhibits during the evidentiary hearing in response to the circumstances of the hearing.

Dated: May 11, 2026

Respectfully submitted,

*/s/ Avery Joseph Welker*
Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)

New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 11, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*<u>/s/ Avery Joseph Welker</u>*
Avery Joseph Welker

# EXHIBIT 23

**Empower Dallas Foundation, Inc.**
**3963 Maple Avenue, Suite 390**
**Dallas, Texas 75219**

October 15, 2019

Crown Global Life Insurance (Cayman) Ltd.
Attn: Suzanne Reynolds
Suite 3206A, 2nd Floor, 45 Market Street, P.O. Box 10467
Camana Bay, Grand Cayman KY1-1004, Cayman Islands

RE: Deferred Variable Annuity Policy, Policy # 30218 (the "Policy")

Dear Ms. Reynolds:

Empower Dallas Foundation, Inc. (the "Foundation") is the policyholder and sole beneficiary of the above-referenced Policy. Pursuant to Article VIII of the Policy, the Foundation hereby requests a Partial Surrender (as defined in the Policy) in the amount of $625,000. In accordance with Section 8.1 of the Policy, the Foundation's Board of Directors have approved this request for a Partial Surrender pursuant to the resolutions attached hereto.

The wiring instructions for the Foundation are as follows:

Nexbank
ABA# 311973208
Acct #

Please let the undersigned know if there is additional information the Foundation needs to provide with respect to this Partial Surrender request. Thank you for your assistance in this matter.

Sincerely,

Matthew J. Randazzo
Vice President

Enclosure

# EMPOWER DALLAS FOUNDATION, INC.

## Unanimous Written Consent of Directors In Lieu of Meeting

THE UNDERSIGNED, being all of the directors of Empower Dallas Foundation, Inc. ("Foundation"), a Delaware nonprofit nonstock corporation, do hereby consent to the adoption of, and do hereby adopt, the following resolutions pursuant to Section 141(f) of the General Corporation Law of the State of Delaware, and hereby direct that this Written Consent be filed with the minutes of the proceedings of the Board of Directors of the Foundation, effective as of October 15, 2019 ("Effective Date"):

WHEREAS, the Foundation is the policyholder and sole beneficiary of that certain Deferred Variable Annuity Policy, Policy Number 30218 (the "Policy"), issued by Crown Global Life Insurance Ltd., a Bermuda exempted company ("Crown");

WHEREAS, the Board of Directors desire to have the Foundation request a partial surrender of the Policy in the amount of $625,000 ("Partial Surrender Request");

NOW, THEREFORE, be it hereby

RESOLVED, that the Board of Directors of the Foundation hereby approve the issuance of the Partial Surrender Request to Crown pursuant to Article VIII of the Policy;

FURTHER RESOLVED, that the officers of the Foundation are hereby authorized to execute and deliver such documents, and to take such other actions, as are appropriate to implement the purposes of the foregoing resolution, with such additional terms and conditions, consistent therewith, as may be approved by such officers; and

FURTHER RESOLVED, that this Written Consent may be validly executed by electronic means to the fullest extent permitted by Delaware law.

IN WITNESS WHEREOF, the undersigned, being all of the directors of the Foundation, have caused this Unanimous Written Consent to be executed as of the Effective Date.

[remainder of page intentionally left blank]

Grant Scott

Helen Holman

Matthew J. Randazzo

Grant Scott

Helen Holman

Matthew J. Randazzo

# EXHIBIT 24

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 22, 2021**

**United States Bankruptcy Judge**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| Debtor. | ) | |

**ORDER (I) CONFIRMING THE FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P. (AS MODIFIED) AND (II) GRANTING RELATED RELIEF**

The Bankruptcy Court[2] having:

a. entered, on November 24, 2020, the *Order (A) Approving the Adequacy of the Disclosure Statement, (B) Scheduling A Hearing to Confirm the Fifth Amended Plan of Reorganization (C) Establishing Deadline for Filing Objections to Confirmation of Plan, (D) Approving Form of Ballots, Voting Deadline and Solicitation Procedures, and (E) Approving Form and Manner of Notice* [Docket No. 1476] (the "Disclosure Statement Order"), pursuant to which the Bankruptcy Court approved the adequacy of the *Disclosure Statement Relating to the Fifth*

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Plan (as defined below). The rules of interpretation set forth in Article I of the Plan apply to this Confirmation Order.

*Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1473] (the "Disclosure Statement") under section 1125 of the Bankruptcy Code and authorized solicitation of the Disclosure Statement;

b. set January 5, 2021, at 5:00 p.m. prevailing Central Time (the "Objection Deadline"), as the deadline for filing objections to confirmation of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (*As Modified*) [Docket No. 1808] (as amended, supplemented or modified, the "Plan");

c. set January 5, 2021, at 5:00 p.m. prevailing Central Time, as the deadline for voting on the Plan (the "Voting Deadline") in accordance with the Disclosure Statement Order;

d. initially set January 13, 2021, at 9:30 a.m. prevailing Central Time, as the date and time to commence the hearing to consider confirmation of the Plan pursuant to Bankruptcy Rules 3017 and 3018, sections 1126, 1128, and 1129 of the Bankruptcy Code, and the Disclosure Statement Order, which hearing was continued to January 26, 2021, at 9:30 a.m. prevailing Central Time and further continued to February 2, 2021;

e. reviewed: (i) the Plan; (ii) the Disclosure Statement; and (iii) *Notice of (I) Entry of Order Approving Disclosure Statement; (II) Hearing to Confirm; and (III) Related Important Dates* (the "Confirmation Hearing Notice"), the form of which is attached as Exhibit 1-B to the Disclosure Statement Order;

f. reviewed: (i) the *Debtor's Notice of Filing of Plan Supplement for the Third Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1389] filed November 13, 2020; (ii) *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1606] filed on December 18, 2020; (iii) the *Debtor's Notice of Filing of Plan Supplement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1656] filed on January 4, 2021; (iv) *Notice of Filing Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with Technical Modifications)t* dated January 22, 2021 [Docket No. 1811]; and (v) *Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland of Highland Capital Management, L.P. (As Modified)* on February 1, 2021 [Docket No. 1875]; (collectively, the documents listed in (i) through (v) of this paragraph, the "Plan Supplements");

g. reviewed: (i) the *Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on December 30, 2020 [Docket No. 1648]; (ii) the *Second Notice of (I) Executory Contracts and*

*Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 11, 2021 [Docket No.1719]; (iii) the *Third Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, if Any, and (III) Related Procedures in Connection Therewith* filed on January 15, 2021 [Docket No. 1749]; (iv) the *Notice of Withdrawal of Certain Executory Contracts and Unexpired Leases from List of Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan* [Docket No. 1791]; (v) the *Fourth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on January 27, 2021 [Docket No. 1847]; (vi) the *Notice of Hearing on Agreed Motion to (I) Assume Nonresidential Real Property Lease with Crescent TC Investors, L.P. Upon Confirmation of Plan and (II) Extend Assumption Deadline* filed on January 28, 2021 [Docket No. 1857]; and (vii) the *Fifth Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtor Pursuant to the Fifth Amended Plan (II) Cure Amounts, if Any, and (III) Released Procedures in Connection Therewith* filed on February 1, 2021 [Docket No. 1873] (collectively, the documents referred to in (i) to (vii) are referred to as "List of Assumed Contracts");

h. reviewed: (i) the *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1814] (the "Confirmation Brief"); (ii) the *Debtor's Omnibus Reply to Objections to Confirmation of the Fifth Amended Chapter 11 Plan of Reorganization of Highland Capital Management*; [Docket No. 1807]; and (iii) the *Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1772] and *Supplemental Certification of Patrick M. Leathem With Respect to the Tabulation of Votes on the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1887] filed on February 3, 2021 (together, the "Voting Certifications").

i. reviewed: (i) the *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505]; (ii) the *Certificate of Service* dated December 23, 2020 [Docket No. 1630]; (iii) the *Supplemental Certificate of Service* dated December 24, 2020 [Docket No. 1637]; (iv) the *Second Supplemental Certificate of Service* dated December 31, 2020 [Docket No. 1653]; (v) the *Certificate of Service* dated December 23, 2020 [Docket No. 1627]; (vi) the *Certificate of Service* dated January 6, 2021 [Docket No. 1696]; (vii) the *Certificate of Service* dated January 7, 2021 [Docket No. 1699]; (viii) the *Certificate of Service* dated January 7, 2021 [Docket No 1700]; (ix) the *Certificate of Service* dated January 15, 2021 [Docket No. 1761]; (x) the *Certificate of Service* dated January 19, 2021 [Docket No. 1775]; (xi) the

*Certificate of Service* dated January 20, 2021 [Docket No. 1787]; (xii) the *Certificate of Service* dated January 26, 2021[Docket No. 1844]; (xiii) the *Certificate of Service* dated January 27, 2021 [Docket No. 1854]; (xiv) the *Certificate of Service* dated February 1, 2021 [Docket No. 1879]; (xv) the *Certificates of Service* dated February 3, 2021 [Docket No. 1891 and 1893]; and (xvi) the *Certificates of Service* dated February 5, 2021 [Docket Nos. 1906, 1907, 1908 and 1909] (collectively, the "Affidavits of Service and Publication");

j. reviewed all filed[3] pleadings, exhibits, statements, and comments regarding approval of the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights;

k. conducted a hearing to consider confirmation of the Plan, which commenced on February 2, 2021, at 9:30 a.m. prevailing Central Time and concluded on February 3, 2021, and issued its oral ruling on February 8, 2021 (collectively, the "Confirmation Hearing);

l. heard the statements and arguments made by counsel in respect of confirmation of the Plan and having considered the record of this Chapter 11 Case and taken judicial notice of all papers and pleadings filed in this Chapter 11 Case; and

m. considered all oral representations, testimony, documents, filings, and other evidence regarding confirmation of the Plan, including (a) all of the exhibits admitted into evidence;[4] (b) the sworn testimony of (i) James P. Seery, Jr., the Debtor's Chief Executive Officer and Chief Restructuring Officer and a member of the Board of Directors of Strand Advisors, Inc. ("Strand"), the Debtor's general partner; (ii) John S. Dubel, a member of the Board of Strand; (iii) Marc Tauber, a Vice President at Aon Financial Services; and (iv) Robert Jason Post, the Chief Compliance Officer of NexPoint Advisors, LP (collectively, the "Witnesses"); (c) the credibility of the Witnesses; and (d) the Voting Certifications.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor, the Bankruptcy Court hereby makes and issues the following findings of fact and conclusions of law:

[3] Unless otherwise indicated, use of the term "filed" herein refers also to the service of the applicable document filed on the docket in this Chapter 11 Case, as applicable.

[4] The Court admitted the following exhibits into evidence: (a) all of the Debtor's exhibits lodged at Docket No. 1822 (except TTTTT, which was withdrawn by the Debtor); (b) all of the Debtor's exhibits lodged at Docket No. 1866; (c) all of the Debtor's exhibits lodged at Docket No. 1877; (d) all of the Debtor's exhibits lodged at Docket No. 1895; and (e) Exhibits 6-12 and 15-17 offered by Mr. James Dondero and lodged at Docket No. 1874.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1. **Findings of Fact and Conclusions of Law.** The findings and conclusions set forth herein, together with the findings of fact and conclusions of law set forth in the record during the Confirmation Hearing, constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

2. **Introduction and Summary of the Plan.** Prior to addressing the specific requirements under the Bankruptcy Code and Bankruptcy Rules with respect to the confirmation of the Plan, the Bankruptcy Court believes it would be useful to first provide the following background of the Debtor's Chapter 11 Case, the parties involved therewith, and some of the major events that have transpired culminating in the filing and solicitation of the Plan of this very unusual case. Before the Bankruptcy Court is the *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, filed on November 24, 2020, as modified on January 22, 2021 and again on February 1, 2021. The parties have repeatedly referred to the Plan as an "asset monetization plan" because it involves the orderly wind-down of the Debtor's estate, including the sale of assets and certain of its funds over time, with the Reorganized Debtor continuing to manage certain other funds, subject to the oversight of the Claimant Trust Oversight Board. The Plan provides for a Claimant Trust to, among other things, manage and monetize the Claimant Trust Assets for the benefit of the Debtor's economic stakeholders. The Claimant Trustee is responsible

for this process, among other duties specified in the Plan's Claimant Trust Agreement. There is also anticipated to be a Litigation Sub-trust established for the purpose of pursuing certain avoidance or other causes of action for the benefit of the Debtor's economic constituents.

3. **Confirmation Requirements Satisfied.** The Plan is supported by the Committee and all claimants with Convenience Claims (*i.e.*, general unsecured claims under $1 million) who voted in Class 7. Claimants with Class 8 General Unsecured Claims, however, voted to reject the Plan because, although the Plan was accepted by 99.8% of the amount of Claims in that class, only 17 claimants voted to accept the Plan while 27 claimants voted to reject the Plan. As a result of such votes, and because Mr. Dondero and the Dondero Related Entities (as defined below) objected to the Plan on a variety of grounds primarily relating to the Plan's release, exculpation and injunction provisions, the Bankruptcy Court heard two full days of evidence on February 2 and 3, 2021, and considered testimony from five witnesses and thousands of pages of documentary evidence in determining whether the Plan satisfies the confirmation standards required under the Bankruptcy Code. The Bankruptcy Court finds and concludes that the Plan meets all of the relevant requirements of sections 1123, 1124, and 1129, and other applicable provisions of the Bankruptcy Code, as more fully set forth below with respect to each of the applicable confirmation requirements.

4. **Not Your Garden Variety Debtor**. The Debtor's case is not a garden variety chapter 11 case. The Debtor is a multibillion-dollar global investment adviser registered with the SEC, pursuant to the Investment Advisers Act of 1940. It was founded in 1993 by James Dondero and Mark Okada. Mark Okada resigned from his role with Highland prior to the

bankruptcy case being filed on October 16, 2019 (the "Petition Date"). Mr. Dondero controlled the Debtor as of the Petition Date but agreed to relinquish control of it on or about January 9, 2020, pursuant to an agreement reached with the Committee, as described below. Although Mr. Dondero remained with the Debtor as an unpaid employee/portfolio manager after January 9, 2020, his employment with the Debtor terminated on October 9, 2020. Mr. Dondero continues to work for and/or control numerous non-debtor entities in the complex Highland enterprise.

5. **The Debtor**. The Debtor is headquartered in Dallas, Texas. As of the Petition Date, the Debtor employed approximately 76 employees. The Debtor is privately-owned: (a) 99.5% by the Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment Trust, a trust created to manage the assets of Mr. Dondero and his family; (c) 0.0627% by Mark Okada, personally and through family trusts; and (d) 0.25% by Strand, the Debtor's general partner.

6. **The Highland Enterprise.** Pursuant to various contractual arrangements, the Debtor provides money management and advisory services for billions of dollars of assets, including collateralized loan obligation vehicles ("CLOs"), and other investments. Some of these assets are managed by the Debtor pursuant to shared services agreements with certain affiliated entities, including other affiliated registered investment advisors. In fact, there are approximately 2,000 entities in the byzantine complex of entities under the Highland umbrella. None of these affiliated entities filed for chapter 11 protection. Most, but not all, of these entities are not subsidiaries (direct or indirect) of the Debtor. Many of the Debtor's affiliated companies are

offshore entities, organized in jurisdictions such as the Cayman Islands and Guernsey. *See* Disclosure Statement, at 17-18.

7. **Debtor's Operational History.** The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates. For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course, primarily through a brokerage account at Jefferies, LLC. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and cause those proceeds to be distributed to the Debtor in the ordinary course of business. The Debtor's current Chief Executive Officer, James P. Seery, Jr., credibly testified at the Confirmation Hearing that the Debtor was "run at a deficit for a long time and then would sell assets or defer employee compensation to cover its deficits." The Bankruptcy Court cannot help but wonder if that was necessitated because of enormous litigation fees and expenses incurred by the Debtor due to its culture of litigation—as further addressed below.

8. **Not Your Garden Variety Creditor's Committee**. The Debtor and this chapter 11 case are not garden variety for so many reasons. One of the most obvious standouts in this case is the creditor constituency. The Debtor did not file for bankruptcy because of any of the typical reasons that large companies file chapter 11. For example, the Debtor did not have a large, asset-based secured lender with whom it was in default; it only had relatively insignificant secured indebtedness owing to Jeffries, with whom it had a brokerage account, and one other entity, Frontier State Bank. The Debtor also did not have problems with its trade vendors or landlords.

The Debtor also did not suffer any type of catastrophic business calamity. In fact, the Debtor filed for Chapter 11 protection six months before the onset of the COVID-19 pandemic. Rather, the Debtor filed for Chapter 11 protection due to a myriad of massive, unrelated, business litigation claims that it faced—many of which had finally become liquidated (or were about to become liquidated) after a decade or more of contentious litigation in multiple forums all over the world. The Committee in this case has referred to the Debtor—under its former chief executive, Mr. Dondero—as a "serial litigator." The Bankruptcy Court agrees with that description. By way of example, the members of the Committee (and their history of litigation with the Debtor and others in the Highland complex) are as follows:

a. **The Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee")**. This Committee member obtained an arbitration award against the Debtor in the amount of $190,824,557, inclusive of interest, approximately five months before the Petition Date, from a panel of the American Arbitration Association. It was on the verge of having that award confirmed by the Delaware Chancery Court immediately prior to the Petition Date, after years of disputes that started in late 2008 (and included legal proceedings in Bermuda). This creditor's claim was settled during this Chapter 11 Case in the amount of approximately $137,696,610 (subject to other adjustments and details not relevant for this purpose).

b. **Acis Capital Management, L.P., and Acis Capital Management GP, LLC ("Acis")**. Acis was formerly in the Highland complex of companies, but was not affiliated with Highland as of the Petition Date. This Committee member and its now-owner, Joshua Terry, were involved in litigation with the Debtor dating back to 2016. Acis was forced by Mr. Terry (who was a former Highland portfolio manager) into an involuntary chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Texas, Dallas Division before the Bankruptcy Court in 2018, after Mr. Terry obtained an approximately $8 million arbitration award and judgment against Acis. Mr. Terry ultimately was awarded the equity ownership of Acis by the Bankruptcy Court in the Acis bankruptcy case. Acis subsequently asserted a multi-million dollar claim against Highland in the Bankruptcy Court for Highland's alleged denuding of Acis to defraud its creditors—primarily Mr. Terry. The litigation involving Acis and Mr. Terry dates back to mid-2016 and has

continued on with numerous appeals of Bankruptcy Court orders, including one appeal still pending at the Fifth Circuit Court of Appeals. There was also litigation involving Mr. Terry and Acis in the Royal Court of the Island of Guernsey and in a state court in New York. The Acis claim was settled during this Chapter 11 Case, in Bankruptcy Court-ordered mediation, for approximately $23 million (subject to other details not relevant for this purpose), and is the subject of an appeal being pursued by Mr. Dondero.

c. **UBS Securities LLC and UBS AG London Branch ("UBS").** UBS is a Committee member that filed a proof of claim in the amount of $1,039,957,799.40 in this Chapter 11 Case. The UBS Claim was based on a judgment that UBS received from a New York state court in 2020. The underlying decision was issued in November 2019, after a multi-week bench trial (which had occurred many months earlier) on a breach of contract claim against non-Debtor entities in the Highland complex. The UBS litigation related to activities that occurred in 2008 and 2009. The litigation involving UBS and Highland and affiliates was pending for more than a decade (there having been numerous interlocutory appeals during its history). The Debtor and UBS recently announced an agreement in principle for a settlement of the UBS claim (which came a few months after Bankruptcy Court-ordered mediation) which will be subject to a 9019 motion to be filed with the Bankruptcy Court on a future date.

d. **Meta-E Discovery ("Meta-E")**. Meta-E is a Committee member that is a vendor who happened to supply litigation and discovery-related services to the Debtor over the years. It had unpaid invoices on the Petition Date of more than $779,000.

It is fair to say that the members of the Committee in this case all have wills of steel. They fought hard before and during this Chapter 11 Case. The members of the Committee, all of whom have volunteered to serve on the Claimant Trust Oversight Board post-confirmation, are highly sophisticated and have had highly sophisticated professionals representing them. They have represented their constituency in this case as fiduciaries extremely well.

9. **Other Key Creditor Constituents.** In addition to the Committee members who were all embroiled in years of litigation with Debtor and its affiliates in various ways, the Debtor has been in litigation with Patrick Daugherty, a former limited partner and employee of the Debtor, for many years in both Delaware and Texas state courts. Mr. Daugherty filed an amended

proof of claim in this Chapter 11 Case for $40,710,819.42 relating to alleged breaches of employment-related agreements and for defamation arising from a 2017 press release posted by the Debtor. The Debtor and Mr. Daugherty recently announced a settlement of Mr. Daugherty's claim pursuant to which he will receive $750,000 in cash on the Effective Date of the Plan, an $8.25 million general unsecured claim, and a $2.75 million subordinated claim (subject to other details not relevant for this purpose). Additionally, entities collectively known as "HarbourVest" invested more than $70 million with an entity in the Highland complex and asserted a $300 million proof of claim against the Debtor in this case, alleging, among other things, fraud and RICO violations. HarbourVest's claim was settled during the bankruptcy case for a $45 million general unsecured claim and a $35 million subordinated claim, and that settlement is also being appealed by a Dondero Entity.

10. **Other Claims Asserted.** Other than the Claims just described, most of the other Claims in this Chapter 11 Case are Claims asserted against the Debtor by: (a) entities in the Highland complex—most of which entities the Bankruptcy Court finds to be controlled by Mr. Dondero; (b) employees who contend that are entitled to large bonuses or other types of deferred compensation; and (c) numerous law firms that worked for the Debtor prior to the Petition Date and had outstanding amounts due for their prepetition services.

11. **Not Your Garden Variety Post-Petition Corporate Governance Structure**. Yet another reason this is not your garden variety chapter 11 case is its post-petition corporate governance structure. Immediately from its appointment, the Committee's relationship with the Debtor was contentious at best. First, the Committee moved for a change of venue from

Delaware to Dallas. Second, the Committee (and later, the United States Trustee) expressed its then-desire for the appointment of a chapter 11 trustee due to its concerns over and distrust of Mr. Dondero, his numerous conflicts of interest, and his history of alleged mismanagement (and perhaps worse).

12. **Post-Petition Corporate Governance Settlement with Committee.** After spending many weeks under the threat of the potential appointment of a trustee, the Debtor and Committee engaged in substantial and lengthy negotiations resulting in a corporate governance settlement approved by the Bankruptcy Court on January 9, 2020.[5] As a result of this settlement, among other things, Mr. Dondero relinquished control of the Debtor and resigned his positions as an officer or director of the Debtor and its general partner, Strand. As noted above, Mr. Dondero agreed to this settlement pursuant a stipulation he executed,[6] and he also agreed not to cause any Related Entity (as defined in the Settlement Motion) to terminate any agreements with the Debtor. The January 9 Order also (a) required that the Bankruptcy Court serve as "gatekeeper" prior to the commencement of any litigation against the three independent board members appointed to oversee and lead the Debtor's restructuring in lieu of Mr. Dondero and (b) provided for the exculpation of those board members by limiting claims subject to the "gatekeeper" provision to those alleging willful misconduct and gross negligence.

---

[5] This order is hereinafter referred to as the "January 9 Order" and was entered by the Court on January 9, 2020 [Docket No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").

[6] *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Docket No. 338] (the "Stipulation").

13. **Appointment of Independent Directors.** As part of the Bankruptcy Court-approved settlement, three eminently qualified independent directors were chosen to lead Highland through its Chapter 11 Case. They are: James P. Seery, Jr., John S. Dubel (each chosen by the Committee), and Retired Bankruptcy Judge Russell Nelms. These three individuals are each technically independent directors of Strand (Mr. Dondero had previously been the sole director of Strand and, thus, the sole person in ultimate control of the Debtor). The three independent board members' resumes are in evidence. The Bankruptcy Court later approved Mr. Seery's appointment as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative. Suffice it to say that this settlement and the appointment of the independent directors changed the entire trajectory of the case and saved the Debtor from the appointment of a trustee. The Bankruptcy Court and the Committee each trusted the independent directors. They were the right solution at the right time. Because of the unique character of the Debtor's business, the Bankruptcy Court believed the appointment of three qualified independent directors was a far better outcome for creditors than the appointment of a conventional chapter 11 trustee. Each of the independent directors brought unique qualities to the table. Mr. Seery, in particular, knew and had vast experience at prominent firms with high-yield and distressed investing similar to the Debtor's business. Mr. Dubel had 40 years of experience restructuring large complex businesses and serving on boards in this context. And Retired Judge Nelms had not only vast bankruptcy experience but seemed particularly well-suited to help the Debtor maneuver through conflicts and ethical quandaries. By way of comparison, in the chapter 11 case of Acis, the former affiliate of Highland that the Bankruptcy Court presided over and which company was

much smaller in size and scope than Highland (managing only 5-6 CLOs), the creditors elected a chapter 11 trustee who was not on the normal trustee rotation panel in this district but, rather, was a nationally known bankruptcy attorney with more than 45 years of large chapter 11 experience. While the Acis chapter 11 trustee performed valiantly, he was sued by entities in the Highland complex shortly after he was appointed (which the Bankruptcy Court had to address). The Acis trustee was also unable to persuade the Debtor and its affiliates to agree to any actions taken in the case, and he finally obtained confirmation of Acis' chapter 11 plan over the objections of the Debtor and its affiliates on his fourth attempt (which confirmation was promptly appealed).

14. **Conditions Required by Independent Directors.** Given the experiences in Acis and the Debtor's culture of constant litigation, it was not as easy to get such highly qualified persons to serve as independent board members and, later, as the Debtor's Chief Executive Officer, as it would be in an ordinary chapter 11 case. The independent board members were stepping into a morass of problems. Naturally, they were worried about getting sued no matter how defensible their efforts—given the litigation culture that enveloped Highland historically. Based on the record of this Case and the proceedings in the Acis chapter 11 case, it seemed as though everything always ended in litigation at Highland. The Bankruptcy Court heard credible testimony that none of the independent directors would have taken on the role of independent director without (1) an adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification from Strand that would be guaranteed by the Debtor; (3) exculpation for mere negligence claims; and (4) a gatekeeper provision prohibiting the commencement of litigation against the independent directors without the Bankruptcy Court's prior authority. This gatekeeper provision was also

included in the Bankruptcy Court's order authorizing the appointment of Mr. Seery as the Debtor's Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative entered on July 16, 2020.[7] The gatekeeper provisions in both the January 9 Order and July 16 Order are precisely analogous to what bankruptcy trustees have pursuant to the so-called "Barton Doctrine" (first articulated in an old Supreme Court case captioned *Barton v. Barbour,* 104 U.S. 126 (1881)). The Bankruptcy Court approved all of these protections in the January 9 Order and the July 16 Order, and no one appealed either of those orders. As noted above, Mr. Dondero signed the Stipulation that led to the settlement that was approved by the January 9 Order. The Bankruptcy Court finds that, like the Committee, the independent board members have been resilient and unwavering in their efforts to get the enormous problems in this case solved. They seem to have at all times negotiated hard and in good faith, which culminated in the proposal of the Plan currently before the Bankruptcy Court. As noted previously, they completely changed the trajectory of this case.

15. **Not Your Garden Variety Mediators.** And still another reason why this was not your garden variety case was the mediation effort. In the summer of 2020, roughly nine months into the chapter 11 case, the Bankruptcy Court ordered mediation among the Debtor, Acis, UBS, the Redeemer Committee, and Mr. Dondero. The Bankruptcy Court selected co-mediators because mediation among these parties seemed like such a Herculean task—especially during COVID-19 where people could not all be in the same room. Those co-mediators were: Retired

[7] *See Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 (the "July 16 Order")

Bankruptcy Judge Alan Gropper from the Southern District of New York, who had a distinguished career presiding over complex chapter 11 cases, and Ms. Sylvia Mayer, who likewise has had a distinguished career, first as a partner at a preeminent law firm working on complex chapter 11 cases, and subsequently as a mediator and arbitrator in Houston, Texas. As noted earlier, the Redeemer Committee and Acis claims were settled during the mediation—which seemed nothing short of a miracle to the Bankruptcy Court—and the UBS claim was settled several months later and the Bankruptcy Court believes the ground work for that ultimate settlement was laid, or at least helped, through the mediation. And, as earlier noted, other significant claims have been settled during this case, including those of HarbourVest (who asserted a $300 million claim) and Patrick Daugherty (who asserted a $40 million claim). The Bankruptcy Court cannot stress strongly enough that the resolution of these enormous claims—and the acceptance by all of these creditors of the Plan that is now before the Bankruptcy Court—seems nothing short of a miracle. It was more than a year in the making.

16. **Not Your Garden Variety Plan Objectors (That Is, Those That Remain)**. Finally, a word about the current, remaining objectors to the Plan before the Bankruptcy Court. Once again, the Bankruptcy Court will use the phrase "not your garden variety", which phrase applies to this case for many reasons. Originally, there were over a dozen objections filed to the Plan. The Debtor then made certain amendments or modifications to the Plan to address some of these objections, none of which require further solicitation of the Plan for reasons set forth in more detail below. The only objectors to the Plan left at the time of the Confirmation Hearing

were Mr. Dondero [Docket No. 1661] and entities that the Bankruptcy Court finds are owned and/or controlled by him and that filed the following objections:

a. *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* (filed by Get Good Trust and The Dugaboy Investment Trust) [Docket No. 1667];

b. *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670];

c. A *Joinder to the Objection filed at 1670 by: NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing* [Docket No. 1677];

d. *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673]; and

e. *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676]. The entities referred to in (i) through (v) of this paragraph are hereinafter referred to as the "Dondero Related Entities").

17. **Questionability of Good Faith as to Outstanding Confirmation Objections.** Mr. Dondero and the Dondero Related Entities technically have standing to object to the Plan, but the remoteness of their economic interests is noteworthy, and the Bankruptcy Court

questions the good faith of Mr. Dondero's and the Dondero Related Entities' objections. In fact, the Bankruptcy Court has good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors. Mr. Dondero wants his company back. This is understandable, but it is not a good faith basis to lob objections to the Plan. As detailed below, the Bankruptcy Court has slowed down plan confirmation multiple times and urged the parties to talk to Mr. Dondero in an attempt to arrive at what the parties have repeatedly referred to as a "grand bargain," the ultimate goal to resolve the Debtor's restructuring. The Debtor and the Committee represent that they have communicated with Mr. Dondero regarding a grand bargain settlement, and the Bankruptcy Court believes that they have.

18. **Remote Interest of Outstanding Confirmation Objectors.** To be specific about the remoteness of Mr. Dondero's and the Dondero Related Entities' interests, the Bankruptcy Court will address them each separately. First, Mr. Dondero has a pending objection to the Plan. Mr. Dondero's only economic interest with regard to the Debtor is an unliquidated indemnification claim (and, based on everything the Bankruptcy Court has heard, his indemnification claims would be highly questionable at this juncture). Mr. Dondero owns no equity in the Debtor directly. Mr. Dondero owns the Debtor's general partner, Strand, which in turn owns a quarter percent of the total equity in the Debtor. Second, a joint objection has been filed by The Dugaboy Trust ("Dugaboy") and the Get Good Trust ("Get Good"). The Dugaboy Trust was created to manage the assets of Mr. Dondero and his family and owns a 0.1866% limited partnership interest in the Debtor. *See* Disclosure Statement at 7, n.3. The Bankruptcy Court is not clear what economic interest the Get Good Trust has, but it likewise seems to be related to Mr. Dondero. Get Good

filed three proofs of claim relating to a pending federal tax audit of the Debtor's 2008 return, which the Debtor believes arise from Get Good's equity security interests and are subject to subordination as set forth in its Confirmation Brief. Dugaboy filed three claims against the Debtor: (a) an administrative claim relating to the Debtor's alleged postpetition management of Multi-Strat Credit Fund, L.P., (b) a prepetition claim against a subsidiary of the Debtor for which it seeks to pierce the corporate veil, each of which the Debtor maintains are frivolous in the Confirmation Brief, and (c) a claim arising from its equity security interest in the Debtor, which the Debtor asserts should be subordinated. Another group of objectors that has joined together in one objection is what the Bankruptcy Court will refer to as the "Highland Advisors and Funds." *See* Docket No. 1863. The Bankruptcy Court understands they assert disputed administrative expense claims against the estate that were filed shortly before the Confirmation Hearing on January 23, 2021 [Docket No. 1826], and during the Confirmation Hearing on February 3, 2021 [Docket No. 1888]. At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and Funds that the Funds have independent board members that run the Funds, but the Bankruptcy Court was not convinced of their independence from Mr. Dondero because none of the so-called independent board members have ever testified before the Bankruptcy Court and all have been engaged with the Highland complex for many years. Notably, the Court questions Mr. Post's credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request, and he is currently employed by Mr. Dondero. Moreover, Dustin Norris, a witness in a prior proceeding (whose testimony was made part of the record at the Confirmation Hearing), recently

testified on behalf of the Highland Advisors and Funds in another proceeding that Mr. Dondero owned and/or controlled these entities. Finally, various NexBank entities objected to the Plan. The Bankruptcy Court does not believe they have liquidated claims against the Debtor. Mr. Dondero appears to be in control of these entities as well.

19. **Background Regarding Dondero Objecting Parties.** To be clear, the Bankruptcy Court has allowed all these objectors to fully present arguments and evidence in opposition to confirmation, even though their economic interests in the Debtor appear to be extremely remote and the Bankruptcy Court questions their good faith. Specifically, the Bankruptcy Court considers them all to be marching pursuant to the orders of Mr. Dondero. In the recent past, Mr. Dondero has been subject to a temporary restraining order and preliminary injunction by the Bankruptcy Court for interfering with Mr. Seery's management of the Debtor in specific ways that were supported by evidence. Around the time that this all came to light and the Bankruptcy Court began setting hearings on the alleged interference, Mr. Dondero's company phone, which he had been asked to turn in to Highland, mysteriously went missing. The Bankruptcy Court merely mentions this in this context as one of many reasons that the Bankruptcy Court has to question the good faith of Mr. Dondero and his affiliates in raising objections to confirmation of the Plan.

20. **Other Confirmation Objections.** Other than the objections filed by Mr. Dondero and the Dondero Related Entities, the only other pending objection to the Plan is the *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671], which objected to the Plan's exculpation, injunction, and

Debtor release provisions. In juxtaposition, to these pending objections, the Bankruptcy Court notes that the Debtor resolved the following objections to the Plan:

a. *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph VV of the Confirmation Order;

b. *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph QQ of the Confirmation Order;

c. *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraph 82 and paragraphs RR and SS of the Confirmation Order;

d. *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666] and the amended joinder filed by Davis Deadman, Paul Kauffman and Todd Travers [Docket No. 1679]. This Objection and the amended joinder were resolved by agreement of the parties pursuant to modifications to the Plan filed by the Debtor;

e. *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668]. This Objection has been resolved pursuant to mutually agreed language by the parties set forth in paragraphs TT and UU of the Confirmation Order; and

f. *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678]. This objection was resolved by the parties pursuant to the settlement of Mr. Daugherty's claim announced on the record of the Confirmation Hearing.

21. **Capitalized Terms.** Capitalized terms used herein, but not defined herein, shall have the respective meanings attributed to such terms in the Plan and the Disclosure Statement, as applicable.

22. **Jurisdiction and Venue.** The Bankruptcy Court has jurisdiction over the Debtor's Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Chapter 11 Case is proper in this district and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

23. **Chapter 11 Petition.** On the Petition Date, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, which case was transferred to the Bankruptcy Court on December 19, 2019. The Debtor continues to operate its business and manage its property as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this Chapter 11 Case. The Office of the United States Trustee appointed the Committee on October 29, 2019.

24. **Judicial Notice.** The Bankruptcy Court takes judicial notice of the docket in this Chapter 11 Case maintained by the clerk of the Bankruptcy Court and the court-appointed claims agent, Kurtzman Carson Consultants LLC ("KCC"), including, without limitation, all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at the hearings held before the Bankruptcy Court during this Chapter 11 Case, including, without limitation, the hearing to consider the adequacy of the Disclosure Statement and the Confirmation Hearing, as well as all pleadings, notices, and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings held before the Bankruptcy Court or the District Court for the Northern District of Texas in

connection with an adversary proceeding or appellate proceeding, respectively, related to this Chapter 11 Case.

25. **Plan Supplement Documents.** Prior to the Confirmation Hearing, the Debtor filed each of the Plan Supplements. The Plan Supplements contain, among other documents, the Retained Causes of Action, the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Senior Employee Stipulation, the Related Entity List, the Schedule of Employees, the Reorganized Limited Partnership Agreement, supplements to the Liquidation Analysis/Financial Projections, the Schedule of Contracts and Leases to be Assumed, and the other Plan Documents set forth therein (collectively, the "Plan Supplement Documents").

26. **Retained Causes of Action Adequately Preserved.** The Bankruptcy Court finds that the list of Retained Causes of Action included in the Plan Supplements sufficiently describes all potential Retained Causes of Action, provides all persons with adequate notice of any Causes of Action regardless of whether any specific claim to be brought in the future is listed therein or whether any specific potential defendant or other party is listed therein, and satisfies applicable law in all respects to preserve all of the Retained Causes of Action. The definition of the Causes of Action and Schedule of Retained Causes of Action, and their inclusion in the Plan, specifically and unequivocally preserve the Causes of Action for the benefit of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust, as applicable.

27. **Plan Modifications Are Non-Material.** In addition to the Plan Supplements, the Debtor made certain non-material modifications to the Plan, which are reflected in (i) the *Redline of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*

*(as Modified)* filed on January 22, 2021 [Docket No. 1809], and (ii) Exhibit B to the *Debtor's Notice of Filing of Plan Supplement to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* filed on February 1, 2021 [Docket No. 1875] (collectively, the "Plan Modifications"). Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation so long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code. None of the modifications set forth in the Plan Supplements or the Plan Modifications require any further solicitation pursuant to sections 1125, 1126, or 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, because, among other things, they do not materially adversely change the treatment of the claims of any creditors or interest holders who have not accepted, in writing, such supplements and modifications. Among other things, there were changes to the projections that the Debtor filed shortly before the Confirmation Hearing (which included projected distributions to creditors and a comparison of projected distributions under the Plan to potential distributions under a hypothetical chapter 7 liquidation). The Plan Supplements and Plan Modifications did not mislead or prejudice any creditors or interest holders nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast votes to accept or reject the Plan. Specifically, the Amended Liquidation Analysis/Financial Projections filed on February 1, 2021 [Docket No. 1875] do not constitute any material adverse change to the treatment of any creditors or interest holders but, rather, simply update the estimated distributions based on Claims that were settled in the interim and provide updated financial data. The filing and notice of the Plan Supplements and Plan Modifications were appropriate and complied with the requirements of

section 1127(a) of the Bankruptcy Code and the Bankruptcy Rules, and no other solicitation or disclosure or further notice is or shall be required. The Plan Supplements and Plan Modifications each became part of the Plan pursuant section 1127(a) of the Bankruptcy Code. The Debtor or Reorganized Debtor, as applicable, is authorized to modify the Plan or Plan Supplement Documents following entry of this Confirmation Order in a manner consistent with section 1127(b) of the Bankruptcy Code, the Plan, and, if applicable, the terms of the applicable Plan Supplement Document.

28. **Notice of Transmittal, Mailing and Publication of Materials.** As is evidenced by the Voting Certifications and the Affidavits of Service and Publication, the transmittal and service of the Plan, the Disclosure Statement, Ballots, and Confirmation Hearing Notice were adequate and sufficient under the circumstances, and all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to the confirmation of the Plan) have been given due, proper, timely, and adequate notice in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law, and such parties have had an opportunity to appear and be heard with respect thereto. No other or further notice is required. The publication of the Confirmation Hearing Notice, as set forth in the *Notice of Affidavit of Publication* dated December 3, 2020 [Docket No. 1505], complied with the Disclosure Statement Order.

29. **Voting.** The Bankruptcy Court has reviewed and considered the Voting Certifications. The procedures by which the Ballots for acceptance or rejection of the Plan were

distributed and tabulated, including the tabulation as subsequently amended to reflect the settlement of certain Claims to be Allowed in Class 7, were fairly and properly conducted and complied with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

30. **Bankruptcy Rule 3016(a).** In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtor as the proponent of the Plan.

31. **Plan Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).** As set forth below, the Plan complies with all of the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

32. **Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).** Section 1122 of the Bankruptcy Code provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interest of such class. The Claims and Equity Interests placed in each Class are substantially similar to other Claims and Equity Interests, as the case may be, in each such Class. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between Holders of Claims and Equity Interests.

33. **Classification of Secured Claims.** Class 1 (Jefferies Secured Claim) and Class 2 (Frontier Secured Claim) each constitute separate secured claims held by Jefferies LLC and Frontier State Bank, respectively, and it is proper and consistent with section 1122 of the Bankruptcy Code to separately classify the claims of these secured creditors. Class 3 (Other

Secured Claims) consists of other secured claims (to the extent any exist) against the Debtor, are not substantially similar to the Secured Claims in Class 1 or Class 2, and are also properly separately classified.

34. **Classification of Priority Claims.** Class 4 (Priority Non-Tax Claims) consists of Claims entitled to priority under section 507(a), other than Priority Tax Claims, and are properly separately classified from non-priority unsecured claims. Class 5 (Retained Employee Claims) consists of the potential claims of employees who may be retained by the Debtor on the Effective Date, which claims will be Reinstated under the Plan, are not substantially similar to other Claims against the Debtor, and are properly classified.

35. **Classification of Unsecured Claims.** Class 6 (PTO Claims) consists solely of the claims of the Debtor's employees for unpaid paid time off in excess of the $13,650 statutory cap amount under sections 507(a)(4) and (a)(5) of the Bankruptcy Code and are dissimilar from other unsecured claims in Class 7 and Class 8. Class 7 (Convenience Claims) allows holders of eligible and liquidated Claims (below a certain threshold dollar amount) to receive a cash payout of the lesser of 85% of the Allowed amount of the creditor's Claim or such holder's *pro rata* share of the Convenience Claims Cash Pool. Class 7 (Convenience Claims) are provided for administrative convenience purposes in order to allow creditors, most of whom are either trade creditors or holders of professional claims, to receive treatment provided under Class 7 in lieu of the treatment of Class 8 (General Unsecured Claims). The Plan also provides for reciprocal "opt out" mechanisms to allow holders of Class 7 Claims to elect to receive the treatment for Class 8 Claims. Class 8 creditors primarily constitute the litigation claims of the Debtor. Class 8 Creditors

will receive Claimant Trust Interests which will be satisfied pursuant to the terms of the Plan. Class 8 also contains an "opt out" mechanism to allow holders of liquidated Class 8 Claims at or below a $1 million threshold to elect to receive the treatment of Class 7 Convenience Claims. The Claims in Class 7 (primarily trade and professional Claims against the Debtor) are not substantially similar to the Claims in Class 8 (primarily the litigation Claims against the Debtor), and are appropriately separately classified. Valid business reasons also exist to classify creditors in Class 7 separately from creditors in Class 8. Class 7 creditors largely consist of liquidated trade or service providers to the Debtor. In addition, the Claims of Class 7 creditors are small relative to the large litigation claims in Class 8. Furthermore, the Class 8 Claims were overwhelmingly unliquidated when the Plan was filed. The nature of the Class 7 Claims as being largely liquidated created an expectation of expedited payment relative to the largely unliquidated Claims in Class 8, which consists in large part of parties who have been engaged in years, and in some cases over a decade of litigation with the Debtor. Separate classification of Class 7 and Class 8 creditors was the subject of substantial arm's-length negotiations between the Debtor and the Committee to appropriately reflect these relative differences.

36. **Classification of Equity Interests.** The Plan properly separately classifies the Equity Interests in Class 10 (Class B/C Limited Partnership Interests) from the Equity Interests in Class 11 (Class A Limited Partnership Interests) because they represent different types of equity security interests in the Debtor and different payment priorities.

37. **Elimination of Vacant Classes.** Section III.C of the Plan provides for the elimination of Classes that do not have at least one holder of a Claim or Equity Interest that is

Allowed in an amount greater than zero for purposes of voting to accept or reject the Plan, and are disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class. The purpose of this provision is to provide that a Class that does not have voting members shall not be included in the tabulation of whether that Class has accepted or rejected the Plan. Pursuant to the Voting Certifications, the only voting Class of Claims or Equity Interests that did not have any members is Class 5 (Retained Employees). As noted above, Class 5 does not have any voting members because any potential Claims in Class 5 would not arise, except on account of any current employees of the Debtor who may be employed as of the Effective Date, which is currently unknown. Thus, the elimination of vacant Classes provided in Article III.C of the Plan does not violate section 1122 of the Bankruptcy Code. Class 5 is properly disregarded for purposes of determining whether or not the Plan has been accepted under Bankruptcy Code section 1129(a)(8) because there are no members in that Class. However, the Plan properly provides for the treatment of any Claims that may potentially become members of Class 5 as of the Effective Date in accordance with the terms of the Plan. The Plan therefore satisfies section 1122 of the Bankruptcy Code.

38. **Classification of Claims and Designation of Non-Classified Claims (11 U.S.C. §§ 1122, 1123(a)(1)).** Section 1123(a)(1) of the Bankruptcy Code requires that the Plan specify the classification of claims and equity security interests pursuant to section 1122 of the Bankruptcy Code, other than claims specified in sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code. In addition to Administrative Claims, Professional Fee Claims, and Priority Tax Claims, each of which need not be classified pursuant to section 1123(a)(1) of the Bankruptcy

Code, the Plan designates eleven (11) Classes of Claims and Equity Interests. The Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

39. **Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2)).** Article III of the Plan specifies that each of Class 1 (Jefferies Secured Claim), Class 3 (Other Secured Claims), Class 4 (Priority Non-Tax Claims), Class 5 (Retained Employee Claims), and Class 6 (PTO Claims) are Unimpaired under the Plan. Thus, the requirement of section 1123(a)(2) of the Bankruptcy Code is satisfied.

40. **Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)).** Article III of the Plan designates each of Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), Class 8 (General Unsecured Claims), Class 9 (Subordinated Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) as Impaired and specifies the treatment of Claims and Equity Interests in such Classes. Thus, the requirement of section 1123(a)(3) of the Bankruptcy Code is satisfied.

41. **No Discrimination (11 U.S.C. § 1123(a)(4)).** The Plan provides for the same treatment by the Plan proponent for each Claim or Equity Interest in each respective Class unless the Holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest. The Plan satisfies this requirement because Holders of Allowed Claims or Equity Interests in each Class will receive the same rights and treatment as other Holders of Allowed Claims or Equity Interests within such holder's respective class, subject only to the voluntary "opt out" options afforded to members of Class 7 and Class 8 in accordance with the terms of the Plan. Thus, the requirement of section 1123(a)(4) of the Bankruptcy Code is satisfied.

42. **Implementation of the Plan (11 U.S.C. § 1123(a)(5)).** Article IV of the Plan sets forth the means for implementation of the Plan which includes, but is not limited to, the establishment of: (i) the Claimant Trust; (ii) the Litigation Sub-Trust; (iii) the Reorganized Debtor; and (iv) New GP LLC, in the manner set forth in the Plan Documents, the forms of which are included in the Plan Supplements.

a. **The Claimant Trust.** The Claimant Trust Agreement provides for the management of the Claimant Trust, as well as the Reorganized Debtor with the Claimant Trust serving as the managing member of New GP LLC (a wholly-owned subsidiary of the Claimant Trust that will manage the Reorganized Debtor as its general partner). The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will all be managed and overseen by the Claimant Trust Oversight Committee. Additionally, the Plan provides for the transfer to the Claimant Trust of all of the Debtor's rights, title, and interest in and to all of the Claimant Trust Assets in accordance with section 1141 of the Bankruptcy Code and for the Claimant Trust Assets to automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement. The Claimant Trust will administer the Claimant Trust Assets as provided under the Plan and the Claimant Trust Agreement contained in the Plan Supplements.

b. **The Litigation Sub-Trust.** The Plan and the Litigation Sub-Trust Agreement provide for the transfer to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims (as transferred to the Claimant Trust by the Debtor) in accordance with section 1141 of the Bankruptcy Code and for the Estate Claims to automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and the Litigation Sub-Trust Expenses, as provided for in the Litigation Sub-Trust Agreement. The Litigation Trustee is charged with investigating, pursuing, and otherwise resolving any Estate Claims (including those with respect to which the Committee has standing to pursue prior to the Effective Date pursuant to the January 9 Order) pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, regardless of whether any litigation with respect to any Estate Claim was commenced by the Debtor or the Committee prior to the Effective Date.

c. **The Reorganized Debtor**. The Reorganized Debtor will administer the Reorganized Debtor Assets, which includes managing the wind down of the Managed Funds.

The precise terms governing the execution of these restructuring transactions are set forth in greater detail in the applicable definitive documents included in the Plan Supplements, including the Claimant Trust Agreement, the Litigation Sub-Trust Agreement, and the Schedule of Retained Causes of Action. The Plan, together with the documents and forms of agreement included in the Plan Supplements, provides a detailed blueprint for the transactions contemplated by the Plan. The Plan's various mechanisms provide for the Debtor's continued management of its business as it seeks to liquidate the Debtor's assets, wind down its affairs, and pay the Claims of the Debtor's creditors. Upon full payment of Allowed Claims, plus interest as provided in the Plan, any residual value would then flow to the holders of Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests). Finally, Mr. Seery testified that the Debtor engaged in substantial and arm's length negotiations with the Committee regarding the Debtor's post-Effective Date corporate governance, as reflected in the Plan. Mr. Seery testified that he believes the selection of the Claimant Trustee, Litigation Trustee, and members of the Claimant Trust Oversight Board are in the best interests of the Debtor's economic constituents. Thus, the requirements of section 1123(a)(5) of the Bankruptcy Code are satisfied.

43. **Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)).** The Debtor is not a corporation and the charter documents filed in the Plan Supplements otherwise comply with section 1123(a)(6) of the Bankruptcy Code. Therefore, the requirement of section 1123(a)(6) of the Bankruptcy Code is satisfied.

44. **Selection of Officers and Directors (11 U.S.C. § 1123(a)(7)).** Article IV of the Plan provides for the Claimant Trust to be governed and administered by the Claimant Trustee. The Claimant Trust, the management of the Reorganized Debtor, and the management and monetization of the Claimant Trust Assets and the Litigation Sub-Trust will be managed by the Claimant Trust Oversight Board. The Claimant Trust Oversight Board will consist of: (1) Eric Felton, as representative of the Redeemer Committee; (2) Joshua Terry, as representative of Acis; (3) Elizabeth Kozlowski, as representative of UBS; (4) Paul McVoy, as representative of Meta-E Discovery; and (5) David Pauker. Four of the members of the Claimant Trust Oversight Committee are the holders of several of the largest Claims against the Debtor and/or are current members of the Committee. Each of these creditors has actively participated in the Debtor's case, both through their fiduciary roles as Committee members and in their individual capacities as creditors. They are therefore intimately familiar with the Debtor, its business, and assets. The fifth member of the Claimant Trustee Oversight Board, David Pauker, is a disinterested restructuring advisor and turnaround manager with more than 25 years of experience advising public and private companies and their investors, and he has substantial experience overseeing, advising or investigating troubled companies in the financial services industry and has advised or managed such companies on behalf of boards or directors, court-appointed trustees, examiners and special masters, government agencies, and private investor parties. The members of the Claimant Trust Oversight Board will serve without compensation, except for Mr. Pauker, who will receive payment of $250,000 for his first year of service, and $150,000 for subsequent years.

45. **Selection of Trustees.** The Plan Supplements disclose that Mr. Seery will serve as the Claimant Trustee and Marc Kirschner will serve as the Litigation Trustee. As noted above, Mr. Seery has served as an Independent Board member since January 2020, and as the Chief Executive Officer and Chief Restructuring Officer since July 2020, and he has extensive management and restructuring experience, as evidenced from his curriculum vitae which is part of the record. The evidence shows that Mr. Seery is intimately familiar with the Debtor's organizational structure, business, and assets, as well as how Claims will be treated under the Plan. Accordingly, it is reasonable and in the Estate's best interests to continue Mr. Seery's employment post-emergence as the Claimant Trustee. Mr. Seery, upon consultation with the Committee, testified that he intends to employ approximately 10 of the Debtor's employees to enable him to manage the Debtor's business until the Claimant Trust effectively monetizes its remaining assets, instead of hiring a sub-servicer to accomplish those tasks. Mr. Seery testified that he believes that the Debtor's post-confirmation business can most efficiently and cost-effectively be supported by a sub-set of the Debtor's current employees, who will be managed internally. Mr. Seery shall initially be paid $150,000 per month for services rendered after the Effective Date as Claimant Trustee; however, Mr. Seery's long-term salary as Claimant Trustee and the terms of any bonuses and severance are subject to further negotiation by Mr. Seery and the Claimant Trust Oversight Board within forty-five (45) days after the Effective Date. The Bankruptcy Court has also reviewed Mr. Kirschner's curriculum vitae. Mr. Kirschner has been practicing law since 1967 and has substantial experience in bankruptcy litigation matters, particularly with respect to his prior experience as a litigation trustee for several litigation trusts, as set forth on the record of the

Confirmation Hearing and in the Confirmation Brief. Mr. Kirschner shall be paid $40,000 per month for the first three months and $20,000 per month thereafter, plus a success fee related to litigation recoveries. The Committee and the Debtor had arm's lengths negotiations regarding the post-Effective Date corporate governance structure of the Reorganized Debtor and believe that the selection of the Claimant Trustee, the Litigation Trustee, and the Claimant Trust Oversight Committee are in the best interests of the Debtor's economic stakeholders. Section 1123(a)(7) of the Bankruptcy Code is satisfied.

46. **Debtor's Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).** Pursuant to section 1129(a)(2) of the Bankruptcy Code, the Debtor has complied with the applicable provisions of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, and 1126 of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order governing notice, disclosure, and solicitation in connection with the Plan, the Disclosure Statement, the Plan Supplements, and all other matters considered by the Bankruptcy Court in connection with this Chapter 11 Case.

47. **Debtor's Solicitation Complied with Bankruptcy Code and Disclosure Statement Order.** Before the Debtor solicited votes on the Plan, the Bankruptcy Court entered the Disclosure Statement Order. In accordance with the Disclosure Statement Order and evidenced by the Affidavits of Service and Publication, the Debtor appropriately served (i) the Solicitation Packages (as defined in the Disclosure Statement Order) on the Holders of Claims in Classes 2, 7, 8 and 9 and Holders of Equity Interests in Classes 10 and 11 who were entitled to vote on the Plan; and (ii) the Notice of Nonvoting Status (as defined in the Disclosure Statement Order) and the

Confirmation Hearing Notice to the Holders of Claims in Classes 1, 3, 4, 5 and 6, who were not entitled to vote on the Plan pursuant to the Disclosure Statement Order. The Disclosure Statement Order approved the contents of the Solicitation Packages provided to Holders of Claims and Equity Interests entitled to vote on the Plan, the notices provided to parties not entitled to vote on the Plan, and the deadlines for voting on and objecting to the Plan. The Debtor and KCC each complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code, as evidenced by the Affidavits of Service and Publication. The Debtor also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class. The Debtor caused the same Disclosure Statement to be transmitted to all holders of Claims and Equity Interests entitled to vote on the Plan. The Debtor has complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order. The Bankruptcy Court rejects the arguments of the Mr. Dondero and certain Dondero Related Entities that the changes made to certain assumptions and projections from the Liquidation Analysis annexed as Exhibit C to the Disclosure Statement (the "Liquidation Analysis") to the Amended Liquidation Analysis/Financial Projections require resolicitation of the Plan. The Bankruptcy Court heard credible testimony from Mr. Seery regarding the changes to the Liquidation Analysis as reflected in the Amended Liquidation Analysis/Financial Projections. Based on the record, including the testimony of Mr. Seery, the Bankruptcy Court finds that the changes between the Liquidation Analysis and the Amended Liquidation Analysis/Financial Projections do not constitute materially adverse change to the treatment of Claims or Equity

Interests. Instead, the changes served to update the projected distributions based on Claims that were settled after the approval of the Disclosure Statement and to otherwise incorporate more recent financial data. Such changes were entirely foreseeable given the large amount of unliquidated Claims at the time the Disclosure Statement was approved and the nature of the Debtor's assets. The Bankruptcy Court therefore finds that holders of Claims and Equity Interests were not misled or prejudiced by the Amended Liquidation Analysis/Financial Projections and the Plan does not need to be resolicited.

48. **Plan Proposed in Good Faith and Not by Means Forbidden by Law (11 U.S.C. § 1129(a)(3)).** The Debtor has proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code. In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of this Chapter 11 Case, the Plan itself, and the extensive, unrebutted testimony of Mr. Seery in which he described the process leading to Plan's formulation. Based on the totality of the circumstances and Mr. Seery's testimony, the Bankruptcy Court finds that the Plan is the result of extensive arm's-length negotiations among the Debtor, the Committee, and key stakeholders, and promotes the objectives and purposes of the Bankruptcy Code. Specifically, the Debtor's good faith in proposing the Plan is supported by the following facts adduced by Mr. Seery:

a. The Independent Board determined that it should consider all potential restructuring alternatives, including pursuit of a traditional restructuring and the continuation of the Debtor's business, a potential sale of the Debtor's assets in one or more transactions, an asset monetization plan similar to that described in the Plan, and a so-called "grand bargain" plan that would involve Mr. Dondero's sponsorship of a plan with a substantial equity infusion.

b. The Debtor subsequently engaged in arm's-length, good faith negotiations with the Committee over an asset monetization Plan commencing in June 2020, which negotiations occurred over the next several months.

c. Negotiations between the Debtor and the Committee were often contentious over disputes, including, but not limited to, the post-confirmation corporate governance structure and the scope of releases contemplated by the Plan.

d. While negotiations with the Committee progressed, the Independent Board engaged in discussions with Mr. Dondero regarding a potential "grand bargain" plan which contemplated a significant equity infusion by Mr. Dondero, and which Mr. Seery personally spent hundreds of hours pursuing over many months.

e. On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [Docket No. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation. As a result of this mediation, the Debtor negotiated the settlement of the claims of Acis and Mr. Terry, which the Bankruptcy Court approved on October 28, 2020 [Docket No. 1302].

f. On August 12, 2020, the Debtor filed its *Chapter 11 Plan of* Reorganization *of Highland Capital Management, L.P*. [Docket No. 944] (the "Initial Plan") and related disclosure statement (the "Initial Disclosure Statement") which were not supported by either the Committee or Mr. Dondero. The Independent Board filed the Initial Plan and Initial Disclosure Statement in order to act as a catalyst for continued discussions with the Committee while it simultaneously worked with Mr. Dondero on the "grand bargain" plan.

g. The Bankruptcy Court conducted a contested hearing on the Initial Disclosure Statement on October 27, 2020. The Committee and other parties objected to approval of the Disclosure Statement at the Initial Disclosure Statement hearing, which was eventually continued to November 23, 2020.

h. Following the Initial Disclosure Statement hearing, the Debtor continued to negotiate with the Committee and ultimately resolved the remaining material disputes and led to the Bankruptcy Court's approval of the Disclosure Statement on November 23, 2020.

i. Even after obtaining the Bankruptcy Court's approval of the Disclosure Statement, the Debtor and the Committee continued to negotiate with Mr. Dondero and the Committee over a potential "pot plan" as an alternative to the Plan on file with the Bankruptcy Court, but such efforts were unsuccessful. This history conclusively demonstrates that the Plan is being proposed in good faith within the meaning of section 1129(a)(3).

49. **Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).** Article II.B of the Plan provides that Professionals will file all final requests for payment of Professional Fee Claims no later than 60 days after the Effective Date, thereby providing an adequate period of time for interested parties to review such claims. The procedures set forth in the Plan for the Bankruptcy Court's approval of the fees, costs, and expenses to be paid in connection with this chapter 11 Case, or in connection with the Plan and incident to this Chapter 11 Case, satisfy the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy Code.

50. **Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).** Article IV.B of the Plan provides for the appointment of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee and the members thereto. For the reasons more fully explained in paragraphs 44-45 of this Confirmation Order with respect to the requirement of section 1123(a)(7) of the Bankruptcy Code, the Debtor has disclosed the nature of compensation of any insider to be employed or retained by the Reorganized Debtor, if applicable, and compensation for any such insider. The appointment of such individuals is consistent with the interests of Claims and Equity Interests and with public policy. Thus, the Plan satisfies section 1129(a)(5) of the Bankruptcy Code.

51. **No Rate Changes (11 U.S.C. § 1129(a)(6)).** The Plan does not provide for any rate change that requires regulatory approval. Section 1129(a)(6) of the Bankruptcy Code is thus not applicable.

52. **Best Interests of Creditors (11 U.S.C. § 1129(a)(7)).** The "best interests" test is satisfied as to all Impaired Classes under the Plan, as each Holder of a Claim or Equity Interest in such Impaired Classes will receive or retain property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would so receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. On October 15, 2020, the Debtor filed the Liquidation Analysis [Docket 1173], as prepared by the Debtor with the assistance of its advisors and which was attached as Exhibit C to the Disclosure Statement. On January 29, 2021, in advance of Mr. Seery's deposition in connection with confirmation of the Plan, the Debtor provided an updated version of the Liquidation Analysis to the then-objectors of the Plan, including Mr. Dondero and the Dondero Related Entities. On February 1, 2021, the Debtor filed the Amended Liquidation Analysis/Financial Projections. The Amended Liquidation Analysis/Financial Projections included updates to the Debtor's projected asset values, revenues, and expenses to reflect: (1) the acquisition of an interest in an entity known as "HCLOF" that the Debtor will acquire as part of its court-approved settlement with HarbourVest and that was valued at $22.5 million; (2) an increase in the value of certain of the Debtor's assets due to changes in market conditions and other factors; (3) expected revenues and expenses arising in connection with the Debtor's continued management of the CLOs pursuant to management agreements that the Debtor decided to retain; (4) increases in projected expenses for headcount (in addition to adding two or three employees to assist in the management of the CLOs, the Debtor also increased modestly the projected headcount as a result of its decision not to engage a Sub-Servicer) and professional fees; and (5) an increase in projected recoveries on notes resulting from the

acceleration of term notes owed to the Debtor by the following Dondero Related Entities: NexPoint Advisors, L.P.; Highland Capital Management Services, Inc.; and HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC). Under the Plan, as of the Confirmation Date, (a) Class 7 General Unsecured Creditors are projected to receive 85% on account of their claims; and (b) Class 8 General Unsecured Creditors are projected to receive at least approximately 71% on account of their Claims. Under a hypothetical chapter 7 liquidation, all general unsecured creditors are projected to receive approximately 55% on account of their Claims. The Bankruptcy Court finds that the distributions that Class 7 and 8 General Unsecured Creditors are projected to receive under the Plan substantially exceeds that which they would receive under a chapter 7 liquidation based on Mr. Seery's testimony, including the following credible reasons he posited, among others:

a. The nature of the Debtor's assets is complex. Certain assets relate to complicated real estate structures and private equity investments in operating businesses. Mr. Seery's extensive experience with the Debtor during the thirteen months since his appointment as an Independent Director and later Chief Executive Officer and Chief Restructuring Officer, provides him with a substantial learning curve in connection with the disposition of the Debtor's assets and are reasonably expected to result in him being able to realize tens of millions of dollars more value than would a chapter 7 trustee.

b. Assuming that a hypothetical chapter 7 trustee could even operate the Debtor's business under chapter 7 of the Bankruptcy Code and hire the necessary personnel with the relevant knowledge and experience to assist him or her in selling the Debtor's assets, a chapter 7 trustee would likely seek to dispose of the Debtor's assets in a forced sale liquidation which would generate substantially less value for the Debtor's creditors than the asset monetization plan contemplated by the Plan.

c. A chapter 7 trustee would be unlikely to retain the Debtor's existing professionals to assist in its efforts to monetize assets, resulting in delays, increased expenses, and reduced asset yields for the chapter 7 estate.

d. The chapter 7 estate would be unlikely to maximize value as compared to the asset monetization process contemplated by the Plan because potential buyers are likely to perceive a chapter 7 trustee as engaging in a quick, forced "fire sale" of assets; and

e. The Debtor's employees, who are vital to its efforts to maximum value and recoveries for stakeholders, may be unwilling to provide services to a chapter 7 trustee.

Finally, there is no evidence to support the objectors' argument that the Claimant Trust Agreement's disclaimed liability for ordinary negligence by the Claimant Trustee compared to a chapter 7 trustee's liability has any relevance to creditor recoveries in a hypothetical chapter 7 liquidation. Thus, section 1129(a)(7) of the Bankruptcy Code is satisfied.

53. **Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).** Classes 1, 3, 4, 5 and 6 are Unimpaired under the Plan. Class 2 (Frontier Secured Claim), Class 7 (Convenience Claims), and Class 9 (Subordinated Claims) have each voted to accept the Plan in accordance with the Bankruptcy Code, thereby satisfying section 1129(a)(8) as to those Classes. However, Class 8 (General Unsecured Claims), Class 10 (Class B/C Limited Partnership Interests), and Class 11 (Class A Limited Partnership Interests) have not accepted the Plan. Accordingly, section 1129(a)(8) of the Bankruptcy Code has not been satisfied. The Plan, however, is still confirmable because it satisfies the nonconsensual confirmation provisions of section 1129(b), as set forth below.

54. **Treatment of Administrative, Priority, Priority Tax Claims, and Professional Fee Claims (11 U.S.C. § 1129(a)(9)).** The treatment of Administrative Claims, Priority Claims, and Professional Fee Claims pursuant to Article III of the Plan, and as set forth below with respect to the resolution of the objections filed by the Internal Revenue Service and

certain Texas taxing authorities satisfies the requirements of sections 1129(a)(9) of the Bankruptcy Code.

55. **Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)).** Class 2 (Frontier Secured Claims) and Class 7 (Convenience Claims) are each Impaired Classes of Claims that voted to accept the Plan, determined without including any acceptance of the Plan by any insider. Therefore, the requirement of section 1129(a)(10) of the Bankruptcy Code is satisfied.

56. **Feasibility (11 U.S.C. § 1129(a)(11)).** Article IV of the Plan provides for the implementation of the Plan through the Claimant Trust, the Litigation Sub-Trust, and the Reorganized Debtor. The Plan provides that the Claimant Trust, among other things, will monetize and distribute the Debtor's remaining assets. The Disclosure Statement, the Amended Liquidation Analysis/Financial Projections, and the other evidence presented at the Confirmation Hearing provide a reasonable probability of success that the Debtor will be able to effectuate the provisions of the Plan. The Plan contemplates the establishment of the Claimant Trust upon the Effective Date, which will monetize the Estate's assets for the benefit of creditors. Mr. Seery testified that the Class 2 Frontier Secured Claim will be paid over time pursuant to the terms of the New Frontier Note and the Reorganized Debtor will have sufficient assets to satisfy its obligations under this note. The Claims of the Holders of Class 7 Claims (as well as those Class 8 creditors who validly opted to receive the treatment of Class 7 Claims) are expected to be satisfied shortly after the Effective Date. Holders of Class 8 Claims (including any holders of Class 7 Claims who opted to receive the treatment provided to Class 8 Claims) are not guaranteed any recovery and will

periodically receive pro rata distributions as assets are monetized pursuant to the Plan and the Claimant Trust Agreement. Thus, section 1129(a)(11) of the Bankruptcy Code is satisfied.

57. **Payment of Fees (11 U.S.C. § 1129(a)(12)).** All fees payable under 28 U.S.C. § 1930 have been paid or will be paid on or before the Effective Date pursuant to Article XII.A of the Plan, thus satisfying the requirement of section 1129(a)(12) of the Bankruptcy Code. The Debtor has agreed that the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case.

58. **Retiree Benefits.** The Plan provides for the assumption of the Pension Plan (to the extent such Pension Plan provides "retiree benefits" and is governed by section 1114 of the Bankruptcy Code). Thus, the Plan complies with section 1129(a)(13) of the Bankruptcy Code, to the extent applicable.

59. **Miscellaneous Provisions (11 U.S.C. §§ 1129(a)(14)-(16)).** Sections 1129(a)(14)-(16) of the Bankruptcy Code are inapplicable as the Debtor (i) has no domestic support obligations (section 1129(a)(14)), (ii) is not an individual (section 1129(a)(15)), and (iii) is not a nonprofit corporation (section 1129(a)(16)).

60. **No Unfair Discrimination; Fair and Equitable Treatment (11 U.S.C. § 1129(b)).** The classification and treatment of Claims and Equity Interests in Classes 8, 10 and 11, which have not accepted the Plan, is proper pursuant to section 1122 of the Bankruptcy Code, does

not discriminate unfairly, and is fair and equitable pursuant to section 1129(b)(1) of the Bankruptcy Code.

a. Class 8. The Plan is fair and equitable with respect to Class 8 General Unsecured Claims. While Equity Interests in Class 10 and Class 11 will receive a contingent interest in the Claimant Trust under the Plan (the "Contingent Interests"), the Contingent Interests will not vest unless and until holders of Class 8 General Unsecured Claims and Class 9 Subordinated Claims receive distributions equal to 100% of the amount of their Allowed Claims plus interest as provided under the Plan and Claimant Trust Agreement. Accordingly, as the holders of Equity Interests that are junior to the Claims in Class 8 and Class 9 will not receive or retain under the Plan on account of such junior claim interest any property unless and until the Claims in Class 8 and Class 9 are paid in full plus applicable interest, the Plan is fair and equitable with respect to holders of Class 8 General Unsecured Claims pursuant to section 1129(b)(2)(B) of the Bankruptcy Code and the reasoning of *In re Introgen Therapuetics* 429 B.R 570 (Bankr. W.D. Tex. 2010).

b. Class 10 and Class 11. There are no Claims or Equity Interests junior to the Equity Interests in Class 10 and Class 11. Equity Interests in Class 10 and 11 will neither receive nor retain any property under the Plan unless Allowed Claims in Class 8 and Class 9 are paid in full plus applicable interest pursuant to the terms of the Plan and Claimant Trust Agreement. Thus, the Plan does not violate the absolute priority rule with respect to Classes 10 and 11 pursuant to Bankruptcy Code section 1129(b)(2)(C). The Plan does not discriminate unfairly as to Equity Interests. As noted above, separate classification of the Class B/C Partnership Interests from the Class A Partnerships Interests is appropriate because they constitute different classes of equity security interests in the Debtor, and each are appropriately separately classified and treated.

Accordingly, the Plan does not violate the absolute priority rule, does not discriminate unfairly, and is fair and equitable with respect to each Class that has rejected the Plan. Thus, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 8, 10, and 11.

61. **Only One Plan (11 U.S.C. § 1129(c)).** The Plan is the only chapter 11 plan confirmed in this Chapter 11 Case, and the requirements of section 1129(c) of the Bankruptcy Code are therefore satisfied.

62. **Principal Purpose (11 U.S.C. § 1129(d)).** Mr. Seery testified that the principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of the application of section 5 of the Securities Act of 1933, and no governmental unit has objected to the confirmation of the Plan on any such grounds. Accordingly, section 1129(d) of the Bankruptcy Code is inapplicable.

63. **Satisfaction of Confirmation Requirements.** Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code and should be confirmed.

64. **Good Faith Solicitation (11 U.S.C. § 1125(e)).** The Debtor, the Independent Directors, and the Debtor's employees, advisors, Professionals, and agents have acted in good faith within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules in connection with all of their respective activities relating to the solicitation of acceptances of the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code, and they are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

65. **Discharge (11 U.S.C. § 1141(d)(3)**). The Debtor is entitled to a discharge of debts pursuant to section 1141(d)(3)(B) of the Bankruptcy Code. Under the Plan, the Claimant Trust or Reorganized Debtor, as applicable, will continue to manage funds and conduct business

in the same manner as the Debtor did prior to Plan confirmation, which includes the management of the CLOs, Multi-Strat, Restoration Capital, the Select Fund and the Korea Fund. Although the Plan projects that it will take approximately two years to monetize the Debtor's assets for fair value, Mr. Seery testified that while the Reorganized Debtor and Claimant Trust will be monetizing their assets, there is no specified time frame by which this process must conclude. Mr. Seery's credible testimony demonstrates that the Debtor will continue to engage in business after consummation of the Plan, within the meaning of Section 1141(d)(3)(b) and that the Debtor is entitled to a discharge pursuant to section 1141(d)(1) of the Bankruptcy Code.

66. **Retention of Jurisdiction.** The Bankruptcy Court may properly retain jurisdiction over the matters set forth in Article XI of the Plan and/or section 1142 of the Bankruptcy Code to the maximum extent under applicable law.

67. **Additional Plan Provisions (11 U.S.C. § 1123(b)).** The Plan's provisions are appropriate, in the best interests of the Debtor and its Estate, and consistent with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

68. **Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)).** The Debtor has exercised reasonable business judgment with respect to the rejection of the Executory Contracts and Unexpired Leases pursuant the terms of the Plan and this Confirmation Order, and such rejections are justified and appropriate in this Chapter 11 Case. The Debtor also filed the List of Assumed Contracts, which contain notices to the applicable counterparties to the contracts set forth on Exhibit "FF" to Plan Supplement filed on February 1, 2021 [Docket No. 1875] and which exhibit sets forth the list of executory contracts and unexpired leases to be

assumed by the Debtor pursuant to the Plan (collectively, the "Assumed Contracts"). With respect to the Assumed Contracts, only one party objected to the assumption of any of the Assumed Contracts, but that objection was withdrawn.[8] Any modifications, amendments, supplements, and restatements to the Assumed Contracts that may have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith. Assumption of any Assumed Contract pursuant to the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

69. **Compromises and Settlements Under and in Connection with the Plan (11 U.S.C. § 1123(b)(3)).** All of the settlements and compromises pursuant to and in connection with the Plan, comply with the requirements of section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019.

70. **Debtor Release, Exculpation and Injunctions (11 U.S.C. § 1123(b)).** The Debtor Release, Exculpation, and Injunction provisions provided in the Plan (i) are within the jurisdiction of the Bankruptcy Court under 28 U.S.C. § 1334; (ii) are integral elements of the transactions incorporated into the Plan, and inextricably bound with the other provisions of the Plan; (iii) confer material benefit on, and are in the best interests of, the Debtor, its Estate, and its

---

[8] *See Notice of Withdrawal of James Dondero's Objection Debtor's Proposed Assumption of Contracts and Cure Amounts Proposed in Connection Therewith* [Docket No. 1876]

creditors; (iv) are fair, equitable, and reasonable; (v) are given and made after due notice and opportunity for hearing; (vi) satisfy the requirements of Bankruptcy Rule 9019; and (vii) are consistent with the Bankruptcy Code and other applicable law, and as set forth below.

71. **Debtor Release.** Section IX.D of the Plan provides for the Debtor's release of the Debtor's and Estate's claims against the Released Parties. Releases by a debtor are discretionary and can be provided by a debtor to persons who have provided consideration to the Debtor and its estate pursuant to section 1123(b)(3)(A) of the Bankruptcy Code. Contrary to the objections raised by Mr. Dondero and certain of the Dondero Related Entities, the Debtor Release is appropriately limited to release claims held by the Debtor and does not purport to release the claims held by the Claimant Trust, Litigation Sub-Trust, or other third parties. The Plan does not purport to release any claims held by third parties and the Bankruptcy Court finds that the Debtor Release is not a "disguised" release of any third party claims as asserted by certain objecting parties. The limited scope of the Debtor Release in the Plan was extensively negotiated with the Committee, particularly with the respect to the Debtor's conditional release of claims against employees, as identified in the Plan, and the Plan's conditions and terms of such releases. The Plan does not release (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual

fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction. The Debtor Release also contains conditions to such releases as set forth in Article X.D of the Plan with respect to employees (the "Release Conditions"). Until the an employee satisfies the Release Conditions or the Release Conditions otherwise terminate, any claims against such employee will be tolled so that if the Release Conditions are not met the Litigation Trustee may pursue claims against an employee at a later date. The evidence before the Bankruptcy Court, including, but not limited to Mr. Seery's testimony, demonstrates that the Debtor is not aware of any claims against any of the Released Parties, that the Released Parties have been instrumental in assisting the Debtor's efforts toward confirmation of the Plan and that, therefore, the releases are a *quid pro quo* for the Released Parties' significant contributions to a highly complex and contentious restructuring. The Committee, whose members hold approximately $200 million in claims against the Estate, is highly sophisticated and is represented by highly sophisticated professionals, and has actively and vigorously negotiated the terms of the Debtor Release, which was the subject of significant controversy at the Initial Disclosure Statement hearing held by the Bankruptcy Court on October 27, 2020.

72. **Exculpation.** Section IX.C of the Plan provides for the exculpation of certain Exculpated Parties to the extent provided therein (the "Exculpation Provision"). As explained below, the Exculpation Provision is appropriate under the unique circumstances of this litigious Chapter 11 Case and consistent with applicable Fifth Circuit precedent. First, with respect to the Independent Directors, their agents, and their advisors, including any employees acting at

their direction, the Bankruptcy Court finds and concludes that it has already exculpated these parties for acts other than willful misconduct and gross negligence pursuant to the January 9 Order. The January 9 Order was specifically agreed to by Mr. Dondero, who was in control of the Debtor up until entry of the January 9 Order. The January 9 Order was not appealed. In addition to the appointment of the Independent Directors in an already contentious and litigious case, the January 9 Order set the standard of care for the Independent Directors and specifically exculpated them for negligence. Mr. Seery and Mr. Dubel each testified that they had input into the contents of the January 9 Order and would not have agreed to their appointment as Independent Directors if the January 9 Order did not include the protections set forth in paragraph 10 of the January 9 Order. Paragraph 10 of the January 9 Order (1) requires that parties wishing to sue the Independent Directors or their agents and advisors must first seek approval from the Bankruptcy Court before doing so; (2) sets the standard of care for the Independent Directors during the Chapter 11 Case and exculpated the Independent Directors for acts other than willful misconduct or gross negligence; (3) only permits suits against the Independent Directors to proceed for colorable claims of willful misconduct and gross negligence upon order of the Bankruptcy Court; and (4) does not expire by its terms.

73. **Existing Exculpation of Independent Directors.** The Bankruptcy Court also finds and concludes that it has already exculpated Mr. Seery acting in the capacity as Chief Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order. The Bankruptcy Court concludes its previous approval of the exculpation of the Independent Directors, their agents, advisors and employees working at their direction pursuant to the January 9 Order, and the Chief

Executive Officer and Chief Restructuring Officer pursuant to the July 16 Order constitutes the law of this case and are *res judicata* pursuant to *In re Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir.1987). The January 9 Order and July 16 Order cannot be collaterally attacked based on the objectors' objection to the exculpation of the Independent Directors, their agents, and advisors, including any employees acting at their direction, as well as the Chief Executive Officer and Chief Restructuring Officer, that the Bankruptcy Court already approved pursuant to the January 9 Order and the July 16 Order.

74. **The Exculpation Provision Complies with Applicable Law.** Separate and apart from the *res judicata* effect of the January 9 Order and the July 16 Order, the Bankruptcy Court also finds and concludes that the Exculpation Provision is consistent with applicable law, including *In re Pacific Lumber Co*., 584 F.3d 229 (5th Cir. 2009), for several reasons:

a. First, the statutory basis for *Pacific Lumber's* denial of exculpation for certain parties other than a creditors' committee and its members is that section 524(e) of the Bankruptcy Code "only releases the debtor, not co-liable third parties." *Pacific Lumber*, 253 F.3d. at 253. However, *Pacific Lumber* does not prohibit all exculpations under the Bankruptcy Code and the court in such case specifically approved the exculpations of a creditors' committee and its members on the grounds that "11 U.S.C. § 1103(c), which lists the creditors' committee's powers, implies committee members have qualified immunity for actions within the scope of their duties.... [I]f members of the committee can be sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case, it will be extremely difficult to find members to serve on an official committee." *Pacific Lumber*, 253 F.3d at 253 (quoting Lawrence P. King, et al, Collier on Bankruptcy, ¶ 1103.05[4][b] (15th Ed. 2008]). *Pacific Lumber's* rationale for permitted exculpation of creditors' committees and their members (which was clearly policy-based and based on a creditors' committee qualified immunity flowing from their duties under section 1103(c) of the Bankruptcy Code and their disinterestedness and importance in chapter 11 cases) does not preclude exculpation to other parties in a particular chapter 11 case that perform similar roles to a creditors' committee and its members. The Independent Directors, and by extension the Chief Executive Officer and Chief Restructuring Officer, were not

part of the Debtor's enterprise prior to their appointment by the Bankruptcy Court under the January 9 Order. The Bankruptcy Court appointed the Independent Directors in lieu of a chapter 11 trustee to address what the Bankruptcy Court perceived as serious conflicts of interest and fiduciary duty concerns with the then-existing management prior to January 9, 2020, as identified by the Committee. In addition, the Bankruptcy Court finds that the Independent Directors expected to be exculpated from claims of negligence, and would likely have been unwilling to serve in contentious cases absent exculpation. The uncontroverted testimony of Mr. Seery and Mr. Dubel demonstrates that the Independent Directors would not have agreed to accept their roles without the exculpation and gatekeeper provision in the January 9 Order. Mr. Dubel also testified as to the increasing important role that independent directors are playing in complex chapter 11 restructurings and that unless independent directors could be assured of exculpation for simple negligence in contentious bankruptcy cases they would be reluctant to accept appointment in chapter 11 cases which would adversely affect the chapter 11 restructuring process. The Bankruptcy Court concludes that the Independent Directors were appointed under the January 9 Order in order to avoid the appointment of a chapter 11 trustee and are analogous to a creditors' committee rather than an incumbent board of directors. The Bankruptcy Court also concludes that if independent directors cannot be assured of exculpation for simple negligence in contentious bankruptcy cases, they may not be willing to serve in that capacity. Based upon the foregoing, the Bankruptcy Court concludes that *Pacific Lumber's* policy of exculpating creditors' committees and their members from "being sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case" is applicable to the Independent Directors in this Chapter 11 Case.[9]

b. Second, the Bankruptcy Court also concludes that *Pacific Lumber* does not preclude the exculpation of parties if there is a showing that "costs [that] the released parties might incur defending against such suits alleging such negligence are likely to swamp either the Exculpated Parties or the reorganization." *Pacific Lumbe*r, 584 F.3d at 252. If ever there was a risk of that happening in a chapter 11 reorganization, it is this one. Mr. Seery credibly testified that Mr. Dondero stated outside the courtroom that if Mr. Dondero's pot plan does not get approved, that Mr. Dondero will "burn the place down." The Bankruptcy Court can easily expect that the proposed Exculpated Parties might expect to incur costs that could swamp them and the reorganization based on the prior litigious conduct of Mr. Dondero and his controlled entities that justify their inclusion in the Exculpation Provision.

[9] The same reasoning applies to the inclusion of Strand in the Exculpation Provision because Strand is the general partner of the Debtor through which each of the Independent Board members act.

75. **Injunction.** Section IX.D of the Plan provides for a Plan inunction to implement and enforce the Plan's release, discharge and release provisions (the "Injunction Provision"). The Injunction Provision is necessary to implement the provisions in the Plan. Mr. Seery testified that the Claimant Trustee will monetize the Debtor's assets in order to maximize their value. In order to accomplish this goal, the Claimant Trustee needs to be able to pursue this objective without the interference and harassment of Mr. Dondero and his related entities, including the Dondero Related Entities. Mr. Seery also testified that if the Claimant Trust was subject to interference by Mr. Dondero, it would take additional time to monetize the Debtor's assets and those assets could be monetized for less money to the detriment of the Debtor's creditors. The Bankruptcy Court finds and concludes that the Injunction Provision is consistent with and permissible under Bankruptcy Code sections 1123(a), 1123(a)(6), 1141(a) and (c), and 1142. The Bankruptcy Court rejects assertions by certain objecting parties that the Injunction Provision constitutes a "third-party release." The Injunction Provision is appropriate under the circumstances of this Chapter 11 Case and complies with applicable bankruptcy law. The Bankruptcy Court also concludes that the terms "implementation" and "consummation" are neither vague nor ambiguous

76. **Gatekeeper Provision**. Section IX.F of the Plan contains a provision contained in paragraph AA of this Confirmation Order and which the Debtor has referred to as a gatekeeper provision (the "Gatekeeper Provision"). The Gatekeeper Provision requires that Enjoined Parties first seek approval of the Bankruptcy Court before they may commence an action against Protected Parties. Thereafter, if the Bankruptcy Court determines that the action is

colorable, the Bankruptcy Court may, if it has jurisdiction, adjudicate the action. The Bankruptcy Court finds that the inclusion of the Gatekeeper Provision is critical to the effective and efficient administration, implementation, and consummation of the Plan. The Bankruptcy Court also concludes that the Bankruptcy Court has the statutory authority as set forth below to approve the Gatekeeper Provision.

77. **Factual Support for Gatekeeper Provision.** The facts supporting the need for the Gatekeeper Provision are as follows. As discussed earlier in this Confirmation Order, prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Mr. Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade. Substantially all of the creditors in this case are either parties who were engaged in litigation with the Debtor, parties who represented the Debtor in connection with such litigation and had not been paid, or trade creditors who provided litigation-related services to the Debtor. During the last several months, Mr. Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor. Such litigation includes: (i) entry of a temporary restraining order and preliminary injunction against Mr. Dondero [Adv. Proc. No. 20-03190 Docket No. 10 and 59] because of, among other things, his harassment of Mr. Seery and employees and interference with the Debtor's business operations; (ii) a contempt motion against Mr. Dondero for violation of the temporary restraining order, which motion is still pending before the Bankruptcy Court [Adv. Proc. No. 20-03190 Docket No. 48]; (iii) a motion by Mr. Dondero's controlled investors in certain CLOs managed by the Debtor that the Bankruptcy Court referred to

as frivolous and a waste of the Bankruptcy Court's time [Docket No. 1528] which was denied by the Court [Docket No. 1605]; (iv) multiple plan confirmation objections focused on ensuring the Dondero Related Entities be able to continue their litigation against the Debtor and its successors post-confirmation [Docket Nos. 1661, 1667, 1670, 1673, 1676, 1677 and 1868]; (v) objections to the approval of the Debtor's settlements with Acis and HarbourVest and subsequent appeals of the Bankruptcy Court's order approving each of those settlements [Docket Nos. 1347 and 1870]; and (vi) a complaint and injunction sought against Mr. Dondero's affiliated entities to prevent them from violating the January 9 Order and entry of a restraining order against those entities [Adv Proc. No. 21-03000 Docket No 1] (collectively, the "Dondero Post-Petition Litigation").

78. **Findings Regarding Dondero Post-Petition Litigation.** The Bankruptcy Court finds that the Dondero Post-Petition Litigation was a result of Mr. Dondero failing to obtain creditor support for his plan proposal and consistent with his comments, as set forth in Mr. Seery's credible testimony, that if Mr. Dondero's plan proposal was not accepted, he would "burn down the place." The Bankruptcy Court concludes that without appropriate protections in place, in the form of the Gatekeeper Provision, Mr. Dondero and his related entities will likely commence litigation against the Protected Parties after the Effective Date and do so in jurisdictions other than the Bankruptcy Court in an effort to obtain a forum which Mr. Dondero perceives will be more hospitable to his claims. The Bankruptcy Court also finds, based upon Mr. Seery's testimony, that the threat of continued litigation by Mr, Dondero and his related entities after the Effective Date will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result

in lower distributions to creditors because of costs and distraction such litigation or the threats of such litigation would cause.

79. **Necessity of Gatekeeper Provision.** The Bankruptcy Court further finds that unless the Bankruptcy Court approves the Gatekeeper Provision, the Claimant Trustee and the Claimant Trust Oversight Board will not be able to obtain D&O insurance, the absence of which will present unacceptable risks to parties currently willing to serve in such roles. The Bankruptcy Court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("AON"), regarding his efforts to obtain D&O insurance. Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so without an exclusion for claims asserted by Mr. Dondero and his affiliates otherwise requires that this Order approve the Gatekeeper Provision. Based on the foregoing, the Bankruptcy Court finds that the Gatekeeper Provision is necessary and appropriate in light of the history of the continued litigiousness of Mr. Dondero and his related entities in this Chapter 11 Case and necessary to the effective and efficient administration, implementation and consummation of the Plan and is appropriate pursuant to *Carroll v. Abide (In re Carroll*) 850 F.3d 811 (5th Cir. 2017). Approval of the Gatekeeper Provision will prevent baseless litigation designed merely to harass the post-confirmation entities charged with monetizing the Debtor's assets for the benefit of its economic constituents, will avoid abuse of the court system and preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants. Any suit against a Protected Party would effectively be a suit against the Debtor, and the Debtor may be required to indemnify the Protected

Parties under the Limited Partnership Agreement, which will remain in effect through the Effective Date, or those certain *Indemnification and Guaranty Agreements*, dated January 9, 2020, between Strand, the Debtor, and each Independent Director, following the Confirmation Date as each such agreement will be assumed pursuant to 11 U.S.C. § 365 pursuant to the Plan.

80. **Statutory Authority to Approve Gatekeeper Provision.** The Bankruptcy Court finds it has the statutory authority to approve the Gatekeeper Provision under sections 1123(a)(5), 1123(b)(6), 1141, 1142(b), and 105(a). The Gatekeeper Provision is also within the spirit of the Supreme Court's "Barton Doctrine." *Barton v. Barbour,* 104 U.S. 126 (1881). The Gatekeeper Provision is also consistent with the notion of a prefiling injunction to deter vexatious litigants, that has been approved by the Fifth Circuit in such cases as *Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll,* 850 F.3d 811 (5th Cir. 2017).

81. **Jurisdiction to Implement Gatekeeper Provision.** The Bankruptcy Court finds that it will have jurisdiction after the Effective Date to implement the Gatekeeper Provision as post-confirmation bankruptcy court jurisdiction has been interpreted by the Fifth Circuit under *United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296 (5th Cir. 2002) and *EOP-Colonnade of Dallas Ltd. P'Ship v. Faulkner (In re Stonebridge Techs., Inc.)*, 430 F.3d 260 (5th Cir. 2005). Based upon the rationale of the Fifth Circuit in *Villegas v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015), the Bankruptcy Court's jurisdiction to act as a gatekeeper does not violate *Stern v. Marshall.* The Bankruptcy Court's determination of whether

a claim is colorable, which the Bankruptcy Court has jurisdiction to determine, is distinct from whether the Bankruptcy Court would have jurisdiction to adjudicate any claim it finds colorable.

82. **Resolution of Objections of Scott Ellington and Isaac Leventon**. Each of Scott Ellington ("Mr. Ellington") and Isaac Leventon ("Mr. Leventon") (each, a "Senior Employee Claimant") has asserted certain claims for liquidated but unpaid bonus amounts for the following periods: 2016, 2017, and 2018, as set forth in Exhibit A to that certain *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1669] (the "Senior Employees' Objection") (for each of Mr. Ellington and Mr. Leventon, the "Liquidated Bonus Claims").

a. Mr. Ellington has asserted Liquidated Bonus Claims in the aggregate amount of $1,367,197.00, and Mr. Leventon has asserted Liquidated Bonus Claims in the aggregate amount of $598,198.00. Mr. Ellington received two Ballots[10] – a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan. Mr. Ellington completed and timely returned both of such Ballots, voted to reject the Plan, and elected to have his Class 8 Liquidated Bonus Claims treated under Class 7 of the Plan, subject to the objections and reservations of rights set forth in the Senior Employees' Objection. If Mr. Ellington is permitted to elect Class 7 treatment for his Liquidated Bonus Claims, then the maximum amount of his Liquidated Bonus Claims will be $1,000,000.

b. Mr. Leventon received two Ballots—a Ballot for Class 7 of the Plan and a Ballot for Class 8 of the Plan. Mr. Leventon completed and timely returned both of such Ballots and voted each such Ballots to rejected the Plan.

c. The Senior Employees' Objection, among other things, objects to the Plan on the grounds that the Debtor improperly disputes the right of Mr. Ellington to elect Class 7 treatment for his Liquidated Bonus Claims and Mr. Leventon's entitlement to receive Class 7 Convenience Class treatment for his Liquidated Bonus Claims. The Debtor contended that neither Mr. Ellington or Mr. Leventon were entitled to elect to receive Class 7 Convenience Class treatment on account of their Liquidated

[10] As defined in the Plan, "Ballot" means the forms(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

Bonus Claims under the terms of the Plan, the Disclosure Statement Order or applicable law.

d. The Debtor and Mr. Ellington and Mr. Leventon negotiated at arms' length in an effort to resolve all issues raised in the Senior Employee's Objection, including whether or not Mr. Ellington and Mr. Leventon were entitled to Class 7 Convenience Class treatment of their Liquidated Bonus Claims. As a result of such negotiation, the Debtor, Mr. Ellington, and Mr. Leventon have agreed to the settlement described in paragraphs 82(e) through 82(k) below and approved and effectuated pursuant to decretal paragraphs RR through SS (the "Senior Employees' Settlement").

e. Under the terms of the Senior Employees' Settlement, the Debtor has the right to elect one of two treatments of the Liquidated Bonus Claims for a Senior Employee Claimant. Under the first treatment option ("Option A"), the Liquidated Bonus Claims will be entitled to be treated in Class 7 of the Plan, and the Liquidated Bonus Claims will be entitled to receive payment in an amount equal to 70.125% of the Class 7 amount of the Liquidated Bonus Claims, subject to the Liquidated Bonus Claims becoming Allowed Claims under the terms of the Plan. Under this calculation, Mr. Ellington would be entitled to receive $701,250.00 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan, and Mr. Leventon would be entitled to receive $413,175.10 on account of his Class 7 Convenience Class Claim when and as Allowed under the Plan. If, however, any party in interest objects to the allowance of the Senior Employee Claimant's Liquidated Bonus Claims and does not prevail in such objection, then such Senior Employee Claimant will be entitled to a payment in an amount equal to 85% of his Allowed Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed on Class 7 Claims). In addition, under Option A, each of Mr. Ellington and Mr. Leventon would retain their respective rights to assert that the Liquidated Bonus Claims are entitled to be treated as Administrative Expense Claims, as defined in Article I.B.2. of the Plan, in which case the holder of such Liquidated Bonus Claims would be entitled to payment in full of the Allowed Liquidated Bonus Claims. Under Option A, parties in interest would retain the right to object to any motion seeking payment of the Liquidated Bonus Amounts as Administrative Expenses.

f. Under the second treatment option ("Option B"), the Debtor would agree that the Senior Employee Claimant has Allowed Liquidated Bonus Claims, no longer subject to objection by any party in interest, in the amounts of the Liquidated Bonus Claims (subject, in the case of Mr. Ellington, to the cap imposed by Class 7). If the Debtor elects Option B as to a Senior Employee Claimant, then such Senior Employee Claimant would be entitled to a payment on account of his Allowed Liquidated Bonus Claims in an amount equal to 60% of the amount of the

Liquidated Bonus Claims (which, in Mr. Ellington's case, would be $600,000 and in Mr. Leventon's case, would be $358,918.80), and such payment would be the sole recovery on account of such Allowed Liquidated Bonus Claims.

g. The Debtor may, with the consent of the Committee, elect Option B with respect to a Senior Employee Claimant at any time prior to the occurrence of the Effective Date. If the Debtor does not make an election, then Option A will apply.

h. Under either Option A or Option B, Mr. Ellington and Mr. Leventon will retain all their rights with respect to all Claims other than the Liquidated Bonus Amounts, including, but not limited to, their Class 6 PTO Claims, other claims asserted as Class 8 General Unsecured Claims, the Senior Employees' claims for indemnification against the Debtor, and any other claims that they may assert constitute Administrative Expense Claims, and any other such Claims are subject to the rights of any party in interest to object to such Claims, and the Debtor reserves any all of its rights and defenses in connection therewith.

i. Subject to entry of this Confirmation Order and as set forth and announced on the record at the hearing on confirmation of the Plan and no party objecting thereto, Mr. Ellington and Mr. Leventon agreed to change the votes in their respective Ballots from rejection to acceptance of the Plan and to withdraw the Senior Employees' Objection.

j. The Senior Employees' Settlement represents a valid exercise of the Debtor's business judgment and satisfies the requirements for a compromise under Bankruptcy Rule 9019(a).

k. For the avoidance of doubt, neither Mr. Leventon nor Mr. Ellington shall be a Released Party under the Plan regardless of how the Senior Employee Claimants' Claims are to be treated hereunder.

Based upon the foregoing findings, and upon the record made before the Bankruptcy Court at the Confirmation Hearing, and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED THAT:**

**A. Confirmation of the Plan.** The Plan is approved in its entirety and **CONFIRMED** under section 1129 of the Bankruptcy Code. The terms of the Plan, including the

Plan Supplements and Plan Modifications, are incorporated by reference into and are an integral part of this Confirmation Order.[11]

**B. Findings of Fact and Conclusions of Law**. The findings of fact and the conclusions of law set forth in this Confirmation Order and on the record of the Confirmation Hearing constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014. All findings of fact and conclusion of law announced by the Bankruptcy Court at the Confirmation Hearing in relation to confirmation of the Plan are hereby incorporated into this Confirmation Order. To the extent that any of the following constitutes findings of fact or conclusions of law, they are adopted as such. To the extent any findings of fact or conclusions of law set forth in this Confirmation Order (including any findings of fact or conclusions of law announced by the Bankruptcy Court at the Confirmation Hearing and incorporated herein) constitutes an order of the Bankruptcy Court, and is adopted as such.

**C. Objections**. Any resolution or disposition of objections to confirmation of the Plan or otherwise ruled upon by the Bankruptcy Court on the record of the Confirmation Hearing is hereby incorporated by reference. All objections and all reservations of rights pertaining to confirmation of the Plan that have not been withdrawn, waived or settled are overruled on the merits, except as otherwise specifically provided in this Confirmation Order.

**D. Plan Supplements and Plan Modifications.** The filing with the Bankruptcy Court of the Plan Supplements and the Plan Modifications constitutes due and

[11] The Plan is attached hereto as **Exhibit A**.

sufficient notice thereof. Accordingly, pursuant to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Modifications and the Plan Supplements do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that Holders of Claims or Equity Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. The Plan Modifications and the Plan Supplements constitute the Plan pursuant to section 1127(a) of the Bankruptcy Code. Accordingly, the Plan, as modified, is properly before the Bankruptcy Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

E. **Deemed Acceptance of Plan.** In accordance with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all Holders of Claims and Equity Interests who voted to accept the Plan (or whom are conclusively presumed to accept the Plan) are deemed to have accepted the Plan as modified by the Plan Modifications. No holder of a Claim shall be permitted to change its vote as a consequence of the Plan Modifications.

F. **Vesting of Assets in the Reorganized Debtor.** Except as otherwise provided in the Plan or this Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code, except with respect to such Liens, Claims, charges, and other encumbrances that are specifically preserved under the Plan upon the Effective Date. The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the

representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

**G. Effectiveness of All Actions.** All actions contemplated by the Plan, including all actions in connection with the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, are authorized to be taken on, prior to, or after the Effective Date, as applicable, under this Confirmation Order, without further application to or order of the Bankruptcy Court, or further action by the directors, managers, officers or partners of the Debtor or the Reorganized Debtor and with the effect that such actions had been taken by unanimous action of such parties.

**H. Restructuring Transactions.** The Debtor or Reorganized Debtor, as applicable, are authorized to enter into and effectuate the Restructuring provided under the Plan, including, without limitation, the entry into and consummation of the transactions contemplated by the Claimant Trust Agreement, the Senior Employee Stipulation, the New GP LLC Documents, the New Frontier Note, the Reorganized Limited Partnership Agreement, the Litigation Sub-Trust Agreement, and the other Plan Documents, and may take any actions as may be necessary or appropriate to effect a corporate restructuring of its business or a corporate restructuring of the overall corporate structure of the Reorganized Debtor, as and to the extent provided in the Plan. Any transfers of assets or equity interests effected or any obligations incurred through the Restructuring pursuant to the Plan are hereby approved and shall not constitute fraudulent conveyances or fraudulent transfers or otherwise be subject to avoidance.

**I. Preservation of Causes of Action.** Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, this Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor, the Litigation Sub-Trust, or the Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan, or this Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, this Confirmation Order). In addition, the right of the Reorganized Debtor, the Claimant Trust, or the Litigation Sub-Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**J. Independent Board of Directors of Strand.** The terms of the current Independent Directors shall expire on the Effective Date without the need for any further or other action by any of the Independent Directors. For avoidance of doubt, the Assumed Contracts

include the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and James Seery*; the *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and John Dubel* and *Indemnification and Guaranty Agreement between Highland Capital Management, Strand Advisors, Inc. and Russell Nelms* and shall each remain in full force and effect notwithstanding the expiration of the terms of any Independent Directors.

**K. Cancellation of Equity Interests and Issuance of New Partnership Interests.** On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be deemed cancelled, and all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, such Class A Limited Partnership Interests and Class B/C Limited Partnership Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement. As of the Effective Date and pursuant to the Plan, new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited

Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

**L. Transfer of Assets to Claimant Trust.** On or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax. Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement.

**M. Transfer of Estate Claims to Litigation Sub-Trust**. On or prior to the Effective Date, the Claimant Trust shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Litigation Sub-Trust all of the Claimant Trust's rights, title, and interest in and to all of the Estate Claims as successor in interest to the Debtor, and in accordance with section 1141 of the Bankruptcy Code, the Estate Claims shall automatically vest in the Litigation Sub-Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Litigation Sub-Trust Interests and Litigation Sub-Trust Expenses. The Litigation Trustee will

be authorized to investigate, pursue, and otherwise resolve the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan, including as successor in interest to the Debtor or Committee, as applicable, in any litigation commenced prior to the Effective Date in which Estate Claims are asserted.

**N. Compromise of Controversies.** In consideration for the distributions and other benefits, including releases, provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims, Equity Interests, and controversies resolved under the Plan and the entry of this Confirmation Order constitutes approval of such compromise and settlement under Bankruptcy Rule 9019.

**O. Objections to Claims**. The Claims Objection Deadline shall be the date that is 180 days after the Effective Date, *provided, however*, that the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee and as otherwise provided under the Plan.

**P. Assumption of Contracts and Leases.** Effective as of the date of this Confirmation Order, each of the Assumed Contacts shall be assumed by the Debtor without the need for any further notice to or action, order, or approval of the Bankruptcy Court, under section 365 of the Bankruptcy Code and the payment of Cures, if any, shall be paid in accordance with the Plan. Each Assumed Contract shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to any of the

Assumed Contracts that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of such Assumed Contracts or the validity, priority, or amount of any Claims that may arise in connection therewith. Assumption of the Assumed Contracts pursuant to Article V.A of the Plan and full payment of any applicable Cure pursuant to the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition, or other bankruptcy-related defaults, arising under any Assumed Contracts.

**Q. Rejection of Contracts and Leases.** Unless previously assumed during the pendency of the Chapter 11 Case or pursuant to the Plan, all other Executory Contracts and Unexpired Leases are rejected as of the date of the entry of this Confirmation Order and pursuant to the terms of the Plan. To the extent that any party asserts any damages resulting from the rejection of any Executory Contract or Unexpired Lease, such claim must be filed within **thirty (30) days** following entry of this Confirmation Order, or such claim will be forever barred and disallowed against the Reorganized Debtor.

**R. Assumption of Issuer Executory Contracts.** On the Confirmation Date, the Debtor will assume the agreements set forth on **Exhibit B** hereto (collectively, the "Issuer Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. In full and complete satisfaction of its obligation to cure outstanding defaults under section 365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the

Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[12] a cumulative amount of $525,000 (the "Cure Amount") as follows:

a. $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

b. $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and the Bankruptcy Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

**S. Release of Issuer Claims.** Effective as of the Confirmation Date, and to the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and

[12] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Issuer Released Claims").

**T. Release of Debtor Claims against Issuer Released Parties.** Upon entry of this Order, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue [(i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe,

(xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton (collectively, the "Issuer Released Parties"),] for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts. Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs S and T hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.

**U. Authorization to Consummate.** The Debtor is authorized to consummate the Plan after the entry of this Confirmation Order subject to satisfaction or waiver of the conditions precedent to the Effective Date of the Plan set forth in Article VIII.A of the Plan. The Plan shall not become effective unless and until the conditions set forth in Article VIII.A of the Plan have been satisfied, or otherwise waived pursuant to Article VIII.B of the Plan.

**V. Professional Compensation.** All requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date

must be filed no **later than sixty (60) days after the Effective Date**. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and an opportunity for hearing in accordance with the procedures established by the Bankruptcy Code and the Bankruptcy Court. The Debtor shall fund the Professional Fee Reserve as provided under the Plan. The Reorganized Debtor shall pay Professional Fee Claims in Cash in the amounts the Bankruptcy Court allows. The Debtor is authorized to pay the pre-Effective Date fees and expenses of all ordinary course professionals in the ordinary course of business without the need for further Bankruptcy Court order or approval. From and after the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 (if applicable) of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor or Claimant Trustee, as applicable, may employ and pay any Professional or Entity employed in the ordinary course of the Debtor's business without any further notice to or action, order, or approval of the Bankruptcy Court.

**W. Release, Exculpation, Discharge, and Injunction Provisions. The following release, exculpation, discharge, and injunction provisions set forth in the Plan are approved and authorized in their entirety, and such provisions are effective and binding on all parties and Entities to the extent provided therein.**

**X. Discharge of Claims and Termination of Interests.** To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or this Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement,

discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or this Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

**Y. Exculpation.** Subject in all respects to Article XII.D of the Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v);

*provided, however*, the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. The Plan's exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

**Z. Releases by the Debtor.** On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person. Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under

any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

**AA. Injunction. Upon entry of this Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan. Except as expressly provided in the Plan, this Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner,**

**in any place whatsoever, that does not conform to or comply with the provisions of the Plan. The injunctions set forth in the Plan and this Confirmation Order shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property. Subject in all respects to Article XII.D of the Plan, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however*, the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in**

**Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.**

**BB. Duration of Injunction and Stays. Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date, shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Bankruptcy Court will enter an equivalent order under Section 105.**

**CC. Continuance of January 9 Order and July 16 Order.** Unless otherwise provided in the Plan, in this Confirmation Order, or in a Final Order of the Bankruptcy Court, each of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, entered by the Bankruptcy Court on January 9, 2020* [Docket No. 339] and *Order Approving the Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020* [Docket No. 854] entered on July 16, 2020 shall remain in full force and effect from the Confirmation Date and following the Effective Date.

**DD. No Governmental Releases.** Nothing in this Confirmation Order or the Plan shall effect a release of any claim by the United States Government or any of its agencies or

any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against any party or person, nor shall anything in this Confirmation Order or the Plan enjoin the United States or any state or local authority from bringing any claim, suit, action, or other proceedings against any party or person for any liability of such persons whatever, including without limitation any claim, suit, or action arising under the Internal Revenue Code, the environmental laws or any criminal laws of the United States or any state and local authority against such persons, nor shall anything in this Confirmation Order or the Plan exculpate any party or person from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, or any criminal laws of the United States or any state and local authority against any party or person.

**EE. Exemption from Transfer Taxes.** Pursuant to section 1146(a) of the Bankruptcy Code, any transfers (whether from the Debtor to the Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtor or the Reorganized Debtor; (b) the Restructuring transactions pursuant to the Plan; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan,

including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment to the fullest extent contemplated by section 1146(a) of the Bankruptcy Code, and upon entry of this Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation of any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

**FF. Cancellation of Notes, Certificates and Instruments.** Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan or as otherwise provided in this Confirmation Order, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the

Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person.

**GG. Documents, Mortgages, and Instruments.** Each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the Plan, including the Restructuring transactions contemplated under the Plan, and this Confirmation Order.

**HH. Post-Confirmation Modifications.** Subject section 1127(b) of the Bankruptcy Code and the Plan, the Debtor and the Reorganized Debtor expressly reserve their rights to revoke or withdraw, or to alter, amend, or modify materially the Plan, one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or this Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XII.B of the Plan.

**II. Applicable Nonbankruptcy Law.** The provisions of this Confirmation Order, the Plan and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

**JJ. Governmental Approvals Not Required.** This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state,

federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement.

**KK. Notice of Effective Date.** As soon as reasonably practicable after the Effective Date, the Reorganized Debtor shall file notice of the Effective Date and shall serve a copy of the same on all Holders of Claims and Equity Interests, and all parties who have filed with the Bankruptcy Court requests to receive notices in accordance with Bankruptcy Rules 2002 and 3020(c). Notwithstanding the above, no notice of Confirmation or Consummation or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtor mailed notice of the Confirmation Hearing, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtor has been informed in writing by such Entity, or is otherwise aware, of that Entity's new address. The above-referenced notices are adequate under the particular circumstances of this Chapter 11 Case and no other or further notice is necessary.

**LL. Substantial Consummation.** On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

**MM. Waiver of Stay.** For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule is waived, and this Confirmation Order shall be effective and enforceable immediately upon its entry by the Bankruptcy Court.

**NN. References to and Omissions of Plan Provisions.** References to articles, sections, and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan. The failure to specifically include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

**OO. Headings.** Headings utilized herein are for convenience and reference only, and do not constitute a part of the Plan or this Confirmation Order for any other purpose.

**PP. Effect of Conflict.** This Confirmation Order supersedes any Bankruptcy Court order issued prior to the Confirmation Date that may be inconsistent with this Confirmation Order. If there is any inconsistency between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation Order govern and control. If there is any inconsistency between the terms of this Confirmation Order and the terms of a final, executed Plan Supplement Document, the terms of the final, executed Plan Supplement Document will govern and control.

**QQ. Resolution of Objection of Texas Taxing Authorities.** Dallas County, Kaufman County, City of Allen, Allen ISD and City of Richardson (collectively, the "Tax Authorities") assert that they are the holders of prepetition and administrative expense claims for 2019, 2020 and 2021 ad valorem real and business personal property taxes. The ad valorem property taxes for tax year 2020 shall be paid in accordance with and to the extent required under

applicable nonbankruptcy law. In the event the 2020 taxes are paid after February 1, 2021, the Tax Authorities may assert any rights and amounts they claim are owed with respect to penalties and interest that have accrued through the date of payment and the Debtor and Reorganized Debtor reserve any all rights and defenses in connection therewith.

a. The Debtor/Reorganized Debtor shall pay all amounts owed to the Tax Authorities for tax year 2021 in accordance with and to the extent required under applicable nonbankruptcy law. The Tax Authorities shall not be required to file and serve an administrative expense claim and request for payment as a condition of allowance of their administrative expense claims pursuant to 11 U.S.C. Section 503(b)(1)(D). With regard to year 2019 ad valorem property taxes, the Tax Authorities will receive payment of their prepetition claims within 30 days of the Effective Date of the Plan. The payment will include interest from the Petition Date through the Effective Date and from the Effective Date through payment in full at the state statutory rate pursuant to 11 U.S.C. Sections 506(b), 511, and 1129, if applicable, subject to all of the Debtor's and Reorganized Debtor's rights and defenses in connection therewith. Notwithstanding any other provision in the Plan, the Tax Authorities shall (i) retain the liens that secure all prepetition and postpetition amounts ultimately owed to them, if any, as well as (ii) the state law priority of those liens until the claims are paid in full.

b. The Tax Authorities' prepetition claims and their administrative expense claims shall not be discharged until such time as the amounts owed are paid in full. In the event of a default asserted by the Taxing Authorities, the Tax Authorities shall provide notice Debtor or Reorganized Debtor, as applicable, and may demand cure of any such asserted default. Subject to all of its rights and defenses, the Debtor or Reorganized Debtor shall have fifteen (15) days from the date of the notice to cure the default. If the alleged default is not cured, the Tax Authorities may exercise any of their respective rights under applicable law and pursue collection of all amounts owed pursuant to state law outside of the Bankruptcy Court, subject in all respects to the Debtor's and Reorganized Debtor's applicable rights and defenses. The Debtor/Reorganized Debtor shall be entitled to any notices of default required under applicable nonbankruptcy law and each of the Taxing Authorities, the Debtor and the Reorganized Debtor reserve any and all of their respective rights and defenses in connection therewith. The Debtor's and Reorganized Debtor's rights and defenses under Texas Law and the Bankruptcy Code with respect to this provision of the Confirmation Order, including their right to dispute or object to the Tax Authorities' Claims and liens, are fully preserved.

**RR. Resolution of Objections of Scott Ellington and Isaac Leventon.** Pursuant to Bankruptcy Rule 9019(a), the Senior Employees' Settlement is approved in all respects. The Debtor may, only with the consent of the Committee, elect Option B for a Senior Employee Claimant by written notice to such Senior Employee Claimant on or before the occurrence of the Effective Date. If the Debtor does not elect Option B, then Option A will govern the treatment of the Liquidated Bonus Claims.

a. Notwithstanding any language in the Plan, the Disclosure Statement, or this Confirmation Order to the contrary, if Option A applies to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee Claimant will receive the treatment described in paragraph 82(e) hereof, and if the Debtor timely elects Option B with respect to the Liquidated Bonus Claims of a Senior Employee Claimant, then the Liquidated Bonus Claims of such Senior Employee will receive the treatment described in paragraph 82(f) hereof.

b. The Senior Employees' Settlement is hereby approved, without prejudice to the respective rights of Mr. Ellington and Mr. Leventon to assert all their remaining Claims against the Debtor's estate, including, but not limited to, their Class 6 PTO Claims, their remaining Class 8 General Unsecured Claims, any indemnification claims, and any Administrative Expense Claims that they may assert and is without prejudice to the rights of any party in interest to object to any such Claims.

c. Pursuant to Bankruptcy Rule 3018(a), Mr. Ellington and Mr. Leventon were permitted to change their votes on the Plan. Accordingly, Mr. Ellington's votes on his Ballots in Class 7 and Class 8 of the Plan were changed from a rejection of the Plan to acceptance of the Plan, and Mr. Leventon's votes on his Ballots in Class 7 and Class 8 of the Plan were, changed from rejections of the Plan to acceptances of the Plan.

d. The Senior Employees' Objection is deemed withdrawn.

**SS. No Release of Claims Against Senior Employee Claimants**. For the avoidance of doubt, the Senior Employees' Settlement, as approved herein, shall not, and shall not be deemed to, release any Claims or Causes of Action held by the Debtor against either Senior

Employee Claimant nor shall either Senior Employee Claimant be, or be deemed to be, a "Released Party" under the Plan.

**TT. Resolution of Objection of Internal Revenue Service.** Notwithstanding any other provision or term of the Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the "IRS Claim"):

(a) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of the date of said notice and demand, then the following shall apply to the IRS:

(1) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code;

(2) The automatic stay of 11 U.S.C. § 362 and any injunction of the Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Bankruptcy Court, and the entire prepetition liability owed to the IRS, together with any unpaid postpetition tax liabilities, may become due and payable immediately; and

(3) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(b) If the IRS declares the Debtor, the Reorganized Debtor, or any successor-in-interest to be in default of the Debtor's, the Reorganized Debtor's and/ or any successor- in-interest's obligations under the Plan, then entire prepetition liability of an IRS' Allowed Claim, together with any unpaid postpetition tax liabilities shall become due and payable

immediately upon written demand to the Debtor, Reorganized Debtor and/or any successor-in-interest. Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(c) The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default, the IRS shall be entitled to proceed as set out in paragraphs (1), (2), and/or (3) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel. The collection statute expiration date for all unpaid federal tax liabilities shall be extended pursuant to non-bankruptcy law.

(d) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(e) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States and its agency the Internal Revenue Service.

(f) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

**UU. IRS Proof of Claim.** Notwithstanding anything in the Plan or in this Confirmation Order, until all required tax returns are filed with and processed by the IRS, the IRS's proof of claim will not be deemed fixed for purposes of Section 502 of the Bankruptcy Code and may be amended in order to reflect the IRS' assessment of the Debtor's unpaid priority and general unsecured taxes, penalties and interest.

**VV. CLO Holdco, Ltd. Settlement** Notwithstanding anything contained herein to the contrary, nothing in this Order is or is intended to supersede the rights and obligations of either the Debtor or CLO Holdco contained in that certain *Settlement Agreement between CLO Holdco, Ltd., and Highland Capital Management, L.P., dated January 25,2021* [Docket No. 1838-1] (the "CLOH Settlement Agreement"). In the event of any conflict between the terms of this Order and the terms of the CLOH Settlement Agreement, the terms of the CLOH Settlement Agreement will govern.

**WW. Retention of Jurisdiction.** The Bankruptcy Court may properly, and upon the Effective Date shall, to the maximum extent permitted under applicable law, retain jurisdiction over all matters arising out of, and related to, this Chapter 11 Case, including the matters set forth in Article XI of the Plan and section 1142 of the Bankruptcy Code.

**XX. Payment of Statutory Fees; Filing of Quarterly Reports.** All fees payable pursuant to 28 U.S.C. § 1930 shall be paid on or before the Effective Date. The Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust shall be jointly and severally liable for payment of quarterly fees to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 through the entry of the Final Decree for the Debtor or the dismissal or conversion of the Chapter 11 Case. Notwithstanding anything to the contrary in the Plan, the U.S. Trustee shall not be required to file any proofs of claim with respect to quarterly fees payable pursuant to 28 U.S.C. § 1930.

**YY. Dissolution of the Committee**. On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have

any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). Notwithstanding the foregoing, any Committee member or Professional may serve following the Effective Date with respect to the Claimant Trust Oversight Board or Litigation Sub-Trust. The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan, the Claimant Trust Agreement, and/or Litigation Sub-Trust in connection with such representation.

**ZZ. Miscellaneous.** After the Effective Date, the Debtor or Reorganized Debtor, as applicable, shall have no obligation to file with the Bankruptcy Court or serve on any parties reports that the Debtor or Reorganized Debtor, as applicable, were obligated to file under the Bankruptcy Code or a court order, including monthly operating reports (even for those periods for which a monthly operating report was not filed before the Effective Date), ordinary course professional reports, reports to any parties otherwise required under the "first" and "second" day orders entered in this Chapter 11 Case (including any cash collateral financing orders entered in this Chapter 11 Case) and monthly or quarterly reports for Professionals; *provided*, *however*, that

the Debtor or Reorganized Debtor, as applicable, will comply with the U.S. Trustee's post confirmation reporting requirements.

**###END OF ORDER###**

**Exhibit A**

**Fifth Amended Plan (as Modified)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| Debtor. | ) | |

# FIFTH AMENDED PLAN OF REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P. (AS MODIFIED)

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS ........ 1

A. Rules of Interpretation, Computation of Time and Governing Law ........ 1

B. Defined Terms ........ 2

ARTICLE II. ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS ........ 16

A. Administrative Expense Claims ........ 16

B. Professional Fee Claims ........ 17

C. Priority Tax Claims ........ 17

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS ........ 18

A. Summary ........ 18

B. Summary of Classification and Treatment of Classified Claims and Equity Interests ........ 18

C. Elimination of Vacant Classes ........ 19

D. Impaired/Voting Classes ........ 19

E. Unimpaired/Non-Voting Classes ........ 19

F. Impaired/Non-Voting Classes ........ 19

G. Cramdown ........ 19

H. Classification and Treatment of Claims and Equity Interests ........ 19

I. Special Provision Governing Unimpaired Claims ........ 24

J. Subordinated Claims ........ 24

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THIS PLAN ........ 24

A. Summary ........ 24

B. The Claimant Trust ........ 25

1. Creation and Governance of the Claimant Trust and Litigation Sub-Trust ........ 25

2. Claimant Trust Oversight Committee ........ 26

**Page**


3. Purpose of the Claimant Trust. ....... 27

4. Purpose of the Litigation Sub-Trust. ....... 27

5. Claimant Trust Agreement and Litigation Sub-Trust Agreement. ....... 27

6. Compensation and Duties of Trustees. ....... 29

7. Cooperation of Debtor and Reorganized Debtor. ....... 29

8. United States Federal Income Tax Treatment of the Claimant Trust. ....... 29

9. Tax Reporting. ....... 30

10. Claimant Trust Assets. ....... 30

11. Claimant Trust Expenses. ....... 31

12. Trust Distributions to Claimant Trust Beneficiaries. ....... 31

13. Cash Investments. ....... 31

14. Dissolution of the Claimant Trust and Litigation Sub-Trust. ....... 31

C. The Reorganized Debtor ....... 32

1. Corporate Existence ....... 32

2. Cancellation of Equity Interests and Release ....... 32

3. Issuance of New Partnership Interests ....... 32

4. Management of the Reorganized Debtor ....... 33

5. Vesting of Assets in the Reorganized Debtor ....... 33

6. Purpose of the Reorganized Debtor ....... 33

7. Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets ....... 33

D. Company Action ....... 34

E. Release of Liens, Claims and Equity Interests ....... 35

F. Cancellation of Notes, Certificates and Instruments ....... 35

**Page**

G. Cancellation of Existing Instruments Governing Security Interests ..... 35

H. Control Provisions ..... 35

I. Treatment of Vacant Classes ..... 36

J. Plan Documents ..... 36

K. Highland Capital Management, L.P. Retirement Plan and Trust ..... 36

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..... 37

A. Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases ..... 37

B. Claims Based on Rejection of Executory Contracts or Unexpired Leases ..... 38

C. Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases ..... 38

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ..... 39

A. Dates of Distributions ..... 39

B. Distribution Agent ..... 39

C. Cash Distributions ..... 40

D. Disputed Claims Reserve ..... 40

E. Distributions from the Disputed Claims Reserve ..... 40

F. Rounding of Payments ..... 40

G. *De Minimis* Distribution ..... 41

H. Distributions on Account of Allowed Claims ..... 41

I. General Distribution Procedures ..... 41

J. Address for Delivery of Distributions ..... 41

K. Undeliverable Distributions and Unclaimed Property ..... 41

L. Withholding Taxes ..... 42

Page

M. Setoffs ..... 42

N. Surrender of Cancelled Instruments or Securities ..... 42

O. Lost, Stolen, Mutilated or Destroyed Securities ..... 43

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS ..... 43

A. Filing of Proofs of Claim ..... 43

B. Disputed Claims ..... 43

C. Procedures Regarding Disputed Claims or Disputed Equity Interests ..... 43

D. Allowance of Claims and Equity Interests ..... 44

1. Allowance of Claims ..... 44

2. Estimation ..... 44

3. Disallowance of Claims ..... 44

ARTICLE VIII. EFFECTIVENESS OF THIS PLAN ..... 45

A. Conditions Precedent to the Effective Date ..... 45

B. Waiver of Conditions ..... 46

C. Dissolution of the Committee ..... 46

ARTICLE IX. EXCULPATION, INJUNCTION AND RELATED PROVISIONS ..... 47

A. General ..... 47

B. Discharge of Claims ..... 47

C. Exculpation ..... 47

D. Releases by the Debtor ..... 48

E. Preservation of Rights of Action ..... 49

1. Maintenance of Causes of Action ..... 49

2. Preservation of All Causes of Action Not Expressly Settled or Released ..... 49

**Page**


F. Injunction ....... 50

G. Duration of Injunctions and Stays ....... 51

H. Continuance of January 9 Order ....... 51

ARTICLE X. BINDING NATURE OF PLAN ....... 51

ARTICLE XI. RETENTION OF JURISDICTION ....... 52

ARTICLE XII. MISCELLANEOUS PROVISIONS ....... 54

A. Payment of Statutory Fees and Filing of Reports ....... 54

B. Modification of Plan ....... 54

C. Revocation of Plan ....... 54

D. Obligations Not Changed ....... 55

E. Entire Agreement ....... 55

F. Closing of Chapter 11 Case ....... 55

G. Successors and Assigns ....... 55

H. Reservation of Rights ....... 55

I. Further Assurances ....... 56

J. Severability ....... 56

K. Service of Documents ....... 56

L. Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code ....... 57

M. Governing Law ....... 58

N. Tax Reporting and Compliance ....... 58

O. Exhibits and Schedules ....... 58

P. Controlling Document ....... 58

**DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION**

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned case (the "Debtor"), proposes the following chapter 11 plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtor. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I of this Plan. The Debtor is the proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtor's history, business, results of operations, historical financial information, projections and assets, and for a summary and analysis of this Plan and the treatment provided for herein. There also are other agreements and documents that may be Filed with the Bankruptcy Court that are referenced in this Plan or the Disclosure Statement as Exhibits and Plan Documents. All such Exhibits and Plan Documents are incorporated into and are a part of this Plan as if set forth in full herein. Subject to the other provisions of this Plan, and in accordance with the requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtor reserves the right to alter, amend, modify, revoke, or withdraw this Plan prior to the Effective Date.

If this Plan cannot be confirmed, for any reason, then subject to the terms set forth herein, this Plan may be revoked.

## ARTICLE I.
## RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW AND DEFINED TERMS

### A. Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with its terms; (d) unless otherwise specified, all references herein to "Articles," "Sections," "Exhibits" and "Plan Documents" are references to Articles, Sections, Exhibits and Plan Documents hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set

forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (j) "$" or "dollars" means Dollars in lawful currency of the United States of America. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B. Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1. "*Acis*" means collectively Acis Capital Management, L.P. and Acis Capital Management GP, LLP.

2. "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Chapter 11 Case that is Allowed pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; and (b) all fees and charges assessed against the Estate pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, and that have not already been paid by the Debtor during the Chapter 11 Case and a Professional Fee Claim.

3. "*Administrative Expense Claims Bar Date*" means, with respect to any Administrative Expense Claim (other than a Professional Fee Claim) becoming due on or prior to the Effective Date, 5:00 p.m. (prevailing Central Time) on such date that is forty-five days after the Effective Date.

4. "*Administrative Expense Claims Objection Deadline*" means, with respect to any Administrative Expense Claim, the later of (a) ninety (90) days after the Effective Date and (b) sixty (60) days after the timely Filing of the applicable request for payment of such Administrative Expense Claim; *provided, however,* that the Administrative Expense Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

5. "*Affiliate*" of any Person means any Entity that, with respect to such Person, either (i) is an "affiliate" as defined in section 101(2) of the Bankruptcy Code, or (ii) is an "affiliate" as defined in Rule 405 of the Securities Act of 1933, or (iii) directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For the purposes of this definition, the term "control" (including, without limitation, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction in any respect of the management or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

6. "*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (a) any Claim that is evidenced by a Proof of Claim that has been timely Filed by the Bar Date, or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy

Code or a Final Order; (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed and for which no Proof of Claim has been timely filed; (c) a Claim Allowed pursuant to the Plan or an order of the Bankruptcy Court that is not stayed pending appeal; or (d) a Claim that is not Disputed (including for which a Proof of Claim has been timely filed in a liquidated and noncontingent amount that has not been objected to by the Claims Objection Deadline or as to which any such objection has been overruled by Final Order); *provided, however,* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed as set forth above.

7. "*Allowed Claim or Equity Interest*" means a Claim or an Equity Interest of the type that has been Allowed.

8. "*Assets*" means all of the rights, titles, and interest of the Debtor, Reorganized Debtor, or Claimant Trust, in and to property of whatever type or nature, including, without limitation, real, personal, mixed, intellectual, tangible, and intangible property, the Debtor's books and records, and the Causes of Action.

9. "*Available Cash*" means any Cash in excess of the amount needed for the Claimant Trust and Reorganized Debtor to maintain business operations as determined in the sole discretion of the Claimant Trustee.

10. "*Avoidance Actions*" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable nonbankruptcy law, including, without limitation, actions or remedies arising under sections 502, 510, 544, 545, and 547-553 of the Bankruptcy Code or under similar state or federal statutes and common law, including fraudulent transfer laws

11. "*Ballot*" means the form(s) distributed to holders of Impaired Claims or Equity Interests entitled to vote on the Plan on which to indicate their acceptance or rejection of the Plan.

12. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time and as applicable to the Chapter 11 Case.

13. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or any other court having jurisdiction over the Chapter 11 Case.

14. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, in each case as amended from time to time and as applicable to the Chapter 11 Case.

15. "*Bar Date*" means the applicable deadlines set by the Bankruptcy Court for the filing of Proofs of Claim against the Debtor as set forth in the Bar Date Order, which deadlines may be or have been extended for certain Claimants by order of the Bankruptcy Court.

16. "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Filing Proofs of Claim and (II) Approving the Form and Manner of Notice Thereof* [D.I. 488].

17. "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

18. "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

19. "*Causes of Action*" means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedy, offset, power, privilege, license and franchise of any kind or character whatsoever, in each case whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. For the avoidance of doubt, Cause of Action includes, without limitation,: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims; (f) the Avoidance Actions, and (g) the Estate Claims. The Causes of Action include, without limitation, the Causes of Action belonging to the Debtor's Estate listed on the schedule of Causes of Action to be filed with the Plan Supplement.

20. "*CEO/CRO*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.

21. "*Chapter 11 Case*" means the Debtor's case under chapter 11 of the Bankruptcy Code commenced on the Petition Date in the Delaware Bankruptcy Court and transferred to the Bankruptcy Court on December 4, 2019, and styled *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj-11.

22. "*Claim*" means any "claim" against the Debtor as defined in section 101(5) of the Bankruptcy Code.

23. "*Claims Objection Deadline*" means the date that is 180 days after the Confirmation Date; *provided, however,* the Claims Objection Deadline may be extended by the Bankruptcy Court upon a motion by the Claimant Trustee.

24. "*Claimant Trust*" means the trust established for the benefit of the Claimant Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Claimant Trust Agreement.

25. "*Claimant Trust Agreement*" means the agreement Filed in the Plan Supplement establishing and delineating the terms and conditions of the Claimant Trust.

26. "*Claimant Trust Assets*" means (i) other than the Reorganized Debtor Assets (which are expressly excluded from this definition), all other Assets of the Estate, including, but not limited to, all Causes of Action, Available Cash, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from such Assets, (ii) any Assets transferred by the Reorganized Debtor to the Claimant Trust on or after the Effective Date, (iii) the limited partnership interests in the Reorganized Debtor, and (iv) the ownership interests in New GP LLC. For the avoidance of doubt, any Causes of Action that, for any reason, are not capable of being transferred to the Claimant Trust shall constitute Reorganized Debtor Assets.

27. "*Claimant Trust Beneficiaries*" means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests.

28. "*Claimant Trustee*" means James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement who will act as the trustee of the Claimant Trust in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement. The Claimant Trustee shall be responsible for, among other things, monetizing the Estate's investment assets, resolving Claims (other than those Claims assigned to the Litigation Sub-Trust for resolution), and, as the sole officer of New GP LLC, winding down the Reorganized Debtor's business operations.

29. "*Claimant Trust Expenses*" means all reasonable legal and other reasonable professional fees, costs, and expenses incurred by the Trustees on account of administration of the Claimant Trust, including any reasonable administrative fees and expenses, reasonable attorneys' fees and expenses, reasonable insurance costs, taxes, reasonable escrow expenses, and other expenses.

30. "*Claimant Trust Interests*" means the non-transferable interests in the Claimant Trust that are issued to the Claimant Trust Beneficiaries pursuant to this Plan; *provided*, *however*, Holders of Class A Limited Partnership Interests, Class B Limited Partnership Interests, and Class C Limited Partnership Interests will not be deemed to hold Claimant Trust Interests

unless and until the Contingent Claimant Trust Interests distributed to such Holders vest in accordance with the terms of this Plan and the Claimant Trust Agreement.

31. "*Claimant Trust Oversight Committee*" means the committee of five Persons established pursuant to ARTICLE IV of this Plan to oversee the Claimant Trustee's performance of its duties and otherwise serve the functions described in this Plan and the Claimant Trust Agreement.

32. "*Class*" means a category of Holders of Claims or Equity Interests as set forth in ARTICLE III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Class A Limited Partnership Interest*" means the Class A Limited Partnership Interests as defined in the Limited Partnership Agreement held by The Dugaboy Investment Trust, Mark and Pamela Okada Family Trust – Exempt Trust 2, Mark and Pamela Okada – Exempt Descendants' Trust, and Mark Kiyoshi Okada, and the General Partner Interest.

34. "*Class B Limited Partnership Interest*" means the Class B Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

35. "*Class B/C Limited Partnership Interests*" means, collectively, the Class B Limited Partnership and Class C Limited Partnership Interests.

36. "*Class C Limited Partnership Interest*" means the Class C Limited Partnership Interests as defined in the Limited Partnership Agreement held by Hunter Mountain Investment Trust.

37. "*Committee*" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee pursuant to 11 U.S.C. § 1102(a)(1) on October 29, 2019 [D.I. 65], consisting of (i) the Redeemer Committee of Highland Crusader Fund, (ii) Meta-e Discovery, (iii) UBS, and (iv) Acis.

38. "*Confirmation Date*" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

39. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

40. "*Confirmation Order*" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

41. *"Convenience Claim"* means any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

42. "*Convenience Claim Pool*" means the $13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. Any Cash remaining in the Convenience Claim Pool after all distributions on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

43. "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

44. "*Contingent Claimant Trust Interests"* means the contingent Claimant Trust Interests to be distributed to Holders of Class A Limited Partnership Interests, Holders of Class B Limited Partnership Interests, and Holders of Class C Limited Partnership Interests in accordance with this Plan, the rights of which shall not vest, and consequently convert to Claimant Trust Interests, unless and until the Claimant Trustee Files a certification that all holders of Allowed General Unsecured Claims have been paid indefeasibly in full, plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, all accrued and unpaid post-petition interest from the Petition Date at the Federal Judgment Rate and all Disputed Claims in Class 8 and Class 9 have been resolved. As set forth in the Claimant Trust Agreement, the Contingent Claimant Trust Interests distributed to the Holders of Class A Limited Partnership Interests will be subordinated to the Contingent Claimant Trust Interests distributed to the Holders of Class B/C Limited Partnership Interests.

45. "*Debtor*" means Highland Capital Management, L.P. in its capacity as debtor and debtor in possession in the Chapter 11 Case.

46. *"Delaware Bankruptcy Court"* means the United States Bankruptcy Court for the District of Delaware.

47. "*Disclosure Statement*" means that certain *Disclosure Statement for Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, as amended, supplemented, or modified from time to time, which describes this Plan, including all exhibits and schedules thereto and references therein that relate to this Plan.

48. "*Disputed*" means with respect to any Claim or Equity Interest, any Claim or Equity Interest that is not yet Allowed.

49. "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

50. "*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized

Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

51. "*Distribution Agent*" means the Claimant Trustee, or any party designated by the Claimant Trustee to serve as distribution agent under this Plan.

52. "*Distribution Date*" means the date or dates determined by the Reorganized Debtor or the Claimant Trustee, as applicable, on or after the Initial Distribution Date upon which the Distribution Agent shall make distributions to holders of Allowed Claims and Interests entitled to receive distributions under the Plan.

53. "*Distribution Record Date*" means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, which date shall be the Effective Date or such later date determined by the Bankruptcy Court.

54. "*Effective Date*" means the Business Day that this Plan becomes effective as provided in ARTICLE VIII hereof.

55. "*Employees*" means the employees of the Debtor set forth in the Plan Supplement.

56. "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.

57. "*Entity*" means any "entity" as defined in section 101(15) of the Bankruptcy Code and also includes any Person or any other entity.

58. "*Equity Interest*" means any Equity Security in the Debtor, including, without limitation, all issued, unissued, authorized or outstanding partnership interests, shares, of stock or limited company interests, the Class A Limited Partnership Interests, the Class B Limited Partnership Interests, and the Class C Limited Partnership Interests.

59. "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

60. "*Estate*" means the bankruptcy estate of the Debtor created by virtue of section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case.

61. "*Estate Claims*" has the meaning given to it in Exhibit A to the *Notice of Final Term Sheet* [D.I. 354].

62. "*Exculpated Parties*" means, collectively, (i) the Debtor and its successors and assigns, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (iv) through (viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

63. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

64. "*Exhibit*" means an exhibit annexed hereto or to the Disclosure Statement (as such exhibits are amended, modified or otherwise supplemented from time to time), which are incorporated by reference herein.

65. "*Federal Judgment Rate*" means the post-judgment interest rate set forth in 28 U.S.C. § 1961 as of the Effective Date.

66. "*File*" or "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Case.

67. "*Final Order*" means an order or judgment of the Bankruptcy Court, which is in full force and effect, and as to which the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for *certiorari*, new trial, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, or, in the event that an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or *certiorari*, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be Filed with respect to such order shall not preclude such order from being a Final Order.

68. "*Frontier Secured Claim*" means the loan from Frontier State Bank to the Debtor in the principal amount of $7,879,688.00 made pursuant to that certain First Amended and Restated Loan Agreement, dated March 29, 2018.

69. "*General Partner Interest*" means the Class A Limited Partnership Interest held by Strand, as the Debtor's general partner.

70. "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an: (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

71. "*Governmental Unit*" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

72. "*GUC Election*" means the option provided to each Holder of a Convenience Claim on their Ballot to elect to receive the treatment provided to General Unsecured Claims.

73. "*Holder*" means an Entity holding a Claim against, or Equity Interest in, the Debtor.

74. "*Impaired*" means, when used in reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75. "*Independent Directors*" means John S. Dubel, James P. Seery, Jr., and Russell Nelms, the independent directors of Strand appointed on January 9, 2020, and any additional or replacement directors of Strand appointed after January 9, 2020, but prior to the Effective Date.

76. "*Initial Distribution Date*" means, subject to the "Treatment" sections in ARTICLE III hereof, the date that is on or as soon as reasonably practicable after the Effective Date, when distributions under this Plan shall commence to Holders of Allowed Claims and Equity Interests.

77. "*Insurance Policies*" means all insurance policies maintained by the Debtor as of the Petition Date.

78. "*Jefferies Secured Claim*" means any Claim in favor of Jefferies, LLC, arising under that certain Prime Brokerage Customer Agreement, dated May 24, 2013, between the Debtor and Jefferies, LLC, that is secured by the assets, if any, maintained in the prime brokerage account created by such Prime Brokerage Customer Agreement.

79. "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

80. "*Limited Partnership Agreement*" means that certain Fourth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., dated December 24, 2015, as amended.

81. "*Litigation Sub-Trust*" means the sub-trust established within the Claimant Trust or as a wholly –owned subsidiary of the Claimant Trust on the Effective Date in each case in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement and Claimant Trust Agreement. As set forth in the Litigation Sub-Trust Agreement, the Litigation Sub-Trust shall hold the Claimant Trust Assets that are Estate Claims.

82. "*Litigation Sub-Trust Agreement*" means the agreement filed in the Plan Supplement establishing and delineating the terms and conditions of the Litigation Sub-Trust.

83. "*Litigation Trustee*" means the trustee appointed by the Committee and reasonably acceptable to the Debtor who shall be responsible for investigating, litigating, and settling the Estate Claims for the benefit of the Claimant Trust in accordance with the terms and conditions set forth in the Litigation Sub-Trust Agreement.

84. "*Managed Funds*" means Highland Multi-Strategy Credit Fund, L.P., Highland Restoration Capital Partners, L.P., and any other investment vehicle managed by the Debtor pursuant to an Executory Contract assumed pursuant to this Plan.

85. "*New Frontier Note*" means that promissory note to be provided to the Allowed Holders of Class 2 Claims under this Plan and any other documents or security agreements securing the obligations thereunder.

86. "*New GP LLC*" means a limited liability company incorporated in the State of Delaware pursuant to the New GP LLC Documents to serve as the general partner of the Reorganized Debtor on the Effective Date.

87. "*New GP LLC Documents*" means the charter, operating agreement, and other formational documents of New GP LLC.

88. "*Ordinary Course Professionals Order*" means that certain *Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course* [D.I. 176].

89. "*Other Unsecured Claim*" means any Secured Claim other than the Jefferies Secured Claim and the Frontier Secured Claim.

90. *"Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, individual, corporation, company, general or limited partnership, limited liability company, unincorporated organization firm, trust, estate, business trust, association, joint stock company, joint venture, government, governmental agency, Governmental Unit or any subdivision thereof, the United States Trustee, or any other entity, whether acting in an individual, fiduciary or other capacity.

91. "Petition *Date*" means October 16, 2019.

92. "*Plan*" means this *Debtor's Fifth Amended Chapter 11 Plan of Reorganization*, including the Exhibits and the Plan Documents and all supplements, appendices,

and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

93. "*Plan Distribution*" means the payment or distribution of consideration to Holders of Allowed Claims and Allowed Equity Interests under this Plan.

94. "*Plan Documents*" means any of the documents, other than this Plan, but including, without limitation, the documents to be filed with the Plan Supplement, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, and as may be modified consistent with the terms hereof with the consent of the Committee.

95. "*Plan Supplement*" means the ancillary documents necessary for the implementation and effectuation of the Plan, including, without limitation, (i) the form of Claimant Trust Agreement, (ii) the forms of New GP LLC Documents, (iii) the form of Reorganized Limited Partnership Agreement, (iv) the Sub-Servicer Agreement (if applicable), (v) the identity of the initial members of the Claimant Trust Oversight Committee, (vi) the form of Litigation Sub-Trust Agreement; (vii) the schedule of retained Causes of Action; (viii) the New Frontier Note, (ix) the schedule of Employees; (x) the form of Senior Employee Stipulation,; and (xi) the schedule of Executory Contracts and Unexpired Leases to be assumed pursuant to this Plan, which, in each case, will be in form and substance reasonably acceptable to the Debtor and the Committee.

96. "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, including any Claims for paid time-off entitled to priority under section 507(a)(4) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

97. "*Pro Rata*" means the proportion that (a) the Allowed amount of a Claim or Equity Interest in a particular Class bears to (b) the aggregate Allowed amount of all Claims or Equity Interests in such Class.

98. "*Professional*" means (a) any Entity employed in the Chapter 11 Case pursuant to section 327, 328 363 or 1103 of the Bankruptcy Code or otherwise and (b) any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to sections 327, 328, 330, 331, 363, 503(b), 503(b)(4) and 1103 of the Bankruptcy Code.

99. "*Professional Fee Claim*" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code, with respect to a particular Professional, for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

100. "*Professional Fee Claims Bar Date*" means with respect to Professional Fee Claims, the Business Day which is sixty (60) days after the Effective Date or such other date as approved by order of the Bankruptcy Court.

101. "*Professional Fee Claims Objection Deadline*" means, with respect to any Professional Fee Claim, thirty (30) days after the timely Filing of the applicable request for payment of such Professional Fee Claim.

102. "*Professional Fee Reserve*" means the reserve established and funded by the Claimant Trustee pursuant this Plan to provide sufficient funds to satisfy in full unpaid Allowed Professional Fee Claims.

103. "*Proof of Claim*" means a written proof of Claim or Equity Interest Filed against the Debtor in the Chapter 11 Case.

104. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

105. "*Protected Parties*" means, collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

106. "*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

107. "*Reduced Employee Claims*" has the meaning set forth in ARTICLE IX.D.

108. "*Reinstated*" means, with respect to any Claim or Equity Interest, (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Equity Interest in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Equity Interest to demand or receive accelerated payment of such Claim or Equity Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim or Equity Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Equity Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Equity Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder

of such Claim or Equity Interest (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

109. "*Rejection Claim*" means any Claim for monetary damages as a result of the rejection of an executory contract or unexpired lease pursuant to the Confirmation Order.

110. "*Related Entity*" means, without duplication, (a) Dondero, (b) Mark Okada ("Okada"), (c) Grant Scott ("Scott"), (d) Hunter Covitz ("Covitz"), (e) any entity or person that was an insider of the Debtor on or before the Petition Date under Section 101(31) of the Bankruptcy Code, including, without limitation, any entity or person that was a non-statutory insider, (f) any entity that, after the Effective Date, is an insider or Affiliate of one or more of Dondero, Okada, Scott, Covitz, or any of their respective insiders or Affiliates, including, without limitation, The Dugaboy Investment Trust, (g) the Hunter Mountain Investment Trust and any of its direct or indirect parents, (h) the Charitable Donor Advised Fund, L.P., and any of its direct or indirect subsidiaries, and (i) Affiliates of the Debtor and any other Entities listed on the Related Entity List.

111. "*Related Entity List*" means that list of Entities filed with the Plan Supplement.

112. "*Related Persons*" means, with respect to any Person, such Person's predecessors, successors, assigns (whether by operation of law or otherwise), and each of their respective present, future, or former officers, directors, employees, managers, managing members, members, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, subsidiaries, divisions, management companies, heirs, agents, and other representatives, in each case solely in their capacity as such.

113. "*Released Parties*" means, collectively, (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

114. "*Reorganized Debtor*" means the Debtor, as reorganized pursuant to this Plan on and after the Effective Date.

115. "*Reorganized Debtor Assets*" means any limited and general partnership interests held by the Debtor, the management of the Managed Funds and those Causes of Action (including, without limitation, claims for breach of fiduciary duty), that, for any reason, are not capable of being transferred to the Claimant Trust. For the avoidance of doubt, "Reorganized Debtor Assets" includes any partnership interests or shares of Managed Funds held by the Debtor but does not include the underlying portfolio assets held by the Managed Funds.

116. "*Reorganized Limited Partnership Agreement*" means that certain Fifth Amended and Restated Agreement of Limited Partnership of Highland Capital Management, L.P., by and among the Claimant Trust, as limited partner, and New GP LLC, as general partner, Filed with the Plan Supplement.

117. "*Restructuring*" means the restructuring of the Debtor, the principal terms of which are set forth in this Plan and the Disclosure Statement.

118. "*Retained Employee Claim*" means any Claim filed by a current employee of the Debtor who will be employed by the Reorganized Debtor upon the Effective Date.

119. "*Schedules*" means the schedules of Assets and liabilities, statements of financial affairs, lists of Holders of Claims and Equity Interests and all amendments or supplements thereto Filed by the Debtor with the Bankruptcy Court [D.I. 247].

120. "*Secured*" means, when referring to a Claim: (a) secured by a Lien on property in which the Debtor's Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the interest of the Debtor's Estate in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

121. "*Security*" or "*security*" means any security as such term is defined in section 101(49) of the Bankruptcy Code.

122. "*Senior Employees*" means the senior employees of the Debtor Filed in the Plan Supplement.

123. "*Senior Employee Stipulation*" means the agreements filed in the Plan Supplement between each Senior Employee and the Debtor.

124. "*Stamp or Similar Tax*" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

125. "*Statutory Fees*" means fees payable pursuant to 28 U.S.C. § 1930.

126. "*Strand*" means Strand Advisors, Inc., the Debtor's general partner.

127. "*Sub-Servicer*" means a third-party selected by the Claimant Trustee to service or sub-service the Reorganized Debtor Assets.

128. "*Sub-Servicer Agreement*" means the agreement that may be entered into providing for the servicing of the Reorganized Debtor Assets by the Sub-Servicer.

129. "*Subordinated Claim*" means any Claim that is subordinated to the Convenience Claims and General Unsecured Claims pursuant to an order entered by the Bankruptcy Court (including any other court having jurisdiction over the Chapter 11 Case) after notice and a hearing.

130. "*Subordinated Claimant Trust Interests*" means the Claimant Trust Interests to be distributed to Holders of Allowed Subordinated Claims under the Plan, which such interests shall be subordinated in right and priority to the Claimant Trust Interests distributed to Holders of Allowed General Unsecured Claims as provided in the Claimant Trust Agreement.

131. "*Trust Distribution*" means the transfer of Cash or other property by the Claimant Trustee to the Claimant Trust Beneficiaries.

132. "*Trustees*" means, collectively, the Claimant Trustee and Litigation Trustee.

133. "*UBS*" means, collectively, UBS Securities LLC and UBS AG London Branch.

134. "*Unexpired Lease*" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

135. "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

136. "*Voting Deadline*" means the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted under the under the Order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125(a) of the Bankruptcy Code and authorizing the Debtor to solicit acceptances of the Plan.

137. "*Voting Record Date*" means November 23, 2020.

## ARTICLE II.
## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

### A. Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on

or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

## B. Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329,330, 331, 503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement. The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

## C. Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor: (a) Cash in an amount of a total value as of the Effective Date of the Plan equal to the amount of such Allowed

Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, or (b) if paid over time, payment of such Allowed Priority Tax Claim in accordance with section 1129(a)(9)(C) of the Bankruptcy Code; or (c) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

### A. Summary

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

### B. Summary of Classification and Treatment of Classified Claims and Equity Interests

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

**C. Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**D. Impaired/Voting Classes**

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

**E. Unimpaired/Non-Voting Classes**

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

**F. Impaired/Non-Voting Classes**

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

**G. Cramdown**

If any Class of Claims or Equity Interests is deemed to reject this Plan or does not vote to accept this Plan, the Debtor may (i) seek confirmation of this Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify this Plan in accordance with the terms hereof and the Bankruptcy Code. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**H. Classification and Treatment of Claims and Equity Interests**

1. *Class 1 – Jefferies Secured Claim*

- *Classification*: Class 1 consists of the Jefferies Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired. Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until

full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*: Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

2. <u>*Class 2 – Frontier Secured Claim*</u>

- *Classification*: Class 2 consists of the Frontier Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim: (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note. The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*: Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject this Plan.

3. <u>*Class 3 – Other Secured Claims*</u>

- *Classification*: Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*: Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 3 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

4. *Class 4 – Priority Non-Tax Claims*

- *Classification*: Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*: Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

5. *Class 5 – Retained Employee Claims*

- *Classification*: Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*: Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

6. *Class 6 – PTO Claims*

- *Classification*: Class 6 consists of the PTO Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*: Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 6

Claims are not entitled to vote to accept or reject this Plan and will not be solicited.

7. *Class 7 – Convenience Claims*

- *Classification*: Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*: Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject this Plan.

8. *Class 8 – General Unsecured Claims*

- *Classification*: Class 8 consists of the General Unsecured Claims.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject this Plan.

9. *Class 9 – Subordinated Claims*

- *Classification*: Class 9 consists of the Subordinated Claims.

  *Treatment*: On the Effective Date, Holders of Subordinated Claims shall receive either (i) their Pro Rata share of the Subordinated Claimant Trust Interests or, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee may agree upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject this Plan.

10. *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*: Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject this Plan.

11. *Class 11 – Class A Limited Partnership Interests*

- *Classification*: Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of this Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject this Plan.

**I. <u>Special Provision Governing Unimpaired Claims</u>**

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

**J. <u>Subordinated Claims</u>**

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Upon written notice and hearing, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to seek entry of an order by the Bankruptcy Court to re-classify or to subordinate any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## ARTICLE IV.
## <u>MEANS FOR IMPLEMENTATION OF THIS PLAN</u>

**A. <u>Summary</u>**

As discussed in the Disclosure Statement, the Plan will be implemented through (i) the Claimant Trust, (ii) the Litigation Sub-Trust, and (iii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited

partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to this Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in this Plan and the Claimant Trust Agreement.

## B. <u>The Claimant Trust</u>[2]

### 1. *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and the Litigation Sub-Trust in accordance with the Plan in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and

[2] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims and the Litigation Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant Trustee shall also be responsible for resolving all Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in this ARTICLE IV, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

2. *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

3. *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in this Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length in ARTICLE IV.C.

4. *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims. Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

5. *Claimant Trust Agreement and Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

(i) the payment of the Claimant Trust Expenses;

(ii) the payment of other reasonable expenses of the Claimant Trust;

(iii) the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

(iv) the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

(v) the orderly monetization of the Claimant Trust Assets;

(vi) litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(vii) the resolution of Claims and Equity Interests in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

(viii) the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

(ix) the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement. The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expense (including, without limitation, any reserve for potential indemnification claims as authorized and provided under the Claimant Trust Agreement), and shall periodically replenish such reserve, as necessary.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. The Litigation Sub-Trust Agreement generally will provide for, among other things:

(i) the payment of other reasonable expenses of the Litigation Sub-Trust;

(ii) the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

(iii) the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

6. *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

7. *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets (including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and Causes of Action, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

8. *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as: (a) a transfer

of the Claimant Trust Assets (other than the amounts set aside in the Disputed Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests. Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

9. *Tax Reporting.*

(a) The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed Claims Reserve as a separate taxable entity.

(b) The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

10. *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court, and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in this Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

11. *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

12. *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

13. *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

14. *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (d) all objections to Disputed Claims and Equity Interests are fully resolved, (e) the Reorganized Debtor is dissolved, and (f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and

no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

## C. The Reorganized Debtor

### 1. *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

### 2. *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

### 3. *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

The Reorganized Limited Partnership Agreement does not provide for, and specifically disclaims, the indemnification obligations under the Limited Partnership Agreement, including any such indemnification obligations that accrued or arose or could have been brought prior to the Effective Date. Any indemnification Claims under the Limited Partnership Agreement that accrued, arose, or could have been filed prior to the Effective Date will be resolved through the Claims resolution process provided that a Claim is properly filed in accordance with the Bankruptcy Code, the Plan, or the Bar Date Order. Each of the Debtor, the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust reserve all rights with respect to any such indemnification Claims.

4. *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

5. *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in this Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

6. *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in this Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

7. *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement,

the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in ARTICLE IV.B.1, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

**D. <u>Company Action</u>**

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to this Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in this Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with this Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in this Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

## E. Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

## F. Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, ARTICLE IV.C.2.

## G. Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

## H. Control Provisions

To the extent that there is any inconsistency between this Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, this Plan shall control.

## I. Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under ARTICLE III.C of this Plan shall receive no Plan Distributions.

## J. Plan Documents

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in ARTICLE I hereof) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

## K. Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

# ARTICLE V.
# TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A. Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to this Plan on or prior to the Confirmation Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan or the Plan Supplement, on the Confirmation Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Confirmation Date, the Debtor may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4),

as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [Docket No. 1122].

**B. Claims Based on Rejection of Executory Contracts or Unexpired Leases**

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Confirmation Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Confirmation Date. Any Rejection Claims that are not timely Filed pursuant to this Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as General Unsecured Claims and shall be treated in accordance with ARTICLE III of this Plan.

**C. Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases**

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with this Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to this ARTICLE V.C shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to this ARTICLE V.C, shall be deemed disallowed and expunged as of the Confirmation Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A. Dates of Distributions

Except as otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that this Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein. If any payment or act under this Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in this Plan. Except as otherwise provided in this Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to this Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in this Plan and in the Confirmation Order. All payments and all distributions made by the Distribution Agent under this Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests. The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under this Plan to such Persons or the date of such distributions.

### B. Distribution Agent

Except as provided herein, all distributions under this Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter. The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

**C. Cash Distributions**

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

**D. Disputed Claims Reserve**

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

**E. Distributions from the Disputed Claims Reserve**

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount. To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of this Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date. For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and be deemed a Claimant Trust Asset.

**F. Rounding of Payments**

Whenever this Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under this Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under this Plan.

**G. *De Minimis* Distribution**

Except as to any Allowed Claim that is Unimpaired under this Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in ARTICLE VI.J hereof within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

**H. Distributions on Account of Allowed Claims**

Except as otherwise agreed by the Holder of a particular Claim or as provided in this Plan, all distributions shall be made pursuant to the terms of this Plan and the Confirmation Order. Except as otherwise provided in this Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

**I. General Distribution Procedures**

The Distribution Agent shall make all distributions of Cash or other property required under this Plan, unless this Plan specifically provides otherwise. All Cash and other property held by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under this Plan shall not be subject to any claim by any Person.

**J. Address for Delivery of Distributions**

Distributions to Holders of Allowed Claims, to the extent provided for under this Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

**K. Undeliverable Distributions and Unclaimed Property**

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under this Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

## L. <u>Withholding Taxes</u>

In connection with this Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to this Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under this Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to this Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

## M. <u>Setoffs</u>

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with this Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

## N. <u>Surrender of Cancelled Instruments or Securities</u>

As a condition precedent to receiving any distribution pursuant to this Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to ARTICLE IV of this Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

**O. Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by this Plan, deliver to the Distribution Agent: (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with ARTICLE VI.O of this Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under this Plan, be deemed to have surrendered such security or note to the Distribution Agent.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

**A. Filing of Proofs of Claim**

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

**B. Disputed Claims**

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest, request the Bankruptcy Court subordinate any Claims to Subordinated Claims, or any other appropriate motion or adversary proceeding with respect to the foregoing by the Claims Objection Deadline or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of this Plan.

**C. Procedures Regarding Disputed Claims or Disputed Equity Interests**

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

## D. Allowance of Claims and Equity Interests

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

### 1. *Allowance of Claims*

After the Effective Date and subject to the other provisions of this Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in this Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

### 2. *Estimation*

Subject to the other provisions of this Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with this Plan and (b) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

### 3. *Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE,**

**ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

## ARTICLE VIII.
## EFFECTIVENESS OF THIS PLAN

### A. Conditions Precedent to the Effective Date

The Effective Date of this Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of ARTICLE VIII.B of this Plan of the following:

- This Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to this Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have become a Final Order and shall be in form and substance reasonably acceptable to the Debtor and the Committee. The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate this Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in this Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under this Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and this Plan are nonseverable and mutually dependent; (iii) the implementation of this Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under this Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under this Plan upon the Effective Date.

- All documents and agreements necessary to implement this Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust

Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement this Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Debtor shall have obtained applicable directors' and officers' insurance coverage that is acceptable to each of the Debtor, the Committee, the Claimant Trust Oversight Committee, the Claimant Trustee and the Litigation Trustee.

- The Professional Fee Reserve shall be funded pursuant to this Plan in an amount determined by the Debtor in good faith.

**B. <u>Waiver of Conditions</u>**

The conditions to effectiveness of this Plan set forth in this ARTICLE VIII (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate this Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

**C. <u>Dissolution of the Committee</u>**

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on

the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

## ARTICLE IX.
## EXCULPATION, INJUNCTION AND RELATED PROVISIONS

### A. General

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

### B. Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by this Plan or the Confirmation Order, all consideration distributed under this Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to this Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by this Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

### C. Exculpation

Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(iv); *provided*, *however,* the foregoing

will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

**D. Releases by the Debtor**

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided pursuant to this ARTICLE IX.D (i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee, shall be deemed null and void and of no force and effect (1) if there is more than one member of the Claimant Trust Oversight Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee (regardless of whether the Employee is then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee):

- sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation

Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (2) the resolution of Claims, or (y) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to this ARTICLE IX.D will vest and the Employee will be indefeasibly released pursuant to this ARTICLE IX.D if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

## E. Preservation of Rights of Action

### 1. *Maintenance of Causes of Action*

Except as otherwise provided in this Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

### 2. *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including,

without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order, except where such Causes of Action have been expressly released in this Plan or any other Final Order (including, without limitation, the Confirmation Order). In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

**F. Injunction**

**Upon entry of the Confirmation Order, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor or the property of the Debtor, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means, any judgment, award, decree, or order against the Debtor or the property of the Debtor, (iii) creating, perfecting, or otherwise enforcing in any manner, any security interest, lien or encumbrance of any kind against the Debtor or the property of the Debtor, (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Debtor or against property or interests in property of the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding paragraph against any successors of the Debtor, including, but not limited to, the Reorganized Debtor, the Litigation Sub-Trust, and the Claimant Trust and their respective property and interests in property.**

**Subject in all respects to ARTICLE XII.D, no Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court**

**(i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Enjoined Party to bring such claim or cause of action against any such Protected Party; *provided, however,* the foregoing will not apply to a claim or cause of action against Strand or against any Employee other than with respect to actions taken, respectively, by Strand or by such Employee from the date of appointment of the Independent Directors through the Effective Date. The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.**

**G. <u>Duration of Injunctions and Stays</u>**

**ARTICLE II. Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, (i) all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under section 362 of the Bankruptcy Code shall remain in full force and effect subject to Section 362(c) of the Bankruptcy Code, and to the extent necessary if the Debtor does not receive a discharge, the Court will enter an equivalent order under Section 105.**

**H. <u>Continuance of January 9 Order</u>**

Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date.

## ARTICLE X.
## <u>BINDING NATURE OF PLAN</u>

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in ARTICLE IX, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to this Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a).

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Pursuant to sections 105 and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Reorganized Debtor, the Claimant Trust, and this Plan to the maximum extent legally permissible, including, without limitation, jurisdiction to:

- allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured, unsecured, or subordinated status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

- grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date; *provided*, *however*, that, from and after the Effective Date, the Reorganized Debtor shall pay Professionals in the ordinary course of business for any work performed after the Effective Date subject to the terms of this Plan and the Confirmation Order, and such payment shall not be subject to the approval of the Bankruptcy Court;

- resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which the Debtor is party or with respect to which the Debtor, Reorganized Debtor, or Claimant Trust may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, any dispute regarding whether a contract or lease is or was executory or expired;

- make any determination with respect to a claim or cause of action against a Protected Party as set forth in ARTICLE IX;

- resolve any claim or cause of action against an Exculpated Party or Protected Party arising from or related to the Chapter 11 Case, the negotiation of this Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, or the transactions in furtherance of the foregoing;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any sale, disposition, assignment or other transfer of the Reorganized Debtor Assets or Claimant Trust Assets, including any break-up compensation or expense reimbursement that may be requested by a purchaser thereof*; provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- if requested by the Reorganized Debtor or the Claimant Trustee, authorize, approve, and allow any borrowing or the incurrence of indebtedness, whether secured or unsecured by the Reorganized Debtor or Claimant Trust; *provided, however*, that neither the Reorganized Debtor nor the Claimant Trustee shall be required to seek such authority or approval from the Bankruptcy Court unless otherwise specifically required by this Plan or the Confirmation Order;

- resolve any issues related to any matters adjudicated in the Chapter 11 Case;

- ensure that distributions to Holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of this Plan;

- decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action (including Estate Claims) that are pending as of the Effective Date or that may be commenced in the future, including approval of any settlements, compromises, or other resolutions as may be requested by the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee whether under Bankruptcy Rule 9019 or otherwise, and grant or deny any applications involving the Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtor, the Claimant Trustee, or Litigation Trustee after the Effective Date, provided that the Reorganized Debtor, the Claimant Trustee, and the Litigation Trustee shall reserve the right to commence actions in all appropriate forums and jurisdictions;

- enter such orders as may be necessary or appropriate to implement, effectuate, or consummate the provisions of this Plan, the Plan Documents, and all other contracts, instruments, releases, and other agreements or documents adopted in connection with this Plan, the Plan Documents, or the Disclosure Statement;

- resolve any cases, controversies, suits or disputes that may arise in connection with the implementation, effectiveness, consummation, interpretation, or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

- issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, effectiveness, consummation, or enforcement of this Plan, except as otherwise provided in this Plan;

- enforce the terms and conditions of this Plan and the Confirmation Order;

- resolve any cases, controversies, suits or disputes with respect to the release, exculpation, indemnification, and other provisions contained herein and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

- enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

- resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Plan Documents, or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement; and

- enter an order concluding or closing the Chapter 11 Case after the Effective Date.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A. Payment of Statutory Fees and Filing of Reports

All outstanding Statutory Fees shall be paid on the Effective Date. All such fees payable, and all such fees that become due and payable, after the Effective Date shall be paid by the Reorganized Debtor when due or as soon thereafter as practicable until the Chapter 11 Case is closed, converted, or dismissed. The Claimant Trustee shall File all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Claimant Trustee shall File with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee. The Reorganized Debtor shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### B. Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan: (a) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order with the consent of the Committee, such consent not to be unreasonably withheld; and (b) after the entry of the Confirmation Order, the Debtor may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### C. Revocation of Plan

The Debtor reserves the right to revoke or withdraw this Plan prior to the Confirmation Date and to File a subsequent chapter 11 plan with the consent of the Committee. If the Debtor revokes or withdraws this Plan prior to the Confirmation Date, then: (i) this Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in this Plan, assumption of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (iii) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtor or any other Entity.

**D. Obligations Not Changed**

Notwithstanding anything in this Plan to the contrary, nothing herein will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

**E. Entire Agreement**

Except as otherwise described herein, this Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

**F. Closing of Chapter 11 Case**

The Claimant Trustee shall, after the Effective Date and promptly after the full administration of the Chapter 11 Case, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Case.

**G. Successors and Assigns**

This Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor and the Claimant Trustee. The rights, benefits, and obligations of any Person or Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Person or Entity.

**H. Reservation of Rights**

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date occurs. Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor, the Reorganized Debtor, the Claimant Trustee, or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor, the Reorganized Debtor, or the Claimant Trustee with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

Neither the exclusion or inclusion by the Debtor of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Documents, nor anything contained in this Plan, will constitute an admission by the Debtor that any such contract or lease is or is not an executory contract or lease or that the Debtor, the Reorganized Debtor, the Claimant Trustee, or their respective Affiliates has any liability thereunder.

Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the

Debtor, the Reorganized Debtor, or the Claimant Trustee under any executory or non-executory contract.

Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, under any executory or non-executory contract or lease.

If there is a dispute regarding whether a contract or lease is or was executory at the time of its assumption under this Plan, the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract.

**I. Further Assurances**

The Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder, and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order. On or before the Effective Date, the Debtor shall File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**J. Severability**

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**K. Service of Documents**

All notices, requests, and demands to or upon the Debtor, the Reorganized Debtor, or the Claimant Trustee to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered addressed as follows:

**If to the Claimant Trust:**

Highland Claimant Trust
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700

Dallas, Texas 75201
Attention: James P. Seery, Jr.

**If to the Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.

**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Attn: Jeffrey N. Pomerantz, Esq.
Ira D. Kharasch, Esq.
Gregory V. Demo, Esq.

**If to the Reorganized Debtor:**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
**with copies to:**

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Attn: Jeffrey N. Pomerantz, Esq.
Ira D. Kharasch, Esq.
Gregory V. Demo, Esq.

### L. Exemption from Certain Transfer Taxes Pursuant to Section 1146(a) of the Bankruptcy Code

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any Stamp or Similar Tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate federal, state or local governmental officials or agents or taxing authority to forego the collection of any such Stamp or Similar Tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such Stamp or Similar Tax or governmental assessment. Such exemption specifically applies, without limitation, to (i) all actions, agreements and documents necessary to

evidence and implement the provisions of and the distributions to be made under this Plan; (ii) the maintenance or creation of security or any Lien as contemplated by this Plan; and (iii) assignments, sales, or transfers executed in connection with any transaction occurring under this Plan.

**M. <u>Governing Law</u>**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Texas, without giving effect to the principles of conflicts of law of such jurisdiction; *provided, however,* that corporate governance matters relating to the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trust, as applicable, shall be governed by the laws of the state of organization of the Debtor, the Reorganized Debtor, New GP LLC, or the Claimant Trustee, as applicable.

**N. <u>Tax Reporting and Compliance</u>**

The Debtor is hereby authorized to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtor is for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**O. <u>Exhibits and Schedules</u>**

All exhibits and schedules to this Plan, if any, including the Exhibits and the Plan Documents, are incorporated and are a part of this Plan as if set forth in full herein.

**P. <u>Controlling Document</u>**

In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control. The provisions of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and of the Confirmation Order, on the other hand, shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of this Plan, the Disclosure Statement, and any Plan Document, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of this Plan, the Disclosure Statement, and the Plan Documents, as applicable.

*[Remainder of Page Intentionally Blank]*

Dated: January 22, 2021

Respectfully submitted,

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: ________________________
James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com

*Counsel for the Debtor and Debtor-in-Possession*

# Exhibit B

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

**Schedule of CLO Management Agreements and Related Contracts to Be Assumed**

1. Servicing Agreement, dated December 20, 2007, by and among Greenbriar CLO, Ltd., and Highland Capital Management, L.P.
2. Investment Management Agreement, dated November 1, 2007, by and between Longhorn Credit Funding, LLC, and Highland Capital Management, L.P. (as amended)
3. Reference Portfolio Management Agreement, dated August 1, 2016, by and between Highland Capital Management, L.P., and Valhalla CLO, Ltd.
4. Collateral Servicing Agreement, dated December 20, 2006, by and among Highland Park CDO I, Ltd., and Highland Capital Management, L.P.
5. Portfolio Management Agreement, dated March 15, 2005, by and among Southfork CLO Ltd., and Highland Capital Management, L.P.
6. Amended and Restated Portfolio Management Agreement, dated November 30, 2005, by and among Jaspar CLO Ltd., and Highland Capital Management, L.P.
7. Servicing Agreement, dated May 31, 2007, by and among Westchester CLO, Ltd., and Highland Capital Management, L.P.
8. Servicing Agreement, dated May 10, 2006, by and among Rockwall CDO Ltd. and Highland Capital Management, L.P. (as amended)
9. Portfolio Management Agreement, dated December 8, 2005, by and between Liberty CLO, Ltd., and Highland Capital Management, L.P.
10. Servicing Agreement, dated March 27, 2008, by and among Aberdeen Loan Funding, Ltd., and Highland Capital Management, L.P.
11. Servicing Agreement, dated May 9, 2007, by and among Rockwall CDO II Ltd. and Highland Capital Management, L.P.
12. Collateral Management Agreement, by and between, Highland Loan Funding V Ltd. and Highland Capital Management, L.P., dated August 1, 2001.
13. Collateral Management Agreement, dated August 18, 1999, by and between Highland Legacy Limited and Highland Capital Management, L.P.
14. Servicing Agreement, dated November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. (as amended)
15. Servicing Agreement, dated October 25, 2007, by and among Stratford CLO Ltd., and Highland Capital Management, L.P.
16. Servicing Agreement, dated August 3, 2006, by and among Red River CLO Ltd., and Highland Capital Management, L.P. (as amended)
17. Servicing Agreement, dated December 21, 2006, by and among Brentwood CLO, Ltd., and Highland Capital Management, L.P.
18. Servicing Agreement, dated March 13, 2007, by and among Eastland CLO Ltd., and Highland Capital Management, L.P.

19. Portfolio Management, Agreement, dated October 13, 2005, by and among Gleneagles CLO, Ltd., and Highland Capital Management, L.P.

20. Members' Agreement and Amendment, dated November 15, 2017, by and between Highland CLO Funding, Ltd. and Highland Capital Management, L.P.

21. Collateral Management Agreement, dated May 19, 1998, by and between Pam Capital Funding LP, Ranger Asset Mgt LP and Highland Capital Management, L.P.

22. Collateral Management Agreement, dated August 6, 1997, by and between Pamco Cayman Ltd., Ranger Asset Mgt LP and Highland Capital Management, L.P.

23. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Red River CLO Ltd. et al

24. Interim Collateral Management Agreement, June 15, 2005, between Highland Capital Management, L.P. and Rockwall CDO Ltd

25. Amendment No. 1 to Servicing Agreement, October 2, 2007, between Highland Capital Management, L.P. and Rockwall CDO Ltd

26. Collateral Servicing Agreement dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.; The Bank of New York Trust Company, National Association

27. Representations and Warranties Agreement, dated December 20, 2006, between Highland Capital Management, L.P. and Highland Park CDO I, Ltd.

28. Collateral Administration Agreement, dated March 27, 2008, between Highland Capital Management, L.P. and Aberdeen Loan Funding, Ltd.; State Street Bank and Trust Company

29. Collateral Administration Agreement, dated December 20, 2007, between Highland Capital Management, L.P. and Greenbriar CLO, Ltd.; State Street Bank and Trust Company

30. Collateral Acquisition Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd

31. Collateral Administration Agreement, dated March 13, 2007, between Highland Capital Management, L.P. and Eastland CLO, Ltd. and Investors Bank and Trust Company

32. Collateral Administration Agreement, dated October 13, 2005, between Highland Capital Management, L.P. and Gleneagles CLO, Ltd.; JPMorgan Chase Bank, National Association

33. Collateral Acquisition Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.

34. Collateral Administration Agreement, dated November 30, 2006, between Highland Capital Management, L.P. and Grayson CLO, Ltd.; Investors Bank & Trust Company

35. Collateral Acquisition Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.

36. Collateral Administration Agreement, dated August 3, 2006, between Highland Capital Management, L.P. and Red River CLO, Ltd.; U.S. Bank National Association

37. Master Warehousing and Participation Agreement, dated April 19, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company

38. Master Warehousing and Participation Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

39. Master Warehousing and Participation Agreement (Amendment No. 2), dated May 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

40. Master Warehousing and Participation Agreement (Amendment No. 1), dated April 12, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

41. Master Warehousing and Participation Agreement (Amendment No. 3), dated June 22, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

42. Master Warehousing and Participation Agreement (Amendment No. 4), dated July 17, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; MMP-5 Funding, LLC; IXIS Financial Products Inc.

43. Collateral Administration Agreement, dated February 2, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; U.S. Bank National Association; IXIS Financial Products Inc.

44. Collateral Administration Agreement, dated April 18, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Highland Special Opportunities Holding Company; U.S. Bank National Association

45. Master Participation Agreement, dated June 5, 2006, between Highland Capital Management, L.P. and Red River CLO Ltd.; Grand Central Asset Trust

46. A&R Asset Acquisition Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Smith Barney Inc.; Highland Loan Funding V Ltd.

47. A&R Master Participation Agreement, dated July 18, 2001, between Highland Capital Management, L.P. and Salomon Brothers Holding Company; Highland Loan Funding V Ltd.

48. Collateral Acquisition Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.

49. Collateral Administration Agreement, dated June 29, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd.; JPMorgan Chase Bank, National Association

50. Master Warehousing and Participation Agreement, dated March 24, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

51. Master Warehousing and Participation Agreement (Amendment No. 1), dated May 16, 2005, between Highland Capital Management, L.P. and Jasper CLO Ltd; MMP-5 Funding, LLC; and IXIS Financial Products Inc.

52. Collateral Administration Agreement, dated December 8, 2005, between Highland Capital Management, L.P. and Liberty CLO Ltd.

53. Collateral Administration Agreement, dated May 10, 2006, between Highland Capital Management, L.P. and Rockwall CDO Ltd; JPMorgan Chase Bank, National Association

54. Collateral Administration Agreement, dated May 9, 2007, between Highland Capital Management, L.P. and Rockwall CDO II, Ltd.; Investors Bank & Trust Company

55. Collateral Administration Agreement, dated March 15, 2005, between Highland Capital Management, L.P. and Southfork CLO Ltd.; JPMorgan Chase Bank, National Association

56. Collateral Administration Agreement, dated October 25, 2007, between Highland Capital Management, L.P. and Stratford CLO Ltd.; State Street

57. Collateral Administration Agreement, dated August 18, 2004, between Highland Capital Management, L.P. and Valhalla CLO, Ltd.; JPMorgan Chase Bank

58. Collateral Acquisition Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.

59. Collateral Administration Agreement, dated May 31, 2007, between Highland Capital Management, L.P. and Westchester CLO, Ltd.; Investors Bank & Trust Company

60. Collateral Administration Agreement, dated December 21, 2006, between Highland Capital Management, L.P. and Brentwood CLO, Ltd.; Investors Bank & Trust Company

# EXHIBIT 25

**From:** "John A. Morris" <jmorris@pszjlaw.com>
**To:** "Louis Phillips" <Louis.Phillips@kellyhart.com>
**Cc:** "Jeff Pomerantz" <jpomerantz@pszjlaw.com>, "amelia.hurt@kellyhart.com" <Amelia.Hurt@kellyhart.com>
**Subject:** Highland: Privileged and confidential settlement communication and materials
**Date:** Tue, 8 Apr 2025 20:22:22 +0000
**Importance:** Normal
**Attachments:** Privileged_and_confidential_-_DRAFT_4.8.25_discussion_materials.pdf; PRIVILEGED_AND_CONFIDENTIAL_DRAFT_SETTLEMENT_STRUCTURE_4.8.25.pdf; HFP_-_Entity_Chart_-_2011.pdf
**Inline-Images:** image001.jpg

---

E-MAIL AND ATTACHMENTS DELIVERED PURSUANT TO FED. R. EVID. 408
AND APPLICABLE CONFIDENTIALITY AGREEMENT

Louis,

Thank you and your team for your time today.

As a follow up, attached are the following:

1. Discussion materials from today (draft numbers)
2. Discussion materials from today (draft structure)
3. HFP entity chart from 2011

On your end, please send us the following at your earliest convenience:

1. Copy of settlement agreement circa 2022 between HMIT and Dugaboy/Okada entities
2. Copy of operative document relating to the [redemption] of the Dolomiti/Hakusan entities limited partnership interest in Rand PE Fund I
3. Copy of operative document providing for the [extinguishment] of participating shares of the supporting organizations of Charitable DAF Holdco, Ltd.

Let’s confer as soon as you’ve had a chance to consider these matters with your team.

Please let us know if you have any questions in the interim.

Regards,

John
**John A. Morris**
Pachulski Stang Ziehl & Jones LLP
Direct Dial: 212.561.7760
Tel: 212.561.7700 | Fax: 212.561.7777
jmorris@pszjlaw.com
vCard | Bio | LinkedIn

Case 19-34054-sgj11 Doc 4275-4 Filed 06/24/25 Entered 06/24/25 15:38:17 Desc
Exhibit 24 Page 24 of 8


PSZJ

Los Angeles | New York | Wilmington, DE | Houston | San Francisco

**Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties**

**Current Snapshot - remaining assets [1]**
*in USD millions, except percentages*

| Asset description | Ref | Claimant Trust [2] | Indemnity Trust [3] | Combined |
|---|---|---|---|---|
| Cash/treasuries | [4] | $ 20.3 | $ 67.9 | $ 88.1 |
| Disputed Claims Reserve | [5] | 2.7 | - | 2.7 |
| Dugaboy Note receivable | [6] | - | 17.6 | 17.6 |
| HCM Korea (note and equity) | [7] | 3.0 | - | 3.0 |
| HCLOF shares | [8] | 2.5 | - | 2.5 |
| HCRE bad faith sanction | [9] | 0.9 | - | 0.9 |
| Kirschner Litigation (main adversary) | [10] | *See footnote* | - | - |
| HMIT note | [11] | *See footnote* | - | - |
| **Total assets** | | **$ 29.4** | **$ 85.5** | **$ 114.8** |

DRAFT - SUBJECT TO CONFIDENTIALITY AGREEMENT

[1] As of April 3, 2025. This disclosure is NOT a balance sheet prepared in accordance with US GAAP. In some instances, values are estimated and actual amounts realized may ultimately differ materially. No liabilities are included herein, including existing liabilities, contingent liabilities, indemnification obligations, or considerations for future expenses, including costs of liquidation that have not yet been, but will be incurred.

[2] Claimant Trust, including consolidation of the various "Plan" entities other than the Indemnity Trust (HCMLP GP, LLC, Highland Capital Management, LP, Litigation Sub-Trust), each on a standalone basis, with intercompany balances eliminated.

[3] Stand-alone assets retained by the Indemnity Trust. Other than less than <$1M retained in cash, remainder of cash is invested in US treasuries with maturities less than 1 year. Excludes <$1M of cash/treasuries on account of the Okada settlement. Pursuant to the Okada settlement, these funds are segregated and are to be repaid to Okada as first-out funds to the extent that any excess exists in the Indemnity Trust. Accordingly, in a settlement scenario, these funds would not be available to Class 10 interest holders.

[4] Cash and treasuries includes full face amount of treasuries maturing within 6 months and has also been adjusted up to assume the near-term receipt of approximately $5 million from Highland CLO Funding, Ltd.

[5] Segregated funds invested in US treasuries with near-term maturities. Funds are reserved for the Daugherty tax proof of claim, which remains pending. If Highland successfully objects to the proof of claim, funds would be released from the Disputed Claims Reserve. If the claim is ultimately allowed in full or in part, funds would be paid to Daugherty on account of the allowed claim and any excess remaining would be released from the Disputed Claims Reserve.

[6] Note receivable from The Dugaboy Investment Trust ("Dugaboy"). ~$17.4M principal and ~$0.2M interest currently outstanding, accruing at approximately $1,553/day. Fair value is less than face value as the note is long-dated, accruing interest at 3.26% and makes annual principal and interest payments through 2046, with the last of such payments due December 31, 2046. Dugaboy is current on its payments, including with the most recent payment completed for year-end 2024. Principal payments due are $790,215 yearly, plus accrued interest, which declines each year as principal declines. The next interest payment due December 31, 2025 is $566,677. No assurance that Dugaboy will continue making the annual principal and interest payments when due, although the holder of the note could accelerate and pursue collection in that event.

[7] 100% equity interest in Highland Capital Management Korea Limited ("HCM Korea"), plus $2.5 million note from HCM Korea. Ultimate value dependent on the monetization of the Caris Life Sciences investment through an expected 2025 IPO, which is expected to be in the range of $2 million to $5 million, but could also exceed or fall short of this range.

[8] Shares of Highland CLO Funding, Ltd. ("HCLOF"), a Guernsey company. Value has been adjusted down to assume a near-term cash dividend of approximately $5 million. Remaining value is primarily tied up in the "Acis 6" asset, for which a NexPoint entity has recently initiated an appeal in the 2nd Circuit Court of Appeals. Ultimate value dependent on the Acis 6 litigation and costs of winding down HCLOF and expected to be in the range of $2 million to $4 million, but could also exceed or fall short of this range.

[9] Bad faith sanction against HCRE of $825,940.55, currently on appeal in the District Court. Fully briefed since November 2024. Award was posted in the court registry and is accruing post-judgment interest at a rate of $118.80/day. Approximately $870k is outstanding, including post-judgment interest currently. No assurance that the appeal will resolve favorably and as a result, there is no assurance that any amounts will ultimately be collected.

[10] Litigation brought by Marc Kirschner as Litigation Trustee to the Litigation Sub-Trust. Adversary proceeding is currently stayed. The value of the claims, their collectibility, and the costs of their continued pursuit is ultimately unknown. For purposes of aggregating the current value of assets for this illustrative presentation, no value has been ascribed.

[11] Within the litigation brought by Marc Kirschner as Litigation Trustee to the Litigation Sub-Trust were claims against HMIT relating to the "HMIT note" receivable, which had originally been a portion of the consideration HMIT paid for acquiring limited partnership interests in Highland in 2015. These claims are also stayed as part of the overall stay in the case. The value of the note, its collectibility, and the costs of their continued pursuit is ultimately unknown. For purposes of aggregating the current value of assets for this illustrative presentation, no value has been ascribed.

**Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties**

**Uses: how much could be left after satisfying Class 9 claims?**
*in USD millions*

| | | | |
|---|---|---|---|
| **Total combined assets** | **$** | **114.8** | *see "current snapshot"* |
| Less: | | | |
| Oustanding Class 9, including interest | | (21.0) | |
| Existing Incentive Compensation triggered through full payment of Class 9 | | (2.5) | |
| Long-dated assets - Dugaboy Note receivable | | (17.6) | [1] |
| Wind down expenses and accrued liabilities | | (20.0) | [2] |
| Pending Class 8 claims (Daugherty tax) | | *See footnote* | [3] |
| Indemnification obligations | | *See footnote* | [4] |
| **Net expected cash prior to any indemnification considerations and necessary reserves** | **$** | **53.7** | [5] |
| **Plus: Non-cash assets - Dugaboy Note receivable** | **$** | **17.6** | |

[1] Note receivable from The Dugaboy Investment Trust ("Dugaboy"). ~$17.4M principal and ~$0.2M interest currently outstanding, accruing at approximately $1,553/day. Fair value is less than face value as the note is long-dated, accruing interest at 3.26% and makes annual principal and interest payments through 2046, with the last of such payments due December 31, 2046. Dugaboy is current on its payments, including with the most recent payment completed for year-end 2024. Principal payments due are $790,215 yearly, plus accrued interest, which declines each year as principal declines. The next interest payment due December 31, 2025 is $566,677. No assurance that Dugaboy will continue making the annual principal and interest payments when due, although the holder of the note could accelerate and pursue collection in that event.

[2] Amount is ultimately TBD and will ultimately depend on litigation, timing of monetization of remaining assets, and operational needs. For example, if additional litigation is brought forth, outside counsel will incur additional time and expense and certain employees may need to be retained for a longer period of time. If actual expenses exceed $20 million, less cash would be potentially available after Class 9; if actual expenses fall short of $20 million, more cash would be potentially available after Class 9.

[3] For illustrative purposes of this presentation, $0 is assumed. However, if the claim is ultimately allowed in full or in part, funds would be paid to Daugherty on account of the allowed claim, which would reduce cash potentially available after Class 9. No assurances can be provided that the claim will be completely disallowed.

[4] For illustrative purposes of this presentation, $0 is assumed. Thus, all funds utilized for purposes of satisfying indemnification obligations will reduce the funds available dollar for dollar. Under current conditions, it is believed that at least $100 million may be needed for indemnification obligations and as a result, there is not sufficient liquidity at this time to even make any further payments to Class 9 interest holders. Assuming a final/non-appealable order, providing for among other things, a complete cessation of litigation and comprehensive releases from the HMIT/DAF parties, the need for indemnification reserves could be greatly reduced.

[5] Assumes HCM Korea, HCLOF, and HCRE bad faith sanctions are monetized for the amounts described on the "current snapshot" ($6.4 million in aggregate). Monetization in excess of these amounts would result in more cash remaining; monetization below those amounts would result in less cash remaining.

DRAFT - SUBJECT TO CONFIDENTIALITY AGREEMENT

***Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties***
**Information request made April 7, 2025**

**(i) Accrued liabilities**

| | Entity | | Amount | |
|---|---|---|---|---|
| End of case/severance bonuses - remaining employees | HCMLP | $ | 1,230,000 | |
| Accounts payable book balance (as of March 31, 2025) | HCMLP | | 576,207 | |
| Estimate of other incurred, but not invoiced for work performed | HCMLP | | 500,000 | *general estimate* |
| **Sub-total (i)** | | **$** | **2,306,207** | *A* |

| **Other liabilities not included in section totals above** | Entity | | Amount | |
|---|---|---|---|---|
| Distribution payable | HCT | $ | 2,656,732 | *previously authorized distributions related to pending Daugherty claim (has offsetting cash reserve; see current snapshot); to be released following resolution of the pending claim* |
| Okada settlement payable | Indemnity Trust | $ | 870,000 | *first-out dollars in treasuries (amount is face of such treasuries) - for purposes of settlement discussions, the cash reserved related to the Okada settlement and the potential first-out dollars are excluded as irrelevant* |

**(ii) Anticipated success or severance (or completion) payments or bonuses**

| | Entity | | Amount | |
|---|---|---|---|---|
| Incentive Compensation Plan | HCMLP/HCT | $ | 2,480,088 | *assuming full payment of the Class 9's; calc'd as 14.71516% on remaining distributions to Class 9 with a time discount applied to the gross dollars distributed* |
| Retention Date payments - employees | HCMLP | | 925,000 | *Retention Date is 9/30/2025* |
| Nate Burns (employee) incentive comp | HCMLP | | - | *Nate receives a portion of the performance fees earned related to HCM Korea; assuming zero for presentation purposes as amounts would be a percentage of incremental value received from HCM Korea* |
| **Sub-total (ii)** | | **$** | **3,405,088** | *B* |

**(iii) Continuing admin budget for the Claimant Trust, Indemnification sub trust and/or litigation sub trust**

| | | | |
|---|---|---|---|
| **See subsequent page; Sub-total (iii)** | **$** | **16,768,874** | ***C - additional detail contained on separate page*** |

| | | | |
|---|---|---|---|
| **Sum of A, B, and C** | **$** | **22,480,169** | |

DRAFT - SUBJECT TO CONFIDENTIALITY AGREEMENT

**(iv) Identity and amount and basis for any holdback(s)**

| **Identity:** | | Amount | ***Basis for amount*** |
|---|---|---|---|
| Sum of A, B, and C from above | $ | 22,480,169 | *from above; See notes and assumptions related to items A, B, and C* |
| Incremental operational reserve | | 5,000,000 | *Excess cash to retain to cover potential cost overages - largest risk is incremental litigation and resulting time and expense of PSZJ plus longer retention of employees/CEO to assist with litigation, if applicable* |
| Indemnification reserves | | 35,000,000 | *Assumes comprehensive releases and settlement amongst the HMIT/DAF Parties; at least $100 million if no settlement* |
| Sum of items above | $ | 62,480,169 | *to below* |

| **Calc of estimated cash available for a prelim distribution to Class 10, assuming settlement** | | **$ millions** | |
|---|---|---|---|
| Current cash/treasuries (see previous page) | $ | 88.1 | *Cash and treasuries (including all Plan entities)* |
| Assets expected to monetize in next 12 months | | 6.4 | *HCM Korea, remainder of HCLOF, bad faith sanction (but excluding near-term Dugaboy Note P&I amortization due December 2025)* |
| **Sub-total** | **$** | **94.5** | |
| less: outstanding Class 9, including interest | | (21.0) | *current outstanding Class 9 with interest* |
| less: holdbacks (from above) | | (62.5) | *from above* |
| Remaining cash available for initial distribution to Class 10 | $ | 11.1 | *[1]* |
| **Round to nearest million** | **$** | **11.0** | |

*[1] Possibility of incremental amount of up to $2.7 million in the event of a successful opposition to the pending Daugherty tax POC, along with incremental interim cash received from Dugaboy Note P&I amortization. Amount also does not include non-cash assets (litigation, oustanding Dugaboy Note, etc).*

***Privileged and confidential - provided pursuant to Rule 408 and the binding Confidentiality Agreement executed amongst the Parties***
**Projected Budget Build-Up**

**Remaining expected budget assuming a comprehensive settlement with HMIT/DAF Parties (excluding accrued liabilities and contingencies separately discussed)**

| **Description** | **Total for budget** | ***Notes and assumptions*** |
|---|---|---|
| Pachulski Stang and other litigation or BK-related | $ 5,000,000 | *Primary issues: expected new litigation to defend (actual causes of action unknown) from Dondero parties, incorporation of HMIT/DAF settlement and approval/appeals of same, appeals of "valuation complaint" and "HCRE bad faith", extension of the Trust for 1 yr. and dissolution issues. Ultimate amount required could vary materially higher or lower.* |
| HCMLP employees salary and benefits (other than CEO) | 4,084,354 | *Assumes declining headcount from 6 to 3, ending August 2026 (monthly trending from approx. $300k/month currently to approx. $200k/month at end)* |
| Claimant Trustee/CEO salary | 2,700,000 | *Assumes 18 months at $150k/month* |
| Litigation Trustee | 360,000 | *Assumes 18 months at $20k/month* |
| Independent Member | 225,000 | *Assumes 18 months at $12.5k/month* |
| Litigation trust (other than Trustee) | 250,000 | *Assuming minimal time and expense other than in conjunction with transfer of main case* |
| Incentive Compensation on distributions to Cl. 10 | TBD | *Provide for alignment in regards to quantum and timing of distributions and management of costs* |
| <u>Overhead related</u> | | |
| Facilities/offsite storage and related | 1,079,121 | *Office space through end of 2026 and offsite document retention through 2028* |
| External tax | 1,000,000 | *Declining each year with final year for tax year 2027* |
| IT costs | 701,760 | *Cloud storage, network infrastructure through 2027, email storage through 2030* |
| Accounting systems and information | 331,045 | *General retention and maintenance through 2028 (primarily Oracle maintenance)* |
| Other professionals | 200,000 | *Misc reserve for other professionals* |
| Other misc overhead | 200,000 | *Misc reserve for other overhead, T&E, entity wind-up costs, etc* |
| Indemnification expenses | 200,000 | *Assuming misc. expenses from misc. matters* |
| US Trustee | 437,594 | Assuming 0.8% of budget + accruals + distributions (assuming $30M total) |
| **Grand total** | **$ 16,768,874** | ***to previous page*** |

DRAFT - SUBJECT TO CONFIDENTIALITY AGREEMENT

# EXHIBIT 26

CROWNGLOBAL
INSURANCE

Deferred Variable Annuity Policy

**This Policy is a Deferred Variable Annuity (DVA) Policy. This Policy is Non-Participating.** Crown Global Life Insurance Ltd., a Bermuda Class C insurance company, will pay, subject to the provisions of this Policy, the Annuity Payments to the Beneficiaries as provided by this Policy, provided that the Policy is In Force.

Signed for the Insurer at its Home Office located at Hamilton, Bermuda on the Issue Date.

12/15/15 Ken Goertzen, [signature]

12/16/15 Janita Burke, [signature]

**THIS IS A LEGAL CONTRACT.**
**PLEASE READ IT CAREFULLY.**

THE INSURER IS INCORPORATED IN BERMUDA AND IS REGISTERED AS A CLASS C INSURER IN BERMUDA PERMITTING IT TO WRITE DEFERRED VARIABLE ANNUITY POLICIES AND CONDUCT OTHER LONG-TERM INSURANCE BUSINESS. THE INSURER IS NOT AUTHORIZED IN ANY JURISDICTION OTHER THAN BERMUDA TO CARRY ON ANY INSURANCE BUSINESS. POLICY ACCOUNT VALUES UNDER THIS POLICY ARE BASED ON THE INVESTMENT EXPERIENCE OF A SEPARATE ACCOUNT ESTABLISHED UNDER THIS POLICY AND THE PRIVATE ACT. THE POLICY ACCOUNT VALUES UNDER THIS POLICY MAY INCREASE OR DECREASE IN AMOUNT. INVESTMENTS OF FUNDS HELD IN THE SEPARATE ACCOUNT MAY BE MADE IN NON-U.S. INVESTMENTS AS WELL AS U.S. INVESTMENTS. THE ASSETS IN THE SEPARATE ACCOUNT MAY BE ADVERSELY AFFECTED BY CHANGES IN FOREIGN GOVERNMENTS, AND OTHER ECONOMIC AND POLITICAL EVENTS, WHICH MIGHT NOT AFFECT U.S. INVESTMENTS OR ENTITIES, AND BY FLUCTUATIONS IN THE ENTITIES, AND BY FLUCTUATIONS IN THE VALUE OF FOREIGN CURRENCY.

Crown Global
Life Insurance Ltd.

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

*continued on next page*

CROWN GLOBAL
INSURANCE

Deferred Variable Annuity Policy

THIS POLICY CANNOT BE TRANSFERRED, ASSIGNED, HYPOTHECATED, OR PLEDGED, WITHOUT THE INSURER'S PRIOR WRITTEN CONSENT, WHICH THE INSURER MAY WITHHOLD IN ITS SOLE AND ABSOLUTE DISCRETION. THIS POLICY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER U.S. FEDERAL OR STATE SECURITIES LAWS OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND, THEREFORE, CANNOT BE TRANSFERRED UNLESS SO REGISTERED OR UNLESS SUCH REGISTRATION IS NOT REQUIRED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THIS POLICY IS AN APPROPRIATE INVESTMENT ONLY FOR PURCHASERS WHO ARE QUALIFIED PURCHASERS WITHIN THE MEANING OF THE U.S. INVESTMENT COMPANY ACT OF 1940 AND ACCREDITED INVESTORS WITHIN THE MEANING OF RULE 501(a) OF REGULATION D PROMULGATED UNDER THE U.S. SECURITIES ACT OF 1933. THIS POLICY IS ALSO APPROPRIATE ONLY FOR SOPHISTICATED PURCHASERS WHO, AMONG OTHER THINGS, HAVE NO NEED FOR ACCESS TO AMOUNTS DESCRIBED IN THE POLICY. ADDITIONAL INFORMATION ON THE RISKS OF PURCHASING A POLICY APPEARS IN THE CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, AS AMENDED THROUGH THE DATE HEREOF, DESCRIBING THE POLICY.

**THE INSURER MAKES NO REPRESENTATION AS TO THE TAX TREATMENT OF THIS POLICY FOR U.S. FEDERAL INCOME TAX PURPOSES OR FOR THE PURPOSES OF THE TAX LAWS OF ANY OTHER JURISDICTION. NO REPRESENTATION IS MADE THAT A PROPOSED POLICYHOLDER WOULD NOT BE SUBJECT TO AUDIT OR EXAMINATION BY THE TAX AUTHORITIES OF ANY JURISDICTION AS A RESULT OF PURCHASING A POLICY.**

**NO REPRESENTATION IS MADE REGARDING THE LIKELIHOOD THAT THE CURRENT U.S. FEDERAL INCOME TAX LAWS, REGULATIONS AND OFFICIAL INTERPRETATIONS OF THE LAW MAY BE CHANGED IN THE FUTURE. IT IS POSSIBLE THAT SUCH CHANGES COULD OCCUR, AND THAT SUCH CHANGES COULD APPLY TO THE POLICY, AND COULD APPLY RETROACTIVELY. THE INSURER HAS RESERVED THE RIGHT IN ITS SOLE AND ABSOLUTE DISCRETION TO MAKE CHANGES TO THE POLICY THAT IT DEEMS NECESSARY TO PRESERVE THE EXPECTED TAX CONSEQUENCES OF THE OWNERSHIP OF THE POLICY AS A RESULT OF CHANGES IN THE LAWS OF THE U.S. OR ANY OTHER JURISDICTION.**

Crown Global
Life Insurance Ltd.

Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

www.crownglobalinsurance.com

CROWNGLOBAL
INSURANCE

# Policy Data Page

## General Policy Data

**All amounts expressed in "$" or "dollars" are in United States dollars**

| | |
|---|---|
| Proposed Policyholder: | Proposed Annuitant: |
| Empower Dallas Foundation, Inc | Grant Scott |
| Proposed Annuitant's Date of Birth: | Gender: |
| | Male |
| Policy Effective Date: 10 Dec, 2015 | Issue Date: 10 Dec, 2015 |

Annuity Starting Date: Deferred

until Annuitant's 85th birthday

at the latest

| Beneficiary: | Beneficiary Interest | Revocable/Irrevocable? |
|---|---|---|
| Empower Dallas Foundation, Inc | 100% | Irrevocable |

Separate Account number : 30218

**Premium Amounts**

| | |
|---|---|
| Initial Premium: | $ 15,903,108.54 |
| Premium Limit: | n/a |
| Premium Deposit: | n/a |

Net Premiums will be deposited to the Separate Account established by the Insurer with respect to the Policy.

CROWNGLOBAL INSURANCE

# Policy Data Page

## Initial Allocation of Payments to Investment Options

| Investment Options | Initial Allocation |
| --- | --- |
| 1. IDF: Atlas IDF, LP/ Rand Advisors LLC | 100% |

Custodian Bank: n/a

Investment Manager: n/a

CROWNGLOBAL INSURANCE

# Policy Data Page

## Policy Fees and Charges

| Charge | Due Date | A□ount of Charge |
|---|---|---|
| Policy Administration Fee | In equal installments in advance on each Liquidity Date | $2,900 per annum |
| Agreed Upon Procedures Fee | Annually | As charged by the outside auditors, currently $1,975. |
| DAC Charges | Each date the Insurer receives a Premium | 0.25% of the amount of Premium payment. *See* Section 9.2 of the Policy. |
| Management & Expense Fee | In advance on each Liquidity Date | The following annual rates expressed as a percentage of the Policy Account Value:<br>0.45% p.a $10mm of Premium<br>0.35% p.a. $11-20mm of Premium<br>0.25% p.a. $21mm+of Premium, provided that if the Policy Account Value exceeds $50mm, the annual rate shall be 0.1% p.a. on the portion of Policy Account Value in excess of $50mm<br>(adjusted for additional premium payments and withdrawals, as applicable)<br>*See* Section 9.3 of the Policy. |
| Policy Set-Up Deposit | Upon submission of the completed Annuity Application Form. | N/A |
| Acceptance Fee | Each date the Insurer receives a Premium payment | Zero |
| Taxes | When paid by the Insurer or its affiliate | *See* Section 9.7 of the Policy. |

# Table of Contents


General Policy Data ........ □
Initial Allocation of Payments to Investment Options ........ □
Policy Fees and Charges ........ □

**Article I General Pro□isions ........ □□**
Section 1.1 Consideration ........ 1□
Section 1.2 Entire Policy ........ 1□
Section 1.□ Survival of Representations, Warrants, Covenants ........ 1□
Section 1.□ Amendment or Modification ........ 1□
Section 1.□ Misstatement of Age ........ 1□
Section 1.□ Non-Participating Policy ........ 1□
Section 1.□ Ownership of Assets ........ 1□
Section 1.□ Rule of Construction ........ 1□
Section 1.□ Governing Law ........ 1□
Section 1.1□ Effective Date of Coverage ........ 1□

**Article II Pre□iu□ Pro□isions ........ □□**
Section 2.1 Premiums ........ 1□
Section 2.2 Insurer□s Right to Refuse Premiums ........ 1□
Section 2.□ Nonpayment of Premium ........ 1□

**Article III Ter□ination Pro□isions ........ □□**
Section □.1 Insurer□s Cancellation Rights ........ 1□
Section □.2 Reinstatement ........ 2□

**Article IV Pre□iu□ In□est□ent□Policy Account Values ........ □□**
Section □.1 The Separate Account ........ 21
Section □.2 Premiums ........ 21
Section □.□ Allocations to Investment Options ........ 21
Section □.□ Compliance with Investor Control Rules ........ 22
Section □.□ Changes in Allocations to Investment Options ........ 2□
Section □.□ Responsibility for Selecting Investment Options ........ 2□
Section □.□ Appointment of Investment Manager and Custodian Ban□ ........ 2□
Section □.□ Timing of Allocations ........ 2□
Section □.□ Investment of Separate Account Assets ........ 2□
Section □.1□ Re□uest for E□tension of Investment Rights With Respect to Ade□uate Diversification ........ 2□
Section □.11 Changes in Investment Options ........ 2□

CROWNGLOBAL INSURANCE


Section □.12 Policy Account Value ........ 2□

**Article V Transfers A□ong In□est□ent Options ........ □□**

Section □.1 General ........ 2□
Section □.2 Conditions on Transfer ........ 2□
Section □.□ Liability ........ 2□
Section □.□ Limits on Right of Transfer ........ 2□

**Article VI Annuity Pro□isions ........ □□**

Section □.1 Annuity Payments ........ □□
Section □.2 Annuity Percentage ........ □□
Section □.□ No Guaranteed Payments ........ □□
Section □.□ Annuity Starting Date ........ □1
Section □.□ Change of Annuity Starting Date ........ □1
Section □.□ Annuity Income Options ........ □1
Section □.□ Maturity Payment ........ □2

**Article VII Loan Pro□isions ........ □□**

Section □.1 Policy Loans ........ □□

**Article VIII Surrender Pro□isions ........ □□**

Section □.1 General ........ □□
Section □.2 Full Surrender ........ □□
Section □.□ Partial Surrender ........ □□

**Article I□ Policy Fees and Charges ........ □□**

Section □.1 Policy Administration Fee ........ □□
Section □.2 DAC Charges ........ □□
Section □.□ Management □ E□pense Fee ........ □□
Section □.□ Policy Set-Up Deposit ........ □□
Section □.□ Acceptance Fee ........ □□
Section □.□ Surrender Charge ........ □□
Section □.□ Ta□es ........ □□
Section □.□ Agreed Upon Procedures Fee ........ □□
Section □.□ Deductions for Fees and Charges ........ □□
Section □.1□ Custodian Ban□and Investment Manager Fees ........ □□

**Article □ Death Benefit Pro□isions ........ □□**

Section 1□.1 Death Benefit ........ □□
Section 1□.2 Due Proof of Death ........ □□

CROWNGLOBAL INSURANCE

**Article □I O□ner□Beneficiary□Assign□ent ..................... □□**

Section 11.1 Proposed Policyholder ..................... □1
Section 11.2 Change of Proposed Policyholder ..................... □1
Section 11.□ Proposed Annuitant ..................... □1
Section 11.□ Change of Proposed Annuitant ..................... □1
Section 11.□ Beneficiary ..................... □2
Section 11.□ Change of Beneficiary ..................... □2
Section 11.□ Assignment ..................... □2

**Article □II Other General Pro□isions ..................... □□**

Section 12.1 Periodic Reports ..................... □□
Section 12.2 Currency and Place of Payment ..................... □□
Section 12.□ Notices, Re□uests and Elections ..................... □□
Section 12.□ Policy Settlement ..................... □□
Section 12.□ Deferment ..................... □□
Section 12.□ Incontestability ..................... □□
Section 12.□ Policyholder Information ..................... □□
Section 12.□ Ta□Matters ..................... □□
Section 12.□ Limitation on Liability of Insurer ..................... □□

CROWNGLOBAL INSURANCE

## Definitions

**Acceptance Fee** □ The fee deducted by the Insurer as stated in the Policy Data Page and described in Section □.□.

**Accredited In□estor** □ An □accredited investor□ as defined in Rule □□1(a) under Regulation D of the Securities Act.

**Age** □ A Proposed Annuitant or Proposed Joint Annuitant□s age on their last birthday.

**Agreed Upon Procedures (□AUP□) Fee** □ The fee deducted by the Insurer as stated on the Policy Data Page and described in Section □.□.

**Annuity Application For□** □ The annuity application provided by the Insurer as completed and signed by the Proposed Policyholder.

**Annuity Pay□ents** □ The benefits payable to the Beneficiary under Section □.1 of this Policy (each an □Annuity Payment□).

**Annuity Starting Date** □ The date on which Annuity Payments under Section □.□ of this Policy commence.

**Beneficiary** □ The persons or entities designated as such on the Annuity Application Form, as amended from time to time, by the Proposed Policyholder, who is entitled to receive Annuity Payments under the Policy, and distributions following the death of the Proposed Policyholder as applicable, in accordance with the terms of the Policy.

**Business Day** □ Any day on which ban□s in the U.S. and Bermuda are open for business.

**Clai□ Date** □ The date on which the Insurer receives written notice and due proof of death of the Proposed Annuitant (or the survivor of the Proposed Joint Annuitants) in accordance with Section 1□.2 at the Insurer□s Home Office.

**Code** □ The U.S. Internal Revenue Code of 1□□□, as amended.

**Confidential Pri□ate Place□ent Me□orandu□** □ The confidential private placement memorandum describing the Policy including all schedules, appendices, attachments,

e□hibits, amendments and supplements thereto, as amended and restated from time to time.

**Contestable Period** □The period of time described in Section 12.□which e□tends for two (2) years from the Issue Date during the lifetime of the Proposed Annuitant.

**DAC Charges** □The amount deducted by the Insurer as set forth in the Policy Data Page and described in Section □.2.

**Death Benefit** □ The death benefit calculated and payable under the provisions of Article X of this Policy.

**Fees and Charges** □ Any applicable fees and charges due under the Policy including, without limitation, the Policy Administration Fee, the DAC Charges, the Management □ E□pense Fee, the Acceptance Fee, Ta□es, and the Agreed Upon Procedures Fee.

**FINMA** □The Swiss Financial Mar□et Supervisory Authority.

**Full Surrender** □A Surrender pursuant to Section □.2.

**Grace Period** □A period of thirty days following the date on which the Insurer ma□es available to the Proposed Policyholder information indicating that (i) the Policy Account Value is less than □2□□,□□□, or (ii) the Policy Account Value is insufficient to pay the Fees and Charges due under the Policy without the Policy Account Value becoming less than □2□□,□□□ following payment of such Fees and Charges.

**Ho□e Office** □ The Insurer□s office in Hamilton, Bermuda. The Insurer□s mailing address is Crown Global Life Insurance Ltd., Canon□s Court, 22 Victoria Street, Hamilton HM 12, Bermuda, email□info□ crownglobalinsurance.com, facsimile□□1-□□□-□□□-□121.

**IDF** □An insurance dedicated fund.

**In Force** □A condition that the Policy has not terminated.

**Initial Pre□iu□** □ The first Premium payment by the Proposed Policyholder as shown on the Policy Data Page.

**Insurance Dedicated Fund** □ An Investment Option involving investment in an investment fund generally formed as a limited partnership or limited liability company

(i) which is intended to operate as an insurance dedicated fund (an □IDF□) and (ii) investment in which is available only to a U.S. or non-U.S. insurance company that regularly engages in the sale of life insurance policies and annuity policies in the ordinary course of its business and is ac□uiring interests in the IDF to hold in a Separate Account established in connection with a Policy and not as part of the general assets of the insurance company.

**Insurer** □ Crown Global Life Insurance Ltd. The Insurer has elected under Code section □□□(d) to be treated as a U.S. domestic corporation for U.S. federal income ta□purposes.

**In□est□ent Ad□iser Act** □The U.S. Investment Adviser Act of 1□□□, as amended.

**In□est□ent Co□pany Act** □ The U.S. Investment Company Act of 1□□□, as amended.

**In□est□ent Option** □ A separate investment option consisting of all or a portion of the assets held in a Separate Account and managed by the investment manager identified therein directly or through an IDF.

**IRS** □The U.S. Internal Revenue Service.

**Issue Date** □The issue date of the Policy as stated on the Policy Data Page.

**□oint Life Annuity** □ An annuity issued on the life of two Proposed Annuitants and under which payments continue as long as either Proposed Annuitant is alive.

**Li□uid Asset Subaccount** □ A Subaccount of the Separate Account, the funds in which are primarily invested in interest-bearing commercial ban□accounts.

**Li□uidity Date** □The last Business Day of each calendar □uarter.

**Managed Subaccount** □ An Investment Option where assets held in a Subaccount are managed by an investment manager unrelated to the Insurer. For the avoidance of doubt, a Managed Subaccount does not include an IDF.

**Manage□ent □ E□pense Fee** □The Management □ E□pense Fee as stated on the Policy Data Page and described in Section □.□.

**Mini□u□ Li□uid Asset Allocation** □ An amount not in e□cess of the e□pected annual Fees and Charges related to the Policy that the Insurer may place in the Li□uid Asset Subaccount.

**Net Pre□iu□** □ A Premium payment less applicable Fees and Charges, including, without limitation, the Acceptance Fee set forth on the Policy Data Page and described in Section □.□.

**Ne□t A□ailable Li□uidity Date** □ For any specified day, the Li□uidity Date on or ne□t following the 1□□th calendar day following the specified day.

**Partial Surrender** □ A Surrender pursuant to Section □.□.

**Policy** □ This Deferred Variable Annuity (DVA) Policy offered by the Insurer.

**Policy Account Value** □ The net fair mar□et value of all assets in the Separate Account bac□ing the Policy, less any accrued but unpaid Fees or Charges.

**Policy Ad□inistration Fee** □ The fee deducted by the Insurer as stated on the Policy Data Page and described in Section □.1.

**Policy Anni□ersary** □ The anniversary of the Policy Effective Date.

**Policy Data Page** □ The pages of this Policy titled □Policy Data Page.□ The Insurer will reissue these pages by means of an endorsement whenever the information on the Policy Data Page is amended, in accordance with the Policy.

**Policy Effecti□e Date** □ The □Policy Effective Date□ of this Policy as stated on the Policy Data Page.

**Policy Set-Up Deposit** □ A non-refundable screening deposit due upon submission of the completed Annuity Application Form as stated on the Policy Data Page and described in Section □.□.

**Policy Year** □ Any one year period beginning on the Policy Effective Date or a Policy Anniversary and ending on the day before the ne□t Policy Anniversary.

**Pre□iu□s** □ The Initial Premium and any subse□uent Premiums paid to the Insurer under this Policy.

CROWNGLOBAL INSURANCE

**Pri□ate Act** □ The private act entitled □The Scottish Annuity □ Life International Insurance Company (Bermuda) Ltd. Consolidation and Amendment Act 2□□1,□as amended and consolidated from time to time.

**Proposed Annuitant** □ The individual whose life is used to determine the duration of the period during which the Annuity Payments will be paid by the Insurer.

**Proposed □oint Annuitants** □ Each Proposed Annuitant (each being a □Proposed Joint Annuitant□) when a second Proposed Annuitant is designated under the Policy and a Joint Life Annuity is selected. Each Proposed Annuitant, including the second Proposed Annuitant, is to generally be designated by the Proposed Policyholder in the Annuity Application Form but may be designated by the Proposed Policyholder after the Issue Date with the consent of the Insurer. The second named Proposed Annuitant shall be designated as the Proposed Joint Annuitant by the Proposed Policyholder in the Annuity Application Form and reflected as such on the Policy Data Page.

**Proposed Policyholder** □ Proposed Policyholder means the individual or entity that proposes or is considering the purchase of a Policy pursuant to the Confidential Private Placement Memorandum. This term shall include a person who has become an actual policyholder through the purchase of a Policy or pursuant to a change made pursuant to Section 11.2.

**□ualified Purchaser** □ A □ualified Purchaser within the meaning of Section 2(a)(□1) of the Investment Company Act.

**SEC** □ The U.S. Securities and E□change Commission.

**Securities Act** □ The U.S. Securities Act of 1□□□, as amended.

**Separate Account** □ A separate investment account established by the Insurer for this Policy pursuant to the terms hereof, and Bermuda law (including the Private Act), the assets of which can be used for the sole purpose of paying claims under this Policy. A Separate Account is not a legal entity under Bermuda law and any references to the Separate Account performing any tas□s means the Insurer in respect of the Separate Account.

**Single Life Annuity** □ An annuity measured by the life of a single Proposed Annuitant.

**Subaccount** □ A subaccount established by the Insurer as a boo□□eeping entry within the Separate Account.

**Surrender** □ A surrender under Article VIII including a Full Surrender under Section □.2 and a Partial Surrender under Section □.□.

**Ta□es** □ The ta□es defined in Section □.□ of this Policy.

**Unscheduled Pre□iu□** □ Any Premium payment other than the Initial Premium or a Premium scheduled on the Policy Data Page or as set forth in an endorsement or attachment to the Policy.

**U.S. Treasury Regulations** □ The U.S. Treasury regulations promulgated under the Code, as amended.

CROWNGLOBAL INSURANCE

## Article I General Pro□isions

### Section □.□ Consideration

This Policy is issued in consideration of the payment of the Initial Premium.

### Section □.□ Entire Policy

This Policy, any endorsements or riders, and the Annuity Application Form constitute the entire contract between the Proposed Policyholder and the Insurer. The Proposed Policyholder, on behalf of the Proposed Policyholder, the Proposed Annuitant, and the Beneficiaries represents, ac□nowledges, and agrees that the Insurer has relied, and is entitled to rely, upon the accuracy of the information and statements made in the Annuity Application Form in deciding to issue this Policy.

### Section □.□ Sur□i□al of Representations□□ arrants□Co□enants

The representations, warrants, covenants, and other statements made in the Annuity Application Form are incorporated herein by reference and shall survive the e□ecution of this Policy.

### Section □.□ A□ end□ ent or Modification

The Insurer cannot modify the Policy without the Proposed Policyholder□s consent, provided that, the Insurer may ta□e any action it deems necessary in order to preserve the U.S. ta□ treatment of the Policy without the Proposed Policyholder□s consent, so long as the Insurer provides □□ days prior notice of any such proposed action to the Proposed Policyholder and discusses with the Proposed Policyholder the legal basis for such change.

### Section □.□ Misstate□ ent of Age

If the Age of any Proposed Annuitant or Proposed Joint Annuitant is misstated on the Annuity Application Form, the Insurer will adjust the Annuity Payments to reflect the correct Age. Any amount that the Insurer has overpaid as a result of any such misstatement shall be deducted from future Annuity Payments made under the Policy. The Insurer will re□uire due proof of the Age or survival of any person on

CROWNGLOBAL INSURANCE

whose continued life any payment or benefit under the Policy is dependent. It is the Proposed Policyholder's obligation to provide proof that is satisfactory to the Insurer.

**Section □.□ Non-Participating Policy**

This Policy is non-participating, which means that the Proposed Policyholder will not share in the Insurer's profits or surplus earnings and that the Insurer will not pay dividends on this Policy.

**Section □.□ Ownership of Assets**

Assets held in the Separate Account are the sole property of the Insurer. The Proposed Policyholder will have no direct proprietary interest in the assets held in any separate account, including, without limitation, the Separate Account with respect to this Policy.

**Section □.□ Rule of Construction**

For purposes of this Policy, the period denoted by the phrase "prior to a Liquidity Date" shall include the Liquidity Date.

**Section □.□ Governing Law**

The Policy will be governed by the laws of Bermuda without regard to its conflict of laws principles, including without limitation, the Private Act and the Life Insurance Act, 1□□□ as may be amended from time to time.

**Section □.□□ Effective Date of Coverage**

Coverage of the Proposed Annuitants under this Policy will begin on the Policy Effective Date.

## Article II Pre□iu□ Pro□isions

### Section □.□ Pre□iu□s

The minimum Initial Premium payable under the Policy is □2 million. Such minimum may be met by aggregating Policies having initial Premiums of □1 million each and purchased by the same Proposed Policyholder. The Insurer has not placed a limitation on the ma□imum amount of Premiums that may be contributed by a Proposed Policyholder. Subject to Section 2.2, additional Premium Payments may be made at any time and from time to time as the Proposed Policyholder□s financial situation permits, provided that the minimum additional Premium Payment may not be less than the minimum Unscheduled Premium.

The Initial Premium is due on the Issue Date. Premiums must be paid or mailed from outside the U.S. to the Insurer at its Home Office. Upon re□uest, a receipt will be provided at the Insurer□s Home Office (or other non-U.S. jurisdiction designated by the Insurer from time to time).

No Initial Premium or additional Premium payments may be made from the U.S. by any Proposed Policyholder (nor will the same be accepted by the Insurer) if said Proposed Policyholder is in the U.S. at the time the decision to ma□e said Premium payment occurs. Further, the Proposed Policyholder may not direct that a Premium payment be made while the Proposed Policyholder is in the U.S. even if the Premium payment is made from outside the U.S.

Premium payments are generally to be made in U.S. Dollars. The Insurer may, in its sole and absolute discretion, accept certain in-□ind asset contributions as Premium payments. The Insurer may reject in-□ind asset contributions in its sole and absolute discretion.

### Section □.□ Insurer□s Right to Refuse Pre□iu□s

The Insurer reserves the right to refuse Premiums and to return Premiums with interest if such Premiums would adversely affect the U.S. ta□ conse□uences the Policy is intended to provide or the ta□ conse□uences under the laws of any other applicable jurisdiction.

CROWNGLOBAL INSURANCE

The Insurer reserves the right not to accept any Premium payments from a Proposed Policyholder who ceases to be a □ualified Purchaser or an Accredited Investor. The Insurer may re□uire any Proposed Policyholder to provide confirmation of the Proposed Policyholder□s status as a □ualified Purchaser or an Accredited Investor before accepting any additional Premium payments. However, subject to any other limitation set forth in this Section 2.2, Premium payments during a Policy Year that do not e□ceed the sum of e□pected Fees and Charges under the Policy for the Policy Year will be accepted.

**Section □.□ Nonpay□ent of Pre□iu□**

If no Premiums are paid after the Initial Premium, the Policy will continue In Force as long as the Policy Account Value is sufficient to pay any applicable Fees and Charges and, following the payment of such Fees and Charges, the Policy Account Value is □□□□,□□□ or more.

CROWNGLOBAL INSURANCE

## Article III Termination Provisions

### Section □.□ Insurer's Cancellation Rights

The Insurer may, in its sole and absolute discretion, cancel the Policy and distribute the Policy Account Value to the Proposed Policyholder if:

1. The Policy Account Value is less than □2□□,□□□ at the end of any calendar quarter prior to the Annuity Starting Date but following the Insurer's acceptance of the Initial Premium payment, notwithstanding any potential negative tax consequences to the Proposed Policyholder or any other person or entity; or

2. The continuing existence of the Policy would require the Insurer, the Policy or the Separate Account backing the Policy to register, or make information filings, with the SEC under the Securities Act, the U.S. Investment Company Act, the U.S. Investment Adviser Act, each as amended from time to time, or the securities laws of any jurisdiction in which the Insurer, the Policy or the Separate Account is not currently registered or required to make information filings; or

□. The Proposed Policyholder or the Proposed Annuitant (or any Proposed Joint Annuitant) changes his or her country of residence for tax, securities regulation, or other purposes; or

□. Subject to the provisions of section 12.□ of the Policy, any declaration in the Annuity Application Form is not exact, truthful, and complete in all material respects; or

□. If the Proposed Policyholder fails to comply with the terms of any of the covenants or declarations made in the Annuity Application Form.

Prior to the Policy termination, the Insurer will provide □□ day notice of such termination to the Proposed Policyholder, which notice shall include the reason for such termination. The Insurer will pay to the Proposed Policyholder the amount, if any, of the Policy Account Value determined as of the Next Available Liquidity Date. Surrender charges will not apply.

CROWNGLOBAL INSURANCE

**Section .  Reinstatement**

If the Policy terminates as the result of the epiration of a Grace Period, it may not be reinstated unless reinstatement is reuired by Bermuda law.

CROWNGLOBAL INSURANCE

## Article IV Pre□iu□ In□est□ent□Policy Account Values

### Section □.□ The Separate Account

The Insurer will establish a Separate Account pursuant to the terms of the Private Act to hold assets that fund obligations arising under each Policy issued by it together with any supplementary contracts hereunder and certain other funds. Income, gains, or losses of each Separate Account are credited to or charged against the assets held in such Separate Account, without regard to other income, gains, or losses of any other Separate Account or business of the Insurer. Under the terms of this Policy and the laws of Bermuda, assets allocated or credited to each Separate Account are the property of the Insurer and the Proposed Policyholder has no direct proprietary interest in such assets.

### Section □.□ Pre□iu□s

Net Premiums received by the Insurer with respect to the Policy will be credited to the related Separate Account. To the e□tent that Premiums are insufficient to pay all Fees and Charges due to the Insurer under the Policy, the Insurer will deduct Fees and Charges from the Separate Account.

Amounts payable to the Proposed Policyholder or any Beneficiary under the Policy will be made by the Insurer from the related Separate Account to the Proposed Policyholder or Beneficiary in accordance with the terms of this Policy. The Insurer will establish Subaccounts within the Separate Account for each Investment Option selected by the Proposed Policyholder. Each Subaccount will correspond to an Investment Option. The Insurer may from time to time change the Investment Options and investment managers available to Proposed Policyholders, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer□s investment management or similar agreement with such investment manager).

### Section □.□ Allocations to In□est□ent Options

On the Annuity Application Form, the Proposed Policyholder will designate the initial allocation of Net Premiums among the available Investment Options and on each Li□uidity Date a Proposed Policyholder□s Net Premiums will be allocated among the

Investment Options according to the allocation percentages selected. Allocation percentages must be □ero or a whole number not less than ten nor greater than 1□□. The sum of the allocation percentages must e□ual 1□□. The Insurer will document the initial allocation on the Policy Data Page. The Insurer has reserved the right to re□uire allocation of an amount e□ual to the e□pected aggregate □uarterly Fees and Charges related to the Policy to the Li□uid Asset Subaccount before application of the allocation percentages designated by the Proposed Policyholder. In addition, the Insurer may transfer amounts from other Investment Options and Subaccounts to the Li□uid Asset Subaccount e□ual to the e□pected □uarterly Fees and Charges.

The specific Investment Options can generally be divided into two categories□ IDFs and Managed Subaccounts. The Insurer is not obligated to offer both IDFs and Managed Subaccounts as Investment Options at any time. Accordingly, at any given time only one of these types of Investment Options may be available.

The Insurer and its affiliates ma□e no recommendations, and provide no investment advice, as to the selection of, and allocations to, Investment Options. The Insurer has not evaluated any of the investment manager□s investment performance and ma□es no recommendation regarding the selection of any investment manager or any IDF. The Insurer does not act as a custodian of cash or investments held in the Separate Account.

**Section □.□ Co□pliance □ith In□estor Control Rules**

The Proposed Policyholder agrees that, e□cept for the selection of the allocation of Separate Account assets among Investment Options as contemplated in Section □.□, and changes to such allocations as contemplated in Section □.□, it will not select, identify or recommend, nor will it contact any investment manager for the purpose of influencing, any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount, including, without limitation, an investment manager with respect to an IDF in which funds held in a particular Subaccount are invested.

A Proposed Policyholder may not have direct contact or communicate with the investment manager of either an IDF or a Managed Subaccount and may not directly participate in the management of the Separate Account or any IDF or Managed Subaccount.

**Section □.□ Changes in Allocations to Investment Options**

The Proposed Policyholder may, at quarterly intervals, reallocate funds among then available Investment Options but may do so no more than twice per calendar year. If a change in allocation percentages requires a transfer of funds between Investment Options, there may be a delay after the Separate Account receives the proceeds from one Investment Option until the next date on which it is possible to reinvest the funds in a different Investment Option. During this delay period (which may be up to one calendar quarter), funds will be invested in the Liquid Asset Subaccount. The Proposed Policyholder acknowledges that this delay may result in the funds having a lower return for this period.

In the event of such a delay, the funds from the liquidated investments will be invested in the Liquid Asset Subaccount until the next Liquidity Date at which time the funds will be re-allocated (together with any related earnings) to the applicable Subaccount originally designated by the Proposed Policyholder for the transfer.

Unless and until the Proposed Policyholder notifies the Insurer in writing of a new Net Premium allocation, the Net Premium allocations as specified in "Initial Allocation of Payment to Investment Options□ on the Policy Data Page will continue to apply to any additional Premium payments.

**Section □.□ Responsibility for Selecting Investment Options**

The Insurer does not and will not make any recommendation as to the Proposed Policyholder's selection or retention of investment managers, allocation of assets among Subaccounts, Investment Options, or investments in particular securities or categories of securities, nor will it evaluate the investment performance of any investment manager. Inclusion of an Investment Option shall not be deemed to be a recommendation of that investment or as an indication that such an investment is suitable for the Proposed Policyholder.

Each Proposed Policyholder acknowledges, represents, warrants, and covenants that it is solely responsible for determining for themselves whether a particular Investment Option is suitable in light of their individual situations. The Insurer and its affiliates make no recommendations, and provide no advice, as to the selection of Investment Options and provide no warranty, representation, or indemnity with respect to the

CROWNGLOBAL
INSURANCE

performance of any Investment Option. Each Proposed Policyholder should consult his or her personal financial advisor concerning Premium allocations.

**Section □.□ Appoint□ent of In□est□ent Manager and Custodian Ban□**

The Insurer shall have the right, e□ercisable in its sole and absolute discretion, to appoint, change, or remove the investment manager and custodian ban□ with respect to each Investment Option or Separate Account, provided that an investment manager shall only be removed for cause (as described in the Insurer□s investment management or similar agreement with such investment manager). A Proposed Policyholder may recommend to the Insurer one or more investment managers or custodian ban□s who meet the Insurer□s general re□uirements after the initial policy date, but the Insurer may accept or reject such recommendation in its sole and absolute discretion.

**Section □.□ Ti□ing of Allocations**

The Insurer will allocate the Proposed Policyholder□s Net Premiums among one or more Investment Options in the percentages specified on the Policy Data Page, as amended from time to time at the written re□uest of the Proposed Policyholder, within two business days following the date the Insurer receives the Net Premiums. Net Premiums received and which are to be allocated to an Investment Option will be initially invested in the Li□uid Asset Subaccount and subse□uently allocated (together with any related earnings) within two business days to the applicable Investment Option (subject to deferral due to li□uidity constraints imposed by the applicable investment manager or IDF and subject to such provisions as to valuation and unit calculation as may be specified by the applicable investment manager).

**Section □.□ In□est□ent of Separate Account Assets**

The Insurer will re□uire each investment manager with respect to a portfolio of an IDF or Managed Account held in the Separate Account and the investment manager of each investment fund or other investment fund in which the assets of the Separate Account are invested, to comply with the following□

1. Investment of assets held in each Subaccount will be sufficiently diversified to comply with the re□uirements of U.S. Treasury Regulation section 1.□1□-□(b). Assets of any investment fund relying upon a □loo□-through□basis for purposes

of meeting such diversification re□uirements will themselves be sufficiently diversified so as to allow the Subaccount to comply with such re□uirements.

2. The investment manager and its employees who are responsible for investment decisions will not accept investment recommendations or ma□e any investment decisions regarding the direct or indirect investment of Separate Account assets based, in whole or in part, on information regarding any investment or group of investments received from any Proposed Policyholder or any representative or adviser of a Proposed Policyholder.

□. No Proposed Policyholder (or any representative or adviser of a Proposed Policyholder) will have the right or be permitted to select or identify any particular investment or group of investments to be made directly or indirectly with the assets of any Subaccount.

□. The investment manager will not commit to invest assets of any Subaccount (or of any underlying investment fund or Managed Account in which a Subaccount has invested directly or indirectly) in mutual funds or other collective investment funds or publicly available investment products (including, without limitation, mar□et-lin□ed deposits and fle□ible deposits) managed, advised and□or distributed by the investment manager or its affiliates and will only do so if (a) in the investment manager□s sole judgment at the time the investment is made, such fund or product is appropriate within the investment objectives and policies of the Subaccount fund or Managed Account and (b) no more than □□□ of the assets on an initial purchase basis (e□cluding mar□et value increases) of the Subaccount fund or Managed Account are invested in such funds or products at any time. Subject to the foregoing, for the avoidance of doubt, assets may be invested in an IDF.

□. In accordance with Section □.□, e□cept for general descriptions of the investment policies of the Investment Options, there will not be any direct or indirect prearrangement, plan or agreement between any Proposed Policyholder (or any Proposed Policyholder□s advisers or representatives) and the investment manager (or any of its employees) regarding the investments to be made directly or indirectly by any Subaccount.

**Section □.□□ Request for Extension of Investment Rights With Respect to Adequate Diversification**

A Proposed Policyholder may make a request for an extension of the Proposed Policyholder's investment rights described in Section □.□ and partial or complete release of the investment manager's obligations in Section □.□ to adequately diversify the assets held in the Separate Account by delivering a written request to the Insurer's Home Office expressing a specific desire for the same. The Insurer may grant or deny such requests in its sole and absolute discretion, for any reason or for no reason whatsoever. Any such request must be approved by the Insurer in writing (and, in the case of an IDF, may also require the consent of the IDF). Absent written approval of the request, the request shall be deemed to have been denied.

The Insurer expresses no opinion and makes no representations or warranties regarding the tax consequences under the laws of the U.S. or any other jurisdiction of the Insurer's decision to grant such requests. By making such a request, a Proposed Policyholder waives any claim against the Insurer, its shareholders, directors, officers, employees, agents or affiliates on behalf of the Proposed Policyholder, any Beneficiaries or any other person for any loss from the Insurer's decision to grant or deny the Proposed Policyholder's request and agrees to hold harmless hereunder the Insurer and its shareholders, directors, officers, employees, agents or affiliates for any such loss.

**Section □.□□ Changes in Investment Options**

The Insurer at any time may add additional Investment Options, remove or restrict existing Investment Options, or add or eliminate an investment manager subject to any required regulatory approval, provided that the Insurer shall only remove an investment manager available to the Proposed Policyholder for cause (as described in the Insurer's investment management or similar agreement with such investment manager). If an Investment Option is removed or restricted or an investment manager is terminated, the Insurer may eliminate the Investment Option as an option for future Premium payments or transfers and may also transfer funds from the Subaccount in which assets invested in the terminated Investment Option were held, to the Liquid Asset Subaccount. An affected Proposed Policyholder may submit instructions to adjust the allocation of Net Premiums among the remaining Investment Options, without charge, for a period of □□ days following receipt of the Insurer's notice of any

such termination. The Insurer will implement those instructions on the Next Available Liquidity Date after receipt.

**Section □.□□ Policy Account Value**

The Policy Account Value is equal to the net fair market value of all assets in the Separate Account backing the Policy, less any accrued but unpaid fees or expenses. The Insurer will determine the Policy Account Value on each Liquidity Date. The Separate Account value will increase or decrease, depending upon the investment experience of the related Subaccounts.

Assets allocated or credited to a Separate Account may be commingled with assets allocated or credited to another Separate Account for purposes of investment. In such circumstances, the Insurer may determine the Policy Account Value of each such Separate Account by the use of accumulation units, which are calculated separately with respect to each commingled investment. The accumulation unit value for each commingled investment will vary to reflect the investment experience of the assets invested therein.

The value of an accumulation unit will be determined on each Liquidity Date. When a commingled investment is made, the Insurer will credit the Separate Account with a number of accumulation units determined by dividing the amount of the investment by the value of the accumulation unit. When assets allocated or credited to a Separate Account are withdrawn from an investment, the accumulation units are reduced.

CROWNGLOBAL INSURANCE

## Article V Transfers Among Investment Options

### Section □.□ General

The Proposed Policyholder may request one transfer among Investment Options per calendar quarter, but no more than twice per calendar year.

### Section □.□ Conditions on Transfer

To effect any transfer, the Proposed Policyholder must submit a transfer request to the Insurer. All transfers are subject to the following conditions□

1. Any applicable Fees and Charges will be deducted from the Subaccount or from the amount which is transferred.

2. Transfers will be effected within □□ days following receipt by the Insurer of a transfer request. Actual settlement of a disposition or redemption from the relevant Subaccount, and reinvestment of the proceeds may be delayed as described below.

3. Any transfer request must clearly specify□ (a) the amount which is to be transferred□ and (b) the Subaccounts which are to be affected.

4. Payments to effect a transfer are subject to the disbursement rules and restrictions of the Subaccount(s).

5. The minimum amount that may be transferred in a single transfer will be the lesser of □2□□,□□□ or the entire interest in a Subaccount.

6. No transfer may be made from the Liquid Asset Subaccount if the amount remaining therein would not equal or exceed the Minimum Liquid Asset Allocation.

7. In the case of an IDF, any additional conditions set forth in the governing documents in the IDF must be satisfied.

**Section □.□ Liability**

Neither the Insurer nor any of the Insurer□s affiliates will be liable for any losses incurred as a result of transfers made in accordance with a Proposed Policyholder□s transfer re□uest including lower returns which may result.

**Section □.□ Li□its on Right of Transfer**

The Insurer may in its sole and absolute discretion defer the right of transfer for any period when it reasonably determines that additional time is necessary to obtain sufficient cash to ma□e the transfer payments. Additional limitations on transfer may be imposed under the terms of any IDF in which assets held in a Separate Account are invested. For the avoidance of doubt, a transfer described in this Section □.□ is a situation where a change from one Investment Option to another Investment Option occurs.

CROWNGLOBAL INSURANCE

## Article VI Annuity Pro□isions

### Section □.□ Annuity Pay□ents

The Insurer will ma□e periodic payments to the Beneficiaries beginning on the Annuity Starting Date and continuing thereafter on each Policy Anniversary to an account located outside the U.S. The amount of each Annuity Payment will e□ual the product of the applicable Annuity Percentage and the Policy Account Value (determined as of the end of the calendar □uarter immediately preceding each Annuity Payment) and will vary depending upon the investment e□perience of the Investment Options in which the Separate Account assets are invested and the age of the Proposed Annuitant.

### Section □.□ Annuity Percentage

The Annuity Percentages are listed in the Appendi□ I to this Policy. The applicable Annuity Percentage will, depend upon the benefit option selected by the Policyholder. In the case of a Single Life Annuity, the Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants. The Annuity Percentage is adjusted for each Annuity Payment.

### Section □.□ No Guaranteed Pay□ents

The Policy Account Value, and thus, the Annuity Payments may increase or decrease depending upon the investment e□perience of the Investment Options selected by the Proposed Policyholder. The sole source for the payment of the Annuity Payments are the assets held in the Separate Account bac□ing the Policy. The Policy does not provide for guaranteed annuity or death benefits. All payments, including upon the death of the Proposed Policyholder or Proposed Annuitant (or Proposed Joint Annuitants) are strictly limited to the assets held in the Separate Account bac□ing the Policy and no Annuity Payments or any other payments under the Policy are payable from any other source.

**Section □.□ Annuity Starting Date**

The Annuity Starting Date must be on the first day of a calendar □uarter and may not be later than the first day of the calendar □uarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant□s or surviving Proposed Joint Annuitant□s) eighty-fifth (□□th) birthday. If the Proposed Policyholder has not chosen an Annuity Starting Date, then the first day of the calendar □uarter of the Proposed Annuitant's (or elder Proposed Joint Annuitant□s or surviving Proposed Joint Annuitant□s) eighty- fifth (□□th) birthday shall be the Annuity Starting Date.

**Section □.□ Change of Annuity Starting Date**

The Proposed Policyholder may change the Annuity Starting Date prior to the then current Annuity Starting Date by delivering a written notice to the Insurer. The new Annuity Starting Date may not be before the Ne□t Available Li□uidity Date for any Investment Option under the Policy as of the date the Insurer receives the notice from the Proposed Policyholder, and may not be later than the first day of the calendar month following the Proposed Annuitant□s □□th birthday. Distributions must commence after the Annuity Starting Date in accordance with re□uirements under the Code.

**Section □.□ Annuity Inco□e Options**

Two (2) basic benefit options are offered under the Policy□(i) a Single Life Annuity, and (ii) a Joint Life Annuity. The benefit option may be changed by the Proposed Policyholder□however, no such change may be made at any time on or after the Annuity Starting Date. A Policyholder may change the selection of any benefit option by giving the Insurer at least thirty (□□) calendar days□written notice prior to the Annuity Starting Date from outside the U.S.

In the case of a Single Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the Proposed Annuitant. In the case of a Joint Life Annuity, the applicable Annuity Percentage is the percentage corresponding to the age of the younger Proposed Joint Annuitant or the survivor of the Proposed Joint Annuitants.

Under both basic benefit options, the amount of each annual Annuity Payment made on or after the Annuity Starting Date will vary in accordance with the age of the Proposed Annuitant (or Proposed Joint Annuitant(s)) and the investment performance of the assets held in the Separate Account and shall be computed by the Insurer□s

actuary each year (and recomputed on the annual anniversary date each year thereafter) by multiplying the applicable Annuity Percentage in the Annuity Percentage Table attached as Appendi□ I to this Policy by the then current Policy Account Value as of the Annuity Starting Date and predetermined on the annual anniversary date each year thereafter. If the Policy Account Value is □ero, then all payments will cease. All Annuity Payments shall be made to an account outside the U.S. The Insurer may consider the adoption of additional benefit options at the re□uest of a Proposed Policyholder.

**Section □.□ Maturity Pay□ent**

Upon the death of the Proposed Annuitant (or survivor of the Proposed Joint Annuitants), the Insurer will pay to the Beneficiaries, or their successors as Beneficiaries, as the case may be, the balance of the Policy Account Value.

CROWNGLOBAL INSURANCE

## Article VII Loan Pro□isions

### Section □.□ Policy Loans

The Proposed Policyholder shall have no guaranteed rights or privileges with respect to loans under a Policy. The Insurer may, in its sole and absolute discretion consider whether to facilitate a Proposed Policyholder□s re□uest to pledge a Policy as collateral security for a loan to be made by the Insurer or institutional or other third party lenders. A pledge of a Policy as collateral security for a loan may be effected only with the prior written consent of the Insurer, which may be granted or denied in the Insurer□s sole and absolute discretion.

CROWNGLOBAL INSURANCE

## Article VIII Surrender Pro□isions

### Section □.□ General

At any time after the Issue Date and prior to the Annuity Starting Date, the Proposed Policyholder may re□uest one or more withdrawals under the Policy from the Separate Account in the form of a Partial Surrender. Withdrawals are possible up to 1□□□ of the Policy Account Value. Should the Policy Account Value be e□ual to or less than □2□□,□□□, the Policy will lapse. The rights of a Proposed Policyholder to ma□e a Surrender under the Policy shall be subject to the consent of all Beneficiaries who have been irrevocably designated by the Proposed Policyholder under the Policy. Subject to this Article VIII, the Proposed Policyholder may Surrender the Policy, in whole or in part, by filing a written re□uest with the Insurer at the Insurer□s Home Office at any time during the lifetime of the Proposed Annuitant. The Policy Account Value which is the subject of the Surrender will be determined as of the Ne□t Available Li□uidity Date occurring after the Insurer receives the re□uest to Surrender.

Although the amount of the Surrender proceeds will be determined as of the Ne□t Available Li□uidity Date after receipt of the Surrender re□uest, the Insurer will use reasonable efforts to pay Surrender proceeds as soon as practicable whether on a Li□uidity Date or another date (subject to such li□uidity constraints and provisions as to valuation and unit calculation as may be specified by the investment manager of the applicable Investment Option).

### Section □.□ Full Surrender

If the Proposed Policyholder re□uests a Full Surrender of the Policy Account Value of the Policy, the Policy will terminate on the date the Proposed Policyholder submits its Surrender re□uest in accordance with Section 12.□.

### Section □.□ Partial Surrender

The Proposed Policyholder may re□uest a Partial Surrender of the Policy for up to and including □□□ of the Policy Account Value of the Policy. No more than one Partial Surrender may be re□uested by the Proposed Policyholder during each □uarter of a Policy Year. As provided in Section □1, any Partial Surrender that causes the Policy Account Value to be reduced to an amount that is less than

□2□□,□□□ may be deemed by the Insurer to be a re□uest for Full Surrender and if so deemed will cause the Policy to be terminated, notwithstanding any potential negative ta□ conse□uences to the Proposed Policyholder or any other person or entity. If the Policy Account Value is reduced to an amount that is less than □2□□,□□□, then the Insurer shall have the right, e□ercisable in its sole and absolute discretion, to treat a Partial Surrender re□uest as a Full Surrender re□uest.

Each Partial Surrender will reduce the Policy Account Value and the amount of any Annuity Payment to be paid after the Annuity Starting Date. An amendment to the Policy will be sent to the Proposed Policyholder outside the U.S. for countersignature upon any re□uest for a Partial Surrender under the Policy. Said amendment shall become a part of the Policy.

CROWNGLOBAL INSURANCE

## Article I□ Policy Fees and Charges

### Section □.□ Policy Ad□inistration Fee

The Insurer will deduct the Policy Administration Fee from the Separate Account as set forth in the Policy Data Page for general administrative e□penses.

### Section □.□ DAC Charges

The amount deducted by the Insurer as set forth on the Policy Data Page to pay for the costs imposed by virtue of the treatment of certain deferred ac□uisition costs for U.S. federal income ta□ purposes under section □□□ of the Code. The amount of the DAC Charge as set forth on the Policy Data Page shall be adjusted to reflect any change in the applicable U.S. federal income ta□ rate. The Insurer shall provide the Proposed Policyholder notice of any change in the DAC Charge.

### Section □.□ Manage□ent □ E□pense Fee

The Insurer will deduct the Management □ E□pense Fee from the Separate Account. The Management □ E□pense Fee is an on-going insurance administration fee described on the Policy Data Page.

### Section □.□ Policy Set-Up Deposit

The Policy Set-Up Deposit is due to the Insurer as set forth on the Policy Data Page upon submission of the completed Annuity Application Form by the Proposed Policyholder. The Policy Set-Up Deposit will be paid into the General Account of the Insurer. Upon issuing the Policy, an amount e□ual to the Policy Set-Up Deposit will be used to offset the Acceptance Fee. If for any reason, a Policy is not issued, the Insurer will retain the Policy Set-Up Deposit to cover medical, underwriting, administration and any other costs incurred by the Insurer in the processing of the application.

### Section □.□ Acceptance Fee

The Insurer will deduct the Acceptance Fee set forth in the Policy Data Page on each date the Insurer receives a Premium payment.

**Section □.□ Surrender Charge**

Surrender charges will not apply to this Policy.

**Section □.□ Ta□es**

The Insurer will deduct only those Ta□es (as defined below) paid by the Insurer or its affiliates to any governmental entity that relate to the Policy or the related Separate Account. These ta□es (the □Ta□es□) e□clusively include withholding ta□es, e□cise ta□es, sales ta□es, stamp ta□es, value added ta□es, state ta□es imposed on the Insurer or its affiliates, and ta□es imposed on Subpart F income of a Separate Account attributable to its investment in a controlled foreign corporation, as well as the deferred ta□ amount and any interest charge or other ta□es imposed on the investments of a Separate Account in a passive foreign investment company, or under the corresponding ta□laws of other jurisdictions.

The Insurer may, in its sole and absolute discretion, pay Ta□es when due and deduct such amounts from the Separate Account at a later date. The Insurer will, in its absolute discretion, determine when Ta□es have resulted from the investment e□perience of any Subaccount or receipt by the Insurer of Premiums.

**Section □.□ Agreed Upon Procedures Fee**

The Insurer will deduct the Agreed Upon Procedures Fee from the Separate Account if the Proposed Policyholder instructs the Insurer to engage a third party audit firm to review charges and provide an Agreed Upon Procedures (AUP) report.

**Section □.□ Deductions for Fees and Charges**

The Fees and Charges are paid to the Insurer under the Policy initially by ma□ing deductions from Premiums and then by ma□ing deductions from the Separate Account. To the e□tent that the Insurer deducts Fees and Charges from the Separate Account, amounts will be deducted first from the Li□uid Asset Subaccount and then from the Subaccounts pursuant to the terms of the Policy.

**Section □.□□ Custodian Ban□ and In□est□ent Manager Fees**

Each custodian ban□ and investment manager will separately deduct any applicable fees charged by it from any Separate Account or Investment Option for which it is acting as custodian or investment manager, as the case may be. The fees of the

custodian ban and investment manager are calculated on an individual basis and may vary depending upon the investment manager and Investment Option(s) selected by the Proposed Policyholder. The list of investment managers and custodians retained by the Insurer is available from the Insurer upon re uest.

## Article □ Death Benefit Pro□isions

### Section □□.□ Death Benefit

If all Beneficiaries and any alternative Beneficiaries predecease the Proposed Policyholder and Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected), then the benefits payable under the Policy to the Beneficiaries or alternative Beneficiaries shall be paid to the Proposed Policyholder until the first to die of the Proposed Policyholder or Proposed Annuitant (or the survivor of the Proposed Joint Annuitants, in the case where a Joint Life Annuity benefit option is selected).

If none of the Beneficiaries or alternative Beneficiaries survives the Proposed Annuitant(s), then the Policy Account Value shall be paid to the Proposed Policyholder upon the Proposed Annuitant□s death (or survivor of the Proposed Joint Annuitants□death, in the case where a Joint Life Annuity benefit option is selected).

If the Proposed Policyholder is not living at the time any benefit under the Policy is payable to the Proposed Policyholder, then such benefit shall be paid to the Proposed Policyholder□s estate, if then open, or if not then to his heirs *per stirpes*, in accordance with the laws of succession in the jurisdiction of the Proposed Policyholder□s last □nown domicile on the date of the Proposed Policyholder□s death.

If the Proposed Policyholder is not an individual, then the Proposed Annuitant (or the younger of the Proposed Joint Annuitants or the survivor of the Proposed Joint Annuitants) shall be recogni□ed as the □primary Proposed Annuitant□and treated as the Proposed Policyholder of the Policy. Any change in the designation of such Proposed Annuitant (or Proposed Joint Annuitant) following the Issue Date (in the case where the Proposed Policyholder is not an individual) shall be treated as the death of the Proposed Policyholder.

If the Proposed Policyholder dies prior to the □annuity starting date□(defined under Code Section □2(c)(□) as the first day of the first period for which an amount is received as an annuity under the contract□such definition possibly differing from the Annuity Starting Date designated under the Policy), then the Proposed Policyholder□s entire interest in the Policy shall be distributed to the Beneficiaries within five (□) years from the date of the Proposed Policyholder□s death, unless the Beneficiaries

elect to receive such interest in distributions made over their life or lives (or over a period not e□tending beyond their respective life e□pectancies), and such distributions begin within one (1) year from the date of the Proposed Policyholder□s death. Any such election must be made in writing and received by the Insurer at the Insurer□s Home Office within 1□□ calendar days from the date of the Proposed Policyholder□s death.

If the Proposed Policyholder dies on or after the □annuity starting date□(as defined under Code Section □2(c)(□)) and before the entire interest in the Policy has been distributed, the remaining portion of the Policy Account Value shall be distributed to the Beneficiaries at least as rapidly as under the method of distributions being used as of the date of the Proposed Policyholder□s death.

Notwithstanding any provision of the Policy, all Death Benefits must be distributed in compliance with the provision of section □2(s) of the Code. Death Benefits payable hereunder will be includible in the gross income of the Beneficiary.

**Section □□.□ Due Proof of Death**

Due proof of death is one of the following received at the Insurer□s Home Office in a form satisfactory to the Insurer in its absolute discretion□

1. A certified copy of a death certificate□

2. A certified copy of a decree of a court of competent jurisdiction as to the finding of death□or

□. Any other proof of death satisfactory to the Insurer.

CROWNGLOBAL INSURANCE

## Article I O ner Beneficiary Assign ent

### Section . Proposed Policyholder

The Proposed Policyholder is the person so named on the Policy Data Page or his or her assignee in accordance with a valid assignment as provided in Section 11.2.

Under Bermuda law, the Proposed Policyholder or his personal representative, trustee in ban ruptcy or legal assignee will be the owner of the rights to payments under the Policy. While the Proposed Policyholder is alive, all rights in the Policy belong to the Proposed Policyholder and may be e ercised without the consent of any Beneficiary, provided that, once an irrevocable designation of Beneficiary is filed, changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary. All of the Proposed Policyholder s rights in the Policy belong to the estate of the Proposed Policyholder if the Proposed Policyholder dies before the Proposed Annuitant. Joint ownership is permitted.

### Section . Change of Proposed Policyholder

The Proposed Policyholder may change the ownership of the Policy by submitting a re uest to the Insurer s Home Office and obtaining written approval of the Insurer. Any approved change will ta e effect on the date specified in the approval.

### Section . Proposed Annuitant

The Proposed Policyholder has the right to designate one Proposed Annuitant or two Proposed Joint Annuitants. The Proposed Annuitants or Proposed Joint Annuitants will be as stated in the Annuity Application Form, unless otherwise endorsed at issue or subse uently changed.

### Section . Change of Proposed Annuitant

Each Proposed Policyholder will have the right to designate and in some cases change the Proposed Annuitant or Proposed Joint Annuitant.

CROWNGLOBAL INSURANCE

**Section □□.□ Beneficiary**

The Proposed Policyholder shall initially designate one or more Beneficiaries on the Policy Data Page. All designations of Beneficiaries are revocable unless specified as irrevocable by the Proposed Policyholder. Once an irrevocable designation of Beneficiary is filed, any changes or elections under the Policy that impair the rights of an irrevocable Beneficiary will not be allowed without the consent of the irrevocable Beneficiary under the Policy.

**Section □□.□ Change of Beneficiary**

Except in the case of an irrevocable Beneficiary, the Proposed Policyholder may change the Beneficiaries by filing a written request from outside the U.S. with the Insurer at its Home Office at any time prior to the Annuity Starting Date. In the case of an irrevocable Beneficiary, the consent of the irrevocable Beneficiary to the change is also required. The change will take effect as of the date the notice is received by the Insurer subject to any payment made or action taken by the Insurer before the Insurer receives the document at its Home Office. A new Beneficiary designation will automatically revoke all prior designations (except an irrevocable Beneficiary designation where the consent of the irrevocable Beneficiary has not been obtained). The Insurer will not be liable for any payment made or action taken before the effective date of the change of Beneficiary.

**Section □□.□ Assignment**

The Proposed Policyholder may transfer, assign, or pledge the Policy or any of their rights under the Policy, including a Section 1□□□ exchange of the Policy with another carrier, without the prior written consent of the Insurer, provided that the Policy may not be assigned unless (i) it is registered under the U.S. federal securities and/or state securities laws or the securities laws of any other jurisdiction unless such registration is not required or an exemption from registration is available and (ii) the assignee is a Qualified Purchaser and Accredited Investor. The Insurer may require satisfactory evidence as to the non-applicability of any such registration requirement or the availability of an exemption from any applicable registration requirement and the Insurer may in its discretion for this purpose request, at the transferor's expense, a favourable legal opinion from transferor's counsel that the provisions of this Section 11.□ have been met.

The Insurer represents and warrants that, subject to the foregoing, it will fully cooperate with any assignment, transfer or e□change, including a □1□□□□e□change of the Policy with another carrier and will cooperate to e□change underlying IDFs or sub-accounts with such carrier. Failure by the Insurer to cooperate with the Proposed Policyholder in a proposed 1□□□ e□change or other transfer, assignment, or pledge of the Policy or any of the Proposed Policyholder□s rights under the Policy, such failure to cooperate as determined by a final judgement in a Bermuda court or other court of relevant jurisdiction, among any other injunctive or other relief resulting therefrom, will result in li□uidated damages to the Proposed Policyholder e□ual to the sum of the (a) then Policy Account Value and (b) any fees or charges, including Management and E□pense Fees, accruing during the period that the non-cooperation (as determined by the a Bermuda court or other court of relevant jurisdiction) e□ists and is continuing, and the Insurer shall be strictly liable for payment of such amount to the Proposed Policyholder. For the avoidance of doubt, the Proposed Policyholder shall be entitled to its Policy Account Value separate from the li□uidated damages amount provided for herein. The Proposed Policyholder (□) ac□nowledges that the Insurer□s ordinary and customary process for 1□□□ e□changes includes obtaining satisfactory assurance from the transferor of compliance with relevant ta□ and disclosure laws with respect to the Policy and indemnification from the new carrier regarding any ta□ obligations relating to the Policy and (y) agrees that following the Insurer□s 1□□□ e□change process will not be considered to be a failure to cooperate by the Insurer.

## Article □II Other General Provisions

### Section □□.□ Periodic Reports

The Insurer will make available to the Proposed Policyholder, for every calendar quarter or portion thereof during which the Policy is In Force, a report that shows activity in the Proposed Policyholder's Separate Account. The Proposed Policyholder expressly authorizes the Insurer to rely upon the information or valuations provided by the selected investment manager and custodian without further inquiry or verification of any kind, nature, or description. Each quarterly statement will set forth the Policy Account Value less applicable expenses and charges at the beginning and end of the reporting period and aggregate adjustments to the same throughout. These quarterly statements shall be made available to the Proposed Policyholder at the Insurer's Home Office. The Insurer will forward annual Separate Account statements to an address of the Proposed Policyholder outside of the U.S. if a request to do so is made by the Proposed Policyholder in writing and delivered to the Insurer's Home Office.

### Section □□.□ Currency and Place of Payment

All transactions between the Proposed Policyholder and the Insurer will be made in U.S. dollars unless otherwise confirmed by the Insurer in writing. All Payments will be made outside the U.S.

### Section □□.□ Notices, Requests and Elections

To be effective, all notices, requests, and elections the Proposed Policyholder makes under the Policy must be in writing, signed by the Proposed Policyholder or sent electronically or via facsimile by the Proposed Policyholder and received by the Insurer. Unless otherwise provided, all notices, requests and elections will be effective when received by the Insurer. Notices, requests and elections may be made by the Proposed Policyholder under the Policy in writing, signed by the Policyholder, sent by facsimile or electronic communication and received by the Insurer at its Home Office or administrative office, provided that the Insurer will not be liable for following instructions communicated by facsimile or electronically and, provided further that acceptance of facsimile or electronic communication by the Insurer will not impose any requirement on the Insurer to employ any procedures to confirm that instructions

received by facsimile communication are genuine. Any notice or report re□uired to be given by the Insurer to the Proposed Policyholder or any other person will be deemed given when sent to such person or such person□s authori□ed representative.

**Section □□.□ Policy Settle□ent**

Prior to any payment of a Death Benefit, due certified proof of death must be submitted to the Insurer.

**Section □□.□ Defer□ent**

The Insurer will e□ecute allowable re□uests for a transfer, Full Surrender or Partial Surrender by the Proposed Policyholder within □□ days of a re□uest. Such re□uests may re□uire conversion of certain Investment Option assets to cash or in-□ind distributions, where possible. This may ta□e longer than □□ days for a variety of reasons, including underlying restrictions on redemptions of assets held pursuant to an Investment Option. In such cases, the Insurer will ta□e reasonable steps to comply with such re□uests at the earliest time possible. The foregoing will be subject to time restrictions within the Insurance Dedicated Fund purchased by a Subaccount.

**Section □□.□ Incontestability**

E□cept as e□pressly provided in the Policy, the Insurer will not contest the validity of the Policy for misstatement, misrepresentation or non-disclosure after the Policy has been In Force for two years from the Issue Date during the lifetime of the Proposed Annuitant. The Policy will be voidable in the event of fraud at any time. If the validity of the Policy is so contested, then (1) the Insurer□s obligation to pay Annuity Payments under the Policy will terminate as of the date the Insurer discovers such misstatement, misrepresentation or non-disclosure, and (2) the Policy Account Value will be determined as of the Ne□t Available Li□uidity Date occurring after the Insurer discovers such misstatement, misrepresentation or non-disclosure and returned to the Proposed Policyholder or the Beneficiaries within □□ days. The Insurer will notify the Proposed Policyholder that the Policy is so terminated and such notice will include the date of termination. The return of the Policy Account Value will be in full and final satisfaction of all the Insurer□s obligations under the Policy. Following the return of the Policy Account Value, the Policy will be void.

**Section □□.□ Policyholder Infor□ation**

The Insurer may disclose Policyholder information to third parties such as ban□s or independent asset managers. Specifically with respect to ban□ing relationships in Swit□erland and in accordance with FINMA Newsletter 1□ (2□1□) □handling of Life insurance with separately managed accounts□portfolios□dated December 2□, 2□1□, the Insurer may disclose Policyholder or source of funding information to ban□ing partners including Policyholder name, date of birth, nationality and address. In any event, the Insurer may be re□uired to confirm in accordance with FINMA Newsletter 1□ (2□1□) that the insurance product related to account openings is set up as a life insurance product according to the legal provisions, including provisions concerning biometric ris□s, of the Insurer□s domicile.

Each U.S. person who has a financial interest in or signature or other authority over any foreign financial accounts, including ban□, securities, or other types of financial accounts, in a foreign country, if the aggregate value of these financial accounts e□ceeds □1□,□□□ at any time during the calendar year, must report that relationship each calendar year by filing Form TD F □□-22.1 (Report of Foreign Ban□ and Financial Accounts), commonly referred to as an □FBAR□, with the Department of the Treasury on or before June □□ of the succeeding year. In addition, and irrespective of the independent FBAR filing obligations that a Proposed Policyholder (or its owner) who is a U.S. person may have, U.S. person directors, officers, or employees of the Insurer who have signature authority over the Separate Account, Subaccounts, or other accounts with respect to the Policy would need to file an FBAR with respect to such accounts and so will the Insurer itself as a U.S. Person with a financial interest in such accounts. On the basis of such filings, the IRS could re□uest information with respect to such filings and the Proposed Policyholder ac□nowledges that the Insurer may provide such FBAR-related information to the IRS if re□uested to do so.

**Section □□.□ Ta□ Matters**

The Proposed Policyholder ac□nowledges that he or she is responsible for complying with all ta□ reporting, filing and payment obligations with respect to this Policy in any jurisdiction in which the Proposed Policyholder is subject to ta□. The Proposed Policyholder must consult its own ta□ advisor with respect to such obligations. The Insurer has not provided, and shall have no responsibility for providing, advice to the Proposed Policyholder with respect to such issues.

CROWNGLOBAL INSURANCE

**Section .  Liitation on Liability of Insurer**

**THE LIABILITY OF THE INSURER FOR BENEFITS UNDER THE POLICY OR FOR ANY LOSS OR OTHER DAMAGES ITH RESPECT TO THE POLICY IS LIMITED TO THE POLICY ACCOUNT VALUE.**

## Appendi□I - Annuity Percentage Table

| Annuitant's Age | Life Expectancy | Annuity Percentage | Annuitant's Age | Life Expectancy | Annuity Percentage |
|---|---|---|---|---|---|
| 10 | 86.2 | 1.1601% | 63 | 33.9 | 2.9499% |
| 11 | 85.2 | 1.1737% | 64 | 33.0 | 3.0303% |
| 12 | 84.2 | 1.1876% | 65 | 32.0 | 3.1250% |
| 13 | 83.2 | 1.2019% | 66 | 31.1 | 3.2154% |
| 14 | 82.2 | 1.2165% | 67 | 30.2 | 3.3113% |
| 15 | 81.2 | 1.2315% | 68 | 29.2 | 3.4247% |
| 16 | 80.2 | 1.2469% | 69 | 28.3 | 3.5336% |
| 17 | 79.2 | 1.2626% | 70 | 27.4 | 3.6496% |
| 18 | 78.2 | 1.2788% | 71 | 26.5 | 3.7736% |
| 19 | 77.3 | 1.2937% | 72 | 25.6 | 3.9063% |
| 20 | 76.3 | 1.3106% | 73 | 24.7 | 4.0486% |
| 21 | 75.3 | 1.3280% | 74 | 23.8 | 4.2017% |
| 22 | 74.3 | 1.3459% | 75 | 22.9 | 4.3668% |
| 23 | 73.3 | 1.3643% | 76 | 22.0 | 4.5455% |
| 24 | 72.3 | 1.3831% | 77 | 21.2 | 4.7170% |
| 25 | 71.3 | 1.4025% | 78 | 20.3 | 4.9261% |
| 26 | 70.3 | 1.4225% | 79 | 19.5 | 5.1282% |
| 27 | 69.3 | 1.4430% | 80 | 18.7 | 5.3476% |
| 28 | 68.3 | 1.4641% | 81 | 17.9 | 5.5866% |
| 29 | 67.3 | 1.4859% | 82 | 17.1 | 5.8480% |
| 30 | 66.3 | 1.5083% | 83 | 16.3 | 6.1350% |
| 31 | 65.3 | 1.5314% | 84 | 15.5 | 6.4516% |
| 32 | 64.3 | 1.5552% | 85 | 14.8 | 6.7568% |
| 33 | 63.3 | 1.5798% | 86 | 14.1 | 7.0922% |
| 34 | 62.3 | 1.6051% | 87 | 13.4 | 7.4627% |
| 35 | 61.4 | 1.6287% | 88 | 12.7 | 7.8740% |
| 36 | 60.4 | 1.6556% | 89 | 12.0 | 8.3333% |
| 37 | 59.4 | 1.6835% | 90 | 11.4 | 8.7719% |
| 38 | 58.4 | 1.7123% | 91 | 10.8 | 9.2593% |
| 39 | 57.4 | 1.7422% | 92 | 10.2 | 9.8039% |
| 40 | 56.4 | 1.7730% | 93 | 9.6 | 10.4167% |
| 41 | 55.4 | 1.8051% | 94 | 9.1 | 10.9890% |
| 42 | 54.4 | 1.8382% | 95 | 8.6 | 11.6279% |
| 43 | 53.4 | 1.8727% | 96 | 8.1 | 12.3457% |
| 44 | 52.4 | 1.9084% | 97 | 7.6 | 13.1579% |
| 45 | 51.5 | 1.9417% | 98 | 7.1 | 14.0845% |
| 46 | 50.5 | 1.9802% | 99 | 6.7 | 14.9254% |
| 47 | 49.5 | 2.0202% | 100 | 6.3 | 15.8730% |
| 48 | 48.5 | 2.0619% | 101 | 5.9 | 16.9492% |
| 49 | 47.5 | 2.1053% | 102 | 5.5 | 18.1818% |
| 50 | 46.5 | 2.1505% | 103 | 5.2 | 19.2308% |
| 51 | 45.5 | 2.1978% | 104 | 4.9 | 20.4082% |
| 52 | 44.6 | 2.2422% | 105 | 4.5 | 22.2222% |
| 53 | 43.6 | 2.2936% | 106 | 4.2 | 23.8095% |
| 54 | 42.6 | 2.3474% | 107 | 3.9 | 25.6410% |
| 55 | 40.6 | 2.4631% | 108 | 3.7 | 27.0270% |
| 56 | 40.7 | 2.4570% | 109 | 3.4 | 29.4118% |
| 57 | 39.7 | 2.5189% | 110 | 3.1 | 32.2581% |
| 58 | 38.7 | 2.5840% | 111 | 2.9 | 34.4828% |
| 59 | 37.8 | 2.6455% | 112 | 2.6 | 38.4615% |
| 60 | 35.8 | 2.7933% | 113 | 2.4 | 41.6667% |
| 61 | 35.8 | 2.7933% | 114 | 2.1 | 47.6190% |
| 62 | 34.9 | 2.8653% | 115 | 1.9 | 52.6316% |

# EXHIBIT 27

# PARTICIPATION AGREEMENT

among

**CROWN GLOBAL LIFE INSURANCE LTD.**

and

**CROWN GLOBAL LIFE INSURANCE LTD.** acting on behalf of each its Separate Accounts set out in Schedule A hereto as may be amended from time to time

and

**ATLAS IDF, LP**

and

**RAND ADVISORS, LLC**

**Dated as of**

**November 30, 2015**

{00290535.DOC; 3}

# TABLE OF CONTENTS


**Page**

ARTICLE I. CERTAIN DEFINITIONS ..... 1

ARTICLE II. SALE AND WITHDRAWAL OF INTERESTS ..... 3

ARTICLE III. NET ASSET VALUE ..... 5

ARTICLE IV. REPRESENTATIONS, WARRANTIES AND COVENANTS ..... 6

ARTICLE V. INVESTMENT RESTRICTIONS; INFORMATION AND REPORTS; OTHER OBLIGATIONS ..... 122

ARTICLE VI. EXPENSES. ..... 13

ARTICLE VII. INDEMNIFICATION ..... 13

ARTICLE VIII. TERMINATION ..... 15

ARTICLE IX. NOTICES, REQUESTS OR CONSENTS ..... 16

ARTICLE X. PRIVACY OBLIGATIONS ..... 16

ARTICLE XI. MISCELLANEOUS ..... 17

**THIS PARTICIPATION AGREEMENT** (this "**Agreement**") is made and entered into by and among **CROWN GLOBAL LIFE INSURANCE LTD.** ("**CGLI**"), a Bermuda exempted company registered as a long term Class C insurer, the Company on behalf of each of its separate accounts (and subaccounts, if any, thereof) set forth on Schedule A hereto ("**Schedule A Separate Accounts**" and together with CGIL, the "**Company**"), as the same may be amended from time to time, **ATLAS IDF, LP**, a Delaware limited partnership (the "**Fund**"), and **RAND ADVISORS, LLC**, a Delaware limited liability company (the "**Adviser**") (collectively, the "**Parties**" and each, a "**Party**"), and shall be effective as of the date set forth on the counterpart signature page hereto.

**WITNESSETH:**

**WHEREAS**, the Fund was organized as a private investment vehicle and is offering its limited partnership interests ("**Interests**") to Eligible Insurance Funds and to separate accounts, or subaccounts thereof, that fund Variable Contracts offered by Eligible Insurance Companies, as such terms are defined below;

**WHEREAS**, the offering and sale of Interests will be exempt from registration or qualification under the U.S. Securities Act of 1933, as amended (the "**1933 Act**");

**WHEREAS**, the Company has established a Separate Account, and may in the future establish additional Separate Accounts (and subaccounts thereof) to hold one or more Interests; and

**WHEREAS**, the Company desires to purchase, and the Fund desires to issue, Interests in accordance with this Agreement.

**NOW, THEREFORE**, the Parties agree as follows:

## ARTICLE I. CERTAIN DEFINITIONS

**1.1** "**Business Day**" means each day the NYSE is open for regular trading, unless defined differently on Schedule A-2 hereto.

**1.2** "**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

**1.3** "**Company Contracts**" means those Variable Contracts issued by the Company and listed on Schedule A hereto, as the same may be amended from time to time.

**1.4** "**Compliant Seed Investment**" means an investment in the Fund by the Adviser made in compliance with the Tax Requirements.

**1.5** "**Confidential Information**" as used in this provision means any term of this Agreement, any transaction in connection with this Agreement, and any other non-public information concerning the Parties and their respective businesses and affiliates that may be acquired by reason of this Agreement or any transaction in connection therewith, but shall not include any information that is in or has entered the public domain other than due to a breach of Section 10 hereof.

**1.6** "**Contract PPM**" means offering memorandum, including any amendment, supplement or addendum thereto, as amended from time to time, utilized in connection with the offering of the Company Contracts.

1.7 "**Customer Information**" means any "non-public personal information" (as defined in Regulation S-P of the U.S. Securities and Exchange Commission (the "**SEC**")) about a Policy Owner or prospective Policy Owner. Customer Information includes, but is not limited to, a Policy Owner's (or prospective Policy Owner's) name, social security number and health and financial information.

1.8 "**Eligible Insurance Company**" means a life insurance company that is taxed as a U.S. life insurance company under Subchapter L of the Code and is eligible to purchase and hold Interests under the Tax Requirements.

1.9 "**Eligible Insurance Fund**" means a regulated investment company, real estate investment trust, limited liability company, limited partnership or trust that is eligible to purchase and hold Interests under the Tax Requirements and is in compliance with Revenue Ruling 2005-7.

1.10 "**Fund PPM**" means offering memorandum, including any amendment, supplement or addendum thereto, as amended from time to time, provided by the Fund or the Adviser to the Company in connection with the offering of Interests.

1.11 "**Fund Agreements**" means the Operating Agreement and the subscription documents of the Fund.

1.12 "**Fund Reports**" shall have the meaning set forth in Section 5.2(b) hereof.

1.13 "**Interest Owner**" means (a) any Eligible Insurance Fund that and (b) any separate account (or a subaccount thereof) of an Eligible Insurance Company on behalf of which the Eligible Insurance Company has invested in one or more Interests.

1.14 "**Operating Agreement**" means the Fund's amended and restated limited partnership agreement dated as of the date set forth on Schedule A-2 hereto.

1.15 "**Policy Owner**" means the owner of a Company Contract.

1.16 "**Policy Representative**" means any agent or representative of a Policy Owner, the grantor or beneficiary of any Policy Owner that is a trust, or any agent or representative of such grantor or beneficiary.

1.17 "**Privacy Law**" means any applicable privacy law.

1.18 "**Sales Literature**" means (i) the Fund PPM and reports provided to the Company by the Fund or the Adviser, (ii) any written or other communication distributed or made available to existing or potential investors or their agents or employees, including brochures, circulars, research reports, market letters, form letters, seminar texts, or reprints of or excerpts from any other advertisement, sales literature, or published article, with respect to the Fund, and (iii) any other material regarding the Fund constituting sales literature or advertising, including all offering materials.

1.19 "**Separate Accounts**" means those separate accounts (or subaccounts thereof) established by the Company for the purpose of holding one or more Interests and listed on

Schedule A hereto, as the same may be amended from time to time. Each Separate Account shall be a separate and distinct owner of Interest(s).

**1.20** "**Tax Requirements**" means the requirements of Section 817(h) of the Code, Regulations 1.817-5 thereunder and any amendments or successor provisions thereto.

**1.21** "**Valuation Date**" means the last Business Day of each calendar month.

**1.22** "**Variable Contract**" means a variable life insurance policy, variable annuity policy or other variable insurance policy that is characterized as a "variable contract" under Section 817(d) of the Code.

## ARTICLE II. SALE AND WITHDRAWAL OF INTERESTS

**2.1 Offering and Sale of Interests.**

**(a)** Subject to Section 8.2 and subject to and on the terms of the Fund PPM, the Fund may offer Interests for purchase in any amount by the Company on behalf of the Separate Accounts, subject to the minimum initial investment amount set forth on Schedule A-2 hereto. The Fund may accept additional capital contributions in any amount, subject to the minimum additional investment amount set forth on Schedule A-2 hereto. Capital contributions will be accepted as of the first Business Day of each calendar month or quarter (as specified on Schedule A-2 hereto) (each, a "**Subscription Date**"). The Company shall notify the Adviser of its intent to purchase Interests by providing notice no later than the date and time set forth on Schedule A-2 hereto. The Company shall complete and send to the Fund the Subscription Form set forth in Appendix A. The Company shall not be required to enter into any agreement other than this Agreement and the Fund Agreements in order to purchase Interests.

**(b)** The Fund may suspend or discontinue its offering of Interests solely in conformity with the Fund PPM upon at least the number of days' prior written notice to the Company set forth on Schedule A-2 hereto.

**(c)** The issuance and transfer of Interests shall be by book entry only, and certificates therefor shall not be issued to the Company or the Separate Accounts.

**2.2 Payment for Interests.** The Company shall transmit by wire transfer federal funds in the amount of the purchased Interests to be received by the Fund no later than the date and time set forth on Schedule A-2 hereto. Federal funds received after that time and date shall be held in a subscription account of the Fund's custodian until the next Subscription Date or returned to the Company upon its request.

**2.3 Withdrawal of Interests.**

**(a) General Withdrawal Terms.** Any withdrawal request shall specify the number and value of the Interest(s) to be withdrawn, shall not be less than the amount set forth on Schedule A-2 hereto and shall be subject to any other requirements set forth on Schedule A-2 hereto. Any partial withdrawal of Interest(s) that leaves the value of the Interest(s) held by a Separate Account at less than the amount set forth on Schedule A-2 hereto as of the date of withdrawal shall be deemed a complete withdrawal. (See Appendix

B for Withdrawal Form.) The terms of this Section 2.3(a) shall apply unless otherwise provided in Sections 2.3(b) through 2.3(f) or on Schedule A-2 hereto.

**(b) Standard Withdrawals.** Subject to Section 2.3(f), the Company will be permitted to redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Standard Withdrawal Request**") as of the last day of any calendar month or quarter as set forth on Schedule A-2 hereto (each, a "**Standard Withdrawal Date**") following the lock-up period set forth on Schedule A-2 hereto. The Adviser may waive the notice period in its discretion. The withdrawal proceeds in connection with a Standard Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

**(c) Death Benefit Withdrawals.** Subject to Section 2.3(f), with respect to withdrawals required for the payment of a death benefit, the Company may redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Death Benefit Withdrawal Request**") as of the last day of any calendar month (each, a "**Death Benefit Withdrawal Date**"). The Adviser may waive the notice period in its discretion. The withdrawal proceeds in connection with a Death Benefit Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

**(d) Special Withdrawals.** Subject to Section 2.3(f), with respect to withdrawals required for the payment of any insurance charges and/or expenses of the Company Contracts or as otherwise agreed upon by the Adviser, the Company may redeem for cash any Interest, in whole or in part, held by a Separate Account upon not less than the number of days' prior written notice to the Adviser set forth on Schedule A-2 hereto (each such notice, a "**Special Withdrawal Request**") as of the last day of any calendar month (each, a "**Special Withdrawal Date**"). The Adviser may waive the notice period in its discretion. The withdrawal proceeds in connection with a Special Withdrawal Request shall be paid in accordance with the timeline set forth on Schedule A-2.

**(e) Withdrawal Events.** Subject to Section 2.3(f), the Company may redeem for cash Interests if any of the following events ("**Withdrawal Events**") occur: (i) the Fund fails to comply with the Tax Requirements, and such noncompliance cannot be cured in a reasonable period of time pursuant to the regulations and proceedings of the U.S. Department of the Treasury (the "**Treasury**") and the U.S. Internal Revenue Service; or (ii) there is a violation of the requirements set forth on Schedule D hereto. The Adviser shall notify the Company as soon as any Withdrawal Event occurs. Upon the occurrence of a Withdrawal Event, the Company may redeem its Interests as of the last day of any calendar month (each, an "**Event Withdrawal Date**") upon not less than 30 days' prior written notice to the Adviser (each such notice an "**Event Withdrawal Request**"). Upon an Event Withdrawal Request, the Fund shall pay 100% of the withdrawal proceeds within 30 days following the Event Withdrawal Date. Event Withdrawal Requests shall not be subject to any lock-up withdrawal requests.

**(f) Limitations on Withdrawal Rights Granted Hereunder.** Notwithstanding the foregoing provisions of this Section 2.3, and any other terms of this Agreement, if the

Adviser determines that compliance with any of the withdrawal and payment rights granted pursuant to this Section 2.3 or any other provisions of this Agreement shall (i) cause it or the Fund to fail to adhere to the Tax Requirements, or (ii) require it to liquidate any asset which is then illiquid and/or part of a Side Pocket Account (as defined in the Operating Agreement), then it may defer such compliance until such failure or requirement shall no longer exist; *provided* that for so long as (x) such condition continues and (y) the Company shall not be receiving payment of any insurance charges and/or expenses of the Company Contracts as a result of such delayed compliance, the Adviser agrees that it shall defer its fees pursuant to Operating Agreement, and such amounts otherwise payable to the Adviser shall instead be paid by the Fund to the Company for such insurance charges and/or expenses.

**2.4 Payment of Withdrawal Proceeds.**

**(a) Payment of Withdrawal Proceeds Generally.** Subject always to any liquidity limitations set out in the Fund PPM, the Fund shall transfer to the Company, or to any person designated by the Company in writing, any withdrawal proceeds via wire transfer in the form of federal funds.

**(b) Payment of Withdrawal Proceeds In-Kind.** The Fund may, but only if permitted by applicable law and in conformity with the Operating Agreement and the Fund PPM, transfer in-kind interests in an underlying investment of the Fund to (i) the Company and/or the Separate Accounts in full or partial satisfaction of any withdrawal request, or (ii) a Policy Owner in full or partial satisfaction of a full or partial surrender of a Company Contract, or to a beneficiary under a Company Contract in full or partial satisfaction of a death benefit payment under such Company Contract; provided, however, that such transfer to a Policy Owner is conducted as a transaction exempt from registration under the 1933 Act. For the avoidance of doubt, notwithstanding the foregoing, the provisions of this Section 2.4(b) shall be subject to the limitations on liquidity and withdrawals, and terms therein on payments with withdrawal proceeds (including, in particular, the payment of withdrawal proceeds in-kind) set forth in in the Fund Agreements.

**2.5 Company Contracts.** The Fund and the Adviser acknowledge and agree that, subject to each Company Contract, CGLI shall have the exclusive right, in its sole discretion, to suspend the offer or sale of any of the Company Contracts or to reject any application for the purchase of any Company Contract.

## ARTICLE III. NET ASSET VALUE

**3.1 NAV Generally.** The Fund shall determine its net asset value (the "**NAV**") on each Valuation Date in the manner prescribed in the Operating Agreement and the Fund PPM. The Adviser shall make the NAV available to the Company in an electronic data file in a format specified by the Company, and shall do so as soon as reasonably practicable after each Valuation Date, and in any event no later than the date and time set forth on Schedule A-2 hereto.

**3.2 Adjustments.** The NAV information provided pursuant to Section 3.1 hereof may be based on estimated values and/or values determined by the Adviser acting in good faith and using reasonable judgment ("**Reasonable Valuations**"), and prospective adjustments shall be made, if necessary, to correct the NAV within a reasonable period of time after the Fund or

the Adviser is in receipt of the Fund's audited financials. No retroactive adjustments shall be made.

## ARTICLE IV. REPRESENTATIONS, WARRANTIES AND COVENANTS

**4.1 Representations, Warranties and Covenants of the Company.** The Company represents and warrants to, and for the benefit of, and covenants and agrees with the Fund and the Adviser that:

**(a)** CGLI is an Eligible Insurance Company that is duly organized, validly existing and in good standing under the laws of Bermuda.

**(b)** The Separate Account(s) are legally and validly established segregated asset accounts (or subaccounts thereof) under the laws of Bermuda (including, without limitation the Bermuda Insurance Act 1978, as amended ("Bermuda Insurance Act") and related rules and regulations and any Bermuda private act to which CGLI or the Separate Accounts are subject), applicable state insurance and tax laws and regulations, and were established by CGIL to set aside and invest premiums attributable to Company Contracts.

**(c)** CGLI has the power and is duly qualified and has all necessary licences, consents, permits and authorities necessary (including those referred to in paragraph 4.1(a) above) to offer and sell the Company Contracts and for the Company to purchase the Interests, all of which are valid and subsisting.

**(d)** The Company shall be an "accredited investor" within the meaning of Rule 501(a) of Regulation D under the 1933 Act (an "**Accredited Investor**"), a "qualified client" within the meaning of Rule 205-3 promulgated under the U.S. Investment Advisers Act of 1940, as amended, and a "qualified purchaser" within the meaning of Section 2(a)(51) of the U.S. Investment Company Act of 1940, as amended (a "**Qualified Purchaser**"; such statute, the "**1940 Act**").

**(e)** The Company Contracts shall be offered and sold, and the Contract PPM and the Fund PPM shall be disseminated to prospective or existing Policy Owners, in compliance in all material respects with all applicable Bermuda, U.S. and other foreign securities, commodities, tax and insurance laws and regulations.

**(f)** CGLI shall sell Company Contracts only to persons that CGLI or its agents reasonably believe to be Accredited Investors and Qualified Purchasers.

**(g)** The Company Contracts shall be treated as Variable Contracts under the Code, provided that the Fund and the Adviser comply with all of the terms of the Operating Agreement and this Agreement, and CGLI shall promptly notify the Fund and the Adviser in writing upon forming a reasonable belief that the Company Contracts will or may no longer qualify for such treatment.

**(h)** The Separate Accounts shall not be subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("**ERISA**").

**(i)** The Contract PPM does not contain any untrue statement of material fact, other than with respect to information provided in writing by the Fund or the Adviser for

inclusion in the Contract PPM. For the avoidance of doubt, the Company is not representing whether the Contract PPM meets the full standards of disclosure contemplated under the 1933 Act, and the U.S. Securities and Exchange Act, as amended, for issuers registered under such Acts, or for issuers that are not so registered.

**(j)** The Company shall not disseminate any information, or make any representation or statement, to any person concerning the offer or sale of Interests or the Company Contracts other than the information, representations and statements contained in the Contract PPM, the Fund PPM, Fund Reports, or any Sales Literature approved by the Adviser for such purposes. This Section 4.1(j) shall not in any way restrict the right of the Company to disseminate materials (such as illustrations) describing the Company, its operations and its products, as well as those materials describing the insurance industry and insurance products generally.

**(k)** The Company shall establish and implement policies and procedures reasonably designed to discharge its obligations under applicable federal laws and regulations regarding money laundering, including, but not limited the Company's Know Your Client (KYC) and due diligence requirements under the Bermuda Proceeds of Crime (Anti-Money Laundering and Anti-Terrorist Financing) Regulations 2008, as amended the regulations of the Treasury and the Executive Orders related to the Treasury's Office of Foreign Assets Control ("**OFAC**"; and, together, the "**AML Procedures**"). The Fund and the Adviser acknowledge that in connection with, and as a complement to its own AML Procedures, where permitted by applicable law, the Company shall be entitled to rely on AML Procedures implemented by third parties with respect to Policy Owners; provided that such acknowledgement shall not limit any rights of the Fund or the advisor relating to AML under the Fund Agreements.

The Company's AML Procedures shall include those reasonably designed to ensure the accuracy of the following representations of the Company:

(i) the identity of each purchaser of a Company Contract has been established by evidence that the Company reasonably believes is genuine;

(ii) the Company reasonably believes that no premium funds tendered for the purchase of a Company Contract are derived directly or indirectly from activities that may contravene relevant U.S. federal or state, or international, laws or regulations related to money laundering; and

(iii) unless the Fund, in its sole discretion, lawfully waives such a requirement, CGIL shall not issue a Variable Contract to any person or entity that the Company reasonably believes, at the time of the possible purchase of the Company Contract, to be:

1. a country, territory, organization, person or entity named in OFAC's List of Specially Designated Nationals and Blocked Persons, as such list may be amended from time to time;

2. a person or entity that resides or has a place of business in a country or territory named on an OFAC list, or that is designated as a

"Non-Cooperative Jurisdiction" by the Financial Action Task Force on Money Laundering, or whose premium funds tendered for the acquisition of a Company Contract are transferred from or through any such country or territory;

3. a "foreign shell bank" as such term is defined in 31 U.S.C. § 5318(j) and Treasury regulations thereunder;

4. a person or entity that resides in, or is organized under, the laws of a jurisdiction designated by the Secretary of the Treasury as a "jurisdiction of primary money laundering concern" pursuant to 31 U.S.C. § 5318A; or

5. a "senior foreign political figure," or a "family member" or "close associate" of a senior foreign political figure as such terms are defined in the *Guidance on Enhanced Scrutiny for Transactions that May Involve the Proceeds of Foreign Official Corruption* issued by the Treasury, unless CGIL has diligently scrutinized the proposed purchase of the Company Contract by or for the benefit of such person and has determined to permit such purchase.

**(l)** The Company shall promptly notify the Fund and the Adviser of any change in the information set forth in this Section 4.1.

**(m)** The Company is not aware of any conflict between this Agreement and any law or regulation to which it may be subject (including under any Bermuda private act).

**4.2 Of the Fund.** The Fund represents and warrants to, and for the benefit of, and covenants and agrees with the Company that:

**(a)** The Fund has been established under the laws of the jurisdiction of its formation and is in good standing thereunder, and qualifies for the exclusion from the definition of "investment company" provided by Section 3(c)(7) of the 1940 Act.

**(b)** The Interests shall be offered and sold in compliance in all material respects with all applicable federal and state laws and regulations.

**(c)** None of the Fund; any predecessor of the Fund; any affiliated issuer of the Fund; any director, executive officer, other officer who is participating in the offering of interests in the Fund, general partner or managing member of the Fund; any beneficial owner of 20% or more of the Fund's outstanding voting equity securities (calculated on the basis of voting power); any promoter connected with the Fund in any capacity; the Adviser; any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of interests in the Fund (a "**Solicitor**"); any general partner or managing member of the Adviser or a Solicitor; or any director, executive officer or other officer who is participating in the offering of interests in the Fund of the Adviser or a Solicitor or general partner or managing member of the Adviser or a Solicitor is subject to any event listed in Rule 506(d)(1).

**(d)** The Fund shall offer and sell Interests only to Eligible Insurance Funds and Eligible Insurance Companies that have certified that they (i) are Accredited Investors and

Qualified Purchasers and (ii) will purchase and hold Interests, directly or indirectly, solely for the benefit of policy owners that they reasonably believe are Accredited Investors and Qualified Purchasers; provided, however, that the Fund may offer and sell Interests to employee benefit plans and other funds subject to ERISA and/or Section 4975 of the Code that meet the requirements of clause (i). Further, the Fund shall, with the exception of any Compliant Seed Investment, issue Interests only to Eligible Insurance Funds and Eligible Insurance Companies with which it has entered into an agreement containing provisions substantially similar to those provisions of this Agreement listed on Schedule A-2 hereto.

**(e)** The Fund shall invest, hold and dispose of its assets in compliance with the Tax Requirements. The Fund or the Adviser shall promptly notify the Company upon forming a reasonable belief that the Fund has ceased, or may cease, to comply with the Tax Requirements, and shall cure any non-conformance within the period for cure afforded by Regulations 1.817-5. The Fund and the Adviser acknowledge that the Fund's compliance with the Tax Requirements is material to their performance under this Agreement.

**(f)** The Fund shall be operated so as to maintain its treatment for U.S. federal income tax purposes as a partnership, or if there is only one Interest Owner, a disregarded entity, under the Code, and the Fund or the Adviser shall promptly notify the Company upon forming a reasonable belief that the Fund has ceased, or may cease, to qualify for such tax treatment.

**(g)** The Fund, the Adviser and their respective officers, directors, employees, principals, affiliates and other representatives shall comply with the requirements set forth on Schedule D hereto so as to prevent any Policy Owner from having "incidents of control" under the Investor Control Doctrine (as defined on Schedule D hereto).

**(h)** The Fund's assets shall be invested in compliance with the investment restrictions set forth on Schedule B hereto, as the same may be modified from time to time pursuant to Section 5.1.

**(i)** The Adviser is and will exercise commercially reasonable best efforts to remain registered with the SEC as an investment adviser; provided that the Adviser shall be deemed to be so registered if it qualifies as a "relying" Adviser. If the Adviser applies to withdraw its registration, the Adviser shall notify the Company at least thirty (30) days prior to the intended effective date of its withdrawal.

**(j)** The Adviser is exempt from registration as a commodity pool operator ("**CPO**") pursuant to CFTC Rule 4.13(a)(3) and shall notify the Company as soon as reasonably practicable upon forming a reasonable belief that such exempt status will change.

**(k)** The Adviser shall have the sole discretionary authority over the Fund's investments and shall manage the Fund in accordance with the Operating Agreement and the Fund PPM; provided that, for the avoidance of doubt, the Fund may invest in Portfolio Funds (as defined in the Fund PPM) and the like, in the manner contemplated in the Fund PPM.

**(l)** The Fund PPM does not contain any untrue statement of material fact, other than with respect to information provided in writing by the Company for inclusion in the Fund PPM. For the avoidance of doubt, the Fund is not representing whether the Fund PPM

meets the full standards of disclosure contemplated under the 1933 Act, and the U.S. Securities and Exchange Act, as amended, for issuers registered under such Acts, or for issuers that are not so registered.

**(m)** No material change shall be made to the Operating Agreement or the Fund PPM (e.g., a change to the Fund's investment objective or strategies) without at least thirty (30) days' prior notice to the Company. Any updates thereto shall be promptly delivered to the Company.

**(n)** Subject to Section 4.1(k), the Fund shall be responsible for anti-money laundering compliance related to its activities, and shall maintain and implement policies and procedures reasonably designed to discharge its obligations under applicable federal laws and regulations regarding money laundering, including, but not limited to, the USA PATRIOT Act of 2001, the regulations of the Treasury and the Executive Orders related to OFAC; provided that for the avoidance of doubt the Fund may delegate such compliance in a manner that is substantially consistent with standard practices of private investment funds in the U.S.

**(o)** The Company shall be provided the most recent audited financial statements of the Fund as soon as reasonably practicable after they become available.

**(p)** Neither the Fund nor the Adviser shall disseminate any information, or make any representation or statement, to any person concerning the Company or the Company Contracts other than the information, representations and statements contained in the Contract PPM, the Fund PPM, any Sales Literature approved by the Company pursuant to Section 5.3, or available in the public domain.

**(q)** Unless the Company otherwise consents, the Fund and the Adviser shall use its commercially reasonable best efforts to ensure that all communications related specifically to the Company Contracts, shall only be between the Company and a Policy Owner or Policy Representative.

**(r)** The Fund shall maintain and implement commercially reasonable procedures to safeguard the confidentiality and integrity of their records with respect to the Fund and the Company.

**(s)** The Fund shall promptly notify the Company upon any change to a service provider to the Company.

**(t)** The Fund is not aware of any conflict between this Agreement and any law or other obligation to which it or the Advisor may not be subject.

**(u)** The Fund shall promptly notify the Company of any change in the information set forth in this Section 4.2.

**(v)** The Fund shall not invest in a "passive foreign investment company" (a "**PFIC**") as defined in Section 1297(a) of the Code unless, prior to making such investment, the Fund has certified to the Company that (i) such PFIC will comply with the requirements of Section 1295(a)(2) of the Code and the Treasury regulations thereunder (e.g., that the PFIC provide its "qualifying electing fund" ("**QEF**") shareholders with a PFIC Annual

Information Statement) or (ii) the Fund will provide information reasonably equivalent to the information contained in a PFIC Annual Information Statement. If the Fund or the Company determines that a PFIC is not in compliance with its QEF reporting requirements, the Fund shall take any steps necessary to cause the PFIC to comply therewith.

**4.3 Of the Adviser.** The Adviser represents, warrants and covenants to the Company that the Adviser shall use reasonable efforts to provide the Company with any information concerning the Adviser that the Company requires in making any filings with any government authority having regulatory authority over the Company.

**4.4 Mutual Representations, Warranties and Covenants.** Each of the Company and the Fund hereto represents and warrants to, and for the benefit of, and covenants and agrees with the other Parties that:

**(a)** it shall use reasonable efforts to cooperate with each other Party and any governmental authority in respect of any such authority's investigation or inquiry concerning this Agreement or any of the transactions contemplated hereby;

**(b)** the Adviser and the Company are not in an affiliate or agency relationship;

**(c)** upon reasonable notice, the execution and delivery of this Agreement and the consummation of the transactions contemplated herein (i) have been duly authorized by all necessary corporate or other formal action by such Party and, when executed and delivered, this Agreement shall be a valid and binding obligation upon such Party enforceable in accordance with its terms; and (ii) the transactions contemplated thereto do not and will not violate, conflict with or constitute a default under any requirement of any law or any regulation of Bermuda, the U.S. or otherwise (including, without limitation, any Bermuda private act);

**(d)** except as otherwise set forth herein, the provisions of this Agreement shall be deemed to control in the case of any conflict between the provisions of this Agreement and the provisions of the Fund PPM, Operating Agreement, or any other agreement entered into between the Company and the Fund or the Adviser;

**(e)** the Operating Agreement and the Fund PPM, as currently in effect, shall have been delivered to the Company prior to the signing of this Agreement; and

**(f)** the representations, warranties and covenants contained in this Agreement and the Fund Agreements (collectively, the "**Party Documents**") are the only representations, warranties and covenants that have been made by any Party to any other Party, and in entering into this Agreement, each Party has relied solely on the information contained in the Party Documents or that it obtained by its own independent investigation.

**4.5 Duration.** The representations, warranties and covenants contained in this Article IV shall be deemed continuing at all times until the termination of this Agreement.

## ARTICLE V. INVESTMENT RESTRICTIONS; INFORMATION AND REPORTS; OTHER OBLIGATIONS

**5.1 Revision of Investment Restrictions.** The investment restrictions of the Company are as set forth on Schedule B hereto. The Company shall be permitted to request a change in such investment restrictions only if such change is necessitated by a change in the laws, regulations or interpretations thereof to which the Company is subject. The Company shall make a request for a change in its investment restrictions in writing to the Fund and the Adviser. If the Adviser determines in its absolute discretion that causing the Fund to comply with the revised investment restrictions proposed by the Company is in the best interests of the Interest Owners, the Parties shall amend Schedule B hereto accordingly. If the Adviser determines otherwise, it shall notify the Company within thirty (30) days of such determination.

**5.2 Provision of Reports and Information.** The Company shall provide to the Adviser, upon request, a specimen copy of the Contract PPM and each Company Contract. The Fund shall on a timely basis provide to the Company the following without charge:

**(a)** a current copy of the Fund PPM (and any amendment or supplement thereto) in any form the Company may reasonably request;

**(b)** electronic copies of those reports and other communications that the Fund provides to its Interest Owners, including its periodic performance reports (collectively, the "**Fund Reports**");

**(c)** any reports and information that the Company requires as a U.S. taxpayer; and

**(d)** any other documents that the Company may reasonably request of the Fund, including, but not limited to, its governing instruments, tax reports, marketing materials, and any government filings and updates and amendments thereto, including, but not limited to, the Adviser's Form ADV; provided that neither the Fund nor the Adviser need supply any agreements or documents of the Fund or the Adviser that are confidential.

**5.3 Review of Sales Literature.** Neither the Fund, the Adviser nor any person acting on their behalf shall use any Sales Literature in which the Company is named without the consent of the Company which shall not be unreasonably withheld or delayed.

**5.4 Distribution of Certain Information by the Company.** The Company shall be permitted, without further review or consent of the Fund or the Adviser, to deliver to Policy Owners, prospective Policy Owners, and their agents and representatives, the Fund PPM (and any amendments or supplements thereto), Fund Reports and any Sales Literature approved for such purposes by the Adviser.

**5.5 Provision of Information Prior to Signing of Agreement.** Prior to signing this Agreement, the Adviser has provided the Company with its most recent Form ADV, and any amendments thereto, as filed with the SEC.

Prior to signing this Agreement, the Fund or the Adviser has provided the Company with (a) the name and address of the Fund's independent auditor(s) and (b) upon the Company's

request, a consent and authorization for the Company to contact the auditor(s) for information reasonably required about the auditor(s) and its/their relationship with the Fund and the Adviser. At any time the Fund retains a different independent auditor, the Fund or the Adviser shall provide the Company with the same consent and authorization upon request. For avoidance of doubt, the Company shall not be entitled to obtain access to the Fund's books and records pursuant to this Section 5.5.

Prior to signing this Agreement, CGIL has provided the Fund with its Class C certificate of registration issued to it by the Bermuda Monetary Authority and any directions and/or approvals relating to it issued by the Bermuda Monetary Authority pursuant to the Bermuda Insurance Act.

**5.6 Certification of Investment Diversification.** As soon as reasonably practicable after the end of each calendar quarter, but in no event later than the number of days after the end of such calendar quarter set forth on Schedule A-2 hereto, the Adviser shall deliver to the Company a written certification in the form of Schedule C hereto.

## ARTICLE VI. EXPENSES

**6.1 Expenses Borne by the Company.** The Company shall bear all of the costs incurred in connection with the (i) filing and qualification of the Company Contracts under any applicable state insurance or securities laws; (ii) preparation of the Contract PPM and any other necessary disclosure documents or regulatory filings with respect to the Company Contracts or the Separate Accounts; (iii) preparation and dissemination to Policy Owners of Fund Reports and of all statements, notices or other documents required by applicable federal and state laws and regulations; (iv) dissemination of the Fund PPM to Policy Owners and prospective Policy Owners; and (v) performance of its obligations under this Agreement.

**6.2 Expenses Borne by the Fund.** The Fund shall bear all of the costs incurred in connection with the offering and sale of Interests to Interest Owners and the performance of its obligations under this Agreement, in addition to the other expenses it bears pursuant to the Operating Agreement and the Fund PPM.

## ARTICLE VII. INDEMNIFICATION

**7.1 Indemnification of Fund Parties.** The Company shall indemnify and hold harmless the Fund and the Adviser (collectively, the "**Fund Parties**" and each, a "**Fund Party**"), against any and all claims, losses, damages or expenses, including without limitation any judgment, settlement, reasonable attorney's and accountant's fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding (collectively, "**Claims**" and each, a "**Claim**"); provided, however, that a Fund Party shall be entitled to indemnification in respect of a Claim only if:

**(a)** the Claim does not arise out of its or another Fund Party's willful misfeasance, bad faith, gross negligence or breach of, or material failure to fulfill any of its representations, warranties or covenants contained herein, and

**(b)** the Claim arises out of, or is based upon, one of the following:

(i) the Company's fraud, willful default or gross negligence in performing its obligations under this Agreement; or

(ii) the Company's breach of, or material failure to fulfill, any representation, warranty, or covenant contained herein, or any material misrepresentation in connection therewith.

7.2 **Indemnification of Company Parties.** The Fund shall indemnify and hold harmless the Company and the Separate Accounts (collectively, the "**Company Parties**" and each, a "**Company Party**"), against any and all Claims; provided, however, that a Company Party shall be entitled to indemnification in respect of a Claim only if:

**(a)** the Claim does not arise out of its or another Company Party's willful misfeasance, bad faith, gross negligence or breach of, or material failure to fulfill to satisfy any of its representations, warranties or covenants contained herein, and

**(b)** the Claim arises out of, or is based upon, one of the following:

(i) the fraud, willful default or gross negligence of a Fund Party in performing its obligations under this Agreement; or

(ii) the breach of, or material failure to fulfill, by any Fund Party any representation, warranty, or covenant contained herein, or any material misrepresentation in connection therewith.

7.3 **Other Indemnification Provisions.** No indemnification, hold harmless, limitation of liability or similar provision in the Fund's Certificate of Formation, the Operating Agreement or any agreement to which the Fund or the Adviser is a party shall preclude or serve as a defense to the indemnification by the Fund of a Company Party pursuant to Section 7.2.

7.4 **Notice of Claim of Indemnification.** A Fund Party or Company Party seeking indemnification under this Article VII (an "**Indemnified Party**") shall give the Party obliged to provide indemnification under this Article VII (an "**Indemnifying Party**") written notice within a reasonable time after the Indemnified Party receives notice of a Claim; provided, however, that a failure to provide, or delay in providing, such notice shall not relieve the Indemnifying Party of any obligation it may have under this Article VII to indemnify the Indemnified Party, unless such failure or delay is the sole or primary cause of the Indemnifying Party's inability to effectively defend against the Claim and materially disadvantages the Indemnifying Party.

7.5 **Assumption of or Participation in Defense Against Claims.** In any situation where an Indemnified Person is directly involved in defending against a Claim, an Indemnifying Party shall be entitled to, at its own expense, (i) participate in the defense of the Claim or (ii) assume the defense against the Claim with counsel reasonably satisfactory to the Indemnified Party. If the Indemnifying Party elects to assume the defense of a Claim, the Indemnifying Party shall, after notice to the Indemnified Party of such election, have no obligation to bear any subsequent fees and expenses independently incurred by the Indemnified Party in connection with the defense of the Claim (excluding reasonable costs of investigation), except that the Indemnifying Party shall be liable for reasonable fees and expenses associated with additional counsel retained by the Indemnified Party where the Indemnifying Party and the Indemnified

Person are both parties to the Claim and their representation by the same counsel would be inappropriate due to an actual or potential conflict of interests. Any assumption or participation in the defense of a Claim pursuant to this Section 7.5 shall not be construed as, or be deemed to create a presumption or inference of, an admission of liability or responsibility by the Indemnifying Party, and shall not estop or otherwise limit the Indemnifying Party from contesting liability in respect of the Claim.

**7.6 Settlements.** An Indemnifying Party shall not be obliged to indemnify an Indemnified Party for the settlement of any Claim that is effected without the former's prior written consent. An Indemnifying Party may settle any Claim on behalf of an Indemnified Party without the Indemnified Party's consent; provided, however, that the settlement involves solely the payment of damages, such damages are fully paid and results in a total release of the Indemnified Party from the Claim. To the extent that its consent to a settlement is required, an Indemnified Party shall not unreasonably withhold its consent to any settlement not involving injunctive relief.

**7.7 Successors.** A successor to any Party shall be entitled to all of the benefits, and shall be subject to the burdens, of this Article VII.

**7.8 Survival.** This Article VII shall survive the termination of this Agreement including, without limitation, a termination by reason of the breach or alleged breach of any representation, warranty or covenant of this Agreement.

## ARTICLE VIII. TERMINATION

**8.1 Termination Generally.** Except as otherwise set forth in this Article VIII, no term of this Agreement shall terminate until the Separate Accounts no longer hold any Interests.

**8.2 Effectiveness of Termination of Offering Obligation.** A termination of the Offering Obligation pursuant to Section 8.2(a) shall take effect immediately. A termination pursuant to Section 8.2(b), (c), (d), (e) or (f) shall be effective immediately after the Fund provides notice to the Company of such termination.

**8.3 Mandatory Withdrawal.** The Fund shall have the right to require the Company, upon at least the number of days' prior written notice to the Company set forth on Schedule A-2 hereto, to redeem any Interest(s) attributable to any Company Contract that ceases to qualify as a Variable Contract or that the Fund reasonably believes will fail to so qualify. The timing of such mandatory withdrawal shall be specified in the Fund's notice to the Company and shall be determined with reference to Section 817(h) of the Code.

**8.4 Termination by Company.** Notwithstanding anything in this Agreement to the contrary, either the Fund or the Company may terminate this Agreement immediately and without penalty to such party:

**(a)** from the date hereof until November 30, 2017, upon at least 30 days' prior written notice to the Fund and the Adviser, or

**(b)** if the Fund or the Adviser has materially breached a representation, warranty or covenant under this Agreement and has failed to cure such breach after being given a reasonable opportunity to cure; provided, however, that the Company need not provide the

Fund or the Adviser a reasonable opportunity to cure if the material breach may, in the Company's reasonable judgment, materially and adversely affect the Company or any of its Separate Accounts or Company Contracts, or any regulatory authority, including, but not limited to, the SEC and any state regulatory authority, has instituted a formal proceeding against the Fund or the Adviser, and the anticipated outcome of such proceeding would, in the Company's reasonable judgment, materially impair the Fund's or the Adviser's ability to perform its obligations under this Agreement or under the Operating Agreement.

## ARTICLE IX. NOTICES, REQUESTS OR CONSENTS

**9.1** Any notice, consent, request or other communication required or permitted by this Agreement (a "**Communication**") to the Fund or the Adviser shall be sent to its address set forth on Schedule A-2 hereto or such other address as the Fund or the Adviser shall designate in writing to the other Parties. Any Communication to the Company required or permitted by this Agreement shall be sent to the address set forth below. Every Communication shall be in writing; shall be sent by registered or certified U.S. mail with return receipt requested, by overnight delivery with a nationally recognized courier, or by electronically transmitted facsimile or other electronic transmission, including electronic mail, with confirmed electronic receipt; and shall be effective upon the earlier of actual receipt and the 10th Business Day after sending.

**If to the Company**: Crown Global Life Insurance Ltd.
Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

With a copy to: Crown Global Life Insurance (Cayman) Ltd
Landmark Square, 2nd Floor
64 Earth Close, SMB, P.O. Box 10467
Grand Cayman KY1-1004
Cayman Islands

**9.2** Each Party may rely conclusively upon, and shall not incur any liability for any action taken in reliance upon, any Communication that it reasonably believes, in good faith, to be genuine and properly authorized by another Party.

## ARTICLE X. PRIVACY OBLIGATIONS

**10.1** The Company is, and each of the Fund and the Adviser may be, a financial institution subject to Privacy Law. To the extent that a Party is subject to Privacy Law, it shall not use or disclose any Customer Information received from another Party unless such use or disclosure is:

**(a)** required by law, regulation or rule, or permitted by Privacy Law;

**(b)** necessary to carry out the purposes for which the Party was given the Customer Information; or

(c) authorized by the express written consent of the Policy Owner or prospective Policy Owner to which the Customer Information relates, where such consent specifies the purposes for which such Customer Information may be used or disclosed.

**10.2** Each Party shall establish and maintain safeguards against any unauthorized access to, or destruction, loss or alteration of, any Customer Information in its possession or control, which safeguards must be at least as rigorous as those the Party uses to secure its own information of a similar nature.

**10.3** Notwithstanding anything in this Agreement to the contrary, including Section 11.7, each Party is expressly authorized hereby to disclose to any person, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated herein and all materials related thereto that are or were provided to such Party.

**10.4** Each Party agrees to keep confidential any Confidential Information that such Party may acquire as a result of this Agreement or any transaction in connection therewith and to ensure that no such Confidential Information is disclosed to or utilized by any of such Party's affiliates or any of its or their respective officers, directors, employees, agents or other representatives (each, a "**Relevant Person**") except for the purpose of permitting a Party to perform its obligations and/or enforce such Party's rights under this Agreement, the Fund Agreements or any transaction in connection therewith or pursuant to this Section 10 and Section 11.4 hereof.

## ARTICLE XI. MISCELLANEOUS

**11.1 Governing Law.** It is the intention of the Parties that the internal laws of Bermuda, as the same may be amended from time to time, shall govern the validity of this Agreement, the construction of its terms and the interpretation of the rights and duties of the Parties.

**11.2 Entire Agreement.** This Agreement, together with any amendments hereto and any other agreements referred to herein (including, without limitation, the Fund Agreements), shall constitute the entire agreement among the Parties with respect to the subject matter hereof, and shall supersede any prior agreement or understanding, oral or written, among the Parties with respect to the subject matter hereof.

**11.3 Waiver.** A Party's failure to insist, or delay in insisting, upon another Party's performance of any term of this Agreement shall not be construed as a waiver of the performance of such term.

**11.4 Access to Books and Records.** Each Party shall, upon request, provide each other Party and any governmental authority with reasonable access to its books and records to the extent that such request relates to a governmental authority's investigation or inquiry concerning this Agreement or any of the transactions contemplated herein. To the extent permitted by applicable law, the access provided pursuant to this Section 11.4 shall not extend to any attorney work product or information protected by the attorney-client privilege.

**11.5 Assignment.** No Party shall assign any right or obligation under this Agreement to a third party without the prior written consent of all of the Parties, which consent shall not be unreasonably withheld. Notwithstanding the previous sentence, the Company may assign,

without the consent of the Fund or the Adviser, any right or obligation under this Agreement to another insurance company that controls, is controlled by or under common control with the Company; provided, however, that the Company provides the Fund and the Adviser with notice as soon as reasonably practicable after such assignment.

**11.6 Third-Party Beneficiary.** This Agreement is not intended to and shall not convey any rights to persons not party to this Agreement.

**11.7 Confidentiality.** No Party shall disclose the terms of this Agreement to any persons not party to this Agreement, except that a Party may disclose the terms of this Agreement to comply with a legal or regulatory requirement or request, or to its representatives where such disclosure is necessary to the Party's performance of its obligations under this Agreement; provided that the Company agrees and acknowledges the disclosures concerning the subject matter hereof set forth in the Fund PPM, and disclosures of a similar nature.

**11.8 Amendment.** No amendment or modification to this Agreement shall be binding upon any Party unless reduced to a writing signed by all of the Parties.

**11.9 Rights and Remedies.** The rights, remedies and obligations contained in this Agreement are in addition to any and all rights, remedies and obligations, at law or in equity, to which the Parties are entitled under state and federal laws.

**11.10 Severability.** In the event that any provision of this Agreement shall be declared invalid or unenforceable, such invalidity or unenforceability shall not affect the validity or enforceability of the other provisions of this Agreement, it being hereby agreed that such provisions are severable and that this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

**11.11 Headings.** The headings in this Agreement are inserted for convenience of reference only and shall not be considered part of this Agreement or affect this Agreement's interpretation.

**11.12 Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and which together shall constitute one and the same instrument.

**SIGNATURE PAGE FOLLOWS**

IN WITNESS WHEREOF, each of the Parties hereto has caused this Participation Agreement to be executed in its name and on its behalf by its duly authorized representative hereto as of November 30, 2015.

**CROWN GLOBAL LIFE INSURANCE LTD.,**

By: [signature]

Name: TERRIA GODWIN

Title: Director

By: [signature]

Name: Avi Hasen

Title: Director

**CROWN GLOBAL LIFE INSURANCE LTD.**, on behalf of each of its Separate Accounts, as set out in Schedule A hereto as may be amended from time to time.

By: [signature]

Name: TERRIA GODWIN

Title: Director

By: [signature]

Name: Avi Hasen

Title: Director

{00290535.DOC; 3}

**ATLAS IDF, LP**

By: Atlas IDF GP, LLC, it general partner

By: ____________________

Name: ____________________

Title: ____________________

**RAND ADVISORS, LLC**

By: ____________________

Name: ____________________

Title: ____________________

**SCHEDULE A**
**As of November 30, 2015**

**SEPARATE ACCOUNTS AND ASSOCIATED POLICIES**

| No. | Name of Separate Account and each Subaccount, if any, thereof: | Form Nos. of Policies Funded by Separate Account: |
|---|---|---|
| | | |

# SCHEDULE A-2
**As of November 30, 2015**

## SUPPLEMENT TO PARTICIPATION AGREEMENT

FUND: Atlas IDF, LP
ADVISER: Rand Advisors, LLC

To the extent that the information below is also provided in the Fund PPM or the Operating Agreement, the parties agree that the information below is the same as the information contained in the Fund PPM or Operating Agreement and is provided for ease of reference.

| | |
|---|---|
| **Section 1.2**<br>"Business Day" | No change to standard definition. |
| **Section 1.13**<br>"Operating Agreement" | Dated as of November 30, 2015. |
| **Section 2.1(a)**<br>Minimum Initial and Additional Investment Amounts / Notice of Intent to Purchase / "Subscription Date" | Minimum initial investment amount: $500,000 or as otherwise consented to in writing by Adviser<br><br>Minimum additional investment amount: $500,000, or as determined by the Adviser in its sole discretion.<br><br>The Company shall notify the Adviser of its intent to purchase Interests by providing notice no later than 12:00 am Eastern time on the 3rd Business Day prior to the relevant Subscription Day.<br><br>The Subscription Date shall be the first Business Day of each calendar month. |
| **Section 2.1(b)**<br>Suspension or Discontinuation of Offering | The Fund may suspend or discontinue its offering of Interests at the discretion of the Adviser upon at least **30** Business Days' prior written notice to the Company. |
| **Section 2.2**<br>Payment for Interests | The Company shall transmit by wire transfer federal funds in the amount of the purchased Interests to be received by the Fund no later than 5:00pm Eastern time on the 3rd Business Day prior to the relevant Subscription Day. |
| **Section 2.3(a)**<br>General Withdrawal Terms | <u>Minimum withdrawal amount</u>: $100,000<br><br>Any partial withdrawal of Interest(s) that leaves the value of the Interest(s) held by a Separate Account at less than $500,000 as of the date of withdrawal shall be deemed a complete withdrawal.<br><br><u>Payment of Withdrawal Proceeds</u>: For the avoidance of doubt, such withdrawals may be satisfied by payments in kind in accordance with the terms of this Agreement. |
| **Section 2.3(b)**<br>Standard Withdrawals | <u>Notice Period</u>: 91 days<br><br><u>Standard Withdrawal Date</u>: Last day of each calendar quarter. |

| | |
|---|---|
| | Lock-up Period: 12 months.<br><br>Payment of Withdrawal Proceeds: 90% of the withdrawal proceeds shall be paid within 90 days following the Standard Withdrawal Date. The balance of the amount payable upon such withdrawal will be paid, without interest, within 90 days after completion of the audited financial statements for the fiscal year in which the withdrawal occurs.<br><br>Payment of Withdrawal Proceeds: For the avoidance of doubt, such withdrawals may be satisfied by payments in kind in accordance with the terms of this Agreement. |
| **Section 2.3(c)**<br>Death Benefit Withdrawals | Notice Period: 91 days prior to Death Benefit Withdrawal Date on prior written notice to the Adviser.<br><br>Death Benefit Withdrawal Date: Last day of any calendar quarter.<br><br>Payment of Withdrawal Proceeds: 100% of the withdrawal proceeds shall be paid as soon as reasonably practicable, but in no case more than 330 days following the Death Benefit Withdrawal Date. For the avoidance of doubt, such withdrawals may be satisfied by payments in kind. |
| **Section 2.3(d)**<br>Special Withdrawals | Notice Period: 91 days prior to a Special Withdrawal Date prior written notice to the Adviser.<br><br>Special Withdrawal Date: Last day of each calendar quarter.<br><br>Payment of Withdrawal Proceeds: 100% of the withdrawal proceeds shall be paid within 90 days following the Special Withdrawal Date. |
| **Section 3.1**<br>NAV Generally | The Adviser shall make the NAV available to the Company no later than 12am Eastern time on the 20th Business Day following each Valuation Date. |
| **Section 4.3(a)**<br>Errors and Omissions Insurance Policy | The Fund shall obtain commercially reasonable coverage in favor of the Adviser, within a reasonable period following the execution of this Agreement. |
| **Section 5.6**<br>Certification of Investment Diversification | The Adviser shall deliver the certification required by Section 5.6 no later than 20 Business Days after the end of the calendar quarter following the quarter to which such certification relates. |
| **Section 8.4**<br>Mandatory Withdrawal | The Fund must provide the Company with at least 5 days' prior written notice of a Mandatory Withdrawal. |
| **Section 9.1**<br>Notices, Consents, Requests or Other Communications | **If to the Fund:**<br>Atlas IDF, LP<br>c/o Atlas IDF GP, LLC<br>87 Railroad Place, Suite 403<br>Saratoga Springs, New York 12866<br><br>**If to the Adviser:**<br>Rand Advisors, LLC<br>87 Railroad Place, Suite 403<br>Saratoga Springs, New York 12866 |

## SCHEDULE B
**As of November 30, 2015**

## INVESTMENT RESTRICTIONS

The Company will not participate in the allocation of gains or losses derived from "New Issues" as defined in the Rules of the U.S. Financial Industry Regulatory Authority ("**FINRA**"), except that the Fund, in its sole discretion, may allocate de minimis levels of such gains or losses in a manner consistent with applicable FINRA Rules.

## SCHEDULE C

## FORM OF COMPLIANCE CERTIFICATION

This compliance certificate ("**Compliance Certificate**") is given by Rand Advisors, LLC, as the adviser (the "**Adviser**") of Atlas IDF, LP (the "**Fund**"), pursuant to Section 5.6 of that Participation Agreement, dated as of November 30, 2015, among the Fund, the Adviser, Crown Global Life Insurance Ltd. ("**CGLI**"), a Bermuda exempted company registered as a long term Class C insurer, the Company (on behalf of each of its separate accounts (and subaccounts, if any, thereof) set forth on Schedule A of the Participation Agreement (as defined below), as such Schedule A may be amended from time to time) ("**Schedule A Separate Accounts**" and together with CGIL, the "**Company**")), as the same may be amended, restated, supplemented or otherwise modified from time to time (the "**Participation Agreement**"). Capitalized terms used, but not defined, in this Compliance Certificate shall have the meanings set forth in the Participation Agreement.

By executing this Compliance Certificate, the Adviser certifies that, as of the calendar quarter ended **[**March 31/June 30/September 30/December 31**]**, 201[-]:

1. The Fund's assets have been invested in compliance with the diversification requirements of Regulations 1.817-5(b) under the Code.

a. No more than 55% of the value of the total assets of the Fund is represented by any one investment;
b. No more than 70% of the value of the total assets of the Fund is represented by any two investments;
c. No more than 80% of the value of the total assets of the Fund is represented by any three investments; and
d. No more than 90% of the value of the total assets of the Fund is represented by any four investments.

| Diversification Test | Name of Issuer | % of Total Assets | Cum % | Test |
|---|---|---|---|---|
| Largest Issuer | [Issuer one] | x.xx% | x.xx% | < 55% TA |
| Second Largest Issuer | [Issuer two] | x.xx% | x.xx% | < 70% TA |
| Third Largest Issuer | [Issuer three] | x.xx% | x.xx% | < 80% TA |
| Fourth Largest Issuer | [Issuer four] | x.xx% | x.xx% | < 90% TA |

2. If the Fund relied on the "look through" provision of Regulation 1.817-5(f), the investments of any underlying investment vehicle must be sufficiently diverse to permit the Fund to comply with the diversification requirements of Regulation 1.817-5(b).

3. The Adviser has in all respects complied with the requirements set forth on Schedule D to the Participation Agreement.

4. The Adviser has reviewed the foregoing statements and certifies that they are true and correct.

IN WITNESS WHEREOF, the Adviser has caused this Compliance Certificate to be executed by one of its authorized officers this ____ day of ________________, 201__.

**Rand Advisors, LLC**

Authorized Signature: ____________________________

Name: ____________________________

## SCHEDULE D

## INVESTOR CONTROL REQUIREMENTS

The Adviser and each of its officers, employees, agents, affiliates or sub-advisers that is in any capacity responsible for, or involved in the determination of, the Fund's investments or investment objective, strategies or policies (each, an "**Adviser Party**"), shall not take any action that would cause any Policy Owner or Policy Representative (together with such Policy Owner, a "**Policy Party**") to be deemed to have such incidents of control as would cause the Fund's income and gains to be currently taxable to the Policy Owner pursuant to the "Investor Control Doctrine" as set forth in Revenue Rulings 77-85, 80-274, 81-225, 82-54, 2003-91, 2003-92, or 2007-7, or described in other materials published by the U.S. Department of the Treasury or the U.S. Internal Revenue Service. In seeking to ensure that no Policy Party is deemed to have incidents of control, each Adviser Party shall at all times act in compliance with the requirements of this Schedule D, as set forth below:

1. All decisions involving the investment of the Fund's assets shall be made by the relevant Adviser Party in its sole and absolute discretion, without any direct or indirect input from any Policy Party.

2. No Adviser Party shall enter into, directly or indirectly, any agreement, plan or other arrangement, whether written or otherwise, with a Policy Party regarding (i) the Fund's investments or investment objective, strategies or policies; (ii) the availability of the Fund as an investment option under the Policy Owner's policy; or (iii) the assets to be held by the Fund.

3. To the extent that the Adviser provides information (i) to a prospective Policy Owner or representative thereof as part of a direct or indirect sale of a Variable Contract, or (ii) to the Company for the Company to communicate with a Policy Party, any Adviser Party may describe: (a) the past performance of the Fund or related performance information with respect to the Fund; (b) its general view of market and industry trends (e.g., its belief that interest rates will rise in the short-term or that technology stocks are over-valued); (c) the background, education and past employment of its staff, including the performance of other funds under its management; and (d) other due diligence information that the Adviser generally provides to prospective investors with respect to the Adviser's other funds and accounts so long as such information does not relate to the quality or rate of return of any investment or group of investments of the Fund.

4. Without limiting the foregoing, no Adviser Party shall knowingly discuss, communicate or solicit in any manner, whether directly or indirectly, the views of any Policy Party on the current or future investments, objectives, strategies or policies of the Fund, either in general or specific terms.

5. No Adviser Party shall at any time be affiliated with a Policy Party; provided, however, that an Adviser Party may maintain such an affiliation if it establishes, pursuant to a legally binding written agreement, procedures to prevent any communication prohibited by this Schedule D.

6. The Company understands that the Adviser provides investment management services to a variety of clients outside the context of Variable Contracts. The Company further understands that the Adviser may provide such services to clients that are Policy Parties. The Adviser recognizes that these relationships could present an opportunity for a Policy Party to communicate with any Adviser Party concerning the Fund in a manner prohibited by this Schedule D. The Adviser shall take appropriate steps to comply with this Schedule D in the context of any such relationships.

**APPENDIX A**

**Instructions:**

A completed and signed copy of the Subscription Form must be delivered by electronic mail to:

jhonis@randadvisors.com

**Payment Instructions for Subscription:**

All contributions should be made by wire transfer to the following account:

[bank name/address]
ABA:
ABA:
For the account of:

Account No.:
For further credit to the account of: [ ]
Account No.: [ ]
Ref: [subscriber's name]

After you have given your bank these wire instructions, please notify the Fund of the exact amount and date of your wire using the contact information above. Doing so will help us identify your payment and credit it to the appropriate account.

**APPENDIX A (Continued)**
**SUBSCRIPTION FORM**
**FOR ATLAS IDF, LP**

**Subscriber's Name:**

Crown Global Life Insurance Ltd. on Behalf of Separate Account __________, __________ Division [Fund #].

**Tax I.D. Number:** __________________

**Type of entity (check one):**
☐ *Corporation*
☐ *Other (__________________)*

**Subscription Amount in US $** ________________ **Policy/Series Identifier (if any):** ______________
☐ *Initial Subscription (minimum US $[_____])**
☐ *Additional Subscription (minimum US $[_____])**

**Date of Investment:** ___/___/____

**Subscriber's Domicile Address:**
Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

*Contact Name:* [____________________]
*Tel:* [____________________]
*Fax:* [____________________]
*E-Mail:* [____________________]

**Subscriber's Mailing Address:**
Landmark Square, 2nd Floor
64 Earth Close
P.O. Box 10467
Grand Cayman KY1-1004
Cayman Islands

*Contact Name:* [____________________]
*Tel:* [____________________]
*Fax:* [____________________]
*E-Mail* [____________________]

* Each subscription shall be treated as a separate Interest/Capital Account.

---

**Subscriber's Wiring Instructions from which funds will originate:**
*Bank* ____________________
*ABA #* ____________________
*For the Account of* ____________________
*Account #:* ____________________
*Reference:* ____________________

CROWN GLOBAL LIFE INSURANCE LTD., on behalf of itself and each of the Accounts named above.

| | |
|---|---|
| By: ____________________________ | By: ____________________________ |
| Name: | Name: |
| Title: | Title: |

________________
Date of Execution

**APPENDIX B**
**WITHDRAWAL FORM**
**FOR ATLAS IDF, LP**

Date:____________

To:

[Tel.: ]
[Fax: ]
Attn: [contact name]

The undersigned hereby requests to redeem the amounts specified below on the next available date following the Fund's receipt of this Withdrawal Request.

**Subscriber's Name:**

____Crown Global Life Insurance Ltd.______ on Behalf of Separate Account _________, __________ Division [Fund #].

**Policy/Series Identifier (if any):** ________________________

**Withdrawal Amount:**
☐ *Full Withdrawal*
☐ *Partial Withdrawal* – Amount in US$* ________________________
*(minimum US $100,000)*

**Type of Withdrawal:**
☐ *Standard Withdrawal* ☐ *Special Withdrawal*
☐ *Death Benefit Withdrawal* ☐ *Event Withdrawal*

**Date of Withdrawal** ___/___/___

**Subscriber's Domicile Address:**
Canon's Court
22 Victoria Street
Hamilton HM 12
Bermuda

*Contact Name:* [____________________]
*Tel:* [____________________]
*Fax:* [____________________]
*E-Mail:* [____________________]
*Crown Global Life Insurance Ltd.*

**Subscriber's Mailing Address:**
Landmark Square, 2nd Floor
64 Earth Close
P.O. Box 10467
Grand Cayman KY1-1004
Cayman Islands

*Contact Name:* [____________________]
*Tel:* [____________________]
*Fax:* [____________________]
*E-Mail* [____________________]

* Any partial withdrawal of Interest(s) that leaves the value of the Interest(s) held by an Account at less than **$500,000** as of the date of withdrawal shall be deemed a complete withdrawal.

---

**Subscriber's Wiring Instructions from which funds will originate:**
*Bank* ________________________
*ABA #* ________________________
*For the Account of* ________________________
*Account #:* ________________________
*Reference:* ________________________

CROWN GLOBAL LIFE INSURANCE LTD., on behalf of itself and each of the Accounts named above.

By: ______________________________ By: ______________________________

Name: Name:
Title: Title:

__________________
Date of Execution

# EXHIBIT 28

Digitally signed by Advance Performance Exponents Inc.
Date: 2025.09.12 14:28:19 -05:00
Reason: Apex Certified
Location: Apex



**Mark E. Patrick**
**First Affidavit**
**September 2025**
**Exhibit MP-1**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 201 OF 2025 (RPJ)**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

1) **MARK ERIC PATRICK**
2) **PAUL MURPHY**
3) **CDMCFAD, LLC**
4) **DFW CHARITABLE FOUNDATION**
5) **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**
6) **CLO HOLDCO, LTD.**

Defendants

---

**FIRST AFFIDAVIT OF MARK ERIC PATRICK**

---

I, **MARK ERIC PATRICK**, of 6716 Glenhurst Drive, Dallas, Texas, United Sates of America, 75254, **MAKE OATH AND SAY** as follows:

1. I am a former director and the sole holder of the management shares (the "**Management Shareholder**") of Charitable DAF Holdco, Ltd (the "**Company**"). I am also:

   (a) The manager of CDMCFAD, LLC ("**CDM**") (the Third Defendant), a limited liability company formed in Delaware on 12 December 2024;

This **AFFIDAVIT** is filed by Campbells LLP, Attorneys for Charitable DAF Fund, LP, whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, Cayman Islands KY1-9010 (Ref: MGM/ROD/18955-44959).

(b) The sole director and sole shareholder of CDH GP, Ltd (the "**GP**") (the Fifth Defendant), a Cayman Islands exempted limited company incorporated on 27 February 2024, which is the general partner of Charitable DAF Fund, LP (the "**Fund**");

(c) A director of CLO Holdco, Ltd ("**CLO**") (the Sixth Defendant), a Cayman Islands exempted limited company incorporated on 13 December 2010, and whose sole shareholder is the Fund; and

(collectively with myself, the "**CDM Defendants**")

(d) A director, the president and the sole member of DFW Charitable Foundation, a Delaware 501(c)(3) nonprofit corporation ("**DFW**") (the Fourth Defendant) incorporated in Delaware on 9 December 2024, which is organized under the General Corporation Law of the State of Delaware exclusively for charitable purposes. DFW is the majority Participating Shareholder of the Company.

2 The Company was placed into voluntary liquidation on 2 April 2025 and Mitchell Mansfield and William Clarke were appointed joint voluntary liquidators (the "**JVLs**").

3 Following the appointment of the JVLs, on 28 April 2025, the Highland Dallas Foundation, Inc., the Highland Kansas City Foundation, Inc., and the Highland Santa Barbara Foundation, Inc (the "**Highland Foundations**"), each the holders of 100 'Participating Shares' in the Company,[1] presented a petition seeking to have the liquidation of the Company continue under the supervision of the Court (the "**Supervision Application**") pursuant to section 131 of the Cayman Islands Companies Act (2025 Revision) (the "**Act**"). Mr Justice Asif KC determined the Supervision Application and, by an order dated 6 May 2025 (the "**Appointment Order**"), directed that Margot MacInnis and Sandipan Bhowmilk of Grant Thornton Specialist Services (Cayman) Limited be appointed as joint official liquidators of the Company (the "**JOLs**"). The Supervision Application was not opposed by DFW or me, in my capacity as the sole Management Shareholder of the Company.

4 The facts and matters in this affidavit are based on my personal knowledge and are true and correct. Where the facts and matters in this affidavit are not within my own knowledge I state

[1] The remaining Participating Shares were held by the Community Foundation of North Texas (5 Participating Shares) and DFW (318 Participating Shares).

the source of such facts and matters and confirm that they are true to the best of my knowledge, information and belief. Where I refer in this affidavit to legal advice received by the CDM Defendants and/or related entities, I do not intend to and do not waive privilege in that advice.

5 There is now produced and shown to me a paginated bundle of true copy documents marked "Exhibit MEP-1" to which I refer in this affidavit. Page references below are to pages of Exhibit MEP-1, unless otherwise stated.

6 I make this affidavit on behalf of the CDM Defendants in support of the summons dated 12 September 2025 (the "**Summons**"). By the Summons, the CDM Defendants seek, *inter alia*, an order that the Company, acting by the JOLs, provide security for the CDM Defendants' costs of these proceedings in the sum of US$6,123,580.00, or in such sum as the Court thinks just, pursuant to section 74 of the Act.

**The Company's financial position and inability to pay current liabilities**

*The DAF Structure*

7 A detailed history of the Company, the structure comprised of the Fund and its associated entities (the "**DAF Structure**"), and the nature of the Highland Foundations' interest in them, is set out in the affidavits dated 4 June 2025 sworn by myself ("**Patrick 1**" on behalf of DFW (pages 1 to 64) and "**Patrick 2**" in my capacity as the Management Shareholder (pages 65 to 84)) and Mr Paul Murphy ("**Murphy 1**") (pages 85 to 142), the other former director of the Company, in the liquidation proceedings [FSD Cause No. 116 of 2025 (JAJ)] (the "**Liquidation Proceedings**"). The relevant history will be elaborated on and explained in detail at the appropriate time, including when responding to the JOLs' evidence for the JOLs' summons dated 15 July 2025 (the "**Injunction Application**").

*The nature of the Highland Foundations interest in the DAF Structure*

8 As the Highland Foundations held Participating Shares only, they held no real economic interest in the Company, and their rights were limited to the repayment of capital (which they did not contribute) and the right to participate in the profits of the Company in accordance with its Articles of Association (pages 143 to 179, see in particular Article 12 at page 154). However, the directors at all times retained absolute discretion as to whether any dividends should be

declared or payable (see Article 104 at page 168). Walkers (Cayman) LLP conducted an analysis of, and prepared slides addressing, the rights of the Participating Shareholders and the Directors of the Company which are at pages 180 to 199 (the "**Walkers Slides**"). As is clear from the Walkers Slides, the Participating Shareholders did not have the right to: (i) cause or vote on distributions, (ii) pro rata distributions based on their shareholding, or (iii) annual or timed distributions and, as noted, the directors at all times retained absolute discretion in this regard.

9 While I understand from legal counsel that the issue was not strictly before the Court, the discretionary nature of the interest held by the Participating Shareholders was commented upon by Mr Justice Asif KC at the hearing of the JOLs' 24 June 2025 sanction application seeking leave to appoint Cayman Islands and US legal counsel (the "**June Sanction Application**") (transcript at pages 200 to 288). His Lordship likened the Company to a discretionary trust and observed that it could have been established as a foundation company (see pages 213 and 214). I consider this to be an astute observation. The purpose of the Fund since its inception has always been to make discretionary charitable distributions to qualifying non-profit organizations and all of the steps undertaken by me in my capacity as 'Control Person' of the DAF Structure, including the DAF Restructuring (see below), were aimed at ensuring this purpose was maintained.

*The DAF Restructuring*

10 In or around October 2024, Mr Murphy and I began the process of restructuring the Company ("**DAF Restructuring**"). The DAF Restructuring was designed to, *inter alia*, (i) safeguard the assets of the Fund from improper interference by Mr James Dondero[2] ("**Mr Dondero**") and related entities, (ii) ensure compliance with applicable legal and tax requirements, and (iii) comply with the DAF Structure's charitable purposes.

11 The steps undertaken as part of the DAF Restructuring, and the rationale for them, are explained in detail at paragraphs 46 to 97 of Murphy 1 (pages 100 to 113). In summary, the DAF Restructuring involved:

(a) the allotment of 318 Participating Shares in the Company to DFW which constituted DFW as the single majority Participating Shareholder of the Company;

[2] Mr Dondero owns and / or controls each of the Highland Foundations and acts as the President, Individual Member and Director of each.

(b) the formation of CDM and the redemption of the Company's interest in CDM; and

(c) distributing the proceeds of the aforementioned redemption to the Participating Shareholders (other than DFW).

12 The above steps were taken in accordance with the Company's constitutional documents and on the advice of professional advisers, including Cayman Islands and US legal counsel, King's Counsel, and independent valuation experts. Mr Murphy and I anticipated that the DAF Restructuring would be objected to by Mr Dondero due to his propensity to litigate matters perceived to undermine his personal interests (as explained in detail in Patrick 1, Patrick 2, and Murphy 1) and, for this reason, we sought the advice of independent legal and professional advisers over many months to guide all aspects of the DAF Restructuring.

13 Following the DAF Restructuring, the Company was placed into voluntary liquidation by way of a directors' resolution. As noted, the subsequent appointment of the JOLs as official liquidators under the supervision of the Court was not opposed by DFW, or myself or Mr Murphy, who welcomed a fair and independent investigation into our conduct and the DAF Restructuring.

*<u>The JOLs' First Report to Contributories</u>*

14 The JOLs' First Report to Contributories is dated 2 July 2025 (the "**First Report**"). A copy of the First Report appears at pages 289 to 309.

15 The First Report relevantly stated that, as at 2 July 2025:

(a) the JOLs had identified assets in the amount of US$155,788.96 and two creditors of the Company whose claims amounted to US$33,889.15 (see page 294);

(b) the JOLs' fees and disbursements for the period 6 May to 31 May 2025 amounted to US$458,071.68 and US$3,073.43, respectively (see page 302);

(c) the JOLs' legal costs incurred in the period 6 May to 31 May 2025 amounted to US$978,916 (see page 302); and

(d) there were insufficient assets with which to meet the fees and expenses of the liquidation (see page 302).

I understand from reading the First Report that the Company's financial standing is significantly compromised. Indeed, on the basis of the Company's current assets and liabilities as set out in the First Report, it appears that the Company is unable to pay its liabilities and is therefore insolvent. The CDM Defendants therefore have significant concerns regarding the Company's financial status, which are heightened by, *inter alia*: (i) the contents of the First Report, and (ii) the indemnity costs order made against the JOLs in respect of the significant costs which were incurred in respect of the June Sanction Application.

*<u>Substantial costs already incurred in the proceedings</u>*

16 As recorded in the First Report, significant sums are being expended by the JOLs in the Liquidation Proceedings, with almost US$1 million spent on legal fees in May 2025 alone. I am informed by legal counsel that it is likely that a large proportion of those fees relate to the JOL's attempts to appoint Johnstone Law as their Cayman Islands legal counsel, the primary issue which was to be determined at the June Sanction Hearing. The JOLs' engagement of Johnstone Law was contested by myself and Mr Murphy owing to his previous representation of the Highland Foundations in a just and equitable winding up petition - filed when the Company was already in voluntarily liquidation - in which allegations of fraud were made against me and repeated in subsequent legal submissions by Mr Johnstone.

17 On the eve of the June Sanction Hearing on 24 June 20025, more than two weeks after Patrick 1, Patrick 2 and Murphy 1 were filed in opposition to the JOLs' sanction application, the JOLs abandoned their application to engage Johnstone Law and instead proposed that Maples be appointed as sole Cayman Islands legal counsel (something which had been repeatedly suggested by my attorneys in inter partes correspondence). The JOLs' change in approach took place after significant costs were incurred by all parties. I understand that the JOLs' conduct in this regard was one of the considerations which resulted in an indemnity costs order being made against them. Given the Company's financial position as outlined in the First Report, the CDM Defendants have serious and justifiable concerns that the Company will not be able to meet that indemnity costs award, let alone any further costs award made in these proceedings.

18 The CDM Defendants, who appeared at the June Sanction Application in an observational capacity, have also incurred substantial costs in the Liquidation Proceedings, primarily as they were forced to bring a summons seeking to vary certain provisions of the Appointment Order

which permitted the JOLs to take steps against the Fund "*if so advised*" without seeking sanction from the Court (described in the First Report as the 'Fund Summons' at page 301).

19 As regards the costs of the current proceedings, the JOLs appeared on an *ex parte* basis before Mr Justice Asif KC in the Liquidation Proceedings on 14 July 2025 and were granted leave to issue the Injunction Application and the associated writ of summons (the "**Writ**")[3]. At the same time as serving the Injunction Application, I am advised by legal counsel that the JOLs requested it be listed before the summer vacation and without reference to the CDM Defendants' (or any of the Defendants') availability. The JOLs obtained a return date for the Injunction Application of 31 July 2025. However, for reasons which were explained in detail in *inter partes* correspondence, the CDM Defendants proposed that the Injunction Application should be adjourned until after the summer vacation, subject to the provision of asset preservation undertakings to the Court and the implementation of a financial reporting protocol (the "**Protocol**").

20 Various draft versions of the Protocol had been offered to the JOLs from as early as 16 May 2025, not as a recognition of any claim (proprietary or otherwise), but as a means of satisfying the JOLs that the assets would be preserved whilst the central issues were resolved between the relevant parties (who the CDM Defendants believe to be DFW and the Highland Foundations). In spite of this, rather than meaningfully engaging with the CDM Defendants on an acceptable form of Protocol, the JOLs filed the Injunction Application and pressed for it to be heard on 31 July 2025 on an *ex parte* on notice basis.[4]

21 Eventually, and in a similar pattern to their behavior ahead of the June Sanctions Application, on the eve of the hearing the JOLs agreed a form of Protocol which was formalized in a consent order dated 31 July 2025 (the "**Consent Order**") (pages 310 to 325). I am advised by legal counsel that, as a result of the JOLs' refusal to meaningfully or constructively engage with the CDM Defendants offer of a Protocol in timely manner, all parties expended significant expenses in preparation for the hearing scheduled for 31 July 2025. This included the preparation by all parties of skeleton arguments and hearing bundles, both of which were ultimately rendered nugatory by the subsequent Consent Order.

[3] Although it remains unclear what was said to Mr Justice Asif KC in order to obtain sanction to issue the Writ.
[4] The JOLs engaged with the CDM Defendants' offer of a Protocol for the first time on 19 June 2025 - i.e. more than one month after it was first offered – and did not make any further effort to agree a suitable Protocol before issuing the Injunction Application.

**The Company's funding arrangements**

22 By letter dated 23 July 2025, Campbells LLP, on behalf of the CDM Defendants, wrote to the JOLs (the "**Campbells' Letter**") regarding the inadequacy of the proposed cross-undertaking in damages in the Injunction Application (the "**Proposed Cross- Undertaking**"). The Proposed Cross Undertaking was provided for at Schedule B to the draft order accompanying the Injunction Application (page 344) and proposed that the Company would pay the reasonable costs of any third parties but would not pay the costs of any Defendant. I am advised that the Proposed Cross-Undertaking is wholly inadequate as it provides no protection for the CDM Defendants and related entities if the injunction is granted and it later transpires that it should not have been.

23 Campbells' Letter articulated the CDM Defendants' concerns regarding the JOLs ability to provide an acceptable cross-undertaking in circumstances where, *inter alia*: (i) the JOLs' were official liquidators of a company in which no assets have been identified in the liquidation other than the alleged claim in the Writ (which is denied), (ii) substantial costs orders have already been made against the liquidation estate, and (iii) the JOLs had failed to confirm the identity of the party providing the cross-undertaking and the quantum thereof. Accordingly, Campbells' letter sought fortification of the Proposed Cross-Undertaking.

24 Further, in light of the CDM Defendants' serious concerns regarding the Company's financial position and its ability to provide an acceptable cross-undertaking, Campbells' Letter also requested the JOLs' proposals regarding security for costs given that the Company had no identified assets and there is a real risk that any costs order in the CDM Defendants' favor would not be satisfied. The Campbells Letter therefore sought confirmation: (i) that the JOLs were prepared to provide security for the CDM Defendants' costs of responding to the Injunction Application, and (ii) regarding the form and amount in of security the JOLs were willing to offer. A copy of Campbells' Letter is at pages 326 to 329.

25 On 25 July 2025, Campbells received a response from Maples and Calder (Cayman) LLP ("**Maples**") on behalf of the JOLs (the "**Maples' Letter**"). A copy of this letter is at pages 346 to 348. The letter revealed that the JOLs had entered into a funding agreement dated 11 July 2025 (the "**Funding Agreement**") with Crossvine Litigation Funding, LLC ("**Crossvine**") and provided a redacted copy of the JOL's application for sanction of the Funding Agreement. A redacted copy of Ms MacInnis' sixth affidavit in support of the application for sanction of the Funding Agreement

("**MacInnis 6**") is at pages 349 to 357 and a redacted copy of the Funding Agreement is at pages 359 to 372. As noted at clause 7 of the Funding Agreement (page 366), Crossvine agrees to meet the reasonable costs of any innocent third parties affected by the Injunction Application, as well as to provide security for any cross-undertaking ordered by the Court.

26 At paragraph 11 of MacInnis 6, the JOLs describe Crossvine as not being "*a traditional third-party funder, but rather…a special purpose vehicle incorporated for the purpose of ultimately Mr Dondero…funding the liquidation of the Company and the JOLs pursuing the Proposed Proceedings*". MacInnis 6 explains that one of Crossvine's two managers is Mr Scott Ellington. As explained at paragraph 123 of Patrick 1 (page 42) and paragraphs 55 to 58 (pages 77 and 78) of Patrick 2, UBS Securities LLC ("**UBS**") are currently awaiting oral argument in the USA in respect of a claim which seeks summary judgment against Mr Ellington, Mr Dondero, and entities related to them, in the sum of approximately US$1.2 billion.

27 There is no description of, or transparency relating to, the financial standing of Crossvine, which appears – from the description provided in MacInnis 6 – to have been structured so as to be a special purpose bankruptcy remote vehicle which, by their own admission, is not a traditional third-party funder and appears to have been incorporated solely to fund the Writ and Injunction Application.[5] The CDM Defendants therefore have well-founded and legitimate concerns about Crossvine's financial status, capacity, willingness, and ability to meet any adverse costs order (as explained further below).

28 Further, given the content of the Funding Agreement, I believe that Mr Dondero's evidence in the Liquidation Proceedings was misleading. Mr Dondero averred at paragraphs 47 and 48 of his first affidavit dated 16 April 2025 in the Liquidation Proceedings, that he would fund the liquidation of the Company and "*not at any time receive a benefit … because of this funding arrangement*." However, the terms of the Funding Agreement contradict this and provide Mr Dondero and Mr Ellington with a contingent upside in the liquidation should certain recoveries be made (page 366).

29 However, notwithstanding the concerns raised above (and below) in respect of Crossvine's funding, I am advised that it has recently come to light in correspondence sent by Maples in the

[5] Given the admissions in MacInnis 6 I believe it is unusual that the JOLs' written submissions for the adjourned 31 July 2025 hearing of the Injunction Application states that the JOLs "*observe that Crossvine is a substantial litigation funder*".

Liquidation Proceedings on 5 September 2025 that, per their letter: "*the initial funding provided by Crossvine has been exhausted*" and "*the JOLs are in advanced discussions with several third-party funders to obtain funding through to the completion of the FSD Proceedings*". I am advised that, if true, this is a significant and extremely concerning development, and one which requires immediate clarification. I believe there was no suggestion in MacInnis 6 or Maples' Letter that Crossvine were only providing preliminary or 'initial funding'. Clearly, the withdrawal of the Company's funding significantly increases the CDM Defendants' concerns that the Company will not be able to pay their costs if they successfully defend the proceedings and underscores the importance of this application.

**Cause of the Company's impecuniosity**

30 I understand from Maples' Letter that the JOLs will contend that the DAF Restructuring is the cause of the Company's impecuniosity and should weigh against the Court making an order for security for costs. However, this completely ignores the reality of the Company's former position within the DAF Structure. As explained in Patrick 1, the Company did not hold voting, control, or management rights in respect of the Fund. Rather, its sole purpose was to act as a 'blocker' for US tax purposes and a conduit through which discretionary, charitable donations would pass. The Company's specific role within the DAF Structure is alluded to in Ms MacInnis' first affidavit in support of the Injunction Application where she records this and notes that "*the Company was incorporated as a blocker for US tax purposes between the Supporting Organisations…and their interest in the* [Fund]".

31 Not only did the Company have no real economic interest in the Fund, but it did not hold any assets or cash reserves except for the discretionary distributions that passed through the Company to the Highland Foundations. Accordingly, I believe that the JOLs' contention regarding the DAF Restructuring being the "*cause of the Company's impecuniosity*" is misconceived and fails to take proper account of (i) the nature of the interest which the Company held in the Fund, and (ii) the reality of the Company's specialized role and function within the DAF Structure, which was to facilitate periodic discretionary charitable distributions, and not to hold assets or cash.

32 In addition, even taking the JOLs' arguments at their height, the root cause of the Company's impecuniosity is a disputed issue which, I am advised, cannot be determined at this stage of the

proceedings. As explained in detail in the various affidavits filed in the Liquidation Proceedings, the purpose of the DAF Restructuring was to avoid improper interference by Mr Dondero in the ongoing operation of the DAF Structure and to ensure that the Fund could continue pursuing its charitable mission, namely making distributions to qualifying non-profit organizations. Notwithstanding those explanations, and despite repeated offers by the CDM Defendants to enter into a Protocol designed to address any reasonable concerns the JOLs may have had regarding the Fund's commercial activities and the risk of dissipation outside the ordinary course of business, the JOLs have nevertheless chosen to incur significant costs by initiating these proceedings for urgent injunctive relief, thereby requiring the CDM Defendants to incur the expense of responding.

33 As I have attested in earlier affidavits in the Liquidation Proceedings, it was Mr Dondero's repeated attempts to improperly exert influence over the DAF Structure which necessitated the DAF Restructuring. Despite the representations referred to at paragraph 29 above regarding the cessation of Crossvine's funding, my current understanding is that Mr Dondero and Mr Ellington, are funding the liquidation of the Company and stand to benefit, both directly (through contingent uplifts provided for in the Funding Agreement) and indirectly (through the JOLs' efforts to interfere with the prosecution of valuable claims held by entities within the DAF Structure which are adverse to them personally, such as the Kirschner Claims described below). As such, I believe it is fair and reasonable that the Company, Crossvine, or some other funder, be required to provide security for the substantial costs that the CDM Defendants will incur in defending these proceedings.

**The Company's ability to meet an adverse costs order**

34 Given MacInnis 6 states that there is insufficient cash available in the liquidation estate to fund these proceedings or the liquidation of the Company, it is clear that the Company's ability to meet any potential adverse costs order is entirely dependent on its funder, which is - or was when the Injunction Application was commenced - Crossvine. As noted at paragraph 25 above and set out in Maples' Letter, the Funding Agreement includes a provision that Crossvine will meet any liability arising under a cross-undertaking in damages. However, Crossvine's financial position is unknown and the CDM Defendants have serious concerns about the reliability of this undertaking and the ability of Crossvine to meet any adverse costs award, particularly given its principals' exposure to several substantial outstanding judgments and proceedings which

establish a clear pattern of avoiding their obligations and liabilities.

35 Although Crossvine is a bankruptcy remote special purpose vehicle and limited information is publicly available regarding its operations, its principals, Mr Dondero and Mr Ellington, have been involved in several proceedings concerning the non-payment of debts and alleged misconduct in the United States. Certain of these matters have given rise to long-running and high-profile litigation. Details of some of these proceedings are provided at paragraphs 122 to 164 of Patrick 1 (pages 42 to 52). For the purposes of this affidavit, I set out below a list of ongoing claims in the United States against Mr Dondero, Mr Ellington, or entities they own or control, which I believe are relevant to the current application for security for costs.:

(a) a US$1.2 billion action by UBS against Mr Dondero and Mr Ellington personally (in addition to entities they own or control), as attested to at paragraphs 152 to 155 of Patrick 1 (page 49);

(b) c.US$300 million in claims pursuant to a complaint dated 15 October 2021 prepared by the Litigation Trustee in the bankruptcy of Highland Capital Management, L.P. (the "**Highland Bankruptcy**") (the "**Kirschner Claims**"), as attested to at paragraphs 165 to 169 of my fourth affidavit in the Liquidation Proceedings sworn on 19 August 2025 on behalf of DFW in support of its application for the removal of the JOLs ("**Patrick 4**") (page 445). Importantly, as noted in Patrick 4, entities within the DAF Structure have now acquired the benefit of the Kirschner Claims, which, if successful, could result in significant recoveries of up to US$300 million against Mr Dondero, Mr Ellington and others, and, as of 3 September 2025, these claimed have been unstayed and are proceeding;

(c) c.US$70 million in claims pursuant to the Highland Employee Retention Assets matter, in which Patrick Daugherty, a former business associate of Mr Dondero and Mr Ellington, is suing Mr Dondero and Mr Ellington, among others, for an amount that I understand to be approximately US$70 million, also described in paragraph 163 of Patrick 1 (page 52);

(d) a c.US$13 million lawsuit to collect on demand notes payable to Atlas IDF, LP (an entity controlled by the DAF Structure) by an entity owned or controlled by Mr Dondero and Mr Ellington, NexPoint Real Estate Partners, LLC, and Mr Dondero's family trust, The Dugaboy Investment Trust ("**Dugaboy**"), as attested to in paragraphs 138 to 140 of

Patrick 1;

(e) a c.US$1 million lawsuit to collect on a US$1 million debt obligation by Highland Capital Management Services, Inc., which Mr Dondero controls and caused to default on a US$1 million promissory note, as attested to in paragraph 141 of Patrick 1 (page 45); and

(f) a c.US$700,000 lawsuit to collect on a put option relating to NexPoint Polo Glen, as attested to in paragraphs 177 to 179 of Patrick 4 (pages 446 and 447).

36 I believe that Mr Dondero has also failed to satisfy obligations to the Highland Foundations. As described at paragraphs 195 to 199 of Patrick 1 (pages 60 to 62), Mr Dondero's family trust, Dugaboy, had a US$9,285,000 obligation to repurchase nearly worthless shares from the Highland Dallas Foundation and failed to do so, raising serious tax compliance issues as identified at paragraph 194 of Patrick 1 (page 60).

37 I am also aware that Mr Ellington is party to a divorce proceeding in Texas (Dallas County Court) in proceedings titled *Stephanie Archer v. Scott Ellington*, No. DF-25-10886, and that a hearing in that proceeding was scheduled for 10 September 2025 at which a temporary restraining order was being sought.[6] Given that Texas is a community property state, Mr Ellington's divorce is likely to create material liabilities for him and could result in an equal division of his property, which further calls into question his and / or Crossvine's ability to meet any costs award made against the Company.

38 As at the date of swearing this affidavit, the JOLs have not provided a revised cross undertaking in damages, nor fortification thereof. The financial risk to the CDM Defendants is therefore further underscored by (i) the JOLs' failure to provide a revised cross undertaking, and (ii) any, let alone the requested, fortification of any cross-undertaking in damages.

39 In summary, the Company's financial position is such that there is a real risk of non-payment of any adverse costs order, and any assurance of payment is dependent on the solvency and willingness of Crossvine, whose own financial position is not known. Further, in light of the recent correspondence referred to at paragraph 29 above, there are now question marks over Crossvine's continued funding of the proceedings. This places the CDM Defendants in an

[6] I understand from US counsel that the court docket records that a temporary restraining order was agreed to by Mr Ellington and his wife in order to avoid a hearing.

unenviable position whereby they are being forced to spend significant sums defending proceedings commenced by a company in official liquidation with no identifiable assets and, if Maples' recent letter is to be believed, no funding in place to pursue the proceedings or meet any adverse costs order.

**The CDM Defendants' estimated costs of the proceedings**

40 The CDM Defendants seek security for their costs in the sum of US$6,123,580, being an estimate of the reasonable costs and disbursements that they are likely to incur up to and including the trial of the proceedings.

41 This estimate is based on the schedule prepared, on my instruction, by Campbells which appears at pages 452 and 453. This schedule sets out incurred and anticipated costs, including anticipated workstreams, legal fees (broken down by seniority of fee earners with hourly rates), disbursements, and Leading Counsel's fees. The schedule sets out the estimated time required by Leading Counsel and attorneys for each stage of the proceedings. I am informed that it incorporates the anticipated hourly charge-out rate for Leading Counsel (US$1,000 per hour), and the capped rates provided for in Practice Direction 1 of 2024 (Guidelines Relating to the Taxation of Costs) for Partner (US$1,250 per hour), Counsel (US$850 per hour) and Associates (US$650 per hour).

42 As set out in the schedule, Campbells has estimated that the total time costs and disbursements likely to be incurred by the CDM Defendants in relation to the proceedings will amount to approximately US$6,123,580 (the "**Security Amount**"). Campbells have informed me that the complexity of the case, the likely volume of documents, and the anticipated length of the proceedings, have all been taken into account in the preparation of the schedule.

43 I believe that one of the causes of the CDM Defendants' increased costs in the proceedings to date has been the JOLs' conduct. As noted at paragraphs 16 to 21 above, these costs include (i) the significant costs incurred preparing for the scheduled hearing of the Injunction Application on 31 July 2025 which was ultimately adjourned when the parties agreed the Consent Order on the eve of trial, and (ii) the JOLs' insistence on engaging a conflicted law firm, Johnstone Law, and continuing with their application for sanction of that firm until the eve of the June Sanction Hearing.

**Risk of payment of security stifling claim**

44 The liquidation of the Company is in its early stages. I understand that this means there has only been limited time for the JOLs to conduct their investigations into the Company's apparent insolvency. This was acknowledged by the JOLs' counsel at the hearing of the June Sanction Application. There, the JOLs' counsel, when addressing the Court, noted that "*[t]he liquidators are not saying that there has been a fraud and they're not saying that the company definitely has a proprietary claim to any assets. They're saying that* ***<u>there needs to be an investigation</u>*** *because the facts are complicated, not straightforward and they need to be understood*" (at page 212, emphasis added). The JOLs subsequently sought leave to file the Writ and the Injunction Application on 4 July 2025 (i.e. 10 days after the June Sanction Application). Accordingly, it appears that the JOLs have commenced these proceedings in circumstances where their investigations are, as suggested by their counsel, incomplete.

45 In any event, notwithstanding the CDM Defendants' concerns regarding the financial status of the Company and its current funder, Crossvine, clause 7 of the Funding Agreement (page 366) provides that Crossvine shall, if required, provide "*any Cross Undertaking, and…if so ordered, …security for any such Cross Undertaking in the sum and on the terms ordered by the Court*". Accordingly, though the reliability of this clause 7 cannot be assessed, the existence of this assurance by the entity who provided the funding for the Company to commence these proceedings should provide the JOLs with adequate protection against any risk (should one exist) that the Company's claim against the CDM Defendants would be stifled by the provision of security.

46 Finally, the Security Amount sought by the CDM Defendants is modest in the context of the sums sought by the Company in the proceedings, such that the CDM Defendants do not see how the request for such security could impede any bona fide claims, should the JOLs identify and pursue any such claims.

**Form and timing of security**

*<u>Form of security</u>*

47 The CDM Defendants seek security in the form of a payment into Court or a bank guarantee from a first-class international bank.

48 The CDM Defendants do not consider an undertaking from Mr Dondero, Mr Ellington, Crossvine, or any entity associated with them, to be appropriate, given the lack of transparency and the ongoing proceedings and collection actions against Mr Dondero and Mr Ellington (including UBS' summary judgment motion in the amount of US$1.2 billion) and the absence of any evidence as to the financial standing of Crossvine.

49 The CDM Defendants consider that the form of security ought to be independent and reliable, and not dependent on the Company's backers or their affiliates.

*Timing of security*

50 Given the uncertainty regarding the Company's funding arrangements, and financial status of its current funder, Crossvine (particularly as regards its principals, Mr Dondero and Mr Ellington), the CDM Defendants seek that security be provided, either in an escrow account under the control of the this Honourable Court, or by way of a guarantee from a Class A bank carrying on business and regulated in the Cayman Islands, before any further (unsecured) costs are incurred. The CDM Defendants may seek further security in respect of additional costs as the case progresses.

**Conclusion**

51 For the reasons set out above, the CDM Defendants respectfully request that the Court order the Company, acting by the JOLs, to provide security for the CDM Defendants' costs in the sum of US$6,123,580, in a form satisfactory to the Court, and with liberty to apply for further security as appropriate.

Sworn at Travis, Texas )
This 12th day of September 2025 )
Before me: )
)
)

[signature] Jennifer Jo Thomas

**Notary Public**

[signature]

**Mark E. Patrick**

NOTARY PUBLIC STATE OF TEXAS
Jennifer Jo Thomas
ID NUMBER 133341819
COMMISSION EXPIRES September 20, 2025

09/20/2025

#3318786v16



Electronically signed and notarized online using the Proof platform.

Mark E. Patrick
First Affidavit
12 September 2025
Exhibit MP-1

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**CAUSE NO: FSD 201 OF 2025 (RPJ)**

**IN THE MATTER OF THE GRAND COURT ACT**

**BETWEEN:**

**CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

Plaintiff

**AND**

1) **MARK ERIC PATRICK**
2) **PAUL MURPHY**
3) **CDMCFAD, LLC**
4) **DFW CHARITABLE FOUNDATION**
5) **CDH GP, LTD. AS GENERAL PARTNER FOR AND ON BEHALF OF CHARITABLE DAF FUND, LP, AND IN ITS CAPACITY AS GENERAL PARTNER**
6) **CLO HOLDCO, LTD.**

Defendants

---

**EXHIBIT MP-1**

---

This is the exhibit MP-1 to the First Affidavit of Mark Patrick sworn on 12 September 2025

Before Me

See Attached Jurat

Notary Public

Mark Patrick

Date of grant of Commission:

Commission Expiry Date:

This **AFFIDAVIT** is filed by Campbells LLP, Attorneys for Charitable DAF Fund, LP, whose address for service is Floor 4, Willow House, Cricket Square, George Town, Grand Cayman, Cayman Islands KY1-9010 (Ref: MGM/ROD/18955-44959).

#3318786v16

**DESCRIPTION OF ATTACHED DOCUMENT**

Title or Type of Document: Jurat

Document Date: 09/12/2025

Number of Pages (including notarial certificate): 19

State of Texas

County of Travis

Sworn to and subscribed before me on 09/12/2025 by Mark Patrick.

NOTARY PUBLIC ★ STATE OF TEXAS ★
Jennifer Jo Thomas
ID NUMBER
133341819
COMMISSION EXPIRES
September 20, 2025

Jennifer Jo Thomas

Jennifer Jo Thomas

Notary Public, State of Texas

Electronically signed and notarized online using the Proof platform.

# EXHIBIT 29

UNITED STATES BANKRUPTCY COURT

Northern DISTRICT OF Texas

Case number 19-34054 sgj11

| | | | |
|---|---|---|---|
| In re: Highland Capital Management, LP | § | Case No. | 19-34054 |
| | § | | |
| | § | | |
| Debtor(s) | § | ☐ Jointly Administered | |

# Post-confirmation Report

Chapter 11

Quarter Ending Date: 09/30/2025

Petition Date: 10/16/2019

Plan Confirmed Date: 02/22/2021

Plan Effective Date: 08/11/2021

This Post-confirmation Report relates to: ◉ Reorganized Debtor
○ Other Authorized Party or Entity: ____________
Name of Authorized Party or Entity

/s/ Zachery Z. Annable
Signature of Responsible Party

Zachery Z. Annable, Hayward PLLC
Printed Name of Responsible Party

10/20/2025
Date

10501 N. Central Expressway, Suite 106
Dallas TX 75231
Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

Debtor's Name Highland Capital Management, LP Case No. 19-34054

**Part 1: Summary of Post-confirmation Transfers**

| | Current Quarter | Total Since Effective Date |
|---|---|---|
| a. Total cash disbursements | $5,432,865 | $191,409,494 |
| b. Non-cash securities transferred | $0 | $0 |
| c. Other non-cash property transferred | $0 | $5,194,652 |
| d. Total transferred (a+b+c) | $5,432,865 | $196,604,146 |

**Part 2: Preconfirmation Professional Fees and Expenses**

| | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| a. | Professional fees & expenses (bankruptcy) incurred by or on behalf of the debtor *Aggregate Total* | | | $0 | $33,005,136 | $0 | $33,005,136 |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | Pachulski Stang Ziehl & Jones | Lead Counsel | $0 | $24,312,860 | $0 | $24,312,860 |
| | ii | Development Specialists, Inc. | Financial Professional | $0 | $5,765,448 | $0 | $5,765,448 |
| | iii | Kurtzman Carson Consultants | Other | $0 | $2,054,716 | $0 | $2,054,716 |
| | iv | Hayward & Associates PLLC | Local Counsel | $0 | $872,112 | $0 | $872,112 |
| | v | | | | | | |
| | vi | | | | | | |
| | vii | | | | | | |
| | viii | | | | | | |
| | ix | | | | | | |
| | x | | | | | | |
| | xi | | | | | | |
| | xii | | | | | | |
| | xiii | | | | | | |
| | xiv | | | | | | |
| | xv | | | | | | |
| | xvi | | | | | | |
| | xvii | | | | | | |
| | xviii | | | | | | |
| | xix | | | | | | |
| | xx | | | | | | |
| | xxi | | | | | | |
| | xxii | | | | | | |
| | xxiii | | | | | | |
| | xxiv | | | | | | |
| | xxv | | | | | | |
| | xxvi | | | | | | |
| | xxvii | | | | | | |
| | xxviii | | | | | | |
| | xxix | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xxx | | | | | | |
| | xxxi | | | | | | |
| | xxxii | | | | | | |
| | xxxiii | | | | | | |
| | xxxiv | | | | | | |
| | xxxv | | | | | | |
| | xxxvi | | | | | | |
| | xxxvii | | | | | | |
| | xxxviii | | | | | | |
| | xxxix | | | | | | |
| | xl | | | | | | |
| | xli | | | | | | |
| | xlii | | | | | | |
| | xliii | | | | | | |
| | xliv | | | | | | |
| | xlv | | | | | | |
| | xlvi | | | | | | |
| | xlvii | | | | | | |
| | xlviii | | | | | | |
| | xlix | | | | | | |
| | l | | | | | | |
| | li | | | | | | |
| | lii | | | | | | |
| | liii | | | | | | |
| | liv | | | | | | |
| | lv | | | | | | |
| | lvi | | | | | | |
| | lvii | | | | | | |
| | lviii | | | | | | |
| | lix | | | | | | |
| | lx | | | | | | |
| | lxi | | | | | | |
| | lxii | | | | | | |
| | lxiii | | | | | | |
| | lxiv | | | | | | |
| | lxv | | | | | | |
| | lxvi | | | | | | |
| | lxvii | | | | | | |
| | lxviii | | | | | | |
| | lxix | | | | | | |
| | lxx | | | | | | |
| | lxxi | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | lxxii | | | | | | |
| | lxxiii | | | | | | |
| | lxxiv | | | | | | |
| | lxxv | | | | | | |
| | lxxvi | | | | | | |
| | lxxvii | | | | | | |
| | lxxviii | | | | | | |
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |

| | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| b. | Professional fees & expenses (nonbankruptcy) incurred by or on behalf of the debtor | | *Aggregate Total* | $0 | $7,604,472 | $0 | $7,604,472 |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | Hunton Andrews Kurth LLP | Other | $0 | $1,149,807 | $0 | $1,149,807 |
| | ii | Foley Gardere, Foley & Lardne | Other | $0 | $629,088 | $0 | $629,088 |
| | iii | Deloitte | Financial Professional | $0 | $553,413 | $0 | $553,413 |
| | iv | Mercer (US) Inc. | Other | $0 | $204,767 | $0 | $204,767 |
| | v | Teneo Capital, LLC | Financial Professional | $0 | $1,364,823 | $0 | $1,364,823 |
| | vi | Wilmer Cutler Pickering Hale | Other | $0 | $2,650,937 | $0 | $2,650,937 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| vii | Carey Olsen | Other | $0 | $280,264 | $0 | $280,264 |
| viii | ASW Law | Other | $0 | $4,976 | $0 | $4,976 |
| ix | Houlihan Lokey Financial Advi | Other | $0 | $766,397 | $0 | $766,397 |
| x | | | | | | |
| xi | | | | | | |
| xii | | | | | | |
| xiii | | | | | | |
| xiv | | | | | | |
| xv | | | | | | |
| xvi | | | | | | |
| xvii | | | | | | |
| xviii | | | | | | |
| xix | | | | | | |
| xx | | | | | | |
| xxi | | | | | | |
| xxii | | | | | | |
| xxiii | | | | | | |
| xxiv | | | | | | |
| xxv | | | | | | |
| xxvi | | | | | | |
| xxvii | | | | | | |
| xxviii | | | | | | |
| xxix | | | | | | |
| xxx | | | | | | |
| xxxi | | | | | | |
| xxxii | | | | | | |
| xxxiii | | | | | | |
| xxxiv | | | | | | |
| xxxv | | | | | | |
| xxxvi | | | | | | |
| xxxvii | | | | | | |
| xxxviii | | | | | | |
| xxxix | | | | | | |
| xl | | | | | | |
| xli | | | | | | |
| xlii | | | | | | |
| xliii | | | | | | |
| xliv | | | | | | |
| xlv | | | | | | |
| xlvi | | | | | | |
| xlvii | | | | | | |
| xlviii | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xlix | | | | | | |
| | l | | | | | | |
| | li | | | | | | |
| | lii | | | | | | |
| | liii | | | | | | |
| | liv | | | | | | |
| | lv | | | | | | |
| | lvi | | | | | | |
| | lvii | | | | | | |
| | lviii | | | | | | |
| | lix | | | | | | |
| | lx | | | | | | |
| | lxi | | | | | | |
| | lxii | | | | | | |
| | lxiii | | | | | | |
| | lxiv | | | | | | |
| | lxv | | | | | | |
| | lxvi | | | | | | |
| | lxvii | | | | | | |
| | lxviii | | | | | | |
| | lxix | | | | | | |
| | lxx | | | | | | |
| | lxxi | | | | | | |
| | lxxii | | | | | | |
| | lxxiii | | | | | | |
| | lxxiv | | | | | | |
| | lxxv | | | | | | |
| | lxxvi | | | | | | |
| | lxxvii | | | | | | |
| | lxxviii | | | | | | |
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | | $0 | $60,171,929 | $0 | $60,171,929 |

## Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan

| | Total Anticipated Payments Under Plan | Paid Current Quarter | Paid Cumulative | Allowed Claims | % Paid of Allowed Claims |
|---|---|---|---|---|---|
| a. Administrative claims | $0 | $0 | $15,750 | $15,750 | 100% |
| b. Secured claims | $5,843,261 | $0 | $5,274,477 | $5,274,477 | 100% |
| c. Priority claims | $16,498 | $0 | $1,213,832 | $1,213,832 | 100% |
| d. General unsecured claims | $205,144,544 | $10,000,000 | $387,308,940 | $397,485,568 | 97% |
| e. Equity interests | $0 | $18,542,025 | $18,542,025 | | |

## Part 4: Questionnaire

a. Is this a final report? Yes ○ No ◉

If yes, give date Final Decree was entered: ____________

If no, give date when the application for Final Decree is anticipated: ____________

b. Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930? Yes ◉ No ○

**Privacy Act Statement**

28 U.S.C. § 589b authorizes the collection of this information and provision of this information is mandatory. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6) and to otherwise evaluate whether a reorganized chapter 11 debtor is performing as anticipated under a confirmed plan. Disclosure of this information may be to a bankruptcy trustee when the information is needed to perform the trustee's duties, or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case, or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**I declare under penalty of perjury that the foregoing Post-confirmation Report and its attachments, if any, are true and correct and that I have been authorized to sign this report.**

| | |
|---|---|
| /s/ James Seery | James Seery |
| Signature of Responsible Party | Printed Name of Responsible Party |
| CEO | 10/20/2025 |
| Title | Date |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

Page 1

Other Page 1

Page 2 Minus Tables

Bankruptcy Table 1-50

Debtor's Name Highland Capital Management, LP Case No. 19-34054

Bankruptcy Table 51-100

Non-Bankruptcy Table 1-50

Non-Bankruptcy Table 51-100

Part 3, Part 4, Last Page

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |

# GLOBAL NOTES TO POST CONFIRMATION REPORT

The Reorganized Debtor has filed the attached post-confirmation report (the "PCR") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court"), on behalf of debtor Highland Capital Management, L.P., Case No. 19-34054 (SGJ) (the "Bankruptcy Case"). The Reorganized Debtor prepared the PCR with the assistance of the Reorganized Debtor's employees, advisors, and professionals. The PCR was prepared solely for the purpose of complying with the post-confirmation quarterly reporting requirements established by the United States Trustee Program (*see* https://www.justice.gov/ust/chapter-11-operating-reports). The PCR should not be relied upon by any persons for any information in connection with current or future financial conditions or events relating to the Reorganized Debtor or its estate.

The financial information contained in the PCR is preliminary, unaudited, limited in scope, and is not prepared in accordance with accounting principles generally accepted in the United States of America nor in accordance with other applicable non-bankruptcy law. In preparing the PCR, the Reorganized Debtor relied on financial data from the books and records available to it at the time of such preparation, as well as certain filings on the docket in the Bankruptcy Case. Although the Reorganized Debtor made commercially reasonable efforts to ensure the accuracy and completeness of the PCR, inadvertent errors or omissions may exist. The Reorganized Debtor reserves the right to amend and supplement the PCR as may be necessary or appropriate.

**Part 2: Preconfirmation Professional Fees and Expenses**

In Section A of the PCR, the Reorganized Debtor listed the bankruptcy related professionals employed in connection with the Bankruptcy Case.

In Section B of the PCR, the Reorganized Debtor listed non-bankruptcy professionals, those that would have been retained absent the Bankruptcy Case, and the ordinary course professionals ("OCP"). Hunton Andrews Kurth LLP ("Hunton") and Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Hale") were originally ordinary course professionals but were later employed

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

professionals. The amounts listed for Hunton and Wilmer Hale include the OCP payments and employed professional payments.

In Section C of the PCR, the Reorganized Debtor totals all payments included in Sections A and B, along with payments made to professional employed by the official committee of unsecured creditors (the "Committee").

The approved current quarter, approved cumulative, and paid cumulative will have the same amount listed due to approval and payment of final fee applications.

**Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan**

The payments made to holders of General Unsecured Claims were disbursed from the Claimant Trust, but for presentation purposes, have been included in Part 3 of the post-confirmation report for the Reorganized Debtor.

The presentation contained in this PCR does not reflect the material and necessary reserves that will be taken in accordance with Reorganized Debtor's governing documents and the Plan.

The Debtor reserves all right to object to any claim in accordance with the terms of the Plan.

The General unsecured claims line item (Part 3. d.) encapsulates the claims of Classes 6, 7, 8, and 9 under the Plan.

Amounts paid in current quarter for Equity interests (Part 3. E.) includes non-cash assignments described in the settlement between the Highland Entities and the HMIT Entities more fully described at Docket No. 4217 - *Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and the Authorizing Actions Consistent Therewith* and as ordered at Docket No. 4297 - *Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith.*

# EXHIBIT 30

UNITED STATES BANKRUPTCY COURT

Northern DISTRICT OF Texas

Case number 19-34054 sgj11

| | | |
|---|---|---|
| In re: Highland Capital Management, LP | § | Case No. 19-34054 |
| | § | |
| | § | |
| Debtor(s) | § | ☐ Jointly Administered |

# Post-confirmation Report

Chapter 11

Quarter Ending Date: 09/30/2025

Petition Date: 10/16/2019

Plan Confirmed Date: 02/22/2021

Plan Effective Date: 08/11/2021

This Post-confirmation Report relates to: ◯ Reorganized Debtor

◉ Other Authorized Party or Entity: Highland Claimant Trust

Name of Authorized Party or Entity

/s/ Zachery Z. Annable
Signature of Responsible Party

10/20/2025
Date

Zachery Z. Annable, Hayward PLLC
Printed Name of Responsible Party

10501 N. Central Expressway, Suite 106
Dallas TX 75231
Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

1934054251021000000000004



009223

Debtor's Name Highland Capital Management, LP Case No. 19-34054

## Part 1: Summary of Post-confirmation Transfers

| | Current Quarter | Total Since Effective Date |
|---|---|---|
| a. Total cash disbursements | $2,639,444 | $466,509,247 |
| b. Non-cash securities transferred | $0 | $0 |
| c. Other non-cash property transferred | $0 | $3,321,685 |
| d. Total transferred (a+b+c) | $2,639,444 | $469,830,932 |

## Part 2: Preconfirmation Professional Fees and Expenses

| | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| a. | Professional fees & expenses (bankruptcy) incurred by or on behalf of the debtor *Aggregate Total* | | | | | | |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | | | | | | |
| | ii | | | | | | |
| | iii | | | | | | |
| | iv | | | | | | |
| | v | | | | | | |
| | vi | | | | | | |
| | vii | | | | | | |
| | viii | | | | | | |
| | ix | | | | | | |
| | x | | | | | | |
| | xi | | | | | | |
| | xii | | | | | | |
| | xiii | | | | | | |
| | xiv | | | | | | |
| | xv | | | | | | |
| | xvi | | | | | | |
| | xvii | | | | | | |
| | xviii | | | | | | |
| | xix | | | | | | |
| | xx | | | | | | |
| | xxi | | | | | | |
| | xxii | | | | | | |
| | xxiii | | | | | | |
| | xxiv | | | | | | |
| | xxv | | | | | | |
| | xxvi | | | | | | |
| | xxvii | | | | | | |
| | xxviii | | | | | | |
| | xxix | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xxx | | | | | | |
| | xxxi | | | | | | |
| | xxxii | | | | | | |
| | xxxiii | | | | | | |
| | xxxiv | | | | | | |
| | xxxv | | | | | | |
| | xxxvi | | | | | | |
| | xxxvii | | | | | | |
| | xxxviii | | | | | | |
| | xxxix | | | | | | |
| | xl | | | | | | |
| | xli | | | | | | |
| | xlii | | | | | | |
| | xliii | | | | | | |
| | xliv | | | | | | |
| | xlv | | | | | | |
| | xlvi | | | | | | |
| | xlvii | | | | | | |
| | xlviii | | | | | | |
| | xlix | | | | | | |
| | l | | | | | | |
| | li | | | | | | |
| | lii | | | | | | |
| | liii | | | | | | |
| | liv | | | | | | |
| | lv | | | | | | |
| | lvi | | | | | | |
| | lvii | | | | | | |
| | lviii | | | | | | |
| | lix | | | | | | |
| | lx | | | | | | |
| | lxi | | | | | | |
| | lxii | | | | | | |
| | lxiii | | | | | | |
| | lxiv | | | | | | |
| | lxv | | | | | | |
| | lxvi | | | | | | |
| | lxvii | | | | | | |
| | lxviii | | | | | | |
| | lxix | | | | | | |
| | lxx | | | | | | |
| | lxxi | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | lxxii | | | | | | |
| | lxxiii | | | | | | |
| | lxxiv | | | | | | |
| | lxxv | | | | | | |
| | lxxvi | | | | | | |
| | lxxvii | | | | | | |
| | lxxviii | | | | | | |
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |

| | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| b. | Professional fees & expenses (nonbankruptcy) incurred by or on behalf of the debtor | | *Aggregate Total* | | | | |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | | | | | | |
| | ii | | | | | | |
| | iii | | | | | | |
| | iv | | | | | | |
| | v | | | | | | |
| | vi | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | vii | | | | | | |
| | viii | | | | | | |
| | ix | | | | | | |
| | x | | | | | | |
| | xi | | | | | | |
| | xii | | | | | | |
| | xiii | | | | | | |
| | xiv | | | | | | |
| | xv | | | | | | |
| | xvi | | | | | | |
| | xvii | | | | | | |
| | xviii | | | | | | |
| | xix | | | | | | |
| | xx | | | | | | |
| | xxi | | | | | | |
| | xxii | | | | | | |
| | xxiii | | | | | | |
| | xxiv | | | | | | |
| | xxv | | | | | | |
| | xxvi | | | | | | |
| | xxvii | | | | | | |
| | xxviii | | | | | | |
| | xxix | | | | | | |
| | xxx | | | | | | |
| | xxxi | | | | | | |
| | xxxii | | | | | | |
| | xxxiii | | | | | | |
| | xxxiv | | | | | | |
| | xxxv | | | | | | |
| | xxxvi | | | | | | |
| | xxxvii | | | | | | |
| | xxxviii | | | | | | |
| | xxxix | | | | | | |
| | xl | | | | | | |
| | xli | | | | | | |
| | xlii | | | | | | |
| | xliii | | | | | | |
| | xliv | | | | | | |
| | xlv | | | | | | |
| | xlvi | | | | | | |
| | xlvii | | | | | | |
| | xlviii | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xlix | | | | | | |
| | l | | | | | | |
| | li | | | | | | |
| | lii | | | | | | |
| | liii | | | | | | |
| | liv | | | | | | |
| | lv | | | | | | |
| | lvi | | | | | | |
| | lvii | | | | | | |
| | lviii | | | | | | |
| | lix | | | | | | |
| | lx | | | | | | |
| | lxi | | | | | | |
| | lxii | | | | | | |
| | lxiii | | | | | | |
| | lxiv | | | | | | |
| | lxv | | | | | | |
| | lxvi | | | | | | |
| | lxvii | | | | | | |
| | lxviii | | | | | | |
| | lxix | | | | | | |
| | lxx | | | | | | |
| | lxxi | | | | | | |
| | lxxii | | | | | | |
| | lxxiii | | | | | | |
| | lxxiv | | | | | | |
| | lxxv | | | | | | |
| | lxxvi | | | | | | |
| | lxxvii | | | | | | |
| | lxxviii | | | | | | |
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | | | $0 | | |

**Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan**

| | Total Anticipated Payments Under Plan | Paid Current Quarter | Paid Cumulative | Allowed Claims | % Paid of Allowed Claims |
|---|---|---|---|---|---|
| a. Administrative claims | $0 | $0 | $15,750 | $15,750 | 100% |
| b. Secured claims | $5,843,261 | $0 | $5,274,477 | $5,274,477 | 100% |
| c. Priority claims | $16,498 | $0 | $1,213,832 | $1,213,832 | 100% |
| d. General unsecured claims | $205,144,544 | $10,000,000 | $387,308,940 | $397,485,568 | 97% |
| e. Equity interests | $0 | $18,542,025 | $18,542,025 | | |

**Part 4: Questionnaire**

a. Is this a final report? Yes ◯ No ◉

If yes, give date Final Decree was entered: ________

If no, give date when the application for Final Decree is anticipated: ________

b. Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930? Yes ◉ No ◯

Debtor's Name Highland Capital Management, LP Case No. 19-34054

**Privacy Act Statement**

28 U.S.C. § 589b authorizes the collection of this information and provision of this information is mandatory. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6) and to otherwise evaluate whether a reorganized chapter 11 debtor is performing as anticipated under a confirmed plan. Disclosure of this information may be to a bankruptcy trustee when the information is needed to perform the trustee's duties, or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case, or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**I declare under penalty of perjury that the foregoing Post-confirmation Report and its attachments, if any, are true and correct and that I have been authorized to sign this report.**

/s/ James Seery
Signature of Responsible Party

James Seery
Printed Name of Responsible Party

Claimant Trustee
Title

10/20/2025
Date

Debtor's Name Highland Capital Management, LP Case No. 19-34054

Page 1

Other Page 1

Page 2 Minus Tables

Bankruptcy Table 1-50

Bankruptcy Table 51-100

Non-Bankruptcy Table 1-50

Non-Bankruptcy Table 51-100

Part 3, Part 4, Last Page

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

**GLOBAL NOTES TO POST CONFIRMATION REPORT**

The Highland Claimant Trust has filed the attached post-confirmation report (the "PCR") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court"), with respect to the case of Reorganized Debtor Highland Capital Management, L.P., Case No. 19-34054 (SGJ) (the "Bankruptcy Case"). The Highland Claimant Trust prepared the PCR with the assistance of the Reorganized Debtor's employees, advisors, and professionals. The PCR was prepared solely for the purpose of complying with the post-confirmation quarterly reporting requirements established by the United States Trustee Program (*see* https://www.justice.gov/ust/chapter-11-operating-reports). The PCR should not be relied upon by any persons for any information in connection with current or future financial conditions or events relating to the Highland Claimant Trust, the Reorganized Debtor or its estate.

The financial information contained in the PCR is preliminary, unaudited, limited in scope, and is not prepared in accordance with accounting principles generally accepted in the United States of America nor in accordance with other applicable non-bankruptcy law. In preparing the PCR, the Highland Claimant Trust relied on financial data from the books and records available to it at the time of such preparation, as well as certain filings on the docket in the Bankruptcy Case. Although the Highland Claimant Trust made commercially reasonable efforts to ensure the accuracy and completeness of the PCR, inadvertent errors or omissions may exist. The Highland Claimant Trust reserves the right to amend and supplement the PCR as may be necessary or appropriate.

**Part 2: Preconfirmation Professional Fees and Expenses**

The Highland Claimant Trust did not make any payment of professional fees prior to Confirmation of the Plan.

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The headquarters and service address for the above-captioned Reorganized Debtor is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

**Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan**

For presentation purposes, the chart showing claims anticipated under the plan, paid claims and allowed claims are reflected in both the Reorganized Debtor and Claimant Trust post-confirmation report under Part 3: Recoveries of the Holders of Claims and Interests under the Confirmed Plan.

The presentation contained in this PCR does not reflect the material and necessary reserves that will be taken in accordance with the Claimant Trust's governing documents and the Plan.

The General unsecured claims line item (Part 3. d.) encapsulates the claims of Classes 6, 7, 8, and 9 under the Plan.

Amounts paid in current quarter for Equity interests (Part 3. E.) includes non-cash assignments described in the settlement between the Highland Entities and the HMIT Entities more fully described at Docket No. 4217 - *Declaration of Gregory V. Demo in Support of Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement with the HMIT Entities and the Authorizing Actions Consistent Therewith* and as ordered at Docket No. 4297 - *Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith.*

# EXHIBIT 31

UNITED STATES BANKRUPTCY COURT

Northern DISTRICT OF Texas

Case number 19-34054 sgj11

In re: Highland Capital Management, LP §
§
§
Debtor(s) §

Case No. 19-34054

☐ Jointly Administered

# Post-confirmation Report

Chapter 11

Quarter Ending Date: 12/31/2025

Petition Date: 10/16/2019

Plan Confirmed Date: 02/22/2021

Plan Effective Date: 08/11/2021

This Post-confirmation Report relates to: (●) Reorganized Debtor
( ) Other Authorized Party or Entity: ____________
Name of Authorized Party or Entity

/s/ Zachery Z. Annable
Signature of Responsible Party

01/20/2026
Date

Zachery Z. Annable, Hayward PLLC
Printed Name of Responsible Party

10501 N. Central Expressway, Suite 106
Dallas TX 75231
Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

Debtor's Name Highland Capital Management, LP Case No. 19-34054

**Part 1: Summary of Post-confirmation Transfers**

| | Current Quarter | Total Since Effective Date |
|---|---|---|
| a. Total cash disbursements | $1,356,194 | $192,765,688 |
| b. Non-cash securities transferred | $0 | $0 |
| c. Other non-cash property transferred | $0 | $5,194,652 |
| d. Total transferred (a+b+c) | $1,356,194 | $197,960,340 |

**Part 2: Preconfirmation Professional Fees and Expenses**

| | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| a. | Professional fees & expenses (bankruptcy) incurred by or on behalf of the debtor *Aggregate Total* | | | $0 | $33,005,136 | $0 | $33,005,136 |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | Pachulski Stang Ziehl & Jones | Lead Counsel | $0 | $24,312,860 | $0 | $24,312,860 |
| | ii | Development Specialists, Inc. | Financial Professional | $0 | $5,765,448 | $0 | $5,765,448 |
| | iii | Kurtzman Carson Consultants | Other | $0 | $2,054,716 | $0 | $2,054,716 |
| | iv | Hayward & Associates PLLC | Local Counsel | $0 | $872,112 | $0 | $872,112 |
| | v | | | | | | |
| | vi | | | | | | |
| | vii | | | | | | |
| | viii | | | | | | |
| | ix | | | | | | |
| | x | | | | | | |
| | xi | | | | | | |
| | xii | | | | | | |
| | xiii | | | | | | |
| | xiv | | | | | | |
| | xv | | | | | | |
| | xvi | | | | | | |
| | xvii | | | | | | |
| | xviii | | | | | | |
| | xix | | | | | | |
| | xx | | | | | | |
| | xxi | | | | | | |
| | xxii | | | | | | |
| | xxiii | | | | | | |
| | xxiv | | | | | | |
| | xxv | | | | | | |
| | xxvi | | | | | | |
| | xxvii | | | | | | |
| | xxviii | | | | | | |
| | xxix | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xxx | | | | | | |
| | xxxi | | | | | | |
| | xxxii | | | | | | |
| | xxxiii | | | | | | |
| | xxxiv | | | | | | |
| | xxxv | | | | | | |
| | xxxvi | | | | | | |
| | xxxvii | | | | | | |
| | xxxviii | | | | | | |
| | xxxix | | | | | | |
| | xl | | | | | | |
| | xli | | | | | | |
| | xlii | | | | | | |
| | xliii | | | | | | |
| | xliv | | | | | | |
| | xlv | | | | | | |
| | xlvi | | | | | | |
| | xlvii | | | | | | |
| | xlviii | | | | | | |
| | xlix | | | | | | |
| | l | | | | | | |
| | li | | | | | | |
| | lii | | | | | | |
| | liii | | | | | | |
| | liv | | | | | | |
| | lv | | | | | | |
| | lvi | | | | | | |
| | lvii | | | | | | |
| | lviii | | | | | | |
| | lix | | | | | | |
| | lx | | | | | | |
| | lxi | | | | | | |
| | lxii | | | | | | |
| | lxiii | | | | | | |
| | lxiv | | | | | | |
| | lxv | | | | | | |
| | lxvi | | | | | | |
| | lxvii | | | | | | |
| | lxviii | | | | | | |
| | lxix | | | | | | |
| | lxx | | | | | | |
| | lxxi | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | lxxii | | | | | | |
| | lxxiii | | | | | | |
| | lxxiv | | | | | | |
| | lxxv | | | | | | |
| | lxxvi | | | | | | |
| | lxxvii | | | | | | |
| | lxxviii | | | | | | |
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |

| | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| b. | Professional fees & expenses (nonbankruptcy) incurred by or on behalf of the debtor | | *Aggregate Total* | $0 | $7,604,472 | $0 | $7,604,472 |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | Hunton Andrews Kurth LLP | Other | $0 | $1,149,807 | $0 | $1,149,807 |
| | ii | Foley Gardere, Foley & Lardne | Other | $0 | $629,088 | $0 | $629,088 |
| | iii | Deloitte | Financial Professional | $0 | $553,413 | $0 | $553,413 |
| | iv | Mercer (US) Inc. | Other | $0 | $204,767 | $0 | $204,767 |
| | v | Teneo Capital, LLC | Financial Professional | $0 | $1,364,823 | $0 | $1,364,823 |
| | vi | Wilmer Cutler Pickering Hale | Other | $0 | $2,650,937 | $0 | $2,650,937 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | vii | Carey Olsen | Other | $0 | $280,264 | $0 | $280,264 |
| | viii | ASW Law | Other | $0 | $4,976 | $0 | $4,976 |
| | ix | Houlihan Lokey Financial Advi | Other | $0 | $766,397 | $0 | $766,397 |
| | x | | | | | | |
| | xi | | | | | | |
| | xii | | | | | | |
| | xiii | | | | | | |
| | xiv | | | | | | |
| | xv | | | | | | |
| | xvi | | | | | | |
| | xvii | | | | | | |
| | xviii | | | | | | |
| | xix | | | | | | |
| | xx | | | | | | |
| | xxi | | | | | | |
| | xxii | | | | | | |
| | xxiii | | | | | | |
| | xxiv | | | | | | |
| | xxv | | | | | | |
| | xxvi | | | | | | |
| | xxvii | | | | | | |
| | xxviii | | | | | | |
| | xxix | | | | | | |
| | xxx | | | | | | |
| | xxxi | | | | | | |
| | xxxii | | | | | | |
| | xxxiii | | | | | | |
| | xxxiv | | | | | | |
| | xxxv | | | | | | |
| | xxxvi | | | | | | |
| | xxxvii | | | | | | |
| | xxxviii | | | | | | |
| | xxxix | | | | | | |
| | xl | | | | | | |
| | xli | | | | | | |
| | xlii | | | | | | |
| | xliii | | | | | | |
| | xliv | | | | | | |
| | xlv | | | | | | |
| | xlvi | | | | | | |
| | xlvii | | | | | | |
| | xlviii | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xlix | | | | | | |
| | l | | | | | | |
| | li | | | | | | |
| | lii | | | | | | |
| | liii | | | | | | |
| | liv | | | | | | |
| | lv | | | | | | |
| | lvi | | | | | | |
| | lvii | | | | | | |
| | lviii | | | | | | |
| | lix | | | | | | |
| | lx | | | | | | |
| | lxi | | | | | | |
| | lxii | | | | | | |
| | lxiii | | | | | | |
| | lxiv | | | | | | |
| | lxv | | | | | | |
| | lxvi | | | | | | |
| | lxvii | | | | | | |
| | lxviii | | | | | | |
| | lxix | | | | | | |
| | lxx | | | | | | |
| | lxxi | | | | | | |
| | lxxii | | | | | | |
| | lxxiii | | | | | | |
| | lxxiv | | | | | | |
| | lxxv | | | | | | |
| | lxxvi | | | | | | |
| | lxxvii | | | | | | |
| | lxxviii | | | | | | |
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | | $0 | $60,171,929 | $0 | $60,171,929 |

## Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan

| | Total Anticipated Payments Under Plan | Paid Current Quarter | Paid Cumulative | Allowed Claims | % Paid of Allowed Claims |
|---|---|---|---|---|---|
| a. Administrative claims | $0 | $0 | $15,750 | $15,750 | 100% |
| b. Secured claims | $5,843,261 | $0 | $5,274,477 | $5,274,477 | 100% |
| c. Priority claims | $16,498 | $0 | $1,213,832 | $1,213,832 | 100% |
| d. General unsecured claims | $205,144,544 | $0 | $387,308,940 | $397,485,568 | 97% |
| e. Equity interests | $0 | $558,045 | $19,100,071 | | |

## Part 4: Questionnaire

a. Is this a final report? Yes ○ No ◉

If yes, give date Final Decree was entered: ______

If no, give date when the application for Final Decree is anticipated: ______

b. Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930? Yes ◉ No ○

**Privacy Act Statement**

28 U.S.C. § 589b authorizes the collection of this information and provision of this information is mandatory. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6) and to otherwise evaluate whether a reorganized chapter 11 debtor is performing as anticipated under a confirmed plan. Disclosure of this information may be to a bankruptcy trustee when the information is needed to perform the trustee's duties, or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case, or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**I declare under penalty of perjury that the foregoing Post-confirmation Report and its attachments, if any, are true and correct and that I have been authorized to sign this report.**

| | |
|---|---|
| /s/ James Seery | James Seery |
| Signature of Responsible Party | Printed Name of Responsible Party |
| CEO | 01/20/2026 |
| Title | Date |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

Page 1

Other Page 1

Page 2 Minus Tables

Bankruptcy Table 1-50

Debtor's Name Highland Capital Management, LP Case No. 19-34054

Bankruptcy Table 51-100

Non-Bankruptcy Table 1-50

Non-Bankruptcy Table 51-100

Part 3, Part 4, Last Page

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | ) | |

## GLOBAL NOTES TO POST-CONFIRMATION REPORT

The Reorganized Debtor has filed the attached post-confirmation report (the "PCR") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court"), on behalf of debtor Highland Capital Management, L.P., Case No. 19-34054 (SGJ) (the "Bankruptcy Case"). The Reorganized Debtor prepared the PCR with the assistance of the Reorganized Debtor's employees, advisors, and professionals. The PCR was prepared solely for the purpose of complying with the post-confirmation quarterly reporting requirements established by the United States Trustee Program (*see* https://www.justice.gov/ust/chapter-11-operating-reports). The PCR should not be relied upon by any persons for any information in connection with current or future financial conditions or events relating to the Reorganized Debtor or its estate.

The financial information contained in the PCR is preliminary, unaudited, limited in scope, and is not prepared in accordance with accounting principles generally accepted in the United States of America nor in accordance with other applicable non-bankruptcy law. In preparing the PCR, the Reorganized Debtor relied on financial data from the books and records available to it at the time of such preparation, as well as certain filings on the docket in the Bankruptcy Case. Although the Reorganized Debtor made commercially reasonable efforts to ensure the accuracy and completeness of the PCR, inadvertent errors or omissions may exist. The Reorganized Debtor reserves the right to amend and supplement the PCR as may be necessary or appropriate.

**Part 2: Preconfirmation Professional Fees and Expenses**

In Section A of the PCR, the Reorganized Debtor listed the bankruptcy related professionals employed in connection with the Bankruptcy Case.

In Section B of the PCR, the Reorganized Debtor listed non-bankruptcy professionals, those that would have been retained absent the Bankruptcy Case, and the ordinary course professionals ("OCP"). Hunton Andrews Kurth LLP ("Hunton") and Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Hale") were originally ordinary course professionals but were later employed

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The service address for the Reorganized Debtor is 6333 Mockingbird Ln., Ste 147 #5045, Dallas, Texas 75214.

Case 3:26-cv-02496-D Document 17-24 Filed 02/08/26 Page 356 of 662 PageID 10153

professionals. The amounts listed for Hunton and Wilmer Hale include the OCP payments and employed professional payments.

In Section C of the PCR, the Reorganized Debtor totals all payments included in Sections A and B, along with payments made to professional employed by the official committee of unsecured creditors (the "Committee").

The approved current quarter, approved cumulative, and paid cumulative will have the same amount listed due to approval and payment of final fee applications.

**Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan**

The payments made to holders of General Unsecured Claims were disbursed from the Claimant Trust, but for presentation purposes, have been included in Part 3 of the post-confirmation report for the Reorganized Debtor.

The presentation contained in this PCR does not reflect the material and necessary reserves that will be taken in accordance with Reorganized Debtor's governing documents and the Plan.

The Debtor reserves all right to object to any claim in accordance with the terms of the Plan.

The General unsecured claims line item (Part 3. d.) encapsulates the claims of Classes 6, 7, 8, and 9 under the Plan.

# EXHIBIT 32

UNITED STATES BANKRUPTCY COURT

Northern DISTRICT OF Texas

Case number 19-34054 sgj11

| | | |
|---|---|---|
| In re: Highland Capital Management, LP<br><br>Debtor(s) | §<br>§<br>§<br>§ | Case No. 19-34054<br><br>☐ Jointly Administered |

# Post-confirmation Report

Chapter 11

Quarter Ending Date: 12/31/2025

Petition Date: 10/16/2019

Plan Confirmed Date: 02/22/2021

Plan Effective Date: 08/11/2021

This Post-confirmation Report relates to: ○ Reorganized Debtor

◉ Other Authorized Party or Entity: Highland Claimant Trust
Name of Authorized Party or Entity

/s/ Zachery Z. Annable
Signature of Responsible Party

01/20/2026
Date

Zachery Z. Annable, Hayward PLLC
Printed Name of Responsible Party

10501 N. Central Expressway, Suite 106
Dallas TX 75231
Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

Debtor's Name Highland Capital Management, LP Case No. 19-34054

## Part 1: Summary of Post-confirmation Transfers

| | Current Quarter | Total Since Effective Date |
|---|---|---|
| a. Total cash disbursements | $1,057,752 | $467,566,998 |
| b. Non-cash securities transferred | $0 | $0 |
| c. Other non-cash property transferred | $0 | $3,321,685 |
| d. Total transferred (a+b+c) | $1,057,752 | $470,888,683 |

## Part 2: Preconfirmation Professional Fees and Expenses

| | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| a. | Professional fees & expenses (bankruptcy) incurred by or on behalf of the debtor *Aggregate Total* | | | | | | |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | | | | | | |
| | ii | | | | | | |
| | iii | | | | | | |
| | iv | | | | | | |
| | v | | | | | | |
| | vi | | | | | | |
| | vii | | | | | | |
| | viii | | | | | | |
| | ix | | | | | | |
| | x | | | | | | |
| | xi | | | | | | |
| | xii | | | | | | |
| | xiii | | | | | | |
| | xiv | | | | | | |
| | xv | | | | | | |
| | xvi | | | | | | |
| | xvii | | | | | | |
| | xviii | | | | | | |
| | xix | | | | | | |
| | xx | | | | | | |
| | xxi | | | | | | |
| | xxii | | | | | | |
| | xxiii | | | | | | |
| | xxiv | | | | | | |
| | xxv | | | | | | |
| | xxvi | | | | | | |
| | xxvii | | | | | | |
| | xxviii | | | | | | |
| | xxix | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xxx | | | | | | |
| | xxxi | | | | | | |
| | xxxii | | | | | | |
| | xxxiii | | | | | | |
| | xxxiv | | | | | | |
| | xxxv | | | | | | |
| | xxxvi | | | | | | |
| | xxxvii | | | | | | |
| | xxxviii | | | | | | |
| | xxxix | | | | | | |
| | xl | | | | | | |
| | xli | | | | | | |
| | xlii | | | | | | |
| | xliii | | | | | | |
| | xliv | | | | | | |
| | xlv | | | | | | |
| | xlvi | | | | | | |
| | xlvii | | | | | | |
| | xlviii | | | | | | |
| | xlix | | | | | | |
| | l | | | | | | |
| | li | | | | | | |
| | lii | | | | | | |
| | liii | | | | | | |
| | liv | | | | | | |
| | lv | | | | | | |
| | lvi | | | | | | |
| | lvii | | | | | | |
| | lviii | | | | | | |
| | lix | | | | | | |
| | lx | | | | | | |
| | lxi | | | | | | |
| | lxii | | | | | | |
| | lxiii | | | | | | |
| | lxiv | | | | | | |
| | lxv | | | | | | |
| | lxvi | | | | | | |
| | lxvii | | | | | | |
| | lxviii | | | | | | |
| | lxix | | | | | | |
| | lxx | | | | | | |
| | lxxi | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | lxxii | | | | | | |
| | lxxiii | | | | | | |
| | lxxiv | | | | | | |
| | lxxv | | | | | | |
| | lxxvi | | | | | | |
| | lxxvii | | | | | | |
| | lxxviii | | | | | | |
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |

| | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| b. | Professional fees & expenses (nonbankruptcy) incurred by or on behalf of the debtor | | *Aggregate Total* | | | | |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | | | | | | |
| | ii | | | | | | |
| | iii | | | | | | |
| | iv | | | | | | |
| | v | | | | | | |
| | vi | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | vii | | | | | | |
| | viii | | | | | | |
| | ix | | | | | | |
| | x | | | | | | |
| | xi | | | | | | |
| | xii | | | | | | |
| | xiii | | | | | | |
| | xiv | | | | | | |
| | xv | | | | | | |
| | xvi | | | | | | |
| | xvii | | | | | | |
| | xviii | | | | | | |
| | xix | | | | | | |
| | xx | | | | | | |
| | xxi | | | | | | |
| | xxii | | | | | | |
| | xxiii | | | | | | |
| | xxiv | | | | | | |
| | xxv | | | | | | |
| | xxvi | | | | | | |
| | xxvii | | | | | | |
| | xxviii | | | | | | |
| | xxix | | | | | | |
| | xxx | | | | | | |
| | xxxi | | | | | | |
| | xxxii | | | | | | |
| | xxxiii | | | | | | |
| | xxxiv | | | | | | |
| | xxxv | | | | | | |
| | xxxvi | | | | | | |
| | xxxvii | | | | | | |
| | xxxviii | | | | | | |
| | xxxix | | | | | | |
| | xl | | | | | | |
| | xli | | | | | | |
| | xlii | | | | | | |
| | xliii | | | | | | |
| | xliv | | | | | | |
| | xlv | | | | | | |
| | xlvi | | | | | | |
| | xlvii | | | | | | |
| | xlviii | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xlix | | | | | | |
| | l | | | | | | |
| | li | | | | | | |
| | lii | | | | | | |
| | liii | | | | | | |
| | liv | | | | | | |
| | lv | | | | | | |
| | lvi | | | | | | |
| | lvii | | | | | | |
| | lviii | | | | | | |
| | lix | | | | | | |
| | lx | | | | | | |
| | lxi | | | | | | |
| | lxii | | | | | | |
| | lxiii | | | | | | |
| | lxiv | | | | | | |
| | lxv | | | | | | |
| | lxvi | | | | | | |
| | lxvii | | | | | | |
| | lxviii | | | | | | |
| | lxix | | | | | | |
| | lxx | | | | | | |
| | lxxi | | | | | | |
| | lxxii | | | | | | |
| | lxxiii | | | | | | |
| | lxxiv | | | | | | |
| | lxxv | | | | | | |
| | lxxvi | | | | | | |
| | lxxvii | | | | | | |
| | lxxviii | | | | | | |
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | | | $0 | | |

## Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan

| | Total Anticipated Payments Under Plan | Paid Current Quarter | Paid Cumulative | Allowed Claims | % Paid of Allowed Claims |
|---|---|---|---|---|---|
| a. Administrative claims | $0 | $0 | $15,750 | $15,750 | 100% |
| b. Secured claims | $5,843,261 | $0 | $5,274,477 | $5,274,477 | 100% |
| c. Priority claims | $16,498 | $0 | $1,213,832 | $1,213,832 | 100% |
| d. General unsecured claims | $205,144,544 | $0 | $387,308,940 | $397,485,568 | 97% |
| e. Equity interests | $0 | $558,045 | $19,100,071 | | |

## Part 4: Questionnaire

a. Is this a final report? Yes ○ No ●

If yes, give date Final Decree was entered: ____________

If no, give date when the application for Final Decree is anticipated: ____________

b. Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930? Yes ● No ○

**Privacy Act Statement**

28 U.S.C. § 589b authorizes the collection of this information and provision of this information is mandatory. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6) and to otherwise evaluate whether a reorganized chapter 11 debtor is performing as anticipated under a confirmed plan. Disclosure of this information may be to a bankruptcy trustee when the information is needed to perform the trustee's duties, or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case, or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**I declare under penalty of perjury that the foregoing Post-confirmation Report and its attachments, if any, are true and correct and that I have been authorized to sign this report.**

| | |
|---|---|
| /s/ James Seery | James Seery |
| Signature of Responsible Party | Printed Name of Responsible Party |
| Claimant Trustee | 01/20/2026 |
| Title | Date |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

Page 1

Other Page 1

Page 2 Minus Tables

Bankruptcy Table 1-50

Debtor's Name Highland Capital Management, LP Case No. 19-34054

Bankruptcy Table 51-100

Non-Bankruptcy Table 1-50

Non-Bankruptcy Table 51-100

Part 3, Part 4, Last Page

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

# GLOBAL NOTES TO POST-CONFIRMATION REPORT

The Highland Claimant Trust has filed the attached post-confirmation report (the "PCR") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court"), with respect to the case of Reorganized Debtor Highland Capital Management, L.P., Case No. 19-34054 (SGJ) (the "Bankruptcy Case"). The Highland Claimant Trust prepared the PCR with the assistance of the Reorganized Debtor's employees, advisors, and professionals. The PCR was prepared solely for the purpose of complying with the post-confirmation quarterly reporting requirements established by the United States Trustee Program (*see* https://www.justice.gov/ust/chapter-11-operating-reports). The PCR should not be relied upon by any persons for any information in connection with current or future financial conditions or events relating to the Highland Claimant Trust, the Reorganized Debtor or its estate.

The financial information contained in the PCR is preliminary, unaudited, limited in scope, and is not prepared in accordance with accounting principles generally accepted in the United States of America nor in accordance with other applicable non-bankruptcy law. In preparing the PCR, the Highland Claimant Trust relied on financial data from the books and records available to it at the time of such preparation, as well as certain filings on the docket in the Bankruptcy Case. Although the Highland Claimant Trust made commercially reasonable efforts to ensure the accuracy and completeness of the PCR, inadvertent errors or omissions may exist. The Highland Claimant Trust reserves the right to amend and supplement the PCR as may be necessary or appropriate.

**Part 2: Preconfirmation Professional Fees and Expenses**

The Highland Claimant Trust did not make any payment of professional fees prior to Confirmation of the Plan.

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The service address for the Reorganized Debtor is 6333 Mockingbird Ln., Ste 147 #5045, Dallas, Texas 75214.

**Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan**

For presentation purposes, the chart showing claims anticipated under the plan, paid claims and allowed claims are reflected in both the Reorganized Debtor and Claimant Trust post-confirmation report under Part 3: Recoveries of the Holders of Claims and Interests under the Confirmed Plan.

The presentation contained in this PCR does not reflect the material and necessary reserves that will be taken in accordance with the Claimant Trust's governing documents and the Plan.

The General unsecured claims line item (Part 3. d.) encapsulates the claims of Classes 6, 7, 8, and 9 under the Plan.

# EXHIBIT 33

UNITED STATES BANKRUPTCY COURT

Northern DISTRICT OF Texas

Case number 19-34054 sgj11

| | | |
|---|---|---|
| In re: Highland Capital Management, LP | § | Case No. 19-34054 |
| | § | |
| | § | |
| Debtor(s) | § | ☐ Jointly Administered |

# Post-confirmation Report

Chapter 11

Quarter Ending Date: 03/31/2026

Petition Date: 10/16/2019

Plan Confirmed Date: 02/22/2021

Plan Effective Date: 08/11/2021

This Post-confirmation Report relates to: (•) Reorganized Debtor

( ) Other Authorized Party or Entity: ____________________
Name of Authorized Party or Entity

/s/ Zachery Z. Annable
Signature of Responsible Party

04/20/2026
Date

Zachery Z. Annable, Hayward PLLC
Printed Name of Responsible Party

10501 N. Central Expressway, Suite 106
Dallas TX 75231
Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

1934054260420000000000001

009262

Debtor's Name Highland Capital Management, LP Case No. 19-34054

**Part 1: Summary of Post-confirmation Transfers**

| | Current Quarter | Total Since Effective Date |
|---|---|---|
| a. Total cash disbursements | $1,728,289 | $194,493,977 |
| b. Non-cash securities transferred | $0 | $0 |
| c. Other non-cash property transferred | $0 | $5,194,652 |
| d. Total transferred (a+b+c) | $1,728,289 | $199,688,629 |

**Part 2: Preconfirmation Professional Fees and Expenses**

| | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| a. | Professional fees & expenses (bankruptcy) incurred by or on behalf of the debtor *Aggregate Total* | | | $0 | $33,005,136 | $0 | $33,005,136 |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | Pachulski Stang Ziehl & Jones | Lead Counsel | $0 | $24,312,860 | $0 | $24,312,860 |
| | ii | Development Specialists, Inc. | Financial Professional | $0 | $5,765,448 | $0 | $5,765,448 |
| | iii | Kurtzman Carson Consultants | Other | $0 | $2,054,716 | $0 | $2,054,716 |
| | iv | Hayward & Associates PLLC | Local Counsel | $0 | $872,112 | $0 | $872,112 |
| | v | | | | | | |
| | vi | | | | | | |
| | vii | | | | | | |
| | viii | | | | | | |
| | ix | | | | | | |
| | x | | | | | | |
| | xi | | | | | | |
| | xii | | | | | | |
| | xiii | | | | | | |
| | xiv | | | | | | |
| | xv | | | | | | |
| | xvi | | | | | | |
| | xvii | | | | | | |
| | xviii | | | | | | |
| | xix | | | | | | |
| | xx | | | | | | |
| | xxi | | | | | | |
| | xxii | | | | | | |
| | xxiii | | | | | | |
| | xxiv | | | | | | |
| | xxv | | | | | | |
| | xxvi | | | | | | |
| | xxvii | | | | | | |
| | xxviii | | | | | | |
| | xxix | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xxx | | | | | | |
| | xxxi | | | | | | |
| | xxxii | | | | | | |
| | xxxiii | | | | | | |
| | xxxiv | | | | | | |
| | xxxv | | | | | | |
| | xxxvi | | | | | | |
| | xxxvii | | | | | | |
| | xxxviii | | | | | | |
| | xxxix | | | | | | |
| | xl | | | | | | |
| | xli | | | | | | |
| | xlii | | | | | | |
| | xliii | | | | | | |
| | xliv | | | | | | |
| | xlv | | | | | | |
| | xlvi | | | | | | |
| | xlvii | | | | | | |
| | xlviii | | | | | | |
| | xlix | | | | | | |
| | l | | | | | | |
| | li | | | | | | |
| | lii | | | | | | |
| | liii | | | | | | |
| | liv | | | | | | |
| | lv | | | | | | |
| | lvi | | | | | | |
| | lvii | | | | | | |
| | lviii | | | | | | |
| | lix | | | | | | |
| | lx | | | | | | |
| | lxi | | | | | | |
| | lxii | | | | | | |
| | lxiii | | | | | | |
| | lxiv | | | | | | |
| | lxv | | | | | | |
| | lxvi | | | | | | |
| | lxvii | | | | | | |
| | lxviii | | | | | | |
| | lxix | | | | | | |
| | lxx | | | | | | |
| | lxxi | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | lxxii | | | | | | |
| | lxxiii | | | | | | |
| | lxxiv | | | | | | |
| | lxxv | | | | | | |
| | lxxvi | | | | | | |
| | lxxvii | | | | | | |
| | lxxviii | | | | | | |
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |

| | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| b. | Professional fees & expenses (nonbankruptcy) incurred by or on behalf of the debtor *Aggregate Total* | | | $0 | $7,604,472 | $0 | $7,604,472 |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | Hunton Andrews Kurth LLP | Other | $0 | $1,149,807 | $0 | $1,149,807 |
| | ii | Foley Gardere, Foley & Lardne | Other | $0 | $629,088 | $0 | $629,088 |
| | iii | Deloitte | Financial Professional | $0 | $553,413 | $0 | $553,413 |
| | iv | Mercer (US) Inc. | Other | $0 | $204,767 | $0 | $204,767 |
| | v | Teneo Capital, LLC | Financial Professional | $0 | $1,364,823 | $0 | $1,364,823 |
| | vi | Wilmer Cutler Pickering Hale | Other | $0 | $2,650,937 | $0 | $2,650,937 |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | vii | Carey Olsen | Other | $0 | $280,264 | $0 | $280,264 |
| | viii | ASW Law | Other | $0 | $4,976 | $0 | $4,976 |
| | ix | Houlihan Lokey Financial Advi | Other | $0 | $766,397 | $0 | $766,397 |
| | x | | | | | | |
| | xi | | | | | | |
| | xii | | | | | | |
| | xiii | | | | | | |
| | xiv | | | | | | |
| | xv | | | | | | |
| | xvi | | | | | | |
| | xvii | | | | | | |
| | xviii | | | | | | |
| | xix | | | | | | |
| | xx | | | | | | |
| | xxi | | | | | | |
| | xxii | | | | | | |
| | xxiii | | | | | | |
| | xxiv | | | | | | |
| | xxv | | | | | | |
| | xxvi | | | | | | |
| | xxvii | | | | | | |
| | xxviii | | | | | | |
| | xxix | | | | | | |
| | xxx | | | | | | |
| | xxxi | | | | | | |
| | xxxii | | | | | | |
| | xxxiii | | | | | | |
| | xxxiv | | | | | | |
| | xxxv | | | | | | |
| | xxxvi | | | | | | |
| | xxxvii | | | | | | |
| | xxxviii | | | | | | |
| | xxxix | | | | | | |
| | xl | | | | | | |
| | xli | | | | | | |
| | xlii | | | | | | |
| | xliii | | | | | | |
| | xliv | | | | | | |
| | xlv | | | | | | |
| | xlvi | | | | | | |
| | xlvii | | | | | | |
| | xlviii | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xlix | | | | | | |
| | l | | | | | | |
| | li | | | | | | |
| | lii | | | | | | |
| | liii | | | | | | |
| | liv | | | | | | |
| | lv | | | | | | |
| | lvi | | | | | | |
| | lvii | | | | | | |
| | lviii | | | | | | |
| | lix | | | | | | |
| | lx | | | | | | |
| | lxi | | | | | | |
| | lxii | | | | | | |
| | lxiii | | | | | | |
| | lxiv | | | | | | |
| | lxv | | | | | | |
| | lxvi | | | | | | |
| | lxvii | | | | | | |
| | lxviii | | | | | | |
| | lxix | | | | | | |
| | lxx | | | | | | |
| | lxxi | | | | | | |
| | lxxii | | | | | | |
| | lxxiii | | | | | | |
| | lxxiv | | | | | | |
| | lxxv | | | | | | |
| | lxxvi | | | | | | |
| | lxxvii | | | | | | |
| | lxxviii | | | | | | |
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | | $0 | $60,171,929 | $0 | $60,171,929 |

**Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan**

| | Total Anticipated Payments Under Plan | Paid Current Quarter | Paid Cumulative | Allowed Claims | % Paid of Allowed Claims |
|---|---|---|---|---|---|
| a. Administrative claims | $0 | $0 | $15,750 | $15,750 | 100% |
| b. Secured claims | $5,843,261 | $0 | $5,274,477 | $5,274,477 | 100% |
| c. Priority claims | $16,498 | $0 | $1,213,832 | $1,213,832 | 100% |
| d. General unsecured claims | $205,144,544 | $0 | $387,308,940 | $397,485,568 | 97% |
| e. Equity interests | $0 | $0 | $19,100,071 | | |

**Part 4: Questionnaire**

a. Is this a final report? Yes ◯ No ◉

If yes, give date Final Decree was entered: ____________

If no, give date when the application for Final Decree is anticipated: ____________

b. Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930? Yes ◉ No ◯



009268

Debtor's Name Highland Capital Management, LP Case No. 19-34054

**Privacy Act Statement**

28 U.S.C. § 589b authorizes the collection of this information and provision of this information is mandatory. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6) and to otherwise evaluate whether a reorganized chapter 11 debtor is performing as anticipated under a confirmed plan. Disclosure of this information may be to a bankruptcy trustee when the information is needed to perform the trustee's duties, or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case, or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**I declare under penalty of perjury that the foregoing Post-confirmation Report and its attachments, if any, are true and correct and that I have been authorized to sign this report.**

/s/ James Seery
Signature of Responsible Party

James Seery
Printed Name of Responsible Party

CEO
Title

04/20/2026
Date

Debtor's Name Highland Capital Management, LP Case No. 19-34054

Page 1

Other Page 1

Page 2 Minus Tables

Bankruptcy Table 1-50

Debtor's Name Highland Capital Management, LP Case No. 19-34054

Bankruptcy Table 51-100

Non-Bankruptcy Table 1-50

Non-Bankruptcy Table 51-100

Part 3, Part 4, Last Page

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Reorganized Debtor. | ) | |

## GLOBAL NOTES TO POST-CONFIRMATION REPORT

The Reorganized Debtor has filed the attached post-confirmation report (the "PCR") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court"), on behalf of debtor Highland Capital Management, L.P., Case No. 19-34054 (SGJ) (the "Bankruptcy Case"). The Reorganized Debtor prepared the PCR with the assistance of the Reorganized Debtor's employees, advisors, and professionals. The PCR was prepared solely for the purpose of complying with the post-confirmation quarterly reporting requirements established by the United States Trustee Program (*see* https://www.justice.gov/ust/chapter-11-operating-reports). The PCR should not be relied upon by any persons for any information in connection with current or future financial conditions or events relating to the Reorganized Debtor or its estate.

The financial information contained in the PCR is preliminary, unaudited, limited in scope, and is not prepared in accordance with accounting principles generally accepted in the United States of America nor in accordance with other applicable non-bankruptcy law. In preparing the PCR, the Reorganized Debtor relied on financial data from the books and records available to it at the time of such preparation, as well as certain filings on the docket in the Bankruptcy Case. Although the Reorganized Debtor made commercially reasonable efforts to ensure the accuracy and completeness of the PCR, inadvertent errors or omissions may exist. The Reorganized Debtor reserves the right to amend and supplement the PCR as may be necessary or appropriate.

**Part 2: Preconfirmation Professional Fees and Expenses**

In Section A of the PCR, the Reorganized Debtor listed the bankruptcy related professionals employed in connection with the Bankruptcy Case.

In Section B of the PCR, the Reorganized Debtor listed non-bankruptcy professionals, those that would have been retained absent the Bankruptcy Case, and the ordinary course professionals ("OCP"). Hunton Andrews Kurth LLP ("Hunton") and Wilmer Cutler Pickering Hale and Dorr LLP ("Wilmer Hale") were originally ordinary course professionals but were later employed

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The service address for the Reorganized Debtor is 6333 Mockingbird Ln., Ste 147 #5045, Dallas, Texas 75214.

professionals. The amounts listed for Hunton and Wilmer Hale include the OCP payments and employed professional payments.

In Section C of the PCR, the Reorganized Debtor totals all payments included in Sections A and B, along with payments made to professional employed by the official committee of unsecured creditors (the "Committee").

The approved current quarter, approved cumulative, and paid cumulative will have the same amount listed due to approval and payment of final fee applications.

**Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan**

For presentation purposes, the chart showing claims anticipated under the plan, paid claims and allowed claims are reflected in both the Reorganized Debtor and Claimant Trust post-confirmation report under Part 3: Recoveries of the Holders of Claims and Interests under the Confirmed Plan.

The presentation contained in this PCR does not reflect the material and necessary reserves that will be taken in accordance with Reorganized Debtor's governing documents and the Plan.

The Debtor reserves all right to object to any claim in accordance with the terms of the Plan.

The General unsecured claims line item (Part 3. d.) encapsulates the claims of Classes 6, 7, 8, and 9 under the Plan.

# EXHIBIT 34

UNITED STATES BANKRUPTCY COURT

Northern DISTRICT OF Texas

Case number 19-34054 sgj11

| | | | |
|---|---|---|---|
| In re: Highland Capital Management, LP | § | Case No. | 19-34054 |
| | § | | |
| | § | | |
| Debtor(s) | § | ☐ Jointly Administered | |

# Post-confirmation Report

Chapter 11

Quarter Ending Date: 03/31/2026

Petition Date: 10/16/2019

Plan Confirmed Date: 02/22/2021

Plan Effective Date: 08/11/2021

This Post-confirmation Report relates to: ○ Reorganized Debtor

◉ Other Authorized Party or Entity: Highland Claimant Trust

Name of Authorized Party or Entity

/s/ Zachery Z. Annable
Signature of Responsible Party

Zachery Z. Annable, Hayward PLLC
Printed Name of Responsible Party

04/20/2026
Date

10501 N. Central Expressway, Suite 106
Dallas TX 75231
Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

Debtor's Name Highland Capital Management, LP Case No. 19-34054

## Part 1: Summary of Post-confirmation Transfers

| | Current Quarter | Total Since Effective Date |
|---|---|---|
| a. Total cash disbursements | $822,543 | $468,389,541 |
| b. Non-cash securities transferred | $0 | $0 |
| c. Other non-cash property transferred | $0 | $3,321,685 |
| d. Total transferred (a+b+c) | $822,543 | $471,711,226 |

## Part 2: Preconfirmation Professional Fees and Expenses

| | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| a. | Professional fees & expenses (bankruptcy) incurred by or on behalf of the debtor *Aggregate Total* | | | | | | |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | | | | | | |
| | ii | | | | | | |
| | iii | | | | | | |
| | iv | | | | | | |
| | v | | | | | | |
| | vi | | | | | | |
| | vii | | | | | | |
| | viii | | | | | | |
| | ix | | | | | | |
| | x | | | | | | |
| | xi | | | | | | |
| | xii | | | | | | |
| | xiii | | | | | | |
| | xiv | | | | | | |
| | xv | | | | | | |
| | xvi | | | | | | |
| | xvii | | | | | | |
| | xviii | | | | | | |
| | xix | | | | | | |
| | xx | | | | | | |
| | xxi | | | | | | |
| | xxii | | | | | | |
| | xxiii | | | | | | |
| | xxiv | | | | | | |
| | xxv | | | | | | |
| | xxvi | | | | | | |
| | xxvii | | | | | | |
| | xxviii | | | | | | |
| | xxix | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xxx | | | | | | |
| | xxxi | | | | | | |
| | xxxii | | | | | | |
| | xxxiii | | | | | | |
| | xxxiv | | | | | | |
| | xxxv | | | | | | |
| | xxxvi | | | | | | |
| | xxxvii | | | | | | |
| | xxxviii | | | | | | |
| | xxxix | | | | | | |
| | xl | | | | | | |
| | xli | | | | | | |
| | xlii | | | | | | |
| | xliii | | | | | | |
| | xliv | | | | | | |
| | xlv | | | | | | |
| | xlvi | | | | | | |
| | xlvii | | | | | | |
| | xlviii | | | | | | |
| | xlix | | | | | | |
| | l | | | | | | |
| | li | | | | | | |
| | lii | | | | | | |
| | liii | | | | | | |
| | liv | | | | | | |
| | lv | | | | | | |
| | lvi | | | | | | |
| | lvii | | | | | | |
| | lviii | | | | | | |
| | lix | | | | | | |
| | lx | | | | | | |
| | lxi | | | | | | |
| | lxii | | | | | | |
| | lxiii | | | | | | |
| | lxiv | | | | | | |
| | lxv | | | | | | |
| | lxvi | | | | | | |
| | lxvii | | | | | | |
| | lxviii | | | | | | |
| | lxix | | | | | | |
| | lxx | | | | | | |
| | lxxi | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | lxxii | | | | | | |
| | lxxiii | | | | | | |
| | lxxiv | | | | | | |
| | lxxv | | | | | | |
| | lxxvi | | | | | | |
| | lxxvii | | | | | | |
| | lxxviii | | | | | | |
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |

| | | | | Approved Current | Approved Cumulative | Paid Current Quarter | Paid Cumulative |
|---|---|---|---|---|---|---|---|
| b. | Professional fees & expenses (nonbankruptcy) incurred by or on behalf of the debtor *Aggregate Total* | | | | | | |
| | *Itemized Breakdown by Firm* | | | | | | |
| | | Firm Name | Role | | | | |
| | i | | | | | | |
| | ii | | | | | | |
| | iii | | | | | | |
| | iv | | | | | | |
| | v | | | | | | |
| | vi | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | vii | | | | | | |
| | viii | | | | | | |
| | ix | | | | | | |
| | x | | | | | | |
| | xi | | | | | | |
| | xii | | | | | | |
| | xiii | | | | | | |
| | xiv | | | | | | |
| | xv | | | | | | |
| | xvi | | | | | | |
| | xvii | | | | | | |
| | xviii | | | | | | |
| | xix | | | | | | |
| | xx | | | | | | |
| | xxi | | | | | | |
| | xxii | | | | | | |
| | xxiii | | | | | | |
| | xxiv | | | | | | |
| | xxv | | | | | | |
| | xxvi | | | | | | |
| | xxvii | | | | | | |
| | xxviii | | | | | | |
| | xxix | | | | | | |
| | xxx | | | | | | |
| | xxxi | | | | | | |
| | xxxii | | | | | | |
| | xxxiii | | | | | | |
| | xxxiv | | | | | | |
| | xxxv | | | | | | |
| | xxxvi | | | | | | |
| | xxxvii | | | | | | |
| | xxxviii | | | | | | |
| | xxxix | | | | | | |
| | xl | | | | | | |
| | xli | | | | | | |
| | xlii | | | | | | |
| | xliii | | | | | | |
| | xliv | | | | | | |
| | xlv | | | | | | |
| | xlvi | | | | | | |
| | xlvii | | | | | | |
| | xlviii | | | | | | |

Debtor's Name Highland Capital Management, LP Case No. 19-34054

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xlix | | | | | | |
| | l | | | | | | |
| | li | | | | | | |
| | lii | | | | | | |
| | liii | | | | | | |
| | liv | | | | | | |
| | lv | | | | | | |
| | lvi | | | | | | |
| | lvii | | | | | | |
| | lviii | | | | | | |
| | lix | | | | | | |
| | lx | | | | | | |
| | lxi | | | | | | |
| | lxii | | | | | | |
| | lxiii | | | | | | |
| | lxiv | | | | | | |
| | lxv | | | | | | |
| | lxvi | | | | | | |
| | lxvii | | | | | | |
| | lxviii | | | | | | |
| | lxix | | | | | | |
| | lxx | | | | | | |
| | lxxi | | | | | | |
| | lxxii | | | | | | |
| | lxxiii | | | | | | |
| | lxxiv | | | | | | |
| | lxxv | | | | | | |
| | lxxvi | | | | | | |
| | lxxvii | | | | | | |
| | lxxviii | | | | | | |
| | lxxix | | | | | | |
| | lxxx | | | | | | |
| | lxxxi | | | | | | |
| | lxxxii | | | | | | |
| | lxxxiii | | | | | | |
| | lxxxiv | | | | | | |
| | lxxxv | | | | | | |
| | lxxxvi | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxvii | | | | | | |
| | lxxxix | | | | | | |
| | xc | | | | | | |



009280

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | xci | | | | | | |
| | xcii | | | | | | |
| | xciii | | | | | | |
| | xciv | | | | | | |
| | xcv | | | | | | |
| | xcvi | | | | | | |
| | xcvii | | | | | | |
| | xcviii | | | | | | |
| | xcix | | | | | | |
| | c | | | | | | |
| | ci | | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | | | $0 | | |

**Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan**

| | Total Anticipated Payments Under Plan | Paid Current Quarter | Paid Cumulative | Allowed Claims | % Paid of Allowed Claims |
|---|---|---|---|---|---|
| a. Administrative claims | $0 | $0 | $15,750 | $15,750 | 100% |
| b. Secured claims | $5,843,261 | $0 | $5,274,477 | $5,274,477 | 100% |
| c. Priority claims | $16,498 | $0 | $1,213,832 | $1,213,832 | 100% |
| d. General unsecured claims | $205,144,544 | $0 | $387,308,940 | $397,485,568 | 97% |
| e. Equity interests | $0 | $0 | $19,100,071 | | |

**Part 4: Questionnaire**

a. Is this a final report? Yes ○ No ◉

If yes, give date Final Decree was entered: ________

If no, give date when the application for Final Decree is anticipated: ________

b. Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930? Yes ◉ No ○

**Privacy Act Statement**

28 U.S.C. § 589b authorizes the collection of this information and provision of this information is mandatory. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6) and to otherwise evaluate whether a reorganized chapter 11 debtor is performing as anticipated under a confirmed plan. Disclosure of this information may be to a bankruptcy trustee when the information is needed to perform the trustee's duties, or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case, or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**I declare under penalty of perjury that the foregoing Post-confirmation Report and its attachments, if any, are true and correct and that I have been authorized to sign this report.**

/s/ James Seery
Signature of Responsible Party

James Seery
Printed Name of Responsible Party

Claimant Trustee
Title

04/20/2026
Date

Debtor's Name Highland Capital Management, LP Case No. 19-34054

Page 1

Other Page 1

Page 2 Minus Tables

Bankruptcy Table 1-50

Debtor's Name Highland Capital Management, LP Case No. 19-34054

Bankruptcy Table 51-100

Non-Bankruptcy Table 1-50

Non-Bankruptcy Table 51-100

Part 3, Part 4, Last Page

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| Reorganized Debtor. | ) | |

**GLOBAL NOTES TO POST-CONFIRMATION REPORT**

The Highland Claimant Trust has filed the attached post-confirmation report (the "PCR") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court"), with respect to the case of Reorganized Debtor Highland Capital Management, L.P., Case No. 19-34054 (SGJ) (the "Bankruptcy Case"). The Highland Claimant Trust prepared the PCR with the assistance of the Reorganized Debtor's employees, advisors, and professionals. The PCR was prepared solely for the purpose of complying with the post-confirmation quarterly reporting requirements established by the United States Trustee Program (*see* https://www.justice.gov/ust/chapter-11-operating-reports). The PCR should not be relied upon by any persons for any information in connection with current or future financial conditions or events relating to the Highland Claimant Trust, the Reorganized Debtor or its estate.

The financial information contained in the PCR is preliminary, unaudited, limited in scope, and is not prepared in accordance with accounting principles generally accepted in the United States of America nor in accordance with other applicable non-bankruptcy law. In preparing the PCR, the Highland Claimant Trust relied on financial data from the books and records available to it at the time of such preparation, as well as certain filings on the docket in the Bankruptcy Case. Although the Highland Claimant Trust made commercially reasonable efforts to ensure the accuracy and completeness of the PCR, inadvertent errors or omissions may exist. The Highland Claimant Trust reserves the right to amend and supplement the PCR as may be necessary or appropriate.

**Part 2: Preconfirmation Professional Fees and Expenses**

The Highland Claimant Trust did not make any payment of professional fees prior to Confirmation of the Plan.

[1] The Reorganized Debtor's last four digits of its taxpayer identification number are (8357). The service address for the Reorganized Debtor is 6333 Mockingbird Ln., Ste 147 #5045, Dallas, Texas 75214.

Case 3:26-cv-02496-D Document 17-24 Filed 09/08/26 Page 395 of 662 PageID 10192

**Part 3: Recoveries of the Holders of Claims and Interests under Confirmed Plan**

For presentation purposes, the chart showing claims anticipated under the plan, paid claims and allowed claims are reflected in both the Reorganized Debtor and Claimant Trust post-confirmation report under Part 3: Recoveries of the Holders of Claims and Interests under the Confirmed Plan.

The presentation contained in this PCR does not reflect the material and necessary reserves that will be taken in accordance with the Claimant Trust's governing documents and the Plan.

The General unsecured claims line item (Part 3. d.) encapsulates the claims of Classes 6, 7, 8, and 9 under the Plan.

# EXHIBIT 35

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
| | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Dallas, Texas<br>June 25, 2025<br>9:30 a.m. Docket |
| Reorganized Debtor. | ) | - MOTION TO EXTEND DURATION OF TRUSTS (4213)<br>- MOTION TO APPROVE SETTLEMENT (4216) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Highland Capital Management Claimant Trust: | John A. Morris<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7760 |
| For the Highland Capital Management Claimant Trust: | Hayley R. Winograd<br>Gregory V. Demo<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>1700 Broadway, 36th Floor<br>New York, NY 10019<br>(212) 561-7732 |
| For the Highland Capital Management Claimant Trust: | Jeffrey N. Pomerantz<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>10100 Santa Monica Blvd., 13th Floor<br>Los Angeles, CA 90067<br>(310) 277-6910 |
| For Marc S. Kirschner, Litigation Trustee: | Robert Scott Loigman<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>295 5th Avenue<br>New York, NY 10016<br>(212) 849-7000 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For the Hunter Mountain Entities: | Louis M. Phillips<br>Amelia L. Hurt<br>KELLY HART & PITRE<br>301 Main Street, Suite 1600<br>Baton Rouge, LA 70801<br>(225) 381-9643 |
| For the Dugaboy Investment Trust: | Deborah Rose Deitsch-Perez<br>STINSON, LLP<br>2200 Ross Avenue, Suite 2900<br>Dallas, TX 75201<br>(214) 560-2201 |
| For the Dugaboy Investment Trust: | Michael Justin Lang<br>CRAWFORD WISHNEW & LANG, PLLC<br>1700 Pacific Avenue, Suite 2390<br>Dallas, TX 75201<br>(214) 817-4500 |
| For Crown Global Life Insurance, Ltd. and The Dallas Foundation: | David L. Curry, Jr.<br>OKIN ADAMS, LLP<br>1113 Vine Street, Suite 240<br>Houston, TX 77002<br>(713) 228-4100 |
| For Patrick Daugherty: | Andrew K. York<br>Drake Rayshell<br>Joshua Smeltzer<br>GRAY REED & MCGRAW, LLP<br>1601 Elm Street, Suite 4600<br>Dallas, TX 75201<br>(214) 954-4135 |
| For the U.S. Trustee: | Erin Marie Schmidt<br>OFFICE OF THE UNITED STATES TRUSTEE<br>1100 Commerce Street, Room 976<br>Dallas, TX 75242-1496<br>(214) 767-1075 |
| Recorded by: | Michael F. Edmond, Sr.<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street, 12th Floor<br>Dallas, TX 75242<br>(214) 753-2062 |

Transcribed by: Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

DALLAS, TEXAS - JUNE 25, 2025 - 9:38 A.M.

THE CLERK: All rise. The United States Bankruptcy Court for the Northern District of Texas, Dallas Division, is now in session, the Honorable Stacey Jernigan presiding.

THE COURT: Good morning. Please be seated.

MR. LANG: Good morning, Judge.

THE COURT: All right. We have Highland settings this morning, Case No. 19-34054. We have two motions: a motion to extend the duration of the Plan Trust, and then a motion under Rule 9019 to approve a settlement between the estate entities and Hunter Mountain entities.

All right. So, lots to get to. Let's quickly get appearances from the participating parties in interest this morning.

MR. MORRIS: Good morning, Your Honor. John Morris; Pachulski Stang Ziehl & Jones. I'm joined by my colleagues Jeffery Pomerantz, Gregory Demo, and Hayley Winograd. And we represent the Highland Capital Management Claimant Trust and Highland Capital Management, LP.

THE COURT: Okay. Good morning. Other appearances?

MR. LOIGMAN: Good morning, Your Honor. Robert Loigman from Quinn Emanuel. We represent the Highland Litigation Trustee, Marc Kirschner.

THE COURT: Good morning.

MS. DEITSCH-PEREZ: Good morning, Your Honor. This

is Deborah Deitsch-Perez from Stinson representing the Dugaboy Trust on the motion to extend the duration of the Trust.

THE COURT: Good morning.

MS. DEITSCH-PEREZ: Good morning.

MR. LANG: Michael Lang for Dugaboy Investment Trust on the 9019 motion.

THE COURT: Good morning.

MR. LANG: Good morning.

MR. PHILLIPS: Good morning, Your Honor. Louis M. Phillips and Amelia L. Hurt; Kelly Hart Hallman -- Kelly Hart Pitre, Louisiana trade name, I don't know why -- appearing on behalf of Hunter Mountain Investment Trust and the Hunter Mountain entities in connection with the 9019 motion.

THE COURT: Good morning.

MR. YORK: Good morning, Your Honor. Drew York along with Joshua Smeltzer and Drake Rayshell from Gray Reed on behalf of Patrick Daugherty with regard to the 9019 motion.

THE COURT: Good morning. Ms. Schmidt?

MS. SCHMIDT: Erin Schmidt on behalf of the U.S. Trustee.

THE COURT: Good morning.

MR. CURRY: Good morning, Your Honor. David Curry from Okin Adams on behalf of The Dallas Foundation and Crown Global Life Insurance, Ltd.

THE COURT: Good morning.

All right. Well, let me ask. I'll start with Mr. Morris, given these are your motions. Do you have any agreements about how you're going to proceed? I'm wondering, first off, are we going to have joint presentations, joint evidence on both motions, or are we going to take one at the time?

MR. MORRIS: Good morning, Your Honor. Thank you very much for hearing us yesterday. It's kind of a big day in the case. We have a milestone that we hope will greatly advance the prosecution of this case, and, frankly, what remains to be done to complete the wind-up of Highland.

There are two motions before the Court. The first is the motion to extend the Trusts. That was filed at Docket No. 4213. We're going to address that one first, Your Honor, because we have a resolution and a stipulation. There's only one objecting party. That was the Dugaboy Investment Trust. And early this morning we reached an agreement whereby Dugaboy is going to withdraw its objection, with prejudice, subject to a stipulation that we will file with the Court but that contains the following terms.

THE COURT: Okay.

MR. MORRIS: Number one, Dugaboy agrees to withdraw its objection to the motion, with prejudice.

Number two, the Trusts expect to dissolve by August 11th, 2026, so that no further extension of the duration of the Trusts will be necessary.

THE COURT: Okay.

MR. MORRIS: And number three, Dugaboy hereby preserves and does not waive its right, if any, to object to any further attempts to extend the date by which the Trusts must be dissolved or to extend the duration of the Trusts.

THE COURT: Wait. I don't understand that third one. Could you repeat it?

MR. MORRIS: It's a reservation of rights.

THE COURT: Okay.

MR. MORRIS: And so Dugaboy preserves and does not waive its right, if any, to object --

THE COURT: Well, okay. I'm sorry. Maybe I zoned out or heard something different.

MR. MORRIS: Uh-huh.

THE COURT: I thought number two of the agreement was August 11th, 2026 would be it; there would be no further extensions.

MR. MORRIS: It's a statement of expectation. It's not a representation. It's not a warranty. We do not believe today, based on the facts and circumstances that we know of, that a further extension will be necessary, but we're not waiving the right to seek it if circumstances change or something unforeseen happens. And all Dugaboy is saying is that, okay, we reserve the right, if any, to object.

THE COURT: Okay.

MR. MORRIS: It's that simple.

THE COURT: Okay. It's sort of confusing, right?

MR. MORRIS: Yeah.

THE COURT: Okay.

MR. MORRIS: Perhaps. If you have any questions, let me try and clarify.

THE COURT: Well, I guess I'll just start with Ms. Deitsch-Perez. Would you come to the podium? We've got I don't know who on the camera, but we want to make sure everyone hears.

MS. DEITSCH-PEREZ: Okay. I'll take a stab at --

THE COURT: Do you confirm what you heard and do you have any clarification of Points 2 and 3?

MS. DEITSCH-PEREZ: Maybe I can make it clear. I confirm that is the stipulation that we agreed upon, and I think all that was intended is the Trusts and the Debtor are saying they expect to be done by August 11, 2026, so that they will not need to make this motion again, but they could not and would not promise that they will be done by then. So Dugaboy is withdrawing the objection to this particular extension but is not waiving the right to object to a further request for an extension. And that's the sum of it. Does that make sense to Your Honor?

THE COURT: It does.

MS. DEITSCH-PEREZ: Okay.

THE COURT: I'm hoping it'll be over by August 11th, 2026, and we'll see where we are at that time.

Well, one of my reasons for a slight bit of confusion is, in reading the 9019 settlement that is before the Court, I saw that there were some future installments payments, if you will, to HMIT, I think up through 2029, maybe.

MR. MORRIS: Sure.

THE COURT: So I was --

MR. MORRIS: So let me clarify.

THE COURT: Okay.

MR. MORRIS: The only thing that we said that we expect to happen as of, you know, by August 11th, 2026 is that the Trusts will be dissolved. But that is not the end of their life. It is a process. Once you file for dissolution, then you have to complete the wind-down. And completing the wind-down will require the completion of all litigation. It will -- right?

All we're talking about is dissolving the Highland Claimant Trust and the Highland Litigation Subtrust so that what remains after that is the Indemnity Trust. And the Indemnity Trust will be fully funded and will be prepared to go forward. And if we ever get to a point when there's no further litigation, the corpus of that will be distributed to whatever stakeholders are entitled to it at that time.

But when we talk about being done by next year, it doesn't

mean the case will be over. It simply means that the Claimant Trust and the Highland Litigation Subtrust will be dissolved. But they still have to complete the wind-up.

THE COURT: Okay. Gotcha.

MS. DEITSCH-PEREZ: And Dugaboy is reserving its rights to object to -- if something is happening that seems improper or untoward or they're seeking additional relief, obviously, we're not waiving the unknown now.

THE COURT: Okay. Gotcha. All right. Well, I appreciate the resolution of these issues. I assume no other party in interest is going to weigh in since we only had a Dugaboy objection.

MR. MORRIS: That was the only objection we had. I'm prepared to, if Your Honor thinks it's necessary or appropriate, or both, to make a very short proffer. A proffer.

THE COURT: Okay. I'll accept that proffer at this time.

MR. MORRIS: Okay. So, Your Honor, we filed on the docket at No. 4253 Exhibits 1 through 65, and we supplemented our exhibit list at Docket No. 4271 with two additional documents, which are Exhibits 66 and 67. We don't believe there's any objection to any of those documents, and we would respectfully move for their admission into evidence.

THE COURT: All right. Could you repeat the numbers

once again?

MR. MORRIS: Yes, Your Honor. So, for the motion for an order further extending the duration of the Trusts, we have two docket entries that contain Highland's exhibits. The first is Docket No. 4253, and that has Exhibits 1 through 65.

THE COURT: Okay.

MR. MORRIS: And then we supplemented at 4271 with Docket -- with Exhibit Numbers 66 and 67.

THE COURT: All right. I presume there's no objection to these exhibits.

All right. They are admitted.

(Claimant Trust's Exhibits 1 through 67 are admitted into evidence.)

JAMES P. SEERY, JR., PROFFER OF TESTIMONY

MR. MORRIS: Okay. So, Your Honor, if called to testify, James P. Seery, Jr., the Claimant Trustee of the Highland Claimant Trust, would testify as follows.

At Exhibits 63 and 64, Highland filed excerpts of the Litigation Trust and the Litigation Subtrust -- the Claimant Trust and the Litigation Subtrust, and each of those excerpts contain Section 9.1, respectively. That's the section of the Trusts that deal with the extensions that may be necessary from to the original three-year term. And Mr. Seery would testify that he's familiar with those provisions and that he understands the requirements of those provisions include,

among other things, the requirement that all objections to claims and equity interests have been resolved and that all assets that the Trustee believes might yield sufficient value to the estate have been sold.

Mr. Seery would also testify that the Highland estate has a number of assets in its possession today, certain of which will be conveyed to Hunter Mountain if the 9019 motion is approved.

Among those assets, Mr. Seery would testify that, in accordance with the proposed settlement agreement, which is at Exhibit 17, in Paragraph 5(b), the Court will see reference to what's known as the Dugaboy Note. The Dugaboy Note is an asset of the estate that will go to Hunter Mountain if the 9019 motion is approved. If it's not approved, then Mr. Seery would testify that he's got to find another way to dispose of it. But it is an asset with a face amount today of about $17 million, so it has substantial value.

There is a note from Hunter Mountain. That also will be disposed of as set forth in Paragraph 4(a) of the proposed settlement agreement. That note is going to be used to reduce the allowed amount of Hunter Mountain's Class 10 claim if the settlement is approved. But that note is also an asset of the estate. It's worth over $60 million. I believe it actually might be in the fifties. But somewhere in the $50 to $60 million range. And that's an asset that needs to be disposed

of.

The estate has a contingent right to receive certain funds under its settlement with Mr. Okada, and it has the Kirschner Litigation. All of these assets will be disposed of. They're very illiquid assets, I'd call them, and it would be very helpful to the estate in moving this case forward if the 9019 motion is approved.

There are other assets that the estate has that will not be monetized by August 11th and which therefore require the extension of the Trusts. Mr. Seery would testify, if called to the stand, that the pursuit of the sale of these assets will yield proceeds that justified the continued pursuit of their monetization. They include interests in Highland CLO Funding, Ltd. Documents pertaining to that can be found at Exhibits 21 and 25.

The Claimant Trust also owns shares in Highland Capital Management Korea, Ltd. Documents relating to that asset can be found at Exhibits 18 through 20. That's an asset that, if Mr. Seery were to testify, he would say that he has been actively engaged in trying to liquidate that asset, but it's not going to be completed by August 11th.

There's also a note that is due from Highland Capital Management Korea, Ltd. That can be found at Exhibit 67. That's another asset that Mr. Seery has concluded and would testify to that he thinks is valuable for the estate but will

not be monetized by the end of this extension period.

And then there's the bad faith award that the estate obtained against HCRE, which remains on appeal. The appeal of that order can be found at Exhibit 15. And there's no further cost, really, to waiting for the Court's decision, but that is an asset of the estate that remains to be monetized.

So there's two buckets of assets, one of which, hopefully, if the 9019 motion is approved, will go to HMIT and that will be helpful. But there's another bucket of assets that are not implicated by the HMIT settlement that will not be monetized before August 11th that Mr. Seery would testify we need a little bit more time and that's why we're going to extend the Trusts.

Mr. Seery would also testify, finally, that there are claims and equity interests that remain unresolved. They include Mr. Daugherty's Class 8 claim. As Your Honor is probably aware at this point, Highland has objected to that claim. It seeks to disallow, subordinate, that particular claim. Otherwise, have it monetized for purposes of winding up the estate.

Mr. Daugherty has moved to dismiss that complaint. That's his right. But our scheduling order already takes us past August 11th.

And then, finally, we've got Dugaboy's Class 11 interest, which has not yet been allowed. If the 9019 motion is

approved today, we do expect to move quickly to get to that point so that we can finish that up. But we don't foresee that being completed before August 11th, either.

So, in sum, Mr. Seery would testify that, from his perspective, the estate still has assets that are valuable to the estate that will not be monetized by August 11th, and there are still one claim and one equity interest that need to be resolved in order to satisfy the test, you know, to get to the dissolution.

So that would be the sum total of his testimony. That's the completion of the proffer. And unless Your Honor has any objections, we're prepared to move to the next motion.

THE COURT: I have a couple of questions.

MR. MORRIS: Sure.

THE COURT: But first I'm going to go ahead and swear in Mr. Seery --

MR. MORRIS: Great.

THE COURT: -- to affirm this, as well as swear him in for what I'm sure will be future testimony today.

MR. MORRIS: Sure.

MR. SEERY: Would you like me to come --

THE COURT: Well, you can just stand in place. Just make sure we hear you.

(The witness is sworn as to both his proffer and future testimony.)

THE COURT: Okay. Thank you.

All right. My question is probably for you.

THE WITNESS: Uh-huh.

THE COURT: Just confirm my understanding. We have one claim and one --

MR. MORRIS: Equity interest.

THE COURT: -- equity interest to resolve? Mr. Daugherty's Class 8 claim and the Dugaboy what would be Class 11 interest?

MR. MORRIS: That is correct.

THE COURT: Did I hear that correctly, Mr. Seery?

THE WITNESS: That's correct, Your Honor.

THE COURT: Okay. Thank you.

And then my other question is, once again, a clarification. I pulled out of your attachments to your motion to extend the Exhibit B, Unresolved Pending Litigation.

MR. MORRIS: Uh-huh.

THE COURT: And at the time this was filed, May 8th, 2025, it showed nine pending matters at all court levels. And I think two of them now are finished. I'm sorry. This is a long question. But maybe I'm wrong. The first two matters, the recusal matter that was at the Fifth Circuit, as well as the gatekeeper appeal, which I know a motion to stay the mandate was at the Supreme Court, both of those are finished now? Done?

MR. MORRIS: Yes, Your Honor.

THE COURT: Okay. So the nine pending matters is now down to seven. And if the Court were to approve the 9019 today, I understand that, well, it looks like, at a minimum, two more would go away?

MR. MORRIS: Precisely.

THE COURT: We have an appeal at the District Court, what we call the Claims Trading Appeal, where Highland had sued -- I'm sorry, Hunter Mountain had sued Highland and others regarding the claims trading issue, I'll call it. So that would go away?

MR. MORRIS: Yes, Your Honor.

THE COURT: And then let me see what else. I've marked all over my chart.

MR. MORRIS: And then I believe Hunter Mountain's motion for leave to file a complaint in the Delaware Chancery Court --

THE COURT: Ah.

MR. MORRIS: -- to remove Mr. Seery will also be dismissed with prejudice --

THE COURT: Okay.

MR. MORRIS: -- if the 9019 motion is approved.

THE COURT: Okay. So, that, yes, Hunter Mountain v. Seery, the Court issued a stay on that being able to go forward in Delaware.

MR. MORRIS: Precisely.

THE COURT: So that would go away.

So, of the nine matters listed, we're down to five. But I'll hear, I guess, about this later with Mr. Seery, the big what I would call Kirschner adversary against lots of defendants which has been abated for a long, long time now. Hunter Mountain would basically receive that lawsuit with those claims? The claims against it go away? And I don't know what we'll hear, I don't know what Hunter Mountain will do with that big adversary, but maybe it doesn't know yet. I don't know.

MR. MORRIS: Yeah.

THE COURT: So, --

MR. MORRIS: Not a question we've concerned ourselves with, Your Honor.

THE COURT: Okay. So that, again, I'm kind of recapping everything.

(Counsel confer.)

MR. MORRIS: Go ahead, Your Honor.

THE COURT: So, again, I'm looking at the chart. If anyone wants to know what I'm looking at, it's at Docket No. 4213-2, filed May 8th. We're down to the HCRE --

MR. MORRIS: Appeal.

THE COURT: -- appeal.

MR. MORRIS: Uh-huh. Which is fully briefed and

we're just waiting for a decision.

THE COURT: Okay. So that bad faith decision may or may not stick, but it's hanging there on appeal.

MR. MORRIS: Uh-huh.

THE COURT: We're down to a Dugaboy -- what we called the Imaging Motion. Or no?

MR. MORRIS: Correct. I guess that's been stayed, but that's out there.

THE COURT: We have the valuation motion of Dugaboy, but I don't know, is it going to be moot after today? I don't know what I'm going to hear today as far as the evidence.

MR. MORRIS: So, that has -- great question -- two plaintiffs in that lawsuit, HMIT and Dugaboy.

THE COURT: Oh, that's right. So --

MR. MORRIS: HMIT is going to dismiss it with prejudice. Dugaboy will still have an active complaint.

THE COURT: Appeal.

MR. MORRIS: My hope is that --

THE COURT: It's an appeal of --

MR. MORRIS: Yes.

THE COURT: Okay.

MR. MORRIS: My hope is that, because we produced so much valuation information to HMIT, which we then had to make available to Dugaboy because that's the way discovery works, that they'll withdraw that complaint.

THE COURT: Okay.

MR. MORRIS: I'm going to make that plea right on the record here, because they've now gotten everything they've asked for. But that's their decision to make, and it's out there. But HMIT is withdrawing itself as a party to that lawsuit, but it does remain in Dugaboy's lap.

THE COURT: Okay. So those potentially three things?

MR. MORRIS: Yeah.

THE COURT: Plus the Daugherty matter?

MR. MORRIS: Yeah.

THE COURT: Okay. Mr. Seery, did I miss something?

THE WITNESS: One clarification, Your Honor. My apologies. One clarification. In the Class 11 subordinated interests, there's a Dugaboy capital account of $740,000. There's also the Strand capital account -- both of these are controlled by Mr. Dondero -- of $994,000. And then Mr. Okada and his affiliates have a combined capital account of $248,000. So we'll -- I said just Dugaboy, but it's actually Dugaboy, Strand, and then Okada and two family trusts of his.

THE COURT: Okay.

MR. MORRIS: And if the 9019 motion is granted, --

THE WITNESS: It's in the footnote. It's in the footnote in the motion.

THE COURT: Yes. I actually had that in my notes.

MR. MORRIS: Yeah.

THE COURT: So I glossed over Class 11 just being Dugaboy. There are Strand and Okada.

All right. So I appreciate that clarification. We're down hopefully to very little litigation. But we have no control over higher courts, when they have time to look at it.

MR. MORRIS: Or future litigation, now that the gatekeeper has been curtailed.

THE COURT: Okay. All right.

Anyone wish to say anything about this motion to extend?

All right. Well, based on the pleadings, the argument, the evidence, I do think it is necessary and appropriate and reasonable to extend the duration of the Highland Trusts through August 11th, 2026. The relief is something that is contemplated as a possibility under the trust documents. Moreover, I think the Court has some authority under Bankruptcy Rule 9006(b) and Bankruptcy Code Section 105 to grant this relief.

The evidence shows there are unliquidated assets and some unfinished litigation that must be resolved before the Trust is in a position to wind down. So, again, I think it's necessary, prudent, and in the best interest. The motion is granted, and the Court duly acknowledges the comments with regard to the stipulation of Dugaboy and the estate. All right.

MR. MORRIS: Thank you very much. So, may I move to

the 9019 motion?

THE COURT: You may.

MR. MORRIS: Okay. With respect to the 9019 motion, there were originally three Objecting Parties: the Dugaboy Investment Trust, Patrick Daugherty, and The Dallas Foundation and an entity called Crown Global.

I'm pleased to report, and I think Your Honor may already be aware, that a settlement has been reached to dispose of The Dallas Foundation and the Crown Global objection. There is a written agreement to that effect that effectuates that. And I'd like to just turn the podium over to Mr. Phillips. Louis Phillips represents the HMIT Entities. I know Mr. Curry is here on behalf of the objecting parties, The Dallas Foundation, but I think -- I think I'll let Mr. Phillips address, you know, the specific terms of the resolution of that objection.

THE COURT: All right. Thank you. And I will say that my staff reached out yesterday to -- I don't know if it was Mr. Curry or someone in your office -- wanting to know have you delivered exhibit notebooks. And it was at that point my staff heard, well, we've resolved.

MR. CURRY: We had just finished.

THE COURT: Okay. All right. So I'm happy to hear what the resolution is.

MR. PHILLIPS: Good morning, Your Honor. Louis M.

Phillips on behalf of the Hunter Mountain Investment Trust and the named parties therein.

We had a written stipulation that has been signed by my firm, by Mr. Curry's firm, by the Pachulski firm, and by the Quinn Emanuel firm that is to be submitted to the -- is to be filed on the record. It also contains a reference to a settlement agreement that will be attached. But we will read the stipulation into the record, if Your Honor would allow me to.

THE COURT: All right. You may.

MR. PHILLIPS: And Mr. Curry is here, and he can tell me whether or not I have read correctly, but I think I have it.

THE COURT: Okay. All right.

MR. PHILLIPS: (reading) Now, wherefore, it is jointly -- hereby jointly stipulated and agreed as follows. The Foundation Parties -- Mr. Curry's clients -- withdraw The Foundation Objection, which is a defined term in the stipulation, with prejudice, in accordance with the terms of the term sheet annexed hereto as Attachment 1. And Attachment 1 will be attached to the stipulation.

Paragraph 2. The Foundation Parties, the HMIT Entities -- that's Hunter Mountain Entities and the Movants; that is, Mr. Morris' client and Quinn Emanuel on behalf of the Litigation Subtrust -- agree that the following language shall be

contained in the proposed order on the 9019 motion. And that's clearly the proposed order. This is not dependent upon the motion being granted. Notwithstanding anything in the settlement agreement or the 9019 order to the contrary, none of The Dallas Foundation, EDF, Okada Family, or Crown (The Foundation Parties) are or will be included in the definition of HMIT Releasors or Highland Releasors. For the avoidance of doubt, however, any attempt by The Foundation Parties to assert a claim against an HMIT released party by, through, or under, including derivatively a Highland entity, or against a Highland released party by, through, or under, including derivatively an HMIT entity, is barred by this order and the settlement agreement.

That is the sum and substance of the stipulation. The settlement agreement we don't think needs to be read to the Court because it's a signed settlement agreement that will be attached as Attachment 1 to the stipulation. And I believe I read it correctly.

THE COURT: Mr. Curry, did he read it correctly?

MR. CURRY: Mr. Phillips did read it correctly, Your Honor. And thank you.

And we want to thank Trustee's counsel and Mr. Phillips for working with us to address some very real concerns. And through the stipulation, we still have some work to do, but we have the time to do it, and maybe move it to where we can

actually get it resolved.

THE COURT: Okay. Well, there are some things I am concerned -- well, I should say, all I really feel the need to go into is you're releasing your objection, your clients are, and all of the parties here, parties to the proposed settlement and the estates, the Debtors, Hunter Mountain, are agreeing that your clients are not releasors under the 9019 settlement if the Court approves it.

MR. CURRY: Correct, Your Honor. Unless and except our clients were to attempt to assert a released claim against a released party, and that's what the "provided, however" was to clarify.

MR. PHILLIPS: And this doesn't affect the estate at all. It basically affects the HMI -- the Hunter Mountain entities. But the language that we have read in the stipulation has been agreed to and is contained within the order that will be proposed.

THE COURT: Okay. You said it better than I said it. The estate is releasing claims --

MR. PHILLIPS: I can't believe that, Your Honor, but thank you.

THE COURT: Well, the estate is releasing claims that it has --

MR. PHILLIPS: Correct.

THE COURT: -- or in Trusts have -- I shouldn't have

said the estate. It's the Trust entities and what's left of the Reorganized Debtors are releasing any claims they have against Hunter Mountain in the proposed settlement --

MR. PHILIPS: Yes.

THE COURT: -- if it's approved. But any direct claims of your clients are not --

MR. CURRY: Well, direct claims that our client has or derivative claims, for example, against Hunter Mountain that are derivative through Hunter Mountain.

THE COURT: Okay. All right.

MR. PHILLIPS: Yeah.

MR. CURRY: Yeah. That was the -- what we were trying to make sure.

THE COURT: Yes. All right. Well, and when I said this is all I care about, what I mean is I don't even know who the heck Crown Insurance is.

MR. PHILLIPS: Correct.

THE COURT: There was a very interesting party in interest objection asserted by the Debtor. And I've learned a lot about a lot of entities during all these years, but that was a new one on me. I understood that it's somewhere in the framework of the --

MR. PHILLIPS: Yes, Your Honor.

THE COURT: -- Charitable DAF.

MR. PHILLIPS: Let's say it's somewhere in the

universe, Your Honor.

THE COURT: The universe? Okay.

MR. PHILLIPS: The universe. Not necessarily the Charitable DAF or Hunter Mountain.

THE COURT: Okay.

MR. PHILLIPS: But in the universe.

THE COURT: Well, but the point is, we've announced anything relevant to --

MR. PHILLIPS: Correct.

THE COURT: -- the Reorganized Debtor, --

MR. PHILLIPS: Correct.

THE COURT: -- Claimant Trust, Subtrust.

MR. PHILLIPS: And the motion -- and the objections of all these entities are withdrawn with prejudice.

THE COURT: All right.

MR. CURRY: And Your Honor, the one thing that I will note, part of our agreement, and it's in the signed term sheet that you'll see, is that we've agreed that if there's a dispute over the settlement to withdraw our objection, this Court will have at least concurrent jurisdiction to resolve that dispute, because it is a settlement to resolve an objection to a core proceeding.

THE COURT: Okay. Thank you.

MR. PHILLIPS: And we have agreed and we do agree that the Court has jurisdiction. It has jurisdiction.

THE COURT: Okay. For what that is worth.

MR. PHILLIPS: Well, that's what we can agree to.

THE COURT: All right. I appreciate that.

Anyone wish to say anything about what's been announced?

All right. Well, I accept this resolution and withdrawal of --

MR. PHILLIPS: Okay. We will be filing --

THE COURT: -- the objection.

MR. PHILLIPS: We will be filing, at the close of this hearing, this stipulation, and we will be clicking whatever ECF box request that the Court so ordered on the stipulation.

THE COURT: Okay. We will be on the lookout for that.

All right. Well, Mr. Lang, you stood up on behalf of Dugaboy.

MR. LANG: I just want to make the Court aware of a letter that was sent last night that involves this from the Caymans, from Grant Thornton.

MR. PHILLIPS: We object.

MR. LANG: I just want to make the Court -- they were asking for a 45-day that the Joint Liquidators --

MR. PHILLIPS: We object to this, Your Honor. That's not a part of the record. This is a person from outer space. Not outer space, but the Cayman Islands. And it's a letter

that we --

THE COURT: Coming from someone --

MR. PHILLIPS: It looks like a letter --

THE COURT: -- who is called Yosemite Sam, I understand, outside of court.

MR. PHILLIPS: Yeah. Yeah. I didn't want to bring that up, but Mr. Morris --

THE COURT: Okay. Well, it's stuck in my brain forever now.

MR. PHILLIPS: -- says it's his favorite cartoon character, so it must be okay.

THE COURT: Okay. Well, okay, I don't want to make light. I think this goes back to what I was saying about there are certain things I care about and certain things I don't care about. And I read from the pleadings, I haven't heard evidence but I've read from the pleadings that there is a lot going on in the Cayman Islands with regard to what I call the Charitable DAF structure or Hunter Mountain.

MR. LANG: Yes.

THE COURT: Parties in that universe. And I don't plan to exercise any control or jurisdiction over that, so I'm hesitant to hear what it is you want to present. I don't know, maybe on cross-examination of Mark Patrick today it may or may not be relevant. But what is it --

MR. LANG: All they ask for is a 45-day basically

abeyance or continuance of the decision on the 9019, to allow them to investigate and weigh in on it.

MR. PHILLIPS: Your Honor?

MR. LANG: They're Joint Liquidators. That's -- I'm just making the Court aware of the request.

THE COURT: Okay. Well, they're not here to articulate that. So I respect your wanting to be transparent and whatnot, but I'm not going to let it stop me from going forward today. Okay.

MR. LANG: Thank you.

THE COURT: Thank you.

MR. PHILLIPS: Your Honor, if I may be excused, that's our position with respect to the withdrawal. We appreciate Your Honor's attention. Thank you.

THE COURT: Okay. Thank you.

MR. CURRY: Thank you, Your Honor.

THE COURT: Anyone else wish to weigh in?

All right. Well, I do, as I was saying, accept the withdrawal of The Dallas Foundation and related entities' objection to the 9019 settlement.

So does that leave only the Daugherty objection to the settlement? Well, and the Dugaboy.

MR. MORRIS: And the Dugaboy, yes.

THE COURT: And Dugaboy, of course.

MR. MORRIS: That's right.

THE COURT: Okay.

MR. MORRIS: So, --

THE COURT: So how did you want to proceed?

MR. MORRIS: So, the way I propose to proceed, Your Honor, I have an opening statement to make --

THE COURT: Okay.

MR. MORRIS: -- with a PowerPoint presentation to present. I would propose that, as the Movant, I go first. Then we can hear from Dugaboy, we can hear from Mr. Daugherty, and then we can put Mr. Seery on the stand.

Assuming that there is no challenge to Mark Patrick's authority to enter into the settlement agreement on behalf of all of the HMIT entities, I would not plan on calling either Mr. Dondero or Ms. Deitsch-Perez, who are under subpoena here, because the challenge to authority was really coming from The Dallas Foundation. Their objection has now been withdrawn. So as long as Mr. Daugherty -- well, really, as long as Dugaboy doesn't challenge Mr. Patrick's authority to enter into the settlement agreement on behalf of the HMIT entities, I think we'll just put on the one witness and be done.

THE COURT: All right. Just so we know what lies ahead, --

MR. MORRIS: Uh-huh.

THE COURT: -- I don't think that Dugaboy objected to Mr. Patrick's authority. I do recall it was just The

Foundation.

MR. LANG: There was no objection on the -- there was no objection.

THE COURT: Okay. And same with Mr. Daugherty? No objection about the authority of Mark Patrick to enter into the settlement?

MR. YORK: There was no objection.

THE COURT: All right.

MR. MORRIS: All right. May I proceed?

THE COURT: You may proceed.

MR. MORRIS: Okay. So, may I approach, Your Honor? I've got a --

THE COURT: You may. Is this a PowerPoint? And everyone else has it, correct?

(Pause.)

THE COURT: You may proceed.

MR. MORRIS: Thank you, Your Honor. John Morris; Pachulski Stang Ziehl & Jones; for Highland Capital Management, LP and the Highland Claimant Trust.

Before I begin, Your Honor, I'd like to move my exhibits into evidence because I will be referring to them in my opening.

THE COURT: All right. So I think I said on Monday the first thing I was going to ask, and I've already blown that, was did you all have good faith discussions regarding

admission of each other's exhibits? And I did see Mr. Lang filed a day or two ago his list of objections. It looked like you were like you were down to about nine or eleven exhibits you were objecting to.

(Counsel confer.)

THE COURT: Out of 123 designations, which I think probably grew overnight to --

MR. MORRIS: Oh, okay. Well, --

MR. LANG: I just have to make clear for the record.

MR. MORRIS: You go ahead and do that.

MR. LANG: Your Honor, I've been told that Dugaboy does challenge the authority. It is not in our objection.

MR. PHILLIPS: It's not in his --

THE COURT: Well, can I ask why it was not in your objection?

MR. LANG: I do not know. I was not counsel of record when the objection was filed. I do not know what was known or not known at that time.

THE COURT: So, --

MR. LANG: So I guess we just seek leave to --

THE COURT: -- if you did not have him on -- was Mark Patrick on your exhibit list? I don't think he was, right?

MR. LANG: He was not.

THE COURT: Okay. So how would you address that? Again, we've had, I know, some back and forth over who was

going to represent Dugaboy on this matter.

MR. LANG: Yes.

THE COURT: I remember the substitutions and whatnot. But --

MR. LANG: We found out late last night that The Foundation was resolving their issue, and that kind of left us in a position.

THE COURT: So what are you saying? You all were relying on --

MR. LANG: Well, the issue had --

THE COURT: -- The Foundation to carry the flag on this one?

MR. LANG: They had raised the issue. They were pursuing the issue. We went through discovery and they were pursuing it. It was already in front of the Court.

THE COURT: All right. What would you like to say, Mr. Morris?

MR. MORRIS: Your Honor, this is more than disappointing. The fact of the matter is Mr. Dondero is funding both the Cayman Islands litigation as well as The Dallas Foundation's prosecution of the objection. The fact that The Dallas Foundation settled doesn't open the door to Mr. Dondero to assert objections that he's never asserted before.

I will tell you what will happen. If Your Honor allows

this, I will have to call Mr. Dondero and Ms. Deitsch-Perez to the stand to offer evidence under subpoena that they personally acknowledge and understand, because Mr. Dondero's signature is on documents that were signed in the year 2025, that Mr. Patrick is authorized to represent HMIT. I really didn't want to do that. But if they want to pursue it, I'll have to do my job.

THE COURT: All right.

MR. LANG: And I want to clarify one thing.

THE COURT: Uh-huh.

MR. LANG: And it goes back to something we already discussed, which is the authority issue is derived from the Cayman Island Joint Liquidators' appointment on May 6th, 2020. And so how that changes the authority, it's -- I think the issue is does he have authority, like Mr. Morris --

THE COURT: All right. Well, before I comment, Mr. Phillips, it's your client representative that we're talking about here. What do you say?

MR. PHILLIPS: Very disappointing, but -- and further revealing the limits of my imagination. There is no objection to authority. There's no evidence of record of objection to authority. There's no evidence even in The Dallas Foundation's papers about authority. Dugaboy did not raise objections to authority. Daugherty did not raise objections to authority. And Mr. Morris was willing to release Ms.

Deitsch-Perez and Mr. Dondero from subpoena in connection with an order that this Court entered that Hunter Mountain objected to. And outside the Court, the evidence will establish, the evidence submitted by Mr. Morris will establish that Hunter Mountain, through authority of Mr. Patrick, objected to Ms. Deitsch-Perez signing on behalf of Hunter Mountain because she did not seek approval and did not have authorization to sign a stipulation before this Court.

Subsequently, after signing the stipulation and entry of the order, we suggested that we would not deal with Ms. Deitsch-Perez, we would only deal with unconflicted counsel, and we dealt with unconflicted counsel to make an agreement with HCLOM and another of Mr. Dondero's entities to avoid filing a motion for reconsideration before this Court based on the fact that, as we have suggested in the motion that we didn't file, Hunter Mountain's approval was not real.

So Mr. Morris has these people under subpoena because we signed an agreement that Mr. Dondero signed to avoid the filing of a motion for reconsideration before this Court, recognizing that Mr. Patrick had authority for Hunter Mountain to sign the agreement. And so that's the purpose of his subpoena.

But our position is there's no suggestion in pleadings by Dugaboy or Daugherty that challenge the authority of Mr. Patrick to execute on behalf of any of the Hunter Mountain

entities. And the one party who, without suggesting an evidentiary basis, but that's fine, they say maybe they did have an evidentiary -- we -- and they withdrew their objection.

THE COURT: Okay. Let me --

MR. MORRIS: Okay. I'm sorry. Just really --

THE COURT: Thirty second.

MR. MORRIS: Really quickly.

THE COURT: Uh-huh.

MR. MORRIS: The letter that Mr. Lang just referred to from the Joint Official Liquidators, addressed to us, asking for an extension of time, doesn't even challenge Mr. Patrick's authority to act today on behalf of the HMIT entities to enter into the settlement agreement. The Joint Official Liquidators wrote to us last night, and they don't say what Mr. Lang is now saying.

MR. PHILLIPS: And the only thing I would say is we got a letter by email from somebody who says, I am who I am. It came through email PDF. We don't challenge the authority. But we would respectfully request -- we're not there. We've made no appearance. We don't challenge the authority. But please wait -- ask the Court to wait the 45 minutes -- 45 days for us. We got a letter. PDF. We don't know who sent it.

THE COURT: Okay.

MR. PHILLIPS: It wouldn't be admissible even if

someone tried to introduce it as evidence.

THE COURT: Okay. Let me just say a few things here. This has felt like a very strange sideshow, I'm going to say. When I read The Foundation's objection, I was, again, scratching my head, who in the heck is Crown Insurance? I know who Dallas Foundation is because there have been charts submitted to me in the past, and I know it's part of the I'm going to say Mr. Phillips' client set over the months, the Charitable Foundation structure. But I'm like, how in the heck do these people have standing? Okay? I have to always consider standing. That's every trial judge's first obligation, does this party have standing? Not a creditor. Not an equity holder. But somehow I guess they're going to explain through evidence how they're a person aggrieved by the proposed settlement.

So that's why I kind of -- hopefully, it doesn't sound flippant -- thought this sounded like a sideshow, because this is a stranger, really, to weigh in.

Okay. So now I'm hearing that a party in interest, which Dugaboy is -- I guess some might argue that, but I think they're affected by the settlement, so that makes them a party in interest -- you're making the same argument. And it's because of a rotation of counsel you didn't make it sooner.

Okay. So I'm just trying to be transparent here, tell you what the Court is thinking. I guess what the Court is

thinking is Mark Patrick is the client representative, so I'm told by the Movants on the 9019, and you, Mr. Phillips, he's the party representative for Hunter Mountain.

MR. PHILLIPS: Yes, Your Honor.

THE COURT: I don't, I guess, know what harm there is, except a longer hearing, in, okay, put him on the stand to testify about the bona fides of the settlement. It's more evidence. But if you all want to call Mr. Dondero, I'm going to require that.

MR. MORRIS: Your Honor?

THE COURT: I mean, as a counterbalance, since it's appearing from the pleadings to be --

MR. MORRIS: Your Honor, respectfully, Mr. Patrick is not on their witness list. He's not on our witness list.

THE COURT: Wasn't he on somebody's witness list?

MR. MORRIS: He was on The Dallas Foundation's witness list.

THE COURT: Oh.

MR. MORRIS: He's not on their witness list. He's not on our witness list. He should not testify today because they're raising an issue that they didn't raise ever before. This is improper. They should just be shut down here.

THE COURT: I think probably you should be shut down. But I kind of go back and forth, what's the harm in having the representative, the person I'm told is the representative of

Highland?

MR. PHILLIPS: Your Honor?

THE COURT: I could limit it to one hour. And the flip side is that Dondero himself, as I guess the representative of Dugaboy, would have to also take the stand, limited to one hour.

MR. PHILLIPS: I'd like to make one note, Your Honor, about the documents that Mr. Morris has introduced. That document list -- and I don't have the numbers in front of me -- but part of the presentation and the reason Mr. Patrick is not on the Movants' motion -- witness and exhibit list, the documents that have been introduced are all of -- include all of the documents evidencing Mr. Patrick's authority as the control person of the entire Hunter Mountain group.

THE COURT: Which they've stipulated.

MR. PHILLIPS: Which they've stipulated to.

THE COURT: Uh-huh.

MR. MORRIS: And to be clear, Your Honor, they can be found at Exhibits 70 through 104. We've got 34 documents in evidence that establish that Mr. Patrick is authorized to act on behalf of each of the HMIT entities. All that's going to happen is we're now going to spend time dealing with an issue that you already described as a sideshow, and we're going to do it for a party who didn't put Mr. Patrick on a witness list, who hasn't objected on this basis, and we've got a

mountain of evidence that shows that he's completely authorized to do this. I just --

MR. PHILLIPS: To which there's no objection.

MR. MORRIS: And you can also look, Your Honor, at Exhibit 69. That's the agreement that Mr. Dondero signed with Mr. Patrick after he got outed for authorizing Ms. Deitsch-Perez to sign a document on behalf of HMIT without Mark Patrick's knowledge or approval. He signed that. Six months ago. And we're going to have a trial here over whether Mark Patrick is authorized to act on behalf of HMIT?

A VOICE: That was long ago.

MR. MORRIS: This is not -- this is not --

THE COURT: We're not going to have a trial. And I fully acknowledge that I am possibly abusing discretion by allowing this. We have our rules, and our rules were not complied with, and it does feel a little bit like ambush. Okay?

But on the flip side of it, it doesn't seem entirely unreasonable to have the representative, the purported representative of Hunter Mountain, who is the counterparty, if you will, to this very major settlement, take the stand. And I'll limit it. And, again, I condition it on Mr. Dondero, the ultimate beneficiary of the Dugaboy Trust, as it's been represented to me in prior filings, --

MR. MORRIS: Correct.

THE COURT: -- he'll have to stay an equal amount of time on the stand. Okay?

MR. MORRIS: Okay.

THE COURT: Okay. Hang on. I've got my smarter staff member handing me a note. Okay.

(Pause.)

THE COURT: Okay. Well, so that's how we're going to stand.

Now, I am going to address Mr. Daugherty here. We're not going to let Mr. Daugherty cross-examine Patrick. Clearly, his objection has been around, and he never said anything about --

MR. YORK: Certainly not as to authority. However, we should be able to examine him as it relates to the portion of the objection that goes to whether the settlement is in the best interest, given the claims that are being -- the Kirschner claims that are being transferred by Highland to the HMIT entities.

THE COURT: All right. Well, you all are going to have to share your 30 minutes.

MR. YORK: That's fine.

THE COURT: Okay? We're giving 30 minutes to Debtor entities, Highland entities, and Hunter Mountain entities collectively, and 30 minutes to Dugaboy and Daugherty collectively. Okay? So, I'm going to have my law clerk

timing you like you're on the clock.

MR. MORRIS: Okay.

THE COURT: Okay?

MR. MORRIS: May I proceed?

THE COURT: You may proceed.

MR. MORRIS: Thank you, Your Honor. So, appearing at Docket 4255 is the Movants' exhibit list, with Exhibits 1 through 123. At Docket 4277 are Exhibits 124 and 125. And at Docket 4280, we've got Exhibit 126.

The Movants respectfully move into evidence all of those documents, with the exception of Exhibits 124 and 125 on Docket No. 4277. Those are the transcripts of The Dallas Foundation representatives, and since we have reached an agreement and The Dallas Foundation has withdrawn their objection, we are not going to offer those two transcripts into evidence as part of the record in this matter.

But Exhibits 1 through 123, and Exhibit 126, we move into evidence.

THE COURT: All right. And as I thought we were going to start talking about a moment ago, Mr. Lang objected to 11 of these 123 designations. Do those still remain? If they do, we're just going to see if they want to be I think offered --

MR. LANG: No, I think we've --

THE COURT: -- the old-fashioned way, but I think

that might be more efficient. I have, in your objection, which is at Docket 4273, you objected to Numbers 10, 12, 13, 57 and 59, and then 64 through 69. Eleven items.

MR. LANG: Mr. Morris clarified that 12 and 13 are one document. But I still, I think that, again, for purposes of the authority issue, Exhibit 13 we don't think is relevant.

MR. MORRIS: Exhibit 13, Your Honor. We'll just take them one at a time.

THE COURT: Yes, go ahead and address it.

MR. MORRIS: Is relevant because it's simply a document that was provided to Highland by Hunter Mountain as part of the negotiations. And we've been asked to produce all of the documents related to the negotiations. This is one of the documents that we received.

THE COURT: Okay. And do I understand 12 and 13 are actually the same thing, or --

MR. MORRIS: Yeah. Well, 12 is the email, 13 is the attachment.

THE COURT: Okay. I overrule the relevance objection. Those will be admitted.

(Claimant Trust's Exhibits 12 and 13 are admitted into evidence.)

MR. LANG: 57.

MR. MORRIS: 57 is also a part of the settlement documents. It's, I think, an email exchange between Mr. Seery

and UBS, which was one of the Class 9 claimants, and we had to obtain their consent and that's part of the process of getting to the settlement agreement.

MR. LANG: I think the objection is it doesn't include the attachment.

MR. MORRIS: It's got all -- it's got numerous attachments on it.

MR. LANG: To 57?

MR. MORRIS: Yeah.

MR. LANG: Mine did not.

MR. MORRIS: Your Honor, we'll withdraw the exhibit.

THE COURT: Okay.

MR. MORRIS: Okay.

THE COURT: 59. Well, you didn't address #10.

MR. LANG: Oh, sorry.

THE COURT: That was the first one.

MR. LANG: Yeah.

MR. MORRIS: We'll withdraw #10.

THE COURT: All right.

MR. MORRIS: Okay.

THE COURT: So, 59?

MR. MORRIS: 59? Your Honor, I'm not surprised they object, because it's at the core of the Court's ability to authorize this settlement.

MR. LANG: We withdrew that.

MR. MORRIS: Oh, you withdrew that?

MR. LANG: Withdrew.

MR. MORRIS: Oh, okay. They withdrew that.

THE COURT: Okay. So, 59 will be admitted.

(Claimant Trust's Exhibit 59 is admitted into evidence.)

MR. MORRIS: And then I think the last is 64 to 69.

THE COURT: Uh-huh.

MR. MORRIS: We were actually prepared to withdraw those exhibits because we didn't think there was a challenge to authority. Now that there's a challenge to authority, we're going to offer all of those in because they're highly relevant to the acknowledge of Mr. Patrick's authority.

THE COURT: All right. And your objection was solely to relevance?

MR. LANG: The objection was relevance because they predate the May 6th issue in the Caymans, which is what caused the entire structure to -- the authority from the top down to be questioned.

THE COURT: All right. Well, you can cross-examine if you want on those items.

MR. LANG: Okay.

THE COURT: But I find they're relevant so they will be admitted, 64 through 69.

(Claimant Trust's Exhibits 64 through 69 are admitted into evidence.)

*[Court Edit: Claimant Trust's Exhibits 1 through 9, 11 through 56, 58 through 123, and 126 are admitted into evidence.]*

THE COURT: All right. And as far as the exhibits of Dugaboy, I think it was just the plan and settlement agreement were all that had been designated. Correct?

MR. LANG: Yes.

MR. MORRIS: No objection.

THE COURT: So, no objection. Those will be admitted.

(Dugaboy Investment Trust's exhibits are admitted into evidence.)

THE COURT: And Daugherty's exhibits?

MR. YORK: Yes, Your Honor. So, Mr. Morris and I conferred yesterday about both sides' exhibits. And my understanding is we've reached an agreement that both sides' exhibits are not objected to. And so therefore we'd move to admit Daugherty's as well.

THE COURT: All right.

MR. YORK: 1 through 42, I believe, it is.

THE COURT: All right. So you confirm?

MR. MORRIS: Yes, Your Honor.

THE COURT: All right. The Court will admit all of Daugherty's 1 through 42, and they appear at Docket Entry 4266.

(Patrick Daugherty's Exhibits 1 through 42 are admitted into evidence.)

THE COURT: All right. Opening statements.

OPENING STATEMENT ON BEHALF OF THE CLAIMANT TRUST

MR. MORRIS: All right. Good morning, Your Honor. John Morris; Pachulski Stang Ziehl & Jones; for Highland Capital Management, LP and the Highland Claimant Trust.

If we can go to the first slide, Your Honor. This is a 9019 motion. It's not a terribly high bar. What the Movant has to show here is that the settlement agreement was the product of arm's-length, good-faith negotiations, and effectively that it's in the best interests of its stakeholders.

THE COURT: Did you want this put on the screen, or does everyone have a hard copy?

MR. MORRIS: Counsel have a hard copy.

THE COURT: Oh, okay.

MR. MORRIS: Yeah. The evidence is going to show, and there really is no dispute, that the settlement agreement is the product of arm's-length, good-faith negotiations. Mr. Seery is going to testify that the negotiations began in late March and they concluded on May 19th. Exhibits 2 through 57, with the exception of the one or two I just withdrew, reflect the parties' negotiations. Mr. Seery is going to testify that the negotiations were conducted by Zoom, by phone call, there

was one in-person meeting, there was many, many email exchanges that are reflected in the exhibits.

Mr. Seery is going to testify about the substance of the negotiations at a high level. Originally, we had sought to have one agreement with Hunter Mountain and the DAF entities. Mr. Patrick was not comfortable with that. He wanted to run them separately. And there was a DAF agreement that was ultimately entered into but that nobody believed required court approval.

So, once that got completed and one of the Fifth Circuit appeals got dismissed as a result, we moved to the Hunter Mountain discussions. Those discussions were robust. There were issues about the timing of the effectiveness of certain of the benefits under the proposed agreement. Highland wanted the releases, for example, to be effective upon signing. Mr. Patrick was unwilling to agree to anything without this Court's approval.

So there were changes that were made over time in terms of the timing of the transfer of the consideration. There were discussions and negotiations and bids and asks about the amounts that would be paid, when they would be paid, the circumstances under -- that they would be paid. There was an enormous amount of information that was exchanged pursuant to a confidentiality agreement that now became public because it's relevant to the Debtors' burden or the Claimant Trust's

burden to carry the day here.

That information included claims information, the trust agreement itself, budgets, asset/liability valuation information, forecasted expenses, because HMIT rightly wondered, you know, what's going to happen to the money? Is it going to be gone before it got its agreed-upon share? So, you know, there will be, I think, indisputable evidence at the end of the day that the settlement is the product of arm's-length, good-faith negotiations.

If we move to the next slide, the evidence will also show that the proposed settlement is indisputably in the best interest of the Highland entities and their stakeholders. Upon court approval, all of the pending litigation that Your Honor identified earlier will be dismissed with prejudice, thereby greatly reducing litigation risk and attendant costs.

The stakeholders will also benefit from the allowance of the HMIT claim at a fixed amount of $337 million. And we will explain -- Mr. Seery will explain to the Court how that number was arrived at.

The estates and their stakeholders will also benefit because, under the proposed settlement, as I indicated earlier, Highland will be able to monetize or otherwise dispose of a number of illiquid assets, including the Dugaboy Note and the estate claims in the Kirschner Litigation. And perhaps most importantly to the estate, we are getting very,

very broad what we refer to as litigation protections from all of the Hunter Mountain entities. It includes not only a release but a covenant not to sue as well as, you know, we could go through it, but -- but we believe that even if Mr. Dondero or somebody else obtains control of Hunter Mountain, unless somebody sets aside this agreement, those protections are going to inure to the benefit of the Trusts, the Indemnity Trust and all of its stakeholders until the end of time, and nobody is ever going to be able to set this agreement aside because it was negotiated in good faith, it was the product of arm's-length negotiations, and it's fair and reasonable to both sides.

So those litigation protections are paramount and they provide another indicator of the benefits that the Claimant Trust is going to receive.

The next slide, Your Honor, is a demonstrative exhibit, although, as always, we have citations to the very specific documents that are now in the record. Mr. Seery will describe for you at a high level how the allowed claim of HMIT was calculated, and it's really just based on the limited partners' capital accounts as of the petition date. And I'll just leave it at that for the moment. There's no magic to it. It's objectively reasonable. It's mathematics. There's really no subjectivity that I'm aware of that goes into this. It's just, hey, let's look at the tax returns, let's look at

the financial statements, and let's look at the partnership agreement, and let's see how the capital account was structured as of the petition date. And that's how you get to, really, $396 million less the amount of the Dugaboy Note. I mean, the HMIT note.

The next slide. With the settlement, the transfer of the Kirschner Litigation is in the best interests of the Movants. I think Mr. Daugherty somehow suggests that really the best thing to do would be to prosecute that litigation. We respectfully disagree. In the Debtors' business -- in the Claimant Trust's business judgment, that would be exactly the wrong thing to do when you are settling with HMIT.

And why is that? When we commenced the Kirschner Litigation a number of years ago, the Kirschner Litigation represented a potential source of funding for indemnification expenses, and at that time, for the payment in full to creditors.

By 2023, 2024, with the success of the Highland team's monetization of assets, the need to pursue and monetize the Kirschner claims became less clear, so we put it on ice. And we voluntarily stayed the litigation to conserve resources.

The settlement with HMIT changes everything. The claims are as valid today as they were yesterday, as they were before we signed the agreement, as they were when we commenced the action. But they have very different value to Highland when

you're settling with HMIT. And that's why we're prepared to transfer the claims today.

Why? Because at this point, unlike when we commenced the action, Class 8 has been paid in full except for Mr. Daugherty's fully-reserved claim, right, in an amount that he agreed to for years and that he ratified and reaffirmed three different times in three different stipulations. That's the only thing that remains in Class 8.

THE COURT: And remind me of the dollar amounts on reserve.

MR. MORRIS: It's approximately $2.5 million. I can --

THE COURT: Okay.

MR. MORRIS: It's -- the dollar amount is specifically set forth --

(Pause.)

MR. MORRIS: It would be, I believe, in Exhibit 60, --

THE COURT: Okay.

MR. MORRIS: -- is the original tolling agreement. And in Paragraph 1 it has the very specific dollar amount. And then in Exhibits 62, 63 -- 61, 62, and 63, those are amendments to the tolling agreement that fully incorporated the original tolling agreement, including the reserve amount. So that amount has been there for years. Nobody has ever said

anything about it. Nobody has ever tried to adjust it. Nobody has ever identified a change in circumstances that would suggest a change was appropriate. But here we are.

So, why is it different and why does the Kirschner Litigation not have so much value to us when we're settling with Class 11? Because Class 8 has been paid in full. Class 9 has been paid 80 percent. If the HMIT settlement is approved, it will receive another 10 percent. So that all that remains is 10 percent of the Class 9s.

And most importantly, Your Honor, with the settlement with HMIT and the Claimant Trust's receipt of the litigation protections, the need for indemnification expenses is going to be greatly reduced. We can give the money where it belongs because all we'll have left is Mr. Dondero and Dugaboy. It really will literally be the only thing. And we need a lot to deal with that, but not as much as we needed when we had to deal with them and HMIT.

And at the end of the day, once you're settling with HMIT, prosecution of the claims would only benefit HMIT, so why should we undertake the expense of doing that?

Is that clear to Your Honor?

THE COURT: It is.

MR. MORRIS: It is? So, it's -- this has nothing to do -- and you're going to hear questions of Mr. Seery, did you value the Kirschner claims? Are you giving them away for

free? No, we didn't value them, because once you're settling with HMIT it doesn't really matter. Once you have the litigation protections, once you know that HMIT is never going to be an adversary of yours, the monetization of the Kirschner claims would insure to their benefit because they will have an allowed claim of $330 million. So even if we sued and even if we got a hundred million dollars, that's going to go to them. Why would we pick up the tab today? A very different scenario than when we prosecuted the case, when the case was commenced.

So, really, really, in the estate's best interest to get value for those claims. The value is reflected in the totality of the agreement. The Court really should look at the body of the consideration that's being received, including the litigation protections.

If we can go to the next slide, Your Honor. As long as we're on the topic of Mr. Patrick's authority, Mr. Seery is going to testify to the work that he did to satisfy himself that Mr. Patrick was duly authorized to act on behalf of each of the HMIT entities in this case.

The next slide here shows an excerpt from the Hunter Mountain Trust Agreement. It's Paragraph 7. And it says, among other things, the Administrator -- who is Mark Patrick -- shall be duly authorized, from time to time, in his sole discretion, to manage the business and affairs of the Trust.

It continues by saying that the Administrator, Mr.

Patrick, shall also have the power to settle, compromise, submit to arbitration, or to submit to any court having jurisdiction in any matter, any matters that are in dispute.

So, you know, this is just one document. It's the Hunter Mountain document. We focus on the Hunter Mountain document because that's the only one of the HMIT entities that has a stake in the Claimant Trust. But, again, Your Honor, if you just -- Mr. Seery will, at a high level, confirm that Exhibits 70 through 104 are documents that definitively establish that Mr. Patrick has the authority to enter into each of these agreements on behalf of the HMIT entities.

Not only that, but he will describe, if asked by you or anybody cross-examining him, why nobody has the ability to interfere with the effectuation of his authority. He doesn't have to get anybody's consent. He doesn't have to -- right? This is all just crystal clear. And whatever entity far up the chain may exist, Your Honor should just think of as a shareholder. And if Coca-Cola came in here and they wanted to do a 9019 motion, a shareholder can't come in and stop Coca-Cola from doing that. If they don't like what Coca-Cola is doing, go file a derivative suit. Go sue Coca-Cola in another court at another time. Not that I'm inviting litigation against Mr. Patrick, but by analogy, this is what we're talking about.

There is no restriction on Mr. Patrick's authority. The

settlement is fair and reasonable. He has authority under the governing documents to do what he has done here, and that is act in the best interests of the HMIT entities. And so this is just one page. Mr. Seery will explain, you know, just the work that he's done to satisfy himself.

The next slide, Your Honor, there's objections about how somehow the settlement agreement violates the plan or the absolute priority rule, all of that. It's not accurate. I'll just leave it at that in terms of how I characterize it.

The next slide is excerpts of -- I think it's the plan of reorganization, Your Honor. And I think we admitted the plan last night. That's Exhibit 126. And they're -- these excerpts are really important because what they show is that Classes 9 and 10 have the indisputable right to accept less favorable treatment. And that's what they've done. Okay? And I think it's Article III, Section H, Subparts 9 and 10. Holders of Class 9 and 10 interests have the right to accept less favorable treatment.

And if we can go to the next slide, I'll just briefly describe the less favorable treatment that these stakeholders have in fact accepted. As permitted by the plan, holders of Class 9 claims consented to the payment in full of Mr. Daugherty's Class 9 claim and the Class 10 distributions, in accordance with the settlement agreement, before their Class 9 claim is paid in full.

And that's Exhibit 59. It may be among the most important documents that have been admitted this morning. Exhibit 59 is the consent of the Class 9 holders other than Mr. Daugherty to accept lesser treatment.

So there's no violation of the plan at all. HMIT is also accepting less favorable treatment than it might otherwise be entitled to if it ever successfully prosecuted its claim. It has less favorable treatment because it's agreeing that it's not a Claimant Trust beneficiary, that its rights are limited to the rights that are given to it under the settlement agreement and nowhere else. It's accepting less favorable treatment because it's agreeing that the Highland entities owe no duty of any kind to any HMIT entity except as provided for in the settlement agreement. It's accepting restrictions on its ability to transfer its Class 10 interests -- more less-favorable treatment -- as a condition to the first and second distributions. They have agreed that they are subject to Mr. Seery's determination that the Highland entities are not at that time under any Threat. "Threat" is a defined term, and it has to do with litigation.

And so if Mr. Seery, in his sole discretion, believes that he needs to conserve resources because he remains years in the future under threat of litigation, he's not going to make the payments to HMIT, and HMIT is okay with that because they understand.

And, of course, in the end, they're accepting less favorable treatment because they're granting to the Claimant Trust the litigation protections.

All stakeholders have been paid in full except for the 10 percent of Class 9 and Mr. Daugherty's Class 8 claim. That claim is the subject of an objection, and as I just walked Your Honor through, it has been fully reserved in an agreed-upon amount for years.

There was some questioning during Mr. Seery's -- one of Mr. Seery's I think three depositions in the last week -- about why he didn't offer Mr. Daugherty the same treatment that he offered to the other Class 9 holders because Mr. Daugherty had about an $800,000 Class 9 claim. Your Honor will see in Exhibit 58 that that claim was paid in full, and Mr. Seery will explain that he found negotiating with Mr. Patrick to be difficult, number one. And number two, it was an amount of money that the estate could afford. And so the other Class 9 claims are substantially bigger, so rather than going through the process of attempting to negotiate with Mr. Daugherty, he just paid it in full. The Claimant Trust had every right to do that. And Mr. Daugherty should not be heard to complain that he actually got everything that he could have ever been entitled to.

THE COURT: And --

MR. MORRIS: Uh-huh?

THE COURT: I don't mean to get you off-track.

MR. MORRIS: That's all right.

THE COURT: But Class 9 claimants, I'm trying to remember who else was in that class. Was it a UBS --

MR. MORRIS: UBS.

THE COURT: -- claim?

MR. MORRIS: Exactly right.

THE COURT: Okay.

MR. MORRIS: And then affiliates of Stonehill and Farallon.

THE COURT: Okay.

MR. MORRIS: Because they had purchased --

THE COURT: They had Class 9 --

MR. MORRIS: They had purchased originally I think it was Josh Terry, and the Redeemer Committee may have had a piece. No, no. No, no, no. HarbourVest. HarbourVest had a piece. Right? So, HarbourVest sold their claim, including the Class 9 claim. Josh Terry sold his claim, including his Class 9 claim. Then there's UBS, who still holds a piece of their claim, and Mr. Daugherty. So, UBS, if you look at Exhibit 59, you'll see the signatures of UBS and the affiliates of Stonehill and Farallon, who all agreed to accept lesser treatment.

THE COURT: Okay.

MR. MORRIS: So, at the end of the day, Your Honor,

the last slide is a slide that I didn't intend to present, frankly, because I didn't ever believe that there was going to be a challenge to authority by anybody other than The Dallas Foundation. But as long as we have it attached, we might as well see it.

As you can see, Your Honor, in the lower right-hand corner, you can see Hunter Mountain is owned by Beacon Mountain, which is owned by CLO Holdco. Like, there is no -- and Mr. Patrick controls it. And it's really on the other side of the ledger, in the DAF house, so to speak, that any of The Dallas Foundation got interested.

Dugaboy is not even on here, by the way. Like, Dugaboy is nobody. The people in here who are now going to challenge the authority of Mr. Patrick, no, not on here. And they're going to do it, they're going to do it without ever having given us notice.

I know Your Honor made your ruling and we'll deal with it, but I don't know if Your Honor was aware of this: They're not on here.

Your Honor, at the end of the day, this is a really, really easy call to make from our perspective. We have been waiting for this moment for years. Finally, a responsible person understands that the way to preserve value is to put the sword down.

Mr. Patrick, I don't know what happened between him and

Mr. Dondero. I don't care. I have no knowledge of that. But clearly he is exercising independence. And that's why we're here, because we finally have somebody who says, you know what, give me everything I can possibly get and I will stop fighting. I wish other people would say that, because then this case would be over. Then the case would really be over.

But getting to a settlement with the Class 10 interest holder who is going to have an allowed claim of $337 million, such that any value in the future is going to go to HMIT, I hope that that -- you know, this is an easy call to make, Your Honor.

I have nothing further at this time, but I look forward to putting Mr. Seery on the stand and making sure that Your Honor has, you know, an adequate, sufficient, overwhelming basis, frankly, to approve this motion.

THE COURT: Okay. I don't mean to stifle you, but --

MR. MORRIS: Yeah.

THE COURT: -- anything more for an opening statement? Mr. Phillips, I'm doing friendlies and then friendlies.

OPENING STATEMENT ON BEHALF OF THE HUNTER MOUNTAIN ENTITIES

MR. PHILLIPS: Your Honor, just briefly. Louis M. Phillips on behalf of the Hunter Mountain entities.

We fully embrace and concur with everything that Mr. Morris has told the Court. From our perspective, and the

reason that -- and you'll see, the documents include all of the back and forth -- we required the Court approval before the effectiveness of any releases, litigation protections, et cetera, for exactly the reason that we needed the Class 9 to agree. And we obtained -- the Highland entities obtained the approval of the Class 9 creditors to our treatment, and I think that the bona fides of this settlement and the value of the settlement and our -- what we are giving in the settlement is, I think, established beyond even the slightest bit of question by the fact that the Class 9 creditors and the Oversight Board of the Claimant Trust all agreed that it was important enough to the estate to get this settlement with Hunter Mountain Investment Trust that they agreed to allow Hunter Mountain Investment Trust to receive the money set forth in the settlement upon the approval. And we have agreed that, notwithstanding appeal rights of some people who really don't have the right to be here, but that's going to be determined by Your Honor, we're not worried about that. We are giving our releases. And the releases are effective upon approval by this Court. We are not requiring any type of final unappealable order that doesn't -- that waits for years before the releases are effective.

Very importantly, it seems to me, from Your Honor's perspective, and I'm reluctant to suggest that I know about that, but our releases are given upon the approval by this

Court of the settlement. They're not -- if the settlement is reversed on appeal, our releases stay.

So the Class 9s that are above the Class 10 have voted, and they have approved, and Mr. Seery is going to testify about that. And we think that in and of itself is a monumental accomplishment. And we appreciate everything Mr. Morris has said. We agree with everything Mr. Morris has said. We agree with everything Mr. Morris has said about the absence of true objection. We agree with everything Mr. Morris has said about the fallacy of suggesting that Mr. Seery had to value the Hunter Mountain -- the Kirschner Litigation proceeds, of which would come to us.

The idea that we need to worry about how much Mr. Dondero entities can pay in connection with the Kirschner Litigation so that we could value the Kirschner Litigation based on what Mr. Dondero can pay, so that to suffice with an objection by Dugaboy maybe that there was no value given. I mean, that's all backwards. Value was given as described by Mr. Morris and will be established by the evidence submitted by Mr. Seery's testimony and the documents that are already in evidence.

And that is it from our standpoint, Your Honor. Thank you.

THE COURT: Thank you. All right. I'll hear from the Objectors. Daugherty's counsel, are you going to go first?

OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

MR. YORK: Thank you, Your Honor. If I may approach.

THE COURT: You may.

MR. YORK: Good morning, Your Honor. Drew York on behalf of Mr. Daugherty.

We're here today regarding the 9019 and Mr. Daugherty's objection. The 9019 motion should be denied. If you turn to the third slide in there, we say that Highland -- Highland, I'm referring to Highland collectively for the Movants -- attempts to put the cart before the horse. So really what's going on here, Your Honor, is we're just asking the Court to follow the rules of the road that it set forth in the plan, the confirmation order, and, frankly, even Highland to follow the terms of the settlement agreement it entered into with Mr. Daugherty.

None of that is happening here as a result of this proposed settlement that's being presented to you today for consideration.

The first problem with the motion and the proposed settlement is that it violates the absolute priority rule, it violates the express terms of the Court's plan, the confirmation order, as well as the Claimant Trust Agreement, because it attempts to fund the contingent Class 10 claims without first resolving, let alone satisfying, Mr. Daugherty's remaining Class 8 claim.

And then, secondly, the settlement agreement does not satisfy the *Jackson Brewing* factors because it prioritizes the HMIT insiders over the estate creditors, including Mr. Daugherty, and it forfeits potential recovery that would go to the benefit of those to creditors to appease litigation pressure.

So, first, I'm going to talk about why the settlement violates the plan, the confirmation order, and the Trust Agreement.

As everyone is aware, the HMIT entities are asserting a Class 10 claim.

If you turn to the next page, as Mr. Morris has acknowledged and admitted here today, Mr. Daugherty has a remaining Class 8 claim. And, importantly, Your Honor, because Mr. Morris and Highland continue to argue that that claim is fully reserved, I would point out that in the settlement agreement between Mr. Daugherty and Highland the parties characterized that claim as a contingent unliquidated claim. A contingent unliquidated claim. And in fact, they went so far, Highland did, in its adversary complaint on the next slide, Your Honor, to again refer to it as an unliquidated and contingent claim that is dependent on the final outcome of the 2008 audit, including the magnitude of any adjustments.

And so Highland cannot come into this courtroom and on the

one hand argue that that claim is fully reserved, and at the same time admit that it is a contingent unliquidated claim that is subject to a myriad of adjustments depending upon the outcome of that audit.

And in reality, when you look at the tolling agreement, there is nothing that the parties said that that was a fully reserved claim at all. That's simply not what they agreed to. They just simply put a number in there, which was put into the reserve account at the time. But it did not constitute a fully reserved claim at all.

Nor has Highland pointed to anything -- in the plan, the confirmation order, or the Claimant Trust Agreement -- that allows Highland to come in and violate those documents by simply saying that we fully reserved for Mr. Daugherty's claim.

THE COURT: Okay. Well, we're going to hear the evidence, but as I understood it, it was an agreed reserved amount. And I asked earlier, was it $2.5 million or -- I feel like it was an agreed amount plus even some interest, acknowledging there might be time. I don't remember every detail from this case, but I'm just telling you that's what my memory is. Am I correct?

MR. YORK: The --

THE COURT: Mr. Daugherty agreed, here's what we'll agree is enough to set aside for our ultimately potentially

allowed claim, *x* amount plus interest? Can you confirm?

MR. YORK: What the tolling agreement provides is that Mr. Daugherty agreed to provide the tolling of the objection deadline. Okay. And Highland then agreed to put $2.56 million into the reserve.

And what the footnote says in the tolling agreement, Exhibit 60, is that the estimated amount of that claim as of -- and let's be clear about this -- as of October 23rd of 2020, was $2.56 million and change. And that's it. And I'm happy to have my colleague, Mr. Smeltzer, who is a tax attorney and deals with these issues all the time, can come up and explain why, at the end of the day, this is still a contingent unliquidated claim and it's subject to a myriad of factors that make it that that amount that Highland has set aside is not necessarily going to be a fully-reserved amount.

That is why the parties have -- had called it both in the settlement agreement and the tolling agreement, and Highland has continued to call it -- characterize it in its adversary complaint as a contingent unliquidated claim. So --

THE COURT: Okay. It's hard to wrap my brain around it. It's a claim that I understood really couldn't be liquidated with certainty until this potential audit of 2008 is final, and there was some discussion of how close to it being final was it. But I guess -- well, I don't know where I'm going here except to say this could be a contingent

unliquidated claim for a -- you know, it's already, what, 17 years?

MR. YORK: Based -- from when the tax return was filed? I think that's correct, Your Honor.

THE COURT: Okay. Well, this is what the adversary is about, right? I guess they're finally saying it should be estimated, liquidated, pursuant to the Bankruptcy Code and we'll be done.

MR. YORK: Correct. In violation of the terms of the settlement agreement between Mr. Daugherty and Highland. Yes, that's --

THE COURT: Wait. Wait. What?

MR. YORK: So, the settlement agreement between Daugherty and Mr. Highland provides --

THE COURT: Mr. Highland?

MR. YORK: I'm sorry. I apologize. Between Mr. Daugherty and Highland --

THE COURT: Uh-huh.

MR. YORK: -- provides that the -- as long as the IRS audit has not had a final -- there's not a final determination, --

THE COURT: Uh-huh.

MR. YORK: -- then any litigation concerning the validity or the amount of Mr. Daugherty's claim is stayed and cannot be brought before the Court. And that's exactly what

their adversary complaint did, which is -- because they admit in their adversary complaint --

THE COURT: Well, okay. I won't pursue this anymore. But what's an estate to do? They're getting criticized for the Trust going on too long. Not by your client, but -- and meanwhile you want, I mean, 2032, are we still going to be waiting on the IRS?

MR. YORK: I don't know because we don't have any insight into what the IRS audit is.

THE COURT: Well, it's been 17 years.

MR. YORK: I understand, Your Honor.

THE COURT: So, --

MR. YORK: But the bottom line is this. The plan -- that Highland entered into the terms of that settlement agreement.

THE COURT: I'm going to say it right now. I'm not keeping this estate open until 2032. I just, I was --

MR. YORK: I presume that --

THE COURT: -- kind of flippantly throwing that out there.

MR. YORK: And --

THE COURT: But this happens in bankruptcy cases a lot, where you've got a contingent unliquidated claim, and there are provisions in the Bankruptcy Code to say what can be done in that scenario. The Court can estimate or liquidate.

MR. YORK: Understood. Your point to me was -- before was that's why Highland brought the adversary complaint, and I was simply pointing out that, pursuant to the express terms of the agreement that Highland reached with Mr. Daugherty, Highland was -- is not allowed to bring the adversary complaint to challenge the validity or amount of Mr. Daugherty's claim so long as the IRS audit has not been -- had a final determination. That's exactly what's going on here with the adversary complaint that they have filed.

THE COURT: Okay.

MR. YORK: Okay. So I think Your Honor is familiar with the terms of the plan, the Fifth Amended Plan and the subordination. But specifically we have two issues. One begins with the Claimant Trust Agreement in Section 5.1(c), which provides that the equity holders shall not have any rights under the agreement unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all of general unsecured creditor beneficiaries have been paid indefeasibly, in full, including, to the extent applicable, all accrued and unpaid postpetition interest, consistent with the plan, and all disputed claims have been resolved.

That has not happened here and it cannot happen because, for one, Mr. Daugherty's unresolved Class 8 claim, and also the remaining Class 9 claims, as I think you'll hear from Mr. Seery. And so there are no rights that can be given to the

HMIT entities pursuant to -- as a Class 10 holder, an allowed Class 10 holder, pursuant to the Claimant Trust Agreement. So the proposed settlement violates the Claimant Trust Agreement's express terms.

It also violates the Court's confirmation order that was entered at -- specifically on Page 45 of the order, in Subparagraph (a): The holders of the equity interests -- which would be the Class 10 and Class 11 equity interests -- that are junior to the claims in Class 8 and Class 9 will not receive or retain under the plan, on account of such junior claim interest, any property, unless and until the claims -- the claims, not the allowed claims, but the claims -- in Class 8 and Class 9 are paid in full, plus applicable interest.

That's exactly what the settlement that is proposed here is designed to do.

And if you turn two pages in, you'll see that in addition to the assignment of the Kirschner claims, what we're also having under this proposed settlement are interim cash distributions that would be made to the HMIT entities, interim cash distributions that theoretically could be made before the resolution of Mr. Daugherty's Class 8 claim, which would be in violation of the plan, the Claimant Trust Agreement, and the confirmation order.

And that is, as best as they put in their agreement, that's approximately $23 million in cash that would be paid

out theoretically in those interim distributions.

One of the things that Mr. Morris said in his opening was that they did not -- Mr. Seery did not negotiate with Mr. Daugherty because he was difficult to deal with. Well, that's surprising, Your Honor, considering, on the other hand, Mr. Morris says to the Court that there were repeated tolling agreements or amendments to the tolling agreement that were entered into by Mr. Daugherty willingly and voluntarily to benefit Highland.

And what really happened when Mr. Morris says that there were good-faith arm's-length negotiations, well, there may have been good-faith, arm's-length negotiations between the HMIT entities and Highland, but what happened here was that Highland actually sought to ice out Mr. Daugherty from all of this completely.

And how did that happen? Well, the evidence is going to show that Highland reached out to the other Class 9 creditors over a month in advance of the motion being filed, sought their consent to the proposed settlement, told them that Mr. Daugherty was not going to be a part of it, told them that Mr. Daugherty's Class 8 claim was going to have an adversary complaint filed against it, told them that once that adversary complaint was granted and the claim was disallowed, then those funds would waterfall down to Class 9, so the Class 9 creditors would get that -- those funds that theoretically are

part of Mr. Daugherty's Class 8 claim.

So at no point in time prior to the filing of the adversary proceeding, or even prior to the filing of the motion for approval of this proposed settlement, did Highland ever contact Mr. Daugherty to attempt to discuss any of this, because they simply wanted to ice him out.

THE COURT: Okay. I'm going to hear evidence. I don't mean to cut you off, but --

MR. YORK: Sure.

THE COURT: -- I was told that Mr. Daugherty was paid $800,000 --

MR. YORK: With respect to his --

THE COURT: -- on his Class 9 claim.

MR. YORK: Correct.

THE COURT: Is that not true?

MR. YORK: So, the day --

THE COURT: Is that true?

MR. YORK: It is true. The day after the motion for entry of the proposed settlement was filed, Mr. Demo sent a letter to my office that was a payoff --

THE COURT: I just wanted to -- I don't need to know every detail.

MR. YORK: Yes. Sure.

THE COURT: Has he been paid?

MR. YORK: His Class 9 claim was paid in full the day

after the proposed settlement was filed.

THE COURT: Okay. So what is the asserted amount of his Class 8 claim?

MR. YORK: We -- again, both sides do not know because they do not have --

THE COURT: What was the asserted amount in the proof of claim that's been reserved for, the Class 8 proof of claim? What was the asserted amount?

MR. YORK: It was listed as contingent unliquidated. And as I understood it, and Your Honor --

MR. MORRIS: No. I think it's approximately $1.7 million, Your Honor.

MR. DAUGHERTY: That's not true.

THE COURT: $1.7 million?

MR. DAUGHERTY: No.

THE COURT: I would look it up, but I don't know if we --

MR. DAUGHERTY: Your Honor, I'll tell you. It was like $1.45 million, and then the interest to October, which was like another $1.3 million. I'm estimating it. But the total is around $2.6 million, $2.7 million at October/November 2020. Up to that point.

THE COURT: Okay. Well, that's kind of a weird process here for an opening statement. But I'm asking because, you know, I always try to stray people into let's be

pragmatic whenever I can. And a pragmatic approach here might have been, if your client didn't think the reserve was big enough, you all could have a discussion about, oh, instead of $2.56 million, it now should, I don't know, $3 million, whatever you say the number is. And there could have been a give and take, instead of all these people showing up in the court and having an all-day hearing.

So I'm just trying to understand that. And you're saying, okay, violation of the absolute priority, when your client took a full payment on his Class 9 claim without Class 8 being quite paid in full. I'm just trying to be pragmatic here. What would it take to make Mr. Daugherty happy? Again, that's just the bankruptcy judge speaking on Chapter 11 world that's trying to get to a pragmatic result.

MR. YORK: We're happy to have that discussion with the other side. We were -- we --

THE COURT: Well, what --

MR. YORK: Yes.

THE COURT: You can't tell me right now? You're here ready to go to battle over this settlement, and I'm trying to figure out what might happen here that would make you all withdraw your objection. And that's what we do in Chapter 11. If there's a way we can pragmatically resolve things, we do.

MR. YORK: Sure.

THE COURT: And it just, I'm picking on you because

we're talking about a $2.5 or so million claim in a situation where people are wanting the estate wrapped up and it's holding hundreds of millions of dollars, I guess.

MR. MORRIS: Not that much, Your Honor.

THE COURT: Not that much anymore. Not that much anymore. A lot has been paid out. But a lot more than $2.56 million, shall we say.

MR. YORK: Understood, Your Honor. And I'm happy to have a conversation with Mr. Morris and see if we can reach a number that's agreeable to accept as, you know, the reserve.

THE COURT: How hard could that be? I don't mean to be --

MR. YORK: Happy to do so. Sure.

THE COURT: How hard could that be, when we're talking about he's been paid $800,000 on his Class 9 ahead of his Class 8, which, to understand your argument, would be an absolute priority rule problem. But, you know, --

MR. YORK: Correct. We indicated that --

THE COURT: -- no picking and choosing what is problematic here. And we're talking about $2.56 million is set aside, and we're talking about the prospect of liquidating it and paying whatever is appropriate way before the IRS is finished. Maybe. I don't know. So how hard could it be to figure out --

MR. YORK: I'm sure we can -- we can have a

conversation real quick and try to see if we can --

THE COURT: Okay. Well, it'll have to be during a break, --

MR. YORK: Sure. Happy to.

THE COURT: -- because we're plowing ahead. Okay. Anything else on your opening statement?

MR. YORK: The only other thing I would point out with respect to the best interests of the estate is that the -- as part of the settlement, the Class 9 holders and the Class 10 holders are actually getting more favorable treatment than Mr. Daugherty's Class 8 claim because of the mutual releases that they're getting pursuant to the terms of the proposed settlement, including the fact that the Class 9 written consent holders who are all -- all have served on the board here are getting those releases as well under the proposed settlement.

THE COURT: It's not a release by your client.

MR. YORK: No, I understand that. I understand that. But they're getting mutual releases from each other on litigation that Highland has -- the Claimant Trust, excuse me, has -- Trustee has, you know, consistently said that they had all of those parties, all of those defendants, dead to rights on.

So, that's all I have.

THE COURT: Okay. I really, I'm trying to focus on

people's standing. Your client has standing. He has a proof of claim that's unresolved. But I'm just trying to understand the economic impact, I guess, on your client. And all I'm hearing is, I don't know, that maybe he thinks more than $2.56 million ought to be reserved. I mean, I'm --

MR. YORK: Given the passage of time, and also given the fact that it's still undetermined as to what's going to happen with that audit and what the penalties might be, considering that the amount that was --

THE COURT: But, again, this is bankruptcy-land. We can't wait around 20 years, 30 years. The Bankruptcy Code contemplates we can at some point estimate --

MR. YORK: Sure.

THE COURT: -- a contingent unliquidated claim.

MR. YORK: I understand.

THE COURT: So I -- all right. Thank you.

MR. YORK: Thank you.

THE COURT: And Mr. Lang?

OPENING STATEMENT ON BEHALF OF THE DUGABOY INVESTMENT TRUST

MR. LANG: We're down to three issues, one of which is the scope of the release, which I think we can work out with Mr. Morris, just to make sure people are carved out, being Dugaboy.

The second issue is the use of the dollar value from the capital account as the basis for the Class 10 claim versus

using the -- well, they're using it on the petition date versus using it -- the current capital account balance or the percentage interest of 99.5 percent, because that prevents the class, as structured, class level (inaudible). And so we have an issue with why they're using the capital account as the basis for the allowed claim, when the plan is silent on how that equity interest is to be valued.

Does that make sense?

THE COURT: Okay. You have a problem with the valuation methodology used here, which was taking the capital account balances from --

MR. LANG: On the petition date.

THE COURT: -- on the petition date?

MR. LANG: Versus using the ownership percentage of the equity on, as repeatedly stated, 99.5 percent of Highland is owned by HMIT, .5 is owned by the Class 11.

THE COURT: Okay. Well, I'm not sure what -- I guess you'll cross-examine Mr. Seery on different possible methodologies.

MR. LANG: Yes.

THE COURT: Okay.

MR. LANG: And so then the third one is the authority issue on Mr. Patrick's authority to enter into the settlement agreement and the transfer of the Dugaboy Note to Mr. Patrick's entity, HMIT.

THE COURT: All right. And, again, I'll just clarify my understanding. Dugaboy -- this came up earlier -- itself has a .1866 percent Class A limited partnership interest?

MR. LANG: I think that's approximately right. Not exact. Is that Mr. Morris' sheet?

THE COURT: It was in several pleadings.

MR. LANG: Okay. Yeah.

THE COURT: Okay. So the question will be, should that be valued at $740,000 or something different?

MR. LANG: More -- there's $65 to $70 million in assets in the estate. There's $20 million in Class 9 debt, is what Mr. Seery -- unpaid Class 9, is what Mr. Seery testified to.

THE COURT: Uh-huh.

MR. LANG: So it's $45 to $50 million would be left after payment of the Class 9. And if they use the ownership percentages, Class 11 gets some money. If they use a $333 million capital account, Class 11 gets nothing.

THE COURT: Okay. I presume that's a material difference, and I'm going to hear about that.

MR. LANG: Yes.

THE COURT: Okay. And then I guess my other thoughts on his interest -- I say his; it's Dugaboy. We tend to equate Dugaboy with Mr. Dondero since we've heard he and his family are the hundred percent beneficiaries. There I guess is a

note that is addressed in the settlement.

MR. LANG: Yes.

THE COURT: I called it the $24.2 million note in my --

MR. LANG: That was --

THE COURT: -- preparation, but it's down to --

MR. LANG: Seventeen-ish.

THE COURT: -- $17 million or whatever. So, right now, Highland is a payee on that note, as well as Get Good Trust, and Hunter Mountain under the proposed settlement gets to substitute in as a co-payee.

So I guess I'm just trying to, in my brain, figure out all the, just like I was doing with Mr. Daugherty, the economic impact of this settlement on your client. And have I just addressed the two things in your view?

MR. LANG: Yes.

THE COURT: Okay.

MR. LANG: I believe so.

THE COURT: Okay. Thank you.

All right. Can we start with evidence? At some point, we'll break for lunch, but we'll figure out as we go. I don't want to be inconvenient to people if people have ordered lunch or something.

MR. MORRIS: We are going to be finished with Mr. Seery on direct well before lunch.

THE COURT: Okay.

MR. MORRIS: Or by lunch, for sure.

THE COURT: It's 11:30.

MR. MORRIS: Yeah.

THE COURT: So, all right.

MR. MORRIS: I do -- I would be remiss if I didn't point out that Mr. Lang just raised yet another issue, the calculation of the allowed amount of HMIT's Class 10 claim. Nowhere in his pleading. Again, hearing about this for the first time as I'm standing here. He raised three issues, only one of which is in their pleading, only one of which I ever heard about from Dugaboy, and that is the scope of the release.

THE COURT: Okay. I don't know if it makes a material difference or not. I am not a mathematician. But --

MR. MORRIS: So Highland -- the Movants call Mr. Seery.

THE COURT: All right. Mr. Seery, if you could approach the witness box. I swore you in earlier for purposes of all testimony today, so you are under oath.

MR. SEERY: Thank you, Your Honor.

JAMES SEERY, CLAIMANT TRUST'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. MORRIS:

Q Good morning, Mr. Seery.

A Good morning.
Q Do you have three binders in front of you?
A I have four binders in front of me.
Q Okay. I just want to make sure you have ours.
A I think -- yes, sir.
Q The fourth has the last few exhibits that we filed on the docket.

Should we wait for Mr. Edmond?

THE WITNESS: That would be good.

THE COURT: Yes. I just noticed. Okay. The recording is always going, so never fear.

(Pause.)

THE COURT: All right.

THE WITNESS: Apologies, Your Honor.

THE COURT: Oh, I didn't see what happened. Was there a spill episode?

And please, if people need breaks, let me know. I sometimes go long without appropriate breaks, so let me know, anybody, if we need to break for bathroom.

MR. MORRIS: May I proceed, Your Honor.

THE COURT: You may.

MR. MORRIS: All right.

BY MR. MORRIS:

Q Are you comfortable, Mr. Seery?
A Yes.

Q I want to actually start a little unscripted with the argument that was just made on behalf of Mr. Daugherty. Did you listen to that?

A I did, Your Honor. Yes, I did. I'll speak to Your Honor. Yes, I did, Your Honor.

Q Did Mr. Daugherty have a Class 9 claim?

A He did have a Class 9 claim.

Q And what was the value of the Class 9 interest that he held?

A It was approximately $3.7 million.

Q And who are the other Class 9 claim holders?

A There are three -- I'm sorry, there are four other Class 9 holders. There is Muck Holdings, LLC. There is Jessup Holdings, LLC. There is UBS AG. And there's UBS Securities, LLC.

Q Okay. And if you can turn to Exhibit 58, which is in Volume 1.

A VOICE: Mr. Morris, what was the exhibit number?

MR. MORRIS: It's 58.

A VOICE: Thank you.

MR. MORRIS: You're welcome.

BY MR. MORRIS:

Q Do you have that in front of you, sir?

A Yes.

Q What is that?

A That is a distribution notice to Mr. Daugherty from the Highland Claimant Trust with the eighth distribution. And I believe this would be related to his Class 9 claim. It may be some 8 -- some Class 8 as well. But March 25 is -- I'm sorry, May 25, my eyes are not that great for close up, this is just related to the payoff of his Class 9 claim. So he'd had a $3.7 million. This was the last -- final payment, so he's been paid in full on his Class 9 claim.
Q So do I have this right, that before you sent this $800,000-plus to him, he had already received $2.9 million on account of his Class 9 claim?
A That's approximately correct, yes.
Q And how many different distributions were made to Mr. Daugherty on account of his Class 9 claim before this last one?
A Two -- two or three. I believe the way we had phrased and put 8 is our total distributions including 8 and 9. So he had a larger Class 8 claim as well. I think it was approximately $8.25 million. That's been paid in full. His Class 9 claim was getting paid in full by this one.
Q Okay. And did Mr. Daugherty receive these prior distributions -- withdrawn. Did the other holders of Class 9 claims also receive pro rata their Class 9 distributions at the same time as Mr. Daugherty?
A Yes. The distributions were pro rata.

Q Okay. Did Mr. Daugherty ever return any of the Class 9 checks that he received and say, oh my goodness, it violates the plan and the absolute priority rule and everything else because his Class 8 claim hasn't been paid in full?

A No, he did not.

Q Did he -- did he suggest that UBS or Muck or Jessup should return their checks that they received on account of their Class 9 claims because his Class 8 claim had remained unresolved?

A No, he did not.

Q Okay. Let's go to the reason that we're really here today, the agreement itself. Did you negotiate the settlement on behalf of the Highland entities?

A Yes, I did.

Q Can you describe for the Court how that came about?

A In December, we had a hearing on -- this is a little bit convoluted, I apologize -- but in December we had a hearing on the HCLOM claim in court, and we settled that claim as a $10 million Class 10 interest.

We moved into the new year and we heard some -- at some point that HMIT disagreed with that settlement, even though HMIT had signed that settlement as acceptable to it in form and substance. And the reason was because HMIT had been the only Class 10 -- not allowed, but the only Class 10 interest in -- under the plan, and defined that way, and we had agreed

pursuant to the plan to put HCLOM in there.

And although HMIT had signed in form and substance acceptable by its attorney, we learned that Mark Patrick had not been consulted and that attorney had simply -- because we were in the room -- had gone in and gotten permission from Mr. Dondero to approve that settlement in form and substance. We didn't know it at the time.

That went away pretty quickly, and we understood that somehow it got resolved.

Shortly after that, sometime I believe in January or early February, there was contact between HMIT counsel and our counsel about a potential settlement. And we had two issues, really, with Mr. Patrick, who controlled two separate entities. There's the DAF entities he controlled and there's the HMIT entities. And we wanted to make sure -- and we had disputes with both of them. We had a Fifth Circuit appeal coming up in DAF and HMIT. And so we were contacted and said, okay, we're willing to settle this if we can get to a place that makes sense to us. And so that was the commencement of those negotiations.

Q And can you describe -- how long did the negotiations last?

A Well, there was negotiation around the NDA, which took some time, and I think we probably got that finalized at around the middle to end of March. And then we began

negotiations in earnest during April. And we took pretty much the full month to get these negotiations done, maybe a month and a half.

Q Can you describe for the Court just how the negotiations were conducted?

A Well, initially, we ensured that the ground rules would be set. We didn't want to waste our time and expense if we weren't going to reach agreement around particularly litigation protections, because that's essential to us, and having any settlement required that.

Secondly, we then -- from their side, they wanted information. So, pursuant to that NDA, which was rather robust, we provided substantial information.

We then had a -- I believe one or two Zoom calls, and then a face-to-face meeting, and then subsequently a number of Zoom calls with our counsel -- usually, these were always with counsel -- so, our counsel, their counsel, principals, my team, Mr. Patrick and his team, to go through each of the items that we exchanged. And then we worked through a framework to -- back and forth on that to a term sheet, to a negotiated structured settlement along the lines of the one you see.

Q And did the parties exchange information as part of the process?

A Yeah. As I explained, we, under our NDA, we gave a lot of

information. We got information back from Mr. Patrick, Mr. Phillips, their teams, about the structure of their entities, how we could interact with them, who was responsible for each entity. And that caused us to, frankly, move from just HMIT to a couple other entities to make sure we had full protection.

Q Did you provide information concerning assets, budgets, expenses, and the like?

A Yeah. The detailed information we provided, it was pretty extensive. So we gave a high-level view of our budget, assuming that we had a settlement with them. We have an asset list that we keep and where each asset was located. So, dollars amounts, what kind of form it was in, whether it was cash, whether it was U.S. Treasuries, whether it was, you know, equity interests. Some couple other assets, as Mr. Morris explained in the opening, had not yet been disposed of. And the valuations we put on those assets.

Q Can you turn, I guess, to any volume, and let's just look at the exhibit list. Are you generally familiar with the documentation concerning the negotiations?

A Yes.

Q Can you confirm that Exhibits 2 through 57 are the emails and information that were disclosed between the Highland side and the HMIT side during the negotiations?

A Yes. And I -- I could look through 2 through 57 now, but

--
Q Yeah.
A -- I have looked through them before, and this is the information back and forth. We generally exchanged, other than at the face-to-face meeting, we exchanged information on Zoom calls as well, but when we get documents we gave them counsel-to-counsel.
Q Okay. And did you instruct me to produce all of the communications with the HMIT side in connection with the discovery requests that were served in this case?
A Yes. We had discovery requests that we went through in detail and reviewed them, and we produced in accordance with those requests.
Q Are you aware of any document that we didn't produce that reflects the parties' negotiations of this agreement?
A No, not at all.
Q Can you describe for the Court the general deal points that were negotiated? Withdrawn. Who was your counterparty to these negotiations?
A The principal on the HMIT side is Mr. Mark Patrick. He had his team. And I was responsible on our side with my team.
Q And can you just describe for the Court what the primary negotiating points were between the two teams?
A Yeah. Number one for us was dismissal of outstanding litigations. So we needed, with prejudice, dismissal of those

litigations. Otherwise, why are we bothering?

Number two, we wanted to make sure that we had litigation protections. These have been around since -- we came up with them during our mediation. They're really important to us. They set up a structure where we can actually count on the estate and the principals of the estate and the indemnified parties of the estate not being attacked. So that was essential to us.

In exchange, we had to fix their claim and allow it in an amount pursuant to the plan, which requires us to fix an amount. And that's the Class 10 interest that they have, which is senior to the Class 11 interests under the plan and the Claimant Trust Agreement.

And then the way the Trust is set up in the plan, it's a waterfall. They -- we advocated for getting everything for us upfront and putting everything for them at the back. They, understandably, didn't like that as much and wanted distributions upfront. So we negotiated around those terms. And I think those are the biggest terms.

We had some assets that we were -- we were -- difficult to monetize that we also were happy to dispose of in this way, with a credit, you know, towards their claim amount.

Q Did you -- and I may have missed this; I apologize if I did -- but did you also negotiate the amounts and the timing of the distributions that would be made to the HMIT entities?

A Yeah. That's what I alluded to, where we -- we had hoped to get everything for us upfront, give them everything later. I think it's the *Wimpy* 'For a hamburger you give me today, I'll gladly pay you Tuesday' structure. That didn't like that as much, so we did work on timing. And that did bring into consideration the other Class 9 holders and timing with respect to payments to the Class 9.
Q Was the topic of the allowed amount of HMIT's Class 10 interest the subject of negotiation?
A The topic of the allowed --
Q Did you discuss how the amount of its allowed interest would be calculated?
A Oh, yeah, that was a, you know, a critical part of the -- or, you know, essential part of the structure. What's the allowed amount they're going to get? The plan requires an amount fixed for that class. We had already had a $10 million HCLOM amount allowed into that class. So we needed to fix that amount.
Q So let's transition to that particular topic, the calculation of HMIT's Class 10 interest. Are you familiar with the methodology that was used to arrive at the Class 10 amount?
A Yes.
Q Can you tell me the process, before we get to the methodology itself? Like, what work was done to figure that

out?

A Well, the structure of limited partnership is that the equity account is treated as what's called a capital account. Each limited partner in a limited partnership has a capital account that tracks their equity interest. As a default rule, it's the amount that a limited partner can expect to get on a sale of the partnership or a liquidation of the partnership. So we used the capital account that had been maintained continuously by Highland to set their capital account amount.

I think the partnership agreement talks about 99-1/2 percent for HMIT. It doesn't talk about dollars because that's kept in the accounting for the partnership. And that amount was consistently kept by Highland up to the petition date. And even after the petition date in the monthly operating reports.

Q If you take a look back at the exhibit list, I would direct your attention to Page 12 of 15. Actually, it starts at the Page 11. At the bottom, it's got the heading, Capital Account Amounts. Are you familiar with Exhibits 113 through 118? And if you need to look at the exhibits, take your time.

A Oh, I'm sorry. I thought you told me 15.

Q No. One -- I did. I mentioned Page 15. But we're just looking at Exhibits 113 to 118.

THE COURT: 113 to what?

MR. MORRIS: 18.

THE COURT: Okay.

THE WITNESS: Um, --

MR. MORRIS: If you look at the index, Your Honor, at the bottom of Page 15 -- 11, you'll see a heading, Capital Accounts --

THE COURT: Right.

MR. MORRIS: -- Amounts. And then that captures Exhibits 113 to 118.

THE WITNESS: Yes.

BY MR. MORRIS:

Q Are those the documents that you and your team relied upon in order to calculate the amount of the allowed Class 10 interest for HMIT?

A These are some of them. I don't know if you have the tax returns in here and the K-1s. Oh, here they are. 115.

Q Yeah. That's 115?

A Yeah. You've got the K-1s for 2018, which fix an amount. Those are signed by Mr. Dondero, and they give the amounts to each partner. And then you've got the adjustments, because those are done in -- they're 2018 year-end. They were done in September of 2019, about a month before the filing.

Q And is that Exhibit 116?

A It's 115 and 116. I believe that's -- 116 is 2019, I believe, and that would have been signed postpetition by -- I believe that was signed by Waterhouse.

Q Okay.
A So it sets out the K-1. The numbers that we have are slightly different because they're in the -- they're not middle of the year, but they're for the petition date of 10/16/19. And there are -- there's economic activity that happens during the year, that you take the year-end from '18 and you have economic activity that would affect, pursuant to the partnership, the capital account of each partner during that year, fixed it on the petition date, and then it's been forward since.
Q Did you apply any of your own subjective views or beliefs in the calculation of the amount of the Class 10 interest held by HMIT?
A No. This was math.
Q And did you hear Dugaboy's counsel suggest in the opening that there was a different methodology that perhaps you could have used, a pro rata methodology, instead of the methodology you used?
A I heard what he said, but it doesn't make any sense. You can't fix an amount that way.
Q And do you understand that Dugaboy, under the partnership agreement, is subordinated to HMIT?
A Dugaboy is subordinated under the partnership agreement for certain distributions. But importantly for our purposes, they're subordinated under the plan. So the Class 11

interests are explicitly subordinated to the Class 10 interests, in both the plan and the Claimant Trust Agreement.
Q Did the Debtor consider putting Dugaboy and HMIT in the same class? Back when the plan was being formulated?
A I -- I don't recall.
Q Do you recall why they're in separate classes?
A They -- they're in separate classes because HMIT had a senior -- a right to senior distributions under the partnership agreement. We set it up that way. Nobody objected to it. That was part of the confirmed plan and the confirmed order.
Q Thank you very much. Let's talk for just a moment about Mr. Patrick's authority. Before entering into the settlement agreement, did you do anything to satisfy yourself that Mr. Patrick had the authority to enter into the settlement agreement on behalf of each of the HMIT entities?
A Yes.
Q What did you do to satisfy yourself?
A Well, as a default rule, I always look at the agreements that I'm going to enter into and the organizational docs. And we did do that. We looked at each of the organizational docs to --
Q Let me stop you there for a second. Are those the documents that are in the exhibit list from 70 through 104?
A I'd have to check the actual numbers, but --

Q If you just look at the exhibit list.
A Oh.
Q It's at the front. You'll see on Page 8 of 15 of the exhibit list there's a heading, --
A Yes.
Q -- E, Patrick Authority, and then I'm asking you if you are aware of what Exhibits 70 through 104 are?
A Yes. So, these, these are -- there's a number of organizational documents that we looked and made sure that Mr. Patrick had authority.

We also knew from our own files that Mr. Patrick, you know, previously had different interests assigned to him, and we know from Mr. Patrick and documents he's given us that John Honis, who was a former controller of some of -- controlled some of these entities and a friend of Dondero's who previously worked at Highland, is on some retail boards, in 2022 transferred those interests to an entity controlled by Mr. Patrick.

Moreover, Mr. Patrick was here in court as the HMIT Administrator, trying to sue the Highland estate. He testified on behalf of HMIT as the Administrator. And the documents are very clear that the Administrator has full control of these entities.
Q We've heard some argument about a Cayman Islands proceeding. Are you generally aware of what's happening in

the Cayman Islands?
A I hesitate to say generally aware. I'm aware that there's a proceeding in the Cayman Islands about involving a blocker corp. And there's disclosure in this Court about what that entity is. It's a blocker corp. in the Caymans that prevents the ultimate charitable entities -- and I put that in quotes -- to -- from receiving UBTI, which is Unrelated Business Income. And in that case, they would have to pay tax on it, and the idea is that they don't want to pay taxes and they don't pay taxes. So that corp. apparently is in some sort of proceeding. That's on the DAF side. That is not on the HMIT side.
Q Okay. So, based on the work that you did and the documents that you reviewed, did you form a view as to whether or not Mr. Patrick is authorized to enter into the settlement agreement on behalf of each of the HMIT entities?
A Yes.
Q And what view did you reach?
A He has complete authority over each of these entities. They run up to entities that he controls or he owns. And he's had that, and it's the structure that was set up a long time ago, and any changes to that structure are just consistent with the documents that let him do these things. And the proceeding in Cayman, whatever that is, has no impact on Mr. Patrick's authority over these entities or any of the entities

in this chain.

Q Did you see anything in the diligence that you conducted that required Mr. Patrick to seek anybody's authority, consent, or approval before entering into the settlement agreement on behalf of the HMIT entities?

A No. And we could go through each document. He has complete authority on each of these entities. And even the objections that were filed that were withdrawn from The Dallas Foundation, they have no -- it's absolutely clear that they have no rights to deal with at all the management of each of these entities. They don't have an ownership interest in it. Crown issued an annuity policy that's a variable policy. They have no rights.

Q All right. Let's turn to the agreement itself. Can you tell the Court why you believe that the settlement agreement is in the Claimant Trust's best interests?

A Number one, this case has been going on for a full five years. We have spent tens of millions of dollars dealing with vexatious and frivolous litigation and attacks. The opportunity to settle with a Class 10 holder and allow their claim under the terms of the settlement is extremely valuable because it moves us much, much closer to a potential resolution of this case, which we would all love to resolve.

Number two, it's fair value for the estate. We are making sure, while we're paying some money out in front, we have

triggers on the backend payments to ensure that the Indemnity Trust has enough assets to protect parties if there are unforeseen litigations. And I can almost bet there'll be at least one or two of those. So it's really, really valuable in that respect.

Three, it cuts down tremendously on what future expenses could be. Because we have gotten these litigation protections, we've basically walled off a potential avenue to be attacked. And I think the structure of this deal is valuable, not only to the fiduciaries and folks who have been responsible for managing this process and who are indemnified by the Claimant Trust or HCMLP, it also enables us to, down the road, pay off the Class 9s and ultimately make distributions to the Class 10s.

Q Is one of the other benefits to this agreement is that it enables the Claimant Trust to dispose of certain illiquid assets?

A Well, that's a -- that is a benefit, because we do have to resolve these claims and dispose of these assets, and we're not in a position to hang around until 2030 or more to do that.

So we've got the Kirschner claims, which would go to HMIT. Again, the way that the waterfall is set up, to the extent that they have value, they are very expensive to pursue. We've spent a ton of money setting them up. We've produced

seven million documents, pages, and received zero in return. We stayed them because we didn't think we needed them for the Class 8 and 9 and it was prudent to do so, and the question was would we need them for indemnification. So disposing of those claims now at this time as part of this settlement, where that value would go to Class 10 anyway, is very valuable.

Q Had you made any efforts prior to entering into this agreement to monetize or otherwise sell the Dugaboy Note?

A Yes.

Q Can you describe for the Court what your efforts were in that regard?

A So, we set out to try to monetize the Dugaboy Note. I contacted -- we put together what we call a teaser, laying out what we knew about Dugaboy, at least up until the time that Dugaboy was no longer part of our computer system. Laid out what we thought the assets were. There's not a lot of public information. Laid out the amortizing of the note. It's a 3.2 percent-ish, 3.26 percent note, I believe, goes to 2047, '46 on the amortization, 2047. And then presented that to I think it's five different investors in distressed funds. Had no interest whatsoever. One investor laughed at me, which I understood that he was aware of the parties and the principals and the collection efforts that would be difficult on that note.

The note is performing, because if it hadn't performed I would have accelerated on the first second and we would have collected the whole thing. But we've seen that show in the other Notes Litigation. And so we didn't -- we didn't get any reception.

We also reached out to Mr. Dondero, in writing, through D.C. Sauder, and made them an offer and tried to get them to respond, and they indicated they had no interest in the note.

Q Turning back to the exhibit list, if you can turn your attention to Page 11 of 15 of the exhibit list, is Section F, Exhibits 105 through 112, the documents that reflect the note and your efforts to dispose of the note?

A Yes.

Q And let's take a look at Exhibit 112 quickly, since that involves Mr. Dondero. Can you just tell the Court what this exhibit is?

A Yes. This is an exchange between D.C. Sauder, Matt McGraner, both of whom work for Dondero, and Dave Klos, our CFO. I'd authorized Dave to make an offer to them to see if we could get cash for the Dugaboy Note. And as you see right below the reply from Mr. Klos, which is -- this is friendly, but Mr. Sauder's indication that they have no interest.

Q Okay. So Highland offered to sell the Dugaboy Note to Mr. Dondero or entities controlled by him, and that offer was rejected without a counteroffer. Do I have that right?

A That's correct.
Q Okay. Let's finish up here. Are you familiar with the objections of Dugaboy and Mr. Daugherty that the settlement somehow violates the plan because it's making distributions to Class 10 before junior classes are paid in full?
A Yes. I'm familiar with those.
Q Do you believe the settlement violates the plan?
A Not at all.
Q And why is that?
A The plan specifically contemplates that -- I don't think it's -- we showed the 9 and 10s, but I think it's any claimant could take less than is being offered by the plan. What we did very specifically is go to the Class 9 claimants and discuss with them this opportunity to settle with HMIT and what it would take, which included some, as I described earlier, payments upfront.
After being fully informed -- they asked a lot of questions, they pushed back quite a bit, as you can expect that they would -- and we reached agreement with those Class 9 claimants in writing to approve the structure of the deal and the settlement and the concurrent payments, as well as the final small payment to Mr. Daugherty on behalf of his Class 9 claim.
Q Could I trouble you to turn to Exhibit 59, please, Mr. Seery?

A I've got it.
Q Are you familiar with that document?
A I am, yes.
Q Can you explain to the Court what that document is?
A This document is the written consent that we entered into with the Class 9 claimants, approving the settlement agreement as well as the payment to Mr. Daugherty.
Q Okay.
A And -- and -- so these -- the payment to Mr. Daugherty would have been non-pro rata, so they agreed to that. And the concurrent payments under the settlement agreement to Class 10 were agreed to by the Class 9 claim holders.
Q So looking at Page 2 at the top, do I have this right, that Mr. Daugherty's original Class 9 subordinated claim was in the amount of $3.75 million, and that with the payment described in this document his claim was paid in full?
A That's correct, yes.
Q And did he complain that he was getting paid in full but the other Class 9 holders were not?
A No. That had never been his complaint.
Q Did he complain that he was getting paid in full on his Class 9 claim but his Class 8 claim remained unresolved?
A No. I think that, as indicated before in my testimony and indicated here, this was the last payment, the 781. Before that, he'd received almost $3 million on account of his Class

9 claim. And pro rata with the other Class 9 claimants.

Q I think you mentioned that your understanding is that, under the plan, creditors can elect to receive less favorable treatment than the plan otherwise provides. Is that right?

A That's correct. And I think that's a pretty standard provision in virtually every plan that I see.

Q Can we just grab that for a second? It's the last exhibit, 126, which is probably in the skinny binder, if you have one.

A Yes. Do you want me to go to the section?

Q Yeah. Just one minute. I want to make sure the judge is with us. Give her a second.

MR. MORRIS: Are you with us, Your Honor?

THE COURT: Yes.

MR. MORRIS: Okay.

BY MR. MORRIS:

Q So if you can turn to Page 23 of Exhibit 126. Does Section 9, under Treatment, Romanette (ii), is that the provision that you were just describing that gives Class 9 holders the ability to receive such other less-favorable treatment as to which such holder and the Claimant Trust may agree upon in writing?

A That's correct.

Q And the same is true with respect to the Class 10 claims, at the top of Page 24?

A That's also correct, yes.
Q All right. And so was the consent that was executed by the Class 9 holders that's Exhibit 59 done in satisfaction of these plan provisions?
A I'd say it's consistent with these. They could elect to receive it or not, but this was, you know, did it under this provision and they were entitled to elect to take lesser treatment, if that's what they agree to.
Q Okay. Can you describe for the Court why you believe that the Class 9 claim holders are receiving less-favorable treatment under -- as a result of this settlement agreement than they would otherwise be entitled to under the plan?
A Well, they would be entitled to receive payments in front of any payments that would be made to Class 10. In addition, they would have been entitled to receive a pro rata distribution of the $800,000 that was paid to Mr. Daugherty, and they agreed to waive those provisions.
Q Okay. Is it your understanding that HMIT is also accepting less favorable treatment than it might otherwise receive if it pursued and succeeded in the prosecution of its claim?
A I suppose, ultimately, if everything was resolved, that they could have gotten a Class 10 interest that wasn't structured along the lines of the settlement agreement. So the settlement agreement takes some of that structure and what

arguably would be value away from them, and this is the amount that they've agreed to have as their allowed claim, as structured by the settlement agreement.

Q And is it your understanding that under the settlement agreement HMIT has disavowed any rights under the Claimant Trust Agreement?

A Under the Claimant Trust Agreement, yes. They have rights under the settlement agreement to receive distributions, and those will ultimately come from the Indemnity Trust as we wind down the Claimant Trust.

Q And did HMIT also agree that it would not be a Claimant Trust beneficiary under the Claimant Trust?

A Yes. And that's very important to us because we have seen lots of litigation, lots of emails, trying to use these types of structures just to create claims, even when there's literally no basis for it. I should -- well, I'll control myself.

Q Yeah. We can stop there.

MR. MORRIS: Your Honor, I have no further questions at this time.

THE COURT: All right. We're going to figure out, are we taking a bathroom break or a short lunch break. I'll poll the audience and then I'll decide. Do people want to take maybe a 30 to 45-minute lunch break, or just a bathroom break and keep going?

THE WITNESS: Thirty minutes.

THE COURT: I'll say -- are you going to have any further examination?

MR. PHILLIPS: I'm going to maybe ask one question, just to bring it up. It's already been -- but one question.

THE COURT: Okay. And then what about Dugaboy and Daugherty? Guesstimate how much examination you'll have.

MR. YORK: Fifteen minutes, maybe.

MR. LANG: Twenty minutes or so.

THE COURT: Why don't we take a five-minute bathroom break, --

MR. PHILLIPS: Sure.

THE COURT: -- and then we'll at least finish this witness.

MR. PHILLIPS: Perfect.

THE COURT: All right?

MR. PHILLIPS: Thank you, Your Honor.

THE WITNESS: Thank you.

THE CLERK: All rise.

(A recess ensued from 12:07 p.m. until 12:15 p.m.)

THE CLERK: All rise.

THE COURT: Please be seated.

(Pause.)

THE COURT: All right. Can I get some help rounding people up?

(Pause.)

THE COURT: All right. We're missing -- okay. We're going back on the record in Highland Capital. We still have Mr. Seery on the witness stand. Mr. Phillips, you had examination. You said one question.

MR. PHILLIPS: I did, Your Honor. And I meant it.

THE COURT: Okay.

CROSS-EXAMINATION

BY MR. PHILLIPS:

Q Could you look at Exhibit 118, please?

A You said 118?

Q Yes, sir.

A Certainly.

Q Did the calculation of the Class 10 claim amount of $336,940,230.58, is that the result of applying the full value to the Highland or Highland Claimant Trust of the HMIT note receivable?

A Apologies, because I can't read this because it's too small, but I can answer the question.

THE COURT: Would you like this?

THE WITNESS: I think I can answer the question without it.

THE COURT: Okay.

THE WITNESS: The -- what we used was the petition date capital account.

BY MR. PHILLIPS:
Q Correct.
A And just like every other claim in bankruptcy, fixed at the petition date. And what we subtracted from that petition date was the petition date amount principal and interest of that HMIT note which was owed to Highland Capital.
Q Thank you.
THE COURT: All right. That was one question. All right. Counsel?
MR. YORK: Thank you, Your Honor. Get it organized here.

CROSS-EXAMINATION

BY MR. YORK:
Q Good afternoon, Mr. Seery.
A Good afternoon.
Q Would you take a look at Exhibit 1 in Daugherty's witness and exhibit binder? It's the settlement agreement between Highland and Mr. Daugherty, I believe.
A Yes, I have it.
Q All right. And can you confirm that is the settlement agreement that Highland and Mr. Daugherty entered into in connection with the claims Mr. Daugherty asserted in the bankruptcy?
A It appears to be, yes.
Q Would you turn to Section 9, then, which is on Page #11,

starts on Page #11?
A Yes.
Q And that relates to a reserved claim that Mr. Daugherty had as part of his proof of claim against Highland in the bankruptcy, correct?
A That's correct.
Q And would you agree with me that the second line of Section 9 there of the settlement agreement describes that claim as a contingent unliquidated claim against the Debtor?
A I would not agree with you on that, no.
Q Why not?
A Because it says, Daugherty contends --
Q Ah. Daugherty contends.
A -- he has a contingent unliquidated claim against the Debtor.
Q Okay. Well, why don't you then turn with me to Daugherty Exhibit #2, which is the -- which is the -- Highland's adversary complaint that was filed against Mr. Daugherty on I believe May 2nd of 2025. Correct?
A I don't recall the specific date and it's blurred at the top. So if you say so, I'll accept that.
Q All right. And if you look at Paragraph 1, the third line, there's a sentence there that says, All of Mr. Daugherty's claims were settled except his unliquidated contingent claim that the Debtor has a continuing and

indefinite obligation to make him whole if a tax refund he apparently received for tax year 2008 on account of his partnership interest is ever successfully challenged by the IRS.

Did I read that correctly?

A You did read that correctly, yes.

Q All right. This reserved claim under the settlement agreement is a Class 8 unsecured claim, correct?

A It is the claim that he asserted and that we initially classed under Class 8 in a fixed amount for a tax refund which is on his statement that he got that he claims he's entitled to more, which would be unsecured as of the petition date. I believe the amount on his payment statement from 2009 is $1.475 million.

Q All right.

THE COURT: Could you pull the microphone closer to you?

THE WITNESS: I'm sorry, Your Honor.

THE COURT: Okay. Good.

MR. YORK: All right.

BY MR. YORK:

Q And, again, my question is pretty simple. And it's a Class 8 unsecured claim, right?

A It's not a Class 8. It was in Class 8. It's been objected to.

Q Right.
A So it is not in a class now at all. We seek to disallow it in its entirety, or, at worst, subordinate it to all creditor claims.
Q Understood. But it has been asserted as a Class 8 general unsecured claim, right?
A He asserted it as that, yes.
Q Okay. And is it fair to say that in the adversary complaint, if you go to Page -- I'm sorry, Paragraph 4 -- Highland alleges that: However, even if Mr. Daugherty's claim is not disallowed in its entire -- I think that should be entirety. Right?
A It should be, yes.
Q It remains contingent on the outcome of the 2008 audit. Correct? Did I read that correctly?
A You did read that correctly, yes.
Q And the next sentence says, It is unclear when, how, or if the 2008 audit will finally be resolved. Correct?
A Correct.
Q And in fact, if you go to, then, Page #7 of the complaint and you look at Footnote 6, at the very end of that footnote it indicates that Highland has an understanding that the resolution may not be expected until approximately 2029. Is that correct?
A The litig... I can't read it because it's small, but the

litigation may not be resolved. The IRS has already issued a final determination on the audit.
Q How do you know that?
A I was advised that by another partner.
Q Who?
A Kurt Plumer.
Q Have you seen the FPAA that was issued by the IRS?
A No, I have not.
Q Have you asked for it?
A Yes.
Q You did, personally?
A My lawyers did.
Q Your lawyers did?
A Yes.
Q Okay. But you -- but you did not, right? Just to be clear.
A No, I did not. My lawyers, acting at my direction, did.
Q Asked the tax matters partner for Highland for that information?
A Asked Mr. Daugherty.
Q Asked Mr. --
A I think asked you, I'm sorry.
Q Oh, asked me for that information?
A Yes.
Q Well, so tell me, why is Mr. Daugherty -- first off, do

you know if Mr. Daugherty has received the FPAA?

A I don't know.

Q Okay. Do you know if anybody else has received an FPAA?

A I was told there was a final determination. I don't know if they've actually received an FPAA. But I do know that Mr. Daugherty has produced a document where the IRS has requested additional information for him. Since they hadn't done that for 17 years, I suspect that they've reached a final determination of the audit.

Q All right. So you don't know whether an FPAA has actually been issued?

A I --

Q True?

A I don't know. And for the Court's benefit, that's a Final Partnership something Determination.

Q Okay. What -- where --

THE COURT: F-A --

THE WITNESS: F-P-P -- I think it's --

MR. YORK: F-P-A-A.

THE WITNESS: -- F-P-A-A.

THE COURT: Okay. The court reporter will no doubt ask, so good.

BY MR. YORK:

Q Tell me, where in the universe is it that -- is it Mr. Daugherty's obligation to provide Highland with the FPAA?

A I don't -- I don't think there's any such obligation that I've seen.

Q And in fact, the IRS audit is handled by the tax matters partner for Highland Capital, correct?

A The IRS audit for Highland Capital's -- from Highland Capital's position is handled by that. The IRS handles their side.

Q Right. From Highland's side. Okay. And that tax matters partner is doing that on behalf of Highland Capital, right?

A I think at this point it's doing it on behalf of the old Highland Capital, not Reorg Highland Capital. We don't have any liability with respect to it, nor do we have any visibility as to what's going on in the tax audit.

Q So even though, under the partnership agreement, that's the tax matters partner that's referred to, Highland Capital cannot compel that tax matters partner to provide that information to them, if an FPAA actually exists?

A I don't think so. That partnership agreement is the pre-effective date partnership agreement.

Q All right.

A The new Highland Reorg Debtor doesn't have these partners and is not a tax matter partner for those -- those audits.

Q So let's go back, then, to Paragraph 4 of the adversary complaint that was filed. And I want to look at the next sentence that Highland wrote there. It says: Moreover, if

the claim is not disallowed, it will need to be estimated, after taking into account the likely outcome of the 2008 audit, including adjustments that result therefrom.

Did I read that correctly?

A You read that correctly.

Q Have -- has anyone at Highland conducted any analysis as of today to determine what Mr. Daugherty's potential liability would be from that IRS audit if that audit was completed today and all interest and penalties were assessed as of today?

A Yes.

Q How much?

A It would be $1.475 million, the amount of his prepetition claim in his proof of claim. Since it's unsecured, whatever happens with the IRS is not a concern of Highland. His claim is that he didn't get that amount as a refund. Either he got that amount or he got some -- some lower amount. It would be a petition -- prepetition-date amount. And under Texas law, he would be entitled to prejudgment interest from 2009 to the petition date at a rate of five percent.

Q Which would be how much?

A It would be approximately $2.2 million in aggregate.

Q Okay. And there would be -- you're saying there would be no penalties or any other -- any other interests or assessments that would -- Mr. Daugherty would be liable for that Highland would also then be liable for under that claim?

A No. There would not. It would not impact his claim against Highland. His claim against Highland is simply: I did not get this refund.

He got the refund. He's now claiming it might be adjusted. If the IRS otherwise has penalties, interest against him for his tax attributes somewhere between 2009 and 2019, that wouldn't be subject to his proof of claim and it wouldn't be the responsibility of Highland.

Q Even if Highland had promised at the time that that refund was made that it would -- it would make him whole with respect to any IRS audit whatsoever?

A It simply --

MR. MORRIS: Objection to the form of the question.

THE WITNESS: It simply didn't do that.

MR. MORRIS: Yeah.

THE COURT: Okay. Overruled.

THE WITNESS: We can -- you could litigate the claim, but that's just not what it says.

BY MR. YORK:

Q So you talked earlier about the Class 9 consent that was obtained, and no one from Highland reached out to Mr. Daugherty to try to seek his consent. Right?

A That's correct.

Q Why not?

A Because I didn't want to.

Q Why?
A Because Mr. Daugherty is an extremely difficult person to deal with. The last time I dealt with Mr. Daugherty on the phone with respect to anything, I had extreme difficulty and got sucked into a stalking lawsuit that I had to testify to that is a complete mess that I want nothing to do with. So originally my counsel said, have no communication with him. But with respect to this, we were objecting to his claim. We knew he would try to hold this up. You have tried to do that and demanded $20 million. So that's why we didn't reach out to you. We just paid the 9 and we have a fully-reserved amount on the 8.
Q You thought that the stalking case that you were pulled into was completely fabricated, didn't you?
A I thought that at the time. I'm not as sure anymore.
Q Oh, really?
A Yeah.
Q Okay. And you actually also told Mr. Daugherty that Mr. Ellington, who brought that case, was a complete liar and POS, right?
A I don't know if I used POS, but I do not think Mr. Ellington is an honest person.
MR. MORRIS: Your Honor, at some point I'm going to on relevance grounds. I think we've got a settlement agreement before the Court that we're trying to get approved

today, not to take discovery on any other matters.

THE COURT: Okay. I'm going to overrule to the extent there was an objection, but I think it's appropriate to worry that we're straying down a road that is not relevant. So, --

MR. YORK: Understood.

THE COURT: -- reign it in.

MR. YORK: All right.

BY MR. YORK:

Q You'd agree that the -- under the terms of the proposed settlement, there will be some interim distributions will be made to the HMIT entities in cash totaling approximately $23 million. Correct?

A Not necessarily, no.

Q Why not?

A Because there's an initial distribution. I believe it's $10 million.

Q Yes.

A And then subsequent distributions are predicated on whether there are threats, either outstanding litigation or threats as defined in the agreement.

Q And so long as those threats don't occur, then those interim -- those additional interim distributions will be made, right?

A Yes. The Indemnity Trust would make those distributions

at those times, and then I have to make -- it's a double trigger, because it has to be no threats and I have to determine that the Indemnity Trust had sufficient assets to meet its obligations for both actual and contingent indemnification obligations.

Q But at a minimum, the HMIT entities will receive at least $10 million?

A Yes.

Q On an interim basis?

A Yes.

Q All right. And you'd agree with me that, under the terms of the plan, the plan provides that the classes get paid in order of priority, correct?

A That's correct.

Q All right. And if you turn to Daugherty Exhibit 4, which is the confirmation order, at Page 45. And Subsection A there in the middle of that has a sentence that says: Accordingly, as the holders of the equity -- excuse me. Strike that. Let me start over. Are you there yet, Mr. --

A Now I am.

Q All right. Accordingly, as the holders of equity interests that are junior to the claims in Class 8 and Class 9 will not receive or retain under the plan on account of such junior claim interest in any property unless and until the claims in Class 8 and Class 9 are paid in full, plus

applicable interest, --

Did I read all that correctly?

A Yes.

Q Okay. And the term "Claim" there is a capitalized term, right?

A Yes.

Q It's not -- it doesn't say allowed claims. It just says claims. Right?

A That's correct.

Q All right. All right. Now, if you'd turn with me to the Claimant Trust Agreement, which is Daugherty Exhibit 5, and go to Section 5(c). Excuse me. 5.1(c). I apologize.

A Yes.

Q And this is -- this is -- relates to the contingent trust interests associated with the Class 10 and Class 11 limited partnership interests in Highland, correct?

A Generally, yes.

Q All right. And you'd agree with me that, in the -- about four lines down, it says: The Claimant Trustee shall allocate to each holder of allowed Class 10-B and C limited partnership interests and each holder of allowed Class 11 Class A limited partnership interests a contingent trust interest equal to the ratio that the amount of each holder's allowed Class 10 or Class 11 interest bears to the total amount of the Class 11 or -- Class 10 or Class 11 interest, excuse me, as applicable

under the plan.
Did I read all of that correctly?
A I believe you did, yes.
Q All right. And under the terms of the proposed settlement, the HMIT entities are getting an allowed Class 10 interest, correct?
A That's correct, yes.
Q All right. And then the next sentence goes on to say: The contingent trust interest shall not vest and the equity holder shall not have any rights under this agreement unless and until the Claimant Trustee files with the Bankruptcy Court a certification that all GUC beneficiaries have been paid indefeasibly in full, including, to the extent applicable, all accrued and unpaid postpetition interest consistent with the plan and all disputed claims have been resolved. The GUC Payment Certification.
Did I read that correctly?
A You did, except you used the article "The" before "contingent trust interest" at the start of the sentence.
Q Fair enough. And the GUC beneficiaries there would be the general unsecured creditor beneficiaries, correct?
A That's correct.
Q And this certification has not been issued yet by the Claimant Trustee in this bankruptcy, correct?
A That's correct.

Q In part because of Mr. Daugherty's remaining unresolved Class 8 claim, correct?
A In part, yes.
Q And also in part because of the remaining Class 9 claimant holders who still have money owed to them on their Class 9 claims?
A In part, yes.
Q Okay. Does the term of the proposed settlement agreement provide those Class 9 consent holders with releases from the HMIT entities?
A No.
Q It does not?
A No.
Q At all?
A No.
Q Even if they were in their capacity serving as board members for Highland Capital?
A Certain of the Class 9 holders are also on the Oversight Board. In their capacity as Oversight Board members, yes, they get -- they get broad releases. UBS, for example, is not. There are no releases in there for the two UBS entities.
Q Would you now -- you can set that binder aside. And if you'd turn with me to Exhibit 60 in the -- Highland's exhibit list.
A Six zero?

Q Yes, sir.
A Yes.
Q This is a copy of the tolling agreement extending objection deadline between -- that's on -- dated July 27th of 2022 between Mr. Daugherty and Highland Capital Management, LP and Highland Claimant Trust. Correct?
A Yes. That's what it appears to be, yes.
Q All right. If you would, go with me to Page 2 at the bottom. There is a Footnote #3. Do you see that?
A Yes.
Q And that footnote relates to, up above, a defined term called a "Reserved Claim," the Reserved Claim being what was discussed earlier in Mr. Daugherty's settlement agreement with Highland, right?
A That's correct, yes.
Q And it states in here that that Reserved Claim means "the contingent and unliquidated claim as referenced in Proof of Claim #205."
Did I read that portion of the footnote correctly?
A Yes.
Q All right. And it goes further to say that the amount listed there of 2.65 million three hundred -- two point six -- let me start ever. $2,650,353 is the amount estimated as of October 23, 2020. Correct?
A That's correct.

Q All right. It doesn't say it's -- anywhere in there that it's a fully -- it fully reserves that unliquidated contingent claim. Correct?
A In what you just read, no.
Q All right. And if you go to Page 1 -- or, I'm sorry, to Page 3, Paragraph 1, the covenant to reserve where Highland agrees to reserve $2,650,353 on account of the reserved claim, does it say anywhere in there that that is -- fully reserves that contingent unliquidated claim anywhere?
A It says exactly what it says. And you read it.
Q That's not my question. Does it say --
A I don't -- well, it says, Further agree to reserve $2.650 [million] on account of the reserved claim in disputed claim reserve.
Q All right. Does it say anywhere in there that that is the fully-reserved amount of that claim?
A Not in that sentence, no.
Q Thank you. All right.

MR. YORK: Your Honor, give me one second. Let me confer.

THE COURT: Okay.

(Pause.)

BY MR. YORK:
Q Mr. Seery, UBS is one of the consent holders, Class 9 consent holders related to the HMIT settlement. Correct?

A There are two UBS entities, UBS AG 66 and UBS Securities, LLC.

Q All right. Did either of those entities sit on the Unsecured Creditors' Committee in this bankruptcy?

A A UBS entity did. I'm not sure which of those did, or whether it was both with one counsel. I don't -- there's a UBS entity on that Creditors' Committee.

Q Is the -- are the members of the Unsecured Creditors' Committee within the definition of the Highland released parties under the proposed HMIT settlement? Do you know?

A I don't know. The members of the Creditors' Committee, I believe, have exculpation anyway, so I don't -- I don't -- I don't know if it captures the old members of the Creditors' Committee. I don't -- for example -- I don't think so. I don't -- I don't know.

MR. YORK: Pass the witness.

THE COURT: All right. Mr. Lang?

THE WITNESS: Do you have a separate binder?

MR. LANG: No.

THE WITNESS: Okay. Will you be using Mr. Daugherty's binder?

MR. LANG: No.

CROSS-EXAMINATION

BY MR. LANG:

Q All right, Mr. Seery. Just to be clear, the Class B and C

-- or the Class A interests and the -- of Highland under the plan, they have 99.5 percent of the -- Highland Capital Management. Correct?
A Could --
Q Sorry. The Class B and C --
A Limited partnership interest.
Q -- shareholder -- limited partnership interests were 99 point -- or, were .5 percent of Highland Capital Management?
A I -- I'm not trying to be difficult.
Q No, it's fine. It's a terrible -- terrible --
A I don't -- I just don't -- I don't understand your question. I apologize.
Q Okay. So, at the time of the petition, --
A Yes.
Q -- Hunter Mountain Investment Trust owned 99.5 percent of Highland Capital Management?
A It owned 99-1/2 percent of the limited partnership interest in Highland Capital Management.
Q And the remainder -- and HMIT has the Class 10 claims. Correct?
A You said something, the remainder? The --
Q Oh, sorry. The remaining interests are owned by the Class 11 claims under the plan.
A The remaining partnership interests are among those entities I testified earlier to, which are Dugaboy, Strand, --

Q And Okada?
A -- Mark Okada individually, and two Mark Okada and Pamela Okada trusts.
Q Okay. And the total assets in the estate right currently you testified are between $65 to $70 million?
A I -- off the top of my head, I don't recall, but it -- rough range, it could be in that general vicinity. That does not include the payments that have to be made to the 9s and expenses. So I believe there's documents in here that we could go through, if you like.
Q And I believe you testified that the remaining unpaid 9s are owed approximately $20 million?
A Approximately $20 million, yes.
Q Okay. And the plan does not say that the equity claims for Class 10 and 11 are to be determined by the capital account values of the limited partnership interests in the Debtor LP?
A That's correct. It says to set an amount. It doesn't tell you how to do the amount.
Q Okay. And under the settlement agreement, Class 10 interests will be allowed in the amount of $336,940,230.58?
A Approximately $336 million, yes.
Q $336 million. Fair. And this is the capital account balance as of -- HMIT's capital account balance as of the petition date, less, I believe, the HMIT note?

A That's correct. So that amount is the net amount.
Q The net? And do you know how the capital account balances were calculated --
A Yes.
Q -- on the petition date?
A Yes.
Q And how were they calculated?
A So, you take the 2018 year-end capital account amount, and then there's activity in the company that gets passed through through the partnership. The partnership agreement -- in this instance, the prepetition Debtor partnership agreement passed through profits and losses on a pro rata basis. There was activity in the first half of the year that affected that capital account. You can see that reflected in the year-end auditeds as well as the K-1 statement that -- for 2018 that was given to HMIT. That would be their 2018 year-end. That then, from an accounting perspective, was used and brought down to the petition date. And between the petition date and year-end 2019, there was additional capital activity, the biggest one of which was the reserve -- full reserve for the $50-plus million for the HMIT note. And so then you'll see the 2009 auditeds that are signed off by Mr. Waterhouse. And in those interim months, then you also see the gross amount of the partner capital each month in the monthly operating reports.

Q And correct me if I'm wrong, but I believe you testified that the capital account balances continued to go down after 2019. So you have the petition date, you have the next year, and did they continue to --
A I don't think I testified to that. What I testified to is that there was economic activity in 2019 that affected the year-end '18 to the petition date. And then from the petition date there was year-end activity -- there was activity from the petition date to year-end '19 that would affect the capital account as reflected in the 2018 auditeds -- they weren't auditeds -- 2018 tax returns signed off by Waterhouse. The biggest part of that activity was the application or the reserve for the Hunter Mountain Note.
Q And was there any activity after the 2019 tax return?
A There was postpetition activity in the partnership, certainly.
Q And did it reduce the capital accounts during those years?
A I assume it would have reduced all of the capital accounts pro rata.
Q Okay. And why'd you use the petition date as the date to determine the value of the capital accounts?
A Because this is bankruptcy and that's the date on which you fix all your claims and interests.
Q If you used -- have you ever used equity ownership percentages to determine the payment to the equity versus

their capital account balances?
A In this case, or elsewhere?
Q Elsewhere.
A I think that's standard. I can't cite you a specific thing, but typically when a partnership liquidates or a partnership is sold, amounts get distributed pursuant to the capital accounts and -- and -- in up to amounts in the capital accounts.
Q You would agree, if you use the percentage of ownership, being 99.5 percent for Class 10 and the .5 percent for Class 11, would potentially leave money for the Class 11 creditors to recover?
A I don't think so. No, I don't agree with that.
Q Why do you say that?
A Because Class 11 is subordinated to Class 10.
Q Okay. So explain how, if $60 million exists and you pay $20 million to the Class 9, --
A Roughly. Yeah.
Q Rough. Just rough math.
A Okay.
Q That leaves $40 million.
A Okay.
Q Correct? And if the ownership interests or the allowed claim for HMIT was 99.5 percent, wouldn't that leave .5 percent of $40 million for the remaining creditors?

A That doesn't make any sense, because 99-1/2 percent of a senior thing means you get everything. So that Class 10 has to be paid in full before the 11.

In addition, there's already an agreed-upon amount on HCLOM for $10 million. So how do I give HCLOM $10 million and 99-1/2 percent to somebody else? There has to be numbers.

Q But to be clear, the plan does not say that the equity claims are determined on capital accounts. Correct?

A That's correct.

Q All right.

MR. LANG: No further questions.

THE COURT: All right. Any redirect?

MR. MORRIS: Just one moment, Your Honor.

(Pause.)

MR. MORRIS: We have no questions, Your Honor.

THE COURT: All right. Any redirect from --

MR. PHILLIPS: No, Your Honor. Thank you.

THE COURT: -- the one question?

Okay. Thank you, Mr. Seery. You are excused from the witness box.

THE WITNESS: Thank you, Your Honor.

(The witness steps down.)

THE COURT: Okay. I'm going to again take proposals. I can live with a 30-minute lunch break. I and my staff can. But it's easier for us than all of you. So do you all want to

negotiate for more?

MR. MORRIS: I just wanted to let the Court know that, with that, the Movants rest. We're not -- we're not going to call anybody else.

THE COURT: Okay.

MR. MORRIS: We reserve the right to cross-examine. We reserve the right to call rebuttal witnesses, including Ms. Deitsch-Perez and Mr. Dondero, depending on what testimony is elicited. So we reserve the right to call rebuttal witnesses. But we're not calling anybody further on our direct case, and we rest.

THE COURT: Okay. So let me --

MR. MORRIS: I'll let them --

THE COURT: -- follow up on that point.

MR. MORRIS: Uh-huh.

THE COURT: There had been a discussion of Mr. Patrick.

MR. MORRIS: Uh-huh.

THE COURT: Limited to one total hour. Thirty minutes collectively, Debtor and HMIT. Thirty minutes collectively, Dugaboy and Daugherty.

MR. MORRIS: You know what, Your Honor.

THE COURT: You're -- you're not asking --

MR. MORRIS: No, maybe I -- I forgot that you had told us we could do it, too. So let's take the lunch break,

let us figure it out, we'll let you know when we come back.

THE COURT: Well, I'm clarifying because I'm deciding --

MR. MORRIS: Yeah.

THE COURT: -- who gets to go first.

MR. MORRIS: Understood.

THE COURT: Each witness.

MR. MORRIS: Understood.

THE COURT: And I presume --

MR. MORRIS: Understood.

THE COURT: -- the Debtor/HMIT would go first.

MR. MORRIS: Yeah.

THE COURT: And then with regard to Dondero, --

MR. MORRIS: Yeah.

THE COURT: -- you all would go first.

MR. MORRIS: So I withdraw what I said. Let us confer during the lunch break and we'll figure out who's going first, whether we do rest or whether we put Mr. Patrick on for a short direct.

THE COURT: Okay. Which leads me to our lunch break. Do people want to negotiate for more than 30 minutes? I don't want to make someone collapse if --

MR. MORRIS: Thirty minutes, or 1:30?

MR. PHILLIPS: 1:30.

MR. MORRIS: 1:30, Your Honor. It's nice and round.

MR. PHILLIPS: One clarification, Your Honor. Because I don't -- I don't -- if one side doesn't take the half hour, does that go over to the other side, or --

THE COURT: No.

MR. PHILLIPS: No?

THE COURT: I don't think -- I'm just giving --

MR. PHILLIPS: Great. Thank you.

THE COURT: And my law clerk said maybe I was confusing about that earlier today.

MR. MORRIS: Yeah.

THE COURT: One hour total, but 30 minutes each. And if one collective team doesn't use the whole 30 minutes, we're not --

MR. MORRIS: Yeah.

THE COURT: -- giving it to the other side. Okay?

MR. PHILLIPS: That was my question.

MR. MORRIS: Understood, Your Honor.

THE COURT: And while I'll let you all discuss whatever you want, what I envisioned is you all would go first with Mr. Patrick, --

MR. MORRIS: Uh-huh.

THE COURT: -- and then Dugaboy and Daugherty would go first on Mr. Dondero. But if you all collectively think it makes sense to do something different, I'll hear.

MR. MORRIS: No. That makes sense, Your Honor.

MR. PHILLIPS: Thank you, Your Honor.

THE COURT: All right. So we'll come back at 1:30 --

MR. YORK: Yes.

THE COURT: -- and resume.

MR. YORK: Thank you so much.

THE COURT: Okay. Thank you.

THE CLERK: All rise.

(A luncheon recess ensued from 12:51 p.m. until 1:33 p.m.)

THE CLERK: All rise.

THE COURT: Please be seated. All right. We're back on the record in the Highland Capital matter, the Rule 9019 motion for approval of a settlement. When we broke, we were waiting to talk about Mr. Patrick and Mr. Dondero as witnesses. Are they going -- is Patrick going to be your witness?

MR. MORRIS: No, Your Honor. We're going to reserve our 30 minutes for rebuttal.

THE COURT: Okay. Thank you.

All right. I'll hear from the Objectors now.

(Pause.)

MR. YORK: Sorry, Your Honor. I didn't realize they were going to observe. So, --

THE COURT: Well, yes. If you understood what I was saying before the break, I presumed they might want to go first with Mr. Patrick, but it was -- you're the one who

wanted him, so if they want to go second, they can go second.

MR. YORK: Well, --

THE COURT: Well, I say "you're." I'm sorry.

MR. LANG: No, it's okay.

THE COURT: Mr. Lang wanted to go --

MR. YORK: Yeah. So are we definitely doing Mark Patrick now?

MR. PHILLIPS: No.

MR. YORK: Oh, okay.

MR. PHILLIPS: We just rested.

THE COURT: Okay.

MR. MORRIS: They can call whoever they want.

THE COURT: They have rested. If you don't want to go forward with any witnesses, you don't have to.

MR. YORK: Oh, we --

THE COURT: But you had wanted to go forward -- you wanted to question Patrick and I said, if he's going to be a witness, then Dondero should also be a witness. Okay? And at most an hour collectively for each witness. If you don't want to call either one of them, you don't have to call either one of them.

MR. LANG: We're going to. I think that they were just going to call Daugherty first. I didn't know if you had an order that you wanted to do this in.

THE COURT: Well, no. I don't care. I guess I don't

care. Was Daugherty listed? I mean, --

MR. YORK: Yes.

THE COURT: I'm sorry. Did you say Daugherty or Dondero?

MR. LANG: Daugherty.

THE COURT: Okay. I'm sorry. So you want to call Daugherty?

MR. YORK: Yes.

THE COURT: And you listed him as a witness?

MR. YORK: Yes.

THE COURT: So you may call Daugherty.

MR. YORK: All right.

MR. MORRIS: Yes. I --

MR. YORK: We'll call Patrick Daugherty, then.

THE COURT: Okay.

MR. MORRIS: I don't believe Dugaboy did, but --

MR. YORK: Right.

MR. MORRIS: -- if they -- if they want to call him, by all means.

THE COURT: Okay.

MR. MORRIS: Yep.

THE COURT: All right. Mr. Daugherty, if you could approach the witness box, I will swear you in. Please raise your right hand.

PATRICK DAUGHERTY, PATRICK DAUGHERTY'S WITNESS, SWORN

THE COURT: All right. Please be seated.

THE WITNESS: Oh, wow. A lot of water up here.

THE COURT: Plenty of water for everyone.

DIRECT EXAMINATION

BY MR. YORK:

Q Good afternoon, Mr. Daugherty. Could you state your name for the record, please?

A Patrick H. Daugherty.

Q Mr. Daugherty, are you a creditor in the Highland Capital bankruptcy?

A Yes, I am.

Q All right. And would you turn to, in the Daugherty exhibit binder, turn to Exhibit 1, please?

A Yes.

Q And this is a settlement agreement between you and Highland Capital Management relating to claims -- your proof of claim that you made in this bankruptcy, correct?

A Yes.

Q And we looked earlier. You were in the courtroom for Mr. Seery's testimony, correct?

A I was.

Q All right. And we talked in Section 9 about the defined Reserved Claim in there. Do you remember that?

A I did.

Q All right. Can you describe what --

A I consider it the Compensation Claim, but yes.
Q Can you describe what the Reserved Claim is?
A Yeah. Basically, it, background, it dates back to the financial crisis of 2008, 2009. Highland was on the brink of filing for bankruptcy. We had a creditor bank led by Bank of America and Scotia, and we were in default. And so the banks came in, declared default, and basically put a limit or terminated our ability to pay cash bonuses. And that -- right after Lehman Brothers failed, so call it September 2008 and going into 2009.

And the problem with that is we were losing people right and left. We had about 22 senior-level guys. We were down -- and I say guys. I think there were some women, too. But we were down to about 12 people. And they were trying to stem the tide of people running out of the doors in order to save the value of Highland. We started the year at about $40 billion under management, and by that time, we were -- I think we were as low as $19 or $20 billion under management.

Hedge funds were rolling up. CLOs did fine. Private equity did fine. Retail funds were having problems. And separate accounts were okay. But we were definitely a firm in crisis and trying to hold on to people.

So the nature of this compensation claim, you know, every year, everybody except Dondero and Okada would get what's called a compensations and award letter. Because Dondero and

Okada were really the only partners. I think you can kind of see that, given your experience. They were called the founding partners. They were the only ones that got true distributions from the firm annually. Guys like us, you know, the other 12 or so, we got cash bonuses and incentive comp and deferred comp. And, you know, obviously, cash compensation was a big part of our compensation, and they were prohibited from the banks from paying it.

So Dondero, with the help of Rick Swadley and some of the other tax people, I don't know if we used out outside firms or not, they came up with this scheme, if you will, where Highland was going to go and use whatever they came up with with the partnerships and whatnot and then generate a tax refund to the senior-level guys. As or in lieu of the cash bonuses that couldn't be paid, they were going to go make these elections and then we were going to get this money.

And if you look at our awards agreement, it says you're going to get *x* amount of money. And it's in the line that historically is the cash bonus.

Also, when we got like our email or whatever that year from Patrick Boyce, our CFO, he was like, Congratulations, your bonus this year was *x*. And it was whatever that amount was on your compensation and award letter.

Well, several of us had the same accountant, John Garvey, at Bland Garvey. Me, Joe Daugherty, and Davis Deadman. And

we took this concept to our accountant and he's like, man, that's really precedent. And so you guys are going to have to basically protect yourselves from -- sorry, go ahead. Make your objection. I'm sure I'm --

MR. MORRIS: I just, I just don't remember what the question was at this point and he's testifying to --

THE WITNESS: Why I got this thing.

THE COURT: It was --

THE WITNESS: My apologies.

MR. MORRIS: -- to conversations and hearsay.

THE COURT: What is the --

MR. YORK: Let me ask a question and I'm going to try to --

THE COURT: -- proof of claim about, was the essence of the question.

MR. YORK: Yeah. Right.

THE COURT: So I sustain. We're getting a little narrative, shall we say.

THE WITNESS: My apologies.

MR. YORK: So, --

THE WITNESS: I'll tighten it up.

BY MR. YORK:

Q All right. So, Mr. Daugherty, what you were getting under this scheme, as you describe it, was a cash bonus that was masked as a refund, correct?

A Look, Highland paid for it however they're going to pay for it. They're the one who created whatever that they did. But for us, it was a cash bonus.

Q Okay.

A But given that I was -- what I was just alluding to, there were concerns about the tax impacts if the IRS didn't agree with Highland. And so what we did is we negotiated for and got from Dondero -- really, I mean, Jim ultimately made the decisions at Highland. He said, look, if you don't -- if this doesn't work, if it doesn't go through, we'll make you whole. And so we got that provision in the compensation and award letter that says if the actual refund deviates materially from the refund, then you'll get substitute compensation. And that was enough for us, --

Q And --

A -- and that's what led to this claim.

Q And was it your understanding that, in terms of making you whole, that was not just whatever you had to pay back for the refund, but also interest and penalties?

A Yeah.

MR. MORRIS: Objection. Leading.

THE COURT: Sustained.

THE WITNESS: That's fair enough.

BY MR. YORK:

Q What was your understanding as to what that 'make you

whole' constituted?
A It was basically to put me and the others back in the position of getting to that number that was listed in the document. So if there were any interest, penalties, pullbacks from the IRS, then we would be made whole at that -- we'd get back the net of that number. However, if the IRS was fine with it, we wouldn't get anything.
Q So there's a chance, depending on how the IRS audit turns out, if the IRS says what Highland did was fine, then you don't owe the IRS anything, right?
A Yeah. That's been a critical thing, that I may not owe the IRS anything, and certainly I wouldn't expect Highland to give me anything.
Q And at that point, what's been reserved as your reserved claim would effectively at that point, from the IRS perspective, the IRS audit perspective, would be a zero dollar amount, right?
A Yeah. I mean, more so. I mean, Jim Seery offered to buy me out with an amount of the reserved claim. And I said, listen, I'm not looking for a windfall here. What I'm looking for is to be made whole, --
Q Right.
A -- it's my insurance policy on what I earned back in 2008, because the alternative is I will have ended up working for free in 2008, plus have to pay penalties and interest going

forward that could wipe out my net worth.
Q All right.
A So I wanted the insurance policy aspect of it.
Q So you heard Mr. Seery's testimony earlier where he said the total amount you would owe was somewhere in the range of $1.4 to $1.5 million if there was --
A He's wrong about that, if that's what he said.
Q Why?
A At the time -- I think the number he was referencing was in our claim number that I filed back in, I want to say, October 2020. And the $1.45 million, what was in the compensation -- was the number in the compensation and awards letter.
The other number that I spoke about from the gallery out there was one point -- I don't know, whatever the interest -- whatever I guessed the interest might be. And then I didn't have anything for penalties. So, at that particular time, took those numbers and said, okay, if the IRS says no way on all this, this is what I'd have to pay, not including penalties.
Q All right. So you've seen today and you listened to the testimony about the footnote in Highland's adversary complaint against you in which they say that the resolution may not be until 2029 of this IRS audit?
A That's correct. I've heard that.

Q All right.
A I've seen it and heard it.
Q All right. As you've sat here today, have you done any calculation back of the napkin to try to estimate what your potential exposure would be to the IRS in terms of interest and penalties as a result of that audit dispute if it wasn't resolved until 2029?
A Yeah. I listened to the judge. I went and ran '33 because that was a number that was just thrown out. At '33, if it's 2033, it's $7.4 million, and if it's 2029 it's $5.7 million.
Q What sort of financial impact would that have on you?
A The latter would pretty much wipe me out. I'm sorry. The former would -- the $5.7 million would wipe me out. The latter would cause me to file for bankruptcy.
Q Okay. Mr. Seery also discussed his -- that he had heard through the grapevine that the IRS audit had been resolved. Has anyone from Highland ever told you that the IRS audit is resolved?
A No one's told me that from anywhere, anyhow, anyway.
Q Have you had a conver... have you had -- so nobody at all, right?
A No one at all.
Q Have you -- did you have a conversation recently with Kurt Plumer over it?

A I did. I had lunch with him at Hillstone.
Q Did he mention it at all?
A No.
Q All right. Could you turn with me to, in your exhibit binder, Exhibit 8, please?
A Yeah.
Q All right. Can you just identify for us what this document is?
A This is a letter I got from the IRS dated November 20th, 2024, basically telling me that the case is open and I may owe money.
Q And specifically, if we look at the first paragraph, it says, "Why You're Receiving This Letter," in bold, right?
A It does.
Q And then below that it says: We might have to adjust your tax return based on our examination of the Highland Capital Management listed above.
Did I read that part correctly?
A Yes.
Q And so is it your understanding that your -- that this is related to the IRS audit of Highland?
A That is my understanding.
Q And that your tax return, your personal tax return may be adjusted as a result of that?
A Mine and my wife's.

Q Which would mean you're subject to interests and penalties as well?
A As is she.
Q Okay. And is this the only letter you've ever received from the IRS?
A No.
Q Related to the Highland Capital Management audit?
A No.
Q All right. Do you receive these periodically?
A Yes. The initial one came I want to say about five months after we filed the returns in two thousand -- it was for the calendar year 2008, so it was April 15th, 2009, I want to say. Maybe it was -- I think the first one came around October, late October 2009.
Q And --
A Like this. I can't -- I don't remember it verbatim.
Q Is this the last communication you have received from the IRS relating to Highland's IRS audit?
A This was it. Yeah.
Q Okay. Has anyone from the IRS ever told you that an FPAA has been issued --
A No.
Q -- with respect to the Highland's audit?
A No. I don't even know what that -- I didn't even know what that was.

Q And you've never received an FPAA from the IRS, right?
A I have not.
Q And you've never -- nobody else has ever sent you an FPAA related to the Highland audit, right?
A No.
MR. MORRIS: I'm being kind, but this is just --
THE COURT: It's leading.
MR. MORRIS: -- testifying from the podium.
THE COURT: Sustained.
THE WITNESS: Yeah.
BY MR. YORK:
Q All right. Mr. Daugherty, would you turn -- we'll switch topics real quick to the tolling agreement. Would you turn in Volume 1 of the Highland exhibits to Exhibit 60, please?
A Volume 1, and then which one, I'm sorry?
Q Exhibit 60.
A Yeah. Yes, I'm there.
Q Why did you enter into -- well, back up. Strike that. Start over. This is the tolling agreement extending a claim objection deadline between you and Highland Capital and the Highland Claimant Trust as of July 27th, 2022, correct?
A That is correct.
Q And is it your signature on Page 6 or 7 of the document on the left-hand side?
A It appears to be, yes.

Q All right. Why did you enter in this tolling agreement? Why did you enter into --
A I'm sorry, what was your question?
Q Why did you enter into this tolling agreement?
A Jim Seery had reached out to me in 2022 and said that they had a problem with -- the Court had an objection deadline that was running and that was somewhat inconsistent with the settlement agreement that we had just gotten approved in early March of 2022 that said they couldn't object, they being Highland, object to the legitimacy or amount of my compensation claim.
So he said, look, you know, we're in a little bit of a predicament here. We can go to the Court or we can try and work this out. And I'm like, hey, I'm fine to work it out. I don't want the estate to be burdened or any way. So we went back and forth on the document, and ultimately I felt that it was the right thing to do. The spirit of our settlement was, you know, I -- they couldn't -- they couldn't challenge this part of my claim, but the *quid pro quo* was I'm not going to be able to beat them out on a technicality by running in here, saying, ah, the objection deadline, you know, expired.
So his solution seemed to be a reasonable one. And we worked with their counsel, I think Demo and to some degree Morris, to work that out for them.
Q How did the estimate come about in Footnote 3?

A I don't know. Nobody ever asked me about it. There was no -- Mr. Morris is right, there was no negotiation about it. Because, frankly, I didn't see that as my problem. They had something to fulfill pursuant to the plan. And there was no back and forth on that reserve amount with Seery whatsoever. He just said, This is what we're doing and, you know, we're going to put this -- and my perception is I didn't have any right to challenge it other than what was in my settlement agreement. And I looked at that as a one-time right to go and seek an estimate, and I didn't want to do it that early in the process.

Q Would you take a look with me at the last recital that's on Page 3 of the document? All right. It says, --

A Oh. You're going to make me read. All right.

Q It says: Whereas, solely to avoid the expense, inconvenience, and uncertainty associated with litigation, and without any party admitting liability, fault, or wrongdoing, or releasing or waiving any rights or defenses with respect to the reserved claim, the parties desire to enter into this agreement to extend the claim objection deadline solely with respect to the reserved claim to January 11th, 2023 at 5:00 p.m. Central Time, defined as the Objection Deadline.

Did I read that part correctly?

A You did.

Q What was your understanding of this recital provision

being put in here?
A Well, I think I just kind of summarized it. There was a problem that the parties didn't, you know, fully recognize could occur that would give me a windfall, and so this was to kind of solve that on an interim basis until we got to a final resolution on this tax refund thing.
I mean, the honest truth, God -- Judge. Not God, Judge. But the honest-to-God's truth is Seery and I had a very good relationship, and we were going back and forth, and his view was that this thing could get resolved in 2022.
Q Did you have an understanding as to whether or not you were reserving all rights with respect to your reserved claim under the terms of the tolling agreement?
A Absolutely I did. Both in emails and in the document.
Q All right.
MR. YORK: Pass the witness.
THE COURT: All right. Any cross? I'm assuming Dugaboy did not have questions. And, Mr. Daugherty, I should have --
MR. LANG: No, we do not.
THE COURT: Okay. Thank you. Cross?
CROSS-EXAMINATION
BY MR. MORRIS:
Q Good afternoon, Mr. Daugherty. Take your time.
A How are you, Mr. Morris?

Q Good. I just have a few questions. You have been paid in full on your Class 9 claim, correct?
A Evidently, yes.
Q And that Class 9 claim was for $3.7 million, correct?
A I believe it was $3.75 million.
Q Thank you for the clarification. Do you recall how many payments you received that resulted in your receipt of $3.75 million?
A I don't.
Q When you received those payments, did you tell Mr. Seery -- did you send it back to Mr. Seery out of any concern that your Class 8 claim has not been resolved?
A No.
Q When you received those payments, did you object to Mr. Seery or to anybody else that it was improper for the other Class 9 holders to receive the payments when your Class 8 claim had not been resolved?
A I had no idea what they were receiving.
Q Did you have any reason to believe that you were receiving a benefit that the other Class 9 claim holders were not receiving?
A Again, I had no idea what they were receiving, so I can't compare the two.
Q Okay. But it is true that you accepted without protest your Class 9 payments, even though your Class 8 claim had not

been resolved, correct?
A I think that's accurate.
Q Okay. I think you mentioned in your proof of claim it had $1.4 million; is that right?
A Again, I'm cuffing it. If you could grab it, I'll -- I want to say it was -- the proof of claim had two components, as I mentioned. There was a, as I mentioned, there was the compensation award amount from my compensation letter of like $1.475 million.
Q Uh-huh.
A Don't quote me on that, but close enough.
Q Approximate.
A And then an interest component that would take me up to that particular time if the IRS reversed it.
Q Okay.
A But no penalties were included.
Q And that approximately $1.45 million, that's money that you received back in 2009?
A I didn't get that full amount in 2009. That was -- I don't want to broaden this up too much, but many times what was promised was not what was delivered. So I got a lesser amount from the IRS.
Q How much less did you receive?
A I want to say, on a net basis, it was just under $1.2 million.

Q Okay. And so it's true that you've had the benefit of the $1.2 million for 15 years now?
A When you say the benefit, what do you mean?
Q It went into your pocket 15 years ago.
A Yeah, but it's a contingent liability I have back to the IRS, so I can't say that it's, you know, not without reservations.
Q But you've had possession of that million and a half dollars now for 15 years, correct?
A Right. And with it comes an obligation --
Q Okay.
A -- contingent back to the IRS.
Q Your claim is a prepetition claim; is that right?
A What do you mean by my claim? Are you talking about the compensation one?
Q Yes.
A Yeah. I mean, that -- that contractual obligation originated in, well, yeah, February 2009.
Q It's not an administrative claim, right?
A I don't believe so, no.
Q It's just -- it's just a claim that existed prior to the petition date. Fair?
A That is fair.
Q Okay. With respect to the reserve, you did agree to that amount of the reserve, fair?

A I did not. I mean, I -- I signed the document, but I did not agree to that amount.
Q Well, --
A I did not negotiate for it or anything like that.
Q Well, but if you turn to Exhibit 60 that you just looked at, --
A sure.
Q -- and you go towards the end of the document, that is your signature on the first Page 7, right?
A Yeah. I've already admitted that.
Q And Paragraph 1 of the agreement that you signed specifically set the reserve at the amount set forth in Paragraph 1, correct?
A That much is true.
Q Okay. And you --
A You just said, did I agree to it, and I'm like, it was in the document.
Q It's in the agreement that you signed, correct?
A For sure.
Q Okay. And you've never asked for that amount to be adjusted, correct?
A I've spoken many times to Mr. Seery and told him that it will need to be adjusted upward as years go by. We've had quite a dialogue along those lines.
Q Okay. But he's never agreed to do that, correct?

A He said when the time comes, we'll figure out -- listen, we had a very collaborative relationship up until like the last year. And so it was like, hey, I'm not going to press you. You don't -- he's fighting off Dondero right and left. You know, and I'm like, I don't want to get in the middle of all this. You go do what you've got to do. We'll both sit tight. In fact, there was dialogue to that very effect.
Q Uh-huh.
A And so this was just all part of sitting tight, thinking that the right thing would be done when we got final analysis to this.
Q Okay. So would you just agree with me that, since signing this agreement, you haven't come to court to seek an adjustment --
A No.
Q -- of the reserve?
A I did not want to be a burden.
Q Okay. And since signing this agreement back in 2022, you and Mr. Seery have not come to an agreement on any adjustment to the reserve, correct?
A We have not.
Q Okay. Do you believe that you have claims against Highland's employees?
MR. YORK: I'm going to object on relevance grounds. Also, outside the scope.

THE COURT: What is the relevance?

MR. MORRIS: We're going to get to the $20 million demand in a moment. I'm laying the foundation. But we have anybody on anybody --

THE COURT: But what's the $20 million demand?

MR. MORRIS: I'll get to it in a moment.

THE WITNESS: There's --

THE COURT: I can't figure out if --

MR. MORRIS: I can make a proffer if you'd like.

THE COURT: -- that's relevant.

MR. MORRIS: I can make a proffer, Your Honor. I'll tell you. I'll tell you right now.

On June 5th, Mr. York called me and said that Mr. Daugherty asserts that he has claims against the Highland employees, and if Highland didn't pay him $20 million he was going to sue them, and he was going to file this objection together with a petition in the Supreme Court opposing Highland's request to stay the issuance of a mandate in the Fifth Circuit.

MR. YORK: First off, if Mr. Morris is going to become a witness, we've got a problem here. Secondly, any sort of communications between us would be 408. And third, it's not relevant to the issue we're here on today.

THE COURT: Okay.

MR. MORRIS: My response to that, Your Honor?

THE COURT: All right. I'm going to allow a little latitude, --

MR. MORRIS: Yeah.

THE COURT: -- but I'm still unclear --

MR. MORRIS: It's about -- it's about three questions.

THE COURT: Okay.

MR. MORRIS: It's about three questions.

THE COURT: You may proceed.

BY MR. MORRIS:

Q Do you believe you have claims against Highland's employees?

A Me personally, no.

Q Okay. Do you -- did you authorize your lawyer to call me and to demand $20 million in exchange for a release and your standing down from filing any objection to this motion?

A I'm not aware that that ever happened. Nobody demanded anything of you.

Q Really?

A Yeah.

Q Do you know that your lawyer used the number $20 million to me?

A Oh, I've read the emails back and forth between you.

Q So why don't you explain to Judge Jernigan what your understanding is as to what your lawyer meant when used $20

million to me.

A I can't say for sure what he meant, but I can tell you from my perspective what I understood.

Q What did you understand?

A I have another entity that I picked up in the settlement with Highland called the Highland Employee Retention Asset Fund. And again, pursuant to the settlement agreement, I mean -- I guess supposedly, I guess, when I think about it, I do have claims individually, because it's with me, that agreement.

But it said that Highland had to turn over all the books and records of the HERA fund. And Mr. Morris was on many of those emails. And they had turned over some of the books and records, but they didn't turn over any of the books and records that implicated Thomas Surgent and David Klos in defrauding HERA in allocating Highland's expenses when they were litigating me, against me, back to HERA.

So I do have a settlement agreement with Highland and these employees, but Highland Employee Retention Assets needs their books and records. And we've made it very clear to you on numerous emails where you, you know, kind of muscled up on us and said this is all you're going to get and tough if you don't like it or whatever.

And so the deeper we get into this, we did get discovery from others, we found that Highland's been withholding

material information.

So as it relates to -- I mean, you're doing that little squeaky thing, and I think he's a fantastic lawyer, but the reality is you guys have created some damages to HERA that you may be accountable for. Your clients, not you.

Q Okay. In the four years since we signed the settlement agreement, you've never asserted a breach of contract claim, have you?

A Well, because we thought you were complying with it. So if you want to go into the details there, in 2022, we were -- asked for more information. 2023, we asked for more information. 2024, we asked for more information. And so those are continuing breaches.

Again, I -- I don't want to go to war with Highland. You're too damn good of an attorney, you're scaring me a little bit. But --

Q I don't want to.

A You know, listen. You know I think well of you.

Q I appreciate that.

A But, you know, I mean, I just wanted the information. I'm not looking to go to war with you guys. I got enough battles that I've got to fight. And so, you know, I guess a number was thrown out or whatever. I don't know the full context of it. But it wasn't -- it wasn't for this IRS compensation issue.

Q But what was the -- my last question. What was the $20 million demand for?
A Again, it's just a number. Y'all were having settlement negotiations. So, I mean, you work off of it.
Q All right.
MR. MORRIS: I have no further questions, Your Honor.
THE WITNESS: Yeah.
THE COURT: All right. Any redirect?
MR. PHILLIPS: I have no questions, Your Honor.
THE COURT: All right. Okay.
MR. YORK: Apologies. I wanted to make sure.
THE COURT: Yes.
MR. YORK: No redirect, Your Honor.

EXAMINATION BY THE COURT

THE COURT: Okay. If you've watched Highland hearings, you know the judge sometimes has questions. I am still trying to understand the 1.4, the 1.2, the 1.475. I understand broadly that, in essence, a cash bonus was negotiated back in early 2009, I think you said.
THE WITNESS: Yes.
THE COURT: After 2008. And so that's, in essence, what was contractually negotiated. But I understand there was a hook, if you will, we're calling it a contingency, whatever word you want to use, where if one day there was an IRS audit and I guess Highland had extra liability for 2008, that this

-- I don't know if I understood it or not.

THE WITNESS: Do you want me to try and guess what you're asking, or --

THE COURT: Try to guess what I'm asking. Again, I'm --

THE WITNESS: The liability -- so, Highland chose to use this tax scheme as a currency to pay us a cash bonus. From our perspective, we weren't stupid. We're like, well, okay, that's great, but if the IRS says --

THE COURT: Okay, I just want to know what -- you say you were contractually entitled to $1.4 million.

THE WITNESS: That's what I was supposed to get for that bonus year.

THE COURT: Okay. But there was a tax contingency, if you will, where -- that's where I want you to jump in.

THE WITNESS: So, Highland had a tax problem. They came up with this mechanism to use whatever they were doing with the IRS to create the cash to pay us a bonus. We looked at it and said, well, this looks fishy -- by the way, every year before that and after that, I've just gotten a cash bonus. But for this one year, when the banks are saying, no, no, no, we get this. And so we looked at this and said, look, this sounds fishy, but if you can't pull it off, we need to be made whole. I can't be in a situation where here I am in 2025 and I may have to pay $5, $6 million to the IRS for the

pleasure of working at Highland.

THE COURT: Okay. See, that's where my disconnect is.

THE WITNESS: Uh-huh.

THE COURT: Because I thought this all turned on a Highland tax return.

THE WITNESS: Oh, no, no. So, Highland did the planning and the creation of the scheme, and I guess ultimately it was Highland's tax return, but it flowed through to us as pass-throughs. K-1s, what have you.

THE COURT: Right.

THE WITNESS: So I guess it's both.

THE COURT: Okay. You were a partner.

THE WITNESS: Well, that's debatable, too. That's debatable, too, because I had a --

THE COURT: Okay. I thought you weren't, but --

THE WITNESS: Well, I wasn't --

THE COURT: But you got -- okay. Let me just skip to, --

THE WITNESS: Yeah.

THE COURT: -- I guess, the important part. You did, you got paid? You said $1.2 million?

THE WITNESS: Yeah. I got a refund back from the IRS for around that amount. Slightly under $1.2 million.

THE COURT: So the contingency you are worried about

that you think gives you a contingent claim against Highland is, what, the IRS comes back and says --

THE WITNESS: And they say, Give us that money back plus interest plus penalties or we're taking your house. And it's a very real threat, because this has gone on, as you've noted, forever. And I went from having a one-point-whatever bonus to possibly having to pay six, seven, eight, I don't know how long this lasts, million dollars back to the IRS for an election that was made by them. As a substitute for paying me a cash bonus the regular way, they did it this way. And that's why we put and negotiated for that term in the compensation agreement that said, if for whatever reason the actual refund is different, we get made whole.

THE COURT: Okay. I may be overthinking this, I do do that sometimes, but I'm still, I'm trying to understand why your claim would escalate up to, you know, you said maybe $5.7 million if, in 2029, this all plays out with the IRS.

THE WITNESS: That --

THE COURT: Because you've gotten the benefit of that money and --

THE WITNESS: Well, no, because if the IRS says --

THE COURT: -- return on that.

THE WITNESS: Sorry. I didn't mean to interrupt.

THE COURT: You know what I'm saying? So I'm trying to figure out why it would grow in the way that you're

suggesting.

THE WITNESS: Can I respond?

THE COURT: Yes.

THE WITNESS: So I've gotten money that the IRS says is not mine. Right? And the IRS says --

THE COURT: And you've had the use of it.

THE WITNESS: Oh, yes.

THE COURT: You've presumably invested it and --

THE WITNESS: Well, no, I mean, you can't --

THE COURT: Well, you've had the ability to. Uh-huh.

THE WITNESS: But you don't want to take risk with something that's not yours, so you're kind of limited, right? But I have, I have that amount of money. Here's the problem, Your Honor, with that. If the IRS says, Give us back our money, here's the interest, here's the principal. Oh, by the way, if it's $7, $8 million, I can't -- I don't have that. I've got to file for bankruptcy in order to give the IRS back money that I'm having to pay them for the pleasure that I had of working for Highland in 2008 when I helped save the company and create a lot of the assets that paid all these people in the room. MGM Studios, Trussway.

THE COURT: Okay.

THE WITNESS: Okay.

THE COURT: Yeah. We are going beyond this.

THE WITNESS: Fair enough.

THE COURT: I was just, I'm zeroing in on this because I'm trying to figure out, I mean, it matters to me if that reserve is likely fair enough, the reserve I'm told you agreed to is fair enough. And I'm having trouble figuring out, I mean, if you've had the use of this money for 17 years or whatever that is, why you would get this extra interest add-on that you're -- $5.7 million or whatever it would be. You know, $3 million more.

THE WITNESS: Can I answer that question?

THE COURT: Uh-huh.

THE WITNESS: Because the IRS didn't look at it as my money. They looked at it as their money. And so if you look at the plain language of the compensation award letter, if the actual amount deviates from the amount that was granted, then Highland was going to give me substitute compensation to make me whole. Making me whole includes the penalties and the interest that I would owe the IRS. Because if you look at it any other way, I had to pay money to work at Highland.

THE COURT: Do I have that letter in my evidence?

THE WITNESS: You should. Drew?

THE COURT: Do I? Maybe I'll just cut this off and look at the letter.

MR. YORK: It's at Daugherty 2, and it's at the back of --

THE WITNESS: There's multiple letters, but this is

one of them.

THE COURT: The letter that you say this claim stems from.

THE WITNESS: Sure.

THE COURT: I'll just cut it off and look at that.

THE WITNESS: Yeah, you can tell her where it is.

MR. YORK: So I think it's at the back of the statement on PD-2. It's at the last page, Your Honor.

THE COURT: Which one?

MR. YORK: P -- Daugherty 2.

THE COURT: Oh, 2? I've got emails.

THE WITNESS: P-2? I don't think so.

THE COURT: Okay. We can move on.

MR. YORK: That's fine. We'll work this out.

THE COURT: Before we're done here today, I want to look at the letter to better understand how the claim could grow substantially to --

MR. YORK: Yeah.

THE COURT: -- $5.7 million by 2029. Okay. Thank you.

THE WITNESS: Thank you, Your Honor.

THE COURT: You're excused.

THE WITNESS: Oh, I found -- I just found it and then I closed it.

THE COURT: Okay. Well, you can --

THE WITNESS: My bad.

THE COURT: -- call my attention to it when you find it.

THE WITNESS: All right.

(The witness steps down.)

THE COURT: All right. Your next witness?

MR. YORK: I believe we're calling Mark Patrick.

THE COURT: All right, Mr. Patrick. All right. Please raise your right hand.

MARK PATRICK, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

THE COURT: All right. Please be seated.

And, Courtney, you're going to start the clock going. I show 2:12. I don't know if my clock's right.

You may proceed.

MR. LANG: And, Your Honor, may I hand the witness -- this is from Mr. Morris' opening. May I use this as Exhibit 3?

THE COURT: Oh, okay. You're talking about the back page of his PowerPoint?

MR. LANG: Yes. Org chart.

THE COURT: Yes. I've got it in front of me. And for the record, I'm going to put this PowerPoint, even though it's not an exhibit *per se*, as a demonstrative aid in the file for this matter. And so it's the last item of the Highland PowerPoint. All right.

MR. LANG: Yes.

DIRECT EXAMINATION

BY MR. LANG:

Q Mr. Patrick, does this Hunter Mountain Investment Trust org chart that I just handed you accurately reflect the structure of the Hunter Mountain Investment Trust ownership today?

A Just give me a few moments to review.

Q Sure.

MR. LEWIS: Your Honor, I had mentioned early on that we object to this whole line of questioning because it's outside the scope of the objection of Dugaboy. And I don't want to interrupt, but I want to make sure that my objection is continuing, because this has nothing to do with the objection presented by Dugaboy.

THE COURT: All right.

MR. PHILLIPS: So we object to the question.

THE COURT: Okay. So the record will reflect basically a running objection from Hunter Mountain?

MR. PHILLIPS: We would appreciate that, Your Honor.

THE COURT: Okay. In light of the failure of Dugaboy to disclose Mark Patrick as a witness, as well as the failure to challenge in a written objection his authority. Okay. So I recognized that this was quite a persuasive objection, but given the magnitude, I would say, of what is going on here,

potentially a settlement that could come very close to ending this long-running plan implementation process, I'm erring, if it's an error, I'm erring on the side of allowing this. All right. But you have a running objection that the record will reflect if one day there is an appeal.

MR. MORRIS: And, Your Honor, the Highland Claimant Trust and the Highland Litigation Subtrust and Highland Capital Management, LP join Mr. Phillips' objection.

THE COURT: Okay. Understood.

MR. PHILLIPS: Thank you very much, Your Honor.

THE COURT: All right.

BY MR. LANG:

Q Mr. Patrick, have you had time to study this Hunter Mountain Investment Trust org chart?

A Yes, I have.

Q And does this accurately show the ownership structure for Hunter Mountain Investment Trust today?

A I'm not sure, without reviewing the underlying corporate documents on some of these entities that you have listed here.

Q Did you help prepare this chart?

A No.

Q No? Okay. So Hunter Mountain Investment Trust is owned by Beacon Mountain, LLC, correct?

A Yes.

Q And Beacon Mountain, LLC is owned by CLO Holdco, LLC,

correct?
A Correct.
Q And CLO Holdco, LLC is owned by CLO Holdco, Limited?
A That's correct.
Q And CLO Holdco, Limited is owned by Charitable DAF Fund, LP?
A Correct.
Q And Charitable DAF Fund 1, LP is owned by CDMC FAD, LLC?
A The ultimate beneficial owner is DFW Charitable Foundation. To my -- to the best of my recollection, I would say that appears accurate. I'm just not a hundred percent.
Q Okay. And --
A But I am a hundred percent that DFW Charitable Foundation is the ultimate beneficial owner. And I'm a hundred percent that Dugaboy Investment Trust has no interest in it. And I'm also a hundred percent that The Dallas Foundation or any --
MR. LANG: Judge, I haven't asked --
THE WITNESS: -- or any other nonprofit has any --
MR. LANG: -- any of these questions.
THE COURT: Okay. There's an objection, nonresponsive. I sustain.
BY MR. LANG:
Q Mr. Patrick, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct?
A (Pause.) I'm just waiting for a relevancy. I don't

understand how that's relevant to my authority --

THE COURT: Okay. You're not allowed to make a relevancy objection. Okay.

MR. PHILLIPS: Your Honor, I think the problem is that, if I could, we have made an objection. And our objection, our running objection is founded on relevancy and founded on improper process. So I would like to just tell the Court, and so my client representative can hear it, that the fact that I'm not standing up every time there's a problematic question, --

THE COURT: Okay.

MR. PHILLIPS: -- because every question is problematic, my objection is being maintained to every question that's being asked.

THE COURT: Okay. You understand that, right?

THE WITNESS: I --

THE COURT: There's a running relevancy objection. You're the witness. You can't make the objection. But it's on the record for whatever use it might have down the road.

MR. PHILLIPS: I have objected to every question that's coming in connection with this line of questioning on the basis of relevance.

THE COURT: I got it. I think we all have it.

MR. PHILLIPS: I'm just --

MR. LANG: Understood.

THE COURT: Yes. And you're thinking he's eating into your 30 minutes?
MR. LANG: Yes.
THE COURT: Okay. We've got it.
THE CLERK: I stopped the time.
MR. LANG: So -- thank you.
THE COURT: Did you stop the time for a minute?
THE CLERK: Yes, I did.
MR. LANG: Thank you.
THE COURT: Okay.
BY MR. LANG:
Q So, to my question, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct? Charitable DAF Holdco, Limited?
A And where is that on the chart?
Q I'm asking, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, Limited.
A Can you show me a corporate document so I know the precise corporation you're referring to?
Q You're the -- you are the manager of -- or the control person of CDHGP Limited, correct?
A Again, I'd have to refresh my recollection, but I am the control person over CDMC.
Q Okay. And CDMC --
A As well as Charitable DAF Fund. I'll represent that to

you.

Q Okay. Was there a transaction in December of 2024 where Charitable DAF Holdco, Limited sold its interest or transferred its interest in Charitable DAF Fund, LP to CDMC FAD, LLC?

A I know you're trying to help other litigation and --

MR. PHILLIPS: Mark.

THE COURT: Okay. Nonresponsive.

THE WITNESS: Your Honor, he's using your time to fish for other litigation to support that --

THE COURT: Okay. Okay. We have a running objection to relevance. I'm going to say that one more time. Okay. Just answer the question as best you can.

THE WITNESS: I'd have to review the corporate documents to refresh my recollection for that time period.

BY MR. LANG:

Q Up until December of 2024, Charitable DAF Fund, LP was owned 100 percent by Charitable DAF Holdco, Limited, wasn't it?

A I don't know what entity you're referring to without a refreshment of corporate documents of that entity. There could be a lot of entities called that.

Q You're aware that there is a proceeding in the Caymans investigating the December 2024 transaction that sold -- where Charitable DAF Holdco, Limited sold its interest in -- and or

transferred its interest in Charitable DAF Fund, LP to CDMC FAD, LLC?

A There are several parts to that question. So the answer is no.

Q Are you aware of a proceeding pending in the Caymans involving Charitable DAF Holdco, Limited?

A Again, I don't know what entity you're referring to. Show me a -- show me a corporate document.

MR. LANG: Your Honor, this was on the Foundation's exhibit list. We cross-designated any document designated as an exhibit by any other party in this case. And I'd like to hand this to the witness.

MR. MORRIS: Which exhibit is it?

THE COURT: Which is -- yes.

MR. LANG: It was on the -- it was on the DAF -- or, the Foundation's exhibit list.

MR. MORRIS: They haven't been admitted into evidence and they've withdrawn their objection. We object, Your Honor.

THE COURT: Yes, they've not been admitted.

MR. LANG: Okay. Well, can I --

MR. PHILLIPS: We object to that, Your Honor. We object to any witness --

MR. LANG: We cross-designated every --

THE COURT: I already discussed at the beginning what we were admitting and that was not disclosed.

MR. LANG: Okay.

THE COURT: As I recall, I said you've only designated the plan and settlement agreement, and the answer was yes.

MR. LANG: Okay.

BY MR. LANG:

Q And we're aware that the Joint Official -- are you aware that there is a Joint Official Liquidator appointed over a Charitable DAF entity in the Cayman Islands?

MR. PHILLIPS: Objection to form.

THE WITNESS: Again, without more specific --

THE COURT: Overruled. Yes.

THE WITNESS: -- specificity, there could be a thousand different actions that you're referring to, in my mind.

BY MR. LANG:

Q Are you aware that the Joint Official Liquidators in the Caymans are investigating transactions involving Charitable DAF Fund, LP and Charitable DAF Holdco, Limited?

A Again, again, I don't specifically know what you're referring to.

MR. PHILLIPS: Your Honor, may I -- excuse me. I don't know that my running objection includes an objection to form for each of the questions. This objection is to form of the questions about, quote, --

THE COURT: What's wrong with the form?

MR. PHILLIPS: -- investigation.

THE COURT: What is wrong with the form of that question? I'm not clear.

MR. PHILLIPS: My objection to form is that the question is an open-ended question with an undefined term, investigation.

THE COURT: Overruled. I don't think that's a vague term. So you may answer.

THE WITNESS: If you show me some document, some complaint or something, I'll be very happy to verify whatever questions related to that. But just giving me verbal words of entities and names and actions, I don't know precisely what you are talking about.

BY MR. LANG:

Q Mr. Patrick, who set up the entities in the Hunter Mountain Investment Trust org chart that is sitting in front of you?

A I'm sorry. Repeat the question?

Q Who set up the various entities that are in the org chart that is on your -- on the stand?

MR. PHILLIPS: Objection to form. Set up. What does that mean?

THE WITNESS: It -- yeah, it's very --

THE COURT: I think we know what it means. Creating,

perhaps.

BY MR. LANG:

Q Created?

A Who? Are you asking if I created it?

Q Did you participate in creating them?

A Did I participate? In which ones?

Q CDMC FAD, LLC.

A What do you mean by participate?

Q Were you involved in creating -- did you initiate the creation of CDMC FAD, LLC?

A Lawyers were.

Q Did you engage in any capacity on behalf of any entity? Were you involved in engaging the lawyers to set up CDMC FAD, LLC?

A Yes, I engaged lawyers to set up entities.

MR. LANG: Objection. Nonresponsive.

THE COURT: Sustained.

MR. LANG: Did you --

THE COURT: He asked about this one particular entity, I think.

BY MR. LANG:

Q Did you --

A Which entity, again, did you ask?

Q CDMC FAD, LLC.

A Yes, I believe I hired a lawyer.

Q And when did CDMC FAD, LLC become a hundred percent owner of Charitable DAF Fund, LP?
A Around the end of March of 2025. I believe.
Q And were you involved in the transaction between -- in which CDMC FAD, LLC obtained a hundred percent interest in Charitable DAF Fund, LP?
A What do you mean by involved? How?
THE COURT: Okay. I can see what's happening here or I have an impression of what's happening here. I feel like you're slowing down this process where I've given 30 minutes to this lawyer. Okay? And I feel like you're feigning confusion. I don't mean to be insulting, but that's how it comes across. Okay? So I need you to speed up your answers and not be confused about things you shouldn't be confused about. Okay?
THE WITNESS: Okay.
THE COURT: I feel like it's late 1980s *Dondi*. Does anyone know what I mean by that? Okay. We've been there, done that, in the federal courts, and we don't like the looking at -- you're not looking up at the ceiling. That's what they did in *Dondi*. Confusion. Delay. Okay?
So I don't mean to chastise you. I'm just telling you that you're going to make us be here a lot longer, and nobody wants that, because I will give him extra time for this. Okay?

THE WITNESS: Understood.

THE COURT: Thank you.

BY MR. LANG:

Q Okay. So you were involved in the transaction in which CDMC FAD, LLC acquired 100 percent ownership interest in Charitable DAF Fund, LP in or around March of 2025, correct?

A Correct.

Q Who did CDMC FAD, LLC obtain its interests in Charitable DAF Fund, LP from in March of 2025?

A From an -- from an entity called Charitable DAF Holdco, Ltd.

Q Charitable DAF Holdco, Ltd., the entity that I asked about earlier, correct?

A Of the same name.

Q Yes. And Charitable DAF Holdco, Ltd. has had Joint Liquidated -- Liquidators, Joint Official Liquidators appointed over it in the Cayman Islands, correct?

A Yes.

Q And those Joint Official Liquidators were appointed over Charitable DAF Holdco, Limited in or around May 6th, 2025?

A In May is what I recall.

MR. LANG: Your Honor, we'll pass the witness.

THE COURT: All right. Do we have any questions?

MR. YORK: No questions, Your Honor.

THE COURT: Okay. Any cross?

MR. MORRIS: Just briefly, Your Honor.

CROSS-EXAMINATION

BY MR. MORRIS:

Q Mr. Patrick, do you know who initiated the proceedings to get the appointment of the Joint Official Liquidators in the Cayman Islands?

A The director and myself, we initially filed for a voluntary joint liquidation in May.

Q And did there come a time when the Cayman court appointed the Joint Official Liquidators?

A Yes.

Q Do you know who asked the court to appoint the Joint Official Liquidators?

A We did, as well as other -- it was an agreement with the participation holders of that entity.

Q And who are the participation holders of that entity?

A It was the DFW Charitable Foundation as a 51 percent holder as well as the Highland Dallas Foundation, Highland Santa Barbara Foundation, and the Highland Kansas City Foundation.

Q And those three foundations that you just mentioned, do you know who controls them?

A Jim Dondero.

Q Is it your understanding that Mr. Dondero was funding the litigation in the Cayman Islands?

A Yes.
Q The Joint Official Liquidators, are you aware of any statement that they've ever made that you are not authorized to act on behalf of any of the HMIT entities?
A Yeah, they've never made a statement that I'm not authorized to act under any of those entities.
Q Okay. Did you receive a letter last night that was purportedly authored by the Joint Official Liquidators?
A Yes.
Q Did you review that letter?
A Yes.
Q Did that letter refer to today's hearing?
A Yes.
Q Are you aware of the Joint Official Liquidators making any appearance in this proceeding?
A No, I'm not aware they made any appearance in this proceeding.
Q Based on your recollection of the contents of that letter, did the Joint Official Liquidators challenge your authority to enter into the settlement agreement on behalf of the HMIT entities?
A No, they did not, because there's no ownership interest.
Q Okay. And what do you mean by that?
A The entity in liquidation owns nothing. And the DFW Charitable Foundation is the ultimate beneficial owner.

Q Are you aware that The Dallas Foundation filed an objection to the settlement agreement on behalf of Empower Dallas Foundation, the Okada Family Foundation, and Crown Global?
A Yes.
Q Are you aware that that objection was withdrawn?
A Yes.
Q Was the withdrawal of that objection the product of negotiations that your counsel had with lawyers for The Dallas Foundation and Crown Global?
A Yes, it was.
Q Did The Dallas Foundation or Crown Global require you to surrender your control position of the HMIT entities as a condition to the withdrawal of their objection?
A To give up my control? No.
Q They didn't ask you to do that, did they?
A No. No.
Q You are the control person for each of the HMIT entities that are party to the settlement agreement, correct?
A That is correct.
Q Are you aware of any requirement in any of the governance documents --
MR. CURRY: Your Honor, I'm not questioning, but I'm going to object to the line of questioning here about what was asked and what was not received into negotiations, because,

frankly, you're getting an imperfect picture there. And I don't think it should be misrepresented. The communications didn't happen with Mr. Patrick.

THE COURT: Okay. I don't know if that objection was a confidential settlement communications.

MR. CURRY: It's a combination of foundation and that he's going into confidential settlement discussions.

MR. MORRIS: Your Honor, it's a very simple question. I'll ask it again.

THE COURT: Okay. We'll let --

BY MR. MORRIS:

Q To the best of best of your knowledge, Mr. Patrick, did The Dallas Foundation or any of the entities on whose behalf it filed its objection require you to surrender your position as the control person of the HMIT entities in exchange for the withdrawal of their objection?

A No, they did not.

Q Thank you. Are you aware -- are you familiar with the governance documents for the HMIT entities?

A Yes, I am.

Q Are you aware of any restriction on your ability to act on behalf of those HMIT entities with respect to -- withdrawn. Are you required to obtain the consent of anyone in order to enter into the settlement agreement on behalf of the HMIT entities?

A No, I am not. I'm the sole authority and control person for that entity.
Q And do you believe that you're entering into the settlement agreement on behalf of the HMIT entities in good faith?
A Yes, I do.
Q Have you received legal counsel before entering into the agreement?
A Yes, I have.
Q Do you believe that you've negotiated the best terms that you could get on behalf of the HMIT entities?
A Yes, I do.
Q Do you believe that you received the information that you believed you required in order to make an informed decision before you entered into the settlement agreement on behalf of the HMIT entities?
A Yes, I did.
MR. MORRIS: I have no further questions, Your Honor.
THE COURT: All right. Mr. Phillips, anything from you?
MR. PHILLIPS: No questions.
THE COURT: Okay. Any redirect?
MR. LANG: Briefly.
THE COURT: Uh-huh.
MR. LANG: Your Honor, because they mentioned the

letter of last night from Grant Thornton, the Liquidators, I'm going to offer that into evidence as the letter that we talked about this morning. But Mr. Morris directly asked him if he reviewed it and asked him questions about it.

THE COURT: Response?

MR. MORRIS: No objection, Your Honor. Go right ahead.

THE COURT: I'll admit it.

MR. LANG: This is --

THE COURT: Do I have it in my notebook?

MR. LANG: -- Dugaboy --

THE COURT: Okay.

REDIRECT EXAMINATION

BY MR. LANG:

Q Mr. Patrick, I've handed you --

THE COURT: We're going to call this Dugaboy 3?

MR. LANG: Dugaboy 3.

THE COURT: Okay.

(Dugaboy Investment Trust's Exhibit 3 is admitted into evidence.)

BY MR. LANG:

Q Mr. Patrick, I've handed you a letter. It's from Grant Thornton dated June 24th, 2025. Do you see that?

A Yes.

Q And is this a true and correct copy of the letter that you

received or that you reviewed from the Joint Liquidators that you referred to in your answers to Mr. Morris' questions?

A Well, it's a PDF. I mean, I'm assuming it's from the Official Liquidators.

Q But this is the letter you were referring to in your testimony a few minutes ago?

A Yes.

Q And do you see on the second paragraph it says that, on May 6th, 2025, the Grand Court of Cayman Islands Financial Services Division appointed Margot MacInnis and Sandipan Bhowmik, each of Grant Thornton Special Services (Cayman) Limited, as the Joint Official Liquidators of the company. Do you see that?

A Yes.

Q And do you see on the second page, it says: Since our appointment, we have been diligently investigating these transactions, including a corporate transaction that occurred in or around December 2024 where the company transferred a hundred percent of its interest in the Fund to CDMC FAD, LLC, which resulted in the company being the sole member of CDM and subsequent redemptions of the company's interests in CDM.

Do you see that?

A Yes.

Q Is that your understanding of what is happening in the Caymans right now, is investigating these transactions?

A Correct.

MR. LANG: Pass the witness.

MR. MORRIS: May I just have that letter, please?

THE COURT: Any recross?

MR. MORRIS: Yeah, just real brief.

RECROSS-EXAMINATION

BY MR. MORRIS:

Q None of the transactions that you were just asked about has anything to do with any of the HMIT entities, correct?

A That's absolutely correct.

Q Okay. And now that we have the letter in the record, if you could look at the third paragraph. Do you see --

A Yeah.

Q Do you see it refers to the Highland Dallas Foundation, Highland Santa Barbara Foundation, and Highland Kansas City Foundation?

A Yes.

Q Are those the three entities that you referred to earlier that are, to the best of your understanding, controlled by Mr. Dondero?

A Yes.

Q Okay. And this is the letter that you said you reviewed and concluded that the Joint Official Liquidators weren't challenging your authority to enter into the agreement on behalf of the HMIT entities; do I have that right?

A Yes. Yes, you do.

MR. MORRIS: I have no further questions, Your Honor.

THE COURT: Okay. I have a question or two.

EXAMINATION BY THE COURT

THE COURT: And again, I apologize if I sounded harsh earlier. I recognize different people present different ways when they testify. It just appeared to me that maybe we were slowing things down unnecessarily. All right?

THE WITNESS: I apologize, too. I'm just a little emotionally upset they're using this proceeding for a benefit someplace else.

THE COURT: Okay. My question, very general question: Do you think this settlement is fair and equitable as far as HMIT is concerned?

THE WITNESS: Absolutely.

THE COURT: And could you tell me why?

THE WITNESS: Yeah. There was no obvious pathway for HMIT to, in my mind, to receive the residual interest of the bankruptcy estate without a settlement with the Debtor. Otherwise, it just seemed to me that it would go on forever. And then I balanced that against the existing litigation and the probability of the outcome weighted against the costs, and determined that it made sense from HMIT's perspective to enter into the settlement agreement.

THE COURT: Okay. And you understand that, as part

of this, you're giving up some litigation claims that have been waged now for a couple of years or more?

THE WITNESS: That is correct, but I'm also receiving the Kirschner Litigation, which I did negotiate to receive.

THE COURT: Okay. And there was a note that the estate -- I've heard it called at some point the $57 million note that HMIT owed Highland, a December 2015 note -- that basically gets credited against the capital account. You understand that?

THE WITNESS: Yes, I do.

THE COURT: Okay. And then you understand that if I approve this deal, I'm not sure why there's going to be $500,000 to HMIT and then also another $10 million to HMIT, but subsequent payments could get held up if there are litigation threats to the Highland Claimant Trust. You understand that, correct?

THE WITNESS: Yes, I do.

THE COURT: Okay. I just, I have to ask. I'm confused about what's going on here. I thought that -- well, let me just ask this: Would you consider yourself crossways with Mr. Dondero now?

THE WITNESS: No, but I'll answer the question. Upon advice of counsel, I quit Skyview Group. And upon advice of counsel, I terminated the back office services that Skyview Group was providing to the DAF.

THE COURT: Okay. Well, you said you're getting maybe a little emotional because of other litigation. I'm just trying -- I don't understand what all that other --

THE WITNESS: Unrelated -- well, unrelated to that. They're clearly trying to use this forum to benefit their Cayman actions. They hired U.S. counsel called Reed Smith, and they've been begging for an organization chart to issue a variety of frivolous lawsuits against the operating DAF entities. So I do apologize, but that's a little upsetting to me because I know we're going to -- that I've just fed them a list of targets in another unrelated matter.

THE COURT: Okay. Reed Smith. Here we go again with -- they've made an appearance for Mr. Seery in this litigation.

MR. MORRIS: Exactly. And we have raised that issue.

THE COURT: Okay.

MR. MORRIS: And I'm surprised to hear that they think they still have the ability to do this. But we will pursue that later.

THE COURT: Okay. All right. I had nothing further. Thank you, Mr. Patrick.

(The witness steps down.)

THE COURT: All right. So where are we now? I said that, again, just trying to balance the playing field, if Dugaboy was given the ability to question Mr. Patrick, then I

would allow I guess you want to call it rebuttal in the form of the Debtor, Reorganized Debtor/Claimant to call Mr. Dondero. Do you choose to call him?

MR. MORRIS: I'm not.

THE COURT: Oh, and I guess I'll allow you, --

MR. MORRIS: Yeah.

THE COURT: -- if you want to put on your client representative, Mr. Lang.

MR. LANG: We call Jim Dondero.

THE COURT: All right. Yes, we are timing.

Please raise your right hand, sir, Mr. Dondero.

JAMES "JIM" DONDERO, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

THE COURT: All right. Thank you. The time is running.

THE WITNESS: Thank you for the time.

DIRECT EXAMINATION

BY MR. LANG:

Q Mr. Dondero, do you claim that Mr. Patrick lost authority to enter into the 9019 settlement -- or, the settlement agreement that's the subject of the 9019 motion today?

A Yes.

Q And when do you claim Mr. Patrick lost authority to enter into that settlement agreement?

A I think it's best if I give a timeline. He left Sky -- can I give a --

MR. PHILLIPS: Objection, Your Honor. Nonresponsive.

THE COURT: Overruled. He can give a timeline.

THE WITNESS: He left Skyview in October, November, walked out the door, never talked to anybody again, never talked to the charities again except through counsel. Never collected severance, anything else. Just walked out the door.

As part of Skyview's review of what he'd been working on and what was the nature and what might have been happening, they discovered numerous abnormalities. They discovered--

THE COURT: Do we have an objection?

MR. MORRIS: We do. We're not going to use this opportunity to smear Mr. Patrick. If the notion is that the breach of the ability to act with authority occurred in May, he should start his timeline in May.

THE COURT: Well, I assumed he was just giving background to explain.

THE WITNESS: Yes.

THE COURT: So I'll overrule.

THE WITNESS: Thank you. I'm going to just give you a little bit of background. Everything that I'm stating is in the public record. I won't do anything to besmirch Mark Patrick. It's all in the public record. It's all in the Cayman pleadings. But there was affidavits regarding embezzlements by vendors where he would request overbilling and the money sent to his house.

MR. PHILLIPS: Your Honor, we're talking about documents outside the scope, not identified, not listed. Objection.

THE WITNESS: It's all --

MR. PHILLIPS: This is not a timeline.

THE COURT: This --

THE WITNESS: It's --

THE COURT: Sustained. We don't have anything in the record. This is --

THE WITNESS: Okay. It's all in the public arena. And so is the insider trading.

MR. PHILLIPS: Objection, Your Honor.

THE WITNESS: So, --

THE COURT: Okay. I sustain.

THE WITNESS: Okay. All right.

And then, yeah, and then there was monies missing. There were large amounts of monies missing from the estate. There was unexplained $16 million of expenses in '23.

MR. PHILLIPS: Objection, Your Honor. They're --

THE COURT: Okay. Explain the relevance, Mr. Lang.

MR. LANG: I thought he was just giving a background.

THE COURT: It's getting rather --

THE WITNESS: Okay, Your Honor. Well, --

THE COURT: -- colorful, shall we say. All right?

THE WITNESS: Okay. Without giving specifics

regarding the embezzlement or --

MR. PHILLIPS: Your Honor?

MR. MORRIS: We move to strike, Your Honor.

MR. PHILLIPS: We move to strike all of this.

MR. MORRIS: We move to strike all of this.

THE COURT: Okay. I grant. We don't have any evidence of embezzlement.

THE WITNESS: Okay. All right. Without detailing any of the bad acts that we -- that it looked like happened from the investigation, we took all the bad acts and all the investigations and we gave them to the three underlying charities. Let's remember the DAF is a legacy charity I set up 15 years ago, or actually, Mark Patrick did the documentation back when he was a loyal employee. And it was three -- around $300 million and about $600 million of liability, I mean, legal claims and other things that were meant to be a family legacy, where the donations would help the community. We've given out more than $50 million over the years. And the recognition would help our various companies or our families. That's what it was. Okay?

Went to the three underlying charities who were the beneficiaries of the DAF as it existed: Santa Barbara, Dallas Foundation, Kansas City. These are large charities that have been around for a hundred years. I don't control them by any form or fashion. As a matter of fact, the Hunts are $4

billion out of the $6 billion in Kansas City. I think I'm a hundred million or whatever. The DAF was a hundred million. I think the Hunts would be disturbed to hear that I control it.

Anyway, so all those charities were beneficiaries. And so we went to them with all the investigative results. And at first, they tried to verify, they tried to have an audience with Mark Patrick. They wanted details. They wanted what -- financials. They wanted to know what was happening. And nothing was forthcoming from Mark Patrick. He didn't think he owed them any fiduciary responsibilities.

MR. PHILLIPS: Objection. Hearsay.

THE WITNESS: No, that's --

THE COURT: What is the out-of-court statement? I'm not sure.

MR. MORRIS: Mark Patrick thinks that he doesn't owe any fiduciary duties.

MR. PHILLIPS: They did an investigation. They tried to do *x*. They tried to do *y*.

THE COURT: Oh, okay. Technically not hearsay, but I think we're getting --

THE WITNESS: Okay.

THE COURT: -- a little far beyond the subject matter. So if we could reign it in, please.

THE WITNESS: Okay. In February, they were noted,

they were notified, or, in particular, Dallas Foundation was notified that their Empower subsidiary, which owned a hundred percent of the HMIT interests that we were talking about, was transferred to an undisclosed company for a million dollars. Without any transparency, without any understanding of who the new owner was, they filed for receivership in Cayman. To the best of the charity's knowledge and based on all the documentation --

MR. PHILLIPS: Your Honor, objection.

THE COURT: Okay. Let me try to understand the relevance. Do you think I opened this up by asking if there was a falling out essentially between you and Patrick? Is that why you're going into this? Or --

THE WITNESS: No, no, no. No. The falling-out is much bigger than this. But I'm just saying the day receivership was filed was the day Mark Patrick lost authority. And I think anybody would look at it that way. It was for liquidation in the Cayman --

THE COURT: Okay. That's his view and we'll either see the --

THE WITNESS: Okay.

THE COURT: -- documents that support that or not.

THE WITNESS: All right. So, your -- yes. Because the question was when do I think he lost authority. I -- you could make the argument he lost it a lot sooner, because for

months beforehand the charities had written him letters saying they wanted their assets distributed in kind, they lost faith in --

THE COURT: Okay.

THE WITNESS: Yeah.

MR. PHILLIPS: Again, Your Honor, objection.

THE COURT: This is hearsay. Okay. I sustain.

THE WITNESS: Okay. Well, they did.

So, eventually, and it takes a lot to get four little old ladies at different charities to get together and agree to file a charity in liquidation, but they did in the Caymans. Okay? And then lo and behold, the response from Mark Patrick was, ha-ha, there are no assets there anymore, I moved them all to my living room --

MR. PHILLIPS: Move to strike, Your Honor.

THE WITNESS: -- at DFW.

MR. PHILLIPS: There's no evidence in the record of this. There was no evidence of any statement. Move to strike.

THE COURT: There's not, right?

THE WITNESS: Well, no, there is, because what Mark Patrick --

THE COURT: Sustained. I don't have it.

MR. PHILLIPS: Your Honor, there is no evidence of any of this.

THE WITNESS: Well, Mark Patrick's testimony, he said -- he said that our receivership was right after his receivership. He had liquidated and taken all the assets out from Dallas, Santa Barbara, and whatever, and moved it all to his charity. So when we tried -- when the poor charities in Texas in the U.S. tried to file for liquidation, his response was ha-ha. And there were no assets there, you know, because he had already filed --

MR. PHILLIPS: Objection.

THE WITNESS: He -- he --

THE COURT: Okay, I've sustained the objection to the ha-ha. Okay.

THE WITNESS: Okay. But he had, he had filed --

MR. PHILLIPS: Your Honor, please, move to strike.

THE COURT: Okay. Let's strike everything after that last question. Ask your next question.

MR. LANG: I don't remember what the first question was.

BY MR. LANG:

Q What happened -- or, what's your understanding of the proceedings in the Caymans?

MR. PHILLIPS: Your Honor, objection. Form. Understanding of the proceedings in the Caymans?

MR. LANG: His understanding is, I mean, his understanding. What's his endgame?

THE COURT: All right. I sustain.

MR. LANG: Okay.

THE WITNESS: The Cayman Islands --

MR. PHILLIPS: Your Honor?

MR. LANG: Hold --

THE COURT: I sustained, so --

THE WITNESS: Oh, sustained. Sorry. Okay.

BY MR. LANG:

Q What is your endgame with respect to your objection over the authority of Mr. Patrick to enter into the settlement agreement that is subject of the 9019?

A The three charities in the U.S. are affected materially. Dallas Foundation can't make payroll as of October. Dallas Foundation --

MR. PHILLIPS: Your Honor, I'll object to this testimony. The Dallas Foundation has withdrawn its objection on behalf of -- Dallas Foundation appearing on behalf of Empower, the Okada Family Foundation, and Crown Global. The Dallas Foundation is no longer a party here and did not even object in its -- an individual capacity. Object.

THE COURT: I sustain the objection. They had an objection. They withdrew it.

Moreover, as I announced early on today, I was really questioning their standing to weigh in.

So in light of all of that, I'm not going to allow

testimony regarding the impact there has been on Dallas Foundation as a result of something Mark Patrick may have done. Okay?

THE WITNESS: Okay. I can answer it differently.

THE COURT: Well, wait for your question. Okay.

BY MR. LANG:

Q Well, what -- what is the --

A What is my goal?

Q Well, yes, what is your goal?

THE COURT: Okay. Yes. Why are you objecting? Why is Dugaboy objecting? How about that?

MR. LANG: Safely.

THE WITNESS: Safely. Without stating where the assets are or might be, they are not with the three charities they were with a year ago. They have zero. And I would like to get those assets back.

(Pause.)

THE COURT: Okay. Go ahead. I have a couple of questions, but maybe you'll hit on them.

MR. LANG: Oh.

BY MR. LANG:

Q Mr. Dondero, are you asking the Court to -- are you objecting to the settlement agreement that is the subject of the 9019, asking the Court to allow the Joint Liquidators in the Caymans to weigh in on the settlement agreement?

A Yes. Or described a little differently, there's no irreparable harm --

MR. PHILLIPS: Objection. Nonresponsive.

BY MR. LANG:

Q Well, let me ask you this: Are you asking --

THE COURT: Let him answer.

MR. LANG: Yes.

THE COURT: Go ahead and answer.

BY MR. LANG:

Q Go ahead.

A There's no irreparable harm for a bit of delay to get to the bottom of where the assets are and what bad deeds have occurred.

Q Is that the reason why you're objecting, is to delay this for 45 days or so?

A Well, I believe the HMIT million-dollar transaction in February was a steal. I believe it was a stolen asset that he -- Mark Patrick's trying to monetize. And I don't believe it's monetized at nearly its fair value. And so I believe that it needs to be reviewed.

Q Are you asking the Court to -- are you objecting simply to allow the Liquidators in the Caymans time to review this transaction and the settlement agreement?

A Yes. There needs to be more time.

Q Okay.

MR. LANG: I'll pass the witness.

THE COURT: All right. Cross?

CROSS-EXAMINATION

BY MR. MORRIS:

Q Good afternoon, Mr. Dondero.

A How's it going?

Q Okay. You referred to the three underlying charities as being The Dallas Foundation, The Highland Santa Barbara Foundation, and The Highland Kansas City Foundation. Do I have that right?

A The three are The Dallas Foundation, Santa Barbara, Kansas City. There's a holding company or there's an entity below it, below each one that I'm on the board of, but it's separate and distinct from the overall charity.

Q Okay. But the ones that are separate and distinct that have the Highland name, --

A Yes.

Q -- those are the ones that you control, correct?

A No. I'm on the board. There's three or four people on the board.

Q Okay. But --

A But we don't control. Otherwise, you know, we would have not recommended the settlement.

Q Does the Hunt family make their contributions to The Dallas Foundation, The Santa Barbara Foundation, and The

Kansas City Foundation, or do they make them to The Highland Dallas Foundation, The Highland Santa Barbara Foundation, and The Highland Kansas City Foundation?
A Most families do it through DAF, so they probably have their own -- they're just involved with Kansas City, as far as I know. I don't know if they're involved in any of these others. But they probably have a Hunt Kansas City.
Q But the ones with the Highland name are the ones who initiated the proceeding in the Cayman Islands to get the Joint Official Liquidators appointed over this entity down there, right?
A Yes, I believe so.
Q And you personally funded that litigation, correct?
A The charities can't make payroll.
Q And the charities, did you tell the charities what's happening here?
A Yes. They're aware.
Q When did you tell the charities what's happening here?
A They've known it for weeks.
Q And they haven't filed any objection in this court, correct?
A They thought it was best for Dallas to file it.
Q And Dallas settled; isn't that right?
A To the surprise of all the other charities.
Q Okay. So today, there's actually no charity who is

objecting to the settlement agreement, correct?
A Because it was -- she got bludgeoned in depositions over the weekend and it happened last night and nobody was aware of it.
Q I didn't bludgeon anybody.
A Well, --
Q I don't bludgeon people.
A She switched course after a Sunday full-day deposition or half-day deposition.
Q Okay. So the charities that you speak of aren't objecting, correct?
A Well, if we had more time. We only had six hours' notice that Dallas fell away. I think they probably would object.
Q And you say -- you began to have concerns about Mark Patrick going all the way back to 2023, right?
A 2023? A little bit, yeah.
Q And then you had real concerns in 2024, right?
A Yeah. I mean, he's an odd duck, but he was really odd towards the end.
Q Did you file a declara... is one of those public documents you mentioned in the Cayman Islands, that's your affidavit, right?
A I believe so.
Q Do you want to grab Binder 3 of 3?
A Sure.

Q And turn to Exhibit 119?
A Yes.
Q Okay. And this is the declara... this is the affidavit that you filed in the Cayman Islands?
A Yes.
Q And if you turn to Page 4, in Paragraph 25 you begin to recite events concerning Mark Patrick that concerned you, correct?
A Yes. I'm glad you're bringing this into evidence.
Q Yes. And in the two years since you started having concerns, has anybody sued Mark Patrick for breach of fiduciary duty?
A No.
Q Have you recommended to any of these charities: Mark Patrick is doing wrong, let's go sue him?
A We were unaware on 90 percent of it until he left.
Q You were aware of everything that's in your declaration. It says in 2023, you have notice of these emails. Right? And you did an investigation in 2024, correct?
A Yes. But it took a while to get the affidavits from third parties.
Q You had the whole investigation done in 2024 and nobody sued Mark Patrick, right?
A We didn't sue him. Correct.
Q You're just mad that you lost control. Isn't that right?

A No.
Q Turn to Paragraph 33, please. You accuse Mr. Patrick of misusing material nonpublic inside information. Is that right?
A Yes.
Q What material nonpublic inside information did he abuse?
A I wasn't involved in the specifics. My understanding is that he had an awareness of a tender or some financial transaction and then was providing inside information to attorneys and then had them do something. But I don't -- I don't know the specifics.
Q Sir, under oath, in this affidavit that you submitted to the Cayman Islands, you accuse Mark Patrick of obtaining and abusing material nonpublic inside information. Can you just tell Judge Jernigan what you had in mind?
A Whatever it says I have in mind. I'm just saying I didn't remember the specifics. I can read it, though, if you'd like me to read it.
Q Well, was it something about a put option?
A Yes.
Q Did he tell The Dallas Foundation that it had a put option? Does that refresh your recollection?
A I don't remember the details.
Q Do you remember who the counterparty was to the put option?

A Counterparty. One of the mutual funds.
Q Does it refresh your recollection that it was the Dugaboy?
A No.
Q Do you remember, sir?
A I don't remember.
Q I'm going to try. I'm going to try and refresh your recollection. Do you remember that Mark Patrick suggested to The Dallas Foundation that it could recover millions of dollars if it simply exercised the put option with Dugaboy?
A My recollection is it was a mutual fund, and it wasn't millions of dollars, but it would disrupt the transaction that was already in place. That's my recollection.
Q Okay.
A And I don't see Dugaboy anywhere in here, by the way.
Q I know. I was wondering if you could just -- I asked you, but it doesn't sound like you know specifically what the material nonpublic --
A Well, --
Q -- inside information is that you accused Mr. Patrick of abusing at that time.
A I know it's been reported. We can get you the details.
Q Okay. You, in fact, acted on behalf of HMIT, didn't you?
A Who is HMIT?
Q Apologies. You personally -- there's no question in your mind that Mark Patrick is the Administrator at HMIT, correct?

A I'm sorry, I'm drawing a blank on HMIT. What is HMIT?
Q I apologize. Hunter Mountain Investment Trust.
A Oh. Okay.
Q I'm calling it HMIT.
A Okay. All right. Sorry.
Q I probably not saying it clearly. I apologize. H-M-I-T. HMIT, that's what I call it. Is there something better that you prefer?
A No, that's fine. Yeah.
Q Okay. So HMIT. Mark Patrick is the Administrator at HMIT, right?
A I believe his status, his dirty hands, I believe he's trying to monetize a stolen asset.
MR. PHILLIPS: Objection, Your Honor. Nonresponsive.
THE COURT: Sustained.
THE WITNESS: No, I -- I saw it. I don't agree --
MR. PHILLIPS: Objection, Your Honor.
THE COURT: Sustained.
MR. PHILLIPS: Move to strike.
THE COURT: Granted.
THE WITNESS: I do not agree.
BY MR. MORRIS:
Q Okay. Has he -- he was at one time the Administrator. You would agree with that, right?
A Yes.

Q And did he stop becoming the Administrator in your mind when the Joint Official Liquidators were appointed?
A Yes. I believe.
Q Okay. So, in your mind, that's when it happened?
Can you describe for the Court the relationship between the entity in the Cayman Islands and HMIT?
A The entity in the Cayman Island, as far as we knew, was the org structure that all the assets were either in or controlled by in the organizational structure before all the HGEQ things that you went over earlier with Mark Patrick.
Q Okay. I'm not asking -- it's my fault. Do you believe the entity in the Cayman Islands controls HMIT?
A HMIT was one of the assets that were owned by the charities until it was moved for a million dollar to who know who.
Q And do you know how many layers there are between the Cayman Islands entity and HMIT?
A I do not.
Q Is it fair to -- in your view, do you believe that the Cayman Islands entity had a direct -- withdrawn. Do you believe that the Cayman Islands entity had an indirect ownership interest in HMIT?
A We believed it was direct.
Q Direct. So it was the owner?
A Well, it was -- it was the direct before it got moved in

February.
Q Hasn't Beacon always been the owner of -- the beneficial owner of HMIT?
A Then it was Beacon that was moved. There was -- charities were notified in February that, for $1 million, the HMIT was sold to an undisclosed, unknown person.
Q Do you believe that the entity in the Cayman Islands ever had the ability to control Hunter Mountain Investment Trust?
A Yeah. It was an asset in the portfolio.
Q And do you believe that that gives it the right to control HMIT?
A Yes. I think the Liquidators will prove that. I think they can go back in time on bad acts and bad behavior and they can regroup assets to their rightful owners.
Q So your concern here is not with corporate authority, it's with the bad acts. Is that fair?
A Well, no. I think you lose your corporate authority when you're fiducially irresponsible or commit corporate crimes.
Q Okay. But you've never -- you've never brought a lawsuit accusing him of that. Fair?
A I think you'll see a litany of stuff come out of the Cayman Islands.
MR. PHILLIPS: Objection. Nonresponsive.
MR. MORRIS: I'm sure we might someday.
THE COURT: Sustained.

THE WITNESS: Yeah. But, no. But I have not, no.
BY MR. MORRIS:
Q Yeah. But you personally, have you ever been the Administrator of Hunter Mountain Investment Trust?
A Not that I'm aware of.
Q Have you ever had any role whatsoever with respect to the Hunter Mountain Investment Trust?
A Not that I -- not that I recall.
Q Okay. Do you recall last December we were here on some litigation concerning HCLOM's scheduled claim?
A You have to give me more of a clue.
Q Remember HCLOM had that $10 million scheduled claim and Highland had filed a bad faith motion and we were all here in court and we wound up settling that matter and HCLOM got a Class 10 interest for $10 million?
A Yes, I vaguely remember that.
Q Okay. And you were here and you were representing HCLOM, right?
A Okay. I don't remember specifics, but, yes, go ahead.
Q Okay. And do you recall that Highland required Hunter Mountain Investment Trust's consent as part of the transaction?
A Vaguely.
Q And you personally authorized that consent back in December, didn't you?

A No.
Q Who did?
A Whoever would have spoke for HMIT at the time.
Q Okay. Let's take a look at Exhibit 68, please.
A So, Binder 2?
Q Yes, please.
A Sorry, this says Pat Daugherty. This is 1 of 3. This one. Okay. Did you say 68?
Q Yes.
A It's not in here, either. 68.
Q So you see that's an order of the Court?
A Yes.
Q And this resolves HCLOM's claim? Take your time.
A I'll leave it in case someone else needs it. Okay.
Q And do you see on the last page of the document there's an electronic signature by Deborah Deitsch-Perez at the Stinson firm as counsel for Hunter Mountain Investment Trust and Dugaboy Investment Trust? Do you see that?
A I'm sorry. I went to the very last page with Mark and I. Is there another page? Oh, okay. Yes. Okay.
Q So you see Stinson has signed both on behalf of you personally and HCLOM, and at the bottom, Stinson and Ms. Deitsch-Perez has also signed on behalf of Hunter Mountain Investment Trust and the Dugaboy Investment Trust? Do you see that?

A Yes. But then it's separate on 69, right?
Q Yeah. We're just looking at 68.
A Okay.
Q Do you know who authorized Ms. Deitsch-Perez to sign her name and tell the Court that the Dugaboy Investment Trust had approved this form of order both as to form and substance? Who acted on behalf of Dugaboy?
A I have no idea. I hope she keeps it straight when she's signing stuff.
Q Well, on whose behalf are you here today?
A Dugaboy's.
Q And are you a representative of Dugaboy?
A Representative? I'm primary beneficiary until I pass.
Q And who's the trustee of Dugaboy?
A I believe it's my sister at the moment.
Q Does she know you're here today testifying on behalf of Dugaboy?
A She knows I'm in court. I didn't -- I wasn't specific.
Q Did you talk to her about the Dugaboy -- does she -- does she even know about the Dugaboy objection?
A I don't know.
Q Okay. So how about Hunter Mountain Investment Trust? Do you know who authorized Ms. Deitsch-Perez to sign this document on behalf of Hunter Mountain Investment Trust?
A When was this? In December or January?

Q Yeah.
A I'm assuming -- I'm assuming Mark Patrick.
Q Late December.
A I'm assuming Mark Patrick. But I don't know.
Q Did you hear about a week later that Mr. Phillips called your lawyer and accused her of signing this document without authority from Hunter Mountain Investment Trust's authorized representative, Mr. Patrick?
A In hindsight, he's been in on it for a while, so --
Q What do you mean, he's been in on it for a while?
A I think he knows the plan Mark Patrick's been putting in place for quite a while.
Q But this document was signed without his knowledge or consent; isn't that right?
A I don't know.
Q And you had to sign a new agreement with Mark Patrick as the authorized representative of HMIT. Didn't you do that, sir?
A I don't know.
Q Okay. Let's take a look at guess I guess probably Exhibit 69. So this is an intercreditor and participation agreement. Do you see that?
A Yes.
Q And it's dated January 10th, 2025, correct?
A Yes.

Q And even though you -- even though Skyview had completed this investigation in which it was alleged that Mr. Patrick misused material nonpublic inside information and he had terminated his relationship with Skyview, you still entered into this agreement with him as the authorized representative of HMIT, correct?
A Those were different work streams, you know, so they were -- but yes.
MR. PHILLIPS: Objection. Nonresponsive.
THE COURT: Sustained.
BY MR. MORRIS:
Q That is -- that is your signature on the last page, correct?
A Yeah. I mean, --
Q It's a simple question. That's your signature, right?
A Yes.
Q And you understood that you were signing an agreement with Mark Patrick, correct?
A Yes.
Q And you signed this agreement in order to avoid Mr. Phillips filing a motion in this court for reconsideration of an order that she signed not knowing that Hunter Mountain had given its consent without authority. Isn't that right?
A No, I had no -- none of that --
Q So what's your memory? Why do you think you entered into

this agreement?
A Because the lawyers put it in front of me as a finished product from what had been going on recently.
Q And you had no understanding of what it was?
A Not with the innuendo and agenda that you were describing. No. I mean, I just -- I knew what it generally involved. That's it.
Q But you would agree with me that you entered into an agreement knowing that Mark Patrick was signing on behalf of Hunter Mountain, correct?
A Yes.
Q I mean, it's right below your name, right?
A Yes.
Q You couldn't have missed it.
A Yes. That part, I'll agree with.
Q Okay. And you signed the agreement with Mark acting as the authorized agent and representative of Hunter Mountain, notwithstanding all of the bad acts that you supposedly were aware of at the time. Correct?
A Object to aware of at the time. They were all coming together in parallel work paths.
THE COURT: Okay.
MR. PHILLIPS: Object. Nonresponsive.
THE COURT: Sustained. Like I told Mr. Patrick, the witness does not get to object.

THE WITNESS: Okay.

BY MR. MORRIS:

Q And just to close the loop, Mr. Dondero, you fully funded The Dallas Foundation's objection, correct?

A And I made additional donations so that they could pursue bad actors and get their money back.

Q You funded the litigation so that The Dallas Foundation could pursue their objection, correct?

A I made additional donations so that they could get some assets back so that they could be a charity again and make donations.

Q Do you get a tax deduction for that donation?

A Yes.

Q Okay. That's nice.

Let's just finish up with the Joint Official Liquidators. Have you spoken to them?

A I do not believe so.

Q Has anybody acting on your behalf spoken with the Joint Official Liquidators?

A I don't know. I think the Joint Official Liquidators are an accounting firm. I think they're Grant Thornton. I think people have spoken to the attorneys down there, but I don't know -- I haven't spoken to Grant Thornton and I don't know if anybody else has.

Q Okay. Did you see the letter that your counsel marked as

the exhibit, the one that was sent last night?

A I've not heard it -- I've not read it, but I've heard you guys read it today.

Q Yeah. Are you aware of the Joint Official Liquidators saying at any time that they didn't believe Mark Patrick had the authority to enter into the settlement agreement on behalf of the HMIT entities?

A I have not.

Q Okay.

MR. MORRIS: No further questions, Your Honor.

THE COURT: All right. Mr. Phillips?

MR. PHILLIPS: Yeah.

THE COURT: Wait. What are we at timewise?

THE CLERK: So their 30 minutes is over. If you intended to give them 30 minutes for Patrick and --

THE COURT: Yes. Yes. They collectively got 30 minutes.

THE CLERK: For both of those --

THE COURT: Yes.

THE CLERK: -- witnesses. Okay. Yes, they're out.

THE COURT: How much did Mr. Morris use?

THE CLERK: Well, I don't know. I just was --

THE COURT: No, no, no, no. 30 minutes for each side for each Patrick and Dondero.

MR. MORRIS: About eight minutes.

THE CLERK: Yes. Mr. Morris -- I think Mr. Phillips may have asked one question, but Mr. Morris mostly -- 30 minutes.

THE COURT: No. On this witness, Phillips hadn't gone.

THE CLERK: No, not this witness.

THE COURT: Okay. That's all I care about, this witness.

THE CLERK: I don't know this witness.

THE COURT: Okay. Do you have a question, Mr. Phillips?

THE CLERK: I was doing 30 minutes for the total.

THE COURT: No, no, no, no, no.

MR. PHILLIPS: Your Honor, I can resolve this. I can resolve this. We have no questions.

THE COURT: Okay. Thank you. Where are we? Mr. Lang, any redirect?

MR. LANG: I'm not sure.

THE COURT: Okay.

THE WITNESS: The last one.

MR. PHILLIPS: Your Honor, the witness is telling the lawyer what question to ask.

THE COURT: Okay.

MR. LANG: I believe I've already asked, which is the endgame.

THE COURT: Okay. Just let's move on. Anything else? What was the question?

REDIRECT EXAMINATION

BY MR. LANG:

Q Mr. Dondero, what are you looking to accomplish through this objection?

MR. PHILLIPS: Asked and answered.

THE COURT: Sustained. Sustained. He did. He was asked and answered.

BY MR. LANG:

Q The endgame in general.

MR. PHILLIPS: Asked and answered.

THE COURT: Answered and answered. Move on.

THE WITNESS: No, no. No, I haven't. No, I --

MR. PHILLIPS: Asked and answered. Move to strike.

THE COURT: You asked him this on your direct earlier.

MR. LANG: I did.

THE WITNESS: But, in general, regarding the --

MR. PHILLIPS: Your Honor?

THE WITNESS: Not just this.

THE COURT: Sustained. Ask another question.

MR. LANG: I don't have any more questions.

THE COURT: Okay. I have a question.

EXAMINATION BY THE COURT

THE COURT: Here is something that I want to understand. What I have before me is whether a settlement with Hunter Mountain, a settlement between the Highland entities, the Claimant Trust, the Subtrusts, and the Hunter Mountain entities, seven of them, is fair and equitable, is in the best interest of the estate. If you were the director, the manager, the representative of Hunter Mountain estate, what would your answer be?

THE WITNESS: It's not in the ZIP Code.

THE COURT: It's not in the ZIP Code?

THE WITNESS: Of fair. Yes.

THE COURT: Okay. Why do you think it's not in the ZIP Code of fair?

THE WITNESS: Okay. We filed in Delaware on a $100 million judgment. Pachulski was our counsel. They told us --

THE COURT: I know all this.

THE WITNESS: It just --

THE COURT: I'm talking about the settlement in front of me right now.

THE WITNESS: -- we'd be in and out in three months, right? We got liquidated instead. We got liquidated for over $850 million, which not enough people talk about. Okay? It would've been $950 million if Seery had done a good job, but it was $850 million we got liquidated for. Okay? The POCs were pumped up. People who supposedly had no claim, all of a

sudden, $300 million.

There's $700 million missing or misallocated from the estate. Okay? There was -- all the original creditors, all the original creditors sold 99 percent of their interest for $160 million. The Farallon and Stonehill went to the beach. There was enough money on the balance sheet. Seery could have given them the $160 million and tossed us the keys. Instead, he had relations, deep relations, undisclosed business relationships with Farallon and Stonehill, --

THE COURT: Okay. I do want you to know --

THE WITNESS: No, but --

THE COURT: -- I've read all this many times.

THE WITNESS: Okay. But so -- so these --

THE COURT: I promise I read every piece of paper submitted.

THE WITNESS: Okay. So, so he sold the POCs to them, and it's been -- they've tripled their money in two and a half years. The professional fees have been $300-odd million. There's interrelationships between all the professionals -- Farallon, Stonehill, Grosvenor, the Hellman & Friedman guys, the Millennium guys who took whatever. All this stuff has to come out.

We're on the edge of a giant RICO case eventually. We're -- that's -- we're on the edge of a giant RICO case. And they should not be giving up their rights for $10, $20 million.

It's crazy for them to give up their rights at Dallas Foundation for 10 or 20 million bucks.

There's $700 million missing. All the original creditors sold for $160 million. The estate was sold for over $850 million. Where'd all the money go? Where'd all the money go and why? You know.

We get updates quarterly, once in a while, well, this much went out to this law firm, this much went out to this, whatever, but no one looks at the gross amount and where'd all the money go? And why? Why did it have to -- why did it have to go down like that? Why do we have to fire --

THE COURT: Okay. I know you have an objection.

THE WITNESS: -- all the employees?

THE COURT: This is narrative.

MR. MORRIS: Yeah. And --

THE COURT: I understand all --

MR. MORRIS: -- I'm not going to cross-examine him, but this is -- this is not accurate.

THE COURT: I understand all of these arguments. You know, I --

THE WITNESS: But I'm just --

THE COURT: Your lawyers at least know, if you don't know, that we wrote a 100-plus-page opinion on the motion of Hunter Mountain to sue for all of this. Okay? So I promise I've heard this and looked at it. But right now, Hunter

Mountain, through Mark Patrick, you question his authority, but they are ready to lay down their swords and not pursue that motion for leave to sue based on the claims trading, and --

THE WITNESS: Have you seen all the insider trading, Farallon, Stonehill? Have you seen the trading and claims on insider information? Have you seen all that stuff?

THE COURT: I've seen the allegations but I --

THE WITNESS: Well, why would you release all those people right now before the RICO?

THE COURT: So I -- Dugaboy -- you've been asked what is your goal? Dugaboy a .18 limited partnership interest --

THE WITNESS: Correct.

THE COURT: -- that is subordinated to Hunter Mountain. I'm just trying to understand the scenario where it makes sense to keep fighting for years to come.

THE WITNESS: Well, RICO transcends this, right? I mean, RICO brings everybody in. Until we get --

THE COURT: Okay. You think it's -- and my question, why is this not fair and equitable and in the best interest of the estate, you think it's better to litigate several more years and maybe have a chance, you know, --

THE WITNESS: At $600 mill. At $600 million.

THE COURT: -- Hunter Mountain would have a chance to --

THE WITNESS: $600 million. Yes.

THE COURT: Okay.

THE WITNESS: Versus $20 million now. But you have to remember, it's all part of -- you have to pay attention to this Mark Patrick stuff.

MR. PHILLIPS: Your Honor?

THE COURT: Okay. Yes. I asked my question. I'm trying to understand why Dugaboy, why its position is this is not fair and equitable and in the best interest and in the range of reasonableness. Those are the buzz words that a judge has to focus on.

THE WITNESS: It's not fair to the charities. I still think no one's ever seen --

THE COURT: The charities aren't parties here.

THE WITNESS: Not yet. Give them a little time. They just heard about the settlement yesterday.

THE COURT: Well, isn't that what the Cayman Islands is all about? What I do doesn't necessarily affect what's happening there.

THE WITNESS: Well, no, but you're saying they're not here today. If you delayed this three weeks, they'd be here. It's just a couple --

THE COURT: They were here and they chose to withdraw.

THE WITNESS: One. One. Just one charity. But the

others, if you give them some time, they'll be here.

THE COURT: Okay. Okay. I think you've answered my question, your theory of how this should play out and how you want it to play out. Okay. All right.

THE WITNESS: Thank you.

THE COURT: That's all. Thank you.

THE WITNESS: Thank you for the time.

THE COURT: Uh-huh.

(The witness steps down.)

THE COURT: All right. I think that concludes our evidence, correct?

MR. YORK: Yes, Your Honor. At least from Daugherty and --

THE COURT: Okay. The Objectors rest. Any rebuttal?

MR. PHILLIPS: No, Your Honor.

THE COURT: Okay.

MR. YORK: Your Honor, would it be okay if we took a five-minute comfort break?

THE COURT: Yes. We may as well turn it into a 10-minute break because that's what's going to happen. All right. We'll be back at 3:40.

THE CLERK: All rise.

(A recess ensued from 3:30 p.m. until 3:44 p.m.)

THE CLERK: All rise.

THE COURT: Please be seated. We're back on the

record in Highland Capital. I will hear closing arguments. And I dangled something out there before lunch and I've never heard any follow-up. I guess no agreement with Daugherty could be reached on the reserve?

MR. YORK: Haven't had that conversation, Your Honor.

THE COURT: You didn't have that conversation? Oh, well. Why didn't you have that conversation?

MR. YORK: We were, during the lunch break, working busily to prepare the rebuttal to Mr. Seery's testimony, --

MR. MORRIS: Yeah.

MR. YORK: -- Your Honor. And so --

THE COURT: Okay. You told me you'd talk about it.

MR. MORRIS: May I proceed, Your Honor?

THE COURT: I guess I don't matter. Do I not matter when I suggest something like that?

Okay. Go ahead.

CLOSING ARGUMENT ON BEHALF OF THE CLAIMANT TRUST

MR. MORRIS: Good afternoon, Your Honor. John Morris; Pachulski, Stang, Ziehl & Jones; for Highland Capital Management, LP and the Highland Claimant Trust and on behalf of the Highland Litigation Subtrust.

I know that we've got Bob Loigman in the courtroom, but I know that -- at least I hope he joins me in this closing argument. I suspect he does.

I don't want to be too long here, Your Honor. We don't

have a high burden. This is a 9019 motion, for goodness' sakes. I've never been involved in such a contentious 9019 motion in my life. We had three depositions on Friday. We had two on Sunday. I think we had two on Monday. For a 9019, I've had one witness sit multiple times.

It's been an extraordinary experience. But at the end of the day, nobody's really challenging the settlement agreement. You've got people challenging, you know, the Cayman Islands. You've got people challenging, is it -- you know, can you jam it in under the plan? We're not jamming anything under the plan. We're following the plan provisions.

Nobody's challenging the bona fides of the motion. Nobody is challenging whether it's the product of good-faith, arm's-length negotiations.

You heard Mr. Seery testify at length about the process. You've got 55 different documents in the record proving that this agreement is the product of arm's-length, good-faith negotiations between parties represented by sophisticated counsel that resulted from an exchange of information, an exchange of proposals, back and forth, and here we are.

It's also in the best interests of the estate. Really not challenged by anybody. Nobody is contending that Highland is getting a raw deal here. Nobody. And the proof that Highland is getting fair consideration and that this settlement is in the best interest of the Claimant Trust and its stakeholders,

it's obvious we are terminating costly, wasteful, and I dare say frivolous litigation. We are disposing of several illiquid assets. We are getting litigation protections that will inure to the benefit of the released parties, the Highland release parties and it will, we believe, provide the protection that we deserve.

It's not just releases. It's covenants not to sue. It's all kinds of bells and whistles in there. Substantial benefits to the estate. And so nobody's really objecting to that.

Nobody's really objecting to the fairness of the settlement to the HMIT parties except for Mr. Dondero, and he's just mad that peace is breaking out. He's just mad because he's not going to be able to litigate anymore. It's not relevant to a 9019 motion. But even if it was, it's ridiculous. It's just ridiculous.

The settlement is fair and reasonable and in the best interest of the creditors. It's the product of good-faith, arm's-length negotiations. And on that alone, it should be approved.

We've had a lot of testimony today about Mark Patrick's authority. The only actual evidence that concerns Mark Patrick's authority are the exhibits in the binder and Jim Seery's testimony about the diligence that he did. And the exhibits in the binder all prove that Mark Patrick has the

authority to act and bind the HMIT entities to the settlement agreement. It's Paragraph 7 of the HMIT trust agreement itself.

Did the objecting parties point you to one single document to support their speculative argument, because it's not anything more than that, that somehow Mark Patrick isn't authorized to do this? There is not a scintilla of evidence that Mark Patrick is not authorized to do this.

And if Your Honor had any concerns about Mr. Patrick, I think he answered them at the end. That he understood exactly what the terms of the agreement are. That he had a reasonable opportunity to consult with counsel and to negotiate. That he knows exactly what he's doing on behalf of these entities. That he believes the best path forward from the HMIT entities is to grab the value today instead of letting it waste.

We welcome Mr. Patrick to the table. It makes a lot of sense. We've been trying to get to this point forever.

Mr. Daugherty. You know, I have no gripes with Mr. Daugherty. I don't know quite what's motivating him these days, but he admitted and the evidence is clear that when he was a Class 9 claim holder, I forget if it's two or three or four occasions, he accepted $3.7 million in multiple payments, without any concern at all as to whether or not it violated the plan, even though his Class 8 claim had remained unresolved.

He didn't send the money back. He didn't say, Mr. Seery, you can't do this because it violates the plan. He knowingly and willingly accepted the benefits of being a Class 9 claim holder. And now he comes and objects on the basis that somehow it's not fair to him as a Class 8 holder? This is what we call estoppel. Right?

I wasn't in a position to really make the argument because I didn't quite understand it until today. Like, how does he come in today and say you can't do this, Your Honor? You can't allow Class 9 and 10 to get a nickel until he's done, when he himself has accepted millions of dollars before his claim is resolved? That doesn't sound right to me. And I don't think the Court should accept that argument.

Just quickly, because I don't want to give it any weight, frankly, but this whole business of the Cayman Islands and the JOLs, the only facts Your Honor has to take into account are that they were appointed before this motion was filed. They've never appeared here. They've never objected. And there is no evidence in the record to suggest, let alone to prove, that the JOLs contend that Mark Patrick does not have the authority to enter into the settlement on behalf of the HMIT entities. There's no evidence of any kind.

What you need to know and need to remember, though, is that whole proceeding in the Cayman Islands is being brought on behalf of not The Kansas City Foundation or The Dallas

Foundation, but The Highland Kansas City Foundation, The Highland Dallas. It's Mr. Dondero, and he's funding it, and it says it in Paragraph I think 47 or 48 of his declaration. He's funding all of that. And he funded The Dallas Foundation's objection here.

And that's why he's upset, because they settled last night without telling him because they didn't want any part of this, Your Honor. That's the truth. That's why they're not here. And they, right, they're the people who suggested that maybe something untoward happened and maybe someday -- because this is the way their objection is characterized. Complete speculation.

If you go back and look at the objection, it's someday, somebody might do something and might someday set it aside. That wasn't a proper basis at the time, but we know that Mark Patrick remains in control of the HMIT entities today because nobody has told the Court otherwise. And we know that The Dallas Foundation has withdrawn its objection. As I asked Mr. Patrick, have you been, you know, removed or clipped or terminated or in any way restricted in your capacity as the Administrator and control person of the HMIT entities as a result of the settlement, and the answer was no.

There's nothing to see here, Your Honor, except the opportunity for the Highland Claimant Trust and its affiliated entities in moving this case forward in an enormously positive

and constructive direction.

We have the opportunity today to put to rest a lot of pending litigation. We have the opportunity today to put to rest a lot of future potential litigation that undoubtedly would have come to pass had these entities remained under the indirect control of Mr. Dondero, because we know that that was the case.

If you remember, Your Honor, we sat here two years ago, June 8th, 2023, on the evidentiary hearing on Hunter Mountain's motion for leave to bring the claims trading case. And if Your Honor will remember, Mr. Patrick at that time was forced to admit that the entirety of that case came in from Mr. Dondero, that he had no knowledge of any facts that related to anything.

I would ask Your Honor to go and compare The Dallas Foundation's objection with Mr. Dondero's declaration that he filed in the Cayman Islands. I'm not going to say they're verbatim, but they are largely, largely the same. This is just Jim Dondero being Jim Dondero, and that is not a basis to overrule or deny the motion under Rule 9019.

It's a product of good faith negotiations, it is clearly in the best interests of the estate, and we respectfully request that as soon as possible Your Honor grant motion.

THE COURT: Okay.

MR. MORRIS: Thank you, Your Honor.

THE COURT: Any closing from the Movant, Co-Movant?

MR. PHILLIPS: Your Honor, thank you very much. Louis M. Phillips on behalf of the --

THE COURT: I don't know if you're the Co-Movant. You're a party to the proposed settlement.

MR. PHILLIPS: I'm not a Co-Movant.

THE COURT: Okay.

MR. PHILLIPS: I'm a party to the settlement.

THE COURT: Uh-huh.

MR. PHILLIPS: I didn't quite make it to that status to be a Co-Movant.

CLOSING ARGUMENT ON BEHALF OF THE HUNTER MOUNTAIN ENTITIES

MR. PHILLIPS: But anyway, we appreciate the Court's time. We appreciate the Court's attention. This was, as the evidence established, we provided and were provided an immense amount of information.

Much of the information, certainly the information about Mr. Patrick's control of the HMIT entities, was provided by us. It was reviewed by Mr. Seery. And Mr. Seery made a very strong case for the amount of diligence he did on our side of the equation. It's not nearly as relevant to Your Honor's decision about whether to approve the settlement whether we got a good deal or not, but the deal we got, we think, is very fair.

The deal we got was negotiated with counsel, with

businesspeople who are very sophisticated. We have agreed on the methodology and of the calculation of our Class 10 claim. The Debtor and the Debtor estate or the Claimant Trust or whoever held the HMIT note got full value for the HMIT note. Any additional value from the HMIT note would come back to HMIT. The Kirschner Litigation would be for the benefit of HMIT. The Dugaboy Note would be for the benefit of HMIT.

All of that is being put into a package and is being resolved, affiliated, administered in a very effective and efficient manner. We are getting some money. We appreciate. We tried to get more. We couldn't. They tried to pay less. We made a deal.

So, Your Honor, I echo and thank Mr. Morris for all of his comments. I appreciate counsel being involved here today. We think this is a fair and equitable settlement. There is no question under 9019 that this settlement should be approved. And the suggestion that this Court should allow itself to just be a vehicle for continued litigation, when we have analyzed it, perhaps from a different perspective, and made the decision that it is time to make our deal now, it is time to take HMIT out of the litigation picture and into the fold of a party in interest of a fixed claim with fixed treatment that's different from the plan, authorized by the plan. And we appreciate it.

Thank you, Your Honor.

THE COURT: Thank you. All right. Mr. Loigman, we didn't mean to ignore you.

CLOSING ARGUMENT ON BEHALF OF MARC S. KIRSCHNER, LITIGATION TRUSTEE

MR. LOIGMAN: Thank you, Your Honor. Robert Loigman, Quinn Emanuel. You didn't ignore me. Louis was just quicker to jump up than I was.

And I step up solely because you asked whether the Co-Movant had anything to add. And we have nothing further to add to what Mr. Morris said. We agree with it wholly. We think this is a fair and complete settlement, and we would ask that the Court approve the settlement under the 9019 motion.

THE COURT: Thank you.

MR. LOIGMAN: Thank You, Your Honor.

THE COURT: All right. The Objectors?

MR. MORRIS: Your Honor?

THE COURT: Oh.

MR. MORRIS: Just to clarify, the motion was made under 9019 and Section 363. I just don't want that to get lost. That's all.

THE COURT: Okay. 363, use of property. Okay. The Objectors?

CLOSING ARGUMENT ON BEHALF OF PATRICK DAUGHERTY

MR. YORK: Thank you, Your Honor. I'll be very brief.

I certainly appreciate that the Court desires to have this bankruptcy wrapped up, given how long it's gone on now, for six -- approximately six years in this court. The fact of the matter is that the settlement agreement that Highland proposes to enter into with Hunter Mountain Investment Trust entities violates the express terms of the plan, the confirmation order, and the Claimant Trust Agreement.

And they have not pointed to any language in there or to argue otherwise. Their only argument has been that they've set a reserve aside. And there's no provision in any of those documents that provides that that's an excuse for them to violate the express terms of the confirmation order, the plan, or the Claimant Trust Agreement, including specifically the language that Class 10 claims are not to receive or retain anything under the plan on account of their interest unless and until the Class 8 and Class 9 claims are paid in full plus applicable interest. And --

THE COURT: I really want to understand that argument. Mr. Seery correctly testified that, pretty much in every Chapter 11 plan we see, there's a disputed claim reserve. Well, I guess unless we have really unsophisticated creditors who don't insist on that. But we had sophisticated creditors. So why doesn't that mechanism, which I would call tried and true, we see it in most cases, why doesn't that resolve this issue you're raising?

MR. YORK: Well, --

THE COURT: And I focused in more than maybe I needed to about the nature of Mr. Daugherty's remaining claim, his Class 8 claim. What was the scope? What's the maximum amount it could be? When might it be resolved? Because I think we have a tried-and-true mechanism that addresses his concerns. Tell me why it doesn't.

MR. YORK: Well, --

THE COURT: Really, I want to understand what you think I'm missing.

MR. YORK: Well, so I think twofold, Your Honor. The first is that the dispute reserve that exists normally would be for whatever the amount of the disputed claim is. And here we're dealing with, as both sides have acknowledged, a claim that they at best could estimate, but they don't know for certain, given all of the machinations that could come out of the IRS audit.

And secondly, specifically with respect to the confirmation order, if it had said that the net 10 and 11 claims could be paid as long as the allowed 8 and 9 claims were paid, then the dispute reserve would provide that protection. But that's not what the language in the confirmation order says. It says claims, not allowed claims. And therefore it's referring to all claims, including disputed claims. And --

THE COURT: But we have a disputed claim reserve. Okay. We have a disputed claim reserve.

MR. YORK: There is, yes, there is a reserve.

THE COURT: So is it your argument that I can't approve a settlement like this until Mr. Daugherty's claim has been resolved with certainty, which might be in 2033 or whatever? I can't keep a bankruptcy estate open, allowing administrative expenses to continue to accrue, because of one contingent unliquidated claim that may never even develop.

MR. YORK: Your Honor, I appreciate the Court's frustration with that, but that's the way that the documents are written in terms of the confirmation order. And so it's an --

THE COURT: So the disputed claim reserve is meaningless?

MR. YORK: No, it is not -- a disputed claim reserve exists, but it does not, under the terms of the confirmation order, in terms of allowing the payment of Class 10 and Class 11 claims, those can't be done until the Class 8 claims are resolved.

THE COURT: You would have -- just a moment -- you would have me keep this estate open for as long as it takes, 2033, whatever, without allowing Class 10 and Class 11 theoretically to get anything?

MR. YORK: At least under --

THE COURT: Let's just let the -- with all respect to Mr. Seery, he's charging a handsome amount. It was agreed to or approved by the Court. Let's just let him continue accruing until 2033 because of Mr. Daugherty's prospect of the IRS saying you owe $1.4 million plus interest and penalties, when he's gotten the use of that all? Help me. This doesn't make sense to me.

MR. YORK: Sure. One way this could be solved is that the payments to -- the cash payments, for example, that are to be made to the HMIT entities, under the proposed settlement could be held in abeyance until the resolution of the Class 8 claim. The Court could modify the proposed settlement based on that. That's one way to deal with the issue, for example.

THE COURT: Do what? Hold it in abeyance?

MR. YORK: Yes. For -- the payments to be made to the Hunter Mountain Investment Trust under the proposed settlement could be -- could be done in accordance with the terms of the confirmation order. We'll just hold those payments until such time.

THE COURT: We who? Put it in the Court Registry?

MR. YORK: Or --

THE COURT: Where it will earn 0.18 percent?

MR. YORK: No. No. It can remain within the Claimant Trust until the time at which the Class 8 claim is

finally and fully resolved.

THE COURT: Okay. Meanwhile, I've approved the extension of the Trusts for one year, with Dugaboy saying, we don't think this should happen again and again and again. We reserve our rights. That's not a good solution.

MR. YORK: Your Honor, I understand the Court's frustration, but this is the terms of the plan and the confirmation order that were entered. Highland needs to follow it.

THE COURT: Okay. What about the estoppel argument that I heard Mr. Morris make?

MR. YORK: Well, sure. So, the first time they raise it is here today. And the one thing that -- the difference is that allowing this settlement to go forward is an effective liquidation of the estate versus where things are now, in which any payments that were made is not an effective liquidation. It doesn't expose anyone that would have priority to Class 10 with respect to anything that happens in the future from, you know, not having sufficient funds to deal with it. That's all.

THE COURT: Okay.

MR. YORK: Thank you, Your Honor.

THE COURT: Thank you. All right. Mr. Lang?

CLOSING ARGUMENT ON BEHALF OF DUGABOY INVESTMENT TRUST

MR. LANG: I'll be brief. Your Honor, there are

three issues that we've raised. One is the capital account balance being used for the claim for the Class 10 holders. The plan does not specify that the capital account balance is to be used. Allowing the $336 million claim to Class 10 ensures that Class 11 will not ever receive a dime. That's guaranteed.

Alternatively, upon the satisfaction of the Class 9, the $20 million approximately owed to Class 9, the holders of HMIT should receive 99.5 percent of the total residual. We think that would be a more fair outcome to the Class 11 claimants.

THE COURT: Wait, say again?

MR. LANG: That, so, of total assets, $70 million approximately, $20 million is owed to Class 9.

THE COURT: Uh-huh.

MR. LANG: Of the remainder from that, HMIT should receive 99.5 percent of those assets, whatever they are, the value, rather than a $336 million claim. That was the objection.

THE COURT: But I didn't get any evidence of a separate way of competing -- of doing that. I heard credible testimony from Mr. Seery about why he used the math he used and I didn't hear any countervailing evidence of, wait, this is a more fair, realistic way of computing it. And what I did hear is the .5 percent limited partnership interest of Dugaboy is subordinated in its payment rights under the limited

partnership agreement of Highland.

MR. LANG: It's subordinated under the plan, but yes, the plan does not say to use --

THE COURT: Under the partnership agreement is the reason the plan did it, is what I've been presented.

MR. LANG: I believe Mr. Seery -- and I could be wrong -- I think I heard him say that he has used the other method, but I could have misheard him in the testimony.

THE COURT: Well, that's not what I heard. I heard him emphasizing the fact that the Class 8 interests, including that of Dugaboy, are subordinated with regard to payment rights under the Highland partnership agreement. And so that's why he didn't think it made sense to just apply percentages.

MR. LANG: That's what he testified to.

THE COURT: So I'm just -- anyway, I'm just trying to figure out what the countervailing evidence is here to suggest his methodology is wrong.

MR. LANG: I believe the partner -- or, the plan says that the Class 10, when the GUC certification is a Class 10, and the Class 11 received pro rata, it doesn't specify the account balance is to be used as the number to determine what they receive.

THE COURT: Okay. You want to point out what you are focused on?

MR. LANG: I believe it's under Treatment.

THE COURT: Okay.

MR. LANG: Section --

THE COURT: I don't want to hunt. I want you to tell me what the language is that you think is supportive of that.

MR. LANG: And the second -- I guess the secondary issue that we probably should just get to is the release. We think it's broad, and just Dugaboy and Dondero are carved out. And Mr. Morris did send me a proposal last -- yesterday evening that I haven't gotten to. But that is an objection that we have, is just to make sure that the -- that nobody can argue that the release covers any claim Dugaboy might have, if any.

THE COURT: Okay. I think many hours ago I remember this being mentioned. I guess it was a little bit more broad than just -- I think it was Highland employees. I don't know.

What is the agreement, Mr. Morris, if you're awake there, on --

MR. MORRIS: I am awake, Your Honor. Apologies.

THE COURT: Okay. I didn't mean to be flippant.

MR. MORRIS: Yeah.

THE COURT: I get punchy and --

MR. MORRIS: That's okay. With respect to the release?

THE COURT: Right.

MR. MORRIS: We don't have an agreement. We have an agreement -- well, I sent a proposal last night, but it didn't get responded to. If they want to accept that proposal, that's terrific.

THE COURT: Okay. I don't know what the agreement says. Are you saying you want to accept what they proposed last night?

MR. LANG: No, I have edits to it. I just couldn't -- I was tied up on another filing last night. I have not been able to get to it today.

THE COURT: Okay. I'm going to make a ruling today. Okay? If it means y'all sit here in the courtroom a while, fine. But just like all of you, I have a mountain of other stuff waiting for me, so I really want to rule today. So, --

MR. LANG: Understood.

THE COURT: Yeah.

MR. LANG: Maybe we can work on it as soon as I'm done and I can get back to 'em --

THE COURT: Okay.

MR. LANG: -- and get back to you.

Your Honor, the -- it's on Page 23 of the plan. It talks about the Class 10 and Class 11, where the partnership interests, that their treatment, they shall receive as pro rata share of the contingent Claimant Trust interests. And all we're asking is that be used or applied as a 99.5/.5

distribution.

(Pause.)

THE COURT: I'm sorry. Go ahead.

MR. LANG: Oh, sorry. I thought you were looking for it.

And the last issue is authority. The only point of the authority argument, Your Honor, is that the Joint Administrators were appointed down in the Caymans to investigate the transaction that moved basically the entire ownership, because it's owned a hundred percent down to HMIT, out. They're investigating the transactions. They have not stipulated to authority. They're looking at everything. They've requested a 45-day delay on this motion. And that's all that -- not even asking to deny the 9019. They were just asking time to basically bless this transaction so that nobody could come back and make an issue of it. But I understand your desire to rule today.

THE COURT: Okay. Any rebuttal?

MR. MORRIS: Yeah, briefly, Your Honor.

REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE CLAIMANT TRUST

MR. MORRIS: I just want to point the Court to two provisions of the operative documents that I think --

THE COURT: Okay.

MR. MORRIS: -- will resolve even further the issues that we've presented today.

The Claimant Trust Agreement -- and I apologize, I don't know if the whole document is in evidence, but I will respectfully suggest to the Court that the Claimant Trust Agreement provides in Article 5, Section 5.1(c), --

THE COURT: Okay. Let me catch up.

MR. MORRIS: Yes.

(Counsel confer.)

THE COURT: It's not Debtor's Exhibit 5.

MR. MORRIS: Yeah.

THE COURT: Daugherty's Exhibit 5?

MR. MORRIS: It's Daugherty Exhibit 5?

MR. YORK: Yes.

THE COURT: Okay.

MR. YORK: So we have a full copy at Daugherty --

THE COURT: I've got it. Daugherty's Exhibit 5.

MR. MORRIS: Okay. So if you could just go to Page 27, Your Honor. And this is in response to Mr. Lang's argument about the calculation of the allowed claim. You'll see it deals with contingent trust interests. And the very last sentence says the equity trust --

THE COURT: Wait. What page again?

MR. MORRIS: 27.

THE COURT: Okay.

MR. MORRIS: Do you see Section C in the middle is Contingent Trust Interests?

THE COURT: No.

THE CLERK: It's 26 of the Claimant Trust Agreement, 27 of the --

THE COURT: Ah, it's 26. Yes. On the bottom, it's 26; on the top, it's 27 of 38.

MR. MORRIS: Okay.

THE COURT: Okay.

MR. MORRIS: And at the end of Section C, it says explicitly: The equity trust interests distributed to allowed holders of Class A limited partnership interests -- that's Dugaboy --

THE COURT: Uh-huh.

MR. MORRIS: -- shall be subordinated to the equity interests distributed to the allowed holders of Class B and C. That's Hunter Mountain. Okay?

So the trust agreement provides for exactly what we're doing here. Dugaboy is in fact subordinated to HMIT. It doesn't get paid until HMIT gets paid in full. And Mr. Seery I think compellingly testified as to the reasonable calculation that he did based on very objective numbers to determine each respective limited partner's capital account.

With respect to Mr. Daugherty, the plan, which is on the docket at 1943, has a definition of Disputed Claim Reserve. And it states, among other things, that the amount of the disputed claim upon which the disputed claim --

THE COURT: Give me the page number.

MR. MORRIS: I apologize, Your Honor.

THE COURT: I've got it right in front of me.

MR. MORRIS: It's Page 7 of the plan.

THE COURT: Okay. All right. I'm there. The Defined Term.

MR. MORRIS: So the Defined Term "Disputed Claim, Claims Reserve Amount" in the middle says: The amount of the disputed claim upon which the disputed claims reserve is calculated shall be -- they've got an A and then a B -- the amount agreed to by the holder of the disputed claim and the Claimant Trustee or Reorganized Debtor, as applicable. And then it says D: Or is otherwise ordered by the Bankruptcy Court, including an estimated -- an order estimating the disputed claim.

And that last provision is vital, Your Honor, because that is the hook upon which you can always hang your hat when you decide that we are not going to wait until 2023 [sic] when the IRS audit may be resolved, because you have the ability, as ordered by the Bankruptcy Court, including estimating the amount of the disputed claim. Which is one of the causes of action that we've asserted in the complaint. It's either to subordinate -- actually, it's to disallow, to subordinate, or to estimate. Because this case does have to end, Your Honor. We actually think he should be bound by the definition in B.

It is an agreed-upon amount.

I've heard the testimony from Mr. Daugherty that there was no negotiation, but he didn't deny that he signed a document that is called an agreement that sets forth the disputed claim amount. And that is an agreement, and I think that satisfies that definition. And even if it didn't, at some point this case has to end.

Thank you, Your Honor.

THE COURT: Okay. Thank you.

All right. Well, it's been a long day and even a longer case. I think a lot of people were on the receiving end of a little bit of my grumpiness at times today, and I apologize for that.

I always feel compelled to say to the lawyers and parties when I rule from the bench that I can assure you it's not knee-jerk. I can assure you my law clerk and I have read every piece of paper submitted. And we come in here I think well-prepared and we just want to listen to the evidence to see if it supports -- who it supports. So I am going to rule from the bench.

I first want to make clear that with regard to the motion before the Court, the motion which was filed May 19th at Docket Entry 4216, pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 363, the Court is being asked to approve a very broad settlement that is between what are

defined as the HMIT entities, seven entities in all; Hunter Mountain Investment Trust; as well as Beacon Mountain, LLC; Rand Advisors, LLC; Rand PE Fund 1, LP; Rand PE Fund Management, LLC; Atlas IDF, LP; and Atlas IDF GP, PLLC. So this proposed compromise and settlement is between all of those Hunter Mountain entities as well as the Reorganized Debtor, the Highland Claimant Trust, the Highland Litigation Subtrust, and the Highland Indemnity Trust.

I first will note that notice has been fulsome, reasonable under the circumstances, to provide due process to anyone affected by the proposed compromise.

The Court would note that the legal standard is a very well-known and established legal standard here. Among other things, the Court is to look at whether the settlement is fair, reasonable, and in the best interest of the estate; whether it would appear reasonable business judgment has been exercised; is the compromise and settlement within the range of reasonableness?

And this involves looking at, among other things, the probability of success in the litigation -- that would be all the various litigation involving HMIT, if it were to go forward; the complexity and likely duration of further litigation and attendant expense, inconvenience, and delay; and all other factors bearing on the wisdom of the compromise. We know that's *Cajun Electric*, *Jackson Brewing*, *Foster*

*Mortgage*, among other cases. I probably left out *AWECO*.

Anyway, applying all of those legal standards here, I do think the evidence was very thorough in showing that the compromise is a product of good faith and arm's-length negotiations. Indeed, it was almost shocking to this Court when I saw the motion, having the history I have with all of the contested issues, adversary proceedings that have transpired over the past few years between Hunter Mountain and the Debtor.

I do think the evidence is that it's fair and equitable and in the best interest of the estate and within the range of reasonableness, given due regard for all of the expense, delay, and likelihood of success.

I'll just briefly recount that, as noted early today, there was an Exhibit B attached to the 9019 motion that listed nine unresolved pending pieces of litigation that the Highland entities are embroiled in. Two of those are now gone. This was filed May 8th, and as of January 25th, they're gone. So seven pieces of litigation, of which two will go entirely away if I approve this settlement. The Kirschner adversary claims against Hunter Mountain will go away.

We have very little, very little, relatively speaking, left in this bankruptcy case to resolve if I approve this settlement. That alone is very, very significant. Again, we have large shall I say issues with Hunter Mountain. Highland

says Hunter Mountain owes the Highland entities something like $57.69 million on a note that Hunter Mountain is payor on dated December 21st, 2015.

The flip side of that is that Hunter Mountain was sued by Kirschner in the Kirschner action on various claims, including this $57 million note. We have had Hunter Mountain file multiple motions for leave to sue Highland, the Claimant Trust, Mr. Seery. And those have been denied, but are in appeal status or remand status or some further litigation status.

And again, we have numerous issues. Hunter Mountain having sought valuation. The Court denied that. It's on appeal.

So, so much goes away, so much further litigation goes away and we make a monumental step in ending this long-running case if I approve this settlement.

Now, on the flip side of this, I know that Dugaboy, through the voice of Mr. Dondero today, expressed that Hunter Mountain is, I forget the words he used, but not -- this isn't close to being fair and equitable as far as he was concerned for Hunter Mountain. That Hunter Mountain, in addition to being through with litigation in this bankruptcy-land, would be paid $500,000 within five days. They would also be paid separately $10 million as an initial distribution, with the hope of two more $6.5 million distributions in '27 and '28.

And it would get a note, which I think has $24 million -- I think it was less than that, $17 or $18 million left on it, perhaps, on which Dugaboy is a maker. The debtor is one of the two payees. The Debtor gives up its rights in that note.

It looks like Hunter Mountain is getting a lot. And again, the way this estate has been liquidated, there is money that can flow to it as a Class 10 equity here, as the evidence has shown.

So I am approving the settlement. I am specifically overruling the remaining objections of both Dugaboy and Mr. Daugherty.

As far as Mr. Daugherty's argument that the settlement violates the absolute priority rule or violates the terms of the plan or the confirmation order or the trust agreement by, putting words in his mouth, skipping over the full payment of whatever his Class 8 claim is going to be and allowing a subordinate class, Class 10, to get paid, I have flipped and studied the wording of the plan and the confirmation order and the defined term for Disputed Reserve. And I referred to a disputed reserve as a tried-and-true provision in Chapter 11 plans. I think it does what needs to happen for precisely this kind of situation, that as long as an appropriate amount is being held in reserve, and the Court can decide what is an appropriate amount, we don't have to hold up a bankruptcy estate for years and years.

So the disputed claim reserve is what allows me to find this is fair and equitable and this isn't some sort of violation of the absolute priority rule. I think this is precisely the reason the disputed claim reserve mechanism is in place, so that we can get on with the business of getting more people paid sooner.

And based on the evidence I've heard, it is an appropriate amount, I think. We're doing a lot of crystal-balling, what may or may not ever happen when, but I think, based on all the persuasive evidence I've heard, the Daugherty objection should be overruled.

As far as Dugaboy, I, as noted, am overruling that objection. I didn't have any persuasive evidence, solid evidence to show me that Mark Patrick doesn't have appropriate corporate governance authority to enter into this settlement agreement.

I realize there's a lot swirling around in the Cayman Islands, and that's going to play out however it plays out. But as of today, I don't have any evidence that he doesn't have authority currently to enter into the settlement. And it speaks volumes that The Foundation backed down. It would seem that they have been convinced that the lack-of-authority argument was not one they wanted to press today. So that is overruled.

I feel like we have all seen this movie many times before.

I wanted to understand, perhaps I went deeper than I needed to, I know Mr. Phillips thinks I went deeper than I needed in hearing some of the testimony from Mr. Patrick and Mr. Dondero, but I'm just trying to understand what's happening here. Why people who were so lockstep and friendly for years of this case suddenly, when we're right on the brink of maybe the case being put to bed -- I'm optimistic; it's not quite that close -- all of a sudden they're at loggerheads.

And so how many times have I seen this over the years, whether it's a breakdown in business and personal relationships, Mr. Daugherty, Mr. Terry, Grant Scott, now Mark Patrick? I'm probably leaving out someone. I don't know. I feel like I'm watching the same movie. Okay, now these two have parted ways. Now these two have parted ways.

And then, as I recall, when Grant Scott withdrew his objection to the HarbourVest settlement all these years ago, 2020, 2021, which he had been lodging for Charitable DAF, I think it was, --

MR. MORRIS: Yes, Your Honor.

THE COURT: -- then what happens? Well, I think Mark Patrick came in to work or replace Grant Scott, and then a bunch of people ended up getting sued in a different court regarding the settlement I approved, the HarbourVest settlement I approved.

So why am I saying this? I just, I'm trying to understand

things I'll never understand. I wanted to maybe hear something that would make me better understand what's happened now between Hunter Mountain, Mark Patrick, and Dondero and Dugaboy, because it sure seems like they were on the same team for many years. But it was very likely irrelevant, as Mr. Phillips kept getting up and down and saying. I just was seeing if it would lead to something relevant that would bear on the wisdom of this compromise, since that's one of my other legal standards. I'm supposed to consider all factors that might bear on the wisdom of the compromise. And so I guess that's where I was going in allowing all of that to come in.

All right. Well, while everyone is not thrilled with this compromise and settlement, I heartily congratulate the human beings that made it happen, and they know who they are. Maybe I do, maybe I don't. But I think it's rather amazing. And I hope that we are not coming to court for hearings in 2032. I don't know who among us will be alive. I'm not going to be alive by then. Certain people might cheer if that's the case. But I congratulate the human beings who made this happen. And you know who you are. Maybe I do, maybe I don't, but I congratulate you.

All right. So I reserve the right to supplement or amend this oral bench ruling in a more fulsome written order. I am asking Mr. Morris and his team to be the scriveners on that order. And obviously, you're going to run it by the other

lawyers here who participated today.

Is there anything else before we wrap it up?

MR. MORRIS: Just one other thing, Your Honor. And I greatly appreciate your comments.

When we draft the order, are we authorized to say that this settlement is approved not only pursuant to 9019 but to 363? Because there are asset sales that are part of this. We moved under that provision, and I didn't hear Your Honor reference that, --

THE COURT: Okay.

MR. MORRIS: -- but we would like to include that in the order.

THE COURT: You may. And that is precisely why I said I reserve the right to supplement or amend, because many times I get out of here and look at this transcript and, ooh, I forgot to say whatever.

MR. MORRIS: Yeah.

THE COURT: So I meant to say that and I didn't, so you may add that.

MR. MORRIS: And I assume all Your Honor wants is a fairly simple form of order that incorporates --

THE COURT: I do not want a 40-page order.

MR. MORRIS: Right.

THE COURT: Okay?

MR. MORRIS: Just an order that incorporates your

comments on the record, and to the extent that Your Honor wants to amend that, you'll do so at your leisure?

THE COURT: Yes.

MR. MORRIS: Perfect.

THE COURT: All right.

MR. MORRIS: Thank you.

THE COURT: Thank you all. We're adjourned.

MR. PHILLIPS: Thank you, Your Honor.

THE CLERK: All rise.

(Proceedings concluded at 4:38 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **06/27/2024**

______________________________________ ________________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

INDEX

PROCEEDINGS 4

OPENING STATEMENTS

By Mr. Morris 48
By Mr. Phillips 62
By Mr. York 64
By Mr. Lang 79

WITNESSES

Claimant Trust's Witnesses

James P. Seery
- Proffer of Testimony by Mr. Morris 11
- Direct Examination by Mr. Morris 83
- Cross-Examination by Mr. Phillips 110
- Cross-Examination by Mr. York 111
- Cross-Examination by Mr. Lang 128

Patrick Daugherty's Witnesses

Patrick Daugherty
- Direct Examination by Mr. York 141
- Cross-Examination by Mr. Morris 154
- Examination by the Court 164

Dugaboy Investment Trust's Witnesses

Mark Patrick
- Direct Examination by Mr. Lang 171
- Cross-Examination by Mr. Morris 184
- Redirect Examination by Mr. Lang 189
- Recross-Examination by Mr. Morris 191
- Examination by the Court 192

James "Jim" Dondero
- Direct Examination by Mr. Lang 195
- Cross-Examination by Mr. Morris 206
- Redirect Examination by Mr. Lang
- Examination by the Court 224
- Recross-Examination by Mr. Morris

INDEX
Page 2

EXHIBITS

Claimant Trust's Exhibits (Motion to Extend Duration)

1 through 67 Received 11

Claimant Trust's Exhibits (Motion to Approve Settlement)

1 through 123, 126 Offered 43
10 Withdrawn 45
12 Received 44
13 Received 44
57 Withdrawn 45
59 Received 46
64-69 Received 46

Dugaboy Investment Trust's Exhibits

Plan and Settlement Agreement Received 47
Exhibit 3 Received 189

Patrick Daugherty's Exhibits

1-42 Received 47

CLOSING ARGUMENTS

By Mr. Morris 231
By Mr. Phillips 238
By Mr. Loigman 240
By Mr. York 240
By Mr. Lang 245
By Mr. Morris 250

RULINGS

Motion for an Order Further Extending Duration of Trusts (4213) 21

INDEX
Page 3

RULINGS, cont'd.

Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with HMIT Entities and Authorizing Actions Consistent Therewith (4216) 28/254

END OF PROCEEDINGS 263

INDEX 264-266