**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P.

§
§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**

§
vs. §

3:26-CV-02496-D

**Highland Capital Management, L.P., et al**-Appellee

§
§

**[4689] Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026**

**APPELLANT RECORD**

**VOLUME 28**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02496-D<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4698] on July 24, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689] now files this *Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the Court's June 15, 2026 Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate?

2. Did the Bankruptcy Court err in finding Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate ("Dugaboy's Motion") [Docket No. 4684] was "without merit?"

3. Did the Bankruptcy Court err in denying Dugaboy's Motion without a full record, including that Dugaboy was not allowed to file a reply brief and was not granted a hearing?

4. Did the Bankruptcy Court err in denying Dugaboy the opportunity to file a reply brief to Highland's Opposition to Dugaboy's Motion, including that Dugaboy indicated a date certain for filing a reply?

5. Did the Bankruptcy Court err in finding Dugaboy's Motion was "without merit" without granting a hearing?

6. Did the Bankruptcy Court err by summarily denying Dugaboy's Motion without explaining its reasoning for the denial?

7. Did the Bankruptcy Court err in failing to consider Dugaboy's Notice of Intervening Event?

8. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(2) when it determined that it had not manifestly erred in deciding the evidence of Mark Patrick's misconduct contained in the Cayman Islands proceeding was not "newly discovered" even though that information was not contained in James Dondero's affidavit executed April 16, 2025?

9. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant

to Rule 60(b)(2) when it determined it had not manifestly erred in deciding the Dondero Affidavit indicated information gained in the Cayman Islands proceedings was not "newly discovered" despite the fact the Affidavit lacked any evidence of the restructuring discovered in the Cayman Islands proceedings?

10. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding on the grounds that Rule 60(b)(3) purportedly requires fraud or misconduct to have occurred in the judicial proceeding itself?

11. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding that Highland did not provide misleading or incomplete answers during the discovery of Mark Patrick's misconduct and resulting lack of authority to negotiate the Rule 9019 settlement agreement from Dugaboy leading to the Rule 9019 Order?

12. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding that Dugaboy had not presented a basis for relief under Rule 60(b)(6) that was separate from the grounds presented for Rule 60(b)(2) and Rule 60(b)(3)?

13. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding on the grounds that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain?

14. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of the Bankruptcy Court's special responsibility to monitor arrangements and settlements made between Highland's appointed managers and third parties?

15. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of its manifest error in failing to consider the Bankruptcy Court's role as a court of equity and responsibility to prevent misconduct before it, such as Mark Patrick's use of stolen assets in the 9019 Settlement?

16. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

Vol. 1 000001 – 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4698] filed by Appellant;

000010 2. The Bankruptcy Court's July 10, 2026 *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000012 4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 2 000648 thru Vol. 3 | 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| Vol. 4 001843 | 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 4 001845 thru vol 6 | 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol 7 003634 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003647 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003650 + 003651 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003652 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003663 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003667 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003670 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 7 003709 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004733 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| vol. 8 004790 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| vol 9 005207 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005209 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005217 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| vol 9 | | Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 04/07/2026<br>005222 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 04/07/2026<br>005225 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 04/10/2026<br>005227 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 04/16/2026<br>005229 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/17/2026<br>005233 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 9 | | | Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| 005330 | 04/17/2026 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| Vol 10 005590 | 04/21/2026 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 005594 | 04/22/2026 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005615 | 04/22/2026 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 005682 | 04/22/2026 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol 10 | | Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| 04/22/2026 005692 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 04/24/2026 005705 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 04/24/2026 005726 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 04/25/2026 005727 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/27/2026 005729 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 04/28/2026 005737 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11<br>005746 | 04/28/2026 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 005755 | 04/28/2026 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005761 | 04/28/2026 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005767 | 04/29/2026 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 005776 | 04/29/2026 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 005783 | 04/29/2026 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| Vol. 10 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| 005785 | 04/29/2026 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005787 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005794 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005796 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005798 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005801 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005884 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005902 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005905 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005907 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund |

Vol. 11

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 05/06/2026 005913 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/06/2026 005920 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/06/2026 005927 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 05/07/2026 005929 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 05/08/2026 005936 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 05/08/2026 005939 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 05/08/2026 005942 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 05/08/2026 005945 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol. 12 05/08/2026 006100 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and* |

Thru Vol 21

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | *Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| 10). 22<br>008156 | 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 008172 | 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 008188 | 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 22 008256 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008293 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008429 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008465 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008472 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008916 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| Vol 25 009554 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| Vol. 26 009868 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| Vol. 27 010229 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| Vol. 28 010538 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 28 | | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| 010664 | 05/11/2026 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29 010736 | 05/11/2026 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol 30 011150 | 05/11/2026 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol 31 011734 | 05/11/2026 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol 32 013203 Thru Vol 33 | 05/11/2026 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34 014888 | 05/11/2026 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol 35 015349 | 05/11/2026 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 015505 | 05/11/2026 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 015506 | 05/12/2026 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 015538 | 05/12/2026 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 015565 | 05/12/2026 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 015566 | 05/15/2026 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36 015569 | 05/18/2026 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol 37 015996 | 05/18/2026 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 016008 | 05/19/2026 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 016079 | 05/20/2026 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 016082 – 016084 | 05/20/2026 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 016085 | 05/21/2026 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 016134 | 05/21/2026 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 37 | | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| 016135 | 05/23/2026 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 016233 | 05/28/2026 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 016490 | 06/15/2026 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s)4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 016504 | 06/15/2026 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| Vol. 39 016505 | 06/29/2026 | 4684 | (162 pgs; 2 docs) Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Appendix) (Edney, Michael) |
| 016667 | 06/29/2026 | 4685 | (7 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s)4679 Order on motion to reconsider). Appellant Designation due by 07/13/2026. (Attachments: # 1 Exhibit)(Edney, Michael) |
| 016674 | 07/06/2026 | 4687 | (32 pgs; 2 docs) Response opposed to (related document(s): 4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 016706 | 07/09/2026 | 4688 | (23 pgs; 2 docs) Notice of Intent to Reply and Request for Hearing on Its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 39 | | | (Attachments: # 1 Appendix)). (Attachments: # 1 Attachment A) (Edney, Michael) |
| 016729 | 07/10/2026 | 4689 | (2 pgs) Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026. (Okafor, M.) Modified text on 7/10/2026 (mdo). |
| 016731 | 07/13/2026 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |
| 016733 | 07/24/2026 | 4698 | (9 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)(Edney, Michael) |
| 016742 | 07/28/2026 | 4704 | (5 pgs) DISTRICT COURT Notice of docketing notice of appeal. Civil Action Number: 3:26-cv-02496-E. (RE: related document(s)4698 Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court;

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J"); and

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No.

4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: August 7, 2026

Respectfully submitted,

*/s/ Michael J. Edney*

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Michael J. Edney*
Michael J. Edney

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S THIRD AMENDED
<u>EXHIBIT LIST FOR THE MAY 11, 2026 HEARING</u>**

COMES NOW, The Dugaboy Investment Trust ("Dugaboy") and files this Exhibit List for the May 11, 2026 Hearing in the Bankruptcy Case.

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 1 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | HCM-D10000002-HCM-D10000013 |
| 2 | Settlement Agreement and General Release | 000813-000836 |
| 3 | 6/4/2024 First Affidavit of Mark Patrick | Dkt. 401-2 (21-03076-sgj) |
| 4 | 7/21/2025 [4-33] Original DAF Org Chart | Dkt. 4-33 (25-11376-BLS) |
| 5 | 7/11/2011 Amended and Restated Exempted Limited Partnership Agreement of Charitable DAF Fund, LP | Dkt. 4-36 (25-11376-BLS) |
| 6 | 2/20/2025 Amended and Restated Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd. | Dkt. 4-06 (25-11376-BLS) |
| 7 | 11/9/2023 Shields Work Plan Memorandum | |
| 8 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 9 | 12/12/2024 Certificate of Formation of CDFMCAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 10 | 12/18/2024 Charitable DAF HoldCo, Ltd. Unanimous Written Resolutions of all of the Directors of the Company | Dkt. 4-45 (25-11376-BLS) |
| 11 | 9/30/2024 Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 12 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 13 | 3/27/2025 CDMCFAD, LLC Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 14 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D100000330 |
| 15 | 2/12/2025 Membership Interest Purchase Agreement | HCM-D10000021-HCM-D10000036 |
| 16 | 2/12/2025 Member Consent of Beacon Mountain | HCM-D10000019-HCM-D10000020 |
| 17 | 11/30/2015 Amended and Restated Limited Partnership Agreement of Atlas IDF, LP | |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 18 | 6/26/2025 Audit of RAND PE Fund I, LP | HMIT_Entities_000022-HMIT_Entities_000039 |
| 19 | 3/6/2024 DAF Structure Chart in 2024 and 2025 | |
| 20 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | |
| 21 | 12/2015-8/2022 Rand Structure Chart | |
| 22 | 2/12/2025 Feb. and May 2025 Rand Structure Chart | |
| 23 | 10/15/2019 Empower Dallas Foundation, Inc. Partial Surrender Request | |
| 24 | 2/22/2021 Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief | Dkt. 1943 (19-34054-sgj11) |
| 25 | 4/8/2025 Email regarding Settlement Agreement | HCMLPHMIT00000656-HCMLPHMIT00000661 |
| 26 | 12/16/2015 Crown Global Deferred Variable Annuity Policy for Empower Dallas Foundation, Inc. | |
| 27 | 11/30/2015 Participation Agreement between Crown Global Life Insurance Ltd. and Other Entities | |
| 28 | 9/12/2025 First Affidavit of Mark Eric Patrick | |
| 29 | 10/21/2025 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 9/30/2025 | Dkt. 4438 (19-34054-sgj11) |
| 30 | 10/21/2025 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 9/30/2025 | Dkt. 4439 (19-34054-sgj11) |
| 31 | 1/21/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 12/31/2025 | Dkt. 4503 (19-34054-sgj11) |
| 32 | 1/21/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 12/31/2025 | Dkt. 4504 (19-34054-sgj11) |
| 33 | 4/20/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 3/31/2026 | Dkt. 4552 (19-34054-sgj11) |
| 34 | 4/20/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 3/31/2026 | Dkt. 4553 (19-34054-sgj11) |
| 35 | 6/25/2025 Hearing Transcript for Case No. 19-34054-sgj-11 | |
| 36 | 4/16/2025 Affidavit of James David Dondero | Dkt. 4534-7 (19-34054-sgj11) |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 37 | 6/9/2025 Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 USC § 363 Approving Settlement with the HMIT Entities | Dkt. 4230 (19-34054-sgj11) |
| 38 | HMIT Structure as of 8/12/2022 – 2/12/2025 | |
| 39 | 2/6/2025 Letter to Dolomiti LLC re Notice of Your Withdrawal from Rand PE Fund I, L.P. | |
| 40 | 2024 Tax Form 990 – Highland Dallas Foundation Inc. | Dkt. 4556-2 (19-34054-sgj11) |
| 41 | 3/27/2025 Admission and Amendment to No. 1 Agreement | Dkt. 4-54 (25-11376-BLS) |
| 42 | 12/12/2024 Certificate of Formation of CDMCFAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 43 | 2/7/2015 Unanimous Written Resolutions of the Board of Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-22 (25-11376-BLS) |
| 44 | 12/18/2024 Unanimous Written Resolutions of all of the Directors of the Company passed on 18 December 2024 in accordance with the Articles of Association of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-45 (25-11376-BLS) |
| 45 | 4/2/2025 Written Resolutions of the Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-47 (25-11376-BLS) |
| 46 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 47 | 7/21/2025 Defendants' Motion to Dismiss and Plea to the Jurisdiction filed in Cause No. 25-BC-01B-0027, The Highland Foundation, Inc. et al. v. Mark Patrick, et al., The Business Court of Texas, First Division | Dkt. 4-91 (25-11376-BLS) |
| 48 | 3/27/2025 Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 49 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 50 | 9/30/2024 Valuation Analysis of 100 Participation Shars of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 51 | 3/7/2024 Written Consent of the Managing Member of Charitable DAF GP, LLC | Dkt. 4-38 (25-11376-BLS) |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 52 | 6/9/2025 Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000001-HCM-D10000001 |
| 53 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) on December 17, 2015 | HCM-D10000002-HCM-D10000013 |
| 54 | Email chain regarding the sale of Class C limited partnership interests from Highland Capital Management, L.P. to Hunter Mountain Investment Trust. Mark Patrick | HCM-D10000014-HCM-D10000015 |
| 55 | Email from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer. | HCM-D10000016-HCM-D10000016 |
| 56 | Email chain from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer | HCM-D10000017-HCM-D10000018 |
| 57 | CLO Holdco, LLC's purchase of all membership interests in Beacon Mountain, LLC from Rand PE Fund I, L.P. | HCM-D10000019-HCM-D10000020 |
| 58 | Membership Interest Purchase Agreement - | HCM-D10000021-HCM-D10000036 |
| 59 | Organizational structure of HMIT entities before and after February 12, 2025. | HCM-D10000037-HCM-D10000038 |
| 60 | Investment Management Agreement -establishes Rand Advisors, LLC as the investment manager for Atlas IDF, LP. | HCM-D10000039-HCM-D10000045 |
| 61 | Investment Management Agreement - establishes Rand Advisors, LLC as the investment manager for Rand PE Fund I, L.P. | HCM-D10000046-HCM-D10000052 |
| 62 | Register of Members for CLO Holdco, Ltd. | HCM-D10000053-HCM-D10000055 |
| 63 | Unanimous Written Consent - executed by Mark Patrick as sole director of Rand Advisors Holding Corp. | HCM-D10000056-HCM-D10000069 |
| 64 | Charitable DAF Fund, LP transferred DAF Holdings stock to CLO HoldCo, Ltd | HCM-D10000070-HCM-D10000072 |
| 65 | Register of Members for Liberty CLO Holdco, Ltd. CLO Holdco, Ltd. | HCM-D10000073-HCM-D10000073 |
| 66 | Limited Liability Company Agreement - establishing Liberty CLO Holdco, LLC as a Delaware limited liability company. | HCM-D10000074-HCM-D10000090 |
| 67 | Register for CDH GP, Ltd. | HCM-D10000091-HCM-D10000091 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 68 | Register of Members for CDH GP, Ltd. | HCM-D10000092-HCM-D10000092 |
| 69 | Register for CLO HoldCo, Ltd. | HCM-D10000093-HCM-D10000094 |
| 70 | Register of General Partners for Charitable DAF Fund, LP. | HCM-D10000095-HCM-D10000095 |
| 71 | Register of Limited Partners for Charitable DAF Fund, LP | HCM-D10000096-HCM-D10000096 |
| 72 | Limited Liability Company Agreement for CDMCFAD, LLC. | HCM-D10000097-HCM-D10000124 |
| 73 | Collation of various documents including resolutions from CDMCFAD, LLC, and a March 2025 letter from Seyfarth Shaw LLP to the IRS reporting potential tax violations by Highland Dallas Foundation, Inc. (Jim Dondero). | HCM-D10000125-HCM-D10000251 |
| 74 | Letter from three Highland foundations to Paul Murphy | HCM-D10000264-HCM-D10000265 |
| 75 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000266-HCM-D10000267 |
| 76 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000268-HCM-D10000269 |
| 77 | Email chain between K. Hendrix and J. Seery, et al. | HCM-D10000270-HCM-D10000271 |
| 78 | Email chain James Seery to Mark Patrick and Shawn Raver | HCM-D10000272-HCM-D10000272 |
| 79 | Email chain from Shawn Raver to J. Seery, et al. | HCM-D10000273-HCM-D10000273 |
| 80 | Email chain from M. Tax to S. Raver, et al. | HCM-D10000274-HCM-D10000274 |
| 81 | Email chain from K. Hendrix to S. Raver, et al. | HCM-D10000275-HCM-D10000276 |
| 82 | Email chain from S. Raver to K. Hendrix, et al. | HCM-D10000277-HCM-D10000278 |
| 83 | Email chain from S. Raver to M. Tax, et al. | HCM-D10000279-HCM-D10000280 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 84 | Note Elevation and Assignment Agreement | HCM-D10000281-HCM-D10000301 |
| 85 | Email from A. Hurt to T. Cournoyer, et al. | HCM-D10000302-HCM-D10000303 |
| 86 | Letter to Dugaboy Investment Trust | HCM-D10000304-HCM-D10000308 |
| 87 | Claims Assignment Agreement | HCM-D10000309-HCM-D10000315 |
| 88 | Email from David Klos at Highland Capital Management to James Seery | HCM-D10000316-HCM-D10000316 |
| 89 | Trust Agreement establishes the Hunter Mountain Investment Trust on December 17, 2015 | HCM-D10000317-HCM-D10000328 |
| 90 | Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000329-HCM-D10000329 |
| 91 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D10000330-HCM-D10000330 |
| 92 | Email from K. Hendrix to A. Gunther, et al. | HCM-D10000331-HCM-D10000332 |
| 93 | Email from K. Hendrix to D. Klos, et al. | HCM-D10000333-HCM-D10000334 |
| 94 | Letter from Campbells LLP to James Seery (CEO of Highland Capital Management, L.P.) and Marc Kirschner | HCM-D10000335-HCM-D10000338 |
| 95 | Email chain from A. Kapuria to S. Raver, et al. | HMIT_Entities_000001-HMIT_Entities_000006 |
| 96 | Email chain from K. Jackson to S. Raver, et al. | HMIT_Entities_000007-HMIT_Entities_000010 |
| 97 | Email chain from S. Reynolds to S. Raver, et al. | HMIT_Entities_000011-HMIT_Entities_000015 |
| 98 | Email from Chris Rice to K. Jackson, et al. | HMIT_Entities_000016-HMIT_Entities_000020 |
| 99 | Email from Chris Rice to S. Raver, et al. | HMIT Entities 000021-HMIT Entities 000021 |
| 100 | Audited financial statements for Rand PE Fund I, L.P. | HMIT_Entities_000022-HMIT_Entities_000039 |
| 101 | Email chain from K. Jackson to S. Raver | HMIT_Entities_000040-HMIT_Entities_000043 |
| 102 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000044-HMIT_Entities_000047 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 103 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities_000048- HMIT Entities 000051 |
| 104 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000052- HMIT_Entities_000054 |
| 105 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000055- HMIT Entities 000057 |
| 106 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000058- HMIT Entities 000058 |
| 107 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000059- HMIT Entities 000059 |
| 108 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000060- HMIT_Entities_000060 |
| 109 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000061- HMIT Entities 000061 |
| 110 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000062- HMIT Entities 000063 |
| 111 | Email chain between Crown Global Insurance and Rand Advisors | HMIT_Entities_000064- HMIT_Entities_000065 |
| 112 | Email from Robert Kipp to M. Patrick, et al. | HMIT Entities 000066- HMIT Entities 000066 |
| 113 | Email chain from A. Gunther to S. Raver, et al. | HMIT Entities 000067- HMIT Entities 000070 |
| 114 | Email chain from S. Raver to A. Gunther, et al. | HMIT_Entities_000071- HMIT_Entities_000074 |
| 115 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000075- HMIT_Entities_000076 |
| 116 | Email chain from S. Raver to J. Seery, et al. | HMIT Entities 000077- HMIT Entities 000078 |
| 117 | Email from C. Rice to S. Raver, et al. | HMIT Entities_000079- HMIT Entities_000079 |
| 118 | Bloomberg invoice | HMIT Entities 000080- HMIT Entities 000080 |
| 119 | Email thread with S&P Global | HMIT_Entities_000081- HMIT_Entities_000083 |
| 120 | S&P Global invoice | HMIT Entities_000084- HMIT Entities_000084 |
| 121 | Email exchange between auditors Chris Rice (NexPoint Services) and Patrick Casale (Cohen & Co) | HMIT Entities_000085- HMIT Entities_000086 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 122 | Financial statement audit | HMIT_Entities_000087-HMIT_Entities_000103 |
| 123 | Email chain C. Rice to S. Raver | HMIT_Entities_000104-HMIT_Entities_000114 |
| 124 | Email chain from S. Raver to C. Rice | HMIT_Entities_000115-HMIT_Entities_000124 |
| 125 | Email from K. Longwell to M. Tax, et al. | HMIT Entities_000125-HMIT Entities_000125 |
| 126 | Civil Investigative Demand issued by the Texas Attorney General's Office to Hunter Mountain Investment Trust (HMIT) on July 14, 2025 | HMIT_Entities_000126-HMIT_Entities_000133 |
| 127 | Email from K. Longwell to M. Tax, et al. | HMIT Entities 000134-HMIT Entities 000134 |
| 128 | Dkt. 23, Notice of Hearing dated 8/27/2025 | HMIT_Entities_000135-HMIT_Entities_000254 |
| 129 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000260-HMIT_Entities_000261 |
| 130 | Email chain from D. Klos to K. Hendrix, et al. | HMIT_Entities_000262-HMIT_Entities_000263 |
| 131 | Email chain from M. Tax to J. Seery, et al. | HMIT_Entities_000264-HMIT_Entities_000264 |
| 132 | Email chain from K. Hendrix to S. Raver, et al. | HMIT_Entities_000265-HMIT_Entities_000266 |
| 133 | Email chain from K. Hendrix to A. Gunther, et al. | HMIT_Entities_000267-HMIT_Entities_000268 |
| 134 | DAF entity structure | VALUESCOPE 000001-VALUESCOPE 000001 |
| 135 | DAF/Rand entity structure | VALUESCOPE_000002-VALUESCOPE_000002 |
| 136 | Law firm forwards legal filing to Mark Patrick (DAF HoldCo) re Chapter 15 filing | VALUESCOPE_000003-VALUESCOPE_000007 |
| 137 | Chapter 15 Petition filing | VALUESCOPE_000008-VALUESCOPE_000026 |
| 138 | Charitable DAF Org structure | VALUESCOPE_000027-VALUESCOPE_000027 |
| 139 | Letter from Reed Smith LLP | VALUESCOPE_000028-VALUESCOPE_000029 |
| 140 | ValueScope, LLC Response | VALUESCOPE_000030-VALUESCOPE_000030 |
| 141 | Certificate of Incorporation, Charitable DAF HoldCo, Ltd. | TDIT004698 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 142 | Legal Relationship Agreement, Highland Kansas City Foundation | TDIT003396–TDIT003398 |
| 143 | Supporting Organization Operating Agreement - Highland Dallas Foundation, Inc. | TDIT003399–TDIT003406 |
| 144 | Supporting Organization Operating Agreement - Highland Santa Barbara Foundation, Inc. | TDIT003407–TDIT003413 |
| 145 | Letter - Highland Dallas Foundation, Inc. | TDIT003389–TDIT003390 |
| 146 | Letter - Highland Santa Barbara Foundation, Inc. | TDIT003391–TDIT003393 |
| 147 | Letter - Highland Kansas City Foundation, Inc. | TDIT003394–TDIT003395 |
| 148 | Employment Agreement - Mark Patrick | TDIT003971–TDIT003988 |
| 149 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011256–TDIT011268 |
| 150 | Memo - Harneys (H&B) | TDIT004274–TDIT004278 |
| 151 | Invoice - G.K. Management Limited | TDIT011038–TDIT011039 |
| 152 | Invoice - G.K. Management Limited | TDIT011040 |
| 153 | Invoice - G.K. Management Limited | TDIT011041 |
| 154 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011058–TDIT011062 |
| 155 | Certificate of Incorporation - Highland Kansas City Foundation, Inc. | TDIT003304–TDIT003306 |
| 156 | Certificate of Incorporation - Highland Dallas Foundation, Inc. | TDIT003326–TDIT003328 |
| 157 | Certificate of Incorporation - Highland Santa Barbara Foundation, Inc. | TDIT003344–TDIT003346 |
| 158 | Invoice - G.K. Management Limited | TDIT011042–TDIT011043 |
| 159 | Invoice - G.K. Management Limited | TDIT011044–TDIT011045 |
| 160 | Invoice - G.K. Management Limited | TDIT011046–TDIT011047 |
| 161 | Invoice - G.K. Management Limited | TDIT011048–TDIT011049 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 162 | Invoice - G.K. Management Limited | TDIT011050–TDIT011051 |
| 163 | Invoice - G.K. Management Limited | TDIT011052–TDIT011053 |
| 164 | Invoice - G.K. Management Limited | TDIT011054–TDIT011055 |
| 165 | Expense Reimbursement - G.K. Management Limited | TDIT011056–TDIT011057 |
| 166 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011088–TDIT011092 |
| 167 | Memorandum – Work Plan - Shields Legal Group | TDIT004699–TDIT004706 |
| 168 | Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT011093–TDIT011128 |
| 169 | Email - Shields Legal Group | TDIT003704 |
| 170 | Limited Partnership Agreement - Charitable DAF Fund, LP | TDIT003414–TDIT003431 |
| 171 | ValueScope Report - ValueScope, Inc. | TDIT004017–TDIT004075 |
| 172 | Expense Report - CLO HoldCo, Ltd. | TDIT003432–TDIT003435 |
| 173 | Audited Financial Statements - Highland Santa Barbara Foundation, Inc. | TDIT003989–TDIT004016 |
| 174 | Resolution of the Directors - Mark Patrick | TDIT003961–TDIT003962 |
| 175 | Resolution of the Directors - Mark Patrick | TDIT003963–TDIT003970 |
| 176 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011129–TDIT011136 |
| 177 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011137–TDIT011150 |
| 178 | Letter - Highland Dallas Foundation, Inc. | TDIT003707–TDIT003708 |
| 179 | Email - Paul Murphy | TDIT003709–TDIT003713 |
| 180 | Email - Walkers | TDIT003714–TDIT003719 |
| 181 | Certificate of Incorporation - DFW Charitable Foundation | TDIT003701–TDIT003703 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 182 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011151–TDIT011164 |
| 183 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011165–TDIT011170 |
| 184 | Resolution - Charitable DAF HoldCo, Ltd. | TDIT003720–TDIT003726 |
| 185 | Assignment - Charitable DAF HoldCo, Ltd. | TDIT003727–TDIT003732 |
| 186 | Agreement - CDMCFAD, LLC | TDIT003733–TDIT003760 |
| 187 | Email - David N. Corkern | TDIT003791–TDIT003792 |
| 188 | ValueScope Report - ValueScope, LLC | TDIT004076–TDIT004130 |
| 189 | Draft Legal Advice - Walkers | TDIT003761–TDIT003765 |
| 190 | Share Issuance Resolution - Charitable DAF HoldCo, Ltd. | TDIT003766–TDIT003790 |
| 191 | Email - PricewaterhouseCoopers (PwC) | TDIT004305–TDIT004323 |
| 192 | Memorandum and Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT003267–TDIT003303 |
| 193 | Form ADV - Rand Advisors, LLC | TDIT003646–TDIT003674 |
| 194 | Brochure - Rand Advisors, LLC | TDIT003675–TDIT003700 |
| 195 | Email - Mark Patrick | TDIT004324–TDIT004340 |
| 196 | ValueScope Report - ValueScope, LLC | TDIT004131–TDIT004205 |
| 197 | Email - FTI Consulting | TDIT004341–TDIT004358 |
| 198 | Director Services Agreement - CDMCFAD, LLC | TDIT011171–TDIT011185 |
| 199 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003955–TDIT003957 |
| 200 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003958–TDIT003959 |
| 201 | Prospectus - NexPoint Real Estate Strategies Fund | TDIT003463–TDIT003599 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 202 | Proxy Statement - NexPoint Capital, Inc. | TDIT003440–TDIT003462 |
| 203 | Written Resolution - CLO HoldCo, Ltd. | TDIT011196–TDIT011197 |
| 204 | Texas Petition - Highland Dallas Foundation, Inc. | TDIT004443–TDIT004688 |
| 205 | Rule 11 Agreement - Highland Dallas Foundation, Inc. | TDIT004693–TDIT004695 |
| 206 | Exhibit Index to Affidavit - Margot MacInnis | TDIT003261-TDIT004712 |
| 207 | Affidavit - Jim Dondero Dugaboy Investment Trust | TDIT004713-TDIT004778 |
| 208 | Texas Petition (Amended) - Highland Dallas Foundation, Inc. | TDIT006527–TDIT006580 |
| 209 | Liquidator's Certificate - Margot MacInnis (JOL) | TDIT006492 |
| 210 | Form ADV - Mark Patrick, Rand PE Fund | TDIT006581-TDIT006609 |
| 211 | Affidavit & Exhibit Index - Margot MacInnis | TDIT004967-TDIT006484 |
| 212 | Affidavit & Exhibit Index | TDIT006485-TDIT006580 |
| 213 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011394-TDIT011405 |
| 214 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011382-TDIT011393 |
| 215 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011425-TDIT011443 |
| 216 | Objection filed by Highland Dallas Foundation, Inc. Grant James Scott III | TDIT011444-TDIT011475 |
| 217 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011476-TDIT011509 |
| 218 | Supplemental Declaration - DFW Charitable Foundation CDMCFAD LLC | TDIT004869-TDIT004945 |
| 219 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) | TDIT006664-TDIT006675 |
| 220 | Affirmation by Mark Patrick | TDIT010529-TDIT010532 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 221 | Operating agreement between Highland Dallas Foundation, Inc. and The Dallas Foundation. | TDIT011406-TDIT011406 |
| 222 | Email exchange between Michael Stockham and Paul Murphy | TDIT010831-TDIT010840 |
| 223 | Form ADV Instructions - None | TDIT006628-TDIT006663 |
| 224 | Declaration by Caroline Maron | TDIT004846-TDIT004868 |
| 225 | Email from Louis M. Phillips requesting execution of two letters with attached documents | TDIT011318-TDIT011323 |
| 226 | Auditor's Report - Highland Capital Management L.P. | TDIT006610-TDIT006627 |
| 227 | Email chain from March 2025 | TDIT011407-TDIT011424 |
| 228 | Amended and Restated Limited Partnership Agreement - Atlas IDF LP | TDIT004779-TDIT004812 |
| 229 | Participation Agreement establishes the framework for Crown Global Life Insurance Ltd to purchase | TDIT004813-TDIT004845 |
| 230 | Investment Management Agreement - Rand PE Fund I | TDIT004946-TDIT004952 |
| 231 | Investment Management Agreement - Rand PE Fund I, L.P. | TDIT004953-TDIT004959 |
| 232 | Limited Partnership Agreement - Rand PE Fund | TDIT004960-TDIT004966 |
| 233 | By-Laws - Highland Kansas City Foundation, Inc. | TDIT003307–TDIT003325 |
| 234 | By-Laws - Highland Dallas Foundation, Inc. | TDIT003329–TDIT003343 |
| 235 | By-Laws - Highland Santa Barbara Foundation, Inc. | TDIT003347–TDIT003361 |
| 236 | Organizational Procedures - Greater Kansas City Community Foundation | TDIT003362–TDIT003388 |
| 237 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003705 |
| 238 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003706 |
| 239 | Expenses Table - Charitable DAF HoldCo, Ltd. | TDIT003960 |
| 240 | Delaware Division of Corporations Search Results - DFW Charitable Foundation | TDIT004696 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 241 | Delaware Division of Corporations Search Results - CDMCFAD, LLC | TDIT004697 |
| 242 | Demonstrative: DAF-Rand Structure Chart | |
| 243 | Certificate of Incorporation of CDH GP, Ltd. | Dkt. 4-95 (25-11376-BLS) |

Dugaboy also reserves the right to introduce any exhibit designated by any other party, to supplement and/or amend its Exhibit List, to introduce any rebuttal exhibits, and to not use any such exhibits during the evidentiary hearing in response to the circumstances of the hearing.

