**UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

**In Re:** Highland Capital Management, L.P.
§
§ Case No 19-34054-sgj11

**The Dugaboy Investment Trust**

**- Appellant**
§
vs. §

3:26-CV-02496-D

**Highland Capital Management, L.P., et al**-Appellee
§
§

**[4689] Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026**

**APPELLANT RECORD**

**VOLUME 29**

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |
| THE DUGABOY INVESTMENT TRUST,<br><br>Appellant,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P. *et al.*,<br><br>Appellees. | Case No. 3:26-cv-02496-D<br><br>INDEX |

**APPELLANT THE DUGABOY INVESTMENT TRUST'S DESIGNATIONS OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL AND STATEMENT OF THE ISSUES TO BE PRESENTED FROM THE BANKRUPTCY COURT'S ORDER DENYING APPELLANT'S MOTION TO ALTER OR AMEND AND FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM ORDER AND MOTION TO VACATE**

Pursuant to Rule 8009(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Appellant The Dugaboy Investment Trust ("Appellant" or "Dugaboy"), having filed a Notice of Appeal [Docket No. 4698] on July 24, 2026, from the Bankruptcy Court's June 15, 2026, *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689] now files this *Designation of Items to be Included in the Record on Appeal and Statement of Issues to be Presented* and respectfully requests that the Clerk prepare and forward the listed items to the District Court for inclusion in the record in connection with this appeal.

**STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

1. Did the Bankruptcy Court err in declining to vacate, modify, or otherwise reconsider the Court's June 15, 2026 Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate?

2. Did the Bankruptcy Court err in finding Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate ("Dugaboy's Motion") [Docket No. 4684] was "without merit?"

3. Did the Bankruptcy Court err in denying Dugaboy's Motion without a full record, including that Dugaboy was not allowed to file a reply brief and was not granted a hearing?

4. Did the Bankruptcy Court err in denying Dugaboy the opportunity to file a reply brief to Highland's Opposition to Dugaboy's Motion, including that Dugaboy indicated a date certain for filing a reply?

5. Did the Bankruptcy Court err in finding Dugaboy's Motion was "without merit" without granting a hearing?

6. Did the Bankruptcy Court err by summarily denying Dugaboy's Motion without explaining its reasoning for the denial?

7. Did the Bankruptcy Court err in failing to consider Dugaboy's Notice of Intervening Event?

8. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(2) when it determined that it had not manifestly erred in deciding the evidence of Mark Patrick's misconduct contained in the Cayman Islands proceeding was not "newly discovered" even though that information was not contained in James Dondero's affidavit executed April 16, 2025?

9. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant

to Rule 60(b)(2) when it determined it had not manifestly erred in deciding the Dondero Affidavit indicated information gained in the Cayman Islands proceedings was not "newly discovered" despite the fact the Affidavit lacked any evidence of the restructuring discovered in the Cayman Islands proceedings?

10. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding on the grounds that Rule 60(b)(3) purportedly requires fraud or misconduct to have occurred in the judicial proceeding itself?

11. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(3) when it determined that it had not manifestly erred in deciding that Highland did not provide misleading or incomplete answers during the discovery of Mark Patrick's misconduct and resulting lack of authority to negotiate the Rule 9019 settlement agreement from Dugaboy leading to the Rule 9019 Order?

12. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding that Dugaboy had not presented a basis for relief under Rule 60(b)(6) that was separate from the grounds presented for Rule 60(b)(2) and Rule 60(b)(3)?

13. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision pursuant to Rule 60(b)(6) when it determined that it had not manifestly erred in deciding on the grounds that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain?

14. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of the Bankruptcy Court's special responsibility to monitor arrangements and settlements made between Highland's appointed managers and third parties?

15. Did the Bankruptcy Court err when it declined to alter or amend its Rule 60 decision on the basis of its manifest error in failing to consider the Bankruptcy Court's role as a court of equity and responsibility to prevent misconduct before it, such as Mark Patrick's use of stolen assets in the 9019 Settlement?

16. Such other Bankruptcy Court errors of fact and law that are identified in Dugaboy's opening appellate brief on the merits.

**DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL**

Vol. 1 000001 – 1. Notice of Appeal for Bankruptcy Case No. 19-34054-sgj11 [Docket No. 4698] filed by Appellant;

000010 2. The Bankruptcy Court's July 10, 2026 *Order Denying Dugaboy's Motion to Alter or Amend and for Reconsideration of Order Denying Motion for Relief from Order and Motion to Vacate* [Docket No. 4689];

3. Any opinion, findings of fact, and conclusions of law of the Bankruptcy Court relating to the issues on appeal;

000012 4. Docket entries kept by the bankruptcy clerk in case no. 19-34054-sg11;

5. Each of the documents and items designated below:

Vol. 2

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| 02/09/2026 | 4513 | (1195 pgs; 66 docs) Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order # 2 Index of Exhibits # 3 Appendix A # 4 Exhibit 1 # 5 Exhibit 2 # 6 Exhibit 3 # 7 Exhibit 4 # 8 Exhibit 5 # 9 Exhibit 6 # 10 Exhibit 7 # 11 Exhibit 8 # 12 Exhibit 9 # 13 Exhibit 10 # 14 Exhibit 11 # 15 Exhibit 12 # 16 Exhibit 13 # 17 Exhibit 14 # 18 Exhibit 15 # 19 Exhibit 16 # 20 Exhibit 17 # 21 Exhibit 18# 22 Exhibit 19 # 23 Exhibit 20 # 24 Exhibit 21 # 25 Exhibit 22 # 26 Exhibit 23 # 27 Exhibit 24 # 28 Exhibit 25 # 29 Exhibit 26 # 30 Exhibit 27 # 31 Exhibit 28 # 32 Exhibit 29 # 33 Exhibit 30 # 34 Exhibit 31# 35 Exhibit 32 # 36 Exhibit 33 # 37 Exhibit 34 # 38 Exhibit 35 # 39 Exhibit 36 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44# 48 Exhibit 45 # 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit A # 59 Exhibit B # 60 Exhibit C #61 Exhibit D # 62 Exhibit E # 63 Exhibit F # 64 Exhibit G # 65 Exhibit H) (Gaddis, John Michael) |
| 02/13/2026 | 4515 | (2 pgs) Order setting hearing on Motion to reconsider (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 3/12/2026 at 10:00 Via WebEx for 4513, Entered on 2/13/2026 (Okafor, M.) |
| | | |

000648 thru Vol. 3

Vol. 4 001843

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| vol. 4 001845 thru vol 6 | 02/27/2026 | 4521 | (1789 pgs; 9 docs) Support/supplemental document/ *Supplemental Exhibits* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate*). (Attachments: # 1 Exhibit B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F # 6 Exhibit G- Part 1 # 7 Exhibit G - Part 2 # 8 Exhibit H) (Gaddis, John Michael) |
| Vol 7 003634 | 02/27/2026 | 4522 | (13 pgs; 4 docs) Motion to file document under seal. *Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019 [UNOPPOSED]* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order # 2 Exhibit I # 3 Exhibit J) (Gaddis, John Michael) |
| 003647 | 03/02/2026 | 4524 | (3 pgs) Order granting motion to seal exhibits (related document # 4522) Entered on 3/2/2026. (Okafor, M.) |
| 003650 & 003651 | 03/02/2026 | 4525 | SEALED document regarding: Sealed Exhibits I & J per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4524 Order on motion to seal). (Attachments: # 1 Exhibit J - Sealed) (Gaddis, John Michael) |
| 003652 | 03/02/2026 | 4526 | (11 pgs; 2 docs) Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael) |
| 003663 | 03/03/2026 | 4527 | (4 pgs) *Notice of Revised Order* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4526 Motion to extend time to Briefing and Hearing Date for Dugaboy's Motion for Relief from Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Gaddis, John Michael)). (Gaddis, JohnMichael) |
| 003667 | 03/04/2026 | 4528 | (3 pgs) Order granting Agreed Joint Motion to Extend Briefing and Hearing Dates for Dugaboy's Motion for Relief From Stay Order and Motion to Vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing reset to 4/27/2026 at 09:00 AM Dallas Judge Jernigan Ctrm for 4513, Entered on 3/4/2026 (Okafor, M.) |
| 003670 | 04/01/2026 | 4533 | (39 pgs; 2 docs) Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 7 003709 | 04/01/2026 | 4534 | (1024 pgs; 20 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17# 18 Exhibit 18 # 19 Exhibit 19) (Annable, Zachery) |
| 004733 | 04/03/2026 | 4535 | (57 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Annable, Zachery) |
| Vol. 8 004790 | 04/03/2026 | 4536 | (417 pgs; 14 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P. and the Highland Claimant Trust's Objection to Dugaboy's Motion for Relief from Order and Motion to Vacate)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4535 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E # 6 Exhibit F # 7 Exhibit G # 8 Exhibit H # 9 Exhibit I# 10 Exhibit J # 11 Exhibit K # 12 Exhibit L # 13 Exhibit M) (Annable, Zachery) |
| Vol 9 005207 | 04/03/2026 | 4537 | (2 pgs) Objection to (related document(s): 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust)*Joinder to Objection [Dkt. No. 4535]* filed by Creditor Hunter Mountain Investment Trust. (Phillips, Louis) |
| 005209 | 04/06/2026 | 4538 | (8 pgs; 2 docs) Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order) (Phillips, Louis) |
| 005217 | 04/06/2026 | 4540 | (5 pgs) Joinder by *To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by ValueScope, LLC, Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (RE: related document(s) 4513 Motion to |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| vol 9 | | Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate, 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*). (Phillips, Louis) |
| 04/07/2026 005222 | 4544 | (3 pgs) Notice of hearing filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM via WebEx for 4533, (Annable, Zachery)Modified on 4/7/2026 (sdw). |
| 04/07/2026 005225 | 4545 | (2 pgs) Notice of hearing filed by CLO Holdco, Ltd., Shields Legal Group, P.C., Attorney Kelly Hart & Pitre (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy Investment Trust) Filed by Shields Legal Group, P.C., CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (Attachments: # 1 Proposed Order)). Hearing to be held on 4/24/2026 at 09:30 AM Lubbock for 4538, (Phillips, Louis) |
| 04/10/2026 005227 | 4546 | (2 pgs) Order rescheduling hearing on motion for relief from order and motion to vacate (RE: related document(s) 4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Hearing to be held on 5/11/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513, Entered on 4/10/2026 (Okafor, M.) |
| 04/16/2026 005229 | 4549 | (4 pgs) Support/supplemental document *Supplement To Motion To Quash And Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests* filed by Attorney Kelly Hart & Pitre, Creditor Shields Legal Group, P.C. (RE: related document(s) 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/17/2026 005233 | 4550 | (97 pgs; 4 docs) Response opposed to (related document(s): 4538 Motion to quash *Requests For Production Of Documents Served Improperly* (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In filed by Attorney Kelly Hart & Pitre, Creditor CLO Holdco, Ltd., |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol 9 | | Interested Party CLO Holdco, Ltd., Creditor Shields Legal Group, P.C.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit A - Kelly Hart Proof of Service # 2 Exhibit B - Shields Legal Group Proof of Service # 3 Exhibit C - CLO Holdco Ltd. Proof of Service) (Harper, Geoffrey) |
| 04/17/2026 005330 | 4551 | (260 pgs; 20 docs) Response opposed to (related document(s): 4533 Motion for protective order (*Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Harper, Geoffrey) |
| Vol 10 04/21/2026 005590 | 4554 | (4 pgs) Support/supplemental document *To Motion To Quash And Joinder To Highland Capital Management, L.P.s Motion For A Protective Order Against The Dugaboy Investment Trusts Discovery Requests* filed by Interested Party CLO Holdco, Ltd. (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)*, 4538 Motion to quash Requests For Production Of Documents Served Improperly (related documents 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* filed by Partner Dugaboy In). (Phillips, Louis) |
| 04/22/2026 005594 | 4555 | (21 pgs) Reply to (related document(s): 4551 Response filed by Partner Dugaboy Investment Trust) *(Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/22/2026 005615 | 4556 | (67 pgs; 5 docs) Declaration re: *(Declaration of John A. Morris in Support of Highland Capital Management, L.P.'s Reply in Further Support of Its Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4555 Reply). (Attachments: # 1 Exhibit 20 # 2 Exhibit 21 # 3 Exhibit 22 # 4 Exhibit 23) (Annable, Zachery) |
| 04/22/2026 005682 | 4558 | (10 pgs) Reply to (related document(s): 4550 Response filed by Partner Dugaboy Investment Trust, 4551 Response filed by Partner Dugaboy Investment Trust) *Reply In Support Of Joinder To Highland Capital Management, L.P.'s Motion For A Protective Order Against The Dugaboy Investment Trust's Discovery Requests And Reply In Support Of Motion To Quash And Joinder To HCMLP Reply* filed by Beacon Mountain, LLC, |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol 10 | | Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre. (Phillips, Louis) |
| 04/22/2026 005692 | 4559 | (12 pgs; 3 docs) Declaration re: *(Declaration Of Louis M. Phillips In Support Of Reply In Support Of The Motion To Quash And Joinder To Reply In Support Of Motion For Protective Order)* filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, Shields Legal Group, P.C., ValueScope, LLC, Interested Party CLO Holdco, Ltd., Attorney Kelly Hart & Pitre (RE: related document(s) 4558 Reply). (Attachments: # 1 Exhibit A - Correspondence on April 6, 2026 between counsel for Dugaboy Investment Trust (Dugaboy) and undersigned counsel # 2 Exhibit B - Correspondence on April 16, 2026 between counsel for Dugaboy and undersigned counsel) (Phillips, Louis) |
| 04/24/2026 005705 | 4561 | (22 pgs) Support/supplemental document *(Highland Capital Management, L.P.'s Slide Deck for Oral Argument on Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4533 Motion for protective order (Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)). (Annable, Zachery) |
| 04/24/2026 005726 | 4563 | (1 pg) Notice *of position* filed by Creditor The Dugaboy Investment Trust. (Harper, Geoffrey) |
| 04/25/2026 005727 | 4564 | (2 pgs) Response opposed to (related document(s): 4563 Notice (generic) filed by Creditor The Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 04/27/2026 005729 | 4567 | (8 pgs; 2 docs) Notice to *Judge Odell regarding Supplemental Intervening Authority* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4533 Motion for protective order *(Highland Capital Management, L.P.'s Motion for a Protective Order Against The Dugaboy Investment Trust's Discovery Requests)* Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Proposed Order)). (Attachments: # 1 Exhibit Attachment 1 - Decision Dated April 22, 2026) (Harper, Geoffrey) |
| 04/28/2026 005737 | 4568 | (9 pgs; 2 docs) Response opposed to (related document(s): 4567 Notice (generic) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11 005746 | 04/28/2026 | 4569 | (9 pgs; 3 docs) Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Meet and Confer Email #2 Proposed Order) (Rose, Sydney) |
| 005755 | 04/28/2026 | 4570 | (6 pgs; 2 docs) Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005761 | 04/28/2026 | 4571 | (6 pgs; 2 docs) Motion for expedited hearing(related documents 4569 Motion to continue, 4570 Motion to extend/shorten time) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Proposed Order) (Rose, Sydney) |
| 005767 | 04/29/2026 | 4572 | (9 pgs; 2 docs) Response opposed to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P.. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 005776 | 04/29/2026 | 4575 | (7 pgs) Objection to (related document(s): 4569 Motion to continue hearing on (related documents 4562 Hearing held)*Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate* filed by Partner Dugaboy Investment Trust, 4570 Motion to extend time to Modify Relevant Time Period for Discovery (RE: related document(s) 4566 Order on motion for protective order, Order on motion to quash) filed by Partner Dugaboy Investment Trust)*Opposition To Motion To Modify Relevant Time Period For Discovery And Motion To Continue filed* by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC, ValueScope, LLC. (Phillips, Louis) |
| 005783 | 04/29/2026 | 4576 | (2 pgs) Order granting the Dugaboy Investment Trust's motion for expedited hearing (Related Doc #4571) (document set for hearing: 4569 Motion to continue, 4570 Motion to extend/shorten time) Hearing to be held on 4/29/2026 at 04:00 PM WebEx for 4569 and for 4570, Entered on 4/29/2026. (Sherman, J.) |

| Vol. 10 | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| 005785 | 04/29/2026 | 4577 | (2 pgs) Notice to take deposition of Mark Patrick filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005787 | 04/29/2026 | 4579 | (7 pgs) US Trustee's comment(s) regarding *Dugaboy Investment Trust's Motion for Reconsideration of the Courts Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement Between the Highland Entities and the HMIT Entities and Authorizing Actions Consistent Therewith* (Schlotzhauer, Joseph) |
| 005794 | 05/01/2026 | 4583 | (2 pgs) Order Denying Motion to Continue Discovery Deadlines and Hearing on The Dugaboy Investment Trust's Motion for Relief from Order and Motion to Vacate Filed by Partner Dugaboy Investment Trust (related document # 4569) Entered on 5/1/2026. (Gotay, Camille) |
| 005796 | 05/01/2026 | 4584 | (2 pgs) Order denying 4570 Motion to Modify Relevant Time Period for Discovery Entered on 5/1/2026. (Gotay, Camille) |
| 005798 | 05/04/2026 | 4589 | (3 pgs) Subpoena on Mark Patrick filed by Creditor The Dugaboy Investment Trust. (Rose, Sydney) |
| 005801 | 05/05/2026 | 4592 | (83 pgs; 5 docs) Motion for protective order *concerning deposition (Emergency)* Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.03.26 Email # 2 Exhibit B - M. Patrick June 23,2025 Deposition Transcript # 3 Exhibit C - 05.04.26 Email # 4 Proposed Order) (Phillips, Louis) |
| 005884 | 05/05/2026 | 4593 | (18 pgs; 4 docs) Motion for expedited hearing(related documents 4592 Motion for protective order) Filed by Beacon Mountain, LLC, Hunter Mountain Investment Trust, Rand Advisors, LLC, Rand PE Fund I, LP, Rand PE Fund Management, LLC (Attachments: # 1 Exhibit A - 05.04.26 Email # 2 Exhibit B - 05.05.26 Email # 3 Proposed Order) (Phillips, Louis) |
| 005902 | 05/05/2026 | 4594 | (3 pgs) Notice of Appearance and Request for Notice by Michael J Edney filed by Creditor The Dugaboy Investment Trust. (Edney, Michael) |
| 005905 | 05/05/2026 | 4595 | (2 pgs) Order denying motion for expedited hearing (Related Doc# 4593) Entered on 5/5/2026. (Noble, Nicholas) |
| 005907 | 05/05/2026 | 4596 | (6 pgs) Response opposed to (related document(s): 4592 Motion for protective order *concerning deposition (Emergency)* filed by Creditor Beacon Mountain, LLC, Creditor Hunter Mountain Investment Trust, Creditor Rand Advisors, LLC, Creditor Rand PE Fund I, LP, Creditor Rand PE Fund |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 11 | | | Management, LLC) filed by Partner Dugaboy Investment Trust. (Rose, Sydney) |
| 005913 | 05/06/2026 | 4597 | (7 pgs) Notice to take deposition of James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005920 | 05/06/2026 | 4598 | (7 pgs) Subpoena on James Dondero filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005927 | 05/06/2026 | 4599 | (2 pgs) Order denying motion for protective order (related document # 4592) Entered on 5/6/2026. (Noble, Nicholas) |
| 005929 | 05/07/2026 | 4600 | (7 pgs) Subpoena on Nancy Dondero, as Trustee of The Dugaboy Investment Trust, filed by Debtor Highland Capital Management, L.P.. (Annable, Zachery) |
| 005936 | 05/08/2026 | 4603 | (3 pgs) Notice of hearing *(Notice of Hearing on Reorganized Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4602 Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s) 4471 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P.). Hearing to be held on 6/10/2026 at 03:00 PM by WebEx for 4602, (Annable, Zachery)Modified on 5/8/2026 (sdw). |
| 005939 | 05/08/2026 | 4604 | (3 pgs) Witness and Exhibit List filed by Creditor Hunter Mountain Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Phillips, Louis) |
| 005942 | 05/08/2026 | 4605 | (3 pgs) Witness List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 005945 | 05/08/2026 | 4607 | (155 pgs; 7 docs) Reply to (related document(s): 4535 Objection filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust) filed by Partner Dugaboy Investment Trust. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6) (Rose, Sydney) |
| Vol. 12 006100 Thru Vol 21 | 05/08/2026 | 4608 | (4743 pgs; 100 docs) Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Witness and* |

| | **Date Filed** | **Docket No.** | **Description/Docket Text** |
|---|---|---|---|
| | | | *Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate). (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18# 19 Exhibit 19 # 20 Exhibit 20 # 21 Exhibit 21 # 22 Exhibit 22 # 23 Exhibit 23 # 24 Exhibit 24 # 25 Exhibit 25 # 26 Exhibit 26 # 27 Exhibit 27 # 28 Exhibit 28 # 29 Exhibit 29 # 30 Exhibit 30 # 31 Exhibit 31# 32 Exhibit 32 # 33 Exhibit 33 # 34 Exhibit 34--Part 1 # 35 Exhibit 34--Part 2 # 36 Exhibit 35--Part 1 #37 Exhibit 35--Part 2 # 38 Exhibit 36--Part 1 # 39 Exhibit 36--Part 2 # 40 Exhibit 37 # 41 Exhibit 38 # 42 Exhibit 39 # 43 Exhibit 40 # 44 Exhibit 41 # 45 Exhibit 42 # 46 Exhibit 43 # 47 Exhibit 44 # 48 Exhibit 45# 49 Exhibit 46 # 50 Exhibit 47 # 51 Exhibit 48 # 52 Exhibit 49 # 53 Exhibit 50 # 54 Exhibit 51 # 55 Exhibit 52 # 56 Exhibit 53 # 57 Exhibit 54 # 58 Exhibit 55 # 59 Exhibit 56 # 60 Exhibit 57 # 61 Exhibit 58# 62 Exhibit 59--Part 1 # 63 Exhibit 59--Part 2 # 64 Exhibit 60 # 65 Exhibit 61 # 66 Exhibit 62 # 67 Exhibit 63 # 68 Exhibit 64 # 69 Exhibit 65 # 70 Exhibit 66 # 71 Exhibit 67 # 72 Exhibit 68 # 73 Exhibit 69--Part 1 # 74 Exhibit 69--Part 2 # 75 Exhibit 69--Part 3 # 76 Exhibit 69--Part 4 # 77 Exhibit 69--Part 5 #78 Exhibit 69 -- Part 6 # 79 Exhibit 69--Part 7 # 80 Exhibit 69--Part 8 # 81 Exhibit 69--Part 9 # 82 Exhibit 70 # 83 Exhibit 71 # 84 Exhibit 72 # 85 Exhibit 73 # 86 Exhibit 74 # 87 Exhibit 75 # 88 Exhibit 76 # 89 Exhibit 77 # 90 Exhibit 78 # 91 Exhibit 79 # 92 Exhibit 80 # 93 Exhibit 81 # 94 Exhibit 82 # 95 Exhibit 83# 96 Exhibit 84 # 97 Exhibit 85 # 98 Exhibit 86 # 99 Exhibit 87) (Annable, Zachery) |
| ol. 22 008156 | 05/08/2026 | 4609 | (16 pgs) Exhibit List *for the May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust(RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Rose, Sydney) |
| 008172 | 05/08/2026 | 4610 | (16 pgs) Amended Exhibit List *for May 11, 2026 Hearing* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4609 List (witness/exhibit/generic)). (Rose, Sydney) |
| 008188 | 05/09/2026 | 4611 | (68 pgs; 3 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust(RE: related document(s) 4608 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 88 # 2 Exhibit 89) (Annable, Zachery) |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol 22 008256 | 05/10/2026 | 4612 | (37 pgs; 2 docs) Amended Exhibit List *Second Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 242) (Rose, Sydney) |
| 008293 | 05/11/2026 | 4613 | (136 pgs; 6 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Second Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 469 List (witness/generic)). (Attachments: # 1 Exhibit 90 # 2 Exhibit 91 # 3 Exhibit 92 # 4 Exhibit 93 # 5 Exhibit 94) (Annable, Zachery) |
| 008429 | 05/11/2026 | 4614 | (36 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Third Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 95 # 2 Exhibit 96 # 3 Exhibit 97) (Annable, Zachery) |
| 008465 | 05/11/2026 | 4615 | (7 pgs) Stipulation by Highland Capital Management, L.P., Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Annable, Zachery) |
| Vol. 23 008472 | 05/11/2026 | 4617 | (444 pgs; 23 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 001 # 2 Exhibit 002 # 3 Exhibit 003 # 4 Exhibit 004 # 5 Exhibit 005 # 6 Exhibit 006 # 7 Exhibit 007 # 8 Exhibit 008 # 9 Exhibit 009 # 10 Exhibit 010 # 11 Exhibit 011 # 12 Exhibit 012 # 13 Exhibit 013 # 14 Exhibit 014 # 15 Exhibit 015 # 16 Exhibit 016 # 17 Exhibit 017 # 18 Exhibit 018 # 19 Exhibit 019 # 20 Exhibit 020 # 21 Exhibit 021 # 22 Exhibit 022) (Welker, Avery) |
| Vol. 24 008916 | 05/11/2026 | 4618 | (638 pgs; 14 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 023 # 2 Exhibit 024 # 3 Exhibit 025 # 4 Exhibit 026 # 5 Exhibit 027 # 6 Exhibit 028 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | # 7 Exhibit 029 # 8 Exhibit 030 # 9 Exhibit 031 # 10 Exhibit 032 # 11 Exhibit 033 # 12 Exhibit 034 # 13 Exhibit 035) (Welker, Avery) |
| Vol 25 009554 | 05/11/2026 | 4619 | (314 pgs; 17 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 036 # 2 Exhibit 037 # 3 Exhibit 038 # 4 Exhibit 039 # 5 Exhibit 040 # 6 Exhibit 041 # 7 Exhibit 042 # 8 Exhibit 043 # 9 Exhibit 044 # 10 Exhibit 045 # 11 Exhibit 046 # 12 Exhibit 047 # 13 Exhibit 048 # 14 Exhibit 049 # 15 Exhibit 050 # 16 Exhibit 051) (Welker, Avery) |
| Vol. 26 009868 | 05/11/2026 | 4620 | (361 pgs; 45 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 052 # 2 Exhibit 053 # 3 Exhibit 054 # 4 Exhibit 055 # 5 Exhibit 056 # 6 Exhibit 057 # 7 Exhibit 058 # 8 Exhibit 059 # 9 Exhibit 060 # 10 Exhibit 061 # 11 Exhibit 062 # 12 Exhibit 063 # 13 Exhibit 064 # 14 Exhibit 065 # 15 Exhibit 066 # 16 Exhibit 067 # 17 Exhibit 068 # 18 Exhibit 069 # 19 Exhibit 070 # 20 Exhibit 071 # 21 Exhibit 072 # 22 Exhibit 073 # 23 Exhibit 074 # 24 Exhibit 075 # 25 Exhibit 076 # 26 Exhibit 077 # 27 Exhibit 078 # 28 Exhibit 079 # 29 Exhibit 080 # 30 Exhibit 081 # 31 Exhibit 082 # 32 Exhibit 083 # 33 Exhibit 084 # 34 Exhibit 085 # 35 Exhibit 086 # 36 Exhibit 087 # 37 Exhibit 088 # 38 Exhibit 089 # 39 Exhibit 090 # 40 Exhibit 091 # 41 Exhibit 092 # 42 Exhibit 093 # 43 Exhibit 094 # 44 Exhibit 095) (Welker, Avery) |
| Vol 27 010229 | 05/11/2026 | 4621 | (309 pgs; 46 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 096 # 2 Exhibit 097 # 3 Exhibit 098 # 4 Exhibit 099 # 5 Exhibit 100 # 6 Exhibit 101 # 7 List of 20 Largest Creditors 102 # 8 Exhibit 103 # 9 Exhibit 104 # 10 Exhibit 105 # 11 Exhibit 106 # 12 Exhibit 107 # 13 Exhibit 108 # 14 Exhibit 109 # 15 Exhibit 110 # 16 Exhibit 111 # 17 Exhibit 112 # 18 Exhibit 113 # 19 Exhibit 114 # 20 Exhibit 115 # 21 Exhibit 116 # 22 Exhibit 117 # 23 Exhibit 118 # 24 Exhibit 119 # 25 Exhibit 120 # 26 Exhibit 121 # 27 Exhibit 122 # 28 Exhibit 123 # 29 Exhibit 124 # 30 Exhibit 125 # 31 Exhibit 126 # 32 Exhibit 127 # 33 Exhibit 128 # 34 Exhibit 129 # 35 Exhibit 130 # 36 Exhibit 131 # 37 Exhibit 132 # 38 Exhibit 133 # 39 Exhibit 134 # 40 Exhibit 135 # 41 Exhibit 136 # 42 Exhibit 137 # 43 Exhibit 138 # 44 Exhibit 139 # 45 Exhibit 140) (Welker, Avery) |
| Vol. 28 010538 | 05/11/2026 | 4622 | (126 pgs; 28 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 141 # 2 |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| | | | Exhibit 142 # 3 Exhibit 143 # 4 Exhibit 144 # 5 Exhibit 145 # 6 Exhibit 146 # 7 Exhibit 147 # 8 Exhibit 148 # 9 Exhibit 149 # 10 Exhibit 150 # 11 Exhibit 151 # 12 Exhibit 152 # 13 Exhibit 153 # 14 Exhibit 154 # 15 Exhibit 155 # 16 Exhibit 156 # 17 Exhibit 157 # 18 Exhibit 158 # 19 Exhibit 159 # 20 Exhibit 160 # 21 Exhibit 161 # 22 Exhibit 162 # 23 Exhibit 163 # 24 Exhibit 164 # 25 Exhibit 165 # 26 Exhibit 166 # 27 Exhibit 167) (Welker, Avery) |
| Vol. 28 010664 | 05/11/2026 | 4623 | (72 pgs; 4 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 168 # 2 Exhibit 169 # 3 Exhibit 170) (Welker, Avery) |
| Vol. 29 010736 | 05/11/2026 | 4624 | (389 pgs; 24 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 171 # 2 Exhibit 172 # 3 Exhibit 173 # 4 Exhibit 174 # 5 Exhibit 175 # 6 Exhibit 176 # 7 Exhibit 177 # 8 Exhibit 178 # 9 Exhibit 179 # 10 Exhibit 180 # 11 Exhibit 181 # 12 Exhibit 182 # 13 Exhibit 183 # 14 Exhibit 184 # 15 Exhibit 185 # 16 Exhibit 186 # 17 Exhibit 187 # 18 Exhibit 188 # 19 Exhibit 189 # 20 Exhibit 190 # 21 Exhibit 191 # 22 Exhibit 192 # 23 Exhibit 193) (Welker, Avery) |
| Vol 30 011150 | 05/11/2026 | 4625 | (584 pgs; 13 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 194 # 2 Exhibit 195 # 3 Exhibit 196 # 4 Exhibit 197 # 5 Exhibit 198 # 6 Exhibit 199 # 7 Exhibit 200 # 8 Exhibit 201 # 9 Exhibit 202 # 10 Exhibit 203 # 11 Exhibit 204 # 12 Exhibit 205) (Welker, Avery) |
| Vol 31 011734 | 05/11/2026 | 4626 | (1469 pgs; 3 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 206 - Part 01 # 2 Exhibit 206 - Part 02) (Welker, Avery) |
| Vol 32 013203 Thru Vol 33 | 05/11/2026 | 4627 | (1685 pgs; 7 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 207 # 2 Exhibit 208 # 3 Exhibit 209 # 4 Exhibit 210 # 5 Exhibit 211 - Part 01 # 6 Exhibit 211 Part 02) (Welker, Avery) |
| Vol. 34 014888 | 05/11/2026 | 4628 | (461 pgs; 18 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 212 # 2 Exhibit 213 # 3 Exhibit 214 # 4 Exhibit 215 # 5 Exhibit 216 # 6 Exhibit 217 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | # 7 Exhibit 218 # 8 Exhibit 219 # 9 Exhibit 220 # 10 Exhibit 221 # 11 Exhibit 222 # 12 Exhibit 223 # 13 Exhibit 224 # 14 Exhibit 225 # 15 Exhibit 226 # 16 Exhibit 227 # 17 Exhibit 228) (Welker, Avery) |
| Vol 35 05/11/2026 015349 | 4629 | (156 pgs; 16 docs) Amended Exhibit List *Third Amended Exhibit List* filed by Creditor The Dugaboy Investment Trust (RE: related document(s) 4612 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 229 # 2 Exhibit 230 # 3 Exhibit 231 # 4 Exhibit 232 # 5 Exhibit 233 # 6 Exhibit 234 # 7 Exhibit 235 # 8 Exhibit 236 # 9 Exhibit 237 # 10 Exhibit 238 # 11 Exhibit 239 # 12 Exhibit 240 # 13 Exhibit 241 # 14 Exhibit 242 # 15 Exhibit 243) (Welker, Avery) |
| 05/11/2026 015505 | 4643 | (1 pg) Court admitted exhibits date of hearing 5/11/2026 (RE: related document(s) 4630 Hearing continued (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner Dugaboy Investment Trust.) Hearing to be held on 5/12/2026 at 09:00 AM Lubbock Judge Odell Ctrm for 4513,) (Noble, Nicholas) (Entered: 05/13/2026) |
| 05/12/2026 015506 | 4634 | (32 pgs; 2 docs) Amended Exhibit List *Fourth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4629 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 244) (Welker, Avery) |
| 05/12/2026 015538 | 4635 | (27 pgs; 2 docs) Amended Exhibit List *Fifth Amended Exhibit List* filed by Partner Dugaboy Investment Trust (RE: related document(s) 4634 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 245) (Welker, Avery) |
| 05/12/2026 015565 | 4645 | (1 pg) Court admitted exhibits date of hearing 5/12/2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and *Motion to Vacate* Filed by Partner Dugaboy Investment Trust) (Gaddis, John Michael)) (Noble, Nicholas). (Entered: 05/13/2026) |
| 05/15/2026 015566 | 4658 | (3 pgs) Amended Witness List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Harper, Geoffrey) |
| Vol. 36 05/18/2026 015569 | 4659 | (427 pgs; 47 docs) Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4605 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 246 # 2 Exhibit 248 # 3 Exhibit 249 # 4 Exhibit 250 # 5 Exhibit 251 # 6 Exhibit 252 # 7 Exhibit 253 # 8 Exhibit 254 # 9 Exhibit 255 # 10 Exhibit 260 # 11 Exhibit 261 # 12 Exhibit 262 # 13 Exhibit 263 # 14 Exhibit 264 # 15 Exhibit 265 # 16 |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| | | Exhibit 266 # 17 Exhibit 267 - Filed Under Seal # 18 Exhibit 268 - Filed Under Seal # 19 Exhibit 269 - File Under Seal # 20 Exhibit 270 - Filed Under Seal # 21 Exhibit 270 # 22 Exhibit 272 # 23 Exhibit 273 # 24 Exhibit 274 # 25 Exhibit 275 # 26 Exhibit 276 # 27 Exhibit 277 # 28 Exhibit 278 # 29 Exhibit 279 # 30 Exhibit 280 # 31 Exhibit 281 # 32 Exhibit 282 # 33 Exhibit 283 # 34 Exhibit 284 # 35 Exhibit 285 # 36 Exhibit 286 # 37 Exhibit 287 # 38 Exhibit 288 # 39 Exhibit 289 # 40 Exhibit 290 # 41 Exhibit 291 # 42 Exhibit 274 - Native Slipsheet # 43 Exhibit 256 - Native Slipsheet # 44 Exhibit 257 - Native Slipsheet # 45 Exhibit 258 - Native Slipsheet # 46 Exhibit 259 - Native Slipsheet) (Rose, Sydney) |
| Vol 37<br>05/18/2026<br>015996 | 4660 | (12 pgs; 2 docs) Motion to file document under seal. Exhibits 267-270 Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Exhibit A - Proposed Order) (Rose, Sydney) (Entered: 05/19/2026) |
| 05/19/2026<br>016008 | 4661 | (71 pgs; 6 docs) Support/supplemental document Additional Exhibits filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 247 # 2 Exhibit 256 # 3 Exhibit 257 # 4 Exhibit 258 # 5 Exhibit 259) (Rose, Sydney) |
| 05/20/2026<br>016079 | 4663 | (3 pgs) Order granting motion for entry of an order authorizing filing of confidential information under seal pursuant to section 107 of the bankruptcy code and federal rule of bankruptcy procedure 9018 (related document # 4660) Entered on 5/20/2026. (Hyden, Kara) |
| 05/20/2026<br>016082 –<br>016084 | 4664 | SEALED document regarding: Exhibit 267 - Exhibit 270 per court order filed by Partner Dugaboy Investment Trust (RE: related document(s) 4663 Order on motion to seal). (Attachments: # 1 Exhibit 268 # 2 Exhibit 269 # 3 Exhibit 270) (Rose, Sydney) |
| 05/21/2026<br>016085 | 4665 | (49 pgs; 4 docs) Amended Witness and Exhibit List *(Highland Capital Management, L.P. and the Highland Claimant Trust's Fourth Amended Witness and Exhibit List with Respect to Hearing to Be Held on May 11, 2026)* filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust (RE: related document(s) 4608 List (witness/exhibit/generic), 4611 List (witness/exhibit/generic), 4613 List (witness/exhibit/generic), 4614 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit 98 # 2 Exhibit 99 # 3 Exhibit 300) (Annable, Zachery) |
| 05/21/2026<br>016134 | 4675 | (1 pg) Court admitted exhibits date of hearing May 21, 2026 (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) and Motion to Vacate Filed by Partner |

| | Date Filed | Docket No. | Description/Docket Text |
|---|---|---|---|
| Vol. 37 | | | Dugaboy Investment Trust (Gaddis, John Michael)) (Wimberley, Shelby) (Entered: 05/28/2026) |
| 016135 | 05/23/2026 | 4669 | (98 pgs; 2 docs) Amended Exhibit List Dugaboy's Seventh Amended Exhibit List filed by Partner Dugaboy Investment Trust (RE: related document(s) 4659 List (witness/exhibit/generic)). (Attachments: # 1 Exhibit Exhibit 292 - Dugaboy Investment Trust's Closing Presentation (May 21, 2026)) (Welker, Avery) |
| Vol. 38 016233 | 05/28/2026 | 4673 | (257 pgs; 4 docs) Stipulation by Highland Capital Management, L.P. and Highland Claimant Trust and The Dugaboy Investment Trust. filed by Debtor Highland Capital Management, L.P. (RE: related document(s) 4513 Motion to Reconsider (related documents 4297 Order on motion to compromise controversy) *and Motion to Vacate*). (Attachments: # 1 Exhibit 55-A # 2 Exhibit 56-A # 3 Exhibit 57-A) (Hayward, Melissa) |
| 016490 | 06/15/2026 | 4678 | (14 pgs) Memorandum of opinion (RE: related document(s)4513 Motion to Reconsider filed by Partner Dugaboy Investment Trust). Entered on 6/15/2026 (Noble, Nicholas) |
| 016504 | 06/15/2026 | 4679 | (1 pg) Order denying motion to reconsider (related document # 4513) Entered on 6/15/2026. (Noble, Nicholas) |
| Vol. 39 016505 | 06/29/2026 | 4684 | (162 pgs; 2 docs) Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust (Attachments: # 1 Appendix) (Edney, Michael) |
| 016667 | 06/29/2026 | 4685 | (7 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Partner Dugaboy Investment Trust (RE: related document(s)4679 Order on motion to reconsider). Appellant Designation due by 07/13/2026. (Attachments: # 1 Exhibit)(Edney, Michael) |
| 016674 | 07/06/2026 | 4687 | (32 pgs; 2 docs) Response opposed to (related document(s): 4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) filed by Partner Dugaboy Investment Trust) filed by Debtor Highland Capital Management, L.P., Other Professional Highland Claimant Trust. (Attachments: # 1 Exhibit 1) (Annable, Zachery) |
| 016706 | 07/09/2026 | 4688 | (23 pgs; 2 docs) Notice of Intent to Reply and Request for Hearing on Its Motion to Alter or Amend the Court's June 15, 2026 Order and Notice of Intervening Event filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4684 Motion to Reconsider(related documents 4679 Order on motion to reconsider) Filed by Partner Dugaboy Investment Trust |

| Date Filed | Docket No. | Description/Docket Text |
|---|---|---|
| Vol. 39 | | (Attachments: # 1 Appendix)). (Attachments: # 1 Attachment A) (Edney, Michael) |
| 07/10/2026 016729 | 4689 | (2 pgs) Order Denying Motion to Reconsider Order Denying Motion for Relief from Order and Motion to Vacate (related document 4684. Order Denying Motion for Relief from Order and Motion to Vacate Entered on 7/10/2026. (Okafor, M.) Modified text on 7/10/2026 (mdo). |
| 07/13/2026 016731 | 4693 | (2 pgs) Notice regarding the record for a bankruptcy appeal to the U.S. District Court. (RE: related document(s) 4685 Notice of appeal. filed by Partner Dugaboy Investment Trust (RE: related document(s) 4679 Order on motion to reconsider). (Attachments: # 1 Exhibit)) (Whitaker, Sheniqua) |
| 07/24/2026 016733 | 4698 | (9 pgs; 2 docs) Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)(Edney, Michael) |
| 07/28/2026 016742 | 4704 | (5 pgs) DISTRICT COURT Notice of docketing notice of appeal. Civil Action Number: 3:26-cv-02496-E. (RE: related document(s)4698 Notice of appeal . Fee Amount $298 filed by Creditor The Dugaboy Investment Trust (RE: related document(s)4689 Order on motion to reconsider). Appellant Designation due by 08/7/2026. (Attachments: # 1 Exhibit Ex. A - Order Denying Motion to Reconsider)) (Whitaker, Sheniqua) |

6. Exhibits 53 and 54 to Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) [Docket Nos. 4513-56 and 4513-57], which are full-text copies of Judge Stacey G. Jernigan's novels He Watches All My Paths and Hedging Death that were lodged with the Bankruptcy Court;

7. The following sealed documents to be sent by paper copy to the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 8009(f): Docket Nos. 4664 ("Exhibit 267"), 4664-1 ("Exhibit 268"), 4664-2 ("Exhibit 269"), 4664-3 ("Exhibit 270"), 4525 ("Exhibit I"), and 4525-1 ("Exhibit J"); and

8. Transcripts of all oral hearings and rulings listed below:

a. Transcript of hearing held April 24, 2026, before Judge Brad W. Odell [Docket No.

Case 19-34054-sgj11 Doc 4707 Filed 08/07/26 Entered 08/07/26 19:37:31 Desc Main Document Page 21 of 23

4562] re: Motion for protective Order;

b. Transcript of hearing held April 29, 2026 before Judge Brad W. Odell [Docket No. 4581] re: Motion to Continue Discovery Deadlines; and

c. Transcript of hearing held May 11, 12, and 21, 2026, before Judge Brad W. Odell [Docket Nos. 4655, 4662, and 4671] re: Motion for Relief from Order and Motion to Vacate.

Dated: August 7, 2026

Respectfully submitted,

*/s/ Michael J. Edney*
Michael J. Edney
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on August 7, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

/s/ *Michael J. Edney*
Michael J. Edney

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@kslaw.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)
New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re:<br><br>HIGHLAND CAPITAL MANAGEMENT, L.P.<br><br>Debtor. | Chapter 11<br><br>Case No. 19-34054 (SGJ) |

**THE DUGABOY INVESTMENT TRUST'S THIRD AMENDED**
**EXHIBIT LIST FOR THE MAY 11, 2026 HEARING**

COMES NOW, The Dugaboy Investment Trust ("Dugaboy") and files this Exhibit List for the May 11, 2026 Hearing in the Bankruptcy Case.

# PAGINATION NUMBERS 010737 – 010761 OMITTED IN ERROR

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 1 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | HCM-D10000002-HCM-D10000013 |
| 2 | Settlement Agreement and General Release | 000813-000836 |
| 3 | 6/4/2024 First Affidavit of Mark Patrick | Dkt. 401-2 (21-03076-sgj) |
| 4 | 7/21/2025 [4-33] Original DAF Org Chart | Dkt. 4-33 (25-11376-BLS) |
| 5 | 7/11/2011 Amended and Restated Exempted Limited Partnership Agreement of Charitable DAF Fund, LP | Dkt. 4-36 (25-11376-BLS) |
| 6 | 2/20/2025 Amended and Restated Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd. | Dkt. 4-06 (25-11376-BLS) |
| 7 | 11/9/2023 Shields Work Plan Memorandum | |
| 8 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 9 | 12/12/2024 Certificate of Formation of CDFMCAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 10 | 12/18/2024 Charitable DAF HoldCo, Ltd. Unanimous Written Resolutions of all of the Directors of the Company | Dkt. 4-45 (25-11376-BLS) |
| 11 | 9/30/2024 Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 12 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 13 | 3/27/2025 CDMCFAD, LLC Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 14 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D100000330 |
| 15 | 2/12/2025 Membership Interest Purchase Agreement | HCM-D10000021-HCM-D10000036 |
| 16 | 2/12/2025 Member Consent of Beacon Mountain | HCM-D10000019-HCM-D10000020 |
| 17 | 11/30/2015 Amended and Restated Limited Partnership Agreement of Atlas IDF, LP | |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 18 | 6/26/2025 Audit of RAND PE Fund I, LP | HMIT_Entities_000022-HMIT_Entities_000039 |
| 19 | 3/6/2024 DAF Structure Chart in 2024 and 2025 | |
| 20 | 12/17/2015 Beacon Mountain / HMIT Trust Agreement | |
| 21 | 12/2015-8/2022 Rand Structure Chart | |
| 22 | 2/12/2025 Feb. and May 2025 Rand Structure Chart | |
| 23 | 10/15/2019 Empower Dallas Foundation, Inc. Partial Surrender Request | |
| 24 | 2/22/2021 Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief | Dkt. 1943 (19-34054-sgj11) |
| 25 | 4/8/2025 Email regarding Settlement Agreement | HCMLPHMIT00000656-HCMLPHMIT00000661 |
| 26 | 12/16/2015 Crown Global Deferred Variable Annuity Policy for Empower Dallas Foundation, Inc. | |
| 27 | 11/30/2015 Participation Agreement between Crown Global Life Insurance Ltd. and Other Entities | |
| 28 | 9/12/2025 First Affidavit of Mark Eric Patrick | |
| 29 | 10/21/2025 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 9/30/2025 | Dkt. 4438 (19-34054-sgj11) |
| 30 | 10/21/2025 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 9/30/2025 | Dkt. 4439 (19-34054-sgj11) |
| 31 | 1/21/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 12/31/2025 | Dkt. 4503 (19-34054-sgj11) |
| 32 | 1/21/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 12/31/2025 | Dkt. 4504 (19-34054-sgj11) |
| 33 | 4/20/2026 Post-Confirmation Report Reorganized Debtor – Quarter Ending Date 3/31/2026 | Dkt. 4552 (19-34054-sgj11) |
| 34 | 4/20/2026 Post-Confirmation Report for Highland Claimant Trust – Quarter Ending 3/31/2026 | Dkt. 4553 (19-34054-sgj11) |
| 35 | 6/25/2025 Hearing Transcript for Case No. 19-34054-sgj-11 | |
| 36 | 4/16/2025 Affidavit of James David Dondero | Dkt. 4534-7 (19-34054-sgj11) |

| **Dugaboy Exhibit No.** | **Description** | **Bates or Dkt. No.** |
|---|---|---|
| 37 | 6/9/2025 Preliminary Objection of the Dugaboy Investment Trust to the Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 USC § 363 Approving Settlement with the HMIT Entities | Dkt. 4230 (19-34054-sgj11) |
| 38 | HMIT Structure as of 8/12/2022 – 2/12/2025 | |
| 39 | 2/6/2025 Letter to Dolomiti LLC re Notice of Your Withdrawal from Rand PE Fund I, L.P. | |
| 40 | 2024 Tax Form 990 – Highland Dallas Foundation Inc. | Dkt. 4556-2 (19-34054-sgj11) |
| 41 | 3/27/2025 Admission and Amendment to No. 1 Agreement | Dkt. 4-54 (25-11376-BLS) |
| 42 | 12/12/2024 Certificate of Formation of CDMCFAD, LLC | Dkt. 4-48 (25-11376-BLS) |
| 43 | 2/7/2015 Unanimous Written Resolutions of the Board of Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-22 (25-11376-BLS) |
| 44 | 12/18/2024 Unanimous Written Resolutions of all of the Directors of the Company passed on 18 December 2024 in accordance with the Articles of Association of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-45 (25-11376-BLS) |
| 45 | 4/2/2025 Written Resolutions of the Directors of the Company for Charitable DAF HoldCo, Ltd. | Dkt. 4-47 (25-11376-BLS) |
| 46 | 12/9/2024 Certificate of Incorporation of DFW Charitable Foundation | Dkt. 4-50 (25-11376-BLS) |
| 47 | 7/21/2025 Defendants' Motion to Dismiss and Plea to the Jurisdiction filed in Cause No. 25-BC-01B-0027, The Highland Foundation, Inc. et al. v. Mark Patrick, et al., The Business Court of Texas, First Division | Dkt. 4-91 (25-11376-BLS) |
| 48 | 3/27/2025 Redemption and Amendment No. 2 Agreement | Dkt. 4-55 (25-11376-BLS) |
| 49 | 3/25/2025 Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd. | Dkt. 4-51 (25-11376-BLS) |
| 50 | 9/30/2024 Valuation Analysis of 100 Participation Shars of Charitable DAF HoldCo, Ltd. | Dkt. 4-52 (25-11376-BLS) |
| 51 | 3/7/2024 Written Consent of the Managing Member of Charitable DAF GP, LLC | Dkt. 4-38 (25-11376-BLS) |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 52 | 6/9/2025 Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000001-HCM-D10000001 |
| 53 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) on December 17, 2015 | HCM-D10000002-HCM-D10000013 |
| 54 | Email chain regarding the sale of Class C limited partnership interests from Highland Capital Management, L.P. to Hunter Mountain Investment Trust. Mark Patrick | HCM-D10000014-HCM-D10000015 |
| 55 | Email from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer. | HCM-D10000016-HCM-D10000016 |
| 56 | Email chain from Highland Capital Management requests corporate formation documents for Charitable DAF Holdings Corp. from Wolters Kluwer | HCM-D10000017-HCM-D10000018 |
| 57 | CLO Holdco, LLC's purchase of all membership interests in Beacon Mountain, LLC from Rand PE Fund I, L.P. | HCM-D10000019-HCM-D10000020 |
| 58 | Membership Interest Purchase Agreement - | HCM-D10000021-HCM-D10000036 |
| 59 | Organizational structure of HMIT entities before and after February 12, 2025. | HCM-D10000037-HCM-D10000038 |
| 60 | Investment Management Agreement -establishes Rand Advisors, LLC as the investment manager for Atlas IDF, LP. | HCM-D10000039-HCM-D10000045 |
| 61 | Investment Management Agreement - establishes Rand Advisors, LLC as the investment manager for Rand PE Fund I, L.P. | HCM-D10000046-HCM-D10000052 |
| 62 | Register of Members for CLO Holdco, Ltd. | HCM-D10000053-HCM-D10000055 |
| 63 | Unanimous Written Consent - executed by Mark Patrick as sole director of Rand Advisors Holding Corp. | HCM-D10000056-HCM-D10000069 |
| 64 | Charitable DAF Fund, LP transferred DAF Holdings stock to CLO HoldCo, Ltd | HCM-D10000070-HCM-D10000072 |
| 65 | Register of Members for Liberty CLO Holdco, Ltd. CLO Holdco, Ltd. | HCM-D10000073-HCM-D10000073 |
| 66 | Limited Liability Company Agreement - establishing Liberty CLO Holdco, LLC as a Delaware limited liability company. | HCM-D10000074-HCM-D10000090 |
| 67 | Register for CDH GP, Ltd. | HCM-D10000091-HCM-D10000091 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 68 | Register of Members for CDH GP, Ltd. | HCM-D10000092-HCM-D10000092 |
| 69 | Register for CLO HoldCo, Ltd. | HCM-D10000093-HCM-D10000094 |
| 70 | Register of General Partners for Charitable DAF Fund, LP. | HCM-D10000095-HCM-D10000095 |
| 71 | Register of Limited Partners for Charitable DAF Fund, LP | HCM-D10000096-HCM-D10000096 |
| 72 | Limited Liability Company Agreement for CDMCFAD, LLC. | HCM-D10000097-HCM-D10000124 |
| 73 | Collation of various documents including resolutions from CDMCFAD, LLC, and a March 2025 letter from Seyfarth Shaw LLP to the IRS reporting potential tax violations by Highland Dallas Foundation, Inc. (Jim Dondero). | HCM-D10000125-HCM-D10000251 |
| 74 | Letter from three Highland foundations to Paul Murphy | HCM-D10000264-HCM-D10000265 |
| 75 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000266-HCM-D10000267 |
| 76 | Email exchange concerning a $500,000 wire transfer payment made pursuant to a settlement agreement. David Klos, representing Highland Capital Management, sent the payment reference to Hunter Mountain. | HCM-D10000268-HCM-D10000269 |
| 77 | Email chain between K. Hendrix and J. Seery, et al. | HCM-D10000270-HCM-D10000271 |
| 78 | Email chain James Seery to Mark Patrick and Shawn Raver | HCM-D10000272-HCM-D10000272 |
| 79 | Email chain from Shawn Raver to J. Seery, et al. | HCM-D10000273-HCM-D10000273 |
| 80 | Email chain from M. Tax to S. Raver, et al. | HCM-D10000274-HCM-D10000274 |
| 81 | Email chain from K. Hendrix to S. Raver, et al. | HCM-D10000275-HCM-D10000276 |
| 82 | Email chain from S. Raver to K. Hendrix, et al. | HCM-D10000277-HCM-D10000278 |
| 83 | Email chain from S. Raver to M. Tax, et al. | HCM-D10000279-HCM-D10000280 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 84 | Note Elevation and Assignment Agreement | HCM-D10000281-HCM-D10000301 |
| 85 | Email from A. Hurt to T. Cournoyer, et al. | HCM-D10000302-HCM-D10000303 |
| 86 | Letter to Dugaboy Investment Trust | HCM-D10000304-HCM-D10000308 |
| 87 | Claims Assignment Agreement | HCM-D10000309-HCM-D10000315 |
| 88 | Email from David Klos at Highland Capital Management to James Seery | HCM-D10000316-HCM-D10000316 |
| 89 | Trust Agreement establishes the Hunter Mountain Investment Trust on December 17, 2015 | HCM-D10000317-HCM-D10000328 |
| 90 | Email from David Klos of Highland Capital Management to Jim Seery | HCM-D10000329-HCM-D10000329 |
| 91 | 8/12/2022 HMIT Appointment of Successor Administrator | HCM-D10000330-HCM-D10000330 |
| 92 | Email from K. Hendrix to A. Gunther, et al. | HCM-D10000331-HCM-D10000332 |
| 93 | Email from K. Hendrix to D. Klos, et al. | HCM-D10000333-HCM-D10000334 |
| 94 | Letter from Campbells LLP to James Seery (CEO of Highland Capital Management, L.P.) and Marc Kirschner | HCM-D10000335-HCM-D10000338 |
| 95 | Email chain from A. Kapuria to S. Raver, et al. | HMIT_Entities_000001-HMIT_Entities_000006 |
| 96 | Email chain from K. Jackson to S. Raver, et al. | HMIT_Entities_000007-HMIT_Entities_000010 |
| 97 | Email chain from S. Reynolds to S. Raver, et al. | HMIT_Entities_000011-HMIT_Entities_000015 |
| 98 | Email from Chris Rice to K. Jackson, et al. | HMIT_Entities_000016-HMIT_Entities_000020 |
| 99 | Email from Chris Rice to S. Raver, et al. | HMIT Entities 000021-HMIT Entities 000021 |
| 100 | Audited financial statements for Rand PE Fund I, L.P. | HMIT_Entities_000022-HMIT_Entities_000039 |
| 101 | Email chain from K. Jackson to S. Raver | HMIT_Entities_000040-HMIT_Entities_000043 |
| 102 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000044-HMIT_Entities_000047 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 103 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities_000048-HMIT Entities 000051 |
| 104 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000052-HMIT_Entities_000054 |
| 105 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000055-HMIT Entities 000057 |
| 106 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000058-HMIT Entities 000058 |
| 107 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT Entities 000059-HMIT Entities 000059 |
| 108 | Email chain between Crown Global Insurance and Rand Advisors. | HMIT_Entities_000060-HMIT_Entities_000060 |
| 109 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000061-HMIT Entities 000061 |
| 110 | Email chain between Crown Global Insurance and Rand Advisors | HMIT Entities 000062-HMIT Entities 000063 |
| 111 | Email chain between Crown Global Insurance and Rand Advisors | HMIT_Entities_000064-HMIT_Entities_000065 |
| 112 | Email from Robert Kipp to M. Patrick, et al. | HMIT Entities 000066-HMIT Entities 000066 |
| 113 | Email chain from A. Gunther to S. Raver, et al. | HMIT Entities 000067-HMIT Entities 000070 |
| 114 | Email chain from S. Raver to A. Gunther, et al. | HMIT_Entities_000071-HMIT_Entities_000074 |
| 115 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000075-HMIT_Entities_000076 |
| 116 | Email chain from S. Raver to J. Seery, et al. | HMIT Entities 000077-HMIT Entities 000078 |
| 117 | Email from C. Rice to S. Raver, et al. | HMIT Entities_000079-HMIT Entities_000079 |
| 118 | Bloomberg invoice | HMIT Entities 000080-HMIT Entities 000080 |
| 119 | Email thread with S&P Global | HMIT_Entities_000081-HMIT_Entities_000083 |
| 120 | S&P Global invoice | HMIT Entities_000084-HMIT Entities_000084 |
| 121 | Email exchange between auditors Chris Rice (NexPoint Services) and Patrick Casale (Cohen & Co) | HMIT Entities_000085-HMIT Entities_000086 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 122 | Financial statement audit | HMIT_Entities_000087-HMIT_Entities_000103 |
| 123 | Email chain C. Rice to S. Raver | HMIT_Entities_000104-HMIT_Entities_000114 |
| 124 | Email chain from S. Raver to C. Rice | HMIT_Entities_000115-HMIT_Entities_000124 |
| 125 | Email from K. Longwell to M. Tax, et al. | HMIT Entities_000125-HMIT Entities_000125 |
| 126 | Civil Investigative Demand issued by the Texas Attorney General's Office to Hunter Mountain Investment Trust (HMIT) on July 14, 2025 | HMIT_Entities_000126-HMIT_Entities_000133 |
| 127 | Email from K. Longwell to M. Tax, et al. | HMIT Entities 000134-HMIT Entities 000134 |
| 128 | Dkt. 23, Notice of Hearing dated 8/27/2025 | HMIT_Entities_000135-HMIT_Entities_000254 |
| 129 | Email chain from S. Raver to K. Hendrix, et al. | HMIT_Entities_000260-HMIT_Entities_000261 |
| 130 | Email chain from D. Klos to K. Hendrix, et al. | HMIT_Entities_000262-HMIT_Entities_000263 |
| 131 | Email chain from M. Tax to J. Seery, et al. | HMIT_Entities_000264-HMIT_Entities_000264 |
| 132 | Email chain from K. Hendrix to S. Raver, et al. | HMIT_Entities_000265-HMIT_Entities_000266 |
| 133 | Email chain from K. Hendrix to A. Gunther, et al. | HMIT_Entities_000267-HMIT_Entities_000268 |
| 134 | DAF entity structure | VALUESCOPE 000001-VALUESCOPE 000001 |
| 135 | DAF/Rand entity structure | VALUESCOPE_000002-VALUESCOPE_000002 |
| 136 | Law firm forwards legal filing to Mark Patrick (DAF HoldCo) re Chapter 15 filing | VALUESCOPE_000003-VALUESCOPE_000007 |
| 137 | Chapter 15 Petition filing | VALUESCOPE_000008-VALUESCOPE_000026 |
| 138 | Charitable DAF Org structure | VALUESCOPE_000027-VALUESCOPE_000027 |
| 139 | Letter from Reed Smith LLP | VALUESCOPE_000028-VALUESCOPE_000029 |
| 140 | ValueScope, LLC Response | VALUESCOPE_000030-VALUESCOPE_000030 |
| 141 | Certificate of Incorporation, Charitable DAF HoldCo, Ltd. | TDIT004698 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 142 | Legal Relationship Agreement, Highland Kansas City Foundation | TDIT003396–TDIT003398 |
| 143 | Supporting Organization Operating Agreement - Highland Dallas Foundation, Inc. | TDIT003399–TDIT003406 |
| 144 | Supporting Organization Operating Agreement - Highland Santa Barbara Foundation, Inc. | TDIT003407–TDIT003413 |
| 145 | Letter - Highland Dallas Foundation, Inc. | TDIT003389–TDIT003390 |
| 146 | Letter - Highland Santa Barbara Foundation, Inc. | TDIT003391–TDIT003393 |
| 147 | Letter - Highland Kansas City Foundation, Inc. | TDIT003394–TDIT003395 |
| 148 | Employment Agreement - Mark Patrick | TDIT003971–TDIT003988 |
| 149 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011256–TDIT011268 |
| 150 | Memo - Harneys (H&B) | TDIT004274–TDIT004278 |
| 151 | Invoice - G.K. Management Limited | TDIT011038–TDIT011039 |
| 152 | Invoice - G.K. Management Limited | TDIT011040 |
| 153 | Invoice - G.K. Management Limited | TDIT011041 |
| 154 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011058–TDIT011062 |
| 155 | Certificate of Incorporation - Highland Kansas City Foundation, Inc. | TDIT003304–TDIT003306 |
| 156 | Certificate of Incorporation - Highland Dallas Foundation, Inc. | TDIT003326–TDIT003328 |
| 157 | Certificate of Incorporation - Highland Santa Barbara Foundation, Inc. | TDIT003344–TDIT003346 |
| 158 | Invoice - G.K. Management Limited | TDIT011042–TDIT011043 |
| 159 | Invoice - G.K. Management Limited | TDIT011044–TDIT011045 |
| 160 | Invoice - G.K. Management Limited | TDIT011046–TDIT011047 |
| 161 | Invoice - G.K. Management Limited | TDIT011048–TDIT011049 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 162 | Invoice - G.K. Management Limited | TDIT011050–TDIT011051 |
| 163 | Invoice - G.K. Management Limited | TDIT011052–TDIT011053 |
| 164 | Invoice - G.K. Management Limited | TDIT011054–TDIT011055 |
| 165 | Expense Reimbursement - G.K. Management Limited | TDIT011056–TDIT011057 |
| 166 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011088–TDIT011092 |
| 167 | Memorandum – Work Plan - Shields Legal Group | TDIT004699–TDIT004706 |
| 168 | Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT011093–TDIT011128 |
| 169 | Email - Shields Legal Group | TDIT003704 |
| 170 | Limited Partnership Agreement - Charitable DAF Fund, LP | TDIT003414–TDIT003431 |
| 171 | ValueScope Report - ValueScope, Inc. | TDIT004017–TDIT004075 |
| 172 | Expense Report - CLO HoldCo, Ltd. | TDIT003432–TDIT003435 |
| 173 | Audited Financial Statements - Highland Santa Barbara Foundation, Inc. | TDIT003989–TDIT004016 |
| 174 | Resolution of the Directors - Mark Patrick | TDIT003961–TDIT003962 |
| 175 | Resolution of the Directors - Mark Patrick | TDIT003963–TDIT003970 |
| 176 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011129–TDIT011136 |
| 177 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011137–TDIT011150 |
| 178 | Letter - Highland Dallas Foundation, Inc. | TDIT003707–TDIT003708 |
| 179 | Email - Paul Murphy | TDIT003709–TDIT003713 |
| 180 | Email - Walkers | TDIT003714–TDIT003719 |
| 181 | Certificate of Incorporation - DFW Charitable Foundation | TDIT003701–TDIT003703 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 182 | Director Services Agreement - Charitable DAF HoldCo, Ltd. | TDIT011151–TDIT011164 |
| 183 | Written Resolution - Charitable DAF HoldCo, Ltd. | TDIT011165–TDIT011170 |
| 184 | Resolution - Charitable DAF HoldCo, Ltd. | TDIT003720–TDIT003726 |
| 185 | Assignment - Charitable DAF HoldCo, Ltd. | TDIT003727–TDIT003732 |
| 186 | Agreement - CDMCFAD, LLC | TDIT003733–TDIT003760 |
| 187 | Email - David N. Corkern | TDIT003791–TDIT003792 |
| 188 | ValueScope Report - ValueScope, LLC | TDIT004076–TDIT004130 |
| 189 | Draft Legal Advice - Walkers | TDIT003761–TDIT003765 |
| 190 | Share Issuance Resolution - Charitable DAF HoldCo, Ltd. | TDIT003766–TDIT003790 |
| 191 | Email - PricewaterhouseCoopers (PwC) | TDIT004305–TDIT004323 |
| 192 | Memorandum and Articles of Association - Charitable DAF HoldCo, Ltd. | TDIT003267–TDIT003303 |
| 193 | Form ADV - Rand Advisors, LLC | TDIT003646–TDIT003674 |
| 194 | Brochure - Rand Advisors, LLC | TDIT003675–TDIT003700 |
| 195 | Email - Mark Patrick | TDIT004324–TDIT004340 |
| 196 | ValueScope Report - ValueScope, LLC | TDIT004131–TDIT004205 |
| 197 | Email - FTI Consulting | TDIT004341–TDIT004358 |
| 198 | Director Services Agreement - CDMCFAD, LLC | TDIT011171–TDIT011185 |
| 199 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003955–TDIT003957 |
| 200 | Resolution of the Directors - Charitable DAF HoldCo, Ltd. | TDIT003958–TDIT003959 |
| 201 | Prospectus - NexPoint Real Estate Strategies Fund | TDIT003463–TDIT003599 |



010772

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 202 | Proxy Statement - NexPoint Capital, Inc. | TDIT003440–TDIT003462 |
| 203 | Written Resolution - CLO HoldCo, Ltd. | TDIT011196–TDIT011197 |
| 204 | Texas Petition - Highland Dallas Foundation, Inc. | TDIT004443–TDIT004688 |
| 205 | Rule 11 Agreement - Highland Dallas Foundation, Inc. | TDIT004693–TDIT004695 |
| 206 | Exhibit Index to Affidavit - Margot MacInnis | TDIT003261-TDIT004712 |
| 207 | Affidavit - Jim Dondero Dugaboy Investment Trust | TDIT004713-TDIT004778 |
| 208 | Texas Petition (Amended) - Highland Dallas Foundation, Inc. | TDIT006527–TDIT006580 |
| 209 | Liquidator's Certificate - Margot MacInnis (JOL) | TDIT006492 |
| 210 | Form ADV - Mark Patrick, Rand PE Fund | TDIT006581-TDIT006609 |
| 211 | Affidavit & Exhibit Index - Margot MacInnis | TDIT004967-TDIT006484 |
| 212 | Affidavit & Exhibit Index | TDIT006485-TDIT006580 |
| 213 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011394-TDIT011405 |
| 214 | Post-Confirmation Quarterly Report - Highland Capital Management L.P. | TDIT011382-TDIT011393 |
| 215 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011425-TDIT011443 |
| 216 | Objection filed by Highland Dallas Foundation, Inc. Grant James Scott III | TDIT011444-TDIT011475 |
| 217 | Objection filed by James D. Dondero, Dugaboy Investment Trust | TDIT011476-TDIT011509 |
| 218 | Supplemental Declaration - DFW Charitable Foundation CDMCFAD LLC | TDIT004869-TDIT004945 |
| 219 | Trust Agreement establishes Hunter Mountain Investment Trust (HMIT) | TDIT006664-TDIT006675 |
| 220 | Affirmation by Mark Patrick | TDIT010529-TDIT010532 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 221 | Operating agreement between Highland Dallas Foundation, Inc. and The Dallas Foundation. | TDIT011406-TDIT011406 |
| 222 | Email exchange between Michael Stockham and Paul Murphy | TDIT010831-TDIT010840 |
| 223 | Form ADV Instructions - None | TDIT006628-TDIT006663 |
| 224 | Declaration by Caroline Maron | TDIT004846-TDIT004868 |
| 225 | Email from Louis M. Phillips requesting execution of two letters with attached documents | TDIT011318-TDIT011323 |
| 226 | Auditor's Report - Highland Capital Management L.P. | TDIT006610-TDIT006627 |
| 227 | Email chain from March 2025 | TDIT011407-TDIT011424 |
| 228 | Amended and Restated Limited Partnership Agreement - Atlas IDF LP | TDIT004779-TDIT004812 |
| 229 | Participation Agreement establishes the framework for Crown Global Life Insurance Ltd to purchase | TDIT004813-TDIT004845 |
| 230 | Investment Management Agreement - Rand PE Fund I | TDIT004946-TDIT004952 |
| 231 | Investment Management Agreement - Rand PE Fund I, L.P. | TDIT004953-TDIT004959 |
| 232 | Limited Partnership Agreement - Rand PE Fund | TDIT004960-TDIT004966 |
| 233 | By-Laws - Highland Kansas City Foundation, Inc. | TDIT003307–TDIT003325 |
| 234 | By-Laws - Highland Dallas Foundation, Inc. | TDIT003329–TDIT003343 |
| 235 | By-Laws - Highland Santa Barbara Foundation, Inc. | TDIT003347–TDIT003361 |
| 236 | Organizational Procedures - Greater Kansas City Community Foundation | TDIT003362–TDIT003388 |
| 237 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003705 |
| 238 | Structure Chart - Charitable DAF HoldCo, Ltd. | TDIT003706 |
| 239 | Expenses Table - Charitable DAF HoldCo, Ltd. | TDIT003960 |
| 240 | Delaware Division of Corporations Search Results - DFW Charitable Foundation | TDIT004696 |

| Dugaboy Exhibit No. | Description | Bates or Dkt. No. |
|---|---|---|
| 241 | Delaware Division of Corporations Search Results - CDMCFAD, LLC | TDIT004697 |
| 242 | Demonstrative: DAF-Rand Structure Chart | |
| 243 | Certificate of Incorporation of CDH GP, Ltd. | Dkt. 4-95 (25-11376-BLS) |

Dugaboy also reserves the right to introduce any exhibit designated by any other party, to supplement and/or amend its Exhibit List, to introduce any rebuttal exhibits, and to not use any such exhibits during the evidentiary hearing in response to the circumstances of the hearing.

Dated: May 11, 2026

Respectfully submitted,

*/s/ Avery Joseph Welker*

Geoffrey S. Harper
Texas Bar No. 00795408
gharper@kslaw.com
John Michael Gaddis
Texas Bar No. 24069747
mgaddis@winston.com
Sydney Rose
Texas Bar No. 24150011
srose@kslaw.com
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
(214) 764-4600

Michael J. Edney*
D.C. Bar No. 492024
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
T. (202) 739-3000
F. (202) 739-3001
michael.edney@morganlewis.com

Martha B. Stolley (*pro hac vice* pending)

New York Bar No. 2965374
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave.
New York, NY 10178-0060
T. (212) 309-6000
F. (212) 309-6001
martha.stolley@morganlewis.com

Avery Joseph Welker
Texas Bar No. 24137706
MORGAN, LEWIS & BOCKIUS LLP
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T. (713) 890-5000
F. (713) 890-5001
avery.welker@morganlewis.com

**Admitted to the bar of this Court*

*Counsel for The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 11, 2026, a true and correct copy of this document was served electronically via the Court's CM/ECF system to the parties registered or otherwise entitled to receive electronic notices in this case.

*/s/ Avery Joseph Welker*
Avery Joseph Welker

# VALUATION ANALYSIS OF 100 PARTICIPATION SHARES OF CHARITABLE DAF HOLDCO, LTD

AS OF
DECEMBER 31, 2023

Prepared for:

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd

VALUESCOPE
Measure | Create | Defend

VALUESCOPE
Measure | Create | Defend

April 11, 2024

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd
2101 Cedar Springs Road, Suite 1200
Dallas, Texas 75201

***RE: Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Patrick:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of December 31, 2023 (the "Valuation Date"). This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.
2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.
7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

The premise of value followed herein is going concern.[1] The liquidation premise of value was considered and rejected as not applicable because the going-concern value results in a "highest and best use" value for the interest.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's advisors. To understand the environment in which DAF operates, we researched relevant information concerning the collateralized debt industry. We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances. Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Financial statements for the Company as of December 31, 2023
- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd
- Information regarding the Company's history and current operations

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information, as well as on other data we developed.

[1] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

**CONCLUSION OF VALUE**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$78,284,712**
**SEVENTY-EIGHT MILLION TWO HUNDRED EIGHTY-FOUR THOUSAND SEVEN HUNDRED TWELVE DOLLARS**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $277,573,090 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$910,076** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.0% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.5% | | *Schedule C.5* |
| Combined Discount | 14.0% | ($127,229) | |
| **FMV Per Share** | | **$782,847** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$78,284,712** | |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

ValueScope, Inc.

ValueScope, Inc.

## TABLE OF CONTENTS


**ENGAGEMENT OVERVIEW** .......... **1**

DESCRIPTION OF THE ASSIGNMENT .......... 1
SCOPE .......... 1
PROCEDURES .......... 1

**DAF OVERVIEW** .......... **2**

COMPANY OVERVIEW .......... 2
SUBJECT INTEREST OVERVIEW .......... 2
CLO OVERVIEW .......... 2
HISTORICAL FINANCIAL ANALYSIS .......... 5

**ECONOMIC AND INDUSTRY OVERVIEW** .......... **6**

**OVERVIEW OF THE U.S. ECONOMY** .......... 6
OVERVIEW OF THE REAL ESTATE LOANS & COLLATERALIZED DEBT INDUSTRY .......... 15

**VALUATION METHODOLOGY** .......... **19**

VALUATION APPROACHES .......... 19
VALUATION METHODS .......... 20
SUMMARY OF THE VALUATION APPROACHES AND METHODS .......... 20

**VALUATION ANALYSIS** .......... **21**

ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE .......... 21

**CONCLUSION OF VALUE - SUBJECT INTEREST** .......... **24**

DISCOUNT FOR LACK OF CONTROL .......... 24
DISCOUNT FOR LACK OF MARKETABILITY .......... 24
CONCLUSION - SUBJECT INTEREST VALUE .......... 26

**ASSUMPTIONS AND LIMITING CONDITIONS** .......... **27**

**APPRAISAL CERTIFICATION** .......... **32**

## TABLE OF SCHEDULES


**HISTORICAL VALUATION SUMMARY ........ SUMMARY 1**

**CURRENT VALUATION SUMMARY ........ SUMMARY 2**

**DAF NET ASSET VALUE ANALYSIS ........ A**

CLO HOLDCO, LTD - SUMMARY BALANCE SHEET ........ A.1
CHARITABLE DAF HOLDCO, LTD - SUMMARY BALANCE SHEET ........ A.2

**DISCOUNT FOR LACK OF CONTROL (DLOC) ANALYSIS ........ B**

CLOSED-END FUND DATA - INVESTMENT GRADE BOND FUNDS ........ B.1
CLOSED-END FUND DATA - US GENERAL EQUITY FUNDS ........ B.2
DLOC CONCLUSION ........ B.3

**DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS ........ C**

DLOM DETERMINATION - PUT OPTION APPROACH ........ C.1
PUT OPTION APPROACH - HISTORICAL VOLATILITY SUMMARY ........ C.2
DLOM DETERMINATION - RESTRICTED STOCK STUDIES ........ C.3
DLOM DETERMINATION - RESTRICTED STOCK STUDIES SUMMARY STATISTICS ........ C.4
DLOM CONCLUSION ........ C.5

# ENGAGEMENT OVERVIEW

## DESCRIPTION OF THE ASSIGNMENT

We were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of December 31, 2023 (the "Valuation Date"). This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

## SCOPE

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections. The first section outlines the description, scope, and procedures of our analysis. The second section provides a brief description of the Company and the Company's financial position. The third section includes a discussion of the national economy and the industry in which the Company operates. The fourth section details a discussion of valuation theory and methodology. The fifth section presents our valuation analysis, and the sixth section presents our conclusion and reconciliation of the fair market value of the Subject Interest.

## PROCEDURES

This valuation analysis was conducted in accordance with generally accepted valuation procedures. These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances. We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information, as well as on other data obtained through additional research. A full discussion of the methodologies employed appears in the following sections of this report.

## DAF OVERVIEW[2]

### COMPANY OVERVIEW

Charitable DAF HoldCo, Ltd is a Cayman Islands "company limited by shares" formed in October 2011. At the Company's inception, the partners agreed to the provisions of the Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd (the "DAF Agreement") and the Companies Law of the Cayman Islands (the "Law"). As a holding company, DAF's predominant assets are interests in the equity tranches of Collateralized Loan Obligations ("CLOs"), the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities.

### SUBJECT INTEREST OVERVIEW

Based on information provided by the Company's management ("Management"), the Subject Interest shares are participation shares that from time to time are expected to receive cash distributions to fulfill certain charitable and expense goals of the owners of the participation shares. The Subject Interest shares are directly affected by the terms of the DAF Agreement and the actions of DAF's director. According to the DAF Agreement, the appointed director controls the business, affairs, and power of the Company (Section 89), including the issuance and purchase of shares on such terms and in such manner as the director determines (Section 44). Director consent is also required for shareholders to transfer their interests in DAF (Section 34). Finally, although shareholders may determine the timing and amounts of dividends (Sections 117 and 118), no dividend can exceed an amount approved by the director (Section 118).

### CLO OVERVIEW

Because the assets ultimately held by DAF predominately reflect equity tranches in one or more CLOs, some discussion is warranted describing a CLO. The diagram below depicts a typical CLO's balance sheet and cash flow. A CLO holds a pool of income-producing assets funded through the issuance of several classes of notes and preferred shares. The notes issued by the CLO are separated into rated and unrated classes.

[2] Based on the Company's memorandum and articles of association and information from management.




The rating of each class is primarily determined through the priority of rights in respect of the cash flows generated by the collateral and the quality of the collateral. The notes issued are long-term notes designed to match or exceed the maturity of the underlying collateral pool. The most subordinated notes or preferred shares of the CLO function in the same manner as voting common stock in a corporation and are generally unrated. They are the residual ownership interest in the CLO issuer. They earn all the excess spread, but concomitantly bear the first loss.

From the example depicted below, CLOs seek to earn the excess spread between lower-rated/higher interest collateral and lower blended cost of its liabilities. Returns are a function of excess spread, less any collateral losses and fees and expenses incurred during the life of the CLO.

**Example:**

| | |
|---|---|
| Yield on assets | LIBOR + 4.0% |
| Liabilities Weighted Avg. Coupon | LIBOR + 1.0% |
| Excess spread (or net interest margin) | 3.0% |

CLOs typically are subject to a number of collateral tests that are designed to protect the holders of, and maintain the credit ratings associated with, CLO debt. Collateral Coverage Tests are cash flow CLO tests that divert cash flows from subordinated tranches, prevent the purchase of new CLO assets, and cause senior tranches to be paid down when their standards are not met. When these tests are violated or are anticipated to be violated

due to negative downward trends, any future cash flow would be used to pay down the highest rated debt within the CLO capital structure, thus, eliminating any distributions and potential recovery to CLO equity interests. The two main collateral coverage tests are the over-collateralization test and the interest coverage test. The over-collateralization test measures how much the value of the pool of assets held by the CLO exceeds the obligations of the CLO. The interest coverage test measures how much the interest income of the CLO from its pool of assets exceeds the interest payment costs on the CLOs' obligations. Collateral Quality Tests are cash flow CLO tests that restrict sales of CLO assets. These tests may include objective measures of pool diversity, average rating, average life, prospective average recovery, and minimum weighted average coupon or spread. Concentration Tests address the presence in the pool of single issuers, percentage of the collateral represented by loan participations, non-U.S. obligors, triple-C rated credits, deferred interest instruments and other factors.

A rating agency approves the legal and credit structure of the CLO, performs due diligence on the parties involved, and rates the various tranches of the debt issued by the CLO and rates the assets owned by the CLO. The Servicer selects the initial collateral of the CLO and supervises it according to prescribed guidelines contained in an indenture or trust deed. The trustee is similar to a custodian in that it holds the assets for the benefit of the debt and equity holders, enforces the terms of the indenture, monitors and reports on collateral performance, and disburses cash to note-holders, preferred shareholders, and service providers according to the indenture.

The assets that have been purchased earn interest. That interest is used to pay fees, expenses and interest of the CLO on a prioritized basis. This is referred to as the interest waterfall. The interest earned is paid down the "waterfall" beginning with the Trustee and Administrative expenses and ending with the equity holders, with a percentage going to the Class I and Class II Equities.




The diagram above depicts the cash flow from a CLO and its respective ordering of payments and obligations. As one can see, the CLO "equity" is the last in line to receive a cash distribution. Accordingly, the valuation of the CLO equity tranches within DAF is strongly influenced by this dynamic.

## HISTORICAL FINANCIAL ANALYSIS

We were provided with the Company's internal financial statements for the three months ended December 31, 2023. These financial statements reflect various professional valuations of DAF's ultimate underlying CLO holdings (assets).

As reported as of the Valuation Date, DAF's sole asset consisted of 100% of the equity of CLO HoldCo, Ltd ("CLO HoldCo"). CLO HoldCo is a holding company which invests in CLOs and other investments. The net asset value for CLO HoldCo was reported as $277.6 million. DAF reported no liabilities as of the Valuation Date. As a result, DAF's book equity as of the Valuation Date was determined to equal $277.6 million.

DAF's balance sheet as of the Valuation Date is presented in Schedule A.2.

# ECONOMIC AND INDUSTRY OVERVIEW

## OVERVIEW OF THE U.S. ECONOMY

The third quarter of 2023 had positive economic growth, higher than the second quarter of 2023. Inflation is cooling down with its lowest rate over a twelve-month period in the last two years recorded in June 2023. This was largely on the back of declining energy prices. In its constant efforts to mitigate the effects of high inflation, the Federal Reserve has kept interest rates at elevated levels so far with cuts expected to begin in early 2024. Initial steady interest rate hikes in 2023 have led to the yield curve inverting, indicating investor's expectation of an economic slowdown. However, the US stock markets gained momentum and have closed higher than their prices at the same time last year due to the declining inflation rate and the expectation of future loosening of monetary policy.

### Gross Domestic Product[3]

Real gross domestic product (GDP) increased at an annual rate of 4.9 percent in the third quarter of 2023, following an increase of 2.1 percent in the second quarter. The acceleration in real GDP in the third quarter primarily reflected an upturn in exports, and acceleration in consumer spending and private inventory investment that were partially offset by a deceleration in nonresidential fixed investment.




3 U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Third Quarter 2023 (Release Date: 12/21/2023)

***Population***

Population growth is an important driver of long-term growth in an economy. The total population increased from 334.3 million in November 2022 to 336.0 million in November 2023.[4] The working-age population (15-64) increased from 207.2 million in October 2022 to 208.8 million in October 2023.[5]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic. It partially recovered in just several months and has been trending upward. In November 2022, the civilian labor force participation rate was 62.2% and stands at 62.8% as of November 2023.[6]







4 U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

5 Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

6 U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

***Employment***

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 199,000 in November 2023 and the unemployment rate edged down to 3.7 percent. Notable job gains occurred in health care and government. Employment also increased in manufacturing, reflecting the return of workers from a strike. Employment in retail trade declined.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased slightly from 6.7% in November 2022 to 7.0% in November 2023.[7]







Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will increase from 3.7% in 2023 to 4.0% in 2026.

---

7 U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

***Inflation***

According to the BLS, the Consumer Price Index for All Urban Consumers (CPI-U) increased 0.1 percent in November on a seasonally adjusted basis, after being unchanged in October. Over the last 12 months, the all-items index increased 3.1 percent before seasonal adjustment.

The index for shelter continued to rise in November, offsetting a decline in the gasoline index. The energy index fell 2.3 percent over the month as a 6.0-percent decline in the gasoline index more than offset increases in other energy component indexes. The food index increased 0.2 percent in November, after rising 0.3 percent in October. The index for food at home increased 0.1 percent over the month and the index for food away from home rose 0.4 percent.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has increased dramatically since April 2021, increasing from 74.2% as of October 2021 to a high of 96.6% in April 2022, and declined to 89.3% in December 2022. The price pressure measure for August 2023 was 86.9%.[8] The forecasters predict current-quarter headline CPI inflation will average 3.5 percent at an annual rate, slightly up from the forecast of 3.4 percent in the last survey[9].




[8] Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 8, 2023.

[9] Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters*, January 10, 2024.

***Interest Rates***

The interest rate on the three-month Treasury bill increased from 4.42% as of December 30, 2022, to 5.40% as of December 29, 2023.[10] The interest rate on the ten-year Treasury note remained the same at 3.88% over the same period.[11]




The interest rate on Moody's Aaa-rated corporate bonds decreased from 4.70% as of December 30, 2022 to 4.65% as of December 29, 2023.[12] The interest rate on the Moody's Baa-rated corporate bonds decreased from 5.87% to 5.49% over the same period.[13]

10 Board of Governors Federal Reserve System, 3 Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

11 Board of Governors Federal Reserve System, 10 Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

12 Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last January 10, 2024.

13 Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.




In the last twelve months, the yield curve remained inverted, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill remaining the same between December 30, 2022, to December 29,2023 at -0.59%.[14]




[14] U.S. Department of the Treasury. *Daily Treasury Yield Curve Rates*, last accessed January 10, 2024

***Corporate Profits***

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) increased $108.7 billion in the third quarter.




***Stock Markets***

The stock markets gained momentum from December 30, 2022, to December 29, 2023. The S&P 500 Total Return[15] Index closed at 7,138.77 on December 30, 2022, and closed higher at 8,971.07 on December 29, 2023. The NASDAQ Composite Total Return Index closed at 12,588.95 on December 30, 2022, and closed higher at 18,208.50 on December 29, 2023.[16] The Dow Jones Industrial Average Total Return Index closed at 79,728.48 on December 30, 2022 and closed higher at 92,630.57 on December 29, 2023.[17] In the graph below, the June 30, 2022, values were set to 100.




15 Total return indices include returns from both income and capital gains
16 *S&P Capital IQ* Database, last accessed January 10, 2024.
17 *S&P Capital IQ* Database, last accessed January 10, 2024.

***Construction & Housing Starts***

Construction spending and housing starts are two other important indicators for the economy. Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment. Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy. Housing starts increased from 1.427 million units in November 2022 to 1.560 million units in November 2023.[18] Construction spending, a seasonally adjusted annual figure, increased from $1.84 trillion in November 2022 to $2.05 trillion in November 2023.[19]




18 U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

19 U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024

***Consumer Confidence***

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has decreased significantly since the post-COVID high of 88.3 in April 2021, coming in at 61.3 in November 2023.[20] The index remains significantly lower than the December 2019 (pre-COVID) value of 99.3. The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions. The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S. This is considered a leading indicator of future consumer expenditures and economic activity.




[20] University of Michigan, *Surveys of Consumers*, November 2023

## OVERVIEW OF THE REAL ESTATE LOANS & COLLATERALIZED DEBT INDUSTRY[21]

The industry comprises non-depository operators that specialize in primary and secondary market lending. Unlike banks and other traditional lenders, industry participants do not rely on deposits to issue loans. Instead, to finance primary market lending to consumers and business, industry operators generate income by securitizing and selling mortgages and other loans on the secondary market. The industry also includes miscellaneous forms of collateralized lending, such as pawn lending.

The primary activities of this industry are:

- Secondary market financing and securitization (i.e. MBSs and CDOs)
- Loans (businesses, real estate, consumers)
- Consumer lending and financing
- Providing other non-depository credit intermediation (i.e. pawnshop operations)
- International trade financing

### *Executive Summary*

The Real Estate Loans and Collateralized Debt industry is composed of non-depository institutions that conduct primary and secondary market lending. Operators in this industry include government agencies in addition to nonagency issuers of mortgage-related securities. Through 2023, rising per capita disposable income and low levels of unemployment helped fuel the increase in primary and secondary market sales of collateralized debt. Nonetheless, due to the outbreak of COVID-19 and the sharp contraction in economic activity due to lockdowns, revenue contracted in 2020, but has since rebounded as the economy has normalized and interest rates have shot up. These trends caused revenue to grow at a CAGR of 0.4% to an estimated $480.6 billion through 2023, with an anticipated spike of 6.4% in 2023. Profit, measured as revenue-less interest and noninterest income, is expected to account for 9.7% of revenue in 2023.

Higher access to credit and greater disposable income have fueled primary market lending over much of the past five years, increasing the variety and volume of loans to be securitized and sold in secondary markets. An additional boon for institutions has been an increase in interest rates, which has raised interest income as the spread between short- and long-term interest rates increased. These macroeconomic factors, combined with changing risk appetite and regulation in the secondary markets, have resurrected collateralized debt trading since the middle of the period. The pandemic had reversed the period's early gains as the 30-year conventional mortgage rate had dropped sharply. Nonetheless, this proved to only be temporary, as rates following the end of pandemic-related restrictions exceeded those earlier in the period.

---

[21] IBISWorld Industry Report 52229, November 2023, *Real Estate Loans & Collateralized Debt in the U.S.*

Although institutions are poised to benefit from a strong economic recovery following the pandemic, slumping rates of homeownership, coupled with an expected plunge of the 30-year mortgage rate, are expected to damage the primary market through 2028. Shaky demand from commercial banking and uncertainty surrounding inflationary pressures will influence institutions' decisions on whether or not to sell mortgage-backed securities and commercial loans to secondary markets. These trends are expected to cause revenue to inch upward at a CAGR of 0.1% to an estimated $483.9 billion through 2028.

***Industry Performance***

The financial industry has experienced steady revenue growth, with a compound annual growth rate (CAGR) of 0.4%, leading to an estimated $480.6 billion in revenue for the year 2023. This growth includes an anticipated 6.4% surge in 2023, with profits expected to reach 9.7%. The strong economic recovery following the challenges of COVID-19 has played a pivotal role in boosting revenue for financial institutions.

Non-depository institutions within the industry rely heavily on stable economic conditions and favorable interest rates to ensure a consistent stream of revenue and customer demand for their services. During the COVID-19 pandemic, the Federal Reserve took measures to cut interest rates in an attempt to stabilize economic conditions, causing homeownership rates to falter due to dampened consumer sentiment. However, as the economy rebounded post-pandemic, homeownership rates flourished, and commercial banking demand rebounded, bolstering institutions' recovery and stimulating new consumer interest in homeownership.

Many companies dealing in mortgage-backed securities (MBSs) seek stability in the broader economy and positive trends in the consumer and real estate markets to continue financing sales into the secondary market.

The shift in Federal Reserve policy toward a more hawkish stance on interest rates and macroeconomic conditions following COVID-19 has influenced core markets among institutions. This shift has also boosted core revenue channels for operators. To counter rising inflationary pressures, the Federal Reserve adopted a hawkish stance on interest rates, leading to steady rate hikes to combat heightened inflation. This has had a notable impact on mortgage rates and the interest rates charged by commercial banks on core financial instruments. Recently, the Federal Reserve decided to hold steady the interest rate level, with the current range standing between 5.25%-5.50%. Institutions benefit from higher interest rates as they generate larger revenue when selling to secondary markets, making the Fed's pivot toward higher interest rates an accelerant for these institutions.

Consistent growth in corporate markets has further bolstered collateralized debt demand among banks. Even during challenging economic conditions, larger corporate companies and commercial banks have remained significant drivers of revenue growth for operators. Over the past five years, growth in corporate profit has heightened this trend and provided commercial banks with greater flexibility to pursue lucrative real estate and collateralized debt opportunities. Despite inflationary pressures across the broader economy, corporate clients have been able to leverage advantageous trends from the Federal Reserve through acquisitions of MBSs, contributing to the industry's growth.

However, shaky consumer metrics have tempered the industry's overall growth rate. While institutions encompass a range of entities, from government-sponsored enterprises like Fannie Mae and Freddie Mac to traditional mortgage companies, consumer sentiment plays a crucial role in influencing revenue growth. If consumers have a lower propensity to acquire mortgages or pursue student loans due to difficulties in repayment, it can shrink demand in the secondary market for MBSs and hinder growth for operators. Recent volatility in student loan delinquencies and consumers' tightening fiscal conditions during COVID-19 have dampened the potential for larger revenue growth from the sale of MBSs and collateralized mortgage obligations (CMOs). Given the uncertainty in consumer confidence due to inflationary pressures, institutions involved in direct sales of securities or policies must remain vigilant regarding consumer sentiment to maximize their growth potential.

***Industry Outlook***

The financial industry is bracing for a challenging period ahead, with anticipated revenue rising at a compound annual growth rate (CAGR) of 0.1% and expected to reach $483.9 billion by 2028. Furthermore, profit margins are poised to decrease to 11.2% in the same year. This projection is driven by several key factors that are expected to shape the industry's trajectory.

One significant factor contributing to this outlook is the uncertainty in the real estate market, which is set to push back the gains made following the COVID-19 pandemic. Despite the prospect of strong consumer confidence in the future, newfound uncertainty surrounding real estate is expected to impact institutional gains. With both the 30-year mortgage rate and homeownership rate projected to decline through 2028, institutions are facing a dual challenge of reduced revenue from core instruments like Mortgage-Backed Securities (MBSs) and decreased consumer activity in primary markets. The Federal Reserve's focus on quashing inflation further complicates matters, as future rate hikes are contingent on steady inflationary pressure, a trend expected to dissipate in the coming years as indicated by the projected decline in the Consumer Price Index (CPI).

Additionally, there is a continuous shift towards the primary market, which is impacting core revenue streams. The disposable income of consumers and their ability to cover immediate expenses, such as credit card debt and student loan payments, is crucial in determining broader consumer sentiment. As these metrics are expected to grow in the coming years, institutions are increasingly turning to primary markets for lucrative alternative loans that can be packaged and securitized. This trend is underscored by the declining agency trading of MBSs, as highlighted by recent data from the Securities Industry & Financial Market Association (SIFMA). Operators are now seeking the safest and most consistently in-demand securities to trade, with a greater focus on student loans and credit cards due to the shifting market dynamics.

Furthermore, the evolving regulatory landscape poses challenges to the lending rate of core financial instruments. The rate of adoption of new federal regulations and the enforcement of existing regulatory laws remains uncertain. Recent changes, such as the removal of a stipulation in the Dodd-Frank Act regarding collateralized loan obligations (CLOs), have impacted investment and liquidity in secondary markets. However, to prevent a recurrence of the 2008 sub-prime mortgage crisis, the federal government may consider imposing regulations aimed at increasing transparency among institutions and minimizing risks in the primary market, which would lead to higher compliance costs for operators.

Lastly, technological evolution is poised to accelerate operational efficiency within the industry. In an uncertain economic landscape, operators are turning to artificial intelligence (AI) and other technology solutions to stabilize expenditures. By upgrading back-end technology for loan processing and market trend analysis, non-depository institutions can make more informed decisions about securitizing and selling less risky loans in open markets. Moreover, leveraging technology can reduce operational costs and streamline manual labor-intensive processes, a trend that gained momentum during the pandemic and is expected to persist in the industry's future.

## VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

### VALUATION APPROACHES

#### *Income Approach*

The income approach quantifies the present value of anticipated future income generated by a business or an asset. Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes. One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow. The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate. The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

#### *Market Approach*

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets. Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset. Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions. The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

#### *Asset-Based (Cost) Approach*

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities. Replacement cost is often a primary indicator of the value of a business' assets. The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it. Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors. The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

## VALUATION METHODS

The following are common valuation methods used under the three approaches:

A. Income Approach
1. Discounted Cash Flow Method (multi-period model)
2. Direct Capitalization Method (single period model)
3. Excess Earnings Method

B. Market Approach
1. Guideline Public Company Method
2. Merger and Acquisition Method

C. Asset-Based Approach
1. Reproduction Cost Method
2. Replacement Cost Method
3. Net Asset Value Method

## SUMMARY OF THE VALUATION APPROACHES AND METHODS

For the valuation of non-controlling interests in holding companies such as DAF, the asset-based approach is most commonly used. When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

## VALUATION ANALYSIS

### ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE

DAF's ultimate holdings are interests in the equity tranches of CLOs, the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities. Accordingly, the fair market value of DAF's equity is based directly on the valuation of these lower tier entities' assets.

DAF's sole asset reported as of the Valuation Date consisted of 100% of the equity of CLO HoldCo. CLO HoldCo is a holding company which invests in CLOs and other investments. We relied upon DAF management's determination of CLO HoldCo's NAV based on the values of its various underlying investments and assets. CLO HoldCo's balance sheet as of the Valuation Date is shown in the following charts and in Schedule A.1.

As shown below, CLO HoldCo's primary assets consist of $513 thousand in CLO investments and $233.4 million in other investments[22]. CLO HoldCo reported $323.6 million in total assets. CLO HoldCo also reported $46.0 million in total liabilities as of the Valuation Date. Therefore, CLO HoldCo's equity can be reasonably stated as $277.6 million.

22 Other investments consist of equity investments in approximately 44 entities.

### CLO HoldCo, Ltd - Summary Balance Sheet

| | Balance Sheet as of: 12/31/2023 | |
|---|---|---|
| | Actual | % |
| **Current Assets** | | |
| Cash & Equivalents | $86,127,092 | 26.6% |
| **Total Current Assets** | 86,127,092 | 26.6% |
| **CLO Investments** | | |
| Aberdeen CLO, Ltd | 0 | 0.0% |
| Red River CLO, Ltd. Preferred Shares | 2,608 | 0.0% |
| Westchester CLO, Ltd | 98,985 | 0.0% |
| VAHA 2004-1A 0.0% | 10,244 | 0.0% |
| VAHA 2004 1X 0.0% | 8,195 | 0.0% |
| Brentwood CLO, Ltd. | 278,584 | 0.1% |
| Liberty CLO, Ltd. | 114,556 | 0.0% |
| Grayson CLO, Ltd. Class II Preference Shares | 157 | 0.0% |
| Rockwall CDO, Ltd. | 118 | 0.0% |
| HLF 1X Floating C1 | 0 | 0.0% |
| PAMCO 1997 1X B | 0 | 0.0% |
| **Total CLO Investments** | 513,446 | 0.2% |
| **Other Assets** | | |
| Other Investments | 233,444,862 | 72.1% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 811,850 | 0.3% |
| Dividends Receivable | 33,730 | 0.0% |
| Note Receivable | 1,471,448 | 0.5% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 323,591,266 | 100.0% |
| **Total Liabilities** | 46,018,176 | 14.2% |
| **Total Equity** | 277,573,090 | 85.8% |
| **Total Liabilities & Equity** | 323,591,266 | 100.0% |

### *DAF NAV Conclusion*

As of the Valuation Date, DAF's balance sheet consisted solely of a 100% ownership interest in CLO HoldCo's equity. Therefore, DAF's NAV can be reasonably stated as $277.6 million (rounded). This analysis is summarized in the following table and in Schedule A.2.

| | Balance Sheet as of: 12/31/2023 Actual | % |
|---|---|---|
| **Assets** | | |
| CLO HoldCo, LTD | $277,573,090 | 100.0% |
| **Total Assets** | $277,573,090 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $277,573,090 | 100.0% |
| **Total Liabilities & Equity** | $277,573,090 | 100.0% |

## CONCLUSION OF VALUE - SUBJECT INTEREST

DAP's NAV was determined to equal $277.6 million as of the Valuation Date. Dividing this NAV by the 305 total participation shares outstanding results in a NAV per share of $910,076. However, sellers of fractional interests in holding companies rarely receive a price equal to the NAV of their investment. This is because the interest holders do not have direct control over the entity's assets and have a limited market for their interests. Therefore, in order to arrive at the fair market value of the Subject Interest shares that are the subject of this analysis, we applied relevant discounts (control and marketability).

### DISCOUNT FOR LACK OF CONTROL

Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls. Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

Due to the Company's ultimate holdings in debt and equity investments, the Company exhibits some of the characteristics of a closed-end fund. Closed-end funds, like open-ended mutual funds, are asset holding companies that typically hold a portfolio of publicly traded securities. However, unlike unit holders in open-ended funds, closed-end fund unit holders who wish to liquidate their investment cannot look to the fund to repurchase their shares. Rather, they must sell them on the open market. The price they receive is not usually equal to the fundamental or net asset value of the investment. Therefore, the fair market value of closed-end funds is generally described in terms of a discount or premium to net asset value.

To align with the Company's holdings, we selected closed-end fund data from investment grade bond funds and general equity funds. The investment grade bond fund data shown in Schedule B.1 indicated mean and median discounts of 3.9% and 4.3%, respectively. The general equity fund data shown in Schedule B.2 indicated mean and median discounts of 10.5% and 11.7%, respectively. Based on these indications, we selected a discount for lack of control of 8.0% to be applicable to the Subject Interest, as shown in Schedule B.3.

### DISCOUNT FOR LACK OF MARKETABILITY

Discounts for lack of marketability (DLOMs) are applied to the shares of private companies based on the premise that an asset or interest in an entity without a readily available market would sell for less to a hypothetical buyer than an identical asset or interest that is readily marketable. Several factors are widely recognized to affect

marketability, such as distributions or dividends, investment performance, holding period to complete a sale, and management performance, among others. We utilized two methods of quantifying a relevant DLOM: the put option approach and an analysis of restricted stock studies.

***Put Option Approach***

The price of a contract providing the right to sell a number of shares (a put option) represents the difference between the non-marketable and marketable price of an asset. For example, if a holder of restricted or non-marketable stock purchases a put option on the underlying asset, the holder would be purchasing marketability. The price of the put determines the size of the DLOM.

In order to determine the price of such a put, we utilized the Black-Scholes put option model.[23] Based on our analysis, we determined that an appropriate volatility for investment grade bond funds and general equity bond funds such as DAF is approximately 15.0% (Schedule C.2) and between one half and one year (averaged to 0.75 years) would be required to sell the Subject Interest in an orderly transaction. As a result of these inputs, the put option approach indicated a discount for lack of marketability of 3.3%. This DLOM indication is presented in Schedule C.1.

***Restricted Stock Study Analysis***

There are several studies that attempt to measure discounts for lack of marketability, and a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest.[24] As mentioned, we would expect between six months and one year to be required to sell the Subject Interest in an orderly transaction.

Schedule C.4 presents a summary of restricted stock studies performed involving issuances of shares during the time period 1997 through 2008, which is when the SEC-mandated lock-up period for restricted stocks was one year. Based on a range of low discounts of 9.0%-10.9%, we selected a 9.7% DLOM utilizing the findings of the restricted stock studies.

***DLOM Conclusion***

The put option approach in Schedule C.1 indicated a DLOM of 3.3%. The restricted stock study analysis in Schedule C.4 indicated a DLOM of 9.7%. Based on these indications, we

---

23 Black, F. and M. Scholes, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy*, May 1973

24 See Schedule C.3

concluded a discount for lack of marketability of 6.5%. This conclusion is presented in Schedule C.5.

## CONCLUSION - SUBJECT INTEREST VALUE

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$78,284,712**
**SEVENTY-EIGHT MILLION TWO HUNDRED EIGHTY-FOUR THOUSAND SEVEN HUNDRED TWELVE DOLLARS**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $277,573,090 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$910,076** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.0% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.5% | | *Schedule C.5* |
| Combined Discount | 14.0% | ($127,229) | |
| **FMV Per Share** | | **$782,847** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$78,284,712** | |

Our conclusion of value is presented in Summary Schedule 2 as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report. We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information as well as on other data we developed. We have no obligation to update this report or our conclusion of value for information that comes to our attention after the date of this report.

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, Inc. is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated; they should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever. Neither the valuation report, nor its contents, nor any reference to the appraiser or ValueScope, Inc. may be referred to or quoted in any registration statement, prospectus, offering memorandum, sales brochure, other appraisal, loan or other agreement or document given to third parties without our prior written consent. In addition, except as set forth in the report, our analysis and report are not intended for general circulation or publication, nor are they to be reproduced or distributed to third parties without our prior written consent. Notwithstanding the foregoing, ValueScope, Inc. permits the Company to distribute this Report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, and we shall have no responsibility for any such unauthorized change.

The valuation may not be used in conjunction with any other appraisal or study. The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts. The appraisal was prepared solely for the purpose, function, and party so identified in the report. The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, without the express written consent of ValueScope, Inc.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

**OPERATIONAL ASSUMPTIONS**

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

**COMPETENT MANAGEMENT ASSUMED**

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership. This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

**NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION**

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement. If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, Inc. must be made in advance. ValueScope, Inc. reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s). We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

## NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE

No opinion is rendered as to legal fee or property title. No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

## LIENS AND ENCUMBRANCES

ValueScope will give no consideration to liens or encumbrances except as specifically stated. We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks. We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

## INFORMATION PROVIDED BY OTHERS

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

## PROSPECTIVE FINANCIAL INFORMATION

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA). We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation guidelines.

## REGULATORY AND ENVIRONMENTAL CONSIDERATIONS

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

## POTENTIAL FUTURE SALES

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided. An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time. Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

**INDEMNIFICATION BY THE COMPANY**

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement. Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement. In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

## APPRAISAL CERTIFICATION

I certify that, to the best of my knowledge and belief:

1. We have not inspected certain assets, properties, or business interests encompassed by this appraisal.
2. We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.
3. We have no personal interest or bias with respect to the subject matter of this report or the parties involved.
4. Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.
5. To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.
6. No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.
7. The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.
8. This report and analysis were prepared under the direction of Steven C. Hastings.
9. I am in compliance with all professional appraisal certifications and licensing.
10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.

By: ValueScope, Inc.

Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, Inc.

## APPENDIX: QUALIFICATIONS OF THE APPRAISER

***Steven C. Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA***
**Principal**
**shastings@valuescopeinc.com, 817-481-4901**

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

### EMPLOYMENT HISTORY

*2006 – Present* *ValueScope, Inc.*

*Principal*
Mr. Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis. As a CPA with significant valuation and financial reporting experience, Mr. Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

2001 – 2006 *Value Capital, LLC*

*Principal*
Mr. Hastings served as a principal with Value Capital, LLC. During his tenure at Value Capital Mr. Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries. He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions. His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000* *Finance Commission of Texas*

*Director*
The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner. As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets. Mr. Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations. He was instrumental in assisting the Savings and Loan Department in writing new Mortgage

Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.

*1994 – 2001* *MedCare Financial Solutions, Inc.*

*President*
Mr. Hastings served as an officer of MedCare Financial Solutions, Inc. and MedCapital Funding Corporation. MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers. MedCare Financial Solutions provided other financial and operational services to health care providers. These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending. Mr. Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.

1986 – 1994 *H.D. Vest Financial Services*

*Executive Vice President and CFO*
As executive vice president and CFO of H.D. Vest Financial Services, Mr. Hastings assisted in placing over $1.5 billion annually in investment. Responsible for day-to-day financial operations and capital structuring, Mr. Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers. Mr. Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr. Hastings supervised stockbrokers' and investment advisors' day-to-day activities. As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies. Being licensed in life, disability, health, property and casualty insurance, Mr. Hasting was instrumental in implementing this line of business at HD Vest.

1979 – 1986 *Arthur Andersen & Co.*

*Senior Manager*
Mr. Hastings served as a senior manager with significant responsibilities in the several industries. He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona
Bachelor of Science - Indiana University, Bloomington, Indiana

**CERTIFICATIONS AND LICENSES**

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

**ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS**

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

**RECENT IRS CASES - OFFICE OF CHIEF COUNSEL**

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.

- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C. Docket No. 30515-09, Nancy Sue Hawk, Transferee, Petitioner v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C. Docket No. 3030-14, Red River Ventures, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015

- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C. Docket No. 1045-13, Estate of Jinana M. Bowey, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C. Docket No. 8401-13, Estate of Edward S. Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.

- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C. Docket No. 223630-12, Michael Tricarichi, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C. Docket No. 6936-10, et al, John M. Alterman, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No. 8097-13, *Sumner Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.*

- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No. 20177-11, *Richard H. Cullifer, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.*

- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

**RECENT IRS CASES - LMSB AUDIT DIVISION**

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.

- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.

- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.

- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.

- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

**RECENT DEPARTMENT OF JUSTICE CASE**

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America. Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No. 4:16-cv-03302, ALPC Services of Texas, Inc. v. United States of America and Internal Revenue Service. Valuation issues report, 2017.

- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No. 12-844, *The Estate of David W. Longaberger v. The United States*. Valuation issues report, 2014.

**RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS**

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al. Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.

- Expert Report June 2018
- Deposition Testimony May 2019

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al. Fraudulent transfer, solvency and economic damages.

- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.

- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No. CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al. Economic damages related to lost wages.

- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No. 2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.

- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No. 14-671C. Always at Market, Inc. v. United States of America (DOD/DOJ). Army & Air Force Exchange Service economic damages.

- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No. CV-05-1483, General Medicine, PC v. Healthsouth Corporation v. General Medicine, PC. Economic damages related to contract dispute.

- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

"Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International

**WHITE PAPERS**

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v. Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

# SCHEDULES

**Charitable DAF HoldCo, Ltd**
**Table of Contents** **Valuation Date: December 31, 2023**

Table of Contents


| Schedule Name | Schedule |
|---|---|
| **Historical Valuation Summary** | Summary Schedule 1 |
| **Current Valuation Summary** | Summary Schedule 2 |
| **DAF Net Asset Value Analysis** | |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.1 |
| Charitable DAF HoldCo, Ltd - Summary Balance Sheet | Schedule A.2 |
| **Discount for Lack of Control (DLOC) Analysis** | |
| Closed-End Fund Data - Investment Grade Bond Funds | Schedule B.1 |
| Closed-End Fund Data - US General Equity Funds | Schedule B.2 |
| DLOC Conclusion | Schedule B.3 |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Put Option Approach | Schedule C.1 |
| Put Option Approach - Historical Guideline Company Volatility Summary | Schedule C.2 |
| DLOM Determination - Restricted Stock Studies | Schedule C.3 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.4 |
| DLOM Conclusion | Schedule C.5 |

**Charitable DAF HoldCo, Ltd**
**Historical Valuation Summary**

**Summary Schedule 1**
**Valuation Date: December 31, 2023**

| | For the Quarter Ended: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **12/31/2021** | **3/31/2022** | **6/30/2022** | **9/30/2022** | **12/31/2022** | **3/31/2023** | **6/30/2023** | **9/30/2023** | **12/31/2023** |
| Company Net Asset Value (NAV) | $243,189,674 | $262,539,795 | $291,234,287 | $289,502,301 | $276,241,856 | $275,227,939 | $270,414,002 | $288,884,011 | **$277,573,090** |
| Discount for Lack of Control | 5.0% | 7.3% | 5.6% | 8.0% | 8.7% | 7.8% | 11.6% | 13.9% | 8.0% |
| Discount for Lack of Marketability | 6.9% | 6.9% | 6.9% | 7.0% | 7.3% | 7.1% | 6.6% | 6.4% | 6.5% |
| Combined Discount | 11.6% | 13.7% | 12.1% | 14.4% | 15.4% | 14.3% | 17.4% | 19.4% | 14.0% |
| **FMV of Subject Interest (Per 100 Shares)** | $70,521,019 | $74,289,035 | $83,919,780 | $81,212,514 | $76,654,941 | $77,292,849 | $73,202,932 | $76,331,301 | **$78,284,712** |

**Charitable DAF HoldCo, Ltd** — **Summary Schedule 2**
**Current Valuation Summary** — **Valuation Date: December 31, 2023**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $277,573,090 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$910,076** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.0% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.5% | | *Schedule C.5* |
| Combined Discount | 14.0% | ($127,229) | |
| **FMV Per Share** | | **$782,847** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$78,284,712** | |

**Charitable DAF HoldCo, Ltd** — **Schedule A.1**
**DAF Net Asset Value Analysis** — **Valuation Date: December 31, 2023**

*CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 12/31/2023 Actual | % |
|---|---|---|
| **Current Assets** | | |
| Cash & Equivalents | $86,127,092 | 26.6% |
| **Total Current Assets** | 86,127,092 | 26.6% |
| **CLO Investments** | | |
| Aberdeen CLO, Ltd | 0 | 0.0% |
| Red River CLO, Ltd. Preferred Shares | 2,608 | 0.0% |
| Westchester CLO, Ltd | 38,985 | 0.0% |
| VALTA 2004-1A 0.0% | 10,244 | 0.0% |
| VALTA 2004-1B 0.0% | 5,195 | 0.0% |
| Brentwood CLO, Ltd | 278,584 | 0.1% |
| Liberty CLO, Ltd. | 114,556 | 0.0% |
| Grayson CLO, Ltd. Class II Preference Shares | 157 | 0.0% |
| Rockwall CDO, Ltd. | 118 | 0.0% |
| HLF 1X Floating C1 | 0 | 0.0% |
| PAMCO 1997-1X B | 0 | 0.0% |
| **Total CLO Investments** | 513,746 | 0.2% |
| **Other Assets** | | |
| Highland CLO Funding, Ltd. | 17,737,063 | 5.5% |
| Highland CLO Funding, Ltd. - Participation Rights | 122,953 | 0.0% |
| TerreStar Corporation New Common | 1,713,458 | 0.5% |
| Sable Permian Resources 7.875% | 2 | 0.0% |
| Celtic Pharma Phinco B.V. (PharmaVI) 17.000% | 0 | 0.0% |
| Bruce Mansfield - 1-07 - Escrow Units | 0 | 0.0% |
| [illegible] Communications [illegible] 6.875% | 351 | 0.0% |
| Crusader Fund II, Ltd. | 113,229 | 0.0% |
| NXDT | 2,740,993 | 0.8% |
| NXR | 1,805,740 | 0.6% |
| HFWM | 3,947,053 | 1.2% |
| AFRENF | 3,040,330 | 0.9% |
| [illegible] Equity Fund I | 3,101,541 | 1.0% |
| Multi Strat | 618,847 | 0.2% |
| Highland Loan Funding V | 0 | 0.0% |
| TerreStar Corporation Term Loan A - Non Convertible | 77,770,586 | 24.0% |
| TerreStar Corporation Term Loan C - Non Convertible | 50,227 | 0.0% |
| NHT Holdco, LLC - Membership Units | 270,770 | 0.1% |
| Big Valley Power Property, LLC | 87,000 | 0.0% |
| NCI Apache Trail, LLC | 990,000 | 0.3% |
| NCI Fort Worth Land, LLC | 877,200 | 0.3% |
| NCI Royse City Land, LLC | 5,649,700 | 1.7% |
| NCI Stewart Creek, LLC | 1,250,000 | 0.4% |
| NLA Assets, LLC | 1,361,900 | 0.4% |
| WMG BELLE AVENUE MEZZANINE, LLC | 3,893,547 | 1.2% |
| WMG Belle Avenue Orlando Partners, LLC | 1,132,000 | 0.4% |
| NREA SB1 Holdings LLC | 5,157,589 | 1.6% |
| NexPoint Adare - Tranche 1 | 11,283,713 | 3.5% |
| NexPoint Skorpios | 45,897,717 | 14.2% |
| Total Wine - Convertible Promissory Note | 20,563 | 0.0% |
| NexPoint Polo Glen Debt | 651,162 | 0.2% |
| MPVG Appraisal Rights Claims | 527,769 | 0.2% |
| COLL | 92,249 | 0.0% |
| ACHC US | 192,760 | 0.1% |
| BIO | 107,189 | 0.0% |
| AC [illegible] CN | 3,778 | 0.0% |
| AC [illegible] CN | 1,728 | 0.0% |
| NREF | 6,221,786 | 1.9% |
| HBIX | 3,380 | 0.0% |
| IGIX | 243,380 | 0.1% |
| TMO | 242,571 | 0.1% |
| PRTB | 7,488 | 0.0% |
| SRG | 220,500 | 0.1% |
| SPXL | 3,858,182 | 1.2% |
| SQQQ | 3,510,277 | 1.0% |
| SRTY | 3,558,579 | 1.1% |
| NexPoint Capital, INC. | 13,278,790 | 4.1% |
| FRLMF 21 GF US cy FRN | 1,154,710 | 0.4% |
| NBSZX | 8,807,107 | 2.7% |
| RWIL | 17 | 0.0% |
| Other Investments | 233,447,862 | 72.1% |
| Cash Collateral | 81,716 | 0.0% |
| Interest Receivable | 611,859 | 0.2% |
| Dividends Receivable | 33,920 | 0.0% |
| Note Receivable | 1,121,748 | 0.3% |
| Due from Affiliate | 740,000 | 0.2% |
| Due from Broker | 627,719 | 0.2% |
| **Total Assets** | 323,501,266 | 100.0% |
| **Total Liabilities** | 46,018,176 | 14.2% |
| **Total Equity** | 277,483,090 | 85.8% |
| **Total Liabilities & Equity** | 323,501,266 | 100.0% |

**Charitable DAF HoldCo, Ltd** — **Schedule A.2**
**DAF Net Asset Value Analysis** — **Valuation Date: December 31, 2023**

*Charitable DAF HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 12/31/2023 | |
|---|---|---|
| | **Actual** | **%** |
| **Assets** | | |
| CLO HoldCo, LTD | $277,573,090 | 100.0% |
| **Total Assets** | $277,573,090 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $277,573,090 | 100.0% |
| **Total Liabilities & Equity** | $277,573,090 | 100.0% |

**Charitable DAF HoldCo, Ltd** | **Schedule B.1**

**Discount for Lack of Control (DLOC) Analysis** | **Valuation Date: December 31, 2023**

*Closed-End Fund Data - Investment Grade Bond Funds*

| **Closed-End Fund Data - Investment Grade Bond Funds** | | | | |
|---|---|---|---|---|
| **Fund Ticker** | **Fund Name** | **Net Asset Value** | **Market Price** | **Premium (Discount)** |
| BKT | BlackRock Income Trust, Inc. | $12.73 | $12.18 | (4.3%) |
| FMY | First Trust Mortgage Income Fund | $11.72 | $12.12 | 3.4% |
| VBF | Invesco Bond Fund | $15.87 | $15.21 | (4.2%) |
| IHTA | Invesco High Income 2024 Target Term Fund | NA | $6.89 | N/A |
| JLS | Nuveen Mortgage and Income Fund | NA | $16.88 | N/A |
| JMM | Nuveen Multi-Market Income Fund | $6.35 | $5.91 | (6.9%) |
| DMO | Western Asset Mortgage Opportunity Fund Inc. | $12.05 | $11.17 | (7.3%) |

| **Summary Statistics** | |
|---|---|
| **Mean Premium (Discount)** | **(3.9%)** |
| **Median Premium (Discount)** | **(4.3%)** |
| **Standard Deviation** | **4.3%** |

*Source: S&P Capital IQ as of market close December 31, 2023*

**Charitable DAF HoldCo, Ltd** | **Schedule B.2**
**Discount for Lack of Control (DLOC) Analysis** | **Valuation Date: December 31, 2023**

*Closed-End Fund Data - US General Equity Funds*

| Closed-End Fund Data - US General Equity Funds | | | | |
|---|---|---|---|---|
| **Fund Ticker** | **Fund Name** | **Net Asset Value** | **Market Price** | **Premium (Discount)** |
| ADX | Adams Diversified Equity Fund, Inc. | $20.56 | $17.71 | (13.9%) |
| BIF | Boulder Growth & Income Fund, Inc. | $0.33 | $0.54 | 65.3% |
| CET | Central Securities Corp. | $46.49 | $37.77 | (18.8%) |
| FOF | Cohen & Steers Closed-End Opportunity Fund, Inc. | NA | $11.20 | N/A |
| GRF | Eagle Capital Growth Fund, Inc. | $10.82 | $9.45 | (12.7%) |
| EVT | Eaton Vance Tax-Advantaged Dividend Income Fund | $21.57 | $22.25 | 3.1% |
| EQS | Equus Total Return, Inc. | $3.49 | $1.45 | (58.4%) |
| FXBY | Foxby Corp. | $23.65 | $13.12 | (44.5%) |
| GDV | The Gabelli Dividend & Income Trust | $25.58 | $21.64 | (15.4%) |
| GAB | The Gabelli Equity Trust Inc. | $5.19 | $5.08 | (2.1%) |
| GAM | General American Investors Company, Inc. | $51.96 | $42.95 | (17.3%) |
| HTD | John Hancock Tax-Advantaged Dividend Income Fund | $19.02 | $18.97 | (0.3%) |
| USA | Liberty All-Star Equity Fund | $6.75 | $6.38 | (5.5%) |
| ASG | Liberty All-Star Growth Fund, Inc. | $5.75 | $5.28 | (8.2%) |
| RMT | Royce Micro-Cap Trust, Inc. | $10.47 | $9.24 | (11.7%) |
| RVT | Royce Value Trust Inc. | $16.42 | $14.56 | (11.3%) |
| SOR | Source Capital, Inc. | $43.91 | $40.38 | (8.1%) |
| SPE | Special Opportunities Fund, Inc. | $14.30 | $11.86 | (17.1%) |
| FUND | Sprott Focus Trust, Inc. | $8.91 | $8.00 | (10.2%) |
| TY | Tri-Continental Corporation | $32.66 | $28.83 | (11.7%) |

| Summary Statistics | |
|---|---|
| **Mean Premium (Discount)** | **(10.5%)** |
| **Median Premium (Discount)** | **(11.7%)** |
| **Standard Deviation** | **23.3%** |

*Source: S&P Capital IQ as of market close December 31, 2023*

**Charitable DAF HoldCo, Ltd** | **Schedule B.3**

**Discount for Lack of Control (DLOC) Analysis** | **Valuation Date: December 31, 2023**

*DLOC Conclusion*

| Discount for Lack of Control Conclusion | | |
|---|---|---|
| DLOC Determination - Closed End Bond Funds (Mean) | 3.9% | *Schedule B.1* |
| DLOC Determination - Closed End Bond Funds (Median) | 4.3% | *Schedule B.1* |
| DLOC Determination - Closed End Equity Funds (Mean) | 10.5% | *Schedule B.2* |
| DLOC Determination - Closed End Equity Funds (Median) | 11.7% | *Schedule B.2* |
| **Concluded Discount for Lack of Control** | **8.0%** | |

**Charitable DAF HoldCo, Ltd** — **Schedule C.1**

**Discount for Lack of Marketability (DLOM) Analysis** — **Valuation Date: December 31, 2023**

*DLOM Determination - Put Option Approach*

**Discount for Lack of Marketability - Put Option Approach**

| | | | |
|---|---|---|---|
| **Option-Pricing Inputs:** | | | |
| Stock Price | **S** | $1.00 | |
| Strike Price | **X** | $1.00 | *(Set to same as stock price)* |
| Expected Life | **T** | 0.75 | *(Years)* |
| Volatility | **s** | 15.0% | *Schedule C.2* |
| Risk-free rate | **R** | 5.50% | *US Treasury Implied Yield for Expected Life* |
| Dividend Yield | **Q** | 0.00% | * |

| | | | |
|---|---|---|---|
| *Intermediate Calculations:* | | *Intermediate Calculations:* | |
| *d1* | *0.38220588* | *-d1* | *-0.38220588* |
| *d2* | *0.25230207* | *-d2* | *-0.25230207* |
| *N(d1)* | *0.64884567* | *N(d1)* | *0.35115433* |
| *N(d2)* | *0.59959620* | *N(d2)* | *0.40040380* |
| Black-Scholes Call Option Price | $0.07 | Black-Scholes Put Option Price | $0.03 |

| | |
|---|---|
| **Implied Discount for Lack of Marketability (DLOM)** | **3.3%** |

** Distributions not expected in the near future*

**Charitable DAF HoldCo, Ltd** — **Schedule C.2**

**Discount for Lack of Marketability (DLOM) Analysis** — **Valuation Date: December 31, 2023**

*Put Option Approach - Historical Guideline Company Volatility Summary*

| Historical Volatility Term | Bond Funds | | | | | Equity Funds | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | BKT | FMY | JMM | JLS | VBF | FXBY | GRF | EQS | SPE | RVT |
| 0.5 Years | 14.1% | 15.2% | 11.5% | 14.6% | 15.0% | 30.4% | 30.3% | 40.7% | 11.7% | 18.4% |
| 1 Year | 12.7% | 15.0% | 11.5% | 12.1% | 14.7% | 27.5% | 26.0% | 40.6% | 11.6% | 19.8% |
| 1.5 Years | 13.4% | 17.0% | 15.0% | 11.9% | 16.5% | 27.2% | 34.6% | 52.3% | 14.2% | 23.9% |
| 2 Years | 13.3% | 16.4% | 15.1% | 12.0% | 15.7% | 27.9% | 37.0% | 49.5% | 14.8% | 25.5% |
| 2.5 Years | 13.1% | 15.2% | 14.1% | 11.4% | 15.1% | 27.8% | 34.0% | 47.5% | 14.3% | 24.3% |
| 3 Years | 12.5% | 14.5% | 13.2% | 10.9% | 14.6% | 122.0% | 31.7% | 48.3% | 13.8% | 23.6% |
| 3.5 Years | 11.8% | 14.1% | 13.4% | 11.0% | 14.1% | 113.8% | 30.4% | 53.8% | 14.7% | 23.1% |
| 4 Years | 12.3% | 15.3% | 18.0% | 17.2% | 16.5% | 108.4% | 32.3% | 56.1% | 24.1% | 29.6% |
| 4.5 Years | 11.7% | 14.7% | 17.3% | 16.3% | 16.1% | 102.4% | 31.5% | 54.8% | 22.9% | 28.3% |
| 5.0 Years | 11.3% | 14.1% | 16.6% | 15.6% | 15.5% | 97.9% | 31.0% | 53.2% | 21.9% | 27.3% |

| Historical Volatility Term | Statistical Summary | | | | | |
|---|---|---|---|---|---|---|
| | Low | 25th % | Median | Mean | 75th % | High |
| **0.5 Years** | 11.5% | 14.2% | **15.1%** | 20.2% | 27.3% | 40.7% |
| **1 Year** | 11.5% | 12.3% | **14.8%** | 19.2% | 24.5% | 40.6% |
| 1.5 Years | 11.9% | 14.4% | 16.8% | 22.6% | 26.4% | 52.3% |
| 2 Years | 12.0% | 14.8% | 16.1% | 22.7% | 27.3% | 49.5% |
| 2.5 Years | 11.4% | 14.2% | 15.1% | 21.7% | 26.9% | 47.5% |
| 3 Years | 10.9% | 13.4% | 14.5% | 30.5% | 29.7% | 122.0% |
| 3.5 Years | 11.0% | 13.5% | 14.4% | 30.0% | 28.6% | 113.8% |
| 4 Years | 12.3% | 16.7% | 21.0% | 33.0% | 31.6% | 108.4% |
| 4.5 Years | 11.7% | 16.1% | 20.1% | 31.6% | 30.7% | 102.4% |
| 5.0 Years | 11.3% | 15.5% | 19.3% | 30.4% | 30.1% | 97.9% |

| | |
|---|---|
| **Concluded Volatility** | **15.0%** |

*Source: Yahoo Finance*

Charitable DAF HoldCo, Ltd
Discount for Lack of Marketability (DLOM) Analysis

Schedule C.3
Valuation Date: December 31, 2023

*DLOM Determination - Restricted Stock Studies*

| | Restricted Stock Studies | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Study | Period Covered | | | | Reported | Reported |
| | Name of Study | Date | From | To | Sub-Sample | Observations | Mean | Median |
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 85 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.5% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2009 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1989 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramanium, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 25.8% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.0% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | 1995 | 2000 | | | | |
| | *Purchase Discount Only* | | | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 536 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 15.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | [illegible] | 8.7% | 10.1% |
| 28 | Billett and Flores | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | NA | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Ferris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.5% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

**Charitable DAF HoldCo, Ltd** | **Schedule C.4**

**Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: December 31, 2023**

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | **Mean** | **Median** |
| **All Studies after 1997 and before 2008** | | |
| **Low** | **9.7%** | **9.0%** |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 2008** | | |
| **Low** | **10.9%** | **9.3%** |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **9.7%** | |

**Charitable DAF HoldCo, Ltd** | **Schedule C.5**
**Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: December 31, 2023**

*DLOM Conclusion*

| **Discount for Lack of Marketability** | | |
|---|---|---|
| DLOM Determination - Put Option Approach | 3.3% | *Schedule C.1* |
| DLOM Determination - Restricted Stock Studies | 9.7% | *Schedule C.4* |
| **Concluded Discount for Lack of Marketability** | **6.5%** | |

**CLO HoldCo, Ltd.**
Balance Sheet
6/30/2024

| Position Name | Par Amount | 5/31 Mark | 6/30 Mark | MV | Repo Financing | Secured Loan To Frontier Bank |
|---|---|---|---|---|---|---|
| TerreStar Corporation Term Loan A - Non Convertible | 82,981,754.50 | 99.78 | 99.80 | 82,815,790.99 | - | - |
| NexPoint Skorpios | 65,000.00 | 525.90 | 452.95 | 29,441,954.82 | - | - |
| NREA SB II Holdings, LLC | 25,000.00 | - | 1,005.92 | 25,147,991.14 | - | - |
| Highland CLO Funding, Ltd. | 75,061,661.00 | 0.19 | 0.19 | 14,029,024.44 | - | - |
| NexPoint Capital, INC. | 2,549,002.29 | 5.32 | 5.22 | 13,305,791.96 | - | - |
| NRSZX | 500,119.62 | 16.95 | 16.88 | 8,442,019.20 | - | - |
| NCI Royse City Land, LLC | 1.00 | 5,649,400.00 | 5,649,400.00 | 5,649,400.00 | - | - |
| NREF | 395,033.00 | 14.22 | 13.72 | 5,419,852.76 | - | - |
| NexPoint Adare - Tranche 1 | 19,500.00 | 294.48 | 273.45 | 5,332,269.21 | - | - |
| WMG BELLE AVENUE MEZZANINE, LLC | 424,000.00 | 9.59 | 9.67 | 4,098,074.48 | - | - |
| SRTY | 119,086.00 | 27.22 | 27.79 | 3,309,399.94 | - | - |
| Conservation Equity Fund I | 1.00 | 3,031,280.00 | 3,001,654.00 | 3,001,654.00 | - | - |
| .SERENG | 1.00 | 2,652,593.75 | 2,741,693.11 | 2,741,693.11 | - | - |
| FFWM | 407,241.00 | 5.92 | 6.55 | 2,667,428.55 | - | - |
| SPXU | 89,724.00 | 32.21 | 28.82 | 2,585,845.68 | - | - |
| WMG Belle Avenue Orlando Partners, LLC | 145,200.00 | 15.23 | 15.23 | 2,211,531.04 | - | - |
| NXRT | 53,129.00 | 36.67 | 39.51 | 2,099,126.79 | - | - |
| SQQQ | 246,117.00 | 10.02 | 8.28 | 2,037,848.76 | - | - |
| NHF | 353,094.00 | 5.51 | 5.53 | 1,952,609.82 | - | - |
| TerreStar Corporation New Common | 5,082.00 | 325.41 | 322.82 | 1,640,571.24 | - | - |
| NLA Assets, LLC | 1.00 | 1,301,900.00 | 1,301,900.00 | 1,301,900.00 | - | - |
| NCI Stewart Creek, LLC | 100.00 | 12,500.00 | 12,500.00 | 1,250,000.00 | - | - |
| NCI Apache Trail, LLC | 1.00 | 940,000.00 | 940,000.00 | 940,000.00 | - | - |
| NCI Fort Worth Land, LLC | 1.00 | 874,200.00 | 874,200.00 | 874,200.00 | - | - |
| NexPoint Polo Glen DST | 101.06 | 6,591.94 | 6,621.74 | 669,192.92 | - | - |
| UDFI | 946,492.00 | 0.62 | 0.58 | 545,936.59 | - | - |
| MPMQ Appraisal Rights Claims | 105,492.00 | 5.00 | 5.00 | 527,460.00 | - | - |
| TGTX | 14,250.00 | 16.30 | 17.79 | 253,507.50 | - | - |
| TMO | 457.00 | 567.98 | 553.00 | 252,721.00 | - | - |
| Multi Strat | 1.00 | 218,841.51 | 213,864.25 | 213,864.25 | - | - |
| ACHC US | 2,500.00 | 68.89 | 67.54 | 168,850.00 | - | - |
| SRG | 30,000.00 | 5.26 | 4.67 | 140,100.00 | - | - |
| NHT Holdco, LLC - Membership Units | 2,108,589.00 | 0.07 | 0.05 | 109,056.22 | - | - |
| Highland CLO Funding, Ltd. - Participation Rights | 520,517.33 | 0.19 | 0.19 | 97,284.69 | - | - |
| COLL | 2,997.00 | 33.14 | 32.20 | 96,503.40 | - | - |
| Big Valley Power Property, LLC | 1.00 | 94,000.00 | 94,000.00 | 94,000.00 | - | - |
| BIO | 332.00 | 286.86 | 273.11 | 90,672.52 | - | - |
| MT Statutory Trust 2002 7.740% - 06/2023 @ Float 7.7400 6/19/2023 | 77,380.04 | 100.03 | 100.03 | 77,405.13 | - | - |
| Crusader Fund II, Ltd., Prior | 147,959.88 | 0.28 | 0.28 | 41,294.60 | - | - |
| TerreStar Corporation Term Loan C - Non Convertible | 38,968.65 | 99.78 | 99.80 | 38,890.71 | - | - |
| Total Wire - Convertible Promissory Note | 20,560.00 | 100.00 | 100.00 | 20,560.00 | - | - |
| HRTX | 5,500.00 | 3.70 | 3.50 | 19,250.00 | - | - |
| ACRG/A/U CN | 17,526.00 | 0.37 | 0.29 | 4,994.91 | - | - |
| ACRG/B/U CN | 7,511.00 | 0.43 | 0.22 | 1,652.42 | - | - |
| PRTK | 18,600.00 | 0.08 | 0.08 | 1,488.00 | - | - |
| iHeartCommunications, Inc. (fka Clear Channel Communications, Inc.) 6.375% - 05/2026 - 45174HBC0 FIX 6.375% 5/1/2026 | 411.00 | 76.64 | 77.86 | 320.00 | - | - |
| ABERD NOT LISTED | 1,000.00 | 0.01 | 0.01 | 11.04 | - | - |
| AMERICAN ENERGY/AEPB FIX @ 7.38% 11/01/2021 02563LAC2 | 464.00 | 0.50 | 0.50 | 2.30 | - | - |
| Total | | | | 225,760,996.14 | $ - | $ - |
| Cash - Jefferies | | | | 34,790,228 | | |
| Cash - Cantor | | | | 414,812 | | |
| Cash - Charles Schwab | | | | 13,421,413 | | |
| Cash - Vista Bank | | | | 19,145,999 | | |
| Cash - NexBank 639 | | | | 12,438,971 | | |
| Cash - NexBank 057 | | | | - | | |
| Cash - JPM | | | | 1,582,718 | | |
| Cash - Wells Fargo | | | | 717,926 | | |
| Cash - Hancock Whitney | | | | 6,040,851 | | |
| HCT Holdco | | | | - | | |
| Collateral Receivable | | | | 81,419 | | |
| Prepaid Admin Fees | | | | - | | |
| Accrued Income | | | | 777,205 | | |
| Dividend Receivable | | | | 184,427 | | |
| Due from affiliate | | | | - | | |
| Distributions Receivable | | | | - | | |
| Due from broker | | | | 637,419 | | |
| HCMSI Loan - Interest | | | | - | | |
| HCMSI Loan | | | | 1,371,222 | | |
| Deferred loan fees | | | | - | | |
| **Total Assets** | | | | **317,365,603.10** | | |

| | |
|---|---|
| **Payables:** | |
| Accrued Expenses | (191,847) |
| Repo Financing Payable | - |
| Secured Notes Payable | - |
| Unsecured Notes Payable | (32,801,593) |
| Nexvest Notes Payable | (1,650,000) |
| HCRE Note | (1,911,125) |
| Due to Broker | (824,037) |
| Loan Interest Payable | (9,649,816) |
| Repo Interest Payable | - |
| Total Amounts Payable | $ (47,028,418) |
| **Total Net Assets** | **$ 270,337,185** |

CLO HoldCo, Ltd.
Performance Summary

| Month | Beginning NAV | Subs/Reds | P&L | Management Fee | Incentive Fee | Ending NAV | Gross Return | YTD Gross Return | Net Return | YTD Net |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/31/2023 | 276,241,856 | (363,206.75) | 1,829,396 | - | - | 277,708,046 | 0.66% | 0.66% | 0.66% | 0.66% |
| 2/28/2023 | 277,708,046 | - | 2,004,483 | - | - | 279,712,529 | 0.72% | 1.39% | 0.72% | 1.39% |
| 3/31/2023 | 279,712,529 | - | (4,484,591) | - | - | 275,227,938 | -1.60% | -0.24% | -1.60% | -0.24% |
| 4/30/2023 | 275,227,938 | (635,950.00) | 987,731 | - | - | 275,579,718 | 0.36% | 0.12% | 0.36% | 0.12% |
| 5/31/2023 | 275,579,718 | - | (1,357,105) | - | - | 274,222,613 | -0.49% | -0.37% | -0.49% | -0.37% |
| 6/30/2023 | 274,222,613 | (252,646.00) | (3,555,966) | - | - | 270,414,002 | -1.30% | -1.66% | -1.30% | -1.66% |
| 7/31/2023 | 270,414,002 | - | 2,746,212 | - | - | 273,160,213 | 1.02% | -0.67% | 1.02% | -0.67% |
| 8/31/2023 | 273,160,213 | 11,870,127.43 | 1,975,180 | - | - | 287,005,521 | 0.72% | 0.05% | 0.72% | 0.05% |
| 9/30/2023 | 287,005,521 | (554,287.00) | 2,432,777 | - | - | 288,884,011 | 0.85% | 0.90% | 0.85% | 0.90% |
| 10/31/2023 | 288,884,011 | - | (6,284,402) | - | - | 282,599,608 | -2.18% | -1.29% | -2.18% | -1.29% |
| 11/30/2023 | 282,599,608 | - | (10,686,904) | - | - | 271,912,704 | -3.78% | -5.03% | -3.78% | -5.03% |
| 12/31/2023 | 271,912,704 | (500,000.00) | 6,458,980 | - | - | 277,871,684 | 2.38% | -2.77% | 2.38% | -2.77% |
| 1/31/2024 | 277,871,684 | (90,122.50) | (3,976,081) | - | - | 273,805,480 | -1.43% | -1.43% | -1.43% | -1.43% |
| 2/29/2024 | 273,805,480 | - | (48,855) | - | - | 273,756,625 | -0.02% | -1.45% | -0.02% | -1.45% |
| 3/31/2024 | 273,756,625 | - | (1,307,067) | - | - | 272,449,558 | -0.48% | -1.92% | -0.48% | -1.92% |
| 4/30/2024 | 272,449,558 | (355,890.00) | (261,066) | - | - | 271,832,602 | -0.10% | -2.01% | -0.10% | -2.01% |
| 5/31/2024 | 271,832,602 | - | (2,381,482) | - | - | 269,451,120 | -0.88% | -2.87% | -0.88% | -2.87% |
| 6/30/2024 | 269,451,120 | - | 886,065 | - | - | 270,337,185 | 0.33% | -2.55% | 0.33% | -2.55% |

CLO HoldCo, Ltd.
o 10 Hold n

| Position | Quantity | FMV |
|---|---|---|
| erreStar Cor orat on erm Loan - on Con ert le | 82,981,754.50 | 82,815,790.99 |
| e Po nt S or o | 65,000.00 | 29,441,954.82 |
| S Hold n , LLC | 25,000.00 | 25,147,991.14 |
| H land CLO und n , Ltd. | 75,061,661.00 | 14,029,024.44 |
| e Po nt Ca tal, C. | 2,549,002.29 | 13,305,791.96 |
| S | 500,119.62 | 8,442,019.20 |
| C oy e C ty Land, LLC | 1.00 | 5,649,400.00 |
| | 395,033.00 | 5,419,852.76 |
| e Po nt dare - ranc e 1 | 19,500.00 | 5,332,269.21 |
| M LL M , LLC | 424,000.00 | 4,098,074.48 |
| **Grand Total** | **162,021,071.41** | **193,682,169.01** |

CLO HoldCo, Ltd.
YTD Expense

| Expense | 1/31/2024 | 2/29/2024 | 3/31/2024 | 4/30/2024 | 5/31/2024 | 6/30/2024 | YTD ($) | YTD (%) |
|---|---|---|---|---|---|---|---|---|
| Legal Fee Expense | 1,082,141 | 1,333,388 | 871,969 | 1,012,494 | 1,232,228 | 652,525 | 6,184,745 | 32.71% |
| Rent Expense | 1,014,693 | - | 2,029,385 | 1,045,133 | 1,045,133 | 1,045,133 | 6,179,477 | 32.68% |
| Directors Fees | - | 2,189,500 | - | - | - | - | 2,189,500 | 11.58% |
| Tax Fee Expense | 95,177 | 56,462 | 288 | 1,038,780 | 69,445 | - | 1,260,152 | 6.66% |
| Interest Expense | 138,361 | 128,977 | 138,168 | 133,776 | 138,375 | 134,209 | 811,866 | 4.29% |
| Fund Administration Expense | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 83,333 | 499,998 | 2.64% |
| Valuation Expense | 48,452 | 40,143 | 34,973 | 93,219 | 87,396 | 109,480 | 413,663 | 2.19% |
| Valuation Expense | 22,178 | 40,143 | 31,058 | 50,421 | 79,680 | 64,412 | 287,892 | 1.52% |
| Misc Fee Expense | 1,849 | 54,951 | 17,451 | 77,710 | 65,125 | 32,968 | 250,054 | 1.32% |
| Acquisition Fee Expense | 70,000 | - | 70,000 | - | - | 70,000 | 210,000 | 1.11% |
| Withholding Expense | 40,753 | 19,460 | 53,802 | 25,972 | 19,502 | 41,506 | 200,995 | 1.06% |
| Clearing Fees | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 120,000 | 0.63% |
| Consulting Fees | 30,000 | - | 30,000 | - | - | 30,000 | 90,000 | 0.48% |
| Administrator Expense | 15,169 | 14,965 | 14,963 | 14,897 | 14,867 | 14,748 | 89,609 | 0.47% |
| Directors and Officers Fee Expense | - | 6,236 | 61,925 | - | - | - | 68,161 | 0.36% |
| Dividend Expense | 1,667 | - | - | 50,868 | - | - | 52,535 | 0.28% |
| Government Fees - Liberty | 1,468 | - | - | - | - | - | 1,468 | 0.01% |
| **Totals** | 2,665,241 | 3,987,558 | 3,457,315 | 3,646,603 | 2,855,084 | 2,298,314 | 18,910,115 | 100.00% |

Report of Independent Auditors and
Consolidated Financial Statements

**Santa Barbara Foundation**

December 31, 2023 with
Summarized Comparative Totals for December 31, 2022

MOSSADAMS

# Table of Contents


| | Page |
|---|---|
| **Report of Independent Auditors** | 1 |
| **Consolidated Financial Statements** | |
| Consolidated Statements of Financial Position | 3 |
| Consolidated Statements of Activities and Changes in Net Assets | 4 |
| Consolidated Statements of Functional Expenses | 5 |
| Consolidated Statements of Cash Flows | 6 |
| Notes to Consolidated Financial Statements | 7 |

MOSSADAMS

# Report of Independent Auditors

The Audit Committee
Santa Barbara Foundation

## Report on the Audit of the Financial Statements

### *Opinion*

We have audited the accompanying consolidated financial statements of Santa Barbara Foundation and its supporting organizations and affiliates, which comprise the consolidated statement of financial position as of December 31, 2023, and the related consolidated statements of activities and changes in net assets, functional expenses, and cash flows for the year then ended, and the related notes to the consolidated financial statements.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of Santa Barbara Foundation and its supporting organizations and affiliates as of December 31, 2023, and the changes in their net assets and cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

### *Basis for Opinion*

We conducted our audit in accordance with auditing standards generally accepted in the United States of America (GAAS). Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of Santa Barbara Foundation and its supporting organizations and affiliates and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### *Other Matter*

We have previously audited the Santa Barbara Foundation and its supporting organizations and affiliates' December 31, 2022, consolidated financial statements, and our report dated September 7, 2023, expressed an unmodified audit opinion on those audited consolidated financial statements. In our opinion, the summarized comparative information presented herein as of and for the year ended December 31, 2023, is consistent, in all material respects, with the audited consolidated financial statements from which it has been derived.

### *Responsibilities of Management for the Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the consolidated financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about Santa Barbara Foundation and its supporting organizations and affiliates' ability to continue as a going concern within one year after the date that the consolidated financial statements are available to be issued.

***Auditor's Responsibilities for the Audit of the Financial Statements***

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with GAAS will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the consolidated financial statements.

In performing an audit in accordance with GAAS, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.
- Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements.
- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of Santa Barbara Foundation and its supporting organizations and affiliates' internal control. Accordingly, no such opinion is expressed.
- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the consolidated financial statements.
- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about Santa Barbara Foundation and its supporting organizations and affiliates' ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control-related matters that we identified during the audit.

Moss Adams LLP

Los Angeles, California
September 5, 2024

## Consolidated Financial Statements

# Santa Barbara Foundation
## Consolidated Statements of Financial Position
## December 31, 2023 With Summarized Comparative Totals for 2022

### ASSETS

| | Without Donor Restrictions | With Donor Restrictions | 2023 Total | Summarized 2022 Total |
|---|---|---|---|---|
| ASSETS | | | | |
| Cash and cash equivalents | $ 82,285,249 | $ 56,094 | $ 82,341,343 | $ 68,287,954 |
| Investments | 543,799,297 | 67,038,247 | 610,837,544 | 458,590,918 |
| Contributions receivable, net | 13,553,708 | 206,926 | 13,760,634 | 21,780,784 |
| Notes receivable, net | 1,390,156 | - | 1,390,156 | 2,336,894 |
| Beneficial interest in trusts | - | 81,184,680 | 81,184,680 | 78,421,897 |
| Property and equipment, net | 12,414,779 | - | 12,414,779 | 12,866,063 |
| Other assets | 258,749 | - | 258,749 | 289,531 |
| Total assets | $ 653,701,938 | $ 148,485,947 | $ 802,187,885 | $ 642,574,041 |

### LIABILITIES AND NET ASSETS

| | Without Donor Restrictions | With Donor Restrictions | 2023 Total | Summarized 2022 Total |
|---|---|---|---|---|
| LIABILITIES | | | | |
| Accounts payable and accrued expenses | $ 593,763 | $ - | $ 593,763 | $ 397,965 |
| Grants payable, net | 68,750 | - | 68,750 | 132,940 |
| Note payable | 2,741,924 | - | 2,741,924 | 2,828,357 |
| Liabilities under split-interest agreements | - | 1,032,190 | 1,032,190 | 1,035,112 |
| Funds held on behalf of others | 33,165,254 | - | 33,165,254 | 27,537,507 |
| Total liabilities | 36,569,691 | 1,032,190 | 37,601,881 | 31,931,881 |
| NET ASSETS | 617,132,247 | 147,453,757 | 764,586,004 | 610,642,160 |
| Total liabilities and net assets | $ 653,701,938 | $ 148,485,947 | $ 802,187,885 | $ 642,574,041 |

See accompanying notes.



CONFIDENTIAL

# Santa Barbara Foundation
## Consolidated Statements of Activities and Changes in Net Assets
## Year Ended December 31, 2023 With Summarized Comparative Totals for 2022

| | Without Donor Restrictions | With Donor Restrictions | 2023 Total | Summarized 2022 Total |
|---|---|---|---|---|
| REVENUE, GAINS, AND OTHER SUPPORT | | | | |
| Contributions | $ 128,873,729 | $ 1,282,500 | $ 130,156,229 | $ 51,180,134 |
| Less contributions raised on behalf of others | (2,306,227) | - | (2,306,227) | (3,105,942) |
| Total contributions and bequests | 126,567,502 | 1,282,500 | 127,850,002 | 48,074,192 |
| Investment income net | 53,348,430 | 7,589,590 | 60,938,020 | 40,128,982 |
| Less investment (income) loss on behalf of others, net | (892,414) | - | (892,414) | 3,862,958 |
| Total investment income, net | 52,456,016 | 7,589,590 | 60,045,606 | 43,991,940 |
| Change in value of split-interest agreements | - | 3,278,277 | 3,278,277 | (4,412,801) |
| Other income | 398,023 | - | 398,023 | 460,673 |
| Net assets released from restrictions | | | | |
| Available for distribution per spending policy | 2,853,154 | (2,853,154) | - | - |
| Reclassifications and other releases from restrictions | 1,154,491 | (1,154,491) | - | - |
| Total revenue, gains, and other support | 183,429,186 | 8,142,722 | 191,571,908 | 88,114,004 |
| EXPENSES | | | | |
| Program services | | | | |
| Grants, net of rescinds | 28,279,240 | - | 28,279,240 | 27,653,249 |
| Less grants made on behalf of others | (564,508) | - | (564,508) | (1,050,740) |
| Total grants, net of rescinds | 27,714,732 | - | 27,714,732 | 26,602,509 |
| Grant making and direct program | 4,715,266 | - | 4,715,266 | 3,749,274 |
| Total program services | 32,429,998 | - | 32,429,998 | 30,351,783 |
| Support services | | | | |
| Administrative and fund management | 3,293,005 | - | 3,293,005 | 2,953,052 |
| Fundraising and development | 1,905,061 | - | 1,905,061 | 1,569,928 |
| Total support services | 5,198,066 | - | 5,198,066 | 4,522,980 |
| Total expenses | 37,628,064 | - | 37,628,064 | 34,874,763 |
| CHANGE IN NET ASSETS | 145,801,122 | 8,142,722 | 153,943,844 | 53,239,242 |
| NET ASSETS, beginning of year | 471,331,125 | 139,311,035 | 610,642,160 | 557,402,918 |
| NET ASSETS, end of year | $ 617,132,247 | $ 147,453,757 | $ 764,586,004 | $ 610,642,160 |

See accompanying notes.

# Santa Barbara Foundation
## Consolidated Statements of Functional Expenses
## Year Ended December 31, 2023 With Summarized Comparative Totals for 2022

| | Program Services | Administrative and Fund Management | Fundraising and Development | 2023 Total | Summarized 2022 Total |
|---|---|---|---|---|---|
| EXPENSES | | | | | |
| Grants, net of rescinds | $ 27,714,732 | $ - | $ - | $ 27,714,732 | $ 26,602,509 |
| Salaries | 1,177,854 | 1,781,244 | 885,822 | 3,844,920 | 3,385,689 |
| Consultants and professional services | 1,298,783 | 258,161 | 45,310 | 1,602,254 | 1,280,988 |
| Employee benefits | 302,636 | 416,124 | 226,976 | 945,736 | 758,898 |
| Project | 731,022 | - | - | 731,022 | 310,942 |
| Depreciation and amortization | 171,858 | 222,086 | 119,819 | 513,763 | 502,228 |
| Technology | 121,944 | 161,392 | 80,158 | 363,494 | 291,011 |
| Community relations | 166,538 | 4,339 | 185,796 | 356,673 | 294,751 |
| Meetings and conferences | 204,176 | 77,806 | 38,543 | 320,525 | 200,558 |
| Payroll taxes | 83,692 | 115,076 | 62,769 | 261,537 | 235,257 |
| Occupancy | 68,548 | 75,289 | 56,312 | 200,149 | 195,114 |
| Rent | 133,892 | 36,673 | 18,167 | 188,732 | 152,931 |
| Advertising | 72,631 | - | 69,268 | 141,899 | 121,849 |
| Publications | 39,056 | 8,926 | 53,560 | 101,542 | 99,026 |
| Dues, subscriptions, licenses, and permits | 39,288 | 38,798 | 19,220 | 97,306 | 134,192 |
| Interest | 29,130 | 39,178 | 16,544 | 84,852 | 87,431 |
| Office | 33,091 | 23,782 | 9,507 | 66,380 | 53,925 |
| Telephone | 19,260 | 21,457 | 10,630 | 51,347 | 49,767 |
| Insurance | 21,867 | 12,674 | 6,660 | 41,201 | 50,697 |
| Unrelated business income tax | - | - | - | - | 67,000 |
| Total expenses, 2023 | $ 32,429,998 | $ 3,293,005 | $ 1,905,061 | $ 37,628,064 | |
| Percentage of total expenses, 2023 | 86% | 9% | 5% | 100% | |
| Total expenses, 2022 | $ 30,351,783 | $ 2,953,052 | $ 1,569,928 | | $ 34,874,763 |
| Percentage of total expenses, 2022 | 87% | 8% | 5% | | 100% |

See accompanying notes.



CONFIDENTIAL

# Santa Barbara Foundation
## Consolidated Statements of Cash Flows
## Years Ended December 31, 2023 and 2022

| | 2023 | 2022 |
|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Contributions received from donors, net of amounts restricted for endowments | $ 31,401,782 | $ 33,828,587 |
| Cash received (spent) into funds held on behalf of others, net of distributions and fees | 5,627,747 | (1,807,755) |
| Cash received from state, county, and city contracts and grants | 791,262 | 969,679 |
| Interest and dividends received | 7,306,381 | 4,426,741 |
| Miscellaneous receipts | 398,023 | 460,674 |
| Interest paid | (84,852) | (87,431) |
| Unrelated business income tax paid | - | (67,000) |
| Grants and awards paid | (26,778,922) | (25,741,569) |
| Cash paid to employees and suppliers for program services | (4,686,136) | (3,719,258) |
| Cash paid to employees and suppliers for support services | (4,402,000) | (3,584,758) |
| Net cash provided by operating activities | 9,573,285 | 4,677,910 |
| CASH FLOWS FROM INVESTING ACTIVITIES | | |
| Payment of lease commissions | (62,479) | - |
| Purchases of property and equipment | - | (74,201) |
| Purchases of investments | (66,406,472) | (336,769,209) |
| Proceeds from sales of investments | 66,024,096 | 356,949,829 |
| Proceeds from notes receivable | 25,000 | 25,000 |
| Return on capital shareholder distribution | 3,250,828 | 1,003,245 |
| Net cash provided by investing activities | 2,830,973 | 21,134,664 |
| CASH FLOWS FROM FINANCING ACTIVITIES | | |
| Distributions received from charitable remainder trusts | 453,064 | 1,108,367 |
| Contributions restricted for endowments | 1,282,500 | 51,530 |
| Payments on notes payable | (86,433) | (83,854) |
| Net cash provided by financing activities | 1,649,131 | 1,076,043 |
| CHANGE IN CASH AND CASH EQUIVALENTS | 14,053,389 | 26,888,617 |
| CASH AND CASH EQUIVALENTS, beginning of year | 68,287,954 | 41,399,337 |
| CASH AND CASH EQUIVALENTS, end of year | $ 82,341,343 | $ 68,287,954 |

See accompanying notes.



CONFIDENTIAL

### Note 1 – Organization and Summary of Significant Accounting Policies

**Organization** – The Santa Barbara Foundation (SBF) is a community foundation incorporated in 1928 under the laws of the State of California as a nonprofit corporation to enrich the lives of the people of Santa Barbara County through philanthropy. It is the mission of SBF to mobilize collective wisdom and philanthropic capital to build empathetic, inclusive, and resilient communities. SBF continues to serve as one of the largest private funding sources for area nonprofits, agencies, and college-bound students.

**Supporting organizations** – SBF works with entities organized as supporting organizations to SBF for the specific and primary purpose of benefiting, performing functions of, and engaging in activities consistent with SBF's charitable purposes. SBF appoints a majority of the members of the governing boards of the supporting organizations. Each governing board may create its own investment policy and grant guidelines. In 2023 and 2022, the following supporting organizations were effectively under SBF's control and were consolidated for financial statement purposes:

- Highland Santa Barbara Foundation, Inc. (HSBF) – organized in November 2011; and
- The Eric and Kelly Schwartz Charitable Trust (EKSCT) – organized in August 2015.

**Affiliates** – In 2023 and 2022, the following affiliates were effectively under SBF's control and were consolidated for financial statement purposes:

- 1111 Chapala Street, LLC, whose primary operating asset is a commercial building located in Santa Barbara, California;
- 300 East Islay Street, LLC, whose primary operating asset is a residential building located in Santa Barbara, California; and
- SBF Properties, LLC, whose purpose is to receive gifts of real property.

**Principles of consolidation** – The accompanying consolidated financial statements as of December 31, 2023 and 2022, include the financial statements of SBF and its supporting organizations and affiliates, listed above. All material inter-organizational transactions and balances have been eliminated in the consolidation.

**Basis of accounting** – The accompanying consolidated financial statements of SBF have been prepared on the accrual basis of accounting under generally accepted accounting principles (U.S. GAAP).

**Reclassifications** – Certain amounts from the December 31, 2022, financial statements have been reclassified to conform to the December 31, 2023 financial statement presentation.

**Description of net assets** – SBF reports information regarding its financial position and activities in two classes of net assets—with donor restrictions and without donor restrictions—based on the existence or absence of donor-imposed restrictions.

SBF's governing documents provide the Board of Trustees with the variance power to modify any restriction or condition placed on gifts to SBF if, in its sole judgment, the Board of Trustees determines that the restriction becomes in effect unnecessary, incapable of fulfillment, or inconsistent with the charitable needs of the community served.

- *Net assets without donor restrictions* represent net assets that are not subject to donor-imposed time restrictions. Net assets without donor restrictions include board-designated funds that have been purposed for designing an Impact Investing program that will promote philanthropic donations, further community impact, and enhance opportunity for financial return.

- *Net assets with donor restrictions* represent net assets that are subject to donor-imposed time restrictions. Net assets with donor restrictions generally include contributions and bequests receivable and planned gifts. Earnings on net assets with donor restrictions are reported as an increase in net assets with donor restrictions. Earnings on donor-restricted endowment funds that have not yet been appropriated are also classified as net assets with donor restrictions. When a restriction expires, net assets with donor restrictions are reclassified to net assets without donor restrictions and reported in the consolidated statements of activities and changes in net assets as "net assets released from restrictions." Net assets with donor restrictions include perpetual income trusts for which the related income is reported as contributions without donor restrictions when received on the consolidated statements of activities and changes in net assets. The change in value of the underlying assets is recorded as an unrealized gain or loss in net assets with donor restrictions on the consolidated statements of activities and changes in net assets. Net assets with donor restrictions also consist of those donor-restricted endowments held by SBF as defined under the Uniform Prudent Management of Institutional Funds Act (UPMIFA).

**Functional expense allocation** – Salaries, employee benefits, and payroll taxes are allocated based on time spent in each functional area by specific employee as estimated by management. Indirect costs included in meetings and conferences, depreciation and amortization, technology, occupancy, office, and rent expense are allocated based on number of employees by functional area based on time spent by specific employee as estimated by management. Certain advertising costs are allocated based on the percentage of the publication devoted to each functional area. All other costs are charged directly to the appropriate functional category.

**Comparative amounts** – The amounts shown for 2022 in the accompanying consolidated financial statements are included to provide a basis for comparison with 2023 and are not intended to present all information necessary for a fair presentation of the 2022 consolidated financial statements in conformity with U.S. GAAP. Accordingly, such information should be read in conjunction with SBF's consolidated financial statements for the year ended December 31, 2022, from which the summarized information was derived.

**Cash and cash equivalents** – SBF considers all highly liquid investments with an initial maturity of three months or less to be cash equivalents.

**Use of estimates** – The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect certain amounts and disclosures. Those estimates and assumptions affect the reported amounts of assets, liabilities, the disclosure of contingent assets and liabilities, and the reported revenues and expenses. It is at least reasonably possible that the significant estimates could change in the coming year.

Significant estimates used in the preparation of these consolidated financial statements include:

- Allocation of certain expenses by function;
- Discount factors used in determining contributions receivable, notes receivable, grants payable, annuities payable by charitable trust, and income interest in charitable trusts;
- Allowance for uncollectible contributions;
- Fair value of assets held by charitable trusts;
- Fair value of certain investments; and
- Depreciable lives of property and equipment.

**Contributions** – Unconditional contributions received are recorded at their fair value on the date of donation. Contributions have been evaluated and determined to be non-reciprocal and unconditional for the year ended December 31, 2023. Unconditional contributions, including promises to give, are recognized as revenue when received. Unconditional promises to give must be accompanied by written documentation prior to being recognized as revenue. Conditional promises to give are recognized when the conditions on which they depend are substantially met. Bequests are recorded at their estimated fair value when all the events required for the transfer of the assets from the estate of the donor to SBF have occurred and/or the court has issued an order to transfer the assets. Noncurrent contributions and bequests receivable are discounted at the net present value utilizing the applicable federal rate set by the Internal Revenue Service (IRS) at the date of the gift.

**Donated goods and services** – Donated goods and services received by SBF are recorded as contributions at fair value at the time of the donation or receipt. For the year ended December 31, 2023, numerous volunteers gave their time and expertise to SBF in a wide variety of areas including: committees, administrative activities, technical and financial advice, and office and public relations activities. These contributions, despite their considerable value to the mission of SBF, are not reflected in the consolidated financial statements. Donated or contributed services are reported at fair value in the consolidated financial statements for voluntary donations of services when those services (1) create or enhance nonfinancial assets, or (2) require specialized skills provided by individuals possessing those skills and are services which would be typically purchased if not provided by donation.

**Investments** – SBF records investments at fair value. The fair value of investments in securities traded on national securities exchanges is valued at the closing price on the last business day of the year. The investments in hedge funds, partnerships, and private equity, for which quoted market prices are not readily available, are determined by management in good faith with the assistance of third-party investment managers using methods they consider appropriate at net asset value (NAV). Realized and unrealized gains and losses are included in the change in net assets, net of investment expenses.

**Income taxes** – SBF and its supporting organizations and affiliates are tax exempt organizations and are not subject to federal or state income taxes, except on unrelated business income, in accordance with Section 501(a) of the Internal Revenue Code. In addition, SBF and its supporting organizations and affiliates qualified for the charitable contribution deduction under Section 170(b)(1)(A) of the Internal Revenue Code and have been classified as organizations that are not private foundations. Unrelated business income tax, if any, is immaterial and no tax provision has been made in the accompanying consolidated financial statements.

SBF and its supporting organizations and affiliates evaluate uncertain tax positions, whereby the effect of the uncertainty would be recorded if the outcome were considered probable and reasonably estimable. As of December 31, 2023, SBF and its supporting organizations and affiliates have no uncertain tax positions requiring accrual.

**Beneficial interest in trusts and split interest agreements** – SBF has a beneficial interest in various trusts and other split-interest agreements. A split-interest agreement is a contribution that results in the sharing of legal rights to certain assets by the nonprofit entity and the donor, including other specified individuals or organizations designated by the donor. Such split-interest agreements are held in charitable remainder trusts, life insurance policies, charitable lead trusts, charitable gift annuities, pooled income funds, and perpetual interest trusts, as follows:

*Charitable remainder trusts* – SBF is named as an irrevocable remainder beneficiary of charitable trusts, which have been established by donors to provide income, generally for life, to designated beneficiaries. SBF is also the irrevocable remainder beneficiary of two life insurance policies. At the end of the term, or upon the death of the income beneficiaries, assets remaining in the trusts will be transferred to SBF. Each year, beneficiaries receive a percentage of the trust's fair value, generally limited to net income or net income with make-up provisions.

If SBF is the trustee, the fair value of the trust is included in investments within the consolidated statements of financial position, a corresponding liability is recorded for the present value of estimated future payments as specified in the trust agreement, and the difference is recognized as a contribution. As of December 31, 2023, there were six such trusts valued at $937,813, with a corresponding liability for estimated future payments of $611,069, factored by discount rates ranging between 2% and 8.2%.

If SBF is not the trustee, contribution revenue and related assets are recognized at the fair value of the trusts' investments, net of the present value of estimated future payments to beneficiaries. As of December 31, 2023, there were thirty such trusts and two life insurance policies valued at a total of $60,502,543, factored by discount rates ranging between 1.4% and 10%, included in beneficial interests in trusts within the consolidated statements of financial position.

*Charitable lead trusts* – SBF is named the lead beneficiary for a charitable lead trust held by third-party trustees. The charitable lead trust is included in beneficial interests in trusts within the consolidated statements of financial position at the present value of future payments to be received under the trust agreement. As of December 31, 2023, there was one such trust valued at $753,114, factored by a discount rate of 1.6%.

*Charitable gift annuities* – Charitable gift annuity donors have contributed assets to SBF in exchange for a promise by SBF to pay a fixed amount for a specified period to the donor or to individuals or organizations designated by the donor. Under the terms of the agreements, no trust exists, as the assets received are held by SBF, and the liability is an obligation of SBF. SBF records new gifts at the fair value of the assets net of the present value of the estimated future payments to beneficiaries factored by the IRS applicable federal rate (AFR) discount rate in effect at the date of the gift contract. As of December 31, 2023, there were twenty-four charitable gift annuities valued at $511,515 with a corresponding liability for estimated future payments of $334,213, factored by discount rates ranging between 4.0% and 11.3%, included in investments within the consolidated statements of financial position. The value of $511,515 exceeds the state of California required reserve of $392,362 by $119,153.

*Pooled income funds* – Pooled income fund donors have contributed assets to SBF in exchange for a net income payout for a specified period. Under the terms of the agreements, no trust exists, as the assets are held by SBF. The fair value of the asset is included in investments within the consolidated statements of financial position and a corresponding liability is recorded for the present value of estimated future payments to beneficiaries factored by the highest yearly rate of return for the past three years for each portfolio ranging between -11.3% and 7.9%. As of December 31, 2023, the fair value of the pooled income funds was $426,525 with a corresponding liability of $86,908.

*Perpetual income trust interest* – SBF is an income beneficiary of seven perpetual trusts. Under these arrangements, the corpus is not controlled by the management of SBF, but SBF has the irrevocable right to receive income on the underlying assets in perpetuity. Five trusts provide discretionary income, and two trusts provide restricted income for student aid and Lompoc area projects. As of December 31, 2023, SBF's share of the fair value of the trusts' investments of $19,929,023 is included in beneficial interests in trusts within the consolidated statements of financial position.

For all beneficial interests in trusts and split-interest agreements, changes in value in subsequent years are recognized in the consolidated statements of activities and changes in net assets as change in value of split-interest agreements.

Beneficial interests in trusts and split-interest agreements for which SBF is trustee totaled $1,875,853 with a corresponding liability under split interest agreements of $1,032,190 as of December 31, 2023. Beneficial interests in trusts and split-interest agreements for which SBF is not trustee and does not control contribution revenue and related assets totaled $81,184,680 as of December 31, 2023.

**Property and equipment** – Property and equipment are stated at cost, or fair value if donated. In general, SBF capitalizes assets with a cost of $5,000 or more and an expected useful life of greater than one year. Depreciation is calculated using the straight-line method over their estimated useful lives as follows:

| | |
|---|---|
| Land | Non-depreciable |
| Building | 27.5–40 years |
| Leasehold improvements | Lesser of lease term or 10–40 years |
| Office equipment | 3–10 years |
| Furniture | 5–10 years |

**Funds held on behalf of others** – SBF receives and distributes assets under certain agency and intermediary arrangements. If a not-for-profit organization (NPO) establishes a fund at SBF with its own funds and specifies itself or its affiliate as the beneficiary of that fund, then SBF accounts for this transfer of assets by such NPO as a liability. The liability is established at the fair value of the funds, which is generally equivalent to the present value of future payments expected to be made to the NPO and is reflected under "funds held on behalf of others" on the consolidated statements of financial position.

**Grants** – Grants are recorded as expenses when they are approved by the Board of Trustees. Grants that are expected to be paid in more than one year are recorded at the present value of future payments factored by a discount using the applicable federal rate at the date of the grant award. All grants payable as of December 31, 2023, are expected to be paid within one year and are not required to be discounted at the present value. SBF records the rescission of grants in the year the grant is cancelled.

**Recently adopted accounting standards** – In June 2016, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) 2016-13, *Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* (CECL), which introduced an expected credit loss methodology for the measurement and recognition of credit losses on most financial assets, including trade accounts receivables. The expected credit loss methodology under ASU 2016-13 is based on historical experience, current condition, and reasonable and supportable forecasts, and replaces the measurement under current U.S. GAAP. The ASU also requires disclosure of information regarding how a company developed its allowance, including changes in the factors that influenced management's estimate of expected credit losses and the reason for those changes. The ASU and its related clarifying updates are effective for fiscal years beginning after December 15, 2022, and interim periods for those fiscal years, for non-public entities. SBF adopted the new standard on January 1, 2023, using the modified-retrospective approach, which did not have a material impact on the consolidated financial statements as of and for the year ended December 31, 2023. Therefore, there was no cumulative effect to beginning net assets as it was determined to be immaterial.

**Subsequent events** – SBF has evaluated subsequent events through September 5, 2024, the date which the consolidated financial statements were available to be issued.

**Note 2 – Contributions Receivable**

Unconditional promises to give are included in the consolidated financial statements as contributions receivable, net. There is no allowance for contributions receivable recorded at December 31, 2023. At December 31, 2023, contributions and bequests receivable are expected to be collected as follows:

| | |
|---|---|
| In one year or less | $ 13,553,708 |
| In more than one year | 242,100 |
| Total contributions receivable | 13,795,808 |
| Discount to present value | (35,174) |
| Contributions receivable, net | $ 13,760,634 |

### Note 3 – Notes Receivable

SBF has two unsecured promissory notes from a donor-advised fund and from a board-designated fund to a nonprofit charitable organization. The notes are presented within the consolidated statements of financial position as notes receivable, net, and are comprised of the following as of December 31, 2023:

| | |
|---|---|
| Receivable in less than one year | $ 225,000 |
| Receivable in two to five years | 1,225,000 |
| Total notes receivable | 1,450,000 |
| Discount to present value | (59,844) |
| Notes receivable, net | $ 1,390,156 |

In December 2016, SBF issued two promissory notes in the amount of $4,000,000 and $500,000, each bearing interest at a variable rate of 1-month SOFR, formerly LIBOR (5.38% at December 31, 2023), plus 1%, not to exceed 5%. Interest is payable in semi-annual installments. Principal payments of 5% of the original principal amount have been due annually since October 15, 2022, with the remaining principal balance due October 15, 2026. The $4,000,000 note has been partially forgiven, $1,000,000 annually, in December 2021, 2022, and 2023. The forgiven portion of the loan satisfied the conditions to be recognized as a contribution expense pursuant to FASB Accounting Standards Codification (ASC) 720-25-25 and FASB ASC 958-605-25-11. The notes are discounted at a rate of 1.68%.

### Note 4 – Investments Return

The following summarizes the investment return in the consolidated statements of activities and changes in net assets for the year ended December 31, 2023:

| | |
|---|---|
| Interest and dividends | $ 8,372,201 |
| Less interest and dividends on behalf of others | (556,105) |
| Total interest and dividends | 7,816,096 |
| Realized gain on investments | 1,966,761 |
| Unrealized gain on investments | 54,359,839 |
| Less net realized and unrealized gain on behalf of others | (3,670,584) |
| Total realized and unrealized gain on investments | 52,656,016 |
| Less: investment fees | (472,734) |
| Add back investment fees on behalf of others | 46,228 |
| Total investment fees | (426,506) |
| Investment income, net | $ 60,045,606 |

**Note 5 – Fair Value Measurement**

Fair value is defined as the price that would be received by SBF to sell an asset or be paid by SBF to transfer a liability (an exit price) in an orderly transaction between market participants on the measurement date. A fair value hierarchy has been established that prioritizes valuation inputs into three broad levels to ensure consistency and comparability. There are three levels of inputs to measure fair value. The valuation hierarchy gives the highest priority to quoted prices in active markets (Level 1) and the lowest priority to unobservable inputs (Level 3).

The standard describes the three levels used to measure fair value:

**Level 1** – Quoted prices in active markets for identical assets or liabilities.

**Level 2** – Observable inputs other than Level 1 prices, such as quoted prices for similar assets or liabilities, quoted prices in markets that are not active, discounted cash flows, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

**Level 3** – Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

Following is a description of the valuation methodologies used for instruments measured at fair value on a recurring basis and recognized in the consolidated statements of financial position, as well as the general classification of such instruments pursuant to the valuation hierarchy.

Where quoted market prices are available in an active market, securities are classified within Level 1 of the valuation hierarchy. If quoted market prices are not available, then Level 2 fair values are estimated by using pricing models for quoted prices of securities with similar characteristics or discounted cash flows. The asset's fair value measurement level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement.

Fair value of Level 3 securities is based on information provided by fund managers, external investment advisors, and other market factors to determine if the carrying value of these investments should be adjusted. Other factors may include, but are not limited to, estimates of liquidation value, prices of recent transactions in the same or similar funds, current performance, future expectations of the particular investment, and changes in market outlook and the financing environment. Because of the inherent uncertainty of valuations, however, those estimated values may differ from the values that would have been used had a ready market existed, and the differences could be material. Independent appraisals of significant real estate held for investment are conducted at frequencies as determined by the fund manager for valuation purposes.

Financial instruments are considered valued at NAV when the investments (hedge funds, private equity, commingled funds, and real asset/real estate funds) are valued at NAV based on capital statements provided by entities that calculate fair value using NAV per share or its equivalent.

The Investment Committee, in conjunction with the external investment advisors, monitors and analyzes the valuation of the investments on a quarterly basis. The Investment Committee reports to the Board of Trustees. The valuation considers variables such as financial performance of investments, recent sale prices of investments, and other pertinent information.

The following table presents assets recognized in the consolidated statements of financial position measured at fair value on a recurring basis and the level in which the fair value measurements fall at December 31, 2023:

| Description | Level 1 | Level 2 | Level 3 | NAV or Equivalent | Total |
|---|---|---|---|---|---|
| Investments | | | | | |
| Global equities | $ 76,289,230 | $ - | $ - | $ 32,312,633 | $ 108,601,863 |
| Domestic equities | 34,381,933 | - | - | - | 34,381,933 |
| International equities | 6,228,985 | - | - | - | 6,228,985 |
| Domestic fixed income funds | 7,285,201 | - | - | - | 7,285,201 |
| Global fixed income funds | 31,334,450 | - | - | 20,528,566 | 51,863,016 |
| Fixed income (illiquid) | - | - | 78,284,712 | - | 78,284,712 |
| Closely held stock | - | - | 249,568,735 | - | 249,568,735 |
| Real estate/natural resources | 7,967,280 | - | - | 17,106,498 | 25,073,778 |
| Infrastructure | - | - | - | 8,195,753 | 8,195,753 |
| Private equity | - | - | - | 26,858,685 | 26,858,685 |
| Partnerships | - | - | 3,094,723 | - | 3,094,723 |
| Hedge funds | - | - | - | 11,400,160 | 11,400,160 |
| Total investments | 163,487,079 | - | 330,948,170 | 116,402,295 | 610,837,544 |
| Beneficial interest in trusts | | | | | |
| Remainder and lead | - | - | 61,255,657 | - | 61,255,657 |
| Perpetual income | - | - | 19,929,023 | - | 19,929,023 |
| Total beneficial interest in trusts | - | - | 81,184,680 | - | 81,184,680 |
| Total assets measured at fair value | $ 163,487,079 | $ - | $ 412,132,850 | $ 116,402,295 | $ 692,022,224 |
| Liabilities under split-interest agreements | $ - | $ 1,032,190 | $ - | $ - | $ 1,032,190 |

The following is a description of the general classification of investments pursuant to the valuation hierarchy:

*Global equities* – Includes investment in domestic and international equities of varying market capitalizations selected by the investment manager. Equities are held as separate ownership shares of a specific company or in the form of mutual funds, commingled funds, or exchange-traded funds (ETFs).

*Domestic and international equities* – Includes investment in either domestic or international equities of varying market capitalizations. Equities are held as separate ownership shares of a specific company or in the form of mutual funds, commingled funds, or ETFs.

*Domestic fixed income funds* – Includes investment in domestic fixed income positions as held in the investment portfolio through either individual bond holdings (treasuries, corporate, government, mortgage, etc.), commingled funds, or through fixed income mutual funds.

*Global fixed income funds* – Includes investment in domestic and international fixed income positions held through either individual bond holdings (treasuries, corporate, government, mortgage, etc.) or through fixed income mutual funds, commingled funds, or ETFs.

*Fixed income (illiquid)* – Includes 100 participation shares in a non-controlling partnership interest composed primarily of collateralized loan obligations. 100% of this investment is held by a supporting organization, HSBF, at fair value.

*Closely held stock (illiquid)* – Includes shares of a C corporation held by EKSCT, a supporting organization; series seed shares of a California nonpublic benefit corporation; and series seed units of a limited liability company focusing on renewable energy development.

*Real estate/natural resources* – Includes thirteen limited partnerships that invest in a diverse group of private real estate investment funds or similar entities that focus on the acquisition, redevelopment, operation, and management of real estate properties or natural resources: timber, precious metals, commodities, mining, energy, etc.; and a local residential rental property held in SBF Properties, LLC.

*Infrastructure* – Includes four core infrastructure funds that have exposure in transportation, communication, food-related water and electricity, power, and energy services.

*Private equity* – Includes twenty-one broadly diversified private equity partnerships with varying allocations to buyouts, distressed opportunities, venture capital, special situations, and secondary funds. Holdings are invested in diversified portfolios of investment partnerships, each of which has a defined term, typically ten to fifteen years, with no right to withdraw prior to termination of the investment partnership. Funds are called as needed by managers and distributions are received through the liquidation of the underlying assets of the fund.

*Partnerships* – Includes three limited partnership interests that are illiquid and receive varying income distributions controlled by the general partner: (1) 24% interest, invested locally in a real estate holding; (2) 45% interest, terminating in June 2062, invested locally in multiple real estate holdings; and (3) 7% interest, invested in multiple other partnerships with domestic and international exposure.

*Hedge funds* – Includes four risk mitigating hedge funds.

The following table provides a reconciliation of assets measured at fair value using significant unobservable inputs (Level 3) for the year ended December 31, 2023:

| Description | January 1, 2023 | Net Gains and (Losses) | Purchases and Issuances | Transfers In and Out | Sales and Settlements | December 31, 2023 |
|---|---|---|---|---|---|---|
| Fixed income (illiquid) | $ 76,654,941 | $ 1,629,771 | $ - | $ - | $ - | $ 78,284,712 |
| Partnerships | 3,216,723 | (169,000) | 47,000 | - | - | 3,094,723 |
| Beneficial interest in trusts | 78,421,897 | 3,204,122 | - | (441,339) | - | 81,184,680 |
| Closely held stock | 126,267,375 | 25,159,762 | 101,392,426 | (3,250,828) | - | 249,568,735 |
| Total assets measured at fair value – Level 3 | $ 284,560,936 | $ 29,824,655 | $ 101,439,426 | $ (3,692,167) | $ - | $ 412,132,850 |



CONFIDENTIAL

The following table represents the Level 3 financial instruments as of December 31, 2023, the valuation techniques used to measure the fair value of those financial instruments, and the significant unobservable inputs and the ranges of values for those inputs.

| Investment | Total Fair Value | Valuation Technique | Unobservable Inputs | Range |
|---|---|---|---|---|
| Fixed income (illiquid) | $ 78,284,712 | Fair value with qualitative discounting model | Lack of control discount and lack of marketability discount | 6.5%–8% |
| Partnerships | 3,094,723 | Market comparable | Listing prices and general partner estimates | 6%–34% |
| Beneficial interest in trusts | 81,184,680 | Present value of annuity or remainder interest | Discounted rate, life expectancies, and remaining payments | 1.4%–10%, 2 to 65 years |
| Closely held stock | 249,568,735 | Discounted cash flow method | Control premium, lack of marketability discount | 5%–25% |
| Total assets measured at fair value – Level 3 | $ 412,132,850 | | | |

The following table provides redemption data and unfunded commitments for investments held at NAV or equivalent:

| Investment | Total Fair Value | Unfunded Commitments | Redemption Frequency | Redemption Notice Period |
|---|---|---|---|---|
| Global equities | $ 32,312,633 | $ - | Monthly | 2 to 14 days |
| Global fixed income | 20,528,566 | - | Monthly | 2 to 10 days |
| Real estate/natural resources | 17,106,498 | 8,656,210 | Non-redeemable | - |
| Infrastructure | 8,195,753 | 2,147,611 | Non-redeemable | - |
| Private equity | 26,858,685 | 15,987,785 | Non-redeemable | - |
| Hedge funds | 11,400,160 | - | Daily to Semiannually | 2 to 90 days |
| Total | $ 116,402,295 | $ 26,791,606 | | |

**Note 6 – Property and Equipment**

Property and equipment at December 31, 2023, consist of the following:

| | |
|---|---|
| Building and leasehold improvements | $ 14,280,359 |
| Land | 3,265,379 |
| Office equipment | 385,971 |
| Furniture | 347,086 |
| Donated artwork | 17,500 |
| Total property and equipment | 18,296,295 |
| Less accumulated depreciation and amortization | (5,881,516) |
| Property and equipment, net | $ 12,414,779 |

**Note 7 – Note Payable**

**Mortgage note payable** – SBF has a mortgage note payable on the 1111 Chapala Street building with Montecito Bank & Trust, which is secured by the property, at an interest rate of 3%. Principal and interest payments of $14,274 are due monthly, with a final balloon payment due on January 20, 2031. In January 2021, the mortgage was refinanced to modify the interest rate to 3% and to extend the maturity date to January 20, 2031. The outstanding principal balance on the mortgage as of December 31, 2023, is $2,741,924.

Future maturities of principal obligations for years ending December 31 are as follows:

| | |
|---|---|
| Years ending December 31: | |
| 2024 | $ 88,914 |
| 2025 | 91,889 |
| 2026 | 94,724 |
| 2027 | 97,645 |
| 2028 | 100,457 |
| Thereafter | 2,268,295 |
| Total | $ 2,741,924 |

### Note 8 – Grants

Grants payable as of December 31, 2023, of $68,750 are due within one year.

Grant expense is comprised of the following for the years ended December 31, 2023 and 2022:

| | 2023 | 2022 |
|---|---|---|
| Donor advised | $ 17,520,112 | $ 16,776,698 |
| Competitive | 3,714,747 | 4,074,689 |
| Field of interest | 2,022,143 | 2,564,099 |
| Donor designated | 1,900,816 | 1,685,353 |
| Supporting organizations | 2,124,957 | 876,157 |
| Fiscal sponsorships | 281,899 | 455,147 |
| Pass-through | 150,058 | 170,366 |
| Total grants, net of rescinds | $ 27,714,732 | $ 26,602,509 |

### Note 9 – Concentrations and Risks

**Credit risk** – SBF maintains cash balances at several banks insured by the Federal Deposit Insurance Corporation (FDIC). The FDIC only insures the first $250,000 of funds on deposit at any one institution. SBF had uninsured cash of approximately $13,237,000 deposited with four different banks. In addition, SBF maintains significant cash balances in money market funds. Such balances are not fully insured. Certain Investments held with financial institutions are insured up to a specific limit by the Securities Investors Protection Corporation (SIPC). At December 31, 2023, the Foundation had amounts that were in excess of the SIPC insurance limits.

**Market risk** – SBF holds its investments in a diversified portfolio. Nevertheless, these investments are exposed to various risks and overall market volatility. Due to the level of risk associated with certain investments, it is reasonably possible that changes in the values of investments will occur in the near term and that such change could materially affect the amounts reported in the consolidated financial statements.

**Concentrated investments** – As of the year ended December 31, 2023, approximately 54% of the fair value of investments and a significant portion of the unrealized gains and losses are attributable to the two supporting organizations, HSBF and EKSCT. The fair value of HSBF's illiquid fixed income and EKSCT's closely held stock position are based upon annual independent third-party valuations using the same techniques and variables as in prior years.

**Supporting organization assets** – As of the year ended December 31, 2023, approximately 41% of total assets were in the two supporting organizations, HSBF and EKSCT.

**Major donors** – For the year ended December 31, 2023, approximately 78% of contributions revenue was from one donor.



CONFIDENTIAL

**Note 10 – Endowment Funds**

**Interpretation of relevant law** – The Board of Trustees of SBF, in concurrence with the advice of legal counsel, has interpreted the California adopted UPMIFA as requiring a long-term investment strategy designed to preserve the fair value of the original gift, as of the gift date. As a result of this interpretation, SBF has classified with the explicit prohibition by the donor as net assets with donor restrictions (a) the original value of gifts donated to the perpetual endowment, (b) the original value of subsequent gifts to the perpetual endowment, and (c) accumulations to the perpetual endowment made in accordance with the direction of the applicable donor gift instrument at the time the accumulation is added to the fund. The remaining portion of the donor-restricted endowment funds are classified as net assets with donor restrictions until those amounts are appropriated for expenditure by SBF in a manner consistent with the standard for prudence prescribed by UPMIFA. In accordance with California UPMIFA, the organization considers the following factors in making a determination to appropriate or invest donor-restricted endowment funds:

1. The duration and preservation of the fund.
2. The purposes of SBF and the donor-restricted endowment fund.
3. General economic conditions.
4. The possible effect of inflation and deflation.
5. The expected total return from income and the appreciation of investments.
6. Other resources of SBF.
7. The investment policies of SBF.

**Endowment investment and spending policies** – SBF has adopted investment and spending policies for endowment assets that attempt to provide a predictable stream of funding to programs supported by its endowment while seeking to maintain the long-term purchasing power of the endowment assets. Endowment assets include those assets of donor-restricted funds that the organization must hold in perpetuity for donor-specified purposes. The endowment assets are invested in a manner that is intended to produce results that provide a reasonable balance between the quest for growth and the need to protect principal. The investment policy calls for a diversified portfolio utilizing various asset classes with a goal of reducing portfolio volatility and risk.

SBF's long-term endowment is invested in a diversified portfolio of domestic equities, international equities, fixed income, and a broad array of alternative investments. The portfolio employs both passive index funds and actively managed funds. The portfolio's objective is to achieve a total return equivalent to or greater than SBF's financial requirements over the long-term time horizon. Long-term investment strategies are used to manage risk with the goal to grow charitable dollars over time. SBF also provides four other investment options for donors that have a shorter time horizon and more immediate spending needs, including a socially responsible investment option.

SBF uses a total investment return methodology for determining its spending policy each year. The portfolio's total returns are achieved through both capital appreciation (realized and unrealized) and current yield (interest and dividends). The spending policy calculates the amount of money annually distributed from SBF's various discretionary funds and other endowed funds for grant making and administrative support. The approved spending policy for the year ended December 31, 2023, for discretionary funds was 4.5%, while other endowed funds were 4%. These percentages are calculated based on a rolling average of the market value for the previous three years.

The spending policy is reviewed annually in light of changing market assumptions, investment returns, and the rate of inflation. Accordingly, over the long term, SBF expects current spending policy to allow its endowment assets to grow.

**Endowment funds with deficiencies** – From time to time, the fair value of the assets associated with individual donor-restricted funds may fall below the level that current law requires SBF to retain for a fund of perpetual duration. In accordance with U.S. GAAP, these deficiencies are reported as a reduction in net assets with donor restrictions. Such deficiencies may result from unfavorable market fluctuations, particularly if the funds were invested in the endowment pool shortly prior to significant market declines. SBF has adopted a policy to spend from underwater endowments with certain limitations. As of December 31, 2023, SBF held seven endowment funds where the principal had fallen below the original corpus due to market conditions. The total fair values, original gift amounts, and deficiencies related to this fund as of December 31, 2023, is as follows:

| | |
|---|---|
| Fair value of underwater endowments | $ 13,296,771 |
| Original endowment gift amount | 14,402,299 |
| Deficiencies of underwater endowment funds | $ (1,105,528) |

Endowment net assets with donor restrictions totaled $65,162,394 consisting of total original gift endowment contributions of $57,176,629 and accumulated earnings of $7,985,765 as of December 31, 2023. Changes in the endowment net assets with donor restrictions for the year ended December 31, 2023, are as follows:

| | With Donor Restrictions |
|---|---|
| Endowment net assets, beginning of year | $ 59,847,087 |
| Net investment return | 7,589,590 |
| Contributions | 1,282,500 |
| Appropriation of endowment net assets for expenditure | (2,853,154) |
| Reclassifications and other releases from restrictions | (703,629) |
| Endowment net assets, end of year | $ 65,162,394 |

There were no endowment net assets without donor restrictions or assets classified as board-restricted endowment funds as of December 31, 2023.

### Note 11 – Related-party Transactions

A majority of trustees and committee members of SBF also serve as trustees of entities receiving grants and support from SBF. Each trustee and committee member completes a conflict of interest declaration form annually. Trustees and committee members who have conflicts abstain from voting.

### Note 12 – Commitments

SBF leases office equipment and office space under non-cancellable operating leases through January 2028. Rent expense under operating leases for the year ended December 31, 2023, was approximately $72,000.

### Note 13 – Retirement Plans

SBF employees who work at least 1,000 hours per year are eligible to participate in a deferred salary savings plan under Section 401(k) of the Internal Revenue Code after one full calendar month of service. SBF matches at its discretion up to 4% of the eligible salary upon participation. For eligible employees with more than one year of service, SBF, at its discretion, contributes up to an additional 6% of the participant’s eligible salary for a total of 10%. SBF employer contributions for the year ended December 31, 2023, totaled $303,333.

In addition, SBF has a non-qualified deferred compensation plan. SBF employer contributions for the year ended December 31, 2023, totaled $22,500.

### Note 14 – Liquidity

SBF structures its financial assets to be available as its general expenditures, liabilities, and other obligations become due. SBF invests cash in excess of daily requirements in short-term investments and money market funds.

Financial assets available to meet cash needs for general expenditure for the following year are comprised of current assets and investments, adjusted for amounts unavailable due to illiquidity, endowments, and other funds with spending policy appropriations beyond one year, and current liabilities payable to vendors, financial institutions, and nonprofit organizations.

Financial assets available to meet cash needs for general expenditures within one year as of December 31, 2023:

| | |
|---|---|
| Cash and cash equivalents | $ 82,341,343 |
| Contributions and bequests receivable, current portion | 13,553,708 |
| Less non-cash bequests receivable of illiquid assets | (5,937,716) |
| Notes receivable, current portion | 225,000 |
| Other assets | 258,749 |
| Current assets | 90,441,084 |
| Investments | 610,837,544 |
| Less investments not available for general expenditures within one year | |
| Illiquid, not convertible to cash beyond one year | (330,948,170) |
| Endowments and other funds subject to spending policy appropriations beyond one year | |
| Without donor restrictions | (113,233,039) |
| With donor restrictions | (65,162,394) |
| Funds held on behalf of others | (33,165,254) |
| Investments available for general expenditures within one year | 68,328,687 |
| Financial assets available to meet cash needs for general expenditures within one year | $ 158,769,771 |

**Note 15 – Net Assets**

Net assets consist of the following for the years ended December 31, 2023 and 2022:

| **Net assets without donor restrictions** | 2023 | 2022 |
|---|---|---|
| Supporting organizations | $ 327,432,299 | $ 203,276,249 |
| Donor-advised funds | 126,914,251 | 124,955,164 |
| Undesignated funds | 96,194,074 | 89,771,251 |
| Field of interest funds | 50,561,579 | 43,271,369 |
| Donor-designated funds | 11,571,347 | 6,158,669 |
| Board-designated funds | 2,479,073 | 2,358,513 |
| Fiscal sponsorship | 1,979,624 | 1,539,909 |
| Total net assets without donor restrictions | $ 617,132,247 | $ 471,331,124 |

| **Net assets with donor restrictions** | 2023 | 2022 |
|---|---|---|
| Donor-restricted endowment funds | $ 65,162,394 | $ 59,847,087 |
| Beneficial interest in remainder and lead trusts | 61,255,657 | 61,084,833 |
| Beneficial income interest in perpetual trusts | 19,929,023 | 17,337,064 |
| Split interest agreements | 899,757 | 837,328 |
| Contributions receivable | 206,926 | 204,723 |
| Total net assets with donor restrictions | $ 147,453,757 | $ 139,311,035 |



CONFIDENTIAL

MOSSADAMS

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE**
**DIRECTORS OF THE COMPANY**

**MADE ON 13th September 2024**

The undersigned, being all of the Directors of the Company, hereby resolve, pursuant to the Articles of Association of the Company, the following directors' resolutions.

**1. REVIEW AND APPROVAL OF COMPENSATION FOR MARK PATRICK.**

1.1 **NOTED THAT:**

(a) Since 24 March 2021, Mr. Mark Patrick has been appointed as President, Chief Investment Officer and General Counsel of the Company, and appointed as President and Chief Investment Officer for seven subsidiaries/affiliated entities.

(b) In or about March 2024, the Company, including Charitable DAF Fund LP, engaged Mercer LLP to conduct an independent compensation review of Mr. Mark Patrick's duties as President, Chief Investment Officer and General Counsel of the Company, and as President and Chief Investment Officer for seven subsidiaries/affiliated entities.

(c) Mercer LLP prepared an independent report dated 26 August 2024 ("Mercer Report") which contains a summary of Mr. Patrick's roles and responsibilities and their methodology for calculating market comparables. At page 5 of that report, Mercer recommended that Mr Patrick's compensation be structured as follows:

a. Base salary: USD $850,000 or USD $750,000 if general partner liability insurance can be acquired to mitigate Mr Patrick's personal risk exposure.

b. Long-term incentive ("LTI") tied to DAF LP returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).

(d) The Mercer report raised two issue for the Company to consider::

a. Whether performance for the LTI compensation be calculated based on 2021 performance or start for the 2022 cycle; and

b. Whether the LTI calculation should be calculated net of all Company expenses or new of fund expenses only.

(e) On 12th September 2024, Mr. Paul Murphy, a co-director of the Company, spoke to Heidi O'Brien, a Partner at Mercer, to discuss the issues identified in 1, 1.1 (d) a. and b. Following this conversation and based on the fact that (i) Ms. O'Brien confirmed that it was not uncommon for similar companies to award employees for the complete fiscal year when starting part way through the year, and (ii) Mr. Patrick was appointed in March 2021, the Directors have concluded that Mr. Patrick's LTI compensation should be calculated on the basis of the 2021 cycle.

(f) In addition, the Directors have concluded that the Company should assess the legal expenses

attributable to investments which impact the LTI compensation and, after that assessment, determine whether the LTI compensation should be increased.

(g) Based on the knowledge of the Directors of Mr. Patrick's roles and responsibilities, the Mercer LLP report and fact that Mr. Patrick is considered a key employee, the Directors have concluded that Mr. Patrick's compensation should be set in accordance with the recommendation in the Mercer report with the additional caveat that Mercer identified that CEOs and CIOs are often compensated on the basis of a base salary, annual incentive and LTI and an annual incentive is not included in the Mercer report. The Directors have concluded that it is in the Company's interest to determine whether an annual incentive should also be included as part of Mr. Patrick's compensation and, if so, how this is to be assessed.

(h) Mr. Patrick has declared his interests to the Company in relation to the matters the subject of this resolution, being that Mr Patrick is Director of the Company, and also employed by the Company as President, Chief Investment Officer, and General Counsel of the Company.

1.2 **IT IS RESOLVED** by unanimous written resolution that:

(a) Mr. Patrick's compensation be fixed, in accordance with recommendation of the Mercer LLP report, as follows:

a. Base salary: USD $850,000, provided that, 100% of the base salary for calendar year 2024 may be paid on or about the date of these resolutions.

b. Long-term incentive tied to DAF LP returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return), less any amounts previously advanced to Mr. Patrick.

(b) The Directors will assess:

a. Whether any adjustment should be made to the LTI calculation based on whether the calculation should be made net of all expenses or net of fund expenses; and

b. Whether Mr. Patrick should receive an annual bonus and the basis of that annual bonus.

Executed by the Directors comprising the entire Board of Directors of the Company:

**BY** ______________________
Paul Murphy - Director
CHARITABLE DAF HOLDCO, LTD.

**BY** ______________________
Mark Patrick - Director
CHARITABLE DAF HOLDCO, LTD.

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE**
**DIRECTORS OF THE COMPANY**

**MADE ON 1 October 2024**

The undersigned, being all of the Directors of the Company, hereby resolve, pursuant to the Articles of Association of the Company, the following directors' resolutions. Any capitalized terms not defined herein are taken from the Directors' Resolution dated 12th September 2024.

**1. ESTABLISHMENT OF COMPENSATION COMMITTEE/GUIDELINES AND APPOINTMENT OF MEMBERS OF COMPENSATION COMMITTEE.**

1.1 **NOTED THAT:**

(a) The Company does not presently have a compensation committee and the Directors believe it is in the best interest of the Company to establish a compensation committee which will be guided and governed by compensation committee guidelines established by the Directors.

(b) Given the Directors knowledge and experience of the Company, the initial appointments to the compensation committee will be Mark Patrick and Paul Murphy.

1.2 **IT IS RESOLVED THAT:**

(a) The Company establish a compensation committee (**"Compensation Committee"**) and adopt the guidelines in the form substantially contained in Appendix 1 to these resolutions (**"Compensation Committee Guidelines"**).

(b) Mark Patrick and Paul Murphy be appointed to the Compensation Committee.

(c) The Company empowers the Compensation Committee to make recommendations to the Directors on all matters outlined in the Compensation Committee Guidelines, provided that, all recommendations by the Compensation Committee are subject to review and approval by the Directors.

(d) The Compensation Committee shall not make any recommendations in relation to Mark Patrick's compensation arising from the resolution passed by the Directors on 12th September 2024, in particular, the LTI payment and annual bonus resolution passed in these Directors' Resolutions paragraph number 2.

**2. FURTHER REVIEW AND APPROVAL OF COMPENSATION FOR MARK PATRICK AND EMPLOYMENT AGREEMENT.**

2.1 **NOTED THAT:**

(a) On 12 September 2024, the Directors passed a directors' resolution addressing Mark Patrick's compensation as a Director, President/CEO, Chief Investment Officer and General Counsel of the Company. The Directors approved compensation in the following amounts:

a. Base salary: USD $850,000.

b. LTI tied to Charitable DAF Fund LP ("DAF LP") returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).

(b) In addition, the Directors resolved that they would assess:

a. Whether any adjustment should be made to the LTI calculation based on whether the calculation should be made net of all expenses or net of fund expenses; and

b. Whether Mr. Patrick should receive an annual bonus and the basis of that annual bonus.

<u>LTI</u>

(c) Paul Murphy noted that the return of the Company is impacted by whether legal expenses should be included as an operational expense of the Company (in which case the LTI payment would be lower) or whether legal expenses have been incurred not as an operational expense but as an expense to preserve, protect and maximize returns to the Company (in which case it is appropriate to exclude these expenses when assessing the Company's return thereby raising the LTI payment, in whole or in part).

(d) Paul Murphy, having a detailed and working knowledge of the Company's legal issues, and having commissioned Shawn Raver, legal advisor to the Company, to provide a breakdown of legal fees (i) which are attributable to the normal operation of the Company's investment portfolio, and (ii) which have been incurred to preserve, protect and maximize returns to the Company, who has assessed that 75% of those legal fees have been incurred to preserve, protect and maximize returns to the Company.

(e) Accordingly, the LTI calculation should be adjusted to award 75% of the difference between the figures noted in page 9 of the Mercer Report which is $975,000.[1]

<u>Annual Bonus</u>

(f) Paul Murphy conducted an independent assessment of whether Mark Patrick should receive an annual bonus and the basis of that annual bonus having regard to the Mercer Report, further discussions with Heidi O'Brien (Partner at Mercer), further review of industry comparables with CEO/CIO roles in complex structured finance senior positions, and assessment of other charitable organisations/structures (acknowledging that the Company and its subsidiaries are not subject to United States of America regulations).

(g) Having (i) reviewed the Compensation Committee Guidelines and, (ii) a detailed working knowledge of the Company and Mark Patrick's roles and responsibilities, Paul Murphy assessed that Mark Patrick is eligible for an annual bonus in the amount of 2.5 times his base salary for the year 2023 and payable immediately for, inter alia, the following reasons:

a. CEOs and CIOs in comparable positions are typically awarded a base salary, annual bonus and form of long term incentive plan which is designed to compensate senior executives for their performance and value to a company on an annual and long term basis (see Mercer Report page 17, which is consistent with and supported by Paul Murphy's

[1] The calculation net of all expense is $4,459,000 and net of fund expenses is $5,759,000 leaving a difference of $1.3m of which $975,000 is 75%.

knowledge of US based asset managers).

b. The Company, in the absence of a senior executive willing to undertake the roles and responsibilities of a CEO, CIO and general counsel would, in the US, have to incur annual expenses of at least $3-4m at the median range and $5-6m at the upper range[2] to appropriately staff these positions.[3] By undertaking the roles of CEO, CIO and General Counsel, Mark Patrick would be undercompensated if the Company were only to award a base salary and LTI.

c. The Company has faced/is facing significant and complex legal issues in Texas, New York, the Cayman Islands and, until recently, Guernsey, which it has had to manage on a reactive and proactive basis and which Mark Patrick has been instrumental in the prosecution and defence of. These include sophisticated parties including US Bank, UBS and a Trustee in Bankruptcy.

d. Mark Patrick was instrumental in 2023/2024 defeating an action by UBS against the Company in New York which significantly reduced the Company's potential liabilities.

e. The risk profile to Mark Patrick as a director, CEO and CIO is high and his decision making will and is likely to be scrutinized which may lead to personal liability. He is undertaking these positions without the benefit of directors' and officers' insurance.

f. Mark Patrick has been instrumental in implementing and driving forward policies that will bring rigorous scrutiny and governance to the Company.

g. The Company's investments over the past three years have outperformed the S&P 500 significantly where the average returns for the S&P 500 over the same period returned 11.49% compared to 16.46% for the Company.

h. To date, Mark Patrick has not been awarded an annual bonus during his tenure at the Company nor has he received benefits which a CEO/CIO would typically enjoy.

(h) These are not a comprehensive list of factors Paul Murphy took into account but form the basis of his independent conclusion that the Directors should (i) enter into an employment agreement in a form drafted by the Company's US and Cayman Islands counsel which reflects the on-going compensation package, and (ii) award an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary.

(i) Mr. Patrick has declared his interests to the Company in relation to the matters the subject of this resolution, being that Mr Patrick is Director of the Company, and also employed by the Company as President, Chief Investment Officer, and General Counsel of the Company.

2.2 **IT IS RESOLVED** by unanimous written resolution that:

---

[2] Per Mercer Report at page 7 and adjusted to account for base compensation and annual bonus/long term incentive for general counsel.

[3] It is noted that the basis for these figures includes assessment of charities and foundations in the US which the Company is not. Whilst useful guidance, the Company must be mindful of the fact that the Company is a Cayman Islands company that holds complex structured financial products through Cayman Islands companies and is not bound by the same provisions that relate to US charities and foundations.

(a) Mark Patrick be awarded:

a. An adjustment to the LTI incentive payment in the amount of $975,000.

b. An annual bonus for the year 2023, payable immediately, of 2.5 times his base salary.

c. No annual bonus for the years 2021 and 2022 given the entirety of the compensation package provided to Mark Patrick as of 12th September 2024 and the date of this resolution.

Executed by the Directors comprising the entire Board of Directors of the Company:

BY ______________________
Paul Murphy - Director

CHARITABLE DAF HOLDCO, LTD.

BY ______________________
Mark Patrick - Director

CHARITABLE DAF HOLDCO, LTD.

**APPENDIX 1**
**COMPENSATION COMMITTEE GUIDELINES**

**Compensation Policy for Executives and Directors**

As adopted on October 1, 2024

1. **Overview and Objectives**

This document sets forth the Compensation Policy for Executives and Directors of Charitable DAF HoldCo, Ltd., its subsidiaries, and CDH GP, Ltd. (collectively, "**Company**").

Compensation is a key component of the Company's overall human capital strategy to attract, retain, reward, and motivate highly skilled individuals that will enhance the Company's value and otherwise assist the Company's to reach its long-term goals. Accordingly, the structure of this Policy is established to tie the compensation of each officer to the Company's goals and performance.

For purposes of this Policy, "Executive Officers" shall mean the Company's Chief Executive Officer, Chief Investment Officer, Chief Company Officer, and Chief Operating Officer, and such other executive officers as appointed by the Company from time to time.

For purposes of this Policy, "Directors" shall mean the Directors as defined in the organizational and governing documents of the Company.

This Policy is subject to applicable law and is not intended, and should not be interpreted as limiting or derogating from, provisions of applicable law to the extent not permitted.

This Policy shall apply to compensation agreements and arrangements which will be approved after the date on which this Policy is adopted and shall serve as Company's Compensation Policy for five (5) years, commencing as of its adoption, unless amended earlier.

The Compensation Committee and the Board of Directors of the Company (the "**Compensation Committee**" and the "**Board**", respectively) shall review and reassess the adequacy of this Policy from time to time.

The Compensation Committee and Board shall have regard to the fact that Charitable DAF HoldCo, Ltd. and its subsidiaries are incorporated and subject to Cayman Islands law (**"Cayman Islands Entities"**). Accordingly, whilst US law, regulation and industry standards (**"US Practices"**) may be taken into account when considering the Objectives (as defined below), the US Practices are not binding on the Cayman Islands Entities, the Cayman Islands Entities having been purposely established as non-US entities, and the Compensation Committee will have regard to all factors which, in its discretion, achieve the Objectives (as defined below).

2. **Objectives**

Company's objectives and goals in setting this Policy are to attract, motivate and retain highly experienced leaders who will contribute to Company's success and enhance shareholder value, while demonstrating professionalism in a highly achievement-oriented culture that is based on merit and rewards excellent performance in the long term, and embedding Company's core values as part of a motivated behavior (**"Objectives"**). To that end, this Policy is designed, among others:

2.1. To closely align the interests of the Executive Officers and Directors with those of Company's shareholders in order to enhance shareholder value;

2.2. To align a significant portion of the Executive Officers' and Directors' compensation with Company's short and long-term goals and performance;

2.3. To provide the Executive Officers and Directors with a structured compensation package, including competitive salaries, performance-motivating cash and equity incentive programs and benefits;

2.4. To strengthen the retention and the motivation of Executive Officers and Directors in the long term; and

2.5. To provide appropriate awards in order to incentivize superior individual excellency and corporate performance.

3. **Compensation Instruments**

3.1 Compensation instruments under this Policy may include, but need not be limited to, the following:

3.1.1 Base salary;

3.1.2 Benefits;

3.1.3 Annual cash bonuses;

3.1.4 Change of control terms;

3.1.5 Retirement and termination terms; and

3.1.6 Long-term and short-term incentive payments

3.2 When fixing compensation instruments the Company may have regard to any matter which, in the Company's complete discretion, is commensurate with the Objectives. Without limitation, this may include:

3.2.1 Assessing an Executive Officer and Director's performance with regard to their contribution to and management of any assets or investments the Company sources or owns from time to time;

3.2.2 Assessing the performance of assets or investments of the Company in relation to overall returns to the Company;

3.2.3 Mitigation of Company liabilities;

3.2.4 Ensuring sound and prudent corporate governance including compliance with all legal, regulatory and industry standards;

3.2.5 Efficient management of service providers;

3.2.6 Risk the Executive Officer and/or the Director is exposed to;

3.2.7 Responsibilities the Executive Officer and/or the Director undertakes; and

3.2.8 Achieving the Company's business and charitable objectives

4. **Benefits**

4.1 The following benefits may be granted to the Executive Officers and Directors in order, among other things, to comply with legal requirements:

4.1.1 Vacation days in accordance with market practice;

4.1.2 Sick days in accordance with market practice;

4.1.3 Convalescence pay according to applicable law;

4.1.4 Company may contribute on behalf of the Executive Officer or Director to an insurance policy (including, without limitation, split-dollar life insurance) or a pension fund, as allowed by applicable law and with reference to Company's policies and procedures and the practice in peer group companies (including contributions on bonus payments); and

4.1.5 Company may contribute on behalf of the Executive Officer or Director towards work disability insurance, as allowed by applicable law and with reference to Company's policies and procedures and to the practice in peer group companies.

4.2 In events of relocation or repatriation of an Executive Officer or Director to another geography, such Executive Officer or Director may receive other similar, comparable or customary benefits as applicable in the relevant jurisdiction in which he or she is employed or additional payments to reflect adjustments in cost of living. Such benefits may include reimbursement for out of pocket one-time payments and other ongoing expenses, such as housing allowance, car allowance, and home leave visit, etc.

4.3 Company may offer additional benefits to its Executive Officers and Directors, which will be comparable to customary market practices, such as, but not limited to: cellular and land line phone benefits, company car and travel benefits, reimbursement of business travel including a daily stipend when traveling and other business related expenses, insurances, other benefits (such as newspaper subscriptions, academic and professional studies), etc., provided, however, that such additional benefits shall be determined in accordance with Company's policies and procedures.

5. **Miscellaneous**

5.1 Nothing in this Policy shall be deemed to grant to any of Company's Executive Officers, employees, directors, or any third party any right or privilege in connection with their employment by or service to the Company, nor deemed to require Company to provide any compensation or benefits to any person. Such rights and privileges shall be governed by applicable personal

employment agreements or other separate compensation arrangements entered into between Company and the recipient of such compensation or benefits. The Board may determine that none or only part of the payments, benefits and perquisites detailed in this Policy shall be granted, and is authorized to cancel or suspend a compensation package or any part of it.

5.2 In the event that new regulations or law amendment in connection with Executive Officers' and Directors' compensation will be enacted following the adoption of this Policy, Company may follow such new regulations or law amendments, even if such new regulations are in contradiction to the compensation terms set forth herein.

*********************

This Policy is designed solely for the benefit of Company and none of the provisions thereof are intended to provide any rights or remedies to any person other than Company.

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE DIRECTORS OF THE COMPANY**

**MADE ON 1 October 2024**

The undersigned, being all of the Directors of the Company, hereby resolve, pursuant to the Articles of Association of the Company, the following directors' resolutions. Any capitalized terms not defined herein are taken from the Directors' Resolution dated 12th September 2024.

**1. ESTABLISHMENT OF COMPENSATION COMMITTEE/GUIDELINES AND APPOINTMENT OF MEMBERS OF COMPENSATION COMMITTEE.**

1.1 **NOTED THAT:**

(a) The Company does not presently have a compensation committee and the Directors believe it is in the best interest of the Company to establish a compensation committee which will be guided and governed by compensation committee guidelines established by the Directors.

(b) Given the Directors knowledge and experience of the Company, the initial appointments to the compensation committee will be Mark Patrick and Paul Murphy.

1.2 **IT IS RESOLVED THAT:**

(a) The Company establish a compensation committee (**"Compensation Committee"**) and adopt the guidelines in the form substantially contained in Appendix 1 to these resolutions (**"Compensation Committee Guidelines"**).

(b) Mark Patrick and Paul Murphy be appointed to the Compensation Committee.

(c) The Company empowers the Compensation Committee to make recommendations to the Directors on all matters outlined in the Compensation Committee Guidelines, provided that, all recommendations by the Compensation Committee are subject to review and approval by the Directors.

(d) The Compensation Committee shall not make any recommendations in relation to Mark Patrick's compensation arising from the resolution passed by the Directors on 12th September 2024, in particular, the LTI payment and annual bonus resolution passed in these Directors' Resolutions paragraph number 2.

**2. FURTHER REVIEW AND APPROVAL OF COMPENSATION FOR MARK PATRICK AND EMPLOYMENT AGREEMENT.**

2.1 **NOTED THAT:**

(a) On 12 September 2024, the Directors passed a directors' resolution addressing Mark Patrick's compensation as a Director, President/CEO, Chief Investment Officer and General Counsel of the Company. The Directors approved compensation in the following amounts:

a. Base salary: USD $850,000.

b. LTI tied to Charitable DAF Fund LP ("DAF LP") returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).

(b) In addition, the Directors resolved that they would assess:

a. Whether any adjustment should be made to the LTI calculation based on whether the calculation should be made net of all expenses or net of fund expenses; and

b. Whether Mr. Patrick should receive an annual bonus and the basis of that annual bonus.

LTI

(c) Paul Murphy noted that the return of the Company is impacted by whether legal expenses should be included as an operational expense of the Company (in which case the LTI payment would be lower) or whether legal expenses have been incurred not as an operational expense but as an expense to preserve, protect and maximize returns to the Company (in which case it is appropriate to exclude these expenses when assessing the Company's return thereby raising the LTI payment, in whole or in part).

(d) Paul Murphy, having a detailed and working knowledge of the Company's legal issues, and having commissioned Shawn Raver, legal advisor to the Company, to provide a breakdown of legal fees (i) which are attributable to the normal operation of the Company's investment portfolio, and (ii) which have been incurred to preserve, protect and maximize returns to the Company, who has assessed that 75% of those legal fees have been incurred to preserve, protect and maximize returns to the Company.

(e) Accordingly, the LTI calculation should be adjusted to award 75% of the difference between the figures noted in page 9 of the Mercer Report which is $975,000.[1]

Annual Bonus

(f) Paul Murphy conducted an independent assessment of whether Mark Patrick should receive an annual bonus and the basis of that annual bonus having regard to the Mercer Report, further discussions with Heidi O'Brien (Partner at Mercer), further review of industry comparables with CEO/CIO roles in complex structured finance senior positions, and assessment of other charitable organisations/structures (acknowledging that the Company and its subsidiaries are not subject to United States of America regulations).

(g) Having (i) reviewed the Compensation Committee Guidelines and, (ii) a detailed working knowledge of the Company and Mark Patrick's roles and responsibilities, Paul Murphy assessed that Mark Patrick is eligible for an annual bonus in the amount of 2.5 times his base salary for the year 2023 and payable immediately for, inter alia, the following reasons:

a. CEOs and CIOs in comparable positions are typically awarded a base salary, annual bonus and form of long term incentive plan which is designed to compensate senior executives for their performance and value to a company on an annual and long term basis (see Mercer Report page 17, which is consistent with and supported by Paul Murphy's

[1] The calculation net of all expense is $4,459,000 and net of fund expenses is $5,759,000 leaving a difference of $1.3m of which $975,000 is 75%.

knowledge of US based asset managers).

b. The Company, in the absence of a senior executive willing to undertake the roles and responsibilities of a CEO, CIO and general counsel would, in the US, have to incur annual expenses of at least $3-4m at the median range and $5-6m at the upper range[2] to appropriately staff these positions.[3] By undertaking the roles of CEO, CIO and General Counsel, Mark Patrick would be undercompensated if the Company were only to award a base salary and LTI.

c. The Company has faced/is facing significant and complex legal issues in Texas, New York, the Cayman Islands and, until recently, Guernsey, which it has had to manage on a reactive and proactive basis and which Mark Patrick has been instrumental in the prosecution and defence of. These include sophisticated parties including US Bank, UBS and a Trustee in Bankruptcy.

d. Mark Patrick was instrumental in 2023/2024 defeating an action by UBS against the Company in New York which significantly reduced the Company's potential liabilities.

e. The risk profile to Mark Patrick as a director, CEO and CIO is high and his decision making will and is likely to be scrutinized which may lead to personal liability. He is undertaking these positions without the benefit of directors' and officers' insurance.

f. Mark Patrick has been instrumental in implementing and driving forward policies that will bring rigorous scrutiny and governance to the Company.

g. The Company's investments over the past three years have outperformed the S&P 500 significantly where the average returns for the S&P 500 over the same period returned 11.49% compared to 16.46% for the Company.

h. To date, Mark Patrick has not been awarded an annual bonus during his tenure at the Company nor has he received benefits which a CEO/CIO would typically enjoy.

(h) These are not a comprehensive list of factors Paul Murphy took into account but form the basis of his independent conclusion that the Directors should (i) enter into an employment agreement in a form drafted by the Company's US and Cayman Islands counsel which reflects the on-going compensation package, and (ii) award an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary.

(i) Mr. Patrick has declared his interests to the Company in relation to the matters the subject of this resolution, being that Mr Patrick is Director of the Company, and also employed by the Company as President, Chief Investment Officer, and General Counsel of the Company.

2.2 **IT IS RESOLVED** by unanimous written resolution that:

---

[2] Per Mercer Report at page 7 and adjusted to account for base compensation and annual bonus/long term incentive for general counsel.

[3] It is noted that the basis for these figures includes assessment of charities and foundations in the US which the Company is not. Whilst useful guidance, the Company must be mindful of the fact that the Company is a Cayman Islands company that holds complex structured financial products through Cayman Islands companies and is not bound by the same provisions that relate to US charities and foundations.

(a) Mark Patrick be awarded:

a. An adjustment to the LTI incentive payment in the amount of $975,000.

b. An annual bonus for the year 2023, payable immediately, of 2.5 times his base salary.

c. No annual bonus for the years 2021 and 2022 given the entirety of the compensation package provided to Mark Patrick as of 12th September 2024 and the date of this resolution.

Executed by the Directors comprising the entire Board of Directors of the Company:

**BY** ______________________________

Paul Murphy - Director

CHARITABLE DAF HOLDCO, LTD.

**BY** ______________________________

Mark Patrick - Director

CHARITABLE DAF HOLDCO, LTD.

**APPENDIX 1**
**COMPENSATION COMMITTEE GUIDELINES**

**Compensation Policy for Executives and Directors**

As adopted on October 1, 2024

1. **Overview and Objectives**

This document sets forth the Compensation Policy for Executives and Directors of Charitable DAF HoldCo, Ltd., its subsidiaries, and CDH GP, Ltd. (collectively, "**Company**").

Compensation is a key component of the Company's overall human capital strategy to attract, retain, reward, and motivate highly skilled individuals that will enhance the Company's value and otherwise assist the Company's to reach its long-term goals. Accordingly, the structure of this Policy is established to tie the compensation of each officer to the Company's goals and performance.

For purposes of this Policy, "Executive Officers" shall mean the Company's Chief Executive Officer, Chief Investment Officer, Chief Company Officer, and Chief Operating Officer, and such other executive officers as appointed by the Company from time to time.

For purposes of this Policy, "Directors" shall mean the Directors as defined in the organizational and governing documents of the Company.

This Policy is subject to applicable law and is not intended, and should not be interpreted as limiting or derogating from, provisions of applicable law to the extent not permitted.

This Policy shall apply to compensation agreements and arrangements which will be approved after the date on which this Policy is adopted and shall serve as Company's Compensation Policy for five (5) years, commencing as of its adoption, unless amended earlier.

The Compensation Committee and the Board of Directors of the Company (the "**Compensation Committee**" and the "**Board**", respectively) shall review and reassess the adequacy of this Policy from time to time.

The Compensation Committee and Board shall have regard to the fact that Charitable DAF HoldCo, Ltd. and its subsidiaries are incorporated and subject to Cayman Islands law (**"Cayman Islands Entities"**). Accordingly, whilst US law, regulation and industry standards (**"US Practices"**) may be taken into account when considering the Objectives (as defined below), the US Practices are not binding on the Cayman Islands Entities, the Cayman Islands Entities having been purposely established as non-US entities, and the Compensation Committee will have regard to all factors which, in its discretion, achieve the Objectives (as defined below).

2. **Objectives**

Company's objectives and goals in setting this Policy are to attract, motivate and retain highly experienced leaders who will contribute to Company's success and enhance shareholder value, while demonstrating professionalism in a highly achievement-oriented culture that is based on merit and rewards excellent performance in the long term, and embedding Company's core values as part of a motivated behavior (**"Objectives"**). To that end, this Policy is designed, among others:

2.1. To closely align the interests of the Executive Officers and Directors with those of Company's shareholders in order to enhance shareholder value;

2.2. To align a significant portion of the Executive Officers' and Directors' compensation with Company's short and long-term goals and performance;

2.3. To provide the Executive Officers and Directors with a structured compensation package, including competitive salaries, performance-motivating cash and equity incentive programs and benefits;

2.4. To strengthen the retention and the motivation of Executive Officers and Directors in the long term; and

2.5. To provide appropriate awards in order to incentivize superior individual excellency and corporate performance.

3. **Compensation Instruments**

3.1 Compensation instruments under this Policy may include, but need not be limited to, the following:

3.1.1 Base salary;

3.1.2 Benefits;

3.1.3 Annual cash bonuses;

3.1.4 Change of control terms;

3.1.5 Retirement and termination terms; and

3.1.6 Long-term and short-term incentive payments

3.2 When fixing compensation instruments the Company may have regard to any matter which, in the Company's complete discretion, is commensurate with the Objectives. Without limitation, this may include:

3.2.1 Assessing an Executive Officer and Director's performance with regard to their contribution to and management of any assets or investments the Company sources or owns from time to time;

3.2.2 Assessing the performance of assets or investments of the Company in relation to overall returns to the Company;

3.2.3 Mitigation of Company liabilities;

3.2.4 Ensuring sound and prudent corporate governance including compliance with all legal, regulatory and industry standards;

3.2.5 Efficient management of service providers;

3.2.6 Risk the Executive Officer and/or the Director is exposed to;

3.2.7 Responsibilities the Executive Officer and/or the Director undertakes; and

3.2.8 Achieving the Company's business and charitable objectives

4. **Benefits**

4.1 The following benefits may be granted to the Executive Officers and Directors in order, among other things, to comply with legal requirements:

4.1.1 Vacation days in accordance with market practice;

4.1.2 Sick days in accordance with market practice;

4.1.3 Convalescence pay according to applicable law;

4.1.4 Company may contribute on behalf of the Executive Officer or Director to an insurance policy (including, without limitation, split-dollar life insurance) or a pension fund, as allowed by applicable law and with reference to Company's policies and procedures and the practice in peer group companies (including contributions on bonus payments); and

4.1.5 Company may contribute on behalf of the Executive Officer or Director towards work disability insurance, as allowed by applicable law and with reference to Company's policies and procedures and to the practice in peer group companies.

4.2 In events of relocation or repatriation of an Executive Officer or Director to another geography, such Executive Officer or Director may receive other similar, comparable or customary benefits as applicable in the relevant jurisdiction in which he or she is employed or additional payments to reflect adjustments in cost of living. Such benefits may include reimbursement for out of pocket one-time payments and other ongoing expenses, such as housing allowance, car allowance, and home leave visit, etc.

4.3 Company may offer additional benefits to its Executive Officers and Directors, which will be comparable to customary market practices, such as, but not limited to: cellular and land line phone benefits, company car and travel benefits, reimbursement of business travel including a daily stipend when traveling and other business related expenses, insurances, other benefits (such as newspaper subscriptions, academic and professional studies), etc., provided, however, that such additional benefits shall be determined in accordance with Company's policies and procedures.

5. **Miscellaneous**

5.1 Nothing in this Policy shall be deemed to grant to any of Company's Executive Officers, employees, directors, or any third party any right or privilege in connection with their employment by or service to the Company, nor deemed to require Company to provide any compensation or benefits to any person. Such rights and privileges shall be governed by applicable personal

employment agreements or other separate compensation arrangements entered into between Company and the recipient of such compensation or benefits. The Board may determine that none or only part of the payments, benefits and perquisites detailed in this Policy shall be granted, and is authorized to cancel or suspend a compensation package or any part of it.

5.2 In the event that new regulations or law amendment in connection with Executive Officers' and Directors' compensation will be enacted following the adoption of this Policy, Company may follow such new regulations or law amendments, even if such new regulations are in contradiction to the compensation terms set forth herein.

*********************

This Policy is designed solely for the benefit of Company and none of the provisions thereof are intended to provide any rights or remedies to any person other than Company.

**CHARITABLE DAF HOLDCO, LTD.**

**(AND THE PARTIES LISTED IN SCHEDULE 1)**

**AND**

**PAUL MURPHY**

---

**DIRECTOR SERVICES AGREEMENT**

---

## TABLE OF CONTENTS


1 Definitions and Interpretation ....................3
2 Appointment of Director ....................4
3 Experts and Advisors ....................5
4 Companies' Obligations and Acknowledgements ....................5
5 Fees, Costs and Expenses ....................6
6 The Director's Liability and Indemnity ....................7
7 Non-Exclusivity ....................7
8 Status ....................8
9 Restrictions ....................8
10 Termination ....................9
11 Notices ....................9
12 General ....................9
13 Governing Law and Jurisdiction ....................10

**THIS AGREEMENT** is effective as of 12th December 2024 (**Agreement**)

**BETWEEN:**

1) **The parties listed in Schedule 1 of this Agreement** (a **Company** or the **Companies** as the context dictates); and

2) **Paul Murphy**, a natural person resident in the Cayman Islands whose address is 67 Fort Street, George Town, Grand Cayman KY1-1007, Cayman Islands (the **Director**).

**RECITALS:**

A) The Companies want the Director to be appointed as a director of the Companies and the Director wants to provide the Services to the Companies on the terms of this Agreement.

**IT IS AGREED AS FOLLOWS:**

**1 Definitions and Interpretation**

1.1 In this agreement, unless the context otherwise requires, the following expressions shall have the following meanings:

**Affiliate** means any parent or subsidiary of a Companies or any other Companies which has the same ultimate parent;

**AML** means the money laundering and terrorist and proliferation financing risks which may need to be addressed by the Director under the AML Regime;

**AML Regime** the Cayman Islands Proceeds of Crime Act (as revised), Terrorism Act (as revised), Proliferation Financing (Prohibition) Act (as revised), Anti-Money Laundering Regulations (as revised), Guidance Notes on the Prevention and Detection of Money Laundering, Terrorist Financing and Proliferation Financing in the Cayman Islands, Guidance on Targeted Financial Sanctions, directives and guidance issued by CIMA and the Financial Reporting Authority of the Cayman Islands and other requirements that may be imposed on the Director to address AML (such anti-money laundering legislation, regulations, guidance notes, directives and guidance, as amended from time to time);

**Articles** means the articles of association of the Companies as the context requires;

**Business Day** means any day on which commercial retail banks are open for banking business in the Cayman Islands (not being a Saturday or a Sunday);

**Law** means the laws of the Cayman Islands or other jurisdiction which may be relevant to the operations of the Companies, including the Companies Law (As Revised) of the Cayman Islands;

**Losses** means any loss, cost, charge, expense, payment, interest, demand, claim, proceeding, suit, penalty, damages, legal fees, liability, obligation, detriment, adverse judgment, order or other sanction;

**Member** means any member from time to time of the Companies;

**Memorandum** means the memorandum of association of the Companies as the context requires; and

**Services** means the services to be provided by the Director to the Companies listed in Schedule 2 to this Agreement.

In this agreement, any reference to:

1.2 a recital, a clause, a sub-clause or a schedule is, unless the context otherwise requires, a reference to a recital, a clause or sub-clause of, or a schedule to, this agreement;

1.3 this agreement or to any agreement or document referred to in this agreement shall be construed as a reference to such agreement or document as amended, varied, modified, supplemented, restated, novated or replaced from time to time; and

1.4 any statute or statutory provision shall, unless the context otherwise requires, be construed as a reference to such statute or statutory provision as it may have been amended, modified, extended, consolidated, re-enacted or replaced and shall include any subordinate legislation made thereunder.

1.5 In this agreement, except where the context otherwise requires, words denoting the singular include the plural and vice versa, words denoting a gender include every gender and references to persons include bodies corporate and unincorporated.

1.6 The recitals and the schedule form part of this agreement and shall have the same force and effect as if they were expressly set out in the body of this agreement.

1.7 Clause headings in this agreement are inserted for convenience only and shall not affect the construction of this agreement.

**2 Appointment of Director**

2.1 Subject to the provisions of this agreement, the Director agrees with the Companies to provide director services to the Companies upon the terms and conditions contained in this agreement.

2.2 The Director will undertake his duties in accordance with what he considers to be the best interests of the Company. However, the Director, in performing his duties as a director of the Companies, shall not be obliged to act in any manner which, in his opinion:

(a) constitute a breach of his fiduciary duties, or otherwise conflict with any laws of the Cayman Islands or other jurisdiction which may be relevant to the operations of the Companies, or be otherwise illegal or immoral; be unethical, unduly onerous or be of such nature that it might damage the reputation of or be detrimental to the Director;

(b) may conflict with any provision of the Memorandum or Articles; or

(c) would result in the risk of prosecution or other sanction of any kind in any jurisdiction or the withdrawal of, or imposition of any conditions in respect of, any licence, consent or other authorisation issued to the Director by any legal, governmental or regulatory authority in any applicable jurisdiction.

2.3 Without prejudice to his general duties as a director of the Companies, the Director agrees with the Companies to discharge his duties and obligations as director of the each Company in accordance with the Articles and to provide and undertake the specific duties listed in Schedule 2 to this agreement.

**3 Experts and Advisors**

3.1 In carrying out the services rendered pursuant to this agreement, the Director shall be entitled to retain on his behalf the services of attorneys, accountants/auditors and other advisers as shall be reasonably necessary for the Director to perform such services and the Company shall be liable to pay all reasonable fees and disbursements thus incurred.

3.2 The Director shall be entitled to rely upon any advice so obtained if the Director reasonably believes that such professional persons are reliable and competent in the matters and/or advice prepared or presented and/or such matters and/or advice is within the person's professional qualifications and competence.

3.3 The Director shall in no event have any liability for anything done or omitted to be done in good faith in reliance upon such advice unless the Director knew the advice to be tainted by manifest error.

**4 Companies' Obligations and Acknowledgements**

4.1 During the continuance of this agreement, the Companies shall:

(a) promptly provide the Director with all such information, documentation and records (as well as notification of any changes which relate to or affect the services being provided hereunder) as the Director may require to perform his duties as a director of the Companies;

(b) keep the Director fully informed as to the business, affairs, financial position and prospects of the Companies;

(c) promptly provide upon request from time to time, all necessary information and documentation required by the Director to comply with any applicable obligations under the AML Regime and supply information in response to the Director's enquiries (if any) to enable the Director to comply with any applicable obligations under the AML Regime and all other statutory responsibilities to make disclosures to relevant authorities in respect of AML and any other criminal activity that the Director may encounter during performance of the Services and the Companies acknowledges that any such disclosures may include confidential information;

(d) neither cause nor permit anything to be done which will or is likely to impose any civil or criminal liability or penalty on the Director; and

(e) provide the following promptly on request from time to time by the Director:

(i) written explanation of the nature of the Companies' business and a detailed business plan;

(ii) evidence satisfactory to the Director of the identity of, and references in relation to, (i) any other directors of the Companies, and (ii) any person (or persons) on whose instructions the Director may act in relation to the Companies; and

(iii) other information and documentation as the Director may from time to time reasonably require in relation to the Companies, its directors, Members or activities.

4.2 The Companies acknowledge that:

(a) the Director shall be entitled for all purposes in relation to dealings with all persons, to rely on the authenticity and accuracy of all information and communications of whatever nature received by the Director in good faith and shall not be responsible or liable to any person for any loss arising by virtue of any such information or communication not being authentic and/or accurate; and

(b) the Director shall be entitled to rely on the authenticity and accuracy of all information and communications received in good faith through facsimile, the Internet or similar systems and shall not be responsible or liable to any person for any loss or damage caused by any such information not being authentic, accurate or any communication transmitted to or by the Director having been interfered with or manipulated by any person.

4.3 The Companies shall procure that:

(a) financial statements of the Companies and any Affiliates of the Companies shall be prepared in respect of each financial year of the Companies or the respective Affiliate in accordance with generally accepted accounting principles; and

(b) such financial statements of the Companies and the Affiliate shall be delivered to the Director.

**5 Fees, Costs and Expenses**

5.1 In consideration of the provision of the services of the Director under this agreement, the Companies shall pay to the Director the fees set out in Schedule 3 to this Agreement.

5.2 The Annual Fee (as defined in Schedule 3 of this Agreement) is not refundable in the event of resignation or removal of the Director, irrespective of the reason or whether the removal was for cause or on notice without cause.

5.3 The fees payable by the Companies to the Director shall not be modified unless otherwise agreed by the Director and the Companies.

5.4 The Director shall be entitled to recover from the Companies all expenses and disbursements (including courier, telephone, facsimile, printing and photocopying) properly incurred or paid by the Director on behalf of the Companies.

**6 The Director's Liability and Indemnity**

6.1 The Director shall not be liable for any Losses whatsoever which he or the Companies may sustain or suffer at any time as a result of, in connection with or in the course of the discharge of their respective duties or obligations under this Agreement or otherwise arising as a result of this Agreement, other than Losses arising by reason of the fraud, dishonesty, wilful neglect and wilful default of the Director. For the avoidance of doubt, the Director will not be answerable for the acts, receipts, neglects or defaults of any other director, employee, officer, partner, limited partner, general partner, manager, agent or trustee of the Company, for the solvency or honesty of any persons with whom assets of the Company are lodged or deposited, for any insufficiency of any security upon which any monies of the Company may be invested, or for any other Losses.

6.2 The Companies shall indemnify and hold harmless, to the fullest extent permitted by Cayman Islands law, on a full indemnity basis, the Director against all Losses which may be made against or incurred by the Director in connection with or as a result of the Director acting as a director of the Company, the performance of this Agreement, any regulatory action relating to or involving the Company or any service provider thereto including the Director, and any acts or omissions of the Company or any service provider thereto otherwise than by reason of the fraud, dishonesty, wilful neglect or wilful default of the Director as aforesaid.

6.3 Where the Articles grant indemnities to the directors of the Company which provide the Director with additional or greater protection than those contained in clause 6.2, the indemnities under the Articles shall be deemed to apply.

6.4 The Company shall advance any costs and expenses incurred by the Director (including attorney's fees) in defending any action, suit, proceeding or investigation for which for which indemnity has been sought. The Director shall reimburse the Companies for any such advances in the event that a final non appealable judgment is given against the Director which finds them to have acted fraudulently, dishonestly, with wilful neglect, or with wilful default.

6.5 For the avoidance of doubt, references in this Agreement to fraud, dishonesty, wilful neglect and wilful default shall mean a final non-appealable finding to such effect by a competent court in relation to the conduct of the relevant party.

6.6 The provisions of this clause 6 shall survive the termination of this Agreement and shall inure to the benefit of the Director in respect of all acts performed by him prior to such termination of office.

**7 Non-Exclusivity**

7.1 The services of the Director under this agreement are not exclusive, and the Director or any Affiliate shall be free to provide similar services to other persons. The Director or any Affiliate shall not be deemed to be given notice of, or to be under any duty to disclose to, the Companies, any fact or thing which may come to the notice of the Director or any Affiliate in the course of the Director or any Affiliate providing similar services to other persons or in the course of the Director's business in

any other capacity or in any manner whatsoever otherwise than in the course of carrying out the Director's duties under this agreement.

**8 Status**

8.1 This agreement constitutes a contract for the provision of services and not a contract of employment.

8.2 None of the provisions of this agreement shall create or be deemed to create a relationship of partnership between the parties to this agreement.

**9 Restrictions**

9.1 The Director shall not, without the written consent of the Companies, at any time after the termination of the services under this agreement, represent himself as being in any way connected with or interested in the business of the Companies.

9.2 None of the parties to this agreement shall do any act, matter or thing which would or might prejudice or bring into disrepute the business or reputation of the other parties to this agreement.

9.3 The Director shall not at any time disclose to any person, and shall treat as confidential, any information relating to the business, finances or other matters of the Companies that he may have obtained as a result of his role under this agreement provided however that the provisions of this clause shall not apply:

(a) to the disclosure of any information already known to the recipient prior to the entering into of this agreement;

(b) to the disclosure of any such information which is or becomes public knowledge otherwise than as a result of the unauthorised or improper conduct of the recipient;

(c) to any extent that disclosure is required under Cayman Islands law or any other applicable law or by an order of the Cayman Islands courts or any other court of competent jurisdiction or pursuant to any direction, request or requirement (whether or not having the force of law) of, the Cayman Islands Monetary Authority and the Cayman Islands Financial Reporting Authority;

(d) to the disclosure of any information to professional advisors who receive the same under a duty of confidentiality; or

(e) to the disclosure of any information with the consent of the parties hereto.

9.4 For the avoidance of doubt, this clause does not preclude the Director from disclosing that he is a director of the Companies.

9.5 In the event of this agreement being terminated for whatever reasons, the provisions of this clause 9 shall remain in full force and effect.

**10 Termination**

10.1 The Director may be removed or cease to hold office in any manner permitted by the Articles, and without prejudice to the generality thereof, shall be entitled to resign from office at will and without recourse by any Party solely by virtue of such resignation.

10.2 This agreement shall be terminated:

(a) upon the Director or the Company or Companies giving 30 days' notice of termination of this Agreement;

(b) upon the Director or the Company giving notice that either Party has committed any material breach of the provisions of this Agreement, and if such breach is capable of remedy, that breach has not remedied said breach within 30 days after the service of written notice requiring it to be remedied;

(c) if a court or tribunal of competent jurisdiction finds that the Director has committed actual fraud or wilful neglect in relation to the Companies or the Director does not challenge an allegation of fraud or wilful neglect by the Companies; or

(d) the Cayman Islands Monetary Authority instructs the Companies that the Director can no longer be a director.

10.3 The termination of this agreement shall be without prejudice to any antecedent liability of the parties to this agreement and, without limitation, the Director shall be entitled to receive all fees, disbursements and other expenses accrued due up to the date of such termination.

10.4 The Company shall expeditiously notify the registrar of companies of any resignation of the Director in accordance with section 55(1)(b) of the Companies Act of the Cayman Islands, but the Director retains the right to give such notice of his resignation to the Registrar and any other registry or person.

**11 Notices**

11.1 Notices to be given hereunder shall be delivered by hand or mailed by prepaid airmail or emailed to the respective addresses set out under the signatories of each party to this agreement.

**12 General**

12.1 This agreement sets out the entire agreement and understanding between the parties in respect of the subject matter of this agreement.

12.2 This agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns.

12.3 If at any time any one or more of the provisions of this agreement is or becomes invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions hereof shall not be in any way affected or impaired thereby.

12.4 The rights of the parties hereunder are cumulative, may be exercised as often as they consider appropriate and are in addition to their respective rights under the general law. They shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing, and in particular any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other right. No act or course of conduct or negotiation on the part of either party shall in any way preclude it from exercising any right or constitute a suspension or variation of any right that it may have hereunder.

12.5 Each party shall do, execute and perform such further acts, deeds and documents as may be required to give full legal and practical effect to this agreement.

12.6 No variation of this agreement shall be effective unless signed by or on behalf of all the parties to this agreement.

12.7 This agreement may be executed in any number of counterparts and provided that every party has executed a counterpart, the counterparts together shall constitute a binding and enforceable agreement between the parties.

**13 Governing Law and Jurisdiction**

13.1 This agreement is governed by and shall be construed in accordance with the laws of Cayman Islands.

13.2 Each of the parties hereto irrevocably agrees that the courts of Cayman Islands shall have exclusive jurisdiction to hear and determine any suit, action or proceeding, and to settle any disputes, which may arise out of or in connection with this agreement and, for such purposes, irrevocably submits to the exclusive jurisdiction of such courts.

**[SIGNATURE PAGE FOLLOWS]**

This Agreement has been entered into by the parties on the day and year first above written.

**SIGNED** for and on behalf of the **COMPANIES**:

)
) Duly Authorised Signatory
)
) Name: Mark Patrick
)
) Title: Director and CEO

**SIGNED** for and on behalf of the **DIRECTOR**:

)
)
)
) Name: Paul Murphy
)
) Title: Director

## SCHEDULE 1: PARTIES

The following companies are parties to this Agreement:

1. Charitable DAF HoldCo, Ltd.
2. Charitable DAF GP, LLC
3. Charitable DAF Fund, L.P.
4. Acis CLO Value Fund II Charitable DAF Ltd,
5. CLO HoldCo, Ltd.
6. Acis Loan Funding, Ltd.
7. Liberty CLO Holdco, Ltd.
8. HCT Holdco 2, Ltd.
9. MGM Studios Holdco, Ltd.

And any other companies that may be agreed by the Parties in writing.

## SCHEDULE 2: SERVICES

1. The Director will devote as much of his time, attention, ability and skills as are required to perform his normal duties as Director of the Companies.

2. The Director will perform his duties faithfully, efficiently and diligently and use all reasonable endeavours to promote the best interests and reputation of the Companies. In particular, the Director's specific services to the Companies will include:

- to declare dividends from time to time subject to be satisfied that the Company declaring the dividend is solvent;
- signing contracts, filings, resolutions, representations and other documents on behalf of the Companies;
- attending all meetings of the Board of the respective Companies in person or by phone; provided that the dates of such meetings have been communicated to the Director by the Companies or its corporate secretary, as applicable, with reasonable advance notice; and provided further that the Director may not be able attend a meeting due to illness or incapacity or any other reasonable circumstances;
- considering all documents contained in board packs provided in advance to the Director by the Companies or its corporate secretary, as applicable, in order to be able to participate in full in the Board's deliberations;
- bringing independent judgment to bear on issues of strategy, policy, resources, performance and regulatory matters;
- providing advice and direction on all matters affecting the Companies;
- planning, developing and enhancing the future strategic direction of the Companies;
- where necessary or appropriate, liaising with the Company's respective shareholders, professional advisers, service providers and regulators; and
- sharing responsibility with the other director(s) of the Companies for the effective control of each Company.

**SCHEDULE 3: FEES**

The Director shall be paid fees in accordance with the following provisions:

1. US$200,000 per annum payable in instalments of US$16,666.66 on the last business day of each calendar month.

2. A discretionary bonus or bonuses in an amount and time determined by the current Chief Executive Officer of the Companies which may also include issuing equitable interests or creating a long-term incentive plan.

Fees shall be paid in cleared funds to the following bank account:

Instructions to: BNY Mellon NY

Swift BIC: IRVTUS3NXXX

ABA No: 021000018

For credit: Butterfield Bank (Cayman) Limited

Swift BIC: BNTBKYKYXXX

Account at BNY: 8033265086

For further credit to: Paul Richard Murphy

Account number: 1361530160011

Docusign Envelope ID: 11CD8132-6630-49A0-A1FE-D8548E9451F8

November 11, 2024

**From**: Highland Dallas Foundation, Inc.
Highland Kansas City Foundation, Inc.
Highland Santa Barbara Foundation, Inc.

**To**: Mr. Paul Murphy
Director of Charitable DAF HoldCo, Ltd.
and Charitable DAF Holdings Corp.
paul@gkmanagement.com.ky

Dear Mr. Murphy:

We write to you collectively on behalf of the following organizations:

1. Highland Dallas Foundation, Inc., a participation shareholder in Charitable DAF HoldCo, Ltd., of which you are a director along with Mark Patrick. As you know, Mr. Patrick also is the managing member of the Charitable DAF GP, LLC, which governs the related Charitable DAF Fund, LP.

2. Highland Kansas City Foundation, Inc., also a participation shareholder in Charitable DAF HoldCo, Ltd.

3. Highland Santa Barbara Foundation, Inc., also a participation shareholder in Charitable DAF Holdco, Ltd.

Highland Dallas Foundation, Inc is a supporting organization of The Dallas Foundation. Highland Kansas City Foundation, Inc. is a supporting organization of Greater Kansas City Community Foundation. Highland Santa Barbara Foundation, Inc. is a supporting organization of Santa Barbara Foundation. The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (collectively the "Foundations") have worked closely with their respective supporting organizations named above to award grants and funding to a wide range of charitable causes that have made tangible, lasting impacts on the communities they serve. Our primary commitment has been, and always will be, our concern for the community, respect for donors, thoughtful giving, and careful investing—core values that have guided each of us throughout our existence.

With these core values and with the well-being of these Foundations in mind, we write you to voice that we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "DAF-related entities"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable. Recently, various competing constituencies provided the Foundations with conflicting information related to the operations and financial inner

workings of the DAF-related entities. This conflicting information raises significant concerns about how the corpus of these funds is administered and spent. The Foundations have no real pathway to verify the information as the current governance structures prevent them from receiving such information, and indeed, efforts to secure additional information have been rebuffed. As a result, these recent submissions demonstrate that the current governance structure is ill-equipped to address such allegations and provide sufficient protection to the economic funds that support so many charitable efforts.

Further, because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities.

Thank you for your attention to this matter. Our counsel with the law firm of Holland & Knight LLP is copied on this letter should you have any questions.

Sincerely yours,

HIGHLAND DALLAS FOUNDATION, INC.

Signed by:

By: ______________________

8C324EA989434F3...

Julie Diaz
Vice President

HIGHLAND KANSAS CITY FOUNDATION, INC.

DocuSigned by:

By: Deborah L Wilkerson

71ED433BB136439...

Debbie Wilkerson
Vice President

HIGHLAND SANTA BARBARA FOUNDATION, INC.

DocuSigned by:

By: Jackie Carrera

66D757ACD1A1461...

Jacqueline M. Carrera
Secretary and Treasurer

cc: David M. Rosenberg
(via email at david.rosenberg@hklaw.com)

Michael Stockham
(via email at michael.stockham@hklaw.com)

**Rachel Baxendale**

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** 26 November 2024 6:32 PM
**To:** Mark Patrick; Geoffrey Sykes
**Cc:** Brandon R. Schaller; dmancino@seyfarth.com; Shawn Raver; Bart Higgins; Lauren Vernon; Philip Aubry; Barnaby Gowrie
**Subject:** RE: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Thanks for this Geoffry,

Mark, I'll let Walkers come back but here are my thoughts:

1. Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful that they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position by diluting them therefore the company should be wound up or an order made for change of management/revocation of the share issuances. It's a very difficult situation to get right without gifting them a potential ground to claim just and equitable grounds.

2. Management shareholders have a right to object to the winding up but they have no special status by virtue of being management shares. I'll have to double check the docs but this would be different if there were something in the articles of association/share issuance agreement where there was an explicit provision where they had agreed not to present a winding up petition. The just and equitable ground is specifically designed to prevent unfair prejudice to a shareholder.

3. I think our main point is to stress that if they take any action they significantly undermine Donderro's position in the bankruptcy and UBS action because he will be seen as the alter ego of DAF as they've always claimed. Additionally, taking steps to preserve independence improves the DAFs standing in those proceedings. This isn't related to the advice but something for the call next week.

Paul.

---

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** Tuesday, November 26, 2024 5:43 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; dmancino@seyfarth.com; Paul Murphy <paul@gkmanagement.com.ky>; Shawn Raver <sraver@dafholdco.com>; Bart Higgins <bhiggins@shieldslegal.com>; Lauren Vernon <Lauren.Vernon@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Subject:** Re: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181]

Another consideration, is that Holdco has management shares. Does the equitable theory take into account the rights of the owner of the management shares when the non-control shares want equitable relief. If the management shareholders, disagrees, are those powers and right abdicated in a equitable wind down proceedong? Seems the Management Shareholder has a right to express its rights as to whether the company should be wound down or not.

On Tue, Nov 26, 2024, 4:26 PM Mark Patrick <mpatrick@dafholdco.com> wrote:

> Charitable DAF Holdco holds only one asset - LP interest in charitable daf fund LP. As a limited partner, Holdco cannot force the partnership to wind its affairs?
>
> On Tue, Nov 26, 2024, 4:11 PM Mark Patrick <mpatrick@dafholdco.com> wrote:
>
>> If new participating shares are issued to a new non-profit, and say per Paul's point they try to implement an "equitable" winding down of the company, but the new shareholders objects, would that help? Also, what could possibly be the basis for any "equitable" liquidation if the Articles don't give such rights.
>>
>> On Tue, Nov 26, 2024, 3:34 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:
>>
>>> Hi Brandon
>>>
>>> Thanks for your time on the phone last week and the below.
>>>
>>> As discussed, please see attached in draft the high priority memo as updated with a new Section E in respect of winding up petitions on the just and equitable ground.
>>>
>>> We look forward to speaking with you tomorrow morning.
>>>
>>> Best regards,
>>>
>>> **Geoffrey Sykes**
>>> Associate
>>> **Walkers (Cayman) LLP**
>>>
>>> **T** +1 345 814 6834 | **M** +1 345 814 6834
>>> www.walkersglobal.com
>>>
>>> Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore
>>>
>>> ---
>>>
>>> **From:** Brandon R. Schaller <bschaller@shieldslegal.com>
>>> **Sent:** Friday, November 22, 2024 1:36 PM
>>> **To:** dmancino@seyfarth.com; Philip Aubry <Philip.Aubry@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
>>> **Cc:** Paul Murphy <paul@gkmanagement.com.ky>; mpatrick@dafholdco.com; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>
>>> **Subject:** DAF - Participating Shares Summary

**[this message is from an external sender]**

---

Doug and Walkers team,

As discussed, here are our notes from a review of the provisions applicable to Participating Shares in the Articles for Charitable DAF HoldCo, Ltd. As you know, we are not licensed in the Cayman Islands, so we would appreciate Walkers' help to confirm/expand our views.

**Rights of Participating Shares*:**

Rights

1. Participate (receive) discretionary dividends. See "Participating Share" and Articles generally.
2. If new shares/classes are issued, and the change would materially adversely vary the Participating Shares, then 2/3rds Participating Shareholder consent is required. See #13.
    a. Issuance of authorized but unissued Participating Shares (i.e., dilution of existing shareholders) makes this consent right contingent on outstanding shares. See #14 and #7.
3. Rights to assets in a winding up in accordance with the waterfall. See #122-124.
4. Certain foundations own 100 Participating Shares out of a total of authorized 4,999,900 Participating Shares. See #7.

No rights

1. Cannot vote shares. See #12.
2. Cannot redeem shares. See "Participating Shares."
3. No rights to information. See #12.
4. No rights to attend meetings. See #12.
5. No rights to notice of meetings. See #12.
6. No rights to pro rata distributions based on % of Participating Shares. See #105.
7. No rights to appoint or remove directors or officers. See Articles generally and #65.
8. No rights to receive notice of issuance of additional shares. See Articles generally.
9. No rights to receive notice of distributions to other Participating Shareholders. See Articles generally.
10. No pre-emptive rights. See Articles generally.

Restrictions

1. If a Participating Shareholder is (i) in breach of any law, (ii) is not a non-profit, or (iii) the directors are of the opinion such Shareholder might result in the Company incurring additional liability, including for legal reasons, the directors may require such Shareholder to transfer its shares. See #21. *Walkers to review.*
2. May be diluted by the directors issuing additional Participating Shares. See #8.
   a. Including additional pari passu shares. See #14.
   b. Dilution may, ultimately, affect the ability of the existing Participating Shareholders to consent to changes to the rights attached to the Participating Shares. See #14, #7, and Articles generally.

*Suggest the foundations confirm that they have the latest version of the Articles (attached). We suspect they do not.

Best regards,

Brandon

**Brandon R. Schaller**

ATTORNEY

16400 Dallas Parkway, Suite 300

Dallas, TX 75248

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

**SHIELDSLEGAL.COM**

This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message. You should not copy it or disclose its contents to any other person. Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses. This e-mail message does not contain or constitute legal advice and/or federal tax advice. The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

**Rachel Baxendale**

**From:** Barnaby Gowrie
**Sent:** 27 November 2024 9:09 AM
**To:** Mark Patrick; Paul Murphy
**Cc:** Geoffrey Sykes; Brandon R. Schaller; dmancino@seyfarth.com; Shawn Raver; Bart Higgins; Lauren Vernon; Philip Aubry
**Subject:** RE: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181]
**Attachments:** Aquapoint L.P. v Xiaohu Fan (CICA (Civil) Appeal No. 14 of 2022).pdf; In the matter of Sigma Finance Corporation (Cause No. FSD 171 of 2024 (DDJ) 19 July 2024).pdf

Hi Mark, Paul

Thanks for your emails. Our answers to Mark's questions are as follows, and we generally agree with Paul's comments in respect of them:

1. *If new participating shares are issued to a new non-profit, and say per Paul's point they try to implement an "equitable" winding down of the company, but the new shareholders objects, would that help?*
    a. Yes, if other shareholders are opposed to an equitable winding up that will be taken into consideration and would likely help. However, it may not be determinative – the question will still be whether, in all of the circumstances, it is just and equitable for the company to be wound up.

2. *Also, what could possibly be the basis for any "equitable" liquidation if the Articles don't give such rights.*
    a. The right to seek a winding up order on the just and equitable ground is provided by legislation (see the Companies Act (2023 Revision) sections 92(e)) and 95(3)).

3. *Charitable DAF Holdco holds only one asset - LP interest in charitable daf fund LP. As a limited partner, Holdco cannot force the partnership to wind its affairs?*
    a. As a limited partner of Charitable DAF Fund LP, Charitable DAF HoldCo Ltd does have standing to present a petition seeking the winding up of Charitable DAF Fund LP, including on the just and equitable basis.

4. *Another consideration, is that Holdco has management shares. Does the equitable theory take into account the rights of the owner of the management shares when the non-control shares want equitable relief. If the management shareholders, disagrees, are those powers and right abdicated in a equitable wind down proceeding? Seems the Management Shareholder has a right to express its rights as to whether the company should be wound down or not.*
    a. As above, on the hearing of a winding up petition on the just and equitable ground, the question will be whether, in all of the circumstances, it is just and equitable for the company to be wound up. The rights and views of the holder of the management shares will be relevant to that consideration, but may not be determinative. If a winding up order is made and a liquidator appointed, the rights of the holder of the management shares will be varied in line with relevant legislation and the articles. Noting the meeting tomorrow morning we have not explored this in detail but please let us know if you would like further advice in that regard.

5. *Please provide a couple Cayman Cases where Equitable wind up occurred for my review based on mismanagement, etc. I'd like some context if this procedure is extra ordinary / rare or an action that does occur leading to Cayman Case Law.*
    a. Winding up orders on the just and equitable ground are not extraordinary or rare in the Cayman Islands. Please see attached two Cayman decisions involving winding up orders on the just and equitable ground (noting that partnerships may be wound up on the just and equitable ground under the same provisions as companies, and that the *Aquapoint* decision is currently on appeal to the Judicial Committee of the Privy Council).

Please let us know if you would like anything further before the meeting tomorrow morning.

Best regards,

Barney

**Barnaby Gowrie**
Partner
**Walkers (Cayman) LLP**

**T** +1 345 914 6365 | **M** +1 345 525 3385
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** Tuesday, November 26, 2024 6:44 PM
**To:** Paul Murphy <paul@gkmanagement.com.ky>
**Cc:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Brandon R. Schaller <bschaller@shieldslegal.com>; dmancino@seyfarth.com; Shawn Raver <sraver@dafholdco.com>; Bart Higgins <bhiggins@shieldslegal.com>; Lauren Vernon <Lauren.Vernon@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Subject:** Re: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

1. Agreed about the perception.

However, I have been exploring funding a large campus in DFW with a major church building, housing, and conference center, and exhibitions. In addition we been having exploring other large donations in the future on the scale of tens of millions leading to hundreds millions for educational buildings for an existing University in Dallas.

People I have spoken to have suggested I form a non profit now to work these endeavors.

On Tue, Nov 26, 2024, 5:31 PM Paul Murphy <paul@gkmanagement.com.ky> wrote:

> Thanks for this Geoffry,
>
> Mark, I'll let Walkers come back but here are my thoughts:
>
> 1. Issuance of new participation shares, where the existing foundations represent a smaller % of the issued and outstanding shares, would weaken any petition based on just and equitable grounds but we must be careful that they don't point to this as ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position by diluting them therefore the company should be wound up or an order made for change of management/revocation of the share issuances. It's a very difficult situation to get right without gifting them a potential ground to claim just and equitable grounds.
>
> 2. Management shareholders have a right to object to the winding up but they have no special status by virtue of being management shares. I'll have to double check the docs but this would be different if there were something in the articles of association/share issuance agreement where there was an explicit provision where

they had agreed not to present a winding up petition. The just and equitable ground is specifically designed to prevent unfair prejudice to a shareholder.

3. I think our main point is to stress that if they take any action they significantly undermine Donderro's position in the bankruptcy and UBS action because he will be seen as the alter ego of DAF as they've always claimed. Additionally, taking steps to preserve independence improves the DAFs standing in those proceedings. This isn't related to the advice but something for the call next week.

Paul.

---

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** Tuesday, November 26, 2024 5:43 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; dmancino@seyfarth.com; Paul Murphy <paul@gkmanagement.com.ky>; Shawn Raver <sraver@dafholdco.com>; Bart Higgins <bhiggins@shieldslegal.com>; Lauren Vernon <Lauren.Vernon@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Subject:** Re: DAF - Participating Shares Summary [WALKERS-AMER_DOCS.FID2294181]

Another consideration, is that Holdco has management shares. Does the equitable theory take into account the rights of the owner of the management shares when the non-control shares want equitable relief. If the management shareholders, disagrees, are those powers and right abdicated in a equitable wind down proceedong? Seems the Management Shareholder has a right to express its rights as to whether the company should be wound down or not.

On Tue, Nov 26, 2024, 4:26 PM Mark Patrick <mpatrick@dafholdco.com> wrote:

> Charitable DAF Holdco holds only one asset - LP interest in charitable daf fund LP. As a limited partner, Holdco cannot force the partnership to wind its affairs?
>
> On Tue, Nov 26, 2024, 4:11 PM Mark Patrick <mpatrick@dafholdco.com> wrote:
>
>> If new participating shares are issued to a new non-profit, and say per Paul's point they try to implement an "equitable" winding down of the company, but the new shareholders objects, would that help? Also, what could possibly be the basis for any "equitable" liquidation if the Articles don't give such rights.
>>
>> On Tue, Nov 26, 2024, 3:34 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

Hi Brandon

Thanks for your time on the phone last week and the below.

As discussed, please see attached in draft the high priority memo as updated with a new Section E in respect of winding up petitions on the just and equitable ground.

We look forward to speaking with you tomorrow morning.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** Friday, November 22, 2024 1:36 PM
**To:** dmancino@seyfarth.com; Philip Aubry <Philip.Aubry@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Paul Murphy <paul@gkmanagement.com.ky>; mpatrick@dafholdco.com; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** DAF - Participating Shares Summary

**[this message is from an external sender]**

---

Doug and Walkers team,

As discussed, here are our notes from a review of the provisions applicable to Participating Shares in the Articles for Charitable DAF HoldCo, Ltd. As you know, we are not licensed in the Cayman Islands, so we would appreciate Walkers' help to confirm/expand our views.

**Rights of Participating Shares*:**

Rights

1. Participate (receive) discretionary dividends. See "Participating Share" and Articles generally.
2. If new shares/classes are issued, and the change would materially adversely vary the Participating Shares, then 2/3rds Participating Shareholder consent is required. See #13.

    a. Issuance of authorized but unissued Participating Shares (i.e., dilution of existing shareholders) makes this consent right contingent on outstanding shares. See #14 and #7.

3. Rights to assets in a winding up in accordance with the waterfall. See #122-124.
4. Certain foundations own 100 Participating Shares out of a total of authorized 4,999,900 Participating Shares. See #7.

No rights

1. Cannot vote shares. See #12.
2. Cannot redeem shares. See "Participating Shares."
3. No rights to information. See #12.
4. No rights to attend meetings. See #12.
5. No rights to notice of meetings. See #12.
6. No rights to pro rata distributions based on % of Participating Shares. See #105.
7. No rights to appoint or remove directors or officers. See Articles generally and #65.
8. No rights to receive notice of issuance of additional shares. See Articles generally.
9. No rights to receive notice of distributions to other Participating Shareholders. See Articles generally.
10. No pre-emptive rights. See Articles generally.

Restrictions

1. If a Participating Shareholder is (i) in breach of any law, (ii) is not a non-profit, or (iii) the directors are of the opinion such Shareholder might result in the Company incurring additional liability, including for legal reasons, the directors may require such Shareholder to transfer its shares. See #21. *Walkers to review.*
2. May be diluted by the directors issuing additional Participating Shares. See #8.

    a. Including additional pari passu shares. See #14.
    b. Dilution may, ultimately, affect the ability of the existing Participating Shareholders to consent to changes to the rights attached to the Participating Shares. See #14, #7, and Articles generally.

*Suggest the foundations confirm that they have the latest version of the Articles (attached). We suspect they do not.

Best regards,

Brandon

**Brandon R. Schaller**

ATTORNEY

16400 Dallas Parkway, Suite 300

Dallas, TX 75248

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

**SHIELDSLEGAL.COM**

This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message. You should not copy it or disclose its contents to any other person. Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses. This e-mail message does not contain or constitute legal advice and/or federal tax advice. The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

---

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

---

State of Delaware
Secretary of State
Division of Corporations
Delivered 04:06 PM 12/09/2024
FILED 04:06 PM 12/09/2024
SR 20244432762 - File Number 10030937

# CERTIFICATE OF INCORPORATION
# OF
# DFW CHARITABLE FOUNDATION
a nonprofit nonstock corporation

I.

The name of the Corporation is DFW Charitable Foundation.

II.

The name of the incorporator is Douglas Mancino. The address of the incorporator is 2029 Century Park East, Suite 3500, Los Angeles, CA 90067.

III.

The address of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

IV.

A. The Corporation is a nonprofit nonstock corporation and is not organized for the private gain of any person. It is organized under the General Corporation Law of the State of Delaware ("DGCL") exclusively for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States internal revenue law (the "Code").

B. In furtherance of its purposes, the Corporation shall have all the general powers and privileges of a corporation granted by the DGCL, as now in effect or as may hereafter be amended, including the power to solicit grants and contributions to further its charitable purposes.

V.

The Corporation shall not have any capital stock and the Corporation is not authorized . The member of the corporation is Mark Patrick. The rights and privileges of the member shall be set forth in the Corporation's bylaws, provided that the member shall not have a "membership interest" in the Corporation within the meaning of section 114(d)(2) of the DGCL.

VI.

A. No part of the activities of the Corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation. The Corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of, or in opposition to, any candidate for public office.

B. Notwithstanding any other provision of this Certificate of Incorporation, the Corporation shall not directly or indirectly carry on any activity which would prevent it from obtaining exemption from Federal income taxation as a corporation described in section 501(c)(3) of the Code, or cause it to lose such exempt status, or carry on any activity not permitted to be carried on by a corporation, contributions to which are deductible under section 170(c)(2) of the Code.

VII.

The property of the Corporation is irrevocably dedicated to charitable purposes, and no part of the net income or assets of the Corporation shall ever inure to the benefit of any director, officer, or member thereof or to the benefit of any private person. Upon the dissolution or winding up of the Corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of the Corporation shall be distributed to a nonprofit fund, foundation, or corporation which is organized and operated exclusively for charitable purposes and which has established its tax-exempt status under section 501(c)(3) of the Code.

VIII.

A director or officer of the Corporation shall not be liable to the Corporation for monetary damages for breach of fiduciary duty as a director or officer, except for liability: (a) for any breach of the director's or officer's duty of loyalty to the Corporation or its members, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, or (c) for any transaction from which the director or officer derived any improper personal benefit. If the DGCL is amended after adoption of this Article VIII to authorize Corporation action further eliminating or limiting the personal liability of directors or officers, then the liability of a director or officer of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any repeal or modification of the foregoing provisions of this Article VIII shall not adversely affect any right or protection of a director or officer of the Corporation existing at the time, or increase the liability of any director or officer of the Corporation with respect to any acts or omissions of such director or officer occurring prior to such repeal or modification.

IX.

The Corporation shall, to the maximum extent permitted from time to time under the law of the State of Delaware, indemnify and upon request shall advance expenses to any person who is or was a party or is threatened to be made a party to any threatened, pending or completed action, suit, proceeding or claim, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was or has agreed to be a member or director or officer of the Corporation, or while the person is or was serving at the request of the Corporation as a director, officer, partner, trustee, employee or agent of any corporation, limited liability company, partnership, joint venture, trust or other entity, against expenses (including reasonable attorneys' fees and expenses), judgments, fines, penalties and amounts paid in settlement incurred in connection with the investigation, preparation to defend, or defense of such action, suit, proceeding or claim; provided however that: (a) the foregoing shall not require the Corporation to indemnify, or advance expenses to, any member or director or officer in connection with any

action, suit, proceeding or claim initiated by or on behalf of such member or director or officer, or any against the Corporation initiated by or on behalf of such member or director or officer; and (b) a member or director or officer seeking indemnification under this Article IX shall execute a written undertaking (reasonably acceptable to the Corporation) to repay the Corporation any expense or other amounts advanced and/or paid to such member or director or officer under this Article IX in the event that it is ultimately determined that such member or director or officer is not entitled to be indemnified by the Corporation. Such indemnification shall not be exclusive of other indemnification rights arising under any bylaw, agreement, vote of directors or member or otherwise and shall inure to the benefit of the heirs and legal representatives of such person. Any person seeking such indemnification under this Article IX shall be deemed to have met the standard of conduct required for such indemnification unless the contrary shall be established. Any repeal or modification of the foregoing provisions of this Article IX shall not adversely affect any right or protection of a member or director or officer of the Corporation with respect to any acts or omissions of such member or director or officer occurring prior to such repeal or modification.

**IN WITNESS WHEREOF**, this Certificate of Incorporation has been executed by its incorporator this 9th day of December, 2024.

/s/ Douglas Mancino
Douglas Mancino, Incorporator

**CHARITABLE DAF HOLDCO, LTD.**

**(AND THE PARTIES LISTED IN SCHEDULE 1)**

**AND**

**PAUL MURPHY**

---

**DIRECTOR SERVICES AGREEMENT**

---

TABLE OF CONTENTS

1 Definitions and Interpretation ....3
2 Appointment of Director ....4
3 Experts and Advisors ....5
4 Companies' Obligations and Acknowledgements ....5
5 Fees, Costs and Expenses ....6
6 The Director's Liability and Indemnity ....7
7 Non-Exclusivity ....7
8 Status ....8
9 Restrictions ....8
10 Termination ....9
11 Notices ....9
12 General ....9
13 Governing Law and Jurisdiction ....10

**THIS AGREEMENT** is effective as of 12th December 2024 (**Agreement**)

**BETWEEN:**

1) **The parties listed in Schedule 1 of this Agreement** (a **Company** or the **Companies** as the context dictates); and

2) **Paul Murphy**, a natural person resident in the Cayman Islands whose address is 67 Fort Street, George Town, Grand Cayman KY1-1007, Cayman Islands (the **Director**).

**RECITALS:**

A) The Companies want the Director to be appointed as a director of the Companies and the Director wants to provide the Services to the Companies on the terms of this Agreement.

**IT IS AGREED AS FOLLOWS:**

**1 Definitions and Interpretation**

1.1 In this agreement, unless the context otherwise requires, the following expressions shall have the following meanings:

**Affiliate** means any parent or subsidiary of a Companies or any other Companies which has the same ultimate parent;

**AML** means the money laundering and terrorist and proliferation financing risks which may need to be addressed by the Director under the AML Regime;

**AML Regime** the Cayman Islands Proceeds of Crime Act (as revised), Terrorism Act (as revised), Proliferation Financing (Prohibition) Act (as revised), Anti-Money Laundering Regulations (as revised), Guidance Notes on the Prevention and Detection of Money Laundering, Terrorist Financing and Proliferation Financing in the Cayman Islands, Guidance on Targeted Financial Sanctions, directives and guidance issued by CIMA and the Financial Reporting Authority of the Cayman Islands and other requirements that may be imposed on the Director to address AML (such anti-money laundering legislation, regulations, guidance notes, directives and guidance, as amended from time to time);

**Articles** means the articles of association of the Companies as the context requires;

**Business Day** means any day on which commercial retail banks are open for banking business in the Cayman Islands (not being a Saturday or a Sunday);

**Law** means the laws of the Cayman Islands or other jurisdiction which may be relevant to the operations of the Companies, including the Companies Law (As Revised) of the Cayman Islands;

**Losses** means any loss, cost, charge, expense, payment, interest, demand, claim, proceeding, suit, penalty, damages, legal fees, liability, obligation, detriment, adverse judgment, order or other sanction;

**Member** means any member from time to time of the Companies;

**Memorandum** means the memorandum of association of the Companies as the context requires; and

**Services** means the services to be provided by the Director to the Companies listed in Schedule 2 to this Agreement.

In this agreement, any reference to:

1.2 a recital, a clause, a sub-clause or a schedule is, unless the context otherwise requires, a reference to a recital, a clause or sub-clause of, or a schedule to, this agreement;

1.3 this agreement or to any agreement or document referred to in this agreement shall be construed as a reference to such agreement or document as amended, varied, modified, supplemented, restated, novated or replaced from time to time; and

1.4 any statute or statutory provision shall, unless the context otherwise requires, be construed as a reference to such statute or statutory provision as it may have been amended, modified, extended, consolidated, re-enacted or replaced and shall include any subordinate legislation made thereunder.

1.5 In this agreement, except where the context otherwise requires, words denoting the singular include the plural and vice versa, words denoting a gender include every gender and references to persons include bodies corporate and unincorporated.

1.6 The recitals and the schedule form part of this agreement and shall have the same force and effect as if they were expressly set out in the body of this agreement.

1.7 Clause headings in this agreement are inserted for convenience only and shall not affect the construction of this agreement.

**2 Appointment of Director**

2.1 Subject to the provisions of this agreement, the Director agrees with the Companies to provide director services to the Companies upon the terms and conditions contained in this agreement.

2.2 The Director will undertake his duties in accordance with what he considers to be the best interests of the Company. However, the Director, in performing his duties as a director of the Companies, shall not be obliged to act in any manner which, in his opinion:

(a) constitute a breach of his fiduciary duties, or otherwise conflict with any laws of the Cayman Islands or other jurisdiction which may be relevant to the operations of the Companies, or be otherwise illegal or immoral; be unethical, unduly onerous or be of such nature that it might damage the reputation of or be detrimental to the Director;

(b) may conflict with any provision of the Memorandum or Articles; or

(c) would result in the risk of prosecution or other sanction of any kind in any jurisdiction or the withdrawal of, or imposition of any conditions in respect of, any licence, consent or other authorisation issued to the Director by any legal, governmental or regulatory authority in any applicable jurisdiction.

2.3 Without prejudice to his general duties as a director of the Companies, the Director agrees with the Companies to discharge his duties and obligations as director of the each Company in accordance with the Articles and to provide and undertake the specific duties listed in Schedule 2 to this agreement.

**3 Experts and Advisors**

3.1 In carrying out the services rendered pursuant to this agreement, the Director shall be entitled to retain on his behalf the services of attorneys, accountants/auditors and other advisers as shall be reasonably necessary for the Director to perform such services and the Company shall be liable to pay all reasonable fees and disbursements thus incurred.

3.2 The Director shall be entitled to rely upon any advice so obtained if the Director reasonably believes that such professional persons are reliable and competent in the matters and/or advice prepared or presented and/or such matters and/or advice is within the person's professional qualifications and competence.

3.3 The Director shall in no event have any liability for anything done or omitted to be done in good faith in reliance upon such advice unless the Director knew the advice to be tainted by manifest error.

**4 Companies' Obligations and Acknowledgements**

4.1 During the continuance of this agreement, the Companies shall:

(a) promptly provide the Director with all such information, documentation and records (as well as notification of any changes which relate to or affect the services being provided hereunder) as the Director may require to perform his duties as a director of the Companies;

(b) keep the Director fully informed as to the business, affairs, financial position and prospects of the Companies;

(c) promptly provide upon request from time to time, all necessary information and documentation required by the Director to comply with any applicable obligations under the AML Regime and supply information in response to the Director's enquiries (if any) to enable the Director to comply with any applicable obligations under the AML Regime and all other statutory responsibilities to make disclosures to relevant authorities in respect of AML and any other criminal activity that the Director may encounter during performance of the Services and the Companies acknowledges that any such disclosures may include confidential information;

(d) neither cause nor permit anything to be done which will or is likely to impose any civil or criminal liability or penalty on the Director; and

(e) provide the following promptly on request from time to time by the Director:

(i) written explanation of the nature of the Companies' business and a detailed business plan;

(ii) evidence satisfactory to the Director of the identity of, and references in relation to, (i) any other directors of the Companies, and (ii) any person (or persons) on whose instructions the Director may act in relation to the Companies; and

(iii) other information and documentation as the Director may from time to time reasonably require in relation to the Companies, its directors, Members or activities.

4.2 The Companies acknowledge that:

(a) the Director shall be entitled for all purposes in relation to dealings with all persons, to rely on the authenticity and accuracy of all information and communications of whatever nature received by the Director in good faith and shall not be responsible or liable to any person for any loss arising by virtue of any such information or communication not being authentic and/or accurate; and

(b) the Director shall be entitled to rely on the authenticity and accuracy of all information and communications received in good faith through facsimile, the Internet or similar systems and shall not be responsible or liable to any person for any loss or damage caused by any such information not being authentic, accurate or any communication transmitted to or by the Director having been interfered with or manipulated by any person.

4.3 The Companies shall procure that:

(a) financial statements of the Companies and any Affiliates of the Companies shall be prepared in respect of each financial year of the Companies or the respective Affiliate in accordance with generally accepted accounting principles; and

(b) such financial statements of the Companies and the Affiliate shall be delivered to the Director.

**5 Fees, Costs and Expenses**

5.1 In consideration of the provision of the services of the Director under this agreement, the Companies shall pay to the Director the fees set out in Schedule 3 to this Agreement.

5.2 The Annual Fee (as defined in Schedule 3 of this Agreement) is not refundable in the event of resignation or removal of the Director, irrespective of the reason or whether the removal was for cause or on notice without cause.

5.3 The fees payable by the Companies to the Director shall not be modified unless otherwise agreed by the Director and the Companies.

5.4 The Director shall be entitled to recover from the Companies all expenses and disbursements (including courier, telephone, facsimile, printing and photocopying) properly incurred or paid by the Director on behalf of the Companies.

**6 The Director's Liability and Indemnity**

6.1 The Director shall not be liable for any Losses whatsoever which he or the Companies may sustain or suffer at any time as a result of, in connection with or in the course of the discharge of their respective duties or obligations under this Agreement or otherwise arising as a result of this Agreement, other than Losses arising by reason of the fraud, dishonesty, wilful neglect and wilful default of the Director. For the avoidance of doubt, the Director will not be answerable for the acts, receipts, neglects or defaults of any other director, employee, officer, partner, limited partner, general partner, manager, agent or trustee of the Company, for the solvency or honesty of any persons with whom assets of the Company are lodged or deposited, for any insufficiency of any security upon which any monies of the Company may be invested, or for any other Losses.

6.2 The Companies shall indemnify and hold harmless, to the fullest extent permitted by Cayman Islands law, on a full indemnity basis, the Director against all Losses which may be made against or incurred by the Director in connection with or as a result of the Director acting as a director of the Company, the performance of this Agreement, any regulatory action relating to or involving the Company or any service provider thereto including the Director, and any acts or omissions of the Company or any service provider thereto otherwise than by reason of the fraud, dishonesty, wilful neglect or wilful default of the Director as aforesaid.

6.3 Where the Articles grant indemnities to the directors of the Company which provide the Director with additional or greater protection than those contained in clause 6.2, the indemnities under the Articles shall be deemed to apply.

6.4 The Company shall advance any costs and expenses incurred by the Director (including attorney's fees) in defending any action, suit, proceeding or investigation for which for which indemnity has been sought. The Director shall reimburse the Companies for any such advances in the event that a final non appealable judgment is given against the Director which finds them to have acted fraudulently, dishonestly, with wilful neglect, or with wilful default.

6.5 For the avoidance of doubt, references in this Agreement to fraud, dishonesty, wilful neglect and wilful default shall mean a final non-appealable finding to such effect by a competent court in relation to the conduct of the relevant party.

6.6 The provisions of this clause 6 shall survive the termination of this Agreement and shall inure to the benefit of the Director in respect of all acts performed by him prior to such termination of office.

**7 Non-Exclusivity**

7.1 The services of the Director under this agreement are not exclusive, and the Director or any Affiliate shall be free to provide similar services to other persons. The Director or any Affiliate shall not be deemed to be given notice of, or to be under any duty to disclose to, the Companies, any fact or thing which may come to the notice of the Director or any Affiliate in the course of the Director or any Affiliate providing similar services to other persons or in the course of the Director's business in

any other capacity or in any manner whatsoever otherwise than in the course of carrying out the Director's duties under this agreement.

**8 Status**

8.1 This agreement constitutes a contract for the provision of services and not a contract of employment.

8.2 None of the provisions of this agreement shall create or be deemed to create a relationship of partnership between the parties to this agreement.

**9 Restrictions**

9.1 The Director shall not, without the written consent of the Companies, at any time after the termination of the services under this agreement, represent himself as being in any way connected with or interested in the business of the Companies.

9.2 None of the parties to this agreement shall do any act, matter or thing which would or might prejudice or bring into disrepute the business or reputation of the other parties to this agreement.

9.3 The Director shall not at any time disclose to any person, and shall treat as confidential, any information relating to the business, finances or other matters of the Companies that he may have obtained as a result of his role under this agreement provided however that the provisions of this clause shall not apply:

(a) to the disclosure of any information already known to the recipient prior to the entering into of this agreement;

(b) to the disclosure of any such information which is or becomes public knowledge otherwise than as a result of the unauthorised or improper conduct of the recipient;

(c) to any extent that disclosure is required under Cayman Islands law or any other applicable law or by an order of the Cayman Islands courts or any other court of competent jurisdiction or pursuant to any direction, request or requirement (whether or not having the force of law) of, the Cayman Islands Monetary Authority and the Cayman Islands Financial Reporting Authority;

(d) to the disclosure of any information to professional advisors who receive the same under a duty of confidentiality; or

(e) to the disclosure of any information with the consent of the parties hereto.

9.4 For the avoidance of doubt, this clause does not preclude the Director from disclosing that he is a director of the Companies.

9.5 In the event of this agreement being terminated for whatever reasons, the provisions of this clause 9 shall remain in full force and effect.

**10 Termination**

10.1 The Director may be removed or cease to hold office in any manner permitted by the Articles, and without prejudice to the generality thereof, shall be entitled to resign from office at will and without recourse by any Party solely by virtue of such resignation.

10.2 This agreement shall be terminated:

(a) upon the Director or the Company or Companies giving 30 days' notice of termination of this Agreement;

(b) upon the Director or the Company giving notice that either Party has committed any material breach of the provisions of this Agreement, and if such breach is capable of remedy, that breach has not remedied said breach within 30 days after the service of written notice requiring it to be remedied;

(c) if a court or tribunal of competent jurisdiction finds that the Director has committed actual fraud or wilful neglect in relation to the Companies or the Director does not challenge an allegation of fraud or wilful neglect by the Companies; or

(d) the Cayman Islands Monetary Authority instructs the Companies that the Director can no longer be a director.

10.3 The termination of this agreement shall be without prejudice to any antecedent liability of the parties to this agreement and, without limitation, the Director shall be entitled to receive all fees, disbursements and other expenses accrued due up to the date of such termination.

10.4 The Company shall expeditiously notify the registrar of companies of any resignation of the Director in accordance with section 55(1)(b) of the Companies Act of the Cayman Islands, but the Director retains the right to give such notice of his resignation to the Registrar and any other registry or person.

**11 Notices**

11.1 Notices to be given hereunder shall be delivered by hand or mailed by prepaid airmail or emailed to the respective addresses set out under the signatories of each party to this agreement.

**12 General**

12.1 This agreement sets out the entire agreement and understanding between the parties in respect of the subject matter of this agreement.

12.2 This agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns.

12.3 If at any time any one or more of the provisions of this agreement is or becomes invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions hereof shall not be in any way affected or impaired thereby.

12.4 The rights of the parties hereunder are cumulative, may be exercised as often as they consider appropriate and are in addition to their respective rights under the general law. They shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing, and in particular any failure to exercise or any delay in exercising any of such rights shall not operate as a waiver or variation of that or any other right. No act or course of conduct or negotiation on the part of either party shall in any way preclude it from exercising any right or constitute a suspension or variation of any right that it may have hereunder.

12.5 Each party shall do, execute and perform such further acts, deeds and documents as may be required to give full legal and practical effect to this agreement.

12.6 No variation of this agreement shall be effective unless signed by or on behalf of all the parties to this agreement.

12.7 This agreement may be executed in any number of counterparts and provided that every party has executed a counterpart, the counterparts together shall constitute a binding and enforceable agreement between the parties.

**13 Governing Law and Jurisdiction**

13.1 This agreement is governed by and shall be construed in accordance with the laws of Cayman Islands.

13.2 Each of the parties hereto irrevocably agrees that the courts of Cayman Islands shall have exclusive jurisdiction to hear and determine any suit, action or proceeding, and to settle any disputes, which may arise out of or in connection with this agreement and, for such purposes, irrevocably submits to the exclusive jurisdiction of such courts.

**[SIGNATURE PAGE FOLLOWS]**

This Agreement has been entered into by the parties on the day and year first above written.

**SIGNED** for and on behalf of the **COMPANIES**:

Duly Authorised Signatory

Name: Mark Patrick

Title: Director and CEO

**SIGNED** for and on behalf of the **DIRECTOR**:

Name: Paul Murphy

Title: Director

**SCHEDULE 1: PARTIES**

The following companies are parties to this Agreement:

1. Charitable DAF HoldCo, Ltd.
2. Charitable DAF GP, LLC
3. Charitable DAF Fund, L.P.
4. Acis CLO Value Fund II Charitable DAF Ltd,
5. CLO HoldCo, Ltd.
6. Acis Loan Funding, Ltd.
7. Liberty CLO Holdco, Ltd.
8. HCT Holdco 2, Ltd.
9. MGM Studios Holdco, Ltd.

And any other companies that may be agreed by the Parties in writing.

**SCHEDULE 2: SERVICES**

1. The Director will devote as much of his time, attention, ability and skills as are required to perform his normal duties as Director of the Companies.

2. The Director will perform his duties faithfully, efficiently and diligently and use all reasonable endeavours to promote the best interests and reputation of the Companies. In particular, the Director's specific services to the Companies will include:

- to declare dividends from time to time subject to be satisfied that the Company declaring the dividend is solvent;
- signing contracts, filings, resolutions, representations and other documents on behalf of the Companies;
- attending all meetings of the Board of the respective Companies in person or by phone; provided that the dates of such meetings have been communicated to the Director by the Companies or its corporate secretary, as applicable, with reasonable advance notice; and provided further that the Director may not be able attend a meeting due to illness or incapacity or any other reasonable circumstances;
- considering all documents contained in board packs provided in advance to the Director by the Companies or its corporate secretary, as applicable, in order to be able to participate in full in the Board's deliberations;
- bringing independent judgment to bear on issues of strategy, policy, resources, performance and regulatory matters;
- providing advice and direction on all matters affecting the Companies;
- planning, developing and enhancing the future strategic direction of the Companies;
- where necessary or appropriate, liaising with the Company's respective shareholders, professional advisers, service providers and regulators; and
- sharing responsibility with the other director(s) of the Companies for the effective control of each Company.

**SCHEDULE 3: FEES**

The Director shall be paid fees in accordance with the following provisions:

1. US$200,000 per annum payable in instalments of US$16,666.66 on the last business day of each calendar month.

2. A discretionary bonus or bonuses in an amount and time determined by the current Chief Executive Officer of the Companies which may also include issuing equitable interests or creating a long-term incentive plan.

Fees shall be paid in cleared funds to the following bank account:

Instructions to: BNY Mellon NY

Swift BIC: IRVTUS3NXXX

ABA No: 021000018

For credit: Butterfield Bank (Cayman) Limited

Swift BIC: BNTBKYKYXXX

Account at BNY: 8033265086

For further credit to: Paul Richard Murphy

Account number: 1361530160011

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE**
**DIRECTORS OF THE COMPANY**

**MADE ON 16th December 2024**

The undersigned, being all of the Directors of the Company, hereby resolve, pursuant to the Articles of Association of the Company, the following directors' resolutions.

1. **APPROVAL OF DISCRETIONARY BONUS FOR PAUL MURPHY.**

2.1 **NOTED THAT:**

(a) Paul Murphy ("Mr. Murphy") has been a Director since 2021 and has a Director's Service Agreement which authorizes the Chief Executive Officer, Mark Patrick ("Mr. Patrick") to award Mr. Murphy a discretionary bonus.

(b) Mr. Patrick has taken note that, during the course of the past three years, Mr. Murphy has:

a. Been instrumental in finding and securing the services of a high value member of the Investment Committee, namely Michael Llodra ("Mr. Llodra").

b. Together with Mr. Llodra, has implemented institutional quality investment guidelines and associated policies and procedures.

c. Overseen, the creation of a compensation committee with associated guidelines.

d. Through the creation and implementation of the investment guidelines, appointment of Mr. Llodra and creation of the compensation committee, significantly enhanced the corporate governance of the Company.

e. Assisted with various litigation matters related to certain assets held by the Company, including but not limited to (i) testimony and advocacy in a case in the Island of Guernsey, (ii) the successful dismissal of an action brought by UBS in New York, and (iii) managing multiple Cayman Island law firms and Kings counsel.

f. Negotiated with the directors of the alleged holder of debt owed by the Company, and coordinated a response to communications with the alleged transferees of such debt.

g. Ongoing operational and structural improvements of the Company in consultation with Cayman Islands law firms and other consultants.

h. Communicated with the participating shareholders ("Foundations") on aspects of the Company's corporate governance, legacy issues and policies and procedures. Further, Mr. Murphy helped the Foundations understand that the Company's corporate governance and leadership were secure, risk managed and all appropriate, such that the Company will continue to effectively support its the charitable mission.

i. Presenting business opportunities to the Company from time to time.

(c) Accordingly, in the view of Mr. Patrick, in his capacity as CEO and as an approving Director, Mr.

Murphy's actions over the past two years have significantly improved the Company's position and Mr. Patrick has determined that a discretionary bonus in the amount of $250,000 is merited.

(d) These are not a comprehensive list of factors Mr. Patrick has taken into account but form the basis of his independent conclusion.

(e) Mr. Murphy has declared his interests to the Company in relation to the matters the subject of this resolution, being that Mr Murphy is Director of the Company.

2.2 **IT IS RESOLVED** by unanimous written resolution that:

(a) Mr. Murphy be awarded a discretionary bonus in the amount of $250,000 which is payable immediately.

**BY** ______________________________

Mark Patrick - Director

CHARITABLE DAF HOLDCO, LTD.

**BY** ______________________________

Paul Murphy - Director

CHARITABLE DAF HOLDCO, LTD.

**APPENDIX 1**
**COMPENSATION COMMITTEE GUIDELINES**

**Compensation Policy for Executives and Directors**

As adopted on October 1, 2024

1. **Overview and Objectives**

This document sets forth the Compensation Policy for Executives and Directors of Charitable DAF HoldCo, Ltd., its subsidiaries, and CDH GP, Ltd. (collectively, "**Company**").

Compensation is a key component of the Company's overall human capital strategy to attract, retain, reward, and motivate highly skilled individuals that will enhance the Company's value and otherwise assist the Company's to reach its long-term goals. Accordingly, the structure of this Policy is established to tie the compensation of each officer to the Company's goals and performance.

For purposes of this Policy, "Executive Officers" shall mean the Company's Chief Executive Officer, Chief Investment Officer, Chief Company Officer, and Chief Operating Officer, and such other executive officers as appointed by the Company from time to time.

For purposes of this Policy, "Directors" shall mean the Directors as defined in the organizational and governing documents of the Company.

This Policy is subject to applicable law and is not intended, and should not be interpreted as limiting or derogating from, provisions of applicable law to the extent not permitted.

This Policy shall apply to compensation agreements and arrangements which will be approved after the date on which this Policy is adopted and shall serve as Company's Compensation Policy for five (5) years, commencing as of its adoption, unless amended earlier.

The Compensation Committee and the Board of Directors of the Company (the "**Compensation Committee**" and the "**Board**", respectively) shall review and reassess the adequacy of this Policy from time to time.

The Compensation Committee and Board shall have regard to the fact that Charitable DAF HoldCo, Ltd. and its subsidiaries are incorporated and subject to Cayman Islands law (**"Cayman Islands Entities"**). Accordingly, whilst US law, regulation and industry standards (**"US Practices"**) may be taken into account when considering the Objectives (as defined below), the US Practices are not binding on the Cayman Islands Entities, the Cayman Islands Entities having been purposely established as non-US entities, and the Compensation Committee will have regard to all factors which, in its discretion, achieve the Objectives (as defined below).

2. **Objectives**

Company's objectives and goals in setting this Policy are to attract, motivate and retain highly experienced leaders who will contribute to Company's success and enhance shareholder value, while demonstrating professionalism in a highly achievement-oriented culture that is based on merit and rewards excellent performance in the long term, and embedding Company's core values as part of a motivated behavior (**"Objectives"**). To that end, this Policy is designed, among others:

2.1. To closely align the interests of the Executive Officers and Directors with those of Company's shareholders in order to enhance shareholder value;

2.2. To align a significant portion of the Executive Officers' and Directors' compensation with Company's short and long-term goals and performance;

2.3. To provide the Executive Officers and Directors with a structured compensation package, including competitive salaries, performance-motivating cash and equity incentive programs and benefits;

2.4. To strengthen the retention and the motivation of Executive Officers and Directors in the long term; and

2.5. To provide appropriate awards in order to incentivize superior individual excellency and corporate performance.

3. **Compensation Instruments**

3.1 Compensation instruments under this Policy may include, but need not be limited to, the following:

3.1.1 Base salary;

3.1.2 Benefits;

3.1.3 Annual cash bonuses;

3.1.4 Change of control terms;

3.1.5 Retirement and termination terms; and

3.1.6 Long-term and short-term incentive payments

3.2 When fixing compensation instruments the Company may have regard to any matter which, in the Company's complete discretion, is commensurate with the Objectives. Without limitation, this may include:

3.2.1 Assessing an Executive Officer and Director's performance with regard to their contribution to and management of any assets or investments the Company sources or owns from time to time;

3.2.2 Assessing the performance of assets or investments of the Company in relation to overall returns to the Company;

3.2.3 Mitigation of Company liabilities;

3.2.4 Ensuring sound and prudent corporate governance including compliance with all legal, regulatory and industry standards;

3.2.5 Efficient management of service providers;

3.2.6 Risk the Executive Officer and/or the Director is exposed to;

3.2.7 Responsibilities the Executive Officer and/or the Director undertakes; and

3.2.8 Achieving the Company's business and charitable objectives

4. **Benefits**

4.1 The following benefits may be granted to the Executive Officers and Directors in order, among other things, to comply with legal requirements:

4.1.1 Vacation days in accordance with market practice;

4.1.2 Sick days in accordance with market practice;

4.1.3 Convalescence pay according to applicable law;

4.1.4 Company may contribute on behalf of the Executive Officer or Director to an insurance policy (including, without limitation, split-dollar life insurance) or a pension fund, as allowed by applicable law and with reference to Company's policies and procedures and the practice in peer group companies (including contributions on bonus payments); and

4.1.5 Company may contribute on behalf of the Executive Officer or Director towards work disability insurance, as allowed by applicable law and with reference to Company's policies and procedures and to the practice in peer group companies.

4.2 In events of relocation or repatriation of an Executive Officer or Director to another geography, such Executive Officer or Director may receive other similar, comparable or customary benefits as applicable in the relevant jurisdiction in which he or she is employed or additional payments to reflect adjustments in cost of living. Such benefits may include reimbursement for out of pocket one-time payments and other ongoing expenses, such as housing allowance, car allowance, and home leave visit, etc.

4.3 Company may offer additional benefits to its Executive Officers and Directors, which will be comparable to customary market practices, such as, but not limited to: cellular and land line phone benefits, company car and travel benefits, reimbursement of business travel including a daily stipend when traveling and other business related expenses, insurances, other benefits (such as newspaper subscriptions, academic and professional studies), etc., provided, however, that such additional benefits shall be determined in accordance with Company's policies and procedures.

5. **Miscellaneous**

5.1 Nothing in this Policy shall be deemed to grant to any of Company's Executive Officers, employees, directors, or any third party any right or privilege in connection with their employment by or service to the Company, nor deemed to require Company to provide any compensation or benefits to any person. Such rights and privileges shall be governed by applicable personal

employment agreements or other separate compensation arrangements entered into between Company and the recipient of such compensation or benefits. The Board may determine that none or only part of the payments, benefits and perquisites detailed in this Policy shall be granted, and is authorized to cancel or suspend a compensation package or any part of it.

5.2 In the event that new regulations or law amendment in connection with Executive Officers' and Directors' compensation will be enacted following the adoption of this Policy, Company may follow such new regulations or law amendments, even if such new regulations are in contradiction to the compensation terms set forth herein.

*********************
This Policy is designed solely for the benefit of Company and none of the provisions thereof are intended to provide any rights or remedies to any person other than Company.

**CHARITABLE DAF HOLDCO, LTD**
the ("**Company**")

**Unanimous Written Resolutions of all of the Directors of the Company passed on 18 December 2024 in accordance with the Articles of Association of the Company**

**1 Declaration of Interests**

**IT IS NOTED THAT** the directors of the Company (each, a "**Director**" and together, the "**Directors**") have declared their respective interests (if any) in the matters contemplated by these resolutions, and any such interest be and is hereby noted, ratified and acknowledged.

**2 Transfer of interest in the Partnership**

2.1 **IT IS NOTED THAT:**

(a) In connection with a corporate restructure of the Company's group, the Company proposes to transfer, convey, assign or otherwise contribute to CDMCFAD, LLC, a Delaware limited liability company (the "**Transferee**"), 100% of the Company's interests in CHARITABLE DAF FUND, LP, an exempted limited partnership established in the Cayman Islands (the "**Partnership**") in consideration for the contribution by the sole member of the Transferee of 100% of the issued and outstanding limited liablity company interests in the Transferee (the "**Transfer**").

(b) In connection with the Transfer, the Company proposes to enter into a deed of assignment and assumption (the "**Deed**"), substantially in the form that was circulated to and carefully considered by the Directors, to be entered into by and among the Company, the Transferee and CDH GP, LTD, solely in its capacity as general partner (the "**GP**") of the Partnership, under the terms of which the Company will transfer, convey, assign or otherwise contribute all of its Transferred Interest (as defined in the Deed) to the Transferee on the terms and conditions set out therein.

(c) Section 1.11(a) of the amended and restated limited partnership agreement of the Partnership dated as of 7 November 2011 as amended on 26 July 2022 and as further amended and restated as of 11 March 2024 (as further amended, restated and/or supplemented from time to time) (the "**Partnership Agreement**") provides that a Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner (each term as defined in the Partnership Agreement).

(d) Under the terms of the Deed, it is expected that:

(i) the Transferee will make in favour of the GP and the Company, each representation, as was made by the Company in connection with its admission as a Limited Partner;

(ii) the Transferee will undertake to perform all of the obligations of a Limited Partner and be bound by and receive the benefit of all terms of the Partnership Agreement and replace the Company as a Limited Partner and will assume all the duties, liabilities and obligations, whether past (to the extent permitted by law), present or future, under the Partnership Agreement with respect to the Transferred Interest;

(iii) the GP will: (x) consent to the assignment and assumption contemplated thereby; (y) acknowledge that all requirements and conditions for the Transfer and the admission of the Transferee as a Limited Partner of the Partnership have been satisfied or waived; and (z) certify that the Transferee will, in accordance with Section 1.15 of the Partnership Agreement, be listed in the books and records of the Partnership as a Limited Partner and as sole legal owner of the Transferred Interest;

(iv) the GP will agree to admit the Transferee as a Limited Partner in respect of the Transferred Interest and remove, in accordance with Section 1.15 of the Partnership Agreement, the name of the Company from the register of Limited Partners maintained in respect of the Partnership; and

(v) the Company and Transferee will undertake to jointly and severally indemnify the GP and the Partnership from any expense arising from the transactions contemplated by the Deed or any losses arising from the breach of the Deed or the Partnership Agreement.

(e) All the requirements of the transfer provisions contained in the Partnership Agreement have been or will be either satisfied by the Company and Transferee or waived by the GP.

(f) U.S. tax counsel has advised the Company and its Directors that reorganization of the Company and its subsidiaries pursuant to the Transfer generally would provide the following benefits and protections to the Company, the Partnership, and the Company's subsidiaries (collectively, the "**DAF**"):

(i) The Transfer would help insulate the DAF from exposure to James Dondero and his entities (collectively, "**Dondero**"), who may be at risk of causing the Internal Revenue Service (the "**IRS**") to revoke the tax-exempt status of one or more of the participating shareholders/supporting organizations, which could imperil the assets of the DAF;

(A) Each Internal Revenue Code (the "**IRC**") Section 501(c)(3) organization must be organized and operating primarily for charitable purposes;

(B) Treasury Regulation Section 1.501(c)(3)-1(c)(1) provides that an organization will not be compliant with the operational test "if more than

an insubstantial part of its activities is not in furtherance of an exempt purpose"; and

(C) An IRC Section 501(c)(3) organization cannot be operated for the benefit of an individual or entity due to the private benefit/private inurement prohibition.

(ii) The Transfer would help reduce the influence of Dondero and, as such, would broaden the charitable scope of DAF for its benefit and the benefit of the public;

(iii) The IRS would look favorably upon any and all attempts for DAF to maintain its influence from "what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement"; and

(iv) Further, due to Dondero's attempts to control the DAF and its assets, DAF runs an increased risk of being embroiled in litigation directed against Dondero and his entities.

(g) Delaware counsel has advised the Company and its Directors that, as a result of the Transfer, the Transferred Interest shall be held by the Transferee, and that certain Limited Liabiltiy Company Agreement of the Transferee (the "**LLC Agreement**"), along with the Transfer generally, shall provide the following benefits and protections to the Company and the Partnership:

(i) Under Delaware law and the Delaware Limited Liability Compay Act (the "**LLC Act**"), there are very few required adminstrative or other requirements for a limited liablity company that cannot be modified or elimintated in a limited liablity company agreement and therefore, the Company and the Partnership will benefit from the contractual freedom and flexbility to provide for its desired terms under the LLC Agreement;

(ii) As a Delaware limited liability company, the Transferee will be governed by the LLC Act, which unlike the statutes in almost every other jurisidction, is updated annually to stay current based on the needs of companies forming in Delaware and the changing markets, as well as any needed changes due to the results of case law;

(iii) Under the LLC Act, the only required filing in Delaware is a certificate of formation that contains only the name of the company and its registered agent and registered office, therefore maintaining the privacy of the members and managers of the company by allowing them to put their business terms into a limited liablity company agreement that is a private document not avialable to the public;

(iv) Under the LLC Act, and the LLC Agreement, the neither the Company nor the Partnership shall be personally liable for the debts, obligations and liabilities of the Transferee, whether such debts, obligations or liabilities arise in contract, tort or otherwise;

(v) As permitted under the LLC Act, the terms of the LLC Agreement eliminate the fiduciary duties of the manager of the Transferee;

(vi) It will be very difficult to dissolve and terminate the Transferee, with any such voluntary decision requiring the consent of the manager of the Transferee;

(vii) The cost to maintain a limited liablity company in Delaware is relatively low, with only a $300 annual state franchise tax and minimal expenses to maintain a Delaware registered agent and registered office;

(viii) Any enforcement action with respect to the LLC Agreement will likely occur in the Delaware Chancery Court, which is known as being one of the most respected and sophisticated business courts in the United States.

2.2 **IT IS HEREBY RESOLVED THAT:**

(a) It is in the best interests of the Company to enter into the Transfer and execute and enter into the Deed and consummate the transactions contemplated thereunder.

(b) A draft of the Deed having been provided to the Directors, the form thereof be approved on behalf of the Company, subject to such amendments and additions thereto as any director, officer or attorney of the Company in his absolute discretion and opinion deems appropriate, the signature of any director, officer or attorney of the Company on the Deed being due evidence for all purposes of his approval of any such amendment or addition and the final terms thereof on behalf of the Company.

(c) The Company do give, make, sign, execute and deliver all such notes, deeds, agreements, letters, notices, certificates, acknowledgments, instructions, fee letters and other documents (whether of a like nature or not) (the "**Ancillary Documents**") as may in the sole opinion and absolute discretion of any director, officer or attorney of the Company be considered necessary or desirable for the purpose of compliance with any condition precedent or the coming into effect of or otherwise giving effect to, consummating or completing or procuring the performance and completion of all or any of the transactions contemplated by or referred to in the Deed and the Company do all other such acts and things as might in the sole opinion and absolute discretion of any director, officer or attorney of the Company be necessary or desirable for the purposes aforesaid.

(d) The Ancillary Documents be in such form as any director, officer or attorney of the Company should in his absolute discretion and sole opinion approve, the signature of any director, officer or attorney of the Company on any of the Ancillary Documents being due evidence for all purposes of his approval of the terms thereof on behalf of the Company.

(e) The Deed and the Ancillary Documents (where required to be executed by the Company) be executed by the signature thereon of any director, officer or attorney of the Company and the Company deliver and perform the Deed and Ancillary Documents.

(f) Any director, officer or attorney of the Company be and they are hereby authorised to take such further actions as they may consider necessary or convenient to effect the foregoing resolutions.

(g) All prior acts of any of the directors, officers or attorneys of the Company in connection with the foregoing resolutions be and they hereby are confirmed, ratified and approved.

[*Signature Page follows*]

**IN WITNESS WHEREOF** the undersigned, being all of the Directors of the Company for the time being, hereby adopt and pass the foregoing resolutions as unanimous written resolutions on the date set out above.

______________________________

Name: **Mark E. Patrick**

Title: Director

______________________________

Name: **Paul Murphy**

Title: Director

**IN WITNESS WHEREOF** the undersigned, being all of the Directors of the Company for the time being, hereby adopt and pass the foregoing resolutions as unanimous written resolutions on the date set out above.

________________________________

Name: **Mark E. Patrick**

Title: Director

________________________________

Name: **Paul Murphy**

Title: Director

**Deed of Assignment and Assumption**

This Deed of Assignment and Assumption (this "**Deed**") is made on the 18th day of December 2024

**BY AND AMONG:**

(1) **CDH GP, LTD**, a company incorporated under the laws of the Cayman Islands, with registered number 407515, whose registered office is at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands (the "**General Partner**"), in its capacity as general partner of **CHARITABLE DAF FUND, LP**, an exempted limited partnership formed under the laws of the Cayman Islands, with registered number 53083, whose registered office is at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands (the "**Partnership**");

(2) **CHARITABLE DAF HOLDCO, LTD**, a company incorporated under the laws of the Cayman Islands, with registered number 263805, whose registered office is at Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands (the "**Transferor**"); and

(3) **CDMCFAD, LLC**, a Delaware limited liability company (the "**Transferee**").

**WHEREAS:**

(A) The General Partner is the general partner of the Partnership which is governed by an amended and restated limited partnership agreement of the Partnership dated as of 7 November 2011 as amended on 26 July 2022 and as further amended and restated as of 11 March 2024 (as further amended, restated and/or supplemented from time to time) (the "**Partnership Agreement**").

(B) Unless otherwise defined, capitalised terms used in this Deed have the meanings given to them in the Partnership Agreement.

(C) In connection with a corporate restructuring of the Transferor's corporate group, the Transferor now wishes to assign to the Transferee the entirety of its interest in the Partnership, together with the rights and obligations attaching thereto (together, the "**Transferred Interest**") for the Consideration (as defined below) to the Transferor, and the Transferee wishes to assume all of the rights and obligations with respect to the Transferred Interest and be admitted to the Partnership, subject to the terms and conditions of this Deed (the "**Assignment**").

(D) The General Partner, whose consent is required for the purpose of the assignment of any interest in the Partnership, hereby provides its consent, subject to the terms and conditions of this Deed.

**NOW IT IS HEREBY AGREED AS FOLLOWS:**

## 1 Assignment of Transferred Interest

1.1 Subject to the terms and conditions of this Deed, the Transferor hereby assigns the Transferred Interest to the Transferee with effect on and from the date of this Deed (the "**Transfer Date**") in consideration for the contribution by the sole member of the Transferee of 100% of the issued and outstanding limited liablity company interests in the Transferee (the "**Consideration**") to the Transferor, and without prejudice to its obligations under clause 7 hereof and subject to the remaining terms and conditions of this Deed, the Transferee shall exercise its reasonable best endeavours to facilitate the implementation of the transfer, assignment, conveyance and contribution of the Consideration to the Transferor, with effect as of the date of this Deed.

1.2 Except as expressly provided herein, no further action by any party hereto and no additional document or instrument of transfer shall be required to evidence such assignment, transfer and assumption.

## 2 Undertaking to be Bound and Power of Attorney

2.1 In accordance with the terms of the Partnership Agreement and upon the General Partner giving its consent to the Assignment, and making appropriate entries for the name and details of the Transferee, including as required by sections 1.11(a) and 1.15 of the Partnership Agreement, into the register of Limited Partners, the Transferee undertakes to the General Partner and the Partnership that it will be bound by and have full benefit of all the terms of the Partnership Agreement and this Deed in the place of and instead of the Transferor in respect of the Transferred Interest and will assume all the duties, liabilities and obligations, whether past (to the extent permitted by law), present or future, of the Transferor under the Partnership Agreement with respect to the Transferred Interest as if the Transferee had been a Limited Partner in the Partnership with respect to the Transferred Interest with effect from the date upon which the Transferor became a Limited Partner pursuant to the terms of the Partnership Agreement and for all other purposes under the Partnership Agreement and any other relevant agreements. Furthermore, the General Partner hereby confirms the satisfaction or due waiver by the General Partner of any and all applicable conditions and restrictions set forth in the Partnership Agreement (or any other relevant agreements) to the proposed Assignment.

2.2 Without limitation to clause 2.1 above, the Transferee hereby constitutes, appoints and grants to the General Partner the power of attorney set out in section 6.4 of the Partnership Agreement with effect on and from the Transfer Date.

2.3 The Transferee hereby makes in favour of the General Partner and the Transferee, each representation, as was made by the Transferor in connection with its admission as a Limited Partner.

## 3 Distributions and other accrued sums in respect of the Transferred Interest

3.1 The Transferor agrees that:

(a) on and from the Transfer Date, it shall cease to have any further entitlement to allocations of income or distributions whatsoever or any other rights or benefits in respect of the Transferor's interest in the Partnership (including, for the avoidance of doubt, any dividends which may be payable in connection with the Transferred Shares relating to the period up to the Transfer Date but which may be paid after the Transfer Date) (collectively, the "**Distributions**");

(b) all Distributions payable to the Transferor under the terms of the Partnership Agreement in respect of the Transferred Interest transferred and assigned hereunder and which accrue during, or are payable by reference to, any period prior to the Transfer Date shall be payable to the Transferee; and

(c) any sums paid to the Partnership in connection with its admission as a Limited Partner or other costs or expenses paid in connection with the establishment or ongoing administration of the Partnership shall not be reimbursed.

## 4 Accession

In consideration of the mutual covenants contained herein, the General Partner, Transferor and Transferee hereby agree that, with effect from the Transfer Date, the Transferee shall have the rights and benefits under, and be bound by the provisions of, the Partnership Agreement in respect of the Transferred Interest and all parties, other than the Transferor, shall be bound by the terms of the Partnership Agreement in every way as if the Transferee was named therein in substitution of and for the Transferor.

## 5 Approval of General Partner and Updates to Register of Limited Partners

5.1 In reliance upon the undertakings, representations and warranties given by the Transferor and Transferee (as applicable) under this Deed, the General Partner:

(a) consents, for the purposes of section 1.11 of the Partnership Agreement and for all other purposes, to the transactions contemplated by this Deed;

(b) acknowledges that all requirements and conditions relating to such transactions have been satisfied or waived; and

(c) certifies that the Transferee will be listed in the books and records of the Partnership as a Limited Partner and as sole legal owner of the Transferred Interest in substitution of and for the Transferor; and

shall, on the Transfer Date, promptly:

(d) record the assignment of the Transferred Interest in accordance with applicable law;

(e) admit the Transferee as a Limited Partner in respect of the Transferred Interest; and

(f) remove the name of the Transferor from the register of Limited Partners.

## 6 Indemnification

6.1 The Transferor and the Transferee hereby agree to indemnify and hold the General Partner and the Partnership harmless from any damage, loss, claim or expense resulting from:

(a) the transactions contemplated by this Deed; or

(b) any breach of this Deed or the Partnership Agreement by the Transferor or the Transferee, whether such breach occurred prior to, on or after the Transfer Date.

6.2 The liability of the Transferor and the Transferee under clause 6.1 shall be joint and several.

## 7 Further Assurances

Each of the parties hereto shall, at any time and from time to time, at the request of the other, promptly and duly execute and deliver any and all such further documents and instruments as may be reasonably required for the Transferor and Transferee to obtain the full benefit of the transactions contemplated by this Deed or as may be required pursuant to the Partnership Agreement to complete the substitution of the Transferor by the Transferee as a Limited Partner of the Partnership.

## 8 Miscellaneous

8.1 All words and terms which are defined in the Partnership Agreement and which are used in this Deed shall (where so used, and save only: (a) where otherwise expressly provided; or (b) where the context otherwise requires) have the same meanings as are given to such words and terms in the Partnership Agreement.

8.2 In this Deed, the clause headings are for convenience only and shall not affect the construction of this Deed, words and terms (including defined terms) denoting the singular shall include the plural and vice versa and words importing any gender shall include all genders.

8.3 The Transferor and the Transferee shall jointly and severally be obligated to reimburse the General Partner and the Partnership for all reasonable expenses (including attorneys' fees and expenses) in connection with the transfer and assignment of the Transferred Interest from the Transferor to the Transferee in accordance with this Deed.

8.4 Neither the Transferor nor the Transferee shall assign all or any part of their rights or obligations under this Deed.

8.5 If any provision of this Deed shall be held to be illegal or unenforceable, the enforceability of the remainder of this Deed shall not be affected.

8.6 This Deed may be signed in any number of counterparts. Any single counterpart or a set of counterparts signed, in either case, by all the parties hereto shall constitute a full and original Deed for all purposes.

8.7 This Deed and the rights of the parties hereto shall be governed by, and interpreted in accordance with, the laws of the Cayman Islands. The parties hereto hereby submit to the non-exclusive jurisdiction of the Cayman Islands courts.

*[signature page to follow]*

**IN WITNESS WHEREOF** the parties have executed and delivered this document as a deed on the date first written above.

*GENERAL PARTNER*

**EXECUTED AND DELIVERED AS A DEED** by

Name: Mark E Patrick
Title: Director
for and on behalf of
**CDH GP, LTD.**
as general partner of
**CHARITABLE DAF FUND, LP,**
in the presence of:

Name: MaryNell Cash
Title: Witness

*TRANSFEREE*

**EXECUTED AND DELIVERED AS A DEED** by

Name: Mark E Patrick
Manager
for and on behalf of
**CDMCFAD, LLC**

in the presence of:

Name: MaryNell Cash
Title: Witness

*TRANSFEROR*

**EXECUTED AND DELIVERED AS A DEED** by

Name:
Title: Director
for and on behalf of
**CHARITABLE DAF HOLDCO, LTD**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**CDMCFAD, LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

**December 18, 2024**

**TABLE OF CONTENTS**

**Page**


Section 1 Definitions....1

1.1 Specific Definitions....1
1.2 General Usage....5

Section 2 Formation....6

2.1 Formation and Name....6
2.2 Term....6
2.3 Purpose and Scope....6
2.4 Principal Office....7
2.5 Delaware Office and Agent....7
2.6 Admission of Members....7
2.7 Contact Information of the Members....7
2.8 Additional Documents....7
2.9 Title to Property....7

Section 3 Capitalization....7

3.1 Capital Contributions....7
3.2 Limitation on Capital Contributions....8
3.3 Withdrawal and Return of Capital....8
3.4 Loans to the Company....8
3.5 Interest on Capital....8
3.6 Limitation of Liability; Return/Withholding of Certain Distributions....8

Section 4 Profits and Losses....9

4.1 Allocations of Company Profits and Losses....9
4.2 Allocation Adjustments Required to Comply With Section 704(b) of the Code....9
4.3 General Allocation and Capital Account Maintenance Provisions....11
4.4 Nonallocation of Distributions to Increases in Minimum Gain....12
4.5 Allocation of Liabilities....12
4.6 Modifications to Preserve Underlying Economic Objectives....12
4.7 Withholding Taxes....12
4.8 Intent of Allocations/Cash Savings Clause....13

Section 5 Distributions....14

5.1 Distributions....14
5.2 Limitation on Distributions....15

Section 6 Administration; Management....15

6.1 Management Powers and Authority of the Manager ....15
6.2 Designation of Manager ....16
6.3 Manager's Power to Bind the Company ....16
6.4 Action by Members ....16
6.5 No Duties to the Company ....16
6.6 Manager and Member Expenses ....16
6.7 Tax Matters; Partnership Representative ....17
6.8 Records and Financial Statements ....18
6.9 Valuation of Company Assets ....18
6.10 Officers. ....19

Section 7 Transfers and Resignations ....19

7.1 Transfers of Interests ....19
7.2 Resignation/Removal of a Member ....19
7.3 Redemption ....19

Section 8 Dissolution and Liquidation ....19

8.1 Dissolving Events ....19
8.2 Winding Up and Liquidation ....20
8.3 Deficit Restoration/Liability ....21

Section 9 Exculpation; Indemnification ....21

9.1 Exculpation ....21
9.2 Indemnification ....21

Section 10 General Provisions ....22

10.1 Meetings ....22
10.2 Action Without a Meeting ....22
10.3 Entire Agreement ....22
10.4 Amendments ....22
10.5 Counterparts; Binding upon Members ....22
10.6 No Third Party Beneficiaries ....22
10.7 Notices, Consents, Elections, Etc ....23
10.8 Severability ....23
10.9 Governing Law ....23
10.10 Status Under the Act ....23
10.11 Partnership for Tax Purposes Only ....23
10.12 Miscellaneous ....23

SCHEDULE A – Member Information

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**CDMCFAD, LLC**

**A DELAWARE LIMITED LIABILITY COMPANY**

This Limited Liability Company Agreement of CDMCFAD, LLC, a Delaware limited liability company, is entered into as of December 18, 2024 and is hereby made effective as of the Effective Date (as defined below).

---

## SECTION 1

## DEFINITIONS

---

**1.1** ***Specific Definitions***. As used in this Agreement:

***Act*** shall mean the Delaware Limited Liability Company Act, Title 6, Delaware Code, Section 18-101 *et seq*.

***Adjusted Capital Account Deficit*** shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a) The Capital Account shall be increased by any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to Treasury Regulations Section 1.704-1(b)(2)(ii)(c) or the penultimate sentences of each of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b) The Capital Account shall be decreased by the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

***Affiliate*** shall mean, with respect to any Person, any other Person with regard to which the Person is controlling, controlled or commonly controlled. For purposes of the preceding sentence, "control" shall mean the power to direct the principal business management and activities of a Person, whether through ownership of voting Securities, by agreement, or otherwise.

***Agreement*** shall mean this Limited Liability Company Agreement of CDMCFAD, LLC, a Delaware limited liability company, including all schedules, appendices, and exhibits hereto, as amended in accordance with the terms hereof.

***Allocation Percentage*** shall mean, for each Member, the percentage set forth on Schedule A, which shall be adjusted as necessary to reflect the Members' varying interests in the Company. For the avoidance of doubt, the aggregate Allocation Percentages of all Members shall at all times equal one hundred percent (100%).

***Capital Account*** shall mean, for each Member, a separate account that is:

(a) Increased by: (i) the amount of such Member's Capital Contribution and (ii) allocations of Profits to such Member pursuant to Section 4;

(b) Decreased by: (i) the amount of cash distributed to such Member by the Company; (ii) the Fair Market Value of any other property distributed to such Member by the Company (determined as of the time of distribution and net of liabilities secured by such property that the Member assumes or to which the Member's ownership of the property is subject); and (iii) allocations of Losses to such Member pursuant to Section 4;

(c) Otherwise adjusted in accordance with the provisions of this Agreement; and

(d) Revalued in connection with any event described in paragraph (a) of the definition of "Gross Asset Value" to the extent the Manager determines that a revaluation is necessary to preserve the economic arrangement of the Members. In determining the amount of any liability for purposes of subparagraphs (a) and (b) above, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Treasury Regulations.

Capital Accounts shall be maintained in accordance with Treasury Regulations Section 1.704-1(b) and specifically in a manner consistent with the Member's interest in the Company and the provisions of this Agreement shall be interpreted and applied in a manner consistent with such regulations and intent.

***Capital Contribution*** shall mean, for any Member, the sum of the net amount of cash and the Fair Market Value of any other property (determined as of the time of contribution and net of liabilities secured by such property that the Company assumes or to which the Company's ownership of the property is subject) contributed by such Member to the capital of the Company. For purposes of this Agreement, each Capital Contribution shall be deemed to have been made at the later of: (i) the Close of Business on the due date of such Capital Contribution as determined in accordance with this Agreement; or (ii) the Close of Business on the date on which such Capital Contribution is actually received by the Company.

***Certificate*** shall mean the Certificate of Formation of the Company, as amended and/or restated from time to time.

***Close of Business*** shall mean 5:00 p.m., local time, in New York, New York.

***Code*** shall mean the United States Internal Revenue Code of 1986, as amended.

***Company*** shall mean CDMCFAD, LLC, a Delaware limited liability company.

***Depreciation*** shall mean, for each Fiscal Year or other period, an amount equal to the federal income tax depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other period; provided, however, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction with respect to such asset for such Fiscal Year or other period bears to such beginning adjusted tax basis; and provided further, that if the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year or other period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Manager.

***Fair Market Value*** shall have the meaning set forth in Section 6.9(b).

***Fiscal Period*** shall mean the Fiscal Year or such shorter period as necessary to take into account the Members' varying interests in the Company.

***Fiscal Year*** shall mean the period from January 1 through December 31 of each year (unless otherwise required by law).

***Gross Asset Value*** shall mean, with respect to any asset, such asset's adjusted basis for federal income tax purposes (except that the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross Fair Market Value of the asset on the date of contribution), except as follows:

(a) The Gross Asset Value of all Company assets shall be adjusted to equal their respective fair market values upon the occurrence of any of the events listed in Treasury Regulations Section 1.704-1(b)(2)(iv)(f)(5); provided, however, that adjustments pursuant to this clause (a) (other than in a liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g)) shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

(b) The Gross Asset Value of any Company asset distributed to any Member shall be the Fair Market Value of such asset on the date of distribution.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (a) or paragraph (b) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

***Interest*** shall mean, for each Member, the entirety of such Member's rights, duties and limited liability company interest in respect of the Company in such Member's capacity as such (as distinguished from any other capacity such as employee, debtor or creditor) and shall include such Member's right, if any, to vote on Company matters, bind the Company vis-à-vis third parties, or receive distributions as well as such Member's obligation under this Agreement, if any, to provide services, make Capital Contributions or take any other action.

***Manager*** shall mean the Person designated as the Manager in Section 6.2.

***Member*** shall mean those Persons admitted as members under this Agreement as shown on Schedule A as such schedule may be updated from time to time, each in such Person's capacity as a member of the Company. Except where the context requires otherwise, a reference in this Agreement to "the Members" shall mean all of the Members.

***Member Minimum Gain*** has the same meaning as the term "partner nonrecourse debt minimum gain" in Treasury Regulations Section 1.704-2(i)(2).

***Member Nonrecourse Deduction*** shall mean an item of loss, expense or deduction attributable to a nonrecourse liability of the Company for which a Member bears the economic risk of loss within the meaning of Treasury Regulations Section 1.704-2(i).

***Minimum Gain*** of the Company or ***Company Minimum Gain*** shall, as provided in Treasury Regulations Section 1.704-2, mean the total amount of gain the Company would realize for federal income tax purposes if it disposed of all assets subject to nonrecourse liability for no consideration other than full satisfaction thereof.

***Person*** shall mean an individual, partnership, corporation, limited liability company, unincorporated organization, trust, joint venture, governmental agency, or other entity, whether domestic or foreign.

***Principal Office*** shall have the meaning set forth in Section 2.4.

***Profits*** and ***Losses*** shall mean, for each Fiscal Year or other Fiscal Period, an amount equal to the Company's taxable income or loss for such Fiscal Year or other Fiscal Period, as applicable, determined in accordance with Section 703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code), with the following adjustments:

(a) Any income of the Company exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to (or subtracted from, as the case may be) such taxable income or loss;

(b) Any expenditures of the Company described in Section 705(a)(2)(B) of the Code (or treated as expenditures described in Section 705(a)(2)(B) of the Code pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from (or added to, as the case may be) such taxable income or loss;

(c) In the event that the Gross Asset Value of any Company asset is adjusted in accordance with paragraphs (a) or (b) of the definition of "Gross Asset Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d) Gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed

by reference to the Gross Asset Value of the asset disposed of, notwithstanding that the adjusted tax basis of such asset differs from its Gross Asset Value;

(e) In lieu of the depreciation, amortization and other cost recovery deductions that would otherwise be taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other Fiscal Period, computed in accordance with the definition of "Depreciation" above; and

(f) Notwithstanding any other provision of this definition, any items that are specially allocated pursuant to Sections 4.2 or 4.3 shall not be taken into account in computing Profits or Losses.

***Securities*** shall mean debt, equity and synthetic securities of any type.

***Term*** shall have the meaning set forth in Section 2.2. Where not capitalized, "term" shall mean the entire period of the Company's existence, including any period of winding-up and liquidation following the dissolution of the Company pursuant to Section 8.1.

***Title XI 2015 RBA*** shall have the meaning set forth in Section 6.7(d).

***Transfer*** shall mean any sale, exchange, transfer, gift, encumbrance, assignment, pledge, mortgage, hypothecation or other disposition, whether voluntary or involuntary.

***Treasury Regulations*** shall mean the regulations issued by the United States Treasury Department and relating to a matter arising under the Code.

***Updated Capital Account*** shall mean, with respect to a Member, such Member's Capital Account determined as if, immediately prior to the time of determination, all of the Company's assets had been sold for Fair Market Value and any previously unallocated Profits and Losses had been allocated pursuant to Section 4.

**1.2** ***General Usage***. The section headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. Except where the context clearly requires to the contrary: (i) each reference in this Agreement to a designated "Section," "Schedule," "Exhibit," or "Appendix" is to the corresponding Section, Schedule, Exhibit, or Appendix of or to this Agreement; (ii) instances of gender or entity-specific usage (*e.g.*, "his," "her," "its," "person" or "individual") shall not be interpreted to preclude the application of any provision of this Agreement to any individual or entity; (iii) the word "or" shall not be applied in its exclusive sense; (iv) "including" shall mean "including, without limitation"; (v) references to laws, regulations and other governmental rules, as well as to contracts, agreements and other instruments, shall mean such rules and instruments as in effect at the time of determination (taking into account any amendments thereto effective at such time without regard to whether such amendments were enacted or adopted after the effective date of this Agreement) and shall include all successor rules and instruments thereto; (vi) references to any specific statute or similar codification of law shall mean such statute or other codification as construed, modified, extended or enabled by any applicable binding governmental rules or regulations; (vii) references to "law" shall mean any applicable law, whether embodied in statute, governmental rule or regulation, case law or other legally binding format; (viii) references to "$" or "dollars" shall mean the lawful

currency of the United States; (ix) references to "federal" shall be to laws, agencies or other attributes of the United States (and not to any State or locality thereof); (x) the meaning of the terms "domestic" and "foreign" shall be determined by reference to the United States; (xi) references to "days" shall mean calendar days and references to "business days" shall mean all days other than Saturdays, Sundays and days that are legal holidays in the State of New York; (xii) references to months or years shall be to the actual calendar months or years at issue (taking into account the actual number of days in any such month or year); (xiii) days, business days and times of day shall be determined by reference to local time in New York, New York; and (xiv) the English language version of this Agreement shall govern all questions of interpretation relating to this Agreement, notwithstanding that this Agreement may have been translated into, and executed in, other languages.

---

## SECTION 2

## FORMATION

---

**2.1** ***Formation and Name***.

(a) The Members hereby enter into this Agreement and form the Company as a limited liability company in accordance with the Act. Mark Patrick is hereby designated as an "authorized person" of the Company within the meaning of the Act, and has executed, delivered and filed the Certificate of Formation of the Company with the Secretary of State of the State of Delaware (such filing being hereby approved and ratified in all respects and the time at which the initial Certificate of Formation is filed with the Secretary of State of the State of Delaware, the "**Effective Date**"). Upon the filing of the Certificate of Formation of the Company with the Secretary of State of the State of Delaware, his powers as an "authorized person" of the Company ceased, and the Manager thereupon became the designated "authorized person" of the Company and shall continue as the designated "authorized person" of the Company within the meaning of the Act. The Manager, as an "authorized person" of the Company within the meaning of the Act, shall execute, deliver and file, or cause the execution, delivery and filing of, all certificates (and any amendments and/or restatements thereof) required or permitted by the Act to be filed with the Secretary of State of the State of Delaware. The Member shall execute, deliver and file, or cause the execution, delivery and filing of any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any other jurisdiction in which the Company may wish to conduct business.

(b) The name of the Company shall be "CDMCFAD, LLC."

**2.2** ***Term***. The "Term" of the Company commenced as of the filing of the Certificate with the Secretary of State of the State of Delaware and shall continue until the Company is dissolved and then wound up pursuant to Section 8.1. Except as provided in Section 8.1, the Company shall not be dissolved.

**2.3** ***Purpose and Scope***. Within the meaning and for purposes of the Act, the purpose and scope of the Company shall include any lawful action or activity permitted to a limited liability company under the Act, as determined by the Manager.

**2.4** ***Principal Office***. The Company shall have a single "Principal Office" which shall at all times be located within the United States. The Principal Office shall be located at such location as may hereafter be determined by the Manager.

**2.5** ***Delaware Office and Agent***. The Company shall maintain a Delaware registered office and agent for service of process as required by the Act. In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Manager shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be, each in accordance with the Act.

**2.6** ***Admission of Members***. Each Person as of the date hereof that has executed this Agreement and whose name is listed under Name and Contact Information on Schedule A, as such Schedule A may be updated from time to time by the Manager, is hereby admitted as a member of the Company. With the consent of the Manager, additional Members may be admitted to the Company from time to time upon each such Person's execution of a counterpart signature page to this Agreement or other joinder agreeing to be bound by the terms of this Agreement.

**2.7** ***Contact Information of the Members***. Set forth below the name of each Member on Schedule A shall be appropriate contact information for such Member. Each Member shall promptly provide the Company with the information required to be set forth for such Member on Schedule A and shall thereafter promptly notify the Company of any change to such information.

**2.8** ***Additional Documents***. The Manager shall cause to be executed, filed, recorded, published, or amended any documents, as the Manager in its reasonable discretion determines to be necessary or advisable: (x) in connection with the formation, operation, dissolution, winding-up, or termination of the Company pursuant to applicable law; or (y) to otherwise give effect to the terms of this Agreement. The terms and provisions of each document described in the preceding sentence shall be initially established and shall be amended as necessary to cause such terms and provisions to be consistent with the terms and provisions of this Agreement.

**2.9** ***Title to Property***. Title to all Company property shall be held in the name of the Company; provided, however, that publicly traded Securities may be held in "street name" or through a similar arrangement with a reputable financial institution.

---

## SECTION 3

## CAPITALIZATION

---

**3.1** ***Capital Contributions***.

(a) ***Initial Capital Contributions***. Each Member has contributed (or is deemed to have contributed) such capital to the Company as set forth on the books and records of the Company. Except to the extent set forth on the books and records of the Company or agreed to by the Manager, all Capital Contributions shall be in cash and/or cash equivalents.

(b) ***Increased Capital Contributions***. The Members may make additional Capital Contributions to the Company at such times and in such amounts as shall be determined by the Manager and the Member making such additional Capital Contribution.

(c) ***Adjustment of Member Allocation Percentages***. Upon (i) the admission of a Member following the date hereof or (ii) the acceptance of Capital Contributions by the Company from a Member following contribution of such Member's initial Capital Contribution, the Manager shall adjust the Allocation Percentage of each Member, and shall accordingly update Schedule A hereto, so that the Allocation Percentages of the Members represent their Interest in the Company taking into account a revaluation of the Company's assets, if any, and in accordance with the economic arrangement of the Members.

**3.2** ***Limitation on Capital Contributions***. Except as specifically provided in this Section 3, no Person shall be permitted or required to make a contribution to the capital of the Company.

**3.3** ***Withdrawal and Return of Capital***. Except as provided in Section 5 and Section 8 or as otherwise agreed to by the Manager, no Member shall be entitled to the return of such Member's Capital Contribution, a distribution in respect of such Member's Capital Account balance, or any other distribution in respect of such Member's Interest.

**3.4** ***Loans to the Company***. No Member shall be required to lend any money to the Company or to guaranty any Company indebtedness.

**3.5** ***Interest on Capital***. No Member shall be entitled to interest on such Member's Capital Contribution, Capital Account balance, or share of unallocated Profits.

**3.6** ***Limitation of Liability; Return/Withholding of Certain Distributions***.

(a) Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member or manager of the Company.

(b) A Member that receives a distribution (i) in violation of this Agreement or (ii) that is required to be returned to the Company under applicable law shall return such distribution within thirty (30) days after demand therefor by the Manager. The Company may elect to withhold from any distributions otherwise payable to a Member amounts due to the Company from such Member.

(c) Nothing in this Section 3.6 shall be applied to release any Member from (i) its obligation to make Capital Contributions or other payments specifically required under this Agreement or (ii) its obligations pursuant to any relationship between the Company and such Member acting in a capacity other than as a Member (including, for example, as a borrower, employee or independent contractor).

## SECTION 4

## PROFITS AND LOSSES

**4.1** ***Allocations of Company Profits and Losses***. Except as otherwise provided in this Agreement, Profits and Losses for each Fiscal Period shall be allocated as follows:

(a) Profits shall be allocated among the Members in the following order of priority:

(i) First, among the Members on a pro rata basis so as to reverse prior allocations of Losses for prior Fiscal Periods under Section 4.1(b)(ii) until cumulative Profit allocated under this Section 4.1(a)(i) equals the cumulative Losses allocated under Section 4.1(b)(ii); and

(ii) Second, among the Members in proportion to their Allocation Percentages.

(b) Losses shall be allocated among the Members in the following order of priority:

(i) First, among the Members on a pro rata basis so as to reverse allocations of Profits for prior Fiscal Periods under Sections 4.1(a)(i) and 4.1(a)(ii), in reverse order, until Losses allocated under this Section 4.1(b)(i) equal the cumulative Profit previously allocated under Sections 4.1(a)(i) and 4.1(a)(ii); and

(ii) Second, among the Members in proportion to their Allocation Percentages.

**4.2** ***Allocation Adjustments Required to Comply With Section 704(b) of the Code***.

(a) ***Limitation on Allocation of Losses***. If an item of Losses otherwise allocable to a Member under Section 4.1(b) would cause such Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year (or increase the amount of such Member Adjusted Capital Account Deficit), the item shall not be allocated to such Member, but shall instead be specially allocated as follows:

(i) To the Members in proportion to their respective positive Capital Account balances, until the Capital Account balance of each Member has been reduced to (but not less than) zero; and

(ii) Next, to the Members as a group in proportion to their respective Allocation Percentages as determined in the reasonable discretion of the Manager.

To the extent that there have been special allocations of Losses away from a Member under this Section 4.2(a) that have not subsequently been reversed pursuant to this sentence or Sections 4.2(f)

or 4.3(e), the next available items of Profits otherwise allocable to such Member pursuant to Section 4.1(a) shall be specially allocated to the Members to whom such items of Losses had been specially allocated under this Section 4.2(a) so as to first offset in reverse order such special allocations of Losses.

(b) ***Qualified Income Offset***. In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.2(b) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 4 have been tentatively made as if this Section 4.2(b) were not in this Agreement.

(c) ***Gross Income Allocation***. In the event any Member has an Adjusted Capital Account Deficit at the end of any Fiscal Year, that Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 4.2(c) shall be made only if and to the extent that the Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Section 4 have been made, as if Section 4.2(b) and this Section 4.2(c) were not in this Agreement.

(d) ***Member Nonrecourse Deductions***. In accordance with the provisions of Treasury Regulations Section 1.704-2(i), each item of Member Nonrecourse Deduction shall be allocated among the Members in proportion to the economic risk of loss that the Members bear with respect to the nonrecourse liability of the Company to which such item of Member Nonrecourse Deduction is attributable.

(e) ***Minimum Gain Chargeback***. This Section 4.2(e) hereby incorporates by reference the "minimum gain chargeback" provisions of Treasury Regulations Section 1.704-2. In general, upon a reduction of Company Minimum Gain or Member Minimum Gain, the preceding sentence shall require that items of income and gain be allocated among the Members in a manner that reverses prior allocations of deductions attributable to liabilities giving rise to Company Minimum Gain or Member Nonrecourse Deductions as well as reductions in the Members' Capital Account balances resulting from distributions that, notwithstanding Section 4.4, are allocable to increases in the Company Minimum Gain. Subject to the provisions of Section 704 of the Code and the Treasury Regulations thereunder, if the Manager determines in its reasonable discretion at any time that operation of such "minimum gain chargeback" provisions likely will not achieve such a reversal by the conclusion of the liquidation of the Company, the Manager shall adjust the allocation provisions of this Section 4 as necessary to accomplish that result.

(f) ***Intent of Regulatory Allocations***. The allocations set forth in Sections 4.2(a) through 4.2(e) are intended to comply with certain regulatory requirements under the Code. The Members intend that, to the extent possible, all allocations made pursuant to such Sections will, over the term of the Company, be offset either with other allocations pursuant to Sections 4.2(a) through 4.2(e) or with special allocations of other items of Company income, gain,

loss or deduction pursuant to this Section 4.2(f). Accordingly, the Manager is hereby authorized and directed to make offsetting allocations of Company income, gain, loss or deduction under this Section 4.2(f) in whatever manner the Manager determines is appropriate so that, after such offsetting special allocations are made, the Capital Accounts of the Members are, to the extent possible, equal to the Capital Accounts each would have if the provisions of Sections 4.2(a) through 4.2(e) were not contained in this Agreement and all Company income, gain, loss, and deduction were instead allocated in accordance with the provisions of Section 4.1.

**4.3** ***General Allocation and Capital Account Maintenance Provisions***.

(a) ***Book - Tax Accounting Disparities***. If Company property is reflected in the Capital Accounts of the Members at a value that differs from the adjusted tax basis of such property (whether because such property was contributed to the Company by a Member or because of a revaluation of the Members' Capital Accounts under Treasury Regulations Section 1.704-1(b)), allocations of depreciation, amortization, income, gain or loss with respect to such property shall be made among the Members in a manner which takes such difference into account in accordance with Code Section 704(c) and the Treasury Regulations issued thereunder using a method determined in the reasonable discretion of the Manager.

(b) ***Allocations in Event of Transfer***. If an Interest in the Company is Transferred in accordance with this Agreement, allocations of Profits and Losses as between the transferor and transferee shall be made using any method selected by the Manager and permitted under Section 706 of the Code.

(c) ***Adjustment to Capital Accounts for Distributions of Property***. If property distributed in kind is reflected in the Capital Accounts of the Members at a value that differs from the Fair Market Value of such property at the time of distribution, the difference shall be treated as Profit or Loss on the sale of the property and shall be allocated among the Members in accordance with the provisions of Section 4.

(d) ***Tax Credits and Similar Items***. Any tax credits or similar items not allocable pursuant to Sections 4.1, 4.2 and 4.3(a) through 4.3(c) shall be allocated to the Members in proportion to their respective Allocation Percentages. Notwithstanding the preceding sentence, if Company expenditures that give rise to tax credits also give rise to Member Nonrecourse Deductions, the tax credits attributable to such expenditures shall be allocated in accordance with Treasury Regulations Section 1.704-1(b)(4)(ii).

(e) ***Reallocation of Certain Losses***. To the extent that: (i) Losses which otherwise would have been allocated to a Member under this Section 4.3 were allocated to one or more other Members pursuant to Section 4.2(a) or any other provision of this Agreement that prohibits the allocation to a Member of Losses which would reduce such Member's Capital Account (or Updated Capital Account) balance below a specified amount; (ii) such allocation has not been reversed pursuant to the subsequent operation of Section 4.2(a) or this Section 4.3(e); and (iii) the Member thereafter returns a distributed amount as required under Section 3.6(b) or otherwise makes a contribution to the capital of the Company, the Capital Accounts of the Members shall be adjusted in connection with such return or contribution (to the extent of the value thereof) to effect a reallocation, in reverse order, of such Losses to the Member.

(f) ***Tax Allocations***. It is intended that items of Company income, gain, loss, deduction or credit recognized for federal income tax purposes shall be allocated among the Members for federal income tax purposes in the same manner as its correlative item of "book" income, gain, loss or deduction is allocated pursuant to Sections 4.1 and 4.2 hereof, to the extent consistent with the requirements of the Code and the Treasury Regulations.

**4.4** ***Nonallocation of Distributions to Increases in Minimum Gain***. To the extent permitted under Treasury Regulations Section 1.704-2(h), distributions to Members shall not be allocable to increases in the Company Minimum Gain. In general, and except as provided in such Treasury Regulations, the preceding sentence is intended to ensure that reductions in a Member's Capital Account balance resulting from distributions of money or other property to that Member are not reversed by the minimum gain chargeback provisions of Section 4.2(e).

**4.5** ***Allocation of Liabilities***. Solely for purposes of determining the Members' respective shares of the nonrecourse liabilities of the Company within the meaning of Treasury Regulations Section 1.752-3(a)(3), each Member's interest in Company Profits shall be equal to the ratio that such Member's Allocation Percentage bears to the aggregate Allocation Percentages of the Members.

**4.6** ***Modifications to Preserve Underlying Economic Objectives***. In the event that (i) there is a change in the federal income tax law, (ii) the Company borrows money or property, or (iii) the Company makes an election to adjust the basis of the Company's assets under Section 754 of the Code, the Manager, acting in his reasonable discretion after consultation with tax counsel to the Company, shall make the minimum modifications to the allocation provisions of this Agreement necessary to preserve the underlying economic objectives of the Members as reflected in this Agreement and, in the case of such a borrowing or election, to properly allocate the tax items relating to such borrowing or election in accordance with the Code and the Treasury Regulations.

**4.7** ***Withholding Taxes***.

(a) The Company shall be permitted to withhold taxes from distributions to, and allocations among, the Members to the extent required by law (as determined by the Manager in the Manager's sole discretion). Except as otherwise provided in this Section 4.7, any amount so withheld by the Company with regard to a Member shall be treated for purposes of this Agreement as an amount actually distributed to such Member pursuant to Section 5.1. An amount shall be considered withheld by the Company if, and at the time, remitted to a governmental agency without regard to whether such remittance occurs at the same time as the distribution or allocation to which it relates; provided, however, that an amount actually withheld from a specific distribution or designated by the Manager as withheld from a specific allocation shall be treated as if distributed at the time such distribution or allocation occurs. Nothing in this Section 4.7(a) shall have any bearing on amounts withheld from a Member in respect of compensation paid or payable to such Member in such Member's capacity as an employee of the Company or pursuant to a bona fide written employment agreement between such Member and the Company.

(b) If, pursuant to Section 4.7(a), an amount withheld with regard to a Member is treated for purposes of this Agreement as an amount distributed to such Member pursuant to

Section 5.1, subsequent actual distributions to such Member pursuant to Section 5.1 shall be reduced as necessary to, as quickly as possible, cause the aggregate distributions to such Member over the term of the Company (including actual distributions and distributions deemed to have occurred pursuant to Section 4.7(a)) to equal the actual distributions that would have been made to such Member if Section 4.7(a) were not part of this Agreement.

(c) To the extent that operation of Section 4.7(a) would create a negative balance in a Member's Updated Capital Account or increase the amount by which such Updated Capital Account balance is negative, the amount of the deemed distribution shall instead be treated as a loan by the Company to such Member, which loan shall be payable upon demand by the Company and shall bear interest at a floating rate equal to the prime rate as announced from time to time by the Wall Street Journal, compounded daily.

(d) In the event that the Manager determines in its discretion that the Company lacks sufficient cash available to pay withholding taxes in respect of a Member, the Manager may, in its sole and absolute discretion, make a loan to the Company to enable the Company to pay such taxes. Any such loan shall be full-recourse to the Company and shall bear interest at a floating rate equal to the prime rate as published from time to time by The Wall Street Journal, compounded daily. Notwithstanding any provision of this Agreement to the contrary, any loan (including interest accrued thereon) made to the Company by a Member or the Manager pursuant to this Section 4.7(d) shall be repaid or returned as promptly as is reasonably possible.

(e) Each Member hereby agrees to indemnify the Company and the other Members for (i) any liability they may incur for failure to properly withhold taxes in respect of such Member, and (ii) any tax liabilities imposed on the Company with respect to such Member; moreover, each Member hereby agrees that neither the Company nor any other Member shall be liable for any excess taxes withheld in respect of such Member's Interest and that, in the event of overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate governmental authority. The obligations of a Member set forth in this Section 4.7 shall survive the resignation of any Member from the Company or any Transfer of a Member's Interest.

**4.8** ***Intent of Allocations/Cash Savings Clause***. The parties intend that the foregoing allocation provisions of this Section 4 shall produce final Capital Account balances of the Members that will permit liquidating distributions that are made in accordance with final Capital Account balances under Section 8.2(d) hereof to be made in a manner identical to the order of priorities set forth in Section 5.1(b). To the extent that the allocation provisions of this Section 4 would fail to produce such final Capital Account balances, (i) such provisions shall be amended by the Manager without the consent of any Member or other Person, if and to the extent necessary to produce such result and (ii) income and loss of the Company for prior open years (including items of gross income and deduction of the Company for such years) shall be reallocated by the Manager among the Members to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the current year and future years, as approved by the Manager. This Section 4.8 shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service ("**IRS**") or any other taxing authority. The Manager shall have the power to amend this Agreement without the consent of the Members, as it reasonably considers advisable, to make the allocations and adjustments described in this Section 4.8. To the extent that after making the allocations and

adjustments described in this Section 4.8, the distributions that any Member will receive under this Agreement are less than the amount of the distributions such Member would receive if all such distributions were made pursuant to the order of priority set forth in Section 5.1(b), the Company may make a guaranteed payment (within the meaning of Section 707(c) of the Code) to such Member (to be made at the time such Member would otherwise receive the distributions that have been reduced) to the extent such payment does not violate the requirements of Sections 704(b) and 514(c)(9)(E) of the Code or may take such other action as reasonably determined by the Manager to offset such reduction.

## SECTION 5

## DISTRIBUTIONS

**5.1** ***Distributions***.

(a) ***General***. Except as otherwise provided in this Agreement, distributions prior to the dissolution of the Company shall be made in accordance with this Section 5.1 and each Member actually receiving amounts pursuant to a specific distribution by the Company shall receive a pro rata share of each item of cash or property of which such distribution is constituted (based upon such Member's share under this Agreement of the total amount to be included in such distribution).

(b) ***Discretionary Distributions***. The Manager may at any time in its sole discretion to the extent the Company has cash and any property available for distribution taking into account current and anticipated needs (including without limitation operating expenses, debt service, guaranteed payments and a reserve for future operating costs), distribute such excess cash and any property available for distributions to the Members in accordance with their respective Allocation Percentages.

(c) ***Tax Distributions.***

(i) Notwithstanding the foregoing, the Company shall distribute to each Member, not later than ninety (90) days after the close of each Fiscal Year, or as soon as reasonably practicable thereafter, an amount of cash equal to the product of the Tax Percentage for such Fiscal Year and such Member's allocated share of the Company's net taxable income and gain for such Fiscal Year as shown on the Company's federal income tax return. The Manager may, in its sole discretion and determination, make distributions pursuant to this Section 5.1(c) on a quarterly basis so as to permit the Members to make quarterly estimated tax payments.

(ii) For purposes of this Section 5.1(c), the "Tax Percentage" shall equal the highest combined federal, state and local marginal tax rate for an individual resident of the State of Texas with respect to net taxable income or net short term capital gains or with respect to net long term capital gains, as applicable. The Manager may adjust the determination of the Tax Percentage to reflect a change in law or rates.

(iii) For purposes of determining whether the Company has satisfied its distribution obligation under Section 5.1(c)(i), all cash distributions made during a Fiscal Year shall be treated as distributions made to satisfy Section 5.1(c)(i) in respect of such Fiscal Year (except to the extent that such distributions were made to satisfy the obligations of the Company under Section 5.1(c)(i) in respect of one or more prior Fiscal Years, in which case such distributions shall be treated as having been made pursuant to Section 5.1(c)(i) in respect of such prior Fiscal Year(s)). Further, distributions made in respect of this Section 5.1(c) during any Fiscal Year shall be treated as satisfying the distribution requirement of Section 5.1(b) hereof with respect to such Fiscal Year (except to the extent that such distributions were made in respect of a prior Fiscal Year, in which case such distribution shall be treated as having been made in respect of such prior Fiscal Year(s)).

(iv) At the election of the Manager, no distribution shall be required pursuant to Section 5.1(c)(i) in respect of any Fiscal Year if the total net taxable income and gain of the Company for such Fiscal Year is less than or equal to One Hundred Thousand Dollars ($100,000).

(v) No distribution shall be required to be made pursuant to this Section 5.1(c) to a Member to the extent such Member has a cumulative net loss with respect to such Member's allocable share of the taxable income or gain, as the case may be, after taking into account allocations for the current and all prior taxable periods.

(vi) The Company shall not make a distribution under this Section 5.1(c) to a Member to the extent such Member is allocated net taxable income and gain solely in connection with (A) redemption of such Member's Interest or (B) a liquidation of the Company.

(d) ***Source of Items Available for Distribution***. In the event that, at the time of a distribution, items available for distribution include items from more than one source, the source of those items actually distributed shall be determined by the Manager in its sole discretion.

**5.2** ***Limitation on Distributions***. No distribution shall be made to a Member pursuant to Section 5.1 if and to the extent that such distribution would: (i) create a negative balance in the Updated Capital Account of such Member or increase the amount by which such Updated Capital Account balance is negative; (ii) cause the Company to be insolvent; or (iii) render the Member liable for a return of such distribution under applicable law. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to a Member on account of its interest in the Company if such distribution would violate the Act or other applicable law.

---

## SECTION 6

## ADMINISTRATION; MANAGEMENT

---

**6.1** ***Management Powers and Authority of the Manager***. Except as otherwise specifically provided in this Agreement, the Company and its business shall be managed, controlled and operated exclusively by the Manager, which shall be the "manager" of the Company

within the meaning of Section 18-101 of the Act and shall have all of the powers and authority in respect of the Company permitted to managers under the Act.

**6.2** ***Designation of Manager***. The initial Manager shall be Mark Patrick. In the event that Mark Patrick dies or is unable to serve as such, the will or other testamentary documentation for Mark Patrick shall designate a successor Manager. To the extent that the will or other related documentation for Mark Patrick fails to provide for a successor Manager or if any such designated individual shall be unable or is unwilling to fill such position, the managing shareholder of Charitable DAF HoldCo, Ltd., shall appoint a successor Manager. To the extent that Mark Patrick desires to resign as Manager, he shall appoint his successor.

**6.3** ***Manager's Power to Bind the Company***.

(a) Notwithstanding any provision of this Agreement to the contrary, any contract agreement, deed, lease, note or other document or instrument executed on behalf of the Company by a Manager shall be deemed to have been duly executed by the Company; no Member's signature shall be required in connection with the foregoing and third parties shall be entitled to rely upon the Manager's power to bind the Company without otherwise ascertaining that the requirements of this Agreement have been satisfied.

(b) The Manager is hereby authorized to file with any governmental entity, on behalf of the Company and the Members, a certificate or similar instrument that evidences the Manager's power to bind the Company as set forth in the preceding paragraph (a).

(c) To the fullest extent permitted by law and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, whenever in this Agreement the Manager is permitted or required to make a decision (i) in its "sole discretion" or "discretion" or under a grant of similar authority or latitude, the Manager shall be entitled to consider only such interests and factors as it desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (ii) in its "good faith" or under another express standard, the Manager shall act under such express standard and shall not be subject to any other or different standard.

**6.4** ***Action by Members***. Except as set forth in Section 6.2, no Member shall have any right to vote with respect to any Company action.

**6.5** ***No Duties to the Company***. To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provisions of law or equity or otherwise, the parties hereto hereby agree that the Manager shall owe no fiduciary duty to any Member or the Company; provided, however, that the foregoing shall not eliminate the duty to comply with the implied contractual covenant of good faith and fair dealing.

**6.6** ***Manager and Member Expenses***.

(a) ***General***. Except as otherwise provided in this Section 6.6, no Manager or Member shall be reimbursed for expenses incurred on behalf of, or otherwise in connection with,

the Company. Any reimbursement paid by a third party for expenses actually reimbursed by the Company shall be retained by (or paid over by the recipient thereof to) the Company.

(b) ***Manager***. The Manager shall be reimbursed by the Company for reasonable out-of-pocket expenses incurred by the Manager on behalf of the Company.

(c) ***Member***. A Member shall be reimbursed for expenses incurred on behalf of the Company only with the approval of the Manager, which approval may be withheld by the Manager in its sole and absolute discretion.

**6.7** ***Tax Matters; Partnership Representative***.

(a) ***Partnership Classification for Tax Purposes***. Except to the extent otherwise required by applicable law (disregarding for this purpose any requirement that can be avoided through the filing of an election or similar administrative procedure), the Manager shall cause the Company to take the position that the Company is a "partnership" or disregarded entity, as applicable, for federal, state and local income tax purposes and shall cause to be filed with the appropriate tax authorities any elections or other documents necessary to give due legal effect to such position. A Member shall not file (and each Member hereby represents that it has not filed) any income tax election or other document that is inconsistent with the Company's position regarding its classification as a "partnership" for applicable federal, state and local income tax purposes.

(b) ***Notice of Inconsistent Treatment of Company Item***. No Member shall file a notice with the IRS under Section 6222(b) of the Code in connection with such Member's intention to treat an item on such Member's federal income tax return in a manner which is inconsistent with the treatment of such item on the Company's federal income tax return.

(c) ***Notice of Settlement Agreement***. Any Member entering into a settlement agreement with the United States Department of the Treasury which concerns a Company item shall notify the Manager of such settlement agreement and its terms within sixty (60) days after the date thereof.

(d) ***Partnership Representative and Audits***.

(i) The Manager shall be the "partnership representative" of the Company (the "**Partnership Representative**") pursuant to and to the extent permitted by Section 6223 of Title XI of the Bipartisan Budget Act of 2015 ("**Title XI 2015 BBA**"). In the event of any pending tax action, investigation, claim or controversy at the Company level that may result in a "partnership adjustment," within the meaning of Section 6241(2) of Title XI 2015 BBA (a "**Partnership Adjustment**"), to any item reported on a federal tax return of any Member(s), the Partnership Representative, shall keep such Member(s) fully and timely informed by written notice of any audit, administrative or judicial proceedings, meetings or conferences with the IRS or other similar material matters that come to its attention in its capacity as Partnership Representative. The Partnership Representative will give the Members not less than fifteen (15) days' prior written notice as to any action to be taken or of any decision not to take action with respect to any such material matter. The Partnership Representative shall act in any similar capacity under applicable state, local or foreign law, subject to similar restrictions and obligations.

The Company shall reimburse the Partnership Representative for its reasonable expenses in connection with the performance of his duties hereunder.

(ii) For any Partnership Adjustment or proposed Partnership Adjustment to the federal income tax returns of the Company for which an "imputed underpayment," within the meaning of Section 6225(b) of Title XI 2015 BBA would arise, then either, (1) the Partnership Representative may require that the Member(s) affected by such Partnership Adjustment file amended returns that take into account such Partnership Adjustments and pay any additional tax due pursuant to Section 6225(c) of Title XI 2015 BBA or (2) if the Partnership Representative does not require the affected Member(s) to file such amended returns as provided in clause (1), and the affected Member(s) do not otherwise file such amended returns, the Partnership Representative may elect application of Section 6226 of Title XI 2015 BBA. In any case, the affected Member(s) shall keep the Partnership Representative fully and timely informed by written notice of any administrative or judicial proceedings, meetings or conferences with the IRS or other similar matters with respect to the Partnership Adjustment, and the Partnership Representative shall have the right to review and comment on any submissions to the IRS, and attend and jointly participate in any meetings or conferences with the IRS.

(iii) This Section 6.7(d) is intended to comply with certain provisions under Title XI 2015 BBA that may be subject to change or further interpretation by the U.S. Treasury or IRS. In the event of such change or further interpretation, the Manager is hereby authorized to amend this Agreement consistent with the provisions of Sections 6.7(d)(i) and 6.7(d)(ii) above.

**6.8** ***Records and Financial Statements***.

(a) The Company shall maintain true and proper books, records, reports, and accounts in which shall be entered all transactions of the Company. The Company shall also maintain all schedules to this Agreement and shall update such schedules promptly upon receipt of new information relating thereto. Notwithstanding anything in Section 18-305 of the Act, except as provided in Section 6.8(b), no Member shall have any right to review or inspect any of the books or records of the Company or receive any other Company information.

(b) Within ninety (90) days after the end of each Fiscal Year, or as soon as reasonably practicable thereafter, the Company shall supply to each Member such Member's IRS Schedule K-1 for such Fiscal Year.

**6.9** ***Valuation of Company Assets***.

(a) ***General***. The Manager shall make a good faith determination of the value of the Company's assets in connection with any distribution pursuant to Section 8.1(b), as required under Section 4.3(c), upon the dissolution of the Company, and whenever otherwise required by this Agreement or determined by the Manager.

(b) ***Binding Effect***. The value of any Company asset or Interest determined pursuant to this Section 6.9 shall be binding upon the Company and the Members and shall establish the "Fair Market Value" of such asset or Interest for all purposes under this Agreement.

**6.10** ***Officers***. The Manager may, from time to time as it deems advisable, select natural persons who are employees or agents of the Company and designate them as officers of the Company (the "**Officers**") and assign titles (including, without limitation, President, Vice President, Secretary, and Treasurer) to any such person. Unless the Manager decides otherwise, if the title given to an Officer is one commonly used for officers of a business corporation formed under the Delaware General Corporation Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. Any delegation pursuant to this Section 6.10 may be revoked at any time by the Manager. An Officer may be removed with or without cause by the Manager.

---

## SECTION 7

## TRANSFERS AND RESIGNATIONS

---

**7.1** ***Transfers of Interests***. To the fullest extent permitted by law, a Member shall not Transfer all or any portion of its Interest without the prior written consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion.

**7.2** ***Resignation/Removal of a Member***. No Member shall resign from the Company or otherwise cease to be a Member without the consent of the Manager, which consent may be granted or withheld in the Manager's sole discretion.

**7.3** ***Redemption***. The Manager, in its sole discretion, may cause any Member's Interest to be redeemed by the Company for any reason. Any Interest of a Member to be redeemed by the Company shall be redeemed for the Fair Market Value of such Interest, as determined by the Manager in its sole discretion. Such payment to the Member shall either be made in cash or pursuant to a promissory note. Such promissory note shall: (i) provide for interest at the lowest rate necessary to avoid the imputation of additional interest under the Code; and (ii) have a stated principal amount of the Fair Market Value of such Member's Interest being redeemed, as determined by the Manager in its sole discretion.

---

## SECTION 8

## DISSOLUTION AND LIQUIDATION

---

**8.1** ***Dissolving Events***. The Company shall be Dissolved upon the occurrence of any of the following events:

(a) An election in writing by the Manager to dissolve the Company;

(b) Any time there are no members of the Company, unless the Company is continued in accordance with the Act; or

(c) The entry of a decree of judicial dissolution of the Company under Section 18-802 of the Act.

To the maximum extent permitted by the Act, the Members hereby waive their rights to seek a judicial dissolution of the Company.

**8.2** ***Winding Up and Liquidation***.

(a) Upon dissolution of the Company, the Manager shall promptly wind up the affairs of, and liquidate the Company. In furtherance thereof, the Manager, as the "liquidating trustee" of the Company within the meaning of the Act shall: (i) continue to have all of the administrative and management rights and powers of the Manager (including the power to bind the Company); and (ii) be reimbursed for Company expenses it incurs. Following dissolution, the Company shall sell or otherwise dispose of assets determined by the Manager to be unsuitable for distribution to the Members, but shall engage in no other business activities except as may be necessary to preserve the value of the Company's assets during the period of winding-up and liquidation. At the conclusion of the winding-up and liquidation of the Company, the Manager shall: (i) hold the books and records of the Company for not less than six years following the termination of the Company under the Act; and (ii) execute, file and record, as necessary, a certificate of cancellation or similar document to effect the termination of the Company under the Act and other applicable laws.

(b) Distributions to the Members in liquidation may be made in cash or in kind, or partly in cash and partly in kind, as determined by the Manager. Distributions in kind shall be valued at Fair Market Value as determined in accordance with the provisions of Section 6.9 and shall be subject to such conditions and restrictions as may be necessary or advisable to preserve the value of the property so distributed or to comply with applicable law. Each Member actually receiving amounts pursuant to a specific distribution shall receive a pro rata share of each item of cash or property of which such distribution is constituted (based upon such Member's share of the total amount to be included in such distribution).

(c) The Profits and Losses of the Company during the period of winding-up and liquidation shall be allocated among the Members in accordance with the provisions of Section 4. If any property is to be distributed in kind, the Capital Accounts of the Members shall be adjusted with regard to such property in accordance with the provisions of Section 4.3(c).

(d) The assets of the Company (including proceeds from the sale or other disposition of any assets during the period of winding-up and liquidation) shall be applied as follows:

(i) First, to repay any claims and obligations of the Company, whether to third parties or the Members, in the order of priority required by law and to the creation of any reserves which the Manager, or the liquidating trustee, as applicable, reasonably deems necessary for all contingent, conditional or unmatured claims or obligations of the Company (which reserves when they become unnecessary in accordance with the Act, shall be distributed in accordance with the provisions of clause (i), below); and

(ii) Next, to the Members in proportion to their respective positive Capital Account balances (after taking into account all adjustments to the Members' Capital Accounts required under Section 8.2(c)).

**8.3** ***Deficit Restoration/Liability***. Except as otherwise specifically provided in this Agreement, a Member shall have no obligation to restore a negative balance in such Member's Capital Account at the time of dissolution of the Company and no liability to the Company or to any other Member in respect of a negative balance in such Member's Capital Account during the term of the Company or at the conclusion of the Company's termination.

## SECTION 9

## EXCULPATION; INDEMNIFICATION

**9.1** ***Exculpation***. To the fullest extent permitted by applicable law, neither the Manager, Partnership Representative nor any Officer or Member nor any officer, director, employee, agent or Affiliate of the foregoing (collectively, the "**Covered Persons**"), shall be liable to the Company, or any other Person who is bound by this Agreement for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Person's gross negligence or willful misconduct.

**9.2** ***Indemnification***.

(a) To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 9.2 by the Company shall be provided out of and to the extent of Company assets only, and no Member nor the Manager shall have personal liability on account thereof.

(b) To the fullest extent permitted by applicable law, expenses (including reasonable legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon the receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Section 9.2.

(c) A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to

the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

(d) The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of a Covered Person to the Company or its members otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

(e) The foregoing provisions of this Section 9.2 shall survive any termination of this Agreement.

## SECTION 10

## GENERAL PROVISIONS

**10.1** ***Meetings***. There shall be no requirement of annual or periodic meetings of the Company's members or managers within the meaning of the Act.

**10.2** ***Action Without a Meeting***. Any action of the Manager may be taken by written consent of the Manager. Any consent or approval required by this Agreement to be "written" may also be made by the use of electronic transmission.

**10.3** ***Entire Agreement***. This Agreement and the other agreements referred to herein, including any employment, services, granting or other similar agreements, contain the entire understanding among the Members, and supersede any prior written or oral agreement between them, with respect to the Company. There are no representations, agreements, arrangements, or understandings, oral or written, among the Members relating to the Company which are not fully expressed in this Agreement (or any employment, services, granting or other similar agreements).

**10.4** ***Amendments***. This Agreement may be amended, in whole or in part, only through a written amendment executed by the Manager.

**10.5** ***Counterparts; Binding upon Members***. This Agreement may be executed in any number of counterparts and, when so executed, all of such counterparts shall constitute a single instrument binding upon all parties notwithstanding the fact that all parties are not signatory to the original or to the same counterpart.

**10.6** ***No Third Party Beneficiaries***. The provisions of this Agreement are not intended to be for the benefit of or enforceable by any third party and shall not give rise to a right on the part of any third party to require a Member to make a Capital Contribution, return distributions, or make other payments to the Company as set forth in this Agreement.

**10.7** ***Notices, Consents, Elections, Etc***. All notices, consents, agreements, elections, amendments, demands and approvals provided for or permitted by this Agreement or otherwise relating to the Company shall be in writing and signed copies thereof shall be retained with the books of the Company. For purposes of the following provisions of this Section 10.7, the term "notice" shall be deemed to include any notice, statement, report, consent or similar item required or permitted to be provided to one or more Persons under this Agreement or applicable law.

**10.8** ***Severability***. In the event that any provision of this Agreement is determined to be invalid or unenforceable, such provision shall be deemed severed from the remainder of this Agreement and replaced with a valid and enforceable provision as similar in intent as reasonably possible to the provision so severed, and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

**10.9** ***Governing Law***. The interpretation and enforceability of this Agreement and the rights and liabilities of the Members and the Manager as such shall be governed by the laws of the State of Delaware. To the extent permitted by the Act and other applicable law, the provisions of this Agreement shall supersede any contrary provisions of the Act or other applicable law.

**10.10** ***Status Under the Act***. This Agreement is the "limited liability company agreement" of the Company within the meaning of Section 18-101 of the Act.

**10.11** ***Partnership for Tax Purposes Only***. As set forth in Section 2.1, the Members hereby form the Company as a limited liability company under the Act. The Members expressly do not intend hereby to form a partnership except insofar as the Company may be treated as a partnership solely for tax purposes.

**10.12** ***Miscellaneous***. This Agreement shall not be construed for or against any party by reason of the authorship or alleged authorship of any provisions hereof or by reason of the status of the respective parties. Each Member hereby specifically consents to the selection of all other Members admitted to the Company pursuant to the terms of this Agreement.

*[remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties have executed this Limited Liability Company Agreement of CDMCFAD, LLC, a Delaware limited liability company, as of the date first above written.

**MEMBERS**:

CHARITABLE DAF HOLDCO, LTD.

By: [signature]
Name: Mark Patrick
Title: Director

**MANAGER**:

[signature]
Name: Mark Patrick

**CDMCFAD, LLC**

**LIMITED LIABILITY COMPANY AGREEMENT**

**SCHEDULE A**

**MEMBER INFORMATION**

**Revised: December 18, 2024**

| Name and Contact Information | Allocation Percentage |
|---|---|
| Charitable DAF Holdco, Ltd.<br>Floor 4, Willow House, Cricket Square<br>Grand Cayman KY1-9010<br>Cayman Islands<br>Attention: Mark Patrick | 100% |

**Rachel Baxendale**

**From:** David N. Corkern <DCorkern@CCSB.com>
**Sent:** 18 December 2024 11:24 PM
**To:** Brandon R. Schaller
**Cc:** Bart Higgins; Brian P. Shaw
**Subject:** DAF--proposed reorganization

CAUTION: This email originated from outside of the organization.

Brian,

In accordance with our conversation this morning with Mark Patrick, here are my initial thoughts regarding the U.S. tax issues that merit a reorganization of Charitable DAF Holco, Ltd. ("DAF"). It is my understanding that DAF currently has four (4) non-voting participating shareholders/supporting organizations, each of which is an IRC Section 501(c)(3) organization (per filings with the IRS) and controlled, directly or indirectly, by James Dondero ("Dondero"). You have detailed instances in which you believe Dondero has acted in ways that create a per se conflict of interest between him and each of the participating shareholders that he controls, as well as DAF. For example, it is my understanding that as recently as November, 2023, Dondero requested the current manager of DAF to transfer approximately $1,000,000 to Sentinel Reinsurance, Ltd. (a Dondero-controlled entity) in payment of legal fees unrelated to DAF or its charitable purposes. It is my further understanding that Grant Scott, the prior manager of DAF and a college friend of Dondero, had a history of using DAF funds to benefit Dondero personally. While the current manager has been acting independently of Dondero and those under Dondero's influence and/or control, this pattern of Dondero's using DAF as his personal "piggy bank" has caused the perception among many of Dondero's creditors that DAF has been or is as his financial alter ego. As such, DAF runs an increased risk of being embroiled in litigation directed against Dondero and his entities.

To the extent that the participating shareholders/supporting organizations have either encouraged or acquiesced in Dondero's accessing DAF funds for his personal benefit, either directly or through the entities that he controls or in which he has considerable financial interest, those organizations run the risk of losing their tax-exempt status with the IRS. Each IRC Section 501(c)(3) organization must be organized <u>and</u> operating primarily for charitable purposes. Treas. Reg. Section 1.501(c)(3)-1(c)(1) provides that an organization will not be compliant with the operational test "if more than an insubstantial part of its activities is not in furtherance of an exempt purpose." Additionally, an IRC Section 501(c)(3) organization cannot be operated for the benefit of an individual or entity—private benefit/private inurement prohibition.

Given what has been detailed about Dondero's past and continued actions with the participating shareholders/supporting organizations and DAF, there is a heightened risk that the IRS could revoke the tax-exempt status of one or more of said participating shareholders/supporting organizations, which could imperil the status and assets of DAF. To help insulate DAF from any such exposure and to facilitate and expand its charitable purposes, DAF is considering a two-prong restructure/reorganization that will bring in additional participating shareholders and create a Delaware blocking LLC. Clearly, expanding the number of shareholders of DAF will dilute the influence of Dondero and the entities controlled by him and, as such, will broaden the charitable scope of DAF for the benefit of the public. The IRS will look favorably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by Dondero and the entities controlled by him to use DAF for his private benefit and private inurement.

David

**David N. Corkern**
*Senior Counsel*
CARRINGTON COLEMAN

O 214.855.3099
DCorkern@CCSB.com / ccsb.com

Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St / Suite 5500 / Dallas, TX 75202

Admitted in Texas, Louisana, and D.C.
LLM in Taxation
**Board Certified Tax Law Specialist —
Louisiana Board of Legal Specialization**

**David N. Corkern**
*Senior Counsel*

CARRINGTON COLEMAN

O 214.855.3099
DCorkern@CCSB.com / ccsb.com

Carrington, Coleman, Sloman & Blumenthal, L.L.P.
901 Main St / Suite 5500 / Dallas, TX 75202

Admitted in Texas, Louisana, and D.C.
LLM in Taxation
**Board Certified Tax Law Specialist —
Louisiana Board of Legal Specialization**

This electronic message is confidential and is intended only for the use of the individual to whom it is addressed. The information may also be legally privileged. This transmission is sent in trust, for the sole purpose of delivery to the intended recipient. If you have received this transmission in error, you are hereby notified that any use, dissemination, distribution or reproduction of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify me by electronic message or telephone at 214-855-3000, and delete the message from your system. Carrington, Coleman, Sloman & Blumenthal, L.L.P. www.carringtoncoleman.com

# VALUATION ANALYSIS OF
# 100 PARTICIPATION SHARES OF
# CHARITABLE DAF HOLDCO, LTD

AS OF
SEPTEMBER 30, 2024

Prepared for:

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd

VALUESCOPE
a marshall + stevens company

VALUESCOPE
a marshall + stevens company

January 7, 2025

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd
2101 Cedar Springs Road, Suite 1200
Dallas, Texas 75201

***RE: Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Patrick:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") out of an assumed 305 participation shares of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of September 30, 2024 (the "Valuation Date"). ValueScope has not independently verified the total number of participation shares outstanding.[1] This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.
2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.

1 The Subject Interest is assumed to effectively represent approximately 32.8% of all participation shares.

7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

The premise of value followed herein is going concern.[2] The liquidation premise of value was considered and rejected as not applicable because the going-concern value results in a "highest and best use" value for the interest.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's advisors. To understand the environment in which DAF operates, we researched relevant information concerning the collateralized debt industry. We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances. Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Financial statements for the Company as of September 30, 2024
- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd
- Information regarding the Company's history and current operations

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information, as well as on other data we developed.

---

[2] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

## CONCLUSION OF VALUE

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$75,961,370**
**SEVENTY-FIVE MILLION NINE HUNDRED SIXTY-ONE THOUSAND THREE HUNDRED SEVENTY DOLLARS**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$882,140** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.1% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) | |
| **FMV Per Share** | | **$759,614** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$75,961,370** | |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

ValueScope, Inc.

ValueScope, Inc.

**TABLE OF CONTENTS**

**ENGAGEMENT OVERVIEW** .......... **1**

DESCRIPTION OF THE ASSIGNMENT .......... 1
SCOPE .......... 1
PROCEDURES .......... 1

**DAF OVERVIEW** .......... **2**

COMPANY OVERVIEW .......... 2
SUBJECT INTEREST OVERVIEW .......... 2
HISTORICAL FINANCIAL ANALYSIS .......... 2

**ECONOMIC AND INDUSTRY OVERVIEW** .......... **4**

OVERVIEW OF THE U.S. ECONOMY .......... 4
OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY .......... 12

**VALUATION METHODOLOGY** .......... **15**

VALUATION APPROACHES .......... 15
VALUATION METHODS .......... 16
SUMMARY OF THE VALUATION APPROACHES AND METHODS .......... 16

**VALUATION ANALYSIS** .......... **17**

ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE .......... 17

**CONCLUSION OF VALUE - SUBJECT INTEREST** .......... **19**

DISCOUNT FOR LACK OF CONTROL .......... 19
DISCOUNT FOR LACK OF MARKETABILITY .......... 19
CONCLUSION - SUBJECT INTEREST VALUE .......... 21

**ASSUMPTIONS AND LIMITING CONDITIONS** .......... **23**

**APPRAISAL CERTIFICATION** .......... **28**

## TABLE OF SCHEDULES

**HISTORICAL VALUATION SUMMARY .................... SUMMARY 1**

**CURRENT VALUATION SUMMARY .................... SUMMARY 2**

**DAF NET ASSET VALUE ANALYSIS .................... A**

CLO HOLDCO, LTD - SUMMARY BALANCE SHEET .................... A.1
CHARITABLE DAF HOLDCO, LTD - SUMMARY BALANCE SHEET .................... A.2

**DISCOUNT FOR LACK OF CONTROL (DLOC) ANALYSIS .................... B**

CLOSED-END FUND DATA - INVESTMENT GRADE BOND FUNDS .................... B.1
CLOSED-END FUND DATA - US GENERAL EQUITY FUNDS .................... B.2
DLOC CONCLUSION .................... B.3

**DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS .................... C**

DLOM DETERMINATION - PUT OPTION APPROACH .................... C.1
PUT OPTION APPROACH - HISTORICAL VOLATILITY SUMMARY .................... C.2
DLOM DETERMINATION - RESTRICTED STOCK STUDIES .................... C.3
DLOM DETERMINATION - RESTRICTED STOCK STUDIES SUMMARY STATISTICS .................... C.4
DLOM CONCLUSION .................... C.5

# ENGAGEMENT OVERVIEW

## DESCRIPTION OF THE ASSIGNMENT

We were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") out of an assumed 305 participation shares of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of September 30, 2024 (the "Valuation Date"). ValueScope has not independently verified the total number of participation shares outstanding.[3] This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

## SCOPE

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections. The first section outlines the description, scope, and procedures of our analysis. The second section provides a brief description of the Company and the Company's financial position. The third section includes a discussion of the national economy and the industry in which the Company operates. The fourth section details a discussion of valuation theory and methodology. The fifth section presents our valuation analysis, and the sixth section presents our conclusion and reconciliation of the fair market value of the Subject Interest.

## PROCEDURES

This valuation analysis was conducted in accordance with generally accepted valuation procedures. These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances. We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information, as well as on other data obtained through additional research. A full discussion of the methodologies employed appears in the following sections of this report.

---

3 The Subject Interest is assumed to effectively represent approximately 32.8% of all participation shares.

## DAF OVERVIEW[4]

### COMPANY OVERVIEW

Charitable DAF HoldCo, Ltd is a Cayman Islands "company limited by shares" formed in October 2011. Upon the shareholders' acceptance of shares, the shareholders agreed to the provisions of the Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd (as amended from time to time in accordance with the provisions thereof, the "DAF Agreement") and the Companies Law of the Cayman Islands (as amended from time to time, the "Law"). As a holding company, DAF's predominant assets were historically interests in the equity tranches of Collateralized Loan Obligations ("CLOs"), the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities.

### SUBJECT INTEREST OVERVIEW

Based on information provided by the Company's management ("Management"), the Subject Interest shares are participation shares that from time to time are expected to receive cash distributions to fulfill certain charitable and expense goals of the owners of the participation shares. The Subject Interest shares are directly affected by the terms of the DAF Agreement and the actions of DAF's directors. According to the DAF Agreement, the appointed directors control the business, affairs, and power of the Company (Sections 72 and 77), including the issuance and purchase of shares on such terms and in such manner as the director determines (Sections 7-10). Director consent is also required for shareholders to transfer their interests in DAF (Section 18). Finally, although shareholders may determine the timing and amounts of dividends (Section 100), no dividend can exceed an amount approved by the directors (Section 101).

### HISTORICAL FINANCIAL ANALYSIS

We were provided with the Company's balance sheet as of September 30, 2024. These financial statements reflect various professional valuations of DAF's ultimate underlying assets.

As reported as of the Valuation Date, DAF's sole asset consisted of 100% of the equity of CLO HoldCo, Ltd ("CLO HoldCo"). CLO HoldCo is a holding company which invests in CLOs and other various investments. The net asset value for CLO HoldCo was reported as

---

4 Based on the Company's memorandum and articles of association and information from management.

$269.1 million. DAF reported no liabilities as of the Valuation Date. As a result, DAF's book equity as of the Valuation Date was determined to equal $269.1 million.

DAF's balance sheet as of the Valuation Date is presented in Schedule A.2.

# ECONOMIC AND INDUSTRY OVERVIEW

## OVERVIEW OF THE U.S. ECONOMY

In the second quarter of 2024, the US economy experienced positive growth that surpassed the pace of the first quarter. Inflation has moderated significantly from its peak of 8.99% in June 2022 to 2.59% by August 2024, reflecting progress toward the Federal Reserve's inflation target. After an extended period of elevated interest rates to curb inflation, recent data pointed to a cooling labor market and continued price stability, prompting the Fed to cut rates by 50 basis points. The steady rate hikes initiated in 2023 led to an inverted yield curve, suggesting investor expectations of an economic slowdown. Nevertheless, US stock markets have gained momentum, with indices closing higher year-over-year, supported by declining inflation and anticipated further monetary easing.

### Gross Domestic Product[5]

Real gross domestic product (GDP) increased at an annual rate of 3.0 percent in the second quarter of 2024, following an increase of 1.6 percent in the first quarter. The acceleration in real GDP in the second quarter primarily reflected accelerations in consumer spending, private inventory investment, and nonresidential fixed investment. These movements were partly offset by a deceleration in residential fixed investment. Imports increased.




5 U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Second Quarter 2024. (Release Date: 9/26/2024).

***Population***

Population growth is an important driver of long-term growth in an economy. The total population increased from 335.4 million in August 2023 to 337.2 million in August 2024.[6] The working-age population (15-64) increased from 208.7 million in August 2023 to 208.9 million in August 2024.[7]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic. It partially recovered in just several months and has been trending upward/flat. In August 2023, the civilian labor force participation rate was 62.8% and stands at 62.7% as of August 2024.[8]







---

6 U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

7 Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

8 U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

### *Employment*

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 142,000 in August 2024 and the unemployment rate increased slightly to 4.2 percent. Job gains occurred in construction and healthcare.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased from 7.1% in August 2023 to 7.9% in August 2024.[9]







Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will be 4.2% for both 2026 and 2027.

[9] U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

***Inflation***

According to the BLS, The Consumer Price Index for All Urban Consumers (CPI-U) increased 0.2 percent in August on a seasonally adjusted basis, after the same increase in July. Over the last 12 months, the all-items index increased 2.5 percent before seasonal adjustment.[10]

The index for shelter rose 0.5 percent in August and was the main factor in the all items increase. The food index increased 0.1 percent in August, after rising 0.2 percent in July. The index for food away from home rose 0.3 percent over the month, while the index for food at home was unchanged. The energy index fell 0.8 percent over the month, after being unchanged in the preceding month.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has declined significantly since a year ago, August 2023, declining from 88.97% to 24.05% in August 2024[11].The forecasters predict current-quarter headline CPI inflation will average 2.3 percent at an annual rate, down from the prediction of 2.8 percent in the previous survey[12].




10 Federal Reserve Bank of St. Louis, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average [CPIAUCSL], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

11 Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

12 Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters,* August 9, 2024.

***Interest Rates***

The interest rate on the three-month Treasury bill declined from 5.32% as of September 29, 2023, to 4.52% as of September 30, 2024.[13] The interest rate on the ten-year Treasury note declined from 4.59% as of September 29, 2023, to 3.81% as of September 30, 2024.[14]




The interest rate on Moody's Aaa-rated corporate bonds declined from 5.36% as of September 29, 2023, to 4.72% as of September 30, 2024.[15] The interest rate on the Moody's Baa-rated corporate bonds declined from 6.37% to 5.44% over the same time.[16]




13 Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

14 Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

15 Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last October 7, 2024.

16 Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

In the last twelve months, the yield curve remained inverted, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill increasing/flattening between September 29, 2023, to September 30,2024 from -0.54% to 0.21%.[17]




***Corporate Profits***

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) increased $132.4 billion in the second quarter of 2024 from the first quarter of 2024.




17 U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates*, last accessed October 7, 2024.

***Stock Markets***[18]

The stock markets gained momentum from September 29, 2023, to September 30, 2024. The S&P 500 Index (SPY) closed at 427.48 on September 29, 2023, and closed higher at 573.76 on September 30, 2024. The NASDAQ Composite Index (QQQ) closed at 334.95 on September 29, 2023, and closed higher at 423.12 on September 30, 2024. The Dow Jones Industrial Average Index (DIA) closed at 358.27 on September 29, 2023 and closed higher at 488.07 on September 30, 2024. In the graph below, the September 30, 2022, values were set to 100.




***Construction & Housing Starts***

Construction spending and housing starts are two other important indicators for the economy. Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment. Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy. Housing starts increased from 1.305 million units in August 2023 to 1.356 million units in August 2024.[19] Construction spending, a seasonally adjusted annual figure, increased from $2.05 trillion in August 2023 to $2.13 trillion in August 2024.[20]

18 CapIQ Database, last accessed October 7, 2024.

19 U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

20 U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.




### *Consumer Confidence*

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has decreased from 69.40 a year ago in August 2023 to 67.90 in August 2024. Although it has declined slightly from a year ago, the index is still well below the pre-COVID high of 101.0 in February 2020.[21] The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions. The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S. This is considered a leading indicator of future consumer expenditures and economic activity.




21 University of Michigan, *Surveys of Consumers*, September 2024

## OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY[22]

This industry is composed of private equity funds, hedge funds, closed-end funds, unit investment trusts and other financial vehicles. Entities in this industry manage securities or other assets on behalf of shareholders, unit holders or other beneficiaries to achieve high returns on targeted investments. This industry excludes insurance and employee-benefit funds, open-end investment funds and trusts, estates and agency accounts.

### *Executive Summary*

In recent years, industry assets have become increasingly integral to institutional investors' portfolios and the larger asset-management market. Institutional investors are individuals or organizations that trade securities in such substantial volumes that they qualify for lower commissions and fewer protective regulations since it's assumed that they're knowledgeable enough to protect themselves. Increasing demand from institutional investors has contributed to the surge in the industry's assets under management (AUM) and revenue during the current period.

In recent years, the industry has continued to enmesh itself more deeply within the broader financial ecosystem despite challenges posed by the COVID-19 pandemic in 2020 and 2021. The pandemic, mainly in the first quarter of 2020, contributed to revenue declines for many operators. Many portfolios, previously thought to be sound investments, were reevaluated, and businesses pivoted their strategies due to the unprecedented nature of the crisis. In the past five years, industry revenue grew at a CAGR of 4.0% to $312.2 billion, including 5.2% in 2024 alone, when profit will increase to 48.9%.

Industry revenue will grow at a CAGR of 4.2% to $383.6 billion over the five years to 2029, when profit will rise to 50.5%. The Federal Reserve is increasing interest rates to quell historically high inflation. These higher interest rates are reducing liquidity in the markets. Private equity firms and hedge funds will have more difficulty raising capital for investments. As characteristics of the financial system change in light of post-financial crisis banking regulations and regulators' recognition of the importance of hedge funds within the financial system, hedge funds will likely experience heightened oversight.

### *Industry Performance*

The Federal Reserve has increased interest rates to combat rampant inflation, which has surged due to persistent supply chain issues and a global energy crisis. After lowering

---

22 IBISWorld Industry Report 52599, July 2024, *Private Equity, Hedge Funds & Investment Vehicles in the U.S.*

rates to historic lows in response to the COVID-19 pandemic, the Fed began raising them in 2022, with the current target rate ranging from 5.25% to 5.50%. These higher rates are reducing liquidity in financial markets, compelling private equity and hedge funds to seek new methods of raising capital, while those unable to adapt are exiting the industry. The previous decade's low-interest-rate environment had been advantageous for these investment vehicles, as it led investors to shift away from fixed-income and credit securities in favor of potentially higher returns. With more accessible funds during that period, fundraising activity surged, and those who capitalized on lower rates are currently benefiting from reduced interest payments and enhanced returns.

Simultaneously, there is a growing interest in Environmental, Social, and Governance (ESG) factors among investors who wish to align their investments with their values. This shift has led private equity firms and hedge fund managers to increasingly incorporate ESG considerations into their investment strategies. For instance, investments are now evaluated for their long-term environmental impact. Investors are also demanding that companies disclose information about their environmental and social performance. In response, private equity firms and hedge funds are diversifying their workforces and integrating ESG principles into their organizational frameworks.

Moreover, minority stakes are becoming more common in private equity firms. As internal competition intensifies, firms are diversifying their investments and establishing smaller, targeted funds, driven by a decrease in liquidity. The significant volatility in prominent markets like the S&P 500 during the COVID-19 pandemic encouraged companies to acquire minority stakes either in other companies or investments. There is a trend towards large private equity groups acquiring minority stakes in one another, as firms seek creative strategies to unlock potential investments. Changes in management types, with CEOs preferring to retain control while leveraging private equity expertise for growth, have also contributed to this trend.

Finally, technology and data analytics are increasingly being utilized by private equity firms and hedge funds to enhance their investment processes. These firms are employing machine learning algorithms to analyze vast amounts of data—such as financial statements, news articles, and social media posts—to uncover trends and insights not immediately visible to human analysts. Additionally, some are automating back-office functions like accounting and compliance using artificial intelligence (AI), which improves task processing and operational efficiency.

***Industry Outlook***

The Federal Reserve's ongoing battle against inflation is likely to result in volatile interest rates in the near future. As inflation continues to affect the U.S. economy, the Fed has signaled that it may maintain or further increase interest rates if necessary. These higher rates will reduce market liquidity, making it more challenging for hedge funds and private

equity firms to raise capital. Firms that cannot adapt may be forced out of the industry. Typically, investors turn to lower-risk investments, such as bonds, when interest rates are high, which will pose significant obstacles for the industry due to decreased liquidity and shifting investor preferences. Consequently, hedge funds and private equity firms will need to be more strategic and innovative in finding profitable investments as liquidity tightens.

At the same time, there is a sustained interest in Environmental, Social, and Governance (ESG) factors. Investors are increasingly concerned about the impact of their investments on the environment and society, seeking to align their portfolios with their values. Private equity firms and hedge fund managers are expected to continue integrating ESG considerations into their investment strategies, with climate change effects increasingly influencing investment decisions across various sectors. As environmental conditions worsen, the importance of selecting investments that contribute positively to the environment will grow. Additionally, as the population becomes more diverse, there is an expectation for hedge funds and private equity firms to reflect this diversity in their operations.

The use of technology and data analytics by private equity firms and hedge funds is expected to expand further. These firms will increasingly rely on advanced technology to identify and evaluate potential investments, and to manage and monitor existing portfolios. With the growing dependence on technology, cybersecurity will become increasingly critical, prompting firms to invest more in securing their technological networks. As artificial intelligence (AI) evolves, it will enable hedge funds and private equity firms to analyze extensive data sets in real-time, facilitating more informed trading and investment decisions. Given that data is now considered a crucial asset, industry players will use improved tools to access and analyze data, aiming to discover new investment opportunities.

Moreover, fintech is emerging as an attractive investment area for private equity, hedge funds, and investment vehicles. The rapidly growing fintech and biotechnology sectors, though currently constrained, are poised for future expansion and will likely attract increased investment. The proximity of Silicon Valley and Wall Street offers industry players easy access to cutting-edge technological innovations and robust financial networks, enhancing their ability to invest in promising new ideas. As the distinction between Silicon Valley and Wall Street continues to blur, private equity firms and hedge funds that can sift through the hype to find valuable opportunities will be well-positioned in the evolving fintech landscape.

## VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

### VALUATION APPROACHES

#### *Income Approach*

The income approach quantifies the present value of anticipated future income generated by a business or an asset. Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes. One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow. The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate. The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

#### *Market Approach*

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets. Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset. Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions. The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

#### *Asset-Based (Cost) Approach*

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities. Replacement cost is often a primary indicator of the value of a business' assets. The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it. Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors. The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

**VALUATION METHODS**

The following are common valuation methods used under the three approaches:

A. Income Approach
   1. Discounted Cash Flow Method (multi-period model)
   2. Direct Capitalization Method (single period model)
   3. Excess Earnings Method

B. Market Approach
   1. Guideline Public Company Method
   2. Merger and Acquisition Method

C. Asset-Based Approach
   1. Reproduction Cost Method
   2. Replacement Cost Method
   3. Net Asset Value Method

**SUMMARY OF THE VALUATION APPROACHES AND METHODS**

For the valuation of non-controlling interests in holding companies such as DAF, the asset-based approach is most commonly used. When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

# VALUATION ANALYSIS

## ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE

DAF's ultimate holdings are interests in various investment assets. DAF's sole asset reported as of the Valuation Date consisted of 100% of the equity of CLO HoldCo. CLO HoldCo is a holding company which invests in CLOs and other investments. We relied upon DAF management's determination of CLO HoldCo's NAV based on the values of its various underlying investments and assets. CLO HoldCo's balance sheet as of the Valuation Date is shown in the following charts and in Schedule A.1.

As shown below, CLO HoldCo's primary assets consist of cash & cash equivalents and other investment investments[23]. CLO HoldCo reported $316.3 million in total assets. CLO HoldCo also reported $47.2 million in total liabilities as of the Valuation Date. Therefore, CLO HoldCo's equity can be reasonably stated as $269.1 million.

***CLO HoldCo, Ltd - Summary Balance Sheet***

| | Balance Sheet as of: 9/30/2024 Actual | % |
|---|---|---|
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

23 Other investments consist of investments in approximately 39 entities.



CONFIDENTIAL

### *DAF NAV Conclusion*

As of the Valuation Date, DAF's balance sheet consisted solely of a 100% ownership interest in CLO HoldCo's equity. Therefore, DAF's NAV can be reasonably stated as $269.1 million (rounded). This analysis is summarized in the following table and in Schedule A.2.

| | Balance Sheet as of: 9/30/2024 | |
|---|---|---|
| | **Actual** | **%** |
| **Assets** | | |
| CLO HoldCo, LTD | $269,052,808 | 100.0% |
| **Total Assets** | $269,052,808 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $269,052,808 | 100.0% |
| **Total Liabilities & Equity** | $269,052,808 | 100.0% |

## CONCLUSION OF VALUE - SUBJECT INTEREST

DAF's NAV was determined to equal $269.1 million as of the Valuation Date. Dividing this NAV by the 305 total participation shares outstanding results in a NAV per share of $882,140. However, sellers of fractional interests in holding companies rarely receive a price equal to the NAV of their investment. This is because the interest holders do not have direct control over the entity's assets and have a limited market for their interests. Therefore, in order to arrive at the fair market value of the Subject Interest shares that are the subject of this analysis, we applied relevant discounts (control and marketability).

### DISCOUNT FOR LACK OF CONTROL

Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls. Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

Due to the Company's ultimate holdings in debt and equity investments, the Company exhibits some of the characteristics of a closed-end fund. Closed-end funds, like open-ended mutual funds, are asset holding companies that typically hold a portfolio of publicly traded securities. However, unlike unit holders in open-ended funds, closed-end fund unit holders who wish to liquidate their investment cannot look to the fund to repurchase their shares. Rather, they must sell them on the open market. The price they receive is not usually equal to the fundamental or net asset value of the investment. Therefore, the fair market value of closed-end funds is generally described in terms of a discount or premium to net asset value.

To align with the Company's holdings, we selected closed-end fund data from investment grade bond funds and general equity funds. The investment grade bond fund data shown in Schedule B.1 indicated mean and median discounts of 2.9% and 2.5%, respectively. The general equity fund data shown in Schedule B.2 indicated mean and median discounts of 12.1% and 13.6%, respectively. Based on these indications, we selected a discount for lack of control of 8.1% to be applicable to the Subject Interest, as shown in Schedule B.3.

### DISCOUNT FOR LACK OF MARKETABILITY

Discounts for lack of marketability (DLOMs) are applied to the shares of private companies based on the premise that an asset or interest in an entity without a readily available market would sell for less to a hypothetical buyer than an identical asset or interest that is readily marketable. Several factors are widely recognized to affect

marketability, such as distributions or dividends, investment performance, holding period to complete a sale, and management performance, among others. We utilized two methods of quantifying a relevant DLOM: the put option approach and an analysis of restricted stock studies.

***Put Option Approach***

The price of a contract providing the right to sell a number of shares (a put option) represents the difference between the non-marketable and marketable price of an asset. For example, if a holder of restricted or non-marketable stock purchases a put option on the underlying asset, the holder would be purchasing marketability. The price of the put determines the size of the DLOM.

In order to determine the price of such a put, we utilized the Black-Scholes put option model.[24] Based on our analysis, we determined that an appropriate volatility for investment grade bond funds and general equity bond funds such as DAF is approximately 12.3% (Schedule C.2) and between one half and one year (averaged to 0.75 years) would be required to sell the Subject Interest in an orderly transaction. As a result of these inputs, the put option approach indicated a discount for lack of marketability of 2.8%. This DLOM indication is presented in Schedule C.1.

***Restricted Stock Study Analysis***

There are several studies that attempt to measure discounts for lack of marketability, and a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest.[25] As mentioned, we would expect between six months and one year to be required to sell the Subject Interest in an orderly transaction.

Schedule C.4 presents a summary of restricted stock studies performed involving issuances of shares during the time period 1997 through 2008, which is when the SEC-mandated lock-up period for restricted stocks was one year. Based on a range of low discounts of 9.0%-10.9%, we selected a 9.7% DLOM utilizing the findings of the restricted stock studies.

***DLOM Conclusion***

The put option approach in Schedule C.1 indicated a DLOM of 2.8%. The restricted stock study analysis in Schedule C.4 indicated a DLOM of 9.7%. Based on these indications, we

---

24 Black, F. and M. Scholes, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy*, May 1973

25 See Schedule C.3



CONFIDENTIAL 011005 835

concluded a discount for lack of marketability of 6.3%. This conclusion is presented in Schedule C.5.

**CONCLUSION - SUBJECT INTEREST VALUE**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$75,961,370**
**SEVENTY-FIVE MILLION NINE HUNDRED SIXTY-ONE THOUSAND THREE HUNDRED SEVENTY DOLLARS**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$882,140** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.1% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) | |
| **FMV Per Share** | | **$759,614** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$75,961,370** | |

Our conclusion of value is presented in Summary Schedule 2 as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report. We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information as well as on other data we developed. We have no obligation to update this

report or our conclusion of value for information that comes to our attention after the date of this report.

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, Inc. is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated; they should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever. Neither the valuation report, nor its contents, nor any reference to the appraiser or ValueScope, Inc. may be referred to or quoted in any registration statement, prospectus, offering memorandum, sales brochure, other appraisal, loan or other agreement or document given to third parties without our prior written consent. In addition, except as set forth in the report, our analysis and report are not intended for general circulation or publication, nor are they to be reproduced or distributed to third parties without our prior written consent. Notwithstanding the foregoing, ValueScope, Inc. permits the Company to distribute this Report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, and we shall have no responsibility for any such unauthorized change.

The valuation may not be used in conjunction with any other appraisal or study. The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts. The appraisal was prepared solely for the purpose, function, and party so identified in the report. The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, without the express written consent of ValueScope, Inc.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

**OPERATIONAL ASSUMPTIONS**

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

**COMPETENT MANAGEMENT ASSUMED**

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership. This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

**NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION**

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement. If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, Inc. must be made in advance. ValueScope, Inc. reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s). We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

**NO CONSIDERATION IS RENDERED AS TO THE LAW OF THE CAYMAN ISLANDS**

No consideration is rendered as to the law of the Cayman Islands. Implications of Cayman Island jurisdiction are not considered.

**NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE**

No opinion is rendered as to legal fee or property title. No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

**LIENS AND ENCUMBRANCES**

ValueScope will give no consideration to liens or encumbrances except as specifically stated. We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks. We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

**INFORMATION PROVIDED BY OTHERS**

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

**PROSPECTIVE FINANCIAL INFORMATION**

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA). We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation

guidelines.

**REGULATORY AND ENVIRONMENTAL CONSIDERATIONS**

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

**POTENTIAL FUTURE SALES**

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided. An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time. Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

**INDEMNIFICATION BY THE COMPANY**

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement. Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement. In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

## APPRAISAL CERTIFICATION

I certify that, to the best of my knowledge and belief:

1. We have not inspected certain assets, properties, or business interests encompassed by this appraisal.
2. We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.
3. We have no personal interest or bias with respect to the subject matter of this report or the parties involved.
4. Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.
5. To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.
6. No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.
7. The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.
8. This report and analysis were prepared under the direction of Steven C. Hastings.
9. I am in compliance with all professional appraisal certifications and licensing.
10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.

By: ValueScope, Inc.



Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, Inc.

## APPENDIX: QUALIFICATIONS OF THE APPRAISER

***Steven C. Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA***
**Principal**
**shastings@valuescopeinc.com, 817-481-4901**

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

### EMPLOYMENT HISTORY

*2006 – Present* *ValueScope, Inc.*

*Principal*
Mr. Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis. As a CPA with significant valuation and financial reporting experience, Mr. Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

2001 – 2006 *Value Capital, LLC*

*Principal*
Mr. Hastings served as a principal with Value Capital, LLC. During his tenure at Value Capital Mr. Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries. He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions. His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000* *Finance Commission of Texas*

*Director*
The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner. As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets. Mr. Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations. He was instrumental in assisting the Savings and Loan Department in writing new Mortgage

Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.

*1994 – 2001* *MedCare Financial Solutions, Inc.*

*President*
Mr. Hastings served as an officer of MedCare Financial Solutions, Inc. and MedCapital Funding Corporation. MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers. MedCare Financial Solutions provided other financial and operational services to health care providers. These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending. Mr. Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.

1986 – 1994 *H.D. Vest Financial Services*

*Executive Vice President and CFO*
As executive vice president and CFO of H.D. Vest Financial Services, Mr. Hastings assisted in placing over $1.5 billion annually in investment. Responsible for day-to-day financial operations and capital structuring, Mr. Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers. Mr. Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr. Hastings supervised stockbrokers' and investment advisors' day-to-day activities. As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies. Being licensed in life, disability, health, property and casualty insurance, Mr. Hasting was instrumental in implementing this line of business at HD Vest.

1979 – 1986 *Arthur Andersen & Co.*

*Senior Manager*
Mr. Hastings served as a senior manager with significant responsibilities in the several industries. He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona
Bachelor of Science - Indiana University, Bloomington, Indiana

**CERTIFICATIONS AND LICENSES**

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

**ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS**

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

**RECENT IRS CASES - OFFICE OF CHIEF COUNSEL**

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.

- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C. Docket No. 30515-09, Nancy Sue Hawk, Transferee, Petitioner v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C. Docket No. 3030-14, Red River Ventures, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015

- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C. Docket No. 1045-13, Estate of Jinana M. Bowey, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C. Docket No. 8401-13, Estate of Edward S. Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.

- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C. Docket No. 223630-12, Michael Tricarichi, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C. Docket No. 6936-10, et al, John M. Alterman, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No. 8097-13, *Sumner Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.*

- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No. 20177-11, *Richard H. Cullifer, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.*

- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

**RECENT IRS CASES – LMSB AUDIT DIVISION**

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.

- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.

- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.

- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.

- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

**RECENT DEPARTMENT OF JUSTICE CASE**

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America. Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No. 4:16-cv-03302, ALPC Services of Texas, Inc. v. United States of America and Internal Revenue Service. Valuation issues report, 2017.

- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No. 12-844, *The Estate of David W. Longaberger v. The United States.* Valuation issues report, 2014.

**RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS**

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al. Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.

- Expert Report June 2018
- Deposition Testimony May 2019

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al. Fraudulent transfer, solvency and economic damages.

- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.

- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No. CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al. Economic damages related to lost wages.

- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No. 2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.

- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No. 14-671C. Always at Market, Inc. v. United States of America (DOD/DOJ). Army & Air Force Exchange Service economic damages.

- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No. CV-05-1483, General Medicine, PC v. Healthsouth Corporation v. General Medicine, PC. Economic damages related to contract dispute.

- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

"Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International

**WHITE PAPERS**

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v. Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

**SCHEDULES**

**Charitable DAF HoldCo, Ltd**
**Table of Contents** **Valuation Date: September 30, 2024**

Table of Contents


| Schedule Name | Schedule |
|---|---|
| **Historical Valuation Summary** | Summary Schedule 1 |
| **Current Valuation Summary** | Summary Schedule 2 |
| **DAF Net Asset Value Analysis** | |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.1 |
| Charitable DAF HoldCo, Ltd - Summary Balance Sheet | Schedule A.2 |
| **Discount for Lack of Control (DLOC) Analysis** | |
| Closed-End Fund Data - Investment Grade Bond Funds | Schedule B.1 |
| Closed-End Fund Data - US General Equity Funds | Schedule B.2 |
| DLOC Conclusion | Schedule B.3 |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Put Option Approach | Schedule C.1 |
| Put Option Approach - Historical Guideline Company Volatility Summary | Schedule C.2 |
| DLOM Determination - Restricted Stock Studies | Schedule C.3 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.4 |
| DLOM Conclusion | Schedule C.5 |

Charitable DAF HoldCo, Ltd
Historical Valuation Summary

Summary Schedule 1
Valuation Date: September 30, 2024

| | For the Quarter Ended: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 9/30/2022 | 12/31/2022 | 3/31/2023 | 6/30/2023 | 9/30/2023 | 12/31/2023 | 3/31/2024 | 6/30/2024 | 9/30/2024 |
| Company Net Asset Value (NAV) | $289,502,301 | $276,241,856 | $275,227,939 | $270,414,002 | $288,884,011 | $277,573,090 | $272,449,558 | $270,432,538 | **$269,052,808** |
| Discount for Lack of Control | 8.0% | 8.7% | 7.8% | 11.6% | 13.9% | 8.0% | 8.7% | 9.7% | 8.1% |
| Discount for Lack of Marketability | 7.0% | 7.3% | 7.1% | 6.6% | 6.4% | 6.5% | 6.6% | 6.2% | 6.3% |
| Combined Discount | 14.4% | 15.4% | 14.3% | 17.4% | 19.4% | 14.0% | 14.7% | 15.3% | 13.9% |
| **FMV of Subject Interest (Per 100 Shares)** | $81,212,514 | $76,654,941 | $77,292,849 | $73,202,932 | $76,331,301 | $78,284,712 | $76,173,502 | $75,101,687 | **$75,961,370** |

| Charitable DAF HoldCo, Ltd<br>Current Valuation Summary | Summary Schedule 2<br>Valuation Date: September 30, 2024 |
|---|---|

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$882,140** | |
| **<u>Applicable Discounts</u>** | | | |
| Discount for Lack of Control | 8.1% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) | |
| **FMV Per Share** | | **$759,614** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$75,961,370** | |

**Charitable DAF HoldCo, Ltd** | **Schedule A.1**
**DAF Net Asset Value Analysis** | **Valuation Date: September 30, 2024**

*CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 9/30/2024 Actual | % |
|---|---|---|
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Highland CLO Funding, Ltd. | 10,002,234 | 3.2% |
| Highland CLO Funding, Ltd. (Participation Rights) | 69,385 | 0.0% |
| MidWave Common | 1,640,571 | 0.5% |
| MidWave - Term Loan A | 85,552,571 | 27.1% |
| MidWave - Term Loan C | 40,174 | 0.0% |
| NexPoint Capital, Inc. (BDC) | 14,223,433 | 4.5% |
| NexPoint Real Estate Strategies Fund Z | 8,487,030 | 2.7% |
| NexPoint Real Estate Finance (NREF) | 6,174,381 | 2.0% |
| NexPoint Residential (NXRT) | 2,338,207 | 0.7% |
| NexPoint Diversified Real Estate (NXDT) | 2,331,025 | 0.7% |
| Small Bay II (Class I) | 3,770,609 | 1.2% |
| Small Bay II (Class II) | 4,047,276 | 1.3% |
| Small Bay II (Class III) | 2,357,682 | 0.7% |
| Polo Glen | 678,545 | 0.2% |
| NHT Holdco | 109,056 | 0.0% |
| ACHC | 158,525 | 0.1% |
| COLL | 115,804 | 0.0% |
| HRTX | 10,945 | 0.0% |
| ACRG/AU | 3,267 | 0.0% |
| ACRG/BU | 1,409 | 0.0% |
| TGTX | 333,308 | 0.1% |
| TMO | 282,686 | 0.1% |
| BIO | 111,081 | 0.0% |
| iHeart Communications | 365 | 0.0% |
| Multi Strat | 107,324 | 0.0% |
| Crusader Fund II, Ltd. | 38,131 | 0.0% |
| BVP Property | 94,000 | 0.0% |
| NCI Apache Trail | 1,104,000 | 0.3% |
| NCI Fort Worth Land | 874,200 | 0.3% |
| NCI Royse City Land | 11,448,367 | 3.6% |
| NCI Stewart Creek | 1,250,000 | 0.4% |
| NLA Assets | 1,766,000 | 0.6% |
| FFWM | 2,541,184 | 0.8% |
| SRG | 139,500 | 0.0% |
| SRTY | 2,380,529 | 0.8% |
| SQQQ | 1,818,805 | 0.6% |
| SPXU | 2,174,013 | 0.7% |
| Serengetti | 2,951,678 | 0.9% |
| Conservation Equity Fund | 3,253,139 | 1.0% |
| MMPQ | 527,460 | 0.2% |
| Total Wire Convertible Promissory Note | 20,560 | 0.0% |
| Sable Permian Resources | 2 | 0.0% |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

**Charitable DAF HoldCo, Ltd** | **Schedule A.2**
**DAF Net Asset Value Analysis** | **Valuation Date: September 30, 2024**

*Charitable DAF HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 9/30/2024 | |
|---|---|---|
| | **Actual** | **%** |
| **Assets** | | |
| CLO HoldCo, LTD | $269,052,808 | 100.0% |
| **Total Assets** | $269,052,808 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $269,052,808 | 100.0% |
| **Total Liabilities & Equity** | $269,052,808 | 100.0% |

**Charitable DAF HoldCo, Ltd** | **Schedule B.1**
**Discount for Lack of Control (DLOC) Analysis** | **Valuation Date: September 30, 2024**

*Closed-End Fund Data - Investment Grade Bond Funds*

| Closed-End Fund Data - Investment Grade Bond Funds | | | | |
|---|---|---|---|---|
| **Fund Ticker** | **Fund Name** | **Net Asset Value** | **Market Price** | **Premium (Discount)** |
| BKT | BlackRock Income Trust, Inc. | $12.65 | $12.43 | (1.7%) |
| FMY | First Trust Mortgage Income Fund | $13.05 | $12.49 | (4.3%) |
| VBF | Invesco Bond Fund | $16.87 | $17.01 | 0.8% |
| VLT | Invesco High Income Trust II | $11.74 | $11.53 | (1.8%) |
| JLS | Nuveen Mortgage and Income Fund | $19.54 | $18.43 | (5.7%) |
| JMM | Nuveen Multi-Market Income Fund | $6.68 | $6.36 | (4.8%) |
| DMO | Western Asset Mortgage Opportunity Fund Inc. | $12.28 | $11.97 | (2.5%) |

| Summary Statistics | |
|---|---|
| **Mean Premium (Discount)** | **(2.9%)** |
| **Median Premium (Discount)** | **(2.5%)** |
| **Standard Deviation** | **2.2%** |

*Sources: CEF Connect as of market close September 30, 2024*

**Charitable DAF HoldCo, Ltd** — **Schedule B.2**
**Discount for Lack of Control (DLOC) Analysis** — **Valuation Date: September 30, 2024**

*Closed-End Fund Data - US General Equity Funds*

| Closed-End Fund Data - US General Equity Funds | | | | |
|---|---|---|---|---|
| **Fund Ticker** | **Fund Name** | **Net Asset Value** | **Market Price** | **Premium (Discount)** |
| ADX | Adams Diversified Equity Fund, Inc. | $24.31 | $21.56 | (11.3%) |
| BIGZ | BlackRock Innovat and Growth Term Trust | $8.54 | $7.55 | (11.6%) |
| CET | Central Securities Corp. | $56.17 | $45.84 | (18.4%) |
| CRF | Cornerstone Total Return Fund | $6.85 | $8.09 | 18.1% |
| GRF | Eagle Capital Growth | $12.03 | $9.88 | (17.9%) |
| FXBY | FOXBY Corp | $27.70 | $16.00 | (42.2%) |
| GDV | Gabelli Dividend & Income | $28.46 | $24.45 | (14.1%) |
| GAM | General American Investors | $62.92 | $53.61 | (14.8%) |
| USA | Liberty All-Star Equity | $7.17 | $7.10 | (1.0%) |
| ASG | Liberty All-Star Growth | $6.03 | $5.61 | (7.0%) |
| JCE | Nuveen Core Equity Alpha | $15.21 | $15.37 | 1.1% |
| RMT | Royce Micro-Cap Trust | $10.84 | $9.61 | (11.3%) |
| STEW | SRH Total Return Fund | $20.51 | $15.80 | (23.0%) |
| SPE | Special Opportunities | $16.37 | $13.91 | (15.0%) |
| FUND | Sprott Focus Trust | $8.91 | $7.70 | (13.6%) |

| Summary Statistics | |
|---|---|
| **Mean Premium (Discount)** | **(12.1%)** |
| **Median Premium (Discount)** | **(13.6%)** |
| **Standard Deviation** | **13.0%** |

*Sources: CEF Connect as of market close September 30, 2024*

| Charitable DAF HoldCo, Ltd | Schedule B.3 |
|---|---|
| Discount for Lack of Control (DLOC) Analysis | Valuation Date: September 30, 2024 |

*DLOC Conclusion*

| Discount for Lack of Control Conclusion | | |
|---|---|---|
| DLOC Determination - Closed End Bond Funds (Mean) | 2.9% | *Schedule B.1* |
| DLOC Determination - Closed End Bond Funds (Median) | 2.5% | *Schedule B.1* |
| DLOC Determination - Closed End Equity Funds (Mean) | 12.1% | *Schedule B.2* |
| DLOC Determination - Closed End Equity Funds (Median) | 13.6% | *Schedule B.2* |
| **Concluded Discount for Lack of Control** | **8.1%** | |

**Charitable DAF HoldCo, Ltd** | **Schedule C.1**
**Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: September 30, 2024**

*DLOM Determination - Put Option Approach*

**Discount for Lack of Marketability - Put Option Approach**

**Option-Pricing Inputs:**

| | | | |
|---|---|---|---|
| Stock Price | **S** | $1.00 | |
| Strike Price | **X** | $1.00 | *(Set to same as stock price)* |
| Expected Life | **T** | 0.75 | *(Years)* |
| Volatility | **s** | 12.3% | *Schedule C.2* |
| Risk-free rate | **R** | 4.18% | *US Treasury Implied Yield for Expected Life* |
| Dividend Yield | **Q** | 0.00% | * |

| *Intermediate Calculations:* | | *Intermediate Calculations:* | |
|---|---|---|---|
| *d1* | *0.34756838* | *-d1* | *-0.34756838* |
| *d2* | *0.24104726* | *-d2* | *-0.24104726* |
| *N(d1)* | *0.63591782* | *N(d1)* | *0.36408218* |
| *N(d2)* | *0.59524076* | *N(d2)* | *0.40475924* |
| Black-Scholes Call Option Price | $0.06 | Black-Scholes Put Option Price | $0.03 |

| | |
|---|---|
| **Implied Discount for Lack of Marketability (DLOM)** | **2.8%** |

** Distributions not expected in the near future*

**Charitable DAF HoldCo, Ltd** | **Schedule C.2**
**Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: September 30, 2024**

*Put Option Approach - Historical Guideline Company Volatility Summary*

| Historical Volatility Term | Bond Funds | | | | | Equity Funds | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | BKT | FMY | JMM | JLS | VBF | FXBY | GRF | EQS | SPE | RVT |
| 0.5 Years | 10.1% | 10.8% | 9.5% | 9.0% | 8.3% | 20.9% | 16.6% | 43.0% | 11.6% | 20.3% |
| 1 Year | 12.3% | 13.7% | 9.9% | 12.0% | 13.0% | 20.7% | 20.2% | 41.7% | 11.4% | 20.1% |
| 1.5 Years | 11.5% | 13.2% | 10.3% | 11.0% | 12.3% | 25.9% | 23.0% | 42.1% | 10.7% | 19.3% |
| 2 Years | 11.8% | 15.3% | 12.5% | 11.0% | 14.4% | 25.6% | 28.6% | 48.3% | 12.3% | 21.7% |
| 2.5 Years | 12.7% | 15.1% | 13.3% | 11.3% | 14.8% | 25.8% | 32.2% | 48.6% | 13.6% | 23.8% |
| 3 Years | 12.6% | 14.8% | 13.4% | 11.2% | 14.2% | 27.4% | 32.2% | 47.4% | 13.6% | 23.8% |
| 3.5 Years | 12.3% | 14.1% | 12.8% | 10.8% | 13.8% | 113.1% | 30.2% | 45.4% | 13.3% | 22.9% |
| 4 Years | 11.8% | 13.9% | 12.6% | 10.6% | 13.7% | 106.5% | 29.2% | 51.4% | 13.4% | 22.7% |
| 4.5 Years | 11.5% | 13.8% | 14.2% | 12.3% | 14.0% | 101.9% | 29.4% | 52.7% | 15.9% | 24.1% |
| 5.0 Years | 11.8% | 14.5% | 16.6% | 15.9% | 15.5% | 97.5% | 30.1% | 53.5% | 22.0% | 27.6% |

| Historical Volatility Term | Statistical Summary | | | | | |
|---|---|---|---|---|---|---|
| | Low | 25th % | Median | Mean | 75th % | High |
| **0.5 Years** | 8.3% | 9.6% | **11.2%** | 16.0% | 19.4% | 43.0% |
| **1 Year** | 9.9% | 12.0% | **13.3%** | 17.5% | 20.1% | 41.7% |
| 1.5 Years | 10.3% | 11.1% | 12.8% | 17.9% | 22.1% | 42.1% |
| 2 Years | 11.0% | 12.3% | 14.8% | 20.1% | 24.6% | 48.3% |
| 2.5 Years | 11.3% | 13.4% | 15.0% | 21.1% | 25.3% | 48.6% |
| 3 Years | 11.2% | 13.5% | 14.5% | 21.1% | 26.5% | 47.4% |
| 3.5 Years | 10.8% | 13.0% | 14.0% | 28.9% | 28.3% | 113.1% |
| 4 Years | 10.6% | 12.8% | 13.8% | 28.6% | 27.6% | 106.5% |
| 4.5 Years | 11.5% | 13.9% | 15.0% | 29.0% | 28.1% | 101.9% |
| 5.0 Years | 11.8% | 15.6% | 19.3% | 30.5% | 29.5% | 97.5% |

| **Concluded Volatility** | **12.3%** |
|---|---|

*Source: Yahoo Finance*

**Charitable DAF HoldCo, Ltd** | **Schedule C.3**
**Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: September 30, 2024**

*DLOM Determination - Restricted Stock Studies*

| | Restricted Stock Studies | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Study | Period Covered | | | | Reported | Reported |
| | Name of Study | Date | From | To | Sub-Sample | Observations | Mean | Median |
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramanium, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | 1995 | 2000 | | | | |
| | *Purchase Discount Only* | | | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | NA | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

**Charitable DAF HoldCo, Ltd** **Schedule C.4**
**Discount for Lack of Marketability (DLOM) Analysis** **Valuation Date: September 30, 2024**

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | **Mean** | **Median** |
| **All Studies after 1997 and before 2008** | | |
| **Low** | **9.7%** | **9.0%** |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 2008** | | |
| **Low** | **10.9%** | **9.3%** |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **9.7%** | |

| Charitable DAF HoldCo, Ltd | Schedule C.5 |
|---|---|
| Discount for Lack of Marketability (DLOM) Analysis | Valuation Date: September 30, 2024 |

*DLOM Conclusion*

| Discount for Lack of Marketability | | |
|---|---|---|
| DLOM Determination - Put Option Approach | 2.8% | *Schedule C.1* |
| DLOM Determination - Restricted Stock Studies | 9.7% | *Schedule C.4* |
| **Concluded Discount for Lack of Marketability** | **6.3%** | |

Walkers Draft: [XX]/2025

Walkers

# Memorandum

**To:** Shields Legal Group, P.C and Charitable DAF Holdco, Ltd.

**From:** Walkers (Cayman) LLP

**Date:** [XX] February 2025

**Subject:** Issuing new shares and seeking declaratory relief, and amending the articles in respect of mediation and arbitration

---

This memorandum is limited to the matters referred to herein and shall not be construed as extending to any other matter or document not referred to herein. This memorandum is given solely for the benefit of Shields Legal Group, P.C and Charitable DAF Holdco, Ltd. and may not be relied upon by any other person without our prior written consent. For greater certainty, this memorandum shall be construed in accordance with the laws of the Cayman Islands. We are Cayman Islands Attorneys at Law and provide no advice or express no views as to any laws other than the laws of the Cayman Islands in force and as interpreted at the date of this memorandum. We have not, for the purposes of this memorandum, made any investigation of the laws, rules or regulations of any other jurisdiction.

The memorandum being provided is a reasoned memorandum based on the laws of the Cayman Islands and court decisions, and we have accordingly applied certain principles established in court decisions to the factors which we think are relevant in connection with the Charitable DAF HoldCo Ltd (and other relevant entities) at the date hereof. Further, where there is an absence of case law or authority in respect of Cayman Islands companies, we have (to the extent possible) applied and consider it reasonable to apply Cayman Islands/English law corporate legal principles. The Grand Court of the Cayman Islands (the "**Cayman Court**") might, however, take into account different factors (or view the factors considered herein differently). Moreover, although the views we have reached are based on reasoning and analysis which is in our view consistent with the authorities reviewed, the Cayman Court could apply different reasoning and, hence, reach a conclusion different to that set out in this opinion.

## A. Introduction

1. You have asked us to consider the following questions:

   (a) In light of a possible just and equitable winding up petition filed by one of the Participating Shareholders, could and should the current articles be amended as they relate to mediation and arbitration; and

   (b) Whether Charitable DAF HoldCo Ltd ("**HoldCo**") could:

      (i) issue new participating shares which would have the effect of diluting the current Participating Shareholders (the "**Share Issue**"); and

(ii) seek declaratory relief in respect of the issue of those shares.

2. The issues which have been outlined to us with respect to the Company and the articles are highly unusual, and the below actions are not without risk. Whilst the articles do confer upon the directors and the Management Shareholder rights including as set out below, the manner in which it appears the company is intended to operate is highly unusual, and at least on one view, appears to cut across certain fundamental principles of Cayman law. As such, the actions being considered are novel to a significant degree, and it is difficult to be certain how a Cayman Court may approach these questions.

3. In summary, in our view:

(a) We recommend amending the articles so as to provide that the Company and the Participating Shareholders must agree that a dispute should be submitted to mediation and/or arbitration. Simultaneously, we recommend amending the memorandum of association to bring the objects of the Company into line with its mission statement; and

(b) In respect of the Share Issue:

(i) The articles of HoldCo grant the directors the power to issue new participating shares which would have the effect of diluting the current Participating Shareholders; and

(ii) We do not recommend that HoldCo issues the shares then immediately seeks declaratory relief – the prospects of success of that application would be low, as the Court will not entertain hypothetical applications, there must be a real and present dispute between the parties.

**B. Amendment of memorandum and articles re object, mediation and arbitration**

*Articles in respect of mediation and arbitration*

4. The mediation and arbitration procedures as set out in Article 137 "*shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company … [and/or] its Shareholders*".

5. The Management Shareholder has the power to amend the articles by written resolution:

"*Subject to the Companies Act (as amended) and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part*" (Article 125).

6. Further, the directors may authorise the variation in rights attaching to the Participating Shares:

"*The Directors, or the Shareholders by Ordinary Resolution, may authorise … the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution*" (Article 8); and

7. Article 8 also provides that such variation may be authorised by the Shareholders by Ordinary Resolution, which in this instance means by the Management Shareholders as Participating Shareholders are not entitled to vote at general meetings of the company:

(a) ""*Ordinary Resolution" means a resolution:*

(i) *passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or*

(ii) *approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed*";

(b) ""*Participating Share" means a non-voting, participating, non-redeemable share in the capital of the Company…*" (Article 1); and

(c) "*Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article*" (Article 12).

8. However, any material adverse variation or abrogation of the rights attaching to the participating shares requires the written consent of at least two-thirds of the participating shareholders:

> *"…the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting*" (Article 13).

9. If the Articles were to be amended such that the Company was able to unilaterally elect whether or not a dispute was to be submitted to mediation and/or arbitration, in our view that would likely be considered a material adverse variation of the rights attaching to the Participating Shares. In that case, a two-thirds majority of the Participating Shareholders would be required to consent to such change. We understand that there is no appetite to put changes to the Articles to the Participating Shareholders.

10. However, if the Articles were amended such that any dispute would only be subject to mediation and/or arbitration if the holders of the Participating Shares and the Company were to agree on that course of action, in our view that is unlikely to constitute a material adverse variation of the rights attaching to the Participating Shares, as their rights relative to the rights of the Company (at least arguably) would not have changed.

11. Participating Shareholders are entitled to vote at separate meetings in respect of any material adverse variation or abrogation of their rights (Article 12). However, the Articles do not provide Participating Shareholders with the right to vote on, or to receive notice of, any variation in their rights which does not constitute a material adverse variation or abrogation. Accordingly, in our view, the directors could amend the articles to provide that disputes are to be subject to mediation and arbitration if the holders of the shares and the Company were to agree, without being required to provide notice of that change to the Participating Shareholders.

*Memorandum in respect of object*

12. The memorandum of the company states at paragraph 3 that "*the objects for which the company is established are unrestricted*". We are instructed that the mission statement of the company is: "*Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*" (email from B Schaller dated 7 February 2025).

13. In order to clarify the proper objects and purpose for which the company was established, the objects of the company should be specifically tied to the mission statement. We consider that amending paragraph 3 of the memorandum so as to specify that the object of the company is as per the mission statement above (rather than generating profit for its shareholders) would provide further support for the argument that the Share Issue is in the interests of the company as a whole (as discussed further below). For clarity, "*a company may, by special resolution, alter its memorandum of association with respect to any objects, powers or other matters specified therein*" (Companies Act (as amended), section 10).

**C. Share Issue**

14. The directors of HoldCo have the power to issue new shares by written resolution:

> "…*all Shares for the time being unissued shall be under the control of the Directors who may: (a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine*" (Article 7).

15. The rights attached to any class of shares, including the participating shares, may:

> "*only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting*" (Article 13).

16. However, the issue of further participating shares is not deemed to be a material adverse variation or abrogation of the rights of the Participating Shareholders:

> "*The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not … be deemed to be materially adversely varied or abrogated by, inter alia, the creation, allotment or issue of further Participating Shares ranking pari passu with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company*" (Article 14).

17. On the basis of the above, in our view, the Articles confer upon the directors of HoldCo the power to issue shares which dilute the Participating Shareholders. The Participating Shareholders do not have any pre-emption rights, or the right to vote on, or receive notice of, the issuance of further participating shares.

18. Directors of Cayman Islands companies are subject to a duty to act in the best interests of the company, which duty is owed to the company as a whole. Accordingly, while the Articles grant the directors the power to issue new shares as outlined above, there must be a corporate benefit to the exercise of that power. In this instance, given that the threat to the Company is coming from one or more of the Participating Shareholders, and that it is a threat to the purpose and existence of the Company, there may be a reasonable basis for the directors to form the view that issuing shares with the intention of mitigating that threat is in the best interests of the Company as a whole (notwithstanding that it would not be in the best interests of the individual Participating Shareholders).

19. In addition, if the incoming Participating Shareholder purchases its new shares, that would distinguish it from the existing Participating Shareholders (who we are instructed paid nothing for their shares) and provide further corporate benefit.

20. Further, we recommend issuing the new shares after the amendment of the memorandum and articles as above, such that the Share Issue is in line with the (new) objects of the Company. Otherwise, we recommend issuing the new shares sooner rather than later, so that the issue is

complete before any winding up petition is presented. If a winding up petition in respect of HoldCo is presented to the Court, and a winding up order is ultimately made, any alteration in the status of the company's members made after the presentation of the petition will be void (unless the Court orders otherwise) (Companies Winding Up Rules (as amended), ss 99 and 100(2)).

## D. Application for declaratory relief

21. It has been suggested that HoldCo could seek declaratory relief from the Cayman Courts in respect of the Share Issue, seeking to bolster the legitimacy of the Share Issue and protect it from challenge.

22. Applications for declaratory relief may be made in the Cayman Islands pursuant to the Grand Court Rules O.15, r.16:

> "*No action or other proceeding shall be open to objection on the ground that a merely declaratory judgment or order is sought thereby, and the Court may make binding declarations of right whether or not any consequential relief is or could be claimed.*"

23. The principles which apply to applications for declaratory relief include the following:

    (a) "*There must, in general, be a real and present dispute between the parties before the court as to the existence or extent of a legal right between them…*"; and

    (b) "*the court must be satisfied that all sides of the argument will be fully and properly put. It must therefore ensure that all those affected are either before it or will have their arguments put before the court*".[1]

24. We understand that the attraction of seeking declaratory relief immediately following the Share Issue to have been avoiding litigation against the Participating Shareholders.

25. However, on the basis of the principles outlined above, if an application for declaratory relief was made immediately following the Share Issue, i.e. before any dispute had arisen with the Participating Shareholders and/or without the Participating Shareholders being before the Court, that application would have low prospects of success.

26. Accordingly, we do not recommend pursing the declaratory relief application in that context. However, if and when a dispute does arise with the participating shareholders in respect of the Share Issue, a declaratory application may still be a useful card to play.

[1] *In the matter of Principal Investing Fund et al*, FSD 268 of 2021 (IKJ), 15 July 2024, at [9], citations omitted.

**Charitable DAF HoldCo, Ltd**
(the "**Company**")

---

**Unanimous Written Resolutions of the Board of Directors of the Company**

---

**1 Directors' Interests**

1.1 It is noted that none of the directors of the Company (together the "**Directors**", and each a "**Director**") have any monetary or financial interest in the matters referred to herein.

**2 Recent Developments**

2.1 It is noted that the Directors have received communications from certain current Participating Shareholders requesting information and making false and misleading claims regarding the Company's and its subsidiaries' finances.

2.2 It is noted that the Directors believe the aforementioned communications were motivated and/or directed by James Dondero as retaliation for Mark Patrick's resignation from Skyview Group and the Company's various efforts to create independence between the Company and its subsidiaries on the one hand and James Dondero and his affiliates on the other hand.

2.3 It is noted that the Directors have knowledge that the false and misleading information forming the basis of these claims was provided by SEI, a back-office service provider to the Company and certain of its subsidiaries, to employees of certain Dondero-controlled entities such as Skyview Group or NexPoint.

2.4 It is noted that none of the concerns raised by the current Participating Shareholders were raised prior to Mark Patrick's resignations from Skyview Group, despite there being no change in the information provided or the frequency of information provided.

**3 U.S. Counsel Tax Advice**

3.1 It is noted that the Directors have received United States Tax Counsel advice that, among other things:

(a) "there is a significantly heightened risk that the Internal Revenue Service of the United States could severely penalize and/or revoke the tax-exempt status of one or more of the current Participating Shareholders, which could imperil the status and assets of the Company"; and

(b) "Increasing the number of Participating Shareholders would mitigate considerations of undue influence/private inurement/private beneift and broaden the scope of DAF's charitable reach to the public; and

(c) "The IRS will look favorably upon any and all attempts for DAF to maintain its

independence from what seems to be persistent attempts by James Dondero and the entities controled by him to use DAF for his private benefit and private inurement."

3.2 It is noted that the Directors believe the Share Issuance (as defined below) to DFW (as defined below) is based on this U.S. tax advice and will protect the Company and the current Participating Shareholders and will also further the Company's charitable mission.

**4 Cayman Counsel Legal Advice**

4.1 It is noted that the Directors have sought and obtained legal advice from separate Cayman Islands counsel ("**Walkers**"), who have confirmed that (i) the Directors have the ability to issue new Participating Shares as contemplated by the Share Issuance, (ii) if the Directors believe the Participating Shares are held by a Restricted Person (as defined in Article 21 of the Company's M&A), the Directors may require such shareholder to transfer its shares, and (iii) the Participating Shareholders have no or limited rights to information.

4.2 It is noted that attached as Exhibit A hereto is the Walkers presentation outlining the rights accompanying the Participating Shares (the "**Walkers Presentation**").

**5 Issue of Shares**

5.1 It is noted that the Company proposes to issue 318 Participating Shares of a nominal or par value of US$0.01 each as fully paid up (the "**Participating Shares**") to DFW Charitable Foundation ("**DFW**"), a Delaware non-profit non-stock corporation (the "**Share Issuance**").

5.2 Following the Share Issuance, DFW shall own 51.04% of the issued Participating Shares of the Company.

5.3 It is resolved that:

(a) the Share Issuance be approved with effect from the date of these resolutions;

(b) Campbells Corporate Services Limited be and is hereby instructed to make the appropriate entry in the register of members of the Company in respect of the Share Issuance;

(c) any and all actions of the Company, the Directors or any officer of the Company taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such actions had been presented for approval and approved by the Directors prior to such action(s) being taken; and

(d) the Directors shall meet on not less than a quarterly basis to discuss recent developments and how to best protect the Company and its shareholders.

## 6 Ancillary Documents

6.1 It is further resolved that:

(a) the Company do give, make, sign, execute and deliver all such agreements, letters, notices, certificates, acknowledgements, instructions and other documents (whether of a like nature or not) (the "**Ancillary Documents**") as may in the sole opinion and absolute discretion of any Director be considered necessary or desirable for the purpose of compliance with any condition precedent or the coming into effect of or otherwise giving effect to, consummating or completing or procuring the performance and completion of all or any of the transactions contemplated by or referred to in all or any of the documents referred to above and the Company do all other such acts and things as might in the sole opinion and absolute discretion of any Director be necessary or desirable for the purpose aforesaid;

(b) the Ancillary Documents be in such form as any Director should in his absolute discretion and sole opinion approve, the signature of any such person on any of the Ancillary Documents being due evidence for all purposes of his approval of the terms thereof on behalf of the Company;

(c) the Ancillary Documents (where required to be executed by the Company) be executed by the signature thereof of any one Director together with such changes as such Director shall in his absolute discretion consider necessary or appropriate (the signature of such Director on any Ancillary Document being conclusive evidence of his approval of the same for and on behalf of the Company);

(d) the Ancillary Documents be valid, conclusive, binding on and enforceable against the Company when executed and delivered in the manner aforesaid;

(e) any and all actions of the Company, or of any Director or officer, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and hereby are ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval, and approved by, the Directors prior to such action being taken; and

(f) the prior execution of any Ancillary Documents by any Director are approved, ratifed and confirmed in all respects.

[*signature page(s) follow(s)*]

______________________________________
Name: **Mark Patrick**
Title: Director

Date: 2-7-2025

Name: **Paul Murphy**
Title: Director

Date: 7th February 2025

Signature Page
Unanimous Written Resolutions of the Board of Directors

**Exhibit A**

**Walkers Presentation**

Walkers

# Participating Shareholder Rights
# **Charitable DAF Holdco Ltd.**



Making financial services work

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

# Binding Effect of Articles of Association

# Binding Effect of Articles of Association

"… the binding effect of the Articles as they stand … is given statutory force by section 25(3) of the Companies Law which reads:

> '(3) Where registered the said articles of association shall bind the company and the members thereof to the same extent as if each member had subscribed his name and affixed his seal thereto, and there were in such articles contained a covenant on the part of himself, his heirs, executors and administrators to conform to all the regulations contained in such articles subject to this law; ….'"

(*In the Matter of Strategic Turnaround Master Partnership Ltd* [2008] CIGC J1128-1, per Chief Justice Smellie at paragraph 135)

# Participation in Discretionary Dividends

# Participate in Discretionary Dividends

"The Participating Shares shall confer upon the Shareholders … the right to participate in the profits or assets of the Company in accordance with these Articles." **(Art 12)**

## Participation in Discretionary Dividends

"The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit." **(Art 102)**

"Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares." **(Art 105)**

**Participating Shareholders do not have:**

- **the right to cause or vote on distributions;**
- **the right to pro rata distributions based on their shareholding;**
- **the right to annual or timed distributions; or**
- **the right to receive notice of distributions to other Participating Shareholders.**

# Removal of Directors

# Removal of Directors

**“**Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.” **(Art 65)**

**Participating Shareholders do not have:**

- the right to remove Directors; or
- the right to appoint Directors.

**Note: the right to appoint Directors is held by the Management Shareholder and the Directors, and the right to remove Directors is held solely by the Management Shareholder (Articles 64, 65, and 69, and Definition of “Ordinary Resolution”).**

# Modification of Rights

## Modification of Rights

"… the rights attached to [any] Class may … only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting." **(Art 13)**

**Participating Shareholders do not have:**

- **the right to cause a distribution; or**
- **the right to amend the Articles.**

# Modification of Rights – Issuance of Shares

"The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not … be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company." **(Art 14)**

"… all Shares for the time being unissued shall be under the control of the Directors who may:

(a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

(b) and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued." **(Art 7)**

**Participating Shareholders do not have:**

- **the right to vote on the issuance of further Participating Shares;**
- **pre-emption rights; or**
- **the right to receive notice of such issuance.**

# Modification of Rights – Issuance of Shares

"The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each…" **(Art 7)**

**Note:** Of the authorised share capital of the Company, 305 Participating Shares have been issued. In accordance with the Articles, the Directors may unilaterally issue additional Participating Shares and thereby dilute the power of existing shareholders for the purposes of voting on matters that may materially adversely vary or abrogate the rights of the Participating Shareholders.

<u>**Additional Note: many of the rights that shareholders of a company typically hold (e.g. the right to receive notices, and the right to vote at general meetings, including in respect of the appointment and removal of directors) are held by the Management Shareholder (Mark Patrick) rather than the Participating Shareholders. In addition, the Directors (Mark Patrick and Paul Murphy) have the ability to unilaterally declare dividends and issue new Participating Shares without the approval of the Participating Shareholders (or the Management Shareholder).**</u>

# Share Redemption

## Share Redemption

“**"Participating Share"** means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Act and these Articles…”

“… the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them…” **(Paragraph 7, Memorandum)**

“The rights conferred upon the holders of the Participating Shares … shall not … be deemed to be materially adversely varied or abrogated by … the redemption or purchase of any Participating Shares of any Class by the Company.” **(Art 14)**

**Participating Shareholders do not have:**

- the right to redeem their shares; or
- the right to vote on the Company’s redemption of their shares.

# Transfer of Shares

# Share Transfer by Notice of the Directors – Restricted Person

"If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles." **(Art 21)**

"**Restricted Person**" means any Person holding Participating Shares:

a) in breach of the law or requirements of any country or governmental authority;
b) that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the Code or an entity or organisation all of whose beneficiaries are exempt under Section 501 (c)(3) of the Code; or
c) in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered."

**Note: the Directors have duties to act, and to exercise their powers, in the best interests of the Company. The scope of those duties includes continually evaluating whether any Participating Shareholder may pose a threat to the Company which could cause them to fall within the definition of Restricted Person, and how best to protect the Company against any such threat.**

# General Meetings

# General Meetings

**“**Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company…” **(Art 12)**

**Participating Shareholders do not have:**

- **the right to receive notice of general meetings;**
- **the right to attend general meetings;**
- **the right to speak at general meetings;**
- **the right to vote at general meetings; or**
- **the right to information regarding proceedings of general meetings.**

# Limited Information Rights

## Limited Information Rights

"The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors." **(Art 108)**

"The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution." **(Art 110)**

**Participating shareholders have very limited information rights. Specifically, the articles do not provide the Participating Shareholders with the following:**

- **the right to inspect any account;**
- **the right to inspect any book; or**
- **the right to inspect any document of the Company.**

Further to the above, we note that :

- This only applies to the limited company which issued the participation shares, i.e. DAF HoldCo;
- It does not apply to subsidiary entities;
- It does not apply to entities in which DAF HoldCo holds a passive interest; and
- There is no "look- through" down through all the entities in the structure.

**Rachel Baxendale**

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** 11 February 2025 4:43 PM
**To:** Geoffrey Sykes; Dakshina Vyas (KY)
**Cc:** Barnaby Gowrie; Philip Aubry; Simon Conway (KY); Christian Begg (KY)
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey - thanks for arranging the call today.

Having discussed again on our side, our view is that the new Delaware entity (CDMCFAD, LLC) effectively has full economic interest *and* control over the Fund, so we don't really see a basis for applying any discounts to the underlying Fund NAV for that entity.

As it relates to the participating shareholders' interest in Charitable DAF Holdco, Ltd, we don't think we can reliably estimate the value / discount given the current fact pattern. While we could make hypothetical assumptions about how the articles may be interpreted, and/or how future cash flows may or may not be distributed, the impact on value is so substantial that we don't think it would be a meaningful exercise (i.e. we'd end up with the discount being 100% in one scenario, but 0% in another).

On that basis, I don't think there is a fee / scope that can work for us currently. If you think we've misunderstood something, or can provide more clarity on the legal position in the future, then we could perhaps revisit this. It sounds like the situation is evolving daily so let us know if anything changes and we can be of assistance elsewhere in the case.

Best,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Tuesday, February 11, 2025 2:43 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Simon, Jamie, all

Thanks for your time on the phone.

Further to the call, we would be grateful if you could please revert back with your views as to next steps by COB tomorrow.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Geoffrey Sykes
**Sent:** 10 February 2025 17:50
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Thanks Jamie.

We'll send a dial-in shortly.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** 10 February 2025 16:15
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey - yes, I think that would make sense too. We can do 2pm if you're happy to share an invite?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Monday, February 10, 2025 3:42 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Happy to discuss. We suggested looping in onshore counsel as they will likely have more information, and in turn they would like to include Delaware counsel.

Unfortunately we can't do tomorrow at 9am, but we have sought onshore counsel's availability for a call tomorrow at 2pm. Would that suit you?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** 10 February 2025 13:12
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey - would you be available for a quick call with Simon on this, and the other updates we discussed earlier.

Conscious the scope / nature of the request is moving around a bit so just want to get aligned on next steps. We could do 9am tomorrow if that works for you?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Friday, February 7, 2025 3:17 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>

**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Geoffrey - let us discuss internally briefly before confirming.

My initial thought is that there is no meaningful difference between the two separate valuations being requested. I.e. The economic interest in the underlying NAV still fully accrues to the participating shareholders. However, voting power / control is with Mark (or entities controlled by Mark). Do you know what your client is expecting to achieve with the restructuring (as this may help us understand the valuation implications)?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Friday, February 7, 2025 8:02 AM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Following on from the below, we had a call with onshore counsel yesterday afternoon.

A new Delaware entity, CDMCFAD LLC, has been inserted into the structure between Charitable DAF HoldCo Ltd and Charitable DAF Fund LP. Please see attached an updated structure chart and the LLC agreement of CDMCFAD.

In addition to the initial exercise, our client would also like a valuation of all of the issued shares in CDMCFAD (all of which are held by Charitable DAF HoldCo), which valuation will again rely on the underlying NAV as previously advised. Please could you provide us with a fee estimate in respect of that valuation, and an updated engagement letter containing Part 1 (Charitable DAF HoldCo) and Part 2 (CDMCFAD).

Please let us know if you require any further information at this stage or if it would be helpful to discuss.

Separately, our client is considering your template NDA, we will let you know once we hear back from them.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Geoffrey Sykes
**Sent:** 05 February 2025 09:23
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Thanks Jamie, will do.

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** 05 February 2025 08:39
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Thanks Geoffrey - see NDA attached. Let us know if this works for your client.

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Tuesday, February 4, 2025 5:01 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Thanks for your draft engagement letter, we will pass on to our client and let you know if they have any comments.

Thanks also re your template NDA – we expect any time saving (in respect of your internal risk approval) will be welcomed by our client, so yes if you could please send a draft we will seek instructions on that as well.

Regarding the further related valuation exercise we discussed briefly on the phone yesterday, we have a call with our clients tomorrow and will revert back with more detail after that.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** 04 February 2025 13:41
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey - please see a draft engagement letter attached for your client's review.

Let us know any comments from your side. Please also send through the NDA when you can. Alternatively, we have a standard template we can use without needing separate risk approval on our side if you'd rather use that?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Monday, February 3, 2025 11:19 AM
**To:** Dakshina Vyas (KY) <dakshina.vyas@pwc.com>; Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Dakshina

Thanks for confirming, and noted re ensuring privilege is maintained if this becomes an expert witness report in due course.

We are content to proceed on that basis, please could you share with us your engagement letter so that we may pass on to our client?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Sent:** 31 January 2025 10:53
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey,

Thank you for confirming. We are happy to contract directly with the client at this stage. However, I wanted to confirm that if this engagement were to move to an expert witness stage later on, we would need to structure it in a way to ensure that our privilege is maintained over the information we share.

Looking forward to your confirmation on this matter.

Regards,
Dakshina

**Dakshina Vyas**
PwC | Manager | Corporate Finance
Office: +1 (345) 914 1791| Mobile: +1 (345) 525 1791
Email: dakshina.vyas@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1-1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Thursday, January 30, 2025 5:08 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie, Dakshina

Thanks for your emails. We appreciate that you would prefer to contract with Walkers or on a joint basis, however unfortunately our firm policy is not to act as the client in matters such as these. Are you able to enter into the agreement directly with Charitable DAF HoldCo Ltd?

We will revert back regarding a proposed NDA as soon as possible.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Wednesday, January 29, 2025 2:38 PM
**To:** Dakshina Vyas (KY) <dakshina.vyas@pwc.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey - yes, thanks for confirming.

Just to follow up on this, we'd prefer to contract with Walkers, but we can make it a joint engagement contract with the underlying client as the party responsible for payment of our fees, and Walkers responsible for giving instructions if that's preferred?

Re: onboarding info - I think we have what we need but will confirm tomorrow. Do you have a standard NDA you'd need us to enter into? If so, please could you share this so we can have our risk team review and approve.

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Sent:** Wednesday, January 29, 2025 2:34 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip.Aubry@walkersglobal.com <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Geoffrey,

Thanks for this. Could you please confirm if the Engagement Letter should be with Charitable DAF HoldCo Ltd (as the Client) and Walkers as our point of contact, or if Walkers will be contracting us on behalf of the client and should be addressed as the client?

Regards,

Dakshina

**Dakshina Vyas**
PwC | Manager | Corporate Finance
Office: +1 (345) 914 1791| Mobile: +1 (345) 525 1791
Email: dakshina.vyas@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1-1104
http://www.pwc.com/kyHi geo,

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Wednesday, January 29, 2025 2:12 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

We are pleased to have been instructed to retain your firm for the valuation.

Please could you send us your engagement letter and let us know what else you need in terms of onboarding.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Geoffrey Sykes
**Sent:** Tuesday, January 28, 2025 6:31 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Thanks Jamie.

We will pass that on to our client and revert back once we have instructions.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Tuesday, January 28, 2025 5:00 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey - I would say 1.5-2 weeks realistically (from date of engagement / receipt of information) for a relatively short-form report.

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Tuesday, January 28, 2025 3:20 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Many thanks for your time on the call last week and your estimate.

As indicated on the call, our client considers that time is of the essence – when is the soonest you could produce the valuation report following formal engagement and execution of an NDA?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Tuesday, January 28, 2025 2:41 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>

**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi all - thanks again for the time on Friday to get a bit more background on this.

As discussed, we've attached an estimate for the valuation work, including the assumptions we've made about the requirements and the specifics of the capital structure.

Let us know if you'd like to discuss.

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Thursday, January 23, 2025 3:28 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Apologies, my mistake – yes 9.30am tomorrow still works.

We look forward to speaking then.

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Thursday, January 23, 2025 3:23 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY)

<simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey - I think we've already got a call in the diary for 9.30am tomorrow if that still works?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Thursday, January 23, 2025 2:23 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Happy to discuss – would 3.30 tomorrow afternoon suit you?

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Thursday, January 23, 2025 12:22 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey - thanks for the update. I think it would still be helpful to jump on a quick call just for a bit more background on the context and what the varying rights are that need to be considered.

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Thursday, January 23, 2025 9:16 AM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

We have had a further discussion with onshore counsel – they would like to proceed with the valuation relying on an NAV figure contained in a previous report dated 30 September 2024. That report found that the NAV of Charitable DAF HoldCo Ltd is $269,052,808. If we are instructed to retain your firm for the valuation our client would be happy to share that report with you following entry into an appropriate NDA.

On that basis, we expect that the valuation will now be primarily concerned with the rights attached to the shares, rather than an analysis of the underlying assets and businesses.

Please let us know if you would still like to discuss tomorrow morning, or if you are able to provide an estimate on that basis.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Geoffrey Sykes
**Sent:** Wednesday, January 22, 2025 9:37 AM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Thanks Jamie.

9.30am tomorrow suits us. I will send a dial-in shortly.

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Wednesday, January 22, 2025 8:31 AM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey - yes, we could do 9.30am or 10.30am on Friday morning if either of those times work?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Tuesday, January 21, 2025 8:35 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Thanks for confirming.  Are you available for a call on Friday morning this week?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Tuesday, January 21, 2025 5:53 PM
**To:** Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Philip - just wanted to follow up on the below to let you know that all our checks are now complete and clear. Let us know when works to discuss.

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Monday, January 20, 2025 11:21 AM
**To:** Simon Conway (KY) <simon.r.conway@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi all - thanks again for reaching out on this.

We've cleared conflicts and are just waiting for one last adverse data check to come back, which we should have tomorrow. Don't foresee any issues with that, so perhaps we could set up a call to discuss the requirement in a bit more detail. Let us know if you have any availability within the windows below:

- Weds 22nd - 11 - 11.30am
- Thurs 23rd - 1pm - 4pm
- Friday 24th - 9.30am - 10am

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

**From:** Simon Conway (KY) <simon.r.conway@pwc.com>
**Sent:** Tuesday, January 14, 2025 1:52 PM
**To:** Philip Aubry <Philip.Aubry@walkersglobal.com>; Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Philip,

Thanks for your note.

Yes, certainly we'll run our conflict checks on the below and, assuming we're clear, a call to discuss the matter would be very helpful for us in coming up with an estimate.

I've copied my colleague Jamie Lawlor, who runs our valuation practice.

Best regards,
Simon

Simon Conway

PwC | Partner
Office: +1 (345) 914 8688 | Mobile: +1 (345) 938 8685 | Fax: +1 (345) 945 4237
Email: simon.r.conway@pwc.com
PricewaterhouseCoopers
PO Box 258, 18 Forum Lane, Camana Bay, Grand Cayman, KY1 1104 Cayman Islands
http://www.pwc.com/

**From:** Philip Aubry <Philip.Aubry@walkersglobal.com>
**Sent:** Tuesday, January 14, 2025 1:35 PM
**To:** Simon Conway (KY) <simon.r.conway@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Subject:** Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Simon,

I am working with Barney Gowrie and am reaching out for assistance with respect to a potential valuation of the shares of Charitable DAF HoldCo Ltd. In the first instance, we would be grateful if you could please run a conflict check in respect of the parties below and confirm you are able to proceed with this instruction. If you are able to proceed with this instruction, please provide an estimate so that we can seek instructions from the client.

For the purposes of your conflict check, the parties are the following:

a) We act for Charitable DAF HoldCo Ltd. (a Cayman entity); and

b) The potential adverse parties are: Highland Dallas Foundation Inc., Highland Kansas City Foundation Inc., and Highland Santa Barbara Foundation Inc. (all Delaware entities), which all hold the participating shares in Charitable DAF HoldCo Ltd.

For your reference, please find attached a structure chart illustrating the above.

Please let us know if you require anything further at this stage.

If helpful, we are happy to discuss.

Best regards,

**Philip Aubry**
Senior Counsel
Walkers (Cayman) LLP

**Walkers** | Making financial services work

**T** +1 345 814 4666 | **M** +1 345 938 4666 | **E** Philip.Aubry@walkersglobal.com
190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands
www.walkersglobal.com

**Secretary**
Monina Thompson | **T** +1 345 814 6842 | **E** Monina.Thompson@walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is

disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

---

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

---

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

Campbells

Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

campbellslegal.com

(14133-42760)

GENERAL REGISTRY CAYMAN ISLANDS

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

*www.verify.gov.ky File#: 263805*

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

1. The name of the Company is Charitable DAF HoldCo, Ltd.

2. The registered office of the Company will be situated at the offices of Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are:

   (a) to benefit community-focused non-profit foundations established or located anywhere in the world or for the purposes recognised as charitable, as the Directors may from time to time determine, in furtherance of the following mission statement: "Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference"; and

   (b) to do all such things in the opinion of the Directors are or may be incidental or conducive to the above objects or any part of them.

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Companies Act (as amended) of the Cayman Islands (the "**Act**").

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power



GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Act to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

**TABLE OF CONTENTS**

**CLAUSE** **PAGE**

**TABLE A** .......... 1

**INTERPRETATION** .......... 1

**PRELIMINARY** .......... 5

**SHARES** .......... 6

**MANAGEMENT SHARES** .......... 6

**PARTICIPATING SHARES** .......... 7

**MODIFICATION OF RIGHTS** .......... 7

**CERTIFICATES** .......... 7

**FRACTIONAL SHARES** .......... 7

**TRANSFER OF SHARES** .......... 8

**TRANSMISSION OF SHARES** .......... 8

**ALTERATION OF SHARE CAPITAL** .......... 9

**REDEMPTION, PURCHASE AND SURRENDER OF SHARES** .......... 9

**TREASURY SHARES** .......... 10

**GENERAL MEETINGS** .......... 11

**NOTICE OF GENERAL MEETINGS** .......... 11

**PROCEEDINGS AT GENERAL MEETINGS** .......... 11

**VOTES OF SHAREHOLDERS** .......... 13

**CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS** .......... 14

**DIRECTORS** .......... 14

**POWERS AND DUTIES OF DIRECTORS** .......... 15



GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

BORROWING POWERS OF DIRECTORS ........ 17
THE SEAL ........ 17
DISQUALIFICATION OF DIRECTORS ........ 17
PROCEEDINGS OF DIRECTORS ........ 18
DIVIDENDS ........ 21
ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION ........ 21
CAPITALISATION OF RESERVES ........ 22
SHARE PREMIUM ACCOUNT ........ 23
NOTICES ........ 23
NON-RECOGNITION OF TRUSTS ........ 24
WINDING UP ........ 25
AMENDMENT OF ARTICLES OF ASSOCIATION ........ 25
CLOSING OF REGISTER OR FIXING RECORD DATE ........ 25
REGISTRATION BYWAY OF CONTINUATION ........ 26
MERGERS AND CONSOLIDATION ........ 26
DISCLOSURE ........ 26
INDEMNITY ........ 27
DISPUTE RESOLUTION ........ 28
AEOI ........ 30



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

**TABLE A**

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Act shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

**INTERPRETATION**

1. In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Act**" means the Companies Act (as amended) of the Cayman Islands.

"**AEOI**" means:

(i) sections 1471 to 1474 of the Code and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

(ii) the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters - the Common Reporting Standard and any associated guidance;

(iii) any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

order to comply with, facilitate, supplement or implement the legislation, regulations or guidance described in sub-paragraphs (i) and (ii); and

(iv) any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs.

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Code**" means the US Internal Revenue Code of 1986, as amended.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Electronic Record**" has the same meaning as in the Electronic Transactions Act.

"**Electronic Transactions Act**" means the Electronic Transactions Act (as amended) of the Cayman Islands.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Management Director**" means a director of the Company holding a Management Share (as defined below).

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Act and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Material Transaction**" means any transaction (or series of connected transactions), including an acquisition, distribution, investment or divestiture by the Company, for the aggregate amount in excess of $250,000;

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

"**Office**" means the registered office of the Company as required by the Act.

"**Ordinary Resolution**" means a resolution:

(a) passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Act and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "Participating Shares" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Act and these Articles, means the Register maintained by the Company pursuant to the Act and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Act and includes any Branch Register(s) established by the Company in accordance with the Act.

"**Restricted Person**" means any Person holding Participating Shares:

(a) in breach of the law or requirements of any country or governmental authority;

(b) that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the Code or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c) in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber.

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Act.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Act, being a resolution:

(a) passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b) approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" and "**US**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a) words importing the singular number shall include the plural number and vice versa;

(b) words importing the masculine gender only shall include the feminine gender and any Person as the context may require;



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

(c) the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d) reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e) reference to a statutory enactment shall include reference to any amendment or re- enactment thereof for the time being in force;

(f) reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case;

(g) reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another;

(h) any requirements as to execution or signature under the Articles including the execution of the Articles themselves can be satisfied in the form of an electronic signature as defined in the Electronic Transactions Act; and

(i) sections 8 and 19(3) of the Electronic Transactions Act shall not apply.

2. Subject to the preceding Articles, any words defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

3. The business of the Company may be commenced at any time after incorporation.

4. The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5. The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6. The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Act and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Act, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Act.

**SHARES**

7. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a) issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

(b) and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

**MANAGEMENT SHARES**

11. The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

## PARTICIPATING SHARES

12. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

## MODIFICATION OF RIGHTS

13. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

14. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.

## CERTIFICATES

15. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

16. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

**TRANSFER OF SHARES**

17. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

18. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

19. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

20. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

21. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

**TRANSMISSION OF SHARES**

22. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

23. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

24. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

**ALTERATION OF SHARE CAPITAL**

25. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

26. The Company may by Ordinary Resolution:

(a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

(b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

(c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

(d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

27. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

**REDEMPTION, PURCHASE AND SURRENDER OF SHARES**

28. Subject to the Act, the Company may:

(a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

(b) purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c) make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Act; and

(d) accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.

29. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

30. The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

31. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

**TREASURY SHARES**

32. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Act. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

33. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

34. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

(a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

(b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Act, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

35. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

**GENERAL MEETINGS**

36. The Directors may, whenever they think fit, convene a general meeting of the Company.

37. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

38. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

**NOTICE OF GENERAL MEETINGS**

39. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

40. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

**PROCEEDINGS AT GENERAL MEETINGS**

41. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

42. No business shall be transacted at any general meeting unless a quorum of Shareholders Is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles,



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

43. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

44. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

45. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

46. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

47. The chairman may adjourn a meeting from time to time and from place to place either:

(a) with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting): or

(b) without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

(i) secure the orderly conduct or proceedings of the meeting; or

(ii) give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

48. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded



GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805



CONFIDENTIAL

by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

49. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

50. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

51. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

**VOTES OF SHAREHOLDERS**

52. On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

53. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

54. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

55. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

56. On a poll votes may be given either personally or by proxy.

57. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

58. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

59. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

60. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

61. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at genera! meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

**CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS**

62. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

**DIRECTORS**

63. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

64. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

65. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

66. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

67. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

68. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.



GENERAL REGISTRY CAYMAN ISLANDS

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

www.verify.gov.ky File#: 263805

69. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

70. The Management Director shall be entitled to cast ten (10) votes on all matters and each other Director shall be entitled to cast one (1) vote. Such voting powers shall apply to voting in any committee or subcommittee of the Board. Every reference in these Articles to a majority or other proportion of the Directors, including for purposes of determining a quorum, shall refer to a majority or other proportion of the votes of the Directors then in office.

**POWERS AND DUTIES OF DIRECTORS**

71. Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

72. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

73. The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

74. The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

75. The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

76. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

77. The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

78. The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495

may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

79. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

**BORROWING POWERS OF DIRECTORS**

80. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

**THE SEAL**

81. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

82. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal. The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

83. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

**DISQUALIFICATION OF DIRECTORS**

84. The office of Director shall be vacated, if the Director:

(a) becomes bankrupt or makes any arrangement or composition with his creditors;



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

(b) dies or is found to be or becomes of unsound mind;

(c) resigns his office by notice in writing to the Company;

(d) is removed from office by Ordinary Resolution;

(e) is removed from office by notice addressed to him at his last known address and signed by ail of his co-Directors (not being less than two in number); or

(f) is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

**PROCEEDINGS OF DIRECTORS**

85. The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

86. A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

87. The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two which must include the Management Director, and if there be one Director the quorum shall be one.

88. A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

89. A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

90. Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

91. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a) all appointments of officers made by the Directors;

(b) the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c) all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

92. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

93. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be, shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors. Notwithstanding anything to the contrary herein, a resolution in writing signed by all the Directors in respect of a Material Transaction must be duly notarized by a notary public.

94. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495



CONFIDENTIAL

95. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

96. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

97. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

98. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

## DIVIDENDS

99. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

100. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

101. The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

102. Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

103. The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

104. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

105. If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

106. No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

107. The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

108. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

109. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

110. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

111. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Act and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

**CAPITALISATION OF RESERVES**

112. Subject to the Act and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii) paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of ail the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares, and any such agreement made under this authority being effective and binding on all those Shareholders; and

(iii) generally do all acts and things required to give effect to any of the actions contemplated by this Article.

**SHARE PREMIUM ACCOUNT**

113. The Directors shall in accordance with the Act establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

114. There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Act, out of capital.

**NOTICES**

115. Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

116. Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

117. Any notice or other document, if served by:

(a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

118. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

119. Notice of every general meeting of the Company shall be given to:

(a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

(b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

**NON-RECOGNITION OF TRUSTS**

120. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805
Auth Code: E90228166495



CONFIDENTIAL

interest in any Share or (except only as otherwise provided by these Articles or as the Act requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

**WINDING UP**

121. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

122. Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

(a) first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

(b) second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

123. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

**AMENDMENT OF ARTICLES OF ASSOCIATION**

124. Subject to the Act and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

**CLOSING OF REGISTER OR FIXING RECORD DATE**

125. For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of,



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

126. In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

127. If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

**REGISTRATION BYWAY OF CONTINUATION**

128. The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

**MERGERS AND CONSOLIDATION**

129. The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Act.

**DISCLOSURE**

130. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805

**INDEMNITY**

131. To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "Covered Person" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes wilful misconduct or Gross Negligence by such Covered Person (as determined by a non-appeaiable judgment of a court of competent jurisdiction).

132. Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

133. To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

134. Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495



CONFIDENTIAL

135. The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

**DISPUTE RESOLUTION**

136. Subject to the prior written consent of all parties involved in the Dispute (as defined below) to such dispute resolution procedures, the following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, a trustee appointed to represent the Company on claims derivative of the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation:

(i) subject to the prior written consent of all parties involved in the Dispute, any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

(ii) the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

(iii) the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

(iv) each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties,

(b) Arbitration:

Subject to the prior written consent of all parties involved in the Dispute to such dispute resolution procedure, if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be administered by JAMS/Endispute pursuant to JAMS' Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

(i) the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, provided, however, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii) the arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrators) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii) the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv) no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty- five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non- parties, shall not be permitted;

(v) all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495



CONFIDENTIAL

opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi) the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

(c) Notwithstanding anything to the contrary herein, for greater certainty, in accordance with the terms herein, if all parties involved in the Dispute do not provide written consent to following the mediation and/or arbitration provisions herein, a party shall maintain its right to pursue his/her/its Dispute in court.

**AEOI**

137. Notwithstanding any other Article, in order to comply with AEOI, any Director shall be entitled to release and/or disclose on behalf of the Company to the Cayman Islands Tax Information Authority or equivalent authority (the "**TIA**") and any other foreign government body as required by AEOI, any information in its or its agents' or delegates' possession regarding a Member including, without limitation, financial information concerning the Member's investment in the Company, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Member. Any such Director may also authorise any third party agent, including but not limited to, the Investment Manager or Administrator, to release and/or disclose such information on behalf of the Company.

138. In order to comply with AEOI and, if necessary, to reduce or eliminate any risk that the Company or its Members are subject to withholding taxes pursuant to AEOI or incur any costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) (together, "**costs**") associated with AEOI, the Directors may cause the Company to undertake any of the following actions:

(a) compulsorily redeem any or all of the Shares held by a Member either (i) where the Member fails to provide (in a timely manner) to the Company, or any agent or delegate of the Company, including but not limited to, the Investment Manager or the Administrator, any information requested by the Company or such agent or delegate pursuant to AEOI; or (ii) where there has otherwise been non-compliance by the Company with AEOI whether caused, directly or indirectly, by the action or inaction of such Member, or any related person, or otherwise;

(b) deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

(i) comply with any applicable requirement to apply and collect withholding tax pursuant to AEOI;

(ii) allocate to a Member an amount equal to any withholding tax imposed on the Company as a result of the Member's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Company with AEOI;



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

(iii) ensure that any AEOI related costs are recovered from the Member(s) whose action or inaction (directly or indirectly, including the action or inaction of any person related to such Member) gave rise or contributed to such costs.

139. In order to give effect to the requirements imposed upon the Company by AEOI, as well as any of the actions contemplated by Articles 138(a) and 139(b), the Directors may undertake any of the following actions:

(a) create separate classes and/or series of Shares ("**AEOI Shares**"), with such rights and terms as the Directors may in their sole discretion determine, and following the compulsory redemption of some or all of a Member's Shares may immediately apply such redemption proceeds in subscribing for such number of AEOI Shares as the Directors determine;

(b) may re-name any number of Shares (whether issued or unissued) as AEOI Shares, create a Separate Account with respect to such AEOI Shares and apply any AEOI related costs or withholding taxes to such Separate Account;

(c) allocate any AEOI costs or withholding tax among Separate Accounts on a basis determined solely by the Directors; and

(d) adjust the Net Asset Value per Share of any relevant Shares (including any AEOI Share).



GENERAL REGISTRY CAYMAN ISLANDS
Filed: 21-Feb-2025 09:26 EST
www.verify.gov.ky File#: 263805 Auth Code: E90228166495

## Annexure

**Fiscal Year**

The fiscal year of the Company ends on the 31st day of December in each year, unless the Directors prescribe some other period therefor.



Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495
www.verify.gov.ky File#: 263805



CONFIDENTIAL

# FORM ADV

## UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND REPORT BY EXEMPT REPORTING ADVISERS

| | |
|---|---|
| **Primary Business Name: RAND ADVISORS, LLC** | **CRD Number: 172839** |
| **Annual Amendment - All Sections** | **Rev. 10/2021** |
| **3/17/2025 8:51:05 AM** | |

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 4.

**Item 1 Identifying Information**

Responses to this Item tell us who you are, where you are doing business, and how we can contact you. If you are filing an *umbrella registration*, the information in Item 1 should be provided for the *filing adviser* only. General Instruction 5 provides information to assist you with filing an *umbrella registration*.

A. Your full legal name (if you are a sole proprietor, your last, first, and middle names):
**RAND ADVISORS, LLC**

B. (1) Name under which you primarily conduct your advisory business, if different from Item 1.A.
**RAND ADVISORS, LLC**

*List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

(2) If you are using this Form ADV to register more than one investment adviser under an *umbrella registration*, check this box ☐

*If you check this box, complete a Schedule R for each relying adviser.*

C. If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.(1)), enter the new name and specify whether the name change is of
☐ your legal name or ☐ your primary business name:

D. (1) If you are registered with the SEC as an investment adviser, your SEC file number: **801-80265**

(2) If you report to the SEC as an *exempt reporting adviser*, your SEC file number:

(3) If you have one or more Central Index Key numbers assigned by the SEC ("CIK Numbers"), all of your CIK numbers:

| CIK Number |
|---|
| 1660386 |
| 1660401 |

E. (1) If you have a number ("*CRD* Number") assigned by the *FINRA's CRD* system or by the IARD system, your *CRD* number: **172839**

*If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

(2) If you have additional *CRD* Numbers, your additional *CRD* numbers:

No Information Filed

F. *Principal Office and Place of Business*

(1) Address (do not use a P.O. Box):

| | | | |
|---|---|---|---|
| Number and Street 1: | | Number and Street 2: | |
| 2101 CEDAR SPRINGS ROAD | | SUITE 1200 | |
| City: | State: | Country: | ZIP+4/Postal Code: |
| DALLAS | Texas | United States | 75201 |

If this address is a private residence, check this box: ☐

*List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for SEC registration, if you are registered only with the SEC, or if you are reporting to the SEC as an exempt reporting adviser, list the largest twenty-five offices in terms of numbers of employees as of the end of your most recently completed fiscal year.*

(2) Days of week that you normally conduct business at your *principal office and place of business:*
◉ Monday - Friday ○ Other:

Normal business hours at this location:
9AM-5PM

(3) Telephone number at this location:
214-908-8130

(4) Facsimile number at this location, if any:

214-550-4459

(5) What is the total number of offices, other than your *principal office and place of business*, at which you conduct investment advisory business as of the end of your most recently completed fiscal year?
0

G. Mailing address, if different from your *principal office and place of business* address:

Number and Street 1: Number and Street 2:
City: State: Country: ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

H. If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

Number and Street 1: Number and Street 2:
City: State: Country: ZIP+4/Postal Code:

| | Yes | No |
|---|---|---|
| I. Do you have one or more websites or accounts on publicly available social media platforms (including, but not limited to, Twitter, Facebook and LinkedIn)? | ◉ | ○ |

*If "yes," list all firm website addresses and the address for each of the firm's accounts on publicly available social media platforms on Section 1.I. of Schedule D. If a website address serves as a portal through which to access other information you have published on the web, you may list the portal without listing addresses for all of the other information. You may need to list more than one portal address. Do not provide the addresses of websites or accounts on publicly available social media platforms where you do not control the content. Do not provide the individual electronic mail (e-mail) addresses of employees or the addresses of employee accounts on publicly available social media platforms.*

J. Chief Compliance Officer

(1) Provide the name and contact information of your Chief Compliance Officer. If you are an *exempt reporting adviser*, you must provide the contact information for your Chief Compliance Officer, if you have one. If not, you must complete Item 1.K. below.

Name: Other titles, if any:
Telephone number: Facsimile number, if any:
Number and Street 1: Number and Street 2:
City: State: Country: ZIP+4/Postal Code:

Electronic mail (e-mail) address, if Chief Compliance Officer has one:

(2) If your Chief Compliance Officer is compensated or employed by any *person* other than you, a *related person* or an investment company registered under the Investment Company Act of 1940 that you advise for providing chief compliance officer services to you, provide the *person's* name and IRS Employer Identification Number (if any):

Name:

IRS Employer Identification Number:

K. Additional Regulatory Contact Person: If a person other than the Chief Compliance Officer is authorized to receive information and respond to questions about this Form ADV, you may provide that information here.

Name: Titles:
Telephone number: Facsimile number, if any:
Number and Street 1: Number and Street 2:
City: State: Country: ZIP+4/Postal Code:

Electronic mail (e-mail) address, if contact person has one:

| | Yes | No |
|---|---|---|
| L. Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*? | ◉ | ○ |

*If "yes," complete Section 1.L. of Schedule D.*

| | Yes | No |
|---|---|---|
| M. Are you registered with a *foreign financial regulatory authority*? | ○ | ◉ |

*Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes," complete Section 1.M. of Schedule D.*

| | Yes | No |
|---|---|---|
| N. Are you a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934? | ○ | ◉ |

| | Yes | No |
|---|---|---|
| O. Did you have $1 billion or more in assets on the last day of your most recent fiscal year? If yes, what is the approximate amount of your assets: | ○ | ◉ |

- $1 billion to less than $10 billion
- $10 billion to less than $50 billion
- $50 billion or more

*For purposes of Item 1.O. only, "assets" refers to your total assets, rather than the assets you manage on behalf of clients. Determine your total assets using the total assets shown on the balance sheet for your most recent fiscal year end.*

P. Provide your *Legal Entity Identifier* if you have one:

A *legal entity identifier* is a unique number that companies use to identify each other in the financial marketplace. You may not have a *legal entity identifier*.

**SECTION 1.B. Other Business Names**

No Information Filed

**SECTION 1.F. Other Offices**

No Information Filed

**SECTION 1.I. Website Addresses**

List your website addresses, including addresses for accounts on publicly available social media platforms where you control the content (including, but not limited to, Twitter, Facebook and/or LinkedIn). You must complete a separate Schedule D Section 1.I. for each website or account on a publicly available social media platform.

Address of Website/Account on Publicly Available Social Media Platform: HTTP://WWW.RANDADVISORS.COM/

**SECTION 1.L. Location of Books and Records**

Complete the following information for each location at which you keep your books and records, other than your *principal office and place of business*. You must complete a separate Schedule D, Section 1.L. for each location.

Name of entity where books and records are kept:
HIGHGATE CONSULTING GROUP INC

Number and Street 1: 2101 CEDAR SPRINGS RD
Number and Street 2: SUITE 1200

| City: | State: | Country: | ZIP+4/Postal Code: |
|---|---|---|---|
| DALLAS | Texas | United States | 75201 |

If this address is a private residence, check this box: ☐

Telephone Number: 214-550-4459
Facsimile number, if any:

This is (check one):
- ○ one of your branch offices or affiliates.
- ● a third-party unaffiliated recordkeeper.
- ○ other.

Briefly describe the books and records kept at this location.
ALL BOOKS AND RECORDS OF THE ADVISER

**SECTION 1.M. Registration with Foreign Financial Regulatory Authorities**

No Information Filed

**Item 2 SEC Registration/Reporting**

Responses to this Item help us (and you) determine whether you are eligible to register with the SEC. Complete this Item 2.A. only if you are applying for SEC registration or submitting an *annual updating amendment* to your SEC registration. If you are filing an *umbrella registration*, the information in Item 2 should be provided for the *filing adviser* only.

A. To register (or remain registered) with the SEC, you must check **at least one** of the Items 2.A.(1) through 2.A.(12), below. If you are submitting an *annual updating amendment* to your SEC registration and you are no longer eligible to register with the SEC, check Item 2.A.(13). Part 1A Instruction 2 provides information to help you determine whether you may affirmatively respond to each of these items.

You (the adviser):

☑ (1) are a **large advisory firm** that either:

(a) has regulatory assets under management of $100 million (in U.S. dollars) or more; or

(b) has regulatory assets under management of $90 million (in U.S. dollars) or more at the time of filing its most recent *annual updating amendment* and is registered with the SEC;

☐ (2) are a **mid-sized advisory firm** that has regulatory assets under management of $25 million (in U.S. dollars) or more but less than $100 million (in U.S. dollars) and you are either:

(a) not required to be registered as an adviser with the *state securities authority* of the state where you maintain your *principal office and place of business*; or

(b) not subject to examination by the *state securities authority* of the state where you maintain your *principal office and place of business*;

*Click **HERE** for a list of states in which an investment adviser, if registered, would not be subject to examination by the state securities authority.*

(3) Reserved

☐ (4) have your *principal office and place of business* **outside the United States**;

☐ (5) are **an investment adviser (or subadviser) to an investment company** registered under the Investment Company Act of 1940;

☐ (6) are **an investment adviser to a company which has elected to be a business development company** pursuant to section 54 of the Investment Company Act of 1940 and has not withdrawn the election, and you have at least $25 million of regulatory assets under management;

☐ (7) are a **pension consultant** with respect to assets of plans having an aggregate value of at least $200,000,000 that qualifies for the exemption in rule 203A-2(a);

☐ (8) are a **related adviser** under rule 203A-2(b) that *controls*, is *controlled* by, or is under common *control* with, an investment adviser that is registered with the SEC, and your *principal office and place of business* is the same as the registered adviser;

*If you check this box, complete* Section 2.A.(8) of Schedule D.

☐ (9) are an **adviser** relying on rule 203A-2(c) because you **expect to be eligible for SEC registration within 120 days;**

*If you check this box, complete* Section 2.A.(9) of Schedule D.

☐ (10) are a **multi-state adviser** that is required to register in 15 or more states and is relying on rule 203A-2(d);

*If you check this box, complete* Section 2.A.(10) of Schedule D.

☐ (11) are an **Internet adviser** relying on rule 203A-2(e);

*If you check this box, complete* Section 2.A.(11) of Schedule D.

☐ (12) have **received an SEC order** exempting you from the prohibition against registration with the SEC;

*If you check this box, complete* Section 2.A.(12) of Schedule D.

☐ (13) are **no longer eligible** to remain registered with the SEC.

***State Securities Authority Notice Filings*** **and State Reporting by** ***Exempt Reporting Advisers***

C. Under state laws, SEC-registered advisers may be required to provide to *state securities authorities* a copy of the Form ADV and any amendments they file with the SEC. These are called *notice filings*. In addition, *exempt reporting advisers* may be required to provide *state securities authorities* with a copy of reports and any amendments they file with the SEC. If this is an initial application or report, check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to direct your *notice filings* or reports to additional state(s), check the box(es) next to the state(s) that you would like to receive notice of this and all subsequent filings or reports you submit to the SEC. If this is an amendment to your registration to stop your *notice filings* or reports from going to state(s) that currently receive them, uncheck the box(es) next to those state(s).

Jurisdictions

| | | | |
|---|---|---|---|
| ☐ AL | ☐ IL | ☐ NE | ☐ SC |
| ☐ AK | ☐ IN | ☐ NV | ☐ SD |
| ☐ AZ | ☐ IA | ☐ NH | ☐ TN |
| ☐ AR | ☐ KS | ☐ NJ | ☑ TX |

| | | | |
|---|---|---|---|
| ☐ CA | ☐ KY | ☐ NM | ☐ UT |
| ☐ CO | ☐ LA | ☑ NY | ☐ VT |
| ☐ CT | ☐ ME | ☐ NC | ☐ VI |
| ☐ DE | ☐ MD | ☐ ND | ☐ VA |
| ☐ DC | ☐ MA | ☐ OH | ☐ WA |
| ☐ FL | ☐ MI | ☐ OK | ☐ WV |
| ☐ GA | ☐ MN | ☐ OR | ☐ WI |
| ☐ GU | ☐ MS | ☐ PA | ☐ WY |
| ☐ HI | ☐ MO | ☐ PR | |
| ☐ ID | ☐ MT | ☐ RI | |

*If you are amending your registration to stop your notice filings or reports from going to a state that currently receives them and you do not want to pay that state's notice filing or report filing fee for the coming year, your amendment must be filed before the end of the year (December 31).*

**SECTION 2.A.(8) Related Adviser**

If you are relying on the exemption in rule 203A-2(b) from the prohibition on registration because you *control*, are *controlled* by, or are under common *control* with an investment adviser that is registered with the SEC and your *principal office and place of business* is the same as that of the registered adviser, provide the following information:

Name of Registered Investment Adviser

*CRD* Number of Registered Investment Adviser

SEC Number of Registered Investment Adviser
-

**SECTION 2.A.(9) Investment Adviser Expecting to be Eligible for Commission Registration within 120 Days**

If you are relying on rule 203A-2(c), the exemption from the prohibition on registration available to an adviser that expects to be eligible for SEC registration within 120 days, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations. You must make both of these representations:

☐ I am not registered or required to be registered with the SEC or a *state securities authority* and I have a reasonable expectation that I will be eligible to register with the SEC within 120 days after the date my registration with the SEC becomes effective.

☐ I undertake to withdraw from SEC registration if, on the 120th day after my registration with the SEC becomes effective, I would be prohibited by Section 203A(a) of the Advisers Act from registering with the SEC.

**SECTION 2.A.(10) Multi-State Adviser**

If you are relying on rule 203A-2(d), the multi-state adviser exemption from the prohibition on registration, you are required to make certain representations about your eligibility for SEC registration. By checking the appropriate boxes, you will be deemed to have made the required representations.

If you are applying for registration as an investment adviser with the SEC, you must make both of these representations:

☐ I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of 15 or more states to register as an investment adviser with the *state securities authorities* in those states.

☐ I undertake to withdraw from SEC registration if I file an amendment to this registration indicating that I would be required by the laws of fewer than 15 states to register as an investment adviser with the *state securities authorities* of those states.

If you are submitting your *annual updating amendment*, you must make this representation:

☐ Within 90 days prior to the date of filing this amendment, I have reviewed the applicable state and federal laws and have concluded that I am required by the laws of at least 15 states to register as an investment adviser with the *state securities authorities* in those states.

**SECTION 2.A.(11) Internet Adviser**

If you are relying on rule 203A-2(e), the Internet adviser exemption from the prohibition on registration, you are required to make a representation about your eligibility for SEC registration. By checking the appropriate box, you will be deemed to have made the required representation.

If you are applying for registration as an investment adviser with the SEC or changing your existing Item 2 response regarding your eligibility for SEC registration, you must make this representation:

☐ I will provide investment advice on an ongoing basis to more than one client exclusively through an *operational interactive website*.

If you are filing an annual updating amendment to your existing registration and are continuing to rely on the Internet adviser exemption for SEC registration, you must make this representation:

☐ I have provided and will continue to provide investment advice on an ongoing basis to more than one client exclusively through an *operational interactive website*.

**SECTION 2.A.(12) SEC Exemptive *Order***

If you are relying upon an SEC *order* exempting you from the prohibition on registration, provide the following information:

Application Number:
803-

Date of *order*:

**Item 3 Form of Organization**

If you are filing an *umbrella registration*, the information in Item 3 should be provided for the *filing adviser* only.

A. How are you organized?

- ○ Corporation
- ○ Sole Proprietorship
- ○ Limited Liability Partnership (LLP)
- ○ Partnership
- ◉ Limited Liability Company (LLC)
- ○ Limited Partnership (LP)
- ○ Other (specify):

*If you are changing your response to this Item, see Part 1A Instruction 4.*

B. In what month does your fiscal year end each year?
DECEMBER

C. Under the laws of what state or country are you organized?

| State | Country |
|---|---|
| Delaware | United States |

*If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor, provide the name of the state or country where you reside.*

*If you are changing your response to this Item, see Part 1A Instruction 4.*

**Item 4 Successions**

| | Yes | No |
|---|---|---|
| A. Are you, at the time of this filing, succeeding to the business of a registered investment adviser, including, for example, a change of your structure or legal status (e.g., form of organization or state of incorporation)? | ○ | ◉ |

*If "yes", complete Item 4.B. and Section 4 of Schedule D.*

B. Date of Succession: (MM/DD/YYYY)

*If you have already reported this succession on a previous Form ADV filing, do not report the succession again. Instead, check "No." See Part 1A Instruction 4.*

**SECTION 4 Successions**

No Information Filed

**Item 5 Information About Your Advisory Business - Employees, Clients, and Compensation**

Responses to this Item help us understand your business, assist us in preparing for on-site examinations, and provide us with data we use when making regulatory policy. Part 1A Instruction 5.a. provides additional guidance to newly formed advisers for completing this Item 5.

***Employees***

*If you are organized as a sole proprietorship, include yourself as an employee in your responses to Item 5.A. and Items 5.B.(1), (2), (3), (4), and (5). If an employee performs more than one function, you should count that employee in each of your responses to Items 5.B.(1), (2), (3), (4), and (5).*

A. Approximately how many *employees* do you have? Include full- and part-time *employees* but do not include any clerical workers.

1

B. (1) Approximately how many of the *employees* reported in 5.A. perform investment advisory functions (including research)?

1

(2) Approximately how many of the *employees* reported in 5.A. are registered representatives of a broker-dealer?

0

(3) Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives*?

0

(4) Approximately how many of the *employees* reported in 5.A. are registered with one or more *state securities authorities* as *investment adviser representatives* for an investment adviser other than you?

0

(5) Approximately how many of the *employees* reported in 5.A. are licensed agents of an insurance company or agency?

0

(6) Approximately how many firms or other *persons* solicit advisory *clients* on your behalf?

0

*In your response to Item 5.B.(6), do not count any of your employees and count a firm only once – do not count each of the firm's employees that solicit on your behalf.*

***Clients***

*In your responses to Items 5.C. and 5.D. do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

C. (1) To approximately how many *clients* for whom you do not have regulatory assets under management did you provide investment advisory services during your most recently completed fiscal year?

0

(2) Approximately what percentage of your *clients* are non-*United States persons*?

0%

D. *For purposes of this Item 5.D., the category "individuals" includes trusts, estates, and 401(k) plans and IRAs of individuals and their family members, but does not include businesses organized as sole proprietorships.*
*The category "business development companies" consists of companies that have made an election pursuant to section 54 of the Investment Company Act of 1940. Unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, do not answer (1)(d) or (3)(d) below.*

Indicate the approximate number of your *clients* and amount of your total regulatory assets under management (reported in Item 5.F. below) attributable to each of the following type of *client*. If you have fewer than 5 *clients* in a particular category (other than (d), (e), and (f)) you may check Item 5.D.(2) rather than respond to Item 5.D.(1).

The aggregate amount of regulatory assets under management reported in Item 5.D.(3) should equal the total amount of regulatory assets under management reported in Item 5.F.(2)(c) below.

If a *client* fits into more than one category, select one category that most accurately represents the *client* to avoid double counting *clients* and assets. If you advise a registered investment company, business development company, or pooled investment vehicle, report those assets in categories (d), (e), and (f) as applicable.

| **Type of *Client*** | **(1) Number of *Client(s)*** | **(2) Fewer than 5 *Clients*** | **(3) Amount of Regulatory Assets under Management** |
|---|---|---|---|
| (a) Individuals (other than *high net worth individuals*) | 0 | ☐ | $ 0 |
| (b) *High net worth individuals* | 0 | ☐ | $ 0 |
| (c) Banking or thrift institutions | 0 | ☐ | $ 0 |
| (d) Investment companies | 0 | | $ 0 |
| (e) Business development companies | 0 | | $ 0 |
| (f) Pooled investment vehicles (other than investment companies and business development companies) | 3 | | $ 153,660,847 |
| (g) Pension and profit sharing plans (but not the plan participants or government pension plans) | 0 | ☐ | $ 0 |
| (h) Charitable organizations | 0 | ☐ | $ 0 |
| (i) State or municipal *government entities* (including government pension plans) | 0 | ☐ | $ 0 |
| (j) Other investment advisers | 0 | ☐ | $ 0 |

| | | | |
|---|---|---|---|
| (k) Insurance companies | 0 | ☐ | $ 0 |
| (l) Sovereign wealth funds and foreign official institutions | 0 | ☐ | $ 0 |
| (m) Corporations or other businesses not listed above | 0 | ☐ | $ 0 |
| (n) Other: | 0 | ☐ | $ 0 |

**Compensation Arrangements**

E. You are compensated for your investment advisory services by (check all that apply):

- ☑ (1) A percentage of assets under your management
- ☐ (2) Hourly charges
- ☐ (3) Subscription fees (for a newsletter or periodical)
- ☐ (4) Fixed fees (other than subscription fees)
- ☐ (5) Commissions
- ☐ (6) *Performance-based fees*
- ☐ (7) Other (specify):

**Item 5 Information About Your Advisory Business - Regulatory Assets Under Management**

**Regulatory Assets Under Management**

**Yes No**

F. (1) Do you provide continuous and regular supervisory or management services to securities portfolios? ◉ Yes ○ No

(2) If yes, what is the amount of your regulatory assets under management and total number of accounts?

| | | U.S. Dollar Amount | | Total Number of Accounts |
|---|---|---|---|---|
| Discretionary: | (a) | $ 153,660,847 | (d) | 80 |
| Non-Discretionary: | (b) | $ 0 | (e) | 0 |
| Total: | (c) | $ 153,660,847 | (f) | 80 |

Part 1A Instruction 5.b. *explains how to calculate your regulatory assets under management. You must follow these instructions carefully when completing this Item.*

(3) What is the approximate amount of your total regulatory assets under management (reported in Item 5.F.(2)(c) above) attributable to *clients* who are non-*United States persons*?

$ 0

**Item 5 Information About Your Advisory Business - Advisory Activities**

**Advisory Activities**

G. What type(s) of advisory services do you provide? Check all that apply.

- ☐ (1) Financial planning services
- ☐ (2) Portfolio management for individuals and/or small businesses
- ☐ (3) Portfolio management for investment companies (as well as "business development companies" that have made an election pursuant to section 54 of the Investment Company Act of 1940)
- ☑ (4) Portfolio management for pooled investment vehicles (other than investment companies)
- ☐ (5) Portfolio management for businesses (other than small businesses) or institutional *clients* (other than registered investment companies and other pooled investment vehicles)
- ☐ (6) Pension consulting services
- ☐ (7) Selection of other advisers (including *private fund* managers)
- ☐ (8) Publication of periodicals or newsletters
- ☐ (9) Security ratings or pricing services
- ☐ (10) Market timing services
- ☐ (11) Educational seminars/workshops
- ☐ (12) Other(specify):

*Do not check Item 5.G.(3) unless you provide advisory services pursuant to an investment advisory contract to an investment company registered under the Investment Company Act of 1940, including as a subadviser. If you check Item 5.G.(3), report the 811 or 814 number of the investment company or investment companies to which you provide advice in* Section 5.G.(3) of Schedule D.

H. If you provide financial planning services, to how many *clients* did you provide these services during your last fiscal year?

- ○ 0
- ○ 1 - 10
- ○ 11 - 25
- ○ 26 - 50
- ○ 51 - 100
- ○ 101 - 250
- ○ 251 - 500
- ○ More than 500

If more than 500, how many?
(round to the nearest 500)

*In your responses to this Item 5.H., do not include as "clients" the investors in a private fund you advise, unless you have a separate advisory relationship with those investors.*

| | | Yes | No |
|---|---|---|---|
| I. | (1) Do you participate in a *wrap fee program*? | ○ | ◉ |

(2) If you participate in a *wrap fee program*, what is the amount of your regulatory assets under management attributable to acting as:

(a) *sponsor* to a *wrap fee program*
$
(b) portfolio manager for a *wrap fee program*?
$
(c) *sponsor* to and portfolio manager for the same *wrap fee program*?
$

*If you report an amount in Item 5.I.(2)(c), do not report that amount in Item 5.I.(2)(a) or Item 5.I.(2)(b).*

*If you are a portfolio manager for a wrap fee program, list the names of the programs, their sponsors and related information in Section 5.I.(2) of Schedule D.*

*If your involvement in a wrap fee program is limited to recommending wrap fee programs to your clients, or you advise a mutual fund that is offered through a wrap fee program, do not check Item 5.I.(1) or enter any amounts in response to Item 5.I.(2).*

| | | Yes | No |
|---|---|---|---|
| J. | (1) In response to Item 4.B. of Part 2A of Form ADV, do you indicate that you provide investment advice only with respect to limited types of investments? | ○ | ◉ |
| | (2) Do you report *client* assets in Item 4.E. of Part 2A that are computed using a different method than the method used to compute your regulatory assets under management? | ○ | ◉ |

K. Separately Managed Account *Clients*

| | Yes | No |
|---|---|---|
| (1) Do you have regulatory assets under management attributable to *clients* other than those listed in Item 5.D.(3)(d)-(f) (separately managed account *clients*)? | ○ | ◉ |

*If yes, complete Section 5.K.(1) of Schedule D.*

| | Yes | No |
|---|---|---|
| (2) Do you engage in borrowing transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ◉ |

*If yes, complete Section 5.K.(2) of Schedule D.*

| | Yes | No |
|---|---|---|
| (3) Do you engage in derivative transactions on behalf of any of the separately managed account *clients* that you advise? | ○ | ◉ |

*If yes, complete Section 5.K.(2) of Schedule D.*

| | Yes | No |
|---|---|---|
| (4) After subtracting the amounts in Item 5.D.(3)(d)-(f) above from your total regulatory assets under management, does any custodian hold ten percent or more of this remaining amount of regulatory assets under management? | ○ | ◉ |

*If yes, complete Section 5.K.(3) of Schedule D for each custodian.*

L. Marketing Activities

| | Yes | No |
|---|---|---|
| (1) Do any of your *advertisements* include: | | |
| (a) Performance results? | ○ | ◉ |
| (b) A reference to specific investment advice provided by you (as that phrase is used in rule 206(4)-1(a)(5))? | ○ | ◉ |
| (c) *Testimonials* (other than those that satisfy rule 206(4)-1(b)(4)(ii))? | ○ | ◉ |
| (d) *Endorsements* (other than those that satisfy rule 206(4)-1(b)(4)(ii))? | ○ | ◉ |
| (e) *Third-party ratings*? | ○ | ◉ |
| (2) If you answer "yes" to L(1)(c), (d), or (e) above, do you pay or otherwise provide cash or non-cash compensation, directly or indirectly, in connection with the use of *testimonials*, *endorsements*, or *third-party ratings*? | ○ | ○ |
| (3) Do any of your *advertisements* include *hypothetical performance* ? | ○ | ◉ |

(4) Do any of your advertisements include predecessor performance ?

## SECTION 5.G.(3) Advisers to Registered Investment Companies and Business Development Companies

No Information Filed

## SECTION 5.I.(2) *Wrap Fee Programs*

No Information Filed

## SECTION 5.K.(1) Separately Managed Accounts

After subtracting the amounts reported in Item 5.D.(3)(d)-(f) from your total regulatory assets under management, indicate the approximate percentage of this remaining amount attributable to each of the following categories of assets. If the remaining amount is at least $10 billion in regulatory assets under management, complete Question (a). If the remaining amount is less than $10 billion in regulatory assets under management, complete Question (b).

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment* . Mid-year is the date six months before the end of year date. Each column should add up to 100% and numbers should be rounded to the nearest percent.

Investments in derivatives, registered investment companies, business development companies, and pooled investment vehicles should be reported in those categories. Do not report those investments based on related or underlying portfolio assets. Cash equivalents include bank deposits, certificates of deposit, bankers' acceptances and similar bank instruments.

Some assets could be classified into more than one category or require discretion about which category applies. You may use your own internal methodologies and the conventions of your service providers in determining how to categorize assets, so long as the methodologies or conventions are consistently applied and consistent with information you report internally and to current and prospective clients. However, you should not double count assets, and your responses must be consistent with any instructions or other guidance relating to this Section.

(a)

| Asset Type | Mid-year | End of year |
|---|---|---|
| (i) Exchange-Traded Equity Securities | % | % |
| (ii) Non Exchange-Traded Equity Securities | % | % |
| (iii) U.S. Government/Agency Bonds | % | % |
| (iv) U.S. State and Local Bonds | % | % |
| (v) *Sovereign Bonds* | % | % |
| (vi) Investment Grade Corporate Bonds | % | % |
| (vii) Non-Investment Grade Corporate Bonds | % | % |
| (viii) Derivatives | % | % |
| (ix) Securities Issued by Registered Investment Companies or Business Development Companies | % | % |
| (x) Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development Companies) | % | % |
| (xi) Cash and Cash Equivalents | % | % |
| (xii) Other | % | % |

Generally describe any assets included in "Other"

(b)

| Asset Type | End of year |
|---|---|
| (i) Exchange-Traded Equity Securities | % |
| (ii) Non Exchange-Traded Equity Securities | % |
| (iii) U.S. Government/Agency Bonds | % |
| (iv) U.S. State and Local Bonds | % |
| (v) *Sovereign Bonds* | % |
| (vi) Investment Grade Corporate Bonds | % |
| (vii) Non-Investment Grade Corporate Bonds | % |
| (viii) Derivatives | % |
| (ix) Securities Issued by Registered Investment Companies or Business Development Companies | % |
| (x) Securities Issued by Pooled Investment Vehicles (other than Registered Investment Companies or Business Development | % |

| | | |
|---|---|---|
| | Companies) | |
| (xi) | Cash and Cash Equivalents | % |
| (xii) | Other | % |

Generally describe any assets included in "Other"

**SECTION 5.K.(2) Separately Managed Accounts - Use of *Borrowings*and Derivatives**

☑ **No information is required to be reported in this Section 5.K.(2) per the instructions of this Section 5.K.(2)**

If your regulatory assets under management attributable to separately managed accounts are at least $10 billion, you should complete Question (a). If your regulatory assets under management attributable to separately managed accounts are at least $500 million but less than $10 billion, you should complete Question (b).

(a) In the table below, provide the following information regarding the separately managed accounts you advise. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise. End of year refers to the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. Mid-year is the date six months before the end of year date.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

In column 3, provide aggregate *gross notional value* of derivatives divided by the aggregate regulatory assets under management of the accounts included in column 1 with respect to each category of derivatives specified in 3(a) through (f).

You may, but are not required to, complete the table with respect to any separately managed account with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

(i) Mid-Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equity Derivative* | (e) *Commodity Derivative* | (f) *Other Derivative* |
| **Less than 10%** | $ | $ | % | % | % | % | % | % |
| **10-149%** | $ | $ | % | % | % | % | % | % |
| **150% or more** | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(ii) End of Year

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* | (3) Derivative Exposures | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | (a) *Interest Rate Derivative* | (b) *Foreign Exchange Derivative* | (c) *Credit Derivative* | (d) *Equity Derivative* | (e) *Commodity Derivative* | (f) *Other Derivative* |
| **Less than 10%** | $ | $ | % | % | % | % | % | % |
| **10-149%** | $ | $ | % | % | % | % | % | % |
| **150% or more** | $ | $ | % | % | % | % | % | % |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

(b) In the table below, provide the following information regarding the separately managed accounts you advise as of the date used to calculate your regulatory assets under management for purposes of your *annual updating amendment*. If you are a subadviser to a separately managed account, you should only provide information with respect to the portion of the account that you subadvise.

In column 1, indicate the regulatory assets under management attributable to separately managed accounts associated with each level of gross notional exposure. For purposes of this table, the gross notional exposure of an account is the percentage obtained by dividing (i) the sum of (a) the dollar amount of any *borrowings* and (b) the *gross notional value* of all derivatives, by (ii) the regulatory assets under management of the account.

In column 2, provide the dollar amount of *borrowings* for the accounts included in column 1.

You may, but are not required to, complete the table with respect to any separately managed accounts with regulatory assets under management of less than $10,000,000.

Any regulatory assets under management reported in Item 5.D.(3)(d), (e), and (f) should not be reported below.

| Gross Notional Exposure | (1) Regulatory Assets Under Management | (2) *Borrowings* |
|---|---|---|
| **Less than 10%** | $ | $ |
| **10-149%** | $ | $ |
| **150% or more** | $ | $ |

Optional: Use the space below to provide a narrative description of the strategies and/or manner in which *borrowings* and derivatives are used in the management of the separately managed accounts that you advise.

**SECTION 5.K.(3) Custodians for Separately Managed Accounts**

No Information Filed

**Item 6 Other Business Activities**

In this Item, we request information about your firm's other business activities.

A. You are actively engaged in business as a (check all that apply):

- ☐ (1) broker-dealer (registered or unregistered)
- ☐ (2) registered representative of a broker-dealer
- ☐ (3) commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- ☐ (4) futures commission merchant
- ☐ (5) real estate broker, dealer, or agent
- ☐ (6) insurance broker or agent
- ☐ (7) bank (including a separately identifiable department or division of a bank)
- ☐ (8) trust company
- ☐ (9) registered municipal advisor
- ☐ (10) registered security-based swap dealer
- ☐ (11) major security-based swap participant
- ☐ (12) accountant or accounting firm
- ☐ (13) lawyer or law firm
- ☐ (14) other financial product salesperson (specify):

*If you engage in other business using a name that is different from the names reported in Items 1.A. or 1.B.(1), complete Section 6.A. of Schedule D.*

| | | Yes | No |
|---|---|---|---|
| B. (1) | Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)? | ○ | ◉ |
| (2) | If yes, is this other business your primary business? | ○ | ○ |

*If "yes," describe this other business on Section 6.B.(2) of Schedule D, and if you engage in this business under a different name, provide that name.*

| | | Yes | No |
|---|---|---|---|
| (3) | Do you sell products or provide services other than investment advice to your advisory *clients*? | ○ | ◉ |

*If "yes," describe this other business on Section 6.B.(3) of Schedule D, and if you engage in this business under a different name, provide that name.*

**SECTION 6.A. Names of Your Other Businesses**

No Information Filed

**SECTION 6.B.(2) Description of Primary Business**

Describe your primary business (not your investment advisory business):

If you engage in that business under a different name, provide that name:

**SECTION 6.B.(3) Description of Other Products and Services**

Describe other products or services you sell to your *client*. You may omit products and services that you listed in Section 6.B.(2) above.

If you engage in that business under a different name, provide that name:

**Item 7 Financial Industry Affiliations**

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients*.

A. This part of Item 7 requires you to provide information about you and your *related persons*, including foreign affiliates. Your *related persons* are all of your *advisory affiliates* and any *person* that is under common *control* with you.

You have a *related person* that is a (check all that apply):

- ☐ (1) broker-dealer, municipal securities dealer, or government securities broker or dealer (registered or unregistered)
- ☐ (2) other investment adviser (including financial planners)
- ☐ (3) registered municipal advisor
- ☐ (4) registered security-based swap dealer
- ☐ (5) major security-based swap participant
- ☐ (6) commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
- ☐ (7) futures commission merchant
- ☐ (8) banking or thrift institution
- ☐ (9) trust company
- ☐ (10) accountant or accounting firm
- ☐ (11) lawyer or law firm
- ☐ (12) insurance company or agency
- ☐ (13) pension consultant
- ☐ (14) real estate broker or dealer
- ☐ (15) sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
- ☐ (16) sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

*Note that Item 7.A. should not be used to disclose that some of your employees perform investment advisory functions or are registered representatives of a broker-dealer. The number of your firm's employees who perform investment advisory functions should be disclosed under Item 5.B.(1). The number of your firm's employees who are registered representatives of a broker-dealer should be disclosed under Item 5.B.(2).*

*Note that if you are filing an umbrella registration, you should not check Item 7.A.(2) with respect to your relying advisers, and you do not have to complete Section 7.A. in Schedule D for your relying advisers. You should complete a Schedule R for each relying adviser.*

*For each related person, including foreign affiliates that may not be registered or required to be registered in the United States, complete Section 7.A. of Schedule D.*

*You do not need to complete Section 7.A. of Schedule D for any related person if: (1) you have no business dealings with the related person in connection with advisory services you provide to your clients; (2) you do not conduct shared operations with the related person; (3) you do not refer clients or business to the related person, and the related person does not refer prospective clients or business to you; (4) you do not share supervised persons or premises with the related person; and (5) you have no reason to believe that your relationship with the related person otherwise creates a conflict of interest with your clients.*

*You must complete Section 7.A. of Schedule D for each related person acting as qualified custodian in connection with advisory services you provide to your clients (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)), regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

**SECTION 7.A. Financial Industry Affiliations**

No Information Filed

**Item 7 *Private Fund* Reporting**

| | Yes | No |
|---|---|---|
| B. Are you an adviser to any *private fund*? | ◉ | ○ |

*If "yes," then for each private fund that you advise, you must complete a Section 7.B.(1) of Schedule D, except in certain circumstances described in the next sentence and in Instruction 6 of the Instructions to Part 1A. If you are registered or applying for registration with the SEC or reporting as an SEC exempt reporting adviser, and another SEC-registered adviser or SEC exempt reporting adviser reports this information with respect to any such private fund in Section 7.B.(1) of Schedule D of its Form ADV (e.g., if you are a subadviser), do not complete Section 7.B.(1) of Schedule D with respect to that private fund. You must, instead, complete Section 7.B.(2) of Schedule D.*

*In either case, if you seek to preserve the anonymity of a private fund client by maintaining its identity in your books and records in numerical or alphabetical code, or similar designation, pursuant to rule 204-2(d), you may identify the private fund in Section 7.B.(1) or 7.B.(2) of Schedule D using the same code or designation in place of the fund's name.*

**SECTION 7.B.(1) *Private Fund* Reporting**

**Funds per Page:** 15 Total Funds: 2

A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:
ATLAS IDF, LP
(b) *Private fund* identification number:
(include the "805-" prefix also)
805-9274628204

2. Under the laws of what state or country is the *private fund* organized:

| State: | Country: |
|---|---|
| Delaware | United States |

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| ATLAS IDF GP, LLC |

(b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

No Information Filed

4. The *private fund* (check all that apply; you must check at least one):
- [ ] (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
- [x] (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

No Information Filed

| | Yes | No |
|---|---|---|
| 6. (a) Is this a "master fund" in a master-feeder arrangement? | ○ | ◉ |

(b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

No Information Filed

| | Yes | No |
|---|---|---|
| (c) Is this a "feeder fund" in a master-feeder arrangement? | ○ | ◉ |

(d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

No Information Filed

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

Yes No

8. (a) Is this *private fund* a "fund of funds"? ○ ◉

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

(b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? ○ ○

Yes No

9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? ○ ◉

10. What type of fund is the *private fund*?

○ hedge fund ○ liquidity fund ◉ private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

$ 29,902,788

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:

$ 500,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

2

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

0%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

Yes No

(b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? ○ ○

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

100%

**Your Advisory Services**

Yes No

17. (a) Are you a subadviser to this *private fund*? ○ ◉

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

No Information Filed

Yes No

18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? ○ ◉

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

No Information Filed

Yes No

19. Are your *clients* solicited to invest in the *private fund*? ○ ◉

*NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

**Private Offering**

Yes No

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? (Yes: selected)

22. If yes, provide the *private fund's* Form D file number (if any):

No Information Filed

B. SERVICE PROVIDERS

Auditors

| | | Yes | No |
|---|---|---|---|
| 23. (a) | (1) Are the *private fund's* financial statements subject to an annual audit? | ◉ | ○ |
| | (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ◉ | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:
COHEN & CO.

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| AKRON | Ohio | United States |

| | Yes | No |
|---|---|---|
| (d) Is the auditing firm an *independent public accountant*? | ◉ | ○ |
| (e) Is the auditing firm registered with the Public Company Accounting Oversight Board? | ◉ | ○ |

If yes, Public Company Accounting Oversight Board-Assigned Number:
925

| | Yes | No |
|---|---|---|
| (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? | ◉ | ○ |

| | Yes | No |
|---|---|---|
| (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ◉ | ○ |

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

◉ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

Prime Broker

| | Yes | No |
|---|---|---|
| 24. (a) Does the *private fund* use one or more prime brokers? | ○ | ◉ |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

No Information Filed

Custodian

| | Yes | No |
|---|---|---|
| 25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ◉ | ○ |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
US BANK

(c) Primary business name of custodian:
US BANK

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DALLAS | Texas | United States |

(e) Is the custodian a *related person* of your firm? Yes ○ No ◉

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
-
CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

**Administrator**

26. (a) Does the *private fund* use an administrator other than your firm? Yes ◉ No ○

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b) Name of administrator:
HIGHGATE CONSULTING GROUP INC

(c) Location of administrator (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DALLAS | Texas | United States |

(d) Is the administrator a *related person* of your firm? Yes ○ No ◉

(e) Does the administrator prepare and send investor account statements to the *private fund's* investors?
◉ Yes (provided to all investors) ○ Some (provided to some but not all investors) ○ No (provided to no investors)

(f) If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?
100%
Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? Yes ○ No ◉

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

No Information Filed

A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:
RAND PE FUND I, L.P.
(b) *Private fund* identification number:
(include the "805-" prefix also)
805-7357834832

2. Under the laws of what state or country is the *private fund* organized:

| State: | Country: |
|---|---|
| Delaware | United States |

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| RAND PE FUND MANAGEMENT, LLC |

(b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

No Information Filed

4. The *private fund* (check all that apply; you must check at least one):
☑ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940
☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

No Information Filed

| | Yes | No |
|---|---|---|
| 6. (a) Is this a "master fund" in a master-feeder arrangement? | ○ | ◉ |

(b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

No Information Filed

| | Yes | No |
|---|---|---|
| (c) Is this a "feeder fund" in a master-feeder arrangement? | ○ | ◉ |

(d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?
Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

No Information Filed

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their

assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

Yes No

8. (a) Is this *private fund* a "fund of funds"? ○ ◉

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

(b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? ○ ○

Yes No

9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? ○ ◉

10. What type of fund is the *private fund*?

○ hedge fund ○ liquidity fund ◉ private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

$ 0

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:

$ 500,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

3

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

0%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

Yes No

(b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? ◉ ○

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

100%

**Your Advisory Services**

Yes No

17. (a) Are you a subadviser to this *private fund*? ○ ◉

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

No Information Filed

Yes No

18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? ○ ◉

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

No Information Filed

Yes No

19. Are your *clients* solicited to invest in the *private fund*? ○ ◉

*NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

Administrator (overlapped, partially legible)

| | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ◉ | ○ |

22. If yes, provide the *private fund's* Form D file number (if any):

No Information Filed

B. SERVICE PROVIDERS

**Auditors**

| | Yes | No |
|---|---|---|
| 23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? | ◉ | ○ |
| (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ◉ | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:

COHEN & CO

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| AKRON | Ohio | United States |

| | Yes | No |
|---|---|---|
| (d) Is the auditing firm an *independent public accountant*? | ◉ | ○ |
| (e) Is the auditing firm registered with the Public Company Accounting Oversight Board? | ◉ | ○ |

If yes, Public Company Accounting Oversight Board-Assigned Number:

925

| | Yes | No |
|---|---|---|
| (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? | ◉ | ○ |

| | Yes | No |
|---|---|---|
| (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ◉ | ○ |

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

◉ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

| | Yes | No |
|---|---|---|
| 24. (a) Does the *private fund* use one or more prime brokers? | ○ | ◉ |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

No Information Filed

**Custodian**

| | Yes | No |
|---|---|---|
| 25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ◉ | ○ |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:
STATE STREET GLOBAL MARKETS, LLC

(c) Primary business name of custodian:
STATE STREET GLOBAL MARKETS, LLC

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| BOSTON | Massachusetts | United States |

| | Yes | No |
|---|---|---|
| (e) Is the custodian a *related person* of your firm? | ○ | ◉ |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):
8 - 69862
CRD Number (if any):
285852

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

**Administrator**

| | Yes | No |
|---|---|---|
| 26. (a) Does the *private fund* use an administrator other than your firm? | ◉ | ○ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b) Name of administrator:
HIGHGATE CONSULTING GROUP INC

(c) Location of administrator (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DALLAS | Texas | United States |

| | Yes | No |
|---|---|---|
| (d) Is the administrator a *related person* of your firm? | ○ | ◉ |

(e) Does the administrator prepare and send investor account statements to the *private fund's* investors?
◉ Yes (provided to all investors) ○ Some (provided to some but not all investors) ○ No (provided to no investors)

(f) If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?
100%
Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

| | | Yes | No |
|---|---|---|---|
| 28. (a) | Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ○ | ◉ |

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

No Information Filed

**Funds per Page:** 15 Total Funds: 2

**SECTION 7.B.(2) *Private Fund* Reporting**

1. Name of the *private fund*:
RAND ADVISORS SERIES I INSURANCE FUND SERIES INTERESTS OF THE SALI MULTISERIES

2. *Private fund* identification number:
(include the "805-" prefix also)
805-9425927696

3. Name and SEC File number of adviser that provides information about this *private fund* in Section 7.B.(1) of Schedule D of its Form ADV filing
Name:
SALI FUND SERVICES
SEC File Number:
801 - 61702

| | | Yes | No |
|---|---|---|---|
| 4. | Are your *clients* solicited to invest in this *private fund*? | ○ | ◉ |

In answering this question, disregard feeder funds' investment in a master fund. For purposes of this question, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

**Item 8 Participation or Interest in *Client* Transactions**

In this Item, we request information about your participation and interest in your *clients*' transactions. This information identifies additional areas in which conflicts of interest may occur between you and your *clients*. Newly-formed advisers should base responses to these questions on the types of participation and interest that you expect to engage in during the next year.

Like Item 7, Item 8 requires you to provide information about you and your *related persons*, including foreign affiliates.

**Proprietary Interest in *Client* Transactions**

| | | Yes | No |
|---|---|---|---|
| A. | Do you or any *related person*: | | |
| (1) | buy securities for yourself from advisory *clients*, or sell securities you own to advisory *clients* (principal transactions)? | ○ | ◉ |
| (2) | buy or sell for yourself securities (other than shares of mutual funds) that you also recommend to advisory *clients*? | ◉ | ○ |
| (3) | recommend securities (or other investment products) to advisory *clients* in which you or any *related person* has some other proprietary (ownership) interest (other than those mentioned in Items 8.A.(1) or (2))? | ◉ | ○ |

**Sales Interest in *Client* Transactions**

| | | Yes | No |
|---|---|---|---|
| B. | Do you or any *related person*: | | |
| (1) | as a broker-dealer or registered representative of a broker-dealer, execute securities trades for brokerage customers in which advisory *client* securities are sold to or bought from the brokerage customer (agency cross transactions)? | ○ | ◉ |
| (2) | recommend to advisory *clients*, or act as a purchaser representative for advisory *clients* with respect to, the purchase of securities for which you or any *related person* serves as underwriter or general or managing partner? | ◉ | ○ |
| (3) | recommend purchase or sale of securities to advisory *clients* for which you or any *related person* has any other sales interest (other than the receipt of sales commissions as a broker or registered representative of a broker-dealer)? | ○ | ◉ |

**Investment or Brokerage Discretion**

| | | Yes | No |
|---|---|---|---|
| C. | Do you or any *related person* have *discretionary authority* to determine the: | | |
| (1) | securities to be bought or sold for a *client's* account? | ◉ | ○ |

(2) amount of securities to be bought or sold for a *client's* account? ◉ ○

(3) broker or dealer to be used for a purchase or sale of securities for a *client's* account? ◉ ○

(4) commission rates to be paid to a broker or dealer for a *client's* securities transactions? ◉ ○

D. If you answer "yes" to C.(3) above, are any of the brokers or dealers *related persons*? ○ ◉

E. Do you or any *related person* recommend brokers or dealers to *clients*? ◉ ○

F. If you answer "yes" to E. above, are any of the brokers or dealers *related persons*? ○ ◉

G. (1) Do you or any *related person* receive research or other products or services other than execution from a broker-dealer or a third party ("soft dollar benefits") in connection with *client* securities transactions? ◉ ○

(2) If "yes" to G.(1) above, are all the "soft dollar benefits" you or any *related persons* receive eligible "research or brokerage services" under section 28(e) of the Securities Exchange Act of 1934? ◉ ○

H. (1) Do you or any *related person*, directly or indirectly, compensate any *person* that is not an *employee* for *client* referrals? ○ ◉

(2) Do you or any *related person*, directly or indirectly, provide any *employee* compensation that is specifically related to obtaining *clients* for the firm (cash or non-cash compensation in addition to the *employee's* regular salary)? ○ ◉

I. Do you or any *related person*, including any *employee*, directly or indirectly, receive compensation from any *person* (other than you or any *related person*) for *client* referrals? ○ ◉

*In your response to Item 8.I., do not include the regular salary you pay to an employee.*

*In responding to Items 8.H. and 8.I., consider all cash and non-cash compensation that you or a related person gave to (in answering Item 8.H.) or received from (in answering Item 8.I.) any person in exchange for client referrals, including any bonus that is based, at least in part, on the number or amount of client referrals.*

**Item 9 Custody**

In this Item, we ask you whether you or a *related person* has *custody* of *client* (other than *clients* that are investment companies registered under the Investment Company Act of 1940) assets and about your custodial practices.

A. (1) Do you have *custody* of any advisory *clients'*: **Yes No**

(a) cash or bank accounts? ◉ ○

(b) securities? ◉ ○

*If you are registering or registered with the SEC, answer "No" to Item 9.A.(1)(a) and (b) if you have custody solely because (i) you deduct your advisory fees directly from your clients' accounts, or (ii) a related person has custody of client assets in connection with advisory services you provide to clients, but you have overcome the presumption that you are not operationally independent (pursuant to Advisers Act rule 206(4)-2(d)(5)) from the related person.*

(2) If you checked "yes" to Item 9.A.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which you have *custody*:

| U.S. Dollar Amount | Total Number of *Clients* |
|---|---|
| (a) $ 153,649,022 | (b) 3 |

*If you are registering or registered with the SEC and you have custody solely because you deduct your advisory fees directly from your clients' accounts, do not include the amount of those assets and the number of those clients in your response to Item 9.A.(2). If your related person has custody of client assets in connection with advisory services you provide to clients, do not include the amount of those assets and number of those clients in your response to 9.A.(2). Instead, include that information in your response to Item 9.B.(2).*

B. (1) In connection with advisory services you provide to *clients*, do any of your *related persons* have *custody* of any of your advisory *clients'*: **Yes No**

(a) cash or bank accounts? ○ ◉

(b) securities? ○ ◉

*You are required to answer this item regardless of how you answered Item 9.A.(1)(a) or (b).*

(2) If you checked "yes" to Item 9.B.(1)(a) or (b), what is the approximate amount of *client* funds and securities and total number of *clients* for which your *related persons* have *custody*:

| U.S. Dollar Amount | Total Number of *Clients* |
|---|---|
| (a) $ | (b) |

C. If you or your *related persons* have *custody* of *client* funds or securities in connection with advisory services you provide to *clients*, check all the following that apply:

(1) A qualified custodian(s) sends account statements at least quarterly to the investors in the pooled investment vehicle(s) you manage. ☐

(2) An *independent public accountant* audits annually the pooled investment vehicle(s) that you manage and the audited financial statements ☑

are distributed to the investors in the pools.

(3) An *independent public accountant* conducts an annual surprise examination of *client* funds and securities. ☐

(4) An *independent public accountant* prepares an internal control report with respect to custodial services when you or your *related persons* are qualified custodians for *client* funds and securities. ☐

*If you checked Item 9.C.(2), C.(3) or C.(4), list in* Section 9.C. of Schedule D *the accountants that are engaged to perform the audit or examination or prepare an internal control report. (If you checked Item 9.C.(2), you do not have to list auditor information in* Section 9.C. of Schedule D *if you already provided this information with respect to the private funds you advise in* Section 7.B.(1) of Schedule D*).*

| | Yes | No |
|---|---|---|
| D. Do you or your *related person(s)* act as qualified custodians for your *clients* in connection with advisory services you provide to *clients*? | | |
| (1) you act as a qualified custodian | ○ | ◉ |
| (2) your *related person(s)* act as qualified custodian(s) | ○ | ◉ |

*If you checked "yes" to Item 9.D.(2), all related persons that act as qualified custodians (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)) must be identified in* Section 7.A. of Schedule D*, regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.*

E. If you are filing your *annual updating amendment* and you were subject to a surprise examination by an *independent public accountant* during your last fiscal year, provide the date (MM/YYYY) the examination commenced:

F. If you or your *related persons* have *custody* of *client* funds or securities, how many *persons*, including, but not limited to, you and your *related persons,* act as qualified custodians for your *clients* in connection with advisory services you provide to *clients?*
2

**SECTION 9.C. *Independent Public Accountant***

No Information Filed

**Item 10 Control Persons**

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you. If you are filing an *umbrella registration*, the information in Item 10 should be provided for the *filing adviser* only.

If you are submitting an initial application or report, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners. If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application or report, you must complete Schedule C.

| | Yes | No |
|---|---|---|
| A. Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies? | ○ | ◉ |

*If yes, complete* Section 10.A. of Schedule D.

B. If any *person* named in Schedules A, B, or C or in Section 10.A. of Schedule D is a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934, please complete Section 10.B. of Schedule D.

**SECTION 10.A. *Control Persons***

No Information Filed

**SECTION 10.B. *Control Person* Public Reporting Companies**

No Information Filed

**Item 11 Disclosure Information**

In this Item, we ask for information about your disciplinary history and the disciplinary history of all your *advisory affiliates*. We use this information to determine whether to grant your application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below. In accordance with General Instruction 5 to Form ADV, "you" and "your" include the *filing adviser* and all *relying advisers* under an *umbrella registration*.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you.

*If you are a "separately identifiable department or division" (SID) of a bank, see the Glossary of Terms to determine who your advisory affiliates are.*

*If you are registered or registering with the SEC or if you are an exempt reporting adviser, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a state, you must respond to the questions as posed; you may, therefore, limit your disclosure to ten years following the date of an event only in responding to Items 11.A.(1), 11.A.(2), 11.B.(1), 11.B.(2), 11.D.(4), and 11.H.(1)(a). For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.*

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

Do any of the events below involve you or any of your *supervised persons*? ( ) Yes (•) No

For "yes" answers to the following questions, complete a Criminal Action DRP:

A. In the past ten years, have you or any *advisory affiliate*:

(1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? ( ) Yes (•) No

(2) been *charged* with any *felony*? ( ) Yes (•) No

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.A.(2) to charges that are currently pending.*

B. In the past ten years, have you or any *advisory affiliate*:

(1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor* involving: investments or an *investment-related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? ( ) Yes (•) No

(2) been *charged* with a *misdemeanor* listed in Item 11.B.(1)? ( ) Yes (•) No

*If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.B.(2) to charges that are currently pending.*

For "yes" answers to the following questions, complete a Regulatory Action DRP:

C. Has the SEC or the Commodity Futures Trading Commission (CFTC) ever:

(1) *found* you or any *advisory affiliate* to have made a false statement or omission? ( ) Yes (•) No

(2) *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes? ( ) Yes (•) No

(3) *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? ( ) Yes (•) No

(4) entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity? ( ) Yes (•) No

(5) imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity? ( ) Yes (•) No

D. Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*:

(1) ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical? ( ) Yes (•) No

(2) ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes? ( ) Yes (•) No

(3) ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? ( ) Yes (•) No

(4) in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity? ( ) Yes (•) No

(5) ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory affiliate*, by *order*, from associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity? ( ) Yes (•) No

E. Has any *self-regulatory organization* or commodities exchange ever:

(1) *found* you or any *advisory affiliate* to have made a false statement or omission? ( ) Yes (•) No

(2) *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a "*minor rule violation*" under a plan approved by the SEC)? ( ) Yes (•) No

(3) *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? ( ) Yes (•) No

(4) disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities? ( ) Yes (•) No

F. Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended? ( ) Yes (•) No

G. Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.? ( ) Yes (•) No

For "yes" answers to the following questions, complete a Civil Judicial Action DRP:

H. (1) Has any domestic or foreign court: **Yes No**

| | | Yes | No |
|---|---|---|---|
| (a) | in the past ten years, *enjoined* you or any *advisory affiliate* in connection with any *investment-related* activity? | ○ | ◉ |
| (b) | ever *found* that you or any *advisory affiliate* were *involved* in a violation of *investment-related* statutes or regulations? | ○ | ◉ |
| (c) | ever dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you or any *advisory affiliate* by a state or *foreign financial regulatory authority*? | ○ | ◉ |
| (2) | Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could result in a "yes" answer to any part of Item 11.H.(1)? | ○ | ◉ |

**Item 12 Small Businesses**

The SEC is required by the Regulatory Flexibility Act to consider the effect of its regulations on small entities. In order to do this, we need to determine whether you meet the definition of "small business" or "small organization" under rule 0-7.

Answer this Item 12 only if you are registered or registering with the SEC **and** you indicated in response to Item 5.F.(2)(c) that you have regulatory assets under management of less than $25 million. You are not required to answer this Item 12 if you are filing for initial registration as a state adviser, amending a current state registration, or switching from SEC to state registration.

For purposes of this Item 12 only:

- Total Assets refers to the total assets of a firm, rather than the assets managed on behalf of *clients*. In determining your or another *person's* total assets, you may use the total assets shown on a current balance sheet (but use total assets reported on a consolidated balance sheet with subsidiaries included, if that amount is larger).
- *Control* means the power to direct or cause the direction of the management or policies of a *person*, whether through ownership of securities, by contract, or otherwise. Any *person* that directly or indirectly has the right to vote 25 percent or more of the voting securities, or is entitled to 25 percent or more of the profits, of another *person* is presumed to *control* the other *person*.

| | | Yes | No |
|---|---|---|---|
| A. | Did you have total assets of $5 million or more on the last day of your most recent fiscal year? | ○ | ○ |
| | *If "yes," you do not need to answer Items 12.B. and 12.C.* | | |
| B. | Do you: | | |
| (1) | *control* another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| (2) | *control* another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| C. | Are you: | | |
| (1) | *controlled* by or under common *control* with another investment adviser that had regulatory assets under management (calculated in response to Item 5.F.(2)(c) of Form ADV) of $25 million or more on the last day of its most recent fiscal year? | ○ | ○ |
| (2) | *controlled* by or under common *control* with another *person* (other than a natural person) that had total assets of $5 million or more on the last day of its most recent fiscal year? | ○ | ○ |

**Schedule A**

**Direct Owners and Executive Officers**

1. Complete Schedule A only if you are submitting an initial application or report. Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.
2. Direct Owners and Executive Officers. List below the names of:
   (a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Compliance Officer is required if you are registered or applying for registration and cannot be more than one individual), director, and any other individuals with similar status or functions;
   (b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act);
   Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.
   (c) if you are organized as a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital;
   (d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and
   (e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) if managed by elected managers, all elected managers.
3. Do you have any indirect owners to be reported on Schedule B? ◉ Yes ○ No
4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.
5. Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).
6. Ownership codes are: NA - less than 5%; A - 5% but less than 10%; B - 10% but less than 25%; C - 25% but less than 50%; D - 50% but less than 75%; E - 75% or more
7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does

not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

(b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

(c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| CHARITABLE DAF HOLDINGS CORP. | DE | OWNER | 08/2022 | E | Y | N | |
| Patrick, Mark | I | CCO | 08/2022 | NA | Y | N | 7626259 |

**Schedule B**

**Indirect Owners**

1. Complete Schedule B only if you are submitting an initial application or report. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners. Use Schedule C to amend this information.
2. Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:
   (a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation;

   For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (b) in the case of an owner that is a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital;

   (c) in the case of an owner that is a trust, the trust and each trustee; and

   (d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, all elected managers.
3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.
4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.
5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).
6. Ownership codes are: C - 25% but less than 50% E - 75% or more
   D - 50% but less than 75% F - Other (general partner, trustee, or elected manager)
7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

   (c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Entity in Which Interest is Owned | Status | Date Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|---|
| LIBERTY CLO HOLDCO, LTD. | FE | CHARITABLE DAF HOLDINGS CORP. | OWNER OF CHARITABLE DAF HOLDINGS CORP. | 04/2023 | E | Y | N | |
| CHARITABLE DAF HOLDCO LTD. | FE | LIBERTY CLO HOLDCO, LTD. | OWNER OF CHARITABLE DAF FUND, L.P. | 11/2011 | E | Y | N | |
| CDH GP, LTD | DE | LIBERTY CLO HOLDCO, LTD. | GNEREAL PARTNER OF CHARITABLE DAF FUND, L.P | 03/2024 | F | Y | N | |
| Patrick, Mark | I | CDH GP, LTD | SOLE OWNER AND SOLE DIRECTOR OF CDH GP, LTD. | 03/2024 | E | Y | N | 7626259 |

**Schedule D - Miscellaneous**

You may use the space below to explain a response to an Item or to provide any other information.

**Schedule R**

No Information Filed

**DRP Pages**

**CRIMINAL DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**Part 2**

**Exemption from brochure delivery requirements for SEC-registered advisers**

SEC rules exempt SEC-registered advisers from delivering a firm brochure to some kinds of clients. If these exemptions excuse you from delivering a brochure to *all* of your advisory clients, you do not have to prepare a brochure.

| | Yes | No |
|---|---|---|
| Are you exempt from delivering a brochure to all of your clients under these rules? | ○ | ● |

*If no, complete the ADV Part 2 filing below.*

Amend, retire or file new brochures:

| Brochure ID | Brochure Name | Brochure Type(s) |
|---|---|---|
| 400181 | ADV PART 2A | Private funds or pools |
| 409351 | ADV PART 2 | Private funds or pools |

**Part 3**

| CRS | Type(s) | Affiliate Info | Retire |
|---|---|---|---|

There are no CRS filings to display.

**Execution Pages**

**DOMESTIC INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

## Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding*, or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing*.

## Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

| | |
|---|---|
| Signature:<br>SHAWN RAVER | Date: MM/DD/YYYY<br>03/17/2025 |
| Printed Name:<br>SHAWN RAVER | Title:<br>OPERATIONS |

Adviser *CRD* Number:
172839

**_NON-RESIDENT_ INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a *notice filing*, as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings*, demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded*, directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a *notice filing*.

2. Appointment and Consent: Effect on Partnerships

If you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner withdraws from or is admitted to the partnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable power of attorney and consent shall be in effect for any action brought against you or any of your former partners.

3. *Non-Resident* Investment Adviser Undertaking Regarding Books and Records

By signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal office in Washington D.C., at any Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current, and complete copies of any or all records that you are required to maintain under Rule 204-2 under the Investment Advisers Act of 1940. This undertaking shall be binding upon you, your heirs, successors and assigns, and any *person* subject to your written irrevocable consents or powers of attorney or any of your general partners and *managing agents*.

Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the *non-resident* investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Signature: Date: MM/DD/YYYY
Printed Name: Title:
Adviser *CRD* Number:
172839