Dated: May 11, 2026

Respectfully submitted,

*/s/ Avery Joseph Welker*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)

New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 11, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Avery Joseph Welker*
Avery Joseph Welker

WK–263805

# Certificate Of Incorporation

*I, **FLOSSIEBELL M. MARAGH** Assistant Registrar of Companies of the Cayman Islands DO HEREBY CERTIFY, pursuant to the Companies Law CAP. 22, that all requirements of the said Law in respect of registration were complied with by*

**Charitable DAF HoldCo, Ltd**

*an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect from the 27th day of October Two Thousand Eleven*

*Given under my hand and Seal at George Town in the Island of Grand Cayman this 27th day of October Two Thousand Eleven*

*(SGD. FLOSSIEBELL M. MARAGH)*

**Assistant Registrar of Companies, Cayman Islands.**

REGISTRAR OF COMPANIES EXEMPTED CAYMAN ISLANDS

***CERTIFIED TO BE A TRUE AND CORRECT COPY***

***Sig..*** *Flossiebell M. Maragh*
*Assistant Registrar*

***Date*** *27 October 2011*

## Agreement and
## Acknowledgment of Legal Relationship

The Highland Kansas City Foundation, Inc. (the "Foundation") will request the IRS to grant to it public charity status, effective as of the date of its incorporation, by reason of its supporting organization relationship with the Greater Kansas City Community Foundation, a Missouri nonprofit corporation ("Community Foundation"). This relationship requires the active oversight and involvement of the Community Foundation. In furtherance of this relationship, the Community Foundation and the Foundation agree as follows:

The Community Foundation shall provide the following Base Services to the Foundation: (1) quarterly statements evidencing all account transactions including receipts, disbursements and investment earnings, (2) access to on-line tools provided to donors by the Community Foundation, (3) information upon request regarding grant making opportunities, (4) processing of all grants, (5) all other services generally provided for donor advised funds by the Community Foundation under the standard administrative fee schedule, and (6) appointment of two of the three directors of the Foundation as required by the Foundation's Articles of Incorporation and Bylaws. Additional services may be provided for an additional fee. Both parties shall agree in writing as to any additional services to be provided and the fee for such additional services.

The Community Foundation shall perform no management, accounting, tax or other services with respect to any subsidiaries of the Foundation, or any entities in which the Foundation owns or holds any interest.

In consideration of the Base Services to be provided, the Foundation shall pay the greater of (i) $62,500 or (ii) the administrative fee as set forth in the Community Foundation's then current public Administrative Fee Schedule (the "Administrative Fee Schedule"). The Foundation hereby acknowledges receipt of the current Administrative Fee Schedule attached as Exhibit B and accepts the terms of said schedule. This fee will be applied against the market value of assets held in the Foundation. Such fees will be assessed monthly, however the Foundation shall at all times maintain a cash reserve sufficient to cover the estimated fees for one year. Any and all direct operating expenses incurred by the Community Foundation, such as transaction fees, courier services, tax return preparation fees for Forms 990, legal fees and special audit fees, will be billed at actual cost. The Administrative Fee Schedule is subject to modification and may be increased or decreased at the sole discretion of the Community Foundation's Board of Directors. The Community Foundation shall promptly notify the Foundation of any such modification and send to the Foundation the new, modified Administrative Fee Schedule.

The Foundation agrees to provide the Community Foundation with any other records and data necessary for the Community Foundation to provide the Foundation with the Base Services and any additional services, and further, the Foundation warrants that any such records and data provided shall be accurate and true and that the Community Foundation may rely on such records and data in fulfilling its obligations hereunder. Further the Foundation shall cooperate in any audit of the Community Foundation for which information related to the Foundation is requested. The Foundation agrees to provide the Community Foundation with any and all information needed to fulfill the Community Foundation's obligations hereunder on such forms and in such format as may be reasonably requested by the Community Foundation.

21481479\V-3

Specifically, the Foundation agrees to provide the Community Foundation with the following on a timely basis (1) copies of the Foundation's Articles of Incorporation and Bylaws and tax exemption letter from the Internal Revenue Service, (2) copies of all Board meeting notices and minutes of the Board meetings, (3) financial reports at least quarterly, (4) copies of all account statements of the Foundation upon request of the Community Foundation, and (5) a copy of the Foundation's annual Form 990 report to the Internal Revenue Service. Further, the Foundation will notify the Community Foundation when any director appointed by the Community Foundation that is not otherwise affiliated with the Community Foundation finishes his or her term, resigns or otherwise ceases to serve.

This Agreement shall commence on November 30, 2011 and shall continue in effect until terminated by either party. Either party may terminate this Agreement upon 60 days advance written notice to the other party.

The Community Foundation is a public charity and any and all terms and conditions of this agreement which would otherwise adversely affect its status as a public charity shall be considered null and void.

This Agreement shall be interpreted and enforced according to the laws of the State of Missouri.

This Agreement contains the entire understanding of the parties and shall not be supplemented with any other term or condition unless such term or condition is reduced to writing and specifically incorporated herein by written agreement of the parties.

The undersigned have read and understand the contents of this agreement and are authorized to enter into this agreement on behalf of the parties hereto.

| | |
|---|---|
| James Dondero, President | Laura W. McKnight, President |
| Highland Kansas City Foundation, Inc. | Greater Kansas City Community Foundation |
| Date: November 30, 2011 | Date: 11/30/11 |



21481479\V-3

**EXHIBIT B**

# ADMINISTRATIVE FEES
## TO SUPPORT THE GREATER KANSAS CITY COMMUNITY FOUNDATION'S MISSION-BASED OPERATIONS

This administrative fee schedule applies to all funds at the Greater Kansas City Community Foundation and its regional affiliates. Through economies of scale, the Foundation is able to charge minimal fees compared to the cost of establishing and maintaining your own private foundation. The fees are used exclusively to support the Community Foundation's operating expenses—your investment in a public charity dedicated to improving the quality of life in our region and ensuring that each philanthropic investment returns the greatest personal and civic benefit possible.

### ANNUAL ADMINISTRATIVE FEES ON THE MARKET VALUE OF FUND ASSETS

**1.00% on the first $500,000**
0.60% on the next $500,000
0.30% on the next $2 million
0.10% on the next $4 million

Funds with assets in excess of $7 million will be charged a flat fee of 0.25% on the total assets. The minimum fee is $250 per year. The minimum amount to establish a fund is $10,000. The fees stated above are the annual fees; fees are charged to the fund monthly based on the average fair market value of assets. For newly established funds, the minimum annual fee is prorated over the remainder of the year.

Funds will be charged for any extraordinary direct expenses incurred on behalf of a specific fund, such as commissions for the sale of contributed stock. Additional fees may be assessed for extraordinary services such as special grant processing and review or other non-standard services.

21481479\V-3

THE DALLAS FOUNDATION

SUPPORTING ORGANIZATION OPERATING AGREEMENT

THIS SUPPORTING ORGANIZATION OPERATING AGREEMENT (this "Agreement") is made and entered into on November 30, 2011, by and between **THE DALLAS FOUNDATION** ("Foundation") and the **HIGHLAND DALLAS FOUNDATION, INC.** ("Supporting Organization"),

**RECITALS:**

A. Foundation is a Texas nonprofit corporation exempt from taxation under Internal Revenue Code ("Code") Section 501(c)(3), and a public charity described in Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Code. The principal objective of Foundation is to solicit, receive and accept property to be administered, used and applied for charitable purposes, primarily but not exclusively in or for the benefit of Dallas County, Texas.

B. Supporting Organization, a Delaware nonprofit non-stock charitable corporation, is established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of Foundation.

C. Supporting Organization expects to obtain a determination letter from the Internal Revenue Service (the "IRS") that Supporting Organization is a tax-exempt organization described in Section 501(c)(3) of the Code and a Type 1 supporting organization described in Section 509(a)(3) of the Code.

D. Foundation and Supporting Organization have entered into this Agreement for the purpose of documenting their agreements relating to the operation of Supporting Organization as a Type 1 supporting organization of Foundation. It is the intent of the parties that the assets held by Supporting Organization will generate funds for grantmaking primarily but not exclusively in Dallas County and for the payment of fees to Foundation under this Agreement.

**NOW THEREFORE,** the parties agree as follows:

## 1. GOVERNANCE OF SUPPORTING ORGANIZATION

1.1 **OPERATIONS.** Supporting Organization is a separately-incorporated corporation, solely responsible for its own operations and for its compliance with tax and other laws. At all times during the term of this Agreement, Supporting Organization shall operate as a Type 1 supporting organization of Foundation, as contemplated in Section 509(a)(3)(B)(i) of the Code. Foundation recognizes that assets contributed to Supporting Organization will be held in the name of Supporting Organization and will be subject to spending and investment policies as shall be determined by the Board of Directors of Supporting Organization from time to time.

1.2 **BOARD OF DIRECTORS.** Supporting Organization's Board of Directors will be the governing body for Supporting Organization. Unless otherwise agreed by the parties, Supporting Organization's initial Board of Directors shall consist of three (3) members.

(a) **FOUNDATION APPOINTMENTS.** Foundation's Board of Trustees, as required by the Code, will at all times appoint a majority of Supporting Organization's directors. Foundation will cooperate with Supporting Organization to ensure that all persons appointed by Foundation are committed to the purposes of Supporting Organization. Foundation's appointees to Supporting Organization's Board of Directors may include Foundation's trustees or staff, as well as third parties selected by Foundation. Foundation's appointees shall not, apart from their service as Supporting

Organization directors or officers, be "disqualified persons" with respect to Supporting Organization as defined in Sections 509(a)(3)(C) and 4946 of the Code. Supporting Organization shall notify Foundation if any appointee is a disqualified person other than by virtue of his or her service as a Supporting Organization director or officer. Foundation's appointees to Supporting Organization's Board of Directors shall serve in accordance with Supporting Organization's Bylaws.

(b) **SUPPORTING ORGANIZATION APPOINTMENTS.** Mr. James Dondero or his successor shall elect or appoint a minority of the members of the Board of Directors of Supporting Organization (i.e., one, as long as the Board of Directors numbers three), who may be a disqualified person(s).

(c) **DISQUALIFIED PERSONS.** Under no circumstances shall individuals who are disqualified persons (other than by virtue of their service as directors or officers of Supporting Organization) have majority control of Supporting Organization's Board of Directors or have veto powers over actions by the Supporting Organization's Board of Directors, nor shall disqualified persons described in Section 4946 of the Code and persons described in Section 4958(c)(3)(B) of the Code be compensated by Supporting Organization or receive grants, loans or similar payments from Supporting Organization.

1.3 **NO COMPENSATION.** The parties agree that in order to avoid even the perception of personal benefit, no directors of Supporting Organization shall receive compensation for their service as such. Notwithstanding the foregoing, Supporting Organization's directors may be reimbursed for reasonable and necessary out of pocket expenses actually incurred for their board service.

1.4 **MEETINGS.** Supporting Organization's Board of Directors shall meet at least once annually in a manner permitted under Delaware law. The directors shall meet at least once annually in person, unless unforeseen circumstances make attendance in person impossible.

## 2. FINANCE AND OPERATIONS

2.1 **FISCAL YEAR.** Supporting Organization's fiscal year shall be the calendar year.

2.2 **SERVICES.** Foundation will provide the services to Supporting Organization described in **SCHEDULE A**, attached, and as such schedule may be amended by Foundation and Supporting Organization in writing from time to time.

2.3 **FEES:**

(a) In consideration for Foundation's services under this Agreement, Supporting Organization shall pay to Foundation the annual fees described more particularly in **SCHEDULE B,** attached.

(b) The parties may agree to additional fees in respect to the performance of any additional services not described in **SCHEDULE A** to this agreement. Foundation shall notify the Supporting Organization in advance of any changes in annual fees set forth in **SCHEDULE A**.

2.4 **INVESTMENTS**

(a) From time to time, some or all of Supporting Organization's funds may be invested with the pooled endowment funds of Foundation to achieve economies of scale and strive for the highest expected level of returns for a given level of risk with the goal of enabling Supporting Organization to achieve its philanthropic and financial objectives. Decisions with respect to the retention, investment, or reinvestment of assets or commingling of assets shall be made by Foundation's Board of Trustees or by a committee or agent authorized by the Board of Trustees, in accordance with Foundation's investment policies. Supporting Organization's funds will be accounted for and reported on separately.

(b) Supporting Organization may at any time remove any or all of its funds invested with Foundation's pooled investment fund and invest its own funds separately from those of Foundation, subject to limitations on investment withdrawals with regard to any particular investment class (e.g., limitations on early withdrawals from "fund of funds"). Supporting Organization may select its own custodian and investment consultant and pay the relevant fees directly, subject to Section 1.2(c) of this Agreement.

3. TERM

3.1 COMMENCEMENT. The term of this Agreement commenced upon the contribution of funds to Supporting Organization on November 30, 2011.

3.2 TERM. Supporting Organization and Foundation intend to engage in a long-term relationship. The initial term of this agreement shall be one year, and the term shall be renewed automatically for successive one-year periods. Notwithstanding the foregoing, this agreement may be terminated at any time by either party providing the other party with 30 days advance written notice of its intent to terminate the Agreement. Should either party wish to terminate this relationship, the following process will be followed:

(a) The parties will agree on amendments to the certificate of incorporation and bylaws of Supporting Organization. The amendments will change the status of Supporting Organization from a supporting organization of Foundation and provide for the transfer of Supporting Organization's assets to one or more of the following entities as determined by Supporting Organization:

(i) A stand-alone publicly-supported organization described in Section 501(c)(3) of the Code.

(ii) A supporting organization of another publicly-supported 501(c)(3) organization.

(iii) A donor-advised fund of a publicly-supported organization described in Section 501(c)(3) of the Code.

(b) Neither party will unreasonably withhold its approval of these amendments.

(c) In the event of the termination of this Agreement, each party shall be responsible for its own fees and costs related to the termination.

3.3 LOSS OF TAX-EXEMPT STATUS. This agreement shall be automatically terminated in the event that Supporting Organization is determined to not qualify as a tax-exempt organization described in Section 501(c)(3) of the Code.

4. INDEMNIFICATION AND INSURANCE

4.1 Foundation will indemnify, defend, and hold harmless Supporting Organization, its officers, directors, employees, members, agents, and affiliated organizations against and from any claims, liability, suits, damages, losses, or expenses whatsoever, including reasonable attorneys fees incurred, arising or alleged to arise out of the acts or omissions of Foundation, its officers, employees, members, agents, and affiliated organizations, under this Agreement. Foundation will maintain at all times during the term of this Agreement general liability and director and officer liability insurance in such amounts and against such risks as are standard in the industry, naming Supporting Organization and its directors and officers as additional insureds. The coverage will protect against the acts or omissions of Supporting Organization, its officers, directors, agents, and employees.

4.2 Supporting Organization will indemnify, defend, and hold harmless Foundation, its officers, trustees, employees, members, agents, and affiliated organizations against and from any claims, liability, suits, damages, losses, or expenses whatsoever, including reasonable attorneys fees incurred, arising or alleged to arise out of the acts or omissions of Supporting Organization, its officers, directors, employees, members, agents, and affiliated organizations, under this Agreement.

5. **MISCELLANEOUS**

5.1 **GOVERNING LAW.** This Agreement and the legal relations between the parties shall be governed by and construed under the laws of the State of Texas.

5.2 **RECORDS.** Supporting Organization will supply to Foundation on a timely basis copies of the following materials as they are created, updated, or amended: incorporation documents; annual filings with the State of Texas; meeting minutes and actions of the Board of Directors and of any committee with Board authority; board contact information; investment statements; and board policies.

5.3 **PUBLICITY.** Foundation may disclose the existence, funding and grants of the Supporting Organization in its Annual Report and other documentation published by Foundation. Any information presented for publication by the media shall be approved in advance by Supporting Organization. Foundation reserves the right to approve in advance any publicity from Supporting Organization mentioning Foundation.

5.4 **FURTHER ASSURANCES.** Each of the parties hereto does hereby covenant and agree, without any further consideration, to execute, acknowledge, and deliver all such other documents and to take all such other actions as may be necessary or convenient in order to carry out more effectively any of the purposes of this Agreement.

5.5 **AMENDMENTS.** This Agreement may be amended from time to time only by written instrument signed by both parties; and this Agreement shall be amended by the parties whenever necessary or advisable in order to comply with requirements of the Code relating to tax-exempt organizations and supporting organizations.

5.6 **ENTIRE AGREEMENT.** This Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior agreements between the parties with regard to such subject matter.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

| | |
|---|---|
| **HIGHLAND DALLAS FOUNDATION, INC.** | **DALLAS FOUNDATION** |
| James Dondero, President | Mary M. Jalonick, President |

## SCHEDULE A

## SCHEDULE OF SERVICES

Foundation will provide to Supporting Organization the services indicated below:

1.1 Administrative Services.

a. Maintenance of Supporting Organization's records, reports and files.

b. Performance of related accounting services for Supporting Organization.

c. Payment of accounts payable and other liabilities of Supporting Organization.

d. Preparation and distribution of all financial statements required to be generated by Supporting Organization.

e. Oversight of the preparation and filing of all federal and state returns required of Supporting Organization.

f. As needed, preparation and distribution to the governing body of Supporting Organization of periodic reports on the financial condition of the Supporting Organization.

1.2 Corporate Formalities Services.

a. Calendaring of required member and board meetings.

b. Notice of all meetings.

c. Facilities and administrative support for member and board meetings.

d. Preparation of minutes.

e. Maintenance of minute book.

f. Assistance with selection of candidates for the board.

1.3 Grant Administration.

a. Assistance with development of program goals, guidelines and a form of Request for Proposal.

b. Disseminate RFP to target groups.

c. Receive and screen all proposals.

d. Preparation of a summary grid of proposals for review and decision by the Supporting Organization.

e. Prepare and send responses to applicants.

f. Disbursement of grants with grant letters.

g. Monitor performance of grantees.

h. Receive and review interim and annual reports from grantees.

Supporting Organization acknowledges that Foundation is providing only the services listed above. Any services not selected, and any services not listed above, shall not be within the scope of Foundation's responsibilities under this Agreement. Without limiting the foregoing, Supporting Organization acknowledges that Foundation is not providing any investment advice or services to Supporting Organization, and that Supporting Organization is responsible for the management and investment of its assets.

## SCHEDULE B

## SCHEDULE OF FEES

In consideration of the services provided to Supporting Organization by Foundation, Supporting Organization shall pay Foundation an annual administrative fee (Fee) in the amount of .25% of the assets owned directly or indirectly by Supporting Organization, plus out-of-pocket costs. The Fee is payable in quarterly installments in arrears in the amount of .0625% of the prior quarter-end net asset value, plus out-of-pocket expenses for said quarter.

## SANTA BARBARA FOUNDATION

### SUPPORTING ORGANIZATION OPERATING AGREEMENT

THIS AGREEMENT is made and entered into on November 30, 2011, by and between the **SANTA BARBARA FOUNDATION** ("Foundation") and the **Highland Santa Barbara Foundation, Inc.** ("Supporting Organization"),

**RECITALS:**

A. Foundation is a California nonprofit public benefit corporation exempt from taxation under Internal Revenue Code ("Code") Section 501(c)(3), and a public charity described in Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Code. The principal objective of Foundation is to solicit, receive and accept property to be administered, used and applied for charitable purposes, primarily but not exclusively in, or for the benefit of Santa Barbara County.

B. Supporting Organization, a Delaware nonprofit non-stock charitable corporation, is a "Type 1 Supporting Organization" under Section 509(a)(3) of the Code established to operate exclusively for the benefit of, to perform the functions of, or carry out the purposes of Foundation.

C. Supporting Organization expects to obtain a determination letter from the Internal Revenue Service that it is a tax-exempt organization under Section 501(c)(3) and a Type 1 supporting organization.

D. Foundation and Supporting Organization have entered into this Agreement for the purpose of documenting their agreements relating to the operation of Supporting Organization as a Type 1 Supporting Organization of Foundation. It is the intent of the parties that each year the assets held by Supporting Organization will generate funds for grantmaking primarily but not exclusively in Santa Barbara County and for the payment of fees to Foundation under this Agreement.

**NOW THEREFORE**, the parties agree as follows:

**1. GOVERNANCE OF SUPPORTING ORGANIZATION**

**1.1 OPERATIONS.** Supporting Organization is a separately-incorporated corporation, solely responsible for its own operations and for its compliance with tax and other laws. At all times during the term of this Agreement, Supporting Organization shall operate as a Type 1 Supporting Organization of Foundation, as contemplated in Section 509(a)(3)(B)(i) of the Code. Foundation recognizes that assets contributed to Supporting Organization will be held in the name of Supporting Organization and will be subject to spending and investment policies as shall be determined by the Board of Directors of Supporting Organization from time to time.

**1.2 BOARD OF DIRECTORS.** Supporting Organization's Board of Directors will be the governing body for Supporting Organization. Unless otherwise agreed by the parties, Supporting Organization's initial Board of Directors shall consist of 3 members.

**(a) FOUNDATION APPOINTMENTS.** Foundation's Board of Trustees, as required by the Code, will at all times appoint a majority of Supporting Organization's directors. Foundation will cooperate with Supporting Organization to ensure that all persons appointed by Foundation are committed to the purposes of Supporting Organization. Foundation's appointees to Supporting Organization's Board of Directors may include Foundation's trustees or staff, as well as third parties selected by Foundation.

Foundation's appointees shall not, apart from their service as Supporting Organization directors or officers, be "disqualified persons" as defined in Sections 509(a)(3)(C) and 4946 of the Code. Supporting Organization shall notify Foundation if any appointee is a disqualified person other than by virtue of his or her service as a Supporting Organization director or officer. Foundation's appointees to Supporting Organization's Board of Directors shall serve at the will of Foundation or for terms outlined in Supporting Organization's Bylaws.

(b) **SUPPORTING ORGANIZATION APPOINTMENTS.** Mr. James Dondero or his successor shall elect or appoint a minority of the board members (i.e., one, as long as the Board of Directors numbers three), who may be a disqualified person(s).

(c) **DISQUALIFIED PERSONS.** Under no circumstances shall individuals who are disqualified persons (other than by virtue of their service as directors or officers of Supporting Organization) have majority control of Supporting Organization's board or have veto powers over Supporting Organization's board. Disqualified persons described in Section 4946 of the Code and persons described in Section 4958(c)(3)(B) of the Code cannot be compensated by Supporting Organization or receive grants, loans or similar payments from Supporting Organization.

1.3 **COMPENSATION.** Foundation does not pay trustees or hire trustees to provide specific services. The parties agree that in order to avoid even the perception of personal benefit, no directors of Supporting Organization shall receive compensation for their service as such. Notwithstanding the foregoing, Supporting Organization's directors may be reimbursed for reasonable and necessary out of pocket expenses actually incurred for their board service.

1.4 **MEETINGS.** Supporting Organization's Board of Directors shall meet at least once annually in a manner permitted under Delaware law.

1.5 **POLICIES.** Within the first year of Supporting Organization's existence, Supporting Organization's Board of Directors shall establish the following policies, and provide copies of such policies to Foundation when they are created and amended: Charitable Mission Statement, Gift Acceptance Policy, Investment Policy, and Grantmaking Policy.

## 2. FINANCE AND OPERATIONS

2.1 **FISCAL YEAR.** Supporting Organization's fiscal year will be the calendar year.

2.2 **SERVICES.** Foundation will provide the services to Supporting Organization described in **SCHEDULE A**, attached, and as such schedule may be amended by Foundation and Supporting Organization in writing from time to time.

2.3 **FEES:**

(a) Supporting Organization shall pay to Foundation the fees described more particularly in **SCHEDULE B**, attached.

(b) The parties may agree to additional fees in respect to the performance of any additional services not described in **SCHEDULE A** to this agreement. Foundation shall notify the Supporting Organization in advance of any changes in administrative fees enacted by Foundation's Board of Trustees.

2.4 INVESTMENTS

(a) From time to time, some or all of Supporting Organization's funds may be invested with the pooled endowment funds of Foundation to achieve economies of scale and strive for the highest expected level of returns for a given level of risk with the goal of enabling Supporting Organization to achieve its philanthropic and financial objectives. Decisions with respect to the retention, investment, or reinvestment of assets or commingling of assets shall be made by Foundation's Board of Trustees or by a committee or agent authorized by the Board of Trustees, in accordance with Foundation's investment policies. Supporting Organization's funds will be accounted for and reported on separately.

(b) Supporting Organization may at any time remove any or all of its funds invested with Foundation's pooled investment fund and invest its own funds separately from those of Foundation, subject to limitations on investment withdrawals with regard to any particular investment class (e.g., limitations on early withdrawals from "fund of funds"). Supporting Organization may select its own custodian and investment consultant and pay the relevant fees directly.

3. TERM

3.1 COMMENCEMENT. The term of this Agreement shall commence upon the contribution of funds to Supporting Organization.

3.2 TERM. Supporting Organization and Foundation intend to engage in a long-term relationship. The initial term of this agreement shall be one year, and the term shall be renewed automatically for successive one-year periods. Notwithstanding the foregoing, this agreement may be terminated at any time by either party providing the other party with 30 days advance written notice of its intent to terminate the Agreement. Should either party wish to dissolve this relationship, the following process will be followed:

(a) The parties will agree on amendments to the certificate of incorporation and bylaws of Supporting Organization. The amendments will change the status of Supporting Organization from a supporting organization of Foundation and provide for the transfer of Supporting Organization's assets to one or more of the following entities as determined by Supporting Organization:

(i) A stand-alone publicly-supported 501(c)(3) organization, or

(ii) A supporting organization of another publicly-supported 501(c)(3) organization.

(iii) A donor-advised fund of a publicly-supported 501(c)(3) organization.

(b) Neither party will unreasonably withhold its approval of these amendments.

(c) In the event of the dissolution of this relationship, each party shall be responsible for its own fees and costs related to the dissolution.

3.3 LOSS OF TAX-EXEMPT STATUS. This agreement shall be automatically terminated upon the date the IRS determines that Supporting Organization is not a tax-exempt organization under Section 501(c)(3) of the Code.

## 4. INDEMNIFICATION AND INSURANCE

**4.1** Foundation will indemnify, defend, and hold harmless Supporting Organization, its officers, directors, employees, members, agents, and affiliated organizations against and from any claims, liability, suits, damages, losses, or expenses whatsoever, including reasonable attorneys fees incurred, arising or alleged to arise out of the acts or omissions of Foundation, its officials, employees, members, agents, and affiliated organizations, under this Agreement. Foundation will maintain at all times during the term of this Agreement general liability and director and officer liability insurance in such amounts and against such risks as are standard in the industry, naming Supporting Organization and its directors and officers as additional insureds. The coverage will protect against the acts or omissions of Supporting Organization, its officers, directors, agents, and employees.

**4.2** Supporting Organization will indemnify, defend, and hold harmless Foundation, its officers, trustees, employees, members, agents, and affiliated organizations against and from any claims, liability, suits, damages, losses, or expenses whatsoever, including reasonable attorneys fees incurred, arising or alleged to arise out of the acts or omissions of Supporting Organization, its officers, directors, employees, members, agents, and affiliated organizations, under this Agreement.

## 5. MISCELLANEOUS

**5.1** **GOVERNING LAW.** This Agreement and the legal relations between the parties shall be governed under the laws of the State of California.

**5.2** **RECORDS.** Supporting Organization will supply to Foundation on a timely basis copies of the following materials as they are created, updated, or amended: incorporation documents; annual filings with the State of California and IRS; meeting minutes and actions of the Board and of any committee with Board authority; board contact information; investment statements; and board policies.

**5.3** **PUBLICITY.** Foundation may disclose the existence, funding and grants of the Supporting Organization in its Annual Report and other documentation published byFoundation. Any information presented for publication by the media shall be approved in advance by Supporting Organization. Foundation reserves the right to approve any publicity from Supporting Organization mentioning Foundation.

**5.4** **FURTHER ASSURANCES.** Each of the parties hereto does hereby covenant and agree, without any further consideration, to execute, acknowledge, and deliver all such other documents and to take all such other actions as may be necessary or convenient in order to carry out more effectively any of the purposes of this Agreement.

**5.5** **AMENDMENTS.** This Agreement may be amended from time to time by written instrument signed by the parties; and this Agreement shall be amended by the parties whenever necessary or advisable in order to comply with requirements of the Code relating to tax-exempt organizations and supporting organizations.

**5.6** **ENTIRE AGREEMENT.** This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements between the parties with regard to such subject matter.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**HIGHLAND SANTA BARBARA FOUNDATION, INC.**

James Dondero, President
November 30, 2011

**SANTA BARBARA FOUNDATION**

Ronald V. Gallo, President & CEO
November 30, 2011

## SCHEDULE A

## SCHEDULE OF SERVICES

Foundation will provide to Supporting Organization the services indicated below:

1.1 Administrative Services.

a. Maintenance of Supporting Organization's records, reports and files.

b. Performance of related accounting services for Supporting Organization.

c. Payment of accounts payable and other liabilities of Supporting Organization.

d. Preparation and distribution of all financial statements required to be generated by Supporting Organization.

e. Oversight of the preparation and filing of all federal and state returns required of Supporting Organization.

f. As needed, preparation and distribution to the governing body of Supporting Organization of periodic reports on the financial condition of the Supporting Organization.

1.2 Corporate Formalities Services.

a. Calendaring of required member and board meetings.

b. Notice of all meetings.

c. Facilities and secretarial support for member and board meetings.

d. Preparation of minutes.

e. Maintenance of minute book.

f. Assistance with selection of candidates for the board.

1.3 Grant Administration.

a. Assistance with development of program goals, guidelines and a form of Request for Proposal.

b. Disseminate RFP to target groups.

c. Receive and screen all proposals.

d. Preparation of a summary grid of proposals for review and decision by the Corporation's governing board or officers.

e. Prepare and send responses to applicants.

f. Disbursement of grants with grant letters.

g. Monitor performance of grantees.

h. Receive and review interim and annual reports from grantees.

Supporting Organization acknowledges that Foundation is providing only the services listed above. Any services not selected, and any services not listed above, shall not be within the scope of Foundation's responsibilities under this Agreement. Without limiting the foregoing, Supporting Organization acknowledges that Foundation is not providing any investment advice or services to Supporting Organization, and that Supporting Organization is responsible for the management and investment of its assets.

## SCHEDULE B

## SCHEDULE OF FEES

In consideration of the services provided to Supporting Organization by Foundation, Supporting Organization shall pay Foundation an annual support fee (Fee) as outlined below. Fees are payable quarterly in arrears and are based on the prior quarter-end net asset value.

1% (100 basis points) per annum (i.e., 25 basis points per quarter) on the first $3 million
0.75% (75 basis points) per annum (i.e., 18.75 basis points per quarter) on the next $2 million
0.50% (50 basis points) per annum (i.e., 12.5 basis points per quarter) on the next $5 million up to $10 million
0.25% (25 basis points) per annum (i.e., 6.25 basis points per quarter) on all amounts over $10 million

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH 45201

DEPARTMENT OF THE TREASURY

Date: JAN 19 2013

HIGHLAND DALLAS FOUNDATION INC
C/O HUNTON & WILLIAMS LLP
DOUGLAS M MANCINO
550 S HOPE ST STE 2000
LOS ANGELES, CA 90071

Employer Identification Number:
45-3961755
DLN:
17053058308022
Contact Person:
SHEILA M ROBINSON ID# 31220
Contact Telephone Number:
(877) 829-5500
Accounting Period Ending:
December 31
Public Charity Status:
509(a)(3)
Form 990 Required:
Yes
Effective Date of Exemption:
November 22, 2011
Contribution Deductibility:
Yes
Addendum Applies:
No

Dear Applicant:

We are pleased to inform you that upon review of your application for tax exempt status we have determined that you are exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code. Contributions to you are deductible under section 170 of the Code. You are also qualified to receive tax deductible bequests, devises, transfers or gifts under section 2055, 2106 or 2522 of the Code. Because this letter could help resolve any questions regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified as either public charities or private foundations. We determined that you are a public charity under the Code section(s) listed in the heading of this letter.

Specifically, we have determined that you are a Type I supporting organization under section 509(a)(3). A Type I supporting organization is operated, supervised, or controlled by one or more publicly supported organizations.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities, for some helpful information about your responsibilities as an exempt organization.

Letter 947 (DO/CG)

HIGHLAND DALLAS FOUNDATION INC

Sincerely,

Holly O. Paz

Holly O. Paz
Director, Exempt Organizations
Rulings and Agreements

Enclosure: Publication 4221-PC

Letter 947 (DO/CG)

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH 45201

DEPARTMENT OF THE TREASURY

Date: FEB 12 2013

HIGHLAND SANTA BARBARA FOUNDATION
INC
C/O MARK PATRICK
300 CRESCENT CT STE 700
DALLAS, TX 75201

Employer Identification Number:
45-3962008
DLN:
17053060398012
Contact Person:
GINGER L JONES ID# 31646
Contact Telephone Number:
(877) 829-5500

Accounting Period Ending:
December 31
Public Charity Status:
509(a)(3)
Form 990 Required:
Yes
Effective Date of Exemption:
November 22, 2011
Contribution Deductibility:
Yes
Addendum Applies:
No

Dear Applicant:

We are pleased to inform you that upon review of your application for tax exempt status we have determined that you are exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code. Contributions to you are deductible under section 170 of the Code. You are also qualified to receive tax deductible bequests, devises, transfers or gifts under section 2055, 2106 or 2522 of the Code. Because this letter could help resolve any questions regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified as either public charities or private foundations. We determined that you are a public charity under the Code section(s) listed in the heading of this letter.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities, for some helpful information about your responsibilities as an exempt organization.

HIGHLAND SANTA BARBARA FOUNDATION

We have sent a copy of this letter to your representative as indicated in your power of attorney.

Sincerely,

Holly O. Paz

Holly O. Paz
Director, Exempt Organizations
Rulings and Agreements

Enclosure: Publication 4221-PC

Letter 947 (DO/CG)

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH 45201

DEPARTMENT OF THE TREASURY

Date: MAR 21 2013

HIGHLAND KANSAS CITY FOUNDATION INC
C/O HUNTON & WILLIAMS LLP
MARGARET S ALFORD
1445 ROSS AVE STE 3700
DALLAS, TX 75202

Employer Identification Number:
45-3961865
DLN:
17053066302032
Contact Person:
GREGORY WOO ID# 95340
Contact Telephone Number:
(877) 829-5500
Accounting Period Ending:
December 31
Public Charity Status:
509(a)(3)
Form 990 Required:
Yes
Effective Date of Exemption:
November 23, 2011
Contribution Deductibility:
Yes
Addendum Applies:
Yes

Dear Applicant:

We are pleased to inform you that upon review of your application for tax exempt status we have determined that you are exempt from Federal income tax under section 501(c)(3) of the Internal Revenue Code. Contributions to you are deductible under section 170 of the Code. You are also qualified to receive tax deductible bequests, devises, transfers or gifts under section 2055, 2106 or 2522 of the Code. Because this letter could help resolve any questions regarding your exempt status, you should keep it in your permanent records.

Organizations exempt under section 501(c)(3) of the Code are further classified as either public charities or private foundations. We determined that you are a public charity under the Code section(s) listed in the heading of this letter.

Specifically, we have determined that you are a Type I supporting organization under section 509(a)(3). A Type I supporting organization is operated, supervised, or controlled by one or more publicly supported organizations.

Please see enclosed Publication 4221-PC, Compliance Guide for 501(c)(3) Public Charities, for some helpful information about your responsibilities as an exempt organization.

Letter 947 (DO/CG)

HIGHLAND KANSAS CITY FOUNDATION INC

Sincerely,

Holly O. Paz

Holly O. Paz
Director, Exempt Organizations
Rulings and Agreements

Enclosure: Publication 4221-PC

Letter 947 (DO/CG)

# EXECUTIVE EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (the "**Agreement**") is made and entered into effective as of March 24, 2021 (the "**Effective Date**"), by and between MARK PATRICK ("**Executive**") and CHARITABLE DAF HOLDCO, LTD., a Cayman Islands company (the "**Company**"), as a "**Party**" or collectively as the "**Parties**".

**WHEREAS**, the Company has employed Executive on the terms and conditions set forth herein since March 24, 2021; and

**WHEREAS**, Executive agrees to be employed by the Company on such terms and conditions as set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants, promises, and obligations set forth herein, the Parties agree as follows:

**1. Employment Term**. Executive's employment hereunder shall be effective as of the Effective Date and shall continue until terminated pursuant to Section 5 of this Agreement.

**2. Position and Duties**.

**2.1 Position**. During the Employment Term, Executive shall serve as the President and CEO, Chief Investment Officer, Chief Financial Officer, and General Counsel of the Company, reporting to the Directors of the Company (the "**Directors**"). In such position, Executive shall have such duties, authority, and responsibilities as shall be determined from time to time by the Directors, which duties, authority, and responsibilities are consistent with Executive's position.

**2.2 Duties**. During the Employment Term, Executive shall perform such duties, as are reasonably assigned to Executive and devote a reasonable amount of Executive's business time and attention to the performance of Executive's duties, including, without limitation, service as an officer for other affiliates and subsidiaries of the Company.

**3. Place of Performance**. The principal place of Executive's employment shall be the place as determined by the Parties; however, Executive shall be permitted to work remotely so long as doing so does not interfere with the Executive's responsibilities under this Agreement. Executive may also be required to travel on Company business during the Employment Term. The Company may provide a remote travel office, or transportation, to accommodate the Executive in his performance of his duties.

**4. Compensation**.

**4.1 Base Salary**. Beginning with the 2023 calendar year, the Company shall pay Executive an annual base salary of $850,000 (the "**Base Salary**") in periodic installments in accordance with customary payroll practices and applicable wage payment laws. Notwithstanding the foregoing, the Executive's annual base salary may be advanced in one or more installments from time to time pursuant to a Director's resolution, but in such amounts not to exceed one year of Base Salary. The Base Salary may be adjusted within the first sixty

(60) days of any calendar year by an amendment to this Agreement in accordance with Section 14 below.

**4.2** **Annual Bonus**. For each fiscal year of the Employment Term, Executive shall be eligible to earn an annual bonus (the "**Annual Bonus**"). The decision to provide an Annual Bonus and the amount and terms of such Annual Bonus shall be in the sole and absolute discretion of the Directors, which may be paid in advance of the close of any one year. The Directors may establish and approve written criteria or guidelines that may be taken into account when determining whether an Annual Bonus should be paid and the amount in which it is paid. In exercising their discretion, the Directors will take into account industry standards in relation to annual bonuses awarded to people employed in comparable positions to Executive.

**4.3** **Discretionary Bonuses**. At any time and from time to time during the Employment Term, the Executive shall be eligible to earn discretionary bonuses (each a "**Discretionary Bonus**"). Such Discretionary Bonuses shall be at the sole and absolute discretion of the Directors.

**4.4** **Long Term Incentive Plan**: Executive shall participate in the Long Term Incentive Plan ("**LTIP**"). The LTIP will cover a period of three (3) years. For purposes of this agreement, the LTIP will cover the period from March 24, 2021 through March 24, 2024 (the "**First LTIP**") and is awarded in the total amount of $4,759,000. The second LTIP period will cover the period from March 25, 2024 through March 24, 2027 (the "**Second LTIP**"). The Second LTIP may be awarded at the discretion of the Directors through a cash payment made at the end of 2027, or by periodic awards in the equity of investments of the Company, or a combination of both.

**4.5** **Retirement Incentive Plan**. At the discretion of the Directors, the Company may authorize a "Retirement Incentive Plan" to be put into place on behalf of the Executive.

**4.6** **Employee Benefits**. During the Employment Term, Executive shall be entitled to participate in an employee benefit plan, including but not limited to health insurance, disability benefits, and retirement plan or other benefit practices and programs as may be implemented from time to time by the Company (collectively, "**Employee Benefit Plans**"), to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law.

**4.7** **Vacation; Paid Time Off**. During the Employment Term, Executive shall be entitled to forty (40) days of paid vacation per calendar year (prorated for partial years). Executive shall receive other paid time off in accordance with Company policies as may exist from time to time or as otherwise determined by the Directors.

**4.8** **Business Expenses**. Executive shall be entitled to reimbursement for all reasonable and necessary out-of-pocket business, entertainment, and travel expenses incurred by Executive in connection with the performance of Executive's duties hereunder.

**4.9** __**Indemnification**__. In the event that Executive is made a party or threatened to be made a party to any action, suit, or proceeding, whether civil, criminal, administrative, or investigative (a "**Proceeding**"), other than any Proceeding initiated by Executive or the Company related to any contest or dispute between Executive and the Company or any of its affiliates or subsidiaries with respect to this Agreement or Executive's employment hereunder, by reason of the fact that Executive is or was a director or officer of the Company, or any affiliate or subsidiary of the Company, or is or was serving at the request of the Company as a director, officer, member, employee, or agent of another corporation or a partnership, joint venture, trust, or other enterprise, Executive shall be indemnified and held harmless by the Company from and against any liabilities, costs, claims, and expenses, including all costs and expenses incurred in defense of any Proceeding (including attorneys' fees).

**5.** __**Employment Term and Termination of Employment**__. The initial term of employment of Executive shall be the period from the Effective Date until December 31, 2021, and thereafter shall automatically renew from year-to-year for additional one (1) year periods, unless either Party provides written notice of non-renewal to the other Party within sixty (60) days prior to the expiration of the applicable Employment Term, or Executive's employment is otherwise terminated in accordance with this Section 5 below (the "**Employment Term**"). In the event of non-renewal of the Employment Term by either Party, Executive shall be entitled to payment of the Severance Payment Amount (as defined in Section 5.2(d) below). The Employment Term and Executive's employment hereunder may be terminated by either the Company or Executive at any time and for any reason; provided that, unless otherwise provided herein, either Party shall be required to give the other Party at least sixty (60) days advance written notice of any termination of Executive's employment. On termination of Executive's employment during the Employment Term, Executive shall be entitled to the compensation and benefits described in this Section 5 and shall have no further rights to any compensation or any other benefits from the Company or any of its affiliates.

**5.1** __**For Cause or Without Good Reason**__.

(a) Executive's employment hereunder may be terminated by the Company for Cause or by Executive without Good Reason. If Executive's employment is terminated by the Company for Cause or by Executive without Good Reason, Executive shall be entitled to receive:

(i) any accrued but unpaid Base Salary and accrued but unused vacation which shall be paid on the Termination Date (as defined below);

(ii) any earned but unpaid Annual Bonus with respect to any completed calendar year immediately preceding the Termination Date, which shall be paid on the otherwise applicable payment date; provided that, if Executive's employment is terminated by the Company for Cause, then any such accrued but unpaid Annual Bonus shall be forfeited;

(iii) reimbursement for unreimbursed business expenses properly incurred by Executive in accordance with Section 4.8 of this Agreement; and

(iv) such employee benefits, if any, to which Executive may be entitled under the Company's employee benefit plans as of the Termination Date; provided that, in no event shall Executive be entitled to any payments in the nature of severance or termination payments except as specifically provided herein; and

(v) accrued and unpaid First or Second LTIP.

Items 5.1(a)(i) through 5.1(a)(v) are referred to herein collectively as the "**Accrued Amounts**". For the avoidance of doubt, any LTIP that has awarded any exposure to an investment such as equity shall be deemed vested if not vested already.

(b) For purposes of this Agreement, "**Cause**" shall mean:

(i) Executive's conviction of or plea of guilty or nolo contendere to a crime that constitutes a felony (or state law equivalent);

(ii) Executive's material breach of the provisions of this Agreement in the course of performing Executive's duties that results in material harm to the Company; or

(iii) Executive is deemed by a court of competent jurisdiction to have engaged in any act or omission constituting willful misconduct, gross negligence, or fraud in the course of performing Executive's duties.

Notwithstanding the foregoing, for subsections (i) to (iii), the Employment Term and Executive's employment shall not be deemed to have been terminated for Cause unless the Company shall have given Executive: (A) written notice setting forth the reasons for the Company's intention to terminate Executive's employment for Cause, and (B) a reasonable opportunity, not to exceed thirty (30) days, to cure such default.

(c) For purposes of this Agreement, "**Good Reason**" shall mean the occurrence of any of the following, in each case during the Employment Term, without Executive's written consent:

(i) a material reduction of, or failure to pay, Executive's Base Salary; or

(ii) a material, adverse change in Executive's authority, duties, or responsibilities (other than (i) temporarily while Executive is physically or mentally incapacitated, (ii) where, if applicable, in Executive's capacity as a director, officer, managing member or other position to exert control or influence in the Company or subsidiary (**"Controlling Position"**), the Executive has directed or caused a material adverse change himself, (iii) where the Company's business has materially changed through no fault of the Company, (iv) or as required by applicable law); or

(iii) Company's material breach of the provisions of this Agreement.

Executive cannot terminate employment for Good Reason unless: (i) Executive has provided written notice to the Company of the existence of the circumstances providing grounds for termination for Good Reason within fifteen (15) days of the initial existence of such grounds, and (ii) the Company has had at least thirty (30) days from the date on which such notice is provided to cure such circumstances. Executive agrees and acknowledges that if he holds a Controlling Position he is obliged to act in good faith and with all due diligence and expedition to help the Company cure any such grounds.

**5.2** **Without Cause or for Good Reason**. The Employment Term and Executive's employment hereunder may be terminated by Executive (i) for Good Reason, (ii) by the Company without Cause, or in the event of non-renewal of the Employment Term in accordance with Section 5. In the event of such termination, Executive shall be entitled to receive the Accrued Amounts and, subject to Executive's compliance with Section 6, Section 7, and Section 8 of this Agreement, Executive shall be entitled to receive the following:

(a) continued Base Salary for twelve (12) months following the Termination Date payable in equal installments, but no less frequently than monthly;

(b) a payment equal to the product of (i) the Annual Bonus, if any, that Executive would have earned for the fiscal year in which the Termination Date (as determined in accordance with Section 5.5) occurs based on achievement of the applicable performance goals for such year and (ii) a fraction, the numerator of which is the number of days Executive was employed by the Company during the year of termination and the denominator of which is the number of days in such year (the "**Pro-Rata Bonus**"), plus any accrued but unpaid Discretionary Bonuses as determined by the Directors. These amounts shall be paid on the date that Annual or Discretionary Bonuses are normally paid;

(c) If Executive timely and properly elects health continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**"), the Company shall reimburse Executive for the monthly COBRA premium paid by Executive for Executive and Executive's dependents. Such reimbursement shall be paid to Executive on the seventh (7th) day of the month immediately following the month in which Executive timely remits the premium payment. Executive shall be eligible to receive such reimbursement until the earliest of: (i) the date Executive is no longer eligible to receive COBRA continuation coverage; and (ii) the date on which Executive becomes eligible to receive substantially similar coverage from another employer or other source; and

(d) An early termination payment in the nature of a severance payment in the amount of $10,000,000 payable at termination (the "**Severance Payment Amount**").

**5.3 Death or Disability.**

(a) Executive's employment hereunder shall terminate automatically on Executive's death during the Employment Term, and the Company may terminate Executive's employment on account of Executive's Disability.

(b) If Executive's employment is terminated during the Employment Term on account of Executive's death or Disability, Executive (or Executive's estate and/or beneficiaries, as the case may be) shall be entitled to receive the following:

(i) the Accrued Amounts; and,

(ii) a lump sum payment equal to the Pro-Rata Bonus, and any accrued but unpaid discretionary bonuses, if any, that Executive earned for the fiscal year in which the termination date occurs which shall be payable on the date that annual bonuses are normally paid to the Company's executives, but in no event later than three (3) months following the end of the fiscal year in which the termination date occurs; and,

(iii) in the event of the Executive's death or disability, the Company shall pay the Executive's estate an amount equal to the Severance Payment Amount.

Notwithstanding any other provision contained herein, all payments made in connection with Executive's Disability shall be provided in a manner which is consistent with federal and state law.

(c) For purposes of this Agreement, "**Disability**" shall mean a condition that entitles Executive to receive long-term disability benefits under the Company's long-term disability plan, or if there is no such plan, Executive's inability, due to physical or mental incapacity, to perform the essential functions of Executive's job, with or without reasonable accommodation, for a period of ninety (90) consecutive days or a period of ninety (90) days in any one hundred eighty (180) day period. Any question as to the existence of Executive's Disability as to which Executive and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to Executive and the Company. If Executive and the Company cannot agree as to a qualified independent physician, each shall appoint such a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to the Company and Executive shall be final and conclusive for all purposes of this Agreement.

**5.4 Notice of Termination.** Any termination of Executive's employment hereunder by the Company or by Executive during the Employment Term (other than termination pursuant to Section 5.3(a) on account of Executive's death) shall be communicated by written notice of termination ("**Notice of Termination**") to the other party hereto in accordance with Section 20 herein. The Notice of Termination shall specify:

(a) The termination provision of this Agreement relied upon;

(b) To the extent applicable, the facts and circumstances claimed to provide a basis for termination of Executive's employment under the provision so indicated;

(c) To the extent applicable, the date notice of intention to terminate Executive's employment was provided or the date notice of existence of the circumstances providing grounds for termination for Good Reason was provided; and

(d) The applicable Termination Date.

**5.5** **Termination Date**. Executive's "**Termination Date**" shall be:

(a) If Executive's employment hereunder terminates on account of Executive's death, the date of Executive's death;

(b) If Executive's employment hereunder is terminated on account of Executive's Disability, the date that it is determined that Executive has a Disability;

(c) Unless otherwise indicated herein, if the Company terminates Executive's employment hereunder for Cause, the date the Notice of Termination is delivered to Executive. If the Company is required to give notice of intention to terminate Executive's employment and an opportunity to cure, and Executive fails to cure same, the date on which the cure period expires;

(d) If the Company terminates Executive's employment hereunder without Cause, the date specified in the Notice of Termination, which shall be no less than sixty (60) days following the date on which the Notice of Termination is delivered;

(e) If Executive terminates Executive's employment hereunder without Good Reason, the date specified in Executive's Notice of Termination, which shall be no less than sixty (60) days following the date on which the Notice of Termination is delivered;

(f) If Executive terminates Executive's employment hereunder with Good Reason, and subject to Executive providing written notice to Company of the existence of the circumstances providing grounds for termination for Good Reason within fifteen (15) days of the initial existence of such grounds, and (ii) the Company having had at least thirty (30) days from the date on which such notice is provided to cure such circumstances and fails to cure same, the date on which the cure period expires; and

(g) In the event of non-renewal of the Employment Term by either Party, the date specified in the Notice of Termination, which shall be no less than sixty (60) days following the date on which the Notice of Termination is delivered

**5.6** **Resignation of All Other Positions**. On termination of Executive's employment hereunder for any reason, Executive shall be deemed to have resigned from all positions that Executive holds as an officer or director of the Company or any of its affiliates or subsidiaries.

**6.** **Cooperation**. The parties agree that certain matters in which Executive will be involved during the Employment Term may necessitate Executive's cooperation in the future. Accordingly, following the termination of Executive's employment for any reason, to the extent reasonably requested by the Directors, Executive shall cooperate with the Company, its affiliates and subsidiaries in connection with matters arising out of Executive's service to the Company; its affiliates or subsidiaries, provided that, the Company shall make reasonable efforts to minimize disruption of Executive's other activities. The Company shall reimburse Executive for reasonable expenses incurred in connection with such cooperation.

**7.** **Confidential Information**. Executive understands and acknowledges that during the Employment Term, Executive will have access to and learn about Confidential Information, as defined below.

**7.1** **Confidential Information Defined**.

(a) Definition.

For purposes of this Agreement, "**Confidential Information**" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, device configurations, embedded data, compilations, metadata, technologies, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists of the Company, or its businesses including its affiliates and subsidiaries, or any existing or prospective customer, supplier, investor or other associated third party, or of any other person or entity that has entrusted information to the Company or its businesses including its affiliates and subsidiaries in confidence.

Executive understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

Executive understands and agrees that Confidential Information includes information developed by Executive in the course of employment by the Company, its affiliates or subsidiaries as if the Company, its affiliates or subsidiaries furnished the same Confidential Information to Executive in the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to Executive; provided that, such disclosure is through no direct or indirect fault of Executive or person(s) acting on Executive's behalf.

(b) Disclosure and Use Restrictions.

Executive agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company, its affiliates or subsidiaries) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Company, its affiliates or subsidiaries and, in any event, not to anyone outside of the direct employ of the Company, its affiliates or subsidiaries, except as required in the performance of Executive's authorized employment duties to the Company or with the prior written consent of the Directors acting on behalf of the Company, its affiliates or subsidiaries, as applicable, in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company, its affiliates or subsidiaries except as required in the performance of Executive's authorized employment duties to the Company, its affiliates or subsidiaries or with the prior consent of the Directors acting on behalf of the Company, its affiliates or subsidiaries, as applicable, in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent).

(c) Permitted Disclosures. Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. Executive shall promptly provide written notice of any such order to the Directors.

(d) Notice of Immunity Under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016 ("DTSA"). Notwithstanding any other provision of this Agreement:

(i) Executive will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that:

(A) is made (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (2) solely for the purpose of reporting or investigating a suspected violation of law; or

(B) is made in a complaint or other document filed under seal in a lawsuit or other proceeding.

(ii) If Executive files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Executive may disclose the Company's trade secrets to Executive's attorney and use the trade secret information in the court proceeding if Executive:

(A) files any document containing trade secrets under seal; and

(B) does not disclose trade secrets, except pursuant to court order.

**8. Restrictive Covenants.**

**8.1 Acknowledgement**. Executive understands that the nature of Executive's position gives Executive access to and knowledge of Confidential Information and places Executive in a position of trust and confidence with the Company, its affiliates and subsidiaries. Executive understands and acknowledges that the services Executive provides to the Company, its affiliate and subsidiaries are unique, special, or extraordinary.

Executive further understands and acknowledges that the Company's ability to reserve these for the exclusive knowledge and use of the Company, its affiliates and subsidiaries is of great competitive importance and commercial value to the Company, its affiliates and subsidiaries and that improper use or disclosure by Executive is likely to result in unfair or unlawful competitive activity.

**8.2 Non-Competition**. Because of the Company's legitimate business interest as described herein and the good and valuable consideration offered to Executive, during the Employment Term and for a period of one (1) year, beginning on the last day of Executive's employment with the Company, Executive agrees and covenants not to engage in Prohibited Activity within the areas in which the Company has conducted business.

For purposes of this Section 8.2, "**Prohibited Activity**" is activity in which Executive contributes Executive's knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, employee, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity to an entity engaged in the same or similar business as the Company, or its affiliates. Prohibited Activity also includes activity that may require or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information.

Nothing herein shall prohibit Executive from purchasing or owning less than one percent (1%) of the publicly traded securities of any corporation, provided that such ownership represents a passive investment and that Executive is not a controlling person of, or a member of a group that controls, such corporation.

This Section 8 does not, in any way, restrict or impede Executive from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. Executive shall promptly provide written notice of any such order to the Directors.

**8.3** **Non-Solicitation of Employees**. Executive agrees and covenants not to directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment of any employee of the Company, or attempt to do so, for a period of one (1) year, to run consecutively, beginning on the last day of Executive's employment with the Company.

**8.4** **Non-Solicitation of Customers**. Executive understands and acknowledges that because of Executive's experience with and relationship to the Company, its affiliates and subsidiaries, Executive will have access to and learn about the Company's, its affiliates' and subsidiaries' customer information. "**Customer Information**" includes, but is not limited to, names, phone numbers, addresses, email addresses, order history, order preferences, chain of command, decisionmakers, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to services.

Executive understands and acknowledges that loss of this customer relationship and/or goodwill will cause significant and irreparable harm.

Executive agrees and covenants, for a period of one (1) year, not to directly or indirectly solicit, contact (including but not limited to email, regular mail, express mail, telephone, fax, instant message, or social media), attempt to contact, or meet with the Company's, its affiliates' or its subsidiaries' customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company, its affiliates or subsidiaries.

**9.** **Acknowledgement**. Executive acknowledges and agrees that the services to be rendered by Executive to the Company, its affiliates and subsidiaries, are of a special and unique character; that Executive will obtain knowledge and skill relevant to the Company's, its affiliates' and subsidiaries' industries, their methods of doing business and marketing strategies by virtue of Executive's employment; and that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interest of the Company, its affiliates and subsidiaries.

Executive further acknowledges that the benefits provided to Executive under this Agreement, including the amount of Executive's compensation, reflects, in part, Executive's obligations and the Company's rights under Section 7 and Section 8, of this Agreement; that

Executive has no expectation of any additional compensation, royalties, or other payment of any kind not otherwise referenced herein in connection herewith; and that Executive will not suffer undue hardship by reason of full compliance with the terms and conditions of Section 7 and Section 8 of this Agreement or the Company's enforcement thereof.

**10.** **Remedies**. In the event of a breach or threatened breach by Executive of Section 7 and Section 8 of this Agreement, Executive hereby consents and agrees that the Company, its affiliates and subsidiaries shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, and that money damages would not afford an adequate remedy, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

**11.** **Proprietary Rights**.

**11.1** **Work Product**. Executive acknowledges and agrees that all right, title, and interest in and to all writings, works of authorship, technology, inventions, discoveries, processes, techniques, methods, ideas, concepts, research, proposals, materials, and all other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by Executive individually or jointly with others during the Employment Term and relate in any way to the business or contemplated business, products, activities, research, or development of the Company, its affiliates or subsidiaries or result from any work performed by Executive for the Company, its affiliates or subsidiaries (in each case, regardless of when or where prepared or whose equipment or other resources are used in preparing the same), all rights and claims related to the foregoing, and all printed, physical and electronic copies, and other tangible embodiments thereof (collectively, "**Work Product**"), as well as any and all rights in and to US and foreign (a) patents, patent disclosures and inventions (whether patentable or not), (b) trademarks, service marks, trade dress, trade names, logos, corporate names, and domain names, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing, (c) copyrights and copyrightable works (including computer programs), mask works, and rights in data and databases, (d) trade secrets, know-how, and other confidential information, and (e) all other intellectual property rights, in each case whether registered or unregistered and including all registrations and applications for, and renewals and extensions of, such rights, all improvements thereto and all similar or equivalent rights or forms of protection in any part of the world (collectively, "**Intellectual Property Rights**"), shall be the sole and exclusive property of the Company, its affiliates or subsidiaries, as applicable.

**11.2** **Work Made for Hire; Assignment**. Executive acknowledges that, by reason of being employed by the Company, its affiliates or subsidiaries, at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in 17 U.S.C. § 101 and such copyrights are therefore owned by the Company, its affiliates or subsidiaries, as applicable. To the extent that the foregoing does not apply, Executive hereby irrevocably assigns to the Company, its affiliates or subsidiaries, as applicable, for no additional consideration, Executive's entire right, title, and interest in and to all Work Product and Intellectual Property Rights therein, including the right

to sue, counterclaim, and recover for all past, present, and future infringement, misappropriation, or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Company's, its affiliates' or subsidiaries' rights, title, or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company, its affiliates, subsidiaries or assigns, would have had in the absence of this Agreement.

**11.3 Further Assurances; Power of Attorney**. During and after the Employment Term, Executive agrees to reasonably cooperate with the Company, its affiliates, subsidiaries and assigns to (a) apply for, obtain, perfect, and transfer to the Company, its affiliates or subsidiaries, as applicable, the Work Product as well as any and all Intellectual Property Rights in the Work Product in any jurisdiction in the world; and (b) maintain, protect and enforce the same, including, without limitation, giving testimony and executing and delivering to the Company, its affiliates and subsidiaries, as the case may be, any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as shall be requested by the Company, its affiliates or subsidiaries. Executive hereby irrevocably grants the Company, its affiliates or subsidiaries, as applicable, power of attorney to execute and deliver any such documents on Executive's behalf in Executive's name and to do all other lawfully permitted acts to transfer the Work Product to the Company, its affiliates or subsidiaries, as the case may be. The power of attorney is coupled with an interest and shall not be affected by Executive's subsequent incapacity.

**11.4 No License**. Executive understands that this Agreement does not, and shall not be construed to, grant Executive any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software, or other tools made available to Executive by the Company.

**12. Security**.

**12.1 Security and Access**. Executive agrees and covenants (a) to comply with all security policies and procedures as in force from time to time including without limitation those regarding the Company's, its affiliates' or subsidiaries' facilities, IT resources and communication technologies ("**Facilities and Information Technology Resources**"); (b) not to access or use any Facilities and Information Technology Resources except as authorized by the Company, its affiliates or subsidiaries; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of Executive's employment by the Company, its affiliates or subsidiaries whether termination is voluntary or involuntary. Executive agrees to promptly notify the Company, its affiliates or subsidiaries, as applicable, in the event Executive learns of any violation of the foregoing by others, or of any other misappropriation or unauthorized access, use, reproduction, or reverse engineering of, or tampering with any Facilities and Information Technology Resources or other Company, affiliate or subsidiary property or materials by others.

**13. Entire Agreement**. Unless specifically provided herein, this Agreement contains all of the understandings and representations between Executive and the Company pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter. The

parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

**14. Modification and Waiver**. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by Executive and the Director of the Company. No waiver by either of the parties of any breach by the other party hereto of any condition or provision of this Agreement to be performed by the other party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the parties in exercising any right, power, or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

**15. Severability**. Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement.

The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law.

The parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

**16. Captions**. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

**17. Counterparts**. This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

**18. Section 409A**.

**18.1 General Compliance**. This Agreement is intended to comply with Section 409A or an exemption thereunder and shall be construed and administered in accordance with Section 409A. Notwithstanding any other provision of this Agreement, payments provided under this Agreement may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from

service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Any payments to be made under this Agreement upon a termination of employment shall only be made upon a "separation from service" under Section 409A. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement comply with Section 409A, and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by Executive on account of non-compliance with Section 409A.

**18.2** **Specified Employees**. Notwithstanding any other provision of this Agreement, if any payment or benefit provided to Executive in connection with Executive's termination of employment is determined to constitute "nonqualified deferred compensation" within the meaning of Section 409A and Executive is determined to be a "specified employee" as defined in Section 409A(a)(2)(b)(i), then such payment or benefit shall not be paid until the first payroll date following the six-month anniversary of the Termination Date or, if earlier, on Executive's death (the "**Specified Employee Payment Date**"). The aggregate of any payments that would otherwise have been paid before the Specified Employee Payment Date and interest on such amounts calculated based on the applicable federal rate published by the Internal Revenue Service for the month in which Executive's separation from service occurs shall be paid to Executive in a lump sum on the Specified Employee Payment Date and thereafter, any remaining payments shall be paid without delay in accordance with their original schedule.

**18.3** **Reimbursements**. To the extent required by Section 409A, each reimbursement or in-kind benefit provided under this Agreement shall be provided in accordance with the following:

(a) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during each calendar year cannot affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year;

(b) any reimbursement of an eligible expense shall be paid to Executive on or before the last day of the calendar year following the calendar year in which the expense was incurred; and

(c) any right to reimbursements or in-kind benefits under this Agreement shall not be subject to liquidation or exchange for another benefit.

**18.4** **Tax Gross-ups**. Any tax gross-up payments provided under this Agreement shall be paid to Executive on or before December 31 of the calendar year immediately following the calendar year in which Executive remits the related taxes.

**19.** **Successors and Assigns**. This Agreement is personal to Executive and shall not be assigned by Executive. Any purported assignment by Executive shall be null and void from the initial date of the purported assignment. The Company may assign this Agreement to any successor or assign (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or

substantially all of the business or assets of the Company. This Agreement shall inure to the benefit of the Company and permitted successors and assigns.

**20. Notice**. Notices and all other communications provided for in this Agreement shall be in writing and shall be delivered personally or sent by registered or certified mail, return receipt requested, or by overnight carrier to the parties at the addresses set forth below (or such other addresses as specified by the parties by like notice):

If to the Company:

CHARITABLE DAF HOLDCO, LTD.

PAUL MURPHY
paul@gkmanagement.com.ky

If to Executive:

MARK PATRICK
Mpatricktax1040@gmail.com

**21. Representations of Executive**. Executive represents and warrants to the Company that:

(a) Executive's acceptance of employment with the Company and the performance of duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which Executive is a party or is otherwise bound.

(b) Executive's acceptance of employment with the Company and the performance of duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.

**22. Withholding**. The Company shall have the right to withhold from any amount payable hereunder any Federal, state, and local taxes in order for the Company to satisfy any withholding tax obligation it may have under any applicable law or regulation.

**23. Survival**. Upon the expiration or other termination of this Agreement, the respective rights and obligations of the parties hereto shall survive such expiration or other termination to the extent necessary to carry out the intentions of the parties under this Agreement.

**24. Governing Law and Jurisdiction.** This agreement is governed by and shall be construed in accordance with the laws of Cayman Islands. Each of the parties hereto irrevocably agrees that the courts of Cayman Islands shall have exclusive jurisdiction to hear and determine any suit, action or proceeding, and to settle any disputes, which may arise out of or in connection with this agreement and, for such purposes, irrevocably submits to the exclusive jurisdiction of such courts.

**25.** **<u>Acknowledgement of Full Understanding</u>**. EXECUTIVE ACKNOWLEDGES AND AGREES THAT EXECUTIVE HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. EXECUTIVE ACKNOWLEDGES AND AGREES THAT EXECUTIVE HAS HAD AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF EXECUTIVE'S CHOICE BEFORE SIGNING THIS AGREEMENT.

**[*SIGNATURE PAGE FOLLOWS*]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

**COMPANY:**

CHARITABLE DAF HOLDCO, LTD.

By: ______________________
Name: Paul Murphy
Title: Director

**EXECUTIVE:**

______________________
MARK PATRICK

**CHARITABLE DAF HOLDCO, LTD.**

**(AND THE PARTIES LISTED IN SCHEDULE 1)**

**AND**

**PAUL MURPHY**

---

**DIRECTOR SERVICES AGREEMENT**

---

TABLE OF CONTENTS


| | | |
|---|---|---|
| 1 | Definitions and Interpretation | 3 |
| 2 | Appointment of Director | 4 |
| 3 | Experts and Advisors | 4 |
| 4 | Companies' Obligations and Acknowledgements | 5 |
| 5 | Fees, Costs and Expenses | 6 |
| 6 | The Director's Liability and Indemnity | 6 |
| 7 | Non-Exclusivity | 6 |
| 8 | Status | 7 |
| 9 | Restrictions | 7 |
| 10 | Termination | 8 |
| 11 | Notices | 8 |
| 12 | General | 8 |
| 13 | Governing Law and Jurisdiction | 9 |

**THIS AGREEMENT** is effective as of 21 April 2021 (**Agreement**)

**BETWEEN:**

1) **The parties listed in Schedule 1 of this Agreement** (a **Company** or the **Companies** as the context dictates); and

2) **Paul Murphy**, a natural person resident in the Cayman Islands whose address is 67 Fort Street, George Town, Grand Cayman KY1-1007, Cayman Islands (the **Director**).

**RECITALS:**

A) The Companies want the Director to be appointed as a director of the Companies and the Director wants to provide the Services to the Companies on the terms of this Agreement.

**IT IS AGREED AS FOLLOWS:**

**1 Definitions and Interpretation**

1.1 In this agreement, unless the context otherwise requires, the following expressions shall have the following meanings:

**Affiliate** means any parent or subsidiary of a Companies or any other Companies which has the same ultimate parent;

**Articles** means the articles of association of the Companies as the context requires;

**Business Day** means any day on which commercial retail banks are open for banking business in the Cayman Islands (not being a Saturday or a Sunday);

**Law** means the Companies Law (Revised) of the Cayman Islands;

**Losses** means any loss, cost, charge, expense, payment, interest, demand, claim, proceeding, suit, penalty, damages, legal fees, liability, obligation, detriment, adverse judgment, order or other sanction;

**Member** means any member from time to time of the Companies;

**Memorandum** means the memorandum of association of the Companies as the context requires; and

**Services** means the services to be provided by the Director to the Companies listed in Schedule 2 to this Agreement.

**Skyview** means [insert company details]

In this agreement, any reference to:

1.2 a recital, a clause, a sub-clause or a schedule is, unless the context otherwise requires, a reference to a recital, a clause or sub-clause of, or a schedule to, this agreement;

1.3 this agreement or to any agreement or document referred to in this agreement shall be construed as a reference to such agreement or document as amended, varied, modified, supplemented, restated, novated or replaced from time to time; and

1.4 any statute or statutory provision shall, unless the context otherwise requires, be construed as a reference to such statute or statutory provision as it may have been amended, modified, extended, consolidated, re-enacted or replaced and shall include any subordinate legislation made thereunder.

1.5 In this agreement, except where the context otherwise requires, words denoting the singular include the plural and vice versa, words denoting a gender include every gender and references to persons include bodies corporate and unincorporated.

1.6 The recitals and the schedule form part of this agreement and shall have the same force and effect as if they were expressly set out in the body of this agreement.

1.7 Clause headings in this agreement are inserted for convenience only and shall not affect the construction of this agreement.

**2 Appointment of Director**

2.1 Subject to the provisions of this agreement, the Director agrees with the Companies to provide director services to the Companies upon the terms and conditions contained in this agreement.

2.2 In performing his duties as a director of the Companies, the Director shall not be obliged to act in any manner which, in his opinion:

(a) may be contrary to law; or

(b) may conflict with any provision of the Memorandum or Articles; or

(c) would result in the risk of prosecution or other sanction of any kind in any jurisdiction or the withdrawal of, or imposition of any conditions in respect of, any licence, consent or other authorisation issued to the Director by any legal, governmental or regulatory authority in any applicable jurisdiction.

2.3 Without prejudice to his general duties as a director of the Companies. the Director agrees with the Companies to provide and undertake the specific duties listed in Schedule 1 to this agreement.

**3 Experts and Advisors**

3.1 In carrying out the services rendered pursuant to this agreement, the Director shall be entitled to retain on his behalf the services of attorneys, accountants/auditors and other advisers as shall be reasonably necessary for the Director to perform such services and shall be entitled to reimbursement of all reasonable fees and disbursements thus incurred.

3.2 The Director shall be entitled to rely upon any advice so obtained if the Director reasonably believes that such professional persons are reliable and competent in the matters and/or advice prepared or presented and/or such matters and/or advice is within the person's professional qualifications and competence. The Companies acknowledge that Skyview is a professional person that is reliable and competent to provide advice to the Director unless the Companies can demonstrate that the Director had actual knowledge that this was not the case.

3.3 The Director shall in no event have any liability for anything done or omitted to be done in good faith in reliance upon such advice unless through the actual fraud or wilful default of the Director.

**4 Companies' Obligations and Acknowledgements**

4.1 During the continuance of this agreement, the Companies shall:

(a) promptly provide the Director with all such information, documentation and records (as well as notification of any changes which relate to or affect the services being provided hereunder) as the Director may require to perform his duties as a director of the Companies;

(b) keep the Director fully informed as to the business, affairs, financial position and prospects of the Companies;

(c) neither cause nor permit anything to be done which will or is likely to impose any civil or criminal liability or penalty on the Director; and

(d) provide the following promptly on request from time to time by the Director:

(i) written explanation of the nature of the Companies' business and a detailed business plan;

(ii) evidence satisfactory to the Director of the identity of, and references in relation to, (i) any other directors of the Companies, and (ii) any person (or persons) on whose instructions the Director may act in relation to the Companies; and

(iii) other information and documentation as the Director may from time to time reasonably require in relation to the Companies, its directors, Members or activities.

4.2 The Companies acknowledge that:

(a) the Director shall be entitled for all purposes in relation to dealings with all persons, to rely on the authenticity and accuracy of all information and communications of whatever nature received by the Director in good faith and shall not be responsible or liable to any person for any loss arising by virtue of any such information or communication not being authentic and/or accurate; and

(b) the Director shall be entitled to rely on the authenticity and accuracy of all information and communications received in good faith through facsimile, the Internet or similar systems and shall not be responsible or liable to any person for any loss or damage caused by any

such information not being authentic, accurate or any communication transmitted to or by the Director having been interfered with or manipulated by any person.

4.3 The Companies shall procure that:

(a) financial statements of the Companies and any Affiliates of the Companies shall be prepared in respect of each financial year of the Companies or the respective Affiliate in accordance with generally accepted accounting principles; and

(b) such financial statements of the Companies and the Affiliate shall be delivered to the Director.

**5 Fees, Costs and Expenses**

5.1 In consideration of the provision of the services of the Director under this agreement, the Companies shall pay to the Director a fee to be paid annually in at such rates as set out in the attached Schedule 3.

5.2 The fees payable by the Companies to the Director shall not be modified unless otherwise agreed by the Director and the Companies.

5.3 The Director shall be entitled to recover from the Companies all expenses and disbursements (including courier, telephone, facsimile, printing and photocopying) properly incurred or paid by the Director on behalf of the Companies.

**6 The Director's Liability and Indemnity**

6.1 The Director shall not, in the absence of fraud or wilful default, be liable for any Losses suffered or incurred by the Companies at any time from any cause whatsoever arising out of any act or omission on the part of the Director in connection with his duties under this agreement.

6.2 The Companies shall indemnify (on a full indemnity basis), whether in the Articles or otherwise, the Director against any Losses that may be suffered or incurred by the Director from time to time in connection with the provision of services pursuant to clause 2 under this agreement save where such Losses arise from the fraud or wilful default of the Director. The Companies will advance to the Director reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding that arises out of such conduct. In the event that such an advance is made by the Companies, the Director must reimburse the Companies for such advanced fees, costs and expenses to the extent that it is subsequently determined that the Director was not entitled to indemnification under this agreement or the Articles.

6.3 The provisions of this clause 6 shall survive the termination of this agreement.

**7 Non-Exclusivity**

7.1 The services of the Director under this agreement are not exclusive, and the Director or any Affiliate shall be free to provide similar services to other persons. The Director or any Affiliate shall not be deemed to be given notice of, or to be under any duty to disclose to, the Companies, any fact or

thing which may come to the notice of the Director or any Affiliate in the course of the Director or any Affiliate providing similar services to other persons or in the course of the Director's business in any other capacity or in any manner whatsoever otherwise than in the course of carrying out the Director's duties under this agreement.

**8 Status**

8.1 This agreement constitutes a contract for the provision of services and not a contract of employment.

8.2 None of the provisions of this agreement shall create or be deemed to create a relationship of partnership between the parties to this agreement.

**9 Restrictions**

9.1 The Director shall not, without the written consent of the Companies, at any time after the termination of the services under this agreement, represent himself as being in any way connected with or interested in the business of the Companies.

9.2 None of the parties to this agreement shall do any act, matter or thing which would or might prejudice or bring into disrepute the business or reputation of the other parties to this agreement.

9.3 The Director shall not at any time disclose to any person, and shall treat as confidential, any information relating to the business, finances or other matters of the Companies that he may have obtained as a result of his role under this agreement provided however that the provisions of this clause shall not apply:

(a) to the disclosure of any information already known to the recipient prior to the entering into of this agreement;

(b) to the disclosure of any such information which is or becomes public knowledge otherwise than as a result of the unauthorised or improper conduct of the recipient;

(c) to any extent that disclosure is required under Cayman Islands law or any other applicable law or by an order of the Cayman Islands courts or any other court of competent jurisdiction or pursuant to any direction, request or requirement (whether or not having the force of law) of, the Cayman Islands Monetary Authority and the Cayman Islands Financial Reporting Authority;

(d) to the disclosure of any information to professional advisors who receive the same under a duty of confidentiality; or

(e) to the disclosure of any information with the consent of the parties hereto.

9.4 For the avoidance of doubt, this clause does not preclude the Director from disclosing that he is a director of the Companies.

9.5 In the event of this agreement being terminated for whatever reasons, the provisions of this clause 9 shall remain in full force and effect.

**10 Termination**

10.1 This agreement shall be terminated:

(a) upon the Director or the Company or Companies giving notice of termination of this Agreement;

(b) if a court or tribunal of competent jurisdiction finds that the Director has committed actual fraud or wilful neglect in relation to the Companies or the Director does not challenge an allegation of fraud or wilful neglect by the Companies; or

(c) the Cayman Islands Monetary Authority instructs the Companies that the Director can no longer be a director.

10.2 The termination of this agreement shall be without prejudice to any antecedent liability of the parties to this agreement and, without limitation, the Director shall be entitled to receive all fees, disbursements and other expenses accrued due up to the date of such termination.

10.3 The Director may notify the registrar of companies and any other registry or person on behalf of the Companies that he is no longer a Director of the Companies.

**11 Notices**

11.1 Notices to be given hereunder shall be delivered by hand or mailed by prepaid airmail or emailed to the respective addresses set out under the signatories of each party to this agreement.

**12 General**

12.1 This agreement sets out the entire agreement and understanding between the parties in respect of the subject matter of this agreement.

12.2 This agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns.

12.3 If at any time any one or more of the provisions of this agreement is or becomes invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions hereof shall not be in any way affected or impaired thereby.

12.4 The rights of the parties hereunder are cumulative, may be exercised as often as they consider appropriate and are in addition to their respective rights under the general law. They shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing, and in particular any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other right. No act or course of conduct or negotiation on the part of either party shall in any way preclude it from exercising any right or constitute a suspension or variation of any right that it may have hereunder.

12.5 Each party shall do, execute and perform such further acts, deeds and documents as may be required to give full legal and practical effect to this agreement.

12.6 No variation of this agreement shall be effective unless signed by or on behalf of all the parties to this agreement.

12.7 This agreement may be executed in any number of counterparts and provided that every party has executed a counterpart, the counterparts together shall constitute a binding and enforceable agreement between the parties.

**13 Governing Law and Jurisdiction**

13.1 This agreement is governed by and shall be construed in accordance with the laws of Cayman Islands.

13.2 Each of the parties hereto irrevocably agrees that the courts of Cayman Islands shall have exclusive jurisdiction to hear and determine any suit, action or proceeding, and to settle any disputes, which may arise out of or in connection with this agreement and, for such purposes, irrevocably submits to the exclusive jurisdiction of such courts.

**[SIGNATURE PAGE FOLLOWS]**

This Agreement has been entered into by the parties on the day and year first above written.

**SIGNED** for and on behalf of the **COMPANIES**:

) ______________________________
) Duly Authorised Signatory
)
) Name: [insert]
)
) Title: [insert]

**SIGNED** for and on behalf of the **DIRECTOR**:

) ______________________________
)
)
) Name: Paul Murphy
)
) Title: Director

**SCHEDULE 1: PARTIES**

The following companies are parties to this Agreement:

1. Charitable DAF HoldCo, Ltd.
2. Charitable DAF GP, LLC
3. Charitable DAF Fund, L.P.
4. Acis CLO Value Fund II Charitable DAF Ltd,
5. CLO HoldCo, Ltd.
6. Acis Loan Funding, Ltd.
7. Liberty CLO Holdco, Ltd.
8. HCT Holdco 2, Ltd.
9. MGM Studios Holdco, Ltd.

And any other companies that may be agreed by the Parties in writing.

**SCHEDULE 2: SERVICES**

The Director shall provide the following specific services to the Companies:

1. Review and approve or disapprove proposals for investments in amounts greater than $1 million supported by an economic analysis by Skyview and an independent appraisal. In the event the Director proposes to disprove an investment, he will give the Companies at least 30 days' notice of his intention to do so and provide detailed written reasons why;

2. To declare dividends from time to time subject to be satisfied that the Company declaring the dividend is solvent; and

3. Subject to being satisfied that the Company or Companies in question would not breach any applicable law or regulation, act upon the reasonable instructions of Skyview as the Director may be given from time to time.

**SCHEDULE 3: FEES**

The Director shall be paid fees in accordance with the following provisions:

1. US$30,000 upon execution of this Agreement and on the anniversary of this Agreement for each subsequent year this Agreement is in effect;

2. US$10,000 three, six and nine months from the date this Agreement is executed;

3. In the event the Director spends over 30 hours providing the Services to the Companies in any three month period, the Director shall be entitled to charge US$500 per hour for any additional work carried out for the Companies.

The Director shall not be entitled to charge more than US$125,000 in any one year unless agreed otherwise by a Company or the Companies.

Fees shall be paid in cleared funds to the following bank account:

**Instructions to:** Wells Fargo N.A., New York
**Swift code:** PNBPUS3NNYC
**ABA code:** 026005092

**For credit:** FirstCaribbean International Bank (Cayman) Limited
**Swift code:** FCIBKYKY
**Account number:** 2000192002655

**For further credit to:** G.K. Management Limited
**Account number:** 1712372

# MEMORANDUM

**Date: July 9, 2021**

**To: Mark Patrick**

**Company: Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd.**

**From: Haynes and Boone, LLP, by Kenneth Bezozo**

**Subject: Donor Advised Funds ("D ”), Sponsoring Organizations and Supporting Organizations -- The Reasons for Making Investments in Offshore Jurisdictions**

---

1. ***What are Donor Advised Funds, Sponsoring Organizations and Supporting Organizations?***

A donor advised fund, or DAF, is a separately managed charitable investment account established by a donor within a public charity (a section 501(c)(3) organization), which is generally referred to as a sponsor. Sponsors may include a community foundation, university, religious organization, or financial institution. The donor (or the donor's designee) typically maintains certain advisory privileges over the DAF funds or account – specifically with respect to charities that should receive donations, although the DAF account is fully and completely owned and controlled by the sponsor.

In some cases, a sponsor can create as a subsidiary a “supporting organization” which also is a Section 501(c)(3) public charity. A supporting organization is a separate entity controlled by the sponsor through its ability to elect a majority of the supporting organization’s governing board. Because of this control, a supporting organization is treated financially as part of a consolidated unit with the sponsor.

Here, for example, The Dallas Foundation formed, and owns and controls, a supporting organization named Highland Dallas Foundation, Inc. (“***Highland Dallas Foundation***”) to assist The Dallas Foundation in carrying out its charitable mission in helping support a wide variety of community affairs. Donations were made to the Highland Dallas Foundation as both the sponsor and the supporting organization. The Highland Dallas Foundation from time to time makes distributions of funds to The Dallas Foundation which in turn makes further distributions to local public charities. ***Exhibit 1*** attached shows these above-described entities, as well as other entities referenced herein that are pertinent to this donor advised fund.

2. ***How Does a Donor Establish a DAF Account?***

To establish a DAF fund or account, a donor must make an irrevocable contribution of assets, such as cash, stock or securities or other business or financial assets, to a sponsoring public charity. The donor’s contribution is recorded and recognized as a donation to the sponsoring

public charity of the DAF. A donor can make additional contributions to the sponsoring organization whenever they choose.

Because a contribution to a sponsoring organization is, for tax purposes, the equivalent of a contribution to a public charity and because the donor gets an immediate tax benefit for the contribution, the contribution, when made, is permanent and irrevocable. This is true even though the donor contribution to the sponsoring organization is in an account that grows tax-free and the donor has advisory rights as to where to invest the assets and donations made from these assets.

Here, the Highland Dallas Foundation is the sponsor of the DAF account which it fully owns and controls. Although the donor has advisory rights regarding investments and donations to charities (by way of a board seat he fills in the supporting organization), the Highland Dallas Foundation has full authority and control over all such decision-making.

3. ***What Type of Investments Can be Made by a Sponsor/Supporting Organization?***

A sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are able to invest in a wide variety of assets including, but not limited to, marketable securities, financial assets, businesses, real estate, private equity and hedge funds. But because the sponsor and supporting organization are both public charities that are tax-exempt organizations, their investments must take into account all laws that could possibly effect their tax-exempt status.

a. ***Can a Sponsor and its Supporting Organization Invest in a Hedge Fund, Private Equity Fund or Similar Investment Vehicle?***

The short answer is yes, but as stated above, a sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are both public charities that are tax-exempt organizations. As a strong general rule, a tax-exempt organization will avoid any investments that will subject it to federal or state taxes. A tax-exempt organization is generally exempt from all federal and state taxes except to the extent it receives income classified as unrelated business taxable income (UBTI), which would be taxed at a 21% rate. The term "unrelated business taxable income" generally means the income derived from an unrelated trade or business regularly conducted by the tax-exempt organization. UBTI also can arise from the receipt of income from debt-financed investments, which is why hedge and private equity funds generally utilize a special investment structure to ensure tax-exempt investors do not have UBTI.

To prevent UBTI from flowing through to a tax-exempt organization, a corporation can be utilized to “block” this income at the corporate level, which is accomplished by having a corporation interposed between the tax-exempt organization and the hedge fund, such as The Charitable DAF Holdco, Ltd. (a corporate blocker) from the Charitable DAF Fund, L.P. Using a structure in this manner is often described as using a "blocker" because the UBTI is blocked out and does not flow through to the tax-exempt investor. Instead, the UBTI is included in the income of, and subject to tax in, the blocker corporation. The blocker corporation thereafter distributes the income to the tax-exempt

investor through the payment of dividends which are not UBTI and therefore not taxable to a tax-exempt organization.

Although using a domestic corporate blocker can avoid the problem of having UBTI passed through to a tax-exempt sponsor or its supporting organization, a U.S.-based blocker corporation will be required to pay corporate and state-level income tax on the income they receive from an investment fund.

b. ***Are There Particular Jurisdictions in Which Hedge and Private Equity Funds form Investment Partnerships and Blocker Corporations for their tax-exempt investors?***

It is common for hedge and private equity funds that have tax-exempt investors such as The Dallas Foundation and Highland Dallas Foundation to utilize an offshore structure to form its investment partnership. In addition, these funds may form offshore blocker corporations as well as for other reasons including the ability to make non-U.S. investments or U.S. investments that do not give rise to U.S. tax for foreign investors (i.e., U.S. investments that do not cause the investor to be "engaged in a U.S. trade or business.") Jurisdictions such as Bermuda and the Cayman Islands are typically used because those countries do not have an income tax regime.

By utilizing an offshore structure with corporate blockers, hedge and private equity funds can ensure their tax-exempt investors will not receive any UBTI from investments held by The Dallas Foundation or Highland Dallas Foundation. In addition, to the extent the sole source of UBTI is through debt financing (which is often the case in a hedge fund), then using an offshore corporate blocker can eliminate this type of UBTI (because the debt financing will not flow through the corporate blocker to taint the income received by the tax-exempt investor). This allows the sponsor (i.e., Highland Dallas Foundation), as well as any other charities that receive distributions from Highland Dallas Foundation or The Dallas Foundation, to receive the largest possible distributions.

Utilizing an offshore structure for hedge and private equity funds in the manner described above for tax-exempt investors is a best practice used by many U.S. law firms representing U.S. hedge and private equity funds. In fact, if a U.S. law firm didn't use offshore blockers in the manner described above, it could be considered a poor practice.

In summary, using an offshore blocker corporation, such as Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd., for many hedge funds minimizes taxes and increases the net after-tax cash flow to the tax-exempt investors because investments grow tax-free, giving a sponsor, such as Highland Dallas Foundation, the potential to create even more capital for philanthropic giving.

4. ***Who Has Control and Authority over the Assets Held by the Sponsor?***

Because a DAF is an account within a sponsor organization, the sponsoring organization has full, complete and final control over the funds in the DAF, which is the case here with the sponsor, the Highland Dallas Foundation. Although the supporting organization permits the donor or the donor's designee to recommend how funds should be invested and how funds should be

distributed to other public charities, Highland Dallas Foundation must approve any investments and all distributions to charities.

In this case, the donor of the charitable DAF, or his designee, is able to appoint a representative to the board of the Highland Dallas Foundation, which allows the donor to recommend investments or distributions to charitable organizations, i.e., organizations that are tax-exempt under Internal Revenue Code section 501(c)(3) and classified as public charities under Internal Revenue Code section 509(a). But the donor (or the donor's designee) only has advisory privileges over making investments and the distribution of funds.

5. ***What Are the Benefits to a Donor of a Contribution to a DAF account?***

A DAF account allows a donor who makes an irrevocable charitable contribution to the DAF account to receive an immediate tax deduction, and with the ability to recommend distributions be made by the sponsor to specific charities either presently or in the future. Also, if the donor contributes certain appreciated assets to the DAF account, such as stock or securities, the donor avoids the recognition of any gain in these appreciated assets. This is a significant additional benefit to donors made available in the Internal Revenue Code.

The DAF assets that are not immediately distributed to charities are then invested and depending on the type of investments and the jurisdiction in what the investments are made, the assets may grow tax-free.

EXHIBIT 3

## Exhibit 1

### Charitable DAF/CLO Holdco Structure Chart




4822-2891-9537 v.7

# G.K. MANAGEMENT LIMITED

P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

12 July 2021 **Invoice #GK-2021-304**

Charitable DAF HoldCo, Ltd (& 8 others)

One Nexus Way

Camana Bay

Grand Cayman, KY1-9005

Cayman Islands

| **Description** | | **Amount (US $)** |
|---|---|---|
| Quarterly Directorship Fee (July – Sep 2021) | | $10,000.00 |
| Additional hourly fee (April – June 2021) | | |
| • Review of corporate docs (9 entities) | 2 hrs | |
| • Review of bankruptcy filings (1,500+ pages) | 15 hrs | |
| • Various calls re: issues facing companies | 4 hrs | |
| • Instructing Cayman attorneys | 1 hr | |
| • Attendance at 2 virtual hearings (re: bankruptcy and contempt) | 11 hrs | |
| • Review of and execution of documents | 2 hrs | |
| • Requesting and certifying copies of various corporate docs | 1hr | |
| • Various emails | 3 hrs | |
| Total hrs | 39 hrs | |
| Total $ @ $500 p.h. & credit for 30 hrs | | $4,500 |
| **Total due for payment** | | **US$ 14,500.00** |

G.K. MANAGEMENT LIMITED
P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

**Payment by Wire Transfer to:**

| | |
|---|---|
| Instructions to: | Wells Fargo N.A., New York |
| Swift code: | PNBPUS3NNYC |
| ABA code: | 026005092 |
| For credit: | FirstCaribbean International Bank (Cayman) Limited |
| Swift code: | FCIBKYKY |
| For further credit to: | G.K. Management Limited |
| Account number: | 1712372 |

# G.K. MANAGEMENT LIMITED

P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

28 September 2021 **Invoice #GK-2021-326**

Charitable DAF HoldCo, Ltd (& 8 others)

One Nexus Way

Camana Bay

Grand Cayman, KY1-9005

Cayman Islands

| **Description** | **Amount (US $)** |
|---|---|
| Quarterly Directorship Fee (Oct – Dec 2021) | $10,000.00 |
| Additional hourly fee (July – Sep 2021) | |
| • N/A | |
| **Total due for payment** | **US$ 10,000.00** |

**Payment by Wire Transfer to:**

| | |
|---|---|
| Instructions to: | Wells Fargo N.A., New York |
| Swift code: | PNBPUS3NNYC |
| ABA code: | 026005092 |
| For credit: | FirstCaribbean International Bank (Cayman) Limited |
| Swift code: | FCIBKYKY |
| For further credit to: | G.K. Management Limited |
| Account number: | 1712372 |

# G.K. MANAGEMENT LIMITED

P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

4 November 2021 **Invoice #GK-2021-334**

Charitable DAF HoldCo, Ltd (& 8 others)

One Nexus Way

Camana Bay

Grand Cayman, KY1-9005

Cayman Islands

| **Description** | **Amount (US $)** |
|---|---|
| HCLOF - Advisory Board (Bi-annual fee) | $5,000.00 |
| **Total due for payment** | **US$ 5,000.00** |

**Payment by Wire Transfer to:**

Instructions to: Wells Fargo N.A., New York
Swift code: PNBPUS3NNYC
ABA code: 026005092

For credit: FirstCaribbean International Bank (Cayman) Limited
Swift code: FCIBKYKY

For further credit to: G.K. Management Limited
Account number: 1712372

**CHARITABLE DAF HOLDCO, LTD.**

**(AND THE PARTIES LISTED IN SCHEDULE 1)**

**AND**

**PAUL MURPHY**

---

**AMENDMENT TO**

**DIRECTOR SERVICES AGREEMENT DATED 21 APRIL 2021**

---

TABLE OF CONTENTS

1 Definitions and Interpretation ....................3
2 Amendment of DSA ....................4

**THIS AGREEMENT** is effective as of 8 November 2021 (**Agreement**)

**BETWEEN:**

1) **The parties listed in Schedule 1 of this Agreement** (a **Company** or the **Companies** as the context dictates); and

2) **Paul Murphy**, a natural person resident in the Cayman Islands whose address is 67 Fort Street, George Town, Grand Cayman KY1-1007, Cayman Islands (the **Director**).

**RECITALS:**

A) The Companies and Director entered into a Director Services Agreement dated 21 April 2021 (**"DSA"**) and, pursuant to the terms of this Agreement, want to vary those terms in accordance with Clause 12.6 of the DSA.

**IT IS AGREED AS FOLLOWS:**

**1 Definitions and Interpretation**

1.1 In this agreement, unless the context otherwise requires, the expressions in this Agreement shall have the same meanings as those in the DSA.

In this agreement, any reference to:

1.2 a recital, a clause, a sub-clause or a schedule is, unless the context otherwise requires, a reference to a recital, a clause or sub-clause of, or a schedule to, this agreement;

1.3 this agreement or to any agreement or document referred to in this agreement shall be construed as a reference to such agreement or document as amended, varied, modified, supplemented, restated, novated or replaced from time to time; and

1.4 any statute or statutory provision shall, unless the context otherwise requires, be construed as a reference to such statute or statutory provision as it may have been amended, modified, extended, consolidated, re-enacted or replaced and shall include any subordinate legislation made thereunder.

1.5 In this agreement, except where the context otherwise requires, words denoting the singular include the plural and vice versa, words denoting a gender include every gender and references to persons include bodies corporate and unincorporated.

1.6 The recitals and the schedule form part of this agreement and shall have the same force and effect as if they were expressly set out in the body of this agreement.

1.7 Clause headings in this agreement are inserted for convenience only and shall not affect the construction of this agreement.

**2 Amendment of DSA**

2.1 The DSA is amended as follows:

(a) The Director may accept an appointment to any company, legal entity, committee or any other such position or office which the Companies may want the Director to act. Any such appointment and its terms shall be agreed by the parties in writing.

(b) The companies the Director is appointed to, the Services and the Fees may be varied or agreed by the parties in writing.

2.2 Any appointment pursuant to Clause 2.1 (a) or variation or agreement pursuant to Clause 2.1 (b) shall incorporate the terms of the DSA unless expressly excluded by the parties.

**[SIGNATURE PAGE FOLLOWS]**

This Agreement has been entered into by the parties on the day and year first above written.

**SIGNED** for and on behalf of the **COMPANIES**:

Duly Authorised Signatory

Name: Mark Patrick

Title: Director of the Companies

**SIGNED** for and on behalf of the **DIRECTOR**:



Name: Paul Murphy

Title: Director

# Delaware

*PAGE 1*

*The First State*

*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND KANSAS CITY FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-THIRD DAY OF NOVEMBER, A.D. 2011, AT 4:23 O'CLOCK P.M.*

*A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.*

*5070449 8100*

*111227849*

*You may verify this certificate online at corp.delaware.gov/authver.shtml*

Jeffrey W. Bullock, Secretary of State

*AUTHENTICATION: 9179752*

*DATE: 11-28-11*

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 05:03 PM 11/23/2011*
*FILED 04:23 PM 11/23/2011*
*SRV 111227849 - 5070449 FILE*

# CERTIFICATE OF INCORPORATION

# OF

# HIGHLAND KANSAS CITY FOUNDATION, INC.

FIRST: The name of the corporation is Highland Kansas City Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit the Greater Kansas City Community Foundation, a Missouri nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by the Greater Kansas City Community Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation

Case 3:26-cv-02496-D Document 17-28 Filed 09/08/26 Page 115 of 222 PageID 11630

exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to the Greater Kansas City Community Foundation. If the Greater Kansas City Community Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 22nd day of November, 2011.

James Dondero



78673.000002 EMF_US 37829386v4

# Delaware

PAGE 1

*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND DALLAS FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF NOVEMBER, A.D. 2011, AT 7:34 O'CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.

SECRETARY OF STATE · DELAWARE · 1776 · 1970

Jeffrey W. Bullock, Secretary of State

5069985 8100

AUTHENTICATION: 9177054

111224468

DATE: 11-23-11

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:17 PM 11/22/2011
FILED 07:34 PM 11/22/2011
SRV 111224468 - 5069985 FILE

# CERTIFICATE OF INCORPORATION

# OF

# HIGHLAND DALLAS FOUNDATION, INC.

FIRST: The name of the corporation is Highland Dallas Foundation. Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit The Dallas Foundation, a Texas nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by The Dallas Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions

to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to The Dallas Foundation. If The Dallas Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 2nd day of November, 2011.

James Dondero

# *Delaware*



*The First State*

*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF INCORPORATION OF "HIGHLAND SANTA BARBARA FOUNDATION, INC.", FILED IN THIS OFFICE ON THE TWENTY-SECOND DAY OF NOVEMBER, A.D. 2011, AT 7:36 O'CLOCK P.M.*

*A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.*

SECRETARY OF STATE 1776 DELAWARE 1976

Jeffrey W. Bullock, Secretary of State

5069989 8100

AUTHENTICATION: 9177064

111224480

DATE: 11-23-11

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 09:17 PM 11/22/2011
FILED 07:36 PM 11/22/2011
SRV 111224480 - 5069989 FILE

# CERTIFICATE OF INCORPORATION

# OF

# HIGHLAND SANTA BARBARA FOUNDATION, INC.

FIRST: The name of the corporation is Highland Santa Barbara Foundation, Inc. (sometimes hereinafter referred to as the "corporation").

SECOND: The corporation is organized and shall be operated, exclusively for charitable, educational and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"). Within the scope of the foregoing purposes, the corporation is organized and operated exclusively to support and benefit Santa Barbara Foundation, a California nonprofit corporation that is exempt from federal income taxation under section 501(a) of the Code of 1986 as an organization described in section 501(c)(3) of the Code, and a public charity described in section 509(a)(1) of the Code. In furtherance of these purposes, the corporation shall be controlled by Santa Barbara Foundation within the meaning of Section 509(a)(3)(B)(i) of the Code. The corporation shall possess and exercise all the powers and privileges granted by the Delaware General Corporation Law (the "Law") or by any other law of the State of Delaware or by this Certificate of Incorporation together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the purposes of the corporation. Notwithstanding the foregoing, the corporation shall carry on only those activities permitted to be carried on by an organization that is exempt from taxation under section 501(c)(3) of the Code and an organization that is described in section 509(a)(3) of the Code.

THIRD: The address of the corporation's registered office in the State of Delaware is 1209 Orange Street, New Castle County, Wilmington, Delaware 19801. The name of the corporation's registered agent at such address is The Corporation Trust Company.

FOURTH: The corporation shall be a nonprofit nonstock corporation, and it is not authorized to issue any capital stock. The directors of the corporation shall be elected in the manner and for the terms provided in the corporation's bylaws; provided, however, that the number of directors shall not be fewer than three (3). Unless and except to the extent that the bylaws of the corporation shall so require, the election of directors of the corporation need not be by written ballot.

FIFTH: No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, the corporation's directors, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make grants, loans and similar payments in furtherance of the purposes set forth in Article SECOND hereof unless such compensation, grant, loan or similar payment would constitute an excess benefit transaction as that term is defined in either section 4958(c)(1) or section 4958(c)(3) of the Code. No part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation. The corporation shall not participate in, or intervene in (including the publishing or distribution of statements), any political campaign on behalf of any candidate for public office. Notwithstanding any other provision of this Certificate of Incorporation, the corporation shall not carry on any activities not permitted to be carried on by (i) a corporation exempt from federal income tax under section 501(c)(3) of the Code, (ii) a corporation contributions

to which are deductible under section 170 of the Code, or (iii) a supporting organization described in section 509(a)(3) of the Code.

SIXTH: The corporation shall have perpetual existence.

SEVENTH: To the fullest extent permitted by Law, no director of the corporation shall be liable to the corporation or any member for monetary damages for breach of fiduciary duty as a director, except for liability for (i) any breach of the director's duty of loyalty to the corporation or its members, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, including but not limited to section 4958 of the Code, or (iii) any transaction from which the director derived an improper personal benefit. If the Law is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Law, as so amended. To the fullest extent permitted by Law, the corporation shall indemnify and may purchase and maintain insurance or other arrangements on behalf of any and all of the directors and officers of the corporation whom it may lawfully indemnify and insure to the maximum extent permitted by the Law, as amended from time to time, or by the laws of the State of Delaware, as in effect from time to time, in each case subject to the requirements of section 4958 of the Code. Any repeal or modification of this Article SEVENTH shall not adversely affect any right or protection of a director or officer of the corporation existing at the time of such repeal or modification.

EIGHTH: Upon the dissolution of the corporation, the corporation's assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Code to Santa Barbara Foundation. If Santa Barbara Foundation is no longer described in section 501(c)(3) of the Code at the time of the distribution or is then no longer in existence, the corporation's assets shall be distributed to one or more organizations organized exclusively for charitable, educational, scientific or other exempt purposes and qualified as exempt under section 501(c)(3) of the Code, as shall be determined by the members of the corporation.

NINTH: In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware, the members of the corporation are expressly authorized to make, alter and repeal the bylaws of the corporation.

TENTH: The incorporator is James Dondero whose mailing address is Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240.

I, THE UNDERSIGNED, being the incorporator, for the purpose of forming a corporation under the laws of the State of Delaware do make, file and record this Certificate of Incorporation, and, accordingly, have hereto set my hand this 21st day of November, 2011.

James Dondero

# G.K. MANAGEMENT LIMITED

P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

16 December 2021 **Invoice #GK-2021-336**

Charitable DAF HoldCo, Ltd (& 8 others)

One Nexus Way

Camana Bay

Grand Cayman, KY1-9005

Cayman Islands

| **Description** | | **Amount (US $)** |
|---|---|---|
| Quarterly Directorship Fee (Jan - March 2021) | | $10,000.00 |
| Additional hourly fee (Oct - Dec 2021) | | |
| • Review of various pleadings, witness statements, corporate docs, agreements and structures including motion to intervene, NexPoint litigation, bankruptcy proceedings and legal research/case law. | 31.5 hrs | |
| • Various calls/emails re: HCLOF. | 8 hrs | |
| • Various calls/emails re: Skyview. | 3 hrs | |
| • Instructing Cayman and Guernsey attorneys. Calls, various emails and advice. | 12 hrs | |
| • Various calls/emails with US counsel re: bankruptcy proceedings, regulatory proceedings (Highland) and Skyview. | 5 hr | |
| Total hrs | 59.5 hrs | |
| Total $ @ $500 p.h. & credit for 30 hrs | | $14,500.00 |
| **Total due for payment** | | **US$ 24,500.00** |

**G.K. MANAGEMENT LIMITED**
P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

**<u>Payment by Wire Transfer to:</u>**

| | |
|---|---|
| Instructions to: | Wells Fargo N.A., New York |
| Swift code: | PNBPUS3NNYC |
| ABA code: | 026005092 |
| | |
| For credit: | FirstCaribbean International Bank (Cayman) Limited |
| Swift code: | FCIBKYKY |
| | |
| For further credit to: | G.K. Management Limited |
| Account number: | 1712372 |

# G.K. MANAGEMENT LIMITED

P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

29 March 2022 **Invoice #GK-2022-363**

Charitable DAF HoldCo, Ltd (& 8 others)

One Nexus Way

Camana Bay

Grand Cayman, KY1-9005

Cayman Islands

| **Description** | | **Amount (US $)** |
|---|---|---|
| Quarterly Directorship Fee (April - June 2022) | | $30,000.00 |
| Semi-annual Advisory Board Fee HCLOF (April – Sep 2022) | | $5,000.00 |
| Additional hourly fee (Jan - March 2022) | | |
| • Review of various pleadings, witness statements, corporate docs, agreements and legal research/case law in US Declaratory Proceedings. | 12 hrs | |
| • Review and preparation of various pre-action letter, pleadings, witness statements and legal research/case law in unfair prejudice application re: HCLOF, | 22.5 hrs | |
| • Correspondence and review of bankruptcy proceedings re: interplay with declaratory proceedings and unfair prejudice application | 3 hrs | |
| • Various calls/emails and review of fund documentation. | 5 hrs | |
| Total hrs | 42.5 hrs | |
| Total $ @ $500 p.h. & credit for 30 hrs | | $6,250.00 |
| **Total due for payment** | | **US$ 41,250.00** |

# G.K. MANAGEMENT LIMITED

P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

**Payment by Wire Transfer to:**

| | |
|---|---|
| Instructions to: | Wells Fargo N.A., New York |
| Swift code: | PNBPUS3NNYC |
| ABA code: | 026005092 |
| | |
| For credit: | FirstCaribbean International Bank (Cayman) Limited |
| Swift code: | FCIBKYKY |
| | |
| For further credit to: | G.K. Management Limited |
| Account number: | 1712372 |

# G.K. MANAGEMENT LIMITED

P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

29 July 2022 **Invoice #GK-2022-378**

Charitable DAF HoldCo, Ltd (& 8 others)

One Nexus Way

Camana Bay

Grand Cayman, KY1-9005

Cayman Islands

| **Description** | | **Amount (US $)** |
|---|---|---|
| Quarterly Directorship Fee (July - Sep 2022) | | $10,000.00 |
| Additional hourly fee (April – June 2022) | | |
| • Review of various court docs including affidavit preparation re: Guernsey unfair prejudice action and legal research. | 8 hrs | |
| • Various calls and emails re: strategy in bankruptcy court and interplay with unfair prejudice action including review of legal advice and historic court documents. | 21 hrs | |
| • General calls/emails and review of fund documentation. | 5 hrs | |
| Total hrs | 34 hrs | |
| Total $ @ $500 p.h. & credit for 30 hrs | | $2,000.00 |
| **Total due for payment** | | **US$ 12,000** |

**Payment by Wire Transfer to:**

Instructions to: Wells Fargo N.A., New York

Swift code: PNBPUS3NNYC

ABA code: 026005092

# G.K. MANAGEMENT LIMITED

P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

| | |
|---|---|
| For credit: | FirstCaribbean International Bank (Cayman) Limited |
| Swift code: | FCIBKYKY |
| For further credit to: | G.K. Management Limited |
| Account number: | 1712372 |

# G.K. MANAGEMENT LIMITED

P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

28 September 2022 **Invoice #GK-2022-393**

Charitable DAF HoldCo, Ltd (& 8 others)

One Nexus Way

Camana Bay

Grand Cayman, KY1-9005

Cayman Islands

| **Description** | | **Amount (US $)** |
|---|---|---|
| Quarterly Directorship Fee (Oct - Dec 2022) | | $10,000.00 |
| Additional hourly fee (July – Sep 2022) | | |
| • Detailed review of affidavit for unfair prejudice proceedings including review of exhibits (2,500 pages), correspondence, conference calls and revisions with bankruptcy and Guernsey attorneys. | 23 hrs | |
| • Filing application with bankruptcy court re: gatekeeper provisions, conference calls with KHP re: strategy and approach, finalization of application. | 8 hrs | |
| • Calls with PPM law re: declaratory action and strategy, liaising with Guernsey counsel on declaratory action. | 3 hrs | |
| • Various admin including review of NAV statements, responding to due diligence requests and call with Mark Patrick re: CDO note investigations. | 2.5 hrs | |
| Total hrs | 36.5 hrs | |
| Total $ @ $500 p.h. & credit for 30 hrs | | $ |
| **Total due for payment** | | **US$ 13,250** |

**G.K. MANAGEMENT LIMITED**
P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

**Payment by Wire Transfer to:**

| | |
|---|---|
| Instructions to: | Wells Fargo N.A., New York |
| Swift code: | PNBPUS3NNYC |
| ABA code: | 026005092 |
| | |
| For credit: | FirstCaribbean International Bank (Cayman) Limited |
| Swift code: | FCIBKYKY |
| | |
| For further credit to: | G.K. Management Limited |
| Account number: | 1712372 |

# G.K. MANAGEMENT LIMITED

P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

27th March 2023 **Invoice #GK-2023-45**

Charitable DAF HoldCo, Ltd (& 8 others)

One Nexus Way

Camana Bay

Grand Cayman, KY1-9005

Cayman Islands

| **Description** | | **Amount (US $)** |
|---|---|---|
| Quarterly Directorship Fee (Apr - Jun 2023) | | $35,000.00 |
| Additional hourly fee (Jan - Mar 2023) | | |
| • Preparation and finalization of Guernsey unfair prejudice action including review of affidavit, preparation and review of second affidavit, review of pleadings, review of exhibits, correspondence, conference calls and revisions with bankruptcy and Guernsey attorneys, review and revisions to directions (inc. legal review) for Jan, Feb and March. | 42 hrs | |
| • Bankruptcy court gatekeeper review and management, calls with KHP and various correspondence. | 2.8 hrs | |
| • Calls and emails with PPM law, Ogier and KHP re: declaratory action and strategy, liaising with Guernsey counsel and KHP on declaratory action and interplay with Guernsey action and bankruptcy proceedings. | 6.5 hrs | |
| • Review of Hunter Mountain pleadings (petition, rule 202, submission of evidence, related case, motion | 2.5 hrs | |

**G.K. MANAGEMENT LIMITED**
P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

| | | |
|---|---|---|
| for leave and joint response). | | |
| • Independent review of c-suite compensation with ValueScope including calls, review of independent reports, follow up review of materials used to compile report, drafting and executing board resolution re: compensation. | 5.3 hrs | |
| Total hrs | 59.1 hrs | |
| Total $ @ $500 p.h. & credit for 30 hrs | | $ 14,550 |
| **Total due for payment** | | **US$ 49,550** |

**Payment by Wire Transfer to:**

| | |
|---|---|
| Instructions to: | Wells Fargo N.A., New York |
| Swift code: | PNBPUS3NNYC |
| ABA code: | 026005092 |
| For credit: | FirstCaribbean International Bank (Cayman) Limited |
| Swift code: | FCIBKYKY |
| For further credit to: | G.K. Management Limited |
| Account number: | 1712372 |

# G.K. MANAGEMENT LIMITED

P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

26th June 2023 **Invoice #GK-2023-89**

Charitable DAF HoldCo, Ltd (& 8 others)

One Nexus Way

Camana Bay

Grand Cayman, KY1-9005

Cayman Islands

| **Description** | | **Amount (US $)** |
|---|---|---|
| Quarterly Directorship Fee (Apr - Jun 2023) | | $10,000.00 |
| Bi-Annual HCLOF Advisory Board fee | | $5,000.00 |
| Additional hourly fee (Apr - Jun 2023) | | |
| • Preparation of third Affidavit for Guernsey proceedings including review of exhibits, drafting and correspondence with Ogier. | 16.5 hrs | |
| • Additional correspondence and advice with Ogier and PPM Law on Guernsey and US Bank proceedings. | 5 hrs | |
| • Instructing Campbells on Sentinel Note action including review of UBS proceedings in NY, review of exhibits (3,000+ pages), legal review of action and preparation of emails/letters before action. | 23.8 hrs | |
| Total hrs | 45.3 hrs | |
| Total $ @ $500 p.h. & credit for 30 hrs | | $ 7,650.00 |
| **Total due for payment** | | **US$ 22,650.00** |

# G.K. MANAGEMENT LIMITED

P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

**Payment by Wire Transfer to:**

| | |
|---|---|
| Instructions to: | BNY Mellon NY |
| Swift BIC: | IRVTUS3NXXX |
| ABA No: | 021000018 |
| For credit: | Butterfield Bank (Cayman) Limited |
| Swift BIC: | BNTBKYKYXXX |
| Account at BNY: | 8033265086 |
| For further credit to: | Paul Richard Murphy |
| Account number: | 1361530160011 |

# G.K. MANAGEMENT LIMITED

P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

26th September 2023 **Invoice #GK-2023-184**

Charitable DAF HoldCo, Ltd (& 8 others)

One Nexus Way

Camana Bay

Grand Cayman, KY1-9005

Cayman Islands

| **Description** | | **Amount (US $)** |
|---|---|---|
| Quarterly Directorship Fee (Oct - Dec 2023) | | $10,000.00 |
| Additional hourly fee (July - Sep 2023) | | |
| • Preparation of fourth and fifth Affidavits for Guernsey proceedings including review of exhibits, drafting and correspondence with Ogier. | 11.7 hrs | |
| • Additional correspondence, calls and advice with Ogier and PPM Law on Guernsey and US Bank proceedings. | 17.8 hrs | |
| • Reviewing counsel's advice re: Guernsey proceedings, conference calls and further drafting. | 10.5 hrs | |
| • Advice from Campbells on Sentinel actions and meetings re: directors on note forgiveness. | 13.3 hrs | |
| Total hrs | 48.3 hrs | |
| Total $ @ $500 p.h. & credit for 30 hrs | | $ 11,650.00 |
| **Total due for payment** | | **US$ 21,650.00** |

G.K. MANAGEMENT LIMITED
P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

**Payment by Wire Transfer to:**

| | |
|---|---|
| Instructions to: | BNY Mellon NY |
| Swift BIC: | IRVTUS3NXXX |
| ABA No: | 021000018 |
| For credit: | Butterfield Bank (Cayman) Limited |
| Swift BIC: | BNTBKYKYXXX |
| Account at BNY: | 8033265086 |
| For further credit to: | Paul Richard Murphy |
| Account number: | 1361530160011 |

# G.K. MANAGEMENT LIMITED

P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

20th October 2023 **Invoice #GK-2023-197**

Charitable DAF HoldCo, Ltd (& 8 others)
One Nexus Way
Camana Bay
Grand Cayman, KY1-9005
Cayman Islands

| **Description** | **Amount (US $)** |
|---|---|
| American Airlines flight – Cayman Islands to London | 6,259.38 |
| Flight – London to Guernsey | 310.65 |
| Hotel – Guernsey (2 nights) | 716.10 |
| Hotel – London Heathrow | 252.49 |
| Hotel – Miami | 402.55 |
| **Total due for payment** | **US$ 7,941.17** |

**Payment by Wire Transfer to:**

Instructions to: BNY Mellon NY
Swift BIC: IRVTUS3NXXX
ABA No: 021000018

For credit: Butterfield Bank (Cayman) Limited
Swift BIC: BNTBKYKYXXX
Account at BNY: 8033265086

# G.K. MANAGEMENT LIMITED

P.O. Box 10729, Suite 1, Artemis House, 67 Fort Street
Grand Cayman KY1-1007, CAYMAN ISLANDS
**Tel:** +1 345 946 3459 **Fax:** +1 345 946 3493
**E-mail:** info@gkmanagement.com.ky

For further credit to: Paul Richard Murphy

Account number: 1361530160011

**CHARITABLE DAF HOLDCO, LTD.**

**(AND THE PARTIES LISTED IN SCHEDULE 1)**

**AND**

**PAUL MURPHY**

---

**AMENDMENT TO**

**DIRECTOR SERVICES AGREEMENT DATED 21 APRIL 2021 AND AMENDMENT DATED 8 NOVEMBER 2021**

---

**TABLE OF CONTENTS**


1 Definitions and Interpretation....3
2 Amendment of DSA....4

**THIS AGREEMENT** is effective as of 6 November 2023 (**Agreement**)

**BETWEEN:**

1) **The parties listed in Schedule 1 of this Agreement** (a **Company** or the **Companies** as the context dictates); and

2) **Paul Murphy**, a natural person resident in the Cayman Islands whose address is 45 Beckz Close, George Town, Grand Cayman KY1-1007, Cayman Islands (the **Director**).

**RECITALS:**

A) The Companies and Director entered into a Director Services Agreement dated 21 April 2021 and an Amended Director Services Agreement dated 8 November 2021 (**"DSA"**) and, pursuant to the terms of this Agreement, want to vary those terms in accordance with Clause 12.6 of the DSA.

**IT IS AGREED AS FOLLOWS:**

**1 Definitions and Interpretation**

1.1 In this agreement, unless the context otherwise requires, the expressions in this Agreement shall have the same meanings as those in the DSA.

In this agreement, any reference to:

1.2 a recital, a clause, a sub-clause or a schedule is, unless the context otherwise requires, a reference to a recital, a clause or sub-clause of, or a schedule to, this agreement;

1.3 this agreement or to any agreement or document referred to in this agreement shall be construed as a reference to such agreement or document as amended, varied, modified, supplemented, restated, novated or replaced from time to time; and

1.4 any statute or statutory provision shall, unless the context otherwise requires, be construed as a reference to such statute or statutory provision as it may have been amended, modified, extended, consolidated, re-enacted or replaced and shall include any subordinate legislation made thereunder.

1.5 In this agreement, except where the context otherwise requires, words denoting the singular include the plural and vice versa, words denoting a gender include every gender and references to persons include bodies corporate and unincorporated.

1.6 The recitals and the schedule form part of this agreement and shall have the same force and effect as if they were expressly set out in the body of this agreement.

1.7 Clause headings in this agreement are inserted for convenience only and shall not affect the construction of this agreement.

**2 Amendment of DSA**

2.1 The DSA is amended as follows:

(a) The Director will be paid an annual fee of US$200,000 (two hundred thousand United States dollars) payable on a monthly basis of US$16,666 (sixteen thousand six hundred and sixty-six United States dollars) on the first Business Day of each calendar month with the first monthly payment to be paid upon execution of this Agreement.

(b) The Director, in addition to the Services he already performs for the Company, will:

(i) undertake responsibility for all offshore matters involving the Companies;

(ii) involve himself in any onshore issues involving the Companies;

(iii) act upon all lawful directions issued by Mark Patrick subject to the Director discharging his fiduciary duties to the Companies including acting with independence of judgement; and

(iv) make himself available to the Companies at all times acting with due diligence and expedition.

**[SIGNATURE PAGE FOLLOWS]**

This Agreement has been entered into by the parties on the day and year first above written.

**SIGNED** for and on behalf of the **COMPANIES**:

Duly Authorised Signatory

Name: Mark Patrick

Title: Director of the Companies

**SIGNED** for and on behalf of the **DIRECTOR**:

Name: Paul Murphy

Title: Director

# MEMORANDUM WOR PLAN[1]

RE: Work Plan, Scope of Work, and Deliverables

DATE: November 9, 2023

---

This Memorandum is intended to be informational and provide guidance. It sets forth the work plan, scope of work, and requested deliverables for your review of matters relating to the following entities (highlighted in red). We would like your review to focus on the entities highlighted. As a general overview, we are looking for memorandums and opinions relating to potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc., as further outlined below and to be flagged as part of your review.




## I. LEGAL RESEARCH POTENTIAL LITIGATION ISSUES[2]

a. <u>Transfer of 100% of Management Shares in Charitable DAF Holdco, Ltd., and 100% ownership interest in Charitable DAF GP, LLC, by Grant Scott to Mark Patrick.</u>

---

[1] This Memorandum is attorney worked product, privileged, and confidential. Neither it nor its contents may be shared in any manner without express written permission from Shields Legal Group, P.C.

[2] The client will require a written agreement detailing the scope of work (this may be used as an attachment or reference) and hourly rates.

1. Confirm each of these transfers is valid and enforceable under Cayman law
2. Is consideration a requirement under Cayman law
3. If so, did each transfer have consideration under Cayman law
4. Note: we understand there was no monetary consideration for each transfer, but there were tax considerations for this transfer including potential future tax liability. Donor also implicitly consented to the transfer of the voting shares by not objecting since the transfer.
5. Analyze whether holders of the participation shares in org chart have legal standing to challenge the validity of these transfers and bring any other claims against Charitable DAF Holdco, LTD., Charitable DAF Fund LP, and CLO Holdco, LTD.
6. Analyze whether Donor has legal standing to challenge the validity of these transfers and bring any other claims against Charitable DAF Holdco, LTD., Charitable DAF Fund LP, and CLO Holdco, LTD.

ii. **Priority: high[3].**

iii. **Work product: legal opinion[4] and or memorandum.**

1. **Note: we may need to rely on opinions and memoranda in potential future disputes.**

iv. **Anticipated attorney hours to completion: 30.**

b. Who would have standing under Cayman law for alleged corporate malfeasance or assert lack of corporate control from the transfers Specifically, we want to understand third parties' abilities (in addition to regulators' abilities).

[3] Guides for priority:
-High: response requested within two weeks;
-Medium: response requested within four weeks; and
-Low: response requested within six weeks.
[4] Legal opinions and memorandums should include citations to and copies of relevant and applicable authorities.

i. **Priority: high.**

ii. **Work product: legal opinion and or memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

c. What are defenses under Cayman law estoppel, waiver, statute of limitations, consent, others

i. **Priority: high.**

ii. **Work product: legal opinion and or memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

d. Is there a corporate alter ego concept under Cayman law, and if so, what are defenses to it

i. **Priority: high.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

**II. CORPORATE REVIEW**.

a. Top-down review of each entity with respect to corporate structure, management, ownership, capitalization, and voting.

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 30.**

b. Written confirmation that the DAF is not a "regulated entity" under Cayman law and not subject to those compliance requirements. To reiterate, the DAF is not a "Fund" in the traditional sense: (i) there is no PPM and (ii) there are no subscribers/investors.

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

c. Confirm who controls these entities. We have reviewed the corporate documents and understand the Delaware law implications but only the plain language of the Cayman documents. To streamline your review, our short-form analysis is attached on Annex A

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 25.**

d. Who can remove a director

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 0.**

e. Who, or under what circumstances, can change the ownership of the Management Shares in Charitable DAF Holdco, Ltd.

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 0.**

f. What control rights does the donor ames Dondero have (note: it appears he appoints the successor to the Management Shares if there is a death or disability event)

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

g. Are there any actions the controlling person/managing member cannot take

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 2.**

h. Given there are two directors of several entities (Mark Patrick and Paul Murphy) and Mark appears to control the ownership/shareholder voting interest, and given certain provisions

seem to say "the directors run the business," how is this share of control divided among what one director can do, what two directors can do, and what the voting interest can do

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 10.**

i. Can the controlling person dilute shares, e.g., the Participation Shares in Charitable DAF Holdco, Ltd.

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

j. Can the controlling person redeem shares, e.g., the Participation Shares in Charitable DAF Holdco, Ltd.

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

k. Is there any Cayman law requirement that Charitable DAF Holdco, Ltd. distribute money upwards to the next level of entities (Highland Dallas Foundation, Inc. and others)

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

l. Could Charitable DAF Holdco, Ltd. liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares worthless

i. **Priority: medium.**

ii. **Work product: memorandum.**

iii. **Anticipated attorney hours to completion: 5.**

III. **CORPORATE PROACTIVE ACTIONS**.

a. What can be done at this point to make these share transfers bulletproof

  i. **Priority: medium.**

  ii. **Work product: memorandum.**

  iii. **Anticipated attorney hours to completion: 15.**

b. Is it possible to proactively confirm the validity of these transfers with the government

  i. **Priority: low.**

  ii. **Work product: memorandum.**

  iii. **Anticipated attorney hours to completion: 10.**

c. Would Cayman regulators perform a prophylactic checkup

  i. **Priority: low.**

  ii. **Work product: email answer.**

  iii. **Anticipated attorney hours to completion: 1.**

d. Determine whether any compliance with corporate formalities generally or new rules effective 10/13/23 is required or advisable.

  i. **Priority: low.**

  ii. **Work product: memorandum.**

  iii. **Anticipated attorney hours to completion: 5.**

e. Given the scope and focus of this review, please feel free to flag any other ideas that supplement these points. Our "issue spotting" is from the standpoint of a U.S. law firm.

  i. **Priority: low.**

  ii. **Work product: email advice discussion.**

  iii. **Anticipated attorney hours to completion: TBD.**

f. For your context, we are working on an indemnification and affidavit from the former Director of these entities, Grant Scott, who will attest to the validity of the share transfer.

**Annex A**

**Plain Language Control Analysis**[5]

1. Charitable DAF Holdco, Ltd.: Mark Patrick controls this entity.
   a. Mark Patrick owns 100% of the Management Shares [1], which are the only voting shares [2].
   b. The Directors run the company. [3] The Directors are Mark Patrick and Paul Murphy. [4]
   c. Mark Patrick may remove Paul Murphy as Director. [5]
2. Charitable DAF GP, LLC: Mark Patrick controls this entity.
   a. Mark Patrick is the Managing Member and Sole Member. [6]
   b. The Managing Member runs the company. [7]
3. Charitable DAF Fund, LP: Mark Patrick controls this entity.
   a. Mark Patrick controls Charitable DAF GP, LLC. [8]
   b. Charitable DAF GP, LLC is the GP and controls this entity. [9]
4. CLO Holdco, Ltd.: Mark Patrick controls this entity.
   a. Mark Patrick controls Charitable DAF Fund, LP. [10]
   b. Charitable DAF Fund, LP is the sole shareholder. [11]
   c. The Directors run the company. [12] The Directors are Mark Patrick [13] and Paul Murphy [14].
   d. Mark Patrick may remove Paul Murphy as Director. [15]
5. Liberty CLO Holdco, Ltd.: Mark Patrick controls this entity.
   a. Mark Patrick controls CLO Holdco, Ltd.
   b. CLO Holdco, Ltd. is the sole shareholder. [16]
   c. The Directors run the company. [17] Mark Patrick and Paul Murphy are Directors. [18] [19]

---

[5] This is not intended to be legal advice and is provided in a summary format for reference purposes only.
[1] *See* Tab 24 Share Trans Scott to Patrick 03.24.21; Tab 25 Assign Assump of Mem Int Agr 03.24.21; and Tab 31 Reg of Mems 10.27.11.
[2] *See* definitions of "Management Shares" and "Participating Shares" and Paragraph 11 of Tab 22 A R Memo and Arts of Assoc 01.19.15.
[3] *See* Paragraph 80 of Tab 22 A R Memo and Arts of Assoc 01.19.15.
[4] *See* Tabs 26-27 SH Resol of Sole SH, appt Patrick as Dir 03.24.21 and Tab 32 Resol of Sole Dir, appt Murphy 4.22.21.
[5] *See* Paragraph 93(d) of Tab 22 A R Memo and Arts of Assoc 01.19.15 (providing that a Director can be removed by Ordinary Resolution) and definition of "Ordinary Resolution" (a vote by Management Shares).
[6] *See* Tab 25 Assign Assum of Mem Int Agr 03.24.21.
[7] *See* Paragraph 5 of Tab 07 A R Co Agr substit Scott for Dondero as Managing Mem (the Managing Member controls the company).
[8] See above.
[9] *See* Section 1.6(a) of Tab 10 A R LP Agr 11.07.11 (the GP shall have full discretion in management and control).
[10] See above.
[11] *See* Tab 03 Regist of Mems 12.13.10.
[12] *See* Paragraph 85 of Tab 01 Memo and Arts of Assoc 12.13.10 (the business of the Company shall be managed by the Directors).
[13] *See* Tab 30 SH Resol of Sole SH, appt Patrick as Dir 04.02.21.
[14] *See* Tab 32 Resol of Sole Dir, appt Murphy 4.22.21.
[15] *See* Paragraph 98(d) of Tab 01 Memo and Arts of Assoc 12.13.10 (providing that a Director can be removed by Ordinary Resolution) and definition of "Ordinary Resolution" (a vote by Shares).
[16] *See* LIBERTYCLO HOLDCO, LTD ROM.
[17] *See* Paragraph 89 of Liberty CLO Holdco, Ltd. Memorandum and Articles of Incorporation (6 un 12).
[18] *See* Tab 26 Resol of Sole SH, appt Patrick as Dir 03.24.21 and Tab 32 Resol of Sole Dir, appt Murphy 4.22.21.
[19] *See* LIBERTY CLO HOLDCO, LTD. ROD (the Intertrust Register of Directors, listing Mark E. Patrick and Paul Murphy).

d. Mark Patrick may remove Paul Murphy as Director. [20]

6. Charitable DAF Holdings Corp. (f/k/a Rand Advisors Holding Corp.): Mark Patrick controls this entity.
   a. Mark Patrick controls Charitable DAF Fund, LP. [21]
   b. Charitable DAF Fund, LP is the sole shareholder. [22]
   c. Mark Patrick is the sole member of the Board of Directors [23] and runs the company [24] .

[20] *See* Paragraph 102(d) of Liberty CLO Holdco, Ltd. Memorandum and Articles of Incorporation (6 un 12) (providing that a Director can be removed by Ordinary Resolution) and definition of “Ordinary Resolution” (a vote by Shares).
[21] See above.
[22] *See* fourth “Resolved” paragraph in Tab 03 Consent of BOD 01.05.22.
[23] *See* Tab 03 Consent of BOD 01.05.22.
[24] *See* Section 3.01 of Tab 04 Bylaws.

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S THIRD AMENDED**
**EXHIBIT LIST FOR THE MAY 11, 2026 HEARING**

COMES NOW, The Dugaboy Investment Trust ("Dugaboy") and files this Exhibit List for the May 11, 2026 Hearing in the Bankruptcy Case.

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 1 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | HCM-D10000002-HCM-D10000013 |
| 2 | Settlement Agreement and General Release | 000813-000836 |
| 3 | 6/4/2024 First Affidavit of Mark Patrick | Dkt. 401-2 (21-03076-sgj) |
| 4 | 7/21/2025 [4-33] Original DAF Org Chart | Dkt. 4-33 (25-11376-BLS) |
| 5 | 7/11/2011 Amended and Restated Exempted Limited Partnership Agreement of Charitable DAF Fund, LP | Dkt. 4-36 (25-11376-BLS) |
| 6 | 2/20/2025 Amended and Restated Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd. | Dkt. 4-06 (25-11376-BLS) |
| 7 | 11/9/2023 Shields Work Plan Memorandum | |
| 8 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 9 | 12/12/2024 Certificate of Formation of CDFMCAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 10 | 12/18/2024 Charitable DAF HoldCo, Ltd. Unanimous Written Resolutions of all of the Directors of the Company | Dkt. 4-45 (25-11376-BLS) |
| 11 | 9/30/2024 Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 12 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 13 | 3/27/2025 CDMCFAD, LLC Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 14 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D100000330 |
| 15 | 2/12/2025 Membership Interest Purchase Agreement | HCM-D10000021-HCM-D10000036 |
| 16 | 2/12/2025 Member Consent of Beacon Mountain | HCM-D10000019-HCM-D10000020 |
| 17 | 11/30/2015 Amended and Restated Limited Partnership Agreement of Atlas IDF, LP | |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 18 | 6/26/2025 Audit of RAND PE Fund I, LP | HMIT_Entities_000022-HMIT_Entities_000039 |
| 19 | 3/6/2024 DAF Structure Chart in 2024 and 2025 | |
| 20 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | |
| 21 | 12/2015-8/2022 Rand Structure Chart | |
| 22 | 2/12/2025 Feb. and May 2025 Rand Structure Chart | |
| 23 | 10/15/2019 Empower Dallas Foundation, Inc. Partial Surrender Request | |
| 24 | 2/22/2021 Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief | Dkt. 1943 (19-34054-sgj11) |
| 25 | 4/8/2025 Email regarding Settlement Agreement | HCMLPHMIT00000656-HCMLPHMIT00000661 |
| 26 | 12/16/2015 Crown Global Deferred Variable Annuity Policy for Empower Dallas Foundation, Inc. | |
| 27 | 11/30/2015 Participation Agreement between Crown Global Life Insurance Ltd. and Other Entities | |
| 28 | 9/12/2025 First Affidavit of Mark Eric Patrick | |
| 29 | 10/21/2025 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 9/30/2025 | Dkt. 4438 (19-34054-sgj11) |
| 30 | 10/21/2025 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 9/30/2025 | Dkt. 4439 (19-34054-sgj11) |
| 31 | 1/21/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 12/31/2025 | Dkt. 4503 (19-34054-sgj11) |
| 32 | 1/21/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 12/31/2025 | Dkt. 4504 (19-34054-sgj11) |
| 33 | 4/20/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 3/31/2026 | Dkt. 4552 (19-34054-sgj11) |
| 34 | 4/20/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 3/31/2026 | Dkt. 4553 (19-34054-sgj11) |
| 35 | 6/25/2025 Hearing Transcript for Case No. 19-34054-sgj-11 | |
| 36 | 4/16/2025 Affidavit of James David Dondero | Dkt. 4534-7 (19-34054-sgj11) |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 37 | 6/9/2025 Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 USC § 363 Approving Settlement with the HMIT Entities | Dkt. 4230 (19-34054-sgj11) |
| 38 | HMIT Structure as of 8/12/2022 – 2/12/2025 | |
| 39 | 2/6/2025 Letter to Dolomiti LLC re Notice of Your Withdrawal from Rand PE Fund I, L.P. | |
| 40 | 2024 Tax Form 990 – Highland Dallas Foundation Inc. | Dkt. 4556-2 (19-34054-sgj11) |
| 41 | 3/27/2025 Admission and Amendment to No. 1 Agreement | Dkt. 4-54 (25-11376-BLS) |
| 42 | 12/12/2024 Certificate of Formation of CDMCFAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 43 | 2/7/2015 Unanimous Written Resolutions of the Board of Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-22 (25-11376-BLS) |
| 44 | 12/18/2024 Unanimous Written Resolutions of all of the Directors of the Company passed on 18 December 2024 in accordance with the Articles of Association of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-45 (25-11376-BLS) |
| 45 | 4/2/2025 Written Resolutions of the Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-47 (25-11376-BLS) |
| 46 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 47 | 7/21/2025 Defendants' Motion to Dismiss and Plea to the Jurisdiction filed in Cause No. 25-BC-01B-0027, The Highland Foundation, Inc. et al. v. Mark Patrick, et al., The Business Court of Texas, First Division | Dkt. 4-91 (25-11376-BLS) |
| 48 | 3/27/2025 Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 49 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 50 | 9/30/2024 Valuation Analysis of 100 Participation Shars of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 51 | 3/7/2024 Written Consent of the Managing Member of Charitable DAF GP, LLC | Dkt. 4-38 (25-11376-BLS) |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 52 | 6/9/2025 Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000001-HCM-D10000001 |
| 53 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) on December 17, 2015 | HCM-D10000002-HCM-D10000013 |
| 54 | Email chain regarding the sale of Class C limited partnership interests from Highland Capital Management, L.P. to Hunter Mountain Investment Trust. Mark Patrick | HCM-D10000014-HCM-D10000015 |
| 55 | Email from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer. | HCM-D10000016-HCM-D10000016 |
| 56 | Email chain from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer | HCM-D10000017-HCM-D10000018 |
| 57 | CLO Holdco, LLC's purchase of all membership interests in Beacon Mountain, LLC from Rand PE Fund I, L.P. | HCM-D10000019-HCM-D10000020 |
| 58 | Membership Interest Purchase Agreement - | HCM-D10000021-HCM-D10000036 |
| 59 | Organizational structure of HMIT entities before and after February 12, 2025. | HCM-D10000037-HCM-D10000038 |
| 60 | Investment Management Agreement -establishes Rand Advisors, LLC as the investment manager for Atlas IDF, LP. | HCM-D10000039-HCM-D10000045 |
| 61 | Investment Management Agreement - establishes Rand Advisors, LLC as the investment manager for Rand PE Fund I, L.P. | HCM-D10000046-HCM-D10000052 |
| 62 | Register of Members for CLO Holdco, Ltd. | HCM-D10000053-HCM-D10000055 |
| 63 | Unanimous Written Consent - executed by Mark Patrick as sole director of Rand Advisors Holding Corp. | HCM-D10000056-HCM-D10000069 |
| 64 | Charitable DAF Fund, LP transferred DAF Holdings stock to CLO HoldCo, Ltd | HCM-D10000070-HCM-D10000072 |
| 65 | Register of Members for Liberty CLO Holdco, Ltd. CLO Holdco, Ltd. | HCM-D10000073-HCM-D10000073 |
| 66 | Limited Liability Company Agreement - establishing Liberty CLO Holdco, LLC as a Delaware limited liability company. | HCM-D10000074-HCM-D10000090 |
| 67 | Register for CDH GP, Ltd. | HCM-D10000091-HCM-D10000091 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 68 | Register of Members for CDH GP, Ltd. | HCM-D10000092-HCM-D10000092 |
| 69 | Register for CLO HoldCo, Ltd. | HCM-D10000093-HCM-D10000094 |
| 70 | Register of General Partners for Charitable DAF Fund, LP. | HCM-D10000095-HCM-D10000095 |
| 71 | Register of Limited Partners for Charitable DAF Fund, LP | HCM-D10000096-HCM-D10000096 |
| 72 | Limited Liability Company Agreement for CDMCFAD, LLC. | HCM-D10000097-HCM-D10000124 |
| 73 | Collation of various documents including resolutions from CDMCFAD, LLC, and a March 2025 letter from Seyfarth Shaw LLP to the IRS reporting potential tax violations by Highland Dallas Foundation, Inc. (Jim Dondero). | HCM-D10000125-HCM-D10000251 |
| 74 | Letter from three Highland foundations to Paul Murphy | HCM-D10000264-HCM-D10000265 |
| 75 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000266-HCM-D10000267 |
| 76 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000268-HCM-D10000269 |
| 77 | Email chain between K. Hendrix and J. Seery, et al. | HCM-D10000270-HCM-D10000271 |
| 78 | Email chain James Seery to Mark Patrick and Shawn Raver | HCM-D10000272-HCM-D10000272 |
| 79 | Email chain from Shawn Raver to J. Seery, et al. | HCM-D10000273-HCM-D10000273 |
| 80 | Email chain from M. Tax to S. Raver, et al. | HCM-D10000274-HCM-D10000274 |
| 81 | Email chain from K. Hendrix to S. Raver, et al. | HCM-D10000275-HCM-D10000276 |
| 82 | Email chain from S. Raver to K. Hendrix, et al. | HCM-D10000277-HCM-D10000278 |
| 83 | Email chain from S. Raver to M. Tax, et al. | HCM-D10000279-HCM-D10000280 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 84 | Note Elevation and Assignment Agreement | HCM-D10000281-HCM-D10000301 |
| 85 | Email from A. Hurt to T. Cournoyer, et al. | HCM-D10000302-HCM-D10000303 |
| 86 | Letter to Dugaboy Investment Trust | HCM-D10000304-HCM-D10000308 |
| 87 | Claims Assignment Agreement | HCM-D10000309-HCM-D10000315 |
| 88 | Email from David Klos at Highland Capital Management to James Seery | HCM-D10000316-HCM-D10000316 |
| 89 | Trust Agreement establishes the Hunter Mountain Investment Trust on December 17, 2015 | HCM-D10000317-HCM-D10000328 |
| 90 | Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000329-HCM-D10000329 |
| 91 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D10000330-HCM-D10000330 |
| 92 | Email from K. Hendrix to A. Gunther, et al. | HCM-D10000331-HCM-D10000332 |
| 93 | Email from K. Hendrix to D. Klos, et al. | HCM-D10000333-HCM-D10000334 |
| 94 | Letter from Campbells LLP to James Seery (CEO of Highland Capital Management, L.P.) and Marc Kirschner | HCM-D10000335-HCM-D10000338 |
| 95 | Email chain from A. Kapuria to S. Raver, et al. | HMIT_Entities_000001-HMIT_Entities_000006 |
| 96 | Email chain from K. Jackson to S. Raver, et al. | HMIT_Entities_000007-HMIT_Entities_000010 |
| 97 | Email chain from S. Reynolds to S. Raver, et al. | HMIT_Entities_000011-HMIT_Entities_000015 |
| 98 | Email from Chris Rice to K. Jackson, et al. | HMIT_Entities_000016-HMIT_Entities_000020 |
| 99 | Email from Chris Rice to S. Raver, et al. | HMIT Entities 000021-HMIT Entities 000021 |
| 100 | Audited financial statements for Rand PE Fund I, L.P. | HMIT_Entities_000022-HMIT_Entities_000039 |
| 101 | Email chain from K. Jackson to S. Raver | HMIT_Entities_000040-HMIT_Entities_000043 |
| 102 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000044-HMIT_Entities_000047 |



010670

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 103 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities_000048-HMIT Entities 000051 |
| 104 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000052-HMIT_Entities_000054 |
| 105 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000055-HMIT Entities 000057 |
| 106 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000058-HMIT Entities 000058 |
| 107 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000059-HMIT Entities 000059 |
| 108 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000060-HMIT_Entities_000060 |
| 109 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000061-HMIT Entities 000061 |
| 110 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000062-HMIT Entities 000063 |
| 111 | Email chain between Crown Global Insurance and Rand Advisors | HMIT_Entities_000064-HMIT_Entities_000065 |
| 112 | Email from Robert Kipp to M. Patrick, et al. | HMIT Entities 000066-HMIT Entities 000066 |
| 113 | Email chain from A. Gunther to S. Raver, et al. | HMIT Entities 000067-HMIT Entities 000070 |
| 114 | Email chain from S. Raver to A. Gunther, et al. | HMIT_Entities_000071-HMIT_Entities_000074 |
| 115 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000075-HMIT_Entities_000076 |
| 116 | Email chain from S. Raver to J. Seery, et al. | HMIT Entities 000077-HMIT Entities 000078 |
| 117 | Email from C. Rice to S. Raver, et al. | HMIT Entities_000079-HMIT Entities_000079 |
| 118 | Bloomberg invoice | HMIT Entities 000080-HMIT Entities 000080 |
| 119 | Email thread with S&P Global | HMIT_Entities_000081-HMIT_Entities_000083 |
| 120 | S&P Global invoice | HMIT Entities_000084-HMIT Entities_000084 |
| 121 | Email exchange between auditors Chris Rice (NexPoint Services) and Patrick Casale (Cohen & Co) | HMIT Entities_000085-HMIT Entities_000086 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 122 | Financial statement audit | HMIT_Entities_000087-HMIT_Entities_000103 |
| 123 | Email chain C. Rice to S. Raver | HMIT_Entities_000104-HMIT_Entities_000114 |
| 124 | Email chain from S. Raver to C. Rice | HMIT_Entities_000115-HMIT_Entities_000124 |
| 125 | Email from K. Longwell to M. Tax, et al. | HMIT Entities_000125-HMIT Entities_000125 |
| 126 | Civil Investigative Demand issued by the Texas Attorney General's Office to Hunter Mountain Investment Trust (HMIT) on July 14, 2025 | HMIT_Entities_000126-HMIT_Entities_000133 |
| 127 | Email from K. Longwell to M. Tax, et al. | HMIT Entities 000134-HMIT Entities 000134 |
| 128 | Dkt. 23, Notice of Hearing dated 8/27/2025 | HMIT_Entities_000135-HMIT_Entities_000254 |
| 129 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000260-HMIT_Entities_000261 |
| 130 | Email chain from D. Klos to K. Hendrix, et al. | HMIT_Entities_000262-HMIT_Entities_000263 |
| 131 | Email chain from M. Tax to J. Seery, et al. | HMIT_Entities_000264-HMIT_Entities_000264 |
| 132 | Email chain from K. Hendrix to S. Raver, et al. | HMIT_Entities_000265-HMIT_Entities_000266 |
| 133 | Email chain from K. Hendrix to A. Gunther, et al. | HMIT_Entities_000267-HMIT_Entities_000268 |
| 134 | DAF entity structure | VALUESCOPE 000001-VALUESCOPE 000001 |
| 135 | DAF/Rand entity structure | VALUESCOPE_000002-VALUESCOPE_000002 |
| 136 | Law firm forwards legal filing to Mark Patrick (DAF HoldCo) re Chapter 15 filing | VALUESCOPE_000003-VALUESCOPE_000007 |
| 137 | Chapter 15 Petition filing | VALUESCOPE_000008-VALUESCOPE_000026 |
| 138 | Charitable DAF Org structure | VALUESCOPE_000027-VALUESCOPE_000027 |
| 139 | Letter from Reed Smith LLP | VALUESCOPE_000028-VALUESCOPE_000029 |
| 140 | ValueScope, LLC Response | VALUESCOPE_000030-VALUESCOPE_000030 |
| 141 | Certificate of Incorporation, Charitable DAF HoldCo, Ltd. | TDIT004698 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 142 | Legal Relationship Agreement, Highland Kansas City Foundation | TDIT003396–TDIT003398 |
| 143 | Supporting Organization Operating Agreement - Highland Dallas Foundation, Inc. | TDIT003399–TDIT003406 |
| 144 | Supporting Organization Operating Agreement - Highland Santa Barbara Foundation, Inc. | TDIT003407–TDIT003413 |
| 145 | Letter - Highland Dallas Foundation, Inc. | TDIT003389–TDIT003390 |
| 146 | Letter - Highland Santa Barbara Foundation, Inc. | TDIT003391–TDIT003393 |
| 147 | Letter - Highland Kansas City Foundation, Inc. | TDIT003394–TDIT003395 |
| 148 | Employment Agreement - Mark Patrick | TDIT003971–TDIT003988 |
| 149 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011256–TDIT011268 |
| 150 | Memo - Harneys (H&B) | TDIT004274–TDIT004278 |
| 151 | Invoice - G.K. Management Limited | TDIT011038–TDIT011039 |
| 152 | Invoice - G.K. Management Limited | TDIT011040 |
| 153 | Invoice - G.K. Management Limited | TDIT011041 |
| 154 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011058–TDIT011062 |
| 155 | Certificate of Incorporation - Highland Kansas City Foundation, Inc. | TDIT003304–TDIT003306 |
| 156 | Certificate of Incorporation - Highland Dallas Foundation, Inc. | TDIT003326–TDIT003328 |
| 157 | Certificate of Incorporation - Highland Santa Barbara Foundation, Inc. | TDIT003344–TDIT003346 |
| 158 | Invoice - G.K. Management Limited | TDIT011042–TDIT011043 |
| 159 | Invoice - G.K. Management Limited | TDIT011044–TDIT011045 |
| 160 | Invoice - G.K. Management Limited | TDIT011046–TDIT011047 |
| 161 | Invoice - G.K. Management Limited | TDIT011048–TDIT011049 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 162 | Invoice - G.K. Management Limited | TDIT011050–TDIT011051 |
| 163 | Invoice - G.K. Management Limited | TDIT011052–TDIT011053 |
| 164 | Invoice - G.K. Management Limited | TDIT011054–TDIT011055 |
| 165 | Expense Reimbursement - G.K. Management Limited | TDIT011056–TDIT011057 |
| 166 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011088–TDIT011092 |
| 167 | Memorandum – Work Plan - Shields Legal Group | TDIT004699–TDIT004706 |
| 168 | Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT011093–TDIT011128 |
| 169 | Email - Shields Legal Group | TDIT003704 |
| 170 | Limited Partnership Agreement - Charitable DAF Fund, LP | TDIT003414–TDIT003431 |
| 171 | ValueScope Report - ValueScope, Inc. | TDIT004017–TDIT004075 |
| 172 | Expense Report - CLO HoldCo, Ltd. | TDIT003432–TDIT003435 |
| 173 | Audited Financial Statements - Highland Santa Barbara Foundation, Inc. | TDIT003989–TDIT004016 |
| 174 | Resolution of the Directors - Mark Patrick | TDIT003961–TDIT003962 |
| 175 | Resolution of the Directors - Mark Patrick | TDIT003963–TDIT003970 |
| 176 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011129–TDIT011136 |
| 177 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011137–TDIT011150 |
| 178 | Letter - Highland Dallas Foundation, Inc. | TDIT003707–TDIT003708 |
| 179 | Email - Paul Murphy | TDIT003709–TDIT003713 |
| 180 | Email - Walkers | TDIT003714–TDIT003719 |
| 181 | Certificate of Incorporation - DFW Charitable Foundation | TDIT003701–TDIT003703 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 182 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011151–TDIT011164 |
| 183 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011165–TDIT011170 |
| 184 | Resolution - Charitable DAF HoldCo, Ltd. | TDIT003720–TDIT003726 |
| 185 | Assignment - Charitable DAF HoldCo, Ltd. | TDIT003727–TDIT003732 |
| 186 | Agreement - CDMCFAD, LLC | TDIT003733–TDIT003760 |
| 187 | Email - David N. Corkern | TDIT003791–TDIT003792 |
| 188 | ValueScope Report - ValueScope, LLC | TDIT004076–TDIT004130 |
| 189 | Draft Legal Advice - Walkers | TDIT003761–TDIT003765 |
| 190 | Share Issuance Resolution - Charitable DAF HoldCo, Ltd. | TDIT003766–TDIT003790 |
| 191 | Email - PricewaterhouseCoopers (PwC) | TDIT004305–TDIT004323 |
| 192 | Memorandum and Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT003267–TDIT003303 |
| 193 | Form ADV - Rand Advisors, LLC | TDIT003646–TDIT003674 |
| 194 | Brochure - Rand Advisors, LLC | TDIT003675–TDIT003700 |
| 195 | Email - Mark Patrick | TDIT004324–TDIT004340 |
| 196 | ValueScope Report - ValueScope, LLC | TDIT004131–TDIT004205 |
| 197 | Email - FTI Consulting | TDIT004341–TDIT004358 |
| 198 | Director Services Agreement - CDMCFAD, LLC | TDIT011171–TDIT011185 |
| 199 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003955–TDIT003957 |
| 200 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003958–TDIT003959 |
| 201 | Prospectus - NexPoint Real Estate Strategies Fund | TDIT003463–TDIT003599 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 202 | Proxy Statement - NexPoint Capital, Inc. | TDIT003440–TDIT003462 |
| 203 | Written Resolution - CLO HoldCo, Ltd. | TDIT011196–TDIT011197 |
| 204 | Texas Petition - Highland Dallas Foundation, Inc. | TDIT004443–TDIT004688 |
| 205 | Rule 11 Agreement - Highland Dallas Foundation, Inc. | TDIT004693–TDIT004695 |
| 206 | Exhibit Index to Affidavit - Margot MacInnis | TDIT003261-TDIT004712 |
| 207 | Affidavit - Jim Dondero Dugaboy Investment Trust | TDIT004713-TDIT004778 |
| 208 | Texas Petition (Amended) - Highland Dallas Foundation, Inc. | TDIT006527–TDIT006580 |
| 209 | Liquidator's Certificate - Margot MacInnis (JOL) | TDIT006492 |
| 210 | Form ADV - Mark Patrick, Rand PE Fund | TDIT006581-TDIT006609 |
| 211 | Affidavit & Exhibit Index - Margot MacInnis | TDIT004967-TDIT006484 |
| 212 | Affidavit & Exhibit Index | TDIT006485-TDIT006580 |
| 213 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011394-TDIT011405 |
| 214 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011382-TDIT011393 |
| 215 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011425-TDIT011443 |
| 216 | Objection filed by Highland Dallas Foundation, Inc. Grant James Scott III | TDIT011444-TDIT011475 |
| 217 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011476-TDIT011509 |
| 218 | Supplemental Declaration - DFW Charitable Foundation CDMCFAD LLC | TDIT004869-TDIT004945 |
| 219 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) | TDIT006664-TDIT006675 |
| 220 | Affirmation by Mark Patrick | TDIT010529-TDIT010532 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 221 | Operating agreement between Highland Dallas Foundation, Inc. and The Dallas Foundation. | TDIT011406-TDIT011406 |
| 222 | Email exchange between Michael Stockham and Paul Murphy | TDIT010831-TDIT010840 |
| 223 | Form ADV Instructions - None | TDIT006628-TDIT006663 |
| 224 | Declaration by Caroline Maron | TDIT004846-TDIT004868 |
| 225 | Email from Louis M. Phillips requesting execution of two letters with attached documents | TDIT011318-TDIT011323 |
| 226 | Auditor's Report - Highland Capital Management L.P. | TDIT006610-TDIT006627 |
| 227 | Email chain from March 2025 | TDIT011407-TDIT011424 |
| 228 | Amended and Restated Limited Partnership Agreement - Atlas IDF LP | TDIT004779-TDIT004812 |
| 229 | Participation Agreement establishes the framework for Crown Global Life Insurance Ltd to purchase | TDIT004813-TDIT004845 |
| 230 | Investment Management Agreement - Rand PE Fund I | TDIT004946-TDIT004952 |
| 231 | Investment Management Agreement - Rand PE Fund I, L.P. | TDIT004953-TDIT004959 |
| 232 | Limited Partnership Agreement - Rand PE Fund | TDIT004960-TDIT004966 |
| 233 | By-Laws - Highland Kansas City Foundation, Inc. | TDIT003307–TDIT003325 |
| 234 | By-Laws - Highland Dallas Foundation, Inc. | TDIT003329–TDIT003343 |
| 235 | By-Laws - Highland Santa Barbara Foundation, Inc. | TDIT003347–TDIT003361 |
| 236 | Organizational Procedures - Greater Kansas City Community Foundation | TDIT003362–TDIT003388 |
| 237 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003705 |
| 238 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003706 |
| 239 | Expenses Table - Charitable DAF HoldCo, Ltd. | TDIT003960 |
| 240 | Delaware Division of Corporations Search Results - DFW Charitable Foundation | TDIT004696 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 241 | Delaware Division of Corporations Search Results - CDMCFAD, LLC | TDIT004697 |
| 242 | Demonstrative: DAF-Rand Structure Chart | |
| 243 | Certificate of Incorporation of CDH GP, Ltd. | Dkt. 4-95 (25-11376-BLS) |

Dugaboy also reserves the right to introduce any exhibit designated by any other party, to supplement and/or amend its Exhibit List, to introduce any rebuttal exhibits, and to not use any such exhibits during the evidentiary hearing in response to the circumstances of the hearing.

Dated: May 11, 2026

Respectfully submitted,

*/s/ Avery Joseph Welker*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)

New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 11, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Avery Joseph Welker*
Avery Joseph Welker

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS REVISED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 24 JANUARY 2024)**

---

Campbells

Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

campbellslegal.com

(14133-42760)

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS REVISED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 24 JANUARY 2024)**

---

1. The name of the Company is Charitable DAF HoldCo, Ltd.

2. The registered office of the Company will be situated at the offices of Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Act (as revised) of the Cayman Islands (the "**Act**").

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Act.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or

any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Act to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.

TABLE OF CONTENTS

CLAUSE

TABLE A ....1
INTERPRETATION ....1
PRELIMINARY ....5
SHARES ....6
MANAGEMENT SHARES ....6
PARTICIPATING SHARES ....7
MODIFICATION OF RIGHTS ....7
CERTIFICATES ....7
FRACTIONAL SHARES ....7
TRANSFER OF SHARES ....8
TRANSMISSION OF SHARES ....8
ALTERATION OF SHARE CAPITAL ....9
REDEMPTION, PURCHASE AND SURRENDER OF SHARES ....9
TREASURY SHARES ....10
GENERAL MEETINGS ....11
NOTICE OF GENERAL MEETINGS ....11
PROCEEDINGS AT GENERAL MEETINGS ....11
VOTES OF SHAREHOLDERS ....13
CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS ....14
DIRECTORS ....14
ALTERNATE DIRECTOR ....15
POWERS AND DUTIES OF DIRECTORS ....15
BORROWING POWERS OF DIRECTORS ....17
THE SEAL ....17
DISQUALIFICATION OF DIRECTORS ....17

**PROCEEDINGS OF DIRECTORS** ....... 18
**DIVIDENDS** ....... 21
**ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION** ....... 21
**CAPITALISATION OF RESERVES** ....... 22
**SHARE PREMIUM ACCOUNT** ....... 23
**NOTICES** ....... 23
**NON-RECOGNITION OF TRUSTS** ....... 24
**WINDING UP** ....... 25
**AMENDMENT OF ARTICLES OF ASSOCIATION** ....... 25
**CLOSING OF REGISTER OR FIXING RECORD DATE** ....... 25
**REGISTRATION BYWAY OF CONTINUATION** ....... 26
**MERGERS AND CONSOLIDATION** ....... 26
**DISCLOSURE** ....... 26
**INDEMNITY** ....... 27
**DISPUTE RESOLUTION** ....... 28
**AEOI** ....... 30

# CHARITABLE DAF HOLDCO, LTD

---

**THE COMPANIES ACT (AS REVISED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED __ JANUARY 2024)**

---

## TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Act shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

## INTERPRETATION

1. In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Act**" means the Companies Act (as revised) of the Cayman Islands.

"**AEOI**" means:

(i) sections 1471 to 1474 of the Code and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

(ii) the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters – the Common Reporting Standard and any associated guidance;

(iii) any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in

order to comply with, facilitate, supplement or implement the legislation, regulations or guidance described in sub-paragraphs (i) and (ii); and

(iv) any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs.

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Code**" means the US Internal Revenue Code of 1986, as amended.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Electronic Record**" has the same meaning as in the Electronic Transactions Act.

"**Electronic Transactions Act**" means the Electronic Transactions Act (as revised) of the Cayman Islands.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Act and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

"**Office**" means the registered office of the Company as required by the Act.

"**Ordinary Resolution**" means a resolution:

(a) passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a

poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Act and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "Participating Shares" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Act and these Articles, means the Register maintained by the Company pursuant to the Act and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Act and includes any Branch Register(s) established by the Company in accordance with the Act.

"**Restricted Person**" means any Person holding Participating Shares:

(a) in breach of the law or requirements of any country or governmental authority;

(b) that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the Code or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c) in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber.

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Act.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Act, being a resolution:

(a) passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" and "**US**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a) words importing the singular number shall include the plural number and vice versa;

(b) words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c) the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d) reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e) reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;

(f) reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case;

(g) reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another;

(h) any requirements as to execution or signature under the Articles including the execution of the Articles themselves can be satisfied in the form of an electronic signature as defined in the Electronic Transactions Act; and

(i) sections 8 and 19(3) of the Electronic Transactions Act shall not apply.

2. Subject to the preceding Articles, any words defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

3. The business of the Company may be commenced at any time after incorporation.

4. The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5. The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6. The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Act and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may

keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Act, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Act.

**SHARES**

7. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

(b) and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

**MANAGEMENT SHARES**

11. The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.

## PARTICIPATING SHARES

12. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

## MODIFICATION OF RIGHTS

13. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

14. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.

## CERTIFICATES

15. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

16. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

**TRANSFER OF SHARES**

17. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

18. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

19. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

20. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

21. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

**TRANSMISSION OF SHARES**

22. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

23. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the

Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

24. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

**ALTERATION OF SHARE CAPITAL**

25. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

26. The Company may by Ordinary Resolution:

(a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

27. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

**REDEMPTION, PURCHASE AND SURRENDER OF SHARES**

28. Subject to the Act, the Company may:

(a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;

(b) purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c) make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Act; and

(d) accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.

29. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

30. The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

31. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

**TREASURY SHARES**

32. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Act. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

33. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

34. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

(a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

(b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Act, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.

35. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

**GENERAL MEETINGS**

36. The Directors may, whenever they think fit, convene a general meeting of the Company.

37. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

38. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

**NOTICE OF GENERAL MEETINGS**

39. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

40. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

**PROCEEDINGS AT GENERAL MEETINGS**

41. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

42. No business shall be transacted at any general meeting unless a quorum of Shareholders Is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles,

one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

43. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

44. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

45. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

46. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

47. The chairman may adjourn a meeting from time to time and from place to place either:

(a) with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting): or

(b) without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

(i) secure the orderly conduct or proceedings of the meeting; or

(ii) give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

48. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded

by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

49. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

50. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

51. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

**VOTES OF SHAREHOLDERS**

52. On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

53. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

54. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

55. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

56. On a poll votes may be given either personally or by proxy.

57. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

58. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

59. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

60. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

61. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at genera! meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

62. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

## DIRECTORS

63. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

64. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

65. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

66. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

67. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

68. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

69. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

**ALTERNATE DIRECTOR**

70. Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be deemed to be an officer of the Company solely as a result of his appointment as an alternate. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

71. Any Director may appoint any Person , whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

**POWERS AND DUTIES OF DIRECTORS**

72. Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

73. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or

by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

74. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

75. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

76. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

77. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

78. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

79. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and

may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

80. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

**BORROWING POWERS OF DIRECTORS**

81. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

**THE SEAL**

82. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary {or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

83. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

84. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

**DISQUALIFICATION OF DIRECTORS**

85. The office of Director shall be vacated, if the Director:

(a) becomes bankrupt or makes any arrangement or composition with his creditors;

(b) dies or is found to be or becomes of unsound mind;

(c) resigns his office by notice in writing to the Company;

(d) is removed from office by Ordinary Resolution;

(e) is removed from office by notice addressed to him at his last known address and signed by ail of his co-Directors (not being less than two in number); or

(f) is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

**PROCEEDINGS OF DIRECTORS**

86. The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

87. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

88. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one. A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

89. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

90. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director

shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

91. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

92. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a) all appointments of officers made by the Directors;

(b) the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c) all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

93. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

94. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

95. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

96. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

97. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

98. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

99. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

### DIVIDENDS

100. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

101. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

102. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

103. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

104. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

105. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

106. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

107. No dividend shall bear interest against the Company.

### ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

108. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

109. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

110. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

111. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

112. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Act and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

**CAPITALISATION OF RESERVES**

113. Subject to the Act and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii) paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or

debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of ail the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares, and any such agreement made under this authority being effective and binding on all those Shareholders; and

(iii) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

**SHARE PREMIUM ACCOUNT**

114. The Directors shall in accordance with the Act establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

115. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Act, out of capital.

**NOTICES**

116. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

117. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

118. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

119. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

120. Notice of every general meeting of the Company shall be given to:

(a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

**NON-RECOGNITION OF TRUSTS**

121. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial

interest in any Share or (except only as otherwise provided by these Articles or as the Act requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

**WINDING UP**

122. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

123. Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

(a) first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

(b) second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

124. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

**AMENDMENT OF ARTICLES OF ASSOCIATION**

125. Subject to the Act and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

**CLOSING OF REGISTER OR FIXING RECORD DATE**

126. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of,

attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

127. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

128. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

**REGISTRATION BYWAY OF CONTINUATION**

129. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

**MERGERS AND CONSOLIDATION**

130. The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Act.

**DISCLOSURE**

131. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

**INDEMNITY**

132. To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "Covered Person" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes wilful misconduct or Gross Negligence by such Covered Person (as determined by a non-appeaiable judgment of a court of competent jurisdiction).

133. Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

134. To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

135. Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

136. The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

**DISPUTE RESOLUTION**

137. The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, a trustee appointed to represent the Company on claims derivative of the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation:

(i) any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

(ii) the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

(iii) the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

(iv) each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties,

(b) Arbitration:

if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit

dismissed: Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be administered by JAMS/Endispute pursuant to JAMS' Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

(i) the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, provided, however, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii) the arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrators) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii) the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv) no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted;

(v) all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi) the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

**AEOI**

138. Notwithstanding any other Article, in order to comply with AEOI, any Director shall be entitled to release and/or disclose on behalf of the Company to the Cayman Islands Tax Information Authority or equivalent authority (the "**TIA**") and any other foreign government body as required by AEOI, any information in its or its agents' or delegates' possession regarding a Member including, without limitation, financial information concerning the Member's investment in the Company, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Member. Any such Director may also authorise any third party agent, including but not limited to, the Investment Manager or Administrator, to release and/or disclose such information on behalf of the Company.

139. In order to comply with AEOI and, if necessary, to reduce or eliminate any risk that the Company or its Members are subject to withholding taxes pursuant to AEOI or incur any costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) (together, "**costs**") associated with AEOI, the Directors may cause the Company to undertake any of the following actions:

(a) compulsorily redeem any or all of the Shares held by a Member either (i) where the Member fails to provide (in a timely manner) to the Company, or any agent or delegate of the Company, including but not limited to, the Investment Manager or the Administrator, any information requested by the Company or such agent or delegate pursuant to AEOI; or (ii) where there has otherwise been non-compliance by the Company with AEOIwhether caused, directly or indirectly, by the action or inaction of such Member, or any related person, or otherwise;

(b) deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

(i) comply with any applicable requirement to apply and collect withholding tax pursuant to AEOI;

(ii) allocate to a Member an amount equal to any withholding tax imposed on the Company as a result of the Member's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Company with AEOI;

(iii) ensure that any AEOI related costs are recovered from the Member(s) whose action or inaction (directly or indirectly, including the action or inaction of any person related to such Member) gave rise or contributed to such costs.

140. In order to give effect to the requirements imposed upon the Company by AEOI, as well as any of the actions contemplated by Articles 139 (a) and 140(b), the Directors may undertake any of the following actions:

(a) create separate classes and/or series of Shares ("**AEOI Shares**"), with such rights and terms as the Directors may in their sole discretion determine, and following the compulsory redemption of some or all of a Member's Shares may immediately apply such redemption proceeds in subscribing for such number of AEOI Shares as the Directors determine;

(b) may re-name any number of Shares (whether issued or unissued) as AEOI Shares, create a Separate Account with respect to such AEOI Shares and apply any AEOI relatedcosts or withholding taxes to such Separate Account;

(c) allocate any AEOI costs or withholding tax among Separate Accounts on a basis determined solely by the Directors; and

(d) adjust the Net Asset Value per Share of any relevant Shares (including any AEOI Share).

**Rachel Baxendale**

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 05 February 2024 1:20 PM
**To:** Philip Aubry
**Cc:** Geoffrey Sykes; Bart Higgins
**Subject:** FW: Cayman GP
**Attachments:** image001.png

r r d r

---

FYI

SHIELDS LEGAL GROUP

R D R R
r
r 3
T
r 3
E r d

r r d d r

---

**From** Mark Tax <mpatricktax1040@gmail.com>
**Sent** Monday, February 5, 2024 12:18 PM
**To** Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc** Shawn Raver <sraver@hotmail.com>; Bart Higgins <bhiggins@shieldslegal.com>
**Sub ect** Re: Cayman GP

CAUTION: This email originated from outside of the organization.

Doesn't matter to me. Whatever from a strategic point of view - hard to find or track, or trace. Or find owners etc. Generic name. Strong litigation protection.

On Mon, Feb 5, 2024, 11:43 AM Brandon R. Schaller <bschaller@shieldslegal.com> wrote:

> Mark,
>
> Question from Walkers. Do you want the new Cayman GP to be a Cayman LLC or an exempted company?

*Execution Version*

**DATED 11 March 2024**

**SECOND AMENDED AND RESTATED**
**EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP**

---

WARNING
THE TAKING OR SENDING BY ANY PERSON OF AN ORIGINAL OF THIS DOCUMENT INTO THE CAYMAN ISLANDS MAY GIVE RISE TO THE IMPOSITION OF CAYMAN ISLANDS STAMP DUTY

*Execution Version*

**TABLE OF CONTENTS**

**PAGE**


| | | |
|---|---|---|
| ARTICLE I | GENERAL PROVISIONS; COMPENSATION AND EXPENSES | 1 |
| 1.1 | Continuation. | 1 |
| 1.2 | Name. | 1 |
| 1.3 | Purpose and Powers. | 1 |
| 1.4 | Registered Office. | 1 |
| 1.5 | Partners. | 1 |
| 1.6 | Powers. | 1 |
| 1.7 | Term. | 2 |
| 1.8 | Admission of New Partners. | 2 |
| 1.9 | Taxable Year. | 2 |
| 1.10 | Liability of Partners | 2 |
| 1.11 | Limitation on Assignability of Partners' Interests. | 2 |
| 1.12 | Definitions. | 2 |
| 1.13 | Service Providers. | 3 |
| 1.14 | Partnership Expenses. | 3 |
| 1.15 | Partnership Records. | 3 |
| 1.16 | Limited Partner Information. | 3 |
| ARTICLE II | POWERS | 4 |
| 2.1 | Partnership Powers. | 4 |
| 2.2 | Rights, Powers, Limitations on Liability and Indemnification of General Partner. | 5 |
| ARTICLE III | CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES | 7 |
| 3.1 | Capital Contributions. | 7 |
| 3.2 | Capital Account; Allocation of Profits and Losses. | 7 |
| ARTICLE IV | LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWLS FROM CAPITAL ACCOUNT | 8 |
| 4.1 | Legal Interest. | 8 |
| 4.2 | Distributions. | 8 |
| 4.3 | Withdrawal. | 8 |
| ARTICLE V | DURATION OF PARTNERSHIP | 9 |
| 5.1 | Commencement of Winding Up. | 9 |
| 5.2 | Winding Up. | 9 |
| 5.3 | Termination. | 9 |
| ARTICLE VI | MISCELLANEOUS | 9 |
| 6.1 | Tax Matters Partner. | 9 |
| 6.2 | Right to Hire. | 9 |
| 6.3 | Applicable Law, etc. | 10 |
| 6.4 | Power of Attorney. | 10 |
| 6.5 | Tax Elections Under the Internal Revenue Code. | 10 |
| 6.6 | Amendments to Partnership Agreement. | 10 |
| 6.7 | Investment Representation. | 11 |
| 6.8 | Notices. | 11 |
| 6.9 | General Partner Determinations. | 11 |
| 6.10 | Dispute Resolution. | 11 |
| 6.11 | Successors and Assigns. | 13 |
| 6.12 | Severability. | 13 |
| 6.13 | No Third Party Rights. | 13 |
| 6.14 | No Right to Partition. | 14 |

*Execution Version*

**SECOND AMENDED AND RESTATED**

**EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF CHARITABLE DAF FUND, LP**

**THIS SECOND AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT** (the "Agreement") is made on 11 March 2024

BETWEEN

(1) CDH GP, Ltd., a Cayman Islands exempted company having its registered office at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands as general partner (the "**General Partner**");

(2) Charitable DAF HoldCo, Ltd, a Cayman Islands exempted company having its registered office at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands as limited partner (the "**Limited Partner**"); and

(3) Each individual, partnership, corporation, limited liability company, trust or other entity (each, a "**Person**") admitted as a limited partner or general partner (collectively, the "**Partners**") of the Partnership (as defined below) in accordance with this Agreement, including any Persons hereafter admitted as Partners in accordance with this Agreement and excluding any Persons who cease to be Partners in accordance with this Agreement.

**WHEREAS**, Charitable DAF Fund, LP (the "**Partnership**") was formed on October 25, 2011 and registered as an exempted limited partnership pursuant to and in accordance with the Exempted Limited Partnership Act (as amended) of the Cayman Islands (the "**Act**"), and an Initial Limited Partnership Agreement of the Partnership was entered into as of the same date (the "**Initial Agreement**");

**WHEREAS**, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein;

**WHEREAS**, the Limited Partner and Charitable DAF GP, LLC, as general partner of the Partnership, amended and restated the Initial Agreement in its entirety on November 7, 2011 ("**A&R LPA**");

**WHEREAS**, Charitable DAF GP, LLC assigned to the General Partner its general partnership interest and the General Partner assumed the obligations of Charitable DAF GP, LLC, as general partner of the Partnership pursuant to an assignment and assumption agreement dated 7 March 2024; and

**WHEREAS**, the Limited Partner and the General Partner, desire to amend and restate the A&R LPA in its entirety as set forth below.

**NOW THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby adopt this Agreement to be their Limited Partnership Agreement, as follows:

**IT IS AGREED:**

## ARTICLE I

## GENERAL PROVISIONS; COMPENSATION AND EXPENSES

1.1 Continuation. The parties hereto continue the Partnership as an exempted limited partnership formed on October 25, 2011 pursuant to the Act.

1.2 Name. The name of the Partnership is Charitable DAF Fund, LP or such other name as the General Partner may from time to time determine provided that the words "Limited Partnership" or the abbreviations "LP" or "L.P." shall be included in the name as required by the Act.

1.3 Purpose and Powers. The purpose of the Partnership shall be to invest and trade, directly or indirectly, in securities of all types and other investment vehicles and instruments, and to engage in any lawful activity for which exempted limited partnerships may be formed under the Act. At least initially, a majority of the Partnership's assets shall be invested in shares of CLO HoldCo, Ltd., a Cayman Islands exempted company ("**CLO HoldCo**"), but the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.

1.4 Registered Office. The registered office of the Partnership is c/o Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands or such other place in the Cayman Islands as the General Partner may in its absolute discretion from time to time determine. The General Partner shall make the required filings with the Registrar of Exempted Limited Partnerships of any change to the Partnership's registered office in accordance with the Act.

1.5 Partners. The name and addresses of the Partners are as follows:

| **Name** | **Address** |
|---|---|
| CDH GP, LTD. (General Partner) | c/o Campbells Corporate Services Limited<br>Floor 4, Willow House<br>Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands |
| Charitable DAF HoldCo, Ltd (Limited Partner) | c/o Campbells Corporate Services Limited<br>Floor 4, Willow House<br>Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands |

1.6 Powers.

(a) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and conduct of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of an exempted limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in

this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.

(b) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management or conduct of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

1.7 Term. The Partnership was established on October 25, 2011 and shall continue until wound up and subsequently dissolved in accordance with this Agreement or any amendment or modification thereof.

1.8 Admission of New Partners. The General Partner may at any time admit one or more new Partners on such terms as it may determine in its sole discretion; provided that any such new Limited Partner shall have as its equity owners solely Indirect Charitable Owners.

1.9 Taxable Year. The Taxable Year of the Partnership shall be a calendar fiscal year, or such other fiscal year as the General Partner shall determine in their sole discretion from time to time.

1.10 Liability of Partners

(a) The General Partner shall be liable for all of the debts, liabilities and obligations of the Partnership.

(b) Except to the extent otherwise required by law or this Agreement, a Limited Partner shall not be personally liable for any obligations of the Partnership to third parties nor for the return of any distributions from the Partnership to the Limited Partner. Limited Partners should not take part in the conduct of the business of the Partnership and should not deal with third parties, nor for the return of any distributions from the Partnership to the Limited Partner, or otherwise hold itself out, as a general partner of the Partnership. A Limited Partner may be liable for the tax audit and related expenses referred to in Section 6.1

1.11 Limitation on Assignability of Partners' Interests.

(a) A Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner. Any attempted assignment or substitution not made in accordance with this section shall be void *ab initio*.

(b) The General Partner may not assign their interests in the Partnership to any entity that is not under common control with the General Partner without the consent of a majority-in-interest of the Limited Partners. Notwithstanding the foregoing, the General Partner may freely assign their economic interest in the Partnership in whole or in part. The General Partner shall file, or cause to be filed, any amended Section 10 Statement with the Cayman Islands Registrar of Exempted Limited Partnerships required to be filed pursuant to Section 10 of the Act to give effect to the provisions of this Section 1.11.

1.12 Definitions. For the purpose of this Agreement, unless the context otherwise requires:

(a) General Partner. The term "**General Partner**" shall refer to CDH GP, Ltd., and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

Indirect Charitable Owners. The term "Indirect Charitable Owner" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 50l(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

(b) Limited Partner. The term "**Limited Partner**" shall refer to Charitable DAF HoldCo Ltd (and each person subsequently admitted as a limited partner by the General Partner pursuant to the terms of this Agreement).

(c) Partner. The term "**Partner**" shall refer to the General Partner or the Limited Partner.

1.13 Service Providers. The General Partner may engage one or more Persons to act, or remove any one or more Persons from so acting, as service providers to the Company (including, without limitation, as manager, administrator, custodian, registrar and transfer agent, investment manager, investment adviser, sponsor and/or prime broker, auditors and legal counsel to the Partnership) in its sole discretion; provided, that any compensation paid to any such service provider that is affiliated with the General Partner shall be in an amount customary for services of a similar nature.

1.14 Partnership Expenses. The Partnership will bear its own operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees (if any), taxes, research costs, legal and accounting expenses and other operating expenses. In addition, the Partnership will bear its pro rata share of CLO HoldCo's operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees, taxes, research costs, legal and accounting expenses and other operating expenses. The Partnership will also bear (or reimburse the General Partner for) its organizational fees and expenses. To the extent the Partnership shares trading expenses with other accounts that may be managed by the General Partner or any affiliates, it will bear a proportionate share of the associated costs. In no event shall the General Partner receive any compensation from the Partnership.

1.15 Partnership Records. The General Partner shall cause to be maintained at the principal office of the Partnership, or at such other place as the Act may permit, a register of limited partnership interests which shall include such information as may be required by the Act (the "**Register**"). The Register shall not be part of this Agreement. The General Partner shall, from time to time, update the Register as required by the Act to accurately reflect the information therein and no action of any Limited Partner shall be required to amend or update the Register. [Upon the prior consent of the General Partner, the Limited Partners shall have the right to inspect the Register.] Any reference in this Agreement to the Register shall be deemed a reference to the Register as in effect from time to time. Subject to the terms of this Agreement, the General Partner may take any action authorised hereunder in respect of the Register, including making the Register available at the registered office to satisfy any order or notice pursuant to the Tax Information Authority Act (as amended) without any need to obtain the consent of any other Partner.

1.16 Limited Partner Information. Other than what has been expressly agreed to be provided to the Limited Partners herein, the Limited Partners are not entitled to any other additional information regarding the Partnership (including for the purposes of section 22 of the Act (which is disapplied with respect to the Partnership)) unless agreed by the General Partner in its sole discretion.

**ARTICLE II**

**POWERS**

2.1 Partnership Powers.

The Partnership shall have the following powers:

(a) To purchase, sell, invest and trade, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non- U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, syndicated debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; statutory claims; royalty claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (all such items being called herein a "**Financial Instruments**"), and to sell Financial Instruments short and cover such sales;

(b) To possess, transfer, mortgage, pledge, charge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Financial Interests held or owned by the Partnership with the ultimate objective of the preservation, protection, improvement and enhancement in value thereof and to hold such Financial Interests in the name of the Partnership, in the name of any securities broker or firm, in the name of any nominee of such firm, or in the name of any other nominee or any other street name, or any combination thereof;

(c) To lend, either with or without security, any Financial Instruments, funds or other properties of the Partnership, including by entering into reverse repurchase agreements, and, from time to time, undertake leverage on behalf of the Partnership;

(d) To borrow or raise moneys and, from time to time, without limit as to amount, to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any of the foregoing instruments and of the interest thereon by mortgage upon or pledge, charge,

conveyance or assignment in trust of the whole or any part of the property of the Partnership, whether at the time owned or thereafter acquired, and to sell, pledge, charge or otherwise dispose of such bonds or other obligations of the Partnership for its purposes;

(e) To have and maintain one or more offices within or without the Cayman Islands and in connection therewith to rent or acquire office space, engage personnel and do such other acts and things as may be necessary or advisable in connection with the maintenance of such office or offices;

(f) To open, maintain and close bank accounts and brokerage accounts, including the power to draw checks or other orders for the payment of monies; and

(g) To enter into, make and perform all contracts, agreements and other undertakings as may be necessary or advisable or incidental to the carrying out of the foregoing objects and purposes.

2.2 Rights, Powers, Limitations on Liability and Indemnification of General Partner.

(a) Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the General Partner, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including members of any committee and parties acting as agents for the execution of transactions) (each, a **"Covered Person"** and collectively, **"Covered Persons")** shall be subject to the provisions of this Section.

(b) To the fullest extent permitted by law, no Covered Person shall be liable to the Partnership or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Partnership, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Partnership, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Partnership whom such Covered Person believes is authorized to make such suggestions on behalf of the Partnership, (iii) any act or omission by the Partnership, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Partnership selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c) Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Partnership or in furtherance of the business of the Partnership in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d) To the fullest extent permitted by law, the Partnership shall indemnify and save harmless Covered Persons (the **"Indemnitees"),** from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection

with the business of the Partnership, any investment made under or in connection with this Agreement, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Partnership, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or gross negligence.

(e) Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

(f) The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

(g) The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h) **Notwithstanding anything in this Agreement to the contrary, the aggregate maximum amount that a Covered Person may be liable to the Partnership and/or any of the Partners pursuant to this Agreement shall, to the extent not prohibited by law, never exceed the amount of management and incentive fees received by such Covered Person from the Partnership under this Agreement prior to the date that the acts or omissions giving rise to a claim for indemnification or liability shall have occurred. In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits. No Covered Person shall incur any liability for interest on any monies at any time received by such Covered Person or any investment loss or other charge resulting therefrom with respect to amounts invested hereunder.**

(i) **<u>WAIVER OF CONSUMER RIGHTS:</u> The Partnership and each of the Limited Partners waive all of their respective rights, if any, under the Deceptive Trade Practices-Consumer Protection Act, Section 17.41 et seq., Texas Business & Commerce Code ("DTPA"), a law that gives consumers special rights and protections. After consultation with an attorney of Partnership's own selection, Partnership voluntarily consents to this waiver. This waiver includes any right to recover attorneys' fees under the DTPA Further, Partnership waives all of its rights to any and all protections afforded by any other state or federal Consumer Protection Acts, including the recovery of attorneys' fees.**

(j) No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Covered Person, the Partnership (and not the applicable Covered Person) shall be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence or reckless or intentional misconduct of any Covered Person. Given the volume of transactions executed on behalf of the Partnership, Limited Partners acknowledge that trading errors (and similar errors) will occur and that the Partnership shall be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Covered Person.

(k) This Section 2.2 shall survive a Limited Partner's withdrawal as a limited partner of the Partnership and any termination of this Agreement.

## ARTICLE III

## CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES

3.1 Capital Contributions.

(a) Each Partner has made the capital contributions to the Partnership in the amount set forth in the records of the Partnership. The Limited Partner has contributed to the Partnership all of the outstanding equity interests of CLO HoldCo.

3.2 Capital Account; Allocation of Profits and Losses.

(b) There shall be established for each Partner on the books of the Partnership as of the first day of the fiscal period during which such Partner was admitted to the Partnership a capital account for such Partner in an amount equal to his capital contribution to the Partnership.

(c) Since the General Partner's capital account and contributions shall be the minimum required by Act, all income, deductions, gains, losses and credits of the Partnership shall be allocated shall be for the benefit of the Limited Partner, except as may otherwise be required by law. In the event any valuation of assets is necessary or appropriate, the General Partner shall determine such value in any reasonable manner determined by the General Partner in its sole discretion consistent with relevant accounting principles and applicable law.

(d) For purposes of determining the share of any items allocated to any period during the relevant Taxable Year of the Partnership, such shares shall be determined by the General Partner using any method permitted by the Code and the regulations thereunder. All allocations to be made by the General Partner may be overridden if necessary to comply with the Code, the regulations thereunder or other applicable law.

(e) To the extent that the Partnership pays withholding taxes as to a Partner, such amounts shall be charged to the applicable Partner's capital account; provided, however, that any such amounts may be treated as an advance to the Partner with interest to be charged to that Partner's capital account at a rate determined by the General Partner.

(f) Each Partner agrees not to treat, on any tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with treatment of such item by the Partnership.

## ARTICLE IV

## LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL WITHDRAWLS FROM CAPITAL ACCOUNT

4.1 Legal Interest. Each Partner shall have and own during any Taxable Year an undivided interest in the Partnership equal to his opening capital account for such period.

4.2 Distributions.

(a) Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses. In determining the amount of cash or securities available for distribution, the General Partner may retain reasonable reserves in such amounts as it determines may be necessary to cover expenses, contingencies and losses. Notwithstanding the foregoing, distributions made in connection with a sale of all or substantially all of the Partnership's assets or a liquidation of the Partnership shall be made in accordance with the capital account balances of the Partners within the time period set forth in Treasury Regulations Section 1.704- 1(b)(2)(ii)(b)(3).

(b) The General Partner may withhold and pay over to the U.S. Internal Revenue Service (or any other relevant taxing authority) such amounts as the Partnership is required to withhold or pay over, pursuant to the Code or any other applicable law, on account of a Partner's distributive share of the Partnership's items of gross income, income or gain.

(c) For purposes of this Agreement, any taxes so withheld or paid over by the Partnership with respect to a Partner's distributive share of the Partnership's gross income, income or gain shall be deemed to be a distribution or payment to such Partner, reducing the amount otherwise distributable to such Partner pursuant to this Agreement and reducing the capital account of such Partner. If the amount of such taxes is greater than any such distributable amounts, then such Partner and any successor to such Partner's interest shall pay the amount of such excess to the Partnership, as a contribution to the capital of the Partnership. Notwithstanding anything to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, will not be required to make a distribution to any Partner on account of its interest in the Partnership if such distribution would violate any provision of the Act or any other applicable law.

4.3 Withdrawal. Without the consent of the General Partner, no Partner may withdraw as a Partner or make withdrawals from such Partner's capital account. In the event the General Partner permits any such withdrawal, the withdrawal shall be on such terms and conditions as the General Partner shall determine in its sole discretion. The General Partner may require the withdrawal of all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall be directly or indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code.

## ARTICLE V

**DURATION OF PARTNERSHIP**

5.1 Commencement of Winding Up. The Partnership shall be required to be wound up and subsequently dissolved pursuant to the provisions of Section 36(1)(a) of the Act after the earliest of:

(a) the service of a notice by the General Partner on the other Partners requiring that the Partnership be wound up and dissolved; or

(b) the withdrawal by or resignation of the General Partner as general partner of the Partnership; or

(c) the withdrawal of all Limited Partners.

Upon the occurrence of any such event, the Partnership's affairs shall be wound up by the General Partner or such other Person as the General Partner shall appoint to act as liquidator of the Partnership.

5.2 Winding Up. Upon the commencement of the winding up of the Partnership, the General Partner (or a duly appointed liquidator, as applicable) shall proceed with the liquidation and distribution of the assets of the Partnership in an orderly manner in accordance with this Agreement and the Act.

5.3 Termination. Upon completion of the winding up of affairs of the Partnership in accordance with the Act and this Agreement, the General Partner (or liquidator, as applicable) shall execute a notice of dissolution ("**Notice of Dissolution**") in respect of the Partnership and cause such Notice of Dissolution to be filed with the Registrar of Exempted Limited Partnerships of the Cayman Islands, and this Agreement shall terminate.

**ARTICLE VI**

**MISCELLANEOUS**

6.1 Tax Matters Partner. The General Partner shall at all times constitute, and have full powers and responsibilities, as the Tax Matters Partner of the Partnership. In the event the Partnership shall be the subject of an income tax audit by any Federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and his decision shall be final and binding upon, the Partnership and each Partner thereof, and the Tax Matters Partner shall be indemnified and held harmless by the Partnership and each Partner for any action so taken by him in good faith. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership to the extent of available Partnership funds, and any excess shall be paid by the Partners individually in proportion to their percentage interests in the Partnership.

6.2 Right to Hire.

(a) Nothing herein shall preclude the General Partner from engaging on behalf of the Partnership the services of any person or firm, whether or not affiliated with the General Partner, including the General Partner, to render for compensation such services to the Partnership as may be necessary to implement the business purposes of the Partnership. For the avoidance of doubt, the General Partner and the Limited Partners confirm that any such compensation is received by the General Partner in its capacity as general partner of the Partnership and in

furtherance of the General Partner's authority to conduct the Partnership's business and affairs on behalf of the Partnership.

(b) Each of the Partners consents that the General Partner or any Limited Partner or any affiliate (as defined in the Securities Act of 1933, as amended, and the regulations thereunder) of any of them, including without limitation the investment manager of the CLO HoldCo, may engage in or possess an interest in directly or indirectly, any other present or future business venture of any nature or description for his own account, independently or with others, including but not limited to, any aspect of the securities business or any other business engaged in by the Partnership, and may become the general partner in other partnerships; and neither the Partnership nor any Partner shall have any rights in or to such independent venture or the income or profits derived therefrom.

(c) The General Partner and any affiliate or employee of such General Partner, may hereafter render investment advisory services to other investors with respect to, and/or may own, purchase or sell, securities or other interests in property the same as or similar to those which the General Partner may purchase, hold or sell on behalf of the Partnership.

6.3 Applicable Law, etc. This Agreement: (i) shall be binding on the executors, administrators, estates, heirs and legal successors of the Partners; (ii) shall be governed by, and construed in accordance with, the laws of the Cayman Islands; and iii) may be executed in more than one counterpart, all of which taken together shall constitute one and the same instrument.

6.4 Power of Attorney. Each of the undersigned does hereby constitute and appoint the General Partner, with full power of substitution, his true and lawful representative and attorney in-fact, in his name, place and stead to make, execute, sign and file this Agreement and any amendment to this Agreement authorized by the terms of this Agreement, and all such other instruments, documents and certificates (and any amendments thereto) which may from time to time be required by the laws of the Cayman Islands, the United States of America, or any state in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid and subsisting existence of the Partnership and to take any further action that the General Partner considers advisable in its sole discretion in connection with the exercise of its authority pursuant to this Agreement.

This power of attorney is intended to secure a proprietary interest of the General Partner and, in addition, the obligations of each relevant Limited Partner under this Agreement and shall be irrevocable.

6.5 Tax Elections Under the Internal Revenue Code. The General Partner shall have the authority to make all tax elections and determinations on behalf of the Partnership under the Internal Revenue Code, the regulations promulgated thereunder or other applicable law to effect any elections, determinations or capital allocations.

6.6 Amendments to Partnership Agreement. The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the consent of the General Partner together with the consent of a majority in interest of the Limited Partners, insofar as is consistent with the laws governing this Agreement. Notwithstanding the foregoing, the General Partner shall have the right to effect amendments to this Agreement without the consent of any Limited Partner, including without limitation, to reflect: a change in the location of the Partnership's principal place of business; a change in the registered office or registered agent; a change in the name of the Partnership; admission of Partners in accordance with this Agreement; a change that is necessary to qualify the Partnership as a limited partnership under the laws of any state or that is necessary or advisable in the opinion of the Tax Matters Partner to ensure that the Partnership will not be treated as an association taxable as a corporation for Federal income tax purposes; a change of the provisions relating to the management fee or other compensation to the General Partner so that such provisions conform to any applicable requirements of the U.S. Securities and Exchange

Commission and other regulatory authorities; a change (i) that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state agency or contained in any Federal or state statute, compliance with any of which the General Partner deems to be in the best interests of the Partnership and the Limited Partners, (ii) that is required or contemplated by this Agreement, or (iii) that is necessary or desirable to implement new regulations published by the Internal Revenue Service with respect to partnership allocations of income, gain, loss, deduction and credit; a change to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provision with respect to the matters or questions arising under this Agreement which will not be inconsistent with the provisions hereof; or a change that does not adversely affect the Limited Partners in any material respect; provided, that in no event shall the General Partner effect any amendment to this Agreement that has the effect of giving the General Partner any economic benefits in the assets of the Partnership; provided further, that the General Partner shall give notice to the Limited Partners of any such amendment.

6.7 Investment Representation. Each Partner hereby acknowledges and represents that it acquired its interest in the Partnership for investment purposes only and not with a view to its resale or distribution.

6.8 Notices. All notices, requests or approvals that any party hereto is required or desires to give to any Partner or to the Partnership shall be in writing signed by or on behalf of the party giving the same and delivered personally or sent overnight express mail by a reputable private carrier or by prepaid registered or certified mail, return receipt requested, addressed (i) to the Limited Partner at the address set forth in this Agreement; (ii) to the Partnership at the principal place of business of the Partnership with a copy of such notice sent simultaneously to the General Partner at 6716 Glenhurst Dr., Dallas, TX 75254; or (iii) to the respective party at such other address or addresses as the party may specify from time to time in a writing given to the Partnership in the manner provided in this Section 6.8 of ARTICLE VI. Notice shall be deemed to have been duly given and received (i) on the date of delivery, if personally delivered, (ii) on the next business day subsequent to sending by overnight express mail as aforesaid, or iii) on the third day subsequent to mailing if mailed as aforesaid; provided that any withdrawal notices shall not be deemed to have been given until actually received by the Partnership.

6.9 General Partner Determinations. Any determinations or calculations made by the General Partner shall, if made in good faith and in the absence of manifest error, be binding upon the Partnership and its Limited Partners.

6.10 Dispute Resolution. The following procedures shall be used to resolve any controversy or claim **("Dispute")** arising out of, relating to or in connection with the Agreement or otherwise involving the Partnership, its Partners and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation.

(1) Any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

(2) The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(3) The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

(4) Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

(b) Arbitration. If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect **("Arbitration Rules").** In the event of a conflict, the provisions of this document will control.

(1) The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act ("FAA"), and resolved by the arbitrators, provided, however, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a state arbitration act preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(2) The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(3) The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code§ 38.001(8), which rights the parties expressly waive.

(4) No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty- five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(5) All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(6) The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

6.11 Successors and Assigns. Subject to the limitations set forth in Section 1.11, this Agreement shall inure to the benefit of and be binding upon the parties and to their respective heirs, executors, administrators, successors and permitted assigns. For the avoidance of doubt, any Limited Partner who becomes a former Limited Partner shall remain bound to all terms and conditions of this Agreement.

6.12 Severability. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of the Agreement.

6.13 No Third Party Rights. Any Covered Person not being a party to this Agreement, may enforce any rights granted to it pursuant to this Agreement in its own right as if it were a party to this Agreement. Except as expressly provided in the foregoing sentence, a person who is not a party to this Agreement shall not have any rights under the Contracts (Rights of Third Parties) Act (as amended)

of the Cayman Islands to enforce any term of this Agreement. Notwithstanding any term of this Agreement, the consent of or notice to any person who is not a party to this Agreement shall not be required for any termination, rescission or agreement to any variation, waiver, assignment, novation, release or settlement under this Agreement at any time."

6.14 No Right to Partition. Each of the Partners, on behalf of themselves and their shareholders, partners, principals, members, successors and assigns, if any and as permitted hereunder, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held.

**[Signature Page follows.]**

**IN WITNESS WHEREOF,** the undersigned have executed and delivered this Amended and Restated Exempted Limited Partnership Agreement as a Deed on the day and year first above written.

**EXECUTED AS A DEED by Charitable DAF Holdco, Ltd, as Limited Partner:**

Duly Authorised Signatory

**Name:** Mark Patrick

**Title:** Director

in the presence of:

Kasey J. Rose

Signature of Witness

Name: Kasey J. Rose

Address: 16400 Dallas Pkwy, Ste 300
Dallas, TX 75248

**EXECUTED AS A DEED by CDH GP, Ltd. as General Partner:**

Duly Authorised Signatory

**Name:** Mark Patrick

**Title:** Director

in the presence of:

Kasey J. Rose

Signature of Witness

Name: Kasey J. Rose

Address: 16400 Dallas Pkwy, Ste 300
Dallas, TX 75248